JOHN W. BERRY (Cal. Bar No.295760)
Email: berryj@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
E-mail: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

FILED
CLERK, U.S. DISTRICT COURT

05/26/16

CENTRAL DISTRICT OF CALIFORNIA
BY:  D. Roberts  DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES C. LIU;<br>XIN WANG a/k/a LISA WANG;<br>PACIFIC PROTON THERAPY<br>REGIONAL CENTER, LLC;<br>PACIFIC PROTON EB-5 FUND, LLC;<br>and BEVERLY PROTON CENTER,<br>LLC f/k/a LOS ANGELES COUNTY<br>PROTON THERAPY, LLC,<br><br>Defendants. | SACV16-00974 CJC (AGRx)<br><br>Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Charles C. Liu and Xin Wang reside in this district.

## SUMMARY

3.     This case involves an ongoing fraudulent scheme perpetrated by defendant Charles C. Liu ("Liu") and his wife, defendant Xin Wang, a/k/a Lisa Wang ("Wang"), to defraud Chinese investors in the federal "EB-5 Immigrant Investor Program," which is administered by the United States Citizenship and Immigration Service ("USCIS").  To date, the defendants have defrauded at least 50 Chinese investors of almost $27 million by falsely claiming that their monies would be invested in a program that met the requirements of the EB-5 program, and would be used to build and operate a proton therapy cancer treatment center in Southern California.

4.     The EB-5 Immigrant Investor Program was created to stimulate the U.S. economy with capital investment from foreign investors.  Under the program, foreign investors can receive a permanent visa to live and work in the U.S. if they make a capital investment that satisfies certain conditions over a two-year period, including the creation of jobs.  Under the program's regulations, the foreign investors must put "the required amount of capital at risk for the purpose of generating a return."

5.     From at least October 2014 to the present, the defendants have offered

and sold, and continue to offer, EB-5 investments to Chinese investors, allegedly to fund the development and operation of the cancer treatment center.  The investors made their investment in two parts: a $500,000 "Capital Contribution," which was to be escrowed for use in developing and operating the center, and a $45,000 "Administrative Fee."

6.      Rather than invest the investors' Capital Contributions as promised— and as required for the investors to meet the EB-5 program requirements—the defendants misappropriated or diverted approximately $17.4 million from the accounts where the contributions were deposited.  Liu misappropriated at least $6,285,000 for himself, and his wife and co-defendant, Wang, misappropriated at least $1,400,000.  Liu also transferred over $11,845,000 to three marketing firms in China, including $3,500,000 to a firm of which Wang is CEO and chairman of the board.  Liu also allowed most of the Administrative Fees to be used for undisclosed purposes.  As a result, the EB-5 eligible cancer treatment center that the defendants represented would be constructed with investor funds has not been built.  Liu and Wang have carried out this fraud through a number of entities, three of which are named as defendants.

7.      The defendants' fraud is still ongoing.  The majority of the funds dissipated by the defendants were transferred as recently as February and March 2016, shortly after the SEC subpoenaed Liu for investigative testimony.  Also, the website primarily used to offer the EB-5 investments to Chinese investors remains active, and continues to market and promote the investments in a materially misleading manner.

8.      By engaging in this conduct, the defendants have violated, and continue to violate, the antifraud provisions of Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) & 240.10b-5(c), and Liu and the corporate defendants have violated, and continue to violate Exchange Act Rule 10b-

5(b), 17 C.F.R. § 240.10b-5(b).  Liu is also violating Section 10(b) and Rule 10b-5 as a control person of each of the corporate defendants.

## THE DEFENDANTS

9.     **Charles C. Liu ("Liu")** resides in Laguna Niguel, California.  He holds an MFA degree in Arts Administration.  From 2004 to 2009, Liu sold medical equipment relating to proton therapy for a company based in Hong Kong.  Liu controls each of the three corporate defendants.

10.    **Xin Wang a/k/a Lisa Wang ("Wang")** is Liu's wife and resides with him in Laguna Niguel, California.  Wang was trained in China as a pharmacist, and worked in China as a pharmacist for approximately one year.  Wang holds key positions at the corporate defendants and is CEO and chairman of the board of one of the China-based firms that solicited investors for the defendants.

11.    **Pacific Proton Therapy Regional Center, LLC ("Pacific Proton")** is a California limited liability company, headquartered in Laguna Niguel, California.  Liu controls Pacific Proton and is its president.  On June 28, 2012, USCIS approved Pacific Proton's application to become a regional center under the EB-5 program.

12.    **Pacific Proton EB-5 Fund, LLC ("PPEB5 Fund")**, is a Delaware limited liability company formed on November 15, 2010 and headquartered in Montebello, California.  In its offering materials, PPEB5 Fund claimed that it offered an EB-5-eligible investment that used investor proceeds to loan funds to develop and operate a proton therapy cancer treatment center in Los Angeles County.  Pacific Proton is the sole manager of the PPEB5 Fund.

13.    **Beverly Proton Center, LLC f/k/a Los Angeles County Proton Therapy, LLC ("Beverly Proton")** is a California limited liability company, headquartered in Laguna Niguel, California.  Liu co-founded Beverly Proton to develop and operate a proton therapy cancer treatment center using funds raised by the PPEB5 Fund.  Liu is president of Beverly Proton, and is its treasurer and managing member.  Wang is Beverly Proton's "Vice President in Marketing of Asia

1 [sic]."

## THE FRAUDULENT SCHEME

**A.     The EB-5 Immigrant Investor Program**

14.     The EB-5 Immigrant Investor Program sets aside EB-5 visas for participants who invest in commercial enterprises associated with regional centers approved by USCIS based on proposals for promoting economic growth.

15.     Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in a "commercial enterprise" in the United States may petition the USCIS (called an "I-526 Petition") and receive conditional permanent residency status for a two-year period.  USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

16.     The EB-5 Immigrant Investor Program requires a showing that the foreign investor has placed the required amount of capital at risk for "the purpose of generating a return" on the capital placed at risk.  The foreign investor must invest at least $500,000 in a "Targeted Employment Area" and thereby create at least ten full-time jobs for United States workers.  If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa and live and work in the United States permanently.

17.     Many EB-5 investments are administered by entities called "regional centers."  EB-5 regional centers are designated by USCIS to administer the EB-5 investment projects based on proposals for promoting economic growth.

18.     Regional center investment vehicles are typically offered as limited partnership interests or limited liability company units, which are managed by a person or entity other than the foreign investor, who acts as a general partner or managing member of the investment vehicle.  To become a regional center, the entity must demonstrate, with supporting economic and statistical studies, how it will promote economic growth, including job creation.

**B.     Designation Of Defendant Pacific Proton As A Regional Center**

19.     On or about November 19, 2010, Liu applied to USCIS, on behalf of Pacific Proton, for its designation as a "regional center" under the EB-5 immigrant investor program.

20.     Liu signed the application on behalf of Pacific Proton as its president. Liu reviewed the application before it was submitted to USCIS.

21.     In the application, Liu made the following representations, among others:

(a)     Pacific Proton had formed the PPEB5 Fund to serve as the investment vehicle for its first project.  EB-5 investors would make their qualifying investment in the PPEB5 Fund, which would then pool the funds and make a loan to Beverly Proton (then known as Los Angeles County Proton Therapy, LLC), to partially finance the development and operation of a proton therapy center and commercial office space.

(b)     Beverly Proton would develop and operate an innovative new cancer treatment center using proton beam radiation for treatment of oncology patients in Montebello, California.  In addition to the proton therapy center, the building was expected to contain 125,000 square feet of medical office space and ancillary facilities.  Beverly Proton would also develop and construct a new 30,000 square foot office building in Monterey Park, California, which would contain a restaurant, pharmacy, and radiation therapy office and multiple-use medical office space.

(c)     Each investor would be required to invest $500,000 as a "Capital Contribution" in the PPEB5 Fund and to pay an "Administrative Fee" of approximately $45,000 before applying to USCIS for their I-526 petition.  Pacific Proton would use an escrow account to hold the foreign investor's $500,000 Capital Contribution.  Once the escrow agent receives confirmation that the investor's I-526 Petition was approved, the escrowed funds would be released to the PPEB5 Fund for

1  deployment to Beverly Proton.  If USCIS were to deny the I-526 Petition, then the
2  $500,000 Capital Contribution investment would be returned to the investor, together
3  with 50% of the Administrative Fee.

4         (d)     According to an economic report included with the application,
5  the project would "create an estimated 4,775 permanent new jobs, boost output by
6  $728 million per year, and increase labor (household) income by $217 million per
7  year."

8         (e)     Pacific Proton and the project would have a "transformative
9  effect" and "a substantial and ongoing economic impact" on the counties of Los
10  Angeles, Orange, Riverside and San Bernardino, "creating over 4,500 permanent,
11  full-time jobs and yielding an economic impact of nearly $728 million per year once
12  completed."

13        22.     On June 28, 2012, USCIS approved the designation of Pacific Proton as
14  a regional center under the EB-5 Immigrant Investor Program.

15  **C.    Liu and Wang's Roles in the Corporate Defendants**

16        23.     Liu has been the president of the regional center, Pacific Proton, since
17  2010.  Until recently, Liu owned 75% of the membership interests in Pacific Proton.

18        24.     Liu receives $350,000 a year in compensation from Pacific Proton.

19        25.     From about January 19, 2016 to April 4, 2016, Wang was the secretary
20  of Pacific Proton.  Wang was "elected" to this position by her husband, Liu.

21        26.     Beverly Proton is the purported job-creating vehicle sponsored by
22  Pacific Proton in connection with Pacific Proton's status as a USCIS-approved
23  regional center.  It is the entity that is supposed to develop and operate the proton
24  therapy cancer treatment center.

25        27.     Liu co-founded Beverly Proton with Dr. John Thropay, a radiation
26  oncologist.  Liu has been Beverly Proton's president since 2010, and is its treasurer
27  and managing member.  He owns 75% of its membership interests.

28        28.     On January 19, 2016, Liu and Wang were elected by Liu as the two sole

directors of Beverly Proton.  Wang has also been Beverly Proton's "Vice President in Marketing of Asia [sic]" since 2011.

29.　　Liu receives $550,000 a year in compensation from Beverly Proton.

30.　　On January 28, 2016, Wang entered into an agreement with Beverly Proton pursuant to which she is to receive a $280,000 annual salary from Beverly Proton, going back to 2011.  Liu signed the employment agreement with Wang on behalf of Beverly Proton.

31.　　Once released from escrow, the PPEB5 Fund received the Capital Contributions paid by the investors, and then loaned the pooled Capital Contributions to Beverly Proton.  Pacific Proton received the Administrative Fees paid by investors. Liu, through his control of Pacific Proton, is the sole manager of the PPEB5 Fund, and has been its manager since 2010.

32.　　Liu receives $200,000 a year in compensation from the PPEB5 Fund.

33.　　During the entire relevant period, up to and including the present, Liu has been the sole signatory on all bank accounts held in the name of each entity defendant, except that Dr. Thropay, was also a signatory on the Beverly Proton account from October 2015 until Liu caused passage of a board resolution on January 19, 2016, removing Thropay from the account.

**D.　The EB-5 Offering**

34.　　From at least October 1, 2014 to the present, the defendants have offered and sold investments in the form of limited liability company, or "LLC," units in the PPEB5 Fund.  To date, the defendants have raised at least $26,967,918 from at least 50 investors in China.

35.　　Of that amount, at least $24,712,217 was raised as "Capital Contributions" through an offering of the LLC units in the PPEB5 Fund.  The remainder, or at least $2,255,701, was received by Pacific Proton as required "Administrative Fees."

36.　　Liu and the PPEB5 Fund provided offering materials to each investor

consisting of: (1) a private offering memorandum ("POM") dated May 1, 2013; (2) an Escrow Agreement attached to the POM as Appendix A; (3) an Operating Agreement attached to the POM as Appendix B; and (4) a Subscription Agreement attached to the POM as Appendix C.

37.   The POM states that the PPEB5 Fund is offering the LLC units for $500,000 each, and can offer up to 300 LLC units (one per each accredited investor) for a maximum offering of $150 million.

38.   The POM further states that each $500,000 investment, or "Capital Contribution," would be held in escrow until notice was given to the PPEB5 Fund that the investor's I-526 Petition had been filed with USCIS.

39.   The POM that was provided to investors differs from the original POM provided to and approved by USCIS in at least two material respects.  First, the amount of the offering had been reduced from $193 million to $150 million.  Second, the POM provided to investors states that the investor's Capital Contribution will be released from escrow when the investor files an I-526 Petition for residency with USCIS, rather than when that application is approved.

40.   The POM further states that, once released from escrow, the offering proceeds were to be loaned from the PPEB5 Fund to Beverly Proton to develop and operate a proton therapy center in Los Angeles County under the medical direction of Dr. Thropay.  The POM states that Beverly Proton "intends to use the proceeds from this Offering to finance development and operation" of the proton therapy center.

41.   Additionally, the POM states that the PPEB5 Fund would charge investors an "Administrative Fee" of $45,000 to pay for "Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering."  Investors paid the Administrative Fee directly to Pacific Proton.

42.   The POM explicitly states that "Proceeds of this Offering do not include Administrative Fees.  Offering expenses, commissions and fees incurred in

connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions."

43.     Liu provided the information contained in the POM, and reviewed and approved it.

44.     The investments in the PPEB5 Fund were securities.  In fact, the POM refers to the investments as "securities," even noting that "these securities have not been registered under the Securities Act of 1933" [capitalized in original].

45.     The investments in the PPEB5 Fund were investments of money.  As set forth in the POM, each investor was required to invest a minimum of $500,000 as a "Capital Contribution" for one LLC unit.  As required by USCIS regulations, the investor's investment money must be "at risk for the purpose of generating a return on such capital."

46.     The investments in the PPEB5 Fund were also investments in a common enterprise.  The investors' $500,000 Capital Contributions were pooled together in a single escrow account, and, once released from that account were pooled together in a single account held by the PPEB5 Fund.  The PPEB5 Fund, in turn, lent those funds to Beverly Proton in order to develop and operate a proton therapy center.  The investor funds were pooled together in a single account held by Beverly Proton.

47.     According to the POM, Beverly Proton is to pay the PPEB5 Fund an annual interest payment of 0.25% on the loan (comprised of the investors' Capital Contributions).

48.     Any profits from investments in the PPEB5 Fund were to be derived from the efforts of others.  Liu solely manages the PPEB5 Fund; the investors have no management role.  The POM further provides that Pacific Proton is the sole manager of the PPEB5 Fund, and that investors will have limited involvement in the management of PPEB5 Fund.

49.     Additionally, the POM emphasizes that the success of the PPEB5 Fund and Beverly Proton is principally dependent on current management personnel for

operation of the business.  In particular, the POM states that Beverly Proton "is dependent upon the continued involvement of Dr. Thropay and Mr. Liu in this Project personally.  The loss of services of either Dr. Thropay or Mr. Liu would have a material adverse effect on PPEB5 [Fund]'s and the Borrower's business, financial condition and results of operations."

50.     The POM further states that Beverly Proton "will be required to hire and retain skilled employees at all levels of operations in a market where such qualified employees are in high demand and are subject to receiving competing offers.  The inability to hire needed employees on a timely basis . . . could have a material adverse effect on the ability to meet the schedules of the strategic plan."  Investors are therefore dependent on the efforts of others to ensure that the venture is profitable.

**E.     The Sales Efforts**

51.     Liu retained at least three China-based marketing firms to solicit investors:  (a) Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), based in Hong Kong; (b) United Damei Group, United Damei Investment Company, Ltd. and/or Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), based in China; and (c) Hong Kong Delsk Business Co., Ltd. ("Delsk"), based in Hong Kong or China.

52.     Wang is CEO and chairman of the board of UDG.  The UDG website describes Wang in different places as "CEO" and "Chairman" (as also stated on her business card).  It also includes her picture at the top of a group of pictures of the "Executive Team."

53.     As alleged below, Oversees Chinese, UDG and Delsk received substantial sums of investor funds.

54.     Liu personally participated in the offer and sale of investments in the PPEB5 Fund to Chinese investors.  Liu met investors a number of times at the proposed site for the proton center in Southern California.

55.     Wang also participated in the sales effort on behalf of Beverly Proton

and UDG.  She held the title of "Vice President in Marketing of Asia [sic]" for Beverly Proton.  Her responsibilities included promotions and marketing, and attracting patients from overseas for cancer treatment.

56.     With Liu's knowledge, Wang spoke about the project to potential investors and patients at multiple meetings organized in China in 2014 and 2015, including in Beijing, Shanghai and Guangzhou.  Wang was aware when she spoke to potential patients that the Beverly Proton proton therapy cancer treatment center was not completed.  Wang also met with investors and answered questions about living in the United States, such as questions about schools, taxes and the real estate market.

57.     In 2015, Liu and Wang attended a meeting about proton therapy in Beijing organized by UDG, which had an audience of about 200 people, including potential investors.

**F.     The UDG Promotional Materials**

58.     UDG has an active website that continues to promote the investments in the PPEB5 Fund.

59.     The website touts the proton therapy cancer treatment center that was to be constructed and operated with investor funds.

60.     For example, UDG's website states that the Beverly Proton therapy center project "is a secure and reliable investment project."

61.     The UDG website also states:  "Among the various American EB-5 programs currently, the advantages of Los Angeles Proton Therapy Center are quite outstanding, and our company has a very professional case processing team and customer service team, application process of clients are quite smooth, and there have been [*sic*] good news frequently, we will continue sharing these good news with you!"

62.     UDG's website also claims that the Beverly Proton project is using the proton therapy technology of Optivus Proton Therapy, Inc. ("Optivus").  UDG's website has descriptions of the Optivus technology, including that it was used by

Loma Linda University, and a description of Loma Linda University's cancer treatment program.  The website touts the Optivus proton therapy technology, stating that "Optivus is the equipment supplier of Los Angeles Proton Therapy Center.  It is . . . the most effective, reliable, precise and environmental proton therapy system in the market currently . . . .  LAPTC will use new Optivus Conforma 3000 System . . . ."

63.   UDG's website also includes a section entitled "Government Support," which includes pictures of government officials, including former president George Herbert Walker Bush and former California Governor Arnold Schwarzenegger, accompanied by copies of letters from each of them.

64.   Wang understood that the photograph of former Governor Schwarzenegger, which was also hanging at UDG's offices, was maybe there "for promotional purposes."

65.   The letter from former President Bush (dated April 2008 and addressed to the "Party Secretary of Shanghai City") and the letter from then-Governor Schwarzenegger (dated July 2007 and also to the "Shanghai Party Secretary") both touted Optivus and its technology.  While the letters appear to be letters of support for proton therapy in general at the time they were written, they are completely unrelated to the Beverly Proton project and predated its formation.  Nevertheless, the UDG website presents them under the heading and on a specific page entitled "Government Support."

**G.   The Stalled Therapy Center Project**

66.   Dr. Thropay owned a medical office building on the site where the proton therapy center was purportedly to be built with PPEB5 Fund investor monies. Liu caused that office building to be demolished in or about mid-2015 but there is presently no construction at that site for the new Beverly Proton treatment center.  In fact, no construction permits have been obtained for the project.

67.   Liu knows that construction for the new therapy center has not begun. He has personally toured the site, both before and after the demolition of the office

building. Similarly, Wang is aware that construction is not complete.

68. Beverly Proton also paid Optivus approximately $368,100 for Optivus equipment. However, in 2015, Liu decided to purchase radiation therapy equipment from a competing manufacturer. No Optivus equipment was ever delivered to the project. Nor has any equipment from the competitor been delivered to the project site.

69. Furthermore, on March 18 and 22, 2016, respectively, counsel for Optivus and Loma Linda University wrote separate letters to the PPEB5 Fund in care of Liu, protesting the defendants' continued use of their names, and instructing that their names not be used in conjunction with the project.

70. The Optivus letter stated that Optivus viewed it as "highly inappropriate" for Pacific Proton and Beverly Proton to suggest that Optivus is involved in the project on an ongoing basis or to use Optivus' name and reputation for purposes of promoting the proposed facility. It also stated that, to the extent Pacific Proton or Beverly Proton have held themselves out to any investors as affiliated, associated or otherwise endorsed by Optivus, "any such representation is false and misleading and must be properly addressed, by (without limitation) the immediate notification to any investors that Optivus has no ongoing involvement" in the project.

71. Similarly, Loma Linda University stated in its letter that the use of its name, logo and health care services "are presented in a manner that is likely to confuse visitors to the [Pacific Proton] website into believing that there is an affiliation or sponsorship between [Pacific Proton/Beverly Proton] on the one hand, and [the University and its medical center] on the other." It also states that, to the extent that Pacific Proton or Beverly Proton have held themselves out to investors as being affiliated, associated or otherwise endorsed by the university, "any such representation was, and is, false and misleading, and [Pacific Proton and Beverly Proton] must promptly address such misrepresentations by, without limitation,

1  immediately notifying investors that [Loma Linda University] and its affiliates,

2  including [its medical center], have no sponsorship or affiliation" with the project.

3  **H.     The Removal of Dr. Thropay**

4          72.     Liu has also recently made a series of management changes that

5  significantly diminished Dr. Thropay's role in the project.

6          73.     In late October 2015, Liu entered into a memorandum of understanding

7  with a southern California cancer treatment hospital, to develop a proton therapy

8  center.  In connection with this agreement, Liu stated that the hospital would operate

9  the Beverly Proton therapy center and be able to name the center's medical director,

10 which appears to have ended Dr. Thropay's role as medical director of the treatment

11 facility as set forth in the offering documents.

12         74.     While the hospital had been negotiating a letter of intent with Liu, the

13 negotiations stalled and eventually ceased.  Thus, as of now, there is no clearly

14 designated medical director of the proposed proton therapy center.

15         75.     Earlier this year, Liu then reorganized Pacific Proton and Beverly Proton

16 to diminish Dr. Thropay's role and interest in those entities.  On January 19, 2016,

17 Liu, as the member holding 75% of the membership interests of Pacific Proton,

18 removed Dr. Thropay as an officer of the regional center, and appointed himself

19 president and treasurer/chief financial officer, and appointed Wang secretary.  That

20 same day, at the annual meeting for Beverly Proton, Liu, as the member holding 75%

21 of the membership interests, nominated and elected himself and Wang as the sole

22 directors of Beverly Proton, and authorized himself, as managing member, to execute

23 documents, agreements and instruments.

24         76.     On April 4, 2016, after being subpoenaed and providing investigative

25 testimony to the SEC, Liu reorganized the companies again.  He purportedly sold

26 50% of Pacific Proton to a former salesperson of a company that sold proton therapy

27 equipment, for $1 per unit.  No payments have been made by this person for the

28 purchase of Pacific Proton, however.  At that time, the former salesman allegedly

COMPLAINT                                    15

replaced Liu as Pacific Proton's president and treasurer, and Liu replaced Wang as its secretary.

77.     In purportedly selling part of Pacific Proton to this former salesman, Liu diluted Dr. Thropay's interest in Pacific Proton from 25% to 12.5% by giving the putative purchaser a 50% ownership, Liu a 37.5% ownership, and Dr. Thropay only a 12.5% ownership.  Before this purported change in ownership structure, Liu owned 75% of the membership interests in Pacific Proton.

**I.     Delsk's Letter to Liu**

78.     Delsk understood that they were the exclusive marketing agent in the Chinese region for the Beverly Proton EB-5 project after September 24, 2014, and Liu was aware that Delsk had that understanding.

79.     In or after November 3, 2015, Delsk sent Liu a letter expressing its concerns that its exclusive sales agency agreement with Pacific Proton was still valid, and that "the project and all relevant materials provided by Pacific Proton . . . for promotion of EB-5 project in Chinese region must be authentic, timely, complete and comply with the relevant laws and regulations of the United States and China."

80.     In the letter, Delsk stated that: "Due to the capital structure problem (namely, the absence of equity capital), in [the project]," in September 2015, Delsk had formally requested that Liu suspend promotional activities for the project in China, "while we wait for legal proof from you demonstrating that the capital structure problem has been solved," and that it met with Liu "again regarding the capital structure of this project on November 3, 2015."  Delsk concluded by stating, that in its view, the PPEB5 Fund needed to issue a written document to inform all of its investors of, among other things: "the current status of capital raised by [the] project company," "explaining the progress of construction," and "[e]xplaining the status of the capital of all investors (in which account their funds are currently deposited, and whether the funds have been embezzled or misappropriated)."

81.     Notwithstanding that Delsk's letter placed Liu on notice that additional

disclosure to investors was necessary regarding the material facts of the progress of construction and the use of their monies, no such further disclosure has been provided investors.

**J.    The Misappropriation of Investor Funds**

82.    Approximately $24 million in Capital Contributions were raised from the investors, but at least $17.4 million (net of funds returned by Overseas Chinese as alleged below) was not used to develop or construct the proton therapy center, as represented in the POM sent to investors.  Instead, these funds were misappropriated by Liu, Wang and the three corporate defendants.

83.    Specifically, at least $19,530,000 was diverted to Liu, Wang and the three China-based marketing firms; Overseas Chinese returned $2,060,130 of these funds to the PPEB5 Fund and Beverly Proton.  Thus, at least $17,469,870 was misappropriated or otherwise diverted for uses other than those disclosed in the investor disclosures.  Most of these funds came from the investors' Capital Contributions.

84.    Liu personally received at least $6,285,000 from the accounts where investor proceeds were deposited.  Of that amount, $4,270,000 was transferred to him as recently as February and March 2016, shortly after he was subpoenaed to give investigative testimony to the SEC.

85.    Wang personally received at least $1,400,000 from the accounts where investor proceeds were deposited.  Of that amount, $996,000 was transferred to her in March 2016.

86.    Liu also transferred over $11,845,000 to the three marketing firms in China (Overseas Chinese, UDG and Delsk) from the accounts where investor proceeds were deposited.

87.    The three firms also received a substantial amount of the Administrative Fees paid by the investors.

88.    Liu also misused a portion of the Administrative Fees, taking at least

1  $1,600,000 for his and Wang's personal use.

2        **a.**    **Overseas Chinese Was Paid Over $7.7 Million**

3      89.    Liu knew that, pursuant to an agreement he reviewed, approved and

4  signed on or about March 8, 2013, on behalf of Beverly Proton with Overseas

5  Chinese, Overseas Chinese was being paid $75,000 for each investor it obtained, plus

6  an annual marketing fee of $800,000.  The agreement further provided that Overseas

7  Chinese would return all marketing fees plus a $1,000,000 penalty within 36 months

8  if funds less than $50,000,000 are raised by Overseas Chinese in 36 months.

9      90.    Overseas Chinese solicited 11 investors who invested in the PPEB5

10  Fund.

11      91.    Overseas Chinese was paid a total of $7,722,000—the vast majority of

12  which came from investor Capital Contributions—to recruit the 11 investors.

13      92.    Subsequently, Overseas Chinese returned $2,060,130 it apparently owes

14  Beverly Proton, apparently as a result of its failure to raise the required $50 million.

15  It appears that Liu has dissipated most of the funds returned by Overseas Chinese.

16  Overseas Chinese currently retains $5,661,870 in investor funds.

17        **b.**    **UDG Was Paid $3,815,000**

18      93.    Liu knew that, pursuant to identical agreements he signed on behalf of

19  Pacific Proton on or about August 18 and August 12, 2013, with, respectively, United

20  Damei Investment Co. Ltd. and Beijing Pacific Damei Consulting Co. Ltd., which

21  had identical addresses in Beijing, UDG was to be paid a net present value "interest

22  fee" by Beverly Proton (who was not a party to the agreement) of $35,000 for each

23  investor it obtained, the entire $45,000 Administrative Fee, an immediate "document

24  preparation fee" of $500,000 upon signing of the Agreement, and a $650,000 annual

25  marketing fee.

26      94.    The agreement with UDG was signed by Wenli Yao on behalf of United

27  Damei Investment Co. Ltd.  Ms. Yao is Wang's mother and Liu's mother-in-law.

28  Ms. Yao lives with Liu and Wang in Laguna Niguel.  She does not speak or read

1  English, the language in which the Agreement is written.

2       95.    UDG solicited 10 investors who invested in the PPEB5 Fund.

3       96.    UDG was paid a total of $3,815,000—the vast majority of which came
4  from Capital Contributions—to recruit the ten investors.  All of these monies were
5  paid to International and Commercial Bank of China, in Hong Kong.

6           **c.**    **Delsk Was Paid $1,387,500**

7       97.    Liu also caused fees to be paid to Delsk, based in China, which was
8  another entity he hired to solicit investors.

9       98.    Delsk solicited 37 investors who invested in the PPEB5 Fund.

10       99.    Delsk was paid a total of $1,387,500—the vast majority of which came
11  from Capital Contributions—to recruit the 37 investors.  All of these monies were
12  paid to Hang Seng Bank, in Hong Kong.

13  **K.**    **The Defendants' State of Mind in Carrying Out the Fraud**

14       100.    At all relevant times, Liu and Wang knowingly, recklessly and/or
15  negligently engaged in a fraudulent scheme by misappropriating the Capital
16  Contributions and Administrative Fees paid by investors, so that most of these funds
17  have not been used as represented in the POM and other disclosures to investors.

18       101.    As president of Pacific Proton and Beverly Proton, and, through Pacific
19  Proton, the sole manager of the PPEB5 Fund, Liu's state of mind is imputed to each
20  of these entities.

21       102.    Liu understood that the sole source of funds for the offering expenses,
22  including legal, accounting and administrative expenses, and commissions and fees
23  relating to the offering would come from the $45,000 Administrative Fee, paid by
24  each investor, and not the $500,000 Capital Contribution each investor made.  He
25  further understood that the Administrative Fee was paid by the investor directly to the
26  regional center, Pacific Proton, and not the investment fund, PPEB5 Fund.

27       103.    Liu also understood that the investors were investing in the PPEB5
28  Fund, which then made a loan to Beverly Proton, the purpose of which was to fund

and develop the project by partially financing construction and operation of a proton therapy center. Liu further understood that all of the investor funds from the PPEB5 Fund, consisting of each investor's $500,000 Capital Contribution, were to be paid towards this loan.

104. Notwithstanding Liu's understanding that the Capital Contributions were to be used, according to the POM and other investor disclosures, to develop and operate the therapy center and that commissions and fees relating to the offering were required to be paid from the Administrative Fees and not the Capital Contributions, Liu knew that (a) he and Wang received millions of dollars from the Capital Contributions and Administrative Fees and (b) both Pacific Proton, which received the Administrative Fee, and Beverly Proton, which received the loan consisting of the investors' Capital Contributions, were paying commissions to the three Chinese firms.

105. Also, during the relevant time, Liu was, and is, the signatory on the relevant bank accounts of the three corporate defendants through which the misappropriation of investor funds took place.

106. Wang acted negligently, at a minimum, with respect to the misleading UDG website statements. She marketed the proton therapy to investors and patients, and she and her husband received millions of dollars from the project. Given that, and her role at the corporate defendants and UDG, Wang should have known that investor money was being misused, contrary to the claims on UDG's website.

107. Wang was also UDG's CEO and chairman, and thus should have known that its website was materially misleading in the way it touted the success of the project, and did so with photographs and letters of government officials, which Wang understood were used for promotional reasons.

108. Wang acted at least negligently in obtaining at least $1.4 million of investor money by means of these misleading claims.

COMPLAINT                                    20

**L.     The Misrepresentations and Omissions**

109.   In addition to their fraudulent scheme, the defendants have made materially false and misleading statements and omissions to the PPEB5 Fund investors, and have obtained investor proceeds by means of these misstatements and omissions.

110.   As alleged above, the POM states that Capital Contributions from investors would be placed at risk, for the purpose of satisfying the EB-5 program criteria, in order to fund the development and operation of a proton therapy center in Los Angeles, and that the Administrative Fees paid by investors would be used for administrative expenses.

111.   These representations were materially false and misleading because the majority of the Capital Contributions were not used for that stated purpose.  Instead, they were misappropriated by Liu and Wang, and dispersed to the three Chinese firms.  In addition, as alleged above, the Administrative Fees were misused.

112.   Also, even though construction of the treatment center has not even begun, and the investor funds set aside for that construction have largely been misappropriated and dissipated, Liu and the three corporate defendants have omitted, and not disclosed, this material information to investors and potential investors.

113.   In addition, notwithstanding that the POM states that the project "is dependent upon the continued involvement of Dr. Thropay" and that the "loss of services" of Dr. Thropay "would have a material adverse effect on PPEB5 [Fund]'s and [Beverly Proton's] business, financial condition and results of operations," Liu and the three corporate defendants have omitted, and not disclosed to actual and potential investors that Dr. Thropay has been effectively removed from the project and that there is, currently, no medical director.

114.   At all relevant times, Liu, who is ultimately responsible for the POM and other disclosures to investors, knew, or was reckless and negligent in not knowing, that these representations and omissions were false and misleading.  His state of mind

is imputed to Pacific Proton, Beverly Proton and the PPEB5 Fund, due to his control and/or management of them.

115.   In addition, UDG's website misleadingly implies that the proton therapy project is going well and is a "safe and reliable" investment.

116.   The website also misleadingly implies the project will use the Optivus proton therapy technology, including letters touting that specific technology from former President Bush and then-Governor Schwarzenegger, when, in fact, the Beverly Proton project is no longer using that specific technology.  Moreover, the website presents these letters as "support" for the project, but they are completely unrelated to the Beverly Proton project and are dated before the project was ever formed.

117.   UDG's website was therefore materially misleading because the project has stalled and is not being constructed, the investor proceeds were being dissipated and misused, and the Optivus technology was not being used at the site.

118.   At all relevant times, Wang, who is the CEO and chairman of the board of UDG, was, and is, at least negligent in not knowing that these misleading representations were and are being made on UDG's website to actual and potential investors.

**M.   The Ongoing Fraud**

119.   UDG's website, which markets and promotes the investment in the PPEB5 Fund, is still active and thus continues to promote and encourage investments in the fund.

120.   Of the at least $17,469,870 misappropriated and dissipated by defendants, $5,266,000 was diverted from the project as recently as February and March 2016, shortly after the SEC subpoenaed Liu for investigative testimony.

121.   Specifically, in February and March 2016, $4,270,000 was transferred to Liu and $996,000 was transferred to Wang.  The overwhelming majority of these funds came from investor Capital Contributions.

# FIRST CLAIM FOR RELIEF

## Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against all Defendants)

122.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

123.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

124.   Each of the defendants knew, or was reckless in not knowing, that he, she or it employed devices, schemes and artifices to defraud.  Each of the defendants knew, or was reckless or negligent in not knowing, that he, she or it obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

125.   By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

### SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

**Violations of Section 10(b) of the Exchange Act**

**and Rules 10b-5(a) and 10b-5(c) Thereunder**

**(against all Defendants as primary violators, and, alternatively,**

**against Liu as a control person under Section 20(a) of the Exchange Act)**

126.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

127.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

128.   Each of the defendants knew, or was reckless in not knowing, that he, she or it employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

129.   By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

130.   Defendant Liu was a control person of defendants Pacific Proton, PPEB5 Fund and Beverly Proton because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities. Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant Liu is liable to the SEC to same extent as each of these corporate defendants for those defendants' violations of Section 10(b) and Rules 10b-5(a) and

(c) thereunder.

## THIRD CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5(b) Thereunder**

**(against Defendants Liu, Pacific Proton, PPEB5 Fund and Beverly Proton as primary violators, and, alternatively, against Liu as a control person under Section 20(a) of the Exchange Act)**

131.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

132.   By engaging in the conduct described above, defendant Liu, Pacific Proton, PPEB5 Fund and Beverly Proton, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

133.   Defendants Liu, Pacific Proton, PPEB5 Fund and Beverly Proton, and each of them, knew, or was reckless in not knowing, that he or it made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

134.   By engaging in the conduct described above, defendants Liu, Pacific Proton, PPEB5 Fund and Beverly Proton violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

135.   Defendant Liu was a control person of defendants Pacific Proton, PPEB5 Fund and Beverly Proton because he possessed, directly or indirectly, the power to

1  direct or cause the direction of the management and policies of each of these entities.

2  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),

3  defendant Liu is liable to the SEC to same extent as each of the entity defendants for

4  those defendants' violations of Section 10(b) and Rule 10b-5(b) thereunder.

### **PRAYER FOR RELIEF**

6  WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

8  Issue findings of fact and conclusions of law that defendants committed the

9  alleged violations.

### **II.**

11  Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil

12  Procedure, temporarily, preliminarily and permanently enjoining defendants Liu,

13  Wang, Pacific Proton, PPEB5 Fund and Beverly Proton, and their officers, agents,

14  servants, employees, and attorneys, and those persons in active concert or

15  participation with any of them, who receive actual notice of the orders by personal

16  service or otherwise, and each of them, from violating Section 17(a) of the Securities

17  Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b),

18  and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### **III.**

20  Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil

21  Procedure, temporarily, preliminarily and permanently enjoining defendants Liu,

22  Wang, Pacific Proton, PPEB5 Fund and Beverly Proton, and their officers, agents,

23  servants, employees, and attorneys, and those persons in active concert or

24  participation with any of them, who receive actual notice of the orders by personal

25  service or otherwise, and each of them, from, directly or indirectly, participating in

26  the offer or sale of any security which constitutes an investment in a "commercial

27  enterprise" under the United States Government EB-5 visa program administered by

28  the USCIS, including engaging in activities with a broker, dealer, or issuer, or a

COMPLAINT                                26

Regional Center designated by the USCIS, for purposes of issuing, offering, trading, or inducing or attempting to induce the purchase or sale of any such EB-5 investment.

## IV.

Issue in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the funds and assets of defendants; ordering repatriation of any funds or assets transferred overseas; prohibiting each of the defendants from destroying documents; and ordering accountings by each of the defendants.

## V.

Order defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, and to repatriate any funds or assets they caused to be sent overseas.

## VI.

Order defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 26, 2016

*/s/ John W. Berry*
John W. Berry
Attorney for Plaintiff
Securities and Exchange Commission

COMPLAINT                                                        27