FILED
CLERK, U.S. DISTRICT COURT
05/26/16
CENTRAL DISTRICT OF CALIFORNIA
BY: D. Roberts DEPUTY

JOHN W. BERRY (Cal. Bar No. 295760)
Email: berryj@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
E-mail: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

CHARLES C. LIU;
XIN WANG a/k/a LISA WANG;
PACIFIC PROTON THERAPY REGIONAL CENTER, LLC;
PACIFIC PROTON EB-5 FUND, LLC;
and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,

Defendants.

Case No. SACV16-00974 CJC (AGRx)

**DECLARATION OF JACOB A. REGENSTREIF IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED, AND ORDERS (1) FREEZING ASSETS; (2) REPATRIATING ASSETS; (3) REQUIRING ACCOUNTINGS; (4) PROHIBITING THE DESTRUCTION OF DOCUMENTS**

**FILED UNDER SEAL**

I, Jacob A. Regenstreif, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney admitted to practice law by the State Bar of California and by this Court. I am currently a Senior Counsel with Plaintiff Securities and Exchange Commission's ("SEC") Los Angeles Regional Office. I have personal knowledge of the matters set forth herein, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2. I make this declaration in support of the SEC's accompanying *Ex Parte* Application for a Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not be Granted, and Orders: (1) Freezing Assets; (2) Repatriating Assets; (3) Requiring Accountings; and (4) Prohibiting the Destruction of Documents.

3. True and correct copies of excerpts from the transcript of the investigative testimony of Charles C. Liu ("Liu") taken on March 23, 2016 are attached as Exhibit 1.

4. True and correct copies of excerpts from the transcript of the investigative testimony of Xin Wang ("Wang") taken on May 4, 2016 are attached as Exhibit 2.

5. True and correct copies of excerpts from the transcript of the investigative testimony of Wenli Yao ("Yao") taken on May 12, 2016 are attached as Exhibit 3.

6. A true and correct copy of Pacific Proton Therapy Regional Center, LLC's ("Pacific Proton") application for EB-5 regional center designation to the U.S. Citizenship and Immigration Services ("USCIS"), dated November 19, 2010 and marked as Exhibit 4 in the investigative testimony of Liu, is attached as Exhibit 4.

7. A true and correct copy of Pacific Proton EB-5 Fund, LLC's (the "PPEB5 Fund") Private Offering Memorandum, dated May 1, 2013 and marked as Exhibit 5 in the investigative testimony of Liu, is attached as Exhibit 5.

8. A true and correct copy of Liu's Background Questionnaire submitted to the SEC, dated March 15, 2016 and marked as Exhibit 3 in the investigative testimony of Liu, is attached as Exhibit 6.

9. A true and correct copy of the Consent of Majority Member of Pacific Proton Therapy Regional Center, LLC A California Limited Liability Company, dated January 19, 2016 and marked as Exhibit 24 in the investigative testimony of Liu, is attached as Exhibit 7.

10. A true and correct copy of the Minutes of Annual Meeting of Members, Beverly Proton Center, LLC, A California Limited Liability Company, dated January 19, 2016 and marked as Exhibit 23 in the investigative testimony of Charles C. Liu, is attached as Exhibit 8.

11. A true and correct copy of the Employment Agreement between Beverly Proton Center, LLC f/k/a Los Angeles Country Proton Therapy, LLC ("Beverly Proton") and Wang, dated January 28, 2016 and marked as Exhibit 29 in the investigative testimony of Wang, is attached as Exhibit 9.

12. A true and correct copy of Wang's United Damei Investment Company's ("UDG") business card provided to the SEC by Wang is attached as Exhibit 10.

13. A true and correct copy of a letter dated June 28, 2012 from USCIS approving Pacific Proton's application to be designated a regional center under the EB-5 program is attached as Exhibit 11.

14. A true and correct copy of the Consent of Majority Member of Pacific Proton Therapy Regional Center, LLC A California Limited Liability Company, dated April 4, 2016, is attached as Exhibit 12.

15. A true and correct copy of the Employment Agreement between Beverly Proton and Liu, dated April 5, 2016, is attached as Exhibit 13.

16. A true and correct copy of the Employment Agreement between PPEB5 Fund and Liu, dated July 1, 2012, is attached as Exhibit 14.

17. A true and correct copy of the Employment Agreement between Pacific Proton and Liu, dated June 28, 2012, is attached as Exhibit 15.

18. A true and correct copy of the Employment Agreement between Beverly Proton and Michael Cogswell ("Cogswell"), dated April 11, 2016, is attached as Exhibit 16.

19. A true and correct copy of the Employment Agreement between Pacific Proton and Cogswell, dated April 5, 2016, is attached as Exhibit 17.

20. A true and correct copy of an investigative subpoena issued by the SEC to Liu, dated February 4, 2016, is attached as Exhibit 18.

21. A true and correct copy of a letter from counsel for Liu listing corrections to the transcript of Liu's investigative testimony, dated May 16, 2016, is attached as Exhibit 19.

22. A true and correct copy of a letter from counsel for Loma Linda University to PPEB5 Fund and Beverly Proton, dated March 22, 2016, is attached as Exhibit 20.

23. A true and correct copy of a letter from counsel for Optivus Proton Therapy, Inc. to PPEB5 Fund and Beverly Proton, dated March 18, 2016, is attached as Exhibit 21.

24. A true and correct copy of the Engagement Agreement between Beverly Proton and Overseas Chinese Immigration Consulting, Ltd., dated March 8, 2013 and marked as Exhibit 10 in the investigative testimony of Liu, is attached as Exhibit 22.

25. A true and correct copy of the Engagement Agreement between UDG and Pacific Proton and Beverly Proton, dated August 18, 2013 and marked as Exhibit 11 in the investigative testimony of Liu, is attached as Exhibit 23.

26. A true and correct copy of a statement from JPMorgan Chase Bank, N.A. ("Chase") to Beverly Proton regarding the account ending in 5152 for the month of January 2015, which was produced to the SEC by Chase and bears Bates number

SEC-JPMCB-P-0000103 and was marked as Exhibit 13 in the investigative testimony of Liu, is attached as Exhibit 24.

27. A true and correct copy of a statement from Chase to Beverly Proton regarding the account ending in 5152 for the month of November 2015, which was produced to the SEC by Chase and bears Bates number SEC-JPMCB-P-0000158 and was marked as Exhibit 15 in the investigative testimony of Liu, is attached as Exhibit 25.

28. A true and correct copy of a statement from Chase to Beverly Proton regarding the account ending in 5152 for the month of October 2015, which was produced to the SEC by Chase and bears Bates number SEC-JPMCB-P-0000149 and was marked as Exhibit 17 in the investigative testimony of Liu, is attached as Exhibit 26.

29. A true and correct copy of a letter from Hong Kong Delsk Business Co., Ltd. to Pacific Proton, which was marked as Exhibit 16 in the investigative testimony of Liu, is attached as Exhibit 27.

30. A true and correct copy of the engagement agreement between Beijing Pacific Damei Consulting Company, Ltd. and Pacific Proton and Beverly Proton, dated August 12, 2013 which was marked as Exhibit 31 in the investigative testimony of Wang, is attached as Exhibit 28.

31. A true and correct copy of the Pacific Proton investor list, which was produced to the SEC by Liu and marked as Exhibit 35 in the investigative testimony of Wang, is attached as Exhibit 29.

32. A true and correct copy of the driver license or identification card application of Yao, dated September 16, 2011 which was produced to the SEC by the California Department of Motor Vehicles, is attached as Exhibit 30.

33. A true and correct copy of the Chase business signature card for Beverly Proton account ending in 5152, which was produced to the SEC by Chase and bears

Bates number SEC-JPMCB-P-000083 and was marked as Exhibit 8 in the investigative testimony of Liu, is attached as Exhibit 31.

34. A true and correct copy of a page titled Executive Team which was printed from UDG's website on May 2, 2016 and was marked as Exhibit 33 in the investigative testimony of Wang, is attached as Exhibit 32. These pages were still accessible on the internet as of May 25, 2016.

35. A true and correct copy of a page titled Government Support which was printed from UDG's website on May 2, 2016 and was marked as Exhibit 34 in the investigative testimony of Wang, is attached as Exhibit 33. These pages were still accessible on the internet as of May 25, 2016.

36. A true and correct copy of pages from Pacific Proton's website, printed on January 21, 2016, is attached as Exhibit 34. These pages were still accessible on the internet as of May 25, 2016.

37. A true and correct copy of pages from UDG's website, printed on May 23, 2016, is attached as Exhibit 35. These pages were still accessible on the internet as of May 25, 2016.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of May, 2016 in Los Angeles, California.

*/s/ Jacob A. Regenstreif*
JACOB A. REGENSTREIF

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. LA-04639-A
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC )

WITNESS: Charles C. Liu
PAGES: 1 through 177
PLACE: Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
DATE: Wednesday, March 23, 2016

The above entitled matter came on for hearing, pursuant to notice, at 9:17 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

and documents.

(SEC Exhibit 2 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I've handed you Exhibit 2. This is the subpoena that calls for your testimony today.

Is this a copy of the subpoena that you're appearing to pursuant here today?

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 3 a background questionnaire dated March 15th, 2016.

(SEC Exhibit 3 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I've handed you Exhibit 3.

Mr. Liu, did you complete this background questionnaire as requested by the staff?

A I completed it by myself.

Q Exhibit 3 is what you completed?

A Yes. I think that I saw one error here.

Q So what's the error that you noticed?

A My resume in the last page, education is 1988 to 1991 instead of -- it's a typo here, and I provided -- I think there's two versions, so

obviously this was the previous one.

Q So just for clarification, under "Education," your MFA in Arts Administration from Columbia University was '88 to '91?

A Yes.

Q And are the answers contained in Exhibit 3 accurate and truthful to the best of your knowledge?

A Yes.

Q And have there been any changes since you completed Exhibit 3?

A No.

Q Is there anything in Exhibit 3 you'd like to clarify?

A No.

Q When did you become a U.S. citizen?

A It was a long time ago.

Q Approximately.

A Approximately 17 years ago.

Q And when did you get granted citizenship?

A It was 2014.

Q And you're currently married to Xin Wang?

A Yes.

Q And your current residence is [redacted]

A Correct.

Q Let me direct you to Page 3 of Exhibit 3. Question 14, "Privately-held companies."

Do you see that?

A Yes.

Q So you're currently president of Beverly Proton Center?

A Yes.

Q Pacific Proton Therapy Regional Center?

A Yes.

Q You're president there too?

A Yes.

Q And you're the manager of Pacific Proton EB-5 Fund?

A Yes.

Q Now you're also president of United MPH Ventures, LLC?

A Yes.

Q What is that?

A It's a holding company. The company is to develop -- because currently we're developing the proton center, the Kansas center in Montebello, but our business plan is to develop more centers over the United States, like San Francisco, Seattle, Miami, New York, to use the same model to develop the cancer and the proton centers.

Q So United MPH Ventures --
A Is a holding company.
Q -- that will develop additional proton therapy centers?
A Yes.
Q Are there any other officers of United MPH Ventures?
A Officers? Not at this moment.
Q Are there any investors in United MPH Ventures?
A Not yet.
Q And are you the sole owner of United MPH Ventures?
A Yes -- no, actually, I'm sorry. My wife owns partially.
Q How much does she own?
A I think it's 25 percent.
Q And it's just the two of you?
A Yes.
Q Any of these potential centers, are they in some level of development?
A Early stage. Early stage means we have some medical staff and business representatives looking at sites, talking to the potential partners of medical centers and universities.

Q And where have you started that process?

A We started in San Francisco, Seattle and in Miami.

Q Have any funds been raised for any of those sites?

A No, not yet.

Q And in San Francisco, who's your partner in San Francisco?

A Again, it's early stage -- you know, discussions. The partner has not been identified up to today.

Q Is that the same for Seattle and Miami?

A It's different.

Q So in Seattle, do you have a partner?

A No. It's all the same status.

Q So each of the three sites --

A We just started, actually, not too long ago, because our focus is to complete the first one first, use the first one as a model, and then copy the same model to different cities in the United States. So we are focused primarily on the first one.

Q The next company you list is MP Medical Hotel, Inc.

A Uh-huh.

Q And you're the director?

A Yes.

Q What is MP Medical Hotel?

A The concept -- first, let me introduce the concept of this -- MPH Ventures. Our business model is to build proton center, cancer center, and also a hotel, a medical hotel, within the same complex, and then to target the international cancer patients because there's more and more cancer patients from overseas coming to the United States for treatment. That's why we picked up all the gateway cities. They all have international flights in and out of United States.

For example, the Montebello site, it's 30 minutes away from LAX. So that is our business model. So we have set up this company called MP Medical Hotel. We have signed a lease with Beverly Hospital which is adjacent to the current proton site just across the street. So that's what it's for. We just actually hired architect to do the initial conceptual drawings for their project.

So basically, again, the model is proton center, cancer center and medical hotel. Why do we need medical hotel? For the cancer patients, for the proton patients. The treatment lasts between 30 days

and 90 days, particularly like prostate cancer, it takes about 50 treatments. 50 treatments means you do a treatment per day. So you add it up, you spend about three months.

But proton therapy is outpatient. You don't -- it's not hospitalized. You go there 20 minutes a day, but you still have to travel there. So that's why, for the sake of convenience, it's important to build a hotel. Particularly we target all the international patients because, you know, with the current medical reimbursement rates, it's pretty low.

But cash patients, international patients, they pay cash. Actually, they spend more money on the treatment side. So to provide a concierge service in a hotel like this is important.

Q So who is the architect that you hired for the hotel at the Montebello site?

A The architect's name is Creative Design. It's called Creative Design Associates.

MR. GARTENBERG: May I have a minute while nothing is pending? I just want to speak to my client.

MR. REGENSTREIF: Let me just finish this line, and then we'll get to it; okay?

MR. GARTENBERG: Sure.

BY MR. REGENSTREIF:

Q Is the MP Medical Hotel part of the Beverly Proton Center, LLC?

A No. It's not part of the EB-5 offering.

Q It's separate from the EB-5 offering?

A It's separate.

Q And then has there been investors for the hotel?

A No, not yet.

Q There's no investors?

A No.

Q And there's been no fundraising?

A No.

Q And it's not part of the EB-5?

A No.

MR. GARTENBERG: Okay now?

MR. REGENSTREIF: Yeah, that's fine.

Let's go off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

So where were we?

MR. GARTENBERG: We had just gone through what MP Medical Hotel was and whether there were

investors.

BY MR. REGENSTREIF:

Q So as I understand it, there are no investors in MP Medical Hotel; is that correct?

A That is correct.

Q So what is the next entity, SC MPH Fund, LP?

A Okay. This is a vehicle entity we set up to raise capital for the Beverly Hospital, which is a neighbor of current site.

Q So this is raising capital for the hospital?

A Yes. It's a separate venture through the -- sponsored by Pacific Proton Therapy Regional Center.

Q So this is through the regional center?

A Yes. It's a separate project. Our site is on the campus of Beverly Hospital, and Beverly Hospital is trying to raise some EB-5 money capital through the regional center and to upgrade the current emergency room and the maternity center.

Q So SC MPH Fund is a project sponsored through the regional center?

A Yes.

Q And it will be raising EB-5 funds?

A Uh-huh.
Q Could you say "yes"? I'm sorry.
A Yes.
MR. GARTENBERG: Wait until he finishes the question.
THE WITNESS: Okay. I'm sorry.
BY MR. REGENSTREIF:
Q It will be raising EB-5 funds?
A (Witness nods head.)
Q You have to say "yes."
A Yes.
Q And then, as I understand it, it's Beverly Hospital to upgrade their emergency room and maternity ward?
A Yes.
Q And you're the general partner of that?
A Yes.
Q And so SC MPH Fund, is that equivalent to the Pacific Proton EB-5 Fund?
A Similar.
Q So it's another of the NCEs through the regional center?
A Yes.
Q Does that require --
MR. GARTENBERG: I'm sorry, "NCEs"?

MR. REGENSTREIF: That is the term used by the United States Customs and Immigration Service through approved regional centers.

THE WITNESS: "New Commercial Enterprise."

MR. GARTENBERG: Thank you. I've learned something today. Thanks.

BY MR. REGENSTREIF:

Q Now, to do a new commercial enterprise, do you have to get approved from USCIS?

A Yes, because the regional center -- as long as the project is in the same geographic area or shares the same industrial codes, you don't have to get the separate approval. You can file contingent upon the approval. You can file -- in other words, you can file a separate case.

Q Under the regional center?

A Under the regional center.

Q And have you done that for SC MPH Fund?

A No.

Q Have you raised any money for SC MPH Fund?

A No.

Q You said you're a general partner for SC MPH Fund.

Are there any other partners?

A No.

Q And there are no investors?
A No.
Q Have you done any offerings or attempted to sell any interests in SC MPH Fund?
A No. Not yet.
Q Who do you deal with at Beverly Hospital? Who do you talk to there?
A The CEO, president and the executive team.
Q Who are those people?
A Do you want to know the names?
Q Yes, please.
A The CEO is Alice Cheng. I don't know how to spell it, honestly.
Q That's fine.
A Alice Cheng, and also Wendy. Wendy is their COO. Sorry, I can't remember the last name.
Q That's okay. Whatever you know.
A And then Larry. Larry is the CFO. So these three individuals are being worked with.
Q And is there some kind of MOU or agreement between SC MPH Fund and Beverly Hospital?
A Yes.
Q And has that been provided to us in the productions?
A No.

MR. GARTENBERG: Was it called for?

MR. REGENSTREIF: It was not. We didn't know about any of these entities, so it may yet be called for.

BY MR. REGENSTREIF:

Q So let's go into the next one.

SC MPH Management, LLC. What is that?

A It's the management company of SC MPH Fund.

Q I see.

So it's the management company for the fund for what will be an EB-5 project for Beverly Hospital?

A Yes.

Q And are you the sole owner of SC MPH Management, LLC?

A Yes.

Q And are there any other members besides yourself?

A I'm the only member.

MS. LEVIN: What does "MPH" stand for?

THE WITNESS: Medical Proton Hotel.

MS. LEVIN: And what does "SC" stand for?

THE WITNESS: Southern California.

MS. LEVIN: Thank you.

BY MR. REGENSTREIF:

Q Just so I'm clear, for the medical hotel and the MPH Fund and the MPH Management, LLC, there have been no investors yet?

A No investors.

Q But United MPH Ventures is separate from those three other entities?

A Yes.

Q And there's still no investors in United MPH Ventures either?

A No.

Q And United MPH Ventures, your wife is also a 25 percent owner?

A Yes.

Q But in none of the other three entities, MPH Medical Hotel, SC MPH Fund or SC MPH Management?

A No.

Q On Page 4 -- top of Page 4, Exhibit 3, you list yourself as "President of Beverly International Cancer Center, LLC."

What is that?

A It's entity to develop the cancer center. As I explained, it was part of United MPH Ventures. So cancer center, proton center and the hotel.

Q So this is the third component?

A Yeah, for project development.

Q And this is one that is not -- it's not EB-5?
A No, no.
Q And there are no investors yet?
A No investors yet, but we are in discussion with potential strategic non EB-5 investors.
Q Non EB-5?
A Uh-huh.
Q Let's go to Page 5 of Exhibit 3. It's the carryover for Question 19. It's identified in "Bank Accounts." Go to Page 5, please.
A Sure.
Q Do you see the two bank accounts identified?
A Yes.
Q Are those your only two bank accounts?
A Yes.
Q And so the digits there, 30221 for Bank of America, those are the last five of the account number?
A No. Actually that's the address.
Q Oh, that's the address?
A Yeah.
Q You didn't identify account numbers?
A Is it required?

Q If you look -- for some reason, this got split up. If you look at 20, it says -- little four, it says the account number.
A That's easy. I can provide that. That's no problem.
Q Great. I appreciate that.
A Yeah.
Q So if you could -- and maybe your lawyers can note that we need the account numbers for the two bank accounts.
A But the first one is already closed.
Q Bank of America is closed?
A A while ago, but it was within three years. That's why I provided it.
Q So Chase is the one you're using currently?
A Yeah, Chase is the one I'm using, because it's the last three years, so I provided it.
Q Thank you. I appreciate that. So if we can get the account numbers for those.
A Yeah.
Q So if we could go to Page 10. Question 35 asks about your employment activities.
A Okay.
Q So at the bottom of Page 10, prior to Pacific Proton EB-5, you worked at Century Medical

Investment --
A Yes.
Q -- from 2004 to 2009?
A Yes.
Q What was that?
A It was a company set up to sell the medical equipment, particularly the proton equipment, in China.
Q And what was your position?
A I was president and also CEO for this company, and we will try to promote a U.S. technology to China.
Q The company was based in Hong Kong?
A Yes.
Q And what kind of medical --
A Proton therapy.
Q So it's all proton therapy?
A That's why I got involved.
Q And how did you get involved with proton therapy?
A How did I get involved? First, I started my own business a long time ago by selling medical equipment, radiation. Actually, diagnostic equipment like MRI and computer tomography. And then I was able to know one of the key U.S. proton therapy

Q Did you have any involvement before that?
A Before, no.
Q So your current wife is Xin Wang?
A Yes.
Q When did you get married?
A 13 years ago.
Q And she's involved in the -- as we discussed -- in these entities related to SC MPH; is that right? Does she have any other employment?
A She also has a position with Beverly Proton Center.
Q She does?
A Yeah.
Q And what's her position at Beverly Proton Center?
A She's vice president in overseas marketing, in marketing Asia.
Q And when did she assume that position with Beverly Proton Center?
A She got involved from day one, which is 2011.
Q 2011?
A Yeah.
Q What does her job entail? What are her responsibilities with Beverly Proton Center?

A Her responsibility is to promote because she had some medical background before. I basically am on the sales side, and she did a lot of promotions and also marketing work for this company, for this project.

Q Promotions and marketing work for the company related to --

A Related to raising capital, related to bringing overseas patients to the United States as well.

Q So both the operational side of bringing patients --

A Yes.

Q -- and also fundraising capital?

A Yes, yeah, on the marketing side.

Q On the marketing side?

A Yeah.

Q So what does that mean, "the marketing side"?

A Just to give example, she hosts seminars for clients, for the medical centers, United States, because we are also working with major U.S. cancer centers in the United States such as City of Hope and Mayo Clinic and others, because our center is still under construction, before we -- our center is open

you're saying "you," it's not necessarily -- it's not clear that it's him, but maybe the entity.

BY MR. REGENSTREIF:

Q Which entity receives the referral fee?

A Which entity? It's Beverly Proton Center.

Q So Beverly Proton Center, LLC, not the EB-5 Fund?

A No.

Q And not the regional center?

A No, no.

Q The Beverly Proton Center, LLC?

A Yeah, because it's different category.

Q So since we're discussing this, do you receive a salary from Beverly Proton Center?

A Yes.

Q What's your salary?

A I think it's $750,000 a year.

Q $750,000 a year?

A Yeah.

Q And do you receive that weekly? Monthly?

A Not exactly, not monthly. I receive -- if there's sufficient funds because the fundraising -- if it's only sufficient funds, then I withdrew the money from the company. If not sufficient, I don't.

Q So you receive a salary from Beverly

Proton, LLC?
A Yes.
Q Not the EB-5 Fund?
A EB-5 Fund I receive some compensation as well because I'm the manager.
Q So you receive compensation from them, too?
A Yeah.
Q How much do you receive from them?
A $200,000 a year.
Q So that's in addition to the 750- from Beverly Proton?
A Yes.
Q And then do you receive compensation from the regional center?
A Yes.
Q How much is that?
A 350- a year.
Q $350,000 a year?
A Yeah.
Q In addition to the 200- and the 750-?
A Yeah.
Q And does your wife receive a salary from any of these entities?
A My wife receives a salary from the project company, not the other two.

Q Approval from USCIS for what?
A To raise funds, EB-5 funds overseas to promote project.
Q And what do you understand to be the EB-5 program? What is that to you?
A EB-5 program is -- what does it mean to me?
Q Yeah. What is the EB-5 program?
A EB-5 program was created by U.S. Congress in the early '90s to allow the regional center to raise funds for the Employment-Based Category 5 investors to create jobs. That's my basic understanding.
Q And so the investors have to provide a certain amount of funds pursuant to the EB-5 program; is that right?
A Yes. Each investor has to invest up to either half a million or $1 million in an area designated by the state government. It depends on the employment/unemployment rate. It can be half a million dollars or $1 million. It depends on the targeted employment/unemployment area.
Q And to take advantage of the EB-5 program, the regional center has to be approved by USCIS?
A Yes.
Q And your regional center was approved by

USCIS?
A Yes.
Q And did you initiate that approval? Did you seek that approval?
A What do you mean "seek approval"?
Q Did you, Charles Liu --
A I submitted the applicant.
Q You submitted the application?
A Yeah, with our legal counsel's assistance.
Q And what is your formal title with the regional center?
A Formal title is, I was the president from day one.
Q And are you the sole owner of the regional center?
A No. I have a partner.
Q And your partner's name is?
A Dr. Thropay, who is radiation oncologist.
Q And how much of the regional center do you own?
A I own 75 percent, and he owns 25 percent.
Q And so through the regional center, explain to me how you first came to the EB-5 program.
How did you decide to access that program as a means of fundraising? Where did you hear about

we discussed, a commercial enterprise, a new commercial enterprise; is that right?

A Yes.

Q And so the EB-5 Fund, LLC, that is the NCE?

A Pacific Proton EB-5 Fund is NCE.

Q And then Beverly Proton Center, LLC is the job-creating vehicle for the EB-5, LLC fund; is that right?

A That is correct.

Q Are there any other job-creating entities besides Beverly Proton under the Pacific Proton EB-5 Fund?

A No.

Q And Beverly Proton Center, has it been known by any other names?

A Yes. Previously it was called Los Angeles County Proton Therapy, LLC.

Q And when did the name change?

A I think mid 2015.

Q Why did the name change?

A The name changed because we tried to be part of the Beverly Hospital complex and because we also have a plan to develop Beverly Hotel and Beverly Cancer Center, so we tried to consolidate all the names to be consistent.

Q Are there any employees of the Beverly Proton, LLC?

A Not direct employees. Contractors.

Q So Beverly Proton has contracts with employment agencies -- they have contractors -- or you have independent contractors?

A Independent contractors and also business consultants. We have a lot of business consultants.

Q Let's start with the independent contractors.

How many independent contractors do you have?

A Two.

Q What are their names?

A One is called Lance, L-a-n-c-e; Gong, G-o-n-g is the last name. And we have another one but who already left -- who left the company.

Q What was that person's name?

A Richard Zheng. Last name is Z-h-e-n-g.

Q What does Lance do?

A Lance does lots of administrative work, and also to the airport, to pick up visitors, clients, investors coming from overseas. A lot of concierge work.

Q And what did Richard do?

A We have two separate offices. One is in Orange County. The other is in Montebello within the hospital complex. And because we have a site for development, from time to time, we had a lot of investors and also visitors. So Richard is based in that office.

Q In Montebello?

A In Montebello.

Q So Richard would take investors to look at the site?

A Yes.

Q And would anyone else accompany Richard when he was taking investors on the site?

A I'm sorry?

Q Was anybody else with Richard when he would take investors on the site?

A He was the only one because the distance, it's still pretty far, so he's on site and he lives nearby.

Q The investors who are coming to look at the site, these were investors for the EB-5 Fund?

A Well, you have the investors, EB-5 Fund and non EB-5. We have potential strategic investors as well, not just for EB-5.

Q But they toured the site?

A Yes.
Q Did you ever meet the investors at the site?
A Yes, a number of times.
Q How many times, approximately?
A About ten.
Q Ten times at the site?
A Yeah.
Q Ten different investors or more than that?
A Well, obviously there are more than investors. But for me, because I travel quite often internationally back and forth -- so every time we have an investor, if I'm out of town, I don't go.

MR. GARTENBERG: We've been going about an hour.

MR. REGENSTREIF: Let's go off the record.

(A brief recess was taken.)

MR. REGENSTREIF: Let's go back on the record.

MR. GARTENBERG: I just wanted to make one thing clear. Mr. Liu referred to "non EB-5 investors." I'd be happy to ask him questions now or if you want to put it to him. But from my conversation with him, I understand these are not people who've actually invested. What he testified

to, from what he's explained to me is these are potential investors.

If he gets to the stage where we're dealing with actual investments before making the investment, he would consult with counsel to make sure that he's in compliance within the applicable securities laws in dealing with those people.

So you may want to ask questions, or if you want, I can ask him questions, but I want to make sure when he says "investors," particularly given that English is obviously not his first language, what he means is "potential future investors" when he's talking about non EB-5 people.

BY MR. REGENSTREIF:

Q But there have been EB-5 investors?

A Sure.

Q And the funds are in receipt of the EB-5 Fund, LLC?

A Yes.

Q How many EB-5 investors are there?

A 47, 48, I think. 47.

Q And approximately how much money does that amount to?

A 23 million.

Q 23 million from EB-5 investors?

A Uh-huh.

Q And the non EB-5 investors are all at the potential stage?

A Potential stage.

Q So there are no non EB-5 investors right now?

A No, as of today.

MR. GARTENBERG: Thank you.

MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit 4 this document which is a G-28 Notice of Entry of Appearance from the Department of Homeland Security and an application submitted thereunder dated November 19, 2010.

(SEC Exhibit 4 was marked for identification.)

BY MR. REGENSTREIF:

Q So, Mr. Liu, I will hand you, in just a second, Exhibit 4. I want you to take a look. And I'd like you to turn to Page 6 at the top and just confirm for me that that is your signature.

MR. GARTENBERG: Do you have a copy for us?

MR. REGENSTREIF: I don't, unfortunately.

MR. GARTENBERG: Let me look at it first before you look at it.

BY MR. REGENSTREIF:

Q Do you recognize Exhibit 4?

A Yes.

Q Is that your signature on the first page?

A Yes.

Q So you've seen this request for designation sent to USCIS?

A Yes.

Q And did you provide the information contained within the request in the exhibits?

A Yes.

Q And did you write the application to USCIS?

A No.

Q Who wrote the application?

A My legal counsel.

Q But you provided your legal counsel with all the information contained in Exhibit 4?

A Yes.

Q And did you review the application before it was submitted to USCIS?

A Yes.

Q And why did you go with Miller Mayer as your lawyer? How did you hook up with them?

MR. GARTENBERG: You can answer that.

THE WITNESS: Miller Mayer was the leading

MS. LEVIN: Okay. Thank you.

BY MR. REGENSTREIF:

Q So who manages the regional center day to day?

A I do.

Q And you and Dr. Thropay are the only owners of the regional center?

A That is correct.

Q And there are no other investors in the regional center?

A No.

Q And the EB-5, LLC, who manages the EB-5, LLC?

A I manage the EB-5, LLC.

Q Is there anyone else?

A No.

Q And do the investors of the EB-5, LLC have a management role in the EB-5, LLC?

A No.

Q And let me direct you to Exhibit 4 again. It's Page 224 of the exhibit, but I've marked it with a paper clip for your convenience. This is an org chart for the Los Angeles County Proton Center. Take a look.

Do you recognize the organization chart?

A Yes.
Q Is that accurate?
MR. GARTENBERG: As of today or as of when the application was filed?
MR. REGENSTREIF: As of the application.
THE WITNESS: As of the application, it was correct. Not correct today.
BY MR. REGENSTREIF:
Q And how is it not correct today?
A Because this chart is about the future operation management of this center, and we change the structure I think last December, I think, or last November. Yeah. At the end of last year.
Q Last year, 2015?
A Yeah, last year, 2015. And Dr. Thropay is -- there's -- he's no longer the managing director of this company because we signed an MOU with the City of Hope, and the City of Hope will be our manager, operational company, to run the center.
Q Dr. Thropay, you said he's 25 percent owner of Beverly?
A Yes.
Q Is he still involved?
A He's no longer involved on the operational side. He's just a passive -- we had a resolution

passed early this year. He's no longer -- he does not hold any management titles and officers of this company. He's just a member of LLC.

Q And why is that?

A Because City of Hope does not want -- for medical center, there's no -- there's only one medical director, not two. So I think it's important for our center to be associated with a big prestigious cancer center, so that's why we passed the board resolution and work with City of Hope instead of Dr. Thropay who is just individual radiation oncologist.

MR. GARTENBERG: I'm not entirely sure what's encompassed by your question, so you may want to ask if there was some kind of dispute between them because it seemed to be called for. I'm not sure it's called for.

MR. REGENSTREIF: Yeah. Usually I'd ask a follow-up, so you don't have to presume that I won't ask a follow-up.

MR. GARTENBERG: I want to make sure not only that he's telling the truth, but that the Staff has confidence that he's telling the truth.

MR. REGENSTREIF: Absolutely.

MR. GARTENBERG: It was not in any way to

providing the dosage for the patients. So by the time we get the equipment, it has to be simultaneously ready for that. That's another one.

There are a lot.

Q So there's contracts for all of these people?

A Yes, we have contracts. We have signed contracts.

MR. REGENSTREIF: Were these contracts part of the production?

MR. GARTENBERG: They weren't asked for. Anything else that's related, if you give us a list at the end -- we'll keep a list, but I just want to make sure.

MR. REGENSTREIF: Sure.

MR. GARTENBERG: We'll check with you what it is, and we'll be happy to get it for you.

THE WITNESS: Yeah. We have a stack of documents.

BY MR. REGENSTREIF:

Q And have you paid these people yet?

A Yeah, of course.

Q So you mentioned demolishing.

A Yes.

Q What was that about?

A There was an existing building onsite. It was an old MOB building. It has to be demolished.
Q What's an "MOB building"?
A MOB means "medical office building."
Q And so the building was on the site where the proton therapy center is going?
A Yes.
Q And who owned the building? Did Beverly Proton own the building?
A No.
Q Who owned it?
A Dr. Thropay. Dr. Thropay owns a piece of land.
Q Where the center is going?
A Yes.
Q And the building was demolished?
A Yes.
Q Is there currently construction going on at the site?
A Not at this moment. Not at this moment because we had some -- this dispute with Dr. Thropay.
Q And it's his site?
A Yes.
Q Do you intend to build on that site?
A I have two options. One is to build --

continue the path, build on his site. And also we're about to sign a lease agreement with Beverly Hospital. Beverly Hospital is adjacent to the site. Next to the site there's a parcel available for us to develop the proton center as well.

Q So you have two possible sites?

A Yes, we have two possible sites.

Q Why did you demolish the first site then?

A Why? Because there's no Option 2 before the dispute. Now, because of dispute, we have Option 2. Before, it was Option 1 only.

Q So before the dispute -- and you demoed the site -- you were ready to start building?

A Yes.

Q And that's on hold now?

A Yes. And then we're preparing for Option B because we have to build.

Q And when investors came, you mentioned investors visited the site, correct?

A Yes.

Q And when they came with you, did they see the already existing building or did they see something else?

A Well, we had investors come in earlier who saw the building is still there. And then we also

have some investors -- you know, visitors come in after the demolishment -- after demolishing the building.

Q And you took investors after demolishing?

A Yes.

Q You personally?

A On some occasions, yes.

MS. LEVIN: Were these people who were visiting the site, had they already invested in the EB-5 or were they thinking about investing?

THE WITNESS: Some already invested. Very few invested because once -- the normal pattern is once they invested, they probably don't come back to see it again. But most of them came to see it before they sign the agreement.

MS. LEVIN: So there were people who visited the site, and then subsequently invested?

THE WITNESS: Yes.

BY MR. REGENSTREIF:

Q Have there been any permits yet to build again?

A The permits -- we have demolishing permit, and that the architect is applying for the construction permit. We should get it pretty soon because the city is being very cooperative.

Q And the architect -- which architect?

A We have two. One of them -- one of the first is called Skanska. Skanska is I think one of the largest construction companies in the United States. And we signed an agreement for them to take care of all the pre-construction work. And then because of potential change of the site and also the change of the equipment, before we were considering a company called hospital Optivus, this is the company that has been in the United States for a while.

Q This was the company that you had previous business relationships with, correct?

A Yes, yes. And now we signed a purchase agreement with a company called Mevion. It's an excellent, great company, and they have sold more than ten systems to the United States, and they're all over the United States now.

And because of change of technology, so we switched to another architect in Boston area. The key principal in architect is Steve Cooney (phonetic), who is also our project manager. We signed agreement already.

Q And the name of the firm?

A The name of the firm is called -- it's very hard to pronounce.

THE WITNESS: It was $200 million before. Now we downsized to $120 million because the new equipment is cheaper. And the construction, of course, accordingly, is less. So the new offering is $120 million instead of $200 million.

MR. GARTENBERG: You say "200-."

Was it 200- or -- I'm pointing to the document -- 150-?

THE WITNESS: 150-. I'm sorry. I'm talking about total investment because we have also -- potentially have some equity money for the investment. But for EB-5 it's -- for EB-5 it was a different number. This is 193- something.

MR. REGENSTREIF: 193 million.

THE WITNESS: This is 150 million. Now the new number will be $60 million.

BY MR. REGENSTREIF:

Q I'm going to summarize this, and you catch me if I'm wrong.

A Uh-huh.

Q There have been two offering memorandum. There is a third in process.

A Yes.

Q The first one, which was part of Exhibit 4 which was the application to USCIS, was not provided

to EB-5 investors?
A No. It's provided to set up regional center, for approval of regional center.
MS. LEVIN: And the dollar amount on that one was --
BY MR. REGENSTREIF:
Q And the dollar amount on that one was $193 million?
A Yes.
Q And the second one, which we will come to, was the one provided to the EB-5 investors?
A Correct.
Q And the dollar amount on that one, which we will look at, was $150 million?
A Correct.
Q And that one was provided to USCIS through the I-526 application?
A Yes.
Q The I-526 application is made for each individual EB-5 investor as part of their green card process?
A Yes.
MS. LEVIN: And so what's the dollar amount of the third one that has not been used yet?
THE WITNESS: $60 million.

MS. LEVIN: 60 million for the EB-5?
THE WITNESS: Yes.
MS. LEVIN: Thank you.
MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit No. 5 an offering memorandum for 300 membership units of Pacific Proton EB-5 Fund, LLC, and it has the date at the bottom of 5/1/2013.
(SEC Exhibit 5 was marked for identification.)
BY MR. REGENSTREIF:
Q I've handed you Exhibit 5. Take a minute to look at it.
Do you recognize Exhibit 5?
A Yes.
Q And what is Exhibit 5?
A Exhibit 5 is the private memorandum for Pacific Proton EB-5 Fund. This is the latest version of the PPM.
Q So this is the second version --
A Second -- in other words second, yes.
Q -- that we just discussed?
A Yes.
Q And did you provide the information contained within Exhibit 5?

A Did I provide it to the attorney? Yes, yes.
Q And did you review Exhibit 5?
A Yes.
Q And approve it?
A Yes.
Q And the attorney who drafted Exhibit 5, which attorney was that?
A Well, the first draft version was prepared by Miller Mayer, and the second one was updated or revised by an attorney called David Derrico. David Derrico is a legal counsel, and he did the second draft.
Q What firm is Mr. Derrico with?
A David Derrico.
Q His own firm?
A His own firm.
MS. LEVIN: So Exhibit 5 was the version of the PPM that was provided to investors?
THE WITNESS: Yes.
BY MR. REGENSTREIF:
Q Let's turn to Page 6 of Exhibit 5.
Are you on Page 6 which is the summary of the offering terms?
A Yes. Uh-huh.

Q So under "Securities," the security offered was one unit of the limited liability company membership of the EB-5 Fund, LLC; is that right?
A That's right.
Q And each unit was for $500,000?
A Yes.
Q And it was for a total of 300 units?
A Yes.
Q And then under that, there are administrative fees of $45,000.
A Yes.
Q And that administrative fee, did you understand that that would be where the offering expenses, including legal, accounting and administrative expenses, and commissions and fees relating to the offering would come from that administrative fee?
A Yes.
Q And only from that administrative fee?
A Yes.
Q And that $45,000, that was directed to the EB-5 Fund or was it directed to the regional center?
A You mean when investor sent in the funds?
Q Yes.
A It was directly to the regional center.

MR. GARTENBERG: May I have a minute while no question is pending?

MR. REGENSTREIF: You know what? Let's just finish this one thought.

MR. GARTENBERG: I really want to speak to my client while there's no question pending.

MR. REGENSTREIF: Fine. Let's go off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

BY MR. REGENSTREIF:

Q So under that, back to Page 6 of Exhibit 5, we're looking at "borrower."

Do you see that?

A Yes.

Q So it says, "Los Angeles County Proton Therapy, LLC" is the borrower.

A Uh-huh.

Q That's now Beverly Proton; is that correct?

A Yes.

Q And the investment basically -- I'm going to characterize it; tell me if I'm right here -- the investors are investing in the EB-5, LLC which then makes a loan to L.A. County Proton; is that right?

A That is correct.

MR. REGENSTREIF: Can we go off the record?

MR. GARTENBERG: Sure.

(A brief recess was taken.)

MR. REGENSTREIF: Back on the record.

BY MR. REGENSTREIF:

Q So your understanding of what the loan to what was then Los Angeles County Proton Therapy and is now Beverly Proton --

A Yes.

Q -- the purpose of that loan was what?

A To fund the project, to develop the project.

Q And then the bottom of Page 6 of Exhibit 5, there's a management fee.

Do you see that?

A Uh-huh.

Q So that is the fee that the regional center would have received from the EB-5 Fund, LLC; is that right?

A Yes.

Q And that was to be three percent of gross revenues?

A Yes.

Q Has the EB-5 Fund, LLC had any gross

Angeles County Proton Therapy."
A Yes.
Q Is that correct?
A Yes.
Q The loan has already -- it's already happened.
There's funds going from EB-5 to Beverly Proton?
A Yes.
Q But there have been no payments made under that loan yet back to EB-5?
A No, because it's a five-year loan.
Q And LAPT is Beverly Proton; is that right?
A Yes.
Q It says, "We'll use the loan proceeds to partially finance a construction and operation of a proton therapy center."
Is that your understanding of what the use of funds of the loan was for?
A Yes.
Q And all the investor funds were to go to the loan?
A Yes.
Q Let's turn to Page 20 now of Exhibit 5. It says, "PP EB-5 estimated use of proceeds."

Do you see that in that paragraph?
A Yes.
Q So again, it says "Borrower" -- which means Beverly Proton; is that right?
A Yes.
Q -- "intends to use the proceeds from this offering to finance development and operation of the now Beverly Proton Center"; is that right?
A Yes.
Q And then there's a Footnote 2.
Do you see that at the bottom of the page?
A Yes.
Q And that says, "The proceeds of this offering do not include administrative fees. Offering expenses, commissions and fees inferred in connection with this offering shall be paid from the proceeds in," capital "A," "Administrative," capital "F," "Fees, and not from EB-5 capital contributions."
A Yes.
Q And that's inaccurate?
A Yes.
Q So the $500,000 in investor funds to the EB-5 Fund were solely to go to the loan?
A Uh-huh.
Q "Yes"?

A Yes.
Q And then the loan was to be used for -- to finance development and operation of Beverly Proton?
A Correct.
Q Let's turn to Page 25 of Exhibit 5.
Do you see "Management" at the bottom of the page, that last paragraph?
A Yes.
Q So the "manager," which is the regional center; is that right?
A Yes.
Q And the "regional center," you are the manager of the regional center?
A Yes.
Q "The manager," it says in Exhibit 5 on Page 25, "has full, exclusive and complete authority and power and discretion to manage and control the business affairs."
Do you see that?
A Yes.
Q So no investor has management responsibilities of the EB-5 Fund?
A No.
Q I'm sorry?
A No.

Q It's just solely you as the manager of the regional center?

A Yes.

MR. GARTENBERG: Just reading from the document that you authored and noted -- and he's not a lawyer -- it says here that members have limited rights to take part in management or to bind the company, and then it refers to specific sections of the operating agreement.

So would it be correct that you don't know, as a nonlawyer, exactly what those sections of the operating agreements say, correct? I'm looking at Page 26, "Members have limited rights to take part in the management to bind the company," and then it refers to Article 4, Sections 4.1 through 4.2 of the operating agreement.

As far as you know, are those sections in effect?

THE WITNESS: I'm not sure I fully understand.

MR. GARTENBERG: That's really my point.

When you say the members don't have management authority, you're not overruling whatever the operating agreement says, are you? The operating agreement is the operating instrument.

THE WITNESS: Yes. Operating agreement, yes, is the core, I guess.

BY MR. REGENSTREIF:

Q So let me ask you this: Has any EB-5 investor had any management responsibilities for the EB-5 Fund?

A No.

Q You're the only one that's managed the EB-5 Fund?

A Yes.

Q When did the offering begin? When did you start fundraising?

A 2013, because we received approval in 2012.

Q Approximately when in 2013?

A Mid.

Q And did you retain any brokers?

A Yes.

MR. GARTENBERG: Let him finish the question, please. Wait until he finishes.

BY MR. REGENSTREIF:

Q Who?

A Quite a few. One of them is Overseas Chinese Immigration. The other is U.S. RITA -- called U.S. RITA. It was another company.

Q U.S. RITA?

A Yes, called U.S. RITA, yeah. And then we have United Damei Investment. And then -- well, there's -- it's kind of -- because of the Chinese names, it's a translation, so it's sometimes -- I can't remember all the names.

Q But those three, were those the three brokers, or were there other brokers?

A There were other brokers.

Q How many others?

A Another three, four.

Q Do you know the other three, four names?

A I can't. I know who I'm dealing with, but I can't remember the company's name.

Q Who are you dealing with?

A Because a lot of translations -- because the Chinese translation, we communicate -- because I grew up in China also, so I can speak the local dialect. So we speak the local dialect, local language. I can't remember.

Q What about the names of the individuals you were dealing with, those three or four other brokers?

A I can remember one of them is Mr. Wang. Last name is Wang, and first name is J-i-n.

Q But he doesn't work for either Overseas Chinese, U.S. RITA or United Damei?

A Yeah.
Q Anyone else from one of those other brokerage firms?
A Not that I can think of.
MS. LEVIN: And, I'm sorry. You were mentioning that you spoke a local dialect.
So is that something other than Mandarin Chinese?
THE WITNESS: Yeah, Shanghainese, because I grew up in Shanghai. So many dialects.
BY MR. REGENSTREIF:
Q So let's start with Overseas Chinese.
Where are they based?
A Hong Kong, I think. Based in Hong Kong.
Q And is there some kind of brokerage agreement with them?
A Yeah, we had agreement.
Q You had an agreement with them?
A Yeah.
Q And were they paid a commission?
A Yeah, they were paid a commission, yes.
Q And did EB-5 Fund pay the commission to them or were they being paid commission by the investors?
MR. GARTENBERG: Or some other alternative?

MR. REGENSTREIF: Sure. Of course.

THE WITNESS: Yeah. They were paid by the regional center, and also by the project.

BY MR. REGENSTREIF:

Q By both?

A Yeah, by both.

Q So Overseas Chinese was paid by both the regional center and by Beverly Proton?

A Yes.

Q And these were fees associated with their successful selling of investments to EB-5 investors?

A Correct.

Q And what was the arrangement? What was the commission?

A Commissions paid 75,000 per each investor.

Q 75,000 per each investor?

A Yeah.

MS. LEVIN: And how many investors did they get to date?

THE WITNESS: How many investors --

MS. LEVIN: -- did Overseas Chinese obtain to date?

THE WITNESS: I don't have exact numbers. I can't remember exact.

BY MR. REGENSTREIF:

way.

MR. GARTENBERG: Okay.

BY MR. REGENSTREIF:

Q So tell me, what were the terms?

A The term is upon the successful completion of the fundraising, we pay 75- for each -- the clients they brought in. And we also pay a marketing fee to them as well.

Q So a marketing fee on top of 75,000?

A Yeah. Marketing fee is different. It's to do the promotions, other stuff.

Q And how much was the marketing fee?

A Marketing fee is --

Q Just do what you know.

MR. GARTENBERG: I offered to do that. You prefer what he remembers.

BY MR. REGENSTREIF:

Q First I want to know what you remember.

A About half a million a year for marketing.

Q And you said that Overseas Chinese is based in Hong Kong?

A Yes.

Q And who do you work with at Overseas Chinese?

A A gentleman called Mr. Wang and his

associates. They have an office in China.

Q And does Mr. Wang own Overseas Chinese?

A I guess so.

Q If you don't know, that's fine.

A Yeah. I guess so.

MR. GARTENBERG: Do you know for a fact -- because when you say, "I guess," did you ever ask him?

THE WITNESS: No, because when you deal with the company, you don't ask.

MR. REGENSTREIF: Sure. That's why you said, "I guess."

THE WITNESS: Yeah.

MR. REGENSTREIF: I heard what he meant.

THE WITNESS: It's a business community.

MR. GARTENBERG: I got it. Thank you.

MS. LEVIN: What's his first name, Mr. Wong's first name?

THE WITNESS: I think he's called Walter.

BY MR. REGENSTREIF:

Q Walter?

A Yeah, Walter.

MS. LEVIN: Thank you.

BY MR. REGENSTREIF:

Q So next, United Damei.

So they are another broker retained?
A Yes.
Q So sitting here, without looking at the documents, what generally were the terms with United Damei?
A It's marketing fees plus the brokerage fee of 75,000 for each client.
Q And the marketing fee was also 500,000?
A In that neighborhood.
Q In that neighborhood.
And who did you deal with at Untied Damei?
A They have a gentleman called Mr. Chen, last name is C-h-e-n.
MS. LEVIN: First name?
THE WITNESS: X-i-a-o.
MS. LEVIN: Xiao.
THE WITNESS: J-u-n-g. Xiao Jung Chen. So last name is Chen, first name is Xiao Jung.
BY MR. REGENSTREIF:
Q Does your wife have any involvement with United Damei? I know that you said she was involved in the --
A Yes. Partially she's helping them from marketing. Because they're Chinese, they work together.

Q Did Untied Damei pay your wife?
A No.
Q And where is Untied Damei based?
A Beijing.
Q They're in Beijing?
A Yeah.
Q And how many investors have they successfully solicited?
A Quite a few.
Q 10? 15?
A 20.
Q 20?
A Yeah.
Q Approximately?
A Approximately.
Q And Overseas, approximately how many have they solicited?
MR. GARTENBERG: You mean who actually became --
MR. REGENSTREIF: Right, successfully solicited.
THE WITNESS: Four to five.
BY MR. REGENSTREIF:
Q Four to five?
A Yes.

Q And then U.S. RITA, they were also a broker you dealt with?
A For a short period of time.
Q Did they successfully solicit any investors?
A No.
Q Let's start with Untied Damei.
How did they solicit investors? What was their marketing process, if you know?
A I'm here most of the time, so the reason we want to hire the broker is to -- I don't have this headache. I can focus on the construction, on the business development for our center. So in terms of how they do that, it's, I guess, through the networks, business seminars, advertising, website, local magazine, newspapers, friends.
Q Let me ask it this way: Have you, yourself, ever participated in any of the marketing efforts to investors by the brokers?
A Not myself, but I --
MR. GARTENBERG: That's all he asked.
THE WITNESS: No.
BY MR. REGENSTREIF:
Q Did your wife participate in those -- in that process?

A Yes.
Q And how did she participate in that process?
A She's made a speech, spoke about the project on behalf of Beverly Proton.
Q A speech to who?
A Speech to the guests, invited guests, potential clients on behalf of the company.
Q And those invited guests were potential investors as well as clients?
A Yes.
Q And when was that meeting?
A When was that meeting? She told me she went to multiple meetings in 2014, '15, but I can't remember.
Q So more than one of those kinds of meetings?
A Yes.
Q In person?
A In person.
Q And those were in Mainland China?
A Yes.
Q Do you know where in Mainland China?
A Beijing, Shanghai, Guangzhou is the primary three major cities where you do business.

Q That's where the money is?
A Yes. Exactly.
Q You did not accompany her?
A No.
Q And have you ever been on one of these trips to get investors in Mainland China?
A Once.
Q When was that?
A I was there I think 2015. I accompanied the former mayor Antonio Villaraigosa. He was an invited speaker, and I was there. I think that was the only -- to my best knowledge, that was the only occasion because of him, so I went there.
Q And so you accompanied the former mayor to China for a speaking engagement?
A Yes.
Q And he spoke to investors, potential investors?
A The audience.
Q So the audience was made up of potential investors?
A As far as I know, yes.
Q And was this particular audience -- did Overseas Chinese sponsor this, or was it Untied Damei or one of the brokers?

A I think Untied Damei.
Q United Damei did it?
A Yes.
Q And did you pay Mayor Villaraigosa for this appearance?
A The regional center, yes.
Q The regional center?
A Yes.
Q Travel?
A Travel.
Q And any other sort of fee?
A I think just the travel.
Q So he was part of the marketing to potential investors?
A Uh-huh.
Q You have to say "yes."
A Yes. I'm sorry.
Q It's unnatural because we can nod and see each other.
A Yeah.
Q Did anyone else go on that trip besides yourself and the mayor?
A Thropay and his sister.
Q Novodor?
A Ruth Novodor.

Q So the four of you went?
A Yes.
Q Was there any typed-up remarks that you made or a speech?
A No. I was just sitting there.
Q You were just sitting there?
A Uh-huh.
Q The mayor gave the speech?
A Yes.
Q Did you provide him with a speech to give?
A No. He was a natural speaker.
Q What did he say? He's a politician, right?
A He's a great speaker. He was a great speaker. Actually, we have a video recording.
Q So this is one of the videos?
MR. GARTENBERG: First I hear of this speech.
MR. REGENSTREIF: But you guys said there are videos, right?
THE WITNESS: Yes. He made a great, great speech in talking about Los Angeles, and he invited the Chinese to be the second home.
MR. GARTENBERG: But if that's something you want, we'll get you that video.
THE WITNESS: He's a great speaker. We

didn't offer him anything to say. He just -- naturally he just --

BY MR. REGENSTREIF:

Q He sold Los Angeles?

A How great the city, how -- everybody was --

MR. GARTENBERG: May I ask: Did he talk about the proton therapy center?

THE WITNESS: Yes, of course. He did a lot of homework, actually, because before he didn't know too much about the proton therapy. And then he did a lot of research and find out, and then he talked about the proton therapy.

MR. GARTENBERG: It's called for by the subpoena. It's the first time we hear of it. We'll get you a copy.

MR. REGENSTREIF: That's fine.

BY MR. REGENSTREIF:

Q And so related to that, were there EB-5 investors who made investments who were at that meeting?

A That, I can't tell. There's so many, like, over --

Q How many people were there?

A A couple of hundred. I don't know.

Q And was that in Beijing or Shanghai?

A Beijing.
Q And that was approximately when? 2015?
A Yeah, 2015.
Q Early? Mid?
A I remember he was wearing a coat.
Q So, cold?
A So I think it was March or February.
Q Early 2015?
A Yeah, early 2015.
Q We won't pin you down.
Early 2015?
A He said, "It's like New York, the weather," so it must be that period of time.

MR. GARTENBERG: Just keep in mind that he's going to need from 1:00 to 1:30 to make a call. And separate from that, we also need to eat lunch. So if you can try to work that into your schedule.

MR. REGENSTREIF: Then let's go off the record, and we'll break for lunch.

(Whereupon, a luncheon recess was taken.)

A F T E R N O O N S E S S I O N

MR. REGENSTREIF: Back on the record.

So I'm going to ask the court reporter to mark as Exhibit 6 a document Bates-stamped SEC-JPMCB-P-184 through 186.

(SEC Exhibit 6 was marked
for identification.)
BY MR. REGENSTREIF:
Q So take a minute to look at Exhibit 6, Mr. Liu.
So, Mr. Liu, on the first page of Exhibit 6, which is a signature card for a bank account at Chase, is that your signature?
A Yes.
Q And then on the second page of Exhibit 6, at the bottom, is that your signature under "Partner/Member/Manager"?
A Yes.
Q And this is for the signature card -- Exhibit 6 is for Chase Bank account No. 6 -- last four, 6428 at the top of Page 1 on the right.
Do you see that?
A Yes.
Q And is that the bank account for the regional center?
A Yes.
Q And are you the only signatory on the bank account for the regional center?
A Yes.
Q And does anyone else have access to that

bank account?
A No.
Q And is that bank account for business at the regional center?
A Yes.
Q And only business for the regional center?
A Yes.
Q And is this the account, account 6428 in Exhibit 6, where the administrative fee goes?
A Yes.
Q And the administrative fee is only for the operating expenses and marketing fees and commissions as we discussed previously as numbered in the offering memorandum?
A Yes. You mean is it the only account?
Q This is the account where the administrative fee goes?
A Yes.
Q And the administrative fee is for those items that we discussed before?
A Yes.
MS. LEVIN: Does the administrative fee ever go to any other bank accounts or only this account?
THE WITNESS: This is the only one.

MS. LEVIN: Okay. Thank you.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 7 a document -- another signature card that is nine pages long and Bates-stamped SEC-JPMCB-P-3 through 11.

(SEC Exhibit 7 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I've handed you Exhibit 7.

A Okay.

Q Mr. Liu, on Exhibit 7, the first page, is that your signature?

A Yes.

Q And this signature card is for the Chase account with the last four digits 1028.

And is this the account for the EB-5 Fund, LLC?

A Yes.

Q And are you the only signatory on this account?

A Yes.

Q And does anyone have any access to the funds in this account?

A No.

Q And this is the account that the EB-5

investor funds, once they're released from escrow, come to this account?

A Yes.

Q And only this account?

A Yes.

Q And this account is solely used for the EB-5, LLC Fund?

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 8 a signature card from Chase for account ending, last four, 5152, and it's Bates-stamped SEC-JPMCB-P-83 through 90.

(SEC Exhibit 8 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I handed you Exhibit 8 which is the signature card as I described.

On Page 1 of Exhibit 8, is that your signature at the first line?

A Yes.

Q And then under it says -- the second line, it lists "John P. Thropay." There's no signature. It just says, "Refer to add partner or member not president"; is that right?

A Yes.

Q Are you the only signatory of this account?

A Yes.

Q You have access to this account?

A Yes.

Q Dr. Thropay can't access funds in this account?

A Well, I think he has access to the account, but I'm the only member to sign.

Q Yeah. That makes sense.

A Because he's a member.

Q Right, and you'll see in a minute that that makes sense.

And so this account in Exhibit 8, which is 5152, this one is for Los Angeles County Proton Therapy, LLC. This is for Beverly Proton, LLC.

A Yes.

Q So this is the project's account?

A Yes.

Q And the funds in this account are only for the project?

A Yes.

Q And so the loan from the EB-5 Fund would then go to this account?

A Yes.

Q And the funds in this account are meant

end, either after the testimony or by e-mail, whatever, if we can make sure our list matches with your list so nothing is overlooked.

MR. REGENSTREIF: Absolutely. And I appreciate that. And we'll come back to these two. Let's close the loop on this, and then we'll come back.

MR. GARTENBERG: Okay.

MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit 9 a signature card for an account at Chase 5152, and Bates-stamped SEC-JPMCB-P-78 through 82.

(SEC Exhibit 9 was marked for identification.)

BY MR. REGENSTREIF:

Q So I've handed you Exhibit 9, Mr. Liu.
Is that signature yours, the first signature at the top there?
A Yes.
Q And this Exhibit 9 is the signature card for Beverly Proton's account at Chase?
A Yes.
Q So this is the account for the project?
A Yes.
Q And then the second signature underneath,

it says "John Thropay."

Is that Dr. Thropay's signature? Do you know?

A That's his signature because I handed it to him.

Q You handed it to him?

A Yes. But the truth is, he's no longer part of this after the new board resolution.

Q Once he's on the signature card in Exhibit 9, did he have access to the funds in the account or not?

A Well, I don't know what's the banking rule, but I'm assuming, yes, because he had his signature. But after the new board resolution, he was no longer on the list.

Q October 25, 2015?

A Yeah.

Q And so once the board resolution -- which is when exactly?

A January.

Q January 2016?

A January -- I think January 18.

Q 2016?

A 2016, yeah.

Q So it would only be from October 2015 to

January 2016?

A Yes.

MR. REGENSTREIF: So let's go off the record.

(A brief recess was taken.)

MR. REGENSTREIF: Let's go back on the record.

We're at Exhibit 10, right?

DEPOSITION REPORTER: Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark a four-page document entitled, "Engagement Agreement," dated January 28, 2013, between L.A. County Proton Therapy and Overseas Chinese Immigration Consulting.

(SEC Exhibit 10 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I handed you Exhibit 10. This is the engagement agreement with Overseas Chinese Immigration Consulting.

A Uh-huh.

Q Do you recognize Exhibit 10?

A Yes.

Q And on the last page of Exhibit 10, is that your signature for Los Angeles County Proton Therapy?

A Yes.
Q And this is the engagement agreement with Overseas Chinese Immigration Consulting?
A Yes.
Q This is for their efforts to solicit EB-5 investors?
A Yes.
Q And then on Page 1 of Exhibit 10, paragraph 4, "Consultants Compensation."
Do you see that?
A Yes.
Q Are these terms accurate, "$75,000 per investor who invests"?
A Uh-huh.
Q Is that a "yes?"
MR. GARTENBERG: He needs a verbal answer.
THE WITNESS: Yes.
BY MR. REGENSTREIF:
Q And that was to be paid upon filing of the I-526 petition?
A Yes.
Q And then No. 5, underneath that on Page 1 of Exhibit 10, the marketing fee.
So it's $800,000 per year?
A Yes.

court reporter to mark as Exhibit 11 a document titled, "Engagement Agreement," and it looks like between United Damei Investment Company and Pacific Proton Regional Center, Los Angeles County Proton Therapy, dated August 18 and August 15, 2013.

(SEC Exhibit 11 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I handed you Exhibit 11.

So in the second to last page of Exhibit 11, did you sign this?

A Yes.

Q And then the following page, "Yao Wenli."

A Uh-huh.

Q Who is Yao Wenli?

A I think it's their legal representative of this company in China.

Q Have you spoken to Yao?

A No. Actually, I spoke a lot with the executive teams.

Q But not with --

A Not with Ms. Yao.

Q Not with Ms. Yao?

A No.

MS. LEVIN: Is Yao Wenli any relation to

you?

THE WITNESS: No.

MS. LEVIN: Is she a friend?

THE WITNESS: No.

BY MR. REGENSTREIF:

Q And so Exhibit 11 is the agreement through which Damei was to solicit EB-5 investors for the project?

A Yes.

Q And then if you turn to Page 3 of Exhibit 11, so paragraph 2, "Rates, fees and charges," under 2.1, "Fees A."

A Yes.

Q "500,000 shall become due and payable to UDG upon signing."

A Yes.

Q Was $500,000 paid to Damei?

A Yes.

Q And then it looks like in paragraph C there, it looks like there was -- $35,000 was due to Damei per investor.

A Uh-huh.

Q Is that correct?

A Yes.

Q And then it also says in paragraph D that

"UDG will receive $45,000 of the administrative fee."
A Yes.
Q So they were also paid 45,000 of the administrative fee per investor?
A Yes.
Q So it was 35,000 plus 45,000?
A That is correct.
Q So it was 45,000 from the administrative fee?
A Yes.
MS. LEVIN: So then where was the 35,000 coming from?
THE WITNESS: That's from the project company, not the regional center.
BY MR. REGENSTREIF:
Q From Beverly Proton?
A Yes.
Q And then "E," it says "Marketing fee."
So that's $650,000 per year?
A Yes.
Q And has that been paid to Damei?
A I think it's partially.
Q Now, again, Exhibit 11 does not contain the marketing efforts as we spoke before related to clients and general promotion?

A Patient, yeah.
Q It does not?
A It does not.
Q Did Dr. Thropay or anyone else review either Exhibit 10 or Exhibit 11 before he signed it?
A Did he review? I don't think so.
Q Just "yes" or "no."
A No, no.
MR. GARTENBERG: I want to make sure that you understood the question. He said Dr. Thropay or anyone else.
Do you know who else reviewed the agreement?
THE WITNESS: Well, our legal counsel prepared this draft for us.
BY MR. REGENSTREIF:
Q Exhibit 11?
A Yes.
Q Who was your legal counsel for Exhibit 11?
A Legal counsel was -- well, actually, their legal counsel.
Q Damei?
A Damei's legal counsel.
And then I have our legal counsel review it, so we didn't draft this. They're more

have that resolution.

BY MR. REGENSTREIF:

Q And then back to Exhibit 10.

A If you need it, I can provide it.

Q Back to Exhibit 10, which is the agreement of Overseas Chinese.

You were the only one on behalf of then Los Angeles County Proton Therapy to review and approve this Exhibit 10?

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 12 a bank statement for Chase Bank account, last four, 6428, through October 2014, Bates-stamped SEC-JPMCB-P-187 through 192.

(SEC Exhibit 12 was marked for identification.)

BY MR. REGENSTREIF:

Q This is Exhibit 12. Take a look. So Exhibit 12 is a bank statement.

It's the regional center bank account -- right? -- 6428?

A Yes.

Q So I want to ask about a couple of deposits. So on Page 1, the first one, the deposit

But most of the time I used the other one ending in 3763 for business purposes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 13 a bank statement for a bank account from Chase, 5152, which is L.A. County Proton Therapy bank account, dated January 1, 2015 through January 30, 2015, Bates-stamped SEC-JPMCB-P 103 through 106.

(SEC Exhibit 13 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I handed you Exhibit 13. So this is a statement for Chase account 5152.

So that is Beverly Proton's bank account --

A Uh-huh.

Q -- is that right?

A Yes.

Q So this would be the account that received the loan from the EB-5 Fund?

A Yes.

Q So let me direct you to the second page of Exhibit 13. That second one, January 2nd, $50,025 withdrawal, and it's to Antonio Villaraigosa.

A Yes.

Q In that same description, there's the word

"honorarium."

A Yes.

Q So is this the honorarium that was paid to former mayor Villaraigosa that we discussed earlier this morning?

A Yes.

Q And this came from the Beverly Proton account?

A Yes.

Q And then further down on the same page of Exhibit 13, on January 3rd, 2015, there's a wire transfer out for $200,000, it says, "to Overseas-Chinese Banking Corp., Singapore."

A Yes.

Q So is this Overseas Chinese Immigration Consulting that we were discussing before?

A Yes.

Q Do you know what this $200,000 payment was for?

A It's for the commissions and marketing fee, I think.

Q The marketing fee discussed in Exhibit 10, or is this the marketing fee separate in that other document that we don't have?

A It's for the document we talked about

MS. LEVIN: And how is that decided? Who decided that and how is it documented?

THE WITNESS: There is an employment agreement to reflect this.

BY MR. REGENSTREIF:

Q For the regional center?

A Yes, for the -- oh, this is Beverly Center.

Q I'm sorry. Beverly Proton, yes.

A Because she's recruited by the Beverly Proton Center, as I mentioned earlier.

Q So there's an employment agreement between Beverly Proton and Xin Wang.

A Yes.

Q Do we have that?

MR. GARTENBERG: You didn't ask for that, I don't think. I'll be happy to get it for you.

MR. REGENSTREIF: Great.

BY MR. REGENSTREIF:

Q And, again, let me direct you now to an entry for a $250,000 wire on November 4th on that same page of Exhibit 15. And this wire is to "Industrial and Commercial Bank, Central Hong Kong."

Do you see that?

A Yes.

Q The reference there, it says "broker fees."

Do you see that?
A Yes.
Q What's that for?
A That is for United Damei for the brokerage fee.
Q So wires to Industrial and Commercial Bank?
A Yeah. This is the bank name. It doesn't show that. I don't know why it doesn't show the company name.
Q So wires to that bank are to the Damei account?
A Yes.
Q Then on November 12, 2015, there's a $3 million wire to Mevion?
A Yes.
Q So Mevion, we discussed this morning?
A Yes.
Q Mevion makes proton --
A Therapy equipment.
Q And what is this $3 million wire for?
A It's for the deposit and down payment -- actually, what we call "phase one payment." We have a purchase agreement to reflect that. We'll be happy to provide it.
Q Sure. And then right under that on

November 13, there's a $150,000 wire to a Wells Fargo account. It says, "Beneficiary: Xin Wang."
A That's her compensation.
Q That's her compensation? That's part of the salary from Beverly Proton?
A Yeah.
Q And then on 11/16 on that same page, there's an $85,600 wire to something called --
A Oh, yeah.
Q -- "Size X Studio."
A That's the new architects and our project manager for the --
Q The new site?
A For the new site, for Mevion Systems.
Q So we've got that. And then on that same page, November 24th, there's a $75,000 wire to Hang Seng Bank.
Do you see that?
A Same page?
Q Yeah, same page. "November 24th," three from the bottom.
A Yeah. This is another brokerage firm.
Q Do you know which one? It's not Hang Seng, right?
A Hang Seng is a bank. It's called Delsk.

Q Delsk. So we didn't mention Delsk this morning.

Who is Delsk?

A Another brokerage firm. They also provide clients, you know, investors to us.

MR. GARTENBERG: I'm sorry, what date was that withdrawal?

MR. REGENSTREIF: That's November 24th, 2015.

THE WITNESS: That's a brokerage fee.

BY MR. REGENSTREIF:

Q That's a brokerage fee?

A Yeah.

MR. GARTENBERG: May I have a minute with my client?

MR. REGENSTREIF: Sure.

Let's go off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

BY MR. REGENSTREIF:

Q So we were still looking at Exhibit 15.

So Hang Seng -- $75,000 was to Delsk --

A Uh-huh.

Q -- is that right?

A Yeah.

MR. GARTENBERG: And just to add, what I've learned is that there -- I've learned there is some written agreement with Delsk that I was unaware of before. We'll get you a copy of that, but I've been told it's in Chinese.

MR. REGENSTREIF: Well, we're coming to that.

MR. GARTENBERG: Okay.

MR. REGENSTREIF: I appreciate that.

BY MR. REGENSTREIF:

Q And then again at the bottom of that second page on Exhibit 15, that $250,000 wire to Industrial and Commercial Bank, that's the account for Damei, right?

A Yes.

Q And that would have been for -- a success fee?

A Yes.

Q Let me also ask: The second one there for $39,500, that's for John and Maricela Thropay.

That's Dr. Thropay; is that right?

A Yes.

Q A lease fee?

A Yeah, land lease fee.

Q For where the building was; is that right?
A Yes.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 16 a three-page document, Bates-stamped PPEB5-419 through 421.
(SEC Exhibit 16 was marked for identification.)
BY MR. REGENSTREIF:
Q I've handed you Exhibit 16 which looks like a letter to you, Mr. Liu, which is -- well, you'll confirm for me, Exhibit 16, is this Mandarin?
A Yeah.
Q And then there's English translation under it.
Have you seen Exhibit 16 before?
A It's a letter sent to me in Chinese.
Q They sent it to you in Chinese?
A Yeah. They sent it to me in Chinese. In Chinese, not English.
Q So you have not seen --
A This is the first time I see the English one.
Q But you have see the Chinese in Exhibit 16 before?
A Yes.

Q And so can you tell me -- I don't need a forensic translation here -- but to your eyes -- and take your time -- is the English translation contained in Exhibit 16 under the Mandarin on top generally accurate?

A Sorry. I can't do.

You mean right away?

Q No, no. Not right away. Let's go through one at a time.

A If you give me a day.

Q Okay. That's fair enough. I don't speak Mandarin, so I thought I'd take my best shot.

A Sorry. I wish I could.

Q So let's go through and let me ask you some questions.

The first full paragraph in English, it says, as I read it, that "Hong Kong Delsk Business Company" -- that's Delsk; is that right?

A Yes.

Q -- "signed an exclusive sales agency agreement for the Chinese region on September 24th, 2014"; is that correct?

A Yes.

Q So they were the exclusive Chinese region sales agent for L.A. County Proton Therapy project

after September 24, 2014?

A Yeah, but they still -- does not include -- we had also agreement before we signed this agreement which allow the other agents we signed before to continue to do fundraising for our project.

Q And then the next paragraph, it says, "There's a capital structure problem," and they request --

A That's what it says.

Q So what was that?

A I don't know. I think it's bullshit. They try to accuse us because --

Q So tell me what they said and why it's not accurate.

A Let me tell you the story, the true story.

MR. GARTENBERG: But -- but -- I'm sorry. Lawyers get nervous when a question is put to you and you're about to tell a story. If the story is the direct answer to what he said, please answer it. If it's something else, I'd like to discuss it with you first.

Can you answer his question?

THE WITNESS: I think it's in terms of knowing the truth. I think I pretty much would like to tell Tony the background information.

attorney-client.

MR. REGENSTREIF: But what firm he is with is not privileged either.

MR. GARTENBERG: If he knows the name of the firm, he can give it to you. I'm was offering to go beyond what he knows. If you'd rather go on what he knows, that's fine.

THE WITNESS: I can tell you it's a big firm, leading firm.

MR. GARTENBERG: My intention is not to shut you down from information but to offer you more information.

MR. REGENSTREIF: Sure.

BY MR. REGENSTREIF:

Q So Exhibit 18, on January 29, Page 3, there's a $50,000 wire to Greenberg Traurig.

Do you see that?

A Yeah.

Q What is that for?

A It's attorney retainer fee for the construction.

Q For the construction?

A Yeah.

Q The construction related to?

A Related to the previous arrangement with

another big construction company.

Q Skanska?

A Yeah.

Q That construction is not happening now?

A Yeah. That's why we need an attorney.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 19 a withdrawal slip from Chase from account ending 5152, Bates-stamp SEC-JPMCB-P-168, and it's dated November 26, 2015.

(SEC Exhibit 19 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I've handed you Exhibit 19.

Is that your signature on it?

A Yes.

Q And it's for $160,000, a withdrawal from the 5152 account.

A Yes.

Q Do you know what that was for?

A I can't remember. There's no -- we should have something attached to it. Based on this -- I write checks, I make payments almost every day. I don't know, but I can easily find out.

Q But right now, you don't know?

A No. Just based on this --

Q Okay. Earlier this morning, you disclosed that you had an account at Chase.

A Yes.

Q If I said that the last four of that account was 3076, does that sound right?

A Sounds right.

MS. LEVIN: That's a personal account?

THE WITNESS: Yes.

BY MR. REGENSTREIF:

Q Let me ask: R. Allen Construction, what's that?

A It's demolishing company.

Q Are they the company that demolished the building?

A Yes.

Q Have they done any other work for you?

A They finished the construction -- the demolishing work for me for the Thropay site, but they're also going to be the demolishing company for the site on the Beverly Hospital.

Q The Beverly Hospital site that you're -- the second option?

A Also signed agreement.

Q Now, Optivus is another company that makes proton therapy equipment; is that right?

A That was previous. This is the one more expensive.

MR. REGENSTREIF: So let me ask the court reporter to mark as Exhibit 20 a check dated November 25th, 2015 to Optivus.

(SEC Exhibit 20 was marked for identification.)

BY MR. REGENSTREIF:

Q I handed you a check, the check in Exhibit 20, for $368,099.69. In the memo line, it says, "Pre-construction services."

What is that?

A Yes. Yes. We hired them as the consultants on the technology side for half a million dollars, the total agreement. This is the remaining payment.

Q Are they still involved now that you've gone with Mevion?

A (Witness nods head.) Competitors.

MS. LEVIN: So the answer was "no"? You shook your head.

THE WITNESS: The answer is "no."

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 21 a check dated April 10, 2015.

then till the date of this filing?

A Yeah. To the date of this filing, yes.

Q Have there been any other funds like these, represented in a form like this, "Paid out by Beverly Proton," prior to fiscal 2015?

A Could you elaborate?

Q Yes. So has Beverly Proton spent any money on hard or soft costs or related expenses that are not contained in Exhibit 22 in this list we just reviewed in any other fiscal year?

A Yes, because this is filed annually.

Q Approximately how much?

A A million.

MR. GARTENBERG: I'm sorry?

THE WITNESS: A-million-dollar range.

Think about the lease fee every month.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 23 a document titled, "Minutes of Annual Meeting of Members of Beverly Proton Center, LLC."

(SEC Exhibit 23 was marked for identification.)

BY MR. REGENSTREIF:

Q I've handed you Exhibit 23.

Do you recognize Exhibit 23?

A Yes.
Q And so what is it?
A This is an annual meeting for all the members of Beverly Proton Center, LLC conducted -- held on January 19, 2016.
Q And it looks like in the minutes report, that you and Xin Wang, your wife, were appointed sole directors of the company; is that right?
A Yes, starting from this date, that date.
Q And it authorizes you as the managing member to execute documents, agreements and instruments?
A Uh-huh.
Q And you're the only one authorized to do that?
A Yeah, because -- yes.
Q And there are no other officers at this point at Beverly Proton?
A No.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 24 a document titled, "Consent of Majority Member of Pacific Proton Therapy Regional Center, LLC."
(SEC Exhibit 24 was marked for identification.)

BY MR. REGENSTREIF:
Q Mr. Liu, I handed you Exhibit 24.
Mr. Liu, do you recognize Exhibit 24?
A Yes.
Q Is Exhibit 24 a consent by the regional center to make you the president and treasurer and chief financial officer of the regional center, and your wife as secretary; is that right?
A Yes.
Q And the two of you are the only officers of the regional center?
A That is correct, starting from that date.
Q Was Dr. Thropay ever an officer of the regional center?
A He was. I think he had a title, but never exercised it because I was also authorized to -- by the books I think he was included. But as a matter of fact, he also authorized me to act 100 percent. I have that document, too.
Q But starting from January 19, 2016, the only two officers are you and your wife?
A Yes.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 25 a document titled, "Pacific Proton EB-5 Fund, LLC, Proton

PROOFREADER'S CERTIFICATE

In the Matter of: PACIFIC PROTON THERAPY REGIONAL CENTER, LLC

Witness: Charles C. Liu

File Number: LA-04639-A

Date: Wednesday, March 23, 2016

Location: Los Angeles, California 90071

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

(Proofreader's Name) 4/1/16 (Date)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, Ann Morales, Professional Shorthand Reporter, hereby certify that the foregoing transcript consisting of 175 pages is a complete, true, and accurate transcript of the testimony indicated, held on March 23, 2016, in the matter of Pacific Proton Therapy Regional Center

I further certify that this proceeding was recorded by me, and the foregoing transcript has been prepared under my direction.

DATE: April 1, 2016

Official Reporter: Ann Morales

Ann Morales

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. LA-04639-A
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC )

WITNESS: Xin Wang
PAGES: 1 through 88
PLACE: Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
DATE: Wednesday, May 4, 2016

The above entitled matter came on for hearing, pursuant to notice, at 9:18 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

Q Beverly Proton Center, you're vice president of Beverly Proton Center?
A Yes.
Q And any other positions as officer or director?
INTERPRETER SHU: This is the interpreter speaking, what would you like me to do?
MR. GARTENBERG: I think there's an issue with respect to the translation. We can do one of two things, whichever the SEC wants, I say this with respect to the interpreter and fully appreciate how difficult it is to interpret, but I believe that she's translating -- I'm informed she's translating the word "officer" as "supervisor." We can either do what we're doing and try to go forward with what we have, or you can have a court reporter also keep an actual audio transcript, if not, I would ask that we correct supervisor and officer so the record is clear.
MS. LEVIN: I would just like to state that none of us are in a position to determine whether the SEC's interpreter or your interpreter has made the correct interpretation. So I suggest that we put it on the record that your interpreter believes that our interpreter is using the word "supervisor" on

Mandarin Chinese as opposed to "officer."

MR. GARTENBERG: Absolutely. I agree with you a hundred percent. I'm suggesting a way to proceed, but that's fine. I agree with you completely.

MS. LEVIN: Let's proceed.

INTERPRETER SHU: Thank you.

BY MR. REGENSTREIF:

Q So the answer is?

A What's your question?

Q Who knows.

A Are you asking me if I have any other companies or --

Q Yes.

A No.

Q Great.

MS. LEVIN: Setting aside officer and director, are you affiliated with any other companies either as an employee, an advisor, or in any other position?

THE WITNESS: In China or in the U.S. or both?

MS. LEVIN: Both, please.

THE WITNESS: In China, actually, I represented Beverly Proton Center to do the marketing

promotion in China, so in China they probably would print a business card for me stating I am the director of the board, but actually in China, it's just on the paper. It doesn't mean anything.

BY MR. REGENSTREIF:

Q Just Beverly Proton?

A In China, actually, I didn't get paid, no wages, just a card.

Q That said you were director, board of directors of Beverly Proton?

A No, it's a business card that has business relationship with because they have business -- they have business relationship with Beverly Proton so when I went to China for marketing promotion, they hoped that I could do the promotion for both sides, so that's a business card.

MR. GARTENBERG: I would like to point out, while I do not know the practice in China, elsewhere in the world director is used different than we use board of directors. Your question you assume a director is a member of the board. Director in some countries is an officer title. With that, I need to speak to my client.

MS. LEVIN: I have one follow-up question.

MR. GARTENBERG: Please, absolutely.

MS. LEVIN: When you said "both sides," what did you mean?

THE WITNESS: Okay. The Chinese partnership company as well as the agency for the Beverly Proton here.

BY MR. REGENSTREIF:

Q What is the name of the Chinese partnership company?

A Pacific Damei, D-a-m-e-i, UDG Group, UDG Group, and with the logo it says UDG Group, but the name is Pacific Damei, D-a-m-e-i.

Q Your role with Pacific Damei is what?

A No role, just help them. The Pacific Proton send me to China to help them to do marketing promotion. I also represented U.S. Beverly Proton to go to China to do some medical seminar or consultation.

MR. GARTENBERG: May I now have a moment to speak to my client?

MR. REGENSTREIF: Absolutely. Off the record.

(Recess taken from 9:52 until 9:57.)

MR. REGENSTREIF: Back on the record.

BY MR. REGENSTREIF:

Q So back to Exhibit 27, page 7. So on page

7 it says that you have a diploma from Jinzhou Medical School; is that right?
A Yes.
Q Is that a medical degree to be a doctor?
A In China, actually, it's for the pharmacist, not for the doctor.
Q You were trained to be a pharmacist?
A Correct.
Q Were you ever a pharmacist?
A Yes.
Q In China?
A Yes.
Q And in the United States?
A No.
Q How long were you a pharmacist?
A It was a long time ago. Let me think. Approximately a year.
Q Did you have any specialty?
A What do you mean by "specialty"?
Q Any particular type of pharmacy that you did or just generally?
A Just general.
Q Do you know of an entity called Pacific Proton Therapy Regional Center?
A I did not hear it clearly. What is the

BY MR. REGENSTREIF:

Q A lot of time?

A Yes.

Q That's a good enough answer for me. When you're talking in China, are you asking people to invest money in the project?

A No.

Q So it's just about the cure?

A Yes.

Q And the goal when you're talking about the cure is for people to sign up for the cure?

A Yes.

MR. GARTENBERG: Excuse me.

(A discussion was held off the record.)

MR. REGENSTREIF: She's been using treatment instead of cure. Treatment is a more professional word than cure.

MR. GARTENBERG: That was my concern whether that was a language issue.

MS. LEVIN: I didn't know you had learned Mandarin in the last ten minutes.

MR. GARTENBERG: I have a sense for when a word might mean something different.

MR. REGENSTREIF: That's quite a skill.

BY MR. REGENSTREIF:

Q Do you get a salary from Beverly Proton?
A Yes.
Q How much?
A 280,000 per year.
Q How long have you received that salary?
A Before they did not pay me. They just paid me.
Q This year?
A Yes.
MR. GARTENBERG: May I double check that? Were you paid at all -- this is on the record -- were you paid at all in 2015? If you don't know, say you don't know.
THE WITNESS: I can check my accounting records.
BY MR. REGENSTREIF:
Q Right now you're not sure if you were paid before 2016?
A They paid me, but I'm not sure about the timing.
Q Okay.
MR. GARTENBERG: May I have a minute, please?
(A discussion was held off the record.)
BY MR. REGENSTREIF:

Q So did you receive any payments at all before 2016?

A Yes, just a little.

Q Most of the payments to you have been made in 2016, this year?

A I'm not sure about the timing. I have to check.

MR. GARTENBERG: May I remind her that if you -- please translate.

INTERPRETER SHU: I'm waiting for your statement.

MR. GARTENBERG: If you're not sure, tell them you're not sure. If he wants to have you try to remember or something else, he will tell you. But it is -- if you are not sure, it is better to say you're not sure than guess and make him think you know for sure if you don't.

THE WITNESS: Okay.

BY MR. REGENSTREIF:

Q Have you ever met with anyone who is investing money into the project?

A What do you mean?

Q If someone invested money into Beverly Proton EB-5, did you meet with them?

A Yes.

Q Why?
A Because while I was doing the marketing promotion, they may have some questions or they want to get more information about the cure, I would tell them. And also they would ask me or try to get more information about the school here, the taxes here, as well as the real estate market. They hope I could help them.
Q Did you ever ask them to invest?
A No.
MS. LEVIN: You said you were paid a salary by Beverly Proton Center; correct?
THE WITNESS: Correct.
MS. LEVIN: How much have you, in fact, been paid?
THE WITNESS: Right now approximately -- they already paid me.
MS. LEVIN: And how much approximately?
THE WITNESS: Per year $280,000 on that basis.
MS. LEVIN: I understand but what have you actually received?
THE WITNESS: Adding up together over a million. I don't remember the exact amount because in the beginning there was little by little.

A No.
Q Who was your contact at Damei?
A Mr. Chen, C-h-e-n.
Q What was Mr. Chen's first name?
A Xiao Chun, X-i-a-o, C-h-u-n.
Q What is his role at Damei?
A He -- I'm not sure.
Q And how many times have you met with Mr. Chen?
A We meet very often.
Q Many times a year?
A Not sure.
Q How many times have you met with him in 2016?
A I'm really not sure.
Q You met with him many times?
A Correct.
Q Do you get paid by Damei?
A No.
MS. LEVIN: What do you discuss when you meet with Mr. Chen?
THE WITNESS: He will tell me nothing, actually. We would talk -- we will talk about something related to the medical, and he will also ask me about the progress on Proton. Sometimes we

had patients he will like me to help. Before the center was built, he would like me to help in the U.S. to see. Sometimes we will talk about -- sometimes we will talk about afterwards when the patients came to the U.S. for treatment, things like that, because there was an insurance company which will like to come here to have partnership to work together, some hospitals and similar channels like that.

BY MR. REGENSTREIF:

Q Did any patients ever come here?

MR. GARTENBERG: I think she was in the middle of the sentence.

THE WITNESS: Finished.

BY MR. REGENSTREIF:

Q Did any patients ever come here?

A They do now, yes.

Q Where are they being treated?

A There was no treatment provided. They came here for exam.

MR. GARTENBERG: For?

INTERPRETER SHU: Exam.

BY MR. REGENSTREIF:

Q Did Beverly Proton get paid for bringing patients for exams?

A Beverly Proton is not finished yet. They will not exam at Beverly Proton.

Q Did you help bring the patients to be examined here in the United States?

A I was -- I just help them for the coordinating.

Q Did you get paid for helping them?

A No.

Q What doctors are you working with to examine these patients?

A Dr. Supay.

Q Where does Dr. Supay work?

A Before he or she was working at this Proton, I believe he or she in the future will work at Proton, but before it is established he or she has his or her clinic.

Q You don't know if the doctor is a man or a woman?

A Man.

MR. GARTENBERG: Is Supay Thropay?

THE WITNESS: Thropay.

MR. REGENSTREIF: T-h-r-o-p-a-y.

MR. GARTENBERG: Is this the Thropay, and I use the word loosely, who was partners with your husband?

Q Do you remember what was discussed?
A I didn't understand, they all spoke English.
Q Okay. Do you know why there would be a picture of President Clinton on the right bottom of page 11?
A I don't know why, probably just for promotions.
MS. LEVIN: When did your husband meet former President Clinton?
THE WITNESS: Before we got married.
BY MR. REGENSTREIF:
Q When did you get married?
A 2003.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 29 an Employment Agreement between Beverly Proton and Ms. Wang.
(SEC Exhibit No. 29 was marked for identification.)
BY MR. REGENSTREIF:
Q Do you recognize Exhibit 29?
A Yes.
Q Can you tell me what Exhibit 29 is?
A It's an agreement reached between myself and Beverly Proton.

Q An agreement to do what?

A Agreement is something reached between both parties.

Q And what was the agreement to do? What did the agreement ask you to do?

A This thing actually asked me to do the promotions and the marketings in China and also overseas medical treatment in the U.S. Before the business was established the marketing and promotion will be done in China, and this is my understanding about my duty.

Q Turn to the last page of Exhibit 29. Is that your signature on the right?

A Yes.

Q And it was -- did you sign this January 28th, 2016?

A Yes.

Q Why did you sign an agreement January 28, 2016?

A Because, actually, we have been willing to sign on this agreement but it just did not happen. I don't know on that date, we just did. Before the company has not had money since the business was not established, and afterwards and then we talk about that, it's the time to reach the agreement.

Q So there was -- you didn't have an agreement before Exhibit 29?

MR. GARTENBERG: Written agreement or oral agreement? For the record, I think the question is clear without an explanation of whether he is referring to a written agreement or an oral agreement.

BY MR. REGENSTREIF:

Q Did you have a written agreement before Exhibit 29?

A No.

Q Did you have an oral agreement before Exhibit 29?

A Yes.

Q What was the oral agreement?

A Just ask me to do the promotions in China.

Q Did the oral agreement include terms for payment?

A As I said in the beginning, there would be no payment and they hope I would understand and afterwards they would pay me back.

Q And so you signed an agreement in January 2016 because at that point the company had money to pay you?

A I don't know.

Q Do you have a credit card?
A With my husband together.
Q But not from the company?
A I believe so, I'm not sure.
Q Back to the first page of Exhibit 29, why aren't you getting the salary since January 2011?
A At that time the business was not established. They had no money.
Q So back to the end of the document Exhibit 29, on the left, the signature, whose signature is that?
A I believe it is my husband's.
Q When you entered into this agreement Exhibit 29, January 2016, were you now an officer of the Beverly Proton?
A Yes.
Q Was Dr. Thropay still involved with Beverly Proton when you signed Exhibit 29?
THE INTERPRETER: I'm sorry, what was the question?
BY MR. REGENSTREIF:
Q Was he still involved in Beverly Proton?
A I don't know.
Q Did Dr. Thropay agree to this employment agreement, if you know?

Q Can you look through it --
A I cannot read.
Q So let me say that this is a -- Exhibit 11 is an Engagement Agreement with United Damei Investment Company and Pacific Proton Regional Therapy Center.
A I don't know.
Q Okay. So you've never seen Exhibit 11 before?
A Correct.
Q Did you know there was an agreement between United Damei and the Regional Center?
A I don't know.
Q Can you turn to the last page of Exhibit 11.
A (Witness complies.)
Q The signature there is Yao, Wen Li, then it says by Wen Li Yao director. Do you know Wen Li Yao?
A My mother's name.
Q Your mother's name. Do you recognize your mother's signature on Exhibit 11?
A I have never seen her signature.
Q So you don't recognize it?
A Correct.
Q Do you know if your mother Ms. Yao works

for United Damei?

A That's not possible.

Q Why is it not possible?

A Because she's here taking care of my children for trial.

Q She's never worked for United Damei?

A Of course not.

Q Does she have a job other than taking care of your children?

A No, she's retired.

Q What did she do?

A In China?

Q Yes.

A Electricity.

Q She was an electrician?

A You can say that.

MS. LEVIN: When did she come to the United States?

THE WITNESS: It has been a long time. It was a long time ago, let me think. I'm not sure the exact time.

MS. LEVIN: Was it before or after your children were born?

THE WITNESS: After.

BY MR. REGENSTREIF:

Q How old are your children?

A One is 12, but according to the Chinese way to calculate age, that one should be 13, that child was born in year 2003, and then the other one is ten years old.

MS. LEVIN: Did your mother come to the United States when your oldest child was still a baby?

THE WITNESS: No, the oldest was six already.

MS. LEVIN: Has your mother always lived with you?

THE WITNESS: Yes.

MS. LEVIN: Do you know anybody else with your mother's name, anybody else that has the same name as your mother?

THE WITNESS: Same last name, probably there are; same first name, I'm not sure.

MS. LEVIN: Which is her first name and which is her last name?

THE WITNESS: Yao, Y-a-o is the last name, Wen Li is the first name.

MS. LEVIN: Thank you.

BY MR. REGENSTREIF:

Q What language do you speak at home to your

Q I've handed you Exhibit 31. Have you ever seen Exhibit 31 before?
A No.
Q Have you ever heard of in the last page of Exhibit 31 this is signed by Chen, Xiao Chun. Do you recognize that name?
A Yes, I recognize the name.
Q Is this Mr. Chen who we spoke about this morning who you work with at United Damei?
A Same name.
Q Same name. Do you know if Mr. Chen speaks English?
A I'm not sure.
Q Do you know if there's a difference between Beijing Pacific Damei and United Damei?
A I'm not sure.
MS. LEVIN: Before today -- before today have you heard the name Beijing Pacific Damei?
THE WITNESS: Yes.
BY MR. REGENSTREIF:
Q You've heard of both names?
A Yes.
Q But you don't know the difference between the two?
A I don't know.

MS. LEVIN: Do you know if they are both part of the UDG Group that you mentioned earlier?

THE WITNESS: I'm not sure, however, I feel -- I don't know.

BY MR. REGENSTREIF:

Q Have you ever been to an office that belongs to Damei?

A The office had UDG.

Q Where was the office?

A Beijing, Chao Yang District, Chao Yang, Shen Fu building, S-h-e-n F-u.

Q Are there any other Damei offices?

A UDG?

Q UDG.

A I know -- I know there are some in other cities.

Q Have you ever been to any of the other offices?

A Yes.

Q Which ones?

A Beijing, Shanghai, Qingdao, Q-i-n-g-d-a-o, and Guangzhou, G-u-a-n-g-z-h-o-u.

Q Is that all when you were talking to the clients about the treatment?

A Yes.

Damei.

MR. REGENSTREIF: I'm going to ask the court reporter to mark Exhibit 32 a pamphlet, that's one, two, three, four, five, six, seven pages long. Says Polular Project for Safety.

MS. LEVIN: Polular, for the record, we believe that might be a typo, P-o-l-u-l-a-r.

(SEC Exhibit No. 32 was marked for identification.)

BY MR. REGENSTREIF:

Q I've handed you Exhibit 32. Do you recognize Exhibit 32?

A I recognize the photo.

Q What's the photo?

A It's the picture which features myself, my husband, and the president from Granada.

MS. LEVIN: When was it taken?

THE WITNESS: I don't know which time that photo was taken.

BY MR. REGENSTREIF:

Q On the first page of Exhibit 32, it says that you are chairman of the board of United Damei Group.

A That's what I told you. That's why I told you earlier on the business card it stated my title.

Q And the business card says chairman of the board United Damei Group?

A Yes, it stated that on my business card.

MR. GARTENBERG: May I check? Are you sure the business card says chairman?

THE WITNESS: I don't know about in English.

BY MR. REGENSTREIF:

Q What does it say in Chinese?

A President or chairman.

MR. GARTENBERG: This might be important.

MS. LEVIN: Sure.

MR. REGENSTREIF: Speak up. Tell me what you think.

MS. LEVIN: For the record, this is Mr. Gartenberg's translator. May I have your name.

INTERPRETER KOLE: This is Penny Kole, P-e-n-n-y, K-o-l-e, court certified Mandarin interpreter. The interpreter is very familiar with the term "chairman of the board" in Chinese, and that term is always translated into dong shi xhang, chairman of the board. That's what I heard from the witness.

MR. REGENSTREIF: That's what the witness said?

INTERPRETER KOLE: Correct.

MR. GARTENBERG: Did she say that her title from the card is chairman of the board?

INTERPRETER KOLE: Yes, that's what this interpreter heard.

BY MR. REGENSTREIF:

Q Are you chairman of the board of United Damei Group?

A Just on the business card.

MS. LEVIN: So just for marketing purposes?

THE WITNESS: Correct.

MS. LEVIN: You are not, in fact, the chairman of the board?

THE WITNESS: Correct.

MR. GARTENBERG: May I have a minute?

MR. REGENSTREIF: Sure. Let's go off the record.

(Recess taken from 11:47 until 11:59.)

MR. REGENSTREIF: Back on the record.

BY MR. REGENSTREIF:

Q Do you recognize Exhibit 32, other than the picture?

A I have never seen this.

Q Let's turn to the second page of Exhibit 32. Have you ever seen, if not in this exhibit,

elsewhere the pictures of former Governor Schwarzenegger, former President George W. Bush, and former President George H. Bush in this context?

A Their photos?

Q Why would their -- have you ever seen photos of --

MR. GARTENBERG: I didn't hear the answer.

MR. REGENSTREIF: She said "their photos," question mark. And I said, yes, their photos --

THE WITNESS: These photos it seems like -- I'm not sure I have seen all of them, but I remember I have seen maybe some of them in the office somewhere.

BY MR. REGENSTREIF:

Q Which office?

A UDG's office.

Q Pictures -- some pictures of President George W. Bush?

A I have seen this, Schwarzenegger.

Q You've seen Schwarzenegger's picture?

A Uh-huh.

Q Why are these included in Damei's offices?

A I don't know. They -- I don't know, maybe for promotion purpose.

Q What kind of promotion purpose?

A Maybe he wrote a letter to one of the leaders in China and stating his support to Proton.

Q Support for this particular Proton project?

A I'm not sure.

MR. GARTENBERG: Would you ask her, looking at her face, it's her testimony, if she knows this or is she assuming this.

BY MR. REGENSTREIF:

Q Do you know this or are you assuming this?

A Know what?

Q Why these pictures would be used for the Proton Therapy Center.

A Proton Therapy Center, they were not in the Proton Therapy Center. I saw them at UDG's office.

Q These pictures?

A This one. I'm not sure about the other two.

Q But the Schwarzenegger picture?

A Yes.

MS. LEVIN: That's fine. Sorry.

BY MR. REGENSTREIF:

Q Why was the Schwarzenegger picture up in the Damei office?

A You have to ask Damei.

MR. REGENSTREIF: Did you have a question?

MS. LEVIN: If you turn back to the first page of Exhibit 32, did you ever see the picture of you and your husband and the prime minister of Granada in Damei's office?

THE WITNESS: I'm not sure. I'm not sure the photo was hanging there.

MS. LEVIN: So you don't know if you saw it in UDG's office?

THE WITNESS: I don't recall. I'm not sure.

BY MR. REGENSTREIF:

Q Can you turn to the fifth page of Exhibit 32.

A (Witness complies.)

Q Have you ever heard of the law firm Miller Meyer?

A I'm not sure.

Q Turn to the last page of Exhibit 32.

A (Witness complies.)

Q Have you ever seen this page of Exhibit 32 before?

A No.

Q Have you ever seen an invitation to investors to come to the United States made by Damei to see the project before?

A No.

Q Have you ever seen anything that invited investors by Damei to meet with government officials in the United States?

A No.

MR. GARTENBERG: Whichever you prefer, I have a few questions about the business card, do it at the end or now when it's fresh?

MR. REGENSTREIF: I want you to do at the end.

MR. GARTENBERG: No problem.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 33, a printout of the Executive Team United Damei Website page.

(SEC Exhibit No. 33 was marked for identification.)

BY MR. REGENSTREIF:

Q I handed you, Ms. Wang, Exhibit 33. Do you recognize Exhibit 33?

A This page?

Q Yes.

A No.

Q The top picture, is that a picture of you?

A Yes.

Q And then there are three pictures below

10. Again, a picture of former Governor Schwarzenegger, do you know why this would have been on UDG's Web page? No guessing.

A I don't know.

Q And then the page after that, which is page 5 of Exhibit 34, it's a letter from Governor Schwarzenegger, says page 4 of 10. Have you ever seen that letter before?

A I'm not sure.

Q Next page of Exhibit 34, do you know who that is?

A Yes.

Q Who is it?

A Former mayor of Los Angeles.

Q Have you ever met the former mayor?

A Yes.

Q How did you meet him?

A On one occasion, a promotion in China.

Q What was he in China promoting?

A At that time he was in China and there was an event with Delsk and he was present.

Q He made a presentation on behalf of Beverly Proton with Delsk?

A I'm not sure I heard from the interpretation of the interpreter's at the meeting

that he was representing the United States to welcome Chinese people to invest in the U.S.

Q Did you make any presentation at that meeting?

A No.

Q Turn to the eighth page of Exhibit 34, says page 7 of 10 at top.

A (Witness complies.)

Q Bottom picture on that page, is that you on the far left?

A Yes.

Q Who are these people?

A And that individual was from Beijing Hospital 301. I'm not sure at that time what kind of capacity he was holding.

Q The gentleman next to you?

A Correct.

Q And then next to him?

A My husband, Charles.

Q And then next to your husband to the right in the middle, who is that?

A That's the leader from Hospital 301.

Q And the gentleman to his right?

A I believe that individual was in the leader role from the manufacturer of Proton.

PROOFREADER'S CERTIFICATE

In the Matter of: PACIFIC PROTON THERAPY REGIONAL CENTER, LLC
Witness: Xin Wang
File Number: LA-04639-A
Date: Wednesday, May 4, 2016
Location: Los Angeles, California 90071

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

(Proofreader's Name) (Date)

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, the undersigned, Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative of employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name Denise C Herft.

NDTCA Signed Electronic Transcript

Dated: May 4, 2016

Certificate Number 12983

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. LA-04639-A
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC )

WITNESS: Wenli Yao
PAGES: 1 through 26
PLACE: Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
DATE: Thursday, May 12, 2016

The above entitled matter came on for hearing, pursuant to notice, at 10:06 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

blurred because of dia- -- dia- -- cataracts.

Q Cataracts, okay. But other than that, you're okay?

A Recently, my physical condition has not been well, but today I'm fine.

Q Okay. Thank you.

MR. REGENSTREIF: Going to ask the court reporter to mark as Exhibit 41, a cover letter, a subpoena and attachment addressed to Ms. Yao.

(SEC Exhibit No. 41 was marked for identification.)

MR. REGENSTREIF: I've handed you Exhibit 41. This is a copy of the subpoena you're appearing here pursuant to.

Did you receive the subpoena?

A Probably, yes.

Q And did you --

MS. DOLUKHANYAN: Yes. For the record, we've gone over the subpoena with her. And since she does not speak or read English or understand English, the subpoena was translated for her. So she understands she's appearing according to the subpoena, but she does not understand or read English so she's not able to recognize the document.

MR. REGENSTREIF: But you're representing

marked Exhibit 11.

(SEC Exhibit No. 11 was referred to.)

BY MR. REGENSTREIF:

Q Can you turn to the last page of Exhibit 11?

A (Witness complies.)

Q Do you recognize the name on the last page of Exhibit 11?

A This one?

Q Yes.

A That's my name.

Q Is that your signature?

A I don't recall.

Q But it is your name?

A The spelling is mine.

MS. LEVIN: When you sign your name, do you sign in Chinese characters or in English?

THE WITNESS: My regular signature?

MS. LEVIN: Yes.

THE WITNESS: Sometimes I will use Chinese, sometimes I will use like this.

BY MR. REGENSTREIF:

Q And when you sign, not in Chinese, is this how you sign on Exhibit 11?

A Um.

Q Yes?

A That's how I sign my name.

Q But you've never heard of a company called United Damei Investment Company?

A I don't recall. I have never heard of that.

Q Do you ever sign any documents that your daughter asks you to sign?

A No.

Q What about your son-in-law?

A No.

Q Do you drive?

A I don't know how to drive.

Q Do you have a driver's license?

A I don't know how to drive, no.

Q But do you have a card with your picture and address on it?

A I.D.? Yeah, I have I.D.

Q From the State of California?

A I believe so, yes.

Q Have you made an application for an I.D. from the State of California?

A Yes.

MR. REGENSTREIF: I'm going to ask the

court reporter to mark as Exhibit 43 a driver's license or identification card application, dated September 16th, 2011.

(SEC Exhibit No. 43 was marked for identification.)

BY MR. REGENSTREIF:

Q I've handed you Exhibit 43. Can you look at the bottom of the page?

Is that your signature at the bottom of the page?

A Yes, looks like my signature.

Q And you do have an identification card from California?

A Um.

Q Yes?

A Yes. Yes.

Q And then, also, in the middle of the page, is that your signature as well?

A It looks like -- it looks like my signature, but I don't know what it is.

Q Okay. I'm going to hand you previously marked Exhibit 33, which is a printout from UDG's website.

(SEC Exhibit No. 33 was referred to.)

PROOFREADER'S CERTIFICATE

In the Matter of: PACIFIC PROTON THERAPY REGIONAL CENTER, LLC

Witness: Wenli Yao

File Number: LA-04639-A

Date: Thursday, May 12, 2016

Location: Los Angeles, California 90071

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

Donna S. Raya 5/13/16

(Proofreader's Name) (Date)

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, Rosalyn Adams, reporter, hereby certify that the foregoing transcript is a complete, true and accurate transcript of the testimony indicated, held on Thursday, May 12, 2016, at 444 South Flower Street, Suite 900, Los Angeles, CA 90010, in the matter of: Pacific Proton Therapy Regional Center.

I further certify that this proceeding was recorded by me and that the foregoing transcript has been prepared under my direction.

Date: May 12, 2016

Official Reporter: Rosalyn Adams

*Diversified Reporting Service, Inc.*

OMB No. 1615-0105; Expires 04/30/2012

# G-28, Notice of Entry of Appearance as Attorney or Accredited Representative

Department of Homeland Security

## Part 1. Notice of Appearance as Attorney or Accredited Representative

**A. This appearance is in regard to immigration matters before:**

☒ USCIS - List the form number(s): Regional Center Application

☐ ICE - List the specific matter in which appearance is entered:

☐ CBP - List the specific matter in which appearance is entered:

**B. I hereby enter my appearance as attorney or accredited representative at the request of:**

List Petitioner, Applicant, or Respondent. **NOTE:** Provide the mailing address of Petitioner, Applicant, or Respondent being represented, and **not** the address of the attorney or accredited representative, except when filed under VAWA.

| Principal Petitioner, Applicant, or Respondent | | | A Number or Receipt Number, if any | |
|---|---|---|---|---|
| Name: Last | First | Middle | | ☒ Petitioner ☐ Applicant ☐ Respondent |
| PACIFIC PROTON THERAPY REGIONAL CENTER, LLC | | | | |

| Address: Street Number and Street Name | Apt. No. | City | State | Zip Code |
|---|---|---|---|---|
| c/o Charles Liu 200 E. Beverly Blvd.,Suite 200 | | Montebello | CA | 90840-7001 |

Pursuant to the Privacy Act of 1974 and DHS policy, I hereby consent to the disclosure to the named Attorney or Accredited Representative of any record pertaining to me that appears in any system of records of USCIS, USCBP, or USICE.

**Signature of Petitioner, Applicant, or Respondent** [signature] **Date** 9-15-2010

## Part 2. Information about Attorney or Accredited Representative *(Check applicable items(s) below)*

A. ☒ I am an attorney and a member in good standing of the bar of the highest court(s) of the following State(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia: New York State Third Appellate Division

**I am not** ☒ **or** ☐ **am subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law (If you are subject to any order(s), explain fully on reverse side).**

B. ☐ I am an accredited representative of the following qualified non-profit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals pursuant to 8 CFR 1292.2. Provide name of organization and expiration date of accreditation:

C. ☐ I am associated with
The attorney or accredited representative of record previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request *(If you check this item, also complete item A or B above in* ***Part 2****, whichever is appropriate).*

GOVERNMENT EXHIBIT AM 4 3.23.16 LA4639 PENGAD 800-631-6989

## Part 3. Name and Signature of Attorney or Accredited Representative

**I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.**

| Name of Attorney or Accredited Representative | Attorney Bar Number(s), if any |
|---|---|
| Stephen Yale-Loehr | 2547081 |
| Signature of Attorney or Accredited Representative: [signature] | Date: 11-19-10 |

Complete Address of Attorney or Organization of Accredited Representative (Street Number and Street Name, Suite No., City, State, Zip Code)
Miller Mayer, LLP 202 E. State St., Suite 700, Ithaca, NY 14850

| Phone Number *(Include area code)* | Fax Number, if any *(Include area code)* | E-Mail Address, if any |
|---|---|---|
| 607-273-4200 | 607-272-6694 | syl@millermayer.com |

Form G-28 (Rev. 04/22/09)N

# MILLER MAYER, LLP

ATTORNEYS AT LAW

202 East State Street, Suite 700
Ithaca, New York 14850
Telephone: 607.273.4200
Fax: 607.272.6694
Web: www.millermayer.com
Email: syl@millermayer.com

R. James Miller
John Moss Hinchcliff
Elena Salerno Flash
Rosanne Mayer
George R. Pfann, Jr.
David A. Tyler
Hilary T. Fraser
Laurie M. Johnston
Adam R. Schaye
Carolyn S. Lee
Hayden R. Brainard, Jr.
Kimberly N. Rothman

Nicolai Hinrichsen
Kristal Ozmun

Of Counsel
Stephen Yale-Loehr
Randall L. Reed

AL3100664

**SUBMISSION CONTAINS CONFIDENTIALCOMMERCIAL INFORMATION. PER FOIA (5 U.S.C. § 552(b)(4)), SUBMITTER REQUESTS PREDISCLOSURE NOTIFICATION PER PRESIDENTIAL EXECUTIVE ORDER NO. 12,600, 52 Fed. Reg. 23781 (June 23, 1987)**

November 19, 2010

Via Federal Express

U.S. Citizenship and Immigration Service
California Service Center
ATTN: EB5 RC Proposal
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**RE:** Request for Designation of the Pacific Proton Therapy Regional Center, LLC ("PPTRC") under the Immigrant Investor Pilot Program

Dear Examiner:

I represent Applicant Pacific Proton Therapy Regional Center, LLC ("PPTRC") for purposes of its request for designation as a Regional Center under the Immigrant Investor Pilot Program. My G-28 is attached at Exhibit 1.

This letter transmits the enclosed regional center application as submitted by Pacific Proton Therapy Regional Center and its President Charles Liu. Pacific Proton Therapy Regional Center is also seeking exemplar pre-approval for its first project, Pacific Proton EB-5 Fund. Please consider Ms. Liu's letter and accompanying exhibits as a complete regional center application.

Please contact me if you have any questions.

Sincerely,

Stephen Yale-Loehr

Enclosures

H:\9520\003\PPTRC transmittal ltr.doc

# EXHIBIT 1

**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**
200 E. BEVERLY BLVD., SUITE 200
MONTEBELLO, CA 90640-7001
T: 323-517-9800 F: 323-727-7574

**SUBMISSION CONTAINS CONFIDENTIALCOMMERCIAL INFORMATION. PER FOIA (5 U.S.C. § 552 (b)(4)), SUBMITTER REQUESTS PREDISCLOSURE NOTIFICATION PER PRESIDENTIAL EXECUTIVE ORDER NO. 12,600, 52 FED. REG. 23781 (JUNE 23, 1987)**

November 19, 2010

**Via Federal Express**

U.S. Citizenship and Immigration Services
California Service Center
ATTN: EB-5 RC Proposal
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**Application:** Request for Designation as EB-5 Regional Center
**Applicant:** Pacific Proton Therapy Regional Center, LLC
**Geography:** Counties of Los Angeles, Orange, Riverside, San Bernardino, California

**RE:** Designation of the Pacific Proton Therapy Regional Center (PPTRC) under the Immigrant Investor Pilot Program

Dear Examiner:

This letter and exhibits constitute an application for EB-5 regional center designation by Pacific Proton Therapy Regional Center, LLC to stimulate investment in Los Angeles, Orange, Riverside, and San Bernardino Counties in the State of California. I am the Managing Principal of Pacific Proton Therapy Regional Center, LLC and in this capacity hereby submit the present Regional Center application. My resume is attached at Exhibit 2.

The proposed regional center will be called the Pacific Proton Therapy Regional Center ("PPTRC"). This letter and attached exhibits explain how this proposal meets the requirements for regional center designation set forth at 8 C.F.R. § 204.6(m)(3).

**Pacific Proton Therapy Regional Center is also requesting approval of its first project, Pacific Proton EB-5 Fund, LLC, which will loan EB-5 investor funds to Los Angeles County Proton Therapy, LLC to partially finance the development and construction of a proton therapy center and commercial office buildings. Accordingly, we have included an Exemplar**

**I-526 Petition, project-specific I-526 business plan, and final versions of all offering materials.**

**Introduction**

PPTRC is requesting approval to focus investments in the economic clusters of Construction (NAICS 23), Manufacturing (NAICS 33), Healthcare and Social Assistance (NAICS 62), Accommodation and Food Services (NAICS 72), Administrative and Support Services (NAICS 56), and Retail Trade (NAICS 44). PPTRC has already identified and begun planning for its first project, Los Angeles County Proton Center and commercial office buildings (together, the "Project"). An independent economic report shows that the Project will create an estimated 4,775 permanent new jobs, boost output by $728 million per year, and increase labor (household) income by $217 million per year. PPTRC and the Project will have a substantial and ongoing economic impact in Los Angeles, Orange, Riverside, and San Bernardino counties, California.

**Geographical Area**

This proposal requests regional center designation for investments in the geographical area of Los Angeles, Orange, Riverside, and San Bernardino counties in the State of California. Please see a map of the proposed regional center at Exhibit 6. Investments made within targeted employment areas ("TEAs") within this geographical area will be $500,000; investments made in other parts of this geographical area that are not in a TEA will be $1,000,000. A TEA is either a rural area or an area designated by the appropriate state agency as having an unemployment rate of at least 150% of the national average unemployment rate.

California Governor Arnold Schwarzenegger designated the California Business, Transportation and Housing Agency ("BTH") as the agency responsible for determining high unemployment areas. Please see Governor's Letter at Exhibit 7. See also letter from Gabor Morocz, Deputy General Counsel, BTH, and data from the BTH website supporting TEA designation for the Project, attached at Exhibit 8.

**Management and Administration**

Mr. Charles Liu and Dr. John P. Thropay are the Managing Principals of PPTRC. Both Managing Principals will administer and manage the Regional Center to ensure project goals and regional center requirements are met. Charles Liu is also Chairman and CEO of Century Medical Investment Holdings Ltd., an exclusive sales agency for Optivus Proton Therapy, Inc. in China. Mr. Liu has twenty years of work experience in management and the medical field.

John P. Thropay, M.D. graduated from UCLA with a degree in Medicine and completed his residency in Radiation Oncology at LAC/USC Medical Center. Dr. Thropay currently serves as the Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Inc.

PPTRC also plans to retain the law firm of Miller Mayer, LLP ("Miller Mayer") to ensure timely and accurate compliance with applicable USCIS regional center reporting requirements, as further detailed in the Pacific Proton Therapy Regional Center, LLC Business Plan at Exhibit 2.

To ensure quality and consistency of all immigrant investor I-526 petitions submitted to the USCIS, Miller Mayer will also act as preferred immigration counsel for individual PPTRC investors. Miller Mayer will work with PPTRC to assemble and draft all necessary regional center business and investor documentation required by USCIS for I-526 petition approval. In addition, PPTRC will engage the services of outside accountants to prepare annual financial documents for all PPTRC projects.

**Regional Center Marketing**

PPTRC will have both an Internet presence and engage in direct marketing. Direct marketing includes, among other things, print and Internet advertisements and trade shows. Total marketing costs are estimated to be $100,000 for the first year of operation and will be paid by Mr. Charles Liu, PPTRC's managing member. For further details, please see the Pacific Proton Therapy Regional Center, LLC Business Plan at Exhibit 2.

**Regional Center Expenses and Budget**

As indicated in the Expense Attestation Letter from PPTRC Principal Charles Liu, attached at Exhibit 9, PPTRC has spent $49,798 to date on initial start-up expenses for the Regional Center. Charles Liu has committed a total of $200,000 to ensure the successful operation of PPTRC. Please see Expense Attestation letter at Exhibit 9 for evidence of this commitment. This combined dedicated capital is sufficient to sustain PPTRC's marketing efforts and post-approval operations, distinct from immigrant investors' required capital investments in a new commercial enterprise within the regional center. Further, Charles Liu pledges to supply additional resources as needed if PPTRC requires additional operating capital.

Please see also Pacific Proton Therapy Regional Center, LLC bank statements attached at Exhibit 9, which further document and enumerate expenses incurred.

**Investment Structure and Terms**

PPTRC will organize a separate investment entity such as a limited liability company (the "LLC") for each investment opportunity. EB-5 investors will make qualifying investments in the LLC and become a Member with rights equivalent to those of a limited partner under the Uniform Limited Partnership Act. In most cases, PPTRC will serve as the Manager of the LLC and be responsible for the day-to-day conduct of the business and affairs of the LLC. LLC Members will only risk their capital contribution; they are not liable for the daily affairs of the LLC. PPTRC may

be a member of the LLC, depending on the business terms of each project.

Investments by EB-5 petitioners in the LLC will be made in exchange for equity. Investors will invest $500,000 if in a TEA, or $1,000,000 if outside of a TEA, into the LLC in exchange for membership interests in the LLC. There is no guarantee that distributions will be made. Any distributions will be made only from available cash flow and/or excess proceeds. The full $500,000 capital contribution will be made available to the job creating enterprise as required by *Matter of Izummi*. Limited Liability Company Operating Agreements will not permit EB-5 capital to be used for organizational or operation expenses, or for management fees paid in connection with the operation of the LLC. PPTRC intends to charge investors an additional up-front administrative fee of approximately $45,000 ("Administrative Fee") to cover such expenses, although PPTRC reserves the right to increase or decrease the Administrative Fee in its sole discretion.

The number of EB-5 investors per LLC will vary depending on the size of the project, the type of investment, and the number of jobs that will be directly and indirectly created. PPTRC will return an EB-5 investor's funds without interest if his or her I-526 petition is denied. PPTRC may also return part of the Administrative Fee under certain conditions.

In some cases, the LLC will represent the investment opportunity and investors will make direct equity investments into the project. In the alternative, EB-5 capital contributions will be loaned, invested, or used to purchase bonds for qualified projects upon I-526 approval and will not be guaranteed by the LLC or PPTRC. Loans to qualified projects will be made under terms that do not allow for principal repayment over the initial 5 years of the loan. Equity investments will be made into qualified projects that PPTRC expects can be profitably liquidated or sold no sooner than 5 years after the initial EB-5 investment. Bonds will similarly not be eligible for repurchase sooner than 5 years from the date of purchase.

PPTRC anticipates using an escrow account for management of an immigrant investor's capital contribution. Once the escrow agent receives confirmation that an immigrant investor's I-526 petition has been approved, such investor's capital contribution will be released and deployed into the project. Alternatively, if the LLC constitutes a direct project investment, the capital contribution will simply be released from escrow to the control of the LLC for use in the qualifying project.

Before any investment, PPTRC will require the project entity to provide a job creation analysis using economic methodologies acceptable to the USCIS. The decision whether to proceed with an investment will be based in part on the job creation potential of the target project. EB-5 funds shall be deployed to ensure that at least ten new, qualifying, full-time jobs for each immigrant investor will be created within the regional center geographic area, as approved by USCIS. LLC investments will generally be made as part of a coordinated capital program, probably along with other domestic capital sources.

**The First Project: Los Angeles County Proton Center**

PPTRC has formed Pacific Proton EB-5 Fund, LLC ("PPEB-5") to serve as the investment vehicle for its first project. EB-5 investors will make their qualifying investment in PPEB-5, which will then pool the funds and make a loan to Los Angeles County Proton Therapy, LLC ("LAPT") to partially finance the development and construction of a proton therapy center and commercial office space. LAPT will develop and operate an innovative new cancer treatment center using proton beam radiation for treatment of oncology patients in Montebello, California. In addition to the proton therapy center, the building is also expected to contain 125,000 square feet of medical office space and ancillary facilities. LAPT will also develop and construct a new 30,000 square foot office building in Monterey Park, California. This building will contain a restaurant, pharmacy, and radiation therapy office on the first floor and multiple-use medical office space on floors two and three.

Investors must invest $500,000 plus an Administrative Fee of approximately $45,000 in PPEB-5 before applying for their I-526 petition. PPTRC will use an escrow account for an immigrant investor's $500,000 capital contribution. Once the escrow agent receives confirmation that an immigrant investor's I-526 petition has been approved, the funds will be released to PPEB-5 for deployment to LAPT. Please see the escrow agreement at Exhibit 18. If the USCIS denies the I-526 petition, PPTRC will return the investor's capital contribution. PPTRC will also return fifty percent of the investor's Administrative Fee upon denial of the I-526 petition; however, the remaining fifty percent is non-refundable. Please see Pacific Proton Fund EB-5, LLC Business Plan at Exhibit 11, Private Offering Memorandum at Exhibit 16, and Loan Documents at Exhibit 19 for detailed information on the Project.

The Operating Agreement, Private Offering Memorandum ("POM"), and Subscription Agreement attached at Exhibits 14, 16, and 17, respectively, are currently drafted to reflect an investment in Pacific Proton EB-5 Fund, LLC. For purposes of this regional center application, these documents also serve as generic templates for all future PPTRC investment projects.

**Employment Creation**

PPTRC plans to use a USCIS approved input-output model such as IMPLAN, RIMS II, REMI, or REDYN to show how each investment by an immigrant investor in the regional center will directly and indirectly create at least 10 jobs within the regional center's geographic area.

Attached at Exhibit 12 is an economic report prepared by Michael Evans of Evans, Carroll & Associates. For purposes of estimating the economic impacts of LAPT, Mr. Evans used the RIMS II final demand multipliers. The report analyses the job creation potential and economic impact of the development and construction of the Project in the regional center geographic area. The report estimates that the project will create 4,775 new jobs. The report also serves as a template for other future projects PPTRC may conduct in the regional center.

**Conclusion**

PPTRC and the Project will have a transformative effect on the counties of Los Angeles, Orange, Riverside, and San Bernardino, California, creating over 4,500 permanent, full-time jobs and yielding an economic impact of nearly $728 million per year once completed. These California counties desperately need the economic stimulus that PPTRC investments will provide. Therefore we urge you to promptly adjudicate and approve this regional center application and first project, which fully satisfy the requirements for EB-5 regional center designation and project approval. We look forward to your early approval.

Sincerely,

Charles Liu
PPTRC President

Attachment: Document Index and Exhibits

H:\9520\002\Final submission documents\LA Proton Exemplar Cover Letter 11.19.2010 FINAL.doc

**Document Index and Exhibits**
**Pacific Proton Therapy Regional Center, LLC**
**Regional Center Application**

| Exhibit No. | Description |
|---|---|
| 1 | Signed G-28 form |

**Pacific Proton Therapy Regional Center, LLC documents:**

| | |
|---|---|
| 2 | Regional Center business plan, including resumes from Regional Center principals |
| 3 | Articles of Organization for Pacific Proton Therapy Regional Center, LLC |
| 4 | Operating agreement |
| 5 | Regional Center information to add to USCIS website |
| 6 | Map of proposed regional center geographical area and TEAs |
| 7 | Letter from California Governor Arnold Schwarzenegger designating the California Business, Transportation and Housing Agency as the agency responsible for certifying areas of high unemployment |
| 8 | Letter from Gabor Morocz, Deputy General Counsel, California Business, Transportation and Housing Agency (BTH), and data from BTH website supporting list of TEA designations |
| 9 | Expense and budget information, including PPTRC bank statements and expense attestation letter. |

**Pacific Proton EB-5 Fund, LLC documents:**

| | |
|---|---|
| 10 | Exemplar I-526 petition |
| 11 | Pacific Proton EB-5 Fund, LLC Business Plan |
| 12 | Economic report and economist team information |
| 13 | Articles of Organization |
| 14 | Final Operating Agreement |

| | |
|---|---|
| 15 | Final Investor Suitability Questionnaire |
| 16 | Final Private Placement Memorandum |
| 17 | Final Subscription Agreement |
| 18 | Final Capital Contribution Escrow Agreement and list of proposed escrow agents |
| 19 | Loan Documents |
| 20 | Articles of Organization of Borrower, Los Angeles County Proton Therapy, LLC |

# EXHIBIT 2

# *Business Plan of*
# *Pacific Proton Therapy Regional Center, LLC*

***November 2010***

## *1. Introduction:*

Pacific Proton Therapy Regional Center, LLC ("PPTRC") was organized in 2010 as a California limited liability company. PPTRC will be owned and managed by principals Dr. John Thropay and Mr. Charles Liu, who each have more than 20 years of experience in their respective fields of radiation therapy and medical business development. Resumes for both principals are attached at Appendix A.

PPTRC was formed to create permanent jobs in Los Angeles, Orange, San Bernardino, and Riverside counties in the State of California by investing in the targeted economic sectors of Construction (NAICS 23), Manufacturing (NAICS 33), Healthcare and Social Assistance (NAICS 62), Accommodation and Food Services (NAICS 72), Administrative and Support Services (NAICS 56), and Retail Trade (NAICS 44). PPTRC will raise foreign investment capital through the USCIS EB-5 Immigrant Investor Pilot Program to finance the development of projects in the named economic sectors. PPTRC will seek out and encourage the creation of new business opportunities to permanently stimulate the economy within RC geographic area.

PPTRC's first proposed project is a proton therapy center and commercial office buildings in Los Angeles County California.. The proton therapy center will be located at 111 West Beverly Boulevard, Montebello, CA 90640. One of the commercial office buildings will be located on the same site while the other will be located at 120 W. Hellman Avenue, Monterey Park, California. The Project will create a total of over 5,000 new jobs in the identified regional center geographic area.

## *2. Regional Center Geographic Area:*

This proposal requests regional center designation for the four county area of Los Angeles, San Bernardino, Orange, and Riverside counties in the State of California.

Investments made within targeted employment areas (TEAs) within this geographical area will be $500,000. Investments made in areas that are not TEAs will be $1,000,000. Governor Arnold Schwarzenegger designated the Business, Transportation and Housing Agency (BTH) as the agency responsible for designating areas of high unemployment in the State of California. On November 9, 2010, BTH designated the 20 census tract area encompassing the commercial office building to be located at 120 W. Hellman Avenue, Monterey Park, Los Angeles, California as a high unemployment area. The proton therapy center will be located at 111 W. Beverly Boulevard, Montebello, California, Census Tract 5301.01. BTH lists this location as a high unemployment area on its website. As such, both of these locations presently qualify as TEA's.

## *3. Principals:*

***Dr. John Thropay.*** Dr. John P. Thropay is Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Inc. Dr. Thropay also serves as

Medical Director of Radiation Oncology Stereotactic Radiosurgery for the Rotating Gamma Institute of Orange County.

Dr. Thropay opened his first radiation oncology center in 1980 in California. Since then he has expanded the operation to include seven outpatient clinics throughout Southern California and two additional international facilities in the Dominican Republic and Los Mochis, Mexico. His clinics have earned distinction as the first freestanding outpatient clinic network to be JCAHO-certified, thereby earning the same distinction for its safety guidelines and protocols as other major and prestigious medical institutions.

Building upon his expertise in patient care and treatment and his passion for scientific/translational research, Dr. Thropay established Clinical Trials & Research Associates (CTRA) in 1999 to bring some of the world's latest breakthroughs in cancer treatment to the local and diverse ethnic communities. CTRA became one of California's only full-time, free-standing, privately owned investigative site authorized to conduct phase II-IV clinical research protocols.

Due to Dr. Thropay's extensive experience both as a physician and as a multi-cultural patient advocate, he was invited to serve as a member of the University of California at Los Angeles (UCLA) Institutional Review Board for Oncology Trials where he shares insights regarding care to the large and diverse oncology population of the Greater Los Angeles Area. He also serves on the Advisory Board at the University of California at Irvine (UCI) for the Clinical Trials, Medical Device and Drug Development Committee.

Dr. Thropay graduated from UCLA with a degree in medicine and completed his residency in Radiation Oncology at LAC/USC Medical Center. He is distinguished and respected by his peers within the oncology profession and is an active member in numerous organizations, including, The Tumor Board, American College of Radiation Oncology, the American Medical Association, Los Angeles Radiological Association and the Association of Clinical Research Professionals.

***Mr. Charles Liu.*** Mr. Liu received his Master's Degree in Arts Management from Columbia University in 1991. During the period 1993-2004, Mr. Liu was working in venture capital, investing primarily in medical equipment, real estate, and media companies. Mr. Liu was a member of the Chinese American Trade Association from 1995-2000 and won the Outstanding Young Entrepreneur's award in Shanghai in 1997 and in 1999. Mr. Liu received a Letter of Commendation from former President Bill Clinton for his contribution to his nation's greatness

### 4. *Administrative Oversight and Compliance*

Collectively, principals Dr. John Thropay and Mr. Charles Liu will administer and manage PPTRC to ensure project goals and regional center requirements are met. In particular, they will:

- Review potential investments according to various criteria, including whether: (1) the potential investment will be profitable for the investors, benefit the PPTRC

geographic area, and complement PPTRC's plan for developing the Regional Center; (2) the potential investment will create enough direct and indirect jobs, using the criteria described in the attached economic report; (3) the potential investment will promote improved regional productivity, domestic capital investment, and economic growth, as required by 8 C.F.R. § 204.6(m)(3); and (4) the job-creating enterprise will be within the geographic scope of the Regional Center.

- Market the Regional Center to potential foreign nationals. A proposed marketing plan is set forth below.
- Identify qualified individual petitioners for specific investment opportunities.
- Manage the flow of information to investors and their agents and representatives for the submission of I-526 and I-829 petitions filed through the Regional Center.
- Provide documentation regarding potential investment opportunities.
- Manage the funds invested by immigrant petitioners, as applicable.
- Provide monthly and annual financial reports to immigrant petitioners as well as information required for tax return preparation.
- Comply with applicable EB-5 regional center reporting and administrative requirements established by USCIS, including those set forth in USCIS's December 1, 2009 letter to the all approved regional centers.

In addition, the Regional Center plans to retain the law firm of Miller Mayer, LLP ("Miller Mayer") to ensure timely and accurate compliance with applicable USCIS regional center reporting requirements. To ensure quality and consistency of all immigrant investor I-526 petitions submitted to USCIS, Miller Mayer will work with PPTRC to assemble and draft all necessary regional center business and investor documentation required by USCIS for I-526 petition approval.

PPTRC will monitor all investment activities under its authority and shall maintain records, data and information to report to USCIS, upon request, the following information for each Federal Fiscal Year to date, starting with the initial year of designation:

- adequate monitoring and due diligence of immigration information;
- adequate evaluation of all commercial activities engaged in by immigrant investors;
- adequate reporting of employment data;
- adequate reporting of alien petition information and status;
- adequate reporting of financial and investment information of EB-5 investors; and
- adequate reporting on marketing efforts, including website information.

PPTRC will notify the USCIS within 15 business days of any change of address or occurrence of any material change in:

- the name and contact information of the responsible official and/or Point of Contact (POC) for PPTRC;
- the management and administration of PPTRC;
- PPTRC's corporate structure;
- PPTRC's mailing address, website address, email address, phone or fax number;

- the scope of PPTRC's operations and focus;
- PPTRC's business plan;
- any new, reduced or expanded delegation of authority, memorandum of understanding, agreement or contract with another party to represent or act on behalf of PPTRC;
- the economic focus of PPTRC; or
- any material change relating to PPTRC's basis for its most recent designation and/or reaffirmation by USCIS.

**Other Contractual Management Relationships**

In addition to managing day to day operations, PPTRC may contract with other service providers to carry out certain regional center responsibilities. For instance, PPTRC may:

- develop contractual agreements with local financial institutions and industry specialists to develop the credit analysis to be incorporated in PPTRC's project selection process;

- enter into an agreement with a commercial institution with international experience to handle all the loan closing and monitoring functions related to each project;

- engage public accountants and other professionals to protect the integrity of all projects;

- communicate with the EB-5 investors to assure that they obtain timely performance, tax and other data related to the investments;

- enter into appropriate escrow agreements with a financial institution with an international service department for the deposit of EB-5 investor funds. Such agreements may provide that the investor funds representing the capital contribution will be held until the investor's I-526 is approved. A separate fund would be maintained for any fees and expenses;

- engage a reputable and experienced firm to perform the background and due diligence checks on EB-5 investors; and

- provide a list of approved, experienced and qualified U.S. immigration lawyers, all members in good standing of the *American Immigration Lawyers Association*, who are available to handle individual immigrant investor cases. Immigrant investors will need to select an attorney from the list. PPTRC will not receive a referral fee from any attorney.

5. ***Operational Guidelines.***

**Project Evaluation.** PPTRC will evaluate potential investment projects to ensure consistency with the USCIS regional center designation and the objectives of PPTRC.

PPTRC will conduct an assessment of such projects collectively with in-house professionals as well as certain 3rd parties to confirm consistency with PPTRC's regional center designation, project viability, timetables, capital investment requirements, pro-forma income projections, preliminary job creation potential, investor marketability, and other elements that will bear on the success of PPTRC and the projects it sponsors.

**Project Management.** PPTRC will maintain close contact with the management of entities that may be involved in projects underway within the regional center to ensure that financial and job creation targets are met. PPTRC will provide assistance and guidance as appropriate to eliminate any variance between actual and target objectives and milestones.

**"Accredited Investor" Verification.** PPTRC will follow applicable U.S. Securities and Exchange Commission rules for classifying an EB-5 investor as an "Accredited Investor" according to the definitions contained in Rule 501 of Regulation D. Two applicable definitions, either of which must be met by potential EB-5 investors, are as follows:

- A natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase; or

- A natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year.

Each prospective EB-5 investor will be required to complete a questionnaire that provides adequate supporting information to verify compliance with either of these definitions.

**Source of Funds.** PPTRC will adhere to all USCIS rules and regulations relating to confirming the legal source of funds used for investments in PPTRC projects. PPTRC's escrow bank will also comply with 31 U.S.C. 5318(i), "Due Diligence for United States Private Banking and Correspondent Bank Accounts Involving Foreign Persons".

**Recruitment.** PPTRC will use various overseas recruiters and immigration brokers to identify potential EB-5 investors. PPTRC intends to pay a finder's fee for such services that will be paid from an EB-5 investor's Administrative Fee, which is separate from the EB-5 capital contribution.

**Due Diligence.** PPTRC will require investors to complete investor questionnaires and provide documentation regarding, among other things, the source of their EB-5 investment funds, financial documents (such as bank records and tax returns), investment documents, business documents, and personal identity documentation. PPTRC will also require EB-5 investors to provide to the investor's immigration attorney similar documentation necessary to file an I-526 petition. In sum, PPTRC is confident that its investor funds will be lawfully obtained based on:

- PPTRC's due diligence investor questionnaires and document requests;

- The escrow bank's obligation to comply with 31 U.S.C. § 5318(i) "Due Diligence for United States Private Banking and Correspondent Bank Accounts Involving Foreign Persons";
- The immigration attorney's source and path of funds analysis submitted with individual I-526 petitions; and
- USCIS's own background check conducted on all I-526 petitioners.

6. ***Implementation strategy:***

***A. Investment structure.*** PPTRC contemplates organizing a special purpose entity such as a Limited Partnership ("LP") (or limited liability company) into which EB-5 investors will make their qualifying equity investments. The EB-5 investors will be given the rights normally granted to limited partners pursuant to the Uniform Limited Partnership Act. In most cases, PPTRC will serve as the General Partner of the LP and will be responsible for the conduct of the business and affairs of the LP. Limited Partners will only risk their capital contribution; they are not liable for the general affairs of the LP. The LP will subsequently loan, make equity investments, or purchase bonds to finance projects in the identified economic sectors. PPTRC will seek to finance projects associated with municipalities or considered beneficial to local communities.

Investments by EB-5 petitioners in the LP will be made in exchange for equity. Investors will invest $500,000, or $1,000,000 if outside of a TEA, into the LP in exchange for limited partnership interests in such LP. There is no guarantee that distributions will be made. Any distribution will be made only from available cash flow and/or excess proceeds. The full $500,000 capital contribution will be made available to the job creating enterprise as required by *Matter of Izummi*. Limited Partnership Agreements will prohibit EB-5 capital from being used for organizational or operation expenses. PPTRC intends to charge investors an up-front administrative fee of approximately $45,000 ("Administrative Fee") to cover such expenses, although RC reserves the right to increase or decrease the Administrative Fee in its sole discretion.

The number of EB-5 investors per LP will vary, depending on the size of the project, the type of investment, and the number of jobs that will be directly and indirectly created. PPTRC will return an EB-5 investor's funds without interest if his or her I-526 Petition is denied.

EB-5 capital contributions will be loaned, invested, or used to purchase bonds for qualified projects upon I-526 approval and will not be guaranteed by the LP or PPTRC. Loans to qualified projects will be made under terms that do not allow for principal repayment over the initial 5 years of the loan. Equity investments will be made into qualified projects that PPTRC expects can be profitably liquidated or sold no sooner than 5 years after the initial EB-5 investment. Bonds will similarly not be eligible for repurchase sooner than 5 years from the date of purchase.

PPTRC anticipates using escrow accounts for management of an immigrant investor's Capital Contribution. Once the escrow agent receives confirmation that an immigrant investor's I-526 Petition has been approved, such investor's capital contribution will be

released and deployed into the project; the Administrative Fee will be released to PPTRC to pay for offering expenses. Please note that PPTRC has not yet determined what bank will serve as escrow agent and therefore the final escrow agreements may differ from the versions enclosed with this application.

Before any investment, PPTRC will require the LP to provide an econometric job creation analysis using economic methodologies acceptable to the USCIS. The decision of whether to proceed with an investment will be based in part on the job creation potential of the target project. EB-5 funds shall be deployed to ensure that at least ten new, qualifying, full-time jobs for each immigrant investor will be created within the Regional Center Geographic Area, as approved by USCIS. LP investments will generally be made as part of a coordinated capital program, probably along with other domestic capital sources.

All investment targets will be identified in the comprehensive I-526 business plan submitted with individual petitions. PPTRC will provide I-526 petitioners with the option of moving to another Qualifying Investment, consistent with PPTRC's designation approval and any amendment(s), upon the happening of certain events. Those events include, but are not limited to, the LP's failure to raise the minimum offering amount and PPTRC's determination that the LP project will not meet job creation needs. Prior to moving any I-526 petitioner to another Qualifying Investment, PPTRC will obtain verification from a qualified economist that such a change will have no adverse impact on the job creation contemplated in the Economic Report submitted with the I-526 petition. PPTRC will comply with all USCIS guidance on the evolving procedure for instituting such a substitution, including submitting revised I-526 petitions as may be required.

***B. Investment projects.*** The sample Confidential Offering Memorandum ("COM"), Operating Agreement, and Subscription Agreement are currently drafted to reflect an investment in the Pacific Proton EB-5 Fund, LLC. PPEB-5 will subsequently loan the EB-5 investment proceeds to Los Angeles County Proton Therapy, LLC to partially finance the construction and operation of a proton therapy center and two commercial office buildings.

7. ***Economic methodology:***

PPTRC will use a USCIS approved input/output model such as IMPLAN, RIMS II, REDYN, or REMI to ascertain job creation and economic impact of its proposed projects. Evans, Carroll & Associates produced the economic analysis of PPTRC's first proposed projecy using RIMS II. Input/output analysis is a means of examining relationships within an economy, both between businesses and between businesses and final consumers. It captures all of the monetary market transactions for consumption in a given time period. The resulting mathematical formulae allow examination of the effects of a change in one or several economic activities on an entire economy.

8. ***Marketing budget and strategy:***

PPTRC is budgeting $100,000 for marketing expenses in the first year following regional center designation. Principal Charles Liu has committed to supply $200,000 in funds for the

initial year of PPTRC operations, including marketing. PPTRC intends to use a number of marketing strategies, including:

- use of U.S. immigration lawyers;
- establishing an informational website;
- extensive web advertising, outreach campaigns, and search engine optimization efforts;
- creating supplemental print materials such as business cards, brochures, and direct mail pieces;
- creating alliances with 3rd party organizations that promote the EB-5 program;
- attending industry trade shows; and
- conducting seminars in the United States and overseas about PPTRC.

9. ***Financial information:***

Principal Charles Liu will provide funding for RC's initial operating expenses. Start-up expenses consist primarily of legal and consulting fees related to obtaining regional center designation. The following is an estimate of the expenses related to regional designation and first year operations:

| | |
|---|---|
| • Legal fees (including immigration and corporate counsel) | $ 75,000 |
| • Consulting fees | $ 15,000 |
| • Research | $ 10,000 |
| • Marketing | $100,000 |

This combined dedicated capital is sufficient to sustain PPTRC, distinct from immigrant investors' required capital investments in a new commercial enterprise within the regional center. Further, Principal Charles Liu pledges to supply additional resources as needed if PPTRC requires additional operating capital. PPTRC will charge all EB-5 investors a standard administrative fee of $45,000.00 that will provide funds for ongoing operational expenses.

H:\9520\002\Final submission documents\RC business plan 11.18.2010 FINAL.doc

# RESUME

| | |
|---|---|
| Name | Liu, C Charles |
| Sex | Male |
| Nationality | USA |
| Place of Birth | P.R.China |
| Date of Birth | [redacted] |
| Marital Status | Married |
| Contact Information | Email: charlesliu@me.com<br>Mobile: (626) 688-4898 |

## ACADEMIC HISTORY

| | |
|---|---|
| 1982-1985 | Bachelor's Program<br>Shanghai Normal University, China |
| 1985-1986 | Master's Program<br>Zhejiang Academy of Fine Arts, China |
| 1986-1987 | Master's Program<br>San Jose State University, California, USA |
| 1987-1988 | Ph.D Program in Art History<br>City University of New York, New York, USA |
| 1988-1990 | MFA in Arts Administration<br>Columbia University, New York City, USA |

## WORKING HISTORY

| | |
|---|---|
| 1991-1993 | Segal Fine Art Publishing Inc (USA)<br>Responsible for art publishing for Asian Region as Marketing Director |
| 1993-1995 | CLCC International Inc (USA)<br>Trading of high-end medical equipment to PR China and Hong Kong market as company CEO |
| 1995-1997 | Shanghai Oriental Pearl Landmark Co. Ltd<br>General Manager/Developer of Shanghai TV Broadcasting Building |
| 1997-1999 | Shanghai J.C.Hightech Entertainment Co. Ltd<br>Developer and Managing Director of Shanghai Space City, Shanghai Oriental Pearl TV Tower |
| 1999-2004 | Founder and Chairman of Five Star Satellite TV Operations in Hong Kong, Macau and Beijing |
| 2004-2010 | Chairman and CEO of Century Medical Investment Holdings Ltd, an exclusive sales agent for American company, Optivus Proton Therapy Inc in China |
| 2010 –present | Pacific Proton Therapy Regional Center, LLC<br>President |

# RESUME

**Name:** John P. Thropay, M.D.

**Nationality:** USA

**Date of Birth:** August 1, 1949

**Address:** [redacted] Bradbury, CA [redacted]

**Email:** jthropay@beverlyoncology.com

---

Dr. John P. Thropay is Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Inc. Dr. Thropay's mission is to provide the best possible outcomes for cancer patients. Dr. Thropay also serves as Medical Director of Radiation Oncology Stereotactic Radiosurgery for the Rotating Gamma Institute of Orange County.

Dr. Thropay opened his first radiation oncology center in 1980. Since then he has expanded the operation to seven outpatient clinics throughout Southern California and two additional facilities outside the US (Dominican Republic and Los Mochis, Mexico). He has earned distinction as creator of the first freestanding outpatient clinic network to be JCAHO-certified, thereby earning the same distinction for its safety guidelines and protocols as other major, prestigious medical institutions. Through these ventures, his mission has remained the same: to provide the highest-quality cancer treatment care by working with exceptional professionals – a team of multicultural and multi-linguistic physicians, nurses, and staff who help him be the first to bring best-in-class services and technologies to our communities.

Dr. Thropay, along with his medical team, became highly experienced in translational research having introduced a wealth of new and emerging technologies to the community over the last 30 years. Key examples include the 1979 introduction of Brachytherapy, the popular implant technology practiced by an elite group of radiation oncologists. In 2008, he was the first to introduce and treat patients with electronic (green – no iridium) Brachytherapy in California. In 1997, his was the first freestanding facility in California to install and treat patients with Intensity Modulated Radiation Therapy (IMRT), winning an award from the City Council of Los Angeles for bringing such advanced technology to Los Angeles and surrounding communities ahead of other major institutions. In 1985, he introduced to his treatment protocol Hyperthermia, the unique heat treatment used in special cases in conjunction with Radiation Therapy to reduce recurrence of certain cancers.

Building upon his treatment expertise and his passion for scientific/translational research, Dr. Thropay established Clinical Trials & Research Associates (CTRA) in 1999, bringing some of the world's latest breakthroughs in cancer treatment to Southern California's local and diverse ethnic communities. His site became one of California's only full-time, free-standing, privately owned investigative sites authorized to conduct phase II-IV clinical research protocols.

Due to Dr. Thropay's extensive experience both as a physician and as a multi-cultural patient advocate, he was invited to serve as a member of the University of California at Los Angeles (UCLA) Institutional Review Board for Oncology Trials. There he shares insights regarding provision of care to the large and diverse oncology population of the greater Los Angeles area. He also serves on the Advisory Board at the University of California at Irvine (UCI) for the Clinical Trials: Medical Device and Drug Development Committee.

Dr. Thropay graduated from UCLA with a degree in Medicine and completed his residency in Radiation Oncology at LAC/USC Medical Center. He is distinguished and respected by his peers within the oncology profession, and is an active member in numerous organizations, including The Tumor Board, American College of Radiation Oncology, American Medical Association, Los Angeles Radiological Association, and the Association of Clinical Research Professionals.

# EXHIBIT 3

# State of California
## Secretary of State

LLC-1

File # 201024210214

ENDORSED - FILED
in the office of the Secretary of State
of the State of California

AUG 25 2010

### Limited Liability Company Articles of Organization

A $70.00 filing fee must accompany this form.

Important – Read instructions before completing this form.

This Space For Filing Use Only

**Entity Name** (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

PACIFIC PROTON THERAPY REGIONAL CENTER, LLC

**Purpose** (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

**Initial Agent for Service of Process** (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

CHARLES LIU

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 200 E. Beverly Blvd., Suite 200 | Montebello | CA | 90640-7001 |

**Management** (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

☐ ONE MANAGER

☐ MORE THAN ONE MANAGER

☑ ALL LIMITED LIABILITY COMPANY MEMBER(S)

**Additional Information**

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

**Execution**

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

08-25-2010
DATE

[signature]
SIGNATURE OF ORGANIZER Hayden R. Brainard, Partner of Miller Mayer LLP, Organizer

Miller Mayer, LLP
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2010)

APPROVED BY SECRETARY OF STATE

I hereby certify that the foregoing transcript of 1 page(s) is a full, true and correct copy of the original record in the custody of the California Secretary of State's office.

SEP 09 2010

Date:

DEBRA BOWEN, Secretary of State

California Secretary of State Debra Bowen

Secretary of State | Administration | Elections | Business Programs | Political Reform | Archives | Registries

Business Entities (BE)

Online Services
- Business Search
- Disclosure Search
- E-File Statements
- Mail Processing Times

Main Page
Service Options
Name Availability
Forms, Samples & Fees
Annual/Biennial Statements
Filing Tips
Information Requests (certificates, copies & status reports)
Service of Process
FAQs
Contact Information

Resources
- Business Resources
- Tax Information
- Starting A Business
- International Business Relations Program

Customer Alert (misleading business solicitations)

## Business Entity Detail

Data is updated weekly and is current as of Friday, September 03, 2010. It is not a complete or certified record of the entity.

| | |
|---|---|
| **Entity Name:** | PACIFIC PROTON THERAPY REGIONAL CENTER, LLC |
| **Entity Number:** | 201024210214 |
| **Date Filed:** | 08/25/2010 |
| **Status:** | ACTIVE |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Address:** | 16 CORPORATE WOODS BLVD, 15 |
| **Entity City, State, Zip:** | ALBANY NY 12211 |
| **Agent for Service of Process:** | CHARLES LIU |
| **Agent Address:** | 200 E BEVERLY BLVD STE 200 |
| **Agent City, State, Zip:** | MONTEBELLO CA 90640-7001 |

* Indicates the information is not contained in the California Secretary of State's database.

* **Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search** **New Search** **Printer Friendly** **Back to Search Results**

Privacy Statement | Free Document Readers
Copyright © 2010 California Secretary of State

# EXHIBIT 4

# OPERATING AGREEMENT
# OF
# PACIFIC PROTON THERAPY REGIONAL CENTER, LLC

*a California Limited Liability Company*

Dated August 25, 2010

200 E. Beverly Boulevard, Suite 200
Montebello, CA 90640

**OPERATING AGREEMENT**
**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**

This Operating Agreement ("Agreement") is entered into and effective on August 25, 2010 by and between the undersigned members listed on Schedule A hereto ("Members"), as amended from time to time; WHEREAS, the Members have caused Articles of Organization to be filed with the California Secretary of State forming a limited liability company under the name "PACIFIC PROTON THERAPY REGIONAL CENTER, LLC" (the "Company"); and WHEREAS, the Company is formed for the purpose of operating a USCIS (defined below) designated regional center under the EB-5 Pilot Program (defined below); and WHEREAS, the parties hereto desire to set forth certain understandings and agreements among them with respect to the affairs of the Company and the conduct of its business; NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the parties hereby agree as follows:

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meaning set forth below. Other terms defined throughout this Agreement shall have the meanings respectively ascribed to them.

"***Adjusted Capital Contribution***" means, with respect to each Member, the aggregate capital contributed to the Company by such Member reduced, from time to time, (i) by any return of a Capital Contribution made pursuant to the Agreement, and (ii) by the aggregate distributions of Net Proceeds from a Capital Event made to such Member pursuant to the Agreement.

"***Affiliate***" means, with respect to any Member, any Person: (i) which owns more than 50% of the voting interests in the Member; or (ii) in which the Member owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by, or under common control with, another Person.

"***Agent***" means any officer, director, employee, trustee, partner, agent or representative of a Member acting for or on behalf of such Member or the Company.

"***Available Cash Flow***" means funds provided from operation of the Company, without deductions for depreciation, but after deducting funds used to pay all expenses and debts of the Company, including administrative operational expenses, debt payments, capital improvements, and less the amount set aside by for reserves.

"***Bankruptcy***" means, with respect to any Member: (i) an assignment for the benefit of creditors; (ii) a voluntary petition in bankruptcy; (iii) adjudication as a bankrupt or insolvent; (iv) the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, regulation or law; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding of this nature; (vi) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of such Member's properties or of all or any substantial part of the Member's properties; or (vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

"***Capital Contribution***" or "***Contribution***" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"***Capital Event***" means the refinance, sale, exchange or other disposition of the Property or any portion thereof, including an involuntary conversion or condemnation of real property or any portion thereof.

"***Code***" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision, and all applicable Treasury Regulations.

"***Contributed Property***" means any property contributed (or deemed contributed under Code §708) to the Company at any time or from time to time.

"***Deficit Capital Account***" means the situation whereby the Company has distributed to a Member distributions in excess of such Members Capital Account.

"***EB-5 Pilot Program***" means the program adopted by the U.S. Congress creating the EB-5 Immigrant Investor Pilot Program.

"***Economic Interest***" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"***Incapacity***" means (i) the entry of a judgment by a court of competent jurisdiction to the effect that a Member who is an individual is incompetent to manage such Member's affairs, or the appointment of a guardian ad litem by a court of competent jurisdiction to manage such Member's affairs; or (ii) the incapacity of a Member who is an individual to perform his or her duties as a Member as determined by (a) the vote of at least a majority of the Units not held by such Member, and if such Member is not in agreement with such determination, the certification of a physician selected by mutual agreement between such Member and the holders of at least a majority of the Membership Units not held by such Member, or (b) the certification of a physician selected by the Member and, if the holders of at least a majority of the Units not held by the Member are not in agreement with such certification, the certification of a physician selected by mutual agreement between the Member and the holders of at least a majority of the Units not held by such Member.

"***Interest Holder***" means any Person who holds an Economic Interest, whether as a Member or an unadmitted assignee of a Member.

"***Involuntary Withdrawal***" means, with respect to any Member, the occurrence of any of the following events: (i) the Bankruptcy of a Member; (ii) if the Member is an individual, the Member's death or Incapacity; (iii) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust; (iv) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; (v) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or (vi) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

"***Majority-In-Interest***" means Members holding a majority of all Members' or Interest Holders', as the case may be, Economic Interests in the Company.

"***Membership Interest***" means all of the rights of a Member in the Company, including a Member's: (i) Economic Interest; (ii) right to participate in the management of the Company; and any right to information granted herein to Members.

"***Membership Percentages***" means at any time, all Percentages then held by Members.

"***Net Proceeds from a Capital Event***" means the net proceeds derived by the Company from a Capital Event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness, the discharge of any other expenses or liabilities of the Company and the establishment of appropriate reserves, all as determined by a Majority-In-Interest of the Members.

"***Percentage***" or "***Percentage Interest***" means, as to a Member, the percentage set forth after the Member's name on <u>Schedule A</u>, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Economic Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Economic Interest.

"***Person***" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"***Profits***" and "***Losses***" mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (including all items required to be stated separately) with the following adjustments: (a) Any income exempt from federal income tax shall be included; and (b) Any expenditures of the Company described in Code Section 705(a)(2)(B) (including expenditures treated as such pursuant to Treas. Reg. Section 1.704-1(b)(2)(iv)(i)) shall be subtracted.

"***Property***" or the "***Company Property***" means all real and personal property of the Company.

"***Regulations***" or "***Treas. Reg.***" means the income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

"***Transfer***" means — when used as a noun — any sale, hypothecation, pledge, assignment, gift, bequest, attachment, or other transfer, including transfers by operation of law, and — when used as a verb — means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

"***Units***" mean units representing each Member's undivided interest in the capital of the Company.

"***USCIS***" means the United States Citizenship and Immigration Services.

"***Voluntary Withdrawal***" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE 1

## FORMATION OF THE COMPANY

1.1 **Formation of Limited Liability Company**. The Members have organized the Company pursuant to the provisions of the Beverly-Killea Limited Liability Company Act, as amended from time to time (the "Act"), under the name "PACIFIC PROTON THERAPY REGIONAL CENTER, LLC". Except as otherwise provided herein, all rights, liabilities and obligations of the Members shall be as provided in the Act. Except for federal and state income tax purposes, the Members intend that the Company not be a partnership, limited partnership or joint venture.

1.2 **Principal Place of Business and Registered Agent**. The principal place of business of the Company shall be 200 E. Beverly Blvd., Suite 200, Montebello, CA 90640, or at such other place in the State of California as may be designated by the Members. The Registered Agent of the Company in the State of California is Charles Lui until otherwise determined by the Members.

1.3 **Purposes**. The purposes of the Company shall be to engage in any lawful acts or activities for which limited liability companies may be formed under the Act. Notwithstanding the foregoing, intending the Company to be a limited liability company under the Act, for the sole purpose of operating USCIS designated regional center under the EB-5 Pilot Program.

1.4 **Duration of the Company**. The Company shall commence on the date on which its Articles of Organization were accepted and filed by the California Secretary of State, and shall continue in perpetuity until dissolved in accordance with this Agreement.

## ARTICLE 2

## CAPITALIZATION

2.1 **Units; Initial Capital Contributions.**

2.1.1 Each Member's undivided interest in the capital of the Company shall be represented by membership Units. Each Unit shall be identical in all respects to every other Unit.

2.1.2 The Company shall be capitalized by each Member contributing his or her Capital Contribution set forth on Schedule A attached hereto, with such Member receiving, in exchange therefor, the number of Units set forth therein. A Member shall not have the right to demand or receive the return of his/her Capital Contribution except as otherwise expressly provided herein. The Members shall have no obligation to make additional Capital Contributions. The Members may make an additional Capital Contribution to the Company upon consent of a Majority-In-Interest of the Members. No interest shall be paid on Capital Contributions.

2.1.3 Interest will be charged by the Company to a Member on the sum of any deemed distributions charged to such Member's Capital Account from obligations to the Company arising under Section 4.9 concerning federal income tax withholding. The interest charged will be computed on a calendar year compounded basis at a rate equal to two percent above the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate", such interest to be collected by reduction of any distributions payable to the Member immediately following the calculation

of the year's interest by the Company. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Member's Capital Account. This Section 2.2.3 will survive the termination of a Member's status as a Member.

2.1.4 No Member shall have any right to withdraw or make a demand for the withdrawal of any of his/her Capital Contribution (or the capital interest reflected in such Member's Capital Account) until the full and complete winding up and liquidation of the Company. No Member shall have the right to demand Company Property.

2.1.5 Loans or advances by any Member to the Company can only be made after and in addition to a Member's initial Capital Contribution. Loans or advances by any Member to the Company shall not be considered additional Capital Contributions and shall not increase the Capital Account of the lending or advancing Member. No Member shall be required to lend any cash or property to the Company.

2.1.6 Each Unit of the Company shall be certificated in the form deemed appropriate by the Company. The certificate or certificates evidencing the Units in the Company shall be endorsed, as follows:

"*The Units represented by this certificate are subject to the terms and conditions of an Operating Agreement dated as of August 25, 2010, among the original owner of record and the other members of the Company. Any purchaser or transferee of these Units is bound by the agreement and shall be considered a party to the agreement. The Company will mail to the holder of this certificate, without charge, a copy of such agreement within five (5) days after receiving a written request therefor.*"

The foregoing endorsement shall also include such other legends and notices as the Company deems necessary and appropriate. After endorsement, the certificate or certificates shall be delivered to the Members who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such Membership Units. The Company agrees that it will cause a similar endorsement to be placed on all certificates hereafter issued by it and which are subject to the provisions of this Agreement.

2.3 **Capital Accounts.**

2.2.1 The Company shall establish and maintain Capital Accounts ("Capital Accounts") for each Member in accordance with the Code, applicable Regulations, and the provisions hereof. Except as required by the Code, the Capital Account of each Member shall consist of his Capital Contribution, as increased by any contribution of capital subsequent to his original Capital Contribution, and by such Member's share of Company income and gain allocated after the date hereof to such Member, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Member, the amount of all losses allocated after the date hereof to such Member, and any amounts charged under Section 4.10 to such Member.

2.2.2 The provisions of this Article 2 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the Regulations promulgated under the Code, in light of the distributions and the Capital Contributions made pursuant hereto. All allocations of items that cannot have economic effect (including credits and nonrecourse deductions) shall be allocated to the Members in accordance with their respective Percentage Interests. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation.

2.2.3 The Capital Account of a transferring Member shall become the Capital Account of his/her transferee to the extent it relates to the Units transferred.

## ARTICLE 3

## ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated in the following order and priority: (a) First, to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) The balance, to the Members in accordance with the Percentage Interests.

To the extent the allocations of profits and losses otherwise provided under this Agreement are not made in accordance with a Member's Interest in the Company within the meaning of Code Section 704, the allocations shall be made to the appropriate Members in the necessary and required amounts in order to comply with Code Section 704(b).

In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Company Profits (or Company Losses) allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Percentage Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Members.

3.2 **Limitation on Allocation of Losses.** Notwithstanding the foregoing, the Losses allocated pursuant hereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have a Deficit Capital Account at the end of any fiscal year. In the event some but not all of the Members would have a Deficit Capital Account as a consequence of an allocation of Losses pursuant hereto, the limitation set forth in this Section 3.2 shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Regulation Section 1.704-1(b)(2)(ii)(d).

3.3. **Deficit Capital Accounts at Liquidation.** The Members shall have no liability to the Company, to the Members, or to the creditors of the Company on account of any deficit balance in their Capital Accounts upon liquidation of the Company, provided, however, that any Member for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.8 is required to pay to the Company the amount of any negative balance in his Capital Account, but such payment shall not exceed the sum of the obligations under Section 4.10. This Section 3.3 will survive the termination of a Member's status as a Member. A Member must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Company in collecting amounts under this provision from a Member.

3.4 **Distributions.** Members shall determine the timing, amount, if any, and form (cash or Property) of all distributions to Members in its sole discretion and notwithstanding any other provision of this Agreement.

3.4.1 **Available Cash Flow.** Available Cash Flow shall be distributed at least annually (a) first, to Members in payment of accrued unpaid Mandatory Distributions; (b) then to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (c) the balance to the Members in accordance with the Percentage Interests.

3.4.2 **Net Proceeds from a Capital Event or from Dissolution.** The Net Proceeds from a Capital Event and/or a distribution resulting from the dissolution of the Company shall be distributed in the same manner as Available Cash Flow. Net Proceeds from a Capital Event and/or a distribution from the dissolution of the Company shall be distributed to Members within 120 days of such Capital Event or dissolution of the Company.

3.4.3 **Limitation on Distributions.** Notwithstanding any other provision of this Article 3, the Company shall not make a distribution:

3.4.3.1 To the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests, exceed the fair value of the assets of the Company; or

3.4.3.2 To the extent that such distribution is prohibited under the Act.

3.5 **Mandatory Distributions**. The Company shall make distributions to Members for the payment of U.S. Federal, State or local taxes incurred by such Member as a result of allocation of Profits to such Member by the Company. The amount distributable with respect to any year shall be equal to the aggregate amount of U.S. Federal, state and local income taxes payable by the Members with respect to the taxable income of the Company, assuming, for purposes of determining the amount of such distribution, that each Member will be taxed on the net amount set forth in the Member's respective K-1 at the highest marginal individual Federal income tax rate for such year, and at the highest marginal individual state and local income tax rates applicable to any Member for each such taxable year; and (ii) such distributions shall be payable at such time or times and in such amounts as will enable the Members to avoid penalties and interest otherwise payable on account of the failure to pay a sufficient amount of estimated taxes as required by law, which. Such distributions shall be made within 90 days of the end of the Company's fiscal year or such other time or times as may be determined by the Members.

3.6 **Record Date**. All items of Company income, gain, loss and deduction shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, if any Units in the Company shall be transferred during a taxable year, items of Company income, gain, loss and deduction for such period shall be allocated among the original Members and the successor on the basis of the number of days each was a Member during such period; provided, however, that if the Company has any extraordinary non-recurring items for the taxable year in which the transfer of Units occurs, such period shall be segregated into two or more segments in order to account for income, gain, loss, deductions or proceeds attributable to such extraordinary non-recurring items of the Company.

## ARTICLE 4
## MANAGEMENT

4.1 **Participation by Members**. All Members have the right to participate in the management and conduct of the Company's business. Subject to the limitations imposed by this Agreement or by action of the Members, each Member is an agent of the Company and has authority to bind the Company in the ordinary course of the Company's business.

4.2 **Actions by Members**. Except as otherwise provided in this agreement, all decisions requiring action of the Members or relating to the business or affairs of the Company will be decided by the affirmative vote or consent of a Majority-In-Interest of the Members. Members may act with or without a meeting, and any Member may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

4.3 **Time Devoted to Company; Other Ventures**. (a) Members shall devote so much of their time to the business of the Company as in its judgment the conduct of the Company's business reasonably requires. Members may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Company, and neither the Company nor any of the other Members shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of the acquisition of Units.

(b) A Member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member. A Member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members. Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

4.4 **Books and Records**. (a) The Company shall maintain or cause to be maintained complete and accurate books of account (containing such information as shall be necessary to record allocations and

distributions), and make such records and books of account available for inspection by any Member, or any Member's duly authorized representative, during regular business hours and at the principal office of the Company, upon reasonable notice and for any purpose related to his or her ownership of Units.

(b) Within sixty (60) days after the end of each calendar year, there shall be prepared and distributed to all Members reasonable tax-reporting information, in sufficient detail to enable such Member to prepare such Member's federal, state and local income tax returns.

(c) Within ninety (90) days after the end of each calendar year, there shall be prepared and distributed to each Member, a balance sheet, and a report of the receipts, disbursements, net profits and losses, and cash flow of the Company, and the share of the net profits and losses and cash flow of each Member for such calendar year. Such balance sheet and report shall be prepared by the Company's accountant in accordance with the method of accounting used by the Company for tax purposes.

4.5 **Tax Matters Member**. Charles Liu shall serve as the Tax Matters Member of the Company, as provided in Regulations issued pursuant to Section 6231 of the Code. Each Member, by the execution of this Agreement, consents to such designation of the Tax Matters Member and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Company shall indemnify and reimburse the Tax Matters Member for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Members. The payment of all such expenses shall be made before any distributions to Members are made by the Company. The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Member.

4.6 **Tax Returns**. The taxable year of the Company shall be the calendar year. The Members shall, at Company expense, cause the Company to prepare and file all tax returns required to be filed by the law for each fiscal year of the Company.

4.7 **Tax Elections and Adjustments**. The Members may cause the Company to make, forego or revoke such elections or adjustments for federal income tax purposes as necessary or advisable, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Units of any Member, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Company or any similar provision enacted in lieu thereof. The Members will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

4.8 **Federal Income Tax Withholding**. The Company may withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Members. In the event that the Company learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the Company will issue an invoice to the Member. If the invoice is not paid within sixty (60) days, the Company will charge the amount against the Member's Capital Account. This Section will survive the termination of a Member's status as a Member.

4.9 **Officers**. Members may, from time to time, by vote of a Majority-In-Interest appoint one or more officers of the Company and delegate such duties to such Officers as they deem appropriate, including a President, Secretary, Treasurer, and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and such other officers as the Members may deem necessary. Officers may but need not be Members. Any two or more of such offices may be held by the same person, but no officer shall execute, acknowledge or verify any instrument in more than one capacity, if such instrument is required to be executed, acknowledged or verified by two or more officers. Officers, if any, shall have only such authority and perform such duties as may be determined by the Members.

## ARTICLE 5

## INDEMNIFICATION

5.1 **Third Party Actions**. The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Company) by reason of the fact that he is or was a member, manager, officer or employee of the Company, or is or was serving at the request of the Company as a manager, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

5.2 **Derivative Actions**. The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit, including all appeals, by or in the right of the Company to procure a judgment in its favor by reason of the fact that he is or was a member, manager, officer or employee of the Company, or is or was serving at the request of the Company as a member, manager, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

5.3 **Rights After Successful Defense**. To the extent that a member, manager, officer or employee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 5.1 or 5.2, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

5.4 **Other Determination of Rights**. Except in a situation governed by Section 5.3, any indemnification under Section 5.1 or 5.2 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the member, manager, officer or employee is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 5.1 or 5.2. Such determination shall be made by a Majority-In-Interest of disinterested Members.

5.6 **Advances of Expenses**. Expenses of each person indemnified hereunder incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Company in advance of the final disposition of such action, suit or proceeding as authorized by a Majority-In-Interest of disinterested Members upon receipt of an undertaking by or on behalf of the member, manager, officer or employee, to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Company.

5.7 **Nonexclusiveness; Heirs**. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law or under the Articles of Organization, or any agreement, vote of members, any insurance purchased by the Company,

or otherwise, both as to action in his/her or its official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a member, manager, officer or employee and shall inure to the benefit of the heirs, executors and administrators of such a person.

5.8 **Purchase of Insurance**. The Company may purchase and maintain insurance on behalf of any person who is or was a member, manager, officer or employee of the Company, or is or was serving at the request of the Company as a manager, officer or employee of another company, partnership, joint venture, trust or other enterprise against any liability asserted against him/her or it and incurred by him/her or it in any such capacity, or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Article or of the Act.

## ARTICLE 6

## EXPENSES

6.1 **Company Expenses**. The Company shall pay all costs and expenses related to operation of the business of the Company which may include, but are not limited to: (1) All costs of personnel employed by the Company or performing services for the Company; (2) All costs of borrowed money including repayment of advances to the Company made by a Member which shall be paid, at an interest rate equal to the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate" plus 1%; (3) All administrative costs, legal, audit, accounting, brokerage and other fees; (4) Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of Units of the Company or in connection with the business of the Company; (5) Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site managers, real estate brokers, insurance brokers and other agents, including Affiliates of the Company, or any Member; (6) Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and financing and refinancing of Company Property; (7) The cost of insurance obtained in connection with the business of the Company; (8) Expenses of organizing, revising, amending, converting, modifying or terminating the Company; (9) Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members; (10) Expenses in connection with preparing and mailing reports required to be furnished to Members for required tax reporting, or other purposes which the Company deems appropriate; (11) Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies; and (12) Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Company Property.

## ARTICLE 7

## MEMBERS

7.1 **Members**. The Company shall at all times maintain a current and a past list setting forth (in alphabetical order) the full name, last known mailing address (including full street number), number of Units, and Percentage Interest of each current and former Member of the Company. The names, full residential addresses, number of Units, and Percentage Interest of the initial Members of the Company are as reflected on <u>Schedule A</u> of this Agreement and are hereby made a part hereof. With each change in the Company's membership (or any information on <u>Schedule A</u>), the Company shall revised such list to reflect such changes. Members shall have only the rights and powers set forth in this Agreement unless otherwise provided by the Act.

7.2 **Meetings**. Meetings of the Members may be called by any Member. Not less than 10 or more than 60 days before the date fixed for a meeting of members, written notice stating the time and place of the meeting, and in the case of a special meeting the purposes of such meeting, shall be given by or at the direction of the Member calling the meeting. The notice shall be given by personal delivery or by mail to each member entitled to notice of the meeting who is of record as of the day next preceding the day on which notice is given or, if a record date therefor is duly fixed, of record as of said date; if mailed, the notice shall be addressed to the members at their respective addresses as they appear on the records of the

Company. Notice of the time, place and purposes of any meeting of members may be waived in writing, either before or after the holding of such meeting, by any members, which writing shall be filed with or entered upon the records of the meeting. The attendance of any members at any such meeting without protesting the lack of proper notice, prior to or at the commencement of the meeting, shall be deemed to have waived notice of such meeting.

7.5 **Quorum; Adjournment**. At any meeting of Members, whether present in person or by proxy, a Majority-In-Interest of Members shall constitute a quorum for such meeting; provided, however, that no action required by law, by the Articles of Organization to be authorized or taken by a designated proportion of the Percentage Interests of the Company, or a particular class thereof, may be authorized or taken by a lesser proportion; and provided, further, that the holders of a majority of the Percentage Interests represented thereat, whether or not a quorum is present, may adjourn such meeting from time to time; if any meeting is adjourned, notice of such adjournment need not be given if the time and place to which such meeting is adjourned are fixed and announced at such meeting. Members may participate in any meeting through telephonic or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

7.4 **Voting of Members**. On any matter before the Members for a vote, each Member shall have one vote for each Unit owned by him. The following actions shall require the approval of Members holding a majority of the then outstanding Units: (i) any modification to the Operating Agreement materially changing the rights of the Members; and (ii) dissolution of the Company. Members entitled to vote or to act with respect to Units in the Company may vote or act in person or by proxy. The person appointed as proxy need not be a Member. Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the person having appointed a proxy shall not operate to revoke the appointment. Notice to the Company, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or act previously taken or authorized.

7.5 **Action Without a Meeting**. Any action which may be authorized or taken at a meeting of the members may be authorized or taken without a meeting in a writing or writings signed by all of the members entitled to vote on such matter, which writing or writings shall be filed with or entered upon the records of the Company. A facsimile, photographic, photostatic, facsimile or similar transmission or reproduction of a writing signed by a member, shall be regarded as signed by the member for purposes of this Section.

## ARTICLE 8
## RESTRICTIONS ON TRANSFER

8.1 **Transfers**. No Member may voluntarily Transfer all, or any portion of, or any interest or rights in, the Units owned by the Member. Each Member acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The voluntary Transfer of any Units, including Economic Interests, in violation of the prohibition contained in this Article 8 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Units are attempted to be transferred in violation of this Article 8 shall not be entitled to vote, receive distributions from the Company, or have any other rights in or with respect to the Units.

8.2 **Voluntary Withdrawal**. No Member shall have the right or power to Voluntarily Withdraw from the Company. Any Voluntary Withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such Member.

8.3 **Involuntary Withdrawal**. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawing Member shall thereupon become an Interest Holder, but shall not become a Member. The successor Interest Holder shall have all the rights of an Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of the Units, the fair market value of the Member's Economic Interest.

8.4 **Right of First Refusal.**

8.4.1 **Voluntary Transfer**. If any Member intends to transfer his/her Units or any part thereof to any person or entity, after obtaining approval required hereunder, such Member shall give written notice to the Company of his intention so to transfer. The notice, in addition to stating the fact of the intention to transfer Units, shall describe (i) the Units to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so, the amount of the consideration and the other terms of the sale. The Company shall promptly send a copy of such notice to all other Members of the Company.

8.4.2 **Company Option**. Within thirty (30) days after the receipt by the Company of the notice of intention to transfer the Units, the Company may exercise an option, which is hereby granted by the Member intending to Transfer his/her Units, to purchase the Units proposed to be transferred, for the price and upon the other terms hereinafter provided. The Company may, at its election, terminate its option period by giving a notice to the selling Member and all other Members that the Company has elected not to exercise its option granted in this Section 8.4.2.

8.4.3 **Member Option**. In the event that the option granted to the Company in Section 8.4.2 is not exercised in its entirety, then the remaining Members of the Company may, within the earlier of (i) sixty (60) days from receipt of notice of intention to transfer from the transferring Member, or (ii) thirty (30) days from receipt of notice that the Company has elected not to exercise its option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one Member exercises the option hereunder, such Members (hereinafter, the "**Participating Members**") shall be entitled to purchase a proportion of the Units proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Percentages of each such Participating Member and the denominator of which shall be equal to the aggregate Percentages owned by all Participating Members, or such other proportion of such Units as shall be agreed upon in writing by all Participating Members. The option granted to the Members in this Section 8.4.3 shall expire at the end of the option period herein granted if options for the Units are not exercised by the last date of such option period.

8.4.4 **Involuntary Transfer**. If a Member's Units are transferred by operation of law to any person (such as, but not limited to, a deceased Member's estate, a Member's trustee in bankruptcy, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent Member), the Company within forty-five (45) days of the receipt by it of actual notice of the transfer may exercise its option, which is hereby granted, and, if not exercised by the Company, the Members within sixty (60) days of the receipt of actual notice of the transfer may exercise their respective options, which are hereby granted, to purchase the Units so transferred for the price determined and in the manner provided in this Section 8.4.

8.4.6 **Exercise of Options**. The purchase options granted in this Section 8.4 shall be exercised by delivery of written notice of exercise within the time periods provided in said section to the transferring Member and/or the proposed transferee in the case of a transfer pursuant to Section 8.4.2, 8.4.3 or 8.4.4, as the case may be.

8.4.7 **Failure to Exercise Option**. If the purchase options are not exercised in compliance with this Section 8.4, then the Units may be transferred to the proposed transferee named in the notice required by Section 8.4.1, and upon the terms therein stated, or to the transferee in the case of an Involuntary Withdrawal, within thirty (30) days after the expiration of the option period granted in Section 8.4.4. In the case of a Transfer as the result of an Involuntary Withdrawal, unless otherwise prohibited therein, the Units, after the expiration of the option periods set forth therein shall, in the hands of the transferee, be subject to the provisions of this Agreement. A subsequent transferee under Section 8.4 shall thereafter be subject to the terms of this Agreement as if such transferee had originally executed it. Unless and until admitted as a Member, any transferee of any Units, shall be merely an Interest Holder and subject to the terms of this Agreement.

8.4.7 **Transfers Not in Compliance with this Section**. If a Transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring Member by Section 8.4.1, or is not within the time periods provided, or the transferor, after the transfer, reacquires the transferred Units, the Units transferred shall remain subject to this Company Agreement as if no transfer had been made.

8.4.8 **Fair Market Value.**

8.4.8.1 The value of each Unit to be purchased and sold upon exercise of the option granted in Section 8.4.4 shall be its Fair Market Value determined pursuant to an independent appraisal performed by an independent appraisal firm qualified in valuing interests in comparable companies in the same industry to determine the Fair Market Value and to prepare a written appraisal of any Units to be repurchased upon exercise of the option granted in Section 8.4.4. Without limiting the appraiser's consideration of any particular relevant fact in preparing its appraisal, the appraiser shall take into account (i) the criteria discussed in the previous sentence in determining the Fair Market Value of any Units (or portion thereof), (ii) the fact that only the Economic Interest is being transferred, if applicable, and (iii) in such a case, the transferring Member's death. The Fair Market Value of the Units shall be determined as of the last day of the month preceding the month in which the transfer of the Units occurred, unless the transfer shall have occurred within three (3) months prior to or within three (3) months after the end of a fiscal year of the Company, in which case Fair Market Value shall be determined as of the last day of such fiscal year.

8.4.8.2 In the event the transferee disagrees with the Fair Market Value determined by the independent appraiser pursuant to Section 8.4.8.1, such transferee shall notify the remaining Members in writing within thirty (30) days after such transferee receives the notice from remaining Members of the determination of Fair Market Value prescribed in Section 8.4.8.1 above. If the remaining Members and such transferee cannot agree on such Fair Market Value within thirty (30) days after the receipt by the remaining Members of the transferee's notice disagreeing with such determination, then the issue shall be referred to two (2) appraisers, one of which shall be the remaining Member's existing appraiser and one of which shall be selected by the transferee. If such appraisers cannot agree upon a Fair Market Value within thirty (30) days after they are appointed as provided for above, then the issue shall be referred to an appraiser selected by the appraisers selected by the remaining Members and the transferee. The parties to the dispute shall cause such additional appraiser to render within thirty (30) days after its appointment a decision regarding the Fair Market Value, such decision shall be binding on the parties to the dispute for the purpose of this Section 8.4.8.

8.4.8.3 The Company shall bear the fees and expenses of the appraiser selected by the remaining Member under Section 8.4.8.1. The Company shall also bear the fees and expenses of the appraiser selected by the transferee and the additional appraiser selected under Section 8.4.8.2 in the event the Fair Market Value finally determined pursuant to Section 8.4.8.2 is more than 10% greater than the Fair Market Value initially proposed by the remaining Members (or an appraiser chosen pursuant to Section 8.4.8.2); and, provided, further, however, that if the Fair Market Value of the Units of more than one transferring Member is the subject of any appraiser's determination under this Section 8.4.8, then each transferee shall pay his or her pro rata share (based upon the Fair Market Value of all such transferees' interests) of the fees and expenses, if any, required to be borne by such transferees under this Section 8.4.8.

8.4.8.4 Notwithstanding anything to the contrary herein, no payment of the purchase price under this Article 8 may be made to any selling Member or his/her legal representatives to the extent the remaining Members determine that (a) such payment would cause an event of default or potential event of default to occur under the terms of any credit agreement to which the Company is a party, (b) the Company is unable to fund such payment out of available cash or secure reasonable financing to make such payment, or (c) such payment would otherwise have a materially negative impact on the Company or its business. In such circumstance, the Company agrees that is shall use its good-faith efforts to (a) have such default or potential event of default waived with respect to such payment, (b) secure such reasonable financing, or (c) pay that portion of such payment that does not cause a materially negative

impact on the Company or its business and pay the remainder of any such payment as soon as practicable without causing such a materially negative impact. In addition, each selling Member hereby agrees and acknowledges that the right to receive any payment of purchase price shall be forfeited by such selling Member if prior to the making of such payment the remaining Members determine that the selling Member has breached the terms of this Company Agreement (which breach remains uncured).

8.4.10 **Purchase Price**. The price of each Unit to be purchased and sold under this Agreement shall be as follows:

8.4.10.1 A purchase of Units pursuant to the options granted under Sections 8.4.2, 8.4.3 or 8.4. shall be the consideration set forth in the notice required of a selling Member by Section 8.4.1.

8.4.10.2 A purchase of Units pursuant to the option granted under Section 8.4.5 shall be for a price equal to one hundred (100%) percent of the Fair Market Value of Units established under Section 8.4.9.

8.4.11 **Closing; Payment of the Purchase Price**. The purchase price for the Units shall be paid in cash. Unless otherwise agreed by the parties, the closing of the sale and purchase of the Units shall take place on the later of thirty (30) days after the delivery to the selling Member or the transferee of the written notice by the Company of its exercise of the option to purchase the selling Member's Units or thirty (30) days after the date on which Fair Market Value is determined pursuant to Section 8.4.8 above.

8.5 **Effect of Assignment**. A Member shall cease to be a Member of the Company and to have the power to exercise any rights or powers of a Member upon transfer of all of the Member's Units.

8.6 **Rights of Interest Holders**. Interest Holders have no voting rights in the Company and are only entitled to receive the Economic Interest attributable to the Units transferred, subject to the terms and conditions set forth in this Agreement.

8.7 **Admission of Additional Members**. A Person may be admitted as a Member and, upon such admission, shall be admitted to all the rights, including Economic Interests and voting rights, of the Units upon approval of a Majority-In-Interest of Members. Members may grant or withhold the approval of such admission in their sole and absolute discretion. If so admitted, such newly admitted Member shall have all the rights and powers and be subject to all the restrictions and liabilities of the Units assigned. The admission of an Interest Holder to membership, without more, shall not release the Member originally assigning the Units from any liability to the Company that may have existed prior to the admission of the Interest Holder as a Member of the Company. No Members admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Company may, at the time a Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted in accordance with the Code.

## ARTICLE 9

## WITHDRAWAL; DISSOLUTION AND WINDING UP

9.1 **Withdrawal**. A Member shall not be permitted to withdraw or resign from the Company. The death, incompetency, adjudication of bankruptcy, whether voluntary or involuntary, or the Bankruptcy or dissolution of a Member during the term of this Agreement, shall not affect the Company or its business.

9.2 **Termination of the Company**. The Company shall be terminated and dissolved upon the first to occur of the following: (a) upon the unanimous vote of the Members; or (b) upon the sale of all or substantially all the assets of the Company.

9.3 **Winding Up**. Upon the termination of the Company pursuant to Section 10.2 above, a full and general accounting shall be taken of the Company's business, and the affairs of the Company shall be

wound up. Any profits earned or losses incurred since the last accounting shall be allocated among, or borne by, the Members in the same manner as Profits. The Members shall wind up and liquidate the Company by selling the Company's assets, or by distributing such assets in kind, subject to the Company's liabilities, or by a combination thereof, as determined by a Majority-In-Interest of Members. The proceeds of such liquidation shall be applied and distributed in the following order of priority, by the end of the taxable year during which the liquidation occurs (or, if later, within ninety (90) days after the date of the liquidation): (a) to the payment of any debts and liabilities of the Company; (b) to the setting up of any reserve which the Members shall reasonably deem necessary to provide for any contingent or unforeseen liabilities or obligations of the Company, with any excess in such reserve remaining after such liabilities are satisfied to be distributed as soon as practicable in the manner hereinafter set forth; and (c) thereafter, the balance of the proceeds, if any, shall be distributed in accordance with the positive Adjusted Capital Contributions of the Members, as determined after taking into account all capital account adjustments for the Company's taxable year during which such liquidation occurs. For purposes of this subsection, a liquidation of the Company shall mean a liquidation as defined in Section 1.704-1(b)(2)(ii)(g) of the Regulations.

9.4 **Statement**. The Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the date of complete liquidation.

9.5 **Return of Capital Contributions**. Notwithstanding anything in this Agreement to the contrary, no Member shall be personally liable for the return of the capital contributions of the Members, or any portion thereof, it being expressly understood that any such return of the capital contributions of the Members shall be made solely from Company assets.

## ARTICLE 10

## DISCLOSURES AND REPRESENTATIONS

10.1 **Disclosure by Company**. In connection with the offer and sale of Units to Members hereunder, the Company hereby discloses that the Units have not been registered under the Federal Securities Act of 1933, as amended (the "**Securities Act**"), and are being offered and sold by the Company pursuant to one or more exemptions from registration under the Securities Act, including the exemption provided by Section 4(2) of the Securities Act, Regulation D promulgated thereunder, and exemptions available under applicable state securities laws and regulations.

10.2 **Representations and Warranties**. In connection with a Member's purchase of Units, each Member represents and warrants, which representations and warranties shall survive the consummation of the Member's purchase of such Units, as follows: (a) the Member's principal residence is located within the country, state/province and at the address listed in Schedule A hereto; (b) the Member is aware that no market exists for the resale of Units; (c) the Member is purchasing the Units for investment and not for distribution; (d) the Member is aware of all restrictions imposed by the Company on the sale or transfer of the Units, including, but not limited to, any restrictive legends appearing on the certificate(s) and/or other document(s) evidencing the Units; (e) the Member acknowledges and understands that the Company has been organized with the intention that it qualify for taxation as a Company for U.S. federal income tax purposes. The Member acknowledges that the provisions of Subchapter K of the Code, and the Regulations promulgated thereunder will apply to the Company, and intend that the allocations of taxable income and loss, distributions to the Members and maintenance of Capital Accounts all conform to the requirements of the Code and the applicable Regulations; (f) the Member has full legal capacity to execute and agree to this Agreement and to perform his obligations hereunder; (g) the Member has duly executed and delivered this Agreement; (h) the Member's authorization, execution, delivery and performance of this Agreement do not conflict with any other material agreement or arrangement to which that Member is a party or by which he is bound or with any law or regulation to which that Member is subject; and (i) this Agreement constitutes the valid, binding and enforceable agreement of that Member, except to the extent such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights

and remedies of creditors, as well as general principles of equity (regardless of whether considered in a proceeding in equity or in law).

## ARTICLE 11
## MISCELLANEOUS

11.1 **Amendments**. This Agreement may be amended only with the written approval of all of the Members.

11.2 **Obligations and Rights of Transferees**. Any person who acquires in any manner whatsoever any Membership Unit in the Company, irrespective of whether such person has accepted and assumed in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to, and to be bound by, all the obligations of this Agreement with the same force and effect as any predecessor in interest of such person.

11.3 **Benefit and Binding Effect**. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next of kin, legatees, administrators, executors, legal representatives, nominees, successors and permitted assigns.

11.4 **Integration**. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

11.5 **Governing Law**. This Agreement and the rights of all parties hereunder shall be governed by, and construed in accordance with, the laws of the State of California, without regard to the conflicts of laws principles thereof.

11.6 **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be considered an original when executed by one or more of the Members.

11.7 **Severability**. If any provision of this Agreement is declared by any court of competent jurisdiction to be invalid or unenforceable such invalidity or unenforceability shall not affect the remaining provisions of this Agreement. If such invalidity or unenforceability is due to the court's determination that the provision's scope is excessively broad or restrictive under applicable law then in effect, the parties hereby jointly request that such provision be construed by modifying its scope so as to be enforceable to the fullest extent of applicable law then in effect. If any provision is held to be invalid or unenforceable with respect to a particular circumstance, such provision shall nevertheless remain in full force and effect in all other circumstances.

11.8 **No Waiver**. The waiver by any party hereto of any breach of any provision of this Agreement shall not be deemed a continuing waiver, and shall not affect any subsequent breach of the same or different provisions of this Agreement.

11.9 **Further Assurances**. Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including using all commercially reasonable efforts to remove any legal impediment to the consummation or effectiveness of such transactions and to obtain any consents and approvals required under this Agreement.

11.10 **Neutral Construction**. The construction and interpretation of any clause or provision of this Agreement shall be construed without regard to the identity of the party that prepared this Agreement, and no presumption shall arise as a result that this Agreement was prepared by one party or the other.

11.11 **Attorneys' Fees**. In the event a dispute arises regarding this Agreement, the prevailing party shall be entitled to recover all attorneys' fees and expenses incurred.

11.12 **Injunctive Relief**. Without intending to limit the remedies available to either party, each party hereby acknowledges that a breach of any of the restrictive covenants contained in this Agreement may result in material and irreparable injury to the other party for which there is no adequate remedy at law, and that it may not be possible to measure damages for such injuries with reasonable certainty. In the event of such a breach or threat thereof, a party shall be entitled to obtain a temporary restraining order and/or a preliminary injunction restraining any other party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants in this Agreement. The parties expressly agree that it shall not be a defense in such an injunction action that a party had previously breached this Agreement.

11.13 **Representation of Counsel**. All parties acknowledge that prior to executing this Agreement, they have been advised to seek independent legal counsel. In executing this Agreement, all parties represent and warrant that they relied exclusively upon the advice of their respective independent legal counsel and are not entering into this Agreement based upon any representation of any other party or any other party's counsel.

11.14 **Jurisdiction**. Any and all legal proceedings to enforce this Agreement, or to enforce or vacate any judgment or award rendered therein, whether in contract, tort, equity or otherwise, shall be brought in the state or federal courts sitting in the district encompassing Los Angeles County, California, the parties hereto hereby waiving any claim or defense that such forum is not convenient or proper. Each party hereby agrees that any such court shall have in personam jurisdiction over it, and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner specified by law.

11.15 **Force Majeure**. Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused (I) by causes beyond that party's reasonable control and occurring without its fault or negligence, including, without limitation, failure of suppliers, subcontractors, and carriers, or party to substantially meet its performance obligations under this Agreement, provided that, as a condition to the claim of nonliability, the party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

11.16 **Notice**. All notices, requests, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service, if personally served; (b) on the day of facsimile over telephone lines with same day first class mailing of both the original of the documents and a proof of transmission; (c) on the day after mailing if sent by express overnight air courier guaranteeing next day delivery with written evidence of delivery; or (d) five (5) days after the date of mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed to the parties at the addresses listed above. Each party is required to notify the other party in the above manner of any change in address.

**[SIGNATURE PAGE FOLLOWS]**

**OPERATING AGREEMENT**
**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**
*a California Limited Liability Company*

Dated August 25, 2010

IN WITNESS WHEREOF, each Member has executed this Operating Agreement on the day and year first written above and by so doing consents to and agrees to be bound by the terms of this agreement.

**MEMBERS**

______________________________
Charles Liu

______________________________
John P. Thropay, M.D.

**OPERATING AGREEMENT**
**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**
a California Limited Liability Company

**SCHEDULE A**

**OFFICERS, MEMBERS, UNITS**
*As of August 25, 2010*

**Members**

| Name and Address | No. of Units | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Charles Liu<br>11 Candlewood<br>Montebello, CA | 75 | $1 | 75% |
| John P. Thropay, M.D.<br>[redacted]<br>BRADBURY, CA | 25 | $1 | 25% |

**Officers**

| Name and Address | Office | |
|---|---|---|
| John P. Thropay, M.D. | President | [redacted] BRADBURY, CA |
| Ruth T. Lopez Novodor | Secretary | [redacted] BRADBURY CA |
| Charles Liu | Treasurer | [redacted] IRVINE, CA |

# EXHIBIT 5

**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**
200 E. BEVERLY BLVD., SUITE 200
MONTEBELLO, CA 90640-7001
T: 323-517-9800 F: 323-727-7574

U.S. Citizenship and Immigration Service
California Service Center
ATTN: EB5 RC Proposal
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

Re: Pacific Proton Therapy Regional Center Information for USCIS Website

To whom it may concern:

Please note the below information concerning the Pacific Proton Therapy Regional Center. Please use this information for the USCIS website subsequent to regional center designation.

**Name of Regional Center:** Pacific Proton Therapy Regional Center, LLC

**Address:** 200 E. Beverly Blvd, Suite 200, Montebello, CA 90640

**Primary Contact:** Charles Liu, President

**Email/Web Address:** charlesliu@me.com

**Phone:** 323-517-9800 **Fax:** 323-727-7574

**Geographic Scope:** Los Angeles, Orange, San Bernardino, and Riverside Counties, CA

**Industries:** Construction (NAICS 23), Manufacturing (NAICS 33), Healthcare and Social Assistance (NAICS 62), Accommodation and Food Services (NAICS 72), Administrative and Support Services (NAICS 56), and Retail Trade (NAICS 44)

Sincerely,

Charles Liu
President

# EXHIBIT 6

Pacific Proton Therapy Regional Center Geographical Area




11-19-10

# EXHIBIT 7

GOVERNOR ARNOLD SCHWARZENEGGER

April 21, 2008

Ms. Barbara Q. Velarde
Chief
Office of Service Center Operations
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue NW
Room 2123
Washington, DC 20529

RE: State Designation of Agency

Dear Ms. Velarde,

Under section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), 10,000 immigrant visas per year are available to qualified individuals seeking permanent resident status on the basis of their engagement in a new commercial enterprise. I am writing to update your records as to the authorized California Agency to designate geographic areas as a high unemployment area ("targeted employment area") to comply with the components of the Immigration Investor Program.

As Governor of the State of California, I select the Secretary of Business, Transportation and Housing (BTH), or his or her designee, to be the authorized entity empowered to certify identified targeted employment area that meet the qualifications to be designated for the Immigration Investor Program. The Secretary of BTH will, upon request, certify by letter to the U.S. Citizenship and Immigration Services that the areas where the investments are being directed meets the definition of "high unemployment," that the data reflects the unemployment rate for the area to be in excess of 150 percent of the national average and the "targeted employment area" designation will remain in effect for the foreseeable future.

Sincerely,

Arnold Schwarzenegger

/la

STATE CAPITOL • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# EXHIBIT 8

**STATE OF CALIFORNIA**

**ARNOLD SCHWARZENEGGER**
Governor

Department of Alcoholic Beverage Control
Department of Corporations
Department of Financial Institutions
California Highway Patrol
California Housing Finance Agency
Department of Housing & Community Development
Department of Managed Health Care
Department of Motor Vehicles
Board of Pilot Commissioners

**DALE E. BONNER**
Secretary

Department of Real Estate
Department of Transportation
Office of the Patient Advocate
Office of Real Estate Appraisers
Office of Traffic Safety
California Film Commission
California Office of Tourism
Infrastructure and Economic Development Bank
Public Infrastructure Advisory Commission

**BUSINESS, TRANSPORTATION AND HOUSING AGENCY**

November 9, 2010

Department of Homeland Security
U.S. Citizenship and Immigration Services (USCIS)
California Service Center
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

To Whom It May Concern:

Section 204.6(i) of Title 8, Code of Federal Regulations (CFR) governing alien entrepreneur immigrant visa petitions under the USCIS administered EB-5 visa program authorizes the state government of any state of the United States to designate a particular geographic or political subdivision located within a metropolitan statistical area or within a city or town having a population of 20,000 or more within such state as a high unemployment area if the area experienced an unemployment rate of at least 150 percent of the national average. The designation of high unemployment areas in the State of California has been delegated to the Secretary of the Business, Transportation and Housing Agency. Accordingly, this agency is the authorized entity in California to designate a particular area within these statistical areas as a high unemployment area. *8 FCR §204.6(j)(6)(ii)*. It is also this agency that has the authority to certify that a metropolitan statistical area, a specific county, city, town, or census designated place (CDP) within a metropolitan statistical area, has experienced an average unemployment rate of 150 percent of the national average rate. Such certification is based on official estimated unemployment data provided by the Employment Development Department of this state.

The national average unemployment rate for calendar year 2009, as calculated by the U.S. Bureau of Labor Statistics, was 9.3% requiring an unemployment rate of 13.95% or greater for "high unemployment area" eligibility.

A request for designation of a special high unemployment area has been received to accommodate a prospective medical office at 120 W. Hellman Avenue, Monterey Park, Los Angeles, California. The desired geographical area would include 20 contiguous census tracts as listed below. **The area identified as a whole has an average unemployment rate of 17.7%.** This unemployment rate was calculated based on the Census Share Methodology prescribed by the U.S. Department of Labor for all states in designating high unemployment areas under the Immigration Act of 1990. As shown in the calculations, the Census Share Methodology

980 9th Street, Suite 2450 • Sacramento, CA 95814-2719 • (916) 323-5400 • Fax: (916) 323-5440
www.bth.ca.gov • FLEX YOUR POWER! • BE ENERGY EFFICIENT!

indicated that the unemployment rate of the designated area consisting of the listed census tracts was over 150 percent of the national unemployment rate for calendar year 2009.

| Census Tract | 2000 Empl | 2000 Unempl | 2000 Un Rate | 2009 Lab Force | 2009 Empl | 2009 Unempl | 2009 Un Rate |
|---|---|---|---|---|---|---|---|
| 204910 | 838 | 196 | 19.0% | 1,231 | 918 | 314 | 25.5% |
| 204920 | 907 | 175 | 16.2% | 1,273 | 993 | 280 | 22.0% |
| 205120 | 1,071 | 220 | 17.0% | 1,525 | 1,173 | 352 | 23.1% |
| 481713 | 1,122 | 76 | 6.3% | 1,350 | 1,228 | 122 | 9.0% |
| 481714 | 875 | 101 | 10.3% | 1,120 | 958 | 162 | 14.4% |
| 482101 | 1,870 | 122 | 6.1% | 2,243 | 2,047 | 195 | 8.7% |
| 482102 | 1,269 | 86 | 6.3% | 1,527 | 1,389 | 138 | 9.0% |
| 482701 | 1,612 | 139 | 7.9% | 1,988 | 1,765 | 223 | 11.2% |
| 530400 | 1,181 | 239 | 16.8% | 1,676 | 1,293 | 383 | 22.8% |
| 530500 | 1,215 | 209 | 14.7% | 1,665 | 1,330 | 335 | 20.1% |
| 530602 | 396 | 89 | 18.4% | 576 | 434 | 143 | 24.7% |
| 530902 | 1,255 | 148 | 10.5% | 1,611 | 1,374 | 237 | 14.7% |
| 531000 | 1,728 | 200 | 10.4% | 2,212 | 1,892 | 320 | 14.5% |
| 531102 | 951 | 153 | 13.9% | 1,286 | 1,041 | 245 | 19.0% |
| 531301 | 1,838 | 353 | 16.1% | 2,578 | 2,012 | 565 | 21.9% |
| 531302 | 2,029 | 316 | 13.5% | 2,728 | 2,222 | 506 | 18.6% |
| 531501 | 2,207 | 278 | 11.2% | 2,862 | 2,416 | 445 | 15.6% |
| 532302 | 1,264 | 181 | 12.5% | 1,674 | 1,384 | 290 | 17.3% |
| 532303 | 1,618 | 290 | 15.2% | 2,236 | 1,772 | 464 | 20.8% |
| 532304 | 1,188 | 305 | 20.4% | 1,789 | 1,301 | 488 | 27.3% |
| Total | 26434 | 3876 | 14.7% | 35150 | 28943 | 6207 | 17.7% |

Therefore, in accordance with the cited federal regulations, the Business, Transportation and Housing Agency is hereby designating the geographic subdivision consisting of the area described by the census tracts listed above as a high unemployment area ("targeted employment area"), for the purposes of alien entrepreneur visa requests. *8 CFR sections 204.6(h)(i) and (j)(6)(ii).*

This designation is effective until April of 2011 when unemployment estimate data will be published for calendar year 2010. The Census Share Methodology will continue to be used in subsequent years and, given the uncertainties about the area's unemployment rate and the

national unemployment rate there is no guarantee that this area will continue to remain a high unemployment area ("targeted employment area").

Sincerely,

GABOR MOROCZ
Deputy General Counsel

For DALE E. BONNER
Secretary of the Business, Transportation and Housing Agency

| County | FIP Code | 2000 Census Tract | 2000 Total Pop. | 2000 Labor Force Emp. | 2000 Labor Force Unemp. | 2000 Unemp. Rate | 2009 AA Labor Force | 2009 AA Labor Force Emp. | 2009 AA Labor Force Unemp. | 2009 AA Unemp. Rate | 2009 Qualify |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alameda | 001 | 400800 | 3367 | 1461 | 193 | 11.67% | 1825 | 1437 | 389 | 21.29% | YES |
| Alameda | 001 | 400900 | 2457 | 1138 | 118 | 9.39% | 1357 | 1119 | 238 | 17.51% | YES |
| Alameda | 001 | 401000 | 5709 | 2304 | 262 | 10.21% | 2793 | 2266 | 527 | 18.88% | YES |
| Alameda | 001 | 401300 | 2920 | 1050 | 144 | 12.06% | 1322 | 1033 | 290 | 21.92% | YES |
| Alameda | 001 | 401400 | 4765 | 1266 | 333 | 20.83% | 1915 | 1245 | 670 | 35.00% | YES |
| Alameda | 001 | 401500 | 2578 | 770 | 290 | 27.36% | 1341 | 757 | 584 | 43.53% | YES |
| Alameda | 001 | 401600 | 1768 | 531 | 192 | 26.56% | 909 | 522 | 387 | 42.54% | YES |
| Alameda | 001 | 401700 | 1768 | 707 | 83 | 10.51% | 862 | 695 | 167 | 19.38% | YES |
| Alameda | 001 | 401800 | 2063 | 521 | 107 | 17.04% | 728 | 512 | 215 | 29.60% | YES |
| Alameda | 001 | 401900 | 797 | 359 | 35 | 8.88% | 423 | 353 | 70 | 16.64% | YES |
| Alameda | 001 | 402100 | 1258 | 387 | 132 | 25.43% | 646 | 381 | 266 | 41.12% | YES |
| Alameda | 001 | 402200 | 1712 | 495 | 172 | 25.79% | 833 | 487 | 346 | 41.57% | YES |
| Alameda | 001 | 402300 | 413 | 202 | 20 | 9.01% | 239 | 199 | 40 | 16.85% | YES |
| Alameda | 001 | 402400 | 2628 | 750 | 115 | 13.29% | 969 | 738 | 232 | 23.89% | YES |
| Alameda | 001 | 402500 | 1695 | 537 | 117 | 17.89% | 764 | 528 | 236 | 30.84% | YES |
| Alameda | 001 | 402700 | 2008 | 746 | 99 | 11.72% | 933 | 734 | 199 | 21.36% | YES |
| Alameda | 001 | 402800 | 1863 | 528 | 56 | 9.59% | 632 | 519 | 113 | 17.84% | YES |
| Alameda | 001 | 403000 | 2602 | 728 | 71 | 8.89% | 859 | 716 | 143 | 16.64% | YES |
| Alameda | 001 | 403100 | 1676 | 418 | 87 | 17.23% | 586 | 411 | 175 | 29.88% | YES |
| Alameda | 001 | 405400 | 8381 | 3495 | 302 | 7.95% | 4045 | 3437 | 608 | 15.03% | YES |
| Alameda | 001 | 405500 | 4147 | 1879 | 182 | 8.83% | 2214 | 1848 | 366 | 16.55% | YES |
| Alameda | 001 | 405600 | 3734 | 1749 | 169 | 8.81% | 2060 | 1720 | 340 | 16.51% | YES |
| Alameda | 001 | 405900 | 7883 | 2586 | 359 | 12.19% | 3266 | 2543 | 723 | 22.13% | YES |
| Alameda | 001 | 406100 | 4301 | 1422 | 144 | 9.20% | 1688 | 1398 | 290 | 17.17% | YES |
| Alameda | 001 | 406201 | 5802 | 1612 | 324 | 16.74% | 2237 | 1585 | 652 | 29.15% | YES |
| Alameda | 001 | 406202 | 5084 | 1558 | 190 | 10.87% | 1915 | 1532 | 382 | 19.98% | YES |
| Alameda | 001 | 406300 | 4410 | 1362 | 188 | 12.13% | 1718 | 1339 | 378 | 22.03% | YES |
| Alameda | 001 | 406400 | 2267 | 667 | 110 | 14.16% | 877 | 656 | 221 | 25.24% | YES |
| Alameda | 001 | 406500 | 6262 | 2355 | 378 | 13.83% | 3077 | 2316 | 761 | 24.73% | YES |
| Alameda | 001 | 406600 | 7805 | 3095 | 307 | 9.02% | 3662 | 3044 | 618 | 16.88% | YES |
| Alameda | 001 | 407000 | 6652 | 2562 | 345 | 11.87% | 3214 | 2519 | 695 | 21.61% | YES |
| Alameda | 001 | 407100 | 8376 | 3021 | 515 | 14.56% | 4008 | 2971 | 1037 | 25.87% | YES |
| Alameda | 001 | 407200 | 7132 | 2406 | 269 | 10.06% | 2908 | 2366 | 542 | 18.62% | YES |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles | 037 | 504001 | 4784 | 2234 | 339 | 13.18% | 2989 | 2446 | 543 | 18.16% | YES |
| Los Angeles | 037 | 530004 | 3641 | 1239 | 174 | 12.31% | 1635 | 1357 | 279 | 17.04% | YES |
| Los Angeles | 037 | 530101 | 5208 | 1793 | 200 | 10.04% | 2283 | 1963 | 320 | 14.03% | YES |
| Los Angeles | 037 | 530202 | 3912 | 1427 | 197 | 12.13% | 1878 | 1562 | 315 | 16.80% | YES |
| Los Angeles | 037 | 530204 | 3659 | 1320 | 154 | 10.45% | 1692 | 1445 | 247 | 14.58% | YES |
| Los Angeles | 037 | 530301 | 2553 | 819 | 113 | 12.12% | 1078 | 897 | 181 | 16.79% | YES |
| Los Angeles | 037 | 530302 | 6304 | 2075 | 349 | 14.40% | 2831 | 2272 | 559 | 19.74% | YES |
| Los Angeles | 037 | 530400 | 3853 | 1181 | 239 | 16.83% | 1676 | 1293 | 383 | 22.84% | YES |
| Los Angeles | 037 | 530500 | 4576 | 1215 | 209 | 14.68% | 1665 | 1330 | 335 | 20.10% | YES |
| Los Angeles | 037 | 530602 | 1584 | 396 | 89 | 18.35% | 576 | 434 | 143 | 24.74% | YES |
| Los Angeles | 037 | 530700 | 2187 | 636 | 93 | 12.76% | 845 | 696 | 149 | 17.62% | YES |
| Los Angeles | 037 | 530901 | 3954 | 969 | 228 | 19.05% | 1426 | 1061 | 365 | 25.60% | YES |
| Los Angeles | 037 | 530902 | 4010 | 1255 | 148 | 10.55% | 1611 | 1374 | 237 | 14.71% | YES |
| Los Angeles | 037 | 531000 | 5511 | 1728 | 200 | 10.37% | 2212 | 1892 | 320 | 14.48% | YES |
| Los Angeles | 037 | 531102 | 2975 | 951 | 153 | 13.86% | 1286 | 1041 | 245 | 19.05% | YES |
| Los Angeles | 037 | 531301 | 5490 | 1838 | 353 | 16.11% | 2578 | 2012 | 565 | 21.93% | YES |
| Los Angeles | 037 | 531302 | 6568 | 2029 | 316 | 13.48% | 2728 | 2222 | 506 | 18.55% | YES |
| Los Angeles | 037 | 531501 | 7634 | 2207 | 278 | 11.19% | 2862 | 2416 | 445 | 15.56% | YES |
| Los Angeles | 037 | 531502 | 3367 | 1053 | 190 | 15.29% | 1457 | 1153 | 304 | 20.88% | YES |
| Los Angeles | 037 | 531602 | 4407 | 1319 | 184 | 12.24% | 1739 | 1444 | 295 | 16.95% | YES |
| Los Angeles | 037 | 531603 | 3539 | 969 | 157 | 13.94% | 1312 | 1061 | 251 | 19.16% | YES |
| Los Angeles | 037 | 531800 | 5274 | 1671 | 190 | 10.21% | 2134 | 1830 | 304 | 14.26% | YES |
| Los Angeles | 037 | 531901 | 6402 | 1988 | 240 | 10.77% | 2561 | 2177 | 384 | 15.01% | YES |
| Los Angeles | 037 | 532001 | 3182 | 989 | 119 | 10.74% | 1273 | 1083 | 191 | 14.97% | YES |
| Los Angeles | 037 | 532002 | 3109 | 999 | 115 | 10.32% | 1278 | 1094 | 184 | 14.41% | YES |
| Los Angeles | 037 | 532101 | 6593 | 2041 | 330 | 13.92% | 2763 | 2235 | 528 | 19.13% | YES |
| Los Angeles | 037 | 532302 | 4581 | 1264 | 181 | 12.53% | 1674 | 1384 | 290 | 17.32% | YES |
| Los Angeles | 037 | 532303 | 4453 | 1618 | 290 | 15.20% | 2236 | 1772 | 464 | 20.77% | YES |
| Los Angeles | 037 | 532304 | 3877 | 1188 | 305 | 20.43% | 1789 | 1301 | 488 | 27.30% | YES |
| Los Angeles | 037 | 532500 | 4343 | 1543 | 214 | 12.18% | 2032 | 1689 | 343 | 16.86% | YES |
| Los Angeles | 037 | 532603 | 3492 | 1068 | 135 | 11.22% | 1386 | 1169 | 216 | 15.60% | YES |
| Los Angeles | 037 | 532700 | 2777 | 749 | 135 | 15.27% | 1036 | 820 | 216 | 20.86% | YES |
| Los Angeles | 037 | 532800 | 4387 | 1105 | 255 | 18.75% | 1618 | 1210 | 408 | 25.24% | YES |
| Los Angeles | 037 | 532900 | 6389 | 1602 | 338 | 17.42% | 2295 | 1754 | 541 | 23.58% | YES |
| Los Angeles | 037 | 533000 | 7166 | 2076 | 261 | 11.17% | 2691 | 2273 | 418 | 15.53% | YES |
| Los Angeles | 037 | 533104 | 4219 | 1384 | 174 | 11.17% | 1794 | 1515 | 279 | 15.53% | YES |
| Los Angeles | 037 | 533105 | 2684 | 566 | 208 | 26.87% | 953 | 620 | 333 | 34.96% | YES |

# EXHIBIT 9

PACIFIC PROTON THERAPY REGIONAL CENTER, LLC
200 E. BEVERLY BLVD., SUITE 200
MONTEBELLO, CA 90640-7001
T: 323-517-9800 F: 323-727-7574

U.S. Citizenship & Immigration Services
California Service Center
Attn: EB-5 RC Proposal
P.O. Box 10590
Laguna Niguel, CA 92607-0526

November 17, 2010

To Whom It May Concern:

This letter is written to confirm that Pacific Proton Therapy Regional Center, LLC ("PPTRC") has to date incurred the following expenses in connection with its USCIS regional center application:

| | |
|---|---|
| 1. Regional Center Legal Fees | $14,798 |
| 2. Economist Fees | $20,000 |
| 3. RC Organization Fees | $15,000 |
| TOTAL | $49,798 |

In addition to the approximately $50,000 already spent on the regional center application, PPTRC principal, Charles Liu, has committed an additional $150,202 to the first-year operational budget of PPTRC. Of this additional capital, PPTRC expects to dedicate $100,000 to marketing expenses.

Charles Liu has thus committed a total of $200,000 to the success of the Pacific Proton Therapy Regional Center and has the resources to contribute additional capital if necessary. I confirm that this combined dedicated capital is sufficient to sustain the Pacific Proton Therapy Regional Center, distinct from immigration investors' required capital investments in a new commercial enterprise within the regional center. Further, I pledge to supply additional resources as needed if the Pacific Proton Therapy Regional Center requires additional capital.

I am fully committed to the success of PPTRC and believe the above described funds are sufficient to sustain the regional center independent of the capital contributions of EB-5 investors.

Sincerely,

Charles C Liu
President

CHASE

# Deposit Account Balance Summary

11/02/2010

Requestor information:

PACIFIC PROTON THERAPY REGIONAL CENTER LLC (LV)
200 E BEVERLY BLVD STE 200
MONTEBELLO, CA 90640-7001

| Summary of Deposit Account | | | | |
|---|---|---|---|---|
| **Account Number** | **Account Type** | **Open Date** | **Current Balance** | **Avg Balance (12 mos)** |
| [redacted]6428 | BusinessClassic | 09/27/2010 | $80,171.86 | $129.00 |

| Customer Information | |
|---|---|
| PACIFIC PROTON THERAPY REGIONAL CENTER | Sole Owner |
| CHARLES LIU | Signer |
| | |
| | |
| | |
| | |
| | |
| | |

Deposit Account Balance Summary request completed by:

LUCERO VALDEZ
(714) 731-2018
Irvine Blvd

**PLEASE NOTE THAT THE INFORMATION PROVIDED IN THIS LETTER WILL BE THE ONLY INFORMATION RELEASED BY JPMorgan Chase, N.A.**

This letter is written as a matter of business courtesy, without prejudice, and is intended for the confidential use of the addressee only. No consideration has been paid or received for the issuance of this letter. The sources and contents of this letter are not to be divulged and no responsibility is to attach to this bank or any of its officers, employees or agents by the issuance or contents of the letter which is provided in good faith and in reliance upon the assurances of confidentiality provided to this bank. Information and expressions of opinion of any type contained herein are obtained from the records of this bank or other sources deemed reliable, without independent investigation, but such information and expressions are subject to change without notice and no representation or warranty as to the accuracy of such information or the reliability of the sources is made or implied or vouched in any way. This letter is not to be reproduced, used in any advertisement or in any way whatsoever except as represented to this bank. This bank does not undertake to notify of any changes in the information contained in this letter. Any reliance is at the sole risk of the addressee.

**Evans, Carroll & Associates, Inc**
**2785 NW 26th St., Boca Raton FL 33434**
**561-470-9035**
mevans@evanscarrollecon.com

**INVOICE 1938** **October 27, 2010**

Charles Liu

| | |
|---|---|
| Original contract for EB-5 Proton Center Report | $15,000 |
| Already paid | $5,000 |
| Additional fee for adding proton equipment manufacturing | $2,500 |
| Additional fee for adding second office building, including TEA analysis | $2,500 |
| Total amount for EB-5 study | $20,000 |
| Due now | $5,000 |
| Due when report is completed | $10,000 |

Thank you

Please make all checks payable to Evans, Carroll & Associates, Inc.

# EXHIBIT 10

OMB No.1615-0026; Exp. 01/31/2012

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

# I-526, Immigrant Petition by Alien Entrepreneur

**Do Not Write in This Block - For USCIS Use Only (Except G-28 Block Below)**

| Classification | Action Block | Fee Receipt |
|---|---|---|
| Priority Date | | **To be completed by Attorney or Representative, if any**<br>☒ G-28 is attached<br>Attorney's State License No. 2547081 |

Remarks:

**START HERE - Type or print in black ink.**

## Part 1. Information About You

Family Name: | Given Name: | Middle Name:

In care of street Number and Name:

Address: | Apt. #

City | State or Province | Country | Zip/Postal Code

Date of Birth (mm/dd/yyyy) / / | Country of Birth | Social Security # (if any) | A # (if any)

**If you are in the United States, provide the following information:** Date of Arrival (mm/dd/yyyy) | I-94 #

Current Nonimmigrant Status | Date Current Status Expires (mm/dd/yyyy) | Daytime Phone # with Area Code

## Part 2. Application Type *(Check one)*

a. ☒ This petition is based on an investment in a commercial enterprise in a targeted employment area for which the required amount of capital invested has been adjusted downward.

b. ☐ This petition is based on an investment in a commercial enterprise in an area for which the required amount of capital invested has been adjusted upward.

c. ☐ This petition is based on an individual in a commercial enterprise that is not in either a targeted area or in an upward adjustment area.

## Part 3. Information About Your Investment

Pacific Proton Therapy Regional Center, LLC

Name of commercial enterprise in which funds are invested: Pacific Proton EB-5 Fund, LLC

Street Address: 200 E. Beverly Boulevard, Suite 200 Montebello, CA 90640

Phone # with Area Code: (626) 688-4898

Business organized as (corporation, partnership, etc.): Limited Liability Company

Kind of business (e.g. furniture manufacturer): *

Date established (mm/dd/yyyy): 11/17/2010

IRS Tax #: [redacted]2283

* Construction (NAICS 23), Manufacturing (NAICS 33), Healthcare and Social Assistance (NAICS 62), Accommodation and Food Services (NAICS 72), Administrative and Support Services (NAICS 56), and Retail Trade (NAICS 44)

RECEIVED ________ RESUBMITTED: ________ RELOCATED: SENT ________ REC'D ________

Form I-526 (Rev. 01/06/10)Y

## Part 3. Information About Your Investment *(Continued)*

| | | | |
|---|---|---|---|
| Date of your initial investment(mm/dd/yyyy) | | Amount of your initial investment | $ 500,000.00 |
| Your total capital investment in the enterprise to date | $ 500,000.00 | Percentage of the enterprise you own | 0.26% |

If you are not the sole investor in the new commercial enterprise, list on separate paper the names of all other parties (natural and non-natural) who hold a percentage share of ownership of the new enterprise and indicate whether any of these parties is seeking classification as an alien entrepreneur. Include the name, percentage of ownership and whether or not the person is seeking classification under section 203(b)(5). **NOTE:** A "natural" party would be an individual person and a "non-natural" party would be an entity such as a corporation, consortium, investment group, partnership, etc.

If you indicated in **Part 2** that the enterprise is in a targeted employment area or in an upward adjustment area, name the county and state: County: Los Angeles State: CA

## Part 4. Additional Information About the Enterprise

**Type of Enterprise (check one):**

- [x] New commercial enterprise resulting from the creation of a new business.
- [ ] New commercial enterprise resulting from the purchase of an existing business.
- [ ] New commercial enterprise resulting from a capital investment in an existing business.

**Composition of the Petitioner's Investment:**

| | |
|---|---|
| Total amount in U.S. bank account | $ 0.00 |
| Total value of all assets purchased for use in the enterprise | $ 0.00 |
| Total value of all property transferred from abroad to the new enterprise | $ 0.00 |
| Total of all debt financing | $ 0.00 |
| Total stock purchases | $ 0.00 |
| Other (explain on separate paper) Unconditional escrow account. Please see accompanying letter. | $ 500,000.00 |
| **Total** | $ 500,000.00 |

**Income:**

| | | | | |
|---|---|---|---|---|
| When you made the investment | Gross | $ 0.00 | Net | $ 0.00 |
| Now | Gross | $ 0.00 | Net | $ 0.00 |

**Net worth:**

| | | | | |
|---|---|---|---|---|
| When you made investment | Gross | $ 0.00 | Now | $ 0.00* |

* Pending approval of I-526 petition.

## Part 5. Employment Creation Information

**Number of full-time employees in the enterprise in U.S.** (excluding you, your spouse, sons, and daughters)

When you made your initial investment? 0 Now 0 Difference 0

How many of these new jobs were created by your investment? *

How many additional new jobs will be created by your additional investment? 0*

What is your position, office, or title with the new commercial enterprise? * Please see attached letter.

Member

Briefly describe your duties, activities, and responsibilities.

Will advise on policy formation (see attached letter).

What is your salary? $ 0.00 What is the cost of your benefits? $ 0.00

## Part 6. Processing Information

**Check One:**

- [ ] The person named in **Part 1** is now in the United States, and an application to adjust status to permanent resident will be filed if this petition is approved.
- [ ] If the petition is approved and the person named in **Part 1** wishes to apply for an immigrant visa abroad, complete the following for that person:

Country of nationality:

Country of current residence or, if now in the United States, last permanent residence abroad:

If you provided a United States address in **Part 1**, print the person's foreign address:

If the person's native alphabet is other than Roman letters, write the foreign address in the native alphabet:

Are you in deportation or removal proceedings? ☐ Yes (Explain on separate paper) ☐ No

Have you ever worked in the United States without permission? ☐ Yes (Explain on separate paper) ☐ No

## Part 7. Signature *Read the information on penalties in the instructions before completing this section.*

I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct. I authorize the release of any information from my records that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking.

**Signature** [signature] Date 11-16-2010

**NOTE:** *If you do not completely fill out this form or fail to the submit the required documents listed in the instructions, you may not be found eligible for the immigration benefit you are seeking and this petition may be denied.*

## Part 8. Signature of Person Preparing Form, If Other Than Above (Sign below)

I declare that I prepared this application at the request of the above person, and it is based on all information of which I have knowledge.

**Signature** [signature] Print Your Name Stephen Yale-Loehr 2547081 Date 11-19-10

Firm Name Miller Mayer, LLP Daytime phone # with area code (607) 273-4200

Address 202 E. State St. Suite 700, Ithaca, NY 14850

# EXHIBIT 11

# Pacific Proton EB-5 Fund, LLC

Business Plan Prepared by
PACIFIC PROTON THERAPY REGIONAL CENTER, LLC

# Table of Contents


**Executive Summary** 4

**The Proton Beam Center** 7

**Overview** 7

**Location** 7

**Stakeholders** 8

**The Market** 9

*About Proton Beam Therapy* 9

*Project Market Area* 11

*Competitors* 13

**Marketing Plan** 15

*Target Customer Groups* 15

*Marketing Approach* 15

**Project Pro-Forma Financial Analysis** 17

*Revenue Forecast* 17

*Operating Expense Forecast* 20

*Operating Cash Flow Forecast* 23

**Market Assessment and Feasibility Conclusions** 26

**Management Team** 27

**Job Creation** 30

**The Monterey Park Office Building** 30

**The Building** 31

**Roll-out Plan** 32

**Market Analysis** 32

**Leasing Strategy** 32

**Job Creation** 33

***Appendix A: Monterey Park Office Building Elevations***

***Appendix B: Organizational Chart and Job Descriptions within the Proton Therapy Center***

# Table of Contents (continued)

**FIGURES**

Figure 1: Los Angeles County Proton Center Location 8
Figure 2: Cancer Locations Treated at Loma Linda Facility, 1990 to 2008 10
Figure 3: Facility Market Area 12
Figure 4: Projected 2010 Cancer Cases in Facility Market Area 12
Figure 5: Estimated Stabilized Facility Patient Mix, 2014 13
Figure 6: Proton Beam Therapy Centers in the US 14
Figure 7: Estimated Project Schedule 17
Figure 8: Estimated Facility Capacity 18
Figure 9: Facility Utilization 19
Figure 10: Treatment Reimbursement Rates 19
Figure 11: Operating Expense Forecast 20
Figure 12: Operating Forecast 24
Figure 13: Low Demand Scenario Operating Forecast 25
Figure 14: Low Reimbursement Rate Scenario Operating Forecast 26
Figure 15: Medical Office Building Sales Cost and Income Projections 33