JOHN W. BERRY (Cal. Bar No. 295760)
Email: berryj@sec.gov
GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
E-mail: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Southern Division**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,<br><br>Defendants. | Case No. SACV16-00974-CJC (AGRx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS CHARLES C. LIU AND XIN (LISA) WANG**<br><br>Date: February 6, 2017<br>Time: 1:30 p.m.<br>Ctrm: 9B<br>Judge: Hon. Cormac J. Carney |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

A. The EB-5 Program ..... 2

B. Liu Forms an EB-5 Regional Center ..... 2

C. Liu's and Wang's Roles with the Entity Defendants ..... 2

D. The Stated Terms of the Fraudulent EB-5 Offering ..... 3

E. Liu and Wang Personally Solicit Investors ..... 5

F. Liu and Wang Accomplish Very Little and Liu Ousts Thropay ..... 5

G. Liu and Wang Misappropriate Investor Money ..... 6

H. Dissipation of Investor Funds to Foreign Accounts ..... 6

I. Liu's and Wang's Material Misrepresentations and Omissions ..... 7

J. Liu and Wang Refuse to Answer the SEC's Written Discovery ..... 8

K. Liu and Wang Assert Their Fifth Amendment Rights At Deposition ..... 8

III. ARGUMENT ..... 9

A. Standard of Review ..... 9

B. Liu and Wang Violated the Antifraud Provisions ..... 9

1. Liu and Wang offered and sold securities ..... 10

2. Liu and Wang engaged in a scheme to defraud ..... 11

3. Liu's and Wang's false statements and omissions ..... 13

4. Liu and Wang acted with scienter and their conduct was unreasonable ..... 16

C. Liu and Wang Failed to Respond to Written Discovery and Invoked Their Fifth Amendment Privilege ..... 16

1. Refusal to answer written discovery ..... 16

2. Liu's and Wang's invocation of the Fifth Amendment ..... 17

D. Liu and Wang Should Be Permanently Enjoined ..... 19

E. Liu and Wang Should Be Ordered To Pay Monetary Remedies ..... 20

1. Liu and Wang should disgorge their illegal gains ............................ 20
2. Liu and Wang should pay prejudgment interest .............................. 23
3. Liu and Wang should pay civil penalties ........................................ 23

IV. CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## CASES


*Aaron v. SEC*
446 U.S. 680 (1980)....9

*Anderson v. Libby Lobby, Inc.*
477 U.S. 242 (1986)....9

*Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*
552 U.S. 1162 (2008)....12

*Basic Inc. v. Levinson*
485 U.S. 224 (1988)....14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)....9

*Conlon v. United States*
474 F.3d 616 (9th Cir. 2007)....16

*Cooper v. Pickett*
137 F.3d 616 (9th Cir. 1997)....12

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976)....10

*FTC v. Medicor, LLC, et al.*
217 F. Supp. 2d 1048 (C.D. Cal. 2002)....17

*SEC v. Gowrish*,
2011 WL 2790482 (N.D. Cal. Jul. 14, 2011)....25

*Herman & MacLean v. Huddleston*
459 U.S. 375 (1983)....10

*SEC v. J.T. Wallenbrock & Assocs.*,
440 F.3d 1109 (9th Cir. 2006)....20, 21, 22

*Janus Capital Group, Inc. v. First Derivative Traders*
564 U.S. 135 (2011)....13, 14, 15

*Krohn v. San Bernardino County Sheriff's Dept.*
No. EDCV 06-00595 GW (AJW), 2008 WL 4390162 (C.D. Cal. Sept. 10, 2008)....17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986)....9

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*
547 U.S. 71 (2006)....11

*Middlesex Retirement Sys. v. Quest Software Inc.*

527 F. Supp. 2d 1164 (C.D. Cal. 2007)....12

*Nationwide Life Ins. Co. v. Richards*
541 F.3d 903 (9th Cir. 2008)....17, 18, 19

*Rainier Nat'l. Bank v. Hartstein*
NO. 91-36165, 1993 WL 175265 (9th Cir. 1993)....18

*Sanchez v. Vild*
891 F.2d 240 (9th Cir. 1989)....9

*SEC v. Abacus International Holding Corp.*
2001 WL 940913 (N.D. Cal. Aug. 16, 2001)....25

*SEC v. Benger*
931 F. Supp. 2d 904 (N.D. Ill. 2013)....14

*SEC v. Benson*
657 F. Supp. 1122 (S.D.N.Y. 1987)....18

*SEC v. Burns*
817 F.2d 471 (9th Cir. 1987)....10

*SEC v. CMKM Diamonds, Inc.*
635 F. Supp. 2d 1185 (D. Nev. 2009)....25

*SEC v. Coates*
137 F. Supp. 2d 413 (S.D.N.Y. 2001)....24

*SEC v. Colello*
139 F.3d 674 (9th Cir. 1998)....18

*SEC v. Constantin*
939 F.Supp.2d 288 (S.D.N.Y. 2013)....16

*SEC v. Cross Fin. Services, Inc.*
908 F. Supp. 718 (C.D. Cal. 1995)....23

*SEC v. Cymaticolor Corp.*
106 F.R.D. 545 (S.D.N.Y. 1985)....17

*SEC v. Dain Rauscher, Inc.*
254 F.3d at 856....9, 10, 14

*SEC v. Fehn*
97 F.3d 1276 (9th Cir. 1996)....19

*SEC v. First City Financial Corp., Ltd.*
890 F.2d 1215 (D.C. Cir. 1989)....21

*SEC v. First Jersey Sec., Inc.*
101 F.3d 1450 (2d Cir. 1996)....23

*SEC v. First Pacific Bancorp*
142 F.3d 1186 (9th Cir. 1998)....20

*SEC v. Gallard*
1997 WL 767570 (S.D.N.Y. Dec. 10, 1997) .....16

*SEC v. Interlink Data Network of Los Angeles, Inc.*
1993 WL 603274 (C.D. Cal. 1993) .....18, 22

*SEC v. Koracorp Indus., Inc.*
575 F.2d 692 (9th Cir. 1978) .....19

*SEC v. Lowrance*
No. 11-CV-03451-EJD, 2012 WL 2599127 (N.D. Cal. Jul. 5, 2012) .....12

*SEC v. Luna*
No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202 (D. Nev. Feb. 26, 2014) 18

*SEC v. Manor Nursing Ctrs., Inc.*
458 F.2d 1082 (2d Cir.1972) .....22, 23

*SEC v. Marker*
427 F. Supp. 2d 583 (M.D. Fla. 2006) .....24

*SEC v. Moran*
944 F. Supp. 286 (S.D.N.Y. 1996) .....24

*SEC v. Murphy*
626 F.2d 633 (9th Cir. 1980) .....19, 23, 25

*SEC v. Olins*
762 F. Supp. 2d 1193 (N.D. Cal. 2011) .....20, 23, 24

*SEC v. Palmisano*
135 F.2d 860 (2d Cir. 1998) .....24

*SEC v. Pittsford Capital Income Ptrs., LLC*
No. 06 Civ. 6353 T(P), 2007 WL 2455124 (W.D.N.Y. Aug. 23, 2007) .....22

*SEC v. Platforms Wireless Int'l. Corp.,*
617 F.3d 1072 (9th Cir. 2010) .....10, 14, 20, 21, 22

*SEC v. Private Equity Management Group*
No. CV 09-2901 PSG, 2009 WL 2019788 (C.D. Cal. Jul. 2, 2009) .....12

*SEC v. R.G. Reynolds Enterprises, Inc.*
952 F.2d 1125 (9th Cir. 1991) .....10, 11

*SEC v. Rana Research, Inc.*
8 F.3d 1358 (9th Cir. 1993) .....14

*SEC v. Rind*
991 F.2d 1486 (9th Cir. 1993) .....20

*SEC v. Rogers*
1981 WL 1622 (C.D. Cal. Mar. 31, 1981) .....15

*SEC v. Sahley*

No. 92 Civ. 8842 (JSM), 1994 WL 9682 (S.D.N.Y. Jan. 10, 1994) ................. 22

*SEC v. Sells*
No. C-11-4941, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) .................. 12, 13

*SEC v. W.J. Howey Co.*
328 U.S. 293 (1946) .......................................................................... 10, 11

*SEC v. Watermark Financial Services Group, Inc.*
No. 08-CV-361S, 2012 WL 501450 (W.D.N.Y. Feb. 14, 2012) ...................... 22

*SEC v. Wencke*
622 F.3d 1363 (9th Cir. 1980) .................................................................. 20

*SEC v. Wilde*
No. SACV 11-0315 DOC (AJWx), 2012 WL 6621747 (C.D. Cal. Dec. 17, 2012) .................................................................................................. 12

*SEC v. Zandford*
535 U.S. 813 (2002) .................................................................................. 12

*Simpson v. AOL Time Warner, Inc.*
452 F.3d 1040 (9th Cir. 2006) .................................................................. 12

*Superintendent of Ins. v. Bankers Life & Casualty, Co.*
404 U.S. 6 (1971) ..................................................................................... 11

*Taylor v. List*
880 F.2d 1040 (9th Cir. 1989) .................................................................... 9

*TSC Indus. v. Northway*
426 U.S. 438 (1976) .................................................................................. 14

**<u>Securities Act of 1933</u>**

Section 17(a)
[15 U.S.C. § 77q(a)] ........................................................................ 9, 10, 11

Section 17(a)(1)
[15 U.S.C. § 77q(a)(1)] ............................................................ 9, 11, 13, 14

Section 17(a)(2)
[15 U.S.C. § 77q(a)(2)] ...................................................................... 9, 14, 15

Section 17(a)(3)
[15 U.S.C. § 77q(a)(3)] ............................................................ 9, 11, 13, 14

Section 2(a)(1)
[15 U.S.C. § 77b(a)(1)] .............................................................................. 10

Section 20
[15 U.S.C. § 77t] ........................................................................................ 24

Section 20(b)
[15 U.S.C. § 77t(b)] .................................................................................... 19

Section 20(d)
[15 U.S.C. § 77t(d)] .....24

Section 20(d)(3)(B)(i)
[15 U.S.C. § 77t(d)(3)(B)(i)] .....24

Section 20(d)(3)(B)(ii)
[15 U.S.C. § 77t(d)(3)(B)(ii)] .....24

Section 20(d)(3)(B)(iii)
[15 U.S.C. § 77t(d)(3)(B)(iii)] .....24

**Securities Exchange Act of 1934**

Section 10(b)
[15 U.S.C. § 78j(b)] .....9, 10, 11, 13

Section 21(d)
[15 U.S.C. § 78u(d)] .....19, 24

Section 21(d)(3)(B)
[15 U.S.C. § 78u(d)(3)(B)] .....24

Section 21(d)(3)(B)(i)
[15 U.S.C. § 78u(d)(3)(B)(i)] .....24

Section 21(d)(3)(B)(ii)
[15 U.S.C. § 78u(d)(3)(B)(ii)] .....24

Section 21(d)(3)(B)(iii)
[15 U.S.C. § 78u(d)(3)(B)(iii)] .....24

Section 3(a)(10)
[15 U.S.C. § 78c(a)(10)] .....10

**FEDERAL REGULATIONS**

8 C.F.R. § 204.6(j)(2) .....11

Rule 10b-5
[17 C.F.R. § 240.10b-5] .....9, 11, 13, 14

**OTHER AUTHORITIES**

Rule 36
[Fed. R. Civ. P. 36] .....1, 2

Rule 36(a)(3)
[Fed. R. Civ. P. 36(a)(3)] .....16

Rule 56(a)
[Fed. R. Civ. P. 56(a)] .....9

## I. INTRODUCTION

This past spring, the SEC proffered compelling evidence of defendants Charles C. Liu's and Xin (Lisa) Wang's scheme to misappropriate more than $20 million from their EB-5 investors, and the lies and omissions that were told in service of their illegal securities offering. On that showing, this Court found on July 11 that the SEC had established a *prima facie* case and reasonable likelihood that Liu and Wang had engaged in securities fraud. Dkt. No. 77 at 1. In the six months since, the SEC's substantial proof has remained unaltered, undisturbed, and unrefuted by defendants. What's more, Liu and Wang have now paved a clear path for this Court to grant summary judgment in the SEC's favor.

First, Liu and Wang never answered or even objected to the SEC's October written discovery requests, including discovery propounded under Fed. R. Civ. P. 36 seeking Liu's and Wang's admission of facts which prove every element of the securities law charges against them. Those facts may now be deemed admitted on summary judgment. Second, Liu and Wang invoked their Fifth Amendment privilege against self-incrimination in response to November deposition questions aimed at establishing those very same elements. Because two consequences necessarily follow – Liu and Wang should be precluded from offering evidence on those subjects, and this Court should further draw an adverse inference against them – there is no conceivable way in which Liu and Wang may now evade an adverse judgment.

The combination of the SEC's independent evidence of fraud; the price of Liu's and Wang's refusal to respond to the SEC's written discovery; and the unavoidable import of defendants' Fifth Amendment assertions, dispels any vestige of a genuine dispute of material fact. This matter is ripe for summary judgment. The SEC respectfully requests that the Court grant its motion in every respect.

## II. STATEMENT OF FACTS

The following facts are drawn from the SEC's affirmative proof, the answers filed by the individual defendants, and facts deemed admitted by Liu and Wang under

Fed. R. Civ. P. 36.

**A. The EB-5 Program**

The EB-5 Immigrant Investor Program administered by U.S. Citizenship and Immigration Services ("USCIS") promotes economic growth in the United States by granting visas to foreign investors on several strict conditions. Statement of Uncontroverted Facts ("SUF") at ¶ 1. Entities that the USCIS designates as "regional centers" administer EB-5 investment projects. *Id.* at ¶ 7. To obtain conditional permanent residency status for a period of two years, foreign investors must invest in a "commercial enterprise" that is associated with a USCIS-approved regional center. *Id.* at ¶¶ 1-3. For that investment to be eligible for the EB-5 program, the foreign investment must be at least $500,000, made in a "Targeted Employment Area," create at least ten full-time jobs, and significantly, the investment must actually put the investors' capital at risk for "the purpose of generating a return." *Id.* at ¶¶ 4-5.

**B. Liu Forms an EB-5 Regional Center**

Liu co-founded defendant Beverly Proton Center, LLC ("Beverly Proton") with Dr. John Thropay, a radiation oncologist; Beverly Proton was to operate a proton therapy cancer treatment center in Southern California. *Id.* at ¶¶ 10-11. To capitalize that business, Liu decided to raise money under the auspices of the EB-5 program. *Id.* at ¶ 9. In 2010, Liu submitted an application to USCIS to have defendant Pacific Proton Therapy Center, LLC ("Pacific Proton") designated as a regional center. *Id.* at ¶ 12. Liu also formed the Pacific Proton EB-5 Fund ("PPEB5-Fund") to act as the investment vehicle for foreigners interested in making an EB-5-eligible investment in his proposed Beverly Proton cancer treatment center. *Id.*at ¶ 13. On June 28, 2012, USCIS approved Liu's regional center application. *Id.* at ¶ 14.

**C. Liu's and Wang's Roles with the Entity Defendants**

Liu controlled Beverly Proton throughout the relevant period. *Id.*at ¶¶ 17-18. In addition to owning 75% of the company, Liu has been Beverly Proton's president, treasurer, and managing member since 2010. *Id.* at ¶¶ 15-16. He caused Beverly

Proton to pay him $750,000 in annual compensation, and in January 2016, he elected himself and his wife, co-defendant Xin (Lisa) Wang, as the only two directors of the company. *Id.* at ¶¶ 19-20. In addition to her board role, Wang was Beverly Proton's Vice President of Marketing in Asia. *Id.* at ¶ 21. Wang was likewise handsomely compensated by Beverly Proton: Liu executed, on Beverly Proton's behalf, a 2016 employment agreement with Wang which provided her with $200,000 in annual compensation, and also paid her that compensation on a retroactive basis, all the way back to 2011. *Id.* at ¶¶ 22-23.

Liu controlled Pacific Proton throughout the relevant period. *Id.* at ¶¶ 26-27. Liu owned 75% of Pacific Proton, held the title of president, and awarded himself a substantial annual salary ($350,000) from Pacific Proton. *Id.* at ¶¶ 24-25, 28. Wang, for her part, was also an officer of the company, and served as its corporate secretary. *Id.* at ¶ 29. Liu further controlled the PPEB5 Fund because Pacific Proton is the fund's sole manager, and Liu controls Pacific Proton. *Id.* at ¶¶ 30-31. Yet again, Liu caused an entity under his control to pay him an ample salary, in this case $200,000 in annual compensation from the PPEB5 Fund. *Id.* at ¶ 32.

**D. The Stated Terms of the Fraudulent EB-5 Offering**

From October 2014 through April 2016, defendants offered and sold investments in the form of limited liability company units in the PPEB5 Fund, for $500,000 each, raising at least $26,967,918 from 50 investors in China (the "Pacific Proton offering"). *Id.* at ¶ 34. Each investor in the Pacific Proton offering was provided with a May 2013 private offering memorandum ("POM") setting forth the terms of their investment. *Id.* at ¶ 36. Liu provided the information contained in the POM and reviewed and approved the content of all of its disclosures. *Id.* at ¶ 53.

With respect to the nature of their investment, the POM: refers to investments as "securities," *id.* at ¶¶ 38-39, describes those purchasing the limited liability company units as "investors" and "accredited investors," *id.* at ¶¶ 40-41, stresses that investors' investments "must be at risk to qualify" for the EB-5 program in that

investors must show that they have "placed the required amount of capital at risk for the purpose of generating a return on such capital," *id.* at ¶ 42, confirms that limited liability company units in the PPEB5 Fund meets those regulatory conditions, *id.* at ¶ 43, and explains that although "actual returns could differ materially and adversely from those expressed or implied" given "important risk factors," the "primary motive" of investors in the Pacific Proton offering "should be for long-term appreciation." *Id.* at ¶¶ 44-45.

The POM also defined the manner in which investor funds would be used. It states that each $500,000 investment – defined by the POM as a "Capital Contribution" – could only be used to fund a loan from the PPEB5 Fund to Beverly Proton for the purpose of developing and operating a proton therapy center in Los Angeles County under the medical direction of Dr. Thropay. *Id.* at ¶¶ 47-48. Separate from the $500,000 Capital Contribution, the PPEB5 Fund charged investors an additional $45,000 "Administrative Fee," which was to be paid directly to the PPEB5 Fund. *Id.* at ¶¶ 49-50. Importantly, the POM represented that Capital Contributions and Administrative Fees were distinct and to be used for divergent purposes:

> Proceeds of this Offering do not include Administrative Fees. Offering expenses, commissions and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions.

*Id.* at ¶ 51.

Last, the POM emphasizes that Dr. Thropay's contributions to the proposed project were critical to the success of the investment. The POM provides that Beverly Proton "is dependent upon the continued involvement of Dr. Thropay" and that the "loss of services of either Dr. Thropay or Mr. Liu would have a material adverse effect on PPEB5 [Fund]'s and the Borrower's business, financial condition and results of operations." *Id.* at ¶ 52.

**E. Liu and Wang Personally Solicit Investors**

Liu and Wang both met with investors and personally encouraged them to invest in the Pacific Proton EB-5 project. *Id.* at ¶¶ 59-61. Separately, Liu engaged several marketing firms, including Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), United Damei Group, United Damei Investment Company, Ltd., and Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), and Hong Kong Delsk Business Co., Ltd. ("Delsk"). *Id.* at ¶ 57. Of the known investors in the PPEB5 Fund, 11 were solicited by Overseas Chinese, 10 by UDG, and 37 by Delsk. *Id.* at ¶ 58.

UDG – one of the main marketing firms who solicited investments in the Pacific Proton EB-5 project – is inextricably tied to Wang and Liu. Wang was the chief executive officer and chairman of the board of UDG, and she and her husband controlled UDG. *Id.* at ¶¶ 62-64. UDG operated a website that promoted the Pacific Proton offering through several affirmative representations, including that: the offering was a "secure and reliable investment project" which had advantages over other EB-5 projects because it used established technology from Optivus Proton Therapy, Inc. ("Optivus") that is "the most effective, reliable, precise and environmental proton therapy system in the market." *Id.* at ¶¶ 66-71.

**F. Liu and Wang Accomplish Very Little and Liu Ousts Thropay**

While in 2015 some work to demolish a building owned by Dr. Thropay was accomplished by Liu, the actual construction of a therapy center never commenced. *Id.* at ¶¶ 74-76. Rather, Liu worked in 2015 to consummate a deal with another southern California cancer center that would have cut Dr. Thropay out of any future involvement in Beverly Proton. *Id.* at ¶ 81-82. By January 2016, Liu had removed Dr. Thropay as an officer of Pacific Proton, appointed himself as president and treasurer/chief financial officer of the entity, and appointed Wang as its corporate secretary. *Id.* at ¶¶ 83-84. Liu finalized that purge by electing himself and Wang as Beverly Proton's sole directors in January 19, 2016. *Id.* at ¶ 86.

Despite this abject lack of progress, of the $26.7 million raised by Liu and Wang from foreign investors from 2014 to 2016, only $234,899.19 remained in the corporate defendants bank accounts as of June 3, 2016. *Id.* at ¶ 131. This near-total dissipation of investor funds was occasioned by Liu and Wang's massive misappropriation of investor money.

**G. Liu and Wang Misappropriate Investor Money**

It is beyond dispute that Pacific Proton offering proceeds were used in a way that violated the terms and representations made by the PPEB5 Fund POM. *Id.* at ¶ 87. The most glaring breach of the POM's terms concerns their transfer of tens of millions of investor dollars to either enrich themselves, or to pay commissions – forbidden by the POM with respect to investors' Capital Contributions – to the overseas marketers who brought investors to the Pacific Proton project. Of the $26,967,918 raised by Liu and Wang, $24,712,217 was sent to the PPEB 5 Fund and earmarked as Capital Contributions. *Id.* at ¶¶ 88-89. Although that $24.7 million in Capital Contributions was required, under the POM, to be loaned to Beverly Proton and then spent in furtherance of its proposed cancer therapy center, Liu and Wang diverted almost $21.2 million of investor money for their own purposes. Liu took $6.7 million in investor funds for himself. Compounding her husband's windfall, another $1.538 million of investor money went to bank accounts under Wang's control. And last, Liu sent $12.9 million in commissions to the overseas marketers, including UDG – an entity controlled by him and Wang – which individually received $3.815 million. *Id.* at ¶¶ 90-110. Further, Liu used company funds to pay a hodge-podge of his living expenses, including the cost of the private education enjoyed by Liu's and Wang's dependent children. *Id.* at ¶¶ 112-114.

**H. Dissipation of Investor Funds to Foreign Accounts**

Once the SEC subpoenaed Liu in February 2016, Liu and Wang quickly dissipated investor funds by transferring them en masse to foreign bank accounts. Liu took $4.27 million of the $6.7 million he misappropriated during February and

March alone. *Id.*at ¶ 116. Wang received $1 million of the $1.538 million she misappropriated in March, as well. *Id.* at ¶ 117. In all, Liu sent nearly $17 million in investor funds out of the U.S. to foreign locations. *Id.* at ¶¶ 119, 123-127.

**I. Liu's and Wang's Material Misrepresentations and Omissions**

The POM provided to investors and the UDG website's promotional statements were both materially misleading. First, the POM represented that Capital Contributions would only be used to fund the development and operation of a proposed cancer treatment center, while Administrative Fees would be used to pay commission and other offering expenses. This was undisputedly false. Because Liu and Wang misappropriated the vast majority of the investors' Capital Contributions for either their personal use or for excessive commissions to overseas marketers, most of the investor money was never used for actual development work. *Id.* at ¶¶ 87-116.

Next, Liu's removal of Dr. Thropay from the cancer therapy project rendered the POM's statements about his central involvement materially misleading as well. The POM stated that the investment project's success was "dependent" on Dr. Thropay's continuous involvement, and explicitly drew the conclusion that losing Dr. Thropay "would have a material adverse effect" on the PPEB5 Fund and Beverly Proton's "business, financial condition and results of operations." Liu and Wang, however, failed to inform investors of Dr. Thropay's ouster. *Id.* at ¶¶ 52, 83.

Finally, Liu and Wang controlled UDG, which touted the Beverly Proton treatment center project over the internet as a "safe and reliable" investment, in large part because it was using proton therapy technology from an established market participant, Optivus. *Id.* at ¶¶ 65-73. Those statements were materially misleading given Liu's decision to abandon the Optivus technology in 2015. *Id.* at ¶¶ 77, 80. Indeed, Optivus engaged outside counsel to convey this very point to Liu. *Id.* at ¶ 80 ("[I]t is highly inappropriate for [Pacific Proton, Beverly Proton] and others associated with those entities, to suggest that Optivus is involved in the project on an ongoing basis or to use Optivus' name and reputation for purposes of promoting the

proposed [cancer treatment] facility, all without Optivus' authorization.").

**J. Liu and Wang Refuse to Answer the SEC's Written Discovery**

On October 18, 2016, the SEC propounded written discovery on Liu and Wang, including Rule 36 requests to admit and Rule 33 interrogatories. Leung Decl. at ¶¶ 3-4, 8-9, Exs. 1-2, 6-7. The SEC's Rule 36 requests sought Liu's and Wang's admission of every fact critical to the elements of its antifraud claims, including: the individual defendants' ownership, role and control of the corporate defendants and UDG (*id.* at ¶¶3-4, Exs. 1 and 2 (RFA Nos. 1-10)); facts showing that limited liability company units in the PPEB5 Fund are securities (*id.* at ¶¶ 3-4, Exs. 1 and 2 (RFA No. 14)); the gross proceeds (*e.g.*, investor money raised) of their fraudulent offering (*id.* at ¶¶ 3-4, Exs. 1 and 2 (RFA Nos. 13, 15)); Liu's and Wang's misappropriation and dissipation of investor funds (*id.* at ¶¶ 3-4, Exs. 1 and 2 (RFA Nos. 16-24)); and that the individual defendants acted with fraudulent intent, recklessly, or unreasonably in stealing investor funds and either making false statements in the POM, or obtaining money by means of those false statements. *Id.* at ¶¶3-4, Exs. 1 and 2 (RFA Nos. 25-27. The SEC's Rule 33 interrogatories covered those same subjects, and specifically asked Liu and Wang for the factual basis for their defenses. *See, e.g., id.* at ¶¶ 8-9, Exs. 6-7 (Interrog. Nos. 8, 16-17).

Liu's and Wang's written discovery responses were originally due on November 21. At their request, the SEC agreed to an extension of time to December 2. Dkt. No. 194-2 at ¶ 8, Ex. 6. In spite of that extension, neither Liu nor Wang timely answered or objected to the SEC's October 18 requests for admission and interrogatories. *Id.* at ¶ 10.

**K. Liu and Wang Assert Their Fifth Amendment Rights At Deposition**

After being ordered to appear for deposition, Liu and Wang each asserted their Fifth Amendment right against self-incrimination when questioned by the SEC on the material issues in this case; namely, whether they had engaged in a scheme to misappropriate investor funds, whether they had made (or obtained money by means

of ) misstatements and omissions to investors, their mental state in perpetrating their fraud, and the significance, to a reasonable investor, of their lies, omissions, and fraudulent misappropriation. SUF at ¶¶ 142-161.

## III. ARGUMENT

### A. Standard of Review

Summary judgment is appropriate when there are no genuine disputes as to any material fact regarding the plaintiff's claims. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of identifying the evidence that demonstrates the absence of any material fact. *See Celotex*, 477 U.S. at 323. Once the movant has met its burden, the nonmoving party may not rest on conclusory allegations or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must come forward with significant probative evidence tending to support its claim that material, triable issue of fact remain. *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Liu and Wang Violated the Antifraud Provisions

Liu's and Wang's fraudulent EB-5 offering ran afoul of the antifraud provisions of the federal securities laws. Section 17(a) prohibits fraud in the offer or sale of securities, and Section 10(b) prohibits fraud in connection with the purchase or sale of any security. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001). Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require a showing of scienter, whereas violations of Section 17(a)(2) and 17(a)(3) only require a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980). Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). In the Ninth Circuit, scienter may be established by a showing of either "deliberate recklessness" or "conscious recklessness." *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010). Recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n. 30 (1983); *SEC v. Burns*, 817 F.2d 471, 474 (9th Cir. 1987). Negligence, by contrast, is the absence of "reasonable prudence." *Dain Rauscher, Inc.*, 254 F.3d at 856-57. Liu and Wang have violated both Section 17(a) and Section 10(b).

**1. Liu and Wang offered and sold securities**

The EB-5 investments offered and sold by Liu and Wang are securities. As this Court found when denying Liu's and Wang's motion to dismiss:

> Here, every indication made to investors was that they were putting money at risk to purchase investment[ ] instruments that would produce a profit. Those instruments are therefore securities under the meaning of the federal securities laws.

Dkt. No. 139 (Order on Liu MTD) at 9. Because the SEC's proof fully corroborates the allegations of its complaint, the Court may now reach the same conclusion on summary judgment.

Since they are "investment contracts," the Pacific Proton investments fall within the heartland of the definition of securities set forth in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Under the Supreme Court's *Howey* test, a financial instrument is an investment contract if it is: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). All three *Howey* elements are met here.

First, investors invested money – they all purchased PPEB5 Fund limited liability company units by investing a $500,000 "Capital Contribution" that had to be "at risk for the purpose of generating a return" under the requirements of the EB-5

program. 8 C.F.R. § 204.6(j)(2). And second, Liu's and Wang's victims invested their money in a "common enterprise" that was dependent on the efforts of others, given the pooling of investors' funds, and their passive involvement in the Beverly Proton therapy center project, a fact that further establishes the final prong of the *Howey* analysis. *See R.G. Reynolds*, 952 F.2d at 1130 ("common enterprise" element is satisfied by either horizontal commonality (pooling of investor funds) or strict vertical commonality (returns are dependent on efforts of promoter)).[1]

**2. Liu and Wang engaged in a scheme to defraud**

Having misappropriated more than $20 million in investor funds, Liu and Wang cannot genuinely dispute that they engaged in a scheme to defraud their EB-5 investors. The individual defendants' misappropriation of over $20 million of investor money is central to their misconduct. That vein of defendants' fraud triggers the "scheme liability" provisions of the antifraud statutes – Section 17(a)(1) and (a)(3) of the Securities Act, and Rule 10b-5 (a) and (c) of the Exchange Act. Those provisions prohibit defendants from engaging in a "scheme … to defraud" or a "course of business which operates … as a fraud." 15 U.S.C. §§ 77q(a)(1), (3); 17 C.F.R. §§ 240.10b-5(a), (c). The SEC's first count against Liu and Wang is brought under all of the subsections of Section 17(a), including the scheme liability sub-provisions (a)(1) and (a)(3), and its second count against Liu and Wang is brought specifically under subsections (a) and (c) of Rule 10b-5. *See* Dkt. No. 1 at pp. 23-24.

A defendant is subject to scheme liability if she "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance

[1] And separately, both the "in the offer and sale," and "in connection with the purchase or sale" elements of Section 17(a) and Section 10(b) are clearly met here. The "in connection with the purchase or sale" element is established by proof that the fraud "coincides with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006); *see also Superintendent of Ins. v. Bankers Life & Casualty, Co.*,404 U.S. 6, 12-13 (1971) ("in connection with" requires only that there be "deceptive practices touching" the purchase or sale of securities).

of the scheme." *Simpson v. AOL Time Warner*, *Inc*., 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008); *see also SEC v. Sells*, No. C-11-4941, 2012 WL 3242551, *7 (N.D. Cal. Aug. 10, 2012); *Middlesex Retirement Sys. v. Quest Software Inc*., 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007). A defendant can be held liable for engaging in a fraudulent scheme under these provisions if she "'committed a manipulative or deceptive act in furtherance of a scheme,'" which is an act that "create[s] the false appearance of fact." *Simpson*, 452 F.3d at 1048 (quoting *Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997)).

The misappropriation of investor money fits squarely within the confines of scheme liability, *see*, *e.g*., *SEC v. Zandford*, 535 U.S. 813, 820-21 (2002) (addressing scheme liability arising from defendant's misappropriation of securities from brokerage client without his knowledge or consent), as acknowledged by this Court when finding that the SEC's allegations that Wang used UDG to misappropriate investor money sufficiently pled a claim for scheme liability. Dkt. No. 140 (Wang MTD Order) at 7:15-28; *see also SEC v. Wilde*, No. SACV 11-0315 DOC (AJWx), 2012 WL 6621747, *5 (C.D. Cal. Dec. 17, 2012) (finding defendants violated Sections 17(a) and 10(b) for "knowingly or recklessly engag[ing] in a fraudulent practice to misappropriate investors' money"); *SEC v. Lowrance*, No. 11-CV-03451-EJD, 2012 WL 2599127, *4 (N.D. Cal. Jul. 5, 2012) ("Offering a security for sale with the intent to misappropriate the proceeds is a fraudulent scheme"); *SEC v. Private Equity Management Group*, No. CV 09-2901 PSG, 2009 WL 2019788, *14 (C.D. Cal. Jul. 2, 2009) (holding that misappropriation of investor money which coincides with the sale of securities violates federal securities laws).

Liu and Wang took advantage of the EB-5 investment program to quickly raise a massive amount of money, all told, at least $26.9 million in less than two years. They then transferred more than $21.1 million of that amount to either themselves, or to overseas marketers in the form of exorbitant commissions. *See*, *e.g*., SUF at ¶¶ 99-

101, 104-105 (defendants paid Overseas Chinese and UDG $702,000 and $381,500 in commissions, respectively, per investor). Liu and Wang have not been able to dispute that they took this money, and cannot refute it now.

Liu's and Wang's deceptive conduct – their use and dissipation of that $21.1 million – was in stark contravention of the terms of the POM, which prohibited the use of Capital Contributions to pay commissions and instead designated those funds for development of the therapy center, and also irreconcilable with disclosures made by the UDG website, which gave investors the false impression that the EB-5 project was making real progress. That progress was illusory. Next to no development work had in fact been done for the simple reason that Liu and Wang had frittered away upwards of 75% of all investor money raised on themselves and commissions to foreign marketers, with one of those marketers being under their control, and thus an additional source of personal enrichment for Liu and Wang. Liu and Wang are liable under the scheme provisions of the antifraud statutes.[2]

**3. Liu's and Wang's false statements and omissions**

Separate from their scheme to misappropriate investor funds, Liu and Wang are also charged with defrauding investors with material misrepresentations and omissions. Specifically, in count III of its complaint, the SEC alleges that Liu made those misrepresentations and omissions in violation of Section 10(b) of the Exchange Act and Rule 10b-5 (b); and in count I alleges that Liu and Wang obtained money by

---

[2] Unlike a claim alleging misrepresentations under Rule 10b-5 (b) where the SEC is required to allege and prove who "made" the misrepresentation under the Supreme Court's holding in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), the SEC has no such burden for scheme liability claims brought under Section 17(a)(1) and (3), or Rule 10b-5(a) and (c). *See* Dkt. No. 76 at 16-19. And so to the extent misstatements are made in the course of a fraudulent scheme, the SEC need not demonstrate who actually "made" them to sustain its fraudulent scheme claim. *See, e.g.*, *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("Janus only discussed what it means to 'make' a statement for purposes of Rule 10b-5(b), and did not concern 17(a)(1) or (3) or Rule 10b5-(a) or (c)"); *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, *7 (N.D. Cal. Aug. 10, 2012) ("[a]llowing liability for Defendants' alleged conduct under Rule 10b-5(a) and (c) would not make *Janus* meaningless because *Janus* did not address these sections").

means of those falsehoods in violation of Section 17(a)(2) of the Securities Act.

To establish a violation of Section 10(b) and Rule 10b-5 (b) as alleged against Liu in count III of the complaint, the SEC must show that Liu, in connection with the purchase or sale of a security: (1) made an untrue statement or omitted to state a material fact, (2) with scienter; (3) by means of interstate commerce. See 17 C.F.R. § 240.10b-5(b). *SEC v. Platforms Wireless Int'l Corp*., 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana Research, Inc*., 8 F.3d 1358, 1364 (9th Cir. 1993). As for count I against both Liu and Wang for violating Section 17(a)(2), the SEC must prove that they obtained money "by means of" materially false statements or omissions in the offer or sale of a security. *See, e.g., SEC v. Dain Rauscher, Inc*., 254 F.3d at 856.[3] For both Rule 10b-5(b) and Section 17(a)(2) claims, the misstatements and omissions must concern material facts. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976); *SEC v. Platforms Wireless*, 617 F.3d at 1092. Liability arises not only from affirmative representations but also from failures to disclose material information. *SEC v. Dain Rauscher*, 254 F.3d at 855-56.

The SEC has established its count I claim against Liu for making material misrepresentations in the POM's disclosures to investors. Liu reviewed and approved the content of that key disclosure document and is thus its "maker" for purposes of

[3] Under *Janus*, the SEC must show that Liu "made" the misleading statements and omissions for him to be liable under Section 10(b) and Rule 10b-5. *See* 131 S. Ct. at 2302 (the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether to communicate it"). The *Janus* decision, however, has no bearing on Section 17(a)(2) misrepresentation and omission claims (and as discussed above, *see supra* n. 2, *Janus* does not govern scheme liability claims under Section 17(a)(1) or liability for transactions, practices, or courses of practice that operate as a fraud under Section 17(a)(3). *See* Dkt. No. 76 at 16-19; *see also, e.g., SEC v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill. 2013) ("vast majority of courts dealing with the question of whether *Janus* also applies to claims under Section 17 have answered that question with a resounding 'no'") (citing cases).

*Janus*. SUF at ¶ 53. The POM was materially misleading because the defendants' diversion of more than $21 million in investor funds to their own coffers, or to overseas marketers as absurdly large commissions, cannot be squared with the POM's express representation that Capital Contributions raised from investors would be used to "finance development and operation of the therapy center," and not be used to pay commissions. The POM further misled investors by representing that Dr. Thropay would be a key member of the project's management team, whose loss "would have a material impact" on the PPEB5 Fund's performance and operations; in spite of these representations, defendants never disclosed Dr. Thropay's January 2016 ouster from the project.

As for the Section 17(a)(2) count I against Liu and Wang, which does not require proof that they "made" any of the misstatements under *Janus*, the irrefutable evidence is that both of them obtained money by means of these misleading statements. Offering proceeds were raised "by means" of the false statements and omissions in the POM about the use of proceeds and Dr. Thropay's continued role at the project. *See, e.g.*, *SEC v. Rogers*, 1981 WL 1622, *3-4 (C.D. Cal. Mar. 31, 1981). Those proceeds were also obtained by means of UDG's website, which touted the Pacific Proton EB-5 investment with false promises about the success of the project (*e.g.*, underscoring its use of Optivus technology that had actually been abandoned). SUF at ¶¶ 65-73. Wang undisputedly controlled UDG – in fact, she should be deemed to have admitted as much. *See infra* Argument C(1); SUF at ¶ 64. Liu and Wang then took most of those fraudulently obtained proceeds to enrich themselves or overseas brokers, including Wang's UDG. *See* Dkt. No 76 (Order on PI) at 13:20-28 (finding that "[i]t is beyond question that the SEC has made out a prima facie case of securities violations" by the entity defendants because "at the very least, the PPEB5 Fund made false representations in its POM that ended up enriching all of the Corporate Defendants, who received funds from duped investors.").

Finally, the misrepresentations and omissions were unquestionably material.

*See SEC v. Constantin*, 939 F.Supp.2d 288, 307-08 (S.D.N.Y. 2013) (misappropriation of investor funds material); *SEC v. Gallard*, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) (same). In fact, as addressed below, Liu and Wang should not be permitted to argue to the contrary since they declined to answer deposition questions on the materiality of their falsehoods. SUF at ¶¶ 154, 160.

#### 4. Liu and Wang acted with scienter and their conduct was unreasonable

Facts establishing Liu's and Wang's wrongful mental state and the unreasonableness of their conduct should be deemed admitted by the Court, given their failure to answer the SEC's requests to admit. *See infra* Argument C(1); SUF at ¶¶ 132-141. In addition, the SEC has demonstrated with affirmative evidence that Liu knew of the misappropriation and, as someone who reviewed and approved the POM, knew that the diversion of investor money violated the terms of that document. Moreover, Liu received a letter from Optivus that told him, point blank, that disclosures to investors were misleading. As for Wang, she was in charge of marketing proton therapy to investors, and she likewise knew that she and her husband were taking millions of dollars from the project. At the least, Wang knew or should have known that investor money was being misused, contrary to the claims on UDG's website.

### C. Liu and Wang Failed to Respond to Written Discovery and Invoked Their Fifth Amendment Privilege

#### 1. Refusal to answer written discovery

Under Rule 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3); *see, e.g.*, *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007) ("Unanswered requests for admissions may be relied on as the basis for granting summary judgment"); *Krohn v. San Bernardino County Sheriff's*

*Dept.*, No. EDCV 06-00595 GW (AJW), 2008 WL 4390162, *4 (C.D. Cal. Sept. 10, 2008) (granting summary judgment in light of unanswered Rule 36 requests). Moreover, when a party fails to respond, no motion to establish the admissions is needed because Rule 36(a) is self-executing. *FTC v. Medicor, LLC, et al.*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002). Accordingly, the Court has ample grounds to grant summary judgment on the basis of, *inter alia*, the dozens of factual admissions made by Liu and Wang as a consequence of their refusal to answer the SEC's Rule 36 requests for admission. *See, e.g.*, SUF at ¶¶ 54-56, 87-88, 91, 94, 132-141.

**2. Liu's and Wang's invocation of the Fifth Amendment**

At deposition, Liu and Wang invoked the Fifth Amendment when questioned about the material facts in this case, including their misappropriation of investor funds, false statements to investors, their mental state and the reasonableness of their conduct, and how investors would have perceived the truth of what was done by Liu and Wang. *See* SUF at ¶¶142-161. Though it is their constitutional right, that invocation of the privilege has consequences: first, Liu and Wang should be precluded from offering evidence on these issues, and second, this Court should draw an adverse inference against them. *See, e.g.*, Dkt. No. 185-1, Ex. 1 (10/7/16 Hearing Tr.) at 66:5-17 (anticipating present motion and request for adverse inference – "[T]hen you make [a Fifth Amendment assertion] and then I say yes, it's a valid assertion of the privilege. And if I make that, then there's going to be a motion. I don't know if it's a summary judgment motion or what to say that there should be an adverse inference from the assertion of the Fifth.")

"Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910-11 (9th Cir. 2008). Because the whole objective of discovery is to ascertain the position of an adverse party on controverted issues, *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 549 (S.D.N.Y. 1985), "it would be an abuse of the Fifth Amendment to

allow a civil litigant to use it to offer proofs while denying the adversary discovery of his contentions." *SEC v. Benson*, 657 F. Supp. 1122, 1129 *S.D.N.Y. 1987); *see also SEC v. Interlink Data Network of Los Angeles, Inc.*, 1993 WL 603274, *8 n. 97 (C.D. Cal. 1993). To assess whether preclusion is proper, courts apply a balancing test:

> Because the interest is constitutionally based, 'the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced,' and 'the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.

*Nationwide*, 541 F.3d at 910 (citation omitted). The balance of interests warrants preclusion here.

Liu and Wang have thwarted the SEC's efforts to obtain plainly discoverable information – their own account of what happened, including any facts they might claim in defense of the SEC's suit – by asserting their Fifth Amendment right. Under these circumstances, preclusion should be "the price of, not a penalty for, [Liu's and Wang's] invocation of the Fifth Amendment." *Rainier Nat'l. Bank v. Hartstein*, NO. 91-36165, 1993 WL 175265, at *5 (9th Cir. 1993) (affirming preclusion order at trial following defendant's Fifth Amendment assertion at deposition).

Second, this Court may additionally draw an adverse inference from Liu's and Wang's Fifth Amendment assertions – *e.g.*, that because they refused to answer questions about whether they engaged in a scheme to misappropriate investor money with fraudulent intent, the Court may infer that to be true. "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). An adverse inference is not automatic, and in *SEC v. Luna*, the court summarized what the SEC must show for an inference to be drawn:

> The Court does not draw the inference unless (1) the SEC has a substantial need for the information, (2) no other, less burdensome means of obtaining the information exists, (3) "the value of presenting [the] evidence is not "substantially outweighed by the danger of unfair prejudice to the party asserting the privilege," and (4) independent evidence of the fact about which the party refuses to testify exists.

No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202, at *12 (D. Nev. Feb. 26, 2014) (quoting *Nationwide*, 541 F.3d at 911-12). Each of these criteria is satisfied here.

The SEC has a substantial need for Liu's and Wang's testimony because their own account of the relevant events – and any admissions made by them in the course of being interrogated on their conduct – would be more compelling and probative than any alternative source of evidence on that subject. Further, the SEC has presented ample independent evidence of defendants' fraud, as evidenced by this Court's entry of a preliminary injunction against Liu and Wang. *See, e.g.*, Dkt. No. 76 (Order on PI) at 13:20-28. This Court accordingly has abundant cause to draw an adverse inference that: Liu and Wang controlled UDG, *id.* at ¶¶ 142-143, Liu and Wang offered and sold securities, SUF at ¶¶ 145-146, 161, they engaged in a scheme to misappropriate the money they raised through their EB-5 offering, *id.* at ¶¶ 148, 157-158, they made false statements to their investors, *id.* at ¶¶ 147, 149-150, they acted unreasonably and with scienter, *id.* at ¶¶ 151-154, 159, and investors would have considered facts about the true use of their funds to be significant to their investment. *Id.* at ¶¶ 154, 160.

**D. Liu and Wang Should Be Permanently Enjoined**

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that when the evidence establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC. *SEC v. Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996). Factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *Id.* Here, the totality of the circumstances weighs in favor of a permanent injunction. As stated

above, Liu and Wang acted with a high degree of scienter, their conduct also extended over a period of years, and there is no evidence that they have recognized the wrongful nature of his conduct, nor provided any assurances against future violations. The Court should therefore enter a permanent injunction against future violations.

In addition, the Court has the equitable power to issue a conduct-based injunction. *See, e.g.*, *SEC v. Wencke*, 622 F.3d 1363, 1369 (9th Cir. 1980) (holding that order prohibiting nonparty from initiating litigation against an entity in receivership is within the court's equitable powers). The SEC accordingly requests that the Court also enjoin Liu and Wang from engaging in any further EB-5-related solicitation of investors.

### E. Liu and Wang Should Be Ordered To Pay Monetary Remedies

#### 1. Liu and Wang should disgorge their illegal gains

In the Ninth Circuit, it is well-settled that this Court has broad equity powers to order the disgorgement of ill-gotten gains obtained through a defendant's violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. J.T. Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (disgorgement is an appropriate equitable remedy for violations of the securities laws); *SEC v. Olins*, 762 F. Supp. 2d 1193, 1197 (N.D. Cal. 2011).

To prove an appropriate disgorgement amount, the SEC need only show a "reasonable approximation" of profits causally connected to the violation. *Platforms Wireless*, 617 F.3d at 1096; *J.T. Wallenbrock*, 440 F.3d at 1113-14. Once the SEC has made such a showing, the burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215,

1232 (D.C. Cir. 1989)). As the Ninth Circuit observed, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (quoting *First City Financial*, 890 F.2d at 1231, 1232).

No such uncertainty exists here. Liu and Wang admit that they raised at least $26,967,918 from 50 Chinese investors. SUF at ¶ 34. Not a single dime was ever paid to any of those investors, and only a small portion – $234,899.19 – remains. The defendants' ill-gotten gains from their offering fraud is therefore the gross proceeds from the Pacific Proton offering, less the small amount that remains in the corporate accounts,, or $26,733,018.81. That is the is the appropriate amount of disgorgement.[4]

Moreover, Liu's and Wang's claim that they may offset "legitimate" business expenses arising from their scheme to misappropriate more than $20 million in investor funds is without merit. *See* Dkt. No. 121. To start, the vast majority of expenses that Liu and Wang have previously claimed to be "legitimate" simply aren't. The $12.9 million Liu paid to overseas marketers was transferred in contravention of the plain language of the POM. Thus, factual premise for the individual defendants' claim of a "legitimate expenses" offset is without merit.

Moreover, Liu's and Wang's legal premise for an offset has been repeatedly rejected by the Ninth Circuit. In this circuit, the proper disgorgement amount for an offering fraud like this one equals the total amount of proceeds fraudulently raised from the investors, less whatever may have been paid back to investors. *JT Wallenbrock & Associates*, 440 F.3d at 1111-13 (affirming disgorgement award of $139.4 million, which represented "the entire proceeds from the scheme less amounts paid to investors"); *Platforms Wireless*, 617 F.3d at 1096-97 (affirming disgorgement

---

[4] This calculation is in fact conservative given other evidence that the total amount raised by Liu and Wang may in fact exceed $31 million. *See* SUF at ¶ 35 (Pacific Proton-produced investor list showing 58 investors indicates $31.6 million was raised). The $26.9 million in gross proceeds is based on the SEC's analysis of the bank records obtained during its investigation, which ran from October 2014 to April 2016. It is not inclusive of any amounts potentially raised prior to that timeframe.

award of about $1.75 million, which equaled the total "amount of proceeds obtained from" illegal offering); *SEC v. Interlink Data Network of Los Angeles, Inc.*, Civ. A. No. 93-3073 R1993 WL 603274, at *12-13 (C.D. Cal. Nov. 15, 1993) (where defendants engaged in "boiler-room" operation to fraudulently raise money in illegal stock offering, holding "each defendant should be held jointly and severally liable for the return of the entire amount raised," which was $12,285,035); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972) ("it was appropriate for the district court to order [defendants] to disgorge the proceeds received in connection with the [securities] offering"); *SEC v. Sahley*, No. 92 Civ. 8842 (JSM), 1994 WL 9682 (S.D.N.Y. Jan. 10, 1994) ("The investors who lost their entire investment are entitled to an order of disgorgement of the full amount raised through those fraudulent statements."); *SEC v. Watermark Financial Services Group, Inc.*, No. 08-CV-361S, 2012 WL 501450, at *8 (W.D.N.Y. Feb. 14, 2012) (finding defendants liable for offering fraud and setting disgorgement at $5.2 million, which was "the total amount still owed [to investors]"); *SEC v. Pittsford Capital Income Ptrs., LLC*, No. 06 Civ. 6353 T(P), 2007 WL 2455124, at *16 (W.D.N.Y. Aug. 23, 2007) (same, and setting disgorgement at $11.7 million by subtracting amount returned to investors from total amount raised in fraudulent offering).

Consequently, it is of no moment that defendants may no longer have all of the $26.9 million they fraudulently raised from investors. "A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *Platforms Wireless*, 617 F.3d at 1098. As the Ninth Circuit succinctly explained:

> [It] would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place.

*JT Wallenbrock*, 440 F.3d at 1114; *see also Platform Wireless*, 617 F.3d at 1097-98 ("[t]he manner in which [the defendant] chose to spend the illegally obtained funds

has no relevance to the disgorgement calculation.") (quoting *JT Wallenbrock*, 440 F.3d at 1113) (internal quotations omitted). This Court should accordingly find Liu and Wang jointly and severally liable for disgorgement in the amount of $26,733,018.81.

**2. Liu and Wang should pay prejudgment interest**

Disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct. *SEC v. Manor Nursing*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Cross Fin. Services, Inc.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995). The decision whether to grant prejudgment interest and the rate used are generally matters confided to the district court's broad consideration, taking into consideration the need to fully compensate the wronged party for actual damages suffered, consideration of fairness and the relative equities of the award, the remedial purposes of the statute involved, and such other general principles considered relevant by the court. *See SEC v. Olins*, 762 F. Supp. 2d at 1198-99 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)). Accordingly, the Court should further order Liu and Wang to disgorge prejudgment interest in the amount of $89,110.06, running from April 30, 2016 (the last possible date on which Liu and Wang had raised all $26,967,918) to June 1, 2016 (the date the SEC brought this enforcement action).

**3. Liu and Wang should pay civil penalties**

In this motion, the SEC seeks an order imposing third-tier penalties against Liu and Wang. SEC counsel, however, is unable to move the Court for a specific penalty at this time. Although we have already prepared a penalty recommendation for approval by the commissioners of the SEC, we expect that the Commission will not be able to act on our recommendation until the end of January under its present schedule. Once counsel receives penalty authority from the Commission, the SEC will propose specific penalty amounts for Liu and Wang. We have, however, briefed the *Murphy* factors and related law on penalties within this brief in anticipation of our

specific penalty request.

Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. §78u(d)(3)(A), provides that the SEC may seek, and the Court may impose, civil monetary penalties for violations of the Exchange Act. Section 20 of the Securities Act, 15 U.S.C. § 77t(d)(2) contains similar provisions. Congress enacted civil penalty provisions to achieve the dual goals of punishment of the individual violator and deterrence of future violations. *SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D. Fla. 2006) (citing *SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001)); *SEC v. Palmisano*, 135 F.2d 860, 866 (2d Cir. 1998). The deterrence of securities law violations through the imposition of monetary sanctions serves several important goals, including encouraging investor confidence, increasing the efficiency of financial markets, and promoting stability in the securities industry. *See Palmisano*, 135 F.2d at 866.

The Exchange Act and Securities Act provide for three tiers of penalties, and the amount of any penalty is to be "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 78u(d)(3)(B), 77t(d). First tier penalties may be imposed for any violation of either Act. *See id*. §§ 78u(d)(3)(B)(i), 77t(d)(3)(B)(i). Second tier penalties apply to violations that "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement." *Id*. §§ 78u(d)(3)(B)(ii), 77t(d)(3)(B)(ii). Third tier penalties apply to violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. §§ 78u(d)(3)(B)(iii), 77t(d)(3)(B)(iii).

The specific amount of the civil penalty imposed within each tier is discretionary. *See Olins*, 769 F. Supp. 2d at 1199 (citing *SEC v. Moran*, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996)). Consistent with the goal of deterrence, this Court may award third tier penalties of up to either "the gross amount of pecuniary gain to the defendant as a result" of the defendant's securities law violations or $150,000, whichever is higher. 15 U.S.C. § 78u(d)(3)((B)(iii), 77t(d)(3)(B)(iii).

In assessing an appropriate civil penalty, courts frequently consider the factors used for determining the appropriateness of injunctive relief set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980). *See, e.g., SEC v. Abacus International Holding Corp*., 2001 WL 940913, *5 (N.D. Cal. Aug. 16, 2001); *SEC v. Gowrish*, 2011 WL 2790482, *9 (N.D. Cal. Jul. 14, 2011). Those factors are: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations. *See Murphy*, 626 F.2d at 655; *see also SEC v. CMKM Diamonds, Inc*., 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009).

All of these factors militate in favor of substantial civil penalty against Liu and Wang. Liu and Wang knew exactly what they were doing when they took more than $21 million in investor funds over a multi-year period. There is further evidence that Liu and Wang were involved in other EB-5 investment projects apart from the Pacific Proton investment that forms the basis for this case. They have offered this Court no assurances against future violations, and given their sustained activity in the EB-5 space, there remains an actual potential of future violations. For all of those reasons, this Court should impose third-tier civil penalties against Liu and Wang.

## IV. CONCLUSION

Based on the undisputed evidence, the SEC is entitled to summary judgment and injunctive and monetary relief on all of its claims against Liu and Wang.

Dated: January 4, 2017

*/s/ Gary Y. Leung*
John W. Berry
Gary Y. Leung
Attorneys for Plaintiff
Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On January 4, 2017, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS CHARLES C. LIU AND XIN (LISA) WANG** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 4, 2017

*/s/ Gary Y. Leung*
GARY Y. LEUNG

**_SEC v. Liu et al._**
**United States District Court—Central District of California**
**Case No. SACV16-00974-CJC (AGRx)**

**SERVICE LIST**

*Counsel for Defendants Charles C. Liu and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq.
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu, the controlling shareholder of each*)
Hervé Gouraige, Esq.
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

(*on Charles C. Liu, controlling shareholder of each*)
c/o Charles C. Liu
[redacted]

[redacted]
Beijing, China 100125
Email: charlesliul26@gmail.com
Email: charlesliu@me.com
Email: liu@pptus.com

*Defendant Pacific Proton EB-5 Fund, LLC*:

*(on Charles C. Liu, controlling shareholder of the manager*)
c/o Charles C. Liu
[redacted]
Beijing, China 100125Email: charlesliul26@gmail.com
Email: charlesliu@me.com
Email: liu@pptus.com