Lawrence B. Steinberg (State Bar No. 101966)
*LSteinberg@buchalter.com*
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
Attorneys for defendants CHARLES C. LIU and XIN WANG a/k/a LISA WANG

Hervé Gouraige (admitted *pro hac vice*)
*hgouraige@sillscummis.com*
William R. Stuart III
(admitted *pro hac vice)*
*wstuart@sillscummis.com*
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
Telephone: (973) 643-5989
Facsimile: (973) 643-6500

Attorneys for defendants CHARLES C. LIU and XIN WANG a/k/a LISA WANG

Sills Cummis & Gross P.C.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC<br><br>Defendants. | Case No. SACV16-00974CJC (AGRx)<br><br>**DEFENDANTS CHARLES C. LIU AND XIN WANG'S MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF HERVÉ GOURAIGE IN OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**<br>**DATE: FEBRUARY 6, 2017**<br>**TIME: 1:30 P.M.**<br>**COURTROOM: 913**<br>**JUDGE: HONORABLE CORMAC J. CARNEY** |

# TABLE OF CONTENTS


PAGE

MEMORANDUM OF POINTS AND AUTHORITIES .......... 2

I. INTRODUCTION .......... 2

II. STATEMENT OF FACTS .......... 3

A. The Purpose of the PPEB5 Fund Was To Accept Foreign Investments To Fund A Cancer Treatment Center .......... 3

B. The Project Was Well Underway Prior To The SEC's Investigation Of Defendants .......... 4

III. ARGUMENT .......... 7

A. Standard of Review .......... 7

B. Summary Judgment Should Be Denied Because There Is A Genuine Dispute Over The SEC's Claim That Defendants Made Material Misstatements Or Omissions Of Fact .......... 7

C. Summary Judgment Should Also Be Denied Because The Materiality Of Defendants' So-Called Representations And Omissions Cannot Be Decided In A Summary Judgment Motion .......... 11

D. Summary Judgment Should Be Denied Because There Exists A Genuine Dispute Over Whether Defendants Misappropriated Funds .......... 13

E. Summary Judgment Should Be Denied Because The "Investments" Are Not Subject To Federal Securities Law As "Investment Contracts" Due To a Lack Of Primary Profit Motive .......... 14

F. Defendants' Assertion Of Their Fifth Amendment Privilege Does Not Preclude Them From Offering Evidence In Opposition To The SEC's Motion For Summary Judgment And Does Not Entitle The SEC To An Adverse Inference .......... 17

G. Summary Judgment Should Be Denied Because The SEC Has Failed To Establish That Defendants Acted With Scienter Or Were Negligent, And Defendants' Decision To Invoke The Fifth Amendment And Not Respond To The SEC's Requests For Admissions Does Not Render The SEC's Allegations Admitted .......... 19

## TABLE OF CONTENTS
(continued)

**PAGE**

H. The Court's Entry Of The Preliminary Injunction Has No Bearing On The SEC's Motion For Summary Judgment............. 21

I. Summary Judgment Should Be Denied As To WANG Because There Is No Evidence Supporting Any Of The Elements Of Securities Fraud As To WANG............................... 21

J. The SEC's Request For A Permanent Injunction and Imposition Of Monetary Remedies Should Be Denied................ 23

IV. CONCLUSION ........................................................................... 25

Sills Cummis & Gross P.C.

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)....7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....8

*Campbell v. Gerrans*,
592 F.2d 1054 (9th Cir. 1979)....20

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)....7

*Earth Island Inst. v. Carlton*,
No. 2:09-cv-02020-MCE-EFB, 2012 U.S. Dist. LEXIS 44177 (E.D. Cal. Mar. 28, 2012)....21

*Grenader v. Spitz*,
537 F.2d 612 (2d Cir. 1976).... 15, 16

*Griffin v. California*,
380 U.S. 609 (1965)....20

*Hateley v. SEC*,
8 F.3d 653 (9th Cir. 1993)....24

*Malloy v. Hogan*,
378 U.S. 1 (1964)....20

*Nationwide Life Ins. Co. v. Richards*,
541 F.3d 903 (9th Cir. 2008)....18

*Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*,
210 F.3d 1099 (9th Cir. 2000)....7

*Rice v. Branigar Org., Inc.*,
922 F.2d 788 (11th Cir. 1991)....15

*RJR Nabisco, Inc. v. European Cmty*,
136 S.Ct. 2090 (2016)....23

*Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000)....18

*SEC v. Benson*,
657 F. Supp. 1122 (S.D.N.Y. 1987)....25

*SEC v. Blatt*,
583 F.2d 1325 (5th Cir. 1978)....24

*SEC v. Dain Rauscher, Inc.*,
254 F.3d 852 (9th Cir. 2001).... 8, 21

*SEC v. Fraser*,
No. CV-09-00443-PHX-GMS, 2009 U.S. Dist. LEXIS 70198 (D. Az. Aug. 11, 2009)....23

*SEC v. JT Wallenbrock & Assocs.*,
440 F.3d 1109 (9th Cir. 2006).... 24, 25

*SEC v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972)....24

*SEC v. Morgan Keegan & Co.*,
678 F.3d 1233 (11th Cir. 2012).... 8, 21

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007).... 11, 19

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010).... 24, 25

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)....14

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)....12

*United Housing Foundation, Inc. v. Forman*,
421 U.S. 837 (1975).... 13, 14, 15, 16

Sills Cummis & Gross P.C.

Sills Cummis & Gross P.C.

**STATUTES**

1933 Act Section 17(a), 15 U.S.C. ....................7

1934 Act § 77q, Section 10(b), 15 U.S.C. §78 ....................7

*Fed. R. Civ. P.* 56(c)(2) ....................7

*Fed. R. Civ. Pro.* 12(b)(1) and 12(b)(6) ....................3

Rule 10b-5 .................... 7, 19

Rule 12(b)(6) ....................3

Rule 56 ....................3

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendants CHARLES C. LIU ("LIU") and XIN WANG, a/k/a LISA WANG ("WANG") (collectively referred to herein as "Defendants") hereby submit their Memorandum of Points and Authorities in opposition to the Securities and Exchange Commission's (the "SEC") Motion for Summary Judgment.

## I. INTRODUCTION

This case is based on alleged violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. The SEC claims that LIU, his wife, WANG, and three entities, the Pacific Proton EB5 Fund, LLC (the "PPEB5 Fund"), Pacific Proton Therapy Regional Center, LLC (the "Regional Center"), Beverly Proton Center, LLC f/k/a Los Angeles County Proton Therapy, LLC ("Beverly Proton") engaged in securities fraud in the offer and sale of interests in the PPEB5 Fund under the EB-5 Immigrant Investor Program administered by the U.S. Citizenship and Immigration Services ("UCIS").

The SEC contends that Defendants made various misrepresentations and factual omissions and misappropriated investors' capital contributions. The SEC argues now that it is entitled to summary judgment because it has "substantial proof" of Defendants' commission of securities fraud, the Court should deem crucial material facts admitted because Defendants failed to respond to the SEC's requests to admit, and the Court should make adverse inference findings of certain facts because Defendants have invoked their Fifth Amendment privilege against self-incrimination.

The SEC's motion must be denied for multiple reasons: (1) there is a genuine dispute over the materiality of Defendants' alleged misrepresentations and omissions; (2) materiality is decided by the trier of fact and is not appropriate for summary judgment; (3) there is a genuine dispute over whether Defendants misappropriated funds; (4) the investments in the PPEB5 Fund were not

Sills Cummis & Gross P.C.

securities[1]; (5) the SEC is not entitled to an adverse inference based on Defendants' assertion of their Fifth Amendment privilege; (6) the SEC's requests to admit are not deemed admitted by Defendants' failure to answer; (7) the Court's preliminary findings to grant an injunction has no bearing on this summary judgment motion; (8) there is no evidence supporting any of the elements of securities fraud as to WANG; and (9) the SEC's request for a permanent injunction and imposition of monetary remedies should be denied because there are no grounds for summary judgment.

## II. STATEMENT OF FACTS

### A. The Purpose of the PPEB5 Fund Was To Accept Foreign Investments To Fund A Cancer Treatment Center

On November 15, 2010, LIU formed the PPEB5 Fund, which accepted foreign investments under the federal EB-5 Immigrant Investment Program to fund the construction and development of a proton therapy cancer treatment center in Southern California (the "Project"). January 17, 2017 Declaration of Hervé Gouraige ("Gouraige") Ex. 1, Liu Dep. at pp. 34:15-36:8; POM at 6 (Dkt. No. 7, ¶ 7, Ex. 5, p. 456). Pursuant to the Private Offering Memorandum ("POM") issued by the PPEB5 Fund, units of $500,000 were offered to qualified non-U.S. citizens seeking permanent resident status in the United States. POM at 2 (Dkt. No. 7, ¶ 7, Ex. 5, p. 452). Non-U.S. citizens invested in the Project in order to obtain an EB-5 visa for permanent residency in the United States. *See* May 13, 2013 Policy Memorandum, U.S. Citizenship and Immigration Services ("USCIS Policy Memorandum") at 1; Coffee, John "News From California: The 9th Circuit and the SEC Challenge New York,"

---

[1] The Court denied Defendants' motion under Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6) to dismiss the Complaint on this ground. The Court treated that motion as one under Rule 12(b)(6) and applied the well-pleaded allegation rule in denying the motion. Dkt. No. 139, at 2 n. 2. In the summary judgment context, we renew the ground of that motion both because Rule 56 requires a higher standard and because Defendants wish to preserve the legal issue.



Sills Cummis & Gross P.C.

*The CLS Blue Sky Blog* (July 20, 2015), http://clsbluesky.law.columbia.edu/2015/07/20/news-from-californiat-the-9th-circuit-and-the-sec-challenge-newyork/; http://en.wikipedia.org/wiki/EB-5_visa - cite_note - Green_Card_Through_Investment-1#cite_note-Green_Card_Through_Investment-1.

The investors' funds were to be loaned to Beverly Proton, the company tasked with building the proton therapy center. POM at 6 (Dkt. No. 7, ¶ 7, Ex. 5, p. 456). The loan to Beverly Proton was subject to a total of 1.25% interest over five years ($6,125 of the $500,000 investment) and was unsecured and subordinate to other debt of Beverly Proton[2]. Appendix F to POM (Dkt. No. 84-1). In addition to the $500,000 capital contribution, investors were required to pay a $45,000 administrative fee. POM at 6 (Dkt. No. 7, ¶ 7, Ex. 5, p. 456). Given the very low interest rate, the subordination of the loan, and the $45,000 administrative fee, there was no realistically net financial benefit to investors (even if the Project succeeded), and therefore the only rational reason for investors to participate was to obtain a visa under the EB-5 Program. POM at 6 (Dkt. No. 7, ¶ 7, Ex. 5, p. 456); Appendix F to POM (Dkt. No. 84-1).

### B. The Project Was Well Underway Prior To The SEC's Investigation Of Defendants

Despite the SEC's repeated criticisms of LIU and the Project, the evidence shows that LUI made every effort to complete the Project as originally planned, and the only thing standing in the way of the Project's success is the SEC and its enforcement action. From the start, LIU hired (on behalf of Beverly Proton) many consultants to work on the Project, including two major architects, consultants on radiation shielding, a construction company to demolish the existing building on the land leased from Dr. Thropay's company

[2] The loan, however, was guaranteed by Beverly Oncology & Imaging Centers, Medical Group, Inc., a California corporation owned by John P. Thropay, M.D., a 30% owner of Pacific Proton and Beverly Proton. Gouraige Dec., Ex. 2.



Sills Cummis & Gross P.C.

to house the proton therapy center, and a consultant on the use of a dosage for the radiation treatment, Gouraige Dec., Ex. 1, Liu Dep. at p. 55:10-21, 56:8-12, 56:20-57:4. LIU also signed a purchase agreement with Mevion, a proton therapy company, which included a $3 million down payment. Gouraige Dec., Ex. 1, Liu Dep. at pp. 56:13-19; 135:13-24.

Although one of the potential sites for the Project was ready for construction, it was delayed because of a dispute with Dr. Thropay, the co-founder of Beverly Proton. Gouraige Dec., Ex. 1, Liu Dep. at p. 57:23-58:21. In mid-2015, LIU saw an opportunity to move the Project forward by working with the City of Hope, a prestigious medical center in California. Gouraige Dec., Ex. 1, Liu Dep. at pp. 50:14-51:4, 54:11-13. Dr. Thropay disagreed because he did not get along with Dr. Jeffrey Wong, chairman of the radiology department at City of Hope, and working with the City of Hope would result in Dr. Thropay's sister losing her job on the Project. Gouraige Dec., Ex. 1, Liu Dep. at pp. 52:1-53:23. As a result of this disagreement, Dr. Thropay's involvement in the Project ended. Gouraige Dec., Ex. 1, Liu Dep. at p. 53:8-11. LIU worked with Harlan Levine, the CEO of the City of Hope Foundation, and Dr. Fong, a well-known doctor with City of Hope Medical Center, on plans for the new proton therapy center. Gouraige Dec., Ex. 1, Liu Dep. at pp. 49:11-50:3. LIU also hired his own consultant, Michael Hunn, the former CEO of Providence Medical Center, to work with the City of Hope to help the Project come to fruition. Gouraige Dec., Ex. 1, Liu Dep. at p. 51:19-23. Ultimately, a memorandum of understanding was signed between Beverly Proton and City of Hope to further the goals of the Project. Gouraige Ex. 1, Liu Dep. at p. 50:4-8, 54:18-55:3.

One of the architects that LIU worked with on the Project applied for a construction permit, which LIU believed (at the time of his March 23, 2016 investigative deposition) would be obtained in short order because of

Sills Cummis & Gross P.C.

Sills Cummis & Gross P.C.

cooperation from the City. Gouraige Dec., Ex. 1, Liu Dep. at p. 60:20-25. LIU initially worked with Skanska on the Project, one of the largest construction companies in the world. Gouraige Dec., Ex. 1, Liu Dep. at p. 61:2-6. As a result of a change in the proton therapy technology used on the Project – from Optivus to Mevion – and a change in the site of the Project, LUI switched to another architect, Steve Cooney who is also project manager. Gouraige Dec., Ex. 1, Liu Dep. at p. 61:6-22. LIU switched from Optivus to Mevion because the equipment that Mevion offered saved the Project $90 million in costs. Gouraige Dec., Ex. 1, Liu Dep. at pp. 66:24-67:6.

In order to ensure that there will be adequate patients once the proton therapy center is up and running, Beverly Proton entered into agreements with overseas companies to bring patients to the proton therapy center, and has already brought patients to the United States, generating referral fees. Gouraige Dec., Ex. 1, Liu Dep. at p. 30:4-32:12. One of these marketers is a group of two companies collectively called the United Damei Group ("UDG"). Gouraige Dec., Ex. 1, Liu Dep. at pp. 30:4-32:12, 105:14-106:9. In total, Beverly Proton has paid over $7 million to generate jobs for the Project. Gouraige Dec., Ex. 1, Liu Dep. at p. 160:20-23.

Unfortunately, the SEC's pursuit of its claims against Defendants has put the Project on ice. Management of Beverly Proton have resigned for lack of pay and other reasons associated with the enforcement action, outside legal and other professionals are unable to continue to work without a management team providing guidance and assuring payment for their services, a potential relationship with Beverly Hospital to work with the proton therapy center is on hold, and private equity firms that had expressed making substantial investments in the proton therapy center before this case are waiting for the outcome. Dkt. No. 122 at pp. 3-4.

Sills Cummis & Gross P.C.

## III. ARGUMENT

### A. Standard of Review

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. A fact issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258. The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id.* at 322-23. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

### B. Summary Judgment Should Be Denied Because There Is A Genuine Dispute Over The SEC's Claim That Defendants Made Material Misstatements Or Omissions Of Fact

The SEC's claims against Defendants are based on the antifraud provisions of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q, Section 10(b) of the 1934 Act, 15 U.S.C. §78, and Rule 10b-5, 17 C.F.R. § 240.10b-5. Dkt. No. 1 at ¶¶ 122-135. To obtain relief under these provisions, the SEC must come forward with evidence that Defendants "ma[de] [1] a material misstatement or omission [2] in

connection with the offer or sale of a security [3] by means of interstate commerce." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). *See also SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012). The requirement of materiality is satisfied only if the evidence shows that the misstatement or omission "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The SEC bases its claims on the following so-called misrepresentations/omissions:

- The representation in the POM prohibiting the use of Capital Contributions to pay commissions;
- The representation in the POM that Capital Contributions raised from investors would be used to finance development and operation of the therapy center;
- The failure to disclose that Dr. Thropay was "ousted" from the Project in January 19, 2016; and
- Disclosures made by the UDG website which gave investors the false impression that the EB-5 project was making real progress.

(SEC Brief in Support of its motion for Summary Judgment ("SEC Br.") at pp. 13, 15. Since there exists a genuine dispute as to whether any of these representations or omission were material, the SEC's motion for summary judgment must be denied.

Although the POM provides that capital contributions from investors would be used to finance development and operation of the therapy center and that commissions incurred in connection with the offering would not be paid from the capital contributions, the POM also makes clear that the provisions regarding use of capital contributions are estimates that are subject to change. For instance, the POM provides that PPBE5 "has broad discretion to adjust the application and allocation of the proceeds of this Offering in order to address

Sills Cummis & Gross P.C.

Sills Cummis & Gross P.C.

changed circumstances and opportunities." POM at 20 (Dkt. No. 7, ¶ 7, Ex. 5, p. 470). Moreover, the POM notifies investors that the use of investor proceeds is "based on current information . . . which could change as the Project moves forward." POM at 20 (Dkt. No. 7, ¶ 7, Ex. 5, p. 470). Furthermore, Investors in the Project were advised that their investment would be used not only to construct and operate the center, but to market it. Gouraige Dec., Ex. 1, Liu Dep. at pp. 106:21-109:8.

Regarding Dr. Thropay, the SEC has not presented any evidence that Defendants failed to notify investors that he was no longer involved in the Project as of January 19, 2016. In any case, even if there was a failure to disclose Dr. Thropay's departure from the Project, that fact would not have been material and relevant to the investors. As of December 31, 2015, all of the investors had already made their investments, Dkt. No. 16 at ¶ 16, and there is no evidence that any POMs were sent to any potential investors after Dr. Thropay left. Finally, failure to disclose the dissociation of Dr. Thropay was not material because his departure increased the likelihood of success of the Project by allowing LIU to work with the City of Hope, a prestigious medical center in California, which was in the best interests of the success of the new proton therapy center. Gouraige Dec., Ex. 1, Liu Dep. at pp. 47:23-54:13.

Finally, the SEC claims that the UDG website contained "false promises" about the success of the Project because it underscored the use of Optivus technology, which had been "abandoned." The SEC has offered no evidence that the switch from Optivus to Mevion was material to investors. There is no evidence that investors would not have invested if they were told that the Project would no longer use Optivus equipment. In the view of management, Mevion was a better alternative. LIU switched from the Optivus technology to Mevion to save the Project $90 million in costs, and there is no evidence that

the change in technology had any negative impact on the Project. Gouraige Dec., Ex. 1, Liu Dep. at pp. 66:24-67:6.

As a result of LIU's efforts, substantial progress was made in getting the proton center up and running before the SEC's enforcement action put the Project on hold:

- LIU hired many consultants to work on the Project on behalf of Beverly Proton, including two major architects, consultants on radiation shielding, a construction company to demolish the existing building to house the proton therapy center, and a consultant on the use of a dosage for the radiation treatment, Gouraige Dec., Ex. 1, Liu Dep. at p. 55:10-21, 56:8-12, 56:20-57:4;
- LIU signed a purchase agreement with Mevion, a proton therapy company, which included a $3 million down payment, Gouraige Dec., Ex. 1, Liu Dep. at pp. 56:13-19; 135:13-24;
- One of the potential sites for the Project is ready for construction, Gouraige Dec., Ex. 1, Liu Dep. at p. 57:23-58:17; 59:12-14;
- In mid-2015, LIU saw an opportunity to move the Project forward by working with the City of Hope, a prestigious medical center in California, Gouraige Dec., Ex. 1, Liu Dep. at pp. 54:11-13, 50:14-51:4;
- LIU worked with Harlan Levine, the CEO of the City of Hope Foundation, and Dr. Fong, a well-known doctor with City of Hope Medical Center on plans for the new proton therapy center, Gouraige Dec., Ex. 1, Liu Dep. at pp. 49:11-50:3;
- LIU hired his own consultant, Michael Hunn, former CEO of Providence Medical Center, to work with the City of Hope to help the Project come to fruition and ultimately, a memorandum of understanding was signed between Beverly Proton and City of Hope to further the goals of the Project, Gouraige Dec., Ex. 1, Liu Dep. at p. 50:4-8, 54:18-55:3;
- One of the architects that Liu was working with on the Project has applied for a construction permit, which (at the time his March 23, 2016 investigative deposition) LIU believed would be obtained soon, Gouraige Dec., Ex. 1, Liu Dep. at p. 60:20-25;
- Liu switched from Optivus to Mevion to save the Project $90 million in costs, Gouraige Dec., Ex. 1, Liu Dep. at pp. 66:24-67:16;

Sills Cummis & Gross P.C.

- To ensure that there will be adequate patients once the proton therapy center is up and running, Beverly Proton entered into agreements with overseas companies to bring patients to the proton therapy center, and has already brought patients to the United States, generating referral fees. Gouraige Dec., Ex. 1, Liu Dep. at p. 30:4-32:12;
- Beverly Proton has paid over $7 million to generate jobs for the Project, Gouraige Dec., Ex. 1, Liu Dep. at p. 160:20-23.

Since there are disputed issues of fact regarding whether Defendants made material misstatements or omissions regarding the EB-5 investment, summary judgment should be denied.

### C. Summary Judgment Should Also Be Denied Because The Materiality Of Defendants' So-Called Representations And Omissions Cannot Be Decided In A Summary Judgment Motion

The issue of "materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'" *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *In re Apple Computer Sec. Litigation*, 886 F.2d 1109, 1113 (9th Cir. 1989)). This is because materiality "depends on determining a hypothetical investor's reaction to the alleged misstatement." *Id.* As enunciated by the Supreme Court:

> The determination [of materiality] requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment."

Sills Cummis & Gross P.C.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)) (footnote omitted).

Assessment of materiality is generally improper at the summary judgment stage **even when there are no disputed material facts**. *See* 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2729, at 556 (3d ed. 1998) *("[E]ven when there is no dispute as to the facts*, it usually is for the jury to decide whether the conduct in question meets the reasonable-person standard." (emphasis added)), *cited in TSC Indus.*, 426 U.S. at 450 n. 12. Hence, even in the absence of disputed facts regarding the materiality of Defendants' representations and omissions to investors in this case, the SEC's motion for summary judgment would be premature because the issue of materiality must be decided by a trier fact.

This is particularly true here because, in addition to the fact that the factual basis for the SEC's claim of materiality is disputed, the so-called securities at issue here are not securities at all – they are payment by a foreign national in exchange for a visa to allow the investor residency in the United States. *See infra* at p.p. 14-17. Since the POM was issued and the resulting "investments" were made pursuant to the EB-5 Immigrant Investor Program, the main purpose was not to get a return on investment (which is all but impossible under the terms of the POM that were disclosed to all investors), but to get an EB-5 visa. USCIS Policy Memorandum at 1; Coffee, John "News From California: The 9th Circuit and the SEC Challenge New York," The CLS Blue Sky Blog (July 20, 2015), http://clsbluesky.law.columbia.edu/2015/07/20/news-from-californiat-the-9th-circuit-and-the-sec-challenge-new-york/; http://en.wikipedia.org/wiki/ EB-5_visa - cite_note - Green_Card_Through_Investment-1#cite_note-Green_Card_Through_Investment-1; Gouraige Ex. 2, Appendix F to POM.

Sills Cummis & Gross P.C.

Where there is no reasonable expectation of profits, the "investment" is not a "security" for the purpose of the federal securities law, regardless of the label attached to the investment. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975). Since the purpose of the investment was to obtain a visa and not for a return on the investment, it is extremely unlikely that the trier of fact would find that any of the representations and omissions noted by the SEC would have been material to the reasonable "investor" in this instance.

**D. Summary Judgment Should Be Denied Because There Exists A Genuine Dispute Over Whether Defendants Misappropriated Funds**

In seeking summary judgment, the SEC relies heavily on its claim that Defendants "misappropriated more than $20 million in investor funds," consisting of $6.7 million taken by LUI, $1.538 taken by WANG and $12.9 million provided to overseas marketing firms. SEC's Br. at pp. 6, 11. As with the issue of materiality, misappropriation is a disputed issue of fact that must be decided by the trier of fact at trial, and not in a summary judgment motion.

The SEC alleges that "Liu took $6.7 million in investor funds for himself." SEC's Br. at p. 6. The evidence, however, shows that LIU was entitled to compensation for his work as President of Beverly Proton and Pacific Proton, and as manager of the PPEB5 Fund, which began in 2010. Dkt. No. 7, ¶ 3, Ex. 1, pp. 12:5-11, 32:13-19, 33:3-19; DKT. No. 7, ¶ 6, Ex. 4. Based on this evidence, a trier of fact is entitled to disagree with the SEC and conclude that LIU was justifiably paid for his work on the Project. Like LIU, WANG was entitled to compensation for her work with Beverly Proton, which began in 2011. Dkt. No. 7, ¶ 4, Ex. 2, pp. 26:1-4; 28:11-20; SEC's Statement of Uncontroverted Facts at ¶ 22. As with LIU, a trier of fact could reasonably conclude that WANG was entitled to receive the $1.538 million that the SEC says was wrongfully taken, as fair compensation for her services. Without

Sills Cummis & Gross P.C.

Defendants' work on the Project, there would have been no vehicle for the investors to obtain their EB5 visas and no prospective new proton therapy cancer center.

With respect to the $12.9 million provided to the overseas marketing companies, a substantial portion has been returned pursuant to the contracts, and therefore cannot be considered "misappropriated." Of the $7,300,000 that the SEC alleges Overseas Chinese received from the PPEB5 Fund, it has already returned $2,060,130, and had promised to return the remainder in equal monthly installments of $500,000. Dkt. No. 6, ¶¶ 21(b), 22, Dkt. No. 31-1, ¶ 5. Of the $3,815,000 that the SEC alleges UDG received from the PPEB5 Fund, UDG has already returned $500,000 and promised to return another $3,150,000. Dkt. No. 31-4, ¶ 5. There is no reason to complain of the $1,045,000 provided to Hong Kong Delsk Business Co., Ltd. ("Delsk") because it secured 37 investors. Applying an administrative fee of $45,000 per investor to 37 investors would exceed the amount attributed to Delsk. The SEC concedes this fee was reasonable. Dkt. No. 58, at 8.

### E. Summary Judgment Should Be Denied Because The "Investments" Are Not Subject To Federal Securities Law As "Investment Contracts" Due To a Lack Of Primary Profit Motive

To determine whether an investment is a "security", courts apply the test from *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The elements are (1) an investment of money (2) in a common enterprise (3) with the expectation of profits produced by another. *Id.* at 298-99. Here, the third element, expectation of profits, cannot be established by the SEC. At least, a trier of fact can disagree about an expectation of profits.

The seminal case is *United Housing v. Forman*, 421 U.S. 837. *Forman* involved residents of a cooperative housing project who had purchased shares called "stock" to acquire an apartment in the co-operative. The Court noted that

Sills Cummis & Gross P.C.

the Securities Acts are focused "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interests of investors." *Id.* at 849. Disagreeing with the SEC's position, the Court then held that the co-op stock was not a security because the investors "were attracted solely by the prospect of acquiring a place to live, and not by the financial returns on their investments." *Id.* at 853. The Court noted that the investors could profit from income derived from the leasing of "commercial facilities, professional offices and parking spaces, and its operation of community washing machines," but concluded that this profit was too "insubstantial to bring the entire transaction within the Securities Acts." *Id.* at 855-56.

In the wake of *Forman*, courts look to the primary purpose of the investment in determining whether it is a security – i.e., whether it was to purchase something to use or consume (*e.g.*, a share in a co-op) or to derive profits. If it was intended to primarily derive profits, it is likely a security. If it was intended to purchase something to use or consume, it is likely not a security.

In *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790-91 (11th Cir. 1991), plaintiffs purchased lots in a beach-club development and equity memberships in the development's country club, which plaintiffs characterized as securities. The court disagreed because, although promotional material referenced buying the property as an investment, the court concluded that "people buy houses and lots in a beach-club development primarily to use them" and memberships in a country club to use the club. *Id.*

*Grenader v. Spitz*, 537 F.2d 612 (2d Cir. 1976), a case similar to *Forman*, involved investors purchasing shares of stock in a co-op. Noting the *Forman* court's emphasis on the "economic reality" of the motivations behind the

investment and that fact that the tenants there were "seeking residential housing for their personal use and were not purchasing investment securities simply because the transaction was evidenced by shares of stock," the court concluded that the "stock" was not a security. *Id.* at 617. The *Grenader* court held that although there was a possibility of distributions to shareholders from earnings and profits, and the shareholders could sell their shares for a profit depending on the real estate market, "the transaction here essentially involves the acquisition of a residence," and the securities laws were therefore inapplicable. *Id.* at 618.

**The SEC has not come forward with any evidence that EB-5 investors have an expectation of profits.** The fact that an agency regulation requires the investments to be at risk does not support a factual finding of an investor's expectation of profit. The investor, in this case, may put his money at risk, even if he expects a loss, so long as he gets his green card and U.S. citizenship. Thus, like *Forman* and *Grenader*, the essence of the transaction is the acquisition of green cards, not a monetary return on investment depending on efforts of others. As set forth in the USCIS EB-5 guidance document, the "purpose of the EB-5 program is to promote the immigration of people" who can contribute capital to American businesses. USCIS Policy Memorandum at 1. For the investors, the purpose of the EB-5 Program is to "receive conditional permanent resident status in the United States for a two-year period . . . and [a]fter two years, if the [investors] have satisfied the conditions of the EB-5 Program and other criteria of eligibility, the conditions are removed and [they] become unconditional lawful permanent residents of the United States." *Id.*

Because the program provides green cards to investors, participation in the program involves the submission of multiple applications verifying the legitimacy of the investor's capital contribution. "An immigrant investor seeking admission into the United States as a lawful permanent resident" must

Sills Cummis & Gross P.C.

file two applications, one at the start (the Form I-526 Petition) and one "[w]ithin ninety days prior to the two-year anniversary of the date on which the immigrant investor obtained conditional lawful permanent resident status" (the Form I-829 Petition). *Id.* at 20-21. Form I-526 requires the investor to demonstrate that he "has invested, or is actively in the process of investing, lawfully obtained capital in a new commercial enterprise in the United States that will create full-time positions for not fewer than ten qualifying direct employees." *Id.* Form I-829 requires the investor to demonstrate that he has "substantially met the capital investment requirement and continuously maintained his or her capital investment over the two years of conditional residence" and "that the commercial enterprise created or can be expected to create, within a reasonable time, ten full-time jobs for qualifying employees." *Id.* at 20-22.

Capital contributions made by EB-5 investors to acquire a green card are not securities as defined by federal law. They are the price paid by foreign citizens in exchange for being granted permanent residency in the United States.

**F. Defendants' Assertion Of Their Fifth Amendment Privilege Does Not Preclude Them From Offering Evidence In Opposition To The SEC's Motion For Summary Judgment And Does Not Entitle The SEC To An Adverse Inference**

The SEC argues that Defendants' assertion of their Fifth Amendment privilege during their November 9 and 10, 2016 depositions in this case precludes them from introducing evidence disputing the material facts and warrants adverse inferences. Defendants strongly disagree.

Defendants acknowledge they invoked the Fifth Amendment. But that does not automatically result in adverse inferences against them. "'Because the privilege is constitutionally based' . . . the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked

Sills Cummis & Gross P.C.

must be carefully balanced [and] 'the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.'" *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) (quoting *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994)).

There is no prejudice to the SEC here. All of the evidence cited by Defendants in their opposition to the SEC's summary judgment motion has been available to and relied on by the SEC, including the investigational deposition testimony of LUI and WANG and LIU's document production, which was all provided to the SEC before the Complaint was filed. There is absolutely no basis to preclude Defendants from submitting *that evidence* in opposition to the SEC's motion.

Moreover, the SEC may not rely solely on an adverse inference to meet its burden of proof to establish a material fact. It must present evidence to support the fact it is requesting the Court to infer. *Doe ex rel. Rudy-Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) (prohibiting an adverse inference when there is "no corroborating evidence to support the fact under inquiry"). Conclusive adverse inferences are only allowed when the party against whom it is sought has engaged in obstructionist behavior, such as spoliation of documents, or whose invocation of the privilege has thwarted its opposition's discovery efforts. *Doe ex rel. Rudy-Glanzer*, 232 F.3d at 1264; *Nationwide Life Ins. Co. v. Richards,* 541 F.3d 903, 912 (9th Cir. 2008) (adverse inference appropriate only when "there is a substantial need for the information and there is not another less burdensome way of obtaining that information.").

As discussed above, before the Complaint was filed in this case, Defendants cooperated with the SEC by making themselves available for investigative depositions and produced documents. Defendants should not be prejudiced with an adverse inference based on the assertion of their Fifth

Sills Cummis & Gross P.C.

Sills Cummis & Gross P.C.

Amendment rights regarding financial assets for the purpose of effectuating an asset freeze through compelled repatriation, particularly given the fact that they cooperated with the SEC before the SEC initiated its enforcement action. The post-Complaint depositions ordered by the Court and discovery served by the SEC were focused on issues relating to the location of corporate documents and the financial assets of the Defendants, including identification of their bank accounts. These facts are relevant to issues of assets freeze, repatriation, and security for a disgorgement fund and any penalties awarded by the Court. These are all remedial issues that have nothing to do with the factual issues bearing on whether or not Defendants are liable under the securities laws. On that central issue, the Defendants, pre-Complaint, testified before the SEC, did not assert any Fifth Amendment privilege, and the SEC therefore had ample opportunity to ask any question relevant to the facts material for liability. Despite such opportunity, its motion for summary judgment now is plainly deficient and should be denied.

**G. Summary Judgment Should Be Denied Because The SEC Has Failed To Establish That Defendants Acted With Scienter Or Were Negligent, And Defendants' Decision To Invoke The Fifth Amendment And Not Respond To The SEC's Requests For Admissions Does Not Render The SEC's Allegations Admitted**

Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require proof of scienter. *See*, *e.g.*, *Phan*, 500 F.3d at 908. Violations of Sections 17(a)(2) and (3) require a showing of negligence. *Id.* The SEC argues that scienter and negligence should be deemed admitted in this case because Defendants failed to answer the SEC's requests to admit. SEC's Br. at p. 16. The SEC is well aware, however, that Defendants failed to respond to the requests to admit for the same reasons Defendants chose not to respond to similar questions at their November 9 and 10, 2016 depositions in this case –

because they are asserting their Fifth Amendment privilege against self-incrimination. The Defendants had already twice asserted their fifth amendment privilege (in their answers and at the depositions), and the requests to admit simply restated in the main the financial questions that had been exhaustively inquired into at the depositions. Dkt. No. 207, at 6-7 n. 6.

The caselaw is clear that the Fifth Amendment privilege "protects the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and that he is to suffer no penalty for his silence." *Campbell v. Gerrans*, 592 F.2d 1054, 1057 (9th Cir. 1979) (citing *Spevack v. Klein*, 385 U.S. 511, 515 (1967)). Penalty in this context is not limited to a fine or imprisonment – it applies to anything that would be considered "costly." *See Griffin v. California*, 380 U.S. 609 (1965); *Malloy v. Hogan*, 378 U.S. 1 (1964).

If the SEC's argument is accepted and all of its requests to admit are deemed admitted by Defendants' silence (without adequate evidence to support the admitted facts), Defendants could pay the ultimate price of losing the case and facing a multi-million dollar judgment. The importance of the Fifth Amendment as a shield against unwarranted investigation and prosecution of both the innocent and the possibly guilty person requires that the Court show particular sensitivity to put a party to its proof before inferring or deeming a fact admitted as a result of the assertion of the Fifth Amendment. It is beyond dispute that granting summary judgment here based on the meager evidentiary showing by the SEC would prove to be a costly penalty for Defendants' assertion of the privilege. That act itself therefore would run afoul of the Fifth Amendment. It should be rejected by the Court. *See*, *e.g.*, *Campbell*, 592 F.2d at 1058 (reversing dismissal of plaintiff's case based on plaintiff's assertion of the Fifth Amendment in discovery because "dismissal of an action is costly" for plaintiff's silence).

Sills Cummis & Gross P.C.

Sills Cummis & Gross P.C.

### H. The Court's Entry Of The Preliminary Injunction Has No Bearing On The SEC's Motion For Summary Judgment

In further support of its motion, the SEC argues that the Court has already found that the SEC established a *prima facie* case against Defendants in its Preliminary Injunction. SEC's Br. at p. 1. The procedural posture and standard governing motions for preliminary injunction are entirely different from motions for summary judgment. The Court's preliminary injunction ruling is not dispositive in reviewing the SEC's motion for summary judgment. *See, e.g.*, *Earth Island Inst. v. Carlton*, No. 2:09-cv-02020-MCE-EFB, 2012 U.S. Dist. LEXIS 44177, at *43 (E.D. Cal. Mar. 28, 2012) ("As a catch all, Plaintiff argues that this court's and the Ninth Circuit's opinions are irrelevant because a 'motion for preliminary injunction does not equate to an adjudication on the merits.' Plaintiff is correct: the procedural posture and the standard governing the motion for preliminary injunction are entirely different than these motions for summary judgment, and thus, are not controlling." ).

### I. Summary Judgment Should Be Denied As To WANG Because There Is No Evidence Supporting Any Of The Elements Of Securities Fraud As To WANG

The motion against WANG should be denied because there is no evidence establishing any of the elements of securities fraud as to WANG. In order to establish securities fraud, the SEC must come forward with evidence that Defendants "ma[de] [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). *See also SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

As asserted by the SEC, WANG had a limited role in the Project – in China, not in the U.S. She served as Vice President of Marketing of Asia for Beverly Proton and was given the title of CEO and Chairman of the Board of

UDG, one of the overseas companies retained by Beverly Proton to solicit investors and provide marketing.

There is no company named "UDG." The SEC has consolidated two companies and defined them as "UDG." Dkt. No. 1991-1, at 5. In connection with her role and involvement at UDG, one of the three Chinese marketing firms, Defendant WANG wore two separate hats. In one, she was an employee of Beverly Proton who helped UDG (under contract with Beverly Proton) market the Project in China and in particular solicited Chinese patients who would use the proton therapy services of the Project once built. In another role, WANG, who was also at the same time an Ambassador from Grenada to China, worked with UDG to get Chinese citizens to vacation in Grenada. In that role, UDG deemed it helpful to designate WANG for public purposes as its "Chairman," although in fact she was not officially an officer of the company. WANG testified to not being chairman of UDG at her investigative deposition. WANG'S May 4, 2016 Deposition. (Dkt. No. 7, ¶4, Ex. 2, at p. 59:7 to 4).

The evidence submitted by the SEC in support of its position that WANG was the chairman of UDG is insufficient to prove that fact at this posture of the litigation. The SEC evidence includes use of a business card listing her as UDG's chairman, references in the UDG website to her as chairman, Chinese government records showing that WANG was the "manager" of UDG, and LIU reference to her in business dealings as chairman. Conspicuously missing from that evidence is any official corporate records from China regarding the two UDG companies in which WANG is listed as chairman. Needless to say, it is difficult for WANG to prove a negative. But, as the party with the initial burden to prove the fact, the absence of official corporate records listing WANG as chairman of any UDG company indicates a failure of poof by the SEC. While the SEC's evidence was appropriately relied upon by the Court to



Sills Cummis & Gross P.C.

support a preliminary finding that Wang was UDG's chairman, reliance on that evidence at this stage is inappropriate to support such finding.

There is no evidence that WANG was involved in or ever made any misrepresentations to any investors in the U.S., or that she was personally involved in the offer or sale of the "securities" in this case. There is no evidence that WANG made any misrepresentation in the U.S. The SEC proffered evidence relates to statements or meetings in China. For that reason alone, the Court should deny summary judgment against WANG. *See RJR Nabisco, Inc. v. European Cmty,* 136 S.Ct. 2090 (2016). Nor is there any evidence that WANG was involved in any manipulative or deceptive act with regard to the investors in the Project. *See SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2009 U.S. Dist. LEXIS 70198 at *30 (D. Az. Aug. 11, 2009) ("To be liable for a scheme to defraud, a defendant must have 'committed a manipulative or deceptive act in furtherance of the scheme.'") (quoting, *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)). Securities fraud is not proven by virtue of the defendant's employment with the entity that made the alleged misstatement. There must be proof of actual wrongdoing. There is no such proof here regarding WANG.

**J. The SEC's Request For A Permanent Injunction and <u>Imposition Of Monetary Remedies Should Be Denied</u>**

Under the misimpression that it is entitled to summary judgment, the SEC petitions the Court for entry of a permanent injunction, monetary remedies in the form of disgorgement, prejudgment interest, and civil penalties. Since summary judgment should be denied because the SEC has not advanced enough evidence to support its claims against Defendants and/or there exist genuine issues of material facts, the SEC has not established legal grounds for its claimed damages and its request for relief should be summarily denied.

In any case, on the merits, the SEC is not entitled to a judgment in the amount it seeks. The SEC, like any litigant before this Court, is entitled to traditional equitable remedies under the same standards that this Court would use for any other plaintiff in traditional jurisdiction in equity—no greater, no less. *See* George P. Roach, A Default Rule of Omnipotence: Implied Jurisdiction and Exaggerated Remedies in Equity for Federal Agencies, 12 *Fordham J. Corp. & Fin. L.* 1, at *71-74 & *114-15 (2007) [Roach, *A Default Rule of Omnipotence*].

If the Court concludes that disgorgement is appropriate, it also has broad discretion to determine the amount to be disgorged. *See SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006). In calculating the amount to be disgorged, a court should be guided by the purposes of disgorgement – to deprive a wrongdoer of unjust enrichment and to deter future violators by making violations of the securities laws unprofitable. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010); *see also JT Wallenbrock*, 440 F.3d at 1113. Disgorgement should neither be unreasonable nor excessive. *Hateley v. SEC*, 8 F.3d 653, 655-56 (9th Cir. 1993). *See* Roach, *A Default Rule of Omnipotence* at *71 & *74-85. ("At present, most opinions that address the issue of measuring the defendant's unjust enrichment approve the deduction of all direct or variable costs that are related to the relevant revenue."). Ordering disgorgement of an amount beyond a defendant's profits, therefore, "*would constitute a penalty assessment*." *Id.* (emphasis added); *see also SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) (warning that disgorgement should not to be used punitively); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104-05 (2d Cir. 1972) (holding that court can compel disgorgement of only net profits and interest wrongfully obtained). The SEC has failed to meet its burden.

Sills Cummis & Gross P.C.

"The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *Platforms Wireless*, 617 F.3d at 1096 (internal quotation marks and citations omitted). Once the SEC presents a reasonable approximation, the burden shifts to the defendant to demonstrate "that he received less than the full amount allegedly misappropriated and sought to be disgorged." *SEC v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987)*; accord Platforms Wireless*, 617 F.3d at 1096 (holding that, after a reasonable approximation is shown, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation"). The SEC requests the entire gross amount that Defendants received in support of the Project, approximately $27 million, as the appropriate amount of disgorgement. SEC's Br. at p. 21. The Court should deny that request. In *JT Wallenbrock*, the Ninth Circuit recognized the possibility of deducting legitimate business expenses when calculating disgorgement but refused to offset any deductions in that case because the defendants were seeking "an offset for *entirely illegitimate* expenses incurred to perpetuate an *entirely fraudulent* operation." 440 F.3d at 1115 (emphasis in original). That is not the case here.

## IV. CONCLUSION

For the foregoing reasons, Defendants LIU and WANG respectfully request that the Court deny the SEC's Motion for Summary Judgment in its entirety.

Dated: January 17, 2017

SILLS CUMMIS & GROSS P.C.

By: /s/ Hervé Gouraige
Hervé Gouraige,
Attorneys for Defendants
Charles C. Liu and Xin (Lisa) Wang

BUCHALTER NEMER
Attorneys for defendants CHARLES C. LIU and XIN WANG a/k/a LISA WANG

Sills Cummis & Gross P.C.

**DECLARATION OF HERVÉ GOURAIGE**

I, Hervé Gouraige, do say and declare as follows:

1. I am an attorney at law, admitted *pro hac vice* in the Central District of California in this matter and a member in good standing of the bars of New Jersey and New York. I am a member of the law firm of Sills Cummis & Gross P.C., attorneys for Defendants Charles C. Liu ("Mr. Liu") and Xin Wang ("Mrs. Wang") in this action.

2. A true and correct copy of the March 23, 2016 investigational deposition of Charles C. Liu is attached hereto as Exhibit 1.

3. A true and correct copy of the guarantee by Beverly Oncology & Imaging Centers, Medical Group, Inc., a California corporation owned by John P. Thropay, M.D., a 30% owner of Pacific Proton and Beverly Proton is attached hereto as Exhibit 2.

Executed this 17th day of January, 2017, in Newark, New Jersey.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Hervé Gouraige

Sills Cummis & Gross P.C.

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

SILLS CUMMIS & GROSS P.C.,
One Riverfront Plaza, Newark, New Jersey 07102
Telephone No. (973) 643-7000; Facsimile No. (973) 643-6500.

On January 17, 2017, I caused to be served the document entitled **DEFENDANTS' CHARLES C. LIU AND XIN WANG MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF HERVÉ GOURAIGE AND STATEMENT OF GENUINE DISPUTED FACTS AND COUNTER-STATEMENT OF UNCONTROVERTED FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 17, 2017 ______________________________

*/s/* Hervé Gouraige

Sills Cummis & Gross P.C.