# EXHIBIT 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. LA-04639-A
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC )

WITNESS: Charles C. Liu
PAGES: 1 through 177
PLACE: Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
DATE: Wednesday, March 23, 2016

The above entitled matter came on for hearing, pursuant to notice, at 9:17 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

TONY REGENSTREIF, ESQ.
VICTORIA A. LEVIN, Assistant Regional Director
Securities and Exchange Commission
Division of Enforcement
444 South Flower Street, Suite 900
Los Angeles, California 90071
(323) 965-3998

On behalf of the Witness:

EDWARD GARTENBERG, ESQ.
MILENA DOLUKHANYAN, ESQ.
Gartenberg, Gelfand & Hayton, LLP
15260 Ventura Blvd., Suite 1920
Sherman Oaks, California 91403
(213) 542-2100

C O N T E N T S


| WITNESS: | | EXAMINATION |
|---|---|---|
| Charles C. Liu | | 6 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 | Form 1662 | 8 |
| 2 | Subpoena | 10 |
| 3 | Background questionnaire | 10 |
| 4 | G-28 Notice of Entry of Appearance from the Department of Homeland Security and application submitted 11/19/10 | 43 |
| 5 | Offering memorandum for 300 membership units of Pacific Proton EB-5 Fund, LLC dated 5/1/2013 | 69 |
| 6 | Signature card, Bates Nos. SEC-JPMCB-P-184 through 186 | 99 |
| 7 | Signature card, Bates Nos. SEC-JPMCB-P-3 through 11 | 101 |
| 8 | Signature card, Bates No. SEC-JPMCB-P-83 through 90 | 102 |
| 9 | Signature card, Bates Nos. SEC-JPMCB-P-78 through 82 | 111 |
| 10 | Engagement Agreement dated 1/28/13 | 113 |

CONTENTS (CONT.)



| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 11 | Engagement Agreement dated 8/18/13 and 8/25/13 | 117 |
| 12 | Chase bank statement (6428) through October 2014, Bates Nos. SEC-JPMCB-P-187 through 192 | 122 |
| 13 | Chase bank statement (5152) dated 1/1/15 through 1/30/15, Bates Nos. SEC-JPMCB-P-103 through 106 | 127 |
| 14 | Chase bank statement (6428) dated 4/1/15 through 4/30/15, Bates Nos. SEC-JPMCB-P-377 through 384 | 129 |
| 15 | Chase bank statement (5152) dated 10/31/15 through 11/30/15, Bates Nos. SEC JPMCB P 158 through 161 | 133 |
| 16 | Three-page document, Bates Nos. PPEB5-419 through 421 | 139 |
| 17 | Chase bank statement (5152) dated 10/1/15 through 10/30/15, Bates Nos. SEC-JPMCB-P-149 through 152 | 145 |
| 18 | Chase bank statement (5152) dated 1/1/16 through 1/29/16, Bates Nos. SEC-JPMCB-P-176 through 179 | 147 |

C O N T E N T S (CONT.)


| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 19 | Chase withdrawal slip (5152) dated 11/26/15, Bates No. SEC-JPMCB-P-168 | 152 |
| 20 | Check dated 11/25/15 to Optivus | 154 |
| 21 | Check dated 4/10/15 to Licheng Zheng | 155 |
| 22 | I-924A Annual Filing Supplement to Regional Center Designation | 156 |
| 23 | Minutes of Annual Meeting of Members of Beverly Proton Center, LLC | 161 |
| 24 | Consent of Majority Member of Pacific Proton Therapy Regional Center, LLC | 162 |
| 25 | Pacific Proton EB-5 Fund, LLC, Proton Therapy Center Project, Supplemental Update to Business Plan, February 2016 | 164 |

P R O C E E D I N G S

MR. REGENSTREIF: We're on the record at 9:17 a.m. on Wednesday, March 23rd, 2016.

Please raise your right hand.

MR. LIU: (As requested.)

MR. REGENSTREIF: Do you swear to tell the truth, the whole truth and nothing but the truth?

MR. LIU Yes, I do.

Whereupon,

CHARLES C. LIU

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. REGENSTREIF:

**Q Please state and spell your full name, including your middle name, for the record.**

A Charles C. Liu.

**Q Can you spell Liu, please.**

A L-i-u.

**Q My name is Tony Regenstreif, and this is Victoria Levin, and we are officers of the Commission for the purposes of this proceeding.**

**This is an investigation by the United States Securities and Exchange Commission in the matter of Pacific Proton Therapy Regional Center,**

LLC, to determine whether there have been violations of certain provisions of the federal securities laws. However, the facts developed in this investigation might constitute violations of other federal or state, civil or criminal laws.

Mr. Liu, do you understand that your oath here today is the same oath as in a court of law?

A Yes, I do.

Q Have you ever had your deposition or testimony taken before?

A No.

Q I'll just generally explain the rules of the road. Everything that we're saying is being transcribed into written form by the court reporter, so we should try to talk clearly and not over one another. So if I ask you a question, you should wait until the completion of the question to answer, and I will try to let you answer before I ask a follow-up.

There should only be verbal responses, so no head nods or nonverbal responses. And if you don't understand something, please let me know and I'll try to rephrase the question. Otherwise, I assume you've understood the question.

Prior to the opening of the record, I provided you with a copy of the Formal Order and

**Supplemental Formal Order of Investigation in this matter. It will be available for your examination during the course of this proceeding.**

**Have you had an opportunity to review the Formal Order?**

A Yes.

MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit 1 Supplemental Information Form 1662.

(SEC Exhibit 1 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 1.**

**Have you had an opportunity to review Exhibit 1?**

A Yes.

**Q Do you have any questions concerning Exhibit 1?**

A No.

**Q Mr. Liu, are you represented by counsel today?**

A Yes.

MR. REGENSTREIF: Would counsel please identify themselves.

MR. GARTENBERG: Yes. Edward Gartenberg

and Milena Dolukhanyan from the Law Firm of Gartenberg, Gelfand & Hayton.

MR. REGENSTREIF: So as I explained before, Counsel, all the exhibits will be returned to us at the end of today's deposition. And so as a result, please don't write on them except to note the exhibit number.

BY MR. REGENSTREIF:

**Q Mr. Liu, do you understand that the staff requests your testimony here today based on your best recollection of events?**

A Yes.

**Q So I don't want you to speculate or guess. Just give me the best answers to your personal knowledge. If you do have a belief or an understanding, let me know, and then I can ask some questions about that.**

**Are you aware of any reason why you feel that you cannot go forward with your best testimony today?**

A No.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 2 a multi-page document consisting of a cover letter addressed to Mr. Liu and an accompanying subpoena for testimony

and documents.

(SEC Exhibit 2 was marked
for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 2. This is the subpoena that calls for your testimony today.**
**Is this a copy of the subpoena that you're appearing to pursuant here today?**

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 3 a background questionnaire dated March 15th, 2016.

(SEC Exhibit 3 was marked
for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 3.**
**Mr. Liu, did you complete this background questionnaire as requested by the staff?**

A I completed it by myself.

**Q Exhibit 3 is what you completed?**

A Yes. I think that I saw one error here.

**Q So what's the error that you noticed?**

A My resume in the last page, education is 1988 to 1991 instead of -- it's a typo here, and I provided -- I think there's two versions, so

obviously this was the previous one.

**Q So just for clarification, under "Education," your MFA in Arts Administration from Columbia University was '88 to '91?**

A Yes.

**Q And are the answers contained in Exhibit 3 accurate and truthful to the best of your knowledge?**

A Yes.

**Q And have there been any changes since you completed Exhibit 3?**

A No.

**Q Is there anything in Exhibit 3 you'd like to clarify?**

A No.

**Q When did you become a U.S. citizen?**

A It was a long time ago.

**Q Approximately.**

A Approximately 17 years ago.

**Q And when did you get granted citizenship?**

A It was 2014.

**Q And you're currently married to Xin Wang?**

A Yes.

**Q And your current residence is 55 Asilomar Road?**

A Correct.

**Q Let me direct you to Page 3 of Exhibit 3. Question 14, "Privately-held companies."**
**Do you see that?**
A Yes.
**Q So you're currently president of Beverly Proton Center?**
A Yes.
**Q Pacific Proton Therapy Regional Center?**
A Yes.
**Q You're president there too?**
A Yes.
**Q And you're the manager of Pacific Proton EB-5 Fund?**
A Yes.
**Q Now you're also president of United MPH Ventures, LLC?**
A Yes.
**Q What is that?**
A It's a holding company. The company is to develop -- because currently we're developing the proton center, the Kansas center in Montebello, but our business plan is to develop more centers over the United States, like San Francisco, Seattle, Miami, New York, to use the same model to develop the cancer and the proton centers.

**Q So United MPH Ventures --**
A Is a holding company.
**Q -- that will develop additional proton therapy centers?**
A Yes.
**Q Are there any other officers of United MPH Ventures?**
A Officers? Not at this moment.
**Q Are there any investors in United MPH Ventures?**
A Not yet.
**Q And are you the sole owner of United MPH Ventures?**
A Yes -- no, actually, I'm sorry. My wife owns partially.
**Q How much does she own?**
A I think it's 25 percent.
**Q And it's just the two of you?**
A Yes.
**Q Any of these potential centers, are they in some level of development?**
A Early stage. Early stage means we have some medical staff and business representatives looking at sites, talking to the potential partners of medical centers and universities.

**Q And where have you started that process?**
A We started in San Francisco, Seattle and in Miami.
**Q Have any funds been raised for any of those sites?**
A No, not yet.
**Q And in San Francisco, who's your partner in San Francisco?**
A Again, it's early stage -- you know, discussions. The partner has not been identified up to today.
**Q Is that the same for Seattle and Miami?**
A It's different.
**Q So in Seattle, do you have a partner?**
A No. It's all the same status.
**Q So each of the three sites --**
A We just started, actually, not too long ago, because our focus is to complete the first one first, use the first one as a model, and then copy the same model to different cities in the United States. So we are focused primarily on the first one.
**Q The next company you list is MP Medical Hotel, Inc.**
A Uh-huh.

**Q And you're the director?**
A Yes.
**Q What is MP Medical Hotel?**
A The concept -- first, let me introduce the concept of this -- MPH Ventures. Our business model is to build proton center, cancer center, and also a hotel, a medical hotel, within the same complex, and then to target the international cancer patients because there's more and more cancer patients from overseas coming to the United States for treatment. That's why we picked up all the gateway cities. They all have international flights in and out of United States.

For example, the Montebello site, it's 30 minutes away from LAX. So that is our business model. So we have set up this company called MP Medical Hotel. We have signed a lease with Beverly Hospital which is adjacent to the current proton site just across the street. So that's what it's for. We just actually hired architect to do the initial conceptual drawings for their project.

So basically, again, the model is proton center, cancer center and medical hotel. Why do we need medical hotel? For the cancer patients, for the proton patients. The treatment lasts between 30 days

and 90 days, particularly like prostate cancer, it takes about 50 treatments. 50 treatments means you do a treatment per day. So you add it up, you spend about three months.

But proton therapy is outpatient. You don't -- it's not hospitalized. You go there 20 minutes a day, but you still have to travel there. So that's why, for the sake of convenience, it's important to build a hotel. Particularly we target all the international patients because, you know, with the current medical reimbursement rates, it's pretty low.

But cash patients, international patients, they pay cash. Actually, they spend more money on the treatment side. So to provide a concierge service in a hotel like this is important.

**Q So who is the architect that you hired for the hotel at the Montebello site?**

A The architect's name is Creative Design. It's called Creative Design Associates.

MR. GARTENBERG: May I have a minute while nothing is pending? I just want to speak to my client.

MR. REGENSTREIF: Let me just finish this line, and then we'll get to it; okay?

MR. GARTENBERG: Sure.
BY MR. REGENSTREIF:
**Q Is the MP Medical Hotel part of the Beverly Proton Center, LLC?**
A No. It's not part of the EB-5 offering.
**Q It's separate from the EB-5 offering?**
A It's separate.
**Q And then has there been investors for the hotel?**
A No, not yet.
**Q There's no investors?**
A No.
**Q And there's been no fundraising?**
A No.
**Q And it's not part of the EB-5?**
A No.
MR. GARTENBERG: Okay now?
MR. REGENSTREIF: Yeah, that's fine.
Let's go off the record.
(Counsel conferred with the witness.)
MR. REGENSTREIF: Let's go back on the record.
So where were we?
MR. GARTENBERG: We had just gone through what MP Medical Hotel was and whether there were

investors.

BY MR. REGENSTREIF:

**Q So as I understand it, there are no investors in MP Medical Hotel; is that correct?**

A That is correct.

**Q So what is the next entity, SC MPH Fund, LP?**

A Okay. This is a vehicle entity we set up to raise capital for the Beverly Hospital, which is a neighbor of current site.

**Q So this is raising capital for the hospital?**

A Yes. It's a separate venture through the -- sponsored by Pacific Proton Therapy Regional Center.

**Q So this is through the regional center?**

A Yes. It's a separate project. Our site is on the campus of Beverly Hospital, and Beverly Hospital is trying to raise some EB-5 money capital through the regional center and to upgrade the current emergency room and the maternity center.

**Q So SC MPH Fund is a project sponsored through the regional center?**

A Yes.

**Q And it will be raising EB-5 funds?**

A Uh-huh.
**Q Could you say "yes"? I'm sorry.**
A Yes.
MR. GARTENBERG: Wait until he finishes the question.
THE WITNESS: Okay. I'm sorry.
BY MR. REGENSTREIF:
**Q It will be raising EB-5 funds?**
A (Witness nods head.)
**Q You have to say "yes."**
A Yes.
**Q And then, as I understand it, it's Beverly Hospital to upgrade their emergency room and maternity ward?**
A Yes.
**Q And you're the general partner of that?**
A Yes.
**Q And so SC MPH Fund, is that equivalent to the Pacific Proton EB-5 Fund?**
A Similar.
**Q So it's another of the NCEs through the regional center?**
A Yes.
**Q Does that require --**
MR. GARTENBERG: I'm sorry, "NCEs"?

MR. REGENSTREIF: That is the term used by the United States Customs and Immigration Service through approved regional centers.

THE WITNESS: "New Commercial Enterprise."

MR. GARTENBERG: Thank you. I've learned something today. Thanks.

BY MR. REGENSTREIF:

**Q Now, to do a new commercial enterprise, do you have to get approved from USCIS?**

A Yes, because the regional center -- as long as the project is in the same geographic area or shares the same industrial codes, you don't have to get the separate approval. You can file contingent upon the approval. You can file -- in other words, you can file a separate case.

**Q Under the regional center?**

A Under the regional center.

**Q And have you done that for SC MPH Fund?**

A No.

**Q Have you raised any money for SC MPH Fund?**

A No.

**Q You said you're a general partner for SC MPH Fund.**

**Are there any other partners?**

A No.

**Q And there are no investors?**
A No.
**Q Have you done any offerings or attempted to sell any interests in SC MPH Fund?**
A No. Not yet.
**Q Who do you deal with at Beverly Hospital? Who do you talk to there?**
A The CEO, president and the executive team.
**Q Who are those people?**
A Do you want to know the names?
**Q Yes, please.**
A The CEO is Alice Cheng. I don't know how to spell it, honestly.
**Q That's fine.**
A Alice Cheng, and also Wendy. Wendy is their COO. Sorry, I can't remember the last name.
**Q That's okay. Whatever you know.**
A And then Larry. Larry is the CFO. So these three individuals are being worked with.
**Q And is there some kind of MOU or agreement between SC MPH Fund and Beverly Hospital?**
A Yes.
**Q And has that been provided to us in the productions?**
A No.

MR. GARTENBERG: Was it called for?
MR. REGENSTREIF: It was not. We didn't know about any of these entities, so it may yet be called for.
BY MR. REGENSTREIF:
**Q So let's go into the next one.**
**SC MPH Management, LLC. What is that?**
A It's the management company of SC MPH Fund.
**Q I see.**
**So it's the management company for the fund for what will be an EB-5 project for Beverly Hospital?**
A Yes.
**Q And are you the sole owner of SC MPH Management, LLC?**
A Yes.
**Q And are there any other members besides yourself?**
A I'm the only member.
MS. LEVIN: What does "MPH" stand for?
THE WITNESS: Medical Proton Hotel.
MS. LEVIN: And what does "SC" stand for?
THE WITNESS: Southern California.
MS. LEVIN: Thank you.
BY MR. REGENSTREIF:

Q Just so I'm clear, for the medical hotel and the MPH Fund and the MPH Management, LLC, there have been no investors yet?
A No investors.
Q But United MPH Ventures is separate from those three other entities?
A Yes.
Q And there's still no investors in United MPH Ventures either?
A No.
Q And United MPH Ventures, your wife is also a 25 percent owner?
A Yes.
Q But in none of the other three entities, MPH Medical Hotel, SC MPH Fund or SC MPH Management?
A No.
Q On Page 4 -- top of Page 4, Exhibit 3, you list yourself as "President of Beverly International Cancer Center, LLC."
What is that?
A It's entity to develop the cancer center. As I explained, it was part of United MPH Ventures. So cancer center, proton center and the hotel.
Q So this is the third component?
A Yeah, for project development.

Q And this is one that is not -- it's not EB-5?
A No, no.
Q And there are no investors yet?
A No investors yet, but we are in discussion with potential strategic non EB-5 investors.
Q Non EB-5?
A Uh-huh.
Q Let's go to Page 5 of Exhibit 3. It's the carryover for Question 19. It's identified in "Bank Accounts." Go to Page 5, please.
A Sure.
Q Do you see the two bank accounts identified?
A Yes.
Q Are those your only two bank accounts?
A Yes.
Q And so the digits there, 30221 for Bank of America, those are the last five of the account number?
A No. Actually that's the address.
Q Oh, that's the address?
A Yeah.
Q You didn't identify account numbers?
A Is it required?

Q If you look -- for some reason, this got split up. If you look at 20, it says -- little four, it says the account number.
A That's easy. I can provide that. That's no problem.
Q Great. I appreciate that.
A Yeah.
Q So if you could -- and maybe your lawyers can note that we need the account numbers for the two bank accounts.
A But the first one is already closed.
Q Bank of America is closed?
A A while ago, but it was within three years. That's why I provided it.
Q So Chase is the one you're using currently?
A Yeah, Chase is the one I'm using, because it's the last three years, so I provided it.
Q Thank you. I appreciate that. So if we can get the account numbers for those.
A Yeah.
Q So if we could go to Page 10. Question 35 asks about your employment activities.
A Okay.
Q So at the bottom of Page 10, prior to Pacific Proton EB-5, you worked at Century Medical

**Investment --**

A Yes.

**Q -- from 2004 to 2009?**

A Yes.

**Q What was that?**

A It was a company set up to sell the medical equipment, particularly the proton equipment, in China.

**Q And what was your position?**

A I was president and also CEO for this company, and we will try to promote a U.S. technology to China.

**Q The company was based in Hong Kong?**

A Yes.

**Q And what kind of medical --**

A Proton therapy.

**Q So it's all proton therapy?**

A That's why I got involved.

**Q And how did you get involved with proton therapy?**

A How did I get involved? First, I started my own business a long time ago by selling medical equipment, radiation. Actually, diagnostic equipment like MRI and computer tomography. And then I was able to know one of the key U.S. proton therapy

manufacturer called Optivus. Optivus was a company we developed in Loma Linda Proton Center.

**Q Can you speak up just a little bit? I'm sorry.**

A Optivus was the company to develop Loma Linda Proton Center. It was a famous one.

**Q So through Century Medical Investment --**

A Yes, I was the -- this company was appointed as a chief representative to sell that equipment.

**Q Optivus equipment?**

A Yes, in China.

**Q And how did you go from your previous job, McCall Five-Star Satellite TV, to being hooked up with Optivus?**

A I have been an entrepreneur since I left my first job. I have been the boss of my own -- actually worked on my own and then started different ventures, and this is one of the ventures I started in China. So medical, media, real estate, these main three areas I got involved in the past 25 years, I guess.

**Q So your involvement with proton therapy goes back to at least 2004?**

A 2004, yeah.

**Q Did you have any involvement before that?**
A Before, no.
**Q So your current wife is Xin Wang?**
A Yes.
**Q When did you get married?**
A 13 years ago.
**Q And she's involved in the -- as we discussed -- in these entities related to SC MPH; is that right? Does she have any other employment?**
A She also has a position with Beverly Proton Center.
**Q She does?**
A Yeah.
**Q And what's her position at Beverly Proton Center?**
A She's vice president in overseas marketing, in marketing Asia.
**Q And when did she assume that position with Beverly Proton Center?**
A She got involved from day one, which is 2011.
**Q 2011?**
A Yeah.
**Q What does her job entail? What are her responsibilities with Beverly Proton Center?**

A Her responsibility is to promote because she had some medical background before. I basically am on the sales side, and she did a lot of promotions and also marketing work for this company, for this project.

**Q Promotions and marketing work for the company related to --**

A Related to raising capital, related to bringing overseas patients to the United States as well.

**Q So both the operational side of bringing patients --**

A Yes.

**Q -- and also fundraising capital?**

A Yes, yeah, on the marketing side.

**Q On the marketing side?**

A Yeah.

**Q So what does that mean, "the marketing side"?**

A Just to give example, she hosts seminars for clients, for the medical centers, United States, because we are also working with major U.S. cancer centers in the United States such as City of Hope and Mayo Clinic and others, because our center is still under construction, before we -- our center is open

to the public, we started a program called "patient referral program," so we're able to bring overseas patients to the United States for treatment.

**Q So before the center was opened, was there a company that did that work?**

A Beverly Proton Center was the company because this is our model. We target international patients.

**Q Has Beverly Proton Center brought any international patients over to the U.S. already?**

A Yes.

**Q And have you generated revenue from those patients?**

A I took referral fees.

**Q Referral fees?**

A Yes.

**Q From the cancer centers?**

A Because we're not finished yet. We're still under construction, so we refer our patients to the other cancer centers in the United States.

**Q And what is the referral fee received by Beverly Proton?**

A What's the referral fee?

**Q How much?**

A I don't have that number, but we signed

agreements, and that was overseas accounts.

**Q So you signed agreements to overseas companies to bring the patients over?**

A Yes.

**Q And the overseas companies pay you?**

A The overseas company pays us, yes. And also the -- yeah. Overseas company pays us, yes.

**Q And who are the overseas companies?**

A Who are these overseas companies? Quite a few. I don't have my -- I can't remember because a lot of it is in different language, in Chinese.

**Q Let's just do one.**

A One of them is --

MR. GARTENBERG: It's not a memory test. If you don't remember, you don't remember.

THE WITNESS: Yeah. I can't remember, but it was certainly -- there's an insurance company we also worked with called NCL. They provide the patients. They're called "New China Life."

BY MR. REGENSTREIF:

**Q And they provide the patients to you?**

A Yes.

**Q And they pay you a referral fee?**

A They pay us a referral fee, yes, yes.

MR. GARTENBERG: Just for the record, when

you're saying "you," it's not necessarily -- it's not clear that it's him, but maybe the entity.

BY MR. REGENSTREIF:

**Q Which entity receives the referral fee?**

A Which entity? It's Beverly Proton Center.

**Q So Beverly Proton Center, LLC, not the EB-5 Fund?**

A No.

**Q And not the regional center?**

A No, no.

**Q The Beverly Proton Center, LLC?**

A Yeah, because it's different category.

**Q So since we're discussing this, do you receive a salary from Beverly Proton Center?**

A Yes.

**Q What's your salary?**

A I think it's $750,000 a year.

**Q $750,000 a year?**

A Yeah.

**Q And do you receive that weekly? Monthly?**

A Not exactly, not monthly. I receive -- if there's sufficient funds because the fundraising -- if it's only sufficient funds, then I withdrew the money from the company. If not sufficient, I don't.

**Q So you receive a salary from Beverly**

**Proton, LLC?**
A Yes.
**Q Not the EB-5 Fund?**
A EB-5 Fund I receive some compensation as well because I'm the manager.
**Q So you receive compensation from them, too?**
A Yeah.
**Q How much do you receive from them?**
A $200,000 a year.
**Q So that's in addition to the 750- from Beverly Proton?**
A Yes.
**Q And then do you receive compensation from the regional center?**
A Yes.
**Q How much is that?**
A 350- a year.
**Q $350,000 a year?**
A Yeah.
**Q In addition to the 200- and the 750-?**
A Yeah.
**Q And does your wife receive a salary from any of these entities?**
A My wife receives a salary from the project company, not the other two.

**Q So that would be Beverly Proton?**
A Yes.
**Q And how much in salary does she receive from Beverly Proton?**
A $200,000 a year.
**Q But not from the EB-5, LLC?**
A No.
**Q And not from the regional center?**
A Not from the regional center.
MS. LEVIN: And besides salary, do you or your wife receive any other compensation from any of these entities?
THE WITNESS: Just the salary.
BY MR. REGENSTREIF:
**Q So let's back up and talk about Pacific Proton Therapy Regional Center.**
**Are you familiar with that?**
A Yes.
**Q And what is Pacific Proton?**
A Pacific Proton --
**Q Let's agree on a name for it. Let's just call it "the regional center."**
A Okay. The regional center was established and set up to get the approval from USCIS and also to promote proton project.

**Q Approval from USCIS for what?**
A To raise funds, EB-5 funds overseas to promote project.
**Q And what do you understand to be the EB-5 program? What is that to you?**
A EB-5 program is -- what does it mean to me?
**Q Yeah. What is the EB-5 program?**
A EB-5 program was created by U.S. Congress in the early '90s to allow the regional center to raise funds for the Employment-Based Category 5 investors to create jobs. That's my basic understanding.
**Q And so the investors have to provide a certain amount of funds pursuant to the EB-5 program; is that right?**
A Yes. Each investor has to invest up to either half a million or $1 million in an area designated by the state government. It depends on the employment/unemployment rate. It can be half a million dollars or $1 million. It depends on the targeted employment/unemployment area.
**Q And to take advantage of the EB-5 program, the regional center has to be approved by USCIS?**
A Yes.
**Q And your regional center was approved by**

**USCIS?**

A Yes.

**Q And did you initiate that approval? Did you seek that approval?**

A What do you mean "seek approval"?

**Q Did you, Charles Liu --**

A I submitted the applicant.

**Q You submitted the application?**

A Yeah, with our legal counsel's assistance.

**Q And what is your formal title with the regional center?**

A Formal title is, I was the president from day one.

**Q And are you the sole owner of the regional center?**

A No. I have a partner.

**Q And your partner's name is?**

A Dr. Thropay, who is radiation oncologist.

**Q And how much of the regional center do you own?**

A I own 75 percent, and he owns 25 percent.

**Q And so through the regional center, explain to me how you first came to the EB-5 program.**

**How did you decide to access that program as a means of fundraising? Where did you hear about**

**the EB-5 program first?**

A The first time I heard about EB-5 was through a local Chinese newspaper. Actually before that, I did not know this kind of program existed because I was already a U.S. citizen for a long time. Personally it's not my concern in terms of immigration. But I looked at this paper and find out there's an EB-5 program -- existed, which can help developers to raise funds overseas to develop project. That's how it started.

**Q And the regional center was your first EB-5 project?**

A Yes.

**Q And as we discussed, you're in the process of doing another EB-5 project; is that right?**

A Yes.

**Q Have you done any others besides the two we discussed?**

A No.

**Q So explain the structure to me.**

**It's the regional center; is that right?**

A Yes.

**Q And the structure is approved by USCIS?**

A That is correct.

**Q And under the regional center, you get, as**

**we discussed, a commercial enterprise, a new commercial enterprise; is that right?**

A Yes.

**Q And so the EB-5 Fund, LLC, that is the NCE?**

A Pacific Proton EB-5 Fund is NCE.

**Q And then Beverly Proton Center, LLC is the job-creating vehicle for the EB-5, LLC fund; is that right?**

A That is correct.

**Q Are there any other job-creating entities besides Beverly Proton under the Pacific Proton EB-5 Fund?**

A No.

**Q And Beverly Proton Center, has it been known by any other names?**

A Yes. Previously it was called Los Angeles County Proton Therapy, LLC.

**Q And when did the name change?**

A I think mid 2015.

**Q Why did the name change?**

A The name changed because we tried to be part of the Beverly Hospital complex and because we also have a plan to develop Beverly Hotel and Beverly Cancer Center, so we tried to consolidate all the names to be consistent.

**Q Are there any employees of the Beverly Proton, LLC?**

A Not direct employees. Contractors.

**Q So Beverly Proton has contracts with employment agencies -- they have contractors -- or you have independent contractors?**

A Independent contractors and also business consultants. We have a lot of business consultants.

**Q Let's start with the independent contractors.**

**How many independent contractors do you have?**

A Two.

**Q What are their names?**

A One is called Lance, L-a-n-c-e; Gong, G-o-n-g is the last name. And we have another one but who already left -- who left the company.

**Q What was that person's name?**

A Richard Zheng. Last name is Z-h-e-n-g.

**Q What does Lance do?**

A Lance does lots of administrative work, and also to the airport, to pick up visitors, clients, investors coming from overseas. A lot of concierge work.

**Q And what did Richard do?**

A We have two separate offices. One is in Orange County. The other is in Montebello within the hospital complex. And because we have a site for development, from time to time, we had a lot of investors and also visitors. So Richard is based in that office.

**Q In Montebello?**

A In Montebello.

**Q So Richard would take investors to look at the site?**

A Yes.

**Q And would anyone else accompany Richard when he was taking investors on the site?**

A I'm sorry?

**Q Was anybody else with Richard when he would take investors on the site?**

A He was the only one because the distance, it's still pretty far, so he's on site and he lives nearby.

**Q The investors who are coming to look at the site, these were investors for the EB-5 Fund?**

A Well, you have the investors, EB-5 Fund and non EB-5. We have potential strategic investors as well, not just for EB-5.

**Q But they toured the site?**

A Yes.

**Q Did you ever meet the investors at the site?**

A Yes, a number of times.

**Q How many times, approximately?**

A About ten.

**Q Ten times at the site?**

A Yeah.

**Q Ten different investors or more than that?**

A Well, obviously there are more than investors. But for me, because I travel quite often internationally back and forth -- so every time we have an investor, if I'm out of town, I don't go.

MR. GARTENBERG: We've been going about an hour.

MR. REGENSTREIF: Let's go off the record.

(A brief recess was taken.)

MR. REGENSTREIF: Let's go back on the record.

MR. GARTENBERG: I just wanted to make one thing clear. Mr. Liu referred to "non EB-5 investors." I'd be happy to ask him questions now or if you want to put it to him. But from my conversation with him, I understand these are not people who've actually invested. What he testified

to, from what he's explained to me is these are potential investors.

If he gets to the stage where we're dealing with actual investments before making the investment, he would consult with counsel to make sure that he's in compliance within the applicable securities laws in dealing with those people.

So you may want to ask questions, or if you want, I can ask him questions, but I want to make sure when he says "investors," particularly given that English is obviously not his first language, what he means is "potential future investors" when he's talking about non EB-5 people.

BY MR. REGENSTREIF:

**Q But there have been EB-5 investors?**

A Sure.

**Q And the funds are in receipt of the EB-5 Fund, LLC?**

A Yes.

**Q How many EB-5 investors are there?**

A 47, 48, I think. 47.

**Q And approximately how much money does that amount to?**

A 23 million.

**Q 23 million from EB-5 investors?**

A Uh-huh.
**Q And the non EB-5 investors are all at the potential stage?**
A Potential stage.
**Q So there are no non EB-5 investors right now?**
A No, as of today.
MR. GARTENBERG: Thank you.
MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit 4 this document which is a G-28 Notice of Entry of Appearance from the Department of Homeland Security and an application submitted thereunder dated November 19, 2010.
(SEC Exhibit 4 was marked for identification.)
BY MR. REGENSTREIF:
**Q So, Mr. Liu, I will hand you, in just a second, Exhibit 4. I want you to take a look. And I'd like you to turn to Page 6 at the top and just confirm for me that that is your signature.**
MR. GARTENBERG: Do you have a copy for us?
MR. REGENSTREIF: I don't, unfortunately.
MR. GARTENBERG: Let me look at it first before you look at it.

BY MR. REGENSTREIF:
Q Do you recognize Exhibit 4?
A Yes.
Q Is that your signature on the first page?
A Yes.
Q So you've seen this request for designation sent to USCIS?
A Yes.
Q And did you provide the information contained within the request in the exhibits?
A Yes.
Q And did you write the application to USCIS?
A No.
Q Who wrote the application?
A My legal counsel.
Q But you provided your legal counsel with all the information contained in Exhibit 4?
A Yes.
Q And did you review the application before it was submitted to USCIS?
A Yes.
Q And why did you go with Miller Mayer as your lawyer? How did you hook up with them?
MR. GARTENBERG: You can answer that.
THE WITNESS: Miller Mayer was the leading

law firm in the United States focusing on the regional center application as well as the EB-5 program and one of the key principals who was also a law professor at Cornell University. And I was referred to them by a lawyer friend of mine because at that time I didn't know which firm is the best.

BY MR. REGENSTREIF:

**Q And is Miller Mayer still your legal counsel on the EB-5 portion of your project?**

A Yes. They are still our legal counsel, yes.

MS. LEVIN: What was the name of your lawyer friend that referred you to them?

THE WITNESS: The name?

MS. LEVIN: Yes.

THE WITNESS: Richard Lew, L-e-w.

MS. LEVIN: Thank you.

BY MR. REGENSTREIF:

**Q And when was that?**

A 2010, because that's when I started the application.

MS. LEVIN: So you're saying 2010 because you looked at Exhibit 4 which shows the application was 2010, correct?

THE WITNESS: Yes, that is correct.

MS. LEVIN: Okay. Thank you.
BY MR. REGENSTREIF:
**Q So who manages the regional center day to day?**
A I do.
**Q And you and Dr. Thropay are the only owners of the regional center?**
A That is correct.
**Q And there are no other investors in the regional center?**
A No.
**Q And the EB-5, LLC, who manages the EB-5, LLC?**
A I manage the EB-5, LLC.
**Q Is there anyone else?**
A No.
**Q And do the investors of the EB-5, LLC have a management role in the EB-5, LLC?**
A No.
**Q And let me direct you to Exhibit 4 again. It's Page 224 of the exhibit, but I've marked it with a paper clip for your convenience. This is an org chart for the Los Angeles County Proton Center. Take a look.**
**Do you recognize the organization chart?**

A Yes.
**Q Is that accurate?**
MR. GARTENBERG: As of today or as of when the application was filed?
MR. REGENSTREIF: As of the application.
THE WITNESS: As of the application, it was correct. Not correct today.
BY MR. REGENSTREIF:
**Q And how is it not correct today?**
A Because this chart is about the future operation management of this center, and we change the structure I think last December, I think, or last November. Yeah. At the end of last year.
**Q Last year, 2015?**
A Yeah, last year, 2015. And Dr. Thropay is -- there's -- he's no longer the managing director of this company because we signed an MOU with the City of Hope, and the City of Hope will be our manager, operational company, to run the center.
**Q Dr. Thropay, you said he's 25 percent owner of Beverly?**
A Yes.
**Q Is he still involved?**
A He's no longer involved on the operational side. He's just a passive -- we had a resolution

passed early this year. He's no longer -- he does not hold any management titles and officers of this company. He's just a member of LLC.

**Q And why is that?**

A Because City of Hope does not want -- for medical center, there's no -- there's only one medical director, not two. So I think it's important for our center to be associated with a big prestigious cancer center, so that's why we passed the board resolution and work with City of Hope instead of Dr. Thropay who is just individual radiation oncologist.

MR. GARTENBERG: I'm not entirely sure what's encompassed by your question, so you may want to ask if there was some kind of dispute between them because it seemed to be called for. I'm not sure it's called for.

MR. REGENSTREIF: Yeah. Usually I'd ask a follow-up, so you don't have to presume that I won't ask a follow-up.

MR. GARTENBERG: I want to make sure not only that he's telling the truth, but that the Staff has confidence that he's telling the truth.

MR. REGENSTREIF: Absolutely.

MR. GARTENBERG: It was not in any way to

suggest you wouldn't ask a follow-up, but I was just reaching out to --

MR. REGENSTREIF: Our job is to find the truth. So if you can help me find the truth, I invite you to help me.

MR. GARTENBERG: I want you to come out of the meeting comfortable.

MR. REGENSTREIF: Yeah.

MS. LEVIN: Can I just ask a question?

MR. REGENSTREIF: Sure.

MS. LEVIN: Before we move on, the City of Hope, who are you working with there?

THE WITNESS: Dr. Harlan Levine, who is the CEO.

MS. LEVIN: Harlan Levine?

THE WITNESS: L-e-v-i-n-e.

MS. LEVIN: He's the CEO at the City of Hope?

THE WITNESS: City of Hope foundation. There's two vehicles -- two within City of Hope, and he's the person working with us.

MS. LEVIN: Are you working with anybody else at the City of Hope?

THE WITNESS: A few doctors.

MS. LEVIN: And what are their names?

THE WITNESS: Dr. Fong, who is also well-known. I don't know what his specialty is, but he's a very well-known doctor in the City of Hope.

Primarily I have a legal team. I have also a consultant. They are working on behalf of Beverly Proton Center. I have consultants, I have a legal attorney, legal counsel and myself directly dealing with Dr. Harlan Levine. We signed the MOU together.

MS. LEVIN: Dr. Fong at City of Hope.

Any other doctors at City of Hope?

THE WITNESS: I know their names, but I'm not directly working with them because I'm not a doctor.

MS. LEVIN: But who was going to be the medical director from the City of Hope?

THE WITNESS: From the City of Hope, there's a chairman of radiation department, Jeffrey Wong. And actually we're going to form a committee to hire a nation- -- an individual nationwide -- a well-known individual who has done proton before because City of Hope has not -- there's no proton center.

In California there's only one proton center, which is Loma Linda. And the rest of centers, they want to build. But so far, there's no

other centers. So we'll find a medical director -- a nationwide name. We have few candidates already whom we're going to recruit for this venture because City of Hope is a well-known brand national cancer center.

MS. LEVIN: And who is the legal team working on your behalf?

THE WITNESS: Who is my legal team?

MS. LEVIN: Yeah.

THE WITNESS: Nixon Peabody. They have office in Downtown which is a leading firm specializing in medical. Jill was my chief legal counsel, J-i-l-l. I can't remember her last name.

BY MR. REGENSTREIF:

**Q Is she at Nixon Peabody, Jill?**

A Yes, she's with Nixon Peabody, and she directly works with City of Hope's legal counsel. First name is James. James has been with City of Hope for over 25 years, and they work together.

And I have my own consultant, Michael Hunn. Michael used to be a CEO for a big medical system in the United States, Providence. He was a CEO for Providence, and now he's my consultant working with City of Hope for this venture.

MS. LEVIN: Okay. Thank you.

BY MR. REGENSTREIF:

**Q I want to go back to two areas.**
A If you want the truth, I will tell you the truth.
**Q Excellent. Your counsel suggested there was some kind of dispute between you and Dr. Thropay.**
A Yes.
**Q So what was that?**
A Early stage, development stage, when we submitted the applications to USCIS, we signed -- I signed a nonbinding MOU with Dr. Thropay. First of all, Dr. Thropay is a radiation oncologist. He owns Beverly Oncology. Beverly Oncology has seven clinical centers in Southern California.
Dr. Thropay is a doctor. He's very busy seeing patients every day. And his sister is Ruth Novodor, chief operating officer. Ruth Novodor is the name that's here (indicating).
MS. LEVIN: And the witness is pointing to the chart on Exhibit 4.
THE WITNESS: She runs all the clinic centers for her brother, Dr. Thropay. And based on the nonbinding MOU, Ruth Novodor is supposed to be the operational person in the future to run this proton center. That's what this chart is about.
And then later, after Thropay found out we

are working with -- I'm working with City of Hope, he was extremely mad and pissed off for two reasons: He told me he has one enemy within City of Hope who is Dr. Jeffrey Wong. Dr. Jeffrey Wong is a chairman of the radiation department. He told me it's his enemy, from doctor's perspective. I don't know what is that.

And also he strongly opposed my position in dealing with City of Hope. He told me he can find another branch to work with, or he can just run by himself as a medical director. And to me, I think it's for the future development, it's important for a new center to be associated with prestigious cancer center to develop further.

Also at the same time, his sister was running everything for him, got also pissed off and mad because she is now going to -- she's going to lose that job on the management side which means she is not going to be compensated for the operation because if we hire our side, operational firm or center, we have to pay -- our center has to pay a management fee. It's very standard in this industry. So she is also very, very mad.

But to me, I think for the future, for the investors, for the future -- the interest, I think

this is the best I should do. And also City of Hope is very strongly -- they feel if they manage this center, they will not allow another medical director. Only one medical director. That's the reason -- that's the dispute. That's where the dispute came from.

BY MR. REGENSTREIF:

**Q And this happened approximately when? In late 2015?**

A Yeah.

**Q So when did you start talking to City of Hope?**

A Mid 2015.

**Q And when did you tell Dr. Thropay that you were talking to City of Hope?**

A Right after I started and I informed him, and he was extremely -- not happy.

MS. LEVIN: So is there an agreement or MOU with City of Hope?

THE WITNESS: Yes, we had MOU signed.

BY MR. REGENSTREIF:

**Q And when was that signed?**

MR. GARTENBERG: If you're not sure, tell them you're not sure, but give them your best memory.

THE WITNESS: My best memory is November.

That's my guess, but I can go back to check.
MS. LEVIN: Sometime in 2015?
THE WITNESS: Yeah, for sure.
BY MR. REGENSTREIF:
**Q And then I wanted to back up again also on business consultants for Beverly Proton. We discussed that you have two independent contractors or had two independent contractors.**
A Yes.
**Q And then you said you had business consultants?**
A Yes.
**Q How many business consultants?**
A Including architecture?
**Q Yes.**
A That's a lot.
**Q Well, let's do entities; okay? How many architects do you have, companies?**
A Two. Two major ones. But because of the complexity of this project, you have small -- other individual ones.
**Q So when you say "business consultants," are these people that you have some kind of contractual arrangements with?**
A Oh, yeah. We have contract.

**Q So business consultants, you have firms you've hired to do certain processes?**

A Yes.

**Q So you have two architectural firms?**

A Two major ones.

**Q And then what are the other business consultants?**

A You know, for example -- what are others? We have a consultant on the shielding, the radiation, because the radiation center you have to put a big wall, and we have special consultant on the shielding.

We signed an agreement, purchase agreement, with another U.S. proton therapy company. They provide the equipment, a company in Boston called Mevion, and they are our consultants as well because we signed the purchase agreement. We already spent money and paid the deposit. And that's one of them. That's the major one.

On the construction side we have -- we hire demolishing company to demolish the building, the existing building. And then we have special consultant on the use of a dosage for the treatment because that's in line with the proton equipment. You have to have professional medical company

providing the dosage for the patients. So by the time we get the equipment, it has to be simultaneously ready for that. That's another one.

There are a lot.

**Q So there's contracts for all of these people?**

A Yes, we have contracts. We have signed contracts.

MR. REGENSTREIF: Were these contracts part of the production?

MR. GARTENBERG: They weren't asked for. Anything else that's related, if you give us a list at the end -- we'll keep a list, but I just want to make sure.

MR. REGENSTREIF: Sure.

MR. GARTENBERG: We'll check with you what it is, and we'll be happy to get it for you.

THE WITNESS: Yeah. We have a stack of documents.

BY MR. REGENSTREIF:

**Q And have you paid these people yet?**

A Yeah, of course.

**Q So you mentioned demolishing.**

A Yes.

**Q What was that about?**

A There was an existing building onsite. It was an old MOB building. It has to be demolished.
**Q What's an "MOB building"?**
A MOB means "medical office building."
**Q And so the building was on the site where the proton therapy center is going?**
A Yes.
**Q And who owned the building? Did Beverly Proton own the building?**
A No.
**Q Who owned it?**
A Dr. Thropay. Dr. Thropay owns a piece of land.
**Q Where the center is going?**
A Yes.
**Q And the building was demolished?**
A Yes.
**Q Is there currently construction going on at the site?**
A Not at this moment. Not at this moment because we had some -- this dispute with Dr. Thropay.
**Q And it's his site?**
A Yes.
**Q Do you intend to build on that site?**
A I have two options. One is to build --

continue the path, build on his site. And also we're about to sign a lease agreement with Beverly Hospital. Beverly Hospital is adjacent to the site. Next to the site there's a parcel available for us to develop the proton center as well.

**Q So you have two possible sites?**

A Yes, we have two possible sites.

**Q Why did you demolish the first site then?**

A Why? Because there's no Option 2 before the dispute. Now, because of dispute, we have Option 2. Before, it was Option 1 only.

**Q So before the dispute -- and you demoed the site -- you were ready to start building?**

A Yes.

**Q And that's on hold now?**

A Yes. And then we're preparing for Option B because we have to build.

**Q And when investors came, you mentioned investors visited the site, correct?**

A Yes.

**Q And when they came with you, did they see the already existing building or did they see something else?**

A Well, we had investors come in earlier who saw the building is still there. And then we also

have some investors -- you know, visitors come in after the demolishment -- after demolishing the building.

**Q And you took investors after demolishing?**

A Yes.

**Q You personally?**

A On some occasions, yes.

MS. LEVIN: Were these people who were visiting the site, had they already invested in the EB-5 or were they thinking about investing?

THE WITNESS: Some already invested. Very few invested because once -- the normal pattern is once they invested, they probably don't come back to see it again. But most of them came to see it before they sign the agreement.

MS. LEVIN: So there were people who visited the site, and then subsequently invested?

THE WITNESS: Yes.

BY MR. REGENSTREIF:

**Q Have there been any permits yet to build again?**

A The permits -- we have demolishing permit, and that the architect is applying for the construction permit. We should get it pretty soon because the city is being very cooperative.

**Q And the architect -- which architect?**

A We have two. One of them -- one of the first is called Skanska. Skanska is I think one of the largest construction companies in the United States. And we signed an agreement for them to take care of all the pre-construction work. And then because of potential change of the site and also the change of the equipment, before we were considering a company called hospital Optivus, this is the company that has been in the United States for a while.

**Q This was the company that you had previous business relationships with, correct?**

A Yes, yes. And now we signed a purchase agreement with a company called Mevion. It's an excellent, great company, and they have sold more than ten systems to the United States, and they're all over the United States now.

And because of change of technology, so we switched to another architect in Boston area. The key principal in architect is Steve Cooney (phonetic), who is also our project manager. We signed agreement already.

**Q And the name of the firm?**

A The name of the firm is called -- it's very hard to pronounce.

**Q That's fine. As best you can.**
A If I have access to the phone, I can tell you right away.
Do you want me to find it?
**Q No, no, no.**
MR. GARTENBERG: If they need something, they will ask us to find it later.
BY MR. REGENSTREIF:
**Q It's called Studio something?**
A Studio something.
**Q As your lawyer had said a couple of times, I just want what you know. No guesses, so "Studio something" is fine.**
A We signed an agreement on the architectural site, and also they would act as a project manager for Beverly Proton.
**Q So have investor funds been used for all of these various actions?**
A Yes.
MR. GARTENBERG: Well, just to be clear, the investment in the regional center offering is to make a loan. So in a sense, the investor funds are used just to make a loan. I assume your question is: What is the money that's loaned, then used for?
MR. REGENSTREIF: Right. That's right.

Great.
Now is a good time to take a break. Let's go off the record.
(A brief recess was taken.)
MR. REGENSTREIF: Back on the record.
BY MR. REGENSTREIF:
Q **So I'm going to direct you back to Exhibit 4. And contained within Exhibit 4, there is something called "Exhibit 16" which is a private offering memorandum for 386 limited liability company membership units of Pacific Proton EB-5 Fund, LLC.**
MR. GARTENBERG: May I see that for a minute or two?
MR. REGENSTREIF: Sure.
BY MR. REGENSTREIF:
Q **When counsel is done with that, I'm going to hand it to you to review.**
MS. LEVIN: And just to be clear, Exhibit 16 is not the Government 16 from this investigation. It was Exhibit 16 that was part of the application.
MR. GARTENBERG: Okay. Thank you.
BY MR. REGENSTREIF:
Q **Mr. Liu, so I handed you that PPM.**
**Do you recognize that?**
A Yes.

**Q Is that the final version of the offering memorandum for the EB-5 Fund, LLC?**
A Final version as of today?
**Q As of what was provided to investors.**
A Yes.
MR. GARTENBERG: Let's make sure that that question is accurate -- that that answer is accurate.
Was there a later version of the PPM that was sent out to investors?
THE WITNESS: We have not sent out to investors, but we almost complete the revision, updated one.
BY MR. REGENSTREIF:
**Q But there was an offering memorandum provided to the EB-5 investors?**
A That was the one. This was the one.
**Q Are you sure?**
A Yes.
MR. GARTENBERG: Let me have a moment. Frankly, I am confused. We looked at the production that we gave you, and the production of the PPM that we produced is not identical to this.
MR. REGENSTREIF: Which was my question.
THE WITNESS: Oh, yes, yes. That's why I -- let me tell you, this is a PPM we provided from

day one. When we submitted the full application to USCIS for approval, this is the first set of documents. And then when we filed -- when the attorney does the real filing for each applicant for each investor for green cards -- they call it "I-526 application" -- they amend it. So that was for the first application.

BY MR. REGENSTREIF:

**Q What we're looking at now was for the first application?**

A Yes. And then we have another version which is for the filing of the I-526 petition.

**Q And that second version of the offering memorandum, it's the offering memorandum that was provided to the EB-5 investors?**

A Provided it to EB-5 investors, provided it to USCIS.

MR. GARTENBERG: But what he wants to make sure -- if I may -- is the second version, the version that you gave to my firm that we produced, that's the one that was actually used with the investors?

THE WITNESS: Yes.

Mr. G and we produced a version in English originally. And then I think last night, I believe

we provided one that we were given that was in Chinese.

Were the investors given one --

THE WITNESS: The Chinese translation was also based on the second one, not the first one.

MR. GARTENBERG: That's what I wanted to make sure was clear. Thank you.

And when he says one is being prepared, that's yet a third version that has not been used, correct?

THE WITNESS: Yes, but will be used soon.

BY MR. REGENSTREIF:

**Q But has not yet been?**

A Not yet because of the -- as indicated, because of change of vendor -- change to the size of investment.

**Q Right.**

MR. GARTENBERG: Among other things, there were other changes, not just the size of the investment.

THE WITNESS: And also the changes because of the management side because it was through City of Hope instead of Dr. Thropay.

MS. LEVIN: What's the change to the size of the investment?

THE WITNESS: It was $200 million before. Now we downsized to $120 million because the new equipment is cheaper. And the construction, of course, accordingly, is less. So the new offering is $120 million instead of $200 million.

MR. GARTENBERG: You say "200-."

Was it 200- or -- I'm pointing to the document -- 150-?

THE WITNESS: 150-. I'm sorry. I'm talking about total investment because we have also -- potentially have some equity money for the investment. But for EB-5 it's -- for EB-5 it was a different number. This is 193- something.

MR. REGENSTREIF: 193 million.

THE WITNESS: This is 150 million. Now the new number will be $60 million.

BY MR. REGENSTREIF:

**Q I'm going to summarize this, and you catch me if I'm wrong.**

A Uh-huh.

**Q There have been two offering memorandum. There is a third in process.**

A Yes.

**Q The first one, which was part of Exhibit 4 which was the application to USCIS, was not provided**

**to EB-5 investors?**

A No. It's provided to set up regional center, for approval of regional center.

MS. LEVIN: And the dollar amount on that one was --

BY MR. REGENSTREIF:

**Q And the dollar amount on that one was $193 million?**

A Yes.

**Q And the second one, which we will come to, was the one provided to the EB-5 investors?**

A Correct.

**Q And the dollar amount on that one, which we will look at, was $150 million?**

A Correct.

**Q And that one was provided to USCIS through the I-526 application?**

A Yes.

**Q The I-526 application is made for each individual EB-5 investor as part of their green card process?**

A Yes.

MS. LEVIN: And so what's the dollar amount of the third one that has not been used yet?

THE WITNESS: $60 million.

MS. LEVIN: 60 million for the EB-5?
THE WITNESS: Yes.
MS. LEVIN: Thank you.
MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit No. 5 an offering memorandum for 300 membership units of Pacific Proton EB-5 Fund, LLC, and it has the date at the bottom of 5/1/2013.
(SEC Exhibit 5 was marked for identification.)
BY MR. REGENSTREIF:
**Q I've handed you Exhibit 5. Take a minute to look at it.**
**Do you recognize Exhibit 5?**
A Yes.
**Q And what is Exhibit 5?**
A Exhibit 5 is the private memorandum for Pacific Proton EB-5 Fund. This is the latest version of the PPM.
**Q So this is the second version --**
A Second -- in other words second, yes.
**Q -- that we just discussed?**
A Yes.
**Q And did you provide the information contained within Exhibit 5?**

A Did I provide it to the attorney? Yes, yes.

**Q And did you review Exhibit 5?**

A Yes.

**Q And approve it?**

A Yes.

**Q And the attorney who drafted Exhibit 5, which attorney was that?**

A Well, the first draft version was prepared by Miller Mayer, and the second one was updated or revised by an attorney called David Derrico. David Derrico is a legal counsel, and he did the second draft.

**Q What firm is Mr. Derrico with?**

A David Derrico.

**Q His own firm?**

A His own firm.

MS. LEVIN: So Exhibit 5 was the version of the PPM that was provided to investors?

THE WITNESS: Yes.

BY MR. REGENSTREIF:

**Q Let's turn to Page 6 of Exhibit 5.**

**Are you on Page 6 which is the summary of the offering terms?**

A Yes. Uh-huh.

Q So under "Securities," the security offered was one unit of the limited liability company membership of the EB-5 Fund, LLC; is that right?
A That's right.
Q And each unit was for $500,000?
A Yes.
Q And it was for a total of 300 units?
A Yes.
Q And then under that, there are administrative fees of $45,000.
A Yes.
Q And that administrative fee, did you understand that that would be where the offering expenses, including legal, accounting and administrative expenses, and commissions and fees relating to the offering would come from that administrative fee?
A Yes.
Q And only from that administrative fee?
A Yes.
Q And that $45,000, that was directed to the EB-5 Fund or was it directed to the regional center?
A You mean when investor sent in the funds?
Q Yes.
A It was directly to the regional center.

MR. GARTENBERG: May I have a minute while no question is pending?
MR. REGENSTREIF: You know what? Let's just finish this one thought.
MR. GARTENBERG: I really want to speak to my client while there's no question pending.
MR. REGENSTREIF: Fine. Let's go off the record.
(Counsel conferred with the witness.)
MR. REGENSTREIF: Let's go back on the record.
BY MR. REGENSTREIF:
**Q So under that, back to Page 6 of Exhibit 5, we're looking at "borrower."**
**Do you see that?**
A Yes.
**Q So it says, "Los Angeles County Proton Therapy, LLC" is the borrower.**
A Uh-huh.
**Q That's now Beverly Proton; is that correct?**
A Yes.
**Q And the investment basically -- I'm going to characterize it; tell me if I'm right here -- the investors are investing in the EB-5, LLC which then makes a loan to L.A. County Proton; is that right?**

A That is correct.
MR. REGENSTREIF: Can we go off the record?
MR. GARTENBERG: Sure.
(A brief recess was taken.)
MR. REGENSTREIF: Back on the record.
BY MR. REGENSTREIF:
**Q So your understanding of what the loan to what was then Los Angeles County Proton Therapy and is now Beverly Proton --**
A Yes.
**Q -- the purpose of that loan was what?**
A To fund the project, to develop the project.
**Q And then the bottom of Page 6 of Exhibit 5, there's a management fee.**
**Do you see that?**
A Uh-huh.
**Q So that is the fee that the regional center would have received from the EB-5 Fund, LLC; is that right?**
A Yes.
**Q And that was to be three percent of gross revenues?**
A Yes.
**Q Has the EB-5 Fund, LLC had any gross**

**revenues?**
A EB-5 Fund has gross revenues? I don't quite understand that question because when you say "gross revenue" -- it's talking about the total amount of funds being raised?
**Q Well, you tell me. So here in Exhibit 5 it says, "Three percent of the gross revenues."**
**Do you see that?**
A I think it's -- I think we're referring to the project, not referring to the PP EB-5 Fund, because PP EB-5 Fund is a vehicle to raise EB-5 money, but EB-5 money called "gross revenues"? That, I'm not sure.
**Q So you're not sure?**
A I don't write this, you know.
MR. GARTENBERG: You answered. You said you're not sure.
THE WITNESS: I'm not sure. I'm not sure.
BY MR. REGENSTREIF:
**Q That's fine.**
**Has a management fee been paid to the regional center?**
A I'm not sure.
**Q Has the fee been paid to the regional center?**

MR. GARTENBERG: And he does not want you to guess. If you know, please answer. If you don't know, you don't know. You can check the books later.
THE WITNESS: Not through PB EB-5.
BY MR. REGENSTREIF:
**Q Has any management fee been paid to the regional center --**
A No.
**Q -- from any source?**
A From the -- no. There's a sponsorship agreement between the project company and regional center, so the regional center received the sponsorship fees from Pacific Proton, from Beverly Proton Center.
**Q So a sponsorship fee from Beverly Proton to the regional center?**
A Yes.
**Q And that is laid out in a sponsorship agreement?**
A Yes.
**Q And do you know what that sponsorship fee is?**
A Yes.
**Q What is it?**
A It's 800,000 per year.

**Q 800,000 per year?**
A Yes.
**Q From Beverly Proton to the regional center?**
A Yes.
**Q And that's in the sponsorship agreement?**
A Yes.
**Q Was the sponsorship agreement provided to the EB-5 investors?**
MR. GARTENBERG: If you know, tell him. If you don't know -- if you truthfully don't know, then tell him you don't know.
THE WITNESS: I'm not sure. I'm not sure because how do you interpret that, you know?
MR. GARTENBERG: If you know, tell him. If you don't, tell him you don't know.
THE WITNESS: If I'm not sure, what do I say?
MR. GARTENBERG: If you're not sure, you say, "I'm not sure." Without waiving privilege, we went over this. If the answer is, "I don't remember," "I'm not sure," that's the correct answer, if that's what the facts are.
THE WITNESS: I'm not sure.
BY MR. REGENSTREIF:
**Q Absolutely. No speculating, no guessing.**

If you don't know, you don't know. It's okay.
A All right.
Q Let's turn to Page 7 of Exhibit 5, the "Escrow capital contributions."
Do you see that?
A Yes.
Q So the EB-5 investor funds were escrowed; is that right?
A Yes.
Q And who was the escrow agent?
A East West Bank.
Q East West Bank is the escrow?
A And actually East West Bank is a depository bank, and the escrow agent is called Atlantic Escrow.
Q And then the funds are released upon notice of the filing of each investor's I-526 petition?
A Upon filing, upon receipt of USCIS application.
Q Receipt by who?
A By USCIS.
Q And do you notify the escrow agent? Is that how it works?
A Yes, every time we got a receipt from USCIS, I would submit the receipt to the escrow agent, and then escrow agent release the funds.

Q And then the funds are released to the EB-5 Fund, LLC account?

A Yes.

Q And approximately $23 million of that has been released to the EB-5 Fund?

A Yes.

Q Let me turn to page 15 of Exhibit 5 to the bottom, the "Distribution of Profits From Operations."

A Page 15. Okay.

Q Do you see the bottom paragraph, "Distribution"?

A Yes.

Q Reviewing that, has there been any repayment on the loan by Beverly Proton to the EB-5 Fund?

A No.

Q Now, let's turn to Page 18 of Exhibit 5.

Do you see the second paragraph under -- from the top under, "Pacific Proton EB-5 Fund, LLC"?

A The second paragraph?

Q Yes.

A Okay.

Q So it says, "The EB-5 will pull investor funds and make a loan of up to 150 million to Los

**Angeles County Proton Therapy."**

A Yes.

**Q Is that correct?**

A Yes.

**Q The loan has already -- it's already happened.**

**There's funds going from EB-5 to Beverly Proton?**

A Yes.

**Q But there have been no payments made under that loan yet back to EB-5?**

A No, because it's a five-year loan.

**Q And LAPT is Beverly Proton; is that right?**

A Yes.

**Q It says, "We'll use the loan proceeds to partially finance a construction and operation of a proton therapy center."**

**Is that your understanding of what the use of funds of the loan was for?**

A Yes.

**Q And all the investor funds were to go to the loan?**

A Yes.

**Q Let's turn to Page 20 now of Exhibit 5. It says, "PP EB-5 estimated use of proceeds."**

Do you see that in that paragraph?
A Yes.
Q So again, it says "Borrower" -- which means Beverly Proton; is that right?
A Yes.
Q -- "intends to use the proceeds from this offering to finance development and operation of the now Beverly Proton Center"; is that right?
A Yes.
Q And then there's a Footnote 2.
Do you see that at the bottom of the page?
A Yes.
Q And that says, "The proceeds of this offering do not include administrative fees. Offering expenses, commissions and fees inferred in connection with this offering shall be paid from the proceeds in," capital "A," "Administrative," capital "F," "Fees, and not from EB-5 capital contributions."
A Yes.
Q And that's inaccurate?
A Yes.
Q So the $500,000 in investor funds to the EB-5 Fund were solely to go to the loan?
A Uh-huh.
Q "Yes"?

A Yes.
Q And then the loan was to be used for -- to finance development and operation of Beverly Proton?
A Correct.
Q Let's turn to Page 25 of Exhibit 5.
Do you see "Management" at the bottom of the page, that last paragraph?
A Yes.
Q So the "manager," which is the regional center; is that right?
A Yes.
Q And the "regional center," you are the manager of the regional center?
A Yes.
Q "The manager," it says in Exhibit 5 on Page 25, "has full, exclusive and complete authority and power and discretion to manage and control the business affairs."
Do you see that?
A Yes.
Q So no investor has management responsibilities of the EB-5 Fund?
A No.
Q I'm sorry?
A No.

**Q It's just solely you as the manager of the regional center?**

A Yes.

MR. GARTENBERG: Just reading from the document that you authored and noted -- and he's not a lawyer -- it says here that members have limited rights to take part in management or to bind the company, and then it refers to specific sections of the operating agreement.

So would it be correct that you don't know, as a nonlawyer, exactly what those sections of the operating agreements say, correct? I'm looking at Page 26, "Members have limited rights to take part in the management to bind the company," and then it refers to Article 4, Sections 4.1 through 4.2 of the operating agreement.

As far as you know, are those sections in effect?

THE WITNESS: I'm not sure I fully understand.

MR. GARTENBERG: That's really my point.

When you say the members don't have management authority, you're not overruling whatever the operating agreement says, are you? The operating agreement is the operating instrument.

THE WITNESS: Yes. Operating agreement, yes, is the core, I guess.
BY MR. REGENSTREIF:
**Q So let me ask you this: Has any EB-5 investor had any management responsibilities for the EB-5 Fund?**
A No.
**Q You're the only one that's managed the EB-5 Fund?**
A Yes.
**Q When did the offering begin? When did you start fundraising?**
A 2013, because we received approval in 2012.
**Q Approximately when in 2013?**
A Mid.
**Q And did you retain any brokers?**
A Yes.
MR. GARTENBERG: Let him finish the question, please. Wait until he finishes.
BY MR. REGENSTREIF:
**Q Who?**
A Quite a few. One of them is Overseas Chinese Immigration. The other is U.S. RITA -- called U.S. RITA. It was another company.
**Q U.S. RITA?**

A Yes, called U.S. RITA, yeah. And then we have United Damei Investment. And then -- well, there's -- it's kind of -- because of the Chinese names, it's a translation, so it's sometimes -- I can't remember all the names.

**Q But those three, were those the three brokers, or were there other brokers?**

A There were other brokers.

**Q How many others?**

A Another three, four.

**Q Do you know the other three, four names?**

A I can't. I know who I'm dealing with, but I can't remember the company's name.

**Q Who are you dealing with?**

A Because a lot of translations -- because the Chinese translation, we communicate -- because I grew up in China also, so I can speak the local dialect. So we speak the local dialect, local language. I can't remember.

**Q What about the names of the individuals you were dealing with, those three or four other brokers?**

A I can remember one of them is Mr. Wang. Last name is Wang, and first name is J-i-n.

**Q But he doesn't work for either Overseas Chinese, U.S. RITA or United Damei?**

A Yeah.
**Q Anyone else from one of those other brokerage firms?**
A Not that I can think of.
MS. LEVIN: And, I'm sorry. You were mentioning that you spoke a local dialect.
So is that something other than Mandarin Chinese?
THE WITNESS: Yeah, Shanghainese, because I grew up in Shanghai. So many dialects.
BY MR. REGENSTREIF:
**Q So let's start with Overseas Chinese.**
**Where are they based?**
A Hong Kong, I think. Based in Hong Kong.
**Q And is there some kind of brokerage agreement with them?**
A Yeah, we had agreement.
**Q You had an agreement with them?**
A Yeah.
**Q And were they paid a commission?**
A Yeah, they were paid a commission, yes.
**Q And did EB-5 Fund pay the commission to them or were they being paid commission by the investors?**
MR. GARTENBERG: Or some other alternative?

MR. REGENSTREIF: Sure. Of course.
THE WITNESS: Yeah. They were paid by the regional center, and also by the project.
BY MR. REGENSTREIF:
**Q By both?**
A Yeah, by both.
**Q So Overseas Chinese was paid by both the regional center and by Beverly Proton?**
A Yes.
**Q And these were fees associated with their successful selling of investments to EB-5 investors?**
A Correct.
**Q And what was the arrangement? What was the commission?**
A Commissions paid 75,000 per each investor.
**Q 75,000 per each investor?**
A Yeah.
MS. LEVIN: And how many investors did they get to date?
THE WITNESS: How many investors --
MS. LEVIN: -- did Overseas Chinese obtain to date?
THE WITNESS: I don't have exact numbers. I can't remember exact.
BY MR. REGENSTREIF:

**Q And was the agreement between -- I'm not sure if it was regional center or if it was the EB-5 Fund or what have you.**

A Not EB-5 Fund for sure.

**Q So the agreement with one of the entities, Overseas Chinese, is that provided to us in the production?**

MR. GARTENBERG: Yes. I'm looking at it.

MR. REGENSTREIF: Well, it was relatively shortly, so that's fine.

BY MR. REGENSTREIF:

**Q It was provided?**

A Yes.

MR. GARTENBERG: But based on the conversation that I've had with my client, I'm not sure that all of the terms are reflected in the writing.

BY MR. REGENSTREIF:

**Q So let's talk about, you sitting here today, what the terms of the agreement with Overseas Chinese were.**

MR. GARTENBERG: If you don't have it at your fingertips, if you want to take a minute, I've got it at mine. You can make copies of it.

MR. REGENSTREIF: Well, let's go first this

way.

MR. GARTENBERG: Okay.

BY MR. REGENSTREIF:

**Q So tell me, what were the terms?**

A The term is upon the successful completion of the fundraising, we pay 75- for each -- the clients they brought in. And we also pay a marketing fee to them as well.

**Q So a marketing fee on top of 75,000?**

A Yeah. Marketing fee is different. It's to do the promotions, other stuff.

**Q And how much was the marketing fee?**

A Marketing fee is --

**Q Just do what you know.**

MR. GARTENBERG: I offered to do that. You prefer what he remembers.

BY MR. REGENSTREIF:

**Q First I want to know what you remember.**

A About half a million a year for marketing.

**Q And you said that Overseas Chinese is based in Hong Kong?**

A Yes.

**Q And who do you work with at Overseas Chinese?**

A A gentleman called Mr. Wang and his

associates. They have an office in China.

**Q And does Mr. Wang own Overseas Chinese?**

A I guess so.

**Q If you don't know, that's fine.**

A Yeah. I guess so.

MR. GARTENBERG: Do you know for a fact -- because when you say, "I guess," did you ever ask him?

THE WITNESS: No, because when you deal with the company, you don't ask.

MR. REGENSTREIF: Sure. That's why you said, "I guess."

THE WITNESS: Yeah.

MR. REGENSTREIF: I heard what he meant.

THE WITNESS: It's a business community.

MR. GARTENBERG: I got it. Thank you.

MS. LEVIN: What's his first name, Mr. Wong's first name?

THE WITNESS: I think he's called Walter.

BY MR. REGENSTREIF:

**Q Walter?**

A Yeah, Walter.

MS. LEVIN: Thank you.

BY MR. REGENSTREIF:

**Q So next, United Damei.**

**So they are another broker retained?**
A Yes.
**Q So sitting here, without looking at the documents, what generally were the terms with United Damei?**
A It's marketing fees plus the brokerage fee of 75,000 for each client.
**Q And the marketing fee was also 500,000?**
A In that neighborhood.
**Q In that neighborhood.**
**And who did you deal with at Untied Damei?**
A They have a gentleman called Mr. Chen, last name is C-h-e-n.
MS. LEVIN: First name?
THE WITNESS: X-i-a-o.
MS. LEVIN: Xiao.
THE WITNESS: J-u-n-g. Xiao Jung Chen. So last name is Chen, first name is Xiao Jung.
BY MR. REGENSTREIF:
**Q Does your wife have any involvement with United Damei? I know that you said she was involved in the --**
A Yes. Partially she's helping them from marketing. Because they're Chinese, they work together.

**Q Did Untied Damei pay your wife?**
A No.
**Q And where is Untied Damei based?**
A Beijing.
**Q They're in Beijing?**
A Yeah.
**Q And how many investors have they successfully solicited?**
A Quite a few.
**Q 10? 15?**
A 20.
**Q 20?**
A Yeah.
**Q Approximately?**
A Approximately.
**Q And Overseas, approximately how many have they solicited?**
MR. GARTENBERG: You mean who actually became --
MR. REGENSTREIF: Right, successfully solicited.
THE WITNESS: Four to five.
BY MR. REGENSTREIF:
**Q Four to five?**
A Yes.

**Q And then U.S. RITA, they were also a broker you dealt with?**

A For a short period of time.

**Q Did they successfully solicit any investors?**

A No.

**Q Let's start with Untied Damei.**

**How did they solicit investors? What was their marketing process, if you know?**

A I'm here most of the time, so the reason we want to hire the broker is to -- I don't have this headache. I can focus on the construction, on the business development for our center. So in terms of how they do that, it's, I guess, through the networks, business seminars, advertising, website, local magazine, newspapers, friends.

**Q Let me ask it this way: Have you, yourself, ever participated in any of the marketing efforts to investors by the brokers?**

A Not myself, but I --

MR. GARTENBERG: That's all he asked.

THE WITNESS: No.

BY MR. REGENSTREIF:

**Q Did your wife participate in those -- in that process?**

A Yes.
**Q And how did she participate in that process?**
A She's made a speech, spoke about the project on behalf of Beverly Proton.
**Q A speech to who?**
A Speech to the guests, invited guests, potential clients on behalf of the company.
**Q And those invited guests were potential investors as well as clients?**
A Yes.
**Q And when was that meeting?**
A When was that meeting? She told me she went to multiple meetings in 2014, '15, but I can't remember.
**Q So more than one of those kinds of meetings?**
A Yes.
**Q In person?**
A In person.
**Q And those were in Mainland China?**
A Yes.
**Q Do you know where in Mainland China?**
A Beijing, Shanghai, Guangzhou is the primary three major cities where you do business.

**Q That's where the money is?**
A Yes. Exactly.
**Q You did not accompany her?**
A No.
**Q And have you ever been on one of these trips to get investors in Mainland China?**
A Once.
**Q When was that?**
A I was there I think 2015. I accompanied the former mayor Antonio Villaraigosa. He was an invited speaker, and I was there. I think that was the only -- to my best knowledge, that was the only occasion because of him, so I went there.
**Q And so you accompanied the former mayor to China for a speaking engagement?**
A Yes.
**Q And he spoke to investors, potential investors?**
A The audience.
**Q So the audience was made up of potential investors?**
A As far as I know, yes.
**Q And was this particular audience -- did Overseas Chinese sponsor this, or was it Untied Damei or one of the brokers?**

A I think Untied Damei.
**Q United Damei did it?**
A Yes.
**Q And did you pay Mayor Villaraigosa for this appearance?**
A The regional center, yes.
**Q The regional center?**
A Yes.
**Q Travel?**
A Travel.
**Q And any other sort of fee?**
A I think just the travel.
**Q So he was part of the marketing to potential investors?**
A Uh-huh.
**Q You have to say "yes."**
A Yes. I'm sorry.
**Q It's unnatural because we can nod and see each other.**
A Yeah.
**Q Did anyone else go on that trip besides yourself and the mayor?**
A Thropay and his sister.
**Q Novodor?**
A Ruth Novodor.

**Q So the four of you went?**
A Yes.
**Q Was there any typed-up remarks that you made or a speech?**
A No. I was just sitting there.
**Q You were just sitting there?**
A Uh-huh.
**Q The mayor gave the speech?**
A Yes.
**Q Did you provide him with a speech to give?**
A No. He was a natural speaker.
**Q What did he say? He's a politician, right?**
A He's a great speaker. He was a great speaker. Actually, we have a video recording.
**Q So this is one of the videos?**
MR. GARTENBERG: First I hear of this speech.
MR. REGENSTREIF: But you guys said there are videos, right?
THE WITNESS: Yes. He made a great, great speech in talking about Los Angeles, and he invited the Chinese to be the second home.
MR. GARTENBERG: But if that's something you want, we'll get you that video.
THE WITNESS: He's a great speaker. We

didn't offer him anything to say. He just -- naturally he just --

BY MR. REGENSTREIF:

**Q He sold Los Angeles?**

A How great the city, how -- everybody was --

MR. GARTENBERG: May I ask: Did he talk about the proton therapy center?

THE WITNESS: Yes, of course. He did a lot of homework, actually, because before he didn't know too much about the proton therapy. And then he did a lot of research and find out, and then he talked about the proton therapy.

MR. GARTENBERG: It's called for by the subpoena. It's the first time we hear of it. We'll get you a copy.

MR. REGENSTREIF: That's fine.

BY MR. REGENSTREIF:

**Q And so related to that, were there EB-5 investors who made investments who were at that meeting?**

A That, I can't tell. There's so many, like, over --

**Q How many people were there?**

A A couple of hundred. I don't know.

**Q And was that in Beijing or Shanghai?**

A Beijing.
**Q And that was approximately when? 2015?**
A Yeah, 2015.
**Q Early? Mid?**
A I remember he was wearing a coat.
**Q So, cold?**
A So I think it was March or February.
**Q Early 2015?**
A Yeah, early 2015.
**Q We won't pin you down.**
**Early 2015?**
A He said, "It's like New York, the weather," so it must be that period of time.
MR. GARTENBERG: Just keep in mind that he's going to need from 1:00 to 1:30 to make a call. And separate from that, we also need to eat lunch. So if you can try to work that into your schedule.
MR. REGENSTREIF: Then let's go off the record, and we'll break for lunch.
(Whereupon, a luncheon recess was taken.)
A F T E R N O O N S E S S I O N
MR. REGENSTREIF: Back on the record.
So I'm going to ask the court reporter to mark as Exhibit 6 a document Bates-stamped SEC-JPMCB-P-184 through 186.

(SEC Exhibit 6 was marked
for identification.)
BY MR. REGENSTREIF:
**Q So take a minute to look at Exhibit 6, Mr. Liu.**
**So, Mr. Liu, on the first page of Exhibit 6, which is a signature card for a bank account at Chase, is that your signature?**
A Yes.
**Q And then on the second page of Exhibit 6, at the bottom, is that your signature under "Partner/Member/Manager"?**
A Yes.
**Q And this is for the signature card -- Exhibit 6 is for Chase Bank account No. 6 -- last four, 6428 at the top of Page 1 on the right.**
**Do you see that?**
A Yes.
**Q And is that the bank account for the regional center?**
A Yes.
**Q And are you the only signatory on the bank account for the regional center?**
A Yes.
**Q And does anyone else have access to that**

**bank account?**

A No.

**Q And is that bank account for business at the regional center?**

A Yes.

**Q And only business for the regional center?**

A Yes.

**Q And is this the account, account 6428 in Exhibit 6, where the administrative fee goes?**

A Yes.

**Q And the administrative fee is only for the operating expenses and marketing fees and commissions as we discussed previously as numbered in the offering memorandum?**

A Yes. You mean is it the only account?

**Q This is the account where the administrative fee goes?**

A Yes.

**Q And the administrative fee is for those items that we discussed before?**

A Yes.

MS. LEVIN: Does the administrative fee ever go to any other bank accounts or only this account?

THE WITNESS: This is the only one.

MS. LEVIN: Okay. Thank you.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 7 a document -- another signature card that is nine pages long and Bates-stamped SEC-JPMCB-P-3 through 11.

(SEC Exhibit 7 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 7.**

A Okay.

**Q Mr. Liu, on Exhibit 7, the first page, is that your signature?**

A Yes.

**Q And this signature card is for the Chase account with the last four digits 1028.**

**And is this the account for the EB-5 Fund, LLC?**

A Yes.

**Q And are you the only signatory on this account?**

A Yes.

**Q And does anyone have any access to the funds in this account?**

A No.

**Q And this is the account that the EB-5**

**investor funds, once they're released from escrow, come to this account?**

A Yes.

**Q And only this account?**

A Yes.

**Q And this account is solely used for the EB-5, LLC Fund?**

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 8 a signature card from Chase for account ending, last four, 5152, and it's Bates-stamped SEC-JPMCB-P-83 through 90.

(SEC Exhibit 8 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I handed you Exhibit 8 which is the signature card as I described.**

**On Page 1 of Exhibit 8, is that your signature at the first line?**

A Yes.

**Q And then under it says -- the second line, it lists "John P. Thropay." There's no signature. It just says, "Refer to add partner or member not president"; is that right?**

A Yes.

**Q Are you the only signatory of this account?**
A Yes.
**Q You have access to this account?**
A Yes.
**Q Dr. Thropay can't access funds in this account?**
A Well, I think he has access to the account, but I'm the only member to sign.
**Q Yeah. That makes sense.**
A Because he's a member.
**Q Right, and you'll see in a minute that that makes sense.**
**And so this account in Exhibit 8, which is 5152, this one is for Los Angeles County Proton Therapy, LLC. This is for Beverly Proton, LLC.**
A Yes.
**Q So this is the project's account?**
A Yes.
**Q And the funds in this account are only for the project?**
A Yes.
**Q And so the loan from the EB-5 Fund would then go to this account?**
A Yes.
**Q And the funds in this account are meant**

**for -- to be spent on the project and construction; is that right?**

A And marketing and other work capital.

**Q When you say "marketing," what do you mean?**

A "Marketing" means to promote this project.

**Q To promote the project for clients to come and use the project, or investors? What do you mean?**

A "Promotion" means -- because we're in the healthcare business, we were trying to -- before the construction completed, we were trying to bring patients through this center to other U.S. medical cancer centers.

In other words, by the time we complete our construction, we were able to see immediately enough clients particularly from overseas to come to our center. We don't have to start a campaign, advertise right away, you know. But that takes time for people to absorb to the patient, to the clients to absorb. So what we're trying to do is to do the marketing right away.

**Q So "marketing" means for clients/patients?**

A Patients, yes.

MS. LEVIN: And what kind of marketing was done or is being done or has been done to get patients?

THE WITNESS: What kind of marketing? You know, magazine articles, newspaper articles and press release, video, seminar and working with hospital networks in China.

MS. LEVIN: So who is doing that marketing for you?

THE WITNESS: My wife.

MS. LEVIN: Your wife is?

THE WITNESS: Yeah.

BY MR. REGENSTREIF:

**Q And only your wife?**

A Wife and other agents. My wife represents Beverly Proton Center because she's paid to do this.

**Q But these other agents are agents seeking out patients?**

A Yes. We have our agents, brokers working.

**Q But this is for patients?**

A Yes, for the patients. And also publicity, you know, to make our center known.

MR. GARTENBERG: May I ask a question that I think will help?

To some extent, are the same people who are marketing to the investors in the EB-5 Fund also marketing for patients?

THE WITNESS: We have one firm, yes.

BY MR. REGENSTREIF:
**Q What's that firm?**
A United Damei Group.
**Q So that one firm is also marketing for patients?**
A Yes.
**Q But that's it?**
A Yeah, for EB-5 marketing, and also for the patient referral.
MR. GARTENBERG: What about Overseas Chinese? Do they help with marketing for patients, too?
THE WITNESS: They do some, too. They do some, too. Because when they are promoting our project, it's promoting medical project. So they are trying to -- we try to fully utilize the resources because one of the investors can be potentially a patient, or their friends, their relatives may become a patient. So we're actually doing both.
BY MR. REGENSTREIF:
**Q Were the EB-5 investors told that their investment would also be used for marketing, for this kind of marketing, as you described?**
A They were told by -- in what way? Written language or verbal conversation?

**Q Either. Both.**
A Yeah. Verbally, yes. But written language, we don't have that kind of document to provide to them.
**Q But verbally you told them that their investment would be used both to construct and operate the center and also to market it?**
A Yes.
**Q But there's no written documentation of that?**
MR. GARTENBERG: May I have a minute after he answers before you go on to the next question?
BY MR. REGENSTREIF:
**Q So there's no documentation of that?**
A (Witness nods head.)
**Q You have to verbalize. You shook your head "no."**
A Verbal, written document to each of our investors. The agents knows, not the investors. There's a difference between the agents, brokers and investors.
"Investors," you're referring to each individual EB-5 investor?
**Q Yes.**
A No, we did not verbally. It's not -- we're

directly not dealing with the investors. We deal with investors -- each investor through our agents. So our agents, they may just verbally tell his clients/investors, but we don't directly tell them.

MR. GARTENBERG: And just to be clear, you're asking about that specific use of it, not the broad language that's in the offering document that broadly covers, for example, other costs without defining them?

MR. REGENSTREIF: I'm asking exactly what he said.

MR. GARTENBERG: Right.

He's asking: To your knowledge, did you specifically tell the investors that part of the marketing was for ultimate use of the facility?

THE WITNESS: Did we tell the investors?

MR. GARTENBERG: That specifically.

THE WITNESS: No, because we don't -- we don't talk to investors directly. It's all through the marketing agent.

MS. LEVIN: So did you instruct the brokers to tell the EB-5 investors that some of the money would be used for marketing to patients?

THE WITNESS: Did we instruct? No, I did not instruct.

MS. LEVIN: So you don't know whether --
THE WITNESS: But they know -- they're fully aware of what we are doing.
MS. LEVIN: And how do you know that?
THE WITNESS: Because we had the agreement signed to refer patients. It's between this company and also the brokers. It's not between this company and individual investors.
BY MR. REGENSTREIF:
**Q So this goes to what Ed raised this morning.**
**You have these written agreements between -- I'm not sure which of the entities, but the three entities and the brokers?**
MR. GARTENBERG: No. What we produced -- and remember, if you would, please, that the subpoena called for, I believe, October 2014 forward. And from what he's testified to, the two written agreements are with UDG and with China Overseas, and we produced those to you.
I have copies here. To the extent he has any additional agreements with them -- I don't know if he does or doesn't -- I'd be happy to talk to him about those. But the agreements that we understood to be covered by the subpoena, we have, yes.

MR. REGENSTREIF: Could we get those now?
MR. GARTENBERG: Absolutely.
MR. REGENSTREIF: Great. Thank you.
MR. GARTENBERG: To clarify, because I think it's important, in addition to the agreements that I've given to the SEC here again, my question is: Are there other agreements dealing with other subjects?
THE WITNESS: Yeah, because I thought it was irrelevant, so I didn't provide.
BY MR. REGENSTREIF:
**Q So are there agreements with Damei and Overseas Chinese?**
A Yes.
**Q And those agreements are about what?**
A About referral patient. It's about marketing and referral patient.
**Q Are those post 2014?**
A Post 2014, yes.
MR. GARTENBERG: I don't think that's called for by the subpoena, but we'll be very happy, if you want, you know -- give it to you.
MR. REGENSTREIF: Yes, of course. I would like that.
MR. GARTENBERG: And if we could at the

end, either after the testimony or by e-mail, whatever, if we can make sure our list matches with your list so nothing is overlooked.

MR. REGENSTREIF: Absolutely. And I appreciate that. And we'll come back to these two. Let's close the loop on this, and then we'll come back.

MR. GARTENBERG: Okay.

MR. REGENSTREIF: So I'm going to ask the court reporter to mark as Exhibit 9 a signature card for an account at Chase 5152, and Bates-stamped SEC-JPMCB-P-78 through 82.

(SEC Exhibit 9 was marked for identification.)

BY MR. REGENSTREIF:

**Q So I've handed you Exhibit 9, Mr. Liu.**
**Is that signature yours, the first signature at the top there?**

A Yes.

**Q And this Exhibit 9 is the signature card for Beverly Proton's account at Chase?**

A Yes.

**Q So this is the account for the project?**

A Yes.

**Q And then the second signature underneath,**

**it says "John Thropay."**
**Is that Dr. Thropay's signature? Do you know?**
A That's his signature because I handed it to him.
**Q You handed it to him?**
A Yes. But the truth is, he's no longer part of this after the new board resolution.
**Q Once he's on the signature card in Exhibit 9, did he have access to the funds in the account or not?**
A Well, I don't know what's the banking rule, but I'm assuming, yes, because he had his signature. But after the new board resolution, he was no longer on the list.
**Q October 25, 2015?**
A Yeah.
**Q And so once the board resolution -- which is when exactly?**
A January.
**Q January 2016?**
A January -- I think January 18.
**Q 2016?**
A 2016, yeah.
**Q So it would only be from October 2015 to**

**January 2016?**
A Yes.
MR. REGENSTREIF: So let's go off the record.
(A brief recess was taken.)
MR. REGENSTREIF: Let's go back on the record.
We're at Exhibit 10, right?
DEPOSITION REPORTER: Yes.
MR. REGENSTREIF: I'm going to ask the court reporter to mark a four-page document entitled, "Engagement Agreement," dated January 28, 2013, between L.A. County Proton Therapy and Overseas Chinese Immigration Consulting.
(SEC Exhibit 10 was marked for identification.)
BY MR. REGENSTREIF:
**Q Mr. Liu, I handed you Exhibit 10. This is the engagement agreement with Overseas Chinese Immigration Consulting.**
A Uh-huh.
**Q Do you recognize Exhibit 10?**
A Yes.
**Q And on the last page of Exhibit 10, is that your signature for Los Angeles County Proton Therapy?**

A Yes.
**Q And this is the engagement agreement with Overseas Chinese Immigration Consulting?**
A Yes.
**Q This is for their efforts to solicit EB-5 investors?**
A Yes.
**Q And then on Page 1 of Exhibit 10, paragraph 4, "Consultants Compensation."**
**Do you see that?**
A Yes.
**Q Are these terms accurate, "$75,000 per investor who invests"?**
A Uh-huh.
**Q Is that a "yes?"**
MR. GARTENBERG: He needs a verbal answer.
THE WITNESS: Yes.
BY MR. REGENSTREIF:
**Q And that was to be paid upon filing of the I-526 petition?**
A Yes.
**Q And then No. 5, underneath that on Page 1 of Exhibit 10, the marketing fee.**
**So it's $800,000 per year?**
A Yes.

**Q Plus some provision if funds don't exceed $50 million; is that right?**
A Yeah.
**Q There should be a return?**
A Yes.
**Q Has there been any funds returned?**
A Not yet.
**Q Because you haven't raised $50 million yet?**
A Yeah, but still ongoing.
**Q Is there still ongoing EB-5 investors?**
A Yeah, because --
MR. GARTENBERG: Let's make sure this is clear.
Since about the end of November 2015 until today, have you raised any EB-5 funds for this?
THE WITNESS: No, because we went through a structure change internally.
MR. GARTENBERG: That's why I was concerned when you said "ongoing."
MR. REGENSTREIF: Okay.
THE WITNESS: Because lawyers are working on the new PPM.
BY MR. REGENSTREIF:
**Q So no one is currently soliciting EB-5 investors?**

A We asked them to hold.
**Q Okay. Now, Exhibit 10 only concerns Overseas Chinese Immigration's efforts to get EB-5 investors; is that right?**
A Yes.
**Q This document, Exhibit 10, does not concern marketing efforts that we were discussing earlier with respect to the clients and patients and the general promotion?**
A There was a separate agreement. I didn't provide it because I thought it was irrelevant.
**Q That's fine.**
**But Exhibit 10 does not cover that?**
A Yes, yes.
**Q And do you know if L.A. County Proton Therapy has paid the marketing fee on Exhibit 10, the $800,000 fee per year?**
A Partial.
**Q Partial?**
A Yeah.
**Q What does that mean?**
A "Partial" means we paid some, and we still holding some because the numbers has not been fully solicited.
MR. REGENSTREIF: I'm going to ask the

court reporter to mark as Exhibit 11 a document titled, "Engagement Agreement," and it looks like between United Damei Investment Company and Pacific Proton Regional Center, Los Angeles County Proton Therapy, dated August 18 and August 15, 2013.

(SEC Exhibit 11 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I handed you Exhibit 11.**
**So in the second to last page of Exhibit 11, did you sign this?**
A Yes.
**Q And then the following page, "Yao Wenli."**
A Uh-huh.
**Q Who is Yao Wenli?**
A I think it's their legal representative of this company in China.
**Q Have you spoken to Yao?**
A No. Actually, I spoke a lot with the executive teams.
**Q But not with --**
A Not with Ms. Yao.
**Q Not with Ms. Yao?**
A No.
MS. LEVIN: Is Yao Wenli any relation to

you?

THE WITNESS: No.

MS. LEVIN: Is she a friend?

THE WITNESS: No.

BY MR. REGENSTREIF:

**Q And so Exhibit 11 is the agreement through which Damei was to solicit EB-5 investors for the project?**

A Yes.

**Q And then if you turn to Page 3 of Exhibit 11, so paragraph 2, "Rates, fees and charges," under 2.1, "Fees A."**

A Yes.

**Q "500,000 shall become due and payable to UDG upon signing."**

A Yes.

**Q Was $500,000 paid to Damei?**

A Yes.

**Q And then it looks like in paragraph C there, it looks like there was -- $35,000 was due to Damei per investor.**

A Uh-huh.

**Q Is that correct?**

A Yes.

**Q And then it also says in paragraph D that**

**"UDG will receive $45,000 of the administrative fee."**

A Yes.

**Q So they were also paid 45,000 of the administrative fee per investor?**

A Yes.

**Q So it was 35,000 plus 45,000?**

A That is correct.

**Q So it was 45,000 from the administrative fee?**

A Yes.

MS. LEVIN: So then where was the 35,000 coming from?

THE WITNESS: That's from the project company, not the regional center.

BY MR. REGENSTREIF:

**Q From Beverly Proton?**

A Yes.

**Q And then "E," it says "Marketing fee."**

**So that's $650,000 per year?**

A Yes.

**Q And has that been paid to Damei?**

A I think it's partially.

**Q Now, again, Exhibit 11 does not contain the marketing efforts as we spoke before related to clients and general promotion?**

A Patient, yeah.

**Q It does not?**

A It does not.

**Q Did Dr. Thropay or anyone else review either Exhibit 10 or Exhibit 11 before he signed it?**

A Did he review? I don't think so.

**Q Just "yes" or "no."**

A No, no.

MR. GARTENBERG: I want to make sure that you understood the question. He said Dr. Thropay or anyone else.

Do you know who else reviewed the agreement?

THE WITNESS: Well, our legal counsel prepared this draft for us.

BY MR. REGENSTREIF:

**Q Exhibit 11?**

A Yes.

**Q Who was your legal counsel for Exhibit 11?**

A Legal counsel was -- well, actually, their legal counsel.

**Q Damei?**

A Damei's legal counsel.

And then I have our legal counsel review it, so we didn't draft this. They're more

experienced than we ck do, actually. This is my first time to do the EB-5.

MR. GARTENBERG: I think he wants to know, other than lawyers and Damei, did anybody else review it?

THE WITNESS: No.

BY MR. REGENSTREIF:

**Q Just you?**

A Yeah.

MS. LEVIN: And who was your legal counsel that reviewed this Exhibit 11?

MR. GARTENBERG: Again, if you don't remember, you don't.

THE WITNESS: Yeah, I don't remember this one because it was a while ago. I had multiple attorneys. I don't know.

MS. LEVIN: And was there a board resolution?

THE WITNESS: Yes.

MS. LEVIN: There is a board resolution that relates to both Exhibits 10 and 11?

THE WITNESS: There's a board resolution authorizing me to represent the company 100 percent to deal with these issues. And my partner, Dr. Thropay, authorized me -- I have that document. I

have that resolution.

BY MR. REGENSTREIF:

**Q And then back to Exhibit 10.**

A If you need it, I can provide it.

**Q Back to Exhibit 10, which is the agreement of Overseas Chinese.**

**You were the only one on behalf of then Los Angeles County Proton Therapy to review and approve this Exhibit 10?**

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 12 a bank statement for Chase Bank account, last four, 6428, through October 2014, Bates-stamped SEC-JPMCB-P-187 through 192.

(SEC Exhibit 12 was marked for identification.)

BY MR. REGENSTREIF:

**Q This is Exhibit 12. Take a look. So Exhibit 12 is a bank statement.**

**It's the regional center bank account -- right? -- 6428?**

A Yes.

**Q So I want to ask about a couple of deposits. So on Page 1, the first one, the deposit**

**was a $50,000 deposit on October 1st, 2014.**
**Do you see that?**
A That's the first page, right?
**Q Yeah, right at the top.**
A The top. Okay.
**Q It says "transfer," and it's Xin Wang.**
**Is that your wife?**
A Yes.
**Q So she made a $50,000 deposit. And then carry over to the second page of Exhibit 12 at the top, she made two additional deposits on October 15 for $45,000 and $3,500.**
A Yes.
Which page?
**Q The second page at the top.**
A Yes.
**Q Do you know why she was making that deposit?**
A I think it was -- I think the original center at that time did not have sufficient funds, so I asked her to make a loan to the company.
**Q Was there a written loan document for that?**
A No, because she is my wife.
**Q But this is the regional center's business account.**

A Yes.
**Q So let's turn to Page 3 of Exhibit 12. Looking at the ATM --**
MS. LEVIN: Let's make sure we're all on the same page.
MR. REGENSTREIF: Yeah.
THE WITNESS: Page 3, right?
BY MR. REGENSTREIF:
**Q Yes, Page 3 or Exhibit 12 --**
A Yeah. Uh-huh.
**Q -- is ATM credit card withdrawals.**
A Uh-huh.
**Q So the second one down on October 6th is Caesars Palace for $10,400.**
A Uh-huh.
**Q What was that for?**
A That's for the -- you know, I had a group of visitors from China, so it's for entertainment.
**Q And so the following ones for Caesars on October 7 --**
A Yeah. We stayed there a couple of days.
**Q -- and then the 9th?**
A Three days, I think. I remember.
**Q Those were visitors?**
A Yeah.

**Q Who were those visitors?**
A Just potential clients.
**Q Clients, not investors?**
A Potential investors and clients, both.
**Q How many?**
A Five.
**Q Do you remember who they were?**
A Do I remember --
**Q Who the five people were?**
A They are from China.
**Q Yeah.**
A They are from China. They are not here.
**Q That's fine.**
**Do you know their names?**
A I can't remember.
MS. LEVIN: Did any of those five ultimately become EB-5 investors?
THE WITNESS: That, I don't -- I can't remember because there's other people I never met. They brought friends' friends. So in terms of names, I can't remember their names.
BY MR. REGENSTREIF:
**Q And Page 4, the next page of Exhibit 12, there are more electronic withdrawals.**
**Do you see that?**

A Could you say it again.
**Q That page you're on, Page 4 of Exhibit 12, there's a title that says, "Electronic Withdrawals."**
**Do you see that?**
A Yes.
**Q And then under that, there are payments -- at the top, there are payments to Chase credit card ending in 3763, and then one for a Chase credit card ending in 0571.**
**Do you see those two entries?**
A Yeah. That's my credit card.
**Q That's your credit card?**
A Yeah. I used my credit card to pay for business expenses.
**Q And that credit card is for business expenses?**
A Yes.
**Q And then also on that same page on October 2nd, there's a Barclaycard, U.S. credit card. There's a $5,000 withdrawal.**
**Do you see that?**
A That's my credit card, too.
**Q Is that also a business credit card?**
A I don't use often for business. It's my personal card, but I think I only used a few times.

But most of the time I used the other one ending in 3763 for business purposes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 13 a bank statement for a bank account from Chase, 5152, which is L.A. County Proton Therapy bank account, dated January 1, 2015 through January 30, 2015, Bates-stamped SEC-JPMCB-P 103 through 106.

(SEC Exhibit 13 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I handed you Exhibit 13. So this is a statement for Chase account 5152.**

**So that is Beverly Proton's bank account --**

A Uh-huh.

**Q -- is that right?**

A Yes.

**Q So this would be the account that received the loan from the EB-5 Fund?**

A Yes.

**Q So let me direct you to the second page of Exhibit 13. That second one, January 2nd, $50,025 withdrawal, and it's to Antonio Villaraigosa.**

A Yes.

**Q In that same description, there's the word**

"honorarium."
A Yes.
Q So is this the honorarium that was paid to former mayor Villaraigosa that we discussed earlier this morning?
A Yes.
Q And this came from the Beverly Proton account?
A Yes.
Q And then further down on the same page of Exhibit 13, on January 3rd, 2015, there's a wire transfer out for $200,000, it says, "to Overseas-Chinese Banking Corp., Singapore."
A Yes.
Q So is this Overseas Chinese Immigration Consulting that we were discussing before?
A Yes.
Q Do you know what this $200,000 payment was for?
A It's for the commissions and marketing fee, I think.
Q The marketing fee discussed in Exhibit 10, or is this the marketing fee separate in that other document that we don't have?
A It's for the document we talked about

today.

**Q So then the next wire out that same day, January 23rd, 2015, to Overseas-Chinese Banking Corp. for 150,000, is that also for fees related to successfully soliciting EB-5 investors?**

A Yes.

**Q And then again on January 27th for $225,000 out, it's "Overseas-Chinese Banking Corp."**

**Do you see that?**

A Yes.

**Q Is that also a brokerage fee for successfully soliciting EB-5?**

A Yes.

**Q So wires of this account 5152 to Overseas-Chinese Immigration is going to be these fees associated with soliciting EB-5 investors?**

A That is correct.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 14 a bank statement from Chase account 6428, April 1, 2015 through April 30, 2015. This is from the regional center bank account, Bates-stamped SEC-JPMCB-P 377 through 384.

(SEC Exhibit 14 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I handed you Exhibit 14.**
**So this, again, is from the regional center bank account; is that right?**
A Okay.
MS. LEVIN: And just for the record, ending in 428.
BY MR. REGENSTREIF:
**Q So the first page of Exhibit 14, that first deposit, April 1, 2015, for $45,050, is that an administrative fee from an EB-5 investor?**
A Yes.
**Q So they, the EB-5 investor, was directed to wire the $45,000 administrative fee directly to the regional center bank account?**
A That is correct.
**Q And, again, on Page 3 of Exhibit 14, ATM withdrawals on April 8th, there's a Caesars Palace charge for $1,905.**
**Do you see that?**
A Yes.
**Q And then again on April 8, there are two more, one of $2,602.95 and one of $2,082.95.**
**Do you see that?**
A Yes.
**Q What was that for?**

A It's the same -- it's for the trips, for our visitors and the clients.
**Q Let's turn to Page 4 of Exhibit 4, "Electronic Withdrawals."**
**You can see on April 3rd, there are a number of Anthem Blue premium payments.**
**What is that?**
A Yes. That's the insurance payment.
**Q Insurance payment for what?**
A For myself and also my family members.
**Q Now, at the bottom of the page, April 20th, the second to the last entry for $1,500.**
**Do you see that?**
A Which page?
**Q The same page we're on.**
A The bottom one?
**Q Yes, Page 4 of Exhibit 14.**
**Do you see that?**
A Yes.
**Q What's "Marianapolis Preparatory School," the second to last entry on April 20th?**
A That's for my son's boarding school.
**Q It's a payment to the boarding school?**
A Yes.
**Q And then again up on that same page, Page 4**

**of Exhibit 14, on April 14th, there are four American Express payments.**

A Uh-huh.

**Q What's that?**

A It's for travel. Sometimes I use American Express because the company does not have American Express card, so it's reimbursement of my travel expenses.

**Q And then on April 14 on that same page, there's a $15,000 charge to the Law Offices of Rachel Lew, and then it says "fee."**

A That's for the immigration -- one of the immigration lawyers.

**Q Immigration lawyer?**

A Yeah.

**Q And it also says "Kexin Wang."**
**Who is that? Do you know?**

A One of the investors.

MS. LEVIN: An EB-5 investor?

THE WITNESS: Yeah.

MS. LEVIN: Because before, we talked about EB-5 investors and other investors, so I just want to make sure.

THE WITNESS: Uh-huh.

MR. REGENSTREIF: I'm going to ask the

court reporter to mark as Exhibit 15 a bank statement from October 31, 2015 to November 30, 2015, Chase account 5152 which is Beverly Proton's account, and it is Bates-stamped SEC-JPMCB-P-158 through 161.

(SEC Exhibit 15 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I handed you Exhibit 15 which is a statement from October 31 through November 30, 2015 for Beverly Proton. And so on the second page of Exhibit 15, on November 2nd, at the top of the "electronic withdrawals" -- do you see that?**

A Uh-huh.

**Q -- there's a $50,000 withdrawal for Xin Wang.**

A Yeah.

**Q Xin Wang is your wife?**

A Yes.

**Q What was that for?**

A For the compensation.

**Q You said earlier today her compensation is $200,000 a year?**

A Yeah.

**Q And it's paid in $50,000 chunks?**

A Yeah.

MS. LEVIN: And how is that decided? Who decided that and how is it documented?

THE WITNESS: There is an employment agreement to reflect this.

BY MR. REGENSTREIF:

**Q For the regional center?**

A Yes, for the -- oh, this is Beverly Center.

**Q I'm sorry. Beverly Proton, yes.**

A Because she's recruited by the Beverly Proton Center, as I mentioned earlier.

**Q So there's an employment agreement between Beverly Proton and Xin Wang.**

A Yes.

**Q Do we have that?**

MR. GARTENBERG: You didn't ask for that, I don't think. I'll be happy to get it for you.

MR. REGENSTREIF: Great.

BY MR. REGENSTREIF:

**Q And, again, let me direct you now to an entry for a $250,000 wire on November 4th on that same page of Exhibit 15. And this wire is to "Industrial and Commercial Bank, Central Hong Kong."**

**Do you see that?**

A Yes.

**Q The reference there, it says "broker fees."**

**Do you see that?**
A Yes.
**Q What's that for?**
A That is for United Damei for the brokerage fee.
**Q So wires to Industrial and Commercial Bank?**
A Yeah. This is the bank name. It doesn't show that. I don't know why it doesn't show the company name.
**Q So wires to that bank are to the Damei account?**
A Yes.
**Q Then on November 12, 2015, there's a $3 million wire to Mevion?**
A Yes.
**Q So Mevion, we discussed this morning?**
A Yes.
**Q Mevion makes proton --**
A Therapy equipment.
**Q And what is this $3 million wire for?**
A It's for the deposit and down payment -- actually, what we call "phase one payment." We have a purchase agreement to reflect that. We'll be happy to provide it.
**Q Sure. And then right under that on**

**November 13, there's a $150,000 wire to a Wells Fargo account. It says, "Beneficiary: Xin Wang."**

A That's her compensation.

**Q That's her compensation? That's part of the salary from Beverly Proton?**

A Yeah.

**Q And then on 11/16 on that same page, there's an $85,600 wire to something called --**

A Oh, yeah.

**Q -- "Size X Studio."**

A That's the new architects and our project manager for the --

**Q The new site?**

A For the new site, for Mevion Systems.

**Q So we've got that. And then on that same page, November 24th, there's a $75,000 wire to Hang Seng Bank.**

**Do you see that?**

A Same page?

**Q Yeah, same page. "November 24th," three from the bottom.**

A Yeah. This is another brokerage firm.

**Q Do you know which one? It's not Hang Seng, right?**

A Hang Seng is a bank. It's called Delsk.

**Q Delsk. So we didn't mention Delsk this morning.**

**Who is Delsk?**

A Another brokerage firm. They also provide clients, you know, investors to us.

MR. GARTENBERG: I'm sorry, what date was that withdrawal?

MR. REGENSTREIF: That's November 24th, 2015.

THE WITNESS: That's a brokerage fee.

BY MR. REGENSTREIF:

**Q That's a brokerage fee?**

A Yeah.

MR. GARTENBERG: May I have a minute with my client?

MR. REGENSTREIF: Sure.

Let's go off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

BY MR. REGENSTREIF:

**Q So we were still looking at Exhibit 15.**

**So Hang Seng -- $75,000 was to Delsk --**

A Uh-huh.

**Q -- is that right?**

A Yeah.
MR. GARTENBERG: And just to add, what I've learned is that there -- I've learned there is some written agreement with Delsk that I was unaware of before. We'll get you a copy of that, but I've been told it's in Chinese.
MR. REGENSTREIF: Well, we're coming to that.
MR. GARTENBERG: Okay.
MR. REGENSTREIF: I appreciate that.
BY MR. REGENSTREIF:
**Q And then again at the bottom of that second page on Exhibit 15, that $250,000 wire to Industrial and Commercial Bank, that's the account for Damei, right?**
A Yes.
**Q And that would have been for -- a success fee?**
A Yes.
**Q Let me also ask: The second one there for $39,500, that's for John and Maricela Thropay.**
**That's Dr. Thropay; is that right?**
A Yes.
**Q A lease fee?**
A Yeah, land lease fee.

**Q For where the building was; is that right?**
A Yes.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 16 a three-page document, Bates-stamped PPEB5-419 through 421.
(SEC Exhibit 16 was marked for identification.)
BY MR. REGENSTREIF:
**Q I've handed you Exhibit 16 which looks like a letter to you, Mr. Liu, which is -- well, you'll confirm for me, Exhibit 16, is this Mandarin?**
A Yeah.
**Q And then there's English translation under it.**
**Have you seen Exhibit 16 before?**
A It's a letter sent to me in Chinese.
**Q They sent it to you in Chinese?**
A Yeah. They sent it to me in Chinese. In Chinese, not English.
**Q So you have not seen --**
A This is the first time I see the English one.
**Q But you have see the Chinese in Exhibit 16 before?**
A Yes.

Q And so can you tell me -- I don't need a forensic translation here -- but to your eyes -- and take your time -- is the English translation contained in Exhibit 16 under the Mandarin on top generally accurate?
A Sorry. I can't do.
You mean right away?
Q No, no. Not right away. Let's go through one at a time.
A If you give me a day.
Q Okay. That's fair enough. I don't speak Mandarin, so I thought I'd take my best shot.
A Sorry. I wish I could.
Q So let's go through and let me ask you some questions.
The first full paragraph in English, it says, as I read it, that "Hong Kong Delsk Business Company" -- that's Delsk; is that right?
A Yes.
Q -- "signed an exclusive sales agency agreement for the Chinese region on September 24th, 2014"; is that correct?
A Yes.
Q So they were the exclusive Chinese region sales agent for L.A. County Proton Therapy project

**after September 24, 2014?**

A Yeah, but they still -- does not include -- we had also agreement before we signed this agreement which allow the other agents we signed before to continue to do fundraising for our project.

**Q And then the next paragraph, it says, "There's a capital structure problem," and they request --**

A That's what it says.

**Q So what was that?**

A I don't know. I think it's bullshit. They try to accuse us because --

**Q So tell me what they said and why it's not accurate.**

A Let me tell you the story, the true story.

MR. GARTENBERG: But -- but -- I'm sorry. Lawyers get nervous when a question is put to you and you're about to tell a story. If the story is the direct answer to what he said, please answer it. If it's something else, I'd like to discuss it with you first.

Can you answer his question?

THE WITNESS: I think it's in terms of knowing the truth. I think I pretty much would like to tell Tony the background information.

MR. REGENSTREIF: You've got to ask Ed.
MR. GARTENBERG: Go ahead.
THE WITNESS: The owner of this company --
BY MR. REGENSTREIF:
**Q Delsk?**
A -- Delsk, he likes this project so much and he was trying to get rid of me, take over the project. And he approached my partner, Thropay, which I think was very unethical. I was very mad. And Dr. Thropay didn't even share that information with me. That was after I engaged in a conversation with City of Hope. So they worked together behind my back.
I just wanted to share that information.
**Q That's the background?**
A And they started to give me a hard time, you know.
**Q So Exhibit 16 is part of that hard time?**
A Yes.
**Q So the capital structure --**
A Why he got this copy obviously is through Dr. Thropay. I'm dealing with the client and brokers myself? Dr. Thropay is not supposed to have access to this kind of document. How did he get it? Think about it. They worked together against me. Just think about it twice.

**Q So that's basically the story of Exhibit 16?**

A They think they can bring their own clients and get rid of me and work with Dr. Thropay. That was the intention.

MS. LEVIN: So that was the November 3rd, 2015 meeting? Who was at that meeting?

THE WITNESS: November?

MS. LEVIN: It's the third English paragraph down on the first page of Exhibit 16. It says, "Both parties met again regarding the capital structure problem of this project on November 3rd, 2015."

THE WITNESS: Yeah. It was we had a number of meetings back and forth, you know. Arguing back and forth, each other.

BY MR. REGENSTREIF:

**Q You and --**

A And the Delsk representatives.

**Q You said the owner of Delsk likes the project.**

**Who is that?**

A Because he's the owner of the company.

**Q Who is that?**

A Mr. Wang. He's the owner. He controls 100

percent of that company. So all the employees, all the representatives are working under him. And he thinks he made an offer once -- well, not verbally, you know. Just trying to say, you know, he can put money in. I can get bought out.

But again, what made me very angry was he approached Dr. Thropay and Thropay's sister and brother-in-law, and they worked together behind the scene, behind my back.

MR. GARTENBERG: Did you ever reach an agreement with them after this letter?

THE WITNESS: No, no. And then they started giving me a hard time, you know, trying to dig all the problems of the project. "Oh, you have no equity." I just give you --

MR. GARTENBERG: Just answer his questions; okay?

THE WITNESS: But I think this is important, you know. It's important.

MS. LEVIN: And what's Mr. Wong's first name?

THE WITNESS: J-i-n-g.

MR. GARTENBERG: May I have a minute now?

MR. REGENSTREIF: Yeah. Sure.

Off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

I'm going to ask the court reporter to mark Exhibit 17. Exhibit 17 is a bank statement dated October 1, 2015 through October 30, 2015, Chase account ending in 5152, Beverly Proton, LLC, Bates-stamped SEC-JPMCB-P-149 through 152.

(SEC Exhibit 17 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I hand you Exhibit 17. So this is the account for Beverly Proton. I want to direct you to the second page of Exhibit 17 under "Electronic Withdrawals." So, again, October 2nd, 2015, that first electronic withdrawal for 450,000.**

**So that's Industrial and Commercial Bank -- you determined that's the broker's fees for Untied Damei?**

A Yes.

**Q So that's, again, one of those fees for successful EB-5 investors?**

A Yes, and marketing.

**Q And marketing.**

**Is there a list of EB-5 investors that**

**shows who United Damei solicited and who Overseas Chinese and who Delsk did?**

A We don't have that.

**Q You don't have that kind of list?**

A No.

**Q The investor list you provided to us, is there some way to determine whether they came from Damei or from Overseas or from Delsk?**

A I can do homework.

MR. GARTENBERG: We'll get back to you about that.

Just to remind you, any requests for documents or more information, we'll discuss it.

MR. REGENSTREIF: I will always go through Ed. I'm not going to get to you and ask for this. Ed knows the process. Don't worry, but I appreciate your diligence. Let's go on here.

BY MR. REGENSTREIF:

**Q So on Exhibit 17, Page 2, on October 7, 2015, there is a $90,000 wire to Xin Wang.**

**Do you see that?**

A Yes.

**Q What's that for?**

A That's for the compensation.

**Q That's for the compensation?**

A With the employment.

**Q Pursuant to that employment agreement?**

A Uh-huh.

**Q And then again on October 14, 2015, that $150,000 wire out to Hang Seng, that's the Delsk bank account?**

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 18 a bank statement from Chase, dated January 1, 2016 through January 29, 2016, account number, last four, 5152, Beverly Proton account, SEC-JPMCB-P-176 through 179.

(SEC Exhibit 18 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 18. I want to direct you to the second page, the exhibit, the last two withdrawal entries on that page, January 4th for $180,000. That's to you.**

**Do you see that?**

A Yeah.

**Q And then there's another one underneath January 8th to you for $150,000.**

**What was that for?**

A My compensation.

**Q And then carry over to the third page of Exhibit 18, again, on January 14th, there's another $100,000 transfer to you. And then under that on January 19th, there's a $350,000 to you. And then on January 21st and 25th, there are two more transfers to you, one for $90,000 and one for $180,000.**

**Do you see that?**

A Yeah. That's all part of my compensation.

**Q So this $1.05 million is your compensation?**

A Yes.

**Q So typically you receive it -- you don't get -- well, have you been paid since this from Beverly Proton?**

A I think so.

**Q Is there any disclosure to EB-5 investors about your salary?**

A You're not required to do that.

MR. GARTENBERG: He doesn't want you to argue.

THE WITNESS: I'm not arguing.

BY MR. REGENSTREIF:

**Q "Yes" or "no" is fine.**

A Sorry. This is my first time. I'm not used to this.

**Q That's okay.**

MS. LEVIN: That's okay. But you said you're not required to do that.

What is your knowledge based on?

MR. GARTENBERG: If that's based on attorney-client communication, just tell her it's based on attorney-client, but do not discuss anything further than that.

THE WITNESS: Yeah. It's based on the -- I consulted with attorneys.

MS. LEVIN: And which attorney did you consult with?

THE WITNESS: Michael Homier.

MR. GARTENBERG: May I have a minute with him because this is a delicate attorney-client -- I want to make sure we're not treading on attorney-client hereon.

MS. LEVIN: Sure, but I'm allowed to find out what attorney he talked to.

MR. GARTENBERG: I'm not questioning that you are. But as soon as we trip into attorney-client information from his volunteering something that I'm not really sure he should -- which was really not triggered by your question as much as by his volunteering, I want to make sure that we don't wind up with attorney-client spilling out any more than it

has already.

MR. REGENSTREIF: Okay. Off the record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

MR. GARTENBERG: Just so I can make a record, to the extent that Mr. Liu made any disclosure which might be deemed by somebody else's attorney-client, it certainly was not an intentional waiver of attorney-client. And I want to preserve whatever rights we can with respect to attorney-client, make clear that there's no intentional waiver.

MS. LEVIN: Okay. And can he tell me who counsel was?

MR. GARTENBERG: I think he responded to that already.

MR. REGENSTREIF: We missed it.

MR. GARTENBERG: Did the reporter get it?

THE COURT REPORTER: Yes.

(The reporter read back the record.)

MR. REGENSTREIF: What firm is he with?

MR. GARTENBERG: We can give you the contact information from Mr. Homier, if you need it, but there's no intentional waiver of any

attorney-client.

MR. REGENSTREIF: But what firm he is with is not privileged either.

MR. GARTENBERG: If he knows the name of the firm, he can give it to you. I'm was offering to go beyond what he knows. If you'd rather go on what he knows, that's fine.

THE WITNESS: I can tell you it's a big firm, leading firm.

MR. GARTENBERG: My intention is not to shut you down from information but to offer you more information.

MR. REGENSTREIF: Sure.

BY MR. REGENSTREIF:

**Q So Exhibit 18, on January 29, Page 3, there's a $50,000 wire to Greenberg Traurig.**

**Do you see that?**

A Yeah.

**Q What is that for?**

A It's attorney retainer fee for the construction.

**Q For the construction?**

A Yeah.

**Q The construction related to?**

A Related to the previous arrangement with

another big construction company.

**Q Skanska?**

A Yeah.

**Q That construction is not happening now?**

A Yeah. That's why we need an attorney.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 19 a withdrawal slip from Chase from account ending 5152, Bates-stamp SEC-JPMCB-P-168, and it's dated November 26, 2015.

(SEC Exhibit 19 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 19.**

**Is that your signature on it?**

A Yes.

**Q And it's for $160,000, a withdrawal from the 5152 account.**

A Yes.

**Q Do you know what that was for?**

A I can't remember. There's no -- we should have something attached to it. Based on this -- I write checks, I make payments almost every day. I don't know, but I can easily find out.

**Q But right now, you don't know?**

A No. Just based on this --

**Q Okay. Earlier this morning, you disclosed that you had an account at Chase.**
A Yes.
**Q If I said that the last four of that account was 3076, does that sound right?**
A Sounds right.
MS. LEVIN: That's a personal account?
THE WITNESS: Yes.
BY MR. REGENSTREIF:
**Q Let me ask: R. Allen Construction, what's that?**
A It's demolishing company.
**Q Are they the company that demolished the building?**
A Yes.
**Q Have they done any other work for you?**
A They finished the construction -- the demolishing work for me for the Thropay site, but they're also going to be the demolishing company for the site on the Beverly Hospital.
**Q The Beverly Hospital site that you're -- the second option?**
A Also signed agreement.
**Q Now, Optivus is another company that makes proton therapy equipment; is that right?**

A That was previous. This is the one more expensive.

MR. REGENSTREIF: So let me ask the court reporter to mark as Exhibit 20 a check dated November 25th, 2015 to Optivus.

(SEC Exhibit 20 was marked for identification.)

BY MR. REGENSTREIF:

**Q I handed you a check, the check in Exhibit 20, for $368,099.69. In the memo line, it says, "Pre-construction services."**

**What is that?**

A Yes. Yes. We hired them as the consultants on the technology side for half a million dollars, the total agreement. This is the remaining payment.

**Q Are they still involved now that you've gone with Mevion?**

A (Witness nods head.) Competitors.

MS. LEVIN: So the answer was "no"? You shook your head.

THE WITNESS: The answer is "no."

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 21 a check dated April 10, 2015.

(SEC Exhibit 21 was marked
for identification.)

BY MR. REGENSTREIF:

Q **I've handed you Exhibit 21.**
**It's to Licheng Zheng; is that right?**
A Uh-huh.
Q **Who is that?**
A He's our independent contractor. He's no longer with us. He was there with us for one year, so this is a monthly payment to him.
Q **Was he based in Montebello?**
A Montebello.
Q **He was in Montebello?**
A Uh-huh.
Q **And Lance was --**
A Based in Orange County.
Q **And Lance is still an independent contractor --**
A Yes.
Q **-- with the regional center?**
A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 22 a document dated December 28th, 2015, which is titled, "I-924A Annual Filing Supplement to Regional Center Designation."

(SEC Exhibit 22 was marked for identification.)

BY MR. REGENSTREIF:

**Q I've handed you, Mr. Liu, Exhibit 22. It's a cover letter from the law firm of Seyfarth & Shaw.**

**Do you recognize Exhibit 22?**

A Yes.

**Q Can you tell me what it is?**

A They are our legal counsel for the regional center.

**Q So they are handling the USCIS portion?**

A Yes, yes.

**Q So it's no longer Miller Mayer?**

A We're still using Miller Mayer --

**Q In addition to --**

A -- in addition.

**Q On Page 1 of Exhibit 22, it says that -- at the bottom there it says, "For the fiscal year ended September 30, 2015, the regional center reports that there were $4,086,906 in capital investment."**

**Do you see that?**

A Yes.

**Q And then there was an additional -- in the following period after September 30, 2015, there was an additional $3,239,174 in capital investment.**

A Yes.
**Q Can you tell me what constituted that 4 million fiscal year ended in September 30, 2015?**
A I should have a list somewhere.
**Q Sure. We'll get there. So then let's just go on.**
A Yeah. We paid a deposit for Mevion.
**Q Right, and we looked at that.**
A There's a list in the back.
**Q So Page 5 of Exhibit 22, that's your signature, the signature of the applicant?**
A Yes.
**Q So did you review and approve the information contained in Exhibit 22?**
A Yes.
**Q It's Part 3 of the form. At the bottom of the page, it's PPEB5-449.**
A Yes.
**Q So it says that the 4 million was construction industrial building.**
A Uh-huh.
**Q Does that help?**
A Yes, the aggregate EB-5 capital investment.
**Q So what does that entail?**
A What's included?

**Q Yes.**

A The down payment and deposit we paid to the new vendor, to Mevion.

**Q So why don't we go to the last three pages of Exhibit 22. It's the continuation sheet. So it says at the top of the page under Parts 1 and 3, it says that, "The regional center was changing its name to Pacific Regional Medical Center."**

**Has that happened yet?**

A Yes.

**Q Has that happened yet?**

A It was changed at the state level, but regional center has to be approved by USCIS. So at USCIS we have not heard from them, in terms of the name.

**Q So it's not completely approved yet?**

A From USCIS, it's not. From state government, yes.

**Q Understood. And then the chart at the bottom of that page in Exhibit 22, it says, "Included cost for job creation."**

**Do you see that?**

A Yes.

**Q So these are the descriptions of the expenses. So it says, "Construction of building,**

pre-construction work, hard or a soft cost." This one is listed as "soft."

What's a "hard" or a "soft cost"?

A The soft cost -- I learned that before. I didn't know that before. Soft cost means architectural, design, consulting. Hard cost means equipment, demolishing and reconstruction.

Q And these are all costs -- when you're saying the hard cost or a soft cost, these are all particular types of cost associated with the EB-5 --

A Yeah.

Q -- and the jobs created thereunder?

A It's a terminology used by the economist and approved for USCIS.

Q So those are terms that are specific to EB-5 funds?

A Yes.

Q Got it. So the pre-construction word "soft," which is what you described before, is about two-and-a-half million dollars --

A Uh-huh.

Q -- is that right?

A Yes.

Q And then, again, "consulting work by equipment vendor" is also a soft cost. It's another

nearly $500,000.
A Yes.
Q And then the following page, the second page of the continuation sheet of Exhibit 22, at the top, it's "hard, $158,763."
Was that the demolition?
A Yes.
Q And then, "architectural consulting, soft," for 171,000 and change.
A Yeah.
Q So that's the total -- then there's the total from that?
A Uh-huh.
Q That was for fiscal 2015?
A Yes.
Q And then substantially all of the funds paid after fiscal year 2015 were the $3 million deposit with Mevion?
A Yes.
Q And this 7 million plus represents the money paid by Beverly Proton as part of generating the jobs for the EB-5 program?
A Yes.
Q And that's all of the funds paid by Beverly Proton as generating the jobs in fiscal 2015, and

**then till the date of this filing?**

A Yeah. To the date of this filing, yes.

**Q Have there been any other funds like these, represented in a form like this, "Paid out by Beverly Proton," prior to fiscal 2015?**

A Could you elaborate?

**Q Yes. So has Beverly Proton spent any money on hard or soft costs or related expenses that are not contained in Exhibit 22 in this list we just reviewed in any other fiscal year?**

A Yes, because this is filed annually.

**Q Approximately how much?**

A A million.

MR. GARTENBERG: I'm sorry?

THE WITNESS: A-million-dollar range.

Think about the lease fee every month.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 23 a document titled, "Minutes of Annual Meeting of Members of Beverly Proton Center, LLC."

(SEC Exhibit 23 was marked for identification.)

BY MR. REGENSTREIF:

**Q I've handed you Exhibit 23.**

**Do you recognize Exhibit 23?**

A Yes.
**Q And so what is it?**
A This is an annual meeting for all the members of Beverly Proton Center, LLC conducted -- held on January 19, 2016.
**Q And it looks like in the minutes report, that you and Xin Wang, your wife, were appointed sole directors of the company; is that right?**
A Yes, starting from this date, that date.
**Q And it authorizes you as the managing member to execute documents, agreements and instruments?**
A Uh-huh.
**Q And you're the only one authorized to do that?**
A Yeah, because -- yes.
**Q And there are no other officers at this point at Beverly Proton?**
A No.
MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 24 a document titled, "Consent of Majority Member of Pacific Proton Therapy Regional Center, LLC."
(SEC Exhibit 24 was marked for identification.)

BY MR. REGENSTREIF:

Q Mr. Liu, I handed you Exhibit 24.
Mr. Liu, do you recognize Exhibit 24?

A Yes.

Q Is Exhibit 24 a consent by the regional center to make you the president and treasurer and chief financial officer of the regional center, and your wife as secretary; is that right?

A Yes.

Q And the two of you are the only officers of the regional center?

A That is correct, starting from that date.

Q Was Dr. Thropay ever an officer of the regional center?

A He was. I think he had a title, but never exercised it because I was also authorized to -- by the books I think he was included. But as a matter of fact, he also authorized me to act 100 percent. I have that document, too.

Q But starting from January 19, 2016, the only two officers are you and your wife?

A Yes.

MR. REGENSTREIF: I'm going to ask the court reporter to mark as Exhibit 25 a document titled, "Pacific Proton EB-5 Fund, LLC, Proton

Therapy Center Project, Supplemental Update to Business Plan, February 2016."

(SEC Exhibit 25 was marked for identification.)

BY MR. REGENSTREIF:

**Q Mr. Liu, I've handed you Exhibit 25. Do you recognize it?**

A Yes.

**Q And can you tell me what it is?**

A It's a revised business plan.

**Q And did you draft the business plan?**

A Legal counsel, not me.

**Q Did you provide legal counsel with the information contained in Exhibit 25?**

A Yes.

**Q And did you review Exhibit 25 --**

A Yes.

**Q -- and approve it?**

A Yes.

**Q And has Exhibit 25 been provided to any investors?**

A There's still a few.

MR. GARTENBERG: The question is --

THE WITNESS: No, no, no.

BY MR. REGENSTREIF:

**Q It has not been provided to any investors?**
A No.
**Q And is this part of the process of drafting the offering memorandum No. 3?**
A Yes.
**Q And so Page 1 of Exhibit 25, "It's management's position" is the last few lines of it. It's Page 1, "It's management's position that" --**
MR. GARTENBERG: Before we get too far down the road here, if this is a draft from --
This is a draft that your lawyers worked on?
THE WITNESS: Yes.
MR. GARTENBERG: Sounds to me like this is work product. I don't know how the SEC has work product from Pacific Proton Therapy Center.
Can you tell me?
MR. REGENSTREIF: No.
MR. GARTENBERG: Well, if it's work product, I'm not going to have him answer questions about work product. However, this has gotten into your hands, it's gotten into your hands without authority. And now you're on notice of it, so I'm asking for it back.
MS. LEVIN: Well, we don't -- you don't

even know if it's work product.

MR. GARTENBERG: It sounds like it. It sounds like it from the testimony. If this is a draft that counsel prepared -- let me ask him. Let me talk to him, because if it's a draft that counsel prepared -- I don't know who gave you work product for the EB-5 Fund.

MR. REGENSTREIF: Let me ask one question, not about that document. Not about this document.

MR. GARTENBERG: That's fine.

BY MR. REGENSTREIF:

**Q Did you send it to anyone, not an investor and who is not represented by that lawyer?**

MR. GARTENBERG: That's a good question. Perfect.

THE WITNESS: Delsk.

MR. REGENSTREIF: So I think that's waived, right?

MR. GARTENBERG: I need to make an inquiry, but probably.

MR. REGENSTREIF: Will you let him answer questions about that?

MR. GARTENBERG: Not until I talk to him outside.

MR. REGENSTREIF: So let's go off the

record.

(Counsel conferred with the witness.)

MR. REGENSTREIF: Let's go back on the record.

MR. GARTENBERG: Based upon the information that I've now -- kindly, thanks to the SEC -- have been able to inquire, it sounds to me like this was intended as work product, that an attorney drafted it, but that Mr. Liu took it on himself to send it to Delsk as a third party.

And accordingly I will withdraw my objection to your questioning about it and the demand that it's work product and properly obtained and inadvertently -- not improperly in the sense that the SEC has done anything improper, but possibly inadvertently obtained.

In any event, based on the information I have, I withdraw that. As I said on the record, I assume the Staff understands, under the circumstances, why I had to take the position before that I did.

MR. REGENSTREIF: Absolutely.

BY MR. REGENSTREIF:

**Q So now we'll ask some questions about Exhibit 25. So back to Page 1 of Exhibit 25.**

**It says, "It's management's position that updating a specific brand of equipment used or updating financial projections to match the change in medical pricing landscape do not constitute material changes from the proton therapy center project presented in May 2013."**

**So is that about the change from Optivus to Mevion?**

A Yes.

MR. GARTENBERG: May we just clarify one thing?

At this point, this is still a draft, correct?

THE WITNESS: This is a draft, not final, because the information needs to be filled in.

BY MR. REGENSTREIF:

**Q So it's a draft; is that right?**

A Yes.

**Q And it has not been shown to any investors or potential investors?**

A No, because it's not final.

**Q But this specific language that I read on Page 1 of Exhibit 25 relates from the change of Optivus to Mevion?**

A Yes.

**Q Now, regarding that, did you discuss that change with Dr. Thropay?**

A Yes.

**Q And what was his reaction to that?**

A At the beginning -- the truth was, at the beginning, he was okay. And later he was opposed to this idea. And then he particularly opposed to the management, the MOU I signed with City of Hope.

**Q So originally he was --**

A He was okay. He was okay. But later he said, "No. Don't do this. Do something else," you know. But now the original -- he was also opposed to the original vendor, which is Optivus, because the price is much higher.

**Q That's fine. Second page of Exhibit 25, it has the sources of funds. So I think we discussed earlier this morning the offering amount has been decreased to 120 million; is that right?**

A Yes. We discussed this.

**Q So this document contains that information, and that information is what we discussed this morning?**

A Yes.

**Q And now the EB-5 Capital, the goal is 60 million raised?**

A Yes.
**Q Now, it says here in the paragraph -- in the middle of Page 2, it says, "GCS Capital," in parens, "HA Company, Limited signed a memorandum of understanding dated September 28, 2015" --**
A Uh-huh.
**Q -- "regarding financing of $60 million towards the project."**
A Uh-huh.
**Q What is GCS Capital?**
A It's a private equity investment company in Hong Kong. They're interested in the equity investment.
**Q This would the non EB-5 portion?**
A Non EB-5. And then also interested in -- if we sign the final agreement with City of Hope.
**Q So they have an MOU, but there's not an agreement to fund?**
A Not yet. Not yet.
**Q And then, "Use of Funds" on Page 2, underneath it says, "Hard construction costs and soft costs" -- do you see that? -- and then "equipment" on Page 2?**
A Yeah.
**Q So is that hard and soft as we discussed?**

A Yes.
Q And so when you use the terms "hard cost" and "soft cost," you mean those EB-5 terms?
A Yes.
Q And then at the bottom of Page 2, you say, "Soft costs includes 5.8 million."
A Yeah.
Q And then on Page 5 of Exhibit 25, it says the address has been updated from 111 West Beverly Boulevard to 105 West Beverly.
A Yes.
Q So that 105 is the hospital land --
A Yes.
Q -- and not Dr. Thropay's land?
A Exactly.
Q Now, do you have to provide USCIS with these updates?
A Yes.
Q You do?
A Yes.
Q Have you provided USCIS with this?
A Yes.
Q And then the last page of Exhibit 25, it refers to the MOU with City of Hope.
A Yeah.

**Q So that MOU has been signed?**
A Oh, yeah.
**Q Is there more --**
A Lawyers are working on the definitive agreement.
**Q So that's in process, but that's not complete? It's simply still a Memorandum of Understanding?**
A Yes.
**Q So it's a process.**
A Yes.
MR. REGENSTREIF: Now is a good time for a break.
Let's go off the record.
(A brief recess was taken.)
MR. REGENSTREIF: Let's go back on the record.
BY MR. REGENSTREIF:
**Q Other than the documents I showed you during this proceeding, did you review any documents in preparation for your testimony today?**
A Did I review documents for the testimony today?
**Q And I don't want you to tell me that you talked -- anything that you talked about with your**

**lawyer, any privileged conversations. Just documents.**

A Documents.

**Q Did you review any documents?**

A Yes, I reviewed.

**Q And were there documents that you didn't review today that we reviewed?**

MR. GARTENBERG: Except to the extent I showed you anything -- I don't want you to disclose that. Except for what I showed you when we met, did you look at anything else?

THE WITNESS: No.

MR. GARTENBERG: On the record he has to hear that.

Is the answer "no"?

THE WITNESS: No.

BY MR. REGENSTREIF:

**Q And other than with your attorney, have you spoken with anyone about this investigation?**

A (Witness nods head.)

MR. GARTENBERG: He needs a verbal answer.

THE WITNESS: No.

BY MR. REGENSTREIF:

**Q And other than with your attorney, have you spoken with anyone about your appearance here today?**

A No.

**Q And has anyone suggested to you how you should --**

MR. GARTENBERG: He also had other counsel that he spoke to.

When you say, "your attorney," he's including not just me but --

MR. REGENSTREIF: His other lawyers.

MR. GARTENBERG: Right. He had another lawyer who referred him to me when he got the subpoena.

MR. REGENSTREIF: Okay.

MS. LEVIN: And who was that lawyer?

MR. GARTENBERG: I'm not sure that that's really relevant who he spoke to, to refer him to me.

MS. LEVIN: So was it just for --

MR. GARTENBERG: The other lawyer you spoke to about this investigation was simply to get the name of who you should hire, and he referred you to me?

MS. LEVIN: Okay. Yeah.

MS. LEVIN: I just wanted to confirm it was purely for referral purposes.

BY MR. REGENSTREIF:

**Q And so has anyone suggested to you how you**

**should respond to questions asked of you today?**

A No.

MR. REGENSTREIF: So at the moment I have no further questions for you at this time. I may, however, call you again to testify in this matter. And should that be necessary, we'll contact you through your lawyer.

Do you wish to clarify anything or add anything to the statements you've made here today?

THE WITNESS: No.

MR. REGENSTREIF: Counsel, do you wish to ask any questions?

MR. GARTENBERG: We reserve whatever rights -- and it's never quite clear to me what those rights are that we have -- to ask questions at a later time. But to the extent we have them, we reserve them.

MR. REGENSTREIF: And so we are off the record. Thank you.

(Whereupon, at 4:06 p.m., the examination was concluded.)

* * * * *

PROOFREADER'S CERTIFICATE

In the Matter of: PACIFIC PROTON THERAPY REGIONAL CENTER, LLC
Witness: Charles C. Liu
File Number: LA-04639-A
Date: Wednesday, March 23, 2016
Location: Los Angeles, California 90071

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

________________________ ________________________
(Proofreader's Name) (Date)