**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,**<br><br>**Defendants.** | **Case No.: SACV 16-00974-CJC(AGRx)**<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS LIU AND WANG** |

## I. INTRODUCTION

Defendant Charles C. Liu formed and controlled three corporate entities, Beverly Proton Center, LLC (“Beverly Proton”), Pacific Proton EB 5 Fund LLC (“PPEB5 Fund”), and Pacific Proton Therapy Regional Center (“Pacific Proton”) (together with PPEB5 Fund and Beverly Proton, “Corporate Defendants”), purportedly to build and operate a proton therapy cancer treatment center in southern California. Liu financed the cancer center with nearly $27 million dollars of international investment through the EB-5 Immigrant Investor Program.

Instead of pursuing proton therapy, Liu funneled over $20 million of investor money to himself, his wife Defendant Xin Wang, and marketing companies associated with them. Millions of dollars were transferred shortly after Plaintiff Securities and Exchange Commission (“SEC”) subpoenaed Liu as part of the SEC’s initial investigation in February 2016.

The SEC now seeks summary judgment against Liu and Wang. For the following reasons, the Court GRANTS the SEC’s motion. A judgment and permanent injunction shall issue forthwith.

## II. FACTUAL BACKGROUND

Liu used the EB-5 Immigrant Investor Program to ostensibly develop and run a proton cancer therapy center in Montebello, California. (*See* Dkt. 7 [hereinafter “Regenstreif Decl.”] Ex. 1 at 10, 14, 36; Dkt. 200-1 ¶ 9.) Through that program, foreigners can obtain permanent residency in the United States by investing at least $500,000 in a “Targeted Employment Area” and thereby creating at least ten full-time

jobs for United States workers.[1] (Dkt. 200-1 ¶ 5; *see also* Dkt. 81 at 2 n.3.) Investments are often administered by "regional centers," which are designated and approved by the United States Customs and Immigration Service ("USCIS") as EB-5 eligible projects. (Dkt. 200-1 ¶ 1.)

**1. Formation of Corporate Defendants and the EB-5 Offering**

Liu, along with his business partner Dr. John Thropay, formed three entities in 2010, Pacific Proton, PPEB5 Fund, and Beverly Proton,[2] to facilitate investment. (*See* Dkt. 200-1 ¶¶ 10, 11; Dkt. 150-1 Ex. 1 (Pacific Proton Operating Agreement); Regenstreif Decl. Ex. 5 [Private Offering Memorandum, hereinafter "POM"] at 475; Dkt. 81 at 2.) Ownership of Pacific Proton was originally split 75% for Liu and 25% for Dr. Thropay, (Regenstreif Decl. Ex. 4 [hereinafter "EB-5 Application"] at 149; Regenstreif Decl. Ex. 1 [hereinafter "Liu Questioning"] at 36); Beverly Proton was allocated the same way with Liu as Beverly Proton's President and Dr. Thropay as its CEO, (*see* Regenstreif Decl. Ex 8; POM at 464–65, 471). Pacific Proton was PPEB5 Fund's sole manager. (POM at 475–76, 456.)

On November 19, 2010, Liu and Dr. Thropay applied to USCIS to designate Pacific Proton as an EB-5 regional center. (EB-5 Application at 146.) Beverly Proton purportedly would develop and operate the proton therapy treatment center; it was the job-creating vehicle sponsored by Pacific Proton, the USCIS-approved regional center. (Dkt. 200-1 ¶¶ 11–13; *see also* Liu Questioning at 38.) The USCIS application estimated

---

[1] Under this program, foreign investors who make requisite capital investments in eligible commercial enterprises can file a I-526 Petition for conditional permanent residency status for a two year period. (Dkt. 200-1 ¶ 2.) Thereafter, the foreign investor can apply to have the conditions removed and live and work in the United States permanently. (*Id.* ¶ 6.)

[2] This entity was originally named Los Angeles County Proton Therapy, LLC. (Liu Questioning at 38.) It was renamed Beverly Proton Center, LLC, for branding purposes in 2015. (*Id.*) For clarity, the Court refers to it as Beverly Proton throughout this Order.

that the cancer treatment facility would create more than 4,500 new jobs and have an economic impact of $728 million per year. (*Id.*) USCIS approved Pacific Proton's application on June 28, 2012. (Dkt. 200-1 ¶ 14; Regenstreif Decl. Ex. 11.)

Pacific Proton, PPEB5 Fund, and Beverly Proton each played an important role in Liu's scheme. Foreign investors purchased shares in PPEB5 Fund, enabling them to petition USCIS for permanent residency in the United States. (Dkt. 81 at 2–3; Liu Questioning at 38.) Each share of PPEB5 Fund was $500,000 (the "Capital Contribution"); investors also paid a $45,000 "Administrative Fee" directly to Pacific Proton. (Dkt. 200-1 ¶ 37; Liu Questioning at 71; Dkt. 81 at 2; POM at 456; *see* EB-5 Application at 152.) Investing members of PPEB5 Fund had limited rights to participate in its management; Pacific Proton had "full, exclusive and complete authority, power, and discretion" to run it. (POM at 475–76, 456.) PPEB5 Fund loaned investor money to Beverly Proton to support the development of the proton therapy center. (*See* Dkt. 200-1 ¶ 47; Dkt. 81 at 3; EB-5 Application at 426–42 (Loan Agreement); Dkt. 84-1 (amended and restated loan agreement).)

From October 1, 2014, to April 2016, at least fifty investors purchased shares of PPEB5 Fund.[3] (*See* Dkt. 200-1 ¶ 34; Dkt. 16 [hereinafter "Pearson Decl. II"] ¶ 12; Liu Questioning at 42 (indicating forty seven or forty eight investors).) Their investment

---

[3] In total, USCIS received fifty eight I-526 Petitions for this project and approved eight. (Dkt. 148-1 Ex. 6 at 12.) Per Liu's EB-5 Application and the POM, investor Capital Contributions would initially be placed in escrow. (EB-5 Application at 163, 412–15 (Escrow Agreement); POM at 457.) Liu's EB-5 Application stated that the funds would be released upon USCIS' *approval* of an investor's I-526 petition. (EB-5 Application at 161, 163–64, 412.) Liu's POM, given to investors, however, stated that the funds would be released from escrow and loaned to Beverly Proton upon an investor's *filing* of their I-526 Petition. (POM at 474.) In addition, the EB-5 Application stated that if USCIS were to deny the investor's application, the Capital Contribution and half of the Administrative Fee would be returned to the investor. (EB-5 Application at 152.) The POM, however, stated that the entire Application Fee and Capital Contribution would be refunded in the event of USCIS denial. (POM at 456, 457.)

constituted $24,712,217 in Capital Contributions[4] and $2,255,701 in Administrative Fees. (Pearson Decl. II ¶ 12.) No non-EB-5 funds were raised for the project. (Liu Questioning at 43.)

The POM clearly delineated the purposes and legitimate uses of Capital Contributions and Application Fees. It stated that Liu and Corporate Defendants would use the entire Capital Contribution to create the proton therapy center. (*See* POM at 470 (“Other expected uses of [Capital Contributions] include construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the project.”); *id.* at 470 n.2 (“Offering expenses, commissions and fees incurred in connection with this Offering shall [not] be paid . . . from EB-5 Capital Contributions.”); *id.* at 468 (Beverly Proton “will use the [Capital Contributions] to partially finance the construction and operation of a proton therapy center.”).) In contrast, the POM explicitly stated that the Administrative Fee would be spent on, *inter alia*, offering expenses and marketing. (POM at 452 (“PPEB5 charges an administrative fee . . . for payment of expenses incurred in connection with this Offering.”); *id.* at 456 (Administrative Fee to “pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering.”); *id.* at 470 n.2 (same).)

**2. Liu’s Diversion of Funds**

Liu did not adhere to the POM. Instead, he diverted approximately $20 million of investor money to marketing companies, himself, and Wang.

---

[4] According to PPEB5 Fund general ledger, one investor had contributed a portion of the $500,000 prior to October 1, 2014 (the date at which Pearson, SEC’s expert, began analysis). (Pearson Decl. II ¶ 15.) If the ledger is accurate, then the total Capital Contribution would be $25,000,000, or fifty investments of $500,000. (*Id.*)

i. Marketing Companies

Payments were made of $12,924,500 to three overseas marketing companies: Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), Hong Kong Delsk Business Co., Ltd. ("Delsk"), and United Damei Group, United Damei Investment Company, Ltd., and/or Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"). (Dkt. 200-1 ¶ 97; Dkt. 212 ¶ 97.)

On March 8, 2013, Liu signed an agreement with Overseas Chinese to pay it $800,000 per year and $75,000 per successful investor. (Regenstreif Decl. Ex. 22; *see* Liu Questioning 85–89; Dkt. 15-2 Ex. 1.) Overseas Chinese received $7,722,000 from Corporate Defendants[5] and successfully solicited eleven investors. (Dkt. 200-1 ¶¶ 98, 100; Pearson Decl. II ¶ 49(a); *see* Liu Questioning at 91 (indicating four or five successful investors).)

In August 2013,[6] Liu signed an agreement with UDG promised to pay UDG $80,000 per investor, $500,000 immediately as a "document preparation fee," and $650,000 annually. (Regenstreif Decl. Ex. 28 § 2.1(a),(c)–(e); *see* Liu Questioning at 89–91.) UDG received $3,815,000 and successfully solicited ten investors. (Dkt. 200-1 ¶¶ 102, 104; Pearson Decl. II ¶ 49(b); *see* Liu Questioning at 91 (indicating successful solicitation of twenty investors).)

On September 24, 2014, Liu signed an agreement with Delsk to pay it $75,000 per successful investor. (*See* Regenstreif Decl. Ex. 27; Liu Questioning 136–37, 139–41.)

---

[5] Overseas Chinese returned $2,060,130 of this money. (Dkt. 6 ¶ 28.)

[6] Liu signed two identical contracts with UDG on August 13 and August 18, 2013. (*See* Regenstreif Decl. Exs. 23, 28.) Since the contract expressly supersedes all prior agreements, (*id.* § 8.1), the Court treats the August 18, 2013, contract as controlling.

(*Id.*) Delsk received $1,387,500 and recruited thirty seven successful investors. (Dkt. 200-1 ¶¶ 106, 108; Pearson Decl. II ¶ 49(c).)

ii. Liu and Wang

Liu received $6,714,580 from Corporate Defendants and Wang received $1,400,000 from Corporate Defendants, ostensibly as "salary." In 2012, Liu signed five-year employment agreements with Pacific Proton and PPEB5 Fund with annual salaries of $350,000[7] and $200,000, respectively. (*See* Regenstreif Decl. Ex. 15 (Pacific Proton-Liu agreement); *id.* Ex. 14 (PPEB5 Fund-Liu agreement).)

On January 19, 2016, Liu removed Dr. Thropay as Chief Executive Officer of Pacific Proton and elected himself as President and Treasurer and Wang as Secretary. (*See* Regenstreif Decl. Ex. 7.) The same day, Liu held a meeting of Beverly Proton with only himself in attendance at which he nominated himself and Wang as the sole directors. (*Id.* Ex. 8.) A few days later, on January 28, 2016, Wang signed a five-year employment agreement with Liu (acting for Beverly Proton), entitling her to compensation of $250,000 annually retroactively from January 2011. (*Id.* Ex. 9 at 495.) According to Liu, she had recruited investors since 2011. (Liu Questioning at 28–29; *see also* Regenstreif Decl. Ex. 2 (Wang Questioning) at 28, 33.)

In April 2016, two months *after* the SEC's February 4, 2016, subpoena and shortly following his March 23, 2016, questioning by the SEC, Liu signed a five-year employment agreement with Beverly Proton. (*See* Regenstreif Decl. Ex. 13 at 519; *id.* Ex. 18 (subpoena).) His annual salary was $550,000 retroactively from January 2011.[8]

---

[7] The Pacific Proton employment agreement also promised Liu a bonus of eight percent of total capital raised once there were twenty investors. (*See* Regenstreif Decl. Ex. 15 at 528; Liu Questioning at 33.)

[8] He was also promised a bonus of eight percent of total capital raised (with a maximum of $28,000,000). (Regenstreif Decl. Ex. 13 at 511.)

(*See* Regenstreif Decl. Ex. 13 at 511; *but see* Liu Questioning (stating on March 23, 2016, salary of $750,000 from Beverly Proton).)

The substantial majority of the money Liu and Wang directly received was transferred in 2016. Liu received $5,000 between October 1, 2014, and December 31, 2014; $1,389,580 in 2015; and $4,270,000 between January 1, 2016, and April 30, 2016). (Pearson Decl. II ¶ 20; *see also* Dkt. 200-1 ¶ 116; Dkt. 212 ¶ 116.) Wang received $50,000 from October 1, 2014, to December 31, 2014; $354,000 in 2015; and $996,000 in March 2016. (*Id.* ¶ 21; *see also* Dkt. 200-1 ¶ 117; Dkt. 212 ¶ 117.)[9]

Wang and Liu were also deeply connected to UDG, which was paid $3,815,000. (Dkt. 200-1 ¶¶ 102.) Wang's business card listed her as the chairman and the company website includes her picture as part of the management team. (Regenstreif Decl. Exs. 10, 32.) She is also identified in photos as UDG's president;[10] Liu referred to UDG as "my wife's company." (*See* Dkt. 59-1 Ex. 10 at 62, 64; *id.* Ex. 8 at 55.)

By all appearances, Wang's mother, Ms. Yao Wenli, signed the marketing agreement between UDG and Liu in August 2013 on behalf of UDG.[11] (*See* Regenstreif

---

[9] According to the Monitor, Liu and Wang received $10,878,545 ($8,034,567 in cash to Liu, $335,997 in expenses (including tuition, rent, insurance, utilities), $543,042 in credit card bills (all "with no identified business purpose"), $357,245 of casino-related expenses, and $1,607,694 in transfers to Wang or payments on her behalf). (Dkt. 146 at 9, Ex. B.) Additionally, over $225,000 was paid for the lease and/or purchase of seemingly more than one automobile, but the Monitor did not locate any vehicles or records related to them. (*Id.* at 9–10.)

[10] It is possible that the underlying Chinese word is variously translated as President and Chairman. (*See* Regenstreif Decl. Ex. 2 at 58 (Wang questioning).) Clarifying the particulars is unnecessary since the underlying point, that Wang is a senior controlling member of UDG, does not turn on whether she is President or Chairman.

[11] When confronted with the contract by the SEC in March 2016 as part of his investigatory testimony, Liu claimed to have never spoken to Ms. Yao and that he did not know who she was. (*See* Liu Questioning at 117–18.) Wang stated it was impossible for her mother to work for UDG, since she lived with Liu and Wang raising and taking care of their children. (Regenstreif Decl. Ex. 2 at 50–52.) Ms. Yao does not speak or read English, the language of the contract; she denied signing it. (Regenstreif

Decl. Ex. 23 at 594.) UDG's public listing on the Chinese Government's website for Chinese companies named Ms. Yao as the person with ownership interest, UDG's executive director, and a shareholder until May 19, 2016. (Dkt. 59-1 Ex. 11 at 68 ¶¶ 6–8, 82–83.) The same listing stated that Wang was UDG's manager until May 19, 2016. (*Id.* at 68 ¶ 8(e).) The individual who is currently listed as UDG's Supervisor is Liu's assistant. (Dkt. 59-1 Ex. 11 at 68 ¶ 9.)

**3. State of the Proton Therapy Center**

Despite significant investment, nearly no construction on the proton therapy center has taken place. Instead, Liu burned through the millions left after payments to himself, Wang, and the marketers on half-hearted attempts to convey the illusion of progress.

The original planned site of the project was land owned by Dr. Thropay. (Dkt. 37 ¶ 19.) On April 17, 2013, Beverly Proton signed a thirty year lease with Dr. Thropay with rent of $1,000,000 per year. (*Id.* Ex. 13.) The existing building on the land was only demolished in mid-2015. (Liu Questioning at 57–59.) According to filings, Beverly Proton spent $315,487 improving Dr. Thropay's property and paid him $838,500 in rent. (Dkt. 37 ¶¶ 19, 22; *id.* Exs. 12, 14.)

However, in 2015, Liu decided to pursue a partnership with the City of Hope cancer hospital which would preclude Dr. Thropay's involvement in the project. (Liu Questioning at 47; Dkt. 37 Ex. 7 (copy of Memorandum of Understanding between City of Hope and Beverly Proton).) As a result, Dr. Thropay sought to cancel the lease and

---

Decl. Ex. 3 at 8–9, 17–18.) Liu later submitted a correction to his testimony admitting that Ms. Yao is his mother in law, though he stated he does not believe she signed the contract. (*Id.* Ex. 19.)

reclaim the property, (Dkt. 37 ¶ 22);[12] Liu subsequently had to explore a second location for the center. (Liu Questioning at 57–59.)

Liu paid Optivius, a California proton therapy unit manufacturer, $368,100 for consulting services to design the center based on Dr. Thropay's property and an Optivius proton therapy machine. (Dkt. 6 ¶ 20(f); Liu Questioning at 15–16, 61, 153–54.) However, Liu later decided to purchase a Mevion proton therapy machine instead; he made a $3 million deposit in November 2015. (Dkt. 146 at 11; Liu Questioning at 136; *see* Regenstreif Decl. Ex. 21; Dkt. 31 Ex. 3 at 5 (Liu stating at SEC questioning that no investor solicitation had taken place since November 2015).) Liu then retained an entirely different architectural firm to design the center on the second location for a Mevion unit. (*See* Liu Questioning at 61, 136.) Unsurprisingly, no construction permits were ever obtained. (*Id.* at 60.)

**4. Procedural History**

On February 4, 2016, the SEC subpoenaed Liu to provide records and testimony. (*See* Regenstreif Decl. Ex. 18.) On May 26, 2016, the SEC filed the operative Complaint, naming Beverly Proton, Pacific Proton, PPEB5 Fund, Liu, and Wang as Defendants and alleging three counts of securities fraud. (Dkt. 1.)

Simultaneously, the SEC filed an *ex parte* application for a Temporary Restraining Order ("TRO") and an Order to Show Cause why a preliminary injunction should not be granted. (Dkt. 4.) Following a hearing on May 27, 2016, the Court issued a TRO and Order to Show Cause on May 31, 2016. (Dkts. 11, 14.) The SEC had sought repatriation

---

[12] Dr. Thropay initiated an unlawful detainer proceeding against Beverly Proton and Liu on May 16, 2016. (Dkt. 65 Ex. 1.) Those proceedings are stayed pending the outcome of this case. (Dkt. 146 at 7; Dkt. 65 Ex. 4 at 121–22.)

and accountings in their *ex parte* TRO, which the Court denied. (*Compare* Dkt. 4 at 4, Dkt. 4-1 at 6–7 *with* Dkt. 14.)

On June 3, 2016, the SEC filed a motion asking the Court to order the Defendants to provide accountings of their assets and repatriate assets held in foreign locations by them and by UDG. (Dkt. 15 at 1.) On July 1, 2016, the SEC moved for the Court to appoint a monitor over Corporate Defendants. (Dkt. 63.)

On July 11, 2016, following a hearing, (Dkt. 101), the Court issued a preliminary injunction against all defendants, (Dkt. 77). The preliminary injunction echoed the TRO's provisions. (*See id.* at 1–7.) That same day, the Court appointed a monitor, Michael Grassmueck, over Corporate Defendants. (Dkt. 79.)

At the July 11, 2016, hearing, the Court emphasized that constitutional rights may be implicated by the preliminary injunction and the SEC's desire to have the Monitor interview Liu and Wang.[13] Perhaps inspired by the Court, on July 26, 2016, Liu and Wang filed a motion seeking permanent relief from the Court-ordered repatriation, document production, and accounting based on their Fifth Amendment rights. (Dkt. 108.) Following briefing, (Dkts. 116, 119, 121, 160, 161), and a hearing on October 7,[14] 2016, the Court denied Liu and Wang's motion in substantial part and issued an amended preliminary injunction on October 17, 2016, (Dkts. 173, 179).

---

[13] Contemporaneous with Liu and Wang's advancement of their Fifth Amendment arguments, Liu and Wang both moved to dismiss the case for lack of jurisdiction on July 12, 2016. (Dkts. 81, 86.) Following briefing (Dkts. 113, 115 (SEC oppositions); Dkts. 122, 123 (Liu and Wang replies)), the Court denied those motions on August 17, 2016, (Dkts. 140, 141).

[14] The hearing was originally set for August 22. (*See* Dkt. 108.) On August 9, Liu and Wang filed an unopposed *ex parte* application to continue the hearing to September 12, (Dkt. 126), which the Court granted, (Dkt. 137). The parties then stipulated to continue the hearing to September 19. (Dkts. 142, 147.) The parties then stipulated again to continue the hearing, which was reset to October 7. (Dkts. 157, 158.)

The amended preliminary injunction ordered Liu and Wang to repatriate $26,967,918 by November 18, 2016. (Dkt. 179 § VIII.) Repatriation was ordered because, as of June 3, 2016, Corporate Defendants had only $234,899.19 in their accounts,[15] (Dkt. 163 ¶ 27), and the SEC's investigation revealed that Liu repeatedly transferred millions of dollars from his domestic accounts to China Merchants Bank, (Pearson Decl. II ¶¶ 46, 48).[16]

The amended preliminary injunction also set a hearing for November 4, 2016, at which Liu and Wang were ordered to appear and be examined "as to their financial condition and affairs" and at which Liu and Wang were welcome to assert their Fifth Amendment rights. (Dkt. 179 § X.) Citing a medical emergency precluding travel to the United States, on October 28, 2016, Liu and Wang filed an *ex parte* application to continue the November 4, 2016, hearing to January 6, 2017, and the repatriation deadline from November 18, 2016, to fourteen days after the hearing. (Dkt. 184.) Following briefing, (Dkts. 185, 186), on November 1, 2016, the Court granted their application in limited part, ordering Liu and Wang to appear for a videoconference deposition within ten days. (Dkt. 187.) The repatriation deadline of November 18, 2016, remained unchanged. (*Id.*)

Liu and Wang's depositions occurred on November 10 and November 9, respectively. Liu asserted his Fifth Amendment right and refused to answer many

---

[15] The Monitor reports that the aggregate cash held by Corporate Defendants as of October 4, 2016, was $244,844. (Dkt. 168 at 5.)

[16] Liu transferred $3,750,000 to China Merchants Bank between April 2015 and April 2016—$500,000 in October 2015 from PPEB5 Fund account and the balance, $3,250,000, from his personal account in nine large transfers between February 26, 2016, and April 5, 2016. (Dkt. 15-1 at 6 (citing Pearson Decl. II ¶¶ 46, 48).) For example, on March 11, 2016, a day after taking $1.8 million from PPEB5 Fund and Beverly Proton accounts, Liu transferred $750,000 to China Merchants Bank. (*See* Pearson Decl. II ¶ 48(d).) Then, the day after Liu's March 23, 2016, SEC testimony, he made a lump-sum transfer of $250,000 from his personal account to a China Merchants Bank account. (*See id.*; Liu Questioning.)

questions,[17] including (1) did Pacific Proton investors have an expectation of profit, (2) were offering proceeds intentionally not used or expended consistently with the POM, (3) should he have known, under a reasonable standard of care, that the descriptions of how proceeds would be used in the POM were false, and (4) did he engage in a scheme to misappropriate investor funds by failing to disclose the true uses of the funds. (Dkt. 199-2 Ex. 4 at 78–93; Dkt. 194-2 Ex. 2; Dkt. 208 Ex. 3.)

Wang also asserted her Fifth Amendment right and refused to answer many questions, including: (1) did she control any accounts of Corporate Defendants at any time, (2) did she engage in a scheme to misappropriate investor money by failing to disclose to investors the true use of their money, and (3) did investors have an expectation of profit. (Dkt. 199-2 Ex. 5 at 97–107; Dkt. 194-2 Ex. 3; Dkt. 208 Ex. 2.)

Liu and Wang failed to comply with the Court's repatriation order. (*Id.* ("Counsel have advised the SEC that defendant Liu is attempting to obtain loans in China in order to settle this case and repatriate funds to the Monitor.").) Shortly thereafter, the Court directed Liu and Wang to show cause why they should not be held in civil contempt for (1) failure to respond to the Government's interrogatories and requests for admissions,[18] (2) refusal to answer questions regarding their finances, and (3) failure to comply with

[17] In the interest of brevity, a full summary of the interrogatories and deposition questions to which Liu and Wang asserted their Fifth Amendment rights is appended to this Order.

[18] These were originally due November 21, 2016. (Dkt. 199-1 Exs. 1, 2, 6, 7.) At Liu and Wang's request, the SEC extended the deadline to December 2, after Liu and Wang requested a forty-five day extension. (Dkt. 214-1 ¶ 3; Dkt. 194-2 Ex. 6.) Neither Liu nor Wang timely answered or objected to the requests for admission and interrogatories, nor were answers or objections served as of January 23, 2017. (Dkt. 214-1 ¶ 3.) Liu and Wang argue that the Court should not deem the SEC's requests for admissions admitted even though they failed to comply with Federal Rule of Civil Procedure 36(a)(3) by not responding to them. (Dkt. 211 at 19–20.) The Court does not rely on any of the requests for admission in its analysis.

this Court's orders, including repatriation. (Dkt. 196.) The SEC filed the instant motion for summary judgment on January 4, 2017. (Dkt. 199.)[19]

After briefing was received, (Dkts. 207, 211, 214), at a hearing on February 6, 2017, the parties represented that settlement could be imminent. Accordingly, the Court converted the monitorship into a receivership, held the order to show cause regarding civil contempt and the SEC's motion for summary judgment in abeyance for three weeks, and ordered supplemental briefing as to civil penalties. (*Id.*; Dkt. 219.) The parties filed a joint stipulation for leave to escrow potential settlement funds on February 24, 2017; the deadline set was March 17, 2017. (Dkt. 223.)

On March 20, 2017, the SEC filed a status report indicating that, despite Liu and Wang's agreement to transfer $26,967,918, they failed to do so and accordingly asked the Court to rule on its pending summary judgment motion. (Dkt. 235.) Liu and Wang filed a statement the following day in which their attorney stated, "Counsel are advised by Defendant Liu that despite diligent efforts to make arrangements for transfer of the settlement funds by on or before March 17, 2017 (and a last-minute agreement by the SEC to accept an irrevocable letter of credit issued to the firm of Defendants' counsel on or about March 20, 2017), and further communications between counsel and Defendant Liu up to about 12:37 p.m. EDT today, Defendants are unable to transfer the settlement funds without the grant of additional time. . . . Accordingly, Counsel for Defendants hereby advise the Court that we do not oppose the request by the SEC (Docket No. 235) for the Court to decide the pending and fully briefed summary judgment motion based upon the papers previously submitted by the parties." (Dkt. 236 at 1–2.)

---

19 Liu and Wang filed an *ex parte* application for an extension of time to respond to the motion on the grounds that settlement discussions were ongoing. (Dkt. 204.) The Court denied their motion. (Dkt. 206.)

## III. LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 325. A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325. Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the

moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The Court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## IV. DISCUSSION

Before the Court is the SEC's motion for summary judgment against Liu and Wang. (Dkt. 199.) The Court's analysis addresses Liu and Wang's threshold challenge

to the SEC's motion, then considers the SEC's claims against Liu and Wang, and finally turns to the SEC's request for remedies.

### 1. Threshold Issue

Liu and Wang raise a threshold argument that federal securities law does not apply to the EB-5 investments in this case. (*See* Dkt. 211 at 14–17.) Liu and Wang are attempting to revive their previously-asserted argument that the EB-5 investments are not securities and accordingly the securities laws do not apply. (*Cf.* Dkts. 81, 86.)

"Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). "To that end, it enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment." *Id.* Both the Securities and Exchange Acts define "security" as meaning, among other things, "any . . . investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). An investment is an investment contract if it is (1) an investment of money (2) in a common enterprise (3) with the expectation of profits (4) generated from the efforts of others. *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946); *see also* Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

Liu and Wang's argument challenges the applicability of the third prong. They argue that there is not an expectation of profits because EB-5 investors "may put . . . money at risk, even if [they] expect[] a loss, so long as [they] get [their] green card and U.S. citizenship." (Dkt. 211 at 16; *see id.* at 17 ("Capital contributions made by EB-5 investors to acquire a green card are not securities as defined by federal law. They are the price paid by foreign citizens in exchange for being granted permanent residency in the United States.").)

Contrary to Liu and Wang's argument, "while the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, [the Court] must focus [its] inquiry on what the purchasers were offered or promised." *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). The POMs refer to the investments as securities, specify the interest rate PPEB5 Fund will earn on Capital Contributions loaned to the project LLCs, and describe investors' return on investment. (*E.g.*, POM at 452.) As this Court previously stated, investors expected profits, albeit small ones. (Dkt. 139 at 8; *see also* POM at 466 (stating that "the primary motive of investors should be for long-term appreciation").) Furthermore, "nobody would dispute that EB-5 investors are motivated in significant part by obtaining lawful permanent residency in the United States. But the fact that the acquisition of EB-5 shares comes with unrelated benefits does not somehow convert the shares from securities into something else." (Dkt. 139 at 10 (citing *S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.3d 459, 464 (9th Cir. 1985) (investors had expectation of profits even though the investment was 'promoted primarily for the tax benefits which would accrue as a result of anticipated initial losses')).) Accordingly, securities laws applies to PPEB5 Fund offering and Liu and Wang's conduct.

**2. Securities Fraud Claims**

The SEC's Complaint alleges three securities fraud causes of action against Liu and Wang: (1) violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1),(2),(3), (Dkt. 1 ¶¶ 122–25); (2) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a),(c), (*id.* ¶¶ 126–30); and (3) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b), against Liu only, (*id.* ¶¶ 131–35). As the Court finds that the SEC is entitled to summary judgment on its Section 17(a)(2) of the Securities Act claim against Liu and

Wang, which is a sufficient basis for the remedies the SEC seeks, it is unnecessary to reach the SEC's other claims.

Section 17(a)(2) of the Securities Act prohibits "any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). Liu and Wang need not make or omit the untrue statement to be liable. *See Sec. & Exch. Comm'n v. Husain*, No. 216CV03250ODWE, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017).

There is no dispute that Liu and Wang received $6,714,580 and $1,538,000 of investor monies. (Dkt. 200-1 ¶¶ 116–17; Dkt. 212 ¶¶ 116–17.) There is also no dispute that UDG received $3,815,000. (Dkt. 200-1 ¶ 121; Dkt. 212 ¶ 121.) In addition, the parties agree that the POM states that "[o]ffering expenses, commissions, and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions." (Regenstreif Decl. Ex. 4 at 470 n.2; Dkt. 200-1 ¶ 51; Dkt. 212 ¶ 51.) Capital Contributions, in contrast, were to be used "to finance development and operation" of the proton therapy center. (Regenstreif Decl. Ex. 4 at 470; Dkt. 200-1 ¶ 48; Dkt. 212 ¶ 48.)

Liu and Wang argue that they cannot be liable for violations of Section 17(a)(2) because there were no untrue statements or omissions in the POM. Liu and Wang are wrong. Their actions contravene the POM's clear delineation between appropriate uses of Capital Contributions (development and operation of the project) and Administrative Fees (commissions, fees, and marketing). Liu reached agreements with marketers that inherently violated the POM. Liu promised Overseas Chinese $800,000 per year and $75,000 per investor and he promised UDG $650,000 annually and $35,000 per investor.

(*Id.* Ex. 22 at 581; Ex. 23.) It is *impossible* for those payments to not include an investor's Capital Contribution, since the Administrative Fee was only $45,000. Indeed, marketers received $12,924,500. (Dkt. 200-1 ¶ 97; Dkt. 212 ¶ 97.)

Liu also failed to inform investors that he would award himself and Wang "salaries" totaling $6,714,580 and $1,538,000. (Dkt. 200-1 ¶¶ 116–17; Dkt. 212 ¶¶ 116–17.) In the context of the marketing agreements that account for more than 100% of the Administrative Fees, any compensation, and certainly such exorbitant remuneration, would have to come from Capital Contributions, not Administrative Fees. That fact is wholly absent from the POM's description of Capital Contributions.

Liu and Wang argue that their compensation and the marketing fees do not render the POM untrue, relying on the POM's statements that estimated uses of Capital Contributions "are based on current information . . . which could change as the Project moves forward" and that PPEB5 Fund has "broad discretion to adjust the . . . allocation of the proceeds of this Offering in order to address changed circumstances and opportunities." (Dkt. 211 at 7–8 (citing POM at 470).) Their argument is unavailing. As a threshold matter, Liu and Wang do not identify a single "changed circumstance," let alone one so radical that could excuse over 75% of funds going to Liu, Wang, and marketers. Fundamentally, residual acknowledgement that PPEB5 Fund had some limited discretion to adapt to unforeseen future circumstances does not negate the entirety of the POM, which conveys to investors that their investments will be used in a manner compliant with the EB-5 program and in furtherance of the proton therapy project. Liu and Wang's ignoring the plain language of the POM and appropriating investor funds for exorbitant personal enrichment, (*see* POM at 456 (stating that PPEB5 Fund's manager is

entitled to a management fee of 3%, or approximately $800,000 total), and enticing additional investors renders the terms of the POM untrue.[20]

Liu and Wang also argue that the Court cannot determine on summary judgment whether any untrue statements or omissions were material because materiality should be left to the trier of fact. (Dkt. 211 at 11.) A fact is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). While the Supreme Court has recognized that materiality determinations require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," thereby rendering materiality a task suited to the jury, it also acknowledged that materiality can be resolved as a matter of law when established omissions are "so obviously important to an investor[] that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (quotation omitted). This is just such a case. No reasonable investor would consider $21 million—approximately three quarters of the $27 million invested—going to Liu, Wang, and marketers insignificant on their investment decision.

Liu and Wang's argument that EB-5 investors would not find such misappropriation to be material because they care only about their visas, (Dkt. 211 at 12–

---

[20] Liu and Wang's argument that investors were advised that their investment would be used to market the project is entirely frivolous and does not create a genuine dispute of material fact. (Dkt. 211 at 8.) The support for that argument is a particularly convoluted portion of Liu's deposition in which he admitted that such advisement was not contained in any written materials and that he believed brokers who sought out investors had been advised of the marketing use of proceeds, though he did not actually tell the brokers that fact. (Dkt. 211 Ex. 1 at 106–09.) Needless to say, there is no genuine dispute of material fact that investors were not in any way informed that their Capital Contributions would go to marketers tasked with enticing additional investors.

13), is also unavailing. Such vast misappropriation is fundamentally inconsistent with the EB-5 program and would drastically undermine the project's viability and therefore threaten investors' ability to obtain visas. (*See* Dkt. 221 Ex. 1 (USCIS termination of Liu's EB-5 offering).) Therefore, there is no genuine dispute that any reasonable EB-5 investor would deem the omissions and misrepresentations in the POM material.

Finally, the SEC must show that Liu and Wang were negligent in order for them to be liable under Section 17(a)(2). *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). The touchstone of negligence is the departure from the standards of ordinary care. Liu and Wang's receipt of millions of dollars of investor funds was unequivocally negligent. No reasonable party managing the development of a EB-5-compliant proton therapy center in accordance with the representations made to investors would allow construction to languish while funneling millions of dollars to themselves, to foreign entities they controlled,[21] and to foreign entities tasked with enticing more investors.

Summary judgment is GRANTED in favor of the SEC as to their Section 17(a)(2) claim against Liu and Wang. As that violation is sufficient to trigger imposition of the remedies the SEC seeks, it is unnecessary to consider the SEC's remaining claims against them.

---

[21] Liu and Wang contest whether they controlled at least one of the UDG entities. (*See* Dkt. 212 ¶¶ 62–64.) However, both asserted their Fifth Amendment rights when asked whether either of them control or have controlled UDG or have the authority to direct its decision-marking on its management, operations, and policies. (Dkt. 199-2 Ex. 4 at 80–83; *id.* Ex. 5 at 97–99.) An adverse inference from those statements—that they control UDG—is appropriate given that the SEC has produced numerous pieces of evidence, discussed above, to that effect. There is also a substantial need for information about UDG and there is not another less burdensome way of obtaining it. *See Doe ex rel. Rudy–Glanzer v. Glanzer*, 232 F.3d 1258, 1264–65 (9th Cir. 2000). Finally, the fact that Wang self-servingly claimed in her first deposition to not be the chairman UDG, (Regenstreif Decl. Ex. 2 at 59), does not create a genuine dispute of material fact given the extensive evidence presented by the SEC and her subsequent refusal to answer questions about her relationship with UDG. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

**3. Remedies**

The SEC's motion asks the Court to permanently enjoin Liu and Wang, order them to disgorge their ill-gotten gains and pay prejudgment interest, and impose civil penalties. (Dkt. 199 at 19–25.) Liu and Wang do not object to prejudgment interest, (Dkt. 221 at 17), so the Court considers the other remedies in turn.

i. Permanent Injunction

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), authorize permanent injunctions where there is a reasonable likelihood of a future violation of the securities laws. *S.E.C. v. Murphy*, 626 F.2d 633, 639 (9th Cir. 1980); *U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996). Factors to be considered include "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations." *Fehn*, 97 F.3d at 1295–96 (quoting *Murphy*, 626 F.2d at 655).

The totality of the circumstances support imposition of a permanent injunction prohibiting Liu and Wang from engaging in any further EB-5-related investor solicitation. There is overwhelming evidence that Liu and Wang acted with a high degree of scienter. Liu set up various corporate entities, all under his control, and expended extensive effort over several years to have the Corporate Defendants qualify under the EB-5 investor program. (*See* Dkt. 200-1 ¶¶ 12–14; Dkt. 212 ¶¶ 12–14.) After Liu reorganized Pacific Proton Beverly Proton to marginalize Dr. Thropay and elevate himself and Wang, Liu and Wang signed employment agreements entitling them to exorbitant retroactive salaries. (Regenstreif Decl. Exs. 7, 8, 9, 13.) Liu's personal bank

account received numerous transfers of funds from the Corporate Defendants, and transferred significant sums were immediately thereafter transferred to Wang, foreign bank accounts, and accounts associated with United MPH Ventures, Liu's holding company. (Pearson Decl. II ¶¶ 27–29.) Wang's personal bank accounts also received repeated transfers of funds from the Corporate Defendants and disbursed funds to Liu, United MPH Ventures, and to cover personal expenses, including school tuition and real estate. (*See id.* ¶¶ 32–39.) Liu personally met with investors, Wang gave speeches encouraging investment, and they organized and attended a meeting in Beijing in 2015 with approximately 200 people to solicit investors. (Dkt. 200-1 ¶¶ 59–61; Dkt. 212 ¶¶ 59–61.)

Liu and Wang's high degrees of scienter are further confirmed by adverse inferences based on their assertion of the Fifth Amendment in their depositions. "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). The Ninth Circuit has delineated that, since there is "tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding," adverse inferences may only be taken when certain conditions are met. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264–65 (9th Cir. 2000). Specifically, courts must "analyz[e] each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation. . . . In each particular circumstance, the competing interests of the party asserting the privilege[] and the party against whom the privilege is invoked must be carefully balanced. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side. In that light, no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome

way of obtaining that information." *Id.* at 1265 (quotation omitted); *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911–12 (9th Cir. 2008); *S.E.C. v. Jasper*, 678 F.3d 1116, 1125–26 (9th Cir. 2012). In addition, "an adverse inference can be drawn [only] when silence is countered by *independent evidence* of the fact being questioned." *Glanzer*, 232 F.3d at 1264 (emphasis in original).[22]

In their depositions, Liu and Wang asserted their Fifth Amendment rights and refused to answer the question "Did you engage in [a scheme to misappropriate Pacific Proton investor funds] with fraudulent intents?" (Dkt. 208 Ex. 3 at 86; *id.* Ex. 2 at 61–62). Liu also refused to answer, based on the Fifth Amendment: (1) "Is it true that you intended to have the Pacific Proton offering proceeds used or expended in a manner that was inconsistent with the terms and disclosures of the Pacific Proton offering memoranda?" (*id.* Ex. 3 at 90); (2) "Is it true that you knew false statements concerning the Pacific Proton offering and the use of proceeds from that offering were being made to investors in the Pacific Proton offering?" (*id.* Ex. 3 at 92–93); and (3) "Is it true that you intended not to disclose to investors in the Pacific Proton offering that offering proceeds would be used in a manner that was inconsistent with the terms and disclosures of the Pacific Proton offering memoranda?" (*id.* Ex. 3 at 91).

The adverse inferences from these assertions of the Fifth Amendment are that Liu and Wang engaged in a scheme to misappropriate investor funds with fraudulent intent, that Liu intended to have the investor funds used inconsistently with the POM, that Liu intentionally failed to tell investors that, and that Liu knew the POM made false

---

[22] Liu and Wang argue that, because they cooperated with the SEC earlier in its investigation, they should categorically not be prejudiced by an adverse inference. (Dkt. 211 at 18–19.) Categorical inoculation from adverse inferences is directly contrary to the context-driven analysis mandated by *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000). As demonstrated in the following analysis, the Court takes each adverse inference being sensitive to prejudice to Liu and Wang and having found that the inference is supported by independent evidence, there is a substantial need for the information, and no alternative less burdensome method to obtain it.

statements. These adverse inferences are justified because they are supported by the independent evidence of scienter discussed above. There also is a substantial need for the information, as scienter is a factor relevant to the Court's consideration of whether to impose a permanent injunction against Liu and Wang.

Finally, there is also no alternative, less burdensome method to obtain information about Liu and Wang's scienter. Direct evidence of scienter, "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), consists of an individual's testimony. Therefore, there is no alternative less burdensome method of obtaining direct evidence of Liu and Wang's scienter other than adverse inferences from their deposition. As for additional circumstantial evidence beyond the evidence summarized above, Liu and Wang have consistently stymied, thwarted, and stonewalled the SEC's attempts to obtain business records, such as emails, that could confirm their high degrees of scienter. (*See, e.g.*, Dkt. 106 at 4 (Monitor's June 25, 2016, report that Liu and Wang provided only minimal information as to the locations of corporate records, including Liu's computer); Dkt. 146 at 3, 4 (Monitor's August 22, 2016, report that "[t]he corporate offices were devoid of records one would typically find in a business of this nature" and "the corporate computers were removed from the Laguna Niguel office before the Monitor was given access"); Dkt. 168 at 3–4 (Monitor's October 4, 2016, report that "the circuitous manner of the production through corporate counsel, when combined with Mr. Liu's refusal to answer substantive questions about corporate documents or operations, made it impossible for the monitor to verify that Mr. Liu had in fact turned over all documents in his possession"); Dkt. 174 at 8–9, 12–13 (SEC at October 7, 2016, hearing reporting that no emails or text messages had been produced by Defendants); *id.* at 34 (the Monitor stating that accessing emails or text messages were "the only way to get any hope" of recovering assets); Dkt. 208 Ex. 2 at 76, 78, 80, 89–90 (Wang testifying that she has not performed any search for electronic files and that she does not recall whether she sent emails in connection with Beverly

Proton); *id.* Ex. 3 at 109–30 (Liu testifying that he used email pervasively, that no emails or electronic files had been produced, and that his email account had been hacked in June 2016, wiping out all of his emails).) For these reasons, the adverse inferences as to Liu and Wang's high degrees of scienter are appropriate.

The remaining *Fehn* factors also support injunctive relief. To date, Liu and Wang have not recognized the wrongfulness of their conduct. (*Cf.* Dkt. 221 at 16 (Liu and Wang acknowledging only that Liu "made some mistakes by failing to dot the i's and cross the t's of his business operations," failed "to be sensitive to the conflict of interests [sic] issues raised by his wife's involvement with UDG," and failed to "properly document compensation being paid to himself and his wife").) Their conduct also extended over a period of years and impacted many investors. As this was their professional occupation—marketing the project and soliciting EB-5 investors—there is reason to believe that they could violate securities laws in the context of EB-5 offerings again. Finally, all Liu and Wang offer about future violations is their lawyers' unsworn statement that their belief is that Liu and Wang do not intend to participate in the EB-5 program in the future. (*See* Dkt. 221 at 16 n.1.) That falls far short of a sincere assurance from the perpetrator that future violations will not occur. A permanent injunction will issue forthwith.

ii. Disgorgement

This Court has broad, discretionary equitable power to order the disgorgement of ill-gotten gains to deprive a wrongdoer of unjust enrichment and to deter others from violating securities laws. *S.E.C. v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006); *see also SEC v. Colello*, 139 F.3d 674, 679 (9th Cir. 1998) ("To order disgorgement, the district court . . . need find only that [the defendant] has no right to retain the funds illegally taken from the victims."). If disgorgement is appropriate, there

is further discretionary authority in the amount to be disgorged; a "disgorgement calculation requires only a 'reasonable approximation of profits causally connected to the violation.'" *JT Wallenbrock*, 440 F.3d at, 1113 (quoting *S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998)).

Liu and Wang do not directly argue that disgorgement is inappropriate here; rather they challenge the amount the SEC requests. (*See* Dkt. 211 at 23–25; Dkt. 221.) Indeed, disgorgement is necessary and appropriate in the wake of a massive fraud implicating scores of victims. The SEC seeks disgorgement of the total amount raised, $26,967,918, an amount Liu and Wang do not dispute, offset by the $234,899.19 that remained in corporate accounts on June 3, 2016. (Dkt. 199 at 21; *see also* Dkt. 163 ¶ 26.) Liu and Wang propose offsetting by the amount in the corporate accounts as of April 30, 2016 ($527,614). Since the temporary restraining order issued May 31, 2016, the Court sees no reason to ignore asset transfers between April 30, 2016, and June 3, 2016, and Liu and Wang present none. (*See* Dkt. 221 at 4–5; Dkt. 149-2 at 5, 6 (Liu and Wang's June 9, 2016, resignation letters resigning from all positions in Corporate Defendants).)

While Liu and Wang argue extensively that disgorgement should also be offset by their "legitimate" business expenses, (*id.* at 4–10), the Ninth Circuit has indicated that the proper amount of disgorgement is the entire proceeds from a scheme minus amounts paid to investors, *see JT Wallenbrock*, 440 F.3d at 1113. "[I]t would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place." *Id.* at 1114. Liu and Wang's attempt to distinguish Ninth Circuit authority on the grounds that those cases dealt with entirely fraudulent enterprises whereas their project was at least partially legitimate is futile. (*See* Dkt. 221 at 4–10.) The contracts with overseas marketers and a significant portion of Liu's compensation were set at the inception of the project. Given extensive evidence of a thorough, long-

standing scheme to defraud investors, the Court agrees with the SEC that a reasonable approximation of the profits causally connected to Liu and Wang's violation is the total investment minus funds remaining, or $26,733,018.81.

iii. Civil Penalties

Finally, the SEC urges the Court to impose civil penalties. The Exchange Act and the Securities Act authorize three tiers of penalties, and the penalty amount is to be "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 78u(d)(3)(B), 77t(d). First tier penalties can be imposed for any violation of the act; second tier penalties are appropriate if the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and third tier penalties apply to violations that qualify for second tier penalties and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* The Court agrees with the SEC that third tier penalties are appropriate. The factors considered above regarding permanent injunctive relief apply to this analysis and unquestionably support imposition of civil penalties. *See Sec. & Exch. Comm'n v. Lee*, No. CV 14-06865-RGK (EX), 2015 WL 12751703, at *7 (C.D. Cal. Oct. 28, 2015).

The amount of the civil penalty imposed is within a court's discretion. *See* 15 U.S.C. §§ 78u(d)(3)(B), 77t(d). The SEC suggests $6,714,580 for Liu, the undisputed amount that he took for himself. (Dkt. 220 at 3–4; Dkt. 200-1 ¶ 116; Dkt. 212 ¶ 116.) The Court agrees that the money Liu personally took from investors is the appropriate amount of civil penalty to impose. As for Wang, the SEC suggests $5,353,000, made up of the undisputed $1,538,000 she was paid and the $3,815,000 UDG was paid. (Dkt. 220 at 4; Dkt. 200-1 ¶ 116; Dkt. 212 ¶ 116.) While Wang was deeply involved in UDG, the Court believes the appropriate civil penalty to impose is her direct personal gain from investors, $1,538,000.

**V. CONCLUSION**

For the foregoing reasons, the SEC's motion for summary judgment is GRANTED. A judgment and permanent injunction consistent with this Order will issue forthwith. The Order to Show Cause regarding civil contempt is DISCHARGED AS MOOT.

DATED: April 20, 2017

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

# APPENDIX

## Details of the Interrogatories, Requests for Admission, and Liu and Wang's Assertion of Fifth Amendment Privilege at their Depositions

The SEC deposed Liu and Wang in November 2016 and served them with interrogatories and requests for admission. The interrogatories and requests for admission were propounded to Liu and Wang on October 18, 2016. (Dkt. 199-1 Exs. 1, 2, 6, 7.) Liu's request for admissions sought admissions regarding his and Wang's relationship to Pacific Proton, PPEB5 Fund, Beverly Proton, UDG, and Ms. Yao. (*Id.* Ex. 1 at 10–13.) It also asked him to admit knowledge of the EB-5 program, the total investment proceeds, and that he received at least $6,714,580 from October 2014 to April 2016, including at least $4,270,000 from February to March 2016. (*Id.* at 13–14.) Admissions were also sought regarding the receipt of funds by Wang, Overseas Chinese, UDG, and Delsk, Liu's funds transfers, his intentional deviations from the POM, and the veracity of various exhibits. (*Id.* at 14–23.) Finally, Liu was asked to admit that he was capable of complying with the repatriation order. (*Id.* at 19.) Wang's request for admissions sought substantially equivalent admissions. (*See id.* Ex. 2 at 35–48.)

The SEC also propounded eighteen interrogatories on Liu and Wang. (*Id.* Exs. 6, 7.) The interrogatories asked:

1. The nature of Liu and Wang's financial interest in various entities including Corporate Defendants and the Chinese marketers as of January 1 in 2014, 2015, 2016, and July 1, 2016.
2. Their titles as employees, officers, managers, or directors of various entities including Corporate Defendants and the Chinese marketers.
3. Pacific Proton's proceeds, including the total amount of Capital Contributions and Administrative Fees.
4. Amount of Pacific Proton's proceeds distributed or transferred, directly or indirectly, to Ms. Yao, Liu, Wang, or their children.
5. Amount of Pacific Proton's proceeds distributed or transferred, directly or indirectly, to the Chinese marketers.

6. Amount of Pacific Proton's proceeds expended to develop, construct, manage, or operate the cancer treatment facility.
7. Amount of Pacific Proton's proceeds they caused to be transferred, directly or indirectly, to foreign accounts.
8. Whether all of Pacific Proton's proceeds were expended or used consistent with the POM's terms.
9. Whether Liu, Wang, or Ms. Yao has or used to have a financial interest in UDG and the time period and nature of such interest.
10. Whether Liu, Wang, or Ms. Yao has or used to have any control over UDG and the time period and nature of such control.
11. Whether they intended Pacific Proton's proceeds to be used in a manner inconsistent with the POM, and if so approximately when such intent formed.
12. Whether they intended to disclose to investors that the proceeds would not be used in a manner consistent with the POM, and if so approximately when such intent formed.
13. How the full amount of Pacific Proton's proceeds were disbursed, with dates, amounts, and recipients.
14. Whether they have the ability or financial means to transfer $26,967,818. If not, to identify all facts and evidence supporting that assertion.
15. Whether they can cause Overseas Chinese or UDG to repatriate Pacific Proton's proceeds.[23]

---

[23] Attached to their briefing on the issuance of a preliminary injunction, Liu submitted declarations from Walter Wang, "an authorized representative and one hundred percent . . . equity owner of Overseas Chinese," (Dkt. 31-1 ¶ 1), stating that Overseas Chinese would return all marketing fees in $500,000 monthly payments beginning in May 2016, (*id.* ¶ 5). They also attached a declaration from Chen Xiaojun, "the managing director and one hundred percent . . . equity owner of" UDG, (Dkt. 31-4), stating that UDG had agreed to return "Marketing and Other Fees" of $3,150,000 by December 31, 2016 and that "[n]one of the Marketing and Other Fees or agent fees paid to UDG was paid directly or indirectly to" Liu or Wang, (*id.* ¶ 5). They did not provide a letter from Delsk; the briefing noted that the total Delsk allegedly received was less than the amount of investor Administrative Fees for the thirty seven investors Delsk allegedly recruited, implying any refund was unnecessary. (*See* Dkt. 31 at 10.)

16. Identify all documents or communications that they contend demonstrate that they did not defraud investors, that they did not misappropriate proceeds, that they did not obtain money by making false statements, that the SEC's Complaint is not true, or that they do not have the ability or financial means to satisfy a monetary judgment.
17. Identify all witnesses they contend could or would testify that they did not defraud investors, that they did not misappropriate proceeds, that the Complaint's allegations are not true, or that they do not have the ability or financial means to satisfy a monetary judgment.
18. Identify all financial accounts of every nature held in their name or in which they have a direct or indirect beneficial interest, including institution name, address, account number, and account type.

(*Id.* Ex. 6 at 115–18; *id.* Ex. 7 at 130–33.) Liu and Wang's discovery responses were originally due November 21, 2016. At their request, the SEC extended the deadline to December 2. (Dkt. 214-1 ¶ 3; Dkt. 194-2 Ex. 6 (including Liu and Wang's initial request for a forty five day extension).) Neither Liu nor Wang timely answered or objected to the requests for admission and interrogatories, nor were answers or objections served as of January 23, 2017. (Dkt. 214-1 ¶ 3.)

The SEC also took Liu and Wang's depositions on November 10 and November 9, respectively. Liu asserted his Fifth Amendment right and refused to answer the following questions regarding:

1. The total value of all funds and other assets under his control, his net worth, the value of cash under his control, the value of assets under his control that can be readily converted to cash, and whether he controls funds or other assets,

including assets that can be readily converted to cash, having a total value of at least $26,967,918.

2. His ability to transfer or cause to be transferred $26,967,918 in overseas funds into the bank account of the Court-appointed Monitor by November 18, 2016 or at any point in time within the next year.

3. His ability to transfer or cause to be transferred $26,967,918 in funds into the bank account of the Court-appointed Monitor by November 18, 2016 or at any point in time within the next year.

4. His ability and preparation to comply with the repatriation section of the Preliminary Injunction.

5. Whether there is any reason why compliance with the repatriation section is impossible or why he cannot comply.

6. The largest amount of funds he could transfer on or by November 18, 2016, or within the next year.

7. That he could transfer at least $6,714,580 on or by November 18, 2016.

8. That he caused $6,714,580 of investor funds to be transferred into his control.

9. That he is able to transfer at least $8,252,580 to the Monitor by November 18, 2016.

10. That he caused $1,538,000 of investor funds to be transferred to Wang.

11. That he misappropriated at least $8,252,580 from Pacific Proton investors and that he never disclosed to any investors that he would transfer at least $8,252,580 to his control.

12. His personal knowledge of Wang’s financial condition, how he knows about her financial condition, Wang’s ability to comply with the repatriation order, and any reason why she cannot comply with it.

13. That he was able to have Overseas Chinese return all funds paid to it and that he was able to deposit such funds in the Monitor’s account.

14. That Overseas Chinese has agreed to return $5,710,025, that he played some role in that agreement, and that he caused Overseas Chinese to agree.

15. Whether the Overseas Chinese declaration was true and accurate, whether he had seen it in its draft form, whether he had a role in editing any drafts of the declaration, whether he had any input into the content of the declaration, whether he caused Overseas Chinses to sign the declaration, requested the signature, and whether he understands the agreement described in the declaration to be binding on Overseas Chinese.

16. Whether he was able to cause UDG to return all funds or deposit all funds in the Monitor's bank account.

17. Whether UDG agreed to return at least $3,150,000.

18. Whether he negotiated the agreement with UDG, caused UDG to agree, his relationship with the Declarant who claimed to be the 100% equity owner of UDG, and whether he caused the Declarant to become the 100% equity owner of UDG.

19. Whether he had seen the UDG declaration in draft form, whether he edited the declaration, had input into its content, caused the Declarant to sign it, request that the Declarant sign it, and whether he understood the agreement described in the declaration to be binding on UDG.

20. Whether he or Wang controls UDG, has the authority to direct its decision-making, management, operations, and policies, whether Wang ever controlled UDG, had or has the authority to direct its decision-making, management, operations, and policies, was ever UDG's CEO, President, chairman of the board.

21. Identify each and every bank in which he had an account, use of an account, or had a financial or ownership interest in an account for the last twenty years.

22. Identify the account numbers, how much money is currently in the accounts, whether he has overseas bank accounts, and the overseas banks in which he has an account, use of an account, or a financial or ownership interest in an account.

23. Whether he holds, uses, or has a financial interest in any account at China Merchants Bank and the account numbers of such accounts.

24. How much money is currently in overseas bank accounts that he holds, uses, or in which he has a financial or ownership interest.

25. Credit cards that he currently uses, their account numbers, and who pays the balances on them.

26. Identify each and every brokerage firm in which he had an account, used an account, or had a financial or ownership interest in an account, for the last twenty years, the account numbers, and the current approximate value of each account.

27. His financial interest in bonds of any kind.

28. Whether he owns or has an ownership interest in any Certificates of Deposit, stocks, mutual funds, or any other kind of investment fund.

29. Whether he has any retirement accounts and if so their current value.

30. Whether he owns any life insurance and the cash surrender value of each life insurance policy.

31. Identify all real property that he has owned or in which he has had a financial or ownership interest in the last twenty years.

32. Whether he owned real property outside of the United States, in China, in Hong Kong, or Grenada in the last twenty years, whether he has sold any of those real properties, the sale proceeds from such sales, and what he did with those proceeds.

33. Identify all real property he currently owns, their locations, and their present fair market value.

34. Whether he has ever transferred real property to a trust in the last twenty years, the identity of such trusts.

35. Whether he receives any rental income or owns any rental properties.

36. Whether he had overseas bank accounts during the SEC's investigation, whether they are frozen, and their account numbers.

37. Whether he transferred funds from his domestic personal bank account to a China Merchants Bank account which he controls.

38. Whether he had accessed funds maintained at any non-United States financial institution since May 31, 2016.

39. Whether he pays any money in monthly living expenses.

40. Amount of income received from his trade or profession or other sources during each of the last ten years.

41. Whether he currently owns any businesses, has owned any businesses in the last ten years, has been an officer, director, or registered agent for any company in the last ten years, and the name and his title at each businesses.

42. Whether and how much cash is in his residence.

43. That more than $20 million of the capital raised was paid to him, Wang, or overseas marketers.

44. Whether he has an interest in any type of trust or receives trust income.

45. Whether he holds assets outside the United States and their descriptions.

46. Whether he made a gift to anyone since 2010, the value of such gifts, and the recipients.

47. Whether any money is held on his behalf by someone else.

48. Whether there were at least 58 investors and whether the total amount of money raised in connection with Pacific Proton was at least $31,160,000.

49. Whether investors in Pacific Proton depend on the entrepreneurial or managerial skill of him or others to generate returns on their investment.

50. Whether Pacific Proton investors had an expectation of profit.

51. Whether he transferred at least $3.25 million from personal bank accounts in the United States to China Merchants Bank from February to April 2016.

52. That offering proceeds were not used or expended consistently with the POM.

53. Whether he engaged in a scheme to misappropriate investor funds by failing to disclose the true uses of the funds.

54. Whether he engaged in said scheme with fraudulent intents.

55. Whether he dealt directly with investors or communicated with them about their investment.

56. That Pacific Proton investors would have considered it to be a significant piece of information that he was using their funds in the manner in which he did.

57. Whether he knew false statements concerning the offering and use of proceeds were being made to investors.

58. The identity and location of all personal property worth more than $500, the approximate value of such property, and whether he owns any jewelry, paintings, art, or collectables, including a coin or stamp collection

59. That Pacific Proton offering proceeds were not used or expended consistent with the POM.

60. That he intended to have the offering proceeds used or expended in a manner inconsistent with the POM.

61. That he intended not to disclose to investors that proceeds would be used or expended in a manner inconsistent with the POM.

62. That he made false statements concerning the Pacific Proton offering and the use of proceeds to investors.

63. That the POM’s description of how proceeds would be used was false.

64. That he should have known, under a reasonable standard of care, that the descriptions of how proceeds would be used in the POM were false.

65. That he knew false statements concerning the offering and use of proceeds were being made to investors.

66. That he recklessly disregarded that false statements were being made to investors in the POM.

67. Whether he disclosed to the SEC every bank account, investment brokerage account, or financial institution account held in Corporate Defendants' name, controlled by Corporate Defendants, or in which Corporate Defendants have a beneficial interest.

68. Identify all bank accounts, investment brokerage accounts, or financial institution accounts held in Corporate Defendants' name, controlled by Corporate Defendants, or in which Corporate Defendants have a beneficial interest.

69. Whether Corporate Defendants have bank, brokerage, or financial institution account records that they have not produced to the SEC

(Dkt. 199-2 Ex. 4 at 78–93; Dkt. 194-2 Ex. 2.) Liu also stated that he intended to assert his Fifth Amendment privilege in response to any questions about (1) funds and assets under his or Wang's control, (2) his or Wang's ability to comply with the repatriation order, (3) his ability to cause Overseas Chinese to return investor funds, (4) his ability to cause UDG to return investor funds, (5) his United States and overseas bank accounts, his brokerage accounts, his investments, and his retirement accounts, (6) real property owned and sold in the last twenty years, (7) real property that he currently owns, uses, or has an ownership or financial interest in, (8) real estate trusts, (9) money or assets held by another person on his behalf, (10) his ability to cause UDG to return funds, (11) any questions concerning his control of UDG, (12) Wang's control of UDG, (13) money or assets held by another person on his behalf, (14) rental properties, (15) current living expenses, and (16) assets he holds outside the United States. (*See* Dkt. 199-2 Ex. 4 at 78–93; Dkt. 194-2 Ex. 2.)

//

Wang asserted her Fifth Amendment right and refused to answer the following questions regarding:

1. Whether she controls assets having a total value of at least $26,967,918.
2. Her approximate net worth, the value of all cash under her control, the value of all assets under her control that can be readily converted into cash.
3. That she has control over at least $26,967,918 in funds, that she could transfer $26,967,918 in overseas funds to the Monitor's account by November 18, 2016.
4. That she is able to comply with the repatriation order.
5. Whether there is any reason why it would be impossible or that she is unable to comply with the repatriation order.
6. The largest amount of funds she would be able to transfer or cause to be transferred to the Monitor's account by November 18, 2016, or at any point in the next year.
7. That she is able to transfer at least $6,714,580, $1,538,000, and $8,252,580 to the Monitor's account by November 18, 2016.
8. Her personal knowledge of Liu's financial condition, whether he controls funds or other assets having a total value of at least $26,967,918, the total value of all funds and assets under his control.
9. Liu's ability to comply with the repatriation order, any reason that it would be impossible for him to comply, and that Liu can transfer $26,967,918 in overseas funds to the Monitor's account by November 18, 2016.
10. That Liu caused to be transferred to accounts under his control at least $6,714,580 of investor funds.
11. That Liu caused to be transferred to accounts under her control at least $1,538,000 in investor funds.

12. If she is familiar with Overseas Chinese, that she is able to cause Overseas Chinese to return all funds, that she can transfer such funds to the Monitor's account.
13. Whether Overseas Chinese has agreed to return $5,710,025 and whether she negotiated the agreement.
14. Her familiarity with UDG, her ability to cause UDG to return all funds, and her ability to deposit such funds in the Monitor's account.
15. Whether UDG agreed to return $3.15 million in fees, that she negotiated the agreement to do so, and that she caused UDG to agree to return at least $3.15 million in fees.
16. Whether she or Liu controls UDG, has the authority to direct its decision making concerning its management, operations and policies, and whether she was UDG's CEO or chairman of the board.
17. Identification of every bank and each foreign bank in which she had had an account, used an account, or had a financial interest in an account for the last twenty years, and the amount of money currently in those accounts.
18. Whether she has any bank accounts outside the United States, the amount of money currently in foreign accounts that she holds, uses, or has a financial or ownership interest in.
19. The amount of money currently in United States bank accounts that she holds, uses, or has a financial or ownership interest in.
20. Identify all her credit cards.
21. Identify each and every brokerage firm in which she had an account, use of an account, or financial or ownership interest in an account in the last twenty years, the account numbers, and the current approximate value of each account.
22. Whether she owns any bonds, mutual funds, or an interest in any other kind of investment fund.

23. Whether she owns any Certificates of Deposit or life insurance, the cash surrender value of the life insurance policies, whether she holds any retirement accounts, their account numbers, and their current value.

24. Whether she owns her apartment, whether there are mortgages on her apartment, expenses associated with living there, and the source of the funds from which she pays such expenses.

25. Identify all real property that she has owned or in which she has had a financial interest in the last twenty years, whether she has sold any of those properties, the sales proceeds, and what she did with the sales proceeds.

26. Whether she has owned property in China, Hong Kong, or Grenada.

27. Identify all real property that she currently owns, their location, their present fair-market value for each.

28. Identify all real property that she currently owns located in the United States.

29. Whether she has ever transferred or caused to be transferred real property to a trust in the last twenty years, and the identity of each trust.

30. Whether she receives any rental income.

31. Her monthly living expenses, how she pays those expenses, how much she mays each month on a mortgage or for rent, food, utilities, phone service, cable and internet, insurance, medical expenses, child care, and entertainment.

32. Whether she was an officer of Beverly Proton and whether she had control over Beverly Proton's bank accounts at any point between 2010 and 2016.

33. Whether she controlled bank accounts for Pacific Proton at any point between 2010 and 2016.

34. Whether she controlled bank accounts of PPEB5 Fund LLC at any point from 2010 to 2016.

35. That she controls the corporate bank accounts from 2010 to the present, including during the time that investor funds were being raised.

36. That she caused Corporate Defendants to misappropriate investor funds.

37. Her income in each of the last 15 years in connection with her professional work.

38. Her current sources of income, and her income from working at the cultural department of China and at a hospital pharmacy.

39. That she misappropriated funds invested by investors in PPEB5 Fund.

40. That she engaged in a scheme to misappropriate investor money by failing to disclose to investors the true use of their money.

41. That she acted with fraudulent intent when engaging in that scheme.

42. That she, Liu, and Corporate Defendants raised at least $26,967,918 from investors.

43. That she directly interacted with investors when soliciting their investment.

44. Whether she knew that investors would have found the misappropriation of their money a significant piece of information relevant of their investment.

45. That investors invested with the expectation of profit.

46. Whether she currently owns or has a financial interest in any businesses, has owned any other businesses in the last ten years, and whether she has been an officer, director, or registered agent for any company in the last ten years.

47. Whether she has an interest in any type of trust or receives trust income.

48. Whether she holds any assets outside the United States and descriptions of all assets she holds that are located outside the United States.

49. Whether any money is held by someone else on her behalf.

50. Identify all personal property currently in her possession worth more than $500, where it is located, and the approximate value of each piece of personal property.

51. Whether she owns jewelry worth more than $500, collectables, art, automobiles, boats, or aircrafts.

52. Whether she has made a gift of any of her real or personal property to anyone since 2010 and the value and recipient of each gift.

53. Whether she receives any money from others to help support herself or her dependents.

54. Whether she was a corporate officer of Pacific Proton of Beverly Proton, or director of Beverly Proton.

55. The location of Pacific Proton's books and records, that not all of their books and records have been produced to the Monitor or the SEC.

56. Whether she sent emails in her capacity as an officer of Beverly Proton and whether Liu searched for electronically stored information that is Pacific Proton's corporate property.

57. That not all of Beverly Proton's books and records had been produced and the basis of her claim that she did not have any of Beverly Proton's books or records in her possession.

58. That not all of PPEB5 Fund's books and records had been produced to the Monitor or to the SEC.

59. Who updated Pacific Proton's books and records.

60. Whether she has ever destroyed any of Pacific Proton's, Beverly Proton's, or PPEB5 Fund's books and records, electronic or physical.

61. Whether she has disclosed to the SEC every bank account, investment brokerage account, or financial institution account held in the name of or controlled by Corporate Defendants that she knew about, the identities of such accounts, whether she has any such accounts in her possession, custody, or control, whether she has destroyed records for any such account, whether she has any records in her possession for such accounts that she has not produced,

(Dkt. 199-2 Ex. 5 at 97–107; Dkt. 194-2 Ex. 3; Dkt. 208 Ex. 2.) Wang also stated that she intended to assert her Fifth Amendment privilege in response to any questions about (1) her or Liu's ability to comply with the repatriation order, (2) her or Liu's ability to transfer or cause the transfer of funds to the Monitor's account, (3) her ability to cause

Overseas Chinese to return investor funds, (4) her ability to cause UDG to return investor funds, (5) her control of UDG, (6) Liu's control of UDG, (7) her foreign and United States bank accounts, (8) her credit cards, brokerage accounts, retirement accounts, and any type of account at any type of financial institution, (9) her financial investments, (10) her personal residence, (11) real property that she currently owns or has a financial interest in, (12) real estate trusts (13) use and misappropriation of investor funds by Corporate Defendants, (14) her assets outside the United States, (15) her personal property, (16) funds and assets under her or Liu's control, (17) her living expenses, (18) involvement in any businesses over the last ten years, including any compensation received, (19) her sources of income, past and present, and (20) her possession, custody, or control of financial account records of Corporate Defendants. (*See* Dkt. 199-2 Ex. 5 at 97–107; Dkt. 194-2 Ex. 3; Dkt. 208 Ex. 2.)