# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   SECURITIES AND EXCHANGE    ) Case No.
    COMMISSION,                ) 8:16-cv-00974-CJC-AGR
5                              )
              Plaintiff,       )
6                              )
         vs.                   )
7                              )
    CHARLES C. LIU; XIN WANG   )
8   a/k/a LISA WANG;           )
    PACIFIC PROTON THERAPY     )
9   REGIONAL CENTER, LLC;      )
    PACIFIC PROTON EB-5        )
10  FUND, LLC; and BEVERLY     )
    PROTON CENTER,             )
11  LLC f/k/a LOS ANGELES      )
    COUNTY PROTON THERAPY,     )
12  LLC,                       )
                               )
13            Defendants.      )
    _____)

14

15

16

17      REMOTE VIDEOTAPED DEPOSITION OF CHARLES C. LIU

18                    VIA WEBEX

19            Wednesday, February 24, 2021

20

21

22

23

24  Reported by:
    Diane M. Bolan, CSR No. 12883
25  Job No. 210224DBO

                                                    1

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4   SECURITIES AND EXCHANGE     ) Case No.
     COMMISSION,                 ) 8:16-cv-00974-CJC-AGR
 5                               )
            Plaintiff,           )
 6                               )
         vs.                     )
 7                               )
     CHARLES C. LIU; XIN WANG    )
 8   a/k/a LISA WANG;            )
     PACIFIC PROTON THERAPY      )
 9   REGIONAL CENTER, LLC;       )
     PACIFIC PROTON EB-5         )
10   FUND, LLC; and BEVERLY      )
     PROTON CENTER,              )
11   LLC f/k/a LOS ANGELES       )
     COUNTY PROTON THERAPY,      )
12   LLC,                        )
                                 )
13          Defendants.          )
     _____)
14

15

16

17           Remote videotaped deposition of CHARLES C.

18   LIU, taken on behalf of Plaintiff, via Webex, beginning

19   at 5:19 p.m. (PT) and ending at 11:46 p.m. (PT) on

20   Wednesday, February 24, 2021, before Diane M. Bolan,

21   Certified Shorthand Reporter No. 12883.

22

23

24

25
```

2

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 64

```
 1        Webex Proceedings, Wednesday, February 24, 2021

 2              5:19 p.m. (PT) - 11:46 p.m. (PT)

 3

 4             THE VIDEOGRAPHER:  Here begins the

05:19  5   videotape deposition of Charles Liu in the matter of

 6   the SEC versus Liu, et al.  This case is being heard in

 7   the United States District Court, Central District of

 8   California, Southern Division, case number

 9   8:16-cv-00974-CJC-AGR.  The deposition is being held

05:20 10   via Webex.

11             Today's date is February 24th, 2021.  The

12   time on the record is 5:19 p.m.  My name is Tim Hunter.

13   I'm the legal videographer.  Our court reporter today

14   is Diane Bolan.

05:20 15             Counsel, will you please introduce yourself

16   and state whom you represent for the record, starting

17   with noticing counsel.

18             MR. LEUNG:  Gary Leung for plaintiff.

19             MR. REGENSTREIF:  Tony Regenstreif for

05:20 20   plaintiffs.

21             MR. GOURAIGE:  Mr. Gouraige for defendant.

22             THE VIDEOGRAPHER:  Can you please swear in

23   the witness.

24             (Whereupon, CHARLES C. LIU, called as a

05:21 25   witness on behalf of the Plaintiff, was sworn and
```

5

```
 1   Proton, the project entity, was to pay Mr. Cogswell for
 2   his development services?
 3        A.   I don't remember.  Please, just open the
 4   file.  Then you know.
06:58  5           (Exhibit 120 marked prior to the commencement
 6   of the deposition.)
 7        Q.   BY MR. LEUNG:  I'm showing the witness what
 8   will be marked Exhibit 120.  It's a nine-page document.
 9   First page is entitled "Employment Agreement."  It
06:58 10  reads, "This agreement is made by and between Beverly
11   Proton Center, LLC, a California limited liability
12   company, formally known as Los Angeles County Proton
13   Therapy, LLC (hereinafter called 'Company') and Charles
14   C. Liu (hereinafter called 'Employee'."
06:58 15           I'm sorry.  I pulled up the wrong one.  I'm
16   going to show you a different document.
17           (Exhibit 121 marked prior to the commencement
18   of the deposition.)
19        Q.   BY MR. LEUNG:  For the record, I'm displaying
07:00 20  for the witness a five-page document that will be
21   marked Exhibit 121.  The first page of that five-page
22   document is entitled "Employment Agreement."  It reads,
23   "This agreement is made by and between Beverly Proton
24   Center, LLC, a California limited liability company,
07:00 25  formerly known as Los Angeles County Proton Therapy,
```

50

1    LLC (hereinafter called 'Company') and Michael Cogswell

2    (hereinafter called 'Employee'."

3           Mr. Liu, I'm going to flip through the

4    documents.  The first question is going to be, do you

07:01  5    recognize Exhibit 121?

6       A.   Yeah, this is a document I signed.

7       Q.   Okay.  And is Exhibit 121 a true and accurate

8    copy of an employment agreement that you executed on

9    behalf of Beverly Proton with Mr. Cogswell?

07:01  10      A.   Yes.

11      Q.   Is that a true and accurate copy --

12      A.   Yes.

13      Q.   Good.  All right.  Directing your attention

14   to Section 4 of the agreement, it says, "Employee shall

07:01  15   receive as compensation an annual base salary of

16   $350,000."

17          That's something you agreed to; right?

18      A.   Yes.

19      Q.   On behalf of Beverly Proton; correct?

07:01  20      A.   Yes.

21      Q.   Did you consult with anybody else at Beverly

22   Proton before awarding $350,000 a year in annual

23   compensation to Mr. Cogswell?

24      A.   I did some market research about, you know,

07:02  25   the salary amount for, you know, medical company.

51

1      Q.   What was that market research?  Tell me about

2  it.

3      A.   Well, it was -- I Google it, and then, you

4  know, just check, you know, what is the standard salary

07:02  5  basis for, you know, medical company of a project size

6  like us.

7      Q.   Okay.  So you did some -- you looked at the

8  internet, and then you awarded somebody 600 grand a

9  year in compensation; right?

07:02  10     A.   Yes.

11     Q.   Okay.

12     A.   And also asked a few, you know, friends in

13  the medical area.

14     Q.   You didn't consult with Dr. Thropay, though,

07:03  15  did you.

16     A.   I did not consult with him.

17     Q.   He was your partner, he was an owner of

18  Beverly Proton, and you didn't talk to him about this

19  employment deal with Mr. Cogswell; correct?

07:03  20     A.   Yeah, but he was -- I was -- I was in charge

21  of the daily operation.

22     Q.   I see.

23     A.   And I was appointed by him.

24     Q.   When did he appoint you in charge of the

07:03  25  daily operation?

52

1        Q.    Are you checking your phone, sir?

2        A.    Yeah, I just tried to get that information

3    for you.

4        Q.    What other information do you have on your

07:09  5    phone?  Do you have the information on your phone

6    concerning your proton cancer therapy project?

7        A.    No, nothing.  This is a new phone, never -- I

8    just have contact information.  I tried to get a name

9    for you.

07:09  10       Q.    Okay.

11       A.    I can't find it.  I can't find it.  But if

12   you give me some time, I can easily get the record for

13   you and send it to Herve.

14       Q.    We can move on.

07:09  15             Directing your attention --

16       A.    That's easy.  That's easy to find out, Gary.

17       Q.    We can move on.

18             Directing your attention back to Exhibit 121,

19   are you with me?  The very last page, the signature

07:10  20   page, do you see that?

21       A.    Yes.

22       Q.    You signed this contract?

23       A.    Yes.

24       Q.    On or about April 11, 2016?

07:10  25       A.    Yes.

56

1    Q.   Same with Michael Cogswell, he signed it

2    April 11, 2016?

3    A.   Yes.

4    Q.   And that's when he became an employee of

07:10   5    Beverly Proton; correct?

6    A.   Yes.

7    Q.   Okay.  April 11th.

8         (Exhibit 120 marked prior to the commencement

9    of the deposition.)

07:10   10   Q.   BY MR. LEUNG:  Directing your attention to

11   Exhibit 120, which is displayed on your screen, for the

12   record, Exhibit 120 is a nine-page document, also

13   entitled "Employment Agreement."  The very first

14   sentence says, "This agreement is made by and between

07:11   15   Beverly Proton Center, LLC, a California limited

16   liability company, formerly known as Los Angeles County

17   Proton Therapy, LLC (hereinafter called 'Company') and

18   Charles C. Liu (hereinafter called 'Employee'."

19        I'm turning to the very last page.  Looks

07:11   20   like it was signed and dated by you, sir, April 5th,

21   2016.  Is that your signature?

22   A.   Yes.

23   Q.   Is this a true and accurate copy of an

24   April 5th, 2016 purported employment agreement between

07:11   25   you and Beverly Proton?

57

```
 1        A.   Yes.

 2             MR. GOURAIGE:   I object to "purported

 3   employment agreement."   I'm not sure what that means.

 4   We're looking at a document that's an employment

07:11  5   agreement and he's testified that he signed it.   What

 6   do you mean, "purported" agreement?   Is this --

 7        Q.   BY MR. LEUNG:   Is it not purported, sir?

 8   You can just say so.   You're the witness.   Do you think

 9   this is the real agreement?   Say it.

07:11 10             MR. GOURAIGE:   I'm not sure what you mean,

11   "the real agreement," Gary.

12        Q.   BY MR. LEUNG:   Okay.   Mr. Liu, employee

13   compensation, Section 4, let me blow it up for you,

14   because I don't want you to have to strain your eyes.

07:12 15             That reads, "Employee shall receive as

16   compensation an annual base salary of $550,000.   The

17   company agrees to pay the employee since January 2011.

18   In addition to base salary, the employee shall earn

19   bonus on the following basis:   8 percent of the total

07:12 20   capital, including debt financing raised reached up to

21   $28 million."

22             Did you have to negotiate those terms with

23   anyone?

24        A.   Did I -- well, I negotiated with Mike

07:12 25   Cogswell, because he was one of the officers of the
```

58

1   company.

2       Q.   How did that negotiation go?  Was it in

3   person, was it over e-mail, was it by the phone --

4       A.   Verbal.  It's a verbal conversation.

07:13   5       Q.   Okay.  How long was that conversation?

6       A.   Well, a few meetings in the office.

7       Q.   What was your...

8            Okay.  What was your first offer to Mr.

9   Cogswell with respect to your comp?  Did you start at

07:13   10   550 and get the 550, or did you go high?  What was your

11   negotiation strategy there?

12       A.   Well, I told him the whole story, how I

13   started this project, you know, and then -- and then I

14   think I deserve this amount, given the nature of the

07:13   15   work I've done, given the nature of investment money I

16   spent myself --

17       Q.   And he said yes.

18       A.   -- from the beginning.

19       Q.   Did he say yes?

07:13   20       A.   Yes, he said yes.

21       Q.   Did he counter you with a lower number before

22   agreeing to what you had proposed?

23       A.   No.

24       Q.   Okay.  So he just said yes.  All right.

07:14   25            "The Company agrees to pay the employee since

59

1    January 2011."

2            You previously testified that you never had

3    an employment agreement up until April of 2016 with

4    Beverly Proton, so this made you whole; right?  You

07:14 5    were able to get that, what you thought you deserved

6    from the beginning of 2011 all the way through to April

7    of 2016; right?

8            A.   Yes.

9            Q.   Okay.  And Mr. Cogswell, he said yes.

07:14 10           A.   Yes.

11           Q.   And he was acting on behalf of Beverly Proton

12   when he said yes and he signed this employment with

13   you; right?

14           A.   Yes.

07:14 15           Q.   Okay.  Going to the signature page, it's

16   dated April 5th, 2016.  About three minutes ago, you

17   testified Mr. Cogswell wasn't an employee of Beverly

18   Proton until April 11th.  How did he have the authority

19   to enter into such a rich compensation agreement with

07:15 20   you at this time?

21           A.   Well, I guess they didn't date it right.  I

22   can't remember.

23           (Interruption by the court reporter.)

24           THE WITNESS:  Maybe the document was not

07:15 25   dated correctly.

60

1    Q.   BY MR. LEUNG:  And then you said, "I can't

2  remember;" is that right?

3    A.  Yes.

4    Q.   Okay.  So, you know, regardless of the

07:15  5  chronology that you can't remember, you agreed to pay

6  Mr. Cogswell $600,000 a year, he agreed to pay you

7  $550,000 a year and also compensation dating back to

8  2011, you shook hands, you walked away, and you were

9  both pleased; correct?

07:16  10    A.   Say that again.  What do you mean, "walked

11  away"?

12    Q.   You were both pleased with the employment

13  agreements that you had mutually executed with one

14  another; is that a fair characterization?

07:16  15    A.   I won't say pleased or not pleased.  It's

16  just a business practice.

17    Q.   Okay.

18    A.   To hire someone, you have to sign agreement.

19  Someone work for company, someone has to be

07:16  20  compensated.  I don't understand, because the project

21  has not been completed.  What do you mean, pleased or

22  not pleased?  I don't agree -- I disagree what you

23  said.

24    Q.   Okay.

07:17  25    A.   And also something you should know, this is

61

1  remembering these things, Gary.  It not happened

2  yesterday.

3        Q.   I'm not asking you for a date yet, sir.  I'm

4  asking you if you remember your wife being employed by

07:26  5  the company.

6        A.   Yes, of course I remember.

7        Q.   Okay.  And what was the nature of her

8  employment?  What were her job responsibilities at

9  Beverly Proton?

07:27 10        A.   I think vice president, vice president in

11  marketing.

12        Q.   And what did she have to do as VP of

13  marketing?  What was her responsibilities when she

14  showed up for work?  What was she responsible for

07:27 15  doing --

16        A.   Basically she did --

17             (Interruption by the court reporter.)

18             THE WITNESS:  Okay.  She was responsible for

19  promoting the project in China, only in China.

07:28 20        Q.   BY MR. LEUNG:  How would she promote the

21  project in China?

22        A.   Attended seminars, you know, present -- you

23  know, introduce the project to clients, to potential

24  clients, attended a few functions, meetings, and also

07:28 25  meetings also working with Chinese insurance companies,

66

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 75

1    tried to bring them over to U.S., and one of them she

2    successfully completed was Xinhua Insurance Company,

3    which is one of the largest insurance companies in

4    China, and we signed an MOU because of her

07:29  5    contribution.

6        Q.    Do you know if you produced that Xinhua MOU

7    to the SEC as part of its pre-file investigation or in

8    this enforcement action?

9        A.    Before.  Before.  We provided before.  I

07:29 10    remember.

11        Q.    I just want to make sure I've got the

12    insurance spelling right.  One word, X-i-n-h-u-a?

13        A.    Yes.

14        Q.    Okay.  And I don't think you were...

07:29 15              Well, I'll just ask you.  Did Miss Wang have

16    any role in raising capital?

17        A.    No, she has no role raising capital, but she

18    was facilitating.

19        Q.    What do you mean by "facilitating"?

07:30 20        A.    Facilitating means, you know, to promote.

21        Q.    Promote what?

22        A.    Promote the project, introduce a project,

23    because she was used to be a TV hostess.  She's good at

24    Chinese, you know, Mandarin, good at presentation, good

07:30 25    at, you know, introducing the project, you know,

67

1    showing the video, showing the PPT, you know, to the

2    potential investors and the clients.   That's her

3    strength.

4         Q.   Okay.

07:30  5    A.   She was a very well-known TV hostess in China

6    before.

7         Q.   That must be nice.

8              Did Miss Wang ever travel to the United

9    States and meet with potential investors or investors

07:30  10   here?

11        A.   Never.

12        Q.   Never.  Not even once; right?

13        A.   Not even once.

14        Q.   Okay.  But you had a home here, though;

07:31  15   right?

16        A.   Yes, rented.

17        Q.   What's the address --

18             Rented home.

19        A.   No, no, no.  Leased out.  It's our home.

07:31  20   It's our home.  I'm saying just we just leased out

21    because we were not there.

22        Q.   Oh, you're leasing that home out to people

23    now.

24        A.   Yes.

07:31  25   Q.   Okay.  How much rent are you charging your

68

```
          1        Q.    Yeah.

          2        A.    I looked at all the receipts, business

             expenses, receipts, you know, the money I spent for the

             project.  I did look at all the documents, yes.

07:54     5        Q.    Receipts from whom?

          6        A.    Travel, you know, all kinds of expenses, you

             know, also lots of money I advanced before, before the

             project, before the project, you know, before we start,

             you know, before we get -- we received approval from

07:54    10  USCIS, and lots of money was spent.

         11        Q.    Receipts from who?  What receipts

             corroborated the expenses that you spoke to --

         13        A.    Invoices, legal fees, accounting fees, you

             know, economic report, all the third-party consultants,

07:54    15  all these needs to spend money.

         16        Q.    Um-hmm.  And they added up into a multiple of

             10,000 --

         18        A.    Just gave you example.  I spent about half

             million dollars to Steve Yale's firm before the project

07:55    20  was approved, but the company was already established.

         21        Q.    Steve Yale worked on the capital raise?

         22        A.    No, Steve Yale, it's a big law firm who

             helping people to approve EB-5 Regional Center at

             USCIS.

07:55    25        Q.    For the purpose of raising capital under the
```

                                                                    79

1    EB-5 program; right?

2         A.    Yes.  But before --

3         Q.    That was the object of Mr. Yale's legal

4    representation, working with USCIS to put you in a

07:55  5    position to raise money through EB-5 investors;

6    correct?

7         A.    Yes.

8         Q.    To raise money through an EB-5 offering;

9    correct?

07:55 10         A.    Yes.

11         Q.    When you sat down and you looked at all the

12    receipts and you thought about how much capital you had

13    put into the company, why didn't you just come up with

14    one sum and make one transfer?  Why are you

07:56 15    transferring these big chunks of money over the course

16    of a week or so every day or every other day?  Why

17    didn't you just do it in one fell swoop?

18         A.    Well, you know, maintain, you know, a good

19    balance with the bank.

07:56 20         Q.    Were you maintaining a good balance with the

21    bank in February and March of 2016?  Did the balance

22    ever get low because of these withdrawals, do you

23    recall?

24         A.    What You mean?  You're asking me why I did

07:56 25    not get, you know, just once, instead of a few.  That's

80

1    one of the reasons.

2        Q.    Okay.  So your earlier testimony about how

3    you paid yourself this $4.27 million because of your

4    employment agreement, that's not true, right, and

07:57 5  instead, you paid yourself the $4.27 million because

6    you felt like you were owed money by Beverly Proton;

7    fair?

8            MR. GOURAIGE:  I object to the question.

9    It's -- I'm not even sure I understand the question.

07:57 10           MR. LEUNG:  Okay.

11       Q.    BY MR. LEUNG:  Fair?

12       A.    Can you repeat?

13       Q.    When I first started asking you questions

14   about this $4.27 million that you pulled out of Beverly

07:58 15  Proton and Pacific Regional Center after receiving an

16   SEC subpoena, you explained that that was compensation

17   owed to you under your employment agreement.  Remember

18   that?

19       A.    Yes.

07:58 20       Q.    And then I explained to you that your

21   employment agreement, which we just looked at, was

22   dated April 5th, 2016, which is subsequent to all these

23   transfers.  Do you recall that line of questioning?

24       A.    Yes.

07:58 25       Q.    So is it your sworn testimony that you paid

81

1    yourself this $4.27 million because Beverly Proton owed

2    you some sort of money for everything you had put into

3    the company?  That's your testimony; right?

4         A.   And also my time, my effort to make the

07:58  5    project work.

6         Q.   And the basis of that obligation isn't the

7    later employment agreement, it's just what you said:

8    You put in time, you put in work, you paid some

9    expenses, and you wanted to get paid back; right?

07:59  10        A.   Yes.

11        Q.   Dr. Thropay, did he approve these transfers?

12        A.   No.  I was -- you know, he authorized me to

13    sign by myself at the bank.

14        Q.   He gave you that blank check.

07:59  15        A.   Sorry?

16        Q.   I'll withdraw it.

17             Okay.  So that amount of money, that

18    $4.27 million, was transferred to your personal account

19    at Chase; right?  You remember you had a personal

07:59  20    account at Chase Bank, as well?

21        A.   Yes.

22        Q.   Okay.  And do you recall then transferring

23    funds out of your personal Chase account to an account

24    in China at China Merchants Bank?  Do you recall

08:00  25    anything like that?

82

1    Pacific Proton Regional Center at Caesar's, in Las

2    Vegas?

3         A.   Yeah, I brought Chinese, you know, to Vegas a

4    few times.

08:07  5       Q.   What did you do in Vegas with the Chinese

6    folks that you just testified to?

7         A.   You know, dinner, shows, casino, you know,

8    all the -- you know, Vegas is just Vegas.

9         Q.   And who were these Chinese folks that you

08:07 10   were entertaining?

11        A.   Occasional investors.  I don't remember

12   exactly their names.

13        Q.   So, I mean, you were marketing, then, in the

14   hope that you'd be able to raise capital from them?

08:07 15       A.   Yeah, of course.

16        Q.   Okay.  Do you recall withdrawing funds at

17   Caesar's in Las Vegas from the Regional Center, Pacific

18   Proton Regional Center corporate account?

19        A.   Yeah, a few times I remember.

08:08 20       Q.   Why did you do that?

21        A.   Well, I just needed cash.

22        Q.   Why not take it out of your personal account?

23        A.   Because it's Vegas, Gary.  Have you been to

24   Vegas?

08:08 25       Q.   Not in a long time.

86

1   medical office?

2        A.   As part of construction.

3        Q.   Yeah.  Did you erect a structure, or was it

4   just a hole in the ground?  That's what I'm asking you.

08:52  5   I know you were in the process, but did you get to the

6   part of the process where it was more than just a hole

7   in the ground?

8        A.   We demolished the building.  We also dig the

9   hole in the ground, because proton needs, you know, 10

08:52  10   meters, 10 meters, you know, underground space.  We

11   already started that part.

12        Q.   Did there come a time where you began

13   construction on another site, one that wasn't 111 West

14   Beverly?

08:53  15        A.   No.  We were planning to -- we were planning

16   to, you know, move that location because I noticed

17   Thropay was not cooperative.  So my idea, my plan is

18   possibly down the road to find another site within the

19   hospital.

08:53  20        Q.   You just said you were in the middle of

21   building a tower at 111 West Beverly, and then you said

22   you were building on another site, that was your plan,

23   your choice.  So what's the truth here?  Were you in

24   the middle of constructing a proton cancer therapy

08:53  25   center at 111 West Beverly or not?

96

1          A.   We were in the middle of construction, okay?

2     That is true.   At the same time, I had a dispute with

3     Thropay.   So that's why I start to think maybe it's

4     better to find another site, to disconnect relationship

08:54  5     with him and to find a better site, to build another,

6     better one.

7          Q.   Can we agree that had you moved to another

8     site, say 105 West Beverly, all the construction work

9     that you had conducted on the 111 West Beverly site

08:54 10     would have gone to waste?

11               MR. GOURAIGE:   That's a hypothetical

12     question.   I'm not sure -- what do you mean, it would

13     have gone to waste?

14          Q.   BY MR. LEUNG:   All the work you did on 111

08:54 15     West Beverly, of what benefit would it have been to

16     your project if you had moved the project site to 105

17     West Beverly?

18          A.   Well, it is not going to be wasted.   One can

19     still be the office building.   The other can be

08:54 20     supporting center, the other can be the proton center.

21     They all connected --

22          Q.   You just said --

23          A.   -- office building above the proton center.

24          Q.   You just said you wanted to separate from

08:55 25     Thropay and his property.

97

1        A.   We also want to build a cancer center.   That

2    was just, as my legal guy, my legal counsel said, it's

3    a hypothetical question, because we were in the middle

4    of doing this.   You ask me a hypothetical question, and

08:55  5    I answered you.

6        Q.   I'm inquiring as to the testimony that you've

7    given under oath within the last two or three minutes.

8    You said you wanted to move to 105 West Beverly because

9    you needed a separate --

08:55  10       A.   I had idea.   I had an idea.   It was no

11   action.

12       Q.   Are you familiar with the construction firm

13   R. Allen?

14       A.   Yes.

08:55  15       Q.   Were you ever --

16       A.   They're the company who did, I think,

17   demolishing.   Also -- also introduced by Ruth.

18       Q.   Were you ever invoiced by R. Allen for work

19   at 105 West Beverly?

08:56  20       A.   105 Beverly.   105.   Yes, we didn't sign, I

21   think, the agreement.

22       Q.   Okay.   Proton cancer therapy equipment was

23   never delivered to either of your project sites; right?

24       A.   You mean...

08:56  25            Never delivered?   What does that mean,

98

1    "delivered"?

2        Q.    It's a tangible piece of equipment.   Did

3    somebody bring it to your project site is what I mean.

4    Do you not understand what I'm asking you?

08:56  5        A.    Of course not delivered, because the

6    construction site is not ready.   How can it be

7    delivered?   It's building -- in the middle of

8    building -- middle of building the manufacturing site.

9        Q.    So it was never delivered, never installed --

08:57 10        A.    No, of course not delivered.

11        Q.    Never used; right?

12        A.    Yeah, of course not used.

13        Q.    Okay.   So no patients were ever treated at

14    your project site; right?

08:57 15        A.    Gary, you ask me -- you can answer this

16    question by yourself.   Why you ask me?   Why waste the

17    time asking me?

18        Q.    Because you're the witness and I'm not.

19    Answer the question.

08:57 20        A.    If the site is -- how can they --

21        MR. GOURAIGE:   Mr. Liu, Mr. Liu, let me

22    interject an objection here.

23        Gary, we all know the building wasn't built,

24    the center wasn't built.   How can patients be treated

08:57 25    there?   I think the witness is trying to explain to you

99

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 86

1      Q.    Um-hmm.  Okay.  When was the last time you

2   spoke with Dr. Huang?

3      A.    Oh, it was about two, three years ago.

4      Q.    In relation to anything connected to your

09:05 5   Pacific Proton Therapy --

6      A.    No, no, we never talked about it.

7      Q.    Okay.  Were you in the habit of introducing

8   Dr. Huang to folks as your business partner?

9      A.    Business partner?

09:06 10      Q.    Yeah.

11      A.    Through Dr. Huang?

12      Q.    Yeah.  Did you tell people that you were

13   doing business with -- that Dr. Huang was your business

14   partner?

09:06 15      A.    Did I tell?  No.

16          (Exhibit 124 was marked prior to the

17   commencement of the deposition.)

18      Q.    BY MR. LEUNG:  Okay.  Mr. Liu, if you could

19   direct your attention to my screen share, I am showing

09:06 20   you a 146-page document that's been marked Exhibit 124.

21   This is a court filing.  It's entitled "Memorandum of

22   Points and Authorities of Defendants Charles C. Liu and

23   Xin Wang in Opposition to Plaintiff's Motion to

24   Continue Asset Freeze; Declaration of Herve Gouraige."

09:07 25          Have you seen this document before?  It's a

105

1    brief.   It's got a declaration from your counsel.   It's

2    got exhibits to that declaration.   Is this something

3    that you've seen and reviewed?

4         A.   Yes.

09:07  5         Q.   Okay.   When did you see it; before or after

6    it was filed?

7         A.   When did I see this?

8         Q.   Yes, when did you see it?

9         A.   I received documents every day.   I don't

09:07  10  remember which date.   You asked me that.

11         Q.   Do you recall whether you received this

12   document before it was filed or after it was filed?

13         A.   Before it was filed.

14         Q.   And did you review it for accuracy?

09:08  15         A.   Yes, I did review.

16         Q.   Okay.   And how long did it take you to review

17   it for accuracy?

18         A.   Well, I check, you know, every page --

19         Q.   All 146 --

09:08  20         A.   -- every sentence.

21         Q.   Okay.   Let me scroll down to Mr. Gouraige's

22   declaration.   Is that also something you reviewed;

23   right?   You understand the affidavit was submitted

24   along with the court brief?

09:08  25         A.   Are you asking me?

                                                      106

1  witness.  You're the one that raised your right hand

2  and took the oath, and you're the one that's answering

3  the question.  So if you know what he said is true, you

4  can tell me that.  If you don't, I'd like you to tell

09:12  5  me that, as well.

6       MR. GOURAIGE:  Wait a minute.  I'm going to

7  object to this examination because the witness has seen

8  the document, he's testified he reviewed it, he

9  approved it.  He's also testified the accounting firm,

09:13  10  Marcum, prepared it.  That was made clear when the

11  document was submitted to the court.

12       You're going to take the testimony of the

13  Marcum accountant, who worked from this document.  You

14  can ask that person about those numbers and how they

09:13  15  calculated the numbers.  I mean, this witness here is

16  not -- he doesn't have knowledge about how those

17  numbers were calculated.

18       Q.   BY MR. LEUNG:  Mr. Liu, is that correct, you

19  don't have any knowledge about how these numbers --

09:13  20       A.   I have no knowledge.

21       Q.   Okay.  Well, moving away from the actual

22  numbers, I just want to talk about the titles, the

23  headings of these two charts, "Proton Therapy Project

24  Deductible Business Expenses," and then "Liu Deductible

09:13  25  Business Expenses."

109

1           What's the difference between those two

2   things?  Do you know what that difference is?

3           MR. GOURAIGE:  Objection to the question.

4   Ask him did he write the -- prepare those titles.  He

09:14  5   has no basis or knowledge.  You're asking him to

6   speculate as to what somebody else wrote.

7       Q.   BY MR. LEUNG:  Do you know what those titles

8   mean, because you did testify --

9       A.   I have no knowledge.

09:14 10       Q.   I'm not done.

11           You testified earlier that you reviewed every

12   line of this court filing, and now you're saying you

13   have no knowledge.  I just want to make sure.  You

14   don't know anything about this exhibit?

09:14 15       A.   No, now you're asking me a specific question.

16   I'm answering you a specific question.  I have no

17   knowledge.  You said added up.  I have no knowledge

18   about that.  As I said, you know, I think that, you

19   know, professional.  I'm not accountant, okay?

09:14 20       Q.   All right.  But you are the person that was

21   involved in these expenses, so I'll ask you an easier

22   question.

23           All right.  There's some line items here

24   under the heading "Professional Fees."  You know what

09:15 25   professional fees are; right?  You're an entrepreneur.

110

```
 1            THE VIDEOGRAPHER:  Going off the record at

 2      9:23 p.m.

 3                             (Recess.)

 4            THE VIDEOGRAPHER:  Back on the record at

09:39  5      9:38 p.m.

 6         Q.   BY MR. LEUNG:  Mr. Liu, what is United MPH

 7      Ventures?

 8         A.   It's a company.  It's basically a shell

 9      company I set it up.  You know, I had a plan to develop

09:39 10      the second proton project, you know, at different

11      locations, but it just -- before the first one is

12      completed, it just a plan.

13         Q.   United MPH never had any ownership interest

14      in Beverly Proton, did it?

09:39 15         A.   No.

16         Q.   Do you know a person by the name of Alice

17      Cheng?

18         A.   Yes, Alice Cheng, she is, you know, CEO,

19      president of the Beverly Hospital.

09:40 20         Q.   Okay.  And you testified earlier to some

21      business discussions with Harlan Levine at the City of

22      Hope.  Do you recall that testimony?

23         A.   Yes.  Actually, it was Levine -- City of Hope

24      was introduced me by Alice.

09:40 25         Q.   I see.  Do you recall in mid 2015 beginning
```

117

```
 1   discussions with City of Hope and Beverly Hospital
 2   about a proton cancer therapy center to be constructed
 3   on Beverly Hospital's campus?  Do you recall those
 4   discussions?
09:40  5         A.   Yes.  We had that plan, yes.
 6         Q.   Okay.  And did you subsequently enter into a
 7   Memorandum of Understanding with respect to this joint
 8   venture between you, Beverly Hospital, and City of
 9   Hope?
09:41 10         A.   Yes, we signed MOU, yes.
11         Q.   Okay.  And Dr. Thropay was not a part of this
12   deal; is that correct?
13         A.   No, he was not part of this.
14         Q.   Ruth Novodor, his sister, was not a part of
09:41 15   this deal; correct?
16         A.   Not part of this deal either.
17         Q.   Okay.  And the proton cancer therapy project
18   under discussion with Beverly Hospital and City of Hope
19   was not going to have Dr. Thropay as its medical
09:41 20   director; right?
21         A.   No.
22              No, actually -- actually half to, half not.
23   Actually, we were proposing, you know, to ask Dr.
24   Thropay to be the main medical director of this new
09:42 25   venture, but --
```

                                                              118

1    pursuant to that consulting agreement?

2         A.   I can't remember, but we did pay him.

3         Q.   Do you recall if you paid Michael Hunn using

4    funds from the EB-5 fund?

09:49  5         A.   I don't think so.

6         Q.   Do you recall if you paid Michael Hunn using

7    funds from the Beverly Proton corporate account?

8         A.   I think the fund -- the project company.  So

9    as far as I can remember, the project fund.  Not EB-5

09:49  10   fund, not Regional Center.  It's the project company.

11   The project company is to develop all these things.

12        Q.   What project company are you referring to?

13   What's the name of the project company?

14        A.   Beverly.  Beverly.  Beverly.

09:50  15        Q.   Beverly.  Beverly Proton wasn't a party to

16   your MOU for this new venture, though, was it?

17        A.   Beverly Proton was not a venture for this,

18   that is correct.

19        Q.   So why were you using Beverly Proton funds to

09:50  20   pay Michael Hunn, somebody that was working on the new

21   venture, rather than the old venture?

22        A.   Because the new venture did not have a bank

23   account.  So this was the early development costs, and

24   then later, later the new vehicle, new company has bank

09:50  25   account, you know, this money will be transferred back.

123

1   ('COHMF'); with respect to the development and

2   operation of [i] a new proton beam therapy center on

3   the Beverly Hospital campus," and then it goes on.

4           I'm going to flip through this document for

09:52  5   you, but my first question is, is Exhibit 105 a true

6   and accurate copy from a Memorandum of Understanding

7   that you caused to be executed on behalf of United MPH

8   Ventures with Beverly Hospital and with City of Hope on

9   or about October 22nd, 2015?

09:53 10       A.    Yes, it's a true copy.

11       Q.    Okay.  And Beverly Proton --

12       A.    Let me -- let me --

13           Excuse me.  Let me add something on your

14   previous question.

09:53 15           Okay.  I truly I don't remember, you know,

16   which account, you know, the consulting fee was paid,

17   you know, but this memorandum I don't think -- and if

18   there's any fee associated.  But in Michael Hunn's

19   case, I can remember which bank account, okay, when

09:54 20   paid Michael Hunn.  And possibly it's Regional Center,

21   okay?  We can double-check.  But let me tell you why

22   Regional Center.

23           Because Regional Center, to set up Regional

24   Center is not just to develop one project.  You know,

09:54 25   it can develop hundreds, hundreds for different

125

1    used to pay Michael Hunn?

2        A.   It's expenses.  This is consulting fee, part

3    of expenses.

4        Q.   Michael Hunn's consulting work was part of

09:58  5    the offering expense?

6        A.   Of course, to develop from projects.

7        Q.   I see.

8        A.   I said, not just dedicated one project.  For

9    different projects.

09:58 10        Q.   The construction work was part of the

11    offering expense; correct?

12        A.   The construction is part of offering.

13    Construction, yes, of course.  Construction people use

14    the capital to build, to do the construction, yes.

09:58 15        Q.   Okay.  And the legal fees paid to firms like

16    Miller Mayer, those are also part of the offering

17    expense; right?

18        A.   Yeah, but some relate to the project, some

19    relate to the EB-5.  If it's EB-5-related, you pay

09:58 20    through Regional Center.  If it's project-related, you

21    know, you pay through the project company --

22        Q.   Well, what about Mevion?  Is that --

23        A.   -- the project, that's all.

24        Q.   What about Mevion?  Is that offering expense

09:59 25    or project expense?

                                                                128

```
 1        A.    Project expense, for sure.
 2        Q.    Um-hmm.  Okay.  So Hunn, the consultant, he's
 3   offering expense, certain lawyers are offering expense.
 4        A.    Yes.
09:59 5   Q.    What about Marcum?  What about the accounting
 6   for these entities?  Is that offering expense?
 7        A.    Yeah, this is -- of course.  They do the
 8   accounting for the project company, they do the
 9   accounting for EB-5 fund, they did the accounting for
09:59 10  the Regional Center.  Of course.
11        Q.    Accounting expense.
12        A.    Yeah.
13              (Exhibit 104 marked prior to the commencement
14   of the deposition.)
10:00 15  Q.    BY MR. LEUNG:  I want to direct your
16   attention to a one-page document that's been previously
17   marked Exhibit 104.  This is an October 19th, 2015
18   e-mail sent by you to Levine with a cc to Michael Hunn,
19   and you're writing, "Dear Mr. Harlan, I would like to
10:00 20  inform you that Mr. Michael Hunn has been engaged by my
21   firm as my representative to work with City of Hope
22   regarding our proposed partnership and joint ventures.
23   All the best, Charles Liu."
24              Did I read that right?
10:00 25  A.    Yeah.
```

129

1   general.

2       A.   Business plan?  Business plan -- okay,

3   basically, project company has its own business plan,

4   and then the original center has its own business plan.

10:02  5   You know, each one is different.  Each one has

6   different functions and role.

7       Q.   Okay.  Let me ask it differently.

8            I mean, to the extent you had to prepare a

9   business plan and submit it as part of your USCIS

10:02 10   application for the Pacific Proton Regional Center,

11   that's an offering expense, right, because you're

12   trying to get USCIS to believe and do a B-5 offering?

13   Is that fair?

14       A.   Yes, yes.

10:02 15       Q.   After you continued your discussions with

16   Harlan Levine and City of Hope, did there come a time

17   when Mr. Levine was confused about which entity he was

18   dealing with, Beverly Proton or United MPH?

19       A.   I remember he asked me a question -- you

10:03 20   know, Alice asked me a question before, and I clarified

21   it with him.

22       Q.   What questions did he ask?

23       A.   We had an intervening lunch meeting, you

24   know, about what is the role of the, you know, Regional

10:03 25   Center, which is the role of the project company, blah,

131

1            (Exhibit 128 was marked prior to the

2    commencement of the deposition.)

3        Q.   BY MR. LEUNG:   Okay.   I'm about to show you a

4    document that will be marked Exhibit 128.

10:45  5            Exhibit 128, for the record, is a 12-page

6    document.   First page there is a letterhead of Marcum

7    Accountants, Advisors.   This letter is addressed to

8    you.   "Dear Charles," at United MPH Ventures, LLC, and

9    it reads, "Enclosed are the following partnership

10:46 10   returns prepared on behalf of United MPH, LLC for the

11   year ended December 31st, 2014."

12            And then going down, "The original of each of

13   the above-mentioned returns should be dated and signed

14   in accordance with the filing instructions included

10:46 15   with a copy of the return.   This copy is for your use

16   and should be retained for your files."

17            I'm just going to scroll down.

18            And, Mr. Liu, did you file this 2014

19   partnership return with the IRS, as directed by your

10:47 20   accountants at Marcum?

21        A.   Yes, that's for -- for which company?

22        Q.   United MPH Ventures.

23        A.   Yeah, I think we filed it, yes.

24        Q.   And is Exhibit 128 a true and accurate copy

10:47 25   of your 2014 partnership tax returns for United MPH

155

1   Ventures?

2        A.   Yes.

3             (Exhibit 129 was marked prior to the

4   commencement of the deposition.)

10:47 5      Q.   BY MR. LEUNG:   I'm about to show you what

6   will be marked as Exhibit 129.   For the record,

7   Exhibit 129 is a 45-page document.   First page says

8   "Taxpayer Copy."   Next page is a letter from Marcum

9   addressed to Charles at United MPH Ventures, LLC.   It

10:48 10  reads, "Enclosed are the following partnership returns

11  prepared on behalf of United MPH Ventures, LLC for the

12  year ended December 31st, 2015.   2015 U.S. Return of

13  Partnership Income."

14            Mr. Liu, did you cause to be filed the

10:48 15  partnership tax returns for 2015 for United MPH

16  Ventures, as reflected in this Exhibit 129?

17       A.   Yes.

18       Q.   And is Exhibit 129 a true and accurate copy

19  of United MPH Ventures' tax returns for the year 2015?

10:49 20      A.   Yes.   It's a shell company.   It didn't do any

21  business.

22       Q.   Do you recall when you first engaged Marcum

23  to provide accounting services for you and your

24  businesses, Mr. Liu?

10:50 25      A.   Yes.   What are you trying to say?

156

```
            1            I didn't see -- do you have Exhibit 35?
            2       Q.   Oh, I'm sorry.  Let me share this with you.
            3            For the record, I'm showing the witness
            4   what's been previously marked Exhibit 35.
11:29       5       A.   Yes, yes.
            6       Q.   Mr. Liu, do you recognize Exhibit 35?
            7       A.   Yes.
            8       Q.   Is this an investor list that you prepared?
            9       A.   Yes.
11:29      10       Q.   Does Exhibit 35 list all of the investors in
           11   the PPEB5 Fund?
           12       A.   Yes.
           13       Q.   The column on the left entitled "Agent," does
           14   that list for each investor the marketing firm that
11:29      15   brought the investor to the PPEB5 Fund?
           16       A.   Yes.
           17       Q.   And then the column on the right entitled
           18   "Petitioner," that's the name of each investor; right?
           19       A.   Yes.
11:30      20       Q.   Is this information accurate, sir?
           21       A.   Yes.
           22       Q.   Was it current --
           23       A.   Except -- except -- let me finish.  Except a
           24   few investors' money were already returned.
11:30      25       Q.   Which investors' money were returned?
```

                                                                171

**GRADILLAS COURT REPORTERS**
(424) 239-2800

Exhibit 2 Page 100

1        A.   I can -- because there's some -- you know, my

2    eyes is getting blurry, but I can, you know, identify,

3    because some of -- you know, husband and wife, you

4    know, wife and husband.  You know, it's hard for me to

11:30  5    identify right away, but I remember, you know, a few

6    has been returned.

7        Q.   Okay.  Are there documents you could consult

8    to figure out exactly who on the list in Exhibit 35 --

9        A.   Yes.  I would appreciate it if you could send

11:31 10    a copy to my legal counsel and my legal counsel can

11    forward it to me.  I can print it out and I can spend

12    some time going through this list myself and then to

13    provide you the documentations and which one has been

14    refunded.

11:31 15        Q.   And you're referring to documentation

16    memorializing the fact of the refund?  You have that

17    documentation?

18        A.   I think so, yeah.

19        Q.   Okay.  Where is it?

11:31 20        A.   I think...

21             Where is it?

22        Q.   Yeah, where is it?

23        A.   I think I kept one printed copy, because one

24    of them, you know, was signed when I was in China, and

11:32 25    the other one I remember was returned by U.S.  So I had

172

1   to -- you know, I will take a note and then provide you

2   the documents you need.

3        Q.    When did these returns of investor capital

4   occur?

11:32   5        A.    Gary, it's been a while.  Let a document

6   speak for itself.

7        Q.    I'm just asking for general time frame.

8   After the SEC filed its case, or before?

9        A.    One is before, the other one is after.

11:32 10        Q.    Okay.  And the one that occurred --

11        A.    I think maybe two before, one after.  That I

12   can't exactly remember, two or three.

13        Q.    Okay.  And you've not produced this

14   documentation yet, right, but you've committed to

11:33 15   collecting it and providing it to the SEC?

16        A.    You mean the documents that we just talking

17   about?

18        Q.    Yeah.  The documents --

19        A.    I never provided that, no.  I never provided

11:33 20   that.

21             (Exhibit 132 marked prior to the commencement

22   of the deposition.)

23        Q.    BY MR. LEUNG:  Yeah.  Okay.  I want to direct

24   your attention to Exhibit 132.  This is an internal

11:33 25   e-mail string within Marcum between Trang Lam and Stan

173

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 102

1                        REPORTER'S CERTIFICATE

2

3              I, DIANE M. BOLAN, Certified Shorthand

4    Reporter No. 12883, in and for the State of California,

5    do hereby certify:

6              That prior to being examined, the witness

7    named in the foregoing deposition was by me duly sworn

8    to testify the truth, the whole truth, and nothing but

9    the truth;

10             That said deposition was taken down by me

11   in shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction,

13   and that the foregoing transcript contains a full, true

14   and verbatim record of the said deposition.

15             I further certify that I have no interest

16   in the event of the action.

17             DATED this 1st day of March, 2021.

18

19

20

21              _____
                        *Diane M. Bolan*

22              DIANE M. BOLAN, CSR No. 12883

23

24

25

                                                          184

Exhibit 2 Page 103