# EXHIBIT 3

# ATTACHMENT
# 4-A

Exhibit 3 Page 104

# Pacific Proton EB-5 Fund, LLC



**Business Plan Prepared by**
**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**

## PROTON THERAPY CENTER PROJECT

## Table of Contents

**Pacific Proton EB-5 Fund, LLC** **4**

**Executive Summary of the Project** **4**

Sources of Funds 6

Uses of Funds 6

**The Proton Beam Center** **6**

Overview 6

Location 7

Stakeholders 7

The Market 8

    About Proton Beam Therapy 8
    Project Market Area 11
    Competitors 13

Marketing Plan 14

    Target Customer Groups 14
    Marketing Approach 14

Project Pro-Forma Financial Analysis 16

    Revenue Forecast 16
    Operating Expense Forecast 19
    Operating Cash Flow Forecast 23

Market Assessment and Feasibility Conclusions 25

Management Team 26

**Job Creation** **29**

Attachment A: MOU from Hanhong Private Equity Management Corporation
Attachment B: Skanska USA Building, Inc. construction bid and detailed timeline
Attachment C: Optivus Proton Therapy, Inc. equipment list and quote
Attachment D: Executed land lease between John Thropay and LACPT, LLC
Attachment E: Organizational Chart and Job Descriptions within the Proton Therapy Center
Attachment F: Architectural Renderings of the Proton Beam Therapy Center
Attachment G: Information about Dr. John Thropay and Beverly Oncology & Imaging

Exhibit 3 Page 106

## Table of Contents (continued)

**FIGURES**

Figure 1:  Los Angeles County Proton Center Location     7
Figure 2:  Cancer Locations Treated at Loma Linda Facility, 1990 to 2008     10
Figure 3:  Facility Market Area     11
Figure 4:  Projected 2010 Cancer Cases in Facility Market Area     12
Figure 5:  Estimated Stabilized Facility Patient Mix, 2014     12
Figure 6:  Proton Beam Therapy Centers in the US     13
Figure 7:  Estimated Project Schedule     16
Figure 8:  Estimated Facility Capacity     17
Figure 9:  Facility Utilization     18
Figure 10:  Treatment Reimbursement Rates     18
Figure 11:  Operating Expense Forecast     19
Figure 13:  Low Demand Scenario Operating Forecast     24
Figure 14:  Low Reimbursement Rate Scenario Operating Forecast     25

Exhibit 3 Page 107

# Pacific Proton EB-5 Fund, LLC

Principals Dr. John Thropay and Mr. Charles Liu organized Pacific Proton EB-5 Fund, LLC ("PPEB5") in November, 2010. PPEB5 is a Delaware limited liability company of 200 E. Beverly Boulevard, Montebello, California, formed to serve as the new commercial enterprise in an EB-5 Immigrant Investor Program ("EB-5 Program") project offering. PPEB5 will offer up to 300 Units of limited liability company interests to qualified non-U.S. citizens seeking permanent resident status in the United States through the EB-5 Program who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Act"). Investors acquiring Units in this offering will be members of PPEB5, and will be entitled to a stake in the project and a preferred return of 0.25% per annum, dependent upon the performance of the project. As the project is located in a designated Targeted Employment Area ("TEA"), the price of each Unit is $500,000 for a maximum offering of $150 million.

PPEB5 will pool investor funds and make a loan of the full $150 million[1] to Los Angeles County Proton Therapy, LLC ("LAPT"), a California limited liability company located at 200 E. Beverly Boulevard, Suite 200, Montebello, California 90840. LAPT will pay interest on the loan at 0.25% per annum with principal due and owing 5 years from the date of the last advance under the loan. LAPT will use the loan proceeds to partially finance the construction and development of a proton therapy center, which will be located at 111 W. Beverly Boulevard, Montebello, California, a qualifying TEA, as designated by the California Governor's Office of Business and Economic Development. LAPT will own and operate the proton therapy center, which constitutes the "Project" for purposes of this business plan.

The Project must create a total of at least 3,000 full time jobs to satisfy the job creation requirements of each of the 300 EB-5 investors. Evans, Carroll & Associates produced a report entitled "Economic Impact of the Construction and Operation of a Proton Therapy Cancer Center as Part of an EB-5 Regional Center Encompassing Los Angeles, Orange, Riverside, and San Bernardino Counties," which states that the Project will create a total of 3,908 jobs, more than enough to satisfy the requirements of all EB-5 investors.

The project will be part of the Pacific Proton Therapy Regional Center, a USCIS-approved Regional Center (approval number RCW 1034350098).

## Executive Summary of the Project

### Los Angeles County Proton Center

Los Angeles County Proton Therapy, LLC, will develop the Los Angeles County Proton Center (the "Facility"), an innovative new cancer treatment center using proton beam radiation for treatment of oncology patients. John P. Thropay, M.D., a respected radiation oncologist with decades of experience in treating cancer in underserved ethnic communities and introducing cutting-edge treatment modalities to those communities, will

---

[1] We note that the total project cost is estimated to be $200 million. LAPT will obtain the remainder of the needed funds from equity investors and/or lenders other than PPEB5.

Exhibit 3 Page 108

head the Facility.  Supporting Dr. Thropay is a team of health professionals with extensive experience in growing and managing clinical oncology treatment centers (in both the United States and Latin America), controlling costs, building quality programs, and contracting effectively with managed-care plans.

The Facility, to be located at 111 W. Beverly Boulevard, Montebello, California 90640, will provide radiation oncology treatment using proton beam therapy to patients from Southern California and (through our management team's international connections) Latin America and Southern China.

The management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching and serving those markets.  This experience will help both in establishing the venture with Southern California patients and in working with international patients.

Proton beam therapy has demonstrated clinical advantages for cancer treatment over other forms of radiation therapy, including greater control of the beam and higher concentration of energy in the tumor.  Associated side effects are generally less severe.  The nearest competing proton beam facility is at Loma Linda University, which is geographically distant from the proposed center and already running at close to capacity. There is room for an additional proton beam center in Southern California, and the Los Angeles County Proton Center will tap that opportunity.  As capacity in the region grows and waiting times for treatment shorten, the types of cancer that can be treated with proton therapy will increase.

An estimated 33 million people will be living in the Southern California market area by 2014, the first full year of planned Facility operation.  Many of these people are from ethnicities and cultural backgrounds that make it difficult for them to utilize conventional (i.e., English-only) centers.  Thus, the market area contains a sizable base of patients who will benefit from the Facility's services.  The Facility's marketing plan, based in part on successful approaches currently in use at the Loma Linda facility, is designed to reach patients, doctors, and other decision-influencers with a range of message and media types.

The Los Angeles County Proton Center has set the following objectives:

- To complete construction of the facility, and be certified and ready to begin treatment, within 30 months of funding.
- To execute provider contracts for proton beam therapy with Individual Practice Associations (IPAs) covering half the insured population in Southern California within 30 months of funding.
- To achieve throughput of eight cases per working day by the end of month 48.

Exhibit 3 Page 109

## Sources of Funds

| Source of Funds | Amount | Percentage |
|---|---|---|
| EB-5 Capital: | $150,000,000 | 75% |
| Other Funding: | $50,000,000 | 25% |
| TOTAL: | $200,000,000 | 100% |

A total of $200 million is anticipated to construct, develop, purchase equipment for, and operate the facility. $150 million is scheduled to come from EB-5 investors. Pending the successful raise of EB-5 funding, Hanhong Private Equity Management Corporation has issued a Memorandum of Understanding regarding providing funding in the amount of $50 million. (See MOU attached as Attachment A.) LACPT is also in negotiations with other lending entities to ensure back-up sources of funding in addition to EB-5.

## Uses of Funds

| Use of Funds | Amount |
|---|---|
| Hard Construction Costs (Direct): | $77,722,156 |
| Soft Costs (Indirect): | $16,814,726 |
| Proton Center Equipment: | $100,000,000 |
| Working Capital & Other Costs: | $5,463,118 |
| TOTAL: | $200,000,000 |

The total construction cost for the facility (direct hard construction costs and indirect soft construction costs) is $94,536,882. This figure is further detailed and supported in a construction bid provided by Skanska USA Building, Inc., attached hereto as Attachment B.

The proton center equipment necessary for treatment includes a Proton Synchrotron System and other medical equipment, and is anticipated to cost about $100,000,000. This estimate (with a 2% cushion to account for potential cost increases) is supported by a quote provided by Optivus Proton Therapy, Inc., attached as Attachment C.

Over $5 million is set aside for working capital for start-up operations, which will be used until revenues from operations are sufficient to cover operational expenses.

# The Proton Beam Center

## Overview

Los Angeles County Proton Therapy, LLC, a California limited liability company ("LAPT" or "the Company") will develop and operate a new, state-of-the-art proton beam therapy treatment facility in the City of Montebello, California.  The Facility, to be called the Los Angeles County Proton Center, will provide comprehensive proton beam therapy treatment services to people suffering from a number of cancers and other diseases.

## Location

Montebello is located 15 minutes to the east of downtown Los Angeles (see Figure 1). The population in and around the town represents a wide range of ethnicities and socioeconomic circumstances. Montebello is surrounded by freeways providing quick access (under one hour) to each of the three major airports serving Southern California, as well as to the world-famous attractions of Hollywood, Rodeo Drive, Beverly Hills, Malibu, Disneyland, and Universal Studios.

The site of the proposed Facility comprises approximately 1.5 acres adjacent to Beverly Hospital, which holds more than 200 inpatient beds. Both sites share frontal access to Beverly Boulevard, one of the main streets in Montebello. The site is currently owned by Dr. John Thropay of the Beverly Oncology and Imaging Group and principal of LAPT.

### Figure 1: Los Angeles County Proton Center Location



## Stakeholders

**Los Angeles County Proton Therapy, LLC** – LAPT will be the developer of the planned Facility. The Company will operate the Facility and building and the provision of patient services.

**Beverly Oncology and Imaging Medical Group** (Beverly) – Beverly is a nationally recognized cancer center that is pioneering breakthrough solutions in radiation oncology by merging leading technologies with superior care and delivering treatments to ethnically and culturally distinct populations. Dr. John Thropay of Beverly and his partners own the

Exhibit 3 Page 111

1.5-acre site that will be leased by the Company under a long-term contract to build the Facility. More information about Dr. Thropay and Beverly Oncology and Imaging is attached hereto as Attachment G.

**Optivus Proton Beam Therapy, Inc.** (Optivus) – Optivus is a proton beam technology developer formed in 1993 by engineers who developed the Proton Beam Treatment Centers at Loma Linda University Medical Center. Since the construction of the Loma Linda Facility, Optivus has been its technology and systems maintenance provider. It conducts research and development for its product platform and assists in the operation of the Loma Linda facility. Optivus was the first FDA-cleared company to provide proton therapy systems and remains the only U.S. company with FDA clearance. Optivus will contract with the Company to provide all necessary initial and ongoing proton beam treatment technology and related maintenance under a standard services contract for the Facility.

## The Market

### About Proton Beam Therapy

Proton beam therapy is a form of radiation treatment used to treat certain types of cancer, as well as other non-cancerous diseases, in the human body. Radiation treatment, in general, is intended to kill or damage cancerous cells so that they are unable to grow and/or divide. By focusing a controlled beam of radiation on the site of the cancer, the growth of malignant tumors is generally reversed. In the best cases, cancerous cells are completely eradicated from the body.

Proton beam therapy is an evolved form of radiation treatment that has a major advantage over other types of radiation treatment in that the associated side effects are significantly reduced. This reduction is achieved by the ability to focus the release of proton radiation at the end of the beam's path (at the site of the tumor), thus causing little or no damage to the healthy tissues nearby.

**History of Proton Therapy in the United States.** The study of particle accelerators was first extended to medical use in proposals put forth in the 1940s, stemming from work done to develop the atomic bombs used in World War II. Research continued over several decades and major advances were made by the U.S. Department of Energy and the Fermi National Accelerator Laboratory in the 1980s. The first hospital-based proton beam therapy center in the U.S. was established in Loma Linda, California in 1990.

Between 1990 and December 2008, the Loma Linda facility treated over 13,000 patients, or roughly one quarter of those treated with proton therapy worldwide. Over the past 15 years, proton beam therapy facilities have been installed at a handful of locations around the country.

**Cancer Treatment Options.** Several cancer treatment options have been used successfully for many years and continue to be refined to improve results and reduce unwanted side effects. As with proton beam therapy, these other treatment options are

Exhibit 3 Page 112

most successful in treating certain types of cancers at certain stages. The three major categories of treatment options include:

- **Chemotherapy.** Chemotherapy is the treatment of cancer with drugs that can destroy cancer cells by impeding their growth and reproduction. Chemotherapy drugs are given by injection or taken orally. Chemotherapy can have many unpleasant side effects, such as nausea, vomiting, hair loss, and mouth sores.

- **Radiation Therapy.** Radiation therapy (of which proton beam therapy is one type) uses energy concentrated into waves or streams of particles that are aimed at cancer cells to kill or change them so they can no longer grow. Radiation therapy can be used on almost any part of the body and generally attempts to deliver high doses of radiation to cancer cells while limiting damage to healthy body tissues. Some of the more common types of radiation used for cancer treatment are:

  - *High-energy photons* – the most common type of treatment in use today
  - *Electron or particle beams* – generally used for tumors close to the skin because these beams cannot penetrate deep into the body
  - *Proton beams* – a relatively new treatment type that is good at limiting collateral damage
  - *Neutron beams* – in limited use due to severe side effects.

- **Surgical Oncology.** Surgery can be done as a preventative measure, as part of the diagnosis, or as a treatment approach.

**Potential for Growth in Use of Proton Beam Therapy.** Proton beam therapy is an effective treatment for a wide range of localized tumors in the head and neck, lungs, prostate, bladder, spinal cord, gastrointestinal tract, and eyes, among others. New research is pioneering the use of proton beam therapy for other locations, including breast cancer, which affects one in eight women in the U.S. Despite the advantages of proton beam therapy over other cancer treatments, market penetration of this technology has been slow. Today, relatively few cancers are typically treated with proton beam therapy.

The vast majority of proton beam treatments have historically been for prostate cancer. As shown in Figure 2, over 68% of treatments performed at the Loma Linda Facility have been for prostate cancer, followed at a distant second by cancers of the head and neck (5.7%).

Exhibit 3 Page 113

**Figure 2: Cancer Locations Treated at Loma Linda Facility, 1990 to 2008**



A number of related factors are behind the slow market penetration of proton beam therapy. First, the expensive and highly specialized equipment required has deterred many cancer facilities from investing in this technology. Few cancer centers in the U.S. currently offer proton beam therapy. This is true even among the centers with the best reputations, where patients are most likely to want to go.

Oncologists tend to recommend the treatment options available at the centers where they practice, both because they are readily available and because those are the options with which they are most familiar. Thus, oncologists are less likely to recommend proton beam therapy, even to patients who might benefit from it, if it is not offered at the center where they practice. Referral networks – that is, the existing relationships between doctors and other types of cancer treatment facilities – have thus minimized the penetration of proton beam therapy into the overall market for cancer treatment. In the vast majority of cases, patients become aware of proton beam therapy through their own research, without the help of existing mainstream hospital networks.

With few centers offering proton beam therapy, patients who choose it must often wait weeks or months to begin treatment. Long waiting periods are generally unacceptable to people with rapidly spreading types of cancer; they will only entertain treatment options that can begin immediately. This is one reason behind the prominence of prostate cancer in the list of conditions historically treated with proton beam therapy. This type of cancer is often slow-growing; thus, patients can wait to start treatment.

Still, the decreased incidence of side effects makes proton beam therapy a potentially superior treatment for many patients with many forms of cancer. The imbalance between the potential demand for and the current availability of proton beam treatment is typical of new or developing products or services gaining popularity in the market. As the benefits of

Exhibit 3 Page 114

the proton beam treatment option become more widely understood by patients, demand for these services is expected to grow, leading to the development of additional facilities. In fact, proton beam therapy is ultimately expected to partially or fully replace other cancer treatment options that cause more negative side effects.

### Project Market Area

The Facility will draw the vast majority of its patients from within a 200-mile radius, designated for this analysis as the Facility Market Area. Figure 3 presents a map of the Market Area.

**Figure 3: Facility Market Area**



In addition to patients from Southern California, the Facility will draw patients from Latin America, using the relationships developed through Dr. Thropay's ownership interest in OncoServ (a radiation oncology group in the Dominican Republic which Dr. Thropay co-founded), and from Southern China, using the Company's Asian investor relations to identify patients seeking state-of-the-art radiation oncology treatment in the U.S. The Southern California market, however, is the Facility's main focus.

The population of the Facility Market Area is currently estimated to be 23.3 million, and is expected to grow to 30 million by the first full year of Facility operation, in 2014. Within this area, the American Cancer Society projects a large number of cancer cases in 2010, as shown in Figure 4, many of which might be appropriate for proton beam treatment.

Exhibit 3 Page 115

**Figure 4:  Projected 2010 Cancer Cases in Facility Market Area**



Figure 5 shows the number of cases of four specific cancer locations (and "other" locations corresponding to the cancers described in the table above) in the Facility Market Area expected for 2014, as well as the number of cases expected to be treated by the Facility.

**Figure 5:  Estimated Stabilized Facility Patient Mix, 2014**

| | Lung | Breast | Prostate | Brain/CNS | Other | Total |
|---|---|---|---|---|---|---|
| Annual Market Area Incidents | 22,140 | 34,287 | 38,649 | 1,955 | 44,337 | 141,369 |
| Facility Market Share | 0.8% | 0.7% | 5.5% | 8.0% | 1.0% | |
| Facility Patients | 180 | 240 | 2,130 | 160 | 440 | 3,150 |
| Percent of Facility Patients | 5.7% | 7.6% | 67.6% | 5.1% | 14.0% | 100.0% |

*Source: US Center for Disease Control, PB Analysis*

The Facility is expected to have a capacity of roughly 3,300 patients per year by 2018, as outlined in the Project Pro Forma Financial Analysis section of this report.  This equates to 4.2% of the current 79,500 new cancer cases per year in the Facility Market Area, and 2.2% of the 141,000 annual new cancer patients estimated to be diagnosed with one of the cancer types listed in Figure 5 in 2014.

The Company does not expect the Facility to capture 4.2% of cancer patients across all cancer types, as prostate cancer treatment has historically made up the vast majority of proton beam treatments.  That said, the Company expects the relatively high capacity of the Facility to impact the percentage distribution of disease types treated at the Facility.  Initially, the Facility expects to capture a relatively large share of prostate and brain/CNS (central nervous system) cancer cases, and for the foreseeable future prostate cancer is expected to be the most frequently treated cancer type at the Facility.  Over time, the share of lung, breast, and other cancer cases is expected to grow.

Exhibit 3 Page 116

**Competitors**

According to the National Association for Proton Therapy, there are seven proton beam therapy centers currently operating in the U.S. and an additional three under construction. Figure 6 lists these locations, as well as five additional "planned" facilities that are in various early stages of project development. Still River Systems, one of these "planned" facilities, is a Boston-based company developing small-scale proton beam therapy applications. These applications are less expensive to build than the current full-scale systems to be used at the Facility and they could be installed at existing hospital facilities, though the Still River website does not indicate specific target locations. Still River has not obtained FDA clearance for its systems.

**Figure 6:  Proton Beam Therapy Centers in the US**

| Operating Facilities | Location | Date Opened |
|---|---|---|
| Loma Linda Medical Treament Center | Loma Linda, CA | 1990 |
| Massachusetts General Hospital | Boston, MA | 2002 |
| Indiana University | Bloomington, IN | 2004 |
| University of Texas | Houston, TX | 2006 |
| University of Florida | Jacksonville, FL | 2006 |
| Procure Proton Therapy Center | Oklahoma City, OK | 2009 |
| University of Pennsylvania | Philadelphia, PA | 2009 |
| **Facilities Under Construction** | | **Planned Opening** |
| Hampton University | Hampton, VA | 2010 |
| Northern Illinois University | West Chicago, IL | 2010 |
| Procure Proton Therapy Center | Warrenville, IL | 2011 |
| **Facilities in Planning** | | |
| Los Angeles County Proton Center | Montebello, CA | |
| Proton Therapy Foundation Miami | Miami Township, OH | |
| University of Miami | Miami, FL | |
| Procure Proton Therapy Center | Detroit, MI | |
| Procure Proton Therapy Center | Boca Raton, FL | |
| McLaren Health Care | Flint, MI | |
| Still River Systems | Multiple | |

In the Facility Market Area, the nearest competing proton beam facility is at Loma Linda University in California. This facility is well-known and has been operating for almost 20 years. Its pricing structure is similar to that proposed for the Facility. However, it is three times farther away from Los Angeles, has not been updated in several years, and is already running at close to capacity.

Conventional radiation therapy is available at many freestanding facilities in Southern California, including OnCure, Vantage, and other chains. These facilities have good penetration into managed care contracting, good conventional therapy equipment, and a pricing structure similar to the Facility's (most facilities do, as they are based on insurance reimbursement rates). However, they do not provide proton beam therapy, with its many clinical advantages. With considerable capital sunk into their existing equipment, adding proton beam equipment is unlikely. In addition, these facilities are hard pressed to show significant differentiation from each other.

Throughout California, hospitals have their own radiation oncology centers. These centers have strong relations with referring physician networks, good managed care contracting in their local areas, and credibility at the community level. However, as they do not differentiate on the basis of equipment, it is difficult for them to build up referrals over a wider geographic area. None of them offers proton beam therapy.

Individual radiation oncologists also operate in freestanding offices throughout California. While they have credibility as physicians and knowledge of the communities they serve, they generally have limited capital backing and lack state-of-the-art technology.

Given the limitations of other providers in the area, there is room for an additional proton beam center in Southern California. The Los Angeles County Proton Center will tap that opportunity, serving a patient population that does not have a local option for proton beam treatment.

## Marketing Plan

The marketing strategy will extend the strategy used by Company management in its Beverly Oncology sites, emphasizing its ability to supply the area's white, Hispanic, and Asian customers with the linguistic/cultural understanding that they need as well as the leading-edge clinical tools that will give them the best care. Dr. John Thropay, the team's medical director, has considerable experience presenting the benefits of new radiation oncology modalities to referring physician and patient populations in the United States, Latin American, and the People's Republic of China. The Company will build on this experience using several initiatives to reach targeted customer groups.

### Target Customer Groups

As prostate cancer is the cancer type most frequently treated with proton beam therapy, men aged 50 and older will be the primary group targeted in the marketing effort. A secondary group of cancer patients who will be targeted include those with cancers of the brain and spinal cord, eye, head and neck, chest, and pelvis. While cancer is much more common in the older segments of the population, proton beam therapy is also applicable to localized tumors in children and some effort will be expended to inform people in the 21 to 45 age group who are most likely to be parents of children ages 0 to 18.

### Marketing Approach

Management has developed a two-pronged marketing approach consisting of marketing (1) directly to potential patients, and (2) to doctors and other health professionals for the Facility. As noted earlier, the majority of proton beam therapy patients have historically been self-referred. The Company's marketing approach seeks to continue growing the number of self-referred patients but also to establish the Facility within the existing referral network of doctors in the Facility Market Area.

The strategy to reach *potential patients directly* will include the following approaches:

Exhibit 3 Page 118

- **Media Strategy.**  A media strategy consisting of newspaper, radio, and magazine advertisements will be deployed in successive three-month campaigns.  The media strategy will be supplemented by public relations efforts that will include a press kit and supplemental information that can be used to create stories on the new Facility.

- **Public Relations Strategy.**  Through news outlets and other public forums, the Company will advertise events such as grand openings and make major milestone announcements.  It will also sponsor educational seminars on all aspects of proton beam therapy to help build the new Facility's credibility.  The Company will retain a public relations firm and begin an initial PR campaign in Southern California three months before the site opens.  This effort will stress the treatment benefits of proton therapy and will note that the location provides access to underserved ethnic populations in the Southern California market.

- **Alumni Referral Program.**  Alumni are one of the most valuable sources of referrals.  The Company will develop a structured program to allow Facility patients to share their experiences with prospective patients and provide contact information to people they know who may be interested in the Facility's services.

The marketing strategy to penetrate *existing doctor referral networks* will revolve around a select group of internal specialists and doctors from the Facility who will meet with and educate physicians, medical groups, and other hospital personnel in the Facility Market Area.  This group of staff will develop avenues to disseminate new information to the medical community and streamline communication channels so that questions from patients and medical practitioners are answered quickly.  For example, six months before the site will open Dr. Thropay will give a series of regional presentations to potential referral physicians to learn about proton beam therapy and what it can do for their patients.  These presentations will be videotaped and put on the Los Angeles County Proton Center's website, which will then be cross-linked to other cancer sites.  Coinciding with the PR effort described above, the Company will conduct walk-throughs of the site with managed care plans, IPAs, referring physician groups, and media personnel.

*Patient inquiries* will be handled by an internal call center staffed with trained personnel who can answer questions about proton beam treatment and direct callers to case managers or physicians if necessary.  Callers will have access to the alumni network of patients for first-hand reports on their experience, as well as insurance advisors to answer questions about financial aspects of the treatment.

A collection of marketing materials will be sent to each caller to provide additional information and background on the procedure.  Brochures, frequently-asked-question sheets, flow and process charts, articles and studies on proton beam therapy, and informational videos will be part of a comprehensive package.  Finally, all of this information and additional materials will be made available on a comprehensive website. The website is one of the most important components of the marketing plan, as most people who do not know about proton beam therapy will begin their search for cancer treatment options on the internet.

Exhibit 3 Page 119

Plans for reaching international patients include these:

- Within six months of the Facility's opening, the Company will have master referral arrangements with health channels in the Dominican Republic and the People's Republic of China/Hong Kong/Macau.
- Within nine months after the Facility's opening, the Company will begin PR campaigns in these international markets.

## Project Pro-Forma Financial Analysis

### Revenue Forecast

The Facility is expected to begin operations within 3 years of the start of construction. Construction of the Facility shell and acquisition of necessary technology will be undertaken concurrently to allow development to proceed as quickly as possible. Some operating employees will be trained during construction to allow the least amount of system downtime possible upon opening for patient treatment. Shown below in Figure 7 is the anticipated schedule for the timing of major project phases.

**Figure 7:  Estimated Project Schedule**



| Construction Phase | EB-5 funds combined with other funding, construction jobs created: | 1454.0 |
| Equipment Phase | EB-5 funds combined with other funding, equipment purchased, jobs created: | 620.0 |
| Operation Phase | All funds have been deployed, jobs created from operations: | 1834.0 |

2,074 jobs created within 2.5 years from first EB-5 investors (double black lines)
All 3,908 jobs created within 2.5 years from last EB-5 investors (double red lines)

The revenue forecast assumes that the demand for treatments at the Facility will exceed treatment capacity. A detailed calculation of Facility capacity is shown in Figure 8. Total patient and treatment capacities assume 98% system up time – that is, the percentage of

Exhibit 3 Page 120

time the proton acceleration system will be available during operating hours in any given year.  This calculation does not take into account the Facility ramp-up period, which provides time for marketing and staff/customer development.

### Figure 8:  Estimated Facility Capacity

| Gantry Capacity | Constant | Unit | Amount |
|---|---|---|---|
| Average Minutes Per Treatment | 10 | minutes | |
| Average Treatments Per Room/Hour | | treatments | 6 |
| Average Number of Operating Hours Per Day | 16 | hours | |
| Average Operating Days Per Year | 300 | days | |
| Average Treatment Capacity Per Year / Rm | | treatments | 28,800 |
| Average Treatments Per Patient (Overall) | 30 | treatments | |
| Average Patient Capacity Per Year / Rm | | patients | 960 |
| Average Treatment Capacity Per Year / Rm | | treatments | 28,800 |
| Average Patient Capacity Per Year / Rm | | patients | 960 |
| Average Number of Rooms In Use | 3 | rooms | |
| Total Gantry Treatment Capacity Per Year | | treatments | 86,400 |
| Total Gantry Patient Capacity Per Year | | patients | 2,880 |
| **Fixed Beam Capacity** | **Constant** | **Unit** | **Amount** |
| Average Minutes Per Treatment | 20 | minutes | |
| Average Treatments Per Room/Hour | | treatments | 3 |
| Average Number of Operating Hours Per Day | 16 | hours | |
| Average Operating Days Per Year | 300 | days | |
| Average Treatment Capacity Per Year / Rm | | treatments | 14,400 |
| Average Treatments Per Patient (Overall) | 30 | treatments | |
| Average Patient Capacity Per Year / Rm | | patients | 480 |
| Average Treatment Capacity Per Year / Rm | | treatments | 14,400 |
| Average Patient Capacity Per Year / Rm | | patients | 480 |
| Average Number of Rooms In Use | 1 | rooms | |
| Total Fixed Beam Treatment Capacity Per Year | | treatments | 14,400 |
| Total Fixed Beam Patient Capacity Per Year | | patients | 480 |
| **Total Capacity Summary (98% system up-time)** | | | |
| Total Treatment Capacity Per Year | | treatments | 98,784 |
| Total Patient Capacity Per Year | | patients | 3,293 |

At full capacity, the Facility is estimated to be able to perform 98,874 treatments per year.  At an average of 30 treatments per patient, this translates to the treatment of approximately 3,293 patients per year.  The Facility, which will be open 300 days per year, will therefore be able to perform an estimated 329 treatments per day.

Patient positioning is the most time-consuming part of a treatment.  To reduce treatment times relative to other proton beam therapy centers, the Facility will employ Optivus' robotic patient positioning technology.  With this system, patient alignment is calculated

Exhibit 3 Page 121

and adjustments are made automatically, increasing patient throughput by an expected
50% over previous-generation technology.

It is expected that, after the first partial year of operations, capacity will ramp up from 80%
in the first full year of operations, to full capacity (95%) in the third full year of operations,
as shown in Figure 9.  Peak capacity will most likely never reach 100% due to the logistical
realities of running the center, including missed appointments, patient tardiness, etc.

**Figure 9:  Facility Utilization**

| Period | % Capacity Achieved | Patient Capacity |
|---|---|---|
| 2012 | - | - |
| 2013 | - | - |
| 2014 | - | - |
| 2015 | 25% | 24,696 |
| 2016 | 80% | 79,027 |
| 2017 | 90% | 88,906 |
| 2018 | 95% | 93,845 |
| 2019 | 95% | 93,845 |
| 2020 | 95% | 93,845 |
| 2021 | 95% | 93,845 |

The calculated capacity of the Facility in any given year is in turn used to estimate revenue.
Revenue generated by the Facility is derived from reimbursements (payments) for
treatments.    These reimbursements are paid to the Facility in the form of
Medicare/Medicaid reimbursements, commercial insurance/managed care payments, or
payments from individuals not using insurance.   Because reimbursement rates for
treatment differ greatly across these payer sources, it is necessary to estimate the number
of patients that will utilize each source to pay for their treatment regimen.  See Figure 11
for a summary of the assumptions used to calculate projected Facility revenue.

**Figure 10:  Treatment Reimbursement Rates**

| Payer | Percentage of Treatments | % of Medicare Reimbursement Rate | Reimbursement Amount (2009$) |
|---|---|---|---|
| Commercial/Managed Care | 48% | 175% | $1,944 |
| Medicare | 44% | 100% | $1,111 |
| Medicaid | 4% | 0% | $0 |
| Private Payment | 4% | 200% | $2,221 |

Based on the data from Optivus' Proton Center #2 (an Optivus client whose identity was
kept confidential at their request), 48% of patients are expected to make use of commercial
insurance or managed care for payment/reimbursement of their treatment costs.   The
Company estimates that payments received by the Facility from commercial insurance will
be 175% of the rate paid for an average Medicare treatment.  Medicare is the next most
popular reimbursement method used, at 44% of projected patients.  Medicaid usage,
projected at 4% of patients, is estimated at 0% of Medicare rates (no expected

Exhibit 3 Page 122

reimbursement for these treatments).  Finally, private payment for treatments, at 4% of projected reimbursements, is assumed to bring the Facility 200% of the average Medicare payment.

The rates in Figure 10 are presented in 2009 dollars; however, it is estimated that the reimbursement rates collected from each type of payer will grow at a constant annual rate of 5% based on a composite calculation of actual Medicare reimbursement growth rates from 2005 to 2008.  Because all other reimbursement rates are calculated using Medicare payment amounts as a base (see above), it is assumed that the payments from other types of reimbursements (commercial/managed care, private, etc.) will grow at this same rate.  This rate escalation is taken into account when calculating projected revenues in the pro-forma financial analysis.  Finally, it is assumed that uncollectable revenue and other charitable care (non-Medicaid) represents 5% of gross revenues based on past experience at Proton Center #2.

### Operating Expense Forecast

Figure 11 shows the Facility expense forecast from the commencement of construction in 2012 through 2019.  Each expense category has been numbered for reference with the respective cost item description.  It is assumed that each expense will escalate by 3.0% per year unless otherwise noted in the description.

**Figure 11:  Operating Expense Forecast**

| Expenses | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Total Adjusted Salary Expense | - | $0.78 | $5.34 | $10.99 | $11.32 | $11.66 | $12.01 | $12.37 |
| 2 | Technology License Fee | - | - | - | $2.81 | $5.80 | $5.97 | $6.15 | $6.33 |
| 3 | Supplies Cost | - | - | - | $1.39 | $4.58 | $5.31 | $5.77 | $5.94 |
| 4 | Repairs and Maintenance Cost | - | - | - | $2.36 | $4.87 | $5.02 | $5.17 | $5.32 |
| 5 | ACTS Management Fee | $0.04 | $0.20 | $1.28 | $3.42 | $4.62 | $4.93 | $5.17 | $5.35 |
| 6 | Staff Benefits Expense | - | $0.23 | $1.58 | $3.32 | $3.49 | $3.66 | $3.85 | $4.04 |
| 7 | Ancillary Patient Care Cost | - | - | - | $0.93 | $3.05 | $3.54 | $3.85 | $3.96 |
| 8 | Marketing Cost | $0.09 | $0.17 | $1.72 | $3.44 | $2.89 | $3.41 | $3.78 | $3.97 |
| 9 | Insurance Cost | - | $0.18 | $1.25 | $2.57 | $2.64 | $2.72 | $2.80 | $2.89 |
| 10 | Incentive and Overtime Pay | - | $0.14 | $0.96 | $1.98 | $2.04 | $2.10 | $2.16 | $2.23 |
| 11 | Legal, Accounting & Consulting Costs | $0.02 | $0.03 | $0.21 | $0.43 | $1.44 | $1.71 | $1.89 | $1.98 |
| 12 | Utilities Cost | - | $0.12 | $0.80 | $1.65 | $1.70 | $1.76 | $1.81 | $1.86 |
| 13 | Other Expenses | $0.05 | $0.09 | $0.62 | $1.24 | $1.28 | $1.31 | $1.35 | $1.39 |
| 14 | Treatment Planning Cost | - | - | - | $0.76 | $0.78 | $0.81 | $0.83 | $0.86 |
| 15 | Land Lease Cost | $0.28 | $0.29 | $0.30 | $0.30 | $0.31 | $0.32 | $0.33 | $0.34 |
| | **Total Operating Expenses** | **$0.47** | **$2.23** | **$14.05** | **$37.60** | **$50.82** | **$54.22** | **$56.92** | **$58.84** |
| | Y.O.Y. Growth Percentage | - | 374.6% | 531.0% | 167.5% | 35.2% | 6.7% | 5.0% | 3.4% |

**Total Adjusted Salary Expense (Line 1):** This item represents the total base payroll to be paid to staff employed at the Facility.  The dollar amounts shown represent salaries net of benefits, incentive pay, or any other amount paid to employees outside of their stated annual salary.  At full operation, it is assumed that the Facility will have a staff of at least 123 employees holding positions from administrative to executive levels.

**Technology License Fee (Line 2):** This fee is charged to the Facility for the use of proprietary Optivus proton therapy technology.  Optivus will provide support including,

Exhibit 3 Page 123

but not limited to, system upgrades, equipment demonstrations, training, and a direct help line for Facility technical support, for a fee of $5 million per year (subject to annual escalation of 3.0%).

Technology licensing fees, combined with royalties, are a common contracting method used by companies developing patented technologies to recoup some of the up-front costs borne during the research and development stages of their product's life cycle. A recent survey/report by Intellectual Property Research Associates, Inc. titled "Royalty Rates for Technology, 4th Edition"[2] summarizes industry-wide benchmarks for the licensing of technology using data from past contracts. The study shows that the most frequent royalty rate charged for the use of licensed equipment is 5% of net sales. The amount Optivus will charge annually for licensing its technology, while not structured as a percentage of sales, equates to approximately 5.3% of net sales from the year the Facility opens until the end of the study period.

**Supply Cost (Line 3):** The cost of supplies varies directly with the number of patients treated by the Facility. Supply cost per patient treated is estimated at $1,500. Supplies are uniquely manufactured for each patient and include items to assist with treatment including wax tissue and apertures for the shaping and moderation of the proton beam and patient immobilization devices for use during treatment.

**Repairs and Maintenance Cost (Line 4):** Optivus will provide contracted maintenance services, including both scheduled and unscheduled preventive and corrective maintenance on the treatment equipment and machinery. The cost of this service is estimated at 5% of the initial capital cost of the treatment technology ($84 million) per year (subject to 3% annual escalation). Included in the fee are parts replacement, daily calibration of equipment and machinery, and all repair and upkeep deemed necessary to maintain continued operations of the technology at the high availability level that is required to achieve the Facility's maximum treatment capacity. A comprehensive renewal and replacement plan will also be provided in relation to technology upgrades and enhancement to sustain a perpetually modern facility. This plan will include equipment testing and monitoring, as well as maintenance of compliance records for treatment devices. The renewal and replacement plan will also include performance monitoring of the system to ensure its continuous operation at specified levels.

**ACTS Management Fee (Line 5):** The ACTS management fee is assessed as a percentage of all other cost items. Ten percent of the sum of all above cost line items will be paid to ACTS by the Facility as a fee for providing management oversight and specialized knowledge of proton therapy operations related to:

- Clinical operations, management, and quality assurance
- Recruiting, staffing and training (all non-physician employees)
- Arranging competitive employee benefits for non-physician employees
- Marketing to patients, physicians and payers
- Support services, from patient intake through follow-up

---

[2] http://www.ipresearch.com/books.html

Exhibit 3 Page 124

- Patient services including financial clearance, counseling, nutrition and support group
- Patient concierge travel and housing services
- Billing and collections
- Joint Commission on Accreditation of Healthcare Organizations compliance

As part of this fee, ACTS will provide management staffing in addition to the Facility employees required for the provision of services.

**Staff Benefits Expense (Line 6):** In addition to salaries paid to employees, an additional 28% of base salary (Line 1) is estimated to pay employee benefits such as health care, paid time off, and other individual expense items incurred by employing a labor force at the Facility. Benefits are paid starting with the first employees hired. Based on historical data from Proton Center #2 and expectations that benefits costs will continue to increase at higher rates than general inflation, it is assumed that benefits expenses will grow by 5% per year instead of the 3% annual rate used to escalate other expense items.

**Ancillary Patient Care Cost (Line 7):** Ancillary patient care is provided to patients by the Facility as part of the cost of a patient's overall treatment package. This cost is estimated at $1,000 per patient treated. Ancillary patient care is a method, employed by similar proton therapy centers, of promoting the overall health of patients during their treatment stay, and normally includes such amenities as fitness center privileges, yoga classes, cafeteria plans, access to a nutritionist/dietician, psychological counseling, etc.

**Marketing Costs (Line 8):** Marketing costs are those costs anticipated to be incurred by purchasing television, newspaper, and other advertising space both locally and nationally. National advertising campaigns are essential to grow the business in light of the fact that a considerable number of patients are expected to come from outside of the Facility Market Area. It will be necessary to heavily market the Facility, especially in the early years of operation, to ensure a consistent flow of new patients. This cost is estimated at 2% of net revenue in each year.

**Insurance Cost (Line 9):** Insurance will be a necessary cost of mitigating the financial and safety risks of operating the Facility. The Facility is not assumed to need any special insurance related to the unique type of medical treatment it provides; however, the Facility will need to procure standard business insurance coverage such as fire, theft, liability, etc.

**Incentive and Overtime Pay (Line 10):** Incentive and Overtime pay is derived from base salaries (Line 1). It is estimated that bonus and incentive pay will equal 12% of base salaries, and overtime pay will be 6% of base salaries. In total, incentive and overtime pay will equal 18% of base salaries. This 18% of salary is calculated before benefits are added to base salaries. Providing employees with the opportunity for incentive pay is part of the Facility's core strategy to achieve its maximum treatment capacity.

**Legal, Accounting & Consulting Costs (Line 11):** The services of legal teams, accounting firms, and consultancies will be required to keep the center operating efficiently and in

Exhibit 3 Page 125

compliance with any laws and standards imposed on it by regulatory agencies.  Legal, accounting, and consulting costs are estimated at 1% of net revenue.

**Utilities Cost (Line 12):**  Around 90% of this annual amount is expected to be directly related to the proton accelerator's need to draw a large amount of electricity to operate. Other utilities such as water and natural gas will represent the remainder of utility costs.

**Other Expenses (Line 13):** Other expenses represent all other costs that are not identified within a specific category in this projection.  Other expenses are included in order to provide contingency in the event that actual costs are higher than expected.  It is assumed that other expenses will total $1.1 million per year in 2009 dollars.

**Treatment Planning Costs (Line 14):**  Treatment planning costs refer to costs incurred for obtaining user licenses for the software necessary to plan the treatment of patients with the proton therapy system.  This software was originally developed jointly by the James M. Slater, M.D. Proton Treatment and Research Center at Loma Linda University and PerMedics Medical Systems, and will be licensed to the Facility for approximately $22,500 per license.  The Facility is assumed to need 30 licenses.

**Land Lease Cost (Line 15):**  The land shall be leased for 30 years for $1 million per year. The executed lease for the property between John P. Thropay (landlord) and Charles Liu for Los Angeles County Proton Therapy, LLC is attached hereto as Attachment D.

Exhibit 3 Page 126

### Operating Cash Flow Forecast

The Facility is forecast to begin earning an operating profit in 2015 or within one year of the start of operations (2016) and prior to when maximum treatment capacity is achieved (2018). Eight-year cash flow projections are shown in Figure 12. Additionally, two alternative operating scenarios were analyzed and are presented in the following sections.

**Figure 12: Operating Forecast**
(dollars in millions)

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | |
| Patients | - | - | - | 823 | 2,634 | 2,964 | 3,128 | 3,128 |
| Treatments | - | - | - | 24,696 | 79,027 | 88,906 | 93,845 | 93,845 |
| **Revenue** | | | | | | | | |
| Gross Proton Treatment Revenue | - | - | - | $45.26 | $152.01 | $179.49 | $198.85 | $208.70 |
| Less: Uncollectable Revenue Amounts | - | - | - | ($2.26) | ($7.60) | ($8.97) | ($9.94) | ($10.44) |
| **Net Revenue** | - | - | - | **$43.00** | **$144.41** | **$170.52** | **$188.91** | **$198.27** |
| **Expenses** | | | | | | | | |
| 1 Total Adjusted Salary Expense | - | $0.78 | $5.34 | $10.99 | $11.32 | $11.66 | $12.01 | $12.37 |
| 2 Technology License Fee | - | - | - | $2.81 | $5.80 | $5.97 | $6.15 | $6.33 |
| 3 Supplies Cost | - | - | - | $1.39 | $4.58 | $5.31 | $5.77 | $5.94 |
| 4 Repairs and Maintenance Cost | - | - | - | $2.36 | $4.87 | $5.02 | $5.17 | $5.32 |
| 5 ACTS Management Fee | $0.04 | $0.20 | $1.28 | $3.42 | $4.62 | $4.93 | $5.17 | $5.35 |
| 6 Staff Benefits Expense | - | $0.23 | $1.58 | $3.32 | $3.49 | $3.66 | $3.85 | $4.04 |
| 7 Ancillary Patient Care Cost | - | - | - | $0.93 | $3.05 | $3.54 | $3.85 | $3.96 |
| 8 Marketing Cost | $0.09 | $0.17 | $1.72 | $3.44 | $2.89 | $3.41 | $3.78 | $3.97 |
| 9 Insurance Cost | - | $0.18 | $1.25 | $2.57 | $2.64 | $2.72 | $2.80 | $2.89 |
| 10 Incentive and Overtime Pay | - | $0.14 | $0.96 | $1.98 | $2.04 | $2.10 | $2.16 | $2.23 |
| 11 Legal, Accounting & Consulting Costs | $0.02 | $0.03 | $0.21 | $0.43 | $1.44 | $1.71 | $1.89 | $1.98 |
| 12 Utilities Cost | - | $0.12 | $0.80 | $1.65 | $1.70 | $1.76 | $1.81 | $1.86 |
| 13 Other Expenses | $0.05 | $0.09 | $0.62 | $1.24 | $1.28 | $1.31 | $1.35 | $1.39 |
| 14 Treatment Planning Cost | - | - | - | $0.76 | $0.78 | $0.81 | $0.83 | $0.86 |
| 15 Land Lease Cost | $0.28 | $0.29 | $0.30 | $0.30 | $0.31 | $0.32 | $0.33 | $0.34 |
| **Total Operating Expenses** | **$0.47** | **$2.23** | **$14.05** | **$37.60** | **$50.82** | **$54.22** | **$56.92** | **$58.84** |
| **Operating Profit** | | | | | | | | |
| **EBITDA** | ($0.47) | ($2.23) | ($14.05) | $5.40 | $93.59 | $116.29 | $131.98 | $139.43 |

Exhibit 3 Page 127

**Low Demand Scenario.** The Low Demand Scenario is characterized by a 25% reduction in anticipated demand. In the event that the Facility does not achieve 100% of the demand projected, but only reaches 75%, the pro forma in Figure 13 represents an estimation of the financial implications. This reduction in demand has a slight effect on variable costs, but a more significant result of this fall in demand is manifest in the associated fall in revenue. Even with less demand than anticipated, the Facility is expected to achieve operating profitability in 2016.

Note, in an effort to be conservative, job creation estimates in the accompanying economic analysis are based off the 2016 net revenue figure from this Low Demand Scenario ($108.3M).

**Figure 13: Low Demand Scenario Operating Forecast**
(dollars in millions)

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | | |
| | Patients | - | - | - | 617 | 1,976 | 2,223 | 2,346 | 2,346 |
| | Treatments | - | - | - | 18,522 | 59,270 | 66,679 | 70,384 | 70,384 |
| **Revenue** | | | | | | | | | |
| | Gross Proton Treatment Revenue | - | - | - | $33.95 | $114.01 | $134.62 | $149.14 | $156.53 |
| Less: | Uncollectable Revenue Amounts | - | - | - | ($1.70) | ($5.70) | ($6.73) | ($7.46) | ($7.83) |
| | **Net Revenue** | - | - | - | **$32.25** | **$108.31** | **$127.89** | **$141.68** | **$148.70** |
| **Expenses** | | | | | | | | | |
| 1 | Total Adjusted Salary Expense | - | $0.78 | $5.34 | $10.99 | $11.32 | $11.66 | $12.01 | $12.37 |
| 2 | Technology License Fee | - | - | - | $2.81 | $5.80 | $5.97 | $6.15 | $6.33 |
| 3 | Supplies Cost | - | - | - | $1.04 | $3.44 | $3.98 | $4.33 | $4.46 |
| 4 | Repairs and Maintenance Cost | - | - | - | $2.36 | $4.87 | $5.02 | $5.17 | $5.32 |
| 5 | ACTS Management Fee | $0.04 | $0.20 | $1.23 | $3.26 | $4.32 | $4.58 | $4.79 | $4.95 |
| 6 | Staff Benefits Expense | - | $0.23 | $1.58 | $3.32 | $3.49 | $3.66 | $3.85 | $4.04 |
| 7 | Ancillary Patient Care Cost | - | - | - | $0.69 | $2.29 | $2.65 | $2.89 | $2.97 |
| 8 | Marketing Cost | $0.06 | $0.13 | $1.29 | $2.58 | $2.17 | $2.56 | $2.83 | $2.97 |
| 9 | Insurance Cost | - | $0.18 | $1.25 | $2.57 | $2.64 | $2.72 | $2.80 | $2.89 |
| 10 | Incentive and Overtime Pay | - | $0.14 | $0.96 | $1.98 | $2.04 | $2.10 | $2.16 | $2.23 |
| 11 | Legal, Accounting & Consulting Costs | $0.01 | $0.02 | $0.16 | $0.32 | $1.08 | $1.28 | $1.42 | $1.49 |
| 12 | Utilities Cost | - | $0.12 | $0.80 | $1.65 | $1.70 | $1.76 | $1.81 | $1.86 |
| 13 | Other Expenses | $0.05 | $0.09 | $0.62 | $1.24 | $1.28 | $1.31 | $1.35 | $1.39 |
| 14 | Treatment Planning Cost | - | - | - | $0.76 | $0.78 | $0.81 | $0.83 | $0.86 |
| 15 | Land Lease Cost | $0.28 | $0.29 | $0.30 | $0.30 | $0.31 | $0.32 | $0.33 | $0.34 |
| | **Total Operating Expenses** | **$0.44** | **$2.17** | **$13.52** | **$35.90** | **$47.53** | **$50.38** | **$52.72** | **$54.48** |
| **Operating Profit** | | | | | | | | | |
| | EBITDA | ($0.44) | ($2.17) | ($13.52) | ($3.65) | $60.78 | $77.51 | $88.96 | $94.22 |

Exhibit 3 Page 128

**Low Payment Rate Scenario.**  The Low Payment Rate scenario (shown in Figure 14) considers the consequences of a projected Medicare reimbursement rate which is 10% lower than the base 2010 rate forecast in this study.  This has no cost implications, but has a negative effect on projected revenue since reimbursement rates are tied directly to treatment revenue.  Operating profitability is still anticipated from 2016 forward.

**Figure 14:  Low Reimbursement Rate Scenario Operating Forecast**
(dollars in millions)

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | |
| Patients | - | - | - | 823 | 2,634 | 2,964 | 3,128 | 3,128 |
| Treatments | - | - | - | 24,696 | 79,027 | 88,906 | 93,845 | 93,845 |
| **Revenue** | | | | | | | | |
| Gross Proton Treatment Revenue | - | - | - | $40.74 | $136.81 | $161.54 | $178.96 | $187.83 |
| Less:   Uncollectable Revenue Amounts | - | - | - | ($2.04) | ($6.84) | ($8.08) | ($8.95) | ($9.39) |
| **Net Revenue** | - | - | - | $38.70 | $129.97 | $153.46 | $170.02 | $178.44 |
| **Expenses** | | | | | | | | |
| 1  Total Adjusted Salary Expense | - | $0.78 | $5.34 | $10.99 | $11.32 | $11.66 | $12.01 | $12.37 |
| 2  Technology License Fee | - | - | - | $2.81 | $5.80 | $5.97 | $6.15 | $6.33 |
| 3  Supplies Cost | - | - | - | $1.39 | $4.58 | $5.31 | $5.77 | $5.94 |
| 4  Repairs and Maintenance Cost | - | - | - | $2.36 | $4.87 | $5.02 | $5.17 | $5.32 |
| 5  ACTS Management Fee | $0.04 | $0.20 | $1.26 | $3.38 | $4.58 | $4.88 | $5.12 | $5.29 |
| 6  Staff Benefits Expense | - | $0.23 | $1.58 | $3.32 | $3.49 | $3.66 | $3.85 | $4.04 |
| 7  Ancillary Patient Care Cost | - | - | - | $0.93 | $3.05 | $3.54 | $3.85 | $3.96 |
| 8  Marketing Cost | $0.08 | $0.15 | $1.55 | $3.10 | $2.60 | $3.07 | $3.40 | $3.57 |
| 9  Insurance Cost | - | $0.18 | $1.25 | $2.57 | $2.64 | $2.72 | $2.80 | $2.89 |
| 10  Incentive and Overtime Pay | - | $0.14 | $0.96 | $1.98 | $2.04 | $2.10 | $2.16 | $2.23 |
| 11  Legal, Accounting & Consulting Costs | $0.01 | $0.03 | $0.19 | $0.39 | $1.30 | $1.53 | $1.70 | $1.78 |
| 12  Utilities Cost | - | $0.12 | $0.80 | $1.65 | $1.70 | $1.76 | $1.81 | $1.86 |
| 13  Other Expenses | $0.05 | $0.09 | $0.62 | $1.24 | $1.28 | $1.31 | $1.35 | $1.39 |
| 14  Treatment Planning Cost | - | - | - | $0.76 | $0.78 | $0.81 | $0.83 | $0.86 |
| 15  Land Lease Cost | $0.28 | $0.29 | $0.30 | $0.30 | $0.31 | $0.32 | $0.33 | $0.34 |
| **Total Operating Expenses** | $0.46 | $2.20 | $13.84 | $37.17 | $50.34 | $53.66 | $56.30 | $58.18 |
| **Operating Profit** | | | | | | | | |
| EBITDA | ($0.46) | ($2.20) | ($13.84) | $1.53 | $79.63 | $99.81 | $113.72 | $120.26 |

## Market Assessment and Feasibility Conclusions

The Facility's large size, with a capacity of roughly 329 treatments per day at stabilization, will require an overall market penetration rate of 2.2% to achieve 95% capacity throughput.  There is a large population surrounding the Facility within a 200-mile radius, and relatively high cancer rates and an aging population within the area roughly 60 miles from the Facility.  These demographic features of the Facility Market Area provide the platform for the Facility to attract patients.  The Facility will rely on its marketing plan and successful approaches currently in use at the Loma Linda Facility to build a backlog of patients.

As other similar services begin to be offered in nearby market areas, diversifying the disease mix treated at the Facility will become more important.  The Company's expectation of 95% of capacity throughput is an aggressive goal but appears to be attainable with a sizeable backlog of patients suffering from a variety of disease types.

Exhibit 3 Page 129

Aside from robust demand for the facility's services, changes in the following revenue-side factors could have implications for the Facility's top line:

- Patient throughput rate
- Potential volatility of Medicare payment rates
- The mix of payment rates realized (Medicare vs. other managed care, etc.)
- Reimbursement rates by payment type.

If the Facility achieves its expected capacity and patient throughput, the revenue generation from the facility will be very strong, aided by the increases in Medicare rates for proton beam treatment procedures for 2010. While the up-front capital costs represent a substantial investment, the Facility could recoup its investment within four years of the start of construction.

## Management Team

Our management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching those markets. This experience will help both in establishing the venture with Southern California patients and in working with international patients.

### John P. Thropay, M.D., Chairman and Chief Executive Officer

Dr. John P. Thropay is Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Inc. Dr. Thropay's mission is to provide the best possible outcomes for cancer patients. Dr. Thropay also serves as Medical Director of Radiation Oncology Stereotactic Radiosurgery for the Rotating Gamma Institute of Orange County.

Dr. Thropay opened his first radiation oncology center in 1980. Since then he has expanded the operation to seven outpatient clinics throughout Southern California and two additional facilities outside the U.S. (Dominican Republic and Los Mochis, Mexico). He has earned distinction as creator of the first freestanding outpatient clinic network to be JCAHO-certified, thereby earning the same distinction for its safety guidelines and protocols as other major, prestigious medical institutions. Through these ventures, his mission has remained the same: to provide the highest-quality cancer treatment care by working with exceptional professionals – a team of multicultural and multi-linguistic physicians, nurses, and staff who help him be the first to bring best-in-class services and technologies to our communities.

Dr. Thropay, along with his medical team, became highly experienced in translational research having introduced a wealth of new and emerging technologies to the community over the last 30 years. Key examples include the 1979 introduction of Brachytherapy, the popular implant technology practiced by an elite group of radiation oncologists. In 2008, he was the first to introduce and treat patients with electronic (green – no iridium) Brachytherapy in California. In 1997, his was the first freestanding facility in California to install and treat patients with Intensity Modulated Radiation Therapy (IMRT), winning an

Exhibit 3 Page 130

award from the City Council of Los Angeles for bringing such advanced technology to Los Angeles and surrounding communities ahead of other major institutions. In 1985, he introduced to his treatment protocol Hyperthermia, the unique heat treatment used in special cases in conjunction with Radiation Therapy to reduce recurrence of certain cancers.

Building upon his treatment expertise and his passion for scientific/translational research, Dr. Thropay established Clinical Trials & Research Associates (CTRA) in 1999, bringing some of the world's latest breakthroughs in cancer treatment to Southern California's local and diverse ethnic communities. His site became one of California's only full-time, free-standing, privately owned investigative sites authorized to conduct phase II-IV clinical research protocols.

Due to Dr. Thropay's extensive experience both as a physician and as a multi-cultural patient advocate, he was invited to serve as a member of the University of California at Los Angeles (UCLA) Institutional Review Board for Oncology Trials. There he shares insights regarding provision of care to the large and diverse oncology population of the greater Los Angeles area. He also serves on the Advisory Board at the University of California at Irvine (UCI) for the Clinical Trials: Medical Device and Drug Development Committee.

Dr. Thropay graduated from UCLA with a degree in Medicine and completed his residency in Radiation Oncology at LAC/USC Medical Center. He is distinguished and respected by his peers within the oncology profession, and is an active member in numerous organizations, including The Tumor Board, American College of Radiation Oncology, American Medical Association, Los Angeles Radiological Association, and the Association of Clinical Research Professionals.

More information about Dr. Thropay and Beverly Oncology and Imaging is attached hereto as Attachment G.

**Charles Liu, President**

Mr. Liu received his Master's Degree in Arts Management from Columbia University in 1991. During the period 1993-2004, Mr. Liu was working in venture capital, investing primarily in medical equipment, real estate, and media companies. Mr. Liu was a member of the Chinese American Trade Association from 1995-2000 and won the Outstanding Young Entrepreneur's award in Shanghai in 1997 and in 1999. Mr. Liu received a Letter of Commendation from former President Bill Clinton for his contributions.

**Ruth Lopez Novodor, Chief Operating Officer and Corporate Secretary**

Ruth Lopez Novodor serves as CEO for Beverly Oncology and Imaging Centers (BOI) Medical Group, Inc., a position she has held since 1980. In this capacity, Ms. Lopez Novodor is responsible for the company's business planning and execution of strategic goals locally and internationally. Ms. Lopez Novodor also served as CEO for Americade Home Health Agency (AHHA) for approximately 15 years prior to its sale. Americade was formed to fill a gap in service in the Los Angeles and surrounding communities as identified first by the needs of Dr. Thropay's patients. With a staff of 50 skilled nurses, home health aides, social

Exhibit 3 Page 131

workers, and occupational, speech, and respiratory therapists, Americade provided much needed care to a broad base of multi-cultural patients confined to the home.

Ms. Lopez Novodor, along with her brother, John P. Thropay, M.D., co-founded VivaHealth Plan. Ms. Lopez Novodor served as CEO and developed the concept from its inception in 1989 to licensure and operational status. This first-of-its-kind HMO was specifically designed to provide all-encompassing healthcare services in Spanish to the burgeoning Hispanic population in Southern California and served as a catalyst for the evolution of ethnically and culturally responsive models of healthcare delivery.

Ms. Lopez Novodor has served as a Delegate to the White House on Small Business; a two-term Chairman of the Board of the Latin Business Association (LBA); a four-year member of Wells Fargo Bank's Corporate Diversity Council; and a board member for El Proyecto del Barrio, a health and human services organization. She currently serves on the board of The National Federation of Independent Business (NFIB); is Chairman of the Leadership Council of NFIB California; is a member of the Adaptive Business Leaders (ABL) Organization, a Healthcare Executive Roundtable; and holds appointments from the Mayor of Los Angeles, Antonio Villaraigosa, and the Governor of California, Arnold Schwarzenegger, to the Workforce Investment Board of Los Angeles (WIB) and the California Citizens Compensation Commission (CCCC), respectively.

Ms. Lopez Novodor holds an MBA and a Bachelor of Science degree in Business Administration from Pepperdine University. In 1996, she completed the University of Missouri's Executive Program for Managed Care at Kansas City's National Center for Managed Health Care Administration and Henry W. Bloch School of Business and Public Administration. She is currently pursuing a PhD in Leadership and Change at Antioch University.

**Fred Croft, Chief Financial Officer**

Mr. Croft was Chief Executive Officer for Spectrum Restaurant Group (raised capital by successful asset sales before developing buyout offers) and Omni Laboratories Inc. (supply chain/fabrication solutions for major brands). He also served as Chief Operating Officer for Mizati Wheels, a publicly-traded auto aftermarket company where he re-built the sales department and increased year-over-year sales by 35%, and he was CFO for Beverly Oncology Centers.

Mr. Croft was an engagement manager with KPMG Peat Marwick, handling American Medical International, Marvin Davis, Sony Capital, and Dean Witter Capital Markets. With PVM Partners, his clients include Edison International, Fenway Partners, Platinum Equity, Gruppo Campari, American Capital Strategies, Jardine Matheson, Changhong Ltd., American Apparel, Shenzhen Zowee Technology Ltd., Marlin Capital Partners, and Kaiser Permanente. He's helped clients in marketing management and development, strategic alliance building, restructurings, supply chain management, analysis of financing alternatives, acquisitions mergers and divestitures, and recapitalization projects.

Mr. Croft was a co-founder of Altamira Group, the software company that created fractal image compression, and the award-winning "Genuine Fractals" product which eventually

Exhibit 3 Page 132

became part of Adobe Photoshop. He also co-founded VHP, a Latino-focused health maintenance organization which was eventually sold to New York Life.

Mr. Croft is a subject matter expert for the California Society of Certified Public Accountants. He was also co-author of the Anderson School's "Solutions For Our State" study, and served as guest lecturer for UCLA, UC Berkeley, and the University of Southern California's EC2 business incubator. Mr. Croft also received a Letter of Commendation for his analyses of economic issues affecting national health policy from the Clinton White House.

## Job Creation

Construction and development of the Facility will cost $200 million. Using RIMS II final demand multipliers, we see that these activities will create 2,074 new jobs within the regional center geographic area. Using the conservative "low demand" scenario, the operations of the proton therapy center are projected to generate $108.3 million in revenue. This figure is entered into the RIMS II model and produces an additional 1,834 new jobs, for a total of 3,908 projected jobs. Please see the attached economic analysis for more detail.

| Table A.  Summary of Revenue and Employment Effects | | | |
|---|---|---|---|
| Activity | Revenue $ million | RIMS II Multiplier | Total Jobs | NAICS Code |
| Phase I | | | | |
| Construction of Building | 91.94 | 15.82 | 1454.5 | 2362 |
| Manufacturing Proton Equipment | 100 | 6.204 | 620.4 | 3345 |
| Phase I totals | 191.94 | | 2074.9 | |
| Phase II | | | | |
| Operation of Cancer Center | 108.3 | 16.93 | 1833.5 | 622 |
| Overall project total | 302.8 | | 3908.5 | |

Please see Attachment E for an organizational chart and job descriptions for the proton therapy center.

Please see Attachment F for architectural renderings of the proton therapy center.

Exhibit 3 Page 133

# ATTACHMENT A

Exhibit 3 Page 134



北京市朝阳区建国路 91 号金地中心大厦 B 座 30 层，邮编 100022
30/F, B Tower, Gemdale Plaza, Beijing 100022, China
电话 Phone +86 10-5851-0555
传真 Fax +86 10-5851-0666
网址 Website hanhongpe.com

## 汉红股权投资基金管理有限公司
HANHONG PRIVATE EQUITY
MANAGEMENT CORPORATION

# MEMORANDUM OF UNDERSTANDING

This memorandum of understanding (this "**Memorandum**") summarizes certain
principal terms of a proposed agreement (the "**Proposed Agreement**") by and
between Los Angeles County Proton Therapy, LLC, a California limited liability
company ("**LACPT**"), and Beijing Hanhong Private Equity Management   Co., Ltd.,
an entity organized and existing under the laws of the People's Republic of China
("**Hanhong**"), pursuant to which Hanhong would make an equity investment in
LACPT, and LACPT would give Hanhong a certain percentage ownership interest in
LACPT, pursuant to certain terms and conditions.   (Each of LACPT and Hanhong
may be referred to herein as a "party", or collectively, the "parties".)

This Memorandum is non-binding.   Except for the paragraph captioned "Expenses",
no legally binding obligations will be created, implied or inferred until a definitive
agreement is executed and delivered by each of LACPT and Hanhong.   Any party
may at any time end discussions and negotiations, without having to give any reasons
for doing so or incurring any liability for the payment of damages or the
reimbursement of costs or expenses relating to such termination of discussion.

All dollar amounts referred to in this Memorandum shall be in United States Dollars.

| | |
|---|---|
| **The Investment** | Upon fulfillment of the conditions set forth below, Hanhong will make an equity investment of fifty million dollars ($50,000,000) in LACPT (the "**Investment**"), and upon receipt of such investment, LACPT will transfer to Hanhong twenty-five percent (25%) of the ownership interests in LACPT. |
| **Purpose** | The Investment may be used by LACPT for any of its business purposes. In particular, the Investment is being made in anticipation of the development of the Los Angeles County Proton Center, a new cancer treatment center using proton beam radiation for the treatment of oncology patients (the "**Project**"). |
| **EB-5 Offering** | LACPT or its affiliate will conduct a private offering under the "EB-5 |

Exhibit 3 Page 135



北京市朝阳区建国路 91 号金地中心大厦 B 座 30 层，邮编 100022
30/F, B Tower, Gemdale Plaza, Beijing 100022, China
电话 Phone +86 10-5851-0555
传真 Fax +86 10-5851-0666
网址 Website hanhongpe.com

## 汉红股权投资基金管理有限公司

**HANHONG PRIVATE EQUITY
MANAGEMENT CORPORATION**

Immigrant Investor Program" (the "**EB-5 Program**") to raise a maximum amount of up to one hundred fifty million dollars ($150,000,000), from a maximum of three hundred (300) investors (the "**EB-5 Investors**") for the purposes of the Project (the "**Offering**").

Each EB-5 Investor will make an investment of at least five hundred thousand dollars ($500,000) (a "**Capital Contribution**") into Pacific Proton EB-5 Fund, LLC or another entity formed for the purpose of conducting the Offering (the "**EB-5 Entity**"). Each EB-5 Investor will also pay an administrative fee in an amount to be determined in the discretion of LACPT (the "**Administrative Fee**"), which may be used to pay expenses of the Offering, including costs and fees associated with any brokers, finders, or migration consultants used in connection with the Offering. No portion of the Administrative Fee will be considered a Capital Contribution to the EB-5 Entity.

EB-5 Investors will deposit funds into the EB-5 Entity's escrow account or accounts and such funds will be released to the EB-5 Entity upon the filing of each EB-5 Investor's I-526 Immigrant Petition by Alien Entrepreneur, or such other event as determined by LACPT. In connection with the Investment, funds from the Offering will be deemed to have been received by the EB-5 Entity once such funds have been deposited by an EB-5 Investor into such escrow account or accounts of the EB-5 Entity.

After the completion of the Offering, the EB-5 Entity will loan the total amount of the Capital Contributions raised by the Offering to LACPT or its affiliate for purposes of the Project.

**Terms of EB-5 Investment**

The EB-5 Investors' investments will be subject to the following terms, as may be modified or expanded upon by LACPT:

- Each EB-5 Investor must be both (a) an "accredited investor" pursuant to Rule 506 of Regulation D under the Securities Act of 1933 (the "**Securities Act**"), and (b) not a "U.S. Person" pursuant to Rule 902 of Regulation S under the Securities Act.

- EB-5 Investors will receive an annual preferred return equal to one quarter of one percent (0.25%) of their Capital Contribution.

- No EB-5 Investor may receive a return of his or her Capital Contribution until his or her I-829 Petition by Entrepreneur to

Exhibit 3 Page 136



北京市朝阳区建国路 91 号金地中心大厦 B 座 30 层，邮编 100022
30/F, B Tower, Gemdale Plaza, Beijing 100022, China
电话 Phone +86 10-5851-0515
传真 Fax +86 10-5851-0666
网址 Website hanhongpe.com

**汉红股权投资基金管理有限公司**
**HANHONG PRIVATE EQUITY**
**MANAGEMENT CORPORATION**

Remove Conditions has been adjudicated.

- The EB-5 Entity shall return the EB-5 Investors' Capital Contributions five (5) years after it received such Capital Contributions, or at such other time as determined by LACPT.

- EB-5 Investors will have voting and policy-making rights in the EB-5 Entity only to the extent required by the United States Citizenship and Immigration Services and applicable law.

**Condition Precedent to Investment**

Hanhong will make the Investment subject to the successful raise of at least one hundred million dollars ($150,000,000) in Capital Contributions through the Offering.   If LACPT fails to raise at least one hundred million dollars ($150,000,000) in Capital Contributions through the Offering, Hanhong will have no obligation to make the Investment.

*fifty* *fifty*

**Terms of Investment**

Hanhong's Investment in LACPT will be subject to the following terms, as may be modified or expanded upon by the parties:

- All distributions and allocations of profits and losses of LACPT will be made pro-rata to the members of LACPT (the **"Members"**), according to their respective percentage interests in LACPT.

- All matters requiring a vote of the Members will require the unanimous consent of all Members.

- Hanhong's membership interest in LACPT will be freely transferable by Hanhong to any other individual or legal entity.

- Government's approval on foreign investment

**Additional Capital**

In addition to the Offering proceeds and the Investment, LACPT shall have the right to seek additional funding for the Project through investments from equity investors in Hong Kong or the People's Republic of China, or any other equity or debt funding sources as determined by LACPT.

**Expiration of Memorandum**

This Memorandum will expire on the date that is one year after the date this Memorandum has been signed by both parties.

**Expenses**

Each party will be responsible for its expenses incurred with respect to the transaction contemplated hereby.

**Language**

This Memorandum's controlling language for all matters relating to the interpretation is Chinese.

Exhibit 3 Page 137



北京市朝阳区建国路 91 号金地中心大厦 B 座 30 层，邮编 100022
30/F, B Tower, Gemdale Plaza, Beijing 100022, China
电话 Phone +86 10-5851-0555
传真 Fax +86 10-5851-0666
网址 Website hanhongpe.com

## 汉红股权投资基金管理有限公司

HANHONG PRIVATE EQUITY
MANAGEMENT CORPORATION

LOS ANGELES COUNTY PROTON THERAPY, LLC

By: _____
Name: CHARLES LIU
Title: President

Date: 04-24-2013

HANHONG PRIVATE EQUITY CO., LTD.

By: _____
Name: LIU YANG
Title: Founding Partner & President

Date: 23-04-2013

Exhibit 3 Page 138

# ATTACHMENT B

Exhibit 3 Page 139

This **AGREEMENT** is made as of the _____15th_____ day of April in the year of 2013, by and between the following parties, for services in connection with the Project identified below.

**OWNER:**

Los Angeles County Proton Therapy, LLC

**PRELIMINARY SERVICES DESIGN-BUILDER:**

Skanska USA Building Inc.

518 East Township Line Road, Suite 200

Blue Bell, PA 19422

**PROJECT:**

Los Angeles County Proton Therapy Center

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

Exhibit 3 Page 140

## Article 1
## General

**1.1      Duty to Cooperate.** Owner and Preliminary Services Design-Builder ("Design-Builder" or "Skanska") commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith to permit each party to realize the benefits afforded under this Agreement.

**1.2      Basic Definitions.**

.1   *Agreement* refers to this executed contract for Preliminary Services between Owner and Design-Builder

.2   *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

.4   *Deliverables* shall mean Design-Builder's Preliminary Evaluation; Schematic Design Documents; Cost Estimate and Preliminary Schedule and those other specific Deliverables set forth in Exhibit A to this Agreement.

.3   *Designer* is a qualified, licensed design professional who may either be retained by the Design-Builder or furnished by licensed employees of the Design-Builder, or employed or retained by anyone under contract with Design-Builder or Subcontractor, to furnish professional services required under this Agreement.

.5   *Hazardous Materials* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

.6   *Legal Requirements* are applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

.7   *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, performance requirements and other Project-specific technical materials and requirements.

.8   *Site* is the land or premises on which the Project is located.

.9   *Work* shall mean all Design-Builder's design, consulting and other services required to perform its services under this Agreement.

## Article 2
## Design-Builder's Services and Responsibilities

**2.1      Design Services.** Design-Builder shall, consistent with applicable state licensing laws, exercise reasonable skill and judgment in the performance of its services. Architectural and engineering services shall be procured from licensed, independent design professionals retained by the Design-Builder pursuant to a separate agreement ("Design Consultants") or furnished by licensed employees of the Design-Builder. The person or entity providing architectural and engineering services shall be referred to as the Designer.

> **2.1.1      Standard of Care.** The standard of care for all professional services performed to execute the Work shall be the care and skill ordinarily used by members of the profession practicing under similar conditions at the same time and locality of the Project.

**2.2      Basic Preliminary Services.** The Design-Builder's Basic Preliminary Services are those services set forth in Sections 2.2 and 2.3.

**2.2.1      Preliminary Evaluation.** The Design-Builder shall review the Owner's Project Criteria to assist in identifying the requirements for the design and construction of the Project and will verify with Owner that the requirements meet the Owners' Project expectations and objectives. Additionally, the Design-Builder's review shall, as Design-Builder believes appropriate, propose alternative architectural, civil, structural, mechanical, electrical and other systems for review by the Owner.

**2.2.2      Preliminary Evaluation Meeting.** Within 30 days of the effective date of this Agreement Owner and Design/Builder shall discuss Design/Builder's Preliminary Evaluation and Owner's Project Criteria and agree upon what revisions, if any, should be made to such criteria. If applicable, Design-Builder shall issue Deviation List from Owner's initial Project Criteria.

Page 2 of 7

Exhibit 3 Page 141

**2.2.3    Preliminary Design Build Deliverables.** The Design-Builder shall, for the amount set forth and agreed in this Agreement, perform the Work and services necessary to complete all Deliverables set forth in **Exhibit A** to this Agreement. Except for those deliverables set forth explicitly within Exhibit A, no other deliverable, or work or service is required by to be performed by Design-Builder pursuant to this Agreement, unless the same is authorized by a mutually agreed and executed Change Order.

**2.3    Proposal.** In addition to its responsibility for completing the deliverables set forth at Exhibit A hereto, at or around time of completion of the Design Development Documents and Specifications, Design-Builder shall issue to the Owner a Proposal and proposed form of Agreement to complete the project (the "D/B Agreement"). The Parties agree that it will be the D/B Agreement and not this preliminary services Agreement which will operate as the means by which Design-Builder will proceed with site activities including demolition and construction and Project procurement of long-lead items. Unless otherwise agreed by the Parties pursuant to modifications of this Agreement, project mobilization and long-lead procurement shall not commence until such time as the D/B Agreement has been executed.

**2.4    Review of Proposal.** Design-Builder and Owner shall meet to discuss and review the Proposal within 30 days of the Proposal's transmission.

**2.5    Completion of This Agreement.** Design-Builder's Work under this Agreement shall be deemed completed following sixty (60) days from the transmission of the last deliverable by Design-Builder.

**2.6    Additional Services.** If requested by the Owner, Design-Builder shall perform Additional Services as more specifically described and attached to this Agreement as **Attachment A – Additional Services**. The Basic Preliminary Services as referred to in Section 2.2 and 2.3 shall not be considered Additional Services. The cost for Additional Services shall be as set forth in Attachment A or as otherwise mutually agreed upon in cost and scope by Owner and Design-Builder, with the Contract Price for this Agreement, as

set forth in Section 6.1 hereof, being adjusted accordingly.

**2.7    Warranty.** Design-Builder warrants that it will perform the Work in a professional and workmanlike manner and that the Deliverables will reflect Design-Builder's reasonable professional judgment. Owner shall advise Design-Builder in writing within thirty (30) days of its receipt of a Deliverable that one or more of the Project parameters addressed in the Deliverable does not reflect, in the opinion of Owner, reasonable professional judgment on the part of Design-Builder. Design-Builder shall promptly revise any aspect of the Deliverable that does not reflect reasonable professional judgment. THE ONLY WARRANTIES MADE BY DESIGN-BUILDER IN CONNECTION WITH THE WORK AND DELIVERABLES REQUIRED UNDER THIS AGREEMENT ARE THOSE SET FORTH IN THIS SECTION 2.7. THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND THOSE ARISING FROM COURSE OF DEALING AND USAGE OF TRADE. OWNER'S SOLE AND EXCLUSIVE REMEDY FOR WARRANTY NONCOMFORMITIES OR OTHER DEFECTS IN THE WORK OR DELIVERABLES SHALL BE FOR CONSULTANT TO REVISE AND RESUBMIT THE DELIVERABLE AS SET FORTH IN THIS SECTION 2.7. THIS LIMITED REMEDY SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE.

**Article 3**
**Owner's Services and Responsibilities**

**3.1    Timely Performance.** Owner shall throughout the performance of this Agreement cooperate fully with Design-Builder. Owner shall perform its responsibilities, obligations and services, including its reviews and approvals of Design-Builder's submissions, in a timely manner so as not to delay or interfere with Design-Builder's performance of its obligations under this Agreement.

**3.2    Owner's Project Criteria.** Owner shall provide Design-Builder with Owner's Project Criteria including among other things:

a.    Key Functional and Performance Objectives for the project

  i.    Patient throughput and staff requirements

Exhibit 3 Page 142

b.    Architectural and Aesthetic Objectives

c.    Minority and Small Business Goals

d.    Energy and Sustainability Goals

e.    Major Milestones

f.    Available Budget and Restraints on Cash

**3.3      Owner Provided Information.** Owner shall provide, at its own cost and expense, for Design-Builder's information and use, the following, all of which Design-Builder is entitled to rely upon without independent verification in performing its obligations hereunder:

.1      Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper design and construction of the Project;

.2      A legal description of the Site;

.3      To the extent available, as-built and record drawings of any existing structures at the Site; and

.4      To the extent available, environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site.

.5      Owner's Project Criteria, and any draft specifications, drawings or depictions of Owner's program and project requirements

**3.4** If the Owner elects to proceed with the Project beyond the Preliminary Design-Build Services provided in this Agreement, the Owner and the Design-Builder shall enter into a separate agreement for the completion of the design and the construction of the Project ("Design/Build Agreement").

**3.5      Termination.** Owner shall have the right to terminate the Agreement for its convenience at any time and for any reason prior to Design-Builder's completion of the Work on fifteen (15) days prior written notice to that effect. Owner shall pay Design-Builder a convenience termination payment composed of amounts due for performance of Work through the date of termination and Design-Builder's reasonable costs of complying with such termination, including termination

payments to any Designer(s) or other professionals. Owner's sole and exclusive right to terminate Design-Builder's performance of the Work is as provided in this Section 3.5. Design-Builder's sole and exclusive remedy for such termination shall be Owner's payment of the convenience termination payment as provided in this Section 3.5. The convenience termination payment shall be invoiced and processed by the Parties as set forth in Section 7.

**3.6      Suspension.** Owner may suspend performance of all or any part of the Work and thereafter request Design-Builder to resume performance of suspended Work, in each case by giving the Design-Builder five (5) days prior written notice specifying the date for the suspension or resumption of the Work. If Owner has not requested Design-Builder to resume performance of suspended Work with thirty (30) days of the suspension date, Design-Builder may thereafter terminate the Agreement on written notice to Owner and such termination will be treated as a termination for Owner's convenience under Section 3.5. If Design-Builder has suffered any additional costs, schedule impact or other impacts to its performance as a result of Owner's suspension of the Work, Design-Builder shall not be required to resume performance unless the Parties have executed a Change Order that equitably adjusts Design-Builder's rights and obligations under this Agreement as necessary to compensate Design-Builder for such impacts.

**3.7      Cost Consultant.** In lieu of seeking competitive bids, LAPCT reserves the right to hire a 3rd party cost consultant familiar with this type of work to review trade contractor and consultant scopes and pricing.

### Article 4
### Ownership of Work Product

**4.1      Work Product.** All Deliverables including drawings, specifications and other documents and electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyright thereto.

**4.2      Owner's Limited License.** If the Parties fail to reach agreement on Design-Builder's Proposal or otherwise execute a Design/Build Agreement and Owner proceeds to design and construct the Project through its employees, agents or third parties, Design-Builder, upon payment of the amounts due Design-Builder under this Agreement, shall grant Owner a limited license to use the Work Product to complete the Project, conditioned on the following:

Page 4 of 7

Exhibit 3 Page 143

.1    Owner acknowledges that any use of the Work Product or Deliverables is at Owner's sole risk without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including its Designer(s) and other consultants of any tier (collectively the "Indemnified Parties"). Owner shall defend, indemnify and hold harmless the Indemnified Parties from any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use of the Work Product;

.2    Owner agrees not to use the Work Product for purposes other than the Project without Design-Builder's prior written consent, and

.3    Owner agrees to pay Design-Builder the additional sum of Fifty Thousand Dollars ($50,000) as compensation for the right to use the Work Product in accordance with this Article 4.

### Article 5
### Contract Time

**5.1    Commencement Date.** Design-Builder shall commence performance of the services set forth in this Agreement within five (5) days of Design-Builder's receipt of Owner's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.   Design-Builder shall complete such services on or about 14 calendar days after the Date of Commencement.

### Article 6
### Contract Price

**6.1    Contract Price – Lump Sum.** The Owner shall pay Design-Builder in accordance with Article 7 of this Agreement the Sum of ($)____5,211,308.00 ___, ("Contract Price"), subject to adjustments and changes to the Agreement.

**6.1.1  Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, the following markups shall be allowed on such changes:  Applicable General Conditions and Management in addition to a 6% Fee.

**6.2    Scope of Contract Price.** The Contract Price shall be the full compensation due Design-Builder for the performance of all services set forth in this Agreement, and shall be deemed to include all the sales, use, consumer and other taxes required to by paid by Design-Builder in connection with this Agreement. The Contract Price shall be adjusted to reflect any Additional Services agreed upon by the parties after execution of this Agreement.

### Article 7
### Procedure for Payment

**7.1    Schedule of Values.** The Parties have agreed upon a Schedule of Values included here as **Exhibit B** to this Agreement.

**7.2  Payment.** Design-Builder and Owner agree upon the following method for partial and final payment to Design-Builder for the services.  Owner shall pay for Design/Build mobilization payment of an additional $100,000 per month over the monthly invoice amount for Work and Services for the first 5 months. Thereafter, Design-Builder shall invoice Owner for the Work and Services on a monthly basis based upon a percent complete of the remaining value of the individual schedule items.  Owner shall notify Design-Builder within five (5) business days after receipt of an invoice if it disputes all or some portion of the invoice. Owner and Design-Builder shall promptly attempt to effect a resolution of any dispute.  Owner may withhold payment of only that portion of an invoice disputed by Owner in good faith until the dispute has been resolved and shall pay the undisputed portion of any invoice net thirty (30) days.  All late payments shall be subject to interest commencing five (5) days after payment is due shall be calculated as the Prime Rate as reported in the Wall Street Journal on the first day of the month in which the late payment is received, plus three percent (Prime + 3%).

**7.1.1    Failure to Pay.** The Parties acknowledge that a failure to pay amounts owed constitutes a material breach of this Agreement.

**7.3    Owner's Failure to Pay – Suspension.** Design-Builder may suspend its performance of the Work on five (5) days written notice to Owner if Owner fails to pay Design-Builder all invoiced amounts when due.  Design-Builder shall not be required to resume performance of suspended Work until all past due amounts have been paid by Owner, including interest, and if Design-Builder has suffered any additional cost or

Exhibit 3 Page 144

schedule impacts to its performance as a result of the suspension, the Parties have executed a Change Order that equitably adjusts Design-Builder's rights and obligations under the Agreement as necessary to compensate Design-Builder for such impacts.

**7.4    Owner's Failure to Pay – Termination.**  In the event Design-Builder has not received payment of an amount due from Owner within thirty (30) days of its due date, Design-Builder may, at its sole election, terminate the Agreement on written notice to Owner. The Termination will be treated as a termination for Owner's convenience under Section 3.5 of this Agreement.

**Article 8**
**Other Provisions**

**8.1    Dispute Resolution.**  The parties agree that any claim, dispute or controversy arising out of or relating to this Agreement or the breach thereof shall first be submitted to non-binding mediation administered by the American Arbitration Association ("AAA") pursuant to the Construction Industry Mediation Rules then in effect. Any claim, dispute, or controversy arising out of or relating to this Agreement or the breach thereof which has not been resolved by mediation shall be resolved by litigation. Each party hereto, by entering into this Agreement consents and submits to the exclusive jurisdiction of the courts of the state or district in which the Design-Builder's home office for the Project is located over any action at law, suit in equity or other proceeding which may arise out of this Agreement.  OWNER AND DESIGN-BUILDER EACH EXPRESSLY WAIVE TRIAL BY JURY ON ANY AND ALL DISPUTES AND CLAIMS ARISING OUT OF THIS AGREEMENT WHETHER BY OR AGAINST THE DESIGN-BUILDER, THE OWNER OR ANY OTHER PERSON OR ENTITY.

**8.2    Assignment.**  Neither Design-Builder nor Owner shall assign, transfer, or sublet any portion or part of its obligations under this Agreement without the prior written consent of the other party and any such non-authorized assignment shall be null and void and of no force or effect.

**8.3    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the state in which Design/Builder's home office out of which the Project being performed is located, excluding the conflicts of laws principles thereof.

**8.4    Severability.**  If any provision or any part of a provision of this Agreement shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to applicable laws by any authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provisions or parts of the provision of this Agreement, which shall remain in full force and effect as if the unenforceable provision or part was deleted.

**8.5    Liability Limitations.**  Neither Party shall be liable under or in connection with this Agreement for any consequential, special, incidental, indirect, punitive or exemplary damages, or damages arising from or in connection with loss of use, loss of revenue, loss of actual or anticipated profit, or cost of capital, whether based on delay, contract, tort, negligence, strict liability, warranty, indemnity, error and omission or otherwise, and each Party hereby releases the other from any such liability. Nothing in this Section 8.5 shall limit Owner's payment obligations under the Agreement.

**8.5.1**    In no event shall Design-Builder's liability arising out of or in connection with the performance or nonperformance of any or all Work or other obligations under the Agreement exceed the amount paid Design-Builder under this Agreement, whether based on delay, contract, tort, negligence, strict liability, warranty, indemnity, error and omission or otherwise.

**8.6    Amendment & Survival.**  The terms and conditions of this Agreement shall prevail, notwithstanding any variance with any purchase order or other similar written instrument submitted by Owner to Design-Builder in connection with the Work whether formally rejected by Design-Builder or not.  This Agreement may be modified only by Change Order or other written amendment executed by the Parties. In the event that any term or condition of this Agreement is found to be illegal or unenforceable, the term or condition shall be deemed stricken to the extent and in the jurisdictions necessary for compliance with applicable law and modified only to the extent necessary to comply with applicable law and the remaining terms and conditions shall remain in full force and effect.

**8.8    Other Provisions.**  Other provisions, if any, shall be attached hereto as **Attachment B – Other Provisions.**  In executing this Agreement, Owner and Preliminary Services Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

Page 6 of 7

Exhibit 3 Page 145

8.7     Entire Agreement.  This Agreement forms the entire agreement between Owner and Design-Builder. No oral representations or other agreements have been made by the parties except as specifically stated in this Agreement.

OWNER:                                           DESIGN-BUILDER:

Los Angeles County Proton Therapy, LLC           Skanska USA Building Inc.

_____               _____
(Signature)                                      (Signature)

CHARLES LIU                                      EDWARD SZWARC
_____               _____
(Printed Name)                                   (Printed Name)

President                                        EXECUTIVE VP
_____               _____
(Title)                                          (Title)

Date:  4-23-2013                                 Date:  4/24/2013

Exhibit 3 Page 146

## EXHIBIT "A"

Attachment to **Preconstruction Services Agreement No. 149017-EST** dated **April 15, 2013**, by and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

**As an extension of Section 2.3 of this agreement, please find below the assumptions and deliverables for this project:**

| Description/Assumption | Montebello, CA |
|---|---|
| | |
| | |
| Location | 111 W. Beverly Blvd. City of Montebello, CA 90640 |
| Proton Therapy Area | 78,000 SF |
| MOB Area (excludes proton clinic) | 51,743 SF |
| Total Parking (spaces) | 370 |
| Below grade parking (spaces) | 216 |
| | Yes - 3.5 levels, Precast Concrete |
| | adjacent to PT/Clinic/MOB |
| Above grade parking (spaces) | 154 |
| | Yes - 2.5 levels, CIP Concrete |
| | adjacent to PT/Clinic/MOB |
| Above Grade Structure | Structural Steel |
| Above Grade Exterior | Combination of mostly metal panels, storefront and curtain wall glazing and terra cotta rain screen |
| Number of Gantry Rooms | 3 |
| Imaging | Part of Proton Clinic |
| Linacs Below Grade | Yes, 2 Furnished by Others or Relocated |
| MOB Primary Function | Varied |
| MOB Location | On top of the Diagnostic Center |
| Extended Stay Hotel | No |
| Conference Center | No |
| Common Space | Entry drive under 2nd floor |
| Special Features | Community Room |
| | |
| Preconstruction Start | May, 2013 |
| Preconstruction Completion | April, 2014 |
| Preconstruction Duration (months) | 11 |
| | |

**Montebello, CA – Summary of Preconstruction Services**

The scope of preconstruction services for the Los Angeles County Proton Therapy Center shall consist of the following items with the team noted in Exhibit "B" of this agreement:

1. Development of plans and specifications and the necessary documentation for project plan submission and start of project construction consisting of:
   a. A Proton Therapy Treatment facility based on the Optivus equipment platform with 3 Gantries.
   b. A Proton Therapy Clinic on top of the proton center.
   c. A Medical Office Tower that will have the functionality of a diagnostic center situated on top of the proton center.

Summary Scope of Work  Exhibit A – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r5 (08/2007 ed. Rev. 0)

Exhibit 3 Page 147

## EXHIBIT "A"

Attachment to **Preconstruction Services Agreement No. 149017-EST** dated **April 15, 2013**, by and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

      d.   Structured parking as required to meet the needs of the project.

2. Option Development and Conceptual Design
   a. Conduct two (2) high level programming meetings (interviews) with the various user groups.
   b. Document the program requirements for use as the Conceptual Basis of Design
      i. Key Functional and Performance Objectives for the project
      ii. Patient throughput and staff requirements
      iii. Architectural and Aesthetic Objectives
   c. Develop up to three (3) Blocking, Stacking and Site Layout options
   d. Develop key benefits and limitations of each option
   e. Determine the size of the site required to fulfill the various options
   f. Select the preferred blocking and stacking option
   g. Phase 1A assessment of the building to be demolished (by LACPT)
   h. Produce four (4) architectural renderings of the selected option
   i. Develop a conceptual descriptive narrative for each building, mechanical, electrical and plumbing system
   j. Define a level of quality, redundancy and capacity for MEP system
   k. Define utility requirements to meet the requirements of the building systems.
   l. Develop a conceptual cost estimate for the selected blocking and stacking option
   m. Develop a Level 1 overall project schedule for the selected option
   n. Develop high level logistics plan for the site
   o. Determine the Energy and Sustainability Goals for the project
   p. Develop commitment and cash flow curve to support the concept design
   q. Compile all documentation into a conceptual study report

3. Schematic Design Package
   a. From approval of the Conceptual design above develop basic architectural floor plans for each level and roof.
   b. Site investigation and survey
   c. Geotechnical survey, analysis and report
   d. Traffic impact study
   e. Structural
      i. Develop foundation design based on the geotechnical survey
      ii. Develop concrete structure plans
      iii. Develop steel framing plans
   f. MEP
      i. Create preliminary equipment sizing and schedules
      ii. Provide design load calculations
      iii. Develop system riser diagrams and flow information
      iv. Start coordination with architectural systems for routing
   g. Update the Basis of design for all disciplines including level of finish information
   h. Update target value estimate for selected site
   i. Update the Level 1 overall project schedule based on the updated information
   j. Develop commitment and cash flow curve to support the schematic design
   k. Compile all documentation into a schematic design package.

4. Design Development Package
   a. City of Montebello Planning Department Submission Package
   b. Architectural Drawings
   c. Civil Engineering
      i. Transportation Engineering.
      ii. Civil and Site Engineering
      iii. Environmental Approvals

Summary Scope of Work  Exhibit A – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r5
(08/2007 ed. Rev. 0)

Exhibit 3 Page 148

# EXHIBIT "A"

Attachment to **Preconstruction Services Agreement No. 149017-EST** dated **April 15, 2013**, by and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

        iv. DEP Approvals
        v. Municipal Approvals
        vi. Utility Coordination
        vii. Landscape Architecture
    d. Structural Engineering (for all levels and areas)
        i. Structural Engineering – Foundation System
        ii. Structural Engineering – Building Superstructure
    e. Interior Design development
    f. MEP Drawing development and Coordination with Design Assist Sub-contractors

5. Information from Optivus including facility Interface document and calculations for the radiation shielding analysis. Radiation shielding analysis to be provided by LACPT.
6. Construction Document Package
    a. City of Montebello Building Permit package
    b. construction documents will be completed for all disciplines
    c. The construction documents will be developed to a level suitable for bidding, permitting and construction.
    d. Early release packages such as site design and foundation design in this phase
    e. Finalized Construction Documents will be utilized to secure any remaining permits.
    f. Provide all Division 1 "General Requirements" specifications
7. Mechanical & Electrical Design – The following systems will be provided as Design Assist contracts, including professional engineering/design, documentation, permitting, supervision, labor, equipment, and material as required for a complete installation of the following work.
    a. Fire Protection Engineering/Design
    b. Mechanical Engineering/Design
        i. Plumbing piping and fixtures
        ii. HVAC, HVAC equipment, piping, sheet metal and controls
    c. Electrical Engineering/Design
        iii. Electrical lighting, power, services and site lighting
        iv. Fire Alarm Systems
        v. Security & CCTV systems – house systems only
        vi. Telecommunications raceways and cabling
8. Skanska USA Building Preconstruction & Estimating Services
    a. Project planning, logistics and coordination for deliverables to include:
        i. Logistics Plan
        ii. Safety Plan
        iii. Preliminary Construction Schedule
    b. Client Reviews for available Budget
    c. Client Reviews for Cash Flow understanding and restraints resulting in a deliverable of a Cash Flow Curve which would form the basis of a Schedule of Values for the Construction Project.
    d. Cost estimating to support a Target Value Design
    e. Scheduling services and Client reviews to determine major project milestones
    f. Long Lead Procurement Planning resulting in a deliverable of a recommended Procurement Plan for the Core and Shell and the Owner Furnished Equipment.
    g. Development of a Minority and Small Business Goal Plan
9. Skanska will coordinate its work with the land use consultant.
10. Deliverables will be provided in accordance with Exhibit "B" – Schedule of Values and the project schedule.
11. Review of Non-Disclosure Agreement (NDA) programs and planning for owner's control
12. Use or REVIT and Building Information Modeling Technology (BIM) to Skanska VDC standards.

Summary Scope of Work  Exhibit A – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r5
(08/2007 ed. Rev. 0)

Exhibit 3 Page 149

## EXHIBIT "A"

Attachment to **Preconstruction Services Agreement No. 149017-EST** dated **April 15, 2013**, by and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

**The total cost associated for the above scope of work is $ 5,211,308.**

The following has been provided as an allowance within the costs above:

1. Cost for an Acoustical Consultant
2. LEED Services and Consulting
3. Cost for a Lighting Consultant
4. Cost for an Exterior Envelope Consultant, testing and mock-ups for same

The following scope of work is not included in the above costs:

1. Preliminary and Final Facility Interface Documents (FID) for the Optivus Proton Therapy Equipment.
2. Site Development Fees:
   a. Legal Fees
   b. Cost of Building Permits, and Permit Expediter fees, if required.
   c. Cost for Plan Review Fees by the City of Montebello, State of California, or Office of Statewide Health Planning and Development (OSHPD)
   d. Specific Traffic consulting requirements due to the City of Montebello review
   e. Utility development fees.
   f. Permits from the California Department of Oil, Gas, and Geothermal Resources (DOGGR)
   g. Survey of existing structures
   h. Environmental Studies and Clearances
   i. Archeological Surveys
   j. Hazmat review
3. Construction Costs:
   a. Costs for Demolition of the existing structure and Procurement, Mobilization and Construction and Commissioning of the new building.
   b. Construction administration by the design team for the new construction.
   c. Building Testing and Inspection Services
   d. Costs for Procurement Services or Purchase of Long Lead Equipment for the Architectural, MEP, or Facility equipment.
4. Leasing Related Costs:
   a. Design of "White Box" area for future fit out or leasing (if any)
   b. Efforts for Special Funding and Loan Applications
   c. Special requirements for Leasing
5. Equipment Related Costs:
   a. Costs for the Radiation Shielding Physicist.
   b. Furnishing & Equipment (F F & E) design related to the Medical Office Building.
   c. Proton Therapy component/material suppliers, technology, equipment vendor design and software development and performance start-up services.
   d. LINAC Design, technology, equipment vendor design, software and start-up services
   e. Certifications and approvals for Patient Treatment
   f. Cost for Fixtures, Furnishing and Equipment (FF&E) FF&E consultant/design or procurement.

Summary Scope of Work Exhibit A – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r5 (08/2007 ed. Rev. 0)

Exhibit 3 Page 150

## EXHIBIT "B"

Attachment to **Preconstruction Services Agreement No. 149017-EST** dated April 15, **2013**, by and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

### Schedule of Values – Preconstruction Services

**As an extension of Section 7.1 of this agreement, please see below for a breakdown of costs for this work at 111 West Beverly Blvd., Montebello, CA 90640:**

| Discipline | Contractor/Professional | Design Preconstruction Fees | Construction Administration Fees |
|---|---|---|---|
| Architectural | Davis Partnership | $ 3,317,784 | Not in this Phase |
| Civil Engineering | KPFF Consulting Engineers | In Davis above | N/A |
| Initial Land & Topographic Survey | TBD | In Davis above | N/A |
| Land Use | Lawson | In Davis above | N/A |
| Structural Engineering | O'Donnell & Naccarato | In Davis above | N/A |
| Geotechnical Services | Geotechnologies | In Davis above | N/A |
| Traffic Consulting & Study | Linscott, Law & Greenspan Engrs | $ 17,700 | N/A |
| Environmental Consulting | AEI Consulting Engineers | $ 1,600 | N/A |
| Mechanical Design | RK Mechanical (Design Assist) | $ 531,177 | N/A |
| Electrical Design | Sachs Electric (Design Assist) | $ 190,000 | N/A |
| Preconstruction & Estimating Services | Skanska USA Building | $ 485,000 | N/A |
| Reimbursables | FOR ALL ABOVE | $ 300,000 | N/A |
| General Liability Insurance & Fees required for commencement | FOR ALL ABOVE | $ 306,547 | N/A |
| Construction Field Startup Services | Skanska USA Building | Not in this Phase | N/A |
| Proton Design Services & Coordination (FID) | Optivus – to be provided timely with the project design development | By LACPT | N/A |
| Shielding Consultant | TBD – to be provided timely with the project design development | By LACPT | N/A |
| Permits & Fees | ALL | Not in this Phase | N/A |
| Phase 1A Assessment | TBD | BY LACPT | N/A |

Schedule of Values  Exhibit B – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r4 (08/2007 ed. Rev. 0)

Exhibit 3 Page 151

## EXHIBIT "B"

Attachment to **Precontruction Services Agreement No. 149017-EST** dated April 15, **2013**, by
and between **Los Angeles County Proton Therapy, LLC** and **SKANSKA USA BUILDING
INC.** for **Los Angeles County Proton Therapy Center, Montebello, CA**

| Discipline | Contractor/Professional | Design Preconstruction Fees | Construction Administration Fees |
|---|---|---|---|
| Environmental Studies and Clearances | TBD | BY LACPT | N/A |
| Concrete Consultant | Baker Concrete - ALLOWANCE | $ 10,000 | N/A |
| Rigging Consultant | George Young Co. - ALLOWANCE | $ 15,000 | N/A |
| LEED Consulting Services | TBD - ALLOWANCE | $ 5,500 | N/A |
| Acoustical Consultant | TBD - ALLOWANCE | $ 3,500 | N/A |
| Lighting Consultant | TBD - ALLOWANCE | $ 7,500 | N/A |
| Exterior Envelope Consultant | TBD - ALLOWANCE | $ 20,000 | N/A |
| Long Lead Equipment – Proton Therapy | Optivus | Not Included | N/A |
| Long Lead Equipment – Building Elements | Skanska USA Building | Not in this Phase | N/A |
| Long Lead Equipment – Mechanical Systems | Skanska USA Building | Not in this Phase | N/A |
| Long Lead Equipment – Electrical Systems | Skanska USA Building | Not in this Phase | N/A |
| | | | |
| PRELIMINARY DESIGN/BUILD SERVICES – TOTAL | | $ 5,211,308 | |

Schedule of Values  Exhibit B – Preconstruction Services Agreement – LACPT Montebello 2013-02-28r4
(08/2007 ed. Rev. 0)

Exhibit 3 Page 152



LOS ANGELES COUNTY PROTON THERAPY - MONTEBELLO PROJECT

Cashflow Projection for Preconstruction Funding Prior to Full Financing Complete

SUMMARY & CASH FLOW

LOS ANGELES COUNTY PROTON THERAPY - MONTEBELLO PROJECT

Exhibit 3 Page 153

SKANSKA

**Financing/Funding**
- Notice To Proceed (NTP) Preconstruction
- Proton Therapy Provider Begins FID
- Project Development & Financing
- Equity Capital Available
- USDS Processing Of Application
- USDS Processing Of Application Complete
- Financing Complete

**City/County/State Approvals**
- Preliminary Submissions
- Plan Development
- City Response
- Submit Plan Development Application
- LA County Submission
- Submit Radiation Shielding Report
- LA County Approval
- Demolition & Excavation Permit Issued
- State DOH Approval
- Submit Building Permit Application
- Building Permit
- City Issue Foundation Permit
- City Issue Building Permit

**Design**
- Finalize Options
- Site Survey & Soil Borings
- Schematic Design Documents
- Design Development
- Construction Documents
- Issue Foundation Permit Design Package

Los Angeles County Proton Therapy Center, LLC
Los Angeles County Proton Therapy Center (Proposed)
Reconstruction Contract - Summary Schedule

Exhibit 3 Page 154



Exhibit 3 Page 155

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| **Financing/Funding** | | | | |
| **Project Development Financing** | | | | |
| FIN210 | Notice To Proceed (NTP) Preconstruction | 0 | 15APR13* | |
| FIN040 | Proton Therapy Provider Begin FID | 0 | 15APR13 | |
| FIN015 | EB-Sales In China | 75 | 01MAY13 | 15AUG13 |
| FIN025 | Equity Capital Available | | | 15AUG13 |
| FIN020 | USCIS Processing Of Application | 130 | 16AUG13 | 20FEB14 |
| FIN036 | USCIS Processing Of Application Complete | 0 | | 20FEB14 |
| FIN030 | Financing Complete | 0 | | 21MAR14 |
| **y/County/State Approvals** | | | | |
| **Preliminary Submissions** | | | | |
| PERM40 | Develop TOC For Preliminary Submission | 5 | 15APR13 | 19APR13 |
| PERM45 | Preliminary Submission To The City | 15 | 15APR13 | 03MAY13 |
| PERM010 | Meeting With Fire Department | 15 | 15APR13 | 03MAY13 |
| PERM055 | City Review | 10 | 06MAY13 | 17MAY13 |
| PERM35 | City Response | 0 | | 17MAY13 |
| **Plan Development** | | | | |
| PERM40 | Traffic Study | 70 | 22APR13 | 30JUL13 |
| PERM45 | Environmental Impact Investigation | 40 | 11JUN13 | 06AUG13 |
| PERM050 | Finalize Submission | 10 | 07AUG13 | 20AUG13 |
| PERM55 | Submit Plan Development Application | 15 | 15APR13 | 03MAY13 |
| | City Review | 105 | 21AUG13 | 20JAN14 |
| PERM55 | Decision Letter From City | 0 | | 20JAN14 |
| **Submit Radiation Shielding Report** | | | | |
| PERM070 | LA County Submission | 0 | 18SEP13 | |
| RAD5 | LA County Review | 411 | 18SEP13 | 18NOV13 |
| PERM080 | LA County Approval | 0 | | 19NOV13 |
| PERM065 | State DOH Review | 45 | 14NOV13 | 20JAN14 |
| PERM060 | State DOH Approval | 0 | | 20JAN14 |
| **Permits** | | | | |
| PERM65 | Demolition & Excavation Permit | 22 | 14NOV13 | 16DEC13 |

Gantt timeline milestones/bars:
- Notice To Proceed (NTP) Preconstruction
- Proton Therapy Provider Begin FID
- EB-Sales In China
- Equity Capital Available
- USCIS Processing Of Application
- USCIS Processing Of Application Complete
- Financing Complete
- Develop TOC For Preliminary Submission
- Preliminary Submission To The City
- Meeting With Fire Department
- City Review
- City Response
- Traffic Study
- Environmental Impact Investigation
- Finalize Submission
- Submit Plan Development Application
- City Review
- Decision Letter From City
- LA County Submission
- LA County Review
- LA County Approval
- State DOH Review
- State DOH Approval
- Demolition & Excavation Permit

Legend: Early Bar / Progress Bar / Critical Activity — Start Date / Finish Date / Data Date (15APR13, 24APR13, 15MAR16-12)

© Primavera Systems, Inc.

Los Angeles County Proton Therapy Center - Montebello
Los Angeles County Proton Therapy Center, LLC
Preconstruction Contract - Detailed Schedule

Sheet 1 of 4

**SKANSKA**

Exhibit 3 Page 156

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish | Timeline (2013–2017) |
|---|---|---|---|---|---|
| PTPER07 | Demolition & Excavation Permit Issued | 0 | | 16DEC13 | Demolition & Excavation Permit Issued |
| PERMS5 | Submit Building Permit Application | 0 | 21JAN14 | | Submit Building Permit Application |
| PERM190 | City Review | 0 | 21JAN14 | 21MAR14 | City Review |
| PERMa8 | City Issue Foundation Permit | 0 | | 14FEB14* | City Issue Foundation Permit |
| PERM106 | City Issue Building Permit | 0 | | 21MAR14 | City Issue Building Permit |
| **Design** | | | | | |
| DDSGN10 | Prepare Options | 15 | 15APR13 | 03MAY13 | Prepare Options |
| SITE10 | Site Survey | 15 | 15APR13 | 03MAY13 | Site Survey |
| 120 | Soil Borings And Geotech Report | 30 | 22APR13 | 03JUN13 | Soil Borings And Geotech Report |
| DDSGN20 | Present Options To LACPT | 5 | 06MAY13 | 10MAY13 | Present Options To LACPT |
| DDSGN25 | Finalize Selected Option-Preliminary Submission | 10 | 13MAY13 | 24MAY13 | Finalize Selected Option-Preliminary Submission |
| DDSGN30 | Schematic Design | 45 | 29MAY13 | 30JUL13 | Schematic Design |
| DDSGN40 | Schematic Design Review and Approval | 15 | 31JUL13 | 20AUG13 | Schematic Design Review and Approval |
| DDSGN50 | Design Development | 97 | 31JUL13 | 16DEC13 | Design Development |
| DDSGN60 | Construction Documents-Long Lead Equipment | 129 | 18SEP13 | 21MAR14 | Construction Documents-Long Lead Equipment |
| DDSGN65 | CDs-Site,Civil,Struc,Shield,Encls,UG Utilities | 129 | 18SEP13 | 21MAR14 | CDs-Site,Civil,Struc,Shield,Encls,UG Utilities |
| DDSGN70 | CDs-MEP Interior Finishes | 129 | 18SEP13 | 21MAR14 | CDs-MEP Interior Finishes |
| DDSGN75 | CDs-Site Finishes | 129 | 18SEP13 | 21MAR14 | CDs-Site Finishes |
| DDSGN96 | Issue Foundation Permit Design Package | 0 | | 20DEC13* | Issue Foundation Permit Design Package |
| DDSGN95 | Issue Building Permit Design Package | 0 | | 21JAN14 | Issue Building Permit Design Package |
| **Proton Therapy Equipment** | | | | | |
| PTEQ10 | Preliminary Shielding Report | 30 | 25JUN13 | 06AUG13 | Preliminary Shielding Report |
| OT5 | Final Shielding Design And Report | 49 | 07AUG13 | 15OCT13 | Final Shielding Design And Report |
| **Optivus** | | | | | |
| OPTV10 | Define Iso Centers For Treatment Equipment | 201 | 15APR13 | 10MAY13 | Define Iso Centers For Treatment Equipment |
| OPTV15 | Preliminary FRD | 65 | 15APR13 | 16JUL13 | Preliminary FRD |
| OPTV20 | Info To Support Prelim Shielding Analysis | 45 | 13MAY13 | 16JUL13 | Info To Support Prelim Shielding Analysis |
| OPTV25 | Info To Support Final Radiation Shielding Report | 64 | 17JUL13 | 15OCT13 | Info To Support Final Radiation Shielding Report |
| OPTV30 | Final FRD - Items That Interface With Structure | 101 | 17JUL13 | 16DEC13 | Final FRD - Items That Interface With Structure |
| OPTV35 | Final FRD For MEP Connections & Interconnections | 88 | 17DEC13 | 22APR14 | Final FRD For MEP Connections & Interconnections |

Exhibit 3 Page 157

**Building Construction**

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| **Site** | | | | |
| CON3240 | Proton Therapy Construction NTP | 0 | 18NOV13* | 18NOV13* |
| CON695 | Mobilizing & Enabling | 20 | 18NOV13 | 16DEC13 |
| CON520 | Demolition | 43 | 17DEC13 | 17FEB14 |
| CON890 | Site Utilities - Proton Therapy MOB | 151 | 22MAY14 | 26DEC14 |
| CON6120 | Complete Sitework - Proton Therapy MOB | 128 | 07JUL15 | 06JAN16 |
| **Proton Therapy** | | | | |
| CON635 | Shoring and Mass Excavation - Proton Therapy | 46 | 19FEB14 | 23APR14 |
| CON5S | Proton Therapy Technology NTP | 0 | | 23APR14 |
| x300 | Foundations - Proton Therapy | 139 | 24APR14 | 24OCT14 |
| CON5325 | Proton Therapy Procurement & Manufacturing | 502 | 24APR14 | 14APR16 |
| CON595 | Electrical Roughins - Proton Therapy | 216 | 20MAY14 | 31MAR15 |
| CON5100 | Waterproofing & Backfill - Proton Therapy | 129 | 25JUN14 | 26DEC14 |
| CON5170 | Shielding Pour & Finishes | 349 | 27OCT14 | 10MAR16 |
| CON5105 | Elec Sys & Equipment Start-up - Proton Therapy | 174 | 29DEC14 | 03SEP15 |
| CON5360 | Temp Waterproofing & Space Conditioning In Place | 0 | | 25JAN15 |
| CON5175 | Install Proton Therapy Technology Equipment | 310 | 30JAN15 | 14JUL16 |
| CON5110 | Elevators - Proton Therapy | 44 | 01APR15 | 02JUN15 |
| CON5155 | Mechanical Systems - Proton Therapy | 217 | 03MAR15 | 07JAN16 |
| CON5160 | Plumbing Systems - Proton Therapy | 219 | 01APR15 | 09FEB16 |
| CON5185 | Elect Finishes & Communications - Proton Therapy | 195 | 02APR15 | 07JAN16 |
| CON5190 | Fire Protection Systems - Proton Therapy | 195 | 05MAY15 | 09FEB16 |
| SI85 | Bldg MEP - F-P Systems Commissioning - PT | 44 | 08JAN16 | 10MAR16 |
| CON5130 | Proton Therapy Technology Startup | 196 | 15JUL16 | 21APR17 |
| | 1st Patient Treatment - Proton Therapy | 0 | | 21APR17 |
| **MOB** | | | | |
| CON5395 | Superstructure - MOB | 87 | 27OCT14 | 02MAR15 |
| CON5640 | Building Envelope - MOB | 88 | 03MAR15 | 06JUL15 |
| CON5200 | Mechanical Systems - MOB | 195 | 02APR15 | 07JAN16 |
| CON5375 | Electrical Roughins - MOB | 129 | 05MAY15 | 04NOV15 |
| CON5205 | Plumbing Systems - MOB | 172 | 15MAY15 | 07JAN16 |
| CON5115 | Elevators - MOB | 44 | 03JUN15 | 04AUG15 |

Sheet 3 of 4

Exhibit 3 Page 158

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| CON5210 | Fire Protection Systems - MOB | 152 | 02JAN15 | 07JAN16 |
| CON580 | Interior Fit Out & Finishes - MOB | 173 | 07JUL15 | 10MAR16 |
| CON5195 | Electrical Finishes & Communications - MOB | 120 | 06AUG15 | 09FEB16 |
| CON5125 | Elec Sys & Equipment Start-up - MOB | 68 | 05NOV15 | 11MAR16 |
| CON5215 | Bldg MEP - F/P Systems Commissioning - MOB | 44 | 08JAN16 | 09MAR16 |
| CON580 | Construction Complete (C of O) | 0 | | 11MAR16 |
| CON5200 | Closeout | 40 | 14MAR16 | 06MAY16 |
| CON551 | 1st Patient Treatment - Linac | 0 | | 06MAY16 |

**Parking Garage**

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| 4840 | Shoring & Mass Excavation - Parking Garage | 432 | 24APR14 | 24JUN14 |
| CON525 | Foundations - Parking Garage | 87 | 27OCT14 | 03MAR15 |
| CON555 | Site Utilities - Parking Garage | 110 | 26NOV14 | 04MAY15 |
| CON580 | Waterproofing & Backfill - Parking Garage | 66 | 29DEC14 | 01APR15 |
| CON515 | Superstructure - Parking Garage | 88 | 03MAR15 | 06JUL15 |
| CON540 | Building Envelope - Parking Garage | 64 | 07JUL15 | 05OCT15 |
| CON545 | MEP - F/P Electrical Rough-ins - Parking Garage | 85 | 07JUL15 | 03NOV15 |
| CON550 | Complete Sitework - Parking Garage | 196 | 06AUG15 | 06MAY16 |
| CON155 | Fit-out & Finishes - Parking Garage | 131 | 04SEP15 | 10MAR16 |
| CON140 | Elevators - Parking Garage | 65 | 06OCT15 | 07JAN16 |

Exhibit 3 Page 159

**SKANSKA**

Exhibit 3 Page 160



Exhibit 3 Page 161

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| **Project Development Financing** | | | | |
| **Financing/Funding** | | | | |
| FIN010 | Notice To Proceed (NTP) Preconstruction | 0 | 15APR13* | |
| FIN040 | Proton Therapy Provider Begin P/D | 0 | 15APR13 | |
| FIN015 | IEB-Sales In China | 75 | 01MAY13 | 15AUG13 |
| FIN025 | Equity Capital Available | 0 | 15AUG13 | |
| FIN020 | USCIS Processing Of Application | 130 | 16AUG13 | 20FEB14 |
| FIN035 | USCIS Processing Of Application Complete | 0 | 20FEB14 | |
| FIN030 | Financing Complete | 0 | 21MAR14 | |
| **City/County/State Approvals** | | | | |
| **Preliminary Submissions** | | | | |
| PERM20 | Develop TOC For Preliminary Submission | 5 | 15APR13 | 19APR13 |
| PERM10 | Preliminary Submission To The City | 15 | 15APR13 | 03MAY13 |
| PERM30 | Meeting With Fire Department | 15 | 15APR13 | 03MAY13 |
| PERM25 | City Review | 10 | 06MAY13 | 17MAY13 |
| PERM05 | City Response | 0 | 17MAY13 | |
| **Plan Development** | | | | |
| PERM... | Traffic Study | 70 | 22APR13 | 30JUL13 |
| ...AMS | Environmental Impact Investigation | 40 | 11JUN13 | 04AUG13 |
| PERM50 | Finalize Submission | 10 | 07AUG13 | 20AUG13 |
| PERM55 | Submit Plan Development Application | 0 | 20AUG13 | |
| PERM60 | City Review | 105 | 21AUG13 | 17JAN14 |
| PERM65 | Decision Letter From City | 0 | 20JAN14 | |
| **Submit Radiation Shielding Report** | | | | |
| PERM70 | LA County Submission | 0 | 18SEP13 | |
| ...MT5 | LA County Review | 41 | 18SEP13 | 13NOV13 |
| PERM80 | LA County Approval | 0 | 13NOV13 | |
| PERM85 | State DOH Review | 0 | 20JAN14 | |
| PERM90 | State DOH Approval | 0 | 20JAN14 | |
| **Permits** | | | | |
| PERM95 | Demolition & Excavation Permit | 22 | 14NOV13 | 1EDEC13 |

Timeline headers: 2013 — M A M J J A S O N D; 2014 — J F M A M J J A S O N D; 2015 — J F M A M J J A S O N D; 2016 — J F M A M J J A S O N D; 2017 — J F M A

Milestone/bar labels:
- Notice To Proceed (NTP) Preconstruction
- Proton Therapy Provider Begin P/D
- IEB-Sales In China
- Equity Capital Available
- USCIS Processing Of Application
- USCIS Processing Of Application Complete
- Financing Complete
- Develop TOC For Preliminary Submission
- Preliminary Submission To The City
- Meeting With Fire Department
- City Review
- City Response
- Traffic Study
- Environmental Impact Investigation
- Finalize Submission
- Submit Plan Development Application
- City Review
- Decision Letter From City
- LA County Submission
- LA County Review
- LA County Approval
- State DOH Review
- State DOH Approval
- Demolition & Excavation Permit

© Primavera Systems, Inc.

Los Angeles County Proton Therapy Center - Montebello
Los Angeles County Proton Therapy, LLC
Early Target - Detailed Schedule

Sheet 1 of 4

**SKANSKA**

Exhibit 3 Page 162

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| **Design** | | | | |
| PERM07 | Demolition & Excavation Permit Issued | 0 | | 16DEC13 |
| PERM65 | Submit Building Permit Application | 0 | | 16DEC13 |
| PERM100 | City Review | 43 | 21JAN14 | 21MAR14 |
| PERM08 | City Issue Foundation Permit | 0 | | 14FEB14* |
| PERM05 | City Issue Building Permit | 0 | | 21MAR14 |
| DSGN10 | Prepare Options | 15 | 15APR13 | 03MAY13 |
| ESITE10 | Site Survey | 15 | 15APR13 | 03MAY13 |
| 120 | Soil Borings And Geotech Report | 30 | 22APR13 | 03JUN13 |
| GSGA200 | Present Options To LADPT | 5 | 06MAY13 | 10MAY13 |
| DSGA25 | Finalize Selected Option-Preliminary Submission | 10 | 13MAY13 | 24MAY13 |
| DSGA20 | Schematic Design | 45 | 28MAY13 | 30JUL13 |
| DSGA40 | Schematic Design Review and Approval | 15 | 31JUL13 | 20AUG13 |
| DSGA60 | Design Development | 97 | 31JUL13 | 16DEC13 |
| DSGA60 | Construction Documents-Long Lead Equipment | 129 | 18SEP13 | 21MAR14 |
| DSM65 | CDs-Site,Civil,Struc,Shield,Encls,Util Utilities | 129 | 18SEP13 | 21MAR14 |
| DS70 | CDs-MEP Interiors Finishes | 129 | 18SEP13 | 21MAR14 |
| DSBI75 | CDs-Site Finishes | 139 | 18SEP13 | 21MAR14 |
| DSG205 | Issue Foundation Permit Design Package | 0 | | 20DEC13 |
| DSG85 | Issue Building Permit Design Package | 0 | 21JAN14 | |
| **Proton Therapy Equipment** | | | | |
| PTEQ10 | Preliminary Shielding Design And Report | 30 | 26JUN13 | 06AUG13 |
| OT6 | Final Shielding Design And Report | 49 | 07AUG13 | 15OCT13 |
| **Optivus** | | | | |
| OPTY10 | Define Iso Centers For Treatment Equipment | 20 | 15APR13 | 10MAY13 |
| OPTY15 | Preliminary FID | 65 | 15APR13 | 16JUL13 |
| OPTY16 | Info To Support Prelim Shielding Analysis | 45 | 13MAY13 | 16JUL13 |
| OPTY25 | Info To Support Final Radiation Shielding Report | 64 | 17JUL13 | 15OCT13 |
| OPTY05 | Final FID | 107 | 17JUL13 | 16DEC13 |
| OPTY20 | Final FID - Items That Interface With Structure | 107 | 17JUL13 | 16DEC13 |
| OPTY25 | Final FID For MEP Connections & Interconnections | 88 | 17DEC13 | 22APR14 |

Exhibit 3 Page 163

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| **Building Construction** | | | | |
| **Site** | | | | |
| CON-6240 | Proton Therapy Construction NTP | 0 | 18NOV13* | |
| CON-6205 | Mobilizing & Enabling | 201 | 18NOV13 | 16DEC13 |
| CON-6201 | Demolition | 43 | 17DEC13 | 17FEB14 |
| CON-6090 | Site Utilities - Proton Therapy MOB | 151 | 23MAY14 | 26DEC14 |
| CON-6120 | Complete Sitework - Proton Therapy MOB | 128 | 07JUL15 | 06JAN16 |
| **Proton Therapy** | | | | |
| CON-6225 | Shoring and Mass Excavation - Proton Therapy | 46 | 19FEB14 | 23APR14 |
| **~CON-6230** | Proton Therapy Technology NTP | 0 | | 23APR14 |
| ~CON-6530 | Foundations - Proton Therapy | 139 | 24APR14 | 29OCT14 |
| CON-6235 | Proton Therapy Procurement & Manufacturing | 479* | 24APR14 | 14MAR16 |
| CON-6085 | Electrical Roughs-Ins - Proton Therapy | 216 | 23MAY14 | 31MAR15 |
| CON-6100 | Waterproofing & Backfill - Proton Therapy | 129 | 25JUN14 | 26DEC14 |
| CON-6170 | Shielding, Fitout & Finishes | 348 | 27OCT14 | 18MAR16 |
| CON-6105 | Elec Sys & Equipment Start-up - Proton Therapy | 174 | 29DEC14 | 03SEP15 |
| CON-6235 | Temp Waterproofing & Space Conditioning In Place | 0 | | 29JAN15 |
| CON-6380 | Install Proton Therapy Technology Equipment | 349* | 30JAN15 | 14JUN16 |
| CON-6575 | Mechanical Systems - Proton Therapy | 217 | 30JAN15 | 07JAN16 |
| CON-6150 | Elevators - Proton Therapy | 44 | 01APR16 | 02JUN15 |
| CON-6185 | Elect Finishes & Communications - Proton Therapy | 219 | 01APR15 | 09FEB16 |
| CON-6180 | Plumbing Systems - Proton Therapy | 195 | 02APR15 | 07JAN16 |
| CON-6165 | Fire Protection Systems - Proton Therapy | 195 | 05MAY15 | 09FEB16 |
| CON-6190 | Bldg MEP - F P Systems Commissioning  PT | 44 | 06MAY16 | 16MAR16 |
| SBS | Proton Therapy - Technology Startup | 196 | 14APR16 | 26JAN17 |
| CON-6130 | 1st Patient Treatment - Proton Therapy | 0 | | 26JAN17 |
| **MOB** | | | | |
| CON-6395 | Superstructure - MOB | 87 | 27OCT14 | 02MAR15 |
| CON-6545 | Building Envelope - MOB | 88 | 03MAR15 | 06JUL15 |
| CON-6200 | Mechanical Systems - MOB | 195 | 02APR15 | 07JAN16 |
| CON-6575 | Electrical Rough Ins - MOB | 129 | 02APR15 | 04NOV15 |
| CON-6205 | Plumbing Systems - MOB | 172 | 09MAY15 | 07JAN16 |
| CON-6115 | Elevators - MOB | 44 | 03JUN15 | 04AUG15 |

Exhibit 3 Page 164

| Activity ID | Activity Description | Duration Days | Planned Start | Planned Finish |
|---|---|---|---|---|
| CON2070 | Fire Protection Systems - MOB | 152 | 03JUN15 | 07JAN16 |
| CON3560 | Interior Fit Out & Finishes - MOB | 175 | 07JUL15 | 16MAR16 |
| CON3195 | Electrical Finishes & Communications - MOB | 130 | 06AUG15 | 09FEB16 |
| CON3125 | Elec Sys & Equipment Start-up - MOB | 88 | 05NOV15 | 11MAR16 |
| CON3215 | Bldg MEP - F.P Systems Commissioning - MOB | 44 | 06JAN16 | 16MAR16 |
| CON680 | Construction Complete (C of O) | 0 | | 11MAR16 |
| CON5200 | Closeout | 40 | 14MAR16 | 06MAY16 |
| CON651 | 1st Patient Treatment - Linac | 0 | | 06MAY16 |
| **Parking Garage** | | | | |
| I540 | Shoring & Mass Excavation - Parking Garage | 43 | 26APR14 | 26JUN14 |
| CON5055 | Foundations - Parking Garage | 87 | 27OCT14 | 02MAR15 |
| CON5065 | Site Utilities - Parking Garage | 110 | 26NOV14 | 04MAY15 |
| CON5020 | Waterproofing & Backfill - Parking Garage | 66 | 29DEC14 | 01APR15 |
| CON5135 | Superstructure - Parking Garage | 89 | 03MAR15 | 06JUL15 |
| CON5140 | Building Envelope - Parking Garage | 64 | 07JUL15 | 05OCT15 |
| CON5145 | MEP - F.P Electrical Rough-ins - Parking Garage | 65 | 03JUL15 | 03NOV15 |
| CON5150 | Complete Sitework - Parking Garage | 106 | 06AUG15 | 06JAN16 |
| CON5155 | Final & Finishes - Parking Garage | 131 | 04SEP15 | 16MAR16 |
| CON5160 | Elevators - Parking Garage | 65 | 06OCT15 | 07JAN16 |

Sheet 4 of 4

Exhibit 3 Page 165

# ATTACHMENT C

Exhibit 3 Page 166



*Experience, Expertise and a Commitment to Excellence™*

To:   Dr. John Thropay
Los Angeles County Proton Center, LLC
200 East Beverly Blvd.
Montebello, CA  90640

| *Quote No.* |
| --- |
| CFO 11 003 |

From:   Optivus Proton Therapy, Inc.
1475 S. Victoria Court
San Bernardino, CA 92408
Phone: (909) 799-8342
www.optivus.com

| *Date:* |
| --- |
| August 2, 2011 |

**Conforma 3000 System Configuration Quoted:**
- **3 Gantry Treatment Rooms with Passive Beam Nozzles**

| Item | Description of Product or Services | Qty | Extended Price |
| --- | --- | --- | --- |
| 1. | **Proton Synchrotron System:** | 1 | Included |
| |   • **Proton Synchrotron Accelerator:** | | |
| |      • Electronic variable energy 70-250 MeV | | |
| |      • Supports Beam Scanning | | |
| |      • Supports respiratory gating | | |
| |      • **Major Components:** | | |
| |        • Hydrogen ion source | | |
| |        • Solenoid 1 magnet & Solenoid 2 magnet | | |
| |        • Radio Frequency Quadrapole injector linac | | |
| |        • Injection line quad magnets | | |
| |        • Particle Debuncher | | |
| |        • 180° Magnet | | |
| |        • 25° Magnet | | |
| |        • Injection septum magnet | | |
| |        • Electrostatic injection kicker | | |
| |        • Quad magnets | | |
| |        • Trim magnets | | |
| |        • Sextupole magnets | | |
| |        • Dipole magnets | | |
| |        • Beam position monitors | | |
| |        • Precision beam energy monitoring system | | |
| |        • Radio Frequency Cavity | | |
| |        • Lambertson extraction magnet | | |
| |        • Electrostatic extraction septum | | |
| |        • 10° Magnet | | |
| |        • 20° Magnet | | |
| |        • Electronics racks | | |
| |        • All power supplies | | |
| |   • **Low Conductivity Water System:** | | |
| |      • Deionized water generator | | |

Exhibit 3 Page 167

| Item | Description of Product or Services | Qty | Extended Price |
|---|---|---|---|
| | &#8226; Heat exchanger<br>&#8226; Safety system<br>&#8226; Water leak detection system<br>&#8226; **Vacuum System:**<br>  &#8226; Vacuum pumps for ion source, RFQ, and synchrotron<br>  &#8226; Ion pumps & ion gauges<br>  &#8226; Vacuum safety system<br>  &#8226; High vacuum control & monitoring system<br>&#8226; **Synchrotron/Beam Transport Control Console:**<br>  &#8226; Host computers and real-time embedded computers<br>  &#8226; Selection verification safety system<br>  &#8226; Beam transport control and safety interlocks<br>  &#8226; Safety system indicators<br>  &#8226; Area monitoring system<br>  &#8226; Cooling system indicators | | |
| 2. | **Switchyard Beam Transport System:**<br>&#8226; **Switchyard:**<br>  &#8226; Guidance system for a 70-250 MeV proton beam from the accelerator to multiple destinations<br>&#8226; **Major Components:**<br>  &#8226; Beam dump<br>  &#8226; One set of beam switching hardware<br>  &#8226; Complete set of bending and focusing magnets<br>  &#8226; Complete set of beam position and profile intensity monitors<br>  &#8226; Control and diagnostic devices<br>  &#8226; Safety system<br>  &#8226; Water leak detection system<br>  &#8226; Dipole field monitoring system<br>  &#8226; Cooling system indicators<br>&#8226; **Vacuum System:**<br>  &#8226; Beam Transport<br>  &#8226; Vacuum pumps and monitors along entire beam line, beginning at the Lambertson extraction magnet and continuing to the vacuum window at the entrance to the beam delivery system in each treatment room<br>  &#8226; Vacuum safety system<br>  &#8226; High vacuum control system | 1 | Included |
| 3. | **Gantry Based Treatment System:**<br>&#8226; **Gantry Structure:**<br>  &#8226; Gantry enclosure that accommodates robotic patient positioner<br>  &#8226; Angular Precision: < ± 0.1 degree<br>&#8226; **Major Components:**<br>  &#8226; Corkscrew isocentric gantry system with dual rings and seismic support system<br>  &#8226; Radiation shield ng<br>  &#8226; Gantry monument system<br>  &#8226; Complete set of gantry mounted bending and focusing magnets | 3 | Included |

Exhibit 3 Page 168

| Item | Description of Product or Services | Qty | Extended Price |
|------|-----------------------------------|-----|----------------|
| | ▪ Quad ladder | | |
| | ▪ Quad truss | | |
| | ▪ Beam monitoring system | | |
| | ▪ Cable spool | | |
| | ▪ Cable trays | | |
| | ▪ Patient enclosure assembly | | |
| | ▪ Pneumatic manifold | | |
| | ▪ Vacuum system | | |
| | ▪ Electronics racks | | |
| | ▪ Junction boxes | | |
| | ▪ All power supplies | | |
| | ▪ **Gantry Motion System:** | | |
| | ▪ Motor drive system with overload protection | | |
| | ▪ Servo amplifier | | |
| | ▪ Motion control system | | |
| | ▪ Dual control pendants, fail/safe pneumatic brakes, and brake control system | | |
| | ▪ **Passive Nozzles:** | | |
| | ▪ Passive double scattering system | | |
| | ▪ High precision beam monitoring system | | |
| | ▪ Interchangeable cone extension with a keyed set of collimator plates for each cone extension and retracting frame/cone extension interface structure | | |
| | ▪ Retractable structure assembly | | |
| | ▪ One cone extension and modulator wheels | | |
| | ▪ Set of aperture and bolus frames | | |
| | ▪ **Gantry Digital Imaging System:** | | |
| | ▪ Radiographic flat panel digital imaging (two) | | |
| | ▪ X-ray source (two) | | |
| | ▪ X-ray generator | | |
| | ▪ Retractable image receptor (two) | | |
| | ▪ Laser beam position system | | |
| | ▪ Image manipulation and display hardware | | |
| | ▪ System network | | |
| | ▪ Image correction software | | |
| | ▪ Image archive service | | |
| | ▪ Alignment application | | |
| | ▪ Operator controls | | |
| | ▪ **Gantry Treatment Area:** | | |
| | ▪ Precision Patient Alignment System (PPAS) Robotic Positioner | | |
| | ▪ Integrated multi-function hand pendent | | |
| | ▪ In-room display monitor (two) | | |
| | ▪ CCD Cameras | | |
| | ▪ Laser beam patient position system | | |
| | ▪ **Control Consoles:** | | |
| | ▪ Host and real-time embedded computers | | |
| | ▪ Selection verification system | | |

Exhibit 3 Page 169

Quote #CFO 11 003

| Item | Description of Product or Services | Qty | Extended Price |
|---|---|---|---|
| | ▪ Safety system indicators<br>▪ Area monitoring system<br>▪ Beam lock token key<br>▪ Remote treatment room camera control | | |
| 4. | **Eye Beam Treatment System:**<br>▪ **Stationary Beam Support Structure:**<br>  ▪ Beam pipe and stand<br>  ▪ Nozzle stand<br>▪ **Nozzle:**<br>  ▪ Passive beam scattering system<br>  ▪ Beam monitoring system<br>▪ **Eye Beam Room Treatment Area:**<br>  ▪ Eye nozzle treatment chair<br>  ▪ CCD cameras<br>  ▪ Remote treatment room camera control<br>  ▪ Laser beam patient position system<br>  ▪ X-ray generator, control for two sources<br>  ▪ Imaging system, retractable digital image receptors<br>▪ **Control Console:**<br>  ▪ Beam line control console<br>  ▪ Host and real-time embedded computers<br>  ▪ Selection verification system<br>  ▪ Safety system indicators<br>  ▪ Area monitoring system<br>  ▪ Beam lock token keys | | Not Included |
| 5. | **Research Room:**<br>▪ Operator console<br>▪ Multi beam line Y magnet<br>▪ Support stand<br>▪ Intercom system<br>▪ Room area camera monitoring system | | Not Included |
| 6 | **Real-time, Integrated Facility Control System:**<br>▪ **Major components:**<br>  ▪ Accelerator control electronics, computers and software<br>  ▪ Beam transport and switch control electronics, computers, and software<br>  ▪ Gantry beam room treatment control electronics, computers, and software<br>  ▪ Eye beam room treatment control electronics, computers, and software<br>  ▪ Local area data network<br>  ▪ Unix-based host computers with graphical user interface<br>  ▪ Treatment calibration software system<br>  ▪ Patient database<br>  ▪ Remote diagnostics<br>  ▪ Redundant treatment monitoring to ensure accurate and safe operation | 1 | Included |

Quote #CFO 11 003

| Item | Description of Product or Services | Qty | Extended Price |
|------|-----------------------------------|-----|----------------|
| | ▪ Multi-function electronic treatment prescription<br>▪ Automatic treatment configuration set-up<br>▪ Configuration parameter management software<br>▪ Electronic record and verify system<br>▪ Bar-code scanners for the patient specific devices; patient chart, immobilization devices, aperture, bolus, and modulator wheel<br>▪ Centralized storage system for proton treatment and proton machine data | | |
| 7 | **Integrated Facility Safety System:**<br>▪ **Major Components:**<br>  ▪ Emergency shutdown systems<br>  ▪ Interlock control safety system<br>  ▪ Treatment room and restricted area access control safety systems<br>  ▪ Selection verification system<br>  ▪ Water distribution safety system<br>  ▪ Vacuum safety system | 1 | Included |
| 8. | **Patient Immobilization System:**<br>▪ **Major Components:**<br>  ▪ Head and neck immobilization<br>  ▪ Bite block immobilization for gantry rooms-vacuum assisted<br>  ▪ Vacuum immobilization system control<br>  ▪ Immobilization devices integrated with the Conforma 3000 Modular Patient Support System (MPSS)<br>▪ **CT Scanner Table Adapter**<br>  ▪ CT couch must be to Optivus' specifications<br>  ▪ One table adapter set provided | 1 | Included |
| 9. | **Patient Specific Device Manufacturing Package:**<br>▪ **Tissue Compensator Manufacturing Package:**<br>  ▪ CNC Milling machine-networked with treatment planning system<br>  ▪ Bar-coding machine-networked with treatment planning system<br>  ▪ Tissue compensator (bolus) wax cutting station<br>▪ **Aperture Manufacturing Package:**<br>  ▪ Block-cutting machine-networked with treatment planning system<br>  ▪ Melting pot<br>  ▪ Cooling table | | Not Included |
| 10 | **Facility Management Information System-Software Only:**<br>▪ Personnel and resource scheduling<br>▪ Patient queuing<br>▪ Patient intake<br>▪ Patient follow-up<br>▪ Patient throughput analysis and report<br>▪ Clinical management | | Not Included |
| 11. | **Odyssey Treatment Planning Package:**<br>▪ Full 3D proton treatment planning capability<br>▪ Eye treatment planning capability<br>▪ High patient throughput capability<br>▪ Near real-time dose calculation | 1 | Included |

Exhibit 3 Page 171

Quote #CFO 11 003

| Item | Description of Product or Services | Qty | Extended Price |
|------|-----------------------------------|-----|----------------|
| | • Computer workstations<br>• Network capability to patient databases and proton centralized storage systems<br>• Inputs CT/MRI/PET images | | |
| 12. | **Facility to Technology Interface:**<br>• Production Schedule/Cost Model Coordination<br>• Technology Installation Commissioning | 1 | Included |
| 13. | **Construction & Architectural Fee:**<br>• Patient Treatment Rooms<br>• General Circulation Mechanical & Electrical<br>• Shielding, site-prep, improvements, utilities<br>• Architectural and engineering fees<br>• Excludes taxes, equipment and furnishings | | Not Included |
| 14. | **Staff Training:**<br>• Clinical Nurses<br>• Medical Physicists<br>• Radiation Therapists<br>• Tech Assistant<br>• Dosimetrists<br>• Physicians<br>• Accelerator Control Operators<br>• Travel and lodging costs are not included | 1 | Included |

| | | | |
|---|---|---|---|
| **Quotation Total** | | | $98,000,000 |

This quotation is in U.S. dollars and does not include taxes: local, state, federal or international.
This quote is an estimate, which is subject to change based on site-specific information.
This quote shall remain valid for 90 days from the below date.
One-year warranty included in this quote
Maintenance and Technology Upgrade Agreements are separate, and available upon request.

Payment terms:
   $19,600,000.00 – Due upon contract signing.
   $ 2,175,000.00 – Due each month, for 35 months
   $ 2,275,000.00 – Due upon system commissioning

Daryl L.
Anderson

By: _____    Date: August 2, 2011
   Daryl L. Anderson, CFO

Exhibit 3 Page 172

# ATTACHMENT D

Exhibit 3 Page 173

# GROUND LEASE

This Ground Lease ("Lease") is entered into on *April 17* , 2013 by and between John P. Thropay, M. D., a resident of California, referred to in this Lease as "Lessor," and Los Angeles County Proton Therapy, LLC, a California limited liability company, referred to in this Lease as "Lessee." The parties to this Lease are referred to sometimes individually as a "Party" and collectively as the "Parties."

## RECITALS

A. Lessor is the owner of certain real property in the County of Los Angeles, State of California, commonly known as 111 W. Beverly Blvd., Montebello, California 90640, described on Exhibit "A" hereto, which is attached and made a part of this lease (referred to in this lease as "the Premises").

B. Lessee and its related parties are developing a project to for the purpose of constructing a medical facility that will house a proton therapy treatment center and other commercial office operations which shall be financed by a combination of U.S. investors and foreign investors participating in the EB5 visa program ("the Project")

C. Lessee desires to lease the Premises (together with certain appurtenant rights and easements) for the purpose of constructing a medical facility that will house a proton therapy treatment center and commercial office building ("the Medical Center"), appurtenant parking areas, and other related improvements (collectively referred to in this lease as "the Improvements") in accordance with the agreement of the parties as set forth in this Lease.

## ARTICLE 1
## LEASE OF PREMISES AND TERM OF LEASE

Section 1.01. **Agreement to Lease.** For and in consideration of the rents to be paid and covenants to be performed by Lessee under this Lease, Lessor agrees to lease the Premises to Lessee, and Lessee agrees to lease the Premises from Lessor, on the terms and conditions set forth in this Lease. Except as expressly otherwise provided in this Lease, "the Premises" includes the real property plus any appurtenances and easements described in Exhibit "A" of this Lease, exclusive of any Improvements now or subsequently located on the Premises, notwithstanding that any Improvements may or shall be construed as affixed to and as constituting part of the described Premises, and without regard to whether ownership of the Improvements is in Lessor or in Lessee

Section 1.02. **Status of Title.** Title to the leasehold estate created by this Lease is subject to all exceptions, easements, rights, rights-of-way, and other matters of record as of the date hereof. Within 90 days of the execution of this Lease, Lessor shall obtain a Preliminary Title Report issued by a title company of Lessor's choice, which will be attached as Exhibit "B" hereto.

Exhibit 3 Page 174

Section 1.03. **Term of Lease**. The term of this Lease shall be for a period of thirty (30) years commencing on the Effective Date as defined in Section 1.04 hereof, and continuing thirty (30) years after the Effective Date, unless terminated earlier as provided in this Lease.

Section 1.04. **Effective Date**.  This Lease will be effective as of the date on which Lessee receives a minimum of One hundred million dollars ($100,000,00) in funding for the Project ("the Effective Date"). In the event Lessee does not receive funding for the Project within twenty-four (24) months from the date of its execution by the Parties, Lessor shall have the right to terminate this Lease upon sixty (60) days written notice to Lessee.  If Lessor terminates this Lease in accordance with this Section 1.04, neither Party shall have any further rights or obligations hereunder.

## ARTICLE 2
## RENT

Section 2.01. **Base Rent.** In addition to any other rent required under this lease, Lessee agrees to pay to Lessor a base annual rent ("Base Rent") for each year during the term of this Lease commencing on the Effective Date in the amount of One Million U.S Dollars ($1,000,000), payable in equal monthly installments of Eighty-Three Thousand, Three Hundred and Thirty Three Dollars and Thirty-Four Cents ($83,333.34), subject to upward adjustment as provide in Section 2.12 hereof.

Section 2.02 **Annual Adjustment of Base Rent**.  The Base Rent shall be subject to adjustment on the first day of the month after each one year anniversary of the Lease commencement ("Adjustment Date"), by the amount of the CPI Increase over the prior year.  The Base rent as adjusted at each Adjustment Date shall be the "Base Rent for the subsequent year and such adjusted Base Rent shall be paid monthly as provided in Section 2.01 above. The "CPI Increase" shall be calculated on each Adjustment Date by comparing the Consumer Price Index for the Los Angeles Area, All Urban Consumers, All Items, Los Angeles, California (Base Years 1982-84 =100) (the "CPI") for the closest calendar month prior to the immediately preceding Adjustment Date (or, with respect to the First Adjustment Date, prior to the Commencement Date) for which the CPI is published, to the CPI for the closest calendar month prior to the applicable Adjustment Date for which the CPI is published. The increase in the CPI indicated by such comparison, stated as a percentage, shall be defined herein with respect to each Adjustment Date as the "CPI Increase". Such adjustments shall be subject to the minimum percentage increase of 4% per year and the maximum percentage of 6% per year.

If, during the Term of the Lease, the CPI is no longer published, the Lessor shall, for the purposes of computation of any adjustments in Monthly Base Rent, substitute such other Index, as is then generally recognized as most comparable to the CPI and accepted for similar determinations. If sufficient data is unavailable for Lessor to make the determination specified in this Section 2.02 on any Adjustment Date, Lessee shall continue to pay the Monthly Base Rent payable immediately prior to such Adjustment Date. As soon as the necessary data becomes available, Lessor shall determine the Monthly Base Rent payable from and after such Adjustment Date and notify Lessee of the adjustment in

Exhibit 3 Page 175

writing, and within fifteen days after such notice Lessee shall pay to Lessor the amount by which the Monthly Base Rent for the period following such Adjustment Date exceeds the amount previously paid by Lessee as Monthly Base Rent for such period.

Section 2.03. **Time and Place for Payment of Rent.** All Base Rent provided for in Section 2.01 of this lease, as adjusted annually pursuant to Section 2.01 of this lease shall be paid by Lessee on a monthly basis on the first day of each calendar month. All rent required under this lease shall be paid to Lessor at 120 W. Beverly Boulevard, Suite    , Montebello, California 90640, or any other place or places that Lessor may designate by written notice to Lessee from time to time.

Section 2.04. **Late Charges.** Lessee hereby acknowledges that late payment by Lessee to Lessor of rent and other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any other sum due from Lessee shall not be received by Lessor or Lessor's designated agent within five (5) days after such amount is due and owing, Lessee shall pay to Lessor a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of rent, then rent shall automatically become due and payable quarterly in advance, rather than monthly, notwithstanding Section 2.03 or any other provision of this Lease to the contrary.

Section 2.05. **Security Deposit.** Lessee will deposit with Lessor as of the Effective Date a security deposit ("the Security Deposit") in the sum of one million five hundred thousand dollars ($1,500,000.00), to be held and applied by Lessor in the following manner:

(a) If, at any time during the term of this lease, any of the rent payable by Lessee to Lessor under this lease should be overdue and unpaid, or if any other sums payable by Lessee to Lessor under the terms of this lease should be overdue and unpaid, Lessor may, at Lessor's option, appropriate and apply any portion of the Security Deposit, up to the whole amount of that deposit, to the payment of the overdue rent or sums. In the event of any such appropriation and application by Lessor, Lessee shall promptly, on receipt of written demand by Lessor, restore the amount so appropriated or applied to the Security Deposit. Lessee's failure to do so within ten (10) days after receipt of the written demand by Lessor, shall constitute a breach of this lease by Lessee.

(b) Should Lessee, at any time during the term of this lease, be in default in the performance of any of the terms, covenants, and conditions of this lease, Lessor may, after terminating this lease, appropriate and apply any portion of the Security Deposit, up to the

Exhibit 3 Page 176

whole amount of the Security Deposit, that may be required to compensate Lessor for damages caused by Lessee's breach to the payment of those damages to Lessor.

(e) Should Lessee fully and faithfully perform all the terms, covenants, and conditions of this lease, including the prompt payment of rent as required. Lessor shall, on expiration or earlier termination of this lease, return the full amount of the Security Deposit without interest to Lessee.

Section 2.06. **No Partnership or Joint Venture.**  Nothing in this lease shall be construed to render Lessor in any way or for any purpose a partner, joint venturer, or associate in any relationship with Lessee other than that of Lessor and Lessee, nor shall this lease be construed to authorize either to act as agent for the other.

**ARTICLE 3**
**USE OF PREMISES**

Section 3.01. **Condition of Premises at Commencement Date.**  Lessee acknowledges that there is currently existing structure on the Premises and that Lessee accepts the Premises "AS IS" and "WHERE IS."  Lessee shall be responsible for removing such structure prior to construction of the as of the Medical Center and making such other environmental remediations, any changes to the soil or ground, or other corrections as required by the appropriate zoning authorities. Lessor makes no representation or warranty as to the condition of Premises or the suitability of the Premises for Lessee's intended use. Lessee shall be responsible for conducting any and all soil tests, environmental impact studies, zoning adjustments or any other matters that may be required for the construction and operation of the premises.

Section 3.02. **Permitted Use.** Lessee shall use the Premises solely for the purpose of constructing, maintaining, and leasing for profit a first-class medical facility and commercial office building. Lessee shall not change the use of the Premises without first obtaining the written consent of Lessor.  Lessee shall not use, suffer or permit the use of the Premises in any manner that will tend to create or constitute waste, nuisance or unlawful acts.

Section 3.03. **Compliance With Laws.** Lessee shall, at Lessee's own cost and expense, comply with all statutes, ordinances, regulations, and requirements of all governmental entities, both federal and state and county or municipal, including those requiring capital improvements to the Premises or Improvements, relating to any use and occupancy of the Premises (and specifically not limited to any particular use or occupancy by Lessee), whether those statutes, ordinances, regulations, and requirements are now in force or are subsequently enacted. If any license, permit, or other governmental authorization is required for the lawful use or occupancy of the Premises or any portion of the Premises, Lessee shall procure and maintain it throughout the term of this lease. The judgment of any court of competent jurisdiction, or the admission by Lessee in a proceeding brought against Lessee by any government entity, that Lessee has violated any such statute, ordinance, regulation, or requirement shall be conclusive as between Lessor and Lessee and shall constitute grounds for termination of this lease by Lessor.

4

Exhibit 3 Page 177

Section 3.04. **Prohibited Uses.** Lessee shall not use or permit the Premises or any portion of the Premises to be improved, developed, used, or occupied in any manner or for any purpose that is in any way in violation of any valid law, ordinance, or regulation of any federal, state, county, or local governmental agency, body, or entity. Furthermore, Lessee shall not maintain, commit, or permit the maintenance or commission of any nuisance as now or hereafter defined by any statutory or decisional law applicable to the Premises or any part of the Premises.

Section 3.05. **Hazardous Materials.**

(a) Definition of Hazardous Materials and Environmental Laws. "Hazardous Materials" means any (a) substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated or addressed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. sections 9601, et seq. ("CERCLA"); the Hazardous Materials Transportation Act ("HMTA") 49 U.S.C. section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. section 6901, et seq. ("RCRA"); the Toxic Substances Control Act, 15 U.S.C. sections 2601, et seq. ("TSCA"); the Clean Water Act, 33 U.S.C. sections 1251, et seq.; the California Hazardous Waste Control Act, Health and Safety Code sections 25100, et seq.; the California Hazardous Substances Account Act, Health and Safety Code sections 26300, et seq.; the California Safe Drinking Water and Toxic Enforcement Act, Health and Safety Code sections 25249.5, et seq.; California Health and Safety Code sections 25280, et seq.; (Underground Storage of Hazardous Substances); the California Hazardous Waste Management Act, Health and Safety Code sections 25170.1, et seq.; California Health and Safety Code sections 25501, et seq. (Hazardous Materials Response Plans and Inventory); or the Porter-Cologne Water Quality Control Act, California Water Code sections 13000, et seq., all as amended, or any other federal, state or local statute, law, ordinance, resolution, code, rule, regulation, order or decree regulating, relating to or imposing liability (including, but not limited to, response, removal and remediation costs) or standards of conduct or performance concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter may be in effect (collectively, "Environmental Laws"); (b) any substance, product, waste or other material of any nature whatsoever whose presence in and of itself may give rise to liability under any of the above statutes or under any statutory or common law theory based on negligence, trespass, intentional tort, nuisance, strict or absolute liability or under any reported decisions of a state or federal court; (c) petroleum or crude oil, including but not limited to petroleum and petroleum products contained within regularly operated motor vehicles and (d) asbestos.

(b) Lessor's Representations and Disclosures. Lessor represents that it has provided Lessee with a description of the Hazardous Materials on or beneath the Property as of the date hereof, attached hereto as Exhibit C and incorporated herein by reference and that except as described in the documents identified in Exhibit C, Lessor has no actual knowledge of any Hazardous Materials at the Premises. Lessee acknowledges that in providing the attached Exhibit C, Lessor has satisfied its obligations of disclosure pursuant to California Health & Safety Code Section 25359.7 which requires:

> "Any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substances has come to be

Exhibit 3 Page 178

located on or beneath that real property shall, prior to the sale, lease or rental of the real property by that owner, give written notice of that condition to the buyer, lessee or renter of the real property."

(c) Use of Hazardous Materials. Lessee shall not cause or permit any Hazardous Materials to be brought upon, kept or used in, on or about the Premises by Lessee, its agents, employees, contractors, licensee, guests, visitors or invitees without the prior written consent of Lessor. Lessor shall not unreasonably withhold such consent so long as Lessee demonstrates to Lessor's reasonable satisfaction that such Hazardous Materials are necessary or useful to Lessee's business and will be used, kept and stored in a manner that complies with all applicable Environmental Laws. Lessee shall, at all times, use, keep, store, handle, transport, treat or dispose all such Hazardous Materials in or about the Premises in compliance with all applicable Environmental Laws. Lessee shall remove all Hazardous Materials used or brought onto the Premises during the Lease Term from the Project prior to the expiration or earlier termination of the Lease.

(d) Lessee's Environmental Indemnity.  Lessee agrees to indemnify and hold Lessor harmless from any liabilities, losses, claims, damages, penalties, fines, attorney fees, expert fees, court costs, remediation costs, investigation costs, or other expenses resulting from or arising out of the use, storage, treatment, transportation, release, presence, generation, or disposal of Hazardous Materials on, from or about the Project, and/or subsurface or ground water, after the Commencement Date from an act or omission of Lessee (or Lessee's successor), its agents, employees, invitees, vendors, contractors, guests or visitors.

(e) Lessee's Obligation to Promptly Remediate.  If the presence of Hazardous Materials on the Premises after the Commencement Date results from an act or omission of Lessee (or Lessee's successors), its agents, employees, invitees, vendors, contractors, guests, or visitors results in contamination or deterioration of the Premises or any water or soil beneath the Premises, Lessee shall promptly take all action necessary or appropriate to investigate and remedy that contamination, at its sole cost and expense, provided that Lessor's consent to such action shall first be obtained, which consent shall not be unreasonably withheld.  In no event shall Lessee be responsible for, and Lessor shall indemnify and hold Lessee harmless with respect to, remediation of Hazardous Materials identified in Exhibit C which are at the Premises prior to the Commencement Date.

(f) Notification.  Lessor and Lessee each agree to promptly notify the other of any communication received from any governmental entity concerning Hazardous Materials or the violation of Environmental Laws that relate to the Premises.

## ARTICLE 4
## TAXES AND UTILITIES

Section 4.01. **Lessee to Pay Taxes.**  Lessee shall pay during the term of this lease, without abatement, deduction, or offset, any and all real and personal property taxes, general and special assessments, and other charges (including any increase caused by a change in the tax rate or by a change in assessed valuation of any description levied or assessed during the term of this lease by any governmental agency or entity on or against the Premises, the

6

Exhibit 3 Page 179

Improvements located on the Premises, personal property located on or in the Premises or
Improvements, and the leasehold estate created by this lease.

Section 4.02. **Proration of First and Last Year Taxes.**  Notwithstanding the provisions of
Section 4.01 of this lease, all taxes, assessments, or other charges levied or assessed during
the tax years in which the term of this lease commences and ends shall be prorated between
Lessor and Lessee as of 12:01 A.M. on the date the term commences and on the date the
term ends, respectively, on the basis of tax years that commence on July 1 and end on June
30 of each year. Lessor shall pay the taxes, assessments, or other charges for the year in
which the term of this lease commences and Lessee shall promptly, on service of written
request by Lessor, reimburse Lessor for Lessee's share of those taxes, assessments, or other
charges. Lessee shall pay the taxes, assessments, and other charges for the year in which
this lease is to end; and Lessor shall promptly, on service of written request by Lessee,
reimburse Lessee for Lessor's share of those taxes, assessments, and other charges.

Section 4.03. **Separate Assessment of Leased Premises.**  Should the Premises be assessed
and taxed with or as part of other property owned by Lessor before the commencement of
the term of this lease, Lessor shall arrange with the taxing authorities to have the Premises
taxed and assessed as a separate parcel distinct from any other real or personal property
owned by Lessor. Should the Premises be assessed and taxed for the year in which this
lease is to commence with or as part of other property owned by Lessor, the share of the
taxes, assessments, or other charges for which Lessee is liable to pay under Section 4.02
shall be determined as follows. Lessee shall pay an amount equal to that portion of the
taxes, assessments, and other charges that bears the same ratio to the total of the taxes,
assessments, and other charges as the ground area of the Premises bears to the ground area
of the total taxed property.

Section 4.04. **Payment Before Delinquency.**  Any and all taxes and assessments and
installments of taxes and assessments required to be paid by Lessee under this lease shall
be paid by Lessee at least thirty (30) 10 days before each such tax, assessment, or
installment of tax or assessment becomes delinquent. Lessee shall deliver to Lessor the
official and original receipt evidencing the payment of any taxes, assessments, and other
charges required under this Article.

Section 4.05. **Taxes Payable in Installments.**  Should any special tax or assessment be
levied on or assessed against the Premises that may be either paid in full before a
delinquency date within the term of this lease or paid in installments over a period either
within or extending beyond this lease, Lessee shall have the option of paying the special
tax or assessment in installments. The fact that the exercise of the option to pay the tax or
assessment in installments will cause the Premises to be encumbered with bonds or will
cause interest to accrue on the tax or assessment is immaterial and shall not interfere with
the free exercise of the option by Lessee. Should Lessee exercise the option to pay any
such tax or assessment in installments, Lessee shall be liable to pay only those installments
becoming due during the term of this lease. Lessor shall cooperate with Lessee and on
written request of Lessee execute or join with Lessee in executing any instruments required
to permit any such special tax or assessment to be paid in installments.

Exhibit 3 Page 180

Section 4.06. **Contest of Tax.** Lessee shall have the right to contest, oppose, or object to the amount or validity of any tax, assessment, or other charge levied on or assessed against the Premises or any part of the Premises; provided, however, that the contest, opposition, or objection must be filed before the tax, assessment, or other charge at which it is directed becomes delinquent and that written notice of the contest, opposition, or objection must be given to Lessor at least thirty (30) days before the date the tax, assessment, or other charge becomes delinquent. Lessor shall, on written request of Lessee, join in any such contest, opposition, or objection if Lessee determines that joinder is necessary or convenient for the proper prosecution of the proceedings. Lessee shall be responsible for and shall pay all costs and expenses in any contest or legal proceeding instituted by Lessee. In no event shall Lessor be subjected to any liability for costs or expenses connected to any contest by Lessee, and Lessee agrees to indemnify and hold Lessor harmless from any such costs and expenses. Furthermore, no such contest, opposition, or objection shall be continued or maintained after the date the tax, assessment, or other charge at which it is directed becomes delinquent unless Lessee has done one of the following:

(a) Paid the tax, assessment, or other charge under protest before its becoming delinquent;

(b) Obtained and maintained a stay of all proceedings for enforcement and collection of the tax, assessment, or other charge by posting a bond or other security required by law for such a stay; or

(c) Delivered to Lessor a good and sufficient surety bond in an amount specified by Lessor and issued by a bonding corporation licensed to do business in California, conditioned on the payment by Lessee of the tax, assessment, or charge together with any fines, interest, penalties, costs, and expenses that may have accrued or been imposed thereon within 30 days after final determination of Lessee's contest, opposition, or objection to the tax, assessment, or other charge.

Section 4.07. **Tax Returns and Statements.** Lessee shall, as between Lessor and Lessee, have the duty of attending to, preparing, making, and filing any statement, return, report, or other instrument required or permitted by law in connection with the determination, equalization, reduction, or payment of any taxes, assessments, or other charges that are or may be levied on or assessed against the Premises, the Improvements located on the Premises, personal property located on or in the Premises or Improvements, and the leasehold estate created by this lease.

Section 4.08. **Tax Hold-Harmless Clause.** Lessee shall indemnify and hold Lessor and Lessor's property, including the Premises and any Improvements now or subsequently located on the Premises, free and harmless from any liability, loss, or damage resulting from any taxes, assessments, or other charges required by this Article to be paid by Lessee and from all interest, penalties, and other sums imposed thereon and from any sales or other proceedings to enforce collection of any such taxes, assessments, or other charges.

Section 4.09. **Utilities.** Lessee shall pay or cause to be paid, and hold Lessor and Lessor's property including the Premises free and harmless from, all charges for the furnishing of gas, water, electricity, telephone service, and other public utilities to the Premises during

8

Exhibit 3 Page 181

the lease's term and for the removal of garbage and rubbish from the Premises during the term of this lease.

Section 4.10. **Payment by Lessor.** Should Lessee fail to pay within the time specified in this Article any taxes, assessments, or other charges required by this Article to be paid by Lessee, Lessor may, without notice to or demand on Lessee, pay, discharge, or adjust that tax, assessment, or other charge for the benefit of Lessee. In that event, Lessee shall promptly on written demand of Lessor reimburse Lessor for the full amount paid by Lessor in paying, discharging, or adjusting that tax, assessment, or other charge together with interest thereon at the then-maximum legal rate from the date of payment by Lessor until the date of repayment by Lessee. If this Article does not specify the time within which Lessee must pay any charge required by this Article, Lessee shall pay that charge before it becomes delinquent.

**ARTICLE 5**
**CONSTRUCTION BY TENANT**

Section 5.01. **Duty to Construct.** Lessee shall, at Lessee's sole cost and expense, construct or cause to be constructed on the Premises, a medical facility and commercial office building ("the Medical Center") in the manner and according to the terms and conditions specified in this Article. Construction of the Medical Center must begin within twelve (12) months of the Effective Date and must be completed within three (3) years of the commencement of construction. The failure of Lessee to begin construction within twelve months of the Effective Date or failure of Lessee to complete the construction of the Medical Center within three (3) years of the commencement of construction shall be an Event of Default by Lessee.

Section 5.02. **Construction Bond.** Prior to any construction being done on the Premises, Lessee shall secure a bond in the estimated amount of the cost of construction of the Medical Center naming Lessor as the beneficiary ("Bond"). The Bond shall protect Lessor in the event that Lessee fails to complete construction of the Medical Center by the date agreed to between Lessor and Lessee. The Bond shall be subject to Lessor's approval prior to issuance and shall be issued by an insurance bonding company licensed to do business in the State of California, rated A- or better by A.M. Best Company, size category XV or better. The bond shall be non-cancellable and any cancellation of the Bond prior to completion of the Medical Center will be an Event of Default by Lessee.

Section 5.03. **Requirement of Lessor's Written Approval.** No structure or other improvement of any kind shall be constructed on the Premises unless and until the plans, specifications, and proposed location of that structure or improvement have been approved in writing by Lessor. Furthermore, no structure or other improvement shall be constructed on the Premises that does not comply with plans, specifications, and locations approved in writing by Lessor.

Section 5.04. **Preparation and Submission of Plans.** Lessee shall, at Lessee's own cost and expense, engage a licensed architect or engineer to prepare plans and specifications for

9

Exhibit 3 Page 182

the Medical Center and shall submit the following to Lessor for approval:

(a) Within 180 days after execution of this Lease, two copies of the following:

(1) Drawings and materials in the form of plans, elevations, sections, and rendered perspectives sufficient to convey the architectural design of the Medical Center to Lessor; and

(2) A statement of estimated construction costs for the Medical Center prepared by the engaged architect or engineer.

(b) Within 90 days after approval by Lessor of the items specified in subsection (a) of this Section and the obtaining by Lessee of any variance permits, use permits, or rezoning required for the Medical Center, two copies of the following:

(1) Detailed working drawings, plans, and specifications for the Medical Center; and

(2) A revised statement of estimated construction costs for the Medical Center prepared by the engaged architect or engineer.

Section 5.05. **Lessor's Approval or Rejection of Plans.** Within 60 days after receipt by Lessor of any of the documents submitted to Lessor for approval under Section 5.03 of this lease, Lessor shall either approve those documents by endorsing Lessor's approval on each such document and returning one set of the documents to Lessee, or Lessor shall give written notice to Lessee of any objections Lessor may have to those documents. Lessor's failure to give written notice to Lessee within that 60-day period of any objections Lessor may have to the documents shall constitute approval of the documents by Lessor. Within 30 days after service on Lessee of the written notice of Lessor's objections, Lessee may deliver corrective amendments to the documents to Lessor and Lessor shall, within 30 days after receiving the corrective amendments, serve written notice on Lessee of Lessor's approval or rejection of the documents as so amended. Failure of Lessor to serve written notice on Lessee within that 30-day period after receipt of the corrective amendments shall constitute approval by Lessor of the documents as so amended.

Section 5.06. **Changes in Plans.** After approval by Lessor of the documents pertaining to the Medical Center described in Section 5.03(b) of this lease, any substantial change in the plans or specifications for the Medical Center shall be approved by Lessor. For purposes of this Section, "substantial change" means one that materially changes the exterior appearance of the Medical Center or one that results in a decrease in construction costs of $100,000 or more. Lessor's failure to give written notice to Lessee of any objections Lessor may have to any proposed changes within 60 days after a written statement of the proposed changes has been given to Lessor by Lessee shall constitute Lessor's approval of the changes. Minor changes in work or materials not constituting a substantial change need not be approved by Lessor but a copy of the altered plans and specifications reflecting those changes shall be given to Lessor.

10

Exhibit 3 Page 183

Section 5.07. **All Work on Written Contract.** All work required in the construction of the Medical Center, including any site preparation work, landscaping work, and utility installation work, as well as actual construction work on the Medical Center, shall be performed only by competent contractors licensed under the laws of the State of California and shall be performed in accordance with written contracts with those contractors. Each such contract shall provide that the final payment under the contract due to the contractor shall be in an amount equaling at least ten percent (10%) of the full amount payable under the contract and shall not be paid to contractor until whichever of the following last occurs:

(a) The expiration of 35 days from the date of recording by Lessee as owner of a Notice of Completion of the Medical Center, Lessee agreeing to record that Notice of Completion promptly within the time specified by law for the recording of that notice; or

(b) The settlement and discharge of all liens of record claimed by persons who supplied either labor or materials for the construction of the Medical Center.

Section 5.08. **Performance and Lien Bonds.** Each contractor engaged by Lessee to perform any services for construction of the Medical Center, including any construction, site preparation, utility installation, landscaping, or parking lot construction services, shall furnish to Lessee, who shall deliver copies of both of the following to Lessor, at the contractor's own expense at the time of entering a contract with Lessee for those services:

(a) A bond issued by a corporate surety authorized to issue surety insurance in California in an amount equal to one hundred percent (100%) of the contract price payable under the contract securing the faithful performance by the contractor of its contract with Lessee; and

(b) A bond issued by a corporate surety authorized to issue surety insurance in California in an amount equal to fifty percent (50%) of the contract price payable under the contract securing the payment of all claims for the performance of labor or services on, or the furnishing of materials for, the performance of the contract.

Section 5.09. **Compliance With Law and Standards.** The Medical Center shall be constructed, all work on the Premises shall be performed, and all buildings or other improvements on the Premises shall be erected in accordance with all valid laws, ordinances, regulations, and orders of all federal, state, county, or local governmental agencies or entities having jurisdiction over the Premises; provided, however, that any structure or other improvement erected on the Premises, including the Medical Center, shall be deemed to have been constructed in full compliance with all such valid laws, ordinances, regulations, and orders when a valid final Certificate of Occupancy entitling Lessee and subtenants of Lessee to occupy and use the structure or other improvement has been duly issued by proper governmental agencies or entities. All work performed on the Premises under this lease, or authorized by this lease, shall be done in a good workmanlike manner and only with new materials of good quality and high standard.

Section 5.10. **Construction of Medical Center.** Lessee shall cause construction of the Medical Center to be commenced no later than sixty (60) days after approval by Lessor of the documents described in Section 5.03(b) of this lease, shall then cause construction of

11

Exhibit 3 Page 184

the Medical Center to be diligently pursued without unnecessary interruption, and shall
cause the Medical Center to be completed and ready for occupancy not later than four (4)
years after commencement of its construction. Lessee shall be excused for any delays in
construction or commencement of construction caused by the act of Lessor, the act of any
agent of Lessor, the act of any governmental authority, the act of any public enemy, acts of
God, the elements, war, war defense conditions, litigation, strikes, walkouts, or other
causes beyond Lessee's control. Lessee shall, however, use reasonable diligence to avoid
any such delay and to resume construction as promptly as possible after the delay.

Section 5.11. **Mechanics' Liens.** At all times during the term of this lease, Lessee shall
keep the Premises and all Improvements now or hereafter located on the Premises free and
clear of all liens and claims of liens for labor, services, materials, supplies, or equipment
performed on or furnished to the Premises. Should Lessee fail to pay and discharge or
cause the Premises to be released from any such lien or claim of lien within twenty (20)
days after service on Lessee of written request from Lessor to do so, Lessor may pay,
adjust, compromise, and discharge any such lien or claim of lien on any terms and in any
manner that Lessor may deem appropriate. In that event, Lessee shall, on or before the first
day of the next calendar month following any such payment by Lessor, reimburse Lessor
for the full amount paid by Lessor in paying, adjusting, compromising, and discharging
that lien or claim of lien, including any attorneys' fees or other costs expended by Lessor,
together with interest at the then-maximum legal rate from the date of payment by Lessor
to the date of repayment by Lessee.

Section 5.12. **Zoning and Use Permits.** Should Lessee deem it necessary or appropriate
to obtain any use permit, variance, or rezoning of the Premises to construct or operate the
Medical Center, Lessor agrees to execute any documents, petitions, applications, and
authorizations that may be necessary or appropriate and hereby appoints Lessee as Lessor's
attorney in fact to execute in the name and on behalf of Lessor any such documents,
petitions, applications, or authorizations; provided, however, that any such permits,
variances, or rezoning shall be obtained at the sole cost and expense of Lessee and Lessee
agrees to protect and save Lessor and the property of Lessor, including the Premises, free
and harmless from any such cost and expense.

Section 5.13. **Ownership of Improvements.** Title to all Improvements, including the
Medical Center, to be constructed on the Premises by Lessee shall be owned by Lessee
until expiration of the term or earlier termination of this lease. All Improvements,
including the Medical Center, on the Premises at the expiration of the term or earlier
termination of this lease shall, without compensation to Lessee, then automatically and
without any act of Lessee or any third party become Lessor's property. Lessee shall
surrender the Improvements to Lessor at the expiration of the term or earlier termination of
this lease, free and clear of all liens and encumbrances, other than those, if any, permitted
under this lease or otherwise created or consented to by Lessor. Lessee agrees to execute,
acknowledge, and deliver to Lessor any instrument requested by Lessor as necessary in
Lessor's opinion to perfect Lessor's right, title, and interest to the Improvements and the
Premises.

13

Exhibit 3 Page 185

## ARTICLE 6
## ENCUMBRANCE OF LEASEHOLD ESTATE

Section 6.01. **Lessee's Right to Encumber.** Lessee may, at any time and from time to time
during the term of this lease, encumber to any institutional lender regulated by state or
federal authority (referred to in this lease as "Lender"), by deed of trust or mortgage or
other security instrument, all of Lessee's interest under this lease and the leasehold estate
hereby created in Lessee (referred to in this lease as a "Leasehold Encumbrance") for any
purpose or purposes without the consent of Lessor. However, no Leasehold Encumbrance
incurred by Lessee in accordance with this Section shall, and Lessee shall not have power
to incur any encumbrance that shall, constitute in any way a lien or encumbrance on
Lessor's fee interest in the Premises. Any Leasehold Encumbrance shall be subject to all
covenants, conditions, and restrictions set forth in this lease and to all rights and interests
of Lessor, except as is otherwise provided in this lease. Lessee shall give Lessor prior
written notice of any Leasehold Encumbrance, together with a copy of the deed of trust,
mortgage, or other security interest evidencing the Leasehold Encumbrance.

Section 6.02. **Notice to and Service on Lender.** Lessor shall mail to any Lender who has
given Lessor written notice of its name and address, a duplicate copy of any and all notices
Lessor may from time to time give to or serve on Lessee in accordance with or relating to
this lease, including but not limited to any notice of default, notice of termination, or notice
regarding any matter on which Lessor may predicate or claim a default. Any notices or
other communications permitted by this or any other section of this lease or by law to be
served on or given to Lender by Lessor shall be deemed duly served on or given to Lender
when deposited in the United States mail, first-class postage prepaid, addressed to Lender
at the last mailing address for Lender furnished in writing by Lender to Lessor.

Section 6.03. **No Modification Without Lender's Consent.** For as long as there is any
Leasehold Encumbrance in effect, Lessee and Lessor hereby expressly stipulate and agree
that they will not modify this lease in any way nor cancel this lease by mutual agreement
without the written consent of Lender having that Leasehold Encumbrance.

Section 6.04. **Right of Lender to Realize on Security.** A Lender with a Leasehold
Encumbrance shall have the right at any time during the term of this lease and the
existence of the encumbrance to do both of the following:

(a) Any act or thing required of Lessee under this lease, and any such act or thing done and
performed by Lender shall be as effective to prevent a forfeiture of Lessee's rights under
this lease as if done by Lessee; and

(b) Realize on the security afforded by the leasehold estate by foreclosure proceedings,
accepting an assignment in lieu of foreclosure, or other remedy afforded in law or in equity
or by the security instrument evidencing the Leasehold Encumbrance (referred to in this
lease as "the Security Instrument"), and (1) To transfer, convey, or assign the title of
Lessee to the leasehold estate created by this lease to any purchaser at any foreclosure sale,
whether the foreclosure sale is conducted under court order or a power of sale contained in
the Security Instrument, or to an assignee under an assignment in lieu of foreclosure; and

Exhibit 3 Page 186

(2) To acquire and succeed to the interest of Lessee under this lease by virtue of any foreclosure sale, whether the foreclosure sale is conducted under a court order or a power of sale contained in the Security Instrument, or by virtue of an assignment in lieu of foreclosure.

The Lender or any person or entity acquiring the leasehold estate shall be liable to perform Lessee's obligations under this lease only during the period, if any, in which that entity or person has ownership of the leasehold estate or possession of the Premises.

Section 6.05. **Right of Lender to Cure Defaults.** For as long as there is in effect any Leasehold Encumbrance, before Lessor may terminate this lease because of any default under or breach of this lease by Lessee, Lessor must give written notice of the default or breach to Lender and afford Lender the opportunity after service of the notice to do one of the following:

(a) Cure the breach or default within ten (10) days after expiration of the time period granted to Lessee under this lease for curing a default, when the default can be cured by the payment of money to Lessor or some other person;

(b) Cure the breach or default within ten (10) days after expiration of the time period granted to Lessee under this lease for curing a default, when the breach or default must be cured by something other than the payment of money and can be cured within that time; or
(c) Cure the breach or default in any reasonable time that may be required when something other than money is required to cure the breach or default and cannot be performed within ten (10) days after expiration of the time period granted to the tenant under this lease for curing a default, provided that acts to cure the breach or default are commenced within that time period after service of notice of default on Lender by Lessor and are thereafter diligently continued by Lender.

Section 6.06. **Foreclosure in Lieu of Curing Default.** Notwithstanding any other provision of this lease, a Lender under a Leasehold Encumbrance may forestall termination of this lease by Lessor for a default under or breach of this lease by Lessee by commencing proceedings to foreclose the Leasehold Encumbrance. The proceedings so commenced may be for foreclosure of the Leasehold Encumbrance by order of court or for foreclosure of the Leasehold Encumbrance under a power of sale contained in the Security Instrument. The proceedings shall not, however, forestall termination of this lease by Lessor for the default or breach by Lessee unless all of the following conditions are met.

(a) The proceedings are commenced within 90 days after service on Lender of the notice described in Section 6.05 of this lease;

(b) The proceedings are, after having been commenced, diligently pursued in the manner required by law to completion; and

(c) Lender keeps and performs all of the terms, covenants, and conditions of this lease requiring the payment or expenditure of money by Lessee until the foreclosure proceedings

14

Exhibit 3 Page 187

are complete or are discharged by redemption, satisfaction, payment, or conveyance of the leasehold estate to Lender.

Section 6.07. **Assignment Without Consent on Foreclosure** A transfer of Lessee's leasehold interest under this lease to any of the following shall not require the prior consent of Lessor:

(a) A purchaser at a foreclosure sale of the Leasehold Encumbrance, whether the foreclosure sale is conducted under court order or a power of sale in the instrument creating the encumbrance, provided Lender under the Leasehold Encumbrance gives Lessor written notice of the transfer, including the name and address of the purchaser and the effective date of the transfer;

(b) An assignee of the leasehold estate of Lessee under an assignment in lieu of foreclosure, provided Lender under the Leasehold Encumbrance gives Lessor written notice of the transfer, including the name and address of the assignee and the effective date of the assignment; or

(c) A purchaser or assignee of the purchaser at a foreclosure sale of the Leasehold Encumbrance or of the assignee of the leasehold estate of Lessee acquired under an assignment in lieu of foreclosure, provided the purchaser or assignee delivers to Lessor its written agreement to be bound by all of the provisions of this lease.

Section 6.08. **New Lease to Lender.** Notwithstanding any other provision of this lease, should this lease terminate because of any default under or breach of this lease by Lessee, Lessor agrees to enter into a new lease for the Premises with Lender under a Leasehold Encumbrance, as Lessee, provided all of the following conditions are satisfied:

(a) A written request for the new lease is served on Lessor by Lender within 60 days after service on Lender of the notice described in Section 6.05 of this lease;

(b) The new lease (1) Is for a term ending on the same date the term of this lease would have ended had this lease not been terminated; (2) Provides for the payment of rent at the same rate that would have been payable under this lease during the remaining term of this lease had this lease not been terminated; and (3) Contains the same terms, covenants, conditions, and provisions as are contained in this lease (except those that have already been fulfilled or are no longer applicable);

(c) Lender, on execution of the new lease by Lessor, shall pay any and all sums that would at the time of the execution of the new lease be due under this lease but for its termination and shall otherwise fully remedy, or agree in writing to remedy, any other defaults under or breaches of this lease committed by Lessee that can be remedied;

(d) Lender, on execution of the new lease, shall pay all reasonable costs and expenses, including attorneys' fees and court costs, incurred in terminating this lease, recovering possession of the Premises from Lessee or the representative of Lessee, and preparing the new lease;

15

Exhibit 3 Page 188

(e) The new lease shall be subject to all existing subleases between Lessee and subtenants, provided that for any sublease, the subtenant agrees in writing to attorn to Lender (or its assignee); and

(f) The new lease shall be assignable by Lender but not by any assignee of Lender without the prior written consent of Lessor.

Section 6.09. **No Merger of Leasehold and Fee Estates.** For as long as any Leasehold Encumbrance is in existence, there shall be no merger of the leasehold estate created by this lease and the fee estate of Lessor in the Premises merely because both estates have been acquired or become vested in the same person or entity, unless Lender otherwise consents in writing.

Section 6.10. **Lender as Assignee of Lease.** No Lender under any Leasehold Encumbrance shall be liable to Lessor as an assignee of this lease unless and until Lender acquires all rights of Lessee under this lease through foreclosure, an assignment in lieu of foreclosure, or as a result of some other action or remedy provided by law or by the instrument creating the Leasehold Encumbrance.

Section 6.11. **Lender as Including Subsequent Security Holders.** Except for purposes of Section 6.08, the term "Lender" as used in this lease shall mean not only the institutional lender that loaned money to Lessee and is named as beneficiary, mortgagee, secured party, or security holder in the Security Instrument creating any Leasehold Encumbrance, but also all subsequent purchasers or assignees of the leasehold interest secured by the Leasehold Encumbrance.

Section 6.12. **Two or More Lenders.** In the event two or more Lenders each exercise their rights under this lease and there is a conflict that renders it impossible to comply with all requests of Lenders, the Lender whose Leasehold Encumbrance would have senior priority in the event of a foreclosure shall prevail.

## ARTICLE 7
## REPAIRS AND RESTORATION

Section 7.01. **Maintenance by Lessee.** At all times during the term of this lease Lessee shall, at Lessee's own cost and expense, keep and maintain the Premises, all Improvements, and all appurtenances (including landscaped and parking areas) now or hereafter on the Premises in a first-class condition, in good order and repair, and in a safe and clean condition.

Section 7.02. **Requirements of Governmental Agencies.** At all times during the term of this lease, Lessee, at Lessee's own cost and expense, shall do all of the following:

(a) Make all alterations, additions, or repairs to the Premises or the Improvements on the Premises required by any valid law, ordinance, statute, order, or regulation now or hereafter made or issued by any federal, state, county, local, or other governmental agency or entity;

16

Exhibit 3 Page 189

(b) Observe and comply with all valid laws, ordinances, statutes, orders, and regulations now or hereafter made or issued respecting the Premises or the Improvements on the Premises by any federal, state, county, local, or other governmental agency or entity;

(c) Contest if Lessee, in Lessee's sole discretion, desires by appropriate legal proceedings brought in good faith and diligently prosecuted in the name of Lessee, or in the names of Lessee and Lessor when appropriate or required, the validity or applicability to the Premises of any law, ordinance, statute, order, or regulation now or hereafter made or issued by any federal, state, county, local, or other governmental agency or entity; provided, however, that any such contest or proceeding, though maintained in the names of Lessee and Lessor, shall be without cost to Lessor, and Lessee shall protect the Premises and Lessor from Lessee's failure to observe or comply during the contest with the contested law, ordinance, statute, order, or regulation; and

(d) Indemnify and hold Lessor and the property of Lessor, including the Premises, free and harmless from any and all liability, loss, damages, fines, penalties, claims, and actions resulting from Lessee's failure to comply with and perform the requirements of this Section.

Section 7.03. **Lessee's Duty to Restore Premises.** If at any time during this lease's term, any Improvements now or hereafter on the Premises are destroyed in whole or in part by fire, theft, the elements, or any other cause not the fault of Lessor, this lease shall continue in full force and effect and Lessee, at Lessee's own cost and expense, shall repair and restore the damaged Improvements. Any restoration by Lessee shall comply with original plans for the Improvements described in Article 5, except as may be modified by Lessee to comply with the terms of any sublease of the Improvements, or except as may be otherwise modified by Lessee and approved in writing by Lessor. The work of repair and restoration shall be commenced by Lessee within one hundred and twenty (120) days after the damage or destruction occurs and shall be completed with due diligence not later than one year after the work is commenced. In all other respects, the work of repair and restoration shall be done in accordance with the requirements for original construction work on the Premises set forth in Article 5 of this lease. Lessee's obligation for restoration described in this Section shall exist whether or not funds are available from insurance proceeds.

Section 7.04. **Option to Terminate Lease for Destruction.** Notwithstanding Section 7.03 of this lease, Lessee shall have the right to terminate this lease if, during the last five years of the lease's term, the Improvements are damaged or destroyed by a casualty for which Lessee is not required under this lease to carry insurance and the cost to repair or restore the damaged or destroyed Improvements exceeds 50 percent of the fair market value of the Improvements immediately before the damage or destruction

Section 7.05. **Application of Insurance Proceeds.** Any and all fire or other insurance proceeds that become payable at any time during the term of this lease because of damage to or destruction of any Improvements on the Premises shall be paid to Lessee and applied by Lessee toward the cost of repairing and restoring the damaged or destroyed Improvements in the manner required by Section 7.03 of this lease, or, if this lease is terminated under Section 7.04, applied by Lessee toward payment of the Leasehold Encumbrances)

17

Exhibit 3 Page 190

## ARTICLE 8
## INDEMNITY AND INSURANCE

Section 8.01. **Indemnity Agreement.** Lessee shall indemnify and hold Lessor and Lessor's property, including the Premises and Improvements now or hereafter on the Premises, free and harmless from any and all liability, claims, loss, damages, or expenses resulting from Lessee's occupation and use of the Premises, specifically including, without limitation, any liability, claim, loss, damage, or expense arising by reason of the following:

(a) The death or injury of any person, including Lessee or any person who is an employee or agent of Lessee, or by reason of the damage to or destruction of any property, including property owned by Lessee or by any person who is an employee or agent of Lessee, from any cause whatever while that person or property is in or on the Premises or in any way connected with the Premises or with any of the Improvements or personal property on the Premises;

(b) The death or injury of any person, including Lessee or any person who is an employee or agent of Lessee, or by reason of the damage to or destruction of any property, including property owned by Lessee or any person who is an employee or agent of Lessee, caused or allegedly caused by either (1) the condition of the Premises or some building or improvement on the Premises, or (2) some act or omission on the Premises of Lessee or any person in, on, or about the Premises with the permission and consent of Lessee;

(c) Any work performed on the Premises or materials furnished to the Premises at the instance or request of Lessee or any person or entity acting for or on behalf of Lessee; or

(d) Lessee's failure to perform any provision of this lease or to comply with any requirement of law or any requirement imposed on Lessee or the Premises by any duly authorized governmental agency or political subdivision.

Section 8.02. **Limitations on Lessor's Liability.** The term "Lessor" as used herein shall mean only the owner or owners at the time in question of the fee title of the Premises. In the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership. For any breach of this Lease by Lessor, the liability of Lessor (including all persons and entities that comprise Lessor, and any successor Lessor) and any recourse by Lessee against Lessor shall be limited to the interest of Lessee in and to the interest of Lessor's successors in interest, in and to the Premises. On behalf of itself and all persons claiming by, through, or under Lessee, Lessee expressly waives and releases Lessor and each owner, member, agent and employee of Lessor from any personal liability for breach of this Lease.

18

Exhibit 3 Page 191

Section 8.03. **Liability Insurance**. Lessee shall, at Lessee's own cost and expense, procure and maintain during the entire term of this lease a broad form comprehensive coverage policy of public liability insurance issued by an insurance company licensed by the State of California insuring Lessee and Lessor against loss or liability caused by or connected with Lessee's occupation and use of the Premises under this lease in amounts not less than the following:

(a) Ten Million Dollars ($10,000,000) for injury to or death of one person and, subject to that limitation for the injury or death of one person, of not less than Fifteen Million Dollars ($15,000,000) for injury to or death of two or more persons as a result of any one accident or incident; and

(b) Replacement Value for the Medical Center  for damage to or destruction of any property.

Section 8.04. **Fire and Casualty Insurance.**  Lessee shall, at Lessee's own cost and expense, at all times during the term of this lease, keep all Improvements on the Premises insured for their full replacement value by insurance companies authorized to do business in the State of California against loss or destruction by fire and the perils commonly covered under the standard extended coverage endorsement to fire insurance policies in the county where the Premises are located. For as long as there is any Leasehold Encumbrance in existence, that policy shall also contain a standard lender endorsement.

Section 8.05. Notwithstanding anything to the contrary contained in Section 8.03 of this lease, the insurance required by Section 8.03 of this lease shall, whether or not included in the standard extended coverage endorsement referred to in Section 8.03, insure all Improvements on the Premises against loss or destruction by windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, fire, smoke damage, and sprinkler leakage. Furthermore, the insurance required by Section 8.04 of this lease during the construction of the Medical Center described in Article 5 shall include coverage for course of construction, vandalism, and malicious mischief, insuring the Medical Center during its construction and all materials delivered to the site of the Medical Center for their full insurable value.

Section 8.06. **Deposit of Insurance With Lessor and Lender** Lessee shall, within 10 days after the execution of this lease and promptly thereafter when any such policy is replaced, rewritten, or renewed, deliver to Lessor and Lender a true and correct copy of each insurance policy required by this Article of this lease or a certificate executed by the insurance company or companies or their authorized agent evidencing that policy or policies.

Section 8.07. **Notice of Cancellation of Insurance.** Each insurance policy required under this Article shall contain a provision that it cannot be cancelled for any reason unless at least thirty (30) days' prior written notice of the cancellation is given to Lessor and to Lender in the manner required by this lease for service of notices on Lessor by Lessee.

19

Exhibit 3 Page 192

## ARTICLE 9
## CONDEMNATION

Section 9.01. **Total Condemnation.** If, during the term of this lease, fee title to all of the Premises or to all of the Improvements, or the entire leasehold estate of Lessee is taken under the power of eminent domain by any public or quasi-public agency or entity (a "Total Taking"), this lease shall terminate as of 12:01 A.M. on whichever of the following occurs first: (1) the date legal title becomes vested in the agency or entity exercising the power of eminent domain, or (2) the date actual physical possession is taken by the agency or entity exercising the power of eminent domain. Thereafter, both Lessor and Lessee shall be released from all obligations under this lease, except those specified in Section 9.05.

Section 9.02. **Partial Taking--Parking Areas.** If, at any time during the term of this lease, a taking occurs that is less than a Total Taking and affects the parking areas for the Medical Center, all compensation and damages payable for that taking shall be made available to and used, to the extent reasonably needed, by Lessee to repair any portion of the remaining parking areas damaged by the taking and to replace the parking areas taken with other new parking areas on the portion of the Premises not taken, provided that replacement is then permitted by existing law. Plans and specifications for the replacement parking areas must first be approved in writing by Lessor but may include, when practicable and when permitted by law, deck parking facilities to replace ground level parking facilities taken by eminent domain. Notwithstanding anything to the contrary in this Section, if the portion of the parking areas taken by eminent domain results in a net loss of ten percent (10%) or more of the area of the Premises that can, after considering any replacement parking areas that can be lawfully constructed on the remaining portion of the Premises by reasonable methods, be devoted to parking areas as compared with the area devoted to those parking areas immediately before the taking, Lessee may terminate this lease in the manner prescribed by Section 9.04 of this lease.

Section 9.03. **Partial Taking—Improvements.** If at any time during the term of this lease a taking occurs that is less than a Total Taking and affects the rentable portion of the Improvements on the Premises, all compensation and damages payable for that taking (excluding any portion payable for a taking of parking areas) shall be made available to and used, to the extent reasonably needed, by Lessee to repair any portion of the remaining rentable portion of the Improvements damaged by the taking and to replace the rentable portion of the Improvements taken with other new rentable space on the portion of the Premises not taken, provided that replacement is then permitted by existing law. Plans and specifications for the replacement rental space must be compatible, in terms of architecture and quality of construction, with the Improvements not taken and must be first approved in writing by Lessor. Notwithstanding anything to the contrary in this Section, if the rentable portion of the Improvements taken by eminent domain results in a net loss of ten percent (10%) or more of the area of the Premises that can, after considering any replacement rentable space that can be lawfully constructed on the remaining portion of the Premises, be devoted to rentable space as compared with the area devoted to that rentable space immediately before the taking, Lessee may terminate this lease in the manner prescribed by Section 9.04 of this lease.

20

Exhibit 3 Page 193

Section 9.04. **Termination for Partial Taking.** Lessee may terminate this lease for the reasons stated in either Section 9.02 or Section 9.03 of this lease, or both, by serving written notice of termination on Lessor within ninety (90) days after Lessee has received from Lessor or from the condemning authority written notice of an intended taking that sets forth the extent and scope of the intended taking. If Lessee elects to terminate this lease, the effective date of termination shall be the earlier of (1) the date of termination specified in Lessee's notice to Lessor or (2) the date the condemning authority takes physical possession of the portion of the Premises taken by eminent domain. On termination of this lease under this Section, all subleases and subtenancies in or on the Premises or any portion or portions of the Premises created by Lessee under this lease shall also terminate and the Premises shall be delivered to Lessor free and clear of all such subleases and subtenancies; provided, however, that Lessor may, at Lessor's option, by mailing written notice to any subtenant, allow the subtenant to attorn to Lessor and continue its occupancy on the Premises as a tenant of Lessor. On termination of this lease under this Section, both Lessor and Lessee shall be released from all obligations to the other under this lease except those specified in Section 9.05.

Section 9.05. **Condemnation Award.** Any compensation or damages awarded or payable because of the taking of all or any portion of the Premises by eminent domain shall be allocated between Lessor and Lessee as follows:

(a) All compensation or damages awarded or payable for the taking by eminent domain of any land that is part of the Premises shall be paid to and be the sole property of Lessor, free and clear of any claim of Lessee or any person claiming rights to the Premises through or under Lessee.

(b) All compensation or damages awarded or payable because of any Improvements constructed or located on the portion of the Premises taken by eminent domain when only a portion of the Premises is taken by eminent domain and Lessee is not entitled to or does not terminate this lease shall be applied in the manner specified in Section 9.02 or Section 9.03 toward the replacement of those Improvements with equivalent new Improvements on the remaining portions of the Premises.

(c) All compensation or damages awarded or payable because of any Improvements constructed or located on the portion of the Premises taken by eminent domain when this lease is terminated because of the taking by eminent domain, whether all or only a portion of the Premises is taken by eminent domain, shall be allocated between Lessee and Lessor as follows:

(1) That percentage of the compensation or damages awarded or payable because of the Improvements that equals the percentage of the full term of this lease that has, at the time of the taking, not expired shall belong to and be the sole property of Lessee.

(2) That percentage of the compensation or damages awarded or payable because of the Improvements that equals the percentage of the full term of this lease that has, at the time of the taking, expired shall belong to and be the sole property of Lessor.

21

Exhibit 3 Page 194

(3) The term "time of taking" as used in this subparagraph shall mean 12:01 A.M. of whichever of the following shall first occur: the date that title, or the date that physical possession of the portion of the Premises on which the Improvements are located, is taken by the agency or entity exercising the eminent domain power.

(d) Any severance damages awarded or payable because only a portion of the Premises is taken by eminent domain shall be:

(1) The sole and separate property of Lessee during the first 10 years of the term of this lease;

(2) Equally divided, except to the extent needed to replace any Improvements taken by eminent domain with equivalent Improvements on the remaining portion of the Premises when Lessee cannot or does not terminate this lease, between Lessor and Lessee during the first to tenth years of the term of this lease; and

(3) The sole and separate property of Lessor during the last ten (10) years of the term of this lease.

Section 9.06. **Rent Abatement for Partial Taking.** If title and possession of only a portion of the Premises is taken under the power of eminent domain by any public or quasi-public agency or entity during the term of this lease and Lessee does not or cannot under Section 9.02 or Section 9.03 terminate this lease, then this lease shall terminate as to the portion of the Premises taken under eminent domain as of 12:01 A.M. on whichever of the following first occurs: the date title is taken, or the date actual physical possession of the portion taken by eminent domain is taken, by the agency or entity exercising the eminent domain power. Furthermore, the rent payable under this lease shall, as of that time, be reduced in the same proportion that the value of the portion of the Premises taken by eminent domain bears to the full value of the Premises at that time; provided, however, that Lessee shall, subject to the provisions of Sections 9.02 and 9.03 of this lease, replace any Improvements or facilities with equivalent new facilities on the remaining portion of the Premises and do all other acts at Lessee's own cost and expense required by the eminent domain taking to make the remaining portion of the Premises fit for the uses specified in this lease.

Section 9.07. **Voluntary Conveyance in Lieu of Eminent Domain.** A voluntary conveyance by Lessor of title to all or a portion of the Premises to a public or quasi-public agency or entity in lieu of and under threat by that agency or entity to take it by eminent domain proceedings shall be considered a taking of title to all or any portion of the Premises under the power of eminent domain subject to the provisions of this Article.

## ARTICLE 10
## ASSIGNMENT AND SUBLEASING

Section 10.01. **No Assignment Without Lessor's Consent.** Lessee may assign this lease or any interest in this lease, subject to the prior written consent of Lessor. Lessor shall not unreasonably withhold or delay its consent, and shall grant consent if the proposed

Exhibit 3 Page 195

assignee is financially qualified and has sufficient experience in the operation and management of commercial Medical Centers to perform all the agreements, undertakings, and covenants of this lease and all other agreements entered into by Lessee which relate to the management, operation, maintenance, construction, and restoration of the Improvements and the Premises. To assist Lessor in determining whether or not the proposed assignee is so qualified, Lessee shall furnish to Lessor at no expense to Lessor, before that assignment, detailed and complete financial statements of the proposed assignee, audited by a certified public accountant reasonably satisfactory to Lessor (if the proposed transferee causes its statements to be so audited in its normal course of business), together with detailed and complete information about the business of the proposed assignee, including its experience in operating commercial Medical Centers, the use to be made of the Premises and Improvements by the proposed assignee, projections by the proposed assignee of the sources of funds to be used to repay any indebtedness of Lessee that the proposed assignee will assume or take subject to, or agree to pay to Lessee, and other claims on and requirements for those funds, together with any other information as Lessor may reasonably require to assist Lessor in determining whether or not the proposed assignee is so qualified. Lessor shall have forty-five (45) days after receipt of the information described above to notify Lessee of whether it consents or does not consent to the proposed assignment. Absent any such notification by Lessor during the forty-five (45) day period, Lessor shall be conclusively deemed to have consented to the assignment. A consent by Lessor to one assignment shall not be deemed to be a consent to any subsequent assignment. Any assignment made contrary to the terms of this Section shall be null and void unless otherwise permitted by this Article.

Section 10.02. **Leasehold Encumbrances and Subsequent Transfers.** Notwithstanding the provisions of Section 10.01 of this lease, Lessee may without the prior written consent of Lessor transfer and assign all Lessee's interest under this lease and Lessee's leasehold estate created under this lease to a Lender under a Leasehold Encumbrance (as defined in Section 6.01 of this lease). Any transfer, conveyance, or assignment resulting from a foreclosure or acceptance of a deed in lieu of foreclosure by any Lender (as defined in Section 6.01 of this lease), or any transfer, conveyance, or assignment by any Lender following its acquisition of this lease and the leasehold estate of Lessee created by this lease as a result of foreclosure or acceptance of a deed in lieu of foreclosure shall not require the prior consent of Lessor.

Section 10.03. **Lessee's Right to Sublease.** Lessee shall have the right to sublease all or any portion of the Premises from time to time, and at all times during the term of this lease, without Lessor's consent; provided, however, that the following conditions are met:

(a) The term of any sublease shall not extend beyond the term of this lease.

(b) Any and all subleases shall be expressly made subject to all of the terms, covenants, and conditions of this lease; and

(c) Any subtenant shall be required to attorn to Lessor in the event of Lessee's default under this lease.

23

Exhibit 3 Page 196

Section 10.04. **Transfers to or by Corporation.** Notwithstanding Section 10.01 of this lease, Lessee may, without the prior consent of Lessor, transfer and assign all of Lessee's interest under the lease and the leasehold estate created under this lease to a corporation now or hereafter organized in which Lessee owns at least eighty percent (80%) of all outstanding shares of stock. If Lessee is a corporation, or if Lessee's interest in this lease is assigned to a corporation under the sentence above, any transfer or assignment of any stock or interest in the corporation totaling in the aggregate more than twenty-five percent (25%) of all such stock or interest in the corporation shall be considered an assignment of this lease requiring the prior written consent of Lessor and subject to the standards set forth in Section 10.01; provided, however, that any transfer of shares to a shareholder's spouse, children, or grandchildren caused by the shareholder's death shall be excepted from this requirement.

## ARTICLE 11
## DEFAULT AND REMEDIES

Section 11.01. **Continuation of Lease in Effect** Should Lessee breach this lease and abandon the Premises before the natural expiration of the lease's term, Lessor may continue this lease in effect by not terminating Lessee's right to possession of the Premises, in which event Lessor shall be entitled to enforce all Lessor's rights and remedies under this lease, including the right to recover the rent specified in this lease as it becomes due under this lease.

Section 11.02. **Termination and Unlawful Detainer.** In the event of a tenant default under this lease, Lessor may terminate this lease by written notice to Lessee and may also do the following:

(a) Bring an action to recover the following from Lessee:

(1) The worth at the time of award of the unpaid rent that had been earned at the time of termination of the lease;

(2) The worth at the time of award of the amount by which the unpaid rent that would have been earned after termination of the lease until the time of award exceeds the amount of rental loss that Lessee proves could have been reasonably avoided;
(3) The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of rental loss that Lessee proves could be reasonably avoided; and

(4) Any other amount necessary to compensate Lessor for all detriment proximately caused by Lessee's failure to perform Lessee's obligations under this lease; and

(b) Bring an action, in addition to or in lieu of the action described in subparagraph (a) of this Section, to reenter and regain possession of the Premises in the manner provided by the laws of unlawful detainer of the State of California then in effect

24

Exhibit 3 Page 197

Section 11.03. **Breach and Default by Lessee.** All covenants and agreements contained in this lease are declared to be conditions to this lease and to the term hereby leased to Lessee. Should Lessee fail to perform any covenant, condition, or agreement contained in this lease and the default is not be cured within thirty (30) days after written notice of the default is served on Lessee by Lessor, then Lessee shall be in default under this lease. In addition to Lessee's failure to perform any covenant, condition, or agreement contained in this lease within the cure period permitted by this Section, the following shall constitute a default by Lessee under this lease:

(a) The failure of Lessee to begin construction of the Medical Center within twelve months of the Effective Date;

(b) The failure of Lessee to complete the construction of the Medical Center within three (3) years of the commencement of construction of the Medical Center;

(c) The cancellation of the Bond required under Section 5.02 prior to completion of construction of the Medical Center;

(d) The appointment of a receiver to take possession of the Premises or Improvements, or of Lessee's interest in, to, and under this lease, the leasehold estate or of Lessee's operations on the Premises for any reason, including, without limitation, assignment for benefit of creditors or voluntary or involuntary bankruptcy proceedings, when not released within sixty (60) days;

(e) An assignment by Lessee for the benefit of creditors; or the voluntary filing by Lessee or the involuntary filing against Lessee of a petition, other court action, or suit under any law for the purpose of (1) adjudicating Lessee a bankrupt, (2) extending time for payment, (3) satisfaction of Lessee's liabilities, or (4) reorganization, dissolution, or arrangement on account of, or to prevent, bankruptcy or insolvency; provided, however, that in the case of an involuntary proceeding, if all consequent orders, adjudications, custodies, and supervisions are dismissed, vacated, or otherwise permanently stayed or terminated within ninety (90) days after the filing or other initial event, then Lessee shall not be in default under this Section; and

(f) The subjection of any right or interest of Lessee to or under this lease to attachment, execution, or other levy, or to seizure under legal process when the claim against Lessee is not released within ninety (90) days.

Section 11.04. **Cumulative Remedies.** The remedies given to Lessor in this Article shall not be exclusive but shall be cumulative with and in addition to all remedies now or hereafter allowed by law and elsewhere provided in this lease.

Section 11.05 **Waiver of Breach.** The waiver by Lessor of any breach by Lessee of any of the provisions of this lease shall not constitute a continuing waiver or a waiver of any subsequent breach by Lessee of either the same or a different provision of this lease.

Exhibit 3 Page 198

Section 11.06. **Surrender of Premises.** On expiration or earlier termination of this lease, Lessee shall surrender the Premises and all Improvements in or on the Premises to Lessor in as good, safe, and clean condition as practicable, reasonable wear and tear excepted.

# ARTICLE 12
## OTHER PROVISIONS

Section 12.01. **Force Majeure.** Except as otherwise expressly provided in this lease, if the performance of any act required by this lease to be performed by either Lessor or Lessee is prevented or delayed by reason of any act of God, strike, lockout, labor trouble, inability to secure materials, restrictive governmental laws or regulations, or any other cause (except financial inability) not the fault of the party required to perform the act, the time for performance of the act will be extended for a period equivalent to the period of delay and performance of the act during the period of delay will be excused. However, nothing contained in this section shall excuse the prompt payment of rent by Lessee as required by this lease or the performance of any act rendered difficult or impossible solely because of the financial condition of the party required to perform the act.

Section 12.02. **Estoppel Certificate.**
  (a) Lessee shall at any time upon not less than fifteen (15) days' prior written notice from Lessor execute, acknowledge and deliver to Lessor a statement in writing (i) certifying, if true, that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying, if true, that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging, if true, that there are not, to Lessee's knowledge, any uncured defaults on the part of Lessor hereunder, or specifying such defaults if any are claimed and (iii) certifying or acknowledging such other matters as are requested by any prospective lender or buyer which are reasonably related to the loan or sale transaction.  Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.

  (b) Lessee's failure to deliver such statement within such time shall be conclusive upon Lessee (i) that this Lease is in full force and effect, without modification except as may be represented by Lessor, (ii) that there are no uncured defaults in Lessor's performance, and (iii) that not more than one month's rent has been paid in advance.

Section 12.03. **Additional Rent.** Any monetary obligations of Lessee to Lessor under the terms of this Lease shall be deemed to be Additional Rent and Lessor shall have all the rights and remedies for the nonpayment of same as it would have for nonpayment of Base Rent, except that the one year requirement of Code of Civil Procedure Section 1161(2) shall apply only to scheduled installments of Base Rent and not to any Additional Rent. All references to "rent" (except specific references to either Base Rent or Additional Rent) shall mean Base Rent and Additional Rent.

Section 12.04. **Attorneys' Fees.** Should any litigation be commenced between the parties to this lease concerning the Premises, this lease, or the rights and duties of either in relation thereto, the party prevailing in that litigation shall be entitled, in addition to any other relief

26

Exhibit 3 Page 199

that may be granted in the litigation, to a reasonable sum as and for that party's attorneys' fees in that litigation that shall be determined by the court in that litigation or in a separate action brought for that purpose.

Section 12.05. **Notices to Lessor.** Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to Lessor by Lessee or any Lender described in Article 6 of this lease shall be in writing and shall be deemed duly served and given when personally delivered to Lessor, to any managing employee of Lessor, or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, and sent by express mail that allows for tracking, addressed to Lessor at 120 W. Beverly Blvd., Montebello, California 90640. Lessor may change Lessor's address for the purpose of this section by giving written notice of that change to Lessee in the manner provided in Section 12.04; Lessee shall then transmit a copy of that notice to any Lender described in Article 6 of this lease.

Section 12.06. **Notices to Lessee.** Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to Lessee by Lessor shall be in writing and shall be deemed duly served and given when personally delivered to Lessee, any managing employee of Lessee, or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, and sent by express mail that allows for tracking, addressed to Lessee at 120 West Beverly Blvd. Montebello, CA 90640. Lessee may change its address for the purpose of this section by giving written notice of that change to Lessor in the manner provided in Section 12.03 of this lease.

Section 12.07. **Covenants and Conditions.** Each provision of this Lease to be observed or performed by Lessee shall be deemed both a covenant and a condition.

Section 12.08 **Entry and inspection.** Lessee shall permit Lessor or Lessor's agents to enter the premises at reasonable times and upon reasonable notice for the purpose of inspecting the premises, and shall permit Lessor, at any time within sixty (60) days prior to the expiration of this Lease, to place upon the premises any usual "To Let," "For Lease" or "For Sale" signs, and permit persons desiring to purchase or lease the Premises to inspect the Premises at reasonable times.

Section 12.09 **Governing Law.** This lease, and all matters relating to this Lease, shall be governed by the laws of the State of California in force at the time any need for interpretation of this Lease or any decision or holding concerning this Lease arises. Any legal or equitable action or proceeding brought with respect to the Lease or the Premises shall be brought in Los Angeles County, California and the Parties submit to the jurisdiction of the state and federal courts located in Los Angeles County, California.

Section 12.10 **Binding on Heirs and Successors.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of Section 8.02 (lessor liability), this Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto, but nothing in this

27

Exhibit 3 Page 200

section shall be construed as a consent by Lessor to any assignment of this Lease or any interest in the Lease by Lessee except as provided in Article 10 of this lease.

Section 12.11. **Partial Invalidity.** If any provision of this lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions of this lease shall remain in full force and effect unimpaired by the holding.

Section 12.12. **Sole and Only Agreement.** This instrument constitutes the sole and only agreement between Lessor and Lessee respecting the Premises, the leasing of the Premises to Lessee, the construction of the Medical Center described in this lease on the Premises, and the lease terms set forth in this lease, and correctly sets forth the obligations of Lessor and Lessee to each other as of its date. Any agreements or representations respecting the Premises, their leasing to Lessee by Lessor, or any other matter discussed in this lease not expressly set forth in this instrument are null and void.

Section 12.09. **Time of Essence.** Time is expressly declared to be of the essence of this lease.

Section 12.10 **Section Headings.** Section headings are for the convenience of the parties only and shall not be considered in construing or interpreting this Agreement.

Section 12.1. **Memorandum of Lease for Recording.** Neither Lessor nor Lessee shall record this lease without the written consent of the other. However, Lessor and Lessee shall, at the request of either at any time during the term of this lease, execute a memorandum or "short form" of this lease for purposes of, and in a form suitable for, recordation. The memorandum or "short form" of this lease shall describe the parties, set forth a description of the leased premises, specify the term of this Lease, incorporate this Lease by reference, and include any other provisions required by Lender(s).

IN WITNESS WHEREOF, the parties hereto by their respective duly authorized officers have executed this Lease on the date noted above to be effective as set forth above:

LANDLORD

John P. Thropay

TENANT
Los Angeles County Proton Therapy, LLC

By Charles Liu, Manager

28

Exhibit 3 Page 201

Exhibit A
Legal Description

To be Provided

29

Exhibit 3 Page 202

Exhibit B
Preliminary Title Report

To be Provided

30

Exhibit 3 Page 203

Exhibit C
Hazardous Materials Disclosure

To be Provided

31

Exhibit 3 Page 204

# ATTACHMENT E

Exhibit 3 Page 205



**LOS ANGELES COUNTY PROTON CENTER**
TABLE OF ORGANIZATION

Exhibit 3 Page 206

# PROTON THERAPY JOB DESCRIPTION SUMMARY

| TITLE | SUMMARY OF JOB |
|---|---|
| BILLING CLERK | Responsible for processing all patient financial records and related accounting records consistently and with a high standard of accuracy on a timely basis. |
| BILLING/ACCTS. RECEIVABLE | Responsible for review and timely submission of insurance claims to insurance carrier. Responsible for timely follow up communication with insurance companies. This person researches, organizes and actively works to maintain financial accounts current. |
| CEO | CEO Manages and directs company toward its primary objectives. Establishes current and long range objectives, plans and policies, subject to the approval by the Governing Body. Dispenses advice, guidance, direction and authorization to carry out major plans and procedures, consistent with established policies and Governing Body approval. Oversees the adequacy and soundness of Beverly Oncology financial structure. Reviews operating results of the organization, compares them to established objectives, and takes steps to ensure that appropriate measures are taken to correct unsatisfactory results. |
| CFO | CFO will work closely with the CEO and Board of Directors to lead and manage the daily financial activities of company. The CFO will provide dependable strategic leadership, a consistent financial perspective, and active contribution to critical management decisions. This position provides financial, asset/liability, risk management and audit leadership and oversight, and provides leadership and direction throughout the company on issues of profitability and quantification results. CFO will provide accurate management, oversee regulatory and governance reporting, and have responsibility for effective and efficient company operations. |
| CHIEF RADIATION THERAPIST | The Chief Radiation Therapist performs the following functions under the direction of the physician. Chief Therapist demonstrates knowledge, skills, and competency necessary to administer radiation therapy treatments. Uses appropriate and extensive job knowledge and experience in setting up, calculating and treating radiation therapy patients. Acts as a resource, support and teacher for other therapists when questions arise. |

Exhibit 3 Page 207

| | |
|---|---|
| CLINIC SUPERVISOR | Responsible for overseeing the day to day management operations of the facility, specifically in the day to day tasks of the Front Office and Back Office. Ensures compliance with patient care quality standards as it relates to the care provided to all age groups of patients. Maintains performance improvement activities within the department and participates in CQI, Radiation Safety, Risk Management and Infection Control activities. Assures competency of all personnel. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. |
| CLINICAL RESEARCH DIRECTOR | Responsible for planning, organizing and directing the overall operation of Clinical Trials. Maintain investigator site profile for sponsor/CRO global database. Monitor site compliance and maintain a system to ensure effective data flow for the institution and its affiliates. Responsible for regulatory documents submission. Responsible for assessing patients with the Investigator protocol eligibility. Register patients to protocols, collect and submit data as specified in the protocol. Maintains performance improvement activities within the department and participates in CQI, Radiation Safety, Risk Management activities. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. |
| CONTROLLER | Under general direction of the Chief Executive Officer/Chief Financial Officer, oversees the operations in connection with financial matters including accounts receivable and payable, payroll, and auditing; trains and supervises department staff; develops and initiates systems, policies, and procedures for transacting financial matters; and ensures that the financial system is accurate, efficient, and in accordance with professional accounting practices and governmental regulations. |
| CREDENTIALING COORDINATOR | Credentials Coordinator is responsible for assuring that the credentialing of practitioners is conducted in accordance with approved credentialing policies & procedures. The Credentials Coordinator must have the ability to work independently, while following set procedures and adhering to continual deadlines. The Credentials Coordinator must assure that procedures are followed meticulously and consistently for each applicant. Strong documentation skills are necessary as well as outstanding organizational skills. |

Exhibit 3 Page 208

| | |
|---|---|
| DIRECTOR MARKETING & BUSINESS DEVELOPMENT | The Director of Marketing and Business Development will have direct accountability for ensuring we have enough patients to operate our Proton Center at capacity. This position will be responsible for leading and developing the regional strategic plan and execution of pre-launch, launch and ongoing marketing initiatives to ensure success of the Center. He or she will have direct accountability for assessing the market opportunities, developing detailed plans and leading the specific tactics to generate an ongoing patient referral stream and high patient demand. The individual will have responsibility for developing and leading the local marketing and sales programs, including all key aspects of generating patient leads. This will include, but not be limited to, physician and hospital outreach, patient advocacy, PR, advertising, coordination of clinical educational programs and local, cooperative programs. |
| DIRECTOR OR TECHNOLOGY | The Technical Director is responsible for planning, organizing and directing the overall operations of the Radiation Therapy Department. Ensures compliance with patient care quality standards as it relates to the care provided to all age groups of patients. Maintains performance improvement activities within the department and participates in CQI, Radiation Safety, Risk Management and Infection Control activities. Assures competency of all personnel. Assists in formulating the budget. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. Provides overall direction and management for Radiation Therapy services. Assures operational goals and objectives are achieved through planning and implementation of programs, procedures, systems and support personnel. Develops initiatives to improve key service functions that will increase or achieve high levels of customer satisfaction in critical key service areas. |
| DIRECTOR, HUMAN RESOURCES | Director provides leadership and direction in aligning workforce strategies with organizational goals and strategies to support the recruitment, retention and engagement of the workforce. Provides interpretation of and recommendations to management on Human Resources related policies and programs. Ensures compliance with all regulatory agencies. Recommends and implements effective human resources programs, practices and processes that are aligned with the mission, vision and values of the organization. |
| DIRECTOR, NURSING AND PATIENT MANAGEMENT | Responsible for planning, organizing and directing the overall operation of the Oncology Services Department. Ensures compliance with patient care quality standards as it relates to the care provided to all age groups of patients. Maintains performance improvement activities within the department and participates in CQI, Radiation Safety, Risk Management and Infection Control activities. Assures competency of all personnel. Assists in formulating the budget. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. |

Exhibit 3 Page 209

| DIRECTOR, PHYSICST | Responsible for the oversight of radiation therapy physics department. The director of physics plays a vital role with clinical, educational and managerial components. As a clinical coordinator, it is the responsibility of the Director of Physics to be intimately involved with the treatment planning and delivery process. The director should be well versed in all treatment protocols and modalities. He or she should function as the resident expert for all treatment planning systems, and the director shall institute proper quality assurance protocols to ensure the safe and accurate delivery of radiation therapy. As an educator, it is the responsibility of the physicist to acquire and disseminate valuable technical information throughout company. The director works with the therapists to ensure that all treatment and quality assurance protocols are fully understood. The director works with the entire staff to ensure that new and evolving technologies are utilized to their fullest capabilities. In this highly technological and rapidly evolving field, director functions as a reservoir of knowledge for the staff. Through ongoing continuing education, the director ensures that company remains on the cutting edge of radiation oncology. As a manager, the director of physics is responsible for the proper direction and utilization of the physics and dosimetry staff. The director must ensure that all physics and dosimetry staff are motivated, efficient and highly qualified. The director of physics shall ensure the physics group functions to the high standards established. |
| DOSIMETRIST | A staff person that is involved with the clinical requirements of patient treatment prescribed by the radiation oncologist, the physical requirements specified by the physicist for calibrating and executing the patients prescription and the simulation and treatment delivery procedures implemented by the therapist. Responsible for the accurate documentation and communication of all phases of these processes. Participates in charts rounds, CQI and Radiation Safety meetings. |
| Engineer (hardware physics/planning) | TBD |
| EXEC. ASSISTANT | Provides executive coordination and administrative support to the Chief Executive Officer, President & Medical Director in the efficient and smooth management of the organizational administration of the operations. |
| LEGAL CONTRACTING | Responsible for planning, organizing and directing project based programs for company. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. The purpose of this job is to perform project based marketing functions associated with the planning, organization and implementation of various activities designed to enhance customer service within company structure and ultimately produce new customers. Responsible for all aspects of contracts and contract negotiations. |

Exhibit 3 Page 210

| | |
|---|---|
| MEDICAL ASSISTANT/APPOINTMENT SCHEDULER | Coordinates the scheduling of patients through interviews by telephone or in person of patients and/or families or other representatives such as Physician office personnel to obtain necessary scheduling information. Records all the required information into the scheduling system computer. |
| MEDICAL ASSISTANT/AUTHORIZATION COORDINATOR | Obtains authorizations efficiently and timely. Knowledgeable in HMO & PPO authorization process. Able to handle multiple tasks.<br><br>This position is responsible for managing the systems, policies, and procedures for review and processing of requests for authorizations, referrals and notifications of medical services from practitioners, clinical facilities, and providers. |
| MEDICAL ASSISTANTS (FO/BO) | A Medical Receptionist/Medical Assistant is a staff person who is knowledgeable in back and front office medical assistant procedures. A staff person who receives callers at office, determines nature of business, and directs callers. Schedules appointments, takes messages, schedules patient hospital admissions, specialist consultations and other appointments. Knowledgeable in HMO authorization process. Able to handle multiple tasks. This person will perform those assignments that will prepare the patient for the physician examination and perform all other duties entailed in the patient flow process. |
| MEDICAL DIRECTOR | The Medical Director participates in the provision of clinical care, oversees day to day clinical operations, patient safety, compliance, and assures that all clinical sites have adequate coverage. Medical Director will work with CEO and CFO with departmental and cancer center budget development, and participate in strategic planning and assessment for the department and the cancer center. Oversee peer review, chart rounds, and coordinates tumor registry and facilitate tumor boards. |
| PATIENT DRIVER | Transports patients for Radiation Therapy, MRI, and/or CT Appointments as arranged by transportation supervisor. Responsible for reporting vehicle malfunctions and keeping preventive maintenance current. Ensures patient safety at all times. Maintains vehicle neat and clean for patient transport. |

Exhibit 3 Page 211

| | |
|---|---|
| PATIENT EDUCATOR | Patient educator utilizes clinical expertise, discretion, and independent judgment to apply specialized radiation medicine case management and care coordination methodologies and practices in the outpatient clinic setting; interacts with prospective patients and facilitates pretreatment evaluation and insurance authorization or individualized payment plans; coordinates care among interdisciplinary team (physicians, medical physicists, radiation therapists, nurses) and ensures each patient has timely and appropriate services following radiation medicine disease-specific treatment protocols; ensures efficient patient flow through clinic; facilitates monitoring and evaluation of medically appropriate cost effective quality care; identifies high risk financial, clinical, and social cases with potential negative impact; follows-up with patients post discharge to collaboratively manage care with physician providers. |
| PHYSICIST | A staff person or consultant that is primarily involved with the evaluation, delivery, and optimization of radiation therapy. Their role has clinical and educational components. It is the responsibility of the physicist to provide a high standard of clinical physics service and supervision. Must strive to identify, evaluate and correct unintended deviations that may occur in the treatment delivery and Quality Improvement processes. Also responsible for maintaining quality improvement and control of radiation oncology equipment. |
| PROTOCOL DEVELOPMENT | TBD |
| RADIATION ONCOLOGIST | Radiation oncologist is responsible for consultation, dose prescription, treatment planning, treatment supervision and treatment summary reports. Performs intracavitary, interstitial and intraluminal brachytherapy. The radiation oncologist is responsible for chart reviews and management of morbidity of patients undergoing radiation therapy. Responsible for documenting tolerance to treatment (KPS and KTOG) and follow each patient to the greatest possible extent and document the outcome of therapy. Conducts weekly chart rounds with interdisciplinary team. |
| RADIATION THERAPIST | A staff person performs following functions under the supervision of the physician. Applies roentgen rays and/or deep heat to patients for therapeutic purposes. Positions patient under therapy unit, adjusts immobilization devices and affixes lead blocks to protect unaffected areas. Assists with implant procedures. Maintains performance improvement activities within the department and participates in CQI activities. Maintains efficient and effective department operation while complying with all JCAHO, federal, state and local regulatory laws, standards and protocols. |
| RADIATION THERAPY ASSISTANT | A staff person who will assist the radiation therapists in the treatment preparation of patients undergoing radiation therapy. All procedures will be conducted under the direct supervision of a licensed radiation therapist. |

Exhibit 3 Page 212

| REGISTERED NURSE | A staff person who assesses, plans, implements and evaluates the individualized nursing care provided to cancer patients. Delivers high quality professional nursing care, performs technical nursing skills with a high degree of proficiency, and promotes the team approach in the delivery of patient care. Executes physicians orders, completes documentation according to standards and performs duties as ordered. May oversee clinical care of other personnel, including LVNs and Medical Assistants. Provides education to patients/ family members that will improve their care during and after the deliver of radiation therapy treatments. |
|---|---|
| REGULATORY COMPLIANCE OFFICER | The Regulatory Compliance Officer, as required by Federal and California regulatory agencies, serves as the officer responsible for implementation, monitoring, and enforcement of the Compliance Program as well as the Privacy Program. Implements forward-looking approach to predict trends and create solutions, not merely the ability to identify problems; able to develop partnerships, high functioning teams, and good working relationships across work units; fosters an open, transparent, and collaborative management style; experience with decision making in the face of imperfect and uncertain information; possesses good presentation skills with both large and small groups; able to operate effectively in an ambiguous and frequently changing environment; demonstrates a leadership presence that projects credibility, integrity, discretion, and confidentiality; is self-motivating, curious, and independent; Understands and executes a focus on best practices; consistently demonstrates and promotes an optimistic and enthusiastic work environment; is prompt; develops work product that is accurate, comprehensive and detail-oriented; ability to read, analyze and interpret general business periodicals, professional journals, technical procedures, and governmental regulations; ability to write clear, concise reports, business correspondence, and procedures. |
| RESEARCH STUDY COORDINATOR | Responsible for completion, submission and retention of regulatory documents. Responsible for assigning patients with the Investigator for protocol eligibility. Register patients to protocols, collect and submit data as specified in the protocol. Will oversee the conduct of office procedures to support the clinical trials process. |
| SAFETY MANGER | Safety Manager is responsible for assisting in the ongoing organization-wide process to collect information about deficiencies and opportunities for improvement in the environment of care management programs and overall security of the Company. This individual also has responsibility for ensuring compliance with the Company wide safety and security Program. The Safety Officer has primary responsibility for reporting, coordinating and communicating all applicable safety laws, and regulations and ensuring compliance. |

Exhibit 3 Page 213

| | |
|---|---|
| SYSTEMS ENGINEER | IT Tech responsible for ensuring the company Information Technology (IT) equipment and infrastructure are properly functional at all sites. This position is responsible for break / fix activities as well as new equipment installation. Configuration, set-up and inventorying of hardware and IT equipment for multiple sites. (Scanners, printers, PCs, Touch screens (time clocks, POIs etc.), other hardware) Problem resolution of computer applications, hardware, network and other technical issues. Maintaining hardware at the Vibra hospitals located in Texas, Colorado and Southern Kentucky. Recommendations on upgrading the servers and other equipment at the corporate facilities. Evaluation and recommendations of hardware to be used in a hospital setting. Working with the leadership in identifying technology needs, in alignment with the corporate IT strategy. |
| SYSTEMS ENGINEER | A staff person who is responsible for the maintenance, service, and QA procedures of all operational equipment. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state, federal and local regulatory laws, standards and protocols. |
| TRANSCRIPTIONIST | Performs functions associated with transcription of dictation. Transcribes medical dictation according to established company procedures. Appropriately edits, revises and clarifies dictation without altering the meaning or changing the dictator's style. Maintains and updates resource tools, both electronic and hard copy, such as new medical terms, etc. Takes telephone and/or faxed requests from physicians/clinical areas, and collaborates with other staff, when necessary, to satisfy request. (Ex: STAT transcription, correction of report errors, etc.) Knowledge of anatomy, physiology, clinical medicine, surgery, diagnostic tests, radiology, pathology and pharmacology as well as English language rules. Ability to recognize, interpret and evaluate inconsistencies, discrepancies, and inaccuracies in medical dictation from originators with various accents, dialects and dictation styles. |
| TRANSPORT SUPERVISOR | Manger is responsible for planning, organizing and directing the overall operation of the Transportation Department. Ensures compliance with patient care quality standards as it relates to the care provided. This person supervises all drivers, assures transportation personnel competency, monitors the operation and maintenance of transportation vehicles and equipment. Maintains efficient and effective department operation while requiring compliance with all JCAHO, state and local regulatory laws, standards and protocols |

Exhibit 3 Page 214

| V.P. TECHNOLOGY | The Director of MIS will oversee, coordinate and direct all functions and activities of the Management Information Systems department. Will assume overall responsibility for coordinating the planning, development, implementation and support of the company strategic projects. Coordinates and consults on all aspects of information technology / management information system activities in the hospital, including hospital specific applications, which may be managed by individual departments. Provides for optimal use of the management information services by all hospital departments. The Director has oversight of budgets, staffing, short and long range planning, program development, policy and procedure for the MIS department. Ensures compliance with local, state and federal regulations and regulatory agencies, efficiency of services and delivery of optimal customer service. |
|---|---|

Exhibit 3 Page 215

# ATTACHMENT F

Exhibit 3 Page 216



Exhibit 3 Page 217



Exhibit 3 Page 218



Exhibit 3 Page 219

Proton Therapy Clinic
(10,000 SF)

Administration
(9,000 SF)

MOB
(3 levels, 50,000 SF)

Proton Therapy Treatment

Linacs

Imaging Semi Trailer

Parking Structure
(4 levels above grade/ 3 below)

Building Support

PPTRC - Montabello, CA

SECTION

Exhibit 3 Page 220

DAVIS PARTNERSHIP ARCHITECTS

OPTIVUS PROTON THERAPY

SKANSKA

Proton Therapy Clinic
(10,000 SF)

Lobby / Community Room

Pedestrian Link from Parking

Imaging Trailer

Proton Therapy Treatment
(3 stories below grade)

Building Support

Loading Dock

Parking Structure
(4 levels above grade/ 3 below)

PPTRC - Montabello, CA

GROUND LEVEL FLOOR PLAN

Exhibit 3 Page 221



Exhibit 3 Page 222

# ATTACHMENT G

Exhibit 3 Page 223



# BEVERLY ONCOLOGY & IMAGING
## Medical Group, Inc.



Accredited by
The Joint Commission



## John P. Thropay, M.D.
*Renowned Medical Professional and Patient Advocate*
**Medical Visionary and Scientific Breakthrough Researcher**

### Founder, Medical Director, and President
### Beverly Oncology & Imaging (BOI) Medical Group, Inc.

As Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Dr. John P. Thropay's mission is to provide the best possible outcomes for cancer patients. His commitment to excellence is reflected in his medical team's unparalleled innovation in clinical skill, turnkey technology applications, and professional management.

Dr. Thropay opened his first radiation oncology center, in 1980. He began his practice as a pioneer of Brachytherapy. This breakthrough therapy would thus allow for the direct irradiation of cancerous tissue. Brachytherapy can be used in place of, or as a complement to, external beam irradiation.

Since then BOI has expanded to seven outpatient clinics throughout Southern California and has earned the distinction of being among the first freestanding outpatient clinics to be Joint Commission certified, thereby operating within the same safety guidelines and protocols as other larger and prestigious medical institutions. Through these ventures, his mission has remained the same: To provide the highest-quality cancer treatment care through a comprehensive set of wellness programs and support groups for his patients and their families, from this region's multicultural population, regardless of socioeconomic background.

Dr. Thropay, a medical visionary and highly respected researcher in the war against cancer, along with his medical team, are renowned experts in administering IMRT (Intensity Modulated Radiation Therapy), one of the most promising, revolutionary cancer treatment therapies available today. A vast improvement over standard radiation, IMRT allows the delivery of extremely precise doses of radiation that destroys cancer cells while minimizing harm to surrounding healthy tissues.

While the adoption of IMRT has been rapid, Dr. Thropay has been at the forefront in the development and application of this procedure since its inception. This is because IMRT requires physics expertise and

Exhibit 3 Page 224

sophisticated treatment planning capabilities, as well as linear accelerators to administer the treatment – all of which Dr. Throgay and his medical staff have provided at BOI's outpatient centers for the past twenty-nine years.

Building upon his IMRT expertise and his passion for scientific research, in 1999 Dr. Throgay established Clinical Trials & Research Associates (CTRA) to develop some of the world's latest breakthroughs to treat cancer. He and his professional team became one of California's full-time, free-standing and privately-owned investigative sites authorized to conduct phase I-IV clinical research protocols. CTRA consists of a well qualified research staff that is highly trained to conduct outpatient research studies according to GCP (Good Clinical Practice) guidelines, FDA (Food and Drug Administration) and Sponsor regulations.

Under Dr. Throgay's direction, CTRA's commitment to high quality clinical trial management highlights our superior level of performance. Consistent with its innovative approach to clinical research, CTRA is one of a few select research facilities to conduct Oncology studies in the United States. CTRA's multiple protocols include the following areas/indications:

- Non-Small Cell Lung Cancer
- Cancer Treatment Related Bone Loss - Breast Cancer
- Cancer Cachexia - NSCLC, Colorectal Cancer and Pancreatic Cancer
- Lymphoma
- Metastatic Breast Cancer
- NSCLC with Brain Metastases
- Cancer Treatment Related Anemia – Solid Tumors
- Radiation-Induced Mucositis - Head and Neck Cancer
- Gastric Cancer
- Advanced Breast Cancer
- Febrile Neutropenia
- Cancer-Related Weight Loss
- Chemobrain
- Cancer Pain Management

Concurrently Dr. Throgay serves as a member of the UCLA Medical Institutional Review Board 2 (M-IRB2). This board's commitment is to apply the highest ethical standards for safeguarding the rights and welfare of human subjects in research.

In addition, Dr. Throgay and CTRA have worked with the some of the world's leading sponsors, CRO's and pharmaceuticals, including but not limited to the following:

- Abbott
- Advanced Biologics
- Amgen
- Ark Therapeutics
- Aris
- Astra-Zeneca
- Aventis
- Bayer
- BioTechnology Corporation
- Bristol-Myers-Squibb
- Celgene
- Cell Therapeutics
- Coulter
- Covance
- Enzon
- Ingenix

- Integrium
- Inveresk Research
- Johnson and Johnson
- McNeil
- Novartis
- Ortho-McNeil
- Parexel
- PDD Development
- PRA International
- Pharmacyclics
- Sanofi Synthelabo
- Takeda
- Target Research
- Telik
- Wyeth

Exhibit 3 Page 225

Dr. Thropay's passion for discovering breakthrough cancer treatments has garnered interest from other oncologists and medical professionals across the country to conduct joint clinical trials. Results from his clinical research have appeared in a number of highly respected oncology trades and medical journals.

Dr. Thropay is not only highly respected for his clinical skills, but also for his acumen in foreseeing future technological advances and their potential usages. Notable examples are the integration of advanced technologies such as the Peacock IMRT System, MicroSelectron HDR, and frameless Stereotactic Radiosurgery, to treat brain tumors.

Dr. Thropay graduated from UCLA with a degree in Medicine and completed his residency in Radiation Oncology at USC/LAC Medical Center. He is distinguished and respected by his peers within the oncology profession, and is an active member in numerous organizations, including, The Tumor Board, American College of Radiation Oncology, American Medical Association, Los Angeles Radiological Association and the Association of Clinical Research Professionals.

Exhibit 3 Page 226

Medical Staff Memberships
John P. Thropay, MD
Page 1 of 4

## MEDICAL STAFF MEMBERSHIPS

John P. Thropay, M.D.
Beverly Oncology & Imaging Medical Group, Inc.
120 W. Beverly Boulevard
Montebello, CA  90640

| HOSPITAL | TYPE | SINCE |
|---|---|---|
| ALHAMBRA HOSPITAL<br>100 South Raymond Avenue<br>Alhambra, CA  91802<br>818-570-1606 | CONSULTING | 10/84 |
| Anaheim General<br>3350 W. Ball Rd.<br>Anaheim, CA  92801<br>714-827-6701 | Courtesy | 05/05 |
| Anaheim Regional Medical Center<br>1111 West La Palma Ave.<br>Anaheim, CA<br>714-999-3828 | Courtesy | 05/05 |
| BELLFLOWER DOCTORS HOSPITAL<br>9542 East Artesia Boulevard<br>Bellflower, CA  90706<br>310-925-8355 | CONSULTING | 12/88 |
| BEVERLY HOSPITAL<br>309 West Beverly Boulevard<br>Montebello, CA  90640<br>323-725-4258 | ACTIVE/CONSULTING | 12/79 |
| COAST PLAZA MEDICAL CENTER<br>13100 Studebaker Road<br>Norwalk, CA  90605<br>310-868-3751 | CONSULTING | 5/85 |
| COMMUNITY HOSPITAL OF<br>HUNTINGTON PARK<br>2623 East Slauson Boulevard<br>Huntington Park, CA  90255<br>323-583-1931 | CONSULTING | 1/85 |

Exhibit 3 Page 227

**Medical Staff Memberships**
**John P. Thropay, MD**
**Page 2 of 4**

| | | |
|---|---|---|
| DOWNEY COMMUNITY HOSPITAL<br>11500 Brookshire Avenue<br>Downey, CA  90241<br>310-904-5141 | COURTESY<br>Consult | 9/81<br>6/05 |
| EAST LOS ANGELES<br>DOCTORS HOSPITAL<br>4060 Whittier Boulevard<br>Los Angeles, CA  90023 | ACTIVE | 2/80 |
| Fountain Valley Medical Center<br>17100 Euclid St.<br>Fountain Valley, CA<br>714-966-7200 | Courtesy | 4/09 |
| Garden Grove Medical Center<br>12601 Garden Grove Blvd.<br>Garden Grove, CA<br>714-827-6701 | Courtesy | 6/06 |
| GARFIELD MEDICAL CENTER<br>525 North Garfield Avenue<br>Monterey Park, CA  91754<br>323-573-2222 | CONSULTING | 05-05 |
| GREATER EL MONTE<br>COMMUNITY HOSPITAL<br>1701 South Santa Anita Avenue<br>South El Monte, CA  91733<br>818-579-7777 | COURTESY | 3/81 |
| HOLLYWOOD COMMUNITY HOSPITAL<br>6245 DeLongpre Avenue<br>Hollywood, CA  90028<br>213-462-2271 | CONSULTING | 7/85 |
| Huntington Beach Hospital<br>17772 Beach Blvd.<br>Huntington Beach, CA | Courtesy | 5/05 |
| KINDRED SPECIALTY HOSPITAL<br>14900 E. Imperial Highway<br>La Mirada, CA 90638<br>Phone: (562) 944-1900 xt. 3674 | CONSULTING | 10/98 |

Exhibit 3 Page 228

**Medical Staff Memberships**
**John P. Thropay, MD**
**Page 3 of 4**

| | | |
|---|---|---|
| La Palma Intercommunity Hospital<br>7901 Walker Street<br>La Palma, CA 90623<br>714-670-7400 | Courtesy | |
| LOS ANGELES COMMUNITY HOSPITAL<br>4081 East Olympic Boulevard<br>Los Angeles, CA  90018<br>213-267-0477 | ACTIVE | 8/86 |
| LOS ANGELES METROPOLITAN<br>MEDICAL CENTER<br>2231 South Western Avenue<br>Los Angeles, CA  90018<br>323-737-7372 | CONSULTING<br>SPECIALIST | 9/86 |
| METHODIST HOSPITAL OF ARCADIA<br>300 West Huntington Drive<br>Arcadia, CA  91007<br>818-445-4441 | PROVISIONAL/<br>COURTESY | 2/93 |
| MIDWAY HOSPITAL MEDICAL CENTER<br>5925 San Vicente Boulevard<br>Los Angeles, CA  90019<br>213-938-3161 | COURTESY | 7/85 |
| MISSION HOSPITAL<br>311 East Florence Avenue<br>Huntington Park. CA  90255<br>213-582-8261 | CONSULTING | 5/85 |
| MONTEREY PARK HOSPITAL<br>900 South Atlantic Avenue<br>Monterey Park, CA  91754<br>818-570-9000 | COURTESY | 7/81 |
| Orange Coast Memorial<br>9920 Talbert Ave.<br>Fountain Valley, CA | Courtesy | 4/08 |
| PACIFIC ALLIANCE MEDICAL CENTERCOURTESY<br>531 West College Street<br>Los Angeles. CA  90012<br>213-624-8411 | 3/87 | |

Exhibit 3 Page 229

**Medical Staff Memberships**
**John P. Thropay, MD**
**Page 4 of 4**

| | | |
|---|---|---|
| PRESBYTERIAN INTERCOMMUNITY HOSPITAL<br>12401 East Washington Boulevard<br>Whittier, CA  90602<br>310-698-0811 | COURTESY | 9/88 |
| QUEEN OF ANGELS / HOLLYWOOD PRESBYTERIAN HOSPITAL<br>1300 North Vermont<br>Los Angeles, CA  90027<br>213-413-3000 | COURTESY | 7/88 |
| TEMPLE COMMUNITY HOSPITAL<br>235 North Hoover Street<br>Los Angeles, CA  90004<br>213-382-7252 | ASSOCIATE | 3/85 |
| West Anaheim Medical Center<br>3033 West Orange Ave,<br>Anaheim, CA 92804 | Courtesy | 5/05 |
| WHITTIER HOSPITAL MEDICAL GROUP<br>15151 East Janine Drive<br>Whittier, CA  90605<br>310-945-3561 | COURTESY | 9/92 |

Exhibit 3 Page 230



# BEVERLY ONCOLOGY & IMAGING
## Medical Group, Inc.



Accredited by
The Joint Commission



## Peter C. Ree, M.D.

CERTIFICATION
American Board of Radiology in Therapeutic
Radiology – December 14, 1978

EDUCATION

1975-1978
Stanford University Hospital, Stanford, CA
Fellowship in Radiation Oncology. Chief Resident
July through September, 1977. Clinical work includes: extensive experience in
Hodgkin's disease, lymphoma and prostate cancer. I have also participated on a number
of I-125 and Ir-192 implants, in addition to the usual radium experience, plus three
months dealing entirely with head and neck cancer with an emphasis on implantation.

External rotations include three months each in the
Radiation Therapy Departments at the Universities of
California and San Francisco; and the Santa Clara Valley Medical Center.

1974-1975
Mt. Zion Hospital in San Francisco, California rotating Internship. This included four
months in Radiation Therapy with Dr. Joseph Castro.

1970-1974
University of Chicago, Pritzker School of Medicine.
While a medical student, I spent four months in the
Radiation Therapy Department with Dr. Melvin Greim.

1967-1970
University of Pennsylvania. A.B. in Psychology.

Exhibit 3 Page 231

HONORS

1977-1978        American Cancer Society fellow at Stanford University Hospital Division

1974             Nels Stanjord prize for graduation senior medical American Cancer Society Student Fellow (III
                 Student doing best work in radiology)

EMPLOYMENT

2005-Present     Beverly Oncology & Imaging Medical Group, Inc.
                Montebello, Monterey Park and Downey, CA
                Private Practice of Radiation Oncology

1980-2005       Downey Radiation Oncology Medical Clinic
                Downey, CA
                Private practice of Radiation Oncology

1978-1980       Temporary positions in private practice of
                Radiation Oncology in Bakersfield and Fresno,
                California while awaiting construction in
                Downey, California.

PUBLICATIONS

1.)             Factors Influencing Local Recurrence after Abdomino -Peri neal Resection for Cancer of the
                Rectum and Rectosigmoid.
                British  Journal of Surgery 62: 727-730, 1975.

2.)             Rectal and Rectosigmoid Carcinoma:  Physician's Prediction
                of Local Recurrence.  Journal of Surgical Research 18: (1):
                1-7, January, 1975.

3.)             Long Extension of Effective CS-US Interval by Anesthesia between CS and US.  Journal of
                Comparative and Physiological Psychology, 80: (1):  430-l8, July, 1972.

LICENSURE

                Physician and Surgeon, California and Texas
                Certified X-Ray Supervisor and Operator, California

Exhibit 3 Page 232

Medical Staff Memberships
Peter C. Ree, MD
Page 1 of 1

## MEDICAL STAFF MEMBERSHIPS

Peter C. Ree, M.D.
Beverly Oncology & Imaging Medical Group, Inc.
11480 Brookshire Avenue, Suite 100
Downey, CA  90241

| HOSPITAL | TYPE | SINCE |
|---|---|---|
| DOWNEY COMMUNITY HOSPITAL<br>Downey, CA  90241 | ACTIVE | 1980 |
| COAST PLAZA MEDICAL CENTER<br>Norwalk, CA  90605 | PROVISIONAL | 1981 |
| Anaheim Memorial<br>Anaheim, CA | Courtesy | 1982 |
| ANAHEIM GENERAL HOSPITAL<br>Anaheim, CA | COURTESY | 1982 |
| Garfield Medical Center<br>Monterey Park, CA | Courtesy | 2008 |
| LA PALMA INTERCOMMUNITY HOSPITAL<br>La Palma, CA | CONSULTING | 1983 |
| MEDICAL CENTER OF GARDEN GROVE<br>Garden Grove, CA | COURTESY | 1983 |
| HUMANA HOSPITAL HUNTINGTON BEACH<br>Huntington Beach, CA | PROVISIONAL | 1992 |
| PACIFICA HOSPITAL<br>Huntington Beach, CA | PROVISIONAL | 1992 |

Exhibit 3 Page 233



**BEVERLY ONCOLOGY & IMAGING**
**Medical Group, Inc.**



Accredited by
The Joint Commission

### Ruth Lopez Novodor

*Gender, Minority, and Socio-Economic Advocacy Expert*
*Multi-Disciplinary Business Executive*
**CEO, Beverly Oncology & Imaging (BOI) Medical Group, Inc.**
**Former Chairman of the Board, Latin Business Association (LBA)**

Ruth Lopez Novodor serves as CEO for Beverly Oncology and Imaging (BOI) Medical Group, Inc., a position that she has held since 1980. In this capacity, Ms. Lopez Novodor is responsible for the company's business planning and execution of strategic goals.

During her tenure, Ms. Lopez Novodor has managed the strategic growth of BOI - from the establishment of its first radiation therapy center in the city of Montebello - to its seven present locations throughout Los Angeles County. The company's medical professional team is known for building a family-like relationship with each patient by demonstrating compassion and cultural sensitivity to provide the highest-quality cancer treatment for the region's multi-cultural population. Under her direction and execution, Ms. Lopez Novodor has helped this medical center achieve national recognition and industry credibility by receiving accreditation by the Joint Commission on Accreditation of Healthcare Organizations.

Ms. Lopez Novodor also served as CEO for Americade Home Health Agency (AHHA). AHHA served the L.A. and surrounding communities with a staff of 50 skilled nurses, home health aides, social workers, and occupational, speech, and respiratory therapists. With a goal of better serving patients in their homes, Ms. Lopez Novodor facilitated a partnership between AHHA and BOI to provide true "end-to-end" cancer patient treatment services.

In addition, Ms. Lopez Novodor held a two-term Chairmanship of the Latin Business Association (LBA), the largest organization of Latino business-owners in the United States. Under her leadership, she grew and championed the outreach of 43,000 Latino-owned businesses to Fortune 500 and Global 2500 corporations, bringing the LBA to a new level of national prominence and international recognition. As of recently, the LBA's procurement efforts have resulted in more than $330 million in contracts and loans to its members. Additionally, the LBA forged a partnership with Peter F. Drucker, the country's "father of management," to produce management articles in English and Spanish for its business-to-business publication, the *LBA Business Review Magazine;* grew the annual Latino Business Expo, the largest Latino business-to-business trade show in the nation; and co-founded the LBAI (Latin Business Association Institute), a non-profit educational, research, and economic development organization, to twice their size.

Exhibit 3 Page 234

Ms. Lopez Novodor, along with her brother, John P. Thropay, M.D., co-founded and served as CEO of VivaHealth Services, Inc. (VSI), a healthcare management company. Credited as her first entrepreneurial success, this first-of-its-kind HMO provided all-encompassing healthcare services in Spanish was specifically designed for the burgeoning Hispanic population in Southern California. During her tenure at VSI, Ms. Lopez Novodor was responsible for establishing the first, all Spanish-speaking network of healthcare providers under the name "Spanish Speaking Health Professionals (SSHP)," as well as for designing the first Latino-oriented health risk assessment tool in conjunction with Latino's Futures Group out of UCLA.

Prior to her work with VSI, Ms. Lopez Novodor was CEO of VivaHealth Plan, from its inception and early days of organizing and planning in 1989, to licensure and operational status in March of 1994. The Plan provided medical care to individuals through a wide range of primary care and specialty physicians in private practice settings, and through participating hospitals. VivaHealth Plan provided all services in the Spanish language, with particular sensitivity and responsiveness to the Hispanic culture.

Ms. Lopez Novodor continues to balance her professional career, public service, and private life. She served as a Delegate to the White House on Small Business Administration; a board member of The National Federation of Independent Business (NFIB), the largest advocacy organization representing 460,000 small and independent businesses in Washington, D.C. and all 50 state capitals; a member of The Trusteeship, an affiliate of The International Women's Forum (IWF), a prestigious, worldwide organization of 3,800 preeminent women of significant and diverse achievement; a former Executive Council member for the Adaptive Business Leaders (ABL) Organization, a professional membership consisting of more than 100 health care CEOs and suppliers; a Los Angeles Impact Task Force member, to which she was appointed by L.A. Mayor James Hahn to study and identify the impacts of the economic downturn since the September 11th terrorist attacks; a former member of Wells Fargo Bank's Corporate Diversity Council; and a board member for El Proyecto del Barrio, a provider of comprehensive human services for Hispanics, and economically disadvantaged youth and adults, in the San Fernando Valley. The YWCA of Greater Los Angeles awarded her the "Silver Achievement Award," which is given only to those individuals who have distinguished themselves in the community through professional, volunteer, and/or philanthropic activities that have made a significant difference. She currently serves as board member of the organization.

Ms. Lopez Novodor holds an MBA and Bachelor of Science degree in Business Administration from Pepperdine University. In 1996, she completed the Executive Program for Managed Care at the University of Missouri, at Kansas City's National Center for Managed Health Care Administration, and Henry W. Bloch School of Business and Public Administration.

She is active with her husband and three children, and participates as a speaker at many entrepreneurial conferences and community activities throughout the country.

Exhibit 3 Page 235

 **Beverly Oncology & Imaging Medical Group, Inc.**
**Service Delivery Matrix** 

Not all services are delivered at every site. The matrix below identifies, by service, the site of delivery.

| Service | Site |
|---|---|
| Megavoltage<br>  Simple, Intermediate, Complex | Pasadena      Garden Grove<br>Montebello      Huntington Beach<br>Monterey Park      Downey |
| Orthovoltage<br>  Simple, Intermediate, Complex | Monterey Park Office<br>Pasadena Office |
| Implants | Montebello      Garden Grove<br>Monterey Park      Huntington Beach |
| IMRT | Montebello      Garden Grove<br>Monterey Park      Huntington Beach<br>Downey |
| MRI , CT & Ultrasound | Montebello Imaging Office |
| Xoft | Montebello      Downey<br>Garden Grove      Huntington Beach |
| Gamma Knife | Anaheim (in 2010) |

Locations:

| Pasadena Office | Monterey Park Office | Montebello Office | Montebello Imaging Office | Corporate Office |
|---|---|---|---|---|
| 2750 E. Washington Bl.,<br>Suite 100<br>Pasadena. CA  91107<br><br>Phone:<br>626-794-2836<br>Fax:<br>626-794-1697 | 605 N. Garfield Ave<br>Monterey Park, CA<br>91754<br><br>Phone:<br>626-571-6729<br>Fax:<br>626-571-1170 | 120 W. Beverly Blvd.<br>Montebello, CA 90640<br><br>Phone:<br>323-724-8780<br>Fax:<br>323-728-9936 | 111 W. Beverly Blvd.,<br>Suite 104<br>Montebello, CA 90640<br><br>Phone:<br>323-724-8755<br>Fax:<br>323-727-7212 | 200 E. Beverly Blvd.,<br>Suite 200<br>Montebello, CA 90640<br><br>Phone:<br>323-517-9800<br>Fax:<br>323-727-7574 |
| Physicians:<br><br>John P. Thropay, MD<br>Peter Ree, MD | Physicians:<br><br>John P. Thropay, MD<br>Shiu Cheong Au, MD<br>Janice Rha, MD<br>James Chuang, MD<br>Peter Ree, MD | Physicians:<br><br>John P. Thropay, MD<br>Janice Rha, MD<br>Peter Ree, MD | Physicians:<br><br>Michael Fischer, MD | Ruth Lopez Novodor,<br>CEO |
| **Downey** | **Garden Grove** | **Anaheim** | **Huntington Beach** | |
| 11480 Brookshire Ave,<br>Suite 100<br>Downey, CA  90241<br><br>Phone:<br>562-861-9914<br>Fax<br>562-869-0034 | 12555 Garden Grove Bl.,<br>Suite 101<br>Garden Grove, CA<br>92843<br><br>Phone:<br>714-530-5930<br>Fax<br>714-530-5675 | 3400 West Ball Rd.,<br>Suite 101<br>Anaheim, CA  92804<br><br>Phone:<br>323-517-9800<br>Fax<br>323-727-7574 | 8201 Newman Ave,<br>Suite 101<br>Huntington Beach, CA<br>92647<br><br>Phone:<br>714-500-0975<br>Fax<br>714-500-0977 | |
| Physicians:<br><br>John P. Thropay, MD<br>Peter Ree, MD | Physicians:<br><br>John P. Thropay, MD<br>Peter Ree, MD | Physicians:<br><br>John P. Thropay, MD<br>Peter Ree, MD | Physicians:<br><br>John P. Thropay, MD<br>Peter Ree, MD | |

Exhibit 3 Page 236



Exhibit 3 Page 237



# Beverly Oncology & Imaging Medical Group, Inc.

## nomos*STAT* RADIOSURGERY

### INTENSITY MODULATION AND OPTIMIZED BEAM PLACEMENT

nomos*STAT*'s dynamic arc delivery shapes and modulates the beam while the gantry is rotating, providing up to 40 individual intensitymodulated beams per every 5 degrees of rotation.

Arcs as long as 340 degrees can be delivered, each arc delivering a cylinder of radiation 20cm in diameter over a cumulative 30cm field length in 1cm, 2cm or 4mm slices, and delivering two slices at a time.







### INTENSITY MODULATION
Each of the potential 2,560 pencil beams per arc can be modulated in 10% steps.



### TANGENTIAL BEAM DELIVERY

Intensity-modulated beams are delivered individually, not as overlapping field segments, allowing beams to be placed on the tangent of a target or sensitive structure, carving out steep dose gradients.

  

Metastatic T-spine with tumor wrapped around spinal cord

Tangential beam delivery carves out steep dose gradients

Dose is delivered to the tumor while avoiding the spinal cord



Exhibit 3 Page 238



# BEVERLY ONCOLOGY & IMAGING
## Medical Group, Inc.



Accredited by
The Joint Commission

Dear Doctor,

We are currently contracted with the following health plans and groups:

- Access IPA
- Aetna Health of California, Inc.
- Affiliated Doctors of Orange County
- Alhambra Hospital Medical Center
- Alliance Physicians Medical Corporation
- Allied Physicians of California
- Associated Hispanics of Southern California IPA
- Avalon Medical Group
- Bella Vista Medical Group
- Beverly Hospital
- Blue Cross of California
- Bright Medical Associates, Inc.
- Advantage Care IPA
- California Coast IPA Medical Group, Inc.
- Care 1st Health Plan
- CareMore Medical Group
- CIGNA
- Community Family Care
- Downey Select IPA Medical Group, Inc.
- Easy Choice Health Plan
- Exceptional Care Medical Group
- Family Care Specialists IPA
- Family Health Alliance Medical Group, Inc.
- First Health Network

- Genesis Healthcare
- Global Care Medical Group IPA
- Great-West Healthcare of California, Inc.
- Greater San Gabriel Valley Physicians
- Healthcare Partners Affiliates Medical Group
- Health Net, Inc.
- Hispanic Physician IPA Medical Corporation
- Huntington Provider Group, A Medical Group, Inc.
- Kaiser Permanente
- Korean American Medical Group Provider
- La Vida Medical Group
- Monarch Preferred Provider Group
- Molina Healthcare of California
- Northwest Orange County Medical Group, Inc.
- PacifiCare Preferred Provider Organization
- Permanente Medical Group
- Physician Associates of the Greater San Gabriel Valley
- Physician's Healthways IPA and Affiliates
- Preferred IPA of California
- Prospect Medical Group
- Talbert Medical Group
- United Healthcare
- Pacific Alliance MRI/CT

Regards,

*Joseph D. Thropay*
Marketing/ Communications
BOI
323) 517-9812 *Private Line*
562) 397-8448 *Cell Phone*
*jc@beverlyoncology.com*

---

200 E. Beverly Blvd., Suite 200, Montebello, CA  90640
Tel (323) 517-9800 - Fax (323) 727-7574 – www.beverlyoncology.com

Exhibit 3 Page 239



# BEVERLY ONCOLOGY & IMAGING MEDICAL CENTER, Inc.

HOME

ONCOLOGY SERVICES

IMAGING SERVICES

RESEARCH

SPECIAL CARE OPTIONS

LOCATIONS

ABOUT US

- Mission
- History
- Executive Staff
- Doctors
- JCAHO Accreditation
- Privacy Policy

CONTACT US

Est 1980

## ABOUT US

**History:** BOI persistently seeks hope in cancer treatment

In May 1980, Doctor Thropay founded Beverly Oncology and Imaging Medical Group, Inc. after he completed both his medical schooling at UCLA and his residency at USC. At this time, he created one of the first freestanding radiation centers in Southern California and began his earliest practice in Montebello. He set his goal on providing technically advanced therapies in radiation to his own community.

History has demonstrated that BOI became a leading innovator by providing services of the broadest range to their patients. The members of BOI endeavored to be the first in their community to provide the newest treatment technology. As a result, a year after BOI's entrepreneurial beginning, Dr. Thropay put into practice the first treatment planning system that improved accuracy of targeting by 25%. Keeping in BOI's newly formed tradition of innovation, the next year, BOI put into operation the first One Minute CT in order to improve treatment-planning processes.

Increasing in size and purpose, in 1985, BOI opened its second office in the Wilshire / Fairfax community and, in 1987, its third office opened in Pasadena. With this expansion, in 1990, BOI installed the first Open Bore MRI in order to service both larger or claustrophobic patients. BOI continued to advance by applying the first HDR (high Dose Radiation) with the Nucletron Corporation in LA County and in 1993 implemented the first frameless stereotactic radiosurgery system in Southern CA.

Setting full focus on operating the best and latest treatment capabilities in the area of radiation, in 1997, BOI installed the first 3D IMRT in a freestanding cancer care facility making BOI the fourth in CA to implement this technology. Early execution of IMRT allowed BOI to maintain the cutting edge on the experience curve, now treating over 1200 patients at our combined medical facilities.

The successes of IMRT coupled with Dr. Thropay's enjoyment of research directed him to establish Clinical Trials and Research Associates (CTRA) in order to continuously search for better treatments for cancer patients.

At the break of the new millennium, after setting up 3DIMRT at Beverly Hills Oncology, BOI began using image-guided radiation with BAT technology. Because of BOI's extensive experience and aim of advancement, in 2005, it acquired three new medical locations in Orange County and one in Downey aspiring to afford more communities with the latest in cancer treatment while remaining devoted to their Mission of Best Outcomes in Cancer Care.

Careers  News  FAQ  Resources

Exhibit 3 Page 240



# BEVERLY ONCOLOGY & IMAGING MEDICAL CENTER, Inc.

HOME

ONCOLOGY SERVICES

IMAGING SERVICES

RESEARCH

SPECIAL CARE OPTIONS

LOCATIONS

ABOUT US

- Mission
- History
- Executive Staff
- Doctors
- JCAHO Accreditation
- Privacy Policy

CONTACT US

## ABOUT US
### JCAHO Accreditation

At Beverly Oncology and Imaging (BOI) we are one of the few JCAHO accredited outpatient radiation oncology practices in California. BOI's oncology centers located in Montebello, Pasadena, and Monterey Park, and BOI's imaging center in Montebello have all been JCAHO accredited. We have received accreditation for 9 consecutive years. Our Joint Commission Accreditation is what sets us apart from other freestanding cancer care centers because we maintain the same quality as an acute care hospital yet we retain a private facility faithful to your personalized health care needs.

### What is JCAHO Accreditation?

Joint Commission (JCAHO) is an independent, non-profit organization that currently accredits nearly 16,000 healthcare organizations in the United States. They are the predominant standard setting accrediting body in health care. By asking for accreditation, an organization agrees to be measured against national and worldwide standards set by health care professionals. The Joint Commission board is governed by, not only certified physicians and nurses, but consumers as well. The goal of the JCAHO is to improve the quality and safety of health care organizations by providing a report card for the public, offering an objective evaluation for the organization's performance, as well as aiding in professional staff recruitment and education. Since BOI has earned and maintained accreditation, it has committed itself to continually improving the way it delivers care and services.

Careers   News   FAQ   Resources

Exhibit 3 Page 241



## BEVERLY ONCOLOGY & IMAGING MEDICAL CENTER, Inc.

HOME

ONCOLOGY SERVICES

IMAGING SERVICES

RESEARCH

SPECIAL CARE OPTIONS

- Transportation
- B C E D P
- Prescription Discount

LOCATIONS

ABOUT US

CONTACT US

### SPECIAL CARE OPTIONS

BCEDP: Breast Cancer Early Detection Programs

BOI is creating access to early breast cancer detection programs. The California Department of Health Services' Cancer Detection Section (CDS) administers the comprehensive Cancer Detection Programs: Every Woman Counts. This program, implemented October 1, 2002, incorporates health education, outreach activities, clinical services, and patient care management that provides women with necessary breast and cervical cancer screenings and follow-ups, at no cost to eligible women. Qualification for this program is based on a Primary Care Provider's certification that a recipient is uninsured or underinsured based on the recipient's disclosure, is over the age of 40, satisfies the income criteria, and lives in California.

For women who qualify, Cancer Detection Programs: Every Women Counts, provides the following services at no cost:

1) A Clinical breast examination;
2) A Mammogram;
3) Diagnostic tests, if indicated.

Beverly Oncology and Imaging (BOI), a Medi-Cal licensed facility, is a strong advocate for the Every Woman Counts program. BOI provides patients with the highest quality care.

Careers   News   FAQ   Resources

Exhibit 3 Page 242



## BEVERLY ONCOLOGY & IMAGING MEDICAL CENTER, Inc.

HOME

ONCOLOGY SERVICES

IMAGING SERVICES

RESEARCH

SPECIAL CARE OPTIONS

- Transportation
- B C E D P
- Prescription Discount

LOCATIONS

ABOUT US

CONTACT US

### SPECIAL CARE OPTIONS

Transportation: Helping You Keep Your Appointments

Beverly Oncology and Imaging provides transportation to and from all BOI Locations in Los Angeles and Orange County for patients in the area who are in need. Upon pick up, BOI drivers safely assist you from your home into one of BOI's vehicles, secure you in the vehicle, and drive you to your appointment. Our drivers are knowledgeable in securing wheelchairs and gurneys into our company vans for your safety and comfort.

This service is offered as a courtesy to our patients, as we know it is difficult for many of our patients to arrange transportation otherwise. Aiding our patients in keeping appointments helps maintain their treatment plans, which is a crucial part of success in battling cancer. BOI's transportation is **FREE OF CHARGE** for our patients.

The development of our Transportation Department evidences BOI's commitment to you and your family's cancer treatment success. Please call and make an appointment today for a consultation and have BOI pick you up. To schedule your pick up, simply choose the **Location** of your appointment and call to speak with a BOI representative. You will receive a phone call verifying your request at least one hour before your pick up.

Careers   News   FAQ   Resources

Exhibit 3 Page 243