# EXHIBIT 4

# PRIVATE OFFERING MEMORANDUM

## 300 LIMITED LIABILITY COMPANY MEMBERSHIP UNITS
### OF
## PACIFIC PROTON EB-5 FUND, LLC



200 E. Beverly Boulevard, Suite 200
Montebello, CA 90840

Contact: Mr. Charles Liu
at (626) 688-4898

The information contained in this Private Offering Memorandum together with all exhibits hereto (the "Offering Memorandum") is provided on a confidential basis only to prospective investors in Pacific Proton EB-5 Fund, LLC. All information contained herein shall be treated as secret and no part of it shall be disclosed to others, reproduced in whole or in part, or used in any other manner without the prior written consent of Pacific Proton EB-5 Fund, LLC.

NAME OF OFFEREE: _____   MEMORANDUM NO.: _____



Exhibit 4 Page 244

## PRIVATE OFFERING MEMORANDUM
### 300 LIMITED LIABILITY COMPANY MEMBERSHIP UNITS
### OF
### PACIFIC PROTON EB-5 FUND, LLC

| | |
|---|---|
| **Securities**: | Limited Liability Company Membership Interests ("Units") |
| **Maximum Offering** | $150,000,000 |
| **Minimum Investment** | $500,000 (1 Unit) |
| **Initial Administrative Fee** | $45,000 |

Pacific Proton EB-5 Fund, LLC ("PPEB5"), a Delaware limited liability company, was formed on November 15, 2010. PPEB5 is offering for sale Units of limited liability company membership interests at a purchase price of $500,000 per Unit to qualified non-U.S. citizens seeking permanent resident status in the United States through the Immigrant Investor Program ("EB-5 Program") established by the Immigration and Nationality Act, who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Act"). Investors acquiring Units in this offering will be members of PPEB5.

This Offering Memorandum is furnished by PPEB5 solely for use by qualified investors in evaluating the offering described herein (the "Offering"). Investment funds will be held in escrow prior to closing in accordance with the escrow agreement attached hereto ("Escrow Agreement") as **APPENDIX A**. PPEB5 charges an administrative fee (the "Administrative Fee") for payment of expenses incurred in connection with this Offering ("Offering Expenses").The Administrative Fee will not be held in escrow and will be applied to Offering Expenses immediately upon receipt.

INVESTMENT IN SMALL BUSINESSES INVOLVES A HIGH DEGREE OF RISK, AND INVESTORS SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS THEY CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. **SEE "RISK FACTORS" BELOW FOR THE RISK FACTORS THAT MANAGEMENT BELIEVES PRESENT THE MOST SUBSTANTIAL RISKS TO AN INVESTOR IN THIS OFFERING.**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THESE AUTHORITIES HAVE NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY OTHER APPLICABLE LAW OR APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES ADMINISTRATOR. THE SEC DOES NOT PASS UPON THE MERITS OF ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR SELLING LITERATURE. THESE SECURITIES ARE OFFERED UNDER AN EXEMPTION FROM REGISTRATION; HOWEVER, THE SEC HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THESE SECURITIES ARE EXEMPT FROM REGISTRATION.

The information in this Offering Memorandum is furnished on a confidential basis exclusively for your use and retention and by accepting this Offering Memorandum you agree not to transmit, reproduce or make available to any other person (other than your legal, tax, accounting and other advisers) all or any part of this Offering Memorandum without the express written permission of PPEB5.

Exhibit 4 Page 245

| SECURITIES DISCLOSURE NOTICES |
| --- |

THIS OFFERING MEMORANDUM CONTAINS FORWARD-LOOKING STATEMENTS BASED ON MANAGEMENT'S EXPERIENCE AND EXPECTATIONS ABOUT PPEB5'S BUSINESS PLAN. THOSE STATEMENTS ARE SOMETIMES INDICATED BY WORDS SUCH AS "EXPECTS," "BELIEVES," "SEEKS," "MAY," "INTENDS," "ATTEMPTS," "WILL" AND SIMILAR EXPRESSIONS. SUCH FORWARD-LOOKING STATEMENTS ARE NOT GUARANTIES OF FUTURE PERFORMANCE AND ARE SUBJECT TO MANY RISKS, UNCERTAINTIES AND ASSUMPTIONS THAT ARE DIFFICULT TO PREDICT. THEREFORE, ACTUAL RETURNS COULD DIFFER MATERIALLY AND ADVERSELY FROM THOSE EXPRESSED OR IMPLIED IN ANY FORWARD-LOOKING STATEMENTS AS A RESULT OF VARIOUS FACTORS. THE SECTION ENTITLED "RISK FACTORS" IN THIS OFFERING MEMORANDUM DISCUSSES SOME OF THE IMPORTANT RISK FACTORS THAT MAY AFFECT PPEB5'S RETURNS. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THOSE RISKS, IN ADDITION TO OTHER INFORMATION IN THIS OFFERING MEMORANDUM, BEFORE DECIDING WHETHER TO INVEST IN PPEB5. PPEB5 UNDERTAKES NO OBLIGATION TO REVISE OR UPDATE ANY FORWARD-LOOKING STATEMENT FOR ANY REASON.

THIS IS A PRIVATE OFFERING AND IS AVAILABLE ONLY TO INVESTORS WHO ARE "ACCREDITED INVESTORS" AS DEFINED UNDER THE ACT. EACH SUCH INVESTOR MUST, EITHER ALONE OR TOGETHER WITH A PURCHASER REPRESENTATIVE THAT IS NOT COMPENSATED BY OR AFFILIATED WITH PPEB5 OR ITS MANAGEMENT, HAVE SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT SUCH INVESTOR IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THIS INVESTMENT AND MUST BE ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. NO OFFER IS BEING MADE HEREBY TO ANY PERSON WHO HAS NOT FURNISHED TO PPEB5 COMPLETED AND SIGNED SUBSCRIPTION MATERIALS ATTACHED AS EXHIBITS TO THIS OFFERING MEMORANDUM, AND WHO IS NOT SHOWN BY SUCH INFORMATION TO MEET THE SUITABILITY STANDARDS FOR THIS OFFERING.

THE UNITS HAVE NOT BEEN REGISTERED UNDER THE ACT, OR REGISTERED OR QUALIFIED UNDER ANY APPLICABLE STATE SECURITIES LAWS, AND ARE OFFERED IN RELIANCE ON EXEMPTIONS FROM SUCH REGISTRATION UNDER THE ACT AND QUALIFICATION UNDER SECTION 4(2) AND REGULATION D UNDER SUCH ACT AND SIMILAR PROVISIONS OF SUCH STATE LAWS. A PURCHASER OF UNITS MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD BECAUSE UNITS HAVE NOT BEEN SO REGISTERED OR QUALIFIED AND ARE SUBJECT TO RESTRICTIONS ON TRANSFER PURSUANT TO SUCH ACT AND SUCH STATE LAWS AND OTHERWISE. UNITS CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION ARE AVAILABLE AND CERTAIN CONDITIONS ARE MET. NO MARKET FOR UNITS CAN BE EXPECTED TO DEVELOP. DO NOT CONSIDER INVESTING IF YOU ARE NOT FINANCIALLY SOPHISTICATED AND CAPABLE OF EVALUATING THE MERITS AND RISKS OF THE INVESTMENT, EITHER ON YOUR OWN OR WITH THE ASSISTANCE OF YOUR PROFESSIONAL ADVISORS.

PPEB5 RESERVES THE RIGHT TO ACCEPT OR REJECT ANY SUBSCRIPTION TO PURCHASE UNITS FOR ANY REASON. THIS OFFERING WILL CONTINUE UNTIL TERMINATED BY PPEB5, WHICH MAY BE BEFORE SUBSCRIPTIONS FOR ANY MAXIMUM OFFERING HAS BEEN RAISED.

THIS OFFERING MEMORANDUM IS AN OFFER ONLY TO THE OFFEREE NAMED ON THE COVER PAGE, AND ONLY IF DELIVERY OF THIS OFFERING MEMORANDUM WAS MADE BY, OR AUTHORIZED BY, PPEB5.

NO ONE HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS ABOUT PPEB5 OR THE UNITS, OTHER THAN THOSE REPRESENTATIONS MADE IN THIS OFFERING MEMORANDUM.

Exhibit 4 Page 246

THEREFORE, DO NOT CONSIDER ANY INFORMATION WHICH HAS BEEN DESCRIBED TO YOU ORALLY. PLEASE MAKE SURE THAT YOU INVEST SOLELY ON THE BASIS OF THE INFORMATION IN THIS OFFERING MEMORANDUM. THIS OFFERING MEMORANDUM IS NOT LEGAL, TAX OR FINANCIAL ADVICE. PLEASE CONSULT YOUR OWN PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX AND FINANCIAL IMPLICATIONS OF THIS INVESTMENT AND AS TO YOUR SUITABILITY FOR THIS INVESTMENT.

INVESTORS IN THIS OFFERING MAY INVEST GREATER AMOUNTS AND RECEIVE A PROPORTIONATELY SMALLER INTEREST IN THE PROFITS AND DISTRIBUTIONS OF PPEB5 THAN OTHER MEMBERS.

PPEB5 WILL RESPOND TO ANY QUESTIONS YOU OR YOUR ADVISORS MAY HAVE CONCERNING THIS OFFERING AND WILL MAKE AVAILABLE FOR EXAMINATION BY YOU OR YOUR ADVISORS SUCH RECORDS AND FILES IN ITS POSSESSION AS MAY BE PERTINENT TO YOUR DECISION WHETHER TO INVEST IN UNITS.

THE TERMS AND CONDITIONS OF THIS OFFERING, THE RIGHTS, PREFERENCES, PRIVILEGES AND RESTRICTIONS ON UNITS AND THE RIGHTS AND LIABILITIES OF THE MANAGERS AND PPEB5 ARE GOVERNED BY THE OPERATING AGREEMENT AND THE SUBSCRIPTION AGREEMENT BETWEEN EACH MEMBER AND PPEB5, THE FORMS OF WHICH ARE INCLUDED AS APPENDICES HERETO, AND THE DESCRIPTION OF ANY OF SUCH MATTERS IN THE TEXT OF THIS OFFERING MEMORANDUM IS SUBJECT TO AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH APPENDICES.

THE OFFEREE, BY ACCEPTING DELIVERY OF THIS OFFERING MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO PPEB5 IF THE OFFEREE DOES NOT SUBSCRIBE FOR UNITS. THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY OF THESE SECURITIES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION IN SUCH STATE.

NOTICE TO RESIDENTS OF ALL STATES

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE LAWS. THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

Exhibit 4 Page 247

| TABLE OF CONTENTS |
|---|

SECURITIES DISCLOSURE NOTICES ........................................................................................ 3

SUMMARY OF OFFERING TERMS ......................................................................................... 6

EB-5 IMMIGRATION DISCLOSURES ..................................................................................... 9

RISK FACTORS ........................................................................................................................ 13

BUSINESS PLAN SUMMARY ................................................................................................ 18

CAPITAL REQUIREMENTS AND ESTIMATED USE OF PROCEEDS .............................. 20

MATERIAL RELATIONSHIPS AND CONTRACTS ............................................................. 22

SUMMARY OF LOAN TERMS ............................................................................................... 24

SUMMARY OF THE OPERATING AGREEMENT ............................................................... 25

SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION ...................................... 28

INCOME TAX CONSIDERATIONS ....................................................................................... 29

DOCUMENTS AVAILABLE FOR INSPECTION .................................................................. 29

**Appendices**

A.   ESCROW AGREEMENT
B.   OPERATING AGREEMENT
C.   SUBSCRIPTION AGREEMENT
D.   TARGETED EMPLOYMENT AREA LETTER
E.   ECONOMIC ANALYSIS OF EVANS, CARROLL & ASSOCIATES
F.   AMENDED AND RESTATED LOAN DOCUMENTS

| SUMMARY OF OFFERING TERMS |
|---|

The following is only a summary of certain of the information contained in this Offering Memorandum and is qualified in its entirety by reference to this Offering Memorandum, including the Exhibits hereto.

**Issuer**
Pacific Proton EB-5 Fund, LLC ("PPEB5"), a Delaware limited liability company of Montebello, CA formed in November, 2010, is offering for sale Units of limited liability company membership interests in PPEB5 to Accredited Investors pursuant to the EB-5 Program (defined below). Pacific Proton Therapy Regional Center, LLC a California limited liability company, is the sole Manager ("Manager") of PPEB5.

**Securities**
One Unit of limited liability company membership interest of PPEB5 shall be issued to Investors in this Offering for each $500,000 investment. One Unit will constitute approximately 0.33% of all Units of PPEB5 if the Maximum Offering hereunder (300 Units) is sold. There is no Minimum Offering amount.

**Minimum Investment**
$500,000.00 ("Capital Contribution").

**Administrative Fees**
PPEB5 will charge an Administrative Fee of $45,000 ("Administrative Fee") to pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering. Investors will pay the Administrative Fee directly to the Regional Center. The Regional Center will refund the Administrative Fee if (a) an Investor's subscription is not accepted, or (b) if an Investor's I-526 application is denied without possibility of cure. The Regional Center will not refund all or any part of the Administrative Fee for any other reason. The Administrative Fee will not be held in escrow.

**Borrower**
Los Angeles County Proton Therapy, LLC ("Borrower") is a California limited liability company of 200 E. Beverly Blvd., Suite 200, Montebello, CA formed in November, 2010. Borrower seeks financing from PPEB5 for development and operation of a proton therapy center in Los Angeles County, California (the "Project").

**Estimated Use of Proceeds**
PPEB5 will loan ("Loan") the proceeds of this Offering to the Borrower to develop and operate a proton therapy center in Los Angeles County, California. PPEB5 will make the Loan to Borrower on the terms set forth in the Loan Documents attached hereto as **APPENDIX F**. See *Capital Requirements and Estimated Use of Proceeds* and *Summary of Loan Terms* below.

**EB-5 Regional Center Sponsorship**
The Project is sponsored by Pacific Proton Therapy Regional Center, LLC, (the "Regional Center" or "PPTRC"), a California limited liability company of Montebello, CA. The Regional Center is a regional center authorized by U.S. Citizenship and Immigration Services ("USCIS") under the EB-5 Immigrant Investor Program ("EB-5 Program") to establish and solicit investment from foreign investors in U.S. businesses for the purpose of creating U.S. jobs.

**Management Fee**
The Manager shall receive a management fee equal to three (3.0%) percent of the gross revenues, if any, of PPEB5, payable on the first day of each month for the preceding period. If there is more than one Manager, the management fee shall be distributed among the Managers on a pro rata basis unless otherwise agreed by the Managers.

Exhibit 4 Page 249

| | |
|---|---|
| **Escrow of Capital Contributions** | All Capital Contributions will be held in escrow pursuant to the Escrow Agreement attached hereto as **APPENDIX A**. The escrow agent will release each Capital Contribution to PPEB5 upon notice of filing of each Investor's I-526 Petition with USCIS. Once an Investor's I-526 petition has been filed with USCIS, the Regional Center will refund an Investor's Capital Contribution and Administrative Fee only if an Investor's I-526 petition is denied by USCIS without possibility of cure. The Regional Center will not refund all or any part of the Capital Contribution or Administrative Fee for any other reason. Please see the Escrow Agreement and Subscription Agreement for further details. |
| **Investor Qualification** | This Offering is made pursuant to an exemption from registration under the Act, including the exemption provided by Section 4(2) of the Act, Regulation D and Regulation S promulgated thereunder, and exemptions available under applicable state securities laws. Units will be offered and sold only to persons who (a) are not U.S. Persons, as that term is defined in Regulation S under the Securities Act, and (b) both are (i) "accredited investors" within the meaning of Regulation D under the Securities Act and (ii) "qualified purchasers" as that term is defined in Section 2(a)(51) of the Investment Company Act of 1940. In addition, the Units may not be assigned or transferred without the consent of the Manager (which may be granted or denied in the sole discretion of the Manger) and satisfaction of certain other conditions.  Under the federal securities laws, any Units acquired in this Offering generally may not be offered or sold prior to the expiration of a one-year period from the date of purchase. |
| | It is anticipated that PPEB5will not be required to register as an investment company under the Investment Company Act.  PPEB5 will rely on an exception contained in Section 3(c)(7) of the Investment Company Act. PPEB5 will obtain appropriate representations and undertakings from purchasers of the Units to assure that the conditions of "beneficial ownership" will be met on an ongoing basis.  Certain Investors may be asked to furnish additional information to the Manager to enable PPEB5's counsel to ensure PPEB5's compliance with the Investment Company Act. |
| **Additional Capital Contributions** | No Member is under any obligation to make additional Capital Contributions to PPEB5. Members may make additional Capital Contributions upon consent of the Manager and in accordance with the Operating Agreement ("Operating Agreement"). See *Summary of Operating Agreement* below. |
| **Transfer Restrictions; No Resale** | Units may not be transferred without consent of the Manager. There are other substantial restrictions on the transfer of Units further described in the Operating Agreement. No market for the Units exists and no market is expected to develop. See *Risk Factors* below. |
| **Distribution of Profits** | The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits of PPEB5. Available Cash Flow and Net Proceeds from a Capital Event (as defined in the Operating Agreement), if any, will be distributed as follows: |

- to Members in payment of Mandatory Distributions (See Section 3.6 of the Operating Agreement);
- then to EB-5 Members pro rata in accordance with each EB-5 Member's Adjusted Capital Contribution in an amount up to each such EB-5 Member's Adjusted Capital Contribution; and
- then to Members other than EB-5 Members pro rata in accordance with each of such Member's Adjusted Capital Contribution in an amount up to each

Exhibit 4 Page 250

such Member's Adjusted Capital Contribution; and

- then to Members in accordance with their Percentage Interests (as defined in the Operating Agreement).

PPEB5 shall not make any distribution (i) if after such distribution liabilities of PPEB5, other than liabilities to Members on account of their Units (as defined in the Operating Agreement), exceed the fair value of the assets of PPEB5, (ii) to EB-5 Members to the extent that such distribution results in reducing such EB-5 Member's Capital Account below the EB-5 Minimum Capital Requirement (as defined in the Operating Agreement), or (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, the foregoing restrictions shall no longer apply.

**Member Voting**

Members will have limited involvement in management of PPEB5, including limited voting rights as more specifically described in the Operating Agreement. Member approval is required only for the following actions: (i) modification of the Operating Agreement materially changing the rights of the Members; (ii) dissolution of PPEB5 prior to the end of the fifth year after admission of the last EB-5 Member, and (iii) other matters presented to the Members for their vote by the Manager. Each Member shall have one vote on such matters for each Unit owned. See *Summary of Operating Agreement* below.

**Plan of Distribution**

PPEB5 may make offers and sales of Units directly to investors through its Manager, agents and affiliates and may engage and pay one or more brokers, investment advisors, finders or other parties commissions or other fees in connection with the sale of Units pursuant to this Offering. Any such commissions or other fees paid in connection with the sale of Units pursuant to this Offering shall be paid only out of the proceeds of Administrative Fees.

**Reports**

Members will receive financial statements and a K-1 statement reflecting their allocable share of PPEB5's profits and losses annually.

**Subscriptions Procedure**

Investors may subscribe for Units by executing and delivering the Escrow Agreement (**APPENDIX A**), Operating Agreement (**APPENDIX B**), and Subscription Agreement (**APPENDIX C**), his/her Capital Contribution to PPEB5 and the Administrative Fee to the Regional Center. PPEB5 may accept or reject any subscription at any time at or prior to the closing of the Offering or at such later date as PPEB5 may determine. In the event that a subscription is not accepted or in the event the conditions precedent to the closing of the Offering are not satisfied or waived, in either case on or before the closing of the Offering or such later date as may be determined by PPEB5, Capital Contributions shall be returned, without interest or deduction. No interest will be paid on any subscription funds. Upon rejection of a subscription the Regional Center shall return a Subscriber's Administrative Fee without interest or deduction. Upon acceptance of an Investor's subscription, filing of his/her I-526 Petition and release of escrow, he/she will be admitted as an EB-5 Member of PPEB5. See *Subscription Procedure and Plan of Distribution* below.

Exhibit 4 Page 251

## EB-5 IMMIGRATION DISCLOSURES

The U.S. Congress created the employment-based fifth preference ("EB-5") immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy. The minimum amount required to invest is $1 million, although that amount is reduced to $500,000 if the investment is made in a high unemployment area or qualifying rural area ("Targeted Employment Area" or "TEA"). Each investment must create or save at least 10 permanent full-time jobs for U.S. workers.

In 1992, to stimulate interest in the EB-5 program, the U.S. Congress enacted the EB-5 Immigrant Investor Pilot Program ("Pilot Program"). The Pilot Program allows public and private entities to apply to the United States Citizenship and Immigration Services ("USCIS") for regional center designation for the purpose of developing qualifying investments for foreign investors under the Pilot Program. A regional center provides a structure for focusing foreign investment in a specific U.S. geographic area and for promoting economic growth in such area through increased export sales, improved productivity, creation of new jobs, and increased domestic capital investment. Immigrant investors can qualify under the Pilot Program by making a qualifying investment in a project sponsored by a USCIS-approved regional center.

Investors in this Offering who have subscribed for Units with the intention of applying for permanent residency in the United States through the Pilot Program should be aware of certain risk factors involving the Pilot Program and its administration. See *Risk Factors* below. PPEB5 has no experience administering the Pilot Program, which could lead to delays for investors in the process of obtaining conditional and/or permanent residency in the U.S.

An Investor who purchases Units with the intention of obtaining conditional and permanent residency in the U.S. is encouraged, along with his/her advisors, to make his/her own independent review of the Pilot Program and the various immigration risk factors relating to the process of obtaining conditional and permanent residency status to determine if an investment in the Units is a suitable approach for him/her.

NEITHER PPEB5 NOR THE REGIONAL CENTER MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN PPEB5 WILL MEET THE REQUIREMENTS OF THE PILOT PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN PPEB5 WILL RESULT IN AN IMMIGRANT INVESTOR RECEIVING CONDITIONAL OR PERMANENT RESIDENT STATUS.

*General Immigration Risks.* Congress and/or USCIS may change the law, regulations, or interpretations of the law, including the Pilot Program, without notice and in a manner that may be detrimental to an Investor, PPEB5, and/or the Regional Center. Investors who obtain conditional or permanent resident status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent resident status. The process of obtaining conditional and permanent resident status involves numerous factors and circumstances that are not within the control of the Regional Center, PPEB5, or the Borrower. These include an Immigrant Investor's immigration history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Pilot Program.

*PPTRC Regional Center Designation.* The Regional Center was designated as a regional center by the USCIS to participate in the Pilot Program on June 28, 2012. Accordingly, the Regional Center has limited experience in administering a regional center pursuant to the requirements of the Pilot Program, which could lead to delays for investors in the process of obtaining conditional or permanent residency in the U.S.

*Pilot Program Expiration Date.* The expiration date for legislation authorizing the Pilot Program, including the Regional Center sponsoring this Project, is currently September 30, 2015. It is generally expected that the U.S. Congress will extend the Pilot Program; however, there can be no assurance that this will occur or that Investor petitions or applications submitted before the Pilot Program's current termination date will be adjudicated by the USCIS.

Exhibit 4 Page 252

***Green Card Processing.*** All filings with USCIS should be prepared and filed by a qualified U.S. immigration attorney. After an EB-5 investment is made an Investor must start the immigration process by filing an I-526 Petition with USCIS. Filing of an Investor's I-526 Petition requires USCIS to certify that the investment qualifies under the Pilot Program. As of the date of this document, USCIS estimates issuing approvals (or denials) of I-526 Petitions within approximately four months time; however, processing times often exceed that and it is impossible to conclusively predict USCIS processing times.

After an I-526 Petition is approved, an Investor must file an I-485 Adjustment of Status Form if he/she is already located within the United States, or apply for an immigrant visa via consular processing if living abroad. If approved, the Investor will then be granted conditional resident status. Conditional resident status is valid for a period of two years and confers the same rights as permanent unconditional residency, but is subject to satisfaction of certain conditions. Investors should not physically move to the United States until their immigrant visa has been issued.

Within the 90 days preceding the second anniversary of an Investor's admission to the United States as a conditional permanent resident, an Investor must file an I-829 Petition to remove the conditions to permanent residency ("I-829 Petition"). The I-829 Petition confirms that the investment has been made, is still in place, and that the job creation requirement has been satisfied or will be satisfied within a reasonable time.

Once the conditions to permanent residency are removed, a permanent green card is granted for indefinite permanent resident status in the United States. The time from I-526 Petition filing until removal of conditions is currently about three years but depends on the circumstances of each petitioner. U.S. citizenship is possible approximately five years after approval of conditional residency, upon satisfaction of residency and other criteria. All estimates of processing times are approximations and dependent on each individual's specific circumstances. There is no guarantee that the requisite number of jobs will result from any investment or that other factors, related and unrelated to the investment, will not prevent approved of the I-526 Petition, granting of conditional or permanent residency, or removal of conditions.

***Job Creation.*** At the time of filing an I-526 Petition, each Investor must demonstrate that he/she has made a qualifying investment into a new commercial enterprise that will create full-time employment for 10 or more qualified employees. USCIS currently requires an Investor to submit evidence that demonstrates that such jobs will be created within the two-year period of conditional residence. For purposes of adjudication of the I-526 Petition, USCIS deems the two-year period to commence six months after the approval of the I-526 Petition. Therefore, PPEB5 must adequately demonstrate that the requisite number of jobs will be in place 2.5 years from the date of approval of an Investor's I-526 Petition. Evidence of timely job creation consists primarily of the comprehensive business plan prepared by PPEB5 for filing with each Investor I-526 Petition and the preliminary economic analysis of Evans, Carroll & Associates commissioned by PPEB5 projecting the number of jobs resulting from the construction and operation of the Project. PPEB5's business plan is available for review upon request. See *Business Plan Summary* below.

PPEB5 is offering Units to a maximum of 300 investors (One Unit per $500,000). This will require evidence of creation of at least 3,000 jobs. PPEB5's Economic Analysis attached at **APPENDIX E** estimates that the Project will create approximately 3,908 jobs. This Economic Analysis is based upon the Borrower's proposed activity, the amount of capital that will be spent in the local economy and general assumptions regarding the national economy, the regional economy of the Regional Center Geographic Area (California counties of Los Angeles, Orange, San Bernardino, and Riverside), and other circumstances of this Project. There is no assurance that the Economic Analysis or the assumptions upon which it is based are accurate or that actual job creation will be close to or equal to the number predicted in such analysis. Depending upon the disparity there may be insufficient employment to remove conditional residency status, resulting in a delay or denial of removal of conditions, for any Investor.

***Proving Lawful Source of Funds.*** As part of the I-526 Petition, an Investor must present to the USCIS clear documentary evidence of the *source* and *path* of funds invested in PPEB5. Generally, the Investor can satisfy the source of funds requirements by submitting documents showing that he/she has a level of income from legal sources that would yield sufficient funds for the investment. USCIS generally requires copies of income tax

Exhibit 4 Page 253

returns for the previous 5 years to satisfy the source of funds requirement. For Investors who do not have such records, there may be other records that can be provided to the USCIS by an Investor to demonstrate that the investment funds came from legal sources. All such matters regarding an Investor's I-526 Petition should be discussed with his/her immigration counsel.

*Policymaking Position.* The Pilot Program requires an Investor to hold a policymaking or management position within PPEB5. PPEB5 believes that each Investor, as a member of PPEB5, is provided with powers and duties under the Operating Agreement sufficient to meet the USCIS requirement that an Immigrant Investor is actively participating in policymaking or management of a new commercial enterprise. However, there is no guarantee that USCIS will agree.

*At-Risk Investment.* An Investor's investment must be at risk to qualify for the Pilot Program. As part of the I-526 Petition, an Investor must show evidence that he/she has placed the required amount of capital at risk for the purpose of generating a return on such capital. PPEB5 believes that an investment in the Units will place an Investor's capital investment in PPEB5 at risk because there is no assurance that the business of the Borrower will generate sufficient revenue to repay the Loan and allow for the return of any Investor's investment in the Units at any time, or ever.

*TEA Determinations.* Under the Pilot Program, an immigrant investor must invest $1,000,000 in a new commercial enterprise that will benefit the U.S. economy and create full time employment for 10 or more U.S. workers. This $1,000,000 amount is reduced to $500,000 if the new commercial enterprise is principally doing business in a targeted employment area ("TEA"). A TEA is an area with unemployment of at least 150% of the national average (a "high unemployment area") or a rural area. A rural area is not within a Metropolitan Statistical Area and has a population of less than 20,000.

Regional center designation proposals set forth the TEAs within the proposed Regional Center Geographic Area. However, under current USCIS guidelines, TEA determinations are made by the USCIS at the time of filing of each I-526 Petition. If an immigrant investor's investment is made prior to filing his/her I-526 Petition, the area must qualify as a TEA at the time of such investment. If such investment is not yet irrevocably committed to a qualifying investment at the time the I-526 Petition is filed, then the area must qualify as a TEA at the time of the filing of the I-526 Petition.

On July 20, 2012, the California Governor's Office of Business and Economic Development designated a geographic area inclusive of the future location of the Project in the City of Montebello, California, as a high unemployment area. As such, this location presently qualifies as a TEA. However, no assurance can be given that the geographic area in which the Borrower is doing business will qualify as TEAs at the time of investment or filing of any I-526 Petition. If such geographic area does not qualify as a TEA at the time of investment or time of filing of the I-526 Petition, whichever is first in time, the minimum investment under the Pilot Program will be increased to $1,000,000.

*Economic Sector.* Each regional center is limited to qualifying investments in approved economic sectors. The Regional Center is approved to facilitate qualifying investments in the economic sectors of Construction (NAICS 23), Manufacturing (NAICS 33), and Healthcare and Social Assistance (NAICS 62). PPEB5 believes that an investment in this Offering and subsequent Loan to the Borrower will qualify as an investment in the named economic sectors.

*New Commercial Enterprise.* A "commercial enterprise" includes "any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned." The commercial enterprise must be "new" in that it was established after November 29, 1990. PPEB5 was formed as a private, for-profit entity on November 15, 2010. It is believed that PPEB5 will qualify as a new commercial enterprise, but there is no guarantee that USCIS will adjudge it to be such.

Exhibit 4 Page 254

***Admissibility to the U.S.*** Foreign persons applying for a U.S. green card must demonstrate that they are admissible to the United States. Section 212 of the Immigration and Nationality Act sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving a green card or entering the U.S. Foreign individuals who are ineligible to receive a green card or be admitted to the U.S. include but are not limited to an individual who is determined to have a communicable disease of public health significance; is determined to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the individual or others; is determined to be a drug abuser or addict; or has been convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political offense), among other factors. Each Investor should review all factors affecting his/her admissibility to the U.S. with qualified immigration counsel.

Exhibit 4 Page 255

| RISK FACTORS |
| --- |

AN INVESTMENT IN PPEB5 AND ITS LOAN TO BORROWER HAVE CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN PPEB5 AND THE BORROWER SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE INVESTMENTS OF THE NATURE AND RISK OF THIS OFFERING, AND (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN PPEB5.

***Immigration Risk***. There is no guarantee that an Investor in this Offering will obtain conditional and/or permanent residency in the United States as a result of his/her investment in PPEB5. Numerous factors could delay or prevent an Investor from obtaining conditional permanent residency or removal of conditions, including the Regional Center's lack of operating history, Investor admissibility factors (further discussed above), general economic factors affecting Borrower's ability to create sufficient jobs for each Investor or as estimated in the Economic Analysis (see **APPENDIX B**) commissioned by PPEB5, evolving immigration law, adjudication standards and regulation, and failure of the U.S. Congress to extend the Pilot Program.

***Financial Projections***. Because neither PPEB5 nor the Borrower have an operating history and have only recently been organized, no balance sheet or income statement based on actual operations of either company is available. The Financial Projections contained in the Business Plan are based upon what the Borrower believes to be reasonable assumptions concerning certain factors affecting the probable future operations of the Borrower. No assurances can be made that these forecasts will prove to be accurate, and Investors are cautioned against placing excessive reliance on such projections in deciding whether to invest in this Offering. In particular, construction, and capital costs are very volatile and may cause the Borrower to seek additional capital or alternative forms of capital, which could result in increased risk of default in repayment of the Loan.

***Medicare/Medicaid Reimbursement.*** Borrower's Financial Projections are based on assumptions derived primarily from the operation of other U.S. proton therapy centers and historical rates for reimbursements (payments) for treatments. These reimbursements will be paid to the Borrower in the form of Medicare/Medicaid reimbursements, commercial insurance/managed care payments, or payments from individuals not using insurance. Because reimbursement rates for treatment differ greatly across these payer sources, Borrower has estimated the number of patients that will utilize each source of payment. In addition, reimbursement rates fluctuate and are difficult to predict. The information used by Borrower to prepare its business plan, financial forecasts and Economic Analysis are estimates based on management's experience and research. Any deviation, change or fluctuation in such estimates may positively or negatively impact actual operations of the proton center, actual revenues to the Borrower and job creation. Accordingly, inaccuracy of Borrower's estimates may affect Borrower's ability to repay the Loan and its ability to create jobs sufficient for any Investor to obtain conditional and/or permanent residency in the United States.

***Collateral Security***. The Loan is unsecured (See *Loan Documents*, **APPENDIX F**). As a result, any claims by PPEB5 against Borrower, for breach of the Loan Agreement, including default in payment, or otherwise, may be subordinate to the rights of senior lenders and/or other obligations secured by the Borrower's assets and there is no guaranty of payment or collection. In addition, PPEB5 would be a general unsecured creditor in the event of Borrower's bankruptcy, and there is no guaranty that the liquidation value of Borrower's assets would be sufficient to satisfy any claim(s) arising under the Loan. It is possible, in the event of liquidation of the Borrower, that the proceeds of liquidation will not exceed Borrower's liabilities to priority lenders and therefore may be insufficient to repay all or part of the Loan.

***Job Creation***. Each EB-5 Investor must submit evidence that his/her investment created 10 jobs with his/her I-829 Petition. The I-829 Petition is submitted within the 90 days preceding the second anniversary of his/her receipt of a conditional green card. This date is approximately 2.5 years from the date of approval of his/her I-526 Petition.

Exhibit 4 Page 256

Borrower's business plan currently estimates that completion of the Proton Center will take approximately 3-3.5 years. Only when construction of the Proton Center is nearly complete can Borrower hire and train all employees necessary for operation of the Proton Center. Failure of Borrower to effectively manage the timing of Investor I-526 filings to coincide with the development of the Proton Center and resulting job creation could result in delay or denial of removal of conditions and/or permanent residency.

*Additional Financing.* Borrower's business plan requires financing in addition to the proceeds of this Offering to complete the Project. Borrower is currently seeking but has not yet obtained any commitment from any investors or lenders for such financing. There is no guaranty Borrower will be able to obtain the additional financing required to complete the Project on favorable terms or at all.

*Material Contracts.* Borrower's business plan requires that it negotiate and enter into certain agreements for equipment and services, among other things, for operation of the Proton Center. Such Agreements include agreements for the purchase of proton beam equipment, license, and maintenance services with Optivus or another provider, real property lease for the Proton Center location, construction contracts, employment agreements with key personnel and agreements with various Individual Practice Associates. Failure of Borrower to effectively negotiate and enter into these agreements on terms favorable to Borrower could negatively impact the profitability of the Project and repayment of the Loan.

Borrower entered into a lease agreement ("111 Lease") with Dr. John P. Thropay for lease of real property located and known as 111 W. Beverly Blvd., Montebello, CA on September 14, 2011 for development and operation of the Proton Therapy Center. The 111 Lease is for a term of 30 years, commencing upon Lessee obtaining at least $100,000,000 of funding for the Project. Lessor may terminate the 111 Lease if such funding is not obtained in a reasonable period of time. Rent under the 111 Lease is $1,000,000 annually. The 111 Lease is a triple net lease, accordingly, Lessee is responsible for payment of rent, taxes, insurance and all maintenance costs for the leased premises.

Failure of the Company and/or Borrower to satisfy the conditions to the 111 Lease could adversely impact its ability to successfully implement its business plan and create jobs necessary for any Investor in this Offering to remove conditions to permanent residency in the United States. There is no assurance that Borrower will be able to negotiate a new lease, or extend the time for satisfaction of any conditions to the 111 Lease if it is not able to obtain the required funding or commence and complete construction in accordance with the 111 Lease.

*Commercial Real Estate Office Market.* The Project will result in the creation of approximately 125,000 square feet of new commercial office space in Los Angeles County, California. There is no guaranty that Borrower will be able to lease this office space on favorable terms or at all, particularly in light of the current economic conditions in the United States generally and the market for such space in Los Angeles County.

*Lack of Operating History.* PPEB5 was formed for the specific purpose of raising funds under the Pilot Program to loan to the Borrower. Accordingly, PPEB5 has no operating history. Although the principal owners of PPEB5 have experience operating other cancer therapy centers, Borrower has no operating history. Further, although the Regional Center was formed in 2011, this Project is the first investment sponsored by it under the Pilot Program. This lack of operating history for both PPEB5 and the Regional Center could cause delays in or denial of permanent residency for Investors.

*Potential Conflict of Interest; Key Person.* Dr. Thropay is an owner and President of Beverly Oncology Imaging and Medical Group, Inc. of Montebello, CA, a member of the Regional Center, an owner and CEO of Borrower and landlord to Borrower. In such capacities, Dr. Thropay controls the Borrower, the Regional Center, and PPEB5. The obligations of Dr. Thropay to the Regional Center, PPEB5 and the Borrower, are not exclusive, and he need only devote so much time to PPEB5's affairs, and/or the Borrower's affairs, as he determines to be necessary in his sole discretion. Dr. Thropay may from time to time, be involved in development and/or operation of other businesses, including other EB-5 projects, proton therapy centers or other cancer treatment centers that may compete with Borrower. Commitments undertaken by Dr. Thropay may adversely affect his ability to manage the Project and the profitability of the Project and any investment in the Units. See *Material Relationships and Contracts* below.

Dr. Thropay is a key person and important to the success of the Project, and, therefore, Borrower's ability to repay the Loan. Dr. Thropay's death or other unavailability may negatively affect PPEB5's operation and possibly Borrower's ability to repay the Loan.

Exhibit 4 Page 257

Charles Liu is a member of the Regional Center, and President and an owner of Borrower. In such capacities, Charles Liu controls the Borrower and the Regional Center and PPEB5. The obligations of Charles Liu to the Regional Center, PPEB5 and the Borrower, are not exclusive, and he need only devote so much time to PPEB5's affairs, and/or the Borrower's affairs, as he determines to be necessary in his sole discretion. Charles Liu may from time to time, be involved in development and/or operation of other businesses, including other EB-5 projects, proton therapy centers or other cancer treatment centers that may compete with Borrower. Commitments undertaken by Charles Liu may adversely affect his ability to manage the Project and the profitability of the Project and any investment in the Units. See *Material Relationships and Contracts* below.

Charles Liu is a key person and important to the success of the Project, and, therefore, Borrower's ability to repay the Loan. Charles Liu's death or other unavailability may negatively affect PPEB5's operation and possibly Borrower's ability to repay the Loan.

***Skilled Employees.*** The operation of the proton therapy center will require Borrower to hire or contract for services with a substantial number of professionals and highly skilled employees, including staff physicians, nurses, engineers, and radiation therapists. Borrower will compete for these skilled workers and professionals with other proton therapy centers and other medical treatment facilities and related businesses in California and throughout the United States. Accordingly, it may be difficult to locate and retain all of the professionals and skilled employees necessary to operate the proton center during the time periods required of Borrower to demonstrate job creation sufficient for each Investor. Failure of Borrower to adequately staff the operation of the proton center may negatively affect job creation, patient throughput and actual revenues generated by the proton center and therefore its ability to repay the Loan.

***Single Source Service Provider.*** Borrower intends to engage Optivus Proton Beam Therapy, Inc. ("Optivus"), a proton beam technology developer in California, to provide all necessary proton beam treatment technology and related maintenance, under a service contract for the proton center. Optivus is the only U.S. company with U.S. Food and Drug Administration (FDA) clearance to provide proton therapy systems. Borrower has not commenced discussions with Optivus or negotiation of the terms for provision of such services at this time. The terms of engagement of Optivus, or any other service provider, will include costs for the provision of maintenance services, licensing fees, equipment upgrades and related services. Any change in the Borrower's estimate of these costs, or its failure or inability to engage Optivus, could negatively affect the profitability of the Borrower and its ability to repay the Loan. See *Business Plan Summary* below.

***Government Regulation.*** Regulations, regulatory actions and court decisions in the future could have both a positive and/or negative impact on the operations and financial condition of PPEB5 and the Borrower and its ability to compete. PPEB5 will be subject to substantial scrutiny by USCIS. A substantial part of the legal structure and requirements of the Pilot Program derive from regular guidance from USCIS, which is subject to regular change and cannot be predicted. Such changes are unpredictable and could negatively affect PPEB5.

The operation of radiation machines that can operate in excess of 500KVP are regulated by the State of California. Accordingly, development, construction and operation of the proton center must satisfy the requirements of the California Court of Regulations and other requirements of the State of California before commencement of operations and throughout the construction process. Any change in regulations or requirements related to the development of the proton center could have a positive or negative impact on the timing and costs related to development and construction and operation of the proton center. These delays and/or negative impacts could negatively impact Borrower's ability to create the jobs required under the EB-5 Program in the time period required by the EB-5 Program. Accordingly, there is no guarantee that an investment in the Units will result in conditional and/or permanent residency in the United States.

***Health Care Legislation.*** There can be no guarantee that any legislation, now existing or enacted into law in the future, will not negatively impact the profitability of the Proton Center, and Borrower's repayment of the Loan.

***Distribution of Profits from Operations.*** Because distribution of profits by PPEB5 is dependent upon repayment of the Loan by Borrower and such repayment is related to market conditions, costs of operating the Proton Therapy Center, and numerous other factors, there is no assurance that there will be cash from operations of Borrower sufficient to repay the Loan and therefore be available for distribution to Members. There is no assurance that projected revenues and/or returns are feasible or likely to be achieved. Accordingly, PPEB5 Members who borrowed all or part of their Capital Contribution must understand that repayment of the Loan by

Exhibit 4 Page 258

Borrower and distribution of profits by PPEB5 to Members is subject to market forces and cannot be relied upon as a source of funds to repay such debt. Further, PPEB5 is prohibited by law from returning all or part of an EB-5 Member's Capital Contribution prior to 5 years from his/her admission as a Member. The Loan Documents provide for interest only payments during the term and Borrower is prohibited from paying principal until after the Initial Term (See *Summary of Loan Terms*). Accordingly, Investors should not rely on income from distributions from PPEB5 for repayment of his/her debt obligations or for any other reason.

***General Risks of Ownership of an Ongoing Business Enterprise***. The repayment of the Loan by Borrower will be subject to the risks generally incident to the ownership of an ongoing business, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; relative appeal of products versus competitive brands; reduction in the cost of operating competing businesses; decrease in employment; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds; changes in tax rates and other operating expenses; changes in governmental rules and fiscal policies, acts of God, including earthquakes, which may cause uninsured losses; environmental risks; and other factors which are beyond the control of PPEB5 or the Borrower. Increases in operating expenses, among other factors, could result in the Borrower's inability to meet all of its cash obligations. Any decrease in income received by the Borrower may threaten repayment of the Loan and thereby reduce and possibly eliminate the amount of cash available for distribution to Members, since Borrower's operating expenses, such as property taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as advertising and promotion may increase. If the income from operation of the Proton Therapy Center is not sufficient to meet operating expenses and/or debt service, Borrower may have to dispose of assets or obtain alternative financing on disadvantageous terms in order to raise needed funds.

***General Tax Risks***. Investment in this Offering involves substantial tax risks. Although the primary motive of investors should be for long-term appreciation, state and federal legislatures and tax authorities may alter and change the permissible deductions that may be taken with respect to the Project and its income, and may change the tax rates to less favorable rates. In addition, the state and federal tax authorities may be more likely to audit taxpayers with higher incomes or partnership income or loss. Since Investors generally fall into this category, PPEB5 also has an increased risk of being audited. Such an examination could result in adjustments to items that are related to PPEB5. Investors may incur legal or other professional expenses in connection with such audit or the adjustments resulting from such audit. PPEB5 has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, PPEB5, the Borrower or its business. Some tax risks include, without limitation, the following: (i) Changes in federal income tax laws; (ii) PPEB5 and/or Borrower status; (iii) Taxable income in excess of distributions; (iv) Allocation of tax items among Members; (v) Allocation of purchase price; (vi) Borrower termination; (vii) At risk limitations; (viii) Risk of audit; (ix) Profit objective; and (x) Limitations on passive losses. This tax discussion is not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in PPEB5 and the Borrower. PPEB5 has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Borrower. Each Investor must consult his/her own accountant or tax advisor with respect to the tax consequences of investment in the Units.

In addition, there is risk that Investors may be taxed in the United States based on their worldwide income. Investors should seek professional counsel regarding their tax residency and status in the United States prior to investing in this Offering. See *Income Tax Considerations* below.

***Illiquidity; Limited Transferability of Units***. The Units are a highly illiquid asset in that they cannot be readily sold or pledged as collateral for a loan or other obligation. A Member may not assign, sell or transfer his Units to another party except as provided for in the Operating Agreement. See *Summary of Operating Agreement* below. There is no public market for sale of the Units and it is not anticipated that a market will develop for the purchase or sale of the Units. Consequently, Members may not be able to liquidate their investment in PPEB5 in the event of their desire or need to do so.

***Limitation of General Partner's Liability***. The Operating Agreement (**APPENDIX B**) provides the Manager shall not be liable to Members for any loss or liability incurred in connection with the affairs of PPEB5, so long as such loss or liability did not result from intentional wrongdoing. Therefore, a Member may have a more limited right of action against the Manager than he would have had absent these provisions in the Operating Agreement. See *Summary of Operating Agreement* below.

Exhibit 4 Page 259

***Limited Right to Participate in Management***. The Members of PPEB5 will not have a right to participate in the active management of PPEB5 or the Borrower or the decisions made by the Manager, except as expressly provided in the Operating Agreement. See *Summary of Operating Agreement* below.

***No Independent Counsel***. No independent counsel has been retained to represent the interests of the Members. No documents required in connection with this Offering have been reviewed by an attorney on behalf of the Members. Each Investor is urged to consult with his/her own counsel as to the terms and provisions of all such documents and all other documents relating thereto as well as his/her own accountant as to the final information and projections provided.

***Uninsured Losses; Casualty Insurance***. Certain risks in connection with the business of the Borrower, and therefore an investment in PPEB5, are either uninsurable or not insurable at commercially reasonable rates, and could have a detrimental effect on PPEB5 and the Borrower. Examples of uninsurable losses are those arising from flood, earthquakes, war and acts of God, among others.  Should such an uninsurable loss occur, PPEB5 and the Borrower could suffer a loss of some or all of the capital invested in the Project as well as the loss of any potential profits from the Project.

***No Firm Commitments to Purchase Units.*** No commitment exists by anyone to purchase all, or any portion of the Units being offered.  PPEB5 can give no assurance that the Maximum Offering or any of the Units will be sold.

***Lack of Diversification***. PPEB5 will have all of its assets invested in the Borrower.  Accordingly, PPEB5 is reliant on Borrower solely for return on its investment by repayment of the Loan.

***Dependence on Management and Personnel.*** PPEB5's and the Borrower's success are principally dependent on their current management personnel for the operation of the businesses. The Borrower is dependent upon the continued involvement of Dr. Thropay and Mr. Liu in this Project personally. The loss of services of either Dr. Thropay or Mr. Liu would have a material adverse effect on PPEB5's and the Borrower's business, financial condition and results of operations. The Borrower will also be required to hire and retain skilled employees at all levels of operations in a market where such qualified employees are in high demand and are subject to receiving competing offers. The inability to hire needed employees on a timely basis and/or the inability to retain those that are so hired could have a material adverse effect on the ability to meet the schedules of the strategic plan.

***Competition***.    Although there are no other proton therapy centers in Los Angeles County there are others throughout the United States, including one in Loma Linda, California (San Bernardino County, (+/-) 50 miles from Montebello, CA).  PPEB5 and Borrower expect competition to increase as consumer demand continues to increase for proton therapy.

***Impact of Consumer Spending***. The success of the Borrower's operations depends, to a significant extent, upon a number of factors affecting reimbursement payments and reimbursement rates for medical treatments, disposable income, including economic conditions and factors such as employment, business conditions, interest rates, taxation, global oil prices and terrorism. There can be no assurance that the Borrower's business, results of operations and financial condition will not be adversely affected by changes in consumer spending. A downturn in the U.S. or world economy could affect discretionary spending, which could adversely affect sales and the anticipated exit strategy.

***General.*** Neither PPEB5 nor the Borrower can assure any Investor that the Borrower will be successful in addressing the risks it may encounter, and its failure to do so could have a material adverse effect on business, and the financial condition and results of operations. The future of the Borrower depends on acquiring proper funding, marketing to possible purchasers and establishing a client base at the Proton Center. There can be no assurance that the Borrower's methods and procedures will be successful.

Exhibit 4 Page 260

| BUSINESS PLAN SUMMARY |
| --- |

**Pacific Proton EB-5 Fund, LLC**

Principals Dr. John Thropay and Mr. Charles Liu organized Pacific Proton EB-5 Fund, LLC ("PPEB5") in November, 2010. PPEB5 is a Delaware limited liability company of 200 E. Beverly Boulevard, Montebello, California 90640 formed to serve as the new commercial enterprise in an EB-5 Immigrant Investor Program ("EB-5 Program") project offering. PPEB5 will offer up to 300 Units of limited liability company membership interests to qualified non-U.S. citizens seeking permanent resident status in the United States through the EB-5 Program who meet PPEB5's Investor suitability requirements. Investors acquiring Units in this offering will be members of PPEB5. The price of each Unit is $500,000 for a maximum offering of $150 million.

PPEB5 will pool investor funds and make a loan of up to $150 million[1] to Los Angeles County Proton Therapy, LLC ("LAPT"), a California limited liability company of 200 E. Beverly Boulevard, Suite 200, Montebello, California 90640. LAPT will pay interest on the loan at the rate of 0.25% per annum with principal due and owing 5 years from the date of the last advance under the loan. LAPT will use the loan proceeds to partially finance the construction and operation of a proton therapy center with commercial office space in Los Angeles County, CA (the "Project"). The proton therapy center with office space will be located at 111 W. Beverly Boulevard, Montebello, Los Angeles County, CA. All Project components will be owned and operated by LAPT.

**Los Angeles County Proton Therapy, LLC**

- **Los Angeles County Proton Center**

Los Angeles County Proton Therapy, LLC ("LAPT"), will develop and operate the Los Angeles County Proton Center (the "Proton Center") at 111 W. Beverly Boulevard, Montebello, California 90640. The Proton Center will provide an innovative new cancer treatment to oncology patients using proton beam radiation. Proton beam therapy has demonstrated clinical advantages for cancer treatment over other forms of radiation therapy, including greater control of the beam and higher concentration of energy in the tumor. Associated side effects are generally less severe. The Proton Center will primarily treat patients from Southern California and (through the management team's international connections) Latin America and Southern China.

An estimated 33 million people will be living in the Southern California market area by 2014, the first full year of planned Proton Center operation. Many of these people are from ethnicities and cultural backgrounds that make it difficult for them to utilize conventional (i.e., English-only) centers. Thus, the market area contains a sizable base of patients who will benefit from the Proton Center's services. The Facility's marketing plan, based in part on successful approaches currently in use at the first U.S. proton therapy center in Loma Linda, California, is designed to reach patients, doctors, and other decision-influencers with a range of message and media types.

The nearest competing proton beam facility is at Loma Linda University, which is geographically distant (+/- 50 miles) from the proposed center and already running at close to capacity. There is room for an additional proton beam center in Southern California, and the Proton Center will tap that opportunity. As capacity in the region grows and waiting times for treatment shorten, the types of cancer that can be treated with proton therapy will increase.

John P. Thropay, M.D., a respected radiation oncologist with decades of experience in treating cancer in underserved ethnic communities and introducing cutting-edge treatment modalities to those communities, will head the Proton Center. Supporting Dr. Thropay will be a team of health professionals with extensive experience in growing and managing clinical oncology treatment centers (in both the United States and Latin America), controlling costs, building quality programs, and contracting effectively with managed-care plans.

---

[1] We note that the total project cost is estimated to be $200 million. LAPT will obtain the remainder of the needed funds from equity investors and/or lenders other than PPEB5.

Exhibit 4 Page 261

The management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching and serving those markets. This experience will help both in establishing the venture with Southern California patients and in working with international patients.

The Proton Center will also contain 125,000 square feet of commercial office space ("Office Space") with space allocated as follows: medical office space (75,000), assisted living (25,000), outpatient surgery (7,000), restaurant (5,000), pharmacy (5,000), daycare center (2,000), and miscellaneous back office (6,000).

**Comprehensive Business Plan**

LAPT's comprehensive business plan to be filed with each Investor's I-526 Petition is available on request.

Exhibit 4 Page 262

## CAPITAL REQUIREMENTS AND ESTIMATED USE OF PROCEEDS

In order to achieve its objectives as described in its business plan, Borrower requires approximately $200,000,000. PPEB5 is conducting this Offering to raise funds in the amount of up to $150,000,000 to loan to the Borrower to finance the Project. Borrower is simultaneously seeking other sources of debt and/or equity financing for the remaining capital requirements.

*PPEB5 Estimated Use of Proceeds*

Although PPEB5 has broad discretion to adjust the application and allocation of the proceeds of this Offering in order to address changed circumstances and opportunities, PPEB5 intends to loan the proceeds of this Offering to Borrower for the uses described in this Offering Memorandum.[2] Borrower intends to use the proceeds from this Offering to finance development and operation of the Los Angeles Proton Therapy Center described in Borrower's business plan. See *Summary of Business Plan* below.

*Borrower's Estimated Use of Proceeds*

| Use of Funds | Amount |
|---|---|
| Hard Construction Costs (Direct): | $77,722,156 |
| Soft Costs (Indirect): | $16,814,726 |
| Proton Center Equipment: | $100,000,000 |
| Working Capital & Other Costs: | $5,463,118 |
| TOTAL: | $200,000,000 |

The foregoing estimates are based on current information provided in Borrower's business plan, which could change as the Project moves forward. Other expected uses of proceeds include construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the Project.

As further described in *Summary of Loan Terms* below, Borrower is required to create 10 new full-time direct, indirect and/or induced jobs for each EB-5 investor whose Capital Contribution is advanced under the Loan within two years of approval of each such Investor's I-526 petition. If PPEB5 fails to create sufficient jobs, PPEB5 has an option allowing it to require immediate repayment of that portion ("Shortfall Qualifying Amount") of the principal Loan amount attributable to those investors whose requisite 10 jobs were not created within two years of the approval of their I-526 petitions. In the event Borrower fails to create the number of jobs required under the Loan and PPEB5 exercises its option for repayment, PPEB5 may invest the Shortfall Qualifying Amount in another Qualifying Investment (as defined in the *Operating Agreement*).

*Additional Financing*

Borrower is seeking additional financing in the form of debt and equity financing for the balance of capital requirements of the Project. Borrower requires approximately $50 million in financing in addition to the Maximum Offering amount. Any additional debt required by Borrower may be senior in priority to the Loan because the Loan is unsecured.

*Return on Investment*

Profits of the Borrower, if any, will be used first to pay operating expenses and service debts and obligations of the Borrower including the Loan. Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the Borrower in its sole discretion for maintenance, capital improvements, earthquake and structural repairs to the Proton Therapy Center. Any remaining profits may be available for distribution to its members in accordance with its Operating Agreement.

---

[2] Proceeds of this Offering do not include Administrative Fees. Offering Expenses, commissions and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions.

Exhibit 4 Page 263

Profits of PPEB5, if any, will be used first to pay operating expenses and service debts and obligations of PPEB5 including the Management Fee to the Manager (See *Operating Agreement*). Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the PPEB5 in its sole discretion. Any remaining profits may be available for distribution by PPEB5 to Members in accordance with the Operating Agreement (**APPENDIX B**).

The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits by PPEB5. Available Cash Flow, if any, will first be distributed as follows: (a) to Members in payment of Mandatory Distributions (See Section 3.6 of the Operating Agreement); (b) then to EB-5 Members pro rata in accordance with each EB-5 Member's Adjusted Capital Contribution in an amount up to each EB-5 Member's Adjusted Capital Contribution; (c) then to Members pro rata in accordance with each Member's Adjusted Capital Contribution in an amount up to each Member's Adjusted Capital Contribution; and (d) then to Members in accordance with their Percentage Interests in PPEB5. Net Proceeds from a Capital Event (as defined in the Operating Agreement), if any, and/or distributions in liquidation of PPEB5, if any, will be distributed in the same manner as Available Cash Flow.  See *Operating Agreement* (**APPENDIX B**).

PPEB5 shall not make a distribution (i) if after such distribution, liabilities of PPEB5, other than liabilities to Members on account of their Units, exceed the fair value of the assets of PPEB5, (ii) to EB-5 Members, other than distributions from Available Cash Flow, prior to the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a PPEB5 Member, the foregoing restriction (ii) shall no longer apply. See *Summary of Operating Agreement* below.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 investor's investment prior to the end of the fifth year after the investment is made. Accordingly, it is possible that no return of capital will be made to any EB-5 Member of PPEB5 prior to the end of the fifth year after the closing of this Offering or his/her investment, whichever is later. See *EB-5 Immigration Disclosures* and *Risk Factors* above.

## CAPITALIZATION

THE FOLLOWING DESCRIBES THE UNIT CAPITAL OF **PPEB5** BEFORE AND AFTER THE OFFERING. As of the date hereof, authorized Unit capital of PPEB5 consists of an unlimited number of Units.

| PPEB5 Capitalization | Outstanding Units: As of 11-20-2010 | Percentage Interest: As of 11-20-2010 | Outstanding Units: Minimum Offering | Percentage Interest: Minimum Offering | Outstanding Units: Maximum Offering | Percentage Interest: Maximum Offering |
|---|---|---|---|---|---|---|
| EB-5 Members | 0 | 0.00% | 1 | 100% | 300 | 100% |
| Total | 0 | 0.00% | 1 | 100% | 300 | 100% |

If the Maximum Offering is sold by PPEB5, each EB-5 Member will own approximately 0.33% of PPEB5. EB-5 Members will collectively own 100% of PPEB5. There is no minimum offering amount. The minimum number of Units that can be sold pursuant to this Offering is 1 Unit.

THE FOLLOWING DESCRIBES THE UNIT CAPITAL OF **BORROWER** BEFORE AND AFTER THE OFFERING. As of the date hereof, authorized Unit capital of Borrower consists of an unlimited number of Units.

| Borrower Capitalization | Outstanding Units: | Percentage Interest |
|---|---|---|
| Charles Liu | 75 | 75% |
| Dr. John Thropay | 25 | 25% |
| Total | 100 | 100% |

Exhibit 4 Page 264

## MATERIAL RELATIONSHIPS AND CONTRACTS

***Dr. John P. Thropay***

Dr. John P. Thropay has an interest in the following companies that are expected to have material relationships and/or contracts with PPEB5 and/or the Borrower:

1. Pacific Proton Therapy Regional Center, LLC ("PPTRC" or "Regional Center");
2. Pacific Proton EB-5 Fund, LLC ("PPEB5" or the "Company");
3. Los Angeles County Proton Therapy, LLC ("LAPT" or Borrower); and
4. Beverly Oncology and Imaging Medical Group, Inc.

***Charles Liu***

Mr. Liu has an interest in the following companies that are expected to have material relationships and/or contracts with PPEB5 and/or the Borrower:

1. Pacific Proton Therapy Regional Center, LLC ("PPTRC" or "Regional Center");
2. Pacific Proton EB-5 Fund, LLC ("PPEB5" or the "Company"); and
3. Los Angeles County Proton Therapy, LLC ("LAPT" or Borrower).

***Pacific Proton Therapy Regional Center, LLC***

Dr. Thropay and Mr. Liu are the members of the Regional Center. USCIS rules and regulations relating to the Pilot Program require that, in order to maintain the validity of its approval and designation, an approved regional center must continue to meet the statutory requirements of the Pilot Program by serving the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment. The USCIS thus requires regional centers to monitor all investment activities under its sponsorship and to maintain records, data and information on a quarterly basis in order to report to the USCIS upon request year to date information for each Federal Fiscal Year. Such records, data and information include, but are not limited to, the Regional Center's administration, oversight and management plan, biographical and other relevant investor data, and total Regional Center investment and job creation totals. Pacific Proton Therapy Regional Center, LLC has engaged Miller Mayer, LLP[3] to administer the regional center in accordance with USCIS rules and regulations relating to the Pilot Program.

***Pacific Proton EB-5 Fund, LLC***

Pacific Proton Therapy Regional Center, LLC is also the Manager (as defined in the Operating Agreement, **APPENDIX B**) of PPEB5, and will have control of the business and affairs of PPEB5.

***Proton Beam Equipment: Single Service Provider***

Optivus Proton Beam Therapy, Inc. ("Optivus") is a proton beam technology developer formed in 1993 by engineers who developed the Proton Beam Treatment Centers at Loma Linda University Medical Center. Since the construction of the Loma Linda Facility, Optivus has been the technology and systems maintenance provider for the Loma Linda Facility. Optivus conducts research and development for its product platform and assists in the operation of the Loma Linda Facility. Optivus was the first FDA-cleared company to provide proton therapy systems, and remains the only U.S. company with FDA clearance. LAPT will contract with Optivus, or another service provider, to provide all necessary initial and ongoing proton beam treatment technology and related maintenance, under a standard services contract for the Facility. LAPT has not commenced discussions with Optivus or negotiation of the terms for provision of such services at this time.

***Property Leases***

LAPT intends to lease certain property to effectuate this Project. The property intended to be leased by LAPT is owned by Dr. Thropay. Dr. John P. Thropay is an owner of the real property located at 111 West Beverly Boulevard, Montebello, CA at which the Proton Center is to be located.

---

[3] http://www.millermayer.com/Immigration/EB5Investors/tabid/126/Default.aspx

Exhibit 4 Page 265

*Los Angeles County Proton Center, LLC*

Dr. Thropay and Mr. Liu are the owners of the Borrower. Dr. Thropay will be the Chairman, CEO and Medical Director of the Proton Center. Mr. Liu will be President of the Proton Center. Ruth Lopez Novodor, a current employee of Beverly Oncology and Dr. Thropay's sister, will be Chief Operating Officer of the Proton Center. The Borrower will have an independent board of directors that will have control and oversight of the operations of the Borrower and its officers.

*Individual Practice Associations (IPAs)*

The Borrower's business plan assumes that it will be able to conclude agreements with Individual Practice Associations to provide proton beam therapy services to the Proton Center. No such agreements have been negotiated or concluded. The costs, benefits and terms of such agreements are unknown. An IPA is an association of medical professionals that provides services through an entity in accordance with a compensation arrangement, while retaining their private practices, to collectively contract with HMOs and other managed care plans.

*Miller Mayer, LLP*

Miller Mayer, LLP represents the Regional Center and LAPT in connection with this Offering and the Project. Miller Mayer, LLP may also represent certain Investors in connection with their immigration to the United States, whether by way of the purchase of Units in this Offering or otherwise. The Regional Center, LAPT and any Investors purchasing Units in this Offering may be required to sign a conflict waiver and/or consent to representation prior to any engagement of Miller Mayer, LLP.

*Evans Carroll & Associates*

Evans Carroll & Associates is an economic consultant firm retained by LAPT to assist in the preparation of the Borrower's business plan, and the Economic Analysis attached at **APPENDIX E**.

Exhibit 4 Page 266

| SUMMARY OF LOAN TERMS |
| --- |

**Purpose**. Prior to the closing of the first Unit offered hereunder, PPEB5 will enter into an Amended and Restated Loan Agreement (the "Loan") with Borrower. The proceeds of the Loan will be used to finance the Project.

**Amount**. The Loan amount is a minimum of $500,000 and a maximum of $150,000,000, depending upon the number of Units sold in this Offering. Whether or not the maximum Loan amount is advanced, the Borrower may seek alternative and additional financing.

**Term; Repayment**. The balance of all Advances and all accrued unpaid interest on the Loan shall be repaid as follows. Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate per annum of one quarter of one percent (0.25%) until the expiration of 5 years from the last Advance (the "Initial Term"). Upon the expiration of the Initial Term, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The Borrower may not, without PPEB5's prior express written consent, prepay the Note prior to the expiration of 5 years from the last Advance. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of PPEB5.

**Disbursement**. Disbursement of Loan proceeds will be made to Borrower as they become available upon filing of Investor I-526 Petitions and in accordance with the Escrow Agreement. It shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the Borrower and its subsidiaries, taken as a whole.

**Promissory Note and Loan Collateral**. The Borrower will issue a Promissory Note with full recourse to the Borrower. The Loan shall be unsecured.

**Senior Debt**. Borrower may incur other debt and in connection therewith, grant security interests senior to those granted to PPEB5 under the Loan Agreement.

**Job Requirement**. Borrower is required to create a minimum of 10 new full-time direct, indirect and/or induced jobs for each EB-5 Investor whose Capital Contribution is advanced under the Loan. Borrower acknowledges that failure to create and maintain the requisite number of jobs within two years of approval of each Investor's I-526 petition with USCIS provides PPEB5 with an option allowing it to require immediate repayment of that portion of the principal Loan amount attributable to those investors whose requisite 10 jobs were not created within such period.

**Loan Documents**. PPEB5 has issued a Commitment Letter to Borrower, a copy of which is available upon request. The Promissory Note and Loan Agreement to be executed by Borrower are available for review upon request.

Exhibit 4 Page 267

## SUMMARY OF THE OPERATING AGREEMENT

The rights and obligations of the members of the Company will be governed by the Operating Agreement which is attached to this Offering Memorandum. It is recommended that each prospective investor read the entire Operating Agreement. The following is a brief summary of some of the provisions of the Operating Agreement. The summary below and all statements made elsewhere in this Offering Memorandum relating to the Operating Agreement are qualified in their entirety by reference to the Operating Agreement.

**Member Capital Contributions.** Each Member's capital contribution must be paid at the time such member subscribes to purchase Units in the Offering and shall be paid in cash. No Member is obligated to make additional capital contributions (Article 2 §2.2, Operating Agreement). Each Investor's Capital Contribution will be credited to his/her Capital Account. Terms governing the maintenance of Capital Accounts are set forth in the Operating Agreement. (Article 2 §2.2, Operating Agreement).

**Liabilities of the Members.** If an Investor's I-526 Petition is approved by USCIS he/she, will be admitted as a member of the Company.  No member has the right to withdraw all or any portion of his or its capital contribution until the full and complete winding up and liquidation of the business. (Article 2 §2.2.4, Operating Agreement).

**Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated in the following order and priority: (a) first, to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) the balance, to the Members in accordance with the Percentage Interests. (Article 3 §3.1, Operating Agreement).

**Distributions.** Available Cash Flow, if any, shall be distributed (a) first, to Members in payment of Mandatory Distributions (as defined in the Operating Agreement); (b) to EB-5 Members in accordance with their unpaid Adjusted Capital Contribution, payable in proportion to the unpaid amounts thereof; and (c) the balance to Members in accordance with their respective Percentage Interests. Net Proceeds from a Capital Event and/or a distribution from the liquidation of the Company shall be distributed in the same manner as Available Cash Flow. The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits of PPEB5. (Article 3 §3.4, Operating Agreement).

The rules and regulations governing the EB-5 Pilot Program prohibit the return of an EB-5 investor's investment prior to the end of five years from their investment. Accordingly, PPEB5 shall not make any distribution (i) if after such distribution liabilities of PPEB5, other than liabilities to Members on account of their Units (as defined in the Operating Agreement), exceed the fair value of the assets of PPEB5, (ii) To EB-5 Members prior to the end of their At-Risk Period, other than distributions of Profits from Available Cash Flow, in amounts equal to the amount by which their respective Adjusted Capital Contribution exceeds their initial Capital Contribution set forth on Schedule A. Upon expiration of an EB-5 Member's At-Risk Period (as defined in the Operating Agreement), the foregoing restriction shall no longer apply, or (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, the foregoing restrictions shall no longer apply. (Article 3 §3.4.2, Operating Agreement).

The Company shall make distributions to Members for the payment of U.S. Federal, State or local taxes, payable at such time or times and in such amounts as will enable the Members to avoid penalties and interest otherwise payable on account of the failure to pay a sufficient amount of estimated taxes as required by law, which distributions shall be made at such time or times as may be determined by the Manager. (Article 3 §3.6, Operating Agreement).

**Management.** The Company operates under the direction of a Manager, Pacific Proton Therapy Regional Center, LLC, a California limited liability company. The Manager has full, exclusive and complete authority, power and discretion to manage and control the business and affairs, including the management and operation of the Company and any special purpose entities organized to carry out the Project, to make all decisions regarding those matters in its sole discretion, and to perform any and all other acts incident to or customary for the

Exhibit 4 Page 268

business. Members have limited rights to take part in the management of, or to bind, the Company. (Article 4 §4.1-4.2, Operating Agreement).

A Manager shall not have any liability to the Company or to any Member for any mistakes or errors in judgment, or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A Manager shall be liable only for acts and/or omissions involving intentional wrongdoing. Actions or omissions taken in reliance upon the advice of legal counsel that they are within the scope of a Manager's authority hereunder shall be conclusive evidence of good faith; provided, however, a Manager shall not be required to procure such advice to be entitled to the benefit of this subparagraph. (Article 4 §4.3, Operating Agreement).

**Management Fee.** The Manager shall receive a management fee equal to three (3.0%) percent of the gross revenues, if any, of the Company, payable on the first day of each month for the preceding period. If there is more than one Manager, the management fee shall be distributed among the Managers on a pro rata basis unless otherwise agreed by the Managers. (Article 4 §4.10, Operating Agreement).

**Tax Elections and Adjustments**. The Manager is authorized to cause the Company to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles. (Article 4 §4.8, Operating Agreement).

**Federal Income Tax Withholding**. The Manager is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Members. (Article 4 §4.9, Operating Agreement).

**Indemnification.** (Article 5, Operating Agreement). The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding (other than an action, suit or proceeding by or in the right of the Company) by reason of the fact that he is or was a member, manager, officer or employee of the Company, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection therewith if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.  Indemnification may be made by the Company upon a determination that indemnification is proper in the circumstances and all applicable standards of conduct have been met. Expenses of each person indemnified under Article 5 may be paid by the Company in advance of the final disposition of such action as authorized by the Manager upon receipt of an undertaking to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Company.

**Voting.** On any matter presented to the Members for their vote, each Member shall have one vote for each Unit owned by him. The following actions shall require the approval of Members holding a majority of the then outstanding Units: (i) any modification to the Operating Agreement materially changing the rights of the Members; and (ii) dissolution of the Company prior to the sooner of repayment of the Loan or the end of five years from the first advance under the Loan.  (Article 7, Operating Agreement).

**Rights and Obligations of Members.** Members have limited rights to participate in the management and control of the business and may not transact any business in the name of the Company. (Article 7, Operating Agreement).

**Restrictions on Transfer.**  (Article 8, Operating Agreement).

*Restrictions.* Units may not be transferred by Members without consent of the Manager. Additional restrictions on transfer of Units are described in the Operating Agreement. No Member shall have the right or power to Voluntarily Withdraw from the Company. Any withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such Member. Members other than EB-5 Members may dispose of all or any portion of the Member's Units to

Exhibit 4 Page 269

transferees that are current Members of the Company. Any attempted disposition of an interest in the Company not in compliance with this Article is null and void.

*Right of First Refusal*. If a Member intends to transfer Units or any part thereof, after obtaining approval of the Manager, or if a Member's Units are transferred by operation of law, such Member (or his/her representative, if deceased) shall give written notice to the Company of his intention so to transfer stating the fact of the intention to transfer Units, and shall describe (i) the interest to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so, the amount of the consideration and the other terms of the sale. The Company may purchase such interest proposed to be transferred, for the price and upon the other terms provided in Article 8. If the Company does not purchase such interest then the remaining Members may, purchase such interest for the price and upon the other terms provided in Article 8. If more than one Member exercises such option, such Members shall be entitled to purchase pro rata with such other Members. Transfers not in compliance with the terms hereof shall remain subject to the Operating Agreement as if no transfer had been made. The value and price of each interest to be purchased and sold upon exercise of such options shall be either the consideration set forth in the notice required of a selling Member or the Fair Market Value of the interest, depending on the method of transfer. (Article 8, Operating Agreement).

**Dissolution and Termination.** The Company shall be dissolved upon the first to occur of the following: (a) upon consent of all Members during the At-Risk Period of any EB-5 Member; (b) in the sole discretion of the Manager after the expiration of the At-Risk Period of all EB-5 Members; or (c) upon the sale of all or substantially all of the assets of the Company. (Article 10 Operating Agreement).

**Termination of Interest.** The Membership Interest of any Member shall be terminated by (a) dissolution of the Company as provided in the Operating Agreement and distribution of the proceeds of liquidation in accordance therewith; (b) the agreement of a Member, or his/her personal representative, and the Manager; and (c) at any time after the At-Risk Period of an EB-5 Member with the Manager's written notice of termination together with return of the value of such EB-5 Member's Membership Interest, determined as follows. The value of a Member's Membership Interest shall be computed by adding the balance of the Member's Adjusted Capital Contribution and any other amounts owed to the Member by the Company and subtracting from the sum of the above totals the sum of all amounts owed by the Member to the Company. Good will of the Company business, as well as other intangible items, shall not be valued.

**Power of Attorney.** Pursuant to the Operating Agreement, each Member appoints the Manager, with full power and substitution, as his, her, or its lawful attorney-in-fact to act in his, her, or its name, place, and stead to make, execute, swear to, verify, acknowledge, correct and file documents deemed necessary by the Manager for the business of the Company. (Article 12, Operating Agreement).

Exhibit 4 Page 270

| SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION |
| --- |

**Subscription Procedure**

To subscribe to purchase Units in this Offering, a subscriber must transmit the following prior to the termination of this Offering, as follows:

To PPEB5:

1. Investor Capital Contributions for Units ($500,000 per Unit subscribed for) shall be paid by a wire transfer to the PPEB5 Escrow Account established by each subscriber of Units with PPEB5 according to the wire instructions provided by PPEB5.
2. Executed counterpart signature page to the PPEB5 Escrow Agreement (**APPENDIX A** hereto).
3. Executed counterpart signature page to the Operating Agreement (**APPENDIX B** hereto).
4. Executed complete Subscription Agreement (**APPENDIX C** hereto).
5. Executed and complete Investor Questionnaire.

To the Regional Center:

1. Administrative Fees ($45,000 per Unit subscribed for) shall be paid by wire transfer according to the wire instructions provided by the Regional Center.

The subscription period will begin on the date of this Offering Memorandum and will continue until the Maximum Offering is sold or the Offering is terminated by PPEB5. There is no Minimum Offering amount. All Capital Contributions received from subscribers for Units shall be deposited in the PPEB5 Escrow Account established for Capital Contributions pending filing of subscriber I-526 Petitions with USCIS.

If a subscriber's subscription is rejected by the Company prior to filing of his/her I-526 Petition by USCIS, (i) his/her Capital Contribution, $500,000 per Unit subscribed for, and (ii) his/her Administrative Fee shall be returned to him/her, without interest or deduction.

Upon notice of filing of each subscriber's I-526 Petition, his/her Capital Contributions will be released to PPEB5 and advanced to Borrower as part of the Loan. After filing of a subscriber's I-526 Petition, that subscriber shall have no right to revoke or withdraw his/her subscription. Once an Investor's I-526 petition has been filed with USCIS, the Regional Center will refund an Investor's Capital Contribution and Administrative Fee only if an Investor's I-526 petition is denied by USCIS without possibility of cure. The Regional Center will not refund all or any part of the Capital Contribution or Administrative Fee for any other reason.

**Plan of Distribution**

The Units will be offered to prospective investors by PPEB5, and/or its duly authorized agents. Fees and commissions of such agents may be paid by the Regional Center or PPEB5 from Administrative Fees. Prospective investors are limited to qualified non-U.S. citizens seeking permanent residence in the United States through the EB-5 Program who are Accredited Investors (as defined in the Act). The Units are offered subject to PPEB5's right to withdraw the Offering at any time without notice and/or to reject any subscription. This Offering may be terminated if events have occurred, which in the Manager's sole judgment, make it impracticable or inadvisable to proceed with, continue or consummate the Offering described herein. There is no assurance that all or any of the Units will be sold.

Exhibit 4 Page 271

## INCOME TAX CONSIDERATIONS

Each Investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his/her investment in PPEB5, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return. All Investors in this Offering should seek professional tax advice prior to investing in this Offering.

## DOCUMENTS AVAILABLE FOR INSPECTION

Statements made in this Offering Memorandum and Appendices hereto concerning any agreements, contracts or other documents are not necessarily complete and reference to such documents in their entireties is recommended. As each such statement is qualified in all respects by reference to such documents, prospective investors desiring to examine any or all of the documents referred to in this Offering Memorandum should contact PPEB5.

Exhibit 4 Page 272