# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4    _____
                                     )
 5    SECURITIES AND EXCHANGE        )
      COMMISSION,                    )
 6                                   )
               Plaintiff,            )
 7                                   )
         vs.                         ) No. SACV 16-00974-CJC
 8                                   )        (AGRx)
      CHARLES C. LIU; XIN WANG       )
 9    a/k/a LISA WANG, et al.,       )
                                     )
10             Defendants.           )
      _____)
11
12
13
14       REMOTE DEPOSITION OF RUTH THROPAY LOPEZ NOVODOR
15                   ZOOM VIDEOCONFERENCE
16                 Monday, February 22, 2021
17                         Volume I
18
19
20
21    Reported by:
      VALERIE D. GRANILLO
22    CSR No. 11469
      Job No. 4413391
23
24
25    PAGES 1 - 189
```

Page 1

Veritext Legal Solutions
866 299-5127

Exhibit 6 Page 292

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   _____
                                    )
 5   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 6                                  )
             Plaintiff,             )
 7                                  )
        vs.                         ) No. SACV 16-00974-CJC
 8                                  )     (AGRx)
     CHARLES C. LIU; XIN WANG       )
 9   a/k/a LISA WANG, et al.,       )
                                    )
10           Defendants.            )
     _____)
11
12
13            Remote Deposition of RUTH THROPAY LOPEZ
14   NOVODOR, Volume I, taken on behalf of Defendants, via Zoom
15   Videoconference, California, beginning at 9:15 a.m. and
16   ending at 4:15 p.m., on Monday, February 22, 2021, before
17   VALERIE D. GRANILLO, Certified Shorthand Reporter No.
18   11469.
19
20
21
22
23
24
25
                                                      Page 2
```

```
 1                    Monday, February 22, 2021
 2                           9:15 a.m.
 3
 4            RUTH THROPAY LOPEZ NOVODOR,
 5   having been administered an oath, was examined and
 6   testified as follows:
 7
 8         MR. GOURAIGE:  Gary, do you want to note
 9   appearances before we start?
10         MR. LEUNG:  Yes, please.  You want to go ahead?
11         MR. GOURAIGE:  Yeah, I'll start.  Herve Gouraige
12   of Sills Cummis & Rose, Ms. Novodor.  I represent the
13   defendant in this case, Charles Liu, and his wife.  I'm
14   not sure I'm pronouncing her first name correctly, Xin
15   Wang or Lisa Wang.
16         THE WITNESS:  Thank you.
17         MR. LEUNG:  Good morning, Ms. Novodor.  Gary
18   Leung for plaintiff SEC.
19         THE WITNESS:  Good morning.
20         MS. GOLDSTEIN:  Good morning, Counsel.  Anya
21   Goldstein for the witness, Ruth Lopez Novodor.
22                          EXAMINATION
23   BY MR. GOURAIGE:
24      Q   Ms. Novodor, let me start with a preliminary
25   question.  Could you just state your full name for the
```

Page 8

1   BY MR. GOURAIGE:
2       Q    So you did everything that Charles Liu directed
3   you to do?
4       A    In this situation, yes.
5       Q    Did you ever question what he was doing?
6       A    Sometimes I would ask him.
7       Q    Such as?  When did you ask him?
8       A    Why he wanted me to tear down the building when
9   he had already told the folks in Beijing that it was
10  already torn down.  And then he wanted me to run and get
11  everybody out of the building in a big hurry like
12  yesterday.  And these were referring doctors to
13  Dr. Thropay.  It was a total, total disaster.  I
14  questioned him about doing that and not to misrepresent
15  anything further in the future.  So yes, I have questioned
16  him when it's extremely apparent that there is a
17  miscommunication.
18      Q    And how did you -- I'm sorry.  How did you
19  question him?  Did you -- did you do it orally or did you
20  write him letters, e-mails?
21      A    I spoke to him by phone.
22      Q    And that's the only way that you questioned him?
23      A    It's a pretty sensitive topic, and we had a lot
24  of respect for him.  We wanted to make this work, and we
25  were trying to support him every which way we could in any

Page 62

```
 1   way possible.  But he was asking for a lot to have us tear
 2   down that building immediately and not pay what he said he
 3   would pay, the 1.5 million.  It was a lot.  It was a lot
 4   for Dr. Thropay to have to deal in addition to everything
 5   else that he has to do as a physician and that we have to
 6   do to run our business.  It was a major disadvantage.  It
 7   cost the company a tremendous amount.
 8        Q    What did it cost?  When you say "the company,"
 9   BOIC?
10        A    BOIC and Dr. Thropay personally.
11        Q    Okay.  What did it cost BOIC?
12        A    Cash flow.
13        Q    To tear down the building?
14        A    Yes.
15        Q    How did --
16        A    Referral doctors were angry with him.  And they
17   were referral -- referring sources to the business.  It
18   was very complicated.
19        Q    So the doctors were unhappy because the building
20   got torn down, and they stopped making referrals to BOIC?
21        A    Not all of them.  But there were one or two that
22   were very angry that they had to get out in like 30 to 60
23   days.  And they had been there for years.
24        Q    Okay.  Any other -- any other reasons why it
25   impacted your cash flow?
```

```
 1       A    Yes.
 2       Q    All right.  Ms. Novodor, you had explained for us
 3   earlier today that you did not receive any employment
 4   compensation in connection with your role at Beverly
 5   Proton.  Do you recall that testimony?
 6       A    Yes.
 7       Q    And you were not to receive any employment
 8   compensation until the project actually got operational is
 9   that what you said?
10       A    Exactly.  Correct.
11       Q    Okay.  And is that a yes?
12       A    Yes.
13       Q    And you also explained for us that as of April
14   2016, no progress on the project had really been made
15   aside from the demolition of your office building on 111
16   West Beverly, which displaced your existing tenants.  Do
17   you recall that testimony?
18       A    Yes.
19       Q    Yes?
20       A    Yes.
21       Q    I'm sorry.  My connection may be off.  You may
22   have been audible, but I didn't hear you, and I just need
23   to make sure we get a clean record.
24            Okay.  And you had no control over the bank
25   accounts for the PP EB-5 Fund, Beverly Proton or the
```

Page 142

```
 1   has 25 percent interest.  This entity, Beverly Proton
 2   Center, LLC, has entered into a purchase agreement with
 3   Mevion.  Starting from January 18th, 2016, I will act as
 4   CEO president, and Dr. Thropay and his sister, Ruth, will
 5   no longer be the officers of this entity."
 6             Did I read that correctly?
 7        A    Yeah.
 8        Q    Does it appear to you that you're being cut out
 9   of the deal including the amount of money that was spent
10   on Mevion?  Is that a yes?
11        A    Yes, thank you.  Yes.
12        Q    And so Ms. Novodor, we've gone through statements
13   in the private offering memorandum as well as the business
14   plan that was filed with USCI that refer to Optivus as the
15   sole source provider.  We've also gone through e-mails
16   that you weren't included in by and among City of Hope,
17   Beverly Hospital, Charles Liu and Michael Hunn, his
18   representative for United MPH, that addressed this
19   purchase of Mevion equipment in 2015.
20             Based on the facts and information that you've
21   personally seen and your dealings with Mr. Liu over time
22   in connection with this EB-5 project, do you have any
23   confidence that the money he spent on Mevion was
24   consistent with what he was representing to investors and
25   consistent with his obligations to you and your brother as
```

Page 167

```
 1   his business partners?
 2           MR. GOURAIGE:  Objection.
 3           THE WITNESS:  No.
 4           (Exhibit 112 was marked for identification by
 5           the court reporter and is attached hereto.)
 6   BY MR. LEUNG:
 7      Q    Okay.  Ms. Novodor, directing your attention to
 8   Exhibit 112.  This is a one-page document.  It bears the
 9   letterhead United MPH Ventures.  It's dated March 10th,
10   2016.  It's signed by Charles C. Liu.
11           I just want to direct your attention to the
12   watermark at the bottom.  It says "Project address 105
13   West Beverly Boulevard."  And it also begins, "Dear Sir or
14   Madam, United MPH Ventures, LLC is in development of a
15   series of cancer treatment proton therapy centers across
16   the U.S."
17           That project address that's listed at the bottom,
18   again, that's not your property, is it?
19      A    No, it's not.
20      Q    And it's not the 111 West Beverly property owned
21   by your brother and you that's referenced in the private
22   offering memorandum and the business plan filed with UCIS,
23   is it?
24      A    No.
25           (Exhibit 113 was marked for identification by
```

Page 168

```
 1              the court reporter and is attached hereto.)
 2    BY MR. LEUNG:
 3         Q    Directing your attention to Exhibit 113.  This is
 4    a one-page document.  It is executed by a Richard Stuping
 5    at R Alan Construction.  You see it's dated April 16th,
 6    2016?
 7         A    Right.
 8         Q    Okay.  We had talked -- or you had spoken with
 9    Mr. Gouraige earlier today about construction work
10    performed by R Alan Construction with respect to your
11    property at 111 West Beverly.  Is that correct?
12         A    That's correct.
13         Q    Do you see, though, that this later invoice in
14    April of 2016 is for different work?  It's for work
15    concerning building demolition at 105 -- sorry.
16         A    I see it.
17         Q    105 West Beverly.  You see it, right?
18         A    Yeah.
19         Q    Okay.
20         A    On ours.
21         Q    And you also see that previously invoiced
22    payments had already been paid in the amount of 151 grand?
23         A    Uh-huh.
24         Q    Given the fact that in the summer of 2015,
25    Mr. Liu had pressured you and your brother to spend money
```

Page 169

```
 1   to demolish the existing office building on 111 West
 2   Beverly, does it make any sense to you as a business
 3   person that additional construction work would be
 4   undertaken at a completely new project site unless someone
 5   was trying to cut a new deal with City of Hope and Beverly
 6   Hospital?
 7           MR. GOURAIGE:  Objection, two objections.  Pure
 8   speculation; and second, the characterization "caused you
 9   to spend money."
10   BY MR. LEUNG:
11       Q    Please go ahead.
12       A    I was not aware that Beverly Proton, LLC paid for
13   the demolition of 105 at all.
14       Q    And if you had been aware of it, would you have
15   objected in your capacity as somebody that was to be the
16   chief operating officer of Beverly Proton once the
17   operation got underway?
18       A    Absolutely.
19       Q    Earlier today you testified on the facts and
20   circumstances of Mr. Villaraigosa's --
21       A    That's correct.  It's close.
22       Q    -- involvement with Beverly Proton.  Am I correct
23   that whatever amounts were paid to Mr. Villaraigosa in
24   connection with Beverly Proton, those amounts were paid in
25   an effort to raise capital?
```

Page 170

```
 1   Proton.  I know that she was helping him market.  That's
 2   all I know.
 3        Q    And so if she had no formal employment
 4   relationship with Beverly Proton until, say, February
 5   2016, can you think of any reason why she'd be receiving
 6   close to a million dollars in the form of one single
 7   transfer from Beverly Proton's corporate account?
 8             MR. GOURAIGE:  Object to lack of foundation to
 9   the question.  I think you should ask her first if she has
10   any knowledge of services she provided.
11   BY MR. LEUNG:
12        Q    Any idea why she might have been getting a
13   million dollars from the Beverly Proton corporate account
14   without any formal employment relationship with Beverly
15   Proton?  It seems a bit odd.
16        A    Mr. Leung, I was not aware of whatever
17   relationship she had.  I'm sorry.  I can't address what
18   she did, what she didn't do other than she did marketing.
19   I was not privy to what she was getting paid or not paid
20   until I read all the transcripts.
21        Q    What was your understanding of the marketing work
22   that Ms. Wang was engaged in?
23        A    Well, she helped put the marketing materials
24   together.  She would set up travel plans for Dr. Thropay
25   across the country and China to meet doctors.  And that
```

Page 180

1   was about it.  That's what she did.  She set those up, so,
2   you know, I don't know more than that.
3       Q   Did investors -- potential investors ever visit
4   the project site at 111 West Beverly?
5       A   The Delsk ones for sure.  If the others came, I
6   believe, yes, Charlie would let us know somebody's coming
7   to the site.
8       Q   And do you recall whether Ms. Wang was present at
9   any of these visits by potential investors at the project
10  site?
11      A   I did see her at a couple of those.
12      Q   And she was there in her capacity as somebody
13  working on marketing; is that right?
14      A   You know, they spoke Chinese.  I'm not sure what
15  she told them.  I always thought she was just doing
16  marketing.
17          MR. LEUNG:  Fair enough.  Thank you, Ms. Novodor.
18          Pass the witness.
19          MR. GOURAIGE:  Couple of questions, Ms. Novodor.
20                    FURTHER EXAMINATION
21  BY MR. GOURAIGE:
22      Q   The total number of investors, depending on which
23  version is correct, is either 50 or 58.  Let's assume it's
24  within that range, 50 or 58 investors.
25      A   Okay.

Page 181

```
 1              I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4              That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
 9   machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12              Further, that if the foregoing pertains to
13   the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [ ] was not requested.
16              I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19              IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated: March 3, 2021
23                       _____
24                       VALERIE D. GRANILLO
25                       CSR No. 11469
```

Page 189