# EXHIBIT 15

# OPERATING AGREEMENT

## OF

## LOS ANGELES COUNTY PROTON CENTER, LLC

*a California Limited Liability Company*

November 16, 2010

200 E. Beverly Boulevard, Suite 200
Montebello, CA 90640

Exhibit 15 Page 379

# OPERATING AGREEMENT
## LOS ANGELES COUNTY PROTON CENTER, LLC

This Operating Agreement ("Agreement") is entered into and effective as of November 16, 2010 by and between the undersigned members listed on Schedule A hereto ("Members"), as amended from time to time; WHEREAS, the Members have caused Articles of Organization to be filed with the California Secretary of State forming a limited liability company under the name "LOS ANGELES COUNTY PROTON CENTER, LLC" (the "Company"); and WHEREAS, the Company is formed for the purpose of development and operation of a proton therapy center and commercial office buildings in Los Angeles County, California; and WHEREAS, the parties hereto desire to set forth certain understandings and agreements among them with respect to the affairs of the Company and the conduct of its business; NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the parties hereby agree as follows:

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meaning set forth below. Other terms defined throughout this Agreement shall have the meanings respectively ascribed to them.

"**Adjusted Capital Contribution**" means, with respect to each Member, the aggregate capital contributed to the Company by such Member reduced, from time to time, (i) by any return of a Capital Contribution made pursuant to the Agreement, and (ii) by the aggregate distributions of Net Proceeds from a Capital Event made to such Member pursuant to the Agreement.

"**Affiliate**" means, with respect to any Member, any Person: (i) which owns more than 50% of the voting interests in the Member; or (ii) in which the Member owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above, or (iv) who otherwise controls, is controlled by, or under common control with, another Person.

"**Available Cash Flow**" means funds provided from operation of the Company, without deductions for depreciation, but after deducting funds used to pay all expenses and debts of the Company, including administrative operational expenses, debt payments, capital improvements, and less the amount set aside for reserves.

"**Bankruptcy**" means, with respect to any Member: (i) an assignment for the benefit of creditors; (ii) a voluntary petition in bankruptcy; (iii) adjudication as a bankrupt or insolvent; (iv) the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, regulation or law; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding of this nature; (vi) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of such Member's properties or of all or any substantial part of the Member's properties; or (vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

"**Board of Directors**" or "**Board**" mean the persons elected by the Members annually, and from time to time, charged by the Agreement with management of the business and affairs of the Company.

"**Capital Contribution**" or "**Contribution**" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"**Capital Event**" means the refinance, sale, exchange or other disposition of Property or any portion thereof, including an involuntary conversion or condemnation of real property or any portion thereof.

Exhibit 15 Page 380

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law or any corresponding provision, and all applicable Regulations.

"*Contributed Property*" means any property contributed (or deemed contributed under Code §708) to the Company.

"*Deficit Capital Account*" means the situation whereby the Company has made distributions to a Member in excess of such Members Capital Account.

"*Economic Interest*" means a Person's share of the Profits and Losses of, and the right to receive distributions of Profits from, the Company.

"*Incapacity*" means (i) the entry of a judgment by a court of competent jurisdiction to the effect that a Member who is an individual is incompetent to manage such Member's affairs, or the appointment of a guardian ad litem by a court of competent jurisdiction to manage such Member's affairs; or (ii) the incapacity of a Member who is an individual to perform his or her duties as a Member as determined by (a) the vote of at least a majority of the Units held by such Member, and if such Member is not in agreement with such determination, the certification of a physician selected by mutual agreement between such Member and the holders of at least a majority of the Units not held by such Member, or (b) the certification of a physician selected by the Member and, if the holders of at least a majority of the Units not held by the Member are not in agreement with such certification, the certification of a physician selected by mutual agreement between the Member and the holders of at least a majority of the Units not held by such Member.

"*Interest Holder*" means any Person who holds an Economic Interest, whether as a Member or an unadmitted assignee of a Member.

"*Involuntary Withdrawal*" means, with respect to any Member, the occurrence of any of the following events: (i) the Bankruptcy of a Member; (ii) if the Member is an individual, the Member's death or Incapacity; (iii) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust; (iv) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; (v) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or (vi) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

"*Majority-In-Interest*" means Members holding a majority of all Members' or Interest Holders', as the case may be, Economic Interests in the Company.

"*Membership Interest*" means all of the rights of a Member in the Company, including a Member's: (i) Economic Interest; (ii) right to participate in the management of the Company; and any right to information granted herein to Members.

"*Membership Percentages*" all Percentage Interests held by Members at any time.

"*Net Proceeds from a Capital Event*" means the net proceeds derived by the Company from a Capital Event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness, the discharge of any other expenses or liabilities of the Company and the establishment of appropriate reserves, all as determined by the Board.

"*Percentage*" or "*Percentage Interest*" means, as to a Member, the percentage set forth after the Member's name on Schedule A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Economic Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Economic Interest.

"*Person*" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"*Profits*" and "*Losses*" mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (including all items required to be stated separately) with the following adjustments: (a) Any income exempt from federal income tax shall be included; and (b) Any expenditures of the Company described in Code Section 705(a)(2)(B) (including expenditures treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) shall be subtracted.

"*Property*" means all real and personal property of the Company.

"*Regulation*" means the income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

Exhibit 15 Page 381

"*Transfer*" means — when used as a noun — any sale, hypothecation, pledge, assignment, gift, bequest, attachment, or other transfer, including transfers by operation of law, and — when used as a verb — means to sell, hypothecate, pledge, assign, give, bequeath, or otherwise transfer.

"*Units*" mean units representing each Member's undivided interest in the capital of the Company.

"*Voluntary Withdrawal*" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE 1

## FORMATION OF THE COMPANY

1.1 **Formation of Limited Liability Company.** The Members have organized the Company pursuant to the provisions of the Beverly-Killea Limited Liability Company Act, as amended from time to time (the "Act"), under the name "LOS ANGELES COUNTY PROTON CENTER, LLC". Except as otherwise provided herein, all rights, liabilities and obligations of the Members shall be as provided in the Act. Except for federal and state income tax purposes, the Members intend that the Company not be a partnership, limited partnership or joint venture.

1.2 **Principal Place of Business and Registered Agent.** The principal place of business of the Company shall be 200 E. Beverly Blvd., Suite 200, Montebello, CA 90640, or at such other place in the State of California as may be designated by the Board from time to time. The Registered Agent of the Company in the State of California is Charles Lui until otherwise determined by the Board.

1.3 **Purposes.** The purpose of the Company is to engage in any lawful acts or activities for which limited liability companies may be formed under the Act. Without limiting the foregoing, the Company was organized to develop and operate a proton therapy center and commercial office buildings in Los Angeles County, California.

1.4 **Duration of the Company.** The Company shall commence on the date on which its Articles of Organization were accepted and filed by the California Secretary of State, and shall continue in perpetuity until dissolved in accordance with this Agreement.

## ARTICLE 2

## CAPITALIZATION

2.1 **Units; Initial Capital Contributions.**

2.1.1    Each Member's undivided interest in the capital of the Company shall be represented by membership Units. Each Unit shall be identical in all respects to every other Unit.

2.1.2    The Company shall be capitalized by each Member contributing his/her Capital Contribution set forth on Schedule A attached hereto, with such Member receiving, in exchange therefor, the number of Units set forth therein. A Member shall not have the right to demand or receive the return of his/her Capital Contribution except as otherwise expressly provided herein. The Members shall have no obligation to make additional Capital Contributions. Members may make additional Capital Contributions upon consent of the Board. No interest shall be paid on Capital Contributions.

2.1.3    Interest will be charged by the Company to a Member on the sum of any deemed distributions charged to such Member's Capital Account from obligations to the Company arising under Section 4.11. The interest charged will be computed on a calendar year compounded basis at a rate equal to two percent above the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate", such interest to be collected by reduction of any distributions payable to the Member immediately following the calculation of the year's interest by the Company. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Member's Capital Account. This Section will survive the termination of a Member's status as a Member.

Exhibit 15 Page 382

2.1.4    No Member shall have any right to withdraw or make a demand for the withdrawal of any of his/her Capital Contribution (or the capital interest reflected in such Member's Capital Account) until the full and complete winding up and liquidation of the Company. No Member shall have the right to demand Property.

2.1.5    Loans or advances by any Member to the Company can only be made after and in addition to a Member's initial Capital Contribution and upon approval of the Board. Loans or advances by any Member to the Company shall not be considered additional Capital Contributions and shall not increase the Capital Account of the lending or advancing Member. No Member shall be required to lend any cash or property to the Company.

2.1.6    Each Unit of the Company shall be certificated in the form deemed appropriate by the Board. The certificate or certificates evidencing Units shall be endorsed, as follows:

*"The Units represented by this certificate are subject to the terms and conditions of an Operating Agreement dated as of November 16, 2010, among the members of the Company. Any purchaser or transferee of these Units is bound by the Operating Agreement and shall be considered a party to such agreement. The Company will mail to the holder of this certificate, without charge, a copy of such agreement within five (5) days after receiving a written request therefor."*

The foregoing endorsement shall also include such other legends and notices as the Company deems necessary and appropriate. After endorsement, the certificate(s) shall be delivered to the Members who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such Units. A similar endorsement shall be placed on all certificates hereafter issued subject to the provisions of this Agreement.

## 2.3 Capital Accounts.

2.2.1    The Company shall establish and maintain Capital Accounts ("Capital Accounts") for each Member in accordance with the Code, applicable Regulations, and the provisions hereof. Except as required by the Code, the Capital Account of each Member shall consist of his/her Capital Contribution, as increased by any subsequent Contribution and by such Member's share of Company income and gain allocated after the date hereof to such Member, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Member, the amount of all losses allocated after the date hereof to such Member, and any amounts charged under Section 4.11 to such Member.

2.2.2    The provisions of this Article 2 as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit to have substantial economic effect under the Regulations promulgated under the Code, in light of the distributions and the Capital Contributions made pursuant hereto. All allocations of items that cannot have economic effect (including credits and nonrecourse deductions) shall be allocated to the Members in accordance with their respective Percentage Interests. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation.

2.2.3    The Capital Account of a transferring Member shall become the Capital Account of his/her transferee to the extent it relates to the Units transferred.

Exhibit 15 Page 383

# ARTICLE 3

## ALLOCATIONS AND DISTRIBUTIONS

3.1. **Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated in the following order and priority: (a) First, to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) The balance, to the Members in accordance with the Percentage Interests.

To the extent the allocations of profits and losses otherwise provided under this Agreement are not made in accordance with a Member's Interest in the Company within the meaning of Code Section 704, the allocations shall be made to the appropriate Members in the necessary and required amounts in order to comply with Code Section 704(b).

In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Company Profits (or Company Losses) allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Percentage Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Members.

3.2. **Limitation on Allocation of Losses.** Notwithstanding the foregoing, the Losses allocated pursuant hereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have a Deficit Capital Account at the end of any fiscal year. In the event some but not all of the Members would have a Deficit Capital Account as a consequence of an allocation of Losses pursuant hereto, the limitation set forth in this Section 3.2 shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Regulation Section 1.704-1(b)(2)(ii)(d).

3.3. **Deficit Capital Accounts at Liquidation.** The Members shall have no liability to the Company, to the Members, or to the creditors of the Company on account of any deficit balance in their Capital Accounts upon liquidation of the Company, provided, however, that any Member for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.11 is required to pay to the Company the amount of any negative balance in his Capital Account, but such payment shall not exceed the sum of the obligations under Section 4.11. This Section 3.3 will survive the termination of a Member's status as a Member. A Member must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Company in collecting amounts under this provision from a Member.

3.4. **Distributions.** The Board shall determine the timing, amount, if any, and form of all distributions to Members in its sole discretion and notwithstanding any other provision of this Agreement.

    3.4.1.   **Available Cash Flow.** Available Cash Flow shall be distributed at least annually (a) first, to Members in payment of accrued unpaid Mandatory Distributions; (b) then to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (c) the balance to the Members in accordance with the Percentage Interests.

    3.4.2.   **Net Proceeds from a Capital Event or from Dissolution.** The Net Proceeds from a Capital Event and/or a distribution resulting from the dissolution of the Company shall be distributed in the same manner as Available Cash Flow. Net Proceeds from a Capital Event and/or a distribution from the dissolution of the Company shall be distributed to Members within 120 days of such Capital Event or dissolution of the Company.

    3.4.3.   **Limitation on Distributions.** Notwithstanding any other provision of this Article 3, the Company shall not make a distribution to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests, exceed the fair value of the assets of the Company; or to the extent that such distribution is prohibited under the Act.

Exhibit 15 Page 384

3.5. **Mandatory Distributions**. The Company shall make distributions to Members for the payment of U.S. Federal, State or local taxes incurred by such Member as a result of allocation of Profits to such Member by the Company. The amount distributable with respect to any year shall be equal to the aggregate amount of U.S. Federal, state and local income taxes payable by the Members with respect to the taxable income of the Company, assuming, for purposes of determining the amount of such distribution, that each Member will be taxed on the net amount set forth in the Member's respective K-1 at the highest marginal individual Federal income tax rate for such year, and at the highest marginal individual state and local income tax rates applicable to any Member for each such taxable year; and (ii) such distributions shall be payable at such time or times and in such amounts as will enable the Members to avoid penalties and interest otherwise payable on account of the failure to pay a sufficient amount of estimated taxes as required by law, which. Such distributions shall be made within 90 days of the end of the Company's fiscal year or such other time or times as may be determined by the Members.

3.6. **Record Date**. All items of Company income, gain, loss and deduction shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, if any Units in the Company shall be transferred during a taxable year, items of Company income, gain, loss and deduction for such period shall be allocated among the original Members and their successors on the basis of the number of days each was a Member during such period; provided, however, that if the Company has any extraordinary non-recurring items for the taxable year in which the transfer of Units occurs, such period shall be segregated into two or more segments in order to account for income, gain, loss, deductions or proceeds attributable to such extraordinary non-recurring items of the Company.

## ARTICLE 4

## MANAGEMENT

4.1 **Board of Directors**. The business and the affairs of the Company shall be managed by a Board of Directors elected by the Members annually. The number of directors constituting the Board shall be determined by resolution of the Members entitled to vote, but shall not be less than two (2). The Board shall be elected annually by the Members at a meeting held for such purpose or at a special meeting called for such purpose, or by unanimous written consent, with the candidates receiving the greatest number of votes being elected. Directors need not be Members. Each Director shall hold office until the next annual meeting of Members and until his successor is elected, or until his earlier resignation, removal or death. Any Director may resign at any time, such resignation to take effect immediately or at such other time as the Director may specify. In the event of the occurrence of any vacancy in the Board, however caused, the remaining Directors, though less than a majority of the entire, may, by the vote of a majority of their number, fill any vacancy for the unexpired term.

4.2 **Meetings**. Regular meetings of the Board may be held at such times and places within or without the State of California as determined by resolution of the Board. Special meetings of the Board may be held upon call by the President or any two Directors on notice as provided herein. Except as otherwise provided herein, a quorum necessary for taking action at any Board meeting shall be two-thirds of the Directors then in office.

4.3 **Notice**. No notice is required for regularly scheduled meetings of the Board. Written notice of the time, place and purposes of a special meeting shall be given to each Director, either by personal delivery or by mail, telegram, or cablegram, at least 2 days before such meeting.

4.4 **Action Without Meeting**. Any action which may be authorized or taken at a meeting of the Board may be authorized or taken without a meeting in a writing(s) signed by all Directors, which writing(s) shall be filed with or entered upon the records of the Company. A telegram, telex, cablegram, or similar transmission by a Director, or a photographic, facsimile or similar reproduction of a writing signed by a Director, shall be regarded as signed by the Director for purposes of this Section.

Exhibit 15 Page 385

4.5  **Voting**. Except as otherwise provided herein, all decisions requiring action of the Board will be decided by the affirmative vote of a majority of the Directors present at a duly call meeting of the Board or by written consent as provided herein. Directors may participate in any meeting by any means of communication reasonable under the circumstances and by which each Director can hear each other Director. Directors may not participate in any meeting by proxy.

4.6  **Liability**. A Director shall not have any liability to the Company or to any Member for any mistakes or errors in judgment, or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A Director shall be liable only for acts and/or omissions involving intentional wrongdoing. Actions or omissions taken in reliance upon the advice of legal counsel that they are within the scope of a Director's authority hereunder shall be conclusive evidence of good faith; provided, however, a Director shall not be required to procure such advice to be entitled to the benefit of this subparagraph.

4.7  **Books and Records**. (a) The Company shall maintain or cause to be maintained complete and accurate books of account (containing such information as shall be necessary to record allocations and distributions), and make such records and books of account available for inspection by any Member, or any Member's duly authorized representative, during regular business hours and at the principal office of the Company, upon reasonable notice and for any purpose related to his or her ownership of Units. (b) Within sixty (60) days after the end of each calendar year, there shall be prepared and distributed to all Members reasonable tax-reporting information, in sufficient detail to enable such Member to prepare such Member's federal, state and local income tax returns.(c) Within ninety (90) days after the end of each calendar year, there shall be prepared and distributed to each Member, a balance sheet, and a report of the receipts, disbursements, net profits and losses, and cash flow of the Company, and the share of the net profits and losses and cash flow of each Member for such calendar year. Such balance sheet and report shall be prepared by the Company's accountant in accordance with the method of accounting used by the Company for tax purposes.

4.8  **Tax Matters Member**. Charles Liu, or such other person determined by the Board from time to time, shall serve as the Tax Matters Member of the Company, as provided in Regulations issued pursuant to Code §6231. Each Member, by the execution of this Agreement, consents to such designation of the Tax Matters Member and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Company shall indemnify and reimburse the Tax Matters Member for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Members. The payment of all such expenses shall be made before any distributions to Members are made by the Company. The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Member.

4.9  **Tax Returns**. The taxable year of the Company shall be the calendar year. The Company shall, at Company expense, prepare and file all tax returns required to be filed by law.

4.10  **Tax Elections and Adjustments**. The Board may cause the Company to make, forego or revoke such elections or adjustments for federal income tax purposes as necessary or advisable, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Units of any Member, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Company or any similar provision enacted in lieu thereof. The Members will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

4.11  **Federal Income Tax Withholding**. The Company may withhold any sums required by the Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise

Exhibit 15 Page 386

affects distributions, allocations or payments to the Members. In the event that the Company learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the Company will issue an invoice to the Member. If the invoice is not paid within sixty (60) days, the Company will charge the amount against the Member's Capital Account. This Section will survive the termination of a Member's status as a Member.

4.12 **Election of Officers.** The Board shall elect a President, Secretary and a Treasurer annually at a meeting immediately following the annual meeting of Members. The Board may, in its discretion, also elect one or more Vice Presidents and such other officers as the Board deems necessary. Officers may but need not be Directors or Members. Any two or more offices may be held by the same person, but no officer shall execute, acknowledge or verify any instrument in more than one capacity, if such instrument is required to be executed, acknowledged or verified by two or more officers. Officers, if any, shall have only such authority and perform such duties as may be determined by the Board. Officers shall hold office until the next annual meeting of the Board and until their successors are elected, except in case of resignation, removal from office or death. The Board may remove any officer at any time with or without cause. Any vacancy in any office may be filled by the Board.

4.13 **Duties of Officers.** The Board is authorized to delegate the authority and duties of any officer to any other officer and generally to control the action of the officers and to require the performance of duties in addition to those mentioned herein. The duties of the officers of the Company shall be as follows:

    4.13.1  *President.* The President shall preside at all meetings of Members and the Board. The President shall have general executive supervision over the property, business and affairs of the Company, including executing all authorized deeds, mortgages, bonds, contracts, and other obligations in the name of the Company and shall have such other authority and shall perform such other duties as may be determined by the Board.

    4.13.2  *Vice Presidents.* The Vice Presidents shall, respectively, have such authority and perform such duties as may be determined by the Board.

    4.13.3  *Secretary.* The Secretary shall keep the minutes of meetings of Members and the Board. The Secretary shall keep such books as may be required by the Board, shall give notices of Member meetings and of Board meetings required hereunder, or otherwise, and shall have such authority and shall perform such other duties as may be determined by the Board.

    4.13.4  *Treasurer.* The Treasurer shall receive and have in charge all money, bills, notes, bonds, stocks in other companies, and similar property belonging to the Company, and shall do with the same as may be ordered by the Board. The Treasurer shall keep accurate financial accounts and hold the same open for the inspection and examination of the Directors and shall have such authority and shall perform such other duties as may be determined by the Board.

    4.13.5  *Other Officers.* Other officers, if any, shall have such authority and perform such duties as may be determined by the Board.

4.14 **Compensation.** Directors shall not receive any stated salary for their services, but, on resolution of the Board, a fixed sum for expenses of attendance, if any, may be allowed for attendance at each meeting, regular or special, provided that nothing herein contained shall be construed to preclude any Director from serving the Company in any other capacity and receiving compensation therefor. The compensation of officers and employees of the Company, or the method of fixing such compensation, shall be determined by or pursuant to authority conferred by the Board or any committee of the Board.

Exhibit 15 Page 387

## ARTICLE 5

### INDEMNIFICATION

5.1 **Third Party Actions.** The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals (other than an action, suit or proceeding by or in the right of the Company) by reason of the fact that he is or was a member, manager, director, officer or employee of the Company and/or its Affiliates, or is or was serving at the request of the Company and/or its Affiliates as a manager, director, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and/or its Affiliates and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Company and/or its Affiliates and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

5.2 **Derivative Actions.** The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, including all appeals, by or in the right of the Company or its Affiliates to procure a judgment in its favor by reason of the fact that he/she is or was a Member, manager, director, officer or employee of the Company, or is or was serving at the request of the Company or any Affiliate as a member, manager, director, trustee, officer or employee of another company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company or an Affiliate, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

5.3 **Rights After Successful Defense.** To the extent that a member, manager, director, officer or employee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in this Article 5, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

5.4 **Other Determination of Rights.** Except in a situation governed by §5.3, any indemnification under this Article 5 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the member, manager, director, officer or employee is proper in the circumstances because he/she has met the applicable standard of conduct set forth in this Article 5. Such determination shall be made by the Board.

5.6 **Advance of Expenses.** Expenses of each person indemnified hereunder incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Company in advance of the final disposition of such action, suit or proceeding as authorized by the Board upon receipt of an undertaking by or on behalf of the member, manager, director, officer or employee, to repay such amount unless it shall ultimately be determined that he/she is entitled to be indemnified by the Company under this Article.

Exhibit 15 Page 388

**5.7 Nonexclusiveness; Heirs.** The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law or under the Articles of Organization, or any agreement, vote of the Board, any insurance purchased by the Company, or otherwise, both as to action in his/her or its official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a member, manager, director, officer or employee and shall inure to the benefit of his/her heirs, executors and administrators.

**5.8 Purchase of Insurance.** The Company may purchase and maintain insurance on behalf of any person who is or was a member, manager, director, officer or employee of the Company or any Affiliate, or is or was serving at the request of the Company or any Affiliate as a manager, director, officer or employee of another company, partnership, joint venture, trust or other enterprise against any liability asserted against him/her or it and incurred by him/her or it in any such capacity, or arising out of his status as such, whether or not the Company or any Affiliate would have the power to indemnify him against such liability under the provisions of this Article or of the Act.

## ARTICLE 6

### EXPENSES

**6.1 Company Expenses.** The Company shall pay all costs and expenses related to operation of the business of the Company, and its Affiliates, which may include, but are not limited to: (1) All costs of personnel employed by or performing services for the Company or any Affiliate; (2) All costs of borrowed money including repayment of advances to the Company or any Affiliate made by a Member which shall be paid, at an interest rate equal to the prime rate of interest from time to time announced by Bank of America, or its successors, to be its "prime rate" plus 1%; (3) All administrative costs, legal, audit, accounting, brokerage and other fees; (4) Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of Units of the Company or any Affiliate or in connection with the business of the Company or any Affiliate; (5) Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site managers, real estate brokers, insurance brokers and other agents of the Company or any Affiliate, or any Member of the Company; (6) Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and financing and refinancing of Property; (7) The cost of insurance obtained in connection with the business of the Company or any Affiliate; (8) Expenses of organizing, revising, amending, converting, modifying or terminating the Company or any Affiliate; (9) Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members; (10) Expenses in connection with preparing and mailing reports required to be furnished to Members for required tax reporting, or other purposes which the Company deems appropriate; (11) Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies; and (12) Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Property.

## ARTICLE 7

### MEMBERS

**7.1. Members.** The Company shall at all times maintain a current and a past list setting forth (in alphabetical order) the full name, last known mailing address (including full street number), number of Units, and Percentage Interest of each current and former Member of the Company. The names, full residential addresses, number of Units, and Percentage Interest of the initial Members of the Company are as reflected on Schedule A of this Agreement and are hereby made a part hereof. With each change in the any information on Schedule A, the Company shall revise such list to reflect such changes. Members shall have only the rights and powers set forth in this Agreement unless otherwise provided by the Act.

**7.2. Meetings.** There shall be an annual meeting of Members for the election of directors and the transaction of such other business as may properly be brought before such meeting. Special meetings of

Exhibit 15 Page 389

Members may be called by the President or the Board acting at a meeting, or by all Directors acting without a meeting, or by Members holding at least fifty-one percent (51%) of the Units of the Company. Special meetings may be held on any business day. All meetings shall be held at the principal office of the Company, or at such other place as may be designated by the Board or by the President, and specified in the notice of such meeting.

7.3.   **Notice.** The notice shall be given by personal delivery or by mail to each Member entitled to notice of the meeting who is of record as of the day next preceding the day on which notice is given or, if a record date therefor is duly fixed, of record as of said date; if mailed, the notice shall be addressed to the Members at their respective addresses as they appear on the records of the Company. Notice of the time, place and purposes of any meeting of Members may be waived in writing, either before or after the holding of such meeting, by any Members, which writing shall be filed with or entered upon the records of the meeting. The attendance of any Members at any such meeting without protesting the lack of proper notice, prior to or at the commencement of the meeting, shall be deemed to have waived notice of such meeting. Upon request in writing delivered either in person or by registered mail to the President or the Secretary by any persons entitled to call a meeting of Members, such officer shall forthwith cause to be given to the Members entitled thereto notice of a meeting to be held on a date not less than 7 or more than 60 days after the receipt of such request, as such officer may fix. If such notice is not given within 20 days after the delivery or mailing of such request, the persons calling the meeting may fix the time of the meeting and give notice thereof as provided herein, or cause such notice to be given by any designated representative.

7.4.   **Quorum; Adjournment.** At any meeting of Members, whether present in person or by proxy, a Majority-In-Interest of Members shall constitute a quorum for such meeting; provided, however, that no action required by law, or by the Articles of Organization to be authorized or taken by a designated proportion of the Percentage Interests of the Company, or a particular class thereof, may be authorized or taken by a lesser proportion; and provided, further, that the holders of a majority of the Percentage Interests represented thereat, whether or not a quorum is present, may adjourn such meeting from time to time; if any meeting is adjourned, notice of such adjournment need not be given if the time and place to which such meeting is adjourned are fixed and announced at such meeting.

7.5.   **Telephonic Communication.** Members may participate in any meeting through telephonic or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

7.6.   **Voting of Members.** On any matter before the Members for a vote, each Member shall have one vote for each Unit owned by him. The following actions shall require the approval of Members holding a majority of the then outstanding Units: (i) modification to the Operating Agreement materially changing the rights of the Members; (ii) election of directors, and (iii) dissolution of the Company. Members entitled to vote or to act with respect to Units in the Company may vote or act in person or by proxy. The person appointed as proxy need not be a Member. Unless the writing appointing a proxy otherwise provides, the presence at a meeting of the person having appointed a proxy shall not operate to revoke the appointment. Notice to the Company, in writing or in open meeting, of the revocation of the appointment of a proxy shall not affect any vote or act previously taken or authorized.

7.7.   **Action Without a Meeting.** Any action which may be authorized or taken at a meeting of Members may be authorized or taken without a meeting in a writing(s) signed by all Members entitled to vote on such matter, which writing(s) shall be filed with or entered upon the records of the Company. A facsimile, photographic, facsimile or similar transmission or reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section.

7.8.   **Time Devoted to Company; Other Ventures.** (a) Members shall devote so much of their time to the business of the Company as in its judgment the conduct of the Company's business reasonably requires. Members may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Company, and

Exhibit 15 Page 390

neither the Company nor any of the other Members shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of the acquisition of Units.

(b) A Member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member. A Member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members. Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

## ARTICLE 8
## RESTRICTIONS ON TRANSFER

8.1     **Transfers.** No Member may voluntarily Transfer all, or any portion of, or any interest or rights in, the Units owned by the Member. Each Member acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The voluntary Transfer of any Units, including Economic Interests, in violation of the prohibition contained in this Article shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Units are attempted to be transferred in violation of this Article 8 shall not be entitled to vote, receive distributions from the Company, or have any other rights in or with respect to the Units.

8.2     **Voluntary Withdrawal.** No Member shall have the right or power to Voluntarily Withdraw from the Company. Any Voluntary Withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such Member.

8.3     **Involuntary Withdrawal.** Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawing Member shall thereupon become an Interest Holder, but shall not become a Member. The successor Interest Holder shall have all the rights of an Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of the Units, the fair market value of the Member's Economic Interest.

8.4     **Right of First Refusal.**

8.4.1   **Voluntary Transfer.** If any Member intends to transfer his/her Units or any part thereof to any person or entity, after obtaining approval required hereunder, such Member shall give written notice to the Company of his intention so to transfer. The notice, in addition to stating the fact of the intention to transfer Units, shall describe (i) the Units to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so, the amount of the consideration and the other terms of the sale. The Company shall promptly send a copy of such notice to all other Members of the Company.

8.4.2   **Company Option.** Within thirty (30) days after the receipt by the Company of the notice of intention to transfer the Units, the Company may exercise an option, which is hereby granted by the Member intending to Transfer his/her Units, to purchase the Units proposed to be transferred, for the price and upon the other terms hereinafter provided. The Company may, at its election, terminate its option period by giving a notice to the selling Member and all other Members that the Company has elected not to exercise its option granted in this Section.

8.4.3   **Member Option.** In the event that the option granted to the Company in Section 8.4.2 is not exercised in its entirety, then the remaining Members of the Company may, within the earlier of (i) sixty (60) days from receipt of notice of intention to transfer from the transferring Member, or (ii) thirty (30) days from receipt of notice that the Company has elected not to exercise its option, exercise an option which is hereby granted, to purchase all of the Units for the price and upon the other terms hereinafter provided. If more than one Member exercises the option hereunder, such Members (hereinafter, the "**Participating Members**") shall be entitled to purchase a proportion of the Units

Exhibit 15 Page 391

proposed to be transferred determined by a fraction, the numerator of which shall be equal to the Percentages of each such Participating Member and the denominator of which shall be equal to the aggregate Percentages owned by all Participating Members, or such other proportion of such Units as shall be agreed upon in writing by all Participating Members. The option granted to the Members in this Section 8.4.3 shall expire at the end of the option period herein granted if options for the Units are not exercised by the last date of such option period.

8.4.4  **Involuntary Transfer**. If a Member's Units are transferred by operation of law to any person (such as, but not limited to, a deceased Member's estate, a Member's trustee in bankruptcy, a purchaser at any creditor's or court sale or the guardian or conservator of an incompetent Member), the Company within forty-five (45) days of the receipt by it of actual notice of the transfer may exercise its option, which is hereby granted, and, if not exercised by the Company, the Members within sixty (60) days of the receipt of actual notice of the transfer may exercise their respective options, which are hereby granted, to purchase the Units so transferred for the price determined and in the manner provided in Section 8.4.

8.4.6  **Exercise of Options**. The purchase options granted in this Section 8.4 shall be exercised by delivery of written notice of exercise within the time periods provided in said section to the transferring Member and/or the proposed transferee in the case of a transfer pursuant to Section 8.4.2, 8.4.3 or 8.4.4, as the case may be.

8.4.7  **Failure to Exercise Option**. If the purchase options are not exercised in compliance with this Section 8.4, then the Units may be transferred to the proposed transferee named in the notice required by Section 8.4.1, and upon the terms therein stated, or to the transferee in the case of an Involuntary Withdrawal, within thirty (30) days after the expiration of the option period granted in Section 8.4.4. In the case of a Transfer as the result of an Involuntary Withdrawal, unless otherwise prohibited therein, the Units, after the expiration of the option periods set forth therein shall, in the hands of the transferee, be subject to the provisions of this Agreement. A subsequent transferee under Section 8.4 shall thereafter be subject to the terms of this Agreement as if such transferee had originally executed it. Unless and until admitted as a Member, any transferee of any Units, shall be merely an Interest Holder and subject to the terms of this Agreement.

8.4.7  **Transfers Not in Compliance with this Section**. If a Transfer is not upon the terms or is not to the transferee stated in the notice required of the transferring Member by Section 8.4.1, or is not within the time periods provided, or the transferor, after the transfer, reacquires the transferred Units, the Units transferred shall remain subject to this Agreement as if no transfer had been made.

8.4.8  **Fair Market Value**.

8.4.8.1  The value of each Unit to be purchased and sold upon exercise of the option granted in Section 8.4.4 shall be its Fair Market Value determined pursuant to an independent appraisal performed by an independent appraisal firm qualified in valuing interests in comparable companies in the same industry to determine the Fair Market Value and to prepare a written appraisal of any Units to be repurchased upon exercise of the option granted in Section 8.4.4. Without limiting the appraiser's consideration of any particular relevant fact in preparing its appraisal, the appraiser shall take into account (i) the criteria discussed in the previous sentence in determining the Fair Market Value of any Units (or portion thereof), (ii) the fact that only the Economic Interest is being transferred, if applicable, and (iii) in such a case, the transferring Member's death. The Fair Market Value of the Units shall be determined as of the last day of the month preceding the month in which the transfer of the Units occurred, unless the transfer shall have occurred within three (3) months prior to or within three (3) months after the end of a fiscal year of the Company, in which case Fair Market Value shall be determined as of the last day of such fiscal year.

8.4.8.2  In the event the transferee disagrees with the Fair Market Value determined by the independent appraiser pursuant to Section 8.4.8.1, such transferee shall notify the remaining Members

Exhibit 15 Page 392

in writing within thirty (30) days after such transferee receives the notice from remaining Members of the determination of Fair Market Value prescribed in Section 8.4.8.1 above.  If the remaining Members and such transferee cannot agree on such Fair Market Value within thirty (30) days after the receipt by the remaining Members of the transferee's notice disagreeing with such determination, then the issue shall be referred to two (2) appraisers, one of which shall be the remaining Member's existing appraiser and one of which shall be selected by the transferee.  If such appraisers cannot agree upon a Fair Market Value within thirty (30) days after they are appointed as provided for above, then the issue shall be referred to an appraiser selected by the appraisers selected by the remaining Members and the transferee.  The parties to the dispute shall cause such additional appraiser to render within thirty (30) days after its appointment a decision regarding the Fair Market Value, such decision shall be binding on the parties to the dispute for the purpose of this Section 8.4.8.

        8.4.8.3  The Company shall bear the fees and expenses of the appraiser selected by the remaining Member under Section 8.4.8.1. The Company shall also bear the fees and expenses of the appraiser selected by the transferee and the additional appraiser selected under Section 8.4.8.2 in the event the Fair Market Value finally determined pursuant to Section 8.4.8.2 is more than 10% greater than the Fair Market Value initially proposed by the remaining Members (or an appraiser chosen pursuant to Section 8.4.8.2); and, provided, further, however, that if the Fair Market Value of the Units of more than one transferring Member is the subject of any appraiser's determination under this Section 8.4.8, then each transferee shall pay his or her pro rata share (based upon the Fair Market Value of all such transferees' interests) of the fees and expenses, if any, required to be borne by such transferees under this Section 8.4.8.

        8.4.8.4  Notwithstanding anything to the contrary herein, no payment of the purchase price under this Article 8 may be made to any selling Member or his/her legal representatives to the extent the remaining Members determine that (a) such payment would cause an event of default or potential event of default to occur under the terms of any credit agreement to which the Company is a party,  (b) the Company is unable to fund such payment out of available cash or secure reasonable financing to make such payment, or (c) such payment would otherwise have a materially negative impact on the Company or its business.  In such circumstance, the Company agrees that is shall use its good-faith efforts to (a) have such default or potential event of default waived with respect to such payment, (b) secure such reasonable financing, or (c) pay that portion of such payment that does not cause a materially negative impact on the Company or its business and pay the remainder of any such payment as soon as practicable without causing such a materially negative impact.  In addition, each selling Member hereby agrees and acknowledges that the right to receive any payment of purchase price shall be forfeited by such selling Member if prior to the making of such payment the remaining Members determine that the selling Member has breached the terms of this Company Agreement (which breach remains uncured).

    8.4.10  **Purchase Price.** The price of each Unit to be purchased and sold under this Agreement shall be as follows:

        8.4.10.1 A purchase of Units pursuant to the options granted under this Section 8.4 shall be the consideration set forth in the notice required of a selling Member by Section 8.4.1.

        8.4.10.2 A purchase of Units pursuant to the option granted under Section 8.4.5 shall be for a price equal to one hundred (100%) percent of the Fair Market Value of Units established under Section 8.4.9.

    8.4.11  **Closing; Payment of the Purchase Price.** The purchase price for the Units shall be paid in cash. Unless otherwise agreed by the parties, the closing of the sale and purchase of the Units shall take place on the later of thirty (30) days after the delivery to the selling Member or the transferee of the written notice by the Company of its exercise of the option to purchase the selling Member's Units or thirty (30) days after the date on which Fair Market Value is determined pursuant to Section 8.4.8 above.

Exhibit 15 Page 393

8.5     **Effect of Assignment.** A Member shall cease to be a Member of the Company and to have the power to exercise any rights or powers of a Member upon transfer of all of the Member's Units.

8.6     **Rights of Interest Holders.** Interest Holders have no voting rights in the Company and are only entitled to receive the Economic Interest attributable to the Units transferred, subject to the terms and conditions set forth in this Agreement.

8.7     **Admission of Additional Members.** A Person may be admitted as a Member and, upon such admission, shall be admitted to all the rights, including Economic Interests and voting rights, of the Units upon approval of the Board. The Board may grant or withhold the approval of such admission in its sole and absolute discretion. If so admitted, such newly admitted Member shall have all the rights and powers and be subject to all the restrictions and liabilities of the Units assigned. The admission of an Interest Holder to membership, without more, shall not release the Member originally transferring the Units from any liability to the Company that may have existed prior to the admission of the Interest Holder as a Member of the Company. No Member admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Company may, at the time a Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted in accordance with the Code.

8.8     **Securities Laws.** Notwithstanding the preceding provisions of this Article, no proposed or intended Transfer of Units shall be effective, unless and until it appears, to the satisfaction of counsel for the Company, that such assignment, transfer or sale will not be in violation of, or otherwise render the Company and/or any Member liable under, the Securities Act, and the rules and regulations promulgated thereunder, or under the applicable state securities laws of any state or states.

## ARTICLE 9
## WITHDRAWAL; DISSOLUTION AND WINDING UP

9.1     **Withdrawal.** A Member shall not be permitted to withdraw or resign from the Company. The death, incompetency, adjudication of bankruptcy, whether voluntary or involuntary, or the Bankruptcy or dissolution of a Member during the term of this Agreement, shall not affect the Company or its business.

9.2     **Termination of the Company.** The Company shall be terminated and dissolved upon vote of the Members.

9.3     **Winding Up.** Upon the termination of the Company pursuant to Section 9.2 above, a full and general accounting shall be taken of the Company's business, and the affairs of the Company shall be wound up. Any profits earned or losses incurred since the last accounting shall be allocated among, or borne by, the Members in the same manner as Profits. The Board shall wind up and liquidate the Company by selling the Company's assets, or by distributing such assets in kind, subject to the Company's liabilities, or by a combination thereof, as determined by the Board. The proceeds of such liquidation shall be applied and distributed in the following order of priority, by the end of the taxable year during which the liquidation occurs (or, if later, within ninety (90) days after the date of the liquidation): (a) to the payment of any debts and liabilities of the Company; (b) to the setting up of any reserve which the Members shall reasonably deem necessary to provide for any contingent or unforeseen liabilities or obligations of the Company, with any excess in such reserve remaining after such liabilities are satisfied to be distributed as soon as practicable in the manner hereinafter set forth; and (c) thereafter, the balance of the proceeds, if any, shall be distributed in accordance with the positive Adjusted Capital Contributions of the Members, as determined after taking into account all capital account adjustments for the Company's taxable year during which such liquidation occurs. For purposes of this subsection, a liquidation of the Company shall mean a liquidation as defined in Regulation §1.704-1(b)(2)(ii)(g).

9.4 **Statement.** The Members shall be furnished with a statement prepared by the Company's accountants, which shall set forth the assets and liabilities of the Company as of the date of complete liquidation.

Exhibit 15 Page 394

9.5 **Return of Capital Contributions.** Notwithstanding anything in this Agreement to the contrary, no Member shall be personally liable for the return of Contributions of Members, or any portion thereof, it being expressly understood that any such return of Contributions of Members shall be made solely from Company assets.

## ARTICLE 10

## DISCLOSURES AND REPRESENTATIONS

10.1 **Disclosure by Company.** In connection with the offer and sale of Units to Members, the Company hereby discloses that the Units have not been registered under the Federal Securities Act of 1933, as amended (the "**Securities Act**"), and are being offered and sold by the Company pursuant to one or more exemptions from registration under the Securities Act, including the exemption provided by Section 4(2) of the Securities Act, Regulation D promulgated thereunder, and Regulation S and exemptions available under applicable state securities laws and regulations.

10.2 **Representations and Warranties.** In connection with a Member's purchase of Units, each Member represents and warrants, which representations and warranties shall survive the consummation of the Member's purchase of such Units, as follows: (a) the Member's principal residence is located within the country, state/province and at the address listed in Schedule A hereto; (b) the Member is aware that no market exists for the resale of Units; (c) the Member is purchasing the Units for investment and not for distribution; (d) the Member is aware of all restrictions imposed by the Company on the sale or transfer of the Units, including, but not limited to, any restrictive legends appearing on the certificate(s) and/or other document(s) evidencing the Units; (e) the Member acknowledges and understands that the Company has been organized with the intention that it qualify for taxation as a Company for U.S. federal income tax purposes. The Member acknowledges that the provisions of Subchapter K of the Code, and the Regulations thereunder will apply to the Company, and intend that the allocations of taxable income and loss, distributions to the Members and maintenance of Capital Accounts all conform to the requirements of the Code and the applicable Regulations; (f) the Member has full legal capacity to execute and agree to this Agreement and to perform his obligations hereunder; (g) the Member has duly executed and delivered this Agreement; (h) the Member's authorization, execution, delivery and performance of this Agreement do not conflict with any other material agreement or arrangement to which that Member is a party or by which he is bound or with any law or regulation to which that Member is subject; and (i) this Agreement constitutes the valid, binding and enforceable agreement of that Member, except to the extent such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as general principles of equity (regardless of whether considered in a proceeding in equity or in law).

## ARTICLE 11

## MISCELLANEOUS

11.1 **Obligations and Rights of Transferees.** Any person who acquires in any manner whatsoever any Membership Unit in the Company, irrespective of whether such person has accepted and assumed in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to, and to be bound by, all the obligations of this Agreement with the same force and effect as any predecessor in interest of such person.

11.3 **Benefit and Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next of kin, legatees, administrators, executors, legal representatives, nominees, successors and permitted assigns.

11.4 **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.

Exhibit 15 Page 395

11.5 **Governing Law.** This Agreement and the rights of all parties hereunder shall be governed by, and construed in accordance with, the laws of the State of California, without regard to the conflicts of laws principles thereof.

11.6 **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be considered an original when executed by one or more of the Members.

11.7 **Severability.** If any provision of this Agreement is declared by any court of competent jurisdiction to be invalid or unenforceable such invalidity or unenforceability shall not affect the remaining provisions of this Agreement. If such invalidity or unenforceability is due to the court's determination that the provision's scope is excessively broad or restrictive under applicable law then in effect, the parties hereby jointly request that such provision be construed by modifying its scope so as to be enforceable to the fullest extent of applicable law then in effect. If any provision is held to be invalid or unenforceable with respect to a particular circumstance, such provision shall nevertheless remain in full force and effect in all other circumstances.

11.8 **No Waiver.** The waiver by any party hereto of any breach of any provision of this Agreement shall not be deemed a continuing waiver, and shall not affect any subsequent breach of the same or different provisions of this Agreement.

11.9 **Further Assurances.** Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including using all commercially reasonable efforts to remove any legal impediment to the consummation or effectiveness of such transactions and to obtain any consents and approvals required under this Agreement.

11.10 **Neutral Construction.** The construction and interpretation of any clause or provision of this Agreement shall be construed without regard to the identity of the party that prepared this Agreement, and no presumption shall arise as a result that this Agreement was prepared by one party or the other.

11.11 **Attorneys' Fees.** In the event a dispute arises regarding this Agreement, the prevailing party shall be entitled to recover all attorneys' fees and expenses incurred.

11.12 **Injunctive Relief.** Without intending to limit the remedies available to either party, each party hereby acknowledges that a breach of any of the restrictive covenants contained in this Agreement may result in material and irreparable injury to the other party for which there is no adequate remedy at law, and that it may not be possible to measure damages for such injuries with reasonable certainty. In the event of such a breach or threat thereof, a party shall be entitled to obtain a temporary restraining order and/or a preliminary injunction restraining any other party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants in this Agreement. The parties expressly agree that it shall not be a defense in such an injunction action that a party had previously breached this Agreement.

11.13 **Representation of Counsel.** All parties acknowledge that prior to executing this Agreement, they have been advised to seek independent legal counsel. In executing this Agreement, all parties represent and warrant that they relied exclusively upon the advice of their respective independent legal counsel and are not entering into this Agreement based upon any representation of any other party or any other party's counsel.

11.14 **Jurisdiction.** Any and all legal proceedings to enforce this Agreement, or to enforce or vacate any judgment or award rendered therein, whether in contract, tort, equity or otherwise, shall be brought in the state or federal courts sitting in the district encompassing Los Angeles County, California, the parties hereto hereby waiving any claim or defense that such forum is not convenient or proper. Each party hereby agrees that any such court shall have in personam jurisdiction over it, and agrees that a final

Exhibit 15 Page 396

judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner specified by law.

11.15 **Force Majeure.** Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused by causes beyond that party's reasonable control and occurring without its fault or negligence, including, without limitation, failure of suppliers, subcontractors, and carriers, or party to substantially meet its performance obligations under this Agreement, provided that, as a condition to the claim of nonliability, the party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon. Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused.

11.16 **Notice.** All notices, requests, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service, if personally served; (b) on the day of facsimile over telephone lines with same day first class mailing of both the original of the documents and a proof of transmission; (c) on the day after mailing if sent by express overnight air courier guaranteeing next day delivery with written evidence of delivery; or (d) five (5) days after the date of mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed to the parties at the addresses listed above. Each party is required to notify the other party in the above manner of any change in address.

### [SIGNATURE PAGE FOLLOWS]

Exhibit 15 Page 397

**OPERATING AGREEMENT**
**LOS ANGELES COUNTY PROTON CENTER, LLC**
*a California Limited Liability Company*

Dated November 16, 2010

IN WITNESS WHEREOF, each Member has executed this Operating Agreement on the day and year first written above and by so doing consents to and agrees to be bound by the terms of this agreement.

**MEMBERS**

_____
Charles Liu

_____
John P. Thropay, M.D.

Exhibit 15 Page 398

**OPERATING AGREEMENT**
**LOS ANGELES COUNTY PROTON CENTER, LLC**
a California Limited Liability Company

### SCHEDULE A

*As of November 16, 2010*

**Members**

| Name and Address | No. of Units | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Charles Liu<br>REDACTED<br>Irvine, CA REDACTED | 75 | $1 | 75% |
| John P. Thropay, M.D.<br>REDACTED<br>Bradbury, CA REDACTED | 25 | $1 | 25% |

**Director Name and Address**

John P. Thropay, M.D.
REDACTED
Bradbury, CA REDACTED

Charles Liu
REDACTED
Irvine, CA REDACTED

| Officer Name and Address | Office |
|---|---|
| John P. Thropay, M.D.<br>REDACTED<br>Bradbury, CA REDACTED | President |
| Ruth T. Lopez Novodor | Secretary |
| Charles Liu<br>REDACTED<br>Irvine, CA REDACTED | Treasurer |

Exhibit 15 Page 399