# EXHIBIT 24

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                 Plaintiff,           )
6                                     ) Case No.
           vs.                        ) 8:16-cv-00974-CJC-AGR
7                                     )
     CHARLES C. LIU; XIN WANG a/k/a    )
8    LISA WANG; PACIFIC PROTON THERAPY )
     REGIONAL CENTER, LLC; PACIFIC     )
9    PROTON EB-5 FUND, LLC; and        )
     BEVERLY PROTON CENTER, LLC f/k/a  )
10   LOS ANGELES COUNTY PROTON         )
     THERAPY, LLC,                     )
11                                     )
                 Defendants.           )
12   _____ )

13

14

15            REMOTE VIDEO DEPOSITION OF TRANG LAM

16                      MARCH 9, 2021

17             CONDUCTED VIA VIDEOCONFERENCE

18

19

20

21

22

23
     Reported by
24   Cynthia J. Vega, RMR,
     RDR, CSR 6640, CCRR 95
25   Job No. 210309CJV

                                                          1

1          The remote video deposition of Trang Lam, a

2     Witness herein, located in the City of Costa Mesa,

3     State of California, taken on behalf of Plaintiff, on

4     Tuesday, March 9, 2021, beginning at the hour of

5     10:04 a.m. PST, remotely before Cynthia J. Vega, CSR

6     No. 6640, located in the City of Carlsbad, County of

7     San Diego, State of California.

8

9

10                    REMOTE APPEARANCES

11

12    For the Plaintiff:

13    SECURITIES AND EXCHANGE COMMISSION

14    By:  Gary Y. Leung

15         Jacob A. Regenstreif

16    444 South Flower Street, Suite 900

17    Los Angeles, California  90071

18    (323) 965-3998

19    leungg@sec.gov

20    regenstreifj@sec.gov

21

22

23

24

25

                                                        2

                                    TRANG LAM,

2   Witness herein, being first duly sworn, testifies as

3   follows:

4

5                                   EXAMINATION

6   BY MR. LEUNG:

10:06:03  7       Q.   Good morning, Ms. Lam.

10:06:04  8       A.   Good morning.

10:06:06  9       Q.   Can you please state your name and spell it

10:06:09 10   for the record.

10:06:10 11       A.   Trang Lam, T-r-a-n-g, L-a-m.

10:06:17 12       Q.   Ms. Lam, am I correct that you're located in

10:06:19 13   Costa Mesa, California, today?

10:06:22 14       A.   Yes.

10:06:23 15            MR. LEUNG:  Does counsel stipulate that the

10:06:25 16   remote oath administered by the court reporter

10:06:28 17   complies with the requirements of 30(b)(5)?

10:06:34 18            MR. BERGER:  Yes.

10:06:38 19            MR. LEUNG:  Herve?

10:06:38 20            MR. GOURAIGE:  I do.  Yes.

10:06:40 21            MR. LEUNG:  Thank you.

10:06:41 22   BY MR. LEUNG:

10:06:42 23       Q.   Ms. Lam, have you ever given a video

10:06:44 24   deposition before?

10:06:45 25       A.   No.

                                                              7

Exhibit 24 Page 438

10:22:56 1      Q.   This isn't evident in Exhibit 136, but do you

10:23:19 2  recall listing the AICPA under the "Organizations"

10:23:23 3  heading on your LinkedIn profile?

10:23:28 4      A.   I don't think that I did, but we are required

10:23:31 5  to be a member of the AICPA as an employment --

10:23:38 6      Q.   What is the -- oh, I'm sorry.  Go ahead.

10:23:39 7      A.   Yeah.  As an employment, you know, for

10:23:42 8  Marcum, we are required to have that, to pay for the

10:23:46 9  dues and be a member of AICPA.

10:23:50 10     Q.   And you are a member of AICPA?

10:23:52 11     A.   Yes.

10:23:54 12     Q.   How long have you been a member of AICPA?

10:23:57 13     A.   Ever since I start working with Marcum -- for

10:24:00 14  Marcum.

10:24:02 15     Q.   What is the AICPA?

10:24:05 16     A.   It's the -- I'm sorry.  I can't -- I don't

10:24:17 17  remember the full designation for AICPA.

10:24:25 18     Q.   That's fine.  The AICPA, does that provide

10:24:32 19  guidance to its membership on their professional

10:24:34 20  standards as certified public accountants?

10:24:38 21     A.   Yes.

10:24:45 22     Q.   When did you first come to work for Defendant

10:24:49 23  Liu or his affiliated companies?

10:24:54 24     A.   I believe in 2015.

10:24:58 25     Q.   What do you recall about the facts and

20

10:25:00  1   circumstances of Marcum's retention by Mr. Liu in

10:25:04  2   2015?

10:25:06  3        A.   I was working with a partner, Stan Lam.  He

10:25:10  4   was the one that brought in the client.

10:25:17  5        Q.   And who else was on the team that was working

10:25:18  6   for Mr. Liu as Stan Lam's client?

10:25:22  7        A.   There was another bookkeeper.  Her name is

10:25:25  8   Nancy McDaniel.

10:25:30  9        Q.   Nancy McDaniel was the bookkeeper on the

10:25:32 10   engagements.  And what was your role on the

10:25:34 11   engagement, Ms. Lam?

10:25:37 12        A.   My role was the manager on the engagement.

10:25:40 13        Q.   What does it mean to be a Marcum manager on a

10:25:44 14   professional services engagement?

10:25:45 15        A.   I reviewed the -- her work and communicate

10:25:50 16   with the client requesting additional information if

10:25:53 17   necessary.

10:25:58 18        Q.   Who did you communicate with at the clients

10:25:59 19   in connection with your 2015 and 2016 professional

10:26:02 20   services work for Mr. Liu and his affiliated entities?

10:26:08 21        A.   Mr. Liu.

10:26:08 22        Q.   Anybody else?

10:26:10 23        A.   That's it.

10:26:12 24        Q.   Did you ever speak with a Michael Cogswell?

10:26:16 25        A.   No.

21

10:26:19  1       Q.   Did you ever speak with Xin Wang, X-i-n, last

10:26:26  2   name W-a-n-g, also known as Lisa Wang?

10:26:31  3       A.   No.

10:26:33  4       Q.   Did you ever communicate as part of your 2015

10:26:36  5   and 2016 engagement with Dr. John Thropay?

10:26:41  6       A.   No.

10:26:42  7       Q.   Did you ever communicate as part of your 2015

10:26:43  8   and 2016 engagement with Ruth Novodor?

10:26:48  9       A.   No.

10:26:50  10      Q.   In connection with your 2015 and 2016

10:26:53  11  engagement, did you ever communicate with anybody at

10:26:56  12  Mevion?

10:26:57  13      A.   No.

10:27:01  14      Q.   And during your 2015 and 2016 work on the Liu

10:27:08  15  and affiliated entity engagement, did you ever

10:27:10  16  communicate with anybody at a company called Optivus,

10:27:12  17  O-p-t-i-v-u-s?

10:27:16  18      A.   No.

10:27:31  19      Q.   In order to perform the work that Marcum had

10:27:34  20  been engaged to do in 2015 and 2016, would you agree

10:27:39  21  that Marcum needed information about Mr. Liu's --

10:27:47  22  strike that.

10:27:48  23           In order to do the work that Marcum was

10:27:49  24  engaged to do in 2015 and 2016, would you agree that

10:27:52  25  Marcum needed certain information about Beverly

22

10:27:56  1   Proton, PP EB-5 Fund, and Pacific Proton?

10:28:03  2       A.   Yes.

10:28:04  3       Q.   And you received that information in the

10:28:07  4   course of doing your work; correct?

10:28:10  5       A.   Yes.

10:28:11  6       Q.   What was that information?  Could you

10:28:13  7   describe what information you received and what it was

10:28:18  8   and who communicated it to you?

10:28:21  9       A.   Mr. Liu provided us with past year income tax

10:28:25  10  return prepared by another CPA.  He also provided us

10:28:28  11  with bank statements for all of the entities and also

10:28:34  12  check stubs.

10:28:43  13      Q.   In terms of documents, any other information

10:28:45  14  that Mr. Liu provided to Marcum in the course of its

10:28:48  15  work in 2015 and 2016?

10:28:51  16      A.   He also provided us with employment contract

10:28:55  17  for him and Xin Wang.

10:29:03  18      Q.   Any other documentary material that Mr. Liu

10:29:06  19  provided to Marcum in the course of its work in 2015

10:29:10  20  and 2016?

10:29:10  21      A.   Also he provided the business credit card

10:29:14  22  statements.

10:29:28  23      Q.   How many credit cards was that, if you

10:29:30  24  recall?

10:29:32  25      A.   There was one that -- on Beverly Proton

23

10:29:35 1   books.

10:29:38 2       Q.   Any other credit cards besides the one that

10:29:41 3   was in the name of Beverly Proton?

10:29:43 4       A.   That was the only one that we have -- that we

10:29:45 5   have the statements.

10:29:50 6       Q.   Okay.  Any other documentary materials

10:29:52 7   provided by Mr. Liu to Marcum in connection with its

10:29:55 8   work in 2015 and 2016?

10:29:59 9       A.   He also provided payroll return for 2013, I

10:30:02 10  believe.

10:30:07 11      Q.   What's a payroll return?

10:30:09 12      A.   It is wages paid to employees, and you've got

10:30:15 13  to file that with the IRS and California EDD to report

10:30:18 14  the wages compensation.

10:30:25 15      Q.   Any other documentary material that was

10:30:27 16  provided to Marcum in connection with its professional

10:30:29 17  work for Mr. Liu in 2015 and 2016?

10:30:34 18      A.   For the business entity, I believe that

10:30:37 19  that's all that we received.

10:30:38 20      Q.   Okay.  You spoke to bank statements for the

10:30:43 21  three entities.  Were you referring to Pacific Proton,

10:30:45 22  Beverly Proton, and PP EB-5 Fund?

10:30:49 23      A.   Yes.

10:30:49 24      Q.   Do you recall the time periods for those bank

10:30:51 25  statements that Mr. Liu provided to Marcum in

24

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 443

10:30:54 1    connection with its 2015 and 2016 work?

10:30:59 2        A.    At first, we only were engaged to perform

10:31:04 3    bookkeepings and income tax services for 2014 and '15,

10:31:09 4    and we used the beginning balance that was from the

10:31:17 5    return prepared by the other CPA.

10:31:21 6            Then he came back and say those beginning

10:31:25 7    balance was not correct, so he wanted to -- us to do

10:31:32 8    the bookkeeping from inception to 2015.  So we went

10:31:41 9    back, and for some entity -- like, for example, the

10:31:45 10   Regional Pacific Proton, we went back to 2010 and did

10:31:50 11   the bookkeeping from there until 2015.  He provided us

10:31:54 12   with bank statement, and we entered the transaction

10:31:59 13   based on the bank statement.

10:32:01 14       Q.    Okay.  The bookkeeping work from 2010 to 2015

10:32:07 15   for Pacific Proton, you went back and you got further

10:32:11 16   bank statements.  Any other materials that you

10:32:14 17   considered when performing the bookkeeping work that

10:32:17 18   you did for Pacific Proton from 2010 to 2015, anything

10:32:21 19   besides the bank statements?

10:32:23 20       A.    Yes.  Bank statement.

10:32:26 21       Q.    Is that it?

10:32:27 22       A.    For Regional Center, for Pacific Proton,

10:32:31 23   there was no credit card, so we did not request that

10:32:35 24   from him.  Just bank statements.

10:32:40 25       Q.    Okay.  Beverly Proton, the project company,

25

10:32:45 1   did the bookkeeping work that Marcum was doing, did

10:32:49 2   that extend earlier than 2014 as well?

10:32:53 3       A.   Yes, we did.

10:32:55 4       Q.   How far back did you -- did the firm go?

10:32:57 5       A.   I believe it -- the entity started in 2012,

10:33:01 6   so we went back to 2012.

10:33:05 7       Q.   And what materials did Marcum consider when

10:33:09 8   performing the bookkeeping services for Beverly Proton

10:33:11 9   from 2012 up to 2015?

10:33:16 10       A.   Bank statements, and we also request check

10:33:19 11   stub from him.   And when that is not available, we

10:33:26 12   record the transaction based on the bank statement and

10:33:29 13   we ask him for the description, who was the check paid

10:33:35 14   to and what was it for.

10:33:38 15       Q.   When you say "him," you're referring to

10:33:40 16   Mr. Liu?

10:33:41 17       A.   Yes.

10:33:44 18       Q.   So would it be fair to say that to the extent

10:33:46 19   the bank records and the check stubs for Beverly

10:33:50 20   Proton, for Pacific Proton, the Regional Center, and

10:33:53 21   PP EB-5 Fund did not disclose enough information for

10:33:56 22   you to properly classify a given transaction, you

10:34:01 23   asked Mr. Liu about it and he provided you with

10:34:03 24   information?

10:34:06 25       A.   Yes.

26

10:34:12   1        Q.   Apart from what was communicated to you about

10:34:16   2   the reason for a given transaction by Mr. Liu, was

10:34:24   3   Marcum able to obtain any other information verifying

10:34:27   4   Mr. Liu's accounts of what the transaction had been

10:34:32   5   for?

10:34:32   6        A.   No.   We just based on his representation and

10:34:36   7   bank statement that he provided us.

10:34:41   8        Q.   Okay.   Just to close the loop, PP EB-5

10:34:48   9   Fund -- did Marcum perform bookkeeping services for

10:34:53  10   PP EB-5 Fund going back to periods earlier than 2013?

10:34:57  11        A.   Yes.

10:34:59  12        Q.   How far back did Marcum go?

10:35:02  13        A.   I have to check, but I believe that we went

10:35:06  14   back to the beginning.

10:35:09  15        Q.   And what year do you recall the beginning

10:35:11  16   being?

10:35:20  17        A.   2012 or '13.   I -- I don't remember.

10:35:27  18        Q.   And what materials did Marcum consider when

10:35:31  19   performing bookkeeping services for the PP EB-5 Fund

10:35:34  20   going back to potentially 2012?

10:35:37  21        A.   He provided us with bank statement and list

10:35:41  22   of investor.

10:35:48  23        Q.   Anything else?

10:35:50  24        A.   That's it.

10:35:52  25        Q.   And to the extent the information contained

27

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 446

10:35:55  1   in the bank statements or the investor list was not

10:36:00  2   sufficient for Marcum to make an account

10:36:02  3   classification, what did you do with respect to the

10:36:04  4   PP EB-5 bookkeeping work?

10:36:07  5       A.   We asked him for clarification.

10:36:12  6       Q.   And "him" is Mr. Liu?

10:36:13  7       A.   Yes.

10:36:14  8       Q.   And on the basis of information communicated

10:36:15  9   to you by Mr. Liu, you then made account

10:36:18 10   classifications for the PP EB-5 Fund; correct?

10:36:21 11       A.   Yes.

10:36:22 12       Q.   Did Marcum undertake any further verification

10:36:25 13   work to corroborate what Mr. Liu was telling the firm

10:36:28 14   about a given transaction by the PP EB-5 Fund?

10:36:31 15       A.   No.   That is -- that was not part of our

10:36:34 16   engagement.

10:36:44 17       Q.   You explained for me earlier that when Marcum

10:36:46 18   was first engaged, it was engaged to perform

10:36:50 19   bookkeeping and tax services for 2014 and 2015 and

10:36:54 20   that the engagement subsequently changed.  You also

10:36:57 21   testified that the dates that the bookkeeping work was

10:37:01 22   performed on went further back than 2014.  Did

10:37:04 23   anything else change about the engagement in 2015 and

10:37:08 24   2016?

10:37:11 25       A.   Not that I know of.

28

```
10:42:04  1   don't have to be independent, you know, from the
10:42:09  2   client.
10:42:11  3            MR. BERGER:  Gary, can I interrupt for one
10:42:13  4   second?  Can I provide a legal point in there?
10:42:17  5            MR. LEUNG:  Sure.
10:42:20  6            MR. BERGER:  Depending on state law, some
10:42:22  7   states classify compilation as assurance and some do
10:42:26  8   not.
10:42:27  9            I think that Ms. Lam is -- there's a
10:42:33 10   difference between -- maybe we can rephrase the
10:42:36 11   question.  Financial statement preparation is
10:42:40 12   preparing a financial statement as if you were an
10:42:43 13   internal accountant.  It is not providing any
10:42:46 14   assurance of accuracy.  It's just taking the numbers
10:42:49 15   that the client provides and putting a financial
10:42:51 16   statement together.
10:42:52 17            But I would let Ms. Lam clarify if I've got
10:42:56 18   that wrong.
10:42:57 19            THE WITNESS:  Yes.  So what we did for
10:42:59 20   Mr. Liu was to input the transaction in QuickBooks.
10:43:04 21   QuickBooks has a predefined chart of account.  The
10:43:10 22   balance sheet and profit and loss has already been set
10:43:13 23   up.  We input the transaction, we reconcile the bank
10:43:18 24   account, we push a button, then we have the balance
10:43:21 25   sheets and the profit and loss that you had copies of.
```

                                                                    32

Exhibit 24 Page 448

10:43:26  1   BY MR. LEUNG:

10:43:29  2       Q.   Ms. Lam, did you hear your counsel's

10:43:30  3   description of a financial statement preparation

10:43:32  4   engagement?

10:43:36  5       A.   Yes.

10:43:37  6       Q.   Do you agree with that characterization of

10:43:39  7   the scope of that sort of engagement, financial

10:43:42  8   statement preparation?

10:43:43  9       A.   For Mr. Liu, the engagement for -- with him

10:43:46 10   was bookkeeping and income tax service.  So the report

10:43:53 11   that we generate from QuickBooks was to help us

10:43:57 12   prepare tax return.  It was only for management use,

10:44:02 13   not third party.

10:44:05 14       Q.   Let's -- go ahead.

10:44:08 15       A.   Yes, management use only.

10:44:10 16       Q.   No third parties?

10:44:11 17       A.   No third party.

10:44:13 18       Q.   And the work that was -- the bookkeeping work

10:44:15 19   that was done in 2015 and 2016 was not pursuant to a

10:44:20 20   financial statement preparation engagement?

10:44:22 21       A.   No.

10:44:29 22       Q.   Just to be clear, no, it was not; right?

10:44:32 23       A.   No, it was not.

10:44:33 24       Q.   Thank you.

10:44:41 25            Okay.  And so as part of the work in 2015 and

33

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 449

10:44:44   1   2016, you and your team at Marcum did not verify the

10:44:49   2   accuracy or completeness of the information that had

10:44:51   3   been provided by Mr. Liu?

10:44:53   4        A.   No, we did not.

10:44:56   5        Q.   As part of the work prepared -- Marcum

10:45:00   6   engaged in -- strike that.

10:45:02   7             As part of the work Marcum did for Mr. Liu

10:45:05   8   and Beverly Proton and PP EB-5 Fund and Pacific Proton

10:45:11   9   in 2015 and 2016, you and your team at Marcum did not

10:45:15   10  gather evidence to express an opinion on the materials

10:45:21   11  generated by QuickBooks pursuant to your bookkeeping

10:45:24   12  work; is that correct?

10:45:26   13       A.   No, we did not.

10:45:32   14       Q.   As part of your engagement in 2015 and 2016

10:45:39   15  for Mr. Liu and Pacific Proton, Beverly Proton, and

10:45:45   16  PP EB-5 Fund, you and your team at Marcum did not

10:45:52   17  issue a report on the materials generated by the

10:45:59   18  QuickBooks reports prepared pursuant to your

10:46:03   19  bookkeeping work, did you?

10:46:04   20       A.   No, we did not.

10:46:21   21       Q.   If you could open up Exhibit 130.

10:46:35   22            MR. LEUNG:   And for the record, Exhibit 130

10:46:36   23  is a 15-page document.   It was previously marked at

10:46:42   24  another deposition.   It appears to be an email string

10:46:48   25  between Stan Lam and Charles Liu that begins on

34

| | | |
|---|---|---|
| 10:46:56 | 1 | April 29, 2015, leading into May 23, 2015, and there |
| 10:47:00 | 2 | is an attachment to this email string.  That |
| 10:47:06 | 3 | attachment appears to be a letter dated April 28, |
| 10:47:10 | 4 | 2015, under Marcum's letterhead. |
| 10:47:11 | 5 | BY MR. LEUNG: |
| 10:47:11 | 6 | Q.   Take your time to flip through the attachment |
| 10:47:14 | 7 | to the email in Exhibit 130, Ms. Lam, but when you're |
| 10:47:20 | 8 | ready, my first question is going to be:  Do you |
| 10:47:22 | 9 | recognize that attachment? |
| 10:47:23 | 10 | A.   Yes. |
| 10:47:26 | 11 | Q.   What is the attachment to the email string in |
| 10:47:29 | 12 | Exhibit 130? |
| 10:47:32 | 13 | A.   Is the Marcum engagement letter. |
| 10:47:35 | 14 | Q.   And the scope of Marcum's engagement is |
| 10:47:41 | 15 | accurately reflected by this engagement letter? |
| 10:47:43 | 16 | A.   Yes. |
| 10:47:46 | 17 | Q.   What is the purpose of an engagement letter |
| 10:47:48 | 18 | in your field? |
| 10:47:49 | 19 | A.   It's a contract.  It's an agreed-upon |
| 10:47:51 | 20 | procedure that -- between us and the client. |
| 10:47:58 | 21 | Q.   And then looking at the very first page of |
| 10:48:02 | 22 | the attachment Bates-numbered Marcum_CLiu_7275, it's a |
| 10:48:09 | 23 | letter addressed to Charles Liu, second paragraph |
| 10:48:11 | 24 | begins, "The purpose of this letter, including |
| 10:48:14 | 25 | Attachments A and B (collectively, the 'Agreement'), |

35

```
10:48:17  1   is to document the understanding between Marcum LLP

10:48:19  2   ('Marcum,' the 'firm,' 'we,' 'us' or 'our') and

10:48:24  3   Beverly Proton Center, Inc. and related entities (see

10:48:27  4   Attachment B) ('client,' 'company,' 'you' or 'your')

10:48:31  5   related to the tax compliance services ('tax

10:48:34  6   services') and accounting services ('accounting

10:48:38  7   services'), collectively 'services' for the company

10:48:40  8   for the years 2013, 2014 and 2015."

10:48:44  9         I just read that for you.  Is that consistent

10:48:47 10   with your understanding, this engagement letter set

10:48:51 11   forth the scope of the work that Marcum was to

10:48:53 12   perform?

10:48:53 13       A.   Yes.

10:48:54 14       Q.   Okay.  If you can open up Exhibit 131.

10:49:11 15            MR. LEUNG:  For the record, I've displayed to

10:49:12 16   the witness and counsel a document that's been

10:49:16 17   previously marked Exhibit 131.  It's a 16-page

10:49:19 18   document.  The very first page of the document bears

10:49:22 19   Marcum's letterhead.  It's dated May 11, 2016, and the

10:49:26 20   letter is addressed to Charles Liu.

10:49:28 21   BY MR. LEUNG:

10:49:30 22       Q.   Ms. Lam, once again, take as much time as you

10:49:31 23   need to flip through the document.  My first question

10:49:34 24   is going to be:  Do you recognize Exhibit 131?

10:49:37 25       A.   Yes.
```

36

10:49:38  1      Q.    What is Exhibit 131?

10:49:39  2      A.    It's Marcum engagement letter.

10:49:44  3      Q.    Why was a second engagement letter executed

10:49:45  4   on or about May 2016?

10:49:48  5      A.    You know, for different years.  So the other

10:49:51  6   one was, I believe, for '13 and '14, and --

10:50:00  7      Q.    This one was for '15?

10:50:01  8      A.    Yeah.

10:50:02  9      Q.    Okay.  So you have the ability to pull up

10:50:10 10   Exhibit 130 and also Exhibit 131.  Again, take your

10:50:17 11   time.

10:50:18 12            Each of these engagement letters has a

10:50:20 13   section entitled "Accounting Services."

10:50:24 14      A.    Yes.

10:50:24 15      Q.    I would just like you to confirm for me that

10:50:29 16   besides the difference in Exhibit 130, which refers to

10:50:35 17   monthly accounting services, and Exhibit 131, which

10:50:38 18   refers to quarterly accounting services, the language

10:50:44 19   describing the scope of the accounting services to be

10:50:47 20   provided by Marcum is identical in the 2016 engagement

10:50:52 21   letter and the 2015 engagement letter, Exhibits 131

10:50:57 22   and 130, respectively.

10:51:00 23      A.    Yes, they are identical.

10:51:14 24      Q.    Okay.  Let's stick with Exhibit 131.

10:52:19 25            So page 3, accounting services -- are you

37

10:52:21 1   with me?

10:52:22 2       A.   Yes.

10:52:22 3       Q.   That sentence or that section begins with,

10:52:28 4   "We will perform accounting -- quarterly accounting

10:52:30 5   services that include," and then there is a series of

10:52:32 6   bullet points.  Those bullet points, do they

10:52:37 7   accurately reflect the accounting services that were

10:52:39 8   rendered by Marcum in 2015 and 2016?

10:52:42 9       A.   Yes.

10:52:44 10      Q.   Okay.  The very first bullet point reads,

10:52:48 11  "Post coded transactions to the company's general

10:52:48 12  ledger."

10:52:55 13          (Reporter clarification.)

10:52:57 14      Q.   The very first bullet point reads, "Post

10:52:59 15  coded transactions to the company's general ledger.

10:53:03 16  You must code all check stubs/checks as to the proper

10:53:07 17  account number for recording in the general ledger."

10:53:10 18          Who is the "you" that's being referred to in

10:53:13 19  Marcum's engagement letter?

10:53:16 20      A.   The client.

10:53:19 21      Q.   And in this engagement, the client was

10:53:21 22  Mr. Liu?

10:53:21 23      A.   Yes.

10:53:23 24      Q.   And did Mr. Liu, in connection with Marcum's

10:53:26 25  work in 2015 and 2016, code check stubs and checks as

38

10:53:30  1    to the proper account number for recording in the

10:53:33  2    general ledgers of Pacific Proton, Beverly Proton, and

10:53:39  3    PP EB-5 Fund?

10:53:39  4        A.    Yes.   On the check stub that he provided, he

10:53:41  5    would note what was that check for.    Then we would

10:53:47  6    code it to the correct general account.

10:53:52  7        Q.    And without that information from Mr. Liu,

10:53:55  8    you and your team at Marcum were not in a position to

10:53:58  9    code those checks --

10:54:01 10        A.    Correct.

10:54:01 11        Q.    -- to the proper account?

10:54:01 12        A.    Yes.

10:54:02 13        Q.    Okay.   The second bullet point reads,

10:54:06 14    "Proposing adjusting or correcting journal entries to

10:54:09 15    be reviewed and approved by the company."

10:54:11 16            What's an adjusting or correcting journal

10:54:14 17    entry?

10:54:15 18        A.    For example, if we record depreciation or we

10:54:20 19    classify transaction from one account to the other.

10:54:28 20        Q.    And to the extent there were adjusting or

10:54:31 21    correcting journal entries in the QuickBooks reports

10:54:35 22    prepared by Marcum for the three entities in 2015 and

10:54:37 23    2016, those adjustments and corrections needed to be

10:54:43 24    approved by Mr. Liu?

10:54:45 25        A.    Yes.   We usually communicated with him, and

39

Exhibit 24 Page 455

10:56:09  1    Q.   -- is that right?

10:56:09  2    A.   Yes.

10:56:09  3    Q.   And there is a series of bullet points.

10:56:11  4         Those bullet points, do those accurately list

10:56:15  5  tasks that Marcum had no responsibility for

10:56:19  6  undertaking pursuant to its engagement in the work it

10:56:23  7  performed in 2015 and 2016?

10:56:26  8    A.   Yes.

10:56:28  9    Q.   And did Mr. Liu, the client, have

10:56:31 10  responsibility for doing each of the bullet points

10:56:34 11  listed under the "In this engagement, we," Marcum,

10:56:37 12  "have no responsibility" section?

10:56:41 13    A.   That's his responsibility.

10:56:42 14    Q.   Okay.  Moving on, the next paragraph says,

10:56:47 15  "We are not being engaged to prepare financial

10:56:49 16  statements or perform compilation, review or audit

10:56:53 17  services."

10:56:53 18         Is that an accurate statement?

10:56:54 19    A.   Yes.

10:56:56 20    Q.   And Marcum did not, in fact, in 2015 and 2016

10:56:59 21  prepare financial statements or perform compilation,

10:57:02 22  review, or audit services, did it?

10:57:05 23    A.   We did not.

10:57:06 24    Q.   It goes on to say, "Accordingly, our work in

10:57:13 25  this engagement is not intended to result in the

41

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 456

10:57:15   1   preparation or issuance of a financial statement.

10:57:17   2   Should you require a financial statement we would be

10:57:20   3   pleased to discuss with you the requested level of

10:57:22   4   service."

10:57:25   5           Before this past year, did there come a time

10:57:27   6   when Mr. Liu engaged in discussions with Marcum about

10:57:32   7   increasing the scope of its work to include

10:57:37   8   preparation of financial statements?

10:57:41   9       A.   I was not aware.

10:57:42  10       Q.   Okay.  The next paragraph, we've already

10:57:54  11   discussed adjusting or correcting journal entries.  I

10:57:58  12   want to start with the sentence, "You are responsible

10:58:02  13   for reviewing the entries and understanding the nature

10:58:05  14   of any proposed entries and the impact they have on

10:58:07  15   your books and records.  You are responsible for

10:58:09  16   adjusting the books and records to correct material

10:58:12  17   misstatements."

10:58:13  18           The "you" is a reference to Mr. Liu, your

10:58:15  19   client; correct?

10:58:17  20       A.   Yes.

10:58:29  21       Q.   Next paragraph, "The above accounting

10:58:32  22   services will be performed based on data and

10:58:34  23   information you provide to us.  We will not verify or

10:58:37  24   audit this information.  None of these services can be

10:58:42  25   relied on to detect errors, fraud or illegal acts that

42

Exhibit 24 Page 457

10:58:46   1   may exist."

10:58:48   2          Is that statement accurate?

10:58:50   3      A.   Yes.

10:58:53   4      Q.   Did the work that Marcum performed for

10:58:56   5   Mr. Liu, Beverly Proton, PP EB-5 Fund, and Pacific

10:58:59   6   Proton in 2015 and 2016 comport with that statement?

10:59:07   7      A.   Yes.  We did accounting services for him.

10:59:10   8      Q.   And those accounting services that you did

10:59:12   9   for Mr. Liu were not to be relied on to detect errors,

10:59:16   10   fraud, or illegal acts; correct?

10:59:19   11      A.   Yes.

10:59:21   12      Q.   Marcum did not verify or audit any

10:59:23   13   information provided to it by Mr. Liu in connection

10:59:27   14   with the 2015 and 2016 work; correct?

10:59:30   15      A.   We did not.

10:59:51   16      Q.   I'm not sure if I've covered this.  Moving

10:59:53   17   back to page 4 of the engagement letter,

10:59:56   18   second-from-last paragraph at the bottom, there is a

11:00:01   19   sentence that begins, "Additionally."  It says,

11:00:03   20   "Additionally, we are prohibited by professional

11:00:06   21   standards from preparing source documents and

11:00:08   22   authorizing or approving transactions.  Accordingly,

11:00:11   23   management must determine and approve all transactions

11:00:14   24   including appropriate account classifications."

11:00:17   25          Is that an accurate statement?

43

| | | |
|---|---|---|
| 11:00:20 | 1 | A.   Yes. |
| 11:00:22 | 2 | Q.   And did the work that Marcum performed for |
| 11:00:25 | 3 | Mr. Liu, Beverly Proton, PP EB-5 Fund, and Pacific |
| 11:00:30 | 4 | Proton in 2015 and 2016 comport with that statement? |
| 11:00:35 | 5 | A.   Yes. |
| 11:01:19 | 6 | Q.   I'm going to skip to Exhibit 142.  If you can |
| 11:01:22 | 7 | open up 142, please. |
| 11:01:35 | 8 | MR. LEUNG:  For the record, Exhibit 142 is a |
| 11:01:38 | 9 | three-page document.  It will be marked Exhibit 142. |
| 11:01:41 | 10 | (Exhibit 142 was marked for identification.) |
| 11:01:41 | 11 | BY MR. LEUNG: |
| 11:01:43 | 12 | Q.   It appears to be an email string between you, |
| 11:01:46 | 13 | Stan Lam, Milena Dolukhanyan, D-o-l-u-k-h-a-n-y-a-n, |
| 11:01:53 | 14 | and others.  The email string runs from April 19, |
| 11:02:03 | 15 | 2016, to April 20, 2016. |
| 11:02:08 | 16 | Ms. Lam, do you recognize Exhibit 142? |
| 11:02:10 | 17 | A.   Yes. |
| 11:02:13 | 18 | Q.   And is 142 a true and accurate copy of the |
| 11:02:17 | 19 | email communications you had regarding the work that |
| 11:02:20 | 20 | Marcum had been engaged in on behalf of Pacific |
| 11:02:24 | 21 | Proton, Beverly Proton, and PP EB-5 Fund back in 2016? |
| 11:02:28 | 22 | A.   Yes. |
| 11:02:28 | 23 | Q.   Okay.  And in Exhibit 142, are you |
| 11:02:38 | 24 | transmitting certain QuickBooks reports to Milena |
| 11:02:45 | 25 | Dolukhanyan? |

44

11:02:48  1      A.   Yes.

11:02:49  2      Q.   And do you see in her reply email to you on

11:02:53  3  Tuesday, April 19, at 5:44 p.m. -- I'm just going to

11:02:58  4  call her Milena -- Milena writes, "Ms. Lam, Thank you

11:03:01  5  for your email.  This is to confirm that we have

11:03:04  6  received balance sheets, profit and loss and general

11:03:06  7  ledgers for Pacific Proton EB-5, LLC, Beverly Proton

11:03:11  8  Center, LLC, and Pacific Medical Regional Center, LLC,

11:03:15  9  for 2014 and 2015.  Are there income statements and

11:03:20 10  statements of retained earnings and cash flows for any

11:03:23 11  of these entities for 2014 and 2015?  If so, please

11:03:27 12  provide them to us."

11:03:28 13          And then you write her back on April 20, and

11:03:32 14  you write, "Milena, Profit and loss is the same as

11:03:34 15  income statement.  There was no statements of retained

11:03:37 16  earnings and statement of cash flows for these

11:03:40 17  entities.  Please keep in mind that we were engaged

11:03:43 18  only to do bookkeeping and tax preparation.  These

11:03:45 19  QuickBooks reports were generated from the bookkeeping

11:03:48 20  services and they were intended for management use

11:03:50 21  only."

11:03:51 22          Those last few sentences, those are accurate

11:03:55 23  statements; correct?

11:03:56 24      A.   Yes.

11:03:58 25      Q.   And what you told Milena in April 2016 is

45

11:04:02  1    consistent with what you've testified to today, that

11:04:07  2    the work Marcum did in 2015 and 2016 was bookkeeping

11:04:11  3    work and not financial statement preparation; is that

11:04:14  4    true?

11:04:15  5        A.   Yes.

11:04:18  6        Q.   And with respect to the output, you describe

11:04:21  7    those as QuickBooks reports that were generated from

11:04:26  8    the bookkeeping services.  What did you mean by that?

11:04:30  9        A.   That's when we go to "Report" in QuickBooks

11:04:33 10    and print the balance sheet and the profit and loss on

11:04:35 11    the software.

11:04:40 12        Q.   And in the course of pressing the button and

11:04:44 13    having the QuickBooks software generate from the

11:04:45 14    general ledger a report on P&L, did you add any

11:04:52 15    financial notes to the report?

11:04:55 16        A.   I believe that when we did the 2014, the

11:04:59 17    beginning balance that we carried forward were from

11:05:03 18    the previous CPA tax return that they prepared.  So I

11:05:08 19    put some notes in there that we don't have -- those

11:05:12 20    number came from the tax return prepared with other

11:05:15 21    CPAs.

11:05:17 22        Q.   Okay.  And do you recall if those QuickBooks

11:05:20 23    reports that you transmitted in April of 2016 had a no

11:05:27 24    assurance -- or sorry -- a "Management Use Only"

11:05:31 25    watermark?

46

11:18:08  1      A.   There might be some adjustment.  Like I said,

11:18:10  2   we did the past year accounting.  I remember

11:18:18  3   collecting during that time.  So the previous report

11:18:23  4   probably had notes in there that the beginning balance

11:18:25  5   came from tax return prepared by other CPA.  These

11:18:29  6   report here probably was done after the bookkeeping

11:18:36  7   that we did for those past year.

11:18:38  8      Q.   Okay.  So the Excel spreadsheets attached to

11:18:50  9   your email in Exhibit 141 would reflect all the

11:18:54 10   bookkeeping services performed by Marcum for the

11:18:57 11   entire 2012 --

11:19:00 12      A.   Yes.

11:19:00 13      Q.   -- to 2015 period?

11:19:01 14      A.   Right.

11:19:10 15      Q.   But once again, these QuickBooks reports that

11:19:14 16   were generated and transmitted in August of 2016, they

11:19:18 17   were not created in connection with the financial

11:19:22 18   statement preparation engagement; correct?

11:19:24 19      A.   No, they were not.

11:19:29 20      Q.   All right.  I want to open up one of the

11:19:31 21   attachments to your email.  That is Exhibit 141C.  So

11:19:40 22   from Egnyte, you should be able to download the file.

11:19:42 23   I'll also share it on my screen.  And once downloaded,

11:19:50 24   you should be able to see it in Excel, as opposed to

11:19:54 25   the web browser.  Let me know if you're having some

                                                                    53

11:23:54  1      A.   Yes.

11:23:57  2      Q.   Any other information provided by Mr. Liu

11:23:59  3  that provided justification for that management fee

11:24:03  4  classification with respect to all personal expenses

11:24:07  5  or any other funds transfers to Mr. Liu by the Beverly

11:24:10  6  Proton account?

11:24:12  7      A.   Just the employment contract.

11:24:14  8      Q.   Okay.  You see the account 3110 distribution?

11:24:31  9      A.   Yes.

11:24:32 10      Q.   What was that account for?

11:24:35 11      A.   That account is like a holding account where

11:24:37 12  we would code all of the expenses that the company

11:24:45 13  paid on his behalf, and then later on we reclassify

11:24:49 14  the total to the account 1666 as management fees to

11:24:55 15  him.

11:25:02 16      Q.   What information did you receive from Mr. Liu

11:25:04 17  that -- strike that.

11:25:10 18           You spoke to a number of transfers to Mr. Liu

11:25:14 19  being personal expenses or -- personal expenses or

11:25:19 20  expenses of Beverly Proton, Ms. Lam?

11:25:23 21      A.   Any of the Beverly Proton expenses would go

11:25:27 22  to profit and loss related to the -- we would code it

11:25:36 23  to the business expense.

11:25:40 24           Anything that's personal in nature, we would

11:25:43 25  code it to distribution at first and then reclassify

56

11:25:48 1    to management fee.

11:25:51 2         Q.   So personal expenses of Mr. Liu were coded as

11:25:54 3    distributions and then reclassified as management

11:25:56 4    fees?

11:25:56 5         A.   Yes.

11:25:58 6         Q.   In every instance?

11:26:00 7         A.   Every instance, yes.

11:26:02 8         Q.   And what was the rationale for those

11:26:05 9    classifications?

11:26:06 10            Actually, first off, were those

11:26:08 11   classifications approved by Mr. Liu?

11:26:11 12        A.   Yes.

11:26:13 13        Q.   They weren't approved by Marcum; right?

11:26:15 14        A.   No.

11:26:17 15        Q.   And what was the justification for that

11:26:18 16   treatment of those personal expenses?

11:26:21 17        A.   Because they are personal in nature.

11:26:24 18   Cannot -- we cannot treat it as business expense.

11:26:30 19        Q.   And then why were they reclassified as

11:26:32 20   management fees?

11:26:34 21        A.   Because based on the agreement that he had

11:26:36 22   with the company, he is entitled to a certain amount

11:26:42 23   of compensation.  And we reclassify those as

11:26:48 24   management fees to him.

11:26:51 25        Q.   And that agreement you're referring to is

57

11:26:53  1   Mr. Liu's employment agreement with Beverly Proton;

11:26:56  2   correct?

11:26:56  3       A.   Yes.

11:27:00  4       Q.   And there isn't anything else that justifies

11:27:03  5   that classification besides the employment agreement

11:27:06  6   with Beverly Proton and Liu?

11:27:08  7       A.   Yes, just the employment agreement.

11:27:32  8       Q.   Account number 1668 marketing fees, what

11:27:36  9   transactions were classified as marketing fees?

11:27:40 10       A.   The marketing fees, I believe those are the

11:27:46 11   payments to Industrial Banking.  Let me look at the

11:27:55 12   general ledger.

11:28:03 13           (Reporter clarification.)

11:28:04 14           MR. LEUNG:  I can't hear you, Herve, what you

11:28:05 15   said.

11:28:08 16           MR. GOURAIGE:  I didn't hear the page number,

11:28:09 17   Gary.

11:28:10 18           MR. LEUNG:  The page number of the -- we're

11:28:13 19   using the native Excel spreadsheet.  This is

11:28:16 20   Exhibit 141C.

11:28:19 21           MR. GOURAIGE:  Right.

11:28:20 22           MR. LEUNG:  The Bates number for 141C is --

11:28:24 23   if you print it out, it's Marcum_CLiu_7409 to 7484.

11:28:42 24   BY MR. LEUNG:

11:28:43 25       Q.   So I've isolated the only transactions,

58

11:28:44  1   Ms. Lam, classified as marketing fees under account

11:28:47  2   number 1668.  Does that refresh your recollection as

11:28:51  3   to what kinds of transactions were classified to that

11:28:54  4   account?

11:28:55  5       A.   I'm trying to expand the general ledger

11:28:58  6   because it's -- so I can see the detail.

11:29:06  7       Q.   Are you able to do that on your screen, or

11:29:07  8   are you asking me to do it?

11:29:08  9       A.   Yeah.  I can't do it on my screen.  Can you

11:29:13 10   just point to --

11:29:14 11       Q.   Sure.  Is there a particular place you'd like

11:29:20 12   me to go to?

11:29:21 13       A.   Yeah.  The marketing fees that you were

11:29:22 14   referring to.

11:29:29 15       Q.   Sure.

11:29:35 16       A.   Yeah.  So those are payment to Industrial

11:29:37 17   Commercial Bank.

11:29:40 18       Q.   Okay.  And so what was the basis of that

11:29:45 19   classification?

11:29:48 20       A.   We were told by Mr. Liu that the payment to

11:29:51 21   that company was for marketing fees.

11:29:55 22       Q.   Okay.  Any other information you received

11:29:59 23   from Mr. Liu apart from his oral admonition that these

11:30:02 24   should be marketing fees?

11:30:03 25       A.   No.  That's all.

59

11:30:05   1      Q.   No documents, no invoices, no bills of sale,

11:30:09   2   nothing in that vein; correct?

11:30:12   3      A.   No.  We don't have any of those documents.

11:30:16   4      Q.   Okay.  All right.  Account number 1600

11:30:20   5   medical equipment.

11:30:24   6      A.   Yes.

11:30:24   7      Q.   Okay.  I'm going to show you the general

11:30:28   8   ledger entries associated with that, the couple

11:30:32   9   transactions in 2015.  What kinds of transactions were

11:30:36  10   classified as 1600 medical equipment?

11:30:42  11      A.   This one here is a payment, electronic fund

11:30:47  12   transfer, that came out of his -- the Beverly Proton

11:30:49  13   bank account for $3 million, and it was to a company

11:30:55  14   called -- I believe it's Mevion or Optivus, one of

11:31:02  15   those.

11:31:02  16           And Nancy McDaniel, our bookkeeper, she

11:31:10  17   Googled the company and it was a medical company.  And

11:31:18  18   we confirmed with Mr. Liu that was it for medical

11:31:24  19   equipment and he was told -- we were told that it was

11:31:27  20   a deposit for equipment.

11:31:33  21      Q.   Was Marcum able to review the sales contract

11:31:36  22   for that transaction?

11:31:37  23      A.   We don't have any of that.

11:31:40  24      Q.   So no documentary information about the

11:31:43  25   transaction itself.  An Internet search that confirmed

60

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 467

11:31:48  1   that Mevion was a company and then information from

11:31:51  2   Mr. Liu formed the basis for this classification;

11:31:53  3   correct?

11:31:53  4        A.    Yes.

11:32:28  5        Q.    Account number 6165, what kinds of

11:32:31  6   classifications are coded to that account?

11:32:34  7        A.    Attorney fees, consulting fees, accounting

11:32:36  8   fees would go to that account.

11:32:42  9        Q.    And on what information were these account

11:32:43 10   classifications based?

11:32:46 11        A.    We would record these transaction from the

11:32:49 12   check stub that he provided, and on it there was name

11:32:53 13   of these attorney fees and we coded to legal and

11:32:57 14   professional.

11:33:03 15        Q.    Okay.  So my question is directed to all the

11:33:04 16   years in which you prepared the general ledger for

11:33:07 17   Pacific Proton, Beverly Proton, and PP EB-5 Fund.

11:33:10 18             For legal and professional fees, am I correct

11:33:13 19   that the documentary information you saw were check

11:33:18 20   stubs, but you did not receive any information in the

11:33:20 21   way of invoices, itemized work statements, engagement

11:33:28 22   letters, anything of that sort that would indicate

11:33:31 23   what services were actually being rendered?

11:33:33 24        A.    No.  We did not have any of those documents.

11:33:38 25        Q.    Okay.  And the check stubs that you based the

61

Exhibit 24 Page 468

11:33:41 1   general ledger on which identified a service provider

11:33:45 2   that Mr. Liu then explained was a law firm or other

11:33:50 3   professional service provider, did those check stubs

11:33:54 4   spell out whether the expenses related to the EB-5

11:34:02 5   offering or the Pacific Proton Cancer Center project?

11:34:07 6   Offering versus project.

11:34:09 7        A.   No.

11:34:10 8        Q.   Did the check stubs give you any information

11:34:11 9   on that question?

11:34:12 10       A.   No, because they were -- the check stubs

11:34:15 11  were, you know, from the entity.  And so for Beverly

11:34:20 12  Proton, then we would just code it to legal and

11:34:25 13  professional.  We would have no idea -- we did not

11:34:29 14  know it is related to the offering or to anything

11:34:32 15  else.  We don't know.

11:34:39 16       Q.   Account number 1750 L/R Pacific Proton

11:34:42 17  Regional.  I think L/R means loan repayment; is that

11:34:48 18  correct?

11:34:48 19       A.   Loan receivable.

11:34:51 20       Q.   Loan receivable.

11:34:54 21            For each of these account classifications,

11:34:56 22  did Mr. Liu provide Marcum with copies of an actual

11:35:01 23  loan agreement between Beverly Proton and Pacific

11:35:05 24  Proton Regional Center?

11:35:07 25       A.   No.  I did not see any loan agreement.

62

11:35:28  1      Q.   Account number 1664 agent's fees, what did

11:35:31  2  that account classification pertain to?

11:35:36  3      A.   These payment were paid to oversea Chinese

11:35:42  4  immigration consulting.

11:35:44  5      Q.   What does agent's fees mean?

11:35:48  6      A.   We were told that those were agent fees

11:35:50  7  and -- from Mr. Liu, he said that each investor, EB-5

11:36:01  8  investor, that they were able to recruit, 75,000 has

11:36:07  9  to be paid to oversea Chinese banking as the agent

11:36:17 10  fees.

11:36:20 11      Q.   And did Mr. Liu orally communicate that

11:36:23 12  information?

11:36:24 13      A.   I have an email -- we have email

11:36:27 14  communication from him telling us that -- how it need

11:36:31 15  to be booked.

11:36:33 16      Q.   Okay.  Mr. Liu telling you how it needed to

11:36:35 17  be booked?

11:36:36 18      A.   Yes.

11:36:38 19      Q.   Did Mr. Liu provide you with an agreement

11:36:42 20  between overseas Chinese banking and any of the

11:36:48 21  subject entities?

11:36:49 22      A.   No.

11:37:06 23      Q.   Account number 6055 consulting.  What

11:37:14 24  transactions did the consulting 6055 account pertain

11:37:18 25  to?

63

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 470

11:37:19  1       A.   So like I said, these payment were paid to

11:37:22  2   oversea Chinese banking corporation.   Originally we

11:37:27  3   coded to consulting.   Then we reclassified and put it

11:37:33  4   on the balance sheet.

11:37:38  5       Q.   As agent's fees?

11:37:39  6       A.   Yes.

11:37:42  7       Q.   Why did Marcum originally classify these

11:37:44  8   amounts as consulting?

11:37:47  9       A.   We just -- you know, based on the description

11:37:53 10   on the wire transfer that it went out from the bank

11:37:56 11   statement -- from his bank statement and send it to

11:37:59 12   oversea consulting.   And we just -- because the

11:38:03 13   consulting was part of the -- a part of the name of

11:38:06 14   the recipient, then we just code it to consulting.

11:38:12 15   And then confirm it with him where is the proper

11:38:18 16   classification it should be, and we move it to agent

11:38:22 17   fees on the balance sheet.

11:38:25 18       Q.   Okay.   Account number 2510 L/P Pacific Proton

11:38:35 19   EB-5 Fund.   I assume L/P means loan payable?

11:38:38 20       A.   Yes.

11:38:43 21       Q.   Why were these debit transactions classified

11:38:49 22   in this way?

11:38:53 23       A.   Let me see.   Because the money came in

11:38:55 24   from -- from the EB-5 program to Beverly Proton.   So

11:39:05 25   it's a payable on Beverly Proton book, but it's a

64

11:39:11  1  receivable on the EB-5 book.

11:39:13  2      Q.   Do you know why the EB-5 investor funds came

11:39:16  3  in to Beverly Proton's account as opposed to the

11:39:21  4  PP EB-5 Fund account?

11:39:25  5      A.   I believe all of the fund from the investor

11:39:28  6  came in to the EB-5 program or account, EB-5 account.

11:39:34  7  And then from there, the EB-5 would loan Beverly

11:39:38  8  Proton money to pay for marketing fee, agent fees, all

11:39:46  9  of that.

11:39:49 10      Q.   Yeah, maybe I'm misunderstanding this.

11:39:51 11          These debit amounts, this is money that

11:39:55 12  Beverly Proton is transferring to the PP EB-5 Fund;

11:39:59 13  right?

11:40:00 14      A.   No.  You're looking at the Beverly Proton

11:40:04 15  general ledger; right?

11:40:06 16      Q.   Yes.

11:40:07 17      A.   So when the money come in, it will be a debit

11:40:10 18  to cash, then a credit to the loan payable Pacific

11:40:17 19  EB-5 Fund.

11:40:19 20      Q.   I see.  Okay.  All right.  One last one,

11:40:33 21  travel expense account number 6500.  On what

11:40:38 22  information did Marcum base its classification of

11:40:42 23  transactions to the 6500 travel expense account?

11:40:47 24      A.   We review the credit card statement that he

11:40:50 25  provided, the client provided.  And, for example, it

65

11:40:56  1  say "Air China," then we code it to travel expense.

11:41:04  2      Q.   To the extent that travel was personal, would

11:41:08  3  it have been coded to travel expense on the Beverly

11:41:11  4  Proton general ledger?

11:41:15  5      A.   We don't know if it's business or -- because

11:41:18  6  the credit card was a business credit card, we assume

11:41:22  7  that all of that transaction was business related, so

11:41:25  8  we code it to travel expense.

11:41:32  9           THE REPORTER:  Counsel, can we take a break

11:41:32 10  when you get to a good place, please?

11:42:16 11           MR. LEUNG:  Yeah.  Now is a good stopping

11:42:17 12  point.  How about ten minutes?

11:42:19 13           THE REPORTER:  Thank you.

11:42:21 14           MR. LEUNG:  Sure thing.  Going off record at

11:42:23 15  11:42 Pacific time.  Let's get back on at 11:52.

11:42:31 16           THE VIDEOGRAPHER:  Going off the record at

11:42:31 17  11:42 a.m.

11:43:02 18           (Recess, 11:42 a.m. to 12:00 p.m.)

11:43:05 19           THE VIDEOGRAPHER:  And we're back on the

12:00:37 20  record at 12:00 p.m.

12:00:38 21  BY MR. LEUNG:

12:00:42 22      Q.   Welcome back, Ms. Lam.  If you could open up

12:00:44 23  Exhibit 140 again and turn to page 129 of 167.

12:00:50 24      A.   Okay.

12:00:50 25      Q.   And that is that compensation chart that we

66

12:11:34  1       A.   But the expense that we record -- but the

12:11:38  2   expense were actually on Beverly Proton books.  So we

12:11:43  3   record this intercompany transfer general entry.

12:11:49  4       Q.   I see.  So the expense is being booked to

12:11:51  5   Beverly Proton as a management fee and then by Beverly

12:11:55  6   Proton to Liu; correct?

12:11:56  7       A.   Yes.

12:11:56  8       Q.   And the informational basis for that

12:11:58  9   reclassification again is the employment agreement

12:12:01 10   between Liu and Beverly Proton; right?

12:12:03 11       A.   Yes.

12:12:06 12       Q.   Okay.  With respect to these journal

12:12:08 13   adjustments, I just want to make sure.  Liu approved

12:12:17 14   the account classifications; right?

12:12:20 15       A.   Yes.

12:12:21 16       Q.   And it's not the case that Marcum as part of

12:12:24 17   its engagement obtained reasonable assurance that that

12:12:27 18   account classification wouldn't result in a material

12:12:31 19   misstatement?

12:12:32 20       A.   No.  It's not our engagement to do that.

12:12:36 21       Q.   It didn't obtain limited assurance or any

12:12:40 22   assurance in that respect; correct?

12:12:41 23       A.   No.  We only -- our engagement was for

12:12:44 24   bookkeeping and income tax services.

12:12:48 25       Q.   Got it.  And Marcum did not perform any

73

Exhibit 24 Page 474

12:12:50  1   verification or substantiation procedures with respect

12:12:52  2   to this journal adjustment; correct?

12:12:55  3      A.   No, we did not.

12:13:05  4      Q.   Then going to the general ledgers tab, if we

12:13:09  5   go to column R, split, and then we pull up only the

12:13:15  6   1666 management fees --

12:13:18  7      A.   Yes.

12:13:20  8      Q.   -- transactions.

12:13:21  9           We're seeing the two transactions that were

12:13:24  10  reclassed to the management fee account; correct?

12:13:28  11     A.   Yes.

12:13:32  12     Q.   Why don't we close 141A and open up 141B.

12:14:03  13     A.   Okay.  I'm ready.

12:14:07  14     Q.   Your computer is faster than mine.  I'm still

12:14:09  15  waiting for mine to download, if you can just bear

12:14:11  16  with me.

12:14:11  17          I'll ask you a question.  Is Exhibit 141B the

12:14:22  18  native version of which you've just opened in your

12:14:25  19  Excel spreadsheet -- or Microsoft Excel program a true

12:14:29  20  and accurate copy of the general ledger report and

12:14:33  21  related QuickBooks reports for the Beverly Proton

12:14:39  22  Center account in 2014 that you transmitted to Don

12:14:43  23  Wise and others on or about August 3, 2016?

12:14:46  24     A.   Yes.

12:14:52  25     Q.   If we can start with the adjusting journal

74

12:33:12  1          "Answer:  That's a true copy, yes.

12:33:13  2          "Do you need the question read back for you

12:33:15  3  sir?

12:33:15  4          "Can you read back the question, please,

12:33:18  5  Diane.

12:33:18  6          (Question read.)

12:33:19  7          "Answer:  Yes."

12:33:20  8          Okay.  So again, whether it's the MOU or the

12:33:23  9  employment agreement, nobody from the company or

12:33:27 10  Mr. Liu ever communicated to you that the employment

12:33:30 11  agreement on which you based all of those management

12:33:34 12  fee classifications for Beverly Proton didn't exist

12:33:36 13  until April 2016; right?

12:33:40 14      A.   Yes.  I did not.

12:33:50 15      Q.   Did Mr. Liu ever explain for you or your team

12:33:53 16  at Marcum the facts and circumstances surrounding his

12:33:59 17  signing of that April 5, 2016, employment agreement

12:34:02 18  with Beverly Proton?

12:34:06 19      A.   Not to me.

12:34:11 20      Q.   You don't recall a Michael Cogswell, do you?

12:34:15 21      A.   No.  I've never met him.  Probably just

12:34:19 22  through email, but I've never met him.

12:34:21 23      Q.   Okay.  Did you know that Michael Cogswell had

12:34:25 24  been previously employed by a proton therapy equipment

12:34:29 25  manufacturer called Mevion?

84

```
12:41:40  1   also said that she had never met or knew anything
12:41:43  2   about Mr. Cogswell.
12:41:50  3   BY MR. LEUNG:
12:41:50  4       Q.   All right.  Well, let's just take a big step
12:41:52  5   back.
12:41:53  6            In the course of preparing the general
12:42:00  7   ledgers for Beverly Proton, Pacific Proton, and PP
12:42:06  8   EB-5 Fund for all of the years that Marcum did these
12:42:11  9   accounting services for, transactions needed to be
12:42:14 10   classified; correct?
12:42:17 11       A.   Yes.
12:42:19 12       Q.   Did Marcum approve any of those transactions?
12:42:26 13            MR. BERGER:  What does "approve" mean,
12:42:28 14   please?
12:42:29 15            MR. LEUNG:  It means what it meant in the
12:42:31 16   engagement letter.
12:42:31 17   BY MR. LEUNG:
12:42:31 18       Q.   Did Marcum approve any of those transactions?
12:42:38 19            MR. GOURAIGE:  I'll object to the question.
12:42:45 20            MR. BERGER:  I think that Marcum's engagement
12:42:46 21   letter approval was based on information provided by
12:42:49 22   Mr. Liu.  I don't think that Marcum undertook any
12:42:52 23   independent obligations -- we've already established
12:42:55 24   that -- to confirm or look at any -- or confirm the
12:43:00 25   accuracy of --
```

90

Exhibit 24 Page 477

12:43:05  1          MR. LEUNG:  Steve, I'd like to hear it from

12:43:06  2   the witness.  Can I just ask my question?

12:43:14  3          THE REPORTER:  There was a bit of overlap.

12:43:15  4   BY MR. LEUNG:

12:43:15  5      Q.   Ms. Lam, can you please answer my question?

12:43:17  6      A.   So we record the transaction in according

12:43:20  7   with the information that was provided to us by the

12:43:22  8   client; for example, the management fees, we base it

12:43:26  9   on the agreement, the employment contract that he

12:43:28 10   provided, so we reclassified it from distribution to

12:43:32 11   management fees.

12:43:36 12      Q.   In recording those transactions, Marcum and

12:43:39 13   your team did not approve the transactions; right?

12:43:42 14      A.   We record it based --

12:43:44 15          MR. GOURAIGE:  I object to the word

12:43:45 16   "approve."

12:43:49 17   BY MR. LEUNG:

12:43:50 18      Q.   Please go ahead.

12:43:51 19      A.   We record it based on the information

12:43:54 20   provided by the client.

12:43:57 21      Q.   And when you recorded based on the

12:44:00 22   information provided by the client, Marcum and your

12:44:02 23   team did not approve of any of those transactions; is

12:44:05 24   that correct?

12:44:05 25      A.   We recorded it.

91

12:44:06 1         MR. GOURAIGE:   Again, objection to the word

12:44:07 2    "approve."

12:44:13 3    BY MR. LEUNG:

12:44:13 4         Q.   What's the difference between recording and

12:44:16 5    approving?   Did you -- when you say you recorded the

12:44:19 6    transactions, are you testifying that Marcum approved

12:44:21 7    all the transactions?

12:44:22 8         A.   We just record it.   That doesn't mean that

12:44:25 9    it's approved, it's right or wrong.   We record it

12:44:28 10   based on the information provided by the client.

12:44:32 11        Q.   And that's -- Ms. Lam, that's all I'm asking.

12:44:34 12        A.   Yes.

12:44:35 13        Q.   Marcum did not approve any of the

12:44:37 14   transactions recorded in the general ledgers during

12:44:39 15   its work in 2015 and '16; right?

12:44:43 16        A.   We just record it, yes.   We do not audit.   We

12:44:47 17   did not audit.   We did not confirm.   We did not do any

12:44:52 18   of that.   We just record the transaction based on the

12:44:56 19   documents provided to us by the client.

12:44:59 20        Q.   And for those transactions and the account

12:45:02 21   classifications, it was management that approved those

12:45:05 22   account classifications, not Marcum; correct?

12:45:08 23        A.   Yes.

12:45:11 24        Q.   And management in this case was Mr. Liu and

12:45:13 25   Mr. Liu only; correct?

92

12:45:14  1      A.   Yes.

12:45:15  2      Q.   Okay.  For all of those account

12:45:20  3  classifications, it was not Marcum's job to obtain

12:45:23  4  reasonable assurance that the classifications wouldn't

12:45:25  5  result in a material misstatement; right?

12:45:28  6      A.   That was not under the scope of our

12:45:33  7  engagement.

12:45:34  8      Q.   And for all of those account classifications,

12:45:36  9  it was not Marcum's job to obtain even limited

12:45:39 10  assurance that those classifications didn't need to be

12:45:42 11  materially modified; correct?

12:45:44 12      A.   No.

12:45:45 13      Q.   Okay.  Throughout the entire course of the

12:45:49 14  2015 and 2016 accounting services engagement, Marcum

12:45:53 15  did not perform any inquiry or analytical procedures

12:45:57 16  as to the appropriateness of the account

12:45:59 17  classifications for all of these transactions that

12:46:01 18  were recorded to the general ledger; is that correct?

12:46:04 19      A.   That's correct.  Our engagement was strictly

12:46:07 20  for bookkeeping and income tax services.

12:46:11 21      Q.   And with respect to all of these transactions

12:46:12 22  and all of these account classifications for Pacific

12:46:17 23  Proton, Beverly Proton, and PP EB-5 Fund, Marcum did

12:46:21 24  not perform any verification or substantiation

12:46:23 25  procedures as to the appropriateness of those

93

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 24 Page 480

12:46:26 1   classifications as part of its work in 2015 and 2016;

12:46:30 2   is that correct?

12:46:31 3       A.   That is correct.

12:46:33 4       Q.   And Marcum issued no formal report in

12:46:36 5   conjunction with the QuickBooks reports that it

12:46:38 6   generated in 2015 and 2016; correct?

12:46:41 7       A.   We did not.

12:47:24 8       Q.   Approximately when did you cease work on the

12:47:27 9   Liu and related entity engagement in 2016?

12:47:32 10      A.   When we completed the tax return for the

12:47:35 11  entities.  I believe that was September of -- 15 of

12:47:42 12  2016.

12:47:45 13      Q.   Did you handle billing for the engagement or

12:47:47 14  was that Mr. Lam's end?

12:47:51 15      A.   Mr. Lam did it.

12:47:52 16      Q.   Do you recall if Liu paid his outstanding

12:48:00 17  invoices for services rendered back in 2016?

12:48:03 18      A.   I don't remember.  I don't know.

12:49:23 19      Q.   Ms. Lam, earlier today you testified about

12:49:26 20  how the time period for the bookkeeping services

12:49:28 21  expanded to earlier dates for each of the three

12:49:32 22  entities.  You also explained that the bookkeeping

12:49:34 23  work for those earlier periods was based on bank

12:49:38 24  statements and canceled checks.

12:49:40 25          Do you recall reviewing anything in the way

94

Exhibit 24 Page 481

1                    REPORTER'S CERTIFICATE

2

3          I, Cynthia J. Vega, a Certified Shorthand

4    Reporter for the State of California, do hereby

5    certify:

6          That the witness in the foregoing remote

7    deposition was by me duly sworn remotely; that the

8    remote deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported by me stenographically and

11   were transcribed through computerized transcription

12   under my direction; and the foregoing is a true and

13   correct record of the testimony and proceedings taken

14   at that time.

15         I further certify that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing proceeding and caption named or in any way

18   interested in the outcome of the cause in said

19   caption.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 12th day of March, 2021.

22         Reading and Signing was requested.

23

24   _____

25         Cynthia J. Vega, CSR No. 6640