GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
Email: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>          vs.<br><br>CHARLES C. LIU;<br>XIN WANG a/k/a LISA WANG;<br>PACIFIC PROTON THERAPY<br>REGIONAL CENTER, LLC;<br>PACIFIC PROTON EB-5 FUND,<br>LLC; and BEVERLY PROTON<br>CENTER, LLC f/k/a LOS ANGELES<br>COUNTY PROTON THERAPY,<br>LLC,<br><br>                      Defendants. | Case No. 8:16-cv-00974-CJC-AGR<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S CORRECTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR DISGORGEMENT AGAINST DEFENDANTS LIU AND WANG**<br><br>Date:          June 7, 2021<br>Time:         1:30 p.m.<br>Ctrm:        9B<br>Judge:       Hon. Cormac J. Carney |

# **TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................1

II. STATEMENT OF FACTS ...............................................................................1

    A. Liu and Wang's Fraudulent EB-5 Securities Offering........................1

    B. Procedural History .............................................................................2

        1. This Court's prior findings of fact ...........................................2

        2. The Supreme Court's decision on disgorgement......................4

III. ARGUMENT ....................................................................................................5

    A. Legal Standard....................................................................................5

    B. Investor Funds Raised Less Legitimate Expenses Is $20,871,758.81 ..................................................................................5

        1. Proceeds raised from defrauded investors ...............................6

        2. Offering expenses .....................................................................7

        3. Business expenses for project development and operations.................................................................................7

        4. Net profits: proceeds raised less legitimate expenses..............8

    C. Purported "Business" Expenditures Arising from Liu's Self-Dealing and Corporate Looting Are Not Legitimate Expenses .............................................................................................9

        1. The Pacific Proton Business Plan and PPEB5 Fund POM .......................................................................................10

        2. Liu forces Dr. Thropay to demolish his office building at 111 W. Beverly to convey the illusion of progress.............11

        3. Liu engages in self-dealing when spending $3 million in Beverly Proton funds to benefit United MPH ...................11

        4. Liu engages in self-dealing when abandoning the 111 W. Beverly project site ............................................................14

    D. The Exorbitant Compensation Liu and Wang Paid Themselves Is Not a Legitimate Expense ............................................................15

    E. Defendants' Self-Serving Characterization of Their Expenses May Be Disregarded..........................................................................17

        1. Marcum's prior tabulation of "deductible business expenses" ...............................................................................17

i

2.    Marcum's bookkeeping services relied on Liu........................18

3.    Defendants' legitimate expense evidence is therefore circular.............................................................................21

F.    Wang Engaged in Concerted Misconduct with Liu ..........................21

IV.    CONCLUSION.............................................................................25

# **TABLE OF AUTHORITIES**

## **CASES**

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946)..................................................................................5

*Liu v. SEC*,
   140 S. Ct. 1936 (2020)..............................................................4, 5, 9, 21, 24

*Magnesystems, Inc. v. Nikken, Inc.*,
   933 F. Supp. 944 (C.D. Cal. 1996) ..........................................................2

*North River Ins. Co. v. Philadelphia Reinsurance Corp.*,
   63 F.3d 160 (2d Cir. 1995) ......................................................................3

*Providence Rubber Co. v. Goodyear*,
   76 U.S. 788 (1869)....................................................................................4

*SEC v. Calvo*,
   378 F.3d 1211 (11th Cir. 2004) ................................................................5

*SEC v. Cross Fin. Services*,
   908 F. Supp. 718 (C.D. Cal. Sept. 5, 1995).............................................25

*SEC v. Curative Biosciences, Inc.*,
   No. 8:18-CV-00925-SVW, 2020 WL 7345681 (C.D. Cal. Oct. 22, 2020).......22

*SEC v. First City Financial Corp., Ltd.*,
   890 F.2d 1215 (D.C. Cir. 1989)...........................................................5, 17

*SEC v. First Pac. Bancorp*,
   142 F.3d 1186 (9th Cir. 1998) ..................................................................5

*SEC v. JT Wallenbrock & Associates*,
   440 F.3d 1109 (9th Cir. 2006) ................................................................17

*SEC v. Liu*,
   262 F. Supp. 3d 957 (C.D. Cal. 2017)................................1, 2, 3, 16, 24

*SEC v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972) ..................................................................25

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010)...................................................5, 17, 25

*SEC v. Slowinski*,
   2020 WL 7027639 (N.D. Ill. Nov. 29, 2020)..........................................9

*United States v. Mills*,
   810 F.2d 907 (9th Cir. 1987) ....................................................................3

*Williamsburg Wax Museum v. Historic Figures, Inc.*,
   810 F.2d 243 (D.C. Cir.1987)...................................................................2

**FEDERAL STATUTES**

26 U.S.C. § 6621(a)(2)..............................................................25

**Securties Act of 1933**

Section 17(a)(2)
        [15 U.S.C. § 77q(a)(2)].........................................2

**Securities Exchange Act of 1934**

Section 21(d)
        [15 U.S.C. § 78u(d)]...........................................24

Section 21(d)(5)
        [15 U.S.C. § 78u(d)(5)].........................................4

Section 21(d)(7)
        [15 U.S.C. § 78u(d)(7)]......................................5, 24

## I.   <u>INTRODUCTION</u>

This case has been remanded from the Supreme Court on one narrow issue – the precise amount of net profits that defendants Charles C. Liu and Xin Wang must disgorge as a consequence of their securities law violations.  "[T]here is no question that Defendants committed securities fraud.  There is no question that they must pay civil penalties for that fraud.  And there is no question they must disgorge their net profits." Dkt. No. 297 at 4.  The SEC now moves for a final judgment that orders Liu and Wang to disgorge, jointly and severally, $20,871,758.81 in net profits.

## II.   <u>STATEMENT OF FACTS</u>

### A.   Liu and Wang's Fraudulent EB-5 Securities Offering

Beginning on October 1, 2014 and through April 2016, defendant Liu used the EB-5 Immigrant Investor program to obtain more than $26 million in funds from investors, for the ostensible purpose of developing and operating a proton cancer therapy center in Montebello, California that would in turn generate new employment opportunities in that community.  *SEC v. Liu*, 262 F. Supp. 3d 957, 961 (C.D. Cal. 2017).  Liu and Dr. John Thropay, Liu's business partner, had formed defendant Pacific Proton Therapy Regional Center, LLC ("Pacific Proton") years earlier, and Pacific Proton was designated as an EB-5 regional center by USCIS in 2012.  *Id.* at 961-962.  They also formed defendant Beverly Proton Center, LLC ("Beverly Proton"), the entity that would purportedly develop and operate the proton cancer therapy center sponsored by Pacific Proton.  *Id.*  Last, Liu and Dr. Thropay formed defendant Pacific Proton EB-5 Fund ("PPEB5 Fund") to act as the private fund investment vehicle for defendants' EB-5 securities offering.  *Id.*  Each share of the PPEB5 Fund required investors to pay a $500,000 Capital Contribution to the PPEB5 Fund, as well as a $45,000 Administrative Fee to Pacific Proton.  *Id.*  The PPEB5 Fund was then supposed to loan investors' capital contributions to Beverly Proton to support the development of the proton therapy cancer center.  *Id.*

The private offering memorandum ("POM") that defendants provided to

1

investors "clearly delineated the purposes and legitimate uses of Capital Contributions and [Administrative] Fees." For the $500,000 investors paid in Capital Contributions:

> [The POM] stated that Liu and Corporate Defendants would use the entire Capital Contribution to create the proton therapy center. (*See* POM at 470 ("Other expected uses of [Capital Contributions] include construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the project."); *id*. at 470 n.2 ("Offering expenses, commissions and fees incurred in connection with this Offering shall [not] be paid ... from EB–5 Capital Contributions."); *id*. at 468 (Beverly Proton "will use the [Capital Contributions] to partially finance the construction and operation of a proton therapy center.").)

In contrast, as to the $45,000 paid by investors as an Administrative Fee:

> [T]he POM explicitly stated that the Administrative Fee would be spent on, *inter alia*, offering expenses and marketing. (POM at 452 ("PPEB5 charges an administrative fee ... for payment of expenses incurred in connection with this Offering."); *id*. at 456 (Administrative Fee to "pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering."); *id*. at 470 n.2 (same).)

262 F. Supp. 3d at 962. Despite raising a significant amount of capital – $26 million in a little more than a year – nearly no construction on the proton therapy center took place. Rather, "Liu burned through the millions left after payments to himself, Wang, and the marketers on half-hearted attempts to convey the illusion of progress." *Id.* at 964. On April 20, 2017, this Court granted summary judgment for the SEC as to defendants' liability under Section 17(a)(2) of the Securities Act.

## B. Procedural History

### 1. This Court's prior findings of fact

This matter is now on remand from the Supreme Court. Because the Ninth Circuit upheld this Court's liability findings and imposition of a permanent injunction barring defendants from soliciting EB-5 investors in the future, and defendants did not challenge those rulings before the Supreme Court, those factual findings are undisturbed on remand as the law of the case. *See Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 950 (C.D. Cal. 1996) (quoting *Williamsburg Wax Museum v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir.1987)) ("[u]nder the law of the

case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time"); *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 164-65 (2d Cir. 1995) (same); *see also United States v. Mills*, 810 F.2d 907, 909 (9th Cir. 1987) (even in cases where an argument has not been waived as not raised on appeal, the law of the case doctrine generally provides that "in order to maintain consistency during the course of a single case, reconsideration of questions previously decided should be avoided"). Accordingly, the following facts have been resolved.

Liu reached agreements with marketers that inherently violated the POM. Given the excessive compensation promised and paid to them for soliciting investment in the PPEB5 Fund, it was impossible for those offering expenses to comply with the POM by not exceeding the $45,000 Administrative Fee. *See Liu*, 262 F. Supp. 2d at 970. What's more, "Liu also failed to inform investors that he would award himself and Wang 'salaries' totaling $6,714,580 and $1,538,000" which necessarily would have had to be paid out of investors' Capital Contributions"; that material fact was "wholly absent from the POM's description of Capital Contributions." *Id.* at 970. These "actions contravene[d] the POM's clear delineation between appropriate uses of Capital Contributions (development and operation of the project) and Administrative Fees (commissions, fees, and marketing)," and Liu and Wang consequently violated the antifraud provisions of the federal securities laws. *Id.*

"Liu and Wang's receipt of millions of dollars of investor funds was unequivocally negligent" since "[n]o reasonable party managing the development of a EB-5-compliant proton therapy center in accordance with the representations made to investors would allow construction to languish while funneling millions of dollars to themselves, to foreign entities they controlled, and to foreign entities tasked with

3

enticing more investors." *Id.* at 972.  In addition, "[t]here [was] overwhelming evidence that Liu and Wang acted with a high degree of scienter," including *inter alia* Liu's self-dealing when cutting Dr. Thropay out of the project in order to elevate himself and Wang, their hasty execution of employment agreements in 2016 putatively entitling them to exorbitant retroactive salaries, and Liu's and Wang's rampant misappropriation of investor funds by way of repeated and large-dollar transfers to their personal accounts and for their personal use.  *Id.* at 972-973.

### 2.    The Supreme Court's decision on disgorgement

The Supreme Court held that this Court had authority to award disgorgement as "equitable relief" under 15 U.S.C. § 78u(d)(5), emphasizing that recovery of unjust enrichment was a "mainstay of equity courts" that lay "within the heartland of equity." *Liu v. SEC*, 140 S. Ct. 1936, 1942-43 (2020).  The Court further held that disgorged funds generally must be returned to victims for their benefit under Section 21(d)(5), *id.* at 1947-49; joint-and-several liability must be consistent with equitable principles, *id.* at 1949; and courts must deduct legitimate expenses before ordering disgorgement, *id*. at 1949-50.

With respect to business expenses, the Supreme Court reasoned that equity "courts limited awards to the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'" *Liu*, 140 S. Ct. at 1945 (emphasis added) (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869)).  Accordingly, in calculating Liu's and Wang's ill-gotten gains, this court must make "allowance for the cost and expense of conducting [a] business" that produced the funds subject to disgorgement.  140 S. Ct. at 1950 (alteration in original ) (internal quotation marks omitted).  The Supreme Court agreed that the defendants misappropriated and must disgorge most of the offering proceeds they stole from investors, *id.*, but remanded for this Court to distinguish between misappropriated funds and funds that were spent in accordance with the offering documents provided to investors and had "value" to investors

1    "independent of fueling a fraudulent scheme." *Id*. at 1950.

2    **III.    ARGUMENT**

3         **A.    Legal Standard**

4         "A disgorgement award that does not exceed a wrongdoer's net profits and is

5    awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)."

6    *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020). *See also* 15 U.S.C. § 78u(d)(7) ("In any

7    action or proceeding brought by the Commission under any provision of the securities

8    laws, the Commission may seek, and any Federal court may order, disgorgement").

9    *Liu* did not address or purport to change long-standing precedent that in order to be

10   entitled to disgorgement, the SEC needs to produce only a reasonable approximation

11   of the defendant's ill-gotten gains. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d

12   1072, 1096 (9th Cir. 2010) (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191

13   (9th Cir. 1998)).

14        Upon the Commission's production of a reasonable approximation, the burden

15   shifts to the defendant to demonstrate the SEC's estimate is not reasonable. *Platforms*

16   *Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d

17   1215, 1232 (D.C. Cir. 1989)). Similarly, if the Commission's "measure of

18   disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose

19   illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir.

20   2004); *see Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

21        **B.    Investor Funds Raised Less Legitimate Expenses Is $20,871,758.81**

22        From October 1, 2014 to April 28, 2016, defendants fraudulently raised

23   $26,423,168 from investors. Their offering expenses were capped at the $45,000

24   administrative fee received from each investor. Since that sum – $2,210,701 – was

25   dwarfed by what defendants actually paid to overseas marketers, only $2,210,701

26   may be deducted as legitimate offering expenses. As to business expenses for the

27   development of the proton cancer therapy project itself, only $3,105,809 are

28   deductible in accordance with the POM. Defendants Liu and Wang should therefore

be ordered to disgorge $20,871,758.81, net of the $ 234,899.19 that remains in the corporate accounts.  *See* § III(B)(1)-(4), *infra*.

In contrast, Liu and Wang will argue that they must disgorge nothing for their fraud, on the back of their wildly-inflated math that all told, they legitimately dissipated <u>$26,348,101.00</u> in investor funds.  *See* Dkt. No. 296-1 at pp. 111-114.  But Liu's misconduct and his self-dealing shortly before the SEC brought this enforcement action, render many of his claimed expenses illegitimate.  That includes the $3 million in investor funds he redirected to Mevion, the equipment manufacturer that Liu inexplicably dropped Optivus for in November 2015, as well as the millions in exorbitant "compensation" Liu and Wang paid themselves in the course of their fraud.  *See* § III(C) and (D), *infra*.  Second, defendants' proffered expense deductions are all grounded on a broken and incomplete evidentiary foundation because they are thinly-documented and unverified.  *See* § III(E), *infra*.  The expenses classifications applied by the corporate defendants' accountant to these funds transfers in their general ledgers were based on Liu's bare say-so; that accountant performed zero verification and substantiation work on the financial transfers at issue, did not engage in an audit, review, or even compilation in accordance with professional accounting standards, and thus provided no assurance as to those amounts.  *See id.*  Third, and finally, Wang and Liu engaged in concerted misconduct and should be found jointly and severally liable for disgorgement.  *See* § III(F), *infra*.

### 1.   Proceeds raised from defrauded investors

From October 1, 2014 to April 28, 2016, the corporate defendants' bank records show that defendants received, net of apparent refunds to investors, $24,212,467 in capital contributions and $2,210,701 in administrative fees, for a total of $26,423,168 raised from investors.  Leung Decl. at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 25-26, 29, Ex. 4.[1]

---

[1] Based on its review of the corporate defendants' bank records, the SEC calculated $26,967,918 in

### 2.   Offering expenses

All told, commissions paid to UDG, Overseas Chinese, and Delsk in connection with the $26 million raised from October 1, 2014 through April 2016 exceeded $10 million.  *Id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶ 37, Ex. 5; Dkt. No. 6 at ¶ 22.  Moreover, according to the POM and Liu's deposition testimony, additional expenses of the offering – as opposed to development and operational expenses of the project itself – included professional fees paid to Marcum (the CPA that performed bookkeeping services for the corporate defendants), legal fees associated with work on USCIS and EB-5 issues, and amounts paid to economic consultants retained to work on the Pacific Proton regional center application.  *Id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 34-35; *see also id.* at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 79:21-80:10, 128:4-6, 15-21, 129:2-10, 131:7-14.

But the entire sum of each $45,000 administrative fee received was easily exhausted by the excessive commissions defendants paid to UDG, Overseas Chinese, and Delsk.  And only that amount – the $2,210,701 in administrative fees paid as reflected in the corporate defendants' bank records – may be deducted as a legitimate offering expense in accordance with the POM.  No other offering expenses incurred in excess of $2,210,701 are deductible.  *Id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 33-37.

### 3.   Business expenses for project development and operations

As to business expenses for the project that defendants claimed to be developing, $3,105,809 in legitimate expenses are deductible.  These amounts are

---

funds received, net of refunds, from investors in October 2014 through December 2015 (the last transfer of investor funds to the corporate defendants occurred on December 31, 2015).  *See* Dkt. No. 6 at ¶¶ 17, 27 ($24,712,217 capital contributions + $2,255,701 administrative fees), Exs. 8 and 12; Dkt. No. 160-1 at ¶ 8.  This amount, less the remaining funds in the frozen corporate accounts, is $26,733,018.80.  See Dkt. No. 163 at ¶ 27.  On summary judgment, the SEC submitted this figure, which the defense did not contest.  Dkt. No. 200-1 (SUF) at p. 21, ¶ 131; Dkt. No. 212 at p. 21, ¶ 131.  During discovery on remand, however, Liu asserted that certain additional funds had been refunded to investors.  Leung Decl. at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at  171:20-173:20.  Following this testimony, the SEC's expert reviewed the bank records and identified what may have been a further refund in the amount of 544,750, and Irwin thus arrived at $26,423,168 in investor deposits from October 1, 2014 to April 28, 2016.  *See* Leung Decl. at ¶ 3, Ex. 1 (Irwin Report) at Ex. 4 re:  "Li, Longwen".

calculated from construction, rent, equipment, and other operating expenses (tax payments, insurance costs, travel, consulting fees, permit and license fees, among others) reflected in the corporate defendants' bank records in the time period for which that source data is available (September 10, 2013 through April 28, 2014), and then recorded as such in the corporate defendants' general ledgers by their bookkeeper at Marcum. *Id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 40-42, Ex. 6. Because that period reaches back further in time than October 1, 2014, when defendants first began raising the $26,423,168 in investor proceeds at issue, this $3,105,809 business expense deduction is conservative and over-inclusive in defendants' favor. Moreover, apart from manifest personal expenditures by Liu and Wang, the SEC's calculation generously assumes that nearly all of the business expenses recorded on the corporate defendants' general ledgers were in fact legitimate and in service of the project's development. For the reasons given below at § III(F), that factual premise is far from proven here. *See id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶ 26 ("I have assumed … that Marcum's classifications of cash outlays was accurate. I note that Marcum prepared the general ledger and QuickBooks reports based on Mr. Liu's directions and the notes featuring on the records and 'check stubs' provided to it, and did not exercise any judgment as to the appropriateness of the classification.").

However, neither the $3 million Liu transferred to Mevion, nor the combined $9,116,859 that Liu and Wang took from the corporate defendants during the period of time that the $26 million was raised – whether through a direct transfer of funds to a Liu or Wang financial account, or by way of an obvious personal expense masked as a corporate expense – are deductible as a legitimate expenses, as further discussed below. *Id.* at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 48-49, Exs. 7 and 8.

### 4.   Net profits:  proceeds raised less legitimate expenses

Accordingly, defendants should be ordered to disgorge $20,871,758.81 – the gross amount raised from their defrauded investors, less refunds and legitimate expenses – in net profits:

| | | |
|---|---|---|
| **Net Funds Raised From Defrauded Investors from October 2014 to April 2016 Less Funds Remaining in Corporate Accounts** | $26,423,168 - $234,899.19 | |
| **Offering Expenses In Accordance with POM from October 2014 to April 2016** | | $2,210,701 |
| **Business Expenses for Project Development In Accordance with POM from October 2014 to April 2016** | | $3,105,809 |
| **Net Profits from Fraud** | $20,871,758.81 | |

## C.     Purported "Business" Expenditures Arising from Liu's Self-Dealing and Corporate Looting Are Not Legitimate Expenses

Defendants are not entitled to deduct expenses that they incurred solely to fuel their fraudulent scheme for their own personal gain.  *Liu*, 140 S. Ct. at 1950; *see also SEC v. Slowinski*, 2020 WL 7027639, *4 (N.D. Ill. Nov. 29, 2020) (holding that funds diverted to pay business expenses of defendant's other companies must be disgorged – "Because Slowinski had an interest in the profitability of those companies, cost offsets to their general operations still amount to his personal gain.").  Dr. Thropay was Liu's business partner and the chief executive officer of the corporate defendants.  The efforts that Liu took in the second half of 2015 to remove him from the project, and drop Optivus in favor of Mevion, essentially siphoned EB-5 investor money out of the project investors were promised into Liu's own separate project, for Liu's own personal gain.  Thus, the $3 million that he paid to Mevion – an expenditure for which the corporate defendants, in the end, received nothing of substance – was not a legitimate expense and contravened the POM.

By the same token, neither Dr. Thropay nor Novodor, his sister and chief operating officer for the proton therapy project, was ever paid employment compensation by the corporate defendants on the understanding that they would defer a salary until the medical center was actually up and running.  Here, defendants are only entitled to deduct amounts they spent in accordance with the offering documents to establish the proton therapy center; they are not entitled to deduct the "salaries" they awarded themselves when siphoning money from their fraudulent scheme, or

amounts they spent to fuel that scheme which had no independent value.  *Liu*, 140 S. Ct. at 1950.  And so the exorbitant "salaries" that Liu and Wang began to pay themselves once millions of dollars of investor capital began to flow into the corporate defendants' coffers are not a legitimate expense of the EB-5 offering either.

### 1.     The Pacific Proton Business Plan and PPEB5 Fund POM

The offering materials that defendants used to solicit investment highlighted Dr. Thropay's role in the project as the cancer center's medical director, touted Optivus as the project's equipment supplier, and identified Dr. Thropay's property at 111 W. Beverly as the future project site.  The Pacific Proton business plan lists Dr. Thropay as the project's chairman and chief executive officer and emphasizes his professional experience in the field of oncology and cancer treatment care.  Leung Decl. at ¶ 5, Ex. 3 (Depo. Ex. 102 – 5/1/13 Business Plan).  Optivus is featured prominently in the Pacific Proton business plan, described as a project "stakeholder," and represented as being the supplier that will "provide all necessary initial and ongoing proton beam treatment technology."  *Id.* at p. 8.  The use of Optivus technology also undergirds the business plan's pro forma financial projections.  *Id.* at 16-22 (basing operating expenses, treatment reimbursement rates, and facility capacity on use of Optivus equipment).   The business plan states, last, that the proton therapy center will be located at 111 W. Beverly, noting that the property is a qualifying "TEA," or targeted employment area.  *Id.* at p. 4.

The POM echoes the Pacific Proton business plan in its description of Dr. Thropay as "a key person and important to the success of the Project," whose unavailability may negatively affect any investment in the PPEB5 Fund.  *Id.* at ¶ 6, Ex. 4 (Inv. Ex. 5/Depo. Ex. 101 – POM) at p. 14.  The POM further states that Optivus is the project's "single source service provider," and that the project's failure or inability to engage Optivus could likewise adversely impact the value of PPEB5 Fund's shares.  *Id.* at p. 15.  As with the Pacific Proton business plan, Beverly Proton's lease for 111 W. Beverly is called out as a material contract by the POM,

1   which again identifies that property as the development site.  *Id.* at pp. 14, 18.

2          **2.**      **Liu forces Dr. Thropay to demolish his office building at 111**

3                   **W. Beverly to convey the illusion of progress**

4         Pacific Proton's regional center application was approved by USCIS in 2012.

5   Years of inactivity then passed.  Then, in summer 2015, Liu pushed Dr. Thropay to

6   immediately demolish the office building he owned on his 111 W. Beverly property

7   in Montebello.  Leung Decl. at ¶ 7, Ex. 5 (Dr. Thropay Depo. Tr.) at 33:3-34:4,

8   117:16-118:22.  Dr. Thropay acceded.  *Id.*  Dr. Thropay's existing medical office

9   tenants were required to vacate the premises, and a construction firm demolished the

10  building and dug a hole in the ground, as demanded by Liu.  *Id.* at ¶ 8, Ex. 6

11  (Novodor Depo. Tr.) at 62:2-63:23; ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 96:3-98:11.

12  Liu wanted that work done because he had misrepresented the amount of progress

13  made to "the folks in Beijing" and pushed Dr. Thropay and Novodor "to run and get

14  everybody out of the building in a big hurry like it was yesterday."  *Id.* at ¶ 8, Ex. 6

15  (Novodor Depo. Tr.) at 62:7-17; *see also id.* at ¶ 8, Ex. 6 (Dr. Thropay Depo. Tr.) at

16  117:20-118:22 (Liu "was screaming at us on the phone … And he was really saying,

17  'You gotta do it fast, because [investors and potential investors are] calling me, and

18  they're pressuring me to see some progress.'").

19         **3.**      **Liu engages in self-dealing when spending $3 million in**

20                  **Beverly Proton funds to benefit United MPH**

21        Beginning in July, however, Liu surreptitiously began negotiations with City of

22  Hope and Beverly Hospital to form a joint venture with Liu's own company, United

23  MPH Ventures.  Leung Decl. at ¶ 9, Ex. 7 (7/15 email string re: draft MOU)  at p. 1

24  (Liu discussing MOU for joint venture and describing UDG as his "marketing arm").

25  Liu's new joint venture was nearly identical to his project with Dr. Thropay – it was

26  for the development and operation of a new proton beam therapy center in

27  Montebello, and would be funded by capital raised from EB-5 investors.  *Id.* at ¶ 10,

28  Ex. 8 (10/22/15 United MPH-Beverly-COH MOU – Depo. Ex. 105) at p. 1; *see also*

*id.* at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 125:4-10.  After talks had sufficiently progressed, in mid-October Liu reached out to an accountant at Marcum, writing that "I need to set up a new vehicle in CA to work with City of Hope.  Proposed name: Beverly Cancer Center, LLC.  Holding Company:  United MPH Ventures, LLC." *Id.* at ¶ 11, Ex. 9 (Depo. Ex. 103) (10/14/15 Liu email string with Marcum) at p. 2.

The October 22, 2015 MOU eventually executed between United MPH, City of Hope, and Beverly Hospital makes no mention of defendant Beverly Proton – the project entity co-owned by Dr. Thropay and Liu that was to be loaned investor funds in accordance with the POM.  *Id.* at ¶ 10, Ex. 8 (10/22/15 United MPH-Beverly-COH MOU – Depo. Ex. 105) at Ex. A, pp. 4-5.[2]  Instead, Liu's new MOU provided that "United MPH Ventures, in partnership with Beverly Hospital, is developing space, procuring equipment, and establishing relationships with third parties in order to create a proton therapy center … in the city of Montebello[.]" *Id.* (emphasis added); *see also id.* at ¶ 12, Ex. 10 (Depo. Ex. 104) (10/19/15 Liu email to COH) ("I would like to inform you that Mr. Michael Hunn has been engaged by my firm as my representative to work with City of Hope regarding our proposed partnership and joint ventures.  All the best, Charles Liu[,] President & CEO[,] United MPH Ventures, LLC."); ¶ 13, Ex. 11 (Depo. Ex. 112) (3/10/16 Liu ltr. on United MPH letterhead).  Later correspondence among Liu and his new partners at COH and Beverly Hospital made clear that "Charles' vision for the Cancer Center is strictly between United MHP [sic], COH, and Beverly." *Id.* at ¶ 14, Ex. 12 (Depo. Ex. 106) (11/18/15 email string between Liu, COH, and Beverly Hospital) at p. 1; *see also id.* at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 118:6-21.  United MPH has never owned any part of Beverly Proton, nor could Liu convey his own interest in Beverly Proton to United MPH without Dr. Thropay's consent.  *See id.* at ¶ 15, Ex. 13 (Depo. Ex. 128) (United MPH tax returns showing no ownership); ¶ 16, Ex. 14 (Depo. Ex. 129)

---

[2] Beverly Hospital and defendant Beverly Proton have no affiliation.

1  (same); ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 155:3-156:21; ¶ 17, Ex. 15 (Beverly

2  Proton Operating Agreement) at Art. 8.1; ¶ 4, Ex. 2 (Liu Depo. Tr.) at 117:13-15.

3       Liu's decision to abandon Optivus and transfer $3 million in funds from the

4  Beverly Proton corporate account to Mevion is inextricably intertwined with the self-

5  dealing he pursued through his separate company, United MPH.  Around the time

6  that the United MPH-COH-Beverly Hospital MOU was executed, Liu's business

7  consultant, working on behalf of United MPH, repeatedly broached the prospect of

8  that new joint venture retaining Mevion as its equipment vendor.  *See*, *e.g.*, Leung

9  Decl. at ¶ 18, Ex. 16 (Depo. Ex. 107) (10/21/15 email re:  Mevion); ¶ 19, Ex. 17

10  (Depo. Ex. 108 ) (11/4/15 United MPH-COH-Beverly Hospital agenda) (listing items

11  "Definitive Agreement between COHMF & United MPH Ventures LLC" and

12  "Equipment Selection (Mevion Proton System)"); ¶ 20, Ex. 18 (Depo Ex. 109)

13  (11/16/15 email re: Mevion press release) ("I am working on a draft communication

14  for United MPH … and am also coordinating the communication with Mevion.

15  Mevion is drafting a press release on the purchase of the Proton System by United.").

16       But rather than using United MPH funds – of which it had none – Liu executed

17  a supply agreement with Mevion on behalf of Beverly Proton, and transferred $3

18  million of that entity's funds (raised from PPEB5 Fund investors) to Mevion as a

19  down payment in November 2015.  In time, however, Liu's new partners at COH and

20  Beverly Hospital began to elicit confusion about which entity had actually paid the $3

21  million to Mevion:  United MPH (who they were working with), or Beverly Proton

22  (jointly owned by Dr. Thropay and not a party to the MOU).  *Id.* at ¶ 21, Ex. 19

23  (Depo. Ex. 110) (1/7/16 email from COH to Liu) ("We are still … trying to define the

24  structures and understand the how [sic] funding and the entity that purchased the

25  Mevion unit will transfer to the entity that will partner with City of Hope."); ¶ 22, Ex.

26  20 (2/8/16 email from COH to Liu) at p. 2 ("To me, we are asking for simple data

27  points … The name and ownership and governance of the business entity that will

28  own and manage the Proton Center, i.e., inclusive of settlement agreement with Dr.

Thropay … Understanding which entity paid Mevion for the downpayment on the proton unit."). Liu attempted to clean up that glaring discrepancy by simply removing Dr. Thropay from any management role at Beverly Proton. *See id.* at ¶ 21, Ex. 19 (Depo. Ex. 110) at p. 1. Beverly Proton, in any event, received nothing of value from Mevion in exchange for the $3 million spent by Liu. *Id.* at ¶ 4, Ex. 2 (Liu Depo. Tr.) at 98:22-99:12.

Dr. Thropay was not aware of Liu's machinations. Had Liu's self-dealing been in full view, Dr. Thropay would have questioned the legitimacy of the Mevion payment, as those funds had been diverted in a manner contrary to the goal of the Pacific Proton cancer therapy project. *Id.* at ¶ 7, Ex. 5 (Dr. Thropay Depo. Tr.) at 130:16-132:4. Novodor was also kept in the dark by Liu, and she agreed with Dr. Thropay as to the illegitimacy of Liu's dealings with Mevion, United MPH, City of Hope, and Beverly Hospital. *Id.* at ¶ 8, Ex. 6 (Novodor Depo. Tr.) at 167:8-168:3.

### 4. Liu engages in self-dealing when abandoning the 111 W. Beverly project site

In the same vein, Liu abandoned the 111 W. Beverly project site once his joint venture with COH and Beverly Hospital began in earnest. He made plans to spend investor funds to develop a proton therapy center at 105 W. Beverly, a property owned by Beverly Hospital. *See id.* at ¶ 23, Ex. 21 (Depo. Ex. 113) (R. Alan Construction invoice re: 105 W. Beverly); ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 96:12-98:11. Spending PPEB5 Fund investor contributions on construction work at 105 W. Beverly was also contrary to Dr. Thropay's and Novodor's understanding of how investor funds were to be applied. *Id.* at ¶ 8, Ex. 6 (Novodor Depo. Tr.) at 169:8-170:18; ¶ 7, Ex. 5 (Dr. Thropay Depo. Tr.) at 132:6-20.

***

This whole course of self-dealing underscores the fact that investor funds spent to fuel Liu's scheme to oust Dr. Thropay, to advance Liu's own personal gain, should not be deducted as legitimate expenses. That is especially so since Dr. Thropay was

never paid employment compensation by any of the corporate defendants, on his understanding that he would defer a salary until the proton therapy cancer center was developed and operational.  *Id.* at ¶ 7, Ex. 5 (Dr. Thropay Depo. Tr.) at 136:9-137:11 ("I did it all without pay.  I did it on my own for the project to get done.").  His sister and the chief operating officer of the corporate defendants, Ruth Novodor, was not paid employment compensation either on that same understanding.  *Id.* at ¶ 8, Ex. 6 (Novodor Depo. Tr.) at 142:2-12.  Liu and Wang, on the other hand, diverted more than $9 million in investor funds to themselves from October 2014 through April 2016, with those transfers markedly accelerating after Dr. Thropay's ouster from the companies and Liu's receipt of an SEC investigative subpoena in February 2016.  *See* Dkt. No. 200-1 (SEC SMJ SUF) at ¶¶ 93, 96.  Accordingly, Liu's payments to Mevion and construction expenses associated with work at 105 W. Beverly are not legitimate expenses and they contravene the POM and the Pacific Proton business plan provided to investors, which are replete with statements about the integral role of Optivus and the intended project site at 111 W. Beverly.  *See also* Leung Decl. at ¶ 4, Ex. 2 (Liu Depo. Tr.) at 123:6-25 (misappropriating Beverly Proton funds to pay United MPH consultant).

### D.   The Exorbitant Compensation Liu and Wang Paid Themselves Is Not a Legitimate Expense

Moreover, defendants' efforts to deduct, as a "legitimate" business expense, the millions of investor funds they took for themselves as purportedly "reasonable compensation" reveals the logical incoherence at the core of their net profits arguments.  In Marcum's general ledger, every dollar of the corporate funds Liu and Wang personally took were recorded as a "management fee."  All transfers classified as "management fees" were then booked as an expense in the QuickBooks reports generated on the basis of those general ledgers.  Next, citing the opinion of their retained "reasonable compensation" expert, Ted Ginsburg, Liu and Wang assert that they should have been paid more than $7 million for their supposed work at the

15

corporate entity defendants (Ginsburg further opines that the POM and this Court's factual findings as to defendants' exorbitant compensation in violation of the POM are wholly "irrelevant").  *See* Leung Decl. at ¶ 24, Ex. 22 (Ginsburg Depo. Tr.) at 37:17-44:3, 140:21-143:4.  And so, according to defendants, their disgorgement liability should be offset by at least $7.2 million in "legitimate expenses," never mind that these expenses coincide with the very funds that they looted from the subject companies, and are nothing more than "wrongful gains under another name."

There is no dispute that Liu and Wang used the corporate accounts as their personal piggy-bank.  By Liu's own account, "if there's sufficient funds because [of] fundraising … then I withdrew the money from the company.  If not sufficient, I don't."  Leung Decl. at ¶ 25, Ex. 23 (3/23/16 Liu Inv. Tr.) at 32:20-24; *see also id*. at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 86:16-24 ("Q.  Okay.  Do you recall withdrawing funds at Caesar's in Las Vegas from the Regional Center, Pacific Proton Regional Center corporate account?  A. Yeah, a few times I remember.  Q. Why did you do that?  A. Well, I just needed cash.  Q.  Why not take it out of your personal account?  A. Because it's Vegas, Gary.  Have you been to Vegas?").  The timing, amounts, and frequency of the transfers to Liu's and Wang's personal accounts bear this out, as these transfers hastened once defendants learned they were being investigated by the government.  *See Liu*, 262 F. Supp. 2d at 964; *see also* Leung Decl. at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 83:12-84:10.  Last, the SEC's expert analysis confirms that Liu and Wang made habitual use of corporate funds to meet their personal needs, no matter how quotidian.  *See id*. at ¶ 3, Ex. 1 (Irwin report) at ¶ 49, Ex. 8 (itemizing personal expenses paid with corporate funds including $56,173 at Caesar's Palace as well as assorted gardening and landscaping, DMV, water bills, Sirius XM, preparatory school, and gas station payments).  Defendants' securities fraud violations owe in part to the exorbitant compensation they paid themselves; it would defy logic to conclude, as defendants wish this Court would do, that this very same excessive compensation is somehow a legitimate expense of their fraudulent securities offering.

### E.    Defendants' Self-Serving Characterization of Their Expenses May Be Disregarded

Beyond all this, defendants' proffered "legitimate" expense calculation further suffers from an irremediable evidentiary deficit.  For large swaths of claimed expenses – especially those during time periods in which bank records were unquestionably not available to the SEC or the defense's experts – there is no competent evidence of:  (i) the fact that an expense was actually incurred; and (ii) even if incurred, whether the facts and circumstances of that payment demonstrate that the expense was a valid and legitimate use of investor funds.

When seeking disgorgement, the SEC only needs to present evidence of a "reasonable approximation" of the defendants' ill-gotten gains.  *Platforms Wireless*, 617 F.3d at 1096; *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1113-14 (9th Cir. 2006).  Once the SEC has made that showing, the burden shifts to the defendant to "'demonstrate that the disgorgement figure was not a reasonable approximation.'" *Platforms Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp.*, Ltd., 890 F.2d at 1232).  This burden, as the Ninth Circuit explained, rightfully belongs to the wrongdoer:

> We place this burden on the defendants because information is not "obtainable at negligible cost."  The defendants are more likely than the SEC to have access to evidence [demonstrating that the SEC's approximation is not reasonable]….  [W]e conclude that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."

*Id*. (quoting *First City Financial*, 890 F.2d at 1231, 1232).  For the reasons below, defendants cannot meet their burden to demonstrate that the Commission's approximation of their ill-gotten gains is not reasonable.

### 1.    Marcum's prior tabulation of "deductible business expenses"

When opposing this Court's asset freeze in November 2020, defendants filed a declaration of their counsel purporting to tabulate the "Proton Therapy Project's" deductible business expenses ($25,278,622.00) and Liu's own deductible business

1   expenses ($26,348,101.00).  Dkt. No. 296-1 at pp. 111-114 of 114 (Depo. Ex. 124).

2   Defense counsel averred that this accounting had been prepared by "the outside

3   accounting firm of the project companies."  Dkt. No. 286-1 (Gouraige Decl.) at ¶ 9.

4   That outside accounting firm was Marcum LLP, which Liu had engaged to perform

5   accounting services for the corporate defendants in spring 2015, before the

6   commencement of this action.  Leung Decl. at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at

7   105:16-106:4, 109:6-17.  On remand, Liu again hired Marcum, this time to provide

8   retained expert opinions.  Liu's second expert witness, Ronald Friedman at Marcum,

9   has prepared a balance sheet, profit and loss statement, and cash flow statement for

10  the corporate entities that purports to reflect those "deductible business expenses."

## 2.    Marcum's bookkeeping services relied on Liu

12      Trang Lam was the Marcum accountant who in 2015 and 2016 prepared the

13  general ledgers that served as the factual predicate for all of Friedman's expert work.[3]

14  In those general ledgers, each corporate funds transfer was coded to a particular

15  account classification.  For example, the general ledgers recorded personal transfers

16  to Liu to a "Management Fees" account, transfers to Overseas Chinese to a

17  "Consulting" account (based on the inclusion of the word, "consulting" in the full

18  name of the Overseas Chinese entity) and later an "Agent's Fees" account, transfers

19  to the other marketers – Delsk and UDG – to a "Marketing" account, and transfers to

20  Mevion as "Medical Equipment."  All of these account classifications – and many

21  others – were then booked as "expenses" on the press-the-button QuickBooks reports

22  generated from those general ledgers.  Leung Decl. at ¶ 26, Ex. 24 (Lam Depo. Tr.) at

23  20:22-21:17, 32:18-25.

24      And so the linchpin of defendants Liu's and Wang's legitimate expense

25  analysis is this.  The defense takes the position that hundreds of thinly and/or

26  undocumented historical transactions are legitimate expenses just because they have

---

[3] Friedman was deposed on April 20 and the SEC will supplement this brief with citations to his
testimony once a transcript is prepared.

been recorded and classified as such in the Marcum general ledgers.  But that facile argument is wholly circular.  Critically, there is no dispute as to the limitations on Lam's work when preparing those general ledgers.  Marcum performed "bookkeeping" services and bookkeeping services only:

> Q.    Marcum did not approve any of the transactions recorded in the general ledgers during its work in 2015 and '16; right?
>
> A.    We just record it, yes.  We do not audit.  We did not audit.  We did not confirm.  We did not do any of that.  We just record the transaction based on the documents provided to us by the client.
>
> Q.    And for those transactions and the account classifications, it was [Liu] that approved those account classifications, not Marcum; correct?
>
> A.    Yes …
>
> Q.    Okay.  Throughout the entire course of the 2015 and 2016 accounting services engagement, Marcum did not perform any inquiry or analytical procedures as to the appropriateness of the account classifications for all of these transactions that were recorded to the general ledger; is that correct?
>
> A.    That's correct.  Our engagement was strictly for bookkeeping and income tax services.

Leung Decl. at ¶ 26, Ex. 24 (Lam Depo. Tr.) at 92:13-93:1, 93:13-94:3; *see generally id.* at 22:23-27:7, 90:4-94:7.

Consistent with that bookkeeping engagement, Marcum did not undertake any verification work to corroborate what Liu was saying about a given transaction.  *See id.* at ¶ 26, Ex. 24 (Lam Depo. Tr.) at 27:25-28:16, 33:25-34:20, 38:24-39:12, 73:12-74:3.  Marcum did not speak with anyone other than Liu about the corporate entities' financial transactions; at no point did Marcum seek information, receive information, or otherwise communicate with any of the counter-parties to corporate transfers classified as business expenses, nor did the firm speak with Liu's business partners, Dr. Thropay and Novodor.  *See*, *e.g.*, *id.* at 21:18-22:18, 27:1-7, 58:25-62:15, 63:1-64:17, 65:20-66:8.  And when the bank or business record information provided by defendants to Lam was incomplete, Lam simply took as truth Liu's word on what a transaction was for.  *See id.*

One salient example is this:  the only basis for the general ledger's

classification of millions in transfers to Liu as "management fee" expenses was a purported April 5, 2016 employment agreement between Liu and Beverly Proton that: (i) Marcum never sought any information on; (ii) was executed on Beverly Proton's behalf by a stalking horse corporate officer who was not an employee of the company at the time; (iii) inexplicably awarded Liu putative back pay dating years into the past; and (iv) was not in any case, according to Liu's own telling, the actual reason for Liu's decision to loot the company after receiving an SEC subpoena in February 2016. Leung Decl. at ¶ 26, Ex. 24 (Lam Depo. Tr.) at 56:8-58:7, 84:8-22; *id.* at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 50:18-52:16, 56:18-57:7, 57:10-58:1, 58:12-61:3, 81:13-82:13; *id.* at ¶ 27, Ex. 25 (Depo. Ex. 121) (4/11/16 Cogswell agreement); *id.* at ¶ 28, Ex. 26 (Depo. Ex. 120) (4/5/16 Liu agreement).

In sum, Marcum's work to construct the general ledgers for Beverly Proton, Pacific Proton, and the PPEB5 Fund was not a financial statement preparation engagement and its work product was not to be relied on by third-parties. *Id.* at ¶ 26, Ex. 24 (Lam Depo. Tr.) at 32:19-34:20; *see also id.* at 34:21-35:16, 36:14-37:23, 41:14-23, 42:10-44:5, 44:8-46:5, 53:8-19; ¶ 29, Ex. 27 (Depo. Ex. 130) at Marcum_CLiu_00007277-278 (4/28/15 Marcum engagement ltr.) ("We are not being engaged to prepare financial statements or perform compilation, review or audit services … The above accounting services will be performed based on data and information you provide to us. We will not verify or audit this information. None of these services can be relied on to detect errors, fraud or illegal acts that may exist" and "Additionally, we are prohibited by professional standards from preparing source documents and authorizing or approving transactions."); *id.* at ¶ 30, Ex. 28 (Depo. Ex. 131) (5/11/16 Marcum engagement ltr.) (same); ¶ 31, Ex. 29 (Depo. Ex. 142) (4/20/16 Marcum email) ("Please keep in mind that we were engaged only to do bookkeeping and tax preparation. These QuickBooks Reports were generated from the bookkeeping services and they were intended for Management Use Only.").

### 3.    Defendants' legitimate expense evidence is therefore circular

Defendants' putative proof on legitimate expenses – based fundamentally on the general ledgers Lam created as part of a bookkeeping engagement – is circular and probative of nothing.  That is because Liu admitted, at deposition, that he cannot substantiate the accuracy of Marcum's transaction classifications.  Returning to the sworn tabulation of "deductible business expenses" defendants filed with the Court on November 16, 2020, the SEC questioned Liu at deposition about the accuracy of the figures in that court filing:  $25,278,622.00 in deductible business expenses for the Proton Therapy Project and $26,348,101 in deductible business expenses claimed personally by Liu.  Liu conceded an utter lack of knowledge.  Leung Decl. at ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 105:18-106:4, 109:6-110:19.

Liu could not vouch for the accuracy of those amounts, how they had been calculated, or whether the hundreds if not thousands of line items contributing to defendants' eight-figure expense calculation were legitimately incurred in accordance with the representations made by the POM.  *Id.*  And so Marcum's reliance on Liu's *ipse-dixit* when constructing the corporate entities' general ledgers makes no sense in view of Liu's corollary admissions.  Marcum's work to create the purported "financial statements" proffered by the defense did not involve any verification or substantiation of any of the transaction classifications on which those "financial statements" are fundamentally based, nor did Marcum perform any compilation, review, or audit services.  Under the parameters of their engagement, Marcum instead took Liu's word for it.  The combination of Liu's professed ignorance and Marcum's admittedly circumscribed scope of work is a path to nowhere.  Defendants cannot meet their burden of refuting the SEC's reasonable approximation.

### F.    Wang Engaged in Concerted Misconduct with Liu

Joint-and-several liability can be imposed "for partners engaged in concerted wrongdoing."  *Liu*, 140 S. Ct. at 1949.  In such circumstances, the "historic profits remedy thus allows some flexibility to impose collective liability."  *Id*.; *see also SEC*

*v. Curative Biosciences*, *Inc.*, No. 8:18-CV-00925-SVW, 2020 WL 7345681, at *6 (C.D. Cal. Oct. 22, 2020) (joint and several liability warranted where defendants were "partners engaged in concerted wrongdoing" and they "did not provide any evidence indicating that one of them 'did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust").

Wang played a crucial role in this scheme, and joined in Liu's misappropriation of investor funds in contravention of the POM. Wang made investor presentations that promoted the proton cancer therapy project, and worked to raise the investor capital that she and her husband later misappropriated. Leung Decl. at ¶ 32, Ex. 30 (2/25/21 Wang Depo. Tr.) at 15:6-18:8 ("Q. Ms. Wang, the clients you refer to, those were potential investors in your EB-5 project in the United States; correct? A. Yes."); ¶ 8, Ex. 6 (Novodor Depo. Tr.) at 180:21-181:11, ¶ 7, Ex. 5 (Dr. Thropay Depo. Tr.) at 104:15-105:18 (Wang worked to "sell EB-5 and try and promote sales" and seemed "to be acutely aware of finances"), 107:3-16, 108:17-109:19 (Wang sold an EB-5 share and cut Delsk out of the commission); ¶ 4, Ex. 2 (2/24/21 Liu Depo. Tr.) at 66:7-68:3. It was these promotional efforts that Wang now claims entitle her to the investor funds she took from corporate defendants.

Defendants learned of the SEC's investigation in February 2016, when they were first subpoenaed for documents by its staff. Separate from the many transfers to Liu's personal bank account, Wang herself received $1 million in investor funds in March 2016. At deposition, Wang could not credibly explain why, at a time when the project was being investigated by the government, she had received a seven-figure sum of money notwithstanding the abject lack of progress on the proton therapy center project. Instead, she evasively referred to a promise by her husband to pay her a wage for her past work "interfacing with China and do some research and to develop connections," and reasoned "nobody would do the work for so many years without the pay, because I need to live." Leung Decl. at ¶ 32, Ex. 30 (2/25/21 Wang Depo. Tr.) at 26:8-28:6.

Yet, Wang admitted she had no contemporaneous documentation for either the services she had performed for the corporate defendants, or the purported expenses that she believed she had been reimbursed for. *Id.* at 28:15-20, 40:12-41:10, 60:5-62:25, 68:12-71:7 (asserting that substantial payments from Pacific Proton, with which Wang had no employment relationship, were for reimbursement of expenses she cannot document). And in spite of the millions of dollars paid to UDG for soliciting investment in the project – a company that Liu himself described as Wang's company – Wang incredibly denied the fact that she had been paid commission compensation for attracting investment in the PPEB5 Fund, even when provided the names of all of the investors UDG had ostensibly been paid commissions for. *Id.* at 41:24-48:25.

As for the bogus February 2016 employment agreement that Liu executed with Wang, she claimed that contract justified the $1 million she took in spring 2016. During her deposition, however, she evinced zero understanding of the agreement itself. While the employment contract vested Wang with responsibility "for the day-to-day operation of the corporation and its production facility," Wang did not know what that meant, or even which corporate defendant – Pacific Proton, Beverly Proton, or PPEB5 Fund – she had been entrusted with these responsibilities for. *Id.* at 50:12-56:17; ¶ 33, Ex. 31 (Depo. Ex. 123) (Wang k). According to her, "I only know that I should be paid money." *Id.* at ¶ 32, Ex. 30 (Wang Depo. Tr.) at 55:19-56:17.

Liu and Wang both participated in the securities fraud: Wang freely admitted that she had engaged in EB-5 marketing efforts that were of such significance, she had rightly received a seven-figure wage paid entirely out of investor funds. Liu and Wang further commingled their finances, as reflected by the many shared personal expenses that they paid for with investor money. In short, Wang was no "mere passive recipient of profits." *Id.* at 1949. Where, as here: (i) a securities law violator engaged in concerted wrongdoing by actively participating in an offering fraud; (ii) later flouted an order of the Court to repatriate investor funds that she and her co-defendant husband had misappropriated; and (iii) because of her refusal to allow

23

discovery into her finances given her fifth amendment privilege against self-incrimination (*see Liu*, 262 F. Supp. 3d at 962-963, Appx.) apportionment is practically impossible, equity compels a finding that defendant Wang should be held jointly-and-severally liable with defendant Liu.

***

In conclusion, a reasonable approximation of Liu's and Wang's net profits is $20,871,758.81.  That sum is the amount they fraudulently raised from investors from October 1, 2014 to April 28, 2016 ($26,423,168 minus remaining corporate funds of $234,899.19), less legitimate expenses in the form of:  (i) offering expenses allowable under the POM ($2,210,701); and (ii) business expenses for project development, recorded in the corporate defendants' general ledger and assumed to have been appropriately classified, that do not contravene the POM ($3,105,809).

Several categories of payments claimed by the defense are not deductible as legitimate expenses.  First, any and all offering expenses in excess of the $2,210,701 cap on Administrative Fees violated the terms of the POM and are accordingly illegitimate and non-deductible.  *See Liu*, 262 F. Supp. 2d at 970.  Second, the $3 million transfer to Mevion that Liu orchestrated as part of his plan to oust Dr. Thropay from the project, and proceed with new partners and a company of his own, is not a legitimate expense that accords with the POM.  Third, in no sense are the millions of dollars of investor funds that Liu and Wang took for themselves a legitimate expense of their fraudulent securities offering.  Finally, Liu and Wang should be held jointly and severally liable for disgorgement.

The SEC's disgorgement request is also consistent with both the new provision for disgorgement in Exchange Act 21(d)(7), 15 U.S.C. § 78u(d)(7), and *Liu*'s holding that disgorgement should be distributed to harmed investors where feasible, 140 S. Ct. at 1948-49.  After *Liu*, Congress amended Exchange Act Section 21(d) on January 1, 2021 to add new Section 21(d)(7), which expressly authorizes courts to award disgorgement in Commission actions. *See* National Defense Authorization Act

24

("NDAA") for Fiscal Year 2021, Pub. L. No. 116-283.  The disgorgement award sought here satisfies both this provision and the standard in *Liu* because if the Commission is able to collect the requested disgorgement from Liu and Wang a distribution to harmed investors is feasible.  There are a limited number of investors in this case, who are identified, along with the amounts of their investment.  Accordingly, a distribution would be relatively inexpensive to accomplish provided the Commission collects disgorgement.

Last, disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct.  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Cross Fin. Services*, 908 F. Supp. 718, 734 (C.D. Cal. Sept. 5, 1995).  Prejudgment interest based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2) is a method for calculating prejudgment interest on disgorgement in SEC actions that has been affirmed by the Ninth Circuit.  *See Platforms Wireless*, 617 F.3d at 1099.  Thus, in addition to disgorging $20,871,758.81, Liu and Wang should also be ordered to pay prejudgment interest thereon from April 30, 2016 to June 1, 2016, the calculation of which is set forth in the Leung Declaration, and totals $70,713.06.  Leung Decl., ¶ 34, Ex. 33.

## IV.   **CONCLUSION**

For all of the foregoing reasons, the SEC respectfully requests that the Court enter a final judgment ordering, *inter alia*, defendants Liu and Wang to pay $20,871,758.81 in disgorgement, and prejudgment interest of $70,713.06.

Dated:  April 26, 2021                                    Respectfully submitted,

*/s/ Gary Y. Leung*
Gary Y. Leung
Jacob A. Regenstreif
Attorneys for Plaintiff
Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On April 26, 2021, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S CORRECTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR DISGORGEMENT AGAINST DEFENDANTS LIU AND WANG** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  April 26, 2021                    */s/ Gary Y. Leung*
                                                        GARY Y. LEUNG

*SEC v. Liu, et al.*
**United States District Court—Central District of California**
**Case No. 8:16-cv-00974-CJC-AGR**

### SERVICE LIST

*Counsel for Defendants Charles C. Liu and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu¸ the controlling shareholder of each*)
Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com