Lawrence B. Steinberg (State Bar No. 101966)
 *LSteinberg@buchalter.com*
BUCHALTER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Hervé Gouraige (admitted *pro hac vice*)
 *hgouraige@sillscummis.com*
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
Telephone: (973) 643-5989
Facsimile: (973) 643-6500

Attorneys for defendants CHARLES C. LIU
and XIN WANG a/k/a "LISA WANG"

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,<br><br>                    Defendants. | Case No. SACV 16-00974 CJC (AGRx)<br><br>**DEFENDANTS CHARLES C. LIU AND XIN WANG, A/K/A LISA WANG'S MEMORANDUM IN OPPOSITION TO SECURITIES AND EXCHANGE COMMISSION MOTION FOR DISGORGEMENT**<br><br>Date:  June 7, 2021<br>Time: 1:30 p.m.<br>Courtroom:  9B<br>Judge: Honorable Cormac J. Carney |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...................................................................1
STATEMENT OF FACTS ..........................................................................2
  A. Procedural History.........................................................................2
  B. The Court's Decision ....................................................................2
  C. The Proton Therapy Project .........................................................3
  D. Beverly Hospital and City of Hope Foundation............................6
  E. Designated Expert Reports ..........................................................11
    1. SEC Pecuniary Gain Expert: Carlyn Irwin ......................11
    2. Defendants' Net-Profits Expert: Ron Friedman................16
    3. Defendants' Reasonable Compensation Expert: Ted Ginsburg.....18

ARGUMENT .............................................................................................20
I. LIU HOLDS ONLY NET PROFITS OF A WRONGDOER CAN BE DISGORGED AS EQUITABLE REMEDY .................................................20
II. THE NATIONAL DEFENSE AUTHORIZATION ACT DID NOT SUPERSEDE *LIU* .........................................................................21
III. NEITHER THE LIMITED REMAND NOR THE CMP STATUTE AUTHORIZES THE SEC TO GET ADDITIONAL PECUNIARY GAINS AS PENALTY...............................................................................22
  A. CMP Statute does not Allow Gross and Net Pecuniary Gain Penalties for the Same Offense ................................................22
  B. Irwin's Report Lacks Credibility and Independence .........................23
IV. THE SEC HAS FAILED TO ESTABLISH WANG'S JOINT-AND-SEVERAL LIABILITY ...........................................................24
V. THE SEC PROPOSED FINAL JUDGMENT VIOLATES *LIU* ......................25
CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Austin v. United States,*
   509 U.S. 602 (1993)................................................................................22

*FTC v. Noland,*
   2020 WL 4530459 (D. Ariz. August 6, 2020)..........................................20, 22

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999)................................................................................25

*Hudson v. United States,*
   522 U.S. 93 (1997)..................................................................................22

*Liu v. SEC,*
   140 S. Ct. 1936 (2020)......................................................................passim

*Morrison v. Nat'l Australia Bank,*
   561 U.S. 247 (2010)................................................................................25

*S.E.C. v. Yang,*
   824 Fed. Appx. 445 (9th Cir. 2020)........................................................20

*SEC v. Bevil,*
   2020 WL 7048263 (D. Nev. Nov. 30, 2020)............................................25

*SEC v. Huffman,*
   996 F.2d 800 (5th Cir. 1993) ..................................................................22

*SEC v. Husain,*
   2021 WL 1146381 (C. D. Cal. March 25, 2021)......................................20

*SEC v. San Francisco Reg'l Ctr, LLC,*
   2020 WL 4569844 (N. D. Cal. Aug. 7, 2020), *appeal dismissed,*
   No. 20-17055 (9th Cir. Jan. 14, 2021)....................................................20

**STATUTES**

15 U.S.C. 77t(d)(2)(A)-(C) ..........................................................................23

15 U.S.C. § 77t(d)(2) ..................................................................................1

15 U.S.C. § 78u(d)(5)..........................................................................................1, 3, 22

1933 Securities Act, 15 U.S.C. § 77q(a)(2)............................................................1

National Defense Authorization Act for Fiscal Year 2021 Sections
    6501(a)(1) and (a)(3), Pub. L. No. 116-283 (to be codified at 15
    U.S.C. §§ 78u(d)(3) and 78u(d)(7))....................................................................21

**PRELIMINARY STATEMENT**

This case is on remand from the Supreme Court only to reconsider disgorgement. Plaintiff Memorandum. (Dkt. 319-1, at 6.) ("SEC Br.").  Defendants were found liable under 17(a)(2) of the 1933 Securities Act, 15 U.S.C. § 77q(a)(2), and ordered to pay $8.2 million in penalties. On remand, this Court ruled defendants "must disgorge their net profits." (Dkt. No. 297, at 4.)

The Court invalidated the SEC's gross-receipts-as-ill-gotten-gain standard for disgorgement but held it could recover "net profits" as disgorgement—only as an "equitable remedy" for benefit of investors. *Liu v. SEC*, 140 S. Ct. 1936 (2020). A task prior to granting disgorgement, therefore, is determination of net profits and, if so, how much each defendant received. Moreover, this Court must decide joint-and-several liability and whether the amount disgorged must be for restitution to investors.

The SEC redefines the Court's equitable disgorgement standard from "net profits" to "net pecuniary gains," the standard for civil monetary penalties ("CMP"). *See* 15 U.S.C. § 77t(d)(2) ("the gross amount of *pecuniary gain to such defendant* as a result of the violation") (emphasis added). The SEC's motion for equitable disgorgement is based entirely on its expert's calculation of "net pecuniary gains."

That argument is impermissible under SEC authority for disgorgement as "equitable remedy" (15 U.S.C. § 78u(d)(5)) or for CMP. This Court has already awarded "gross pecuniary gain" CMPs, which was affirmed. Because the SEC fails to prove net profits, and defendants' expert submits proof of significant project

company losses, this Court should deny the SEC's equitable disgorgement motion.[1]

## STATEMENT OF FACTS

### A.    Procedural History

On April 20, 2017, the Final Judgment granted the SEC gross-receipts disgorgement of $26,733,018.81 and CMPs against Liu ($6,714,580) and Wang ($1,538,000) with interest of at least $89,110.06 for a total judgment of $35,074,708.87.   (Dkt. Nos. 238, at 29 & 254.) Disgorgement granted was the "total amount raised" from investors less the corporate bank account balance. (Dkt. 238, at 28.) Penalties were the individual compensation from total gross receipts. This Court declined to include in Wang's penalty the $3,815,000 the SEC claims UDG was paid. (*Id*. at 29.)

The Court vacated the Final Judgment. The SEC's statutory authority only entitles it, based on "individual liability from wrongful profits," to disgorgement of "net profits" as equitable relief for restitution to investors. *Liu* at 1940, 1942-47. The Court remanded on three issues.[2]

### B.    The Court's Decision

First, what are the "legitimate business expenses" incurred by the project companies? *Id*. at 1945. Second, what is the "net profits from wrongdoing after

---

[1] The investors are seeking compensatory damages in a California state court class action. (Declaration of Hervé Gouraige in Opposition to the SEC Motion for Disgorgement ("Gouraige Decl."), Exh. 1.)

[2] "The Supreme Court agreed that the defendants misappropriated and must disgorge most of the offering proceeds they stole from investors, *id*., but remanded for this Court to distinguish between misappropriated funds and funds that were spent in accordance with the offering documents provided to investors and had 'value' to investors 'independent of fueling a fraudulent scheme.' *Id*. at 1950." SEC Br. at 9. We have not found these statements, except for the quoted language, in the Court's decision at 1950 or elsewhere.

deducting legitimate expenses?" *Id.* at 1946. Third, "[t]he rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits." *Id*. That common-law rule Congress incorporated in section 78u(d)(5), the Court held, requires "individual liability for wrongful profits." *Id*. at 1949.

## C.    The Proton Therapy Project

In or about 2010, Dr. John Thropay, a physician-businessman, wanted to build a proton-beam therapy center. He owned a medical practice whose CEO was his sister, Ms. Ruth Lopez Novodor. Dr. Thropay could not raise the large amount of needed capital.  Jon Slater, CEO of Optivus Proton Therapy, Inc. ("Optivus") and son of Dr. James M. Slater, a pioneer in the development of proton therapy at Loma Linda University Medical Center, introduced Dr. Thropay to Charles C. Liu. (Gouraige Decl., Exh. 2, Thropay dep., at 14:12-19:10 & 47:6-49:18.) Liu was chairman and CEO of Century Medical Investment Holdings, Ltd., exclusive China sales agent for Optivus. (*Id*., Exh. 7, at 2.)

Liu told Dr. Thropay that he could raise the capital from Chinese investors through the EB-5 program. Liu and Dr. Thropay set up three companies: the Pacific Proton Therapy Regional Center, LLC ("Regional Center"), the Pacific Proton EB-5 Fund, LLC ("EB-5 Fund"), and the Beverly Proton Center, LLC, f/k/a Los Angeles County Proton Therapy, LLC ("Beverly Center"). The Regional Center would serve as the umbrella organization to sponsor multiple job-creating enterprises ("JCE") such as Beverly Center, its first JCE. The EB-5 Fund would raise capital to be loaned to Beverly Center to build the proton-beam center. Those loans would be guaranteed by Dr. Thropay's company, Beverly Oncology & Imaging Medical Group, Inc. ("Beverly Oncology"). Novodor, CEO of Beverly

Oncology, signed the Pledge Agreement on August 2, 2013. (*Id.*, Exh. 3.)[3] The Regional Center would be the sole EB-5 Fund manager. Once the Center was built, Novodor would serve as COO, Dr. Thropay its medical director and chairman, and Liu its president for investor relations. The Beverly Center would include proton-beam facility, medical office building, and commercial space. (*Id.*, Exh. 4, Liu 2/24/21 dep., at 97:14-21.)

Liu took the risks and incurred the initial out-of-pocket start-up costs. Neither Dr. Thropay nor Novodor put up any funds. (*Id.*, Exh. 4, Liu 2/24/21 dep., at 90:5-10.)[4] Liu was responsible for most of the development work. (*Id.*, Exh.6.) During the period 2010-16, to and from Beijing, China to work on the project. On four of those trips, Dr. Thropay (and Novodor on one trip) accompanied Liu, with all first-class travel, hotel, and other expenses paid by Liu.  (*Id.*, Exh. 2, Thropay dep., at 27:3-28:6.)

On November 19, 2010, Liu applied to designate Pacific Proton a Regional Center. (*Id.*, Exh. 7.) On February 16, 2011, Liu and Dr. Thropay signed a nonbinding MOU that provided a "conceptual framework" for Beverly Center. (*Id.*, Exh. 6, MOU re Pacific Proton Therapy Project.) The February 16 MOU gave Liu responsibility for administration and raising capital through the EB-5 program. Dr. Thropay would be responsible for directing clinical functions and supervising

---

[3] Beverly Oncology's "unencumbered assets" were pledged to guaranty the loans. The total loans, Dr. Thropay understood, could be $200 million. According to Dr. Thropay, Beverly Oncology's unencumbered assets at the time were probably no greater than $250,000. (*Id.*, Exh. 2, Thropay dep., at 28:7-32:13.) Dr. Thropay told Novodor of the assets' value, but neither informed Liu, although Dr. Thropay states he informed Liu that his company could not guaranty all the loans. Liu was under the impression that the Pledge Agreement was full guaranty. (*Id.*, Exh. 4, Liu 2/24/21 dep., at 91:1-9.)

[4] The parties are negotiating a proposed stipulated order regarding a dispute over questions and answers at Liu's deposition. The disputed portions of Liu's deposition transcript are redacted.

professional services. Novodor would provide administrative services through a management company. The Feb. 16 MOU allocated equity to Dr. Thropay (25%) and Liu (75%), and provided for future employment agreements and salaries for Liu, Dr. Thropay, and Novodor. The Regional Center license was approved on June 28, 2012.

Liu then began to raise capital. Liu retained three brokers: Overseas Chinese Immigration Consulting, Ltd., Agreement, March 8, 2013, Dkt. 7-5, at 89-92 ("Overseas Chinese"); Beijing Pacific Damei Consulting Co., Ltd./United Damei Investment Co., Ltd., August 18, 2013, Dkt. 7-5, at 93-102 ("UDG"); and Hong Kong Delsk Business Co., Ltd. exclusive agency agreement dated on or about September 24, 2014, Dkt. 7-6, at 8-10 ("Delsk").

By May 1, 2013, a private offering memorandum ("POM") was prepared to raise $150 million from 300 investors, each contributing $500,000 in capital and $45,000 in administrative fees. (*Id.*, Exh. 8, POM, May 1, 2013.) Capital was to "finance the development and operation" of the Beverly Center and administrative fees were restricted to offering expenses. (*Id.*, Exh. 8, POM, at 20.)

The POM informed EB-5 Unit investors that the Units could not be transferred, and the investment was locked in the project for at least five (5) years. (*Id.*, Exh. 8.) In a letter advising Dr. Thropay that as of July 6, 2015 it had attracted "over 100 EB-5 investors," Delsk made clear that "most of [sic] if not all of these investors are investing in the project hoping to receive permanent residency status in the US." (*Id.*, Exh. 9.)

The kick-off event occurred in China in December 2014. (Dkt. 59-2, at ¶ 4.) From 2013 to the end of 2015, the EB-5 Fund raised about $29 million in capital from 58 investors and $2,700,000 in administrative fees. The project companies

also had interest and miscellaneous non-EB-5 funds. (*Id.*, Exh. 10, Pearson dep., at 26:21-27:1 & 44:8-46:4; Pearson Decl., Dkt. No. 6, ¶¶ 21 & 34, at 7 ("various deposits" of $500,250).) Receipts of investor funds started in 2013 ($2,508,528) and 2014 ($3,004,652), and the disproportionate share was received in 2015 ($23,500,000). (*Id.*, Exh. 5, Friedman Report, Exh. 6C; Exh. 52, March 2015 Zhan/Liu email.)

## D.   Beverly Hospital and City of Hope Foundation

By summer of 2015, investors wanted to be "update[d] … on the progress made in construction and the negotiation with *major medical institutions* on sponsoring the center." (*Id.*, Exh. 9, Delsk letter to Dr. Thropay (emphasis added).) Liu pressed Dr. Thropay to demolish the medical office building on his land, and, with knowledge of Dr. Thropay,[5] he began discussions with Beverly Hospital and COH to bring them into the project. Liu wanted to enlist Beverly Hospital and COH as "major medical institutions" to please investors.

Neither Novodor nor Dr. Thropay was in the dark about COH and Beverly Hospital. On July 22, 2015, Dr. Thropay, Novodor on behalf of Beverly Oncology, Liu on behalf of Beverly Center, and Alice Cheng on behalf of Beverly Hospital

---

[5] Dr. Thropay and Novodor contend that Liu pressured them to demolish the building. (*Id.*, Exh. 2, Thropay dep., at 33:3-34:4, 117:16-118:22; Novodor dep., at 62:2-63:3; Liu 2/24/21 dep., at 96:3-98:11.) Dr. Thropay claims he learned of City of Hope ("COH") and Beverly Hospital's involvement in the project through his physician friends and colleagues at these institutions. (*Id.*, Exh. 2, Thropay dep., at 51:23-54:12.) The SEC accepts Dr. Thropay's factual narrative. SEC Br. at 16-20 ("Liu's self-dealing when cutting Dr. Thropay out of the project in order to elevate himself and Wang," at 9; "Liu surreptitiously began negotiations with City of Hope and Beverly Hospital," at 16; "Dr. Thropay was not aware of Liu's machinations," at 19; "Liu abandoned the 111 W. Beverly project site [Dr. Thropay's land] once his joint venture with COH and Beverly Hospital began in earnest. He made plans to spend investor funds to develop a proton therapy center at 105 W. Beverly, a property owned by Beverly Hospital." (*id.*).) Contemporaneous documents contradict Dr. Thropay.

signed an MOU regarding exchange of real property. (*Id*., Exh. 11, MOU re Exchange of Real Property; Exh. 44.) The purpose of this July 22 MOU was to combine three adjacent parcels (111 W. Beverly owned by Dr. Thropay, 105 W. Beverly and 101 E. Beverly owned by Beverly Hospital) to construct a "proton therapy treatment center" and a "new medical facility and commercial office building." Liu explained why the building demolition on Dr. Thropay's land and remedial work at 105 W. Beverly were proper business expenses for the Beverly Center project. (*Id*., Exh. 4, Liu 2/24/21 dep., at 95:5-100:9; Exhs. 45 & 51.)

Dr. Thropay did not want to work with Beverly Hospital and COH. COH requires physicians to be employees, and there was no indication Dr. Thropay was prepared to do that. Dr. Thropay's practice would also be disadvantaged by the July 22 MOU he signed with Beverly Hospital that granted "Beverly Hospital … exclusivity for [certain] services."  (*Id*., Exh. 11, Land Exchange MOU, section 4D.)  The director of radiation oncology at Beverly Hospital, according to Novodor, had made defamatory comments about Dr. Thropay. Above all, Dr. Thropay wanted his sister appointed CEO of Beverly Center.

By mid-October 2015, Liu was in a dispute with Dr. Thropay about his sister's role, and he noticed that Dr. Thropay "was not cooperative" in moving forward with COH and Beverly Hospital. (*Id*., Exh. 4, Liu 2/24/21 dep., at 96:17 & 97:1-3.) Liu decided to "disconnect" with Dr. Thropay. He formed the United MPH Ventures, LLC. to build the project with Beverly Hospital. (*Id*., Exh. 49.) He retained a consultant, Michael Hunn, to handle discussions with Beverly Hospital and COH. He entered into a separate MOU with Beverly Hospital without Dr. Thropay (*Id*., Exhs. 12 & 13 & 49.) Nonetheless, as late as mid-November 2015, Liu was still meeting with Dr. Thropay to resolve his objections to working with

Beverly Hospital. (*Id*., Exh. 14, Alice Cheng Nov. 16, 2015 email to Harlan Levine re Liu-Dr. Thropay Nov. 13 meeting.)

In a November 18, 2015 email to Dr. Harlan Levine, CEO of COH, Alice Cheng, CEO of Beverly Hospital, summarized the relationships:

> I don't think Dr. Thropay is interested in employment with COH. As outlined in the MOU, Charles' vision for the Cancer Center is strictly between United MHP [sic], COH, and Beverly. Dr. Thropay's ownership and involvement are limited to Beverly Proton Center only. Dr. Thropay understands that the plan is to bring a nationally renowned proton specialist to lead the Center. Based on Charles' and my meeting with Dr. Thropay and his sister, Ruth Lopez (who's also his business manager), the main reason they don't want to collaborate with COH is Dr. Wong. They don't understand why Dr. Wong has been going around making defamatory comments about Dr. Thropay. Dr. Thropay said he's only met Dr. Wong once. His sister was extremely emotional when I confirmed with her the decision to enter into the DA process with COH. She felt that Dr. Thropay was betrayed by both Charles and Beverly for working with their 'enemy'. As such, they both are refusing to compromise in this partnership.

(*Id*., Exh. 14.)[6]

While Liu wanted to build the proton center to get investors their U.S. citizenships (hopefully with Dr. Thropay), Dr. Thropay chose another path. Dr. Thropay joined Delsk[7] to work against Liu. Dr. Thropay and Delsk tried to take

---

[6]  The MOU referred to in Alice Cheng's email is one among Beverly Hospital, COH, and United MPH, Liu's new company to get the project done. (*Id*., Exh. 13, MOU re proton therapy center on Beverly Hospital campus, Oct. 22, 2015.) United MPH and COH agreed in that MOU to identify a "nationally recognized" physician with "deep knowledge and experience in proton therapy" to serve as the medical director of the center.

[7] Although Delsk had an exclusive contract to recruit investors, Liu also worked with Overseas Chinese and UDG.  In fact, according to the SEC, both Overseas Chinese ($7.7 million, 11 buyers) and UDG ($3.8 million, 10 buyers) were paid substantially more than Delsk ($1.4 million, 37 buyers).

over the project after the SEC enforcement action.[8]

On or about November 18, 2015, Dr. Thropay and Novodor, at the invitation of Delsk, went to Beijing to meet with representatives of Delsk. Before leaving, Dr. Thropay obtained Chase bank records and reviewed them with the Delsk representatives in Beijing. They concluded from those records and others that Liu had engaged in undefined improprieties. (*Id*., Exh. 2, Thropay dep., at 57:15-72:9.)  When he returned to the U.S., Dr. Thropay had his counsel at the SEC Law Firm write a letter dated December 1, 2015 to Liu to inquire about the alleged financial improprieties and request an accounting. (*Id*., Exh. 15.)

According to Dr. Thropay, he received no meaningful response from Liu regarding his inquiries. Dr. Thropay and Novodor decided to become whistleblowers. They retained counsel at McGuireWoods, a former SEC Los Angeles Regional office attorney, to represent them in their SEC meetings. Dr. Thropay and Novodor started meeting with SEC attorneys in or about December 2015 and, through their counsel, began sharing documents, information, and their views of the facts with the SEC. (*Id*., Exh. 42, McGuireWoods letters to SEC.) After the SEC commenced this action on May 26, 2016, Delsk, through its Los Angeles counsel at O'Melveny, provided a declaration from Edison Zhan, Director of American Project at Delsk, submitted to this Court in support of the SEC's motion for preliminary injunction and other restraints. (*Id.*, Exh. 16, Zhan Decl., June 23, 2016; Dkt. 59-2.)[9]

---

[8]  Delsk and Dr. Thropay had discussions with this Court's appointed Monitor/Receiver regarding a "written proposal for completion of the project." The Receiver concluded that even with return of investor funds, the difficulties outweighed the financial benefits of concluding the project. (Dkt. 244, at 4; *Id*., Exh. 2, Thropay dep., at 72:10-73:25.)

[9] In early January 2016, Liu learned that Dr. Thropay was working with UCLA and another proton manufacturer to build his own proton-beam center. (*Id*., Exh. 17.)

On January 19, 2016, Liu convened a Beverly Center board meeting to remove Dr. Thropay as an officer.[10] In November 2015, Mevion had entered into equipment and service contracts with Beverly Center and not with United MPH. Beverly Center had deposited $3 million with Mevion on or about November 10, 2015 for the equipment. A previous $368,000 deposit with Optivus was forfeited to switch to Mevion. The Mevion equipment sale to Beverly Center could not be transferred to United MPH without Dr. Thropay's consent. SEC Br. at 17.

Novodor was not clueless about Mevion. On October 21, 2015, Hunn, Liu's representative, mentioned Mevion as a vendor to Levine. (*Id*., Exh. 43.) Mevion was known to Novodor long before Hunn brought up the company. In fact, Novodor introduced Liu to Mevion. (*Id*., Exh. 41, Mevion June 23, 2014 quote for equipment sale to Beverly Oncology sent to Novodor; Exh. 4, Liu 2/24/21 dep., at 31:14-32:18.) Both Dr. Thropay and Novodor thought the Optivus system is too big and too expensive. (*Id*. at 31:22-32:11.) The Beverly Center Mevion equipment *contract proposal* dated October 30, 2015 was addressed to Novodor; a copy of it contains substantial hand-written notes that Dr. Thropay identifies as her hand-writing. (*Id***.**, Exh. 18; Exh. 2, Thropay dep., at 98:12-99:4.)

Dr. Thropay and Novodor are not credible witnesses. When asked whether she had been involved in lawsuits as plaintiff or defendant, Novodor testified "no." (*Id***.**, Exh. 19, Novodor dep., 9:16-20.) That statement is false. As an example defendants submit a complaint for fraud against Novodor, Dr. Thropay, and Beverly Oncology filed on February 21, 2006 in New York County Supreme Court. (*Id***.**, Exh. 20.) Similarly, during his deposition, Dr. Thropay was shown a

---

[10] Dr. Thropay still remains an equity owner.

document with hand-written notes indicating that a "hospital" could be sued for "interference with prospective economic opportunity" and asked whether he considered such an action against Liu, Beverly Hospital, and COH, he said, "No. I don't sue people." (*Id.*, Exh. 48, at 15-16; Exh. 2, Thropay dep., at 101:9-104:11; quote at 104:4) That statement is false. Defendants submit several docket sheets showing Dr. Thropay as plaintiff and one complaint filed by him. (*Id.*, Exhs. 21-25.)

**E.    Designated Expert Reports**

After remand, the parties conducted discovery and nine depositions on the issues of net profits and defendants' joint-and-several liability, including three designated experts and the SEC's and defendants' accountant.

**1.    SEC Pecuniary Gain Expert: Carlyn Irwin**

Irwin did not prepare a P&L statement[11] showing profits or losses. (*Id.*, Exh. 27, Irwin dep., at 78:15-87:10.) Instead, Irwin calculates "net pecuniary gains" to defendants. (*Id.*, Exh. 26, Irwin Report, Exhibit 9.)[12] Irwin was not asked to and did not allocate the pecuniary gains between the defendants. (*Id.*, Exh. 27, Irwin dep., at 54:5-55-9 & 93:12-13.)

---

[11]  CPAs also refer to a P&L statement as an income statement, an earnings statement, or a statement of operations. A company's financials are the balance sheet, an income statement, and cash flow statement. (*Id.*, Exh. 10, Pearson dep., at 83:24-84:6.)

[12] After Irwin was deposed about her erroneous calculations, her Exhibit 9 making those calculations was revised with an Exhibit 9A resulting in an increase in defendants' pecuniary gains. Exhibit 9A was served as a "supplemental" exhibit on defendants on April 23, when the SEC filed its disgorgement motion. (*Id.*, Exh. 28.)  Defendants have had no opportunity to examine Irwin on the revised Exhibit 9A, and they respectfully request that this Court not consider Exhibit 9A.

Irwin begins with an incorrect gross-receipts number. Irwin claims, three times, that the Supreme Court *ordered* gross-receipts disgorgement of $26,733,019.[13] The number is incorrect in any event; it should be $300,000 less (Exhibit 9A makes this correction). It is also incorrect about the number of investors; Irwin listed 50 (some with different names from Marcum's list) and Marcum counted 58 less one refund. Lastly, Pearson noted the project company accounts included non-EB-5 funds; Irwin's Report did not indicate deduction of those funds. (*Id.*, Exh. 27, Irwin dep., at 19:7-23:7; *Id.*, Exh. 10, Pearson dep., at 23:20-25.)[14]

Irwin divided deductible expenditures into offering expenses and business expenditures. Offering expenses were for the POM offer to investors (net total of $10,954,375) and the maximum amount Irwin allowed was $2,210,701 ($45,000 from 50 investors). While Irwin considers broker fees to marketers as offering expenses, her maximum allowed amount for offering expenses disallowed substantial portions of broker payments. (*Id.*, Exh. 26, Irwin Report at 17 & Exh. 5.)

The POM sought to raise $150 million from 300 EB-5 investors. Assuming that Irwin's 50 investors is correct, the Regional Center could have budgeted anticipated investor fees of $11,250,000. To incentivize the brokers to raise $150 million, it could have borrowed against the anticipated revenue stream to incur the substantial up-front costs, and then paid off the loans with the future stream of fees and other revenues. But that would have added interest costs. Instead, the Regional

---

[13] As support, twice in footnotes Irwin cited this Court's disgorgement decision, Irwin Report at 9 & 11, and once cited the June 22, 2020 Court decision, Exh. 9, n. 1. (Gouraige Decl., Exh. 27, Irwin dep., at 11:9-19:6.)

[14] Irwin reviewed the Pearson data. (Irwin Report, Appendix B, at 2, 3, & 4-6.) Irwin does not explain why non-EB-5 funds were included or were not excluded.

Center, as project manager, decided, as authorized by the POM (a fact Irwin disregards), to reallocate capital for those expenditures and avoid the interest expense. Irwin does not explain why a rigid $2.2 million cap was the only option permitted by the POM. Nor does Irwin explain why the future income from 250 investors is disregarded.

Irwin's cardinal rule was that an expenditure had to be consistent with the business purpose of the POM "from a forensic accounting perspective." (Irwin Report at 6; Gouraige Decl., Exh. 27, Irwin dep., at 28:24-29:8.). Using that standard, Irwin concluded that only $3,105,809 of $6,105,809 of expenditures was deductible. The $3 million Mevion deposit cannot be deducted because it "deviate[s] from the provisions of the POM." (Irwin Report at 15.) Irwin allowed deductions for rent payments to Dr. Thropay and payments to Optivus, but not for the Mevion deposit because Mevion was not mentioned in the POM. (Irwin Report at 19-20.) Irwin disregards the POM's reference to buying equipment from Optivus or "another provider." (Irwin Report at 19.)

Irwin's treatment of the rental payments and the Mevion deposit reflects an unprincipled inconsistency. Irwin accepts the mere mention of the land lease from Dr. Thropay in the POM as sufficient to find the payments legitimate business expenditures, but disregards the POM's requirement that the ground lease cannot be effective until the fund had raised $100 million. Indeed, Irwin did not request to see the land lease contract or amendment. (Gouraige Decl., Exh. 27, Irwin dep., at 68:23-78-:14.) Had she reviewed the contracts, she would have learned that the initial contract on September 14, 2011, like the POM, required a $100 million capital raise before the lease becomes effective. If the capital goal was not achieved within one year, Dr. Thropay had the right to terminate the ground lease without

any further rights or obligations for either party. (*Id.*, Exh. 29, Ground Lease ¶ 1.04.)

On March 31, 2015, Dr. Thropay and Liu amended the lease, as the POM allowed, to make it effective April 1, 2015 with rent of $39,500/month. Rent was paid to Dr. Thropay presumably until April 2016.[15] (In his state court declaration, Dr. Thropay states he had not been paid rent since April 2016. (*Id.*, ¶ 5.)) Marcum calculates Dr. Thropay's rental payments as $838,500 (which it treats as a receivable from him to Beverly Center after Dr. Thropay forfeited the lease), and Irwin calculates those payments at $524,000. (Irwin Report at Exhibit 6.)

Dr. Thropay's rent payments and the Mevion deposit should be treated consistently under Irwin's standard. Irwin's only basis for different treatment is that the Mevion deposit was in fact to benefit United MPH. (Gouraige Decl., Exh. 27, Irwin dep., at 29:23-41:24.) The deposit was made by Beverly Center and Mevion sold the equipment to Beverly Center. (*Id.*, Exhs. 30 & 31.) Irwin attributed the sale to United MPH based on Hunn's email that an upcoming Mevion press release would indicate a sale to United MPH. (Irwin Report at 20; Gouraige Decl., Exh. 27, Irwin dep., at 90:23-91:4; Exh. 47, Hunn email.) In fact, the Mevion press release, which did not mention United MPH, stated it made the sale to "Los Angeles Proton Center." (Gouraige Decl., Exh 47.)[16] The equipment could not be transferred to United MPH without Dr. Thropay's consent, and there is no evidence he consented. (SEC Br. at 17.) United MPH did not receive any benefit.

---

[15] With consent of the Receiver, and no opposition from the SEC, Dr. Thropay obtained an order partially lifting this Court's orders to permit him to forfeit the 30-year lease in state court. (Dkt. 241.)

[16] Beverly Center was formerly known as Los Angeles County Proton Therapy, LLC. (Gouraige Decl., Exh. 26, Irwin Report at 2.)

Irwin's methodology is flawed. To arrive at the net pecuniary gains of $20,222,511, Irwin subtracts the total deductible expenditures she calculated ($5,316,510) from the adjusted net receipts ($25,539,021). Irwin then attributes the entire difference as net pecuniary gains to Liu and Wang whether or not defendants received the funds or they were paid to third parties unrelated to defendants. Payments to Overseas Chinese, which Irwin concedes she lacks any evidence went to Liu and Wang (*Id***.**, Exh. 27, Irwin deposition, at 54:3-58:12; *Id*., Exh. 10, Pearson dep., at 37:9-39:19.), are deemed gains to Liu and Wang. Even payments to Delsk, which Irwin was not aware had supported the SEC (*Id***.**, Exh. 27, Irwin deposition, at 58:13-64:8.),[17] was considered gains to Liu and Wang. So too was the $3 million Mevion deposit, on the ground it was *intended* to benefit United MPH.[18] (*Id***.**, Exh. 27, Irwin dep., at 53:2-54:2.)

Lorraine Pearson, the SEC in-house accountant, was not *requested* to prepare P&L statements. (*Id*., Exh. 10, Pearson dep., at 78:16-79:16.) Irwin's explanation for not preparing a P&L, as an independent expert, is that it's not possible to do so for start-up companies without revenues. Irwin did a misappropriation analysis to derive "net pecuniary gains." (*Id*. at 87:11-89:10.)

Irwin makes significant errors. Friedman's Rebuttal Report documents the errors contained in Irwin's Report. (*Id*., Exh. 32, Friedman Rebuttal, April 9, 2021.) Exhibit 1 of that Report shows the differences between Irwin's numbers and Marcum's. (*Id*., Exh. 32, Friedman Rebuttal Report, at Exh. 1.)

---

[17] Irwin did not ask the SEC for documents about Delsk. (*Id*., Exh. 27, Irwin dep., at 58:13-62:10.)

[18] Irwin's compensation analysis is discussed *infra* at p. 19 .

### 2.     Defendants' Net-Profits Expert: Ron Friedman

Friedman prepared balance sheets, cash flow, and P&L statements, which show significant losses ($16,500,000). (*Id.*, Exh. 5, Friedman Report, Exhs. 1-3; Exh. 46.) Friedman reviewed the expenses in light of the POM and determined which ones were legitimate business expenses and which ones were personal. Personal expenses were charged to Liu as compensation.[19] (*Id.*, Exh. 5, Friedman Report; *Id.*, Exh. 33, Freidman dep., at 105:4-107:16.)

In 2015, Ms. Trang Lam, a Marcum CPA, started doing bookkeeping/accounting and tax work for the project companies and for Liu and Wang as the account manager. (*Id.*, Exh. 34, Lam dep. at 20:22-21:17.) Lam reviewed and relied on bank statements, cancelled checks, check stub notations, income tax returns prepared by the previous accountant, business credit card statements, 2013 payroll returns, employment agreements between the companies and Liu and Wang, and email communications. (*Id.*, Lam dep., at 22:23-24:19.) She did not communicate with the vendors, did not review invoices, and did not do audit. Nor did she authorize transactions for the companies or classify the expenses; Liu did that. When she had a question, she would only communicate with Liu. (*Id.*, Lam dep., at 21:18-23.) Expenses such as casino expenditures whose nature indicated a personal, not business expense, would ultimately be classified as management fee to Liu and reported as personal income on tax returns prepared by Marcum. (*Id.*, Exh. 34, Lam dep., at 97:1-98:9.)

---

[19] Obviously, $26,348,101 in expenses is not claimed "personally by Liu." SEC Br. at 26. The SEC misreads the title of a defense exhibit. (Dkt. 296-1, Exh. 7, at 113.)

Friedman treated the expenses consistently. The Mevion $3 million deposit and Dr. Thropay land lease payments are legitimate business expenses. However, Friedman ultimately booked both as receivables. Beverly Center could not make further payments to Mevion or build on Dr. Thropay's land, and, as a result, Dr. Thropay decided to forfeit the Beverly 30-year lease (but keep the lease payments) and Mevion kept (as Optivus had done) the deposit as nonrefundable. Friedman also booked as receivables the excess compensation received by Liu ($2,013,579) and Wang ($1,066,285) based on the Ginsburg reasonable compensation study, discussed below. Because Overseas Chinese did not produce the required number of investors, Friedman invoked the penalty contractual provision of its agreement and booked a refund of $3,400,000 from that broker. (Friedman Report, Exh. 1 & 1E n. 4.)

Friedman relied on documentary evidence to prepare the financials. Optivus requested $495,000 for equipment deposit; Friedman booked $368,100 based on check stubs from the bank showing the deposit. (Friedman Report, Exh. 1B, n.2.) Payments to Miller Mayer for legal work are shown as $43,033, but the law firm's own records totaled $103,480; Friedman *assumed* that the amount in excess of his number was booked as start-up costs by the previous accountant, and Friedman expensed that amount. (Friedman Report, Exh. 2A; Gouraige Decl., Exh. 35, Proton Payments to MM.)

Friedman gave Dr. Thropay the benefit of the doubt about total lease payments. Marcum had a deposit of $100,000 and lease payments of $738,500 for a total of $838,500. (Friedman Report, Exh. 2F.) However, Dr. Thropay may have been paid more. In addition to the deposit, the amended lease effective April 1, 2015 had monthly payments of $39,500; assuming payments till April 2016, Dr.

Thropay was paid $474,000. The amended lease also referred to another $375,000 deposit he would be allowed to keep. These payments total $949,000.

### 3. Defendants' Reasonable Compensation Expert: Ted Ginsburg

Ginsburg determined what a market-based reasonable compensation would have been for Liu and Wang given their titles, functions, nature of business, the geographic area of the project, and monetary level of the project. (Gouraige Decl., Exh. 36, Ginsburg Report.) Ginsburg concluded that actual compensation exceeded the market level by about $3 million. From 2010 to 2016, he estimated reasonable total compensation for Liu (for commission ($2,285,880) and pay for service ($4,925,812)) of $7,211,692. For Wang, he concluded reasonable compensation for 2013-14 was $367,215. Because his objective methodology did not take into account subjective factors such as employee bad behavior or the quality of services rendered (criteria a company may consider in awarding *actual compensation*), Ginsburg explained that exogenous factors of any kind would not have been relevant to his analysis. (*Id*., Exh. 37, Ginsburg dep., at 40:15-44:3 & 139:7-144:25.)

Ginsburg viewed compensation as fees/commissions for getting investors and for services rendered. To determine commission, he reviewed 20 samples of EB-5 program Notices of Exempt Offering of Securities (Form D) from the SEC EDGAR database. The Form D's contain information about commissions and finder's fee expenses. The median fee paid by these companies was 9.25%; the commission paid to Liu was 8%. To determine compensation for services, he used the Executive Compensation Assessor, a survey source operated by the Economic Research Institute widely used by compensation industry consultants;

the data are reported at the 25th percentile, median, and 75th percentile. Ginsburg used the median.

Irwin's method focused on actual compensation to Liu and Wang, the POM, employment agreements, and determined that none of the compensation Liu and Wang received is legitimate "deductible compensation." Irwin did not request information about any services provided by Liu and Wang because she deemed it irrelevant to her analysis. (*Id*., Exh. 27, Irwin dep., at 67:19-68:19.)

Irwin accepts the SEC's position that Liu's April 5, 2016 employment contract with Beverly Center was signed by Cogswell when he was not an employee (*id*., Exh. 27, Irwin dep., at 66:2-67:4); but she disregards Liu's testimony that the dates in the documents could be wrong (*id*., Exh. 4, Liu 2/24/21 dep., at 60:15-22) and fails to consider that Cogswell had an April 5, 2016 employment agreement with the Regional Center. (*Id*., Exh. 39.) Compensation in the employment agreements, which provided for retroactive payments, was disallowed because not authorized by the POM. Compensation after October 2014 was conditioned by the *nonbinding* MOU between Dr. Thropay and Liu to raising the necessary capital. Since that was not done, no compensation was due. A commission of 8% of capital raised was also not authorized by the POM. In any case, commission is an offering expense and the maximum offering expense had been reached. (Irwin Report at 22.)

Irwin's relevant experience was using compensation as "part of the bigger evaluation of damages or whatever issues was at hand [in cases in which she was an expert witness]." (*Id*., Exh. 27, Irwin dep., at 8:3-9:17.) Irwin's lack of expertise in reasonable executive compensation of pre-revenue start-up companies leads her into contradiction and making an irrational conclusion. (*Id*.,

Exh. 38, Ginsburg Rebuttal April 9, 2021 letter.) Irwin concludes Liu and Wang cannot be paid, but service providers may be compensated. Compensation to a start-up's management is conditioned on success of the project.

## ARGUMENT

## I.

## LIU HOLDS ONLY NET PROFITS OF A WRONGDOER CAN BE DISGORGED AS EQUITABLE REMEDY

Disgorgement, as equitable remedy, requires restitution of net profits to investors. Net profits is not merely the limiting measure for disgorgement calculated based on pecuniary gains or receipts (gross or net):

> The court discussed the history of the term 'disgorgement' and common law principles of restitution and accountings at length. At all points in the analysis, however, the focus was on *profits-based* remedies imposed against *wrongdoers. See Liu*, 140 S. Ct. at 1942–44.

*SEC v. San Francisco Reg'l Ctr, LLC*, 2020 WL 4569844, *2 (N. D. Cal. Aug. 7, 2020) (emphases in original), *appeal dismissed*, No. 20-17055 (9th Cir. Jan. 14, 2021). *See SEC v. Husain,* 2021 WL 1146381, *11 (C. D. Cal. March 25, 2021) (absent record evidence of net profits, court denies SEC request to reopen discovery to prove net profits and denies SEC disgorgement); *FTC v. Noland*, 2020 WL 4530459, at *4 (D. Ariz. August 6, 2020) (the Court [in *Liu*] held that SEC had gone too far in past cases, by failing to limit disgorgement awards to the 'defendant's net profits from wrongdoing' and thus 'transforming it into a penalty outside [the SEC's] equitable powers.' *Id.* at 1944-47." A disgorgement award must be "restitutionary," not punitive. *S.E.C. v. Yang*, 824 Fed. Appx. 445, 447 (9th Cir. 2020) (mem.).

The SEC has not shown any net profit by defendants. Defendants' expert has demonstrated the project companies incurred significant losses. In short, there are no net profits to award as equitable disgorgement. To the extent the SEC argues that a net-receipts disgorgement award that reflects a defendant's misappropriated "pecuniary gain" (defined to include gains to unrelated third parties) is appropriate so long as it does not exceed net profits, the argument is contrary to *Liu's* ruling and, in any case, is unavailing on the present record. Any disgorgement award will exceed the proof of zero net profit. The SEC argument continues to rely, contrary to *Liu*, on a standard of depriving the defendants of "net pecuniary gains" as a deterrent instead of granting restitution of net profits made by defendants to investors.

## II.

## THE NATIONAL DEFENSE AUTHORIZATION ACT DID NOT SUPERSEDE *LIU*

After *Liu*, Congress enacted Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 (to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7)):

> In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

Congress has not spoken in the clear language required to overrule the Court's *Liu* decision. "Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term 'disgorgement' in various statutes." *Liu* at 1947. The statutory language does not define disgorgement to revert to the pre-*Liu* case law of depriving a defendant of receipts from investors as ill-gotten gains for deterrence.

The statute is best construed as affirming the Court's ruling in *Liu* that in enacting section 78u(d)(5) in 2005, Congress incorporated common-law equitable doctrine in the securities laws. Congress authorized any "equitable relief that may be appropriate or necessary for the benefit of investors" against a background of case law dating to 1970 that awarded disgorgement to deprive a *defendant* of *ill-gotten gains* as a deterrent. *See Noland*, 2020 WL 4530459, at *5 ("disgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer ... [and] does not aim to compensate the victims of the wrongful acts, as restitution does.") (quoting *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)).

In *Liu,* rather than invalidate disgorgement for lack of authority to support SEC disgorgement non-equitable practices, the Court construed it as a restitutionary "equitable, profit-based remedy" under section 78u(d)(5). *Liu* at 1944-47. Congress adopted that interpretation in the National Defense Authorization Act. "Congress' own use of the term 'disgorgement' in assorted statutes did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity." *Id*. at 1947.

A construction of the newly enacted statute retroactively to impose disgorgement of pecuniary gains as a deterrent to securities law violation (a form of penalty) would violate the due process clause of the Constitution's Fifth Amendment. *Hudson v. United States,* 522 U.S. 93, 103 (1997); *Austin v. United States*, 509 U.S. 602, 609-10 (1993).

### III.

### NEITHER THE LIMITED REMAND NOR THE CMP STATUTE AUTHORIZES THE SEC TO GET ADDITIONAL PECUNIARY GAINS AS PENALTY

### A.    CMP Statute does not Allow Gross and Net Pecuniary Gain Penalties for the Same Offense

The CMP statute allows a specified range of monetary amounts for penalties or a defendant's "gross amount of pecuniary gain" as a result of a violation. 15 U.S.C. 77t(d)(2)(A)-(C).   In this case, the SEC requested defendants' "gross pecuniary gain." (Dkt. 220, at 2.)  This Court agreed with the SEC and awarded third-tier penalties of $8.2 million. (Dkt. 238, at 29.) Affirmance of that ruling therefore resolved the penalty issue. (Dkt. 293-1, at 5.)

Based on Irwin's calculation of "net pecuniary gains" as "misappropriated funds" (Gouraige Decl., Exh. 27, Irwin dep. at 87:11-13), the SEC is essentially making a second request for "net pecuniary gain" as additional penalty in the guise of disgorgement.[20]  The CMP statute does not allow for multiple penalties for the same offense. In any event, even if the appellate affirmance did not settle that issue, this Court should not accept Irwin's conclusions.

**B.    Irwin's Report Lacks Credibility and Independence**

Unlike defendants' experts, whose independence led them to reach opinions differing from defendants', Irwin's opinions are the SEC's positions. Irwin makes conclusions without evidence (*e.g.*, the Overseas Chinese and Delsk payments attributed as gains to defendants based on speculation), fails to request evidence that would undermine her conclusions (*e.g.*, not requesting documents about Delsk and the ground lease and amendment), and disregards unfavorable evidence (*e.g.*, the POM requirement that the lease could not become effective until $100 million had been raised). Concluding Overseas Chinese, Delsk, and Mevion payments are not legitimate business expenses is not a valid basis to attribute the payments as gains to Liu and Wang without any evidence they actually received or benefited from those payments. (Gouraige Decl., Exh. 27, Irwin dep., at 57:15-58:2.) ("We don't

---

[20]  Irwin's net pecuniary gains are basically the defendants' compensation ($9,116,859), broker fees ($10,954,375), and the Mevion deposit ($3 million).

know what their relationship with these brokers are, there could be, you know, other funds going, coming back to them, we don't know.")

## IV.

## THE SEC HAS FAILED TO ESTABLISH WANG'S JOINT-AND-SEVERAL LIABILITY

*Liu* permits "liability for partners engaged in concerted wrongdoing." *Liu* at 1949.   As the SEC puts it, "Liu's business partners [were] Dr. Thropay and Novodor." (SEC Br. at 24.)

Wang was not a business partner, as a reading of her deposition will show. (Gouraige Decl., Exh. 50, Wang 2/25/21 dep.) Liu would instruct her what he needed her to do, and as long as it was not illegal, she would do it to help. (*Id*. at 68:1-6.) She only speaks Mandarin Chinese and does not read or understand English; she relies on her husband to translate English documents. (*Id*., at 9:24-10:4.) Rental and purchase of her house in Laguna Niguel, CA is "all handled by my husband." (*Id*., at 11:23-13:19 & 24:20-23.) She was not aware how much capital had been raised. (*Id.* at 24:25-25:16 & 64:22-67:25.)

The February 16 MOU's Time and Responsibility Chart assigns project tasks to Liu, Dr. Thropay, and Novodor but none to Wang. (*Id*., Exh. 6.) She was not an equity owner in the project companies. She did not have signatory authority for bank account. Dr. Thropay concedes that "she was just there to help is all I could see, and that's what she would explain to me." (*Id*., Exh.2, Thropay dep., at 105:15-16.)

Wang helped Liu by marketing the proton-beam therapy to potential patients in China and, through her contacts in China, developed relationships and agreements with large insurers. (*Id*., Exh. 50, Wang dep., at 14:13-21:21; 28:15-36:6.)

### V.

### THE SEC PROPOSED FINAL JUDGMENT VIOLATES *LIU*

Defendants oppose the entry of and object to the SEC's proposed final judgment. First, use of frozen assets, once released, must be restricted for investor restitution. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). Second, all collected disgorgement must be distributed to investors. *SEC v. Bevil*, 2020 WL 7048263, *2 (D. Nev. Nov. 30, 2020). Third, the judgment erroneously refers to "net pecuniary gains" as "net profits." (¶ III.) Fourth, defendants object to the clause that the "allegations are true and are admitted." (¶ V.)  Fifth, final judgment should not be entered until after this Court has decided Wang's argument to dismiss the case against her.[21]

### CONCLUSION

The SEC's motion for disgorgement should be denied.

Dated: May 7, 2021      Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
By:    /s/Hervé Gouraige
      Hervé Gouraige
Attorneys for Defendants

BUCHALTER
A Professional Corporation

By: /s/Lawrence B. Steinberg
     Lawrence B. Steinberg
Attorneys for defendants

---

[21] Wang's memorandum regarding *Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010) is due June 11, 2021.