# Exhibit 1

Law Offices of Steven P. Scandura
STEVEN P. SCANDURA (BAR NO. 153796)
1601 N. Sepulveda Blvd. #502
Manhattan Beach, CA 90266-5133
Tel: (310) 473-6300
Fax: (310) 626-9780

Attorney for Plaintiffs,
ZHAO HUI SHI and JUN LU

FILED
Superior Court of California
County of Los Angeles
08/27/2020
Sherri R. Carter, Executive Officer / Clerk of Court
By: E. Avena Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| ZHAO HUI SHI and JUN LU, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RACHEL H. LEW; JOHN P. THROPAY; WOLFSDORF ROSENTHAL LLP; MILLER MAYER, LLP; DAVID GERALD DERRICO; U.S. REGIONAL ECONOMIC DEVELOPMENT AUTHORITY, LLC; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO. **BC662775**<br>UNLIMITED CIVIL<br>[Hon. Richard J. Burdge]<br><br>**CLASS ACTION**<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br>**(1) FRAUD (INCLUDING CONSPIRACY AND/OR AIDING AND ABETTING FRAUD)**<br>**(2) LEGAL MALPRACTICE**<br>**(3) NEGLIGENT MISREPRESENTATION**<br>**(4) PENAL CODE §496(c) CLAIMS**<br><br>Dept. 37<br>Action Filed: 5/25/2017<br>Trial Date: 7/27/2020 |

Plaintiffs ZHAO HUI SHI and JUN LU ("Plaintiffs") allege as follows (additions to the Third Amended Complaint are underlined, deletions are ~~stricken out~~):

1. INTRODUCTION. This is an EB-5 Investor Visa fraud case where the defendants here are the recipients of stolen money, the attorneys and others who conspired with and actively assisted the primary perpetrators in taking at least $27,000,000 from innocent Investment Visa applicants. Defendants are



Electronically Received 08/27/2020 06:17 PM

alleged to be co-conspirators who materially assisted in the scheme to defraud Plaintiffs and others similarly situated into investing their money into the fraudulent operation. The liability of Defendants herein is based primarily on principles of conspiracy and of aiding and abetting within a grand fraudulent scheme involving dozens of victims.

2. PLAINTIFF CLASS. The class consists of at least 54 victims who relied on documents prepared by Defendant Miller Mayer which taken as a whole represent as real and legitimate a project that was neither. Upon personal knowledge, in part, and on information and belief, it is alleged that the acts complained of occurred within four years of the filing of this Complaint, perpetrated primarily against immigrants from Mainland China. Lead Plaintiff ZHAO HUI SHI is one such immigrant victim from China. During that time Plaintiff ZHAO HUI SHI and dozens of people like her were solicited by the Defendants or their agents, or by other people, to pay money to participate in what was represented to be a legitimate investment visa program under the United States Government's EB-5 investment visa program.

3. JURISDICTION AND VENUE. The contract at issue pertains, in part, to the development of a medical facility at 111 W. Beverly Blvd., Montebello, CA 90640, where performance, at least in substantial part, was required. Plaintiff JUN LU was at the relevant time a resident of the State of California, and Defendants Rachel H. Lew and John P. Thropay are also residents of the State of California.

4. NAMED PLAINTIFFS. The named Plaintiffs are Zhao Hui

Shi, a Chinese national who was attempting to immigrate to the United States under the EB-5 Investment Visa Program, and Jun Lu, at the time a resident of California, who paid a portion of the money that was stolen by Defendants' co-conspirators. The Named Plaintiffs are in nearly exactly the same position as all of the other the Class Plaintiffs, having been lured in by the same scheme, having been led to pay their money to the perpetrators in the same way by the defendant conspirators and aiders and abettors as the other Class Plaintiffs, and having been victimized in the same way by the defendant lawyers as were the other Class Plaintiffs.

5. DESIGNATION OF PLAINTIFF CLASS. The Plaintiff Class is composed of 54 individual investor applicants who are residents of China or the United States, who paid their money in the same way as did the Named Plaintiffs, and who were induced to invest by the same representations and conspiracy as the Named Plaintiffs. Plaintiffs plead that they are part of a class of 54 victims who all lost the exact same amount of money in exactly the same way from a group of defendants who all played the same role in the scam. Three law firms, Defendant WOLFSDORF ROSENTHAL, Defendant LEW, and Defendant DAVID DERRICO, all got blocks of clients from the "agents" and all took the cases serially or in-bulk and on a no-questions-asked basis. All three processed the same forms (*prepared by Miller Mayer*), and all three did exactly the same work on each. None did any investigation, nor did any include a meaningful escrow for the funds. This case presents nearly perfect uniformity among the Plaintiffs as well as among the law firm defendants. The only

difference is that each of the clients only went to one of the three firms, and not to all three. It appears that all of the Class members received the exact same Private Offering Memorandum ("POM") and all attended the same basic standardized seminar or sales pitch that was just repeated all over China. Plaintiffs all invested $500,000 and all lost all of their money with nothing to show for it. The entire project was a complete fabrication written off a template by lawyers who specialize in cranking out the paperwork on a *no questions asked* basis. There was never any project. Nothing about it was real - - except for the money each Class Member lost. Regardless of what each Plaintiff was told, the whole thing was a scam and reliance is demonstrated by the fact that they paid money to a project that was not and never was real. All Class Members paid money for exactly the same reason. Focusing on differences in what victims were told or how they relied on it elevates form over substance. In substance, all were exactly the same. Not only are all 54 claims similar, but this was an assembly line-like process purposely designed to be identical in every respect:

a. Each victim was recruited into the same regional center created by Defendant Miller Mayer by salesmen armed with documents prepared by Miller Mayer.

b. Each victim received the same forms prepared by Defendant Miller Mayer.

c. Each victim received a set of Trojan Horse escrow instructions that enabled the perpetrator to quickly and easily steal the money.

d. Each victim invested in exactly the same project.

e. Each victim was assigned out to a lawyer they did not know beforehand.

f. Each lawyer worked on a no-questions-asked basis. Each lawyer ignored obvious red flags and undertook no due diligence whatsoever.

g. Each victim had their money stolen shortly after wiring it to a common ~~escrow~~ account. The same account was used for all of the ~~escrows~~ victims.

h. Each lawyer continued to take on new clients in this scam even after earlier clients had just had all their money stolen.

I. Each victim is now in exactly the same place: their money is gone. Liu stole it.

j. This was one single common plan that should be litigated as a class for fairness and efficiency.

6. DESIGNATION OF SUBCLASSES. To address any theoretical or actual differences among the Class Members, Plaintiffs designate three Subclasses of Plaintiffs, as follows:

a. SUBCLASS 1: The subclass of approximately 35 Plaintiffs who were represented in their EB-5 petition by Defendant WOLFSDORF ROSENTHAL.

b. SUBCLASS 2: The subclass of approximately 10 Plaintiffs who were represented in their EB-5 petition by Defendant LEW.

c. SUBCLASS 3: The subclass of approximately 9 Plaintiffs who were represented in their EB-5 petition by Defendant DERRICO.

Each such subclass is identical in all respects except the name

of the attorney hired to process the paperwork. All of the paperwork was in substance identical, and each of the Class Members were treated in substantially the same way in each Subclass and as between the Subclasses. Each of the defendants' misconduct as alleged herein was substantially the same as to each Subclass and across the Subclasses.

7. COMMONALITY. Plaintiffs are informed and believe and thereon allege that each of the Class Plaintiffs and each of the Subclass Plaintiffs all received essentially the same POM in approximately the same way from either Defendant LIU or his agents. Plaintiffs are informed and believe and thereon allege that each of the Class Plaintiffs and each of the Subclass Plaintiffs all received the same or nearly identical sham escrow agreement drafted by Miller Mayer which provided no protection and was merely a phantom escrow designed by Miller Mayer to create an illusion of safety. Plaintiffs are informed and believe and thereon allege that each of the Class Plaintiffs and each of the Subclass Plaintiffs all received substantially the same representations and misrepresentations about the investment project, *i.e.*, that it was a real project, that the perpetrator was well qualified to complete the project, that a qualified doctor was running the enterprise, and that there was an actual intent to complete the project, among other things. The representations promulgated to each of the Class and Subclass members were substantially identical because the project was created from a template prepared by Miller Mayer and used a common set of marketing materials. This was a cookie-cutter set-up where all of the cases were intended to be identical.

Each Class Member's case was identical to the others by design. None of the representations made to any of the investors was true, as evidenced by the fact that the whole project through and through was a scam that never really existed nor could it ever really exist in practical terms.

8. Further, Plaintiffs are informed and believe and thereon allege that each of the Class Members were solicited individually or in large groups and the representations were conveyed to them in person or at seminars held in various cities in China. The circumstances under which each victim received the misrepresentations were substantially identical: the scam was set up so that a common set of materials and substantially identical representations were made to each potential investor, and the manner of delivering the representations was identical by design, so that the project could be marketed by surrogates throughout China. Each victim is believed to have been a Chinese citizen and a resident of China. In broad terms, that the project was for a series of "Proton Therapy" cancer treatment centers, as per the common POM, the representations were the same throughout the Class. This main representation was false in that the project was through-and-through an illusion cooked up by LIU, Thropay, and Miller Mayer. As such, all of the victims received the main false representation.

9. Further, the representation of each victim by the attorney defendants herein were nearly identical, if not exactly identical, in that each was solicited in China in substantially the same manner (in person or at a seminar by surrogates promoting a copy of the POM and a phantom escrow), each was then

sent to one of three attorneys in the United States who each did substantially identical work on each matter, who all worked on each case on a no-questions-asked-basis, and whose clients in this matter were all referred to them by the opposing party in the transaction (Liu) or by his agents.

10. As a practical matter, the representation provided to each class plaintiff was identical in all material respects as the representation provided by Defendant LEW to Plaintiff Shi. In each case, the clients were treated in bulk and substantially identically in an assembly-line like process. The Plaintiffs, for all practical terms, had little to no contact with the attorneys to whom they had been assigned by the perpetrators, nor did they even meet their attorneys beforehand. Each Plaintiff paid approximately the same amount of money in approximately the same way and based on the same or substantially the same written representations to the defendant attorneys herein. Any differences are inconsequential to this case, necessarily by design, because the handling of each was supposed to be assembly-line-like and identical in all material respects (otherwise, separate POM’s would have been drafted, which does not appear to have been the case).

11. The representation of each Class Plaintiff was the same in that each defendant attorney used the same template created by Miller Mayer for each Plaintiff. The actual employees of each law firm did nearly identical work on each petition for each Class Plaintiff, and the work performed amounted to filling out the same template for each Class Plaintiff. Each defendant immigration attorney (LEW, WOLFSDORF

ROSENTHAL, and DERICO) committed identical negligence in the same manners and with the same consequence for each class plaintiff, and each Class Plaintiff suffered in the same way: they lost $500,000 each because each time and for each plaintiff the attorney assigned to each by the perpetrators ignored the ineffective escrow documents, which were the same for all of the class plaintiffs, ignored the numerous red flags concerning the perpetrators, which were again the same for all class plaintiffs, and failed to conduct any inquiry, investigation, or diligence in representing the class plaintiffs.

12. Each defendant attorney represented each such Class Plaintiff in nearly exactly the same way because the work was uniform and homogenous. Each defendant attorney undertook to represent the various class members by wrote, using a template, such that the representation was standardized and uniform among the class. It appears that none of the attorneys examined the escrow agreements, or if they did, they failed to inform any of the Class Plaintiffs of the significance of the lack of substance or effectiveness of the escrow, since no rational person would knowingly agree to a phantom escrow or the release of the money to the perpetrator long before construction could even begin.

13. In each instance for each Class member, the immigration attorneys committed the same error: they failed to conduct proper due diligence and failed to obtain informed consent to limit their representation. In each case, the attorneys undertook their representation on a no-questions-asked basis. In each instance, the plaintiffs paid approximately the

same money to the attorneys and received nearly identical services, or lack thereof. In short, each of the defendant immigration attorneys agreed to undertake the representation of the class plaintiffs in bulk, and treated them in bulk, such that the representation was intended to undertaken in a uniform manner using a uniform template.

14. The only difference between the representation of the plaintiffs within and between the Subclasses by the immigration attorneys were the individual names and demographic/financial information, which differences had nothing to do with the claims or damages alleged herein. However, the work performed was the same, and the lack of work performed (*ie.*, due diligence, ignoring red flags, etc.) was the same or nearly identically so throughout the class. For example, the class plaintiffs were referred to the defendant immigration law firms en masse by the perpetrators of the fraud, sequentially as they were signed up by the perpetrators one after the other. Additionally, the relationship which resulted in the representation was between the perpetrators of the fraud and the immigration attorney defendants, such that the plaintiffs were only a commodity to be milked for $500,000 each plus attorney fees paid to the immigration attorneys.

15. Otherwise, the representation of each class plaintiff was essentially identical, and the negligence and participation in the fraud was the same across the class. In particular, each of the class plaintiffs was sent to the various immigration attorneys without any volition or input on their part. In short, they were told where to go and had no choice in the

matter. Thereafter, the immigration attorneys performed the same work for each plaintiff, which consisted on having assistants collect and input onto a template the identifying, demographic, and financial data, then preparing the same template petitions for each class plaintiff, and then by signing said petitions without any good faith belief in the honesty of the project.

16. In each case, the conduct of the immigration attorneys was the same, and any differences in the representation was trivial and inconsequential to the acts complained of herein. Further, the negligence and fraudulent acts were performed by the defendant attorneys against the class as a whole, and not just against specific individuals. For example, the bogus escrow agreements were common to all Class and Subclass members. The immigration attorneys made a conscious decision not to review any of the escrow agreements involved in the whole project (*or if they did, they failed to advise any class members of the defects*). The immigration attorneys treated this as one project and one commons set of facts. The only difference for the immigration attorneys was the names of the clients. Factually, from the immigration attorneys' perspectives, the clients were merely faceless customers.

17. NAMED DEFENDANTS. Defendant LEW is believed to be a resident of, and an attorney licensed in, the State of California who was hired by Plaintiff SHI and nine other Class Plaintiffs to prosecute the immigration petition on her behalf. Plaintiffs are informed and believe that Defendant LEW knew of the fraudulent scheme to steal money by false pretenses from

potential immigrants such as Plaintiff SHI, or should have known of said scheme but for her willful ignorance, and that she encouraged and allowed Plaintiffs to pay the money to the perpetrators knowing that said money would very likely be stolen, or negligently and recklessly ignoring the high probability that it would be stolen, and in any event failed to advise of the clear and present danger that Plaintiffs had been caught in a fraudulent scheme despite the affirmative duty to do so.

18. Defendant THROPAY, whom Plaintiffs are informed and ~~belief~~ believe is a licensed medical doctor, is believed to be a resident of the County of Los Angeles, State of California. Based on information and belief it is alleged that Defendant THROPAY was a business associate of Charles C. Liu and/or Lisa Wang, the primary perpetrators of a fraudulent scheme to steal money by false pretenses from potential immigrants such as Plaintiff Shi. Plaintiffs are informed and believe that Defendant THROPAY conspired with Charles C. Liu and/or Lisa Wang to, *inter alia*, create the appearance of a legitimate operation. Plaintiffs are informed and believe that Defendant THROPAY aided and abetted Charles C. Liu and/or Lisa Wang by, *inter alia*, lending his credibility and legitimacy to the scheme without a good faith belief that the scheme was honest and legitimate. Defendant THROPAY received at least $680,500 in unearned proceeds in connection with the transaction, in addition to $300,000 spent to improve a parcel of land owned by him.

19. Defendant WOLFSDORF ROSENTHAL (dismissed) is believe to be a law firm located in the City of Santa Monica, State of

California, and staffed by attorneys licensed in the State of California. Plaintiffs are informed and believe that they were retained by about 35 Class Plaintiffs to prosecute immigration petitions on their behalf as part of the perpetrators' fraudulent scheme. Plaintiffs are informed and believe that said Defendant and its staff attorney(s) who handled this matter knew of the fraudulent scheme to steal money by false pretenses from potential immigrants, or should have know of said scheme but for their willful ignorance, and encouraged and allowed Plaintiffs to pay the money to the perpetrators knowing that said money would very likely be stolen, or negligently and recklessly ignoring the high probability that it would be stolen, and in any event failed to advise of the clear and present danger that Plaintiffs had been caught in a fraudulent scheme despite the affirmative duty to do so.

20. Defendant MILLER MAYER, LLP, ~~which has been stricken from this case by the Court,~~ is believe to be a law firm located and staffed by attorneys licensed in the State of New York. Plaintiffs are informed and believe that they were retained by the perpetrators of the fraud to prepare the documents used to lure in Plaintiff SHI and the other Class Plaintiffs and to create the appearance of a legitimate EB-5 program. Plaintiffs are informed and believe that said Defendant and its staff attorney(s) who handled this matter knew of the fraudulent scheme to steal money by false pretenses from potential immigrants, had to have known, or should have known of said scheme but for their willful ignorance, and nonetheless assisted the perpetrators knowing that Plaintiffs' money would be stolen.

In particular, said defendant could have only participated in this scheme by purposely turning a blind eye and by suppressing knowledge of the inability to the perpetrators to actually undertake the project they were supposedly funding.

21. Defendant DERRICO is believe to be a lawyer licensed in the State of California but residing in the City of Boca Raton, State of Florida. Plaintiffs are informed and believe that he was retained by about 10 Class Plaintiffs to prosecute the immigration petition on their behalf. Plaintiffs are informed and believe that said Defendant knew of the fraudulent scheme to steal money by false pretenses from potential immigrants, or should have known of said scheme but for his willful ignorance, and encouraged and allowed Plaintiffs to pay the money to the perpetrators knowing that said money would very likely be stolen, or negligently and recklessly ignoring the high probability that it would be stolen, and in any event failed to advise of the clear and present danger that Plaintiffs had been caught in a fraudulent scheme despite the affirmative duty to do so.

22. Defendant U.S. REGIONAL ECONOMIC DEVELOPMENT AUTHORITY, LLC is believe to be a corporation located in the City of Boca Raton, State of Florida. Plaintiffs are informed and believe that said Defendant helped the perpetrators organize the fraudulent scheme and assisted in the preparation of documents for the perpetrators. Plaintiffs are informed and believe that said Defendant and its staff who handled this matter knew of the fraudulent scheme to steal money by false pretenses from potential immigrants, or should have know of said

scheme but for their willful ignorance, and encouraged and allowed Plaintiffs to pay the money to the perpetrators knowing that said money would very likely be stolen, or negligently and recklessly ignoring the high probability that it would be stolen, with the intention of creating a scheme that the perpetrators could exploit to steal the money. In particular, said defendant could have only participated in this scheme by purposely turning a blind eye and by suppressing knowledge of the inability to the perpetrators to actually undertake the project they were supposedly funding.

23. The true names and capacities, whether individual, corporate, associate or otherwise of defendants named herein as DOES 1 through 50, inclusive, are unknown to Plaintiffs who, therefore, sue said defendants by such fictitious names, and Plaintiffs will ask leave of Court to amend this Complaint when their true names and capacities have been ascertained.

24. Based on information and belief it is alleged that each of the defendants, including those designated as a DOE, is a fraudulent transferee or transferor, alter ego, associate, partner, officer, director, or conspirator, or is responsible, negligently, or in some actionable manner for the events, and happenings herein referred to and caused the injuries and damages proximately thereby to Plaintiffs as herein alleges either through the defendants' own conduct or through the conduct of their agents, servants, and/or employees, or, through the ownership, partnership, lease, sale of the instrumentality causing the injury or in some other actionable manner.

25. Based on information and belief it is alleged that at

all times herein mentioned, defendants, and each of them, were the agents, servants and employees of every other defendant, and the acts of each defendant as herein alleged were performed within the course and scope of that agency, service or employments and with the knowledge and consent of the remaining defendant(s) and each of them. Hereinafter, all defendants including Doe Defendants, will sometimes be referred to collectively as "Defendants". It is further alleged on information and belief that each of the Defendants was a co-conspirator of the other, and also of the perpetrators of the fraud, Charles C. Liu and/or Lisa Wang, or otherwise aided and abetted in the fraud.

**UNDERLYING TRANSACTION**

26. U.S. immigration law allows certain foreign nationals who are employment-based immigrants to become lawful permanent residents and get a Green Card. One employment-based (EB) "preference immigrant" category includes foreign nationals who have invested or are actively in the process of investing $500,000 in targeted employment areas in a new commercial enterprise that will benefit the U.S. economy and create at least 10 full-time positions for qualifying employees. These foreign nationals are also called "EB-5 immigrant investors" because they are in the employment-based fifth preference visa category. The underlying transaction at issue in this case is an EB-5 Investment Visa offering which turned out to be a fraud wherein Lead Plaintiffs were lured into paying $500,300 to perpetrators Charles C. Liu ("Liu") and Xin Wang ("Wang"), aka

"Lisa Wang," who essentially stole Plaintiffs' money.

27. The EB-5 Immigrant Investor Program administered by U.S. Citizenship and Immigration Services ("USCIS") promotes economic growth in the United States by granting visas to foreign investors on several strict conditions. Entities that the USCIS designates as "regional centers" administer EB-5 investment projects. To obtain conditional permanent residency status for a period of two years, foreign investors must invest in a "commercial enterprise" that is associated with a USCIS-approved regional center. For that investment to be eligible for the EB-5 program, the foreign investment must be at least $500,000, made in a "Targeted Employment Area," create at least ten full-time jobs, and significantly, the investment must actually put the investors' capital at risk for "the purpose of generating a return."

27.1 The perpetrator, Charles Liu, hired respondent Miller Mayer, LLP, to create documents he then used to market a fake investment project to Chinese would-be immigrants, who were then divvied up to three law firms to process EB-5 visa petitions one by one.

27.2 In 2010, Charles Liu applied to USCIS to have his project, which he called "Pacific Proton Therapy Center, LLC," approved as a regional center. Through Miller Mayer's efforts, USCIS approved Pacific Proton Therapy Center as a regional center in 2012. Liu formed the Pacific Proton EB-5 Fund as the vehicle to attract investment money from seminars in China.

27.3 Charles Liu retained Miller Mayer to create a Private Offering Memorandum ("POM"), the substance of which is largely

set out in two paragraphs on the second page, which represented that investors' capital contributions would be held in escrow. Defendant Miller Mayer wrote: "Pacific Proton EB-5 Fund, LLC ('PPEB5') … is offering for sale Units of limited liability company membership interests at a purchase price of $500,000 per Unit to qualified non-U.S. citizens seeking permanent resident status in the United States through the Immigrant Investor Program … Investment funds will be held in escrow prior to closing in accordance with the escrow agreement attached hereto ('Escrow Agreement') as APPENDIX A."

27.4 On Page 18 of the POM, Defendant Miller Mayer wrote: "PPEB5 will pool investor funds and make a loan of up to $150 million1 to Los Angeles County Proton Therapy, LLC ('LAPT'), a California limited liability company[.]"

27.5 The footnote which Defendant Miller Mayer wrote reads: "We note that the total project cost is estimated to be $214 million. LAPT will obtain the remainder of the needed funds from equity investors and/or lenders other than PPEB5."

27.6 Miller Mayer also prepared the "Escrow Agreement," where Defendant Miller Mayer wrote: "Investor's Capital Contribution shall be disbursed by the Escrow Agent to the Company upon the Company delivering written notice to the Escrow Agent of USCIS approval of the Investor's I-526 Petition."

27.7 Another Escrow Agreement paragraph Defendant Miller Mayer wrote specifically relieved the escrow agent of any duty to verify that USCIS has actually approved an investor's petition, as long as Liu wrote the escrow agent the letter representing that it had been approved: "The Escrow Agent may

rely upon, and shall be protected in acting or refraining from acting upon, any written notice, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties."

27.8 Thus Miller Mayer prepared an offering description that represented funds would be pooled and placed in an escrow, but then actually created nothing more than a demand account in which the bank, acting as escrow officer, had no duties or responsibilities other than to release the money when presented with a notice from the perpetrator's company.

27.9 So while Miller Mayer drafted a Private Offering Memorandum that represented that "PPEB5 will pool investor funds and make a loan of up to $150 million to Los Angeles County Proton Therapy" and "Investment funds will be held in escrow prior to closing," it drafted an actual escrow agreement required neither pooling nor closing, and simply allowed the money to be withdrawn immediately upon demand, without verification of any conditions or documents.

28. Plaintiffs were sold on an EB-5 Regional Center, Beverly Proton Center, LLC ("Beverly Proton"), which Liu co-founded with Defendant THROPAY, a radiation oncologist. Beverly Proton was promoted as a proton therapy cancer treatment center to be located in Southern California. Liu acted to raise money under the auspices of the EB-5 program. In 2010, Liu submitted an application to USCIS to have defendant Pacific Proton Therapy Center, LLC ("Pacific Proton") designated as a regional center. Liu also formed the Pacific Proton EB-5 Fund

("PPEB5-Fund") to act as the investment vehicle for foreigners interested in making an EB-5-eligible investment in his proposed Beverly Proton cancer treatment center. On June 28, 2012, U.S. Customs and Immigration Service ("USCIS") approved Liu's regional center application. USCIS approval was not a validation of the project itself.

29. Beverly Proton was owned 75% by Liu and 25% by Defendant THROPAY, who was the Chairman and Chief Executive Officer of the Regional Center from December 2, 2013, until Liu replaced him on January 19, 2016. The 75/25 ownership percentage arrangement does not make commercially reasonable business sense, assuming it were a legitimate operation: the ownership interest of Defendant THROPAY is too small, since he was supposed to be contributing the property and doing all the work. Likewise, the idea that Liu paid $680,000, plus $300,000 in improvements, for essentially nothing but Defendant THROPAY's name and his reputation, and where Liu made no serious effort to pursue the project, makes no sense either. Rather, the unearned money paid to Defendant THROPAY and the lopsided ownership percentage in favor of Liu imply that neither had any intention of actually opening the facility and it was all just a ploy to legitimize Liu's scheme to steal the investor's money. In short, Defendant THROPAY was given almost a million dollars and a 25% ownership share for merely lending his name and reputation to a project which would never be built, all without having to do anything but smile.

30. Liu controlled Pacific Proton throughout the relevant period and held the title of president. With the knowledge and

consent of Defendant THROPAY, Liu awarded himself a substantial annual salary ($350,000) from Pacific Proton. Also with the knowledge and consent of Defendant THROPAY, Liu used his position to run an EB-5 Fund, which also paid him an ample salary of $200,000 annually.

31. From at least as early as October 2012 (*per Lew Declaration at ¶18*)~~October 2014~~ through April 2016, defendants offered and sold investments in the form of limited liability company units in the PPEB5 Fund, for $500,000 each, raising at least $26,967,918 from 50 investors in China (the "Pacific Proton offering"). Each investor in the Pacific Proton offering was provided with a 2010 or later ~~May 2013 Private Offering Memorandum ("~~POM~~")~~ setting forth the terms of their investment. The POM emphasizes that Dr. THROPAY's contributions to the proposed project were critical to the success of the investment. The POM provides that Beverly Proton "is dependent upon the continued involvement of Dr. Thropay" and that the "loss of services of either Dr. THROPAY or Mr. Liu would have a material adverse effect on PPEB5 [Fund]'s and the Borrower's business, financial condition and results of operations."

32. Plaintiffs are informed and believe that LIU and WANG both met with investors and personally encouraged them to invest in the Pacific Proton EB-5 project. These sales pitches were done with the knowledge and consent of Defendants, or subject to their willful ignorance. Each investor was given the POM and essentially the same cookie-cutter sales pitch. In substance, the information given to each potential investor was the same: LIU was an experienced expert in the field who had assembled a

qualified team to build out multiple cancer treatment centers in Southern California in a $214 million project that had received all necessary approvals and was ready to build. None of this was true. Liu engaged several marketing firms, including Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), United Damei Group, United Damei Investment Company, Ltd., and Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), and Hong Kong Delsk Business Co., Ltd. ("Delsk"). Of the known investors in the PPEB5 Fund, 11 were solicited by Overseas Chinese, 10 by UDG, and 37 by Delsk. Wang was the chief executive officer and chairman of the board of UDG, and she and her husband controlled UDG. UDG operated a website that promoted the Pacific Proton offering through several affirmative representations, including that: the offering was a "secure and reliable investment project" which had advantages over other EB-5 projects because it used established technology from Optivus Proton Therapy, Inc. ("Optivus") that is "the most effective, reliable, precise and environmental proton therapy system in the market."

33. From October 2014 through April 2016, each Class Plaintiff was presented with a sales pitch to invest in the scheme. Specifically, they were told that this was a legitimate medical infrastructure project for the purpose of creating a real cancer treatment center. They were told that the perpetrators were experienced in the field and were in a position to open and operate a profitable center. None of these facts were true. Not only was it not a real project, but it was organized in such a way that no legitimate doctor would ever

participate in Thropay's role in the scheme (because the doctor was given such a small ownership interest) and it was managed by people (the perpetrators) who had no idea how to do what they claimed they were going to do (set up a sophisticated cancer treatment center). There was never any possibility that the project would get built as proposed to the Class Plaintiffs, and there was never any chance that it was a real project, as opposed to a complete scam. Each of the Defendants was in a position to quickly recognize that the perpetrators were engaged in fraud, yet chose to turn a blind eye to the deficiencies and acted as though it was a legitimate enterprise.

34. More importantly, the Class Plaintiffs were presented with an array of professionals (the defendants herein) who lent their credibility to the project (without conducting adequate investigation or due diligence) so as to convince Plaintiffs that the project was real and legitimate, when in fact it was not. The Class Plaintiffs relied on the participation of those professionals in deciding to pay their money to the perpetrators. Said reliance was reasonable under the circumstances because the professionals were operating what appeared to be legitimate law firms and corporations. In reliance in part on the support of Dr. THROPAY and the other professionals, Plaintiffs then trusted the perpetrators and paid their money, which the perpetrators then promptly stole. The professionals (defendants herein) profited handsomely from the scheme without having to do significant work in comparison to the compensation received. In short, the professionals were compensated more for looking the other way than for doing actual

work.

35. Plaintiffs are informed and believe that the defendants herein were hired to create a veneer of legitimacy that lasted just long enough for them to get paid and for the perpetrators to steal the money. Plaintiffs are informed and believe that the defendants herein in fact created a veneer of legitimacy that lasted just long enough for them to get paid and for the perpetrators to steal the money. In fact, the veneer of legitimacy created by the defendants herein lasted just long enough for them to get paid and for the perpetrators to steal the money. Plaintiffs are informed and believe that none of the defendant professionals expressed any reservations or concerns to any of the Plaintiffs despite an affirmative duty to do so and despite overwhelming evidence in their possession that the enterprise lacked even the most fundamental aspects of a legitimate operation (such as the existence of a real operation to establish and build a cancer treatment center).

36. In fact, very little if anything was done towards the project. In 2015 some work to demolish a building owned by Defendant THROPAY was accomplished with the invested funds, to the sole benefit of Defendant THROPAY. Of the $26.7 million raised by Liu and Wang from foreign investors from 2014 to 2016, only $234,899.19 remained in the ~~corporate defendants~~ bank accounts as of June 3, 2016. This near-total dissipation of investor funds was occasioned by Liu and Wang's massive misappropriation of investor money. The Pacific Proton offering proceeds were used in a way that violated the terms and representations made by the PPEB5 Fund POM. Tens of millions of

investor dollars were transferred to either enrich Liu and Wang, or to pay commissions to the overseas marketers who brought investors to the Pacific Proton project. Of the $26,967,918 raised by Liu and Wang, $24,712,217 was sent to the PPEB 5 Fund and earmarked as Capital Contributions. Although that $24.7 million in Capital Contributions was required, under the POM, to be loaned to Beverly Proton and then spent in furtherance of its proposed cancer therapy center, Liu and Wang diverted almost $21.2 million of investor money for their own purposes. Liu took $6.7 million in investor funds for himself. Compounding her husband's windfall, another $1.538 million of investor money went to bank accounts under Wang's control. And last, Liu sent $12.9 million in commissions to the overseas marketers, including UDG, an entity controlled by him and Wang - which individually received $3.815 million. Further, Liu used company funds to pay a hodge-podge of his living expenses, including the cost of the private education enjoyed by Liu's and Wang's dependent children. Liu and Wang dissipated investor funds by transferring them en masse to foreign bank accounts. Liu took $4.27 million of the $6.7 million he misappropriated during February and March of 2016. Wang received $1 million of the $1.538 million she misappropriated in March of 2016. In all, Liu sent nearly $17 million in investor funds out of the U.S. to foreign locations.

37. The POM provided to investors and the UDG website's promotional statements were both materially misleading. ~~First, the~~ The POM represented, *inter alia*, that Capital Contributions would only be used to fund the development and operation of a

proposed cancer treatment center, while Administrative Fees would be used to pay commission and other offering expenses. This was undisputedly false. Because Liu and Wang misappropriated the vast majority of the investors' Capital Contributions for either their personal use or for excessive commissions to overseas marketers, most of the investor money was never used for actual development work.

38. Liu and Wang took advantage of the EB-5 investment program to quickly raise a massive amount of money, all told, at least $26.9 million in less than ~~two~~ four years. They then transferred more than $21.1 million of that amount to either themselves, or to overseas marketers in the form of exorbitant commissions. Liu's and Wang's deceptive conduct – their use and dissipation of that $21.1 million – was in stark contravention of the terms of the POM, which prohibited the use of Capital Contributions to pay commissions and instead designated those funds for development of the therapy center, and also irreconcilable with disclosures made by the UDG website, which gave investors the false impression that the EB-5 project was making real progress. That progress was illusory. Next to no development work had in fact been done for the simple reason that Liu and Wang had frittered away upwards of 75% of all investor money raised on themselves and commissions to foreign marketers, with one of those marketers being under their control, and thus an additional source of personal enrichment for Liu and Wang.

39. The documents drafted by the defendant Miller Mayer ~~professionals~~ contained no real safeguards to protect investors,

and basically left the door wide open to allow the thieves to steal the money. For example, the defendant <u>immigration </u>lawyers allowed their clients' money to be released directly to the perpetrators' enterprise without restrictions such as <u>real</u> escrow accounts or rudimentary <u>capital </u>controls. It appears that none of the defendant ~~professionals~~ <u>immigration attorneys</u> communicated to any of their clients the fact that the enterprise lacked basic capital controls and that no mechanisms were in place to protect their money. In fact, it appears that the defendant ~~professionals~~ <u>immigration attorneys </u>actively attempted to limit their own responsibilities towards their clients so as to exclude any duty to report to their clients the obvious fraud that they were promoting. In short, the ~~professionals~~ <u>immigration attorney </u>defendants intentionally tried to exclude from their responsibilities the duty to inform their clients of the fraud and the duty to conduct basic due diligence on the scheme, despite ethical obligations which prohibit such limitations.

40. By submitting applications to the U.S. Government, said defendant professionals<u>, including Miller Mayer,</u> were representing to the Government that the scheme was legitimate, when in fact they had no good faith basis to make such a representation. Each of the Class Plaintiffs had a right to rely on the duty of the professionals not to submit fraudulent schemes to the Government, and in so doing, had the right to rely on the duty of each of the professionals to report to them any suspicious information, facts, or deficiencies. Plaintiffs are informed and believe that none of the professional

defendants reported any of the suspicious information, facts, or deficiencies.

41. Plaintiffs are informed and believe that each Class Plaintiff was referred to the defendant ~~professionals~~ <u>immigration attorneys </u>by the perpetrators of the fraud. Plaintiffs are informed and believe that none (or nearly none) of the Class Plaintiffs ever met the defendant ~~professionals~~ <u>immigration attorneys (except that Plaintiff SHI met LEW after her money was already taken)</u>, and that each Class Plaintiff was assigned a lawyer by the perpetrators of the fraud. Each of the defendant ~~professionals~~ <u>immigration attorneys </u>knew that they were receiving clients *en masse* by the opposing party in the transactions, and therefore were aware of their heightened ethical duty to investigate the circumstances of the retention and the ethical duty to conduct due diligence to insure that the representation was not being obtained for an improper purpose (which in fact is was). In short, the ~~professional~~ <u>immigration attorneys </u>defendants were paid hundreds of thousands of dollars each for taking a clients in bulk by the perpetrators of a scam which should have been obvious to professionals, without meeting the clients and without doing any basic due diligence, and all the while purposely limiting their own duties to their clients to exclude any responsibility to investigate the legitimacy of the underlying transaction. In so doing, the defendant ~~professionals~~ <u>immigration attorneys </u>violated ethical standards and improperly limited the scope of their representation so as to allow them to keep making money off the scheme without having to report anything negative to their clients which might scare

them off. No reasonable lawyer would do such a thing.

42. Defendants herein conspired with ~~each other~~ Liu in a common scheme to defraud Plaintiffs ~~and to have Plaintiffs enter into the real estate transaction for the subject Property~~. In furtherance of the conspiracy, each of the defendants undertook certain duties and made representations to Plaintiffs to induce them to enter into the transaction ~~for the subject Property~~. Each defendant acted jointly and with ~~each other~~ Liu to defraud Plaintiffs by their actions, inaction and malfeasance, or ratified said conduct.

43. In particular, Plaintiffs are informed and believe and thereon allege that Defendants THROPAY, MILLER MAYER, and LEW accepted money in connection with LIU and WANG's fraudulent scheme, knowing full well that neither LIU nor WANG were in any position to undertake the project, and knowing full well that neither LIU nor WANG were in any way capable of undertaking the project. It had to have been painfully obvious to ~~both~~ Miller Mayer, Thropay and ~~Wang~~ Lew that Liu and Wang were simply scamming these investors out of their money. Further, ~~neither~~ Thropay, Miller Mayer, and ~~nor~~ LEW ~~undertook~~ failed to undertake sufficient ~~due diligence~~ investigation to determine if the investment was legitimate. Further, Defendant LEW was well aware of the proliferation in EB-5 fraud and turned a blind eye towards Liu and Wang. The same was true for Defendants MILLER MAYER, WOLFSDORF ROSENTHAL, and DERRICO. Further, both Thropay and LEW accepted money from the proceeds of the fraud and/or the investors, without a good faith belief in the legitimacy of the project.

44. Plaintiffs were harmed by Liu and Wang’s theft of their money. Defendant THROPAY is responsible for that harm because he was part of a conspiracy to commit fraud and theft. In particular, Defendant THROPAY was aware of sufficient facts and information, such as the inability of Liu and Wang to undertake the project, the lack of real substance to their proposals, the shallow nature of the company (consisting of just themselves), the lack of experience, the lack of commitment, and the wildly outlandish and unsupported claims of success being made, as well as the oddly favorable terms given to Liu and Wang, all show that Defendant THROPAY had merely sold his name to the project for what amounted to $980,000, and therefore was aware that Liu and Wang planned to commit theft and agreed with that goal and intended that the investor’s money be taken. Defendant THROPAY’s lending his name to the venture and acceptance of money from it amounted to cooperation and an agreement to cooperate with Liu and Wang in their scheme. Likewise, Defendant LEW had represented multiple investors in this scheme and had more than sufficient information to discern the true nature of Liu and Wang’s illicit plans. The only way for Defendant LEW to have maintained a lack of knowledge of the scheme would have been to have intentionally turned a blind eye towards Liu and Wang’s conduct, and to have intentionally remained willfully ignorant of the unfolding scheme. Further, Defendant LEW was under an affirmative duty to investigate the facts and circumstances presented to her, and intentionally failed to do so in order to maintain plausible deniability.

45. The underlying fraud which formed the basis of the

conspiracy and aiding and abetting is well established by the Federal Court judgment against Charles Liu. There is no real need to plead Liu's ~~that~~ fraud with greater specificity because all of the parties are very familiar with the facts and have ready access to the evidence through PACER. The United States District Court has already issued a judgment against perpetrators Liu and Wang. In so doing, its order granting summary judgment makes numerous factual findings and lays out the whole scam in great detail. The facts found by the District Court are not reasonably disputable. In addition, Plaintiffs here have previously supplied this Court with the declarations of Jacob A. Regenstreif, Lorraine Pearson, and John W. Berry, which all lay out with admissible evidence the facts of this case and the fraud by Liu and Wang. The main facts are as follows:

a. Defendant LEW took at least 10 clients in-bulk (*which should have triggered a duty to investigate who was directing so many clients to her on just one project*) and received payment through the opposing party;

b. Defendant LEW did not check the escrow agreement (*which is probably the most important document for her clients in the matter*);

c. Defendant LEW handled ~~the~~ petitions sequentially, yet did nothing to check on the status of prior submissions as she was presenting new ones;

d. Defendant LEW ignored the transaction documents;

e. Defendant LEW failed to confirm the escrow agreement was working;

f. Defendant LEW failed to confirm that the project was even real; and

g. Defendant LEW improperly limited her representation and ignored red flags.

46. The legal malpractice case against Defendant LEW can be summarized as: she received money from the opposing party, then allowed her clients to wire money into a Trojan Horse escrow, did nothing to question any aspect of the transaction, completed the documents on a no-questions-asked basis so that the money could be released from escrow, and did nothing to monitor the escrow or the project. Like WOLFSDORF ROSENTHAL, even after one client's money had been taken, LEW continued to process more victims for Liu so that more money could be taken. Like WOLFSDORF ROSENTHAL, she was working on a virtual assembly line with the perpetrator. They were not just aiders and abettors, they were willing participants. A jury can infer from this course of conduct an intent by Defendants to join in the fraud and do their parts to rubber-stamp forms created by Defendant Miller Mayer so that Liu could take ~~pry~~ the money out of the escrow account. It does not appear that Defendants performed more than a dozen hours worth of work for each plaintiff, if any attorney time at all was expended, yet got paid substantial sums of money.

47. Defendant LEW took money from the opposing party to prepare applications which the perpetrator then used to justify releasing the money from escrow without the victims' knowledge or consent. At the very least, Defendant LEW had a duty to disclose her conflict of interest and the consequences of her

insisting on working only on a no-questions-asked basis.

48. A lawyer is a fiduciary of the highest order, Defendants LEW and WOLFSDORF ROSENTHAL had a duty to disclose their conflicts of interest, to disclose the fact that they were taking clients in-bulk from the opposing party, and to disclose the fact that they were ignoring obvious red flags such as being handed clients in-bulk from the opposing party and then being paid money directly from that party (*which are very good indicators that a fraud is in progress*).

49. All class members suffered exactly the same loss in exactly the same way. Not only are these claims similar, but because this was an assembly line-like process, they were purposely designed to be identical in every respect:

a. Each victim was recruited into the same regional center created by Defendant Miller Mayer by salesmen armed with documents prepared by Miller Mayer.

b. Each victim received the same forms prepared by Defendant Miller Mayer.

c. Each victim received a set of Trojan Horse escrow instructions drafted by Miller Mayer that enabled the perpetrator to quickly and easily steal the money.

d. Each victim invested in exactly the same project.

e. Each victim was assigned out to a lawyer they did not know beforehand.

f. Each lawyer worked on a no-questions-asked basis. Each lawyer ignored obvious red flags and undertook no due diligence whatsoever.

g. Each victim had their money stolen shortly after

wiring it to Liu's a common escrow account. The same account was used for all of the escrows.

h. Each immigration lawyer continued to take on new clients in this scam even after earlier clients had just had their money stolen.

I. Each victim is now in exactly the same place: their money is gone. Liu stole it.

j. This was one single common plan that should be litigated as a class for fairness.

**FIRST CAUSE OF ACTION FOR FRAUD**

(Against all Defendants except Defendant WOLFSDORF ROSENTHAL, which has been stricken from this cause of action by the Court)

50. The allegations contained in the preceding paragraphs are here incorporated by reference as though fully set forth at this point.

50.1 **Who:** Charles Liu joined with Defendant Thropay and together hired Defendant Miller Mayer to prepare fraudulent documents used to solicit money from Plaintiff SHI and the other class plaintiffs. Material false and misleading representations were written by unknown employees of Defendant Miller Mayer, acting within the course and scope of their employment, which were used to scam the plaintiffs. Defendant Thropay joined in the scam, profited by it, and was instrumental in carrying it out. Defendant Lew joined in the scam after it was in progress, assisting by processing approximately 10 victims one-by-one through the process of having their money stolen.

50.2 **When:** In or about 2010, Liu retained Defendant Miller Mayer to prepare an EB-5 regional center application and other documents relating to a fake project. At that time, Liu was in the process of setting up a fraud which he intended to unleash on would-be Chinese immigrants trying come to the United States. Liu engaged the services of Defendant Miller Mayer for the purpose of committing a crime: specifically, he needed lawyers to prepare documents to make his scam look like a real project even though it was not. He also needed lawyers to process the investors through the USCIS without looking too closely at the documents and without looking into Liu's operations. On August 25, 2010, Defendant Miller Mayer formed Pacific Proton Therapy Regional Center, LLC, for Liu. On or before August 25, 2010, Defendant Miller Mayer knew that Thropay was only getting 25% when he and his sister were doing all the work and Liu was getting 75% for doing nothing other than hiring Defendant Miller Mayer (and orchestrating the whole fraudulent scheme), and that the capital contributions were only one dollar each. On or about November 15, 2010, Defendant Miller Mayer, formed Pacific Proton EB-5 FUND, LLC, as a Delaware corporation, for Liu for the purpose of selling shares therein to immigrant investors. On or about November 19, 2010, Defendant Miller Mayer prepared an application letter on behalf of Liu for submission to the USCIS. The letter application states that Defendant Miller Mayer would be retained to ensure accuracy in the application and to assemble and draft all necessary regional center business and *investor* documentation. On or about November 20, 2010, Defendant Miller Mayer prepared a $214 million Private Offering

Memorandum ("POM") and accompanying Escrow Agreement for Liu to use to solicit his victims. This POM appears to have been the same POM that was shown to Plaintiff SHI. The POM and Escrow Agreement prepared by Defendant Miller Mayer contained false and misleading statements, as discussed below. Plaintiff SHI did not discover the falsity of the POM until the general public did in late 2016.

50.3 **Where:** The proposed project was to be built in Montebello, California. Liu and Thropay were both based in Southern California. Defendant Miller Mayer practices in New York, but undertook this project in California. Most of the victims were recruited in China.

50.4 **What:** The fraud was carried out in three major components:

(1) the preparation of the POM and Escrow Agreement, which were fraudulent as discussed below;

(2) the solicitation of victims using materials prepared by Defendant Miller Mayer; and

(3) the theft of funds by Liu while the immigration lawyers he selected to represent the victims turned a blind eye and kept feeding more and more victims into the scam over the course of at least four years.

The POM was fraudulent through and through. As has subsequently become obvious, there was nothing real about the project. It was all a hoax. The District Court correctly stated:

"Despite significant investment, nearly no construction on the proton therapy center has taken place. Instead, Liu burned through the millions left after payments to himself,

Wang, and the marketers on half-hearted attempts to convey the illusion of progress."

Defendant Miller Mayer's liability is based on: (1) preparation of documents which it had no reasonable basis for believing to be true, and (2) preparation of the fraudulent escrow agreement template used to steal the money. Defendant Miller Mayer engaged in willful blindness, creating or procuring all documents the perpetrators needed to steal each class plaintiff's money. Defendant Miller Mayer had to have known the documents it assembled would be given to people like Plaintiffs. The POM and associated documents were basically the only tangible thing ever created for the project. A subsequent POM was dated May 1, 2013, after Plaintiff SHI had already lost her money, but it appears to have been substantively identical, except for a disclaimer buried deep within it which made it slightly more truthful that "Upon notice of filing of each subscriber's 1-526 Petition, his/her Capital Contributions will be released..." This change was too cryptic and buried too deep to have made any practical difference and the document was just as fraudulent as the prior version prepared by Miller Mayer. In practical terms, the November 20, 2010 version and the May 1, 2013 version are functionally identical and just as fraudulent.

50.5 **How:** Defendant Miller Mayer committed fraud by preparing two fraudulent documents, *inter alia*, specifically for use by Liu to solicit funds in $500,000 increments. These documents were the POM and an accompanying Escrow Agreement. These documents were the key to the whole scam. Without them, Liu could not have stolen the money as he did. Liu needed to

find lawyers willing to prepare documents for a fake project like his, and found Miller Mayer to be a willing participant. Miller Mayer also lent its name and credibility to help Liu sell the project to the victims. The POM was fraudulent because:

(1) the POM written by Miller Mayer described a project that was not real;

(2) the POM written by Miller Mayer stated that funds would pooled and loaned to the project, whereas the escrow agreement provided no verification of either pooling or any capital controls;

(3) the escrow agreement was illusory and provided no protection as the money was to be released to Liu merely *on his demand* with a notice that he himself was to generate according to the scheme created by defendant Miller Mayer;

(4) the POM falsely promised that funds would be held in escrow;

(5) the escrow agreement drafted by defendant Miller Mayer titled "Escrow Agreement" provided no notice to the opposing party (*plaintiffs* ), no verification, no closing, no closing statement, and no obligations on the part of the escrow agent other than to comply with Liu's demand to release the money. All it really did was provide a basis to release the money on demand, and of course, provide a broad release of liability to the bank. It was made to look like an escrow agreement without actually creating a meaningful escrow;

(6) Miller Mayer created a template Form I-526 for other law firms to use to submit applications to USCIS,

which further enabled the fraud to proceed smoothly and consistently;

(7) in practical terms, Miller Mayer created a fraud-in-a-box, sold it to Liu, for him to unleash on the world like a lab-created virus;

(8) the money was in fact easily stolen. The Declaration of the SEC's accountant, Lorraine Pearson, CPA, details the theft of the money in complete detail. Exhibit 6 to her declaration shows that the escrow was a joke – money deposited was removed by Liu in most cases within a few months, evidently with no regard for any escrow protections. In practice, the escrow was a complete sham. By including an escrow agreement, but in failing to provide any mechanism to actually establish a real escrow, defendant Miller Mayer cloaked the project in an aura of safety but gave Liu the freedom to easily steal the money. The accounting (Exhibit 6 to Ms. Pearson's declaration), shows how the escrow account did nothing to stop the free and rapid transfer of money by Liu. The fact that defendant Miller Mayer structured the transaction with phantom escrow provisions shows a callous disregard for the gutting of the most important protection the investors might have. The money could not have been stolen had a real escrow mechanism been created and made a real part of the documents prepared by defendant Miller Mayer. Instead, Miller Mayer created a whole package that Liu could take to China and sell to over 50 people at $500,000 each. Without an actual escrow mechanism, it was nothing more than a

license to steal. If the program had been real, and was not a fraud, then adding an effective escrow requirement would not have hurt anything. Weakening the escrow provision to the point of surplusage did nothing to benefit anyone except the thieves; and

(9) Miller Mayer is the one that titled it an "Escrow Agreement." That title was itself a misrepresentation independent of anything Liu said or did. It was one of the most important representations of the whole scheme. The escrows were the linchpins of the scam. A real escrow that released money only to the project itself would have protected all of the class plaintiffs. Defendant's calling the document an "Escrow Agreement" was in and of itself fraudulent since the agreement does not on its face create a real escrow. It is really just a release of liability made to look like an escrow.

50.6 **Falsity**: The documents Miller Mayer prepared were false in multiple respects:

(1) There was no project, there never was any project. It was all fake through and through. This is essentially the finding of the District Court in the case against Liu.

(2) The POM promises an escrow, when the purported escrow agreement was illusory and really only served to facilitate the release of the money without verification or confirmation.

(3) The escrow agreement is mislabeled as an "Escrow Agreement" and was made to look like an escrow agreement when it clearly was not.

(4) The specific language of the POM that: "Investment funds will be held in escrow prior to closing in accordance with the escrow agreement attached hereto ('Escrow Agreement') as APPENDIX A" was false when written because at the same time as Miller Mayer wrote this document it also wrote an escrow agreement to accompany it which did nothing of the sort, did not even contain the word "closing," and had no mechanism for a closing.

(5) The POM falsely states that "All Capital Contributions will be held in escrow pursuant to the Escrow Agreement attached hereto as APPENDIX A." The "Escrow Agreement attached ... as APPENDIX A" was not actually an escrow agreement and did not provide any reliable mechanism to hold the money, and did not even contain the word "closing."

(6) The POM contains a material omission under the section titled "RISK FACTORS" in that it omits to advise potential investors that the escrow agreement is illusory and provides only superficial protection of the investor's money.

(7) The POM represents that "the principal owners of PPEB-5 have experience operating other cancer therapy centers," whereas the primary (75%) owner had no experience in that regard and the other own operated nothing even close to what was being proposed (he operated a medication administration clinic whereas the proposal was for a $214 million medical engineering project).

(8) The POM promises that "PPEB-5 will pool investor

funds and make a loan of up to $193 million to Los Angeles County Proton Therapy...," however the documents Miller Mayer prepared did not provide for pooling of the money and instead provided for the nearly immediate dissipation of the funds. No mechanism was provided to insure that the minimum amount of funding had been secured (*i.e.*, pooled) before Liu was free to take the money. The POM and associated documents are devoid of any protections for the investors and instead facilitate the easy theft of the money without the need for anything other than superficial progress on the project.

(9) The escrow agreement written by Miller Mayer was an illusory escrow. It states "The Escrow Agent, the Company and the Investor now desire to enter into an agreement governing the terms and conditions of *the escrow of* the Investor's initial Capital Contribution to the Company." (*Emphasis added.*) However, farther down in the document it states: "Investor's Capital Contribution shall be disbursed by the Escrow Agent to the Company upon *the Company delivering written notice* to the Escrow Agent of USCIS approval of the Investor's 1-526 Petition." (*Emphasis added.*) It then states: "The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and shall not be subject to, nor have any liability or responsibility under, nor to be obligated to recognize, the Subscription Agreement or any other agreement between, or directions or instructions of, any of the parties hereto or any other person in carrying out its duties hereunder,

except for written directions or notices delivered to the Escrow Agent in accordance with of this Agreement." In short, the escrow agent has no duty other than to follow the notice provided by Charles Liu. It then states: "The Escrow Agent shall not be responsible for any act or failure to act hereunder except in the case of its willful misconduct, gross negligence, or bad faith." As such, the escrow agent had no duties other than to follow Liu's instruction, and it could not be held liable for releasing the money too early. Miller Mayer's escrow agreement provided for no notice to the depositor, no confirmation of the condition of release, no verification of the demand for release, no closing, no closing statement, no final accounting, and no control over the funds. Therefore, the statement repeatedly written by Miller Mayer that investor money would go into an escrow was knowingly false since the very escrow Miller Mayer created for the project was illusory and of no protective value at all.

(10) Miller Mayer included a section in its escrow agreement titled "Notices" yet the agreement does not provide for any notice to the investor of the release of the money. It states: "The Escrow Agent may rely upon, and shall be protected in acting or refraining from acting upon, any written notice, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties." This provision means that the escrow agent was required to rely solely on whatever notice Liu provided and

was not obligated to confirm or verify any fact. In so doing, Miller Mayer created the literal opposite of an escrow.

(11) Miller Mayer lent its name and credibility to help Liu sell a nonexistent project to the victims when it had no basis to believe that the project was real.

(12) The POM written by Miller Mayer described a project that was not real.

(13) The POM written by Miller Mayer stated that funds would pooled and loaned to the project, whereas the escrow agreement provided failed to provide verification of either pooling or a loan.

(14) Miller Mayer created a template Form I-526 for other law firms to use to submit applications to USCIS, which further enabled the fraud to proceed smoothly and consistently.

(15) In practical terms, Miller Mayer created a fraud-in-a-box, sold it to Liu, for him to unleash on the world like a lab-created virus.

(16) The fact that all of the money was released from escrow shortly after deposit, whereas petition approval takes a year or more, shows that Miller Mayer's escrow agreements worked exactly as planned. Liu got a hold of the money long before any petitions were approved. In fact, most if not all the money was released without USCIS petition approvals. According to the District Court, "In total, USCIS received fifty eight I-526 Petitions for this project and approved eight." There was never any pooling

of the funds and the project never proceeded much past the phase of Liu collecting everyone's money and stealing it.

50.7 **Scienter:** Defendant Miller Mayer created a complete investment scam for Liu out of whole cloth. Defendant Miller Mayer knew facts that made it plain that Liu's Proton Therapy Center was not a real project:

(1) Documents assembled by Miller Mayer for Liu described an enormous undertaking. The scale and high degree of difficulty of the project had to have been extremely obvious to Miller Mayer. This was something that highly specialized operations carry out. Miller Mayer wrote the total project cost repeatedly throughout the materials. It involved close to $75 million just to build the metal scaffolding and linkages to support the proton therapy equipment, which itself was multi-story in size. Another $14 million was required just to build he surrounding building. There was no reason to release any of the investor's money until financing for the full $214 million had been secured (*the investors also paid administrative fees which were supposed to cover the promoters' operating costs*). This is not the kind of thing that can be partially built and have any value. It is an all or nothing type of venture, and this fact had to have been very obvious to Miller Mayer as it was preparing the Escrow Agreement. However, Miller Mayer created an escrow agreement that allowed all of the funds to be released almost immediately without regard for whether or not the project was actually proceeding. Not only did that serve

no legitimate business purpose, but the only thing it did do was allow Liu to quickly and efficiently steal the money without notice to the investors.

(2) Miller Mayer used filler materials and boilerplate in place of substance. Miller Mayer knew that there was no team in place capable of pulling off a $214 million medical engineering project. This is evidenced by the fact that Miller Mayer wrote the POM and other documents using mostly generic information that could fit most any type of project. The team consisted solely of a brother and sister and an Art-History diplomate. The documents are devoid of any real substantive plans or engineering reports, as one would expect from a real POM.

(3) Miller Mayer knew that the compensation arrangement whereby Liu, who was contributing $1.00 and no significant experience, capital, or labor, was getting 75% of the business, and Dr. Thropay and his sister, who were to be doing all the work and providing medical expertise, management, the land, were getting only 25%. It had to have been obvious that no real project of this magnitude would be organized around someone like Liu, who was contributing essentially nothing yet getting 75%. Liu was not providing any of the capital and he was not obligated to arranged for any specific portion of the capital. These facts were obvious signs that Dr. Thropay had no expectation of it going anywhere and he was just getting more than $900,000 to put his name and reputation into the promotional materials. Given Miller Mayer's extensive

experience in EB-5 projects, the ownership imbalance must have been painfully obvious, and they knew that it could not be real.

(4) The POM called for an escrow, and the word "escrow" featured prominently in both the POM and ultimately how the scheme was marketed to the victims. Miller Mayer created the escrow that was shown as part of the sales package presented to Plaintiff SHI.

(5) Miller Mayer labeled its escrow agreement an "Escrow Agreement" even though it did not in fact create an escrow. Miller Mayer prepared a document for Liu that looked like and escrow agreement, appeared to be an escrow agreement, but was not in fact an escrow agreement. It was actually only a deposit instruction which allowed Liu to essentially take the money at will, and most of the document was about absolving the bank of any possible liability. It provided for no notice to the depositor, no confirmation of the condition of release, no verification of the demand for release, no closing, no closing statement, no final accounting, and no control over the funds. In order to prepare such a document, Miller Mayer had to make conscious choices about how to prepare the document and what to include. Miller Mayer made a conscious choice to create a document that allowed almost immediate release and further made a conscious choice to exclude items normally thought of as essential to an escrow, such as notice, confirmation, verification, closing, a closing statement, a final accounting, and

control over the funds. Miller Mayer also made a conscious choice to mislabel the document an "Escrow Agreement" and made a conscious choice to make it look like an escrow agreement, when in fact it was not.

(6) The POM and accompanying materials were essentially a fraud-in-a-box, derived from a template or prior work for other clients, which only needed to be good enough to fool foreigners who read little to no English and who are hiring immigration lawyers selected by Liu (who like Lew, acted on a no-questions-asked basis and did not even look at the transaction documents). Miller Mayer knew that no one sophisticated enough to tell the difference would be examining the documents. It is unreasonable to conclude that Miller Mayer could have ever believed that the POM it created would actually be relevant to a high-tech medical engineering project such as the one proposed. They might as well have been proposing building another Space Shuttle. Further, by only substituting a few words (and by changing the names and biographies, etc.), the POM could have been used for just about any business venture. It was so generic in nature as to be obviously fraudulent to the drafter. Put another way, there is a good reason there is no substance to the POM: because there was no substance to the project. That is why the POM is mostly filler, fluff, and disclaimers.

(7) Miller Mayer's POM proposes a $214 million project, yet, "Proton Treatment" was an unproven technology, the scheme was launched at the depth of the

Great Recession when no one was building medical facilities, Obamacare was supposedly decimating the healthcare industry, and no sector of the economy was booming, least of all healthcare. Investing in a medical facility, especially one based exclusively on a single, unproven technology, seems obviously to be a project only for a team of experts. At $214 million, it was an obvious absurdity that Liu, whose advanced degree was in art history, would be doing this. Similarly, the POM contains inconsistent and outlandish claims for the project. The business plan identifies 38 new employment positions to be created, but the Economic Impact study claims the creation of 5,350 jobs. The fact that an amateur was proposing to open a highly risky high-tech medical facility centered on one single unproven technology in the middle of the deepest recession then in memory was an enormous red flag that Miller Mayer had to have seen. At the very least, a duty of inquiry arose as to Miller Mayer and the documents it was preparing for Liu to use to solicit money from foreign investors.

50.8 **Reliance:** Plaintiff SHI and all of the class plaintiffs relied first and foremost on the primary representation of Miller Mayer's POM and accompanying documents, when taken as a whole, that the project was real and legitimate. Liu testified to the SEC that the POM was provided to the investors. The purpose of the POM was to convey the impression of legitimacy and substance to the project, neither of which were true. Its very existence was something that an investor

could rely on in deciding whether or not to participate. No plaintiff would have paid any money to Liu had they known that the project was fake and not real. This was the primary reliance by each plaintiff. As proof of that reliance, each plaintiff paid at least $500,000 towards the project believing it to be real based on the totality of the documentation created by Miller Mayer and distributed by Liu and his agents. In addition, Plaintiff SHI relied on the promise that the money would be held in escrow, as likely did all of the other class plaintiffs. As part of the sales package marketed to the victims, a document titled "Escrow Agreement" was included. Liu personally described the documents, including the escrow agreement, to Plaintiff SHI, as did he and his agents for the other class plaintiffs. The presence of an "escrow" was a key selling point in the presentation to Plaintiff SHI, as it more likely than not was for the other class plaintiffs. As evidence of her reliance on the project, the POM, the escrow agreement, and the official look and feel of the documents, Plaintiff SHI and each other class plaintiff paid at least $500,000 to Liu to accept his proposal. In fact, each class plaintiff relied on the representations in exactly the same way: they paid a half million dollars each.

50.9 **Damages:** Plaintiff SHI and each class plaintiff each lost $500,000 plus administrative costs and immigration lawyer fees directly and proximately caused by Miller Mayer's fraudulent misrepresentations and participation in the fraud. The acts and omissions of Defendants Thropay and Lew also proximately caused those damages, and each should be held

jointly and severally liable.

51. As alleged above, Defendants Miller Mayer, THROPAY, LEW, and the other defendants conspired with Liu and Wang to defraud numerous investors of their money, and/or aided and abetted in the fraud. In particular, as alleged above, Liu and Wang convinced the investors such as Plaintiffs that the investment was real and legitimate by using Defendant THROPAY and the other Defendant professionals to give credibility to the project, who did so willingly and with full knowledge of adverse facts. In fact, the investment was not real or legitimate, and all of the representations in the POM were essentially fraudulent. In short, Plaintiffs trusted Liu and Wang primarily because Defendant THROPAY and the other defendant professionals gave their credibility to the project. But for the actual cooperation of Defendants THROPAY and the other defendant professionals, Plaintiffs would not have trusted the project enough to invest.

52. Plaintiffs are informed that Defendants Miller Mayer, LLP and U.S. Regional Economic Development Authority, LLC prepared documents which they knew would be used by the perpetrators to steal the Plaintiffs' money. Said documents were prepared without protections which would have prevented the fraud (such as escrow accounts). In preparing those documents, Defendants Miller Mayer, LLP and U.S. Regional Economic Development Authority, LLC would have necessarily have come into contact with information which would have tipped them off to the fraud. Either they ~~say~~ saw such information and ignored it, or were deprived of such basic information by the perpetrators such

that they were put on notice of the fraud by the lack of adequate supporting documentation and did the work anyway. In short, either they knew of the fraud, or purposely turned a blind eye to it - - all for money which they were paid that ultimately came from funds stolen from Plaintiffs.

53. After the fact of the first investments by victims in the scheme, Defendants THROPAY and the professional defendants continued to give aid and assistance to Liu and Wang by continuing to maintain the appearance of a legitimate project, thereby proximately causing Plaintiffs to invest as well. By the time Plaintiffs invested, Defendants knew that a scam was being perpetrated and still gave substantial assistance or encouragement to Liu and Wang, thereby proximately causing Plaintiffs to invest.

54. Plaintiffs relied on the POM, on the representations by Defendant THROPAY of his central involvement in the project, as conveyed to Plaintiffs through the POM and by Defendant professionals, and on the continued involvement of Defendants THROPAY and LEW in the project. In fact, Plaintiffs were sent to the Defendant immigration attorneys ~~professionals~~ specifically because they were represented to have had experience with the project and could vouch for its viability and legitimacy. During Plaintiffs' initial contact with Defendants, it was implied and clearly understood that Defendants were verifying that this was a legitimate EB-5 investment. Further, neither Defendant THROPAY nor the Defendant professionals expressed their doubts in the project or their willful blindness to the scam that was underway, to

potential investors, or to Plaintiffs, and kept that information secret, and Plaintiffs are informed and believe that the other defendants did the same. All had a duty to disclose their doubts because they were fully aware that their representations would be conveyed to persons such as Plaintiffs through the POM or through the legal representation by Defendants.

55. In reliance on the credibility of Defendants THROPAY and the professionals, Plaintiffs SHI and LU paid Liu and Wang more than $500,300. Plaintiffs are informed and believe that the other Class Plaintiffs did the same. These payments were reasonable given the central involvement of Defendant THROPAY and the implied approval of Defendant LEW and the other professionals. Defendants were fully aware that their representations would be conveyed to persons such as Plaintiffs through the POM or through the representation by Defendant LEW and the other professionals.

56. Defendants LEW, THROPAY, WOLFSDORF ROSENTHAL, MILLER MAYER, DERRICO, U.S. Regional Economic Development Authority, LLC, and Does 1 through 50 all must have been painfully aware that Liu and Wang were scamming Plaintiffs, in particular by the nature of the transaction which they were presented (among other things, because it was an obvious facade of an investment project, because it lacked meaningful controls to prevent the money from being stolen, because the perpetrators had no ability to complete the project, because said defendants were participating under extremely suspicious circumstances, because said defendants were actively trying to limit their exposure for the fraud, because said defendants were avoiding even the most

rudimentary due diligence, because said defendants were asked to make representations to the Federal Government without first conducting due diligence, because said defendants were asked to do very little work for a very large amount of money, because the immigration attorney defendants were hired by the adverse parties in the underlying transaction yet oddly did not investigate the circumstances, because defendants failed to implement capital controls or even a basic escrow account which had the effect of allowing the perpetrators to steal the money, and because of the prevalence of EB-5 scams) knew of the scheme by the perpetrators to defraud Plaintiffs and joined in it. In short, Defendants left the barn doors open so that the thieves could steal the horses in the middle of the night. Further, said defendants agreed with the perpetrators by purposely looking the other way and intended that the fraud be committed by preventing protections from being inserted in the transactions and by refusing to warn Plaintiffs or to even conduct rudimentary investigations. Again, the fact that said defendants tried to limit their own exposure shows a consciousness of guilt from the very beginning. In addition, each of the defendants herein provided material assistance and support to the perpetrator (by drafting the documents and petitions needed to consummate the fraud, and by refusing to conduct required diligence) which proximately caused the loss of Plaintiffs' money (had they done what they were supposed to do under the law, then none of the Plaintiffs would have paid money to the perpetrators).

57. As a direct and proximate result of the

representations by Defendants THROPAY in the POM and LEW and the other professionals in the course of representing Plaintiffs, and further as a result of the omission to warn Plaintiffs by said Defendants, Plaintiffs each lost over $500,000, in an exact amount as will be established at trial.

58. As alleged above, Defendants THROPAY, MILLER MAYER, and LEW ~~and the other professionals~~ acted with a conscious disregard for the rights of Plaintiffs by intentionally or recklessly lending their names, reputations, and credibility to Liu and Wang, thereby enabling Liu and Wang to steal over $24,000,000 from the Class Plaintiffs. Defendants THROPAY, MILLER MAYER, and LEW ~~and the other professionals~~ received money for their involvement, all at the expense of the investors who were victimized. Such conduct was done with malice, fraud, and oppression, as defined by Civil Code section 3294. Further, all of the conduct of Liu and Wang was fully ratified by Defendants, who had numerous opportunities to warn investors of the fraud, but failed to do so, in order to receive money. Defendants' course of conduct was willful, wanton, and for the purpose of injuring Plaintiffs. For these reasons, Plaintiffs are entitled to punitive damages in an amount sufficient to deter and punish defendants, to be established according to proof, or in the amount of $1,500,000 for each Class Plaintiff.

**SECOND CAUSE OF ACTION FOR LEGAL MALPRACTICE**

(Against all Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO only)

59. The allegation contained in the preceding paragraphs

are here incorporated by reference as though fully set forth at this point.

60. As alleged above, Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO became attorney for Plaintiffs prior to the investment made by Plaintiffs. At said time, Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO had a duty to investigate the matter and to advise Plaintiffs of any suspicious behavior by Liu and Wang. Evidently, Defendants either did no investigation whatsoever, or turned a blind eye towards the clear frivolity of the scheme and the extremely high probability that it was all just a scam. It had to have been painfully obvious to Defendants that Plaintiffs were just being set up in a massive scam.

61. Plaintiffs are informed and believe and thereon allege that Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO had represented other EB-5 Investors in Liu and Wang’s scam, and therefore gained sufficient knowledge to discern the fraud and to warn subsequent Plaintiffs. Further, the continuing stream of income coming from clients investing in Liu and Wang’s scam created an incentive for Defendants to turn a blind eye, and therefore an economic conflict of interest arose between Defendants and Plaintiffs, such that Defendants would not want to have warned Plaintiffs for fear of losing future income.

62. In general, Defendants are liable for legal malpractice because they failed to conduct even minimal due diligence and failed to properly advise her clients of the clear risk of fraud with this project. At the very least, they had a duty to make sure that they were not being fed clients in-bulk

by the perpetrator for the purpose of consummating a fraud against those clients, which in fact was the case.

63. Defendants either knew exactly what they were getting their clients into, or then they must have acted with willful blinders on. First, it should have been a giant red flag to be getting clients in-bulk from the same source. The fact that the perpetrator divvied up the clients to three law firms, and that the firms accepted these clients without conducting any investigation whatsoever as to why they were getting these clients, is appalling. The fact that each undertook a "limited" representation of these clients is more than just suspicious, it is unethical. It reflects a conscious effort to ignore all of the warning signs. Defendants were curiously uncurious in this matter.

64. More specifically, the documents presented to each plaintiff by the perpetrator contained a Trojan Horse: the escrow provision which rendered the escrows illusory (*the money could be released to the perpetrators "...upon the Company delivering written notice to the Escrow Agent of USCIS approval ..."*) Later, the provision was weakened even further when the language was changed to: "The escrow agent will release each Capital Contribution to PPEB5 upon notice of filing of each Investor's 1-526 Petition with USCIS." Obviously, with either version this escrow is purposely backwards - - the company is protected, not the applicants. It is like installing a door to a vault with the keyed-handle on the inside and the non-locking handle on the outside. For the escrow to be effective, the company cannot simply obtain the money by presenting a "notice"

that it prepares itself. This is just the fox guarding the henhouse. It should have been an obvious flaw for Defendants to spot. What else could they have cared about, if not that?

65. It comes as no surprise then that the perpetrators withdrew the money from escrow almost immediately and without hindrance. For example, on March 11, 2015, Mr. Cao Xiang wired $500,250 to the escrow, and less than a month later, the money was withdrawn to an unrestricted account. This pattern repeated throughout until the SEC came and shut the scam down. What is particularly troubling is the clear hand-and-mouth coordination between the law firm Defendants and the perpetrators. The perpetrators signed up the applicants, then the law firms filled out the forms (*from templates prepared by Defendant Miller Mayer*), then the petitions were filed, and then the money was released. Simple and easy, but pure fraud.

66. As such, the Defendant law firms played an important role in the scam. Without Defendants' willingness to refrain from asking any questions about the project, the applicants would never have been able to submit the applications and the money would have remained in the escrow account. Without Defendants' willingness to turn a blind eye and ignore the obviously fraudulent nature of the escrow agreement, then the scam could never have occurred because any ethical lawyer would have immediately rejected the escrow as illusory (*or recommended filing suit to enjoin its release*).

67. Defendants had to have known that by merely submitting the petition for any particular client that the client's money would then be released from escrow. As such, the victim is in

the first instance each individual client whose money was taken as soon as a Defendant law firm submitted that client's petition. But also, all subsequent members of the class were hurt because Defendants' willingness to keep playing along with the scam allowed the perpetrators to keep going. Though the Defendant law firms may not have started the fire, they were certainly throwing gasoline on it. Without Defendants' willingness to carry on with blinders, oblivious to the immediate withdrawal of their own clients' funds long before any USCIS approval, then the scam would have been stopped after only a few investors.

68. In fact, Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO failed to act with the reasonable skill, diligence, and caution required of them by this representation, and failed to act within the level of competence of an immigration attorney practicing EB-5 Investment Visa Law in Southern California. Particularly, Defendants failed to conduct any reasonable investigation, or hid their knowledge from Plaintiffs, and failed to warn of the extremely high likelihood that the whole project was just a scam. Of particular concern is the fact that these lawyers accepted clients *en masse* from what amounted to be opposing parties in the transactions, yet purposely failed to investigate the nature of the referrals or the probability of a pending scam. Each of these lawyers had more than sufficient evidence before them to create an affirmative duty of inquiry which would have readily revealed the fraud, yet none performed their duty and each turned a blind eye to the scam. The fact that each took affirmative steps to try to shield themselves

from any duty to investigate shows a consciousness of guilt. In fact, there appears to have been no effort to advise the clients of any consequence of the supposed limitation of representation, nor was there any explanation of the inherent conflict of interest of the attorneys taking multiple clients from the same source that happened to be aligned with or actually the opposing party to the transactions. There does not appear to have been any informed conflict of interest waivers by any of the Class Members. However, Plaintiffs are informed and believe that each of the attorney defendants failed to obtain the informed consent of their clients to limit the representation to exclude any responsibility to look at, review, or analyze the transactions, nor did they properly limit their representation to exclude responsibility to monitor, or even just check up on, the escrow account into which their clients' money was being deposited. Efforts by attorneys to affirmatively limit their duty to protect their clients from fraud such as this are impermissible in the United States in general, and in California in particular.

69. Said defendants were negligent by the standards of any lawyer in any jurisdiction by accepting clients *en masse* from an adversarial party without performing adequate due diligence, in failing to warn their clients of the risk of fraud, by failing to investigate the numerous "red flags" presented by the representation under these circumstances, by failing to advise their clients of the lack of safeguards to protect their clients from fraud, by trying to limit their representation to exclude the duty to report the fraud, and by failing to act as

reasonable lawyers to warn and protect their clients. Such negligence should be characterized as "gross negligence" or "extreme negligence" which could only have occurred by attorneys who were purposely turning a blind eye to the scam. As a direct and proximate result of that negligence, Plaintiffs each lost in excess of $500,000, and are each entitled to the refund of fees paid to their lawyers.

70. Plaintiffs SHI and LU did not discover the true nature of underlying fraud, and therefore Defendants' negligence, until after suit was filed against Liu and Wang by the Securities and Exchange Commission on May 26, 2016. Plaintiffs did not discover the involvement of Defendants WOLFSDORF ROSENTHAL, and DERRICO until August 24, 2017.

71. As alleged above, Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO acted with a conscious disregard for the rights of Plaintiffs by intentionally or recklessly lending their names, reputations, and credibility to Liu and Wang, thereby enabling Liu and Wang to steal over $24,000,000 from investors. Defendants received money for their involvement at the expense of the investors who were victimized. Such conduct was done with malice, fraud, and oppression, as defined by Civil Code section 3294. Further, all of the conduct of Liu and Wang was fully ratified by Defendants, who had numerous opportunities to warn investors of the fraud, but failed to do so, in order to receive money. Defendants' course of conduct was willful, wanton, and for the purpose of injuring Plaintiffs. For these reasons, Plaintiffs are entitled to punitive damages in an amount sufficient to deter and punish defendant, to be

established according to proof, or in the amount of $1,500,000 for each Plaintiff.

**THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

(Against all Defendants except Defendant WOLFSDORF ROSENTHAL, which has been stricken from this cause of action by the Court)

72. The allegation contained in the preceding paragraphs are here incorporated by reference, except the legal malpractice allegations, as though fully set forth at this point.

72.1 **Who:** Charles Liu joined with Defendant Thropay and together hired Defendant Miller Mayer to prepare fraudulent documents used to solicit money from Plaintiff SHI and the other class plaintiffs. Miller Mayer knew or should have known that it was being retained to perpetrate a fraud, yet did so anyway. Material false and misleading representations were written by unknown employees of Defendant Miller Mayer, acting within the course and scope of their employment, which were used to scam the plaintiffs. Defendant Thropay joined in the scam, profited by it, and was instrumental in carrying it out. Defendant Lew joined in the scam after it was in progress, assisting by processing approximately 10 victims one-by-one through the process of having their money stolen. All of the defendants had ample reason to know that the whole project was a scam, yet intentionally or negligently turned a blind eye to it and continued to participate in the scheme despite the fact that many people were losing a half-million dollars each.

72.2 **When:** In or about 2010, Liu retained Defendant Miller

Mayer to prepare an EB-5 regional center application and other documents relating to a fake project. At that time, Liu was in the process of setting up a fraud which he intended to unleash on would-be Chinese immigrants trying come to the United States. Liu engaged the services of Defendant Miller Mayer for the purpose of committing a crime: specifically, he needed lawyers to prepare documents to make his scam look like a real project even though it was not. He also needed lawyers to process the investors through the USCIS without looking too closely at the documents and without looking into Liu's operations. On August 25, 2010, Defendant Miller Mayer formed Pacific Proton Therapy Regional Center, LLC, for Liu. On or before August 25, 2010, Defendant Miller Mayer knew or should have known that Thropay was only getting 25% when he and his sister were doing all the work and Liu was getting 75% for doing nothing other than hiring Defendant Miller Mayer (and orchestrating the whole fraudulent scheme), and that the capital contributions were only one dollar each. On or about November 15, 2010, Defendant Miller Mayer, formed Pacific Proton EB-5 FUND, LLC, as a Delaware corporation, for Liu for the purpose of selling shares therein to immigrant investors. On or about November 19, 2010, Defendant Miller Mayer prepared an application letter on behalf of Liu for submission to the USCIS. The letter application states that Defendant Miller Mayer would be retained to ensure accuracy in the application and to assemble and draft all necessary regional center business and *investor* documentation. On or about November 20, 2010, Defendant Miller Mayer prepared a $214 million Private Offering Memorandum ("POM") and accompanying

Escrow Agreement for Liu to use to solicit his victims. This POM appears to have been the same POM that was shown to Plaintiff SHI. The POM and Escrow Agreement prepared by Defendant Miller Mayer contained false and misleading statements, as discussed below. Plaintiff SHI did not discover the falsity of the POM until the general public did in late 2016.

72.3 **Where:** The proposed project was to be built in Montebello, California. Liu and Thropay were both based in Southern California. Defendant Miller Mayer practices in New York, but undertook this project in California. Most of the victims were recruited in China.

72.4 **What:** The fraud was carried out in three major components:

(1) the preparation of the POM and Escrow Agreement, which were fraudulent as discussed below;

(2) the solicitation of victims using materials prepared by Defendant Miller Mayer; and

(3) the theft of funds by Liu while the immigration lawyers he selected to represent the victims turned a blind eye and kept feeding more and more victims into the scam over the course of at least four years.

The POM was fraudulent through and through. As has subsequently become obvious, there was nothing real about the project. It was all a hoax. The District Court correctly stated:

> "Despite significant investment, nearly no construction on the proton therapy center has taken place. Instead, Liu burned through the millions left after payments to himself,

Wang, and the marketers on half-hearted attempts to convey the illusion of progress."

Defendant Miller Mayer's liability is based on: (1) preparation of documents which it had no reasonable basis for believing to be true, and (2) preparation of the fraudulent escrow agreement template used to steal the money. Defendant Miller Mayer engaged in willful or negligent blindness, creating or procuring all documents the perpetrators needed to steal each class plaintiff's money. Defendant Miller Mayer had to have known the documents it assembled would be given to people like Plaintiffs. The POM and associated documents were basically the only tangible thing ever created for the project. A subsequent POM was dated May 1, 2013, after Plaintiff SHI had already lost her money, but it appears to have been substantively identical, except for a disclaimer buried deep within it which made it slightly more truthful that "Upon notice of filing of each subscriber's 1-526 Petition, his/her Capital Contributions will be released..." This change was too cryptic and buried too deep to have made any practical difference and the document was just as fraudulent as the prior version prepared by Miller Mayer. In practical terms, the November 20, 2010 version and the May 1, 2013 version are functionally identical and just as fraudulent.

72.5 **How:** Defendant Miller Mayer committed fraud by preparing two fraudulent documents, *inter alia*, specifically for use by Liu to solicit funds in $500,000 increments. These documents were the POM and an accompanying Escrow Agreement. These documents were the key to the whole scam. Without them, Liu could not have stolen the money as he did. Liu needed to

find lawyers willing to prepare documents for a fake project like his, and found Miller Mayer to be a willing participant. Miller Mayer also lent its name and credibility to help Liu sell the project to the victims. The POM was fraudulent because:

(1) the POM written by Miller Mayer described a project that was not real;

(2) the POM written by Miller Mayer stated that funds would pooled and loaned to the project, whereas the escrow agreement provided no verification of either pooling or any capital controls;

(3) the escrow agreement was illusory and provided no protection as the money was to be released to Liu merely *on his demand* with a notice that he himself was to generate according to the scheme created by defendant Miller Mayer;

(4) the POM falsely promised that funds would be held in escrow;

(5) the escrow agreement drafted by defendant Miller Mayer titled "Escrow Agreement" provided no notice to the opposing party (*plaintiffs* ), no verification, no closing, no closing statement, and no obligations on the part of the escrow agent other than to comply with Liu's demand to release the money. All it really did was provide a basis to release the money on demand, and of course, provide a broad release of liability to the bank. It was made to look like an escrow agreement without actually creating a meaningful escrow;

(6) Miller Mayer created a template Form I-526 for other law firms to use to submit applications to USCIS,

which further enabled the fraud to proceed smoothly and consistently;

(7) in practical terms, Miller Mayer created a fraud-in-a-box, sold it to Liu, for him to unleash on the world like a lab-created virus;

(8) the money was in fact easily stolen. The Declaration of the SEC's accountant, Lorraine Pearson, CPA, details the theft of the money in complete detail. Exhibit 6 to her declaration shows that the escrow was a joke – money deposited was removed by Liu in most cases within a few months, evidently with no regard for any escrow protections. In practice, the escrow was a complete sham. By including an escrow agreement, but in failing to provide any mechanism to actually establish a real escrow, defendant Miller Mayer cloaked the project in an aura of safety but gave Liu the freedom to easily steal the money. The accounting (Exhibit 6 to Ms. Pearson's declaration), shows how the escrow account did nothing to stop the free and rapid transfer of money by Liu. The fact that defendant Miller Mayer structured the transaction with phantom escrow provisions shows a callous disregard for the gutting of the most important protection the investors might have. The money could not have been stolen had a real escrow mechanism been created and made a real part of the documents prepared by defendant Miller Mayer. Instead, Miller Mayer created a whole package that Liu could take to China and sell to over 50 people at $500,000 each. Without an actual escrow mechanism, it was nothing more than a

license to steal. If the program had been real, and was not a fraud, then adding an effective escrow requirement would not have hurt anything. Weakening the escrow provision to the point of surplusage did nothing to benefit anyone except the thieves; and

(9) Miller Mayer is the one that titled it an "Escrow Agreement." That title was itself a misrepresentation independent of anything Liu said or did. It was one of the most important representations of the whole scheme. The escrows were the linchpins of the scam. A real escrow that released money only to the project itself would have protected all of the class plaintiffs. Defendant's calling the document an "Escrow Agreement" was in and of itself fraudulent since the agreement does not on its face create a real escrow. It is really just a release of liability made to look like an escrow.

72.6 **Falsity**: The documents Miller Mayer prepared were false in multiple respects:

(1) There was no project, there never was any project. It was all fake through and through. This is essentially the finding of the District Court in the case against Liu.

(2) The POM promises an escrow, when the purported escrow agreement was illusory and really only served to facilitate the release of the money without verification or confirmation.

(3) The escrow agreement is mislabeled as an "Escrow Agreement" and was made to look like an escrow agreement when it clearly was not.

(4) The specific language of the POM that: "Investment funds will be held in escrow prior to closing in accordance with the escrow agreement attached hereto ('Escrow Agreement') as APPENDIX A" was false when written because at the same time as Miller Mayer wrote this document it also wrote an escrow agreement to accompany it which did nothing of the sort, did not even contain the word "closing," and had no mechanism for a closing.

(5) The POM falsely states that "All Capital Contributions will be held in escrow pursuant to the Escrow Agreement attached hereto as APPENDIX A." The "Escrow Agreement attached ... as APPENDIX A" was not actually an escrow agreement and did not provide any reliable mechanism to hold the money, and did not even contain the word "closing."

(6) The POM contains a material omission under the section titled "RISK FACTORS" in that it omits to advise potential investors that the escrow agreement is illusory and provides only superficial protection of the investor's money.

(7) The POM represents that "the principal owners of PPEB-5 have experience operating other cancer therapy centers," whereas the primary (75%) owner had no experience in that regard and the other own operated nothing even close to what was being proposed (he operated a medication administration clinic whereas the proposal was for a $214 million medical engineering project).

(8) The POM promises that "PPEB-5 will pool investor

funds and make a loan of up to $193 million to Los Angeles County Proton Therapy...," however the documents Miller Mayer prepared did not provide for pooling of the money and instead provided for the nearly immediate dissipation of the funds. No mechanism was provided to insure that the minimum amount of funding had been secured (*i.e.*, pooled) before Liu was free to take the money. The POM and associated documents are devoid of any protections for the investors and instead facilitate the easy theft of the money without the need for anything other than superficial progress on the project.

(9) The escrow agreement written by Miller Mayer was an illusory escrow. It states "The Escrow Agent, the Company and the Investor now desire to enter into an agreement governing the terms and conditions of *the escrow of* the Investor's initial Capital Contribution to the Company." (*Emphasis added*.) However, farther down in the document it states: "Investor's Capital Contribution shall be disbursed by the Escrow Agent to the Company upon *the Company delivering written notice* to the Escrow Agent of USCIS approval of the Investor's 1-526 Petition." (*Emphasis added*.) It then states: "The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and shall not be subject to, nor have any liability or responsibility under, nor to be obligated to recognize, the Subscription Agreement or any other agreement between, or directions or instructions of, any of the parties hereto or any other person in carrying out its duties hereunder,

except for written directions or notices delivered to the Escrow Agent in accordance with of this Agreement." In short, the escrow agent has no duty other than to follow the notice provided by Charles Liu. It then states: "The Escrow Agent shall not be responsible for any act or failure to act hereunder except in the case of its willful misconduct, gross negligence, or bad faith." As such, the escrow agent had no duties other than to follow Liu's instruction, and it could not be held liable for releasing the money too early. Miller Mayer's escrow agreement provided for no notice to the depositor, no confirmation of the condition of release, no verification of the demand for release, no closing, no closing statement, no final accounting, and no control over the funds. Therefore, the statement repeatedly written by Miller Mayer that investor money would go into an escrow was knowingly false since the very escrow Miller Mayer created for the project was illusory and of no protective value at all.

(10) Miller Mayer included a section in its escrow agreement titled "Notices" yet the agreement does not provide for any notice to the investor of the release of the money. It states: "The Escrow Agent may rely upon, and shall be protected in acting or refraining from acting upon, any written notice, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties." This provision means that the escrow agent was required to rely solely on whatever notice Liu provided and

was not obligated to confirm or verify any fact. In so doing, Miller Mayer created the literal opposite of an escrow.

(11) Miller Mayer lent its name and credibility to help Liu sell a nonexistent project to the victims when it had no basis to believe that the project was real.

(12) The POM written by Miller Mayer described a project that was not real.

(13) The POM written by Miller Mayer stated that funds would pooled and loaned to the project, whereas the escrow agreement provided failed to provide verification of either pooling or a loan.

(14) Miller Mayer created a template Form I-526 for other law firms to use to submit applications to USCIS, which further enabled the fraud to proceed smoothly and consistently.

(15) In practical terms, Miller Mayer created a fraud-in-a-box, sold it to Liu, for him to unleash on the world like a lab-created virus.

(16) The fact that all of the money was released from escrow shortly after deposit, whereas petition approval takes a year or more, shows that Miller Mayer's escrow agreements worked exactly as planned. Liu got a hold of the money long before any petitions were approved. In fact, most if not all the money was released without USCIS petition approvals. According to the District Court, "In total, USCIS received fifty eight I-526 Petitions for this project and approved eight." There was never any pooling

of the funds and the project never proceeded much past the phase of Liu collecting everyone's money and stealing it.

72.7 **Scienter:** No reasonable law firm in Miller Mayer's position would have completed the work it did for Liu without at the very least strongly suspecting that the whole thing was a fraud. Defendant Miller Mayer, after all, created a complete investment scam for Liu out of whole cloth. Defendant Miller Mayer knew or should have known facts that made it plain that Liu's Proton Therapy Center was not a real project:

(1) Documents assembled by Miller Mayer for Liu described an enormous undertaking. The scale and high degree of difficulty of the project had to have been extremely obvious to Miller Mayer. This was something that highly specialized operations carry out. Miller Mayer wrote the total project cost repeatedly throughout the materials. It involved close to $75 million just to build the metal scaffolding and linkages to support the proton therapy equipment, which itself was multi-story in size. Another $14 million was required just to build he surrounding building. There was no reason to release any of the investor's money until financing for the full $214 million had been secured (*the investors also paid administrative fees which were supposed to cover the promoters' operating costs*). This is not the kind of thing that can be partially built and have any value. It is an all or nothing type of venture, and this fact had to have been very obvious to Miller Mayer as it was preparing the Escrow Agreement. However, Miller Mayer created an escrow

agreement that allowed all of the funds to be released almost immediately without regard for whether or not the project was actually proceeding. Not only did that serve no legitimate business purpose, but the only thing it did do was allow Liu to quickly and efficiently steal the money without notice to the investors.

(2) Miller Mayer used filler materials and boilerplate in place of substance. Miller Mayer knew or should have known that there was no team in place capable of pulling off a $214 million medical engineering project. This is evidenced by the fact that Miller Mayer wrote the POM and other documents using mostly generic information that could fit most any type of project. The team consisted solely of a brother and sister and an Art-History diplomate. The documents are devoid of any real substantive plans or engineering reports, as one would expect from a real POM.

(3) Miller Mayer knew or should have known that the compensation arrangement whereby Liu, who was contributing $1.00 and no significant experience, capital, or labor, was getting 75% of the business, and Dr. Thropay and his sister, who were to be doing all the work and providing medical expertise, management, the land, were getting only 25%. It had to have been obvious that no real project of this magnitude would be organized around someone like Liu, who was contributing essentially nothing yet getting 75%. Liu was not providing any of the capital and he was not obligated to arranged for any specific portion of the capital. These facts were obvious signs that Dr. Thropay

had no expectation of it going anywhere and he was just getting more than $900,000 to put his name and reputation into the promotional materials. Given Miller Mayer's extensive experience in EB-5 projects, the ownership imbalance must have been painfully obvious, and they knew or should have known that it could not be real.

(4) The POM called for an escrow, and the word "escrow" featured prominently in both the POM and ultimately how the scheme was marketed to the victims. Miller Mayer created the escrow that was shown as part of the sales package presented to Plaintiff SHI.

(5) Miller Mayer labeled its escrow agreement an "Escrow Agreement" even though it did not in fact create an escrow. Miller Mayer prepared a document for Liu that looked like and escrow agreement, appeared to be an escrow agreement, but was not in fact an escrow agreement. It was actually only a deposit instruction which allowed Liu to essentially take the money at will, and most of the document was about absolving the bank of any possible liability. It provided for no notice to the depositor, no confirmation of the condition of release, no verification of the demand for release, no closing, no closing statement, no final accounting, and no control over the funds. In order to prepare such a document, Miller Mayer had to make conscious choices about how to prepare the document and what to include. Miller Mayer made a conscious choice to create a document that allowed almost immediate release and further made a conscious choice to

exclude items normally thought of as essential to an escrow, such as notice, confirmation, verification, closing, a closing statement, a final accounting, and control over the funds. Miller Mayer also made a conscious choice to mislabel the document an "Escrow Agreement" and made a conscious choice to make it look like an escrow agreement, when in fact it was not.

(6) The POM and accompanying materials were essentially a fraud-in-a-box, derived from a template or prior work for other clients, which only needed to be good enough to fool foreigners who read little to no English and who are hiring immigration lawyers selected by Liu (who like Lew, acted on a no-questions-asked basis and did not even look at the transaction documents). Miller Mayer knew or should have known that no one sophisticated enough to tell the difference would be examining the documents. It is unreasonable to conclude that Miller Mayer could have ever believed that the POM it created would actually be relevant to a high-tech medical engineering project such as the one proposed. They might as well have been proposing building another Space Shuttle. Further, by only substituting a few words (and by changing the names and biographies, etc.), the POM could have been used for just about any business venture. It was so generic in nature as to be obviously fraudulent to the drafter. Put another way, there is a good reason there is no substance to the POM: because there was no substance to the project. That is why the POM is mostly filler, fluff, and disclaimers.

(7) Miller Mayer's POM proposes a $214 million project, yet, "Proton Treatment" was an unproven technology, the scheme was launched at the depth of the Great Recession when no one was building medical facilities, Obamacare was supposedly decimating the healthcare industry, and no sector of the economy was booming, least of all healthcare. Investing in a medical facility, especially one based exclusively on a single, unproven technology, seems obviously to be a project only for a team of experts. At $214 million, it was an obvious absurdity that Liu, whose advanced degree was in art history, would be doing this. The fact that an amateur was proposing to open a highly risky high-tech medical facility centered on one single unproven technology in the middle of the deepest recession then in memory was an enormous red flag that Miller Mayer had to have seen. At the very least, a duty of inquiry arose as to Miller Mayer and the documents it was preparing for Liu to use to solicit money from foreign investors.

72.8 **Reliance:** Plaintiff SHI and all of the class plaintiffs relied first and foremost on the primary representation of Miller Mayer's POM and accompanying documents, when taken as a whole, that the project was real and legitimate. Liu testified to the SEC that the POM was provided to the investors. The purpose of the POM was to convey the impression of legitimacy and substance to the project, neither of which were true. Its very existence was something that an investor could rely on in deciding whether or not to participate. No

plaintiff would have paid any money to Liu had they known that the project was fake and not real. This was the primary reliance by each plaintiff. As proof of that reliance, each plaintiff paid at least $500,000 towards the project believing it to be real based on the totality of the documentation created by Miller Mayer and distributed by Liu and his agents. In addition, Plaintiff SHI relied on the promise that the money would be held in escrow, as likely did all of the other class plaintiffs. As part of the sales package marketed to the victims, a document titled "Escrow Agreement" was included. Liu personally described the documents, including the escrow agreement, to Plaintiff SHI, as did he and his agents for the other class plaintiffs. The presence of an "escrow" was a key selling point in the presentation to Plaintiff SHI, as it more likely than not was for the other class plaintiffs. As evidence of her reliance on the project, the POM, the escrow agreement, and the official look and feel of the documents, Plaintiff SHI and each other class plaintiff paid at least $500,000 to Liu to accept his proposal. In fact, each class plaintiff relied on the representations in exactly the same way: they paid a half million dollars each.

72.9 **Damages:** Plaintiff SHI and each class plaintiff each lost $500,000 plus administrative costs and immigration lawyer fees directly and proximately caused by Miller Mayer's fraudulent misrepresentations and participation in the fraud. The acts and omissions of Defendants Thropay and Lew also proximately caused those damages, and each should be held jointly and severally liable.

73. As alleged above, Defendants conspired with Liu and Wang to defraud numerous investors of their money. In particular, as alleged above, Liu and Wang convinced the investors such as Plaintiffs that the investment was real and legitimate by using Defendants to give credibility to the project. In fact, the investment was not real or legitimate, and all of the representations in the POM were essentially fraudulent. In short, Plaintiffs trusted Liu and Wang primarily because Defendants gave their credibility to the project. But for the actual cooperation of Defendants, Plaintiffs would not have trusted the project enough to invest. Defendants allowed their names to be associated with the project negligently and without conducting any investigation to determine if their names were being used to scam investors, as clearly appeared to be the case. Such failure by Defendants was not only negligent, but reckless, and amounted to turning a blind eye to the fraud in progress.

74. After the fact of the first investments by victims in the scheme, Defendants continued to give aid and assistance to Liu and Wang by continuing to maintain the appearance of a legitimate project, thereby proximately causing Plaintiffs to invest as well. By the time Plaintiffs invested, Defendants knew or should have known that a scam was being perpetrated and still gave substantial assistance or encouragement to Liu and Wang, thereby proximately causing Plaintiffs to invest.

75. Plaintiffs relied on the POM, on the representations by Defendant THROPAY of his central involvement in the project, as conveyed to Plaintiffs through the POM and by Defendants, and

on the continued involvement of Defendants in the project. In fact, Plaintiffs were sent to Defendant professionals specifically because they were represented to have had experience with the project and could vouch for its viability and legitimacy. During Plaintiffs' contact with Defendant professionals, it was implied and clearly understood that Defendants were verifying that this was a legitimate EB-5 investment. Further, none of the Defendants expressed their doubts in the project or their willful blindness to the scam that was underway, to potential investors, or to Plaintiffs, and kept that information secret. Both had a duty to disclose their doubts because they were fully aware that their representations would be conveyed to persons such as Plaintiffs through the POM or through the legal representation by the Defendant professionals.

76. In reliance on the credibility of Defendants, Plaintiffs paid Liu and Wang more than $500,300. This payment was reasonable given the central involvement of Defendant THROPAY and the implied approval of Defendant professionals. Defendants were fully aware that their representations would be conveyed to persons such as Plaintiffs through the POM or through the representation by the Defendant professionals.

77. As a direct and proximate result of the representations by Defendants THROPAY in the POM and the professionals in the course of representing Plaintiffs, and further as a result of the omission to warn Plaintiffs by said Defendants, Plaintiffs each lost over $500,000, in an exact amount as will be established at trial.

78. Defendants LEW, THROPAY, WOLFSDORF ROSENTHAL, Miller Mayer, DERRICO, U.S. Regional Economic Development Authority, LLC, and Does 1 through 50 all must have been painfully aware that Liu and Wang were scamming Plaintiffs, in particular by the nature of the transaction which they were presented (among other things, because it was an obvious facade of an investment project, because it lacked meaningful controls to prevent the money from being stolen, because the perpetrators had no ability to complete the project, because said defendants were participating under extremely suspicious circumstances, because said defendants were actively trying to limit their exposure for the fraud, because said defendants were avoiding even the most rudimentary due diligence, because said defendants were asked to make representations to the Federal Government without first conducting due diligence, because said defendants were asked to do very little work for a very large amount of money, because the attorney defendants were hired by the adverse parties in the underlying transaction yet oddly did not investigate the circumstances, because defendants failed to implement capital controls or even a basic escrow account which had the effect of allowing the perpetrators to steal the money, and because of the prevalence of EB-5 scams) knew or should have known of the scheme by the perpetrators to defraud Plaintiffs and joined in it. In short, Defendants left the barn doors open so that the thieves could steal the horses in the middle of the night. Further, said defendants agreed with the perpetrators by purposely looking the other way and intended that the fraud be committed by preventing protections from being inserted in the

transactions and by refusing to warn Plaintiffs or to even conduct rudimentary investigations. Again, the fact that said defendants tried to limit their own exposure shows a consciousness of guilt from the very beginning. In addition, each of the defendants herein provided material assistance and support to the perpetrator (by drafting the documents and petitions needed to consummate the fraud, and by refusing to conduct required diligence) which proximately caused the loss of Plaintiffs' money (had they done what they were supposed to do under the law, then none of the Plaintiffs would have paid money to the perpetrators).

79. As alleged above, Defendants acted with a conscious disregard for the rights of Plaintiffs by intentionally or recklessly lending their names, reputations, and credibility to Liu and Wang, thereby enabling Liu and Wang to steal over $24,000,000 from investors. Defendants received money for their involvement, all at the expense of the investors who were victimized. Such conduct was done with malice, fraud, and oppression, as defined by Civil Code section 3294. Further, all of the conduct of Liu and Wang was fully ratified by Defendants, who had numerous opportunities to warn investors of the fraud, but failed to do so, in order to receive money. Defendants' course of conduct was willful, wanton, and for the purpose of injuring Plaintiffs. For these reasons, Plaintiffs are entitled to punitive damages in an amount sufficient to deter and punish defendants, to be established according to proof, or in the amount of $1,500,000.

//

**FOURTH CAUSE OF ACTION FOR RECOVERY UNDER PENAL CODE §496(c)**

(Against all Defendants except Defendants MILLER MAYER AND WOLFSDORF ROSENTHAL, which has been stricken from this cause of action by the Court)

80. The allegation contained in the preceding paragraphs are here incorporated by reference, except the legal malpractice allegations, as though fully set forth at this point.

81. As alleged above, Defendants THROPAY and the professionals conspired with Liu and Wang to defraud numerous investors of their money. In particular, as alleged above, Liu and Wang convinced the investors such as Plaintiffs that the investment was real and legitimate by using Defendants THROPAY and the professionals to give credibility to the project. In fact, the investment was not real or legitimate, and all of the representations in the POM were essentially fraudulent. In short, Plaintiffs trusted Liu and Wang primarily because Defendants THROPAY and the professionals gave their credibility to the project. But for the actual cooperation of Defendants THROPAY and the professionals, Plaintiffs would not have trusted the project enough to invest. Defendants THROPAY and professionals thereafter received the proceeds of the fraud, and specifically, Defendant THROPAY received stolen money from the perpetrators in the amount of $960,000.

82. After the fact of the first investments by victims in the scheme, Defendants continued to give aid and assistance to Liu and Wang by continuing to maintain the appearance of a legitimate project, thereby proximately causing Plaintiffs to invest as well. By the time Plaintiffs invested, Defendants

knew or should have known that a scam was being perpetrated and still gave substantial assistance or encouragement to Liu and Wang, thereby proximately causing Plaintiffs to invest.

83. Plaintiffs relied on the POM, on the representations by Defendant THROPAY of his central involvement in the project, as conveyed to Plaintiffs through the POM and by the Defendant professionals, and on the continued involvement of Defendants THROPAY and the professionals in the project. In fact, Plaintiffs were sent to the Defendant professionals specifically because they were represented to have had experience with the project and could vouch for its viability and legitimacy. During Plaintiffs' contact with the Defendant professionals, it was implied and clearly understood that Defendants were verifying that this was a legitimate EB-5 investment. Further, neither Defendant THROPAY nor the Defendant professionals expressed their doubts in the project or their willful blindness to the scam that was underway, to potential investors, or to Plaintiffs, and kept that information secret. All defendants had a duty to disclose their doubts because they were fully aware that their representations would be conveyed to persons such as Plaintiffs through the POM or through the representation by the Defendant professionals.

84. In reliance on the credibility of Defendants THROPAY and the professionals, Plaintiffs each paid Liu and Wang at least $500,000. This payment was reasonable given the central involvement of Defendant THROPAY and the implied approval of the Defendant professionals. Defendant were fully aware that their representations would be conveyed to persons such as Plaintiffs

through the POM or through the representation by the Defendant professionals.

85. Defendants LEW, THROPAY, WOLFSDORF ROSENTHAL, Miller Mayer, DERRICO, U.S. Regional Economic Development Authority, LLC, and Does 1 through 50 all must have been painfully aware that Liu and Wang were scamming Plaintiffs, in particular by the nature of the transaction which they were presented (among other things, because it was an obvious facade of an investment project, because it lacked meaningful controls to prevent the money from being stolen, because the perpetrators had no ability to complete the project, because said defendants were participating under extremely suspicious circumstances, because said defendants were actively trying to limit their exposure for the fraud, because said defendants were avoiding even the most rudimentary due diligence, because said defendants were asked to make representations to the Federal Government without first conducting due diligence, because said defendants were asked to do very little work for a very large amount of money, because the attorney defendants were hired by the adverse parties in the underlying transaction yet oddly did not investigate the circumstances, because defendants failed to implement capital controls or even a basic escrow account which had the effect of allowing the perpetrators to steal the money, and because of the prevalence of EB-5 scams) knew or should have known of the scheme by the perpetrators to defraud Plaintiffs and joined in it. In short, Defendants left the barn doors open so that the thieves could steal the horses in the middle of the night. Further, said defendants agreed with the perpetrators by

purposely looking the other way and intended that the fraud be committed by preventing protections from being inserted in the transactions and by refusing to warn Plaintiffs or to even conduct rudimentary investigations. Again, the fact that said defendants tried to limit their own exposure shows a consciousness of guilt from the very beginning. In addition, each of the defendants herein provided material assistance and support to the perpetrator (by drafting the documents and petitions needed to consummate the fraud, and by refusing to conduct required diligence) which proximately caused the loss of Plaintiffs’ money (had they done what they were supposed to do under the law, then none of the Plaintiffs would have paid money to the perpetrators).

86. As a direct and proximate result of the representations by Defendants THROPAY in the POM and the professionals in the course of representing Plaintiffs, and further as a result of the omission to warn Plaintiffs by said Defendants, Plaintiffs each lost over $500,000, in an exact amount as will be established at trial. Therefore, the acts alleged herein are violations of California Penal Code §496, entitling Plaintiffs to recover treble damages and attorney's fees pursuant to Penal Code §496(c).

WHEREFORE, judgment is sought by Plaintiffs Against Defendants, as follows:

<u>FIRST CAUSE OF ACTION</u>

(Against All Defendants except Defendant WOLFSDORF ROSENTHAL ~~and Miller Mayer~~, who have been stricken from this cause of action by the Court)

1. Special damages in the amount of $550,000 for each Plaintiff, or according to proof;

2. For interest thereon at the legal rate from December 31, 2012, or according to proof;

3. Punitive damages in the amount of $1,500,000 for each Plaintiff, or according to proof;

4. For costs of suit; and

5. For such other and further relief as the Court may deem just and proper.

SECOND CAUSE OF ACTION

(Against Defendants LEW, WOLFSDORF ROSENTHAL, and DERRICO Only)

1. Special damages in the amount of $550,000 for each Plaintiff, or according to proof;

2. For interest thereon at the legal rate from December 31, 2012 for each Plaintiff, or according to proof;

3. Punitive damages in the amount of $1,500,000 for each Plaintiff, or according to proof;

4. For costs of suit; and

5. For such other and further relief as the Court may deem just and proper.

THIRD CAUSE OF ACTION

(Against All Defendants except Defendant WOLFSDORF ROSENTHAL ~~and Miller Mayer,~~ who ~~have~~ has been stricken from this cause of action by the Court)

1. Special damages in the amount of $550,000 for each Plaintiff, or according to proof;

2. For interest thereon at the legal rate from December

31, 2012 for each Plaintiff, or according to proof;

3. Punitive damages in the amount of $1,500,000 for each Plaintiff, or according to proof;

4. For costs of suit; and

5. For such other and further relief as the Court may deem just and proper.

FOURTH CAUSE OF ACTION

(Against All Defendants except Defendant WOLFSDORF ROSENTHAL and Miller Mayer~~, who have been stricken from this cause of action by the Court~~)

1. Special damages in the amount of $550,000 for each Plaintiff, or according to proof;

2. For interest thereon at the legal rate from December 31, 2012 for each Plaintiff, or according to proof;

3. For treble damages Punitive damages pursuant to Penal Code §496(c);

4. For costs of suit and attorney fees pursuant to Penal Code §496(c); and

5. For such other and further relief as the Court may deem just and proper.

DATED: August 27, 2020

**Law Offices of Steven P. Scandura**

STEVEN P. SCANDURA, ESQ.
Attorney for Plaintiffs,
ZHAO HUI SHI, JUN LU, and those similarly situated

# PROOF OF SERVICE

(BY MAIL & eSERVICE)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1601 N. Sepulveda Blvd. #502, Manhattan Beach, CA 90266-5133.

I served the foregoing document described as:

**FOURTH AMENDED COMPLAINT FOR: (1) FRAUD (INCLUDING CONSPIRACY AND/OR AIDING AND ABETTING FRAUD); (2) LEGAL MALPRACTICE; (3) NEGLIGENT MISREPRESENTATION; (4) PENAL CODE §496(c) CLAIMS**

on the attorneys in this action by email and placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at the below-stated location, addressed as follows:

CANDICE M. BRYNER, ESQ.
BRYNER CROSBY, APC
2780 Roosevelt Avenue, Ste 206
Irvine, CA 92620
Email: candice@brynerlaw.com

TAMMY H. LUND, ESQ.
Law Offices of Tammy H. Lund
200 E. Beverly Blvd., Suite 200
Montebello, CA 90640
Email: tammy@jvley.com

ANDREW J. WAXLER, ESQ.
Kaufman, Dolowich, Voluck LLP
11755 Wilshire Blvd., Ste 2400
Los Angeles, CA 90025-1519
Email: awaxler@kdvlaw.com

Executed and performed on August 27, 2020, at Alhambra, California.

I declare under penalty of perjury that the above is true and correct.

Signed: ______________________

[printed: Steven P. Scandura]

TO ORDER COPIES OF ANY DOCUMENTS LISTED BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 03/22/2021**

**Current Date:** 3/22/2021
**Source:** SUPERIOR COURT, LOS ANGELES COUNTY, CALIFORNIA

**DISCLAIMER**

This Data is provided for informational purposes only and it is not the official record. For copies of the official record (of an incarceration, conviction or court filing record) contact the source agency or court. In addition to any obligations under your Subscriber Agreement, your use of this data may be governed by the Supplier Additional Terms (see Footer).

## CASE INFORMATION

| | |
|---|---|
| **Case Title:** | ZHAO HUI SHI ET AL v. RACHEL H LEW ET AL |
| **Court:** | SUPERIOR COURT, LOS ANGELES COUNTY |
| **Division:** | CENTRAL DISTRICT |
| **Case Number:** | BC662775 |
| **Case Type:** | CIVIL |
| **Case Subtype:** | FRAUD (NO CONTRACT) (GENERAL JURISDICTION) |
| **Date Filed:** | 05/25/2017 |
| **Case Status:** | PENDING |

## PARTICIPANT INFORMATION

### LU JUN

**Type:** PLAINTIFF

### LU JUN

**Type:** APPELLANT

### SHI ZHAO HUI

**Type:** PLAINTIFF

### SHI ZHAO HUI

**Type:** APPELLANT

**DERRICO DAVID GERALD**

**Type:** DEFENDANT

**GUERRA # 10977 SANDRA**

**Type:** NON-PARTY

**LEW RACHEL H.**

**Type:** DEFENDANT

**MILLER MAYER LLP**

**Type:** DEFENDANT

**THROPAY JOHN P.**

**Type:** DEFENDANT

**US REGIONAL ECONOMIC DEVELOPMENT AUTH.**

**Type:** DEFENDANT

**WILCOX # 9178 WIL S.**

**Type:** NON-PARTY

**WOLFDORF ROSENTHAL LLP**

**Type:** DEFENDANT

**WOLFDORF ROSENTHAL LLP**

**Type:** RESPONDENT

## ATTORNEY INFORMATION

### STEVEN P. SCANDURA

**Attorney Status:** ATTORNEY FOR PLAINTIFF

### CANDICE BRYNER

**Attorney Status:** ATTORNEY FOR DEFENDANT

### NIV V. DAVIDOVICH

**Attorney Status:** ATTORNEY FOR DEFENDANT

### JENNIFER E. NEWCOMB

**Attorney Status:** ATTORNEY FOR DEFENDANT

### JENNIFER K. SAUNDERS

**Attorney Status:** ATTORNEY FOR DEFENDANT

### ANDREW J. WAXLER

**Attorney Status:** ATTORNEY FOR DEFENDANT

## CALENDAR INFORMATION (87)

| Date/Time: | Description: | Location: | Judge: |
|---|---|---|---|
| 07/27/2021 10:00 AM | **Event:** JURY TRIAL | **Department:** 37 **Court Location:** 111 NORTH HILL STREET | |
| 07/20/2021 08:30 AM | **Event:** FINAL STATUS CONFERENCE | **Department:** 37 **Court Location:** 111 NORTH HILL STREET | |
| 03/30/2021 08:30 AM | **Event:** HEARING ON APPLICATION FOR ORDER FOR APPEARANCE AND EXAMINATION | **Department:** 37 **Court Location:** 111 NORTH HILL STREET | |
| 03/09/2021 3:30 PM | **Event:** INFORMAL DISCOVERY CONFERENCE (IDC) **Disposition:** NOT HELD | **Department:** 37 | |

| | | |
|---|---|---|
| | - ADVANCED AND VACATED | |
| 03/03/2021 4:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 02/04/2021 5:22 PM | **Event:** COURT ORDER | **Department:** 37 |
| 01/11/2021 08:30 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE **Disposition:** HELD | **Department:** 37 |
| 10/01/2020 1:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 09/29/2020 10:00 AM | **Event:** TRIAL **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 09/22/2020 08:30 AM | **Event:** FINAL STATUS CONFERENCE **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 09/04/2020 08:30 AM | **Event:** HEARING ON MOTION TO CONTINUE TRIAL **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 08/20/2020 3:00 PM | **Event:** HEARING ON MOTION - OTHER (MOTION FOR ORDER TO SHOW CAUSE RE CONTEMPT) **Disposition:** HELD | **Department:** 37 |
| 08/14/2020 08:30 AM | **Event:** HEARING ON MOTION FOR SUMMARY JUDGMENT **Disposition:** NOT HELD - TAKEN OFF CALENDAR BY PARTY | **Department:** 37 |
| 08/06/2020 1:30 PM | **Event:** HEARING ON MOTION TO CONTINUE TRIAL **Disposition:** NOT HELD - VACATED BY COURT | **Department:** 37 |
| 07/31/2020 08:30 AM | **Event:** HEARING ON MOTION FOR SUMMARY JUDGMENT **Disposition:** HELD | **Department:** 37 |
| 07/28/2020 10:00 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) **Disposition:** HELD | **Department:** 37 |
| 07/27/2020 | **Event:** COURT ORDER | **Department:** 37 |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| 1:30 PM | | |
| 07/20/2020 10:00 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) **Disposition:** NOT HELD - CONTINUED - STIPULATION | **Department:** 37 |
| 07/16/2020 1:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 07/10/2020 08:30 AM | **Event:** HEARING ON EX PARTE APPLICATION (TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION TO CONTINUE TRIAL AND ALL PRETRIAL DATES, OR IN THE ALTERNATIVE, TO CONTINUE THE TRIAL ON AN EX PARTE BASIS) **Disposition:** HELD | **Department:** 37 |
| 07/07/2020 1:30 PM | **Event:** HEARING ON MOTION - OTHER (MOTION FOR ORDER TO SHOW CAUSE RE CONTEMPT) **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 07/06/2020 10:00 AM | **Event:** HEARING ON MOTION - OTHER (MOTION FOR ORDER TO SHOW CAUSE RE CONTEMPT) **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 07/06/2020 08:30 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 06/09/2020 1:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 05/29/2020 1:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 05/11/2020 08:30 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO | **Department:** 37 |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | STRIKE (CCP 430.10) **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | |
| 04/27/2020 08:30 AM | **Event:** HEARING ON MOTION - OTHER (MOTION FOR ORDER TO SHOW CAUSE RE CONTEMPT) **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 04/20/2020 08:30 AM | **Event:** COURT ORDER | **Department:** 37 |
| 04/16/2020 08:30 AM | **Event:** COURT ORDER | **Department:** 37 |
| 03/11/2020 08:30 AM | **Event:** HEARING ON MOTION TO CONTINUE TRIAL **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 |
| 03/09/2020 3:00 PM | **Event:** COURT ORDER | **Department:** 37 |
| 02/25/2020 08:30 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES **Disposition:** HELD | **Department:** 37 |
| 02/21/2020 08:30 AM | **Event:** HEARING ON MOTION TO COMPEL (DEPOSITION OF PERSON MOST KNOWLEDGEABLE REGARDING CLIENT CONTACT INFORMATION, ETC.) **Disposition:** NOT HELD - TAKEN OFF CALENDAR BY PARTY | **Department:** 37 |
| 02/14/2020 08:30 AM | **Event:** HEARING ON MOTION - OTHER (FOR ORDER REQUIRING PLAINTIFFS TO FILE AN UNDERTAKING; DECLARATION OF JENNIFER SAUNDERS IN SUPPORT THEREOF;) **Disposition:** NOT HELD - TAKEN OFF CALENDAR BY PARTY | **Department:** 37 |
| 01/27/2020 08:30 AM | **Event:** HEARING ON MOTION FOR PROTECTIVE ORDER **Disposition:** NOT | **Department:** 37 |

| | | |
|---|---|---|
| | HELD - TAKEN OFF CALENDAR BY PARTY | |
| 01/24/2020 08:30 AM | **Event:** HEARING ON EX PARTE APPLICATION ( TO ADVANCE THE HEARING DATE OF ITS MOTION FOR ATTORNEY'S FEES ON APPEAL, ETC.) **Disposition:** HELD | **Department:** 37 |
| 01/24/2020 08:30 AM | **Event:** HEARING ON MOTION FOR SUMMARY JUDGMENT **Disposition:** NOT HELD - RESCHEDULED BY PARTY | **Department:** 37 |
| 12/30/2019 3:30 PM | **Event:** COURT ORDER | **Department:** 37 |
| 11/15/2019 08:30 AM | **Event:** HEARING ON MOTION TO COMPEL DISCOVERY (NOT "FURTHER DISCOVERY") **Disposition:** HELD | **Department:** 37 |
| 11/06/2019 08:30 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) **Disposition:** HELD | **Department:** 37 |
| 11/06/2019 08:30 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) **Disposition:** HELD | **Department:** 37 |
| 10/28/2019 08:30 AM | **Event:** HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) **Disposition:** HELD - CONTINUED | **Department:** 37 |
| 09/24/2019 10:00 AM | **Event:** TRIAL **Disposition:** NOT HELD - CONTINUED - PARTY'S MOTION | **Department:** 37 |
| 09/16/2019 08:30 AM | **Event:** FINAL STATUS CONFERENCE **Disposition:** HELD - CONTINUED | **Department:** 37 |
| 09/16/2019 08:30 AM | **Event:** HEARING ON MOTION TO CONTINUE TRIAL **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 09/04/2019 08:30 AM | **Event:** HEARING ON EX PARTE APPLICATION (FOR ORDER | **Department:** 37 |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | SHORTENING TIME/ ADVANCING HEARING FOR MOTION TO CONTINUE TRIAL) **Disposition:** HELD | | |
| 09/03/2019 08:30 AM | **Event:** HEARING ON EX PARTE APPLICATION (FOR ORDER SHORTENING TIME/ ADVANCING HEARING FOR MOTION TO CONTINUE TRIAL) **Disposition:** NOT HELD - TRAILED | **Department:** 37 | |
| 08/29/2019 08:30 AM | **Event:** HEARING ON EX PARTE APPLICATION (TO CONTINUE TRIAL) **Disposition:** HELD | **Department:** 37 | |
| 07/29/2019 08:30 AM | **Event:** HEARING ON APPLICATION FOR ORDER FOR APPEARANCE AND EXAMINATION **Disposition:** NOT HELD - VACATED BY COURT | **Department:** 44 | EDWARD B. MORETON |
| 07/10/2019 08:30 AM | **Event:** HEARING ON MOTION FOR SUMMARY JUDGMENT **Disposition:** NOT HELD - RESCHEDULED BY PARTY | **Department:** 37 | |
| 06/17/2019 08:30 AM | **Event:** HEARING ON MOTION FOR PROTECTIVE ORDER ((PER STIP/ORD 3/19/19)) **Disposition:** HELD | **Department:** 37 | |
| 06/17/2019 08:30 AM | **Event:** HEARING ON MOTION TO COMPEL FURTHER DISCOVERY RESPONSES **Disposition:** HELD | **Department:** 37 | |
| 05/22/2019 1:30 PM | **Event:** NON-APPEARANCE CASE REVIEW | **Department:** 44 | EDWARD B. MORETON |
| 05/08/2019 08:30 AM | **Event:** HEARING ON MOTION FOR SUMMARY JUDGMENT | **Department:** 37 | |
| 04/04/2019 08:30 AM | **Event:** HEARING ON MOTION FOR PROTECTIVE ORDER **Disposition:** NOT HELD - ADVANCED AND CONTINUED - BY COURT | **Department:** 37 | |
| 03/19/2019 | **Event:** COURT ORDER | **Department:** 37 | |

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| 1:30 PM | | |
| 12/19/2018 4:00 PM | **Event:** INFORMAL STATUS CONFERENCE **Disposition:** HELD | **Department:** 37 |
| 12/11/2018 4:00 PM | **Event:** INFORMAL STATUS CONFERENCE **Disposition:** NOT HELD - CONTINUED - STIPULATION | **Department:** 37 |
| 11/15/2018 08:30 AM | **Event:** HEARING ON MOTION - OTHER ( SECURITY OR UNDERTAKING) **Disposition:** NOT HELD - VACATED BY COURT | **Department:** 37 |
| 11/15/2018 08:30 AM | **Event:** HEARING ON MOTION - OTHER (FOR UNDERTAKING PURSUANT TO CODE OF PROCEDURE SECTION 1030;) **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 11/15/2018 08:30 AM | **Event:** HEARING ON MOTION - OTHER (MOTION TO REQUIRE AN UNDERTAKING) **Disposition:** NOT HELD - VACATED BY COURT | **Department:** 37 |
| 11/15/2018 08:30 AM | **Event:** HEARING ON MOTION - OTHER (TO REQUIRE AN UNDERTAKING) **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 09/27/2018 08:36 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 09/06/2018 08:35 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 08/28/2018 08:36 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; DEMURRER SUSTAINED WITH LEAVE) | **Department:** 37 |
| 08/21/2018 08:30 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION | **Department:** 37 |

| | | |
|---|---|---|
| | TO STRIKE (HEARING ON DEMURRER; CONTINUED BY COURT) | |
| 08/15/2018 08:36 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; CONTINUED BY COURT) | **Department:** 37 |
| 08/06/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; CONTINUED BY COURT) | **Department:** 37 |
| 08/02/2018 08:30 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES (MOTION - ATTORNEY FEES; ADVANCED TO A PREVIOUS DATE) | **Department:** 37 |
| 07/25/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; ADVANCED TO A PREVIOUS DATE) | **Department:** 37 |
| 07/20/2018 08:30 AM | **Event:** EX-PARTE PROCEEDINGS **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 07/10/2018 08:30 AM | **Event:** EX-PARTE PROCEEDINGS **Disposition:** HELD - MOTION GRANTED | **Department:** 37 |
| 07/03/2018 08:35 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES (MOTION FOR ATTORNEY FEES; ADVANCED TO A PREVIOUS DATE) | **Department:** 37 |
| 06/22/2018 00:00 AM | **Event:** COURT ORDER **Disposition:** HELD | **Department:** 37 |
| 06/15/2018 08:35 AM | **Event:** HEARING ON MOTION FOR ATTORNEY FEES (MOTION FOR ATTORNEY FEES; CONTINUED BY COURT) | **Department:** 37 |
| 05/15/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION | **Department:** 37 |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | TO STRIKE (HEARING ON DEMURRER; OFF CALENDAR) | |
| 05/14/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; OFF CALENDAR) | **Department:** 37 |
| 05/02/2018 08:30 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; DEMURRER SUSTAINED WITH LEAVE) | **Department:** 37 |
| 04/17/2018 08:36 AM | **Event:** HEARING ON SPECIAL MOTION TO STRIKE UNDER CCP SECTION 425.16 (ANTI-SLAPP MOTION) (MOTION-ANTI-SLAPP; GRANTED IN PART) | **Department:** 37 |
| 03/27/2018 08:30 AM | **Event:** UNKNOWN EVENT TYPE | **Department:** 37 |
| 03/22/2018 08:36 AM | **Event:** HEARING ON MOTION TO STRIKE ((CONTINUED BY COURT)) | **Department:** 37 |
| 03/21/2018 3:30 PM | **Event:** NON-APPEARANCE CASE REVIEW **Disposition:** HELD | **Department:** 37 |
| 03/01/2018 08:32 AM | **Event:** CASE MANAGEMENT CONFERENCE **Disposition:** HELD | **Department:** 37 |
| 01/05/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE **Disposition:** NOT HELD - ADVANCED AND VACATED | **Department:** 37 |
| 01/03/2018 08:35 AM | **Event:** HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE (HEARING ON DEMURRER; OFF CALENDAR) | **Department:** 37 |
| 11/16/2017 08:32 AM | **Event:** CASE MANAGEMENT CONFERENCE **Disposition:** HELD | **Department:** 37 |
| 09/08/2017 08:30 AM | **Event:** ORDER TO SHOW CAUSE RE: FAILURE TO FILE | **Department:** 37 |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | PROOF OF SERVICE (OSC-FAILURE TO FILE PROOF OF SERV; MATTER CONTINUED) | |

**FILING INFORMATION (606)**

| **Date:** | **Description:** | **Party:** |
|---|---|---|
| 03/03/2021 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE (IDC) OFF CALENDAR) OF 03/03/2021) | **Filing Party:** FILED BY CLERK |
| 03/03/2021 | **Document Description:** MINUTE ORDER ( (COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE (IDC) OFF CALENDAR)) | **Filing Party:** FILED BY CLERK |
| 02/26/2021 | **Document Description:** ANSWER (TO PLAINTIFFS' UNVERIFIED FOURTH AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 02/23/2021 | **Document Description:** PROOF OF PERSONAL SERVICE | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 02/18/2021 | **Document Description:** NOTICE OF RULING ((FEBRUARY 4, 2021)) | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF) |
| 02/16/2021 | **Document Description:** APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 02/16/2021 | **Document Description:** DECLARATION (OF SUSAN M. BENSON IN SUPPORT OF SUBPOENA TO PRODUCE DOCUMENTS AT EXAMINATION OF JUDGMENT DEBTOR ZHAO HUI SHI) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 02/16/2021 | **Document Description:** SUBPOENA DUCES TECUM AND PROOF OF SERVICE | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 02/04/2021 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE (IDC)) OF 02/04/2021) | **Filing Party:** FILED BY CLERK |
| 02/04/2021 | **Document Description:** MINUTE ORDER ( (COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE (IDC))) | **Filing Party:** FILED BY CLERK |
| 01/13/2021 | **Document Description:** SUBSTITUTION OF ATTORNEY | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 01/12/2021 | **Document Description:** NOTICE (OF ENTRY OF ORDER SUSTAINING DEFENDANT MILLER MAYER LLP DEMURRER TO PLAINTIFFS FOURTH AMENDED COMPLAINT WITHOUT LEAVE TO AMEND) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 01/11/2021 | **Document Description:** MINUTE ORDER ( (HEARING ON | **Filing Party:** FILED BY CLERK |

| | | |
|---|---|---|
| | DEMURRER - WITHOUT MOTION TO STRIKE)) | |
| 01/11/2021 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 01/04/2021 | **Document Description:** EVIDENTIARY OBJECTIONS TO OPPOSITION FILED TO DEFENDANT MILLER MAYER LLP'S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 01/04/2021 | **Document Description:** REPLY (IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 01/04/2021 | **Document Description:** REQUEST FOR JUDICIAL NOTICE (IN SUPPORT OF REPLY OF DEFENDANT MILLER MAYER LLP?S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 01/04/2021 | **Document Description:** SUPPLEMENTAL DECLARATION (OF JENNIFER E. NEWCOMB IN SUPPORT OF REPLY OF DEFENDANT MILLER MAYER LLP'S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 12/28/2020 | **Document Description:** OPPOSITION (TO DEFENDANT MILLER MAYER'S DEMURRER TO FOURTH AMENDED COMPLAINT.) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 11/17/2020 | **Document Description:** NOTICE OF CHANGE OF ADDRESS OR OTHER CONTACT INFORMATION | **Filing Party:** FILED BY TAMMY LUND (ATTORNEY) |
| 10/14/2020 | **Document Description:** WRIT OF EXECUTION ((LOS ANGELES)) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/13/2020 | **Document Description:** ANSWER | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 10/13/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/13/2020 | **Document Description:** NOTICE (RETURN OF ISSUED WRIT) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/01/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 10/01/2020) | **Filing Party:** FILED BY CLERK |
| 10/01/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 09/29/2020 | **Document Description:** DECLARATION (OF JENNIFER | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |

| | | |
|---|---|---|
| | E. NEWCOMB IN SUPPORT OF DEMURRER) | |
| 09/29/2020 | **Document Description:** DEMURRER - WITHOUT MOTION TO STRIKE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 09/29/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 09/28/2020 | **Document Description:** STIPULATION AND ORDER (STIPULATION AND ORDER STRIKING CLASS ACTION CLAIM AGAINST RACHEL H. LEW) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/27/2020 | **Document Description:** AMENDED COMPLAINT ( (4TH)) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/27/2020 | **Document Description:** WRIT OF EXECUTION ((LOS ANGELES)) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/26/2020 | **Document Description:** WRIT OF EXECUTION ((LOS ANGELES)) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE (AMENDED NOTICE OF ASSOCIATION OF COUNSEL FOR LIMITED PURPOSE) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/24/2020 | **Document Description:** NOTICE OF REJECTION - POST JUDGMENT | **Filing Party:** FILED BY CLERK |
| 08/20/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON MOTION - | **Filing Party:** FILED BY CLERK |

| | | |
|---|---|---|
| | OTHER MOTION FOR ORDER TO SHOW CAUSE RE C...)) | |
| 08/10/2020 | **Document Description:** NOTICE OF REJECTION - POST JUDGMENT | **Filing Party:** FILED BY CLERK |
| 08/06/2020 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/06/2020 | **Document Description:** OPPOSITION (TO DEFENDANT WOLFDORF ROSENTHAN'S MOTION FOR CONTEMPT; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF STEVEN P. SCANDURA) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/31/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON MOTION FOR SUMMARY JUDGMENT)) | **Filing Party:** FILED BY CLERK |
| 07/28/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10))) | **Filing Party:** FILED BY CLERK |
| 07/28/2020 | **Document Description:** NOTICE (OF TAKING DEFENDANT MILLER MAYER, LLPS MOTION TO CONTINUE TRIAL AND ALL PRETRIAL DATES OFF CALENDAR) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/28/2020 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/28/2020 | **Document Description:** ORDER (APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/27/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 07/27/2020) | **Filing Party:** FILED BY CLERK |
| 07/27/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 07/24/2020 | **Document Description:** DECLARATION (OF RACHEL LEW IN OPPOSITION TO MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/24/2020 | **Document Description:** OBJECTION (TO PLAINTIFFS' EVIDENCE) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/24/2020 | **Document Description:** OPPOSITION (TO MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/24/2020 | **Document Description:** REPLY (IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ ADJUDICATION) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/21/2020 | **Document Description:** OBJECTION (EVIDENTIARY OBJECTIONS TO OPPOSITIONS FILED TO DEMURRER AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |

| | | |
|---|---|---|
| 07/21/2020 | **Document Description:** REPLY (IN SUPPORT OF DEFENDANT MILLER MAYER LLPS DEMURRER TO PLAINTIFFS THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/21/2020 | **Document Description:** REPLY (IN SUPPORT OF DEFENDANT MILLER MAYER LLPS MOTION TO STRIKE PORTIONS OF PLAINTIFFS THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/21/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/21/2020 | **Document Description:** SUPPLEMENTAL DECLARATION (OF JENNIFER E. NEWCOMB IN SUPPORT OF REPLIES IN SUPPORT OF DEFENDANT MILLER MAYER LLPS DEMURRER TO, AND MOTION TO STRIKE PORTIONS OF, PLAINTIFFS THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/17/2020 | **Document Description:** OPPOSITION (TO DEFENDANT RACHEL LEW?S MOTION FOR SUMMARY JUDGMENT) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/17/2020 | **Document Description:** SEPARATE STATEMENT | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/16/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 07/16/2020) | **Filing Party:** FILED BY CLERK |
| 07/16/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 07/13/2020 | **Document Description:** OPPOSITION (PLAINTIFFS? OPPOSITION TO DEFENDANT MILLER MAYER?S DEMURRER TO THIRD AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/13/2020 | **Document Description:** OPPOSITION (PLAINTIFFS? OPPOSITION TO DEFENDANT MILLER MAYER?S MOTION TO STRIKE PORTIONS OF PLAINTIFFS? THIRD AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/13/2020 | **Document Description:** STIPULATION AND ORDER (TO CONTINUE DEMURRER AND MOTION TO STRIKE) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF); MILLER MAYER, LLP (DEFENDANT) |
| 07/10/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER H...)) | **Filing Party:** FILED BY CLERK |
| 07/10/2020 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |

| | | |
|---|---|---|
| 07/09/2020 | **Document Description:** EX PARTE APPLICATION (TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION TO CONTINUE TRIAL AND ALL PRETRIAL DATES, OR IN THE ALTERNATIVE, TO CONTINUE THE TRIAL ON AN EX PARTE BASIS) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 06/12/2020 | **Document Description:** APPEAL RECORD DELIVERED | **Filing Party:** FILED BY CLERK |
| 06/10/2020 | **Document Description:** NOTICE (OF HEARING ON MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 06/09/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 06/09/2020) | **Filing Party:** FILED BY CLERK |
| 06/09/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 05/29/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 05/29/2020) | **Filing Party:** FILED BY CLERK |
| 05/29/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 05/27/2020 | **Document Description:** MOTION TO CONTINUE TRIAL DATE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 05/13/2020 | **Document Description:** DECLARATION (OF RACHEL LEW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ ADJUDICTION) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** EXHIBIT LIST | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** MOTION FOR SUMMARY JUDGMENT | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** SEPARATE STATEMENT | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/13/2020 | **Document Description:** SUBSTITUTION OF ATTORNEY | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 04/20/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 04/20/2020) | **Filing Party:** FILED BY CLERK |
| 04/20/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 04/16/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 04/16/2020) | **Filing Party:** FILED BY CLERK |
| 04/16/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 03/25/2020 | **Document Description:** DECLARATION (OF JENNIFER E. NEWCOMB IN COMPLIANCE WITH CODE OF CIVIL PROCEDURE SECTIONS 430.41 AND 435.5) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| 03/25/2020 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 03/25/2020 | **Document Description:** MOTION TO STRIKE (NOT INITIAL PLEADING) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 03/25/2020 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 03/25/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 03/11/2020 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 03/10/2020 | **Document Description:** MOTION FOR AN OSC RE: CONTEMPT (CCP 1209) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 03/09/2020 | **Document Description:** CERTIFICATE OF MAILING FOR ((COURT ORDER) OF 03/09/2020) | **Filing Party:** FILED BY CLERK |
| 03/09/2020 | **Document Description:** MINUTE ORDER ( (COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 03/09/2020 | **Document Description:** ORDER (ON DEFENDANT'S MOTON FOR ATTORNEY'S FEES) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 03/06/2020 | **Document Description:** NOTICE TO REPORTER TO PREPARE TRANSCRIPT ON APPEAL (;B303465, NOA 1/3/20;) | **Filing Party:** FILED BY CLERK |
| 02/27/2020 | **Document Description:** NOTICE OF DEFAULT ("U") | **Filing Party:** FILED BY CLERK |
| 02/25/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON MOTION FOR ATTORNEY FEES)) | **Filing Party:** FILED BY CLERK |
| 02/25/2020 | **Document Description:** NOTICE OF RULING (ON WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 02/24/2020 | **Document Description:** OBJECTION (TO DEFENDANT WOLFSDORF ROSENTHAL'S NEW EVIDENCE SUBMITTED WITH REPLY BRIEF) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 02/19/2020 | **Document Description:** RESPONDENT'S NTC DESIGNATING RECORD OF APPEAL "U" | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 02/18/2020 | **Document Description:** OBJECTION (EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN OPPOSITION TO MOTION FOR ATTORNEY'S FEES ON APPEAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 02/18/2020 | **Document Description:** REPLY ( IN SUPPORT OF MOTION FOR ATTORNEY'S FEES ON APPEAL PURSUANT TO CCP 425.16(C)) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |

| | | |
|---|---|---|
| 02/18/2020 | **Document Description:** REQUEST (SUPPLEMENTAL REQUEST TO TAKE JUDICIAL NOTICE ON MOTON FOR ATTORNEY'S FEES ON APPEAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 02/11/2020 | **Document Description:** APPEAL - REPORTER APPEAL TRANSCRIPT PROCESS FEE PAID | **Filing Party:** FILED BY JUN LU (APPELLANT); ZHAO HUI SHI (APPELLANT) |
| 02/10/2020 | **Document Description:** NTC DESIGNATING RECORD OF APPEAL APP-003/010/103 | **Filing Party:** FILED BY JUN LU (APPELLANT); ZHAO HUI SHI (APPELLANT) |
| 02/10/2020 | **Document Description:** OPPOSITION (TO DEFENDANT WOLFSDORF ROSENTHAL'S MOTION FOR ATTORNEY FEES) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 02/07/2020 | **Document Description:** WRIT OF EXECUTION ((LOS ANGELES)) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 01/28/2020 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 01/27/2020 | **Document Description:** REQUEST FOR REFUND / ORDER | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 01/24/2020 | **Document Description:** EX PARTE APPLICATION (DEFENDANT WOLFSDORF ROSENTHAL LLP'S EX PARTE APPLICATION TO ADVANCE THE HEARING DATE OF ITS MOTION FOR ATTORNEY'S FEES ON APPEAL, ETC.) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 01/24/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 01/24/2020 | **Document Description:** MINUTE ORDER ( (HEARING ON EX PARTE APPLICATION TO ADVANCE THE HEARING DATE ...)) | **Filing Party:** FILED BY CLERK |
| 01/22/2020 | **Document Description:** NOTICE (OF ERRATA TO MOTION FOR ATTORNEY'S FEES ON APPEAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (RESPONDENT) |
| 01/17/2020 | **Document Description:** NOTICE (OF TAKING MOTION TO COMPEL DEPOSITION OF PERSON MOST KNOWLEDGEABLE OFF CALENDAR) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 01/17/2020 | **Document Description:** NOTICE (OF TAKING OF MOTION FOR PROTECTIVE ORDER RE EXPERT WITNESS EXCHANGE OFF CALENDAR) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 01/08/2020 | **Document Description:** NOTICE OF FILING OF NOTICE OF APPEAL (UNLIMITED CIVIL) (NOA:1/3/20; "U") | **Filing Party:** FILED BY CLERK |

| | | |
|---|---|---|
| 01/06/2020 | **Document Description:** MEMORANDUM OF COSTS (SUMMARY) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 01/03/2020 | **Document Description:** APPEAL - NOTICE OF APPEAL/CROSS APPEAL FILED ("U") | **Filing Party:** FILED BY JUN LU (APPELLANT); ZHAO HUI SHI (APPELLANT) |
| 12/31/2019 | **Document Description:** MEMORANDUM (MEMORANDUM OF COSTS ON APPEAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 12/31/2019 | **Document Description:** MOTION FOR ATTORNEY FEES | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 12/31/2019 | **Document Description:** REQUEST (TO TAKE JUDICIAL NOTICE IN CONJUNCTION WITH MOTION FOR ATTORNEY'S FEES ON APPEAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 12/30/2019 | **Document Description:** APPEAL - REMITTITUR - OTHER (- AFFIRMED, IN PART AND REVERSED IN PART. B290792) | **Filing Party:** FILED BY CLERK |
| 12/30/2019 | **Document Description:** MINUTE ORDER ( (IN CHAMBERS COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 12/30/2019 | **Document Description:** ORDER ((PROPOSED) ORDER OF DISMISSAL/JUDGMENT AS TO DEFENDANT WOLFSDORF ROSENTHAL LLP) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 12/30/2019 | **Document Description:** ORDER - DISMISSAL | **Filing Party:** FILED BY COURT |
| 11/27/2019 | **Document Description:** ORDER ([PROPOSED] ORDER RE: JUDGMENT CREDITOR WOLFSDORF ROSENTHAL, LLP'S MOTION TO COMPEL VERIFIED RESPONSES TO POST-JUDGMENT SPECIAL INTERROGATORIES FROM ZHAO HUI SHI AND JUN LU AND AWARD OF SANCTIONS) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 11/15/2019 | **Document Description:** ANSWER | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 11/15/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON MOTION TO COMPEL DISCOVERY (NOT "FURTHER DISCOVERY"))) | **Filing Party:** FILED BY CLERK |
| 11/07/2019 | **Document Description:** NOTICE OF RULING (RE: DEMURRER AND MOTIONS TO STRIKE OF DEFENDANTS WOFSDORF ROSENTHAL LLP AND RACHEL H. LAW) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 11/06/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10); HEA...)) | **Filing Party:** FILED BY CLERK |
| 10/30/2019 | **Document Description:** NOTICE (OF CONTINUATION OF HEARING DATE FOR DEFENDANT RACHEL | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | H. LEW'S DEMURRER AND MOTION TO STRIKE PLAINTIFF'S CLASS ACTION THIRD AMENDED COMPLAINT) | |
| 10/30/2019 | **Document Description:** REPLY ( IN SUPPORT OF DEMURRER TO PLAINTIFFS' THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/30/2019 | **Document Description:** REPLY ( IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/30/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/28/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON DEMURRER - WITH MOTION TO STRIKE (CCP 430.10))) | **Filing Party:** FILED BY CLERK |
| 10/28/2019 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 10/24/2019 | **Document Description:** OPPOSITION (TO DEMURRER OF WOLFSDORF ROSENTHAL) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 10/24/2019 | **Document Description:** OPPOSITION (TO MOTION TO STRIKE OF WOLFSDORF ROSENTHAL) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 10/17/2019 | **Document Description:** PROOF OF SERVICE BY MAIL | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 10/17/2019 | **Document Description:** REPLY (TO PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL H. LEW'S DEMURRER TO PLAINTIFF'S CLASS ACTION THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 10/15/2019 | **Document Description:** OPPOSITION (TO DEMURRER OF DEFENDANT RACHEL LEW'S DEMURRER TO THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 10/15/2019 | **Document Description:** OPPOSITION (TO MOTION TO STRIKE PORTIONS OF THIRD AMENDED COMPLAINT) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 10/02/2019 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 09/16/2019 | **Document Description:** MINUTE ORDER ( (FINAL STATUS CONFERENCE; HEARING ON MOTION TO CONTINUE TRIAL)) | **Filing Party:** FILED BY CLERK |
| 09/16/2019 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| 09/11/2019 | **Document Description:** OPPOSITION (TO PLAINTIFFS' MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 09/05/2019 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 09/04/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON EX PARTE APPLICATION FOR ORDER SHORTENING TIME/ADV...)) | **Filing Party:** FILED BY CLERK |
| 09/03/2019 | **Document Description:** EX PARTE APPLICATION (FOR ORDER SHORTENING TIME/ADVANCING HEARING FOR MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 09/03/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON EX PARTE APPLICATION FOR ORDER SHORTENING TIME/ADV...)) | **Filing Party:** FILED BY CLERK |
| 08/30/2019 | **Document Description:** OPPOSITION (TO PLAINTIFF'S EX PARTE APPLICATION FOR AN ORDER SHORTENING TIME TO HEAR AN OMNIBUS MOTION TO CONTINUE TRIAL AND REQUEST FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/30/2019 | **Document Description:** OPPOSITION (TO PLAINTIFFS' EX PARTE APPLICATION FOR ORDER TO SHORTEN TIME TO BRING MOTION TO CONTINUE TRIAL) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/29/2019 | **Document Description:** EX PARTE APPLICATION (TO CONTINUE TRIAL) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/29/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON EX PARTE APPLICATION TO CONTINUE TRIAL)) | **Filing Party:** FILED BY CLERK |
| 08/29/2019 | **Document Description:** MOTION TO CONTINUE TRIAL DATE (DUE TO PENDING DEMURRERS, APPEAL, AND CLASS CERTIFICATIONS) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/29/2019 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/28/2019 | **Document Description:** OPPOSITION ( TO PLAINTIFFS' EX PARTE APPLICATION TO CONTINUE TRIAL) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/28/2019 | **Document Description:** OPPOSITION (PARTIAL OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION TO CONTINUE TRIAL) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/20/2019 | **Document Description:** DECLARATION (OF DEMURRING | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |

| | | |
|---|---|---|
| | PARTY IN SUPPORT OF AUTOMATIC EXTENSION) | |
| 08/20/2019 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/20/2019 | **Document Description:** PROOF OF SERVICE BY MAIL | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/20/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/19/2019 | **Document Description:** ANSWER | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 08/16/2019 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE (CCP 430.10) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/16/2019 | **Document Description:** MOTION RE: (ORDER REQUIRING PLAINTIFFS FILE AN UNDERTAKING) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/16/2019 | **Document Description:** MOTION TO STRIKE (NOT INITIAL PLEADING) | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/16/2019 | **Document Description:** MOTION TO STRIKE (NOT INITIAL PLEADING) (PORTIONS OF PLAINTIFFS' CLASS ACTION THIRD AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/16/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY WOLFSDORF ROTHENTHAL LLP (DEFENDANT) |
| 08/15/2019 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/14/2019 | **Document Description:** MOTION TO COMPEL (DEPOSITION OF PERSON MOST KNOWLEDGEABLE REGARDING CLIENT CONTACT INFORMATION AND FEE PAYMENT RCVD; AND TO COMPEL PRODUCTION OF DOCS. RQSTD BY SAID NTC. OF DEPO.) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/14/2019 | **Document Description:** SEPARATE STATEMENT | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 08/09/2019 | **Document Description:** MOTION FOR PROTECTIVE ORDER | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 07/15/2019 | **Document Description:** AMENDED COMPLAINT (3RD) | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 07/15/2019 | **Document Description:** COMPLAINT (3RD) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 06/18/2019 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |

| | | |
|---|---|---|
| 06/17/2019 | **Document Description:** MINUTE ORDER ( (HEARING ON MOTION TO COMPEL FURTHER DISCOVERY RESPONSES; HEAR...)) | **Filing Party:** FILED BY CLERK |
| 06/17/2019 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | |
| 06/10/2019 | **Document Description:** REPLY (TO OPPOSITION TO AMENDED MOTION FOR PROTECTIVE ORDER) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/10/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/07/2019 | **Document Description:** OBJECTION (EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/07/2019 | **Document Description:** OBJECTION (EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/04/2019 | **Document Description:** OPPOSITION ( TO PLAINTIFFS' MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/04/2019 | **Document Description:** OPPOSITION (TO DEFENDANT WOLFSDORF ROSENTHAL? S MOTION FOR PROTECTIVE ORDER) | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 06/04/2019 | **Document Description:** RESPONSE ( TO PLAINTIFFS' SEPARATE STATEMENT RE MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/31/2019 | **Document Description:** NOTICE ( OF FILING PROOFS OF SERVICE RE AMENDED NOTICE OF MOTION FOR PROTECTIVE ORDER) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/24/2019 | **Document Description:** MOTION TO COMPEL DISCOVERY (NOT FURTHER DISCOVERY) - 1 MOVING PARTY, 1 MOTION | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/24/2019 | **Document Description:** SEPARATE STATEMENT | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/23/2019 | **Document Description:** MOTION RE: (AMENDED NOTICE OF | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |

| | | |
|---|---|---|
| | MOTION AND MOTION FOR PROTECTIVE ORDER) | |
| 05/22/2019 | **Document Description:** MINUTE ORDER ( (NON-APPEARANCE CASE REVIEW RE APPLICATION AND ORDER FOR APPEA...)) | **Filing Party:** FILED BY CLERK |
| 05/21/2019 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/21/2019 | **Document Description:** MOTION TO COMPEL FURTHER DISCOVERY RESPONSES | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 05/21/2019 | **Document Description:** SEPARATE STATEMENT | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 05/07/2019 | **Document Description:** DECLARATION (DECLARATION OF SUSAN BENSON IN SUPPORT OF DUCES TECUM) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/07/2019 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/07/2019 | **Document Description:** NOTICE OF LIEN | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/07/2019 | **Document Description:** SUBPOENA DUCES TECUM AND PROOF OF SERVICE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 04/02/2019 | **Document Description:** NOTICE OF RULING (ON STIPULATION) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 03/19/2019 | **Document Description:** CERTIFICATE OF MAILING FOR (MINUTE ORDER (IN CHAMBERS COURT ORDER) OF 03/19/2019) | **Filing Party:** FILED BY CLERK |
| 03/19/2019 | **Document Description:** MINUTE ORDER ( (IN CHAMBERS COURT ORDER)) | **Filing Party:** FILED BY CLERK |
| 03/19/2019 | **Document Description:** STIPULATION AND ORDER (STIPULATION AND ORDER RE MOTION FOR PROTECTIVE ORDER AND EXTENSION OF ORDER RE FILING OF AMENDED COMPLAINT) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 02/25/2019 | **Document Description:** NOTICE ( OF ASSOCIATION OF COUNSEL FOR LIMITED PURPOSE) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 02/01/2019 | **Document Description:** SUBSTITUTION OF ATTORNEY | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 01/22/2019 | **Document Description:** CERTIFICATE OF MAILING FOR ([NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE]) | **Filing Party:** FILED BY CLERK |
| 01/22/2019 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND | **Filing Party:** FILED BY CLERK |

| | | |
|---|---|---|
| | ORDER FOR PLAINTIFF TO GIVE NOTICE | |
| 12/19/2018 | **Document Description:** MINUTE ORDER ((INFORMAL STATUS CONFERENCE)) | **Filing Party:** FILED BY CLERK |
| 12/14/2018 | **Document Description:** INFORMAL DISCOVERY CONFERENCE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 12/14/2018 | **Document Description:** PLAINTIFFS' BRIEF FOR INFORMAL DISCOVERY CONFERENCE | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 12/11/2018 | **Document Description:** MINUTE ORDER ((INFORMAL STATUS CONFERENCE)) | **Filing Party:** FILED BY CLERK |
| 12/10/2018 | **Document Description:** STIPULATION TO CONTINUE INFORMAL DISCOVERY CONFERENCE | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 12/07/2018 | **Document Description:** NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CCP SECTION 425.16 | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 11/21/2018 | **Document Description:** ORDER GRANTING DEFENDANT MILLER MAYER LLP'S MOTION FOR ATT4ORENEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16 | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 11/20/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 11/15/2018 | **Document Description:** MINUTE ORDER ((HEARING ON MOTION - OTHER TO REQUIRE AN UNDERTAKING; HEARING ...)) | **Filing Party:** FILED BY CLERK |
| 11/15/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 11/15/2018 | **Document Description:** OTHER - (COURT'S TENTATIVE RULING) | **Filing Party:** FILED BY CLERK |
| 11/07/2018 | **Document Description:** DEFENDANT MILLER MAYER LLP'S REPLY IN SUPPORT OF MOTION FOR UNDERTAKING PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030 | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 11/07/2018 | **Document Description:** PROOF OF PERSONAL SERVICE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 11/07/2018 | **Document Description:** REPLY (TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO REQUIRE AN UNDERTAKING) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 11/07/2018 | **Document Description:** SUPPLEMENTAL DECLARATION OF PATRICK J. GOODIE II | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |

| | | |
|---|---|---|
| | IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO REQUIRE AN UNDERTAKING | |
| 11/01/2018 | **Document Description:** OPPOSITION (PLAINTIFF'S OPPOSITION TO DEFENDANT MILLER MAYER'S MOTION FOR UNDERTAKING) | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 11/01/2018 | **Document Description:** OPPOSITION (PLAINTIFF'S OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S MOTION FOR UNDERTAKING) | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 10/24/2018 | **Document Description:** NOTICE (OF ENTRY OF ORDER) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 10/24/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) (BY MAIL (NOTICE OF ENTRY OF ORDER)) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 10/15/2018 | **Document Description:** MOTION RE: (UNDERTAKING) | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 10/05/2018 | **Document Description:** DECLARATION (OF BERNARD WOLFSDORF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER) | |
| 10/05/2018 | **Document Description:** DECLARATION (OF PATRICK J. GOODE, II, IN SUPPORT OF MOTION FOR PROTECTIVE ORDER) | |
| 10/05/2018 | **Document Description:** MEMORANDUM OF POINTS & AUTHORITIES | |
| 10/05/2018 | **Document Description:** MOTION FOR PROTECTIVE ORDER | |
| 10/05/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | |
| 10/01/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | |
| 10/01/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | |
| 10/01/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 10/01/2018 | **Document Description:** MEMORANDUM OF POINTS | |

| | | |
|---|---|---|
| | AND AUTHORITIES IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | |
| 10/01/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO REQUIRE AN UNDERTAKING | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 10/01/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO REQUIRE AN UNDERTAKING | |
| 10/01/2018 | **Document Description:** PROOF OF SERVICE | |
| 09/28/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 09/28/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16 | |
| 09/27/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 09/27/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF EX PARTE APPLICATION TO ADVANCE HEARING DATE FOR WOLFSDORF ROSENTHAL, LLP'S MOTION FOR UNDERTAKING | |
| 09/27/2018 | **Document Description:** EX PARTE APPLICATION TO ADVANCE HEARING DATE FOR WOLFSDORF ROSENTHAL, LLP'S MOTION FOR UNDERTAKING | |
| 09/27/2018 | **Document Description:** EX-PARTE APPLICATION | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 09/27/2018 | **Document Description:** MINUTE ORDER | |
| 09/27/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-09-27 00:00:00 | **Filing Party:** FILED BY CLERK |
| 09/27/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 09/20/2018 | **Document Description:** AMENDED REPLY TO PLAINTIFFS' AMENDED OPPOSITION TO WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS AND SUPPLEMENTAL BRIEF | |
| 09/20/2018 | **Document Description:** PROOF OF SERVICE | |
| 09/20/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 09/20/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 09/14/2018 | **Document Description:** PLAINTIFFS' RESPONSE TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF RE MOTION FOR ATTORNEY FEES | |
| 09/14/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 09/11/2018 | **Document Description:** NOTICE OF CHANGE OF ADDRESS OR OTHER CONTACT INFORMATION | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 09/11/2018 | **Document Description:** PLAINTIFF'S ATTORNEY'S NOTICE OF CHANGE OF ADDRESS | |
| 09/06/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-09-06 00:00:00 | **Filing Party:** FILED BY CLERK |
| 09/06/2018 | **Document Description:** OTHER - (COURT'S RULING) | **Filing Party:** FILED BY CLERK |
| 09/06/2018 | **Document Description:** OTHER - (MINUTE ORDER) | **Filing Party:** FILED BY CLERK |
| 09/05/2018 | **Document Description:** BRIEF-SUPPLEMENTAL | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 09/05/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 09/05/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE IN SUPPORT OF WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF RE: MOTION FOR ATTORNEY'S FEES AND COSTS | |
| 09/05/2018 | **Document Description:** PROOF OF SERVICE | |
| 09/05/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 09/05/2018 | **Document Description:** WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS | |
| 09/04/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 09/04/2018 | **Document Description:** NOTICE OF RULLING | |
| 08/30/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/30/2018 | **Document Description:** NOTICE OF ERRATA RE REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16 | |
| 08/29/2018 | **Document Description:** OBJECTION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| 08/29/2018 | **Document Description:** OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA IN CONNECTION WITH OPPOSITION TO DEFENDANT MILLER MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16 | |
| 08/29/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 08/29/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/28/2018 | **Document Description:** LAW AND MOTION RULINGS | |
| 08/28/2018 | **Document Description:** MINUTE ORDER | |
| 08/28/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-08-28 00:00:00 | **Filing Party:** FILED BY CLERK |
| 08/28/2018 | **Document Description:** ORDER | **Filing Party:** FILED BY COURT |
| 08/28/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | |
| 08/28/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY COURT |
| 08/23/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 08/23/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT MILLER MAYER'S MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | |
| 08/20/2018 | **Document Description:** NOTICE TO REPORTER TO PREPARE TRANSCRIPT ON APPEAL (UNLIMITED CIVIL) | |
| 08/20/2018 | **Document Description:** NTC TO REPTR/MON TO PREP TRANSCRPT | **Filing Party:** FILED BY CLERK |
| 08/20/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/20/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 08/20/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF | |

| | | |
|---|---|---|
| | ROSENTHAL LLC'S MOTION FOR SANCTIONS | |
| 08/20/2018 | **Document Description:** SUPPLEMENTAL DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLC'S MOTION FOR SANCTIONS | |
| 08/15/2018 | **Document Description:** MINUTE ORDER | |
| 08/15/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-08-15 00:00:00 | **Filing Party:** FILED BY CLERK |
| 08/14/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 08/14/2018 | **Document Description:** PLAINTIFFS OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP S MOTION FOR SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | |
| 08/14/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/14/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 08/14/2018 | **Document Description:** REPLY TO PLAINTIFFS OPPOSITION TO DEFENDANT RACHEL H. LEW'S MOTION TO STRIKE PLAINTIFF'S CLASS ACTION SECOND AMENDED COMPLAINT | |
| 08/14/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL H. LEW'S DEMURRER TO PLAINTIFF'S CLASS ACTION SECOND AMENDED COMPLAINT | |
| 08/14/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/08/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 08/08/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S DEMURRER TO SECOND AMENDED COMPLAINT, ETC | |
| 08/08/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/08/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/08/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 08/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 08/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 08/08/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/07/2018 | **Document Description:** AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 08/07/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/07/2018 | **Document Description:** DECLARATION OF TAMMY HORTON LUND RE: MEET AND CONFER FOR CONTINUED HEARING RE DEFENDANT JOHN P. THROPAY'S DEMURRER AND MOTION TO STRIKE | |
| 08/07/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/07/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/07/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/06/2018 | **Document Description:** COURT'S TENTATIVE MINUTE ORDER | |
| 08/06/2018 | **Document Description:** MINUTE ORDER | |
| 08/06/2018 | **Document Description:** MINUTE ORDER | |
| 08/06/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-08-06 00:00:00 | **Filing Party:** FILED BY CLERK |
| 08/06/2018 | **Document Description:** MISCELLANEOUS-OTHER | **Filing Party:** FILED BY COURT |
| 08/03/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/03/2018 | **Document Description:** DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOIFSDORT ROSENTHAL LLP | |
| 08/03/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION FOR SANCTIONS BY | |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | DEFENDANT WOLFSEJORF ROSENTHAL LLP | |
| 08/03/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 08/03/2018 | **Document Description:** MOTION FOR SANCTIONS | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/03/2018 | **Document Description:** NOTICE OF MOTION AND MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 08/03/2018 | **Document Description:** POINTS AND AUTHORITIES | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/03/2018 | **Document Description:** REQUEST FOR JUDJCIAL NOTICE IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 08/01/2018 | **Document Description:** PROOF OF SERVICE | |
| 08/01/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/31/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 07/30/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO .JOHN P. THROPAY'S DFMURRER & MOTION TO STRIKE | |
| 07/30/2018 | **Document Description:** OBJECTION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/30/2018 | **Document Description:** REPLY TO OPPOSITION TO MOTION TO STRIKE AND DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT; ETC | |
| 07/30/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/24/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 07/24/2018 | **Document Description:** NOTICE OF RULING (JULY 20, 2018) | |
| 07/24/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 07/24/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT JOHN P. THROPAY'S DEMURRER AND MOTION TO STRIKE; AND MEMORANDUM OF POINTS AND AUTHORITIES | |

| | | |
|---|---|---|
| 07/20/2018 | **Document Description:** EX-PARTE APPLICATION | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 07/20/2018 | **Document Description:** MINUTE ORDER | |
| 07/20/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-07-20 00:00:00 | **Filing Party:** FILED BY CLERK |
| 07/20/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |

| | | |
|---|---|---|
| 07/20/2018 | **Document Description:** PLAINTIFFS' EX PARTE APPLICATION PURSUANT TO C.C.P. 473 TO CONTINUE DEMURRER TO ALLOW PLAINTIFFS TO FILE THE ATTACHED OPPOSITION BRIEF;ETC | |
| 07/20/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S DEMURRER AND MOTION TO STRIKE; ETC | |
| 07/18/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/18/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED DEMURRER AND MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 07/18/2018 | **Document Description:** PROOF OF SERVICE | |
| 07/18/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/18/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 07/18/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 07/18/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/17/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING | |
| 07/17/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING AND ORDER | **Filing Party:** FILED BY CLERK |
| 07/17/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING AND ORDER | **Filing Party:** FILED BY CLERK |
| 07/12/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/12/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY REGARDING MEET AND CONFER | |

| | | |
|---|---|---|
| 07/12/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/12/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP'S EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 07/10/2018 | **Document Description:** DEFENDANT MILLER MAYER LLP'S EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 07/10/2018 | **Document Description:** EX-PARTE APPLICATION | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 07/10/2018 | **Document Description:** MINUTE ORDER | |
| 07/10/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-07-10 00:00:00 | **Filing Party:** FILED BY CLERK |
| 07/06/2018 | **Document Description:** PROOF OF SERVICE | |
| 07/06/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/03/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/03/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-07-03 00:00:00 | **Filing Party:** FILED BY CLERK |
| 07/03/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/03/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT, ETC | |
| 07/03/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE, ETC | |
| 07/03/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/03/2018 | **Document Description:** PROOF OF SERVICE BY 1ST CLASS MAIL | |
| 07/03/2018 | **Document Description:** REQUEST FOR JUDI1AL NOTICE | |
| 07/03/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' | |

| | | |
|---|---|---|
| | CLASS ACTION SECOND AMENDEND COMPLAINT; ETC | |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION SECOND AMENDED COMPLAINT; ETC | |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION SECOND AMENDED COMPLAINT; ETC | |
| 07/02/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/02/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 07/02/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 06/29/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/29/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/29/2018 | **Document Description:** JOINT REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER AND MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL, LLP'S MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WOLFSDORF ROSENTHAL'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/29/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO | |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | |
| 06/29/2018 | **Document Description:** POINTS AND AUTHORITIES | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/29/2018 | **Document Description:** PROOF OF SERVICE | |
| 06/29/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/29/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/28/2018 | **Document Description:** APPELLANTS NOTICE DESIGNATING RECORD ON APPEAL (UNLIMITED CIVIL CASE) | |
| 06/28/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 06/28/2018 | **Document Description:** NOTICE OF COURT ORDER | |
| 06/26/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/26/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | |
| 06/26/2018 | **Document Description:** PROOF OF SERVICE | |
| 06/26/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/22/2018 | **Document Description:** MINUTE ORDER | |
| 06/22/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-06-22 00:00:00 | **Filing Party:** FILED BY CLERK |
| 06/19/2018 | **Document Description:** NOTICE OF FILING OF NOTICE OF APPEAL (UNLIMITED JURISDICTION) | |
| 06/19/2018 | **Document Description:** NTC TO ATTORNEY RE NOTICE OF APPEAL | **Filing Party:** FILED BY CLERK |
| 06/18/2018 | **Document Description:** NOTICE OF APPEAL | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 06/18/2018 | **Document Description:** NOTICE OF APPEAL/CROSS-APPEAL | |
| 06/08/2018 | **Document Description:** NOTICE OF CONTINUANCE OF HEARING DATE ON DEFENDANT WOLFSDORF REOSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS | |
| 06/08/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING AND ORDER | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |

| | | |
|---|---|---|
| 06/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS | |
| 06/08/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 06/04/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 06/04/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | |
| 05/25/2018 | **Document Description:** CLASS ACTION SECOND AMENDED COMPLAINT FOR: (1) FRAUD (INCLUDING CONSPIRACY AND/ OR AIDING AND ABETTING FRAUD); ETC | |
| 05/25/2018 | **Document Description:** COMPLAINT (2ND) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 05/25/2018 | **Document Description:** MEMO OF COSTS | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 05/25/2018 | **Document Description:** MEMORANDUM OF COSTS | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 05/25/2018 | **Document Description:** MEMORANDUM OF COSTS (SUMMARY) | |
| 05/25/2018 | **Document Description:** MOTION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 05/25/2018 | **Document Description:** NOTICE OF MOTION AND MOTION OF DEFENDANT MILLER MAYER LLP FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16; ETC | |
| 05/25/2018 | **Document Description:** SECOND AMENDED COMPLAINT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 05/23/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/23/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 05/23/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |

| | | |
|---|---|---|
| 05/23/2018 | **Document Description:** NOTICE OF MOTION | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/23/2018 | **Document Description:** NOTICE OF MOTION AND MOTION FOR ATTORNEYS FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 05/23/2018 | **Document Description:** POINTS AND AUTHORITIES | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/23/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 05/23/2018 | **Document Description:** PROOF OF SERVJCE | |
| 05/15/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-05-15 00:00:00 | **Filing Party:** FILED BY CLERK |
| 05/14/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-05-14 00:00:00 | **Filing Party:** FILED BY CLERK |
| 05/11/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 05/11/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 05/11/2018 | **Document Description:** NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 05/11/2018 | **Document Description:** NOTICE OF TAKING DEMURRER AND MOTION TO STRIKE OFF CALENDAR | |
| 05/03/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 05/03/2018 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 05/03/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP S SPECIAL MOTION TO STRIKE PLAINTIFFS COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 05/03/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT RACHEL H. LEW'S DEMURRER, MOTION TO STRIKE AND REQUEST FOR JUDICIAL NOTICE TO PLAINTIFFS' CLASS ACTION FIRST AMENDED COMPLAINT | |
| 05/02/2018 | **Document Description:** COURT'S RULING | |
| 05/02/2018 | **Document Description:** MINUTE ORDER | |

| | | |
|---|---|---|
| 05/02/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-05-02 00:00:00 | **Filing Party:** FILED BY CLERK |
| 05/02/2018 | **Document Description:** MISCELLANEOUS-OTHER | **Filing Party:** FILED BY COURT |
| 05/02/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | |
| 05/02/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/26/2018 | **Document Description:** OBJECTION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/26/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/26/2018 | **Document Description:** SUPPLEMENTAL EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE | |
| 04/26/2018 | **Document Description:** SUPPLEMENTAL REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 04/24/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/24/2018 | **Document Description:** NOTICE OF ENTRY OF ORDER | |
| 04/19/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND OF ORDER FOR PLAINTIFF TO GIVE NOTICE | |
| 04/19/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 04/19/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S DEMURRER; ETC | |
| 04/19/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S MOTION TO STRIKE; ETC | |
| 04/17/2018 | **Document Description:** COURT'S RULING | |
| 04/17/2018 | **Document Description:** MINUTE ORDER | |
| 04/17/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-04-17 00:00:00 | **Filing Party:** FILED BY CLERK |
| 04/17/2018 | **Document Description:** MISCELLANEOUS-OTHER | **Filing Party:** FILED BY COURT |

| | | |
|---|---|---|
| 04/17/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | |
| 04/17/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 04/10/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO WOLFSDORF ROSENTHAL'S SPECIAL MOTION TO STRIKE | |
| 04/10/2018 | **Document Description:** OBJECTION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/10/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/10/2018 | **Document Description:** PROOF OF SERVICE | |
| 04/10/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/10/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 04/10/2018 | **Document Description:** SUPPLEMENTAL DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/10/2018 | **Document Description:** SUPPLEMENTAL DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 04/09/2018 | **Document Description:** NOTICE OF HEARING ON DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 04/09/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING AND ORDER | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 04/04/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 04/04/2018 | **Document Description:** PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE RE OPPOSITION | |

| | | |
|---|---|---|
| | TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S SPECIAL MOTION TO STRIKE (ANTI-SLAPP) | |
| 04/04/2018 | **Document Description:** PLAINTIFFS OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL S SPECIAL MOTION TO STRIKE (ANTI-SLAPP) | |
| 04/04/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 03/23/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT; AND PROOF OF SERVICE THEREOF | |
| 03/22/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-03-22 00:00:00 | **Filing Party:** FILED BY CLERK |
| 03/21/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 03/21/2018 | **Document Description:** MINUTE ORDER | |
| 03/21/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-03-21 00:00:00 | **Filing Party:** FILED BY CLERK |
| 03/21/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 03/21/2018 | **Document Description:** NOTICE | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 03/21/2018 | **Document Description:** NOTICE OF HEARING RE DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT; DEMURRER TO COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES | |
| 03/21/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES | |
| 03/21/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 03/21/2018 | **Document Description:** PROOF OF SERVICE BY FIRST-CLASS MAIL CIVIL | |
| 03/21/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 03/21/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | |
| 03/15/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE | |
| 03/15/2018 | **Document Description:** OBJECTION DOCUMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| 03/15/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | |
| 03/15/2018 | **Document Description:** REPLY/ RESPONSE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 03/14/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND OF ORDER FOR PLAINTIFF TO GIVE NOTICE | |
| 03/14/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE | **Filing Party:** FILED BY CLERK |
| 03/12/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 03/12/2018 | **Document Description:** DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/12/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE, II, IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/12/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/12/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 03/12/2018 | **Document Description:** NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/12/2018 | **Document Description:** POINTS AND AUTHORITIES | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 03/12/2018 | **Document Description:** PROOF OF SERVICE | |
| 03/12/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 03/12/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 03/12/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/09/2018 | **Document Description:** OPPOSITION DOCUMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 03/09/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO SPECIAL MOTION TO STRIKE (ANTI-SLAPP); MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | |
| 03/09/2018 | **Document Description:** PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE | |
| 03/09/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 03/06/2018 | **Document Description:** NOTICE OF RULING (MARCH 1, 2018) | |
| 03/01/2018 | **Document Description:** CASE MANAGEMENT ORDER | |
| 03/01/2018 | **Document Description:** MINUTE ORDER | |
| 03/01/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-03-01 00:00:00 | **Filing Party:** FILED BY CLERK |
| 03/01/2018 | **Document Description:** ORDER | **Filing Party:** FILED BY COURT |
| 02/22/2018 | **Document Description:** DEFENDANT MILLER MAYER LLP'S NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16; ETC | |
| 02/22/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY MILLER MAYER, LLP (DEFENDANT) |
| 02/22/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/22/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE | |

| | | |
|---|---|---|
| | OF CIVIL PROCEDURE SECTION 425.16 | |
| 02/21/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 02/21/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/21/2018 | **Document Description:** PROOF OF SERVICE | |
| 02/21/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' CLASS ACTION FIRST AMENDEND COMPLAINT; MEMORANDUM OF POINTS OF AUTHORITIES; ETC | |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF | |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS OF AUTHORITIES; DECLARATION OF RACHEL H. LEW, ESQ | |
| 02/20/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/20/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/20/2018 | **Document Description:** PROOF OF SERVICE | |
| 02/20/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/20/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/15/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 02/15/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 02/15/2018 | **Document Description:** CIVIL DEPOSIT | |
| 02/08/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 02/08/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 02/08/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT, MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF | |
| 02/08/2018 | **Document Description:** DEMURRER | **Filing Party:** FILED BY WOLFDORF ROSENTHAL, LLP (DEFENDANT) |
| 02/08/2018 | **Document Description:** JOINT REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER AND MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 02/08/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL, LLP'S MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 02/08/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 02/08/2018 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/08/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 02/08/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT | |
| 02/08/2018 | **Document Description:** POINTS AND AUTHORITIES | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/08/2018 | **Document Description:** PROOF OF SERVICE | |
| 02/08/2018 | **Document Description:** PROOF OF SERVICE (NOT SUMMONS AND COMPLAINT) | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/08/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 02/05/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 02/05/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 01/24/2018 | **Document Description:** PROOF-SERVICE/SUMMONS | |
| 01/22/2018 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 01/22/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | |
| 01/22/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 01/22/2018 | **Document Description:** PROOF-SERVICE/SUMMONS | |
| 01/05/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-01-05 00:00:00 | **Filing Party:** FILED BY CLERK |
| 01/03/2018 | **Document Description:** MINUTE ORDER | |
| 01/03/2018 | **Document Description:** MINUTE ORDER ENTERED: 2018-01-03 00:00:00 | **Filing Party:** FILED BY CLERK |
| 12/26/2017 | **Document Description:** NOTICE OF RULING | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 12/26/2017 | **Document Description:** NOTICE OF RULING - AND - NOTICE OF FILING OF FIRST AMENDED COMPLAINT | |
| 12/19/2017 | **Document Description:** COMPLAINT (1ST) | **Filing Party:** FILED BY JUN LU (PLAINTIFF); ZHAO HUI SHI (PLAINTIFF) |
| 12/19/2017 | **Document Description:** FIRST AMENDED COMPLAINT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 12/19/2017 | **Document Description:** FIRST ANENDED COMPLAINT FOR: (1) FRAUD (INCLUDING CONSPIRACY AND/OR AIDING AND ABETTING FRAUD); ETC | |
| 11/16/2017 | **Document Description:** MINUTE ORDER | |
| 11/16/2017 | **Document Description:** MINUTE ORDER ENTERED: 2017-11-16 00:00:00 | **Filing Party:** FILED BY CLERK |
| 11/08/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 11/08/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 11/06/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 11/06/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |

| | | |
|---|---|---|
| 10/19/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 10/19/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF) |
| 10/05/2017 | **Document Description:** DEMURRER | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 10/05/2017 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 10/05/2017 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' COMPLAINT; ETC | |
| 10/05/2017 | **Document Description:** NOTTON OF MOTION AND MOTION TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES | |
| 10/05/2017 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY JOHN P. THROPAY (DEFENDANT) |
| 10/05/2017 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | |
| 09/29/2017 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PUNITIVE AND EXEMPLARY DAMAGES; PORTIONS OF PLAINTIFFS' COMPLAINT; AND ATTORNEYS' FEES; ETC | |
| 09/29/2017 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' COMPLAINT; ETC | |
| 09/29/2017 | **Document Description:** DEMURRER | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 09/29/2017 | **Document Description:** MOTION TO STRIKE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 09/29/2017 | **Document Description:** NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; ETC | |
| 09/29/2017 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | **Filing Party:** FILED BY RACHEL H. LEW (DEFENDANT) |
| 09/08/2017 | **Document Description:** MINUTE ORDER | |
| 09/08/2017 | **Document Description:** MINUTE ORDER ENTERED: 2017-09-08 00:00:00 | **Filing Party:** FILED BY CLERK |
| 09/05/2017 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 09/05/2017 | **Document Description:** DECLARATION RE: GOOD FAITH ATTEMPT TO MEET AND CONFER PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 430.41(A)(2) | |
| 08/31/2017 | **Document Description:** DECLARATION OF DEMURRING | |

| | | |
|---|---|---|
| | PARTY IN SUPPORT OF AUTOMATIC EXTENSION | |
| 08/30/2017 | **Document Description:** DECLARATION | **Filing Party:** FILED BY DEFENDANT/RESPONDENT |
| 08/15/2017 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 08/15/2017 | **Document Description:** PROOF-SERVICE/SUMMONS | |
| 08/11/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | |
| 08/11/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | **Filing Party:** FILED BY PLAINTIFF/ PETITIONER |
| 08/01/2017 | **Document Description:** NOTICE OF CASE MANAGEMENT CONFERENCE | |
| 08/01/2017 | **Document Description:** NOTICE OF CASE MANAGEMENT CONFERENCE | **Filing Party:** FILED BY CLERK |
| 08/01/2017 | **Document Description:** ORDER TO SHOW CAUSE HEARING | |
| 08/01/2017 | **Document Description:** OSC-RE OTHER (MISCELLANEOUS) | **Filing Party:** FILED BY CLERK |
| 08/01/2017 | **Document Description:** PROOF OF SERVICE SUMMONS | |
| 08/01/2017 | **Document Description:** PROOF-SERVICE/SUMMONS | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF) |
| 05/25/2017 | **Document Description:** COMPLAINT | **Filing Party:** FILED BY ZHAO HUI SHI (PLAINTIFF); JUN LU (PLAINTIFF) |
| 05/25/2017 | **Document Description:** CONPLAINT FOR: (1) FRAUD ;ETC | |
| 05/25/2017 | **Document Description:** SUMMONS | |

**DOCKET PROCEEDINGS (425)**

| Date: | Entry #: | Description: | Date Docketed: | Party: | |
|---|---|---|---|---|---|
| 03/03/2021 | | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE IDC OFF CALENDAR OF 03/03/2021 | | | View Add to request |
| 03/03/2021 | | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE IDC OFF CALENDAR | | | View Add to request |
| 02/26/2021 | | **Document Description:** ANSWER - ANSWER DEFENDANT MILLER MAYER LLPS ANSWER TO PLAINTIFFS UNVERIFIED FOURTH AMENDED COMPLAINT | | | View Add to request |
| 02/23/2021 | | **Document Description:** PROOF OF PERSONAL SERVICE | | | View Add to request |

| | | |
|---|---|---|
| 02/18/2021 | **Document Description:** NOTICE OF RULING - NOTICE OF RULING FEBRUARY 4, 2021 | View Add to request |
| 02/16/2021 | **Document Description:** APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | View Add to request |
| 02/16/2021 | **Document Description:** DECLARATION - DECLARATION OF SUSAN M. BENSON IN SUPPORT OF SUBPOENA TO PRODUCE DOCUMENTS AT EXAMINATION OF JUDGMENT DEBTOR ZHAO HUI SHI | View Add to request |
| 02/16/2021 | **Document Description:** SUBPOENA DUCES TECUM AND PROOF OF SERVICE | View Add to request |
| 02/04/2021 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE IDC OF 02/04/2021 | View Add to request |
| 02/04/2021 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER RE: INFORMAL DISCOVERY CONFERENCE IDC | View Add to request |
| 01/13/2021 | **Document Description:** SUBSTITUTION OF ATTORNEY | View Add to request |
| 01/12/2021 | **Document Description:** NOTICE - NOTICE OF ENTRY OF ORDER SUSTAINING DEFENDANT MILLER MAYER LLP DEMURRER TO PLAINTIFFS FOURTH AMENDED COMPLAINT WITHOUT LEAVE TO AMEND | View Add to request |
| 01/11/2021 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON DEMURRER - WITHOUT MOTION TO STRIKE | View Add to request |
| 01/11/2021 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 01/04/2021 | **Document Description:** OBJECTION - OBJECTION EVIDENTIARY OBJECTIONS TO OPPOSITION FILED TO DEFENDANT MILLER MAYER LLP'S DEMURRER | View Add to request |

| | | |
|---|---|---|
| | TO PLAINTIFFS' FOURTH AMENDED COMPLAINT | |
| 01/04/2021 | **Document Description:** REPLY - REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT | View Add to request |
| 01/04/2021 | **Document Description:** REQUEST FOR JUDICIAL NOTICE - REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLPS DEMURRER TO PLAINTIFFS FOURTH AMENDED COMPLAINT | View Add to request |
| 01/04/2021 | **Document Description:** SUPPLEMENTAL DECLARATION - SUPPLEMENTAL DECLARATION OF JENNIFER E. NEWCOMB IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S DEMURRER TO PLAINTIFFS' FOURTH AMENDED COMPLAINT | View Add to request |
| 12/28/2020 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFFS OPPOSITION TO DEFENDANT MILLER MAYERS DEMURRER TO FOURTH AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES | View Add to request |
| 11/17/2020 | **Document Description:** NOTICE OF CHANGE OF ADDRESS OR OTHER CONTACT INFORMATION | View Add to request |
| 10/14/2020 | **Document Description:** WRIT OF EXECUTION - WRIT OF EXECUTION LOS ANGELES | View Add to request |
| 10/13/2020 | **Document Description:** ANSWER | View Add to request |
| 10/13/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | View Add to request |
| 10/13/2020 | **Document Description:** NOTICE - NOTICE RETURN OF ISSUED WRIT | View Add to request |
| 10/01/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF | View Add to request |

| | | |
|---|---|---|
| | MAILING FOR COURT ORDER OF 10/01/2020 | |
| 10/01/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View Add to request |
| 09/29/2020 | **Document Description:** DECLARATION - DECLARATION OF JENNIFER E. NEWCOMB IN SUPPORT OF DEMURRER | View Add to request |
| 09/29/2020 | **Document Description:** DEMURRER - WITHOUT MOTION TO STRIKE | View Add to request |
| 09/29/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 09/28/2020 | **Document Description:** STIPULATION AND ORDER - STIPULATION AND ORDER STIPULATION AND ORDER STRIKING CLASS ACTION CLAIM AGAINST RACHEL H. LEW | View Add to request |
| 08/27/2020 | **Document Description:** AMENDED COMPLAINT - AMENDED COMPLAINT 4TH | View Add to request |
| 08/27/2020 | **Document Description:** WRIT OF EXECUTION - WRIT OF EXECUTION LOS ANGELES | View Add to request |
| 08/26/2020 | **Document Description:** WRIT OF EXECUTION - WRIT OF EXECUTION LOS ANGELES | View Add to request |
| 08/25/2020 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | View Add to request |
| 08/25/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | View Add to request |
| 08/25/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | View Add to request |
| 08/25/2020 | **Document Description:** NOTICE - NOTICE AMENDED NOTICE OF ASSOCIATION OF COUNSEL FOR LIMITED PURPOSE | View Add to request |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |

| | | |
|---|---|---|
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 08/25/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 08/24/2020 | **Document Description:** NOTICE OF REJECTION - POST JUDGMENT | View Add to request |
| 08/20/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION - OTHER MOTION FOR ORDER TO SHOW CAUSE RE C | View Add to request |
| 08/10/2020 | **Document Description:** NOTICE OF REJECTION - POST JUDGMENT | View Add to request |
| 08/06/2020 | **Document Description:** NOTICE OF RULING | View Add to request |
| 08/06/2020 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFFS OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHALS MOTION FOR CONTEMPT; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF STEVEN P. SCANDURA | View Add to request |
| 07/31/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION FOR SUMMARY JUDGMENT | View Add to request |
| 07/28/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON DEMURRER - WITH MOTION TO STRIKE CCP 430.10 | View Add to request |
| 07/28/2020 | **Document Description:** NOTICE - NOTICE OF TAKING DEFENDANT MILLER MAYER, LLPS MOTION TO CONTINUE TRIAL AND ALL PRETRIAL DATES OFF CALENDAR | View Add to request |
| 07/28/2020 | **Document Description:** NOTICE OF RULING | View Add to request |

| | | |
|---|---|---|
| 07/28/2020 | **Document Description:** ORDER - ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 07/27/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 07/27/2020 | View Add to request |
| 07/27/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View Add to request |
| 07/24/2020 | **Document Description:** DECLARATION - DECLARATION OF RACHEL LEW IN OPPOSITION TO MOTION TO CONTINUE TRIAL | View Add to request |
| 07/24/2020 | **Document Description:** OBJECTION - OBJECTION TO PLAINTIFFS' EVIDENCE | View Add to request |
| 07/24/2020 | **Document Description:** OPPOSITION - OPPOSITION TO MOTION TO CONTINUE TRIAL | View Add to request |
| 07/24/2020 | **Document Description:** REPLY - REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ADJUDICATION | View Add to request |
| 07/21/2020 | **Document Description:** OBJECTION - OBJECTION EVIDENTIARY OBJECTIONS TO OPPOSITIONS FILED TO DEMURRER AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS THIRD AMENDED COMPLAINT | View Add to request |
| 07/21/2020 | **Document Description:** REPLY - REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLPS DEMURRER TO PLAINTIFFS THIRD AMENDED COMPLAINT | View Add to request |
| 07/21/2020 | **Document Description:** REPLY - REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLPS MOTION TO STRIKE PORTIONS OF PLAINTIFFS THIRD AMENDED COMPLAINT | View Add to request |
| 07/21/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 07/21/2020 | **Document Description:** SUPPLEMENTAL DECLARATION - SUPPLEMENTAL DECLARATION SUPPLEMENTAL DECLARATION OF JENNIFER E. NEWCOMB IN SUPPORT OF REPLIES IN SUPPORT OF DEFENDANT MILLER MAYER LLPS DEMURRER TO, AND MOTION TO STRIKE PO | View Add to request |
| 07/17/2020 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFFS OPPOSITION TO DEFENDANT RACHEL LEWS MOTION FOR SUMMARY JUDGMENT | View Add to request |
| 07/17/2020 | **Document Description:** SEPARATE STATEMENT | View Add to request |
| 07/16/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 07/16/2020 | View Add to request |

| | | |
|---|---|---|
| 07/16/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View / Add to request |
| 07/13/2020 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFFS OPPOSITION TO DEFENDANT MILLER MAYERS DEMURRER TO THIRD AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES | View / Add to request |
| 07/13/2020 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFFS OPPOSITION TO DEFENDANT MILLER MAYERS MOTION TO STRIKE PORTIONS OF PLAINTIFFS THIRD AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES | View / Add to request |
| 07/13/2020 | **Document Description:** STIPULATION AND ORDER - STIPULATION AND ORDER TO CONTINUE DEMURRER AND MOTION TO STRIKE | View / Add to request |
| 07/10/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER H | View / Add to request |
| 07/10/2020 | **Document Description:** NOTICE OF RULING | View / Add to request |
| 07/09/2020 | **Document Description:** EX PARTE APPLICATION - EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION TO CONTINUE TRIAL AND ALL PRETRIAL DATES, OR IN THE ALTERNATIVE, TO CONTINUE THE TRIAL ON AN | View / Add to request |
| 06/10/2020 | **Document Description:** NOTICE - NOTICE OF HEARING ON MOTION TO CONTINUE TRIAL | View / Add to request |
| 06/09/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 06/09/2020 | View / Add to request |
| 06/09/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View / Add to request |
| 05/29/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 05/29/2020 | View / Add to request |
| 05/29/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View / Add to request |
| 05/27/2020 | **Document Description:** MOTION TO CONTINUE TRIAL DATE | View / Add to request |
| 05/13/2020 | **Document Description:** DECLARATION - DECLARATION OF RACHEL LEW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/ADJUDICTION | View / Add to request |
| 05/13/2020 | **Document Description:** EXHIBIT LIST | View / Add to request |
| 05/13/2020 | **Document Description:** MOTION FOR SUMMARY JUDGMENT | View / Add to request |

| | | |
|---|---|---|
| 05/13/2020 | **Document Description:** PROOF OF SERVICE NOT SUMMONS AND COMPLAINT | View Add to request |
| 05/13/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 05/13/2020 | **Document Description:** SEPARATE STATEMENT | View Add to request |
| 05/13/2020 | **Document Description:** SUBSTITUTION OF ATTORNEY | View Add to request |
| 04/20/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 04/20/2020 | View Add to request |
| 04/20/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View Add to request |
| 04/16/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 04/16/2020 | View Add to request |
| 04/16/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View Add to request |
| 03/25/2020 | **Document Description:** DECLARATION - DECLARATION OF JENNIFER E. NEWCOMB IN COMPLIANCE WITH CODE OF CIVIL PROCEDURE SECTIONS 430.41 AND 435.5 | View Add to request |
| 03/25/2020 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE CCP 430.10 | View Add to request |
| 03/25/2020 | **Document Description:** MOTION TO STRIKE NOT INITIAL PLEADING | View Add to request |
| 03/25/2020 | **Document Description:** PROOF OF SERVICE NOT SUMMONS AND COMPLAINT | View Add to request |
| 03/25/2020 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 03/11/2020 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 03/10/2020 | **Document Description:** MOTION FOR AN OSC RE: CONTEMPT CCP 1209 | View Add to request |
| 03/09/2020 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR COURT ORDER OF 03/09/2020 | View Add to request |
| 03/09/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER COURT ORDER | View Add to request |
| 03/09/2020 | **Document Description:** ORDER - ORDER ON DEFENDANT'S MOTON FOR ATTORNEY'S FEES | View Add to request |
| 03/06/2020 | **Document Description:** APPEAL - NOTICE COURT REPORTER TO PREPARE APPEAL TRANSCRIPT - APPEAL - NOTICE COURT REPORTER TO PREPARE APPEAL TRANSCRIPT ;B303465, NOA 1/3/20 | View Add to request |
| 02/27/2020 | **Document Description:** APPEAL - NOTICE OF DEFAULT ISSUED - APPEAL - NOTICE OF DEFAULT ISSUED "U" | View Add to request |

| | | |
|---|---|---|
| 02/25/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION FOR ATTORNEY FEES | View Add to request |
| 02/25/2020 | **Document Description:** NOTICE OF RULING - NOTICE OF RULING ON WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES | View Add to request |
| 02/24/2020 | **Document Description:** OBJECTION - OBJECTION TO DEFENDANT WOLFSDORF ROSENTHAL'S NEW EVIDENCE SUBMITTED WITH REPLY BRIEF | View Add to request |
| 02/19/2020 | **Document Description:** APPEAL - NTC DESIGNATING RECORD OF APPEAL APP-003/010/103 - RESPONDENT'S NTC DESIGNATING RECORD OF APPEAL "U" | View Add to request |
| 02/18/2020 | **Document Description:** OBJECTION - OBJECTION EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN OPPOSITION TO MOTION FOR ATTORNEY'S FEES ON APPEAL | View Add to request |
| 02/18/2020 | **Document Description:** REPLY - REPLY IN SUPPORT OF MOTION FOR ATTORNEY'S FEES ON APPEAL PURSUANT TO CCP 425.16C | View Add to request |
| 02/18/2020 | **Document Description:** REQUEST - REQUEST SUPPLEMENTAL REQUEST TO TAKE JUDICIAL NOTICE ON MOTON FOR ATTORNEY'S FEES ON APPEAL | View Add to request |
| 02/10/2020 | **Document Description:** APPEAL - NTC DESIGNATING RECORD OF APPEAL APP-003/010/103 | View Add to request |
| 02/10/2020 | **Document Description:** OPPOSITION - OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL'S MOTION FOR ATTORNEY FEES | View Add to request |
| 02/07/2020 | **Document Description:** WRIT OF EXECUTION - WRIT OF EXECUTION LOS ANGELES | View Add to request |
| 01/28/2020 | **Document Description:** NOTICE OF RULING | View Add to request |
| 01/27/2020 | **Document Description:** REQUEST FOR REFUND / ORDER | View Add to request |
| 01/24/2020 | **Document Description:** EX PARTE APPLICATION - EX PARTE APPLICATION DEFENDANT WOLFSDORF ROSENTHAL LLP'S EX PARTE APPLICATION TO ADVANCE THE HEARING DATE OF ITS MOTION FOR ATTORNEY'S FEES ON APPEAL, ETC | View Add to request |
| 01/24/2020 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | View Add to request |
| 01/24/2020 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON EX | View Add to request |

| | | |
|---|---|---|
| | PARTE APPLICATION TO ADVANCE THE HEARING DATE | |
| 01/22/2020 | **Document Description:** NOTICE - NOTICE OF ERRATA TO MOTION FOR ATTORNEY'S FEES ON APPEAL | View Add to request |
| 01/17/2020 | **Document Description:** NOTICE - NOTICE OF TAKING MOTION TO COMPEL DEPOSITION OF PERSON MOST KNOWLEDGEABLE OFF CALENDAR | View Add to request |
| 01/17/2020 | **Document Description:** NOTICE - NOTICE OF TAKING OF MOTION FOR PROTECTIVE ORDER RE EXPERT WITNESS EXCHANGE OFF CALENDAR | View Add to request |
| 01/08/2020 | **Document Description:** NOTICE OF FILING OF NOTICE OF APPEAL UNLIMITED CIVIL - NOTICE OF FILING OF NOTICE OF APPEAL UNLIMITED CIVIL NOA:1/3/20; "U" | View Add to request |
| 01/06/2020 | **Document Description:** MEMORANDUM OF COSTS SUMMARY | View Add to request |
| 01/03/2020 | **Document Description:** APPEAL - NOTICE OF APPEAL/CROSS APPEAL FILED - APPEAL - NOTICE OF APPEAL/ CROSS APPEAL FILED "U" | View Add to request |
| 12/31/2019 | **Document Description:** MEMORANDUM - MEMORANDUM MEMORANDUM OF COSTS ON APPEAL | View Add to request |
| 12/31/2019 | **Document Description:** MOTION FOR ATTORNEY FEES | View Add to request |
| 12/31/2019 | **Document Description:** REQUEST - REQUEST TO TAKE JUDICIAL NOTICE IN CONJUNCTION WITH MOTION FOR ATTORNEY'S FEES ON APPEAL | View Add to request |
| 12/30/2019 | **Document Description:** APPEAL - REMITTITUR - OTHER - APPEAL - REMITTITUR - AFFIRMED B290792 | View Add to request |
| 12/30/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER IN CHAMBERS COURT ORDER | View Add to request |
| 12/30/2019 | **Document Description:** ORDER - DISMISSAL | View Add to request |
| 12/30/2019 | **Document Description:** ORDER - ORDER PROPOSED ORDER OF DISMISSAL/ JUDGMENT AS TO DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 11/27/2019 | **Document Description:** ORDER - ORDER [PROPOSED] ORDER RE: JUDGMENT CREDITOR WOLFSDORF ROSENTHAL, LLP'S MOTION TO COMPEL VERIFIED RESPONSES TO POST-JUDGMENT SPECIAL INTERROGATORIES FROM ZHAO HUI SHI AND JUN LU AND AWARD OF S | View Add to request |
| 11/15/2019 | **Document Description:** ANSWER | View Add to request |
| 11/15/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION TO COMPEL DISCOVERY NOT "FURTHER DISCOVERY" | View Add to request |

| | | |
|---|---|---|
| 11/07/2019 | **Document Description:** NOTICE OF RULING - NOTICE OF RULING RE: DEMURRER AND MOTIONS TO STRIKE OF DEFENDANTS WOLFSDORF ROSENTHAL LLP AND RACHEL. H. LAW | View Add to request |
| 11/06/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON DEMURRER - WITH MOTION TO STRIKE CCP 430.10; HEA | View Add to request |
| 10/30/2019 | **Document Description:** NOTICE - NOTICE OF CONTINUATION OF HEARING DATE FOR DEFENDANT RACHEL H. LEW'S DEMURRER AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION THIRD AMENDED COMPLAINT | View Add to request |
| 10/30/2019 | **Document Description:** REPLY - REPLY IN SUPPORT OF DEMURRER TO PLAINTIFFS' THIRD AMENDED COMPLAINT | View Add to request |
| 10/30/2019 | **Document Description:** REPLY - REPLY IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' THIRD AMENDED COMPLAINT | View Add to request |
| 10/30/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 10/28/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON DEMURRER - WITH MOTION TO STRIKE CCP 430.10 | View Add to request |
| 10/28/2019 | **Document Description:** NOTICE OF RULING | View Add to request |
| 10/24/2019 | **Document Description:** OPPOSITION - OPPOSITION TO DEMURRER OF WOLFSDORF ROSENTHAL | View Add to request |
| 10/24/2019 | **Document Description:** OPPOSITION - OPPOSITION TO MOTION TO STRIKE OF WOLFSDORF ROSENTHAL | View Add to request |
| 10/17/2019 | **Document Description:** PROOF OF SERVICE BY MAIL | View Add to request |

| | | |
|---|---|---|
| 10/17/2019 | **Document Description:** REPLY - REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL H. LEW'S DEMURRER TO PLAINTIFF'S CLASS ACTION THIRD AMENDED COMPLAINT | View Add to request |
| 10/15/2019 | **Document Description:** OPPOSITION - OPPOSITION TO DEMURRER OF DEFENDANT LEW TO THIRD AMENDED COMPLAINT | View Add to request |
| 10/15/2019 | **Document Description:** OPPOSITION - OPPOSITION TO MOTION TO STRIKE PORTIONS OF THIRD AMENDED COMPLAINT | View Add to request |
| 10/02/2019 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | View Add to request |
| 09/16/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER FINAL STATUS CONFERENCE; HEARING ON MOTION TO CONTINUE TRIAL | View Add to request |
| 09/16/2019 | **Document Description:** NOTICE OF RULING | View Add to request |
| 09/11/2019 | **Document Description:** OPPOSITION - OPPOSITION TO PLAINTIFFS' MOTION TO CONTINUE TRIAL | View Add to request |
| 09/05/2019 | **Document Description:** NOTICE OF RULING | View Add to request |
| 09/04/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON EX PARTE APPLICATION FOR ORDER SHORTENING TIME/ADV | View Add to request |
| 09/03/2019 | **Document Description:** EX PARTE APPLICATION - EX PARTE APPLICATION FOR ORDER SHORTENING TIME/ ADVANCING HEARING FOR MOTION TO CONTINUE TRIAL | View Add to request |
| 09/03/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON EX PARTE APPLICATION FOR ORDER SHORTENING TIME/ADV | View Add to request |
| 08/30/2019 | **Document Description:** OPPOSITION - OPPOSITION OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR AN ORDER SHORTENING TIME TO HEAR AN OMNIBUS MOTION TO CONTINUE TRIAL AND REQUEST FOR SANCTIONS AGAINST PLAINTIFFS AND THEIR C | View Add to request |
| 08/30/2019 | **Document Description:** OPPOSITION - OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION FOR ORDER TO SHORTEN TIME TO BRING MOTION TO CONTINUE TRIAL | View Add to request |
| 08/29/2019 | **Document Description:** EX PARTE APPLICATION - EX PARTE APPLICATION TO CONTINUE TRIAL | View Add to request |
| 08/29/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON EX PARTE APPLICATION TO CONTINUE TRIAL | View Add to request |

| | | |
|---|---|---|
| 08/29/2019 | **Document Description:** MOTION TO CONTINUE TRIAL DATE - MOTION TO CONTINUE TRIAL DATE DUE TO PENDING DEMURRERS, APPEAL, AND CLASS CERTIFICATIONS | View Add to request |
| 08/29/2019 | **Document Description:** NOTICE OF RULING | View Add to request |
| 08/28/2019 | **Document Description:** OPPOSITION - OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION TO CONTINUE TRIAL | View Add to request |
| 08/28/2019 | **Document Description:** OPPOSITION - OPPOSITION PARTIAL OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION TO CONTINUE TRIAL | View Add to request |
| 08/20/2019 | **Document Description:** DECLARATION - DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 08/20/2019 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE CCP 430.10 | View Add to request |
| 08/20/2019 | **Document Description:** PROOF OF SERVICE BY MAIL | View Add to request |
| 08/20/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 08/19/2019 | **Document Description:** ANSWER | View Add to request |
| 08/16/2019 | **Document Description:** DEMURRER - WITH MOTION TO STRIKE CCP 430.10 | View Add to request |
| 08/16/2019 | **Document Description:** MOTION RE: - MOTION RE: ORDER REQUIRING PLAINTIFFS FILE AN UNDERTAKING | View Add to request |
| 08/16/2019 | **Document Description:** MOTION TO STRIKE NOT INITIAL PLEADING - MOTION TO STRIKE NOT INITIAL PLEADING PORTIONS OF PLAINTIFFS' CLASS ACTION THIRD AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF | View Add to request |
| 08/16/2019 | **Document Description:** MOTION TO STRIKE NOT INITIAL PLEADING | View Add to request |
| 08/16/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 08/15/2019 | **Document Description:** DECLARATION - DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 08/14/2019 | **Document Description:** MOTION TO COMPEL - MOTION TO COMPEL DEPOSITION OF PERSON MOST KNOWLEDGEABLE REGARDING CLIENT CONTACT INFORMATION AND FEE PAYMENT RCVD; AND TO COMPEL PRODUCTION OF DOCS. RQSTD BY SAID NTC. OF DEPO | View Add to request |
| 08/14/2019 | **Document Description:** SEPARATE STATEMENT | View Add to request |
| 08/09/2019 | **Document Description:** MOTION FOR PROTECTIVE ORDER | View Add to request |

| | | |
|---|---|---|
| 07/15/2019 | **Document Description:** AMENDED COMPLAINT | View Add to request |
| 06/18/2019 | **Document Description:** NOTICE OF RULING | View Add to request |
| 06/17/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION TO COMPEL FURTHER DISCOVERY RESPONSES; HEAR | View Add to request |
| 06/17/2019 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 06/10/2019 | **Document Description:** REPLY - REPLY TO OPPOSITION TO AMENDED MOTION FOR PROTECTIVE ORDER | View Add to request |
| 06/10/2019 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 06/07/2019 | **Document Description:** OBJECTION - OBJECTION EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER | View Add to request |
| 06/07/2019 | **Document Description:** OBJECTION - OBJECTION EVIDENTIARY OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA SUBMITTED IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES | View Add to request |
| 06/04/2019 | **Document Description:** OPPOSITION - OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES | View Add to request |
| 06/04/2019 | **Document Description:** OPPOSITION - OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHALS MOTION FOR PROTECTIVE ORDER | View Add to request |
| 06/04/2019 | **Document Description:** RESPONSE - RESPONSE TO PLAINTIFFS' SEPARATE STATEMENT RE MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES | View Add to request |
| 05/31/2019 | **Document Description:** NOTICE - NOTICE OF FILING PROOFS OF SERVICE RE AMENDED NOTICE OF MOTION FOR PROTECTIVE ORDER | View Add to request |
| 05/24/2019 | **Document Description:** MOTION TO COMPEL DISCOVERY NOT FURTHER DISCOVERY - 1 MOVING PARTY, 1 MOTION | View Add to request |
| 05/24/2019 | **Document Description:** SEPARATE STATEMENT | View Add to request |
| 05/23/2019 | **Document Description:** MOTION RE: - MOTION RE: AMENDED NOTICE OF MOTION AND MOTION FOR PROTECTIVE ORDER | View Add to request |
| 05/22/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER NON-APPEARANCE | View Add to request |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | CASE REVIEW RE APPLICATION AND ORDER FOR APPEA | |
| 05/21/2019 | **Document Description:** ABSTRACT OF JUDGMENT - CIVIL AND SMALL CLAIMS | View Add to request |
| 05/21/2019 | **Document Description:** MOTION TO COMPEL FURTHER DISCOVERY RESPONSES | View Add to request |
| 05/21/2019 | **Document Description:** SEPARATE STATEMENT | View Add to request |
| 05/07/2019 | **Document Description:** DECLARATION - DECLARATION DECLARATION OF SUSAN BENSON IN SUPPORT OF DUCES TECUM | View Add to request |
| 05/07/2019 | **Document Description:** MEMORANDUM OF COSTS AFTER JUDGMENT, ACKNOWLEDGMENT OF CREDIT, AND DECLARATION OF ACCRUED INTEREST | View Add to request |
| 05/07/2019 | **Document Description:** NOTICE OF LIEN | View Add to request |
| 05/07/2019 | **Document Description:** SUBPOENA DUCES TECUM AND PROOF OF SERVICE | View Add to request |
| 04/02/2019 | **Document Description:** NOTICE OF RULING - NOTICE OF RULING ON STIPULATION | View Add to request |
| 03/19/2019 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR MINUTE ORDER IN CHAMBERS COURT ORDER OF 03/19/2019 | View Add to request |
| 03/19/2019 | **Document Description:** MINUTE ORDER - MINUTE ORDER IN CHAMBERS COURT ORDER | View Add to request |
| 03/19/2019 | **Document Description:** STIPULATION AND ORDER - STIPULATION AND ORDER STIPULATION AND ORDER RE MOTION FOR PROTECTIVE ORDER AND EXTENSION OF ORDER RE FILING OF AMENDED COMPLAINT | View Add to request |
| 02/25/2019 | **Document Description:** NOTICE - NOTICE OF ASSOCIATION OF COUNSEL FOR LIMITED PURPOSE | View Add to request |
| 02/01/2019 | **Document Description:** SUBSTITUTION OF ATTORNEY | View Add to request |
| 01/22/2019 | **Document Description:** CERTIFICATE OF MAILING FOR - CERTIFICATE OF MAILING FOR [NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE] | View Add to request |
| 01/22/2019 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE | View Add to request |
| 12/19/2018 | **Document Description:** MINUTE ORDER - MINUTE ORDER INFORMAL STATUS CONFERENCE | View Add to request |
| 12/14/2018 | **Document Description:** BRIEF - PLAINTIFFS' BRIEF FOR INFORMAL DISCOVERY CONFERENCE | View Add to request |

| | | |
|---|---|---|
| 12/14/2018 | **Document Description:** INFORMAL DISCOVERY CONFERENCE | View Add to request |
| 12/11/2018 | **Document Description:** MINUTE ORDER - MINUTE ORDER INFORMAL STATUS CONFERENCE | View Add to request |
| 12/10/2018 | **Document Description:** STIPULATION AND ORDER - STIPULATION TO CONTINUE INFORMAL DISCOVERY CONFERENCE | View Add to request |
| 12/07/2018 | **Document Description:** NOTICE OF ENTRY OF JUDGMENT - NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CCP SECTION 425.16 | View Add to request |
| 11/21/2018 | **Document Description:** ORDER - ORDER GRANTING DEFENDANT MILLER MAYER LLP'S MOTION FOR ATT4ORENEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE § 425.16 | View Add to request |
| 11/20/2018 | **Document Description:** NOTICE OF RULING | View Add to request |
| 11/15/2018 | **Document Description:** MINUTE ORDER - MINUTE ORDER HEARING ON MOTION - OTHER TO REQUIRE AN UNDERTAKING; HEARING | View Add to request |
| 11/15/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 11/15/2018 | **Document Description:** OTHER - - OTHER - COURT'S TENTATIVE RULING | View Add to request |
| 11/07/2018 | **Document Description:** DECLARATION - SUPPLEMENTAL DECLARATION OF PATRICK J. GOODIE II IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO REQUIRE AN UNDERTAKING | View Add to request |
| 11/07/2018 | **Document Description:** PROOF OF PERSONAL SERVICE | View Add to request |
| 11/07/2018 | **Document Description:** REPLY - DEFENDANT MILLER MAYER LLP'S REPLY IN SUPPORT OF MOTION FOR UNDERTAKING PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030 | View Add to request |
| 11/07/2018 | **Document Description:** REPLY - REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO REQUIRE AN UNDERTAKING | View Add to request |
| 11/01/2018 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFF'S OPPOSITION TO DEFENDANT MILLER MAYER'S MOTION FOR UNDERTAKING | View Add to request |
| 11/01/2018 | **Document Description:** OPPOSITION - OPPOSITION PLAINTIFF'S OPPOSITION TO DEFENDANT WOLFSDORF | View Add to request |

| | | |
|---|---|---|
| | ROTHENTHAL LLP'S MOTION FOR UNDERTAKING | |
| 10/24/2018 | **Document Description:** PROOF OF SERVICE NOT SUMMONS AND COMPLAINT - PROOF OF SERVICE NOT SUMMONS AND COMPLAINT BY MAIL NOTICE OF ENTRY OF ORDER | View Add to request |
| 10/15/2018 | **Document Description:** MOTION RE: - MOTION RE: UNDERTAKING | View Add to request |
| 10/05/2018 | **Document Description:** DECLARATION - OF BERNARD WOLFSDORF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER | View Add to request |
| 10/05/2018 | **Document Description:** DECLARATION - OF PATRICK J. GOODE, II, IN SUPPORT OF MOTION FOR PROTECTIVE ORDER | View Add to request |
| 10/05/2018 | **Document Description:** MEMORANDUM OF POINTS & AUTHORITIES | View Add to request |
| 10/05/2018 | **Document Description:** MOTION FOR PROTECTIVE ORDER | View Add to request |
| 10/05/2018 | **Document Description:** PROOF OF SERVICE NOT SUMMONS AND COMPLAINT | View Add to request |
| 10/01/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | View Add to request |
| 10/01/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO REQUIRE AN UNDERTAKING | View Add to request |
| 10/01/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO REQUIRE AN UNDERTAKING | View Add to request |
| 10/01/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 09/28/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE ? 425.16 | View Add to request |

| | | |
|---|---|---|
| 09/27/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF EX PARTE APPLICATION TO ADVANCE HEARING DATE FOR WOLFSDORF ROSENTHAL, LLP'S MOTION FOR UNDERTAKING | View Add to request |
| 09/27/2018 | **Document Description:** EX PARTE APPLICATION TO ADVANCE HEARING DATE FOR WOLFSDORF ROSENTHAL, LLP'S MOTION FOR UNDERTAKING | View Add to request |
| 09/27/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 09/27/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 09/20/2018 | **Document Description:** AMENDED REPLY TO PLAINTIFFS' AMENDED OPPOSITION TO WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS AND SUPPLEMENTAL BRIEF | View Add to request |
| 09/20/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 09/14/2018 | **Document Description:** PLAINTIFFS' RESPONSE TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF RE MOTION FOR ATTORNEY FEES | View Add to request |
| 09/11/2018 | **Document Description:** PLAINTIFF'S ATTORNEY'S NOTICE OF CHANGE OF ADDRESS | View Add to request |
| 09/06/2018 | **Document Description:** OTHER - - OTHER - COURT'S RULING | View Add to request |
| 09/06/2018 | **Document Description:** OTHER - - OTHER - MINUTE ORDER | View Add to request |
| 09/05/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE IN SUPPORT OF WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF RE: MOTION FOR ATTORNEY'S FEES AND COSTS | View Add to request |
| 09/05/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 09/05/2018 | **Document Description:** WOLFSDORF ROSENTHAL LLP'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS | View Add to request |
| 09/04/2018 | **Document Description:** NOTICE OF RULLING | View Add to request |
| 08/30/2018 | **Document Description:** NOTICE OF ERRATA RE REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE ? 425.16 | View Add to request |
| 08/29/2018 | **Document Description:** OBJECTIONS TO DECLARATION OF STEVEN P. SCANDURA IN CONNECTION WITH OPPOSITION TO DEFENDANT MILLER | View Add to request |

| | | |
|---|---|---|
| | MAYER LLP'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE 425.16 | |
| 08/29/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 08/28/2018 | **Document Description:** LAW AND MOTION RULINGS | View Add to request |
| 08/28/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 08/28/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 08/23/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT MILLER MAYER'S MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | View Add to request |
| 08/20/2018 | **Document Description:** NOTICE TO REPORTER TO PREPARE TRANSCRIPT ON APPEAL UNLIMITED CIVIL | View Add to request |
| 08/20/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 08/20/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLC'S MOTION FOR SANCTIONS | View Add to request |
| 08/20/2018 | **Document Description:** SUPPLEMENTAL DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLC'S MOTION FOR SANCTIONS | View Add to request |
| 08/15/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 08/14/2018 | **Document Description:** PLAINTIFFS? OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP? S MOTION FOR SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | View Add to request |
| 08/14/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 08/14/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL H. LEW'S DEMURRER TO PLAINTIFF'S CLASS ACTION SECOND AMENDED COMPLAINT | View Add to request |
| 08/14/2018 | **Document Description:** REPLY TO PLAINTIFFS? OPPOSITION TO DEFENDANT RACHEL H. LEW'S MOTION TO STRIKE PLAINTIFF'S CLASS ACTION SECOND AMENDED COMPLAINT | View Add to request |

| | | |
|---|---|---|
| 08/08/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S DEMURRER TO SECOND AMENDED COMPLAINT, ETC | View Add to request |
| 08/08/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 08/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 08/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 08/07/2018 | **Document Description:** AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 08/07/2018 | **Document Description:** DECLARATION OF TAMMY HORTON LUND RE: MEET AND CONFER FOR CONTINUED HEARING RE DEFENDANT JOHN P. THROPAY'S DEMURRER AND MOTION TO STRIKE | View Add to request |
| 08/07/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 08/06/2018 | **Document Description:** COURT'S TENTATIVE MINUTE ORDER | View Add to request |
| 08/06/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 08/06/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 08/03/2018 | **Document Description:** DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOIFSDORT ROSENTHAL LLP | View Add to request |
| 08/03/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSEJORF ROSENTHAL LLP | View Add to request |
| 08/03/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 08/03/2018 | **Document Description:** NOTICE OF MOTION AND MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 08/03/2018 | **Document Description:** REQUEST FOR JUDJCIAL NOTICE IN SUPPORT OF MOTION FOR SANCTIONS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |

| | | |
|---|---|---|
| 08/01/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 07/30/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO .JOHN P. THROPAY'S DFMURRER & MOTION TO STRIKE | View Add to request |
| 07/30/2018 | **Document Description:** REPLY TO OPPOSITION TO MOTION TO STRIKE AND DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT; ETC | View Add to request |
| 07/24/2018 | **Document Description:** NOTICE OF RULING JULY 20, 2018 | View Add to request |
| 07/24/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT JOHN P. THROPAY'S DEMURRER AND MOTION TO STRIKE; AND MEMORANDUM OF POINTS AND AUTHORITIES | View Add to request |
| 07/20/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 07/20/2018 | **Document Description:** PLAINTIFFS' EX PARTE APPLICATION PURSUANT TO C.C.P. ?473 TO CONTINUE DEMURRER TO ALLOW PLAINTIFFS TO FILE THE ATTACHED OPPOSITION BRIEF;ETC | View Add to request |
| 07/20/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S DEMURRER AND MOTION TO STRIKE; ETC | View Add to request |
| 07/18/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED DEMURRER AND MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 07/18/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 07/18/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 07/18/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL LLP'S UNOPPOSED MOTION TO STRIKE TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 07/17/2018 | **Document Description:** NOTICE RE: CONTINUANCE OF HEARING | View Add to request |
| 07/12/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY REGARDING MEET AND CONFER | View Add to request |
| 07/12/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP'S EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION FOR | View Add to request |

| | | |
|---|---|---|
| | ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425 | |
| 07/10/2018 | **Document Description:** DEFENDANT MILLER MAYER LLP'S EX PARTE APPLICATION TO SPECIALLY SET AN EARLIER HEARING DATE ON DEFENDANT'S MOTION FOR ATTORNEYS' FEES PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 07/10/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 07/06/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 07/03/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT, ETC | View Add to request |
| 07/03/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE, ETC | View Add to request |
| 07/03/2018 | **Document Description:** PROOF OF SERVICE BY 1ST CLASS MAIL | View Add to request |
| 07/03/2018 | **Document Description:** REQUEST FOR JUDI1AL NOTICE | View Add to request |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' CLASS ACTION SECOND AMENDEND COMPLAINT; ETC | View Add to request |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION SECOND AMENDED COMPLAINT; ETC | View Add to request |
| 07/02/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION SECOND AMENDED COMPLAINT; ETC | View Add to request |
| 06/29/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 06/29/2018 | **Document Description:** JOINT REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER AND MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 06/29/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL, LLP'S MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |

| | | |
|---|---|---|
| 06/29/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WOLFSDORF ROSENTHAL'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 06/29/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 06/29/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SECOND AMENDED COMPLAINT | View Add to request |
| 06/29/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 06/28/2018 | **Document Description:** APPELLANTS NOTICE DESIGNATING RECORD ON APPEAL UNLIMITED CIVIL CASE | View Add to request |
| 06/28/2018 | **Document Description:** NOTICE OF COURT ORDER | View Add to request |
| 06/26/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 06/26/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 06/22/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 06/19/2018 | **Document Description:** NOTICE OF FILING OF NOTICE OF APPEAL UNLIMITED JURISDICTION | View Add to request |
| 06/18/2018 | **Document Description:** NOTICE OF APPEAL/CROSS-APPEAL | View Add to request |
| 06/08/2018 | **Document Description:** NOTICE OF CONTINUANCE OF HEARING DATE ON DEFENDANT WOLFSDORF REOSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS | View Add to request |
| 06/08/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO WOLFSDORF ROSENTHAL LLP'S MOTION FOR ATTORNEY'S FEES AND COSTS | View Add to request |
| 06/04/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | View Add to request |
| 05/25/2018 | **Document Description:** CLASS ACTION SECOND AMENDED COMPLAINT FOR: 1 FRAUD INCLUDING CONSPIRACY AND/ OR AIDING AND ABETTING FRAUD; ETC | View Add to request |
| 05/25/2018 | **Document Description:** MEMORANDUM OF COSTS SUMMARY | View Add to request |
| 05/25/2018 | **Document Description:** NOTICE OF MOTION AND MOTION OF DEFENDANT MILLER MAYER LLP FOR ATTORNEYS' | View Add to request |

| | | |
|---|---|---|
| | FEES PURSUANT TO CODE OF CIVIL PROCEDURE ? 425.16; ETC | |
| 05/23/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 05/23/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |

| | | |
|---|---|---|
| 05/23/2018 | **Document Description:** NOTICE OF MOTION AND MOTION FOR ATTORNEYS FEES AND COSTS BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 05/23/2018 | **Document Description:** PROOF OF SERVJCE | View Add to request |
| 05/11/2018 | **Document Description:** NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 05/11/2018 | **Document Description:** NOTICE OF TAKING DEMURRER AND MOTION TO STRIKE OFF CALENDAR | View Add to request |
| 05/03/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT MILLER MAYER LLP?S SPECIAL MOTION TO STRIKE PLAINTIFFS? COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 05/03/2018 | **Document Description:** NOTICE OF RULING ON DEFENDANT RACHEL H. LEW'S DEMURRER, MOTION TO STRIKE AND REQUEST FOR JUDICIAL NOTICE TO PLAINTIFFS' CLASS ACTION FIRST AMENDED COMPLAINT | View Add to request |
| 05/02/2018 | **Document Description:** COURT'S RULING | View Add to request |
| 05/02/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 05/02/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 04/26/2018 | **Document Description:** SUPPLEMENTAL EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE | View Add to request |
| 04/26/2018 | **Document Description:** SUPPLEMENTAL REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 04/24/2018 | **Document Description:** NOTICE OF ENTRY OF ORDER | View Add to request |
| 04/19/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND OF ORDER FOR PLAINTIFF TO GIVE NOTICE | View Add to request |
| 04/19/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S DEMURRER; ETC | View Add to request |
| 04/19/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO DEFENDANT RACHEL LEW'S MOTION TO STRIKE; ETC | View Add to request |
| 04/17/2018 | **Document Description:** COURT'S RULING | View Add to request |

| | | |
|---|---|---|
| 04/17/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 04/17/2018 | **Document Description:** ORDER APPOINTING COURT APPROVED REPORTER AS OFFICIAL REPORTER PRO TEMPORE | View Add to request |
| 04/10/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO WOLFSDORF ROSENTHAL'S SPECIAL MOTION TO STRIKE | View Add to request |
| 04/10/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 04/10/2018 | **Document Description:** REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 04/10/2018 | **Document Description:** SUPPLEMENTAL DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT WOLFSDORF ROSENTHAL LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 04/09/2018 | **Document Description:** NOTICE OF HEARING ON DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 04/04/2018 | **Document Description:** PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE RE OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL LLP'S SPECIAL MOTION TO STRIKE ANTI-SLAPP | View Add to request |
| 04/04/2018 | **Document Description:** PLAINTIFFS? OPPOSITION TO DEFENDANT WOLFSDORF ROTHENTHAL?S SPECIAL MOTION TO STRIKE ANTI-SLAPP | View Add to request |
| 03/23/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT; AND PROOF OF SERVICE THEREOF | View Add to request |
| 03/21/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 03/21/2018 | **Document Description:** NOTICE OF HEARING RE DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT; DEMURRER TO COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES | View Add to request |
| 03/21/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES | View Add to request |

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| 03/21/2018 | **Document Description:** PROOF OF SERVICE BY FIRST-CLASS MAIL?CIVIL | View Add to request |
| 03/21/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 03/15/2018 | **Document Description:** EVIDENTIARY OBJECTIONS TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE SUBMITTED IN OPPOSITION TO MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE | View Add to request |
| 03/15/2018 | **Document Description:** REPLY IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S MOTION TO STRIKE PLAINTIFFS' COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 03/14/2018 | **Document Description:** NOTICE OF CASE REASSIGNMENT AND OF ORDER FOR PLAINTIFF TO GIVE NOTICE | View Add to request |
| 03/12/2018 | **Document Description:** DECLARATION OF BERNARD WOLFSDORF IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 03/12/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE, II, IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 03/12/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 03/12/2018 | **Document Description:** NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY DEFENDANT WOLFSDORF ROSENTHAL LLP | View Add to request |
| 03/12/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 03/12/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SPECIAL MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 BY | View Add to request |

| | | |
|---|---|---|
| | DEFENDANT WOLFSDORF ROSENTHAL LLP | |
| 03/09/2018 | **Document Description:** PLAINTIFFS' OPPOSITION TO SPECIAL MOTION TO STRIKE ANTI-SLAPP; MEMORANDUM OF POINTS AND AUTHORITIES; AND THE DECLARATION OF STEVEN P. SCANDURA | View Add to request |
| 03/09/2018 | **Document Description:** PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 03/06/2018 | **Document Description:** NOTICE OF RULING MARCH 1, 2018 | View Add to request |
| 03/01/2018 | **Document Description:** CASE MANAGEMENT ORDER | View Add to request |
| 03/01/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 02/22/2018 | **Document Description:** DEFENDANT MILLER MAYER LLP'S NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16; ETC | View Add to request |
| 02/22/2018 | **Document Description:** LEGACY DOCUMENT - LEGACY DOCUMENT TYPE: MOTION TO STRIKE | View Add to request |
| 02/22/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 02/22/2018 | **Document Description:** REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT MILLER MAYER LLP'S SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16 | View Add to request |
| 02/21/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/21/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/21/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' CLASS ACTION FIRST AMENDEND COMPLAINT; MEMORANDUM OF POINTS OF AUTHORITIES; ETC | View Add to request |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFFS' CLASS ACTION FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF | View Add to request |
| 02/20/2018 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' COMPLAINT; | View Add to request |

| | | |
|---|---|---|
| | MEMORANDUM OF POINTS OF AUTHORITIES; DECLARATION OF RACHEL H. LEW, ESQ | |
| 02/20/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/16/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/15/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/15/2018 | **Document Description:** CIVIL DEPOSIT | View Add to request |
| 02/08/2018 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 02/08/2018 | **Document Description:** DECLARATION OF PATRICK J. GOODE II IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT, MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT, AND REQUEST FOR JUDICIAL | View Add to request |
| 02/08/2018 | **Document Description:** JOINT REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEMURRER AND MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 02/08/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT WOLFSDORF ROSENTHAL, LLP'S MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 02/08/2018 | **Document Description:** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 02/08/2018 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 02/08/2018 | **Document Description:** NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF PLAINTIFFS' FIRST AMENDED COMPLAINT | View Add to request |
| 02/08/2018 | **Document Description:** PROOF OF SERVICE | View Add to request |
| 02/05/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |
| 01/24/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |

| | | |
|---|---|---|
| 01/22/2018 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 01/22/2018 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |
| 01/03/2018 | **Document Description:** MINUTE ORDER | View Add to request |
| 12/26/2017 | **Document Description:** NOTICE OF RULING - AND - NOTICE OF FILING OF FIRST AMENDED COMPLAINT | View Add to request |
| 12/19/2017 | **Document Description:** FIRST ANENDED COMPLAINT FOR: 1 FRAUD INCLUDING CONSPIRACY AND/OR AIDING AND ABETTING FRAUD; ETC | View Add to request |
| 11/16/2017 | **Document Description:** MINUTE ORDER | View Add to request |
| 11/06/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 10/19/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 10/05/2017 | **Document Description:** NOTICE OF HEARING ON DEMURRER TO PLAINTIFFS' COMPLAINT; ETC | View Add to request |
| 10/05/2017 | **Document Description:** NOTTON OF MOTION AND MOTION TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES | View Add to request |
| 10/05/2017 | **Document Description:** REQUEST FOR JUDICIAL NOTICE | View Add to request |
| 09/29/2017 | **Document Description:** DEFENDANT RACHEL H. LEW'S NOTICE OF MOTION AND MOTION TO STRIKE PUNITIVE AND EXEMPLARY DAMAGES; PORTIONS OF PLAINTIFFS' COMPLAINT; AND ATTORNEYS' FEES; ETC | View Add to request |
| 09/29/2017 | **Document Description:** DEFENDANT RACHEL H. LEW'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR DEMURRER AND MOTION TO STRIKE PLAINTIFFS' COMPLAINT; ETC | View Add to request |
| 09/29/2017 | **Document Description:** NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; ETC | View Add to request |
| 09/08/2017 | **Document Description:** MINUTE ORDER | View Add to request |
| 09/05/2017 | **Document Description:** DECLARATION RE: GOOD FAITH ATTEMPT TO MEET AND CONFER PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 430.41A2 | View Add to request |
| 08/31/2017 | **Document Description:** DECLARATION OF DEMURRING PARTY IN SUPPORT OF AUTOMATIC EXTENSION | View Add to request |
| 08/15/2017 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |
| 08/11/2017 | **Document Description:** CASE MANAGEMENT STATEMENT | View Add to request |
| 08/01/2017 | **Document Description:** NOTICE OF CASE MANAGEMENT CONFERENCE | View Add to request |

| | | |
|---|---|---|
| 08/01/2017 | **Document Description:** ORDER TO SHOW CAUSE HEARING | View Add to request |
| 08/01/2017 | **Document Description:** PROOF OF SERVICE SUMMONS | View Add to request |
| 05/25/2017 | **Document Description:** CONPLAINT FOR: 1 FRAUD ;ETC | View Add to request |
| 05/25/2017 | **Document Description:** SUMMONS | View Add to request |

TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG, et al.,<br><br>Defendants. | No. SACV 16-00974-CJC (AGRx) |

REMOTE DEPOSITION OF JOHN THROPAY, M.D.
ZOOM VIDEOCONFERENCE
Friday, March 5, 2021
Volume I

Reported by:
VALERIE D. GRANILLO
CSR No. 11469
Job No. 4413389

PAGES 1 - 144





EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

______________________________
)
SECURITIES AND EXCHANGE )
COMMISSION, )
)
Plaintiff, )
)
vs. ) No. SACV 16-00974-CJC
) (AGRx)
CHARLES C. LIU; XIN WANG )
a/k/a LISA WANG, et al., )
)
Defendants. )
______________________________)

Remote Deposition of JOHN THROPAY, M.D., Volume I, taken on behalf of Defendants, via Zoom Videoconference, California, beginning at 9:00 a.m. and ending at 1:55 p.m., on Friday, March 5, 2021, before VALERIE D. GRANILLO, Certified Shorthand Reporter No. 11469.



APPEARANCES:

For Plaintiff:
UNITED STATES SECURITIES & EXCHANGE COMMISSION
BY: GARY Y. LEUNG
Attorney at Law
444 South Flower Street, Suite 900
Los Angeles, California 90071
(323) 965-3998
leungg@sec.gov

For Defendants:
SILLS CUMMIS & GROSS
BY: HERVE GOURAIGE
Attorney at Law
1 Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-5989
hgouraige@sillscummis.com



APPEARANCES (continued):

For JOHN THROPAY, M.D.:
MCGUIRE WOODS
BY: MOLLY M. WHITE
Attorney at Law
1800 East Century Park East, 8th Floor
Los Angeles, California 90067-1501
(301) 956-3423
mwhite@mcguirewoods.com



INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| JOHN THROPAY, M.D. Volume I | | |
| | BY MR. GOURAIGE | 7, 132 |
| | BY MR. LEUNG | 110, 140 |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 78 | Declaration of John Thropay | 40 |
| Exhibit 79 | Letter 3-27-16 from the Delsk Group to Charles Liu and Dr. Thropay | 71 |
| Exhibit 80 | Membership Certificate | 96 |
| Exhibit 81 | Proposed Lease/Purchase Terms for Beverly Hospital | 97 |
| Exhibit 82 | Time and Responsibility Chart | 98 |
| Exhibit 83 | Mevion Document with Handwriting | 98 |
| Exhibit 84 | Business Plan of Pacific Proton Therapy Regional Center, LLC | 99 |
| Exhibit 85 | Chase Bank Statements | 100 |
| Exhibit 86 | Document 38-2 | 101 |
| Exhibit 87 | Pledge Agreement | 134 |
| Exhibit 88 | MOU Pacific Proton Therapy Project | 137 |






EXHIBIT 2

INDEX (continued):

PREVIOUSLY MARKED EXHIBITS


| NUMBER | DESCRIPTION |
|---|---|
| Exhibit 101 | Private Offering Memorandum Pacific Proton EB-5 Fund, LLC |
| Exhibit 103 | E-mail from Mr. Liu to Stan Lam dated 10-15-15 |
| Exhibit 104 | E-mail from Mr. Liu to Harlan Levine dated 10-19-15 |
| Exhibit 105 | Memorandum of Understanding between Beverly Hospital Alice Cheng, COHMF Harlan Levine and United MPH Ventures Charles Liu |
| Exhibit 106 | E-mails between Alice Cheng, Harlan Levine, Charles Liu and Michael Hunn |
| Exhibit 107 | E-mail dated 10-21-15 from Michael Hunn to Harlan Levine |
| Exhibit 109 | E-mail string starting on 11-13-15 to 11-16-15 between Michael Hunn and City of Hope |
| Exhibit 110 | E-mail string dated 1-7-16 from Harlan Levine at City of Hope to Charles Liu |




Friday, March 5, 2021
9:00 a.m.

JOHN THROPAY, M.D.,

having been administered an oath, was examined and testified as follows:

MR. GOURAIGE: Dr. Thropay, my name is Herve Gouraige. I'm an attorney for Charles Liu and Lisa Wang in this SEC enforcement act.

MR. LEUNG: Gary Leung for plaintiff.

MS. WHITE: Molly White for the witness, Dr. John Thropay.

EXAMINATION

BY MR. GOURAIGE:

Q Dr. Thropay, have you had experience in having your deposition taken before?
A Yes.
Q So I'm sure you're familiar with some ground rules. But because of our current pandemic -- and I appreciate that both you and your attorney are wearing face masks -- I'm going to ask you to speak up a bit so both I and the court reporter can hear you when you answer the question. Okay?
A Uh-huh.



Q Dr. Thropay, state for the record your residence address in California.
A 719 Nicholas Lane, Arcadia, 91006.
Q Are you married, Dr. Thropay?
A Yes.
Q Do you have any children?
A Yes.
Q How many children?
A Three.
Q Could you tell me where you attended college?
A UCLA.
Q When did you graduate?
A '71 with bachelor's and '75 in medical school.
Q Did you do your residency in California?
A Yes.
Q Where did you do your residency?
A USC.
Q And what is your specific area of medicine?
A Radiation oncology.
Q Could you briefly describe for me what is radiation oncology and what do you do as the radiation oncologist?
A We use X-rays or other forms of radiation to treat cancer.
Q You say X-rays or other forms. Is proton therapy



considered another form of radiation?
A Yes.
Q And are you experienced in the use of proton therapy to treat cancer?
A No.
Q Where do you practice currently?
A In Orange County and Los Angeles.
Q At which institutions, hospitals do you practice?
A I am on staff at 25 hospitals.
Q All in California?
A Yes.
Q Do you practice outside of the United States?
A Yes.
Q Where?
A Dominican Republic.
Q Any other place?
A No longer. No other place.
Q Where did you used to practice outside of the U.S.?
A Guatemala, Los Mochis, Mexico and Dominican Republic.
Q Did you ever do any work in Peru?
A No, but I visited.
Q Were you involved in a company called Oncoserv that did work in Peru?

A I was involved and part of Oncoserv, but we did no work in Peru.
Q What did Oncoserv do in Peru?
A We spoke about the possibility of doing work in Peru.
Q What was your role in that discussion?
A Medical director of a new radiation facility.
Q The facility was not built in Peru?
A No.
Q In addition to your medical practice, do you own medical businesses?
A No.
Q Are you familiar with a company called Beverly Oncology?
A Yes.
Q Is that your company?
A Yes.
Q Do you own it 100 percent?
A Yes.
Q Is Beverly Oncology an umbrella company, so to speak, for a group of other companies?
A No.
Q How many Beverly Oncologies are there?
A There is one that I'm aware of and another one that I was not aware of but just became aware of.

Page 10

Q What is the other one that you were not aware of and just became aware of?
A They took my same name, but they put an LLC.
Q And do you know who the "they" are you're referring to?
A Yes.
Q Who are they?
A Bill Novodor.
Q That's your brother-in-law, correct?
A Correct.
Q Has he worked for you in the past?
A Yes.
Q Did he work at Beverly Oncology?
A Yes.
Q Did he work along with your sister Rose Lopez Novodor at Beverly Oncology?
A Yes.
Q What did Bill Novodor do at Beverly Oncology?
MS. WHITE: Objection.
THE WITNESS: Well, he was supposed to be some sort of a manager.
BY MR. GOURAIGE:
Q And what was he managing?
A I'm not sure. Ruth was working with him more closely than I.

Page 11

Q When did you find out that he had used Beverly Oncology's name with the LLC in it?
A About a month ago.
Q What did you do about that?
A We're doing an ongoing investigation at this time.
Q Is Mr. Novodor still working for you at Beverly Oncology?
A No.
Q Is your sister still working for you at Beverly Oncology?
A No.
Q And did you fire your sister from Beverly Oncology?
A She left voluntarily.
Q Was that before or after you found out about what Bill Novodor did in using the name of Beverly Oncology?
A It was before.
Q So her leaving had nothing to do with Bill Novodor's conduct about the use of your company name?
A I was unaware of it, no.
Q How many clinics does Beverly Oncology own?
A Three.
Q And do you work at all of those clinics?
A I'm sorry?

Page 12

Q Do you work in all of the clinics?
A Yes.
Q Do you provide only radiation oncology services at those clinics?
A Yes.
Q How much of your time is devoted to medical practice versus business side?
A Versus business what? I didn't hear the last word.
Q Versus the business aspect of running the company, Beverly Oncology?
A At this time it's about 70 percent Beverly Oncology and 30 percent business.
Q Before your sister left Beverly Oncology, was she mainly responsible for the management of Beverly Oncology?
A Yes.
Q Were you then spending more time on your medical practice?
A Yes.
Q Dr. Thropay, when did you first -- before I do that, let me ask you a question. Do you speak any foreign languages other than Spanish?
A A little Chinese recently.
Q Which dialect? Mandarin Chinese?
A Mandarin.

Page 13

Q Now, tell me when did you first meet Charles Liu?
A I'm not sure of the exact year. Maybe '13, 2013 perhaps.
Q Are you sure it's '13?
A No.
Q Could it have been 2010?
A Yes.
Q Where did you meet him?
A At my office, at the corporate office that we used to have.
Q How did you come to meet him?
A It was by introduction by John Slater from Loma Linda University Physics Department.
Q And why did Mr. Slater introduce Charles Liu to you?
A Because I was working with John Slater, the physicist, to set up a proton center.
Q And what happened to that project?
A The financing went out with the investment banking crisis. The company that we were working with to finance it went bankrupt.
Q Did he then introduce Mr. Liu to you as somebody who could help you with the financing?
A He didn't, no. He just said he was a salesman for their company, and he was interested in selling a



machine and putting up a proton center.
Q Now, please correct me if I get it wrong. My understanding is proton therapy is more effective than X-ray or chemo because it focuses the proton on the cancerous cells and avoids damage to nearby cells. Is that correct?
A Not totally.
Q Could you explain it to me then?
A It's not superior to chemotherapy in the sense that it cannot treat the entire body, and it's not always superior to external beam radiation because it depends on the clinical situation. But it does have its place in the overall scheme.
Q When you first met with Charles Liu at your business office, who else was present at the meeting?
A I think Ruth was there.
Q So it's you, Ruth and Charles Liu. Anybody else?
A No.
Q What did you tell Charles Liu?
A At the first meeting?
Q Yes.
A Virtually nothing. We just talked and listened.
Q What did you talk about?
A The proton project.
Q Did you tell him about the project you were



trying to build with Mr. Slater?
A Yes and -- that's true, uh-huh.
Q Did you tell him Mr. Slater couldn't come up with financing?
A I just said that the investment banker went bankrupt, so there's no financing at this time.
Q Did you ask him whether he could come up with financing?
A No.
Q Did you ask him anything?
A I asked him what he was doing, how he expected to finance it. I didn't ask for financing. I just was just there to listen to what he had to say.
Q So what did he say to you?
A He said that he was interested in opening up a proton center. And we said we weren't sure about it. We'd have to think about it.
Q Did he ask you whether you were interested in joining up and opening up the proton center?
A At the first meeting very little was stated.
Q How long was that meeting?
A Oh, about 15 minutes.
Q Did you talk at all about the amount of capital you would need to build a proton center?
A Not at the first meeting.



Q Did there come a time when you talked about that?
A Yes.
Q And when was that?
A Oh, a few months later. He would come back. He came back a second time, and we spoke a little bit more.
Q Where was that meeting a few months later?
A In the same office, corporate office.
Q Can you recall the year of that meeting?
A Probably the same year, a few months later.
Q So you think it might be in 2010?
A Yes.
Q So at some point a few months after the first meeting you're talking about building a proton therapy, and you discussed the amount of capital you might need; is that correct?
A That is correct.
Q Okay. So tell me, then, at this meeting what did you tell him about the capital you will need?
A I just told him what John Slater told us, that it was going to be about 200 to 220 million.
Q And did you ask for his help in raising that kind of money?
A No.
Q And where was the money going to come from? Where was the capital to come from to build the proton







EXHIBIT 2

therapy center?
A I didn't know, and he didn't have any capital.
Q Did he tell you that?
A At the first or second meeting -- not the first. But at the second or third, he said that he was going to look for capital because he wanted to put it up.
Q Did he tell you where he was going to look for capital?
A No.
Q During either of those first two meetings, did he try to sell you any medical equipment?
A Not that I am aware of or recall.
Q So did you have other meetings with him after the second meeting?
A Yes.
Q And at which meeting did you agree to start with him a project to build a proton center?
A He called and said that he had found a financing vehicle, and he wanted to speak to me and Ruth. So this was some months later. I figured he had forgotten about it or had lost interest. And so I told Ruth that he had called me. So we sat down and met with him, and that's when he mentioned EB-5.
Q When he mentioned EB-5, did you know what that was?

Page 18

A No.
Q You had never heard of or been involved in financing through EB-5?
A Correct.
Q What did he say to you about EB-5?
A That he could raise all the money necessary.
Q The $200 million?
A Yes.
Q Through EB-5?
A Yes.
Q Did he mention to you private equity capital?
A Yes.
Q And did he say to you that he would also use private equity capital to help build the center?
A I don't think he was that specific. I think it was more to do the permits. He told me I would not have to raise capital for the permits, that he would pay for that.
Q At the meetings that you had with Charles Liu, was Ruth Novodor always present?
A I believe so.
Q So it was always just the three of you?
A Correct. At that time, yes, the three of us.
Q When he mentioned the EB-5 program to you, what was your reaction to that?

Page 19

MS. WHITE: Objection; vague.
THE WITNESS: I had never heard of it. I didn't know what he was talking about. So I just said, "Oh, you found financing."
BY MR. GOURAIGE:
Q Did you agree to use that method of financing?
A Well, he was going to use it, not me. I just said if you can raise the money, then that will be fine.
Q Was there -- did there come a time when you had an understanding with Charles Liu about the role that you and he and your sister Ruth would play in this project?
A Yes.
Q When was that?
A He came back after he had done more research, I guess, on EB-5, and he was more convinced that he could raise it. So he said he would raise 100 percent of the money and give us a percentage of the ownership; that I would be the medical director, and I could hire the proton physician of my choice; and that my sister could be the manager; and that he would give us 25 percent, and he would take 75 percent during the construction. And after it was constructed, he would transfer 75 percent to myself and Ruth, and he would become 25 percent.
Q And did you agree to those terms?
A Yes.

Page 20

Q Did Ruth agree to those terms?
A Yes.
Q By the way, up until that point, was Lisa Wang, Charles' wife, involved in those discussions?
A No.
Q Was she given a role in the project?
A Later on, I believe so.
Q But at this time before you filed the application with USCIS, was there a role designated for Lisa Wang?
A I was not aware of her presence at all.
Q Did you ever see any of the early documents listing the task that had to be done list Lisa Wang and assign some role for her in the project?
MS. WHITE: Objection; lacks foundation, vague. You can answer.
THE WITNESS: I didn't see hardly any of the paperwork.
BY MR. GOURAIGE:
Q Did you ever see any documentation about a list of items to be done by the lawyers to get the company set up in the project?
A Yes.
Q Did you ever see a document like that mention Lisa Wang?
A I didn't pay too much attention to names on the

Page 21





EXHIBIT 2

documents, so I don't recall seeing that.
Q Did you have any discussion with Charles Liu about how you would -- how he would raise money through the EB-5 program?
A Very little, because I know -- I knew nothing about it. But typically he would tell me what he was planning.
Q Did he explain to you that he was going to form a regional center?
A Yes.
Q And did you understand that you would be an equity owner in that regional center?
A Yes.
Q Did you ever hear the name of Pacific Proton Therapy Regional Center?
A Yes.
Q Is that the regional center that you and Charles Liu formed?
A I believe so.
Q And did you own 25 percent of that center?
A I think so. I'm not sure.
Q Well, did you ever see a certificate indicating that you owned 25 percent of that center?
A I might have recently.
Q Did you sign an operating agreement for the LLC



that was Pacific Proton Therapy Regional Center?
A Yes.
Q And did that document indicate that you were 25 percent member of that LLC?
A Yes.
Q Did you also form another company with Charles Liu called Beverly Proton Center?
A I believe so.
Q Did you also own 25 percent of that center?
A I don't recall.
Q Was the Beverly Proton Center, LLC the company that was going to operate the proton therapy center?
A I think so.
Q And were you given a designated position for that center?
A Yes.
Q What was going to be your title at that center?
A The medical director.
Q Was your sister Ruth given a title, designated title, for that center?
A I believe so.
Q What was going to be her title?
A Probably some type of managerial position. I don't recall exactly.
Q Was she designated the COO, chief operating



officer, of that center?
A Very possible, very likely, yes, uh-huh.
Q Did you also form a third company with Charles Liu called Beverly Proton -- I'm sorry, Pacific Proton EB-5 Fund? Did you ever hear that company?
A Yes.
Q Was that the company that was going to be the funding source that was going to raise the EB-5 funds and provide the capital to Beverly Center?
A I believe so, uh-huh.
Q Did you have any involvement in the EB-5 Fund?
A No.
Q Was Charles Liu solely responsible for raising the capital?
A Yes.
Q Did you apply -- when I say you, I mean the Pacific Proton -- let's call it regional center, too many protons. When the Regional Center applied to UCIS to become a regional center, were you involved in that application?
A Yes.
Q Do you remember the name of the lawyer who prepared the papers and submitted the application?
A No.
Q Does Steven Yale-Loehr ring a bell for you?



A No.
Q Did you see the application that was submitted to USCIS before it was submitted there?
A I think I leafed through it. It was very voluminous. And basically, I did not understand the legalese.
Q Did you approve the document to be submitted?
A I was told that the attorneys were one of the top attorneys in New York and that their work was above reproach. And so I signed it based on that understanding.
Q And who told you that?
A My sister.
Q Did she mention -- she give you any more information about Steven Yale-Loehr?
A I don't recall the name.
Q Do you remember a person who was teaching at Cornell Law School?
A No.
Q Do you remember the firm of Miller & Mayer?
A I've heard that one, yes, uh-huh.
Q And that was the firm that helped prepare the papers to submit the application to USCIS; is that correct?
A I believe so.
Q Now, Dr. Thropay, when you started to set up

these companies and to form the proton therapy center with Charles Liu, did you fully intend to develop the center and get it operational?
A Yes.
Q Did there come a time when -- strike that.
Did you have any authority over the Regional Center's bank account?
A No.
Q And who had that authority?
A Charles Liu.
Q Did he have authority over all of the finances?
A Yes.
Q Now, did you -- did there come a time when you found out how much capital Charles Liu had been raised -- had raised through the EB-5 Fund?
A I never was clear on how much he raised.
Q Did there come a time when you had any idea of how much money he raised?
A I think after my first or second trip to China via Hong Kong, he had a broker at that time, and I understood that there had been a few sales.
Q When you say "sales," what are you referring to?
A EB-5 sales.
Q And explain those to me. What are they?
A My understanding is that if a person put up



500,000 for a project, that it would be considered a loan to be repaid, and they would be able to get a green card.
Q How many trips did you make to China?
A I think there were about five trips.
Q Were they all with Charles Liu or to go over to meet with him?
A Except the last one.
Q That was the trip in November of 2015?
A Correct.
Q So excluding that trip, who paid for all the trips you made to China?
A Charles Liu.
Q Do you know where the funds came to pay for those trips?
A No.
Q Was that before any EB-5 units had been sold?
A I believe the first -- I'm not sure. I really don't know because he wouldn't tell me.
Q Do you have any idea, roughly, how much it cost for you to fly to China for those five trips?
A No. I didn't look at the ticket. When I went by myself, I think it was like 3- or $4,000.
Q What class did you fly?
A First class, business.
Q Did your sister go with you?



A On the last vacation she did.
Q Did -- and who paid for your hotel and other expenses while you were in China?
A Charles Liu.
Q Did he ever ask you to advance any expenses?
A No.
Q Did there come a time that Charles Liu and you discussed loans from the EB-5 Fund to the Beverly Proton Center?
A I attempted to speak to him about it, but he refused.
Q Did you ultimately agree with him to have Beverly Oncology sign a pledge agreement?
A I'm sorry. Sign a?
Q Pledge agreement.
A A pledge agreement? There was a pledge agreement, yes.
Q Do you recall that agreement?
A Yes.
Q And did you agree to have Beverly Oncology sign that agreement?
A Yes.
Q What was your understanding of what your company, Beverly Oncology, was starting and pledging to guarantee?
A It was for an unencumbered assets.



Q Of Beverly Oncology?
A Of Beverly Oncology.
Q Did you understand that Beverly Oncology pledged its unencumbered assets to guarantee the loans from the EB-5 Fund to the Beverly Center?
A Yes.
Q Did you understand the amount of money that EB-5 fund was going to loan out to Beverly Center?
A Yes.
Q What amount was that?
A I assumed it was going to be 200 million at the end.
Q At the time you signed the pledge, did you have any idea of how much money your company would guarantee?
A Yes. We told Charles Liu that our company was not capable of guaranteeing the entire amount, that we had very little unencumbered -- we had very little unencumbered assets. There's a ring.
MS. WHITE: Sorry.
MR. GOURAIGE: Do you want to take a break, Molly?
MS. WHITE: I think it stopped. We're fine. My apologies.
MR. GOURAIGE: That's all right.
Q So Dr. Thropay, when you said you couldn't





Veritext Legal Solutions
866 299-5127

EXHIBIT 2

guarantee the whole amount, you were referring to the $200 million?
A Yes. I told that to my sister and --
Q Your sister was CEO of Beverly Oncology at the time?
A Yes.
Q What was roughly the value of unencumbered assets that Beverly Oncology had when you signed that pledge agreement?
MR. LEUNG: Objection; lacks foundation.
MS. WHITE: Join.
THE WITNESS: I'm not sure. Might be 250,000.
BY MR. GOURAIGE:
Q Did you tell Charles Liu that at the time?
A Yes. Not that number, but I told him we were unable to guarantee the EB-5, all the EB-5 people.
Q But your sister Ruth went on and signed the pledge agreement; is that correct?
A I believe so.
Q Has anybody raised with you, Dr. Thropay, the amount of money that your guarantee had secured?
MS. WHITE: Objection; vague. Lacks foundation.
THE WITNESS: Nobody's spoken to me about it. It was understood that we did not have funds to pledge it. It was requested of us by Charles Liu.

Page 30

BY MR. GOURAIGE:
Q Do you now understand that Beverly Center did not repay the loans to the EB-5 funds? Do you understand that at this point?
MR. LEUNG: Object to form.
MS. WHITE: Join.
MR. LEUNG: I think you mean Beverly Center.
MR. GOURAIGE: I'm sorry. What was the objection, Gary?
MR. LEUNG: I think your question referred to Beverly Center, which isn't one of the corporate defendants in this case, and I don't think you've defined Beverly Center either. So if you want to tighten that up, maybe we could get a better record.
MR. GOURAIGE: Well, I think I referred --
MR. LEUNG: You said Beverly Center.
BY MR. GOURAIGE:
Q Dr. Thropay, you understand Beverly Proton Center was going to be the center that was going to be running the proton therapy?
A Correct.
Q Okay. Do you understand that the EB-5 Fund was making loans to Beverly Proton Center?
A Yes.
Q Okay. And you understood that your company,

Page 31

Beverly Oncology, pledged its unencumbered assets to guarantee those loans?
A Whatever it could cover.
Q Right. So my question to you now is, do you now understand that Beverly Proton Center did not repay those loans to the EB-5 Fund?
A There is no way to pay it, so it was not paid.
Q So ultimately, the EB-5 Fund investors, the Chinese investors, have not been repaid. Is that correct?
MS. WHITE: Objection; lacks foundation.
THE WITNESS: Not from me. I'm not expected to pay them. They're supposed to be paid from the project when it's built.
BY MR. GOURAIGE:
Q And the project hasn't been built?
A Right. So everything's null and void.
Q So let's talk a little bit about the building of the project. The location to build the center was a piece of land that you owned; is that correct?
A Correct.
Q And that land was at 111 West Beverly Boulevard?
A Yes.
Q Did you talk with Charles Liu about leasing that land to Beverly Center to build the proton center?
A Did I talk to him about leasing?

Page 32

Q Yes.
A Yes.
Q Did you ultimately agree on a lease agreement for a 30-year term to Beverly Center?
A 30? Well, after it would be built. After it was built, I believe. But we had a one-year contract with him for lease.
Q When you say "one-year contract," what contract are you referring to?
A This was -- let me see. I think it was about April or May of 2014. And I told him -- and the lease came up -- or something came up for renewal, and I told him I didn't see anything happening and that I would give him one year to get the project going. And so we renewed the lease but only for one year, because I had been waiting like three or four years, and I didn't see anything happen.
Q You renewed the lease with Beverly for one year. When was that renewal?
A I think it's April or May.
Q Of what year?
A I think it was 2014 or early '15. Oh, must be 2015, about April or May.
Q Is that when you signed the lease?
A Yeah. I told him I would give him one year to

Page 33

get the building up and running.
Q So he didn't get the building up and running April 2015 to April 2016, correct?
A About that, yes, I believe so.
Q And then what did you do?
MS. WHITE: Objection; vague.
THE WITNESS: I forgot when the lease was up. Maybe it was August. When the lease came up and he didn't do anything on the land, I canceled it. I said it's cancellable. So I said the lease is up, uh-huh.
BY MR. GOURAIGE:
Q Why did you cancel?
A Alvarado Smith our -- I think our real estate attorneys -- oh, I'm sorry.
MS. WHITE: Sorry. I'm just going to admonish the witness not to disclose any attorney-client privileged conversations you had with Alvarado Smith.
THE WITNESS: We canceled via attorneys, according to the contract.
BY MR. GOURAIGE:
Q Did your attorneys have (audio glitch) to cancel it?
MS. WHITE: I'm sorry. Can you read back the question. I didn't quite hear it.
THE REPORTER: One of your words dropped. I

Page 34

have.
(Record Read.)
BY MR. GOURAIGE:
Q Did your attorneys have to go to court to cancel it?
A Eventually they had to go to court.
Q Were you aware that the SEC filed this action you're being deposed in on May 26, 2016?
A May 26, '16. Yes.
Q And at that point, the center had not been built on your lot?
A Correct.
Q Did you take legal steps to cancel the lease before the SEC filed its action?
A Legal steps?
Q Yes.
A No. We just notified them that the lease would be up.
Q After the SEC filed the action, were you paid any rental payment?
A Ruth would know better. I'm not sure.
Q During the course of the year from April 2015 to roughly April 2016, were you paid any rent for the land lease?
A Yes.

Page 35

Q Do you recall how much you were paid?
A About 40,000 a month, I believe.
Q Do you recall the total amount you were paid?
A About 500,000. I'm not sure.
Q Does the number 838,500 ring a bell for you?
A Yeah, could be that, uh-huh.
Q Those payments were made to you from EB-5 investor funds; is that correct?
MR. LEUNG: Objection; lacks foundation.
MS. WHITE: Join.
THE WITNESS: I don't know where they really came from. On one occasion he said it was his personal funds for one payment.
BY MR. GOURAIGE:
Q You said "he." Would you identify who you're referring to?
A Charles Liu.
Q So he told you that he was using his personal funds to pay for the land, and you believed that, for one payment?
Q For one payment.
A Uh-huh.
Q The total number I just mentioned to you, 838,500, did he ever tell you -- did he ever tell you that all of that was his personal funds?

Page 36

A No.
Q Were you aware that more than 90 percent of the funds capital used by Beverly came from EB-5 funding?
MS. WHITE: Objection; lacks foundation.
THE WITNESS: I assume that it was because they were the ones that were going to put up the building.
BY MR. GOURAIGE:
Q So let's talk about putting up the building then. After you signed the lease agreement, there was a building on your property at the time; is that right, Dr. Thropay?
A Yes.
Q Was that building demolished?
A Yes.
Q Who paid for the demolition?
A Charles Liu.
Q Was there remediation that had to be done to the land?
A Yes.
Q Was that done?
A Yes.
Q Who paid for the land remediation?
A Charles Liu.
Q Now, the lease rental payments were made to you, correct?
A Correct.

Page 37





EXHIBIT 2

Q This was not an effort by Charles Liu to funnel investor money to you personally, was it?
MS. WHITE: Objection; calls for speculation. Lacks foundation.
MR. LEUNG: Object to form.
THE WITNESS: This was what I felt is an arm's length lease. I spoke to John Slater. I was warned that if -- with the old vault, now everything's different. But in those days, it would take so much concrete that if the project didn't finish, your land would be left worthless. It's considered high risk. And so based on information from others, we agreed on a lease amount. Plus, we had lost a lot of rental income. When people moved out, he prohibited us from re-leasing the space. So we had tremendous losses prior to him commencing the lease. And all these factors were put together for what I considered to be an arm's length agreement for him to use the property and lease it for construction.
BY MR. GOURAIGE:
Q Dr. Thropay, did you understand that after the SEC action on May 26, 2016, all assets of this project were frozen by the court's order?
A I think so. I'm not really fully aware of everything.
Q Did you get any lease rental payments after May

Page 38

of 2016?
A I don't recall. I know that we did stop them because the lease was up. And so when the lease was up, of course we're not going to get any rental payments. And it was all canceled because there was no construction.
MR. GOURAIGE: Maybe this is a good time just to take a few-minutes break. I'm just going to introduce an exhibit for the witness.
MR. LEUNG: Great.
MR. GOURAIGE: Okay.
MR. LEUNG: We'll come back in about five minutes?
MR. GOURAIGE: Yes.
(Recess.)
BY MR. GOURAIGE:
Q So Dr. Thropay, did you understand that when the SEC filed the action, all of the assets of the company, whether it was Regional Center or Beverly Center, the EB-5 funds were frozen and the court appointed a monitor to oversee those assets? Did you understand that?
A I didn't understand it at the time.
Q When did you understand it?
A When I had to go to court to enforce the cancellation of the lease. I couldn't --
Q And what was -- I'm sorry I interrupted you.

Page 39

Please finish.
A I found out I couldn't.
Q What was the reason for the cancellation of the lease?
A Because I didn't see enough progress.
Q In building the Center on your lot?
A Yes. I didn't see -- he tore down the building, and that was it.
Q Well, you were not being paid any rent after May of 2016; is that correct?
A I believe -- I believe not. I believe you're correct.
Q Was it your understanding that the building on your lot had to start -- they had to start construction by April of 2016?
A It is my -- I'm not sure when the lease was up. I think it was up about the time the SEC stepped in. And so I really don't recall, but --
MS. WHITE: Don't guess.
MR. GOURAIGE: Okay. I'm going to show you an exhibit, Dr. Thropay, that I'd like you to look at, so give me a second.
(Exhibit 78 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:

Page 40

Q So Dr. Thropay, I hope you can see it. I just put on the screen Exhibit 78 for you to look at. Take a look at it. Take as long as you need to read the document, and then I'm going to ask you whether you recognize it.
MS. WHITE: Okay. Give us one second, please.
Do you want me to go through page by page? These are the attachments.
MR. GOURAIGE: The attachments are pretty long, but take a look at them. You should read your affidavit.
MS. WHITE: He did read his affidavit. I'm just going to show him what is attached.
MS. WHITE: And I will represent for the record that Dr. Thropay has reviewed his declaration. We just scrolled through the exhibits so as not to consume tremendous amounts of time. So if you have questions about the exhibits, please direct us to the exhibits and give us time to review.
MR. GOURAIGE: I have questions about his affidavit.
Q Dr. Thropay, you've just read through your affidavit; is that correct?
A Correct.
Q And the signature is yours; is that correct?
A Correct.

Page 41





EXHIBIT 2

Q And at the time you signed the affidavit, everything in the affidavit was true and correct, right?
A Yes.
Q So did you understand at that time, Dr. Thropay, that you could not forfeit the lease without getting prior approval from the federal court?
A Correct.
Q And your lawyer had to go to federal court to get that approval; is that correct?
A I don't know federal court or civil court. I don't know which one he went to, but I know he had to go to court.
Q And the judge approved, allowed your lawyer to continue with the state court action; is that correct?
A I don't recall.
Q But you know that you continued with the state court action, and you forfeited the lease; is that correct?
A What do you mean "forfeited the lease"?
Q Well, Beverly Center had a lease that had a right to use your property for a period of time. You forfeited it and you got the property back, correct?
A Correct.
Q So after the state court action, there was no lease on your property. There was no restriction by any

Page 42

third party; is that correct?
A Correct.
Q So you were free to do with the land whatever you wanted?
A I thought I could.
Q Okay. Did you -- did anyone ask you, Dr. Thropay, to return the rental payments you had received?
A No.
Q So you were never requested by the SEC to return those funds as potential disgorgement asset; is that correct?
A Not at that time. Not at that time.
Q Did the SEC ever ask you that since that time?
A The -- Grassmuk (phonetic), he told me to be prepared to do that.
Q And when did he tell you that?
A I believe it was either the first or the second meeting.
Q Do you remember when the meeting occurred?
A It was after the SEC appointed him to be, I guess, the collector of funds. And at our first meeting we got to know each other, and he told me and Ruth to be prepared to return all the rental.
Q Did that meeting occur in 2016?

Page 43

A I believe so.
Q And did he ask you to return it to an account that he had set up, a bank account he had set up?
A No. He said in the future, be prepared, because they might ask for it.
Q Did he ask you to put it in escrow?
A No.
Q Who's the "they" who might ask for it, did he tell you?
A Who's the what?
Q Who was the person or persons who might ask for the rental payments back? Did Mr. Grassmuk tell you?
A I think he was the one in charge of collecting the money. So he was telling us to be prepared, because he might ask it of us.
Q I see. Did he ever ask you to return those rental payments?
A Not at that time, no.
Q Has he ever at any time asked you?
A No.
Q Have you been asked by any investors to return those payments?
A By one investor, yes.
Q And who was that investor?
A I think it's Mr. Xi.

Page 44

Q Who is Mr. Xi?
A He's a person that apparently, from what I understand, loaned half of the 500,000 to his friend or relative or somebody in China to help them qualify for the EB-5 program.
Q How did he ask you to return that money?
A I was contacted via an attorney.
Q Who is the attorney? Do you remember his name?
A Not off the top of my head.
Q Do you have it written down somewhere?
A Probably in the office. There's loads of paperwork going back and forth between him and the attorneys.
Q Did he ask you to return the money by letter, by e-mail, by some other means of communication?
A He didn't ask me to return the money per se.
Q What did he ask you to do?
A He's suing. He's suing for millions of dollars on behalf of -- he wants to make it a class action suit on behalf of all the investors.
Q Has he sued you personally?
A Yes.
Q Where is that action pending?
A I think in Los Angeles.
Q State or federal court?

Page 45

A It's a civil, so I guess state court.
Q And are you represented in that case?
A Yes.
Q Who is your attorney?
A Niv Davidovich
Q When was that action filed?
A About two years ago, I would assume, estimate.
Q And what is the status of that lawsuit, Dr. Thropay?
A It's in discovery.
Q Have you been deposed in that lawsuit?
A No.
Q Has your sister Ruth been deposed in that lawsuit?
A No.
Q Do you know if there are other defendants in that case?
A I'm not aware of anyone else.
Q Did you make any arrangements to refund that 838,500 in rental payment you got?
MS. WHITE: Objection; lacks foundation.
BY MR. GOURAIGE:
Q In case you have to?
A No.
Q Dr. Thropay, do you have any idea how much a

Page 46

proton therapy equipment will cost?
MS. WHITE: Objection; vague.
THE WITNESS: It depends what period of time you're talking about.
BY MR. GOURAIGE:
Q Back in 2015, 2016, do you have any idea how much it would cost then?
A The price had come down significantly to about 28 to 25 million.
Q That's the current price?
A That is now current.
Q What was it back then in 2015, 2016?
A With the Optivus, from the same one they have at Loma Linda, probably 100 million.
Q And Optivus, is that a company known to you?
A Yes.
Q Did you introduce Charles Liu to Optivus?
A No.
Q Did your sister Ruth introduce him to Optivus?
A No.
Q Were you aware that he had entered into a contract with Optivus to supply the proton equipment?
A Yes.
Q Were you aware that he had made a down payment to Optivus for that equipment?

Page 47

A Yes.
Q Do you -- were you aware of the amount of money he had made -- he had paid as the down payment?
A I don't know exactly if it's a down payment, but Dr. Slater at Optivus who introduced Charles Liu to us -- not us to him -- told me he had never been paid. And so I relayed that to Charles Liu that they were complaining. And I think at about that time he was switching to Mevion. So he paid them I think it was around 500,000 to Optivus.
Q To Optivus. Now, as far as you know, Optivus is in the business of proton therapy equipment; is that correct?
A Yes.
Q It's not a front to funnel money for illegal purposes, is it?
A Not that I'm aware of.
Q I have to add a little bit of levity to these proceedings; otherwise, we all get too serious. What is your answer, Dr. Thropay? I didn't hear it.
A I said not that I'm aware of.
Q Okay. How about Mevion? You mentioned Mevion. Is that another company that manufactures this equipment, the proton therapy equipment?
A Yes.
Q And were you aware that Charles Liu, in fact, did

Page 48

enter into a contract with Mevion?
A Yes.
Q Did you ever see the contract?
A Yes.
Q Do you recall the price of the equipment he was buying?
A Approximately.
Q What was it?
A About 25 million.
Q And do you recall that Charles Liu made a down payment on that contract?
A Yes.
Q And do you recall the amount he paid in the down payment?
A I think it was 3 million.
Q Again, Mevion is a legitimate company in the business; is that right?
A I believe so.
Q Were you aware of anything illegal with respect to the Mevion contract and down payment?
A I really was not privy to all the details that went on between him and the salesperson.
Q So is -- I don't understand your answer. Is that you were not aware?
A I'm not aware of their private meetings. All I

Page 49





EXHIBIT 2

knew was about the 3 million. I was left out of it totally. It was not discussed with me. But I understood that there were other dealings to do other things. But I was never informed.
Q So we've talked about three payments now. Rental payments to you, payment to Optivus and a payment to Mevion. As far as you know, all of those payments were proper businesses expenses by Beverly; is that correct?
MR. LEUNG: Objection to form. Compound. Object to the form as misstating the record with respect to Mevion.
MS. WHITE: Join.
BY MR. GOURAIGE:
Q Dr. Thropay, can you answer that?
A I believe they were all legitimate. I was happy he was -- I was hoping he was making progress.
Q And the -- by the way, there was a building on your land when it was leased; is that correct?
A There was a building, yes.
Q And that building was demolished to build the Beverly Center; is that correct?
A Correct.
Q And that was paid by Charles Liu through the investor capital; is that correct?
A I believe so.

Page 50

Q Now, and that building was demolished, if you could recall, maybe in the summer of 2015; is that correct?
A Summer of '15? Not '16? I am not sure of the year. '15 could be it, uh-huh.
Q Let me try to put some context. Maybe that might refresh your recollection. The summer of 2016 was after the SEC action was filed. You don't think the building was demolished during that summer, do you?
A I think it was demolished before the SEC Grassmuk came into the picture.
Q And the SEC filed the action on May 26, 2016. So the building was demolished before that date?
A Correct.
Q And if it was demolished during the summer months, it was most likely during the summer of 2015?
A Yes.
Q So now I want to direct your attention to the period you think it was demolished until the end of 2015 and ask you this question. Did there develop a major business dispute between you and Charles Liu?
A What type of a dispute are you referring to?
Q Well, I'll be more specific. Was there a dispute about appointing your sister Ruth as CEO of Beverly Center?

Page 51

A Not that I'm aware of.
Q Did you ever ask Charles Liu to appoint your sister Ruth as CEO of Beverly Center?
A I think he had already made her an officer for the Beverly Center. I don't recall any dispute about it. It was there from the beginning.
Q Well, she was designated to be chief operating officer; is that correct?
A Who?
Q Your sister Ruth was designated to be the chief operating officer, COO; is that correct?
A Yes, uh-huh. That is correct.
Q You were going to be the medical director?
A Correct.
Q And Charles Liu was going to be president?
A Correct.
Q Now, did he tell you that he wanted to appoint somebody from Beverly Center as CEO who had a national and international status and reputation?
A No.
Q And you're pretty sure about that?
A I am sure about that.
Q Was there any other dispute between you and Charles Liu in the fall between -- any time between let's say September of 2015 until December of 2015?

Page 52

A Yes.
Q What was that dispute?
A I was supposed to be the medical director and become the majority owner after it was built, and I was going to select a proton professor or a person of renown in proton to direct the center. And he disregarded that. He tried to find a proton medical director independently of me. He spoke to people I knew. And I told him, "Why are you talking to these people? I know them. I trained with them. They were my professors at USC. I can talk to them. I'm in charge of the medical part." And he was interfering in my role, embarrassing me to my colleagues as if I didn't know them.
Q Who did you learn --
THE REPORTER: I didn't hear your question.
THE WITNESS: Could you repeat that?
BY MR. GOURAIGE:
Q Who did you learn Charles Liu was talking to?
A Dr. Chang at USC.
Q Anybody else?
A I heard indirectly that he was also talking to one of my colleagues at City of Hope.
Q And who was that?
A I don't recall his name now. But I was never included. And that was my dispute.

Page 53

Q Was he a radiation oncologist at City of Hope?
A Yes. I know everybody there. I know virtually everybody there and at USC. That was my role. And yes, that was a dispute.
Q By the way, just for the record, when you refer to Dr. Cheng, C-h-e-n-g, is that Dr. Alice Cheng?
A Eric Chang, chairman at USC.
Q Oh.
A The department of radiation, oncology.
Q Dr. Eric Chang, okay. Anybody else he was talking to that you found out about?
A No. Those were the only two that I heard about.
Q Do you know Harlan Levine?
A I don't recall that name. I don't know him.
Q And how did you find out that Charles was talking to these people?
A The radiation oncology community is very small. We all know each other. I immediately knew he was violating our contract. They would call me and tell me he was meeting at USC. My friends would call me, say, "Aren't you supposed to be the medical director?" So he was embarrassing me to my colleagues.
Q Did you consider that a sort of breach of trust by him?
A Yes.

Page 54

Q And what did you find out he was talking to these people about?
A About the medical directors.
Q So he was planning to build a center with others and not include you?
A Correct.
Q Did you confront him about that?
A Yes.
Q When did you do that?
A When I found out about it. I said, "I'm supposed to be the" -- as soon as I found out, I called him.
Q What did you say to him and what did he say to you?
A He said that the investors in China wanted a university to be affiliated with the center, and I said, "Fine. Why didn't you tell me?"
Q And what did he say to you?
A He just said, "Well, I'm in charge. I'm 75 percent owner. I can do what I want."
Q And what did you do?
A There was nothing for me to do. But he did arrange one meeting with USC.
Q And who was -- did you go to that meeting?
A I went to that meeting.
Q Who was present?

Page 55

A Dr. Eric Chang, his assistant, various administrators from USC, myself and Ruth. He was not present.
Q Who's the "he" who was not present?
A Charles.
Q What was the purpose of that meeting?
A To talk to USC about participation in the project.
Q And did you talk with them about that?
A To who?
Q To USC representatives you met with?
A Oh, yes. They came. They came to my office. I introduced them to my staff. They walked through the office. We had a nice discussion. But all the paperwork that was given to us had COH on it. It was very embarrassing, the way he set up the meeting.
Q COH refers to which institution?
A City of Hope.
Q So was Charles trying to build a project with City of Hope?
A I don't know.
MS. WHITE: Objection; lacks foundation.
THE WITNESS: I don't know what he was doing. But we met with USC. He sent over the materials. All of them said City of Hope. They were immediately insulted.

Page 56

BY MR. GOURAIGE:
Q That was the people from USC?
A Yes. So he embarrassed me again.
Q Were you insulted?
A Yes.
Q Were you upset that Charles had done that?
A Yes. He didn't know what he was doing in the medical arena. That was my dispute.
Q And do you remember the time period when these events occurred?
A It was probably in 2016. He had failed to get a person from USC, so.
Q In 2016?
A Yeah, uh-huh.
Q So in 2015, before you made the trip in November 2015 to China, did you suspect there was something improper about the use of the investor funds?
A No.
Q Did anybody bring to your attention any such suspicion?
A Later on, yes, uh-huh.
Q When you say "later on," when?
A I think it was in 2016, '15. Probably '15, in August or September of '15.
Q August or September of '15. And who brought that

Page 57



Veritext Legal Solutions
866 299-5127

EXHIBIT 2

to your attention?
A A man came by my office. He lived in Temple City, he said. He said he was from China mainland, and he had friends that worked for a company called Delsk. And I said, "Oh, Delsk, they're very famous in China, and they're helping us on the project." He said that he was reporting to them about the project and that they had asked him to see if there was any progress. He came with a friend who was also Asian, but I don't know if he was from China or not. But this particular person was. And he said Delsk was very concerned that no construction had occurred. And I agreed with him because I had put a limit on the lease for one year. And if not, everything was going to be canceled. I was not going to wait any longer. But he told me that Delsk -- uh-huh.
Q I'm sorry to interrupt you. Are you finished with your answer?
A Basically, yeah.
Q Do you remember the name of this individual?
A Not now.
Q Can you describe him to me?
A He was, I'd say, about 5-6 to 5-7, slender. He came to me with casual, regular street clothes, if you will. He said he wanted to talk -- he told the receptionist. It was at my Alhambra office. He told the

Page 58

receptionist that he wanted to talk to me, and I said, "Who?" And they said, "Somebody wants to talk to you about Delsk and your construction." So I said, "Oh, fine. Have him come in." So he identified himself. I identified myself. And that was it.
Q Was that before you went to China in November of 2015?
A Yes.
Q How did it come about that you made the trip in November of 2015 to China?
A Well, there were a series of things. After this gentleman came to me, I called Charles Liu, and I said, "I've been waiting for four years for a building. You should have some funds now. A fellow came by the office and told me that you should have sufficient funds to start the project." He told me that he wouldn't start the project until he had 30 million saved. So I told him I wanted an accounting of everything that had occurred. So he set up a meeting, and we met at Dal Rae restaurant in Pico Rivera.
He didn't want Ruth present, so I met alone with him. That's the same place that we had signed the one-year extension or the one-year cutoff time, same restaurant, but around that time after this man came to my office. He said fine. We went there. He had no

Page 59

paperwork. I said, "Don't you have any accounting records?" He said no. I said, "Well, that's what I want to see." He said, "Okay. I'll get it for you, but everything's going fine. Everything's going good."
I said, "But when is the construction going to start?" He said, "Any time. We demolished the building, and we're -- that's the beginning of the construction. In China, that means construction has begun."
So I went back and I spoke to Ruth. I said I didn't get any information. And so another month went by. And I had a call from Delsk from China. And they said, "Do you know what's going on?" And I said, "No. All I know is that my land is empty, and nothing's happening." And they said, "Well, you're supposed to be a participant in it." And I said, "Yeah, I'm supposed to, I guess. But on the first part, he's supposed to be in charge. And on the medical part, on the second part, that's when I'm supposed to be in charge. So right now I'm just waiting on him."
And then they called me again the following week, and they said, "We have people walking around the area in Montebello telling us that they don't see any change." And so I called Charles Liu again. And I said, "I want to know exactly what's happening." So we set up another meeting again at Dal Rae Restaurant in Pico Rivera. And I

Page 60

said, "Bring all your financial information, everything that you have. I want to know the exact status of the project and when you're going to start construction." He said, "Fine. Don't bring Ruth. I'll meet with you, just you and I." And I said okay.
So we met again at Dal Rae Restaurant about one or two months after that. And again, he brought nothing. He said, "You don't have to worry. I have everything under control." I said, "You were supposed to bring me papers and accounting statements." He said, "You don't need them. Everything's fine."
Then I got another call from Delsk. They said, "Did you meet with him?" I said, "Yes, I met with him." "And what did he tell you?" I said, "Nothing. I really don't know what's going on." So they then said, "Can you get into the bank records?" I said, "I don't know. The bank never called me." I was never notified of anything, but I was supposed to be a signer on one of the accounts. I don't know how many accounts he had, but there was one at Chase Bank. So I said okay.
So my Alhambra office is basically across the street from one of the Chase branches. So I went to that Chase branch and I said, "I'm supposed to be a signer on one of the accounts here for a proton center." And they looked it up, and they identified me. And I said my name

Page 61

is supposed to be somewhere. So they found a bank card with my signature, but my phone number had been changed, and my contact information was moved from the second person to the third or the fourth person. So I never got a phone call, and my phone number was not there. It was somebody else's phone number, I assume one of Charles Lui's friends.

When they opened up the account, there was a phone call -- I don't know from where -- asking who I was and why I was inquiring. And the lady that I was dealing with said that I had identified myself and that my name was actually on the bank card, and that from what she could tell, she would be able to speak to me. And they granted her permission at that point to speak to me. And she printed up all the bank statements. I didn't understand them, so I took them to our accountant.

Our accountant said it looks very suspicious, and that's when I called Delsk back and I said, "I did what you requested. My accountant is very concerned about what might be occurring." And we set up -- and they said, "We want to meet with you right away. Come to China so we can talk."

So we made copies, and we flew to China that Thanksgiving weekend, and I gave them all the bank statements. They also were very concerned, and they made



me feel very uncomfortable.

Q Did you know, Dr. Thropay, who Delsk was before they contacted you?

A Yes.

Q And what did you know them to be?

A Brokers to sell EB-5 funds throughout China.

Q Did you understand that they were involved in your proton therapy project?

A Yes.

Q Had you had any dealings with Delsk before they contacted you?

A Yes.

Q And when did you have your first dealing with Delsk?

A We had a meeting with Delsk in China where Charles Liu introduced me to them. It was a national meeting of their salespeople somewhere in China. I don't recall what city we were in. And I went there with the former mayor of Los Angeles, Villaraigosa. And he spoke, I spoke, and some professors spoke from Chinese universities. They spoke and the salespeople spoke. And they were going to become the salespersons for the EB-5 program in mainland China. And that's -- they seemed to be a very successful group of people in China.

Q What did you talk about?



A I gave a talk about proton therapy.

Q And did you understand that Delsk was serving as a broker to recruit investors in China for the project you and Charles Liu were putting together?

A Yes.

Q Did you understand in November of 2015 how much money Delsk had been paid for its services?

A No.

Q Did your accountant ever say to you what was suspicious about Chase bank records you gave him or her?

A I didn't hear the question.

MS. WHITE: You cut out.

BY MR. GOURAIGE:

Q Did your accountant tell you what was suspicious about the Chase bank records you gave to him or her?

A He said that a lot of money had gone out of the account, a huge sum of money; that he couldn't imagine where such a sum would go. And he was wondering why the construction had not started if there was that sum of money.

Q Well, did he tell you where the money went to?

A No, he couldn't tell.

Q Now, do you -- the person who called you from China from Delsk, did that person introduce himself or herself to you?



A Yes.

Q What was the name given to you?

A I don't recall their names now.

Q Does the name Edison Zhan ring a bell for you?

A Yes. When I went to China I met him.

Q Did you meet with anyone else in China?

A I met with the president and owner of Delsk.

Q Who was that?

A I don't recall his name.

Q Is it somebody named Wang Yang?

A I'm not sure.

Q Is it a male?

A Yes, it's a male.

Q Now, I'm focusing now, Dr. Thropay, on the November 2015 trip to China, not the earlier trip where you met with the Delsk people. But in November 2015 when you went to China, did you meet with Edison Zhan?

A Meet with Edison Chung?

Q Zhan.

A Zhan. I met with him. He acted as translator. And I met with the, I guess, a panel of executives for Delsk.

Q Did you have with you the Chase bank records?

A Yes.

Q Did you give them the Chase bank records?







EXHIBIT 2

A Yes.
Q Did you talk about those records?
A In the sense that these were copies that I received. I don't know how much money was raised. I don't know what they mean. I really had very little knowledge, but my accountant said they looked suspicious to him, so I gave it to them.
Q Okay. Did Edison Zhan tell you how much money had been raised through the EB-5 investors?
A Yes.
Q What did he tell you?
A That they had raised about 30 million, if I recall correctly.
Q And was that the --
MS. WHITE: Sorry. Can I just get clarification as to time. Is this at the November 2015 meeting?
THE WITNESS: Yes. This is at the November '15 meeting.
BY MR. GOURAIGE:
Q So was that the first time you had heard the number of $30 million being raised?
A Yes.
Q And so what happened? What was the outcome of your discussions in China with Edison Zhan and the Delsk people?



A The president became very depressed. The man that was in charge of signing the contract told me he had made a grave error; that he had been sold a bill of goods by Charles Liu, and he was very repentant about it after they saw the accounts. And I didn't know what to do, and they didn't, and they were just very upset at the situation. So we came back and again asked for information from Charles Liu and said we're concerned about what's going on. And he wouldn't talk to us. He wouldn't answer my calls.
Q When you met with the Delsk representative in China and you said they showed you the contract, are you referring to the contract they signed with Charles Liu to recruit Chinese investors?
A I didn't see the contract. But the person that wrote the contract told me that he had made a big mistake.
Q Did he tell you how much Delsk had been paid by Charles Liu?
A No.
Q When you came back to the States and you tried to reach Charles and he wasn't responding, what did you do?
A My accountants said that I should get legal advice.
Q Up until that point, Dr. Thropay, when Delsk reached out to you and you went to China, what specific



steps had you personally seen that Charles Liu was making to develop this proton therapy project?
A What particular? I didn't understand. Did you say what particular depth did you say?
Q Steps. What steps did you do?
A Oh, steps. After the demolition of the building, I didn't see much except he started talking to these medical centers. And like I told you, I had a dispute with him about that. And I didn't see any progress after that, so I -- so basically, that's it. I don't know.
MS. WHITE: We've been going about an hour. Can we take a short break?
MR. GOURAIGE: Yeah. Why don't we take a few minutes.
MS. WHITE: Okay, thanks.
(Recess.)
BY MR. GOURAIGE:
Q So Dr. Thropay, when you came back from China after you talked with Delsk and you said you needed counsel, legal counsel, did you hire an attorney?
A Yes.
Q And who was that?
A Mr. Lance.
Q Could you spell his name, please?
A L-a-n-c-e. I'm trying to remember his last name.



I just call him Lance.
Q Is it Lance John Kimmel?
A Oh, yes, Kimmel, yes.
Q Did you hire Mr. Kimmel to investigate the financial documents you had gotten from Chase and what Charles Liu was doing?
MS. WHITE: I'm going to object, because I think we're getting into the attorney-client privilege here in terms of what the purposes were for hiring Mr. Kimmel. And I'm going to ask the --
MR. GOURAIGE: Well, I'm not sure it's privileged why he hired him. I won't ask him what he told him and what Mr. Kimmel advised him. I just want to know the purpose of the retention.
MS. WHITE: Okay. And again, you can talk about the purpose for engaging Mr. Kimmel, but let's not get into any conversations or directions that you gave him.
THE WITNESS: I wanted to have an accounting of the numbers where I had failed twice, and so I thought he could help me.
BY MR. GOURAIGE:
Q And you wanted that accounting from Charles Liu?
A Correct.
Q And when you say "an accounting," what do you mean by "an accounting"?







EXHIBIT 2

A Basically, Delsk wanted to know where the money was going, and so then I wanted to know also after speaking to them. But he wouldn't answer my calls, so I got legal counsel.
Q And did you get an accounting from Charles Liu?
A No. He never responded.
Q Did he ever respond to the lawyer -- to the letter that Mr. Kimmel sent to him?
A No.
Q What did you do after that?
A I think we sent another letter to various people. Nobody would answer us.
Q Did you talk with Delsk?
A I spoke with Delsk. They're calling me constantly. I said we're not getting any information, and there's no response.
MR. GOURAIGE: Okay. So give me a minute, here, Dr. Thropay. I'm going to go here and introduce another exhibit for you to look at.
BY MR. GOURAIGE:
Q Dr. Thropay, you should be able -- do you see the exhibit on your screen?
MS. WHITE: Not yet. But let me -- there it goes. We have it. Thank you.
MR. GOURAIGE: Okay. And that is Exhibit --



Valerie, is that 79 or 80?
THE REPORTER: 79.
(Exhibit 79 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q That should be marked Exhibit 79, Dr. Thropay. Please take a look at it and let me know when you're ready.
A Uh-huh. Uh-huh. What was the date of this letter? March '16, uh-huh.
MS. WHITE: Okay. Dr. Thropay has reviewed the letter.
BY MR. GOURAIGE:
Q Okay. It's addressed to you and Charles Liu, Dr. Thropay. Did you get that document at the time?
A I'm not sure.
Q Have you seen this document since?
A Yes, uh-huh.
Q Did the president of Delsk make a trip to California?
A I know he did. I'm not sure when.
Q Did you meet with him?
A Yes.
Q Was Charles Liu in that meeting?
A No.



Q What did you talk to him about?
A He wanted to know about the progress of the construction.
Q Did he tell you any more about the finances?
A He was very depressed. He said that this is the first fate here they had in China, that reputation was very important, and he would make good, I guess, on the money to the EB-5 people to maintain his reputation, that he was very disappointed.
Q So this was in March of 2016. This is before the SEC action. After the SEC action, Dr. Thropay, did you have a conversation with the court-appointed monitor about this project?
A No.
Q Did you ask Delsk to have a conversation with the court-appointed monitor?
A No.
Q And I think, if I heard you correctly, Dr. Thropay, your answer was no?
A Correct. No.
Q You never had any discussion with the monitor about restructuring the project and trying to raise the capital to complete it with Delsk?
A Not that I can recall.
Q Are you saying that might have happened, you



don't recall it, or it did not happen?
A There was some talk, but I was not privy to it.
Q You think Delsk might have had those conversations with the monitor without you?
MR. LEUNG: Objection; calls for speculation.
MS. WHITE: Join.
THE WITNESS: I suspected it, but I really have no intimate knowledge of anything of that.
BY MR. GOURAIGE:
Q Did Delsk ever tell you that they had this conversation with the monitor?
A No.
Q Did Delsk ever tell you that they were interested in continuing the project with you without Charles Liu?
A Yes.
Q When did they tell you that?
A It was after the SEC stepped in.
Q Do you remember what time period?
A After my meeting with Grassmuk, perhaps a month or so later.
Q Do you remember when you met with Mr. Grassmuk?
A Not exactly. Probably in February. January, February.
Q Would that have been 2017?
A I believe so, uh-huh.

Q And then it was shortly after that you talked with Delsk?
A Yes, uh-huh.
Q Did you ever mention any of these conversations to Charles Liu?
A No. He never would return my calls.
Q So going back now to late 2015 when you came back from China and you hired Mr. Kimmel and you didn't get the accounting from Charles Liu, what did you decide to do?
A I didn't know really what to do, and we weren't getting any answers. And my accountants were telling me that it looked like money was being siphoned. So I felt we should report it to the authorities.
Q And did you?
A Yes.
Q And how did you do that?
A We had a meeting with the SEC.
Q Who's the "we" who had the meeting?
A Who's the?
MS. WHITE: Who was at the meeting.
THE WITNESS: Oh, who was at the meeting? Myself, Ruth, counsel and several people from the SEC. I don't remember their names, maybe three.
BY MR. GOURAIGE:
Q Who was the counsel?



A Lance Kimmel and Molly White.
Q And you hired Molly White after you had hired Mr. Kimmel?
A Yes.
Q And on the SEC side, you don't remember the names of the persons who were there?
A No.
Q How many people from the SEC?
A I think three or four.
Q Was a person named Tony Regenstreif at that meeting?
A The name rings a bell.
Q Do you remember what month the meeting took place?
A I don't know if it was after we went to China in November, I don't know if it was in -- I think we requested it in the middle of -- a few weeks later, in December.
Q And when did the meeting actually occur?
A I don't recall exactly, because an appointment was set up. But I think it was in December. It was around the holidays, and we didn't expect much to happen.
Q And who did the talking at the meeting? You did the talking? Ruth did the talking?
A Primarily, I had Ruth -- we just turned over the



bank statements and told them what Delsk had been concerned about and our concerns and that we had lost contact with Charles. And we didn't know what was happening. So it was like we're just there to give it to somebody that can handle it.
Q And when you say "give it to somebody that can handle it," what is it that you wanted the SEC to handle?
A To find out what was going on, to see if there was wrongdoing and to see what could be done to correct it.
Q Up until that meeting, what is it that you suspected was the wrongdoing?
A I -- I really didn't know. I had no information, and he wouldn't talk to me. I was in the dark.
Q In terms of the finances on the collections side, you didn't know how much had been collected; is that correct?
A No. That is correct.
Q In terms of the finances on the expenditure side, you knew about some of the expenses; isn't that correct?
A Yes.
Q And those expenses that you knew about, did you suspect anything improper, inappropriate about them?
A With Optivus, no, because I had a clear communication with John Slater at Loma Linda. With



Mevion, I don't know. The salesman Cogswell was let go by Mevion shortly after. I don't know why. So I'm not sure how straight or clean that relationship is. And the teardown of the building, that was strictly done through the contractor, and everything was straightforward through them. I had no contact with the funds.
Q So the salesman at Mevion, do you know why he was let go?
A Not exactly.
Q Any reason to believe that it had nothing to do with the Beverly Proton sale?
A It had something directly, maybe not, or indirectly, but I'm not sure.
Q So let me run some payments down that I think you may have been familiar with. You tell me if, up at that point when you were talking with the SEC, you suspected anything improper about the payment. The lease payments to you, you didn't suspect anything improper about that, did you?
A No, no.
Q You mentioned earlier the former mayor of Los Angeles, I guess Villaraigosa, who went to China with you?
A Yes.
Q Did you know he had been paid a consultant fee of about $50,000?







EXHIBIT 2

A I knew he had been paid a consultant fee. I don't know the amount.
Q Did you suspect anything improper about that?
A No. I think that's the way he makes a living.
Q The person named, I think, Nisy, N-i-s-y, Ipe, I-p-e, there was a payment made to that person, 57,200, for consulting work. Did you suspect anything improper about that?
A No.
Q The payment made to R Alan Construction, were you aware that payments were made to R Alan Construction?
A Is that for the demolition? I'm not sure. Yeah. Yeah. I think that's where I saw their name. I know Shubin.
Q Did you suspect --
A No, I didn't suspect.
Q Skanska, an architectural firm.
A Right.
Q Did they do work for the project?
A Yes. Yes, they did.
Q Did they get paid?
A I don't know.
Q Did you suspect anything improper about the work that they did?
A No.

Page 78

Q So the report you made to the SEC when you met with them was your accountant suspected things on the Chase account and Delsk had concerns and you wanted the SEC to investigate?
A I wanted somebody to look into it. Because in addition to those funds, other funds had been disbursed.
Q Did you receive any monies from the Regional Center account, Dr. Thropay?
A No, except for rental. Everything I did was volunteer.
Q Except for the rental, you're referring to land lease?
A Correct, uh-huh.
Q So if the accounting records for the Regional Center showed a deficit in your member account in that LLC of over 140,000 -- I'm sorry, over $100,000, that would be incorrect?
MS. WHITE: Objection; lacks foundation.
MR. LEUNG: Join in the foundational objection. Also object to form as misstating the evidence.
THE WITNESS: I have no idea. My accountants thought it was much more than that.
BY MR. GOURAIGE:
Q Did you ever receive a K-1 tax statement from the LLC?

Page 79

A I believe so.
Q And you still have those K-1s?
A I don't know. I don't think -- we turned in everything we have.
Q I don't know that you -- well, when you say you turned in, you turned them over to your attorneys?
A Right. And everything you requested for this hearing, we turned it in.
Q Well, I don't believe the K-1s have been produced. I will --
MS. WHITE: Just to clarify, Dr. Thropay is referring to the subpoena that Mr. Liu has served that included a document request. As counsel's aware, we conducted a search in good faith at the offices of Beverly Oncology. We were able to locate some hard copy documents. But a network server had gone down, and so -- and it actually was infected with malware. It has been unplugged. We offered to hire a forensic re-discovery vendor to somehow retrieve that, and Mr. Gouraige decided that that was not necessary. So to the extent there are documents that may or may not be on that network drive, but we were unable to search.
BY MR. GOURAIGE:
Q Well, Dr. Thropay, do you have those K-1s now? Would your accountants have them or do you have them?

Page 80

A Not that I'm aware of.
Q Well, I would like to request that you search your own papers and ask your accountants to give you copies of those K-1s and also would like to ask you to turn over to your attorney the documents regarding the class action you testified to earlier by one of the investors who reached out to you. And I would request that those documents be produced to defendants promptly.
MS. WHITE: Mr. Gouraige, you and I had an e-mail communication wherein you narrowed the scope of the documents. You also asked me to go to third parties to retrieve documents. I told you you served the subpoena on Dr. Thropay in his personal capacity. And we searched his offices, and that's your response. Dr. Thropay has not been subpoenaed for those records. You did not request them. And if you would like them, you can serve a subpoena, and we'll respond to the subpoena.
MR. GOURAIGE: All right. So I've made the request. You've made your objection. Maybe we shouldn't take more time during this deposition to resolve that issue. So we'll go back. We can take that up at some future time. We'll go back to Dr. Thropay.
Q So Dr. Thropay, it's your testimony that you personally never received any funds from the Regional Center account?

Page 81





EXHIBIT 2

A Personally, no. Everything I did was volunteer.
Q Now, after that first meeting with the SEC and before the SEC filed a complaint on May 26, 2016, did you or your attorney continue to have communications with the SEC?
A No. We thought it was forgotten.
Q Did you produce documents to your attorney to be turned over to the SEC?
A Just the receipts -- I mean, the bank statements.
Q When you received a letter from an attorney for Optivus requesting that Charles Liu and the project cease using Optivus' name in connection with the project, did you turn that over to your attorney to be turned over to the SEC?
A I don't know about that.
Q Well, which part don't you know about? That you turned it over or that it was turned over to the SEC?
A Where they got it, it was public information I would assume. They were very upset. John Slater called me, and he was very upset at what was happening. I told him I had no control, and I was very sorry that they were -- that Charles Liu was using their center. He wasn't even buying their machine. And so I really don't know. I just told Charles to stop using it. But he didn't listen to me, and I couldn't make contact.

Page 82

Q When you decided to terminate the lease, land lease and seek forfeiture, did you, through your attorney, advise the SEC of your decision?
MS. WHITE: I'm just going to admonish the witness not to disclose any attorney-client communications.
THE WITNESS: I was unaware that it was frozen. So we went to another attorney, real estate attorney, to try and get the land back so we could look for another way to put up the proton center.
BY MR. GOURAIGE:
Q Did you tell -- did you tell the SEC that you decided to terminate the lease of this project that had been --
THE REPORTER: I'm sorry. I lost your question. There's some rustling of some papers, and I can't hear.
MR. GOURAIGE: Let me try again.
Q Before you terminated the lease, when you made the decision to terminate and you wrote to the company Beverly you were going to terminate the lease because they hadn't built the project within the time they were supposed to, did you tell the SEC that you were going to do that?
A No.
Q At the time that you met with the SEC, whenever

Page 83

the period was, probably -- let's assume it's after January of 2016, on or after January of 2016. Up until today, are you still an equity owner in the Regional Center and the Beverly Center?
MS. WHITE: Objection; misstates -- lacks foundation. You can answer.
THE WITNESS: I don't think it even exists. There's nothing there.
BY MR. GOURAIGE:
Q Well, you say there's nothing there. You're saying the company LLCs have been dissolved?
A I don't know what's happened to them. I have no knowledge. To me, they are gone.
Q Well, the project is. The project is gone, hasn't been done. But the company is still in existence. Aren't you still a 25 percent equity owner in the company?
MS. WHITE: I'm sorry. Can you restate the question?
BY MR. GOURAIGE:
Q Dr. Thropay, when I think we started this deposition, you indicated that the financial structure of these companies would be that Charles Liu was going to own 75 percent of the Regional Center and you would own 25 percent. Is that correct?
A Only at the initial phase for construction.

Page 84

Q And thereafter, it was going to be shifted to you. But I'm talking about before now. The construction never occurred.
A Right, uh-huh.
Q So at the time you met with Delsk in November of 2015, you were an equity owner in the Regional Center and in the Beverly Center; isn't that correct?
A Yes, yes.
Q At the time that you met with the SEC, you were an equity owner in the Regional Center and in the Beverly Center; isn't that correct?
A Yes.
Q As an equity owner, you and Charles Liu were partners at the time, were you not?
A On paper, yes.
Q Did you breach your trust to him just like you testified he breached his trust to you by talking to City of Hope and Beverly Hospital?
MR. LEUNG: Objection; incomplete hypothetical.
MS. WHITE: Join.
THE WITNESS: I had nothing to breach. He was doing everything.
BY MR. GOURAIGE:
Q He was doing everything, but you were reporting everything to an outside party.

Page 85

MS. WHITE: Objection; argumentative. Vague.
THE WITNESS: There was nothing to report. I knew nothing except the bank records.
BY MR. GOURAIGE:
Q Well, you went to -- you don't know whether you went to Beijing, but you went to China. You met with Delsk. You told them about internal operations of your business relationship with Charles Liu.
A No. I have no knowledge of internal operations.
MS. WHITE: Objection; mischaracterizes the testimony. Argumentative.
BY MR. GOURAIGE:
Q You went -- I'm just sticking with the facts. You went to China and you told them about what was happening between you and Charles Liu.
MS. WHITE: Objection; mischaracterizes the testimony.
THE WITNESS: No, I didn't do that.
BY MR. GOURAIGE:
Q Did you give them the bank records that you and Charles Liu had opened a bank account at Chase?
A Yes, uh-huh.
Q So did you tell Charles Liu before you did that you were going to do that?
A Yes, but he wouldn't answer my calls.



Q Oh, you told him you were going to share these documents with Delsk?
A If he would answer my call.
MR. LEUNG: Objection; argumentative. And this is well outside the scope of fact discovery afforded under the court's scheduling order.
MS. WHITE: I'll join in the objection.
BY MR. GOURAIGE:
Q You called him; he didn't answer. Correct?
A Correct.
MR. LEUNG: Same objection.
BY MR. GOURAIGE:
Q Did you write him an e-mail?
A Yes, we wrote to him.
Q Did you write him an e-mail and tell him you were going to meet with Delsk?
A We didn't tell him we were going to meet with Delsk on that day, but we told him we wanted to meet with Delsk.
Q Did you write him an e-mail and tell him you were going to meet with the SEC?
A No. We did -- oh.
Q So Dr. Thropay --
MS. WHITE: I'm sorry, I'm sorry. Can we go off the record for one moment.



(Discussion held off the record.)
MS. WHITE: We're back one the record.
BY MR. GOURAIGE:
Q Dr. Thropay, your company, Beverly Oncology, it's my understanding your electronic server crashed in October of 2019; is that correct?
A Correct.
Q At the time that happened, did you hire an IT firm to find out what had happened, whether you could restore the records?
A Yes.
Q Which firm did you hire?
A We have an IT firm. Edgar, he's our consultant, and he brings in IT personnel as needed.
Q And he did that in October 2019 to find out what happened to your server?
A Yes.
Q And what happened?
A Ransomware had been placed. We were totally nonfunctional.
Q And did you report that to the authorities?
A I don't think so.
Q I assume your servers would contain medical information about your patients; isn't that correct?
A Correct.



Q And that information is supposed to be maintained privately under HIPAA; isn't that correct?
A That is correct.
Q Did you take any steps to make sure that, one, your patients' personal medical information was not disclosed?
A Yes.
Q What did you do?
A I don't know what they did. But the personnel administrator and the computer people said that they had only taken financial -- I'm not sure. But they told me that there was no personal financial -- or personal information taken about the patients and that it was not reportable.
Q So you didn't report it either to the healthcare authorities, state or federal, or to even your patients?
MS. WHITE: Objection; asked and answered and mischaracterizes testimony.
MR. GOURAIGE: Well, why don't, if I mischaracterized it, I'll ask the court reporter Valerie to please read the last question and answer, please.
(Record Read.)
BY MR. GOURAIGE:
Q So I think if I've mischaracterized your testimony, Dr. Thropay, tell me, please. I think, as I







EXHIBIT 2

understand your answer, you -- your in-house people determined it was not reportable so you didn't report it.
A I think our legal counsel also told us the same thing.
MS. WHITE: Okay. Again, you need to be careful, again, not to talk about what your lawyers said.
THE WITNESS: I had it on good advice. We sought expert opinion before making the decision. We thought we would have to do that, but we were told we did not have to do it.
BY MR. GOURAIGE:
Q You were told -- you were told you did not have to report to patients or to outside authorities?
MS. WHITE: Objection; asked and answered. You can answer one more time.
THE WITNESS: That's what the legal counsel advised -- not the legal -- that's who the expert opinions told me, because I expected to do that.
BY MR. GOURAIGE:
Q But just to get the fact correctly, you did not do that?
A Correct.
Q Okay. So was there a -- you -- does your company maintain any backup system to preserve data in the event of disaster?



A We do now.
Q Did you do before October 2019?
A No.
Q And you're not required to maintain that under California law. That's the question if you know the answer to?
MS. WHITE: I'm sorry. You cut out a little bit. Can you please repeat the question?
MR. GOURAIGE: Yeah. I asked him if he's required to maintain disaster backup system under California law, if he knows.
THE WITNESS: Not that I'm aware of.
BY MR. GOURAIGE:
Q Now, Dr. Thropay, would you consider yourself a sophisticated business person in addition to being a very good physician?
MR. LEUNG: Object to form.
THE WITNESS: I have no training in business.
BY MR. GOURAIGE:
Q I was just going to ask you that. You have no training in business, but you own quite a few business entities, don't you?
A No.
Q Don't you own -- well, you own Beverly Oncology?
A Yes, my own office.



Q Right. And that has several clinics, doesn't it?
A Yeah. But just clinics, uh-huh.
Q And you run those clinics, both -- you provide high quality health services to your patients, and you're also looking to make money. Is that right?
A It's whatever the government pays.
Q When you say the government, you're referring to Medicare, Medicaid and other governmental healthcare programs?
A Yes. We work in a disadvantaged area. And yes, we are dependent on those type of payments.
Q You understand the difference between profit and revenues, don't you?
A Maybe, sort of.
Q You hesitate. You don't understand the difference between revenues and profits?
MS. WHITE: Objection; argumentative. And the terms -- it's vague. I mean the terms have different meanings in different context.
MR. LEUNG: Object to the extent the question calls for opinion testimony.
BY MR. GOURAIGE:
Q That's what I'm -- in running your medical practice, Dr. Thropay, your bailiwick there, what do you understand profits to mean?



A A positive account. You're in the black.
Q Better to be in the black than in the red?
A Uh-huh.
Q As far as you know, the entities that you have an equity owner of, the Regional Center and the Beverly Proton Center, was either of them ever in the black during the period that you were involved with them?
MS. WHITE: Objection; lacks foundation.
MR. LEUNG: Join.
THE WITNESS: I have no knowledge of the finances.
BY MR. GOURAIGE:
Q Did you ever ask -- did you ever get financial statements?
A No.
Q And did you ask for them?
A Yes.
Q When did you ask for them?
A All the time. Every time we traveled to China I'd ask him.
Q You'd ask Charles Liu?
A Yes.
Q And what did he say to you?
A He'd say, "Don't worry about it."
Q Did you know who was the accounting firm for the







EXHIBIT 2

company?
A No.
Q Did you ever ask Charles Liu who were the outside accountants?
A He wouldn't talk to me. I don't know. I just asked for the papers. I didn't know who he was using.
Q Dr. Thropay, do you have a financial interest in this lawsuit?
A Financial interest?
MR. LEUNG: Objection; vague.
THE WITNESS: In which lawsuit?
BY MR. GOURAIGE:
Q This pending lawsuit that you're being deposed in.
A Not that I am aware of.
Q You have no -- are you saying you have no financial or you're not aware that you have a financial interest?
A I have no financial interest in the outcome. I'm not looking for money.
Q Well, I understand you're not looking for money. I'm saying are you entitled to money?
A I don't know.
Q Have you asked?
A No.

Page 94

Q Would you be willing to agree that any money you're entitled to should be returned to investors?
A Yeah, that's what I'm hoping.
Q Are you prepared to refund the lease payments to investors as part of disgorgement?
A If we were asked to.
Q Did you ever ask Delsk to refund any of the monies they got to the investors as part of disgorgement?
MS. WHITE: Objection; lacks foundation.
THE WITNESS: No, I never asked them.
MR. GOURAIGE: Okay. Let me just -- I am done with my examination. I have -- the only thing I need to do, if we can take a five-minute break, there are about, I think, six documents approximately from the documents you produced to me that I just want to show Dr. Thropay and have him explain the documents to me. But I have not been able to upload them to the Exhibit Share. So I need to figure out a way of doing that in five minutes, and then we can resume.
MS. WHITE: Okay. We'll take a break.
MR. GOURAIGE: Thank you.
(Recess.)
MR. GOURAIGE: Dr. Thropay, you're looking at what's been marked Exhibit 80.
MS. WHITE: Yes, we have it.

Page 95

(Exhibit 80 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Okay. Do you recognize the document?
A Yes.
Q Is that -- is that certificate still effective as far as you're concerned?
MS. WHITE: Objection; lacks foundation.
BY MR. GOURAIGE:
Q Well, what is the document, Dr. Thropay?
A This is membership certificate.
Q And that's a 25 percent membership certificate in an LLC, correct?
A I don't know. Mine looks like a 2.5. Or is it a 25? Maybe it's not clear. Okay. 25, uh-huh. That is what we had agreed.
Q And which company is that?
A LA County Proton.
Q Was that the predecessor to Beverly Proton Center?
A I believe so.
Q And so that's -- that's the 25 percent interest you had in that LLC, right?
A Right.
MR. GOURAIGE: Okay. Let me just -- I'm going to

Page 96

get another exhibit for you. Bear with me a second.
(Exhibit 81 was marked for identification by the court reporter and is attached hereto.)
MR. GOURAIGE: Dr. Thropay, you should now see Exhibit 81.
MS. WHITE: Hold on. It's still loading.
MR. GOURAIGE: Okay. It's incredibly slow. I don't understand why.
MS. WHITE: We have it.
BY MR. GOURAIGE:
Q Dr. Thropay, once you look at it, tell me if you recognize the document.
A This, I don't know.
Q You've never seen this document?
A Only in the last few days when they pulled out documents to send to you. I just saw this maybe a week ago.
Q So you don't know what this is?
A No.
Q Up in the first paragraph where it refers to 111 West Beverly Boulevard, that is the address of your lot where the Beverly Center was going to be built, right?
A Correct, uh-huh.
MR. GOURAIGE: Okay. So we'll go on to the next exhibit. You should be seeing Exhibit 82, Dr. Thropay.

Page 97





EXHIBIT 2

Let me know once you see it.
MS. WHITE: We have Exhibit 82.
(Exhibit 82 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Have you seen that document before, Dr. Thropay?
A Not before last week or so.
Q So you have no idea who prepared it or what it's referring to?
A I would assume it might have been Ruth, but I'm not sure. I don't know who else might have prepared it.
MR. GOURAIGE: Okay. The next exhibit you will soon seen, Dr. Thropay, is I think written in Chinese, and I'd like you to decipher it for me.
(Exhibit 83 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Do you recognize the document?
MS. WHITE: We will look at Exhibit 83.
BY MR. GOURAIGE:
Q Dr. Thropay, do you recognize it?
A No. I think I saw it about a week ago, if it's the same one.
Q Tell me something. I know you don't -- maybe you've never seen it. You don't recognize it. Do you



recognize the handwriting?
A It looks like my sister's, like Ruth.
Q I see. The handwriting looks like hers. Okay. All right. Thank you. We'll move on to the next one.
You should soon be seeing Exhibit 84, Dr. Thropay. Take a look at it. Tell me if you recognize it.
MS. WHITE: We have Exhibit 84, and I'm scrolling through so the witness can review.
THE WITNESS: I've seen it before.
MS. WHITE: Okay.
THE WITNESS: Yes, I've seen it.
(Exhibit 84 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q And what is it?
A I guess it was the business plan it's titled.
Q Do you know who prepared it?
A Not exactly.
Q Do you have any -- did you have any role in preparing it?
A Just my biography, probably.
Q Other than biography, did you provide any information to go into it?
A Not that I'm aware of.



Q Did you review it at the time it was prepared before it was submitted?
A I read through it.
Q Do you recall if you had any objections or issues or problems with anything that's in it?
A I'm not -- I didn't think I was qualified to do that. It depends on counsel.
Q And that's the lawyer that you think Charles Liu had hired to submit this to USCIS?
A Yes. I believe it was abstracted from his data.
MR. GOURAIGE: Okay. So let me pull up the next document for you, Dr. Thropay. Bear with me a second.
MS. WHITE: We have Exhibit 85.
(Exhibit 85 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Okay. So take a look at this, Dr. Thropay, and tell me if you recognize it.
A Yes, I recognize it.
Q What is it?
A This is what the bank printed out to me.
Q And is it part of the documents you gave or showed to Delsk?
A Yes.
Q Is it part of the documents you gave to the SEC



when you first met with them?
A Yes.
Q The handwriting on it, whose handwriting is that?
A I think it's Ruth's. It's not mine.
Q Is there -- when you look at this document now, is there anything specific that you pointed out to Delsk or the SEC when you gave it to them?
A No. I pointed out nothing.
MR. GOURAIGE: Dr. Thropay, you should now see document Exhibit 86. Tell me if you recognize the document.
(Exhibit 86 was marked for identification by the court reporter and is attached hereto.)
MR. LEUNG: Herve, can you pause for 15 seconds or so. I'm actually having a hard time pulling up 86, so please bear with me just a minute.
MR. GOURAIGE: Okay.
MS. WHITE: No worries. It's a long document, and we are taking our time to scroll through it.
MR. LEUNG: Let me just interpose an objection. Exhibit 86, although evidently produced in this manner, is an incomplete copy of a court filing in the SEC enforcement action that was submitted in June of 2016 by the corporate defendants. And I believe this is only part of the declaration attested to by Don Weiss that was

submitted by the corporate defendants in this case at document number 38-2.
THE WITNESS: Yeah. This didn't come from me. He's working with somebody else.
MS. WHITE: We're still scrolling through the document. I don't know if you want to start asking questions.
BY MR. GOURAIGE:
Q Dr. Thropay, do you recognize the document? Do you know what it is?
A No.
Q Okay. So let me -- I think there's some things maybe you could answer anyway. The address up on -- I think it's the first -- it's page 12 under "Executive Summary," 105 West Beverly Boulevard, Montebello, California. That is not your lot; is that correct?
A That is correct.
Q And you had never seen this document before today?
A Correct.
Q Do you know whose handwriting it is? If you go to page 13, there is a circle around the number 74,217 and then a line, and it looks like a question mark. And then there's a handwritten something next to it. Do you know whose handwriting that is?



A No.
Q Again, if you keep scrolling down, I think at page 15 there are more handwritten notes, one at the top. It looks like "25 owned." And it looks like a D-R for me there. I'm not sure what that is. And then below, above "City Detail" it says "Sue Beverly Hospital." Do you know whose handwriting that is?
A No, I don't recognize it.
Q If you go to the next page where it says "25 percent Doctor" -- looks like D-R, period, capital T, period. Is that referring to you?
A Dr. T?
Q Yes.
A I would assume they're talking about my percentage.
Q And it looks like the handwritten note says "Can he be diluted," question mark.
A Right. I don't know whose writing that is.
Q And then at the page 16, "Sue hospital for interference with prospective business opportunity." Sounds like a first rate legal mind wrote that note.
A Yeah, it doesn't look like any writing I recognize.
Q Dr. Thropay, did you at any time, after you found out Charles Liu was talking to City of Hope and Beverly



Hospital, did you at any time consider suing Liu and Beverly Hospital and City of Hope for interference with your contract with Charles Liu?
A No. I don't sue people.
Q You've never sued anybody?
A No.
Q You sure about that?
A As far as I'm aware. I always try and settle everything peaceably.
Q Have you been sued?
A Yes.
Q So I guess if I continue to ask, you just don't recognize the handwriting on this document?
A No. It's not mine, and it's not Ruth's.
Q Okay. So we are almost done, you'll be happy to know, Dr. Thropay. And I think these will be very quick.
I believe you testified that when you went to China -- and I'm not talking about the November 2015 trip, an early trip where you met the Delsk people -- and you spoke to them about proton therapy, did you meet Charles Lui's wife, Lisa Wang, at that meeting?
A At the Delsk meeting?
Q Yes.
A Yes.
Q And did you talk with her?



A Yes.
Q Did she speak at that meeting?
A I don't recall.
Q Did you talk with her about what her role was in the project?
A Yes.
Q And did you ask her what it was?
A Yes.
Q What did she tell you?
A She would help set up meetings. And also she started her own company on the side to do some auxiliary work, I guess, to help her husband. And she would sell EB-5 and try and promote sales. Meetings that I went to, she would set up everything and sometimes introduce a speaker. And she was just there to help is all I could see, and that's what she would explain to me.
Q Did she have anything to do with the finances?
A She seemed to be acutely aware of finances.
Q And what did she say that led you to believe that?
A She didn't tell me anything, but I would hear her speaking to her husband in the van.
Q You would hear her speaking to her husband. And what would she be saying to her husband?
A She'd be asking about money.

Q Money, capital invested in this project?
A Just money. I don't understand -- at that time I didn't understand much Chinese, but I knew the word for money.
Q And what is the word for money?
A Qian.
Q And she was speaking in Chinese, and you understood it?
A I understood a few words here and there, but indirectly I could figure it out.
Q And where do -- did you have any conversations with her in Chinese when you were there?
A Yes.
Q And you could speak the language enough that you could talk with her?
A Only a few things, like the weather. You know, things that I had learned in my vocabulary I would practice with her, uh-huh.
Q How many times did you meet with her when you traveled -- I think you traveled about five times to China?
A Yeah, almost.
Q How many times did you meet with her?
A I think except the first time, I think -- I think the first time we met up with her somewhere in China



briefly. And then after that, I believe she was on every trip except the last one with Delsk.
Q Did you ever have meetings with her and Charles in the U.S.?
A I think once she came to the office. Might have been more times, but at least once she came to the corporate office, if I recall correctly.
Q Which corporate office?
A 200 East Beverly Boulevard.
Q And whose corporate office was that?
A Beverly Oncology.
Q And why did she come to the office?
MS. WHITE: Objection; lacks foundation. If you know.
THE WITNESS: Just accompanying her husband and to talk about the project.
BY MR. GOURAIGE:
Q And she sat in on a meeting with you and Charles and Ruth?
A Yes, as far as I can recall one time.
Q And was the meeting conducted in English?
A Yes.
Q Did she speak any -- at all during the meeting?
A A little.
Q In Chinese?



A No, in her English and courtesies, you know, the standard, you know, how are you and what have you.
Q Didn't say much beyond that?
A Correct.
Q At any time did you and Charles discuss having a position for Lisa Wang in the Beverly Center after the center was built?
A Mostly he would tell me what he was doing. There was very little discussion. But yes, he did say she was working with him.
Q He told you that when?
A When we went to China and she was there. When she came to the office, it was just the polite hello. But when we were there, I saw she took an active role. And he said she was helping him and also starting her own business.
Q Did she tell you what she did in China for the project?
A No, but I saw her selling EB-5s.
Q I'm sorry. What do you mean selling EB-5s?
A When I was there, she was in discussion with a family, and it was without the knowledge of Delsk. And she sold an EB-5 share to someone, and they were celebrating. They were very happy. And I was told not to say anything to Delsk.



Q And who told you not to say anything to Delsk?
A Charles Liu.
Q And did he explain to you why you should not say anything to Delsk?
A Because he had an exclusive contract with Delsk.
Q So Delsk was supposed to sell all the units?
A That was what he told me.
Q And when Lisa Wang was speaking to that investor, this was all in Chinese?
A Yes.
Q And you fully understood what they were saying?
A I wasn't in the room. I saw them outside the room. And they told me she was having the discussion to sell an EB-5. I was told that in English.
Q And who told you that?
A Charles Liu.
Q I see. And then Charles told you not to mention it to Delsk?
A Correct.
Q Later on in November of 2015 when you met with Delsk, did you tell Delsk about that sale?
A No.
Q Have you ever told anybody else about that sale before today's testimony?
A No.

MR. GOURAIGE: That ends my examination of the witness. And I'll pass him over to you, Gary, if you have any questions.

MR. LEUNG: Dr. Thropay, Molly, it's about 5 until 1:00. I think I can do this in about half an hour. Not sure if you'd want to take a quick break, power through?

MS. WHITE: We did have lunch delivered, but Dr. Thropay says he's fine and would like to power through. So let's get this done.

MR. LEUNG: Fantastic. Thank you.

EXAMINATION

BY MR. LEUNG:

Q Good afternoon, Dr. Thropay. My name's Gary Leung. I'm counsel for the plaintiff in this case, the Securities and Exchange Commission. How are you doing today?

A Fine, thank you.

Q I gather from your testimony that you're somewhat proficient in Chinese. I just wanted to commend you for being the only person in this case that actually consistently pronounces defendants Lui's surname in the right way, so thank you for that.

First question, you spoke with Mr. Gouraige a little bit earlier about overhearing conversations between



defendant Wang and defendant Liu in Chinese. And you would hear the word "qian," which is Chinese for "money." Do you recall that testimony?

A Yes.

Q In overhearing these conversations between Mr. Liu and Ms. Wang, did you ever hear the phrase "duo chien"?

A No, I didn't hear that. I know what it means.

Q How about "hen duo chien"?

A No, I didn't hear that one either.

(Reporter Clarification.)

BY MR. LEUNG:

Q Last question on this line and I'll move on. Did you ever hear, in those conversations between Mr. Liu and Ms. Wang, the Chinese phrase "duoshao chien"? "Duoshao chien?"

A I don't recall hearing that.

Q All right. Changing subjects.

MR. GOURAIGE: Gary, if I may interrupt as perhaps the only non Chinese speaker, other than the reporter, are you going to translate those phrases for me?

MR. LEUNG: Sure, I can do it on the record. "Duo chien" means "more money." "Hen duo chien" means "a lot of money." And "duoshao chien" means "how much money."



Q Moving on. Okay. You testified at length at this deposition and explained for Mr. Gouraige that you had concerns towards the end of 2015 and going into 2016, which you reported to Delsk and then to the SEC. Do you recall that testimony?

A Yes.

Q Okay. The SEC has filed with the court in this case evidence showing that from 2014, October 2014, through April 2016, your business partner, defendant Liu, transferred $8 million from the corporate accounts for Beverly Proton PP EB-5 Fund and Pacific Proton Regional Center to his own personal accounts and his wife's personal accounts at Chase. Were you at any time aware of that fact?

A No.

Q The SEC has also filed in this case evidence with the court showing that of that $8 million, more than 4.3 million was transferred in February, March and April of 2016 after Mr. Liu was first served with an SEC investigative subpoena. In that time frame -- February, March, April 2016 -- did you have any awareness that Mr. Liu was removing that much money from the corporate accounts and transferring it to the personal accounts of him and his wife?

A No, I had no idea. I am in shock.



Q All right. I am going to share my screen in a moment. Do you see my screen, sir? I'm trying to share with you an Adobe PDF file. Is that visible to you on your monitor?

MS. WHITE: Hold on one moment. I'm sorry. My bad. Okay. We got it.

MR. LEUNG: And for the record, I will not be marking this exhibit, but I am displaying for the witness a PDF file of the miniscript for Charles Lui's February 24th, 2021 deposition testimony. I'm going to direct the witness to page 83 of that transcript.

Q And I just want to read for you some testimony, get your reaction to it, sir, page 83, beginning at line 12.

"Question: On February 26th, you sent $250,000 out of that personal Chase account to an account at China Merchants Bank. On February 29 you sent another $250,000 out of that personal account to an account at China Merchants Bank. On March 1st, the next day, you sent another $250,000 out of your personal account to China Merchants Bank. Six days later, March 7th from your personal account at Chase, you sent $500,000, half a million dollars, to an





EXHIBIT 2

overseas account in China, China Merchants Bank. On March 11th, four days after that, you sent $750,000 from your Chase personal account to an overseas account in China, at China Merchants Bank. On March 14th, you sent $500,000 from your Chase personal account to a foreign bank account in China, China Merchants Bank. March 24th, another $250,000 out of your personal account at Chase to China Merchants Bank in China. April 1st, another $250,000 out of your personal account to China Merchants Bank. And finally April 5th, 2016 a final $250,000 was transferred from your personal Chase account to China Merchants Bank. That's a lot of money. Do you remember where you sent the money to and why you sent it?"

"Answer: It's my personal money."

Having read that deposition testimony for you, Dr. Thropay, were you aware that after transferring several million dollars from the corporate bank accounts to his own personal accounts, Mr. Liu was sending these vast sums of money overseas to his bank accounts in China?

Page 114

A No, no.

Q "Question: So --"

"Answer: I can send it wherever I want."

"Question: Okay. And you sent it to your personal account overseas at China Merchants Bank?"

"Answer: I think so."

"Question: Do you still have that money?"

"Answer: Do I still have money?"

"Question: Yes."

"Answer: No, I don't have that money."

"Question: What happened to it?"

"Answer: That's my business. That's my personal salary."

Do you agree with Mr. Lui's characterization, Dr. Thropay, that the money that he caused to be transferred from the corporate accounts to his own accounts and then to his personal accounts overseas was Mr. Lui's business and his personal money that he could spend as he saw fit?

MR. GOURAIGE: Objection. There's no foundation for the witness to answer that question. He has no knowledge.

MR. LEUNG: I'll withdraw it.

Page 115

Q Dr. Thropay, having seen the deposition testimony today, does it appear to you that the concerns that you reported to Delsk and the concerns that you then reported to the SEC in 2016 were well founded?

MR. GOURAIGE: Objection.

THE WITNESS: Yeah. This could have started the construction. It is very disappointing.

BY MR. LEUNG:

Q Dr. Thropay, earlier this morning, Mr. Gouraige asked you a series of questions about a pledge that BOIC had entered into. He didn't show you that pledge, but he did ask you questions about your understanding of that pledge. What I'm asking you is, to the extent the understanding you had that you testified to this morning is contradicted by what's actually written down on that piece of paper and executed to, you would defer in terms of the legal import of that pledge to what's written down, right?

MR. GOURAIGE: Objection to the question. Vague and unclear question.

THE WITNESS: I guess I'd have to defer.

BY MR. LEUNG:

Q Okay. Dr. Thropay, would you have entered into that pledge if you had known that your business partner was going to misappropriate several million dollars from

Page 116

your companies?

MR. GOURAIGE: Objection.

THE WITNESS: Of course not.

MR. GOURAIGE: Pure speculation.

THE WITNESS: No. I would have -- in fact, that was my question to Ruth. He has all the money.

BY MR. LEUNG:

Q Mr. Liu asked you and your sister for that pledge; is that correct?

A Correct.

Q Do you recall what he communicated to you with respect to why he wanted that pledge from your medical practice?

A He said it was requested by the clients and that it was a pure formality.

Q Do you recall that around summer of 2015, your existing office building on your 111 West Beverly property was demolished? Do you recall that?

A Yes.

Q Did Mr. Liu, before that demolition work had occurred, before that construction work had occurred, did he pressure you to commence that work?

MR. GOURAIGE: Objection to the word "pressure."

THE WITNESS: He was screaming at us on the phone.

Page 117

BY MR. LEUNG:
Q What was he saying?
A He said that the people were passing by the property, and I guess he found out that the Delsk people were looking at it. And he said he had to prove that the project was moving ahead. And I said yeah, I want it to move ahead, and I'll do everything I can to help it move ahead. And I didn't want to demolish it because we were losing so much money. We couldn't -- we were already scraping up money to make the mortgage payment, because the rents were inadequate, because we couldn't fill it with anybody. I said without it, then we have to pay the whole thing, which we're still doing. But I said if this will promote the project, I'll make the sacrifice. And he was really saying, "You gotta do it fast, because they're calling me, and they're pressuring me to see some progress." And I said, "Well, if it's going to progress, I'll do everything I can."
Q And the "they" you're referring to -- or the "they" that Mr. Liu was referring to were investors and potential investors?
A Correct.
Q If you could refer to your Marked Exhibits folder on the Egnyte page and open up for me Exhibit 101, please.
And for the record, I've directed the witness's



attention to a document that's been previously marked Government Exhibit 5 and also Deposition Exhibit 101. The very first page of the document bears a heading "Private Offering Memorandum 300 Limited Liability Company Membership Units of Pacific Proton EB-5 Fund, LLC." The document's dated May 1st, 2013.
Take your time to flip through it, sir. But my first question will be have you seen this document before? Have you seen Exhibit 101 before?
A Yes.
Q What do you understand Exhibit 101 to be, Dr. Thropay?
A That this was the sale price for a unit for them to be able to get a green card and that this would be a debt to be paid back to them once it was built.
Q Dr. Thropay, do you know whether Exhibit 101 was an offering memorandum that defendant Liu would provide to EB-5 investors interested in investing in the Proton Therapy Cancer Center project?
A I believe so.
Q Okay. I'm going to direct your attention to page 15 of the document.
MS. WHITE: Just so we're on -- well, and I just want to make sure we're on the same page. It's the page marked number 15 at the bottom?



THE WITNESS: Yes, marked number 15 at the bottom.
MS. WHITE: Thank you. We're there.
BY MR. LEUNG:
Q Do you see in the middle of page 15 there's a heading that reads "Single Service Provider"?
A Yes.
Q First sentence says, "Borrower intends to engage Optivus Proton Beam Therapy, Inc. Optivus, a proton beam technology developer in California, to provide all necessary proton beam treatment technology and related maintenance under service contract for the Proton Center."
Is that consistent with your understanding, at least going into the end of 2015, that Optivus was to be the proton therapy equipment provider for your project?
A Yes.
Q Mr. Gouraige asked you if you had any knowledge of the accounting firm that Mr. Liu retained on behalf of the corporate defendants, and you testified that you did not. My question is, does the firm Marcum ring a bell with you?
A No.
Q Stan Lam, an accountant at Marcum, did you ever deal with him?
A No.



Q If you could open up Exhibit 103. And for the record, Exhibit 103 is a --
MS. WHITE: Hold on. You're going to kill me, but I just lost the feed. And, of course, I'm a dinosaur, so I now have to get my IT person to help. I'm so sorry.
MR. LEUNG: You want to go off the record?
MS. WHITE: Yes, let's go off the record. My apologies.
(Recess.)
BY MR. LEUNG:
Q So Dr. Thropay, if you could direct your attention to what's been previously marked Exhibit 103 for the record, this is a three-page document. It bears the Bates number Marcum_CLiu_10233 through 235. This is an e-mail string that you're not on. It begins with an e-mail first in time on October 14th and ends with an e-mail last in time October 15th. And it appears to be between Mr. Liu and a Stan Lam at Marcum.
I just want to direct your attention to the second page of the three-page document, halfway down the page, and this is an e-mail that Mr. Liu is sending to Mr. Lam October 14th, 2015 at 4:20 p.m.
Are you with me?
A Uh-huh.
MS. WHITE: We are.







EXHIBIT 2

BY MR. LEUNG:
Q Mr. Liu is writing Stan, "I need to set up a new vehicle in California to work with City of Hope, proposed name Beverly Cancer Center, LLC, holding company United MPH Ventures, LLC."
At the time, Dr. Thropay, had you ever heard of a company called United MPH Ventures?
A No.
Q And at the time was Mr. Liu giving you any forewarning that he was speaking with your company's CPA to set up new entities?
A No.
Q Okay. If you could open up Exhibit 104, please.
MS. WHITE: We have Exhibit 104.
MR. LEUNG: Great.
Q Before we talk about Exhibit 104, you testified earlier today about later learning that Mr. Liu had been in discussions with the City of Hope regarding any potential proton cancer therapy project with them. Do you recall that testimony?
A Yes.
Q And I believe the thrust of your testimony was that you weren't told about those discussions and you had been cut out of those discussions. Did I hear that right?
A Yes.

Page 122

Q If I could redirect your attention to Exhibit 104. For the record, this is a one-page document. It bears the page number COH-SEC0000506. And this appears to be an e-mail sent by Charles Liu to a Harlan Levine on October 19th, 2015. Subject line is Mr. Michael Hunn. Do you know who Mr. Michael Hunn is, Dr. Thropay?
A No.
Q Have you ever met a Michael Hunn?
A Not that I -- no.
Q Did you ever approve the use of Beverly Proton funds to be paid to Michael Hunn in return for consulting services?
A No.
Q All right. Mr. Lui's e-mail on October 19th to Harlan Levine says, "Dear Mr. Harlan, I would like to inform you that Mr. Michael Hunn has been engaged by my firm as my representative to work with City of Hope regarding our proposed partnership and joint ventures. All the best, Charles Liu, president and CEO, United MPH Ventures, LLC."
He's not signing off in this e-mail "President Beverly Proton," is he?
A No.
Q Okay. So that's October 19th to Michael Hunn.
In you could open up Exhibit 105, please.

Page 123

MS. WHITE: We have it opened.
BY MR. LEUNG:
Q Okay. For the record, Exhibit 105 is a seven-page document. It's entitled "Memorandum of Understanding." If you could just flip through it and let me know once you're ready to answer.
Have you seen this MOU before outside of the context of this case?
A No, I've never seen it before.
Q Okay. And the very first page of Exhibit 105 says "Memorandum of Understanding." And it reads, "This memorandum of understanding, memorandum of understanding, is intended to document our discussions to date concerning the proposed affiliation and joint venture among Beverly Community Hospital Association, DBA Beverly Hospital, a California nonprofit public benefit corporation, Beverly Hospital, United MPH Ventures LLC, a Delaware limited liability company, United MPH Ventures, and City of Hope Medical Foundation, a California nonprofit public benefit corporation, COHMF. With respect to the development and operation of, Roman 1, a new proton beam therapy center on the Beverly Hospital Campus."
Dr. Thropay, you don't own property on the Beverly Hospital campus, do you?
A No.

Page 124

Q Your property, 111 West Beverly, which you demolished and engaged in remediation work on in the summer of 2015, that's not located on the Beverly Hospital campus, is it?
A No.
Q And the parties to this MOU -- United MPH, City of Hope, Beverly Hospital -- you've got no role in any of those entities, do you?
A None whatsoever.
Q Okay. Then turning to the last page of Exhibit 105 -- I'm sorry. I'm going to direct you to page -- I guess it's 3.
MS. WHITE: We've got page 3 up.
BY MR. LEUNG:
Q Beverly Proton is not a signatory to this MOU. Is that correct, sir?
A That is correct.
Q Pacific Proton Therapy Regional Center is not a signatory to this MOU, is it?
A No.
Q The PP EB-5 Fund is not a signatory to this MOU, is it?
A No.
Q Neither are you or your sister, correct?
A Correct.

Page 125





EXHIBIT 2

Q But Mr. Liu is on behalf of United MPH Ventures, right?
A Right.
Q This MOU's dated October 22nd, 2015. At or near that time, was Mr. Liu telling you that he was entering into business discussions to do a joint venture for Proton Therapy Cancer Center with Beverly Hospital and City of Hope without your involvement?
A No, never told me.
Q If you could open up Exhibit 107, sir -- I'm sorry, 106.
MS. WHITE: We have Exhibit 106 open.
BY MR. LEUNG:
Q For the record, Exhibit 106 is a two-page document Bates-numbered COH_SEC 546 to 547. It's an e-mail string between defendant Liu, Michael Hunn, Alice Cheng, Harlan Levine. First e-mail in time is a month later, November 16th, 2015. Last e-mail in time is November 18th, 2015.
I just want to direct your attention, sir, to the latest e-mail in time, very first e-mail in the document itself. It's from an Alice Cheng to Charles Liu and others, November 18th, 2015, 12:16:27 a.m. Do you know who Alice Cheng is, Dr. Thropay?
A Yes. Yes, I know her.

Page 126

Q Where does she work or where did she work back in 2015, if you know?
A At Beverly Hospital.
Q Okay. And Ms. Cheng's writing to Dr. Levine and Mr. Liu and Mr. Lui's representative, Michael Hunn. "Hi, Dr. Levine. Short answer to your question, I don't think Dr. Thropay is interested in employment with COH as outlined in the MOU. Charles' vision of the cancer center is strictly between United MHP, COH and Beverly."
Does this e-mail suggest to you, consistent with your lack of knowledge about Mr. Lui's side dealings, that Liu was attempting to start up a new joint venture, form a new entity and build an entirely different proton therapy center than the one that was represented in Beverly Proton and PP EB-5 Fund's offering materials?
MR. GOURAIGE: Object to the question.
THE WITNESS: I only knew through people that I know at City of Hope that he was meeting with them, but I had no idea the depth of the agreement that he was making with them.
BY MR. LEUNG:
Q Okay. Let's focus on the subject Mevion. If you could open up Exhibit 107, please.
MS. WHITE: We have Exhibit 107 open.
MR. LEUNG: Thank you.

Page 127

Q Exhibit 107, for the record, is a one-page document Bates numbered COH-SEC 0000453. It's an e-mail string between Michael Hunn, Mr. Lui's representative and United MPH Ventures and Harlan Levine at City of Hope. The subject line is Mevion Medical Systems to install a proton therapy system in Switzerland. Mr. Hunn is writing to City of Hope. "Good talking with you this morning. I did a site visit at the Beverly campus today."
That's not your property, right? That's the Beverly Hospital campus?
A I would assume so. It's not mine.
Q Okay. And Mr. Hunn's saying, "Attached is a proton vendor that I mentioned." And you see there's a link to a Mevion Web site?
A Uh-huh, yes, I see it.
Q Okay. And you've never had any direct dealings with Michael Hunn?
A No.
Q Michael Hunn never brought Mevion to you, did he?
A No.
Q He brought Mevion to the attention of City of Hope as Charles Lui's representative for United MPH. Does that appear to be the case?
A That appears to be the case.
Q If you could open up Exhibit 109, please.

Page 128

MS. WHITE: We have Exhibit 109.
BY MR. LEUNG:
Q Okay. For the record, Exhibit 109 is a five-page document Bates-numbered COH-SEC 761 through 763. This is e-mail string with the subject line "Communications Planning Drafts Pending." And the participants to this e-mail string include a Mike Cogswell, a Heidi Hebson, who's designated as a VP business development for the City of Hope in the e-mail itself as well as Michael Hunn, Mr. Lui's representative at United MPH Ventures.
At the very top of the exhibit there's a November 16, 2015 e-mail from Hunn to Heidi Hebson and also Mike Cogswell and Harlan Levine and Alice Chen. And he writes, "Heidi, I am working on a draft communication for United MPH Ventures, LLC and also coordinating the communication with Mevion. Mevion is drafting a press release on the purchase of the proton system by United."
Now, I think there came a time when you're aware that Mr. Liu had caused about $3 million of Beverly Proton funds to be transferred to Mevion. Did you have any clue at the time that his representative, Michael Hunn, was talking with City of Hope about United purchasing a proton system machine from Mevion, United MPH Ventures?
A No. No, I don't know.
Q If you could turn to the second page of the

Page 129





EXHIBIT 2

document, it looks like there's some draft language regarding the communications planning. And it says "Investors, EB-5 investors, of United MPH Ventures, LLC."

Did anyone communicate to you whether it was Mr. Liu or otherwise that he was out raising EB-5 funds for United MPH ventures and not your company?

A No, I had no idea.

Q And then further down in the draft language, it says, "Proposed announcement," in parens, "a draft of language, script Q&A," closed parens, "noting that an MOU has been signed, that an equipment vendor has been selected, Mevion, the site has been prepared for construction that there is a 120 (sic) exclusive negotiating period and that the project was moving forward."

You were an owner of Beverly Proton. You were to be the medical director of Beverly Proton. Again, did you have any awareness that an MOU between City of Hope, Mr. Lui's company, United MPH, Beverly Hospital had been signed and that they were intending to purchase Mevion equipment with Beverly Proton funds?

A I had no idea.

Q Having seen all of these documents and these e-mail communications that you weren't privy to, Dr. Thropay, does that evidence give you cause for concern

Page 130

with respect to the legitimacy of the $3 million that Mr. Liu caused to be transferred from Beverly Proton's bank account to Mevion?

MR. GOURAIGE: Objection. Absolutely no knowledge on witness's part. No foundation for the question. Contract is between Mevion and Beverly Center. It was addressed to his sister. It wasn't addressed to United MPH.

THE WITNESS: It explains why the administrator with whom I had a previously good relationship, I would practice Chinese with her in the lunchroom. She stopped talking to me. I called Mevion. No one would speak to me. I found out who the salesperson was, and I said, "I'm supposed to be the medical director." And he wouldn't tell me anything. I said, "I need to see the machine at least. I'd like to know more about the Mevion." So they finally agreed to fly me to Barnes Jewish Hospital. But it was treated like I was out of the picture. And I was confused. So this explains a lot to me. Alice Cheng to this day would just say hi and take off.

BY MR. LEUNG:

Q And does it appear to you that money that Mr. Liu caused to be paid to Mevion was part and parcel of his self dealing in the course of entering into an MOU between his company, Beverly Hospital, and City of Hope?

Page 131

MR. GOURAIGE: Objection.

THE WITNESS: It appears that the funds were being diverted to people that were not part of the EB-5 program that I had signed, or at least so I thought.

BY MR. LEUNG:

Q Dr. Thropay, Mr. Gouraige asked you earlier today about a construction company called R Alan. Do you recall that testimony?

A Yes.

Q Okay. Your property is located at 111 West Beverly.

A Correct.

Q Beverly Hospital was located, or part of its campus, was at 105 West Beverly. Is that correct?

A Correct.

Q To the extent R Alan was paid for construction services on 105 West Beverly, is that consistent with your understanding of how the proton therapy project was to be conducted by your companies?

A No, it's not consistent.

MR. LEUNG: I'll pass the witness.

MR. GOURAIGE: Thank you.

FURTHER EXAMINATION

BY MR. GOURAIGE:

Q Dr. Thropay, I'd like for you to open up I

Page 132

think -- let me just confirm it. Give me a second. Your affidavit, I believe it's marked 78.

MS. WHITE: We have Exhibit 78 open.

MR. GOURAIGE: I want you to scroll down, Molly, and show the witness -- I'm trying to find. Okay. The pages of the ECF pagination, it's page 12, section 104, of the lease agreement.

MS. WHITE: We have section 1.04 of the lease agreement in front of us.

BY MR. GOURAIGE:

Q Dr. Thropay, could you read that paragraph, please.

A "This lease will be effective as of the date that which" --

Q You can read it to yourself.

A Oh, okay. Yes.

Q Did the project -- did Mr. Liu raise $100 million for the project?

A I don't know.

Q Well, did -- I think you testified earlier Delsk told you he had raised 30 million?

A Yes.

Q So this paragraph indicates that the lease is not effective until the project has raised 100 million?

A That was our original agreement.

Page 133

Q But you were paid lease payment, correct?
A Yes. We modified the agreement.
Q Did you change this paragraph?
A It was superseded by a subsequent agreement where he would have one year to do the construction and also the lease, that he would pay us because we were losing so much money while waiting and didn't see anything happening. So he agreed to modify it.
Q And when was the -- are you referring to the amended lease?
A I would assume so. I'm not sure, but I know that he entered into another agreement.
Q So my question to you is, notwithstanding this paragraph, do you believe that you were entitled to lease payments as early as April of 2015, May 2015?
A I asked him to start making payments, and he said he was willing to.
Q And he did?
A And he did.
Q And you accepted them?
A Yes.
MR. GOURAIGE: Okay. I am going to show you a new exhibit I am going to just mark for you, so if you can just bear with me a second.
(Exhibit 87 was marked for identification by



the court reporter and is attached hereto.)
MR. GOURAIGE: So Dr. Thropay, you should now see Exhibit 87. That's the pledge agreement.
MS. WHITE: We have Exhibit 87.
BY MR. GOURAIGE:
Q Okay. Is there anything in that -- Mr. Leung pointed out I did not show you the exhibit when I asked you the question. Is there anything in this document that you see that would lead you to change any of the testimony you gave today about the pledge agreement?
A What testimony are you referring to?
Q Your testimony about this document, this pledge agreement. Anything that you want to change now that you've looked at the document?
MS. WHITE: Objection; vague.
BY MR. GOURAIGE:
Q Is there an answer, Dr. Thropay?
A I don't see what there is to change.
Q Bear with me a second here.
So there were -- were you aware of any documents that provided for the amount of money that Charles Liu was to be paid for his role in raising capital?
A No.
Q You testified earlier that you were basically involved with the medical aspects of the project, and



Charles Liu was going to raise the capital.
A Correct.
Q Did Charles Liu raise the $27 million in capital without any help from you?
A I only would give talks on proton in China, and that was it.
Q Did you provide any other service to the project?
A Just the real estate.
Q Well, between November 19, 2010 when the Regional Center applied, and November of 2015 when you made your trip to China, other than leasing your land, did you personally provide any service to the project? Did you do any work for the project?
A I met every Friday at the corporate office with Skanska to go over the plans. Loma Linda was there. Skanska was there. This was a weekly meeting. They would come from Loma Linda. The meetings would take a couple of hours. I worked arduously. It was time out of my schedule. And the Skanska made a big manual, a book of all their drawings, which has mysteriously left my office. I don't know where it went. But yeah. I was working hard on the architects. Charles Liu came to one or two of the meetings for construction and for development of the project. I was at every single meeting. This is my dream to have a proton center. And the first -- he never came,



but I was there for every meeting. I participated actively.
Q Were you providing on the medical side, in terms of meeting with the companies that were going to provide the medical equipment, substantial amount of your time in providing service?
A I did it all without pay. I did it on my own for the project to get done.
Q Were you entitled to be paid? Did you have an agreement with Charles Liu about getting paid?
A No. I never asked for money.
Q Let me -- just bear with me a second. I want to introduce, Dr. Thropay, I believe it's exhibit -- let me just see the number here that I just introduced. 88. Would you look at the document?
MS. WHITE: We have Exhibit 88.
(Exhibit 88 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Have you Exhibit 88?
A Yes.
Q Okay. Could you look at, Dr. Thropay, the last page of Exhibit 88. And tell me, is that your signature?
A Yes.
Q And now go back up to up I think -- let's see --







EXHIBIT 2

page 4, paragraph C on that page 4. Do you see that?
A Yes, uh-huh.
Q And I'm going to read it to you. "Dr. Thropay shall be paid an annual salary of 350,000 plus reimbursement of expenses plus reimbursement of expenses" (sic) "in accordance with the company's policies and procedures."
Did I read that correctly?
A Yes.
Q You signed that document?
A Yes.
Q You read it before you signed it?
A Yes, especially the last line.
Q And you understood that you were entitled -- you were to be paid $350,000 for your annual salary for your service?
MR. LEUNG: Objection; misstates the document.
THE WITNESS: No. This would be -- my understanding is after the facility was built.
BY MR. GOURAIGE:
Q Right.
A That would be my salary.
Q Right. And that's why you were providing the service to get the project developed so it could get started and get patients and make money, and you would be



paid, correct?
A I had the patients to put it in. I'm the one that's making the business go. So that is the normal salary that was offered to medical directors. And there's a thing -- a line at the bottom. That's okay.
Q Dr. Thropay -- I'm sorry. Did you finish your answer?
A Yes.
Q Okay. Mr. Leung just asked you about funds transfers from company accounts to personal accounts of Charles Liu. Do you know whether these were treated by him and the Marcum accounting firm as compensation to him?
MS. WHITE: Objection; lacks foundation.
MR. LEUNG: Objection; misstates evidence.
THE WITNESS: I know nothing about what he did financially.
BY MR. GOURAIGE:
Q So you don't know anything about the funds transfer?
A I saw funds going out, but I don't know where they went or what they were for.
Q Well, you said you saw funds going out. I thought you testified earlier that you didn't have access to the Chase account.
A After I got the Chase account statement, I became



aware that funds were going out.
Q Right.
A Before, I had no idea.
Q Right. So that was in 2015, correct?
A Right.
Q When the -- do you know the year that the fund, the EB-5 Fund started actually receiving capital?
A No.
Q So you just didn't know much about the finances and revenues and expenses other than the -- what you've talked about, rental of equipment -- I mean rental of your land, purchase of equipment and land, the demolishing of the building on your land; is that correct?
A Correct.
MR. GOURAIGE: Okay. I have no further questions. Gary, your witness.
MR. LEUNG: Let's stay with Exhibit 88. I'll be real quick.

FURTHER EXAMINATION

BY MR. LEUNG:
Q If you have that in front of you, Dr. Thropay, could you turn to section 11 on the very last page. You see section 11 says "Binding except as specifically provided in sections 8, 9 and 12 of this MOU and a mutual confidentiality agreement, parties will not be legally



obligated with respect to any of the matters identifies" -- that's a typo -- "herein."
Did I read that right, sir?
A Yes.
Q Okay. Now, section 6A talks about Mr. Lui's compensation. That's not one of those provisions of this MOU that's legally binding according to section 11, is it? 6A, that's on the list of sections 8, 9 and 12 that are legal and binding, correct?
A Yeah, 8, 9 and 12. Correct.
Q Okay. And you talked about the compensation that you anticipated being paid to you upon commencement of operations. Do you recall that testimony with Mr. Gouraige?
A Yes.
Q And redirecting your attention to section 6C on page 4 -- you covered this with Herve, but it says, "Dr. Thropay shall be paid an annual salary of $350,000."
Did you ever draw an annual salary $350,000 from any of the project companies or investment fund or Regional Center?
A No. Zero.
Q Zero. Did you take $8.3 million from the corporate accounts?
A No. I never touched it.







EXHIBIT 2

Q Okay. And then turning back to binding section -- nonbinding section 6 dash --

MR. GOURAIGE: Objection to the implication --

MR. LEUNG: -- it says Mr. Liu.

MR. GOURAIGE: Objection to the implication that the defendants took $8.2 million from the account.

MR. LEUNG: It's in the record.

Q Section 6A reads, "Mr. Liu shall be entitled to a success fee for all capital raised from the EB-5 and other investors in an amount equal to 8 percent of the capital raised."

So that's nonbinding section 6A. Let's live in a world -- let's suppose that it was actually binding, which it isn't. Is 8 percent of $27 million equal to 8 million or dramatically less than 8 million?

A Dramatically less.

MR. LEUNG: Pass the witness.

MR. GOURAIGE: I have no further questions for the witness.

MR. LEUNG: Review and sign, Molly?

MS. WHITE: Yes, please. Send it to me.

(TIME NOTED: 1:55 p.m.)

Page 142

I, JOHN THROPAY, M.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _______ day of _____________, 2021, at ______________________, _________________.

(City) (State)

___________________________________

JOHN THROPAY, M.D.

VOLUME I

Page 143

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 17, 2021

VALERIE D. GRANILLO

CSR No. 11469

Page 144

**&**

**&** 3:4,13 25:19

**0**

**0000453** 128:2
**07102-5400** 3:17

**1**

**1** 1:25 3:16 79:24 124:21
**1-7-16** 6:22
**1.04** 133:8
**10-15-15** 6:8
**10-19-15** 6:10
**10-21-15** 6:17
**100** 5:22 10:18 20:16 47:14 133:17,24
**100,000** 79:16
**101** 5:23 6:5 118:24 119:2,9,11 119:16
**10233** 121:14
**103** 6:7 121:1,2,12
**104** 6:9 122:13,14 122:16 123:2 133:6
**105** 6:11 102:15 123:25 124:3,10 125:11 132:14,17
**106** 6:15 126:11,12 126:14
**107** 6:17 126:10 127:23,24 128:1
**109** 6:19 128:25 129:1,3
**11** 140:22,23 141:7
**11-13-15** 6:19
**11-16-15** 6:20
**110** 5:6 6:22
**111** 32:21 97:20 117:17 125:1 132:10
**11469** 1:22 2:18 144:25
**11th** 114:2
**12** 102:14 113:14 133:6 140:24 141:8,10
**120** 130:13
**12:16:27** 126:23
**13** 14:2,4 102:22
**132** 5:5
**134** 5:24
**137** 5:25
**140** 5:6
**140,000** 79:16
**144** 1:25
**14th** 114:6 121:16 121:22
**15** 16:22 33:22 51:4,5 57:23,23,24 57:25 66:17 101:14 103:3 119:22,25 120:1,5
**15th** 121:17
**16** 35:9 51:4 71:10 103:19 129:12
**16-00974** 1:7 2:7
**16th** 126:18
**17** 144:21
**1800** 4:7
**18th** 126:19,23
**19** 136:9
**19th** 123:5,14,24
**1:00** 110:5
**1:55** 2:16 142:22
**1s** 80:2,9,24 81:4
**1st** 113:20 114:11 119:6

**2**

**2.5.** 96:14
**200** 17:20 19:7 29:11 30:1 107:9
**2010** 14:6 17:10 136:9
**2013** 14:2 119:6
**2014** 33:11,22 112:8,8
**2015** 27:8 33:23 34:3 35:22 47:6 47:12 51:2,16,19 52:25,25 57:15,16 59:7,10 64:6 65:15,16 66:16 74:7 85:6 104:18 109:20 112:3 117:16 120:14 121:22 123:5 125:3 126:4,18,19 126:23 127:2 129:12 134:15,15 136:10 140:4
**2016** 34:3 35:8,23 38:21 39:1 40:10 40:15 43:25 47:6 47:12 51:7,12 57:11,13,23 72:10 82:3 84:2,2 101:23 112:3,9,19 112:21 114:14 116:4
**2017** 73:24
**2019** 88:6,15 91:2
**2021** 1:16 2:16 7:1 113:10 143:11 144:21
**220** 17:20
**22nd** 126:4
**235** 121:14
**24th** 113:10 114:9
**25** 9:9 20:20,23 22:20,23 23:3,9 47:9 49:9 84:16 84:23 96:12,15,15 96:22 103:4,9
**250,000** 30:12 113:16,18,21 114:9,12,15
**26** 35:8,9 38:21 51:12 82:3
**26th** 113:15
**27** 136:3 142:14
**28** 47:8
**29** 113:18

**3**

**3** 27:22 49:15 50:1 125:12,13 129:19 131:1
**3-27-16** 5:13
**30** 13:13 33:4,5 59:17 66:12,21 133:21
**300** 119:4
**301** 4:9
**323** 3:9
**350,000** 138:4,15 141:18,19
**38-2** 5:23 102:2

**4**

**4** 138:1,1 141:17
**4,000** 27:22
**4.3** 112:17
**40** 5:12
**40,000** 36:2
**4413389** 1:22
**444** 3:7
**4:20** 121:22

**5**

**5** 1:16 2:16 6:6 7:1 18:23,24 19:3,5,9 19:24 20:15 22:4 24:5,8,11 26:15,23 27:16 28:8 29:5,7 30:16,16 31:3,22 32:6,8 36:7 37:3 39:18 45:5 63:6 63:22 66:9 72:8 105:13 108:23 109:14 110:4 112:11 119:2,5,18 125:21 127:15 130:3,5 132:3 140:7 142:9
**5-6** 58:22
**5-7** 58:22
**50,000** 77:25
**500,000** 27:1 36:4 45:3 48:9 113:25 114:6
**546** 126:15
**547** 126:15
**57,200** 78:6
**5s** 108:19,20
**5th** 114:14

**6**

**6** 142:2
**643-5989** 3:18
**6a** 141:5,8 142:8 142:12
**6c** 141:16

**7**

**7** 5:5
**70** 13:12
**71** 5:14 8:13
**719** 8:3
**7355** 144:23
**74,217** 102:22
**75** 8:13 20:21,22 55:18 84:23
**750,000** 114:3
**761** 129:4
**763** 129:4
**78** 5:12 40:23 41:2 133:2,3
**79** 5:13 71:1,2,3,6
**7th** 113:23

**8**

**8** 112:10,17 140:24 141:8,10 142:10 142:14,14,15
**8.2** 142:6
**8.3** 141:23
**80** 5:15 71:1 95:24 96:1
**81** 5:16 97:2,5
**82** 5:18 97:25 98:2 98:3
**83** 5:19 98:15,19 113:11,13
**838,500** 36:5,24 46:20
**84** 5:20 99:5,8,13
**85** 5:22 100:13,14
**86** 5:23 101:10,12 101:15,21
**87** 5:24 134:25 135:3,4
**88** 5:25 137:14,16 137:17,20,23 140:17
**8th** 4:7

**9**

**9** 140:24 141:8,10
**90** 37:2
**900** 3:7
**90067-1501** 4:8
**90071** 3:8
**91006** 8:3
**956-3423** 4:9
**96** 5:15
**965-3998** 3:9
**97** 5:17
**973** 3:18
**98** 5:18,19
**99** 5:21
**9:00** 2:15 7:2

**a**

**a.m.** 2:15 7:2 126:23
**able** 27:2 62:13 70:21 80:15 95:17 119:14
**absolutely** 131:4
**abstracted** 100:10
**accepted** 134:20
**access** 139:23
**accompanying** 107:15
**account** 26:7 44:2 44:3 62:8 64:17 79:3,8,15 81:25 86:21 93:1 113:16 113:17,19,19,22 113:24 114:1,4,4,7 114:7,10,13,16 115:5 131:3 139:24,25 142:6
**accountant** 62:16 62:17,19 64:9,14 66:6 79:2 120:23
**accountants** 67:22 74:11 79:21 80:25 81:3 94:4
**accounting** 59:18 60:1 61:10 69:18 69:22,24,25 70:5 74:9 79:14 93:25 120:18 139:12
**accounts** 61:18,19 61:24 67:5 112:10 112:12,13,23,23 114:23,24,25 115:18,19,19 139:10,10 141:24
**act** 7:10
**acted** 65:20
**action** 35:7,14,19 38:21 39:17 42:14 42:17,24 45:19,23 46:6 51:8,12 72:11,11 81:6 101:23 144:17,18
**active** 108:14
**actively** 137:2
**acutely** 105:18
**add** 48:17
**addition** 10:10 79:6 91:15
**address** 8:2 97:21 102:13
**addressed** 71:14 131:7,7
**administered** 7:5 144:7
**administrator** 89:10 131:9
**administrators** 56:2
**admonish** 34:15 83:4
**adobe** 113:3
**advance** 28:5
**advice** 67:23 90:7
**advise** 83:3
**advised** 69:13 90:17






EXHIBIT 2

**affidavit** 41:10,11 41:20,22 42:1,2 133:2
**affiliated** 55:15
**affiliation** 124:14
**afforded** 87:5
**afternoon** 110:14
**ago** 12:3 46:7 97:17 98:22
**agree** 18:16 20:6 20:24 21:1 28:12 28:20 33:3 95:1 115:16
**agreed** 38:12 58:12 96:16 131:17 134:8
**agreement** 5:24 22:25 28:13,15,16 28:17,18,21 30:9 30:18 33:3 37:9 38:17 127:19 133:7,9,25 134:2,4 134:12 135:3,10 135:13 137:10 140:25
**agrx** 1:8 2:8
**ahead** 118:6,7,8
**al** 1:9 2:9
**alan** 78:10,11 132:7,16
**alhambra** 58:25 61:21
**alice** 6:12,15 54:6 126:16,22,24 129:13 131:19
**allowed** 42:13
**alvarado** 34:13,17
**amended** 134:10
**amount** 16:23 17:14 29:7,10,16 30:1,21 36:3 38:12 48:2 49:13 78:2 135:21 137:5 142:10
**amounts** 41:16
**angeles** 3:8 4:8 9:7 45:24 63:19 77:22
**announcement** 130:9
**annual** 138:4,15 141:18,19
**answer** 7:23 21:15 48:19 49:23 50:14 58:17 67:10 70:3 70:12 72:19 84:6 86:25 87:3,9 89:21 90:1,15 91:6 102:13 114:20 115:3,7,10 115:12,14,23 124:6 127:6 135:17 139:7
**answered** 89:17 90:14
**answers** 74:11
**anticipated** 141:12
**anybody** 15:17 30:20 53:20 54:10 57:19 104:5 109:23 118:12
**anyway** 102:13
**apologies** 29:23 121:8
**apparently** 45:2
**appear** 116:2 128:23 131:22 143:6
**appearances** 3:1 4:1
**appears** 121:17 123:3 128:24 132:2
**application** 21:8 24:20,23 25:2,22 91:9 94:6,24 95:6 95:10 116:10 117:8 120:17 132:6 134:16 135:7 137:11 139:9
**applied** 24:18 136:10
**apply** 24:16
**appoint** 52:2,17
**appointed** 39:19 43:21 72:12,16
**appointing** 51:24
**appointment** 75:20
**appreciate** 7:21
**approval** 42:6,9
**approve** 25:7 123:10
**approved** 42:13
**approximately** 49:7 95:14
**april** 33:11,20,23 34:3,3 35:22,23 40:15 112:9,18,21 114:11,14 134:15
**arcadia** 8:3
**architects** 136:22
**architectural** 78:17
**arduously** 136:18
**area** 8:18 60:21 92:10
**arena** 57:8
**argumentative** 86:1,11 87:4 92:17
**arm's** 38:6,17
**arrange** 55:22
**arrangements** 46:19
**asian** 58:9
**asked** 16:11 44:19 44:21 58:8 67:7 81:11 89:17 90:14
**asking** 62:9 102:6 105:25 116:13
**aspect** 13:10
**aspects** 135:25
**asset** 43:11
**assets** 28:25 29:4 29:18 30:7 32:1 38:21 39:17,20
**assign** 21:13
**assistant** 56:1
**association** 124:15
**assume** 37:5 46:7 62:6 82:19 84:1 88:23 98:10 103:14 128:11 134:11
**assumed** 29:11
**attached** 40:24 41:12 71:4 96:2 97:3 98:4,16 99:14 100:15 101:13 128:12 135:1 137:18 143:7
**attachments** 41:8 41:9
**attempted** 28:10
**attempting** 127:12
**attended** 8:10
**attention** 21:25 51:18 57:19 58:1 119:1,21 121:12 121:19 123:1 126:20 128:21 141:16

**attested** 101:25
**attorney** 3:6,15 4:6 7:9,21 34:16 45:7,8 46:4 68:20 69:8 81:5 82:4,7 82:10,13 83:2,5,8 83:8 144:18
**attorneys** 25:8,9 34:14,18,21 35:4 45:13 80:6
**audio** 34:21
**august** 34:8 57:24 57:25
**authorities** 74:13 88:21 89:16 90:13
**authority** 26:6,9 26:11
**auxiliary** 105:11
**avoids** 15:5
**aware** 10:24,25,25 11:1,2 18:12 21:10 35:7 37:2 38:23 46:18 47:21 47:24 48:2,16,20 48:25 49:19,24,25 52:1 78:11 80:13 81:1 91:12 94:15 94:17 99:25 104:8 105:18 112:13 114:22 129:18 135:20 140:1
**awareness** 112:21 130:18

**b**

**bachelor's** 8:13
**back** 17:4,5 20:14 34:23 39:11 42:22 44:12 45:12 47:6 47:12 60:9 62:18 67:7,20 68:18 74:7,7 81:21,22 83:9 88:2 119:15 127:1 137:25 142:1
**backup** 90:24 91:10
**bad** 113:6
**bailiwick** 92:24
**bank** 5:22 26:7 44:3 61:16,17,20 62:1,12,15,24 64:10,15 65:23,25 76:1 82:9 86:3,20 86:21 100:21 113:17,20,23 114:2,5,7,8,11,13 114:17,23,25 115:6 131:3
**banker** 16:5
**banking** 14:20
**bankrupt** 14:21 16:6
**barnes** 131:17
**based** 25:10 38:11
**basically** 25:5 58:18 61:21 68:10 70:1 135:24
**bates** 121:14 126:15 128:2 129:4
**beam** 15:11 120:9 120:9,11 124:21
**bear** 97:1 100:12 101:16 134:24 135:19 137:12
**bears** 119:3 121:13 123:3
**beginning** 2:15 52:6 60:7 113:13
**begins** 121:15
**begun** 60:8
**behalf** 2:14 45:19 45:20 120:18 126:1
**beijing** 86:6
**believe** 19:21 21:7 22:19 23:8,21 24:10 25:24 27:17 30:19 33:6 34:4 36:2 40:11,11,11 43:18 44:1 49:18 50:15,25 73:25 77:10 80:1,9 96:21 100:10 101:24 104:17 105:19 107:1 119:20 122:22 133:2 134:14 137:13
**believed** 36:19
**bell** 24:25 36:5 65:4 75:12 120:20
**benefit** 124:16,19
**best** 123:19
**better** 31:14 35:21 93:2
**beverly** 5:17 6:12 10:13,20,23 11:13 11:16,18 12:1,7,10 12:13,17,22 13:11 13:12,14,15 23:7 23:11 24:4,9 28:8 28:12,20,24 29:1,2 29:3,5,8 30:4,8 31:2,7,11,13,16,18 31:23 32:1,5,21,24 33:4,18 37:3 39:18 42:20 50:8 50:21 51:24 52:3 52:5,18 77:11 80:14 83:20 84:4 85:7,10,18 88:4 91:24 93:5 96:19 97:21,22 102:15 103:6,25 104:2 107:9,11 108:6 112:11 117:17 122:4 123:10,22 124:14,15,16,22 124:24 125:1,3,7 125:15 126:7 127:3,9,14 128:8 128:10 129:19 130:16,17,19,21 131:2,6,25 132:11 132:13,14,17
**beyond** 108:3
**big** 67:16 136:19
**bill** 11:8,18 12:17 12:19 67:3
**binding** 140:23 141:7,9 142:1,13
**biography** 99:22 99:23
**bit** 7:22 17:5 32:17 48:17 91:7 110:25
**black** 93:1,2,6
**body** 15:10
**boic** 116:10
**book** 136:19
**borrower** 120:8
**bottom** 119:25 120:2 139:5
**boulevard** 32:21 97:21 102:15 107:9
**branch** 61:23
**branches** 61:22
**breach** 54:23 85:16,21
**breached** 85:17
**break** 29:20 39:7 68:12 95:13,20

110:6
**briefly** 8:20 107:1
**bring** 57:19 61:1,4 61:9
**brings** 88:14
**broker** 26:20 64:3
**brokers** 63:6
**brother** 11:9
**brought** 57:25 61:7 128:19,21
**build** 16:1,24 17:25 18:17 19:14 32:18,24 50:20 55:4 56:19 127:13
**building** 17:13 32:17 34:1,2 37:6 37:8,9,12 40:6,7 40:13 50:17,19,20 51:1,8,13 59:13 60:6 68:6 77:4 117:17 140:13
**built** 10:8 32:13,15 33:5,6 35:10 53:4 83:21 97:22 108:7 119:15 138:19
**business** 5:20 13:7 13:8,10,13 15:15 27:24 48:11 49:17 51:21 86:8 91:15 91:18,21,21 99:17 103:20 108:16 112:9 115:14,20 116:24 126:6 129:8 139:3
**businesses** 10:11 50:8
**buying** 49:6 82:23

**c**

**c** 1:8 2:8 54:6 68:25 138:1
**california** 1:2 2:2 2:15 3:8 4:8 8:2 8:14 9:10 71:20 91:5,11 102:16 120:10 122:3 124:16,19 144:2
**call** 24:17 54:19,20 60:11 61:12 62:5 62:9 69:1 87:3
**called** 9:24 10:13 18:18,22 23:7 24:4 55:11 58:4 59:12 60:20,23 61:17 62:18 64:23 82:19 87:9 122:7 131:12 132:7
**calling** 70:14 118:16
**calls** 38:3 67:10 70:3 73:5 74:6 86:25 92:21
**campus** 124:22,24 125:4 128:8,10 132:14
**cancel** 34:12,21 35:4,13
**canceled** 34:9,18 39:5 58:14
**cancellable** 34:10
**cancellation** 39:24 40:3
**cancer** 8:24 9:4 119:19 122:4,19 126:7 127:8
**cancerous** 15:5
**capable** 29:16
**capacity** 81:13
**capital** 16:23 17:14,18,25 18:2,6 18:8 19:11,14,17 24:9,14 26:14 37:3 50:24 72:23 103:10 106:1 135:22 136:1,3 140:7 142:9,10
**card** 27:2 62:1,12 119:14
**careful** 90:5
**case** 31:12 46:2,17 46:23 102:1 110:15,21 112:8 112:16 124:8 128:23,24 144:14
**casual** 58:23
**cause** 130:25
**caused** 115:17 129:19 131:2,23
**cease** 82:11
**celebrating** 108:24
**cells** 15:5,5
**center** 5:21 14:17 15:1 16:16,19,24 18:1,17 19:14 22:9,12,15,17,20 22:23 23:1,7,9,11 23:12,15,17,20 24:1,9,17,18,19 26:1,2 28:9 29:5,8 31:2,7,11,13,16,18 31:19,23 32:5,18 32:24,24 33:4 35:10 39:18,18 40:6 42:20 50:21 51:25 52:3,5,18 53:6 55:4,15 61:24 79:8,15 81:25 82:22 83:10 84:4,4,23 85:6,7 85:10,11 93:5,6 96:20 97:22 108:6 108:7 112:12 119:19 120:12 122:4 124:21 125:18 126:7 127:8,14 131:6 136:10,25 141:21
**center's** 26:7
**centers** 68:8
**central** 1:2 2:2
**century** 4:7
**ceo** 30:4 51:24 52:3,18 123:19
**certificate** 5:15 22:22 96:6,11,12
**certified** 2:17 144:1
**certify** 144:3,16
**chairman** 54:7
**chang** 53:19 54:7 54:10 56:1
**change** 60:22 134:3 135:9,13,18
**changed** 62:2
**changing** 111:18
**characterization** 115:16
**charge** 44:13 53:11 55:18 60:16 60:18 67:2
**charles** 1:8 2:8 5:14 6:14,16,24 7:9 14:1,14 15:14 15:17,19 19:19 20:10 21:4 22:2 22:17 23:6 24:3 24:13 26:2,10,14 27:5,12 28:4,7 29:15 30:14,25 32:23 36:17 37:15 37:22 38:1 47:17 48:5,7,25 49:10 50:23 51:21 52:2 52:15,24 53:18

54:15 56:5,19 57:6 59:12 60:23 62:6 63:16 64:4 67:4,8,13,18,21 68:1 69:6,22 70:5 71:14,24 73:14 74:5,9 76:3 82:11 82:22,24 84:22 85:13 86:8,15,21 86:23 93:21 94:3 100:8 103:25 104:3,20 107:3,18 108:5 109:2,16,17 113:9 123:4,19 126:22 127:8 128:22 135:21 136:1,3,22 137:10 139:11

**chart** 5:18

**chase** 5:22 61:20 61:22,23 64:10,15 65:23,25 69:5 79:3 86:21 112:13 113:16,24 114:3,6 114:10,16 139:24 139:25

**chemo** 15:4

**chemotherapy** 15:9

**chen** 129:13

**cheng** 6:12,15 54:6 54:6 126:17,22,24 131:19

**cheng's** 127:4

**chief** 23:25 52:7 52:10

**chien** 111:7,9,15 111:16,23,23,24

**children** 8:6,8

**china** 26:19 27:3 27:11,20 28:3 45:4 55:14 57:16 58:3,5,10 59:6,10 60:8,11 62:21,23 63:6,15,17,23,24 64:3,24 65:5,6,15 65:17 66:24 67:12 67:25 68:18 72:6 74:8 75:15 77:22 86:6,14 93:19 104:18 106:21,25 108:12,17 113:17 113:20,22 114:1,1 114:5,5,8,8,10,11 114:13,16,25 115:5 136:5,11

**chinese** 13:23,24 32:9 63:20 67:14 98:13 106:3,7,12 107:25 109:9 110:20 111:1,2,15 111:20 131:11

**choice** 20:19

**chung** 65:18

**circle** 102:22

**city** 6:21,23 53:22 54:1 56:18,20,25 58:3 63:18 85:17 103:6,25 104:2 122:3,18 123:17 124:18 125:6 126:7 127:18 128:4,7,21 129:8 129:22 130:18 131:25 143:11

**civil** 42:10 46:1

**cjc** 1:7 2:7

**clarification** 66:15 111:11

**clarify** 80:11

**class** 27:23,24 45:19 81:6

**clean** 77:3

**clear** 26:16 76:24 96:15

**client** 34:16 69:8 83:5

**clients** 117:14

**clinical** 15:12

**clinics** 12:22,24 13:1,4 92:1,2,3

**cliu** 121:14

**closed** 130:10

**closely** 11:25

**clothes** 58:23

**clue** 129:20

**cogswell** 77:1 129:7,13

**coh** 56:15,17 123:3 126:15 127:7,9 128:2 129:4

**cohmf** 6:12 124:20

**colleagues** 53:12 53:22 54:22

**collected** 76:16

**collecting** 44:13

**collections** 76:15

**collector** 43:22

**college** 8:10

**come** 14:11 16:3,7 17:1,4,24,25 20:9 26:5,13,17 28:7 39:11 47:8 59:4,9 62:21 102:3 107:12 136:17

**commence** 117:22

**commencement** 141:12

**commencing** 38:15

**commend** 110:20

**commission** 1:5 2:5 3:4 110:16

**communicate** 130:4

**communicated** 117:11

**communication** 45:15 76:25 81:10 129:14,15

**communications** 82:4 83:6 129:5 130:2,24

**community** 54:17 124:15

**companies** 10:21 26:1 84:22 117:1 132:19 137:4 141:20

**company** 9:24 10:13,16,20 12:20 13:11 14:20,25 21:20 23:6,11 24:3,5,7 28:23 29:14,15 31:25 39:17 47:15 48:22 49:16 58:4 83:19 84:11,15,16 88:4 90:23 94:1 96:17 105:11 119:4 122:4,7 124:18 130:6,19 131:25 132:7 139:10

**company's** 122:10 138:6

**compensation** 139:12 141:6,11

**complaining** 48:7

**complaint** 82:3

**complete** 72:23

**completion** 144:14

**compound** 50:9

**computer** 89:10

**concern** 130:25
**concerned** 58:11 62:19,25 67:8 76:2 96:7
**concerning** 124:13
**concerns** 76:2 79:3 112:3 116:2 116:3
**concrete** 38:9
**conduct** 12:20
**conducted** 80:14 107:21 132:19
**confidentiality** 140:25
**confirm** 133:1
**confront** 55:7
**confused** 131:19
**connection** 82:12
**consider** 54:23 91:14 104:1
**considered** 9:1 27:1 38:11,16
**consistent** 120:13 127:10 132:17,20
**consistently** 110:22
**constantly** 70:15
**constructed** 20:22
**construction** 20:21 38:18 39:5 40:14 58:11 59:3 60:5,7,8 61:3 64:19 72:3 78:10 78:11 84:25 85:2 116:7 117:21 130:13 132:7,16 134:5 136:23
**consultant** 77:24 78:1 88:13
**consulting** 78:7 123:11
**consume** 41:15
**contact** 62:3 76:3 77:6 82:25
**contacted** 45:7 63:3,11
**contain** 88:23
**contained** 143:8
**context** 51:6 92:19 124:8
**continue** 42:14 82:4 104:12
**continued** 4:1 6:1 42:16
**continuing** 73:14
**contract** 33:6,8,8 34:19 47:22 49:1 49:3,11,20 54:19 67:2,12,13,15,16 104:3 109:5 120:12 131:6
**contractor** 77:5
**contradicted** 116:15
**control** 61:9 82:21
**conversation** 72:12,15 73:11
**conversations** 34:17 69:17 73:4 74:4 106:11 110:25 111:5,14
**convinced** 20:15
**coo** 23:25 52:11
**coordinating** 129:15
**copies** 62:23 66:3 81:4
**copy** 80:15 101:22
**cornell** 25:17
**corporate** 14:9 17:7 31:11 101:24 102:1 107:7,8,10 112:10,22 114:23 115:18 120:19 136:14 141:24
**corporation** 124:16,20
**correct** 11:9,10 15:2,6 17:15,16 19:4,23 25:23 27:9 30:18 31:21 32:9,19,20 34:3 35:12 36:8 37:24 37:25 40:10,12 41:22,23,24,25 42:2,7,9,14,18,22 42:23 43:1,2,12 48:12 50:8,18,21 50:22,24 51:3,14 52:8,11,12,14,16 55:6 69:23 72:20 76:9,17,18,20 79:13 84:24 85:7 85:11 87:9,10 88:6,7,24,25 89:2 89:3 90:22 96:13 97:23 102:16,17 102:20 108:4 109:19 117:9,10 118:22 125:16,17 125:24,25 132:12 132:14,15 134:1 136:2 139:1 140:4 140:13,14 141:9 141:10 143:9
**corrected** 143:8
**corrections** 143:6
**correctly** 66:13 72:18 90:20 107:7 138:8
**cost** 27:19 47:1,7
**counsel** 68:20,20 70:4 74:22,25 90:3,16 100:7 110:15
**counsel's** 80:13
**county** 9:7 96:18
**couple** 136:17
**course** 35:22 39:4 117:3 121:4 131:24
**court** 1:1 2:1 7:23 35:4,6 39:19,23 40:24 42:6,8,10,10 42:12,14,17,24 45:25 46:1 71:4 72:12,16 89:20 96:2 97:3 98:4,16 99:14 100:15 101:13,22 112:7 112:17 135:1 137:18
**court's** 38:22 87:6
**courtesies** 108:1
**cover** 32:3
**covered** 141:17
**cpa** 122:10
**crashed** 88:5
**crisis** 14:20
**csr** 1:22 144:25
**cummis** 3:13
**current** 7:20 47:10 47:11
**currently** 9:6
**cut** 64:12 91:7 122:24
**cutoff** 59:23

**d**

**d** 1:21 2:17 103:4 103:10 144:24
**dal** 59:19 60:25 61:6
**damage** 15:5

**dark** 76:14
**dash** 142:2
**data** 90:24 100:10
**date** 51:13 71:9 124:13 133:13 144:19
**dated** 6:8,10,17,22 119:6 126:4 144:21
**davidovich** 46:5
**day** 87:18 113:21 131:20 143:10
**days** 38:9 97:15 113:23 114:2
**dba** 124:15
**deal** 120:24
**dealing** 62:10 63:13 131:24
**dealings** 50:3 63:10 127:11 128:16
**dear** 123:15
**debt** 119:15
**december** 52:25 75:18,21
**decide** 74:9
**decided** 80:19 83:1,13
**decipher** 98:14
**decision** 83:3,19 90:8
**declaration** 5:12 41:14 101:25
**declare** 143:4
**defendant** 111:1,1 112:9 119:17 126:16
**defendants** 1:10 2:10,14 3:12 31:12 46:16 81:8 101:24 102:1 110:22 120:19 142:6
**defer** 116:16,21
**deficit** 79:15
**defined** 31:12
**delaware** 124:17
**delivered** 110:8
**delsk** 5:13 58:4,5 58:11,15 59:3 60:11 61:12 62:18 63:2,10,14,15 64:2 64:7,24 65:7,16,22 66:24 67:11,17,24 68:19 70:1,13,14 71:19 72:15,23 73:3,10,13 74:2 76:1 79:3 85:5 86:7 87:2,16,18,19 95:7 100:23 101:6 104:19,22 107:2 108:22,25 109:1,4 109:5,6,18,21,21 112:4 116:3 118:4 133:20
**demolish** 118:8
**demolished** 37:12 50:20 51:1,9,10,13 51:15,19 60:6 117:18 125:2
**demolishing** 140:12
**demolition** 37:14 68:6 78:12 117:20
**department** 14:13 54:9
**dependent** 92:11
**depends** 15:11 47:3 100:7
**deposed** 35:8 46:11,13 94:13
**deposition** 1:14 2:13 7:17 81:20 84:21 112:2 113:10 114:21 116:1 119:2 144:13
**depressed** 67:1 72:5
**depth** 68:4 127:19
**describe** 8:20 58:21
**description** 5:11 6:4
**designated** 21:9 23:14,19,25 52:7 52:10 129:8
**detail** 103:6
**details** 49:21
**determined** 90:2
**develop** 26:2 51:20 68:2
**developed** 138:24
**developer** 120:10
**development** 124:20 129:8 136:23
**devoted** 13:6
**dialect** 13:24
**difference** 92:12 92:16
**different** 38:8 92:18,19 127:13
**diluted** 103:17
**dinosaur** 121:4
**direct** 41:17 51:18 53:6 113:10 119:21 121:11,19 125:11 126:20 128:16
**directed** 118:25
**direction** 144:10
**directions** 69:17
**directly** 77:12
**director** 10:7 20:18 23:18 52:13 53:3,7 54:21 130:17 131:14
**directors** 55:3 139:4
**disadvantaged** 92:10
**disappointed** 72:9
**disappointing** 116:7
**disaster** 90:25 91:10
**disbursed** 79:6
**disclose** 34:16 83:5
**disclosed** 89:6
**discovery** 46:10 80:18 87:5
**discuss** 108:5
**discussed** 17:14 28:8 50:2
**discussion** 10:6 22:2 56:14 72:21 88:1 108:9,21 109:13
**discussions** 21:4 66:24 122:18,23 122:24 124:13 126:6
**disgorgement** 43:11 95:5,8
**displaying** 113:8
**dispute** 51:21,22 51:23 52:5,23 53:2,25 54:4 57:8 68:8

**disregarded** 53:6
**dissolved** 84:11
**district** 1:1,2 2:1,2
**diverted** 132:3
**doctor** 103:10
**document** 5:19,23 21:23 23:3 25:7 41:4 71:15,17 80:13 96:4,10 97:12,14 98:6,18 100:12 101:5,10 101:11,18 102:2,6 102:9,18 104:13 119:1,3,8,22 121:13,20 123:2 124:4,13 126:15 126:21 128:2 129:4 130:1 135:8 135:12,14 137:15 138:10,17
**document's** 119:6
**documentation** 21:19
**documents** 21:11 22:1 69:5 80:16 80:21 81:5,8,11,12 82:7 87:2 95:14 95:14,16 97:16 100:22,25 130:23 135:20
**doing** 10:4 12:5 16:11 56:23 57:7 69:6 85:22,24 95:18 108:8 110:16 118:13
**dollars** 45:18 113:25 114:23 116:25
**dominican** 9:15,20
**don** 101:25
**dr** 5:14 7:8,12,16 8:1,4 13:20 25:25 29:25 30:20 31:18 37:10 38:20 39:16 40:21 41:1,14,21 42:4 43:7 46:9,25 48:5,19 50:14 53:19 54:6,6,10 56:1 63:2 65:14 67:24 68:18 70:18 70:21 71:6,11,15 72:11,19 79:8 80:11,24 81:13,14 81:22,23 84:20 87:23 88:4 89:25 91:14 92:24 94:7 95:15,23 96:10 97:4,11,25 98:6,13 98:21 99:6 100:12 100:17 101:9 102:9 103:12,24 104:16 110:4,9,14 114:22 115:17 116:1,9,23 119:12 119:16 121:11 122:6 123:6 124:23 126:24 127:4,6,7 130:25 132:6,25 133:11 135:2,17 137:13 137:22 138:3 139:6 140:21 141:18
**draft** 129:14 130:1 130:8,9
**drafting** 129:16
**drafts** 129:6
**dramatically** 142:15,16
**draw** 141:19
**drawings** 136:20
**dream** 136:24
**drive** 80:21
**dropped** 34:25
**duo** 111:6,9,23,23
**duoshao** 111:15 111:15,24

**e**

**e** 6:7,9,15,17,19,22 45:15 54:6 68:25 78:6 81:9 87:13 87:15,20 121:15 121:16,17,21 123:4,14,21 126:16,17,18,21 126:21 127:10 128:2 129:5,7,9,12 130:24
**earlier** 65:15 77:21 81:6 110:25 116:9 122:17 132:6 133:20 135:24 139:23
**early** 21:11 33:22 104:19 134:15
**east** 4:7,7 107:9
**eb** 6:6 18:23,24 19:3,5,9,24 20:15 22:4 24:5,8,11 26:15,23 27:16 28:8 29:5,7 30:16 30:16 31:3,22 32:6,8 36:7 37:3 39:18 45:5 63:6 63:22 66:9 72:8 105:13 108:19,20 108:23 109:14 112:11 119:5,18 125:21 127:15 130:3,5 132:3 140:7 142:9
**ecf** 133:6
**edgar** 88:13
**edison** 65:4,17,18 66:8,24
**effective** 15:3 96:6 133:13,24
**effort** 38:1
**egnyte** 118:24
**either** 18:10 31:13 43:18 89:15 93:6 111:10
**electronic** 88:5
**else's** 62:6
**embarrassed** 57:3
**embarrassing** 53:12 54:22 56:16
**employee** 144:17
**employment** 127:7
**empty** 60:13
**ends** 110:1 121:16
**enforce** 39:23
**enforcement** 7:10 101:23
**engage** 120:8
**engaged** 123:16 125:2
**engaging** 69:16
**english** 107:21 108:1 109:14
**enter** 49:1
**entered** 47:21 116:11,23 134:12
**entering** 126:5 131:24
**entire** 15:10 29:16
**entirely** 127:13
**entities** 91:22 93:4 122:11 125:8
**entitled** 94:22 95:2 124:4 134:14 137:9 138:14

142:8
**entity** 127:13
**equal** 142:10,14
**equipment** 18:11 47:1,22,25 48:11 48:22,23 49:5 120:15 130:11,21 137:5 140:11,12
**equity** 19:11,14 22:12 84:3,16 85:6,10,13 93:5
**eric** 54:7,10 56:1
**error** 67:3
**escrow** 44:6
**especially** 138:13
**estate** 34:13 83:8 136:8
**estimate** 46:7
**et** 1:9 2:9
**event** 90:24
**events** 57:10
**eventually** 35:6
**everybody** 54:2,3
**everything's** 32:16 38:8 60:4,4 61:11
**evidence** 79:20 112:8,16 130:25 139:14
**evidently** 101:21
**exact** 14:2 61:2
**exactly** 23:24 48:4 60:24 73:22 75:20 77:9 99:19
**examination** 5:2 7:14 95:12 110:1 110:12 132:23 140:19
**examined** 7:5
**exchange** 1:5 2:5 3:4 110:16
**excluding** 27:10
**exclusive** 109:5 130:13
**executed** 116:16 143:10
**executive** 102:14
**executives** 65:21
**exhibit** 5:12,13,15 5:16,18,19,20,22 5:23,24,25 6:5,7,9 6:11,15,17,19,22 39:8 40:21,23 41:2 70:19,22,25 71:3,6 95:17,24 96:1 97:1,2,5,25 97:25 98:2,3,12,15 98:19 99:5,8,13 100:13,14 101:10 101:12,21 113:8 118:24 119:2,2,9 119:11,16 121:1,2 121:12 122:13,14 122:16 123:1,25 124:3,10 125:10 126:10,12,14 127:23,24 128:1 128:25 129:1,3,11 133:3 134:23,25 135:3,4,7 137:13 137:16,17,20,23 140:17
**exhibits** 6:2 41:15 41:17,17 118:23
**existence** 84:15
**existing** 117:17
**exists** 84:7
**expect** 75:22
**expected** 16:11 32:11 90:18
**expenditure** 76:19
**expenses** 28:3,5 50:8 76:20,22 138:5,5 140:10
**experience** 7:16
**experienced** 9:3
**expert** 90:8,17
**explain** 15:8 22:8 26:24 95:16 105:16 109:3
**explained** 112:2
**explains** 131:9,19
**extension** 59:23
**extent** 80:20 92:20 116:13 132:16
**external** 15:11

**f**

**face** 7:22
**facility** 10:7,8 138:19
**fact** 48:25 87:5 90:20 112:14 117:5
**factors** 38:16
**facts** 86:13
**failed** 57:11 69:19
**faith** 80:14
**fall** 52:24
**familiar** 7:19 10:13 77:15
**family** 108:22
**famous** 58:5
**fantastic** 110:11
**far** 48:10 50:7 93:4 96:7 104:8 107:20
**fast** 118:15
**fate** 72:6
**february** 73:22,23 112:18,20 113:9 113:15,18
**federal** 42:6,8,10 45:25 89:16 144:13
**fee** 77:24 78:1 142:9
**feed** 121:4
**feel** 63:1
**fellow** 59:14
**felt** 38:6 74:12
**figure** 95:18 106:10
**figured** 18:20
**file** 113:3,9
**filed** 21:8 35:7,14 35:19 39:17 46:6 51:8,12 82:3 112:7,16
**filing** 101:22
**fill** 118:11
**final** 114:14
**finally** 114:14 131:17
**finance** 14:21 16:12
**finances** 26:11 72:4 76:15,19 93:11 105:17,18 140:9
**financial** 61:1 69:5 84:21 89:11,12 93:13 94:7,9,17,17 94:19
**financially** 139:16 144:16
**financing** 14:19,23 16:4,6,8,12 18:18 19:3 20:4,6
**find** 12:1 53:7 54:15 55:1 76:8 88:9,15 133:5

**fine** 20:8 29:22 55:16 59:3,25 60:4 61:4,11 110:9,18
**finish** 38:10 40:1 139:6
**finished** 58:16
**fire** 12:13
**firm** 25:19,21 78:17 88:9,12,13 93:25 120:18,20 123:17 139:12
**first** 13:20 14:1 15:14,20 16:20,25 17:12 18:4,4,10 26:19 27:17,24 43:18,22 60:16 63:13 66:20 72:6 82:2 97:20 101:1 102:14 103:21 106:24,25 110:24 112:19 119:3,8 120:8 121:16 124:10 126:17,21 136:25
**fit** 115:21
**five** 27:4,20 39:11 95:13,18 106:20 129:3
**flew** 62:23
**flip** 119:7 124:5
**floor** 4:7
**flower** 3:7
**fly** 27:20,23 131:17
**focus** 127:22
**focuses** 15:4
**focusing** 65:14
**folder** 118:23
**following** 60:20
**follows** 7:6
**foregoing** 143:5 144:4,6,10,12
**foreign** 13:21 114:7
**forensic** 80:18
**forewarning** 122:10
**forfeit** 42:5
**forfeited** 42:17,19 42:21
**forfeiture** 83:2
**forgot** 34:7
**forgotten** 18:20 82:6
**form** 9:1 22:8 23:6 24:3 26:1 31:5 38:5 50:9,10 79:20 91:17 127:12
**formality** 117:15
**formed** 22:18
**former** 63:19 77:21
**forms** 8:23,25
**forth** 45:12 144:5
**forward** 130:15
**found** 12:16 18:18 20:4 26:14 40:2 54:11 55:10,11 62:1 103:24 118:4 131:13
**foundation** 21:14 30:10,22 32:10 36:9 37:4 38:4 46:21 56:22 79:18 84:6 93:8 95:9 96:8 107:13 115:22 124:19 131:5 139:13
**foundational** 79:19
**founded** 116:4
**four** 33:16 59:13 75:9 114:2
**fourth** 62:4
**frame** 112:20
**free** 43:3
**friday** 1:16 2:16 7:1 136:14
**friend** 45:3 58:9
**friends** 54:20 58:4 62:7
**front** 48:14 133:9 140:21
**frozen** 38:22 39:19 83:7
**fully** 26:2 38:23 109:11
**fund** 6:6 24:5,11 26:15 28:8 29:5,8 31:22 32:6,8 112:11 119:5 125:21 140:6,7 141:20
**fund's** 127:15
**funding** 24:8 37:3
**funds** 24:8 27:13 30:24 31:3 36:8 36:12,19,25 37:3 39:19 43:11,22 57:17 59:14,15 63:6 77:6 79:6,6 81:24 123:11 129:20 130:5,21 132:2 139:9,18,20 139:22 140:1
**funnel** 38:1 48:14
**further** 130:8 132:23 140:15,19 142:18 144:12,16
**future** 44:4 81:22

**g**

**g** 54:6
**gary** 3:5 7:11 31:9 110:2,14 111:19 140:16
**gather** 110:19
**gentleman** 59:12
**getting** 42:5 69:8 70:15 74:11 137:10
**give** 20:17,20 25:13 33:13,25 40:22 41:6,18 65:25 70:17 76:4 76:6 81:3 86:20 130:25 133:1 136:5
**given** 21:6 23:14 23:19 56:15 65:2 144:11
**giving** 122:9
**glitch** 34:21
**go** 27:5,25 35:4,6 39:23 41:7 42:8 42:11 55:23 64:18 70:18 77:1,8 81:11,21,22 87:24 97:24 99:24 102:21 103:9 121:6,7 136:15 137:25 139:3
**goes** 70:24
**going** 7:22 17:20 17:24 18:5,7 20:7 22:8 23:12,17,22 24:7,8 29:8,11 31:19,19 33:14 34:15 37:6 39:4,7 40:20 41:4,12 45:12 52:13,15

53:5 58:14,14 60:4,4,5,12 61:3 61:15 63:22 67:9 68:11 69:7,10 70:2,18 74:7 76:8 83:4,20,22 84:22 85:1 86:24 87:1 87:16,17,21 91:20 96:25 97:22 111:21 112:3 113:1,10 116:25 118:17 119:21 120:14 121:3 125:11 134:22,23 136:1 137:4 138:3 139:20,22 140:1
**good** 39:6 60:4 72:7 80:14 90:7 91:16 110:14 128:7 131:10
**goods** 67:3
**gotta** 118:15
**gotten** 69:5
**gouraige** 3:14 5:5 7:8,9,15 11:22 20:5 21:18 29:20 29:24 30:13 31:1 31:8,15,17 32:14 34:11,20 35:3 36:14 37:7 38:19 39:6,10,13,15 40:20,25 41:9,19 46:22 47:5 50:13 53:17 57:1 64:13 66:19 68:13,17 69:11,21 70:17,20 70:25 71:5,13 73:9 74:24 79:23 80:19,23 81:9,18 83:11,17 84:9,19 85:23 86:4,12,19 87:8,12 88:3 89:19,23 90:11,19 91:9,13,19 92:22 93:12 94:12 95:11 95:21,23 96:3,9,25 97:4,7,10,24 98:5 98:12,17,20 99:15 100:11,16 101:9 101:17 102:8 107:17 110:1,24 111:19 112:2 115:22 116:5,9,19 117:2,4,23 120:17 127:16 131:4 132:1,6,22,24 133:4,10 134:22 135:2,5,16 137:19 138:20 139:17 140:15 141:14 142:3,5,18
**government** 92:6 92:7 119:2
**governmental** 92:8
**graduate** 8:12
**granillo** 1:21 2:17 144:24
**granted** 62:14
**grassmuk** 43:15 44:12 51:10 73:19 73:21
**grave** 67:3
**great** 39:9 122:15
**green** 27:2 119:14
**gross** 3:13
**ground** 7:19
**group** 5:13 10:21 63:24
**guarantee** 28:24 29:4,14 30:1,16,21 32:2
**guaranteeing** 29:16
**guatemala** 9:20
**guess** 20:15 40:19 43:22 46:1 60:15 65:21 72:7 77:22 99:17 104:12 105:12 116:21 118:4 125:12

**h**

**h** 54:6
**half** 45:3 110:5 113:25
**halfway** 121:20
**handle** 76:5,7,7
**handwriting** 5:19 99:1,3 101:3,3 102:21,25 103:7 104:13
**handwritten** 102:24 103:3,16
**happen** 33:17 73:1 75:22
**happened** 14:18 66:23 72:25 84:12 88:8,9,16,18 115:13
**happening** 33:13 60:13,24 76:4 82:20 86:15 134:7
**happy** 50:16 104:15 108:24
**hard** 80:15 101:15 136:21
**harlan** 6:9,13,15 6:18,23 54:13 123:4,15,15 126:17 128:4 129:13
**head** 45:9
**heading** 119:3 120:6
**health** 92:4
**healthcare** 89:15 92:8
**hear** 7:23 13:8 22:14 24:5 34:24 48:19 53:15 64:11 83:16 105:21,23 111:2,6,8,10,14 122:24
**heard** 19:2 20:2 25:20 53:21 54:12 66:20 72:18 122:6
**hearing** 80:8 111:17
**hebson** 129:7,12
**heidi** 129:7,12,14
**held** 88:1
**hello** 108:13
**help** 14:23 17:21 19:14 45:4 69:20 105:10,12,15 118:7 121:5 136:4
**helped** 25:21
**helping** 58:6 108:15
**hen** 111:9,23
**hereto** 40:24 71:4 96:2 97:3 98:4,16 99:14 100:15 101:13 135:1 137:18 143:7
**herve** 3:14 7:8 101:14 141:17
**hesitate** 92:15
**hgouraige** 3:19
**hi** 127:5 131:20
**high** 38:11 92:4
**hipaa** 89:2





EXHIBIT 2

**hire** 20:18 68:20 69:4 80:18 88:8 88:12
**hired** 69:12 74:8 75:2,2 100:9
**hiring** 69:9
**hold** 97:6 113:5 121:3
**holding** 122:4
**holidays** 75:22
**hong** 26:20
**hope** 6:21,23 41:1 53:22 54:1 56:18 56:20,25 85:18 103:25 104:2 122:3,18 123:17 124:18 125:7 126:8 127:18 128:4,7,22 129:9 129:22 130:18 131:25
**hoping** 50:16 95:3
**hospital** 5:17 6:12 85:18 103:6,19 104:1,2 124:15,15 124:17,22,24 125:3,7 126:7 127:3 128:10 130:19 131:17,25 132:13
**hospitals** 9:8,9
**hotel** 28:2
**hour** 68:11 110:5
**hours** 136:18
**house** 90:1
**huge** 64:17
**huh** 7:25 16:2 24:2 24:10 25:20 34:10 36:6,22 51:5 52:12 57:14,21 58:15 71:9,9,10,18 73:25 74:3 79:13 85:4 86:22 92:2 93:3 96:15 97:23 106:18 121:24 128:15 138:2
**hunn** 6:16,18,20 123:5,6,8,11,16,24 126:16 127:5 128:3,6,17,19 129:9,12,21
**hunn's** 128:12
**husband** 105:12 105:22,23,24 107:15
**hypothetical** 85:19

**i**

**idea** 26:17 27:19 29:14 46:25 47:6 79:21 98:8 112:25 127:19 130:7,22 140:3
**identification** 40:23 71:3 96:1 97:2 98:3,15 99:13 100:14 101:12 134:25 137:17
**identified** 59:4,5 61:25 62:11
**identifies** 141:2
**identify** 36:15
**illegal** 48:14 49:19
**imagine** 64:17
**immediately** 54:18 56:25
**implication** 142:3 142:5
**import** 116:17
**important** 72:7
**improper** 57:17 76:23 77:17,18 78:3,7,23
**inadequate** 118:11
**inappropriate** 76:23
**include** 55:5 129:7
**included** 53:25 80:13
**income** 38:13
**incomplete** 85:19 101:22
**incorrect** 79:17
**incredibly** 97:7
**independently** 53:7
**index** 5:1 6:1
**indicate** 23:3
**indicated** 84:21
**indicates** 133:23
**indicating** 22:22
**indirectly** 53:21 77:13 106:10
**individual** 58:19
**infected** 80:17
**inform** 123:16
**information** 25:14 38:11 60:10 61:1 62:3 67:8 70:15 76:13 82:18 88:24 89:1,5,13 99:24
**informed** 50:4
**initial** 84:25
**initialed** 143:7
**ink** 143:7
**inquiring** 62:10
**install** 128:5
**institution** 56:17
**institutions** 9:8
**insulted** 56:25 57:4
**intend** 26:2
**intended** 124:13
**intending** 130:20
**intends** 120:8
**interest** 18:21 94:7 94:9,18,19 96:22
**interested** 14:25 16:15,18 73:13 119:18 127:7 144:17
**interference** 103:20 104:2
**interfering** 53:12
**internal** 86:7,9
**international** 52:19
**interpose** 101:20
**interrupt** 58:16 111:19
**interrupted** 39:25
**intimate** 73:8
**introduce** 14:14 14:22 39:7 47:17 47:19 64:24 70:18 105:14 137:13
**introduced** 48:5 56:13 63:16 137:14
**introduction** 14:12
**invested** 106:1
**investigate** 69:4 79:4
**investigation** 12:5
**investigative** 112:20
**investing** 119:18
**investment** 14:19 16:5 141:20
**investor** 36:8 38:2 44:23,24 50:24

57:17 109:8
**investors** 32:8,9 44:21 45:20 55:14 64:3 66:9 67:14 81:7 95:2,5,8 118:20,21 119:18 130:3,3 142:10
**involved** 9:24 10:1 19:2 21:4 24:19 63:7 93:7 135:25
**involvement** 24:11 126:8
**ipe** 78:5
**issue** 81:21
**issues** 100:4
**items** 21:20

**j**

**january** 73:22 84:2,2
**jersey** 3:17
**jewish** 131:17
**job** 1:22
**john** 1:14 2:13 4:3 5:3,12 7:4,12 14:12,16 17:19 38:7 69:2 76:25 82:19 143:4,16
**join** 30:11 31:6 36:10 50:12 73:6 79:19 85:20 87:7 93:9
**joining** 16:19
**joint** 123:18 124:14 126:6 127:12
**judge** 42:13
**june** 101:23

**k**

**k** 1:9 2:9 79:24 80:2,9,24 81:4
**keep** 103:2
**kill** 121:3
**kimmel** 69:2,3,4,9 69:13,16 70:8 74:8 75:1,3
**kind** 17:21
**knew** 22:5 50:1 53:8 54:18 76:20 76:22 78:1 86:3 106:3 127:17
**know** 11:4 18:2,24 20:3 22:5 27:13 27:18 35:21 36:11 39:2 42:10,11,11 42:16 43:23 46:16 48:4,10 50:7 53:9 53:13 54:2,2,13,14 54:18 56:21,23 57:7 58:9 60:12 60:13,24 61:2,15 61:16,19 62:9 63:2,5 66:4,5 67:5 68:10 69:13 70:1 70:2 71:7,21 72:2 74:10 75:15,16 76:3,13,16 77:1,2 77:7,24 78:2,13,22 80:3,5 82:15,16,24 84:12 86:5 89:9 91:5 93:4,25 94:5 94:6,23 96:14 97:13,18 98:1,11 98:24 99:18 102:6 102:10,21,24 103:6,18 104:16 106:16 107:14 108:1,2 111:8 119:16 123:6 124:6 126:23,25 127:2,18 129:24 131:16 133:19 134:11 136:21 139:11,15,18,20 140:6,9
**knowledge** 66:6 73:8 84:13 86:9 93:10 108:22 115:24 120:17 127:11 131:5
**known** 47:15 116:24
**knows** 91:11
**kong** 26:20

**l**

**l** 68:25
**la** 96:18
**lack** 127:11
**lacks** 21:14 30:10 30:22 32:10 36:9 37:4 38:4 46:21 56:22 79:18 84:5 93:8 95:9 96:8 107:13 139:13
**lady** 62:10
**lam** 6:7 120:23 121:18,22
**lance** 68:23 69:1,2 75:1
**land** 32:19,21,24 34:9 35:23 36:19 37:17,21 38:10 43:3 50:18 60:13 79:11 83:1,9 136:11 140:12,12 140:13
**lane** 8:3
**language** 106:14 130:1,8,10
**languages** 13:22
**late** 74:7
**latest** 126:21
**law** 3:6,15 4:6 11:9 25:17 91:5 91:11
**lawsuit** 46:8,11,14 94:8,11,13
**lawyer** 24:22 42:8 42:13 70:7 100:8
**lawyers** 21:20 90:6
**lead** 135:9
**leafed** 25:4
**learn** 53:14,18
**learned** 106:17
**learning** 122:17
**lease** 5:16 33:3,7 33:11,15,18,24 34:7,8,10 35:13,17 35:24 37:9,23 38:7,12,15,18,25 39:3,3,24 40:4,16 42:5,17,19,20,25 58:13 77:17 79:12 83:1,2,13,18,20 95:4 133:7,8,13,23 134:1,6,10,14
**leased** 50:18
**leasing** 32:23,25 38:14 136:11
**leaving** 12:19
**led** 105:19
**left** 12:15 13:14 38:10 50:1 136:20
**legal** 35:13,15 67:22 68:20 70:4 90:3,16,17 103:21 116:17 141:9
**legalese** 25:6
**legally** 140:25 141:7
**legitimacy** 131:1

**legitimate** 49:16 50:15
**length** 38:7,17 112:1
**letter** 5:13 45:14 70:8,11 71:10,12 82:10
**leung** 3:5 5:6 7:11 7:11 30:10 31:5,7 31:10,16 36:9 38:5 39:9,11 50:9 73:5 79:19 85:19 87:4,11 91:17 92:20 93:9 94:10 101:14,20 110:4 110:11,13,15 111:12,22 113:7 115:25 116:8,22 117:7 118:1 120:4 121:6,10 122:1,15 124:2 125:14 126:13 127:21,25 129:2 131:21 132:5,21 135:6 138:17 139:9,14 140:17,20 142:4,7 142:17,20
**leungg** 3:10
**levine** 6:9,13,16,18 6:23 54:13 123:4 123:15 126:17 127:4,6 128:4 129:13
**levity** 48:17
**liability** 119:4 124:18
**limit** 58:12
**limited** 119:4 124:17
**linda** 14:13 47:14 76:25 136:15,17
**line** 102:23 111:13 113:13 123:5 128:5 129:5 138:13 139:5
**link** 128:14
**lisa** 1:9 2:9 7:9 21:3,9,12,24 104:21 108:6 109:8
**list** 21:12,19 141:8
**listen** 16:13 82:25
**listened** 15:22
**listing** 21:12
**little** 13:23 16:20 17:5 22:5 29:17 29:17 32:17 48:17 66:5 91:7 107:24 108:9 110:25
**liu** 1:8 2:8 5:14 6:7 6:9,14,16,24 7:9 14:1,14,22 15:14 15:17,19 19:19 20:10 22:2,18 23:7 24:4,13 26:2 26:10,14 27:5,12 28:4,7 29:15 30:14,25 32:23 36:17 37:15,22 38:1 47:17 48:5,7 48:25 49:10 50:23 51:21 52:2,15,24 53:18 59:12 60:23 63:16 64:4 67:4,8 67:13,18 68:1 69:6,22 70:5 71:14,24 73:14 74:5,9 80:12 82:11,22 84:22 85:13 86:8,15,21 86:23 93:21 94:3 100:8 103:25 104:1,3 109:2,16 111:1,6,14 112:9 112:19,22 114:24 117:8,20 118:20 119:17 120:18 121:18,21 122:2,9 122:17 123:4,19 126:1,5,16,22 127:5,12 129:19 130:5 131:2,22 133:17 135:21 136:1,3,22 137:10 139:11 142:4,8
**live** 142:12
**lived** 58:2
**living** 78:4
**llc** 5:21 6:6 11:3 12:2 22:25 23:4 23:11 79:15,25 96:13,23 119:5 122:4,5 123:20 124:17 129:15 130:3
**llcs** 84:11
**loading** 97:6
**loads** 45:11
**loan** 27:1 29:8
**loaned** 45:3
**loans** 28:8 29:4 31:3,23 32:2,6
**locate** 80:15
**located** 125:3 132:10,13
**location** 32:18
**loehr** 24:25 25:14
**loma** 14:12 47:14 76:25 136:15,17
**long** 16:21 41:3,9 101:18
**longer** 9:17 58:14
**look** 18:6,7 27:21 40:21 41:2,3,10 70:19 71:7 79:5 83:9 97:11 98:19 99:6 100:17 101:5 103:22 137:15,22
**looked** 61:25 66:6 74:12 135:14
**looking** 92:5 94:20 94:21 95:23 118:5
**looks** 62:17 96:14 99:2,3 102:23 103:4,4,10,16 130:1
**lopez** 11:15
**los** 3:8 4:8 9:7,20 45:24 63:19 77:21
**losing** 118:9 134:6
**losses** 38:15
**lost** 18:21 38:13 76:2 83:15 121:4
**lot** 35:11 38:13 40:6,14 64:16 97:21 102:16 111:24 114:17 131:19
**lui's** 62:7 104:21 110:22 113:9 115:16,20 123:14 127:5,11 128:3,22 129:10 130:19 141:5
**lunch** 110:8
**lunchroom** 131:11

**m**

**m** 4:5
**m.d.** 1:14 2:13 4:3 5:3 7:4 143:4,16
**machine** 15:1 82:23 129:23 131:15 144:9

**mail** 6:7,9,17,19 6:22 45:15 81:9 87:13,15,20 121:15,16,17,21 123:4,14,21 126:16,17,18,21 126:21 127:10 128:2 129:5,7,9,12 130:24
**mails** 6:15
**mainland** 58:3 63:23
**maintain** 72:8 90:24 91:4,10
**maintained** 89:1
**maintenance** 120:12
**major** 51:20
**majority** 53:4
**making** 31:23 50:16 68:1 90:8 127:19 134:16 139:3
**male** 65:12,13
**malware** 80:17
**man** 58:2 59:24 67:1
**management** 13:15
**manager** 11:21 20:20
**managerial** 23:23
**managing** 11:23
**mandarin** 13:24 13:25
**manner** 101:21
**manual** 136:19
**manufactures** 48:22
**march** 1:16 2:16 7:1 71:10 72:10 112:18,21 113:20 113:23 114:2,5,8 144:21
**marcum** 120:20 120:23 121:14,18 139:12
**mark** 102:23 103:17 134:23
**marked** 6:2 40:23 71:3,6 95:24 96:1 97:2 98:3,15 99:13 100:14 101:12 118:23 119:1,25 120:1 121:12 133:2 134:25 137:17
**marking** 113:8
**married** 8:4
**masks** 7:22
**materials** 56:24 127:15
**matters** 141:1
**mayer** 25:19
**mayor** 63:19 77:21
**mcguire** 4:4
**mcguirewoods.c...** 4:10
**mean** 24:16 31:7 42:19 66:5 69:25 82:9 92:18,25 108:20 140:11
**meanings** 92:19
**means** 45:15 60:8 111:8,23,23,24
**medicaid** 92:8
**medical** 8:13 10:7 10:10,11 13:6,17 18:11 20:18 23:18 52:13 53:3,7,11 54:21 55:3 57:8 60:17 68:8 88:23 89:5 92:23 117:12 124:19 128:5 130:17 131:14 135:25 137:3,5 139:4
**medicare** 92:8
**medicine** 8:18
**meet** 14:1,8,11 27:6 61:4,13 62:21 65:6,17,18 71:22 87:16,17,18 87:21 104:20 106:19,23
**meeting** 15:15,20 16:20,21,25 17:6,8 17:13,17 18:4,14 18:16 43:19,20,22 43:25 54:20 55:22 55:23,24 56:6,16 59:19 60:25 63:15 63:17 66:16,18 71:24 73:19 74:17 74:18,20,21 75:11 75:13,19,23 76:11 82:2 104:21,22 105:2 107:18,21 107:23 127:18 136:16,24 137:1,4
**meetings** 18:10,13 19:19 49:25 105:10,13 107:3 136:17,23
**member** 23:4 79:15
**membership** 5:15 96:11,12 119:5
**memorandum** 6:5 6:11 119:4,17 124:4,11,12,12
**mention** 19:11 21:23 25:13 74:4 109:17
**mentioned** 18:23 18:24 19:24 36:23 48:21 77:21 128:13
**merchants** 113:17 113:20,22 114:1,5 114:8,11,13,17 115:6
**met** 15:14 18:22 56:11,24 59:19,21 61:6,13 65:5,7,16 65:20,21 67:11 73:21 79:1 83:25 85:5,9 86:6 101:1 104:19 106:25 109:20 123:8 136:14
**method** 20:6
**mevion** 5:19 48:8 48:21,21 49:1,16 49:20 50:7,11 77:1,2,7 127:22 128:5,14,19,21 129:16,16,20,23 130:12,20 131:3,6 131:12,16,23
**mexico** 9:20
**mhp** 127:9
**michael** 6:16,17 6:20 123:5,6,8,11 123:16,24 126:16 127:5 128:3,17,19 129:9,21
**middle** 75:17 120:5
**mike** 129:7,12
**miller** 25:19

**million** 17:20 19:7 29:11 30:2 47:9 47:14 49:9,15 50:1 59:17 66:12 66:21 112:10,17 112:18 113:25 114:23 116:25 129:19 131:1 133:17,21,24 136:3 141:23 142:6,14,14,15
**millions** 45:18
**mind** 103:21
**mine** 96:14 101:4 104:14 128:11
**miniscript** 113:9
**minute** 70:17 95:13 101:16
**minutes** 16:22 39:7,12 68:14 95:18
**misappropriate** 116:25
**mischaracterized** 89:20,24
**mischaracterizes** 86:10,16 89:18
**misstates** 84:5 138:17 139:14
**misstating** 50:10 79:20
**mistake** 67:16
**mochis** 9:20
**modified** 134:2
**modify** 134:8
**molly** 4:5 7:12 29:21 75:1,2 110:4 133:4 142:20
**moment** 87:25 113:2,5
**money** 17:22,24 19:6 20:8,17 22:3 26:18 29:7,14 30:21 38:2 44:14 45:6,14,16 48:2,14 64:7,16,17,20,21 66:4,8 70:1 72:8 74:12 92:5 94:20 94:21,22 95:1 105:25 106:1,2,4,5 111:2,23,24,25 112:22 114:17,19 114:20,25 115:9 115:10,12,17,20 117:6 118:9,10 131:22 134:7 135:21 137:11 138:25
**monies** 79:7 95:8
**monitor** 39:19 72:12,16,21 73:4 73:11 113:4
**montebello** 60:22 102:15
**month** 12:3 36:2 60:10 73:19 75:13 126:17
**months** 17:4,6,9 17:12 18:20 51:16 61:7
**morning** 116:9,14 128:7
**mortgage** 118:10
**mou** 5:25 124:7 125:6,15,19,21 127:8 130:10,18 131:24 140:24 141:7
**mou's** 126:4
**move** 99:4 111:13 118:7,7
**moved** 38:13 62:3
**moving** 112:1 118:6 130:14
**mph** 6:13 122:5,7 123:19 124:17,18 125:6 126:1 128:4 128:22 129:10,15 129:23 130:3,6,19 131:8
**mutual** 140:24
**mwhite** 4:10
**mysteriously** 136:20

**n**

**n** 54:6 68:25 78:5
**name** 7:8 11:3 12:2,17,20 22:14 24:22 25:15 45:8 53:24 54:14 58:19 61:25 62:11 65:2 65:4,9 68:24,25 75:12 78:13 82:12 122:4 144:20
**name's** 110:14
**named** 65:10 75:10 78:5
**names** 21:25 65:3 74:23 75:5
**narrowed** 81:10
**national** 52:18 63:16
**near** 126:4
**nearby** 15:5
**necessary** 19:6 80:20 120:11
**need** 16:24 17:14 17:18 41:3 61:11 90:5 95:12,17 122:2 131:15
**needed** 68:19 88:14
**negotiating** 130:14
**neither** 125:24 144:16
**network** 80:16,21
**never** 19:2 20:2 26:16 43:10 48:6 50:4 53:24 61:17 61:17 62:4 70:6 72:21 74:6 81:24 85:3 95:10 97:14 98:25 102:18 104:5 124:9 126:9 128:16,19 136:25 137:11 141:25
**new** 3:17 10:7 25:9 122:2,11 124:21 127:12,13 134:23
**newark** 3:17
**nice** 56:14
**nicholas** 8:3
**nisy** 78:5
**niv** 46:5
**nobody's** 30:23
**non** 111:20
**nonbinding** 142:2 142:12
**nonfunctional** 88:20
**nonprofit** 124:16 124:19
**normal** 139:3
**note** 103:16,21
**noted** 142:22 143:7
**notes** 103:3
**nothing's** 60:13
**notified** 35:17 61:17
**noting** 130:10





EXHIBIT 2

**notwithstanding** 134:13
**november** 27:8 57:15 59:6,10 64:6 65:15,16 66:16,17 75:16 85:5 104:18 109:20 126:18,19 126:23 129:11 136:9,10
**novodor** 11:8,16 11:18 12:7,17 19:20
**novodor's** 12:20
**null** 32:16
**number** 5:11 6:4 30:15 36:5,23 62:2,5,6 66:21 102:2,22 119:25 120:1 121:14 123:3 137:14
**numbered** 126:15 128:2 129:4
**numbers** 69:19

**o**

**oath** 7:5 144:7
**object** 31:5 38:5 50:9 69:7 79:20 91:17 92:20 127:16
**objection** 11:19 20:1 21:14 30:10 30:22 31:9 32:10 34:6 36:9 37:4 38:3 46:21 47:2 50:9 56:22 73:5 79:18,19 81:19 84:5 85:19 86:1 86:10,16 87:4,7,11 89:17 90:14 92:17 93:8 94:10 95:9 96:8 101:20 107:13 115:22 116:5,19 117:2,23 131:4 132:1 135:15 138:17 139:13,14 142:3,5
**objections** 100:4
**obligated** 141:1
**occasion** 36:12
**occur** 43:25 75:19
**occurred** 43:20 57:10 58:12 59:18 85:3 117:21,21
**occurring** 62:20
**october** 88:5,15 91:2 112:8 121:16 121:17,22 123:5 123:14,24 126:4
**offered** 80:18 139:4
**offering** 6:5 119:4 119:17 127:15
**office** 14:9,9 15:15 17:7,7 45:11 56:12,14 58:2,25 59:14,25 61:21 91:25 107:5,7,8,10 107:12 108:13 117:17 136:14,20
**officer** 24:1 52:4,8 52:11
**offices** 80:14 81:14
**oh** 16:22 17:4 20:3 33:22 34:14 54:8 56:12 58:5 59:3 68:6 69:3 74:21 87:1,22 133:16
**okay** 7:24 17:17 31:22,25 39:10 40:20 41:6 43:6 48:21 54:10 60:3 61:5,20 66:8 68:15 69:15 70:17 70:25 71:11,14 90:5,23 95:11,20 96:4,15,25 97:7,24 98:12 99:3,11 100:11,17 101:17 102:12 104:15 112:1,7 113:6 115:4 116:23 119:21 122:13 123:24 124:3,10 125:10 127:4,22 128:12,16 129:3 132:10 133:5,16 134:22 135:6 137:22 139:5,9 140:15 141:5,11 142:1
**old** 38:8
**once** 97:11 98:1 107:5,6 119:15 124:6
**oncologies** 10:23
**oncologist** 8:22 54:1
**oncology** 8:19,21 10:14,20 11:13,16 11:18 12:8,11,14 12:17,22 13:3,11 13:13,14,15 28:13 28:20,24 29:1,2,3 30:4,8 32:1 54:9 54:17 80:15 88:4 91:24 107:11
**oncology's** 12:2
**oncoserv** 9:24 10:1,3
**ones** 37:6
**ongoing** 12:5
**open** 118:24 121:1 122:13 123:25 126:10,12 127:23 127:24 128:25 132:25 133:3
**opened** 62:8 86:21 124:1
**opening** 16:15,19
**operate** 23:12
**operating** 22:25 23:25 52:7,11
**operation** 124:21
**operational** 26:3
**operations** 86:7,9 141:13
**opinion** 90:8 92:21
**opinions** 90:17
**opportunity** 103:20
**optivus** 47:13,15 47:17,19,22,25 48:5,9,10,10 50:6 76:24 82:11,12 120:9,9,14
**orange** 9:7
**order** 38:22 87:6
**original** 133:25 144:13
**outcome** 66:23 94:19
**outlined** 127:8
**outside** 9:12,18 85:25 87:5 90:13 94:3 109:12 124:7
**overall** 15:13
**overhearing** 110:25 111:5
**overseas** 114:1,4 114:25 115:5,19
**oversee** 39:20





EXHIBIT 2

**owned** 22:23 32:19 103:4
**owner** 22:12 53:4 55:19 65:7 84:3 84:16 85:6,10,13 93:5 130:16
**ownership** 20:17

**p**

**p** 78:6
**p.m.** 2:16 121:22 142:22
**pacific** 5:20,25 6:5 22:14 23:1 24:4 24:17 112:11 119:5 125:18
**page** 5:11 41:7,7 102:14,22 103:3,9 103:19 113:11,13 118:24 119:3,21 119:24,24 120:5 121:13,20,20,21 123:2,3 124:4,10 125:10,11,13 126:14 128:1 129:3,25 133:6 137:23 138:1,1 140:22 141:17
**pages** 1:25 133:6
**pagination** 133:6
**paid** 27:10 28:2 32:7,12 35:19,23 36:1,3 37:14,21 40:9 48:3,6,9 49:13 50:23 64:7 67:17 77:24 78:1 78:21 119:15 123:11 131:23 132:16 134:1 135:22 137:9,10 138:4,15 139:1 141:12,18
**pandemic** 7:20
**panel** 65:21
**paper** 85:15 116:16
**papers** 24:23 25:22 61:10 81:3 83:16 94:6
**paperwork** 21:17 45:12 56:14 60:1
**paragraph** 97:20 133:11,23 134:3 134:14 138:1
**parcel** 131:23
**parens** 130:9,10
**park** 4:7
**part** 10:1 53:11 60:16,17,17 82:16 95:5,8 100:22,25 101:24 131:5,23 132:3,13
**participant** 60:14
**participants** 129:6
**participated** 137:1
**participation** 56:7
**particular** 58:10 68:3,4
**parties** 81:11 125:6 140:25
**partner** 112:9 116:24
**partners** 85:14
**partnership** 123:18
**party** 43:1 85:25 144:18
**pass** 110:2 132:21 142:17
**passing** 118:3
**patients** 88:24 89:5,13,16 90:13 92:4 138:25 139:2
**pause** 101:14
**pay** 19:17 21:25 27:13 32:7,12 36:19 118:12 134:6 137:7
**payment** 35:20 36:13,20,21 46:20 47:24 48:3,4 49:11,14,20 50:6,6 77:17 78:6,10 118:10 134:1
**payments** 36:7 37:23 38:25 39:4 43:7 44:12,17,22 50:5,6,7 77:14,17 78:11 92:11 95:4 134:15,16
**pays** 92:6
**pdf** 113:3,9
**peaceably** 104:9
**penalty** 143:5
**pending** 45:23 94:13 129:6
**people** 30:16 38:13 53:8,9 54:16 55:2 57:2 60:21 63:24 65:16 66:25 70:11 72:8 74:22 75:8 89:10 90:1 104:4,19 118:3,4 127:17 132:3
**percent** 10:18 13:12,13 20:16,20 20:21,22,23 22:20 22:23 23:4,9 37:2 55:19 84:16,23,24 96:12,22 103:10 142:10,14
**percentage** 20:17 103:15
**period** 42:21 47:3 51:19 57:9 73:18 84:1 93:7 103:10 103:11 130:14
**perjury** 143:5
**permission** 62:14
**permits** 19:16,17
**person** 25:16 26:25 44:11 45:2 53:5 57:12 58:10 62:4,4 64:23,24 67:15 75:10 78:5 78:6 91:15 110:21 121:5
**personal** 36:12,18 36:25 81:13 89:5 89:12,12 112:12 112:13,23 113:16 113:19,22,24 114:4,7,10,12,16 114:20,24 115:5 115:15,19,20 139:10
**personally** 38:2 45:21 68:1 81:24 82:1 136:12
**personnel** 88:14 89:9
**persons** 44:11 75:6
**pertains** 144:12
**peru** 9:22,25 10:2 10:3,5,8
**phase** 84:25
**phone** 62:2,5,5,6,9 117:25
**phonetic** 43:15
**phrase** 111:6,15
**phrases** 111:21
**physician** 20:19 91:16





EXHIBIT 2

**physicist** 14:17
**physics** 14:13
**pico** 59:20 60:25
**picture** 51:11 131:18
**piece** 32:18 116:16
**place** 9:16,17 15:12 59:22 75:14 144:5
**placed** 88:19
**plaintiff** 1:6 2:6 3:3 7:11 110:15
**plan** 5:20 99:17
**planning** 22:7 55:4 129:6 130:2
**plans** 136:15
**play** 20:11
**plaza** 3:16
**please** 15:2 40:1 41:6,17 68:24 71:7 89:21,21,25 91:8 101:16 118:24 122:13 123:25 127:23 128:25 133:12 142:21
**pledge** 5:24 28:13 28:15,16,16 29:13 30:8,18,24 116:10 116:11,13,17,24 117:9,12 135:3,10 135:12
**pledged** 29:3 32:1
**pledging** 28:24
**plus** 38:12 138:4,5
**point** 17:12 21:3 31:4 35:10 62:14 67:24 77:16
**pointed** 101:6,8 135:7
**policies** 138:6
**polite** 108:13
**position** 23:14,23 108:6
**positive** 93:1
**possibility** 10:4
**possible** 24:2
**potential** 43:11 118:21 122:19
**power** 110:6,9
**pp** 112:11 125:21 127:15
**practice** 9:6,8,12 9:18 10:10 13:7 13:18 92:24 106:18 117:13 131:11
**predecessor** 96:19
**prepare** 25:21
**prepared** 24:23 43:16,24 44:4,14 95:4 98:8,11 99:18 100:1 130:12
**preparing** 99:21
**presence** 21:10
**present** 15:15 19:20 55:25 56:3 56:4 59:21
**preserve** 90:24
**president** 52:15 65:7 67:1 71:19 123:19,21
**press** 129:16
**pressure** 117:22 117:23
**pressuring** 118:16
**pretty** 41:9 52:21
**previously** 6:2 119:1 121:12 131:10
**price** 47:8,10 49:5 119:13
**primarily** 75:25
**printed** 62:15 100:21
**prior** 38:15 42:5 144:7
**private** 6:5 19:11 19:14 49:25 119:3
**privately** 89:2
**privilege** 69:8
**privileged** 34:16 69:11
**privy** 49:21 73:2 130:24
**probably** 17:9 23:23 45:11 47:14 57:11,23 73:22 84:1 99:22
**problems** 100:5
**procedures** 138:7
**proceedings** 48:18 144:4,6,8,14
**produce** 82:7
**produced** 80:10 81:8 95:15 101:21
**professor** 53:5
**professors** 53:10 63:20
**proficient** 110:20
**profit** 92:12
**profits** 92:16,25
**program** 19:24 22:4 45:5 63:23 132:4
**programs** 92:9
**progress** 40:5 50:16 58:8 68:9 72:2 118:17,17
**prohibited** 38:14
**project** 5:25 14:18 15:24,25 18:17 20:11 21:6,13,21 27:1 32:12,15,18 33:14 38:10,21 56:8,19 58:6,7 59:16,17 61:3 63:8 64:3 68:2 72:13,22 73:14 78:19 82:11,12 83:13,21 84:14,14 105:5 106:1 107:16 108:18 118:6,14 119:19 120:15 122:19 130:14 132:18 133:17,18,24 135:25 136:7,12 136:13,24 137:8 138:24 141:20
**promote** 105:13 118:14
**promptly** 81:8
**pronounces** 110:22
**proper** 50:8
**property** 37:10 38:18 42:21,22,25 117:17 118:4 124:23 125:1 128:9 132:10
**proposed** 5:16 122:3 123:18 124:14 130:9
**prospective** 103:20
**proton** 5:20,25 6:6 8:25 9:3 14:17 15:1,3,4,24 16:16 16:19,24 17:13,25 18:17 20:18 22:14

23:1,7,11,12 24:4 24:4,17 26:1 28:8 31:18,20,23 32:5 32:24 47:1,22 48:11,23 53:5,6,7 61:24 63:8 64:1 68:2 77:11 83:10 93:6 96:18,19 104:20 112:11,11 119:5,18 120:9,9 120:11,12,15 122:19 123:10,22 124:21 125:15,18 126:6 127:13,14 128:6,13 129:17 129:19,22 130:16 130:17,21 132:18 136:5,25
**proton's** 131:2
**protons** 24:18
**prove** 118:5
**provide** 13:3 24:9 92:3 99:23 119:17 120:10 136:7,12 137:4
**provided** 135:21 140:24
**provider** 120:6,15
**providing** 137:3,6 138:23
**provisions** 141:6
**public** 82:18 124:16,19
**pull** 100:11
**pulled** 97:15
**pulling** 101:15
**purchase** 5:16 129:17 130:20 140:12
**purchasing** 129:22
**pure** 117:4,15
**purpose** 56:6 69:14,16
**purposes** 48:15 69:9
**put** 11:3 18:6 26:25 37:6 38:16 41:2 44:6 51:6 58:12 83:10 139:2
**putting** 15:1 37:8 64:4

**q**

**q&a** 130:10
**qian** 106:6 111:2
**qualified** 100:6
**qualify** 45:4
**quality** 92:4
**question** 7:24 13:21 31:10 32:4 34:24 51:20 53:15 64:11 83:15 84:18 89:21 91:5,8 92:20 102:23 103:17 110:24 111:13 113:15 115:2,4,8,11,13,23 116:19,20 117:6 119:8 120:20 127:6,16 131:6 134:13 135:8
**questions** 41:16,19 102:7 110:3 116:10,12 140:16 142:18
**quick** 104:16 110:6 140:18
**quite** 34:24 91:21

**r**

**r** 78:10,11 103:4 103:10 132:7,16
**radiation** 8:19,21 8:21,23 9:1 10:7 13:3 15:11 54:1,9 54:17
**rae** 59:19 60:25 61:6
**raise** 19:6,17 20:8 20:16,16 22:3 24:8 72:22 133:17 136:1,3
**raised** 26:14,15,16 26:18 30:20 66:4 66:9,12,21 133:21 133:24 142:9,11
**raising** 17:21 24:13 130:5 135:22
**ransomware** 88:19
**rate** 103:21
**ray** 15:4
**rays** 8:23,25
**reach** 67:21
**reached** 67:25 81:7
**reaction** 19:25 113:13
**read** 34:23 35:2 41:3,10,11,21 89:21,22 100:3 113:12 114:21 133:11,15 138:3,8 138:12 141:3 143:5
**reads** 120:6 124:11 142:8
**ready** 71:8 124:6
**real** 34:13 83:8 136:8 140:18
**really** 27:17 36:11 38:23 40:18 49:21 61:14 66:5 73:7 74:10 76:13 82:23 118:15
**reason** 40:3 77:10
**recall** 17:8 18:12 22:1 23:10,24 25:15 28:18 36:1 36:3 39:2 40:18 42:15 49:5,10,13 51:2 52:5 53:24 54:14 63:18 65:3 65:9 66:13 72:24 73:1 75:20 100:4 105:3 107:7,20 111:3,17 112:5 117:11,16,18 122:20 132:7 141:13
**receipts** 82:9
**receive** 79:7,24
**received** 43:8 66:4 81:24 82:10
**receiving** 140:7
**receptionist** 58:25 59:1
**recess** 39:14 68:16 95:22 121:9
**recognize** 41:5 96:4 97:12 98:18 98:21,25 99:1,6 100:18,19 101:10 102:9 103:8,23 104:13
**recollection** 51:7
**record** 8:1 31:14 35:2 41:13 50:10 54:5 87:25 88:1,2 89:22 111:22 113:7 118:25 121:2,6,7,13 123:2 124:3 126:14





EXHIBIT 2

128:1 129:3 142:7 144:8,11
**records** 60:2 61:16 64:10,15 65:23,25 66:2 79:14 81:15 86:3,20 88:10
**recruit** 64:3 67:14
**red** 93:2
**redirect** 123:1
**redirecting** 141:16
**refer** 54:5 118:23
**referred** 31:10,15
**referring** 11:5 26:22 30:1 33:9 36:16 51:22 67:13 79:11 80:12 92:7 98:9 103:11 118:19,20 134:9 135:11
**refers** 56:17 97:20
**refresh** 51:7
**refund** 46:19 95:4 95:7
**refused** 28:11
**regarding** 81:5 122:18 123:18 130:2
**regenstreif** 75:10
**regional** 5:21 22:9 22:12,15,17 23:1 24:17,18,19 26:6 39:18 79:7,14 81:24 84:3,23 85:6,10 93:5 112:11 125:18 136:9 141:21
**regular** 58:23
**reimbursement** 138:5,5
**related** 120:11
**relationship** 77:3 86:8 131:10
**relative** 45:4 144:17
**relayed** 48:7
**release** 129:16
**remediation** 37:16 37:21 125:2
**remember** 24:22 25:16,19 43:20 45:8 57:9 58:19 68:25 73:18,21 74:23 75:5,13 114:18
**remote** 1:14 2:13
**removing** 112:22
**renewal** 33:12,19
**renewed** 33:14,18
**renown** 53:5
**rent** 35:23 40:9
**rental** 35:20 37:23 38:13,25 39:4 43:7,24 44:12,17 46:20 50:5 79:9 79:11 140:11,11
**rents** 118:11
**repaid** 27:2 32:9
**repay** 31:3 32:5
**repeat** 53:16 91:8
**repentant** 67:4
**report** 74:13 79:1 86:2 88:21 89:15 90:2,13
**reportable** 89:14 90:2
**reported** 1:21 112:4 116:3,3
**reporter** 2:17 7:23 34:25 40:24 53:15 71:2,4 83:15 89:20 96:2 97:3
98:4,16 99:14 100:15 101:13 111:11,21 135:1 137:18 144:2
**reporting** 58:7 85:24
**represent** 41:13
**representative** 67:11 123:17 127:5 128:3,22 129:10,21
**representatives** 56:11
**represented** 46:2 127:14
**reproach** 25:10
**republic** 9:15,21
**reputation** 52:19 72:6,8
**request** 80:13 81:2 81:7,15,19
**requested** 30:25 43:10 62:19 75:17 80:7 117:14 144:15
**requesting** 82:11
**required** 91:4,10
**research** 20:14
**residence** 8:1
**residency** 8:14,16
**resolve** 81:20
**respect** 49:19 50:10 117:12 124:20 131:1 141:1
**respond** 70:7 81:17
**responded** 70:6
**responding** 67:21
**response** 70:16 81:14
**responsibility** 5:18
**responsible** 13:15 24:13
**restate** 84:17
**restaurant** 59:19 59:24 60:25 61:6
**restore** 88:10
**restriction** 42:25
**restructuring** 72:22
**resume** 95:19
**retained** 120:18
**retention** 69:14
**retrieve** 80:19 81:12
**return** 43:7,10,24 44:2,16,21 45:6,14 45:16 74:6 123:11
**returned** 95:2
**revenues** 92:13,16 140:10
**review** 41:18 99:9 100:1 142:20 144:14
**reviewed** 41:14 71:11
**right** 29:24 32:4 32:16 37:10 42:2 42:20 49:17 60:18 62:21 78:18 80:7 81:18 85:4 92:1,5 96:23,24 97:22 99:4 103:18 110:23 111:18 113:1 116:18 122:24 123:14 126:2,3 128:9 138:21,23 140:2,4 140:5 141:3





EXHIBIT 2

**ring** 24:25 29:18 36:5 65:4 120:20
**rings** 75:12
**risk** 38:11
**rivera** 59:20 60:25
**riverfront** 3:16
**role** 10:6 20:10 21:6,9,13 53:12 54:3 99:20 105:4 108:14 125:7 135:22
**roman** 124:21
**room** 109:12,13
**rose** 11:15
**roughly** 27:19 30:7 35:23
**rules** 7:20
**run** 77:14 92:3
**running** 13:10 31:19 34:1,2 92:23
**rustling** 83:16
**ruth** 11:24 15:16 15:17 18:19,21 19:20 20:11,23 21:1 23:19 30:17 35:21 43:23 46:13 47:19 51:24 52:3 52:10 56:2 59:21 60:9 61:4 74:22 75:24,25 98:10 99:2 107:19 117:6
**ruth's** 101:4 104:14

**s**

**s** 78:5
**sacrifice** 118:14
**sacv** 1:7 2:7
**salary** 115:15 138:4,15,22 139:4 141:18,19
**sale** 77:11 109:21 109:23 119:13
**sales** 26:21,22,23 105:13
**salesman** 14:24 77:1,7
**salespeople** 63:17 63:21
**salesperson** 49:22 131:13
**salespersons** 63:22
**sat** 18:22 107:18
**saved** 59:17
**saw** 67:5 78:13 97:16 98:22 108:14,19 109:12 115:21 139:20,22
**saying** 72:25 84:11 94:16,22 105:24 109:11 118:2,15 128:12
**says** 103:6,9,16 110:9 120:8 123:15 124:11 130:2,9 140:23 141:17 142:4
**schedule** 136:19
**scheduling** 87:6
**scheme** 15:13
**school** 8:13 25:17
**scope** 81:10 87:5
**scraping** 118:10
**screaming** 117:24
**screen** 41:2 70:22 113:1,2
**script** 130:10
**scroll** 101:19 133:4
**scrolled** 41:15
**scrolling** 99:8 102:5 103:2
**se** 45:16
**search** 80:14,22 81:2
**searched** 81:13
**sec** 7:10 35:7,14 35:19 38:21 39:17 40:17 43:10,14,21 51:8,10,12 72:11 72:11 73:17 74:17 74:22 75:5,8 76:7 77:16 79:1,4 82:2 82:3,5,8,14,17 83:3,12,22,25 85:9 87:21 100:25 101:7,22 112:4,7 112:16,19 116:4 126:15 128:2 129:4
**sec.gov** 3:10
**sec0000506** 123:3
**second** 17:5 18:4,5 18:14 26:19 40:22 41:6 43:18 60:17 62:3 97:1 100:12 121:20 129:25 133:1 134:24 135:19 137:12
**seconds** 101:14
**section** 133:6,8 140:22,23 141:5,7 141:16 142:2,2,8 142:12
**sections** 140:24 141:8
**secured** 30:21
**securities** 1:5 2:5 3:4 110:16
**see** 21:11,16,19,23 22:22 25:2 33:10 33:13,16 40:5,7 41:1 44:16 49:3 58:8 60:3,22 67:15 68:7,9 70:21 76:8,9 97:4 98:1 99:3 101:9 105:16 109:17 113:2 118:16 120:5 128:13,15 131:15 134:7 135:2,9,18 137:14 137:25 138:1 140:23
**seeing** 22:1 97:25 99:5
**seek** 83:2
**seen** 68:1 71:17 97:14 98:6,13,25 99:10,12 102:18 116:1 119:8,9 124:7,9 130:23
**select** 53:5
**selected** 130:12
**self** 131:24
**sell** 18:11 63:6 105:12 109:6,14
**selling** 14:25 108:19,20
**send** 97:16 115:3 142:21
**sending** 114:24 121:21
**sense** 15:9 66:3
**sent** 56:24 70:8,11 113:15,18,21,24 114:3,6,18,19 115:4 123:4
**sentence** 120:8
**september** 52:25 57:24,25
**series** 59:11 116:10





EXHIBIT 2

**serious** 48:18
**serve** 81:16
**served** 80:12 81:12 112:19
**server** 80:16 88:5 88:16
**servers** 88:23
**service** 120:6,12 136:7,12 137:6 138:16,24
**services** 13:3 64:7 92:4 123:12 132:17
**serving** 64:2
**set** 14:17 21:20 25:25 44:3,3 56:16 59:19 60:24 62:20 75:21 105:10,14 122:2 122:11 144:5
**settle** 104:8
**seven** 124:4
**share** 87:1 95:17 108:23 113:1,2
**she'd** 105:25
**shifted** 85:1
**shock** 112:25
**short** 68:12 127:6
**shorthand** 2:17 144:1,9
**shortly** 74:1 77:2
**show** 40:20 41:12 95:15 116:11 133:5 134:22 135:7
**showed** 67:12 79:15 100:23
**showing** 112:8,17
**shubin** 78:14
**sic** 130:13 138:6
**side** 13:7 75:5 76:15,19 105:11 127:11 137:3
**sign** 22:25 28:13 28:14,20 142:20
**signatory** 125:15 125:19,21
**signature** 41:24 62:2 137:23 144:23
**signed** 25:10 29:13 30:8,17 33:24 37:9 42:1 59:22 67:13 130:11,20 132:4 138:10,12
**signer** 61:18,23
**significantly** 47:8
**signing** 67:2 123:21
**sills** 3:13
**sillscummis.com** 3:19
**single** 120:6 136:24
**siphoned** 74:12
**sir** 113:2,13 119:7 125:16 126:10,20 141:3
**sister** 11:15 12:10 12:13 13:14 20:11 20:19 23:19 25:12 27:25 30:3,4,17 46:13 47:19 51:24 52:3,10 117:8 125:24 131:7
**sister's** 99:2
**site** 128:8,14 130:12
**situation** 15:12 67:7
**six** 95:14 113:23
**skanska** 78:17 136:15,16,19
**slater** 14:12,14,16 16:1,3 17:19 38:7 48:5 76:25 82:19
**slender** 58:22
**slow** 97:7
**small** 54:17
**smith** 34:13,17
**sold** 27:16 67:3 108:23
**solely** 24:13
**somebody** 14:22 45:4 52:18 59:2 62:6 65:10 76:5,6 79:5 102:4
**somewhat** 110:19
**soon** 55:11 98:13 99:5
**sophisticated** 91:15
**sorry** 12:25 24:4 28:14 29:19 31:8 34:14,15,23 39:25 58:16 66:15 79:16 82:21 83:15 84:17 87:24,24 91:7 108:20 113:5 121:5 125:11 126:11 139:6
**sort** 11:21 54:23 92:14
**sought** 90:7
**sounds** 103:21
**source** 24:8
**south** 3:7
**space** 38:14
**spanish** 13:22
**speak** 7:22 10:21 13:21 18:19 28:10 62:13,14 105:2 106:14 107:23 131:12
**speaker** 105:15 111:20
**speaking** 70:3 105:22,23 106:7 109:8 122:10
**specific** 8:18 19:15 51:23 67:25 101:6
**specifically** 140:23
**speculation** 38:3 73:5 117:4
**spell** 68:24
**spend** 115:21
**spending** 13:17
**spoke** 10:4 17:5 38:7 53:8 60:9 63:19,20,20,21,21 70:14 104:20 110:24
**spoken** 30:23
**staff** 9:9 56:13
**stan** 6:7 120:23 121:18 122:2
**standard** 108:2
**start** 18:16 40:14 40:14 59:15,16 60:6 61:3 102:6 127:12 134:16
**started** 25:25 64:19 68:7 84:20 105:11 116:6 138:25 140:7
**starting** 6:19 28:24 108:15
**state** 8:1 42:14,16 42:24 45:25 46:1 89:16 143:11 144:2



Veritext Legal Solutions
866 299-5127

EXHIBIT 2

**stated** 16:20
**statement** 79:24 139:25
**statements** 5:22 61:10 62:15,25 76:1 82:9 93:14
**states** 1:1 2:1 3:4 9:12 67:20
**status** 46:8 52:19 61:2
**stay** 140:17
**stepped** 40:17 73:17
**steps** 35:13,15 68:1,5,5,6 89:4
**steven** 24:25 25:14
**sticking** 86:13
**stop** 39:2 82:24
**stopped** 29:22 131:11
**straight** 77:3
**straightforward** 77:5
**street** 3:7 58:23 61:22
**strictly** 77:4 127:9
**strike** 26:5
**string** 6:19,22 121:15 126:16 128:3 129:5,7
**structure** 84:21
**subject** 123:5 127:22 128:5 129:5
**subjects** 111:18
**submit** 25:22 100:9
**submitted** 24:23 25:2,3,7 100:2 101:23 102:1
**subpoena** 80:12 81:12,17,17 112:20
**subpoenaed** 81:15
**subscribed** 144:20
**subsequent** 134:4
**substantial** 137:5
**success** 142:9
**successful** 63:24
**sue** 103:6,19 104:4
**sued** 45:21 104:5 104:10
**sufficient** 59:15
**suggest** 127:10
**suing** 45:18,18 104:1
**suit** 45:19
**suite** 3:7
**sum** 64:17,18,19
**summary** 102:15
**summer** 51:2,4,7,9 51:15,16 117:16 125:3
**sums** 114:25
**superior** 15:9,11
**superseded** 134:4
**supply** 47:22
**suppose** 142:13
**supposed** 11:20 32:12 53:3 54:21 55:10 60:14,15,16 60:18 61:9,18,23 62:1 83:22 89:1 109:6 131:14
**sure** 7:19 11:24 14:2,4 16:16 22:21 27:17 30:12 35:21 36:4 40:16 51:4 52:21,22 65:11 69:11 71:16 71:21 77:2,13 78:12 89:4,11 98:11 103:5 104:7 110:6 111:22 119:24 134:11
**surname** 110:22
**suspect** 57:16 76:23 77:18 78:3 78:7,15,16,23
**suspected** 73:7 76:12 77:16 79:2
**suspicion** 57:20
**suspicious** 62:17 64:10,14 66:6
**switching** 48:8
**switzerland** 128:6
**system** 90:24 91:10 128:6 129:17,23
**systems** 128:5

**t**

**t** 103:10,12
**take** 20:21 29:20 35:13 38:9 39:7 41:2,3,10 68:12,13 71:7 81:20,21 89:4 95:13,20 99:6 100:17 110:6 119:7 131:20 136:17 141:23
**taken** 2:14 7:17 89:11,13 144:4
**talk** 15:23 16:23 32:17,23,25 37:8 53:10 56:7,9 58:24 59:1,2 62:22 63:25 64:1 66:2 67:9 69:15 70:13 72:1 73:2 76:14 90:6 94:5 104:25 105:4 106:15 107:16 122:16
**talked** 15:22 17:1 50:5 68:19 74:1 140:11 141:11
**talking** 17:13 20:3 47:4 53:9,18,21 54:11,15 55:1 68:7 75:23,24,24 77:16 85:2,17 103:14,25 104:18 128:7 129:22 131:12
**talks** 136:5 141:5
**task** 21:12
**tax** 79:24
**teaching** 25:16
**teardown** 77:4
**technology** 120:10 120:11
**tell** 8:10 14:1 15:19,25 16:3 17:17,18 18:3,7 22:6 27:18 30:14 36:24,24 43:17 44:9,12 52:17 54:19 55:16 61:14 62:13 64:14,21,22 66:8,11 67:17 72:4 73:10,13,16 77:15 83:12,12,22 86:23 87:15,17,20 89:25 97:11 98:24 99:6 100:18 101:10 105:9,21 108:8,17 109:21 131:15 137:23
**telling** 44:14 60:22 74:11 126:5
**temple** 58:2
**term** 33:4

**terminate** 83:1,13 83:19,20
**terminated** 83:18
**terms** 5:16 20:24 21:1 69:9 76:15 76:19 92:18,18 116:16 137:3
**testified** 7:6 81:6 85:17 104:17 112:1 116:14 120:19 122:16 133:20 135:24 139:23
**testifying** 144:7
**testimony** 81:23 86:11,17 89:18,25 92:21 109:24 110:19 111:3 112:5 113:10,12 114:21 116:1 122:20,22 132:8 135:9,11,12 141:13 143:8 144:11
**thank** 70:24 95:21 99:4 110:11,18,23 120:3 127:25 132:22
**thanks** 68:15
**thanksgiving** 62:24
**therapy** 5:21,25 8:25 9:4 15:3 17:13 18:1 22:15 23:1,12 26:1 31:20 47:1 48:11 48:23 63:8 64:1 68:2 104:20 119:19 120:9,15 122:19 124:21 125:18 126:7 127:13 128:6 132:18
**thing** 90:4 95:12 118:13 139:5
**things** 50:3 59:11 79:2 102:12 106:16,17
**think** 15:16 16:17 17:10 19:15,15 22:21 23:13 25:4 26:19 27:4,22 29:22 31:7,10,12 31:15 33:10,20,22 34:13 38:23 40:17 44:13,25 45:24 48:8,9 49:15 51:8 51:10,19 52:4 57:23 69:7 70:11 72:18 73:3 75:9 75:16,21 77:14 78:4,5,13 80:3 84:7,20 88:22 89:24,25 90:3 95:14 98:13,22 100:6,8 101:4 102:12,14 103:2 104:16 106:20,24 106:24,24 107:5 110:5 115:7 127:6 129:18 133:1,20 137:25
**third** 18:5 24:3 43:1 62:4 81:11
**thought** 43:5 69:19 79:22 82:6 90:8 132:4 139:23
**three** 8:9 12:23 19:22,23 33:16 50:5 74:23 75:9 121:13,20
**thropay** 1:14 2:13 4:3 5:3,12,14 7:4 7:8,13,16 8:1,4 13:20 25:25 29:25 30:20 31:18 37:10 38:20 39:16 40:21 41:1,14,21 42:4 43:7 46:9,25 48:19 50:14 63:2 65:14 67:24 68:18 70:18,21 71:6,11 71:15 72:11,19 79:8 80:11,24 81:13,14,22,23 84:20 87:23 88:4 89:25 91:14 92:24 94:7 95:15,23 96:10 97:4,11,25 98:6,13,21 99:6 100:12,17 101:9 102:9 103:24 104:16 110:4,9,14 114:22 115:17 116:1,9,23 119:12 119:16 121:11 122:6 123:6 124:23 126:24 127:7 130:25 132:6,25 133:11 135:2,17 137:13 137:22 138:3 139:6 140:21 141:18 143:4,16
**thrust** 122:22
**ticket** 27:21
**tighten** 31:13
**time** 5:18 12:6 13:6,12,17 16:6 17:1,5 19:23 20:9 21:8 26:5,13,17,20 28:7 29:13 30:5 30:14 37:10 39:6 39:21 40:17 41:16 41:18 42:1,4,21 43:13,13,14 44:18 44:19 47:3 48:8 52:24 57:9 59:23 59:24 60:6 66:16 66:20 71:15 73:18 81:20,22 83:21,25 85:5,9,14 88:8 90:15 93:19,19 100:1 101:15,19 103:24 104:1 106:2,24,25 107:20 108:5 112:13,20 119:7 121:16,17 122:6,9 126:5,17,18,21 129:18,21 136:18 137:5 142:22 144:5
**times** 106:19,20,23 107:6
**title** 23:17,19,20 23:22
**titled** 99:17
**today** 84:3 102:19 110:17 116:2 122:17 128:8 132:6 135:10
**today's** 109:24
**told** 17:19,19 18:21 19:16 25:8 25:11 29:15 30:3 30:15 33:11,12,25 36:18 43:15,23 48:6 53:8 58:15 58:24,25 59:15,16 59:17 67:2,16 68:8 69:12 76:1 81:12 82:20,24





EXHIBIT 2

86:7,14 87:1,18 89:11 90:3,9,12,12 90:18 108:11,24 109:1,7,13,14,15 109:17,23 122:23 126:9 133:21
**tony** 75:10
**top** 25:8 45:9 103:3 129:11
**tore** 40:7
**total** 36:3,23
**totally** 15:7 50:2 88:19
**touched** 141:25
**trained** 53:9
**training** 91:18,21
**transcribed** 144:9
**transcript** 113:11 143:6 144:10,13 144:15
**transfer** 20:22 139:19
**transferred** 112:10,18 114:15 115:18 129:20 131:2
**transferring** 112:23 114:22
**transfers** 139:10
**translate** 111:21
**translator** 65:20
**traveled** 93:19 106:20,20
**treat** 8:24 9:4 15:10
**treated** 131:18 139:11
**treatment** 120:11
**tremendous** 38:15 41:16
**tried** 53:7 67:20
**trip** 26:19 27:8,10 57:15 59:9 65:15 65:15 71:19 104:18,19 107:2 136:11
**trips** 27:3,4,11,14 27:20
**true** 16:2 42:2 143:8 144:11
**trust** 54:23 85:16 85:17
**try** 18:11 51:6 83:9,17 104:8 105:13
**trying** 16:1 56:19 68:25 72:22 113:2 133:5
**turn** 81:5 82:13 129:25 140:22
**turned** 75:25 80:3 80:6,6,8 82:8,13 82:17,17
**turning** 125:10 142:1
**twice** 69:19
**two** 18:10 46:7 54:12 61:7 126:14 136:22
**type** 23:23 51:22 92:11
**typically** 22:6
**typo** 141:2

**u**

**u.s.** 9:19 107:4
**ucis** 24:18
**ucla** 8:11
**uh** 7:25 16:2 24:2 24:10 25:20 34:10 36:6,22 51:5 52:12 57:14,21 58:15 71:9,9,10,18 73:25 74:3 79:13 85:4 86:22 92:2 93:3 96:15 97:23 106:18 121:24 128:15 138:2
**ultimately** 28:12 32:8 33:3
**umbrella** 10:20
**unable** 30:16 80:22
**unaware** 12:21 83:7
**unclear** 116:20
**uncomfortable** 63:1
**undersigned** 144:1
**understand** 22:11 25:5 29:3,7 31:2,3 31:18,22 32:5 38:20 39:16,20,21 39:22 42:4 45:3 49:23 62:16 63:7 64:2,6 68:3 90:1 92:12,15,25 94:21 97:8 106:2,3 119:11
**understanding** 6:11 15:3 20:10 25:10 26:25 28:23 40:13 88:5 116:12 116:14 120:13 124:5,11,12,12 132:18 138:19
**understood** 26:21 30:24 31:25 50:2 106:8,9 109:11 138:14
**unencumbered** 28:25 29:4,17,18 30:7 32:1
**unit** 119:13
**united** 1:1 2:1 3:4 6:13 9:12 122:4,7 123:19 124:17,18 125:6 126:1 127:9 128:4,22 129:10 129:14,17,22,23 130:3,6,19 131:8
**units** 27:16 109:6 119:5
**universities** 63:21
**university** 14:13 55:15
**unplugged** 80:18
**upload** 95:17
**upset** 57:6 67:6 82:19,20
**usc** 8:17 53:10,19 54:3,7,20 55:22 56:2,7,11,24 57:2 57:12
**uscis** 21:9 25:3,22 100:9
**use** 8:23 9:3 12:20 19:13 20:6,7 38:17 42:21 57:17 123:10

**v**

**vacation** 28:1
**vague** 20:1 21:14 30:22 34:6 47:2 86:1 92:18 94:10 116:19 135:15
**valerie** 1:21 2:17 71:1 89:20 144:24
**value** 30:7
**van** 105:22
**various** 56:1 70:11
**vast** 114:25
**vault** 38:8

**vehicle** 18:19 122:3
**vendor** 80:19 128:13 130:11
**venture** 124:14 126:6 127:12
**ventures** 6:13 122:5,7 123:18,20 124:17,18 126:1 128:4 129:10,15 129:23 130:3,6
**versus** 13:7,8,10
**videoconference** 1:15 2:15
**villaraigosa** 63:19 77:22
**violating** 54:19
**virtually** 15:22 54:2
**visible** 113:3
**vision** 127:8
**visit** 128:8
**visited** 9:23
**vocabulary** 106:17
**void** 32:16
**volume** 1:17 2:14 5:3 143:17
**voluminous** 25:5
**voluntarily** 12:15
**volunteer** 79:10 82:1
**vp** 129:8
**vs** 1:7 2:7

**w**

**wait** 58:14
**waiting** 33:16 59:13 60:18 134:7
**walked** 56:13
**walking** 60:21
**wang** 1:8,9 2:8,9 7:9 21:3,9,12,24 65:10 104:21 108:6 109:8 111:1 111:6,15
**want** 29:20 31:13 41:7 51:18 55:19 59:21 60:2,23 61:2 62:21 69:13 95:15 102:6 110:6 113:12 115:3 118:6,8 119:24 121:6,19 126:20 133:4 135:13 137:12
**wanted** 18:6,19 43:4 52:17 55:14 58:24 59:1,18 69:18,22 70:1,2 72:2 76:7 79:3,5 87:18 110:20 117:12
**wants** 45:19 59:2
**warned** 38:7
**way** 21:3 32:7 50:17 54:5 56:16 78:4 83:9 95:18 110:23
**we've** 50:5 68:11 125:13
**wearing** 7:21
**weather** 106:16
**web** 128:14
**week** 60:20 97:16 98:7,22
**weekend** 62:24
**weekly** 136:16
**weeks** 75:17
**weiss** 101:25
**went** 14:19,21 16:5 27:21 30:17 42:11 49:22 55:24 59:6,25 60:9,10 61:22 63:18 64:21 65:5,17 67:25 75:15 77:22 83:8 86:5,6,6,13,14 104:17 105:13 108:12 136:21 139:21
**west** 32:21 97:21 102:15 117:17 125:1 132:10,14 132:17
**whatsoever** 125:9
**whereof** 144:19
**white** 4:5 7:12,12 11:19 20:1 21:14 29:19,22 30:11,22 31:6 32:10 34:6 34:15,23 36:10 37:4 38:3 40:19 41:6,11,13 46:21 47:2 50:12 56:22 64:12 66:15 68:11 68:15 69:7,15 70:23 71:11 73:6 74:20 75:1,2 79:18 80:11 81:9 83:4 84:5,17 85:20 86:1,10,16 87:7,24 88:2 89:17 90:5,14 91:7 92:17 93:8 95:9,20,25 96:8 97:6,9 98:2,19 99:8,11 100:13 101:18 102:5 107:13 110:8 113:5 119:23 120:3 121:3,7,25 122:14 124:1 125:13 126:12 127:24 129:1 133:3,8 135:4,15 137:16 139:13 142:21
**wife** 21:4 104:21 112:24
**wife's** 112:12
**willing** 95:1 134:17
**withdraw** 115:25
**witness** 5:2 7:12 11:20 20:2 21:16 30:12,23 32:11 34:7,16,18 36:11 37:5 38:6 39:8 47:3 53:16 56:23 66:17 69:18 73:7 74:21 79:21 83:5 83:7 84:7 85:21 86:2,18 90:7,16 91:12,18 93:10 94:11 95:10 99:9 99:10,12 102:3 107:15 110:2 113:8,11 115:23 116:6,21 117:3,5 117:24 120:1 127:17 131:9 132:2,21 133:5 138:18 139:15 140:16 142:17,19 144:19
**witness's** 118:25 131:5
**witnesses** 144:6
**wondering** 64:18
**woods** 4:4
**word** 13:9 106:3,5 111:2 117:23





EXHIBIT 2

**words** 34:25 106:9
**work** 9:22,25 10:2 10:4 11:13,15 12:24 13:1 25:9 78:7,19,23 92:10 105:12 117:20,21 117:22 122:3 123:17 125:2 127:1,1 136:13
**worked** 11:11 58:4 136:18
**working** 11:24 12:7,10 14:16,20 102:4 108:10 129:14 136:21
**world** 142:13
**worries** 101:18
**worry** 61:8 93:24
**worthless** 38:10
**write** 87:13,15,20
**writes** 129:13
**writing** 103:18,22 122:2 127:4 128:6
**written** 45:10 98:13 116:15,17
**wrong** 15:2
**wrongdoing** 76:9 76:12
**wrote** 67:16 83:19 87:14 103:21

**x**

**x** 8:23,25 15:4 144:15
**xi** 44:25 45:1
**xin** 1:8 2:8

**y**

**y** 3:5 78:5
**yale** 24:25 25:14
**yang** 65:10
**yeah** 33:25 36:6 57:14 58:18 60:15 68:13 78:12,13 91:9 92:2 95:3 102:3 103:22 106:22 116:6 118:6 136:21 141:10
**year** 14:2 17:8,9 33:4,6,8,14,15,18 33:21,25 35:22 51:5 58:13 59:23 59:23 134:5 140:6
**years** 33:16 46:7 59:13
**york** 25:9

**z**

**zero** 141:22,23
**zhan** 65:4,17,19 65:20 66:8,24
**zoom** 1:15 2:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 3

BEVERLY ONCOLOGY & IMAGING
Medical Group, Inc.

Accredited by
The Joint Commission

**RADIATION ONCOLOGY**
John P. Thropay, M.D.
Shiu-Cheong Au, M.D.
James J. Chuang, M.D.
Janice J. Rha, M.D.

External Beam
Stereotactic Radiosurgery
3D Intensity Modulated &
3D Conformal
Radiation Therapy
Brachytherapy
Therapeutic Nuclear Medicine
Hyperthermia

**CORPORATE OFFICE**
200 E. Beverly Boulevard
Suite 200
Montebello, CA 90640
323-517-9800
323-727-7574 fax
Ruth Lopez Novodor

***Therapy Locations***

**GARDEN GROVE**
12555 Garden Grove Boulevard
Suite 101
Garden Grove, CA 92843
714-530-5930
714-530-5675 fax

**ALHAMBRA**
80 S. Palm Avenue
Alhambra, CA 91801
626-571-6729
626-571-1170 fax

**PASADENA**
2750 E. Washington Boulevard
Suite 100
Pasadena, CA 91104
626-794-2836
626-794-1697 fax

**DOWNEY**
11480 Brookshire Avenue
Suite 100
Downey, CA 90241
562-861-9914
562-869-0034 fax

**MONTEBELLO**
120 W. Beverly Boulevard
Montebello, CA 90640
323-724-8780
323-728-9936 fax

**City of Industry**
18645 Gale Avenue
City of Industry, CA 91748

## Pledge Agreement

The undersigned, Beverly Oncology & Imaging Centers, Medical Group, Inc., a corporation organized under the laws of the State of California, United States of America, agrees to pledge its unencumbered assets as security for the repayment of loans made by Pacific Proton EB-5 Fund, LLC (EB-5 Fund) to Los Angeles County Proton Therapy, LLC (LACPT),to the extent that the EB-5 Fund is not able to secure repayment of the loans made to the LACPT after the EB-5 Fund has exhausted all other remedies available to the EB-5 Fund.

IN WITNESS WHEREOF, the undersigned acting in her capacity as the duly elected and authorized Chief Executive Officer of Beverly Oncology & Imaging Centers, Medical Group, Inc. has caused this instrument to be duly executed and delivered by Beverly Oncology & Imaging Centers, Medical Group, Inc. as of this 2nd day of August, 2013.

BEVERLY ONCOLOGY & IMAGING CENTERS,
MEDICAL GROUP, INC.

By: Ruth Lopez Novodor,
Chief Executive Officer

**Exhibit**
87

EXHIBIT 3

# Exhibit 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE ) Case No.
COMMISSION, ) 8:16-cv-00974-CJC-AGR
)
Plaintiff, )
)
vs. )
)
CHARLES C. LIU; XIN WANG )
a/k/a LISA WANG; )
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC; )
PACIFIC PROTON EB-5 )
FUND, LLC; and BEVERLY )
PROTON CENTER, )
LLC f/k/a LOS ANGELES )
COUNTY PROTON THERAPY, )
LLC, )
)
Defendants. )
___________________________)

REMOTE VIDEOTAPED DEPOSITION OF CHARLES C. LIU
VIA WEBEX
Wednesday, February 24, 2021

Reported by:
Diane M. Bolan, CSR No. 12883
Job No. 210224DBO



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE ) Case No.
COMMISSION, ) 8:16-cv-00974-CJC-AGR
)
Plaintiff, )
)
vs. )
)
CHARLES C. LIU; XIN WANG )
a/k/a LISA WANG; )
PACIFIC PROTON THERAPY )
REGIONAL CENTER, LLC; )
PACIFIC PROTON EB-5 )
FUND, LLC; and BEVERLY )
PROTON CENTER, )
LLC f/k/a LOS ANGELES )
COUNTY PROTON THERAPY, )
LLC, )
)
Defendants. )
___________________________)

Remote videotaped deposition of CHARLES C. LIU, taken on behalf of Plaintiff, via Webex, beginning at 5:19 p.m. (PT) and ending at 11:46 p.m. (PT) on Wednesday, February 24, 2021, before Diane M. Bolan, Certified Shorthand Reporter No. 12883.



APPEARANCES:

For Plaintiff:
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
BY: GARY Y. LEUNG, ESQ.
TONY REGENSTREIF, ESQ.
444 S. Flower Street, Suite 900
Los Angeles, California 90071
(323) 965-3998

For Defendants:
SILLS CUMMIS & GROSS P.C.
BY: HERVE GOURAIGE, ESQ.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

Videographer: Tim Hunter



I N D E X


| WITNESS: | EXAMINATION |
|---|---|
| CHARLES C. LIU | |
| BY MR. LEUNG | 6 |


EXHIBITS


| EXHIBIT | PAGE |
|---|---|
| Exhibit 115 | 9 |
| Exhibit 116 | 17 |
| Exhibit 117 | 25 |
| Exhibit 118 | 45 |
| Exhibit 119 | 47 |
| Exhibit 120 | 50/57 |
| Exhibit 121 | 50 |
| Exhibit 122 | 62 |
| Exhibit 123 | 70 |
| Exhibit 124 | 105 |
| Exhibit 104 | 129 |
| Exhibit 126 | 137 |
| Exhibit 114 | 143 |
| Exhibit 127 | 150 |
| Exhibit 128 | 155 |
| Exhibit 129 | 156 |
| Exhibit 130 | 158 |
| Exhibit 131 | 167 |
| Exhibit 35 | 170 |
| Exhibit 132 | 173 |


NOTE: All exhibits were premarked by plaintiff's counsel.





EXHIBIT 4

Webex Proceedings, Wednesday, February 24, 2021
5:19 p.m. (PT) - 11:46 p.m. (PT)

THE VIDEOGRAPHER: Here begins the videotape deposition of Charles Liu in the matter of the SEC versus Liu, et al. This case is being heard in the United States District Court, Central District of California, Southern Division, case number 8:16-cv-00974-CJC-AGR. The deposition is being held via Webex.

Today's date is February 24th, 2021. The time on the record is 5:19 p.m. My name is Tim Hunter. I'm the legal videographer. Our court reporter today is Diane Bolan.

Counsel, will you please introduce yourself and state whom you represent for the record, starting with noticing counsel.

MR. LEUNG: Gary Leung for plaintiff.

MR. REGENSTREIF: Tony Regenstreif for plaintiffs.

MR. GOURAIGE: Mr. Gouraige for defendant.

THE VIDEOGRAPHER: Can you please swear in the witness.

(Whereupon, CHARLES C. LIU, called as a witness on behalf of the Plaintiff, was sworn and testified as follows:)

MR. LEUNG: Counsel, do defendants stipulate that the remote administration of the oath meets the requirements of Rule 30(b)(5)?

MR. GOURAIGE: I stipulate.

EXAMINATION

BY MR. LEUNG:

**Q.** Mr. Liu, where are you physically located?

**A.** Currently located in Beijing, China.

**Q.** And at what address?

**A.** At what address?

**Q.** Yes, in Beijing, China are you physically located.

**A.** Okay. I have to translate for English. Just give me one second.

Unit 2192, Number 4, Y-u-a-n-g Road, Beijing, China.

**Q.** Is that address your residence?

**A.** Yes.

**Q.** When was the last time you traveled to the United States?

**A.** Last time to travel to United States? 2015? Or 2016, 2015. I can't remember. It's too long. If you want, I can maybe check my passport record.

**Q.** That's okay. I'm just asking for your best recollection as you sit here today.

Did you formerly reside in the United States, Mr. Liu?

**A.** Did I formerly reside?

**Q.** In the United States. Did you live in the United States in the past?

**A.** Yes, before -- before 2015, 2016, 2015, I reside in the United States, yes.

**Q.** Why did you leave the United States?

**A.** Sorry?

**Q.** Why did you leave the United States after residing there back in 2015 or 2016?

**A.** Oh, it's a family decision, and because the kids like to go -- kids like to go -- come back to China.

**Q.** And since leaving the United States in either 2015 or 2016, you've never returned, have you?

**A.** I never return.

**Q.** Not for vacation?

**A.** No.

**Q.** Not for a holiday?

**A.** No.

**Q.** Not for business?

**A.** No.

**Q.** Mr. Liu, you should have received an invite to log into Egnyte, which is a file sharing service. Are you able to pull that site up on your screen in front of you?

**A.** Let me...

That was a different e-mail I received. SEC, the marked exhibits folder, is that the one you're talking about?

**Q.** Yeah, yeah --

**A.** And the --

**Q.** -- Marked Exhibits_Liu_2-24-21. Are you with me?

Let me share my screen, just so you can have the sense of what I'm hoping you're able to pull up on your own screen.

**A.** Okay.

**Q.** Do you see my screen?

**A.** Yes.

**Q.** And do you see there's a page on the Egnyte service that has some file folders, including Marked Exhibits_Liu_2-24-21? Is that something you're able to access on your own computer?

**A.** Hold on one second.

Yeah, it's coded. I just need to put the input to the code. Hold on one second.

Okay. 2rnkhnc...





EXHIBIT 4

**Q.** Mr. Liu, we're on the record, so you may not want to audibly speak while you're typing in your code.
**A.** Oh, okay.
Yeah, I think I opened the file.
(Exhibit 115 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. Great. Can you open up Exhibit 115, please.
**A.** Okay. Exhibit 115.
Wait a minute. Only five pages.
**Q.** Yes.
**A.** Only five pages, right?
**Q.** That's right.
Okay. So let me ask the questions, and you can provide the answers, just as a starting point. How about we do that?
**A.** Sure.
**Q.** All right. Mr. Liu, do you have Exhibit 115 opened up on your screen?
**A.** 115 open on the screen. 115. It's just a letter, your letter.
**Q.** Have you seen this document before, Mr. Liu?
**A.** Please...video con...
Yes, yes.
**Q.** Okay. And are you appearing for deposition

9

pursuant to this deposition notice that I've marked as Exhibit 115?
**A.** Yes.
**Q.** Mr. Liu, have you been deposed in the past?
**A.** Yes.
**Q.** How many times have you given sworn testimony before a court reporter in the past?
**A.** A few times. It was always SEC.
**Q.** You've never sat for a deposition that did not involve the SEC?
**A.** Never.
**Q.** You understand you're under oath; right?
**A.** Yes, yes, of course.
**Q.** Okay. Okay. All right. So you've been deposed in the past, including by me, and you've given investigative testimony to Mr. Regenstreif, as well, so I'll just quickly go over the ground rules in case you need a refresher course.
We do have a court reporter on this VTC. Miss Bolan is transcribing everything that you say, everything that I say, everything that your attorney may say. And since you're under oath, it's important for us to get an accurate transcript of your sworn testimony.
So, in order to do that, in order to make

10

Miss Bolan's job a little bit easier, I'm going to ask you to not speak over me, and I won't speak over you, and that way, we can get a clean record of what's being said. Is that fair?
**A.** That's fair.
**Q.** Okay. And so we can get a written transcript, we need you to respond verbally to my questions, so shrugs, uh-huh, uh-uh, those don't work. Please say yes, please say no, please audibly respond. Is that fair?
**A.** That's fair.
**Q.** Okay. If you don't understand my question, whether because I've phrased it in an odd way or you just don't understand what I'm driving at, I want you to tell me, so I can fix my question, because it's important for you to understand my question. Is that okay?
**A.** Okay.
**Q.** And if you don't tell me that you don't understand my question, I'm going to assume that you do understand my question. Is that fair?
**A.** Fair.
**Q.** All right. From time to time, your counsel may interpose objections. He's making a record to the extent he wants to take an issue to the judge in this

11

case. An objection is not the same thing as an instruction not to answer, so notwithstanding any objections by the parties to my questions, you're required to respond. Do you understand that?
**A.** Yes.
**Q.** Okay. Now, this isn't an endurance test. If you wish to take a break, please let me know. I'm happy to take a break. The only caveat to that is if I have a pending question that you haven't given me an answer to, I'm going to insist that you answer it before we go on break. Does that sound all right with you?
**A.** Yes. Approximately how long is this going to take?
**Q.** We're entitled to up to seven hours, and I have a lot of ground to cover, so I can't make any guarantees that we're going to end in four or three or five or six or seven. We're just going to have to see how it goes. All right?
**A.** Oh. Because I got up early in the morning. I didn't eat anything.
**Q.** We can take a break for your lunch, if you wish.
**A.** Yeah. I think...
What time is it now? It's 9.

12

Q. It's 9:33 your time, sir.
A. Yeah. If we can take a short break maybe in one hour, and we can have -- we can nonstop after that. I only need 20 minutes break.
Q. That will be fine.
A. Will that be okay?
Q. That's okay. We'll take a break in about an hour.
A. Yeah, I just had some quick bites, because recently, you know, I had some diabetes issue, you know.
Q. Understood. Thank you for bringing that to my attention. It's important for you to keep your blood sugar up.
So I will reiterate, if you need to take a break, let me know. The one caveat is, you've got to answer any pending question. So --
A. Yeah, after that, I think it can be nonstop, no worries.
Q. Okay. Great, great.
Mr. Liu, can you think of anything that would prevent you or limit your ability to testify truthfully today?
A. Not much, but I just -- as I said, because, you know, a week ago, I went to see a doctor, my



diabetes, you know, because I had a vision issue, and I went to see a doctor, and, you know, and find out my sugar level went up too high, so it caused some, you know, issues in my eyes. But, in general, I'm okay.
Q. Okay. Your diabetes, is that impacting your ability to recollect past events?
A. No, it just the vision. You know, if it's too small, it's difficult for me to see the words.
Q. I see. I see.
A. Otherwise, it's fine.
Q. Okay. And your diabetes, does that have any impact on your ability to testify truthfully --
A. No.
Q. -- in response to my questions?
A. No.
Q. Okay. All right.
A. Actually, I'm just thinking, because we have not started yet, if we can have, like, 15 minutes break, let me eat something, and then, you know, I'll be okay. Just 10, 15 minutes will be enough for me. I just go down to grab something to eat. Will that be okay?
MR. LEUNG: That's fine.
Let's go off record at 5:36 Pacific Time and get back on record at 5:51 Pacific Time, 9:51 Beijing



time, please.
THE WITNESS: Yes. I will leave my computer open, so in case -- you know, no interruption, so...
THE VIDEOGRAPHER: We're going off the record at 5:36 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 6:04 p.m.
Q. BY MR. LEUNG: Welcome back, Mr. Liu. Are you prepared to proceed?
A. Yes. Thank you.
Q. Okay. Before we went on that lengthy break, we had only gone over some preliminaries, but I think you had indicated to us that you never sat for a deposition outside of the SEC's enforcement action, which we're here today on, and the SEC's pre-filing investigation. Do you recall that testimony?
A. Yes.
Q. Mr. Liu, have you ever been a party to a proceeding in California Superior Court, case number BD576087?
A. U.S. Superior Court?
Q. California Superior Court. Have you ever been in a court case there?
A. No.



Q. No? You never sat for a deposition --
A. No.
Q. I'm sorry. I should have given you the admonition again, and I'll give it to myself. You and I have been cross-talking a fair amount. Sometimes I interject when you're answering, sometimes you interject when I'm answering. That is making the court reporter's job very hard. So let's --
A. Okay.
Q. -- try to be a little bit more disciplined about waiting for the end of a question before beginning your answer --
A. Okay.
Q. -- and I will do the same. Okay?
A. Okay.
Q. So it's your sworn testimony, sir, that you've never been a party to a court action in California Superior Court; is that right?
A. Except SEC.
Q. Just SEC.
A. Yeah.
Q. So it's your sworn testimony today, and you understand you're under oath, that --
A. Yes.
Q. -- you didn't sit for a deposition on





EXHIBIT 4

September 17th, 2014 in a California Superior Court case captioned Wang Ping Guo versus Charles Chi Liu?
**A.** Oh. That was my previous marriage.
**Q.** That was a deposition; right?
**A.** It was not Superior Court. It was a local court.
**Q.** So you need to correct your testimony, don't you.
**A.** Yeah, I need to correct it, but in my recollection, it was too long ago, and it was not -- it was because it was settled before -- afterwards.
**Q.** Okay. With that in mind, have you sat for a deposition in any other court cases besides --
**A.** My recollection --
**Q.** -- what was discussed?
**A.** In my recollection, I do not.
(Exhibit 116 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. If you could go back to your Egnyte screen and open up Exhibit 116.
**A.** 116?
**Q.** Yep, 116.
Are you with me?
**A.** 116?
**Q.** Um-hmm.

17

**A.** Well, as I said, the exhibits you sent only has five pages. It's just a letter, no other --
**Q.** Exhibit 116 has five pages? Exhibit 116, that's what's been opened up?
**A.** 116. 116 dated January 19, `21, Gary Leung, this one?
**Q.** No, Exhibit 116 on your --
**A.** Oh, I never received this. The only exhibit attachment, I said I received only five pages.
**Q.** You're going to have to --
**A.** It's just a letter from you.
**Q.** Sir, refresh the page, please. Click on the file folder again.
**A.** All right.
MR. GOURAIGE: I'm not seeing the exhibit, Gary.
MR. LEUNG: Marked Exhibits_Liu_2-24-21. You don't see Exhibit 116, Herve?
THE WITNESS: Only still five pages. I refresh it.
MR. GOURAIGE: It's not coming up -- I don't see it on my screen here. Is it...
Okay. Let's see.
MR. LEUNG: Do you see it now?
MR. GOURAIGE: No. I see a list of exhibits,

18

but I can't even --
**Q.** BY MR. LEUNG: Let's just go with share screen for now, sir, okay? Do you see I've pulled up on the share screen function of Webex an electronic document that will be marked Exhibit 116? For the record, it is a 25-page document. The first page of the document is dated February 4th, 2016. Do you see it's a letter to you from the United States Securities and Exchange Commission?
**A.** Yes.
**Q.** Have you seen this document before, sir?
**A.** Yes.
**Q.** When did you first see this document?
**A.** When I first see it, just a few days after that letter was dated.
**Q.** Okay. That --
**A.** I received in the mail, received that in the mail.
**Q.** Okay. And did you understand once you received that SEC subpoena that's been marked Exhibit 116, you had an obligation to collect certain documentation provided to the Securities and Exchange Commission?
**A.** Yes, which I did.
**Q.** Which you did.

19

After receiving the 7-4-2016 subpoena from the U.S. securities regulator, what did you do? Did you tell anybody about it?
**A.** No, I did not tell anybody, except my attorney.
**Q.** Did you tell Dr. Thropay about this February 4th, 2016 subpoena?
**A.** Did I tell Dr. Thropay?
**Q.** Yeah. Once you received the subpoena from the SEC, did you tell him about it?
**A.** No, I did not tell anyone, except my attorney, because I don't know what to do.
**Q.** Okay. And at that time, you were engaged in business discussions with the City of Hope, correct, February --
**A.** That is correct.
**Q.** -- 2016?
**A.** That is correct.
**Q.** Did you tell anybody at the City of Hope about the February 4th, 2016 SEC subpoena that you had received?
**A.** No. As I said, I did not tell anyone, except my attorney.
**Q.** You were also engaged at that time with business -- in business discussions with Beverly

20

Hospital; correct?
**A.** Yes.
**Q.** Did you tell anybody at Beverly Hospital that you had been subpoenaed by the SEC, which is the United States securities regulator?
**A.** I did not -- again, I did not tell anyone, except my attorney.
**Q.** Okay. And you were engaged in business dealings at that time with a company called Mevion, as well; isn't that right?
**A.** Yes.
**Q.** Did you tell anybody at Mevion that you had been subpoenaed by the SEC?
**A.** No.
**Q.** What about your accounting firm, Marcum? You had retained Marcum to act as the accounting firm for certain of your corporate entities, as well as you individually; is that correct?
**A.** Yes.
**Q.** After receiving a subpoena from the SEC in February 2016, did you tell Marcum, your accountants that were engaged in tax preparation work for you, that you had been subpoenaed by the SEC?
**A.** Later, yes, but not immediate.
**Q.** How much later?



**A.** How much later? I think after -- because I needed to start to collect information in order to -- you know, to supply the documentations, so I went -- I also went to the accounting firm with my lawyer's advice.
**Q.** So you went to Marcum and told them about the SEC action after it had been filed at the end of May 2016; correct?
**A.** I don't specifically remember the dates.
**Q.** I see. I see. When you were subpoenaed by the SEC back in February 2016, did you subsequently tell any of your investors about that regulatory subpoena?
**A.** No.
**Q.** You didn't tell any investors in the PPEB5 Fund about the SEC subpoena?
**A.** Not directly.
**Q.** What do you mean, "not directly"? Did you tell them indirectly?
**A.** No. I did not tell anyone, except my lawyer and accountant.
**Q.** And these investors in the PPEB5 Fund, they all contributed capital in the amount of $500,000 and also paid a $45,000 administrative fee to Pacific Proton Regional Center, didn't they.



**A.** Well, actually, it does not need me to tell investors, because right after that, other people -- you know, other people already made announcement. Everybody start to know. So I don't need to tell them.
**Q.** Answer my question, sir. My question to you was, investors in the PPEB5 Fund each contributed half a million dollars in capital and also paid a $45,000 administrative fee to Pacific Proton Regional Center; is that correct?
**A.** That is correct.
**Q.** And so at the time, did you believe you had any disclosure obligations to these investors that had invested substantial sums of money in your project that you were under investigation by the SEC back in February of 2016?
**A.** I -- frankly, I don't know, because this is the first time happen to me. I don't know U.S. regulations that well. So that's why I did not tell anyone, except my attorney. I followed -- I followed attorney's advice.
**Q.** Who was your attorney at that time?
**A.** The attorney's name? I think you guys -- this is the guy who used to work for SEC. I think you all met him. You met him before.
**Q.** Do you remember your attorney's name at that



time?
**A.** It's on the record. I can't remember. It's been too long.
**Q.** Okay. That's fair.
**A.** Easy to find it out. Easy to find that out.
**Q.** After receiving the SEC subpoena in February 2016, did you continue to engage in business discussions with the City of Hope without telling them that you were under investigation by the U.S. securities regulator?
**A.** No. After that, I did not continue the conversation.
**Q.** Are you certain of that, sir? You understand you're under oath; right? The testimony you're giving is under penalty of perjury. You understand that; right?
**A.** You are asking me whether I continued the conversation with City of Hope?
**Q.** Yes.
**A.** After investigation?
**Q.** Subsequent to receiving the February 2016 SEC investigative subpoena, did you keep trying to do business with them --
**A.** No.
**Q.** -- without telling them about that subpoena?





EXHIBIT 4

**A.** Gary, let me tell you the facts.
The facts is, once the news break out, no one is going to discuss with me on any business, including City of Hope. And the City of Hope later sent us an e-mail telling us, inform us to stop -- to suspend and stop all the conversation. That's a fact.
(Exhibit 117 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. Can you direct your attention to my shared screen on Webex. I'm showing you what's been marked Exhibit 117. This is a 26-page document. The first page of the document is dated March 24th, 2016. It bears the U.S. Securities and Exchange Commission letterhead. Again, this is a piece of correspondence directed to you. Do you see that?
My question is, do you see that the cover page of Exhibit 117 --
**A.** Yeah. I cannot -- my vision --
THE COURT REPORTER: Mr. Liu, Mr. Liu, excuse me. This is the court reporter. I'm going to ask you to allow the question to be finished before you jump in. I can't write two people at the same time.
THE WITNESS: Okay. What was the...
Did I answer that? I thought I answered that already.



**Q.** BY MR. LEUNG: I'll ask another question.
This document is dated March 24th, 2016. It's about a month and three weeks later. Do you recognize this document, Exhibit 117?
**A.** 117, yes, I've seen this document. Yes.
**Q.** Okay. This is the second subpoena that the SEC sent you for documents, isn't it.
**A.** Yes.
**Q.** Okay. I am going to direct your attention to page 9 of 26 of Exhibit 117. Do you see the section entitled "See Required Documents"? Do you see that, sir?
**A.** Yes.
**Q.** Are you looking down at your phone, sir?
**A.** No, no.
**Q.** Do you have your phone in your hand?
**A.** No, I don't have the phone.
**Q.** Are you communicating with anyone else by way of an electronic device as you're giving this deposition testimony, sir?
**A.** No, no, no.
**Q.** Okay. I just want --
**A.** It's my eyes is the problem.
**Q.** Okay. Do you see the section entitled "Required Documents"?



**A.** Yes.
**Q.** Number 13, "All documents concerning contracts, agreements, leases, and memoranda of understanding with consultants and partners, including, but not limited to, architects, construction companies, medical care providers, such as hospitals and clinics, entered into by PPTRC, EB-5 Fund, LA Proton Therapy, United MPH Ventures, LLC, MP Medical Hotel, Inc., SCMPH Fund, LP, and SCMPH Management, LLC."
Did I read that right, sir?
**A.** Yes.
**Q.** You previously testified at deposition in this case that you corresponded with vendors that were doing business with Beverly Proton and the PPEB5 Fund and the Pacific Proton Regional Center by e-mail, using your me.com account. Do you recall that testimony, sir?
**A.** Yes.
**Q.** That e-mail account was charlescliu@me.com; is that right?
**A.** No, it's charlesliu@me.com.
**Q.** Thank you for correcting me, sir.
And you also testified at deposition that around July 2016, your me.com account was hacked and all of your e-mails were deleted and destroyed and



unrecoverable at that point. Do you recall that testimony?
**A.** Yes.
**Q.** Okay. And that was sworn testimony, as well, and you were testifying truthfully; right?
**A.** Yes.
**Q.** Okay. That's July 2016. This is a March 24th, 2016 subpoena from the SEC. After receiving this March 24, 2016 subpoena from the SEC, did you search your me.com e-mails for responsive communications with vendors and preserve those communications for production to the SEC? Did you do that?
**A.** Yes, I did my best.
**Q.** Did you preserve --
**A.** But a lot of information is no longer available.
**Q.** What information was no longer available as of March 2016?
**A.** I don't know. It's just the e-mail I was using, you know, for everything. It's too many e-mails.
**Q.** So I'll ask again, did you review your e-mails at your me.com address after receiving this March 2016 subpoena from the SEC and identify





EXHIBIT 4

everything that was responsive to the Commission's requests, preserve it, and produce it? Did you do that, sir --
**A.** No --
**Q.** -- did you review all your e-mails?
**A.** -- because I couldn't find most of them after it was hacked. Otherwise, it's -- all the e-mails stay and easily to be reproduced.
**Q.** You testified that you were hacked in July 2016. This is a March 2016 subpoena. Did you not perform a search between March 24th, 2016 --
**A.** No, I said before --
**Q.** -- and --
**A.** -- before hacked, everything was there.
**Q.** Before your e-mail account was hacked and when everything was there, did you search it and did you identify responsive e-mails to the SEC --
**A.** Yes.
**Q.** -- subpoena?
And did you produce them?
**A.** I think so.
**Q.** Do you know so? I'm not calling for your speculation.
**A.** Well, it has been too long, honest with you, it's been too many years. If you want confirm, I can



maybe -- you know, went back to see. But it's been too long. In my recollection, I can't remember.
**Q.** If there are e-mails between you and the City of Hope regarding your business dealings that were produced by the City of Hope in response to an SEC subpoena, can you think of any good reason why you didn't also produce those same e-mails?
**A.** Any good reason?
Well, I should provide. It's good evidence to show the business activities with a prestigious firm, a hospital. Why should avoid it?
**Q.** But if you did not produce that evidence, can you think of why you wouldn't have? Maybe it's because you didn't search for it?
MR. GOURAIGE: I'm going to object to the question, because Mr. Liu has testified he did his best and he believes that he produced the documents. I don't -- you have not presented him, Gary, with any evidence he did not produce those documents, so I think the premise of your question is unfair to him.
**Q.** BY MR. LEUNG: Mr. Liu, do you recall producing in response to an SEC subpoena a single e-mail between you and anyone representing the City of Hope?
**A.** The only person I'm dealing with is the CEO



Levine. Levine? I think the last name or first name Levin --
**Q.** Sir --
**A.** -- is the only person I was dealing with at City of Hope.
**Q.** That's not my question. Do you, sitting here today, recall searching for e-mails between you and the City of Hope and actually producing them to the SEC in response to its investigative subpoena? Is that something you remember doing?
**A.** No, I remembered I followed SEC instructions to do -- you know, to provide everything SEC needs, and my best efforts.
**Q.** Who is Michael Cogswell?
**A.** Mike Cogswell, Mike Cogswell used to be employee of Mevion. When we first met, he was -- he representing the sales side, and he was tried to sell product to us. And later, he expressed his interest working for our company. Actually, this is the person introduced to me by Dr. Thropay's sister, Ruth.
**Q.** When did Miss Novodor introduce Michael Cogswell to you?
**A.** During the period we were selecting the -- in the middle of selecting the, you know, proton system,



because, you know, my contact, initial contact was Optivus in California, and then later, Dr. Thropay said, you know, this might be, you know, too expensive, things like that, or maybe because it taking too much space, so may explore other vendors.
So -- because, you know, both Ruth and Dr. Thropay have been in this business for a long time, I was very much relying on their expertise. And then later, Ruth said to me, you know, Mevion should be a good one. Then introduced Mike Cogswell to me. That's how we met.
**Q.** Miss Novodor introduced Mike Cogswell to you?
**A.** Yes, 100 percent.
**Q.** How did she do that? Did she give you his contact information, did she arrange for you --
**A.** Yes, she gave me all the contact information, phone number, e-mail, and we start to -- then we start to be connected.
**Q.** And what did you do next?
**A.** And then Mr. Cogswell made a few trips from Boston area, because Mevion is located in that area. When came back to California to meet me, have meetings, that's how we started.
**Q.** When did you first meet Mike Cogswell through a business meeting?





EXHIBIT 4

**A.** When?
**Q.** Yes, when.
**A.** I think the year 2015.
**Q.** What part of the year?
**A.** No, I can't remember.
**Q.** What season was it in the year?
**A.** California is all one season.
**Q.** What season was it in the year, if you recall?
**A.** I don't recall.
**Q.** And it's your sworn testimony that Mike Cogswell flew out to California to meet you for the first time at some point in 2015?
**A.** Yes, that's true.
**Q.** All right. And you indicated a little bit earlier today that Mr. Cogswell later expressed interest in you and in your company. Do you recall that?
**A.** Yes.
**Q.** What company was he going to join?
**A.** He was interest in being -- in working with the project company, which is the Los Angeles Proton Center, as well as the marketing company, the Regional Center, both.
**Q.** I should have done this earlier. When I say



"Pacific Proton Regional Center," I'm referring to -- let me make sure I get this right -- Pacific Proton Therapy Regional Center, LLC. Okay? Are we on the same page? "Pacific Proton Regional Center," that's what I'm referring to, do you understand?
**A.** Okay. Yeah, you asked me which company. I said he showed interest in working for both.
**Q.** Yeah. I just want to make sure that we're using the right terms and we're the same page, okay?
**A.** Sure.
**Q.** So the operating entity was formerly Los Angeles County Proton Therapy, LLC and later became Beverly Proton Center, LLC; right?
**A.** Yeah. These two companies, whether name change or not, I'm referring to the project company. The project company means to develop the project.
**Q.** Sir, when I ask you questions, I'm going to have to use defined terms. I'm just attempting to define those terms for you right now. I'm going to call that Beverly Proton. Do you understand that?
**A.** Sure.
**Q.** Beverly Proton equals project company, Pacific Proton equals Regional Center; right? Okay?
**A.** Okay.
**Q.** And there was also a private fund; right?



**A.** Yes.
**Q.** It was called Pacific Proton EB-5 Fund, LLC. I'm going to refer to that as the PPEB5 Fund, okay?
**A.** Okay.
**Q.** All right. So were you interested in hiring Mr. Cogswell for the Regional Center and the project company?
**A.** Yes.
**Q.** Why?
**A.** Well, he has -- he is experienced. He has been in the medical field for a few decades, and he's capable, and also a promoter.
**Q.** What would the experience have been?
**A.** Oh, he was -- he was -- he was very senior person. He was VP at Mevion, and also before Mevion, he was -- I don't remember the name. It's a Fortune 500, you know, company in U.S. He also the VP for that company.
**Q.** Was Mr. Cogswell --
**A.** This is all public record. You can easily find that out. I don't have to.
**Q.** Was Mr. Cogswell a physician?
**A.** No, he's not a physician. He's mostly on the sales side, but he knows -- he knows medical business.
**Q.** And what did you hire him to do?



**A.** What did I hire him to do?
Well, to do -- to do the development of the proton center, you know, and also to do the marketing and the sales, to raise more funds.
**Q.** Development in what respect?
**A.** Development means, you know, develop, because we have chosen -- we signed agreement with Mevion, and he knows Mevion very well. So it's a comprehensive, you know, medical development project, you know, to start a conceptual, you know, design, you know, schematic design, and then construction period. You know, he is capable and he's knowledgeable, he's -- that's -- you know, he's -- that, you know -- I think that he's the best person to fit.
**Q.** Did you hire Mr. Cogswell because he had good contacts at Mevion?
**A.** Yes, because, you know, we chose a Mevion product, so he knows Mevion. It's a plus.
**Q.** When did Mr. Cogswell start with Beverly Proton and Pacific Proton Regional Center?
**A.** I think late -- late 2015, sometime in that range.
**Q.** And do you know anything about the circumstances of Mr. Cogswell's departure from Mevion?
**A.** Departure from Mevion?





EXHIBIT 4

**Q.** Yes.
**A.** Yes. After -- before he signed the contracts with us, then he said he was going to leave Mevion.
**Q.** And it's your recollection that he signed employment agreements with Pacific Proton and Beverly Proton at the end of 2015?
**A.** Yes.
**Q.** Did you understand that Mr. Cogswell was under internal investigation at the time he separated from Mevion?
**A.** No, I was not aware of that.
**Q.** Did you know that Mr. Cogswell was under internal investigation with respect to his relationship with an entity called FGPT at the time that he separated from Mevion?
**A.** No, not at all.
**Q.** Do you know what FGPT is?
**A.** No.
**Q.** You've never had any interaction with a firm called FGPT?
**A.** No.
**Q.** You've never sought out further discussions with FGPT to secure potential funding for your proton cancer therapy project?
**A.** Say again, the firm name.



**Q.** FGPT.
**A.** No, not in my recollection.
**Q.** So you have no recollection of Mr. Cogswell's departure from Mevion potentially being the result of self-dealing on his part relative to his former employer? You have no recollection of that?
**A.** No, I don't know anything about that.
**Q.** Okay. How did you...
Did you negotiate the terms of Mr. Cogswell's employment with him before you signed an employment agreement on behalf of Beverly Proton and Pacific Proton Regional Center with Mr. Cogswell?
**A.** Yes.
**Q.** Tell me about that negotiation. What were the material terms you had to work out with Mr. Cogswell?
**A.** I think it's standard terms. I don't remember the details. It's been too long.
**Q.** Did you negotiate --
**A.** The contract, if you have a copy of the contract, it should speak for itself.
**Q.** Did you negotiate Mr. Cogswell's compensation with him?
**A.** Yes.
**Q.** What was he asking for?



**A.** I cannot remember, honest with you.
**Q.** Do you recall it being a difficult negotiation?
**A.** Sorry?
**Q.** Do you recall it being a difficult negotiation?
**A.** Well, we had, you know, back and forth a few times. I won't say difficult. I would say still friendly.
**Q.** You mentioned that you hired Mr. Cogswell to raise capital in addition to develop the proton cancer therapy project. How was Mr. Cogswell to raise capital once on board? What was he going to do to raise capital?
**A.** Well, for EB-5 projects, you know, most of Chinese investors, you know, like to deal with American guys. It's just something -- it's a common -- it's something, you know, in this field, I think it is very common. So because I was, you know, born in China, so I think it will be very helpful for a true American guy, you know, to be our representative to work with investors, to raise more funds for this project. This is also the reason behind this.
So Mr. Cogswell, you know, right after we signed a contract, he started to work, you know,



immediately, you know, to, you know, fulfill his duties. So he made a few trips I think to China, also, and all the meetings went well. That's all I can recall.
**Q.** Who did he meet with?
**A.** He met -- he met some agents, you know, marketing agents, and also some medical supply people, and also medical insurance people, Chinese medical insurance, because our goal is to bring insurance company into this project.
**Q.** Which insurance company --
**A.** Also equity money, found equity money in China to fund this project, as well. So he met all the related -- you know, project-related people in China.
**Q.** Why was Mr. Cogswell meeting with equipment manufacturers if you had already signed a deal with Mevion?
**A.** No, for a proton, it's a very complicated -- you know, it's a very complicated device. There will be some supporting, you know, equipments, medical equipments. For example, the CT, computer tomography, just give you an example, and other stuff, other medical equipments to be supporting equipments. So that he was also looking for, also, because his knowledge, and he was also -- you know, met I think a





EXHIBIT 4

few medical supplies people.
**Q.** What companies were those --
**A.** Oh --
**Q.** -- medical suppliers?
**A.** -- I couldn't remember. I think I set it up for him, but he went there by himself.
**Q.** The insurance companies that Mr. Cogswell met with, what were they?
**A.** I think one of them is Xinhua Insurance Company, Xinhua Insurance Company. One of largest in China.
**Q.** And who did Mr. Cogswell meet with at Xinhua?
**A.** Sorry?
**Q.** Who at Xinhua did Mr. Cogswell meet with during the business trip that you testified to under oath?
**A.** I think a business develop guy. I can't remember. I can't remember.
**Q.** Okay. And you also mentioned that Mr. Cogswell met with some marketers. What marketers did he meet with?
**A.** I was not there. I don't know. I can't remember.
**Q.** You also referenced some private equity firms that Mr. Cogswell may have met with. What is private



equity?
**A.** Private equity means, you know, a project, a company, investment company interested in -- nothing to do with EB-5. Just, you know, for example, the interest in investing to Beverly Proton, you know, to be a shareholder of the Beverly Proton. That kind of money we're talking about.
**Q.** You signed an operating agreement for Beverly Proton, didn't you?
**A.** Yes.
**Q.** Do you recall that operating agreement ever being amended?
**A.** I think so.
**Q.** When was it amended?
**A.** I think after we decided to use Mevion, choose Mevion system.
**Q.** And when do you recall that amendment being executed?
**A.** Executed.
**Q.** Signed.
**A.** Yeah. That is -- I think it's early 2016 sometime, or late `15.
**Q.** Who was that -- who signed the amendment to the Beverly Proton operating agreement?
**A.** Either -- either Mr. Cogswell or myself. I



don't remember.
**Q.** Do you have any understanding of whether or not an amendment of the operating agreement would have been effective without the execution of all the members in Beverly Proton?
**A.** Do I...
Yes. I think, I think it was Thropay. Thropay also -- I don't know, I forgot whether he signed or not, but if he did not sign, I have power of attorney. He gave it to me.
**Q.** Thropay gave you his power of attorney?
**A.** Yes, to sign, from the beginning. I was -- you know, we had an MOU a long time ago, before we, you know, started the project. You know, I was...
**Q.** That February 16th, 2011 MOU, was that a binding MOU, or was that a non-binding MOU?
**A.** Certain clauses binding, certain clauses not binding.
**Q.** Was the compensation provision of the MOU binding or not binding, sir?
**A.** Could you say it again. Competition?
**Q.** Compensation.
**A.** Compensation.
**Q.** To the extent there were provisions of the MOU between you and Dr. Thropay, were those binding or



non-binding?
**A.** I cannot remember. You can see it.
**Q.** Yes, I can.
You signed an employment agreement with Beverly Proton on or about April 5th, 2016. Before April 5th, 2016, you didn't have an employment contract with Beverly Proton, did you.
**A.** I did not have an employment contract before, only the MOU we signed with Dr. Thropay.
**Q.** Which was binding or non-binding, depending on the person; right?
**A.** Can you please check? I don't have a copy with me.
**Q.** Yeah.
MR. LEUNG: Herve, are you still unable to see anything except Exhibit 115 in the marked exhibits folder?
MR. GOURAIGE: I see a list of exhibits now.
MR. LEUNG: Yeah, it's 115, 116, 117, 118. You see those; right?
MR. GOURAIGE: I do.
**Q.** BY MR. LEUNG: Mr. Liu, do you see a list of exhibits in the Marked Exhibits folder that's four different PDFs entitled Exhibit 115 through Exhibit 118? If you can just refresh that folder,

maybe they'll pop up.
Are you able to see them, sir? Are you able to see the list of exhibits, Mr. Liu?
**A.** Yeah. Today my eyes -- my vision is getting very bad. I can barely see it.
Yes, four exhibits.
**Q.** Okay. Can you open up Exhibit 118, please. Are you able to do that?
**A.** Yeah, I think it's better to just see this. I don't know what you want to open, but this is fine. This should work.
**Q.** You can see my screen now; right?
**A.** Yeah, yeah.
**Q.** Exhibit 118?
**A.** Yeah, yeah, yeah. This is better. This is better.
**Q.** Okay. Good.
(Exhibit 118 was marked prior to the commencement of the deposition.)
MR. LEUNG: For the record, I'm showing -- displaying to the witness a document that will be marked Exhibit 118. It's under the Mevion letterhead, and the heading says, "Do Not Destroy Evidence and Related Instructions." Do you see that, sir?
**A.** Yeah.



**Q.** Okay. You've never seen this document before, have you?
**A.** No.
**Q.** Okay. It goes on to say, "Handed and e-mailed to Michael Cogswell, SVP Sales and Marketing by Patricia Davis, VP, General Counsel on January 12th, 2016." The letter reads, "Mike, The situation with FGPT Group is serious. Until we finish our investigation, 1, you must retain and not delete or destroy any information that's currently stored on any computer to which you have access," and it goes on.
It ends with the sentence, "We will complete our investigation as soon as we can, which, of course, depends on us learning all the facts about FGPT."
So I read that for you, sir, and again, it's your testimony that Mr. Cogswell never communicated to you in words or substance that he was under internal investigation at Mevion at the beginning of 2016, around the time he was talking to you about seeking employment with your firms? That's your testimony?
**A.** Can you repeat?
**Q.** He never told you about FGPT and what was going on with him at Mevion; right?
**A.** Never. I don't know anything about this. I think you should save some time. My advice, maybe you



should save some time and ask him about this question, because I have no knowledge.
**Q.** I don't need your advice, sir. My question is, you don't know anything about FGPT? That's your sworn testimony?
**A.** Never, ever.
**Q.** Okay. We'll see.
All right. I'm still sharing my screen, and you saw me move an exhibit from another folder. I'm displaying to you a five-page PDF that will be marked Exhibit 119. It bears the title "Employment Agreement."
(Exhibit 119 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Very first page it says, "This agreement is made by and between Pacific Medical Regional Center, LLC, a California limited liability company (hereinafter called 'Company') and Michael Cogswell (hereinafter called 'Employee'."
I'm going to flip through it real quick so you can see it, sir, and my question is, do you remember this document?
**A.** Can you show me the full page?
Yes, I remember this document, yes.
**Q.** Is Exhibit 119 a true and accurate copy of an



employment agreement executed between Michael Cogswell and the Pacific Proton Regional Center?
**A.** Yes.
**Q.** Okay. Directing your attention to Section 4 of the agreement entitled "Employee Compensation," that says Cogswell is going to get an annual base salary of a quarter of a million dollars; right?
**A.** Oh, I see. I see where you're -- 250. So is this employment agreement between Cogswell or myself?
**Q.** Cogswell.
**A.** Yes.
**Q.** Okay. And did you agree to that $250,000 annual salary to be paid to Michael Cogswell by the Pacific Proton Regional Center?
**A.** Yes.
**Q.** Nobody else was involved in that decision but you; correct?
**A.** Yes.
**Q.** Okay. And then turning to the final page of the contract, is that a true and accurate copy of your signature?
**A.** Yes.
**Q.** Okay. So you signed this contract, you agreed to this contract, and this is what you negotiated with Mr. Cogswell with respect to Pacific





EXHIBIT 4

Regional Center; right?
A. Yes.
Q. Pacific Proton Regional Center.
A. Yes.
Q. So the contract is dated April 5th, 2016. By now you've been subpoenaed twice by the SEC. Did you tell Mr. Cogswell at this time that the company he was joining was involved in an SEC investigation?
A. Yes, I did tell him.
Q. And what did he say in reaction to that?
A. His reaction?
Q. Yeah. What was his reaction?
A. It's just investigation.
Q. I see. Okay. So 250 grand a year to Cogswell from the Regional Center. Do you recall negotiating an employment agreement between Mr. Cogswell and the Beverly Proton project entity?
A. Yes.
Q. Okay. And Mr. Cogswell under that second employment agreement was to receive additional compensation above and beyond the $250,000 a year that Pacific Proton Regional Center was going to pay him; correct?
A. Yes.
Q. Do you recall how much compensation Beverly



Proton, the project entity, was to pay Mr. Cogswell for his development services?
A. I don't remember. Please, just open the file. Then you know.
(Exhibit 120 marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: I'm showing the witness what will be marked Exhibit 120. It's a nine-page document. First page is entitled "Employment Agreement." It reads, "This agreement is made by and between Beverly Proton Center, LLC, a California limited liability company, formally known as Los Angeles County Proton Therapy, LLC (hereinafter called 'Company') and Charles C. Liu (hereinafter called 'Employee'."
I'm sorry. I pulled up the wrong one. I'm going to show you a different document.
(Exhibit 121 marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: For the record, I'm displaying for the witness a five-page document that will be marked Exhibit 121. The first page of that five-page document is entitled "Employment Agreement." It reads, "This agreement is made by and between Beverly Proton Center, LLC, a California limited liability company, formerly known as Los Angeles County Proton Therapy,



LLC (hereinafter called 'Company') and Michael Cogswell (hereinafter called 'Employee'."
Mr. Liu, I'm going to flip through the documents. The first question is going to be, do you recognize Exhibit 121?
A. Yeah, this is a document I signed.
Q. Okay. And is Exhibit 121 a true and accurate copy of an employment agreement that you executed on behalf of Beverly Proton with Mr. Cogswell?
A. Yes.
Q. Is that a true and accurate copy --
A. Yes.
Q. Good. All right. Directing your attention to Section 4 of the agreement, it says, "Employee shall receive as compensation an annual base salary of $350,000."
That's something you agreed to; right?
A. Yes.
Q. On behalf of Beverly Proton; correct?
A. Yes.
Q. Did you consult with anybody else at Beverly Proton before awarding $350,000 a year in annual compensation to Mr. Cogswell?
A. I did some market research about, you know, the salary amount for, you know, medical company.



Q. What was that market research? Tell me about it.
A. Well, it was -- I Google it, and then, you know, just check, you know, what is the standard salary basis for, you know, medical company of a project size like us.
Q. Okay. So you did some -- you looked at the internet, and then you awarded somebody 600 grand a year in compensation; right?
A. Yes.
Q. Okay.
A. And also asked a few, you know, friends in the medical area.
Q. You didn't consult with Dr. Thropay, though, did you.
A. I did not consult with him.
Q. He was your partner, he was an owner of Beverly Proton, and you didn't talk to him about this employment deal with Mr. Cogswell; correct?
A. Yeah, but he was -- I was -- I was in charge of the daily operation.
Q. I see.
A. And I was appointed by him.
Q. When did he appoint you in charge of the daily operation?





EXHIBIT 4

**A.** All the documents, all the -- check all the minutes, all the information I think we provided before.
**Q.** The corporate minutes and the board resolutions would reflect the fact that Dr. Thropay turned over management of this Beverly Proton entity to you, and you could do what you wished with it; right? That's what you're saying?
**A.** Yeah, I'm in charge. Of course I can make decision.
**Q.** Make decisions about money; right?
**A.** Make decision -- make decision on any management matters.
**Q.** Okay. Including who to award money to; right?
**A.** Depends, you know.
**Q.** Okay. Section 4, "Employee Compensation," goes on and reads, "1 percent of the total capital, including debt financing raised reached up to $60 million."
Was that also a compensation term that you and Mr. Cogswell negotiated and mutually agreed to?
**A.** Yes.
**Q.** I've seen that $60 million figure before in the documents. You tell me, you're the witness, you

53

lived it. How did you arrive at $60 million?
**A.** Why? Because --
**Q.** Yes.
**A.** -- because, initially, initially, the total investment capital is 200 million. After we pick up -- we picked Mevion, because Mevion is much less expensive, so we changed the business plan, we rewrote the business plan and reduced the total investment cost into I think between 100 and 120 million.
**Q.** Okay. And you rewrote the business plan after --
**A.** After we pick up Mevion, after we pick Mevion. Because the previous business plan was based all -- based all on the Optivus system.
**Q.** And the rewritten -- revised business plan, that was never filed with USCIS, was it.
**A.** Oh, we filed. Of course we filed.
**Q.** You filed a revised business plan with USCIS?
**A.** Yes.
**Q.** Okay. Approximately when in 2016 did you file a business plan --
**A.** Right after, right after, because we have to, you know, file with USCIS. First, it's a compliance issue. Second, it's a -- for business, for EB5s, because we also rewrote -- we hired, retained economist

54

to rewrite the economic report, as well as business plan.
**Q.** Approximately when did you file a revised business plan with USCIS in 2016?
**A.** I think it was late 2015.
**Q.** You said 2016, now you're saying late 2015. Can you be precise in --
**A.** Oh, come on. I can't remember. I cannot remember the exact date, but the fact is, we filed, whether 2015 or early 2016.
**Q.** Mr. Liu, is it your sworn testimony that you caused to be filed with USCIS a business plan that incorporated Mevion as your equipment provider?
**A.** Yes.
**Q.** You know --
**A.** We have --
(Interruption by the court reporter.)
THE WITNESS: The answer is, we did file with USCIS.
**Q.** BY MR. LEUNG: What lawyer did you use to file the revised business plan?
**A.** I'm not, you know, remembering people's names, but if you need it, it's easy to find. A lawyer in Florida. His name is...
Just one second.

55

**Q.** Are you checking your phone, sir?
**A.** Yeah, I just tried to get that information for you.
**Q.** What other information do you have on your phone? Do you have the information on your phone concerning your proton cancer therapy project?
**A.** No, nothing. This is a new phone, never -- I just have contact information. I tried to get a name for you.
**Q.** Okay.
**A.** I can't find it. I can't find it. But if you give me some time, I can easily get the record for you and send it to Herve.
**Q.** We can move on.
Directing your attention --
**A.** That's easy. That's easy to find out, Gary.
**Q.** We can move on.
Directing your attention back to Exhibit 121, are you with me? The very last page, the signature page, do you see that?
**A.** Yes.
**Q.** You signed this contract?
**A.** Yes.
**Q.** On or about April 11, 2016?
**A.** Yes.

56

Q. Same with Michael Cogswell, he signed it April 11, 2016?
A. Yes.
Q. And that's when he became an employee of Beverly Proton; correct?
A. Yes.
Q. Okay. April 11th.
(Exhibit 120 marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: Directing your attention to Exhibit 120, which is displayed on your screen, for the record, Exhibit 120 is a nine-page document, also entitled "Employment Agreement." The very first sentence says, "This agreement is made by and between Beverly Proton Center, LLC, a California limited liability company, formerly known as Los Angeles County Proton Therapy, LLC (hereinafter called 'Company') and Charles C. Liu (hereinafter called 'Employee'."
I'm turning to the very last page. Looks like it was signed and dated by you, sir, April 5th, 2016. Is that your signature?
A. Yes.
Q. Is this a true and accurate copy of an April 5th, 2016 purported employment agreement between you and Beverly Proton?

57

A. Yes.
MR. GOURAIGE: I object to "purported employment agreement." I'm not sure what that means. We're looking at a document that's an employment agreement and he's testified that he signed it. What do you mean, "purported" agreement? Is this --
Q. BY MR. LEUNG: Is it not purported, sir? You can just say so. You're the witness. Do you think this is the real agreement? Say it.
MR. GOURAIGE: I'm not sure what you mean, "the real agreement," Gary.
Q. BY MR. LEUNG: Okay. Mr. Liu, employee compensation, Section 4, let me blow it up for you, because I don't want you to have to strain your eyes.
That reads, "Employee shall receive as compensation an annual base salary of $550,000. The company agrees to pay the employee since January 2011. In addition to base salary, the employee shall earn bonus on the following basis: 8 percent of the total capital, including debt financing raised reached up to $28 million."
Did you have to negotiate those terms with anyone?
A. Did I -- well, I negotiated with Mike Cogswell, because he was one of the officers of the

58

company.
Q. How did that negotiation go? Was it in person, was it over e-mail, was it by the phone --
A. Verbal. It's a verbal conversation.
Q. Okay. How long was that conversation?
A. Well, a few meetings in the office.
Q. What was your...
Okay. What was your first offer to Mr. Cogswell with respect to your comp? Did you start at 550 and get the 550, or did you go high? What was your negotiation strategy there?
A. Well, I told him the whole story, how I started this project, you know, and then -- and then I think I deserve this amount, given the nature of the work I've done, given the nature of investment money I spent myself --
Q. And he said yes.
A. -- from the beginning.
Q. Did he say yes?
A. Yes, he said yes.
Q. Did he counter you with a lower number before agreeing to what you had proposed?
A. No.
Q. Okay. So he just said yes. All right.
"The Company agrees to pay the employee since

59

January 2011."
You previously testified that you never had an employment agreement up until April of 2016 with Beverly Proton, so this made you whole; right? You were able to get that, what you thought you deserved from the beginning of 2011 all the way through to April of 2016; right?
A. Yes.
Q. Okay. And Mr. Cogswell, he said yes.
A. Yes.
Q. And he was acting on behalf of Beverly Proton when he said yes and he signed this employment with you; right?
A. Yes.
Q. Okay. Going to the signature page, it's dated April 5th, 2016. About three minutes ago, you testified Mr. Cogswell wasn't an employee of Beverly Proton until April 11th. How did he have the authority to enter into such a rich compensation agreement with you at this time?
A. Well, I guess they didn't date it right. I can't remember.
(Interruption by the court reporter.)
THE WITNESS: Maybe the document was not dated correctly.

60

**Q.** BY MR. LEUNG: And then you said, "I can't remember;" is that right?
**A.** Yes.
**Q.** Okay. So, you know, regardless of the chronology that you can't remember, you agreed to pay Mr. Cogswell $600,000 a year, he agreed to pay you $550,000 a year and also compensation dating back to 2011, you shook hands, you walked away, and you were both pleased; correct?
**A.** Say that again. What do you mean, "walked away"?
**Q.** You were both pleased with the employment agreements that you had mutually executed with one another; is that a fair characterization?
**A.** I won't say pleased or not pleased. It's just a business practice.
**Q.** Okay.
**A.** To hire someone, you have to sign agreement. Someone work for company, someone has to be compensated. I don't understand, because the project has not been completed. What do you mean, pleased or not pleased? I don't agree -- I disagree what you said.
**Q.** Okay.
**A.** And also something you should know, this is



the guy introduced to me by -- he's not my relative. It's not someone I know before.
**Q.** Mr. Liu, is it your understanding that you can only engage in self-dealing when you're dealing with a relative?
**A.** Sorry, I just give example.
(Exhibit 122 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. Mr. Liu, I'm showing you an eight-page document that will be marked Exhibit 122. First page bears the title "Memorandum of Understanding, Pacific Proton Therapy Project."
First sentence reads, "This Memorandum of Understanding (MOU) between Charles Liu and John P. Thropay, both residents of the state of California (each a 'Party' and collectively, the 'Parties'), with respect to the Pacific Proton Therapy Regional Center, LLC project is dated February 16th, 2011."
Let me flip through the document for you.
Do you recognize...
Actually, the first five pages of Exhibit 122, sir, do you recognize it to be a true and accurate copy of the MOU that you had executed with Dr. Thropay regarding the proton therapy project you were working on in connection with the PPEB5 Fund, Pacific



Proton Regional Center, and Beverly Proton?
**A.** Yes.
**Q.** Okay. All right. We had talked about this one a little bit before. This Memorandum of Understanding -- and it's got a Section 6 addressing compensation of parties. Do you see that?
**A.** Yes.
**Q.** And Section 6A concerns your compensation; right?
**A.** Yes.
**Q.** Okay. Let's go to Section 11, though. This is a Memorandum of Understanding, and Section 11 of this MOU is entitled "Binding Effect." "Except as specifically provided in Sections 8, 9, and 12 of this MOU and in the Mutual Confidentiality Agreement, the parties will not be legally obligated with respect to any of the matters identified herein. The parties will only be bound as set forth in any definitive agreement signed with respect to any of the matters identified in this MOU for which the parties agree to enter into in connection with the project."
Your compensation section in this MOU wasn't binding. Subsequent to that, did you and Dr. Thropay enter into a binding agreement regarding your employment compensation?



**A.** This is only -- regarding compensation, this is only document we signed.
**Q.** Okay. And so you didn't have an employment agreement providing for compensation from Beverly Proton until the April 5th, 2016 employment agreement that you executed --
**A.** But verbally, verbally --
**Q.** I'm not done.
-- who at the time was not an employee of Beverly Proton; is that correct?
MR. GOURAIGE: Could you repeat the question, please. I didn't hear the whole question.
Mr. Liu, let him finish the question so I can hear it.
THE WITNESS: Okay.
MR. LEUNG: Diane, could you be so kind to read the question back.
THE COURT REPORTER: I didn't hear it all either. The witness interrupted you mid-sentence.
MR. LEUNG: Okay. I'll try again, then.
**Q.** BY MR. LEUNG: Mr. Liu, am I correct that the only binding written agreement that you had with Beverly Proton that provided for compensation to you from Beverly Proton is the April 5th, 2016 employment agreement that we just talked about, which was marked





EXHIBIT 4

as Exhibit 120?
Do you need the question read back for you, sir?
A. That's a true copy, yes.
MR. LEUNG: Can you read back the question, please, Diane.
(Question read.)
THE WITNESS: Yes.
Q. BY MR. LEUNG: Defendant Wang is your spouse; correct?
A. Yes.
Q. When were you and defendant Wang married?
A. When what?
Q. When were you and defendant Wang married?
A. Oh, married.
Q. Yes. I think you better know the answer to this question.
A year is good. What year?
A. 2000...I think 2002. 2002, December 8th. I could be wrong. If you need it, I can -- I have my marriage certificate.
Q. Was Miss Wong ever an employee of Beverly Proton?
A. I don't remember. Please just check the records. It's all dated. I'm not good with

65

remembering these things, Gary. It not happened yesterday.
Q. I'm not asking you for a date yet, sir. I'm asking you if you remember your wife being employed by the company.
A. Yes, of course I remember.
Q. Okay. And what was the nature of her employment? What were her job responsibilities at Beverly Proton?
A. I think vice president, vice president in marketing.
Q. And what did she have to do as VP of marketing? What was her responsibilities when she showed up for work? What was she responsible for doing --
A. Basically she did --
(Interruption by the court reporter.)
THE WITNESS: Okay. She was responsible for promoting the project in China, only in China.
Q. BY MR. LEUNG: How would she promote the project in China?
A. Attended seminars, you know, present -- you know, introduce the project to clients, to potential clients, attended a few functions, meetings, and also meetings also working with Chinese insurance companies,

66

tried to bring them over to U.S., and one of them she successfully completed was Xinhua Insurance Company, which is one of the largest insurance companies in China, and we signed an MOU because of her contribution.
Q. Do you know if you produced that Xinhua MOU to the SEC as part of its pre-file investigation or in this enforcement action?
A. Before. Before. We provided before. I remember.
Q. I just want to make sure I've got the insurance spelling right. One word, X-i-n-h-u-a?
A. Yes.
Q. Okay. And I don't think you were...
Well, I'll just ask you. Did Miss Wang have any role in raising capital?
A. No, she has no role raising capital, but she was facilitating.
Q. What do you mean by "facilitating"?
A. Facilitating means, you know, to promote.
Q. Promote what?
A. Promote the project, introduce a project, because she was used to be a TV hostess. She's good at Chinese, you know, Mandarin, good at presentation, good at, you know, introducing the project, you know,

67

showing the video, showing the PPT, you know, to the potential investors and the clients. That's her strength.
Q. Okay.
A. She was a very well-known TV hostess in China before.
Q. That must be nice.
Did Miss Wang ever travel to the United States and meet with potential investors or investors here?
A. Never.
Q. Never. Not even once; right?
A. Not even once.
Q. Okay. But you had a home here, though; right?
A. Yes, rented.
Q. What's the address --
Rented home.
A. No, no, no. Leased out. It's our home. It's our home. I'm saying just we just leased out because we were not there.
Q. Oh, you're leasing that home out to people now.
A. Yes.
Q. Okay. How much rent are you charging your

68

tenants at the 55 -- I don't even know how to pronounce it, A-s-i-m-o-i-a-r.
**A.** Asilomar.
**Q.** Yeah. What's the monthly rent you're charging your tenants?
**A.** 7,000 U.S.
**Q.** That's a hefty --
**A.** But we did not receive any rent, unfortunately, because of COVID. The guy just never paid.
**Q.** How long had that tenant been in your home?
**A.** A year.
**Q.** A year.
**A.** Over a year.
**Q.** That's bad timing. I see.
**A.** I know. You just -- also there's big damage, and the tenant tried to offset, and after COVID-19, he just not paying, and plus we are not there. It's difficult to collect the money.
**Q.** What's the name of your tenant?
**A.** Oh, I don't know. I can't remember his name. I think he's a TV -- I think he's a music producer.
**Q.** Is he still in the house? If I drove over there, could I knock on the door and shake his hand?
**A.** Sorry?

69

**Q.** Is he still in your home? If I drove over there tomorrow morning --
**A.** Yeah.
**Q.** -- could I knock on the door and meet him?
**A.** I think possible.
**Q.** Yeah. I could talk to him about --
**A.** Just ask him to pay the rent.
**Q.** -- what he's paying you --
**A.** Just ask him to pay rent.
(Interruption by the court reporter.)
MR. LEUNG: We can move on.
(Exhibit 123 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. All right. Mr. Liu, I'm showing you a document that will be marked Exhibit 123. It was previously marked Investigative Exhibit 29. This is a nine-page document entitled "Employment Agreement." First sentence reads, "This agreement is made by and between Beverly Proton Center, LLC, a California limited liability company, formerly known as Los Angeles County Proton Therapy, LLC (hereinafter called the 'Company') and Xin Wang (hereinafter called 'employee'."
Xin Wang is your wife; right?
**A.** Yes.

70

**Q.** I'm sorry. How do you pronounce Miss Wang's first name?
**A.** Sheen.
**Q.** Sheen.
**A.** Yeah.
**Q.** Okay. And it's Wang?
**A.** Wang is the last name.
**Q.** Okay.
**A.** Very similar to the name of the president.
**Q.** Okay. Mr. Liu, is Exhibit 123 a true and accurate copy of an employment agreement between Beverly Proton and Xin Wang, defendant Wang, dated January 28, 2016?
**A.** Yes.
**Q.** Directing your attention to the last page of Exhibit 123, you signed this employment agreement on behalf of Beverly Proton; correct?
**A.** Yes.
**Q.** On or about January 20th, 2016?
**A.** Yes.
**Q.** Okay. I think if you line them up side by side, the Cogswell agreement, your agreement, and Miss Wang's agreement are almost identical, except for a handful of numbers and the job title.
**A.** Yeah, we used the same template.

71

**Q.** Agreement Section 4, "Employee Compensation," it reads, "Employee shall receive as compensation an annual base salary of $280,000. Company agrees to pay the employee since January 2011."
You agreed to this payment term; right?
**A.** Yes.
**Q.** How did you arrive at $280,000 a year in annual salary?
**A.** Well, because the work she has done and the performance, you know, based on her performances, and also, you know, the accomplishment she has made. So I think she deserves 250 -- 280 a year.
**Q.** What were those accomplishments?
**A.** Well, for example, she successfully, you know, identified one of the largest insurance companies in China and signed an MOU, which is -- I think is most important for this project, because our goal from day one is to identify insurance company in China in order for them to send international patients to the future operation.
**Q.** When was that MOU signed?
I take it you're referring to an MOU with Xin Wang.
**A.** Yes. I think it was signed somewhere in the 2000...2014, `15. You cannot find that document? I

72

think I should be able to locate that and also send you document to support.
**Q.** Will you agree to produce those documents, sir?
**A.** Yes, I agree. I will also send you pictures with meetings, with Xin Wang, you know. I think I remember seeing that.
**Q.** What were the terms of the Xin Wang MOU? Just the material ones, the ones that were significant.
**A.** Yeah, the major terms is to establish special product in line with our project, a cancer -- a proton cancer therapy project in China to -- for insurers to buy that product in order to go to U.S. once our project is completed, is in operation so that -- in that way, the project is going to have a steady income, because there's a big, big cancer patients in China, over 5 million new cancer patients in China. So the demand is huge. But these people, most of patients have difficult time going to U.S. They don't know how to go to U.S. So with this platform and arrangement, they are able to join Xin Wang, and then Xin Wang you know, sent -- work with us directly. That's how it's going to work. It's a very, very important -- you know, this is my business model from day one.
**Q.** And if that insurance company MOU had been a



done deal, you would have told City of Hope about it in your later discussions; right?
**A.** Yes. That's why City of Hope -- that's why Levine got interested, because Levine think -- because I showed them the MOU and also showed them the -- you know, a pamphlet, a product information sheet about this project Xin Wang provided, which got them interested. Levine wants to see more and more high-end Chinese patients from China to Los Angeles, and he thinks before our center is completed, we can send the patients to City of Hope. That's the deal. That's how we -- that's how we signed the MOU. The MOU speak for itself. MOU signed with City of Hope will speak for itself.
**Q.** So the $280,000 a year in compensation that you agreed to pay on behalf of Beverly Proton to your wife was based on her accomplishment in obtaining that MOU, that insurance company MOU; right?
**A.** Yes. That's one of the accomplishments.
**Q.** Yeah, and that insurance company MOU is something that you told Harlan Levine at City of Hope about; right?
**A.** Yes.
**Q.** You told him it was done; right?
**A.** Yes.



**Q.** And you provided him --
**A.** I also sent him copies. I also sent Levine --
**Q.** Okay. That's what I was getting to. Okay.
**A.** -- copies.
**Q.** Okay. Mr. Liu, you know, you were subpoenaed by the SEC on February 4th and again on March 24th, those were just the document subpoenas, in 2016. So February 4th, 2016 is when you first got a subpoena from the SEC.
The bank records for the corporate accounts show that from February through March, you transferred $4.27 million from the Beverly Proton accounts and the Regional Center account to your own personal accounts at --
**A.** Sorry, Gary, excuse me. I just need to use the toilet for two minutes.
**Q.** Of course. Of course.
**A.** Want to use toilet.
MR. LEUNG: Let's take five minutes. Let's go off record at 7:42 California time, 11:42 in the morning Beijing time.
THE VIDEOGRAPHER: Going off the record at 7:42 p.m.
(Recess.)



THE VIDEOGRAPHER: Back on the record at 7:48 p.m.
**Q.** BY MR. LEUNG: Mr. Liu, the bank records in this case show that from February through March of 2016, the corporate entity accounts, the Beverly Proton account, as well as the Pacific Proton Regional Center account, sent $4.27 million to your personal account at Chase. Did you cause those funds to be transferred to your personal account?
**A.** Do you want me to confirm yes or no?
**Q.** Yes, please.
**A.** Yes.
**Q.** Was it you? It was you; right?
**A.** Yes.
**Q.** Okay. So the Beverly Proton account, there's a transfer on February 23rd of $300,000 to you; a couple days later, another $350,000 to you; the day after that, February 26th, another $450,000 transfer to you; three days after that, February 29th, $480,000 transfer to you; the next day, March 1st, 2016, $400,000 again transferred to you.
So that's a lot of transfers over the span of a week, and they are sort of round numbers. How did you decide how much money to send yourself over the course of February 23rd, 2016 to March 1st, 2016?





EXHIBIT 4

**A.** That's from the agreement.
**Q.** Okay. So how did that math work out, 300 grand here, 350 grand there, 450 grand here, 480 grand again, another $400,000? How did that add up to the math in the employment agreement?
**A.** It's still less than the total in the agreement.
(Interruption by the court reporter.)
THE WITNESS: It still was in the total amount from the employment agreement.
**Q.** BY MR. LEUNG: So what were you owed in total under the employment agreement as of --
**A.** I don't have the number with me, but still -- the company still owed me the money.
**Q.** I see. So you know the transfers that I was referring to, I did read you the dates, we're talking about February 23rd to March 1st. You saw that employment agreement. It's dated April 5th. How are you entitled to amounts under an employment agreement that didn't exist?
**A.** You mean the employment date was later? Is that what you said?
**Q.** Yeah, it was. Your agreement with Beverly Proton is dated April 5th, 2016. I just described a series of transfers that, all told, add up to



$4.27 million transferred from Beverly Proton and Pacific Proton Regional Center to you --
**A.** I think --
**Q.** Let me finish. I'm sorry, sir.
-- in February and March of 2016 before that employment agreement existed. So you've just said you were entitled to those sums under your contract. How is that the case if that contract didn't exist?
**A.** Well, I think lots of them are business expense reimbursement, and also include my early investment money.
**Q.** I see. So how did that math add up? Did you sit down with a calculator and look at some receipts and add up business expenses that you had footed, some early amounts that you had put in, and then you just ended up with round totals of 300 grand on one day, and two days later, 350 grand?
**A.** No, I did look at all the expenses list and also, you know, the investment money I made.
**Q.** What records did you look at to perform these calculations about how much the appropriate amount of money would be to pull out of these corporate accounts after you received the subpoena from the SEC at the beginning of February? What did you look at?
**A.** What did I look at it?



**Q.** Yeah.
**A.** I looked at all the receipts, business expenses, receipts, you know, the money I spent for the project. I did look at all the documents, yes.
**Q.** Receipts from whom?
**A.** Travel, you know, all kinds of expenses, you know, also lots of money I advanced before, before the project, before the project, you know, before we start, you know, before we get -- we received approval from USCIS, and lots of money was spent.
**Q.** Receipts from who? What receipts corroborated the expenses that you spoke to --
**A.** Invoices, legal fees, accounting fees, you know, economic report, all the third-party consultants, all these needs to spend money.
**Q.** Um-hmm. And they added up into a multiple of 10,000 --
**A.** Just gave you example. I spent about half million dollars to Steve Yale's firm before the project was approved, but the company was already established.
**Q.** Steve Yale worked on the capital raise?
**A.** No, Steve Yale, it's a big law firm who helping people to approve EB-5 Regional Center at USCIS.
**Q.** For the purpose of raising capital under the



EB-5 program; right?
**A.** Yes. But before --
**Q.** That was the object of Mr. Yale's legal representation, working with USCIS to put you in a position to raise money through EB-5 investors; correct?
**A.** Yes.
**Q.** To raise money through an EB-5 offering; correct?
**A.** Yes.
**Q.** When you sat down and you looked at all the receipts and you thought about how much capital you had put into the company, why didn't you just come up with one sum and make one transfer? Why are you transferring these big chunks of money over the course of a week or so every day or every other day? Why didn't you just do it in one fell swoop?
**A.** Well, you know, maintain, you know, a good balance with the bank.
**Q.** Were you maintaining a good balance with the bank in February and March of 2016? Did the balance ever get low because of these withdrawals, do you recall?
**A.** What You mean? You're asking me why I did not get, you know, just once, instead of a few. That's

one of the reasons.
Q. Okay. So your earlier testimony about how you paid yourself this $4.27 million because of your employment agreement, that's not true, right, and instead, you paid yourself the $4.27 million because you felt like you were owed money by Beverly Proton; fair?
MR. GOURAIGE: I object to the question. It's -- I'm not even sure I understand the question.
MR. LEUNG: Okay.
Q. BY MR. LEUNG: Fair?
A. Can you repeat?
Q. When I first started asking you questions about this $4.27 million that you pulled out of Beverly Proton and Pacific Regional Center after receiving an SEC subpoena, you explained that that was compensation owed to you under your employment agreement. Remember that?
A. Yes.
Q. And then I explained to you that your employment agreement, which we just looked at, was dated April 5th, 2016, which is subsequent to all these transfers. Do you recall that line of questioning?
A. Yes.
Q. So is it your sworn testimony that you paid



yourself this $4.27 million because Beverly Proton owed you some sort of money for everything you had put into the company? That's your testimony; right?
A. And also my time, my effort to make the project work.
Q. And the basis of that obligation isn't the later employment agreement, it's just what you said: You put in time, you put in work, you paid some expenses, and you wanted to get paid back; right?
A. Yes.
Q. Dr. Thropay, did he approve these transfers?
A. No. I was -- you know, he authorized me to sign by myself at the bank.
Q. He gave you that blank check.
A. Sorry?
Q. I'll withdraw it.
Okay. So that amount of money, that $4.27 million, was transferred to your personal account at Chase; right? You remember you had a personal account at Chase Bank, as well?
A. Yes.
Q. Okay. And do you recall then transferring funds out of your personal Chase account to an account in China at China Merchants Bank? Do you recall anything like that?



A. China Merchants Bank?
Q. Yeah.
A. Can you...
Yeah, it's been a while. I really cannot remember exactly.
Q. Okay. Let me see if I --
A. Mostly transferred to Chase Bank.
Q. Let me see if I can refresh your recollection. You had a personal account at Chase. You testified to that; right?
A. Yes.
Q. On February 26th, you sent $250,000 out of that personal Chase account to an account at China Merchants Bank. On February 29th, you sent another $250,000 out of that personal account to an account at China Merchants Bank. On March 1st, the next day, you sent another $250,000 out of your personal account to China Merchants Bank. Six days later, March 7th, from your personal account at Chase, you sent $500,000, half a million dollars, to an overseas account in China at China Merchants Bank. On March 11th, four days after that, you sent $750,000 from your Chase personal account to an overseas account in China at China Merchants Bank. On March 14th, you sent $500,000 from your Chase personal account to a foreign bank account



in China, China Merchants Bank. March 24th, another $250,000 out of your personal account at Chase to China Merchants Bank in China. April 1st, another $250,000 out of your personal account to China Merchants Bank, and finally, April 5th, 2016, a final $250,000 was transferred from your personal Chase account to China Merchants Bank.
That's a lot of money. Do you remember where you sent that money to and why you sent it?
A. It's my personal money.
Q. So --
A. I can send it wherever I want to.
Q. Okay. And you sent it to your personal account overseas at China Merchants Bank?
A. I think so.
[redacted]





EXHIBIT 4

[redacted]
**Q.** Did you ever conduct Pacific Proton Regional Center business at Caesar's in Las Vegas?
**A.** Say again.
**Q.** Did you ever conduct business on behalf of



Pacific Proton Regional Center at Caesar's, in Las Vegas?
**A.** Yeah, I brought Chinese, you know, to Vegas a few times.
**Q.** What did you do in Vegas with the Chinese folks that you just testified to?
**A.** You know, dinner, shows, casino, you know, all the -- you know, Vegas is just Vegas.
**Q.** And who were these Chinese folks that you were entertaining?
**A.** Occasional investors. I don't remember exactly their names.
**Q.** So, I mean, you were marketing, then, in the hope that you'd be able to raise capital from them?
**A.** Yeah, of course.
**Q.** Okay. Do you recall withdrawing funds at Caesar's in Las Vegas from the Regional Center, Pacific Proton Regional Center corporate account?
**A.** Yeah, a few times I remember.
**Q.** Why did you do that?
**A.** Well, I just needed cash.
**Q.** Why not take it out of your personal account?
**A.** Because it's Vegas, Gary. Have you been to Vegas?
**Q.** Not in a long time.



**A.** All right.
**Q.** Okay. A proton cancer therapy center was never constructed on Dr. Thropay's property; correct?
**A.** That is not true. That is actually not true.
**Q.** What was built on Dr. Thropay's property?
**A.** In order to build a proton therapy, of course, first the existing building...
Actually, let me tell you, there's a tremendous amount of work needs to be done before the construction of the proton center. Normally takes about a year. Even we had $20 million cash sitting in the bank, you still need a year to prepare for the construction of a typical proton center. Okay? We spent actually less than a year getting drawings, getting master planning, getting zoning, get everything ready, okay? And then we got a permit to demolish Dr. Thropay's building, which was demolished, and then we were starting, you know, all -- we actually -- we hired the local workers, construction company, you know, we hired one of the largest ones in the U.S.
Unfortunately, in the middle of doing this, you guys intervened and then got everything -- got everything stopped.
**Q.** Okay. So my question was, did you ever construct a proton therapy cancer center on 111 West



Beverly, Dr. Thropay's property, in Montebello, California?
**A.** Yes. As I said, we were in the middle of construction. Demolishing the building is part of the construction. All the drawings were done. This is a phase, phased acquisition. This is a forced acquisition. This is fake assumption. Let me tell you. When people -- every time I say this, I am very, very angry, Gary.
**Q.** Why does that make you so angry?
**A.** Why? Because we were in the middle of construction. All the media people, when they said, oh, this project never started. Bullshit. This is bullshit. I spent years and years making this project work, and then, you know, Dr. Thropay becomes a whistle blower because he's not happy with the management, because he's not happy with City of Hope, he wants to do management himself, so he went to SEC. That's how it happened. If that -- if this did not happen, the thing would have already been completed, this project already completed, started to cure the patients already.
**Q.** So you don't think --
**A.** That's why I'm angry.
**Q.** So you don't think you did anything wrong, do





EXHIBIT 4

you?
A. Sorry?
Q. You don't think you did anything wrong, do you?
A. I did not do anything wrong. The only regret I had, I cannot hide, I should have hired accountants who knows the rules of a listed company, because I'm mature -- I'm not mature enough. I don't think anything about these things. I did not run any listed companies in U.S. before. I don't know accounting rules. I know nothing. But unfortunately, it falls into, you know, SEC, and then because, you know -- because of what, you know, Dr. Thropay and Ruth, they screw up the project. They think they could have find a better partner.
Q. Okay. So you don't recognize any fault on your part with respect to your conduct in connection with this EB-5 offering; is that fair?
A. No. As I said, my regrets was, I should have hired a professional team, meaning those people knows like -- knows the project, also knows accounting, knows the rules, knows how to run listed companies. Then everything will be fine, you know.
I still get compensations. Of course. You know, nobody worked for United States for free. As



entrepreneur, can somebody work for free? Of course not.
Q. There's a big difference between free and $4.27 million, isn't there?
A. Well, project like this size, project like this size, and I took the risk, I was a person who take a risk. Dr. Thropay did not spend a penny. Remember that. I advanced all the money. I borrowed the money from friends and relatives to start this project. It's a big risk taker.
Q. Which friends did you borrow money from?
A. All in China, not in U.S.
Q. Which friends did you borrow money from to start this project?
A. I have many friends to borrow money. Many friends. I have lot of friends in China, because I grew up here. So that's what I'm telling you. The only regrets, you know, this thing could have been avoided.
Now look at reality. Dr. Thropay gets nothing, find investors, get money back. Look at the situation. And I still think SEC's most abhorrent sit at home through pay site. Let facts speak for itself. Let facts to speak for itself. Sooner or later, we'll find that out.



Q. What do you mean by that?
A. What do I mean by that? Because Thropay, because of Ruth.
Have you seen a document, a piece of document? It's a letter. It's called letter of guarantee, okay? They guarantee if a loss of the project, Thropay's company will pay them.
Q. Pay who?
A. Pay all the investors back.
[redacted]
Q. Okay. So you express regret that you didn't hire more sophisticated consultants. Other than that, do you think you did anything wrong?
A. Yes.
Q. What did you do that was wrong?
A. Sorry?
MR. GOURAIGE: I'm sorry. Can you hear me?
MR. LEUNG: I can. You're breaking up, though.
MR. GOURAIGE: Yeah, I just lost connection, and I have not been on the deposition for the past about 16 minutes. I sent you an e-mail. Charles, I sent you an e-mail.



MR. LEUNG: Are you able to reconnect?
MR. GOURAIGE: I have problems getting back. Now I can't get my video on. It disconnected the camera, but --
MR. LEUNG: On our screen we lost your image, but you were still there, so I did not know that you were off.
MR. GOURAIGE: Yeah.
MR. LEUNG: Should we go off the record and try to get this IT connection issue resolved?
THE VIDEOGRAPHER: Off the record at 8:18 p.m.
(Pause in the proceedings.)
(During the pause, Mr. Gouraige requested a segment to be read back. All counsel and the witness were present. The videographer was off the record. The segment began at 7:59 p.m. and ended at 8:17 p.m.)
THE VIDEOGRAPHER: Back on the record at 8:46 p.m.
MR. GOURAIGE: So I want to put an objection on the record that for about 30 minutes or so, I was disconnected from the deposition, and so the witness was unrepresented. I have just heard the court reporter read back the questions and answers that were asked while I was not on the record. Subject to

reviewing the transcript, I think some of the questions are clearly objectionable on various grounds, and I reserve the right to move to strike the answers from the record because the witness was not represented when he was being questioned.
MR. LEUNG: This is counsel for the SEC, for the record. Mr. Gouraige indicated that he was disconnected from the Webex. This was after the fact, beginning with the colloquy concerning transfers from Mr. Liu's Chase personal account to China Merchants Bank leading up to him returning to the call and indicating that he had been disconnected.
Also for the record, this is a Webex VTC deposition. Each participant has a Webex screen on his or her device. Each participant has a rectangular box on that screen associated with them. While Mr. Gouraige's image was not visible, we had no indication that he was not present based on what we were seeing in the Webex application. So we reserve all rights, as well.
Shall we begin?
MR. GOURAIGE: Before we do, just one last thing, Gary, so we can make the record complete.
I did send you two e-mail messages to indicate that I had lost connection, and I also finally



sent an e-mail message to Mr. Liu, asking him to stop the deposition until I could rejoin.
MR. LEUNG: And for the record, I'm not checking my e-mail while I'm deposing a witness, so I did not get your e-mail messages, sir.
MR. GOURAIGE: I'm not suggesting that you did. I'm just saying that I just want to put that on the record.
MR. LEUNG: Okay. Mr. Liu, let's get going again, if that's okay with you.
THE WITNESS: Sure.
**Q.** BY MR. LEUNG: All right. I think the last question I asked before the long pause was, what did you do -- what do you think you did wrong?
**A.** I didn't do anything wrong.
MR. GOURAIGE: With respect to what?
**Q.** BY MR. LEUNG: You didn't do anything wrong, is what you just said, sir?
**A.** I didn't do anything wrong. As I said, my regrets, my regrets, because lack of knowledge and experiences in the U.S., I should have hired professional team to take care of all accounts, take care of everything for me. That's only -- that's my regrets.
**Q.** The 111 West Beverly site, there was never a



building constructed on it which was to serve as the office for the proton therapy cancer center; right?
**A.** When you talking about construction, okay --
**Q.** Listen to my question, sir.
Did you ever build a building on 111 West Beverly that was going to house your proton cancer therapy center? Did you build a building? I understand that you razed down the existing building and then you did some construction work, but did you build a building on that property --
**A.** We were going to build --
**Q.** Did you build a building --
MR. GOURAIGE: Hold on. Mr. Liu, hold on a second.
Gary, you've asked him your question. Could you give him a chance to answer and don't interrupt him when he's trying to answer your question.
MR. LEUNG: Go ahead, Mr. Liu.
THE WITNESS: When we say building, when you say building, finish the building, we are middle of make building, that tower. That's my answer. We were in the middle of -- we were in the middle of constructing this project.
**Q.** BY MR. LEUNG: Did you erect a structure on 111 West Beverly after knocking down Dr. Thropay's old



medical office?
**A.** As part of construction.
**Q.** Yeah. Did you erect a structure, or was it just a hole in the ground? That's what I'm asking you. I know you were in the process, but did you get to the part of the process where it was more than just a hole in the ground?
**A.** We demolished the building. We also dig the hole in the ground, because proton needs, you know, 10 meters, 10 meters, you know, underground space. We already started that part.
**Q.** Did there come a time where you began construction on another site, one that wasn't 111 West Beverly?
**A.** No. We were planning to -- we were planning to, you know, move that location because I noticed Thropay was not cooperative. So my idea, my plan is possibly down the road to find another site within the hospital.
**Q.** You just said you were in the middle of building a tower at 111 West Beverly, and then you said you were building on another site, that was your plan, your choice. So what's the truth here? Were you in the middle of constructing a proton cancer therapy center at 111 West Beverly or not?





EXHIBIT 4

A. We were in the middle of construction, okay? That is true. At the same time, I had a dispute with Thropay. So that's why I start to think maybe it's better to find another site, to disconnect relationship with him and to find a better site, to build another, better one.
Q. Can we agree that had you moved to another site, say 105 West Beverly, all the construction work that you had conducted on the 111 West Beverly site would have gone to waste?
MR. GOURAIGE: That's a hypothetical question. I'm not sure -- what do you mean, it would have gone to waste?
Q. BY MR. LEUNG: All the work you did on 111 West Beverly, of what benefit would it have been to your project if you had moved the project site to 105 West Beverly?
A. Well, it is not going to be wasted. One can still be the office building. The other can be supporting center, the other can be the proton center. They all connected --
Q. You just said --
A. -- office building above the proton center.
Q. You just said you wanted to separate from Thropay and his property.



A. We also want to build a cancer center. That was just, as my legal guy, my legal counsel said, it's a hypothetical question, because we were in the middle of doing this. You ask me a hypothetical question, and I answered you.
Q. I'm inquiring as to the testimony that you've given under oath within the last two or three minutes. You said you wanted to move to 105 West Beverly because you needed a separate --
A. I had idea. I had an idea. It was no action.
Q. Are you familiar with the construction firm R. Allen?
A. Yes.
Q. Were you ever --
A. They're the company who did, I think, demolishing. Also -- also introduced by Ruth.
Q. Were you ever invoiced by R. Allen for work at 105 West Beverly?
A. 105 Beverly. 105. Yes, we didn't sign, I think, the agreement.
Q. Okay. Proton cancer therapy equipment was never delivered to either of your project sites; right?
A. You mean...
Never delivered? What does that mean,



"delivered"?
Q. It's a tangible piece of equipment. Did somebody bring it to your project site is what I mean. Do you not understand what I'm asking you?
A. Of course not delivered, because the construction site is not ready. How can it be delivered? It's building -- in the middle of building -- middle of building the manufacturing site.
Q. So it was never delivered, never installed --
A. No, of course not delivered.
Q. Never used; right?
A. Yeah, of course not used.
Q. Okay. So no patients were ever treated at your project site; right?
A. Gary, you ask me -- you can answer this question by yourself. Why you ask me? Why waste the time asking me?
Q. Because you're the witness and I'm not. Answer the question.
A. If the site is -- how can they --
MR. GOURAIGE: Mr. Liu, Mr. Liu, let me interject an objection here.
Gary, we all know the building wasn't built, the center wasn't built. How can patients be treated there? I think the witness is trying to explain to you



that the question is blatant. You know, obviously, it's an inappropriate question.
MR. LEUNG: Answer the question. Answer the question.
MR. GOURAIGE: What was the question?
THE WITNESS: Those questions, no.
Q. BY MR. LEUNG: Okay. And were any operational revenues ever generated by your project?
A. No.
Q. You did successfully raise capital, though; right?
A. Partially. Only partially.
Q. How much capital do you think you raised from your EB-5 investors?
A. I think about 27 million. We could have raised more.
Q. And that 27 million was raised through your private offering memorandum that you provided to potential investors?
A. Yes.
Q. And it was raised through the business plan that you had prepared and filed with USCIS; right?
A. Yes.
Q. Okay. Did you ever raise any capital from private equity?





EXHIBIT 4

**A.** I was in the middle of doing that.
**Q.** Did you ever raise any capital from private equity?
**A.** I was trying to do that.
**Q.** Did you ever receive capital from a private equity firm in connection with your project?
**A.** No, I was in the middle of doing that.
**Q.** What's GCS Capital?
**A.** GCS?
**Q.** Yeah, GCS Capital. What's GCS Capital?
**A.** GCS. What is the full name?
**Q.** GC, as in Charles --
**A.** Where are they located?
**Q.** I'm just asking you. If you don't know the term --
**A.** No, I mean, I have dealt with too many, too many firms before.
**Q.** Okay. So does the name GCS Capital ring a bell with you? Do you have any recollection of engaging in any sort of business with a firm called GCS Capital?
**A.** I don't remember.
**Q.** Do you know a person named Dr. Huang?
**A.** Oh, yes, he's a friend of mine.
**Q.** How long has he been your friend?

101

**A.** He has been a friend over I think about over 15 years. He was a banker.
**Q.** How did you meet?
**A.** We met in Hong Kong. He was one of the bankers at HSBC. He was the banker at HSBC before.
**Q.** What kind of banker was he at HSBC?
**A.** Investment banker.
**Q.** Okay. And did you have a business relationship with Dr. Huang in addition to your personal relationship?
**A.** No business relationship.
**Q.** He was -- he has never been your business partner?
**A.** No, he was not...
No, actually, yes, long time ago. We were trying to -- you know, to get together to do a project, you know, in Asia. But it's not related to this, nothing to do with this U.S. project.
**Q.** What kind of project in Asia?
**A.** A media satellite.
**Q.** Okay.
**A.** Media company, satellite company. Satellite TV company.
**Q.** So you were never in discussions with Dr. Huang about your proton therapy cancer project here in

102

Montebello, California?
**A.** Well, I mentioned to him a few times, you know, tried to -- because he is well-connected. I tried to ask him whether he can raise some equity money for us.
**Q.** And did he?
**A.** Oh, I think he was trying, but it didn't work out.
**Q.** Did you ever have any business deals with Dr. Huang in the medical device industry space?
**A.** Yeah, we were trying to -- once we were of -- you know, he was also think proton business has a great potential in China, so we were thinking, actually, to form up -- to form a company to represent Optivus system, to sell the systems in China.
**Q.** And did you pursue that venture?
**A.** A little bit, but did not work out.
**Q.** What little bit of pursuit did you engage in?
**A.** Oh, I think we signed kind of a MOU agreement. I think it's MOU with Optivus and tried to represent, you know, represent and just sell the products, systems in China. That was our plan and intention. And then later, we found out in a medical field, people feel not so crazy about Optivus system. They think a little old, a little obsolete, you know,

103

the technology side. So later, we give up.
**Q.** And Optivus was your system provider, at least for a time, with respect to the Beverly Proton --
**A.** In the beginning.
**Q.** In the beginning; right?
**A.** Yes.
**Q.** You also had employment agreements with the Regional Center, as well as the PPEB5 Fund; right?
**A.** Sorry?
**Q.** You also had employment agreements with the PPEB5 Fund, as well as the Pacific Proton Regional Center?
**A.** Yes.
**Q.** Do you know whether or not those employment agreements precluded you from engaging in these side ventures with your friend, Dr. Huang, with respect to Optivus?
**A.** Prevent?
**Q.** Yeah. It's a yes or no question. If it did, it did, and if it didn't, it didn't. I'm just asking you.
**A.** It did not. I'm not aware of that. I mean, why there's prevent? It's just to promote the U.S., you know, system in China. I mean, there's nothing wrong with that.

104



EXHIBIT 4

Q. Um-hmm. Okay. When was the last time you spoke with Dr. Huang?
A. Oh, it was about two, three years ago.
Q. In relation to anything connected to your Pacific Proton Therapy --
A. No, no, we never talked about it.
Q. Okay. Were you in the habit of introducing Dr. Huang to folks as your business partner?
A. Business partner?
Q. Yeah.
A. Through Dr. Huang?
Q. Yeah. Did you tell people that you were doing business with -- that Dr. Huang was your business partner?
A. Did I tell? No.
(Exhibit 124 was marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: Okay. Mr. Liu, if you could direct your attention to my screen share, I am showing you a 146-page document that's been marked Exhibit 124. This is a court filing. It's entitled "Memorandum of Points and Authorities of Defendants Charles C. Liu and Xin Wang in Opposition to Plaintiff's Motion to Continue Asset Freeze; Declaration of Herve Gouraige."
Have you seen this document before? It's a



brief. It's got a declaration from your counsel. It's got exhibits to that declaration. Is this something that you've seen and reviewed?
A. Yes.
Q. Okay. When did you see it; before or after it was filed?
A. When did I see this?
Q. Yes, when did you see it?
A. I received documents every day. I don't remember which date. You asked me that.
Q. Do you recall whether you received this document before it was filed or after it was filed?
A. Before it was filed.
Q. And did you review it for accuracy?
A. Yes, I did review.
Q. Okay. And how long did it take you to review it for accuracy?
A. Well, I check, you know, every page --
Q. All 146 --
A. -- every sentence.
Q. Okay. Let me scroll down to Mr. Gouraige's declaration. Is that also something you reviewed; right? You understand the affidavit was submitted along with the court brief?
A. Are you asking me?



Q. Yeah. Did you also review his declaration?
A. Yes.
Q. Okay. Okay. I'm directing your attention to Exhibit 7 of the Gouraige declaration and a couple of charts. One chart is entitled "Proton Therapy Project Deductible Business Expenses," plural, "Incomplete," and the second chart is entitled "Liu Deductible Business Expenses, Incomplete."
So you reviewed these two charts for accuracy; right?
A. You know, I trust my accountant. I think they did this.
Q. Did you review this chart for accuracy or not?
A. No, because I don't have all the files. I think it's accurate, but I don't have the files, you know, original files. I left in office in Laguna Niguel. I cannot check one by one. So I have to say I relied on, you know, the expertise of, you know, the professional accounting firm.
Q. You didn't calculate these amounts, you know they were calculated by an accounting firm, and you can't check them, but you're basing your testimony on the fact that, evidently, they were prepared by an accounting firm; is that fair?



A. Yes, yes.
Q. Okay. And do you personally know what records they reviewed in order to arrive at these calculations in Exhibit 7 to the Gouraige declaration?
A. Well, they had all the records, I think, before, because I sent the records to them, and then I think they did it based on the records.
Q. Okay. And those records were from 2010 all the way to 2016; right?
A. Yes.
Q. Okay. So these amounts are calculated based on records -- or based on transactions spanning the length of time between 2010 and 2016?
MR. GOURAIGE: Objection. Objection to the 2016 period. Marcum did not have records after December 31st, 2015 until the past month when the SEC produced those records.
Q. BY MR. LEUNG: Okay. And your answer is yes; right, Mr. Liu?
A. I accept what my legal counsel said.
Q. Oh, so you're testifying as to what he said? You're adopting his statement as your sworn testimony?
A. I'm not adopting. I'm saying, you know, my counsel just said it's...
Q. Mr. Liu, he's not a witness here. You're the





EXHIBIT 4

witness. You're the one that raised your right hand and took the oath, and you're the one that's answering the question. So if you know what he said is true, you can tell me that. If you don't, I'd like you to tell me that, as well.
MR. GOURAIGE: Wait a minute. I'm going to object to this examination because the witness has seen the document, he's testified he reviewed it, he approved it. He's also testified the accounting firm, Marcum, prepared it. That was made clear when the document was submitted to the court.
You're going to take the testimony of the Marcum accountant, who worked from this document. You can ask that person about those numbers and how they calculated the numbers. I mean, this witness here is not -- he doesn't have knowledge about how those numbers were calculated.
**Q.** BY MR. LEUNG: Mr. Liu, is that correct, you don't have any knowledge about how these numbers --
**A.** I have no knowledge.
**Q.** Okay. Well, moving away from the actual numbers, I just want to talk about the titles, the headings of these two charts, "Proton Therapy Project Deductible Business Expenses," and then "Liu Deductible Business Expenses."



What's the difference between those two things? Do you know what that difference is?
MR. GOURAIGE: Objection to the question. Ask him did he write the -- prepare those titles. He has no basis or knowledge. You're asking him to speculate as to what somebody else wrote.
**Q.** BY MR. LEUNG: Do you know what those titles mean, because you did testify --
**A.** I have no knowledge.
**Q.** I'm not done.
You testified earlier that you reviewed every line of this court filing, and now you're saying you have no knowledge. I just want to make sure. You don't know anything about this exhibit?
**A.** No, now you're asking me a specific question. I'm answering you a specific question. I have no knowledge. You said added up. I have no knowledge about that. As I said, you know, I think that, you know, professional. I'm not accountant, okay?
**Q.** All right. But you are the person that was involved in these expenses, so I'll ask you an easier question.
All right. There's some line items here under the heading "Professional Fees." You know what professional fees are; right? You're an entrepreneur.



**A.** Yes.
**Q.** Okay.
**A.** Professional what fees?
**Q.** Professional fees.
**A.** Oh, professional fees. Okay.
**Q.** Yes, yes. We're still with Exhibit 7, page 140 of 142. "Professional Fees," "Accounting Marcum LLP." Do you see "Legal Miller Mayer LLP"? Do you see that?
**A.** Yes.
**Q.** You see "Others"? Do you see that?
**A.** Yes.
**Q.** So the Marcum is around $55,000. The Miller Mayer is $42,536. The "Others" is $539,000. Do you know what that "Others" is in reference to --
**A.** What other --
**Q.** -- as you heard those fees --
(Interruption by the court reporter.)
**Q.** BY MR. LEUNG: Going to the line item "Others" under Professional Fees, Mr. Liu, I'm not asking about the calculation. You and I both see it. It's $539,021. I'm just asking you if you know what professional firms incurred those expenses. It can't be Miller Mayer, it can't be Marcum. You're the entrepreneur here. Who did you hire?



**A.** Are you finished?
**Q.** Whose fees go into that "Other" category? I'm finished.
**A.** Okay. All right. I think the item already send a request to my legal counsel stating, you know, there are more than 400,000 -- more than 400,000, you know, charged to Miller Mayer. I think that we're in the middle of requesting the invoices from them. Most is for Miller Mayer.
**Q.** I'm asking about "others."
**A.** "Others" -- I'm saying "Others" is Miller Mayer. I said --
**Q.** Okay. Okay. Then why is the --
**A.** We are in the middle of collecting the invoices.
**Q.** Why isn't that figure just rolled into the Miller Mayer line item?
**A.** Gary, you can ask any dignified lawyer, okay, how much money it needs to set up a new Regional Center in United States. Okay? Over 500 -- over 500 Regional Centers, I assume. Each of them has to spend that kind of money to set up a new Regional Center to be approved.
**Q.** Mr. Liu, do you intend to testify at the evidentiary hearing in this matter?





EXHIBIT 4

**A.** Sorry?
MR. GOURAIGE: I object to that question. I object to that question.
**Q.** BY MR. LEUNG: Do you intend to testify at the evidentiary hearing in this matter, sir?
MR. GOURAIGE: I object to the question. It's irrelevant. I am instructing him not to answer it. That decision will be made if and when the judge calls for an evidentiary hearing and after he consults with his counsel. You know --
**Q.** BY MR. LEUNG: Will you take that instruction, sir?
MR. GOURAIGE: Sorry?
MR. LEUNG: I need an answer from the witness.
**Q.** BY MR. LEUNG: Will you take that instruction from your counsel, Mr. Liu, and not answer my question?
**A.** I don't understand what you're talking about.
**Q.** Your attorney instructed you not to answer. If you take that instruction, you don't answer. If you don't take that instruction, you answer my question.
**A.** I take his instruction.
**Q.** Okay. Now, returning back to Exhibit 7 of Exhibit 124, you testified that the Miller Mayer professional fees are much higher than the 42,000



reflected in this exhibit; right? That's what you were trying to communicate to me?
**A.** Yes.
**Q.** Okay. I'm not disputing that, I'm not arguing with you about that. That's your testimony.
Putting that aside, there is a $539,021 figure in this court filing that asserts that there were other professional fees in that amount, which should be deducted as legitimate expenses. Do you know who the service providers were for those professional fees?
**A.** I think the accountant should have the records. They should provide the records as a basis to reflect this number. This number is not created. It's a number based on the facts, based on the invoices, agreements.
So far as I can recall, this is all the legal, legal fees, and also some of -- you know, we hired people -- to do Regional Center needs a lot of facts, a lot of elements. For example, you hire someone to do economic report, okay? You hire this one and that one, you end up that. As I said, this figure has a base. It's not something they created. I don't think so.
**Q.** I'm not asking that. I'm asking what firms



charged these $539,021 --
**A.** Gary --
**Q.** -- in "Other" fees?
**A.** Gary, I don't have the records with me, but I'm sure the accounting firm has all the records. We can --
**Q.** I'm just asking for the names of the firms. Do you know the names of the firms that refer to that line item?
**A.** No, you asked me all the things I can't remember, you know, all the different -- I still cannot remember the lawyer's name who wrote the -- who changed the business plan for us, you know, but I can easily, you know, send information to my lawyer, and my lawyer can forward it to you. That's not difficult.
**Q.** Do you understand we propounded written discovery requests on you for that very information? Have you seen the SEC's Second Set of Requests for Production? Have you seen a document along those lines?
**A.** Say again.
**Q.** I'll ask a different question.
Since the beginning of this year, in January, have you collected any documents that you provided to your lawyer for production to the SEC in this case?



**A.** Not complete. Some.
**Q.** What did you find?
**A.** What did I find? I find all --
**Q.** Yes.
**A.** I found -- I found all the agreements, business agreements, you know.
**Q.** Where did you find them, Mr. Liu?
**A.** Where did I find it?
**Q.** Yeah. You just testified that you collected some responsive documents --
**A.** Yeah, I kept on disk and I --
(Interruption by the court reporter.)
**Q.** BY MR. LEUNG: Mr. Liu, the disk that you just referenced, tell me about that.
**A.** The disk I have, and I kept all the previous files. So I find some and I send it to my lawyer.
**Q.** Okay. And where has that disk been since --
**A.** It's not a disk. It's a USB. It's a USB drive.
**Q.** And where had that USB drive been the last four years?
**A.** The last four years? It's in my -- I have that with me.
MR. LEUNG: Let's go off record for a 15-minute break. The time is 9:23.

THE VIDEOGRAPHER: Going off the record at 9:23 p.m.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 9:38 p.m.
**Q.** BY MR. LEUNG: Mr. Liu, what is United MPH Ventures?
**A.** It's a company. It's basically a shell company I set it up. You know, I had a plan to develop the second proton project, you know, at different locations, but it just -- before the first one is completed, it just a plan.
**Q.** United MPH never had any ownership interest in Beverly Proton, did it?
**A.** No.
**Q.** Do you know a person by the name of Alice Cheng?
**A.** Yes, Alice Cheng, she is, you know, CEO, president of the Beverly Hospital.
**Q.** Okay. And you testified earlier to some business discussions with Harlan Levine at the City of Hope. Do you recall that testimony?
**A.** Yes. Actually, it was Levine -- City of Hope was introduced me by Alice.
**Q.** I see. Do you recall in mid 2015 beginning

117

discussions with City of Hope and Beverly Hospital about a proton cancer therapy center to be constructed on Beverly Hospital's campus? Do you recall those discussions?
**A.** Yes. We had that plan, yes.
**Q.** Okay. And did you subsequently enter into a Memorandum of Understanding with respect to this joint venture between you, Beverly Hospital, and City of Hope?
**A.** Yes, we signed MOU, yes.
**Q.** Okay. And Dr. Thropay was not a part of this deal; is that correct?
**A.** No, he was not part of this.
**Q.** Ruth Novodor, his sister, was not a part of this deal; correct?
**A.** Not part of this deal either.
**Q.** Okay. And the proton cancer therapy project under discussion with Beverly Hospital and City of Hope was not going to have Dr. Thropay as its medical director; right?
**A.** No.
No, actually -- actually half to, half not. Actually, we were proposing, you know, to ask Dr. Thropay to be the main medical director of this new venture, but --

118

**Q.** Who was proposing that?
**A.** I was proposing that. Alice was proposing that. Alice and I both proposing that. But, unfortunately, what happened was, Levine told us the oncology department, radiation, oncology department, the head of that department did not -- does not like Thropay well. They did not get along. You know, from a professional perspective, they're called enemies. So we find that out later. At beginning, we didn't know. And Levine told us before -- Levine told us afterwards. At beginning, we were proposing, you know, Dr. Thropay should have a role to be the medical director.
**Q.** So notwithstanding your views in the beginning, there came a time that with respect to this new venture, proton cancer therapy venture with City of Hope and Beverly Hospital, Dr. Thropay wasn't going to be the medical director. He was part of the old venture; right?
**A.** Yeah. Okay. On the other venture, you know, we had MOU signed, and Dr. Thropay is going to be the medical director, okay? And then later, we had a dispute. Actually, Dr. Thropay and I had a disagreement. The disagreement basically was, I like to find a big firm, a big brand name to do the management. Thropay, Dr. Thropay liked to have his

119

sister, Ruth, to do the management. That's how disagreement started. Okay?
Before that, we were in good shape. You know, we maintained very good relationship, you know. We had dinner, lunch every week, you know, between friends, between families, you know. I invited him to China a few times. You know, we were in very good -- you know, in very good relationship, actually. And then, you know, we trusted each other until that dispute, that dispute, different idea, you know, came out.
Because my mind, my plan is to hire a big U.S. brand to do the management, because to me, that's important. That's important to attract the big insurance companies from China and also attract big equity money to participate beside the EB-5 money, and also it's easier for the EB-5 investors to recognize the value of this potential project.
But unfortunately, Dr. Thropay had a different view of that. So after he found out I was in conversation with City of Hope, UCLA, he got pissed off.
**Q.** Okay. So new venture, City of Hope, Beverly Hospital, no Thropay, United --
**A.** We were in the middle of doing that. We were

120



EXHIBIT 4

thinking -- it was once we were thinking to retain, to keep -- to invite him to be a medical director, but Levine told us it's not going to work, because the head of radiation, oncologist does not like him.
**Q.** Okay. I understand that. So at the end of the day, notwithstanding your initial inclination to include Dr. Thropay, the new venture was between United MPH, Beverly Hospital, City of Hope, new medical director. The old venture was Dr. Thropay, Ruth Novodor in an operational capacity, Beverly Proton; correct?
**A.** That is correct.
**Q.** Who is Michael Hunn?
**A.** Michael Hunn is a very leading medical -- is a consultant in the medical business. So we hired him, retained him to do the business plan, to do all sorts of things, because he knows also City of Hope well. So that's why we -- actually, he was also introduced to me by Alice, by Alice Chen.
**Q.** So Michael Hunn worked on the new venture --
**A.** Michael Hunn used to be --
Let me talk. Sorry. I didn't finish.
**Q.** Don't interrupt. Let me finish my question.
**A.** Okay.
**Q.** Michael Hunn worked on the new venture;



correct?
**A.** Yes.
**Q.** And that's City of Hope, Beverly Hospital, Beverly campus for the project site, and United MPH; correct?
**A.** Yes.
**Q.** Go ahead. I interrupted you. You wanted to offer --
**A.** Yes, Michael Hunn used to be CEO and the president of very large hospital in Los Angeles. It's called Presbyterian -- I can't remember the full name, but he's very well-known individual in that industry.
**Q.** And he was your representative on the new deal?
**A.** I'm sorry?
**Q.** Michael Hunn was acting as your representative on this new proposed venture?
**A.** As a consultant. No, as a consultant.
**Q.** Consultant. Okay.
**A.** We had a consulting agreement.
**Q.** Did you pay him money pursuant to that consulting agreement?
**A.** Yes, based on that consulting agreement, we paid him the money, yes.
**Q.** What money did you use to pay Mr. Hunn



pursuant to that consulting agreement?
**A.** I can't remember, but we did pay him.
**Q.** Do you recall if you paid Michael Hunn using funds from the EB-5 fund?
**A.** I don't think so.
**Q.** Do you recall if you paid Michael Hunn using funds from the Beverly Proton corporate account?
**A.** I think the fund -- the project company. So as far as I can remember, the project fund. Not EB-5 fund, not Regional Center. It's the project company. The project company is to develop all these things.
**Q.** What project company are you referring to? What's the name of the project company?
**A.** Beverly. Beverly. Beverly.
**Q.** Beverly. Beverly Proton wasn't a party to your MOU for this new venture, though, was it?
**A.** Beverly Proton was not a venture for this, that is correct.
**Q.** So why were you using Beverly Proton funds to pay Michael Hunn, somebody that was working on the new venture, rather than the old venture?
**A.** Because the new venture did not have a bank account. So this was the early development costs, and then later, later the new vehicle, new company has bank account, you know, this money will be transferred back.



**Q.** The private offering memorandum that you provided to investors in the PPEB5 Fund, that was dated May 1st, 2013. Do you recall that?
**A.** Yes.
**Q.** Okay.
**A.** And we amended. We amended -- we did amendment later, after we stopped work with Mevion.
**Q.** You've previously testified to the SEC that you never provided any revised business plans to potential investors or existing investors. Did you testify falsely to the SEC in spring 2016?
**A.** No, I did not.
**Q.** I'm directing your attention to a document previously marked as Exhibit 105, a seven-page document. First page is entitled "Memorandum of Understanding," and it reads, "This Memorandum of Understanding ('Memorandum of Understanding') is intended to document our discussions to date concerning the proposed affiliation and joint venture among Beverly Community Hospital Association dba Beverly Hospital, a California nonprofit public benefit corporation ('Beverly Hospital'); United MPH Ventures LLC, a Delaware limited liability company ('United MPH Ventures'); and the City of Hope Medical Foundation, a California nonprofit public benefit corporation

('COHMF'); with respect to the development and operation of [i] a new proton beam therapy center on the Beverly Hospital campus," and then it goes on.

I'm going to flip through this document for you, but my first question is, is Exhibit 105 a true and accurate copy from a Memorandum of Understanding that you caused to be executed on behalf of United MPH Ventures with Beverly Hospital and with City of Hope on or about October 22nd, 2015?

**A.** Yes, it's a true copy.

**Q.** Okay. And Beverly Proton --

**A.** Let me -- let me --

Excuse me. Let me add something on your previous question.

Okay. I truly I don't remember, you know, which account, you know, the consulting fee was paid, you know, but this memorandum I don't think -- and if there's any fee associated. But in Michael Hunn's case, I can remember which bank account, okay, when paid Michael Hunn. And possibly it's Regional Center, okay? We can double-check. But let me tell you why Regional Center.

Because Regional Center, to set up Regional Center is not just to develop one project. You know, it can develop hundreds, hundreds for different



projects, you know, as long as it's approved by USCIS. So my goal is to develop multiple projects, not just the one.

So to pay people like Michael Hunn is -- you know, it's within that category. That's something I want to say.

**Q.** The administrative fee, the $45,000 administrative fee paid by your investors, that went to the Regional Center; right?

**A.** No. Regional Center -- the way the Regional Center functions, okay, you take administrative fees, okay, from each investor. At the same time, you develop different projects by using the Regional Center. That's the role of the Regional Center.

Did you ask Regional Center --

**Q.** Mr. Liu, I thought the project entity was the entity that had the role of developing the project, as opposed to the Regional Center.

**A.** No, no, that's not true. Project company has a role to develop the project itself. Regional Center has a function approved by USCIS to develop multiple projects. It's all EB-5 projects. Project company can use EB-5 money or they simply do not have to use EB-5 money. That's the difference. Regional Center has to use EB-5 money to develop, but at the same time, they



also can develop different multiple projects. That's all I was saying.

**Q.** Did you extend your offer of materials to your actual investors different from what you just articulated? You defer to what's in your private offering memorandum; right? I mean, you weren't in the business of saying the wrong thing in a private offering memorandum, were you?

**A.** What did I say? Say that again. Can you speak louder?

MR. GOURAIGE: I object to the form of the question. I'm not sure what you mean, "saying the wrong thing in the private offering memorandum."

**Q.** BY MR. LEUNG: Where did the capital contributions from your investors go?

**A.** Capital contribution? Capital contribution?

**Q.** Yes.

**A.** Goes to the project.

**Q.** And where did the administrative fee go?

**A.** The administrative fee is to pay, you know, commissions, fees, expenses, blah, blah, blah.

**Q.** And it went to the Regional Center? Regional Center fees go to the Regional Center?

**A.** Yes.

**Q.** Why is the $45,000 administrative fees being



used to pay Michael Hunn?

**A.** It's expenses. This is consulting fee, part of expenses.

**Q.** Michael Hunn's consulting work was part of the offering expense?

**A.** Of course, to develop from projects.

**Q.** I see.

**A.** I said, not just dedicated one project. For different projects.

**Q.** The construction work was part of the offering expense; correct?

**A.** The construction is part of offering. Construction, yes, of course. Construction people use the capital to build, to do the construction, yes.

**Q.** Okay. And the legal fees paid to firms like Miller Mayer, those are also part of the offering expense; right?

**A.** Yeah, but some relate to the project, some relate to the EB-5. If it's EB-5-related, you pay through Regional Center. If it's project-related, you know, you pay through the project company --

**Q.** Well, what about Mevion? Is that --

**A.** -- the project, that's all.

**Q.** What about Mevion? Is that offering expense or project expense?

A. Project expense, for sure.
Q. Um-hmm. Okay. So Hunn, the consultant, he's offering expense, certain lawyers are offering expense.
A. Yes.
Q. What about Marcum? What about the accounting for these entities? Is that offering expense?
A. Yeah, this is -- of course. They do the accounting for the project company, they do the accounting for EB-5 fund, they did the accounting for the Regional Center. Of course.
Q. Accounting expense.
A. Yeah.
(Exhibit 104 marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: I want to direct your attention to a one-page document that's been previously marked Exhibit 104. This is an October 19th, 2015 e-mail sent by you to Levine with a cc to Michael Hunn, and you're writing, "Dear Mr. Harlan, I would like to inform you that Mr. Michael Hunn has been engaged by my firm as my representative to work with City of Hope regarding our proposed partnership and joint ventures. All the best, Charles Liu."
Did I read that right?
A. Yeah.



Q. You're introducing Michael Hunn to Harlan Levine as the guy that's going to work for you on this new venture with the City of Hope and Beverly Hospital?
A. Yes.
Q. And you've signed this e-mail "President & CEO, United MPH Ventures"; correct?
A. Yes.
Q. And that's because United MPH is the joint venture for City of Hope and Beverly Hospital, as opposed to Beverly Proton; correct?
A. Yes, yes.
Q. Did there come a time when you asked Michael Hunn to go out and see if he could get a management consulting bid from MacKenzie & Company, as well as PWC?
A. Maybe all the medical field. He's not -- you know, he's an expert on the medical stuff, not the accounting stuff.
Q. Okay. The medical stuff.
In preparation of a business plan, that's part of the offering expense, right, because that's something you're filing with USCIS?
A. Are you still talking about referring to Michael Hunn's case?
Q. No, I'm just talking about business plans in



general.
A. Business plan? Business plan -- okay, basically, project company has its own business plan, and then the original center has its own business plan. You know, each one is different. Each one has different functions and role.
Q. Okay. Let me ask it differently.
I mean, to the extent you had to prepare a business plan and submit it as part of your USCIS application for the Pacific Proton Regional Center, that's an offering expense, right, because you're trying to get USCIS to believe and do a B-5 offering? Is that fair?
A. Yes, yes.
Q. After you continued your discussions with Harlan Levine and City of Hope, did there come a time when Mr. Levine was confused about which entity he was dealing with, Beverly Proton or United MPH?
A. I remember he asked me a question -- you know, Alice asked me a question before, and I clarified it with him.
Q. What questions did he ask?
A. We had an intervening lunch meeting, you know, about what is the role of the, you know, Regional Center, which is the role of the project company, blah,



blah.
Q. Did he ever indicate to you that he was confused about which entity had bought or at least paid $3 million to Mevion?
A. No, it's a verbal -- I think it's a verbalization during the lunch or dinner, and he asked me, and, you know, I told him, and I clarified, and it's just -- you know, it's not -- I think he understood later.
Q. Did you ever tell Mr. Levine that as of February 19th, 2016 that you had $23 million in EB-5 capital to bring to the table for your new venture with City of Hope and Beverly Hospital?
A. Yes, yes, I did tell him, yes.
Q. And did you tell him the truth?
A. Yes, I told him the truth.
Q. If the bank records reflect that as of that date, February 19th, 2016, the combined balances in the EB-5 Fund account, the Beverly Proton account, and the Pacific Proton Regional Center weren't 23 million, but were instead barely $5 million, would that have been a lie to Mr. Levine that you told him?
A. Yeah, but I know because I signed -- you know, these investors have signed agreement, they're ready to send funds. I know it's going to come, so





EXHIBIT 4

that's why I said to him.
**Q.** Did it come?
**A.** Yeah, it come later. It came later.
**Q.** Do you recall providing the Commission with the investor list as part of its pre-filing investigation?
**A.** I'm sorry, I didn't hear that.
**Q.** I'll ask you a different question.
You testified under oath before the Commission. Mr. Regenstreif was your questioner at that time. Do you recall that? This was back in the spring of 2015.
**A.** Yes, I remember it.
**Q.** And did you indicate during your testimony that you had stopped raising capital as of the end of 2015?
**A.** At the end of 2015. No, actually, I start to raise capital after getting -- after getting approval from USCIS.
**Q.** I'm sorry, I was mumbling. What I meant to say is, do you recall testifying under oath before the SEC --
**A.** Yes, yes, I would say yeah.
**Q.** -- that you had stopped raising capital at the end of 2015? Stopped.



**A.** Oh, stopped.
MR. GOURAIGE: Can we clarify? When you say "raising capital," are you referring to EB-5 capital, or private equity capital?
MR. LEUNG: EB-5 capital.
MR. GOURAIGE: Okay.
THE WITNESS: Well, I think after receiving notice, a letter from SEC, from SEC, okay, I stopped raising the capital. That's what I told him.
**Q.** BY MR. LEUNG: Okay. So you got the subpoena from the SEC February 4th. We just covered this February 19th representation to your potential business partner, Mr. Levine, in which you said, We've got $23 million in EB-5 investor funds under control. I told you the account balances for the three corporate accounts were barely $5 million. Then you said you expected more and you actually got it. So did more capital come in the door --
**A.** Well, I think --
**Q.** -- subsequent to February 19th --
**A.** -- we're referring to different times periods, different time periods. That was wrong. Was wrong. It was not -- what you said is not true.
**Q.** What did I say that wasn't true?
**A.** You know, the things between what I said to



Levine and what I tested at the SEC. What I was -- what I was tested, tested at the SEC is accurate.
**Q.** Okay.
**A.** I don't really remember the time period you're referring to, but the truth was when I was tested, what I said to SEC was true.
**Q.** What you testified to --
**A.** To a business acquaintance, sometimes it's a business skill. Okay?
**Q.** What skill are you referring to; twisting the truth?
**A.** Who twisted it? No, no, no. I think -- I don't know what to say.
**Q.** I'm sorry. I shouldn't have -- I don't want to put my spin on it. You just said sometimes it's a business skill. What are you talking about?
**A.** No, what I'm talking about, for promoting. He's asking me whether I am financially capable to develop a project with him. That is -- that is -- that is an incentive to say that, and I said -- basically, I said to him, we are capable of doing that.
**Q.** Well, let's see what you said to him.
**A.** Is he a court judge?
**Q.** I'm sorry?
**A.** Is he a regulator? Is he a court judge?



He's just the CEO, right?
**Q.** Are you asking me? Are you asking --
**A.** With people, it's just business.
No, no, I'm not saying -- I'm not accused trying to say something --
**Q.** No, no, no.
**A.** -- that's you. You read somebody's conversation to -- I mean, conversation long, long time ago to...
I don't know what to say.
**Q.** Um-hmm.
**A.** Do you remember a conversation five years ago with your friend? Something you said with your friend? Can you remember clearly? Gary?
**Q.** You know, the way this works is I ask the questions and you give the answers, but I'll answer your question.
I don't remember lying to my friends, because I don't lie to my friends.
MR. GOURAIGE: I think we can cut out the theatrics. You can ask the witness questions. I think the difficulty we're having is your question's imprecise and the witness is having a great deal of difficulty understanding your questions. Saying to somebody you can raise capital and actually going out





EXHIBIT 4

and soliciting capital for investors are two different things. Maybe you should try to be more focused on your questioning.
MR. LEUNG: That's a good suggestion, Herve. I think I can maybe be more focused with my questions if I show the witness what he actually wrote. Just bear with me.
**Q.** BY MR. LEUNG: All right. I'm going to try my best not to strain your eyes, sir.
**A.** Thank you.
**Q.** Of course.
(Exhibit 126 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Okay. Mr. Liu, I'm going to direct your attention to a seven-page document that will be marked Exhibit 126. This is an e-mail string between you and Mr. Levine. The last e-mail in time is February 19th, 2016, and if we go down, you'll see that the e-mail string begins February 17th, 2016.
All right. All right. The first e-mail in time, February 17th, Harlan Levin is writing to you, "Charles, Thank you for joining me for dinner last week and sending documents."
Moving down to the next paragraph, "As discussed, the next step is for you, me, Jill, and



James to get on a call and walk through these documents and talk through some questions. In support of this call, I have included questions we have at the bottom of the e-mail."
So we'll go down to the bottom of the e-mail, and these are Mr. Levine's -- Dr. Levine's questions.
"Proton Center entity, Dr. Thropay. Need confirmation of the entity or entities that will develop/own the Proton Center and cancer center. Based on our dinner, the entity is BPC and not United MPH or others. Is this correct?"
Is Mr. Levine listing some confusion as to who he's actually dealing with, given the fact that he's entered into the Memorandum of Understanding with United MPH, as opposed to Beverly Proton? Does he seem confused in this e-mail to you about who he's contracting with and working with?
**A.** You asking me?
**Q.** Yeah, I'm asking you.
**A.** Yeah, I explained to him later.
**Q.** Okay. The next question is --
**A.** I think he understood.
**Q.** -- about EB-5 funding. "How much has been raised in EB-5 offering? I believe it was $24 million."



Then he wants to know how much is left. He writes, "How much of these funds remain?"
Do you recall getting questions like this from Dr. Levine?
**A.** Yes, I remember he asked me.
**Q.** Okay. And then he's asking about GCS Capital. We talked a little about that before. Why is he asking about GCS Capital? Do you remember?
**A.** Oh, now I remember. GCS Capital is a private equity firm in Hong Kong. You know, they interested, you know, to participate in this venture, initial -- you know, initially, they interested, but after SEC thing, you know, no one, no one. Everyone stopped.
**Q.** Yeah. All right. So you write back same day, February 17th, 2016, and you say, "Dear Harlan, Per our discussion, I thought you were going to tell me whether we will move ahead or not."
And then you go on to write in the next paragraph, "However, if you still can't make a decision by February 22nd, I don't think I would like to continue this exercise anymore. Please bear in mind, I am an entrepreneur and rather spend valuable time doing the real development work to promote City of Hope in China."
And you say, "By the way, Chinese New Year



and holidays are over, and we're about to reach MOU with three Chinese insurance companies on patient referral and equity investment on our proton project in Montebello."
What were those three Chinese insurance companies that you were hoping to secure and anticipating securing an MOU with?
**A.** We -- you know, we worked with three, and one is Xin Wang, and the other Chinese insurance, and the other one I can't remember. I think was Ping An, Ping An Insurance. And then all three, you know, we accomplished -- my wife actually, you know, accomplished, you know, successfully, and we signed MOU with Xin Wang Insurance Company --
**Q.** And --
**A.** -- because we can only choose one.
**Q.** Those MOUs should be part of your production today; correct?
**A.** Yes. I think I can -- I sent copies to SEC before.
**Q.** Okay. So it's your position that you've previously --
**A.** I remember. These are all the exhibits.
**Q.** And can you spell the names of the two insurance companies that you just testified to besides





EXHIBIT 4

Xin Wang?
**A.** Ping An, Ping An, P-i-n-g A-n.
**Q.** Okay. And the third?
**A.** The other one is China Life, I think China Life.
**Q.** Okay. All right. Moving forward in time, looks like you finally answer Mr. Levine's questions. You write in the last e-mail in time, February 19th, 2016, "Attached please see the answers to your questions. Thanks." And you enclose an attachment, which is reproduced here, and do you see the highlighted text?
**A.** Yes.
**Q.** Does that appear to be your answers to Mr. Levine's questions?
**A.** Yes.
**Q.** Okay. EB-5 funding, remember when Mr. Levine was asking you, "How much has been raised in EB-5 offering? I believe it was $24 million"? Did you answer him, "As of today, U.S. dollars 31 million, and another 30 million will be injected from EB-5 investors within the next three to five months"? Is that what you wrote?
**A.** Yes, that's our anticipation, yes.
**Q.** Mr. Levine asked you, "How much of these



funds remain," and you wrote, "23 million" in response; right?
**A.** Yes.
**Q.** You didn't have 23 million in EB-5 funds on February 26 --
**A.** It's anticipation, because at that time, you know, the investors, you know, the security -- already secured the contracts. That's why I said it.
**Q.** The question was, how much of these funds remain, not how much of these funds do you anticipate receiving. Did you misunderstand his question?
**A.** Maybe I misunderstood his question. Maybe.
**Q.** Well, yeah, probably did. But maybe, I guess.
And 23 million was untrue, wasn't it? You didn't have 23 million in EB-5 funds in the corporate account as of February 19, 2016, did you, Mr. Liu?
**A.** We did not have that account number in the bank account, but we had -- you know, I know it's coming because of the investors -- you know, the situation in China.
**Q.** What were the names of the investors that you expected to come in the door in the next three to six months?
**A.** Oh, how can I remember people's names? It's



impossible.
**Q.** Well, they were giving you a half a million dollars.
**A.** No. Come on. I don't know my lawyer's name. You expect me to remember all these people's names?
No, I don't have that talent, Gary. Maybe you have.
**Q.** Okay. Was it your practice to provide business associates and potential investors with documentation from Chase showing the current account balance of the corporate entities' accounts?
**A.** You mean responsibility? To show the bank accounts to the investors?
**Q.** I'll ask a better question.
Bless you.
**A.** Thank you.
(Exhibit 114 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: I'll show you what's been previously marked Exhibit 114. I'll get it up on your screen for you.
Have you seen this document before, Mr. Liu?
**A.** Yes.
**Q.** Who is Brett M. Santos?
**A.** Yes.



**Q.** Who is Brett M. Santos?
**A.** He was a banker at Chase.
**Q.** Okay. When did you see this document before?
**A.** When?
**Q.** Yeah. You said you've seen it before. When have you seen it?
**A.** Yeah, you know, it was dated, you know. That's the date I saw this document.
**Q.** Yeah. Did you provide this document to anyone else?
**A.** Did I provide this document?
**Q.** Yeah, to anyone.
**A.** Let me see. This letter is to...
I think my vision is getting a little worse.
**Q.** I'll make it bigger for you.
**A.** Can you make it larger?
**Q.** I can.
**A.** Can you just...
Okay. Yeah. Yeah. Okay. Account balance reflects...
I don't remember. Truly, I don't remember who I showed this letter to.
**Q.** Did you show it to anyone, regardless of whether or not --
**A.** Honestly --





EXHIBIT 4

**Q.** -- you remember that?
**A.** -- I don't remember.
**Q.** Did you ask --
**A.** It's just a regular --
(Interruption by the court reporter.)
THE WITNESS: Okay. I don't remember showing this letter to anyone, because normally, if the letter has a balance, it's not my habit to show to other people, to show the balance. If it's a reference letter, that's fine, but this is a balance, it's a balance, it's a figure. So normally I don't show to people.
**Q.** BY MR. LEUNG: All right. Did you ask Mr. Santos to prepare this letter?
**A.** Oh, yes. I sent a request to him asking him to provide a letter like that, yeah.
**Q.** So this is for the PPEB5 Fund account, that's account ended 1028.
**A.** Yes.
**Q.** And it says the balance on that account as of October 1st was 8.508 million dollars and change. Do you see that?
**A.** Yes.
**Q.** The actual balance in that account on October 1st, 2015 was $253,286. Do you know why there



is that discrepancy between $253,000 and $8.5 million in this letter?
**A.** I don't remember. You know, I don't remember. It must be the true figure. Why there was a difference? If it's not true figure, I don't think he can provide a letter like this. It's a Chase. It's a Chase Bank.
**Q.** Did you doctor this letter, sir?
**A.** Sorry?
**Q.** Did you doctor this letter, sir?
**A.** What do you mean, "doctor"?
**Q.** Did you make this letter on your own and put a number in it that wasn't true? Did this letter --
**A.** No.
**Q.** -- come from not Brett Santos, but you?
**A.** No, of course not. Never, never.
MR. GOURAIGE: Mr. Liu, let me just speak.
Gary, do you have a good faith basis for asking that question?
MR. LEUNG: I do. It doesn't bear any of the indicia of reliability compared to some of the other correspondence from Mr. Santos. It's got an account balance that's wildly off base relative to the truth, which is readily discernible from the account records themselves, and I'm asking this question because I've



got a good faith basis and the witness is denying it.
MR. GOURAIGE: Right, but what you just said is insufficient to support the question you just asked this witness. There could be a lot of different explanations as to why there was a --
MR. LEUNG: Then make an objection, Herve.
MR. GOURAIGE: -- discrepancy.
I am objecting. I am objecting. And I think it's inappropriate to treat the witness the way you just did. You just asked him a question, had he fabricated a bank letter without any foundation.
MR. LEUNG: I explained my foundation for you. It's more than adequate. And I think you and I know what the best and most reasonable likelihood is here that...
Yeah, I'll move on.
**Q.** BY MR. LEUNG: When was the last time you spoke with Mr. Santos, Mr. Liu?
**A.** Oh, no, I haven't spoken to him I think after the SEC started investigation. After that, I never spoke to him.
I think you should ask him, you should verify with the bank, not me. This is a letter issued from the Chase Bank.
**Q.** I should.



Is Exhibit 114 a true and accurate copy of a letter that was within the custody and control of your corporate entities at the time the SEC brought this case?
**A.** Sorry? I didn't hear that.
**Q.** Okay. Do you know if this letter was produced by your companies during this litigation?
**A.** Do you think this letter was produced by my company? What? This letter --
**Q.** Do you know --
**A.** -- was produced by the bank.
**Q.** Do you know whether a copy of this letter was produced by your company as part of this litigation?
**A.** No, I was not aware. First time. I think -- I think I have all the records in my file. This original letter should sit in my file. I'm saying original, not a copy.
**Q.** Do you know why you have that letter in your file? Did you ask for it?
**A.** Yes, as a bank account holder, we asked for the balance, which is normal, and then they send an original letter to my office, and then I saw this original letter in the file.
**Q.** How frequently did you ask for letters like this from Chase?





EXHIBIT 4

**A.** How frequently?
**Q.** Yeah.
**A.** A few times.
**Q.** Yeah. Would there have been any reason to ask for a letter like this just to --
**A.** Most of letters not for balance. Most of letters is for -- it's a supporting letter, you know, for the project, you know, to -- it's not a balance letter. I think this may be the only balance letter, as I remember.
**Q.** Yeah. It's probably the only one; right?
**A.** Yes. And then I think I have -- you know, we have the original, received the original. The letter was sent to us, and then I saw the original letter in my cabinet, in the file.
**Q.** Um-hmm.
**A.** You can easily verify it with Chase Bank.
**Q.** You just testified that the October 1st, 2016 Chase balance letter for the PPEB-5 fund account ended 1028 is probably the only balance letter you ever got. Do you recall that testimony? It wasn't that long ago. That's what you said; right?
**A.** Yeah.
**Q.** Okay. All right. Well, you've been watching my screen. I'm about to pull up another exhibit. Bear



with me.
(Exhibit 127 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Exhibit 127 bears the Chase letterhead, dated October 16th, 2015. It says, "To Whom it May Concern, This letter is to verify the current balance of Pacific Proton EB-5 Fund, LLC. At present the balance reflects $8,508,397."
That's the very same amount that was set forth in the October 1st, 2015 letter. Do you have any idea why you've got two different letters from October with the same amount, the information in both of letters is wrong, and they're both in your corporate files? Can you explain that for me?
**A.** I do not remember, you know, because I said I requested a few letters multiple times. The request definitely came from us, came from me, but the letters issued from the Chase Bank.
**Q.** If the request came from you, Charles Liu, why is the letter not addressed to you? Why doesn't it say "Dear Charles, This letter is to verify the current balance of" --
**A.** Well, it's for the company. It's not my personal account.
**Q.** Yeah, but you asked for it. Why is it



addressed to --
**A.** Asked for it? The company have account. You ask for the balance. That's -- I mean, what's wrong with that?
**Q.** Why didn't you check the balance online?
**A.** No, you know, it's...
Check balance online? I mean, if this is your logic, why would Chase Bank issue letters for clients?
**Q.** Why did you ask for a letter from Chase Bank setting forth your account balance if that was --
**A.** It's for record, it's for record.
(Interruption by the court reporter.)
THE WITNESS: For company records, not for my records. It's for the company records.
**Q.** BY MR. LEUNG: Mr. Liu, are you certain you never forwarded a letter like this to potential investors or business partners?
**A.** For letters? Look, come on. This is a letter from the Chase Bank.
**Q.** You never sent this to a third party?
**A.** No.
**Q.** Are you sure?
**A.** Third parties? Maybe I showed this when clients may be in the office. I may, you know, show



them, you know, we have some -- the purpose, of course, is to show them we have raised some money and ask them to continue to, you know, inject more funds into the project. It's not -- the company does not have a zero balance. I mean, obviously, that's the purpose to get a letter like this.
**Q.** Potential clients, potential investors?
**A.** Yeah, of course. Other than that, what's the purpose? To enjoy this paper myself?
**Q.** For the record, Mr. Liu, I am showing you Exhibit 124 again. That is the court filing submitted by your counsel in opposition to the SEC's motion to continue the court's asset freeze. You and I talked about Exhibit 7 to the Gouraige declaration before. I just have one follow-up. Let me blow this up for you.
Do you see there's a line item entitled, "Equipment manufacturer deposit forfeited Optivus Proton Beam Therapy"?
**A.** Yes.
**Q.** Do you know what "deposit forfeited" means?
**A.** Deposit forfeit, you know, we made a deposit, and later, later we changed our plan to do the -- to purchase the Mevion. So I think a deposit, we didn't get it back. You're talking about deposit to Optivus, right?





EXHIBIT 4

Q. Yep.
A. Yeah, that's the case. That was the case.
Q. Did there come a time when Optivus served a demand letter on Beverly Proton for unpaid balances owed?
A. Yeah, I think I remember seeing that letter.
Q. Did Beverly Proton not pay its bills to Optivus?
A. Beverly Proton didn't pay Optivus?
Q. Yes.
A. Well, I think after -- as I said, we were planning to pay, but, you know, things changed. We were not able to. Plus, you know, the Mevion thing. And didn't too much. It was only a consulting work actually we paid. I remember. We did not sign the formal, you know, formative agreement, contract. We didn't sign that. It was only a consulting agreement.
Q. Was it your intention to not pay Optivus what it was owed after --
A. No, it was not our intention. We were -- we had intention -- you know, we don't like to owe peoples money. We intend to pay them, but things changed. Things got changed. Plus, we never signed the contract with them, the normal contract, purchase contract. The agreement that we signed with them was the



consulting -- was a consulting agreement, which we paid them.
Q. What changed, though? I mean, they served a demand letter on you towards the end of November 2015 for a couple million dollars. I don't know if you recall that, but that's what the document says. That's several months before you personally pulled out $4.27 million and transferred it to your own personal accounts. Couldn't you have paid Optivus back with the money that you later misappropriated?
A. That's not true. Optivus --
MR. GOURAIGE: I object. I object to the characterization of "money you misappropriated." I think his testimony was -- that's your position, Gary, and you can present that position elsewhere.
MR. LEUNG: I think his testimony is pretty clear.
MR. GOURAIGE: I do think it is very clear, and you're trying to put in your characterization of his testimony.
MR. LEUNG: Well, I'll try not to gild the lily any more.
MR. GOURAIGE: Always a good policy.
MR. LEUNG: Mostly because the lily doesn't need to be gilded.



(Exhibit 128 was marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: Okay. I'm about to show you a document that will be marked Exhibit 128.
Exhibit 128, for the record, is a 12-page document. First page there is a letterhead of Marcum Accountants, Advisors. This letter is addressed to you. "Dear Charles," at United MPH Ventures, LLC, and it reads, "Enclosed are the following partnership returns prepared on behalf of United MPH, LLC for the year ended December 31st, 2014."
And then going down, "The original of each of the above-mentioned returns should be dated and signed in accordance with the filing instructions included with a copy of the return. This copy is for your use and should be retained for your files."
I'm just going to scroll down.
And, Mr. Liu, did you file this 2014 partnership return with the IRS, as directed by your accountants at Marcum?
A. Yes, that's for -- for which company?
Q. United MPH Ventures.
A. Yeah, I think we filed it, yes.
Q. And is Exhibit 128 a true and accurate copy of your 2014 partnership tax returns for United MPH



Ventures?
A. Yes.
(Exhibit 129 was marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: I'm about to show you what will be marked as Exhibit 129. For the record, Exhibit 129 is a 45-page document. First page says "Taxpayer Copy." Next page is a letter from Marcum addressed to Charles at United MPH Ventures, LLC. It reads, "Enclosed are the following partnership returns prepared on behalf of United MPH Ventures, LLC for the year ended December 31st, 2015. 2015 U.S. Return of Partnership Income."
Mr. Liu, did you cause to be filed the partnership tax returns for 2015 for United MPH Ventures, as reflected in this Exhibit 129?
A. Yes.
Q. And is Exhibit 129 a true and accurate copy of United MPH Ventures' tax returns for the year 2015?
A. Yes. It's a shell company. It didn't do any business.
Q. Do you recall when you first engaged Marcum to provide accounting services for you and your businesses, Mr. Liu?
A. Yes. What are you trying to say?





EXHIBIT 4

**Q.** Do you recall when you first engaged Marcum to provide accounting services for you and your businesses?
**A.** Oh. You mean when?
**Q.** Yes, when.
**A.** I don't remember, but this is only accounting firm I used from day one.
**Q.** Okay. Do you recall signing an engagement letter with Marcum?
**A.** Yeah.
**Q.** The engagement letter set forth the terms of their engagement with you; is that correct?
**A.** Yeah, they doing those companies and individual, my personal tax.
**Q.** That engagement letter is a document that describes exactly what they're going to be doing for you; right?
**A.** Yes.
**Q.** It also describes exactly what they're not doing for you?
**A.** I guess. Standard terms from accounting firms.
**Q.** Yeah.
**A.** Gary, can I ask you a question? How much longer do you think this will take?

157

**Q.** I'm getting near the end.
**A.** Okay. Thank you. Because my eyes, sorry.
**Q.** Yeah, no. Screens. Too many of them now.
**A.** I've eaten too many unhealthy stuff --
**Q.** Yeah, yeah.
**A.** -- in China.
(Exhibit 130 was marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: I'm displaying for you on your screen what will be marked as Exhibit 130. It's a 15-page document. It's an e-mail string between you and a Stan Lam from April 29th, 2015 to May 23rd, 2015.
Who is Stan Lam?
**A.** Oh, Stan Lam is -- he's a former partner of this accounting firm, and he retired, and then he introduced me to the current -- the current lady, who is my main contact of the firm.
**Q.** And her name is Trang Lam?
**A.** Yes, yes. Stan was a former partner of this firm.
**Q.** Okay. And do you see enclosed or attached to the e-mail string is a signed copy of an April 28, 2015 engagement letter with Marcum?
**A.** Yeah, he's a -- yes, yes, yes. He's a CPA, yes, yes. Very nice guy, yes.

158

**Q.** Is Exhibit 130 a true and accurate copy of your signed engagement letter with Marcum dated April 28th, 2015?
**A.** Yes, yes.
**Q.** Okay. I'm going to direct your attention to page 3 of the engagement letter. It says, "In this engagement we"...
That's Marcum; right?
**A.** Um-hmm.
**Q.** ..."have no responsibility to," and there's a number of different bullet points. You understood it wasn't Marcum's responsibility to do any of these bullet-pointed tasks below this sentence; right?
**A.** Um-hmm.
**Q.** Okay. And the letter also provides that "We," Marcum, "are not being engaged to prepare financial statements or perform compilation review or audit services."
That was your understanding, too; right?
**A.** Um-hmm. I think it's pretty much standard.
**Q.** Yep. Back in this time frame, in 2015, Marcum wasn't preparing financial statements for your entities, was it?
**A.** Which year?
**Q.** 2015. Back in 2015.

159

**A.** Yeah, possible, because SEC thing, I think.
**Q.** Okay. And they didn't perform a compilation review or an audit either; right?
**A.** Yeah, I don't think -- after the SEC, I think they -- no one tried to get -- you know, do business with us anymore.
**Q.** Let's be clear. This engagement letter is dated April 28, 2015. You weren't subpoenaed by the SEC until February 2016. The engagement letter says it's preparing financial statements, they're not doing an audit, they're not doing a compilation, they're not doing a review. That was your understanding at the time well before the 2015 investigation; correct?
**A.** Yes, because, you know, I guess that's the standard for a big firm.
**Q.** Okay. And they go on to write, "Accordingly, our work in this engagement is not intended to result in the preparation or issuance of a financial statement."
You understood that; right?
**A.** Gary, to be honest with you, because I trust the firm, so I just -- I'm not a guy -- you know, that's why I said only regrets, you know, I had is I should have hired professional people to work with me, you know, to look at each document and have in-house

160

lawyer, in-house accounting guy, and, you know, that kind of thing. I'm not the kind of person to look at all the documents word by word. That's not my expertise.
You know, even -- let me tell you. You know, I went to school in U.S., but still, English is not my native language, okay? It's different. It's very different, you know, for somebody born in U.S., not born -- and outside U.S., very different.
So sometimes I still feel the language is still my barrier. So in order for me to read all these things word by word to understand 100 percent, I have to say, I'm not that kind of person. But when I do business, it's based on trust.
**Q.** The engagement letter then says, "We will not perform management functions or make management decisions for you."
Did Marcum perform any management functions or make management decisions for you?
**A.** I don't think they made decisions for me. But they suggesting, advising, you know, like any accountants, lawyers, you know, or the physicians. Nobody makes decisions for me.
**Q.** Okay. And then later in that paragraph, the engagement letter says, "Additionally, we are



prohibited by professional standards from preparing source documents and authorizing or approving transactions."
Marcum didn't authorize or approve any transactions at your companies, did it?
**A.** I don't think so.
**Q.** Okay. Last sentence of that paragraph, "Accordingly, management must determine and approve all transactions, including appropriate account classifications."
The management that's being referred to, that's you; right?
**A.** Yeah.
**Q.** Okay. And so for Beverly Proton transactions, Marcum wasn't approving those transactions or classifying those transactions with the appropriate account classification, was it? That would be you?
**A.** Yeah, I made all the transactions, you know, not accounting firm.
**Q.** Including the appropriate account classifications. That was you; right?
**A.** No, I didn't prepare, you know, the account classifications, no. It was prepared, I think...
No, because I'm not accounting guy. I don't



know.
**Q.** Well, the engagement letter says, "Accordingly, management must determine and approve all transactions, including" --
**A.** Gary, you should ask them, not me.
**Q.** Okay. Okay.
**A.** It's a letter signed mutually.
**Q.** Yeah, that's my point. You signed it, so this is --
**A.** Yeah --
**Q.** -- this is --
**A.** -- they're the professional. I'm not the professional.
**Q.** Please.
**A.** Yeah, professional --
**Q.** Mr. Liu, wait for me to finish my question.
You signed this letter, and this letter in Exhibit 130 reflects the parties' course and dealing going forward and what the true scope of Marcum's engagement was; right?
**A.** Uh-huh.
MR. GOURAIGE: I object to the question. The letter says what it says. Everybody knows, everybody knows who's had half a year of experience in business, there are lots of letters like that, including lots of



engagement letters from law firms that I've read that say one thing and the firm does something else. The letter says what it says. If you want to know what Marcum did, I think you should ask Marcum. He's testified for you as to what he knows they did.
**Q.** BY MR. LEUNG: Okay. So your testimony, Mr. Liu, is that Marcum violated its professional standards by basically taking over the function of the transaction classification from you, management --
MR. GOURAIGE: Objection. Objection to the question. He has never testified that Marcum violated its professional standards. If you want to make that charge against Marcum, first maybe you better get the facts from them, and then you can make the charge.
We've spent a lot of hours here, Gary, and I've sat patiently and allowed you to have every question that has nothing to do with the issues that are on this remand proceedings. We're really spending a lot of wasted time here, and we're running out of time. Less than 5 percent of your questions have been about net profits or legitimacy of expenses.
MR. LEUNG: Are you done?
MR. GOURAIGE: I am.
MR. LEUNG: Can I continue?
MR. GOURAIGE: It's your deposition.





EXHIBIT 4

MR. LEUNG: Thank you.
Q. BY MR. LEUNG: We talked about Optivus. Did Beverly Proton also end up owing Skanska money, Mr. Liu?
A. Yes.
Q. How much was owed?
A. How much was that?
Q. How much did Beverly Proton owe Skanska that it did not end up paying?
A. Skanska. Oh, Skanska. Skanska, maybe about a million. Maybe. But they -- it's based on their work. We signed -- also signed the consulting agreement with them. Their scope of work is based on the -- by different stages. And later...
Because Skanska was tied up with Optivus, because they designed and then constructed one site for Optivus before, which was unfinished, and then Optivus people introduce them to us and signed agreement. And then later, as I said, we decided to go with -- you know, after discussed with a few experts, you know, medical experts, we think Mevion has a future, plus is much cheaper, less -- you know, easy to operate, and that's why. That's what happened.
Q. And so the work that you had engaged Skanska for was not usable with the Mevion system.



A. No, it's because a different configuration.
Proton is very sophisticated. Each brand has its own configuration. So Mevion's configuration is completely different from Optivus. So it's -- it cannot use that for technical reason.
Q. Okay. So you caused Beverly Proton to make a $3 million up-front payment to Mevion; right?
A. Yes.
Q. And this case happened. We all know that. My question is, did Mevion ever manufacture a proton cancer therapy system for Beverly Proton?
A. Well, I was told beginning, they -- you know, they put order right away and standing by. But later, you know, the SEC thing happened. You know, I don't think they continued that path.
Q. And so they never delivered a system; right?
A. No.
Q. Never --
A. They should pay -- you know, we also kind of in breach, in breach of the agreement because of what happened. But a deposit -- we pay deposit, you know. They supposed to -- they supposed to maybe send it back. I don't know. It's going to be hard.
Q. The Mevion contract provided for Mevion's manufacture of a proton therapy system, delivery of



that system, installation of that system at your site, testing of that system, and various related consulting work. None of that ever occurred.
A. Well, they sent initial technical guy. They sent some technical -- a technical team to check the site, to do the initial measuring, and I think they did some work, you know, just to be honest with you. They did some work.
Q. Okay. Apart from that site visit to take some measuring, any other work that they performed under the contract?
A. Yeah, initial drawings, initial, you know, menu, initial, you know, know-how, and they did some work. They did some work. But not worth $3 million, that's for sure.
Q. Anything else that you haven't mentioned already?
A. Sorry?
Q. Any other work by Mevion that actually took place which you haven't already mentioned? Anything else?
A. No, no.
(Exhibit 131 was marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: I'm showing you what will be



marked as Exhibit 131. Is this a true and accurate copy of a May 11th, 2016 engagement letter between Marcum and you and your companies, which was signed by you, sir?
A. Yes. I haven't seen a signature yet.
Q. Let me scroll down.
Is that your signature, sir, on Exhibit 131?
A. Yes.
Q. And so Exhibit 131 is a true and accurate copy of your May 2016 engagement letter with Marcum?
A. Yes.
Q. Do you recall producing an investor list to the SEC during its pre-file investigation?
A. Yes.
Q. Who drafted that investor list that you provided to the Commission during its pre-filing investigation?
A. Who drafted?
Q. Yeah. Who wrote it? Who put it together?
A. You mean initial -- during early stage of the investigations?
Q. Yeah, back in spring 2016.
A. `16. When? 2016.
Q. Spring 2016. Spring 2016.
A. Gary, I'm sorry, I can barely hear you. Can





EXHIBIT 4

you speak a little louder?
**Q.** Yeah, sure. Did you provide, did you cause -- did you provide the Commission with an investor list during its investigation before it filed its case in spring of 2016?
**A.** Yes, I did.
**Q.** Who prepared that list of investors?
**A.** I prepared that list.
MR. GOURAIGE: I can't hear.
MR. LEUNG: Can you hear me? Mr. Liu?
THE WITNESS: Yes, I can hear you.
MR. LEUNG: Herve, can you hear me?
Herve?
Mr. Liu, can you still hear me?
THE WITNESS: Yes, I'm fine.
MR. LEUNG: Diane, can you hear me?
THE COURT REPORTER: Yes, I'm fine.
MR. LEUNG: Herve, we can't hear you, so --
MR. GOURAIGE: I was briefly disconnected here. I don't know what happened.
MR. LEUNG: Okay. Well, we have some feedback, so --
THE VIDEOGRAPHER: If we can go off the record, I can --
MR. LEUNG: Okay. Off the record at 11:16



Pacific.
THE WITNESS: Maybe I suggest we take a short break? Is that okay?
MR. LEUNG: That's fine.
THE WITNESS: Ten minutes?
MR. LEUNG: Ten minutes, yeah.
THE WITNESS: All right. Ten minutes?
MR. LEUNG: Yes.
MR. GOURAIGE: How much more do you have to go?
MR. LEUNG: Not much more.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 11:27 p.m.
(Exhibit 35 marked prior to the commencement of the deposition.)
**Q.** BY MR. LEUNG: Mr. Liu, did you prepare what's been previously marked Exhibit 35?
**A.** Yes.
**Q.** And what is it?
**A.** What was it?
**Q.** Yeah, what is Exhibit 35?
**A.** Exhibit 35. You know, I prepare all the documents at request of SEC. I prepare all the documents to -- with all the attachments.



I didn't see -- do you have Exhibit 35?
**Q.** Oh, I'm sorry. Let me share this with you.
For the record, I'm showing the witness what's been previously marked Exhibit 35.
**A.** Yes, yes.
**Q.** Mr. Liu, do you recognize Exhibit 35?
**A.** Yes.
**Q.** Is this an investor list that you prepared?
**A.** Yes.
**Q.** Does Exhibit 35 list all of the investors in the PPEB5 Fund?
**A.** Yes.
**Q.** The column on the left entitled "Agent," does that list for each investor the marketing firm that brought the investor to the PPEB5 Fund?
**A.** Yes.
**Q.** And then the column on the right entitled "Petitioner," that's the name of each investor; right?
**A.** Yes.
**Q.** Is this information accurate, sir?
**A.** Yes.
**Q.** Was it current --
**A.** Except -- except -- let me finish. Except a few investors' money were already returned.
**Q.** Which investors' money were returned?



**A.** I can -- because there's some -- you know, my eyes is getting blurry, but I can, you know, identify, because some of -- you know, husband and wife, you know, wife and husband. You know, it's hard for me to identify right away, but I remember, you know, a few has been returned.
**Q.** Okay. Are there documents you could consult to figure out exactly who on the list in Exhibit 35 --
**A.** Yes. I would appreciate it if you could send a copy to my legal counsel and my legal counsel can forward it to me. I can print it out and I can spend some time going through this list myself and then to provide you the documentations and which one has been refunded.
**Q.** And you're referring to documentation memorializing the fact of the refund? You have that documentation?
**A.** I think so, yeah.
**Q.** Okay. Where is it?
**A.** I think...
Where is it?
**Q.** Yeah, where is it?
**A.** I think I kept one printed copy, because one of them, you know, was signed when I was in China, and the other one I remember was returned by U.S. So I had





EXHIBIT 4

to -- you know, I will take a note and then provide you the documents you need.
Q. When did these returns of investor capital occur?
A. Gary, it's been a while. Let a document speak for itself.
Q. I'm just asking for general time frame. After the SEC filed its case, or before?
A. One is before, the other one is after.
Q. Okay. And the one that occurred --
A. I think maybe two before, one after. That I can't exactly remember, two or three.
Q. Okay. And you've not produced this documentation yet, right, but you've committed to collecting it and providing it to the SEC?
A. You mean the documents that we just talking about?
Q. Yeah. The documents --
A. I never provided that, no. I never provided that.
(Exhibit 132 marked prior to the commencement of the deposition.)
Q. BY MR. LEUNG: Yeah. Okay. I want to direct your attention to Exhibit 132. This is an internal e-mail string within Marcum between Trang Lam and Stan

173

Lam, but they are sending to one another a couple attachments.
This is one page.
The next.
And this is the last one.
Have you seen those three pages that I showed you at the end of this five-page exhibit, 132?
A. Can you magnify?
Q. Yeah.
Okay. I'll show them to you again.
A. Is investors list; right?
Q. I'm asking you, have you seen this before?
A. Have I seen this before?
Q. Yes, have you seen these three pages before?
A. No.
Q. Do you know where they came from?
A. I never seen this, but I provided list to them.
Q. Okay.
A. I don't think I've seen this page, but I -- you know, the original list is from my side.
Q. Okay. So this page Bates numbered Marcum_CLiu_5724 that I'm showing you, you've never seen it before?
A. No.

174

Q. Okay. And same with the successive two pages, Bates numbered Marcum_CLiu_5725 and 5726, you've not seen these pages before?
A. No, but the basic information, I guess it's all provided through my side.
Q. Okay. Did you pay Marcum money?
A. Of course.
Q. When was the last time you paid them for their professional services prior to the remand of this case from the Supreme Court? I'm not talking about the last year. I'm talking about before that. When was the last time you paid them?
A. Last time I paid them was I think -- there were two retainer agreements, and I -- you know, I asked a friend of mine to pay them.
MR. LEUNG: Herve, you're present; right?
MR. GOURAIGE: I am, but, you see there's an echo, and it's very hard to hear you, Gary.
MR. LEUNG: I'll try my best to speak up.
MR. GOURAIGE: I don't know why. I have this --
Q. BY MR. LEUNG: Mr. Liu, who was your friend that paid Marcum for you?
A. Who was the friend?
Q. Yes.

175

A. Yeah. His name is -- do you want me to spell the name for you?
Q. Yes, please.
A. Yeah. L-i-j-u-n?
Q. Um-hmm.
A. L-i-u.
Q. Yes. Who is Lijun Liu? How do you know him?
A. Just a friend of mine who --
Q. How much money has he paid Marcum on your behalf?
A. I think was -- total was 40,000.
Q. And when did that transfer of funds occur?
A. Two, three weeks ago.
Q. Had he paid Marcum any amount of money before that $40,000 transfer two or three weeks ago?
A. Before?
Q. Yes.
A. Before, no.
Q. Has Mr. Lijun Liu transferred funds to Mr. Gouraige's law firm in payment of legal services rendered?
MR. GOURAIGE: I'm going to object to this line of questioning. We've discussed that issue with you, and it has nothing to do with the evidentiary hearing coming up. Totally irrelevant.

176



EXHIBIT 4

MR. LEUNG: Please answer, sir.
MR. GOURAIGE: No, I object, and it's not relevant.
MR. LEUNG: Your objection is noted.
Please answer, sir.
THE WITNESS: Do I have to answer?
MR. LEUNG: You do. He's not instructed you not to answer. Answer the question.
MR. GOURAIGE: The question is absolutely irrelevant to the issues that are being litigated.
MR. LEUNG: You've made your objection.
Answer the question, Mr. Liu.
MR. GOURAIGE: You have gone far afield in this examination. We discussed this with you, and I don't think he needs to answer that question.
MR. LEUNG: Answer the question, Mr. Liu.
THE WITNESS: I take my legal advice -- of the legal counsel's advice.
MR. LEUNG: He's not advised you not to answer the question, so you have to answer the question.
THE WITNESS: I'm not answering.
MR. GOURAIGE: I think I am. The question is way beyond the scope of examination. We've spent a lot of hours --

177

MR. LEUNG: Herve, are you instructing the witness not to answer?
MR. GOURAIGE: -- talking about everything but the issues.
MR. LEUNG: Herve, are you instructing the witness not to answer?
MR. GOURAIGE: Yes, with respect to that question.
**Q.** BY MR. LEUNG: Are you taking your counsel's instruction and refusing to answer, Mr. Liu?
**A.** I'm taking my counsel's advice and instruction.
**Q.** Did Lijun Liu pay your attorney's fees in 2016?
MR. GOURAIGE: Again, this has nothing to do with the issues that are being litigated, that are part of the hearing. This is like a, you know, when did you stop beating your wife kind of question.
MR. LEUNG: Are you instructing the witness not to answer, counsel?
MR. GOURAIGE: Yes, yes, yes. Anything that -- you can ask him any question you want with respect to legitimacy of expenses or net profits, but I've allowed you to ask a lot of questions in a lot of hours. It's getting late. It's almost 3 a.m. my time,

178

and I think it's about time we bring this to a close. If you don't have any questions on the issues that are being litigated, it's time to end this deposition.
MR. LEUNG: Are you done?
**Q.** BY MR. LEUNG: Mr. Liu, why is Lijun Liu paying your professional fees on your behalf in connection with this enforcement action?
MR. GOURAIGE: Again, Gary, I'm objecting to this whole line of questioning.
Let me rephrase it.
Tell me how that issue is relevant to net profit or joint and several liability and restitution to investors.
MR. LEUNG: Herve, if you want to instruct the witness not to answer, make that instruction.
MR. GOURAIGE: No, if you're not going to explain to me how it's relevant on those three issues, yes, it is way beyond the scope of examination.
MR. LEUNG: Are you instructing the witness not to answer?
MR. GOURAIGE: Yes.
MR. LEUNG: Mr. Gouraige?
MR. GOURAIGE: Yes, yes.
**Q.** BY MR. LEUNG: Mr. Liu, are you going to take that instruction?

179

**A.** Yes.
MR. LEUNG: Herve, what is your authority for the propriety of an instruction not to answer on the basis of irrelevance, as opposed to an applicable privilege?
MR. GOURAIGE: What's my...
I'm sorry, I didn't hear your question.
MR. LEUNG: You can't instruct on relevance, Herve.
MR. GOURAIGE: Well --
MR. LEUNG: Tell me I'm wrong and tell me why.
MR. GOURAIGE: Well, this hearing is about --
MR. LEUNG: I understand. It's a relevance argument, but you can't instruct on that basis. Tell me I'm wrong. Tell me what case I need to read to correct my misapprehension. You instruct to protect a privilege. That's not the case here. Tell me why I'm wrong.
MR. GOURAIGE: Well, you're not entitled to ask him any question you want, Gary, just because I've allowed --
MR. LEUNG: Yeah, and then you object, and it's admissible or it's not admissible, based on your objection and whether your objection has merit. But

180

that doesn't go to whether or not you can instruct not to answer.

MR. GOURAIGE: Because I'm trying to bring this deposition to a close. We've been at it now for almost seven hours and we're --

MR. LEUNG: We're well under the seven-hour period for examination because of the technical difficulties that we've had to deal with on your end. So don't tell me that we've been going long.

MR. GOURAIGE: I understand. I'm not sure what the technical difficulties -- we're still having echoes here. But you can't just feel that you can ask any question you want that has nothing to do with the issues in litigation. The scope of examination is limited to those issues.

MR. LEUNG: I have no further questions at this time. Pass the witness.

MR. GOURAIGE: I have no questions for the witness.

MR. LEUNG: Review and sign?

MR. GOURAIGE: Yes.

Does he have 30 days, Diane?

THE COURT REPORTER: Yes, Herve, 30 days, and are you ordering a copy?

MR. GOURAIGE: Yes, Diane, please.



THE COURT REPORTER: Okay. Thanks so much, gentlemen.

THE VIDEOGRAPHER: This concludes the videotaped deposition. We're going off the record at 11:46 p.m.

(Deposition concluded at 11:46 p.m.)

(Signature requested.)



CERTIFICATE OF WITNESS

I, CHARLES C. LIU, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on February 24, 2021, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

_____ I have made corrections to my deposition.

_____ I have NOT made any changes to my deposition.

Signed: ___________________________
CHARLES C. LIU

Dated this ________ day of ______________ of 20____.

(IF REQUIRED)
Sworn to and Subscribed before me,
this_______day of________________, 20____.

_____________________
Notary Public          My commission expires:__________



REPORTER'S CERTIFICATE

I, DIANE M. BOLAN, Certified Shorthand Reporter No. 12883, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of the said deposition.

I further certify that I have no interest in the event of the action.

DATED this 1st day of March, 2021.

______________________________________
DIANE M. BOLAN, CSR No. 12883





EXHIBIT 4

ERRATA SHEET

Deposition of: CHARLES C. LIU
Date taken: FEBRUARY 24, 2021
Case: SEC v. LIU, et al.

PAGE LINE

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________

Signed____________________________
Dated_____________________________

185

## A

**A-n** 141:2
**A-s-i-m-o-i-a-r** 69:2
**a.m** 178:25
**a/k/a** 1:8 2:8
**abhorrent** 90:22
**ability** 13:22 14:6,12
**able** 8:2,13,20 45:2,2,8 60:5 73:1,21 86:14 92:1 153:13
**above-mentioned** 155:13
**absolutely** 177:9
**accept** 108:20
**access** 8:21 46:11
**accomplished** 140:12,13
**accomplishment** 72:11 74:17
**accomplishments** 72:13 74:19
**account** 27:16,19,24 29:15 75:14 76:6,7,7,9,15 82:18 82:20,23,23 83:9,13,13,15 83:15,17,19,20,23,23,25 83:25 84:2,4,6,14 86:18,22 93:10 123:7,23,25 125:16 125:19 132:19,19 134:15 142:17,18,19 143:10 144:19 145:17,18,20,24 146:22,24 148:20 149:19 150:24 151:2,11 162:9,17 162:21,23
**accountant** 22:21 107:11 109:13 110:19 114:12
**accountants** 21:21 89:6 155:7,20 161:22
**accounting** 21:15,16 22:4 79:13 89:10,21 107:20,22 107:25 109:9 111:7 115:5 129:5,8,9,9,11 130:18 156:23 157:2,6,21 158:15 161:1 162:20,25
**accounts** 75:11,13,14 76:5 78:22 85:13 94:22 134:16 143:11,13 154:9
**accuracy** 106:14,17 107:10 107:13
**accurate** 10:23 47:25 48:20 51:7,11 57:23 62:23 71:11 107:16 125:6 135:2 148:1 155:24 156:18 159:1 168:1 168:9 171:20
**accused** 136:5
**acquaintance** 135:8
**acquisition** 88:6,7
**act** 21:16
**acting** 60:11 122:16
**action** 15:15 16:17 22:7 67:8 98:11 179:7 184:16
**activities** 30:10
**actual** 109:21 127:4 145:24
**add** 77:4,25 78:12,14 125:13
**added** 79:16 110:17
**addition** 39:11 58:18 102:9
**additional** 49:20
**Additionally** 161:25
**address** 6:10,11,18 28:24 68:17
**addressed** 150:20 151:1 155:7 156:9
**addressing** 63:5
**adequate** 147:13
**administration** 6:3
**administrative** 22:24 23:8 126:7,8,11 127:19,20,25
**admissible** 180:24,24
**admonition** 16:4
**adopting** 108:22,23
**advanced** 79:7 90:8
**advice** 22:5 23:20 46:25 47:3 177:17,18 178:11
**advised** 177:19
**advising** 161:21
**Advisors** 155:7
**affidavit** 106:23
**affiliation** 124:19
**afield** 177:13
**Agent** 171:13
**agents** 40:6,7
**ago** 13:25 17:10 43:13 60:16 102:15 105:3 136:9,12 149:21 176:13,15
**agree** 48:12 61:22 63:20 73:3,5 97:7
**agreed** 48:24 51:17 53:22 61:5,6 72:5 74:16
**agreeing** 59:22
**agreement** 36:7 38:11 42:8 42:11,24 43:3 44:4 47:12 47:16 48:1,5,9 49:16,20 50:9,10,22,23 51:8,14 57:13,14,24 58:3,5,6,9,11 60:3,19 61:18 63:15,18,24 64:4,5,22,25 70:18,19 71:11,16,22,22,23 72:1 77:1,5,7,10,12,18,19,23 78:6 81:4,17,21 82:7 98:21 103:20 122:20,22,23 123:1 132:24 153:16,17,25 154:1 165:13,18 166:20
**agreements** 27:3 37:5 61:13 104:7,10,15 114:16 116:5 116:6 175:14
**agrees** 58:17 59:25 72:3
**ahead** 95:18 122:7 139:17
**al** 5:6 185:3
**Alice** 117:16,18,24 119:2,3 121:19,19 131:20
**Allen** 98:13,18
**allow** 25:21
**allowed** 164:16 178:24 180:22
**amended** 42:12,14 124:6,6
**amendment** 42:17,23 43:3 124:7
**American** 39:16,20
**amount** 16:5 22:23 51:25 59:14 77:10 78:21 82:17 87:9 114:8 150:9,12 176:14
**amounts** 77:19 78:15 107:21 108:11
**and/or** 183:10,12
**Angeles** 1:11 2:11 3:6 33:22 34:12 50:12,25 57:16 70:21 74:9 122:10
**angry** 88:9,10,24
**announcement** 23:3
**annual** 48:6,13 51:15,22 58:16 72:3,8
**answer** 12:2,10,10 13:17 16:12 23:5 25:24 55:18 65:16 84:23 95:16,17,21 99:15,19 100:3,3 108:18 113:7,14,17,19,20,21 136:16 141:7,20 177:1,5,6 177:8,8,12,15,16,20,20 178:2,6,10,20 179:15,20 180:3 181:2
**answered** 25:24 98:5
**answering** 16:6,7 109:2 110:16 177:22
**answers** 9:15 92:24 93:3 136:16 141:9,14
**anticipate** 142:10
**anticipating** 140:7
**anticipation** 141:24 142:6
**anybody** 20:3,4,19 21:3,12 51:21
**anymore** 139:21 160:6
**Apart** 167:9
**appear** 141:14
**APPEARANCES** 3:1
**appearing** 9:25
**applicable** 180:4
**application** 93:19 131:10
**appoint** 52:24
**appointed** 52:23
**appreciate** 172:9
**appropriate** 78:21 162:9,17 162:21
**approval** 79:9 133:18
**approve** 79:23 82:11 162:4 162:8 163:3
**approved** 79:20 109:9 112:23 126:1,21
**approving** 162:2,15
**Approximately** 12:13 54:20 55:3
**April** 44:5,6 49:5 56:24 57:2 57:7,20,24 60:3,6,16,18 64:5,24 77:18,24 81:22 84:3,5 158:12,22 159:3 160:8
**architects** 27:5
**area** 32:21,21 52:13
**arguing** 114:5
**argument** 180:15
**arrange** 32:15
**arrangement** 73:20
**arrive** 54:1 72:7 108:3
**articulated** 127:5
**Asia** 102:17,19
**aside** 114:6
**Asilomar** 69:3
**asked** 34:6 52:12 92:25 94:13 95:15 106:10 115:10 130:12 131:19,20 132:6 139:5 141:25 147:3,10 148:20 150:25 151:2 175:15
**asking** 6:25 24:17 38:25 66:3,4 80:24 81:13 94:1 96:4 99:4,17 101:14 104:20 106:25 110:5,15 111:21,22 112:10 114:25 114:25 115:7 135:18 136:2 136:2 138:18,19 139:6,8 141:18 145:15 146:19,25 173:7 174:12
**asserts** 114:7
**asset** 105:24 152:13
**associated** 93:16 125:18
**associates** 143:9
**Association** 124:20
**assume** 11:20 112:21
**assumption** 88:7
**attached** 141:9 158:21 183:11
**attachment** 18:9 141:10
**attachments** 170:25 174:2
**attempting** 34:18
**attended** 66:22,24
**attention** 13:13 25:10 26:9 48:4 51:13 56:15,18 57:10 71:15 105:19 107:3 124:13

129:16 137:15 159:5 173:24
**attorney** 10:21 20:5,12,23 21:7 23:19,21 43:10,11 113:19
**attorney's** 23:20,22,25 178:13
**attract** 120:14,15
**audibly** 9:2 11:9
**audit** 159:18 160:3,11
**Authorities** 105:22
**authority** 60:18 180:2
**authorize** 162:4
**authorized** 82:12
**authorizing** 162:2
**available** 28:17,18
**avoid** 30:11
**avoided** 90:19
**award** 53:14
**awarded** 52:8
**awarding** 51:22
**aware** 37:11 104:22 148:14

B

**B-5** 131:12
**back** 7:12,14 14:25 15:7,9 17:19 22:11 23:14 30:1 32:22 39:7 56:18 61:7 64:17 65:2,5 76:1 82:9 85:3,8 90:21 91:9 92:2,15 92:18,24 113:23 117:4 123:25 133:11 139:14 152:24 154:9 159:21,25 166:23 168:22 170:13
**bad** 45:5 69:15
**balance** 80:19,20,21 143:11 144:19 145:8,9,10,11,20 145:24 146:23 148:21 149:6,8,9,19,20 150:7,8,22 151:3,5,7,11 152:5
**balances** 132:18 134:15 153:4
**bank** 75:11 76:3 80:19,21 82:13,20,24 83:1,7,14,16 83:18,21,24,25 84:1,3,4,7 84:14 87:12 93:11 123:22 123:24 125:19 132:17 142:19 143:12 146:7 147:11,23,24 148:11,20 149:17 150:18 151:8,10,20
**banker** 102:2,5,6,7 144:2
**bankers** 102:5
**barely** 45:5 132:21 134:16 168:25
**barrier** 161:11
**base** 48:6 51:15 58:16,18 72:3 114:23 146:23
**based** 54:13,14 72:10 74:17 93:18 108:7,11,12 114:15 114:15 122:23 138:9 161:14 165:11,13 180:24
**basic** 175:4
**basically** 66:16 117:8 119:23 131:3 135:20 164:8
**basing** 107:23
**basis** 52:5 58:19 82:6 110:5 114:13 146:18 147:1 180:4 180:15
**Bates** 174:22 175:2
**BD576087** 15:21
**beam** 125:2 152:18
**bear** 137:7 139:21 146:20 149:25
**bears** 25:13 47:11 62:11 150:4
**beating** 178:18
**began** 92:17 96:12
**beginning** 2:18 16:12 43:12 46:18 59:18 60:6 78:24 93:9 104:4,5 115:23 117:25 119:9,11,14 166:12
**begins** 5:4 137:19
**behalf** 2:18 5:25 38:11 51:9 51:19 60:11 71:17 74:16 85:25 125:7 155:10 156:11 176:10 179:6
**Beijing** 6:9,12,16 14:25 75:22
**believe** 23:11 131:12 138:24 141:19
**believes** 30:17
**bell** 101:19
**benefit** 97:15 124:21,25
**best** 6:25 28:14 30:16 31:13 36:14 129:23 137:9 147:14 175:19
**better** 45:9,15,16 65:16 89:15 97:4,5,6 143:14 164:13
**Beverly** 1:10 2:10 20:25 21:3 27:14 34:13,20,22 36:19 37:5 38:11 42:5,6,8 42:24 43:5 44:5,7 49:17,25 50:10,23 51:9,19,21 52:18 53:6 57:5,15,25 60:4,11,17 63:1 64:4,10,23,24 65:22 66:9 70:19 71:12,17 74:16 75:13 76:5,15 77:23 78:1 81:6,14 82:1 85:12 88:1 94:25 95:6,25 96:14,21,25 97:8,9,15,17 98:8,19,20 104:3 117:14,19 118:1,3,8 118:18 119:16 120:23 121:8,10 122:3,4 123:7,14 123:14,14,15,15,17,19 124:20,20,22 125:3,8,11 130:3,9,10 131:18 132:13 132:19 138:15 153:4,7,9 162:14 165:3,8 166:6,11
**beyond** 49:21 177:24 179:18
**bid** 130:14
**big** 69:16 73:16,16 79:22 80:15 90:3,10 119:24,24 120:12,14,15 160:15
**bigger** 144:15
**bills** 153:7
**binding** 43:16,17,18,20,20 43:25 44:10 63:13,23,24 64:22
**bit** 11:1 16:10 33:15 63:4 103:17,18
**bites** 13:9
**blah** 127:21,21,21 131:25 132:1
**blank** 82:14
**blatant** 100:1
**Bless** 143:15
**blood** 13:14
**blow** 58:13 152:15
**blower** 88:16
**blurry** 172:2
**board** 39:13 53:4
**Bolan** 1:24 2:20 5:14 10:20 184:3,22
**Bolan's** 11:1
**bonus** 58:19
**born** 39:19 161:8,9
**borrow** 90:11,13,15
**borrowed** 85:4,20 90:8
**Boston** 32:21
**bottom** 138:3,5
**bought** 132:3
**bound** 63:18
**box** 93:15
**BPC** 138:10
**brand** 119:24 120:13 166:2
**breach** 166:20,20
**break** 12:7,8,11,22 13:2,4,7 13:16 14:19 15:12 25:2 116:25 170:3
**breaking** 91:20
**Brett** 143:24 144:1 146:15
**brief** 106:1,24
**briefly** 169:19
**bring** 40:9 67:1 99:3 132:12 179:1 181:3
**bringing** 13:12
**brought** 86:3 148:3 171:15
**build** 87:6 95:5,7,10,11,12 97:5 98:1 128:14
**building** 87:7,17 88:4 95:1,5 95:7,8,10,12,19,20,20,21 96:8,21,22 97:19,23 99:7,8 99:8,23
**built** 87:5 99:23,24
**bullet** 159:11
**bullet-pointed** 159:13
**bullshit** 88:13,14
**business** 7:23 20:14,25,25 21:8 24:7,23 25:3 27:14 30:4,10 32:7,25 35:24 41:15,17 54:7,8,10,13,15 54:18,21,24 55:1,4,12,21 61:16 73:24 78:9,14 79:2 84:21 85:23,25 100:21 101:20 102:8,11,12 103:9 103:12 105:8,9,13,13 107:6,8 109:24,25 115:13 116:6 117:21 121:15,16 124:9 127:7 130:20,25 131:2,2,3,4,9 134:12 135:8 135:9,16 136:3 143:9 151:18 156:21 160:5 161:14 163:24
**businesses** 156:24 157:3
**buy** 73:13

C

**C** 1:7,17 2:7,17 4:3 5:24 50:14 57:18 105:22 183:4 183:17 185:2
**cabinet** 149:15
**Caesar's** 85:23 86:1,17
**calculate** 107:21
**calculated** 107:22 108:11 109:15,17
**calculation** 111:21
**calculations** 78:21 108:4
**calculator** 78:13
**California** 1:2 2:2 3:6 5:8 15:20,23 16:18 17:1 32:2 32:22 33:7,12 47:17 50:11 50:24 57:15 62:15 70:20 75:21 88:2 103:1 124:21 124:25 184:4
**call** 34:20 93:11 138:1,3
**called** 5:24 21:9 35:2 37:14 37:20 47:18,19 50:13,14 51:1,2 57:17,18 70:22,23 91:5 101:20 119:8 122:11
**calling** 29:22
**calls** 113:9
**camera** 92:4

**campus** 118:3 122:4 125:3
**cancer** 37:24 39:11 56:6 73:11,12,16,17 87:2,25 95:2,6 96:24 98:1,22 102:25 118:2,17 119:15 138:9 166:11
**capable** 35:12 36:12 135:18 135:21
**capacity** 121:10
**capital** 22:23 23:7 39:11,12 39:14 53:18 54:5 58:20 67:16,17 79:21,25 80:12 86:14 100:10,13,24 101:2 101:5,8,10,10,18,21 127:14,16,16 128:14 132:12 133:15,18,24 134:3 134:3,4,5,9,18 136:25 137:1 139:7,8,9 173:3
**captioned** 17:2
**care** 27:6 94:22,23
**case** 1:4 2:4 5:6,8 10:17 12:1 15:3,20,24 17:2 27:13 76:4 78:8 115:25 125:19 130:24 148:4 153:2,2 166:9 169:5 173:8 175:10 180:16,18 185:3
**cases** 17:13
**cash** 86:21 87:11
**casino** 86:7
**category** 112:2 126:5
**cause** 76:8 156:14 169:3
**caused** 14:3 55:12 125:7 166:6
**caveat** 12:8 13:16
**cc** 129:18
**center** 1:9,10 2:9,10 3:10 22:25 23:8 27:15 33:23,24 34:1,3,4,13,23 35:6 36:3 36:20 38:12 47:17 48:2,14 49:1,3,15,22 50:11,24 57:15 62:17 63:1 70:19 74:10 75:14 76:6 78:2 79:23 81:15 85:13,23 86:1 86:17,18 87:2,10,13,25 95:2,7 96:25 97:20,20,23 98:1 99:24 104:8,12 112:19,22 114:19 118:2 123:10 125:2,20,22,23,24 126:9,10,11,14,14,15,18 126:20,24 127:22,23,23 128:20 129:10 131:4,10,25 132:20 138:7,9,9
**Centers** 112:21
**Central** 1:2 2:2 5:7
**CEO** 30:25 117:18 122:9 130:6 136:1
**certain** 19:21 21:17 24:13 43:17,17 129:3 151:16
**certificate** 65:21 183:1 184:1
**Certified** 2:21 184:3
**certify** 183:7 184:5,15
**chance** 95:16
**change** 34:15 145:21 185:4 185:6,7,9,10,12,13,15,16 185:18,19,21,22
**changed** 54:7 115:12 152:22 153:12,22,23 154:3
**changes** 183:10,12,15
**characterization** 61:14 154:13,19
**charge** 52:20,24 53:9 164:13,14
**charged** 112:7 115:1
**charging** 68:25 69:5
**Charles** 1:7,17 2:7,17 4:3 5:5,24 17:2 50:13 57:18 62:14 91:24 101:12 105:22 129:23 137:22 150:19,21 155:8 156:9 183:4,17 185:2
**charlescliu@me.com** 27:19
**charlesliu@me.com** 27:21
**chart** 107:5,7,13
**charts** 107:5,9 109:23
**Chase** 76:8 82:19,20,23 83:7,9,13,19,22,25 84:2,6 93:10 143:10 144:2 146:6 146:7 147:24 148:25 149:17,19 150:4,18 151:8 151:10,20
**cheaper** 165:22
**check** 6:24 44:12 52:4 53:1 65:24 82:14 106:18 107:18 107:23 151:5,7 167:5
**checking** 56:1 94:4
**Chen** 121:19
**Cheng** 117:17,18
**Chi** 17:2
**China** 6:9,12,17 7:15 39:19 40:2,13,14 41:11 66:19,19 66:21 67:4 68:5 72:16,18 73:12,16,17 74:9 82:24,24 83:1,13,16,18,20,21,23,23 84:1,1,2,3,4,6,14 90:12,16 93:10 103:13,15,22 104:24 120:7,15 139:24 141:4,4 142:21 158:6 172:24
**Chinese** 39:16 40:8 66:25 67:24 74:9 86:3,5,9 139:25 140:2,5,9
**choice** 96:23
**choose** 42:16 140:16
**chose** 36:17
**chosen** 36:7
**chronology** 61:5
**chunks** 80:15
**circumstances** 36:24
**City** 20:14,19 24:8,18 25:4,4 30:3,5,23 31:5,8 74:1,3,11 74:13,21 88:17 117:21,23 118:1,8,18 119:15 120:21 120:23 121:8,17 122:3 124:24 125:8 129:21 130:3 130:9 131:16 132:13 139:23
**clarified** 131:20 132:7
**clarify** 134:2
**classification** 162:17 164:9
**classifications** 162:10,22 162:24
**classifying** 162:16
**clauses** 43:17,17
**clean** 11:3
**clear** 85:10 109:10 154:17 154:18 160:7
**clearly** 93:2 136:14
**Click** 18:12
**clients** 66:23,24 68:2 151:9 151:25 152:7
**clinics** 27:6
**close** 179:1 181:4
**code** 8:24 9:2
**coded** 8:23
**Cogswell** 31:14,15,15,23 32:10,12,20,24 33:12,16 35:6,19,22 36:15,19 37:8 37:12 38:12,16 39:10,12 39:24 40:15 41:7,12,14,20 41:25 42:25 46:5,16 47:19 48:1,6,9,10,13,25 49:7,15 49:17,19 50:1 51:1,9,23 52:19 53:22 57:1 58:25 59:9 60:9,17 61:6 71:22
**Cogswell's** 36:24 38:3,9,22
**COHMF'** 125:1
**collect** 19:21 22:2 69:19
**collected** 115:24 116:9
**collecting** 112:14 173:15
**collectively** 62:16
**colloquy** 93:9
**column** 171:13,17
**combined** 132:18
**come** 7:14 55:8 80:13 96:12 130:12 131:16 132:25 133:2,3 134:18 142:23 143:4 146:15 151:19 153:3
**coming** 18:21 142:20
176:25
**commencement** 9:5 17:17 25:7 45:19 47:13 50:5,17 57:8 62:7 70:12 105:17 129:13 137:12 143:17 150:2 155:2 156:4 158:8 167:24 170:15 173:21
**commission** 1:4 2:4 3:4 19:9,23 25:14 133:4,10 168:16 169:3 183:23
**Commission's** 29:1
**commissions** 127:21
**committed** 173:14
**common** 39:17,19
**communicate** 114:2
**communicated** 46:16
**communicating** 26:18
**communications** 28:11,12
**Community** 124:20
**comp** 59:9
**companies** 27:5 34:14 41:2 41:7 66:25 67:3 72:15 89:10,22 120:15 140:2,6 140:25 148:7 157:13 162:5 168:3
**company** 21:9 31:19 33:17 33:20,22,23 34:6,15,16,22 35:7,17,18 40:10,11 41:10 41:10 42:3,3 47:18 49:7 50:12,24 51:25 52:5 57:16 58:17 59:1,25 61:19 66:5 67:2 70:20 72:3,18 73:25 74:18,20 77:14 79:20 80:13 82:3 87:19 89:7 91:7 98:16 102:22,22,23 103:14 117:8,9 123:8,10,11,12,13 123:24 124:23 126:19,22 128:21 129:8 130:14 131:3 131:25 140:14 148:9,13 150:23 151:2,14,15 152:4 155:21 156:20
**Company'** 47:18 50:13 51:1 57:17 70:22
**compared** 146:21
**compensated** 61:20
**compensation** 38:22 43:19 43:22,23 48:5 49:21,25 51:15,23 52:9 53:17,21 58:13,16 60:19 61:7 63:6,8 63:22,25 64:1,4,23 72:1,2 74:15 81:16
**compensations** 89:24
**Competition** 43:21
**compilation** 159:17 160:2 160:11
**complete** 46:12 93:23 116:1

183:8
**completed** 61:21 67:2 73:14 74:10 88:20,21 117:12
**completely** 166:4
**compliance** 54:23
**complicated** 40:18,19
**comprehensive** 36:8
**computer** 8:21 15:2 40:21 46:11
**con** 9:23
**conceptual** 36:10
**Concern** 150:6
**concerning** 27:2 56:6 93:9 124:18
**concerns** 63:8
**concluded** 182:6
**concludes** 182:3
**conduct** 85:22,25 89:17
**conducted** 97:9
**Confidentiality** 63:15
**configuration** 166:1,3,3
**confirm** 29:25 76:10
**confirmation** 138:8
**confused** 131:17 132:3 138:16
**confusion** 138:12
**connected** 32:18 97:21 105:4
**connection** 62:25 63:21 89:17 91:22 92:10 93:25 101:6 179:7
**construct** 87:25
**constructed** 87:3 95:1 118:2 165:16
**constructing** 95:23 96:24
**construction** 27:5 36:11 87:10,13,19 88:4,5,12 95:3 95:9 96:2,13 97:1,8 98:12 99:6 128:10,12,13,13,14
**consult** 51:21 52:14,16 172:7
**consultant** 85:18 121:15 122:18,18,19 129:2
**consultants** 27:4 79:14 91:14
**consulting** 122:20,22,23 123:1 125:16 128:2,4 130:14 153:14,17 154:1,1 165:12 167:2
**consults** 113:9
**contact** 32:1,1,15,16 56:8 158:17
**contacts** 36:16
**contains** 184:13
**continue** 24:7,11 105:24 139:21 152:3,13 164:24
**continued** 24:17 131:15 166:15
**contract** 38:20,21 39:25 44:6,8 48:20,23,24 49:5 56:22 78:7,8 153:16,23,24 153:24 166:24 167:11
**contracting** 138:17
**contracts** 27:3 37:2 142:8
**contributed** 22:23 23:6
**contribution** 67:5 127:16,16
**contributions** 127:15
**control** 134:14 148:2
**conversation** 24:12,18 25:6 59:4,5 120:21 136:8,8,12
**cooperative** 96:17
**copies** 75:2,5 140:19
**copy** 38:20 44:12 47:25 48:20 51:8,11 57:23 62:23 65:4 71:11 125:6,10 148:1 148:12,17 155:15,15,24 156:8,18 158:22 159:1 168:2,10 172:10,23 181:24
**corporate** 21:17 53:4 75:11 76:5 78:22 86:18 123:7 134:15 142:16 143:11 148:3 150:13
**corporation** 124:22,25
**correct** 17:7,9 20:14,16,18 21:1,18 22:8 23:9,10 48:17 49:23 51:19 52:19 57:5 61:9 64:10,21 65:10 71:17 80:6,9 87:3 109:18 118:12 118:15 121:11,12 122:1,5 123:18 128:11 130:6,10 138:11 140:18 157:12 160:13 180:17 183:8
**correcting** 27:22
**corrections** 183:10,13,14
**correctly** 60:25
**corresponded** 27:13
**correspondence** 25:15 146:22
**corroborated** 79:12
**cost** 54:8
**costs** 85:18 123:23
**counsel** 4:21 5:15,17 6:2 11:23 46:6 85:19 92:15 93:6 98:2 106:1 108:20,24 112:5 113:10,17 152:12 172:10,10 178:20
**counsel's** 177:18 178:9,11
**counter** 59:21
**County** 1:11 2:11 34:12 50:12,25 57:16 70:21
**couple** 76:17 107:4 154:5 174:1
**course** 10:13,18 46:13 53:9 54:17 66:6 75:18,18 76:25 80:15 86:15 87:7 89:24 90:1 99:5,10,12 128:6,13 129:7,10 137:11 146:16 152:1,8 163:18 175:7
**court** 1:1 2:1 5:7,13 10:7,19 15:20,22,23,24 16:7,17,18 17:1,5,6,13 25:19,20 55:17 60:23 64:18 66:17 70:10 77:8 92:23 105:21 106:24 109:11 110:12 111:18 114:7 116:12 135:23,25 145:5 151:13 152:11 169:17 175:10 181:23 182:1
**court's** 152:13
**cover** 12:16 25:16
**covered** 134:11
**COVID** 69:9
**COVID-19** 69:17
**CPA** 158:24
**crazy** 103:24
**created** 114:14,23
**cross-talking** 16:5
**CSR** 1:24 184:22
**CT** 40:21
**CUMMIS** 3:9
**cure** 88:21
**current** 143:10 150:7,21 158:16,16 171:22
**currently** 6:9 46:10
**custody** 148:2
**cut** 136:20

**D**

**D** 4:1
**daily** 52:21,25
**damage** 69:16
**date** 5:11 55:9 60:21 66:3 77:21 106:10 124:18 132:18 144:8 185:2
**dated** 18:5 19:7,15 25:12 26:2 49:5 57:20 60:16,25 62:18 65:25 71:12 77:18 77:24 81:22 124:2 144:7 150:5 155:13 159:2 160:8 183:19 184:17 185:25
**dates** 22:9 77:16
**dating** 61:7
**Davis** 46:6
**day** 72:17 73:24 76:17,20 78:16 80:16,16 83:16 106:9 121:6 139:15 157:7 183:19,22 184:17
**days** 19:14 76:17,19 78:17 83:18,21 181:22,23
**dba** 124:20
**deal** 39:16 40:16 52:19 74:1 74:11 118:12,15,16 122:14 136:23 181:8
**dealing** 30:25 31:4 62:4 131:18 138:13 163:18
**dealings** 21:9 30:4
**deals** 103:9
**dealt** 101:16
**Dear** 129:19 139:15 150:21 155:8
**debt** 53:19 58:20
**decades** 35:11
**December** 65:19 108:16 155:11 156:12
**decide** 76:24
**decided** 42:15 165:19
**decision** 7:13 48:16 53:10 53:12,12 113:8 139:19
**decisions** 53:11 161:17,19 161:20,23
**declaration** 105:24 106:1,2 106:22 107:1,4 108:4 152:14
**declare** 183:4
**dedicated** 128:8
**deducted** 114:9
**Deductible** 107:6,7 109:24 109:24
**defendant** 5:21 65:9,12,14 71:12
**defendants** 1:13 2:13 3:8 6:2 105:22
**defer** 127:5
**define** 34:19
**defined** 34:18
**definitely** 150:17
**definitive** 63:18
**Delaware** 124:23
**delete** 46:9
**deleted** 27:25
**delivered** 98:23,25 99:1,5,7 99:9,10 166:16
**delivery** 166:25
**demand** 73:18 153:4 154:4
**demolish** 87:16
**demolished** 87:17 96:8
**demolishing** 88:4 98:17
**denying** 147:1
**department** 119:5,5,6
**departure** 36:24,25 38:4
**depending** 44:10
**depends** 46:14 53:16
**deposed** 10:4,15
**deposing** 94:4

**deposit** 152:17,20,21,21,23 152:24 166:21,21
**deposition** 1:17 2:17 5:5,9 9:6,25 10:1,9 15:15 16:1 16:25 17:4,13,18 25:8 26:20 27:12,23 45:19 47:14 50:6,18 57:9 62:8 70:13 91:23 92:22 93:14 94:2 105:17 129:14 137:13 143:18 150:3 155:2 156:4 158:8 164:25 167:24 170:16 173:22 179:3 181:4 182:4,6 183:6,14,15 184:7 184:10,14 185:2
**described** 77:24
**describes** 157:16,19
**deserve** 59:14
**deserved** 60:5
**deserves** 72:12
**design** 36:10,11
**designed** 165:16
**destroy** 45:23 46:10
**destroyed** 27:25
**details** 38:18
**determine** 162:8 163:3
**develop** 34:16 36:6 39:11 41:17 85:5 117:9 123:11 125:24,25 126:2,13,20,21 126:25 127:1 128:6 135:19
**develop/own** 138:9
**developing** 126:17
**development** 36:2,5,6,9 50:2 123:23 125:1 139:23
**device** 26:19 40:19 93:15 103:10
**diabetes** 13:10 14:1,5,11
**Diane** 1:24 2:20 5:14 64:16 65:6 169:16 181:22,25 184:3,22
**difference** 90:3 110:1,2 126:24 146:5
**different** 8:5 44:24 50:16 115:11,22 117:10 120:10 120:20 125:25 126:13 127:1,4 128:9 131:5,6 133:8 134:21,22 137:1 147:4 150:11 159:11 161:7 161:8,9 165:14 166:1,4
**differently** 131:7
**difficult** 14:8 39:2,5,8 69:19 73:19 115:15
**difficulties** 181:8,11
**difficulty** 136:22,24
**dig** 96:8
**dignified** 112:18
**dinner** 86:7 120:5 132:6
137:22 138:10
**direct** 25:9 26:9 105:19 129:15 137:15 159:5 173:23
**directed** 25:15 155:19
**directing** 48:4 51:13 56:15 56:18 57:10 71:15 107:3 124:13
**direction** 184:12
**directly** 22:17,18 73:22
**director** 118:20,24 119:12 119:17,21 121:2,9
**disagree** 61:22
**disagreement** 119:23,23 120:2
**discernible** 146:24
**disciplined** 16:10
**disclosure** 23:12
**disconnect** 97:4
**disconnected** 92:3,22 93:8 93:12 169:19
**discovery** 115:17
**discrepancy** 146:1 147:7
**discuss** 25:3
**discussed** 17:15 137:25 165:20 176:23 177:14
**discussion** 118:18 139:16
**discussions** 20:14,25 24:8 37:22 74:2 102:24 117:21 118:1,4 124:18 131:15
**disk** 116:11,13,15,17,18
**displayed** 57:11
**displaying** 45:21 47:10 50:19 158:9
**dispute** 97:2 119:22 120:10 120:10
**disputing** 114:4
**District** 1:1,2 2:1,2 5:7,7
**Division** 5:8
**doctor** 13:25 14:2 146:8,10 146:11
**document** 9:22 19:5,6,7,11 19:13 25:12,12 26:2,4,5 45:21 46:1 47:22,24 50:8 50:16,20,22 51:6 57:12 58:4 60:24 62:10,19 64:2 70:15,17 72:25 73:2 75:8 91:4,5 105:20,25 106:12 109:8,11,13 115:19 124:13 124:15,18 125:4 129:16 137:15 143:22 144:3,8,9 144:11 154:6 155:4,6 156:7 157:15 158:11 160:25 173:5
**documentation** 19:22 143:10 172:15,17 173:14
**documentations** 22:3 172:13
**documents** 26:7,11,25 27:2 30:17,19 51:4 53:1,25 73:3 79:4 106:9 115:24 116:10 137:23 138:1 161:3 162:2 170:24,25 172:7 173:2,16 173:18
**doing** 27:14 31:10 66:15 87:21 98:4 101:1,7 105:13 120:25 135:21 139:22 157:13,16,20 160:10,11,12
**dollars** 23:7 48:7 79:19 83:20 141:20 143:3 145:21 154:5
**door** 69:24 70:4 134:18 142:23
**double-check** 125:21
**Dr** 20:6,8 31:20 32:2,6 43:25 44:9 52:14 53:5 62:23 63:23 82:11 87:3,5,16 88:1 88:15 89:13 90:7,20 95:25 101:23 102:9,24 103:9 104:16 105:2,8,11,13 118:11,19,23 119:11,16,20 119:22,25 120:19 121:7,9 138:6,7 139:4
**drafted** 168:15,18
**drawings** 87:14 88:5 167:12
**drive** 116:19,20
**driving** 11:14
**drove** 69:23 70:1
**duly** 184:7
**duties** 40:2

**E**

**E** 4:1
**e-mail** 8:5 25:5 27:15,19 28:20 29:15 30:23 32:17 59:3 91:24,25 93:24 94:1,4 94:5 129:18 130:5 137:16 137:17,19,20 138:4,5,16 141:8 158:11,22 173:25
**e-mailed** 46:5
**e-mails** 27:25 28:10,22,24 29:5,7,17 30:3,7 31:7
**earlier** 33:16,25 81:2 110:11 117:20
**early** 12:20 42:21 55:10 78:10,15 85:4 123:23 168:20
**earn** 58:18
**easier** 11:1 110:21 120:17
**easily** 29:8 35:20 56:12 115:13 149:17
**easy** 24:5,5 55:23 56:16,16 165:22
**eat** 12:21 14:19,21
**eaten** 158:4
**EB-5** 1:9 2:9 27:7 35:2 39:15 42:4 79:23 80:1,5,8 89:18 100:14 120:16,17 123:4,9 126:22,23,23,25 128:19 129:9 132:11,19 134:3,5 134:14 138:23,24 141:17 141:18,21 142:4,16 150:7
**EB-5-related** 128:19
**EB5s** 54:24
**echo** 175:18
**echoes** 181:12
**economic** 55:1 79:14 114:21
**economist** 54:25
**Effect** 63:13
**effective** 43:4
**effort** 82:4
**efforts** 31:13
**Egnyte** 8:1,18 17:20
**eight-page** 62:10
**either** 7:16 42:25,25 64:19 98:23 118:16 160:3
**electronic** 19:4 26:19
**elements** 114:20
**employed** 66:4
**employee** 31:16 48:5 51:14 53:17 57:4 58:12,15,17,18 59:25 60:17 64:9 65:22 72:1,2,4
**employee'** 47:19 50:14 51:2 57:18 70:23
**employer** 38:6
**employment** 37:5 38:10,10 44:4,6,8 46:20 47:11 48:1 48:9 49:16,20 50:9,22 51:8 52:19 57:13,24 58:3,4 60:3 60:12 61:12 63:25 64:3,5 64:24 66:8 70:18 71:11,16 77:5,10,12,18,19,21 78:6 81:4,17,21 82:7 104:7,10 104:14
**enclose** 141:10
**enclosed** 155:9 156:10 158:21
**ended** 78:16 92:17 145:18 149:19 155:11 156:12
**ends** 46:12
**endurance** 12:6
**enemies** 119:8
**enforcement** 15:15 67:8 179:7
**engage** 24:7 62:4 103:18
**engaged** 20:13,24 21:8,22

129:20 156:22 157:1 159:16 165:24
**engagement** 157:8,11,12,15 158:23 159:2,6,7 160:7,9 160:17 161:15,25 163:2,20 164:1 168:2,10
**engaging** 101:20 104:15
**English** 6:14 161:6
**enjoy** 152:9
**enter** 60:19 63:20,24 118:6
**entered** 27:7 138:14
**entertaining** 86:10
**entire** 183:5
**entities** 21:17 129:6 138:8 148:3 159:23
**entities'** 143:11
**entitled** 12:15 26:11,24 44:24 48:5 50:9,22 57:13 63:13 70:17 77:19 78:7 105:21 107:5,7 124:15 152:16 171:13,17 180:20
**entity** 34:11 37:14 49:17 50:1 53:6 76:5 126:16,17 131:17 132:3 138:7,8,10
**entrepreneur** 90:1 110:25 111:25 139:22
**equals** 34:22,23
**equipment** 40:15 55:13 98:22 99:2 152:17
**equipments** 40:20,21,23,23
**equity** 40:12,12 41:24 42:1,2 100:25 101:3,6 103:4 120:16 134:4 139:10 140:3
**erect** 95:24 96:3
**Errata** 183:11 185:1
**ESQ** 3:4,5,9
**establish** 73:10
**established** 79:20
**et** 5:6 185:3
**event** 184:16
**events** 14:6
**everybody** 23:4 163:23,23
**evidence** 30:9,12,19 45:23
**evidentiary** 112:25 113:5,9 176:24
**evidently** 107:24
**exact** 55:9
**exactly** 83:5 86:12 157:16 157:19 172:8 173:12
**examination** 4:2 6:6 109:7 177:14,24 179:18 181:7,14
**examined** 184:6
**example** 40:21,22 42:4 62:6 72:14 79:18 114:20
**Exchange** 1:4 2:4 3:4 19:9 19:22 25:14
**excuse** 25:19 75:16 125:13
**executed** 42:18,19 48:1 51:8 61:13 62:23 64:6 125:7
**execution** 43:4
**exercise** 139:21
**exhibit** 4:7,8,8,9,9,10,10,11 4:11,12,12,13,13,14,14,15 4:15,16,16,17,17 9:5,8,9 9:18 10:2 17:17,20 18:3,3 18:7,8,15,18 19:5,21 25:7 25:11,17 26:4,10 44:16,24 44:25 45:7,14,18,22 47:9 47:11,13,25 50:5,8,17,21 51:5,7 56:18 57:8,11,12 62:7,11,22 65:1 70:12,16 70:17 71:10,16 105:16,20 107:4 108:4 110:14 111:6 113:23,24 114:1 124:14 125:5 129:13,17 137:12,16 143:17,20 148:1 149:25 150:2,4 152:11,14 155:1,4 155:5,24 156:3,6,7,16,18 158:7,10 159:1 163:18 167:23 168:1,7,9 170:15 170:18,22,23 171:1,4,6,10 172:8 173:21,24 174:7
**exhibits** 4:6,21 8:6 18:1,25 44:16,18,23,23 45:3,6 106:2 140:23
**Exhibits_Liu_2-24-21** 8:10 8:20 18:17
**exist** 77:20 78:8
**existed** 78:6
**existing** 87:7 95:8 124:10
**expect** 143:5
**expected** 134:17 142:23
**expense** 78:10 128:5,11,17 128:24,25 129:1,3,3,6,11 130:21 131:11
**expenses** 78:14,18 79:3,6 79:12 82:9 107:6,8 109:24 109:25 110:21 111:23 114:9 127:21 128:2,3 164:21 178:23
**expensive** 32:3 54:7
**experience** 35:13 163:24
**experienced** 35:10
**experiences** 94:21
**expert** 130:17
**expertise** 32:8 107:19 161:4
**experts** 165:20,21
**expires** 183:23
**explain** 99:25 150:14 179:17
**explained** 81:16,20 138:20 147:12
**explanations** 147:5
**explore** 32:5
**express** 91:13
**expressed** 31:18 33:16
**extend** 127:3
**extent** 11:25 43:24 131:8
**eyes** 14:4 26:23 45:4 58:14 137:9 158:2 172:2

## F

**f/k/a** 1:11 2:11
**fabricated** 147:11
**facilitating** 67:18,19,20
**fact** 25:6 53:5 55:9 93:8 107:24 138:13 172:16
**facts** 25:1,2 46:14 90:23,24 114:15,20 164:14
**fair** 11:4,5,10,11,21,22 16:5 24:4 61:14 81:7,11 89:18 107:25 131:13
**faith** 146:18 147:1
**fake** 88:7
**falls** 89:11
**falsely** 124:11
**familiar** 98:12
**families** 120:6
**family** 7:13 85:5
**far** 114:17 123:9 177:13
**fault** 89:16
**February** 1:19 2:20 5:1,11 19:7 20:7,15,20 21:21 22:11 23:15 24:7,21 43:15 62:18 75:7,9,12 76:4,16,18 76:19,25 77:17 78:5,24 80:21 83:12,14 132:11,18 134:11,12,20 137:18,19,21 139:15,20 141:8 142:5,17 160:9 183:9 185:2
**fee** 22:24 23:8 125:16,18 126:7,8 127:19,20 128:2
**feedback** 169:22
**feel** 103:24 161:10 181:12
**fees** 79:13,13 85:17,18,19 110:24,25 111:3,4,5,7,17 111:20 112:2 113:25 114:8 114:11,18 115:3 126:11 127:21,23,25 128:15 178:13 179:6
**fell** 80:17
**felt** 81:6
**FGPT** 37:14,17,20,23 38:1 46:8,14,22 47:4
**field** 35:11 39:18 103:24 130:16
**figure** 53:24 112:16 114:7 114:22 145:11 146:4,5 172:8
**file** 8:1,19 9:4 18:13 50:4 54:21,23 55:3,18,21 148:15,16,19,23 149:15 155:18
**filed** 22:7 54:16,17,17,18 55:9,12 100:22 106:6,12 106:12,13 155:23 156:14 169:4 173:8
**files** 107:15,16,17 116:16 150:14 155:16
**filing** 105:21 110:12 114:7 130:22 152:11 155:14
**final** 48:19 84:5
**finally** 84:5 93:25 141:7
**financial** 159:17,22 160:10 160:18
**financially** 135:18
**financing** 53:19 58:20
**find** 14:2 24:5,5 29:6 35:21 55:23 56:11,11,16 72:25 89:14 90:21,25 96:18 97:4 97:5 116:2,3,3,7,8,16 119:9,24
**fine** 13:5 14:10,23 45:10 89:23 145:10 169:15,17 170:4
**finish** 46:8 64:13 78:4 95:20 121:22,23 163:16 171:23
**finished** 25:21 112:1,3
**firm** 21:15,16 22:4 30:11 37:19,25 79:19,22 98:12 101:6,20 107:20,22,25 109:9 115:5 119:24 129:21 139:10 157:7 158:15,17,20 160:15,22 162:20 164:2 171:14 176:20
**firms** 41:24 46:20 101:17 111:23 114:25 115:7,8 128:15 157:22 164:1
**first** 19:6,13,14 23:17 25:12 31:1,16 32:24 33:13 47:15 50:9,21 51:4 54:23 57:13 59:8 62:11,13,21 70:18 71:2 75:9 81:13 87:7 117:11 124:15 125:5 137:20 148:14 155:6 156:7 156:22 157:1 164:13
**fit** 36:14
**five** 9:10,12 12:18 18:2,3,9 18:19 62:21 75:20 136:12 141:22
**five-page** 47:10 50:20,21 174:7
**fix** 11:15
**flew** 33:12
**flip** 47:20 51:3 62:19 125:4

**Florida** 55:24
**Flower** 3:5
**focused** 137:2,5
**folder** 8:6 18:13 44:17,23,25 47:9
**folders** 8:19
**folks** 86:6,9 105:8
**follow-up** 152:15
**followed** 23:19,19 31:11
**following** 58:19 155:9 156:10
**follows** 6:1
**footed** 78:14
**forced** 88:6
**foregoing** 183:6 184:7,13
**foreign** 83:25
**forfeit** 152:21
**forfeited** 152:17,20
**forgot** 43:8
**form** 103:14,14 127:11
**formal** 153:16
**formally** 50:12
**formative** 153:16
**former** 38:5 158:14,19
**formerly** 7:2,4 34:11 50:25 57:16 70:20
**forth** 39:7 63:18 150:10 151:11 157:11
**Fortune** 35:16
**forward** 115:15 141:6 163:19 172:11
**forwarded** 151:17
**found** 40:12 103:23 116:5,5 120:20
**foundation** 124:24 147:11 147:12
**four** 12:17 44:23 45:6 83:21 116:21,22
**frame** 159:21 173:7
**frankly** 23:16
**free** 89:25 90:1,3
**freeze** 105:24 152:13
**frequently** 148:24 149:1
**friend** 101:24,25 102:1 104:16 136:13,13 175:15 175:22,24 176:8
**friendly** 39:9
**friends** 52:12 85:3,5,6,21 90:9,11,13,15,16,16 120:6 136:18,19
**front** 8:3
**fulfill** 40:1
**full** 47:23 101:11 122:11 184:13
**function** 19:4 126:21 164:8
**functions** 66:24 126:11
131:6 161:16,18
**fund** 1:10 2:10 22:16,22 23:6 27:7,9,14 34:25 35:2 35:3 40:13 62:25 104:8,11 123:4,8,9,10 124:2 129:9 132:19 145:17 149:19 150:7 171:11,15
**funding** 37:23 138:23 141:17
**funds** 36:4 39:22 76:8 82:23 85:20 86:16 123:4,7,19 132:25 134:14 139:2 142:1 142:4,9,10,16 152:3 176:12,19
**further** 37:22 181:16 184:15
**future** 72:19 165:21

**G**

**Gary** 3:4 5:18 18:5,16 25:1 30:18 56:16 58:11 66:1 75:16 86:23 88:9 93:23 95:15 99:15,23 112:18 115:2,4 136:14 143:6 146:18 154:14 157:24 160:21 163:5 164:15 168:25 173:5 175:18 179:8 180:21
**GC** 101:12
**GCS** 101:8,9,10,10,11,18,20 139:6,8,9
**general** 14:4 46:6 131:1 173:7
**generated** 100:8
**gentlemen** 182:2
**getting** 45:4 75:4 87:14,15 87:15 92:2 133:18,18 139:3 144:14 158:1 172:2 178:25
**gild** 154:21
**gilded** 154:25
**give** 6:15 16:4 32:14 40:22 56:12 62:6 95:16 104:1 136:16
**given** 10:6,15 12:9 16:3 59:14,15 98:7 138:13 183:9
**giving** 24:14 26:19 143:2
**go** 7:14,14 10:17 12:11 14:21,24 17:19 19:2 59:2 59:10 63:11 73:13,20 75:21 92:9 95:18 112:2 116:24 122:7 127:15,19,23 130:13 137:18 138:5 139:18 160:16 165:19 169:23 170:10 181:1
**goal** 40:9 72:17 126:2
**goes** 12:19 46:4,11 53:18 125:3 127:18
**going** 11:1,20 12:10,13,17 12:18 15:4 18:10 25:3,20 26:9 30:15 33:20 34:17,19 35:3 37:3 39:13 46:23 47:20 48:6 49:22 50:16 51:3,4 60:15 73:15,19,23 75:23 94:9 95:6,11 97:18 109:6,12 111:19 117:1 118:19 119:16,20 121:3 125:4 130:2 132:25 136:25 137:8,14 139:16 155:12,17 157:16 159:5 163:19 166:23 172:12 176:22 179:16,24 181:9 182:4
**good** 30:6,8,9 32:10 36:15 45:17 51:13 65:18,25 67:23,24,24 80:18,20 120:3,4,7,8 137:4 146:18 147:1 154:23
**Google** 52:3
**Gouraige** 3:9 5:21,21 6:5 18:15,21,25 30:15 44:18 44:21 58:2,10 64:11 81:8 91:19,22 92:2,8,14,20 93:7 93:22 94:6,16 95:13 97:11 99:21 100:5 105:24 107:4 108:4,14 109:6 110:3 113:2,6,13 127:11 134:2,6 136:20 146:17 147:2,7 152:14 154:12,18,23 163:22 164:10,23,25 169:9 169:19 170:9 175:17,20 176:22 177:2,9,13,23 178:3,7,15,21 179:8,16,21 179:22,23 180:6,10,13,20 181:3,10,18,21,25
**Gouraige's** 93:17 106:21 176:20
**grab** 14:21
**grand** 49:14 52:8 77:3,3,3,3 78:16,17
**great** 9:7 13:20,20 103:12 136:23
**grew** 90:17
**GROSS** 3:9
**ground** 10:17 12:16 96:4,7,9
**grounds** 93:2
**Group** 46:8
**guarantee** 91:6,6,10,12
**guarantees** 12:17
**guess** 60:21 85:1 142:14 157:21 160:14 175:4
**Guo** 17:2
**guy** 23:23 39:21 41:17 62:1 69:9 98:2 130:2 158:25 160:22 161:1 162:25 167:4
**guys** 23:22 39:17 87:22

**H**

**habit** 105:7 145:8
**hacked** 27:24 29:7,9,14,15
**half** 23:6 79:18 83:19 118:22 118:22 143:2 163:24
**hand** 26:16 69:24 109:1
**Handed** 46:4
**handful** 71:24
**hands** 61:8
**happen** 23:17 88:19
**happened** 66:1 84:20,24 88:19 119:4 165:23 166:9 166:14,21 169:20
**happy** 12:8 88:16,17
**hard** 16:8 166:23 172:4 175:18
**Harlan** 74:21 117:21 129:19 130:1 131:16 137:21 139:15
**head** 119:6 121:3
**heading** 45:23 110:24
**headings** 109:23
**hear** 64:12,14,18 91:19 133:7 148:5 168:25 169:9 169:10,11,12,14,16,18 175:18 180:7
**heard** 5:6 92:23 111:17
**hearing** 112:25 113:5,9 176:25 178:17 180:13
**hefty** 69:7
**held** 5:9
**helpful** 39:20
**helping** 79:23
**hereinafter** 47:18,19 50:13 50:14 51:1,2 57:17,18 70:22,23
**Herve** 3:9 18:18 44:15 56:13 105:24 137:4 147:6 169:12 169:13,18 175:16 178:1,5 179:14 180:2,9 181:23
**hide** 89:6
**high** 14:3 59:10
**high-end** 74:8
**higher** 113:25
**highlighted** 141:12
**hire** 35:25 36:1,15 61:18 91:14 111:25 114:20,21 120:12
**hired** 39:10 54:25 87:18,20 89:6,20 94:21 114:19 121:15 160:24
**hiring** 35:5

**hold** 8:22,24 95:13,13
**holder** 148:20
**hole** 96:4,6,9
**holiday** 7:21
**holidays** 140:1
**home** 68:14,18,19,20,22 69:11 70:1 90:23
**honest** 29:24 39:1 160:21 167:7
**Honestly** 144:25
**Hong** 102:4 139:10
**hope** 20:14,19 24:8,18 25:4 25:4 30:4,5,24 31:5,8 74:1 74:3,11,13,21 86:14 88:17 117:22,23 118:1,9,18 119:16 120:21,23 121:8,17 122:3 124:24 125:8 129:21 130:3,9 131:16 132:13 139:23
**hoping** 8:13 140:6
**hospital** 21:1,3 30:11 96:19 117:19 118:1,8,18 119:16 120:24 121:8 122:3,10 124:20,21 125:3,8 130:3,9 132:13
**Hospital'** 124:22
**Hospital's** 118:3
**hospitals** 27:6
**hostess** 67:23 68:5
**Hotel** 27:8
**hour** 13:3,8
**hours** 12:15 164:15 177:25 178:25 181:5
**house** 69:23 95:6
**HSBC** 102:5,5,6
**Huang** 101:23 102:9,25 103:10 104:16 105:2,8,11 105:13
**huge** 73:18
**hundreds** 125:25,25
**Hunn** 121:13,14,20,21,25 122:9,16,25 123:3,6,20 125:20 126:4 128:1 129:2 129:18,20 130:1,13
**Hunn's** 125:18 128:4 130:24
**Hunter** 3:13 5:12
**husband** 172:3,4
**hypothetical** 97:11 98:3,4

**I**

**idea** 96:17 98:10,10 120:10 150:11
**identical** 71:23
**identified** 63:17,19 72:15
**identify** 28:25 29:17 72:18 172:2,5
**image** 92:5 93:17
**immediate** 21:24
**immediately** 40:1
**impact** 14:12
**impacting** 14:5
**important** 10:22 11:16 13:13 72:17 73:23 120:14,14
**impossible** 143:1
**imprecise** 136:23
**in-house** 160:25 161:1
**inappropriate** 100:2 147:9
**incentive** 135:20
**inclination** 121:6
**include** 78:10 121:7
**included** 138:3 155:14
**including** 8:19 10:15 25:3 27:4 53:14,19 58:20 162:9 162:21 163:4,25
**income** 73:15 156:13
**Incomplete** 107:6,8
**incorporated** 55:13
**incurred** 111:23
**indicate** 93:25 132:2 133:14
**indicated** 15:14 33:15 93:7 183:11
**indicating** 93:12
**indication** 93:18
**indicia** 146:21
**indirectly** 22:19
**individual** 122:12 157:14
**individually** 21:18
**industry** 103:10 122:12
**inform** 25:5 129:20
**information** 22:2 28:16,18 32:15,16 46:10 53:2 56:2,4 56:5,8 74:6 115:14,17 150:12 171:20 175:4
**initial** 32:1 121:6 139:11 167:4,6,12,12,13 168:20
**initially** 54:4,4 139:12
**inject** 152:3
**injected** 141:21
**input** 8:24
**inquiring** 98:6
**insist** 12:10
**installation** 167:1
**installed** 99:9
**instruct** 179:14 180:8,15,17 181:1
**instructed** 84:24 113:19 177:7
**instructing** 113:7 178:1,5,19 179:19
**instruction** 12:2 113:12,16 113:20,21,22 178:10,12 179:15,25 180:3
**instructions** 31:11 45:24 155:14
**insufficient** 147:3
**insurance** 40:8,9,9,11 41:7 41:9,10 66:25 67:2,3,12 72:15,18 73:25 74:18,20 120:15 140:2,5,9,11,14,25
**insurers** 73:12
**intend** 112:24 113:4 153:22
**intended** 124:18 160:17
**intention** 103:23 153:18,20 153:21
**interaction** 37:19
**interest** 31:19 33:17,21 34:7 42:5 117:13 184:15
**interested** 35:5 42:3 74:4,8 139:10,12
**interject** 16:6,7 99:22
**internal** 37:9,13 46:17 173:24
**international** 72:19
**internet** 52:8
**interpose** 11:24
**interpret** 91:10
**interrupt** 95:16 121:23
**interrupted** 64:19 122:7
**interruption** 15:3 55:17 60:23 66:17 70:10 77:8 111:18 116:12 145:5 151:13
**intervened** 87:22
**intervening** 131:23
**introduce** 5:15 31:22 66:23 67:22 165:18
**introduced** 31:20 32:10,12 62:1 98:17 117:24 121:18 158:16
**introducing** 67:25 105:7 130:1
**invested** 23:13
**investigation** 15:17 23:14 24:9,20 37:9,13 46:9,13,18 49:8,13 67:7 133:6 147:20 160:13 168:13,17 169:4
**investigations** 168:21
**investigative** 10:16 24:22 31:9 70:16
**investing** 42:5
**investment** 42:3 54:5,8 59:15 78:11,19 102:7 140:3
**investor** 126:12 133:5 134:14 168:12,15 169:4 171:8,14,15,18 173:3
**investors** 22:12,15,22 23:2 23:6,12 39:16,22 68:2,9,9 80:5 86:11 90:21 91:9 100:14,19 120:17 124:2,10 124:10 126:8 127:4,15 132:24 137:1 141:21 142:7 142:20,22 143:9,13 151:18 152:7 169:7 171:10 174:11 179:13
**investors'** 171:24,25
**invite** 7:25 121:2
**invited** 120:6
**invoiced** 98:18
**invoices** 79:13 112:8,15 114:15
**involve** 10:10
**involved** 48:16 49:8 110:21
**irrelevance** 180:4
**irrelevant** 113:7 176:25 177:10
**IRS** 155:19
**issuance** 160:18
**issue** 11:25 13:10 14:1 54:24 92:10 151:8 176:23 179:11
**issued** 147:23 150:18
**issues** 14:4 164:17 177:10 178:4,16 179:2,17 181:14 181:15
**item** 111:19 112:4,17 115:9 152:16
**items** 110:23

**J**

**James** 138:1
**January** 18:5 46:6 58:17 60:1 71:13,19 72:4 115:23
**Jersey** 3:11
**Jill** 137:25
**job** 1:25 11:1 16:8 66:8 71:24
**John** 62:14
**join** 33:20 73:21
**joining** 49:8 137:22
**joint** 118:7 124:19 129:22 130:8 179:12
**judge** 11:25 113:8 135:23,25
**July** 27:24 28:7 29:10
**jump** 25:21

**K**

**keep** 13:13 24:22 121:2
**kept** 116:11,15 172:23
**kids** 7:14,14
**kind** 42:6 64:16 102:6,19 103:19 112:21 161:2,2,13 166:19 178:18
**kinds** 79:6

**knock** 69:24 70:4
**knocking** 95:25
**know** 12:7 13:10,11,16,25 14:1,2,4,7,19 15:3 20:12 22:3 23:3,4,16,17 28:20,21 29:22 30:1 31:12,25 32:1,3 32:3,6,9 35:17 36:3,6,9,9 36:10,10,12,13,13,17,23 37:12,17 38:7 39:7,15,16 39:18,19,21,24,25 40:1,1,6 40:14,19,20,25 41:22 42:2 42:4,5 43:8,13,14,14 45:10 46:24 47:4 50:4 51:24,25 52:4,4,5,12 53:16 54:23 55:15,22 59:13 61:4,25 62:2 65:16 66:22,23 67:6 67:20,24,25,25 68:1 69:1 69:16,21 72:10,11,15 73:6 73:19,22,24 74:6 75:6 77:15 78:19 79:3,6,7,8,9 79:14 80:18,18,25 82:12 85:3,4,5,11,17,18 86:3,7,7 86:8 87:18,19 88:15 89:10 89:11,12,12,13,23,25 90:18 91:11 92:6 96:5,9,10 96:16 99:23 100:1 101:14 101:23 102:16,17 103:3,12 103:21,25 104:14,24 106:18 107:11,17,19,19,21 108:2,23 109:3 110:2,7,14 110:18,19,24 111:15,22 112:5,7 113:10 114:9,18 115:8,11,13,14 116:6 117:9,10,16,18 118:23 119:7,9,11,19 120:4,4,5,6 120:7,8,9,10 123:25 125:15,16,17,24 126:1,5 127:20 128:21 130:17 131:5,20,24,24 132:7,8,23 132:24,25 134:25 135:13 136:10,15 139:1,10,11,12 139:13 140:8,11,12,13 142:7,7,19,19,20 143:4 144:7,7 145:25 146:3 147:14 148:6,10,12,18 149:7,8,12 150:15 151:6 151:25 152:1,3,20,21 153:12,13,16,21 154:5 160:5,14,22,23,25 161:1,5 161:5,8,21,22 162:19,23 163:1 164:3 165:20,20,22 166:9,12,14,14,19,21,23 167:7,12,13 169:20 170:23 172:1,2,3,4,4,5,24 173:1 174:16,21 175:14,20 176:7 178:17
**know-how** 167:13
**knowledge** 40:25 47:2 94:20 109:16,19,20 110:5,9,13 110:17,17
**knowledgeable** 36:12
**known** 50:12,25 57:16 70:21
**knows** 35:24,24 36:8,18 89:7,20,21,21,21,22 121:17 163:23,24 164:5
**Kong** 102:4 139:10

**L**

**L-i-j-u-n** 176:4
**L-i-u** 176:6
**LA** 27:7
**lack** 94:20
**lady** 158:16
**Laguna** 107:17
**Lam** 158:12,13,14,18 173:25 174:1
**language** 161:7,10
**large** 122:10
**larger** 144:16
**largest** 41:10 67:3 72:15 87:20
**Las** 85:23 86:1,17
**late** 36:21,21 42:22 55:5,6 178:25
**law** 79:22 164:1 176:20
**lawyer** 22:20 55:20,23 91:12 112:18 115:14,14,25 116:16 161:1
**lawyer's** 22:4 115:12 143:4
**lawyers** 129:3 161:22
**leading** 93:11 121:14
**learning** 46:14
**leased** 68:19,20
**leases** 27:3
**leasing** 68:22
**leave** 7:9,11 15:2 37:3
**leaving** 7:16
**left** 107:17 139:1 171:13
**legal** 3:10 5:13 79:13 80:3 85:17,19 98:2,2 108:20 111:8 112:5 114:18,18 128:15 172:10,10 176:20 177:17,18
**legally** 63:16
**legitimacy** 164:21 178:23
**legitimate** 114:9
**length** 108:13
**lengthy** 15:12
**let's** 14:24 16:8 18:23 19:2 63:11 75:20,20 94:9 116:24 135:22 160:7
**letter** 9:21,21 18:2,11 19:8 19:15 46:7 91:5,5 134:8 144:13,22 145:7,7,10,14 145:16 146:2,6,8,10,12,13 147:11,23 148:2,6,8,9,12 148:16,18,22,23 149:5,7,9 149:9,13,14,19,20 150:6 150:10,20,21 151:10,17,20 152:6 153:4,6 154:4 155:7 156:8 157:9,11,15 158:23 159:2,6,15 160:7,9 161:15 161:25 163:2,7,17,17,23 164:3 168:2,10
**letterhead** 25:14 45:22 150:5 155:6
**letters** 148:24 149:6,7 150:11,13,16,17 151:8,19 163:25 164:1
**Leung** 3:4 4:4 5:18,18 6:2,7 9:7 14:23 15:9 17:19 18:5 18:17,24 19:2 25:9 26:1 30:21 44:15,19,22 45:20 47:15 50:7,19 55:20 57:10 58:7,12 61:1 62:9 64:16,20 64:21 65:5,9 66:20 70:11 70:14 75:20 76:3 77:11 81:10,11 91:20 92:1,5,9 93:6 94:3,9,12,17 95:18,24 97:14 100:3,7 105:18 108:18 109:18 110:7 111:19 113:4,11,14,16 116:13,24 117:6 127:14 129:15 134:5,10 137:4,8 137:14 143:19 145:13 146:20 147:6,12,17 150:4 151:16 154:16,21,24 155:3 156:5 158:9 164:6,22,24 165:1,2 167:25 169:10,12 169:16,18,21,25 170:4,6,8 170:11,17 173:23 175:16 175:19,22 177:1,4,7,11,16 177:19 178:1,5,9,19 179:4 179:5,14,19,22,24 180:2,8 180:11,14,23 181:6,16,20
**level** 14:3
**Levin** 31:2 137:21
**Levine** 31:1,1 74:4,4,8,21 75:3 117:21,23 119:4,10 119:10 121:3 129:18 130:2 131:16,17 132:10,22 134:13 135:1 137:17 138:12 139:4 141:17,25
**Levine's** 138:6,6 141:7,15
**liability** 47:17 50:11,24 57:16 70:20 124:23 179:12
**lie** 132:22 136:19
**Life** 141:4,5
**Lijun** 176:7,19 178:13 179:5
**liked** 119:25
**likelihood** 147:14
**lily** 154:22,24
**limit** 13:22
**limited** 27:5 47:17 50:11,24 57:15 70:20 124:23 181:15
**line** 71:21 73:11 81:23 110:12,23 111:19 112:17 115:9 152:16 176:23 179:9 185:4
**lines** 115:20
**LISA** 1:8 2:8
**list** 18:25 44:18,22 45:3 78:18 133:5 168:12,15 169:4,7,8 171:8,10,14 172:8,12 174:11,17,21
**listed** 89:7,9,22
**Listen** 95:4
**listing** 138:12
**litigated** 177:10 178:16 179:3
**litigation** 148:7,13 181:14
**little** 11:1 16:10 33:15 63:4 103:17,18,25,25 139:7 144:14 169:1
**Liu** 1:7,17 2:7,18 4:3 5:5,6 5:24 6:8 7:3,25 9:1,18,22 10:4 13:21 15:9,19 17:2 25:19,19 30:16,21 44:22 45:3 50:14 51:3 55:11 57:18 58:12 62:3,9,14 64:13,21 70:14 71:10 75:6 76:3 94:1,9 95:13,18 99:21 99:21 105:18,22 107:7 108:19,25 109:18,24 111:20 112:24 113:17 116:7,13 117:6 126:16 129:23 137:14 142:17 143:22 146:17 147:18 150:19 151:16 152:10 155:18 156:14,24 163:16 164:7 165:4 169:10,14 170:17 171:6 175:22 176:7 176:19 177:12,16 178:10 178:13 179:5,5,24 183:4 183:17 185:2,3
**Liu's** 93:10
**live** 7:5
**lived** 54:1
**LLC** 1:9,10,11,12 2:9,10,11 2:12 27:8,9 34:3,12,13 35:2 47:17 50:11,13,24 51:1 57:15,17 62:18 70:20 70:21 124:23 150:7 155:8 155:10 156:9,11

**LLP** 111:8,8
**loans** 85:3,3
**local** 17:5 87:19
**locate** 73:1
**located** 6:8,9,13 32:21 101:13
**location** 96:16
**locations** 117:11
**log** 8:1
**logic** 151:8
**long** 6:23 12:13 17:10 24:3 29:24 30:2 32:7 38:18 43:13 59:5 69:11 86:25 94:13 101:25 102:15 106:16 126:1 136:8,8 149:21 181:9
**longer** 28:16,18 157:25
**look** 78:13,18,20,24,25 79:4 90:20,21 151:19 160:25 161:2
**looked** 52:7 79:2 80:11 81:21
**looking** 26:14 40:24 58:4
**looks** 57:19 141:7
**Los** 1:11 2:11 3:6 33:22 34:11 50:12,25 57:16 70:21 74:9 122:10
**loss** 91:6
**lost** 91:22 92:5 93:25
**lot** 12:16 28:16 76:22 84:8 90:16 114:19,20 147:4 164:15,19 177:24 178:24 178:24
**lots** 78:9 79:7,10 163:25,25
**louder** 127:10 169:1
**low** 80:22
**lower** 59:21
**LP** 27:9
**lunch** 12:22 120:5 131:23 132:6
**lying** 136:18

**M**

**M** 1:24 2:20 143:24 144:1 184:3,22
**MacKenzie** 130:14
**magnify** 174:8
**mail** 19:17,18
**main** 118:24 158:17
**maintain** 80:18
**maintained** 120:4
**maintaining** 80:20
**major** 73:10
**making** 11:24 16:7 88:14
**management** 27:9 53:6,13 88:16,18 119:25 120:1,13 130:13 161:16,16,18,19 162:8,11 163:3 164:9
**Mandarin** 67:24
**manufacture** 166:10,25
**manufacturer** 152:17
**manufacturers** 40:16
**manufacturing** 99:8
**March** 25:13 26:2 28:8,9,19 28:25 29:10,11 75:7,12 76:4,20,25 77:17 78:5 80:21 83:16,18,21,24 84:1 184:17
**Marcum** 21:15,16,21 22:6 108:15 109:10,13 111:7,13 111:24 129:5 155:6,20 156:8,22 157:1,9 158:23 159:2,8,16,22 161:18 162:4,15 164:4,4,7,11,13 168:3,10 173:25 175:6,23 176:9,14
**Marcum's** 159:12 163:19
**Marcum_CLiu_5724** 174:23
**Marcum_CLiu_5725** 175:2
**marked** 8:6,10,19 9:5 10:1 17:17 18:17 19:5,20 25:7 25:11 44:16,23 45:18,22 47:10,13 50:5,8,17,21 57:8 62:7,10 64:25 70:12,15,16 105:16,20 124:14 129:13 129:17 137:12,16 143:17 143:20 150:2 155:1,4 156:3,6 158:7,10 167:23 168:1 170:15,18 171:4 173:21
**market** 51:24 52:1
**marketers** 41:20,20
**marketing** 33:23 36:3 40:7 46:5 66:11,13 86:13 171:14
**marriage** 17:3 65:21
**married** 65:12,14,15
**master** 87:15
**material** 38:15 73:9
**materials** 127:3
**math** 77:2,5 78:12
**matter** 5:5 112:25 113:5
**matters** 53:13 63:17,19
**mature** 89:8,8
**Mayer** 111:8,14,24 112:7,9 112:12,17 113:24 128:16
**me.com** 27:16,24 28:10,24
**mean** 22:18 58:6,10 61:10 61:21 67:19 77:21 80:24 86:13 91:1,2 97:12 98:24 98:25 99:3 101:16 104:22 104:24 109:15 110:8 127:6 127:12 131:8 136:8 143:12 146:11 151:3,7 152:5 154:3 157:4 168:20 173:16
**meaning** 89:20
**means** 34:16 36:6 42:2 58:3 67:20 152:20
**meant** 133:20
**measuring** 167:6,10
**media** 88:12 102:20,22
**medical** 27:6,8 35:11,24 36:9 40:7,8,8,20,23 41:1,4 47:16 51:25 52:5,13 96:1 103:10,23 118:19,24 119:12,17,21 121:2,8,14 121:15 124:24 130:16,17 130:19 165:21
**meet** 32:22,24 33:12 40:5 41:12,14,21 68:9 70:4 102:3
**meeting** 32:25 40:15 131:23
**meetings** 32:22 40:3 59:6 66:24,25 73:6
**meets** 6:3
**members** 43:4
**memoranda** 27:3
**memorandum** 62:11,13 63:4,12 100:18 105:21 118:7 124:1,15,16,17 125:6,17 127:6,8,13 138:14
**memorializing** 172:16
**mentioned** 39:10 41:19 103:2 167:16,20
**menu** 167:13
**Merchants** 82:24 83:1,14,16 83:18,21,24 84:1,3,4,7,14 93:10
**merit** 180:25
**message** 94:1
**messages** 93:24 94:5
**met** 23:24,24 31:16 32:11 40:6,6,13,25 41:7,20,25 102:4
**meters** 96:10,10
**Mevion** 21:9,12 31:16 32:9 32:21 35:15,15 36:7,8,16 36:17,18,24,25 37:3,10,15 38:4 40:17 42:15,16 45:22 46:18,23 54:6,6,12,13 55:13 124:7 128:22,24 132:4 152:23 153:13 165:21,25 166:7,10,24 167:19
**Mevion's** 166:3,24
**Michael** 31:14,22 46:5 47:18 48:1,13 51:1 57:1 121:13 121:14,20,21,25 122:9,16 123:3,6,20 125:18,20 126:4 128:1,4 129:18,20 130:1,12,24
**mid** 117:25
**mid-sentence** 64:19
**middle** 31:25 87:21 88:3,11 95:20,22,22 96:20,24 97:1 98:3 99:7,8 101:1,7 112:8 112:14 120:25
**Mike** 31:15,15 32:10,12,24 33:11 46:7 58:24
**Miller** 111:8,13,24 112:7,9 112:11,17 113:24 128:16
**million** 23:7 48:7 53:20,24 54:1,5,9 58:21 73:17 75:13 76:7 78:1 79:19 81:3,5,14 82:1,18 83:20 85:11 87:11 90:4 100:15,17 132:4,11 132:20,21 134:14,16 138:25 141:19,20,21 142:1 142:4,15,16 143:2 145:21 146:1 154:5,8 165:11 166:7 167:14
**mind** 17:12 120:12 139:21
**mine** 101:24 175:15 176:8
**minute** 9:10 109:6
**minutes** 13:4 14:18,20 53:2 53:4 60:16 75:17,20 91:24 92:21 98:7 170:5,6,7
**misapprehension** 180:17
**misappropriated** 154:10,13
**misunderstand** 142:11
**misunderstood** 142:12
**model** 73:24
**money** 23:13 40:12,12 42:7 53:11,14 59:15 69:19 76:24 77:14 78:11,19,22 79:3,7,10,15 80:5,8,15 81:6 82:2,17 84:8,9,10,16 84:17,19,24 85:4,14 90:8,8 90:11,13,15,21 103:4 112:19,22 120:16,16 122:21,24,25 123:25 126:23,24,25 152:2 153:22 154:10,13 165:3 171:24,25 175:6 176:9,14
**Montebello** 88:1 103:1 140:4
**month** 26:3 108:16
**monthly** 69:4
**months** 141:22 142:24 154:7
**morning** 12:20 70:2 75:22
**motion** 105:23 152:12
**MOU** 43:13,15,16,16,19,25

44:9 62:14,23 63:13,15,20 63:22 67:4,6 72:16,21,22 73:8,25 74:5,12,12,13,18 74:18,20 103:19,20 118:10 119:20 123:16 140:1,7,13
**MOUs** 140:17
**move** 47:9 56:14,17 70:11 93:3 96:16 98:8 139:17 147:16
**moved** 97:7,16
**moving** 109:21 137:24 141:6
**MP** 27:8
**MPH** 27:8 117:6,13 121:8 122:4 124:22,23 125:7 130:6,8 131:18 138:10,15 155:8,10,22,25 156:9,11 156:15,19
**multiple** 79:16 126:2,21 127:1 150:16
**mumbling** 133:20
**music** 69:22
**Mutual** 63:15
**mutually** 53:22 61:13 163:7

**N**

**N** 4:1
**name** 5:12 23:22,25 31:1,1 34:14 35:16 37:25 55:24 56:8 69:20,21 71:2,7,9 101:11,18 115:12 117:16 119:24 122:11 123:13 143:4 158:18 171:18 176:1 176:2
**named** 101:23 184:7,11
**names** 55:23 86:12 115:7,8 140:24 142:22,25 143:5
**native** 161:7
**nature** 59:14,15 66:7
**near** 158:1
**need** 8:23 10:18 11:7 13:4 13:15 17:7,9 23:1,4 47:3 55:23 65:2,20 75:16 87:12 113:14 138:7 154:25 173:2 180:16
**needed** 22:2 86:21 98:9
**needs** 31:12 79:15 87:9 96:9 112:19 114:19 177:15
**negotiate** 38:9,19,22 58:22
**negotiated** 48:25 53:22 58:24
**negotiating** 49:16
**negotiation** 38:14 39:3,6 59:2,11
**net** 164:21 178:23 179:11
**never** 7:17,18 10:9,11 15:14 16:1,17 18:8 37:19,22 46:1 46:16,22,24 47:6 54:16 56:7 60:2 68:11,12 69:9 87:3 88:13 94:25 98:23,25 99:9,9,11 102:12,24 105:6 117:13 124:9 146:16,16 147:20 151:17,21 153:23 164:11 166:16,18 173:19 173:19 174:17,23
**new** 3:11 56:7 73:17 112:19 112:22 118:24 119:15 120:23 121:7,8,20,25 122:13,17 123:16,20,22,24 123:24 125:2 130:3 132:12 139:25
**Newark** 3:11
**news** 25:2
**nice** 68:7 158:25
**Niguel** 107:18
**nine-page** 50:8 57:12 70:17
**non-binding** 43:16 44:1,10
**nonprofit** 124:21,25
**nonstop** 13:3,18
**normal** 148:21 153:24
**normally** 87:10 145:7,11
**Notary** 183:23
**note** 4:21 173:1
**noted** 177:4
**notice** 10:1 134:8
**noticed** 96:16
**noticing** 5:17
**notwithstanding** 12:2 119:13 121:6
**November** 154:4
**Novodor** 31:22 32:12 118:14 121:10
**number** 5:8 6:16 15:20 27:2 32:17 59:21 77:13 114:14 114:14,15 142:18 146:13 159:11
**numbered** 174:22 175:2
**numbers** 71:24 76:23 109:14,15,17,19,22

**O**

**oath** 6:3 10:12,22 16:23 24:14 41:16 98:7 109:2 133:9,21 183:13
**object** 30:15 58:2 80:3 81:8 109:7 113:2,3,6 127:11 154:12,12 163:22 176:22 177:2 180:23
**objecting** 147:8,8 179:8
**objection** 12:1 92:20 99:22 108:14,14 110:3 147:6 164:10,10 177:4,11 180:25 180:25
**objectionable** 93:2
**objections** 11:24 12:3
**obligated** 63:16
**obligation** 19:21 82:6
**obligations** 23:12
**obsolete** 103:25
**obtaining** 74:17
**obviously** 100:1 152:5
**Occasional** 86:11
**occur** 173:4 176:12
**occurred** 167:3 173:10
**October** 125:9 129:17 145:21,25 149:18 150:5,10 150:11
**odd** 11:13
**offer** 59:8 122:8 127:3 183:12
**offering** 80:8 89:18 100:18 124:1 127:6,8,13 128:5,11 128:12,16,24 129:3,3,6 130:21 131:11,12 138:24 141:19
**office** 59:6 95:2 96:1 97:19 97:23 107:17 148:22 151:25
**officers** 58:25
**offset** 69:17
**oh** 7:13 9:3 12:20 17:3 18:8 35:14 41:3 48:8 54:17 55:8 65:15 68:22 69:21 88:13 101:24 103:7,19 105:3 108:21 111:5 134:1 139:9 142:25 145:15 147:19 157:4 158:14 165:10 171:2
**okay** 6:14,25 8:15,25 9:3,7,9 9:14,25 10:14,14 11:6,12 11:17,18 12:6 13:6,7,20 14:4,5,11,16,20,22 15:12 16:9,13,14,15 17:12,19 18:23 19:3,16,19 20:13 21:8 24:4 25:9,23 26:6,9 26:22,24 28:4,7 34:3,6,9 34:23,24 35:3,4 38:8 41:19 45:7,17 46:1,4 47:7 48:4 48:12,19,23 49:14,19 51:7 52:7,11 53:14,17 54:10,20 56:10 57:7 58:12 59:5,8,24 60:9,15 61:4,17,24 62:9 63:3,11 64:3,15,20 66:7,18 67:14 68:4,14,25 70:14 71:6,8,10,21 75:4,4,6 76:15 77:2 81:2,10 82:17 82:22 83:6 84:13 85:7,10 86:16 87:2,13,16,24 89:16 91:6,13 94:9,10 95:3 97:1 98:22 99:13 100:7,24 101:18 102:8,21 105:1,7 105:18 106:5,16,21 107:3 107:3 108:2,8,11,18 109:21 110:19 111:2,5 112:4,13,13,18,20 113:23 114:4,21 116:17 117:20 118:6,11,17 119:19,21 120:2,23 121:5,24 122:19 124:5 125:11,15,19,21 126:11,12 128:15 129:2 130:19 131:2,7 134:6,8,10 135:3,9 137:14 138:21 139:6 140:21 141:3,6,17 143:8 144:3,19,19 145:6 148:6 149:24 155:3 157:8 158:2,21 159:5,15 160:2 160:16 161:7,24 162:7,14 163:6,6 164:6 166:6 167:9 169:21,25 170:3 172:7,19 173:10,13,23 174:10,19,22 175:1,6 182:1
**old** 95:25 103:25 119:17 121:9 123:21
**once** 19:19 20:9 25:2 39:13 68:12,13 73:13 80:25 103:11 121:1
**oncologist** 121:4
**oncology** 119:5,5
**one-page** 129:16
**ones** 73:9,9 87:20
**online** 151:5,7
**open** 9:7,20 15:3 17:20 45:7 45:10 50:3
**opened** 9:4,19 18:4
**operate** 165:22
**operating** 34:11 42:8,11,24 43:3
**operation** 52:21,25 72:20 73:14 125:2
**operational** 100:8 121:10
**opposed** 126:18 130:10 138:15 180:4
**opposition** 105:23 152:12
**Optivus** 32:2 54:14 103:14 103:20,24 104:2,17 152:17 152:24 153:3,8,9,18 154:9 154:11 165:2,15,17,17 166:4
**order** 10:25,25 22:2 72:18 73:13 87:6 108:3 161:11 166:13
**ordering** 181:24
**original** 107:17 131:4 148:16,17,22,23 149:13,13 149:14 155:12 174:21



EXHIBIT 4

**outside** 15:15 161:9
**overseas** 83:20,23 84:14 85:8,13
**owe** 153:21 165:8
**owed** 77:11,14 81:6,17 82:1 153:5,19 165:6
**owing** 165:3
**owner** 52:17
**ownership** 117:13

**P**

**P** 62:14
**P-i-n-g** 141:2
**P.C** 3:9
**p.m** 2:19,19 5:2,2,12 15:5,8 75:24 76:2 92:12,17,17,19 117:2,5 170:14 182:5,6
**Pacific** 1:8,9 2:8,9 14:24,25 22:24 23:8 27:15 34:1,2,4 34:23 35:2 36:20 37:5 38:11 47:16 48:2,14,25 49:3,22 62:12,17,25 76:6 78:2 81:15 85:12,22 86:1 86:17 104:11 105:5 131:10 132:20 150:7 170:1
**page** 4:7 8:18 18:12 19:6 25:12,17 26:10 34:4,9 47:15,23 48:19 50:9,21 56:19,20 57:19 60:15 62:11 71:15 106:18 111:6 124:15 155:6 156:7,8 159:6 174:3,20,22 185:4
**pages** 9:10,12 18:2,3,9,19 62:21 174:6,14 175:2,3
**paid** 22:24 23:7 48:13 69:10 81:3,5,25 82:8,9 122:24 123:3,6 125:16,20 126:8 128:15 132:3 153:15 154:1 154:9 175:8,12,13,23 176:9,14
**pamphlet** 74:6
**paper** 152:9
**paragraph** 137:24 139:19 161:24 162:7
**part** 33:4 38:5 67:7 88:4 89:17 96:2,6,11 118:11,13 118:14,16 119:17 128:2,4 128:10,12,16 130:21 131:9 133:5 140:17 148:13 178:16
**partially** 100:12,12
**participant** 93:14,15
**participate** 120:16 139:11
**parties** 12:3 63:6,16,17,20 151:24
**parties'** 62:16 163:18
**partner** 52:17 89:15 102:13 105:8,9,14 134:13 158:14 158:19
**partners** 27:4 151:18
**partnership** 129:22 155:9 155:19,25 156:10,13,15
**party** 15:19 16:17 123:15 151:21
**Party'** 62:16
**Pass** 181:17
**passport** 6:24
**path** 166:15
**patient** 140:2
**patiently** 164:16
**patients** 72:19 73:16,17,18 74:9,11 88:21 99:13,24
**Patricia** 46:6
**pause** 92:13,14 94:13
**pay** 49:22 50:1 58:17 59:25 61:5,6 70:7,9 72:3 74:16 85:3,17 90:23 91:7,8,9 122:21,25 123:2,20 126:4 127:20 128:1,19,21 153:7 153:9,12,18,22 166:19,21 175:6,15 178:13
**paying** 69:18 70:8 165:9 179:6
**payment** 72:5 166:7 176:20
**PDF** 47:10
**PDFs** 44:24
**penalty** 24:15 183:5
**pending** 12:9 13:17
**penny** 90:7
**people** 23:2,3 25:22 40:7,8 40:14 41:1 68:22 73:18 79:23 88:8,12 89:20 103:24 105:12 114:19 126:4 128:13 136:3 145:9 145:12 160:24 165:18
**people's** 55:22 142:25 143:5
**peoples** 153:21
**percent** 32:13 53:18 58:19 161:12 164:20
**perform** 29:11 78:20 159:17 160:2 161:16,18
**performance** 72:10
**performances** 72:10
**performed** 167:10
**period** 31:24 36:11 108:15 135:4 181:7
**periods** 134:22,22
**perjury** 24:15 183:5
**permit** 87:16
**person** 30:25 31:4,20 35:15 36:14 44:11 59:3 90:6 101:23 109:14 110:20 117:16 161:2,13
**personal** 75:14 76:7,9 82:18 82:19,23 83:9,13,15,17,19 83:22,25 84:2,4,6,10,13,21 86:22 93:10 102:10 150:24 154:8 157:14
**personally** 108:2 154:7
**perspective** 119:8
**Petitioner** 171:18
**phase** 88:6
**phased** 88:6
**phone** 26:14,16,17 32:17 56:1,5,5,7 59:3
**phrased** 11:13
**physically** 6:8,12
**physician** 35:22,23
**physicians** 161:22
**pick** 54:5,12,12
**picked** 54:6
**pictures** 73:5
**piece** 25:14 91:4 99:2
**Ping** 17:2 140:10,10 141:2,2
**pissed** 120:21
**place** 167:20 184:11
**plaintiff** 1:5 2:5,18 3:3 5:18 5:25
**plaintiff's** 4:21 105:23
**plaintiffs** 5:20
**plan** 54:7,8,10,13,15,18,21 55:2,4,12,21 96:17,22 100:21 103:22 115:13 117:9,12 118:5 120:12 121:16 130:20 131:2,2,3,4 131:9 152:22
**planning** 87:15 96:15,15 153:12
**plans** 124:9 130:25
**platform** 73:20
**Plaza** 3:10
**please** 5:15,22 9:8,23 11:9,9 11:9 12:7 15:1 18:12 44:12 45:7 50:3 64:12 65:6,24 76:11 139:21 141:9 163:14 176:3 177:1,5 181:25
**pleased** 61:9,12,15,15,21,22
**plural** 107:6
**plus** 36:18 69:18 153:13,23 165:21
**point** 9:15 28:1 33:13 163:8
**points** 105:22 159:11
**policy** 154:23
**pop** 45:1
**position** 80:5 140:21 154:14 154:15
**possible** 70:5 160:1
**possibly** 96:18 125:20
**potential** 37:23 66:23 68:2,9 100:19 103:13 120:18 124:10 134:12 143:9 151:17 152:7,7
**potentially** 38:4
**power** 43:9,11
**PPEB-5** 149:19
**PPEB5** 22:15,22 23:6 27:14 35:3 62:25 104:8,11 124:2 145:17 171:11,15
**PPT** 68:1
**PPTRC** 27:7
**practice** 61:16 143:8
**pre-file** 67:7 168:13
**pre-filing** 15:16 133:5 168:16
**precise** 55:7
**precluded** 104:15
**preliminaries** 15:13
**premarked** 4:21
**premise** 30:20
**preparation** 21:22 130:20 160:18
**prepare** 87:12 110:4 131:8 145:14 159:16 162:23 170:17,23,24
**prepared** 15:10 100:22 107:24 109:10 155:10 156:11 162:24 169:7,8 171:8
**preparing** 159:22 160:10 162:1
**Presbyterian** 122:11
**present** 66:22 92:16 93:18 150:8 154:15 175:16
**presentation** 67:24
**presented** 30:18
**preserve** 28:11,15 29:2
**president** 66:10,10 71:9 117:19 122:10 130:5
**prestigious** 30:10
**pretty** 154:16 159:20
**prevent** 13:22 104:18,23
**previous** 17:3 54:13 116:15 125:14
**previously** 27:12 60:2 70:16 124:8,14 129:16 140:22 143:20 170:18 171:4
**print** 172:11
**printed** 172:23
**prior** 9:5 17:17 25:7 45:18 47:13 50:5,17 57:8 62:7 70:12 105:16 129:13 137:12 143:17 150:2 155:1 156:3 158:7 167:23 170:15 173:21 175:9 184:6

**private** 34:25 41:24,25 42:2 100:18,25 101:2,5 124:1 127:5,7,13 134:4 139:9
**privilege** 180:5,18
**probably** 142:13 149:11,20
**problem** 26:23
**problems** 92:2
**proceed** 15:10
**proceeding** 15:20
**proceedings** 5:1 92:13 164:18
**process** 96:5,6
**produce** 29:2,20 30:7,12,19 73:3
**produced** 30:5,17 67:6 108:17 148:7,8,11,13 173:13
**producer** 69:22
**producing** 30:22 31:8 168:12
**product** 31:18 36:18 73:11 73:13 74:6
**production** 28:12 115:19,25 140:17
**products** 103:22
**professional** 89:20 94:22 107:20 110:19,24,25 111:3 111:4,5,7,20,23 113:25 114:8,10 119:8 160:24 162:1 163:12,13,15 164:7 164:12 175:9 179:6
**profit** 179:12
**profits** 164:21 178:23
**program** 80:1
**prohibited** 162:1
**project** 23:13 33:22 34:15 34:16,16,22 35:6 36:9 37:24 39:12,22 40:10,13 42:2 43:14 49:17 50:1 52:5 56:6 59:13 61:20 62:12,18 62:24 63:21 66:19,21,23 67:22,22,25 72:17 73:11 73:12,14,15 74:7 79:4,8,8 79:19 82:5 85:5 88:13,14 88:20 89:14,21 90:5,5,9,14 91:7 95:23 97:16,16 98:23 99:3,14 100:8 101:6 102:16,18,19,25 107:5 109:23 117:10 118:17 120:18 122:4 123:8,9,10 123:11,12,13 125:24 126:16,17,19,20,22 127:18 128:8,18,21,23,25 129:1,8 131:3,25 135:19 140:3 149:8 152:4
**project-related** 40:14
128:20
**projects** 39:15 126:1,2,13 126:22,22 127:1 128:6,9
**promote** 66:20 67:20,21,22 104:23 139:23
**promoter** 35:12
**promoting** 66:19 135:17
**pronounce** 69:1 71:1
**property** 87:3,5 88:1 95:10 97:25
**proposed** 59:22 122:17 124:19 129:22
**proposing** 118:23 119:1,2,2 119:3,11
**propounded** 115:16
**propriety** 180:3
**protect** 180:17
**proton** 1:8,9,10,11 2:8,9,10 2:11 22:25 23:8 27:7,14,15 31:25 33:22 34:1,2,4,12,13 34:20,22,23 35:2 36:3,20 36:20 37:5,6,23 38:11,12 39:11 40:18 42:5,6,9,24 43:5 44:5,7 48:2,14 49:3 49:17,22 50:1,11,12,23,25 51:9,19,22 52:18 53:6 56:6 57:5,15,17,25 60:4,11,18 62:12,17,24 63:1,1 64:5,10 64:23,24 65:23 66:9 70:19 70:21 71:12,17 73:11 74:16 75:13 76:5,6,15 77:24 78:1,2 81:6,15 82:1 85:12,12,22 86:1,18 87:2,6 87:10,13,25 95:2,6 96:9,24 97:20,23 98:22 102:25 103:12 104:3,11 105:5 107:5 109:23 117:10,14 118:2,17 119:15 121:10 123:7,15,17,19 125:2,11 130:10 131:10,18 132:19 132:20 138:7,9,15 140:3 150:7 152:18 153:4,7,9 162:14 165:3,8 166:2,6,10 166:11,25
**provide** 9:15 30:9 31:12 114:13 143:8 144:9,11 145:16 146:6 156:23 157:2 169:2,3 172:13 173:1
**provided** 19:22 53:2 63:14 64:23 67:9 74:7 75:1 100:18 115:24 124:2,9 166:24 168:16 173:19,19 174:17 175:5
**provider** 55:13 104:2
**providers** 27:6 114:10
**provides** 159:15
**providing** 64:4 133:4 173:15
**provision** 43:19
**provisions** 43:24
**PT** 2:19,19 5:2,2
**public** 35:20 124:21,25 183:23
**pull** 8:2,13 78:22 149:25
**pulled** 19:3 50:15 81:14 154:7
**purchase** 152:23 153:24
**purported** 57:24 58:2,6,7
**purpose** 79:25 152:1,5,9
**pursuant** 10:1 122:21 123:1
**pursue** 103:16
**pursuit** 103:18
**put** 8:23 78:15 80:4,13 82:2 82:8,8 92:20 94:7 135:15 146:12 154:19 166:13 168:19
**Putting** 114:6
**PWC** 130:15

## Q

**quarter** 48:7
**question** 11:12,15,16,20,21 12:9 13:17 16:11 23:5,5 25:16,21 26:1 30:16,20 31:6 47:1,3,21 51:4 64:11 64:12,13,17 65:2,5,7,17 81:8,9 84:23 87:24 94:13 95:4,15,17 97:12 98:3,4 99:16,19 100:1,2,3,4,5 104:19 109:3 110:3,15,16 110:22 113:2,3,6,17,21 115:22 121:23 125:5,14 127:12 131:19,20 133:8 136:17 138:21 142:9,11,12 143:14 146:19,25 147:3,10 157:24 163:16,22 164:11 164:17 166:10 177:8,9,12 177:15,16,20,21,23 178:8 178:18,22 180:7,21 181:13
**question's** 136:22
**questioned** 93:5
**questioner** 133:10
**questioning** 81:23 137:3 176:23 179:9
**questions** 9:14 11:8 12:3 14:14 34:17 81:13 92:24 93:1 100:6 131:22 136:16 136:21,24 137:5 138:2,3,6 139:3 141:7,10,15 164:20 178:24 179:2 181:16,18
**quick** 13:9 47:20
**quickly** 10:17

## R

**R** 98:13,18
**radiation** 119:5 121:4
**raise** 36:4 39:11,12,13,22 79:21 80:5,8 86:14 100:10 100:24 101:2 103:4 133:18 136:25
**raised** 53:19 58:20 100:13 100:16,17,21 109:1 138:24 141:18 152:2
**raising** 67:16,17 79:25 133:15,24 134:3,9
**range** 36:22
**razed** 95:8
**reach** 140:1
**reached** 53:19 58:20
**reaction** 49:10,11,12
**read** 27:10 46:15 64:17 65:2 65:5,7 77:16 92:15,24 129:24 136:7 161:11 164:1 180:16 183:5,7
**readily** 146:24
**reads** 46:7 50:10,22 53:18 58:15 62:13 70:18 72:2 124:16 155:9 156:10
**ready** 87:16 99:6 132:25
**real** 47:20 58:9,11 139:23
**reality** 90:20
**really** 83:4 135:4 164:18
**reason** 30:6,8 39:23 149:4 166:5 185:5,6,8,9,11,12,14 185:15,17,18,20,21,23
**reasonable** 147:14
**reasons** 81:1
**recall** 15:17 27:16 28:1 30:21 31:7 33:9,10,17 39:2 39:5 40:4 42:11,17 49:15 49:25 80:23 81:23 82:22 82:24 86:16 106:11 114:17 117:22,25 118:3 123:3,6 124:3 133:4,11,21 139:3 149:21 154:6 156:22 157:1 157:8 168:12
**receipts** 78:13 79:2,3,5,11 79:11 80:12
**receive** 49:20 51:15 58:15 69:8 72:2 101:5
**received** 7:25 8:5 18:8,9 19:17,17,20 20:9,21 78:23 79:9 106:9,11 149:13
**receiving** 20:1 21:20 24:6 24:21 28:9,24 81:15 134:7 142:11
**Recess** 15:6 75:25 117:3 170:12
**recognize** 26:4 51:5 62:20

62:22 89:16 120:17 171:6
**recollect** 14:6
**recollection** 7:1 17:10,14,16 30:2 37:4 38:2,3,6 83:9 101:19
**reconnect** 92:1
**record** 5:12,16 6:24 9:1 11:3 11:24 14:24,25 15:4,7 19:6 24:2 35:20 45:20 50:19 56:12 57:12 75:21,23 76:1 92:9,11,16,18,21,25 93:4,7 93:13,23 94:3,8 116:24 117:1,4 151:12,12 152:10 155:5 156:6 169:24,25 170:13 171:3 182:4 184:14
**records** 65:25 75:11 76:3 78:20 108:3,5,6,7,8,12,15 108:17 114:13,13 115:4,5 132:17 146:24 148:15 151:14,15,15
**rectangular** 93:15
**reduced** 54:8 184:12
**refer** 35:3 115:8
**reference** 111:15 145:9
**referenced** 41:24 116:14
**referral** 140:3
**referred** 162:11
**referring** 34:1,5,15 72:22 77:16 123:12 130:23 134:3 134:21 135:5,10 172:15
**reflect** 53:5 114:14 132:17
**reflected** 114:1 156:16
**reflects** 144:20 150:8 163:18
**refresh** 18:12,20 44:25 83:8
**refresher** 10:18
**refund** 172:16
**refunded** 172:14
**refusing** 178:10
**regarding** 30:4 62:24 63:24 64:1 129:22
**regardless** 61:4 144:23
**Regenstreif** 3:5 5:19,19 10:16 133:10
**Regional** 1:9 2:9 22:25 23:8 27:15 33:23 34:1,3,4,23 35:6 36:20 38:12 47:17 48:2,14 49:1,3,15,22 62:17 63:1 75:14 76:6 78:2 79:23 81:15 85:12,22 86:1,17,18 104:8,11 112:19,20,22 114:19 123:10 125:20,22 125:23,23 126:9,10,10,13 126:14,15,18,20,24 127:22 127:22,23 128:20 129:10 131:10,24 132:20
**regret** 89:5 91:13
**regrets** 89:19 90:18 94:20 94:20,24 160:23
**regular** 145:4
**regulations** 23:18
**regulator** 20:2 21:5 24:10 135:25
**regulatory** 22:12
**reimbursement** 78:10
**reiterate** 13:15
**rejoin** 94:2
**relate** 128:18,19
**related** 40:14 45:24 102:17 167:2
**relation** 105:4
**relationship** 37:13 97:4 102:9,10,11 120:4,8
**relative** 38:5 62:1,5 146:23
**relatives** 85:6 90:9
**relevance** 180:8,14
**relevant** 177:3 179:11,17
**reliability** 146:21
**relied** 107:19
**relying** 32:8
**remain** 139:2 142:1,10
**remand** 164:18 175:9
**remember** 6:23 22:9 23:25 24:2 30:2 31:10 33:5 35:16 38:18 39:1 41:5,18,18,23 43:1 44:2 47:22,24 50:3 55:8,9 60:22 61:2,5 65:24 66:4,6 67:10 69:21 73:7 81:17 82:19 83:5 84:8 86:11,19 90:7 101:22 106:10 115:11,12 122:11 123:2,9 125:15,19 131:19 133:13 135:4 136:12,14,18 139:5,8,9 140:10,23 141:17 142:25 143:5 144:21,21 145:1,2,6 146:3 146:4 149:10 150:15 153:6 153:15 157:6 172:5,25 173:12
**remembered** 31:11
**remembering** 55:22 66:1
**remote** 1:17 2:17 6:3
**rendered** 176:21
**rent** 68:25 69:4,8 70:7,9
**rented** 68:16,18
**repay** 85:6
**repeat** 46:21 64:11 81:12
**rephrase** 179:10
**report** 55:1 79:14 114:21
**Reported** 1:24
**reporter** 2:21 5:13 10:7,19 25:19,20 55:17 60:23 64:18 66:17 70:10 77:8 92:24 111:18 116:12 145:5 151:13 169:17 181:23 182:1 184:4
**reporter's** 16:8 184:1
**represent** 5:16 103:14,21,21
**representation** 80:4 134:12
**representative** 39:21 122:13 122:17 129:21
**represented** 93:4
**representing** 30:23 31:17
**reproduced** 29:8 141:11
**request** 112:5 145:15 150:16,19 170:24
**requested** 92:14 150:16 182:7
**requesting** 112:8
**requests** 29:2 115:17,18
**required** 12:4 26:11,25 183:20
**requirements** 6:4
**research** 51:24 52:1
**reserve** 93:3,19
**reside** 7:2,4,8
**residence** 6:18
**residents** 62:15
**residing** 7:12
**resolutions** 53:5
**resolved** 92:10
**respect** 36:5 37:13 48:25 59:9 62:17 63:16,19 89:17 94:16 104:3,16 118:7 119:14 125:1 178:7,23
**respond** 11:7,9 12:4
**response** 14:14 30:5,22 31:9 142:1
**responsibilities** 66:8,13
**responsibility** 143:12 159:10,12
**responsible** 66:14,18
**responsive** 28:10 29:1,17 116:10
**restitution** 179:12
**result** 38:4 160:17
**retain** 46:9 121:1
**retained** 21:16 54:25 121:16 155:16
**retainer** 175:14
**retired** 158:15
**return** 7:18 155:15,19 156:12
**returned** 7:17 171:24,25 172:6,25
**returning** 93:11 113:23
**returns** 155:10,13,25 156:10 156:15,19 173:3
**revenues** 100:8
**review** 28:23 29:5 106:14,15 106:16 107:1,13 159:17 160:3,12 181:20
**reviewed** 106:3,22 107:9 108:3 109:8 110:11
**reviewing** 93:1
**revised** 54:15,18 55:3,21 124:9
**rewrite** 55:1
**rewritten** 54:15
**rewrote** 54:7,10,25
**rich** 60:19
**right** 9:12,13,18 10:12,14 11:23 12:11,19 14:16 16:18 17:4 18:14 21:10 23:2 24:14,16 27:10,20 28:5 33:15 34:2,9,13,19,23 34:25 35:5 39:24 44:11,20 45:12 46:23 47:8 48:7 49:1 51:13,17 52:9 53:7,11,15 54:22,22 59:24 60:4,7,13 60:21 61:2 63:3,9 67:12 68:12,15 70:14,24 72:5 74:2,18,22,24 76:13 80:1 81:4 82:3,9,19 83:10 85:8 87:1 93:3 94:12 95:2 98:23 99:11,14 100:11,22 104:5 104:8 106:23 107:10 108:9 108:19 109:1 110:20,23,25 112:4 114:1 118:20 119:18 126:9 127:6 128:17 129:24 130:21 131:11 136:1 137:8 137:20,20 139:14 141:6 142:2 145:13 147:2 149:11 149:22,24 152:25 157:17 159:8,13,19 160:3,20 162:12,22 163:20 166:7,13 166:16 170:7 171:17,18 172:5 173:14 174:11 175:16
**rights** 93:20
**ring** 101:18
**risk** 90:6,7,10
**Riverfront** 3:10
**road** 6:16 96:18
**role** 67:16,17 119:12 126:14 126:17,20 131:6,24,25
**rolled** 112:16
**round** 76:23 78:16
**Rule** 6:4
**rules** 10:17 89:7,11,22
**run** 89:9,22
**running** 164:19
**Ruth** 31:21 32:6,9 89:13 91:3 98:17 118:14 120:1

121:9

S

**S** 3:5
**salary** 48:6,13 51:15,25 52:4 58:16,18 72:3,8 84:22
**sales** 31:17 35:24 36:4 46:5
**Santos** 143:24 144:1 145:14 146:15,22 147:18
**sat** 10:9 15:14 16:1 17:12 80:11 164:16
**satellite** 102:20,22,22
**save** 46:25 47:1 183:9
**saw** 47:9 77:17 144:8 148:22 149:14
**saying** 53:8 55:6 68:20 94:7 108:23 110:12 112:11 127:2,7,12 136:4,24 148:16
**says** 45:23 47:15 48:6 51:14 57:14 145:20 150:5 154:6 156:7 159:6 160:9 161:15 161:25 163:2,23,23 164:3 164:3
**schematic** 36:11
**school** 161:6
**SCMPH** 27:9,9
**scope** 163:19 165:13 177:24 179:18 181:14
**screen** 8:2,12,14,16 9:19,20 17:20 18:22 19:3,4 25:10 45:12 47:8 57:11 92:5 93:14,16 105:19 143:21 149:25 158:10
**Screens** 158:3
**screw** 89:14
**scroll** 106:21 155:17 168:6
**search** 28:10 29:11,16 30:14
**searching** 31:7
**season** 33:6,7,8
**SEC** 5:6 8:5 10:8,10 16:19 16:20 19:20 20:10,20 21:4 21:13,20,23 22:7,11,16 23:14,23 24:6,21 26:7 28:8 28:9,12,25 29:17 30:5,22 31:8,11,12 49:6,8 67:7 75:7,10 78:23 81:16 88:18 89:12 93:6 108:16 115:25 124:8,11 133:22 134:8,8 134:11 135:1,2,6 139:12 140:19 147:20 148:3 160:1 160:4,9 166:14 168:13 170:24 173:8,15 185:3
**SEC's** 15:15,16 90:22 115:18 152:12
**second** 6:15 8:22,24 26:6 49:19 54:24 55:25 95:14 107:7 115:18 117:10
**section** 26:10,24 48:4 51:14 53:17 58:13 63:5,8,11,12 63:22 72:1
**Sections** 63:14
**secure** 37:23 140:6
**secured** 142:8
**securing** 140:7
**securities** 1:4 2:4 3:4 19:8 19:22 20:2 21:5 24:10 25:13
**security** 142:7
**see** 8:16,18 12:18 13:25 14:2,8,9,9 18:18,22,23,24 18:25 19:3,7,13,14 22:10 22:10 25:15,16 26:10,11 26:11,24 30:1 44:2,16,18 44:20,22 45:2,3,5,9,12,24 47:7,21 48:8,8 49:14 52:22 56:20 63:6 69:15 74:8 77:15 78:12 83:6,8 106:5,7 106:8 111:8,8,11,11,21 117:25 128:7 130:13 135:22 137:18 141:9,11 144:3,13 145:22 152:16 158:21 171:1 175:17
**seeing** 18:15 73:7 93:19 153:6
**seeking** 46:19
**seen** 9:22 19:11 26:5 46:1 53:24 91:4 105:25 106:3 109:7 115:18,19 143:22 144:5,6 168:5 174:6,12,13 174:14,17,20,24 175:3
**segment** 92:15,17
**selecting** 31:24,25
**self-dealing** 38:5 62:4
**sell** 31:18 103:15,21
**seminars** 66:22
**send** 56:13 72:19 73:1,5 74:10 76:24 84:12 93:24 112:5 115:14 116:16 132:25 148:21 166:22 172:9
**sending** 137:23 174:1
**senior** 35:14
**sense** 8:13
**sent** 18:1 25:4 26:7 73:22 75:2,2 76:7 83:12,14,17,19 83:22,24 84:9,9,13 85:13 91:24,25 94:1 108:6 129:18 140:19 145:15 149:14 151:21 167:4,5
**sentence** 46:12 57:14 62:13 70:18 106:20 159:13 162:7
**separate** 97:24 98:9
**separated** 37:9,15
**September** 17:1
**series** 77:25
**serious** 46:8
**serve** 95:1
**served** 153:3 154:3
**service** 8:1,19 114:10
**services** 50:2 156:23 157:2 159:18 175:9 176:20
**set** 41:5 63:18 112:19,22 115:18 117:9 125:23 150:9 157:11
**setting** 151:11
**settled** 17:11
**seven** 12:15,18 181:5
**seven-hour** 181:6
**seven-page** 124:14 137:15
**shake** 69:24
**shape** 120:3
**share** 8:12 19:2,4 105:19 171:2
**shared** 25:10
**shareholder** 42:6
**sharing** 8:1 47:8
**Sheen** 71:3,4
**sheet** 74:6 183:11 185:1
**shell** 117:8 156:20
**shook** 61:8
**short** 13:2 170:2
**shorthand** 2:21 184:3,11
**show** 30:10 47:23 50:16 75:12 76:4 137:6 143:12 143:19 144:23 145:8,9,11 151:25 152:2 155:3 156:5 174:10
**showed** 34:7 66:14 74:5,5 144:22 151:24 174:6
**showing** 25:10 45:20 50:7 62:9 68:1,1 70:15 105:19 143:10 145:6 152:10 167:25 171:3 174:23
**shown** 91:11
**shows** 86:7
**shrugs** 11:8
**side** 31:17 35:24 71:21,22 104:1,15 174:21 175:5
**sign** 43:9,12 61:18 82:13 98:20 153:15,17 181:20
**signature** 48:21 56:19 57:21 60:15 168:5,7 182:7
**signed** 36:7 37:2,4 38:10 39:25 40:16 42:8,20,23 43:9 44:4,9 48:23 51:6 56:22 57:1,20 58:5 60:12 63:19 64:2 67:4 71:16 72:16,21,24 74:12,13 103:19 118:10 119:20 130:5 132:23,24 140:13 153:23,25 155:13 158:22 159:2 163:7,8,17 165:12 165:12,18 168:3 172:24 183:17 185:24
**significant** 73:9
**signing** 157:8
**SILLS** 3:9
**similar** 71:9
**simply** 126:23
**single** 30:22
**sir** 13:1 16:16 18:12 19:3,11 23:5 24:13 26:12,14,20 27:10,17,22 29:3 31:3 34:17 43:20 45:2,24 46:15 47:3,21 56:1 57:20 58:7 62:22 65:3 66:3 73:4 78:4 94:5,18 95:4 113:5,12 137:9 146:8,10 168:4,7 171:20 177:1,5
**sister** 31:20 118:14 120:1
**sit** 7:1 16:25 78:13 90:22 148:16
**site** 8:2 90:23 94:25 96:13 96:18,22 97:4,5,8,9,16 99:3,6,8,14,20 122:4 165:16 167:1,6,9
**sites** 98:23
**sitting** 31:6 87:11
**situation** 46:7 90:22 142:21
**six** 12:18 83:18 142:24
**size** 52:5 90:5,6
**Skanska** 165:3,8,10,10,10 165:15,24
**skill** 135:9,10,16
**small** 14:8
**soliciting** 137:1
**somebody** 52:8 90:1 99:3 110:6 123:20 136:25 161:8
**somebody's** 136:7
**soon** 46:13
**Sooner** 90:24
**sophisticated** 91:14 166:2
**sorry** 7:10 16:3 39:4 41:13 50:15 62:6 69:25 71:1 75:16 78:4 82:15 89:2 91:18,19 104:9 113:1,13 121:22 122:15 133:7,20 135:14,24 146:9 148:5 158:2 167:18 168:25 171:2 180:7
**sort** 76:23 82:2 101:20
**sorts** 121:16
**sought** 37:22

**sound** 12:11
**source** 162:2
**Southern** 5:8
**space** 32:5 96:10 103:10
**span** 76:22
**spanning** 108:12
**speak** 9:2 11:2,2 38:21 74:12,13 90:23,24 127:10 146:17 169:1 173:6 175:19
**special** 73:10
**specific** 110:15,16
**specifically** 22:9 63:14
**speculate** 110:6
**speculation** 29:23
**spell** 140:24 176:1
**spelling** 67:12
**spend** 79:15 84:25 85:2 90:7 112:21 139:22 172:11
**spending** 164:18
**spent** 59:16 79:3,10,18 85:1 85:16 87:14 88:14 164:15 177:24
**spin** 135:15
**spoke** 79:12 105:2 147:18 147:21
**spoken** 147:19
**spouse** 65:9
**spring** 85:8 124:11 133:12 168:22,24,24 169:5
**stage** 85:4 168:20
**stages** 165:14
**Stan** 158:12,13,14,19 173:25
**standard** 38:17 52:4 157:21 159:20 160:15
**standards** 162:1 164:7,12
**standing** 166:13
**start** 22:2 23:4 32:17,17 36:10,19 59:9 79:8 90:9,14 97:3 133:17
**started** 14:18 32:23 39:25 43:14 59:13 81:13 88:13 88:21 96:11 120:2 147:20
**starting** 5:16 9:15 87:18
**state** 5:16 62:15 184:4
**statement** 108:22 160:19
**statements** 159:17,22 160:10
**States** 1:1 2:1 3:4 5:7 6:21 6:22 7:2,5,6,8,9,11,16 19:8 21:5 68:9 89:25 112:20
**stating** 112:5
**stay** 29:7
**steady** 73:15
**step** 137:25
**Steve** 79:19,21,22
**stipulate** 6:2,5
**stop** 25:5,6 94:1 178:18
**stopped** 87:23 124:7 133:15 133:24,25 134:1,8 139:13
**stored** 46:10
**story** 59:12
**strain** 58:14 137:9
**strategy** 59:11
**Street** 3:5
**strength** 68:3
**strike** 93:3
**string** 137:16,19 158:11,22 173:25
**structure** 95:24 96:3
**stuff** 40:22 85:18 130:17,18 130:19 158:4
**Subject** 92:25
**submit** 131:9
**submitted** 106:23 109:11 152:11
**subpoena** 19:20 20:1,7,9,20 21:20 22:13,16 24:6,22,25 26:6 28:8,9,25 29:10,19 30:6,22 31:9 75:9 78:23 81:16 134:10
**subpoenaed** 21:4,13,23 22:10 49:6 75:6 160:8
**subpoenas** 75:8
**Subscribed** 183:21
**subsequent** 24:21 63:23 81:22 134:20
**subsequently** 22:11 118:6
**substance** 46:17
**substantial** 23:13
**successfully** 67:2 72:14 100:10 140:13
**successive** 175:1
**sugar** 13:14 14:3
**suggest** 170:2
**suggesting** 94:6 161:21
**suggestion** 137:4
**Suite** 3:5
**sum** 80:14
**sums** 23:13 78:7
**Superior** 15:20,22,23 16:18 17:1,5
**suppliers** 41:4
**supplies** 41:1
**supply** 22:3 40:7
**support** 73:2 138:2 147:3
**supporting** 40:20,23 97:20 149:7
**supposed** 166:22,22
**Supreme** 175:10
**sure** 9:17 34:2,8,10,21 58:3 58:10 67:11 81:9 85:10 94:11 97:12 110:13 115:5 127:12 129:1 151:23 167:15 169:2 181:10
**suspend** 25:5
**SVP** 46:5
**swear** 5:22
**swoop** 80:17
**sworn** 5:25 10:6,23 16:16,22 28:4 33:11 47:5 55:11 81:25 108:22 183:21 184:7
**system** 31:25 42:16 54:14 103:15,24 104:2,24 165:25 166:11,16,25 167:1,1,2
**systems** 103:15,22

**T**

**table** 132:12
**take** 11:25 12:7,8,14,22 13:2 13:7,15 72:22 75:20 86:22 90:6 94:22,22 106:16 109:12 113:11,16,20,21,22 126:11 157:25 167:9 170:2 173:1 177:17 179:24
**taken** 2:18 184:10 185:2
**taker** 90:10
**takes** 87:10
**talent** 143:6
**talk** 52:18 70:6 109:22 121:22 138:2
**talked** 63:3 64:25 105:6 139:7 152:13 165:2
**talking** 8:7 42:7 46:19 77:16 95:3 113:18 130:23,25 135:16,17 152:24 173:16 175:10,11 178:3
**tangible** 99:2
**tasks** 159:13
**tax** 21:22 155:25 156:15,19 157:14
**Taxpayer** 156:8
**team** 89:20 94:22 167:5
**technical** 166:5 167:4,5,5 181:7,11
**technology** 104:1
**tell** 11:15,19 20:3,4,6,8,10 20:11,19,22 21:3,6,12,21 22:12,15,19,20 23:1,4,18 25:1 38:14 49:7,9 52:1 53:25 87:8 88:7 105:12,15 109:4,4 116:14 125:21 132:10,14,15 139:16 161:5 179:11 180:11,11,15,16,18 181:9
**telling** 24:8,25 25:5 90:17
**template** 71:25
**Ten** 170:5,6,7
**tenant** 69:11,17,20
**tenants** 69:1,5
**term** 53:21 72:5 101:15
**terms** 34:9,18,19 38:9,15,17 58:22 73:8,10 157:11,21
**test** 12:6
**tested** 135:1,2,2,6
**testified** 6:1 27:12,23 29:9 30:16 41:15 58:5 60:2,17 83:10 86:6 109:8,9 110:11 113:24 116:9 117:20 124:8 133:9 135:7 140:25 149:18 164:5,11
**testify** 13:22 14:12 110:8 112:24 113:4 124:11 184:8
**testifying** 28:5 108:21 133:21
**testimony** 10:6,16,24 15:17 16:16,22 17:7 24:14 26:20 27:16 28:2,4 33:11 46:16 46:20 47:5 55:11 81:2,25 82:3 98:6 107:23 108:22 109:12 114:5 117:22 133:14 149:21 154:14,16 154:20 164:6 183:6,9
**testing** 167:2
**text** 141:12
**Thank** 13:12 15:11 27:22 137:10,22 143:16 158:2 165:1
**Thanks** 141:10 182:1
**theatrics** 136:21
**therapy** 1:8,11 2:8,11 27:7 34:3,12 37:24 39:12 50:13 50:25 56:6 57:17 62:12,17 62:24 70:21 73:12 87:2,6 87:25 95:2,7 96:24 98:22 102:25 105:5 107:5 109:23 118:2,17 119:15 125:2 152:18 166:11,25
**thing** 12:1 88:20 90:18 93:23 127:7,13 139:13 153:13 160:1 161:2 164:2 166:14
**things** 32:4 66:1 89:9 110:2 115:10 121:17 123:11 134:25 137:2 153:12,22,23 161:12
**think** 9:4 12:24 13:18,21 15:13 22:1 23:22,23 29:21 30:6,13,19 31:1 33:3 36:13 36:21 38:17 39:18,20 40:2 40:25 41:5,9,17 42:13,15 42:21 43:7,7 45:9 46:25 53:2 54:9 55:5 58:8 59:14 65:16,19 66:10 67:14

69:22,22 70:5 71:21 72:12 72:16,24 73:1,6 74:4 78:3 78:9 84:15 85:6 88:23,25 89:3,8,14 90:22 91:15 93:1 94:12,14 97:3 98:16,21 99:25 100:13,15 102:1 103:7,12,19,20,25 107:11 107:16 108:5,7 110:18 112:4,7 114:12,24 123:5,8 125:17 132:5,8 134:7,19 135:12 136:20,21 137:5 138:22 139:20 140:10,19 141:4 144:14 146:5 147:8 147:13,19,22 148:8,14,15 149:9,12 152:23 153:6,11 154:14,16,18 155:23 157:25 159:20 160:1,4,4 161:20 162:6,24 164:4 165:21 166:15 167:6 172:18,20,23 173:11 174:20 175:13 176:11 177:15,23 179:1

**thinking** 14:17 103:13 121:1 121:1

**thinks** 74:10

**third** 141:3 151:21,24

**third-party** 79:14

**thought** 25:24 60:5 80:12 126:16 139:16

**three** 12:17 26:3 60:16 76:19 98:7 105:3 134:15 140:2,5,8,11 141:22 142:23 173:12 174:6,14 176:13,15 179:17

**Thropay** 20:6,8 32:2,7 43:7 43:8,11,25 44:9 52:14 53:5 62:15,24 63:23 82:11 88:15 89:13 90:7,20 91:2 96:17 97:3,25 118:11,19 118:24 119:7,11,16,20,22 119:25,25 120:19,24 121:7 121:9 138:7

**Thropay's** 31:20 87:3,5,17 88:1 91:7 95:25

**tied** 165:15

**Tim** 3:13 5:12

**time** 5:12 6:20,22 11:23,23 12:25 13:1 14:24,25 15:1 20:13,24 21:9 23:11,17,21 24:1 25:22 32:7 33:13 37:9 37:14 43:13 46:19,25 47:1 49:7 56:12 60:20 64:9 73:19 75:21,22 82:4,8 86:25 88:8 96:12 97:2 99:17 102:15 104:3 105:1 108:13 116:25 119:14 126:12,25 130:12 131:16 133:11 134:22 135:4 136:8 137:17,21 139:22 141:6,8 142:6 147:17 148:3,14 153:3 159:21 160:13 164:19,20 172:12 173:7 175:8,12,13 178:25 179:1 179:3 181:17 184:11

**times** 10:6,8 39:8 86:4,19 103:2 120:7 134:21 149:3 150:16

**timing** 69:15

**title** 47:11 62:11 71:24

**titles** 109:22 110:4,7

**today** 5:13 7:1 13:23 15:16 16:22 31:7 33:16 45:4 85:19 140:18 141:20

**Today's** 5:11

**toilet** 75:17,19

**told** 22:6 46:22 59:12 74:1 74:21,24 77:25 119:4,10 119:10 121:3 132:7,16,22 134:9,15 166:12

**tomography** 40:21

**tomorrow** 70:2

**Tony** 3:5 5:19

**total** 53:18 54:4,8 58:19 77:6 77:9,11 176:11

**Totally** 176:25

**totals** 78:16

**tower** 95:21 96:21

**Trang** 158:18 173:25

**transaction** 164:9

**transactions** 108:12 162:3,5 162:9,15,16,16,19 163:4

**transcribing** 10:20

**transcript** 10:23 11:7 93:1 183:6,8 184:13

**transfer** 76:16,18,20 80:14 176:12,15

**transferred** 75:12 76:8,21 78:1 82:18 83:7 84:6 85:11 123:25 154:8 176:19

**transferring** 80:15 82:22 85:7

**transfers** 76:22 77:15,25 81:23 82:11 93:9

**translate** 6:14

**travel** 6:22 68:8 79:6

**traveled** 6:20

**treat** 147:9

**treated** 99:13,24

**tremendous** 87:9

**tried** 31:17 56:2,8 67:1 69:17 103:3,4,20 160:5

**trip** 41:15

**trips** 32:20 40:2

**true** 33:14 39:20 47:25 48:20 51:7,11 57:23 62:22 65:4 71:10 81:4 87:4,4 97:2 109:3 125:5,10 126:19 134:23,24 135:6 146:4,5,13 148:1 154:11 155:24 156:18 159:1 163:19 168:1,9 183:8 184:13

**truly** 125:15 144:21

**trust** 107:11 160:21 161:14

**trusted** 120:9

**truth** 96:23 132:15,16 135:5 135:11 146:23 184:8,8,9

**truthfully** 13:22 14:12 28:5

**try** 16:10 64:20 92:10 137:2 137:8 154:21 175:19

**trying** 24:22 95:17 99:25 101:4 102:16 103:7,11 114:2 131:12 136:5 154:19 156:25 181:3

**turned** 53:6

**turning** 48:19 57:19

**TV** 67:23 68:5 69:22 102:23

**twice** 49:6

**twisted** 135:12

**twisting** 135:10

**two** 25:22 34:14 75:17 78:17 93:24 98:7 105:3 107:9 109:23 110:1 137:1 140:24 150:11 173:11,12 175:1,14 176:13,15

**typewriting** 184:12

**typical** 87:13

**typing** 9:2

**U**

**U.S** 15:22 20:2 23:17 24:9 25:13 35:17 67:1 69:6 73:13,19,20 87:20 89:10 90:12 94:21 102:18 104:23 120:13 141:20 156:12 161:6,8,9 172:25

**UCLA** 120:21

**uh-huh** 11:8 163:21

**uh-uh** 11:8

**Um-hmm** 17:25 79:16 105:1 129:2 136:11 149:16 159:9 159:14,20 176:5

**unable** 44:15

**underground** 96:10

**understand** 10:12 11:12,14 11:16,20,21 12:4 16:23 19:19 24:13,15 34:5,20 37:8 61:20 81:9 95:8 99:4 106:23 113:18 115:16 121:5 161:12 180:14 181:10

**understanding** 27:4 43:2 62:3,12,14 63:5,12 118:7 124:16,17 125:6 136:24 138:14 159:19 160:12 183:12

**Understanding'** 124:17

**understood** 13:12 132:9 138:22 159:11 160:20

**unfair** 30:20

**unfinished** 165:17

**unfortunately** 69:9 87:21 89:11 119:4 120:19

**unhealthy** 158:4

**Unit** 6:16

**United** 1:1 2:1 3:4 5:7 6:21 6:22 7:2,5,6,8,9,11,16 19:8 21:4 27:8 68:8 89:25 112:20 117:6,13 120:24 121:7 122:4 124:22,23 125:7 130:6,8 131:18 138:10,15 155:8,10,22,25 156:9,11,15,19

**unpaid** 153:4

**unrecoverable** 28:1

**unrepresented** 92:23

**untrue** 142:15

**up-front** 166:7

**usable** 165:25

**USB** 116:18,18,20

**USCIS** 54:16,18,23 55:4,12 55:19 79:10,24 80:4 100:22 126:1,21 130:22 131:9,12 133:19

**use** 34:18 42:15 55:20 75:16 75:19 122:25 126:23,23,25 128:13 155:15 166:5

**V**

**v** 185:3

**vacation** 7:19

**valuable** 139:22

**value** 120:18

**various** 93:2 167:2

**Vegas** 85:23 86:2,3,5,8,8,17 86:23,24

**vehicle** 123:24

**vendors** 27:13 28:11 32:5

**venture** 103:16 118:8,25 119:15,15,18,19 120:23 121:7,9,20,25 122:17 123:16,17,21,21,22 124:19 130:3,9 132:12 139:11

**ventures** 27:8 104:16 117:7

124:22 125:8 129:22 130:6 155:8,22 156:1,9,11,16
**Ventures'** 124:24 156:19
**verbal** 59:4,4 132:5
**verbalization** 132:6
**verbally** 11:7 64:7,7
**verbatim** 184:14
**verify** 147:22 149:17 150:6 150:21
**versus** 5:6 17:2
**vice** 66:10,10
**video** 9:23 68:1 92:3
**videographer** 3:13 5:4,13 5:22 15:4,7 75:23 76:1 92:11,16,18 117:1,4 169:23 170:13 182:3
**videotape** 5:5
**videotaped** 1:17 2:17 182:4
**view** 120:20
**views** 119:13
**violated** 164:7,11
**visible** 93:17
**vision** 14:1,7 25:18 45:4 144:14
**visit** 167:9
**VP** 35:15,17 46:6 66:12
**vs** 1:6 2:6
**VTC** 10:19 93:13

**W**

**wait** 9:10 109:6 163:16
**waiting** 16:11
**walk** 138:1
**walked** 61:8,10
**Wang** 1:7,8 2:7,8 17:2 65:9 65:12,14 67:15 68:8 70:22 70:24 71:6,7,12,12 72:23 73:6,8,21,21 74:7 105:23 140:9,14 141:1
**Wang's** 71:1,23
**want** 6:24 9:2 11:14 26:22 29:25 34:8 45:10 58:14 67:11 75:19 76:10 84:12 85:10 92:20 94:7 98:1 109:22 110:13 126:6 129:15 135:14 164:3,12 173:23 176:1 178:22 179:14 180:21 181:13
**wanted** 82:9 97:24 98:8 122:7
**wants** 11:25 74:8 88:17 139:1
**wasn't** 60:17 63:22 96:13 99:23,24 119:16 123:15 134:24 142:15 146:13 149:21 159:12,22 162:15
**waste** 97:10,13 99:16
**wasted** 97:18 164:19
**watching** 149:24
**way** 11:3,13 26:18 60:6 73:15 108:9 126:10 136:15 139:25 147:9 177:24 179:18
**we'll** 13:7 47:7 90:24 138:5
**we're** 9:1 12:15,17,18 15:4,7 15:16 34:8,9 42:7 58:4 77:16 85:10 111:6 112:7 134:21 136:22 140:1 164:18,19 170:13 181:5,6 181:11 182:4
**we've** 134:13 164:15 176:23 177:24 181:4,8,9
**Webex** 1:18 2:18 5:1,10 19:4 25:10 93:8,13,14,19
**Wednesday** 1:19 2:20 5:1
**week** 13:25 76:23 80:16 120:5 137:22
**weeks** 26:3 176:13,15
**Welcome** 15:9
**well-connected** 103:3
**well-known** 68:5 122:12
**went** 13:25 14:2,3 15:12 22:3,4,6 30:1 40:3 41:6 88:18 126:8 127:22 161:6
**weren't** 127:6 132:20 160:8
**West** 87:25 94:25 95:5,25 96:13,21,25 97:8,9,15,17 98:8,19
**whistle** 88:15
**wife** 66:4 70:24 74:17 140:12 172:3,4 178:18
**wildly** 146:23
**wish** 12:7,23
**wished** 53:7
**withdraw** 82:16
**withdrawals** 80:22
**withdrawing** 86:16
**witness** 4:2 5:23,25 15:2 18:19 25:23 45:21 50:7,20 53:25 55:18 58:8 60:24 64:15,19 65:8 66:18 77:9 92:15,22 93:4 94:4,11 95:19 99:18,25 100:6 108:25 109:1,7,15 113:15 134:7 136:21,23 137:6 145:6 147:1,4,9 151:14 169:11,15 170:2,5,7 171:3 177:6,17,22 178:2,6,19 179:15,19 181:17,19 183:1 184:6
**Wong** 65:22
**word** 67:12 161:3,3,12,12
**words** 14:8 46:17
**work** 11:8 21:22 23:23 38:15 39:21,25 45:11 59:15 61:19 66:14 72:9 73:22,23 77:2 82:5,8 87:9 88:15 90:1 95:9 97:8,14 98:18 103:7,17 121:3 124:7 128:4,10 129:21 130:2 139:23 153:14 160:17,24 165:12,13,24 167:3,7,8,10 167:14,14,19
**worked** 79:21 89:25 109:13 121:20,25 140:8
**workers** 87:19
**working** 31:19 33:21 34:7 62:25 66:25 80:4 123:20 138:17
**works** 136:15
**worries** 13:19
**worse** 144:14
**worth** 167:14
**wouldn't** 30:13
**write** 25:22 110:4 139:14,18 141:8 160:16
**writes** 139:2
**writing** 129:19 137:21
**written** 11:6 64:22 115:16
**wrong** 50:15 65:20 88:25 89:3,5 91:15,17 94:14,15 94:17,19 104:25 127:7,13 134:22,23 150:13 151:3 180:11,16,19
**wrote** 110:6 115:12 137:6 141:23 142:1 168:19

**X**

**X** 4:1
**X-i-n-h-u-a** 67:12
**Xin** 1:7 2:7 70:22,24 71:12 72:22 73:6,8,21,21 74:7 105:23 140:9,14 141:1
**Xinhua** 41:9,10,12,14 67:2,6

**Y**

**Y** 3:4
**Y-u-a-n-g** 6:16
**Yale** 79:21,22
**Yale's** 79:19 80:3
**yeah** 8:8,8,23 9:4 12:24 13:2 13:9,18 16:21 17:9 20:9 25:18 34:6,8,14 42:21 44:14,19 45:4,9,13,13,15 45:15,15,25 49:12 51:6 52:20 53:9 56:2 69:4 70:3 70:6 71:5,25 73:10 74:20 77:23 79:1 83:2,4 85:15,19 86:3,15,19 91:22 92:8 96:3 99:12 101:10 103:11 104:19 105:10,12 107:1 116:9,11 119:19 128:18 129:7,12,25 132:23 133:3 133:23 138:19,20 139:14 142:13 144:5,7,9,12,19,19 145:16 147:16 149:2,4,11 149:23 150:25 152:8 153:2 153:6 155:23 157:10,13,23 158:3,5,5,24 160:1,4 162:13,19 163:8,10,15 167:12 168:19,22 169:2 170:6,22 172:18,22 173:18 173:23 174:9 176:1,4 180:23
**year** 33:3,4,6,8 49:14,21 51:22 52:9 61:6,7 65:18,18 69:12,13,14 72:7,12 74:15 87:11,12,14 115:23 139:25 155:11 156:12,19 159:24 163:24 175:11
**years** 29:25 88:14,14 102:2 105:3 116:21,22 136:12
**Yep** 17:22 153:1 159:21
**yesterday** 66:2

**Z**

**zero** 152:4
**zoning** 87:15

**0**

**07102** 3:11

**1**

**1** 46:9 53:18
**10** 14:20 96:9,10
**10,000** 79:17
**100** 32:13 54:9 161:12
**1028** 145:18 149:20
**104** 4:13 129:13,17
**105** 4:12 97:8,16 98:8,19,20 98:20 124:14 125:5
**11** 56:24 57:2 63:11,12
**11:16** 169:25
**11:27** 170:14
**11:42** 75:21
**11:46** 2:19 5:2 182:5,6
**111** 87:25 94:25 95:5,25 96:13,21,25 97:9,14
**114** 4:14 143:17,20 148:1
**115** 4:8 9:5,8,9,18,20,20 10:2 44:16,19,24
**116** 4:8 17:17,20,21,22,24 18:3,3,5,5,7,18 19:5,21 44:19

**117** 4:9 25:7,11,17 26:4,5,10 44:19
**118** 4:9 44:19,25 45:7,14,18 45:22
**119** 4:10 47:11,13,25
**11th** 57:7 60:18 83:21 168:2
**12** 63:14
**12-page** 155:5
**120** 4:10 50:5,8 54:9 57:8,11 57:12 65:1
**121** 4:11 50:17,21 51:5,7 56:18
**122** 4:11 62:7,11,22
**123** 4:12 70:12,16 71:10,16
**124** 4:12 105:16,20 113:24 152:11
**126** 4:13 137:12,16
**127** 4:14 150:2,4
**128** 4:15 155:1,4,5,24
**12883** 1:24 2:21 184:4,22
**129** 4:13,15 156:3,6,7,16,18
**12th** 46:6
**13** 27:2
**130** 4:16 158:7,10 159:1 163:18
**131** 4:16 167:23 168:1,7,9
**132** 4:17 173:21,24 174:7
**137** 4:13
**140** 111:7
**142** 111:7
**143** 4:14
**146** 106:19
**146-page** 105:20
**14th** 83:24
**15** 14:18,20 42:22 72:25 102:2
**15-minute** 116:25
**15-page** 158:11
**150** 4:14
**155** 4:15
**156** 4:15
**158** 4:16
**16** 91:24 168:23
**167** 4:16
**16th** 43:15 62:18 150:5
**17** 4:8
**170** 4:17
**173** 4:17
**17th** 17:1 137:19,21 139:15
**19** 18:5 142:17
**19th** 129:17 132:11,18 134:12,20 137:18 141:8
**1st** 76:20,25 77:17 83:16 84:3 124:3 145:21,25 149:18 150:10 184:17

**2**

**20** 13:4 87:11 183:19,22
**200** 54:5
**2000** 65:19 72:25
**2002** 65:19,19
**2010** 108:8,13
**2011** 43:15 58:17 60:1,6 61:8 62:18 72:4
**2013** 124:3
**2014** 17:1 72:25 155:11,18 155:25
**2015** 6:22,23 7:7,7,12,17 33:3,13 36:21 37:6 55:5,6 55:10 108:16 117:25 125:9 129:17 133:12,16,17,25 145:25 150:5,10 154:4 156:12,12,15,19 158:12,12 158:22 159:3,21,25,25 160:8,13
**2016** 6:23 7:7,12,17 19:7 20:7,17,20 21:21 22:8,11 23:15 24:7,21 25:13 26:2 27:24 28:7,8,9,19,25 29:10 29:10,11 42:21 44:5,6 46:7 46:18 49:5 54:20 55:4,6,10 56:24 57:2,21,24 60:3,7,16 64:5,24 71:13,19 75:8,9 76:5,20,25,25 77:24 78:5 80:21 81:22 84:5 85:8 108:9,13,15 124:11 132:11 132:18 137:18,19 139:15 141:9 142:17 149:18 160:9 168:2,10,22,23,24,24 169:5 178:14
**2021** 1:19 2:20 5:1,11 183:9 184:17 185:2
**20th** 71:19
**21** 18:5
**210224DBO** 1:25
**2192** 6:16
**22nd** 125:9 139:20
**23** 132:11,20 134:14 142:1,4 142:15,16
**23rd** 76:16,25 77:17 158:12
**24** 1:19 2:20 5:1 28:9 138:24 141:19 183:9 185:2
**24th** 5:11 25:13 26:2 28:8 29:11 75:7 84:1
**25** 4:9
**25-page** 19:6
**250** 48:8 49:14 72:12
**250,000** 48:12 49:21 83:12 83:15,17 84:2,3,5
**253,000** 146:1
**253,286** 145:25
**26** 26:10 142:5
**26-page** 25:11
**26th** 76:18 83:12
**27** 100:15,17
**28** 58:21 71:13 158:22 160:8
**280** 72:12
**280,000** 72:3,7 74:15
**28th** 159:3
**29** 70:17
**29th** 76:19 83:14 158:12
**2rnkhnc** 8:25

**3**

**3** 132:4 159:6 166:7 167:14 178:25
**30** 92:21 141:21 181:22,23
**30(b)(5)** 6:4
**300** 77:2 78:16
**300,000** 76:16
**31** 141:20
**31st** 108:16 155:11 156:12
**323** 3:6
**35** 4:17 170:15,18,22,23 171:1,4,6,10 172:8
**350** 77:3 78:17
**350,000** 51:16,22 76:17

**4**

**4** 6:16 48:4 51:14 53:17 58:13 72:1
**4.27** 75:13 76:7 78:1 81:3,5 81:14 82:1,18 85:11 90:4 154:8
**40,000** 176:11,15
**400,000** 76:21 77:4 112:6,6
**42,000** 113:25
**42,536** 111:14
**444** 3:5
**45** 4:9
**45-page** 156:7
**45,000** 22:24 23:7 126:7 127:25
**450** 77:3
**450,000** 76:18
**47** 4:10
**480** 77:3
**480,000** 76:19
**4th** 19:7 20:7,20 75:7,9 134:11

**5**

**5** 73:17 132:21 134:16 164:20
**5:19** 2:19 5:2,12
**5:36** 14:24 15:5
**5:51** 14:25
**50** 4:11
**50/57** 4:10
**500** 35:17 112:20,20
**500,000** 22:23 83:19,24
**539,000** 111:14
**539,021** 111:22 114:6 115:1
**55** 69:1
**55,000** 111:13
**550** 59:10,10
**550,000** 58:16 61:7
**5726** 175:2
**5th** 44:5,6 49:5 57:20,24 60:16 64:5,24 77:18,24 81:22 84:5

**6**

**6** 4:4 63:5
**6:04** 15:8
**60** 53:20,24 54:1
**600** 52:8
**600,000** 61:6
**62** 4:11
**643-7000** 3:11
**6A** 63:8

**7**

**7** 107:4 108:4 111:6 113:23 152:14
**7-4-2016** 20:1
**7,000** 69:6
**7:42** 75:21,24
**7:48** 76:2
**7:59** 92:17
**70** 4:12
**750,000** 83:22
**7th** 83:18

**8**

**8** 58:19 63:14
**8,508,397** 150:8
**8.5** 146:1
**8.508** 145:21
**8:16-cv-00974-CJC-AGR** 1:4 2:4 5:9
**8:17** 92:17
**8:18** 92:12
**8:46** 92:19
**8th** 65:19

**9**

**9** 4:8 12:25 26:10 63:14
**9:23** 116:25 117:2
**9:33** 13:1
**9:38** 117:5
**9:51** 14:25
**900** 3:5
**90071** 3:6

**965-3998** 3:6
**973** 3:11

# Exhibit 5

Hervé Gouraige
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400

Attorneys for Defendants Charles C. Liu And Xin Wang A/K/A Lisa Wang

---

Securities and Exchange Commission,

Plaintiff,

Vs.

Charles C. Liu; Xin Wang A/K/A Lisa Wang; Pacific Proton Therapy Regional Center, LLC; Pacific Proton Eb-5 Fund, LLC; And Beverly Proton Center, LLC F/K/A Los Angeles County Proton Therapy, LLC,

Defendants.

---

Marcum LLP ("Marcum") was retained by Sills Cummis & Gross P.C. ("Counsel") in this matter as an expert in financial statements analysis.

Marcum analyzed the document provided including but not limited to QuickBooks records, leases, agreements, bank statements, cancelled checks and tax returns for Pacific Proton Therapy Regional Center, LLC ("PPRC"); Pacific Proton Eb-5 Fund, LLC ("EB-5"); and Beverly Proton Center, LLC ("BPC") (collectively "Entities").

Based on the information provided in the above documents, Marcum made the following adjustments to the financial statements including but not limited to:

- Adjusting the expenses of the Entities between balance sheet and profit & loss statements based on the nature of the expenses;
- Adjusting assets based on whether such assets were the assets of the Entities as of April 30, 2016;
- Adjusting management fees based on reasonable compensation studies;
- Adjusting the receivable based on contracts between Entities and third parties[1]; and
- Adjusting the expenses between operational and personal expenses.

Based on the above adjustments Marcum created including but not limited to the following in the exhibits attached:

[1] We have not made a determination about the collectability of the receivables on the balance sheet.



EXHIBIT 5

- Consolidated Balance Sheet at April 30, 2016 for the Entities (Exhibit 1);
- Consolidated Profit and Loss Statement from the Initial Year of Operations through the period ending April 30, 2016 for the Entities (Exhibit 2); and
- Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016 (Exhibit 3).

Marcum concluded that as of April 30, 2016:

- The Entities has assets of approximately $12.5 million (Exhibit 1) which included the following:

    1. Cash of approximately $419,000;
    2. Receivables of $1,500,000;
    3. Receivable from Overseas Chinese Immigration Consulting of $3,400,000;
    4. Receivable from John Paul Thropay of $838,500;
    5. Receivable related to excess management fees paid to Charles Liu of approximately $2,000,000;
    6. Receivable related to excess management fees paid to Xin Wang of approximately $1,066,000;
    7. Deposit related to the purchase of medical equipment of $3,000,000;
    8. Lease Deposit of $200,000; and
    9. Other assets of approximately $72,000.

- The Entities had negligible liabilities. (Exhibit 1)

- The Entities' capital accounts between the EB-5 investors, Charles Liu and John Thropay totaled approximately $12.5 million. (Exhibit 1)

- The Entities' earned a total revenue of approximately $2,700,000 between initial year of operations and April 30, 2016. (Exhibit 2). This revenue was primarily related to the $45,000[2] in administrative fees that were paid by each of the 58 EB-5 investors.

- The Entities' paid approximately $19.3 million in expenses between initial year of operations and April 30, 2016. (Exhibit 2). The majority of funds were spent as follows:

    1. Management fees to Charles Liu of approximately $7,200,000 (Exhibit 2D);
    2. Broker Fees to various third party vendors of approximately $4,300,000 (Exhibit 2B);

[2] Per the Private Offering Memorandum of the Pacific Proton EB-5 Fund, LLC, each investor has to pay $45,000 of initial administrative fee.

3. Marketing fees to various third party vendors of approximately $2,500,000 (Exhibit 2E);
4. Consulting fees to various third party vendors of approximately $2,000,000 (Exhibit 2C);
5. Legal and professional fees to various third party vendors of approximately $783,000 (Exhibit 2A);
6. Demolition expense of approximately $466,000 (Exhibit 2);
7. Travel expense of approximately $414,000 (Exhibit 2);
8. Management fees to Xin Wang of approximately $367,000 (Exhibit 2D); and
9. Rent expense paid to various third party vendors of approximately $321,000 (Exhibit 2F).

The above listed expenses totaled approximately $18,400,000 of the $19,300,000 of the total expenses spent by the Entities.

- The Entities' loss from operations was approximately $16,500,000 between initial year of operations and April 30, 2016. (Exhibit 2).
- The Entities' through it EB-5 investors investment, administrative fees and other miscellaneous income accumulated approximately $31,800,000 between the initial year of operations and April 30, 2016. As of April 30, 2016, only approximately $419,000 remained in the bank accounts of the Entities. (Exhibit 1)

The above discussion is based upon information currently known to us. We reserve the right to rely upon additional information that becomes available to us after the submission of the above and the related exhibits and to supplement or amend our opinions accordingly, but have no obligation to do so.

Ronald Friedman, CPA
Partner

# APPENDIX A

# Ronald S. Friedman

ASSURANCE SERVICES

Ronald S. Friedman is a Partner in the Firm's National Retail/Consumer Products Industry group, he provides consulting services for closely-held and emerging businesses in the apparel, manufacturing, distribution and retail industries.

Mr. Friedman works very closely with his clients providing assistance with many aspects of their businesses. His services include forecasting and budgeting, profit enhancement, succession planning, exit strategies, preparation for sale of a business, assistance in procuring financing, and workout and reorganization consulting. Mr. Friedman's expertise also includes assisting in the negotiations for the purchase or sale of a business.

Additionally, for more than 30 years Mr. Friedman has served as an expert witness in numerous apparel industry cases ranging from valuations in divorce proceedings to disputes between partners in business dealings.

Mr. Friedman is often quoted in the media for his industry expertise with retail, manufacturing and distribution driven companies in the retail/consumer products sector. His recent appearances include television (FOX and PBS), radio (KFWB, Bloomberg Radio and the Wall Street Journal Radio Network) and print (Apparel News, Associated Press, Los Angeles Times, New York Times, The Wall Street Journal and Women's Wear Daily).

## Professional & Civic Affiliations

American Institute of Certified Public Accountants (AICPA)
California Society of Certified Public Accountants (CalCPA)
City of Hope, Professions and Finance Associates, Past President
California State University, Northridge
University Corporation, Board of Directors
National Jewish Hospital, Board of Directors
Temple Ahavat Shalom in Northridge, Past President
Union of Reform Judaism, Presidents Round Table, CHAIR Southern California

## Seminars & Presentations

100 Ways™- The Profit Enhancement Process
Facilitation of Retreats for Professional Service Firms & Other Businesses
Financial Statement Analysis
Inventory Valuations and Auditing
Reading and Understanding Financial Statements
Internal Controls for Business Entities

## Litigation Cases

- Reviewed books and records along with bank statements for cash stolen from company. Bookkeeper signed owners name on personal checks and destroyed them before owner saw bank statements.
- Reviewed credit card charges looking for inappropriate charges by users of the card.
- Worked with private investigators following a clients CFO to casino gambling with company funds he had stolen.
- Reconciled gross profits of a manufacturer to determine why the gross profits were not achieving expected results.
- In a bankruptcy case, looked for money and assets that the owner inappropriately took from the company at the expense of the general creditors.
- Prepared an expert report for litigation in Federal Court as an expert in financial analysis in the Retail/Consumer Products industry.
- Prepared an expert report and testified for an apparel company where minority shareholders claimed they were not fairly charged expenses and the business failed for lack of financial support from the majority shareholders.



**Ronald S. Friedman, CPA***
Partner

## AREAS OF EXPERTISE

Forecasting & Budgeting
Succession Planning
Exit Strategies
Workouts & Reorganizations
Purchase & Sale of Businesses
Litigation Support

## KEY CLIENTS

Apparel
Manufacturing
Distribution
Retail
E-Commerce

## EDUCATION

Bachelor of Science, Accounting
California State University, Northridge

MARCUMGROUP MEMBER

**Licensed by the State of California*

Phone 310.432.7414
ron.friedman@marcumllp.com
www.marcumllp.com

MARCUM ACCOUNTANTS ▲ ADVISORS

EXHIBIT 5

# TESTIMONY EXPERIENCE OF RONALD S. FRIEDMAN

**PRIOR TESTIMONY EXPERIENCE IN THE LAST FOUR YEARS:**

| TOPIC | IN THE MATTER OF | NATURE OF TESTIMONY | VENUE |
|---|---|---|---|
| Breach of Fiduciary Duty | Eric Kweach, an individual V. Sang Lee, an individual; Trinity Sports, Inc., a corporation | Trial | Superior Court of the State of California; County of Los Angeles, Central District |
| Breach of Contract | Imperial Toy LLC v Genna Rosenberg | Arbitration | AAA: Los Angeles |
| Shareholder Dispute | Lou et Lin, LLC v Mitchell Quaranta, Bruce Stern, Jonathan Greenberg, Jama JJ,LLC And SwatFame, Inc and Counter Claims | Arbitration | Jams Los Angeles |
| Breach of Fiduciary Duty | Alison Miller Gjersvik, individually and derivatively on behalf of Golden Too, Inc. and Andrew Assael, individually and derivatively on behalf of Planet Gold Clothing, Inc., Claimants, against Jeffrey D. Fisher and Bruce A. Fischer, Respondents and Golden Too, Inc. and Planet Gold Clothing, Inc., Nominal Respondents | Arbitration | AAA: Manhattan |

**TABLE OF CONTENTS FOR THE EXHIBITS**


| **Exhibit #** | **Name of Exhibit** |
|---|---|
| | |
| Exhibit 1 | Consolidated Balance Sheet at April 30, 2016 |
| Exhibit 1A | Other Receivables |
| Exhibit 1B | Medical Equipment |
| Exhibit 1C | Leasehold Improvements |
| Exhibit 1D | Auto & Truck |
| Exhibit 1E | Development Cost |
| Exhibit 1F | Start Up Cost |
| Exhibit 1G | Lease Deposit |
| Exhibit 2 | Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016 |
| Exhibit 2A | Legal and Professional Fees from Initial Year of Operations through April 30, 2016. |
| Exhibit 2B | Broker Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2C | Consulting Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2D | Management Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2E | Marketing Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2F | Rent Expenses from Initial Year of Operations through April 30, 2016 |
| Exhibit 3 | Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016 |
| Exhibit 4A | Consolidated Profit and Loss Statement for the period from January 1 through April 30, 2016. |
| Exhibit 4B | Consolidated Profit and Loss Statement for the year ending in December 31, 2015 |
| Exhibit 4C | Consolidated Profit and Loss Statement for the year ending in December 31, 2014 |
| Exhibit 4D | Consolidated Profit and Loss Statement for the year ending in December 31, 2013 |
| Exhibit 5A | 2010-2016 Profit and Loss Statement for Pacific Proton Therapy Regional Center, LLC |
| Exhibit 5B | 2012-2016 Profit and Loss Statement for Beverly Proton Center, LLC |
| Exhibit 5C | 2013-2016 Profit and Loss Statement for Pacific Proton EB-5 Fund, LLC |
| Exhibit 6A | Balance Sheet as of December 31, 2015 for Pacific Proton Therapy Regional Center, LLC |
| Exhibit 6B | Balance Sheet as of December 31, 2015 for Beverly Proton Center, LLC |
| Exhibit 6C | Balance Sheet as of December 31, 2015 for Pacific Proton EB-5 Fund, LLC |

# EXHIBIT 1

Exhibit 1

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Balance Sheet at April 30, 2016**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Combined | Consolidating Entries (4) | Consolidated Total | Adjusting Entries | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Ref | Adjusting Entries | Ref | Balance 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | | H=F+G | I | | J | | K=H+I+J |
| **ASSETS** | | | | | | | | | | | | | | |
| Cash | $ 97,389 | $ 29,314 | $ 7,011,293 | $ 7,137,996 | $ - | $ 7,137,996 | $ - | | $ 7,137,996 | $ (6,719,042) | (12) | $ - | | $ 418,954 |
| Intercompany Receivables | - | 4,490,191 | 18,782,169 | 23,272,360 | (23,272,360) | - | - | | - | | | - | | |
| Other Receivables | 25,780 | - | 3,000,000 | 3,025,780 | - | 3,025,780 | (25,780) | (5) | 3,000,000 | (1,500,000) | (5) | - | | 1,500,000 |
| Receivable from Overseas Chinese Immigration Consulting (25) | - | - | - | - | - | - | - | | - | - | | 3,400,000 | (20) | 3,400,000 |
| Receivable from John Paul Thropay (25) | - | - | - | - | - | - | - | | - | - | | 838,500 | (23) | 838,500 |
| Management Fee Recievable from Charles Liu (25) | - | - | - | - | - | - | - | | - | - | | 2,013,579 | (26) | 2,013,579 |
| Management Fee Recievable from Xin Wang (25) | - | - | - | - | - | - | - | | - | - | | 1,066,285 | (26) | 1,066,285 |
| Accrued Interest | - | - | 63,162 | 63,162 | (63,162) | - | - | | - | - | | - | | - |
| Medical Equipment | - | 3,368,100 | - | 3,368,100 | - | 3,368,100 | (368,100) | (6) | 3,000,000 | - | | - | | 3,000,000 |
| Furniture & Fixtures | 63,335 | 2,347 | - | 65,682 | - | 65,682 | - | | 65,682 | - | | - | | 65,682 |
| Office Equipment | 16,109 | - | - | 16,109 | - | 16,109 | - | | 16,109 | - | | - | | 16,109 |
| Leasehold Improvements | 9,784 | 803,636 | - | 813,420 | - | 813,420 | (803,636) | (7) | 9,784 | - | | - | | 9,784 |
| Auto & Truck | 75,258 | - | - | 75,258 | - | 75,258 | (75,258) | (8) | (0) | - | | - | | (0) |
| Accumulated Depreciation | (34,328) | - | - | (34,328) | - | (34,328) | 15,204 | (8) | (19,124) | - | | - | | (19,124) |
| Development Costs | - | - | - | - | - | - | - | | - | - | | - | | |
| Broker's Fees | - | 932,500 | - | 932,500 | - | 932,500 | (932,500) | (9) | - | - | | - | | - |
| Agent's Fees | - | 2,810,025 | - | 2,810,025 | - | 2,810,025 | (2,810,025) | (9) | - | - | | - | | - |
| Management Fees | - | 2,810,799 | 200,000 | 3,010,799 | - | 3,010,799 | (3,010,799) | (9) | - | - | | - | | - |
| Marketing Fees | - | 2,350,025 | - | 2,350,025 | - | 2,350,025 | (2,350,025) | (9) | - | - | | - | | - |
| Start Up Costs | 403,891 | 668,116 | - | 1,072,007 | - | 1,072,007 | (1,072,007) | (10) | - | - | | - | | - |
| A/A - Start Up Costs | (72,139) | (51,100) | - | (123,239) | - | (123,239) | 123,239 | (10) | - | - | | - | | - |
| Lease Deposit | 68,048 | 100,000 | - | 168,048 | - | 168,048 | (68,048) | (11) | 100,000 | 200,000 | (11) | (100,000) | (24) | 200,000 |
| **Total Assets** | **$ 653,126** | **$ 18,313,952** | **$ 29,056,624** | **$ 48,023,703** | $ (23,335,522) | $ 24,688,181 | $ (11,377,734) | | $ 13,310,446 | $ (8,019,042) | | $ 7,218,364 | | $ 12,509,768 |
| | | | | | | - | | | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | | | | | | | | | |
| C/C - Chase Card #3763 | $ 2,094 | $ - | $ - | $ 2,094 | | $ 2,094 | $ - | | $ 2,094 | $ (2,094) | (13) | - | | $ - |
| Accrued Interest Payable | - | 63,162 | - | 63,162 | (63,162) | - | - | | - | - | | - | | - |
| Intercompany Payable | 4,675,568 | 18,596,792 | - | 23,272,360 | (23,272,360) | - | - | | - | - | | - | | - |
| Other Payable | - | 2,100 | - | 2,100 | - | 2,100 | - | | 2,100 | - | | - | | 2,100 |
| Total Liabilities | 4,677,662 | 18,662,054 | - | 23,339,716 | (23,335,522) | 4,194 | - | | 4,194 | (2,094) | | | | 2,100 |
| Capital - Investors | - | - | 29,056,624 | 29,056,624 | - | 29,056,624 | (200,000) | (14) | 28,856,624 | (999,876) | (17) | - | | 27,856,748 |
| Capital - Charles Liu | (3,018,401) | (261,077) | - | (3,279,478) | - | (3,279,478) | (8,384,551) | (15) | (11,664,029) | (5,262,804) | (18) | 5,413,773 | (21) | (11,513,060) |



EXHIBIT 5

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Balance Sheet at April 30, 2016**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Combined | Consolidating Entries (4) | Consolidated Total | Adjusting Entries | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Ref | Adjusting Entries | Ref | Balance 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | | H=F+G | I | | J | | K=H+I+J |
| Capital - John P. Thropay | (1,006,134) | (87,025) | - | (1,093,160) | - | (1,093,160) | (2,793,184) | (16) | (3,886,343) | (1,754,268) | (19) | 1,804,591 | (22) | (3,836,020) |
| **Total Liabilities** | (4,024,536) | (348,102) | 29,056,624 | 24,683,987 | - | 24,683,987 | (11,377,735) | | 13,306,252 | (8,016,948) | | 7,218,364 | | 12,507,668 |
| **Total Liabilities & Equity** | **$ 653,126** | **$ 18,313,952** | **$ 29,056,624** | **$ 48,023,703** | **$ (23,335,522)** | **$ 24,688,181** | **$ (11,377,735)** | | **$ 13,310,446** | **$ (8,019,042)** | | **$ 7,218,364** | | **$ 12,509,768** |

**Notes:**
**(1)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Pacific Medical Regional Center, LLC. - Exhibit 6A.
**(2)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Beverly Proton Center, LLC. - Exhibit 6B.
**(3)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Pacific Proton EB-5 Fund, LLC. - Exhibit 6C.
**(4)** Intercompany payables and receivables were eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** From Exhibit 1A.
**(6)** From Exhibit 1B.
**(7)** From Exhibit 1C.
**(8)** From Exhibit 1D.
**(9)** From Exhibit 1E.
**(10)** From Exhibit 1F.
**(11)** From Exhibit 1G.
**(12)** From Exhibit 3.
**(13)** There was a payment of $10,945.71 made to the Chase Card ending in 3763 in April 2016. We are presuming that this payment included the amount outstanding for this card as of December 31, 2015.
**(14)** From Exhibit 2.
**(15)** This includes 75% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 2 and Exhibit 1F.
**(16)** This includes 25% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 2.
**(17)** From Exhibit 4A.
**(18)** This includes 75% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 4A.
**(19)** This includes 25% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 4A.
**(20)** From Exhibit 2B.
**(21)** This includes 75% of the sum of adjusting entries. From Exhibit 2.
**(22)** This includes 25% of the sum of adjusting entries. From Exhibit 2.
**(23)** From Exhibit 2F and Exhibit 1G.
**(24)** From Exhibit 1G.
**(25)** We have not made a determination about the collectability of the receivables on the balance sheet.
**(26)** From Exhibit 2D

# EXHIBIT 1A

Exhibit 1A

**Securities and Exchange Commission v. Charles Liu et.al**
**Other Receivables**

| | 2014 Pacific Proton Regional Center (1) | 2015 Pacific Proton Regional Center (1) | 30-Apr-16 Pacific Proton Regional Center (1) |
|---|---|---|---|
| **Beginning Balance** | $ - | $ 9,131.25 | $ - |
| **Due from MPH Ventures (2)** | $ (1,768.75) | $ 1,755.00 | $ - |
| **Due from SC Fund (3)** | 10,100.00 | (400.00) | - |
| **Due from SC Mgmt (4)** | 800.00 | 5,130.57 | - |
| **Due from MP Medical Hotel (5)** | - | 10,163.31 | - |
| **Total Other Receivables** | $ 9,131.25 | $ 16,648.88 | $ - |
| **Ending Balance** | $ 9,131.25 | $ 25,780.13 | $ - |

| | Pacific Proton EB-5 Fund | Pacific Proton EB-5 Fund (6) | Pacific Proton EB-5 Fund (6) |
|---|---|---|---|
| **Beginning Balance** | $ - | $ - | $ 3,000,000.00 |
| **Due From Industrial and Commercial Bank (7)** | - | 1,500,000.00 | - |
| **Due From Overseas Chinese Banking Corp. (8) (9)** | - | 1,500,000.00 | (1,500,000.00) |
| **Total Other Receivables** | $ - | $ 3,000,000.00 | $ (1,500,000.00) |
| | | | **To Exhibit 1** |
| **Ending Balance** | $ - | $ 3,000,000.00 | $ 1,500,000.00 |
| **Total Other Receivables** | $ 9,131.25 | $ 3,025,780.13 | $ 1,500,000.00 |
| **Write off (10)** | $ - | $ (25,780.13) | $ - |
| | | **To Exhibit 1 & 2** | |
| **Total Ending Balance of Other Receivables** | $ 9,131.25 | $ 3,000,000.00 | $ 1,500,000.00 |

**Notes:**

**(1)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transactions by Account Report for Due To/From - Group Two as of 12/31/2015.

**(2)** This entity is owned by Charles Liu (75%) and Xin Wang (25%).

**(3)** The general partner is SC Management and the limited partners would be future EB5 investors.

**(4)** This entity is owned by Charles Liu 100% as a Manager and Member.

**(5)** This entity is owned by MPH Ventures, LLC (75%) and Xin Wang (25%).

**(6)** Per email from Charles Liu dated April 6, 2016, these funds were erroneously sent to the above banks from the Pacific Proton EB-5 Fund and that these funds will be returned.

**(7)** Bank statement for account ending in 1028 for August, October and December 2015 shows withdrawal of $500,000 in each month for a total of $1.5 million.

**(8)** Bank statement for account ending in 1028 for (a) August and October 2015 shows withdrawal of $500,000 in each month, (b) November 2015 shows withdrawal of $150,000 and ('c) December 2015 shows withdrawal of $350,000, for a total of $1.5 million.

**(9)** Bank statement for account ending in 1028 for March 2016 documents the return of $1.5 million from Overseas Chinese Banking Corp.

**(10)** These amounts of other receivables were written off as they were deemed to be uncollectible as of December 31, 2015. These were expensed as management fees to Charles Liu since he owns the majority interest in each of these entities.



EXHIBIT 5

# EXHIBIT 1B

Exhibit 1B

**Securities and Exchange Commission v. Charles Liu et.al**
**Medical Equipment**

| | 2014 | 2015 | 30-Apr-16 |
|---|---|---|---|
| | | Beverly Proton Center, LLC | |
| **Beginning Balance** | $ - | $ - | $ 3,000,000 |
| **Mevion Medical Systems (1)** | - | 3,000,000 | - |
| **Optivus Proton Therapy (2)** | - | 368,100 | - |
| **Total Medical Equipment** | $ - | $ 3,368,100 | $ - |
| **Ending Balance** | $ - | $ 3,368,100 | $ 3,000,000 |
| **Adjustments (3)** | $ - | $ (368,100) | $ - |
| | | To Exhibit 1 & 2 | |
| **Total Ending Balance of Medical Equipment** | $ - | $ 3,000,000 | $ 3,000,000 |

**Notes:**

**(1)** Per the System Purchase Agreement dated November 9, 2015 between Mevion Medical Systems and Beverly Proton Center LLC, $3 million was payable upon the execution of the agreement. Per the November 2015 bank statement for account ending in 5152, Mevion Medical Systems was wired these funds on November 12, 2015.

**(2)** Per the Quotation provided by Optivus Proton Therapy, the quotation price is $495,000. Per check stub for check # 1025 and November 2015 bank statement for account ending in 5152, $368,100 was paid to Optivus Proton Therapy. We were not provided any invoice to support this payment.

**(3)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015.

# EXHIBIT 1C

Exhibit 1C

**Securities and Exchange Commission v. Charles Liu et.al**
**Leasehold Improvements**

| | 2014 | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|
| | | Beverly Proton Center, LLC | | |
| **Beginning Balance** | $ - | $ - | | $ - |
| **R Alan Construction (1)** | - | 315,487 | | - |
| **Skanska USA Building Inc. (2)** | - | 402,549 | | - |
| **SCI.X Science Studio, LLC (3)** | - | 85,600 | | - |
| **Total Leasehold Improvements** | $ - | $ 803,636 | | $ - |
| **Ending Balance** | $ - | $ 803,636 | | $ - |
| **Adjustments** | | | | |
| **Consulting Expense (4)** | | (488,149) | **To Exhibit 2** | |
| **Demolition Expense (5)** | | (315,487) | **To Exhibit 2** | |
| **Total Adjustments** | $ - | $ (803,636) | | $ - |
| | | **To Exhibit 1** | | |
| **Total Ending Balance of Leasehold Improvements** | $ - | $ - | | $ - |

**Notes:**

**(1)** Per the contract dated between R Alan Construction and Beverly Proton Center, LLC dated May 2015 proposed price was $183,687. An additional work agreement dated July 2015, there was an additional proposed price for work to be performed of $53,400 for a total of $237,087. We have been provided check stubs and bank statements to support the payments above, however no invoices have been provided. Additionally, there is no support for the payments that were in addition to the proposed prices in the contracts.

**(2)** Per the contract dated April 2013, between Skanska USA Building Inc. and Beverly Proton Center, LLC, the contract price was $5,211,308. We have been provided check stubs and bank statements to support the payments above, however no invoices have been provided.

**(3)** Per the contract between SCI.X Science Studio LLC and Beverly Proton Center, LLC dated November 2015, the fee was $171,200 with half of $85,600 payable upon the execution of the contract . Per the November 2015 bank statement for account ending in 5152, SCI.X Science Studio, LLC was wired these funds on November 16, 2015.

**(4)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015.

**(5)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as demolition expense in the profit and loss statement for year ending December 31, 2015.



EXHIBIT 5

# EXHIBIT 1D

Exhibit 1D

**Securities and Exchange Commission v. Charles Liu et.al**
**Auto & Truck**

| | 2014 | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|
| | | Beverly Proton Center, LLC | | |
| **Beginning Balance** | $ - | $ 75,258 | | $ - |
| **Auto 14 - Place in Service 9/10/2014 (1)** | 38,378 | - | | - |
| **Auto 14 - Place in Service 11/19/2014 (1)** | 36,880 | - | | - |
| **Total Auto & Truck** | 75,258 | $ - | | $ - |
| **Ending Balance** | $ 75,258 | $ 75,258 | | $ - |
| **Depreciation Expense - Current (1)** | $ 5,004 | $ 10,200 | | |
| **Accumulated Depreciation** | - | 5,004 | | |
| **Total Accumulated Depreciation** | $ 5,004 | $ 15,204 | | $ - |
| **Adjustments** | | | | |
| **Management Fees - Charles Liu (2)** | - | 75,258 | **To Exhibit 2** | |
| **Depreciation Expense (3)** | - | 15,204 | **To Exhibit 2** | |
| **Total Adjustments** | $ - | $ 90,462 | | $ - |
| | | **To Exhibit 1** | | |

**Notes:**

**(1)** Source - 2015 Depreciation Schedule for Pacific Medical Regional Center, LLC.

**(2)** It is our understanding that these cars were shipped to China almost immediately after their purchase. We have not been provided any support that documents that these cars were being used for operational purposes of the entity, therefore they are being deemed as for personal use of Charles Liu and the cost of the cars is being expensed as management fees on the profit and loss statement of the entity for year ending December 31, 2015.

**(3)** Since the cars are being expensed as management fees and are no longer deemed as operational asset of the entity, the depreciation on such cars is being reduced since the expense is not an operational expense of the entity.



EXHIBIT 5

# EXHIBIT 1E

Exhibit 1E

**Securities and Exchange Commission v. Charles Liu et.al**
**Development Cost**

| | Entity | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|---|
| | **Entity** | | | | **Broker Fees** | | | |
| **Beginning Balance** | | $ - | | $ - | | $ - | | $ - |
| **Hang Seng Bank (1)** | **Beverly Proton Center, LLC** | $ - | | $ - | | $ 932,500.00 | | $ - |
| **Total Broker Fees** | | $ - | | $ - | | $ 932,500.00 | | $ - |
| **Ending Balance** | | $ - | | $ - | | $ 932,500.00 | | $ - |
| **Adjustments (2)** | | $ - | | $ - | | $ (932,500.00) **To Exhibit 1 & 2** | | $ - |
| **Total Ending Balance of Broker Fee** | | $ - | | $ - | | $ - | | $ - |
| | **Entity** | | | | **Agent's Fees** | | | |
| **Beginning Balance** | | $ - | | $ - | | $ 350,000.00 | | $ - |
| **Oversea Chinese Immigration Consulting (Agent's Fees) (3)** | **Beverly Proton Center, LLC** | $ - | | $ 350,000.00 | | $ - | | $ - |
| **Oversea Chinese Immigration Consulting (Consulting Fees) (3)** | **Beverly Proton Center, LLC** | - | | - | | 5,265,000.00 | | |
| **Oversea Chinese Immigration Consulting (Refund of Fees in Consulting Fees) (3)** | **Beverly Proton Center, LLC** | - | | - | | (29,975.00) | | |
| **Oversea Chinese Immigration Consulting (Reallocation to Pacific Proton Regional Center from Consulting Fees) (3)** | **Beverly Proton Center, LLC** | - | | - | | (2,775,000.00) | | |
| **Total Agent's Fees** | | $ - | | $ 350,000.00 | | $ 2,460,025.00 | | $ - |
| **Ending Balance** | | $ - | | $ 350,000.00 | | $ 2,810,025.00 | | $ - |
| **Adjustments (2)** | | $ - | | $ - | | $ (2,810,025.00) **To Exhibit 1 & 2** | | $ - |
| **Total Ending Balance of Agent's Fee** | | $ - | | $ 350,000.00 | | $ - | | $ - |



EXHIBIT 5

Exhibit 1E

**Securities and Exchange Commission v. Charles Liu et.al**
**Development Cost**

| | Entity | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|---|
| | | | | | Marketing Fees | | | |
| Beginning Balance | | $ - | | $ - | | $ - | | $ - |
| Antonio Ramon Villaraigosa (5) | Beverly Proton Center, LLC | $ - | | $ - | | $ 50,025.00 | | $ - |
| Industrial and Commercial Bank (5) | Beverly Proton Center, LLC | | | | | $ 2,300,000.00 | | |
| Total Marketing Fees | | $ - | | $ - | | $ 2,350,025.00 | | $ - |
| Ending Balance | | $ - | | $ - | | $ 2,350,025.00 | | $ - |
| Adjustments (6) | | $ - | | $ - | | $ (2,350,025.00) | | $ - |
| | | | | | | To Exhibit 1 & 2 | | |
| Total Ending Balance of Marketing Fees | | $ - | | $ - | | $ - | | $ - |
| | Entity | | | | Management Fees | | | |
| Beginning Balance | | $ - | | $ 433,637.67 | | $ 1,991,298.75 | | $ - |
| Charles Liu (Reclass of Distribution to Management Fees) (7) | Beverly Proton Center, LLC | 222,084.22 | To Exhibit 2 | | | | | |
| Charles Liu (Reclass of Management Fee paid by Pacific Proton Regional Center, LLC) (7) | Beverly Proton Center, LLC | 211,553.45 | To Exhibit 2 | 1,449,155.09 | To Exhibit 2 | | | |
| Charles Liu (Reclass of Guaranteed Payments to Management Fees) (7) | Beverly Proton Center, LLC | | | 25,005.99 | To Exhibit 2 | | | |
| Xin Wang (Reclass of Management Fee paid by Pacific Proton Regional Center, LLC) (7) | Beverly Proton Center, LLC | | | 83,500.00 | To Exhibit 2 | | | |
| Xin Wang (Reclass the Cash Disbursements) (7) | Beverly Proton Center, LLC | - | | | | 354,000.00 | To Exhibit 2 | - |
| Charles Liu (Reclass the Cash Disbursements) (7) | Beverly Proton Center, LLC | | | | | 165,500.00 | To Exhibit 2 | |
| Management Fee paid to Pacific Proton Regional Center, LLC (7) | Beverly Proton Center, LLC | - | | - | | 300,000.00 | To Exhibit 2 | |
| Charles Liu (Record Management Fees paid by Pacific Proton Regional Center ) (7) | Pacific Proton EB-5 Fund | | | | | 200,000.00 | To Exhibit 2 | |
| Total Management Fees | | $ 433,637.67 | | $ 1,557,661.08 | | $ 1,019,500.00 | | $ - |
| Ending Balance | | $ 433,637.67 | | $ 1,991,298.75 | | $ 3,010,798.75 | | $ - |



EXHIBIT 5

Exhibit 1E

**Securities and Exchange Commission v. Charles Liu et.al**
**Development Cost**

| | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|
| **Adjustments (8)** | $ - | | $ - | | $ (3,010,798.75) | | $ - |
| | | | | | **To Exhibit 1** | | |
| **Total Ending Balance of Agent's Fee** | $ 433,637.67 | | $ 1,991,298.75 | | $ - | | $ - |
| **Total Ending Balance of Development Costs** | $ 433,637.67 | | $ 2,341,298.75 | | $ - | | $ - |

**Notes:**

**(1)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Broker Fees as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices from Hang Seng Bank to support these expenses.

**(2)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015.

**(3)** Source - Beverly Proton Center, LLC QuickBooks General Ledger for 12/31/2014 and 12/31/2015 and Bank Statement for account ending in 5152.

**(4)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months. We have now recorded this as a receivable on the balance sheet.

**(5)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Marketing Fees as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices with Industrial & Commercial Bank and Antonio Ramon Villaraigosa to support these expenses.

**(6)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as marketing fees in the profit and loss statement for year ending December 31, 2015.

**(7)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Management Fees for 12/31/2013, 12/31/2014, and 12/31/2015 and Pacific Proton EB-5 Fund QuickBooks General Ledger for 12/31/2014. These payments are based on the employment and management agreements. See further discussion in Exhibit 2D.

**(8)** These funds are related to compensation and therefore should be expensed and not capitalized. Therefore, these expenses were adjusted and expensed in the profit and loss statements for year ending 12/31/2015.



EXHIBIT 5

# EXHIBIT 1F

Exhibit 1F

Securities and Exchange Commission v. Charles Liu et.al
Start Up Cost

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|
| | | | **Beverly Proton Center, LLC** | | |
| **Beginning Balance** | $ - | $ 243,354.69 | $ 243,354.69 | | $ - |
| **Shanghai Commercial Bank (1)** | $ 100,000.00 | $ - | | | $ - |
| **Optivus Proton Therapy, Inc. (2)** | 90,069.83 | | | | |
| **Nisy IPE (3)** | 53,284.86 | | | | |
| **John Paul Thropay (4)** | - | | 380,500.00 | | |
| **Nixon Peabody LLP (5)** | - | | 40,027.30 | **To Exhibit 2A** | |
| **Marcum LLP (6)** | - | | 4,233.71 | **To Exhibit 2A** | |
| **Total Start Up Cost** | $ 243,354.69 | $ - | $ 424,761.01 | | $ - |
| **Ending Balance** | $ 243,354.69 | $ 243,354.69 | $ 668,115.70 | | $ - |
| **Adjustments** | | | | | |
| **Broker Fees (7)** | $ - | $ - | $ (100,000.00) | **To Exhibit 2** | $ - |
| **Consulting Fees (8)** | - | - | (143,354.69) | **To Exhibit 2** | |
| **Rent (9)** | - | - | (380,500.00) | **To Exhibit 2** | |
| **Legal and Professional Fees (10)** | - | - | (44,261.01) | **To Exhibit 2** | |
| **Total Adjustments** | $ - | $ - | $ (668,115.70) | | $ - |
| | | | **To Exhibit 1** | | |
| **Total Ending Balance of Start Up Costs** | $ - | $ 243,354.69 | $ - | | $ - |
| **Amortization Expense - Current (18)** | $ 4,496.00 | $ 16,223.00 | $ 30,381.00 | | |
| **Accumulated Amortization** | - | 4,496.00 | 20,719.00 | | |
| **Total Accumulated Amortization** | $ 4,496.00 | $ 20,719.00 | $ 51,100.00 | | $ - |
| **Adjustment to Amortization Expense (18)** | - | - | (51,100.00) | | - |
| | | | **To Exhibit 1 & 2** | | |
| **Total Balance of Amortization Expense** | $ 4,496.00 | $ 20,719.00 | $ - | | $ - |
| | | | **Pacific Proton Regional Center, LLC** | | |
| **Beginning Balance (11)** | $ 73,274.00 | $ 73,274.00 | $ 403,891.19 | | $ - |



EXHIBIT 5

Exhibit 1F

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|
| Payments to Luxury Aquilaria (12) | $ - | $ 222,000.00 | $ - | | $ - |
| Refund of Shanghai Office Deposit (12) | - | (36,270.00) | - | | |
| Payment of Expenses for Shanghai Office (12) | - | (191,112.81) | - | | |
| Overseas Chinese Immigration Consulting Payment (13) | - | 331,000.00 | - | | |
| Charles Liu Distribution for Certain Costs paid by him (14) | - | 5,000.00 | - | | - |
| Total Start Up Costs | $ - | $ 330,617.19 | $ - | | $ - |
| Ending Balance | $ 73,274.00 | $ 403,891.19 | $ 403,891.19 | | $ - |
| Adjustments | | | | | |
| Broker Fees (15) | $ - | $ - | $ (331,000.00) | To Exhibit 2 | $ - |
| Rent - Other (16) | - | - | 36,270.00 | To Exhibit 2 | - |
| Office Expense (17) | - | - | (104,161.19) | To Exhibit 2 | - |
| Charles Liu Distribution (14) | - | - | (5,000.00) | To Exhibit 1 | - |
| Total Adjustments | $ - | $ - | $ (403,891.19) | | $ - |
| | | | To Exhibit 1 | | |
| Total Ending Balance of Start Up Costs | $ 73,274.00 | $ 403,891.19 | $ - | | $ - |
| Amortization Expense - Current (19) | $ 7,327.00 | $ 18,348.00 | $ 29,368.00 | | |
| Accumulated Amortization | 17,096.00 | 24,423.00 | 42,771.00 | | |
| Total Accumulated Amortization | $ 24,423.00 | $ 42,771.00 | $ 72,139.00 | | $ - |
| Adjustment to Amortization Expense (19) | - | - | (72,139.00) | | - |
| | | | To Exhibit 1 & 2 | | |
| Total Balance of Amortization Expense | $ 24,423.00 | $ 42,771.00 | $ - | | $ - |
| Total Ending Balance of Start Up Costs | $ 316,628.69 | $ 647,245.88 | $ - | | $ - |
| Total Ending Balance of Amortization Costs | $ 28,919.00 | $ 63,490.00 | $ - | | $ - |



EXHIBIT 5

Exhibit 1F

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|

**Notes:**

**(1)** Source - Beverly Proton Center, LLC Bank Statements for account ending in 5152 for March 2013. We have not been provided any contract or invoices from Shanghai Commercial Bank to support these expenses.

**(2)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices to support these expenses. Per the Quotation provided by Optivus Proton Therapy, the quotation price is $495,000. Of this $368,100 was expensed under consulting expense in Exhibit 1B. We are assuming that this is remainder of the quotation price being charged.

**(3)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152 for December 2013. Per the contract between Dr. Nisy E. Ipe and Beverly Proton Center, LLC dated September 2013, the proposed price was $372,000. We have not been provided with any invoices to support these payments.

**(4)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, he will be paid $1 million per year or $83,333.34 per month for the land. We have not been provided any invoices to support these payments.

**(5)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices from Nixon Peabody to support these expenses.

**(6)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in

**(7)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to the Shanghai Commercial Bank.

**(8)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to Optivus and Dr. Ipe.

**(9)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent to Dr. Thorpay in the profit and loss statement for year ending December 31, 2015.

**(10)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as legal and professional fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to Marcum LLP and Nixon Peabody.

**(11)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transaction By Account for Start Up Cost as of 12/31/2015. The beginning balance of the start up cost was a balance forward from a previous year. Since Marcum did not participate in calculating this amount and that this information was provided by the client, we do not have a breakdown of this amount nor can we track where the expense came from.

**(12)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transaction By Account for Start Up Cost as of 12/31/2015. These payments and refund were related to the Shanghai office and hence should be expenses similarly and not capitalized.

**(13)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months.

**(14)** There was a payment of $5,000 where in Charles Liu paid for some operational expenses. Payments similar to this amount/description were adjusted as distribution to Charles Liu. Therefore, this amount is also adjusted to distributions.



EXHIBIT 5

Exhibit 1F

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|

**(15)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to the Overseas Chinese Immigration Consulting.
**(16)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent - other in the profit and loss statement for year ending December 31, 2015. This includes the refund of deposit for the Shanghai Office.
**(17)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as Office Expense in the profit and loss statement for year ending December 31, 2015. This includes the payments made to Luxury Aquilaria in 2014 and other expenses from prior to 2013.
**(18)** The source is the Beverly Proton Center, LLC tax returns for 2013 through 2015. Since these expenses were deemed to be expensed and not capitalized the amortization expenses has to be adjusted accordingly.
**(19)** The source is the Pacific Proton Therapy Regional Center, LLC tax returns for 2013 through 2015. Since these expenses were deemed to be expensed and not capitalized the amortization expenses has to be adjusted accordingly.



EXHIBIT 5

# EXHIBIT 1G

Exhibit 1G

**Securities and Exchange Commission v. Charles Liu et.al**
**Lease Deposit**

| | 2013 | 2014 | 2015 | 30-Apr-16 |
|---|---|---|---|---|
| | **Beverly Proton Center, LLC** | | | |
| **Beginning Balance** | $ - | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 |
| **John Paul Thropay (1) (5)** | $ 100,000.00 - | $ - | | $ (100,000.00) |
| **Total Lease Deposit** | $ 100,000.00 | $ - | $ - | $ (100,000.00) |
| **Ending Balance** | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ - |
| **Adjustments** | | | | |
| **Montebello Community Health Service (2)** | $ - | $ - | $ - | $ 200,000.00 |
| **Total Adjustments** | $ - | $ - | $ - | $ 200,000.00 |
| | | | | **To Exhibit 1** |
| **Total Ending Balance of Lease Deposit** | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 200,000.00 |
| | **Pacific Proton Regional Center, LLC** | | | |
| **Beginning Balance (3)** | $ 31,777.60 | $ 68,048.56 | $ 68,048.56 | $ - |
| **Payments to Shanghai Center (3)** | $ 36,270.96 | $ - | $ - | $ - |
| **Total Lease Deposit** | $ 36,270.96 | $ - | $ - | $ - |
| **Ending Balance** | $ 68,048.56 | $ 68,048.56 | $ 68,048.56 | $ - |
| **Adjustments** | | | | |
| **Rent Other (4)** | - | - | (68,048.56) | - |
| **Total Adjustments** | $ - | $ - | $ (68,048.56) | $ - |
| | | | **To Exhibit 1 & 2** | |
| **Total Ending Balance of Lease Deposit** | $ 68,048.56 | $ 68,048.56 | $ - | $ - |
| **Total Ending Balance of Lease Deposit** | $ 168,048.56 | $ 168,048.56 | $ 100,000.00 | $ 200,000.00 |

**Notes:**

**(1)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, he will be paid $1 million per year or $83,333.34 per month for the land. Per the agreement, $100,000 was to be paid as deposit upon the execution of the lease agreement. We have not been provided any invoices to support these payments. Additionally, we have been provided the bank statements for Beverly Proton Center, LLC for February 2013 which documents the $100,000 check.

**(2)** Source - Beverly Proton Center, LLC Bank Statements for account ending in 5152 for a check #1043. We have not been provided any contract or invoices to support these expenses. However, since this was for a lease deposit, it needs to be added into lease deposit calculation.

**(3)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transactions by Account Report for Lease Deposit as of 12/31/2015 and Bank Statements for account ending in 6428. We have not been provided with any invoices to support these payments.

**(4)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent expense in the profit and loss statement for year ending December 31, 2015. This includes the payments to Shanghai Center.

**(5)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, Section 1.04 states that the effective date of the lease is when Beverly Proton Center, LLC receives a minimum of $100 million in funding for the project. Therefore, the rent and security deposit was only due as of or after the effective date. Since Beverly Proton Center, LLC never received the $100 million in funding, the lease never became effective and therefore none of the rent and security deposit was due to John Thropay. We have now recorded this as a receivable on the balance sheet.



EXHIBIT 5

# EXHIBIT 2

Exhibit 2

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Total 12.31.2015 | Adjusting Entries: Pacific Proton Regional Center | Ref | Adjusting Entries: Beverly Proton | Ref | Adjusting Entries: Pacific Proton EB-5 Fund | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.16 (22) | Adjusting Entries | Ref | Adjusted Total 4.30.2016 | Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F | H | | I | | J | | K=H+I+J | L | M | | N=K+L+M | |
| **Income** | | | | | | | | 58 | | | | | | | | | | | |
| **Miscellaneous Income** | $ 893,803 | $ - | $ - | $ (300,000) | $ 593,803 | (389,595) | $ 204,208 | $ - | | $ - | | $ - | | $ 204,208 | $ - | $ - | | $ 204,208 | |
| **Investor Admin Fees (23)** | 2,220,405 | - | - | - | 2,220,405 | 389,595 | 2,610,000 | - | | - | | - | | 2,610,000 | (45,000) | - | | 2,565,000 | |
| **Interest Income** | - | - | 63,162 | (63,162) | - | - | - | - | | - | | - | | - | - | - | | - | |
| **Total Income** | 3,114,208 | - | 63,162 | (363,162) | 2,814,208 | - | 2,814,208 | | | | | | | 2,814,208 | (45,000) | - | | 2,769,208 | |
| **Expense** | | | | | | | | | | | | | | | | | | | |
| **Amortization Expense** | 72,139 | 51,100 | - | - | 123,239 | - | 123,239 | (72,139) | (6) | (51,100) | (6) | - | | - | - | - | | - | |
| **Automobile Expense** | 16,635 | - | - | - | 16,635 | - | 16,635 | - | | - | | - | | 16,635 | - | - | | 16,635 | |
| **Automobile Lease** | 109,349 | - | - | - | 109,349 | - | 109,349 | - | | - | | - | | 109,349 | - | - | | 109,349 | |
| **Broker Fees (24)** | 3,525,000 | - | - | - | 3,525,000 | - | 3,525,000 | 331,000 | (7) | 3,842,525 | (8) | - | | 7,698,525 | (32,500) | (3,400,000) | (30) | 4,266,025 | From Exhibit 2B |
| **Bank Service Charges** | 5,494 | 3,453 | 4,159 | - | 13,106 | - | 13,106 | - | | - | | - | | 13,106 | (154) | - | | 12,952 | |
| **Credit Card Charges** | - | - | - | - | - | - | - | - | | - | | - | | - | - | - | | - | |
| **Commissions (25)** | 315,000 | - | - | - | 315,000 | - | 315,000 | - | | - | | - | | 315,000 | - | - | | 315,000 | |
| **Consulting Fees** | 163,324 | - | - | - | 163,324 | - | 163,324 | - | | 999,603 | (9) | - | | 1,162,928 | 877,274 | - | | 2,040,202 | From Exhibit 2C |
| **Contributions** | 12,500 | - | - | - | 12,500 | - | 12,500 | - | | - | | - | | 12,500 | - | - | | 12,500 | |
| **Computer and Internet Expenses** | 9,895 | - | - | - | 9,895 | - | 9,895 | - | | - | | - | | 9,895 | - | - | | 9,895 | |
| **Demolition Expense** | - | - | - | - | - | - | - | - | | 315,487 | (10) | - | | 315,487 | 151,000 | - | | 466,487 | |
| **Depreciation Expense** | 34,328 | - | - | - | 34,328 | - | 34,328 | (15,204) | (11) | - | | - | | 19,124 | - | - | | 19,124 | |
| **Dues and Subscriptions** | 560 | - | - | - | 560 | - | 560 | - | | - | | - | | 560 | - | - | | 560 | |
| **Insurance** | 20,370 | - | - | - | 20,370 | - | 20,370 | - | | - | | - | | 20,370 | 517 | - | | 20,887 | |
| **Interest Expense** | 775 | 63,162 | - | (63,162) | 775 | - | 775 | - | | - | | - | | 775 | - | - | | 775 | |
| **Legal & Professional Fees (26)** | 607,190 | - | 524 | - | 607,714 | - | 607,714 | - | | 44,261 | (12) | - | | 651,975 | 130,849 | - | | 782,824 | From Exhibit 2A |
| **Licenses and Permits** | 1,888 | 2,130 | 70 | - | 4,088 | - | 4,088 | - | | - | | - | | 4,088 | 480 | - | | 4,568 | |
| **Management Fees - Charles Liu (27)** | 1,400,000 | - | - | - | 1,400,000 | - | 1,400,000 | 101,038 | (13) | 2,073,299 | (14) | 200,000 | (15) | 3,774,337 | 5,450,934 | (2,013,579) | (32) | 7,211,692 | From Exhibit 2D |
| **Management Fees - Xin Wang** | - | - | - | - | - | - | - | - | | 437,500 | (16) | - | | 437,500 | 996,000 | (1,066,285) | (32) | 367,215 | From Exhibit 2D |
| **Management Fees - PPRC** | - | - | - | (300,000) | (300,000) | - | (300,000) | - | | 300,000 | (17) | - | | - | - | - | | - | |
| **Marketing Fees** | - | - | - | - | - | - | - | - | | 2,350,025 | (18) | - | | 2,350,025 | 200,000 | - | | 2,550,025 | From Exhibit 2E |
| **Meals & Entertainment** | 8,483 | 131 | - | - | 8,615 | - | 8,615 | - | | - | | - | | 8,615 | - | - | | 8,615 | |
| **Miscellaneous** | 7,331 | - | - | - | 7,331 | - | 7,331 | - | | - | | - | | 7,331 | - | - | | 7,331 | |
| **Office Expenses** | 71,379 | - | - | - | 71,379 | - | 71,379 | 104,161 | (19) | - | | - | | 175,540 | 4,395 | - | | 179,935 | |
| **Outside Services** | 2,702 | - | - | - | 2,702 | - | 2,702 | - | | - | | - | | 2,702 | - | - | | 2,702 | |
| **Penalty** | 307 | 71 | 185 | - | 563 | - | 563 | - | | - | | - | | 563 | - | - | | 563 | |
| **Postage and Delivery** | 12,365 | - | - | - | 12,365 | - | 12,365 | - | | - | | - | | 12,365 | - | - | | 12,365 | |
| **Printing & Reproduction** | 8,022 | - | - | - | 8,022 | - | 8,022 | - | | - | | - | | 8,022 | - | - | | 8,022 | |
| **Rent (Thropay)** | - | 200,000 | - | - | 200,000 | - | 200,000 | - | | 380,500 | (20) | - | | 580,500 | 158,000 | (738,500) | (31) | - | From Exhibit 2F |
| **Rent (28)** | 263,997 | | - | - | 263,997 | - | 263,997 | 31,779 | (21) | - | | - | | 295,775 | 25,648 | - | | 321,423 | From Exhibit 2F |
| **Telephone** | 41,317 | 1,675 | - | - | 42,992 | - | 42,992 | - | | - | | - | | 42,992 | 1,105 | - | | 44,097 | |
| **Travel (29)** | 390,251 | 23,980 | - | - | 414,231 | - | 414,231 | - | | - | | - | | 414,231 | - | - | | 414,231 | |
| **Payroll Expenses** | 42,444 | - | - | - | 42,444 | - | 42,444 | - | | - | | - | | 42,444 | - | - | | 42,444 | |
| **State Franchise Tax** | 5,700 | 2,400 | 1,600 | - | 9,700 | - | 9,700 | - | | - | | - | | 9,700 | 8,400 | - | | 18,100 | |
| **Total Expense** | 7,148,744 | 348,102 | 6,538 | (363,162) | 7,140,221 | - | 7,140,221 | 480,635 | | 10,692,100 | | 200,000 | | 18,512,956 | 7,971,948 | (7,218,364) | | 19,266,540 | |
| **Net Income (Loss)** | $ (4,034,536) | $ (348,102) | $ 56,624 | $ - | $ (4,326,013) | $ - | $ (4,326,013) | $ (480,635) | | $ (10,692,100) | | $ (200,000) | | $ (15,698,748) | $ (8,016,948) | $ 7,218,364 | | $ (16,497,332) | |
| | | | | | | | | To Exhibit 1 | | To Exhibit 1 | | To Exhibit 1 | | | | To Exhibit 1 | | | |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC - Exhibit 5C.



EXHIBIT 5

Exhibit 2

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016**

| Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Total 12.31.2015 | Adjusting Entries<br>Pacific Proton Regional Center | Ref | Beverly Proton | Ref | Pacific Proton EB-5 Fund | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.16 (22) | Adjusting Entries | Ref | Adjusted Total 4.30.2016 | Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E=A+B+C+D | F | G= E+F | H | | I | | J | | K=H+I+J | L | M | | N=K+L+M | |

**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.
**(6)** From Exhibit 1F.
**(7)** From Exhibit 1F.
**(8)** From Exhibit 1E & 1F.
**(9)** From Exhibit 1B, 1C & 1F.
**(10)** From Exhibit 1C.
**(11)** From Exhibit 1D.
**(12)** From Exhibit 1F.
**(13)** From Exhibit 1A & D.
**(14)** From Exhibit 1E.
**(15)** From Exhibit 1E - Recorded as Management Fees to Charles Liu, instead of capitalized management fees on the balance sheet.
**(16)** From Exhibit 1E.
**(17)** From Exhibit 1E.
**(18)** From Exhibit 1E.
**(19)** From Exhibit 1F.
**(20)** From Exhibit 1F.
**(21)** From Exhibit 1F &1G.
**(22)** From Exhibit 4A.
**(23)** Per the Private Offering Memorandum of the Pacific Proton EB-5 Fund, LLC, each investor has to pay $45,000 of initial administrative fee. Since there were 58 investors, the total fee would be $2,610,000 (58 times $45,000).
**(24)** This includes broker fees of $3,182,500 paid to Overseas Chinese Consulting and $342,500 paid to Hang Seng Bank. Of the $3,182,500 paid to Overseas Chinese Consulting, $2,775,000 was paid by Beverly Proton Center, LLC on behalf of Pacific Proton Regional Center, LLC and the remainder was paid by Pacific Proton Regional Center, LLC directly.
**(25)** These commissions were paid to United Damei Investment Co. based on the September 2015 bank statement ending in 6428. We were not provided any contract and/or invoice to support such payment.
**(26)** From Exhibit 2A.
**(27)** Per the employment agreement between Pacific Proton Regional Center, LLC and Charles Liu, Charles Liu was to be paid compensation of $350,000 each year. These above amount represents the payment of $350,000 from 2012 through 2015.
**(28)** Per Pacific Proton Regional Center, LLC QuickBooks Transaction Detail by Account for Rent for 2013 through 2015.
**(29)** Per Pacific Proton Regional Center, LLC, QuickBooks Transaction Detail by Account for Travel Expenses for 2013 through 2015 and Beverly Proton Center, LLC, QuickBooks Transaction Detail by Account for Travel Expenses for 2010 through 2015.
**(30)** From Exhibit 2B.
**(31)** From Exhibit 2F.
**(32)** From Exhibit 2D.



EXHIBIT 5

# EXHIBIT 2A

Exhibit 2A

**Securities and Exchange Commission v. Charles Liu et.al**
**Legal and Professional Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund (1) | Pacific Proton Regional Center (2) | Total Legal and Professional Fees for 2015 | Adjustment (3) | Adjusted Legal and Professional Fees - 12.31.2015 | Pacific Proton Regional Center - 1.1.2016 to 4.30.2016 (2) | Beverly Proton - 1.1.2016 to 4.30.2016 (4) | Adjusted Legal and Professional Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C=A+B | D | E=C+D | F | G | H=E+F+G |
| Seytarth Shaw LLP | $ - | $ 145,330 | $ 145,330 | $ - | $ 145,330 | $ 36,857 | $ - | $ 182,186 |
| Thorn Run Partners LLC | | 103,500 | 103,500 | | 103,500 | | | 103,500 |
| Nixon Peabody | | 1,636 | 1,636 | 40,027 | 41,663 | | 31,346 | 73,009 |
| Marcum LLP | | 50,802 | 50,802 | 4,234 | 55,036 | 8,399 | | 63,435 |
| Greenberg Traurig | | - | - | - | - | | 50,000 | 50,000 |
| Law Offices of Rachel Lew APLC | | 47,671 | 47,671 | | 47,671 | | | 47,671 |
| Miller Mayer | | 42,536 | 42,536 | | 42,536 | 498 | | 43,033 |
| Jjw Consultancy LTD | | 32,000 | 32,000 | | 32,000 | | | 32,000 |
| Evans, Carroll & Assoc | | 22,500 | 22,500 | | 22,500 | | | 22,500 |
| Homeier & Law PC | | 22,086 | 22,086 | | 22,086 | | | 22,086 |
| Others | 524 | 139,129 | 139,653 | | 139,653 | 3,750 | | 143,403 |
| | $ 524 | $ 607,190 | $ 607,714 | $ 44,261 | $ 651,975 | $ 49,503 | $ 81,346 | $ 782,824 |
| | | | | | **To Exhibit 2** | | | **To Exhibit 2** |

**Notes:**
**(1)** Source: Pacific Proton EB-5 Fund, LLC QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.
**(2)** Source: Pacific Proton Regional Center QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.
**(3)** Source: Exhibit 1F.
**(4)** Source: Beverly Proton Center, LLC QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.



EXHIBIT 5

# EXHIBIT 2B

Exhibit 2B

**Securities and Exchange Commission v. Charles Liu et.al**
**Broker Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Broker Fees | Adjustment | Adjusted Broker Fees - 12.31.2015 | Beverly Proton - 1.1.2016 to 4.30.2016 | Adjusted Broker Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=E+D | G | H=E+F+G |
| Overseas Chinese Immigration Consulting | $ - | $ 3,513,500 | $ 2,810,025 | $ 6,323,525 | | $ 6,323,525 | $ (145,000) | $ 6,178,525 |
| Hang Seng Bank | - | 342,500 | 932,500 | 1,275,000 | | 1,275,000 | 112,500 | 1,387,500 |
| Shanghai Commercial Bank | - | - | 100,000 | 100,000 | | 100,000 | - | 100,000 |
| | $ - | $ 3,856,000 | $ 3,842,525 | $ 7,698,525 | $ - | $ 7,698,525 | $ (32,500) | $ 7,666,025 |
| Overseas Chinese Immigration Consulting (1) | | | | | | | | $ (3,400,000) |
| | | | | | | | | $ 4,266,025 |
| | | | | | | | | **To Exhibit 2** |

**Notes:**

**(1)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months. We have now recorded this as a receivable on the balance sheet.



EXHIBIT 5

# EXHIBIT 2C

Exhibit 2C

**Securities and Exchange Commission v. Charles Liu et.al**
**Consulting Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Consulting Fees | Adjustment | Adjusted Consulting Fees | Pacific Proton Regional Center - 1.1.2016 to 4.30.2016 | Beverly Proton - 1.1.2016 to 4.30.2016 | Adjusted Legal and Professional Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | F | E=F+D | G | H | I=E+G+H |
| X Science Studio | - | - | 85,600.00 | 85,600 | - | 85,600 | | 449,692 | 535,292 |
| Optivus Proton | | | 458,170.00 | 458,170 | | 458,170 | | - | 458,170 |
| Skanska USA | | | 402,549.00 | 402,549 | | 402,549 | | | 402,549 |
| Lance Gong | 113,424 | | | 113,424 | | 113,424 | 103,460 | | 216,884 |
| Michael Cogswell | | | | - | | - | 62,500 | 87,500 | 150,000 |
| Michael Hunn & Assoc | | | | - | | - | | 93,282 | 93,282 |
| Nisy IPE | | | 53,284.86 | 53,285 | | 53,285 | | | 53,285 |
| Licheng Zheny | 45,000 | | | 45,000 | | 45,000 | | | 45,000 |
| IBA Dosimetry | | | | - | | - | | 31,506 | 31,506 |
| Don Wise | | | | - | | - | | 17,500 | 17,500 |
| Mintz Levin | | | | - | | - | | 15,570 | 15,570 |
| Square Peg Design | | | | - | | - | 13,487 | | 13,487 |
| WayLink LLC | 4,900 | | | 4,900 | | 4,900 | | | 4,900 |
| Michael Evans | | | | - | | - | 2,500 | | 2,500 |
| Creative Design | | | | - | | - | 277 | | 277 |
| | $ 163,324 | $ - | $ 999,604 | $ 1,162,928 | $ - | $ 1,162,928 | $ 182,224 | $ 695,050 | $ 2,040,202 |

**To Exhibit 2**



EXHIBIT 5

# EXHIBIT 2D

Exhibit 2D

**Securities and Exchange Commission v. Charles Liu et.al**
**Management Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Management Fees |
|---|---|---|---|---|
| | A | B | C | D=A+B+C |
| Charles Liu | $ 200,000 | $ 1,501,038 | $ 7,524,233 | $ 9,225,271 |
| Xin Wang | - | | 1,433,500 | 1,433,500 |
| | $ 200,000 | $ 1,501,038 | $ 8,957,733 | $ 10,658,771 |

| | |
|---|---|
| Reasonable Compensation/Management Fees | |
| Charles Liu (1) | $ (7,211,692) |
| Xin Wang (1) | (367,215) |
| Total Reasonable Compensation/Management Fees | $ (7,578,907) |
| | |
| Management Fees Receivable to be included in the Assets of the Entities | |
| Charles Liu | $ 2,013,579 |
| Xin Wang | $ 1,066,285 |
| | **To Exhibit 1 & 2** |

Notes:

(1) Based on Ted Ginsburg's compensation analysis dated March 25, 2021 prepared in this matter, the total reasonable compensation for Charles Liu for 2011 through 2016 should have been $7,211,692 and total reasonable compensation for Xin Wang for 2011 through 2016 should have been $367,215. We have now recorded the management fees in excess of the reasonable compensation/management fees as a receivable on the balance sheet.



EXHIBIT 5

# EXHIBIT 2E

Exhibit 2E

**Securities and Exchange Commission v. Charles Liu et.al**
**Marketing Fees from Initial Year of Operations through April 30, 2016.**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Marketing Fees |
|---|---|---|---|---|
| | A | B | C | D=A+B+C |
| Antonio Ramon Villaraigosa | $ - | $ - | $ 50,025 | $ 50,025 |
| Industrial and Commercial Bank | - | - | 2,500,000 | 2,500,000 |
| | $ - | $ - | $ 2,550,025 | $ 2,550,025 |
| | | | | **To Exhibit 2** |



EXHIBIT 5

# EXHIBIT 2F

Exhibit 2F

**Securities and Exchange Commission v. Charles Liu et.al**
**Rent Expenses from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton |
|---|---|---|---|
| | A | B | C |
| John Paul Thropay | $ - | $ - | $ 738,500 |
| AIM Property Services | | 19,878 | - |
| Arden Realty LTD | | 118,634 | - |
| Bre CA Office Owner LLC | | 15,394 | - |
| China Citic Bank | | 42,085 | - |
| Crown Cabot Financial Center | | 38,499 | - |
| Shanghai Centre | | 86,932 | - |
| | $ - | $ 321,423 | $ 738,500 |
| | | **To Exhibit 2** | |
| Rent Expense Paid to John Paul Thropay (1) | | | $ (738,500) |
| | | | $ - |
| | | | **To Exhibit 2** |

**Notes:**

**(1)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, Section 1.04 states that the effective date of the lease is when Beverly Proton Center, LLC receives a minimum of $100 million in funding for the project. Therefore, the rent and security deposit was only due as of or after the effective date. Since Beverly Proton Center, LLC never received the $100 million in funding, the lease never became effective and therefore none of the rent and security deposit was due to John Thropay. We have now recorded this as a receivable on the balance sheet.



EXHIBIT 5

# EXHIBIT 3

Exhibit 3

**Securities and Exchange Commission v. Charles Liu et.al**
**Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016**

| | Pacific Proton EB-5 Fund<br>A | Beverly Proton<br>B | Pacific Proton Regional Center<br>C | Total<br>D=A+B+C | Reclassifying<br>E | Adjusted Total 12.31.2015<br>F=D+E | 1.1.2016 to 4.30.2016<br>G | Adjusted Total 4.30.2016<br>H=F+G |
|---|---|---|---|---|---|---|---|---|
| **CASH IN:** | | | | | | | | |
| Investors' Capital | $ 29,000,000 | $ - | $ - | $ 29,000,000 | $ - | $ 29,000,000 | $ - | $ 29,000,000 |
| Investors' Admin Fees | - | - | 2,220,405 | 2,220,405 | 389,595 | 2,610,000 | (45,000) | 2,565,000 |
| Interest Income | 63,162 | - | - | 63,162 | (63,162) | - | - | - |
| Miscellaneous Income | - | - | 593,803 | 593,803 | (389,595) | 204,208 | - | 204,208 |
| Management Fees (from Beverly Proton) | - | - | 300,000 | 300,000 | (300,000) | - | - | - |
| Capital Contribution | - | - | 10,000 | 10,000 | - | 10,000 | - | 10,000 |
| Loan from credit card | - | - | 2,094 | 2,094 | - | 2,094 | (2,094) | - |
| Loan from Member | - | 2,100 | | 2,100 | - | 2,100 | - | 2,100 |
| **Total Cash Inflow** | **$ 29,063,162** | **$ 2,100** | **$ 3,126,302** | **$ 32,191,564** | **$ (363,162)** | **$ 31,828,402** | **$ (47,094)** | **$ 31,781,308** |
| CASH OUT: | | | | | | | | |
| **Capital Expenditures** | | | | | | | | |
| Medical Equipment Deposit (Melvion) | $ - | $ 3,368,100 | $ - | $ 3,368,100 | $ (368,100) | $ 3,000,000 | $ - | $ 3,000,000 |
| Medical Equipment Consulting (Optivus Proton) | - | - | - | - | 458,170 | 458,170 | - | 458,170 |
| Leasehold Improvements (R. Alan Construction) | - | 315,487 | - | 315,487 | - | 315,487 | 151,000 | 466,487 |
| Leasehold Improvement (Skanska USA) | - | 402,549 | - | 402,549 | - | 402,549 | - | 402,549 |
| Leasehold Improvement (X Science Studio) | - | 85,600 | - | 85,600 | - | 85,600 | 449,692 | 535,292 |
| Leasehold Improvement | - | - | 9,784 | 9,784 | - | 9,784 | - | 9,784 |
| Auto & Trucks | - | - | 75,258 | 75,258 | (75,258) | - | - | - |
| Furniture & Fixtures | - | 2,347 | 63,335 | 65,682 | - | 65,682 | - | 65,682 |
| Office Equipment | - | - | 16,109 | 16,109 | - | 16,109 | - | 16,109 |
| **Total Capital Expenditures** | **$ -** | **$ 4,174,083** | **$ 164,485** | **$ 4,338,568** | **$ 14,812** | **$ 4,353,380** | **$ 600,692** | **$ 4,954,072** |
| **Broker/Commission/Agent Fees** | | | | | | | | |
| Oversea Chinese Immigration Consulting | $ 1,500,000 | $ 2,810,025 | $ 3,182,500 | $ 7,492,525 | $ 331,000 | $ 7,823,525 | $ (1,645,000) | $ 6,178,525 |
| Industrial & Commercial Bank (United Damei Group) | 1,500,000 | 2,300,000 | - | 3,800,000 | 315,000 | 4,115,000 | 200,000 | 4,315,000 |
| Hang Seng Bank (Delsk) | - | 932,500 | 342,500 | 1,275,000 | 100,000 | 1,375,000 | 112,500 | 1,487,500 |
| United Damei Investment | - | - | 315,000 | 315,000 | (315,000) | - | - | - |



EXHIBIT 5

Exhibit 3

Securities and Exchange Commission v. Charles Liu et.al
Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016

| | Pacific Proton EB-5 Fund | Beverly Proton | Pacific Proton Regional Center | Total | Reclassifying | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Adjusted Total 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | H=F+G |
| Antonio Ramon Villaraigosa | - | 50,025 | - | 50,025 | - | 50,025 | - | 50,025 |
| **Total Broker/Commission/Agent Fees** | **$ 3,000,000** | **$ 6,092,550** | **$ 3,840,000** | **$ 12,932,550** | **$ 431,000** | **$ 13,363,550** | **$ (1,332,500)** | **$ 12,031,050** |
| **Management Fees/Distributions** | | | | | | | | |
| Charles Liu - Management Fees | $ 200,000 | $ 2,073,299 | $ 1,400,000 | $ 3,673,299 | $ 101,038 | $ 3,774,337 | $ 5,450,934 | $ 9,225,271 |
| Charles Liu - Distributions | - | - | - | - | 5,000 | $ 5,000 | $ - | $ 5,000 |
| Xin Wang | - | 437,500 | - | 437,500 | - | 437,500 | 996,000 | 1,433,500 |
| Pacific Proton Regional Center | - | 300,000 | - | 300,000 | (300,000) | - | - | - |
| **Total Management Fees** | **$ 200,000** | **$ 2,810,799** | **$ 1,400,000** | **$ 4,410,799** | **$ (193,962)** | **$ 4,216,837** | **$ 6,446,934** | **$ 10,663,771** |
| **Others** | | | | | | | | |
| Loan to Other Entities | | $ - | $ 25,780 | $ 25,780 | $ (25,780) | $ - | $ - | $ - |
| Start Up Cost | - | 668,116 | 403,891 | 1,072,007 | (1,072,007) | - | - | - |
| Lease Deposit (Montebello Community Health Service) | - | - | - | - | - | - | 200,000 | 200,000 |
| Lease Deposit (Thropay) | - | 100,000 | 68,048 | 168,048 | (68,048) | 100,000 | - | 100,000 |
| **Total Other Expenses** | **$ -** | **$ 768,116** | **$ 497,719** | **$ 1,265,835** | **$ (1,165,835)** | **$ 100,000** | **$ 200,000** | **$ 300,000** |
| **General & Administrative** | | | | | | | | |
| Auto Expenses | $ - | $ - | $ 125,984 | $ 125,984 | $ - | $ 125,984 | $ - | $ 125,984 |
| Bad Debts | - | - | - | - | - | - | - | - |
| Bank Service Charges | 4,159 | 3,453 | 5,494 | 13,106 | - | 13,106 | (154) | 12,952 |
| Business License & Permits | 70 | 2,130 | 1,888 | 4,088 | - | 4,088 | 480 | 4,568 |
| Computer & Internet | - | - | 9,895 | 9,895 | - | 9,895 | | 9,895 |
| Consulting Fees | - | - | 163,324 | 163,324 | 53,285 | 216,609 | 427,583 | 644,192 |
| Contributions | - | - | 12,500 | 12,500 | - | 12,500 | - | 12,500 |
| Dues & Subscriptions | - | - | 560 | 560 | - | 560 | - | 560 |
| Insurance | - | - | 20,370 | 20,370 | - | 20,370 | 517 | 20,887 |
| Interest Expense | - | 63,162 | 775 | 63,937 | (63,162) | 775 | | 775 |
| Legal & Professional | 524 | - | 607,190 | 607,714 | 44,261 | 651,975 | 130,849 | 782,824 |
| Meals & Entertainment | - | 131 | 8,483 | 8,615 | - | 8,615 | - | 8,615 |



EXHIBIT 5

Exhibit 3

Securities and Exchange Commission v. Charles Liu et.al
Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016

| | Pacific Proton EB-5 Fund | Beverly Proton | Pacific Proton Regional Center | Total | Reclassifying | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Adjusted Total 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | H=F+G |
| Miscellaneous | - | - | 7,331 | 7,331 | - | 7,331 | - | 7,331 |
| Office Expense | - | - | 71,379 | 71,379 | 104,161 | 175,540 | 4,395 | 179,935 |
| Outside Services | - | - | 2,702 | 2,702 | - | 2,702 | - | 2,702 |
| Payroll & Related Expenses | - | - | 42,444 | 42,444 | - | 42,444 | - | 42,444 |
| Penalties | 185 | 71 | 307 | 563 | - | 563 | - | 563 |
| Postage & Delivery | - | - | 12,365 | 12,365 | - | 12,365 | - | 12,365 |
| Printing & Reproduction | - | - | 8,022 | 8,022 | - | 8,022 | - | 8,022 |
| Rent (John Paul Thropay) | - | 200,000 | - | 200,000 | 380,500 | 580,500 | 158,000 | 738,500 |
| Rent (Others) | - | - | 263,997 | 263,997 | 31,778 | 295,775 | 25,648 | 321,423 |
| State Tax | 1,600 | 2,400 | 5,700 | 9,700 | - | 9,700 | 8,400 | 18,100 |
| Telephone | - | 1,675 | 41,317 | 42,992 | - | 42,992 | 1,105 | 44,097 |
| Travel | - | 23,980 | 390,251 | 414,231 | - | 414,231 | - | 414,231 |
| **Total General & Administrative Expenses** | **$ 6,538** | **$ 297,002** | **$ 1,802,276** | **$ 2,105,816** | **$ 550,823** | **$ 2,656,639** | **$ 756,822** | **$ 3,413,461** |
| **Total Cash Outflow** | **$ 3,206,538** | **$ 14,142,549** | **$ 7,704,481** | **$ 25,053,568** | **$ (363,162)** | **$ 24,690,406** | **$ 6,671,948** | **$ 31,362,354** |
| **Net before Intercompany Loans** | **$ 25,856,624** | **$ (14,140,449)** | **$ (4,578,179)** | **$ 7,137,996** | **$ (0)** | **$ 7,137,996** | **$ (6,719,042)** | **$ 418,954** |
| **Intercompany Loans** | **$ 18,845,331** | **$ (14,169,763)** | **$ (4,675,568)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| **Net Cash Flow** | **$ 7,011,293** | **$ 29,314** | **$ 97,389** | **$ 7,137,996** | | **$ 7,137,996** | **$ (6,719,042)** | **$ 418,954** |
| | | | | | | | **To Exhibit 1** | |
| **Ending Cash (December 31, 2015)** | **$ 7,011,293** | **$ 29,314** | **$ 97,389** | **$ 7,137,996** | | **$ 7,137,996** | | |
| **Ending Cash (April 30, 2016)** | **$ 112,217** | **$ 261,256** | **$ 45,481** | | | | | **$ 418,954** |



EXHIBIT 5

# EXHIBIT 4A

Exhibit 4A

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the period from January 1, 2016 through April 30, 2016.**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total |
|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D |
| **Income** | | | | | |
| Miscellaneous Income | $ 350,000 | $ - | $ - | $ (350,000) | $ - |
| Investor Admin Fees | (45,000) | - | | | (45,000) |
| Interest Income | | | | - | - |
| **Total Income** | **305,000** | **-** | | **(350,000)** | **(45,000)** |
| **Expense** | | | | | |
| Amortization Expense | | - | | | - |
| Automobile Expense | | - | | | - |
| Automobile Lease | - | - | | | - |
| Broker Fees | | (32,500) | | | (32,500) |
| Bank Service Charges | 105 | 665 | (924) | | (154) |
| Credit Card Charges | | - | | | - |
| Commissions | | - | | | - |
| Consulting Fees | 182,224 | 695,050 | | | 877,274 |
| Contributions | | - | | | - |
| Computer and Internet Expenses | | - | | | - |
| Demolition Expense | | 151,000 | | | 151,000 |
| Depreciation Expense | | - | | | - |
| Dues and Subscriptions | | - | | | - |
| Insurance | 517 | - | | | 517 |
| Interest Expense | | - | | - | - |
| Legal & Professional Fees | 49,503 | 81,346 | | | 130,849 |
| Licenses and Permits | 480 | - | | | 480 |
| Management Fees - Charles Liu | 84,521 | 4,366,413 | 1,000,000 | | 5,450,934 |
| Management Fees - Xin Wang | | 996,000 | | | 996,000 |
| Management Fees - PPRC | | 350,000 | | (350,000) | - |
| Marketing Fees | | 200,000 | | | 200,000 |
| Meals & Entertainment | | - | | | - |
| Miscellaneous | | - | | | - |
| Office Expenses | 4,216 | 179 | | | 4,395 |
| Outside Services | | - | | | - |
| Penalty | | - | | | - |
| Postage and Delivery | | - | | | - |
| Printing & Reproduction | | - | | | - |
| Rent | 25,648 | 158,000 | | | 183,648 |
| Telephone | | 1,105 | | | 1,105 |
| Travel | | - | | | - |
| Payroll Expenses | | - | | | - |
| State Franchise Tax | 6,800 | 800 | 800 | | 8,400 |
| **Total Expense** | **354,014** | **6,968,058** | **999,876** | **(350,000)** | **7,971,948** |
| **Net Income (Loss)** | **$ (49,014)** | **$ (6,968,058)** | **$ (999,876)** | **$ -** | **$ (8,016,948)** |



EXHIBIT 5

Exhibit 4A

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the period from January 1, 2016 through April 30, 2016.**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total |
|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.



EXHIBIT 5

# EXHIBIT 4B

Exhibit 4B

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the year ending in December 31, 2015**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| **Miscellaneous Income** | $ 386,895 | $ - | $ - | $ (300,000) | $ 86,895 | $ (11,297) | $ 75,598 |
| **Investor Admin Fees** | 2,180,727 | - | | | 2,180,727 | 11,297 | 2,192,024 |
| **Interest Income** | | | 46,492 | (46,492) | - | | |
| **Total Income** | **2,567,622** | **-** | **46,492** | **(346,492)** | **2,267,622** | | **2,267,622** |
| **Expense** | | | | | | | |
| **Amortization Expense** | 29,368 | 30,381 | | | 59,749 | | 59,749 |
| **Automobile Expense** | 3,943 | - | | | 3,943 | | 3,943 |
| **Automobile Lease** | 34,345 | - | | | 34,345 | | 34,345 |
| **Broker Fees** | 3,525,000 | - | | | 3,525,000 | | 3,525,000 |
| **Bank Service Charges** | 2,398 | 2,235 | 1,469 | | 6,102 | | 6,102 |
| **Credit Card Charges** | - | - | | | - | | - |
| **Commissions** | 315,000 | - | | | 315,000 | | 315,000 |
| **Consulting Fees** | 81,714 | - | | | 81,714 | | 81,714 |
| **Contributions** | 12,500 | - | | | 12,500 | | 12,500 |
| **Computer and Internet Expenses** | 5,875 | - | | | 5,875 | | 5,875 |
| **Demolition Expense** | - | | | | - | | |
| **Depreciation Expense** | 22,054 | - | | | 22,054 | | 22,054 |
| **Dues and Subscriptions** | 420 | - | | | 420 | | 420 |
| **Insurance** | 3,737 | - | | | 3,737 | | 3,737 |
| **Interest Expense** | 775 | 46,492 | | (46,492) | 775 | | 775 |
| **Legal & Professional Fees** | 274,540 | - | 524 | | 275,064 | | 275,064 |
| **Licenses and Permits** | 660 | 30 | 70 | | 760 | | 760 |
| **Management Fees - Charles Liu** | 350,000 | - | | - | 350,000 | | 350,000 |
| **Management Fees - Xin Wang** | - | | | | - | | - |
| **Management Fees - PPRC** | - | | | (300,000) | (300,000) | | (300,000) |
| **Marketing Fees** | - | | | | - | | - |
| **Meals & Entertainment** | 6,188 | 131 | | | 6,319 | | 6,319 |
| **Miscellaneous** | 3,831 | - | | | 3,831 | | 3,831 |
| **Office Expenses** | 25,253 | - | | | 25,253 | | 25,253 |
| **Outside Services** | - | - | | | - | | - |
| **Penalty** | 156 | 71 | 185 | | 412 | | 412 |
| **Postage and Delivery** | 11,730 | - | | | 11,730 | | 11,730 |
| **Printing & Reproduction** | - | - | | | - | | - |
| **Rent** | 79,467 | - | | | 79,467 | | 79,467 |
| **Telephone** | 12,441 | 1,675 | | | 14,116 | | 14,116 |
| **Travel** | 159,120 | 18,705 | | | 177,825 | | 177,825 |
| **Payroll Expenses** | - | - | | | - | | - |
| **State Franchise Tax** | 1,700 | 800 | 800 | | 3,300 | | 3,300 |
| **Total Expense** | **4,962,213** | **100,520** | **3,048** | **(346,492)** | **4,719,289** | | **4,719,289** |
| **Net Income (Loss)** | **$ (2,394,592)** | **$ (100,520)** | **$ 43,444** | **$ -** | **$ (2,451,667)** | | **$ (2,451,667)** |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.



EXHIBIT 5

# EXHIBIT 4C

Exhibit 4C

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the year ending in December 31, 2014**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| **Miscellaneous Income** | $ 285,128 | $ - | $ - | $ - | $ 285,128 | $ (285,128) | $ - |
| **Investor Admin Fees** | - | - | | | - | 285,128 | 285,128 |
| **Interest Income** | | | 11,492 | (11,492) | - | | |
| **Total Income** | **285,128** | **-** | **11,492** | **(11,492)** | **285,128** | | **285,128** |
| **Expense** | | | | | | | |
| **Amortization Expense** | 18,348 | 16,223 | | | 34,571 | | 34,571 |
| **Automobile Expense** | 1,789 | 890 | | | 2,679 | | 2,679 |
| **Automobile Lease** | 40,533 | - | | | 40,533 | | 40,533 |
| **Broker Fees** | - | - | | | - | | - |
| **Bank Service Charges** | 2,087 | - | 2,163 | | 4,250 | | 4,250 |
| **Credit Card Charges** | - | - | | | - | | - |
| **Commissions** | - | - | | | - | | - |
| **Consulting Fees** | 62,680 | - | | | 62,680 | | 62,680 |
| **Contributions** | - | - | | | - | | - |
| **Computer and Internet Expenses** | - | - | | | - | | - |
| **Depreciation Expense** | 6,793 | - | | | 6,793 | | 6,793 |
| **Dues and Subscriptions** | 140 | - | | | 140 | | 140 |
| **Insurance** | 8,520 | - | | | 8,520 | | 8,520 |
| **Interest Expense** | - | 11,492 | | (11,492) | - | | - |
| **Legal & Professional Fees** | 59,544 | - | - | | 59,544 | | 59,544 |
| **Licenses and Permits** | 340 | - | - | | 340 | | 340 |
| **Management Fees** | 350,000 | - | | - | 350,000 | | 350,000 |
| **Meals & Entertainment** | - | - | | | - | | - |
| **Miscellaneous** | - | - | | | - | | - |
| **Office Expenses** | 11,487 | - | | | 11,487 | | 11,487 |
| **Outside Services** | - | - | | | - | | - |
| **Penalty** | - | - | - | | - | | - |
| **Postage and Delivery** | - | - | | | - | | - |
| **Printing & Reproduction** | - | - | | | - | | - |
| **Rent** | 148,598 | 100,000 | | | 248,598 | | 248,598 |
| **Telephone** | 12,012 | - | | | 12,012 | | 12,012 |
| **Travel** | 110,762 | - | | | 110,762 | | 110,762 |
| **Payroll Expenses** | 7,640 | - | | | 7,640 | | 7,640 |
| **State Franchise Tax** | 800 | 800 | 800 | | 2,400 | | 2,400 |
| **Total Expense** | **842,072** | **129,405** | **2,963** | **(11,492)** | **962,949** | | **962,949** |
| **Net Income (Loss)** | **$ (556,944)** | **$ (129,405)** | **$ 8,529** | **$ -** | **$ (677,821)** | | **$ (677,821)** |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee

# EXHIBIT 4D

Exhibit 4D

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the year ending in December 31, 2013**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| **Miscellaneous Income** | $ 93,170 | $ - | $ - | $ - | $ 93,170 | $ (93,170) | $ - |
| **Investor Admin Fees** | 39,678 | - | | | 39,678 | $ 93,170 | 132,848 |
| **Interest Income** | | | 5,178 | (5,178) | - | | |
| **Total Income** | **132,848** | **-** | **5,178** | **(5,178)** | **132,848** | | **132,848** |
| **Expense** | | | | | | | |
| **Amortization Expense** | 7,327 | 4,496 | | | 11,823 | | 11,823 |
| **Automobile Expense** | 1,098 | - | | | 1,098 | | 1,098 |
| **Automobile Lease** | 34,472 | | | | 34,472 | | 34,472 |
| **Broker Fees** | - | | | | - | | - |
| **Bank Service Charges** | 562 | 328 | 526 | | 1,416 | | 1,416 |
| **Credit Card Charges** | - | | | | - | | - |
| **Commissions** | - | | | | - | | - |
| **Consulting Fees** | 10,930 | | | | 10,930 | | 10,930 |
| **Contributions** | - | | | | - | | - |
| **Computer and Internet Expenses** | 2,655 | | | | 2,655 | | 2,655 |
| **Depreciation Expense** | 1,156 | | | | 1,156 | | 1,156 |
| **Dues and Subscriptions** | - | | | | - | | - |
| **Insurance** | 7,006 | | | | 7,006 | | 7,006 |
| **Interest Expense** | - | 5,178 | | (5,178) | - | | - |
| **Legal & Professional Fees** | 187,933 | | - | | 187,933 | | 187,933 |
| **Licenses and Permits** | 638 | - | - | | 638 | | 638 |
| **Management Fees** | 700,000 | | | - | 700,000 | | 700,000 |
| **Meals & Entertainment** | 531 | - | | | 531 | | 531 |
| **Miscellaneous** | 3,500 | | | | 3,500 | | 3,500 |
| **Office Expenses** | 11,539 | | | | 11,539 | | 11,539 |
| **Outside Services** | 401 | | | | 401 | | 401 |
| **Penalty** | - | . | - | | - | | - |
| **Postage and Delivery** | - | | | | - | | - |
| **Printing & Reproduction** | 8,022 | | | | 8,022 | | 8,022 |
| **Rent** | 35,932 | 100,000 | | | 135,932 | | 135,932 |
| **Telephone** | 10,357 | - | | | 10,357 | | 10,357 |
| **Travel** | 60,508 | 5,275 | | | 65,783 | | 65,783 |
| **Payroll Expenses** | 34,804 | | | | 34,804 | | 34,804 |
| **State Franchise Tax** | 1,600 | 800 | - | | 2,400 | | 2,400 |
| **Total Expense** | **1,120,969** | **116,077** | **526** | **(5,178)** | **1,232,394** | | **1,232,394** |
| **Net Income (Loss)** | **$ (988,121)** | **$ (116,077)** | **$ 4,652** | **$ -** | **$ (1,099,546)** | | **$ (1,099,546)** |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.



EXHIBIT 5

# EXHIBIT 5A

6:26 PM
01/19/21
Accrual Basis

Exhibit 5A

## Pacific Proton Therapy Regional Ctr, LLC
## Profit & Loss
January through December

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Jan - Dec 12 | Jan - Dec 11 | Jan - Dec 10 | Total | Jan - April 16 |
|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | |
| 4000 · Income - Consulting | | | | | | | | |
| 4002 · Miscellaneous Income | $ 386,895 | $ 285,128 | $ 93,170 | $ 128,610 | | | $ 893,803 | $ 350,000 |
| 4003 · Investor Admin Fees | 2,180,727 | 0 | 39,678 | 0 | | | 2,220,405 | (45,000) |
| Total 4000 · Income - Consulting | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| Total Income | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| Gross Profit | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| Expense | | | | | | | | |
| 6100 · Amortization Expense | 29,368 | 18,348 | 7,327 | 7,327 | 7,327 | 2,442 | 72,139 | 0 |
| 6110 · Automobile Expense | 3,943 | 1,789 | 1,098 | 159 | 6,277 | 3,370 | 16,635 | |
| 6111 · Automobile Lease | 34,345 | 40,533 | 34,472 | 0 | | | 109,349 | 0 |
| 6115 · Broker Fees | 3,525,000 | 0 | 0 | 0 | | | 3,525,000 | |
| 6120 · Bank Service Charges | 2,398 | 2,087 | 562 | 447 | | | 5,494 | 105 |
| 6125 · Credit Card Charges | 0 | 0 | 0 | 0 | | | 0 | |
| 6134 · Commissions | 315,000 | 0 | 0 | 0 | | | 315,000 | |
| 6135 · Consulting Fees | 81,714 | 62,680 | 10,930 | 8,000 | | | 163,324 | 179,724 |
| 6140 · Contributions | 12,500 | 0 | 0 | 0 | | | 12,500 | |
| 6145 · Computer and Internet Expenses | 5,875 | 0 | 2,655 | 1,365 | | | 9,895 | |
| 6150 · Depreciation Expense | 22,054 | 6,793 | 1,156 | 4,325 | | | 34,328 | |
| 6160 · Dues and Subscriptions | 420 | 140 | 0 | 0 | | | 560 | |
| 6180 · Insurance | 3,737 | 8,520 | 7,006 | 1,107 | | | 20,370 | 517 |
| 6200 · Interest Expense | 775 | 0 | 0 | 0 | | | 775 | |
| 6220 · Legal & Professional Fees | 274,540 | 59,544 | 187,933 | 64,190 | 20,984 | | 607,190 | 49,503 |
| 6230 · Licenses and Permits | 660 | 340 | 638 | 250 | | | 1,888 | 480 |
| 6231 · Management Fees | 350,000 | 350,000 | 700,000 | 0 | | | 1,400,000 | 84,521 |
| 6235 · Meals & Entertainment | 6,188 | 0 | 531 | 1,765 | | | 8,483 | |
| 6240 · Miscellaneous | 3,831 | 0 | 3,500 | 0 | | | 7,331 | |
| 6245 · Office Expenses | 25,253 | 11,487 | 11,539 | 3,437 | 12,336 | 7,327 | 71,379 | 4,216 |
| 6247 · Outside Services | 0 | 0 | 401 | 2,301 | | | 2,702 | 2,500 |
| 6248 · Penalty | 156 | 0 | 0 | 151 | | | 307 | |
| 6250 · Postage and Delivery | 11,730 | 0 | 0 | 184 | | 451 | 12,365 | |
| 6255 · Printing & Reproduction | 0 | 0 | 8,022 | 0 | | | 8,022 | |
| 6290 · Rent | 79,467 | 148,598 | 35,932 | 0 | | | 263,997 | 25,648 |
| 6340 · Telephone | 12,441 | 12,012 | 10,357 | 2,054 | | 4,453 | 41,317 | |
| 6350 · Travel | 159,120 | 110,762 | 60,508 | 8,602 | 33,522 | 17,737 | 390,251 | |
| 6600 · Payroll Expenses | 0 | 7,640 | 34,804 | 0 | | | 42,444 | |
| 6900 · State Franchise Tax | 1,700 | 800 | 1,600 | 0 | 800 | 800 | 5,700 | 6,800 |
| Total Expense | 4,962,213 | 842,072 | 1,120,969 | 105,663 | 81,246 | 36,580 | 7,148,744 | 354,014 |
| Net Income | $ (2,394,592) | $ (556,944) | $ (988,121) | $ 22,947 | $ (81,246) | $ (36,580) | $ (4,034,536) | $ (49,014) |



EXHIBIT 5

# EXHIBIT 5B

3:35 PM
01/19/21
Accrual Basis

# Beverly Proton Center, LLC (LA County Proton Therapy)

Exhibit 5B

## Profit & Loss

January through December

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Jan - Dec 12 | Total | Jan - Apr 16 |
|---|---|---|---|---|---|---|
| Income | $ - | $ - | $ - | $ - | | $ - |
| Expense | | | | | | |
| 6010 · Amortization Expense | 30,381 | 16,223 | 4,496 | 0 | 51,100 | |
| 6040 · Bank Service Charges | 2,235 | 890 | 328 | 0 | 3,453 | 665 |
| 6050 · Broker Fees | 0 | 0 | 0 | 0 | 0 | (32,500) |
| 6054 · Business License & Permits | 30 | 0 | 0 | 2,100 | 2,130 | |
| 6055 · Consulting | 0 | 0 | 0 | 0 | 0 | 695,050 |
| 6075 · Demolition Expense | | | | | 0 | 151,000 |
| 6140 · Interest Expense | 46,492 | 11,492 | 5,178 | 0 | 63,162 | |
| 6165 · Legal & Professional Fees | 0 | 0 | 0 | 0 | 0 | 81,346 |
| 6170 · Management Fees | 0 | 0 | 0 | 0 | 0 | 5,712,413 |
| 6175 · Marketing Fees | 0 | 0 | 0 | 0 | 0 | 200,000 |
| 6180 · Meals and Entertainment | 131 | 0 | 0 | 0 | 131 | |
| 6200 · Office Supplies | | | | | 0 | 179 |
| 6320 · Penalty | 71 | 0 | 0 | 0 | 71 | |
| 6400 · Rent Expense | 0 | 100,000 | 100,000 | 0 | 200,000 | 158,000 |
| 6480 · Telephone Expense | 1,675 | 0 | 0 | 0 | 1,675 | 1,105 |
| 6500 · Travel Expense | 18,705 | 0 | 5,275 | 0 | 23,980 | |
| 6900 · State Franchise Tax | 800 | 800 | 800 | 0 | 2,400 | 800 |
| Total Expense | 100,520 | 129,405 | 116,077 | 2,100 | 348,102 | 6,968,058 |
| Net Income | $ (100,520) | $ (129,405) | $ (116,077) | $ (2,100) | $ (348,102) | $ (6,968,058) |



EXHIBIT 5

# EXHIBIT 5C

3:04 PM
01/19/21
Accrual Basis

**Pacific Proton EB-5 Fund, LLC** **Exhibit 5C**

## Profit & Loss

**January through December**

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Total | Jan - Apr 16 |
|---|---|---|---|---|---|
| **Income** | | | | | |
| **4000 · Sales - Consulting** | $ - | $ - | $ - | $ - | $ - |
| **4100 · Interest Income** | 46,492 | 11,492 | 5,178 | 63,162 | 0 |
| **Total Income** | 46,492 | 11,492 | 5,178 | 63,162 | 0 |
| **Expense** | | | | | |
| **6040 · Bank Service Charges** | 1,469 | 2,163 | 526 | 4,159 | (924) |
| **6070 · Consulting** | 0 | 0 | 0 | 0 | |
| **6165 · Legal & Professional Fees** | 524 | 0 | 0 | 524 | |
| **6175 · License & Permit** | 70 | 0 | 0 | 70 | |
| **6170 . Management Fees** | | | | 0 | 1,000,000 |
| **6190 · Miscellaneous Expense** | 0 | 0 | 0 | 0 | |
| **6350 · Penalty** | 185 | 0 | 0 | 185 | |
| **6900 · State Franchise Tax** | 800 | 800 | 0 | 1,600 | 800 |
| **Total Expense** | 3,048 | 2,963 | 526 | 6,538 | 999,876 |
| **Net Income** | **$ 43,444** | **$ 8,529** | **$ 4,652** | **$ 56,624** | **$ (999,876)** |



EXHIBIT 5

# EXHIBIT 6A

3:17 PM
06/21/16
Accrual Basis

# Pacific Proton Therapy Regional Ctr, LLC

Exhibit 6A

## Balance Sheet

### As of December 31, 2015

| | Dec 31, 15 |
|---|---|
| ASSETS | |
| Current Assets | |
| Checking/Savings | |
| 1010 · Cash in Bank - Checking | $ 97,389 |
| Total Checking/Savings | 97,389 |
| Other Current Assets | |
| 1225 · Due To/From - Group Two | |
| 1226 · Due to MPH Ventures | (14) |
| 1227 · Due From - SC Fund (153216) | 9,700 |
| 1228 · Due From - SC Mgmt (153215) | 5,931 |
| 1229 · Due From - MP Medical Hotel | 10,163 |
| Total 1225 · Due To/From - Group Two | 25,780 |
| Total Other Current Assets | 25,780 |
| Total Current Assets | 123,169 |
| Fixed Assets | |
| 1610 · Furniture & Fixtures | 63,335 |
| 1620 · Office Equipment | 16,109 |
| 1630 · Leasehold Improvements | 9,784 |
| 1640 · Auto & Truck | 75,258 |
| 1699 · Accum Depreciation | (34,328) |
| Total Fixed Assets | 130,157 |
| Other Assets | |
| 1705 · Start Up Cost | 403,891 |
| 1706 · A/A - Start Up Costs | (72,139) |
| 1730 · Lease Deposit | 68,048 |
| Total Other Assets | 399,800 |
| TOTAL ASSETS | **$ 653,126** |
| LIABILITIES & EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Credit Cards | |
| 2030 · Chase Card #3763 | $ 2,094 |
| Total Credit Cards | 2,094 |
| Total Current Liabilities | 2,094 |
| Long Term Liabilities | |
| 2301 · Pacific Proton EB-5 | 185,377 |
| 2420 · L/P - Beverly Proton Center LLC | 4,490,191 |
| Total Long Term Liabilities | 4,675,568 |
| Total Liabilities | 4,677,662 |
| Equity | |
| 3100 · Capital - Charles Liu | (3,018,401) |
| 3200 · Capital - John P. Thropay | (1,006,134) |
| Total Equity | (4,024,536) |
| TOTAL LIABILITIES & EQUITY | **$ 653,126** |



EXHIBIT 5

# EXHIBIT 6B

5:00 PM
01/16/21
Accrual Basis

**Beverly Proton Center, LLC (LA County Proton Therapy)** **Exhibit 6B**

# Balance Sheet

**As of December 31, 2015**

| | Dec 31, 15 |
|---|---|
| ASSETS | |
| Current Assets | |
| Checking/Savings | |
| 1010 · Cash in Bank - Checking | $ 29,314 |
| Total Checking/Savings | 29,314 |
| Total Current Assets | 29,314 |
| Fixed Assets | |
| 1600 · Medical Equipment | 3,368,100 |
| 1610 · Furniture & Fixtures | 2,347 |
| 1630 · Leasehold Improvements | 803,636 |
| 1660 · Development Costs | |
| 1662 · Broker Fees | 932,500 |
| 1664 · Agent's Fees | 2,810,025 |
| 1666 · Management Fees | 2,810,799 |
| 1668 · Marketing Fees | 2,350,025 |
| Total 1660 · Development Costs | 8,903,349 |
| Total Fixed Assets | 13,077,432 |
| Other Assets | |
| 1700 · Start up Cost | 668,116 |
| 1705 · Accumulated Amortization | (51,100) |
| 1730 · Lease Deposit | 100,000 |
| 1750 · L/R - Pacific Proton Regional | 4,490,191 |
| Total Other Assets | 5,207,207 |
| TOTAL ASSETS | **$ 18,313,952** |
| LIABILITIES & EQUITY | |
| Liabilities | |
| Long Term Liabilities | |
| 2500 · Loan Payable - Member | $ 2,100 |
| 2505 · Accrued Interest Payable | 63,162 |
| 2510 · L/P - Pacific Proton EB-5 Fund | 18,596,792 |
| Total Long Term Liabilities | 18,662,054 |
| Total Liabilities | 18,662,054 |
| Equity | |
| 3100 · Capital - Charles Liu | (261,077) |
| 3200 · Capital - John P. Thropay | (87,025) |
| Total Equity | (348,102) |
| TOTAL LIABILITIES & EQUITY | **$ 18,313,952** |



EXHIBIT 5

# EXHIBIT 6C

1:21 PM
08/03/16
Accrual Basis

**Pacific Proton EB-5 Fund, LLC**

**Exhibit 6C**

# Balance Sheet

**As of December 31, 2015**

| | | Dec 31, 15 |
|---|---|---|
| ASSETS | | |
| Current Assets | | |
| Checking/Savings | | |
| 1010 · Checking - Chase | $ | 7,001,348 |
| 1020 · Checking - Citibank | | 9,945 |
| Total Checking/Savings | | 7,011,293 |
| Other Current Assets | | |
| 1300 · L/R - Others | | |
| Industrial & Commercial Bank | | 1,500,000 |
| Overseas Chinese Immigration Co | | 1,500,000 |
| Total 1300 · L/R - Others | | 3,000,000 |
| Total Other Current Assets | | 3,000,000 |
| Total Current Assets | | 10,011,293 |
| Fixed Assets | | |
| 1660 · Development Costs | | |
| 1666 · Management Fees | | 200,000 |
| Total 1660 · Development Costs | | 200,000 |
| Total Fixed Assets | | 200,000 |
| Other Assets | | |
| 1800 · L/R - Beverly Proton Center LLC | | 18,596,792 |
| 1810 · Accrued Interest Receivable | | 63,162 |
| 1850 · L/R - Pacific Proton Regional | | 185,377 |
| Total Other Assets | | 18,845,331 |
| TOTAL ASSETS | $ | 29,056,624 |
| LIABILITIES & EQUITY | | |
| Equity | | |
| 2013 | | |
| LI, Qiong | $ | 501,706 |
| LI, Yanli | | 501,706 |
| SHI, Zhaohui | | 501,706 |
| SUN, Dian | | 501,706 |
| ZHAO, Xin | | 501,706 |
| Total 2013 | | 2,508,528 |
| 2014 | | |
| CHEN, Jun | | 500,775 |
| LIU, Feng | | 500,775 |
| LIU, Jing | | 500,775 |
| SUN, Xiaoming | | 500,775 |
| WANG, Wang | | 500,775 |
| XU, Haijuan | | 500,775 |
| Total 2014 | | 3,004,652 |
| 2015 | | |
| CAO, Xiang | | 500,000 |
| CHEN, Guichan | | 500,000 |
| CHEN, Zhong | | 500,000 |
| DAI, Lixia | | 500,000 |
| DING, Liang | | 500,000 |
| FEI, Jia | | 500,000 |
| HE, He | | 500,000 |
| HU,Runyi | | 500,000 |



EXHIBIT 5

**Pacific Proton EB-5 Fund, LLC**



## Balance Sheet

**As of December 31, 2015**

| | Dec 31, 15 |
|---|---|
| JIANHAO, Zhang | 500,000 |
| LAN, Jie | 500,000 |
| LI, Li | 500,000 |
| LI, Longwen | 500,000 |
| LI, Zengwei | 500,000 |
| LIAN, Chen | 500,000 |
| LIN, Weiping | 500,000 |
| LIN, Wen | 500,000 |
| LIU, Feng (2015) | 500,000 |
| LIU, Genlan | 500,000 |
| LIU, Jingzhong | 500,000 |
| LIU, Rui | 500,000 |
| LIU, Yimin | 500,000 |
| LU, Xueying | 500,000 |
| LU, Zhang | 500,000 |
| MA, Chaoqi | 500,000 |
| QIAN, Yu | 500,000 |
| SHAO, Xiaojing | 500,000 |
| SHEN, Juan | 500,000 |
| SHI, Jinyu | 500,000 |
| TANG, Xiaomin | 500,000 |
| WANG, Kexin | 500,000 |
| WANG, Zihao | 500,000 |
| WEI, Zhao | 500,000 |
| WU, Dong | 500,000 |
| XIANG, Dong | 500,000 |
| XU, Faxiao | 500,000 |
| XU, Guanghe | 500,000 |
| YAN, Chenglong | 500,000 |
| YANG, Jianqiang | 500,000 |
| YANG, Yong | 500,000 |
| YITIAN, Zhou | 500,000 |
| YU, Lifang | 500,000 |
| YUHAN, Shan | 500,000 |
| ZHANG, Fan | 500,000 |
| ZHANG, Haixia | 500,000 |
| ZHAO, Jian | 500,000 |
| ZHOU, Changgang | 500,000 |
| ZHOU, Zhuoxiong | 500,000 |
| Total 2015 | 23,500,000 |
| Net Income | 43,444 |
| Total Equity | 29,056,624 |
| **TOTAL LIABILITIES & EQUITY** | **$ 29,056,624** |

# Exhibit 6

TIME AND RESPONSIBILITY CHART FOR
PACIFIC PROTON THERAPY PROJECT

| Item | Responsible Party | Timetable |
|---|---|---|
| | | |
| Form LLC | Liu and his Counsel | Done |
| Complete LLC Operating Agreement, including defining rights of Members; management of LLC; buy and sell restrictions; etc. | BOIC counsel (Velasco) | |
| | | |
| Prepare preliminary budget for start up and development costs for the Project through initial stages | Liu; RLN; Dr. Thropay; Fred Croft | |
| | | |
| Prepare Shareholders' Agreement | Liu, Velasco, Dr. Thropay, RLN | |
| | | |
| Prepare plan for raising capital from EB5 Investors and other parties; | Liu | |
| | | |
| Prepare offering documents | Counsel for LLC/EB5 Fund | |
| | | |
| Form EB5 Fund | Liu | |
| | | |
| Commence to raise capital for Project and secure investment funds from EB5 Investors and other parties | Liu | |
| | | |
| | | |
| Prepare and file EB5 visa petitions for individual investors | Immigration counsel | |
| | | |
| Form JRT and transfer real property from Dr. Thropay to JRT | Velasco | |
| | | |
| Form Development Group | Velasco | |
| | | |
| Prepare plan for design and construction of the clinic and related facilities: hire firm to oversee project | Optivus | |
| | | |
| Form professional corporation/clinic and obtain licenses permits | Velasco/RLN | |
| | | |

Exhibit
82

| | | |
|---|---|---|
| Form J&R Management Services, Inc. | Velasco | |
| | | |
| Prepare Management Agreement | Velasco | |
| | | |
| Prepare retainer agreement between Liu and LACPT re raising capital. | Counsel for LACPT | |
| | | |
| Prepare Liu Employment Agreement | Counsel for LACPT | |
| | | |
| Prepare employment agreements for Dr. Thropay and RLN | Velasco | |
| | | |
| Prepare lease agreement for proton equipment | Counsel for LATPC | |
| | | |
| Research benefits and/or detriments of selling BOIC to the new entity to provide continuity of care and community outreach. | Liu; RLN; Dr. Thropay | |

MEMORANDUM OF UNDERSTANDING
PACIFIC PROTON THERAPY PROJECT

This Memorandum of Understanding (MOU) between Charles Liu and John P. Thropay, both residents of the State of California (each a "Party" and collectively the "Parties"), with respect to the Pacific Proton Therapy Regional Center, LLC project ("Project") is dated February 16, 2011.

1. Purpose of MOU. This Memorandum of Understanding sets forth the basic terms and conditions for the Project to be jointly developed between Charles Liu ("Liu") and Dr. John P. Thropay ("Thropay") for the construction of a medical facility and commercial office building to be located at 111 E. Beverly Blvd., Montebello, California 90640 ("Facility"), and the installation and operation of a proton therapy treatment center at such Facility, all of which shall be financed by a combination of U.S. investors and foreign investors participating in the EB5 visa program. This MOU provides a conceptual framework and sets out responsibilities for preparation and implementation of the initial steps required for the Project. As with any complex project involving the creation of multiple entities and the participation of various other parties, there will be many details that are not covered by this MOU or which will surface as the Parties proceed to develop and implement the Project. The Parties agree to work in good faith toward achievement of the goals described in this MOU and to resolve all matters that may come up.

2. Parties to Project. As presently envisioned, the initial parties to this Project and the obligations of each such party shall be generally the following:

A. Charles Liu: Mr. Liu shall be the President of the LLC and shall be responsible for the administration of the LLC and finding investors and raising capital from U.S. investors and foreign national seeking to invest in the United States through the EB5 Investor Visa Program. Mr. Liu shall also be President of the LACTP with responsibility for investor relations.

B. Dr. John P. Thropay: Dr. Thropay, individually or through his professional corporation, will be the Chairman and CEO of the LACTP. He will be the medical director for the Project and will direct all clinical functions for the Project. All professional services will be provided solely under the direction of Dr. Thropay and/or his professional corporation.

C. Ruth Lopez Novodor: Ms. Novodor will provide administrative services and operations management through a management company (J&R Management Services, Inc.) to be jointly owned by Ms. Novodor and Dr. Thropay. She will be COO and Secretary of the LACTP.

D. Pacific Proton Therapy Regional Center, LLC ("LLC"): The LLC will manage the EB5 investor visa program and investor relations functions. The LLC will be owned 75% by Liu and 25% by Dr. Thropay. .

E. Pacific Proton EB-5 Fund, LLC ("EB5 Fund"): This entity will serve as the investment vehicle for the EB5 Visa Investors. The EB5 Fund will be owned by the LLC and the EB5 Investors. The ownership structure will be determined by legal requirements for the EB5 investment.

F. JRT Real Estate Holdings, LLC ("JRT"): This company will own the land where the clinic will be constructed and will be owned by Dr. Thropay.

G. Pacific Proton Development Group, LLC ("Development Group"): This company will enter into a long-term ground lease with JTR and will develop the Facility. The Facility will be leased to Los Angeles County Proton Therapy, LLC.

H. Professional Medical Corporation. The professional medical corporation will provide all medical services to patients treated at the LACTP. The professional medical corporation will be owned by Dr. Thropay.

I. Los Angeles County Proton Therapy, LLC ("LACPT"). LACPT will provide non-medical services to the medical corporation. The LACTP will manage the facilities and the proton therapy machine pursuant to a lease with the medical corporation. The LACPT will be owned 75% by Mr. Liu and 25% by Dr. Thropay. Dr. Thropay's 25% membership interest will not be diluted by the EB-5 and other investors' equity participation. A mechanism will be provided whereby Dr. Thropay will ultimately own 75% of LACPT upon the successful operation of LACPT.

3. Next Steps and Documents. The next steps to be taken, the parties responsible and the timetable for action are set forth on the attached Time and Responsibility Chart. The parties agree that concurrent with the preparation of the budget as set forth below, they will prepare a Shareholders' Agreement that will spell out the rights of each party as regards ownership and management of the LACPT.

4. Management of Project. In order to create an organizational structure, manage and control costs and protect the Parties from personal liability, the Project will be managed initially by a Committee consisting of Mr. Liu, Dr. Thropay and Ms. Novodor. As the Project develops and additional entities are created for specific purposes, such entities will be primarily responsible for the specific purposes for which they were organized.

5. Budget; Expenses. Within fourteen (14) business days of the execution of this MOU, the Parties will prepare a budget for the start up costs and expenses to be incurred in connection with the planning and initial work to set up the various entities and commence to prepare the various documents required to develop and implement the Project. Both parties shall have approval rights as to overall amounts, though not on an individual basis. This budget will

also include the minimum amount of capital that must be raised in order to proceed with the Project. In general, it is agreed that expenses shall be allocated as follows:

A. Each Party shall bear the expenses incurred by him for his legal counsel and other personal consultants.

B. Expenses that are generally attributable to development costs shall be borne by the Project.

C. Expenses directly attributable to implementation of the items specified on the Time and Responsibility Chart or which are subsequently identified as Project related will be borne directly by the Project.

D. Expenses not specifically enumerated above will be allocated as agreed to by the Parties.

E. No Party may incur any expense on behalf of the Project which is not budgeted or which exceeds the budget as in effect when the expense is incurred without the written consent of the other Party and if any such expenses are incurred, the Party incurring them will do at his own risk.

F. All consultants, professionals, experts and other advisors that render services to the Project prior to implementation will be approved by both Parties prior to being retained.

G. The budget will deal specifically with any success fees and related expenses that are to be paid to Mr. Liu in connection with his capital raising activities. The budget will also identify any fees and related expenses to be paid to Dr. Thropay and/or Ms. Novodor for services rendered by them in connection with the development of the Project.

H. JRT shall be paid annual rent for the ground lease of one million dollars ($1,000,000.00) payable in equal monthly installments (with the rent to escalate annually in accordance with the increase in the CPI) for a period of thirty (30) years , starting from the date that funding for the Project is received.

6. Compensation of Parties. Subject to the Project successfully raising the minimum amount of agreed upon capital, it is contemplated that the parties will be paid the following amounts:

A. Mr. Liu shall be entitled to a success fee for all capital raised from the EB-5 and other investors in an amount equal to 8% of the capital raised. The terms and conditions of such arrangement will be set forth in a retainer agreement between LACPT and Mr. Liu. Dr. Thropay and Mrs. Novodor will be entitled to the same compensation for any capital they are able to bring to the Project.

B. Once the agreed upon capital has been successfully raised, LACPT shall employ Mr. Liu as president with the responsibility of dealing with investors. Mr. Liu shall be paid a salary of $250,000 per year, plus reimbursement of travel expenses in accordance with the Company's policies and procedures in an amount not to exceed $150,000. The terms and conditions of Mr. Liu's employment will be set forth in an employment agreement between Mr. Liu and LACPT, with a term of five (5) years, subject to renewal upon agreement of the parties.

C. Dr. Thropay shall be paid an annual salary of $350,000, plus reimbursement of expenses plus reimbursement of expenses in accordance with the Company's policies and procedures. Mrs. Novodor shall be paid an annual salary of $200,000.00, plus reimbursement of expenses in accordance with the Company's policies and procedures. Such arrangements shall be for a term of seven years and shall provide protection for a change in control.

D. The management company will be paid for its services in an amount to be determined based on market rates for the type of services to be provided.

7. <u>Compliance With Legal Requirements</u>. All investment transactions shall be effectuated in full compliance with all applicable legal requirements, including, but not limited to, all laws, rules and regulations applicable to the EB5 Visa Investor Program and all state and federal securities laws applicable to the solicitation, sale and issuance of securities. No investment security will be issued unless such security is qualified with the state of California or registered with the Securities Exchange Commission or the issuance of such security is exempt under state or federal law, in which case the security shall be issued in full compliance with the requirements for the applicable exemption. Counsel for Dr. Thropay shall have the right to review all EB5 visa petition documents prior to filing and all offering documents used in connection with the solicitation, sale and issuance of securities to investors prior to their use.

8. <u>Termination of Project</u>. Either Party may terminate its participation in the Project by giving written notice to the other Party without any liability to the other Party; provided, however, that once the EB5 Fund has been formed and funds have been solicited and received by the Fund, the Parties shall be committed to proceeding with the Project or refunding all funds received, less any expenses as permitted under the agreements with the investors.

9. <u>No Exclusivity</u>. This MOU shall not create an exclusive arrangement between the Parties in that Dr. Thropay is free to pursue development opportunities for the Facility with other parties and Liu is also free to pursue development and investment opportunities with other parties; provided, however, that once the EB5 Fund has been formed and funds have been solicited and received by the Fund, the obligations between the Parties as regards the Project shall be exclusive and neither Party shall solicit other parties to be involved in the Project unless the other Party approves such action in writing.

10. Confidentiality. Concurrent herewith, the Parties are executing a Mutual Confidentiality Agreement in the form of Exhibit A hereto which shall apply to all information exchanged by the Parties in connection with the Project.

11. Binding Effect. Except as specifically provided in Sections 8, 9 and 12 of this MOU and in the Mutual Confidentiality Agreement, the Parties will not be legally obligated with respect to any of the matters identifies herein. The Parties will only be bound as set forth in any definitive agreements signed with respect to any of the matters identified in this MOU or which the Parties agree to enter into in connection with the Project. Each of Dr. Thropay and Liu acknowledges that no representations have been made to him except as may be set forth in any definitive agreement executed by the Parties and that neither Party is obligated to proceed with the Project, except as set forth in Sections 8 and 9 above.

12. Law to Govern. This agreement is made under and will be governed and interpreted pursuant to the laws of the State of California and both parties agree to the exclusive jurisdiction of the state and federal courts of the county of Los Angeles. As an inducement to forgo any legal proceedings, the Parties also agree that the prevailing party in any legal dispute arising from this Memorandum of Understanding will be entitled to receive from the losing party all costs and expenses, including reasonable attorneys fees and court costs.

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Understanding as of the date first written above.

John P. Thropay, M.D.

Charles Liu

# Exhibit 7

# MILLER MAYER, LLP

ATTORNEYS AT LAW

R. James Miller
John Moss Hinchcliff
Elena Salerno Flash
Rosanne Mayer
George R. Pfann, Jr.
David A. Tyler
Hilary T. Fraser
Laurie M. Johnston
Adam R. Schaye
Carolyn S. Lee
Hayden R. Brainard, Jr.
Kimberly N. Rothman

202 East State Street, Suite 700
Ithaca, New York 14850
Telephone: 607.273.4200
Fax: 607.272.6694
Web: www.millermayer.com
Email: syl@millermayer.com

Nicolai Hinrichsen
Kristal Ozmun

Of Counsel
Stephen Yale-Loehr
Randall L. Reed

**SUBMISSION CONTAINS CONFIDENTIALCOMMERCIAL INFORMATION. PER FOIA (5 U.S.C. § 552(b)(4)), SUBMITTER REQUESTS PREDISCLOSURE NOTIFICATION PER PRESIDENTIAL EXECUTIVE ORDER NO. 12,600, 52 Fed. Reg. 23781 (June 23, 1987)**

November 19, 2010

Via Federal Express

U.S. Citizenship and Immigration Service
California Service Center
ATTN: EB5 RC Proposal
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**RE:** Request for Designation of the Pacific Proton Therapy Regional Center, LLC ("PPTRC") under the Immigrant Investor Pilot Program

Dear Examiner:

I represent Applicant Pacific Proton Therapy Regional Center, LLC ("PPTRC") for purposes of its request for designation as a Regional Center under the Immigrant Investor Pilot Program. My G-28 is attached at Exhibit 1.

This letter transmits the enclosed regional center application as submitted by Pacific Proton Therapy Regional Center and its President Charles Liu. Pacific Proton Therapy Regional Center is also seeking exemplar pre-approval for its first project, Pacific Proton EB-5 Fund. Please consider Ms. Liu's letter and accompanying exhibits as a complete regional center application.

Please contact me if you have any questions.

Sincerely,

Stephen Yale-Loehr

Enclosures
H:\9520\003\PPTRC transmittal ltr.doc

**PACIFIC PROTON THERAPY REGIONAL CENTER, LLC**
200 E. BEVERLY BLVD., SUITE 200
MONTEBELLO, CA 90640-7001
T: 323-517-9800 F: 323-727-7574

**SUBMISSION CONTAINS CONFIDENTIALCOMMERCIAL INFORMATION. PER FOIA (5 U.S.C. § 552 (b)(4)), SUBMITTER REQUESTS PREDISCLOSURE NOTIFICATION PER PRESIDENTIAL EXECUTIVE ORDER NO. 12,600, 52 FED. REG. 23781 (JUNE 23, 1987)**

November 19, 2010

**Via Federal Express**

U.S. Citizenship and Immigration Services
California Service Center
ATTN: EB-5 RC Proposal
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**Application:** Request for Designation as EB-5 Regional Center
**Applicant:** Pacific Proton Therapy Regional Center, LLC
**Geography:** Counties of Los Angeles, Orange, Riverside, San Bernardino, California

**RE:** Designation of the Pacific Proton Therapy Regional Center (PPTRC) under the Immigrant Investor Pilot Program

Dear Examiner:

This letter and exhibits constitute an application for EB-5 regional center designation by Pacific Proton Therapy Regional Center, LLC to stimulate investment in Los Angeles, Orange, Riverside, and San Bernardino Counties in the State of California. I am the Managing Principal of Pacific Proton Therapy Regional Center, LLC and in this capacity hereby submit the present Regional Center application. My resume is attached at Exhibit 2.

The proposed regional center will be called the Pacific Proton Therapy Regional Center ("PPTRC"). This letter and attached exhibits explain how this proposal meets the requirements for regional center designation set forth at 8 C.F.R. § 204.6(m)(3).

**Pacific Proton Therapy Regional Center is also requesting approval of its first project, Pacific Proton EB-5 Fund, LLC, which will loan EB-5 investor funds to Los Angeles County Proton Therapy, LLC to partially finance the development and construction of a proton therapy center and commercial office buildings. Accordingly, we have included an Exemplar**

**I-526 Petition, project-specific I-526 business plan, and final versions of all offering materials.**

**Introduction**

PPTRC is requesting approval to focus investments in the economic clusters of Construction (NAICS 23), Manufacturing (NAICS 33), Healthcare and Social Assistance (NAICS 62), Accommodation and Food Services (NAICS 72), Administrative and Support Services (NAICS 56), and Retail Trade (NAICS 44). PPTRC has already identified and begun planning for its first project, Los Angeles County Proton Center and commercial office buildings (together, the "Project"). An independent economic report shows that the Project will create an estimated 4,775 permanent new jobs, boost output by $728 million per year, and increase labor (household) income by $217 million per year. PPTRC and the Project will have a substantial and ongoing economic impact in Los Angeles, Orange, Riverside, and San Bernardino counties, California.

**Geographical Area**

This proposal requests regional center designation for investments in the geographical area of Los Angeles, Orange, Riverside, and San Bernardino counties in the State of California. Please see a map of the proposed regional center at Exhibit 6. Investments made within targeted employment areas ("TEAs") within this geographical area will be $500,000; investments made in other parts of this geographical area that are not in a TEA will be $1,000,000. A TEA is either a rural area or an area designated by the appropriate state agency as having an unemployment rate of at least 150% of the national average unemployment rate.

California Governor Arnold Schwarzenegger designated the California Business, Transportation and Housing Agency ("BTH") as the agency responsible for determining high unemployment areas. Please see Governor's Letter at Exhibit 7. See also letter from Gabor Morocz, Deputy General Counsel, BTH, and data from the BTH website supporting TEA designation for the Project, attached at Exhibit 8.

**Management and Administration**

Mr. Charles Liu and Dr. John P. Thropay are the Managing Principals of PPTRC. Both Managing Principals will administer and manage the Regional Center to ensure project goals and regional center requirements are met. Charles Liu is also Chairman and CEO of Century Medical Investment Holdings Ltd., an exclusive sales agency for Optivus Proton Therapy, Inc. in China. Mr. Liu has twenty years of work experience in management and the medical field.

John P. Thropay, M.D. graduated from UCLA with a degree in Medicine and completed his residency in Radiation Oncology at LAC/USC Medical Center. Dr. Thropay currently serves as the Founder, Medical Director, and President of Beverly Oncology and Imaging (BOI) Medical Group, Inc.

PPTRC also plans to retain the law firm of Miller Mayer, LLP ("Miller Mayer") to ensure timely and accurate compliance with applicable USCIS regional center reporting requirements, as further detailed in the Pacific Proton Therapy Regional Center, LLC Business Plan at Exhibit 2.

To ensure quality and consistency of all immigrant investor I-526 petitions submitted to the USCIS, Miller Mayer will also act as preferred immigration counsel for individual PPTRC investors. Miller Mayer will work with PPTRC to assemble and draft all necessary regional center business and investor documentation required by USCIS for I-526 petition approval. In addition, PPTRC will engage the services of outside accountants to prepare annual financial documents for all PPTRC projects.

**Regional Center Marketing**

PPTRC will have both an Internet presence and engage in direct marketing. Direct marketing includes, among other things, print and Internet advertisements and trade shows. Total marketing costs are estimated to be $100,000 for the first year of operation and will be paid by Mr. Charles Liu, PPTRC's managing member. For further details, please see the Pacific Proton Therapy Regional Center, LLC Business Plan at Exhibit 2.

**Regional Center Expenses and Budget**

As indicated in the Expense Attestation Letter from PPTRC Principal Charles Liu, attached at Exhibit 9, PPTRC has spent $49,798 to date on initial start-up expenses for the Regional Center. Charles Liu has committed a total of $200,000 to ensure the successful operation of PPTRC. Please see Expense Attestation letter at Exhibit 9 for evidence of this commitment. This combined dedicated capital is sufficient to sustain PPTRC's marketing efforts and post-approval operations, distinct from immigrant investors' required capital investments in a new commercial enterprise within the regional center. Further, Charles Liu pledges to supply additional resources as needed if PPTRC requires additional operating capital.

Please see also Pacific Proton Therapy Regional Center, LLC bank statements attached at Exhibit 9, which further document and enumerate expenses incurred.

**Investment Structure and Terms**

PPTRC will organize a separate investment entity such as a limited liability company (the "LLC") for each investment opportunity. EB-5 investors will make qualifying investments in the LLC and become a Member with rights equivalent to those of a limited partner under the Uniform Limited Partnership Act. In most cases, PPTRC will serve as the Manager of the LLC and be responsible for the day-to-day conduct of the business and affairs of the LLC. LLC Members will only risk their capital contribution; they are not liable for the daily affairs of the LLC. PPTRC may

be a member of the LLC, depending on the business terms of each project.

Investments by EB-5 petitioners in the LLC will be made in exchange for equity. Investors will invest $500,000 if in a TEA, or $1,000,000 if outside of a TEA, into the LLC in exchange for membership interests in the LLC. There is no guarantee that distributions will be made. Any distributions will be made only from available cash flow and/or excess proceeds. The full $500,000 capital contribution will be made available to the job creating enterprise as required by *Matter of Izummi*. Limited Liability Company Operating Agreements will not permit EB-5 capital to be used for organizational or operation expenses, or for management fees paid in connection with the operation of the LLC. PPTRC intends to charge investors an additional up-front administrative fee of approximately $45,000 ("Administrative Fee") to cover such expenses, although PPTRC reserves the right to increase or decrease the Administrative Fee in its sole discretion.

The number of EB-5 investors per LLC will vary depending on the size of the project, the type of investment, and the number of jobs that will be directly and indirectly created. PPTRC will return an EB-5 investor's funds without interest if his or her I-526 petition is denied. PPTRC may also return part of the Administrative Fee under certain conditions.

In some cases, the LLC will represent the investment opportunity and investors will make direct equity investments into the project. In the alternative, EB-5 capital contributions will be loaned, invested, or used to purchase bonds for qualified projects upon I-526 approval and will not be guaranteed by the LLC or PPTRC. Loans to qualified projects will be made under terms that do not allow for principal repayment over the initial 5 years of the loan. Equity investments will be made into qualified projects that PPTRC expects can be profitably liquidated or sold no sooner than 5 years after the initial EB-5 investment. Bonds will similarly not be eligible for repurchase sooner than 5 years from the date of purchase.

PPTRC anticipates using an escrow account for management of an immigrant investor's capital contribution. Once the escrow agent receives confirmation that an immigrant investor's I-526 petition has been approved, such investor's capital contribution will be released and deployed into the project. Alternatively, if the LLC constitutes a direct project investment, the capital contribution will simply be released from escrow to the control of the LLC for use in the qualifying project.

Before any investment, PPTRC will require the project entity to provide a job creation analysis using economic methodologies acceptable to the USCIS. The decision whether to proceed with an investment will be based in part on the job creation potential of the target project. EB-5 funds shall be deployed to ensure that at least ten new, qualifying, full-time jobs for each immigrant investor will be created within the regional center geographic area, as approved by USCIS. LLC investments will generally be made as part of a coordinated capital program, probably along with other domestic capital sources.

**The First Project: Los Angeles County Proton Center**

PPTRC has formed Pacific Proton EB-5 Fund, LLC ("PPEB-5") to serve as the investment vehicle for its first project. EB-5 investors will make their qualifying investment in PPEB-5, which will then pool the funds and make a loan to Los Angeles County Proton Therapy, LLC ("LAPT") to partially finance the development and construction of a proton therapy center and commercial office space. LAPT will develop and operate an innovative new cancer treatment center using proton beam radiation for treatment of oncology patients in Montebello, California. In addition to the proton therapy center, the building is also expected to contain 125,000 square feet of medical office space and ancillary facilities. LAPT will also develop and construct a new 30,000 square foot office building in Monterey Park, California. This building will contain a restaurant, pharmacy, and radiation therapy office on the first floor and multiple-use medical office space on floors two and three.

Investors must invest $500,000 plus an Administrative Fee of approximately $45,000 in PPEB-5 before applying for their I-526 petition. PPTRC will use an escrow account for an immigrant investor's $500,000 capital contribution. Once the escrow agent receives confirmation that an immigrant investor's I-526 petition has been approved, the funds will be released to PPEB-5 for deployment to LAPT. Please see the escrow agreement at Exhibit 18. If the USCIS denies the I-526 petition, PPTRC will return the investor's capital contribution. PPTRC will also return fifty percent of the investor's Administrative Fee upon denial of the I-526 petition; however, the remaining fifty percent is non-refundable. Please see Pacific Proton Fund EB-5, LLC Business Plan at Exhibit 11, Private Offering Memorandum at Exhibit 16, and Loan Documents at Exhibit 19 for detailed information on the Project.

The Operating Agreement, Private Offering Memorandum ("POM"), and Subscription Agreement attached at Exhibits 14, 16, and 17, respectively, are currently drafted to reflect an investment in Pacific Proton EB-5 Fund, LLC. For purposes of this regional center application, these documents also serve as generic templates for all future PPTRC investment projects.

**Employment Creation**

PPTRC plans to use a USCIS approved input-output model such as IMPLAN, RIMS II, REMI, or REDYN to show how each investment by an immigrant investor in the regional center will directly and indirectly create at least 10 jobs within the regional center's geographic area.

Attached at Exhibit 12 is an economic report prepared by Michael Evans of Evans, Carroll & Associates. For purposes of estimating the economic impacts of LAPT, Mr. Evans used the RIMS II final demand multipliers. The report analyses the job creation potential and economic impact of the development and construction of the Project in the regional center geographic area. The report estimates that the project will create 4,775 new jobs. The report also serves as a template for other future projects PPTRC may conduct in the regional center.

## Conclusion

PPTRC and the Project will have a transformative effect on the counties of Los Angeles, Orange, Riverside, and San Bernardino, California, creating over 4,500 permanent, full-time jobs and yielding an economic impact of nearly $728 million per year once completed. These California counties desperately need the economic stimulus that PPTRC investments will provide. Therefore we urge you to promptly adjudicate and approve this regional center application and first project, which fully satisfy the requirements for EB-5 regional center designation and project approval. We look forward to your early approval.

Sincerely,

Charles Liu
PPTRC President

Attachment: Document Index and Exhibits

H:\9520\002\Final submission documents\LA Proton Exemplar Cover Letter 11.19.2010 FINAL.doc

**Document Index and Exhibits**
**Pacific Proton Therapy Regional Center, LLC**
**Regional Center Application**

| Exhibit No. | Description |
|---|---|
| 1 | Signed G-28 form |

**Pacific Proton Therapy Regional Center, LLC documents:**

| | |
|---|---|
| 2 | Regional Center business plan, including resumes from Regional Center principals |
| 3 | Articles of Organization for Pacific Proton Therapy Regional Center, LLC |
| 4 | Operating agreement |
| 5 | Regional Center information to add to USCIS website |
| 6 | Map of proposed regional center geographical area and TEAs |
| 7 | Letter from California Governor Arnold Schwarzenegger designating the California Business, Transportation and Housing Agency as the agency responsible for certifying areas of high unemployment |
| 8 | Letter from Gabor Morocz, Deputy General Counsel, California Business, Transportation and Housing Agency (BTH), and data from BTH website supporting list of TEA designations |
| 9 | Expense and budget information, including PPTRC bank statements and expense attestation letter. |

**Pacific Proton EB-5 Fund, LLC documents:**

| | |
|---|---|
| 10 | Exemplar I-526 petition |
| 11 | Pacific Proton EB-5 Fund, LLC Business Plan |
| 12 | Economic report and economist team information |
| 13 | Articles of Organization |
| 14 | Final Operating Agreement |

| | |
|---|---|
| 15 | Final Investor Suitability Questionnaire |
| 16 | Final Private Placement Memorandum |
| 17 | Final Subscription Agreement |
| 18 | Final Capital Contribution Escrow Agreement and list of proposed escrow agents |
| 19 | Loan Documents |
| 20 | Articles of Organization of Borrower, Los Angeles County Proton Therapy, LLC |

# Exhibit 8

# PRIVATE OFFERING MEMORANDUM

## 300 LIMITED LIABILITY COMPANY MEMBERSHIP UNITS
## OF
## PACIFIC PROTON EB-5 FUND, LLC

200 E. Beverly Boulevard, Suite 200
Montebello, CA 90840

Contact: Mr. Charles Liu
at (626) 688-4898

EXHIBIT
101

The information contained in this Private Offering Memorandum together with all exhibits hereto (the "Offering Memorandum") is provided on a confidential basis only to prospective investors in Pacific Proton EB-5 Fund, LLC. All information contained herein shall be treated as secret and no part of it shall be disclosed to others, reproduced in whole or in part, or used in any other manner without the prior written consent of Pacific Proton EB-5 Fund, LLC.

NAME OF OFFEREE: ________________________ MEMORANDUM NO.: ____________

GOVERNMENT EXHIBIT Am
5
3.23.16 LA4B9
PENGAD 800-631-6989

**PRIVATE OFFERING MEMORANDUM**
**300 LIMITED LIABILITY COMPANY MEMBERSHIP UNITS**
**OF**
**PACIFIC PROTON EB-5 FUND, LLC**

| | |
|---|---|
| **Securities:** | Limited Liability Company Membership Interests ("Units") |
| **Maximum Offering** | $150,000,000 |
| **Minimum Investment** | $500,000 (1 Unit) |
| **Initial Administrative Fee** | $45,000 |

Pacific Proton EB-5 Fund, LLC ("PPEB5"), a Delaware limited liability company, was formed on November 15, 2010. PPEB5 is offering for sale Units of limited liability company membership interests at a purchase price of $500,000 per Unit to qualified non-U.S. citizens seeking permanent resident status in the United States through the Immigrant Investor Program ("EB-5 Program") established by the Immigration and Nationality Act, who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Act"). Investors acquiring Units in this offering will be members of PPEB5.

This Offering Memorandum is furnished by PPEB5 solely for use by qualified investors in evaluating the offering described herein (the "Offering"). Investment funds will be held in escrow prior to closing in accordance with the escrow agreement attached hereto ("Escrow Agreement") as **APPENDIX A**. PPEB5 charges an administrative fee (the "Administrative Fee") for payment of expenses incurred in connection with this Offering ("Offering Expenses").The Administrative Fee will not be held in escrow and will be applied to Offering Expenses immediately upon receipt.

INVESTMENT IN SMALL BUSINESSES INVOLVES A HIGH DEGREE OF RISK, AND INVESTORS SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS THEY CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. **SEE "RISK FACTORS" BELOW FOR THE RISK FACTORS THAT MANAGEMENT BELIEVES PRESENT THE MOST SUBSTANTIAL RISKS TO AN INVESTOR IN THIS OFFERING.**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED, APPROVED OR DISAPPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THESE AUTHORITIES HAVE NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY OTHER APPLICABLE LAW OR APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES ADMINISTRATOR. THE SEC DOES NOT PASS UPON THE MERITS OF ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR SELLING LITERATURE. THESE SECURITIES ARE OFFERED UNDER AN EXEMPTION FROM REGISTRATION; HOWEVER, THE SEC HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THESE SECURITIES ARE EXEMPT FROM REGISTRATION.

The information in this Offering Memorandum is furnished on a confidential basis exclusively for your use and retention and by accepting this Offering Memorandum you agree not to transmit, reproduce or make available to any other person (other than your legal, tax, accounting and other advisers) all or any part of this Offering Memorandum without the express written permission of PPEB5.



EXHIBIT 8

## SECURITIES DISCLOSURE NOTICES

THIS OFFERING MEMORANDUM CONTAINS FORWARD-LOOKING STATEMENTS BASED ON MANAGEMENT'S EXPERIENCE AND EXPECTATIONS ABOUT PPEB5'S BUSINESS PLAN. THOSE STATEMENTS ARE SOMETIMES INDICATED BY WORDS SUCH AS "EXPECTS," "BELIEVES," "SEEKS," "MAY," "INTENDS," "ATTEMPTS," "WILL" AND SIMILAR EXPRESSIONS. SUCH FORWARD-LOOKING STATEMENTS ARE NOT GUARANTIES OF FUTURE PERFORMANCE AND ARE SUBJECT TO MANY RISKS, UNCERTAINTIES AND ASSUMPTIONS THAT ARE DIFFICULT TO PREDICT. THEREFORE, ACTUAL RETURNS COULD DIFFER MATERIALLY AND ADVERSELY FROM THOSE EXPRESSED OR IMPLIED IN ANY FORWARD-LOOKING STATEMENTS AS A RESULT OF VARIOUS FACTORS. THE SECTION ENTITLED "RISK FACTORS" IN THIS OFFERING MEMORANDUM DISCUSSES SOME OF THE IMPORTANT RISK FACTORS THAT MAY AFFECT PPEB5'S RETURNS. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THOSE RISKS, IN ADDITION TO OTHER INFORMATION IN THIS OFFERING MEMORANDUM, BEFORE DECIDING WHETHER TO INVEST IN PPEB5. PPEB5 UNDERTAKES NO OBLIGATION TO REVISE OR UPDATE ANY FORWARD-LOOKING STATEMENT FOR ANY REASON.

THIS IS A PRIVATE OFFERING AND IS AVAILABLE ONLY TO INVESTORS WHO ARE "ACCREDITED INVESTORS" AS DEFINED UNDER THE ACT. EACH SUCH INVESTOR MUST, EITHER ALONE OR TOGETHER WITH A PURCHASER REPRESENTATIVE THAT IS NOT COMPENSATED BY OR AFFILIATED WITH PPEB5 OR ITS MANAGEMENT, HAVE SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT SUCH INVESTOR IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THIS INVESTMENT AND MUST BE ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. NO OFFER IS BEING MADE HEREBY TO ANY PERSON WHO HAS NOT FURNISHED TO PPEB5 COMPLETED AND SIGNED SUBSCRIPTION MATERIALS ATTACHED AS EXHIBITS TO THIS OFFERING MEMORANDUM, AND WHO IS NOT SHOWN BY SUCH INFORMATION TO MEET THE SUITABILITY STANDARDS FOR THIS OFFERING.

THE UNITS HAVE NOT BEEN REGISTERED UNDER THE ACT, OR REGISTERED OR QUALIFIED UNDER ANY APPLICABLE STATE SECURITIES LAWS, AND ARE OFFERED IN RELIANCE ON EXEMPTIONS FROM SUCH REGISTRATION UNDER THE ACT AND QUALIFICATION UNDER SECTION 4(2) AND REGULATION D UNDER SUCH ACT AND SIMILAR PROVISIONS OF SUCH STATE LAWS. A PURCHASER OF UNITS MUST CONTINUE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD BECAUSE UNITS HAVE NOT BEEN SO REGISTERED OR QUALIFIED AND ARE SUBJECT TO RESTRICTIONS ON TRANSFER PURSUANT TO SUCH ACT AND SUCH STATE LAWS AND OTHERWISE. UNITS CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION ARE AVAILABLE AND CERTAIN CONDITIONS ARE MET. NO MARKET FOR UNITS CAN BE EXPECTED TO DEVELOP. DO NOT CONSIDER INVESTING IF YOU ARE NOT FINANCIALLY SOPHISTICATED AND CAPABLE OF EVALUATING THE MERITS AND RISKS OF THE INVESTMENT, EITHER ON YOUR OWN OR WITH THE ASSISTANCE OF YOUR PROFESSIONAL ADVISORS.

PPEB5 RESERVES THE RIGHT TO ACCEPT OR REJECT ANY SUBSCRIPTION TO PURCHASE UNITS FOR ANY REASON. THIS OFFERING WILL CONTINUE UNTIL TERMINATED BY PPEB5, WHICH MAY BE BEFORE SUBSCRIPTIONS FOR ANY MAXIMUM OFFERING HAS BEEN RAISED.

THIS OFFERING MEMORANDUM IS AN OFFER ONLY TO THE OFFEREE NAMED ON THE COVER PAGE, AND ONLY IF DELIVERY OF THIS OFFERING MEMORANDUM WAS MADE BY, OR AUTHORIZED BY, PPEB5.

NO ONE HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS ABOUT PPEB5 OR THE UNITS, OTHER THAN THOSE REPRESENTATIONS MADE IN THIS OFFERING MEMORANDUM.



EXHIBIT 8

THEREFORE, DO NOT CONSIDER ANY INFORMATION WHICH HAS BEEN DESCRIBED TO YOU ORALLY. PLEASE MAKE SURE THAT YOU INVEST SOLELY ON THE BASIS OF THE INFORMATION IN THIS OFFERING MEMORANDUM. THIS OFFERING MEMORANDUM IS NOT LEGAL, TAX OR FINANCIAL ADVICE. PLEASE CONSULT YOUR OWN PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX AND FINANCIAL IMPLICATIONS OF THIS INVESTMENT AND AS TO YOUR SUITABILITY FOR THIS INVESTMENT.

INVESTORS IN THIS OFFERING MAY INVEST GREATER AMOUNTS AND RECEIVE A PROPORTIONATELY SMALLER INTEREST IN THE PROFITS AND DISTRIBUTIONS OF PPEB5 THAN OTHER MEMBERS.

PPEB5 WILL RESPOND TO ANY QUESTIONS YOU OR YOUR ADVISORS MAY HAVE CONCERNING THIS OFFERING AND WILL MAKE AVAILABLE FOR EXAMINATION BY YOU OR YOUR ADVISORS SUCH RECORDS AND FILES IN ITS POSSESSION AS MAY BE PERTINENT TO YOUR DECISION WHETHER TO INVEST IN UNITS.

THE TERMS AND CONDITIONS OF THIS OFFERING, THE RIGHTS, PREFERENCES, PRIVILEGES AND RESTRICTIONS ON UNITS AND THE RIGHTS AND LIABILITIES OF THE MANAGERS AND PPEB5 ARE GOVERNED BY THE OPERATING AGREEMENT AND THE SUBSCRIPTION AGREEMENT BETWEEN EACH MEMBER AND PPEB5, THE FORMS OF WHICH ARE INCLUDED AS APPENDICES HERETO, AND THE DESCRIPTION OF ANY OF SUCH MATTERS IN THE TEXT OF THIS OFFERING MEMORANDUM IS SUBJECT TO AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH APPENDICES.

THE OFFEREE, BY ACCEPTING DELIVERY OF THIS OFFERING MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO PPEB5 IF THE OFFEREE DOES NOT SUBSCRIBE FOR UNITS. THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY OF THESE SECURITIES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION IN SUCH STATE.

**NOTICE TO RESIDENTS OF ALL STATES**

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND APPLICABLE STATE LAWS. THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.



EXHIBIT 8

## TABLE OF CONTENTS


SECURITIES DISCLOSURE NOTICES .... 3
SUMMARY OF OFFERING TERMS .... 6
EB-5 IMMIGRATION DISCLOSURES .... 9
RISK FACTORS .... 13
BUSINESS PLAN SUMMARY .... 18
CAPITAL REQUIREMENTS AND ESTIMATED USE OF PROCEEDS .... 20
MATERIAL RELATIONSHIPS AND CONTRACTS .... 22
SUMMARY OF LOAN TERMS .... 24
SUMMARY OF THE OPERATING AGREEMENT .... 25
SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION .... 28
INCOME TAX CONSIDERATIONS .... 29
DOCUMENTS AVAILABLE FOR INSPECTION .... 29

Appendices

A. ESCROW AGREEMENT
B. OPERATING AGREEMENT
C. SUBSCRIPTION AGREEMENT
D. TARGETED EMPLOYMENT AREA LETTER
E. ECONOMIC ANALYSIS OF EVANS, CARROLL & ASSOCIATES
F. AMENDED AND RESTATED LOAN DOCUMENTS




EXHIBIT 8

## SUMMARY OF OFFERING TERMS

The following is only a summary of certain of the information contained in this Offering Memorandum and is qualified in its entirety by reference to this Offering Memorandum, including the Exhibits hereto.

**Issuer**

Pacific Proton EB-5 Fund, LLC ("PPEB5"), a Delaware limited liability company of Montebello, CA formed in November, 2010, is offering for sale Units of limited liability company membership interests in PPEB5 to Accredited Investors pursuant to the EB-5 Program (defined below). Pacific Proton Therapy Regional Center, LLC a California limited liability company, is the sole Manager ("Manager") of PPEB5.

**Securities**

One Unit of limited liability company membership interest of PPEB5 shall be issued to Investors in this Offering for each $500,000 investment. One Unit will constitute approximately 0.33% of all Units of PPEB5 if the Maximum Offering hereunder (300 Units) is sold. There is no Minimum Offering amount.

**Minimum Investment**

$500,000.00 ("Capital Contribution").

**Administrative Fees**

PPEB5 will charge an Administrative Fee of $45,000 ("Administrative Fee") to pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering. Investors will pay the Administrative Fee directly to the Regional Center. The Regional Center will refund the Administrative Fee if (a) an Investor's subscription is not accepted, or (b) if an Investor's I-526 application is denied without possibility of cure. The Regional Center will not refund all or any part of the Administrative Fee for any other reason. The Administrative Fee will not be held in escrow.

**Borrower**

Los Angeles County Proton Therapy, LLC ("Borrower") is a California limited liability company of 200 E. Beverly Blvd., Suite 200, Montebello, CA formed in November, 2010. Borrower seeks financing from PPEB5 for development and operation of a proton therapy center in Los Angeles County, California (the "Project").

**Estimated Use of Proceeds**

PPEB5 will loan ("Loan") the proceeds of this Offering to the Borrower to develop and operate a proton therapy center in Los Angeles County, California. PPEB5 will make the Loan to Borrower on the terms set forth in the Loan Documents attached hereto as **APPENDIX F**. See *Capital Requirements and Estimated Use of Proceeds* and *Summary of Loan Terms* below.

**EB-5 Regional Center Sponsorship**

The Project is sponsored by Pacific Proton Therapy Regional Center, LLC, (the "Regional Center" or "PPTRC"), a California limited liability company of Montebello, CA. The Regional Center is a regional center authorized by U.S. Citizenship and Immigration Services ("USCIS") under the EB-5 Immigrant Investor Program ("EB-5 Program") to establish and solicit investment from foreign investors in U.S. businesses for the purpose of creating U.S. jobs.

**Management Fee**

The Manager shall receive a management fee equal to three (3.0%) percent of the gross revenues, if any, of PPEB5, payable on the first day of each month for the preceding period. If there is more than one Manager, the management fee shall be distributed among the Managers on a pro rata basis unless otherwise agreed by the Managers.



EXHIBIT 8

**Escrow of Capital Contributions**

All Capital Contributions will be held in escrow pursuant to the Escrow Agreement attached hereto as **APPENDIX A.** The escrow agent will rclcasc each Capital Contribution to PPEB5 upon notice of filing of each Investor's I-526 Petition with USCIS. Once an Investor's I-526 petition has been filed with USCIS, the Regional Center will refund an Investor's Capital Contribution and Administrative Fee only if an Investor's I-526 petition is denied by USCIS without possibility of cure. The Regional Center will not refund all or any part of the Capital Contribution or Administrative Fee for any other reason. Please see the Escrow Agreement and Subscription Agreement for further details.

**Investor Qualification**

This Offering is made pursuant to an exemption from registration under the Act, including the exemption provided by Section 4(2) of the Act, Regulation D and Regulation S promulgated thereunder, and exemptions available under applicable state securities laws. Units will be offered and sold only to persons who (a) are not U.S. Persons, as that term is defined in Regulation S under the Securities Act, and (b) both are (i) "accredited investors" within the meaning of Regulation D under the Securities Act and (ii) "qualified purchasers" as that term is defined in Section 2(a)(51) of the Investment Company Act of 1940. In addition, the Units may not be assigned or transferred without the consent of the Manager (which may be granted or denied in the sole discretion of the Manger) and satisfaction of certain other conditions. Under the federal securities laws, any Units acquired in this Offering generally may not be offered or sold prior to the expiration of a one-year period from the date of purchase.

It is anticipated that PPEB5will not be required to register as an investment company under the Investment Company Act. PPEB5 will rely on an exception contained in Section 3(c)(7) of the Investment Company Act. PPEB5 will obtain appropriate representations and undertakings from purchasers of the Units to assure that the conditions of "beneficial ownership" will be met on an ongoing basis. Certain Investors may be asked to furnish additional information to the Manager to enable PPEB5's counsel to ensure PPEB5's compliance with the Investment Company Act.

**Additional Capital Contributions**

No Member is under any obligation to make additional Capital Contributions to PPEB5. Members may make additional Capital Contributions upon consent of the Manager and in accordance with the Operating Agreement ("Operating Agreement"). See *Summary of Operating Agreement* below.

**Transfer Restrictions; No Resale**

Units may not be transferred without consent of the Manager. There are other substantial restrictions on the transfer of Units further described in the Operating Agreement. No market for the Units exists and no market is expected to develop. See *Risk Factors* below.

**Distribution of Profits**

The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits of PPEB5. Available Cash Flow and Net Proceeds from a Capital Event (as defined in the Operating Agreement), if any, will be distributed as follows:

- to Members in payment of Mandatory Distributions (See Section 3.6 of the Operating Agreement);
- then to EB-5 Members pro rata in accordance with each EB-5 Member's Adjusted Capital Contribution in an amount up to each such EB-5 Member's Adjusted Capital Contribution; and
- then to Members other than EB-5 Members pro rata in accordance with each of such Member's Adjusted Capital Contribution in an amount up to each



EXHIBIT 8

such Member's Adjusted Capital Contribution; and

- then to Members in accordance with their Percentage Interests (as defined in the Operating Agreement).

PPEB5 shall not make any distribution (i) if after such distribution liabilities of PPEB5, other than liabilities to Members on account of their Units (as defined in the Operating Agreement), exceed the fair value of the assets of PPEB5, (ii) to EB-5 Members to the extent that such distribution results in reducing such EB-5 Member's Capital Account below the EB-5 Minimum Capital Requirement (as defined in the Operating Agreement), or (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, the foregoing restrictions shall no longer apply.

**Member Voting**

Members will have limited involvement in management of PPEB5, including limited voting rights as more specifically described in the Operating Agreement. Member approval is required only for the following actions: (i) modification of the Operating Agreement materially changing the rights of the Members; (ii) dissolution of PPEB5 prior to the end of the fifth year after admission of the last EB-5 Member, and (iii) other matters presented to the Members for their vote by the Manager. Each Member shall have one vote on such matters for each Unit owned. See *Summary of Operating Agreement* below.

**Plan of Distribution**

PPEB5 may make offers and sales of Units directly to investors through its Manager, agents and affiliates and may engage and pay one or more brokers, investment advisors, finders or other parties commissions or other fees in connection with the sale of Units pursuant to this Offering. Any such commissions or other fees paid in connection with the sale of Units pursuant to this Offering shall be paid only out of the proceeds of Administrative Fees.

**Reports**

Members will receive financial statements and a K-l statement reflecting their allocable share of PPEB5's profits and losses annually.

**Subscriptions Procedure**

Investors may subscribe for Units by executing and delivering the Escrow Agreement (**APPENDIX A**), Operating Agreement (**APPENDIX B**), and Subscription Agreement (**APPENDIX C**), his/her Capital Contribution to PPEB5 and the Administrative Fee to the Regional Center. PPEB5 may accept or reject any subscription at any time at or prior to the closing of the Offering or at such later date as PPEB5 may determine. In the event that a subscription is not accepted or in the event the conditions precedent to the closing of the Offering are not satisfied or waived, in either case on or before the closing of the Offering or such later date as may be determined by PPEB5, Capital Contributions shall be returned, without interest or deduction. No interest will be paid on any subscription funds. Upon rejection of a subscription the Regional Center shall return a Subscriber's Administrative Fee without interest or deduction. Upon acceptance of an Investor's subscription, filing of his/her I-526 Petition and release of escrow, he/she will be admitted as an EB-5 Member of PPEB5. See *Subscription Procedure and Plan of Distribution* below.



EXHIBIT 8

## EB-5 IMMIGRATION DISCLOSURES

The U.S. Congress created the employment-based fifth preference ("EB-5") immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy. The minimum amount required to invest is $1 million, although that amount is reduced to $500,000 if the investment is made in a high unemployment area or qualifying rural area ("Targeted Employment Area" or "TEA"). Each investment must create or save at least 10 permanent full-time jobs for U.S. workers.

In 1992, to stimulate interest in the EB-5 program, the U.S. Congress enacted the EB-5 Immigrant Investor Pilot Program ("Pilot Program"). The Pilot Program allows public and private entities to apply to the United States Citizenship and Immigration Services ("USCIS") for regional center designation for the purpose of developing qualifying investments for foreign investors under the Pilot Program. A regional center provides a structure for focusing foreign investment in a specific U.S. geographic area and for promoting economic growth in such area through increased export sales, improved productivity, creation of new jobs, and increased domestic capital investment. Immigrant investors can qualify under the Pilot Program by making a qualifying investment in a project sponsored by a USCIS-approved regional center.

Investors in this Offering who have subscribed for Units with the intention of applying for permanent residency in the United States through the Pilot Program should be aware of certain risk factors involving the Pilot Program and its administration. See *Risk Factors* below. PPEB5 has no experience administering the Pilot Program, which could lead to delays for investors in the process of obtaining conditional and/or permanent residency in the U.S.

An Investor who purchases Units with the intention of obtaining conditional and permanent residency in the U.S. is encouraged, along with his/her advisors, to make his/her own independent review of the Pilot Program and the various immigration risk factors relating to the process of obtaining conditional and permanent residency status to determine if an investment in the Units is a suitable approach for him/her.

NEITHER PPEB5 NOR THE REGIONAL CENTER MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND CONCERNING WHETHER AN INVESTMENT IN PPEB5 WILL MEET THE REQUIREMENTS OF THE PILOT PROGRAM OR OTHER U.S. IMMIGRATION REQUIREMENTS. NO ASSURANCES CAN BE GIVEN THAT AN INVESTMENT IN PPEB5 WILL RESULT IN AN IMMIGRANT INVESTOR RECEIVING CONDITIONAL OR PERMANENT RESIDENT STATUS.

***General Immigration Risks***. Congress and/or USCIS may change the law, regulations, or interpretations of the law, including the Pilot Program, without notice and in a manner that may be detrimental to an Investor, PPEB5, and/or the Regional Center. Investors who obtain conditional or permanent resident status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent resident status. The process of obtaining conditional and permanent resident status involves numerous factors and circumstances that are not within the control of the Regional Center, PPEB5, or the Borrower. These include an Immigrant Investor's immigration history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Pilot Program.

***PPTRC Regional Center Designation.*** The Regional Center was designated as a regional center by the USCIS to participate in the Pilot Program on June 28, 2012. Accordingly, the Regional Center has limited experience in administering a regional center pursuant to the requirements of the Pilot Program, which could lead to delays for investors in the process of obtaining conditional or permanent residency in the U.S.

***Pilot Program Expiration Date.*** The expiration date for legislation authorizing the Pilot Program, including the Regional Center sponsoring this Project, is currently September 30, 2015. It is generally expected that the U.S. Congress will extend the Pilot Program; however, there can be no assurance that this will occur or that Investor petitions or applications submitted before the Pilot Program's current termination date will be adjudicated by the USCIS.



EXHIBIT 8

***Green Card Processing.*** All filings with USCIS should be prepared and filed by a qualified U.S. immigration attorney. After an EB-5 investment is made an Investor must start the immigration process by filing an I-526 Petition with USCIS. Filing of an Investor's I-526 Petition requires USCIS to certify that the investment qualifies under the Pilot Program. As of the date of this document, USCIS estimates issuing approvals (or denials) of I-526 Petitions within approximately four months time; however, processing times often exceed that and it is impossible to conclusively predict USCIS processing times.

After an I-526 Petition is approved, an Investor must file an I-485 Adjustment of Status Form if he/she is already located within the United States, or apply for an immigrant visa via consular processing if living abroad. If approved, the Investor will then be granted conditional resident status. Conditional resident status is valid for a period of two years and confers the same rights as permanent unconditional residency, but is subject to satisfaction of certain conditions. Investors should not physically move to the United States until their immigrant visa has been issued.

Within the 90 days preceding the second anniversary of an Investor's admission to the United States as a conditional permanent resident, an Investor must file an I-829 Petition to remove the conditions to permanent residency ("I-829 Petition"). The I-829 Petition confirms that the investment has been made, is still in place, and that the job creation requirement has been satisfied or will be satisfied within a reasonable time.

Once the conditions to permanent residency are removed, a permanent green card is granted for indefinite permanent resident status in the United States. The time from I-526 Petition filing until removal of conditions is currently about three years but depends on the circumstances of each petitioner. U.S. citizenship is possible approximately five years after approval of conditional residency, upon satisfaction of residency and other criteria. All estimates of processing times are approximations and dependent on each individual's specific circumstances. There is no guarantee that the requisite number of jobs will result from any investment or that other factors, related and unrelated to the investment, will not prevent approved of the I-526 Petition, granting of conditional or permanent residency, or removal of conditions.

***Job Creation.*** At the time of filing an I-526 Petition, each Investor must demonstrate that he/she has made a qualifying investment into a new commercial enterprise that will create full-time employment for 10 or more qualified employees. USCIS currently requires an Investor to submit evidence that demonstrates that such jobs will be created within the two-year period of conditional residence. For purposes of adjudication of the I-526 Petition, USCIS deems the two-year period to commence six months after the approval of the I-526 Petition. Therefore, PPEB5 must adequately demonstrate that the requisite number of jobs will be in place 2.5 years from the date of approval of an Investor's I-526 Petition. Evidence of timely job creation consists primarily of the comprehensive business plan prepared by PPEB5 for filing with each Investor I-526 Petition and the preliminary economic analysis of Evans, Carroll & Associates commissioned by PPEB5 projecting the number of jobs resulting from the construction and operation of the Project. PPEB5's business plan is available for review upon request. See *Business Plan Summary* below.

PPEB5 is offering Units to a maximum of 300 investors (One Unit per $500,000). This will require evidence of creation of at least 3,000 jobs. PPEB5's Economic Analysis attached at **APPENDIX E** estimates that the Project will create approximately 3,908 jobs. This Economic Analysis is based upon the Borrower's proposed activity, the amount of capital that will be spent in the local economy and general assumptions regarding the national economy, the regional economy of the Regional Center Geographic Area (California counties of Los Angeles, Orange, San Bernardino, and Riverside), and other circumstances of this Project. There is no assurance that the Economic Analysis or the assumptions upon which it is based are accurate or that actual job creation will be close to or equal to the number predicted in such analysis. Depending upon the disparity there may be insufficient employment to remove conditional residency status, resulting in a delay or denial of removal of conditions, for any Investor.

***Proving Lawful Source of Funds.*** As part of the I-526 Petition, an Investor must present to the USCIS clear documentary evidence of the *source* and *path* of funds invested in PPEB5. Generally, the Investor can satisfy the source of funds requirements by submitting documents showing that he/she has a level of income from legal sources that would yield sufficient funds for the investment. USCIS generally requires copies of income tax



EXHIBIT 8

returns for the previous 5 years to satisfy the source of funds requirement. For Investors who do not have such records, there may be other records that can be provided to the USCIS by an Investor to demonstrate that the investment funds came from legal sources. All such matters regarding an Investor's I-526 Petition should be discussed with his/her immigration counsel.

***Policymaking Position.*** The Pilot Program requires an Investor to hold a policymaking or management position within PPEB5. PPEB5 believes that each Investor, as a member of PPEB5, is provided with powers and duties under the Operating Agreement sufficient to meet the USCIS requirement that an Immigrant Investor is actively participating in policymaking or management of a new commercial enterprise. However, there is no guarantee that USCIS will agree.

***At-Risk Investment.*** An Investor's investment must be at risk to qualify for the Pilot Program. As part of the I-526 Petition, an Investor must show evidence that he/she has placed the required amount of capital at risk for the purpose of generating a return on such capital. PPEB5 believes that an investment in the Units will place an Investor's capital investment in PPEB5 at risk because there is no assurance that the business of the Borrower will generate sufficient revenue to repay the Loan and allow for the return of any Investor's investment in the Units at any time, or ever.

***TEA Determinations.*** Under the Pilot Program, an immigrant investor must invest $1,000,000 in a new commercial enterprise that will benefit the U.S. economy and create full time employment for 10 or more U.S. workers. This $1,000,000 amount is reduced to $500,000 if the new commercial enterprise is principally doing business in a targeted employment area ("TEA"). A TEA is an area with unemployment of at least 150% of the national average (a "high unemployment area") or a rural area. A rural area is not within a Metropolitan Statistical Area and has a population of less than 20,000.

Regional center designation proposals set forth the TEAs within the proposed Regional Center Geographic Area. However, under current USCIS guidelines, TEA determinations are made by the USCIS at the time of filing of each I-526 Petition. If an immigrant investor's investment is made prior to filing his/her I-526 Petition, the area must qualify as a TEA at the time of such investment. If such investment is not yet irrevocably committed to a qualifying investment at the time the I-526 Petition is filed, then the area must qualify as a TEA at the time of the filing of the I-526 Petition.

On July 20, 2012, the California Governor's Office of Business and Economic Development designated a geographic area inclusive of the future location of the Project in the City of Montebello, California, as a high unemployment area. As such, this location presently qualifies as a TEA. However, no assurance can be given that the geographic area in which the Borrower is doing business will qualify as TEAs at the time of investment or filing of any I-526 Petition. If such geographic area does not qualify as a TEA at the time of investment or time of filing of the I-526 Petition, whichever is first in time, the minimum investment under the Pilot Program will be increased to $1,000,000.

***Economic Sector.*** Each regional center is limited to qualifying investments in approved economic sectors. The Regional Center is approved to facilitate qualifying investments in the economic sectors of Construction (NAICS 23), Manufacturing (NAICS 33), and Healthcare and Social Assistance (NAICS 62). PPEB5 believes that an investment in this Offering and subsequent Loan to the Borrower will qualify as an investment in the named economic sectors.

***New Commercial Enterprise.*** A "commercial enterprise" includes "any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned." The commercial enterprise must be "new" in that it was established after November 29, 1990. PPEB5 was formed as a private, for-profit entity on November 15, 2010. It is believed that PPEB5 will qualify as a new commercial enterprise, but there is no guarantee that USCIS will adjudge it to be such.



EXHIBIT 8

***Admissibility to the U.S.*** Foreign persons applying for a U.S. green card must demonstrate that they are admissible to the United States. Section 212 of the Immigration and Nationality Act sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving a green card or entering the U.S. Foreign individuals who are ineligible to receive a green card or be admitted to the U.S. include but are not limited to an individual who is determined to have a communicable disease of public health significance; is determined to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the individual or others; is determined to be a drug abuser or addict; or has been convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political offense), among other factors. Each Investor should review all factors affecting his/her admissibility to the U.S. with qualified immigration counsel.



EXHIBIT 8

## RISK FACTORS

AN INVESTMENT IN PPEB5 AND ITS LOAN TO BORROWER HAVE CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN PPEB5 AND THE BORROWER SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE INVESTMENTS OF THE NATURE AND RISK OF THIS OFFERING, AND (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN PPEB5.

***Immigration Risk***. There is no guarantee that an Investor in this Offering will obtain conditional and/or permanent residency in the United States as a result of his/her investment in PPEB5. Numerous factors could delay or prevent an Investor from obtaining conditional permanent residency or removal of conditions, including the Regional Center's lack of operating history, Investor admissibility factors (further discussed above), general economic factors affecting Borrower's ability to create sufficient jobs for each Investor or as estimated in the Economic Analysis (see **APPENDIX B**) commissioned by PPEB5, evolving immigration law, adjudication standards and regulation, and failure of the U.S. Congress to extend the Pilot Program.

***Financial Projections***. Because neither PPEB5 nor the Borrower have an operating history and have only recently been organized, no balance sheet or income statement based on actual operations of either company is available. The Financial Projections contained in the Business Plan are based upon what the Borrower believes to be reasonable assumptions concerning certain factors affecting the probable future operations of the Borrower. No assurances can be made that these forecasts will prove to be accurate, and Investors are cautioned against placing excessive reliance on such projections in deciding whether to invest in this Offering. In particular, construction, and capital costs are very volatile and may cause the Borrower to seek additional capital or alternative forms of capital, which could result in increased risk of default in repayment of the Loan.

***Medicare/Medicaid Reimbursement.*** Borrower's Financial Projections are based on assumptions derived primarily from the operation of other U.S. proton therapy centers and historical rates for reimbursements (payments) for treatments. These reimbursements will be paid to the Borrower in the form of Medicare/Medicaid reimbursements, commercial insurance/managed care payments, or payments from individuals not using insurance. Because reimbursement rates for treatment differ greatly across these payer sources, Borrower has estimated the number of patients that will utilize each source of payment. In addition, reimbursement rates fluctuate and are difficult to predict. The information used by Borrower to prepare its business plan, financial forecasts and Economic Analysis are estimates based on management's experience and research. Any deviation, change or fluctuation in such estimates may positively or negatively impact actual operations of the proton center, actual revenues to the Borrower and job creation. Accordingly, inaccuracy of Borrower's estimates may affect Borrower's ability to repay the Loan and its ability to create jobs sufficient for any Investor to obtain conditional and/or permanent residency in the United States.

***Collateral Security.*** The Loan is unsecured (See *Loan Documents,* **APPENDIX F**). As a result, any claims by PPEB5 against Borrower, for breach of the Loan Agreement, including default in payment, or otherwise, may be subordinate to the rights of senior lenders and/or other obligations secured by the Borrower's assets and there is no guaranty of payment or collection. In addition, PPEB5 would be a general unsecured creditor in the event of Borrower's bankruptcy, and there is no guaranty that the liquidation value of Borrower's assets would be sufficient to satisfy any claim(s) arising under the Loan. It is possible, in the event of liquidation of the Borrower, that the proceeds of liquidation will not exceed Borrower's liabilities to priority lenders and therefore may be insufficient to repay all or part of the Loan.

***Job Creation***. Each EB-5 Investor must submit evidence that his/her investment created 10 jobs with his/her I-829 Petition. The I-829 Petition is submitted within the 90 days preceding the second anniversary of his/her receipt of a conditional green card. This date is approximately 2.5 years from the date of approval of his/her I-526 Petition.

Borrower's business plan currently estimates that completion of the Proton Center will take approximately 3-3.5 years. Only when construction of the Proton Center is nearly complete can Borrower hire and train all employees necessary for operation of the Proton Center. Failure of Borrower to effectively manage the timing of Investor I-526 filings to coincide with the development of the Proton Center and resulting job creation could result in delay or denial of removal of conditions and/or permanent residency.

***Additional Financing.*** Borrower's business plan requires financing in addition to the proceeds of this Offering to complete the Project. Borrower is currently seeking but has not yet obtained any commitment from any investors or lenders for such financing. There is no guaranty Borrower will be able to obtain the additional financing required to complete the Project on favorable terms or at all.

***Material Contracts.*** Borrower's business plan requires that it negotiate and enter into certain agreements for equipment and services, among other things, for operation of the Proton Center. Such Agreements include agreements for the purchase of proton beam equipment, license, and maintenance services with Optivus or another provider, real property lease for the Proton Center location, construction contracts, employment agreements with key personnel and agreements with various Individual Practice Associates. Failure of Borrower to effectively negotiate and enter into these agreements on terms favorable to Borrower could negatively impact the profitability of the Project and repayment of the Loan.

Borrower entered into a lease agreement ("111 Lease") with Dr. John P. Thropay for lease of real property located and known as 111 W. Beverly Blvd., Montebello, CA on September 14, 2011 for development and operation of the Proton Therapy Center. The 111 Lease is for a term of 30 years, commencing upon Lessee obtaining at least $100,000,000 of funding for the Project. Lessor may terminate the 111 Lease if such funding is not obtained in a reasonable period of time. Rent under the 111 Lease is $1,000,000 annually. The 111 Lease is a triple net lease, accordingly, Lessee is responsible for payment of rent, taxes, insurance and all maintenance costs for the leased premises.

Failure of the Company and/or Borrower to satisfy the conditions to the 111 Lease could adversely impact its ability to successfully implement its business plan and create jobs necessary for any Investor in this Offering to remove conditions to permanent residency in the United States. There is no assurance that Borrower will be able to negotiate a new lease, or extend the time for satisfaction of any conditions to the 111 Lease if it is not able to obtain the required funding or commence and complete construction in accordance with the 111 Lease.

***Commercial Real Estate Office Market.*** The Project will result in the creation of approximately 125,000 square feet of new commercial office space in Los Angeles County, California. There is no guaranty that Borrower will be able to lease this office space on favorable terms or at all, particularly in light of the current economic conditions in the United States generally and the market for such space in Los Angeles County.

***Lack of Operating History***. PPEB5 was formed for the specific purpose of raising funds under the Pilot Program to loan to the Borrower. Accordingly, PPEB5 has no operating history. Although the principal owners of PPEB5 have experience operating other cancer therapy centers, Borrower has no operating history. Further, although the Regional Center was formed in 2011, this Project is the first investment sponsored by it under the Pilot Program. This lack of operating history for both PPEB5 and the Regional Center could cause delays in or denial of permanent residency for Investors.

***Potential Conflict of Interest; Key Person***. Dr. Thropay is an owner and President of Beverly Oncology Imaging and Medical Group, Inc. of Montebello, CA, a member of the Regional Center, an owner and CEO of Borrower and landlord to Borrower. In such capacities, Dr. Thropay controls the Borrower, the Regional Center, and PPEB5. The obligations of Dr. Thropay to the Regional Center, PPEB5 and the Borrower, are not exclusive, and he need only devote so much time to PPEB5's affairs, and/or the Borrower's affairs, as he determines to be necessary in his sole discretion. Dr. Thropay may from time to time, be involved in development and/or operation of other businesses, including other EB-5 projects, proton therapy centers or other cancer treatment centers that may compete with Borrower. Commitments undertaken by Dr. Thropay may adversely affect his ability to manage the Project and the profitability of the Project and any investment in the Units. See *Material Relationships and Contracts* below.

Dr. Thropay is a key person and important to the success of the Project, and, therefore, Borrower's ability to repay the Loan. Dr. Thropay's death or other unavailability may negatively affect PPEB5's operation and possibly Borrower's ability to repay the Loan.



EXHIBIT 8

Charles Liu is a member of the Regional Center, and President and an owner of Borrower. In such capacities, Charles Liu controls the Borrower and the Regional Center and PPEB5. The obligations of Charles Liu to the Regional Center, PPEB5 and the Borrower, are not exclusive, and he need only devote so much time to PPEB5's affairs, and/or the Borrower's affairs, as he determines to be necessary in his sole discretion. Charles Liu may from time to time, be involved in development and/or operation of other businesses, including other EB-5 projects, proton therapy centers or other cancer treatment centers that may compete with Borrower. Commitments undertaken by Charles Liu may adversely affect his ability to manage the Project and the profitability of the Project and any investment in the Units. See *Material Relationships and Contracts* below.

Charles Liu is a key person and important to the success of the Project, and, therefore, Borrower's ability to repay the Loan. Charles Liu's death or other unavailability may negatively affect PPEB5's operation and possibly Borrower's ability to repay the Loan.

***Skilled Employees.*** The operation of the proton therapy center will require Borrower to hire or contract for services with a substantial number of professionals and highly skilled employees, including staff physicians, nurses, engineers, and radiation therapists. Borrower will compete for these skilled workers and professionals with other proton therapy centers and other medical treatment facilities and related businesses in California and throughout the United States. Accordingly, it may be difficult to locate and retain all of the professionals and skilled employees necessary to operate the proton center during the time periods required of Borrower to demonstrate job creation sufficient for each Investor. Failure of Borrower to adequately staff the operation of the proton center may negatively affect job creation, patient throughput and actual revenues generated by the proton center and therefore its ability to repay the Loan.

***Single Source Service Provider.*** Borrower intends to engage Optivus Proton Beam Therapy, Inc. ("Optivus"), a proton beam technology developer in California, to provide all necessary proton beam treatment technology and related maintenance, under a service contract for the proton center. Optivus is the only U.S. company with U.S. Food and Drug Administration (FDA) clearance to provide proton therapy systems. Borrower has not commenced discussions with Optivus or negotiation of the terms for provision of such services at this time. The terms of engagement of Optivus, or any other service provider, will include costs for the provision of maintenance services, licensing fees, equipment upgrades and related services. Any change in the Borrower's estimate of these costs, or its failure or inability to engage Optivus, could negatively affect the profitability of the Borrower and its ability to repay the Loan. See *Business Plan Summary* below.

***Government Regulation.*** Regulations, regulatory actions and court decisions in the future could have both a positive and/or negative impact on the operations and financial condition of PPEB5 and the Borrower and its ability to compete. PPEB5 will be under substantial scrutiny by USCIS. A substantial part of the legal structure and requirements of the Pilot Program derive from regular guidance from USCIS, which is subject to regular change and cannot be predicted. Such changes are unpredictable and could negatively affect PPEB5.

The operation of radiation machines that can operate in excess of 500KVP are regulated by the State of California. Accordingly, development, construction and operation of the proton center must satisfy the requirements of the California Court of Regulations and other requirements of the State of California before commencement of operations and throughout the construction process. Any change in regulations or requirements related to the development of the proton center could have a positive or negative impact on the timing and costs related to development and construction and operation of the proton center. These delays and/or negative impacts could negatively impact Borrower's ability to create the jobs required under the EB-5 Program in the time period required by the EB-5 Program. Accordingly, there is no guarantee that an investment in the Units will result in conditional and/or permanent residency in the United States.

***Health Care Legislation***. There can be no guarantee that any legislation, now existing or enacted into law in the future, will not negatively impact the profitability of the Proton Center, and Borrower's repayment of the Loan.

***Distribution of Profits from Operations***. Because distribution of profits by PPEB5 is dependent upon repayment of the Loan by Borrower and such repayment is related to market conditions, costs of operating the Proton Therapy Center, and numerous other factors, there is no assurance that there will be cash from operations of Borrower sufficient to repay the Loan and therefore be available for distribution to Members. There is no assurance that projected revenues and/or returns are feasible or likely to be achieved. Accordingly, PPEB5 Members who borrowed all or part of their Capital Contribution must understand that repayment of the Loan by



EXHIBIT 8

Borrower and distribution of profits by PPEB5 to Members is subject to market forces and cannot be relied upon as a source of funds to repay such debt. Further, PPEB5 is prohibited by law from returning all or part of an EB-5 Member's Capital Contribution prior to 5 years from his/her admission as a Member. The Loan Documents provide for interest only payments during the term and Borrower is prohibited from paying principal until after the Initial Term (See *Summary of Loan Terms*). Accordingly, Investors should not rely on income from distributions from PPEB5 for repayment of his/her debt obligations or for any other reason.

***General Risks of Ownership of an Ongoing Business Enterprise***. The repayment of the Loan by Borrower will be subject to the risks generally incident to the ownership of an ongoing business, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; relative appeal of products versus competitive brands; reduction in the cost of operating competing businesses; decrease in employment; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds; changes in tax rates and other operating expenses; changes in governmental rules and fiscal policies, acts of God, including earthquakes, which may cause uninsured losses; environmental risks; and other factors which are beyond the control of PPEB5 or the Borrower. Increases in operating expenses, among other factors, could result in the Borrower's inability to meet all of its cash obligations. Any decrease in income received by the Borrower may threaten repayment of the Loan and thereby reduce and possibly eliminate the amount of cash available for distribution to Members, since Borrower's operating expenses, such as property taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as advertising and promotion may increase. If the income from operation of the Proton Therapy Center is not sufficient to meet operating expenses and/or debt service, Borrower may have to dispose of assets or obtain alternative financing on disadvantageous terms in order to raise needed funds.

***General Tax Risks***. Investment in this Offering involves substantial tax risks. Although the primary motive of investors should be for long-term appreciation, state and federal legislatures and tax authorities may alter and change the permissible deductions that may be taken with respect to the Project and its income, and may change the tax rates to less favorable rates. In addition, the state and federal tax authorities may be more likely to audit taxpayers with higher incomes or partnership income or loss. Since Investors generally fall into this category, PPEB5 also has an increased risk of being audited. Such an examination could result in adjustments to items that are related to PPEB5. Investors may incur legal or other professional expenses in connection with such audit or the adjustments resulting from such audit. PPEB5 has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, PPEB5, the Borrower or its business. Some tax risks include, without limitation, the following: (i) Changes in federal income tax laws; (ii) PPEB5 and/or Borrower status; (iii) Taxable income in excess of distributions; (iv) Allocation of tax items among Members; (v) Allocation of purchase price; (vi) Borrower termination; (vii) At risk limitations; (viii) Risk of audit; (ix) Profit objective; and (x) Limitations on passive losses. This tax discussion is not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in PPEB5 and the Borrower. PPEB5 has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Borrower. Each Investor must consult his/her own accountant or tax advisor with respect to the tax consequences of investment in the Units.

In addition, there is risk that Investors may be taxed in the United States based on their worldwide income. Investors should seek professional counsel regarding their tax residency and status in the United States prior to investing in this Offering. See *Income Tax Considerations* below.

***Illiquidity; Limited Transferability of Units***. The Units are a highly illiquid asset in that they cannot be readily sold or pledged as collateral for a loan or other obligation. A Member may not assign, sell or transfer his Units to another party except as provided for in the Operating Agreement. See *Summary of Operating Agreement* below. There is no public market for sale of the Units and it is not anticipated that a market will develop for the purchase or sale of the Units. Consequently, Members may not be able to liquidate their investment in PPEB5 in the event of their desire or need to do so.

***Limitation of General Partner's Liability***. The Operating Agreement (**APPENDIX B**) provides the Manager shall not be liable to Members for any loss or liability incurred in connection with the affairs of PPEB5, so long as such loss or liability did not result from intentional wrongdoing. Therefore, a Member may have a more limited right of action against the Manager than he would have had absent these provisions in the Operating Agreement. See *Summary of Operating Agreement* below.



EXHIBIT 8

***Limited Right to Participate in Management***. The Members of PPEB5 will not have a right to participate in the active management of PPEB5 or the Borrower or the decisions made by the Manager, except as expressly provided in the Operating Agreement. See *Summary of Operating Agreement* below.

***No Independent Counsel***. No independent counsel has been retained to represent the interests of the Members. No documents required in connection with this Offering have been reviewed by an attorney on behalf of the Members. Each Investor is urged to consult with his/her own counsel as to the terms and provisions of all such documents and all other documents relating thereto as well as his/her own accountant as to the final information and projections provided.

***Uninsured Losses; Casualty Insurance***. Certain risks in connection with the business of the Borrower, and therefore an investment in PPEB5, are either uninsurable or not insurable at commercially reasonable rates, and could have a detrimental effect on PPEB5 and the Borrower. Examples of uninsurable losses are those arising from flood, earthquakes, war and acts of God, among others. Should such an uninsurable loss occur, PPEB5 and the Borrower could suffer a loss of some or all of the capital invested in the Project as well as the loss of any potential profits from the Project.

***No Firm Commitments to Purchase Units.*** No commitment exists by anyone to purchase all, or any portion of the Units being offered. PPEB5 can give no assurance that the Maximum Offering or any of the Units will be sold.

***Lack of Diversification***. PPEB5 will have all of its assets invested in the Borrower. Accordingly, PPEB5 is reliant on Borrower solely for return on its investment by repayment of the Loan.

***Dependence on Management and Personnel.*** PPEB5's and the Borrower's success are principally dependent on their current management personnel for the operation of the businesses. The Borrower is dependent upon the continued involvement of Dr. Thropay and Mr. Liu in this Project personally. The loss of services of either Dr. Thropay or Mr. Liu would have a material adverse effect on PPEB5's and the Borrower's business, financial condition and results of operations. The Borrower will also be required to hire and retain skilled employees at all levels of operations in a market where such qualified employees are in high demand and are subject to receiving competing offers. The inability to hire needed employees on a timely basis and/or the inability to retain those that are so hired could have a material adverse effect on the ability to meet the schedules of the strategic plan.

***Competition***. Although there are no other proton therapy centers in Los Angeles County there are others throughout the United States, including one in Loma Linda, California (San Bernardino County, (+/-) 50 miles from Montebello, CA). PPEB5 and Borrower expect competition to increase as consumer demand continues to increase for proton therapy.

***Impact of Consumer Spending***. The success of the Borrower's operations depends, to a significant extent, upon a number of factors affecting reimbursement payments and reimbursement rates for medical treatments, disposable income, including economic conditions and factors such as employment, business conditions, interest rates, taxation, global oil prices and terrorism. There can be no assurance that the Borrower's business, results of operations and financial condition will not be adversely affected by changes in consumer spending. A downturn in the U.S. or world economy could affect discretionary spending, which could adversely affect sales and the anticipated exit strategy.

***General.*** Neither PPEB5 nor the Borrower can assure any Investor that the Borrower will be successful in addressing the risks it may encounter, and its failure to do so could have a material adverse effect on business, and the financial condition and results of operations. The future of the Borrower depends on acquiring proper funding, marketing to possible purchasers and establishing a client base at the Proton Center. There can be no assurance that the Borrower's methods and procedures will be successful.



EXHIBIT 8

## BUSINESS PLAN SUMMARY

**Pacific Proton EB-5 Fund, LLC**

Principals Dr. John Thropay and Mr. Charles Liu organized Pacific Proton EB-5 Fund, LLC ("PPEB5") in November, 2010. PPEB5 is a Delaware limited liability company of 200 E. Beverly Boulevard, Montebello, California 90640 formed to serve as the new commercial enterprise in an EB-5 Immigrant Investor Program ("EB-5 Program") project offering. PPEB5 will offer up to 300 Units of limited liability company membership interests to qualified non-U.S. citizens seeking permanent resident status in the United States through the EB-5 Program who meet PPEB5's Investor suitability requirements. Investors acquiring Units in this offering will be members of PPEB5. The price of each Unit is $500,000 for a maximum offering of $150 million.

PPEB5 will pool investor funds and make a loan of up to $150 million[1] to Los Angeles County Proton Therapy, LLC ("LAPT"), a California limited liability company of 200 E. Beverly Boulevard, Suite 200, Montebello, California 90640. LAPT will pay interest on the loan at the rate of 0.25% per annum with principal due and owing 5 years from the date of the last advance under the loan. LAPT will use the loan proceeds to partially finance the construction and operation of a proton therapy center with commercial office space in Los Angeles County, CA (the "Project"). The proton therapy center with office space will be located at 111 W. Beverly Boulevard, Montebello, Los Angeles County, CA. All Project components will be owned and operated by LAPT.

**Los Angeles County Proton Therapy, LLC**

- **Los Angeles County Proton Center**

Los Angeles County Proton Therapy, LLC ("LAPT"), will develop and operate the Los Angeles County Proton Center (the "Proton Center") at 111 W. Beverly Boulevard, Montebello, California 90640. The Proton Center will provide an innovative new cancer treatment to oncology patients using proton beam radiation. Proton beam therapy has demonstrated clinical advantages for cancer treatment over other forms of radiation therapy, including greater control of the beam and higher concentration of energy in the tumor. Associated side effects are generally less severe. The Proton Center will primarily treat patients from Southern California and (through the management team's international connections) Latin America and Southern China.

An estimated 33 million people will be living in the Southern California market area by 2014, the first full year of planned Proton Center operation. Many of these people are from ethnicities and cultural backgrounds that make it difficult for them to utilize conventional (i.e., English-only) centers. Thus, the market area contains a sizable base of patients who will benefit from the Proton Center's services. The Facility's marketing plan, based in part on successful approaches currently in use at the first U.S. proton therapy center in Loma Linda, California, is designed to reach patients, doctors, and other decision-influencers with a range of message and media types.

The nearest competing proton beam facility is at Loma Linda University, which is geographically distant (+/- 50 miles) from the proposed center and already running at close to capacity. There is room for an additional proton beam center in Southern California, and the Proton Center will tap that opportunity. As capacity in the region grows and waiting times for treatment shorten, the types of cancer that can be treated with proton therapy will increase.

John P. Thropay, M.D., a respected radiation oncologist with decades of experience in treating cancer in underserved ethnic communities and introducing cutting-edge treatment modalities to those communities, will head the Proton Center. Supporting Dr. Thropay will be a team of health professionals with extensive experience in growing and managing clinical oncology treatment centers (in both the United States and Latin America), controlling costs, building quality programs, and contracting effectively with managed-care plans.

[1] We note that the total project cost is estimated to be $200 million. LAPT will obtain the remainder of the needed funds from equity investors and/or lenders other than PPEB5.



EXHIBIT 8

The management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching and serving those markets. This experience will help both in establishing the venture with Southern California patients and in working with international patients.

The Proton Center will also contain 125,000 square feet of commercial office space ("Office Space") with space allocated as follows: medical office space (75,000), assisted living (25,000), outpatient surgery (7,000), restaurant (5,000), pharmacy (5,000), daycare center (2,000), and miscellaneous back office (6,000).

**Comprehensive Business Plan**

LAPT's comprehensive business plan to be filed with each Investor's I-526 Petition is available on request.

## CAPITAL REQUIREMENTS AND ESTIMATED USE OF PROCEEDS

In order to achieve its objectives as described in its business plan, Borrower requires approximately $200,000,000. PPEB5 is conducting this Offering to raise funds in the amount of up to $150,000,000 to loan to the Borrower to finance the Project. Borrower is simultaneously seeking other sources of debt and/or equity financing for the remaining capital requirements.

***PPEB5 Estimated Use of Proceeds***

Although PPEB5 has broad discretion to adjust the application and allocation of the proceeds of this Offering in order to address changed circumstances and opportunities, PPEB5 intends to loan the proceeds of this Offering to Borrower for the uses described in this Offering Memorandum.[2] Borrower intends to use the proceeds from this Offering to finance development and operation of the Los Angeles Proton Therapy Center described in Borrower's business plan. See *Summary of Business Plan* below.

***Borrower's Estimated Use of Proceeds***

| Use of Funds | Amount |
|---|---|
| Hard Construction Costs (Direct): | $77,722,156 |
| Soft Costs (Indirect): | $16,814,726 |
| Proton Center Equipment: | $100,000,000 |
| Working Capital & Other Costs: | $5,463,118 |
| TOTAL: | $200,000,000 |

The foregoing estimates are based on current information provided in Borrower's business plan, which could change as the Project moves forward. Other expected uses of proceeds include construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the Project.

As further described in *Summary of Loan Terms* below, Borrower is required to create 10 new full-time direct, indirect and/or induced jobs for each EB-5 investor whose Capital Contribution is advanced under the Loan within two years of approval of each such Investor's I-526 petition. If Borrower fails to create sufficient jobs, PPEB5 has an option allowing it to require immediate repayment of that portion ("Shortfall Qualifying Amount") of the principal Loan amount attributable to those investors whose requisite 10 jobs were not created within two years of the approval of their I-526 petitions. In the event Borrower fails to create the number of jobs required under the Loan and PPEB5 exercises its option for repayment, PPEB5 may invest the Shortfall Qualifying Amount in another Qualifying Investment (as defined in the *Operating Agreement*).

***Additional Financing***

Borrower is seeking additional financing in the form of debt and equity financing for the balance of capital requirements of the Project. Borrower requires approximately $50 million in financing in addition to the Maximum Offering amount. Any additional debt required by Borrower may be senior in priority to the Loan because the Loan is unsecured.

***Return on Investment***

Profits of the Borrower, if any, will be used first to pay operating expenses and service debts and obligations of the Borrower including the Loan. Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the Borrower in its sole discretion for maintenance, capital improvements, earthquake and structural repairs to the Proton Therapy Center. Any remaining profits may be available for distribution to its members in accordance with its Operating Agreement.

---

[2] Proceeds of this Offering do not include Administrative Fees. Offering Expenses, commissions and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions.



EXHIBIT 8

Profits of PPEB5, if any, will be used first to pay operating expenses and service debts and obligations of PPEB5 including the Management Fee to the Manager (See *Operating Agreement*). Any remaining profits will be used to establish reserves required by law, in addition to those deemed necessary by the PPEB5 in its sole discretion. Any remaining profits may be available for distribution by PPEB5 to Members in accordance with the Operating Agreement (**APPENDIX B**).

The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits by PPEB5. Available Cash Flow, if any, will first be distributed as follows: (a) to Members in payment of Mandatory Distributions (See Section 3.6 of the Operating Agreement); (b) then to EB-5 Members pro rata in accordance with each EB-5 Member's Adjusted Capital Contribution in an amount up to each EB-5 Member's Adjusted Capital Contribution; (c) then to Members pro rata in accordance with each Member's Adjusted Capital Contribution in an amount up to each Member's Adjusted Capital Contribution; and (d) then to Members in accordance with their Percentage Interests in PPEB5. Net Proceeds from a Capital Event (as defined in the Operating Agreement), if any, and/or distributions in liquidation of PPEB5, if any, will be distributed in the same manner as Available Cash Flow. See *Operating Agreement* (**APPENDIX B**).

PPEB5 shall not make a distribution (i) if after such distribution, liabilities of PPEB5, other than liabilities to Members on account of their Units, exceed the fair value of the assets of PPEB5, (ii) to EB-5 Members, other than distributions from Available Cash Flow, prior to the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a PPEB5 Member, the foregoing restriction (ii) shall no longer apply. See *Summary of Operating Agreement* below.

The rules and regulations governing the Pilot Program prohibit the return of an EB-5 investor's investment prior to the end of the fifth year after the investment is made. Accordingly, it is possible that no return of capital will be made to any EB-5 Member of PPEB5 prior to the end of the fifth year after the closing of this Offering or his/her investment, whichever is later. See *EB-5 Immigration Disclosures* and *Risk Factors* above.

## CAPITALIZATION

THE FOLLOWING DESCRIBES THE UNIT CAPITAL OF **PPEB5** BEFORE AND AFTER THE OFFERING. As of the date hereof, authorized Unit capital of PPEB5 consists of an unlimited number of Units.

| **PPEB5 Capitalization** | **Outstanding Units:** As of 11- 20-2010 | **Percentage Interest:** As of 11- 20-2010 | **Outstanding Units:** Minimum Offering | **Percentage Interest:** Minimum Offering | **Outstanding Units:** Maximum Offering | **Percentage Interest:** Maximum Offering |
|---|---|---|---|---|---|---|
| EB-5 Members | 0 | 0.00% | 1 | 100% | 300 | 100% |
| Total | 0 | 0.00% | 1 | 100% | 300 | 100% |

If the Maximum Offering is sold by PPEB5, each EB-5 Member will own approximately 0.33% of PPEB5. EB-5 Members will collectively own 100% of PPEB5. There is no minimum offering amount. The minimum number of Units that can be sold pursuant to this Offering is 1 Unit.

THE FOLLOWING DESCRIBES THE UNIT CAPITAL OF **BORROWER** BEFORE AND AFTER THE OFFERING. As of the date hereof, authorized Unit capital of Borrower consists of an unlimited number of Units.

| **Borrower Capitalization** | **Outstanding Units:** | **Percentage Interest** |
|---|---|---|
| Charles Liu | 75 | 75% |
| Dr. John Thropay | 25 | 25% |
| Total | 100 | 100% |



EXHIBIT 8

## MATERIAL RELATIONSHIPS AND CONTRACTS

***Dr. John P. Thropay***
Dr. John P. Thropay has an interest in the following companies that are expected to have material relationships and/or contracts with PPEB5 and/or the Borrower:

1. Pacific Proton Therapy Regional Center, LLC ("PPTRC" or "Regional Center");
2. Pacific Proton EB-5 Fund, LLC ("PPEB5" or the "Company");
3. Los Angeles County Proton Therapy, LLC ("LAPT" or Borrower); and
4. Beverly Oncology and Imaging Medical Group, Inc.

***Charles Liu***
Mr. Liu has an interest in the following companies that are expected to have material relationships and/or contracts with PPEB5 and/or the Borrower:

1. Pacific Proton Therapy Regional Center, LLC ("PPTRC" or "Regional Center");
2. Pacific Proton EB-5 Fund, LLC ("PPEB5" or the "Company"); and
3. Los Angeles County Proton Therapy, LLC ("LAPT" or Borrower).

***Pacific Proton Therapy Regional Center, LLC***
Dr. Thropay and Mr. Liu are the members of the Regional Center. USCIS rules and regulations relating to the Pilot Program require that, in order to maintain the validity of its approval and designation, an approved regional center must continue to meet the statutory requirements of the Pilot Program by serving the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment. The USCIS thus requires regional centers to monitor all investment activities under its sponsorship and to maintain records, data and information on a quarterly basis in order to report to the USCIS upon request year to date information for each Federal Fiscal Year. Such records, data and information include, but are not limited to, the Regional Center's administration, oversight and management plan, biographical and other relevant investor data, and total Regional Center investment and job creation totals. Pacific Proton Therapy Regional Center, LLC has engaged Miller Mayer, LLP[3] to administer the regional center in accordance with USCIS rules and regulations relating to the Pilot Program.

***Pacific Proton EB-5 Fund, LLC***
Pacific Proton Therapy Regional Center, LLC is also the Manager (as defined in the Operating Agreement, **APPENDIX B**) of PPEB5, and will have control of the business and affairs of PPEB5.

***Proton Beam Equipment: Single Service Provider***
Optivus Proton Beam Therapy, Inc. ("Optivus") is a proton beam technology developer formed in 1993 by engineers who developed the Proton Beam Treatment Centers at Loma Linda University Medical Center. Since the construction of the Loma Linda Facility, Optivus has been the technology and systems maintenance provider for the Loma Linda Facility. Optivus conducts research and development for its product platform and assists in the operation of the Loma Linda Facility. Optivus was the first FDA-cleared company to provide proton therapy systems, and remains the only U.S. company with FDA clearance. LAPT will contract with Optivus, or another service provider, to provide all necessary initial and ongoing proton beam treatment technology and related maintenance, under a standard services contract for the Facility. LAPT has not commenced discussions with Optivus or negotiation of the terms for provision of such services at this time.

***Property Leases***
LAPT intends to lease certain property to effectuate this Project. The property intended to be leased by LAPT is owned by Dr. Thropay. Dr. John P. Thropay is an owner of the real property located at 111 West Beverly Boulevard, Montebello, CA at which the Proton Center is to be located.

[3] http://www.millermayer.com/Immigration/EB5Investors/tabid/126/Default.aspx



EXHIBIT 8

***Los Angeles County Proton Center, LLC***

Dr. Thropay and Mr. Liu are the owners of the Borrower. Dr. Thropay will be the Chairman, CEO and Medical Director of the Proton Center. Mr. Liu will be President of the Proton Center. Ruth Lopez Novodor, a current employee of Beverly Oncology and Dr. Thropay's sister, will be Chief Operating Officer of the Proton Center. The Borrower will have an independent board of directors that will have control and oversight of the operations of the Borrower and its officers.

***Individual Practice Associations (IPAs)***

The Borrower's business plan assumes that it will be able to conclude agreements with Individual Practice Associations to provide proton beam therapy services to the Proton Center. No such agreements have been negotiated or concluded. The costs, benefits and terms of such agreements are unknown. An IPA is an association of medical professionals that provides services through an entity in accordance with a compensation arrangement, while retaining their private practices, to collectively contract with HMOs and other managed care plans.

***Miller Mayer, LLP***

Miller Mayer, LLP represents the Regional Center and LAPT in connection with this Offering and the Project. Miller Mayer, LLP may also represent certain Investors in connection with their immigration to the United States, whether by way of the purchase of Units in this Offering or otherwise. The Regional Center, LAPT and any Investors purchasing Units in this Offering may be required to sign a conflict waiver and/or consent to representation prior to any engagement of Miller Mayer, LLP.

***Evans Carroll & Associates***

Evans Carroll & Associates is an economic consultant firm retained by LAPT to assist in the preparation of the Borrower's business plan, and the Economic Analysis attached at **APPENDIX E**.



EXHIBIT 8

## SUMMARY OF LOAN TERMS

**Purpose**. Prior to the closing of the first Unit offered hereunder, PPEB5 will enter into an Amended and Restated Loan Agreement (the "Loan") with Borrower. The proceeds of the Loan will be used to finance the Project.

**Amount**. The Loan amount is a minimum of $500,000 and a maximum of $150,000,000, depending upon the number of Units sold in this Offering. Whether or not the maximum Loan amount is advanced, the Borrower may seek alternative and additional financing.

**Term; Repayment**. The balance of all Advances and all accrued unpaid interest on the Loan shall be repaid as follows. Upon and after the First Advance hereunder, Borrower shall make payments of interest only on the outstanding principal balance of all Advances at the rate per annum of one quarter of one percent (0.25%) until the expiration of 5 years from the last Advance (the "Initial Term"). Upon the expiration of the Initial Term, the outstanding principal balance of all Advances and all accrued interest then outstanding shall be due. Interest shall be computed on the basis of a 365 day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all Advances shall bear interest at a rate which is two (2%) percent per annum greater than that which would otherwise be applicable.

The Borrower may not, without PPEB5's prior express written consent, prepay the Note prior to the expiration of 5 years from the last Advance. Thereafter, Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium, and without prior written consent of PPEB5.

**Disbursement**. Disbursement of Loan proceeds will be made to Borrower as they become available upon filing of Investor I-526 Petitions and in accordance with the Escrow Agreement. It shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the Borrower and its subsidiaries, taken as a whole.

**Promissory Note and Loan Collateral**. The Borrower will issue a Promissory Note with full recourse to the Borrower. The Loan shall be unsecured.

**Senior Debt**. Borrower may incur other debt and in connection therewith, grant security interests senior to those granted to PPEB5 under the Loan Agreement.

**Job Requirement**. Borrower is required to create a minimum of 10 new full-time direct, indirect and/or induced jobs for each EB-5 Investor whose Capital Contribution is advanced under the Loan. Borrower acknowledges that failure to create and maintain the requisite number of jobs within two years of approval of each Investor's I-526 petition with USCIS provides PPEB5 with an option allowing it to require immediate repayment of that portion of the principal Loan amount attributable to those investors whose requisite 10 jobs were not created within such period.

**Loan Documents**. PPEB5 has issued a Commitment Letter to Borrower, a copy of which is available upon request. The Promissory Note and Loan Agreement to be executed by Borrower are available for review upon request.



EXHIBIT 8

## SUMMARY OF THE OPERATING AGREEMENT

The rights and obligations of the members of the Company will be governed by the Operating Agreement which is attached to this Offering Memorandum. It is recommended that each prospective investor read the entire Operating Agreement. The following is a brief summary of some of the provisions of the Operating Agreement. The summary below and all statements made elsewhere in this Offering Memorandum relating to the Operating Agreement are qualified in their entirety by reference to the Operating Agreement.

**Member Capital Contributions.** Each Member's capital contribution must be paid at the time such member subscribes to purchase Units in the Offering and shall be paid in cash. No Member is obligated to make additional capital contributions (Article 2 §2.2, Operating Agreement). Each Investor's Capital Contribution will be credited to his/her Capital Account. Terms governing the maintenance of Capital Accounts are set forth in the Operating Agreement. (Article 2 §2.2, Operating Agreement).

**Liabilities of the Members.** If an Investor's I-526 Petition is approved by USCIS he/she, will be admitted as a member of the Company. No member has the right to withdraw all or any portion of his or its capital contribution until the full and complete winding up and liquidation of the business. (Article 2 §2.2.4, Operating Agreement).

**Allocation of Profits and Losses.** Profits and Losses for each fiscal year shall be allocated in the following order and priority: (a) first, to the Members in accordance with their Adjusted Capital Contributions, payable in proportion to the unpaid amounts thereof; and (b) the balance, to the Members in accordance with the Percentage Interests. (Article 3 §3.1, Operating Agreement).

**Distributions.** Available Cash Flow, if any, shall be distributed (a) first, to Members in payment of Mandatory Distributions (as defined in the Operating Agreement); (b) to EB-5 Members in accordance with their unpaid Adjusted Capital Contribution, payable in proportion to the unpaid amounts thereof; and (c) the balance to Members in accordance with their respective Percentage Interests. Net Proceeds from a Capital Event and/or a distribution from the liquidation of the Company shall be distributed in the same manner as Available Cash Flow. The Manager determines in its sole discretion the amount, if any, timing and form of any distribution of profits of PPEB5. (Article 3 §3.4, Operating Agreement).

The rules and regulations governing the EB-5 Pilot Program prohibit the return of an EB-5 investor's investment prior to the end of five years from their investment. Accordingly, PPEB5 shall not make any distribution (i) if after such distribution liabilities of PPEB5, other than liabilities to Members on account of their Units (as defined in the Operating Agreement), exceed the fair value of the assets of PPEB5, (ii) To EB-5 Members prior to the end of their At-Risk Period, other than distributions of Profits from Available Cash Flow, in amounts equal to the amount by which their respective Adjusted Capital Contribution exceeds their initial Capital Contribution set forth on Schedule A. Upon expiration of an EB-5 Member's At-Risk Period (as defined in the Operating Agreement), the foregoing restriction shall no longer apply, or (iii) to the extent such distribution is prohibited under the Act. After the fifth anniversary date of the EB-5 Member's admission as a Member of PPEB5, the foregoing restrictions shall no longer apply. (Article 3 §3.4.2, Operating Agreement).

The Company shall make distributions to Members for the payment of U.S. Federal, State or local taxes, payable at such time or times and in such amounts as will enable the Members to avoid penalties and interest otherwise payable on account of the failure to pay a sufficient amount of estimated taxes as required by law, which distributions shall be made at such time or times as may be determined by the Manager. (Article 3 §3.6, Operating Agreement).

**Management.** The Company operates under the direction of a Manager, Pacific Proton Therapy Regional Center, LLC, a California limited liability company. The Manager has full, exclusive and complete authority, power and discretion to manage and control the business and affairs, including the management and operation of the Company and any special purpose entities organized to carry out the Project, to make all decisions regarding those matters in its sole discretion, and to perform any and all other acts incident to or customary for the



EXHIBIT 8

business. Members have limited rights to take part in the management of, or to bind, the Company. (Article 4 §4.1-4.2, Operating Agreement).

A Manager shall not have any liability to the Company or to any Member for any mistakes or errors in judgment, or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A Manager shall be liable only for acts and/or omissions involving intentional wrongdoing. Actions or omissions taken in reliance upon the advice of legal counsel that they are within the scope of a Manager's authority hereunder shall be conclusive evidence of good faith; provided, however, a Manager shall not be required to procure such advice to be entitled to the benefit of this subparagraph. (Article 4 §4.3, Operating Agreement).

**Management Fee.** The Manager shall receive a management fee equal to three (3.0%) percent of the gross revenues, if any, of the Company, payable on the first day of each month for the preceding period. If there is more than one Manager, the management fee shall be distributed among the Managers on a pro rata basis unless otherwise agreed by the Managers. (Article 4 §4.10, Operating Agreement).

**Tax Elections and Adjustments**. The Manager is authorized to cause the Company to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles. (Article 4 §4.8, Operating Agreement).

**Federal Income Tax Withholding**. The Manager is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Members. (Article 4 §4.9, Operating Agreement).

**Indemnification.** (Article 5, Operating Agreement). The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding (other than an action, suit or proceeding by or in the right of the Company) by reason of the fact that he is or was a member, manager, officer or employee of the Company, against expenses (including attorneys' fees), judgments, decrees, fines, penalties and amounts paid in settlement actually and reasonably incurred by him in connection therewith if he acted in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. Indemnification may be made by the Company upon a determination that indemnification is proper in the circumstances and all applicable standards of conduct have been met. Expenses of each person indemnified under Article 5 may be paid by the Company in advance of the final disposition of such action as authorized by the Manager upon receipt of an undertaking to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Company.

**Voting.** On any matter presented to the Members for their vote, each Member shall have one vote for each Unit owned by him. The following actions shall require the approval of Members holding a majority of the then outstanding Units: (i) any modification to the Operating Agreement materially changing the rights of the Members; and (ii) dissolution of the Company prior to the sooner of repayment of the Loan or the end of five years from the first advance under the Loan. (Article 7, Operating Agreement).

**Rights and Obligations of Members.** Members have limited rights to participate in the management and control of the business and may not transact any business in the name of the Company. (Article 7, Operating Agreement).

**Restrictions on Transfer.** (Article 8, Operating Agreement).

*Restrictions.* Units may not be transferred by Members without consent of the Manager. Additional restrictions on transfer of Units are described in the Operating Agreement. No Member shall have the right or power to Voluntarily Withdraw from the Company. Any withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such Member. Members other than EB-5 Members may dispose of all or any portion of the Member's Units to

transferees that are current Members of the Company. Any attempted disposition of an interest in the Company not in compliance with this Article is null and void.

*Right of First Refusal.* If a Member intends to transfer Units or any part thereof, after obtaining approval of the Manager, or if a Member's Units are transferred by operation of law, such Member (or his/her representative, if deceased) shall give written notice to the Company of his intention so to transfer stating the fact of the intention to transfer Units, and shall describe (i) the interest to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the transfer is for valuable consideration, and (iv) if so, the amount of the consideration and the other terms of the sale. The Company may purchase such interest proposed to be transferred, for the price and upon the other terms provided in Article 8. If the Company does not purchase such interest then the remaining Members may, purchase such interest for the price and upon the other terms provided in Article 8. If more than one Member exercises such option, such Members shall be entitled to purchase pro rata with such other Members. Transfers not in compliance with the terms hereof shall remain subject to the Operating Agreement as if no transfer had been made. The value and price of each interest to be purchased and sold upon exercise of such options shall be either the consideration set forth in the notice required of a selling Member or the Fair Market Value of the interest, depending on the method of transfer. (Article 8, Operating Agreement).

**Dissolution and Termination.** The Company shall be dissolved upon the first to occur of the following: (a) upon consent of all Members during the At-Risk Period of any EB-5 Member; (b) in the sole discretion of the Manager after the expiration of the At-Risk Period of all EB-5 Members; or (c) upon the sale of all or substantially all of the assets of the Company. (Article 10 Operating Agreement).

**Termination of Interest.** The Membership Interest of any Member shall be terminated by (a) dissolution of the Company as provided in the Operating Agreement and distribution of the proceeds of liquidation in accordance therewith; (b) the agreement of a Member, or his/her personal representative, and the Manager; and (c) at any time after the At-Risk Period of an EB-5 Member with the Manager's written notice of termination together with return of the value of such EB-5 Member's Membership Interest, determined as follows. The value of a Member's Membership Interest shall be computed by adding the balance of the Member's Adjusted Capital Contribution and any other amounts owed to the Member by the Company and subtracting from the sum of the above totals the sum of all amounts owed by the Member to the Company. Good will of the Company business, as well as other intangible items, shall not be valued.

**Power of Attorney.** Pursuant to the Operating Agreement, each Member appoints the Manager, with full power and substitution, as his, her, or its lawful attorney-in-fact to act in his, her, or its name, place, and stead to make, execute, swear to, verify, acknowledge, correct and file documents deemed necessary by the Manager for the business of the Company. (Article 12, Operating Agreement).

## SUBSCRIPTION PROCEDURE AND PLAN OF DISTRIBUTION

**Subscription Procedure**
To subscribe to purchase Units in this Offering, a subscriber must transmit the following prior to the termination of this Offering, as follows:

To PPEB5:

1. Investor Capital Contributions for Units ($500,000 per Unit subscribed for) shall be paid by a wire transfer to the PPEB5 Escrow Account established by each subscriber of Units with PPEB5 according to the wire instructions provided by PPEB5.
2. Executed counterpart signature page to the PPEB5 Escrow Agreement (**APPENDIX A** hereto).
3. Executed counterpart signature page to the Operating Agreement (**APPENDIX B** hereto).
4. Executed complete Subscription Agreement (**APPENDIX C** hereto).
5. Executed and complete Investor Questionnaire.

To the Regional Center:

1. Administrative Fees ($45,000 per Unit subscribed for) shall be paid by wire transfer according to the wire instructions provided by the Regional Center.

The subscription period will begin on the date of this Offering Memorandum and will continue until the Maximum Offering is sold or the Offering is terminated by PPEB5. There is no Minimum Offering amount. All Capital Contributions received from subscribers for Units shall be deposited in the PPEB5 Escrow Account established for Capital Contributions pending filing of subscriber I-526 Petitions with USCIS.

If a subscriber's subscription is rejected by the Company prior to filing of his/her I-526 Petition by USCIS, (i) his/her Capital Contribution, $500,000 per Unit subscribed for, and (ii) his/her Administrative Fee shall be returned to him/her, without interest or deduction.

Upon notice of filing of each subscriber's I-526 Petition, his/her Capital Contributions will be released to PPEB5 and advanced to Borrower as part of the Loan. After filing of a subscriber's I-526 Petition, that subscriber shall have no right to revoke or withdraw his/her subscription. Once an Investor's I-526 petition has been filed with USCIS, the Regional Center will refund an Investor's Capital Contribution and Administrative Fee only if an Investor's I-526 petition is denied by USCIS without possibility of cure. The Regional Center will not refund all or any part of the Capital Contribution or Administrative Fee for any other reason.

**Plan of Distribution**
The Units will be offered to prospective investors by PPEB5, and/or its duly authorized agents. Fees and commissions of such agents may be paid by the Regional Center or PPEB5 from Administrative Fees. Prospective investors are limited to qualified non-U.S. citizens seeking permanent residence in the United States through the EB-5 Program who are Accredited Investors (as defined in the Act). The Units are offered subject to PPEB5's right to withdraw the Offering at any time without notice and/or to reject any subscription. This Offering may be terminated if events have occurred, which in the Manager's sole judgment, make it impracticable or inadvisable to proceed with, continue or consummate the Offering described herein. There is no assurance that all or any of the Units will be sold.



EXHIBIT 8

## INCOME TAX CONSIDERATIONS

Each Investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his/her investment in PPEB5, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return. All Investors in this Offering should seek professional tax advice prior to investing in this Offering.

## DOCUMENTS AVAILABLE FOR INSPECTION

Statements made in this Offering Memorandum and Appendices hereto concerning any agreements, contracts or other documents are not necessarily complete and reference to such documents in their entireties is recommended. As each such statement is qualified in all respects by reference to such documents, prospective investors desiring to examine any or all of the documents referred to in this Offering Memorandum should contact PPEB5.

# Exhibit 9

DELSK

Dear Dr. John Thropay:

I am writing to you on behalf of Delsk Group, the sole authorized marketing representative of Los Angeles Proton Therapy Center Project in China. As of July 6, 2015, we have successfully attracted over 100 EB-5 investors to subscribe to the project. Needless to say, their capital contribution is going to be a major factor in the success of building and operating the center. As you may also know, most of if not all of these investors are investing in the project hoping to receive permanent residency status in the US. And the biggest determinant of their petition getting approved is hinged on the center being built.

With that said, we have received a lot of requests from the investors to update them on the progress made in construction and the negotiation with major medical institutions on sponsoring the center. Obviously it is in the best of interest of both you and the center itself to start the construction as soon as possible.

Thank you for your time and we are looking forward to hearing from you.

Best regards,

[signature]

地址：北京市朝阳区建国路 81 号华贸中心 1 号写字楼 21 层 邮编：100025
Add: 21st Floor, T1of China Central Place, No.81of Jianguo Road, Chaoyang District, Beijing 100025
电话/Tel: 0086 10-59696378 传真/Fax: 0086 10-59696370 网址/Website: www.delsk.com

# Exhibit 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION, )
)
)
)
Plaintiff, )
vs. ) No. SACV 16-00974 CJC (AGRx)
)
CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, )
)
)
Defendants. )

REMOTE DEPOSITION OF LORRAINE PEARSON
Huntington Beach, California
Thursday, January 21, 2021

Reported by:
Heather Ayers
CSR No. 11871





EXHIBIT 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE )
COMMISSION, )
)
)
)
Plaintiff, )
vs. ) No. SACV 16-00974 CJC
) (AGRx)
CHARLES C. LIU; XIN WANG a/k/a )
LISA WANG; PACIFIC PROTON )
THERAPY REGIONAL CENTER, LLC; )
PACIFIC PROTON EB-5 FUND, LLC; )
and BEVERLY PROTON CENTER, LLC )
f/k/a LOS ANGELES COUNTY PROTON )
THERAPY, LLC, )
)
)
Defendants. )

Remote Deposition of LORRAINE PEARSON, taken on behalf of the Plaintiff, beginning at 9:05 a.m. and ending at 12:48 p.m., on Thursday, January 21, 2021, before Heather Ayers, Certified Shorthand Reporter No. 11871.



APPEARANCES VIA VIRTUAL ZOOM:
For the Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
BY: GARY Y. LEUNG, ESQ.
444 South Flower Street
Suite 900
Los Angeles, California 90071
(323) 965-3998
leungg@sec.gov

For the Defendant:

SILLS CUMMIS & GROSS P.C.
BY: HERVE GOURAIGE, ESQ.
One Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-5989
hgouraige@sillscummis.com



I N D E X

WITNESS
LORRAINE PEARSON


| Examination by: | Page |
|---|---|
| Mr. Gouraige ------------------------------------ | 7 |


E X H I B I T S


| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 52 | Deposition Notice | 100 |
| Exhibit 53 | November 19, 2010 Letter | 100 |
| Exhibit 54 | Declaration | 100 |
| Exhibit 55 | Third Supplemental Declaration | 100 |
| Exhibit 56 | Supplemental Declaration | 100 |
| Exhibit 57 | Supplemental Declaration | 100 |
| Exhibit 58 | Exhibit 5 to Declaration | 100 |
| Exhibit 59 | Quickbooks Report | 100 |
| Exhibit 60 | Quickbooks | 100 |
| Exhibit 61 | Business Expense Document | 100 |
| Exhibit 62 | Exhibit A to Declaration | 100 |
| Exhibit 63 | Monitor's Written Report | 100 |
| Exhibit 64 | Declaration | 100 |
| Exhibit 65 | Declaration | 100 |
| Exhibit 66 | Declaration | 100 |
| Exhibit 67 | Declaration | 100 |




Huntington Beach, California
Thursday, January 21, 2020
9:05 a.m. to 12:48 p.m.

(This deposition is being taken via Virtual Zoom, and all parties, the witness, and the court reporter are appearing remotely.)

THE COURT REPORTER: Counsel, because we are all appearing by telephone, everyone is going to have to be more conscious than ever of not speaking over each other. If I cannot hear the end of a question or the beginning of an answer, you are going to have a very poor record. If I must consistently interrupt because I cannot hear or understand something that is said, you will not have a good deposition flow.

If there is an objection, I must be able to hear it and know who is objecting. Please state your last name before you speak your objection so I can know who is talking. This is especially important if there is more than one attorney who might object.

Please move your papers and/or legal pads away from your phone so there is no ambient noise.

If you are using a cell phone and you are on a speaker, I may ask you to speak directly into your device

if I can't hear you.
When you mark exhibits, please identify the document by stating the date and number of pages and any other clarifying information.
Due to the need for this deposition to take place remotely because of the government's order for social distancing, the parties will stipulate that the court reporter may swear in the witness over Zoom, and that the witness has verified that she is in fact Lorraine Pearson.

LORRAINE PEARSON,
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. GOURAIGE:
Q Could you state your name and business address for the record, please, Ms. Pearson.
A Sure. My name --
MR. LEUNG: Herve, should we do appearances?
MR. GOURAIGE: I'm going do that, Gary, after she puts her name on the record, then I'll introduce myself and then you can introduce yourself.
BY MR. GOURAIGE:
Q Sorry, Ms. Pearson, we interrupted you.



A My name is Lorraine Pearson. My business address is 444 South Flower Street, Los Angeles, California 90071.
Q Good morning, Ms. Pearson. As you know, my name is Herve Gouraige. I'm one of the attorneys for the defendants in the case of Securities and Exchange Commission versus Charles Liu and Lisa Wang.
Gary, would you like to note your appearance now?
MR. LEUNG: Sure. Gary Leung for the plaintiff, and so stipulated with respect to the oath.
BY MR. GOURAIGE:
Q Ms. Pearson, let's start by telling -- please tell me your educational background, beginning with the college you attended.
A I first attended the College of William & Mary and graduated with a degree in fine arts. Next, I attended Kent State University and graduated with a master's in library science. And then I attended California State Polytechnic University in Pomona, and graduated with a bachelor's degree in accounting.
Q Could you tell me what years you attended William & Mary.
A Sure. That was 1968 through 1972.
Q And Kent State, what years?
A 1972 to 1973.
Q And California Polytechnic?



A 1975 to 1978.
Q After California Polytechnic, did you attend any postgraduate school?
A No. I did not.
Q Did you attend any other educational institution for a certificate or any sort of graduate degree other than those you've told us?
A I did take training to become a certified fraud examiner.
Q Ms. Pearson, do you speak or understand any foreign languages?
A No.
Q And you are a certified public accountant; is that correct?
A Correct.
Q I understand you are licensed in the state of California since 1981; is that correct?
A Correct.
Q And are you licensed in any other state?
A I am not.
Q And I believe you just made reference earlier to your training to be a certified fraud examiner. How long have you been a certified fraud examiner?
A Since 2010.
Q Do you understand that you are appearing here as



an employee of the SEC for this deposition?
A I do.
MR. LEUNG: Objection; vague.
BY MR. GOURAIGE:
Q Have you been deposed before, Ms. Pearson?
A Yes, I have.
Q And is that in connection with your work for the SEC?
A Yes.
Q How many times have you been deposed?
A I believe it's twice before.
Q Were those depositions in federal or state courts or both?
A Federal.
Q Let me -- I'm going to have an exhibit marked before we proceed, so I need to get the exhibit with you. So bear with me a second so I can get in, okay?
Okay. If I have done this correctly, do you see the exhibit marked 52 on your screen, Ms. Pearson?
A Yes, I do.
Q Gary, I believe that was the number we agreed to start with; correct?
MR. LEUNG: That's correct.
BY MR. GOURAIGE:
Q Ms. Pearson, could you tell us what that document







EXHIBIT 10

is?
A It appears to be the new amended notice of depo of Lorraine Pearson.
Q Have you seen it before?
A No, I have not.
Q Do you understand that you're appearing here today pursuant to that notice to testify in this case?
A Yes, I do.
Q Could you tell me what your professional associations have been before you started work for the SEC?
A Do you mean my employment?
Q Your employment history.
A Okay. Okay. From 1978 to 1984, I was an auditor with the firm of Touche Ross, which has since become the firm entitled Deloitte & Touche.
Q And what did you do after that?
A Then I went to the SEC.
Q When did you begin with the SEC?
A 1984.
Q And what division of the SEC do you work?
A Enforcement.
Q What is your title in that division?
A Senior accountant.
Q And give me a brief description of your job

Page 10

function. What do you do?
A What I do is to participate in inquiries and in investigations of possible violations of the federal securities law.
Q Do you work with the lawyers and other personnel in the division of enforcement?
A Yes.
Q Do you perform the function of an independent auditor in your job?
A No, I do not.
Q How many cases have you worked on roughly since you've been with the SEC?
A Probably over --
MR. LEUNG: Objection; vague. Cases? Investigations? What are you referring to?
MR. GOURAIGE: I'm referring to cases.
MR. LEUNG: Filed cases?
MR. GOURAIGE: Filed cases, correct.
THE WITNESS: And by that, you mean cases that were approved by the commission?
BY MR. GOURAIGE:
Q Let me narrow the scope of that. Let's put aside administrative proceedings and focus only on enforcement cases filed by the agency in federal court.
How many such cases have you worked on?

Page 11

A That's difficult for me to estimate.
Q Less than 10, more than 10?
A More than 10.
Q Have you testified in any of your cases at trial or in any -- any hearing in federal court?
A I testified in one case in federal court.
Q How many investigations -- pre-enforcement investigations you've been involved in?
A More than 100.
Q And in the investigations, do you generally perform the same functions?
A It varies greatly.
Q Give me a -- just generally, just describe what you would do to support the SEC lawyers and staff in an investigation.
MR. LEUNG: Objection to form. Herve, there is a lot of different types of violations or potential violations of the federal securities laws. It would be helpful I think for the witness, if you could direct your question to a specific type of case offering fraud, financial fraud, insider trading.
BY MR. GOURAIGE:
Q Okay. So let's just confine ourselves to the offering fraud.
Ms. Pearson, could you tell me generally what

Page 12

function you perform in an investigation on such a case?
A In such a case?
MR. LEUNG: I instruct the witness not to reveal any confidential or privileged information regarding non-public investigations that you may have worked on in the past.
THE WITNESS: In such an investigation, my role can differ tremendously. I am sometimes a participant in testimony taking, not always. I review documents of various types and may provide a declaration.
BY MR. GOURAIGE:
Q Is it fair to say that in general, you review financial documents and records and make calculations and observations based on those records?
A In offering fraud cases?
Q Yes.
A That would be true -- yes, that would be true.
Q Do you make -- do you conduct your own investigation? What I mean by that, do you go beyond the financial record and seek additional documentation or interview witnesses?
MR. LEUNG: Objection; form; vague.
BY MR. GOURAIGE:
Q Ms. Pearson, if you understand the question, you may answer it.

Page 13





EXHIBIT 10

A I'm not sure I understand the question.
Q So let's say in an investigation, you get some bank records from Chase Manhattan Bank. You look at the deposit slip, and you see the information on the deposit slip. Do you ever go out and try to interview somebody at the bank or the owner of that account or some third party to try to get more information to understand what is on the deposit slip?
A Are you asking if I do that on my own?
Q Well, do you do that as part of your job with the SEC? I don't mean if you're like doing something independent of the agency.
A There may be cases that as a result of my review, it is determined to seek additional information.
Q Now, I want to focus your attention on three categories of functions I understand that a CPA would perform.
Do you ever perform audits in your role at the SEC?
A I do not.
Q Do you perform reviews?
A I --
MR. LEUNG: Object to the form; vague. Reviews of what?
BY MR. GOURAIGE:



Q Do you understand as a CPA, Ms. Pearson, a difference between an audit and a review?
A If you're referring to generally accepted auditing standards, if that's what you're referring to, yes, I do understand the difference between those two.
Q Could you tell us what a review is?
A A review is what an auditor does to determine that they do not find any information, any material information that indicates that the financial statements they are reviewing are materially misstated. So it's not an audit.
Q Okay. And an audit would be conducted with everything being verified pursuant to GAAP?
A Everything being -- being examined pursuant to generally accepted auditing standards.
Q And a review is a lesser form of function than an audit; is that correct?
A Correct.
Q And do you know what a compilation is?
A Yes. Under -- under generally accepted auditing standards, a compilation involves the accountant taking the numbers that were presented to them and making -- you know, formulating financial statements and only questioning where there is something that appears materially concerning to the accountant. Otherwise it's



just merely a presentation of what they have been given and put into financial statement form.
Q So if you conduct an audit, you would not accept the numbers that a management company gave you without independent verification; is that right?
A It depends on the number. If it were an immaterial number, I'd probably would not bother with it depending on what the number represents.
Q If it's a material number, you would independently verify it?
A Wouldn't necessarily independently verify, but I would follow auditing standards to be reasonably satisfied that the number is materially correct.
Q But if you were doing a compilation, you would present the numbers given by management making it clear to the recipient that you were not given it with assurance, that it can be relied upon because you're basically transmitting information from a third party; is that correct?
MR. LEUNG: Object to the preamble; object to the form. This whole line of questions, it's not clear whether you're referring to audits or using compilations with respect to financial statements with respect to internal controls over financial reporting. If you could be more precise with your terms of art, Herve, I think we



would get a cleaner record.
MR. GOURAIGE: Ms. Pearson, I'm referring to financial statements.
THE WITNESS: In regards to your question, I would agree except for the fact that the accountant should not prepare the compilation until they are satisfied that there -- they have no -- no questions as to the propriety of the numbers.
BY MR. GOURAIGE:
Q Now, Ms. Pearson, I want to focus your attention on the work that you did in this case that you're being deposed in SEC versus Charles Liu. How would you characterize the function you perform in relation to the three categories we just went over, an audit or review or a compilation?
A None of the above.
Q So now, tell me what is it that you did in the Liu investigation generally with respect to the financial data?
A What I did was review and summarize voluminous business records, including bank records, to trace cash flows to and from various accounts -- bank accounts.
Q So that I understand your testimony, is it fair -- if I'm wrong, please tell me -- you would look at bank records. You would look at cash flows out of accounts







EXHIBIT 10

into other accounts. And you'd prepare schedules about those cash flows. And those schedules are reflected in your declaration you submitted to the court?
A Correct, yes.
Q When -- before the complaint was filed in the Liu case on May 26th, 2016, when did you first start working in the investigation?
A I believe I was first assigned to the investigation in March of 2016.
Q Now, the documents that you reviewed, do you recall generally what time period they covered?
A I believe they generally covered at first through -- well, it's going to vary. It depends on what point I'm in in the investigation.
Q If you take the three declarations that you submitted to the court --
A Uh-huh.
Q -- those documents summarize financial records during what time period?
A I believe from some point in 2014 through approximately April 2016, depending on the account because the accounts had varying monthly closing dates.
Q When you started the work on this investigation, did you have any understanding of what year this -- and I'm going to call it the Proton project started? Did you

Page 18

have any understanding what year it started?
A It was my understanding that it started in 2014.
Q I'm going to mark another exhibit, so bear with me a second. For some reason, I think I have lost -- I am sorry. I think I -- bear with me a second. I need to get the exhibit to you. Oh, I can't seem to get back to the Exhibit Share window I had. I'm only seeing the exhibit that I marked earlier and showed to you.
MR. LEUNG: I've refreshed, and I'm only seeing 52 as of now in the marked exhibits folder.
MR. GOURAIGE: Yeah. Could we take a few minutes break?
(A short break was taken.)
MR. GOURAIGE: If I could ask the court reporter to just read last question and answer for me, please.
(The record was read as follows:
"Question: When you started the work on this investigation, did you have any understanding of what year this -- and I'm going to call it the Proton project started? Did you have any understanding what year it started?
"Answer: It was my understanding that it started in 2014.")
MR. LEUNG: Objection; vague and confusing. The question's reference to Proton project conflates the

Page 19

securities offering charge by the SEC's complaint with the purported work necessary to construct the Proton Cancer Therapy Center that's at issue in this case.
MR. GOURAIGE: Mr. Leung, can I ask, if you have an objection, that you state the objection -- just simply state the objection and not make a speaking objection while I'm trying to examine the witness.
MR. LEUNG: It's not a speaking objection, Herve. I'm entitled to state my objections with specificity.
MR. GOURAIGE: Well, you are. I understand that. But I just wondered if you could state it in such a way so that you are not conveying information to the witness during my examination.
MR. LEUNG: I have not and I will not.
BY MR. GOURAIGE:
Q So, Ms. Pearson, the document that is marked as Exhibit 53, do you recognize it?
A I do not.
Q You've never seen that document before?
A I have not.
Q Would it be news to you if I said to you that that document is the application to the USCIS by Proton, and I'm going to call it -- rather than Pacific Proton, I'm going to call it Pacific. That's the regional company to set up this Proton project that you ultimately got

Page 20

involved in in investigating?
MR. LEUNG: Same objection to the form.
THE WITNESS: It would not be a surprise to me.
BY MR. GOURAIGE:
Q So did you -- during the course of your investigation for the SEC, did you ever do any investigation of financial records between -- I believe document 53 is dated November 19, 2010. So did you ever do any financial investigation of financial records between 2010 and March of 2014?
A I don't know because I remember the earliest investor funds came in in 2014, but I don't remember the month.
Q So is it fair to say that prior to the investor funds coming in 2014, you did not look at any of the financial records of the Proton therapy companies?
MR. LEUNG: Object to the form; argumentative.
THE WITNESS: Yes.
BY MR. GOURAIGE:
Q And so that we're clear, let me define for you what I'm referring to as the Proton companies. There are three companies I'm going to give you the names that I'm going to use during the rest of the deposition that would be helpful. The regional entity I'm going to call Pacific. The fund that raised the investor capital, I'm

Page 21

going to call the EB5 fund. In the company that was the -- what USCIS calls the JCE, I'm going to call Beverly. Beverly, as you know, was the company that was going to build the project; is that correct?
A Correct.
Q And the EB5 fund was the fund where the investor funds would be deposited into; is that correct?
A The capital corp contributions were.
Q Correct. So the capital contributions would be 500,000 per investor; is that correct?
A Correct.
Q And there was an additional 45,000, an administrative fee for investors; is that correct?
A Correct.
Q And those funds went into Pacific's bank accounts; is that correct?
A Correct.
Q And you looked at bank accounts and other financial records for each one of the entities I just mentioned during the time period of 2014 to 2016; is that correct?
A Yes.
Q You did not look at any financial records for Pacific prior to 2014; is that correct?
A Correct.



Q Do you have any understanding of who paid the initial capital between 2010 and 2014 to start the project?
A I do not. My work involved tracing only investor funds.
Q Okay. Now, when you say you trace investor funds, is it fair to say -- let me strike that.
The initial deposit of the investor funds was into a bank account set up by an S Corp agent; is that correct?
A Correct.
Q And that bank was the East West Bank I believe it was called; is that correct?
A Correct.
Q So when you trace investor funds, you would trace them from the East West Bank account to the EB5 fund or Beverly or Pacific; is that correct?
A Yes, after establishing that the funds in the East West Bank came from investors.
Q Did you learn that some of the funds did not come from investors?
A Yes, I did.
Q And do you have any idea how much of those funds did not come from investors?
A No. I wouldn't have that.



MR. LEUNG: Object -- object to form. Which account are we referring to?
THE WITNESS: Well --
BY MR. GOURAIGE:
Q Well, did you -- let's state, for example, the EB5 fund, did you notice funds in the accounts that did not come from investors?
A Yes. I believe so. And I believe that's shown in my first declaration.
Q So let me -- if you do need -- if you need to see your first declaration to refresh your recollection, I'm just going to read some numbers for you from that and see if you recall. But we can put the first declaration up for you if you need it.
Is it correct that you notice that roughly $24,012,137 went from East West Bank, the escrow account, to the EB5 fund?
MR. LEUNG: Is there a particular paragraph in the declaration that you're directing the witness to, Herve?
MR. GOURAIGE: Why don't we -- why don't we put up the -- I've been trying to put up the first declaration for you, Ms. Pearson. That would be helpful.
BY MR. GOURAIGE:
Q Now, it's not allowing me to mark the exhibits,



so let me try another one. If I did this right again, I think, Ms. Pearson, you have an exhibit before you that is marked Exhibit 54; is that correct?
A Yes. I'm opening it right now.
Q Okay.
A Okay.
Q Do you recognize the exhibit?
A Yes, I do.
Q Tell us what it is?
A It is the declaration that I wrote in support of the SEC's application for TRO.
Q And if you can let me just go here to -- if you go to paragraph 21 of Exhibit 53 -- I'm sorry, 54, do you see those numbers?
A Yes.
Q Okay. So it says 24,012,137 for East West Bank.
A Yes.
Q The escrow account?
A Yes.
Q Now, you also state in that same paragraph there is about $1,500,450 from various deposits.
Do you see that?
MR. LEUNG: I'm sorry, Herve, are you referring to paragraph 21?
MR. GOURAIGE: Yes, I am.







EXHIBIT 10

MR. LEUNG: Can you read back the question, please.
(The record was read as follows:
"Question: Now, you also state in that same paragraph there is about $1,500,450 from various deposits.
Do you see that?")
MR. LEUNG: Objection; misstates the exhibit.
BY MR. GOURAIGE:
Q I'm sorry, I -- the paragraph 21 refers to a total of 24,000 [sic] 712,217; is that correct, Ms. Pearson?
A Yes.
MR. LEUNG: Objection; misstates the exhibit.
MR. GOURAIGE: What is your objection, Gary?
MR. LEUNG: You said 24,000 712,217. This is in Exhibit 54. And paragraph 21 is $24,712,217.
MR. GOURAIGE: I'm sorry, I misspoke. Then I meant to say 24,712,217; is that number correct, Ms. Pearson, from --
A Yes, it is.
Q Okay. Now, Subparagraph C of that same paragraph refers to $500,250 from various deposits.
Do you see that?
A Yes.
Q Did you determine the sources of those deposits?



A I did not.
Q Roughly do you remember what was the total amount that was deposited into the funds that is -- that was deposited in the escrow and ultimately to the EB5 fund?
MR. LEUNG: Object to the form; vague and confusing to the extent it's not distinguishing between administrative fees and capital contributions.
BY MR. GOURAIGE:
Q If you remember what the total amount was, Ms. Pearson?
A I don't remember.
Q And now I want to focus on the time period that you reviewed, let's say, roughly in the spring of 2014 until what, April of 2016; is that correct?
A I believe so.
Q Were all of the funds out of the EB5 fund transferred to either Beverly or Pacific?
A I don't remember.
Q Do you remember if you look at your -- and you can look at your declaration if you need to, how much was left in the EB5 fund accounts when the complaint was filed in May of 2016?
MR. LEUNG: Lorraine, Counsel has invited you to review your declaration. To the extent that review would refresh your recollection on the question, please do so.



And do you need the question reread?
THE WITNESS: I -- yes, please.
MR. GOURAIGE: Could the reporter please reread my question.
(The record was read as follows:
"Question: Do you remember if you look at your -- and you can look at your declaration if you need to, how much was left in the EB5 fund accounts when the complaint was filed in May of 2016?")
THE WITNESS: Referring to my declaration at paragraph 29, it appears that as of April 30th, 2016, there was a balance in the EB5 account of $102,272.
BY MR. GOURAIGE:
Q And how much was left in the Beverly account?
A $261,256.
Q And how much was left in the Pacific account?
A About --
MR. LEUNG: Objection; vague as to time frame. Objection; vague as to time frame.
BY MR. GOURAIGE:
Q As of April 30, 2016, Ms. Pearson?
A As of April 30, 2016, a balance in the Beverly Proton account was $261,256. And as of April 30th, 2016, the balance in the Pacific Proton account was $45,481.
Q And did you look at bank records for each bank



account for each one of these entities, the EB5 fund, Beverly, and Pacific?
A Yes.
Q And did you trace funds out of their bank account into other bank accounts during the time period that you reviewed?
A To the extent that it -- the information was provided by the bank, yes.
Q Now -- and if you need to look at your declaration, feel free to do so, and I'll let you know if there is -- which declaration you need to look at to answer these questions.
Did you conclude after you looked at all of the bank records -- let me strike that.
Are you familiar with an entity called Overseas China?
MR. LEUNG: Object to the form.
BY MR. GOURAIGE:
Q Have you ever heard of the name -- of the entity called Overseas China?
A I believe so.
Q Have you ever heard of the name of an entity called Delsk, D-e-l-s-k?
A Yes.
Q And have you ever heard of a couple of entities







EXHIBIT 10

named UDG?
A Yes.
Q Are those three entities marketers in China?
A That is my understanding.
Q Were they entities that you understood received funds from the bank accounts that you reviewed?
A Yes.
Q So now I'm going to ask you with respect to Overseas China, did you conclude that that entity had received approximately $7,300,000 in funds as of -- do you have an objection, Gary?
MR. LEUNG: I'll let you finish.
MR. GOURAIGE: Okay.
BY MR. GOURAIGE:
Q Did you conclude that that entity had received transfers of funds from investor funds of $7,300,000?
A I would have to look at my declaration.
Q Is that your first declaration or which one do you want to look at?
A I don't know yet.
Q Okay. Let me -- let me do this. Just before I do it, it's my understanding that you submitted three declarations to the court. And if I'm mistaken, please correct me. The first one was the one that you are looking at now, which I think is Exhibit 54, and that one



is dated May 26th, 2016; is that correct?
A Correct.
Q You also submitted a second declaration that we're going to mark now as an exhibit, and that's called the first supplemental declaration, and it's dated June 3, 2016.
Is that correct?
A Correct.
Q And you submitted a third declaration, and that one is called Pearson's second supplemental declaration -- or, actually, third supplemental declaration, and it is dated September 18th, 2016.
A There is a second supplemental declaration.
MR. LEUNG: Yeah. Herve, there is four declarations, May 26th, June 3rd, September 20th, September 28th, all 2016.
MR. GOURAIGE: What was the last two dates, Gary?
MR. LEUNG: September 20th, docket number 160-1, September 28th, docket number 163. And so you know, you know, based on our pre-deposition discussions, Lorraine does have hard copies of all four declarations in front of her.
MR. GOURAIGE: Okay. I appreciate that because I was -- and that's helpful because I did not upload the second supplemental declaration, and that's the confusion.



BY MR. GOURAIGE:
Q So let me ask you -- you have in front of you the Pearson declaration. I did upload the first supplemental and the third supplemental. So what I'm going to do is try to display those two to you, and then you have the second supplemental in front of you. So feel free to refer to that one if you need to.
Okay. So bear with me if I can just get the other two.
MR. LEUNG: Lorraine, again, Counsel has invited you to review your declarations to the extent necessary to refresh your recollection. You should take him up on that invitation if you think it's necessary to review those declarations in order to give your best and most accurate testimony.
THE WITNESS: Thank you.
BY MR. GOURAIGE:
Q Ms. Pearson?
A Yes.
Q I'm not sure that I've done this right -- and, actually, the documents that I want to be uploaded may not have been all uploaded. But I tried to show you two of your declarations. One is the first supplemental declaration dated June 3, 2016.
Can you see that on the screen?



A I'm opening it right now.
Q Okay.
MR. LEUNG: Herve, I think the exhibits you've marked 56 and 57 are the same document. They appear to be the first supplemental declaration dated June 3rd, but only partially. The PDF runs through -- it looks like the end of Exhibit 3 to the declaration, which means that Exhibits 4 through 9 of the declaration are missing from what you've uploaded.
MR. GOURAIGE: Yeah. I had a lot of problems uploading the declarations and all of the exhibits.
MR. GOURAIGE: Did you -- is -- did you see the first supplemental declaration?
MR. LEUNG: No. Right now, we -- I -- oh, sorry.
THE WITNESS: I think -- I think 55 is there.
BY MR. GOURAIGE:
Q Okay. So I'm going to suggest this. We're going to take -- can we take a five-minute break? We'll give you, Ms. Pearson, a chance to review your declarations. And then I'm going to ask you some questions about the funds transferred.
A Okay.
MR. LEUNG: Herve, which declaration would you like Ms. Pearson to review?
MR. GOURAIGE: Well, I'd like her to review the







EXHIBIT 10

first supplemental, the third supplemental, both of which could be on the screen, and then the second supplemental, which is not on the screen, Ms. Pearson, but I understand you have it in front of you?
THE WITNESS: Correct.
MR. GOURAIGE: So what I would like for you to view is all three of them, and then I'm going to ask you some questions about the funds transferred. And what I would like for you to do, since we have marked the first supplemental and the third supplemental, if you do refer to the second supplemental, which is not marked as an exhibit, to be specific, when you answer the question, that you're referring to your second supplemental declaration.
THE WITNESS: That's fine.
MR. GOURAIGE: A lot of instructions? You understand those?
THE WITNESS: Yes. I think I do.
MR. GOURAIGE: Okay. So can we take -- off the record, take a five minute break, give Ms. Pearson a chance to review those declarations and then we'll resume?
MR. LEUNG: Sure thing.
MR. GOURAIGE: Okay.
(A short break was taken.)
BY MR. GOURAIGE:

Page 34

Q We're back on the record.
Ms. Pearson, before I ask you some specific questions, I just want to get some numbers before you. And tell me if they are correct based on your review of your declarations. According to your declarations, the EB5 fund and Pacific received approximately $26,967,918 of investor funds.
MR. LEUNG: Lorraine, do you have that figure in mind?
THE WITNESS: You're talking about deposits through the EB5 fund?
BY MR. GOURAIGE:
Q This is the total amount of investor funds received by the fund and Pacific.
A Oh, the total amount transferred from East West Bank?
Q No the -- the investor capital and administrative fees received.
A Okay. I'm --
MR. LEUNG: Object to the form. Ever received or received based on the periods -- time periods of the bank records that you reviewed?
MR. GOURAIGE: I am referring to the time period of the bank records that you reviewed.
THE WITNESS: And are you asking me about

Page 35

deposits to the EB5 account?
BY MR. GOURAIGE:
Q And specific, the total -- I mean --
A Okay.
Q I know I have that somewhere. I just have to find it.
A Okay.
Q So why don't we then -- I want to ask you -- I'm going to focus your attention on two categories of transfers. One would be to the three Chinese marketers we identified earlier, and second will be to the two defendants. So first let's focus on the market.
A Uh-huh.
Q You indicate in your declaration that Overseas Chinese -- Overseas China received approximately 7,722,000 in investor funds?
A That is correct.
Q Now, am I correct that you looked at the bank records and saw funds coming out of the EB5 fund, Beverly, or Pacific Bank accounts going to a bank in Singapore called Overseas Chinese Bank?
A Yes.
Q And how did you know that those funds went to the marketer called Overseas China?
A That was what was indicated on this spreadsheet

Page 36

that I received from Chase Bank for that account, that the payee was Overseas Chinese Immigration Consulting, Ltd.
Q Apart from the information on that document, did you have any other information that indicated to you that that's the recipient of the funds?
A No.
MR. LEUNG: Objection; asked and answered.
BY MR. GOURAIGE:
Q Did you do any investigation to find out what happened to those funds once they were transferred to the Overseas Chinese bank in Singapore?
A I did not.
Q Did you have any evidence that you looked at that indicated any of those funds went from that bank to a personal bank account of either defendant Charles Liu or defendant Lisa Wang?
MR. LEUNG: Objection; compound.
BY MR. GOURAIGE:
Q Do you want to me -- do you understand the question, Ms. Pearson, or do you want me to break it up?
A I understand. I had no such evidence.
Q Let me ask you basically the same questions regarding Delsk. You indicated in your declarations that a total -- well, roughly about a million what, 387 went to Delsk; is that correct?

Page 37

MR. LEUNG: Objection; misstates the affidavit.
MR. GOURAIGE: Which affidavit are you referring to, James?
MR. LEUNG: I'm looking at the first one. I suspect it misstates the second one. If there is a particular portion of any of Ms. Pearson's affidavits that you'd like to direct her to, I think that would be helpful.
BY MR. GOURAIGE:
Q Well, that -- I guess the specific amount is not -- is less important. Did you think there were summaries of the total amounts that went to Delsk, Ms. Pearson? Did you do that?
A Yes, I did.
Q Do you recall the amount that was transferred to Delsk?
A At -- at my supplemental declaration at paragraphs 24, it says $1,387,500.
Q So I was off by $500. But -- so that amount, how did you learn that amount from review of the bank transfers?
A I reviewed the bank transfers, and I found those payments were made to Industrial and Commercial Bank of China.
Q And --

Page 38

A Oh, actually, I misspoke. I'm sorry. Wait. Wait. Wait. I'm getting Delsk and UGD mixed up. Those payments were made to Hang Seng Bank, yes.
Q Hang Seng Bank in Hong Kong; is that correct?
A Correct.
Q And how did you know the Hang Seng Bank account belonged to Delsk?
A It was the testimony of Charles Liu on March 23rd, 2016.
Q Apart from Defendant Liu's testimony, did you have any other information to corroborate that?
A No, I did not.
Q Did you trace the funds after they were received by the Hang Seng Bank to find out what happened to them?
A I did not.
Q Do you have any evidence that any of those funds from the Hang Seng Bank went either to Defendant Liu or the defendant Wang?
A I do not.
Q Okay. So now let's talk about UDG. Now, UDG is a term that refers to two companies. Are you familiar with them?
A My understanding is that UDG stands for United Damei Group.
Q Okay. And they're two separate companies. The

Page 39

details and names don't matter, but let's call it UDG.
A Okay.
Q So your declarations indicate a total of about -- I shouldn't say about -- a total of 3,815,000, that went into the UDG account; is that correct?
A Yes.
Q And those funds were transferred to the Industrial & Commercial Bank in Hong Kong; is that correct?
A Yes.
Q How did you know that the account that that bank in Hong Kong belonged to UDG?
A It was the testimony of Charles Liu on March 23rd, 2016.
Q Did you trace the funds after they were received by the Industrial & Commercial Bank in Hong Kong?
A I did not.
Q Do you have any evidence that any of those funds went either to Defendant Liu or to the Defendant Wang?
MR. LEUNG: Objection; compound.
THE WITNESS: I don't know.
BY MR. GOURAIGE:
Q Now, Ms. Pearson, I'm going to focus on the two defendants, that is Charles Liu and his wife Lisa Wang. And I'm going to give you some aggregate numbers. I think

Page 40

there are totals from your various declarations. But feel free to look at the declarations and let me know if they're; correct?
A Okay.
Q Is it correct that your declarations indicate that Defendant Liu received $6,714,580 of investor funds into personal accounts?
MR. LEUNG: Object to the form; misstates the declarations.
BY MR. GOURAIGE:
Q Do you understand the question, Ms. Pearson?
A I do, okay. Did you say 6,714,005 -- excuse me. Let me restate. Did you say $6,714,580?
Q Yes.
A Yes, that is -- that is correct.
Q And is it correct that your declarations indicate that Defendant Wang received 1,538?
A Yes.
MR. LEUNG: Objection; form. Received from where?
MR. GOURAIGE: From investor funds.
MR. LEUNG: And not bank accounts.
MR. GOURAIGE: I'm not sure what the objection is. What are you saying, not bank accounts, the --
MR. LEUNG: Well, you're misstating the

Page 41

declaration. The declaration is clear on its face. It's talking about a bank records analysis, and you're referring to investor funds.
BY MR. GOURAIGE:
Q Well, Ms. Pearson, just so that we're clear, for the record, when we're referring to these transfers of funds, based on your declarations, we're referring to funds coming out of various bank accounts that belong to either the EB5 fund, Pacific, or Beverly; is that correct?
A I'm not comfortable with equating the two of them because in my declaration, I'm declaring to the flow of funds from certain accounts.
Q I understand that your declaration shows your specific transfers from one account -- let's say from a EB5 account or Beverly account to an account either belonging to a defendant personally or to an account, another company that is, and then the funds are used by the defendant. I'm asking you a different question. Is it correct to say that your declaration -- all of the declarations represent that $1,538,000 of investor funds went to defendant Wang?
MR. LEUNG: Objection; form; conflating investor funds with the analysis again.
THE WITNESS: That is not what my declaration states.



BY MR. GOURAIGE:
Q So could you take a look at your -- I believe it is the second -- no, it's actually your -- the initial declaration.
A Uh-huh.
Q And it's -- if you look at Exhibit 13, at paragraph 9, where you do a combined analysis --
MR. LEUNG: I'm sorry, Exhibit 13 to the May 26th declaration, Herve?
MR. GOURAIGE: Yes.
MR. LEUNG: And paragraph 9, there aren't any paragraphs.
MR. GOURAIGE: I'm sorry, I said paragraph 9. I meant, page 9, I'm referring to ECF pagination.
MR. LEUNG: Okay. Page 96.
THE WITNESS: I'm looking at the exhibit.
MR. LEUNG: I don't think there is a pending question.
BY MR. GOURAIGE:
Q Do you see where you indicate you did a combined analysis of funds going to the defendants Liu and Wang?
A I do a combined analysis of sources of any of the funds, yes.
Q And are you looking at Exhibit 13 at page 27?
A Yes.



Q Okay. And do you indicate there that $6,714,580 went to Defendant Liu?
A Yes.
MR. LEUNG: Objection; misstates the affidavit. Exhibit 13 is describing the affidavit at paragraph 28. Your question is removing a lot of relevant context, Herve.
MR. GOURAIGE: Well, I'm just focusing on the amounts that the witness indicate went to Defendant Liu.
BY MR. GOURAIGE:
Q 6,714,580; is that correct, Ms. Pearson?
A Yeah.
Q And those were investor funds?
A I cannot state that.
Q Some of them could have been non-investor funds?
MR. LEUNG: Objection; misstates the testimony.
MR. GOURAIGE: Well, why don't we let her testify, Gary.
THE WITNESS: Okay. There are four elements of sources of funds, only one of which is funds from investors. So I cannot state that every dollar that went to Mr. Liu came from investors.
BY MR. GOURAIGE:
Q Now, with the case of Defendant Wang in that same section of your declaration, do you indicate that



$1,538,000 went to her?
A Correct.
Q And is your testimony the same with respect to Defendant Wang that you cannot say that all of those funds were investor funds?
MR. LEUNG: Objection; misstates the declaration. This is a bank records analysis.
MR. GOURAIGE: Gary?
MR. LEUNG: You're framing the question in a way there's very overly broad.
MR. GOURAIGE: Gary, stop coaching the witness.
MR. LEUNG: Herve, stop asking an objectionable question.
MR. GOURAIGE: Well, then simply state the objection. You're actually trying to coach the witness on -- the witness on the record, and that's inappropriate.
MR. LEUNG: Object to form; vague and confusing; assumes facts not in evidence.
MR. GOURAIGE: Well, the witness can tell me what -- she knows her declaration and she knows what she is saying.
BY MR. GOURAIGE:
Q Ms. Pearson, again, I will ask you: Is your testimony regarding defendant Wang the same as the Defendant Liu, that you cannot testify that all of those







EXHIBIT 10

funds that went to her were investor funds; is that correct?
MR. LEUNG: Same objection.
THE WITNESS: Yes.
BY MR. GOURAIGE:
Q Okay. Now, in -- wait. Before I go to the next area, let me go back. I'll split the defendants. I'm not asking you, Ms. Pearson, simply about Defendant Liu. Other than the review of the bank records to look at the transfers of funds, did you review any document that showed the work, if any, that Defendant Liu did for these project companies?
A I did not.
Q Did you review any documents that were employment contracts between Defendant Liu and any of these companies?
A I did not. May I make a statement -- oh, sorry. Can -- later on, can we go back to the question regarding the funds paid to Mr. Liu as --
MR. LEUNG: Why don't we do that now.
BY MR. GOURAIGE:
Q Is there something you want to clarify? Go ahead.
A Yes. As evidenced in Exhibit 13, from that spreadsheet, I cannot say that the entire amounts paid to



Mr. Liu came from investor funds. But if you look at the supplemental declaration -- and I believe it's -- hold on. I believe it's Exhibit 56, if I'm correct.
MR. LEUNG: Lorraine, is this the June 3rd declaration?
THE WITNESS: Yes, it is.
MR. LEUNG: Document Number 16?
THE WITNESS: Yes.
If you look at paragraph 27, and you look at paragraph 28, okay, now -- strike that, please. I misspoke.
MR. LEUNG: Paragraph 13?
MR. GOURAIGE: Is that -- you want to --
THE WITNESS: I want to start.
MR. LEUNG: Paragraph 13, Lorraine?
THE WITNESS: Okay. I was referring to Exhibit 13 in the first dec in trying to make a reference to some of the paragraphs in this supplemental dec. But I misstated it.
MR. LEUNG: Lorraine, have a look at paragraph 13.
THE WITNESS: 13 in the supplemental dec.
MR. LEUNG: Yes. And if that refreshes your recollection in a way that allows you to supplement your prior answers, please do so.



THE WITNESS: Okay. It does. If you look as described in paragraph 13 of my supplemental dec and you likewise refer to Exhibit 13 in my original declaration, you can see that the amount of funds deposited in the account that was not from investors is relatively small. So while I cannot say for certain that every dollar that went to Mr. Liu or Ms. Wang came from investor funds, I can state that the majority of it did. Because there is just a few million dollars that went into those accounts, and the amounts that went to Mr. Liu exceed that.
So today I could take the time to do a calculation to determine exactly how much of each of the amounts that went to Mr. Liu and Ms. Wang represented investor funds. I just was not asked to do that for this or the declarations I wrote.
MR. GOURAIGE: Could I ask the court reporter to read back my last question and the witness's last answer, please.
(The record was read as follows:
"Question: Did you review any documents that were employment contracts between Defendant Liu and any of these companies?
"Answer: I did not.")
BY MR. GOURAIGE:
Q Next question. Ms. Pearson, did you review



defendant Liu's tax return to find out whether or not he claimed those funds that you say are majority investor funds that went to him as income on his tax returns?
A I did not.
Q Did you ask the people at the SEC you were working with to get access to the tax returns?
A I did not.
MR. LEUNG: Objection --
BY MR. GOURAIGE:
Q Same question since I split them up with respect to Defendant Wang, did you review any documents or look at any evidence that indicated the work she did for any of these companies?
A I did not.
Q Do you know whether or not she did any work for UDG?
A I don't know.
Q Did you review any employment agreement she might have had with any of these companies?
A I did not.
Q Did you review her tax return to determine whether or not she claimed any money she got from these companies as income?
A I did not.
Q Now, next questions are going to be focused on

certain expenses, and I think they're referred to in one of your declarations. You -- you referred to in your declaration to certain expenses made to schools, right, the Santa Ana school, Trinity Foundation Prep. Do you recall those names?
A Yes.
MR. LEUNG: Gary, can you please tell Lorraine which declaration and what paragraph you're referring to?
MR. GOURAIGE: I'm -- I don't -- Ms. Pearson, do you recall saying that in your declaration?
THE WITNESS: Yes, are we referring to the supplemental declaration, which was filed on June 3rd, 2016, and at least part of this is at paragraph 22.
BY MR. GOURAIGE:
Q Is it fair to say that you saw from the bank records transfers of funds from the project companies to these schools?
A I believe it's from the administrative fees account.
Q Okay. So that's the Pacific account, one of the project companies?
A Yes.
Q Did you do any other investigation about each one of these transfers?
A I did not.

Page 50

Q The -- now, I want to point you for the next question, Ms. Pearson, to a specific part of your -- it's the first supplemental declaration, and it's paragraphs 27 to 30.
Would you look at those photographs?
A Yes.
Q At paragraph 27, subsections A through D, you indicate -- and, now, I'm, I think, quoting from -- paraphrasing from your declaration. But please look at the exact language you used on January 4, 2016, "The Liu" -- "The Defendant Liu account received $180,000 from Beverly, in the same day, they transferred out of that account 50,000 to an entity called MPH Ventures."
Is that correct?
A Yes.
Q Now, do you know that -- strike that.
When you looked at the bank records on that date on January 4, how much money was in that account before the $180,000 transfer?
A I can't tell you today. But I know it was not -- it must have been zero because otherwise I would not have made this statement that the payment was made using funds from the Beverly Proton account. Because in order to make -- I can -- this statement, I would have looked at the balance prior to the receipt of the transfer and seen that

Page 51

none of the payment of 50,000 could have been made without the $180,000 received from the Beverly Proton account. That's why I was able to make this statement that -- this payment was made using funds from the Beverly Proton account.
Q And can you testify today that on that date, January 4, 2016, the balance was zero?
A It had to --
MR. LEUNG: Which account onto the form?
BY MR. GOURAIGE:
Q Can you testify to that, Ms. Pearson?
MR. LEUNG: Object to the form; what account are you referring to?
BY MR. GOURAIGE:
Q Ms. Pearson, you're looking at the paragraph 27, the exact language I just quoted to you the account you're referring to there?
MR. LEUNG: I don't want to be coy about it, Herve. Are you referring to the Beverly Proton account or are you referring to the Liu Chase account? I just want to make sure we've got a clean record.
THE WITNESS: Oh. Oh.
BY MR. GOURAIGE:
Q Well, the transfer of $180,000 came from Beverly; is that correct, Ms. Pearson?

Page 52

A Yes.
Q And it went into an account?
A To the Liu personal account. And Liu could not have made the payment to MPH Ventures without the transfer from Beverly Proton.
Q Okay.
A I do know that.
Q I'm asking you a different question now. Are you speculating that he could not have made it or do you know for a fact or are you testifying today that before that 180,000, that account was at zero?
A It may not have been at zero, but there were probably other payments made prior. When you read the bank accounts, it's in time, so it probably wasn't zero on January 3rd, but there were other payments, other checks coming in being credited, and they could not have written a check of 50,000 without the 180,000 coming in.
Q Are you testifying that that is the case today based on your recollection?
A Yes.
MR. LEUNG: Herve, that's not a fair question.
MR. GOURAIGE: Okay.
MR. LEUNG: All right. You're asking about specific transactions relating to a declaration that summarizes information from at least seven different bank

Page 53

accounts with hundreds, if not thousands of financial transactions. Okay. If you want to ask her a question about the balance, put the bank account statement in front of her.
MR. GOURAIGE: No. I'm asking her about her declaration and her testimony. I think we just got the answer.
BY MR. GOURAIGE:
Q Now, Ms. Pearson, I want to ask you a different question. In that paragraph 27 of your declaration, does it state that the bank account balance was zero or less than 50,000 on January 4, 2016?
MR. LEUNG: Objection; the declaration says what it says.
BY MR. GOURAIGE:
Q Does it say that, Ms. Pearson?
A It does not say that.
Q Thank you.
A It reflects the work that I did.
Q Now, could you read the -- I didn't hear the last response, Miss Reporter. Could you read that last response from the witness, please?
(The record was read as follows:
"Question: Does it say that, Ms. Pearson?
"Answer: It does not say that.

Page 54

"Question: Thank you.
"Answer: It reflects the work that I did.")
BY MR. GOURAIGE:
Q Now, Ms. Pearson, if you recall, in any of the work that you did in reviewing the bank account record, did you come across any information about Charles Liu, Defendant Liu making capital contributions to the project company?
MR. LEUNG: Objection; vague. "Project company" is undefined.
BY MR. GOURAIGE:
Q Do you understand the question, Ms. Pearson?
A I do -- I don't recollect any.
Q Do you recall in one of your declarations, you referred to the Defendant Liu capital account?
A I don't.
Q Do you recall -- let me give you some more information. Do you recall that in one of your declarations -- I'm sorry. I think Gary is not there, so --
MR. LEUNG: No. I'm here. I'm here. I just needed to close the door.
MR. GOURAIGE: Okay.
BY MR. GOURAIGE:
Q Do you recall in one of your -- in your

Page 55

declarations, you referred to the Defendant Liu's capital account for Pacific as of December 31st, 2015, was negative by $1,647,689?
A Can you -- is that in my first declaration?
MR. LEUNG: Herve, do you know what declaration you're referring to in your question?
MR. GOURAIGE: Unfortunately I don't. I'd have to go look into the declarations. I have it in my notes here, and I don't have a reference, so --
MR. LEUNG: Heather, can you read back the last question, please.
(The record was read as follows:
"Question: Do you recall in one of your -- in your declarations, you referred to the Defendant Liu's capital account for Pacific as of December 31st, 2015, was negative by $1,647,689?")
MR. GOURAIGE: Thank you.
BY MR. GOURAIGE:
Q If you don't recall that, Ms. Pearson, we can just take a break, and I'll track it down for you and show it to you specifically.
A I'm sorry, yeah. I don't.
Q Okay. Why don't we just take a five-minute break, okay? Thank you.
(A short break was taken.)

Page 56

BY MR. GOURAIGE:
Q Rather than spend time in trying to track this down, let me approach this differently, Ms. Pearson. I think you state in your declarations, one of them, that for LLC limited liability company, a negative capital account means that the aggregate distributions to the member are greater than capital contribution plus their accumulated net income; is that generally correct?
A I really would like to see it.
Q Well, that's -- let's leave aside for the moment what you said in your declaration.
As a CPA looking at the financials for an LLC, if a member's capital account is negative, does that mean that the aggregate distributions to that member are greater than the member's capital contribution plus their share of accumulated net income?
A It's -- I would say a negative capital account indicates -- either indicates some mixture of losses and withdrawals that exceed the capital contributions.
Q So now, in the case of Defendant Liu in Pacific and in Beverly, LLC, did you understand that he was an equity owner?
A I did not.
Q You had no idea of what his percentage ownership was?

Page 57

A Correct.
Q Did you have any understanding that there might be other members who are were also equity members, equity owners in these LLCs?
A I didn't have any information as to whether -- who the members were.
Q So in an LLC, the net income of the LLC would be distributed assuming it's positive to the members, those who owned equity in the LLC; is that correct?
MR. LEUNG: Object to the incomplete hypothetical; also calls for opinion testimony from this fact witness.
THE WITNESS: I think I would need more information as to how the LLC was set up. I just -- I don't feel able to answer that question.
BY MR. GOURAIGE:
Q So you don't have any information about these particular LLCs, about how they were set up or who were the equity owners; is that correct?
MR. LEUNG: Objection; asked and answered.
THE WITNESS: That's correct.
BY MR. GOURAIGE:
Q So you would not know whether Defendant Liu would be entitled to distribution of net income from these LLCs; is that right?

Page 58

MR. LEUNG: Objection; incomplete hypothetical; calls for opinion testimony; lacks foundation.
BY MR. GOURAIGE:
Q It's a fact question. You don't have any information?
A I have no information as to how the losses or profits were to be distributed.
Q Okay. So -- and you also don't have any information about Defendant Liu's capital contribution to any of these LLCs; is that correct?
A Correct.
Q Do you have -- did you not -- do you -- but did you have information at the time you were doing your review of the bank records as to whether or not any of these LLCs earned any net income?
A No.
Q Did you ever review financial statements for any of the LLCs whose bank records you reviewed?
A I did not.
Q So as you sit here today, you can't tell us whether or not any of these three LLCs accrued any net income?
A Accrued or are you asking me if the LLCs earned any net income?
Q Yes.

Page 59

A I do not know.
Q Let me go ahead and show you one exhibit. Let me try to, Ms. Pearson. I think I just introduced and you should see in your screen a document marked Exhibit 59. Take a look at that document.
A Okay. I see it.
Q Have you seen that document before?
A I believe I have. I have since located the cite in the declaration that you're referring to. And it does represent the balance sheet for Pacific Proton as of December 31, 2015. Oh -- but -- but it -- this must not be what I was looking -- the one I looked at because the capital account did not show the balance.
Q Can I first have your --
MR. LEUNG: It's Exhibit --
BY MR. GOURAIGE:
Q Let me just have you identify the exhibit -- the exhibit that is marked 59 is a financial statement that has basically three parts. It's the balance sheet for the Pacific Proton EB5 fund. And if you scroll down, you'll see a profit and loss statement. And then if you scroll down some more, you'll see a general ledger.
A Oh, okay.
Q And then the last document is an adjusting journal entry. Do you see that, Ms. Pearson?

Page 60

A I'm looking for that adjusting journal entry, if it's --
Q It's the last document after the general ledger. You have to keep scrolling down.
A All of the way to the end?
Q Yes.
A Oh, I see it, adjusting journal entry. Okay. What is the question about the adjusting journal entry?
Q So -- well, no. I want to -- first question is --
A Okay.
Q Exhibit 59, have you seen that document before?
A I don't believe so because my description in my declaration does not agree with this document.
Q Did you see another financial statement that is different from Exhibit 59?
MR. LEUNG: Objection.
THE WITNESS: I'm -- I believe so based on --
MR. LEUNG: Misstates the record. Exhibit 59 is a balance sheet for the PP EB5 fund. The extent you're asking Ms. Pearson what she's seen, please identify the specific corporate entity that you're referring to, Herve.
MR. GOURAIGE: Okay.
BY MR. GOURAIGE:
Q So, Ms. Pearson, your declaration, when you said

Page 61

you just located the paragraph where you referred to the negative capital account with Charles Liu --
A Uh-huh.
Q -- refers to Pacific, not the EB5 fund; is that correct?
A Correct.
Q Okay. So give me a minute, and we're going to mark the Pacific exhibit.
A Okay.
Q Ms. Pearson, if I've done it right, I think you should have it in front of you in the screen, Exhibit 60. Could you look at the document and tell us whether you recognize it.
MR. LEUNG: Herve, has this document been produced?
MR. GOURAIGE: Yes.
MR. LEUNG: Was it produced during the investigation?
MR. GOURAIGE: I don't know whether it was produced during the investigation, Gary.
MR. LEUNG: Well, when was it produced?
MR. GOURAIGE: It was produced -- when you say "when," you mean the time period? It's financials produced by the accountant of the companies, and it would have been at some point in 2016.



MR. LEUNG: I raise this because I'm not sure the Exhibit 60 that you have shown the witness --
MR. GOURAIGE: Can we just have the witness testify?
MR. LEUNG: It is the same version of the document that was produced during the investigation. I've made my record. Go ahead.
THE WITNESS: Okay.
BY MR. GOURAIGE:
Q Do you recognize that, Ms. Pearson?
A I do not.
Q Okay. You've never seen that document?
A I don't believe so because that does not have the balance that I indicated in my declaration.
Q Okay. And if you scroll -- and talking about Exhibit 60 now, if you scroll to the profit and loss statement, it indicates the substantial amount of losses, right, more than 2 million?
A Yes, it does.
Q And so you have a recollection as you look at this document now, this was not the document you saw when you prepared your declaration?
A And that's because when I looked at Mr. Liu's capital account, it does not equal the amount that I said, even though in my declaration, I did state that there is a



list of items making up the negative capital balance including checks and credit card charges. And I do see checks and credit card charges on the exhibits, but the numbers don't correlate.
Q Okay. Do you remember the document that you looked at to prepare your declaration that refers to Defendant Liu's negative capital account? Do you remember where you got that document?
A Because my declaration refers to the Pacific Proton general ledger, I believe we got it from Mr. -- oh, yes, my declaration says it was produced by Mr. Liu. I am looking at paragraph 30 in my first declaration up there.
Q In your declarations, if memory serves me correctly, it refers to both 31 and 15, that time period, the negative capital account?
A Yes.
Q And the financial statement that you are looking at now for Pacific Proton is a financial statement ending in 12/31/2015; is that correct?
A That's correct.
MR. LEUNG: Objection; lacks foundation. The witness -- go ahead.
BY MR. GOURAIGE:
Q The -- and if I understand your testimony here



today correctly, the Exhibit 60 that you're looking at, the numbers in that document do not match what is in your declaration; is that correct?
A That's correct. And lots of times adjustments are made to general ledgers, so it's not a surprise to me.
Q Okay. And do you believe, as you sit here today, that you must have looked at another financial statement?
A Yes, because I do not see the balance for Mr. Liu's capital account that I cite in my declaration.
MR. GOURAIGE: Gary, I am requesting that the SEC produce the financial statement for 2015, that the witness --
MR. LEUNG: Herve, it's been produced. My question for you is: Has this Exhibit 60 been produced and on what date? Because it's clearly a different document. It doesn't bear a Bates number. Where did you obtain this document and when did you produce it to the SEC?
MR. GOURAIGE: Well, we can -- I can get you the Bates number. The exhibits I've used, they do not have the Bates numbers.
MR. LEUNG: Okay. Please, I'm making that request.
MR. GOURAIGE: Well, I'll get you a Bates number for that, but we -- I also would like to see -- you're

saying to me that a different financial statement for 2015 has been produced, Gary?

MR. LEUNG: Yes.

MR. GOURAIGE: And was it produced by the SEC recently in response to our request?

MR. LEUNG: Yes.

MR. GOURAIGE: Okay.

MR. LEUNG: I'm just looking at what you've shown the witness. You know, this is all in reference to her declaration that was executed on May 26th, 2016, on its face, Exhibit 60, which you've shown the witness. It's dated June 14th, 2016. There is no Bates number on it. I'm not sure where you got this. I would like to get to the bottom of that as well.

MR. GOURAIGE: Okay. Well, we'll give you the Bates number of when these were produced. As I said, I believe they were produced by the company. They are not our client's financials. And I also believe that as the witness testified earlier, during the investigation phase when the SEC was subpoenaed, the individuals Defendant Liu and Defendant Wang, previous counsel produced documents to the SEC prior to the filing of the complaint on May 26. But we'll track all of that down. We'll get you the Bates numbers on the documents, okay?

MR. LEUNG: Can you do that for Exhibit 59 as



well?

MR. GOURAIGE: Sure. We'll do it for both sets of financials.

MR. LEUNG: Thank you.

BY MR. GOURAIGE:

Q Okay. So, Ms. Pearson, I think you mentioned earlier about you had located where you made the statement about the negative capital account. And I don't know whether you want to get -- add anything to your testimony -- and I may have cut you off while you said that. So I want to give you the opportunity now if there is something you want to add.

A I don't believe so. Thank you.

Q Okay. So let's move into a different area now. Ms. Pearson, do you continue to work on this case as of the present time?

MR. LEUNG: Objection; vague.

BY MR. GOURAIGE:

Q Well, since the complaint was filed on May 26th, 2016, up until today's deposition, have your responsibilities included doing the type of work that you've been testifying about today in this case?

A Just my declarations.

Q Were you aware of the Supreme Court decision in this case on June 22, 2020?



A I am aware of it.

Q Were you aware from that decision that the Supreme Court said that disgorgement has to be net profit?

MR. LEUNG: Objection; calls for a legal conclusion.

THE WITNESS: That's my understanding.

BY MR. GOURAIGE:

Q As a CPA, do you know what net profits means?

A I do, but it's also my understanding that the Supreme Court decision states legitimate expenses -- only legitimate expenses shall be applied to calculate net profits.

Q So if you -- and as a CPA, what financial statement would you prepare to determine whether a company earned net profit?

MR. LEUNG: Objection; incomplete hypothetical.

BY MR. GOURAIGE:

Q Do you understand the question, Ms. Pearson?

A Yes. I would prepare an income statement.

Q Okay. Sometimes it's called a profit and loss statement, like the exhibits you were just looking at, or maybe even an earnings statement?

A Correct.

Q Is that correct?

A Yes.



Q The income statement would have the top line as the gross receipt?

A Generally net or net sales. It just depends, yeah.

Q And then you deduct from that the -- what you just called as legitimate business expenses?

A Correct.

Q And then you'd get a net number?

A Well, you'd have all kinds of other. There would likely be other line items, but it's going to really summarize, you're correct.

Q I'm trying to keep it -- I'm not a CPA like you, so I'm trying to keep it simple.

A Okay.

Q So if you look at Exhibit 59, for example, the one for the EB5 fund where there -- it was a positive net income net income of $43,000. Do you see that?

MR. LEUNG: What exhibit, Herve, 59?

MR. GOURAIGE: Exhibit 59, the EB5 fund profit and loss statement.

THE WITNESS: Well, I'm sorry. I was looking at 60.

BY MR. GOURAIGE:

Q 60 has the same thing, but it has a huge loss. I want to look at a positive number.







EXHIBIT 10

A Okay. Okay. So 59, okay. So we've got positive net income.
Q Okay. Now, that number, if you look at that profit and loss statement, that's -- that's generally how you figure out the net profit/net income of a company; right?
A I --
MR. LEUNG: Objection --
THE WITNESS: Very, very, very high level. I mean, I don't know if you have accruals in here. I don't know. I mean, there is -- it's really hard for me to say.
BY MR. GOURAIGE:
Q When you say you don't know if you have accruals, what do you mean?
A This could be cash basis. I -- without the footnotes, I don't know how it was calculated, how it was.
Q If you look at the document, the top left-hand, do you see it says "accrual" there? It's an accrual basis?
A Yes, okay, but --
Q So it's not cash basis; it's accrual basis; correct?
A Well, I want to see the liability to see if they accrued any. You know, you could say something. I just want to look at that balance sheet.



Q Go back to the balance sheet and look at the liabilities.
A Okay. I don't see any liabilities. It's all so -- like, this is not a good example. Sorry. It's assets and equity.
Q So let's look at Number 60.
A Okay.
MR. LEUNG: Objection; calls for speculation; lacks foundation.
MR. GOURAIGE: I don't have a question pending yet.
MR. LEUNG: I'll wait then. You can go ahead.
MR. GOURAIGE: Okay.
BY MR. GOURAIGE:
Q So you've looked at Number 60; right?
A Yes.
Q Okay.
A Yes.
Q So the profit and loss at the end of 2015 for that one shows a substantial loss?
A Correct.
Q Okay. Anything wrong with those profit and loss calculations?
MR. LEUNG: Objection; calls for speculation; lacks foundation. You're basically putting a piece of



paper in front of the witness without any corroborating information, Herve.
MR. GOURAIGE: Well, I'm asking -- I'm asking her a question if she needs -- is there anything you need to know, Ms. Pearson, about that P&L statement?
THE WITNESS: Well, there would be a lot of things, but I -- there is at least one line item that jumps out at me. And that is broker fee, based on my understanding, that is not a legitimate use of funds.
BY MR. GOURAIGE:
Q Okay.
A That's not a legitimate expense, so I have a problem with this income statement.
Q Okay. So how would you define a legitimate business expense as a CPA?
A I would have to define it in terms of the work I do.
Q And how would you define it?
A I would define it.
MR. LEUNG: Object to the question to the extent you're calling for the fact witness to express a legal opinion on what a Supreme Court decision means, including terms of art used by the Supreme Court in that decision.
BY MR. GOURAIGE:
Q Let me be very clear. I'm not asking for a legal



opinion, Ms. Pearson. I'm not asking for your opinion. I think you were the one who referred to legitimate business expenses. So I'm trying to understand, what do you mean by legitimate business expenses?
A What I mean by legitimate business expenses is a legal question. Because we're both talking about the Supreme Court opinion, and I'm not an attorney.
Q So when you look at Exhibit 60 and you see those broker's fees, you can't have an opinion as to whether or not they're legitimate expenses because that's a legal question?
A I can have an opinion about it because I know this case. I can't turn around then and say, look at any income statement and determine what is legitimate or not. It depends on the specific of the case.
Q So -- and I -- now we've looked at -- I don't know if you want to look at the Beverly financials, but I can tell you -- I can show them to you, if you'd like. But those also reflect losses. So of the three project companies we talked about that I referred to earlier, Pacific, EB5 fund, and Beverly, only the EB5 fund had a net positive income.
Do you recall that at the end of 2015?
MR. LEUNG: Objection; assumes facts not in evidence; lacks foundation.







EXHIBIT 10

BY MR. GOURAIGE:
Q Do you want to look at the Beverly financials, Ms. Pearson?
A No. I can answer that. I did not look -- except for my mention of the capital account of Mr. Liu, I did not look at the financial statements of the entity.
Q And the lawsuit was filed in May of 2016, and the 2016 financials were prepared at the beginning of 2017. Did you look at the 2016 financials for these three entities?
A Never.
MR. LEUNG: Objection; misstates facts.
MR. GOURAIGE: Which fact?
MR. LEUNG: You say the 2015s were prepared at the start of 2017.
MR. GOURAIGE: No, I said 2016.
MR. LEUNG: Okay.
BY MR. GOURAIGE:
Q Let me -- I don't want to mislead you, Ms. Pearson. The lawsuit, as you know, was commenced on May 26th, 2016. The 2016 financials would have been prepared in early 2017. At that point, the board had appointed a monitor and receiver over the three companies, so the monitor prepared the financials for 2016.
Did you ever look at the 2016 financials?



A No, I never did.
Q Okay. I'm going to show you another exhibit, so please bear with me for a minute.
MR. LEUNG: Herve, did you represent to the witness that -- the monitor prepared financial statements for 2016?
MR. GOURAIGE: I said, yes, I think the monitor prepared financials for 2016. That was the -- well, let's --
MR. LEUNG: 2016?
MR. GOURAIGE: Yes. Let's look at this next exhibit, and then we can look at the 2016 financials.
BY MR. GOURAIGE:
Q So, Ms. Pearson, I've put before you the next exhibit, which I think is Exhibit 61.
Do you see that exhibit?
A It's still coming up.
Q Okay. Let me know when it's up and you've had a chance to look at it.
A Okay. I see it.
Q Have you ever seen what has been marked as Exhibit 60 before?
A No, I have not.
Q Can you tell from the numbers and the description of the expenses that this is referring to the project



companies?
MR. LEUNG: Herve, objection to the question -- to the extent you're suggesting that this exhibit was prepared by the monitor or by an accountant.
MR. GOURAIGE: I didn't -- I'm not.
MR. LEUNG: That is not in fact a submission made by the defense in this case.
MR. GOURAIGE: Gary, stop.
MR. LEUNG: Okay. Make it clear for the witness what she's looking at. She said she hadn't seen it before.
MR. GOURAIGE: Stop.
MR. LEUNG: So don't tell her what it is.
MR. GOURAIGE: Stop trying to coach the witness. No. That's inappropriate.
MR. LEUNG: I'm not coaching the witness. It's inappropriate for you to ask misleading questions. She testified she doesn't know what this document is. It's a defense submission. Can you at least tell her what it is?
MR. GOURAIGE: Well, if you want to say anything else to her about it, you don't get to.
MR. LEUNG: I would like you to ask a fair question.
MR. GOURAIGE: Gary, that is unethical and unprofessional, what you're doing, absolutely.



MR. LEUNG: Your question is unprofessional and unethical. Please ask a fair question of the witness.
MR. GOURAIGE: It is absolutely ethical. I have not said to the witness that this was prepared by the monitor. I've asked her a simple question, has she seen it? She said "no." My next question to you her is --
MR. LEUNG: You need to tell her what it is.
MR. GOURAIGE: No. My next question to her was: Based on the numbers and the description of the items, can she tell that it refers to the Proton, to the project companies?
Now, stop coaching the witness. That is highly unethical.
MR. LEUNG: Objection; lacks foundation. She's never seen this document before.
Ask a good question.
BY MR. GOURAIGE:
Q Ms. Pearson, I understand that you've never seen this document. Do you see numbers on that document and do you see a description of expenses that match? For example, do you see Delsk? Do you see Overseas Chinese? Do you see UDG? Do you see Proton therapy equipment?
A Well, first of all, the title of the document is "Proton Therapy Project Deductible Business Expenses." And second of all, I do recognize some of the line items







EXHIBIT 10

named.
Q Okay. And in connection with your work in this case, have you prepared a document like that that is showing the gross receipts of the investor funds in various expenses?
MR. LEUNG: Objection; assumes facts not in evidence. This is one page of a 114-page court filing. The witness has no idea what this is. And you're asking her to testify under oath if she's done anything like this.
MR. GOURAIGE: Gary, stop. I did not ask her about this document. Now, please, that's very unethical.
MR. LEUNG: Your question references the document, Herve.
BY MR. GOURAIGE:
Q Ms. Pearson, have you in connection with your work in this case prepared any document such as that document or what you would commonly call an income statement or P&L statement or an earning statement?
MR. LEUNG: Objection; compound.
BY MR. GOURAIGE:
Q Okay. So we'll take it one at a time.
Have you prepared an income statement for Pacific Proton?
A I have not, and I have not been asked to.

Page 78

Q Have you prepared an income statement for the EB5 fund?
A I have not, and I have not been asked to.
Q Have you prepared an income statement for Beverly?
A I have not, and I have not been asked to.
Q Have you prepared a document like this spreadsheet that you're looking at, Exhibit 61, that simply lists expenses and gross investor funds for either one of those three companies I just asked you about?
MR. LEUNG: Objection; compound.
THE WITNESS: I have not.
BY MR. GOURAIGE:
Q Okay. I take it you've also not been asked to? I don't want to --
A Correct.
Q -- leave the impression that you've been asked, with this one you had not, okay.
Now, did you -- your counsel referred to the 2016 financials. Did you want to look at those financials, Ms. Pearson? But let me put them up and then ask you if you've ever seen them. Maybe you have not seen them.
A Well, I have not seen them, but go ahead.
Q Ms. Pearson, I think the next exhibit that you should be looking at now is marked 62.

Page 79

Do you see the exhibit?
A I'm really having trouble refreshing mine.
Q Oh, okay.
MR. LEUNG: Herve, will you be marking the entirety of the filing?
MR. GOURAIGE: No.
BY MR. GOURAIGE:
Q Ms. Pearson, just let us know when it pops up and you've had a chance to look at it.
A Oh, I have it, and I've looked at it.
Q Okay. I can represent to you that as to this document, Exhibit 62, that I have reason to believe that it was prepared by the court appointed receiver because it was filed in court. It's the financials for the companies in 2016.
Have you ever seen --
MR. LEUNG: Objection; misstates facts.
MR. GOURAIGE: I'm sorry --
MR. LEUNG: Misstates facts. You misrepresented the document with your preamble. I object.
MR. GOURAIGE: You're objecting to -- maybe I put up the wrong document.
BY MR. GOURAIGE:
Q The document before you --
MR. LEUNG: Herve, may I make a standing

Page 80

objection before you continue, please?
MR. GOURAIGE: Sure.
MR. LEUNG: I object to this line of questions as to Exhibit 62 because you're refusing to mark as an exhibit the entirety of the court submission including the report for which Exhibit 62 is an exhibit. That report describes exactly what Exhibit A now marked as Exhibit 62 is, and you're not allowing the witness to review it.
MR. GOURAIGE: I can mark -- I can mark the report. Ms. Pearson, would you like to see the -- the receiver's report? I just wanted to ask you about the financials, but we can mark the report. Hold on a second.
MR. LEUNG: Counsel is, again, inviting you to review these documents before he begins questioning you on them. Please take the time that you deem necessary to read everything in order to give your best and most accurate answers to his questions.
BY MR. GOURAIGE:
Q So, Ms. Pearson, you now have before you the monitor's report, and that's Exhibit 63. And Exhibit 62 are the 2016 financial for the project companies. Why don't you take your time, look at those documents, and tell me whether you've ever seen the documents before today.

Page 81





EXHIBIT 10

MR. LEUNG: Herve, why don't we go off record for 10 minutes while the witness reviews. I do need to use the restroom.
MR. GOURAIGE: That's fine. We'll take a break for 10 minutes.
MR. LEUNG: Thank you.
(A short break was taken.)
BY MR. GOURAIGE:
Q So, Ms. Pearson, I will represent to you that the -- I believe it's Exhibit 62, the financial statement, as of, I guess, 4/30/16 was prepared by the court-appointed monitor, and you've also looked at their report in connection with that document?
MR. LEUNG: Objection; misstates the evidence.
BY MR. GOURAIGE:
Q Did you ever see -- did you ever see the Exhibit 62, the financial statement?
MR. LEUNG: Objection; misstates the evidence.
THE WITNESS: No, I have not.
BY MR. GOURAIGE:
Q Okay. You had -- you had no role in reviewing it or preparing it or providing information for it or anything of that kind?
A Correct.
Q Let me ask you: I'm just going to pull up the



document. When you look at the financial statements for the three project companies and you look at the consolidated columns, the -- I don't have the -- let me -- I want to get the exact numbers here. The parenthetical's of 30,504,730 for total assets and total liabilities, what does that tell you as an accountant?
MR. LEUNG: Objection; misstates the exhibit. It's not a financial statement. The witness lacks foundation. She's never seen this before.
BY MR. GOURAIGE:
Q Well, let me -- Ms. Pearson, if you look at Exhibit 62 --
A Uh-huh.
Q -- it's a statement -- the first part is a statement of assets to liabilities like a balance sheet; is that correct?
A Correct.
Q And the second part is a statement that -- cash-in/cash-out part of cash flows; is that correct?
A Correct.
Q Okay. There is no income statement in that -- in that document; is that correct?
A Correct.
Q And typically an accountant for a company would prepare three documents for the annual financials, a



balance sheet, an income statement, and a P&L statement; is that correct?
A The three would be the income statement, the balance sheet, and then the cash flow statement.
Q The cash flow statement; is that correct?
A Yes.
Q So what we have here with the monitor too, but no income statement or P&L or earnings statement?
A Correct.
Q I understand you've never seen this document before, but you are a CPA. So as a CPA, looking at this document and looking at the parenthetical containing that 30 million number, what does that tell you?
MR. LEUNG: Objection; calls for speculation; calls for opinion testimony.
THE WITNESS: I'm not -- I'm somewhat confused by this 30 million number. Are you talking about the consolidated entry?
BY MR. GOURAIGE:
Q Your consolidated entry, yes, the negative -- I shouldn't say 30 -- the parenthetical means it's a negative; right? It's losses?
A Right.
Q Not income?
A Right, but the consolidated -- oh, are we looking



at the first statement; right?
Q Yes.
A Okay. The consolidated total of total assets is $5,796,832.
Q Well, maybe if we're looking at -- if you look at it, the first Exhibit 62 --
A Uh-huh.
Q -- the consolidating entries?
A To the right of that is the consolidated total.
Q Your consolidated total?
A Right.
Q Okay. So -- but what are the consolidating entries? What are those?
A That's largely eliminating the intercompany receivables because they owe the money to each other.
Q Among the three companies?
A Yeah.
Q Okay. So the -- if -- as a CPA, if you wanted to know whether any of these companies had a net income, either positive or negative for 2016, you -- could you tell that from these two statements?
A No.
MR. LEUNG: Objection; calls for speculation.
BY MR. GOURAIGE:
Q Okay. Okay. Now, Ms. Pearson, during your work







EXHIBIT 10

in this case, did you ever come across a person by the name of Dr. John Tropez?
A I believe I saw his name in some of the bank records, but that's the extent of my knowledge.
Q Do you have any understanding about his role in connection with this project?
A I do not.
Q You let's go back to your earlier testimony when you mentioned legitimate business expenses, would payment of a land leased from one of Dr. Tropez's companies be considered by you to be a legitimate business expense?
MR. LEUNG: Objection; lacks foundation; calls for speculation. Also object to the extent it's calling for a legal conclusion in the form of an application of a Supreme Court case with a given set of facts. That's been articulated in an incomplete way based on the question.
BY MR. GOURAIGE:
Q I'm not asking you -- I understand you're not -- maybe I should ask you, are you an attorney, Ms. Pearson?
A I am not.
Q Okay. So I'm not asking you for a legal opinion. I'm asking you, as an accountant, a legitimate business expense is rent for land leased -- is that a legitimate business expense?
A I would need more --

Page 86

MR. LEUNG: Objection; lacks foundation; incomplete hypothetical.
BY MR. GOURAIGE:
Q Do you understand the question?
A I do. I understand the question, but I'm unable to answer because an accountant would need more information. They would need to look at documents in order to make that determination.
Q And what sort of documents would you need to look at to make that determination?
A I would have to look at the lease. I would probably consult with the company's attorney. I would -- I might have to take it to my office accounting firm attorneys in order to make sure that that -- the legal matter was accounted for correctly.
Q Okay. That's fair enough.
Let me ask you then a different question. Did you in the documents that you reviewed, did you come across the name Mevion? It's a -- you did come across that?
A Yes, I did.
Q Did you come across any documents showing payments to Mevion?
A I believe I did see money going to Mevion.
Q And would you -- would you consider those

Page 87

payments legitimate business expenses?
MR. LEUNG: Objection; calls for speculation; lacks foundation; incomplete hypothetical.
THE WITNESS: Once again, I don't have enough information to make that determination.
BY MR. GOURAIGE:
Q Okay. So I don't want to ask you about more specific examples. But let me just try to summarize your testimony, and you tell me whether I have it correct, I understand your position correctly.
Before you made a conclusion about whether or not something was a legitimate business expense, you would need additional information? You would need to speak to the lawyers, get documentation before you made that conclusion; is that correct?
MR. LEUNG: Object to the form.
THE WITNESS: Yes, it's partially correct. I would also in this case look to the terms of the offering memorandum.
BY MR. GOURAIGE:
Q Right. So you'd need those additional documents to do that?
A Correct.
Q And am I then correct that before you made a determination about whether -- and let me back -- strike

Page 88

that.
I believe it was Exhibit 59. That's the spreadsheet I showed you. It had a list of expenses on it. I don't want to ask about each one of those expenses, lawyers, accountants, rent, et cetera. But as an accountant, before you made a determination that some expense in the corporate books was income or a loan or a return of capital, you would need additional information, additional documents to make that judgment to reach that conclusion; is that correct?
MR. LEUNG: Can the court reporter read that question back, please.
(The record was read as follows:
"Question: And am I then correct that before you made a determination about whether -- and let me back -- strike that.
I believe it was Exhibit 59. That's the spreadsheet I showed you. It had a list of expenses on it. I don't want to ask about each one of those expenses, lawyers, accountants, rent, et cetera. But as an accountant, before you made a determination that some expense in the corporate books was income or a loan or a return of capital, you would need additional information, additional documents to make that judgment to reach that conclusion; is that correct?")

Page 89

MR. LEUNG: Object to the form.
BY MR. GOURAIGE:
Q Do you understand the question, Ms. Pearson?
A I believe I do. But I would also say you would need support to indicate that the expense belonged properly in that time period. There would be many considerations you would have to look to to determine the propriety of the expense.
Q Okay. So when you look at a transfer from, let's say, Beverly to Delsk or Overseas in this case, you can't make -- you cannot reach a decision about whether or not it's a legitimate business expense simply by looking at the amount that is transferred from one bank to another bank; is that correct?
MR. LEUNG: Objection; misstates the witness's testimony.
MR. GOURAIGE: I'm not asking for testimony. I'm asking for it now.
THE WITNESS: I disagree. I think based on the terms of the offering memorandum, I could make a determination.
Q Okay. So tell me then what you would rely on in it the offering memorandum?
A The terms that state that all administrative fees -- all administrative fees, expenses, and commissions

Page 90

should be paid from the administrative fee paid by the investors.
Q And that's the only thing you would look at?
A That's the first thing I would look at.
Q Anything else?
A I would probably try to get an understanding -- well, that would -- that would -- first of all, that would -- that may or may not preclude me doing more work. I would have to -- I would have to -- I would probably have to talk to an attorney.
Q So if -- I'm trying to understand your testimony. If the payment was made an amount greater than what was in the administrative fees, right, whatever the payment is, it would be not a legitimate business expense?
MR. LEUNG: Objection; asked and answered.
BY MR. GOURAIGE:
Q Well, is that your testimony?
A Okay. I believe that's taking all the admin, the offering expenses, the commissions, and the fees grouped together. If they received the administrative fees, it would appear to me that it would not be a legitimate business expense, but I would surely consult with attorneys.
Q Okay. So the administrative fees in this case, as you know, was roughly 2.5 million; correct?

Page 91

A Right.
Q Any expense over 2.5 million in your view is not a legitimate business expense?
A Any of the expenses that are listed in the offering memorandum as limited to the administrative fee, yes.
Q Well, is it your understanding that all expenses are limited to the funds in the administrative fees?
A All offering expenses, commissions, and fees.
Q Would that include the equipment for cancer treatment?
MR. LEUNG: Objection; lacks foundation.
THE WITNESS: Yeah. I probably don't know enough about that.
BY MR. GOURAIGE:
Q So, again, just to refresh your recollection, the administrative total was 1.5 million. The payment to Mevion was 3 million. Is it your testimony that that payment is not a legitimate business expense because it exceeds the administrative fees?
MR. LEUNG: Objection; asked and answered.
THE WITNESS: I would want to do work to make sure that it did not fall under the category of offering expenses commissions received.
BY MR. GOURAIGE:

Page 92

Q And when you say "it did not fall" --
A Right. I would need legal guidance.
Q Well, so you think ultimately, whether or not it's a legitimate business expense is a pure legal issue?
MR. LEUNG: Objection; misstates the witness's testimony.
THE WITNESS: All I'm stating is in order to comply with the offering memorandum, I would want a clear understanding as to what expenses are covered by the prohibition and what are not.
BY MR. GOURAIGE:
Q Right. So I want to make sure that I understand your testimony.
So there is an offering memorandum. It describes what the administrative fees are going to be used for. It describes what the investor's capital is going to be used for. You're familiar with that; right?
A Correct.
Q By the way, did you read the offering memorandum?
A I read portions of it.
Q Okay. Administrative fees -- and if I misunderstand your testimony, please correct me. Administrative fees were 2.5 million, so any expense that the companies made above 2.5 million would be by definition, not a legitimate business expense?

Page 93





EXHIBIT 10

MR. LEUNG: Objection; asked and answered.
THE WITNESS: Any expense above the 2.5 million debt deemed to be offering expenses, commissions, or fees would be prohibited.
BY MR. GOURAIGE:
Q What do you when you say "offering expenses"? What are you referring to? Give me an example of what you're referring to.
A I cannot do so. That's the terminology of the offering memorandum, and that's what I would need the interpretation of in order to determine the legitimacy of the expense.
Q So the -- this was a project to build a proton therapy center; correct? You understood that?
A Yes.
Q I assume -- I'm not a physician. But I assume in a proton therapy clinic, you've got to have proton therapy equipment; is that correct?
MR. LEUNG: Objection; lacks foundation.
THE WITNESS: I don't know.
BY MR. GOURAIGE:
Q You don't know whether you need any proton therapy --
A I don't know what proton therapy is.
Q All right. Well, that's -- in a way, that's very



good for you because it's -- it's a therapy to treat cancer, and it's a specific type of cancer treatment equipment. But let's call it cancer treatment equipment. This was a project to build a cancer treatment facility. So you've got to have equipment in it to treat people with cancer. But you've got to buy the equipment; right?
A Right.
Q Okay. So -- and I'm trying to figure out, is the money that the Beverly -- for example, that was going to build a center -- spends to buy cancer treatment equipment, whether that's a legitimate business expense or not?
MR. LEUNG: Objection; Ms. Pearson is not the district judge in this case. She does not have the evidentiary record before her. She's not in a position to render an opinion on an ultimate issue, Herve. She's answered your questions as best she can, okay?
BY MR. GOURAIGE:
Q Is that your answer, Ms. Pearson, that it's a legal question that you cannot answer?
MR. LEUNG: Objection; you're asking a CPA what a legal question is, what a fact question is, what a mixed question of facts and law is.
Herve, just ask a better question, please.
MR. GOURAIGE: Yeah. But I'm asking the



questions. Thank you, Gary.
BY MR. GOURAIGE:
Q Ms. Pearson, is that why you can't answer the question, it's a legal question; it's not an accounting question?
A I do not know enough about the transactions to make that purchase to know. I would want some support. I can't sit here and go yay or nay. I haven't seen any documentation of the purchase.
Q I understand, as an accountant, you would want due diligence. You would want to see documentation, the contract to buy the equipment, the purchase order, the fact that the equipment was delivered, et cetera, et cetera. But I'm asking you a different question.
Assuming that the equipment is paid for and is bought for cancer treatment, and the purpose of the project was to build a cancer treatment facility, do I understand you correctly that if it's over the administrative fee, it's not a legitimate business expense?
MR. LEUNG: Object; asked and answered many times over as best the witness can.
MR. GOURAIGE: Well, I think you've been trying to stop her from answering it. But I'd like for her to give me an answer.



MR. LEUNG: She has answered it, Herve.
BY MR. GOURAIGE:
Q Well, Ms. Pearson?
A I don't -- I'm sorry, I don't have enough information. I don't know anything about that transaction, so I feel incapable of answering.
Q What do you know about the payment to the marketers that led you to the conclusion earlier that you would have a question about that expense when you saw it on the 2015 financial?
A Because those payments were identified as brokerage fees.
Q And if they're brokerage fees, they're by definition not legitimate business expenses?
A By definition, I think they would fall under the heading of offering expenses, commissions, or fees.
Q And that is going back to the offering memorandum?
A Correct.
Q And as you sit here today, you recall that the offering memorandum specifically said that?
A Yes.
MR. GOURAIGE: Okay. Could you just -- let's go off the record for a minute and take a break to look at my notes. I think I'm about finished, Gary. So why don't we







EXHIBIT 10

go off the record.
MR. LEUNG: Okay.
(A short break was taken.)
BY MR. GOURAIGE:
Q During your work in this case, did you come across a letter where one of Dr. Tropez's companies guaranteed the loans that the EB5 fund made to Beverly?
A No, I did not.
MR. GOURAIGE: Okay. That's -- that is it for today. I just want to reserve, Gary, on one issue. Subject to reviewing the 2015 financials that the witness reviewed to make her statements about defendant Liu's negative capital account, I've completed my deposition of this witness.
MR. LEUNG: Okay. I hear your reservation.
MR. GOURAIGE: Can I make -- I'd like to ask one last stipulation, just so that the record is clear. As you know, I was not able to upload all four of Ms. Pearson's declarations, so can we stipulate that the four declarations you referred to earlier in the deposition, Gary, will be deemed marked as exhibits in this deposition.
MR. LEUNG: That's fine. The problem is our transcript doesn't have references to -- I mean, it has references to the declarations themselves. I know we're

Page 98

not calling out exhibit numbers, but that's fine, particularly since the witness did have those materials in front of her.
Here's my suggestion, with respect to the stipulation, you know, Exhibits 56, 57, and 58, I think you were endeavoring to mark the second June declaration. We ended up with two exhibits that are identical. And then the third part of 3 of that second declaration in Exhibit 58 -- I suggest we just go with 56, 57, 58. I will, with a CC to you, send complete PDF copies of all four declarations, and let's stipulate that we'll have those marked as 64 for the May 26th, 2016 declaration, Exhibit 65 for the June 3rd, 2016, declaration, Exhibit 66 for the September 20th, 2016 declaration, and Exhibit 67 for the fourth and final September 28th, 2016 declaration.
Does that work?
MR. GOURAIGE: That is fine.
Ms. Pearson, thank you very much for taking the time today to answer my questions. I hope you understand that I'm just a lawyer trying to do his job, and I hope that you didn't think that I was being difficult on you. I appreciate your time.
THE WITNESS: Thank you.
MR. LEUNG: And we'll review and sign under Rule 30. Thank you everybody.

Page 99

MR. GOURAIGE: Thank you.
MR. LEUNG: Thank you, Heather.
(Exhibits 52 through 67 were marked for identification by the deposition officer and are attached hereto.)
(Deposition session ended at 12:48 p.m.)

Page 100

I, LORRAINE PEARSON, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this __________ day of _________, 20___, at _____________________, ___________________.
(City) (State)

___________________________
LORRAINE PEARSON

Page 101

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 01/28/2021



HEATHER AYERS
CSR No. 11871

Page 102





EXHIBIT 10

## &

**&** 3:10 7:14,21 10:16 40:8,16

## 0

**01/28/2021** 102:17
**07102-5400** 3:11

## 1

**1,387,500** 38:18
**1,500,450** 25:21 26:5
**1,538** 41:17
**1,538,000** 42:20 45:1
**1,647,689** 56:3,16
**1.5** 92:17
**10** 12:2,2,3 82:2,5
**100** 4:10,11,12,13 4:14,15,16,17,18 4:19,20,21,22,23 4:24,25 12:9
**102,272** 28:12
**114** 78:7
**11871** 1:24 2:18 102:20
**12/31/2015** 64:20
**12:48** 2:17 5:3 100:6
**13** 43:6,8,24 44:5 46:24 47:12,15,17 47:21,22 48:2,3
**14990** 102:19
**14th** 66:12
**15** 64:15
**16** 47:7
**16-00974** 1:7 2:6
**160-1** 31:18
**163** 31:19
**180,000** 51:11,19 52:2,24 53:11,17
**18th** 31:12
**19** 4:11 21:8
**1968** 7:22
**1972** 7:22,24
**1973** 7:24
**1975** 8:1
**1978** 8:1 10:14
**1981** 8:17
**1984** 10:14,20

## 2

**2** 63:18
**2.5** 91:25 92:2 93:23,24 94:2
**20** 101:10
**2010** 4:11 8:24 21:8,10 23:2
**2014** 18:20 19:2,23 21:10,12,15 22:20 22:24 23:2 27:13
**2015** 56:2,15 60:11 65:11 66:1 71:19 73:23 97:10 98:11
**2015s** 74:14
**2016** 18:6,9,21 22:20 27:14,22 28:9,11,21,22,23 31:1,6,12,16 32:24 39:9 40:14 50:13 51:10 52:7 54:12 62:25 66:10,12 67:20 74:7,8,9,16 74:21,21,24,25 75:6,8,10,12 79:19 80:15 81:22 85:20 99:12,13,14,15
**2017** 74:8,15,22
**2020** 5:2 67:25
**2021** 1:18 2:17
**20th** 31:15,18 99:14
**21** 1:18 2:17 5:2 25:13,24 26:9,16
**22** 50:13 67:25
**23rd** 39:9 40:14
**24** 38:18
**24,000** 26:10,15
**24,012,137** 24:16 25:16
**24,712,217** 26:16 26:18
**26** 66:22
**26,967,918** 35:6
**261,256** 28:15,23
**26th** 18:6 31:1,15 43:8 66:10 67:19 74:21 99:12
**27** 43:24 47:9 51:3 51:7 52:15 54:10
**28** 44:5 47:10
**28th** 31:16,19 99:15
**29** 28:11

## 3

**3** 31:6 32:24 33:7 92:18 99:8
**3,815,000** 40:4
**30** 28:21,22 51:4 64:12 84:13,17,21 99:25
**30,504,730** 83:5
**30th** 28:11,23
**31** 60:11 64:15
**31st** 56:2,15
**323** 3:5
**387** 37:24
**3rd** 31:15 33:5 47:4 50:12 53:15 99:13

## 4

**4** 33:8 51:10,18 52:7 54:12
**4/30/16** 82:11
**43,000** 69:17
**444** 3:4 7:2
**45,000** 22:12
**45,481** 28:24

## 5

**5** 1:9 2:9 4:16
**5,796,832** 85:4
**50,000** 51:13 52:1 53:17 54:12
**500** 38:19
**500,000** 22:10
**500,250** 26:22
**52** 4:10 9:19 19:10 100:3
**53** 4:11 20:17 21:8 25:13
**54** 4:12 25:3,13 26:16 30:25
**55** 4:13 33:15
**56** 4:14 33:4 47:3 99:5,9
**57** 4:15 33:4 99:5 99:9
**58** 4:16 99:5,9,9
**59** 4:17 60:4,18 61:12,16,19 66:25 69:15,18,19 70:1 89:2,17

## 6

**6,714,005** 41:12
**6,714,580** 41:6,13 44:1,11
**60** 4:18 62:11 63:2 63:16 65:1,14 66:11 69:22,24 71:6,15 73:8






EXHIBIT 10

75:22
**61** 4:19 75:15 79:8
**62** 4:20 79:25 80:12 81:4,6,8,21 82:10,17 83:12 85:6
**63** 4:21 81:21
**64** 4:22 99:12
**643-5989** 3:12
**65** 4:23 99:13
**66** 4:24 99:13
**67** 4:25 99:14 100:3

**7**

**7** 4:5
**7,300,000** 30:10,16
**7,722,000** 36:15
**712,217** 26:10,15

**9**

**9** 33:8 43:7,11,13 43:14
**900** 3:4
**90071** 3:5 7:2
**96** 43:15
**965-3998** 3:5
**973** 3:12
**9:05** 2:16 5:3

**a**

**a.m.** 2:16 5:3
**able** 5:17 52:3 58:15 98:18
**absolutely** 76:25 77:3
**accept** 16:3
**accepted** 15:3,15 15:20
**access** 49:6
**account** 14:6 18:21 23:9,16 24:2,16 25:18 28:12,14,16,23,24 29:1,4 36:1 37:1 37:15 39:6 40:5 40:11 42:14,15,15 42:15,16 48:5 50:19,20 51:11,13 51:18,23 52:2,5,9 52:12,16,19,20 53:2,3,11 54:3,11 55:5,15 56:2,15 57:6,13,17 60:13 62:2 63:24 64:7 64:16 65:9 67:8 74:5 98:13
**accountant** 8:13 10:24 15:21,25 17:5 62:24 76:4 83:6,24 86:22 87:6 89:6,21 96:10
**accountants** 89:5 89:20
**accounted** 87:15
**accounting** 7:19 87:13 96:4
**accounts** 17:22,22 17:25 18:1,22 22:16,18 24:6 27:21 28:8 29:5 30:6 36:20 41:7 41:22,24 42:8,12 48:9 53:14 54:1
**accrual** 70:18,18 70:21
**accruals** 70:10,13
**accrued** 59:21,23 70:24
**accumulated** 57:8 57:16
**accurate** 32:14 81:18 102:9
**action** 102:12
**add** 67:9,12
**additional** 13:20 14:14 22:12 88:13 88:21 89:8,9,23,24
**address** 6:17 7:1
**adjusting** 60:24 61:1,7,8
**adjustments** 65:4
**admin** 91:18
**administrative** 11:23 22:13 27:7 35:17 50:18 90:24 90:25 91:1,13,20 91:24 92:5,8,17,20 93:15,21,23 96:19
**affidavit** 38:1,2 44:4,5
**affidavits** 38:6
**agency** 11:24 14:12
**agent** 23:9
**aggregate** 40:25 57:6,14
**agree** 17:5 61:14
**agreed** 9:21
**agreement** 49:18
**agrx** 1:7 2:7
**ahead** 46:23 60:2 63:7 64:23 71:12 79:23
**allowing** 24:25 81:8
**allows** 47:24
**ambient** 5:23
**amended** 10:2
**amount** 27:2,9 35:13,15 38:10,15 38:19,20 48:4 63:17,24 90:13 91:12
**amounts** 38:12 44:9 46:25 48:10 48:13
**ana** 50:4
**analysis** 42:2,23 43:7,21,22 45:7
**angeles** 1:10 2:10 3:5 7:2
**annual** 83:25
**answer** 5:13 13:25 19:15,22 29:12 34:12 48:17,23 54:7,25 55:2 58:15 74:4 87:6 95:19,20 96:3,25 99:19
**answered** 37:7 58:20 91:15 92:21 94:1 95:17 96:21 97:1
**answering** 96:24 97:6
**answers** 47:25 81:18
**apart** 37:3 39:10
**appear** 33:4 91:21 101:6
**appearance** 7:7
**appearances** 3:1 6:20
**appearing** 5:7,10 8:25 10:6
**appears** 10:2 15:24 28:11
**application** 20:22 25:11 86:14
**applied** 68:11
**appointed** 74:23 80:13 82:11
**appreciate** 31:23 99:22

**approach** 57:3
**approved** 11:20
**approximately** 18:21 30:10 35:6 36:15
**april** 18:21 27:14 28:11,21,22,23
**area** 46:7 67:14
**argumentative** 21:17
**art** 16:25 72:23
**articulated** 86:16
**arts** 7:15
**aside** 11:22 57:10
**asked** 37:7 48:14 58:20 77:5 78:25 79:3,6,10,14,17 91:15 92:21 94:1 96:21
**asking** 14:9 35:25 42:18 45:12 46:8 53:8,23 54:5 59:23 61:21 72:3 72:3,25 73:1 78:8 86:18,21,22 90:17 90:18 95:21,25 96:14
**assets** 71:4 83:5,15 85:3
**assigned** 18:8
**associations** 10:10
**assume** 94:16,16
**assumes** 45:18 73:24 78:6
**assuming** 58:8 96:15
**assurance** 16:16
**attached** 100:4 101:7
**attend** 8:2,5
**attended** 7:13,14 7:16,17,20
**attention** 14:15 17:10 36:9
**attorney** 5:21 73:7 86:19 87:12 91:10 102:13
**attorneys** 7:4 87:14 91:23
**audit** 15:2,11,12 15:17 16:3 17:14
**auditing** 15:4,15 15:20 16:12
**auditor** 10:14 11:9 15:7
**audits** 14:18 16:22
**aware** 67:24 68:1 68:2
**ayers** 1:23 2:18 102:20

**b**

**b** 4:8
**bachelor's** 7:19
**back** 19:6 26:1 35:1 46:7,18 48:17 56:10 71:1 86:8 88:25 89:12 89:15 97:17
**background** 7:12
**balance** 28:12,22 28:24 51:25 52:7 54:3,11 60:10,13 60:19 61:20 63:14 64:1 65:8 70:25 71:1 83:15 84:1,4
**bank** 14:3,3,6 17:21,22,24 22:15 22:18 23:9,12,12 23:16,19 24:16 25:16 28:25,25 29:4,5,8,14 30:6 35:16,21,24 36:18 36:20,20,21 37:1 37:11,14,15 38:20 38:22,23 39:3,4,6 39:14,17 40:8,11 40:16 41:22,24 42:2,8 45:7 46:9 50:15 51:17 53:14 53:25 54:3,11 55:5 59:14,18 86:3 90:13,14
**based** 13:14 31:20 35:4,21 42:7 53:19 61:18 72:8 77:9 86:16 90:19
**basically** 16:17 37:22 60:19 71:25
**basis** 70:15,19,21 70:21
**bates** 65:16,20,21 65:24 66:12,16,23
**beach** 1:17 5:1
**bear** 9:17 19:3,5 32:8 65:16 75:3
**beginning** 2:16 5:12 7:12 74:8
**begins** 81:15
**behalf** 2:16
**believe** 8:21 9:11 9:21 18:8,12,20 21:7 23:12 24:8,8 27:15 29:21 43:2 47:2,3 50:18 60:8 61:13,18 63:13 64:10 65:6 66:17 66:18 67:13 80:12 82:10 86:3 87:24 89:2,17 90:4 91:18
**belong** 42:8
**belonged** 39:7 40:12 90:5
**belonging** 42:16
**best** 32:14 81:17 95:17 96:22
**better** 95:24
**beverly** 1:10 2:9 22:2,3 23:17 27:17 28:14,22 29:2 36:19 42:9 42:15 51:12,23 52:2,4,19,24 53:5 57:21 73:17,21 74:2 79:5 90:10 95:9 98:7
**beyond** 13:19
**board** 74:22
**books** 89:7,22
**bother** 16:7
**bottom** 66:14
**bought** 96:16
**break** 19:12,13 33:18 34:20,24 37:20 56:20,24,25 82:4,7 97:24 98:3
**brief** 10:25
**broad** 45:10
**broker** 72:8
**broker's** 73:9
**brokerage** 97:12 97:13
**build** 22:4 94:13 95:4,10 96:17
**business** 4:19 6:17 7:1 17:21 69:6 72:15 73:2,4,5 77:24 86:9,11,22 86:24 88:1,12 90:12 91:14,22 92:3,19 93:4,25 95:11 96:19 97:14





EXHIBIT 10

**buy** 95:6,10 96:12

**c**

**c** 1:8 2:7 26:21
**calculate** 68:11
**calculated** 70:16
**calculation** 48:12
**calculations** 13:13 71:23
**california** 1:2,17 2:2 3:5 5:1 7:2,18 7:25 8:2,17 102:2
**call** 18:25 19:19 20:23,24 21:24 22:1,2 40:1 78:18 95:3
**called** 23:13 29:15 29:20,23 31:4,10 36:21,24 51:13 68:20 69:6
**calling** 72:21 86:13 99:1
**calls** 22:2 58:11 59:2 68:4 71:8,24 84:14,15 85:23 86:12 88:2
**cancer** 20:2 92:10 95:2,2,3,4,6,10 96:16,17
**capital** 21:25 22:8 22:9 23:2 27:7 35:17 55:7,15 56:1,15 57:5,7,13 57:15,17,19 59:9 60:13 62:2 63:24 64:1,7,16 65:9 67:8 74:5 89:8,23 93:16 98:13
**card** 64:2,3
**case** 7:5 10:7 12:6 12:20 13:1,2 17:11 18:6 20:3 44:24 53:18 57:20 67:15,22,25 73:13 73:15 76:7 78:3 78:17 86:1,15 88:18 90:10 91:24 95:14 98:5
**cases** 11:11,14,16 11:17,18,19,24,25 12:4 13:15 14:13
**cash** 17:21,25 18:2 70:15,21 83:19,19 83:19 84:4,5
**categories** 14:16 17:14 36:9
**category** 92:23
**cc** 99:10
**cell** 5:24
**center** 1:9,10 2:8,9 20:3 94:14 95:10
**central** 1:2 2:2
**certain** 42:12 48:6 50:1,3
**certificate** 8:6
**certified** 2:18 8:8 8:13,22,23 102:1
**certify** 102:2,11
**cetera** 89:5,20 96:13,14
**chance** 33:19 34:21 75:19 80:9
**characterize** 17:13
**charge** 20:1
**charges** 64:2,3
**charles** 1:8 2:7 7:6 17:12 37:15 39:8 40:13,24 55:6 62:2
**chase** 14:3 37:1 52:20
**check** 53:17
**checks** 53:15 64:2 64:3
**china** 29:16,20 30:3,9 36:15,24 38:24
**chinese** 36:10,15 36:21 37:2,11 77:21
**cite** 60:8 65:9
**city** 101:11
**cjc** 1:7 2:6
**claimed** 49:2,22
**clarify** 46:22
**clarifying** 6:4
**clean** 52:21
**cleaner** 17:1
**clear** 16:15,21 21:20 42:1,5 72:25 76:9 93:8 98:17
**clearly** 65:15
**client's** 66:18
**clinic** 94:17
**close** 55:22
**closing** 18:22
**coach** 45:15 76:14
**coaching** 45:11 76:16 77:12
**college** 7:13,14
**columns** 83:3
**combined** 43:7,20 43:22
**come** 23:20,24 24:7 55:6 86:1 87:18,19,22 98:5
**comfortable** 42:10
**coming** 21:15 36:19 42:8 53:16 53:17 75:17
**commenced** 74:20
**commercial** 38:23 40:8,16
**commission** 1:4 2:4 3:3 7:6 11:20
**commissions** 90:25 91:19 92:9 92:24 94:3 97:16
**commonly** 78:18
**companies** 21:16 21:21,22 39:21,25 46:12,16 48:22 49:13,19,23 50:16 50:21 62:24 73:20 74:23 76:1 77:11 79:10 80:14 81:22 83:2 85:16,19 86:10 93:24 98:6
**company** 16:4 20:24 22:1,3 42:17 55:8,9 57:5 66:17 68:14 70:5 83:24
**company's** 87:12
**compilation** 15:19 15:21 16:14 17:6 17:15
**compilations** 16:22
**complaint** 18:5 20:1 27:21 28:9 66:22 67:19
**complete** 99:10
**completed** 98:13
**comply** 93:8
**compound** 37:17 40:20 78:20 79:11
**concerning** 15:25
**conclude** 29:13 30:9,15
**conclusion** 68:5 86:14 88:11,15

89:10,25 97:8
**conduct** 13:18 16:3
**conducted** 15:12
**confidential** 13:4
**confine** 12:23
**conflates** 19:25
**conflating** 42:22
**confused** 84:16
**confusing** 19:24 27:6 45:17
**confusion** 31:25
**connection** 9:7 78:2,16 82:13 86:6
**conscious** 5:11
**consider** 87:25
**considerations** 90:7
**considered** 86:11
**consistently** 5:14
**consolidated** 83:3 84:18,20,25 85:3,9 85:10
**consolidating** 85:8 85:12
**construct** 20:2
**consult** 87:12 91:22
**consulting** 37:2
**contained** 101:8
**containing** 84:12
**context** 44:6
**continue** 67:15 81:1
**contract** 96:12
**contracts** 46:15 48:21
**contribution** 57:7 57:15 59:9
**contributions** 22:8 22:9 27:7 55:7 57:19
**controls** 16:24
**conveying** 20:12
**copies** 31:21 99:10
**corp** 22:8 23:9
**corporate** 61:22 89:7,22
**correct** 8:14,15,17 8:18 9:22,23 11:18 15:17,18 16:13,19 18:4 22:4,5,7,9,10,11 22:13,14,16,17,21 22:24,25 23:10,11 23:13,14,17 24:15 25:3 26:10,18 27:14 30:24 31:1 31:2,7,8 34:5 35:4 36:17,18 37:25 39:4,5 40:5,9 41:3 41:5,15,16 42:9,19 44:11 45:2 46:2 47:3 51:14 52:25 57:8 58:1,9,19,21 59:10,11 62:5,6 64:20,21 65:3,4 68:23,24 69:7,11 70:22 71:21 79:16 82:24 83:16,17,19 83:20,22,23 84:2,5 84:9 88:9,15,17,23 88:24 89:10,14,25 90:14 91:25 93:18 93:22 94:14,18 97:19 101:9
**corrected** 101:8
**corrections** 101:6
**correctly** 9:18 64:15 65:1 87:15 88:10 96:18
**correlate** 64:4
**corroborate** 39:11
**corroborating** 72:1
**counsel** 5:9 27:23 32:10 66:21 79:19 81:14
**county** 1:10 2:10
**couple** 29:25
**course** 21:5
**court** 1:1 2:1 5:6,9 6:7 11:24 12:5,6 18:3,16 19:14 30:23 48:16 67:24 68:3,10 72:22,23 73:7 78:7 80:13 80:14 81:5 82:11 86:15 89:11
**courts** 9:12
**covered** 18:11,12 93:9
**coy** 52:18
**cpa** 14:16 15:1 57:12 68:8,13 69:12 72:15 84:11 84:11 85:18 95:21
**credit** 64:2,3
**credited** 53:16
**csr** 1:24 102:20
**cummis** 3:10
**cut** 67:10

**d**

**d** 4:1 29:23 51:7
**damei** 39:24
**data** 17:19
**date** 6:3 51:17 52:6 65:15 102:14
**dated** 21:8 31:1,5 31:12 32:24 33:5 66:12 102:17
**dates** 18:22 31:17
**day** 51:12 101:10
**debt** 94:3
**dec** 47:17,18,22 48:2
**december** 56:2,15 60:11
**decision** 67:24 68:2,10 72:22,23 90:11
**declaration** 4:12 4:13,14,15,16,20 4:22,23,24,25 13:10 18:3 24:9 24:11,13,19,22 25:10 27:20,24 28:7,10 29:10,11 30:17,18 31:3,5,9 31:10,11,13,25 32:3,24 33:5,7,8 33:13,23 34:14 36:14 38:17 42:1 42:1,11,13,19,24 43:4,9 44:25 45:6 45:20 47:2,5 48:3 50:3,8,10,12 51:3 51:9 53:24 54:6 54:10,13 56:4,5 57:11 60:9 61:14 61:25 63:14,22,25 64:6,9,11,13 65:3 65:9 66:10 99:6,8 99:12,13,14,15
**declarations** 18:15 30:23 31:15,21 32:11,14,23 33:11 33:19 34:21 35:5 35:5 37:23 40:3 41:1,2,5,9,16 42:7 42:20 48:15 50:2 55:14,19 56:1,8,14

[declarations - eb5]

57:4 64:14 67:23
98:19,20,25 99:11
**declare** 101:4
**declaring** 42:11
**deduct** 69:5
**deductible** 77:24
**deem** 81:16
**deemed** 94:3
98:21
**defendant** 3:8
37:15,16 39:10,17
39:18 40:19,19
41:6,17 42:16,18
42:21 44:2,9,24
45:4,24,25 46:8,11
46:15 48:21 49:1
49:11 51:11 55:7
55:15 56:1,14
57:20 58:23 59:9
64:7 66:20,21
98:12
**defendant's** 4:9
**defendants** 1:12
2:12 7:5 36:12
40:24 43:21 46:7
**defense** 76:7,19
**define** 21:20 72:14
72:16,18,19
**definition** 93:25
97:14,15
**degree** 7:15,19 8:6
**delivered** 96:13
**deloitte** 10:16
**delsk** 29:23 37:23
37:25 38:12,16
39:2,7 77:21
90:10
**depending** 16:8
18:21
**depends** 16:6
18:13 69:3 73:15
**depo** 10:2
**deposed** 9:5,10
17:12
**deposit** 14:4,4,8
23:8
**deposited** 22:7
27:3,4 48:4
**deposition** 1:16
2:15 4:10 5:5,16
6:5 9:1 21:23
31:20 67:20 98:13
98:21,22 100:4,6
**depositions** 9:12
**deposits** 25:21
26:5,22,25 35:10
36:1
**describe** 12:13
**described** 48:2
**describes** 81:7
93:14,16
**describing** 44:5
**description** 4:9
10:25 61:13 75:24
77:9,20
**details** 40:1
**determination**
87:8,10 88:5,25
89:6,15,21 90:21
**determine** 15:7
26:25 48:12 49:21
68:14 73:14 90:7
94:11
**determined** 14:14
**device** 5:25
**differ** 13:8
**difference** 15:2,5
**different** 12:17
42:18 53:8,25
54:9 61:16 65:15
66:1 67:14 87:17
96:14
**differently** 57:3
**difficult** 12:1
99:21
**diligence** 96:11
**direct** 12:19 38:7
**directing** 24:19
**direction** 102:8
**directly** 5:25
**disagree** 90:19
**discussions** 31:20
**disgorgement** 68:3
**display** 32:5
**distancing** 6:7
**distinguishing**
27:6
**distributed** 58:8
59:7
**distribution** 58:24
**distributions** 57:6
57:14
**district** 1:1,2 2:1,2
95:14
**division** 10:21,23
11:6
**docket** 31:18,19
**document** 4:19 6:3
9:25 20:16,19,22
21:8 33:4 37:3
46:10 47:7 60:4,5
60:7,24 61:3,12,14
62:12,14 63:6,12
63:21,21 64:5,8
65:2,16,17 70:17
76:18 77:15,19,19
77:23 78:3,12,14
78:17,18 79:7
80:12,20,22,24
82:13 83:1,22
84:10,12
**documentation**
13:20 88:14 96:9
96:11
**documents** 13:9
13:13 18:10,18
32:21 46:14 48:20
49:11 66:21,24
81:15,23,24 83:25
87:7,9,18,22 88:21
89:9,24
**doing** 14:11 16:14
59:13 67:21 76:25
91:8
**dollar** 44:21 48:6
**dollars** 48:9
**door** 55:22
**dr** 86:2,10 98:6
**due** 6:5 96:11
**duly** 6:12

**e**

**e** 4:1,8 29:23
**earlier** 8:21 19:8
36:11 66:19 67:7
73:20 86:8 97:8
98:20
**earliest** 21:11
**early** 74:22
**earned** 59:15,23
68:15
**earning** 78:19
**earnings** 68:22
84:8
**east** 23:12,16,19
24:16 25:16 35:15
**eb** 1:9 2:9
**eb5** 22:1,6 23:16
24:6,17 27:4,16,21
28:8,12 29:1 35:6
35:11 36:1,19
42:9,15 60:20
61:20 62:4 69:16
69:19 73:21,21
79:1 98:7



EXHIBIT 10

**[ecf - filed]**


**ecf** 43:14
**educational** 7:12 8:5
**either** 27:17 37:15 39:17 40:19 42:9 42:15 57:18 79:9 85:20
**elements** 44:19
**eliminating** 85:14
**employee** 9:1 102:12
**employment** 10:12 10:13 46:14 48:21 49:18
**endeavoring** 99:6
**ended** 99:7 100:6
**enforcement** 10:22 11:6,23 12:7
**entire** 46:25
**entirety** 80:5 81:5
**entities** 22:19 29:1 29:25 30:3,5 74:10
**entitled** 10:16 20:9 58:24
**entity** 21:24 29:15 29:19,22 30:9,15 51:13 61:22 74:6
**entries** 85:8,13
**entry** 60:25 61:1,7 61:8 84:18,20
**equal** 63:24
**equating** 42:10
**equipment** 77:22 92:10 94:18 95:3 95:3,5,6,11 96:12 96:13,15
**equity** 57:22 58:3 58:3,9,19 71:5
**escrow** 24:16 25:18 27:4
**especially** 5:20
**esq** 3:3,10
**establishing** 23:18
**estimate** 12:1
**et** 89:5,20 96:13 96:13
**ethical** 77:3
**everybody** 99:25
**evidence** 37:13,21 39:16 40:18 45:18 49:12 73:25 78:7 82:14,18
**evidenced** 46:24
**evidentiary** 95:15
**exact** 51:10 52:16 83:4
**exactly** 48:12 81:7
**examination** 4:4 6:15 20:13
**examine** 20:7
**examined** 6:12 15:14
**examiner** 8:9,22 8:23
**example** 24:5 69:15 71:4 77:21 94:7 95:9
**examples** 88:8
**exceed** 48:10 57:19
**exceeds** 92:20
**exchange** 1:4 2:3 3:3 7:5
**excuse** 41:12
**executed** 66:10 101:10
**exhibit** 4:10,11,12 4:13,14,15,16,16 4:17,18,19,20,20 4:21,22,23,24,25 9:15,16,19 19:3,6 19:7,7 20:17 25:2 25:3,7,13 26:7,13 26:16 30:25 31:4 33:7 34:12 43:6,8 43:16,24 44:5 46:24 47:3,17 48:3 60:2,4,15,17 60:18 61:12,16,19 62:8,11 63:2,16 65:1,14 66:11,25 69:15,18,19 73:8 75:2,12,15,15,16 75:22 76:3 79:8 79:24 80:1,12 81:4,5,6,6,7,8,21 81:21 82:10,17 83:7,12 85:6 89:2 89:17 99:1,9,13,13 99:14
**exhibits** 6:2 19:10 24:25 33:3,8,11 64:3 65:20 68:21 98:21 99:5,7 100:3
**expense** 4:19 72:12,15 86:11,23 86:24 88:12 89:7 89:22 90:5,8,12 91:14,22 92:2,3,19 93:4,23,25 94:2,12 95:11 96:20 97:9
**expenses** 50:1,3 68:10,11 69:6 73:3,4,5,10 75:25 77:20,24 78:5 79:9 86:9 88:1 89:3,4,18,19 90:25 91:19 92:4,7,9,24 93:9 94:3,6 97:14 97:16
**express** 72:21
**extent** 27:6,24 29:7 32:11 61:20 72:20 76:3 86:4 86:13

**f**

**f** 1:10 2:10
**face** 42:1 66:11
**facility** 95:4 96:17
**fact** 6:9 17:5 53:10 58:12 59:4 72:21 74:13 76:6 95:22 96:13
**facts** 45:18 73:24 74:12 78:6 80:17 80:19 86:15 95:23
**fair** 13:12 17:23 21:14 23:7 50:15 53:21 76:22 77:2 87:16
**fall** 92:23 93:1 97:15
**familiar** 29:15 39:21 93:17
**federal** 9:12,14 11:3,24 12:5,6,18
**fee** 22:13 72:8 91:1 92:5 96:19
**feel** 29:10 32:6 41:1 58:15 97:6
**fees** 27:7 35:18 50:18 73:9 90:25 90:25 91:13,19,20 91:24 92:8,9,20 93:15,21,23 94:3 97:12,13,16
**figure** 35:8 70:5 95:8
**filed** 11:17,18,24 18:5 27:21 28:9




EXHIBIT 10

50:12 67:19 74:7 80:14
**filing** 66:22 78:7 80:5
**final** 99:15
**financial** 12:21 13:13,20 15:9,23 16:2,23,24 17:3,18 18:18 21:7,9,9,16 22:19,23 54:1 59:17 60:18 61:15 64:18,19 65:7,11 66:1 68:13 74:6 75:5 81:22 82:10 82:17 83:1,8 97:10
**financially** 102:11
**financials** 57:12 62:23 66:18 67:3 73:17 74:2,8,9,21 74:24,25 75:8,12 79:20,20 80:14 81:13 83:25 98:11
**find** 15:8 36:6 37:9 39:14 49:1
**fine** 7:15 34:15 82:4 98:23 99:1 99:17
**finish** 30:12
**finished** 97:25
**firm** 10:15,16 87:13
**first** 6:12 7:14 18:6,8,12 24:9,11 24:13,22 30:18,24 31:5 32:3,23 33:5 33:13 34:1,9 36:12 38:4 47:17 51:3 56:4 60:14 61:9 64:12 77:23 83:14 85:1,6 91:4 91:7
**five** 33:18 34:20 56:23
**flow** 5:16 42:11 84:4,5
**flower** 3:4 7:2
**flows** 17:22,25 18:2 83:19
**focus** 11:23 14:15 17:10 27:12 36:9 36:12 40:23
**focused** 49:25
**focusing** 44:8
**folder** 19:10
**follow** 16:12
**follows** 6:13 19:16 26:3 28:5 48:19 54:23 56:12 89:13
**footnotes** 70:16
**foregoing** 101:5 102:3,5,9
**foreign** 8:11
**form** 12:16 13:22 14:23 15:16 16:2 16:21 21:2,17 24:1 27:5 29:17 35:20 41:8,19 42:22 45:17 52:9 52:12 86:14 88:16 90:1
**formulating** 15:23
**forth** 102:4
**found** 38:22
**foundation** 50:4 59:2 64:22 71:9 71:25 73:25 77:14 83:9 86:12 87:1 88:3 92:12 94:19
**four** 31:14,21 44:19 98:18,20 99:11
**fourth** 99:15
**frame** 28:18,19
**framing** 45:9
**fraud** 8:8,22,23 12:20,21,24 13:15
**free** 29:10 32:6 41:2
**front** 31:21 32:2,6 34:4 54:3 62:11 72:1 99:3
**function** 11:1,8 13:1 15:16 17:13
**functions** 12:11 14:16
**fund** 1:9 2:9 21:25 22:1,6,6 23:16 24:6,17 27:4,16,21 28:8 29:1 35:6,11 35:14 36:19 42:9 60:20 61:20 62:4 69:16,19 73:21,21 79:2 98:7
**funds** 21:12,15 22:7,15 23:5,7,8 23:15,18,20,23 24:6 27:3,16 29:4 30:6,10,16,16 33:21 34:8 35:7 35:13 36:16,19,23 37:5,10,14 39:13 39:16 40:7,15,18 41:6,21 42:3,7,8 42:12,17,20,23 43:21,23 44:13,15 44:20,20 45:4,5 46:1,1,10,19 47:1 48:4,7,14 49:2,3 50:16 51:22 52:4 72:9 78:4 79:9 92:8
**further** 102:9,11

**g**

**gaap** 15:13
**gary** 3:3 6:21 7:7,8 9:21 26:14 30:11 31:17 44:18 45:8 45:11 50:7 55:19 62:20 65:10 66:2 76:8,24 78:11 96:1 97:25 98:10 98:21
**general** 13:12 60:22 61:3 64:10 65:5
**generally** 12:10,13 12:25 15:3,15,20 17:18 18:11,12 57:8 69:3 70:4
**getting** 39:2
**give** 10:25 12:13 21:22 32:14 33:18 34:20 40:25 55:17 62:7 66:15 67:11 81:17 94:7 96:25
**given** 16:1,15,16 86:15
**go** 13:19 14:5 25:12,13 46:6,7,18 46:22 56:8 60:2 63:7 64:23 71:1 71:12 79:23 82:1 86:8 96:8 97:23 98:1 99:9
**going** 5:10,13 6:21 9:15 18:13,25 19:3,19 20:23,24 21:22,23,24 22:1,2 22:3 24:12 30:8 31:4 32:4 33:17 33:17,20 34:7 36:9,20 40:23,25

43:21 49:25 62:7 69:10 75:2 82:25 87:24 93:15,16 95:9 97:17
**good** 5:16 7:3 71:4 77:16 95:1
**gouraige** 3:10 4:5 6:16,21,24 7:4,10 9:4,24 11:16,18,21 12:22 13:11,23 14:25 17:2,9 19:11,14 20:4,10 20:15 21:4,19 24:4,21,24 25:25 26:8,14,17 27:8 28:3,13,20 29:18 30:13,14 31:17,23 32:1,17 33:10,12 33:16,25 34:6,16 34:19,23,25 35:12 35:23 36:2 37:8 37:18 38:2,9 40:22 41:10,21,23 42:4 43:1,10,13,19 44:8,10,17,23 45:8 45:11,14,19,22 46:5,21 47:13 48:16,24 49:9 50:9,14 52:10,14 52:23 53:22 54:5 54:8,15 55:3,11,23 55:24 56:7,17,18 57:1 58:16,22 59:3 60:16 61:23 61:24 62:16,19,22 63:3,9 64:24 65:10,19,24 66:4,7 66:15 67:2,5,18 68:7,17 69:19,23 70:12 71:10,13,14 72:3,10,24 74:1,13 74:16,18 75:7,11 75:13 76:5,8,12,14 76:20,24 77:3,8,17 78:11,15,21 79:13 80:6,7,18,21,23 81:2,10,19 82:4,8 82:15,20 83:10 84:19 85:24 86:17 87:3 88:6,20 90:2 90:17 91:16 92:15 92:25 93:11 94:5 94:21 95:18,25 96:2,23 97:2,23 98:4,9,16 99:17 100:1
**government's** 6:6
**graduate** 8:6
**graduated** 7:15,16 7:19
**greater** 57:7,15 91:12
**greatly** 12:12
**gross** 3:10 69:2 78:4 79:9
**group** 39:24
**grouped** 91:19
**guaranteed** 98:7
**guess** 38:10 82:11
**guidance** 93:2

**h**

**h** 4:8
**hand** 70:17
**hang** 39:3,4,6,14 39:17
**happened** 37:10 39:14
**hard** 31:21 70:11
**heading** 97:16
**hear** 5:12,14,17 6:1 54:20 98:15
**heard** 29:19,22,25
**hearing** 12:5
**heather** 1:23 2:18 56:10 100:2 102:20
**helpful** 12:19 21:24 24:23 31:24 38:8
**hereto** 100:5 101:7
**herve** 3:10 6:20 7:4 12:16 16:25 20:8 24:20 25:23 31:14 33:3,23 43:9 44:7 45:12 52:19 53:21 56:5 61:22 62:14 65:13 69:18 72:2 75:4 76:2 78:14 80:4 80:25 82:1 95:16 95:24 97:1
**hgouraige** 3:12
**high** 70:9
**highly** 77:12
**history** 10:13
**hold** 47:2 81:13
**hong** 39:4 40:8,12 40:16
**hope** 99:19,20
**huge** 69:24
**huh** 18:17 36:13 43:5 62:3 83:13 85:7
**hundreds** 54:1
**huntington** 1:17 5:1
**hypothetical** 58:11 59:1 68:16 87:2 88:3

**i**

**idea** 23:23 57:24 78:8
**identical** 99:7
**identification** 100:4
**identified** 36:11 97:11
**identify** 6:2 60:17 61:21
**immaterial** 16:7
**immigration** 37:2
**important** 5:20 38:11
**impression** 79:17
**inappropriate** 45:16 76:15,17
**incapable** 97:6
**include** 92:10
**included** 67:21
**including** 17:21 64:2 72:22 81:5
**income** 49:3,23 57:8,16 58:7,24 59:15,22,24 68:19 69:1,17,17 70:2,5 72:13 73:14,22 78:18,23 79:1,4 83:21 84:1,3,8,24 85:19 89:7,22
**incomplete** 58:10 59:1 68:16 86:16 87:2 88:3
**independent** 11:8 14:12 16:5
**independently** 16:10,11
**indicate** 36:14 40:3 41:5,16 43:20 44:1,9,25 51:8 90:5

**indicated** 36:25 37:4,14,23 49:12 63:14
**indicates** 15:9 57:18,18 63:17
**individuals** 66:20
**industrial** 38:23 40:8,16
**information** 6:4 13:4 14:4,7,14 15:8,9 16:18 20:12 29:7 37:3,4 39:11 53:25 55:6 55:18 58:5,14,17 59:5,6,9,13 72:2 82:22 87:7 88:5 88:13 89:8,23 97:5
**initial** 23:2,8 43:3
**initialed** 101:7
**ink** 101:7
**inquiries** 11:2
**insider** 12:21
**institution** 8:5
**instruct** 13:3
**instructions** 34:16
**intercompany** 85:14
**interested** 102:12
**internal** 16:24
**interpretation** 94:11
**interrupt** 5:14
**interrupted** 6:25
**interview** 13:21 14:5
**introduce** 6:22,23
**introduced** 60:3
**investigating** 21:1
**investigation** 12:15 13:1,7,19 14:2 17:18 18:7,9 18:14,23 19:18 21:6,7,9 37:9 50:23 62:18,20 63:6 66:19
**investigations** 11:3,15 12:7,8,10 13:5
**investor** 21:12,14 21:25 22:6,10 23:4,6,8,15 30:16 35:7,13,17 36:16 41:6,21 42:3,20,22 44:13,15 45:5 46:1 47:1 48:7,14 49:2 78:4 79:9
**investor's** 93:16
**investors** 22:13 23:19,21,24 24:7 44:21,22 48:5 91:2
**invitation** 32:13
**invited** 27:23 32:10
**inviting** 81:14
**involved** 12:8 21:1 23:4
**involves** 15:21
**issue** 20:3 93:4 95:16 98:10
**item** 72:7
**items** 64:1 69:10 77:9,25

**j**

**james** 38:3
**january** 1:18 2:17 5:2 51:10,18 52:7 53:15 54:12
**jce** 22:2
**jersey** 3:11
**job** 10:25 11:9 14:10 99:20
**john** 86:2
**journal** 60:25 61:1 61:7,8
**judge** 95:14
**judgment** 89:9,24
**jumps** 72:8
**june** 31:6,15 32:24 33:5 47:4 50:12 66:12 67:25 99:6 99:13

**k**

**k** 1:8,10 2:7,10 29:23
**keep** 61:4 69:12,13
**kent** 7:16,23
**kind** 82:23
**kinds** 69:9
**know** 5:18,19 7:3 15:19,23 21:11 22:3 29:10 30:20 31:19,20 36:5,23 39:6 40:11,21 41:2 49:15,17 51:16,20 53:7,9 56:5 58:23 60:1 62:19 66:9 67:8 68:8 70:10,11,13 70:16,24 72:5 73:12,17 74:20 75:18 76:18 80:8 85:19 91:25 92:13 94:20,22,24 96:6,7 97:5,7 98:18,25 99:5
**knowledge** 86:4
**knows** 45:20,20
**kong** 39:4 40:8,12 40:16

**l**

**l** 29:23
**lacks** 59:2 64:22 71:9,25 73:25 77:14 83:8 86:12 87:1 88:3 92:12 94:19
**land** 86:10,23
**language** 51:10 52:16
**languages** 8:11
**largely** 85:14
**law** 11:4 95:23
**laws** 12:18
**lawsuit** 74:7,20
**lawyer** 99:20
**lawyers** 11:5 12:14 88:14 89:5 89:20
**learn** 23:20 38:20
**lease** 87:11
**leased** 86:10,23
**leave** 57:10 79:17
**led** 97:8
**ledger** 60:22 61:3 64:10
**ledgers** 65:5
**left** 27:21 28:8,14 28:16 70:17
**legal** 5:22 68:4 72:21,25 73:6,10 86:14,21 87:14 93:2,4 95:20,22 96:4
**legitimacy** 94:11
**legitimate** 68:10 68:11 69:6 72:9 72:12,14 73:2,4,5 73:10,14 86:9,11 86:22,23 88:1,12 90:12 91:14,21

**[legitimate - marketer]**


92:3,19 93:4,25 95:11 96:19 97:14
**lesser** 15:16
**letter** 4:11 98:6
**leung** 3:3 6:20 7:8 7:8 9:3,23 11:14 11:17 12:16 13:3 13:22 14:23 16:20 19:9,24 20:4,8,14 21:2,17 24:1,18 25:23 26:1,7,13,15 27:5,23 28:18 29:17 30:12 31:14 31:18 32:10 33:3 33:14,23 34:22 35:8,20 37:7,17 38:1,4 40:20 41:8 41:19,22,25 42:22 43:8,11,15,17 44:4 44:16 45:6,9,12,17 46:3,20 47:4,7,12 47:15,20,23 49:8 50:7 52:9,12,18 53:21,23 54:13 55:9,21 56:5,10 58:10,20 59:1 60:15 61:17,19 62:14,17,21 63:1,5 64:22 65:13,22 66:3,6,8,25 67:4 67:17 68:4,16 69:18 70:8 71:8 71:12,24 72:20 73:24 74:12,14,17 75:4,10 76:2,6,9 76:13,16,22 77:1,7 77:14 78:6,13,20 79:11 80:4,17,19 80:25 81:3,14 82:1,6,14,18 83:7 84:14 85:23 86:12 87:1 88:2,16 89:11 90:1,15 91:15 92:12,21 93:5 94:1,19 95:13,21 96:21 97:1 98:2,15,23 99:24 100:2
**leungg** 3:6
**level** 70:9
**liabilities** 71:2,3 83:5,15
**liability** 57:5 70:23
**library** 7:17
**licensed** 8:16,19
**likewise** 48:3
**limited** 57:5 92:5,8
**line** 16:21 69:1,10 72:7 77:25 81:3
**lisa** 1:8 2:8 7:6 37:16 40:24
**list** 64:1 89:3,18
**listed** 92:4
**lists** 79:9
**liu** 1:8 2:7 7:6 17:12,18 18:5 37:15 39:8,17 40:13,19,24 41:6 43:21 44:2,9,22 45:25 46:8,11,15 46:19 47:1 48:7 48:10,13,21 51:10 51:11 52:20 53:3 53:3 55:6,7,15 57:20 58:23 62:2 64:12 66:20 74:5
**liu's** 39:10 49:1 56:1,14 59:9 63:23 64:7 65:9 98:12
**llc** 1:9,9,10,11 2:8 2:9,9,10 57:5,12 57:21 58:7,7,9,14
**llcs** 58:4,18,24 59:10,15,18,21,23
**loan** 89:7,22
**loans** 98:7
**located** 60:8 62:1 67:7
**long** 8:22
**look** 14:3 17:24,25 21:15 22:23 27:19 27:20 28:6,7,25 29:9,11 30:17,19 41:2 43:2,6 46:9 47:1,9,9,20 48:1 49:11 51:5,9 56:8 60:5 62:12 63:20 69:15,25 70:3,17 70:25 71:1,6 73:8 73:13,17 74:2,4,6 74:9,25 75:11,12 75:19 79:20 80:9 81:23 83:1,2,11 85:5 87:7,9,11 88:18 90:7,9 91:3 91:4 97:24
**looked** 22:18 29:13 36:18 37:13 51:17,24 60:12 63:23 64:6 65:7 71:15 73:16 80:10 82:12
**looking** 30:25 38:4 43:16,24 52:15 57:12 60:12 61:1 64:12,18 65:1 66:8 68:21 69:21 76:10 79:8,25 84:11,12,25 85:5 90:12
**looks** 33:6
**lorraine** 1:16 2:15 4:3 6:9,11 7:1 10:3 27:23 31:20 32:10 35:8 47:4 47:15,20 50:7 101:4,14
**los** 1:10 2:10 3:5 7:2
**loss** 60:21 63:16 68:20 69:20,24 70:4 71:19,20,22
**losses** 57:18 59:6 63:17 73:19 84:22
**lost** 19:4
**lot** 12:17 33:10 34:16 44:6 72:6
**lots** 65:4

**m**

**machine** 102:7
**majority** 48:8 49:2
**making** 15:22 16:15 55:7 64:1 65:22
**management** 16:4 16:15
**manhattan** 14:3
**march** 18:9 21:10 39:9 40:13
**mark** 6:2 19:3 24:25 31:4 62:8 81:4,10,10,13 99:6
**marked** 9:15,19 19:8,10 20:16 25:3 33:4 34:9,11 60:4,18 75:21 79:25 81:7 98:21 99:12 100:3
**market** 36:12
**marketer** 36:24

**marketers** 30:3 36:10 97:8
**marking** 80:4
**mary** 7:14,21
**master's** 7:17
**match** 65:2 77:20
**material** 15:8 16:9
**materially** 15:10 15:25 16:13
**materials** 99:2
**matter** 40:1 87:15
**mean** 10:12 11:19 13:19 14:11 36:3 57:13 62:23 70:10 70:11,14 73:3,5 98:24
**means** 33:7 57:6 68:8 72:22 84:21
**meant** 26:18 43:14
**member** 57:7,14
**member's** 57:13 57:15
**members** 58:3,3,6 58:8
**memorandum** 88:19 90:20,23 92:5 93:8,14,19 94:10 97:18,21
**memory** 64:14
**mention** 74:5
**mentioned** 22:20 67:6 86:9
**merely** 16:1
**mevion** 87:19,23 87:24 92:18
**million** 37:24 48:9 63:18 84:13,17 91:25 92:2,17,18 93:23,24 94:2
**mind** 35:9
**mine** 80:2
**minute** 33:18 34:20 56:23 62:7 75:3 97:24
**minutes** 19:11 82:2,5
**mislead** 74:19
**misleading** 76:17
**misrepresented** 80:19
**missing** 33:8
**misspoke** 26:17 39:1 47:11
**misstated** 15:10 47:19
**misstates** 26:7,13 38:1,5 41:8 44:4 44:16 45:6 61:19 74:12 80:17,19 82:14,18 83:7 90:15 93:5
**misstating** 41:25
**mistaken** 30:23
**misunderstand** 93:22
**mixed** 39:2 95:22
**mixture** 57:18
**moment** 57:10
**money** 49:22 51:18 85:15 87:24 95:9
**monitor** 74:23,24 75:5,7 76:4 77:5 82:12 84:7
**monitor's** 4:21 81:21
**month** 21:13
**monthly** 18:22
**morning** 7:3
**move** 5:22 67:14
**mph** 51:13 53:4

**n**

**n** 4:1
**name** 5:18 6:17,19 6:22 7:1,3 29:19 29:22 86:2,3 87:19 102:15
**named** 30:1 78:1
**names** 21:22 40:1 50:5
**narrow** 11:22
**nay** 96:8
**necessarily** 16:11
**necessary** 20:2 32:11,13 81:16
**need** 6:5 9:16 19:5 24:10,10,14 27:20 28:1,7 29:9,11 32:7 58:13 72:4 77:7 82:2 86:25 87:6,7,9 88:13,13 88:21 89:8,23 90:5 93:2 94:10 94:22
**needed** 55:22
**needs** 72:4
**negative** 56:3,16 57:5,13,17 62:2 64:1,7,16 67:8 84:20,22 85:20 98:13
**neither** 102:11
**net** 57:8,16 58:7 58:24 59:15,21,24 68:3,8,11,15 69:3 69:3,8,16,17 70:2 70:5,5 73:22 85:19
**never** 20:19 63:12 74:11 75:1 77:15 77:18 83:9 84:10
**new** 3:11 10:2
**newark** 3:11
**news** 20:21
**noise** 5:23
**non** 13:5 44:15
**note** 7:7
**noted** 101:7
**notes** 56:8 97:25
**notice** 4:10 10:2,7 24:6,15
**november** 4:11 21:8
**number** 6:3 9:21 16:6,7,8,9,13 26:18 31:18,19 47:7 65:16,20,24 66:12,16 69:8,25 70:3 71:6,15 84:13,17
**numbers** 15:22 16:4,15 17:8 24:12 25:14 35:3 40:25 64:4 65:2 65:21 66:24 75:24 77:9,19 83:4 99:1

**o**

**oath** 7:9 78:9 102:6
**object** 5:21 14:23 16:20,20 21:17 24:1,1 27:5 29:17 35:20 41:8 45:17 52:12 58:10 72:20 80:20 81:3 86:13 88:16 90:1 96:21
**objecting** 5:18 80:21
**objection** 5:17,19 9:3 11:14 12:16 13:22 19:24 20:5 20:5,6,6,8 21:2

26:7,13,14 28:18 28:19 30:11 37:7 37:17 38:1 40:20 41:19,23 42:22 44:4,16 45:6,15 46:3 49:8 54:13 55:9 58:20 59:1 61:17 64:22 67:17 68:4,16 70:8 71:8 71:24 73:24 74:12 76:2 77:14 78:6 78:20 79:11 80:17 81:1 82:14,18 83:7 84:14 85:23 86:12 87:1 88:2 90:15 91:15 92:12 92:21 93:5 94:1 94:19 95:13,21

**objectionable** 45:12

**objections** 20:9

**observations** 13:14

**obtain** 65:17

**offering** 12:20,24 13:15 20:1 88:18 90:20,23 91:19 92:5,9,23 93:8,14 93:19 94:3,6,10 97:16,17,21

**office** 87:13

**officer** 100:4

**oh** 19:6 33:14 35:15 39:1 46:17 52:22,22 60:11,23 61:7 64:11 80:3 80:10 84:25

**okay** 9:17,18 10:14,14 12:23 15:12 23:6 25:5,6 25:16 26:21 30:13 30:21 31:23 32:8 33:2,17,22 34:19 34:23 35:19 36:4 36:7 39:20,25 40:2 41:4,12 43:15 44:1,19 46:6 47:10,16 48:1 50:20 53:6 53:22 54:2 55:23 56:23,24 59:8 60:6,23 61:7,11,23 62:7,9 63:8,12,15 64:5 65:6,22 66:7 66:15,24 67:6,14 68:20 69:14 70:1 70:1,1,3,20 71:3,7 71:13,17,22 72:11 72:14 74:17 75:2 75:18,20 76:9 78:2,22 79:14,18 80:3,11 82:21 83:21 85:3,12,18 85:25,25 86:21 87:16 88:7 90:9 90:22 91:18,24 93:21 95:8,17 97:23 98:2,9,15

**once** 37:10 88:4

**opening** 25:4 33:1

**opinion** 58:11 59:2 72:22 73:1,1,7,9 73:12 84:15 86:21 95:16

**opportunity** 67:11

**order** 6:6 32:14 51:23 81:17 87:8 87:14 93:7 94:11 96:12

**original** 48:3

**overly** 45:10

**overseas** 29:15,20 30:9 36:14,15,21 36:24 37:2,11 77:21 90:10

**owe** 85:15

**owned** 58:9

**owner** 14:6 57:22

**owners** 58:4,19

**ownership** 57:24

**p**

**p&l** 72:5 78:19 84:1,8

**p.c.** 3:10

**p.m.** 2:17 5:3 100:6

**pacific** 1:8,9 2:8,9 20:23,24 21:25 22:24 23:17 27:17 28:16,24 29:2 35:6,14 36:20 42:9 50:20 56:2 56:15 57:20 60:10 60:20 62:4,8 64:9 64:19 73:21 78:23

**pacific's** 22:15

**pads** 5:22

**page** 4:4,9 43:14 43:15,24 78:7,7

**pages** 6:3

**pagination** 43:14

**paid** 23:1 46:19,25 91:1,1 96:15

**paper** 72:1

**papers** 5:22

**paragraph** 24:18 25:13,20,24 26:5,9 26:16,21 28:11 43:7,11,13 44:5 47:9,10,12,15,20 48:2 50:8,13 51:7 52:15 54:10 62:1 64:12

**paragraphs** 38:18 43:12 47:18 51:3

**paraphrasing** 51:9

**parenthetical** 84:12,21

**parenthetical's** 83:4

**part** 14:10 50:13 51:2 83:14,18,19 99:8

**partially** 33:6 88:17

**participant** 13:8

**participate** 11:2

**particular** 24:18 38:6 58:18

**particularly** 99:2

**parties** 5:6 6:7 102:13

**parts** 60:19

**party** 14:6 16:18

**payee** 37:2

**payment** 51:22 52:1,4 53:4 86:9 91:12,13 92:17,19 97:7

**payments** 38:23 39:3 53:13,15 87:23 88:1 97:11

**pdf** 33:6 99:10

**pearson** 1:16 2:15 4:3 6:9,11,18,25 7:1,3,11 8:10 9:5 9:19,25 10:3 12:25 13:24 15:1 17:2,10 20:16 24:23 25:2 26:11 26:19 27:10 28:21 32:3,18 33:19,24 34:3,20 35:2






EXHIBIT 10

37:20 38:12 40:23 41:11 42:5 44:11 45:23 46:8 48:25 50:9 51:2 52:11 52:15,25 54:9,16 54:24 55:4,12 56:20 57:3 60:3 60:25 61:21,25 62:10 63:10 67:6 67:15 68:18 72:5 73:1 74:3,20 75:14 77:18 78:16 79:21,24 80:8 81:11,20 82:9 83:11 85:25 86:19 90:3 95:13,19 96:3 97:3 99:18 101:4,14
**pearson's** 31:10 38:6 98:19
**penalty** 101:5
**pending** 43:17 71:10
**people** 49:5 95:5
**percentage** 57:24
**perform** 11:8 12:11 13:1 14:17 14:18,21 17:13
**period** 18:11,19 22:20 27:12 29:5 35:23 62:23 64:15 90:6
**periods** 35:21,21
**perjury** 101:5
**person** 86:1
**personal** 37:15 41:7 53:3
**personally** 42:16
**personnel** 11:5
**phase** 66:19
**phone** 5:23,24
**photographs** 51:5
**physician** 94:16
**piece** 71:25
**place** 6:5 102:4
**placed** 102:6
**plaintiff** 1:6 2:6,16 3:2 7:8
**plaza** 3:11
**please** 5:18,22 6:2 6:18 7:11 17:24 19:15 26:2 27:25 28:2,3 30:23 47:10,25 48:18 50:7 51:9 54:22 56:11 61:21 65:22 75:3 77:2 78:12 81:1,16 89:12 93:22 95:24
**plus** 57:7,15
**point** 18:14,20 51:1 62:25 74:22
**polytechnic** 7:18 7:25 8:2
**pomona** 7:18
**poor** 5:13
**pops** 80:8
**portion** 38:6
**portions** 93:20
**position** 88:10 95:15
**positive** 58:8 69:16,25 70:1 73:22 85:20
**possible** 11:3
**postgraduate** 8:3
**potential** 12:17
**pp** 61:20
**pre** 12:7 31:20
**preamble** 16:20 80:20
**precise** 16:25
**preclude** 91:8
**prep** 50:4
**prepare** 17:6 18:1 64:6 68:14,19 83:25
**prepared** 63:22 74:8,14,22,24 75:5 75:8 76:4 77:4 78:3,17,23 79:1,4 79:7 80:13 82:11
**preparing** 82:22
**present** 16:15 67:16
**presentation** 16:1
**presented** 15:22
**previous** 66:21
**prior** 21:14 22:24 47:25 51:25 53:13 66:22 102:5
**privileged** 13:4
**probably** 11:13 16:7 53:13,14 87:12 91:6,9 92:13
**problem** 72:13 98:23
**problems** 33:10
**proceed** 9:16
**proceedings** 11:23 102:3,5,7
**produce** 65:11,17
**produced** 62:15 62:17,20,21,22,24 63:6 64:11 65:13 65:14 66:2,4,16,17 66:21
**professional** 10:9
**profit** 60:21 63:16 68:3,15,20 69:19 70:4,5 71:19,22
**profits** 59:7 68:8 68:12
**prohibited** 94:4
**prohibition** 93:10
**project** 18:25 19:19,25 20:25 22:4 23:3 46:12 50:16,21 55:7,9 73:19 75:25 77:10 77:24 81:22 83:2 86:6 94:13 95:4 96:17
**properly** 90:6
**propriety** 17:7 90:8
**proton** 1:8,9,10,10 2:8,9,9,10 18:25 19:19,25 20:2,22 20:23,25 21:16,21 28:23,24 51:23 52:2,4,19 53:5 60:10,20 64:10,19 77:10,22,24 78:24 94:13,17,17,22,24
**provide** 13:10
**provided** 29:8
**providing** 82:22
**public** 8:13 13:5
**pull** 82:25
**purchase** 96:7,9 96:12
**pure** 93:4
**purported** 20:2
**purpose** 96:16
**pursuant** 10:7 15:13,14
**put** 11:22 16:2 24:13,21,22 54:3 75:14 79:21 80:21
**puts** 6:22

**putting** 71:25

**q**

**question** 5:12 12:20 13:24 14:1 17:4 19:15,17 26:1,4 27:25 28:1 28:4,6 34:12 37:20 41:11 42:18 43:18 44:6 45:9 45:13 46:18 48:17 48:20,25 49:10 51:2 53:8,21 54:2 54:10,24 55:1,12 56:6,11,13 58:15 59:4 61:8,9 65:14 68:18 71:10 72:4 72:20 73:6,11 76:2,23 77:1,2,5,6 77:8,16 78:13 86:16 87:4,5,17 89:12,14 90:3 95:20,22,22,23,24 96:4,4,5,14 97:9
**question's** 19:25
**questioning** 15:24 81:15
**questions** 16:21 17:7 29:12 33:20 34:8 35:3 37:22 49:25 76:17 81:3 81:18 95:17 96:1 99:19
**quickbooks** 4:17 4:18
**quoted** 52:16
**quoting** 51:8

**r**

**raise** 63:1
**raised** 21:25
**reach** 89:9,24 90:11
**read** 19:15,16 24:12 26:1,3 28:5 48:17,19 53:13 54:20,21,23 56:10 56:12 81:17 89:11 89:13 93:19,20 101:5
**really** 57:9 69:10 70:11 80:2
**reason** 19:4 80:12
**reasonably** 16:12
**recall** 18:11 24:13 38:15 50:5,10 55:4,14,17,18,25 56:13,19 73:23 97:20
**receipt** 51:25 69:2
**receipts** 78:4
**receivables** 85:15
**received** 30:5,10 30:15 35:6,14,18 35:20,21 36:15 37:1 39:13 40:15 41:6,17,19 51:11 52:2 91:20 92:24
**receiver** 74:23 80:13
**receiver's** 81:12
**recipient** 16:16 37:5
**recognize** 20:17 25:7 62:13 63:10 77:25
**recollect** 55:13
**recollection** 24:11 27:25 32:12 47:24 53:19 63:20 92:16
**record** 5:13 6:18 6:22 13:20 17:1 19:16 26:3 28:5 34:20 35:1 42:6 45:16 48:19 52:21 54:23 55:5 56:12 61:19 63:7 82:1 89:13 95:15 97:24 98:1,17 102:6
**records** 13:13,14 14:3 17:21,21,25 18:18 21:7,9,16 22:19,23 28:25 29:14 35:22,24 36:19 42:2 45:7 46:9 50:16 51:17 59:14,18 86:4
**refer** 32:7 34:10 48:3
**reference** 8:21 19:25 47:17 56:9 66:9
**references** 78:13 98:24,25
**referred** 50:1,2 55:15 56:1,14 62:1 73:2,20 79:19 98:20
**referring** 11:15,16 15:3,4 16:22 17:2 21:21 24:2 25:23 28:10 34:13 35:23 38:2 42:3,6,7 43:14 47:16 50:8 50:11 52:13,17,19 52:20 56:6 60:9 61:22 75:25 94:7 94:8
**refers** 26:9,22 39:21 62:4 64:6,9 64:15 77:10
**reflect** 73:19
**reflected** 18:2
**reflects** 54:19 55:2
**refresh** 24:11 27:25 32:12 92:16
**refreshed** 19:9
**refreshes** 47:23
**refreshing** 80:2
**refusing** 81:4
**regarding** 13:4 37:23 45:24 46:18
**regards** 17:4
**regional** 1:9 2:8 20:24 21:24
**relating** 53:24
**relation** 17:13
**relative** 102:12
**relatively** 48:5
**relevant** 44:6
**relied** 16:17
**rely** 90:22
**remember** 21:11 21:12 27:2,9,11,18 27:19 28:6 64:5,7
**remote** 1:16 2:15
**remotely** 5:7 6:6
**removing** 44:6
**render** 95:16
**rent** 86:23 89:5,20
**report** 4:17,21 81:6,6,11,12,13,21 82:12
**reported** 1:23
**reporter** 2:18 5:6 5:9 6:8 19:14 28:3 48:16 54:21 89:11 102:2
**reporting** 16:24
**represent** 42:20 60:10 75:4 80:11 82:9

**represented** 48:13
**represents** 16:8
**request** 65:23 66:5
**requesting** 65:10
**reread** 28:1,3
**reservation** 98:15
**reserve** 98:10
**respect** 7:9 16:23 16:23 17:18 30:8 45:3 49:10 99:4
**response** 54:21,22 66:5
**responsibilities** 67:21
**rest** 21:23
**restate** 41:13
**restroom** 82:3
**result** 14:13
**resume** 34:21
**return** 49:1,21 89:8,23
**returns** 49:3,6
**reveal** 13:3
**review** 13:9,12 14:13 15:2,6,7,16 17:14,20 27:24,24 32:11,13 33:19,24 33:25 34:21 35:4 38:20 46:9,10,14 48:20,25 49:11,18 49:21 59:14,17 81:9,15 99:24
**reviewed** 18:10 27:13 29:6 30:6 35:22,24 38:22 59:18 87:18 98:12
**reviewing** 15:10 55:5 82:21 98:11
**reviews** 14:21,23 82:2
**right** 16:5 25:1,4 32:20 33:1,14 50:3 53:23 58:25 62:10 63:18 70:6 71:15 84:22,23,25 85:1,9,11 88:21 91:13 92:1 93:2 93:12,17 94:25 95:6,7
**riverfront** 3:11
**role** 13:7 14:18 82:21 86:5
**ross** 10:15
**roughly** 11:11 24:15 27:2,13 37:24 91:25
**rule** 99:25
**runs** 33:6

**s**

**s** 4:8 23:9 29:23
**sacv** 1:7 2:6
**sales** 69:3
**santa** 50:4
**satisfied** 16:12 17:6
**saw** 36:19 50:15 63:21 86:3 97:9
**saying** 41:24 45:21 50:10 66:1
**says** 25:16 38:18 54:13,14 64:11 70:18
**schedules** 18:1,2
**school** 8:3 50:4
**schools** 50:3,17
**science** 7:17
**scope** 11:22
**screen** 9:19 32:25 34:2,3 60:4 62:11
**scroll** 60:20,21 63:15,16
**scrolling** 61:4
**sec** 9:1,8 10:11,18 10:19,21 11:12 12:14 14:11,19 17:12 21:6 49:5 65:10,18 66:4,20 66:22
**sec's** 20:1 25:11
**sec.gov** 3:6
**second** 9:17 19:4,5 31:3,10,13,25 32:6 34:2,11,13 36:11 38:5 43:3 77:25 81:13 83:18 99:6 99:8
**section** 44:25
**securities** 1:4 2:3 3:3 7:5 11:4 12:18 20:1
**see** 9:18 14:4 24:10,12 25:14,22 26:6,23 32:25 33:12 43:20 48:4 57:9 60:4,6,21,22 60:25 61:7,15 64:2 65:8,25 69:17 70:18,23,23 71:3 73:8 75:16 75:20 77:19,20,21 77:21,22,22 80:1 81:11 82:16,16 87:24 96:11
**seeing** 19:7,9
**seek** 13:20 14:14
**seen** 10:4 20:19 51:25 60:7 61:12 61:21 63:12 75:21 76:10 77:5,15,18 79:22,22,23 80:16 81:24 83:9 84:10 96:8
**send** 99:10
**seng** 39:3,4,6,14 39:17
**senior** 10:24
**separate** 39:25
**september** 31:12 31:15,16,18,19 99:14,15
**serves** 64:14
**session** 100:6
**set** 20:25 23:9 58:14,18 86:15 102:4
**sets** 67:2
**seven** 53:25
**share** 19:7 57:16
**sheet** 60:10,19 61:20 70:25 71:1 83:15 84:1,4
**short** 19:13 34:24 56:25 82:7 98:3
**shorthand** 2:18 102:1,7
**show** 32:22 56:21 60:2,13 73:18 75:2
**showed** 19:8 46:11 89:3,18
**showing** 78:4 87:22
**shown** 24:8 63:2 66:8,11
**shows** 42:13 71:20
**sic** 26:10
**sign** 99:24
**signature** 102:19
**sills** 3:10
**sillscummis.com** 3:12
**simple** 69:13 77:5

**simply** 20:5 45:14 46:8 79:9 90:12
**singapore** 36:20 37:11
**sit** 59:20 65:6 96:8 97:20
**slip** 14:4,5,8
**small** 48:5
**social** 6:6
**somebody** 14:5
**somewhat** 84:16
**sorry** 6:25 19:5 25:13,23 26:9,17 33:14 39:1 43:8 43:13 46:17 55:19 56:22 69:21 71:4 80:18 97:4
**sort** 8:6 87:9
**sources** 26:25 43:22 44:20
**south** 3:4 7:2
**speak** 5:19,25 8:10 88:13
**speaker** 5:25
**speaking** 5:11 20:6,8
**specific** 12:20 34:12 35:2 36:3 38:10 42:14 51:2 53:24 61:22 73:15 88:8 95:2
**specifically** 56:21 97:21
**specificity** 20:9
**speculating** 53:9
**speculation** 71:8 71:24 84:14 85:23 86:13 88:2
**spend** 57:2
**spends** 95:10
**split** 46:7 49:10
**spreadsheet** 36:25 46:25 79:8 89:3 89:18
**spring** 27:13
**staff** 12:14
**standards** 15:4,15 15:21 16:12
**standing** 80:25
**stands** 39:23
**start** 7:11 9:22 18:6 23:2 47:14 74:15
**started** 10:10 18:23,25 19:1,2,17 19:20,21,22
**state** 5:18 6:17 7:16,18,23 8:16,19 9:12 20:5,6,9,11 24:5 25:20 26:4 44:14,21 45:14 48:8 54:11 57:4 63:25 90:24 101:11 102:2
**statement** 16:2 46:17 51:22,24 52:3 54:3 60:18 60:21 61:15 63:17 64:18,19 65:7,11 66:1 67:7 68:14 68:19,21,22 69:1 69:20 70:4 72:5 72:13 73:14 78:19 78:19,19,23 79:1,4 82:10,17 83:8,14 83:15,18,21 84:1,1 84:3,4,5,8,8 85:1
**statements** 15:9 15:23 16:23 17:3 59:17 74:6 75:5 83:1 85:21 98:12
**states** 1:1 2:1 42:25 68:10
**stating** 6:3 93:7
**stipulate** 6:7 98:19 99:11
**stipulated** 7:9
**stipulation** 98:17 99:5
**stop** 45:11,12 76:8 76:12,14 77:12 78:11 96:24
**street** 3:4 7:2
**strike** 23:7 29:14 47:10 51:16 88:25 89:16
**subject** 98:11
**submission** 76:6 76:19 81:5
**submitted** 18:3,16 30:22 31:3,9
**subparagraph** 26:21
**subpoenaed** 66:20
**subscribed** 102:14
**subsections** 51:7
**substantial** 63:17 71:20
**suggest** 33:17 99:9
**suggesting** 76:3
**suggestion** 99:4
**suite** 3:4
**summaries** 38:11
**summarize** 17:20 18:18 69:11 88:8
**summarizes** 53:25
**supplement** 47:24
**supplemental** 4:13 4:14,15 31:5,10,11 31:13,25 32:3,4,6 32:23 33:5,13 34:1,1,2,10,10,11 34:13 38:17 47:2 47:18,22 48:2 50:12 51:3
**support** 12:14 25:10 90:5 96:7
**supreme** 67:24 68:3,10 72:22,23 73:7 86:15
**sure** 6:19 7:8,22 14:1 32:20 34:22 41:23 52:21 63:1 66:13 67:2 81:2 87:14 92:23 93:12
**surely** 91:22
**surprise** 21:3 65:5
**suspect** 38:5
**swear** 6:8
**sworn** 6:12

**t**

**t** 4:8
**take** 6:5 8:8 18:15 19:11 32:12 33:18 33:18 34:19,20 43:2 48:11 56:20 56:23 60:5 78:22 79:14 81:16,23 82:4 87:13 97:24
**taken** 2:15 5:5 19:13 34:24 56:25 82:7 98:3 102:3
**talk** 39:20 91:10
**talked** 73:20
**talking** 5:20 35:10 42:2 63:15 73:6 84:17
**tax** 49:1,3,6,21
**telephone** 5:10
**tell** 7:12,20 9:25 10:9 12:25 15:6 17:17,24 25:9 35:4 45:19 50:7

51:20 59:20 62:12 73:18 75:24 76:13 76:19 77:7,10 81:24 83:6 84:13 85:21 88:9 90:22
**telling** 7:11
**term** 39:21
**terminology** 94:9
**terms** 16:25 72:16 72:23 88:18 90:20 90:24
**testified** 6:13 12:4 12:6 66:19 76:18
**testify** 10:7 44:18 45:25 52:6,11 63:4 78:9
**testifying** 53:10,18 67:22 102:6
**testimony** 13:9 17:23 32:15 39:8 39:10 40:13 44:16 45:3,24 54:6 58:11 59:2 64:25 67:9 84:15 86:8 88:9 90:16,17 91:11,17 92:18 93:6,13,22 101:8
**thank** 32:16 54:18 55:1 56:17,24 67:4,13 82:6 96:1 99:18,23,25 100:1 100:2
**therapy** 1:9,11 2:8 2:10 20:3 21:16 77:22,24 94:14,17 94:17,23,24 95:1
**thereof** 102:10
**thing** 34:22 69:24 91:3,4
**things** 72:7
**think** 12:19 16:25 19:4,5 25:2 30:25 32:13 33:3,15,15 34:18 38:7,11 40:25 43:17 50:1 51:8 54:6 55:19 57:4 58:13 60:3 62:10 67:6 73:2 75:7,15 79:24 90:19 93:3 96:23 97:15,25 99:5,21
**third** 4:13 14:6 16:18 31:9,11 32:4 34:1,10 99:8
**thousands** 54:1
**three** 14:15 17:14 18:15 21:22 30:3 30:22 34:7 36:10 59:21 60:19 73:19 74:9,23 79:10 83:2,25 84:3 85:16
**thursday** 1:18 2:17 5:2
**time** 18:11,19 22:20 27:12 28:18 28:19 29:5 35:21 35:23 48:11 53:14 57:2 59:13 62:23 64:15 67:16 78:22 81:16,23 90:6 99:19,22 102:4
**times** 9:10 65:4 96:21
**title** 10:23 77:23
**today** 10:7 48:11 51:20 52:6 53:10 53:18 59:20 65:1 65:6 67:22 81:25 97:20 98:10 99:19
**today's** 67:20
**told** 8:7
**top** 69:1 70:17
**total** 26:10 27:2,9 35:13,15 36:3 37:24 38:12 40:3 40:4 83:5,5 85:3,3 85:9,10 92:17
**totals** 41:1
**touche** 10:15,16
**trace** 17:21 23:6 23:15,15 29:4 39:13 40:15
**tracing** 23:4
**track** 56:20 57:2 66:23
**trading** 12:21
**training** 8:8,22
**transaction** 97:6
**transactions** 53:24 54:2 96:6
**transcribed** 102:8
**transcript** 98:24 101:6
**transcription** 102:9
**transfer** 51:19,25 52:24 53:4 90:9
**transferred** 27:17 33:21 34:8 35:15 37:10 38:15 40:7 51:12 90:13
**transfers** 30:16 36:10 38:21,22 42:6,14 46:10 50:16,24
**transmitting** 16:18
**treat** 95:1,5
**treatment** 92:11 95:2,3,4,10 96:16 96:17
**tremendously** 13:8
**trial** 12:4
**tried** 32:22
**trinity** 50:4
**tro** 25:11
**tropez** 86:2
**tropez's** 86:10 98:6
**trouble** 80:2
**true** 13:17,17 101:8
**try** 14:5,7 25:1 32:5 60:3 88:8 91:6
**trying** 20:7 24:22 45:15 47:17 57:2 69:12,13 73:3 76:14 91:11 95:8 96:23 99:20
**turn** 73:13
**twice** 9:11
**two** 15:5 31:17 32:5,9,22 36:9,11 39:21,25 40:23 42:10 85:21 99:7
**type** 12:20 67:21 95:2
**types** 12:17 13:10
**typically** 83:24


**u**


**udg** 30:1 39:20,20 39:23 40:1,5,12 49:16 77:22
**ugd** 39:2
**uh** 18:17 36:13 43:5 62:3 83:13 85:7
**ultimate** 95:16






EXHIBIT 10

**ultimately** 20:25 27:4 93:3
**unable** 87:5
**undefined** 55:10
**undersigned** 102:1
**understand** 5:15 8:10,16,25 10:6 13:24 14:1,7,16 15:1,5 17:23 20:10 34:3,17 37:19,21 41:11 42:13 55:12 57:21 64:25 68:18 73:3 77:18 84:10 86:18 87:4,5 88:10 90:3 91:11 93:12 96:10 96:18 99:19
**understanding** 18:24 19:1,2,18,20 19:22 23:1 30:4 30:22 39:23 58:2 68:6,9 72:9 86:5 91:6 92:7 93:9
**understood** 30:5 94:14
**unethical** 76:24 77:2,13 78:12
**unfortunately** 56:7
**united** 1:1 2:1 39:23
**university** 7:16,18
**unprofessional** 76:25 77:1
**upload** 31:24 32:3 98:18
**uploaded** 32:21,22 33:9
**uploading** 33:11
**uscis** 20:22 22:2
**use** 21:23 72:9 82:2

**v**

**vague** 9:3 11:14 13:22 14:23 19:24 27:5 28:18,19 45:17 55:9 67:17
**varies** 12:12
**various** 13:10 17:22 25:21 26:5 26:22 41:1 42:8 78:5
**vary** 18:13
**varying** 18:22
**ventures** 51:13 53:4
**verbatim** 102:6
**verification** 16:5
**verified** 6:9 15:13
**verify** 16:10,11
**version** 63:5
**versus** 7:6 17:12
**view** 34:7 92:2
**violations** 11:3 12:17,18
**virtual** 3:1 5:5
**voluminous** 17:20
**vs** 1:7 2:6

**w**

**wait** 39:1,2,2 46:6 71:12
**wang** 1:8,8 2:7,8 7:6 37:16 39:18 40:19,24 41:17 42:21 43:21 44:24 45:4,24 48:7,13 49:11 66:21
**want** 14:15 17:10 27:12 30:19 32:21 35:3 36:8 37:19 37:20 46:22 47:13 47:14 51:1 52:18 52:20 54:2,9 61:9 67:9,11,12 69:25 70:23,25 73:17 74:2,19 76:20 79:15,20 83:4 88:7 89:4,19 92:22 93:8,12 96:7,10,11 98:10
**wanted** 81:12 85:18
**way** 20:11 45:9 47:24 61:5 86:16 93:19 94:25
**we've** 52:21 70:1 73:16
**went** 10:18 17:14 22:15 24:16 36:23 37:14,24 38:12 39:17 40:4,19 42:21 44:2,9,21 45:1 46:1 48:7,9 48:10,13 49:3 53:2
**west** 23:12,16,19 24:16 25:16 35:15
**whereof** 102:14
**wife** 40:24
**william** 7:14,20
**window** 19:7
**withdrawals** 57:19
**witness** 4:2 5:6 6:8 6:9 11:19 12:19 13:3,7 17:4 20:7 20:12 21:3,18 24:3,19 28:2,10 32:16 33:15 34:5 34:15,18 35:10,25 40:21 42:24 43:16 44:9,19 45:11,15 45:16,19 46:4 47:6,8,14,16,22 48:1 50:11 52:22 54:22 58:12,13,21 61:18 63:2,3,8 64:23 65:11 66:9 66:11,19 68:6 69:21 70:9 72:1,6 72:21 75:5 76:9 76:14,16 77:2,4,12 78:8 79:12 81:8 82:2,19 83:8 84:16 88:4,17 90:19 92:13,22 93:7 94:2,20 96:22 98:11,14 99:2,23 102:14
**witness's** 48:17 90:15 93:5
**witnesses** 13:21 102:5
**wondered** 20:11
**work** 9:7 10:10,21 11:5 17:11 18:23 19:17 20:2 23:4 46:11 49:12,15 54:19 55:2,5 67:15,21 72:16 78:2,17 85:25 91:8 92:22 98:5 99:16
**worked** 11:11,25 13:5
**working** 18:6 49:6
**written** 4:21 53:16
**wrong** 17:24 71:22 80:22
**wrote** 25:10 48:15






EXHIBIT 10

| x |
|---|
| **x** 4:1,8<br>**xin** 1:8 2:7 |
| **y** |
| **y** 3:3<br>**yay** 96:8<br>**yeah** 19:11 31:14 33:10 44:12 56:22 69:4 85:17 92:13 95:25<br>**year** 18:24 19:1,18 19:20<br>**years** 7:20,23 |
| **z** |
| **zero** 51:21 52:7 53:11,12,14 54:11<br>**zoom** 3:1 5:5 6:8 |

# Exhibit 11

# MEMORANDUM OF UNDERSTANDING RE EXCHANGE OF REAL PROPERTY

This Memorandum of Understanding re Exchange of Real Property ("MOU") is entered into on ~~June~~ July 23, 2015 by and between Beverly Community Hospital Association ("BCH") and Montebello Community Health Services, Inc. ("MCH") (BCH and MCH being together sometimes referred to below as the "Hospital Parties"); John P. Thropay, M.D. ("Thropay"); Beverly Oncology & Imaging Centers, Medical Group Inc. ("Beverly Oncology") and Beverly Proton Center, LLC ("BPC"). This MOU is made with reference to the following facts:

## RECITALS

A. Thropay owns the approximately 1.49 acres of land and building thereon known as 111 W. Beverly Blvd. in Montebello, CA (APN 6346-004-040) (hereinafter, the "111 Property").

B. The Hospital Parties own the approximately 0.4265 acres of land and building thereon known as 105 W. Beverly Blvd. in Montebello, CA (APN 6346-004-033) (hereinafter, the "105 Property").

C. The Hospital Parties also own the approximately 2.62 acres of land and building thereon known as 101 E. Beverly Blvd. in Montebello, CA (APN 6346-004-034) (hereinafter, the "101 Property"). As shown on the Assessor's Parcel Map attached hereto at Exhibit "A", the 101 Property includes a 35-wide strip of land (hereinafter, the "101 Land Strip") adjacent to the easterly edge of the 105 Property. Together, the 111 Property, the 105 Property, and the 101 Land Strip are sometimes hereinafter collectively referred to as the "Subject Properties".

D. Thropay, Beverly Oncology and BPC (collectively, the "Developer Parties") desire to construct and operate on a portion of the Subject Properties a new commercial development (the "Project") that would include a new medical facility and commercial office building. The Project would include a proton therapy treatment center.

E. The Parties foresee significant mutual benefits from development of the Project, including but not limited to an increase in surrounding property values, enhancement of patient care opportunities, and jobs for the community.

F. Developer Parties believe that the lot reconfiguration and property exchange contemplated by this MOU will provide a development site more suitable for the Project than the current location and configuration of the 111 Parcel. Because of the anticipated benefits from the Project, the Hospital Parties will consider facilitating creation of the Project site and related matters as contemplated by this MOU.

## MOU TERMS

With reference to the foregoing, the parties reference in the opening paragraph above (sometimes in this MOU referred to collectively as the "Parties" and each individually as a "Party") set forth their mutual understanding of the potential transaction as follows:



Exhibit
00070
Novodor

EXHIBIT 11

1. Land Exchange Overview.

A. At the close of escrow for the exchange ("Closing"), the Hospital Parties would convey by grant deed all of the 105 Parcel and possibly also portion of the 101 Land Strip to Thropay (or an entity affiliated with the Developer Parties), and in return Thropay would grant to the Hospital Parties an equivalent-sized rectangular land parcel to be created out of the westerly end of the 111 Parcel.

B. The portion of the 101 Land Strip (if any) to be included in the exchange along with the 105 Parcel will be determined by the Hospital Parties in their sole discretion during the Due Diligence Period.

C. In order to comply with the Subdivision Map Act and the subdivision ordinance of the City of Montebello, the pieces of land to be exchanged will need to be established as separate legal lots prior to Closing by means of a lot line adjustment or parcel map. Developer Parties will be responsible for hiring a civil engineer to prepare and process the necessary lot line adjustment and/or parcel map in form and content to be mutually approved by the Parties.

2. Formal Agreement, Due Diligence Period and Schedule.

A. This MOU is not intended to create any binding obligations whatsoever other than the confidentiality provisions of Section 6 below, and without limiting the generality of the foregoing it creates no obligation to continue negotiations or to negotiate in good faith. The purpose of the MOU is to provide an outline of terms that may be considered for inclusion in a future formal agreement, along with such changes and additions as the Parties may negotiate in the formal agreement. The Parties acknowledge that no representations have been made to any Party except as may be set forth in any definitive agreements executed by the Parties.

B. The following is a potential "reasonable best case" schedule for implementing the transaction:

| | |
|---|---|
| June 2015 | Finalize this MOU and begin drafting and negotiating formal agreement. |
| July 2015 | Finalize and execute formal binding agreement. Commence Due Diligence Period and lot line adjustment/parcel map process with City. |
| August 2015 | Conclusion of Due Diligence Period (land survey, Phase I environmental assessment, other feasibility studies desired by each Party). |
| September 2015 | City approval of lot line adjustment or Parcel Map & City Project planning approvals (assumes CEQA categorical exemption -- replacement of existing structures -- or MND). Add 6 mos. if City requires EIR for CEQA compliance. |
| Nov. 2015 | Complete City building plan check for Project plans. |
| Dec. 2015 | Close of escrow for land exchange. Commence site demolition and Project construction. |
| June 2017 | Project grand opening (assumes 18 mos. construction). |

C. The formal agreement will specify the consequences of failure to meet outside milestone dates on the schedule. For example, the transaction will be cancelled if the Closing does not occur by an agreed-upon outside date.

3. Closing Conditions. The Closing will not occur and grant deeds for the property exchange will not be recorded unless and until the following conditions are satisfied:

A. Developer Parties have obtained final City approval of the lot line adjustment or parcel map necessary for the land exchange, in form and content mutually approved by the Parties.

B. Developer Parties have obtained all necessary zoning and building permits and approvals required for the Project from the City of Montebello and any other applicable authorities, in form and content reasonably approved by the Hospital Parties.

C. Developer Parties have entered into a bona fide construction contract for the entire Project with an experienced third party contractor, and have provided an executed copy to the Hospital Parties.

D. Developer Parties have provided the Hospital Parties with reasonable evidence of available funds sufficient for completion of the entire Project.

E. First American or other title company acceptable to the parties is ready and willing to issue an ALTA extended coverage owner's policy for each parcel.

F. The Ground Lease dated September 17, 2013, as subsequently amended on March 31, 2015 between John P. Thropay, M.D. and Los Angeles County Proton Therapy, LLC ("Ground Lease") shall have been appropriately amended to reflect the changes to the 111 Parcel as a result of the lot reconfiguration and property exchange contemplated by this MOU.

G. Other closing conditions that the Parties may negotiate in the formal agreement

4. Post-Closing Obligations. The following post-closing obligations of the Developer Parties will survive the close of escrow and will be secured by recorded covenant, bond, and/or other enforcement mechanism acceptable to the Parties:

A. Developer Parties will demolish the current buildings and improvements located on the Subject Properties.

B. Developer Parties will construct the Project.

C. Hospital Parties will provide Developer Parties with a post-Closing right of entry to use and improve pursuant to this paragraph the new parcel ("New Hospital Lot") granted at Closing to the Hospital Parties. Concurrent with and as part of construction of the Project, Developer Parties will construct a permanent parking lot on the New Hospital Lot with paving, striping, curbs, landscaping and lighting pursuant to plans approved by the City of Montebello and Hospital Parties prior to the Closing. Developer Parties and their contractor will maintain adequate liability insurance naming the Hospital Parties as additional insureds through the date of final completion and acceptance by Hospital Parties of the New Hospital Lot improvements,

and shall indemnify, defend and hold harmless Hospital Parties for any claims, liens, losses and liabilities incurred or arising prior to such date. Following acceptance of the completed New Hospital Lot improvements by the Hospital Parties, the Developer Parties will have no rights to use the New Hospital Lot except as may be agreed from time to time by formal written agreement, and Hospital Parties will be free to discontinue, sell, lease, improve and/or change the use of the New Hospital Lot as they desire from time to time.

D. Developer Parties will not compete with Hospital Parties or Beverly Hospital in providing ancillary services, including but not limited to all labs and diagnostic imaging procedures such as X-Ray, MRI, CT, and PET Scan. Beverly Hospital shall have exclusivity for these services.

5. No Cost to Hospital Parties. Except for the Hospital Parties' own staff time and attorney fees, this land exchange transaction and performance of the formal agreement shall be at no cost or expense to the Hospital Parties, and Developer Parties shall pay for all costs and expenses including but not limited to costs associated with the Due Diligence Period, the planning, permitting and construction of the Project and New Hospital Lot, and all other pre-Closing, Closing and post-Closing costs and expenses.

6. Confidentiality. Each Party shall not, and shall use commercially reasonable efforts to cause its affiliates, members, directors, officers and representatives not to, make any public pronouncements regarding the terms of this MOU or the negotiations contemplated hereby without the prior written consent of the other Parties, except (i) as is required by applicable law, rule or regulation and, if so required, mutual agreement of all Parties on the pronouncement, which agreement shall not be unreasonably withheld or delayed by either Party, or (ii) to the extent such information is already a matter of public record. "Public pronouncement" means any statement, however communicated, including without limitation, a press release or promotional materials, intended for (or reasonably expected to result in) general dissemination, but shall not include any statement (i) intended for and reasonably expected to be limited to the internal use of the maker or other Parties to this MOU, or for the use of a Party's directors, officers, representatives, agents, attorneys, consultants, and employees, prospective investors or other capital source and limited to those on a "need to know" basis, and (ii) not likely to become available to the general public or any segment thereof. The Parties hereby agree to develop a mutually agreed-upon reasonable proposed response to be used in the event inquiries are made concerning the transaction before the definitive agreements are executed consistent with all applicable legal requirements.

7. Other Potential Terms. The following are additional items that are mentioned here as a placeholder for possible future discussion, but which have not been sufficiently discussed or formulated in any detail: (i) the possibility one or both of the Hospital Parties might participate in the operation of the Project, with financial terms to be agreed upon; (ii) the possibility one or both of the Hospital Parties might jointly develop and operate with one or more of the Developer Parties a cancer center on terms to be agreed upon; and (iii) the possibility one or both of the Hospital Parties might build and/or operate jointly with one or more of the Developer Parties a



EXHIBIT 11

clinical trials center for advanced treatments in cancer and for other studies including collaboration on clinical trials.

8. Termination of MOU. Any Party may terminate its participation in the MOU without or without cause in its sole discretion by giving written notice to the other Parties without any liability to any other Party; provided, however, that once definitive agreements have been executed by the parties, the terms of such agreements will govern the Parties' obligations upon termination of their relationship.

BY SIGNING BELOW, the Parties signify that they have reviewed this non-binding MOU.

John P. Thropay, M.D.

Beverly Oncology & Imaging Centers, Medical Group, Inc.

By: Ruth Lopez Novodor, CEO

Beverly Proton Center, LLC

By:
Its: President

Beverly Community Hospital Association

By: Alice Cheng, CEO

Montebello Community Health Services, Inc.

By: Alice Cheng, CEO

ATTACHMENTS

Exhibit "A" - Current Assessor's Map for the Subject Properties

# Exhibit 12

**From:** Charles Liu
**To:** Levine, Harlan
**CC:** Jill Gordon; Michael Hunn
**Sent:** 10/19/2015 8:59:06 PM
**Subject:** Mr. Michael Hunn

Dear Mr. Harlan,

I would like to inform you that Mr. Michael Hunn has been engaged by my firm as my representative to work with City of Hope regarding our proposed partnership and joint ventures.

All the best,

Charles Liu
President & CEO
United MPH Ventures, LLC

EXHIBIT
104

# Exhibit 13

**MEMORANDUM OF UNDERSTANDING**

This Memorandum of Understanding ("Memorandum of Understanding") is intended to document our discussions to date concerning the proposed affiliation and joint venture among Beverly Community Hospital Association dba Beverly Hospital, a California nonprofit public benefit corporation ("Beverly Hospital"); United MPH Ventures LLC, a Delaware limited liability company ("United MPH Ventures"); and City of Hope Medical Foundation, a California nonprofit public benefit corporation ("COHMF"); with respect to the development and operation of (i) a new proton beam therapy center on the Beverly Hospital campus (the "Proton Center"), (ii) an associated ambulatory cancer center on the Beverly Hospital campus (the "Ambulatory Center"), (iii) a culturally sensitive, evidence-based screening program located in Southern California for international patients (the "International Screening Program"), and (iv) a program for outreach to international patients (the "International Outreach Program", and together with the Proton Center, the Ambulatory Center and the International Screening Program, the "Proposed Transaction"). Certain fundamental terms and conditions of the Proposed Transaction are attached as Exhibit A to this Memorandum of Understanding.

1. <u>Documentation</u>. One or more agreements (collectively, the "Definitive Agreements") will be entered into by the parties with respect to the Proposed Transaction and will include representations and warranties, events of default, conditions, covenants, indemnifications, remedies, and other provisions usual and customary for a transaction of this type. Notwithstanding any provision to the contrary contained herein, the Definitive Agreements, at such time as they are fully executed by the parties thereto, will supersede this Memorandum of Understanding and thereafter, this Memorandum of Understanding will be of no further force or effect. No party will have any obligation to execute the Definitive Agreements unless and until the terms thereof are acceptable to that party, as determined in that party's sole discretion. Absent breach of a binding provision of this Memorandum of Understanding by a party, any actions taken by a party in reliance on the preliminary understandings set forth herein shall be at that party's own risk.

2. <u>Public Communication</u>. The timing and content of any announcements, press releases or any public statements concerning the Proposed Transaction shall be determined by mutual agreement of all parties including United MPH Ventures, Beverly Hospital and COHMF or as required by law.

3. <u>Expenses</u>. Each party will bear its own legal, accounting and other fees and expenses related to the preparation of this Memorandum of Understanding and in connection with the Proposed Transaction.

4. <u>Exclusive Negotiations</u>. During the period beginning upon execution of this Memorandum of Understanding and ending the later of (a) one hundred twenty (120) days after the execution of this Memorandum of Understanding, and (b) forty-five days (45) after United MPH Ventures and/or Beverly Hospital provide written notice to COHMF of its intention to terminate the discussions regarding the Proposed Transaction, United MPH Ventures and Beverly Hospital shall not, and shall ensure that their respective affiliates, officers, employees or other agents or representatives do not, without the prior



EXHIBIT
105

written consent of COHMF, directly or indirectly, discuss, encourage, solicit, consider or review any inquiry or proposal from any person or entity with respect to (a) the lease and/or operation of the Proton Center or Ambulatory Center (each as defined in Exhibit A), (b) the development and/or operation of any International Screening Program or International Outreach Program (each as defined in Exhibit A), (c) the development of partnership, affiliation, joint venture or other similar arrangement for the provision of diagnostic imaging, clinical laboratory or other oncology-related diagnostic services for patients of the Proton Center or the Ambulatory Center, or (d) any other transaction or arrangement that, if realized, could reasonably be expected to adversely affect the consummation of the Proposed Transaction.

5. <u>Nonbinding Effect</u>. Although this Memorandum of Understanding does express the current intentions of the parties, as provided herein, the parties acknowledge and agree that, except as provided in the next sentence of this paragraph 5, this Memorandum of Understanding will not create any binding legal commitments among them and any such binding legal commitments will come into place only upon execution and delivery of the Definitive Agreements setting forth the full scope, rights and responsibilities of the parties. Notwithstanding the foregoing, the parties agree upon the execution of this Memorandum of Understanding to be bound by the provisions of this Memorandum of Understanding concerning public communication (paragraph 2), expenses (paragraph 3), exclusive negotiations (paragraph 4), assignment (paragraph 6), and miscellaneous (paragraph 7). Notwithstanding any provision to the contrary contained herein, the Definitive Agreements, as such time as they are fully executed by the parties thereto, will supersede this Memorandum of Understanding and, thereafter, this Memorandum of Understanding will be of no further force or effect. No party will have any obligation to execute the Definitive Agreements unless and until the terms thereof are acceptable to that party, as determined in that party's sole discretion.

6. <u>Assignment</u>. No party to this Memorandum of Understanding may assign its rights or responsibilities without the prior written approval of the other parties.

7. <u>Miscellaneous</u>. This Memorandum of Understanding shall be governed in all respects by the laws of the State of California. This Memorandum of Understanding may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same agreement.

Once fully executed, this Memorandum of Understanding, subject to the terms and conditions set forth above, will remain in effect until the earlier to occur of (a) the execution of the Definitive Agreements; or (b) any party provides written notice to the other parties of its intention to terminate the discussions regarding the Proposed Transaction. Thereafter, this Memorandum of Understanding shall be null and void and of no further force and effect, except for the provisions of paragraphs 2, 3, 4, 5, 6 and 7 hereof, each of which shall survive the expiration of this Memorandum of Understanding in accordance with its terms.

*(signature page follows)*

Beverly Hospital

By: ____________

Name: Alice Cheng

Its: President and CEO

United MPH Ventures

By: ____________

Name: CHARLES LIU

Its: CFO

COHMF

By: ____________

Name: Harlan Levine

Its: Chief Executive

Date: October 22, 2015

**EXHIBIT A**

This outline sets forth certain terms for discussion regarding participation of the parties in the development and support of the Proposed Transaction. Although the parties intend and expect to proceed with a good faith negotiation of the Proposed Transaction based on the following terms and conditions, the obligations of the parties to consummate the Proposed Transaction shall be subject in all respects to the negotiation, execution and delivery of Definitive Agreements, the satisfaction of the terms and condition contained therein, and the approval of the Board of Directors, or authorized representatives, of each of the parties, if required.

1. <u>Parties:</u>
   a. Beverly Community Hospital Association dba Beverly Hospital, a California nonprofit public benefit corporation ("Beverly Hospital")
   b. United MPH Ventures LLC, a Delaware limited liability company ("United MPH Ventures")
   c. City of Hope Medical Foundation a California nonprofit public benefit corporation ("COHMF")
   d. City of Hope National Medical Center, a California nonprofit public benefit corporation ("COHNMC")

2. <u>Background:</u>
   a. United MPH Ventures, in partnership with Beverly Hospital, is developing space, procuring equipment, and establishing relationships with third parties in order to create a proton therapy center and more generally, a cancer center, in the city of Montebello to provide patients with, among other services, the state-of-the-art technology of proton beam therapy and access to a new community cancer center.
   b. COHMF and COHNMC, which together with the Beckman Research Institute, constitute a National Cancer Institute-designated Comprehensive Cancer Center, seeks to partner with United MPH Ventures and Beverly Hospital to create a destination center for proton beam therapy and a leading edge freestanding cancer center serving the Beverly Hospital community and international patients.

3. <u>Proton Center:</u>
   a. United MPH Ventures, with financial assistance from Pacific Medical Regional Center (a "Regional Center" within the meaning of the EB-5 Immigrant Investor Program under the Immigration Act of 1990, as amended), will fund the construction and start-up capital needs of (1) the Proton Center, (2) the Ambulatory Center, and (3) a parking structure. United MPH Ventures or an affiliate thereof will also develop or arrange for the development of a medical hotel facility on property adjacent to the Proton Center and the Ambulatory Center.
   b. United MPH Ventures and COHMF will enter into a long-term lease pursuant to which United MPH Ventures will lease the Proton Center and all of its equipment (except as

otherwise provided by COHMF) to COHMF, which will operate the Proton Center as a free-standing facility under COHMF. The Proton Center lease between United MPH Ventures and COHMF will provide for a per-click or other variable payment structure to allocate financial risk for the Proton Center operations to United MPH Ventures.

c. United MPH Ventures will, during the term of the Proton Center lease, provide economic support to COHMF in order to fund Proton Center operations, including adequate funds for COHMF to provide fair market value income guarantees to certain COHMF-affiliated physicians who will be providing full-time coverage of the Proton Center. The initial strategic plan and capital and operating budgets for the Proton Center shall be subject to the mutual agreement of United MPH Ventures and COHMF, and the provision of economic support by United MPH Ventures will be subject to such terms, conditions and limitations as may be mutually agreed upon by United MPH Ventures and COHMF and set forth in the Definitive Agreements.

d. City of Hope Medical Foundation (COHMF) will:
   i. Provide a nationally recognized, mutually agreed upon physician to serve as the medical director of the Proton Center; this physician will have deep knowledge and experience in proton therapy as well as the ability to build strong relationships across the medical landscape.
   ii. Be the exclusive provider of professional services (i.e. physicians), excluding primary care providers (i.e. internal medicine and general surgery) for the Proton Center.
   iii. Provide or arrange for the provision of all management and administrative staffing and services necessary or appropriate for the operation of the Proton Center.

e. Location and design of the Proton Center will be mutually agreed upon by United MPH Ventures, Beverly Hospital and COHMF, and the selection of the proton equipment and other major medical equipment to be provided by United MPH Ventures (and any material agreements related thereto) will be mutually agreed upon by United MPH Ventures and COHMF.

4. <u>Ambulatory Center</u>
   a. United MPH Ventures and COHMF will enter into a long-term lease pursuant to which United MPH Ventures will lease the Ambulatory Center and all of its equipment (except as otherwise provided by COHMF) to COHMF, which will operate the Ambulatory Center as a free-standing facility under COHMF. The Ambulatory Center lease between United MPH Ventures and COHMF will provide for a fair market value lease payments.
   b. The Ambulatory Center will provide the following: Medical Oncology, Surgical Oncology, Radiation Therapy (non-proton beam), Infusion and such other oncological services as mutually agreed by the parties and set forth in the Ambulatory Center Lease.
   c. COHMF will be the exclusive provider of technical and professional services (e.g., physicians) at the Ambulatory Center, and will provide or arrange for the provision of all

professional (e.g., physician), management and administrative staffing and services necessary or appropriate for the operation of the Ambulatory Center.

d. Location and design of the Ambulatory Center will be mutually agreed upon by United MPH Ventures, Beverly Hospital and COHMF, and selection of the medical equipment (e.g., LINAC) to be provided by United MPH Ventures will be mutually agreed upon by United MPH Ventures and COHMF.

e. United MPH Ventures will provide recruitment assistance, including income guarantees (as described above), to COHMF to bring oncologists into the market to meet market needs as agreed upon by both parties in support of the oncology program, and may provide other short-term economic support to COHMF as necessary in order to fund the initial start-up phase of operations of the Ambulatory Center.

f. COHMF and United MPH Ventures will explore the development of an equity partnership, with COHMF owning a majority and controlling interest, to provide management and administrative services for the operation of the Ambulatory Center.

5. International Screening Program

a. COHMF and COHNMC will work collaboratively with United Damei, China, United MPH Ventures and Beverly Hospital to develop a culturally sensitive, evidence-based program that will deliver concierge service and best practices screening programs and techniques (including molecular genetic testing) to address international market demand. The screening services will be delivered in Southern California.

b. The parties will explore joint venture structures and other potential arrangements that will facilitate and allow shared investment and shared return with respect to the International Screening Program.

6. Diagnostic and Support Services

a. COHMF and Beverly Hospital will work collaboratively to develop a structure for the provision of diagnostic imaging, clinical laboratory and other oncology-related diagnostic services for patients of the Proton Center and the Ambulatory Center.

b. COHMF and Beverly Hospital will also work to define and document oncology-related support services that Beverly Hospital can provide to patients of the Proton Center and the Ambulatory Center to ensure the Proton Center and Ambulatory Center are differentiated and full-service for both local and international patients.

7. International Outreach Program

a. United Damei, China has established a program to market in China on behalf of the Proton Center, so as to attract Chinese patients willing to travel to have treatment performed by the Proton Center. United Damei, China will provide and arrange for travel accommodations, including air and ground transportation, as well as room and board during the patient's stay in the United States.

b. United Damei, China and COHNMC will work cooperatively, and COHNMC will make available the services and expertise of its International Medicine Program, to expand the

scope of the international program to attract Chinese patients willing to travel for the services offered by the Ambulatory Center and other oncology-related services offered by COHMF and COHNMC.

c. United MPH Ventures, Beverly Hospital, COHMF and COHNMC will establish a co-branding arrangement and jointly develop branding strategies and marketing collateral for local and international audiences with respect to the Proton Center, the Ambulatory Center and the other oncology-related services offered by the parties on the Beverly Hospital campus.

*All provisions outlined above are subject to further legal, business and economic analysis and due diligence in order to gain comfort regarding financial viability and compliance with all applicable laws and regulations.*

# Exhibit 14

**From:** Cheng, Alice
**To:** Levine, Harlan
**CC:** Charles Liu; Michael Hunn (michael.hunn@cox.net); Jensen, Vincent; Berkey, Anita
**Sent:** 11/18/2015 12:16:27 AM
**Subject:** RE: Meeting to dicuss Dr. Thropay and Dr. Wong

Hi Dr. Levine:

Short answer to your question, I don't think Dr. Thropay is interested in employment with COH. As outlined in the MOU, Charles' vision for the Cancer Center is strictly between United MHP, COH, and Beverly. Dr. Thropay's ownership and involvement are limited to Beverly Proton Center only. Dr. Thropay understands that the plan is to bring a nationally renowned proton specialist to lead the Center. Based on Charles' and my meeting with Dr. Thropay and his sister, Ruth Lopez (who's also his business manager), the main reason they don't want to collaborate with COH is Dr. Wong. They don't understand why Dr. Wong has been going around making defamatory comments about Dr. Thropay. Dr. Thropay said he's only met Dr. Wong once. His sister was exptremely emotional when I confirmed with her the decision to enter into the DA process with COH. She felt that Dr. Thropay was betrayed by both Charles and Beverly for working with their "enemy". As such, they both are refusing to compromise in this partnership. I just want to provide you with this background information for our discussion on Friday.

Look forward to our call on Friday, thanks.

Alice

---

**From:** Levine, Harlan [mailto:hlevine@coh.org]
**Sent:** Tuesday, November 17, 2015 10:06 AM
**To:** Cheng, Alice
**Cc:** Charles Liu; Michael Hunn (michael.hunn@cox.net); Jensen, Vincent; Berkey, Anita
**Subject:** RE: Meeting to dicuss Dr. Thropay and Dr. Wong

Hi Alice,

Thanks for your note. We will meet internally to address the questions you raise below. It would be helpful to hear your ideas on what you believe Dr. Thropay is interested in. I think we agreed that he does not bring expertise in Proton Beam, so it sounds as if the interest is in the radiation therapy center in the new cancer center. Is this correct and has he indicated any specific desire. For a variety of reasons, we employ our physicians that work at COH centers…do you believe Dr. Thropay is seeking an employment model.

We will explore what issues may exist, but it would be helpful to understand a bit better what Dr. Thropay is thinking.

In terms of meeting, Vince and I are pleased to meet or schedule a call. Given schedules and the fact I am taking off next week, a call may be optimal. I am trying to rearrange the schedule to be free on Friday at either noon or 3 p.m. Will either of these work for you and Michael?

Harlan

---

**From:** Cheng, Alice [mailto:acheng@beverly.org]
**Sent:** Monday, November 16, 2015 4:22 PM
**To:** Levine, Harlan
**Cc:** Charles Liu; Michael Hunn (michael.hunn@cox.net)
**Subject:** RE: Meeting to dicuss Dr. Thropay and Dr. Wong

EXHIBIT 106

Hi Dr. Levine:

Mr. Liu met with Dr. Thropay on Friday per our discussion over the dinner last Wednesday. Michael and I would like to see if we could meet with you and Vince to obtain your input and feedback on the relationship between two physicians before recommending a solution. Mr. Liu understands Dr. Thropay is his issue to address and he still intends to do

so. However, in absence of the knowledge of what exactly is Dr. Wong's issue with Dr. Thropay , it's hard to structure a win-win relationship. Mr. Liu wants to resolve this ASAP. It's obvious that the issue will hamper the progress of the definitive agreements among the parties.

I understand you have a busy schedule, if it works out better on the phone for you and Vince, I will schedule the call. Michael and I can also meet for breakfast, lunch or normal business hours. Please advise and I will have my office coordinate with your Assistant, Anita.

Best,

*Alice*

--------------------------------------------------------------------
*SECURITY/CONFIDENTIALITY WARNING:
This message and any attachments are intended solely for the individual or entity to which they are addressed. This communication may contain information that is privileged, confidential, or exempt from disclosure under applicable law (e.g., personal health information, research data, financial information). Because this e-mail has been sent without encryption, individuals other than the intended recipient may be able to view the information, forward it to others or tamper with the information without the knowledge or consent of the sender. If you are not the intended recipient, or the employee or person responsible for delivering the message to the intended recipient, any dissemination, distribution or copying of the communication is strictly prohibited. If you received the communication in error, please notify the sender immediately by replying to this message and deleting the message and any accompanying files from your system. If, due to the security risks, you do not wish to receive further communications via e-mail, please reply to this message and inform the sender that you do not wish to receive further e-mail from the sender. (fpc5p)
--------------------------------------------------------------------

# Exhibit 15

SEC LAW FIRM

**11693 San Vicente Boulevard**
**Suite 357**
**Los Angeles, California 90049**
**310-207-0665**

www.seclawfirm.com

Writer's direct dial:
310-557-3059

*via email and overnight delivery*

December 1, 2015

Mr. Charles Liu
28202 Cabot Road
Suite 640
Laguna Niguel, California 92677

*RE: PROTON THERPAY PROJECT: DEMAND FOR ACCOUNTING*

Dear Mr. Liu:

This law firm represents Beverly Oncology & Imaging Medical Center, Inc., John Thropay, M.D., Ruth Lopez-Novodor and their respective affiliates (collectively "Beverly Oncology"). This is a legal demand issued to you on behalf of Beverly Oncology. If you are represented by legal counsel, please direct this letter to your attorney immediately and have your attorney notify us of such representation so we can further communicate with your counsel. This is a very serious matter.

We are writing to notify you that Beverly Oncology has reason to believe that certain expenditures from one or more bank accounts (collectively, "Accounts") controlled by you with respect to a proton therapy project (the "Project") may be irregular as to purpose, amount and/or recipient. Despite previous requests from Beverly Oncology for an accounting from you of all funds received by you from various investors in the People's Republic of China in connection with the Project, and all expenses made by you or at your direction from any and all Accounts in connection with the Project, you have not provided such accounting. This is a formal demand for a full, complete and written accounting (the "Accounting") of all funds received in connection with the Project from the commencement date through today's date (whether or not such funds were deposited into Project Accounts) and all expenditures made from all Project Accounts from the commencement date through today's date. Additionally, you are requested to make or authorize no further expenditures from any Project Accounts from this date forward unless Dr. Thropay consents thereto in writing. The Accounting must be submitted to this office not later than 5:00 p.m. local time on Friday, December 4, 2015.

Exhibit
00076
Novodor

EXHIBIT 15

Pending receipt of the Accounting in form and substance satisfactory to Beverly Oncology and its professional advisors, in their sole and absolute discretion, and a full analysis thereof by such persons, Beverly Oncology hereby notifies you that it is suspending all participation and cooperation with you in the Project. During this period, you may not represent to any third party that you speak on behalf of Beverly Oncology or that Beverly Oncology is involved with you in the Project.

This could all merely be a misunderstanding, but the burden is now on you to clarify the full financial status of the Project Accounts and to provide the Accounting. If that is accomplished to the satisfaction of Beverly Oncology and its professional advisors, in their sole and absolute discretion, I believe that this matter will shortly be resolved and the principals will soon be able to move forward together. However, it is also possible that the parties are on the brink of a permanent break in their working relationship due to the serious concerns Beverly Oncology has at this time. I look forward to hearing from your counsel as soon as possible so that all parties can determine the next steps in this matter and where the Project is heading. If I do not hear from your counsel by 5:00 p.m. on Friday, December 4, 2015, or if the Accounting is not proffered by such time, or if the Accounting is not complete, Beverly Oncology may take further action as it deems necessary to protect its interests, without notice to you, including without limitation notifying investors, other third parties and regulators of its concerns.

This letter and the demands contained herein are without waiver of any and all rights of Beverly Oncology, all of which are expressly reserved. Please do not contact Beverly Oncology further regarding the subject matter of this letter.

Very truly yours,

*Lance Jon Kimmel*
Lance Jon Kimmel

cc: John Thropay, M.D.
Ruth Lopez-Novodor

# Exhibit 16

**To:** Regenstreif, Jacob (Tony)[RegenstreifJ@sec.gov]; Berry, John W.[BerryJ@sec.gov]
**From:** deNeve, Jorge
**Sent:** 2016-06-24T09:16:18-04:00
**Importance:** Normal
**Subject:** Delsk: Declaration
**Received:** 2016-06-24T09:16:27-04:00
Zhan Declaration.pdf

Dear John and Tony,

Attached please find a declaration from Edison Zhan. Please let me know if you would like to discuss.

-Jorge

O'Melveny

**J. Jorge deNeve**
jdeneve@omm.com
O: +1-213-430-6649

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Website | LinkedIn | Twitter | Bio

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

DECLARATION OF EDISON ZHAN

I, EDISON ZHAN, declare:

I make this declaration in support of plaintiff Securities and Exchange Commission's motion for temporary restraining order and orders seeking a freeze, accounting, and repatriation of assets filed on May 26, 2016. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to these facts under oath.

1. Since June 2014, I have served as the Director of American Project Operations at Delsk Group ("Delsk"). Delsk was founded in Cologne, Germany in 2008. Among other things, Delsk works with various partners in China which provide overseas investment services to Chinese nationals for projects in Europe and the United States. Delsk currently has branches in Thailand, Hong Kong, and five locations across China. Delsk also has an international staff of over 550 individuals.

2. I am fluent in both English and Mandarin. As part of my job responsibilities at Delsk, I communicate regularly with English-speaking colleagues. From 2007 to 2014, I studied and worked in Scotland. Specifically, I studied within the Interpreting and Translating program at Heriot Watt University. After my studies, I worked as a freelance interpreter for Scottish and Chinese governmental and legal entities. I currently reside in Beijing and have lived in China for over 23 years. Additionally, I have spoken and written Mandarin for most of my life.

3. From at least September 2014 to May 2016, I frequently communicated with Charles Liu regarding the Pacific Proton EB-5 Fund ("PPEB5 Fund") and the Beverly Proton Center project. Until recently, Charles Liu represented to Delsk and me that he served as: (1) the President and controlling member of Pacific Proton Therapy Regional Center, LLC (the "Regional Center"), and (2) the President and controlling member of the Beverly Proton Center. Mr.

Liu also represented that he managed the Pacific Proton EB-5 Fund, LLC. I understand that he did so through the Regional Center. Mr. Liu approached Delsk in 2014 to seek Delsk's assistance in recruiting potential Chinese investors to make investments into the PPEB5 Fund, pursuant to the EB-5 Immigrant Investor Program.

4. Delsk and the Regional Center entered into an exclusive agency agreement, signed by Charles Liu, in China under which only Delsk was permitted to promote and market the Beverly Proton Center project. Delsk hosted a kick-off event for the project in December 2014 at the Park Hyatt Hotel in Beijing. The event was attended by Mr. Liu. At Mr. Liu's request, we also invited Xiaojun Chen. Attached hereto as **Exhibit A** is a true and correct copy of an October 7, 2014, email and attachment that I received from Mr. Liu in which he includes a list of invitees for the kick-off event. Xiaojun Chen is the tenth person listed on the invitation as the Director of the New China Insurance Company (新华保险产品服务总经理). At the kickoff event, I met Xiaojun Chen and he represented himself as the Director of the New China Insurance Company. As discussed below, I have learned that Xiaojun Chen is now identified as the President of United Damei.

5. Attached hereto as **Exhibit B** is a true and correct copy of an email and attachment that I received on October 21, 2015 from Charles Liu of an organizational chart of United MPH Ventures, LLC and its subsidiaries. The organizational chart shows that United Damei US is 100% controlled by United MPH Ventures, LLC, of which Mr. Liu claimed to be the sole owner, President, and CEO. Mr. Liu sent me this chart as part of an effort to reassure me about the project's viability. During this time period I expressed concerns about the project's financing to Mr. Liu on numerous occasions.

6. On June 16, 2016, I visited the official Chinese government website containing registration information filed by Chinese companies (http://gsxt.saic.gov.cn/). Through that website, I was able to access the registration

information for United Damei Investment Co., Ltd. ("United Damei"). Attached hereto as **Exhibit C** is a true and correct copy of the registration information found for United Damei.

7. Attached hereto as **Exhibit D** is a translation of the registration information attached as Exhibit C to this declaration. I have read Exhibit D and compared it to the Exhibit C. Exhibit D is an accurate translation of Exhibit C.

8. The registration statement contained in Exhibit C shows that on May 19, 2016, the following changes were made:

a. The Legal Representative—which in Chinese indicates a person with ownership interest—for United Damei was changed from Wenli Yao to Xiaojun Chen;

b. The Executive Director for United Damei was changed from Wenli Yao to Xiaojun Chen;

c. The Manager for United Damei was changed from Xin Wang to Xiaojun Chen;

d. The Supervisor for United Damei was changed from Zhongsheng Wang to Yinan Li; and

e. The Investors—or shareholders—in United Damei changed from Wenli Yao and Zhongsheng Wang to Xiaojun Chen and Xiaojie Yin.

9. Yinan Li—who is listed as the current Supervisor of United Damei—is also the name of an assistant for Charles Liu with whom I interacted. Mr. Li assisted Delsk when we requested material or support from Mr. Liu for our marketing activities in China.

//

//

//

//

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on June 23, 2016, at Los Angeles, California.

By: ______________________
Edison Zhan

# Exhibit A

Message

**From:** Charles Liu [charlesliu@me.com]
**Sent:** 10/7/2014 12:36:13 AM
**To:** 詹晔 [zhanye@delsk.com]
**CC:** an [an128126@126.com]
**Subject:** 拟邀请名单
**Attachments:** Untitled attachment 00061.pdf

小詹：您好！
附件是拟邀请嘉宾名单

Charles Liu...President
Pacific Proton Therapy Regional Center
28202 Cabot Road, Suite 640
Laguna Niguel, CA 92677
949.365.0088 w...626.688.4898 m
www.pptus.com ... charlesliu@me.com

**拟邀请嘉宾名单**

1. 美国加州前州长或洛杉矶现任市长
2. Skanska 公司总经理 (我们的建筑商/美国第五大建筑商之一)
3. Optivus 公司总裁 (我们设备的供应商)
4. Loma Linda 质子中心负责人
5. Dr Thropay (洛杉矶质子治疗肿瘤中心首席执行官)
6. 中国医学科学院肿瘤医院（国家癌症中心）院长 赫杰
7. 北京肿瘤医院党委书记/教授 朱军
8. 中国医学科学院肿瘤医院质子治疗教授 蔡伟民
9. 中信建设集团总经理
10. 新华保险产品服务总经理

# Exhibit B

Message

**From:** Charles Liu [charlesliu@me.com]
**Sent:** 10/21/2015 1:12:23 PM
**To:** zhanye@delsk.com
**Subject:** United MPH Subsidiaries.pptx
**Attachments:** United MPH Subsidiaries.pptx; Untitled attachment 00568.txt

See my new corporate structure. Keep it confidential

# United MPH Ventures, LLC and Subsidiaries



# Exhibit C

合众达美投资有限公司 统一社会信用代码：91110105318092697N

登记信息 备案信息 动产抵押登记信息 股权出质登记信息 行政处罚信息 经营异常信息 严重违法信息 抽查检查信息

工商公示信息 企业公示信息 其他部门公示信息

**基本信息**

| | | | |
|---|---|---|---|
| 统一社会信用代码 | 91110105318092697N | 名称 | 合众达美投资有限公司 |
| 类型 | 有限责任公司(自然人投资或控股) | 法定代表人 | 陈小军 |
| 注册资本 | 5000 万元 | 成立日期 | 2014年10月31日 |
| 住所 | 北京市朝阳区麦子店街37号20层2050单元 | | |
| 营业期限自 | 2014年10月31日 | 营业期限至 | 2034年10月30日 |
| 经营范围 | 项目投资；投资管理；资产管理；投资咨询；健康咨询（须经审批的诊疗活动除外）。（1、未经有关部门批准，不得以公开方式募集资金；2、不得公开开展证券类产品和金融衍生品交易活动；3、不得发放贷款；4、不得对所投资企业以外的其他企业提供担保；5、不得向投资者承诺投资本金不受损失或者承诺最低收益；企业依法自主选择经营项目，开展经营活动；依法须经批准的项目，经相关部门批准后依批准的内容开展经营活动；不得从事本市产业政策禁止和限制类项目的经营活动。） | | |
| 登记机关 | 朝阳分局 | 核准日期 | 2016年05月19日 |
| 登记状态 | 在营（开业）企业 | | |

**股东信息**

股东的出资信息截止2014年2月28日。2014年2月28日之后工商只公示股东姓名，其他出资信息由企业自行公示。

| 股东类型 | 股东 | 证照/证件类型 | 证照/证件号码 |
|---|---|---|---|
| 自然人股东 | 陈小军 | | |
| 自然人股东 | 殷晓捷 | | |

« 1 »

**变更信息**

| 变更事项 | 变更前内容 | 变更后内容 | 变更日期 |
|---|---|---|---|
| 法定代表人 | 姚文琍 | 陈小军 | 2016-05-19 |
| 投资人 | 详细 | | 2016-05-19 |
| 董事（理事）、经理、监事 | 详细 | | 2016-05-19 |

« 1 »

版权所有：北京市工商行政管理局 地址：北京市海淀区苏州街36号 邮政编码：100080



SEC-Delsk-E-0000013

EXHIBIT 16

当前位置 - 投资人变更信息详细

| 变更前 | | |
|---|---|---|
| 序号 | 姓名/名称 | 投资人类型 |
| 1 | 王忠晨 | 自然人股东 |
| 2 | 姚文刚 | 自然人股东 |

| 变更后 | | |
|---|---|---|
| 序号 | 姓名/名称 | 投资人类型 |
| 1 | 陈小平 | 自然人股东 |
| 2 | 段晓捷 | 自然人股东 |

当前位置 - 主要人员变更信息详细

| 变更前（注：标有*标志的为法定代表人） | | |
|---|---|---|
| 序号 | 姓名 | 职位 |
| 1 | 姚文瑚* | 执行董事 |
| 2 | 王馨 | 经理 |
| 3 | 王忠诚 | 监事 |

| 变更后（注：标有*标志的为法定代表人） | | |
|---|---|---|
| 序号 | 姓名 | 职位 |
| 1 | 陈小军* | 执行董事 |
| 2 | 陈小军* | 经理 |
| 3 | 李亦楠 | 监事 |

# Exhibit D

National Market Players Credit Information Public Disclosure System

United Damei Investment Co., Ltd.
Unified Social Credit Code: 91110105318092697N

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Registration Information | Record-filing Information | Information on Registration of Mortgage of Personal Property | Information on Registration of Equity Pledge | Information on Administrative Punishment | Information on Irregular Operations | Information on Material Violation of Law | Information on Spot Check |

Industrial and Commercial Public Disclosure Information

**Basic Information**

| | | | |
|---|---|---|---|
| Unified Social Credit Code | 91110105318092697N | Name | United Damei Investment Co., Ltd. |
| Type | Limited Liability Company (invested or controlled by natural person(s)) | Legal Representative | Xiaojun CHEN |
| Registered Capital | RMB50 million | Date of Establishment | October 31, 2014 |
| Domicile | Unit 2050, 20/F, 37 Maizidian Street, Chaoyang District, Beijing | | |
| Term of Operation Starting from | October 31, 2014 | Term of Operation Ending on | October 30, 2034 |
| Business Scope | Project investment; investment management; asset management; investment consulting; health consulting (excluding clinic activities which are subject to approval). (1. Without the approval from relevant authority, no funds can be raised publicly; 2. No trading of securities-type products or financial derivatives can be conducted publicly; 3. No loans can be extended; 4. No security can be provided to enterprises other than those it has made investment in; 5. No guarantee can be made to investors that their principal would not be lost or a minimum return would be received; enterprise shall select and conduct business activities at its own discretion in accordance with law; business activities for those subject to approval shall be conducted only after they are approved by relevant authority; no business activities shall be conducted for those falling within the prohibited and restricted categories in the industry policies of Beijing) | | |
| Registration Authority | Chaoyang Branch | Date of Approval | May 19, 2016 |
| Registration | Under operation (opened) enterprise | | |

Enterprise Public

| | | | | |
|---|---|---|---|---|
| Disclosure Information | Status | | | |
| | **Shareholder Information**<br>Information on capital contribution by shareholders as of February 28, 2014, for information thereafter, industrial and commercial authority will only disclose shareholders' names, and other capital contribution information shall be disclosed by enterprises on their own initiative. | | | |
| | **Type of Shareholder** | **Shareholder** | **Type of License/Certificate** | **License/Certificate No.** |
| Other Department Public Disclosure Information | Natural person shareholder | Xiaojun CHEN | | |
| | Natural person shareholder | Xiaojie YIN | | |
| | **Change of Registered Particulars** | | | |
| | **Change of Registered Particulars** | **Before the Change** | **After the Change** | **Date of Change** |
| | Legal Representative | Wenli YAO | Xiaojun CHEN | 2016-05-19 |
| | Investors | Particulars | | 2016-05-19 |
| | Director, manager, supervisor | Particulars | | 2016-05-19 |

Copyright Owned by: Beijing Municipal Administration of Industry and Commerce
Address: 36 Suzhou Street, Haidian District, Beijing 100080

Beijing Enterprise Credit Information Website

Current Location - Particulars of Change of Investors

| Before the Change | | |
|---|---|---|
| No. | Name | Type of Investors |
| 1 | Zhongsheng WANG | Natural person shareholder |
| 2 | Wenli YAO | Natural person shareholder |

| After the Change | | |
|---|---|---|
| No. | Name | Type of Investors |
| 1 | Xiaojun CHEN | Natural person shareholder |
| 2 | Xiaojie YIN | Natural person shareholder |

Beijing Enterprise Credit Information Website

Current Location - Particulars of Change of Major Personnel

| Before the Change (Note: The person marked with * is the legal representative) | | |
|---|---|---|
| No. | Name | Title |
| 1 | Wenli YAO* | Executive Director |
| 2 | Xin WANG | Manager |
| 3 | Zhongsheng WANG | Supervisor |

| After the Change (Note: The person marked with * is the legal representative) | | |
|---|---|---|
| No. | Name | Title |
| 1 | Xiaojun CHEN* | Executive Director |
| 2 | Xiaojun CHEN* | Manager |
| 3 | Yinan LI | Supervisor |

# Exhibit 17

---

**From:** Charles Liu
**To:** Levine, Harlan
**Sent:** 1/7/2016 9:55:41 PM
**Subject:** Re: Proton project

Thanks for your quick response, Harlan

Starting from Jan 18, 2016 after the board resolution, I will excise my majority rights on the entity, which Dr Thropay has 25 pct interest. This entity, Beverly Proton Center, LLC has entered a purchase agreement with Mevion. Starting from 1/18/2016, I will act as CEO/President and Dr Thropay and his sister, Ruth will no longer be the officers of this entity.

All the best,

CHARLES LIU
CEO & President
United MPH Ventures LLC
28202 Cabot Road Suite 640
Laguna Niguel, CA 92677
Tel: 949-365-0088
Cell: 626-688-4898

> On Jan 7, 2016, at 9:43 PM, Levine, Harlan <hlevine@coh.org> wrote:
>
> Charles,
>
> I hope you enjoyed the New Year break as well.
>
> I am thrilled to hear about your progress with the insurance company and look forward to meeting with Dr. Huan. Congratulations.
>
> I agree that it is good to get our word our first. Vince and I are having a call with Michael and Alice tomorrow to help us advance to the next step that would permit this. I would like to reach out to you by email after our call with Michael and Alice and communicate directly with you what may be needed on our end if we don't resolve everything tomorrow. I will be available all weekend so I am sure we will be able to connect.
>
> Our partnership is a high priority for us and we also want to get going. We are still working with Jill and Michael trying to define the structures and understand the how the funding and the entity that purchased the Mevion unit will transfer to the entity that will partner with City of Hope.
>
> Harlan
>
> -----Original Message-----
> From: Charles Liu [mailto:charlesliu@me.com]
> Sent: Thursday, January 07, 2016 7:29 PM
> To: Levine, Harlan
> Subject: Re: Proton project
>
> Harlan,
>
> I hope you had a great holiday break with your family!
>
> I am currently in China and will return towards the end of next week. We are about to enter into a MOU with a major insurance company in China to involve in my cancer/proton project in both LA and China.
>
> My partner, Dr Huan will fly to LA during the third or fourth week of January to meet you.
>
> I was told by my sources in China that Dr Thropay's group is working with UCLA and Japanese/Another American Proton vendor to structure a deal. I DO believe to launch the press

EXHIBIT
110

release will put us in an advantageous position.
>
> All the best,
>
> Charles
>
>> On Dec 20, 2015, at 8:38 AM, Levine, Harlan <hlevine@coh.org> wrote:
>>
>> Charles,
>>
>> It was a pleasure having dinner with you on Thursday. I am sorry the drive was so onerous...and the parking worse!
>>
>> Thank you for sending these documents. We remain keen to move forward quickly. In addition to the Beverly Proton project, I am also intrigued by the opportunity to partner in China. Your idea to put a center in Wuhan makes a lot of sense and we would like to explore an option to support this too. I believe our brand (once you make us a household name) would be very helpful. Also, we could connect the center in the Wuhan center to our team of doctors and even perform the physics in the U.S. Dr. Fong will call to follow up on the concept and will be calling.
>>
>> Look forward to our call on Monday at 8:30.
>>
>> Harlan
>>
>> -----Original Message-----
>> From: Charles Liu [mailto:charlesliu@me.com]
>> Sent: Friday, December 18, 2015 5:19 PM
>> To: Levine, Harlan
>> Cc: Alice Chen; Michael , [redacted]
>> Subject: Funding
>>
>> Harlan,
>>
>> Last night you mentioned the funding source. Here is the proof. We have enough to build one center and plan to raise more to develop in other cities in US and China.
>>
>> All the best,
>>
>> <mg_info.txt>
> <mg_info.txt>

# Exhibit 18

CONFIDENTIAL

Norman

Ron Young

D. Helenowski *

Talk *

WARM => By there

Quote *

✓ added to contacts on 1/7/16

MEVION medical systems

R. Bruce Rakes, MS, PE
Senior Principal Software Engineer

300 Foster Street
Littleton, MA 01460
rbrakes@mevion.com

+1.615.553.2189 (tel)
+1.678.595.9059 (cell)

rbrakes@mac.com

~~EXAM & WANTS : DIER~~

MICROB

$ 1,325

80

25,200
2,000

EMAIL

PLUG

Upgrade

Second write

Later Software

U

Jefferson Hungary

~~DOS~~ Access 75%

Latest generation merging them together any MAC Hardware speed improve *

Plug in

Time point

most = Writing

Plug in

Kopel *

Test *

$7,000 month

Contract

= 1099

OLD

2 wks

$ 225 *

wks

Cell

6 wks

30K

50K *

3 M

50,000

Need => Look up

Helenowski Bruck

Zmed

Ultra Beam *

Varian Med System *

25,000
25,000
25,000

Pull it $

* I'll *

Dennis latest Write

Exhibit 83

THROPAY0000214

EXHIBIT 18

$ 30,000

30,000

25,000 ->

$300

$ 50,000 ->

Auto $

1/3 = 10K*




* [illegible] Dr. Thropay

To Modern America
20 MIN WALKUNTS/YR

80% EQUIP

All $ =
300k = down =
UTC Company =

Gamma Knife 250 Patients
$43,000/Revenue

Cost/Scan =
1 YR $150,000
2 sft 1,00,000

1 mil = layers
1 centers

Scan
Volumetrically
Δ layers in
50 milliseconds

6 sec

4 Sites/6 physicians
9 yrs 1 time =
Ours for Next 10 yrs

* 6% Capability

Stereo
[Free + Clear]

* Construction: 10-12 months
3 months *
Facility Development *

Delivery @
23 MONTH =

Terms: LAST 2 Paymt
PAID OFF
Normal Finance *
Take delivery *
10FT in ground *

~~TBA~~:

~~1st, 2nd~~

1.8MILLION = Dedicated Engineer

=> Ara

~~TBA~~:

39% =

1) 9 - 12mo -
2) Options
3)
24 MO Timeline
2 + 3rd
Hardware
+ Maintenance
November =

MEVION medical systems

Mevion Medical Systems, Inc., 300 Foster Street, Littleton, MA 01460

**QUOTATION # COG10302015BEV**

**QUOTATION FOR:**
Beverly Proton Center, LLC
Attn: Ruth Lopex Novodor
200 East Beverly Blvd #200
Montebello, CA 90640

**INQUIRES, REPLIES AND QUESTIONS:**
Michael Cogswell
Senior Vice President of Sales
Mevion Medical Systems, Inc.
300 Foster Street
Littleton, MA 01460
C: 978-501-6106

| QUOTATION DATE | PAYMENT TERMS | SHIPPING ALLOCATION | VALID TILL |
|---|---|---|---|
| 10/30/2015 | Refer to Exhibit1 | Refer to Exhibit 1 | 12/30/2015 |

These Proposed Terms summarize the principal terms and conditions proposed by Mevion Medical Systems, Inc ("Mevion") with respect to a potential sale and installation of a System, defined below, to **Beverly Proton Center, LLC**. These Proposed Terms are intended solely as a basis for further discussions and are not intended to create and do not constitute a legally binding obligation. No legally binding obligations will be created, implied or inferred until the parties execute a final definitive agreement regarding the sale, installation, and delivery of a System. This quotation document is confidential and intended solely for the information and benefit of the immediate recipient.

Ended Date ? 9 months

| ITEM | QTY | ITEM DESCRIPTION | OFFER PRICE |
|---|---|---|---|
| 1 | 1 | **MEVION S250 Proton Therapy System™ ("System")**<br>1.1. Proton Accelerator Module<br>1.2. Accelerator gantry to precisely position proton accelerator module<br>1.3. Clinical beam-line on in-room high precision treatment gantry<br>1.4. Large field proton applicator with transfer cart<br>1.5. Small field proton applicator with transfer cart<br>1.6. Robotic Couch for high-precision patient positioning with six degrees of motion<br>1.7. Operator's console<br>1.8. Interface to Oncology Information System (Varian ARIA™ or Elekta MOSAIQ™):<br>1.8.1. Patient treatment data transfer and verification<br>1.8.2. Patient treatment data recording<br>1.9. Two (2) Hand pendant controls<br>1.10. Two (2) in-room displays<br>1.11. Verity Patient Positioning System™ with 2D & 3D radiographic imaging software<br>1.12. In-room patient alignment console<br>1.13. Two (2) sets of product manuals | $26,495,000.00 |
| 1 | 1 | **Beam Shaping – Non Obsolescence**<br>*See Description Below.* | Included |
| 1 | 4 | **Training - Clinical Machine Operations**<br>*Scope: Participants will be able to successfully perform image guided proton radiotherapy on the MEVION S250. They will also understand all safety features, daily quality tests, and basic troubleshooting associated with the device.*<br>*Length – 4 days*<br>*Location – Customer Site* | Included |

MEVION medical systems

| | | | |
|---|---|---|---|
| 1 | 2 | **Training - Physician Course**<br>*Scope: Participants will become familiar with the MEVION S250, its capabilities and operational requirements. They will see a range of treatment protocols used in active proton clinics. The participants will review specific processes for preparing, immobilizing, scanning, and designing site-specific treatment plans and delivery techniques.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |
| 1 | 3 | **Training Physics Course**<br>*Scope: Participants will be familiar with the physics of proton therapy as performed on the MEVION S250. They will understand the criteria and standard techniques for acceptance testing and commissioning the equipment. They will understand the safety features, system interlocks, and standard periodic quality tests associated with the equipment. Participants will become familiar with the major components of the MEVION S250 and their operational principals.*<br>*Length – 4 days*<br>*Location – Training Center* | Included |
| 1 | 4 | **Training - Ancillary Staff Course**<br>*Scope: A course designed for radiation oncology staff involved in the routine patient care – This includes Dosimetrist, Physicist, Mold Room Technician, Nursing, Simulation Technicians range of treatment protocols used in active proton clinics. The participant will review specific processes for preparing, immobilizing, scanning, and designing site specific treatment plans.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |
| 1 | 2 | **Training - Biomedical Technician Course**<br>*Scope: A course is designed for the hospital biomedical engineer and physicist who may need to provide basic support for the MEVION S250 proton therapy system.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |
| 1 | 1 | **Training 1 Field Service Engineer for first line of service** | $400,000.00 |
| | | **List Price** | **$26,895,000.00 (USD)** |
| | | **Reference Site Discount** | **$1,495,000 (USD)** |
| | | **Quotation Total** | **$25,400,000 (USD)** |

MEVION medical systems

EXHIBIT 1

PAYMENT TERMS
For each System ordered, milestone payments are set forth below:

| MILESTONE | MILESTONE PAYMENT |
|---|---|
| 1. Execution of Definitive System Purchase Agreement | $4,000,000 |
| 4. Upon shipment of the Gantry Embeds component for the System | $5,000,000 |
| 5. Upon Shipment of the Accelerator Module of the System | $6,000,000 |
| 6. Customer Acceptance of the System | $6,000,000 |
| 7. Clinical Acceptance of the System | $1,000,000 |

ADDITIONAL PURCHASE TERMS

- Each Milestone Payment is due upon achievement of the respective Milestone.
- All prices are quoted in U.S. Dollars.
- Funds may be emitted by check, wire transfer, or letter of credit. Wire transfer information supplied upon request.
- All site modifications and preparation are the customer's responsibility and are to be completed to the specifications provided by Mevion prior to the installation date.
- All payments, when made, shall not be refundable nor creditable for any reason whatsoever, including termination of the final definitive agreement by Customer.
- The Total Price for the System is in consideration of Mevion's building of the System, Mevion's grant of a license to the applicable software, on-site assembly of the System, and all documentation, training, warranties and services that Mevion provides.
- The Total Price for the System does not include the cost of (i) delivery of the System components from Mevion's facility in Littleton, Massachusetts to Customer's facility and the cost of insurance during transport; (ii) rigging required to move the System components from the delivery truck to the point of on-site construction; (iii) preparation of Customer's facility required to accommodate on-site Construction and assembly of the System, including provision of all utility services; (iv) any service agreements after the warranty period, (v) calibration or commissioning of the System, and (vi) any taxes or duties, now or hereafter applicable, levied on, absorbed or otherwise imposed on any of the transactions contemplated here under, including sales or value-added taxes, excise taxes (including medical device excise taxes) or other governmental charges otherwise imposed upon any amounts due hereunder. In each case of clauses (i) through (vi) above, the Customer shall be solely responsible for such costs.
- The final definitive agreement will contain other such terms and conditions usual and customary for an agreement of this type, including without limitation:
    - Confidentiality
    - Representations and Warranties
    - Termination and Termination Rights
    - Change of control provisions
    - Insurance requirements
    - Limitations on liability and disclaimers of damages
    - Indemnifications
    - Dispute resolution

TARGET INSTALLATION DATE SCHEDULE

- A Target Installation Date schedule will be provided upon execution of the final definitive agreement.
- A proposed project timeline suggests a possible [ Date] Installation commencement date provided the Customer's Facility is ready for installation by [Date].

NON-OBSOLESCENCE

Prior to final delivery of the System components, Mevion may update the specifications for the MEVION S250 System to include updated or upgraded parts, components or equipment. Mevion shall, to the extent reasonably possible and at no additional charge to Customer, include any such updated or upgraded parts, components or equipment with the System so that the System, as purchased by Customer and as delivered and installed by Mevion, is the then-current generation or model of the MEVION S250 System in all material respects. Notwithstanding the foregoing, starting 120 days prior to the completion of Milestone Event No. 4 (as described above) (the "Upgrade Threshold Date"), Mevion shall not be obligated to provide any updated or upgraded parts, components or equipment for the System. This "Non-Obsolescence" policy does not entitle Customer to receive any add-on products or additional Mevion products that are generally sold by Mevion as

MEVION medical systems

separately invoiced items from the System ("Optional Technology"). Mevion shall provide Customer with the opportunity to purchase generally available Optional Technology at Mevion's then-current standard rates.

**WARRANTY**

- The System will be warranted to be free from material defects in materials and workmanship and will perform in all material respects in accordance with the Specifications for a period of twelve (12) months commencing on clinical commissioning of the System.
- During the Warranty Period, Mevion Medical Systems guarantees the MEVION S250 Proton Therapy System will achieve a 95% or better uptime as per Mevion standard Uptime Warranty.
- All Warranties are void if the System is (i) damaged by or malfunctions by reason of unreasonable use, misuse, neglect, lack of routine care, or maintenance as described in any System Documentation, failure to use or take any proper precautions as indicated in the System Documentation, user modification of the System if not previously authorized by Mevion, improper service by Customer, repairs, installation or maintenance by personnel not authorized by Mevion, abuse or other causes not arising out of defects in materials or workmanship or (ii) used for the Restricted Uses or otherwise for uses other than the Intended Uses. The Warranties do not cover the System if used in violation of the System Documentation or if the System has or have been moved after construction and installation, or materially altered or modified.

**OPERATING SOFTWARE LICENSE:**

- Subject to the terms and conditions of the final definitive agreement, MEVION grants Customer a limited, non-transferable, non-sublicensable, non-assignable, non-exclusive license to use the Operating Software solely in its executable code version to operate the System, together with the Software Documentation, but only in accordance with the terms set forth in such agreement. Customer shall have no right to access any source code or design documentation relating to the Operating Software. Customer shall not (and shall not allow any other third party to) (i) decompile, disassemble, or otherwise reverse engineer the Operating Software, (ii) remove any product identification, copyright or other notices, (iii) allow others to use the Operating Software to or for the benefit of third parties, or (iv) incorporate into or with other software or create a derivative work of any part of the Operating Software.

Mevion and Customer each have caused this Quotation to be executed by its duly authorized representative.

| MEVION MEDICAL SYSTEMS, INC. | BEVERLY PROTON CENTER, LLC |
|---|---|
| By:__________ | By:__________ |
| Name:__________ | Name:__________ |
| Title:__________ | Title:__________ |

Our focus is upon complete turn-key solutions that will provide necessary levels of funding, structured in a way to be serviceable over financially workable periods which will allow centres to transform their existing operations to the latest Proton technology.

FGPTG would therefore like to establish strong long term ties with companies or organisations that specialise in the structuring and marketing of fixed income financial bonds, underwrite construction and financial projects or companies that can provide asset finance for capital equipment over 10-15 year periods on preferential terms.

We have an established an excellent working relationship with the most technologically advanced manufacturer of cancer treatment equipment, Mevion Medical Systems Inc. and have acquired a number of genuine enquiries from cancer treatment centres in the United States, France and Germany who are looking to develop new Proton cancer treatment centres.

## Vision and Objectives

FGPTG believe we can change the way cancer treatment centres look at their business and the developments of new treatment centres to help advance the the quality of treatment and the number of patients treated each year around the globe.

Our vision is to help develop a number of treatment centres over the next 3 year in the United States, Germany, France, Turkey, Switzerland and the UK. FGPTG believe this will clearly demonstrate the viability of new equipment expenditure to other existing operators who want and need to make the step across to Proton technology for the benefit of patient care, the treatment centres profitability and ultimately the fight against cancer, one of the most long suffering and life changing diseases we have known.

## FGPTG Resources

During the last 9 months FGPTG have also established working business with and have;

- primary contacts with other Proton system manufacturers
- examined the structure, size and viability of the market
- formed a team of market experienced equipment consultants
- access to medical centres who are already operating Proton technology
- senior medical consultant at our disposal to advise and oversee projects
- experienced commercial contractors with knowledge of previous treatment centre developments to carry out the build process of new centres
- access to medical project architects who have designed and developed existing treatment centres
- highly experienced project managers to ensure build phases are on schedule and quality controls adhere to safety and build regulations
- preliminary commitments from 4 treatment centres in the U.S. to adopt the joint venture FGPTG proposal
- established preliminary discussions and commitment with 4-5 European treatment centres that wish to build new Proton treatment centres

## Established Industry Relationships

Although FGPTG have already set wheels in motion developing relationships with the leading equipment manufacturers, contractors, architects and medical consultant within treatment centres, we have also have in-house experience of project management and formed our own team of legal and accounting professionals.

We are however still in need of creating a solid long term relationship with a suitable and known reputable financial provider that is prepared to work on multiple projects and assist FGPTG to deliver bespoke financial solutions to develop new Proton cancer treatment centre around the world.

FGPTG are in search of organisations that can understand and appreciate this market and work with us to create solutions and packages that are flexible and tailored to the individual project development. Each centre is quite individual and the project circumstances are different dependent on geographical location and the nature of their existing operation including the spread of patient treatments.

**Potential New Projects**

Since publicising our alternative finance options to a number of existing Photon x-ray treatment centres we have received a high level of interest from several centres in the United States and Europe.

Some of these are State or Government linked like university and college hospitals, others are private hospitals and medical centres that operate in conjunction with local government treatment quotas and reimbursements.

To date we have received enquiries for Germany, France, Netherlands, Turkey, Switzerland and the United States and although each of the operators would like to work with FGPTG we feel we must concentrate on the most viable developments first.

We have therefore conducted a cost exercise on the European centres and conclude that our attention must focus on the United States as a priority for several financial reasons. These are based on equipment and development costs and operational viability as detailed below.

Priority to the American based operations for the following reasons.

- Development costs, delivery and shipping of equipment and import duties in Europe as these would add a large additional expense to the initial projects.
- The United States has the highest level of health care insurance per capita in the world and the majority of cancer patient treatments are paid for by health care insurance companies.
- Treatment reimbursement rates are calculated differently in the United States so treatments are paid for in fractional treatments also Proton therapy reimbursements are a higher rate than the older Photon x-ray reimbursement levels.
- Reimbursements are up to 3 times that of European centre counterparts, so a financial structure would need to have a longer term and consequently greater financial exposure and a much higher rate of interest over an extended period.

**Project Capital**

The FGPTG scheme is designed to provide alternative development finance without initial funding from the operator/centre. The aim is to raise total development funds through the use of the financial bond leaving existing cash flows intact and retaining all the centres lines of credit.

**Turn-Key Developments**

The aim is to provide a complete Turn-Key solution that requires the operator as little time involvement as possible in respect of the development. Although the operator will have the final say on design and medical requirement for the build of the centre, FGPTG undertake to

co-ordinate the various aspects of the project. FGPTG take responsibility for the fund raising and all the contractual aspects of the development including planning, architecture and construction once the plans have been approved by the operator with FGPTG.

This allows the operator to concentrate on maintaining revenues from their existing business and their primary activities of treating patients until the new centre is complete and ready for new patients to receive Proton therapy treatments.

**Project Management**

Under the development contract FGPTG will provide an industry experienced commercial project manager and surveyor to ensure the co-ordination of each phase of construction. This will include the timing of each phase for delivery of materials and arrival of equipment on site to keep completion schedules on target and the project construction runs as smoothly as possible.

**Development Time Scale**

Presently this is being quoted as a 2 year period by the manufacturer and construction companies as there are a number of aspects that require local permits and architectural approval before any works can be commenced.

The current time scale is broken down into;

- 2-3 months assignment of suitable land site, soil tests and results for the proposed site.
- 3-4 months for planning applications and building permits to be approved and granted.
- 3-5 months for architectural plans and designs for bunker and ancillary buildings.
- 9 months for the manufacture, shipping and installation of the Proton equipment.
- 3-6 moths for the main installation, commissioning and testing of Proton equipment
- 18 months for construction of the equipment treatment bunker and ancillary areas of the treatment centre.
- Due the nature of radiotherapy the construction of the treatment bunker cannot be rushed as this must meet stringent requirements. In the same way the Proton equipment requires ample time for testing to ensure precise alignment of the beam before being put into service.
- The manufacture of the Proton equipment is 4 phases;
- Phase I: relates to the side support cradles that pivot the gantry arms and counterweights.
- Phase II: relates to the synchrocyclotron the part of the equipment which creates Protons.
- Phase III: relates to the gantry the equipment which.
- Phase IV: main installation, testing and commissioning of the Proton equipment.

**Funding Method**

The project development is to be funded through the use of a capital or income bond with a 2 year roll up of interest deferred until maturity of the 7 year bond, when the capital element and the deferred interest from years 1 and 2 are paid to investors.

**Project Costs**

Each project is estimated at an average development cost of $32m USD with a total repayment in the region of $51m over 7 years; however this may vary dependent on the

individual location and centre requirement. FGPTG believe this is an amount that can easily be raised through the private sector or may be of interest and attractive to a corporate lender if funding a number of treatment centres.

**Funding Structure**

The Financial package proposed cannot be serviced from treatment centre incomes until the end of the first quarter of year 3 when the centre is fully operational. FGPTG have therefore not forecasted for any interest or coupon payments during construction and interest from years 1 and 2 will be rolled-up and deferred until the end of the bond term.

FGPTG have examined the bond market and current rates of return based on financial exposure and feel a bond structured over a 7 year period offering 4.5% pa and a total of 31.5 over the full term should be attractive and competitive.

The bond will make annual or bi-annual coupon payments from year 3, and subsequent payments in years 4-5-6. As detailed years 1,2 will be deferred during the construction phases and paid when the bond reaches full term at the beginning of year 8, together with the repayment of the capital sum.

**Repayment Schedules**

The operator/centre will make quarterly payments to FGPTG from patient treatment reimbursements from the end of the first quarter in the first year of the centre being fully operational. The operator/centre is contracted to make-up any shortfall of these treatment reimbursement revenues from their existing medical operation to ensure payments are made as scheduled within the FGPTG contract.

These quarterly payments service the interest and capital sum and reduce financial exposure levels from the outset and allow FGPTG to reduce the underwriting of the bond substantially over the first 2-3 years.

FGPTG have made conservative calculations when creating all financial projections to ensure the serviceability of the bond over the full 7 year term.

**Underwritten Exposure**

In addition the bond will be fully underwritten by a recognised insurance provider for the full term to ensure invested funds are protected from the time of the bond being fully subscripted and throughout the term. This shall be structured on a sliding scale, to take into consideration construction phases where exposure is highest.

Once the treatment centre is operational this cover will be reduced accordingly on a prorate basis but FGPTG and the bond provider shall retain a first charge over the title of the treatment centre until the bond has matured or at the end of the joint ownership period, when all charges shall be released.

**Funding Conditions**

The operator/centre must be able to provide undertakings and guarantees to make the quarterly payments to FGPTG from patient treatment income and agree to a the new treatment centre being joint ownership project venture as FGPTG will only take consultancy fees during the first 2 years during construction.

FGPTG have formulated a structure that will provide centres with completely new treatment facilities without any initial outlay for equipment or the construction of the bunker or ancillary

areas. This is provided the centre can meet minimum patient treatment quotas, assign a suitable land site and is prepared to operate on a shared ownership basis for a set period once fully operational.

**Funding Criteria**

The FGPTG funding criteria is based on the centres current annual treatment quotas and 3 years of medical trading history combined with treatment reimbursements for the patient treatments. The centre has to be able to demonstrate a minimum treatment and revenue income for the previous 3 years and commit to minimum levels for the new Proton centre.

The operator/centre must also be able to assign a suitable unencumbered landsite to FGPTG for the development of the project and provide the bond provider with security against funds raised. This assignment can be in the form of a first charge on the landsite which shall remain in place for a minimum period of 10 years.

The operator must also undertake to ensure all relevant medical; building and business insurances are in place and of adequate cover.

**Treatment Centres Overview**

Internationally there are a large number of private medical organisations and institutions currently operating cancer treatment centres using aging Photon beam systems that would ideally like to upgrade their facility to a modern Proton system. The reason most cannot commit to this logically commercial update is the cost of the new equipment with the latest Proton equipment averaging 4-5 times more expensive than its Photon counterpart.

Although this development may improve overall patient care, results and aid success in the global fight against cancer, it would also significantly increase revenues. However the outlay for new technology remains outside the realms of possibility for most treatment centres unless more flexible and attractive forms of funding can be provided.

Within all industry there is a heavy price tag when replacing, upgrading or expanding an existing operation, this is more prevalent when the industry is dependent on technology. Combine this with a human factor like cancer treatment and one would imagine the business or Industry would have an obligation to ensure their equipment is the best available.

This sadly is not the case; as many radiography facilities are part of hospitals or medical institutions who work on tight budgets and patient numbers, so any additional financial outlay that does not directly increase the number of patients that can be treated will not be considered.

**Budgeting Polices**

These budgeting decisions are regardless of whether the expenditure or new technology may have significant benefits to patients being treated or an increase in levels of treatment success. Thus the majority of existing cancer treatment facilities will continue to operate equipment that literally performs the treatment function but is far from the latest or best treatment available.

To appreciate the need for this type of funding, one needs to understand the nature of the medical world and how the treatment centres operate which we hope to convey in the following section.

The medical market, like many is quite fickle and from the periphery appears in simple need of a logical financial solution, this however is far from the case. Medical centres are plagued with internal politics and red tape that often prevent centres to progress without the approval of numerous social and medical ethics and budgeting committees before they can even consider a new treatment equipment proposal of Proton beam magnitude.

Most medical facilities operate on an institutional style of financial budgets that are controlled by the local financial administrators of the hospital or facility. Budgeting within the medical fraternity is generally set at local levels through the local administrators which are capped to a ceiling that would not allow them to sign off any purchase of equipment over a certain value.

In broad terms; administrators can commit to the replacement of items like CT scanners or equipment up to $5-6m, however once the cost exceeds these levels they need board or regional authorisation which is inherently difficult as this often requires State or local Government approval. The time factor alone makes this an inordinate route and therefore very few even suggest the idea of new Proton therapy equipment.

With the average cost of build and equipment in excess of $30-40m most consider the financial outlay excessive against existing Photon treatment equipment costs of ($8-12m) especially as this additional investment would not increase the number of patients treated.

**Current Enquiries**

All FGPTG enquiries come from existing treatment centres that currently use a Photon X-Ray form of radiotherapy which is somewhat indiscriminate with regard to targeting specific patient treatment areas and therefore creates greater exposure to radiation than Proton beam therapy.

For this reason centres will switch to Proton treatment, but as with any technology linked business the latest equipment is prohibitively expensive and the medical world is no exception with Proton beam systems averaging $20-25m for the Proton beam equipment alone.

This figure excludes any construction costs of a treatment chamber or ancillary areas like reception, changing facilities and recovery rooms which bring the total outlay in excess of $32m per centre.

However; treatment centres realise that with greater public awareness regarding cancer treatment and an increase in number of people being diagnosed with cancer, demand for better cancer patient treatment is likely to dictate a concentrated move to Proton technology.

Treatment reimbursements are also 50-75% higher for Proton treatments so there is an added financial attraction to convert if finance were available to convert from their existing Photon system to the new Proton technology.

**Treatment Statistics**

The following sections outline current treatments, the changes in radiotherapy technology and viable options to provide the most advanced equipment to these vital medical treatment centres.

There are very few people who haven't been affected by cancer in one way or another, whether this is firsthand as a diagnosed cancer sufferer or through a third party association as

the partner, family member, friend or work colleague, most of us know someone that has either been diagnosed or suffered the life changing effects of this undiscriminating disease.

For many the only option to complement cancer drugs is radiotherapy, a form of radiation treatment that kills the cancerous cells in an attempt to cure or at least prevent the spread of the disease to other cells or areas of the body.

**Cancer Treatment Options**

Aside from prescribed drug programmes and surgery, radiotherapy is the most common form of treatment that is viewed as the most effective alternative to surgery in the fight against the spread of cancerous cells and the most widely used since the times of Marie Curie.

In many cases this therapy is the only treatment a patient has in an attempt to cure or stem the spread of the disease to uninfected cells and with a staggering projected 1.6m new cases cancer being diagnosed each year it is no surprise treatment centres need to upgrade to the latest technology.

Estimates are that two thirds of those diagnosed patients will receive some form of radiation, creating a strong focus on how to increase an accurate dose of radiation during therapy whilst reducing the exposure and side effects.

**Treatment Costs**

A recent paper by University College of London Hospital stated that the UK Government has pledged an increase to treatment budgets and that in 2014-15 the NHS will spend £30m sending patients overseas for Proton treatment. The UK currently has only one low energy Proton treatment centre that is designed to treat rare forms of eye cancer. Consequently any other type of cancer that requires the accuracy of Proton treatment current must be sent abroad.

**Ashya King Case**

This is highlighted and highly publicised by the recent case of the UK based 5 year old boy, Ashya King who's parents took Ashya abroad because there is not a Proton beam treatment centre in the UK. Although there is no clinical test evidence that a Proton beam is more effective or kinder to the patient's body, there is a growing trend by Consultants and specialists to refer patients for Proton treatment over Photon X-Ray treatment specifically when dealing with paediatric, brain and spinal cancer cases.

This strongly suggests that Protons are less harmful than Photons and it is medically documented that children are more sucecptible to radiation and why Proton therapy is usually the recommended course for paediatric cancer patients.

This referral trend by cancer specialists strongly suggests there are clearly cases that are better treated with Proton technology. The lack of clinical evidence is mainly due to the small amount of Proton technology being used by mainstream centres and the lack of long-term data to make a clinical study and direct comparison between the two forms of treatment. But on balance there appear to be a number of advantages in the use of Protons to deliver

radiation treatment over Photons, even though Proton technology is yet to produce enough hard evidence to make a measurable assessment.

However; treatment centres realise that with greater public awareness regarding cancer treatment and an increase in number of people being diagnosed with cancer, demand for better cancer patient treatment is likely to dictate a concentrated move to Proton technology

**Proton verses X-Ray Therapy**

To appreciate why so many centres need to make the transition to Proton technology one needs to understand the fundamental difference between these treatment systems and why more patients will demand Proton treatment over photon treatment in the future. In the most basic form X-Rays or Photons share similarities to sunlight but are of a much higher energy so they penetrate the surface of the skin allowing a beam to pass through tissue and bone, which allows physicians to see internal organs or any damage unseen by the naked eye, a medical discovery made in 1895 by a German physicist, W. C. Roentgen.

Soon after this Léopold Freund and Eduard Schiff, suggested X-Rays could be used in the treatment of disease and at approximately the same time, Emil Grubbe, of Chicago started using X-Rays to treat cancer, and possibly the first American physician to use this treatment on a commercial basis.

The Photon X-Ray system is therefore an age old treatment and today's version of this treatment is only a refined progression in this radiation treatment that has been in common use since the discovery of the aforementioned alternative effects of X-Rays made in Europe and the United States in 1895-1896.

Internationally the majority of treatment centres continue to use the X-Ray Photon systems as they cannot afford to make the transition to Photon technology, even though statistics show that physicians and medical specialists are recommending patients to be treated with Proton technology in more delicate areas of patient anatomy or complicated nerve critical patient cases.

**Clinical Results**

Although clinical evidence is still to support Protons are less harmful or are more effective and offer better patient treatment results. The general consensus would have to be that if the Proton beam reduces exposure by more than 50% during treatment it must be better for patients regardless of whether it is more effective as a treatment.

**Radiotherapy**

Radiotherapy as the title suggests is exposure to radiation, which can be highly dangerous and extremely damaging to the human body if exposed to a high or prolonged dosage and why the majority of patients treated using radiotherapy will suffer with a number of common side effects during and after treatment.

Although this form of treatment has been refined over the last 120 years the makeup of a Photon is very different to a Proton and therefore the treatment systems are fundamentally

different. A Proton has a different make up to a Photon as it not just a beam of light that carries an electromagnetic force, a Proton is positively charged atomic element with different characteristics that allows it to be controlled in a completely different way.

In lay terms; a Proton beam is more controllable and concentrated on the specific target area to be treated with far less lateral side scatter which has two benefits, the first is it allows for higher energy dosage to be administered in a single treatment, thus reducing the number of sessions required, the second is this means less exposure to radiation in general.

Although both system beams have to travel through healthy cells and tissue on their way to an infected target area, the Proton beam can be stopped at this point, unlike a Photon beam that continues to travel through the body and kills more healthy cells and tissue whilst exiting the patient's body. This alone suggests a 50% reduction in exposure to radiation which is often attributed to the cause of many regular side effects as a result of receiving radiotherapy.

**Treatment Side Effects**

The most common and early side effects are nausea and diarrhoea when treating areas around the abdomen, incontinence and erectile dysfunction are quite common side effects when treating prostate cancer.

There are also a number of less common late side effects of radiotherapy, which can include lymphedema of the arm, weakening of bone, fibrosis of the lung, atherosclerosis of the heart all of which are the result and as a direct link to being exposed to radiation when receiving radiotherapy treatment. With this in mind any treatment that can reduce unnecessary exposure to radiation has to be a positive move for the patients being treated.

**Specific Medical Applications**

This is particularly relevant when treatment is being administered in areas of the body where other vital nerve sensitive organs are at risk of being affected by radiation or where crucial nerve centres are close to the treatment area. Typically brain and spinal tumours cases will be referred to a Proton treatment centre to reduce risk or damage to critical parts of the patient's body.

As demonstrated by Proton referral trends, it is usually recommended that paediatric cases are treated with Proton therapy rather than Photon treatment as infants are more susceptible to radiation than adults and the long term effects are more damaging to paediatric cancer suffers.

The illustration below demonstrates the two forms of treatment and levels of exposure on the brain during treatment therapy and on a neck and throat treatment that clearly shows the additional exposure of Photon X-Ray therapy over the more controlled and precise Proton treatment.



Irradiation of nasopharyngeal carcinoma by photon (X-ray) therapy (left) and proton therapy (right) Image courtesy of Wikipedia.

FGPTG believe that given the choice all cancer treatment centres would operate the new generation of Proton treatment over the existing systems, a belief that we also feel will be shared by more members of the public as they become aware of the difference in levels of exposure to radiation during treatment between the two systems.

This alone will force the majority of cancer treatment centres to switch from the existing Photon X-Ray beam equipment to a Proton beam system as patients will want what is commonly perceived to be the best treatment available.

**Proton Centre Ratio**

Although Proton therapy is views as a relatively new form of cancer treatment the use of Protons commenced in the 1950's as a clinical treatment in the U.S. but the sheer cost of the equipment and size of the main components heavily restricted the development of Proton centres globally.

Data sources from April 2015 indicate there are 51 particle therapy facilities around the world, a figure that includes Proton beam facilities, and represents a total of 141 treatment rooms available to patients on a regular basis. Of these;

- 43 are proton therapy facilities;
- 4 are carbon therapy facilities;
- 4 are facilities conducting both proton and carbon therapy.

A further breakdown of this data illustrates that of the 43 Proton centres; only 15 are located in the United States, 12 are in Japan, with the remainder scattered thinly throughout Europe, China and Russia as detailed below.

| Particle Therapy Facilities Internationally Utilising Proton or Proton and Carbon or Carbon Technology. | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Country and type of technology | | | | Country and type of technology | | | | Country and type of technology | | | |
| | P | PC | C | | P | PC | C | | P | PC | C |
| United States | 9 | | | Russia | 3 | | | South Africa | 1 | | |
| Japan | 8 | 1 | 2 | France | 2 | | | South Korea | 1 | | |
| Germany | 4 | 1 | | Canada | 1 | | | Sweden | 1 | | |
| China | 1 | 1 | 1 | Czech Rep | 1 | | | Switzerland | 1 | | |
| Italy | 2 | 1 | | Poland | 1 | | | UK | 1 | | |

Please note: This table does not take into account any current centres under construction.
The only current UK Centre is a low energy Proton beam system for treatment of rare eye cancer.

The bar chart below illustrates this more clearly and highlights the real lack of Proton centres on an international scale and demonstrates how disproportionate the ratio of Photon to Proton in one of the leading cancer treatment countries, the United States, where there are over thousands of cancer treatment centres, yet only 9 Proton facilities.




Current statistics show that the United States has in excess of 2200 operational cancer treatment centres, with less than 0.5% of these centres operating a Proton beam system. This figure is on a very slow increase with a very small number of new Proton treatment centres being under construction and due to come on line in 2016-17. But it is thought that even taking account of these new Proton centres, the percentage will remain below 1% of the total cancer treatment centres in the U.S.

The chart below illustrates the slow uptake to Proton treatment over the years in the United States, a pace that will undoubtedly change in the near future with the development of new technology and compact design that make Proton beam equipment much more affordable to treatment centres.

These developments have affected both technical medical, and technical engineering aspects of Proton systems, as the new "state of the art" equipment is not only more accurate in the delivery of the beam, but it is a tenth of the size and requires 10% of the energy to power. This makes the new equipment better for the patient undergoing therapy whilst more practical for the centre financially on an initial cost factor and ongoing maintenance. The energy savings are also a plus making the new equipment far more environmentally friendly.

From 2001 to end of 2014, the world saw on average three particle therapy centres starting to treat patients each year, with an acceleration starting in 2010 and two record years in 2013 and 2014, to reach 51 operational particle therapy sites end of 2014. In addition to this one particle therapy site has opened in Florida at the end of April 2015. FGPTG believe this trend will further accelerate as public awareness increases regarding the two forms of treatment and the reduction in exposure to radiation is more widely known.

Projected statistics suggest that with the average population age increasing each year, by 2030 there will be a demand for over 1200 Proton treatment rooms, if the rate of diagnosis continues escalate at the current levels. This will require an increase of over 1000 treatment rooms in the next 14 years if centres are to meet patient quotas.




**Proton Manufacturers**

There are three main companies that manufacture Proton equipment, the technological leader is without doubt Mevion. This is due to the advanced compact structure of the Proton accelerator which is integrated into the gantry beam arm that delivers the Proton during treatments. This considerably reduces the size, weight and the number of components within the system consequently reducing maintenance.

The Mevion Proton accelerator is attached to the arm, housed directly above the treatment room which reduces the required area considerably. All other manufacturers have a large separate chamber to house the Cyclotron that creates the Protons this requires a vast increase in space together with an exchange system to transport the beam from the Cyclotron chamber to the gantry arm.

Because of its dose-targeting advantages, proton therapy has long been recognized as a superior cancer treatment modality. Dr. Robert Wilson first proposed the use of protons for cancer treatment in 1946 and shortly after, the first clinical treatments were performed at the Berkeley Radiation Laboratory in the mid 1950s and then at the Harvard Cyclotron Laboratory in the early 1960s.

However, the cost, size, and complexity of the proton therapy systems have greatly limited their widespread clinical use. Mevion Medical Systems eliminates these obstacles with the introduction of the MEVION S250™, which is a revolutionary proton therapy system that combines a patented gantry-mounted proton source with a highly integrated, image-based workflow, making proton therapy a practical clinical reality.

The advantages of the Mevion equipment go beyond the medical aspects of the machine's ability to offer greater accuracy and lower exposure to radiation. The operational costs are

substantially less than their counterparts and the clinical treatment availability in terms of treatment hours is a significant 33% higher than the competition, as the Mevion unit can operate for more than 23 hours in any 24 hour day cycle.

The following links are to the main manufactures and suppliers of Proton technology who explain in detail the technical and physical difference between the conventional Photon treatment equipment and Proton therapy on their respective websites.

www.mevion.com www.varian.com www.iba-protontherapy.com
www.hitachi.com www.shi.co.jp www.pronovasolutions.com

**Mevion Single Gantry System Verses Competitors**



***Note: Dimensions in illustration are ascending in order of cubic square metres***

| Company | Dimensions | % Increase on Mevion | Overall Cost/Deposit | Annual Energy Cost | Clinical Availability |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| ProNova | 20 × 22 × 9m | 142% | $25m / $12m | $700,000 | 16 hours |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Hitachi | 29 × 27 × 10m | 369% | $25m / $25m | $500,000 | 16 hours |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

*The above information is sourced and available via the respective companies' websites, printed materials, publicly available material and peer-reviewed articles. The above product and company names are trademark names owned by the respective trademark owner or Company.*

**Financial Projections**

The following financials are produced based upon the average costing of a single gantry stand alone patient treatment chamber for a new cancer treatment centre based in Texas.

| | |
|---|---|
| Proton Equipment (Mevion S250) | - $21,500,000 |
| Bunker Construction | - $ 4,000,000 * |
| Ancillary Dwelling | - $ 1,000,000 * |
| Architecture Cost | - $ 1,000,000 * |
| Quality Assurance Equipment and Licenses | - $ 1,500,000 |
| Medical Equipment excise tax | - $ 500,000 |
| Transport, rigging and delivery | - $ 1,000,000 |
| Consultancy and Project Management for 2 year build phase | - $ 1,200,000 |
| Import duty/state charge/sales tax (8.25% of Machine for Texas) | -$ 1,773,750 |
| **Total Cost** | **- $33,473,750** |
| Marketing, legal's and underwriting (18% of total cost) | - $ 6,025,275 |
| **Total Fund Raise** | **- $39,499,025** |

*(Figures represent the maximum cost price; this figure may be reduced below the forecasted amount)

**Repayment Structure**

The Repayment of the funds has been structured via a 7 year Bond. The Bond will incorporate a 2 year deferred payment roll-up to be paid at the end of the term together with the repayment of the capital sum raised.

Please see example below; Bond rate is set at 4.5% pa:

Total funds raised on Bond $39,499,025 @ 4.5% = $1,777,456 pa.

| | |
|---|---|
| Year One | - Deferred |
| Year Two | - Deferred |
| Year Three | - $1,777,456 (Paid Annually or Bi-Annually) |
| Year Four | - $1,777,456 (Paid Annually or Bi-Annually) |
| Year Five | - $1,777,456 (Paid Annually or Bi-Annually) |
| Year Six | - $1,777,456 (Paid Annually or Bi-Annually) |
| Year Seven | - $1,777,456 (Paid Annually or Bi-Annually) |
| End of term | - $3,554,912 Plus Capital Sum $39,499,025 |
| **Total Repayment** | **$51,941,217** |

**Project Feasibility**

How FGPT Group propose to service the Bond and limit financial exposure.

The following table demonstrates the ability to service our financial Bond obligations.

The reimbursement rate across the United States varies dramatically dependent upon location and actual type of treatment administered. However the minimum level of reimbursement set

throughout America at $45,000 per full treatment (a full treatment is based upon an average of 22 fractions).
Each development project is contracted to a minimum amount of patient treatments per year and will be held liable for any shortfall. The table below illustrates a minimum commitment of 350 patients per year. These minimum patient treatments service the debt adequately and as indicated also generate a substantial level of profit for the centre operator.

All maintenance and electricity costs are deducted from the Net annual income and the centre qualifies to receive the first year of equipment maintenance free as part of the manufacturer's warranty.

Annual payments paid to FGPT Group made by the centre service the debt quarterly. These funds will be held securely on account through FGPT Group to satisfy the final debt balance at end of the 7 year term at the time of Bond maturity.

| Bond Years | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|
| Treatment Years | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Min Reimbursement Rate | $ 45,000 | $ 45,000 | $ 45,000 | $ 45,000 | $ 45,000 |
| Patient Treatments | 350 | 350 | 350 | 350 | 350 |
| Annual Net Income | $15,750,000 | $15,750,000 | $15,750,000 | $ 15,750,000 | $15,750,000 |
| Annual FGPTG Payment | $10,388,244 | $10,388,244 | $10,388,244 | $ 10,388,244 | $10,388,244 |
| Maintenance & Electric | $ 120,000 | $ 2,120,000 | $ 2,120,000 | $ 2,120,000 | $ 2,120,000 |
| Annual Profit | $ 5,241,756 | $ 3,241,756 | $ 3,241,756 | $ 3,241,756 | $ 3,241,756 |

The above illustration is based on a single treatment chamber and gantry to minimise capital outlay whilst optimising patient treatment quotas as historically multiple chamber treatment centres fail to utilise multiple facilities to optimum capacity.

In financial terms means economies of scale do not come into play and multiple chamber facilities result in inflated staffing overhead and operational costs, yet a reduction in actual patient treatments. This is created by multiple chamber facilities dedicating chambers to specific treatment indications, consequently this is often results in treatment rooms lying empty or being occupied by patients waiting for treatment, simply because the chamber is not required immediately by the next patient requiring that specify type of treatment.

In comparison single and double treatment facilities operate on a much tighter treatment schedule, optimising the treatment chamber to ensure patients are only within the treatment chamber when therapy is being administered. This policy combined with properly planned treatment indication schedules produces a higher throughput of patients and therefore much greater reimbursement income revenues.

This observation has caused FGPTG to concentrate on single gantry chamber for new centre development projects at this time as although large multiple centre appear to make good commercial sense and suggest a greater volume of patients and more income, these centres often produce lower revenue incomes and greatly reduced profit due to staffing levels and much higher equipment maintenance costs.

FGPT
GROUP

INSPIRING FUTURE MEDICAL INNOVATION

# 2015

# Medical Development Programme



FGPT Group

Cancer Centre Development Programme

October 2015

FGPT GROUP

INSPIRING FUTURE MEDICAL INNOVATION

**FGPT GROUP**

- The FGPT Group - Why FGPTG was formed
- Vision and Objectives - How we envisage the future
- FGPTG Resources - Contacts and skill sets
- Established Relationships - Medical, technical, construction
- Potential New Projects - USA (4-5) - France (4) - Germany (1) - Italy (1) - Turkey (1-2)

**PROJECT BENEFITS**

- Project Capital - Maintain cash flow, Retain lines of credit, No capital outlay
- Turn-Key Developments - Complete package, Equipped ready to operate
- Project Management - Architectural Planning, Construction, Installation, Testing
- Development Timescale - Breakdown of each phase of build and construction

**FINACIALS**

- Funding Method - Independent investment through Financial Bond
- Project Costs - Development costs are dependent on location
- Funding Structure - 7 Year Income Bond with 2 year Roll-up interest deferment
- Repayment Schedules - Annual/Bi-Annual coupon payments
- Underwritten Exposure - Project independently underwritten by insurance company
- Funding Conditions - Quarterly Payments, Treatment Statistics, Joint Ownership
- Funding Criteria - Suitable Land Site, Reimbursement Levels, Patient Quotas
- Financial Projections - Reimbursement income and Bond servicing Spreadsheet
- Payment Structure - Quarterly serviceability of Bond exposure
- Project Feasibility - Overview of 10 year revenue and profit

**MEDICAL ETHICS**

- Treatment Centres Overview - Existing cancer treatment centres
- Budgeting Policies - Local administrators capped budgets
- Current Enquiries - Existing Photon treatment centres
- Treatment Statistics - UK & Global statistics on cancer as a disease
- Cancer Treatment Options - Cancer treatment discoveries progression of treatment
- Treatment Costs - Government cancer treatment budgets 2014-15
- Ashya King Case - Overseas Proton treatment centres

**TECHNOLOGY**

- Proton verses x-ray Therapy - How Proton radiotherapy works
- Clinical Results - Treatment tests and opinions
- Radiotherapy - How radiotherapy is used to treat cancer
- Treatment Side Effects - Typical side effects from radiotherapy
- Proton Centre Ratio - Ratio of Proton centre against x-ray Photon centres
- Proton Manufacturers - State of the art technology
- Mevion Vs. Competitors - Mevion today's cancer treatment equipment

**INDEX**


Introduction ... Page 4
About FGPT Group ... Page 5
Vision and Objectives ... Page 6
FGPTG Resources ... Page 6
Established Industry Relationships ... Page 6
Potential New Projects ... Page 7
Project Capital ... Page 7
Turn-Key Developments ... Page 7
Project Management ... Page 8
Development Time Scale ... Page 8
Funding Method ... Page 8
Project Costs ... Page 8
Funding Structure ... Page 9
Repayment Schedules ... Page 9
Underwritten Exposure ... Page 9
Funding Conditions ... Page 9
Funding Criteria ... Page 10
Treatment Centres Overview ... Page 10
Budgeting Policies ... Page 10
Current Enquiries ... Page 11
Treatment Statistics ... Page 11
Cancer Treatment Options ... Page 12
Treatment Costs ... Page 12
Ashya King Case ... Page 12
Proton verses X-Ray Therapy ... Page 13
Clinical Results ... Page 13
Radiotherapy ... Page 13
Treatment Side Effects ... Page 14
Specific Medical Applications ... Page 14
Proton Centre Ratio ... Page 15
Proton Manufacturers ... Page 17
Mevion Verses Competitors ... Page 18
Financial Projections ... Page 19
Payment Structure ... Page 19
Project Feasibility ... Page 19
Closing Summary ... Page 21

FGPT GROUP

INSPIRING FUTURE MEDICAL INNOVATION

**Introduction**

The following information has been compiled to highlight a niche medical market that requires an alternative method of funding for cancer treatment centres in the USA and Europe without the need for the institution or medical centre to raise initial capital or funds from existing budgets.

We are therefore seeking lenders and financial organisations that will consider structuring a financial bond to support these projects and promote such a scheme to allow treatment centres to commit to the development and construction of new facilities without affecting their current operation, cash flow or lines of credit.

The FGPT Group aim is to provide a simple turn-key solution from start to finish without distraction or disruption to the hospital treatment centre from their existing function of treating patients. Our objective is to project manage and develop new treatment centres ready to treat patients from the first day of handover.

Due to a series of advances in cancer treatment technology a large number of treatment centres are finding the need for modernisation to bring their treatment centres up to date with technological developments. There are two main changes within the medical both of which signify dramatic change in radiography and patient treatments.

The first is the use of Proton technology rather than Photon x-ray treatment, the second is the size of the equipment that produces Protons. Until a few years ago the change from Photon equipment to Proton equipment would have cost $150m USD a prohibitive price by any standard. Today the price of new Proton technology is $22m approximately 15% of the original figure making it within reach of any successful treatment centre.

The second real development the advance in technology which has reduced the size and weight of the equipment used to generate Protons; historically a centre would require an area the size of a football pitch to accommodate this integral part of the systems equipment.

Today the leading manufacturer has developed a complete Proton system that is not only more accurate in the delivery of the treatment, but it will fit in an area 15% of the previous systems creating opportunities to develop new treatment centres as new standalone facilities adjacent to their existing infrastructure.

The advantage of this is the ability to use existing technical medical staff and other medical facilities of the main hospital or medical centre whilst offering the latest treatment technology to patients.

These developments give rise to an up surge in demand for Proton cancer treatment centres and need for alternative financial solutions to allow existing operators to help develop the next generation of cancer treatments.

With recent statistics indicating that more people are surviving cancer than those dying from cancer and UK Cancer Research announcement in June this year that the UK statistics show an increase from 1-3 to a frightening 1-2 of the UK population will be diagnosed with cancer in their lifetime more new Proton therapy centres are without doubt needed.

FGPTG prepared this document to provide an overview of current treatments, the changes in radiotherapy technology and viable options to provide the most advanced equipment to vital medical treatment centres.

**The FGPT Group**

The FPTG Group is an independent business solutions specialist and development company within the medical sector that is looking to work in conjunction with intuitive financial organisations that can provide the following services, facilities or funds to develop new cancer treatment centres in the United States and selected countries in Europe.

The FGPT Group is headed up by 3 Directors, 2 with long-term medical equipment industry experience who have well established contacts with the medical institutions and large development contractors who can provide the relevant experience within the commercial building sector. The remaining Director is from a financial accounting background. The combination of these individuals will bring a good mix of practical experience and understanding of the medical aspects of the project.

In addition there are a number of consultants who will provide contacts within the medical fraternity who can provide several direct introductions to senior hospital management and medical institutions that have demonstrated an interest in the proposed alternative funding scheme.

FGPT Group Limited have a select team of project consultants to gather as much information regarding the marketplace. FGPTG are also in discussions with a law firm, and accountants to assist with the relevant legal and financial aspects of the contractual process or interact with a third party lender or investment house.

We have a large quantity of medical industry contacts and business solution providers to meet the demand from the treatment centres internationally. Our consultants' background stems from venture capital and business development; this is across a wide spectrum of industries and market sectors linked to working relationships with key personnel within the leading medical equipment market.

FGPTG realise medical treatment centres often get dismissed as a commercial business, mainly due to the large number of state or government funded hospitals and institutions around the world. We feel this is a misguided interpretation but understandable one as the commercial business of these treatment centres is heavily disguised by the medical and health aspects of treatment centres.

Following an in depth analysis of existing medical centres, any suggestion that these key medical facilities do not or cannot operate as a commercial business that will generate income and profits is a huge oversight, and one that often restricts or prevents these treatment centres from considering conventional types of commercial funding to modernise their existing facilities.

FGPT Group see this very differently and have spent the last 9 months liaising with a number of medical centres through a network of consultants and the leading Proton equipment supplier who have identified a growing demand for alternative forms of finance to service critical needs of these medical centres. During this time FGPTG have established; in order for cancer centres to stay up to date with technological advances centre operators need to consider alternative funding options to come in line with new developments in treatment technology.

# Exhibit 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
| vs. | ) No. SACV 16-00974-CJC (AGRx) |
| CHARLES C. LIU; XIN WANG a/k/a LISA WANG, et al., | ) |
| Defendants. | ) |

REMOTE DEPOSITION OF RUTH THROPAY LOPEZ NOVODOR
ZOOM VIDEOCONFERENCE
Monday, February 22, 2021
Volume I

Reported by:
VALERIE D. GRANILLO
CSR No. 11469
Job No. 4413391

PAGES 1 - 189

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
vs. No. SACV 16-00974-CJC (AGRx)
CHARLES C. LIU; XIN WANG a/k/a LISA WANG, et al.,
Defendants.

Remote Deposition of RUTH THROPAY LOPEZ NOVODOR, Volume I, taken on behalf of Defendants, via Zoom Videoconference, California, beginning at 9:15 a.m. and ending at 4:15 p.m., on Monday, February 22, 2021, before VALERIE D. GRANILLO, Certified Shorthand Reporter No. 11469.

Page 2

APPEARANCES:

For Plaintiff:
UNITED STATES SECURITIES & EXCHANGE COMMISSION
BY: GARY Y. LEUNG
Attorney at Law
444 South Flower Street, Suite 900
Los Angeles, California 90071
(323) 965-3998
leungg@sec.gov

For Defendants:
SILLS CUMMIS & GROSS
BY: HERVE GOURAIGE
Attorney at Law
1 Riverfront Plaza
Newark, New Jersey 07102-5400
(973) 643-5989
hgouraige@sillscummis.com

Page 3

APPEARANCES (continued):

For Ruth Thropay Lopez Novodor:
SUMMA LLP
BY: ANYA J. GOLDSTEIN
Attorney at Law
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
(213) 260-9451
anya@summallp.com

Page 4

INDEX


| WITNESS | EXAMINATION |
|---|---|
| RUTH THROPAY LOPEZ NOVODOR Volume I | |
| BY MR. GOURAIGE | 8, 173, 181 |
| BY MR. LEUNG | 139, 179 |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 68 | Pledge Agreement | 43 |
| Exhibit 69 | Beverly Proton Center and R Alan Construction document | 54 |
| Exhibit 70 | MOU Re Exchange of Real Property | 68 |
| Exhibit 71 | Beverly Proton Center and R Alan Construction document | 69 |
| Exhibit 72 | Mevion Budgetary Quotation for Beverly Oncology | 69 |
| Exhibit 73 | Retainer - Nisy E. Ipe | 83 |
| Exhibit 74 | E-mail 12-22-15 from Ruth Lopez Novodor to Ruth Lopez Novodor | 101 |
| Exhibit 75 | Letter 3-28-16 to Mr. Regenstreif from Molly White at McGuire Woods | 104 |
| Exhibit 76 | Letter 12-1-15 to Charles Liu from Lance Kimmel | 117 |


Page 5

INDEX (continued):

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 77 | Deposition Subpoena | 131 |
| Exhibit 101 | Private Offering Memorandum Pacific Proton EB-5 Fund, LLC | 146 |
| Exhibit 102 | Pacific Proton EB-5 Fund Business Plan dated May 1st, 2013 | 150 |
| Exhibit 103 | E-mail from Mr. Liu to Stan Lam dated 10-15-15 | 154 |
| Exhibit 104 | E-mail from Mr. Liu to Harlan Levine dated 10-19-15 | 155 |
| Exhibit 105 | Memorandum of Understanding between Beverly Hospital Alice Cheng, COHMF Harlan Levine and United MPH Ventures Charles Liu | 157 |
| Exhibit 106 | E-mails between Alice Cheng, Harlan Levine, Charles Liu and Michael Hunn | 159 |
| Exhibit 107 | E-mail dated 10-21-15 from Michael Hunn to Harlan Levine. | 161 |
| Exhibit 109 | E-mail string starting on 11-13-15 to 11-16-15 between Michael Hunn and City of Hope | 163 |
| Exhibit 110 | E-mail string dated 1-7-16 from Harlan Levine at City of Hope to Charles Liu | 164 |



| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 111 | E-mail chain beginning July between Alice Cheng, Charles Liu, Harlan Levine and a person named Jae Chung | 153 |
| Exhibit 112 | United MPH Ventures Letter dated 3-10-16 signed by Charles C. Liu | 168 |
| Exhibit 113 | Document Executed by Richard Stuping at R Alan Construction dated 4-16-16 | 168 |
| Exhibit 114 | Letter dated 10-1-15 To Whom it May Concern | 172 |



Monday, February 22, 2021
9:15 a.m.

RUTH THROPAY LOPEZ NOVODOR,
having been administered an oath, was examined and testified as follows:

MR. GOURAIGE: Gary, do you want to note appearances before we start?
MR. LEUNG: Yes, please. You want to go ahead?
MR. GOURAIGE: Yeah, I'll start. Herve Gouraige of Sills Cummis & Rose, Ms. Novodor. I represent the defendant in this case, Charles Liu, and his wife. I'm not sure I'm pronouncing her first name correctly, Xin Wang or Lisa Wang.
THE WITNESS: Thank you.
MR. LEUNG: Good morning, Ms. Novodor. Gary Leung for plaintiff SEC.
THE WITNESS: Good morning.
MS. GOLDSTEIN: Good morning, Counsel. Anya Goldstein for the witness, Ruth Lopez Novodor.

EXAMINATION

BY MR. GOURAIGE:
Q Ms. Novodor, let me start with a preliminary question. Could you just state your full name for the



record, please.
A Ruth Thropay Lopez Novodor.
Q Thank you. And can I call you Ms. Novodor?
A You can call me Ruth. Ms. Novodor is fine too.
Thank you.
Q Have you used any other names?
A Yes.
Q Could you tell us what they are?
A Ruth Mary Thropay. Ruth Lopez Williams.
Q And was Williams a married name?
A That's correct, uh-huh. So is Novodor.
Q Ms. Novodor, have you had your deposition taken before?
A I don't think so. I can't remember. I don't think so, frankly.
Q Have you been involved, either as plaintiff or defendant, in any lawsuit?
A No.
Q Have you never been sued or brought an action?
A No.
MR. LEUNG: Counsel, I don't think the witness has been sworn yet.
THE WITNESS: I did.
MR. GOURAIGE: I thought she was, Gary.
MR. LEUNG: She was? Okay. I'm sorry.

MR. GOURAIGE: It's okay.
Q Ms. Novodor, could you tell us where you attended college?
A Pepperdine University.
Q And you graduated there with what degree?
A In '78 I graduated with a bachelor's degree. In '91 I graduated with an MBA.
Q And that was from the same university?
A Yes.
Q Did you attend any other educational institution for further educational studies?
A Well, only a certificate at the University of Kansas City for managed care. Oh, pardon me. I did attend Ohio -- Antioch University for a Ph.D., but I did not finish my Ph.D. I only took two years, and then I had to leave.
Q Do you speak any other language, other than English that is?
A Well, we call it Bocho. It's kind of half English, half Spanish. I understand Spanish.
Q Okay.
A Maybe, I'd say, 75 percent of it, but I don't speak it fluently. I was born and raised in a community that's Bocho, half and half, so if you call that a language.



Q Do you speak Chinese?
A No.
Q Do you write Mandarin Chinese?
A No.
Q Could you briefly tell us your business experience? I know you're an entrepreneur. Is that correct?
A Well, I've run a small business for over 40 years.
Q Okay.
A And we had a lot of entrepreneurial-type projects.
Q Before you were involved with Beverly Oncology?
A Yes.
Q By the way, so that I don't confuse you, there are a couple of Beverlys in this case. I just want to make sure we're clear on which one we're referring to so the record's clear. The company I just mentioned, the full name is, as I understand it, is Beverly Oncology and Imaging Centers Medical Group, Inc. Is that the company you're referring to?
A That's the company I'm referring to.
Q Do you prefer that we call that BOIC?
A That would be clear. That would help, yes.
Q So before you were in management with BOIC, were



you running another company?
A No. I was working with a company by the name of Amdahl Corporation, and I was running the division of market forecasting for Amdahl Corporation.
Q When did you start with BOIC?
A 1980.
Q And when you started, what was your title?
A Administrator.
Q And were you subsequently promoted?
A It was the same job. I just had a higher title.
Q What was -- what was your --
A Chief financial officer was the first title, and then the second one was chief executive officer.
Q And how long did you serve as CEO of BOIC?
A I want to say -- I don't remember exactly when it transitioned to CEO. But I want to say possibly I was CEO for 25 years -- let's see. 35 years.
Q So you started roughly in 1980. And when did your role at BOIC end?
A October 11th of 2020.
Q And during the period that you were at BOIC, who was the owner of the company?
A Dr. John Paul Thropay.
Q Is that your brother?
A Yes.



Q What were -- and I'm focusing now when you became CEO of BOIC. What were your duties or responsibilities?
A What I took on was the development of strategies for sustainability and to address the concerns that Dr. Thropay had relative to serving underserved communities. Our focus was to deliver high tech state of the art to communities that otherwise would not have access. So that was where my attention was focused.
Q When you say high tech state of the art, are you referring to a service?
A Absolutely, treatment.
Q And what service did BOIC deliver?
A Well, in 1980, Beverly Oncology started with a linear accelerator. It was the first one within 12 miles around where we were born and raised in East Los Angeles. And there were no linear accelerators in our community. So he brought the first. We brought the first linear accelerator to Montebello.
Shortly after that, the technology had advanced for increased accuracy and treatment, which included treatment planning systems. And the only way to get a treatment planning system was to buy a CAT scanner. He invested in a CAT scanner and put it in the hospital's medical building. The year after the hospital bought their own. So we survived through that. But that

technology wasn't available in our community.
The next piece that we did was we founded an HMO, because we found our patients could not communicate with the doctors they had. That HMO was called Viva Health Plan. And it started with a network of Spanish language physicians for the Hispanic community. It was the first of its kind. And it was reported in the Wall Street Journal. It was the first of its kind, and that was where my attention was placed was to find these ways of providing access which previously were not available in the past.
Q Is it fair to say, Ms. Novodor, that during your entire career, you have been involved with or in the healthcare industry?
A Except for Amdahl Corporation, which was an IT company. Sometimes I wish I stayed there. But yes. Most of my career has been involved in healthcare access and in the healthcare community.
Q And your brother, Dr. Thropay, is an oncologist; is that correct?
A He's a radiation oncologist, yes. So he's a specialist in only one delivery mechanism, which is radiation.
Q How many companies have you been affiliated with during your career?



A About four or five related to healthcare. They were all adjuncts of Beverly Oncology.
Q Any others?
A Yes, many -- several not for profit. I was president of the Latin Business Association for four years. I am currently president of the national -- I mean I'm currently president of the National Latina Business Women's Association in the Inland Empire. I also served on the national board of directors for the Federation of Independent Businesses, National Federation of Independent Businesses and served as chairman of the California National Federation of Independent Businesses. So I've been involved in a lot of not for profits in the small business arena and in healthcare.
Q Could it be roughly 15 companies?
MS. GOLDSTEIN: Objection; vague.
BY MR. GOURAIGE:
Q I'm not asking for an exact number. I'm just throwing out the number 15 to see if that's --
A 15 sounds like a lot.
Q Okay.
A You know, maybe 7.
Q When were you first introduced to the defendants in this case Charles Liu and Lisa Wang?
A I believe it was in 2010.



Q And who introduced you to them?
A Me personally?
Q Yes.
A Or our company? Meaning Dr. Thropay, he was introduced to Dr. Thropay first.
Q Okay.
A And he was introduced by Mr. Slater of Optivus.
Q And did you meet his wife at the time in 2010?
A No.
Q Have you met his wife?
A Yes.
Q How many times have you met his wife?
A Maybe four.
Q And did you ever -- I'm sorry. I didn't mean to cut you off. Did you finish your answer?
A I don't know exactly, but I feel like it's about four.
Q Did you ever discuss the proton therapy business with Lisa Wang?
A Not that I recall.
Q Did you discuss the business with Charles Liu and your brother, Dr. Thropay?
A Of course.
Q What was your understanding back in 2010 what the -- and I'm going to call this the proton therapy



project in Montebello. What was your understanding of what that project was going to be at that time?
A With Charles Liu?
Q Yes.
A Charles Liu was introduced to us to provide the funding. He was going to take care of all the funding through a program called the EB-5 Fund.
Q When you say that Charles Liu was introduced to us, who is the us you're referring to?
A Dr. Thropay and myself. He was introduced -- I'm talking about Dr. Thropay, myself, Beverly Oncology. But he was initially introduced directly to Dr. John Thropay.
Q Who conceived of the proton therapy project in Montebello?
A Dr. Thropay had been interested in proton for many years and had engaged in conversation with John Slater of Optivus. John Slater of Optivus approached Dr. Thropay and said, "You're the only doctor I know that has five centers." And actually, it was eight then, I believe. "And you also have a piece of land next to an emergency room. And yes, we would like to work with you on putting in our second machine," because their first machine was in Loma Linda. So we had funding coming through Merrill Lynch until 2008 when the crisis hit and Merrill Lynch was bought by Bank of America. Then it all

got put on the shelf. And that's what happened.
Q So if I understand you correctly, Mr. Liu was going to help with the funding, raising the capital. Your brother, Dr. Thropay, was the oncologist. And together they were going to put together this project?
A Yes.
Q What was your role in it?
A My role was to assist wherever they needed information relative to the business or operation of the actual clinic.
Q Did you participate in discussions with Dr. Thropay and Mr. Liu about the financing of the project?
A Some.
Q How many discussions did you have?
A I really can't tell you. There were several.
Q Would that have been during the period 2009, 2010?
A I'm not sure about 2009, but I know it was right around 2010, yeah.
Q Okay. Were you designated to have a specific management role in the project once it was developed and implemented?
A Yes.
Q And what was the -- what was the role you were

Page 18

going to play? What was your title?
A One title was chief operating officer.
Q Was there another title?
A Not that I recall.
Q What was your brother's title going to be?
A Chief executive officer.
Q Now, are you familiar with an entity called Pacific Proton Regional Center?
A Yes.
Q And what was that organization?
A Exactly what it says, the regional center. The regional center is generally what's formed under EB-5 as the agent for the sales and funding of the project.
Q And so Pacific Proton, the regional center, was going to develop its first project. And I'm going to introduce the second Beverly now. And that was going to be called the Beverly Proton Center.
A Uh-huh.
Q Is that right?
A That's correct.
Q Now --
A That's one of the names. I think there was a name before that. And I'm sorry about my not -- a lack of clarity, but there were many changes and several different organizations. And I don't recall all of them. Some of

Page 19

them I wasn't even aware of. So just bear with me on that one.
Q Sure. Let me see if I can help you recall. Is the previous name for Beverly Los Angeles County Proton Therapy?
A I can't say yes, and I can't say no. But there were two, and I can't remember which one it was where he moved one of the words into a different place in one of the corporations and had a different one with the same word of those five words in a different place. And so I can't tell you.
Q Now, with respect to Beverly Proton, you I think just said that you were designated as the COO, the chief operating officer, and your brother was going to be the CEO, the chief executive officer?
A Again, I cannot be clear. To be honest with you, I was not holding onto that title for anything. The reason I'm not clear is because that was my understanding. However, when the actual corporations were presented to us, he had me in one organization that I was surprised that my name was on, and he had Doctor in a different one. There were so many. I cannot, after all these years, give you the clarification. I may have been able to give you a better picture, but it's just too confusing. There's just too many of them.

Page 20

Q When you say "he," just so the record is clear, are you referring to Mr. Liu?
A That's correct.
Q And was Mr. Liu the person who was the principal individual in charge of putting the Beverly Proton project together?
A Yes.
Q What was his role in that project? What was he supposed to do?
A Well, he reiterated many times that he's an entrepreneur, and he wanted to put this project together. He claimed that he had experience in putting these types of projects together, not necessarily proton. So Dr. Thropay and I both felt that we should give him as much liberty as he needed to get it done. And so he did. And when he needed help, he would come to us and ask if there was any way we could help move the project forward. And that's what we did. We wanted to support the project. We wanted the project to succeed. Dr. Thropay had dreamt about it for years. We had discussed it for a long time. And so we wanted to be very supportive, and we were thankful that he was there to put it through the EB-5 Fund because there wasn't very -- they weren't very many options after the recession. So we were very grateful for that. So his role was to go get the money.

Page 21

Q Did he form Pacific Proton, the regional center?
A Yes, he did. Well, let me put this way. He hired the legal counsel. He put the application in through the legal counsel, and he did those parts. Where he needed help was to get it finally approved, because it was stagnant. It was not going through. And that was where I stepped in with my political relationships, lobbied Washington to at least investigate, which they're -- I don't know why they did, but anyway. And put it -- explain to the folks that this is something Dr. Thropay had been doing and wanting to do for many, many years. This was not a guy coming out of nowhere. And that was really our approach, and it eventually got approved.
Q And the legal --
A It was a team effort.
Q The legal counsel that Mr. Liu hired, do you remember that person's name?
A I only know them as Miller Mayer, but we never spoke to them.
Q Does the name Steven Yale Loehr ring a bell to you?
A Frankly, no.
Q Do you know who paid Miller Mayer firm to put together the paperwork to get the regional center



approved?
A I was told it was Charles.
Q And what -- I think you referred to you did some work with your political contacts to help approval of the regional center. What exactly did you do?
A I inquired as to what the process was and if there was any way to identify what the status was. And that was about -- that was the beginning. And then we did go to Washington, D.C. and meet with other contacts that I had. I retained a firm to help me. And we lobbied to just make sure that -- to identify if there was any possibility of getting a response.
Q Which firm did you retain in Washington to help?
A I can't remember the name honestly right now.
Q Who did you talk with or meet with in Washington to help?
A We met with the staff of about four or five Congress people that were from our community.
Q And which Congress people were you referring to?
A Grace Napolitano. Sorry, I got stuck. Grace Napolitano. And then there was a Republican in Orange County whose name is just not coming to me right now. Oh, man, I wish I could remember that. And Ms. Sanchez. I'm trying to recall who. I believe that -- I believe there was one more that I'm not remembering right this moment.



Those are the ones that actually wrote letters in support of what we were doing. They just wrote letters saying that they really wanted to see this happen in the community.
Q Okay. After the regional center was approved and the -- what did you do to help with the development of Beverly Proton?
A Well, I helped with the business plan that was submitted by Miller Mayer and did some of the research just to support the case for a successful business plan. And that was my major role at that time. That's where he needed the help, so that's what I did for that piece.
Q So did you -- oh, you said that was your major role to help with the -- your personal contacts to help the business plan. Were you involved -- I'm sorry. Did I cut you off?
Were you involved in the initial operations of the project, Beverly Proton?
A No, not at that time. Only the projections were some of the things, but he had already had some of those projections initiated. So -- I'm sorry. What was your question?
Q Okay. Let me ask you another question before I get back to that. Did you have any equity interest in Beverly Proton?



A My understanding is that it wasn't direct. It was -- I was 50 percent of Doctor's share. So it was indirect.
Q And when you say Doctor's --
A Dr. John Thropay.
Q Okay. Did you understand what his share of the company was?
A At that time?
Q Yes.
A Yes.
Q What was his share?
A Well, initially it started at 75 percent. However, they decided to switch it during the funding of the money since Charles was going to take the lion's share of responsibility in finding the funds. And we gave him 75 -- or Dr. Thropay allowed him to take 75 percent with the understanding that he would give back the 75 percent after the operation had begun.
That's my personal understanding. It may not be exactly -- it may not be exact, because there were many documents, different organizations. So my name was listed on one, which right now I can't remember which of the many I was listed on. But that was not as an owner. It was only as the chief operating officer on that one document.
Q Did you know at the time who owned the other 25

percent of Beverly Proton?
A Charles Liu -- no, Dr. Thropay -- yeah. Charles Liu owned 75 percent during the fundraising period, and 25 percent was owned by Dr. Thropay, to which I would have 50 percent. The flip was supposed to occur once it was operational. And that -- yeah.
Q What was your understanding based on?
A Discussions primarily.
Q With whom?
A Dr. Thropay and Charles.
Q Together or separately?
A Together.
Q And to summarize it so that I understand, based on discussions with Dr. Thropay and Charles Liu, you understood that Charles Liu owned 75 percent of Beverly Proton; Dr. Thropay owned 25; and that you were to share 50 percent of Dr. Thropay's 25 percent. Is that correct?
A That's not correct. You left out a piece.
Q Okay. What did I leave out?
A That was temporary.
Q And what was the -- when you say temporary, what do you mean?
A We'd own 75 percent of the operations once the operations started. It was really more for decision making. But that was never -- I don't know if it was ever

Page 26

clarified in writing. I have no memory at this time of whether that was clarified in writing. But that was the discussion and the understanding between the parties at the time. And what you left out was that that was a temporary structure.
Q Okay. What was going to be the permanent structure?
A 75 percent for Dr. Thropay, of which I had 50 percent, and 25 percent for Charles Liu.
Q Did you ever see a document that reflected the temporary structure you just testified about?
A I can't recall.
Q What work did you do, if any, for Beverly Proton?
A Once it was called Beverly Proton, then I participated in discussions with parties that we wanted to partner with such as City of Hope. I did not participate in that one. That never was brought to us, only mentioned. But USC, I partnered -- I participated in discussions with bringing USC to the table. I also lobbied some politicians to gain support for getting USC to participate. And so I was involved only in helping him get the additional parties that he now felt -- originally he didn't feel it was necessary. But he decided he now felt that he needed a large organization to -- to sell or to close whatever deals he was doing that he was dealing

Page 27

with. And so we wanted to support him in that. We said --
Q Again, when you say -- when you say he now felt, are you referring to Charles Liu?
A That's correct.
Q Okay. Were you involved at all in working with Charles Liu to raise capital through the EB-5 program?
MR. LEUNG: Objection; asked and answered.
THE WITNESS: What?
MS. GOLDSTEIN: You can answer the question.
MR. LEUNG: Just interposing an objection, Ms. Novodor. It's not for you. You can answer.
BY MR. GOURAIGE:
Q You want me to clarify the question, Ms. Novodor?
A Yes, please.
Q Okay. As I understand it from your testimony, your brother was the physician, the radiation oncologist. So he was dealing with the delivery of medical services to patients for the center in the future. Mr. Liu was brought in to help raise capital to finance the operation.
A Exactly.
Q And you were sort of the administrative, the COO who was going to administer Beverly Proton?
A Yes.
Q So I'm asking now were you involved at all in

Page 28

working with Mr. Liu to raise the EB-5 capital?
A Indirectly is what I said.
Q What do you mean by indirectly? What did you do?
A When he brought parties to the table that wanted to meet us or get information about us, we would provide that for him. When Delks came along, he was very anxious to make sure that it would be successful. And he asked me if I could -- they were going to have a huge meeting, and he said, "Can you help me by bringing politicians to the meeting? Can you get me Arnold Schwarzenegger?" And I said, "I really don't think so, but I can get you Villaraigosa." So he flew me out there with Villaraigosa, not together, but -- and Dr. Thropay. And when they did their huge meeting with Delks agents, we provided Villaraigosa, who made a speech, and invited them to come home and participate in the project. It went over very well. He's very well known in Beijing. He was at the time. And the place was packed. After -- it was right before Chinese New Year and right after Chinese New Year. That's when all the major sector of funding came in. I consider that indirect assistance.
Q Let me see if I understand you. You've introduced a lot of new names and events. Who is Mr. Villaraigosa?
A Villaraigosa. He was the mayor of Los Angeles

Page 29

for, I think, eight years. Yeah, two terms.
Q Your Spanish is much better than mine.
A Villaraigosa.
Q He was the -- so he was not mayor at the time, correct?
A No.
Q Okay. You also mentioned the name Delsk. Is that spelled D-e-l-s-k?
A D-e-l-s-k. You should be very familiar with them.
Q Who was that?
A Delsk --
Q Yes.
A -- was the company that was the largest at the time EB-5 agency. They had agents all across China, and they hosted every year an event advertising the EB-5 projects they were launching. And that's the event where they have at least 1,000 attendees, multiple agents across China. I don't know. I couldn't even see the back of the room. It was big. And that's where I brought Villaraigosa was to Delsk's annual meeting where they introduced our projects, our project, as the first healthcare project in the United States. Oh, that's -- yeah, healthcare project. They did have a bridge going on in East Coast, which I don't remember what, but...

Page 30

Q You met with Delsk in China?
A We sure did.
Q Okay.
A Beijing.
Q Do you remember the names of the individuals you met with?
A There were so many people. What are you looking for?
Q Was this a room full of people? You had a large meeting or was this a --
A What I described to you, yes.
Q Did you meet with anybody from Delsk personally?
A Yes. I met with his wife for a few minutes. It was more of a social discussion about what was going to happen, how we were going to get there, how great this was and thankful that we brought Villaraigosa. It was a very polite, professional discussion, and she and I got along wonderfully. She's a very classy, professional woman.
Q And whom are you referring to?
A Mrs. Liu. I don't know if she goes by that name.
Q Do you remember her name?
A Charles' wife.
Q Is it Mrs. Wang?
A I believe that is the name she uses, yes, Wang.
Q Is that the first time you had met her?

Page 31

A No.
Q And was there anyone from Delsk present at the meeting?
A Oh, yes. The whole company was there.
Q Did you meet with any specific individuals from Delsk?
A The president and his management team. I apologize. I did forget. We did have lunch with the Delsk company's -- the leadership of Delsk, the president and all the top corporate folks from Delsk that day.
Q Who was the president you met with?
A I can't remember his name.
Q Does the name Wang Jiang (phonetic) ring a bell?
A For me, no.
Q Does the name Edison Zhan ring a bell?
A Yes.
Q You met with him?
A Yes.
Q What was his title at Delsk?
A I don't remember.
Q How many times did you meet with him?
A When we were in Beijing?
Q Yes.
A He was hosting the whole thing, so he was taking us -- you know. He knew where everything was going to

Page 32

happen. He was our contact.
Q Did you discuss the raising of EB-5 capital at the meeting with Delsk?
A Of course.
Q And who else was a participant in that discussion?
A Dr. Thropay, Charles Liu. I truthfully cannot remember if Mrs. Wang was there or not.
Q What was the substance of discussion? What was discussed? What did you say and what did he say?
A It was all about excitement, that this was going through and that they had selected us as one of their projects, and they were going to be able to raise all the money. This is not going to be a problem for them, that we would see money right after Chinese New Year's. It was a very -- it was more of a celebratory lunch.
Q Did you meet with any other companies in China who were going to help raise EB-5 capital?
A I believe we did. And I -- what's bothering me is -- yes, we did.
Q Who did you meet with?
A Centec Bank, the chairman, the president of Centec Bank.
Q Do you remember his name?
A I used to remember that. I can't remember his

Page 33

name now. No, I can't remember his name.
Q And what was going to be the role of that bank?
A Well, they wanted to meet Dr. Thropay from the U.S. And Charles was posing them as potential investors in the entire project.
Q What did you discuss with the chairman of the bank?
A Well, did he want to show us a miniature of the -- of the Olympic stadium made in brass or something. So we all got those gifts. But that was a discussion point for him, very proud that they were the ones that hosted and built the -- I forget what they called it, the Nest, where they had the Olympics. So that was a big deal. And we got models of it, each of us got one. And then the excitement of doing the project. They did ask us questions about the project, and they come out and visit of course. It was a cordial introduction with formalities as well as some casual questions about the project. And Villaraigosa also attended those meetings with us -- or that particular one with us, yeah. So he had a good chat. You know, they had discussion, too, as well. And so it was the type of meeting that you normally have when you're trying to court an investor. And it's polite, and there are exchanges, and there are, you know, promises to work together, etc.



Q Did you meet with any other representatives in China who were going to raise capital for the project?
A I myself, no.
Q Are you familiar with a company called United Da Mei?
A Barely. I mean, I don't know much about them.
Q Are you familiar with a company called Pacific Proton?
A No.
Q Are you familiar with a company called Overseas Chinese?
A No. Oh, I've seen the name.
Q You've seen it. Do you recall meeting with any representatives from Overseas Chinese?
A No. I really don't recall.
Q Do you know which companies helped Charles Liu raise the capital in China?
A One, the only one that I was involved with was Delsk.
Q Do you know how much capital Delsk helped raise?
A Close to 25 million. I don't know the exact number anymore. But they raised the lion's share of the funds.
Q What was the total amount of capital raised, do you recall?



A All parties together?
Q Yes.
A I really don't recall the exact amount. But it was in the -- you know, it was in the 20, 25 million range. 25, maybe 30 million. I can't remember the exact number.
Q And your understanding is Delsk raised about 25 million?
A I'm estimating. It was the majority.
Q Did you ever see any document reflecting that?
A Yes, I did.
Q Do you recall what it was?
A It was a document listing the parties. But the document I saw was early on, and there was only 18 million represented there. I believe. I don't have access to all that anymore, so I'm sorry. But yeah. They actually provided Charles with a list of all of the people that had signed up and what stage they were at. So that is available through Charles.
Q Now, you mentioned -- was it your understanding that Delsk was going to be paid for its work in helping raise the capital?
A Yes, that's provided for.
Q Where is that provided for?
A Well, whatever the offering memorandum would



include, I hope. I can't tell you exactly what that was. I was never involved in the negotiations with Charles in that regard.
Q Okay. So you had -- if I'm correct, and if I'm not, please correct me. You don't know exactly who raised how much and how much they were paid for the work they did raising the capital?
A I would say that, yes. I am absolutely comfortable saying that.
Q So now are you familiar with payments that were made by Beverly to vendors for various --
A Which? Not BOIC, right?
Q Not BOIC.
A Okay.
Q I'm going to call your company that you were CEO of BOIC. And Beverly Proton or Beverly Center will be the first project that the regional center was in.
MR. LEUNG: Counsel, when you say "Beverly," what's the full name of the legal entity that you're referring to?
MR. GOURAIGE: Beverly Proton Center, LLC.
THE WITNESS: All right. Yes, I am familiar with that name.
BY MR. GOURAIGE:
Q So once the capital was raised -- by the way,

before I get to that, Ms. Novodor, are you familiar with an entity called Pacific Proton EB-5 Fund, LLC?

A Now that's another one of those -- I don't know. One of those -- I think there were two of them. I cannot comment on these pieces. We left that with Charles. And we trusted that he knew what he was doing because he had the counsel. He had the attorneys.

Q Was the -- what I'm going to call the EB-5 Fund, the Pacific Proton EB-5 Fund, was the fund vehicle used to raise the capital for Beverly Proton?

A My recollection is not that great. But there was -- I really can't speak to it with accuracy. Because again, there were multiple entities. And sometimes I thought I knew them all, and then I'd find out there was something else. So no. I cannot clearly define what occurred.

MS. GOLDSTEIN: Mr. Gouraige, we've been going about an hour. So when you get to a good point, could we take a brief break?

MR. GOURAIGE: Yes. This is a good point to take a few-minutes break.

MS. GOLDSTEIN: Oh, great. We just need a few minutes or so.

MR. GOURAIGE: Great.

MS. GOLDSTEIN: Thank you.



(Recess.)

BY MR. GOURAIGE:

Q So we're back on the record. Ms. Novodor, just to clarify, this is not an endurance test. If you feel you want to take a break, just let me know. Okay?

A Thank you.

Q And we'll just take a break.

A I appreciate that.

Q So now to go back to where we left off, I want to identify for you the three companies I think we've talked about. The regional center was the entity that would sponsor the project. The project was the development of the proton therapy center by Beverly Proton Center. And the EB-5 Fund was the funding vehicle that would raise the EB-5 capital to build the center. My understanding from your testimony is you did have some talks and discussions in China.

MS. GOLDSTEIN: I'm sorry, Mr. Gouraige, just to clarify, are you representing to the witness, because she doesn't have a memory of these three entities, you are representing for the purposes of the deposition the purpose of the three entities?

MR. GOURAIGE: Yes.

MS. GOLDSTEIN: Thank you.

THE WITNESS: Thank you.



BY MR. GOURAIGE:

Q The discussions with Delsk, were they in Beijing?

A Yes.

Q Okay. So my understanding is while you had some discussions in China, you were not very deeply involved with Charles Liu in raising the EB-5 capital. Is that correct?

A That is correct.

Q But once the capital came in through the EB-5 Fund, were you aware that the fund was going to loan the capital out to the Beverly Proton Center?

A I do remember something about that, yes, that it was going to be classified as a loan, something along those lines.

Q And what do you remember about that?

A Just that the funds would be loaned to the project.

Q Do you have any recollection of how much money was being loaned?

A Well, sir, you have to bear in mind that most of the money -- there maybe four or five were done prior to Delsk. There weren't very many. And from my understanding and the numbers that I looked at, the majority came from Delsk. And that was a moving target for a while. I was not aware where the money was being



deposited initially. I had no part of the banking discussion at all. I was not on any bank accounts. I was not asked to help in that regard. So I focused on the business at hand. I had a business to run. So I only helped when I had to. So I knew nothing and was not invited to participate, which didn't offend me at all at the time because I knew that he had counsel. And I believed that he knew what he was doing at the time.

Q By the way, in terms of your business to run, you're referring to BOIC. Is that correct?

A I'm referring to BOIC.

Q Yes. And did you have people helping you run that business?

A Of course.

Q And who helped you run that business?

A I had officers -- I mean, excuse me, I had a management team, and I had consultants.

Q Was you husband either part of management or a consultant?

A At one time he was but not during those years.

Q Was he management or consultant?

A Back in 2003 he was a co-CEO, but that has nothing to do with this, so.

Q Okay. Now, so the loans from the EB-5 to Beverly Proton, did there come a time there was discussion about a





Veritext Legal Solutions
866 299-5127

guarantee for those loans? Do you recall that?
A I recall a request for us to put up risk, yes.
Q And who made that request?
A Charles Liu.
Q Did he make it to you?
A I'm not sure. I don't know where it came from. I can't remember where it came from. I know we discussed it by phone. That I remember.
Q You don't remember who made the request to you?
A Charles.
Q Oh, okay. So he made the request to you on a phone call?
A I'm not saying that. I don't know if it came by e-mail or if it came by phone or if my brother's the one that told me. I don't remember where it came from.
Q Okay. And as CEO of BOIC, did you agree to guarantee those loans?
A Very reluctantly. I was very disappointed that he felt that was a necessary step in order to keep the business going. There was a tremendous amount of urgency and pressure to get it done as soon as possible. This would be the only thing that could save the project at this time.
Q And who explained that to you?
A Charles.



Q And as COE of BOIC, did you, in fact, guarantee the loans?
A I think that's too general a statement.
Q Did you say it's too general a statement?
A Yes.
Q Well --
A I do not know the legality of what was requested, nor how it stands under the current situation. So I wish not to respond further.
Q Well, let me just show you a document that maybe we can discuss it and help refresh your recollection. So bear with me a second.
MS. GOLDSTEIN: And I'd like to object that we were not provided with hard copies of the exhibits to be used in the deposition from defense counsel.
Mr. Gouraige, if you're getting that pulled up, could you let me know how the -- how this guarantee relates to expenses for the project?
MR. GOURAIGE: Well, we're going to get to that. Let me just go over with the witness first the guarantee after she's reviewed it.
(Exhibit 68 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Ms. Novodor, can you see the exhibit now?



A Excuse me. I need to get a little closer. Yes, I can, sir.
MR. LEUNG: I'm seeing a document that's been marked Exhibit 1. Was that your intention?
MR. GOURAIGE: Oh, I'm sorry. It should be Exhibit 68.
Q So Ms. Novodor, take your time and take a look at the document.
MS. GOLDSTEIN: For the record, we're in the midst of a virtual remote deposition in the midst of the COVID-19 pandemic, and we're -- this deposition is being taken via Zoom. So the exhibit that counsel is referencing right now is pulled up on a monitor. It's about 6 inches wide, I would estimate. So the witness is doing her best, in my view, to view the document.
BY MR. GOURAIGE:
Q Ms. Novodor, when you're finished looking at the document, would you please let us know?
A I'm through.
Q Okay. Is that your signature at the bottom there of the document?
A Yes.
Q And is the document pledging the unencumbered assets of BOIC to guarantee the loans?
A It says, "We agree to pledge." Yes.



Q At the time that you signed this document, did you understand the amount of money that was going to be loaned?
A Yes.
Q How much did you understand it to be?
A Close to 250 million.
Q At the time that you signed this pledge guarantee, did you understand the value of the unencumbered assets of BOIC?
A Yes, I did.
Q And what was the value of those assets?
A I don't know exactly right now.
Q Was it large enough? Was it in excess of 200 million?
A No.
Q Was it anywhere near 200 million?
A No.
Q Okay. So now that the funds are loaned out to Beverly Proton, and Beverly Proton uses the funds to pay vendors. Is that correct, Ms. Novodor?
MR. LEUNG: Objection; lacks foundation.
MS. GOLDSTEIN: Excuse me, Counsel. Are you done with this document?
MR. GOURAIGE: I am for now.
Q So you understood did you not, Ms. Novodor, that

the EB-5 funds were going to be loaned out to Beverly Proton, correct?
A Yes, I did.
Q To your knowledge, were the funds loaned to Beverly Proton?
A That's the million-dollar question. I don't know.
Q Did Beverly Proton make payments to vendors that you were aware of?
MR. LEUNG: Objection; lacks foundation.
BY MR. GOURAIGE:
Q Do you understand the question, Ms. Novodor?
A Please repeat it.
Q Did Beverly Proton make payments to vendors that you were aware of?
A I don't know which entity paid the vendors at this time. I do not recollect which of those multiple entities paid the vendors. It could have been Proton. I don't know. I was not involved in the finances. He was totally -- he was in charge.
Q Did you receive any of the invoices from the vendors, do you recall?
A I do remember receiving an invoice. And as I recall, it was after Charles was not involved. I can't really say truthfully that I recall getting invoices. He

Page 46

was the one in negotiation. I never received initial invoices that I am aware of.
Q Were you aware that Beverly Proton had leased, and it turned into a 30-year lease, with your brother for land that he owned?
A You know, I don't have it in front of me, and I don't remember which entity was in the lease. But I do know that there was a lease that we negotiated with Charles, yes.
Q Were you aware that there were lease payments being made?
A That I was aware of because it pertained to our funds, correct.
Q Do you recall what the amount of the lease payments were on a monthly basis?
A Approximately.
MS. GOLDSTEIN: Objection; vague as to time.
MR. GOURAIGE: The time period?
MS. GOLDSTEIN: That's right.
BY MR. GOURAIGE:
Q Okay. Between April of 2015 and April of 2016, do you --
A In the range of $40,000 a month.
Q Are you sure?
A No. I don't have anything in front of me. I

Page 47

don't remember the exact number. But I do believe it was close to either 37- or it was in the that range, or 40,000, something along those lines.
Q Do you recall whether the annual rental was a million dollars?
MR. LEUNG: Objection. Lacks foundation. Calls for speculation. The witness just testified she doesn't have any documentation in front of her.
MR. GOURAIGE: I'm just asking her for her recollection.
Q I'd like to explore your recollection, Ms. Novodor. Tell me what you recall. If you don't remember anything, tell me you don't remember anything. If you remember it was lower or higher than that amount, tell me that.
MS. GOLDSTEIN: Are you still talking about April 2015 to April 2016 time frame?
MR. GOURAIGE: Yes.
THE WITNESS: I do recall something about a million dollars a year on one of those contracts, but I can't tell you which one.
BY MR. GOURAIGE:
Q So if the rent was a million dollars a year, the monthly rental would be about, on equal installments, $83,333, correct?

Page 48

A Pretty much.
Q Do you remember whether or not your brother was paid that amount during the course of that year for each month in that year?
A No.
Q Okay.
A He was not.
Q He was not paid that amount?
A No.
Q Are you sure about that?
A Well, since you're making me question, I'll say no.
Q Okay. I don't mean to -- I mean, I'm just asking the questions.
A I'm working without the documents in front of me.
Q Right. But I'm asking -- I'm trying to explore what you recall. You're a very intelligent person and have an MBA, sophisticated businesswoman, so I'm just trying to learn what you recall. So if you don't recall, you don't recall. We can go over the documents later to see what they say. We know what they say.
So the -- your brother was paid -- you may not recall exact amount, but he was paid for the land, rental, right?
A My recollection is that we made an arrangement in

Page 49

the lease for him to pay a rate that held the land while he tried to raise the money.
Q Okay.
A That's my recollection of what the transaction was supposed to accomplish. The rents were no longer collectible. The building was torn down. That's what I recall.
Q So you mentioned earlier a company called Optivus. I think it's called O-p-t-i-v-u-s. Is that correct?
A Yes.
Q Was a deposit made with Optivus for proton therapy equipment?
A There's a fine line there. I believe there were consulting fees in the project. I do not recall a deposit on the equipment. Again, I was not involved in cutting these checks or in the decision making of whether they are cut or not. I'm only told maybe in passing that they wrote a check to Optivus.
Q Are you familiar with a company called Mevion, M-e-v-i-o-n?
A Yes.
Q They also manufacture proton therapy equipment; is that correct?
A Absolutely, yes.



Q Do you remember whether a deposit was made with that company for equipment?
A I was told that it was made.
Q Do you remember how much if you were told was paid?
A My recollection -- and it is only a memory; it is not fact -- I believe it was near $3 million. That's what I was told. I had no access to bank accounts or I never witnessed the check or the transfer. I knew nothing about it.
Q And are you familiar with a company called R Alan Construction?
A Yes.
Q And did that company play any part in the proton therapy center?
A Yes. They razed the building after we had to get all the tenants out, and they took care of getting the land ready for Proton.
Q And were they paid for that work?
A I believe they were.
Q How about Mr. -- I'm going to get his name wrong again. I just can't --
A Villaraigosa?
Q Yes. Was he paid for his services?
A I believe so.



Q Do you recall how much he was paid?
A No. I was told that he was taken care of, so whatever that means.
Q So in each of the cases we've just talked about, whether it was Optivus, Mevion, Mr. Villaraigosa, Alan Construction, they provided the services or products to the Proton -- the Center, and they were paid. Was --
MS. GOLDSTEIN: Objection; misstates prior testimony. Lack of foundation.
MR. LEUNG: Join in the foundational objection.
MR. GOURAIGE: Could the court reporter just read for me the first part of my question.
(Record Read.)
BY MR. GOURAIGE:
Q Is that part, Ms. Novodor, is that part of the question that these companies or individuals provided service or products and they were paid. Is that correct?
MR. LEUNG: Objection; lacks foundation.
MS. GOLDSTEIN: Join.
BY MR. GOURAIGE:
Q Go ahead. Could you please answer?
A I can't tell you that.
Q You can't tell me -- well, Mr. Villaraigosa, you said, was taken care of. He was paid for his consulting services. Correct?



A Yes, but I can't say that for every one.
Q Well, was Mevion given a deposit? Was it paid a deposit?
MR. LEUNG: Objection; asked and answered. Argumentative.
MR. GOURAIGE: I'm not trying to argue with the witness, Gary, but you can't have it two ways. You can't first raise an objection on foundation and then say asked and answered. It's been asked and answered, then the foundation is proper. So you need to make up your mind which objection you're going to raise.
MS. GOLDSTEIN: Mr. Gouraige, she said she was told a payment was made, and then you're repeating that saying a service was delivered and a payment was made. Those are two different things, and so not only does it misstate testimony, but there's a lack of foundation for knowing that a payment was made or knowing that services were rendered. That's the basis for my objection.
BY MR. GOURAIGE:
Q Well, Ms. Novodor, you know from your own personal knowledge that Mr. Villaraigosa provided services, consulting services, to the project, right?
A I know what I started in the negotiation, but I was moved out of the negotiation. And whatever was agreed to between him and Charles, Charles would not tell me. So

I cannot say with clarity that what he offered was delivered and that he was received remuneration for it. To the extent -- I have no idea what that was. It was not disclosed to me. And I don't know what arrangement they made separately.
Q When you say "they," you're referring to Charles?
A Villaraigosa -- I'll help you with that one. Villaraigosa and Mr. Liu, Charles Liu.
MR. GOURAIGE: I need a couple of minutes to -- I think last time when I went to the Exhibit Share, I may have accidentally gotten out of it. So I need to get back into it and introduce some more exhibits to show the witness. So give me two minutes, and I'll try to do that. Okay.
MS. GOLDSTEIN: Are we off the record?
MR. GOURAIGE: Yes, we are off the record.
(Recess.)
(Exhibit 69 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q So Ms. Novodor, this document from R Alan Construction that you've reviewed, what is it?
A It is a document listing the demolition of existing structures and site facilities at 111 Montebello (sic) Boulevard.

Page 54

Q And is it referring to the existing structure on the land that was owned by your brother?
A I believe so.
Q And that was the land that was leased by Beverly to build the center?
Did you hear my question, Ms. Novodor?
A Yes. If Beverly is the person in the lease agreement dated 2015, then I can say yes. But I don't remember which of the entities was in the lease agreement. That's my only problem. So if you want to -- you know.
Q Did Alan Construction demolish the building?
A Yes.
Q And they were entitled to get paid for their work there, right?
A Correct.
MR. LEUNG: Objection. Hold on. Let me interpose an objection. I object to the question as misleading to the extent you are referring to construction work performed by R Alan Construction on 105 West Beverly, which is not the represented property for the proton therapy site and is not the property owned by Dr. Thropay.
MR. GOURAIGE: Well, if you look at the document, Gary, I'm looking at a letter dated May 15th, 2015. It's referring to the 111 --
MR. LEUNG: Herve, I see 111. You didn't put 111

Page 55

in your connection. So if you're asking about 105, I've got an objection. If you're not, make it clear.
MR. GOURAIGE: I didn't want to get to that level of detail with the witness.
Q Ms. Novodor --
MR. LEUNG: You know that level of detail matters, Counselor.
BY MR. GOURAIGE:
Q There were -- the lot at 111 West (sic) Beverly is the lot that your brother owned; is that correct?
A That's the one.
Q Okay. And was that the place where Alan Construction demolished the building?
A Yes, it is.
Q Okay. And they were entitled to be paid for the work they did; is that correct?
MR. LEUNG: Same objection to the extent you're referring to work performed by R Alan Construction on 105 West Beverly rather than 111 West Beverly.
MR. GOURAIGE: I'm referring to 111. That's the context of the question.
Q Ms. Novodor, were they entitled to be paid for their work?
A Yes. If they did the service on a normal business contract, yes. If someone did the work, then

Page 56

they would get paid for it.
Q So that's a legitimate business expense, correct?
A Depends on the offering memorandum.
MR. LEUNG: Objection; calls for opinion testimony.
MS. GOLDSTEIN: Join.
BY MR. GOURAIGE:
Q As a businesswoman, you understand that if you hire somebody to do a service or provide a product, they do it, they get paid. They're entitled to get paid, right?
MR. LEUNG: Object to the incomplete hypothetical.
BY MR. GOURAIGE:
Q Do you understand that question, Ms. Novodor?
A It's a very general question.
Q Well, yes, it is a very general question. But generally in business, when you hire somebody to do work and they do their work, they're entitled to get paid, right? And when you pay them, that's proper, right?
MS. GOLDSTEIN: Mr. Gouraige --
MR. LEUNG: Same objection.
MS. GOLDSTEIN: Yeah. I join counselor's objection. And I don't think that -- in addition, I don't think that Ms. Lopez Novodor's opinion on what is a

Page 57

legitimate business expense is relevant here. So I'd ask that you keep your questions focused on facts that she has knowledge of.
BY MR. GOURAIGE:
Q So Ms. Novodor, let me ask the question maybe in a slightly different way. Was it -- was there anything, to your knowledge, illegal about paying Alan Construction company for the work they did at 111?
A I was not --
MR. LEUNG: Objection; calls for a legal conclusion.
BY MR. GOURAIGE:
Q Do you understand the question?
MR. LEUNG: Please go ahead.
BY MR. GOURAIGE:
Q Ms. Novodor, do you understand the question?
A I understand. I mean, I hear your words. My statement is I don't know if it's legal to classify this the way you want it classified. I don't know.
Q I don't want to classify any particular way. I'm just asking questions here, and I'm trying to find out what you know, so.
A Independent of this event, independent of Charles Liu, if I had asked them to do the work for -- in a totally different where there's no offering memorandum



that dictates what is and what isn't, I don't know if it's appropriate. I can't make that statement.
Q When you got the document you just reviewed, Exhibit 69 -- and it's directed to your attention. Did you review them at the time?
A Yes. I followed Charles' instructions completely.
Q Did you say to anyone --
A I did not question him.
Q Did you say to anyone at the time that hey, we can't pay this invoice; we can't pay Alan Construction; it's not appropriate?
A I did not, because I did not know. I still don't know.
Q So leaving aside for now whether you think it's appropriate or not or legitimate or not, just factually, do you know that Alan did the work and they got paid?
A That I know. Well, actually, I didn't see the checks. But from my understanding, he was paid.
Q As the CEO of a business, you don't cut every check that comes out of the business, do you?
A No. The only -- no. But I can always look it up to see if we did it or not. I have access to bank accounts, and I have access to my accounting statements. I had nothing. I didn't have anything to go on.



MS. GOLDSTEIN: Just to be clear by your question, Mr. Gouraige, are you implying that Ms. Lopez Novodor was the CEO of the entity paying for this work?
MR. GOURAIGE: I'm sorry. I didn't hear your objection.
MS. GOLDSTEIN: Are you suggesting that Ms. Lopez Novodor was the CEO of the entity that was paying for this work?
MR. GOURAIGE: Was she the CEO of the entity? She was CEO of BOIC.
Q Is that correct, Ms. Novodor, at the time?
A Yes.
Q The entity that paid for the work was not BOIC; is that correct?
A That is correct.
Q Okay. So the entity would have been Beverly or one of the project company, if you know? Do you know?
A No. Beverly is -- no. It wouldn't have been Beverly. It wouldn't -- oh, you mean Beverly Proton again.
Q Yes.
A Yeah, okay. All right. I'm sorry.
Q That's okay.
A Beverly Proton that claimed that they made the payment, and I did not hear anything contradicting that.



Q Okay.
A At the time. I didn't see anything confirming it either, so.
Q At the time when this payment was being made or at the time when the lease payments were being made to your brother, you -- you personally as the future CEO of -- I mean COO. You were COO of BOIC. As the future CEO of Beverly Proton, you didn't raise any objection and say these payments are inappropriate and can't be made under the document?
A Charles Liu gave me instructions that I followed. He was my higher up that had all the legal knowledge, experience supposedly and said that this is what I should make sure happened. So I got the signatures, and he was on his way.
Q So --
MR. LEUNG: Counsel?
MR. GOURAIGE: Yes.
MR. LEUNG: Can you stipulate that this line of questions concerns the 111 West Beverly site so I don't have to keep reiterating the objections?
MR. GOURAIGE: Yes.
MR. LEUNG: That's a yes?
MR. GOURAIGE: Yes.
MR. LEUNG: Okay, thank you.

BY MR. GOURAIGE:
Q So you did everything that Charles Liu directed you to do?
A In this situation, yes.
Q Did you ever question what he was doing?
A Sometimes I would ask him.
Q Such as? When did you ask him?
A Why he wanted me to tear down the building when he had already told the folks in Beijing that it was already torn down. And then he wanted me to run and get everybody out of the building in a big hurry like yesterday. And these were referring doctors to Dr. Thropay. It was a total, total disaster. I questioned him about doing that and not to misrepresent anything further in the future. So yes, I have questioned him when it's extremely apparent that there is a miscommunication.
Q And how did you -- I'm sorry. How did you question him? Did you -- did you do it orally or did you write him letters, e-mails?
A I spoke to him by phone.
Q And that's the only way that you questioned him?
A It's a pretty sensitive topic, and we had a lot of respect for him. We wanted to make this work, and we were trying to support him every which way we could in any

Page 62

way possible. But he was asking for a lot to have us tear down that building immediately and not pay what he said he would pay, the 1.5 million. It was a lot. It was a lot for Dr. Thropay to have to deal in addition to everything else that he has to do as a physician and that we have to do to run our business. It was a major disadvantage. It cost the company a tremendous amount.
Q What did it cost? When you say "the company," BOIC?
A BOIC and Dr. Thropay personally.
Q Okay. What did it cost BOIC?
A Cash flow.
Q To tear down the building?
A Yes.
Q How did --
A Referral doctors were angry with him. And they were referral -- referring sources to the business. It was very complicated.
Q So the doctors were unhappy because the building got torn down, and they stopped making referrals to BOIC?
A Not all of them. But there were one or two that were very angry that they had to get out in like 30 to 60 days. And they had been there for years.
Q Okay. Any other -- any other reasons why it impacted your cash flow?

Page 63

A That's enough for now.
Q And you said Dr. Thropay also, it cost him a lot. Is that the same thing or is that additional?
A Well, Charles made a promise.
I'd like to speak with my counsel, please.
MS. GOLDSTEIN: Can we take a short break?
MR. GOURAIGE: Sure.
MS. GOLDSTEIN: Thank you.
(Recess.)
BY MR. GOURAIGE:
Q Anytime you need a break, just say so. So Ms. Novodor, can you answer my question now?
A I don't remember the question.
MR. GOURAIGE: Valerie, could you please read the question.
(Record Read.)
MS. GOLDSTEIN: Objection. Mr. Gouraige, this is far outside the scope of discovery permitted by the court's order. If you can explain how this is related to expenses paid by Beverly Proton or one of the relevant entities, that might be a different story. But I don't see the connection.
MR. GOURAIGE: Well, let me try. I think the witness has just testified that Alan Construction did some demolition work at 111 and that as a result -- before I

Page 64

get to that. Mr. Liu insisted that building be torn down immediately. And she was reluctant to do that because it created problems with the physicians who were occupying that building. And then as a result, BOIC and Dr. Thropay lost money. It's relevant to the issue of the work that Alan Construction did and the payments they received for the work that they did.
MS. GOLDSTEIN: How is BOIC or Dr. Thropay losing money relevant to the payments to Alan Construction?
MR. GOURAIGE: This is -- I'm exploring a point that the witness made in response to my question. All that I ask is a simple question. Alan Construction did the work. Were they entitled to be paid? And I think the witness volunteered that it was a terrible situation because the building, Mr. Liu insisted that it be torn down immediately, and that both BOIC and Dr. Thropay lost a lot of money from that. So I wanted to find out what the facts were. I didn't ask the question. Your client raised it.
MS. GOLDSTEIN: Well, we're asking you to move on.
BY MR. GOURAIGE:
Q Well, Ms. Novodor, let me ask you a different question then. You've heard what your counsel -- the exchange your counsel and I just had, right? When you

Page 65

asked for the break, did you ask for -- did you discuss the question that I had pending to you with your attorney?
MS. GOLDSTEIN: Objection; calls for attorney-client privileged information. Don't answer the question.
(Instruction Not to Answer.)
MR. GOURAIGE: Well, it's our position that it is not privileged. If a question is pending and the witness asked for a break to consult with counsel, which your client did, and she was permitted to go on a break and discuss with you. And now you've come back, you've interposed an objection to the question, that is not a privileged communication. If you're instructing your client not to respond to the question, please do so because I want to reserve my right to move to compel an answer to that question.
MS. GOLDSTEIN: I'm instructing my client not to answer the question on the advice of attorney-client privilege.
MR. GOURAIGE: All right. I have stated our position on the record. I'll move on, and we'll reserve the right to compel to get an answer from Ms. Novodor on that question.
Q Before we move on, Ms. Novodor, there is something I want to clarify. We've been talking about 111

Page 66

and 105. 111 was the parcel of land owned by your brother. Do you know who owned 105?
A I would only be guessing, but I believe it was Beverly Hospital.
Q City of Hope Beverly Hospital?
A No City of Hope, no. City of Hope is in Duarte. Beverly Hospital is a community hospital that owned it.
Q Okay. And that is an entirely -- this is the third Beverly we're talking about now. That is an entirely different entity from BOIC or Beverly Proton; is that correct?
A Completely.
Q Were you aware at some point that there was an agreement to exchange land so that the Beverly Proton center would be built ultimately on the 105 parcel rather than 111?
A There were discussions for a potential switch, which never came to fruition.
Q Okay. Were you involved in those discussions?
A Yes, to some degree.
MR. GOURAIGE: So let me -- I'm going to introduce another exhibit now, so I'll take a break and try to show the witness the exhibit.
(Recess.)
MS. GOLDSTEIN: Would you like the witness to

Page 67

review the document?
MR. GOURAIGE: Yes, please.
(Exhibit 70 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Ms. Novodor, have you completed your review of Exhibit 70?
A Yes.
Q Have you seen that document before?
A Yes, I have.
Q And that is an agreement between Beverly hospital, your brother, Charles Liu Beverly Proton to build the center on a different parcel of land owned by Beverly Hospital?
MR. LEUNG: Object to form. Mischaracterizes Exhibit 70, which on its face says it's a nonbinding memorandum of understanding regarding a transaction that the witness just testified was never consummated.
MR. GOURAIGE: I understand your objection.
Q Do you understand my question, Ms. Novodor?
A I was a little distracted, because --
MS. GOLDSTEIN: When you started naming the parties, she started trying to scroll to find the parties.
THE WITNESS: No, the parties are at the top. What I was looking at was the --

Page 68

MS. GOLDSTEIN: Could you please ask your question again, Mr. Gouraige.
THE WITNESS: Okay, I found it. Yeah. This was a memorandum of understanding, and it never went anywhere. There were no final documents relative to this at all.
BY MR. GOURAIGE:
Q Okay. And my question was a very simple one, because I wanted to clarify the record. The testimony that you have provided regarding Alan Construction, all of that related to the parcel on 111. That is the parcel owned by your brother; is that correct?
A That's correct.
Q It has nothing to do with this Beverly Hospital, though; is that correct?
A We have nothing to do with that part.
MR. GOURAIGE: Okay. Let me -- I need to introduce another document for you. Bear with me a second.
MR. LEUNG: Herve, the document on Egnyte that you've marked as Exhibit 71 is the same document as Exhibit 69.
MR. GOURAIGE: I know. I know. That was the wrong one. I'm going to get the right one right now.
(Recess.)
(Exhibit 71 and Exhibit 72 were marked for

Page 69

identification by the court reporter and
are attached hereto.)
BY MR. GOURAIGE:
Q Ms. Novodor, I believe you should be looking at what's marked Exhibit 72.
A Yes. It's not here yet. I mean, we're opening it.
MS. GOLDSTEIN: Just for the record, nothing happens automatically. We have to reload.
MR. GOURAIGE: I know, I know. I keep seeing the circles. It's making my head spin.
MS. GOLDSTEIN: Okay. We now have up a document labeled Exhibit 72.
MR. GOURAIGE: Right. That's the one I need you to look at.
So take your time and look at that.
MS. GOLDSTEIN: And there's no Exhibit 71, correct?
MR. GOURAIGE: I believe there is. It's an Alan Construction document.
MS. GOLDSTEIN: Has the witness been questioned on Exhibit 71?
MR. LEUNG: 69 and 71 are the same thing, so we're skipping that.
MS. GOLDSTEIN: I just want to be clear for the



record. As the person who's next to the witness, she has not reviewed Exhibit 71. If you would like her to, please --
MR. GOURAIGE: No, I don't. I need her to focus on 72.
MS. GOLDSTEIN: Thank you.
MR. GOURAIGE: Thanks.
MR. LEUNG: Valerie, is there a pending question?
THE REPORTER: No.
MR. GOURAIGE: Not yet.
MS. GOLDSTEIN: Mr. Gouraige, do you have a question for the witness?
BY MR. GOURAIGE:
Q Yes. Have you finished, Ms. Novodor, reviewing the document?
A Yes.
Q Okay. You've seen that before?
A I really don't remember this one. And it has my name on it. Let me see the address.
Q You don't think you've ever seen it?
A No. I said --
MR. LEUNG: I'll object to this line.
THE WITNESS: I said I don't remember.
MR. LEUNG: I'll object to this line of questions as outside the scope of permissible discovery. Exhibit



Exhibit 72 purports to be a Mevion budgetary quote for Beverly Oncology, which is not an entity at issue in this case. This exhibit bears no discernible relationship to the corporate defendants charged by the SEC.
MS. GOLDSTEIN: I'll join that objection.
BY MR. GOURAIGE:
Q So you've never seen that? You don't recall ever seeing that?
A I honestly don't remember that coming to Beverly Oncology. And the year is early. I thought it would be closer to 2015. That doesn't -- yeah. I'm a little confused by this particular document. I just don't recall getting one directly to Beverly Oncology. It's just not registering right now.
MR. GOURAIGE: The -- I note the objection from counsel.
Q But at the end there, you see the amount for the equipment. This is a -- I mean, I assume it's cancer treatment equipment being sold by Mevion, Beverly Oncology?
MS. GOLDSTEIN: Objection. The witness has stated that she does not remember receiving this document. She can read it as well as the rest of us, but she doesn't have personal knowledge of this document.
MR. GOURAIGE: I understand that. And I prefaced



my question by saying that I'm just asking her to look at what's on the document.
THE WITNESS: I see.
BY MR. GOURAIGE:
Q So the proton therapy equipment --
A Yes.
Q -- costs a lot of money, correct?
A Of course.
MR. LEUNG: Objection. Object to form. Foundation as well. Calls for speculation. I'm not clear on what you're referring to by proton therapy equipment costs a lot of money.
BY MR. GOURAIGE:
Q Ms. Novodor, are you familiar with the treatment of cancer using proton beam therapy equipment?
A Yes. I'm vaguely familiar. I never ran one.
Q Those equipment cost a lot of money; is that correct?
MS. GOLDSTEIN: Objection; vague. What do you mean by "a lot of money"?
BY MR. GOURAIGE:
Q Well, that one, I think, was roughly -- I don't have the exact number, but $22 million?
MS. GOLDSTEIN: The witness is looking at the document to read the number listed on Exhibit 72.

THE WITNESS: 26,495. That's inexpensive compared to carbon treatment. What are you comparing it to?
BY MR. GOURAIGE:
Q Well, no. I just want to stay on proton therapy. The Beverly -- Beverly Proton was going to set up a center to treat cancer patients with proton therapy. Is that correct?
A Yes, we were.
Q And that equipment costs a lot of money just from your basic knowledge of the business?
MS. GOLDSTEIN: Objection; vague as to "a lot of money."
BY MR. GOURAIGE:
Q In excess of $20 million?
A It is in excess of $20 million according to this quote.
Q Okay. A deposit to buy an equipment like that of 3 million --
A Yes.
Q -- would that -- is that -- based on your knowledge of the business in the industry, is that a reasonable amount to request for a deposit?
MR. LEUNG: Object as calling for opinion testimony. Also calls for speculation.



MS. GOLDSTEIN: Join.
MR. GOURAIGE: I'm not calling for speculation. She's been in the business since 1980. She's a sophisticated person, CEO of the company. She knows the cost of the proton therapy equipment.
Q I'm asking you, Ms. Novodor, is that a reasonable -- based on your knowledge of the business. I know you didn't write the check. I know you didn't control the bank accounts. But paying a $3 million deposit on equipment like that, is that a reasonable deposit?
MR. LEUNG: Object to the incomplete hypothetical. Why don't you fill it, Herve, and say $3 million up front and get nothing in return, is that reasonable.
MR. GOURAIGE: If you want to qualify it, that's fine.
Q Is it nonrefundable?
MS. GOLDSTEIN: Objection. Mr. Gouraige, I don't -- I don't know whether the witness does, but I don't understand your question. Are you saying if someone were to pay $3 million down for equipment as quoted in this quote she didn't receive? What are you asking her?
MR. GOURAIGE: I'm asking her a very simple question.



Q Ms. Novodor, if you understand my question, please answer it. If you don't understand it, let me know. I'll clarify.
You have been in this healthcare business for a long time. You are a sophisticated, intelligent person. You personally -- I understand your testimony you personally didn't write the checks. You personally didn't make the payment to Mevion for the Beverly Proton equipment. But does it strike you as a reasonable deposit for a proton therapy equipment deposit to pay $3 million nonrefundable?
MR. LEUNG: Objection; form. Incomplete hypothetical. You're asking Ms. Novodor to render an opinion on reasonableness without giving her any of the facts and circumstances surrounding the transaction at issue.
MS. GOLDSTEIN: Join.
MR. GOURAIGE: Well, what facts and circumstances would you want her to know, Gary?
MR. LEUNG: I'll have questions.
MR. GOURAIGE: Well, you're making the objection.
MR. LEUNG: And I'm standing by the objection. If you want to debate it on the record, Herve, the 3 million up front was in exchange for nothing, ultimately, at the end of the day. You know that. You also know the



circumstances of the Mevion deal were outside of Dr. Thropay and Ms. Novodor's knowledge. You know that deal was negotiated by Liu on his own, and you know that he was cutting out his partners in connection with that deal. So fill in the hypothetical.
BY MR. GOURAIGE:
Q Okay. So -- so then when -- let's make sure that we understand the context of all these facts.
So Ms. Novodor, let's go back now to the 111 parcel that was leased from your brother. Are you aware -- maybe you don't -- you didn't cut the checks, you don't know the exact amount. You're aware that he was paid rental payment for that land, correct?
A Yes.
Q Okay. Are you aware that at some point in 2016 he took the -- he forfeited the lease and took full possession of the property?
A What? Who forfeited the -- okay. Please reask the question.
Q Your brother between April --
A Dr. Thropay.
Q Between April 2015 to April 2016 --
A Yes.
Q -- was receiving rental payments for the land that the center was going to be built on?

A Yes, correct.
Q After the SEC filed its action on May 26, 2016, your brother, through his attorney, went to court and was able to forfeit the lease because the center had not been built within the time it was required to be built by the lease. And he took possession of the land, and he kept the rental payments.
MS. GOLDSTEIN: Are you representing that to the witness or are you asking a leading question?
THE WITNESS: That's just false.
MR. GOURAIGE: Yes, yes. I am putting in factual context, as Gary suggested we should do with Mevion, and asking her whether that expenditure was a reasonable expenditure by Beverly.
MR. LEUNG: Again, object to form. Are you asking about Mevion? Are you asking about 111 Beverly? What are you asking about, Herve?
BY MR. GOURAIGE:
Q I'm asking about 111, the land owned by your brother between April of 2015 to April of 2016. He received rental payments from investor funds for the lease. He then, after the SEC commenced the action, got permission to forfeit the lease and take the property back, full control of the property, and he also kept the rental payments.

Page 78

A Oh, the previous rental payments.
Q Yes.
A He didn't keep getting rental payments.
Q So is there anything in your judgment -- is there anything improper about those being reasonable business expenditures, the rental payments?
A At the time I do believe they were -- they were payments for giving him access to the land.
Q Right. Before there was a contract, Beverly leased the land for 30 years. It was obligated to make rental payments. It made rental payments to your brother. And when they didn't build the building according to the schedule that your brother claimed, he forfeited the lease. He kept the payments. Do you think your brother did anything improper?
A He rented the land, and that's correct. What's correct is that that was for him to begin construction of the project.
Q Okay.
A And there was a timeline under which he had to do it. It happened to coincide with the SEC. But that was a total, totally independent issue in the lease.
Q So looking back on that transaction now, you wouldn't go back and say well, because your brother forfeited the lease, he has to repay the money back to the

Page 79

investors?
MS. GOLDSTEIN: Objection; calls for improper legal conclusion. And Ms. Lopez Novodor's opinion on that issue is not relevant here.
MR. GOURAIGE: Well, it's relevant to the issue whether it's a legitimate business expense.
MR. LEUNG: I'll join in that objection. I'll also object that the question is misleading, because 111 West Beverly's actually called out in the offering materials, and Mevion is not. And you know that, Herve.
MR. GOURAIGE: Well, that's because of the timing difference. And you also know that, Gary. So but let's not get into these debates. I'm just trying to ask the witness simple questions about facts.
MS. GOLDSTEIN: Ask her questions about facts that she has personal knowledge of. We'll get through this a lot quicker.
MR. GOURAIGE: Okay.
Q So Ms. Novodor, what I just described to you, right, the rental payments were made pursuant to the lease, and your brother kept the payments. So I'm asking you in your opinion as a business person -- not as a lawyer, I know you're not a lawyer. As a business person, is there anything improper and inappropriate about keeping the rental payments?

Page 80

A Up to that time that the SEC came through, there wasn't any reason for us not to collect funds.
Q Right.
A Okay. That's all I can say about it.
Q And as a business -- as a business person, you're also aware that sometimes you do agreements where you require somebody to make a nonrefundable deposit. Is that correct?
A And this was one of them.
Q Right.
A They just never paid.
Q Mevion's nonrefundable deposit, was there anything unusual about the Mevion nonrefundable deposit?
MS. GOLDSTEIN: Objection; lacks foundation. I don't believe you've established that Ms. Lopez Novodor knows anything about a Mevion down payment.
MR. LEUNG: Objection; calls for speculation.
BY MR. GOURAIGE:
Q Well, Ms. Novodor, if you understand the question, you can answer.
A Let me just explain that in any industry, there are variations of how a deal is cut. So, you know, it could be any -- you know, it would be a lot of different things. The question was, was it an appropriate purchase at the time. And I have no control over that decision.

Page 81

It's not about the business element of it, so I can't address it.
Q In business, we do nonrefundable deals all the time. Airlines sell nonrefundable tickets, right?
A I don't know. I'm not going to say I know, because I don't know.
Q Yeah, I mean --
A Well, oh, yeah. I have had a nonrefundable ticket. Okay.
MR. GOURAIGE: Can we take a five-minute break now? Did we agree we're going to break at 3:30 my time for your call, Gary?
MR. LEUNG: Yes, please.
MR. GOURAIGE: So let's take -- let's take a few-minute break now, and I'll be right back.
(Recess.)
(Exhibit 73 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q So Ms. Novodor, did you look at Exhibit 73?
A Yes, sir.
Q Do you know what it is?
A An invoice.
Q It's addressed to you?
A Yeah.



Q Have you seen it before?
A I can't remember the actual document, you know, but I do know that we had a transaction with Nisy Ipe.
Q And what was that transaction?
A Consulting services for a construction company.
Q In connection with what business? Is it for BOIC or was it for Beverly Proton?
A I can't remember. I don't know why it says Beverly Oncology on there. It should be Beverly Proton.
Q Do you know if that invoice was paid?
A I believe it was.
Q And do you know where the funds came from to pay that invoice?
A I'm just going through my mind to try and see if we retained her under Beverly Oncology or Beverly -- I don't recall that. I don't recall that. But I do recall that she provided services, and I do believe she was paid.
Q As you sit here today, do you recall whether you authorized payment from BOIC accounts to vendors who provided services to Beverly Proton?
A Only if there were services that were also provided to us.
Q If they were solely to Beverly Proton?
A Then they would -- then they would have to be written under Beverly Proton. But I -- that's why I'm



confused. I don't remember hiring Nisy for Beverly Oncology, so it's a little confusing for me.
Q Okay. But you know who he is, and you know what he does?
A He, yes.
Q And he is, I assume, a legitimate vendor for that service?
A Yes.
Q Let me -- before I move on to the next subject, I just want do make sure I clarify something. Ms. Novodor, I have been asking you -- as you know -- let me strike that. Strike that. Let me ask you a different question.
Are you aware of the Supreme Court's decision in this?
MS. GOLDSTEIN: Objection; vague. Are you asking whether she is aware that this case went up to the Supreme Court?
MR. GOURAIGE: Yes. It was decided. That's all. I'm just asking her.
Q Are you aware of that?
A Yes. I am aware that it went to the Supreme Court.
Q Okay. So after that decision, what we are engaged in now, all of these proceedings, are about net profits, legitimate expenses, costs, et cetera. That's



why I'm asking you all these questions. I've focused my attention on the expenses that I have reason to believe you may have knowledge of. For example, the lease for the land from your brother, the payments for cancer equipment, the deposit for cancer equipment, the various consultants who did work in connection with that part of the business. I don't want to make an assumption, but I want to ask you this question.
There were a lot of other expenses. For example, Beverly Proton Regional Center had an office that they paid office rent. They had general administrative expenses. They paid taxes, California franchise taxes. They paid other expenses. Were you involved in any of those expenses by Beverly Proton? Were you aware of any of them?
A Taxes, no.
Q Okay.
A No. You know, the rent, just one day I saw him drive in, and he had an office. No. He was managing all of that.
Q Okay. So --
A I would find out just as a matter of, you know, facility, if you will. Oh, we have an office now over on such-and-such street or whatever. So I am not privy to the financial transactions. You know, all the other ones





Veritext Legal Solutions
866 299-5127

or whatever they are, I don't know. He managed that. I had no access to the bank account. I had no -- I didn't get any reports, didn't get any financials.
Q Okay. So I'm not going to ask you any questions about those expenses because, as you just testified, you're not aware of any of them. But you did -- I did want to ask you one question that you've just answered, but I just want to make sure I understand the total answer. Did you ever see financials for Beverly Proton Regional Center, the EB-5 Fund, did you ever see that?
MR. LEUNG: Objection; vague.
THE WITNESS: I don't recall.
BY MR. GOURAIGE:
Q So now let's go to another category of expenses. Well, actually, before I go there, one last question with respect to you. Was there any discussion at any time about the compensation you would receive for your work as COO of Beverly Proton?
A I don't -- I honestly cannot remember that discussion. For me, it was so far off, I never even thought of it as -- I don't remember it if there was a discussion. Of course, we weren't receiving any compensation.
Q Do you remember any discussion of paying you $200,000 a year for your work?



A Okay. Maybe that was the number that came out. But I mean, that's after it's operational is my understanding.
Q Right. I'm not saying that you were paid.
A Okay. Thank you. Because I missed it if it came.
Q No, I'm not saying you were paid that. I'm just saying, I mean, I know you do a lot of nonprofit and volunteering great work in the community. But you weren't doing this as a nonprofit enterprise?
A No.
Q So you were expecting to be paid for your services when the center got started and developed?
A Yes, sir.
Q Okay. And you were providing legitimate services, and there wouldn't have been anything wrong with paying you for your services; is that correct?
MS. GOLDSTEIN: Objection; hypothetical.
THE WITNESS: I mean --
BY MR. GOURAIGE:
Q Well, you did -- I mean --
A It's operational and the funds are there.
Q You've just testified in the past few hours to a lot of things you did. I mean, this is all work you were doing to help develop --



A I didn't expect to get paid for this during development. I didn't expect anything for the development. I was only -- they had to list people, and I was listed as the chief operating officer in one company, which probably was defunct at the time we got all the companies out. I don't remember where that sat. But in original discussions, yeah, they possibly did talk about salary. 200,000 sounds about right.
Q Right.
A Okay. Once it's operational and there's cash flow, yeah.
Q Okay. Now, in all of the dealings you've just testified about for the past few hours, you were interacting with Charles Liu, who was in charge. He had control of the banking accounts. He was negotiating with all the vendors. All of these contracts were being handled by Charles Liu. He too was providing services to the construction -- to the ultimate development of Beverly Proton, wasn't he?
A He was raising funding.
Q Right. Well, he was raising that too. I'm going to ask you about that separately. But now I want to ask you about the services he was providing. I mean, you said -- again, I don't want to put words in your mouth. I think I'm correctly characterizing what you said. He was



in charge. He made the decisions. You never questioned them. He had control of the bank accounts.
A No, I did question him.
Q He made -- well --
A But generally, yeah. If I didn't have any reason to be told that I shouldn't, I wouldn't. But go on.
Q You didn't pick up the phone and talk with Mevion about the cancer equipment, right?
A No. I did talk to them once, but.
Q Okay. Charles Liu did.
A But I hear what you're saying. He did some work. So what's your question?
Q Okay. So the question is like you expected to be paid, you think he expected to be paid or was this just volunteer work?
A The assumption was that we weren't --
MR. LEUNG: Objection. Objection; calls for speculation into Mr. Lui's mindset.
THE WITNESS: We were partners. We weren't gonna get paid.
MS. GOLDSTEIN: Join. Also --
MR. GOURAIGE: You were not going to get paid?
MS. GOLDSTEIN: Mr. Gouraige, also it misstates Ms. Lopez Novodor's prior testimony, which is that she did not expect to get paid during the development phase of the

project.
THE WITNESS: Exactly.
MR. GOURAIGE: I'm not asking -- well, let me clarify.
Q The project, Ms. Novodor, began sort of in, roughly -- let's say it started on November 19, 2010 when the application was submitted to USCI. Is that your recollection?
A Yes.
Q And ultimately ended on November 26, 2016 when the SEC filed a complaint?
A Correct.
Q During that period, what would you call the development phase of the project?
A Getting it up and operational. Building it, setting it up, getting it operational.
Q And when was that going on?
A It never did. I mean, I'm not clear on your question. I mean, the building never went up. He had a year to get it up on the last lease agreement. And I don't know where all the time went, but nothing happened. So I'm not saying he doesn't deserve something or not deserve. That's not my -- that's not for me to decide. But, you know, I'm not -- I'm not the one determining what is legitimate under the offering memorandum. I can't do

Page 90

that for you.
Q I understand that, and I'm not --
A I can't do that. And I don't remember anything outside of that. There were fees allocated for if he sold, but they weren't millions of dollars. I mean, they were whatever is allowed under the EB-5 program. So you're asking me to be a lawyer. I'm not a lawyer.
Q Believe me, I would not ask you to be a lawyer.
A Thank you. I was married to one. I don't need to be one.
Q You can stay as a businesswoman. You can see what lawyers do, and I'm sure you don't want to be a lawyer.
A I don't.
Q So let me go back to my question. So before the application for the regional center was submitted to USDIS on November 19th, 2010 -- now this was your brother's project that he conceived -- Charles Liu came in as the guy who was going to get the EB-5 financing.
A Uh-huh.
Q I think you mentioned earlier a lawyer that he had. And I mentioned the name to you Steven Yale-Loehr. He was the person -- he's the person who signed the letter who sent the application for the USCIF.
A Okay. I didn't remember his name.

Page 91

Q Now, that was a big document, big report. It had an economic analysis of the Montebello area. Obviously the lawyer was paid. That was the development phase. Your brother didn't make those payments as far as you know, right?
A No, no.
Q Charles Liu made those payments?
A Correct.
Q At some future point after they got the POM ready and they started recruiting investors to invest capital, that went into a separate phase of the project. And that was largely done by Charles Liu, correct?
MR. LEUNG: Object to the form. You know, Herve, you've been testifying at length for the last five minutes. Can you please just ask the witness what she knows.
MR. GOURAIGE: I am. I am asking what she has. I mean, I think you need to make up your mind, Gary. When I ask questions, you say you don't give her enough facts and foundation. When I give her facts and foundation, you object to that.
MR. LEUNG: Object to the form. Misleading to the extent you're conflating development work in 2010 with the offering charged by the SEC's complaints, which concerns about 26.9 million raised beginning in October

Page 92

2014 through the end of 2015. We also object on relevance grounds to all these questions about things that happened in 2010, years before these investors invested.
BY MR. GOURAIGE:
Q So Ms. Novodor, you just heard what Mr. Leung said for the SEC. I'm sorry you had -- there was an objection.
So you had the early development and work to get the regional center approved, then you had the fundraising. And according to Mr. Leung, it occurred between 2014 to 2015, 2016. Between 2010 and 2014, there were expenses, right? I mean, Steven Yale-Loehr didn't do this pro bono.
MS. GOLDSTEIN: Objection.
MR. LEUNG: Objection; foundation.
MS. GOLDSTEIN: Join. Ms. Lopez-Novodor testified that she doesn't know the name Steven Loehr. You're asking her whether he was working for free or not.
MR. GOURAIGE: No. She testified that Charles Liu hired a lawyer. She doesn't recall the name of the lawyer.
Q So Miller & Mayer, you are familiar with that law firm?
A Yes.
Q Now, it wasn't your understanding that they were

Page 93

doing pro bono work, was it?
A No. But Charles made it very clear to us that he was also using his personal funds to do some of this. We didn't know which part were his personal funds and which ones were legitimate proton business expenses. But he had the lawyer that could explain to him what was legitimate and what wasn't, so I went by what he said.
Q Okay. So now let's go to what Mr. Leung characterized as the capital raise period that he said occurred between roughly 2014 to early 2016.
A Okay.
MR. LEUNG: I said end of 2015.
MR. GOURAIGE: End of 2015.
Q Now, the question to you, Ms. Novodor, is --
A Yes, sir.
Q -- did you personally play a role in that capital fundraising?
A I told you that I did an -- I did indirectly support that process whenever he needed me to do so.
Q Okay.
A Okay?
Q And did you recruit any investors, any EB-5 investors, to invest?
A I did not. Personally face to face, no.
Q Okay. We talked earlier about Delsk.



A Yes.
Q And I think it's your testimony that you believed Delsk raised about 25 million.
A Yeah. That's what I estimate.
Q Was that a -- was that a guess?
A It is a guess right now. I don't have the documents in front of me.
Q Okay. Do you know how many investors Delsk brought to the project?
MR. LEUNG: Objection; asked and answered.
MR. GOURAIGE: I don't think she even recalls a number. I'm sorry?
MS. GOLDSTEIN: If you don't know, you can't.
THE WITNESS: Yeah.
BY MR. GOURAIGE:
Q Okay. So I just want to -- Ms. Novodor, I want to explain to you what I'm trying to do here. There's no point in me asking you questions about things that you don't know anything about. So we've established that with respect to other administrative expenses, you were not involved with, I understand that. Now I want to establish the extent, if any, to which you were involved in recruiting investors. If you were not involved with that, then I'll move on.
A Yeah. I was not involved other than what I've



already testified.
Q Right.
A Helping him facilitate that.
Q Okay.
MR. LEUNG: Herve, I really do have a hard stop at 12:30. So I don't know how much you have in the next line of questioning that you want to do, but if you could just extend me the courtesy of having us go off record a couple minutes in advance of 12:30, I'd appreciate it.
MR. GOURAIGE: That's fine. You want to break now?
MR. LEUNG: Fine by me.
MS. GOLDSTEIN: Fine by me.
MR. GOURAIGE: That's fine. Why don't we break now. What time are we going to resume?
MR. LEUNG: 1:25, 1:30?
MR. GOURAIGE: I think 1:25 is find with me. Is that good?
MS. GOLDSTEIN: Yes, thank you.
MR. GOURAIGE: Okay.
(Recess.)
BY MR. GOURAIGE:
Q Ms. Novodor, have you -- do you know, I apologize to ask you this question, but I don't want to be faced with an objection of lack of foundation. Do you know what



an income statement is?
A Of course.
Q I thought so.
A Yes.
Q Have you ever seen an income statement for Pacific Proton Regional Center?
A I've seen projections for sure. I've asked for financials. And to be honest with you, I got one page, and the top part was illegible. And I called Charles back to please resend. I don't remember anything else. As far as I know, we never received any financials no matter how much we asked for them.
Q Okay. Would that include also Beverly Proton?
A Yes. I mean, I didn't get any financials for anything, frankly.
Q And when you say no matter how much we asked for them, you asked Charles Liu for them?
A Yes. When the money started coming in, then we really wanted to start finding out what was going on. And yes.
Q Okay.
A It was a little bit flimsy at the beginning, but, I mean, it was just getting starred. But once money really started coming in, we wanted to know where it goes.
Q So let's talk about the money coming in. I

assume you're talking about the EB-5 investor funds?
A Correct.
Q Do you remember what year they started coming in?
A Well, there were a few that were in an earlier year, which I don't know what the exact date was. But it was like about two or three years before Delsk. When Delsk -- I think there were only -- there was just a handful at the beginning. There weren't very many. And I -- but the funds started coming in after Delsk and the Chinese New Year. Then there seemed to be a much heavier influx of cash coming in.
Q Do you recall whether the funds started coming in in 2013?
A You mean the original few?
Q Right, the initial investor funds.
A That sounds about right, but I don't remember the exact year. I'm not good with years. They all flow together with me at this age.
Q How did you know the funds were coming in?
A First of all, we got e-mails from Delsk saying, guess what, we signed up 1, 2, 3, 4, 5. Charlie, did we really get 1, 2, 3, 4, 5? So that's how we started knowing, because Delsk would -- after we went to Delsk, especially, they were in open communication with us. So they wanted us to know when the money was coming in.



Q And the e-mails from Delsk, who at Delsk sent you the e-mails?
A Mostly the gentleman you named spoke fluent English.
Q Edison? Edison Zhan?
A Edison, yeah. Zhan, yes. Z-h-a-n, I believe.
Q Okay. And he would send e-mails to you and to your brother, Dr. Thropay, about the --
A I don't know how they came in. Sometimes they went to Charles. I was not, like, the contact person or anything. I mean, it really was Charles. But he would send copies to us if it was good news or something like that. That's what I'm imagining right now, because I -- I have not looked or can't -- I mean, everything is -- I no longer have access, so I can't remember how it came in. But we did know that there were -- there were folks that were sending money.
Q Apart from the e-mails from Edison Zhan, did you get any other confirmation that, in fact, money was coming in to the checking accounts?
A No, because we had no access to the bank accounts. I had absolutely zero access to the bank accounts.
Q So you just trusted what Edison Zhan was telling you?



A Of course. Operations hadn't started. It wasn't my -- it wasn't my, you know, my time yet. This was all fundraising that Charlie said he was taking care of all of it.
May I turn off my phone?
Q Sure.
A We'll all appreciate it.
Q Okay. Did you know once the funds started coming in, that funds were going out --
A No.
Q -- to pay vendors or other things?
A No. Oh, Charlie told us money was coming in too, and he would tell us if he felt obligated to pay someone like Optivus. He said, "Oh, I decided I was going to pay Optivus, so they would stop sending us" -- sending him invoices. Or he just wanted to get it paid off, because they were the one that introduced us to him. He used to be their salesman, and he came with high, high recommendation.
Q So I am going to show you an exhibit now, Ms. Novodor, and ask you if you recognize it.
A Okay.
MR. GOURAIGE: Bear with me a second.
MS. GOLDSTEIN: I see Exhibit 74. Is that what we should be coming up for the witness?



MR. GOURAIGE: Yes.
(Exhibit 74 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Do you see that exhibit, Ms. Novodor?
A Yes, I see it.
Q Have you seen it before?
A Don't remember it at all. I just don't remember it at all.
Q Do you -- when you look at the name -- that is, I think, both names are your names on the exhibit. From you to you, right?
A Yes, that's what it says. But I don't know what it says. I've never dealt in the Chinese language. I don't know how that happened.
Q And you were sending it -- the e-mail address it was sent to, was that the BOIC e-mail address?
A It says Beverly Oncology right there.
Q And what was the e-mail address that it was coming from?
A That I don't know. Might be the same one.
Q Look at the bottom of the document. There is a reference to a McGuire Woods. Do you know what that is?
A Where?
Q At the bottom of the document.

A "McGuire Woods, may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others."

MS. GOLDSTEIN: For the record, Ms. Lopez Novodor was reading the text on page 2 of Exhibit 74 after testifying that she doesn't remember Exhibit 74.

BY MR. GOURAIGE:

Q Do you know what that is, Ms. Novodor, that -- well, first of all, let me ask you. Do you know what McGuire Woods is?

A I know who they are.

Q Okay. And do you know why that statement is at the bottom of that document you e-mailed to yourself?

MS. GOLDSTEIN: Objection. Lack of foundation. We can all see that this e-mail says from Ms. Lopez Novodor to Ms. Lopez Novodor. But the witness has not testified that she sent this e-mail to herself.

BY MR. GOURAIGE:

Q So okay. Ms. Novodor, the document says Ruth Novodor sending it to Ruth Novodor at Beverly Oncology e-mail address. I understand your testimony that you don't recall it.

A I don't.

Q Do you have any reason to believe that that is a



fraudulent document? Somebody else did it?

A I didn't say that. I just don't know where it came from, because I have no recollection of a document. I just have no recollection at all of this document. I don't even remember getting Chinese e-mails, but I'm sure I got something from Delsk once in a while. But I mean, I didn't know how to read them, so I would just move on to the next thing. I didn't know what it was.

Q Was McGuire Woods your counsel at some point?

A At some point she was -- they were.

Q When was that?

A I want to say 2015. I don't remember when she came on board.

Q Okay. And this was to represent you personally, not --

A I don't know what this is for. I don't know what this even says, sir.

Q No, I'm not talking about the exhibit. I'm sorry. Put aside the exhibit. I'm asking you whether you were being represented personally by McGuire Woods in 2015?

A Yes.

Q So they were not representing BOIC or Beverly Proton?

A I don't remember who they listed. I know I was



one of the clients, one of her clients.

Q Okay. So give me a minute. I'm going to show you another exhibit.

A Is this 74?

MS. GOLDSTEIN: Yeah.

THE WITNESS: Oh, okay.

MS. GOLDSTEIN: Let us know when to refresh, please.

MR. GOURAIGE: Well, the circle is still going around. I guess any minute the document will see it, pop up.

You see that document, Ms. Novodor?

MS. GOLDSTEIN: We just got Exhibit 75. We are opening it.

MR. GOURAIGE: Why don't you take a look at it. Let me know if you recognize it.

MS. GOLDSTEIN: It's several pages, so take your time.

THE WITNESS: Oh, it is several pages? Okay.

(Exhibit 75 was marked for identification by the court reporter and is attached hereto.)

BY MR. GOURAIGE:

Q Do you recognize the letter?

A I remember some of the names. I remember the name Tony. I know Molly.



Q Do you know Mr. Regenstreif?

A Do I know who?

Q Do you know Tony Regenstreif?

A I don't. Not -- I don't remember. I don't remember if I know him. I may have met him, but I don't know, you know.

Q In connection with this case?

A Yeah. Yeah, the name sounds familiar as one of the people from the Securities and Exchange Commission.

Q Okay. Do you know his wife?

A Who's his wife? I'm sorry.

Q You don't know his wife?

A No.

Q Okay. I want to point out to you, I believe, on the second page of the letter, there's a reference to a meeting with Delsk. And it refers to one person as Edison Zhan and then the other person is, what, Xin Wang?

A That was the president. Now I do remember his name.

Q You sure that was the president?

A No.

Q Does the name Wang Jing?

A No, that's the --

Q J-i-n-g ring a bell for you?

A I'm sorry, sir, but they're similar. And I --

this is years later now.
Q That person in that letter is Mr. Liu's wife, Lisa Wang.
A Okay.
Q Did you meet with Lisa Wang as a representative of Delsk?
MS. GOLDSTEIN: He's asking you separate from this -- whatever this document says. Did you meet with Lisa Wang as a representative of Delsk?
THE WITNESS: I don't remember. That's his wife, right. That's why the name sounds familiar.
BY MR. GOURAIGE:
Q So when you say you don't remember, are you -- are you saying that that letter may be accurate, that you did meet with Mr. Wang's wife -- I mean, I'm sorry, Mr. Liu's wife as a representative of Delsk?
A I'm trying to remember if she ever represented herself as Delsk, and I don't think so.
Q Okay. How many times do you think you met her?
A Maybe three, four times.
Q Can you describe her for me?
A Oh, yeah. She's a beautiful woman, tall, stately, professional, alert, bright, articulate. I don't know. What else do you want me to tell you?
Q I mean, look, those are all great descriptions.



You have a very good memory. Going back to the letter now that you're looking at, that's in front of you, Exhibit 74, I believe. As you sit here today, are you certain that --
MS. GOLDSTEIN: Mr. Gouraige, I believe we're on Exhibit 75.
MR. GOURAIGE: I'm sorry, 75. I misspoke.
Q As you sit here today, are you certain the persons you met with in China who represented Delsk were one male, Edison Zhan, and a female or two men?
MS. GOLDSTEIN: Mr. Gouraige, just so the record's clear, you've asked Ms. Lopez Novodor to look at this document that she is not the author of. But am I correct in understanding your question is outside of this document, what the genders of the people who represented Delsk?
MR. GOURAIGE: Yes. I'm asking her as she sits here today and thinks back about that meeting.
Q What do you recall?
A There were many people in the room, and she might have been one of them.
Q Okay.
A But I can't, you know, name everybody that was there. The one I was listening was the gentleman who claimed he was president, so that's all I have to --



that's what I know.
Q Is that the only time that you've met Edison Zhan?
A No.
Q How many times have you met him?
A Well, he had come earlier to check out the site and things like that. So at least once earlier.
Q So now to get back to the funds that Edison Zhan told you were coming in, did you at any point have any suspicion that funds were being misappropriated or improperly used?
A On our own? On my own, no.
Q Did anybody else come to you and say to you --
A Yes, they did. Delsk.
Q Okay. When did that happen, the time period?
A I think it's 2015. They were very desperate to talk to us and told us that they were sure that money was not -- was not being held appropriately in the fund and that they had documents from banks that were sent to them by Charles that they didn't feel were accurate. So they were kind of communicating things that were very unsavory, and we said no, that's not possible. He's very reliable. We have worked with him for, you know, these few years, and he came highly recommended from a very strong foundation, Optivus. And we just don't think that that's



happening, and I'm sure there's an explanation.
And they insisted that we fly over there immediately, and that was the day before Thanksgiving. I usually hosted at my house. I had to tell them all to find a bird somewhere. And we flew to Beijing, because they really wanted to show us what they had.
Q Now, when you say "we," are you referring to you and your brother?
A My brother and I took it very seriously, yes.
Q Okay. Did you go to Beijing?
A I went to Beijing.
Q Did they show you documents?
A Yes.
Q What did they show you?
A Bank statements that were signed, and one of them we couldn't tell if it was legit or not. And we didn't know, so we didn't -- they thought it was maybe forged, but we didn't follow up with that. We just said no, we're going to look into the bank account ourself, and we'll let you know. So we -- oh, before we went, Dr. Thropay went to the bank and brought the documents with us. And so we didn't expect to see what we saw, money coming in from Beijing and going out to Singapore. I didn't know what that was about. We just didn't know.
Q The bank documents you saw, do you recall which

bank?
A I want to say Chase, but I don't remember. And there was another bank that I don't remember. Was it East West Bank, maybe?
Q And the account was a Chase bank account in Beijing?
A I don't know for sure. It was -- no. These were United States banks where supposedly the money was being deposited. And then they didn't know if the funds were being held even before -- they just had a lot of questions, and we didn't have any answers.
Q So let me see if I understand. The investor funds were coming into a bank in the United States. You think it was Chase bank?
A No, I actually think it was a fund bank, the fund. And it was a different bank. It was a smaller bank. I want to say it was an Asian bank of some kind. And that's my recollection. I do not have a perfect recollection at this point.
Q And then the funds were going out to Singapore?
A No. Well, it looked like they were going to Singapore or large chunks of cash were being pulled out of the bank. But we never told Delsk any of that. We had just discovered it while we were sitting at the table looking through them, because we weren't -- did not

Page 110

believe we would find anything.
Q So you and your brother were looking at these bank statements, and you discovered these facts, and you didn't tell -- when you say Delsk, are you talking about Edison Zhan?
A Yes, because we didn't know. We wanted to hear from Charles.
Q So you didn't tell Edison Zhan any of that?
A Maybe we were misinterpreting it. We just didn't expect it from Charles.
Q The bank records you were looking at, were they in English?
A Yes. They were American banks.
Q And whose accounts were they?
A Well, the only one that John had access to -- he did have access -- was to the proton therapy account. He didn't have any access to the fund account. He only had access to the regional center account, I believe. And funds were moved from the fund account to, I believe, the regional center account. And that's where we were picking up that money was going from -- going to Singapore, the ones that we saw going to Singapore and the cash was coming out.
Q So let me understand. I'm having some difficulty here, so maybe you can explain it to me. John is

Page 111

Dr. Thropay, right?
A Yes, sir.
Q He had access to the regional center bank account in the U.S., correct?
A The only way he could access it, though -- because Charlie had taken him off of the online access, and he didn't know it.
Q Okay.
A Is because when we flew to Beijing, he couldn't get in anymore. They said he was not authorized to get on the online anymore. So he walked into the bank and said, "I'm a signer, and I want hard copies."
Q So he -- Dr. Thropay went into the American bank branch office in Beijing and asked for copies of the bank --
A No. Before we flew out there, just like the day before. But we didn't have time to look at them. We were all getting ready to go someplace when we didn't plan on going. So we didn't look at them until a little bit while we were on the plane. And then when we sat down to dinner, we still had the rest of the pages, because it was a big stack, to go through. And we were doing the math to say, well, they put in, you know, 10 million. Let's see. Where is this? Is there 10 million going out too? And we had to try and figure it out.

Page 112

Q Okay. So Dr. Thropay got the records from the US Bank here, and he flew with you to Beijing?
A Right.
Q On the way there you looked at the bank records, and you discovered the monies coming in and going out to Singapore?
A Yes.
Q I thought you said earlier that Edison Zhan asked you to fly to Beijing because he had evidence to show you?
A Yes. That was the first thing I mentioned. And those were letters that Charlie sent to Delsk to prove that the money was -- prove -- that the money was still in the banks they should be in. And letters from one of the banks saying, "We promise you that we will not spend any of the money in the accounts." It just was very unusual.
Q And those letters from Charles Liu to Edison Zhan were in English?
A Yes.
Q And Edison Zhan asked you and Dr. Thropay to fly to Beijing so he could show you those letters?
A Well, he wanted the Delsk higher-ups to give us a stern warning that unless we cleared this up, they were not going to go forward selling the -- they were not going to work with us. And we said, you know, we need to go home and figure out what's going on. We were not aware of

Page 113

any of this, and we're just going to go -- we need to talk to Charles.
Q So while you were in Beijing and you knew from your review of the -- what you think may have been Chase bank statements that something was improper, you did not tell Edison Zhan that?
A When we found out, we weren't sure. What if it's a perfectly legitimate explanation for what we were -- we don't want to just jump to a conclusion. So we left Beijing, came back. At that point, Doctor was worried about his license, so we hired a lawyer.
Q Why -- strike that.
Who hired the lawyer?
A Dr. Thropay and I.
Q Who was the lawyer you hired?
A First one was Lance Kimmel.
Q And did you ask the lawyer to investigate what you had learned?
MS. GOLDSTEIN: Objection; calls for attorney-client privilege information, what she asked her lawyer to do.
MR. GOURAIGE: Well, I'm asking her.
Q You had all this information, Ms. Novodor. You didn't know whether this was all accurate, but it was very troubling to you and Dr. Thropay. He was concerned,



obviously, about his license. And you were concerned because you were involved in the business. So you hired a lawyer. You hired the lawyer to do what? To sue Charles Liu?
A No.
MS. GOLDSTEIN: Objection. Sorry, just take a moment to go slow. At this point, she has testified she consulted with a lawyer. We're very close to privileged information. And I'm curious, Mr. Gouraige, what relevance this has, what kind of information you're seeking so we can sparse out the privileged areas before Ms. Lopez Novodor testifies.
MR. GOURAIGE: Well, the -- what she just volunteered is at the call of the case, because this is an allegation of misappropriation of investor funds by Charles Liu. And she said that they were both concerned about it, and they hired a lawyer.
MS. GOLDSTEIN: Well, on that showing, I'm not going to permit her to testify on what she hired a lawyer to do. She sought legal advice. She sought legal advice from Lance Kimmel. That's what you're entitled to in that area.
MR. GOURAIGE: Well, I mean, she's certainly entitled to assert her privileges. But if she does, we're going to ask the court to not permit testimony on



misappropriation and to draw adverse inferences.
MR. LEUNG: Herve, don't threaten the witness.
MR. GOURAIGE: Pardon?
MR. LEUNG: Don't threaten the witness.
MR. GOURAIGE: I'm not threatening the witness. I just said that she's entitled to assert her privilege, which she has. But we will ask the court to do what you're entitled to do when my clients raise the 5th Amendment. It's a legal position. I'm putting that on our record so her attorney understands our position so there's no misunderstanding down the road.
MR. LEUNG: Ms. Novodor is a third party to this proceeding. Your client has been charged and found liable of securities fraud. She's a third-party witness. So make your record, but this is ridiculous.
MR. GOURAIGE: Well, I think that -- she may be a third -- I mean, she is a third-party witness, but that's not the point. The point is the very issue that we're litigating, the remedial issue is misappropriation --
MR. LEUNG: What's your authority for the legal proposition that you can draw an adverse inference against a third-party witness, someone that's not a party to the litigation?
MR. GOURAIGE: I didn't say I was drawing an adverse inference to a third-party witness.



MR. LEUNG: Okay. Go ahead, please.
MR. GOURAIGE: Okay.
Q Ms. Novodor, I'm going to show you another exhibit, so bear with me for a minute.
A Which one is it?
MS. GOLDSTEIN: It's not up yet. Please let us know when to refresh.
MR. GOURAIGE: I guess it must be refreshing. I see the circle spinning around.
(Exhibit 76 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q So Ms. Novodor, do you see on the screen Exhibit 76?
A Uh-huh. Okay.
Q Do you recognize the document?
MS. GOLDSTEIN: Mr. Gouraige, sorry. She was just telling me to go to the next page.
MR. GOURAIGE: Oh, I'm sorry.
THE WITNESS: I do remember this.
BY MR. GOURAIGE:
Q Do you remember this letter?
A Yes, I do.
Q Could you tell us what it is?
A It's a letter.

Q By the way, before I ask you that question, that's the lawyer you hired to investigate the issues you just testified about?
A I didn't say that.
Q I'm asking you a question.
MS. GOLDSTEIN: This was a letter from your lawyer?
THE WITNESS: This is the lawyer that I hired.
MS. GOLDSTEIN: To provide her with legal advice. Please leave it there, Mr. Gouraige.
BY MR. GOURAIGE:
Q So but that's what I'm trying to find out. The -- let me get the name of the lawyer here.
A Lance Kimmel.
Q Right, Lance Kimmel. You just testified -- your lawyer's asserted an attorney-client privilege on that -- on those communications -- that you hired a lawyer when you came back from Beijing, you and Dr. Thropay.
A Correct.
Q Now I'm showing you an exhibit from Lance Kimmel to my client, Charles Liu. And you've testified again, I think, you recognize the letter?
A I do.
Q And before I ask you about the substance of the letter, I'm asking you is Mr. Kimmel the lawyer that you



had hired when you came back from Beijing to represent you?
A Exactly.
Q Okay. All right. So now tell us what is that letter?
A To please give us an explanation of -- for financial statements, a demand for accounting.
Q And did your lawyer or you or Dr. Thropay get a response from Charles Liu?
A I believe they did, but it wasn't financial statements. It says to speak to my CPA, and he spoke to the CPA and got nothing.
Q And what did you do about that?
MS. GOLDSTEIN: I would caution you not to share any communications you had with any lawyers that you hired. But things you did like consult with a lawyer, other steps you took like that are fair game.
THE WITNESS: I'm just trying to remember what, actually. I don't think -- once we didn't get anything, then, again, I consulted with a lawyer, another lawyer.
BY MR. GOURAIGE:
Q A different lawyer?
A A different lawyer. And Dr. Thropay and I decided to bring it to the SEC.
Q Okay. And when did you -- when did you decide



that?
A When we brought it. 2015 I think it is, 2016. I don't know the year. Let's see. This letter was in 2015, December. Yeah, it was probably not long after this letter.
Q Okay.
A Because we waited a while. So it must have been January, February. I'm not sure, right around there. But it was subsequent because we had nothing to work from.
Q Okay. In late 2015, were you aware of major business differences between Charles Liu and Dr. Thropay?
MS. GOLDSTEIN: I'm going to to object to that question as vague as to -- I'm sorry, major business disagreements. Could you be a little more specific?
THE WITNESS: Yeah. Be specific, please.
BY MR. GOURAIGE:
Q Well, did they have differences about the project, the Beverly Proton project, and the personnel who was to function in what capacity? Were you aware any of that?
A No. We were searching. They were searching for somebody to partner with us.
Q And when you say "they," you're referring to Charles Liu?
A And Dr. Thropay and myself. We were all, you



know, interviewing in the processes.
Q And did you find somebody?
A No. Nobody stepped up in the end, which is what we were -- yeah. They didn't step up in the end. And then when this came up, that was all moot.
Q What about Beverly Hospital?
A That's very interesting when you ask that question. Why are you asking that question?
Q Well, I don't know. Why is it so interesting?
A Because I wasn't aware until after I read that -- you know, I didn't know that there was an arrangement between Beverly Hospital and other folks. I do know that she was holding meetings on Charles' behalf. One time I saw that happen. And that was with USC, and it was very embarrassing. These doctors know us. Dr. Thropay works with them. He went to school with them at USC.
Q Does he know the doctors at Beverly Hospital?
A Yes, of course he does.
Q And --
A But the materials that were printed out showed that she had already met with City of Hope. It said City of Hope on it, COH. She passed that to USC. And we hadn't attended the COH meeting. And we're his partners.
MS. GOLDSTEIN: Let Mr. Gouraige ask a question.
BY MR. GOURAIGE:

Q Okay. Would -- if you know. I mean, I can ask Dr. Thropay this question, but I'll ask it to you. Would Dr. Thropay have agreed to work with Beverly Hospital as a partner in Beverly Proton's project?
A We invited them years before that. And they said they didn't want to have anything to do with the specialty center.
Q Okay. But he was willing to do that?
A Of course.
Q The bank statements you saw that revealed to you this what appeared to be improper movement of funds, did you ever finally identify where the funds went to in Singapore and whether it was improper or not?
A No.
Q I can't hear you. I think --
A No.
Q Okay. So as you sit here today, you don't know that Charles Liu misappropriated any funds from investors?
A That's not my job at this point. I have no idea.
Q Ms. Novodor, did you ever ask Charles Liu to help raise EB-5 funds for another project?
A Never, that I can remember. Maybe I did. You know, it's ten years ago. I thought this was a great model. I was selling it to the politicians. I thought it was a wonderful model and -- ah, okay. I didn't, but my



husband did.
Q Were you aware of that?
MS. GOLDSTEIN: Mr. Gouraige, does this have anything to do with the scope of discovery in this case?
MR. GOURAIGE: Well, I think it has something to do with credibility.
MS. GOLDSTEIN: The credibility of Ms. Lopez Novodor?
MR. GOURAIGE: Yes.
MS. GOLDSTEIN: What's that?
MR. GOURAIGE: Well, I don't think -- I'd like to get the answers from the witness before I share with her where I'm going.
MS. GOLDSTEIN: Okay. Last time you made that representation on the pledge agreement, you never went anywhere that had anything to do with the proper scope of discovery in this case. So I'd like a proffer from you as to -- as to what relevance this has, where it's going.
MR. GOURAIGE: Well, it's relevant to anytime a person testifies, the person's credibility is relevant. It is not substantive evidence on the issues of net profit and losses for legitimate business expenses. But the credibility of any witness is always at issue.
MS. GOLDSTEIN: That doesn't mean you can seek discovery on any extrinsic issue to --



MR. GOURAIGE: I agree with you. But I can certainly seek discovery on issues that did provide motivation, her testimony that would -- that would shed light on credibility. So that's -- this is -- this is one area.
MR. LEUNG: Object. Outside the scope.
MR. GOURAIGE: It's outside -- credibility is outside discovery?
MR. LEUNG: You've not closed the loop. I hear your argument. But under your logic, virtually anything under the sun that the witness knows about that could possibly go to credibility notwithstanding its lack of any clear or direct or even tangential connection to the relevant issues in the case would be discoverable, and that's simply not what rule 26 provides for. So I object; outside the scope.
MR. GOURAIGE: Well --
MS. GOLDSTEIN: I'll ask you to move on, Mr. Gouraige. We're now I don't know how many hours on the record, but hours and hours with this witness. And I'd like you to -- you know. If you have questions about net profits, about whether Liu and Wang can be held liable as partners or her consorted wrongdoing, facts that Ms. Lopez Novodor knows. But questions about whether Ms. Lopez Novodor pitched a different project or whatever it was you



asked her are just far outside these bounds. We've given you quite a bit of latitude here, but we'd like to ask you to move on.
MR. GOURAIGE: Okay. Well, I mean, are you -- are you instructing the witness not to answer these questions?
MS. GOLDSTEIN: Are you going to ask me -- are you going to continue on this line of questioning if I don't despite the court's order in this case?
MR. GOURAIGE: What's the court order that bars this line of questioning?
MS. GOLDSTEIN: Docket 311. Your stipulated scheduling order that sets out the scope of discovery.
MR. GOURAIGE: And it's your position that that order prohibits examination on credibility or motivation?
MS. GOLDSTEIN: It's my position on the record that you've made, which is not very much here about where you're going with this, that you can't just ask questions about any topic that Ms. Lopez Novodor has ever been involved in by calling it credibility. I've given you the offer to make a proffer about where you're going with this so that we can understand whether it has any tangential relationship to these topics. But no. The idea that you can ask her about anything despite the court's -- the Supreme Court's limited demand and the court's limited

discovery order by calling it credibility is not appropriate.
MR. GOURAIGE: Well, first of all, I did not say that I could ask her about anything. Second, I've asked two questions about her request for my client to help her and her husband raise EB-5 funds, which is the very subject of this litigation, in connection with another project. And you cut me off because your position is -- and Gary, I also want to know what the SEC's position is on this -- that that area of credibility and motivation examination is not permitted by the court's order.
MR. LEUNG: How does that fact bear on -- how does that fact even potentially bear on the witness's motivation or credibility?
MR. GOURAIGE: Well, now you're asking me to share with you my litigation strategy. I don't think you're entitled to that. All that I am saying is --
MR. LEUNG: Well, then we're at an impasse here.
MR. GOURAIGE: If that is the SEC's position, and if you are instructing the witness -- if the witness's attorney is instructing her not to answer, and the SEC shares that position, then we too will take the position that the credibility and motivation of our clients, Gary, are not open to your examination at their depositions. And we will similarly instruct our clients not to answer



your questions in those areas.
MR. LEUNG: You're much more experienced than me. You know that these issues aren't susceptible to a bright line rule. First off, Ms. Novodor's a third party. She's not situated in any way remotely like your clients who are both defendants in this case. And you gotta take it on a case-by-case basis. All right. If you just want to say I can't inquire as to credibility, you know, be my guest. Make that instruction. And we'll have to litigate it. But what I am saying is I'm objecting to this line of questioning because it's outside the scope, and you haven't made a proffer on why this even remotely bears on credibility or motivation with respect to the questions that you're attempting to interpose here.
MR. GOURAIGE: Well, are you --
MR. LEUNG: Can we just move on, Herve?
MR. GOURAIGE: No. Are you saying that the credibility of a third-party witness cannot be inquired into?
MR. LEUNG: I'm not saying that. I'm saying you've proffered a couple questions. You've been invited by the witness's counsel to explain why you think answers to those questions are discoverable given rule 26, given the scheduling order. And I'm listening to your answers (sic), and I'm interposing an objection on scope because I



don't think you've connected it.
MR. GOURAIGE: Well, I think -- I think the motivation and the answer is pretty obvious. The witness and her husband asked my client to help raise capital for a different project, and my client declined. That provides a motivation for the witness's testimony. Now, if you're asking the witness not to answer the question and if the SEC's position is that the court's order bars such examination of a third-party witness, so be it. I can't compel the witness to answer my questions today.
So I just want to know if, Anya, are you instructing your client not to answer the question.
MS. GOLDSTEIN: Let's take a --
MR. LEUNG: Herve, real quick. Don't be argumental. There's a court reporter here. Okay? I think we've been very clear.
MR. GOURAIGE: So are you instructing the witness not to answer?
MS. GOLDSTEIN: I'd like to take a quick break.
MR. GOURAIGE: Okay. We'll take a few minutes' break.
(Recess.)
MS. GOLDSTEIN: Mr. Gouraige, I will not instruct the witness not to answer those questions as you've proffered them. I maintain objections, so you're



proceeding in light of my objection.
MR. GOURAIGE: And what is your objection? That the question is improper or what is the objection?
MS. GOLDSTEIN: The questions regarding a prior request to Mr. Liu about another EB-5 Fund projects are outside the scope of discovery in this case, outside the court's ruling, and are therefore improper and, frankly, appear intended to harass a witness. But I'm not going to make -- instruct her not to answer at this point based on your proffer of the two questions you want to ask her.
BY MR. GOURAIGE:
Q Okay. So Ms. Novodor, I have a few questions. The -- do you remember the request to Charles Liu to help raise EB-5 capital for that project in Indio, California?
A No, I have no memory of that. You mean Charles Liu was raising money?
Q I don't. Did you ask him to? Did you write him a letter and ask him to or did your husband write him a letter and ask him to?
A I did not. The answer for me is no.
Q You're not aware that -- you are not aware that such a letter was written?
A I don't know about a letter, but I do know there was a discussion.
Q And who had the discussion?

A Charles and my husband.
Q Did Charles agree to raise capital for your husband?
A I don't believe we got to that point. My husband had other options.
Q Did Charles --
A My husband never got to a point where we were going to raise money.
Q Did Charles decline to raise -- I'm sorry. I don't want to -- why don't you finish your answer.
A I just don't think that it ever -- that we ever proceeded with it.
Q Did Charles Liu decline to raise the EB-5 capital?
A I'm not aware of that at all. That's my husband's.
Q Do you remember the time period when that request was made?
A I really don't. I don't know when it was made. I can't remember what part of all of this it was in. I had enough going on.
Q Okay. Ms. Novodor, I want to ask about your -- well, before I do, let me just -- I have one exhibit to show you. Hold on a second.
MS. GOLDSTEIN: Please let us know when to



refresh.
MR. GOURAIGE: Okay.
(Exhibit 77 was marked for identification by the court reporter and is attached hereto.)
BY MR. GOURAIGE:
Q Ms. Novodor, can you see the next exhibit on your screen?
A Not yet.
Q Okay.
MS. GOLDSTEIN: Asking Ms. Novodor is not really effective, because I'm controlling the exhibits. So you need to tell me when you've uploaded a new one, and then I can refresh it and access it for her. So now we have Exhibit 77 on our screen.
BY MR. GOURAIGE:
Q So could you please look at Exhibit 77, Ms. Novodor?
A Uh-huh.
Q Have you looked at it?
A I looked at it.
Q Okay. Do you know what it is?
A A subpoena to testify at a deposition in a civil action.
Q Okay. Unfortunately, the attached list of documents request was not uploaded. But let me ask you



this. At the time that you looked at the subpoena, did you look at the list of the documents requested attached to it?
A Yes. Yeah, I think so. There was a typed written list of things that they were looking for -- you were looking for.
MS. GOLDSTEIN: I've never seen this subpoena, and I'm not sure if it's the same one that Ms. Lopez Novodor was served with.
THE WITNESS: Yeah, that's what I got. It's similar, isn't it? Subpoena to testify.
MR. GOURAIGE: It's not?
MS. GOLDSTEIN: Similar, but the date's different than the one that, I believe, Ms. Lopez Novodor was served with.
BY MR. GOURAIGE:
Q All right. Well, let me ask you questions without reference to that document. My understanding is that your relationship with BOIC ended as of October 2020. Is that correct?
A October 11th.
Q Yeah. While you were with BOIC, you would have -- during the time period that we've been talking about today from roughly 2010, '11 up until 2015, '16, you would have used the Beverly Oncology e-mail address for



communications with Charles Liu and Edison Zhan and others and your brother. Is that right?
You need to answer not shake your head so the reporter can get your answer.
A Yes.
Q Okay. Thank you. Now, but you also have your own personal computer at home that I've been told -- been represented by your counsel might have copies of documents that would have been on the server at BOIC. Is that correct?
A That may or may not be true. What I mean by that is everything was filed on the drive in Beverly Oncology that would have been filed. What left is what's floating in miscellaneous files of some kind stored on the hard drive.
Q Okay. In late 2015 -- I believe Mr. Kimmel's letter is dated December 1, 2015. Late 2015, early 2016 when you hired Mr. Kimmel and then hired another lawyer and then went to the SEC, were you ever asked to preserve your communications from BOIC and turn them over either to the SEC or your counsel?
A I can't remember if somebody told me to do that or not. But it's not my data. It belongs to Beverly Oncology at this point. So I know it's all there.
Q At BOIC?

A At Beverly Oncology, yes, in the files.
Q When was the last time that you checked your e-mails and documents on the BOIC server and learned that they were still there?
A It would have been a while ago.
Q What's a while ago?
A Like a couple of years ago. I haven't been looking in there for where this material would have been stored. We just -- it's just inactive. There's nothing going on. It's all done. It's all packed up in boxes and binders and stored away, the hard copies if there are any left. And whatever's on the computer is where I stored it.
Q Okay. So is it fair to say that as of December 2015, all of those communications that would have related to BOIC, Beverly Proton, the Regional Center, you, Dr. John Thropay, Charles Liu would have been on the servers at BOIC?
A That's my understanding.
MR. LEUNG: Object to form. Calls for speculation.
BY MR. GOURAIGE:
Q Would it be the same -- would the same be true as of the end of 2016? I assume as you were still working at BOIC at the time.

Page 134

A I believe so.
Q And I think you just said that you thought that maybe as of -- as recently as two years ago, you thought those communications would still be on those servers at BOIC?
A Nothing was removed that I know of.
Q How do you know nothing was removed?
MS. GOLDSTEIN: She said that she knows of.
THE WITNESS: That's just what I know of.
BY MR. GOURAIGE:
Q Have you ever been told that the servers at BOIC crashed?
A Oh, yes, on Halloween night. I was working then, one Halloween night.
Q Do you remember when he told you that?
A When who told me that?
Q Did you say -- did you just say somebody told you that while you were working there?
A Yes, because -- oh, I see what you're saying. Yeah. My IT guy did say that we were hacked.
Q And what's the name of the IT guy who said that to you?
A Edgar Sanchez.
Q And do you remember when he said to you, "We were hacked"?

Page 135

A Probably a day or two afterwards.
Q Afterwards. After what?
A After the night that it happened. I really don't recall.
Q You don't recall any time period when it happened, month or year?
A Oh, it was -- I don't remember. I mean, it was -- I thought it was Halloween. Not this last Halloween, but previous Halloween. It was a holiday night. It was a night that -- yeah, I think it was a Halloween a year ago. It took us a while to satisfy the hackers and get things back up and running.
Q So you were still CEO of BOIC at the time?
A Yes, I was.
Q And what did you do about that? You said it took you a while to satisfy the hackers. What does that mean?
A Yeah. We had backup systems, so we tried to bring all the backup systems up. And some came up. A lot of them did. But the more critical pieces to billing did not, so we had a lot of work to do. I don't know what else we lost. I was not -- the part that I was most occupied with was billing.
Q Okay. So the e-mails that Edison Zhan were sending to you about the funds that are coming in for EB-5 funds for the proton -- for the Beverly Proton project,

Page 136

they would all be on the BOIC servers? They were restored?
A If they had fully restored them, then I would imagine it would be there. But I am no longer there, and I have no way of giving you any accounting. You're going to have to talk to them about that.
Q But you were there for a year, or more maybe, depending on when it happened. You were the CEO. Didn't you take any steps to make sure that the electronic data of the organization was restored?
A Yes. Well, we did what we could. There's so many things that fall through, but I can't guarantee to the exact detail of what fell through and what didn't. Every once in a while we'd find out something was missing. That's the way it is, unfortunately, in this day and age.
Q I understand. What did you do while you were there to restore it?
A Immediately contacted our security team and went through a review of all of the security processes and were they up to date, does this does affect regulatory compliance with Medicare. And it was very critical that we bring the team together and review all of the steps and processes for this not to happen again.
Q Before the -- you said hackers. Did I hear you correctly?

Page 137

A That's what I was told. They were hackers.
Q Okay. Did the company have to pay ransom to the hackers?
A Yeah.
Q Did you report that incident to law enforcement?
A I believe I did, yeah. I don't remember.
Q You don't know whether you did or not?
A No. I can't remember right off the bat.
Q Before the incident, had you downloaded and turned over to the SEC all the communications relevant to the Beverly Proton project?
A It was so long ago. I'm sure that we gave them what they wanted at the time.
MR. GOURAIGE: Okay. Thank you. I don't have any further questions at this point. Thank you, Ms. Novodor.
MR. LEUNG: Herve, do you pass the witness?
MR. GOURAIGE: Pardon?
MR. LEUNG: Do you pass the witness?
MR. GOURAIGE: Yes.
MR. LEUNG: Okay. Ms. Novodor, I want to be mindful of the fact that you're a third party to this case. I know that we have been burdening you with this proceeding throughout the course of the day. So if you'd like to take a break before we get going, I'm happy to do



that. But in general, I'm going to try to be as expeditious as possible. So it's up to you if you want to take five minutes, ten minutes?
MS. GOLDSTEIN: Yeah, let's just take five minutes. Thank you.
MR. LEUNG: Okay. Let's go off the record please.
(Recess.)
EXAMINATION
BY MR. LEUNG:
Q Okay. Ms. Novodor, before we get started, I don't have access rights to the Egnyte platform that your counsel was showing you the exhibits marked by defendants, so I'll be doing something different. I will be sharing my screen on Zoom. I've also provided you with electronic files, which you've hopefully printed out for your convenience, of documents that I may be marking during the course of my examination. So I'll try to orient you to the number that was on the PDF file, and I'll also show you that same document on my screen through the Zoom share screen function. Is that okay?
A Perfect.
Q Okay. Let me introduce myself again. Gary Leung. I'm one of the lawyers for the SEC in this case.
I did want to pick up where you left off with Mr.



Gouraige just now. And he was discussing with you the IT failure that you had at BOIC. And then he asked a couple questions towards the end about materials provided by you to the SEC back in early 2016 as part of its investigation. Do you recall that testimony?
A Yes.
Q Yes? Okay. I wanted to clarify something, because I think the question that Mr. Gouraige put to you might have been imprecise. As part of your interaction with the SEC back in 2016, did you go and hire an IT firm to perform an ESI search of BOIC's systems for each and every communication that you had concerning Beverly Proton?
A Back then?
Q Yeah, back then.
A I don't recall doing that.
Q Yeah. And in that same vein, in 2015 as part of gathering the materials that you ultimately provided for the SEC, did you undertake a search for each and every communication that you had had on a BOIC e-mail account with Delsk or anybody else related to Pacific Proton?
A I don't recall doing that.
Q Okay. I'm going to share my screen. Let me know if you see that. It should be the Egnyte splash page that Mr. Gouraige has provided to you. Are you with me?



A Yes.
Q Okay. And I want to show you Exhibit 76 again. You see this has an SECDEFC ink fraud, and then there's a Bates number associated with it. So I'll represent to you that this was produced out to the defendants. And this is a letter that was provided by you to us back during our prefiling investigation beginning 2016. So I guess my question is, is it the case that while you provided some materials concerning Beverly Proton, it's not as if you ran a top to bottom comprehensive and thorough search of BOIC's ESI for each and every document under the sun that might pertain to the facts and circumstances of your commercial relationship with Mr. Liu, is it?
A No.
Q All right. I do want to change topics now. So you explained for us earlier that you in your capacity -- strike that. Let me just get the terms right.
When I say Beverly Proton, I'm referring to -- let's see -- Beverly Proton Center, LLC. Okay? And when I refer to Pacific Proton Regional Center, I'm referring to Pacific Proton Therapy Regional Center, LLC.
A Okay.
Q And when I refer to PP EB-5 Fund, that will be the Pacific Proton EB-5 Fund, LLC. Okay? We on the same page?

A Yes.
Q All right. Ms. Novodor, you had explained for us earlier today that you did not receive any employment compensation in connection with your role at Beverly Proton. Do you recall that testimony?
A Yes.
Q And you were not to receive any employment compensation until the project actually got operational is that what you said?
A Exactly. Correct.
Q Okay. And is that a yes?
A Yes.
Q And you also explained for us that as of April 2016, no progress on the project had really been made aside from the demolition of your office building on 111 West Beverly, which displaced your existing tenants. Do you recall that testimony?
A Yes.
Q Yes?
A Yes.
Q I'm sorry. My connection may be off. You may have been audible, but I didn't hear you, and I just need to make sure we get a clean record.
Okay. And you had no control over the bank accounts for the PP EB-5 Fund, Beverly Proton or the



Pacific Proton Regional Center; is that correct?
A That's correct.
Q And you've already explained for us how your brother, Dr. Thropay, only had certain privileges to the Pacific Proton Regional Center which were taken from him by Mr. Liu and required him to actually go in person to a branch office; is that correct?
A Yes.
Q So would it be fair to say that both you and your brother in 2015 leading up until the end had no meaningful visibility into what was going on with those three corporate accounts, correct?
A Yes.
Q I'm going to share my screen again, and I'm going to bring up Exhibit 68, which was the very first exhibit that Mr. Gouraige marked for you today. This is, again, a pledge agreement dated August 2nd, 2013. And as I read it, it seems to me that by executing this pledge, Beverly Oncology Imaging Centers, BOIC, essentially guaranteed any unpaid debt to the extent Beverly Proton was not able to pay back Pacific Proton EB-5 Fund. Did I get that right?
MS. GOLDSTEIN: Objection; document speaks for itself.
BY MR. LEUNG:
Q You can answer.



A Yes.
Q Okay. And you had started to explain for Mr. Gouraige why you executed this guarantee. And I think you said words to the effect that Mr. Liu insisted upon it and communicated in some way that it would be significant. Could you elaborate on that? Why was Mr. Liu asking you and your brother to personally guarantee the debts of Beverly Proton in 2013?
A It's only speculation. He didn't say why other than it was urgent in order to go forward. People wanted a guarantee or this funder that he was talking to needed it badly. But it wouldn't be a big deal because we'd never need it. Of course, famous last words. But that's all I know.
Q That's your recollection of what Mr. Liu said to you in connection with the eventual execution of this guarantee?
A Yeah. It was absolutely necessary, and we need to do it now, and he needed it immediately as soon as possible. So I just tried to put as many caveats as I could, because that was never, ever part of the discussion or the agreement.
Q Okay. Did you learn at some point that the SEC had served Mr. Liu with an investigative subpoena at the beginning of February 2016?



A Yes.
Q And did you have any understanding of the transfers that Mr. Liu caused to occur in the Beverly Proton Chase bank account subsequent to getting an investigative subpoena from the SEC in February of 2016?
A I'm sorry. That was a long sentence.
Q It was. I'll strike it.
Ms. Novodor, the SEC has filed evidence in this case with the court showing that in February and March of 2016, after receiving an investigative subpoena, Mr. Liu transferred $4.785 million from the Beverly Proton corporate account at Chase to his own personal account. We've also filed evidence with the court in this case that Mr. Liu caused the Beverly Proton corporate account to send another $1 million to Lisa Wang's personal account. Did Mr. Liu ever tell you that he was doing that?
A Never.
Q Can you think of any reason why Mr. Liu would be doing that?
A I really don't know.
Q And at the same time you have never received any compensation for your work in connection with Beverly Proton; is that correct?
A No.
MR. LEUNG: All right. I'll be showing you an

exhibit it's marked as Exhibit 101. I will share my screen.
(Exhibit 101 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Do you see that, Ms. Novodor?
A Yes.
Q Okay. For the record, I've marked as Exhibit 101 a document previously marked as Investigative Exhibit 5. The first page of Exhibit 101 states "Private offering memorandum Pacific Proton EB-5 Fund, LLC." At the bottom of the document it's dated May 1st, 2013. It's a 29-page document.
I will flip through it, Ms. Novodor. But I guess my first question is have you ever seen the private offering memorandum for the Pacific Proton EB-5 Fund?
A I never saw it until after.
Q The case was filed? Okay. Well, let me direct your attention to a handful of pages here. Well, first off, did you have an understanding as to whether or not Mr. Liu, as part of his capital raising efforts, was distributing to the potential investors and investors a private offering memorandum?
A I assumed that that's what he was handing out, but --



Q And that was?
A Pardon?
Q And that was his function at Beverly Proton, to raise capital, correct?
A Exactly.
Q Documents like Exhibit 101 were Mr. Liu's responsibility at the time; is that correct?
A Yes.
Q Okay. And was it your expectation as Mr. Liu's business partner that whatever written materials he was providing to potential investors and investors, those written materials must be true, accurate and not misleading. Is that fair?
MR. GOURAIGE: Objection.
THE WITNESS: Yes.
BY MR. LEUNG:
Q I'm just asking your expectation, ma'am.
A Yes.
MR. GOURAIGE: You are asking her a legal question she's not qualified to give an answer for.
BY MR. LEUNG:
Q Okay. Let me direct your attention to page 14 of the 29-page Exhibit 101 private offering memorandum.
A Page 14, okay.
Q And there's a section entitled "Material



Contracts." Let me know when you're with me.
A I'm there.
Q Okay. This section first reads "Borrower's business plan requires that it negotiate and enter into certain agreements for equipment and services, among other things, for the operation of Proton Center."
And then moving down to the next paragraph it reads, "Borrower entered into a lease agreement, 111 lease, with Dr. John P. Thropay for lease of real property located and known as 111 West Beverly Boulevard, Montebello, California on September 14th, 2011 for development and operation of the Proton Therapy Center."
That's a correct statement, right?
A Yes.
Q 111 West Beverly Boulevard, which is your property and not Beverly Hospital's, was to be the site of the Proton Therapy Cancer Center as represented to potential investors in this document; is that fair?
A Yes.
Q Let's move to the next page, page 15. Before we go to the exhibit, you spoke at length about Optivus and how Optivus was to be the equipment provider for the Proton Cancer Therapy Center project that you were working on with Mr. Liu and your brother. Do you recall that testimony?



A Yes.
Q Now, returning to page 15 of the private offering memorandum, Exhibit 101, there's a paragraph there that reads, "Single source service provider, borrower intends to engage Optivus Proton Beam Therapy, Inc., Optivus, a proton beam technology developer in California to provide all necessary proton beam treatment technology and related maintenance under a service contract for the Proton Center."
And then moving down to the very last sentence of that paragraph, "Any change in the borrower's estimate of these costs or its failure or inability to engage, Optivus could negatively affect profitability in the borrower in its ability to repay the loan."
Was it your understanding in the course of dealing with Mr. Liu, at least leading into the second half of 2015, that Optivus was an important commercial relationship for you folks to have for your project?
A Yes.
Q And it was someone at Optivus had, in fact, introduced Mr. Liu to you and your brother in the first instance, correct?
A Yes.
Q Did you understand at the time that Optivus was to be the single source service provider for the Cancer

Proton cancer therapy project represented by offering materials like Exhibit 101?
A I did not realize it was this clear.
Q But regardless, it was your expectation that statements and written materials being provided to investors about who this project would engage to provide equipment be accurate and not misleading and complete, correct?
A That is correct.
MR. LEUNG: Okay. Let me direct your attention to a 140-page document, which I don't think you were able to print out given the size of the file. That will be marked as Exhibit 102. And for the record, Exhibit 102 is a copy of the Pacific Proton EB-5 Fund business plan dated May 1st, 2013.
(Exhibit 102 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Have you seen the business plan that was updated as of May 2013 in the past, Ms. Novodor?
A I'm not sure that that's the one I have or have seen, but I have seen one.
Q All right. Let me direct your attention to page 14 of this document. Please bear with me. Sorry, page 26. So we're on page 26 of the May 2013 business plan.

Page 150

It's page 27 of 140 of the PDF itself. But you see there's the heading entitled "Management Team"?
A Uh-huh.
Q Your brother was to be chairman and chief executive officer of Beverly Proton?
A Yeah, that's where it was. Yeah.
Q Charles Liu was to be president, at least according to this business plan, of Beverly Proton? Yes?
A Yes.
Q And once operations were underway, your role, Ms. Novodor, was to be chief operating officer and corporate secretary, correct?
A Yes.
Q Okay. And there's reference to Fred Cross, the chief financial officer, and then the section ends. So I've shown you the entirety of the section of this business plan entitled "Management Team." In that management team section, did you see a reference to Dr. Harlan Levine?
A No.
Q Did you see a reference to anybody named Michael Koslow?
A No.
Q Did you see a reference to a man named Michael Hunn?

Page 151

A No.
Q Did you see a reference to an executive named Alice Cheng, C-h-e-n-g, Alice Cheng?
A No.
Q And then finally, this is page 103 of the 140-page PDF that's Exhibit 102. It is attachment E to the business plan. At the very top of the page you see this org chart, right?
A Yes, I do.
Q Los Angeles County Proton Center, do you recall that being the predecessor name of Beverly Proton?
A Yes, I do.
Q And this org chart is consistent with the management team section that we just reviewed. There's no reference here to City of Hope, Harlan Levine, Beverly Hospital, Alice Cheng, Michael Hunn or Michael Koslow, is there?
A No.
MR. LEUNG: Okay. So this was -- these are materials from May of 2013. Let's go forward in time to 2015.
I'm showing you on my screen a document that will be marked Exhibit 111, so I'm going out of order for the court reporter. And this is an e-mail chain that begins in July between Alice Cheng and, among others, Charles

Page 152

Liu, Harlan Levine and a person named Jae Chung.
(Exhibit 111 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q You're not on the recipient list, are you?
A No.
Q Okay. But Mr. Liu is. I'll go to the very end of the e-mail chain, so latest in time, the first page of Exhibit 111. And Jae Chung is writing to Charles Liu, Alice Cheng, Harlan Levine and others are on July 15th, 2015. "Dear Charles and Alice, my apologies in the delay of getting you the document. Please find attached for your review the initial draft terms and discussion points of the MOU."
Did you ever receive a draft of an MOU by and among Charles Liu, Beverly Hospital and City of Hope back in summer of 2015?
A No.
Q Okay. This is July of 2015. At that time did you know whether or not Mr. Liu had engaged a CPA, an accounting firm, for tax preparation services for Beverly Proton back in summer 2015?
A I do not recall that.
Q Okay. And you don't recall him telling you that he had retained a firm called Marcum, LLP to do tax

Page 153

preparation for Beverly Proton. Do you?
A He may have mentioned it, but I don't recall.
Q Okay. Did you ever meet a man name Stan Lam, L-a-m, who was a partner at Marcum?
A I don't recall at all.
(Exhibit 103 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q So I'll direct your attention to a document that's been marked Exhibit 103. It bears the production numbers Marcum underscore CLiu underscore 10233 to 10235. And I'm going to show you an e-mail that Mr. Liu sent to Stan Lam at Marcum on October 15th, 2015.
"Stan, I need to set up a new vehicle in California to work with City of Hope, proposed name Beverly Cancer Center, LLC, holding company United MPH Ventures, LLC. Thanks. Charles."
Ms. Novodor, have you ever had any sort of ownership interest in an entity called Beverly Cancer Center, LLC?
A I don't know how to answer this. Not with Charles.
Q And did Mr. Liu ever tell you about an entity called Beverly Cancer Center, LLC and offer you the chance to participate in it?



A No.
Q Have you ever had any sort of stake or ownership interest in an entity called you United MPM Ventures, LLC?
A No.
Q Is that something Mr. Liu ever told you about, this company United MPH Ventures, LLC?
A He may have mentioned he was forming another company. But I don't recall -- what's the date of this? Yeah, this is all very close to the end. Yeah. All of a sudden there were these new companies showing up, but we were not informed what they were for or why.
(Exhibit 104 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Now, directing your attention what will be marked Exhibit 104. This is a one-page document that bears the Bates numbers COH-SEC0000506. This is an October 19th, 2015 e-mail, so four days after Mr. Liu has contacted Stan Lam at Marcum about setting up a new entity. And it's an e-mail from Mr. Liu to Harlan Levine with a cc to Michael Hunn, H-u-n-n.
Let me ask first off, do you know Mr. -- Dr. Levine?
A No, I don't, but maybe Dr. Thropay does.
Q Okay.



A I don't.
Q In any event, in Exhibit 104, Mr. Liu is writing to Dr. Levine, "Dear Mr. Harlan, I would like to inform you that Mr. Michael Hunn has been engaged by my firm as my representative to work with City of Hope regarding our proposed partnership and joint ventures. All the best, Charles Liu."
You see he signed off president and CEO, United MPH Ventures, LLC. Do you see that?
A I see that.
Q Did he sign off Charles Liu, President, Beverly Proton in this e-mail?
A No.
Q And he's not copied you or your brother on this e-mail, has he?
A No.
Q Did you ever meet Michael Hunn, who was acting evidently as Mr. Liu's representative for his deal with City of Hope on behalf of United MPH Ventures?
A I cannot recall.
Q Do you know whether Beverly Proton was paying Michael Hunn in the order of $93,000 to render services for United MPH Ventures rather than Beverly Proton?
A No, I was not aware of that.
MR. LEUNG: Okay. I'm going to direct your



attention to Exhibit 105. And this is a seven-page document. It's entitled "Memorandum of Understanding."
(Exhibit 105 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q And I'll flip to the very end of the document, or at least the end of the MOU. It's executed by Beverly Hospital Alice Cheng, COHMF Harlan Levine and United MPH Ventures Charles Liu. Do you see that?
A Yes.
Q And then going back to the first page, it reads, "This memorandum of understanding is intended to document our discussions to date concerning the proposed affiliation and joint venture among Beverly Community Hospital Association doing business as Beverly Hospital, a California nonprofit public benefit corporation, United MPH Ventures, LLC, a Delaware limited liability company, and City of Hope Medical Foundation, California nonprofit public benefit corporation, with respect to the development and operation of a new proton beam therapy center on the Beverly Hospital campus."
Now, you don't own property on the Beverly Hospital campus, do you, Ms. Novodor?
A No.
Q Nor does your brother, Dr. Thropay; is that





Veritext Legal Solutions
866 299-5127

correct?
A No.
Q And directing your attention to Exhibit A to the MOU, there's a section entitled "Number One, Parties." Is Beverly Proton listed as a party to this MOU --
A No.
Q -- Ms. Novodor?
Are you listed as a party to this MOU, Ms. Novodor?
A No.
Q And is your brother listed as a party to this MOU, Ms. Novodor?
A No.
Q Okay. At least when Dr. Levine signed the MOU, he executed it dated October 22nd, 2015. That's just two or three months after summer of 2015 when Mr. Liu insisted that, at least with respect to 111 West Beverly, you and your brother demolish the existing office building and displace your tenants, correct?
A That's correct.
Q Did you have any idea that Mr. Liu was entering into an MOU with the City of Hope and Beverly Hospital to construct a proton therapy cancer center not at 111 West Beverly but 105 West Beverly on Beverly Hospital's campus?
A No.



MR. LEUNG: Directing your attention to what will be marked as Exhibit 106. For the record, this is a two-page document Bates-numbered COH-SEC 546 to 547. The first e-mail in time, which is at the back of the document, is dated November 16th, 2015. It's between Alice Cheng, Harlan Levine and Charles Liu as well as Michael Hunn. And then the last e-mail in time is a couple days later dated November 18, 2015, again between, among others, Alice Chang, Harlan Levine and Charles Liu, who is copied on this e-mail.
(Exhibit 106 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Let's take a look at the last e-mail in time, very first e-mail in the exhibit, the November 18th e-mail. And in that, Ms. Cheng is writing to Harlan Levine at City of Hope, "Hi, Dr. Levine. Short answer to your question is I don't think Dr. Thropay is interested in employment with COH as outlined in the MOU. Charles's vision for the cancer center is strictly between United MHP, COH and Beverly."
Ms. Novodor, did Mr. Liu communicate in words or in substance to either you or your brother back in November of 2015 that his vision for the Proton Cancer Therapy Center that was to be constructed was strictly



between his holding company United MPH, City of Hope and Beverly Hospital?
A We did not know even Beverly Hospital's involved. As far as I'm concerned, no.
Q Okay. So it appears, then, Mr. Liu was negotiating a memorandum of understanding with City of Hope and Beverly Hospital that did not involve you, and at least the MOU itself did not reference Beverly Proton, your company, in any respect, correct?
A As far as --
MR. GOURAIGE: Object to "your company."
BY MR. LEUNG:
Q The company in which your brother held at least a 25 percent stake which was to increase to a 75 percent stake upon operation. I'm referring to Beverly Proton.
A I forgot what your question was. Did I know about it?
Q I'll restate it. It appears, doesn't it, based on the documents that we've reviewed in which I've shown you an MOU between Mr. Liu and City of Hope and Beverly Hospital that Mr. Liu was negotiating a Proton Therapy Cancer Center project that did not involve you, did not involve your brother, and based on the documents themselves did not involve Beverly Proton, which your brother had an ownership interest in, correct?



A Charlie did not advise us of that.
Q Now, we went through the business plan and the private offering memorandum from 2013 which discusses Optivus at length. Do you recall Mr. Hunn ever reaching out to you or your brother to raise the possibility of spending more money in addition to what had been spent with Optivus on equipment manufactured by Mevion?
A Mr. Hunn?
Q Yes, Mr. Hunn.
A I think it's -- you know, I'm vaguely remembering a little bit that -- I am sorry. I now remember Michael Hunn who --
Q Okay.
A -- did approach us with Charlie to use a different piece of technology -- a different technology.
Q And at that time did Mr. Hunn explain that this technology was going to be purchased by United MPH or did he approach you and your brother in connection with Beverly Proton?
A It wasn't clear to me that it was United MPH.
MR. LEUNG: Okay. Directing your attention to Exhibit 107. For the record, this is a one-page document. There's a Bates number COH-SEC 0000453.
(Exhibit 107 was marked for identification by the court reporter and is attached hereto.)





Veritext Legal Solutions
866 299-5127

BY MR. LEUNG:
Q You're not on this e-mail chain, but it appears to be between Michael Hunn, Harlan Levine. And it's dated October 21st, 2015, and he's writing to Mr. Levine.
"Harlan, Good talking with you this morning. I did a site visit at the Beverly campus today. Attached is the proton vendor that I mentioned." And he encloses a link to Mevion.
Now, the memorandum of understanding that was executed was between United MPH, City of Hope and Beverly Hospital. We showed you an e-mail where Mr. Liu was introducing Michael Hunn to City of Hope as his representative for United MPH.
A Yes.
Q Does this give you any pause that evidently Mevion was the idea of Michael Hunn and was being brought to the City of Hope's attention in connection with his engagement by United MPH and not Beverly Proton?
MR. GOURAIGE: Objection. I don't understand the question and the witness is asking to give you pure speculation. She has no knowledge.
MR. LEUNG: I'll withdraw it. I'll withdraw that.
Q Was it ever clear to you, Ms. Novodor, who Michael Hunn was working for? Mr. Liu and United MPH or



Beverly Proton? Was that ever clear?
A No, no.
MR. LEUNG: Okay. I'm showing you what will be marked Exhibit 109.
And Valerie, I'm going out of order again on purpose.
For the record, Exhibit 109 bears the Bates number COH-SEC 761 through 766. It's a five-page PDF document, and it's an e-mail string starting on November 13th, 2015 to November 16th, 2015 between Michael Hunn and certain folks at City of Hope including Harlan Levine, Mike Koslow at Mevion and Alice Cheng at Beverly Hospital.
(Exhibit 109 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Mr. Hunn writes in his November 16th e-mail, "Heidi, I'm working on a draft communication for United MPH Ventures, LLC and am also coordinating the communication with Mevion. Mevion is drafting a press release on the purchase of the proton system by United. I would recommend that we match the communications for consistency."
And then below this in the earlier chain, there is a reference to investors, EB-5 investors of United MPH Ventures, LLC. Do you see that?



A I see it on the screen, yes.
Q Did I read that right?
A EB-5 investors of United -- oh.
Q It does not say EB-5 investors and Beverly Proton, does it?
A No.
Q Okay. These two communications that I've shown you just now on Exhibit 109 where Michael Hunn is communicating with City of Hope on behalf of United MPH Ventures, he's referring to a draft release press release with Mevion for the purchase of a proton system by United. Are those communications consistent with the notion that Beverly Proton should be paying for a Mevion proton therapy piece of equipment?
MR. GOURAIGE: Objection.
THE WITNESS: This is a little more to digest than I expected. No.
MR. LEUNG: Well, evidently there were others that shared in your confusion, Ms. Novodor. Let me show you Exhibit 110.
(Exhibit 110 was marked for identification by the court reporter and is attached hereto.)
BY MR. LEUNG:
Q Okay. You with me?
A Yeah.



Q All right. So we're going into the new year now. I think this is a couple months after you made your trip to China. This is an e-mail string Bates numbered COH-SEC 93 through 94. And one of the earlier e-mails in time is dated January 7th, 2016 is sent by Harlan Levine at City of Hope to Charles Liu. And he's writing, "Charles, I hope you enjoyed the New Year break as well."
Then moving down to the second paragraph, second sentence of that second paragraph, "I would like to reach out to you by e-mail after a call with Michael and Alice and communicate directly with you that what may be needed on our end if we don't resolve everything."
A Excuse me. I don't know where you're at. Oh, here we go. Thank you. Can you start again?
Q Sure, sure. The second paragraph, Mr. Levine is writing halfway through that paragraph, "I would like to reach out to you by e-mail after our call with Michael and Alice and communicate directly with you what may be needed on our end if we don't resolve everything tomorrow. I will be available all weekend, so I am sure we will be able to connect. Our partnership is a high priority for us. We also want to get going. We are still working with Jill and Michael trying to define the structures and understand how the funding and the entity that purchased the Mevion unit will transfer to the entity that will

partner with City of Hope."

"Entity that purchased the Mevion unit," "entity that will partner with City of Hope," is it your reading that those two aren't the same thing? And one is Beverly Proton, and the other is United MPH based on e-mails that I've shown you today?

MR. GOURAIGE: Objection. Pure speculation. Pure guess.

MS. GOLDSTEIN: Join.

THE WITNESS: It doesn't specify here. I'm not sure.

BY MR. LEUNG:

Q Okay. In any event, I've read that e-mail on January 7th from Mr. Levine to you correctly, right? And it appears he's expressing some confusion about who really bought this piece of equipment and how is that going to get to our City of Hope joint venture, right?

A That's correct. It is very confusing.

Q Okay. And here's the last e-mail in time. This is Mr. Liu responding to Mr. Levine's -- Dr. Levine's question about which entity bought what and which entity am I working with.

"Thanks for the quick response, Harlan. Starting from January 18, 2016 after the board resolution, I will excise my majority rights on the entity which Dr. Thropay



has 25 percent interest. This entity, Beverly Proton Center, LLC, has entered into a purchase agreement with Mevion. Starting from January 18th, 2016, I will act as CEO president, and Dr. Thropay and his sister, Ruth, will no longer be the officers of this entity."

Did I read that correctly?

A Yeah.

Q Does it appear to you that you're being cut out of the deal including the amount of money that was spent on Mevion? Is that a yes?

A Yes, thank you. Yes.

Q And so Ms. Novodor, we've gone through statements in the private offering memorandum as well as the business plan that was filed with USCI that refer to Optivus as the sole source provider. We've also gone through e-mails that you weren't included in by and among City of Hope, Beverly Hospital, Charles Liu and Michael Hunn, his representative for United MPH, that addressed this purchase of Mevion equipment in 2015.

Based on the facts and information that you've personally seen and your dealings with Mr. Liu over time in connection with this EB-5 project, do you have any confidence that the money he spent on Mevion was consistent with what he was representing to investors and consistent with his obligations to you and your brother as



his business partners?

MR. GOURAIGE: Objection.

THE WITNESS: No.

(Exhibit 112 was marked for identification by the court reporter and is attached hereto.)

BY MR. LEUNG:

Q Okay. Ms. Novodor, directing your attention to Exhibit 112. This is a one-page document. It bears the letterhead United MPH Ventures. It's dated March 10th, 2016. It's signed by Charles C. Liu.

I just want to direct your attention to the watermark at the bottom. It says "Project address 105 West Beverly Boulevard." And it also begins, "Dear Sir or Madam, United MPH Ventures, LLC is in development of a series of cancer treatment proton therapy centers across the U.S."

That project address that's listed at the bottom, again, that's not your property, is it?

A No, it's not.

Q And it's not the 111 West Beverly property owned by your brother and you that's referenced in the private offering memorandum and the business plan filed with UCIS, is it?

A No.

(Exhibit 113 was marked for identification by



the court reporter and is attached hereto.)

BY MR. LEUNG:

Q Directing your attention to Exhibit 113. This is a one-page document. It is executed by a Richard Stuping at R Alan Construction. You see it's dated April 16th, 2016?

A Right.

Q Okay. We had talked -- or you had spoken with Mr. Gouraige earlier today about construction work performed by R Alan Construction with respect to your property at 111 West Beverly. Is that correct?

A That's correct.

Q Do you see, though, that this later invoice in April of 2016 is for different work? It's for work concerning building demolition at 105 -- sorry.

A I see it.

Q 105 West Beverly. You see it, right?

A Yeah.

Q Okay.

A On ours.

Q And you also see that previously invoiced payments had already been paid in the amount of 151 grand?

A Uh-huh.

Q Given the fact that in the summer of 2015, Mr. Liu had pressured you and your brother to spend money

to demolish the existing office building on 111 West Beverly, does it make any sense to you as a business person that additional construction work would be undertaken at a completely new project site unless someone was trying to cut a new deal with City of Hope and Beverly Hospital?

MR. GOURAIGE: Objection, two objections. Pure speculation; and second, the characterization "caused you to spend money."

BY MR. LEUNG:

Q Please go ahead.

A I was not aware that Beverly Proton, LLC paid for the demolition of 105 at all.

Q And if you had been aware of it, would you have objected in your capacity as somebody that was to be the chief operating officer of Beverly Proton once the operation got underway?

A Absolutely.

Q Earlier today you testified on the facts and circumstances of Mr. Villaraigosa's --

A That's correct. It's close.

Q -- involvement with Beverly Proton. Am I correct that whatever amounts were paid to Mr. Villaraigosa in connection with Beverly Proton, those amounts were paid in an effort to raise capital?

Page 170

A Yes.

Q Okay. And you talked a little bit about a law firm called Miller Mayer that may have worked on the 2012 US -- or 2010 USCIS application for the corporate entities that you were involved in, correct?

A Yes.

Q And by that same token, Miller Mayer was working on the investment offering that was raising capital through the efforts of Mr. Liu, right?

A That is correct.

Q That was the scope of their work on the offering?

A Yes. And the application, I believe, but I didn't have any contracts relative to that.

Q Have you ever heard of an entity called GCS Capital?

A I may have, but I don't have any recollection of it right now.

MR. LEUNG: Valerie, can you do me a favor and read off the exhibit numbers of the documents that I marked during my examination.

THE REPORTER: I have written down 101 through 113 minus 106.

MS. GOLDSTEIN: I think we have seen 106.

MR. LEUNG: I think so too. I don't want to waste your time. We'll get it squared away. I'll pass

Page 171

the witness.

MR. GOURAIGE: Can we just take a couple minutes?

MS. GOLDSTEIN: Sure.

(Recess.)

BY MR. LEUNG:

Q Okay. Welcome back, Ms. Novodor. I actually wasn't quite done. I just have a couple more questions and one more document to show you.

You testified a little bit earlier today about being shown some documentation by Delsk that looked as if it may have been fabricated and these materials potentially, or as you described it, set forth like an account balance for the corporate accounts. Do you recall that testimony?

A Yes.

Q Okay.

A That's what they gave us when we arrived.

(Exhibit 114 was marked for identification by the court reporter and is attached hereto.)

BY MR. LEUNG:

Q Showing you what's been marked Exhibit 114. Is this the document that you were referring to?

A I mean, it's been a while. But when you compare them, the signature wasn't on the original letter. So I think this is it.

Page 172

Q Okay. And it's dated October 1st, 2015, and it says, "To Whom it May Concern. This letter it is to verify the current balance of the Pacific Proton EB-5 Fund, LLC account ending 1028. At present the balance reflects $8,508,427.00. Sincerely, Brett M. Santos."

If it's the case that the actual account balance for the PP EB-5 Fund account ending 1028 on October 1st, 2015 was not in the order of 8.5 million but instead $253,286, would that cause you some concern about the propriety and legitimacy of your business partner, Mr. Liu's, operational decisions?

A Yes.

MR. LEUNG: Pass the witness.

MS. GOLDSTEIN: Mr. Leung, at the risk of keeping my witness here longer than she needs to be here, I have 108 as not having been marked. So I just wanted to clarify with you on that.

THE REPORTER: I also have that. I didn't notice that earlier. So you're right.

MR. LEUNG: Thank you for pointing that out. We will have to skip 108. I'm not going to mark 108. So let's proceed. Herve.

MR. GOURAIGE: Okay, thank you.

FURTHER EXAMINATION

BY MR. GOURAIGE:

Page 173



Veritext Legal Solutions
866 299-5127

Q Ms. Novodor, let's start with the last question and answer. You didn't have anything to do with the checking accounts, did you?
A No.
Q Okay. When Mr. Leung asked you about the Chase balance, you didn't know what was in that account balance, did you?
A No, I did not. But they claimed that that didn't sound right. I don't know what they had, but I didn't have any access to it.
Q Who's the "they" claimed?
A Delsk.
Q Delsk. But you didn't have any personal knowledge of any of this, right?
A No, I did not have personal knowledge of the fact that the balance was 200,000 or whatever he just said. What I was looking at was on something different that maybe wasn't relevant.
Q But you said you didn't have personal knowledge of the fact that the balance was 250,000 or so.
A Right.
Q How is that a fact when you didn't have any knowledge about it?
A What?
Q You don't know -- you don't know what the balance

Page 174

was?
A No, I don't.
Q Okay. Thank you.
A I don't know what the balance is.
Q Now, let me show you. I'm going to show you an exhibit that's been marked before.
A I didn't understand his question.
Q So I've got on the screen, Ms. Novodor, the Beverly Oncology BOIC pledge agreement.
MS. GOLDSTEIN: What exhibit do you have so I can pull it up?
MR. GOURAIGE: It's Exhibit 68.
MS. GOLDSTEIN: Okay. It's up.
BY MR. GOURAIGE:
Q I want you to take a couple minutes, Ms. Novodor, and read that pledge agreement right now.
A Thank you.
Q Okay. Did I hear you correctly respond to Mr. Leung's question that that pledge agreement was a guarantee of payments to the EB-5 Fund if it does not collect the loans?
MS. GOLDSTEIN: I had objected to Mr. Leung's question on the grounds of the document speaks for itself. But I do believe Ms. Lopez Novodor answered the question. So understanding that you're asking her what she answered.

Page 175

BY MR. GOURAIGE:
Q Is that a guarantee of payment?
MS. GOLDSTEIN: Objection. Document speaks for itself.
THE WITNESS: After all other funds were exhausted and if this is a legally binding agreement.
BY MR. GOURAIGE:
Q Is it not a pledge of unencumbered assets of BOIC?
A That's what it says.
Q Okay. Did you and Dr. Thropay personally guarantee those loans?
A Did I what?
Q Did you and Dr. Thropay personally guarantee the EB-5 loans to Beverly Proton?
A No. That I know of, I did not.
Q Okay. You were shown a series of documents and e-mails by Mr. Leung, none of which was copied to you, none of which was sent to you. You never talked with Mr. Levine, did you?
A I don't remember who he is. The name sounds familiar. Is -- he's from City of Hope? I never spoke to anyone that I know of from City of Hope.
Q Okay. Did you speak to --
MS. GOLDSTEIN: Would you like her to refer to

Page 176

any exhibit?
MR. GOURAIGE: No. I think there were so many of them. I don't want to take up the time on that.
Q Just in the interest of time, you never spoke with Mr. Cheng, C-h-e-n-g, did you?
A I talked to her in the past.
Q You talked with her about the arrangements between her and Mr. Liu?
A That I didn't know about.
Q Okay. So during the -- between the summer of 2015 and December of 2015, you had no idea what Mr. Liu was discussing with Beverly Hospital and the City of Hope; is that right?
A That's correct. He was talking, but I didn't know what they were talking about.
Q When you went to Beijing to meet with Edison Zhan, you did not tell Mr. Liu that you were going to Beijing to meet with Edison Zhan, did you?
A No. That was their request.
Q The first written complaint that you made to Mr. Liu -- or I should say your lawyer, Mr. Kimmel, sent to Mr. Liu was dated December 1 of 2015. Is that correct?
A Yes, I believe so. I don't remember the date.
Q Well, take it from me. We can look at it. It was dated December 1, 2015.

Page 177

A Okay.
Q Now, all of those communications Mr. Liu had with Beverly Hospital and City of Hope about the site at 105 and the Mevion equipment, et cetera, all those occurred prior to that December 2015 letter; is that correct?
A I can't recall the dates.
Q Before December 2015, I think you testified when I was examining you, you had no access to the bank accounts. Is that correct?
A That's true. Bank accounts defined as being able to look up an account online or going into the bank and getting access to what numbers or balances are, that's what I mean.
Q Right. Mr. Liu did not tell -- did not share with you how he was handling the funds in the accounts prior to January 2016; is that correct?
A He would make comments about what he's -- that he's going to pay Optivus or he's going to do this or do that. So I'm not sure exactly what your question is.
Q Well, he would make comments that he's going to pay, what, a vendor or a consultant?
A Or he already did, either way. It wasn't a big deal then. We didn't think it was a big deal then.
Q Did he tell you where he was transferring the funds?

Page 178

A No.
Q Okay. After your attorney's letter to Mr. Liu dated December 1, 2015, what was the state of communications between you and Mr. Liu? Did you talk with him after that?
A No.
Q In fact, on January 19th, 2016, he removed your brother from the project; isn't that correct?
A According to his documentation, yes.
MR. GOURAIGE: No further questions at this point. Gary, it's your witness.

FURTHER EXAMINATION

BY MR. LEUNG:
Q Ms. Wang, Lisa Wang, Mr. Lui's spouse, you testified you met her about three or four times, right?
A I can't hear you if you're talking to me.
Q Am I muted or I should just speak up? I need to speak up?
A Speak up a little, yes, please.
Q Okay. Okay. Let me ask you a couple questions about Ms. Wang, Mr. Lui's wife.
A Yes.
Q Was it ever your understanding that she was an employee of Beverly Proton?
A I did not know what her role was in Beverly

Page 179

Proton. I know that she was helping him market. That's all I know.
Q And so if she had no formal employment relationship with Beverly Proton until, say, February 2016, can you think of any reason why she'd be receiving close to a million dollars in the form of one single transfer from Beverly Proton's corporate account?
MR. GOURAIGE: Object to lack of foundation to the question. I think you should ask her first if she has any knowledge of services she provided.
BY MR. LEUNG:
Q Any idea why she might have been getting a million dollars from the Beverly Proton corporate account without any formal employment relationship with Beverly Proton? It seems a bit odd.
A Mr. Leung, I was not aware of whatever relationship she had. I'm sorry. I can't address what she did, what she didn't do other than she did marketing. I was not privy to what she was getting paid or not paid until I read all the transcripts.
Q What was your understanding of the marketing work that Ms. Wang was engaged in?
A Well, she helped put the marketing materials together. She would set up travel plans for Dr. Thropay across the country and China to meet doctors. And that

Page 180

was about it. That's what she did. She set those up, so, you know, I don't know more than that.
Q Did investors -- potential investors ever visit the project site at 111 West Beverly?
A The Delsk ones for sure. If the others came, I believe, yes, Charlie would let us know somebody's coming to the site.
Q And do you recall whether Ms. Wang was present at any of these visits by potential investors at the project site?
A I did see her at a couple of those.
Q And she was there in her capacity as somebody working on marketing; is that right?
A You know, they spoke Chinese. I'm not sure what she told them. I always thought she was just doing marketing.
MR. LEUNG: Fair enough. Thank you, Ms. Novodor. Pass the witness.
MR. GOURAIGE: Couple of questions, Ms. Novodor.

FURTHER EXAMINATION

BY MR. GOURAIGE:
Q The total number of investors, depending on which version is correct, is either 50 or 58. Let's assume it's within that range, 50 or 58 investors.
A Okay.

Page 181

Q Delsk recruited 7 investors. Do you recall how many investors you saw from Delsk visiting the proposed site?
A No.
Q Do you recall when you saw them visiting the site?
A After we went to Beijing, after we did the event with Delsk.
Q So I think you testified earlier you went to Beijing around Thanksgiving of 2015; is that correct?
A That wasn't when I went.
Q That was what?
A I didn't -- I don't believe I testified I went -- I went in -- at Thanksgiving to Beijing to meet with Delsk corporate, not to do the big event.
Q Okay.
A The big event happened earlier than that, and I don't remember exactly what month it was before that.
Q The investors you saw looking at the site -- and by the way, when we say "the site," which site are we talking about? 111?
A Our site.
Q 111?
A They would show up or call from Beverly Hills, because they thought it might be in Beverly Hills, and say



they were here and they wanted to come see the land.
Q So they were Chinese investors speaking Chinese?
A Yeah, and some of them spoke English. You know, they had -- they weren't perfect or fluent, but they were Chinese.
Q And were you invited to see them come and see the site?
A Yes, I would set it up. I also set it up with Alice Chang at the hospital, because Charlie wanted them to walk through the hospital. But I -- you know, we wanted them to see that there was a hospital next to it. That's what we were doing. I don't know what he was doing. But yeah, we had a really good working relationship for a while. And it -- if he said people are coming, I dropped what I was doing, and we would give them the royal treatment, of course.
Q And you saw Lisa Wang present at that site visit?
A I may have seen her once or twice. That's about it. She didn't come to all of them, that's for sure. But I've see her once or twice.
Q Well, once or twice at a site visit?
A Yeah.
Q And do you recall what time period that was?
A That was early on. That was a little earlier before we went to the event with Delsk. It was earlier.



That's my recollection. And let me tell you, I'm doing what I can at this point.
Q What month? What year?
A I don't know.
Q Okay. They were speaking Chinese?
A Yes.
Q So you didn't understand what they were talking about?
A Only if we had a little English, but mostly somebody had to translate.
Q Who was translating for you?
A You know, Charles. Sometimes they would just talk, and he'd fill me in later. But I relied on Charles if he was there.
Q You're not sure whether Charles was there?
A Charles was there most of the time. He wanted to personally show them around, go meet the hospital, look at his nice office up in the other building. And, you know, he gave them the royal treatment.
MS. GOLDSTEIN: I think there might be some confusion, because Ms. Lopez Novodor has testified that there were multiple site visits, and sometimes you are saying "at the site visit" like there was just one time.
THE WITNESS: Yeah, there were multiple.
BY MR. GOURAIGE:



Q How many site visits were there at which you personally were present, Ms. Novodor?
A I can't count them. I want to say maybe ten.
Q And was Charles Liu present at all of them?
A I can't tell you. Sometimes he would tell us to walk them through, and they had enough English speaking that they could go through.
Q And how many times did you see his wife, Lisa Wang, present at those site visits?
A I only saw -- I only remember two right now that I can remember.
Q And you don't remember the time period of those visits?
A They were before we went to Beijing. From her when she was present?
Q Yes.
A It was before we went to Beijing and had the big party. Before Villaraigosa, remember him?
Q Yes.
A Before that. And then after that people were coming to see the land and the building demolished, and they were upset because the building was still up.
Q Well, you took the words out of my mouth. I was going to ask you that question. You demolished a building during the summer of 2015. So did you see her there

before or after the building was demolished?
A Oh, there were some that came before.
Q No. Lisa Wang, was she there before or after the building was demolished?
A You know what, I am guessing at this point. My guess -- and I want to emphasize g-u-e-s-s -- is while it was still up, the building, and she was introducing a couple of her clients or whoever. And I only remember two times right now. That doesn't mean that this is an accurate depiction of what happened.
MR. GOURAIGE: Okay. So I understand your testimony now. Thank you. I have no further questions.
THE WITNESS: No problem.
Can you tell me what's hanging behind your head? It has been entertaining me for the last -- I think I deserve an explanation.
MR. GOURAIGE: That is a piece of art created by my young daughter. And every time I walk into the study, it reminds me of her so I keep it there.
THE WITNESS: You have it very high.
MR. GOURAIGE: I'm glad you noticed it. It's a great piece of art.
THE WITNESS: It's actually very cute, very charming. I've been trying to figure out if it was a cookie on a stick, and she had thrown it up there.



Sorry. Sorry for the diversion.
MR. GOURAIGE: It's okay. No further questions. Gary, your witness.
MR. LEUNG: I think we're all done today. Thank you very much, Ms. Novodor.
MR. GOURAIGE: Thank you, Ms. Novodor.
MR. LEUNG: Counsel, reviewing time?
MS. GOLDSTEIN: Yes. I was just going to say before we go off the record, we would like to request 30 days to review the deposition transcript and sign.
MR. LEUNG: So stipulated.
MR. GOURAIGE: I'm sorry. Anya, I didn't hear your request.
MS. GOLDSTEIN: We're requesting the 30-day period to review the deposition transcript and sign.
MR. GOURAIGE: Okay. That's fine.
THE WITNESS: Many thanks.
MR. GOURAIGE: Thank you.
MR. LEUNG: Thank you.
(TIME NOTED: 4:15 p.m.)



I, RUTH THROPAY LOPEZ NOVODOR, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _______ day of _____________, 2021, at ______________________, _________________.
(City) (State)

_______________________________________
RUTH THROPAY LOPEZ NOVODOR
VOLUME I



I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: March 3, 2021

Valerie D. Granillo
VALERIE D. GRANILLO
CSR No. 11469

**&**

**&** 3:4,13 8:12 93:22

**0**

**0000453** 161:23
**07102-5400** 3:17

**1**

**1** 1:25 3:16 44:4 98:21,22 133:17 145:15 177:22,25 179:3
**1,000** 30:18
**1-7-16** 6:23
**1.5** 63:3
**10** 112:23,24
**10-1-15** 7:10
**10-15-15** 6:9
**10-19-15** 6:11
**10-21-15** 6:18
**101** 5:21 6:4 146:1 146:3,8,10 147:6 147:23 149:3 150:2 171:21
**102** 6:6 150:13,13 150:16 152:6
**10233** 154:11
**10235** 154:11
**1028** 173:4,7
**103** 6:8 152:5 154:6,10
**104** 5:23 6:10 155:12,16 156:2
**105** 6:12 55:19 56:1,18 67:1,2,15 157:1,3 158:24 168:12 169:15,17 170:13 178:3
**1050** 4:7
**106** 6:16 159:2,11 171:22,23
**107** 6:18 161:22,24
**108** 173:16,21,21
**109** 6:20 163:4,7 163:13 164:8
**10th** 168:9
**11** 132:24
**11-13-15** 6:20
**11-16-15** 6:21
**110** 6:23 164:20,21
**111** 7:2 54:24 55:24,25,25 56:9 56:19,20 58:8 61:20 64:25 66:25 67:1,16 69:10 77:9 78:16,19 80:8 142:15 148:8 148:10,15 152:23 153:2,9 158:17,23 168:20 169:11 170:1 181:4 182:21,23
**112** 7:6 168:4,8
**113** 7:8 168:25 169:3 171:22
**114** 7:10 172:18,21
**11469** 1:22 2:18 189:25
**117** 5:25
**11th** 12:20 132:21
**12** 13:14
**12-1-15** 5:24
**12-22-15** 5:20
**12:30** 96:6,9
**131** 6:3
**139** 5:6
**13th** 163:10
**14** 147:22,24 150:24
**140** 150:11 151:1 152:6
**146** 6:5
**14th** 148:11
**15** 15:15,19,20 148:20 149:2
**150** 6:7
**151** 169:22
**153** 7:5
**154** 6:9
**155** 6:11
**157** 6:15
**159** 6:17
**15th** 55:23 153:10 154:13
**16** 132:24
**16-00974** 1:7 2:7
**161** 6:19
**163** 6:22
**164** 6:25
**168** 7:7,9
**16th** 159:5 163:10 163:16 169:5
**172** 7:11
**173** 5:5
**179** 5:6
**18** 36:14 159:8 166:24
**181** 5:5
**189** 1:25
**18th** 159:15 167:3
**19** 44:11 90:6
**1980** 12:6,18 13:13 75:3
**19th** 91:17 155:17 179:7
**1:25** 96:16,17
**1:30** 96:16
**1st** 6:7 146:12 150:15 173:1,7

**2**

**2** 98:21,22 102:6
**20** 36:4 74:15,16
**200** 45:13,16
**200,000** 86:25 88:8 174:16
**2003** 41:22
**2008** 17:24
**2009** 18:17,19
**2010** 15:25 16:8,24 18:18,20 90:6 91:17 92:23 93:3 93:11 132:24 171:4
**2011** 148:11
**2012** 171:3
**2013** 6:7 98:13 143:17 144:8 146:12 150:15,20 150:25 152:20 161:3
**2014** 93:1,11,11 94:10
**2015** 47:21 48:17 55:8,23 72:11 77:22 78:20 93:1 93:11 94:12,13 103:12,21 108:16 120:2,3,10 132:24 133:16,17,17 134:15 140:17 143:10 149:17 152:21 153:11,17 153:19,22 154:13 155:18 158:15,16 159:5,8,24 162:4 163:10,10 167:19 169:24 173:1,8 177:11,11,22,25 178:5,7 179:3 182:10 185:25

**2016** 47:21 48:17 77:15,22 78:2,20 90:10 93:11 94:10 120:2 133:17 134:24 140:4,10 141:7 142:14 144:25 145:5,10 165:5 166:24 167:3 168:10 169:6,14 178:16 179:7 180:5
**2020** 12:20 132:19
**2021** 1:16 2:16 8:1 188:11 189:22
**213** 4:9
**21st** 162:4
**22** 1:16 2:16 8:1 73:23
**22nd** 158:15
**25** 12:17 25:25 26:3,16,17 27:9 35:21 36:4,5,7 95:3 160:14 167:1
**250** 45:6
**250,000** 174:20
**253,286** 173:9
**26** 78:2 90:10 124:15 127:23 150:25,25
**26,495** 74:1
**26.9** 92:25
**260-9451** 4:9
**27** 151:1
**29** 146:12 147:23
**2nd** 143:17

**3**

**3** 51:7 74:19 75:9 75:13,22 76:10,23 98:21,22 189:22
**3-10-16** 7:7
**3-28-16** 5:22
**30** 36:5 47:4 63:22 79:10 187:9,14
**311** 125:12
**323** 3:9
**35** 12:17
**37** 48:2
**3:30** 82:11

**4**

**4** 98:21,22
**4-16-16** 7:9
**4.785** 145:11
**40** 11:8
**40,000** 47:23 48:3
**43** 5:11
**4413391** 1:22
**444** 3:7
**4:15** 2:16 187:20

**5**

**5** 6:5,6 17:7 19:12 21:22 28:7 29:1 30:15,16 33:2,18 38:2,8,9 39:14,15 40:6,9 41:24 46:1 86:10 91:6,19 94:22 98:1,21,22 122:21 126:6 129:5,14 130:13 136:24 141:23,24 142:25 143:21 146:9,11,16 150:14 163:24 164:3,4 167:22 173:3,7 175:20 176:15
**50** 25:2 26:4,17 27:8 181:23,24
**54** 5:13
**546** 159:3
**547** 159:3
**58** 181:23,24
**5th** 116:8

**6**

**6** 44:14
**60** 63:22
**643-5989** 3:18
**68** 5:11,14 43:22 44:6 143:15 175:12
**69** 5:12,16,18 54:18 59:4 69:21 70:23

**7**

**7** 15:22 182:1
**70** 5:14 68:3,7,16
**71** 5:15 69:20,25 70:17,22,23 71:2
**72** 5:17 69:25 70:5 70:13 71:5 72:1 73:25
**73** 5:19 82:17,20
**7355** 189:23
**74** 5:20 100:24 101:2 102:6,7 104:4 107:3
**75** 5:22 10:22 25:12,16,16,17 26:3,15,23 27:8 104:13,20 107:6,7 160:14
**76** 5:24 117:10,14 141:2
**761** 163:8
**766** 163:8
**77** 6:3 131:3,14,16
**78** 10:6
**7th** 165:5 166:14

**8**

**8** 5:5
**8,508,427.00.** 173:5
**8.5** 173:8
**800** 4:7
**83** 5:19
**83,333** 48:25

**9**

**900** 3:7
**90017** 4:8
**90071** 3:8
**91** 10:7
**93** 165:4
**93,000** 156:22
**94** 165:4
**965-3998** 3:9
**973** 3:18
**9:15** 2:15 8:2

**a**

**a.m.** 2:15 8:2
**ability** 149:14
**able** 20:23 33:13 78:4 143:20 150:11 165:21 178:10
**absolutely** 13:11 37:8 50:25 99:22 144:18 170:18
**accelerator** 13:14 13:18
**accelerators** 13:16
**access** 13:8 14:10 14:17 36:15 51:8 59:23,24 79:8 86:2 99:15,21,22 111:15,16,17,18 112:3,5,6 131:13 139:12 174:10 178:8,12

**accidentally** 54:11
**accomplish** 50:5
**account** 86:2 109:19 110:5,5 111:16,17,18,19 111:20 112:3 140:20 145:4,12 145:12,14,15 172:13 173:4,6,7 174:6 178:11 180:7,13
**accounting** 59:24 119:7 137:5 153:21
**accounts** 41:2 51:8 59:24 75:9 83:19 88:15 89:2 99:20 99:22,23 111:14 113:15 142:25 143:12 172:13 174:3 178:9,10,15
**accuracy** 13:20 38:12
**accurate** 106:14 108:20 114:24 147:12 150:7 186:10
**act** 167:3
**acting** 156:17
**action** 9:19 78:2 78:22 131:23 189:17,18
**actual** 18:10 20:19 83:2 173:6
**addition** 57:24 63:4 161:6
**additional** 27:22 64:3 170:3
**address** 13:4 71:19 82:2 101:16 101:17,19 102:22 132:25 168:12,17 180:17
**addressed** 82:24 167:18
**adjuncts** 15:2
**administer** 28:23
**administered** 8:5 189:7
**administrative** 28:22 85:11 95:20
**administrator** 12:8
**advance** 96:9
**advanced** 13:19
**adverse** 116:1,21 116:25
**advertising** 30:16
**advice** 66:18 115:20,20 118:9
**advise** 102:3 161:1
**affect** 137:20 149:13
**affiliated** 14:24
**affiliation** 157:14
**age** 98:18 137:15
**agency** 30:15
**agent** 19:13
**agents** 29:14 30:15 30:18
**ago** 122:23 134:5,6 134:7 135:3 136:11 138:12
**agree** 42:16 44:25 82:11 124:1 130:2
**agreed** 53:24 122:3
**agreement** 5:11 55:8,9 67:14 68:11 90:20 123:15 143:17 144:22 148:8 167:2 175:9,16,19 176:6
**agreements** 81:6 148:5
**agrx** 1:8 2:8
**ah** 122:25
**ahead** 8:10 52:21 58:14 117:1 170:11
**airlines** 82:4
**al** 1:9 2:9
**alan** 5:12,15 7:9 51:11 52:5 54:21 55:11,19 56:12,18 58:7 59:11,17 64:24 65:6,9,12 69:9 70:19 169:5 169:10
**alert** 106:23
**alice** 6:13,16 7:3 152:3,3,16,25 153:10,11 157:8 159:6,9 163:12 165:10,18 183:9
**allegation** 115:15
**allocated** 91:4
**allowed** 25:16 91:6
**amdahl** 12:3,4 14:15
**amendment** 116:9
**america** 17:25
**american** 111:13 112:13
**amount** 35:24 36:3 42:20 45:2 47:14 48:14 49:3 49:8,23 63:7 72:17 74:23 77:12 167:9 169:22
**amounts** 170:23 170:24
**analysis** 92:2
**angeles** 3:8 4:8 13:15 20:4 29:25 152:10
**angry** 63:16,22
**annual** 30:21 48:4
**answer** 16:15 28:10,12 52:21 64:12 66:4,6,16,18 66:22 76:2 81:20 86:9 125:5 126:21 126:25 128:3,7,10 128:12,18,24 129:9,20 130:10 133:3,4 143:25 147:20 154:21 159:17 174:2
**answered** 28:8 53:4,9,9 86:7 95:10 175:24,25
**answers** 110:11 123:12 127:22,24
**antioch** 10:14
**anxious** 29:6
**anya** 4:5,10 8:20 128:11 187:12
**anybody** 31:12 108:13 140:21 151:21
**anymore** 35:22 36:16 112:10,11
**anytime** 64:11 123:19
**anyway** 22:9
**apart** 99:18
**apologies** 153:11
**apologize** 32:8 96:23

**apparent** 62:16
**appear** 129:8 167:8 188:6
**appearances** 3:1 4:1 8:9
**appeared** 122:11
**appears** 160:5,18 162:2 166:15
**application** 22:3 90:7 91:16,24 171:4,12
**appreciate** 39:8 96:9 100:7
**approach** 22:13 161:14,18
**approached** 17:17
**appropriate** 59:2 59:12,16 81:24 126:2
**appropriately** 108:18
**approval** 23:4
**approved** 22:5,14 23:1 24:5 93:9
**approximately** 47:16
**april** 47:21,21 48:16,17 77:20,22 77:22 78:20,20 142:13 169:5,14
**area** 92:2 115:22 124:5 126:10
**areas** 115:11 127:1
**arena** 15:14
**argue** 53:6
**argument** 124:10
**argumental** 128:15
**argumentative** 53:5
**arnold** 29:10
**arrangement** 49:25 54:4 121:11
**arrangements** 177:7
**arrived** 172:17
**art** 13:7,9 186:17 186:22
**articulate** 106:23
**asian** 110:17
**aside** 59:15 103:19 142:15
**asked** 28:8 29:7 41:3 53:4,8,9 58:24 66:1,9 95:10 97:7,12,16 97:17 107:12 112:14 113:8,19 114:20 125:1 126:4 128:4 133:19 140:2 174:5
**asking** 15:18 28:25 48:9 49:13 49:16 56:1 58:21 63:1 65:20 73:1 75:6,23,24 76:13 78:9,13,16,16,17 78:19 80:21 84:11 84:15,19 85:1 90:3 91:7 92:17 93:18 95:18 103:19 106:7 107:17 114:22 118:5,25 121:8 126:15 128:7 131:10 144:6 147:17,19 162:20 175:25
**assert** 115:24 116:6
**asserted** 118:16
**assets** 44:24 45:9 45:11 176:8
**assist** 18:8
**assistance** 29:21
**associated** 141:4
**association** 15:5,8 157:15
**assume** 72:18 84:6 98:1 134:24 181:23
**assumed** 146:24
**assumption** 85:7 89:16
**attached** 43:23 54:19 68:4 70:2 82:18 101:3 104:21 117:11 131:4,24 132:2 146:4 150:17 153:3,12 154:7 155:13 157:4 159:12 161:25 162:6 163:14 164:22 168:5 169:1 172:19 188:7
**attachment** 152:6
**attempting** 127:14
**attend** 10:10,14
**attended** 10:2 34:19 121:23
**attendees** 30:18
**attention** 13:8 14:9 59:4 85:2 146:19 147:22 150:10,23 154:9 155:15 157:1 158:3 159:1 161:21 162:17 168:7,11 169:3
**attorney** 3:6,15 4:6 66:2,4,18 78:3 114:20 116:10 118:16 126:21 189:18
**attorney's** 179:2
**attorneys** 38:7
**audible** 142:22
**august** 143:17
**author** 107:13
**authority** 116:20
**authorized** 83:19 112:10
**automatically** 70:9
**available** 14:1,10 36:19 165:20
**aware** 20:1 40:10 40:25 46:9,15 47:2,3,10,12 67:13 77:11,12,15 81:6 84:13,16,20,21 85:14 86:6 113:25 120:10,19 121:10 123:2 129:21,21 130:15 156:24 170:12,14 180:16

**b**

**bachelor's** 10:6
**back** 16:24 24:24 25:17 30:19 39:3 39:9 41:22 54:11 66:11 77:9 78:24 79:23,24,25 82:15 91:15 97:9 107:1 107:18 108:8 114:10 118:18 119:1 136:12 140:4,10,14,15 141:6 143:21 153:16,22 157:11

159:4,23 172:6
**backup** 136:17,18
**badly** 144:12
**balance** 172:13 173:3,4,6 174:6,6 174:16,20,25 175:4
**balances** 178:12
**bank** 17:25 33:22 33:23 34:2,7 41:2 51:8 59:23 75:9 86:2 89:2 99:21 99:22 109:15,19 109:21,25 110:1,3 110:4,5,13,14,15 110:16,17,17,23 111:3,11 112:3,11 112:13,15 113:2,4 114:5 122:10 142:24 145:4 178:8,10,11
**banking** 41:1 88:15
**banks** 108:19 110:8 111:13 113:13,14
**barely** 35:6
**bars** 125:10 128:8
**based** 26:7,13 74:21 75:7 129:9 160:18,23 166:5 167:20
**basic** 74:11
**basis** 47:15 53:18 127:7
**bat** 138:8
**bates** 141:4 155:17 159:3 161:23 163:7 165:3
**beam** 73:15 149:5 149:6,7 157:20
**bear** 20:1 40:20 43:12 69:17 100:23 117:4 126:12,13 150:24
**bears** 72:3 127:12 154:10 155:16 163:7 168:8
**beautiful** 106:22
**began** 90:5
**beginning** 2:15 7:2 23:8 92:25 97:22 98:8 141:7 144:25
**begins** 152:24 168:13
**begun** 25:18
**behalf** 2:14 121:13 156:19 164:9
**beijing** 29:17 31:4 32:22 40:2 62:9 109:5,10,11,23 110:6 112:9,14 113:2,9,20 114:3 114:10 118:18 119:1 177:16,18 182:7,10,14 185:14,17
**believe** 15:25 17:20 23:24,24 31:24 33:19 36:15 48:1 50:14 51:7 51:20,25 55:3 67:3 70:4,19 79:7 81:15 83:11,17 85:2 91:8 99:6 102:25 105:14 107:3,5 111:1,18 111:19 119:10 130:4 132:14 133:16 135:1 138:6 171:12 175:24 177:23 181:6 182:13
**believed** 41:8 95:2
**bell** 22:21 32:13 32:15 105:24
**belongs** 133:23
**benefit** 157:16,19
**best** 44:15 156:6
**better** 20:24 30:2
**beverly** 5:12,15,18 6:13 11:13,19 13:13 15:2 17:11 19:16,17 20:4,12 21:5 24:7,18,25 26:1,15 27:13,14 28:23 37:11,16,16 37:18,21 38:10 39:13 40:11 41:24 45:19,19 46:1,5,8 46:14 47:3 55:4,7 55:19 56:9,19,19 60:16,18,19,19,24 61:8,20 64:20 67:4,5,7,9,10,14 68:11,12,14 69:13 72:2,9,13,19 74:6 74:6 76:8 78:14 78:16 79:9 83:7,9 83:9,15,15,20,23 83:25 84:1 85:10 85:14 86:9,18 88:18 97:13 101:18 102:21 103:23 120:18 121:6,12,17 122:3 122:4 132:25 133:12,23 134:1 134:16 136:25 138:11 140:12 141:9,18,19 142:4 142:16,25 143:18 143:20 144:8 145:3,11,14,22 147:3 148:10,15 148:16 151:5,8 152:11,15 153:16 153:21 154:1,16 154:19,24 156:11 156:21,23 157:7 157:14,15,21,22 158:5,17,22,24,24 158:24 159:21 160:2,3,7,8,15,20 160:24 161:19 162:6,10,18 163:1 163:12 164:4,13 166:4 167:1,17 168:13,20 169:11 169:17 170:2,5,12 170:16,22,24 175:9 176:15 177:12 178:3 179:24,25 180:4,7 180:13,14 181:4 182:24,25
**beverly's** 80:9
**beverlys** 11:16
**big** 30:20 34:13 62:11 92:1,1 112:22 144:12 178:22,23 182:15 182:17 185:17
**billing** 136:19,22
**binders** 134:11
**binding** 176:6
**bird** 109:5
**bit** 97:22 112:19 125:2 161:11 171:2 172:9 180:15
**board** 15:9 103:13 166:24

**bocho** 10:19,24
**boic** 11:23,25 12:5 12:14,19,21 13:2 13:12 37:12,13,16 41:10,11 42:16 43:1 44:24 45:9 60:10,13 61:7 63:9,10,11,20 65:4 65:8,16 67:10 83:6,19 101:17 103:23 132:19,22 133:9,20,25 134:3 134:16,18,25 135:5,11 136:13 137:1 140:2,20 143:19 175:9 176:9
**boic's** 140:11 141:11
**bono** 93:13 94:1
**born** 10:23 13:15
**borrower** 148:8 149:4,13
**borrower's** 148:3 149:11
**bothering** 33:19
**bottom** 44:20 101:22,25 102:14 141:10 146:11 168:12,17
**bought** 13:24 17:25 166:16,21
**boulevard** 4:7 54:25 148:10,15 168:13
**bounds** 125:1
**boxes** 134:10
**branch** 112:14 143:7
**brass** 34:9
**break** 38:19,21 39:5,7 64:6,11 66:1,9,10 67:22 82:10,11,15 96:10 96:14 128:19,21 138:25 165:7
**brett** 173:5
**bridge** 30:24
**brief** 38:19
**briefly** 11:5
**bright** 106:23 127:3
**bring** 119:24 136:18 137:22 143:15
**bringing** 27:19 29:9
**brother** 12:24 14:19 16:22 18:4 20:14 28:17 47:4 49:2,22 55:2 56:10 61:6 67:2 68:12 69:11 77:10 77:20 78:3,20 79:11,13,14,24 80:21 85:4 92:4 99:8 109:8,9 111:2 133:2 143:4 143:10 144:7 148:24 149:21 151:4 156:14 157:25 158:11,18 159:23 160:13,23 160:25 161:5,18 167:25 168:21 169:25 179:8
**brother's** 19:5 42:14 91:17
**brought** 9:19 13:17,17 27:17 28:20 29:4 30:20 31:16 95:9 109:21 120:2 162:16
**budgetary** 5:17 72:1
**build** 39:15 55:5 68:13 79:12
**building** 13:24 50:6 51:16 55:11 56:13 62:8,11 63:2,13,19 65:1,4 65:15 79:12 90:15 90:19 142:15 158:18 169:15 170:1 184:18 185:21,22,24 186:1,4,7
**built** 34:12 67:15 77:25 78:5,5
**burdening** 138:23
**business** 6:6 11:5 11:8 15:5,7,14 16:18,21 18:9 24:8,10,15 41:4,4 41:9,13,15 42:20 56:25 57:2,18 58:1 59:20,21 63:6,17 74:11,22 75:3,7 76:4 79:5 80:6,22,23 81:5,5 82:1,3 83:6 85:6 94:5 115:2 120:11 120:13 123:22 147:10 148:4 150:14,19,25 151:8,17 152:7 157:15 161:2 167:13 168:1,22 170:2 173:10
**businesses** 15:10 15:11,12
**businesswoman** 49:18 57:8 91:11
**buy** 13:22 74:18

### c

**c** 1:8 2:8 7:7 152:3 168:10 177:5
**california** 1:2 2:2 2:15 3:8 4:8 15:11 85:12 129:14 148:11 149:6 154:15 157:16,18 189:2
**call** 9:3,4 10:19,24 11:23 16:25 37:15 38:8 42:12 82:12 90:13 115:14 165:10,17 182:24
**called** 14:4 17:7 19:7,17 27:14 34:12 35:4,7,10 38:2 50:8,9,20 51:11 80:9 97:9 153:25 154:19,24 155:3 171:3,14
**calling** 74:24 75:2 125:20 126:1
**calls** 48:6 57:4 58:10 66:3 73:10 74:25 80:2 81:17 89:17 114:19 134:20
**campus** 157:21,23 158:24 162:6
**cancer** 72:18 73:15 74:7 85:4,5 89:8 148:17,23 149:25 150:1 154:16,19,24 158:23 159:20,24 160:22 168:15

**capacity** 120:19 141:16 170:15 181:12
**capital** 18:3 28:7 28:20 29:1 33:2 33:18 35:2,17,20 35:24 36:22 37:7 37:25 38:10 39:15 40:6,9,11 92:10 94:9,16 128:4 129:14 130:2,14 146:21 147:4 170:25 171:8,15
**carbon** 74:2
**care** 10:13 17:6 51:17 52:2,24 100:3
**career** 14:13,17,25
**case** 8:13 11:16 15:24 24:10 72:3 84:16 105:7 115:14 123:4,17 124:14 125:9 127:6,7,7 129:6 138:23 139:24 141:8 145:9,13 146:18 173:6 189:14
**cases** 52:4
**cash** 63:12,25 88:10 98:11 110:22 111:22
**casual** 34:18
**cat** 13:22,23
**category** 86:14
**cause** 173:9
**caused** 145:3,14 170:8
**caution** 119:14
**caveats** 144:20
**cc** 155:20
**celebratory** 33:16
**centec** 33:22,23
**center** 5:12,15 19:8,11,12,14,17 22:1,25 23:5 24:5 28:19 37:16,17,21 39:11,13,13,15 40:11 51:15 52:7 55:5 67:15 68:13 74:6 77:25 78:4 85:10 86:10 87:13 91:16 93:9 97:6 111:18,20 112:3 122:7 134:16 141:19,20,21 143:1,5 148:6,12 148:17,23 149:9 152:10 154:16,20 154:24 157:21 158:23 159:20,25 160:22 167:2
**centers** 11:20 17:19 143:19 168:15
**central** 1:2 2:2
**ceo** 12:14,16,16 13:2 20:15 37:15 41:22 42:16 59:20 60:3,7,9,10 61:6,8 75:4 136:13 137:8 156:8 167:4
**certain** 107:3,8 143:4 148:5 163:11
**certainly** 115:23 124:2
**certificate** 10:12
**certified** 2:17 189:1
**certify** 189:3,16
**cetera** 84:25 178:4
**chain** 7:2 152:24 153:8 162:2 163:23
**chairman** 15:11 33:22 34:6 151:4
**chance** 154:24
**chang** 159:9 183:9
**change** 141:15 149:11
**changes** 19:24
**characterization** 170:8
**characterized** 94:9
**characterizing** 88:25
**charge** 21:5 46:20 88:14 89:1
**charged** 72:4 92:24 116:13
**charles** 1:8 2:8 5:24 6:15,17,25 7:3,7 8:13 15:24 16:21 17:3,5,8 23:2 25:14 26:2,2 26:10,14,15 27:9 28:4,7 31:22 33:7 34:4 35:16 36:17 36:19 37:2 38:5 40:6 42:4,10,25 46:24 47:9 53:25 53:25 54:6,8 58:23 59:6 61:11 62:2 64:4 68:12 88:14,17 89:10 91:18 92:7,12 93:19 94:2 97:9 97:17 99:10,11 108:20 111:7,10 113:16 114:2 115:3,16 118:21 119:9 120:11,24 121:13 122:18,20 129:13,15 130:1,2 130:6,9,13 133:1 134:17 151:7 152:25 153:9,11 153:16 154:17,22 156:7,11 157:9 159:6,9 165:6,6 167:17 168:10 184:12,13,15,16 185:4
**charles's** 159:19
**charlie** 98:21 100:3,12 112:6 113:11 161:1,14 181:6 183:9
**charming** 186:24
**chart** 152:8,13
**chase** 110:2,5,14 114:4 145:4,12 174:5
**chat** 34:20
**check** 50:19 51:9 59:21 75:8 108:6
**checked** 134:2
**checking** 99:20 174:3
**checks** 50:17 59:19 76:7 77:11
**cheng** 6:13,16 7:3 152:3,3,16,25 153:10 157:8 159:6,16 163:12 177:5
**chief** 12:12,13 19:2,6 20:13,15 25:24 88:4 151:4 151:11,15 170:16

**china** 30:15,19 31:1 33:17 35:2 35:17 39:17 40:5 107:9 165:3 180:25
**chinese** 11:1,3 29:19,19 33:15 35:11,14 98:10 101:14 103:5 181:14 183:2,2,5 184:5
**chung** 7:5 153:1,9
**chunks** 110:22
**circle** 104:9 117:9
**circles** 70:11
**circumstances** 76:15,18 77:1 141:12 170:20
**city** 6:22,24 10:13 27:16 67:5,6,6 121:21,21 152:15 153:16 154:15 156:5,19 157:18 158:22 159:17 160:1,6,20 162:10 162:12,17 163:11 164:9 165:5 166:1 166:3,17 167:16 170:5 176:22,23 177:12 178:3 188:11
**civil** 131:22
**cjc** 1:7 2:7
**claimed** 21:12 60:24 79:13 107:25 174:8,11
**clarification** 20:23
**clarified** 27:1,2
**clarify** 28:14 39:4 39:19 66:25 69:8 76:3 84:10 90:4 140:7 173:17
**clarity** 19:24 54:1
**classified** 40:13 58:19
**classify** 58:18,20
**classy** 31:18
**clean** 142:23
**clear** 11:17,18,24 20:16,18 21:1 56:2 60:1 70:25 73:10 90:18 94:2 107:12 124:13 128:16 150:3 161:20 162:24 163:1
**cleared** 113:22
**clearly** 38:15
**client** 65:18 66:4 66:10,14,17,18 114:20 116:13 118:16,21 126:5 128:4,5,12
**clients** 104:1,1 116:8 126:23,25 127:5 186:8
**clinic** 18:10
**cliu** 154:11
**close** 27:25 35:21 45:6 48:2 115:8 155:9 170:21 180:6
**closed** 124:9
**closer** 44:1 72:11
**coast** 30:25
**coe** 43:1
**coh** 121:22,23 155:17 159:3,19 159:21 161:23 163:8 165:3
**cohmf** 6:13 157:8
**coincide** 79:21
**collect** 81:2 175:21
**collectible** 50:6
**college** 10:3
**come** 21:16 29:15 34:16 41:25 66:11 108:6,13 183:1,6 183:19
**comes** 59:21
**comfortable** 37:9
**coming** 17:23 22:12 23:22 72:9 97:18,24,25 98:3,9 98:11,12,19,25 99:19 100:8,12,25 101:20 108:9 109:22 110:13 111:23 113:5 136:24 181:6 183:15 185:21
**commenced** 78:22
**comment** 38:5
**comments** 178:17 178:20
**commercial** 141:13 149:17
**commission** 1:5 2:5 3:4 105:9
**communicate** 14:3 159:22 165:11,18
**communicated** 144:5
**communicating** 108:21 164:9
**communication** 66:13 98:24 140:12,20 163:17 163:19
**communications** 118:17 119:15 133:1,20 134:15 135:4 138:10 163:21 164:7,12 178:2 179:4
**communities** 13:6 13:7
**community** 10:23 13:16 14:1,6,18 23:18 24:4 67:7 87:9 157:14
**companies** 14:24 15:15 33:17 35:16 39:10 52:16 88:6 155:10
**company** 11:18,20 11:22 12:1,2,22 14:16 16:4 25:7 30:14 32:4 35:4,7 35:10 37:15 50:8 50:20 51:2,11,14 58:8 60:17 63:7,8 75:4 83:5 88:4 138:2 154:16 155:6,8 157:17 160:1,9,11,13
**company's** 32:9
**compare** 172:23
**compared** 74:2
**comparing** 74:2
**compel** 66:15,22 128:10
**compensation** 86:17,23 142:4,8 145:22
**complaint** 90:11 177:20
**complaints** 92:24
**complete** 150:7
**completed** 68:6
**completely** 59:7 67:12 170:4

**completion** 189:14
**compliance** 137:21
**complicated** 63:18
**comprehensive** 141:10
**computer** 133:7 134:12
**conceived** 17:13 91:18
**concern** 7:11 173:2,9
**concerned** 114:25 115:1,16 160:4
**concerning** 140:12 141:9 157:13 169:15
**concerns** 13:4 61:20 92:25
**conclusion** 58:11 80:3 114:9
**confidence** 167:23
**confidential** 102:1
**confirmation** 99:19
**confirming** 61:2
**conflating** 92:23
**confuse** 11:15
**confused** 72:12 84:1
**confusing** 20:24 84:2 166:18
**confusion** 164:19 166:15 184:21
**congress** 23:18,19
**connect** 165:21
**connected** 128:1
**connection** 56:1 64:22 77:4 83:6 85:6 105:7 124:13 126:7 142:4,21 144:16 145:22 161:18 162:17 167:22 170:24
**consider** 29:21
**consistency** 163:22
**consistent** 152:13 164:12 167:24,25
**consorted** 124:23
**construct** 158:23
**constructed** 159:25
**construction** 5:13 5:16 7:9 51:12 52:6 54:22 55:11 55:18,19 56:13,18 58:7 59:11 64:24 65:6,9,12 69:9 70:20 79:17 83:5 88:18 169:5,9,10 170:3
**consult** 66:9 119:16
**consultant** 41:19 41:21 178:21
**consultants** 41:17 85:5
**consulted** 115:8 119:20
**consulting** 50:15 52:24 53:22 83:5
**consummated** 68:18
**contact** 33:1 99:10
**contacted** 137:18 155:18
**contacts** 23:4,9 24:14
**contain** 102:1
**contained** 188:8
**context** 56:21 77:8 78:12
**continue** 125:8
**continued** 4:1 6:1
**contract** 56:25 79:9 149:8
**contracts** 48:20 88:16 148:1 171:13
**contradicting** 60:25
**control** 75:9 78:24 81:25 88:15 89:2 142:24
**controlling** 131:11
**convenience** 139:17
**conversation** 17:16
**coo** 20:13 28:22 61:7,7 86:18
**cookie** 186:25
**coordinating** 163:18
**copied** 156:14 159:10 176:18
**copies** 43:14 99:12 112:12,14 133:8 134:11
**copy** 150:14
**cordial** 34:17
**corporate** 32:10 72:4 143:12 145:12,14 151:12 171:4 172:13 180:7,13 182:15
**corporation** 12:3 12:4 14:15 157:16 157:19
**corporations** 20:9 20:19
**correct** 9:11 11:7 14:20 19:20 21:3 26:17,18 28:5 30:5 37:4,5 40:7,8 41:10 45:20 46:2 47:13 48:25 50:10 50:24 52:17,25 55:15 56:10,16 57:2 60:11,14,15 67:11 69:11,12,14 70:18 73:7,18 74:8 77:13 78:1 79:16,17 81:8 87:17 90:12 92:8 92:12 98:2 107:14 112:4 118:19 132:20 133:10 142:10 143:1,2,7 143:12 145:23 147:4,7 148:13 149:22 150:8,9 151:12 158:1,19 158:20 160:9,25 166:18 169:11,12 170:21,22 171:5 171:10 177:14,22 178:5,9,16 179:8 181:23 182:10 188:9
**corrected** 188:8
**corrections** 188:6
**correctly** 8:14 18:2 88:25 137:25 166:14 167:6 175:18
**cost** 63:7,8,11 64:2 73:17 75:5
**costs** 73:7,12 74:10 84:25 149:12

**counsel** 8:20 9:21 22:3,4,17 37:18 38:7 41:7 43:15 44:12 45:22 61:17 64:5 65:24,25 66:9 72:16 103:9 127:22 133:8,21 139:13 187:7
**counselor** 56:7
**counselor's** 57:23
**count** 185:3
**country** 180:25
**county** 20:4 23:22 152:10
**couple** 11:16 54:9 96:9 127:21 134:7 140:2 159:8 165:2 172:2,7 175:15 179:20 181:11,19 186:8
**course** 16:23 33:4 34:17 41:14 49:3 73:8 86:22 97:2 100:1 121:18 122:9 138:24 139:18 144:13 149:15 183:16
**court** 1:1 2:1 34:23 43:23 52:11 54:19 68:4 70:1 78:3 82:18 84:17 84:22 101:3 104:21 115:25 116:7 117:11 125:10 128:15 131:4 145:9,13 146:4 150:17 152:24 153:3 154:7 155:13 157:4 159:12 161:25 163:14 164:22 168:5 169:1 172:19
**court's** 64:19 84:13 125:9,24,25 125:25 126:11 128:8 129:7
**courtesy** 96:8
**covid** 44:11
**cpa** 119:11,12 153:20
**crashed** 135:12
**created** 65:3 186:17
**credibility** 123:6,7 123:20,23 124:4,7 124:12 125:15,20 126:1,10,14,23 127:8,13,18
**crisis** 17:24
**critical** 136:19 137:21
**cross** 151:14
**csr** 1:22 189:25
**cummis** 3:13 8:12
**curious** 115:9
**current** 43:8 173:3
**currently** 15:6,7
**cut** 16:15 24:16 50:18 59:20 77:11 81:22 126:8 167:8 170:5
**cute** 186:23
**cutting** 50:16 77:4

**d**

**d** 1:21 2:17 30:8,9 189:24
**d.c.** 23:9
**da** 35:4
**data** 133:23 137:9
**date** 98:5 137:20 155:8 157:13 177:23 189:19
**date's** 132:13
**dated** 6:7,9,11,18 6:23 7:6,9,10 55:8 55:23 133:17 143:17 146:12 150:14 158:15 159:5,8 162:3 165:5 168:9 169:5 173:1 177:22,25 179:3 189:22
**dates** 178:6
**daughter** 186:18
**day** 32:10 76:25 85:18 109:3 112:16 136:1 137:15 138:24 187:14 188:10
**days** 63:23 155:18 159:8 187:10
**deal** 34:14 63:4 77:1,3,5 81:22 144:12 156:18 167:9 170:5 178:23,23
**dealing** 27:25 28:18 149:16
**dealings** 88:12 167:21
**deals** 27:25 82:3
**dealt** 101:14
**dear** 153:11 156:3 168:13
**debate** 76:23
**debates** 80:13
**debt** 143:20
**debts** 144:7
**december** 120:4 133:17 134:14 177:11,22,25 178:5,7 179:3
**decide** 90:23 119:25
**decided** 25:13 27:23 84:18 100:14 119:24
**decision** 26:24 50:17 81:25 84:13 84:23
**decisions** 89:1 173:11
**declare** 188:4
**decline** 130:9,13
**declined** 128:5
**deeply** 40:5
**defendant** 8:13 9:17
**defendants** 1:10 2:10,14 3:12 15:23 72:4 127:6 139:13 141:5
**defense** 43:15
**define** 38:15 165:23
**defined** 178:10
**defunct** 88:5
**degree** 10:5,6 67:20
**delaware** 157:17
**delay** 153:11
**delete** 102:3
**deliver** 13:6,12
**delivered** 53:14 54:2
**delivery** 14:22 28:18
**delks** 29:6,14
**delsk** 30:7,12 31:1 31:12 32:2,6,9,9 32:10,19 33:3 35:19,20 36:7,21 40:2,22,24 94:25

**[delsk - document]**


95:3,8 98:6,7,9,20 98:23,23 99:1,1 103:6 105:16 106:6,9,16,18 107:9,16 108:14 110:23 111:4 113:11,21 140:21 172:10 174:12,13 181:5 182:1,2,8,14 183:25
**delsk's** 30:21
**demand** 119:7 125:25
**demolish** 55:11 158:18 170:1
**demolished** 56:13 185:21,24 186:1,4
**demolition** 54:23 64:25 142:15 169:15 170:13
**depending** 137:8 181:22
**depends** 57:3
**depiction** 186:10
**deposit** 50:12,15 51:1 53:2,3 74:18 74:23 75:10,11 76:9,10 81:7,12,13 85:5
**deposited** 41:1 110:9
**deposition** 1:14 2:13 6:3 9:12 39:21 43:15 44:10 44:11 131:22 187:10,15 189:13
**depositions** 126:24
**describe** 106:21
**described** 31:11 80:19 172:12
**description** 5:10 6:2 7:1
**descriptions** 106:25
**deserve** 90:22,23 186:16
**designated** 18:21 20:13
**desperate** 108:16
**despite** 125:9,24
**detail** 56:4,6 137:13
**determining** 90:24
**develop** 19:15 87:25
**developed** 18:22 87:13
**developer** 149:6
**development** 13:3 24:6 39:12 88:2,3 88:18 89:25 90:14 92:3,23 93:8 148:12 157:20 168:14
**dictates** 59:1
**difference** 80:12
**differences** 120:11 120:17
**different** 19:24 20:8,9,10,21 25:21 53:15 58:6,25 64:21 65:23 67:10 68:13 81:23 84:12 110:16 119:22,23 124:25 128:5 132:13 139:14 161:15,15 169:14 174:17
**difficulty** 111:24
**digest** 164:16
**dinner** 112:21
**direct** 25:1 124:13 146:18 147:22 150:10,23 154:9 156:25 168:11
**directed** 59:4 62:2
**directing** 155:15 158:3 159:1 161:21 168:7 169:3
**direction** 189:10
**directly** 17:12 72:13 165:11,18
**directors** 15:9
**disadvantage** 63:6
**disagreements** 120:14
**disappointed** 42:18
**disaster** 62:13
**discernible** 72:3
**disclosed** 54:4
**discoverable** 124:14 127:23
**discovered** 110:24 111:3 113:5
**discovery** 64:18 71:25 123:4,17,25 124:2,8 125:13 126:1 129:6
**discuss** 16:18,21 33:2 34:6 43:11 66:1,11
**discussed** 21:20 33:10 42:7
**discusses** 161:3
**discussing** 140:1 177:12
**discussion** 27:3 31:14,17 33:6,9 34:10,21 41:2,25 86:16,20,22,24 129:24,25 144:21 153:13
**discussions** 18:11 18:15 26:8,14 27:15,19 39:16 40:2,5 67:17,19 88:7 157:13
**displace** 158:19
**displaced** 142:16
**distracted** 68:21
**distributing** 146:22
**district** 1:1,2 2:1,2
**diversion** 187:1
**division** 12:3
**docket** 125:12
**doctor** 17:18 20:21 114:10
**doctor's** 25:2,4
**doctors** 14:4 62:12 63:16,19 121:15 121:17 180:25
**document** 5:13,16 7:8 25:24 27:10 36:10,13,14 43:10 44:3,8,15,18,21,23 45:1,23 54:21,23 55:22 59:3 61:10 68:1,9 69:17,19,20 70:12,20 71:15 72:12,22,24 73:2 73:25 83:2 92:1 101:22,25 102:14 102:20 103:1,3,4 104:10,12 106:8 107:13,15 117:16 132:18 139:20 141:11 143:22 146:9,12,13 148:18 150:11,24

152:22 153:12 154:9 155:16 157:2,6,12 159:3,5 161:22 163:9 168:8 169:4 172:8 172:22 175:23 176:3
**documentation** 48:8 172:10 179:9
**documents** 25:21 49:15,20 69:5 95:7 108:19 109:12,21,25 131:25 132:2 133:8 134:3 139:17 147:6 160:19,23 171:19 176:17
**doing** 22:11 24:2 27:25 34:15 38:6 41:8 44:15 62:5 62:14 87:10,25 94:1 112:22 139:14 140:16,22 145:16,19 157:15 181:15 183:12,13 183:15 184:1
**dollar** 46:6
**dollars** 48:5,20,23 91:5 180:6,13
**downloaded** 138:9
**dr** 12:23 13:5 14:19 16:4,5,22 17:10,11,12,15,18 18:4,12 21:14,19 22:11 25:5,16 26:2,4,10,14,16,17 27:8 29:13 33:7 34:3 55:21 62:13 63:4,10 64:2 65:4 65:8,16 77:2,21 99:8 109:20 112:1 112:13 113:1,19 114:14,25 118:18 119:8,23 120:11 120:25 121:15 122:2,3 134:17 143:4 148:9 151:19 155:23,24 156:3 157:25 158:14 159:17,18 166:20,25 167:4 176:11,14 180:24
**draft** 153:13,15 163:17 164:10
**drafting** 163:19
**draw** 116:1,21
**drawing** 116:24
**dreamt** 21:19
**drive** 85:19 133:12 133:15
**dropped** 183:15
**duarte** 67:6
**duties** 13:2

**e**

**e** 5:19,20 6:8,10,16 6:18,20,23 7:2 30:8,9 42:14 50:21 62:20 98:20 99:1,2,7,18 101:16 101:17,19 102:3 102:14,16,18,22 103:5 132:25 134:3 136:23 140:20 152:3,6,24 153:8 154:12 155:18,20 156:12 156:15 159:4,7,10 159:14,15,16 162:2,11 163:9,16 165:3,4,10,17 166:5,13,19 167:15 176:18 177:5 186:6
**earlier** 50:8 91:21 94:25 98:4 108:6 108:7 113:8 141:16 142:3 163:23 165:4 169:9 170:19 172:9 173:19 182:9,17 183:24 183:25
**early** 36:14 72:10 93:8 94:10 133:17 140:4 183:24
**east** 13:15 30:25 110:3
**eb** 6:5,6 17:7 19:12 21:22 28:7 29:1 30:15,16 33:2,18 38:2,8,9 39:14,15 40:6,9 41:24 46:1 86:10 91:6,19 94:22 98:1 122:21 126:6 129:5,14 130:13 136:24 141:23,24 142:25 143:21 146:11,16 150:14 163:24 164:3,4 167:22 173:3,7 175:20 176:15
**economic** 92:2
**edgar** 135:23
**edison** 32:15 99:5 99:5,6,18,24 105:16 107:10 108:2,8 111:5,8 113:8,16,19 114:6 133:1 136:23 177:16,18
**educational** 10:10 10:11
**effect** 144:4
**effective** 131:11
**effort** 22:16 170:25
**efforts** 146:21 171:9
**egnyte** 69:19 139:12 140:24
**eight** 17:19 30:1
**either** 9:16 41:18 48:2 61:3 133:20 159:23 178:22 181:23
**elaborate** 144:6
**electronic** 137:9 139:15
**element** 82:1
**embarrassing** 121:15
**emergency** 17:21
**emphasize** 186:6
**empire** 15:8
**employee** 179:24 189:17
**employment** 142:3 142:7 159:19 180:3,14
**encloses** 162:7
**ended** 90:10 132:19
**ends** 151:15
**endurance** 39:4
**enforcement** 138:5
**engage** 149:5,12 150:6
**engaged** 17:16 84:24 153:20 156:4 180:22



Veritext Legal Solutions
866 299-5127

**engagement** 162:18
**english** 10:18,20 99:4 111:12 113:17 183:3 184:9 185:6
**enjoyed** 165:7
**enter** 148:4
**entered** 148:8 167:2
**entering** 158:21
**enterprise** 87:10
**entertaining** 186:15
**entire** 14:13 34:5
**entirely** 67:8,10
**entirety** 151:16
**entities** 38:13 39:20,22 46:18 55:9 64:21 171:4
**entitled** 55:13 56:15,22 57:10,19 65:13 115:21,24 116:6,8 126:17 147:25 151:2,17 157:2 158:4
**entity** 19:7 37:19 38:2 39:11 46:16 47:7 60:3,7,9,13 60:16 67:10 72:2 154:19,23 155:3 155:19 165:24,25 166:2,2,21,21,25 167:1,5 171:14
**entrepreneur** 11:6 21:11
**entrepreneurial** 11:11
**equal** 48:24
**equipment** 50:13 50:16,23 51:2 72:18,19 73:5,11 73:15,17 74:10,18 75:5,10,22 76:9,10 85:4,5 89:8 148:5 148:22 150:7 161:7 164:14 166:16 167:19 178:4
**equity** 24:24
**esi** 140:11 141:11
**especially** 98:24
**essentially** 143:19
**establish** 95:21
**established** 81:15 95:19
**estimate** 44:14 95:4 149:11
**estimating** 36:9
**et** 1:9 2:9 84:25 178:4
**event** 30:16,17 58:23 156:2 166:13 182:7,15 182:17 183:25
**events** 29:23
**eventual** 144:16
**eventually** 22:13
**everybody** 62:11 107:23
**evidence** 113:9 123:21 145:8,13
**evidently** 156:18 162:15 164:18
**exact** 15:18 25:20 35:21 36:3,5 48:1 49:23 73:23 77:12 98:5,17 137:13
**exactly** 12:15 16:16 19:11 23:5 25:20 28:21 37:1 37:5 45:12 90:2 119:3 142:10 147:5 178:19 182:18
**examination** 5:2 8:22 125:15 126:11,24 128:9 139:9,18 171:20 173:24 179:12 181:20
**examined** 8:5
**examining** 178:8
**example** 85:3,9
**excess** 45:13 74:15 74:16
**exchange** 1:5 2:5 3:4 5:14 65:25 67:14 76:24 105:9
**exchanges** 34:24
**excise** 166:25
**excitement** 33:11 34:15
**excuse** 41:16 44:1 45:22 165:13
**executed** 7:8 144:3 157:7 158:15 162:10 169:4 188:10
**executing** 143:18
**execution** 144:16
**executive** 12:13 19:6 20:15 151:5 152:2
**exhausted** 176:6
**exhibit** 5:11,12,14 5:15,17,19,20,22 5:24 6:3,4,6,8,10 6:12,16,18,20,23 7:2,6,8,10 43:22 43:25 44:4,6,12 54:10,18 59:4 67:22,23 68:3,7,16 69:20,21,25,25 70:5,13,17,22 71:2 71:25 72:1,3 73:25 82:17,20 100:20,24 101:2,5 101:11 102:6,7 103:18,19 104:3 104:13,20 107:2,6 117:4,10,13 118:20 130:23 131:3,6,14,16 141:2 143:15,15 146:1,1,3,8,9,10 147:6,23 148:21 149:3 150:2,13,13 150:16 152:6,23 153:2,9 154:6,10 155:12,16 156:2 157:1,3 158:3 159:2,11,15 161:22,24 163:4,7 163:13 164:8,20 164:21 168:4,8,25 169:3 171:19 172:18,21 175:6 175:10,12 177:1
**exhibits** 43:14 54:12 131:11 139:13
**existing** 54:24 55:1 142:16 158:18 170:1
**expect** 88:1,2 89:25 109:22 111:10
**expectation** 147:9 147:17 150:4
**expected** 89:13,14 164:17
**expecting** 87:12

**expeditious** 139:2
**expenditure** 78:13 78:14
**expenditures** 79:6
**expense** 57:2 58:1 80:6
**expenses** 43:18 64:20 84:25 85:2 85:9,12,13,14 86:5 86:14 93:12 94:5 95:20 123:22
**experience** 11:6 21:12 61:13
**experienced** 127:2
**explain** 22:10 64:19 81:21 94:6 95:17 111:25 127:22 144:2 161:16
**explained** 42:24 141:16 142:2,13 143:3
**explanation** 109:1 114:8 119:6 186:16
**explore** 48:11 49:16
**exploring** 65:10
**expressing** 166:15
**extend** 96:8
**extent** 54:3 55:18 56:17 92:23 95:22 143:20
**extremely** 62:16
**extrinsic** 123:25

**f**

**fabricated** 172:11
**face** 68:16 94:24 94:24
**faced** 96:24
**facilitate** 96:3
**facilities** 54:24
**facility** 85:23
**fact** 43:1 51:7 99:19 126:12,13 138:22 149:20 169:24 174:15,20 174:22 179:7
**facts** 58:2 65:18 76:15,18 77:8 80:14,15 92:19,20 111:3 124:23 141:12 167:20 170:19
**factual** 78:11
**factually** 59:16
**failure** 140:2 149:12
**fair** 14:12 119:17 134:14 143:9 147:13 148:18 181:17
**fall** 137:12
**false** 78:10
**familiar** 19:7 30:9 35:4,7,10 37:10,22 38:1 50:20 51:11 73:14,16 93:22 105:8 106:11 176:22
**famous** 144:13
**far** 64:18 86:20 92:4 97:10 125:1 160:4,10
**favor** 171:18
**february** 1:16 2:16 8:1 120:8 144:25 145:5,9 180:4
**federal** 189:13
**federation** 15:9,10 15:12
**feel** 16:16 27:23 39:4 108:20
**fees** 50:15 91:4
**fell** 137:13
**felt** 21:14 27:22,24 28:3 42:19 100:13
**female** 107:10
**figure** 112:25 113:25 186:24
**file** 139:19 150:12
**filed** 78:2 90:11 133:12,13 145:8 145:13 146:18 167:14 168:22
**files** 133:14 134:1 139:16
**fill** 75:13 77:5 184:13
**final** 69:5
**finally** 22:5 122:12 152:5
**finance** 28:20
**finances** 46:19
**financial** 12:12 85:25 119:7,10 151:15
**financially** 189:16
**financials** 86:3,9 97:8,11,14
**financing** 18:12 91:19
**find** 14:9 38:14 58:21 65:17 68:23 85:22 96:17 109:5 111:1 118:12 121:2 137:14 153:12
**finding** 25:15 97:19
**fine** 9:4 50:14 75:17 96:10,12,13 96:14 187:16
**finish** 10:15 16:15 130:10
**finished** 44:17 71:14
**firm** 22:24 23:10 23:13 93:23 140:10 153:21,25 156:4 171:3
**first** 8:14 12:12 13:14,17,17 14:6,8 15:23 16:5 17:22 19:15 30:22 31:25 37:17 43:20 52:12 53:8 98:20 102:10 113:10 114:16 126:3 127:4 143:15 146:10,15 146:19 148:3 149:21 153:8 155:22 157:11 159:4,15 177:20 180:9
**five** 15:1 17:19 20:10 23:17 40:21 82:10 92:14 139:3 139:4 163:8
**flew** 29:12 109:5 112:9,16 113:2
**flimsy** 97:22
**flip** 26:5 146:14 157:6
**floating** 133:13
**flow** 63:12,25 88:11 98:17
**flower** 3:7
**fluent** 99:3 183:4
**fluently** 10:23

**fly** 109:2 113:9,19
**focus** 13:6 71:4
**focused** 13:8 41:3 58:2 85:1
**focusing** 13:1
**folks** 22:10 32:10 62:9 99:16 121:12 149:18 163:11
**follow** 109:18
**followed** 59:6 61:11
**follows** 8:6
**forecasting** 12:4
**foregoing** 188:5 189:4,6,10,12
**forfeit** 78:4,23
**forfeited** 77:16,18 79:13,25
**forged** 109:17
**forget** 32:8 34:12
**forgot** 160:16
**form** 22:1 68:15 73:9 76:12 78:15 92:13,22 134:20 180:6
**formal** 180:3,14
**formalities** 34:17
**formed** 19:12
**forming** 155:7
**forth** 172:12 189:5
**forward** 21:17 113:23 144:10 152:20
**forwarding** 102:4
**found** 14:3 69:3 114:7 116:13
**foundation** 45:21 46:10 48:6 52:9 52:18 53:8,10,16 73:10 81:14 92:20 92:20 93:15 96:25 102:15 108:25 157:18 180:8
**foundational** 52:10
**founded** 14:2
**four** 15:1,5 16:13 16:17 23:17 40:21 106:20 155:18 179:15
**frame** 48:17
**franchise** 85:12
**frankly** 9:15 22:23 97:15 129:7
**fraud** 116:14 141:3
**fraudulent** 103:1
**fred** 151:14
**free** 93:18
**front** 47:6,25 48:8 49:15 75:14 76:24 95:7 107:2
**fruition** 67:18
**full** 8:25 11:19 31:9 37:19 77:16 78:24
**fully** 137:3
**function** 120:19 139:21 147:3
**fund** 6:5,6 17:7 21:22 38:2,8,9,9 39:14 40:10,10 86:10 108:18 110:15,16 111:17 111:19 129:5 141:23,24 142:25 143:21 146:11,16 150:14 173:4,7 175:20
**funder** 144:11
**funding** 17:6,6,23 18:3 19:13 25:13 29:20 39:14 88:20 165:24
**fundraising** 26:3 93:10 94:17 100:3
**funds** 25:15 35:23 40:16 45:18,19 46:1,4 47:13 78:21 81:2 83:12 87:22 94:3,4 98:1 98:9,12,15,19 100:8,9 108:8,10 110:9,13,20 111:19 115:15 122:11,12,18,21 126:6 136:24,25 176:5 178:15,25
**further** 10:11 43:9 62:15 138:15 173:24 179:10,12 181:20 186:12 187:2 189:12,16
**future** 28:19 61:6 61:7 62:15 92:9

**g**

**g** 105:24 152:3 177:5 186:6
**gain** 27:20
**game** 119:17
**gary** 3:5 8:8,17 9:24 53:7 55:23 76:19 78:12 80:12 82:12 92:18 126:9 126:23 139:23 179:11 187:3
**gathering** 140:18
**gcs** 171:14
**genders** 107:15
**general** 43:3,4 57:16,17 85:11 139:1
**generally** 19:12 57:18 89:5
**gentleman** 99:3 107:24
**getting** 23:12 27:20 43:16 46:25 51:17 72:13 79:3 90:15,16 97:23 103:5 112:18 145:4 153:12 178:12 180:12,19
**gifts** 34:10
**give** 20:22,23 21:14 25:17 54:13 92:19,20 104:2 113:21 119:6 147:20 162:15,20 183:15
**given** 53:2 125:1 125:20 127:23,23 150:12 169:24 189:11
**giving** 76:14 79:8 137:5
**glad** 186:21
**go** 8:10 21:25 23:9 39:9 43:20 49:20 52:21 58:14 59:25 66:10 77:9 79:24 86:14,15 89:6 91:15 94:8 96:8 109:10 112:18,22 113:23,24 114:1 115:7 117:1,18 124:12 139:6 140:10 143:6 144:10 148:21 152:20 153:7 165:14 170:11 184:17 185:7 187:9

**goes** 31:20 97:24
**going** 16:25 17:2,6 18:3,5 19:1,5,15 19:15,16 20:14 22:6 25:14 27:6 28:23 29:8 30:24 31:14,15 32:25 33:11,13,14,18 34:2 35:2 36:21 37:15 38:8,17 40:10,13 42:20 43:19 45:2 46:1 51:21 53:11 67:21 69:23 74:6 77:25 82:5,11 83:14 86:4 88:21 89:22 90:17 91:19 96:15 97:19 100:9,14,20 104:2,9 107:1 109:19,23 110:20 110:21 111:21,21 111:22 112:19,24 113:5,23,23,25 114:1 115:19,25 117:3 120:12 123:13,18 125:7,8 125:18,21 129:8 130:8,21 134:10 137:5 138:25 139:1 140:23 143:11,14,14 152:23 154:12 156:25 157:11 161:17 163:5 165:1,22 166:16 173:21 175:5 177:17 178:11,18 178:18,20 185:24 187:8
**goldstein** 4:5 8:20 8:21 15:16 28:10 38:17,22,25 39:18 39:24 43:13 44:9 45:22 47:17,19 48:16 52:8,19 53:12 54:15 57:6 57:21,23 60:1,6 64:6,8,17 65:8,20 66:3,17 67:25 68:22 69:1 70:8 70:12,17,21,25 71:6,11 72:5,21 73:19,24 74:12 75:1,19 76:17 78:8 80:2,15 81:14 84:15 87:18 89:21,23 93:14,16 95:13 96:13,19 100:24 102:5,15 104:5,7,13,17 106:7 107:5,11 114:19 115:6,18 117:6,17 118:6,9 119:14 120:12 121:24 123:3,7,10 123:14,24 124:18 125:7,12,16 128:13,19,23 129:4 130:25 131:10 132:7,13 135:8 139:4 143:22 166:9 171:23 172:3 173:14 175:10,13 175:22 176:3,25 184:20 187:8,14
**gonna** 89:19
**good** 8:17,19,20 34:20 38:18,20 96:18 98:17 99:12 107:1 162:5 183:13
**gotta** 127:6
**gotten** 54:11
**gouraige** 3:14 5:5 8:8,11,11,23 9:24 10:1 15:17 28:13 37:21,24 38:17,20 38:24 39:2,18,23 40:1 43:16,19,24 44:5,16 45:24 46:11 47:18,20 48:9,18,22 52:11 52:14,20 53:6,12 53:19 54:9,16,20 55:22 56:3,8,20 57:7,14,21 58:4,12 58:15 60:2,4,9 61:18,22,24 62:1 64:7,10,14,17,23 65:10,22 66:7,20 67:21 68:2,5,19 69:2,6,16,22 70:3 70:10,14,19 71:4,7 71:10,11,13 72:6 72:15,25 73:4,13 73:21 74:4,14 75:2,16,19,24 76:18,21 77:6 78:11,18 80:5,11 80:18 81:18 82:10 82:14,19 84:18 86:13 87:20 89:22 89:23 90:3 92:17 93:4,19 94:13 95:11,15 96:10,14 96:17,20,22 100:23 101:1,4 102:8,19 104:9,15 104:22 106:12 107:5,7,11,17 114:22 115:9,13 115:23 116:3,5,16 116:24 117:2,8,12 117:17,19,21 118:10,11 119:21 120:16 121:24,25 123:3,5,9,11,19 124:1,7,17,19 125:4,10,14 126:3 126:15,19 127:15 127:17 128:2,17 128:20,23 129:2 129:11 131:2,5,15 132:12,16 134:22 135:10 138:14,18 138:20 140:1,8,25 143:16 144:3 147:14,19 160:11 162:19 164:15 166:7 168:2 169:9 170:7 172:2 173:23,25 175:12 175:14 176:1,7 177:2 179:10 180:8 181:19,21 184:25 186:11,17 186:21 187:2,6,12 187:16,18
**grace** 23:20,20
**graduated** 10:5,6 10:7
**grand** 169:22
**granillo** 1:21 2:17 189:24
**grateful** 21:24
**great** 31:15 38:11 38:22,24 87:9 106:25 122:23 186:22
**gross** 3:13
**grounds** 93:2 175:23

**group** 11:20
**guarantee** 42:1,17 43:1,17,20 44:24 45:8 137:12 144:3 144:7,11,17 175:20 176:2,12 176:14
**guaranteed** 143:19
**guess** 95:5,6 98:21 104:10 117:8 141:7 146:14 166:8 186:6
**guessing** 67:3 186:5
**guest** 127:8
**guy** 22:12 91:19 135:20,21

**h**

**h** 99:6 152:3 155:21 177:5
**hacked** 135:20,25
**hackers** 136:12,16 137:24 138:1,3
**half** 10:19,20,24 10:24 149:17
**halfway** 165:16
**halloween** 135:13 135:14 136:8,9,9 136:11
**hand** 41:4
**handful** 98:8 146:19
**handing** 146:24
**handled** 88:17
**handling** 178:15
**hanging** 186:14
**happen** 24:3 31:15 33:1 108:15 121:14 137:23
**happened** 18:1 61:14 79:21 90:21 93:2 101:15 136:3 136:6 137:8 182:17 186:10
**happening** 109:1
**happens** 70:9
**happy** 138:25
**harass** 129:8
**hard** 43:14 96:5 112:12 133:14 134:11
**harlan** 6:10,14,16 6:19,24 7:4 151:19 152:15 153:1,10 155:20 156:3 157:8 159:6 159:9,16 162:3,5 163:11 165:5 166:23
**head** 70:11 133:3 186:14
**heading** 151:2
**health** 14:4
**healthcare** 14:14 14:17,18 15:1,14 30:23,24 76:4
**hear** 55:6 58:17 60:4,25 89:11 111:6 122:15 124:9 137:24 142:22 175:18 179:16 187:12
**heard** 65:24 93:5 171:14
**heavier** 98:10
**heidi** 163:17
**held** 50:1 108:18 110:10 124:22 160:13
**help** 11:24 18:3 20:3 21:16,17 22:5 23:4,10,13,16 24:6,12,14,14 28:20 29:9 33:18 41:3 43:11 54:7 87:25 122:20 126:5 128:4 129:13
**helped** 24:8 35:16 35:20 41:5,15 180:23
**helping** 27:21 36:21 41:12 96:3 180:1
**hereto** 43:23 54:19 68:4 70:2 82:18 101:3 104:21 117:11 131:4 146:4 150:17 153:3 154:7 155:13 157:4 159:12 161:25 163:14 164:22 168:5 169:1 172:19 188:7
**herve** 3:14 8:11 55:25 69:19 75:13 76:23 78:17 80:10 92:13 96:5 116:2 127:16 128:14 138:17 173:22
**hey** 59:10
**hgouraige** 3:19
**hi** 159:17
**high** 13:6,9 100:18 100:18 165:21 186:20
**higher** 12:10 48:14 61:12 113:21
**highly** 108:24
**hills** 182:24,25
**hire** 57:9,18 140:10
**hired** 22:3,17 93:20 114:11,13 114:15 115:2,3,17 115:19 118:2,8,17 119:1,16 133:18 133:18
**hiring** 84:1
**hispanic** 14:6
**hit** 17:24
**hmo** 14:2,4
**hold** 55:16 130:24
**holding** 20:17 121:13 154:16 160:1
**holiday** 136:9
**home** 29:16 113:25 133:7
**honest** 20:16 97:8
**honestly** 23:14 72:9 86:19
**hope** 6:22,24 27:16 37:1 67:5,6 67:6 121:21,22 152:15 153:16 154:15 156:5,19 157:18 158:22 159:17 160:1,7,20 162:10,12 163:11 164:9 165:6,7 166:1,3,17 167:16 170:5 176:22,23 177:12 178:3
**hope's** 162:17
**hopefully** 139:16
**hospital** 6:13 13:24 67:4,5,7,7 68:12,14 69:13

[hospital - interest]

121:6,12,17 122:3 152:16 153:16 157:8,15,15,21,23 158:22 160:2,7,21 162:11 163:12 167:17 170:6 177:12 178:3 183:9,10,11 184:17
**hospital's** 13:23 148:16 158:24 160:3
**hosted** 30:16 34:12 109:4
**hosting** 32:24
**hour** 38:18
**hours** 87:23 88:13 124:19,20,20
**house** 109:4
**huge** 29:8,14
**huh** 9:11 19:18 91:20 117:15 131:18 151:3 169:23
**hunn** 6:17,19,21 151:25 152:16 155:21 156:4,17 156:22 159:7 161:4,8,9,12,16 162:3,12,16,25 163:10,16 164:8 167:17
**hurry** 62:11
**husband** 41:18 123:1 126:6 128:4 129:18 130:1,3,4,7
**husband's** 130:16
**hypothetical** 57:13 75:13 76:13 77:5 87:18

**i**

**idea** 54:3 122:19 125:23 158:21 162:16 177:11 180:12
**identification** 43:22 54:18 68:3 70:1 82:17 101:2 104:20 117:10 131:3 146:3 150:16 153:2 154:6 155:12 157:3 159:11 161:24 163:13 164:21 168:4,25 172:18
**identify** 23:7,11 39:10 122:12
**illegal** 58:7
**illegible** 97:9
**imagine** 137:4
**imaging** 11:20 143:19
**imagining** 99:13
**immediately** 63:2 65:2,16 102:4 109:3 137:18 144:19
**impacted** 63:25
**impasse** 126:18
**implemented** 18:23
**implying** 60:2
**important** 149:17
**imprecise** 140:9
**improper** 79:5,15 80:2,24 114:5 122:11,13 129:3,7
**improperly** 108:11
**inability** 149:12
**inactive** 134:9
**inappropriate** 61:9 80:24
**inches** 44:14
**incident** 138:5,9
**include** 37:1 97:13
**included** 13:20 167:16
**including** 163:11 167:9
**income** 97:1,5
**incomplete** 57:12 75:12 76:12
**increase** 160:14
**increased** 13:20
**independent** 15:10 15:10,12 58:23,23 79:22
**index** 5:1 6:1
**indio** 129:14
**indirect** 25:3 29:21
**indirectly** 29:2,3 94:18
**individual** 21:5
**individuals** 31:5 32:5 52:16
**industry** 14:14 74:22 81:21
**inexpensive** 74:1
**inference** 116:21 116:25
**inferences** 116:1
**influx** 98:11
**inform** 156:3
**information** 18:9 29:5 66:4 102:2 114:20,23 115:9 115:10 167:20
**informed** 155:11
**initial** 24:17 47:1 98:15 153:13
**initialed** 188:7
**initially** 17:12 25:12 41:1
**initiated** 24:21
**ink** 141:3 188:7
**inland** 15:8
**inquire** 127:8
**inquired** 23:6 127:18
**insisted** 65:1,15 109:2 144:4 158:16
**installments** 48:24
**instance** 149:22
**institution** 10:10
**instruct** 126:25 128:23 129:9
**instructing** 66:13 66:17 125:5 126:20,21 128:12 128:17
**instruction** 66:6 127:9
**instructions** 59:6 61:11
**intelligent** 49:17 76:5
**intended** 102:2 129:8 157:12
**intends** 149:4
**intention** 44:4
**interacting** 88:14
**interaction** 140:9
**interest** 24:24 154:19 155:3 160:25 167:1 177:4

**interested** 17:15 159:18 189:17
**interesting** 121:7 121:9
**interpose** 55:17 127:14
**interposed** 66:12
**interposing** 28:11 127:25
**interviewing** 121:1
**introduce** 19:16 54:12 67:22 69:17 139:23
**introduced** 15:23 16:1,5,7 17:5,8,10 17:12 29:23 30:22 100:17 149:21
**introducing** 162:12 186:7
**introduction** 34:17
**invest** 92:10 94:23
**invested** 13:23 93:3
**investigate** 22:8 114:17 118:2
**investigation** 140:5 141:7
**investigative** 144:24 145:5,10 146:9
**investment** 171:8
**investor** 34:23 78:21 98:1,15 110:12 115:15
**investors** 34:4 80:1 92:10 93:3 94:22,23 95:8,23 122:18 146:22,22 147:11,11 148:18
150:6 163:24,24 164:3,4 167:24 181:3,3,9,22,24 182:1,2,19 183:2
**invited** 29:15 41:6 122:5 127:21 183:6
**invoice** 46:23 59:11 82:23 83:10 83:13 169:13
**invoiced** 169:21
**invoices** 46:21,25 47:2 100:16
**involve** 160:7,22 160:23,24
**involved** 9:16 11:13 14:13,17 15:13 24:15,17 27:21 28:6,25 35:18 37:2 40:5 46:19,24 50:16 67:19 85:13 95:21 95:22,23,25 115:2 125:20 160:3 171:5
**involvement** 170:22
**ipe** 5:19 83:3
**issue** 65:5 72:2 76:16 79:22 80:4 80:5 116:18,19 123:23,25
**issues** 118:2 123:21 124:2,14 127:3

**j**

**j** 4:5 105:24
**jae** 7:5 153:1,9
**january** 120:8 165:5 166:14,24 167:3 178:16
179:7
**jersey** 3:17
**jiang** 32:13
**jill** 165:23
**jing** 105:22
**job** 1:22 12:10 122:19
**john** 12:23 17:12 17:16,17 25:5 111:15,25 134:17 148:9
**join** 52:10,19 57:6 57:23 72:5 75:1 76:17 80:7 89:21 93:16 166:9
**joint** 156:6 157:14 166:17
**journal** 14:8
**judgment** 79:4
**july** 7:2 152:25 153:10,19
**jump** 114:9

**k**

**k** 1:9 2:9 30:8,9
**kansas** 10:13
**keep** 42:19 58:2 61:21 70:10 79:3 186:19
**keeping** 80:24 173:14
**kept** 78:6,24 79:14 80:21
**kimmel** 5:25 114:16 115:21 118:14,15,20,25 133:18 177:21
**kimmel's** 133:16
**kind** 10:19 14:7,8 108:21 110:17 115:10 133:14
**knew** 32:25 38:6 38:14 41:5,7,8 51:9 114:3
**know** 11:6 15:22 16:16 17:18 18:19 22:9,19,24 25:25 26:25 30:19 31:20 32:25 34:21,24 35:6,16,20,21 36:4 37:5 38:3 39:5 42:6,7,13 43:7,17 44:18 45:12 46:7 46:16,19 47:6,8 49:21 53:20,23 54:4 55:10 56:6 58:18,19,22 59:1 59:13,14,17,18 60:17,17 67:2 69:22,22 70:10,10 75:8,8,20 76:3,19 76:25,25 77:2,3,12 80:10,12,23 81:22 81:23 82:5,5,6,22 83:2,3,8,10,12 84:3,3,11 85:18,22 85:25 86:1 87:8 90:21,24 92:5,13 93:17 94:4 95:8 95:13,19 96:6,23 96:25 97:11,24 98:5,19,25 99:9,16 100:2,8 101:13,15 101:21,23 102:9 102:10,12,13 103:2,7,8,16,16,25 104:7,16,25 105:1 105:2,3,5,6,6,10 105:12 106:24 107:23 108:1,23 109:17,20,23,24 110:7,9 111:6

112:7,23 113:24 114:24 117:7 120:3 121:1,9,11 121:11,12,15,17 122:1,17,23 124:19,21 126:9 127:3,8 128:11 129:23,23 130:19 130:25 131:21 133:24 135:6,7,9 136:20 138:7,23 140:23 144:14 145:20 148:1 153:20 154:21 155:22 156:21 160:3,16 161:10 165:13 174:6,9,25 174:25 175:4 176:16,23 177:9 177:15 179:25 180:1,2 181:2,2,6 181:14 183:3,10 183:12 184:4,12 184:18 186:5
**knowing** 53:17,17 98:23
**knowledge** 46:4 53:21 58:3,7 61:12 72:24 74:11 74:22 75:7 77:2 80:16 85:3 162:21 174:14,15,19,23 180:10
**known** 29:17 148:10
**knows** 75:4 81:16 92:16 124:11,24 135:8
**koslow** 151:22 152:16 163:12

**l**

**l** 30:8,9 154:4
**labeled** 70:13
**lack** 19:23 52:9 53:16 96:25 102:15 124:12 180:8
**lacks** 45:21 46:10 48:6 52:18 81:14
**lam** 6:8 154:3,13 155:19
**lance** 5:25 114:16 115:21 118:14,15 118:20
**land** 17:20 47:5 49:23 50:1 51:18 55:2,4 67:1,14 68:13 77:13,24 78:6,19 79:8,10,16 85:4 183:1 185:21
**language** 10:17,25 14:5 101:14
**large** 27:24 31:9 45:13 110:22
**largely** 92:12
**largest** 30:14
**late** 120:10 133:16 133:17
**latest** 153:8
**latin** 15:5
**latina** 15:7
**latitude** 125:2
**launching** 30:17
**law** 3:6,15 4:6 93:22 138:5 171:2
**lawsuit** 9:17
**lawyer** 80:23,23 91:7,7,8,13,21 92:3 93:20,21 94:6 114:11,13,15 114:17,21 115:3,3 115:8,17,19 118:2 118:7,8,13,17,25 119:8,16,20,20,22 119:23 133:18 177:21
**lawyer's** 118:16
**lawyers** 91:12 119:15 139:24
**leadership** 32:9
**leading** 78:9 143:10 149:16
**learn** 49:19 144:23
**learned** 114:18 134:3
**lease** 47:4,7,8,10 47:14 50:1 55:7,9 61:5 77:16 78:4,6 78:22,23 79:14,22 79:25 80:21 85:3 90:20 148:8,9,9
**leased** 47:3 55:4 77:10 79:10
**leave** 10:16 26:19 118:10
**leaving** 59:15
**left** 26:18 27:4 38:5 39:9 114:9 133:13 134:12 139:25
**legal** 22:3,4,15,17 37:19 58:10,18 61:12 80:3 115:20 115:20 116:9,20 118:9 147:19
**legality** 43:7
**legally** 176:6
**legit** 109:16
**legitimacy** 173:10
**legitimate** 57:2 58:1 59:16 80:6 84:6,25 87:15 90:25 94:5,6 114:8 123:22
**length** 92:14 148:21 161:4
**letter** 5:22,24 7:6 7:10 55:23 91:23 104:23 105:15 106:2,14 107:1 117:22,25 118:6 118:22,25 119:5 120:3,5 129:18,19 129:22,23 133:17 141:6 172:24 173:2 178:5 179:2
**letterhead** 168:9
**letters** 24:1,2 62:20 113:11,13 113:16,20
**leung** 3:5 5:6 8:10 8:17,18 9:21,25 28:8,11 37:18 44:3 45:21 46:10 48:6 52:10,18 53:4 55:16,25 56:6,17 57:4,12,22 58:10,14 61:17,19 61:23,25 68:15 69:19 70:23 71:8 71:22,24 73:9 74:24 75:12 76:12 76:20,22 78:15 80:7 81:17 82:13 86:11 89:17 92:13 92:22 93:5,10,15 94:8,12 95:10 96:5,12,16 116:2,4 116:12,20 117:1 124:6,9 126:12,18 127:2,16,20 128:14 134:20 138:17,19,21

139:6,10,24 143:24 145:25 146:5 147:16,21 150:10,18 152:19 153:4 154:8 155:14 156:25 157:5 159:1,13 160:12 161:21 162:1,22 163:3,15 164:18,23 166:12 168:6 169:2 170:10 171:18,24 172:5,20 173:13 173:14,20 174:5 176:18 179:13 180:11,16 181:17 187:4,7,11,19
**leung's** 175:19,22
**leungg** 3:10
**level** 56:3,6
**levine** 6:10,14,17 6:19,24 7:4 151:19 152:15 153:1,10 155:20 155:23 156:3 157:8 158:14 159:6,9,17,17 162:3,4 163:11 165:5,15 166:14 176:20
**levine's** 166:20,20
**liability** 157:17
**liable** 116:13 124:22
**liberty** 21:15
**license** 114:11 115:1
**light** 124:4 129:1
**limited** 125:25,25 157:17
**linda** 17:23
**line** 50:14 61:19 71:22,24 96:7 125:8,11 127:4,10
**linear** 13:14,16,17
**lines** 40:14 48:3
**link** 162:8
**lion's** 25:14 35:22
**lisa** 1:9 2:9 8:15 15:24 16:19 106:3 106:5,9 145:15 179:14 183:17 185:8 186:3
**list** 36:17 88:3 131:24 132:2,5 153:5
**listed** 25:21,23 73:25 88:4 103:25 158:5,8,11 168:17
**listening** 107:24 127:24
**listing** 36:13 54:23
**litigate** 127:9
**litigating** 116:19
**litigation** 116:23 126:7,16
**little** 44:1 68:21 72:11 84:2 97:22 112:19 120:14 161:11 164:16 171:2 172:9 179:19 183:24 184:9
**liu** 1:8 2:8 5:24 6:8 6:10,15,17,25 7:3 7:7 8:13 15:24 16:21 17:3,5,8 18:2,12 21:2,4 22:17 26:2,3,14,15 27:9 28:4,7,19 29:1 31:20 33:7 35:16 40:6 42:4 54:8,8 58:24 61:11 62:2 65:1 65:15 68:12 77:3 88:14,17 89:10 91:18 92:7,12 93:20 97:17 113:16 115:4,16 118:21 119:9 120:11,24 122:18 122:20 124:22 129:5,13,16 130:13 133:1 134:17 141:13 143:6 144:4,6,15 144:24 145:3,10 145:14,16,18 146:21 148:24 149:16,21 151:7 153:1,7,9,16,20 154:12,23 155:5 155:18,20 156:2,7 156:11 157:9 158:16,21 159:6,9 159:22 160:5,20 160:21 162:11,25 165:6 166:20 167:17,21 168:10 169:25 171:9 177:8,11,17,21,22 178:2,14 179:2,4 185:4
**liu's** 106:2,16 147:6,9 156:18 173:11
**llc** 6:5 37:21 38:2 141:19,21,24 146:11 154:16,17 154:20,24 155:3,6 156:9 157:17 163:18,25 167:2 168:14 170:12 173:4
**llp** 4:4 153:25
**loan** 40:10,13 149:14
**loaned** 40:16,19 45:3,18 46:1,4
**loans** 41:24 42:1 42:17 43:2 44:24 175:21 176:12,15
**lobbied** 22:8 23:10 27:20
**located** 148:10
**loehr** 22:21 91:22 93:12,17
**logic** 124:10
**loma** 17:23
**long** 12:14 21:20 76:5 120:4 138:12 145:6
**longer** 50:5 99:15 137:4 167:5 173:15
**look** 44:7 55:22 59:22 70:15,16 73:1 82:20 101:10 101:22 104:15 106:25 107:12 109:19 112:17,19 131:16 132:2 159:14 177:24 178:11 184:17
**looked** 40:23 99:14 110:21 113:4 131:19,20 132:1 172:10
**looking** 31:7 44:17 55:23 68:25 70:4 73:24 79:23 107:2 110:25 111:2,11 132:5,6 134:8

174:17 182:19
**loop** 124:9
**lopez** 1:14 2:13 4:3 5:3,20,21 8:4,21 9:2,9 57:25 60:2,6 80:3 81:15 89:24 93:16 102:5,16,17 107:12 115:12 123:7 124:23,24 125:19 132:8,14 175:24 184:21 188:4,16
**los** 3:8 4:8 13:15 20:4 29:25 152:10
**losing** 65:8
**losses** 123:22
**lost** 65:5,16 136:21
**lot** 11:11 15:13,20 29:23 56:9,10 62:23 63:1,3,3 64:2 65:17 73:7 73:12,17,20 74:10 74:12 80:17 81:23 85:9 87:8,24 110:10 136:18,20
**lower** 48:14
**lui's** 89:18 179:14 179:21
**lunch** 32:8 33:16
**lynch** 17:24,25

**m**

**m** 50:21 154:4 173:5
**ma'am** 147:17
**machine** 17:22,23 189:9
**madam** 168:14
**mail** 5:20 6:8,10 6:18,20,23 7:2 42:14 101:16,17 101:19 102:3,16 102:18,22 132:25 140:20 152:24 153:8 154:12 155:18,20 156:12 156:15 159:4,7,10 159:14,15,16 162:2,11 163:9,16 165:3,10,17 166:13,19
**mailed** 102:14
**mails** 6:16 62:20 98:20 99:1,2,7,18 103:5 134:3 136:23 165:4 166:5 167:15 176:18
**maintain** 128:25
**maintenance** 149:8
**major** 24:11,13 29:20 63:6 120:10 120:13
**majority** 36:9 40:24 166:25
**making** 26:25 49:11 50:17 63:20 70:11 76:21
**male** 107:10
**man** 23:23 151:24 154:3
**managed** 10:13 86:1
**management** 11:25 18:22 32:7 41:17,18,21 151:2 151:17,18 152:14
**managing** 85:19
**mandarin** 11:3
**manufacture** 50:23
**manufactured** 161:7
**march** 145:9 168:9 189:22
**marcum** 153:25 154:4,11,13 155:19
**mark** 173:21
**marked** 43:22 44:4 54:18 68:3 69:20,25 70:5 82:17 101:2 104:20 117:10 131:3 139:13 143:16 146:1,3,8,9 150:13,16 152:23 153:2 154:6,10 155:12,15 157:3 159:2,11 161:24 163:4,13 164:21 168:4,25 171:20 172:18,21 173:16 175:6
**market** 12:4 180:1
**marketing** 180:18 180:21,23 181:13 181:16
**marking** 139:17
**married** 9:10 91:9
**mary** 9:9
**match** 163:21
**material** 134:8 147:25
**materials** 80:10 121:20 140:3,18 141:9 147:10,12 150:2,5 152:20 172:11 180:23
**math** 112:22
**matter** 85:22 97:11,16
**matters** 56:7
**mayer** 22:19,24 24:9 93:22 171:3 171:7
**mayor** 29:25 30:4
**mba** 10:7 49:18
**mcguire** 5:23 101:23 102:1,11 103:9,20
**mean** 15:6 16:14 26:22 29:3 35:6 41:16 49:13,13 58:17 60:19 61:7 70:6 72:18 73:20 82:7 87:2,8,19,21 87:24 88:23 90:18 90:19 91:5 92:18 93:12 97:14,23 98:14 99:11,14 103:6 106:15,25 115:23 116:17 122:1 123:24 125:4 129:15 133:11 136:7,16 172:23 178:13 186:9
**meaning** 16:4
**meaningful** 143:10
**means** 52:3
**mechanism** 14:22
**medical** 11:20 13:24 28:18 157:18
**medicare** 137:21
**meet** 16:8 23:9,15 29:5 31:12 32:5 32:21 33:17,21 34:3 35:1 106:5,8 106:15 154:3 156:17 177:16,18

180:25 182:14 184:17
**meeting** 29:8,10 29:14 30:21 31:10 32:3 33:3 34:22 35:13 105:16 107:18 121:23
**meetings** 34:19 121:13
**mei** 35:5
**memorandum** 6:4 6:12 36:25 57:3 58:25 68:17 69:4 90:25 146:11,16 146:23 147:23 149:3 157:2,12 160:6 161:3 162:9 167:13 168:22
**memory** 27:1 39:20 51:6 107:1 129:15
**men** 107:10
**mentioned** 11:18 27:18 30:7 36:20 50:8 91:21,22 113:10 154:2 155:7 162:7
**merrill** 17:24,25
**met** 16:10,12 23:17 31:1,6,13,25 32:11,17 105:5 106:19 107:9 108:2,5 121:21 179:15
**mevion** 5:17 50:20 52:5 53:2 72:1,19 76:8 77:1 78:12 78:16 80:10 81:13 81:16 89:7 161:7 162:8,16 163:12 163:19,19 164:11 164:13 165:25 166:2 167:3,10,19 167:23 178:4
**mevion's** 81:12
**mhp** 159:21
**michael** 6:17,18 6:21 151:21,24 152:16,16 155:20 156:4,17,22 159:7 161:11 162:3,12 162:16,25 163:10 164:8 165:10,17 165:23 167:17
**midst** 44:10,10
**mike** 163:12
**miles** 13:14
**miller** 22:19,24 24:9 93:22 171:3 171:7
**million** 35:21 36:4 36:5,8,14 45:6,14 45:16 46:6 48:5 48:20,23 51:7 63:3 73:23 74:15 74:16,19 75:9,14 75:22 76:10,24 92:25 95:3 112:23 112:24 145:11,15 173:8 180:6,13
**millions** 91:5
**mind** 40:20 53:10 83:14 92:18
**mindful** 138:22
**mindset** 89:18
**mine** 30:2
**miniature** 34:8
**minus** 171:22
**minute** 82:10,15 104:2,10 117:4
**minutes** 31:13 38:21,23 54:9,13 92:15 96:9 128:20 139:3,3,5 172:2 175:15
**misappropriated** 108:10 122:18
**misappropriation** 115:15 116:1,19
**miscellaneous** 133:14
**mischaracterizes** 68:15
**miscommunicati...** 62:17
**misinterpreting** 111:9
**misleading** 55:18 80:8 92:22 147:13 150:7
**misrepresent** 62:14
**missed** 87:5
**missing** 137:14
**misspoke** 107:7
**misstate** 53:16
**misstates** 52:8 89:23
**misunderstanding** 116:11
**model** 122:24,25
**models** 34:14
**molly** 5:23 104:25
**moment** 23:25 115:7
**monday** 1:16 2:16 8:1
**money** 21:25 25:14 33:14,15 40:18,21,25 45:2 50:2 65:5,9,17 73:7,12,17,20 74:10,13 79:25 97:18,23,25 98:25 99:17,19 100:12 108:17 109:22 110:8 111:21 113:12,12,15 129:16 130:8 161:6 167:9,23 169:25 170:9
**monies** 113:5
**monitor** 44:13
**montebello** 13:18 17:1,14 54:24 92:2 148:11
**month** 47:23 49:4 136:6 182:18 184:3
**monthly** 47:15 48:24
**months** 158:16 165:2
**moot** 121:5
**morning** 8:17,19 8:20 162:5
**motivation** 124:3 125:15 126:10,14 126:23 127:13 128:3,6
**mou** 5:14 153:14 153:15 157:7 158:4,5,8,12,14,22 159:19 160:8,20
**mouth** 88:24 185:23
**move** 21:17 65:20 66:15,21,24 84:9 95:24 103:7 124:18 125:3 127:16 148:20
**moved** 20:8 53:24 111:19

**movement** 122:11
**moving** 40:24 148:7 149:10 165:8
**mph** 6:14 7:6 154:16 155:6 156:9,19,23 157:8 157:17 160:1 161:17,20 162:10 162:13,18,25 163:18,24 164:9 166:5 167:18 168:9,14
**mpm** 155:3
**multiple** 30:18 38:13 46:17 184:22,24
**muted** 179:17

**n**

**n** 50:21 99:6 105:24 152:3 155:21,21 177:5
**name** 8:14,25 9:10 11:19 12:2 19:23 20:4,21 22:18,21 23:14,22 25:21 30:7 31:20,21,24 32:12,13,15 33:24 34:1,1 35:12 37:19,23 51:21 71:19 91:22,25 93:17,20 101:10 104:25 105:8,19 105:22 106:11 107:23 118:13 135:21 152:11 154:3,15 176:21 189:20
**named** 7:4 99:3 151:21,24 152:2 153:1
**names** 9:6 19:22 29:23 31:5 101:11 101:11 104:24
**naming** 68:22
**napolitano** 23:20 23:21
**national** 15:6,7,9 15:10,12
**near** 45:16 51:7
**necessarily** 21:13
**necessary** 27:23 42:19 144:18 149:7
**need** 38:22 44:1 53:10 54:9,11 64:11 69:16 70:14 71:4 91:9 92:18 113:24 114:1 131:12 133:3 142:22 144:13,18 154:14 179:17
**needed** 18:8 21:15 21:16 22:5 24:12 27:24 94:19 144:11,19 165:11 165:18
**needs** 173:15
**negatively** 149:13
**negotiate** 148:4
**negotiated** 47:8 77:3
**negotiating** 88:15 160:6,21
**negotiation** 47:1 53:23,24
**negotiations** 37:2
**neither** 189:16
**nest** 34:13
**net** 84:24 123:21 124:21
**network** 14:5
**never** 9:19 22:19 26:25 27:17 37:2 47:1 51:8 67:18 68:18 69:4 72:7 73:16 81:11 86:20 89:1 90:18,19 97:11 101:14 110:23 122:22 123:15 130:7 132:7 144:13,21 145:17,21 146:17 176:19,22 177:4
**new** 3:17 29:19,19 29:23 33:15 98:10 131:12 154:14 155:10,19 157:20 165:1,7 170:4,5
**newark** 3:17
**news** 99:12
**nice** 184:18
**night** 135:13,14 136:3,10,10
**nisy** 5:19 83:3 84:1
**nonbinding** 68:16
**nonprofit** 87:8,10 157:16,18
**nonrefundable** 75:18 76:11 81:7 81:12,13 82:3,4,8
**normal** 56:24
**normally** 34:22
**note** 8:8 72:15
**noted** 187:20 188:7
**notice** 173:18
**noticed** 186:21
**notion** 164:12
**notwithstanding** 124:12
**november** 90:6,10 91:17 159:5,8,15 159:24 163:9,10 163:16
**novodor** 1:14 2:14 4:3 5:3,21,21 8:4 8:12,17,21,24 9:2 9:3,4,11,12 10:2 14:12 28:12,14 38:1 39:3 43:25 44:7,17 45:20,25 46:12 48:12 52:15 53:20 54:21 55:6 56:5,22 57:15 58:5,16 60:3,7,11 64:12 65:23 66:22 66:24 68:6,20 70:4 71:14 73:14 75:6 76:1,13 77:9 80:19 81:15,19 82:20 84:10 90:5 93:5,16 94:14 95:16 96:23 100:21 101:5 102:5,9,17,17,20 102:21,21 104:12 107:12 114:23 115:12 116:12 117:3,13 122:20 123:8 124:24,25 125:19 129:12 130:22 131:6,10 131:17 132:9,14 138:16,21 139:11 142:2 145:8 146:6 146:14 150:20 151:11 154:18 157:23 158:7,9,12 159:22 162:24 164:19 167:12 168:7 172:6 174:1

175:8,15,24 181:17,19 184:21 185:2 187:5,6 188:4,16
**novodor's** 57:25 77:2 80:3 89:24 127:4
**number** 5:10 6:2 7:1 15:18,19 35:22 36:6 48:1 73:23,25 87:1 95:12 139:19 141:4 158:4 161:23 163:8 181:22
**numbered** 159:3 165:3
**numbers** 40:23 154:11 155:17 171:19 178:12

**o**

**o** 50:9,21
**oath** 8:5 189:7
**object** 43:13 55:17 57:12 68:15 71:22 71:24 73:9 74:24 75:12 78:15 80:8 92:13,21,22 93:1 120:12 124:6,15 134:20 160:11 180:8
**objected** 170:15 175:22
**objecting** 127:10
**objection** 15:16 28:8,11 45:21 46:10 47:17 48:6 52:8,10,18 53:4,8 53:11,18 55:16,17 56:2,17 57:4,22,24 58:10 60:5 61:8 64:17 66:3,12 68:19 72:5,15,21 73:9,19 74:12 75:19 76:12,21,22 80:2,7 81:14,17 84:15 86:11 87:18 89:17,17 93:7,14 93:15 95:10 96:25 102:15 114:19 115:6 127:25 129:1,2,3 143:22 147:14 162:19 164:15 166:7 168:2 170:7 176:3
**objections** 61:21 128:25 170:7
**obligated** 79:10 100:13
**obligations** 167:25
**obvious** 128:3
**obviously** 92:2 115:1
**occupied** 136:22
**occupying** 65:3
**occur** 26:5 145:3
**occurred** 38:16 93:10 94:10 178:4
**october** 12:20 92:25 132:19,21 154:13 155:17 158:15 162:4 173:1,7
**odd** 180:15
**offend** 41:6
**offer** 125:21 154:24
**offered** 54:1
**offering** 6:4 36:25 57:3 58:25 80:9 90:25 92:24 146:10,16,23 147:23 149:2 150:1 161:3 167:13 168:22 171:8,11
**office** 85:10,11,19 85:23 112:14 142:15 143:7 158:18 170:1 184:18
**officer** 12:12,13 19:2,6 20:14,15 25:24 88:4 151:5 151:11,15 170:16
**officers** 41:16 167:5
**oh** 10:13 23:22 24:13 30:23 32:4 35:12 38:22 42:11 44:5 60:19 79:1 82:8 85:23 100:12 100:14 104:6,19 106:22 109:20 117:19 135:13,19 136:7 164:3 165:13 186:2
**ohio** 10:14
**okay** 9:25 10:1,21 11:10 15:21 16:6 18:21 24:5,23 25:6 26:19 27:6 28:6,16 30:7 31:3 37:4,14 39:5 40:4 41:24 42:11,16 44:20 45:18 47:21 49:6,13 50:3 54:14 56:12,15 60:16,22,23 61:1 61:25 63:11,24 67:8,19 69:3,7,16 70:12 71:17 74:18 77:7,15,18 79:19 80:18 81:4 82:9 84:3,23 85:17,21 86:4 87:1,5,15 88:10,12 89:10,13 91:25 94:8,11,20 94:21,25 95:8,16 96:4,20 97:13,21 99:7 100:8,22 102:13,20 103:14 104:2,6,19 105:10 105:14 106:4,19 107:22 108:15 109:10 112:8 113:1 117:1,2,15 119:4,25 120:6,10 122:1,8,17,25 123:14 125:4 128:15,20 129:12 130:22 131:2,9,21 131:24 133:6,16 134:14 136:23 138:2,14,21 139:6 139:11,21,23 140:7,23 141:2,19 141:22,24 142:11 142:24 144:2,23 146:8,18 147:9,22 147:24 148:3 150:10 151:14 152:19 153:7,19 153:24 154:3 155:25 156:25 158:14 160:5 161:13,21 163:3 164:7,24 166:13 166:19 168:7 169:8,19 171:2 172:6,16 173:1,23 174:5 175:3,13,18 176:11,17,24 177:10 178:1

179:2,20,20 181:25 182:16 184:5 186:11 187:2,16
**olympic** 34:9
**olympics** 34:13
**once** 18:22 26:5,23 27:14 37:25 40:9 88:10 89:9 97:23 100:8 103:6 108:7 119:19 137:14 151:10 170:16 183:18,20,21
**oncologist** 14:19 14:21 18:4 28:17
**oncology** 5:18 11:13,19 13:13 15:2 17:11 72:2 72:10,13,20 83:9 83:15 84:2 101:18 102:21 132:25 133:12,24 134:1 143:19 175:9
**ones** 24:1 34:11 85:25 94:5 111:22 181:5
**online** 112:6,11 178:11
**open** 98:24 126:24
**opening** 70:6 104:14
**operating** 19:2 20:14 25:24 88:4 151:11 170:16
**operation** 18:9 25:18 28:20 148:6 148:12 157:20 160:15 170:17
**operational** 26:6 87:2,22 88:10 90:15,16 142:8
173:11
**operations** 24:17 26:23,24 100:1 151:10
**opinion** 57:4,25 74:24 76:14 80:3 80:22
**options** 21:24 130:5
**optivus** 16:7 17:17 17:17 50:9,12,19 52:5 100:14,15 108:25 148:21,22 149:5,5,12,17,20 149:24 161:4,7 167:14 178:18
**orally** 62:19
**orange** 23:21
**order** 42:19 64:19 125:9,10,13,15 126:1,11 127:24 128:8 144:10 152:23 156:22 163:5 173:8
**org** 152:8,13
**organization** 19:10 20:20 27:24 137:10
**organizations** 19:25 25:21
**orient** 139:18
**original** 88:7 98:14 172:24 189:13
**originally** 27:22
**ourself** 109:19
**outlined** 159:19
**outside** 64:18 71:25 77:1 91:4 107:14 124:6,7,8 124:16 125:1
127:11 129:6,6
**overseas** 35:10,14
**owned** 25:25 26:3 26:4,15,16 47:5 55:2,21 56:10 67:1,2,7 68:13 69:11 78:19 168:20
**owner** 12:22 25:23
**ownership** 154:19 155:2 160:25

**p**

**p** 50:9 148:9
**p.m.** 2:16 187:20
**pacific** 6:4,6 19:8 19:14 22:1 35:7 38:2,9 97:6 140:21 141:20,21 141:24 143:1,5,21 146:11,16 150:14 173:3
**packed** 29:18 134:10
**page** 5:10 6:2 7:1 97:8 102:6 105:15 117:18 140:24 141:25 146:10,12 147:22,23,24 148:20,20 149:2 150:11,23,24,25 151:1 152:5,6,7 153:8 155:16 157:1,11 159:3 161:22 163:8 168:8 169:4
**pages** 1:25 104:17 104:19 112:21 146:19
**paid** 22:24 36:21 37:6 46:16,18 49:3,8,22,23 51:5
51:19,24 52:1,7,17 52:24 53:2 55:13 56:15,22 57:1,10 57:10,19 59:17,19 60:13 64:20 65:13 77:13 81:11 83:10 83:17 85:11,12,13 87:4,7,12 88:1 89:14,14,20,22,25 92:3 100:16 169:22 170:12,23 170:24 180:19,19
**pandemic** 44:11
**paperwork** 22:25
**paragraph** 148:7 149:3,11 165:8,9 165:15,16
**parcel** 67:1,15 68:13 69:10,10 77:10
**pardon** 10:13 116:3 138:18 147:2
**part** 41:1,18 51:14 52:12,15,15 69:15 85:6 94:4 97:9 130:20 136:21 140:4,9,17 144:21 146:21
**participant** 33:5
**participate** 18:11 27:16,21 29:16 41:6 154:25
**participated** 27:15 27:18
**particular** 34:20 58:20 72:12
**parties** 27:3,15,22 29:4 36:1,13 68:23,23,24 158:4

**partner** 27:16 120:22 122:4 147:10 154:4 166:1,3 173:10
**partnered** 27:18
**partners** 77:4 89:19 121:23 124:23 168:1
**partnership** 156:6 165:21
**parts** 22:4
**party** 116:12,14 116:17,22,22,25 127:4,18 128:9 138:22 158:5,8,11 185:18 189:18
**pass** 138:17,19 171:25 173:13 181:18
**passed** 121:22
**passing** 50:18
**patients** 14:3 28:19 74:7
**paul** 12:23
**pause** 162:15
**pay** 45:19 50:1 57:20 59:11,11 63:2,3 75:22 76:10 83:12 100:11,13,14 138:2 143:21 178:18,21
**paying** 58:7 60:3,7 75:9 86:24 87:17 156:21 164:13
**payment** 53:13,14 53:17 60:25 61:4 76:8 77:13 81:16 83:19 176:2
**payments** 37:10 46:8,14 47:10,15 61:5,9 65:6,9 77:24 78:7,21,25 79:1,3,6,8,11,11 79:14 80:20,21,25 85:4 92:4,7 169:22 175:20
**pdf** 139:19 151:1 152:6 163:8
**penalty** 188:5
**pending** 66:2,8 71:8
**people** 23:18,19 31:7,9 36:17 41:12 88:3 105:9 107:15,20 144:10 183:14 185:20
**pepperdine** 10:4
**percent** 10:22 25:2 25:12,16,17 26:1,3 26:4,5,15,17,17,23 27:8,9,9 160:14,14 167:1
**perfect** 110:18 139:22 183:4
**perfectly** 114:8
**perform** 140:11
**performed** 55:19 56:18 169:10
**period** 12:21 18:17 26:3 47:18 90:13 94:9 108:15 130:17 132:23 136:5 183:23 185:12 187:15
**perjury** 188:5
**permanent** 27:6
**permissible** 71:25
**permission** 78:23
**permit** 115:19,25
**permitted** 64:18 66:10 126:11
**person** 7:4 21:4 49:17 55:7 71:1 75:4 76:5 80:22 80:23 81:5 91:23 91:23 99:10 105:16,17 106:2 123:20 143:6 153:1 170:3
**person's** 22:18 123:20
**personal** 24:14 25:19 53:21 72:24 80:16 94:3,4 133:7 145:12,15 174:13,15,19
**personally** 16:2 31:12 61:6 63:10 76:6,7,7 94:16,24 103:14,20 144:7 167:21 176:11,14 184:17 185:2
**personnel** 120:18
**persons** 107:9
**pertain** 141:12
**pertained** 47:12
**pertains** 189:12
**ph.d.** 10:14,15
**phase** 89:25 90:14 92:3,11
**phone** 42:8,12,14 62:21 89:7 100:5
**phonetic** 32:13
**physician** 28:17 63:5
**physicians** 14:6 65:3
**pick** 89:7 139:25
**picking** 111:20
**picture** 20:24
**piece** 14:2 17:20 24:12 26:18 161:15 164:14 166:16 186:17,22
**pieces** 38:5 136:19
**pitched** 124:25
**place** 20:8,10 29:18 56:12 189:5
**placed** 14:9
**plaintiff** 1:6 2:6 3:3 8:18 9:16
**plan** 6:7 14:5 24:8 24:10,15 112:18 148:4 150:14,19 150:25 151:8,17 152:7 161:2 167:14 168:22
**plane** 112:20
**planning** 13:21,22
**plans** 180:24
**platform** 139:12
**play** 19:1 51:14 94:16
**plaza** 3:16
**please** 8:10 9:1 28:15 37:5 44:18 46:13 52:21 58:14 64:5,14 66:14 68:2 69:1 71:3 76:2 77:18 82:13 92:15 97:10 102:3 104:8 117:1,6 118:10 119:6 120:15 130:25 131:16 139:7 150:24 153:12 170:11 179:19
**pledge** 5:11 44:25 45:7 123:15 143:17,18 175:9 175:16,19 176:8
**pledging** 44:23

**point** 34:11 38:18 38:20 65:10 67:13 77:15 92:9 95:18 103:9,10 105:14 108:9 110:19 114:10 115:7 116:18,18 122:19 129:9 130:4,7 133:24 138:15 144:23 179:11 184:2 186:5
**pointing** 173:20
**points** 153:13
**polite** 31:17 34:23
**political** 22:7 23:4
**politicians** 27:20 29:9 122:24
**pom** 92:9
**pop** 104:10
**posing** 34:4
**position** 66:7,21 116:9,10 125:14 125:16 126:8,9,19 126:22,22 128:8
**possession** 77:17 78:6
**possibility** 23:12 161:5
**possible** 42:21 63:1 108:22 139:2 144:20
**possibly** 12:16 88:7 124:12
**potential** 34:4 67:17 146:22 147:11 148:18 181:3,9
**potentially** 126:13 172:12
**pp** 141:23 142:25 173:7
**predecessor** 152:11
**prefaced** 72:25
**prefer** 11:23
**prefiling** 141:7
**preliminary** 8:24
**preparation** 153:21 154:1
**present** 32:2 173:4 181:8 183:17 185:2,4,9,15
**presented** 20:19
**preserve** 133:19
**president** 15:5,6,7 32:7,9,11 33:22 105:18,20 107:25 151:7 156:8,11 167:4
**press** 163:19 164:10
**pressure** 42:21
**pressured** 169:25
**pretty** 49:1 62:23 128:3
**previous** 20:4 79:1 136:9
**previously** 14:10 146:9 169:21
**primarily** 26:8
**principal** 21:4
**print** 150:12
**printed** 121:20 139:16
**prior** 40:21 52:8 89:24 129:4 178:5 178:16 189:7
**priority** 165:21
**private** 6:4 146:10 146:15,23 147:23 149:2 161:3 167:13 168:21
**privilege** 66:19 114:20 116:6 118:16
**privileged** 66:4,8 66:13 102:2 115:8 115:11
**privileges** 115:24 143:4
**privy** 85:24 180:19
**pro** 93:13 94:1
**probably** 88:5 120:4 136:1
**problem** 33:14 55:10 186:13
**problems** 65:3
**proceed** 173:22
**proceeded** 130:12
**proceeding** 116:13 129:1 138:24
**proceedings** 84:24 189:4,6,8,14
**process** 23:6 94:19
**processes** 121:1 137:19,23
**produced** 141:5
**product** 57:9
**production** 154:10
**products** 52:6,17
**professional** 31:17 31:18 106:23
**proffer** 123:17 125:21 127:12 129:10
**proffered** 127:21 128:25
**profit** 15:4 123:21
**profitability** 149:13
**profits** 15:13 84:25 124:22
**program** 17:7 28:7 91:6
**progress** 142:14
**prohibits** 125:15
**project** 17:1,2,13 18:5,13,22 19:13 19:15 21:5,8,11,17 21:18,19 24:18 29:16 30:22,23,24 34:5,15,16,18 35:2 37:17 39:12,12 40:17 42:22 43:18 50:15 53:22 60:17 79:18 90:1,5,14 91:18 92:11 95:9 120:18,18 122:4 122:21 124:25 126:8 128:5 129:14 136:25 138:11 142:8,14 148:23 149:18 150:1,6 160:22 167:22 168:12,17 170:4 179:8 181:4 181:9
**projections** 24:19 24:21 97:7
**projects** 11:12 21:13 30:17,22 33:13 129:5
**promise** 64:4 113:14
**promises** 34:24
**promoted** 12:9
**pronouncing** 8:14
**proper** 53:10 57:20 123:16
**property** 5:14 55:20,21 77:17 78:23,24 148:9,16 157:22 168:18,20

169:11
**proposed** 154:15 156:6 157:13 182:2
**proposition** 116:21
**propriety** 173:10
**proton** 5:12,15 6:5 6:6 16:18,25 17:13,15 19:8,14 19:17 20:4,12 21:5,13 22:1 24:7 24:18,25 26:1,16 27:13,14 28:23 35:8 37:16,21 38:2,9,10 39:13,13 40:11 41:25 45:19 45:19 46:2,5,8,14 46:18 47:3 50:12 50:23 51:14,18 52:7 55:20 60:19 60:24 61:8 64:20 67:10,14 68:12 73:5,11,15 74:5,6 74:7 75:5 76:8,10 83:7,9,20,23,25 85:10,14 86:9,18 88:19 94:5 97:6 97:13 103:24 111:16 120:18 134:16 136:25,25 138:11 140:13,21 141:9,18,19,20,21 141:24 142:5,25 143:1,5,20,21 144:8 145:4,11,14 145:23 146:11,16 147:3 148:6,12,17 148:23 149:5,6,7,8 150:1,14 151:5,8 152:10,11 153:22 154:1 156:12,21 156:23 157:20 158:5,23 159:24 160:8,15,21,24 161:19 162:7,18 163:1,20 164:5,11 164:13,13 166:5 167:1 168:15 170:12,16,22,24 173:3 176:15 179:24 180:1,4,13 180:15
**proton's** 122:4 180:7
**proud** 34:11
**prove** 113:11,12
**provide** 17:5 29:5 57:9 118:9 124:2 149:6 150:6
**provided** 29:14 36:17,23,24 43:14 52:6,16 53:21 69:9 83:17,20,22 139:15 140:3,18 140:25 141:6,8 150:5 180:10
**provider** 148:22 149:4,25 167:15
**provides** 124:15 128:6
**providing** 14:10 87:15 88:17,23 147:11
**public** 157:16,19
**pull** 175:11
**pulled** 43:16 44:13 110:22
**purchase** 81:24 163:20 164:11 167:2,19
**purchased** 161:17 165:24 166:2
**pure** 162:20 166:7 166:8 170:7
**purports** 72:1
**purpose** 39:22 163:6
**purposes** 39:21
**pursuant** 80:20
**put** 13:23 18:1,5 21:11,22 22:2,3,9 22:24 42:2 55:25 88:24 103:19 112:23 140:8 144:20 180:23
**putting** 17:22 21:5 21:12 78:11 116:9

**q**

**qualified** 147:20
**qualify** 75:16
**question** 8:25 24:22,23 28:10,14 46:6,12 49:11 52:12,16 55:6,17 56:21 57:15,16,17 58:5,13,16 59:9 60:2 62:5,19 64:12,13,15 65:11 65:12,18,24 66:2,5 66:8,12,14,16,18 66:23 68:20 69:2 69:7 71:8,12 73:1 75:21,25 76:1 77:19 78:9 80:8 81:20,24 84:12 85:8 86:7,15 89:3 89:12,13 90:19 91:15 94:14 96:24 107:14 118:1,5 120:13 121:8,8,24 122:2 128:7,12 129:3 140:8 141:8 146:15 147:20 159:18 160:16 162:20 166:21 174:1 175:7,19,23 175:24 178:19 180:9 185:24
**questioned** 62:14 62:15,22 70:21 89:1
**questioning** 96:7 125:8,11 127:11
**questions** 34:16,18 49:14 58:2,21 61:20 71:24 76:20 80:14,15 85:1 86:4 92:19 93:2 95:18 110:11 124:21,24 125:6 125:18 126:5 127:1,13,21,23 128:10,24 129:4 129:10,12 132:17 138:15 140:3 172:7 179:10,20 181:19 186:12 187:2
**quick** 128:14,19 166:23
**quicker** 80:17
**quite** 125:2 172:7
**quotation** 5:17
**quote** 72:1 74:17 75:23
**quoted** 75:22

**r**

**r** 5:12,15 7:9 51:11 54:21 55:19 56:18 169:5,10
**radiation** 14:21,23 28:17

**raise** 28:7,20 29:1 33:13,18 35:2,17 35:20 36:22 38:10 39:14 50:2 53:8 53:11 61:8 94:9 116:8 122:21 126:6 128:4 129:14 130:2,8,9 130:13 147:4 161:5 170:25
**raised** 10:23 13:15 35:22,24 36:7 37:5,25 65:19 92:25 95:3
**raising** 18:3 33:2 37:7 40:6 88:20 88:21 129:16 146:21 171:8
**ran** 73:16 141:10
**range** 36:5 47:23 48:2 181:24
**ransom** 138:2
**rate** 50:1
**razed** 51:16
**reach** 165:9,17
**reaching** 161:4
**read** 52:12,13 64:14,16 72:23 73:25 103:7 121:10 143:17 164:2 166:13 167:6 171:19 175:16 180:20 188:5
**reading** 102:4,6 166:3
**reads** 148:3,8 149:4 157:11
**ready** 51:18 92:9 112:18
**real** 5:14 128:14 148:9
**realize** 150:3
**really** 18:16 22:13 24:3 26:24 29:11 35:15 36:3 38:12 46:25 71:18 96:5 97:19,24 98:22 99:11 109:6 130:19 131:10 136:3 142:14 145:20 166:15 183:13
**reask** 77:18
**reason** 20:18 81:2 85:2 89:5 102:25 145:18 180:5
**reasonable** 74:23 75:7,10,15 76:9 78:13 79:5
**reasonableness** 76:14
**reasons** 63:24
**recall** 16:20 19:4 19:25 20:3 23:24 27:12 35:13,15,25 36:3,12 42:1,2 46:22,24,25 47:14 48:4,12,19 49:17 49:19,19,20,23 50:7,15 52:1 72:7 72:12 83:16,16,16 83:18 86:12 93:20 98:12 102:23 107:19 109:25 136:4,5 140:5,16 140:22 142:5,17 148:24 152:10 153:23,24 154:2,5 155:8 156:20 161:4 172:13 178:6 181:8 182:1 182:5 183:23
**recalls** 95:11
**receive** 46:21 75:23 86:17 142:3 142:7 153:15
**received** 47:1 54:2 65:6 78:21 97:11 145:21
**receiving** 46:23 72:22 77:24 86:22 145:10 180:5
**recess** 39:1 54:17 64:9 67:24 69:24 82:16 96:21 128:22 139:8 172:4
**recession** 21:24
**recipient** 102:3 153:5
**recognize** 100:21 104:16,23 117:16 118:22
**recollect** 46:17
**recollection** 38:11 40:18 43:11 48:10 48:11 49:25 50:4 51:6 90:8 103:3,4 110:18,19 144:15 171:16 184:1
**recommend** 163:21
**recommendation** 100:19
**recommended** 108:24
**record** 9:1 21:1 39:3 44:9 52:13 54:15,16 64:16 66:21 69:8 70:8 71:1 76:23 96:8 102:5 116:10,15 124:20 125:16 139:6 142:23 146:8 150:13 159:2 161:22 163:7 187:9 189:8 189:11
**record's** 11:18 107:12
**records** 111:11 113:1,4
**recruit** 94:22
**recruited** 182:1
**recruiting** 92:10 95:23
**refer** 141:20,23 167:14 176:25
**reference** 101:23 105:15 132:18 151:14,18,21,24 152:2,15 160:8 163:24
**referenced** 168:21
**referencing** 44:13
**referral** 63:16,17
**referrals** 63:20
**referred** 23:3
**referring** 11:17,21 11:22 13:10 17:9 21:2 23:19 28:4 31:19 37:20 41:10 41:11 54:6 55:1 55:18,24 56:18,20 62:12 63:17 73:11 109:7 120:23 141:18,20 160:15 164:10 172:22
**refers** 105:16
**reflected** 27:10
**reflecting** 36:10

**reflects** 173:5
**refresh** 43:11 104:7 117:7 131:1 131:13
**refreshing** 117:8
**regard** 37:3 41:3
**regarding** 68:17 69:9 129:4 156:5
**regardless** 150:4
**regenstreif** 5:22 105:1,3
**regional** 19:8,11 19:12,14 22:1,25 23:5 24:5 37:17 39:11 85:10 86:10 91:16 93:9 97:6 111:18,20 112:3 134:16 141:20,21 143:1,5
**registering** 72:14
**regulatory** 137:20
**reiterated** 21:10
**reiterating** 61:21
**related** 15:1 64:19 69:10 134:15 140:21 149:7
**relates** 43:18
**relationship** 72:3 125:23 132:19 141:13 149:18 180:4,14,17 183:14
**relationships** 22:7
**relative** 13:5 18:9 69:5 171:13 189:17
**release** 163:20 164:10,10
**relevance** 93:1 115:10 123:18
**relevant** 58:1 64:20 65:5,9 80:4 80:5 123:19,20 124:14 138:10 174:18
**reliable** 108:22
**relied** 184:13
**reload** 70:9
**reluctant** 65:2
**reluctantly** 42:18
**remedial** 116:19
**remember** 9:14 12:15 20:7 22:18 23:14,23 25:22 30:25 31:5,21 32:12,20 33:8,24 33:25,25 34:1 36:5 40:12,15 42:7,8,9,15 46:23 47:7 48:1,12,13,14 49:2 51:1,4 55:9 64:13 71:18,23 72:9,22 83:2,8 84:1 86:19,21,24 88:6 91:3,25 97:10 98:3,16 99:15 101:8,8 102:7 103:5,12,25 104:24,24 105:4,5 105:18 106:10,13 106:17 110:2,3 117:20,22 119:18 122:22 129:13 130:17,20 133:22 135:15,24 136:7 138:6,8 161:11 176:21 177:23 182:18 185:10,11 185:12,18 186:8
**remembering** 23:25 161:10
**reminds** 186:19
**remote** 1:14 2:13 44:10
**remotely** 127:5,12
**removed** 135:6,7 179:7
**remuneration** 54:2
**render** 76:13 156:22
**rendered** 53:18
**rent** 48:23 85:11 85:18
**rental** 48:4,24 49:23 77:13,24 78:7,21,25 79:1,3 79:6,11,11 80:20 80:25
**rented** 79:16
**rents** 50:5
**repay** 79:25 149:14
**repeat** 46:13
**repeating** 53:13
**report** 92:1 138:5
**reported** 1:21 14:7
**reporter** 2:17 43:23 52:11 54:19 68:4 70:1 71:9 82:18 101:3 104:21 117:11 128:15 131:4 133:4 146:4 150:17 152:24 153:3 154:7 155:13 157:4 159:12 161:25 163:14 164:22 168:5 169:1 171:21 172:19 173:18 189:2
**reports** 86:3
**represent** 8:12 103:14 119:1 141:4
**representation** 123:15
**representative** 106:5,9,16 156:5 156:18 162:13 167:18
**representatives** 35:1,14
**represented** 36:15 55:20 103:20 106:17 107:9,15 133:8 148:17 150:1
**representing** 39:19,21 78:8 103:23 167:24
**republican** 23:21
**request** 42:2,3,9 42:11 74:23 126:5 129:5,13 130:17 131:25 177:19 187:9,13
**requested** 43:7 132:2 189:15
**requesting** 187:14
**require** 81:7
**required** 78:5 143:6
**requires** 148:4
**research** 24:9
**resend** 97:10
**reserve** 66:15,21
**resolution** 166:24
**resolve** 165:12,19
**respect** 20:12 62:24 86:16 95:20 127:13 157:19

158:17 160:9 169:10
**respond** 43:9 66:14 175:18
**responding** 166:20
**response** 23:12 65:11 119:9 166:23
**responsibilities** 13:2
**responsibility** 25:15 147:7
**rest** 72:23 112:21
**restate** 160:18
**restore** 137:17
**restored** 137:2,3 137:10
**result** 64:25 65:4
**resume** 96:15
**retain** 23:13
**retained** 23:10 83:15 153:25
**retainer** 5:19
**return** 75:14 102:3
**returning** 149:2
**revealed** 122:10
**review** 59:5 68:1,6 114:4 137:19,22 153:13 187:10,15 189:14
**reviewed** 43:21 54:22 59:3 71:2 152:14 160:19
**reviewing** 71:14 187:7
**richard** 7:8 169:4
**ridiculous** 116:15
**right** 18:19 19:19 23:14,22,25 25:22 29:18,19 33:15 37:12,22 44:13 45:12 47:19 49:16 49:24 53:22 55:14 57:11,20,20 60:22 65:25 66:15,20,22 69:23,23 70:14 72:14 79:9 80:20 81:3,10 82:4,15 87:4 88:8,9,21 89:8 92:5 93:12 95:6 96:2 98:15 98:16 99:13 101:12,18 106:11 112:1 113:3 118:15 119:4 120:8 127:7 132:17 133:2 138:8 141:15,17 142:2 143:21 145:25 148:13 150:23 152:8 164:2 165:1 166:14,17 169:7 169:17 171:9,17 173:19 174:9,14 174:21 175:16 177:13 178:14 179:15 181:13 185:10 186:9
**rights** 139:12 166:25
**ring** 22:21 32:13 32:15 105:24
**risk** 42:2 173:14
**riverfront** 3:16
**road** 116:11
**role** 12:19 18:7,8 18:22,25 21:8,25 24:11,14 34:2 94:16 142:4 151:10 179:25
**room** 17:21 30:20 31:9 107:20
**rose** 8:12
**roughly** 12:18 15:15 73:22 90:6 94:10 132:24
**royal** 183:16 184:19
**rule** 124:15 127:4 127:23
**ruling** 129:7
**run** 11:8 41:4,9,12 41:15 62:10 63:6
**running** 12:1,3 136:12
**ruth** 1:14 2:13 4:3 5:3,20,21 8:4,21 9:2,4,9,9 102:20 102:21 167:4 188:4,16

**s**

**s** 30:8,9 50:9 186:6 186:6
**sacv** 1:7 2:7
**salary** 88:8
**sales** 19:13
**salesman** 100:18
**sanchez** 23:23 135:23
**santos** 173:5
**sat** 88:6 112:20
**satisfy** 136:11,16
**save** 42:22
**saw** 36:14 85:18 109:22,25 111:22 121:14 122:10 146:17 182:2,5,19 183:17 185:10
**saying** 24:2 37:9 42:13 53:14 73:1 75:21 87:4,7,8 89:11 90:22 98:20 106:14 113:14 126:17 127:10,17 127:20,20 135:19 184:23
**says** 19:11 44:25 68:16 83:8 101:13 101:14,18 102:16 102:20 103:17 106:8 119:11 168:12 173:2 176:10
**scanner** 13:22,23
**schedule** 79:13
**scheduling** 125:13 127:24
**school** 121:16
**schwarzenegger** 29:10
**scope** 64:18 71:25 123:4,16 124:6,16 125:13 127:11,25 129:6 171:11
**screen** 117:13 131:7,14 139:15 139:20,21 140:23 143:14 146:2 152:22 164:1 175:8
**scroll** 68:23
**search** 140:11,19 141:10
**searching** 120:21 120:21
**sec** 8:18 72:4 78:2 78:22 79:21 81:1 90:11 93:6 119:24 126:21 133:19,21 138:10 139:24 140:4,10,19 144:23 145:5,8

159:3 161:23 163:8 165:3
**sec's** 92:24 126:9 126:19 128:8
**sec.gov** 3:10
**sec0000506** 155:17
**secdefc** 141:3
**second** 12:13 17:22 19:16 43:12 69:18 100:23 105:15 126:4 130:24 149:16 165:8,8,9,15 170:8
**secretary** 151:12
**section** 147:25 148:3 151:15,16 151:18 152:14 158:4
**sector** 29:20
**securities** 1:5 2:5 3:4 105:9 116:14
**security** 137:18,19
**see** 12:17 15:19 20:3 24:3 27:10 29:22 30:19 33:15 36:10 43:25 49:21 55:25 59:18,23 61:2 64:22 71:19 72:17 73:3 83:14 86:9,10 91:11 100:24 101:5,6 102:16 104:10,12 109:22 110:12 112:23 117:9,13 120:3 131:6 135:19 140:24 141:3,19 146:6 151:1,18,21,24 152:2,7 156:8,9,10 157:9 163:25 164:1 169:5,13,16 169:17,21 181:11 183:1,6,6,11,20 185:8,21,25
**seeing** 44:3 70:10 72:8
**seek** 123:24 124:2
**seeking** 115:11
**seen** 35:12,13 68:9 71:17,20 72:7 83:1 97:5,7 101:7 132:7 146:15 150:19,22,22 167:21 171:23 183:18
**selected** 33:12
**sell** 27:24 82:4
**selling** 113:23 122:24
**send** 99:7,12 145:15
**sending** 99:17 100:15,15 101:16 102:21 136:24
**sense** 170:2
**sensitive** 62:23
**sent** 91:24 99:1 101:17 102:18 108:19 113:11 154:12 165:5 176:19 177:21
**sentence** 145:6 149:10 165:9
**separate** 92:11 106:7
**separately** 26:11 54:5 88:22
**september** 148:11
**series** 168:15 176:17
**seriously** 109:9
**serve** 12:14
**served** 15:8,11 132:9,14 144:24
**server** 133:9 134:3
**servers** 134:18 135:4,11 137:1
**service** 13:10,12 52:17 53:14 56:24 57:9 84:7 149:4,8 149:25
**services** 28:18 51:24 52:6,25 53:17,22,22 83:5 83:17,20,21 87:13 87:16,17 88:17,23 148:5 153:21 156:22 180:10
**serving** 13:5
**set** 74:6 154:14 172:12 180:24 181:1 183:8,8 189:5
**sets** 125:13
**setting** 90:16 155:19
**seven** 157:1
**shake** 133:3
**share** 25:2,6,11,14 26:16 35:22 54:10 119:14 123:12 126:16 139:20 140:23 143:14 146:1 178:14
**shared** 164:19
**shares** 126:22
**sharing** 139:14
**she'd** 180:5
**shed** 124:3
**shelf** 18:1
**short** 64:6 159:17
**shorthand** 2:17 189:1,9
**shortly** 13:19
**show** 34:8 43:10 54:12 67:23 100:20 104:2 109:6,12,14 113:9 113:20 117:3 130:24 139:19 141:2 154:12 164:19 172:8 175:5,5 182:24 184:17
**showed** 121:20 162:11
**showing** 115:18 118:20 139:13 145:9,25 152:22 155:10 163:3 172:21
**shown** 151:16 160:19 164:7 166:6 172:10 176:17
**sic** 54:25 56:9 127:25
**sign** 156:11 187:10 187:15
**signature** 44:20 172:24 189:23
**signatures** 61:14
**signed** 7:7 36:18 45:1,7 91:23 98:21 109:15 156:8 158:14 168:10
**signer** 112:12
**significant** 144:5
**sills** 3:13 8:12
**sillscummis.com** 3:19

**similar** 105:25 132:11,13
**similarly** 126:25
**simple** 65:12 69:7 75:24 80:14
**simply** 124:15
**sincerely** 173:5
**singapore** 109:23 110:20,22 111:21 111:22 113:6 122:13
**single** 149:4,25 180:6
**sir** 40:20 44:2 82:21 87:14 94:15 103:17 105:25 112:2 168:13
**sister** 167:4
**sit** 83:18 107:3,8 122:17
**site** 54:24 55:21 61:20 108:6 148:16 162:6 170:4 178:3 181:4 181:7,10 182:3,6 182:19,20,20,22 183:7,17,21 184:22,23 185:1,9
**sits** 107:17
**sitting** 110:24
**situated** 127:5
**situation** 43:8 62:4 65:14
**size** 150:12
**skip** 173:21
**skipping** 70:24
**slater** 16:7 17:17 17:17
**slightly** 58:6
**slow** 115:7
**small** 11:8 15:13
**smaller** 110:16
**social** 31:14
**sold** 72:19 91:5
**sole** 167:15
**solely** 83:23
**somebody** 57:9,18 81:7 103:1 120:22 121:2 133:22 135:17 170:15 181:12 184:10
**somebody's** 181:6
**someplace** 112:18
**soon** 42:21 144:19
**sophisticated** 49:18 75:4 76:5
**sorry** 9:25 16:14 19:23 23:20 24:15 24:21 36:16 39:18 44:5 60:4,22 62:18 93:6 95:12 103:19 105:11,25 106:15 107:7 115:6 117:17,19 120:13 130:9 142:21 145:6 150:24 161:11 169:15 180:17 187:1,1,12
**sort** 28:22 90:5 154:18 155:2
**sought** 115:20,20
**sound** 174:9
**sounds** 15:20 88:8 98:16 105:8 106:11 176:21
**source** 149:4,25 167:15
**sources** 63:17
**south** 3:7
**spanish** 10:20,20 14:5 30:2
**sparse** 115:11
**speak** 10:17,23 11:1 38:12 64:5 119:11 176:24 179:17,18,19
**speaking** 183:2 184:5 185:6
**speaks** 143:22 175:23 176:3
**specialist** 14:22
**specialty** 122:6
**specific** 18:21 32:5 120:14,15
**specify** 166:10
**speculation** 48:7 73:10 74:25 75:2 81:17 89:18 134:21 144:9 162:21 166:7 170:8
**speech** 29:15
**spelled** 30:8
**spend** 113:14 169:25 170:9
**spending** 161:6
**spent** 161:6 167:9 167:23
**spin** 70:11
**spinning** 117:9
**splash** 140:24
**spoke** 22:20 62:21 99:3 119:11 148:21 176:22 177:4 181:14 183:3
**spoken** 169:8
**sponsor** 39:12
**spouse** 179:14
**squared** 171:25
**stack** 112:22
**stadium** 34:9
**staff** 23:17
**stage** 36:18
**stagnant** 22:6
**stake** 155:2 160:14 160:15
**stan** 6:8 154:3,13 154:14 155:18
**standing** 76:22
**stands** 43:8
**starred** 97:23
**start** 8:9,11,24 12:5 97:19 165:14 174:1
**started** 12:7,18 13:13 14:5 25:12 26:24 53:23 68:22 68:23 87:13 90:6 92:10 97:18,24 98:3,9,12,22 100:1 100:8 139:11 144:2
**starting** 6:20 163:9 166:23 167:3
**state** 8:25 13:6,9 179:3 188:11 189:2
**stated** 66:20 72:22
**stately** 106:23
**statement** 43:3,4 58:18 59:2 97:1,5 102:13 148:13
**statements** 59:24 109:15 111:3 114:5 119:7,11 122:10 150:5 167:12

**states** 1:1 2:1 3:4 30:23 110:8,13 146:10
**status** 23:7
**stay** 74:5 91:11
**stayed** 14:16
**step** 42:19 121:4
**stepped** 22:7 121:3
**steps** 119:17 137:9 137:22
**stern** 113:22
**steven** 22:21 91:22 93:12,17
**stick** 186:25
**stipulate** 61:19
**stipulated** 125:12 187:11
**stop** 96:5 100:15
**stopped** 63:20
**stored** 133:14 134:9,11,12
**story** 64:21
**strategies** 13:3
**strategy** 126:16
**street** 3:7 14:7 85:24
**strictly** 159:20,25
**strike** 76:9 84:11 84:12 114:12 141:17 145:7
**string** 6:20,23 163:9 165:3
**strong** 108:24
**structure** 27:5,7 27:11 55:1
**structures** 54:24 165:23
**stuck** 23:20
**studies** 10:11
**study** 186:18
**stuping** 7:8 169:4
**subject** 84:9 126:7
**submitted** 24:9 90:7 91:16
**subpoena** 6:3 131:22 132:1,7,11 144:24 145:5,10
**subscribed** 189:20
**subsequent** 120:9 145:4
**subsequently** 12:9
**substance** 33:9 118:24 159:23
**substantive** 123:21
**succeed** 21:19
**successful** 24:10 29:7
**sudden** 155:10
**sue** 115:3
**sued** 9:19
**suggested** 78:12
**suggesting** 60:6
**suite** 3:7 4:7
**summa** 4:4
**summallp.com** 4:10
**summarize** 26:13
**summer** 153:17,22 158:16 169:24 177:10 185:25
**sun** 124:11 141:11
**support** 21:18 24:1,10 27:20 28:1 62:25 94:19
**supportive** 21:21
**supposed** 21:9 26:5 50:5
**supposedly** 61:13 110:8
**supreme** 84:13,16 84:21 125:25
**sure** 8:14 11:17 18:19 20:3 23:11 29:7 31:2 42:6 47:24 49:10 61:14 64:7 77:7 84:10 86:8 91:12 97:7 100:6 103:5 105:20 108:17 109:1 110:7 114:7 120:8 132:8 137:9 138:12 142:23 150:21 165:15,15 165:20 166:11 172:3 178:19 181:5,14 183:19 184:15
**surprised** 20:20
**surrounding** 76:15
**survived** 13:25
**susceptible** 127:3
**suspicion** 108:10
**sustainability** 13:4
**switch** 25:13 67:17
**sworn** 9:22
**system** 13:22 163:20 164:11
**systems** 13:21 136:17,18 140:11

**t**

**t** 50:9
**table** 27:19 29:4 110:24
**take** 17:6 25:14,16 38:19,20 39:5,7 44:7,7 64:6 67:22 70:16 78:23 82:10 82:14,14 104:15 104:17 115:6 126:22 127:6 128:13,19,20 137:9 138:25 139:3,4 159:14 172:2 175:15 177:3,24
**taken** 2:14 9:12 44:12 52:2,24 112:6 143:5 189:4
**talk** 23:15 88:7 89:7,9 97:25 108:17 114:1 137:6 179:4 184:13
**talked** 39:10 52:4 94:25 169:8 171:2 176:19 177:6,7
**talking** 17:11 48:16 66:25 67:9 98:1 103:18 111:4 132:23 144:11 162:5 177:14,15 179:16 182:21 184:7
**talks** 39:16
**tall** 106:22
**tangential** 124:13 125:22
**target** 40:24
**tax** 153:21,25
**taxes** 85:12,12,16
**team** 22:16 32:7 41:17 137:18,22 151:2,17,18 152:14
**tear** 62:8 63:1,13
**tech** 13:6,9
**technology** 13:19 14:1 149:6,7 161:15,15,17

**tell** 9:8 10:2 11:5 18:16 20:11 37:1 48:12,13,14,21 52:22,23 53:25 100:13 106:24 109:4,16 111:4,8 114:6 117:24 119:4 131:12 145:16 154:23 177:17 178:14,24 184:1 185:5,5 186:14
**telling** 99:24 117:18 153:24
**temporary** 26:20 26:21 27:5,11
**ten** 122:23 139:3 185:3
**tenants** 51:17 142:16 158:19
**terms** 30:1 41:9 141:17 153:13
**terrible** 65:14
**test** 39:4
**testified** 8:6 27:11 48:7 64:24 68:18 86:5 87:23 88:13 93:17,19 96:1 102:18 115:7 118:3,15,21 170:19 172:9 178:7 179:15 182:9,13 184:21
**testifies** 115:12 123:20
**testify** 115:19 131:22 132:11
**testifying** 92:14 102:7 189:7
**testimony** 28:16 39:16 52:9 53:16 57:5 69:8 74:25 76:6 89:24 95:2 102:22 115:25 124:3 128:6 140:5 142:5,17 148:25 172:14 186:12 188:8 189:11
**text** 102:6
**thank** 8:16 9:3,5 38:25 39:6,24,25 61:25 64:8 71:6 87:5 91:9 96:19 133:6 138:14,15 139:5 165:14 167:11 173:20,23 175:3,17 181:17 186:12 187:4,6,18 187:19
**thankful** 21:22 31:16
**thanks** 71:7 154:17 166:23 187:17
**thanksgiving** 109:3 182:10,14
**therapy** 16:18,25 17:13 20:5 39:13 50:13,23 51:15 55:21 73:5,11,15 74:5,7 75:5 76:10 111:16 141:21 148:12,17,23 149:5 150:1 157:20 158:23 159:25 160:21 164:14 168:15
**thing** 32:24 42:22 64:3 70:23 103:8 113:10 166:4
**things** 24:20 53:15 81:24 87:24 93:2 95:18 100:11 108:7,21 119:16 132:5 136:12 137:12 148:6
**think** 9:14,15,21 19:22 20:12 23:3 29:11 30:1 38:4 39:10 43:3 50:9 54:10 57:24,25 59:15 64:23 65:13 71:20 73:22 79:14 88:25 89:14 91:21 92:18 95:2,11 96:17 98:7 101:11 106:18,19 108:16 108:25 110:14,15 114:4 116:16 118:22 119:19 120:2 122:15 123:5,11 126:16 127:22 128:1,2,2 128:16 130:11 132:4 135:2 136:10 140:8 144:3 145:18 150:11 159:18 161:10 165:2 171:23,24 172:25 177:2 178:7,23 180:5,9 182:9 184:20 186:15 187:4
**thinks** 107:18
**third** 67:9 116:12 116:14,17,17,22 116:25 127:4,18 128:9 138:22
**thorough** 141:10
**thought** 9:24 38:14 72:10 86:21 97:3 109:17 113:8 122:23,24 135:2,3 136:8 181:15 182:25
**threaten** 116:2,4
**threatening** 116:5
**three** 39:10,20,22 98:6 106:20 143:11 158:16 179:15
**thropay** 1:14 2:13 4:3 5:3 8:4 9:2,9 12:23 13:5 14:19 16:4,5,22 17:10,11 17:12,15,18 18:4 18:12 21:14,19 22:11 25:5,16 26:2,4,10,14,16 27:8 29:13 33:7 34:3 55:21 62:13 63:4,10 64:2 65:4 65:8,16 77:2,21 99:8 109:20 112:1 112:13 113:1,19 114:14,25 118:18 119:8,23 120:11 120:25 121:15 122:2,3 134:17 143:4 148:9 155:24 157:25 159:18 166:25 167:4 176:11,14 180:24 188:4,16
**thropay's** 26:17
**throwing** 15:19
**thrown** 186:25
**ticket** 82:9
**tickets** 82:4
**time** 16:8 17:2 21:20 24:11,19 25:8,25 27:1,4 29:18 30:4,15

31:25 41:7,8,20,25 42:23 44:7 45:1,7 46:17 47:17,18 48:17 54:10 59:5 59:10 60:11 61:2 61:4,5 70:16 76:5 78:5 79:7 81:1,25 82:4,11 86:16 88:5 90:21 96:15 100:2 104:18 108:2,15 112:17 121:13 123:14 130:17 132:1,23 134:2,25 136:5,13 138:13 145:21 147:7 149:24 152:20 153:8,19 159:4,7,14 161:16 165:4 166:19 167:21 171:25 177:3,4 183:23 184:16,23 185:12 186:18 187:7,20 189:5
**timeline** 79:20
**times** 16:12 21:10 32:21 106:19,20 108:5 179:15 185:8 186:9
**timing** 80:11
**title** 12:7,10,12 19:1,2,3,5 20:17 32:19
**today** 83:18 107:3 107:8,18 122:17 128:10 132:24 142:3 143:16 162:6 166:6 169:9 170:19 172:9 187:4
**token** 171:7
**told** 23:2 42:15 50:18 51:3,4,8 52:2 53:13 62:9 89:6 94:18 100:12 108:9,17 110:23 133:7,22 135:11 135:15,16,17 138:1 155:5 181:15
**tomorrow** 165:19
**tony** 104:25 105:3
**top** 32:10 68:24 97:9 141:10 152:7
**topic** 62:23 125:19
**topics** 125:23 141:15
**torn** 50:6 62:10 63:20 65:1,15
**total** 35:24 62:13 62:13 79:22 86:8 181:22
**totally** 46:20 58:25 79:22
**transaction** 50:4 68:17 76:15 79:23 83:3,4
**transactions** 85:25
**transcribed** 189:9
**transcript** 187:10 187:15 188:6 189:10,13,15
**transcripts** 180:20
**transfer** 51:9 165:25 180:7
**transferred** 145:11
**transferring** 178:24
**transfers** 145:3
**transitioned** 12:16
**translate** 184:10
**translating** 184:11
**travel** 180:24
**treat** 74:7
**treatment** 13:11 13:20,21,22 72:19 73:14 74:2 149:7 168:15 183:16 184:19
**tremendous** 42:20 63:7
**tried** 50:2 136:17 144:20
**trip** 165:2
**troubling** 114:25
**true** 133:11 134:23 147:12 178:10 188:8 189:11
**trusted** 38:6 99:24
**truthfully** 33:7 46:25
**try** 54:13 64:23 67:23 83:14 112:25 139:1,18
**trying** 23:24 34:23 49:16,19 53:6 58:21 62:25 68:23 80:13 95:17 106:17 118:12 119:18 165:23 170:5 186:24
**turn** 100:5 133:20
**turned** 47:4 138:10
**twice** 183:18,20,21
**two** 10:15 20:7 30:1 38:4 53:7,15 54:13 63:21 98:6 107:10 126:5
129:10 135:3 136:1 158:15 159:3 164:7 166:4 170:7 185:10 186:8
**type** 11:11 34:22
**typed** 132:4
**types** 21:12

**u**

**u** 50:9 155:21 186:6
**u.s.** 34:4 112:4 168:16
**ucis** 168:22
**uh** 9:11 19:18 91:20 117:15 131:18 151:3 169:23
**ultimate** 88:18
**ultimately** 67:15 76:24 90:10 140:18
**underscore** 154:11 154:11
**underserved** 13:5
**undersigned** 189:1
**understand** 10:20 11:19 18:2 25:6 26:13 28:16 29:22 45:2,5,8 46:12 57:8,15 58:13,16 58:17 68:19,20 72:25 75:21 76:1 76:2,6 77:8 81:19 86:8 91:2 95:21 102:22 110:12 111:24 125:22 137:16 149:24 162:19 165:24 175:7 184:7 186:11

**understanding** 6:12 16:24 17:1 20:18 25:1,17,19 26:7 27:3 36:7,20 39:15 40:4,23 59:19 68:17 69:4 87:3 93:25 107:14 132:18 134:19 145:2 146:20 149:15 157:2,12 160:6 162:9 175:25 179:23 180:21
**understands** 116:10
**understood** 26:15 45:25
**undertake** 140:19
**undertaken** 170:4
**underway** 151:10 170:17
**unencumbered** 44:23 45:9 176:8
**unfortunately** 131:24 137:15
**unhappy** 63:19
**unit** 165:25 166:2
**united** 1:1 2:1 3:4 6:14 7:6 30:23 35:4 110:8,13 154:16 155:3,6 156:8,19,23 157:8 157:16 159:20 160:1 161:17,20 162:10,13,18,25 163:17,20,24 164:3,9,11 166:5 167:18 168:9,14
**university** 10:4,8 10:12,14
**unpaid** 143:20
**unsavory** 108:21
**unusual** 81:13 113:15
**updated** 150:19
**uploaded** 131:12 131:25
**ups** 113:21
**upset** 185:22
**urgency** 42:20
**urgent** 144:10
**usc** 27:18,19,20 121:14,16,22
**usci** 90:7 167:14
**uscif** 91:24
**uscis** 171:4
**usdis** 91:16
**use** 161:14
**uses** 31:24 45:19
**usually** 109:4

**v**

**v** 50:9,21
**vague** 15:16 47:17 73:19 74:12 84:15 86:11 120:13
**vaguely** 73:16 161:10
**valerie** 1:21 2:17 64:14 71:8 163:5 171:18 189:24
**value** 45:8,11
**variations** 81:22
**various** 37:11 85:5
**vehicle** 38:9 39:14 154:14
**vein** 140:17
**vendor** 84:6 162:7 178:21
**vendors** 37:11 45:20 46:8,14,16 46:18,22 83:19 88:16 100:11
**venture** 157:14 166:17
**ventures** 6:14 7:6 154:17 155:3,6 156:6,9,19,23 157:9,17 163:18 163:25 164:10 168:9,14
**verify** 173:3
**version** 181:23
**videoconference** 1:15 2:15
**view** 44:15,15
**villaraigosa** 29:12 29:12,15,24,25 30:3,21 31:16 34:19 51:23 52:5 52:23 53:21 54:7 54:8 170:23 185:18
**villaraigosa's** 170:20
**virtual** 44:10
**virtually** 124:10
**visibility** 143:11
**vision** 159:20,24
**visit** 34:16 162:6 181:3 183:17,21 184:23
**visiting** 182:2,5
**visits** 181:9 184:22 185:1,9,13
**viva** 14:4
**volume** 1:17 2:14 5:3 188:17
**volunteer** 89:15
**volunteered** 65:14 115:14
**volunteering** 87:9
**vs** 1:7 2:7

**w**

**waited** 120:7
**walk** 183:10 185:6 186:18
**walked** 112:11
**wall** 14:7
**wang** 1:8,9 2:8,9 8:15,15 15:24 16:19 31:23,24 32:13 33:8 105:17 105:22 106:3,5,9 124:22 179:14,14 179:21 180:22 181:8 183:17 185:9 186:3
**wang's** 106:15 145:15
**want** 8:8,10 11:16 12:15,16 28:14 34:8 39:5,9 55:10 56:3 58:19,20 66:15,25 70:25 74:5 75:16 76:19 76:23 84:10 85:7 85:7 86:7,8 88:22 88:24 91:12 95:16 95:16,21 96:7,10 96:24 103:12 105:14 106:24 110:2,17 112:12 114:9 122:6 126:9 127:7 128:11 129:10 130:10,22 138:21 139:2,25 141:2,15 165:22 168:11 171:24 175:15 177:3 185:3 186:6
**wanted** 21:11,18 21:19,21 24:3

**[wanted - wrongdoing]**


27:15 28:1 29:4 34:3 62:8,10,24 65:17 69:8 97:19 97:24 98:25 100:16 109:6 111:6 113:21 138:13 140:7 144:10 173:16 183:1,9,11 184:16
**wanting** 22:11
**warning** 113:22
**washington** 22:8 23:9,13,15
**waste** 171:25
**watermark** 168:12
**way** 11:15 13:21 21:17 22:2 23:7 37:25 41:9 58:6 58:19,20 61:15 62:22,25 63:1 112:5 113:4 118:1 127:5 137:5,15 144:5 178:22 182:20
**ways** 14:9 53:7
**we've** 38:17 39:10 52:4 66:25 95:19 125:1 128:16 132:23 145:13 160:19 167:12,15
**weekend** 165:20
**welcome** 172:6
**went** 29:16 54:10 69:4 78:3 84:16 84:21 90:19,21 92:11 94:7 98:23 99:10 109:11,20 109:20 112:13 121:16 122:12 123:15 133:19 137:18 161:2 177:16 182:7,9,11 182:13,14 183:25 185:14,17
**west** 55:19 56:9,19 56:19 61:20 80:9 110:4 142:16 148:10,15 158:17 158:23,24 168:13 168:20 169:11,17 170:1 181:4
**whatever's** 134:12
**whereof** 189:19
**white** 5:23
**wide** 44:14
**wife** 8:13 16:8,10 16:12 31:13,22 105:10,11,12 106:2,10,15,16 179:21 185:8
**williams** 9:9,10
**willing** 122:8
**wilshire** 4:7
**wish** 14:16 23:23 43:8
**withdraw** 162:22 162:22
**witness** 5:2 8:16 8:19,21 9:21,23 28:9 37:22 39:19 39:25 43:20 44:14 48:7,19 53:7 54:13 56:4 64:24 65:11,14 66:8 67:23,25 68:18,24 69:3 70:21 71:1 71:12,23 72:21 73:3,24 74:1 75:20 78:9,10 80:14 86:12 87:19 89:19 90:2 92:15 95:14 100:25 102:17 104:6,19 106:10 116:2,4,5 116:14,17,22,25 117:20 118:8 119:18 120:15 123:12,23 124:11 124:20 125:5 126:20 127:18 128:3,7,9,10,17,24 129:8 132:10 135:9 138:17,19 147:15 162:20 164:16 166:10 168:3 172:1 173:13,15 176:5 179:11 181:18 184:24 186:13,20 186:23 187:3,17 189:19
**witness's** 126:13 126:20 127:22 128:6
**witnessed** 51:9
**witnesses** 189:6
**woman** 31:18 106:22
**women's** 15:8
**wonderful** 122:25
**wonderfully** 31:18
**woods** 5:23 101:23 102:1,11 103:9,20
**word** 20:10
**words** 20:8,10 58:17 88:24 144:4 144:13 159:22 185:23
**work** 17:21 23:4 27:13 34:24 36:21 37:6 51:19 55:13 55:19 56:16,18,23 56:25 57:18,19 58:8,24 59:17 60:3,8,13 62:24 64:25 65:5,7,13 85:6 86:17,25 87:9,24 89:11,15 92:23 93:8 94:1 113:24 120:9 122:3 136:20 145:22 154:15 156:5 169:9,14,14 170:3 171:11 180:21
**worked** 108:23 171:3
**working** 12:2 28:6 29:1 49:15 93:18 134:24 135:13,18 148:23 162:25 163:17 165:22 166:22 171:7 181:13 183:13
**works** 121:15
**worried** 114:10
**write** 11:3 62:20 75:8 76:7 129:17 129:18
**writes** 163:16
**writing** 27:1,2 153:9 156:2 159:16 162:4 165:6,16
**written** 83:25 129:22 132:5 147:10,12 150:5 171:21 177:20
**wrong** 51:21 69:23 87:16
**wrongdoing** 124:23

**wrote** 24:1,2 50:19
134:7 135:3

**X**

**xin** 1:8 2:8 8:14
105:17

**Y**

**y** 3:5
**yale** 22:21 91:22
93:12
**yeah** 8:11 18:20
26:2,6 30:1,24
34:20 36:16 57:23
60:22 69:3 72:11
82:7,8,25 88:7,11
89:5 95:4,14,25
99:6 104:5 105:8
105:8 106:22
120:4,15 121:4
132:4,10,22
135:20 136:10,17
138:4,6 139:4
140:15,17 144:18
151:6,6 155:9,9
164:25 167:7
169:18 183:3,13
183:22 184:24
**year** 13:24 29:19
29:19 30:16 47:4
48:20,23 49:3,4
72:10 86:25 90:20
98:3,5,10,17 120:3
136:6,11 137:7
165:1,7 184:3
**year's** 33:15
**years** 10:15 11:9
12:17,17 15:6
17:16 20:22 21:20
22:12 30:1 41:20
63:23 79:10 93:3
98:6,17 106:1
108:23 122:5,23
**yesterday** 62:12
**young** 186:18

**Z**

**z** 99:6
**zero** 99:22
**zhan** 32:15 99:5,6
99:18,24 105:17
107:10 108:3,8
111:5,8 113:8,16
113:19 114:6
133:1 136:23
177:17,18
**zoom** 1:15 2:14
44:12 139:15,20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 20

ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| HCI SECURED MEDICAL RECEIVABLES SPECIAL PURPOSE CORPORATION, Plaintiff, | Index No. |
| against | Date Purchased |
| BEVERLY ONCOLOGY & IMAGING CENTERS MEDICAL GROUP, INC., WILLARD J. NOVODOR, RUTH L. NOVODOR, JOHN P. THROPAY, MARICELA O. THROPAY and NORTHERN HEALTHCARE CAPITAL, LLC, Defendants. | **SUMMONS** |

FILED
FEB 21 2006
NEW YORK COUNTY CLERK'S OFFICE

06600571

To the above-named Defendants:

YOU ARE HEREBY SUMMONED to appear in the Supreme Court of the State of New York, County of New York, at the office of the said Court at 60 Centre Street, New York, New York in the County of New York, State of New York, to file your answer to the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear, or answer, judgment will be taken against you by default, for the relief demanded in the Complaint, with interest thereon, together with attorney's fees and the costs and disbursements of this action.

The basis of venue is: (1) the parties agreed that they submit to the jurisdiction of this Court; (2) the parties have agreed that this dispute shall be governed by and construed in

NY:985083v1

accordance with the laws of the state of New York, without reference to its choice-of-law rules; and (3) defendant Northern Healthcare Capital, LLC maintains offices and is doing business in the County of New York.

In case of your failure to appear, judgment will be taken against you by default for the relief demanded herein.

New York, New York
February 21, 2006

EPSTEIN BECKER & GREEN, P.C.

By: Barry M. Kazan
Barry M Kazan
250 Park Avenue
New York, New York 10177-0077
(212) 351-4500
Attorneys for Plaintiff

To: BEVERLY ONCOLOGY & IMAGING CENTERS MEDICAL GROUP, INC.
200 E. Beverly Boulevard, Suite 200
Montebello, California 90640

WILLARD J. NOVODOR
220 Mount Olive Drive
Bradbury, California 91010

RUTH L. NOVODOR
220 Mount Olive Drive
Bradbury, California 91010

JOHN P. THROPAY
345 Oak Mountain Road
Bradbury Estate, California 91010

MARICELA O. THROPAY
345 Oak Mountain Road
Bradbury Estate, California 91010

NORTHERN HEALTHCARE CAPITAL, LLC
333 Seventh Avenue, Third Floor
New York, New York 10001

NY:985083v1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HCI SECURED MEDICAL RECEIVABLES SPECIAL PURPOSE CORPORATION,

Plaintiff,

against

BEVERLY ONCOLOGY & IMAGING CENTERS MEDICAL GROUP, INC., WILLARD J. NOVODOR, RUTH L. NOVODOR, JOHN P. THROPAY, MARICELA O. THROPAY, and NORTHERN HEALTHCARE CAPITAL, LLC,

Defendants.

Index No.

Date Purchased

FILED FEB 21 2006 NEW YORK COUNTY CLERK'S OFFICE

06600571

**COMPLAINT**

COMES NOW the Plaintiff, by Counsel, and for its Complaint states as follows:

I. Parties

1. Plaintiff HCI Secured Medical Receivables Special Purpose Corporation ("HCI") is a New York corporation with its principal offices at 545 Fifth Avenue, New York, New York 10017.

2. Defendant Beverly Oncology & Imaging Group Medical Centers, Inc. ("Beverly Oncology") is a California corporation with its principal offices at 200 E. Beverly Boulevard, Suite 200, Montebello, California 90640.

3. Defendant Willard J. Novodor ("Bill Novodor") is an individual resident at 220 Mount Olive Drive, Bradbury, California 91010. Bill Novodor is also the co-CEO of defendant Beverly Oncology and a shareholder of Beverly Oncology.



Supreme Court Records OnLine Library - page 3 of 29

4. Defendant Ruth Novodor ("Ruth Novodor") is an individual resident at 220 Mount Olive Drive, Bradbury, California 91010. Ruth Novodor is the wife of Bill Novodor and herself a shareholder of Beverly Oncology.

5. Defendant John P. Thropay ("John Thropay") is an individual resident at 345 Oak Mountain Road, Bradbury Estate, California 91010 and a shareholder of Beverly Oncology.

6. Defendant Maricela Thropay ("Maricela Thropay") is an individual resident at 345 Oak Mountain Road, Bradbury Estate, California 91010. Maricela Thropay is the wife of John Thropay.

7. Defendant, Northern Healthcare Capital, LLC, ("NHC") is a New York limited liability company with its principal place of business at 333 Seventh Avenue, Third Floor, New York, New York 10001.

## II. Venue and Jurisdiction

8. The Court has personal jurisdiction over Defendant Beverly Oncology because it executed on June 23, 2005, a Healthcare Accounts Receivable Purchase Agreement between HCI, as Purchaser, and Beverly Oncology, as Provider, which agreement was counter-signed by HCI, in New York, New York, on July 6, 2005 (the "Receivables Purchase Agreement" or, variously, the "RPA"), in which, among other things, Beverly Oncology consents to the jurisdiction of this Court in any proceedings arising out of or involving the RPA. Section 7.5 of the RPA states, in relevant part:

> THE PROVIDER HEREBY IRREVOCABLY SUBMITS ITSELF AND ITS PROPERTY TO THE JURISDICTION OF THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK. THE PROVIDER AGREES THAT THIS PURCHASE AGREEMENT SHALL BE GOVERNED BY NEW YORK LAW. THE PROVIDER, TO THE EXTENT



Supreme Court Records OnLine Library - page 4 of 29

> PERMITTED BY ANY REQUIREMENTS OF LAW, HEREBY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH SUIT OR PROCEEDING BROUGHT IN SUCH COURTS, ANY CLAIM THAT IT IS NOT SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS, THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT ACTION OR PROCEEDING IS IMPROPER OR THAT THIS PURCHASE AGREEMENT OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT. THE PROVIDER AGREES THAT ITS SUBMISSION TO JURISDICTION IN ANY SUCH SUIT OR PROCEEDING SHALL BE CONCLUSIVE...THE PROVIDER FURTHER WAIVES THE RIGHT TO BRING ANY ACTION ARISING OUT OF THIS AGREEMENT IN ANY COURT OTHER THAN THE FEDERAL DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE SUPREME COURT OF NEW YORK STATE, COUNTY OF NEW YORK.

9. The Court has personal jurisdiction over Defendants Bill Novodor, Ruth Novodor, John Thropay and Maricela Thropay because each executed on June 23, 2005, a Guaranty agreement (each a "Guaranty"; collectively, the "Guaranties") in which each consented to the jurisdiction of this Court in any proceedings arising out of or involving such Guaranties. Paragraph 21 of each Guaranty states, in relevant part:

> GUARANTOR HEREBY IRREVOCABLY SUBMITS, HIS OR HERSELF AND HIS OR HER PROPERTY, TO THE JURISDICTION AND VENUE OF THE UNITED STATES FEDERAL DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND TO THE JURISDICTION AND VENUE OF THE SUPREME COURT FOR THE STATE OF NEW YORK, COUNTY OF NEW YORK, FOR ALL PURPOSES IN CONNECTION WITH THIS GUARANTY, THE PURCHASE AGREEMENT AND THE FUNDING DOCUMENTS. GUARANTOR, TO THE EXTENT PERMITTED BY ANY REQUIREMENTS OF LAW, HEREBY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH SUIT OR PROCEEDING BROUGHT IN SUCH COURTS, ANY CLAIM THAT HE OR SHE OR HIS OR HER PROPERTY IS NOT SUBJECT TO THE JURISDICTION OF THE ABOVE



Supreme Court Records OnLine Library - page 5 of 29

> NAMED COURTS, THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER OR THAT THIS GUARANTY OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT. THE GUARANTOR AGREES THAT HIS OR HER SUBMISSION TO JURISDICTION IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE...GUARANTOR FURTHER CONSENTS THAT ANY SUMMONS, SUBPOENA OR OTHER PROCESS OR PAPERS...OR ANY NOTICE IN CONNECTION WITH ANY PROCEEDINGS HEREUNDER, MAY BE SERVED INSIDER OR OUTSIDE NEW YORK STATE OR THE SOUTHERN DISTRICT OF NEW YORK BY REGISTERED MAIL, RETURN RECEIPT REQUESTED OR BY PERSONAL SERVICE TO GUARANTOR'S ADDRESS FOR NOTICE AS SET FORTH HEREIN....GUARANTOR FURTHER WAIVES THE RIGHT TO BRING ANY ACTION ARISING OUT OF THIS AGREEMENT IN ANY COURT OTHER THAN THE FEDERAL DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE SUPREME COURT OF NEW YORK STATE, COUNTY OF NEW YORK.

10. Venue is proper in this jurisdiction because the plaintiff is a resident of New York County and Defendant NHC is a resident of New York County.

## III. Factual Allegations Common to All Counts

11. HCI performed all duties, obligations and conditions upon it with respect to the actions hereon sued upon, or the same have occurred, been waived or excused by the conduct of one or more of the Defendants.

12. On May 31, 2005, Beverly Oncology entered into a non-binding letter of intent to receive a $2 million funding facility from Health Capital Investors, Inc., parent company of HCI.

13. On or about June 23, 2005, Beverly Oncology and Bill Novodor represented to HCI that: Bill and Ruth Novodor owned their personal residence at 220 Mount Olive Drive, Bradbury, CA; the residence was worth $1.4 million, and was



Supreme Court Records OnLine Library - page 6 of 29

encumbered by first mortgage debt of approximately $700,000 (i.e., the property had approximately $700,000 in equity in it); that the Novodors had a personal net worth of $2.1 million; and that the Novodors would both personally guarantee the obligations of Beverly Oncology to HCI, under a funding agreement between HCI and Beverly Oncology, by giving their respective Guaranties.

14. On or about June 23, 2005, Beverly Oncology and Bill Novodor represented that Bill Novodor and Ruth Novodor would secure their obligations to HCI, under their personal Guaranties, by placing a second mortgage against the Novodors' personal residence, at 220 Mount Olive Drive, Bradbury, CA.

15. On June 23, 2005, Defendant Beverly Oncology executed the RPA, a true and correct copy of which, with exhibits, is attached hereto as **Exhibit A**. Under the RPA, Beverly Oncology granted to HCI, as buyer, a security interest in certain of Beverly Oncology's accounts receivable to be purchased by HCI under the terms and conditions of the RPA (the "Purchased Accounts"; variously, the "Factored Receivables"). The Purchased Accounts would, upon their purchase by HCI, be owned by HCI. In consideration of the same, HCI agreed, subject to the terms and conditions of the RPA, to promptly advance to Beverly Oncology a percentage of the value of the Purchased Accounts and, upon collection in full of the Purchased Accounts, by HCI, to pay over to Beverly Oncology the purchase price, net of HCI's initial advance to Beverly Oncology thereon, and less discount fees and other costs and expenses due by Beverly Oncology to HCI under the RPA.

16. As evidenced by the RPA, Beverly Oncology further granted to HCI a security interest in all accounts and receivables not sold to HCI ("Non-Purchased



Supreme Court Records OnLine Library - page 7 of 29

Accounts; variously, the "Non-factored Receivables"; collectively with the Purchased Accounts, the "Accounts"), together with a security interest in various of Beverly Oncology's other assets as well, as more fully described in the RPA, as collateral security for the obligations of Beverly Oncology to HCI under the RPA. Title to the Non-Purchased Accounts and to the other collateral pledged to HCI would remain in Beverly Oncology.

17. HCI duly perfected its security interest so received in purchased accounts, non-purchased accounts and in other collateral by filing a UCC-1 financing statement with the State of California on July 11, 2005, a true and correct copy of which is attached as **Exhibit B**.

18. Under Section 7.16 of the RPA, all exhibits and schedules attached to the purchase agreement are deemed to be a part of the RPA itself, and the RPA can be modified by the parties only in writing.

19. Under the RPA, Beverly Oncology agreed, among other things, to reimburse HCI's due diligence costs and HCI's reasonable attorney's fees incurred in connection with the negotiation, execution, delivery, performance and enforcement by HCI of the RPA. See e.g. Sections 6.1 and 7.12 of the RPA.

20. As more fully set forth in the Term Sheet attached to and made a part of the RPA, Beverly Oncology agreed to pay to HCI (i) minimum monthly fees; (ii) an early termination fee of $60,000, 3% of the contemplated maximum funding of $2 million, if the RPA were prematurely terminated by Beverly Oncology within one year's time, and (iii) a commitment fee equal to 1.75% of the maximum $2 million facility (i.e., $35,000).



Supreme Court Records OnLine Library - page 8 of 29

21. In Exhibit 3.1(b) of the RPA, titled "Covenants Of Provider", clause (k) provides as follows:

> In consideration of the advances and other financial accommodations made by the Purchaser to the Provider hereunder, the Provider agrees that until all Indebtedness and other Obligations of the Provider to the Purchaser have been satisfied in full, the Provider will not, without the prior written consent of the Purchaser, create or permit any lien or other encumbrance other than those presently existing (and/or those securing advances and other financial accommodations made by the Purchaser to the Provider) to exist on the Collateral pledged hereunder to the Purchaser.

22. Section 5.3 of the RPA, titled Termination, states, in relevant part:

> Termination, however, shall not relieve or discharge the Provider or its duties, obligations or covenants hereunder until all of the Provider's obligations to Purchaser have been satisfied or paid in full, and all of the terms, provisions and conditions of this Purchase Agreement shall remain in effect. The Provider understands that in addition to any other funds due Purchaser in connection with this Purchase Agreement, Provider shall be responsible for cancellation charges, including any remaining Minimum Monthly Fees, if applicable, as specified in the Term Sheet…

23. Beverly Oncology signed the RPA on June 23, 2005. The RPA stated therein that it would become legally effective when accepted (counter-signed) by HCI in New York.

24. The Guarantors signed their respective personal Guaranties on June 23, 2005. True and correct copies of these Guaranties are attached hereto, included as part of Exhibit 7.14 to the RPA (Ex. A hereto).

25. In their respective Guaranties, Bill Novodor, Ruth Novodor, John Thropay and Maricela Thropay (collectively, the "Guarantors") each agreed to guarantee the obligations and duties of Beverly Oncology to HCI, as more fully set forth therein.



Supreme Court Records OnLine Library - page 9 of 29

26. On June 24, 2005, Beverly Oncology wired $17,500 to HCI, one-half of the contractual commitment fee required by the RPA.

27. On July 5, 2005, Beverly Oncology submitted the personal financial statement of Bill Novodor and Ruth Novodor, signed by Bill Novodor, to HCI. Thereon, it was represented that Bill Novodor and his wife personally owned their home, which had a value of $1,400,000, encumbered by a mortgage loan of $696,000; i.e., that the home had substantial equity, of approximately $704,000. The Novodors' financial statement at July 5, 2005, a true and correct copy of which is attached as **Exhibit C,** represented that the Novodors had a personal net worth of $2,104,824.

28. Beverly Oncology and Bill Novodor submitted the Novodors' personal financial statement, on July 5, 2005, which falsely claimed therein that the Novodors owned their home, personally, which home had significant equity above existing liens, as set forth above, knowing that these statements were untrue because, in fact, the Novodors did not own their personal residence at that time.

29. Beverly Oncology and Bill Novodor intended that HCI rely on the false representations in the Novodors' personal financial statement.

30. Beverly Oncology and Bill Novodor submitted the Novodors' personal financial statement to induce HCI into counter-signing the RPA.

31 But for its belief as to the accuracy of the Novodors' personal financial statement, HCI would not have counter-signed the RPA, given the then difficult financial position and lack of credit-worthiness of Beverly Oncology, the Provider, itself.

32. In material reliance on, among other things, the truth and accuracy of the Novodors' July 5, 2005, personal financial statement, showing that (i) the Novodors



Supreme Court Records OnLine Library - page 10 of 29

personally owned their residence at 220 Mount Olive Drive, Bradbury, CA; and (ii) the Mount Olive Drive property had substantial equity, above existing liens, of approximately $700,000, HCI counter-signed the RPA on July 6, 2005, unaware that these representations were false.

33. Under Exhibit 2.1(k) to the RPA, a condition precedent to HCI's initial funding to Beverly Oncology thereunder was HCI's acceptance of the financial statements of all guarantors and HCI's acceptance of the valuation and form of title of all assets listed on the guarantors' financial statements.

34. On or about July 10, 2005, Bill Novodor and Beverly Oncology reconfirmed that the Novodors would secure their personal guaranties of the obligations under the RPA of Beverly Oncology to HCI by a mortgage on their personal residence. HCI ordered a title search on the Novodors residence at 220 Mount Olive Drive and asked for a copy of the Novodors' deed to the property, and for a recent appraisal, to confirm title to the residence and to confirm the market value of the Mount Olive Drive property, as shown on the Novodors' July 5, 2005, financial statement.

35. On July 12, 2005, Beverly Oncology sent HCI a fax showing HCI, for the first time, that rather than owning their house on Mount Olive Drive, as had been represented in the July 5, 2005, personal financial statement, the Novodors instead merely leased the property from its owner, Danny Simon, and held a mere, unexercised, option to buy the property. A true and correct copy of this fax is attached as **Exhibit D**.

36. On July 14, 2005, HCI's information technology consultant met for several hours with the information technology staff of Beverly Oncology, at Beverly Oncology's offices, in California, to discuss data transmission matters related to the RPA.



Supreme Court Records OnLine Library - page 11 of 29

37. On July 15, 2005, HCI advised counsel to Beverly Oncology, Mark Goodfriend, in a fax, a true and correct copy of which is attached as **Exhibit E**, that HCI was uncomfortable with the status of the Novodors' lack of ownership of the 220 Mount Olive Drive residence in Bradbury, which contradicted the July 5, 2005, financial statement. HCI suggested that the Novodors take title to the Mount Olive Drive home by exercising their purchase option, consistent with the prior representations to HCI on this point. HCI also advised that it needed further information to confirm the existing debt on the Mount Olive Drive residence and asked for an appraisal report on the residence.

38. HCI's counsel, who had just recently been retained by HCI on this matter at the time the July 15, 2005 fax was sent, later sent Mr. Goodfriend a related email, also on July 15, 2005, a true and correct copy of which is attached as **Exhibit F**, to advise of his corrected understanding that, in fact, an RPA was already in place between the parties, as of July 6, 2005.

39. On July 25, 2005, Beverly's counsel admitted that clarifications or revisions of the Novodors' July 5, 2005, financial statement should occur.

40. On August 10, 2005, Beverly Oncology faxed to HCI a Grant Deed dated August 9, 2005, a true and correct copy of which is attached as **Exhibit G**, showing that Mr. Danny Simon, owner of record of the 220 Mount Olive Drive property, had, on August 9, 2005, for no consideration, deeded the Mount Olive Drive home to Ruth Novodor, alone.

41. The August 9, 2005 deed of the 220 Mount Olive Drive property from Mr. Simon to Ruth Novodor was confusing to and created concern for HCI, insofar as the purchase option previously disclosed to HCI on or about July 12, 2005, well after the



Supreme Court Records OnLine Library - page 12 of 29

RPA had been counter-signed by HCI on July 6, 2005, was in the name of both Bill and Ruth Novodor, not in the name of Ruth Novodor, alone, and the purchase option contract called for the Novodors to pay a substantial option price to Mr. Simon to acquire title.

42. The apparent lack of any consideration whatsoever for the transfer by Mr. Simon to Ruth Novodor of the 220 Mount Olive Drive home, allegedly worth $1.4 million, per the Novodors' July 5, 2005, financial statement, suggested to HCI that, if HCI ever took judgment against the Novodors on their Guaranties and sought thereafter to enforce the judgment against the Mount Olive Drive property, HCI might encounter possible fraudulent conveyance claims by Mr. Simon's own creditors (who might try to set aside his deed of the property on August 9, 2005, to Ruth Novodor, for inadequate consideration).

43. In the circumstances, HCI asked for more information about Mr. Simon's financial condition on August 9, 2005, why the grant deed to Ruth Novodor had been made in the fashion that it was, contrary to the terms of the Novodors' purchase option from Mr. Simon (which called for title to be taken by both Bill and Ruth Novodor), and why, contrary to the purchase option, no consideration whatsoever had apparently been paid to Mr. Simon by Ruth Novodor for transfer of the deed. HCI also inquired whether Mr. Simon's first mortgage lender was aware of, and had consented to, transfer of title to the 220 Mount Olive Drive property to Ruth Novodor, for no apparent consideration. HCI was concerned that the first mortgagee, if it had not consented to the transfer, might accelerate its loan and try to foreclose the Mount Olive Drive property.

44. Reacting badly to these reasonable inquiries, by letter of August 11, 2005, a true and correct copy of which is attached as **Exhibit H**, Beverly Oncology, via



Supreme Court Records OnLine Library - page 13 of 29

counsel, unequivocally repudiated its obligations under the RPA by claiming that the RPA was no longer in effect between the parties, as of that date. Beverly Oncology's letter also claimed, falsely, that HCI had allegedly executed the RPA after the dispute regarding title to the Novodors' residence had developed when, in fact, HCI signed the RPA several days before, on July 6, 2005, as Exhibit F and the notarized signature of HCI on the RPA both show. Beverly Oncology characterized the RPA as a mere "offer" and claimed that Beverly Oncology had, allegedly, withdrawn its execution of the RPA prior to acceptance of this "offer" by HCI, when, in fact, this assertion was patently false.

45. Beverly Oncology's August 11, 2005 letter noted HCI's willingness to move forward with initial funding, on the terms of the RPA, but, in the face of this expression by HCI, Beverly Oncology nonetheless affirmatively refused to send out the payor notice letters required by the RPA (such notices being sent by Beverly Oncology to direct its various account debtor payors to make payment to the lockboxes set up under the RPA), which notices were among the express conditions precedent to HCI's initial funding obligations in Exhibit 2.1 to the RPA. Beverly Oncology demanded unspecified further "assurances" from HCI before moving forward.

46. Beverly Oncology's actions, in its August 11, 2005, letter to HCI, represented an anticipatory breach of Beverly Oncology's obligations to HCI under the RPA.

47. By letter of August 25, 2005, a true copy of which is attached as **Exhibit I**, HCI declared Beverly Oncology to be in anticipatory breach of the RPA due to the claims and misconduct of Beverly Oncology in the August 11, 2005, letter referenced



Supreme Court Records OnLine Library - page 14 of 29

above, including, among other things, Beverly Oncology's denial therein that a binding contract existed between the parties. HCI's letter advised that, in view thereof, Beverly Oncology owed HCI (i) the balance of the commitment fee - $17,500; (ii) remaining monthly minimum fees, of $17,100; (iii) an early termination fee of $60,000 and (iv) attorney fees of $5,131 through July 31, 2005, plus legal fees thereafter accruing; i.e., a total of $99,731, plus legal fees accruing after July 31, 2005.

48. Before HCI declared, on August 25, 2005, that Beverly Oncology was in anticipatory breach of the RPA, by virtue of the allegations made in its August 11, 2005, letter to HCI, Beverly Oncology had not met the pre-conditions for receipt of an initial funding from HCI under the RPA (which conditions are set forth in Exhibit 2.1 to the RPA) because, among other things, (i) Beverly Oncology had to date failed to send out the lockbox notice letters to payors called for by the RPA, and the lockboxes themselves were not yet functioning (receiving payor cash payments), as a result (see Exhibits 2.1(d), (i) and (j) to the RPA), and (ii) HCI had not yet, after it had executed the RPA on July 6, 2005, accepted the title and value of assets shown on the Novodors' July 5, 2005, financial statement due to HCI having learned, after July 6, 2005, that representations thereon regarding the Novodors' personal ownership of their home, at 220 Mount Olive Drive, Bradbury, CA, were false (see Exhibit 2.1(k) to the RPA).

49 At all times, from and after July 6, 2005, up and until HCI declared Beverly Oncology to be in anticipatory breach of the RPA on August 25, 2005, HCI was ready, willing and able to contractually perform its duties under the RPA, on the terms and conditions of the RPA.



Supreme Court Records OnLine Library - page 15 of 29

50. By letter of August 26, 2005, a true and correct copy of which is attached as **Exhibit J**, Beverly Oncology demanded that HCI withdraw its UCC-1 financing statement, even though fees and expenses due to HCI under the RPA of more than $99,731 were then owing to HCI by Beverly Oncology.

51. In September, 2005, Beverly Oncology and the Novodors refused to provide proof to HCI that the first mortgagee had consented to the transfer of title of the 220 Mount Olive Drive property from Danny Simon to Ruth Novodor on August 9, 2005.

52. In or around October, 2005, Beverly Oncology began to negotiate for financing with a new funding company, defendant NHC. At that time, and as of the date hereof, HCI's UCC-1 financing statement, listing Beverly Oncology as Debtor and HCI, as secured party, evidencing HCI's security interest in receivables and other collateral pledged by Beverly under the RPA, remained of record.

53. HCI's recorded UCC-1 for the Beverly Oncology transaction states, in relevant part:

> NOTICE – PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, THE DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. ENCUMBERING SUCH COLLATERAL, INCLUDING BUT NOT LIMITED TO THE DEBTOR'S ACCOUNTS, CHATTEL PAPER, OR GENERAL INTANGIBLES, IN VIOLATION OF THIS PROSCRIPTION, MAY GIVE RISE TO LEGAL RIGHTS AND REMEDIES BY SECURED PARTY AGAINST THE PERSON OR ENTITY RESPONSIBLE.

54. In or around October, 2005, prior to NHC reaching any contract with Beverly Oncology, NHC (erroneously) advised Beverly Oncology of NHC's (erroneous) belief that HCI's security interest in receivables and other collateral which had been pledged to HCI by Beverly under the RPA, which security interest NHC had actual notice



Supreme Court Records OnLine Library - page 16 of 29

of, by virtue of HCI's UCC-1 financing statement being of record, was void and of no effect, on the basis that HCI had yet to purchase any receivables from Beverly Oncology thereunder. NHC advised Beverly Oncology that Beverly was free to break its covenant under the RPA not to grant further security interests in receivables and other collateral pledged to HCI, until HCI was paid off, and NHC advised Beverly Oncology that it could freely enter into a new funding agreement with NHC under which Beverly Oncology would grant NHC a security interest in receivables and other collateral previously pledged to HCI, in violation of the no junior security interests covenant of the RPA.

55. On or about October 21, 2005, Beverly Oncology began to factor its accounts with NHC, which took a security interest in receivables and other collateral previously pledged to HCI in the RPA, in violation of the no further encumbrance clause of the RPA. A true and correct copy of NHC's UCC-1 financing statement for its financing of Beverly Oncology is attached as **Exhibit K**.

56. In December, 2005, HCI invoiced Beverly Oncology for $111,283.07 due to HCI under the now terminated RPA. A true and correct copy of this invoice is attached as **Exhibit L**.

57. In February, 2006, HCI demanded that NHC turnover to HCI $111,283.07, representing cash proceeds collected by NHC of receivable collateral in which HCI held a first priority security interest, senior to the security interest therein of NHC. HCI further advised NHC of violations of the no junior security interest covenant. NHC has refused to pay any monies to HCI, rejecting this overture.



Supreme Court Records OnLine Library - page 17 of 29

58. In their respective Guaranty to HCI, the Guarantors each waived lack of prior notice of Beverly Oncology's failure to pay its obligations to HCI. See Section 4(b) of each Guaranty.

59. HCI has made demand for payment on the Guarantors, under their respective Guaranties, which demands have not yet been satisfied.

First Cause of Action – Fraudulent Inducement
(Defendants Beverly Oncology and Bill Novodor)

60. The allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth herein.

61. Under Section 7.16 of the RPA, all exhibits and schedules attached to the RPA form a part of the RPA. In Section 7(d) of the Guaranties executed by both Bill Novodor and Ruth Novodor on June 23, 2005, which Guaranties are among the exhibits to the RPA, they each represented that their personal financial statements being delivered to HCI in connection with their Guaranties were true and correct and fairly presented their financial condition, in accordance with Generally Accepted Accounting Principles (GAAP).

62. The personal financial statement of the Novodors delivered to HCI on July 5, 2005, by Bill Novodor and by Beverly Oncology, prior to HCI's counter-signature to the RPA, was delivered with the intent to induce HCI to counter-sign the RPA.

63. On the July 5, 2005 financial statement, the representation thereon that Bill Novodor and his wife owned a personal residence worth $1.4 million, encumbered by mortgage loans of $696,000, was false, insofar as the Novodors held, at that time, only an unexercised option to purchase the 220 Mount Olive Drive property from its then owner, Mr. Danny Simon.



Supreme Court Records OnLine Library - page 18 of 29

64. Beverly Oncology and the Novodors both knew, on July 5, 2005, that the Novodors did not, in fact, hold title to the Mount Olive Drive property.

65. Because the Novodors did not hold title to the 220 Mount Olive Drive property on July 5, 2005, assets on their balance sheets were overstated, by $1.4 million, the claimed value of the home, their liabilities were likewise overstated, by $696,000, the claimed mortgage debt on the home, and the Novodors net worth was overstated by $704,000, the differential.

66. The Novodors' July 5, 2005, financial statement shows that they then owned $25,000 cash, substantially less than the $875,000 option price due to Danny Simon were they to exercise their option to purchase the 220 Mount Olive Drive home from him, at least on terms of the option agreement.

67. Even if the Novodors could somehow raise the $875,000 cash to exercise their purchase option with Mr. Simon, the option contract between the Novodors called for payment of a $875,000 price to Mr. Simon, with the Novodors to also either assume or pay off Mr. Simon's existing first mortgage, of $696,000. Because this total consideration was $1,571,000, more than the $1,400,000 alleged value of the home, the Novodors claimed net worth of $2.1 million on their July 5, 2005, balance sheet was actually overstated by a further $171,000, for a total apparent net worth overstatement of $875,000 ($704,000 plus $171,000) on the July 5, 2005, balance sheet delivered to HCI.

68. HCI reasonably relied on the accuracy of the Novodors' July 5, 2005, financial statement, and on the ownership and value of their personal residence at 220 Mount Olive Drive, Bradbury, CA, and the indebtedness against the home, as listed therein, in entering into the RPA on July 6, 2005.



Supreme Court Records OnLine Library - page 19 of 29

69. HCI was unaware, on July 6, 2005, of the falsity of the representations on the July 5, 2005, financial statement of the Novodors submitted by Beverly Oncology and Bill Novodor.

70. HCI has been damaged by the conduct of Beverly Oncology and Bill Novodor by their submitting to HCI a false financial statement of the Novodors on July 5, 2005, as aforesaid, in that HCI would not have executed the RPA had it known of the true financial condition of the Novodors on July 5, 2005, and that the Novodors did not own their home at 220 Mount Olive Drive, with the value and indebtedness thereon, as had been represented.

WHEREFORE, HCI prays for compensatory damages, including lost profits and consequential damages, against Beverly Oncology and Bill Novodor in an amount to be determined at trial but in no event less than $500,000, for punitive damages, for recovery of HCI's legal fees and costs, and for such other and further relief as is just and proper.

Second Cause of Action – Anticipatory Breach of Contract
(Defendant Beverly Oncology)

71. The allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth herein.

72. At all times, from and after its execution of the RPA on July 6, 2005, until August 25, 2005, when it declared Beverly Oncology to be in anticipatory breach, HCI was able to, prepared to, and did honor its obligations to Beverly Oncology under the RPA, subject to the terms and conditions of the RPA.

73. By Beverly Oncology's letter to HCI of August 11, 2005, which letter, among other things, denied that the RPA represented a binding contract between the parties, claimed (falsely) that Beverly Oncology had revoked its signature prior to HCI's



Supreme Court Records OnLine Library - page 20 of 29

execution of the RPA on July 6, 2005, Beverly Oncology committed an anticipatory breach of its duties and obligations to HCI under the RPA, which breach justified HCI declaring Beverly Oncology to be in anticipatory breach, by HCI's letter of August 25, 2005.

WHEREFORE, HCI prays for damages in the amount of $111,283.07 plus interest thereon and additional damages, including lost profits and consequential damages, against Beverly Oncology, plus recovery of HCI's legal fees and costs incurred from and after December 31, 2005, in collecting the same, plus recovery of anticipated total profits to HCI, as if the RPA had been fully performed, all in an amount to be determined at trial, but in no event less than $500,000, and for such other and further relief as is just and proper.

Third Cause of Action – Breach of Contract
(Defendant Beverly Oncology)

74. The factual allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth herein.

75. The RPA, when counter-signed by HCI on July 6, 2005, created a valid and binding contract between Beverly Oncology and HCI.

76. Beverly Oncology received the benefits of financial accommodations from HCI under the RPA, subject to the terms thereof, from HCI's funding commitments to Beverly Oncology therein and, moreover, from HCI's advance of fees and costs which Beverly Oncology was obligated to reimburse to HCI under the RPA, including, without limitation, HCI's fees, costs and expenses for the preparation, negotiation, execution, administration and enforcement of HCI's rights under the RPA.



Supreme Court Records OnLine Library - page 21 of 29

77. Under the RPA, Beverly Oncology is obligated to pay HCI's legal fees in collecting monies due to HCI by Beverly Oncology under the RPA.

78. HCI performed all its duties and obligations under the RPA prior to the time the RPA was first breached, by Beverly Oncology.

79. The RPA terminated on August 25, 2005, when HCI declared an anticipatory breach by virtue of Beverly Oncology's letter to HCI of August 11, 2005, which letter denied that the RPA represented a binding contract between the parties, claimed (falsely) that Beverly Oncology had revoked its signature prior to HCI's execution of the RPA on July 6, 2005, and demanded that the RPA be "unwound", immediately.

80. While the RPA terminated on August 25, 2005, that termination did not relieve Beverly Oncology of its obligations, duties and covenants therein, until Beverly Oncology had paid HCI all fees, costs and expenses due to HCI under the RPA.

81. Beverly Oncology breached the RPA by refusing to pay HCI $111,283.07 due upon termination, as reflected in HCI's invoices to Beverly Oncology.

82. Beverly Oncology further breached the RPA by entering into a new funding agreement with Defendant NHC on or about October 21, 2005, and, therein, granting NHC a security interest in receivables and other collateral previously pledged to HCI, under the RPA, in violation of the no further security interests clause of the RPA.

83. As a proximate result of Beverly Oncology's breaches of the RPA, HCI has been damaged in the sum of $111,283.07, plus interest thereon, plus attorney's fees and costs in collecting this obligation.



Supreme Court Records OnLine Library - page 22 of 29

WHEREFORE, HCI prays for damages in the amount of $111,283.07 plus interest thereon and additional damages, including lost profits and consequential damages, against Beverly Oncology, and for recovery of HCI's legal fees and costs of collection, in addition thereto, all in an amount to be determined at trial, but in no event less than $500,000, and for such other and further relief as is just and proper

Fourth Cause of Action – Breach of Guaranty
(Defendants Bill Novodor, Ruth Novodor, John Thropay and Marisa Thropay)

84. The allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth herein.

85. As an inducement to HCI to enter into the RPA, Defendants Bill Novodor, Ruth Novodor, John Thropay and Marisa Thropay each guaranteed, in their respective Guaranties, all obligations and duties of Beverly Oncology to HCI.

86. Under the RPA, HCI is owed by Beverly Oncology the sum of $111,283.07, plus interest thereon, and HCI's legal fees and costs to collect the same, which sum remains unpaid despite HCI's demand for payment of the same.

WHEREFORE, HCI demands payment against each of Defendants Bill Novodor, Ruth Novodor, John Thropay and Marisa Thropay in the sum of $111,283.07, plus interest thereon, and additional damages, including lost profits and consequential damages, HCI's legal fees and costs to collect the same, all in an amount to be determined at trial, but in no event less than $500,000, and for such other and further relief as is just and proper.



Supreme Court Records OnLine Library - page 23 of 29

Fifth Cause of Action – Conversion
(Defendant NHC)

87. The allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth therein.

88. By virtue of its security interest in accounts and receivable collateral pledged to HCI by Beverly Oncology under the RPA, which security interest is senior to the security interest taken in accounts and receivables granted to NHC by Beverly Oncology, coupled with Beverly Oncology's defaults, and notice of HCI's senior security interest to NHC, HCI is legally entitled to collect from NHC cash proceeds of HCI's senior security interest in accounts and other receivables.

89. Cash proceeds of accounts and receivables in which HCI has a senior security interest are now being collected and held by NHC, holder of a junior security interest in the collateral, to the exclusion of, and inconsistent with, HCI's legal rights in such collateral proceeds.

90. NHC has wrongfully refused HCI's demand to turnover collected cash proceeds of accounts and other receivable collateral pledged to HCI by Beverly Oncology, in the amount of $111,283.07.

91. NHC has acted with willful and reckless disregard and malice against the legal rights of HCI, in refusing to turnover collected cash proceeds of HCI's senior security interest in accounts and receivables and, previously, in wrongfully urging Beverly Oncology to challenge the validity of HCI's security interest.

WHEREFORE, HCI prays for compensatory damages of $111,283.07 against Defendant NHC, plus interest thereon and additional damages, including lost profits and consequential damages, together with recovery of its legal fees and costs to collect the



Supreme Court Records OnLine Library - page 24 of 29

same, all in an amount to be determined at trial, but in no event less than $500,000, for punitive damages, and for such other and further relief as is just and proper.

Sixth Cause of Action – Tortious Interference with Contract
(Defendant NHC)

92. The allegations of paragraphs 1-59 above are incorporated by reference, as if fully set forth herein.

93. While HCI had declared the RPA terminated for anticipatory breach on August 25, 2005, HCI's security interest in receivables under the RPA remained valid, and the no junior security interest covenant remained operative, until HCI was paid the monies owing by Beverly Oncology under the RPA arising from contract termination. In this regard, Section 5.3 of the RPA, "Termination", states, in relevant part:

> Termination, however, shall not relieve or discharge the Provider of its duties, obligations or covenants hereunder until all of the Provider's obligations to Purchaser have been satisfied or paid in full, and all of the terms, provisions and conditions of this Agreement shall remain in effect.

94. NHC was aware in October, 2005, and on October 21, 2005, from, among other things, HCI's UCC-1 financing statement, then of record, that the RPA prohibited Beverly Oncology from granting security interests in collateral pledged to HCI which were junior to the security interests held by HCI, and it had a duty to investigate the terms of the RPA, and HCI's lien, before taking a competing security interest of its own, in violation of Beverly Oncology's contractual covenants to HCI.

95. NHC willfully, intentionally and wrongfully urged Beverly Oncology to breach its contractual duties to HCI by advising Beverly Oncology, on or about October 21, 2005, to pledge to NHC receivables and other collateral which Beverly Oncology had previously pledged to HCI in the RPA, and by urging Beverly Oncology to challenge



Supreme Court Records OnLine Library - page 25 of 29

and extinguish HCI's security interest, still of record on October 21, 2005 (and still of record as of the date hereof), in violation of the no further security interests covenant contained in the RPA.

96. Beverly Oncology, at the urging of NHC as aforesaid, entered into a new funding agreement with NHC on or about October 21, 2005, wherein Beverly Oncology pledged to NHC receivables and other collateral in which HCI had received a security interest under the RPA, in violation of the terms of the no junior security interests covenant in the RPA.

97. NHC has, independently, further tortiously interfered with the contractual rights of HCI, under the RPA, by intentionally and wrongfully urging Beverly Oncology to challenge the validity of HCI's security interest under the RPA. Beverly Oncology, upon this prodding, filed litigation in California against HCI in January, 2006, which, among other things, challenged the existence and validity of HCI's security interest received from Beverly Oncology in the RPA. HCI, which has moved to dismiss the California litigation, initially due to violation of the forum selection clause contained in the RPA, has been damaged by NHC's wrongful actions.

98. But for NHC's tortious activity, as aforesaid, Beverly Oncology would not have violated its contractual no junior encumbrance covenant to HCI in the RPA, which covenant remains effective, post-termination, until HCI had been fully paid.

99. HCI never consented to Beverly Oncology granting to NHC a security interest in any of the receivables and other collateral in which HCI held a security interest.



Supreme Court Records OnLine Library - page 26 of 29

100. Upon discovering NHC's security interest in late December, 2005, during January, 2006, HCI advised NHC of what appeared to be tortious interference with HCI's security interest and urged NHC to respect the same. NHC refused to do so, on the basis that the priority of HCI's security interest was dependent on whether or not there ever existed a valid contract between HCI and Beverly Oncology, which point, NHC claimed, could not be determined at this point, insofar as Beverly Oncology was disputing the same.

101. Thereafter, HCI sent to NHC, between February 12, 2006, and February 17, 2006, (i) the execution pages to the RPA; (ii) the collateral description from the RPA; (iii) HCI's filed UCC-1 financing statement, including the related collateral description; (iv) the no further security interests covenant from the RPA; (v) the provisions of the RPA governing the reimbursements of HCI's costs and attorney's fees, and providing for the payment of minimum monthly fees and an early termination fee to HCI, and (v) HCI's invoices to Beverly Oncology. HCI requested that NHC honor HCI's senior security interest and turnover to HCI the sum of $111,283.08, which monies, on information and belief, represent collected cash proceeds, received by NHC, of HCI's senior security interest in accounts and receivable collateral. NHC has not responded to this demand and, apparently, refuses to do so.

102. HCI has been damaged by NHC in the amount of at least $111,283.07, plus legal fees to collect the same.

103. NHC's actions as aforesaid were not legally privileged.

104. NHC's actions as aforesaid were a proximate cause of damages to HCI.



Supreme Court Records OnLine Library - page 27 of 29

WHEREFORE, HCI demands compensatory damages against Defendant NHC of $111,283.07, plus interest thereon and additional damages, including lost profits and consequential damages, all in an amount to be determined at trial, but in no event less than $500,000, together with punitive damages, and such other and further relief as is just and proper.

Dated: February 21, 2006

Respectfully submitted,

Barry M. Kazan

Barry M. Kazan, Esq.
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

Attorneys for Plaintiff
HCI Secured Medical Receivables
Special Purpose Corporation

Of Counsel:

David B. Tatge, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
(202) 861-1875



Supreme Court Records OnLine Library - page 28 of 29

Index No.
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HCI SECURED MEDICAL RECEIVABLES
SPECIAL PURPOSE CORPORATION,

Plaintiff,

*- against -*

BEVERLY ONCOLOGY & IMAGING
CENTERS MEDICAL GROUP, INC.,
WILLARD J. NOVODOR, RUTH L. NOVODOR,
JOHN P. THROPAY, MARICELA O. THROPAY,
NORTHERN HEALTHCARE CAPITAL LLC,

Defendants.

SUMMONS AND COMPLAINT

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

Attorneys for Plaintiff

# Exhibit 21

## CASE INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Case Number:** BC291820
JOHN P THROPAY M D ET AL VS MONTEBELLO UROLOGICAL ASSOC ET

**Filing Courthouse:** Stanley Mosk Courthouse

**Filing Date:** 03/10/2003
**Case Type:** Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) (General Jurisdiction)
**Status:** Court-Ordered Dismissal - Other (Other) 02/25/2005

## FUTURE HEARINGS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

None

## PARTY INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

AMADOR RICHARD S. - Attorney for Plaintiff

MONTEBELLO UROLOGICAL ASSOCIATION - Defendant

SCHMIDT JOHN - Attorney for Defendant

THROPAY JOHN P. M.D. - Plaintiff

THROPAY MARICELA O. - Plaintiff

ZIA MAHMOOD A. M.D. - Defendant

## DOCUMENTS FILED

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Documents Filed (Filing dates listed in descending order)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
07/28/2003

**02/28/2005** NOTICE OF RULING RE DEFENDANTS' EX PARTE APPLICATION TO SET ASIDE JUDGMENT

**02/28/2005** NOTICE OF DISMISSAL

**02/28/2005** Notice of Ruling
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**02/28/2005** Notice
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**02/25/2005** Minute Order

**02/25/2005** REQUEST FOR DISMISSAL

**02/25/2005** Request for Dismissal
Filed by Plaintiff/Petitioner

**02/23/2005** SUBSTITUTION OF ATTORNEY -CIVIL

**02/23/2005** SUBSTITUTION OF ATTORNEY-CIVIL

**02/23/2005** DEFENDANTS' EX PARTE APPLICATION TO SET ASIDE JUDGMENT; ETC.

**02/23/2005** SUPPLEMENTAL DECLARATION OF MARCO S. ZAMBRANO, ESQ.

**02/23/2005** Minute Order

**02/23/2005** Ex-Parte Application
Filed by Defendant/Respondent

**02/23/2005** Supplemental Declaration
Filed by Plaintiff/Petitioner

**02/23/2005** Substitution of Attorney
Filed by Defendant/Respondent

**02/23/2005** Substitution of Attorney
Filed by Defendant/Respondent

**02/10/2005** AMENDMENT TO JUDGMENT; ETC.

**02/10/2005** Amended/Corrected Judgment
Filed by Plaintiff/Petitioner

**02/01/2005** ORDER ON PLAINTIFF'S EX PARTE APPLICATION FOR AN ORDER FOR ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFFS AND, ETC

**02/01/2005** Minute Order

**02/01/2005** JUDGMENT PURSUANT TO STIPULATION IN FAVOR OF PLAINTIFFS JOHN P. THROPAY, M.D. AND, ETC

**02/01/2005** Judgment
Filed by Plaintiff/Petitioner

**02/01/2005** Order
Filed by Plaintiff/Petitioner

**01/27/2005** PLAINTIFFS' EX PARTE APPLICATION FOR AN ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANTS MONTEBELLO UROLOGICAL ASSOC. ETC

**01/27/2005** Ex-Parte Application
Filed by Plaintiff/Petitioner

**04/08/2004** Minute Order

**04/08/2004** ORDER RE: STIPULATION RE SETTLEMENT

**04/08/2004** Order
Filed by Plaintiff/Petitioner

**04/08/2004** Order
Filed by Plaintiff/Petitioner

**04/07/2004** STIPULATION RE SETTLEMENT

**04/07/2004** Stipulation
Filed by Plaintiff/Petitioner

**03/10/2004** NOTICE OF FURTHER STATUS CONFERENCE RE OSC DISMISSAL

**03/10/2004** Notice of Status Conference filed
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**03/09/2004** Minute Order

**01/14/2004** NOTICE OF ORDER, ETC.

**01/14/2004** Notice
Filed by Defendant/Respondent

**01/05/2004** ORDER GRANTING ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**01/05/2004** Minute Order

**01/05/2004** ORDER GRANTING ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**01/05/2004** Order
Filed by Defendant/Respondent

**01/05/2004** Order
Filed by Defendant/Respondent

**12/01/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL- CIVIL

**12/01/2003** DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** Declaration
Filed by Defendant/Respondent

**12/01/2003** Motion to Be Relieved as Counsel
Filed by Defendant/Respondent

**12/01/2003** Declaration
Filed by Defendant/Respondent

**12/01/2003** Motion to Be Relieved as Counsel
Filed by Mahmood A. M.D. Zia (Defendant)

**11/26/2003** Minute Order

**11/26/2003** Amended Answer
Filed by Mahmood A. M.D. Zia (Defendant)

**11/21/2003** NOTICE OF CHANGE OF ADDRESS

**11/21/2003** Notice of Change of Address or Other Contact Information
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**10/29/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL

**10/29/2003** Motion to Be Relieved as Counsel
Filed by Defendant/Respondent

**10/15/2003** THIRD AMENDED ANSWER TO COMPLAINT

**10/15/2003** NOTICE OF MOTION AND MOTION TO AMEND ANSWER

**09/30/2003** Minute Order

**09/23/2003** OBJECTIONS TO THE DECLARATION OF MAHMOOD A. ZIA, M.D., SUBMITTED IN OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION

**09/23/2003** REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION; ETC.

**09/23/2003** Objection Document
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**09/23/2003** Reply/Response
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**09/16/2003** DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION

**09/16/2003** NOTICE OF OPPOSITION AND OPPOSITION OF DEFENDANTS TO MOTION FOR SUMMARY JUDGMENT OF PLAINTIFFS; ETC.

**09/16/2003** DECLARATION AND EVIDENCE IN SUPPORT OF DEFENDANTS OPPOSITION TO SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES

**09/16/2003** Opposition Document
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**09/16/2003** Statement of Facts
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**09/16/2003** Declaration
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP 07/28/2003

**07/28/2003** INITIAL STATUS CONFERENCE ORDER

**07/28/2003** Minute Order

**07/14/2003** CASE MANAGEMENT STATEMENT

**07/14/2003** Case Management Statement
Filed by Defendant/Respondent

**07/11/2003** CASE MANAGEMENT STATEMENT

**07/11/2003** Case Management Statement
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**07/10/2003** NOTICE OF CASE MANAGEMENT CONFERENCE

**07/10/2003** Notice of Case Management Conference
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**07/07/2003** STIPULATION TO ALLOW DEFENDANTS TO FILE A SECOND AMENDED ANSWER TO COMPLAINT

**07/07/2003** SECOND AMENDED ANSWER TO COMPLAINT

**07/07/2003** Amended Answer to Complaint
Filed by Defendant/Respondent

**07/07/2003** Stipulation and Order
Filed by Defendant/Respondent

**06/30/2003** Motion for Summary Judgment
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**06/30/2003** SEPARATE STATEMENT OF JOHN P. THROPAY, M.D., AND MARICELA O. THROPAY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ETC.

**06/30/2003** Miscellaneous-Other
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**06/30/2003** Declaration
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**06/30/2003** DECLARATIONS AND EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ETC.

**06/30/2003** NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ETC.

**05/15/2003** AMENDMENT TO ANSWER TO COMPLAINT

**05/15/2003** Answer
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**04/10/2003** SUMMONS

**04/10/2003** SUMMONS

**04/10/2003** Affidavit
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**04/10/2003** Affidavit
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**04/07/2003** ANSWER TO COMPLAINT

**04/07/2003** Answer
Filed by Mahmood A. M.D. Zia (Defendant)

**03/25/2003** Notice of Case Management Conference
Filed by Clerk

**03/10/2003** COMPLAINT FOR (1) BREACH OF CONTRACT-LEASE AGREEMENT; ETC.

**03/10/2003** Complaint
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP 07/28/2003

## PROCEEDINGS HELD

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Proceedings Held (Proceeding dates listed in descending order)

**02/25/2005** at 08:31 AM in Department 45
Ex-Parte Proceedings (Ex Parte Motion; Off Calendar) -

**02/23/2005** at 08:30 AM in Department 45
Ex-Parte Proceedings (Ex Parte Motion; Continued by Court) -

**02/01/2005** at 08:30 AM in Department 45
Ex-Parte Proceedings - **Held - Motion Granted**

**04/12/2004** at 09:00 AM in Department 45
Non-Jury Trial

**04/08/2004** at 08:30 AM in Department 45
Further Status Conference (Further Status Conference; Order of Dismissal) -

**04/01/2004** at 09:00 AM in Department 45
Mandatory Settlement Conference (MSC)

**03/09/2004** at 08:30 AM in Department 45
Post-Mediation Status Conference (Conference-Post Mediation Status; Case Deemed Settled) -

**01/05/2004** at 08:31 AM in Department 45
Hearing on Motion to be Relieved as Counsel - **Held - Motion Granted**

**11/26/2003** at 08:31 AM in Department 45
Unknown Event Type - **Held - Motion Granted**

**09/30/2003** at 08:31 AM in Department 45
Hearing on Motion for Summary Judgment (Motion for Summary Judgment; Denied) -

**07/28/2003** at 08:30 AM in Department 45

Case Management Conference (Conference-Case Management; Trial Date Set) -

## REGISTER OF ACTIONS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Register of Actions (Listed in descending order)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:

09/23/2003

**02/28/2005** NOTICE OF RULING RE DEFENDANTS' EX PARTE APPLICATION TO SET ASIDE JUDGMENT

**02/28/2005** NOTICE OF DISMISSAL

**02/28/2005** Notice of Ruling

Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**02/28/2005** Notice

Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**02/25/2005** at 08:31 AM in Department 45

Ex-Parte Proceedings (Ex Parte Motion; Off Calendar) -

**02/25/2005** Request for Dismissal

Filed by Plaintiff/Petitioner

**02/25/2005** REQUEST FOR DISMISSAL

**02/25/2005** Minute Order

**02/23/2005** at 08:30 AM in Department 45

Ex-Parte Proceedings (Ex Parte Motion; Continued by Court) -

**02/23/2005** SUPPLEMENTAL DECLARATION OF MARCO S. ZAMBRANO, ESQ.

**02/23/2005** Substitution of Attorney

Filed by Defendant/Respondent

**02/23/2005** Supplemental Declaration

Filed by Plaintiff/Petitioner

**02/23/2005** Ex-Parte Application

Filed by Defendant/Respondent

**02/23/2005** Minute Order

**02/23/2005** Substitution of Attorney

Filed by Defendant/Respondent

**02/23/2005** DEFENDANTS' EX PARTE APPLICATION TO SET ASIDE JUDGMENT; ETC.

**02/23/2005** SUBSTITUTION OF ATTORNEY-CIVIL

**02/23/2005** SUBSTITUTION OF ATTORNEY -CIVIL

**02/10/2005** Amended/Corrected Judgment

Filed by Plaintiff/Petitioner

**02/10/2005** AMENDMENT TO JUDGMENT; ETC.

**02/01/2005** at 08:30 AM in Department 45

Ex-Parte Proceedings - **Held - Motion Granted**

**02/01/2005** JUDGMENT PURSUANT TO STIPULATION IN FAVOR OF PLAINTIFFS JOHN P. THROPAY, M.D. AND, ETC

**02/01/2005** Judgment
Filed by Plaintiff/Petitioner

**02/01/2005** Minute Order

**02/01/2005** ORDER ON PLAINTIFF'S EX PARTE APPLICATION FOR AN ORDER FOR ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFFS AND, ETC

**02/01/2005** Order
Filed by Plaintiff/Petitioner

**01/27/2005** Ex-Parte Application
Filed by Plaintiff/Petitioner

**01/27/2005** PLAINTIFFS' EX PARTE APPLICATION FOR AN ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANTS MONTEBELLO UROLOGICAL ASSOC. ETC

**04/12/2004** at 09:00 AM in Department 45
Non-Jury Trial

**04/08/2004** at 08:30 AM in Department 45
Further Status Conference (Further Status Conference; Order of Dismissal) -

**04/08/2004** Order
Filed by Plaintiff/Petitioner

**04/08/2004** Order
Filed by Plaintiff/Petitioner

**04/08/2004** ORDER RE: STIPULATION RE SETTLEMENT

**04/08/2004** Minute Order

**04/07/2004** STIPULATION RE SETTLEMENT

**04/07/2004** Stipulation
Filed by Plaintiff/Petitioner

**04/01/2004** at 09:00 AM in Department 45
Mandatory Settlement Conference (MSC)

**03/10/2004** NOTICE OF FURTHER STATUS CONFERENCE RE OSC DISMISSAL

**03/10/2004** Notice of Status Conference filed
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**03/09/2004** at 08:30 AM in Department 45
Post-Mediation Status Conference (Conference-Post Mediation Status; Case Deemed Settled) -

**03/09/2004** Minute Order

**01/14/2004** Notice
Filed by Defendant/Respondent

**01/14/2004** NOTICE OF ORDER, ETC.

**01/05/2004** at 08:31 AM in Department 45
Hearing on Motion to be Relieved as Counsel - **Held - Motion Granted**

**01/05/2004** Order
Filed by Defendant/Respondent

**01/05/2004** Minute Order

**01/05/2004** ORDER GRANTING ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**01/05/2004** Order
Filed by Defendant/Respondent

**01/05/2004** ORDER GRANTING ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** Declaration
Filed by Defendant/Respondent

**12/01/2003** Motion to Be Relieved as Counsel
Filed by Defendant/Respondent

**12/01/2003** Declaration
Filed by Defendant/Respondent

**12/01/2003** DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL- CIVIL

**12/01/2003** DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**12/01/2003** Motion to Be Relieved as Counsel
Filed by Mahmood A. M.D. Zia (Defendant)

**12/01/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL - CIVIL

**11/26/2003** at 08:31 AM in Department 45
Unknown Event Type - **Held - Motion Granted**

**11/26/2003** Minute Order

**11/26/2003** Amended Answer
Filed by Mahmood A. M.D. Zia (Defendant)

**11/21/2003** Notice of Change of Address or Other Contact Information
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**11/21/2003** NOTICE OF CHANGE OF ADDRESS

**10/29/2003** NOTICE OF MOTION AND MOTION TO BE RELIEVED AS COUNSEL

**10/29/2003** Motion to Be Relieved as Counsel
Filed by Defendant/Respondent

**10/15/2003** NOTICE OF MOTION AND MOTION TO AMEND ANSWER

**10/15/2003** THIRD AMENDED ANSWER TO COMPLAINT

**09/30/2003** at 08:31 AM in Department 45
Hearing on Motion for Summary Judgment (Motion for Summary Judgment; Denied) -

**09/30/2003** Minute Order

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP 09/23/2003

**09/23/2003** OBJECTIONS TO THE DECLARATION OF MAHMOOD A. ZIA, M.D., SUBMITTED IN OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION

**09/23/2003** REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION; ETC.

**09/23/2003** Objection Document
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**09/23/2003** Reply/Response
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**09/16/2003** DECLARATION AND EVIDENCE IN SUPPORT OF DEFENDANTS OPPOSITION TO SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES

**09/16/2003** Declaration
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**09/16/2003** Statement of Facts
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**09/16/2003** Opposition Document
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**09/16/2003** NOTICE OF OPPOSITION AND OPPOSITION OF DEFENDANTS TO MOTION FOR SUMMARY JUDGMENT OF PLAINTIFFS; ETC.

**09/16/2003** DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION

**07/28/2003** at 08:30 AM in Department 45
Case Management Conference (Conference-Case Management; Trial Date Set) -

**07/28/2003** Minute Order

**07/28/2003** INITIAL STATUS CONFERENCE ORDER

**07/14/2003** Case Management Statement
Filed by Defendant/Respondent

**07/14/2003** CASE MANAGEMENT STATEMENT

**07/11/2003** Case Management Statement
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**07/11/2003** CASE MANAGEMENT STATEMENT

**07/10/2003** Notice of Case Management Conference
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**07/10/2003** NOTICE OF CASE MANAGEMENT CONFERENCE

**07/07/2003** SECOND AMENDED ANSWER TO COMPLAINT

**07/07/2003** Stipulation and Order
Filed by Defendant/Respondent

**07/07/2003** Amended Answer to Complaint
Filed by Defendant/Respondent

**07/07/2003** STIPULATION TO ALLOW DEFENDANTS TO FILE A SECOND AMENDED ANSWER TO COMPLAINT

**06/30/2003** Declaration
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**06/30/2003** DECLARATIONS AND EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ETC.

**06/30/2003** NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ETC.

**06/30/2003** Motion for Summary Judgment
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**06/30/2003** SEPARATE STATEMENT OF JOHN P. THROPAY, M.D., AND MARICELA O. THROPAY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ETC.

**06/30/2003** Miscellaneous-Other
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**05/15/2003** AMENDMENT TO ANSWER TO COMPLAINT

**05/15/2003** Answer
Filed by Mahmood A. M.D. Zia (Defendant); Montebello Urological Association (Defendant)

**04/10/2003** SUMMONS

**04/10/2003** Affidavit
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**04/10/2003** SUMMONS

**04/10/2003** Affidavit
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

**04/07/2003** ANSWER TO COMPLAINT

**04/07/2003** Answer
Filed by Mahmood A. M.D. Zia (Defendant)

**03/25/2003** Notice of Case Management Conference
Filed by Clerk

**03/10/2003** COMPLAINT FOR (1) BREACH OF CONTRACT-LEASE AGREEMENT; ETC.

**03/10/2003** Complaint
Filed by John P. M.D. Thropay (Plaintiff); Maricela O. Thropay (Plaintiff)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP 09/23/2003

# Exhibit 22

**User Name:** Anna Singer

**Date and Time:** Monday, April 26, 2021 3:08:00 PM EDT

**Job Number:** 142383427

## Document (1)

1. *C609243, Thropay John P, et al vs. Murphy Evelina, et al*

   **Client/Matter:** 08840021-000001-2136

   **Search Terms:** name(john thropay)

   **Search Type:** Natural Language

   **Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| Dockets | Sources: Dockets California Superior Court; Content Type: Dockets |

# C609243, Thropay John P, et al vs. Murphy Evelina, et al

CA Superior - Los Angeles County

Los Angeles

**This case was retrieved on 04/19/2004**

## Header

**Case Number:** C609243
**Date Filed:** 07/22/1986
**Date Full Case Retrieved:** 04/19/2004
**Status:** Closed
**Misc:** (0) Unknown; Civil

## Summary

**District**: Central
**Case Type**: Civil

## Participants

| Litigants | Attorneys |
|---|---|
| ***Thropay John*** P<br>**Plaintiff** | |
| ***Thropay*** Maricela O<br>**Plaintiff** | |
| Murphy Evelina<br>**Defendant** | |
| Murphy Michael J<br>**Defendant** | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

# Exhibit 23

LexisNexis®

**User Name:** Anna Singer

**Date and Time:** Monday, April 26, 2021 3:09:00 PM EDT

**Job Number:** 142383516

## Document (1)

1. *C490992, Thropay John P vs. Spirtos Basil N, et al*

   **Client/Matter:** 08840021-000001-2136

   **Search Terms:** name(john thropay)

   **Search Type:** Natural Language

   **Narrowed by:**

| **Content Type** | **Narrowed by** |
|---|---|
| Dockets | Sources: Dockets California Superior Court; Content Type: Dockets |

# *C490992, Thropay John P vs. Spirtos Basil N, et al*

CA Superior - Los Angeles County

Los Angeles

**This case was retrieved on 04/19/2004**

## Header

**Case Number:** C490992
**Date Filed:** 03/21/1984
**Date Full Case Retrieved:** 04/19/2004
**Status:** Closed
**Misc:** (0) Unknown; Civil

## Summary

**District**: Central
**Case Type**: Civil

## Participants

| Litigants | Attorneys |
| --- | --- |
| ***Thropay*** ***John*** P<br>**Plaintiff** | |
| Spirtos Basil N<br>**Defendant** | |
| Spirtos Thelma<br>**Defendant** | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

# Exhibit 24

# CASE INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION

**Case Number:** 93U14643
THROPAY, JOHN P VS WILLIAMS, DEWEY

**Filing Courthouse:** Stanley Mosk Courthouse

**Filing Date:** 05/18/1993
**Case Type:** U.D. RESIDENTAIL - UNLAWFUL DETAINER (Limited Jurisdiction)
**Status:** Disposed

# FUTURE HEARINGS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION

None

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION

## Parties

Plaintiff: THROPAY JOHN P
Attorney: WILLIAMS & NENNEY

Defendant: WILLIAMS DEWEY

Defendant: WILLIAMS DORTHY

Defendant: RISTIC SHAWN

Defendant: RISTIC ROSIE

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION

**10/22/2008** CASE DESTROYED PURSUANT TO GC68152 D(10) & D(2)

**08/21/1997** HEARING DELETED - OFF CALENDAR

**08/21/1997** STATUS CONFERENCE HELD, MINUTE ORDER FILED

**08/21/1997** ORDER OF DISMISSAL BY COURT'S MOTION

**08/06/1997** OSC HEARING SET 08/21/97, 0830 AM, DIV 8, NOTICE FILED & MAILED

**07/13/1994** NOTICE TO PLAINTIFF: CLERK'S REVIEW MAILED

**05/19/1993** NOTICE OF UNLAWFUL DETAINER MAILED

**05/18/1993** COMPLAINT FILED