# Exhibit 25

1  SANCHEZ & AMADOR, LLP
   Richard S. Amador, Esq. (SBN 137417)
2  Marco S. Zambrano, Esq. (SBN 204370)
   725 S. Figueroa Street, Suite 3200
3  Los Angeles, California 90017
   (213) 955-7200

**FILED**

LOS ANGELES SUPERIOR COURT

MAR 1 0 2003

JOHN A. CLARKE, CLERK

C. L. Coleman

BY C. L. COLEMAN, DEPUTY

4
   Attorneys for Plaintiffs
5  John P. Thropay, M.D., and
   Maricela O. Thropay          **Case assigned to**
6                               **Judge**
7                                    Mel Recana .

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             FOR THE COUNTY OF LOS ANGELES

10

11

12  JOHN P. THROPAY, M.D., an individual, and ) CASE NO. **BC 291820**
    MARICELA O. THROPAY, an individual,      )
13                                           ) **COMPLAINT FOR (1) BREACH OF**
              Plaintiffs,                    ) **CONTRACT-LEASE AGREEMENT; (2)**
14                                           ) **RENT DUE; AND (3) ATTORNEYS'FEES**
          v.                                 ) **UNDER WRITTEN LEASE [CIV. CODE**
15                                           ) **§3302]**
    MONTEBELLO UROLOGICAL                    )
16  ASSOCIATION, a partnership; MAHMOOD A.)
    ZIA, M.D., individually, and as a partner of )
17  MONTEBELLO UROLOGICAL                    )
    ASSOCIATION; and DOES ONE through TEN )
18  inclusive,                               )
                                             )
19            Defendants.                    )
                                             )
20  _____ )

21

22

23

·24      Comes now Plaintiffs JOHN P. THROPAY, M.D., and MARICELA O. THROPAY

25  (collectively, "Plaintiffs") and allege as follows:

26      1.      Plaintiffs JOHN P. THROPAY, M.D., and MARICELA O. THROPAY, each is,

27  and at all times mentioned in this Complaint each was, an individual residing in the City of

28  Bradbury, County of Los Angeles.

                                          1

1     2.     Defendant MONTEBELLO UROLOGICAL ASSOCIATION is a business

2 organization form unknown.  Plaintiffs are informed and believe and thereupon allege that

3 Defendant MONTEBELLO UROLOGICAL ASSOCIATION, is, and at all times mentioned in

4 this Complaint was, a partnership with its principal place of business in the City of Montebello,

5 County of Los Angeles, and that Defendant MAHMOOD A. ZIA, M.D., is a partner and

6 managing agent of Defendant MONTEBELLO UROLOGICAL ASSOCIATION.

7     3.     Plaintiffs are informed and believe and thereupon allege that Defendant

8 MAHMOOD A. ZIA, M.D., is, and at all times mentioned in this Complaint was, an individual

9 residing in the County of Los Angeles.

10     4.     The true names and capacities of defendants DOES ONE through TEN are

11 unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this Complaint to allege

12 such names and capacities as soon as they are ascertained.

13     5.     On or about May 8, 1991, Plaintiffs leased to Defendant MAHMOOD A. ZIA,

14 M.D., and Defendant MONTEBELLO UROLOGICAL ASSOCIATION (collectively,

15 "Defendants") certain premises known as 111 W. Beverly Boulevard, Suite 224, Montebello,

16 California, 90640 (the "Premises"), under that certain Lease Agreement dated May 8, 1991,

17 between Plaintiffs, Defendants, and Robert Pompa, M.D. (the "Lease Agreement"), a copy of

18 which is attached hereto as **Exhibit A** and incorporated herein by this reference.

19     6.     The Lease Agreement, including one optional extension period exercised by

20 Defendants, was for a term of ten (10) years, which term commenced on August 1, 1991, and

21 expired on July 31, 2001 (the "Original Term").

22     7.     On or about August 1, 1991, Defendants entered into possession of the Premises

23 and occupied the Premises for the entire Original Term and for a period exceeding the Original

24 Term.  Specifically, Defendants remained and continued in possession of the Premises for ten

25 (10) months from the period of August 1, 2001, through on or about May 31, 2002 (the

26 "Holdover Tenancy").  The Lease Agreement provides that upon holding possession of the

27 Premises after the expiration of the Original Term, Defendants would became tenants from

28 month-to-month with all terms and conditions of the Lease Agreement remaining in effect,

Doc# 1 Page# 2 - Doc ID = 1735314733 - Doc Type = OTHE

1   except that during the Holdover Tenancy the rent payable shall be two hundred percent (200%)

2   of the rent payable for the immediately preceding month of the Original Term.

3          8.      Plaintiffs have duly performed all of the conditions of the Lease Agreement and

4   extended tenancy to be performed on Plaintiffs' part.

5          9.      Under the terms of the Lease Agreement, Defendants were required to pay to

6   Plaintiffs for rent of the Premises during the applicable period of the Original Term the amount

7   of Two Thousand Five Hundred Dollars ($2,500.00) per month, payable on the first day of each

8   month in advance. Defendants were required to pay to Plaintiffs for rent of the Premises during

9   the entire ten (10) month period of the Holdover Tenancy the amount of Five Thousand Dollars

10  ($5,000.00) per month (a rate of two hundred percent (200%) of the rent payable for the

11  immediately preceding month of the Original Term), payable on the first day of each month in

12  advance.

13         10.     During the period from January 1, 1999, through July 31, 2001, of the Original

14  Term, the total amount of rent due for the Premises was Seventy-Seven Thousand Five Hundred

15  Dollars ($77,500.00) (31 months at $2,500.00/month). Defendants paid the sum of Forty-Eight

16  Thousand Dollars ($48,000.00) for rent of the Premises for said period, and there is now due,

17  owing, and unpaid for rent under the Original Term the sum of Twenty Nine Thousand Five

18  Hundred Dollars ($29,500.00) plus interest thereon.

19         11.     During the Holdover Tenancy, the total amount of rent due for the Premises was

20  Fifty Thousand Dollars ($50,000.00) (10 months at $5,000.00/month). Defendants paid the sum

21  of Eleven Thousand Five Hundred Dollars ($11,500.00) for rent of the Premises for said period,

22  and there is now due, owing, and unpaid for rent under the Holdover Tenancy the sum of Thirty-

23  Eight Thousand Five Hundred Dollars ($38,500.00) plus interest thereon.

24         12.     The Lease Agreement provides for the payment by Defendants to Plaintiffs of late

25  charges (the "Late Charges") equal to six percent (6%) of any amounts due under the Lease

26  Agreement, including, without limitation, any amounts due under the Holdover Tenancy, that are

27  not received by Plaintiffs after such amounts become due, as more particularly set forth in the

28  Lease Agreement. Defendants have not paid any Late Charges for the amounts past due under

                                              3
           COMPLAINT FOR RENT AND ATTORNEYS' FEES UNDER WRITTEN LEASE [CIV. CODE §3302]

1   the Original Term or the Holdover Tenancy and the same are now due, owing, and unpaid in a

2   sum equal to Four Thousand Eighty Dollars ($4,080.00) ($68,000.00 at 6%).

3          13.     The Lease Agreement provides for the payment by Defendants to Plaintiffs of

4   attorneys' fees in any action brought to enforce the terms of the Lease Agreement, including,

5   without limitation, any action for payment of rent due, as more particularly set forth in the Lease

6   Agreement.

7                               PRAYER

8         WHEREFORE, Plaintiffs JOHN P. THROPAY, M.D., and MARICELA O. THROPAY

9   seek a judgment as follows:

10         1.     For damages for unpaid rent in the sum of Sixty-Eight Thousand Dollars

11   ($68,000.00).

12

13         2.     For Late Charges on said unpaid rent in a sum equal to Four Thousand Eighty

    Dollars ($4,080.00).

14

15         3.     For interest on said sums of unpaid rent and Late Charges from the date such

16   unpaid rent and Late Charges became due at a rate per annum equal to the maximum rate

17   allowed under law.

18   ///

19   ///

20   ///

21

22

23

24

25

26

27

28

                                  4

COMPLAINT FOR RENT AND ATTORNEYS' FEES UNDER WRITTEN LEASE [CIV. CODE §3302]



1     4.    For attorneys' fees and the costs of suit; and

2

3     5.    For such further relief as the Court deems just and proper.

4
                                  Respectfully submitted,

5

6    Dated: March 10, 2003              SANCHEZ & AMADOR, LLP

7

8                               Richard S. Amador
                               Marco S. Zambrano

9                               Attorneys for Plaintiffs John P. Thropay,
                               M.D., and Maricela O. Thropay

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

COMPLAINT FOR RENT AND ATTORNEYS' FEES UNDER WRITTEN LEASE [CIV. CODE §3302]

# J. M. T. PROPERTIES

FOR LEASE BETWEEN
JOHN AND MARICELA THROPAY
AND DRS. ZIA AND POMPA
111 WEST BEVERLY BOULEVARD, SUITE 224
MONTEBELLO, CA  90640

### PAY  SCHEDULE

| 1. | PAID AUGUST 1, 1991 | 13. | # 2500 AUGUST | 25. | # 2856.75 AUGUST |
|---|---|---|---|---|---|
| 2. | PAID SEPTEMBER | 14. | 2500 SEPTEMBER | 26. | 2856.75 SEPTEMBER |
| 3. | PAID OCTOBER | 15. | 2500 OCTOBER | 27. | 2856.75 OCTOBER |
| 4. | PAID NOVEMBER | 16. | 2500 NOVEMBER | 28. | 2856.75 NOVEMBER |
| 5. | 2000 DECEMBER | 17. | 2500 DECEMBER | 29. | 2856.75 DECEMBER |
| 6. | 2000 JANUARY 1992 | 18. | 2500 JAN. 1993 | 30. | 2856.75 JAN. 1994 |
| 7. | 2000 FEBRUARY | 19. | 2500 FEBRUARY | 31. | 2856.75 FEBRUARY |
| 8. | 2000 MARCH | 20. | 2500 MARCH | 32. | 2856.75 MARCH |
| 9. | 2000 APRIL | 21. | 2500 APRIL | 33. | 2856.75 APRIL |
| 10. | 2000 MAY | 22. | 2500 MAY | 34. | 2856.75 MAY |
| 11. | 2000 JUNE | 23. | 2500 JUNE | 35. | 2856.75 JUNE |
| 12. | 2000 JULY | 24. | 2500 JULY | 36. | 2856.75 JULY |

TERM OF LEASE: 5 + 5

37.    2856.75 X Annual CPI increase and added annually thereafter.

- Lessee has the option to extend this five year lease for an additional five years under the same Terms and Conditions without a written notice.

- To terminate this lease after (5) years, lessee must provide lessor with a written notice at least 90 days prior to the termination date.

Initials

### EXHIBIT D

111 WEST BEVERLY BLVD., SUITE 209, MONTEBELLO, CA 90640 • (213) 724-8777

Doc# 1 Page# 20 - Doc ID = 1735314733 - Doc Type = OT

12  Entrance Doors

13. Completion of Improvements

Lessor shall construct and complete improvements to the Premises in accordance with the plans and specifications prepared by _____
_____, dated _____
consisting of sheets _____ (the "Improvements")

14. Preparation of Plans and Specifications

Within _____ days after the date of this Lease Lessor shall prepare at its cost and deliver to Lessee for its approval _____ copies of preliminary plans and specifications for the completion of the Improvements, which plans and specifications shall itemize the work to be done by each party, including a cost estimate of any work required of Lessor in excess of Lessor's Standard Improvements. Lessee shall approve said preliminary plans and specifications and preliminary cost estimate or specify with particularity its objection thereto within _____ days following receipt thereof. Failure to so approve or disapprove within said period of time shall constitute approval thereof. If Lessee shall reject said preliminary plans and specifications either partially or totally, and they cannot in good faith be modified within ten (10) days after such rejection to be acceptable to Lessor and Lessee, this Lease shall terminate and neither party shall thereafter be obligated to the other party for any reason whatsoever having to do with this Lease, except that Lessee shall be refunded any security deposit or prepaid rent. The plans and specifications, when approved by Lessee, shall supersede any prior agreement concerning the Improvements.

15. Construction

If Lessor's cost of constructing the Improvements to the Premises exceeds the cost of Lessor's Standard Improvements, Lessee shall pay to Lessor in cash before the commencement of such construction a sum equal to such excess.

If the final plans and specifications are approved by Lessor and Lessee, and Lessee pays Lessor for such excess, then Lessor shall, at its sole cost and expense, construct the Improvements in accordance with said approved final plans and specifications and all applicable rules, regulations, laws or ordinances

16  Completion.

16.1 Lessor shall obtain a building permit to construct the Improvements as soon as possible.

16.2 Lessor shall complete the construction of the Improvements as soon as reasonably possible after the obtaining of necessary building permits.

16.3 The term "Completion," as used in this Work Letter is hereby defined to mean the date the building department of the municipality having jurisdiction of the Premises shall have made a final inspection of the Improvements and authorized a final release of restrictions on the use of public utilities in connection therewith and the same are in a broom- clean condition

16.4 Lessor shall use its best efforts to achieve Completion of the Improvements on or before the Commencement Date set forth in paragraph 1.5 of the Basic Lease Provisions or within one hundred eighty (180) days after Lessor obtains the building permit from the applicable building department, whichever is later.

16.5 In the event that the Improvements or any portion thereof have not reached Completion by the Commencement Date, this Lease shall not be invalid, but rather Lessor shall complete the same as soon thereafter as is possible and Lessor shall not be liable to Lessee for damages in any respect whatsoever.

16.6 If Lessor shall be delayed at any time in the progress of the construction of the Improvements or any portion thereof by extra work, changes in construction ordered by Lessee, or by strikes, lockouts, fire, delay in transportation, unavoidable casualties, rain or weather conditions, governmental procedures or delay, or by any other cause beyond Lessor's control, then the Commencement Date established in paragraph 1.5 of the Lease shall be extended by the period of such delay

17. Term

Upon Completion of the Improvements as defined in paragraph 16.3, above, Lessor and Lessee shall execute an amendment to the Lease setting forth the date of Tender of Possession as defined in paragraph 3.2.1 of the Lease or of actual taking of possession, whichever first occurs, as the Commencement Date of this Lease.

18. Work Done by Lessee

Any work done by Lessee shall be done only with Lessor's prior written consent and in conformity with a valid building permit and all applicable rules, regulations, laws and ordinances, and be done in a good and workmanlike manner with good and sufficient materials. All work shall be done only with union labor and only by contractors approved by Lessor, it being understood that all plumbing, mechanical, electrical wiring and ceiling work are to be done only by contractors designated by Lessor.

19. Taking of Possession of Premises

Lessor shall notify Lessee of the Estimated Completion Date at least ten (10) days before said date  Lessee shall thereafter have the right to enter the Premises to commence construction of any Improvements Lessee is to construct and to equip and furnish the Premises, as long as such entry does not interfere with Lessor's work. Lessee shall take possession of the Premises upon the tender thereof as provided in paragraph 3.2.1 of the Lease to which this Work Letter is attached. Any entry by Lessee of the Premises under this paragraph shall be under all of the terms and provisions of the Lease to which this Work Letter is attached.

20  Acceptance of Premises

Lessee shall notify Lessor in writing of any items that Lessee deems incomplete or incorrect in order for the Premises to be acceptable to Lessee within ten (10) days following Tender of Possession as set forth in paragraph 3.2.1 of the Lease to which this Work Letter is attached. Lessee shall be deemed to have accepted the Premises and approved construction if Lessee does not deliver such a list to Lessor within said number of days

## WORK LETTER TO STANDARD OFFICE LEASE

Dated APRIL 11, 1991 ___ ___ _____

By and between  JOHN & MARICELA THROPAY and  DR'S ZIA & POMPA _____

The Premises shall be constructed in accordance with Lessor's Standard Improvements, as follows:

1. Partitions

2. Wall Surfaces

3. Draperies

4. Carpeting

5. Doors

6. Electrical and Telephone Outlets

7. Ceiling

8. Lighting

9. Heating and Air Conditioning Ducts

10. Sound Proofing

11. Plumbing

c 1984 American Industrial Real Estate Association       FULL SERVICE-GROSS

Initials: ____

**EXHIBIT C**

PAGE 1 OF 2 PAGES

# RULES AND REGULATIONS FOR STANDARD OFFICE LEASE



Dated __APRIL 11, 1991__

By and Between __JOHN & MARICELA THROPAY and DR'S ZIA & POMPA__

## GENERAL RULES

1  Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2  Lessor reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety, reputation, or property of the Office Building Project and its occupants.

3  Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Office Building Project.

4  Lessee shall not keep animals or birds within the Office Building Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5  Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6  Lessee shall not alter any lock or install new or additional locks or bolts.

7  Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities. No foreign substances of any kind are to be inserted therein.

8  Lessee shall not deface the walls, partitions or other surfaces of the premises or Office Building Project.

9  Lessee shall not suffer or permit any thing in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Office Building Project.

10  Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor. Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.

11  Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.

12  Lessor reserves the right to close and lock the Building on Saturdays, Sundays and legal holidays, and on other day  '.  tween the hours of 6:00 P.M. and 6:00 A.M. of the following day. If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.

13  Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14  No window coverings, shades or awnings shall be installed or used by Lessee.

15  No Lessee, employee or invitee shall go upon the roof of the Building.

16  Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.

17  Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.

18  Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.

19  The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20  Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor or any applicable governmental agency.

21  Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.

22  Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23  Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Office Building Project and its occupants. Lessee agrees to abide by these and such rules and regulations.

## PARKING RULES

1  Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."

2  Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

3  Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges. Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.

4  Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

5  Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.

6  Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

7  Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle. Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which are assumed by the party using the parking area.

8  Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.

9  The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

10  Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.

11  Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

12  Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

Initials: [handwritten initials]

© 1984 American Industrial Real Estate Association

**FULL SERVICE-GROSS**

**EXHIBIT B**

PAGE 1 OF 1 PAGES

# STANDARD OFFICE LEASE

## FLOOR PLAN



**EXHIBIT A**

© 1984 American Industrial Real Estate Association          FULL SERVICE-GROSS



Initials:

 

43. Authority. If Lessee is a corporation, trust, or general or limited partnership, Lessee, and each individual executing this Lease on behalf of such entity represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity. If Lessee is a corporation, trust or partnership, Lessee shall, within thirty (30) days after execution of this Lease, deliver to Lessor evidence of such authority satisfactory to Lessor.

44. Conflict. Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

45. No Offer. Preparation of this Lease by Lessor or Lessor's agent and submission of same to Lessee shall not be deemed an offer to Lessee to lease. This Lease shall become binding upon Lessor and Lessee only when fully executed by both parties.

46. Lender Modification. Lessee agrees to make such reasonable modifications to this Lease as may be reasonably required by an institutional lender in connection with the obtaining of normal financing or refinancing of the Office Building Project.

47. Multiple Parties. If more than one person or entity is named as either Lessor or Lessee herein, except as otherwise expressly provided herein, the obligations of the Lessor or Lessee herein shall be the joint and several responsibility of all persons or entities named herein as such Lessor or Lessee, respectively.

48. Work Letter. This Lease is supplemented by that certain Work Letter of even date executed by Lessor and Lessee, attached hereto as Exhibit C, and incorporated herein by this reference.

49. Attachments. Attached hereto are the following documents which constitute a part of this Lease.

EXHIBIT D

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

IF THIS LEASE HAS BEEN FILLED IN IT HAS BEEN PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY THE REAL ESTATE BROKER OR ITS AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO; THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

|  LESSOR  |  LESSEE  |
|---|---|
| By John P. Thropay, M.D. | By Mahmood Zia |
| Its Owner | Its Owner |
| By | By Robert Pompa |
| Its | Its Owner |
| Executed at | Executed at |
| on | on |
| Address | Address |

© 1984 American Industrial Real Estate Association          FULL SERVICE—GROSS

PAGE 10 OF 10 PAGES

For these forms write or call the American Industrial Real Estate Association, 350 South Figueroa Street, Suite 275, Los Angeles, CA 90071. (213) 687-8777.
© 1984—By American Industrial Real Estate Association. All rights reserved. No part of these words may be reproduced in any form without permission in writing.



32.3 Lessor shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults and safes, and in the case of emergency to enter the Premises by any reasonably appropriate means, and any such entry shall not be deemed a forceable or unlawful entry or detainer of the Premises or an eviction. Lessee waives any charges for damages or injuries or interference with Lessee's property or business in connection therewith.

33. Auctions. Lessee shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the Premises or the Common Areas without first having obtained Lessor's prior written consent. Notwithstanding anything to the contrary in this Lease, Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to grant such consent. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease.

34. Signs. Lessee shall not place any sign upon the Premises or the Office Building Project without Lessor's prior written consent. Under no circumstances shall Lessee place a sign on any roof of the Office Building Project.

35. Merger. The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, or a termination by Lessor, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subtenancies or may, at the option of Lessor, operate as an assignment to Lessor of any or all of such subtenancies.

36. Consents. Except for paragraphs 33 (auctions) and 34 (signs) hereof, wherever in this Lease the consent of one party is required to an act of the other party such consent shall not be unreasonably withheld or delayed.

37. Guarantor. In the event that there is a guarantor of this Lease, said guarantor shall have the same obligations as Lessee under this Lease.

38. Quiet Possession. Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessee shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease. The individuals executing this Lease on behalf of Lessor represent and warrant to Lessee that they are fully authorized and legally capable of executing this Lease on behalf of Lessor and that such execution is binding upon all parties holding an ownership interest in the Office Building Project.

38. Options.

39.1 Definition. As used in this paragraph the word "Option" has the following meaning: (1) the right or option to extend the term of this Lease or to renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (2) the option of right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Office Building Project or other property of Lessor or the right of first offer to lease other space within the Office Building Project or other property of Lessor; (3) the right of option to purchase the Premises or the Office Building Project, or the right of first refusal to purchase the Premises or the Office Building Project or the right of first offer to purchase the Premises or the Office Building Project, or the right or option to purchase other property of Lessor, or the right of first refusal to purchase other property of Lessor or the right of first offer to purchase other property of Lessor.

39.2 Options Personal. Each Option granted to Lessee in this Lease is personal to the original Lessee and may be exercised only by the original Lessee while occupying the Premises who does so without the intent of thereafter assigning this Lease or subletting the Premises or any portion thereof, and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Lessee; provided, however that an Option may be exercised by or assigned to any Lessee Affiliate as defined in paragraph 12.2 of this Lease. The Options, if any, herein granted to Lessee are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise.

39.3 Multiple Options. In the event that Lessee has any multiple options to extend or renew this Lease a later option cannot be exercised unless the prior option to extend or renew this ~~~~ se has been so exercised.

39.4 Effect of Default on Options.

(a) Lessee shall have no right to exercise an Option, notwithstanding any provision in the grant of Option to the contrary, (i) during the time commencing from the date Lessee gives to Lessee a notice of default pursuant to paragraph 13.1(c) or 13.1(d) and continuing until the noncompliance alleged in said notice of default is cured, or (ii) during the period of time commencing on the day after a monetary obligation to Lessor is due from Lessee and unpaid (without any necessity for notice thereof to Lessee) and continuing until the obligation is paid, or (iii) in the event that Lessor has given to Lessee three or more notices of default under paragraph 13.1(c), or paragraph 13.1(d), whether or not the defaults are cured, during the 12 month period of time immediately prior to the time that Lessee attempts to exercise the subject Option, (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in default of any of the terms, covenants or conditions of this Lease.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of paragraph 39.4(a).

(c) All rights of Lessee under the provisions of an Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and during the term of this Lease, (i) Lessee fails to pay to Lessor a monetary obligation of Lessee for a period of thirty (30) days after such obligation becomes due (without any necessity of Lessor to give notice thereof to Lessee), or (ii) Lessee fails to commence to cure a default specified in paragraph 13.1(d) within thirty (30) days after the date that Lessor gives notice to Lessee of such default and/or Lessee fails thereafter to diligently prosecute said cure to completion, or (iii) Lessor gives to Lessee three or more notices of default under paragraph 13.1(c), or paragraph 13.1(d), whether or not the defaults are cured, or (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in default of any of the terms, covenants and conditions of this Lease.

40. Security Measures—Lessor's Reservations.

40.1 Lessee hereby acknowledges that Lessor shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Office Building Project. Lessee assumes all responsibility for the protection of Lessee, its agents, and invitees and the property of Lessee and of Lessee's agents and invitees from acts of third parties. Nothing herein contained shall prevent Lessor, at Lessor's sole option, from providing security protection for the Office Building Project or any part thereof, in which event the cost thereof shall be included within the definition of Operating Expenses, as set forth in paragraph 4.2(b).

40.2 Lessor shall have the following rights:

(a) To change the name, address or title of the Office Building Project or building in which the Premises are located upon not less than 90 days prior written notice;

(b) To, at Lessee's expense, provide and install Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate;

(c) To permit any lessee the exclusive right to conduct any business as long as such exclusive does not conflict with any rights expressly given herein;

(d) To place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the buildings or the Office Building Project or on pole signs in the Common Areas;

40.3 Lessee shall not:

(a) Use a representation (photographic or otherwise) of the Building or the Office Building Project or their name(s) in connection with Lessee's business;

(b) Suffer or permit anyone, except in emergency, to go upon the roof of the Building.

41. Easements.

41.1 Lessor reserves to itself the right, from time to time, to grant such easements, rights and dedications that Lessor deems necessary or desirable, and to cause the recordation of Parcel Maps and restrictions, so long as such easements, rights, dedications, Maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee shall sign any of the aforementioned documents upon request of Lessor and failure to do so shall constitute a material default of this Lease by Lessee without the need for further notice to Lessee.

41.2 The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

42. Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment, and there shall survive the right on the part of said party to institute suit for recovery of such sum. It it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

Initials: ___



to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to the responding party's knowledge, any uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project or of the business of Lessee.

(b) At the requesting party's option, the failure to deliver such statement within such time shall be a material default of this Lease by the party who is to respond, without any further notice to such party, or it shall be conclusive upon such party that (i) this Lease is in full force and effect, without modification except as may be represented by the requesting party, (ii) there are no uncured defaults in the requesting party's performance, and (iii) if Lessor is the requesting party, not more than one month's rent has been paid in advance.

(c) If Lessor desires to finance, refinance, or sell the Office Building Project, or any part thereof, Lessee hereby agrees to deliver to any lender or purchaser designated by Lessor such financial statements of Lessee as may be reasonably required by such lender or purchaser. Such statements shall include the past three (3) years' financial statements of Lessee. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17. **Lessor's Liability.** The term "Lessor" as used herein shall mean only the owner or owners, at the time in question, of the fee title or a lessee's interest in a ground lease of the Office Building Project, and except as expressly provided in paragraph 15, in the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers the then grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership.

18. **Severability.** The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

19. **Interest on Past-due Obligations.** Except as expressly herein provided, any amount due to Lessor not paid when due shall bear interest at the maximum rate then allowable by law or judgments from the date due. Payment of such interest shall not excuse or cure any default by Lessee under this Lease; provided, however, that interest shall not be payable on late charges incurred by Lessee nor on any amounts upon which late charges are paid by Lessee.

20. **Time of Essence.** Time is of the essence with respect to the obligations to be performed under this Lease.

21. **Additional Rent.** All monetary obligations of Lessee to Lessor under the terms of this Lease, including but not limited to Lessee's Share of Operating Expense Increase and any other expenses payable by Lessee hereunder shall be deemed to be rent.

22. **Incorporation of Prior Agreements; Amendments.** This Lease contains all agreements of the parties with respect to any matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. This Lease may be modified in writing only, signed by the parties in interest at the time of the modification. Except as otherwise stated in this Lease, Lessee hereby acknowledges that neither the real estate broker listed in paragraph 15 hereof nor any cooperating broker on this transaction nor the Lessor or any employee or agents of any of said persons has made any oral or written warranties or representations to Lessee relative to the condition or use by Lessee of the Premises or the Office Building Project and Lessee acknowledges that Lessee assumes all responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and the compliance thereof with all applicable laws and regulations in effect during the term of this Lease.

23. **Notices.** Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery or by certified or registered mail, and shall be deemed sufficiently given if delivered or addressed to Lessee or to Lessor at the address noted below or adjacent to the signature of the respective parties, as the case may be. Mailed notices shall be deemed given upon actual receipt at the address required, or forty-eight hours following deposit in the mail, postage prepaid, whichever first occurs. Either party may by notice to the other specify a different address for notice purposes except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice purposes. A copy of all notices required or permitted to be given to Lessor hereunder shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate by notice to Lessee.

24. **Waivers.** No waiver by Lessor of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Lessee of the same or any other provision. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to or approval of any subsequent act by Lessee. The acceptance of rent hereunder by Lessor shall not be a waiver of any preceding breach by Lessee of any provision hereof, other than the failure of Lessee to pay the particular rent so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

25. **Recording.** Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a "short form" memorandum of this Lease for recording purposes.

26. **Holding Over.** If Lessee, with Lessor's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Lessee, except that the rent payable shall be two hundred percent (200%) of the rent payable immediately preceding the termination date of this Lease, and all Options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month tenancy.

27. **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28. **Covenants and Conditions.** Each provision of this Lease performable by Lessee shall be deemed both a covenant and a condition.

29. **Binding Effect; Choice of Law.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, successors and assigns. This Lease shall be governed by the laws of the State where the Office Building Project is located and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Office Building Project is located.

30. **Subordination.**

(a) This Lease, and any Option or right of first refusal granted hereby, at Lessor's option, shall be subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation or security now or hereafter placed upon the Office Building Project and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Lessee's right to quiet possession of the Premises shall not be disturbed if Lessee is not in default and so long as Lessee shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. If any mortgagee, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Lessee, this Lease and any Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof.

(b) Lessee agrees to execute any documents required to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be. Lessee's failure to execute such documents within ten (10) days after written demand shall constitute a material default by Lessee hereunder without further notice to Lessee or, at Lessor's option, Lessor shall execute such documents on behalf of Lessee as Lessee's attorney-in-fact. Lessee does hereby make, constitute and irrevocably appoint Lessor as Lessee's attorney-in-fact and in Lessee's name, place and stead, to execute such documents in accordance with this paragraph 30(b).

31. **Attorneys' Fees.**

31.1 If either party or the broker(s) named herein bring an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, trial or appeal thereon, shall be entitled to his reasonable attorneys' fees to be paid by the losing party as fixed by the court in the same or a separate suit, and whether or not such action is pursued to decision or judgment. The provisions of this paragraph shall inure to the benefit of the broker named herein who seeks to enforce a right hereunder.

31.2 The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred in good faith.

31.3 Lessor shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notice of default and consultations in connection therewith, whether or not a legal transaction is subsequently commenced in connection with such default.

32. **Lessor's Access.**

32.1 Lessor and Lessor's agents shall have the right to enter the Premises at reasonable times for the purpose of inspecting the same, performing any services required of Lessor, showing the same to prospective purchasers, lenders, or lessees, taking such safety measures, erecting such scaffolding or other necessary structures, repairs, improvements or additions to the Premises or to the Office Building Project as Lessor may reasonably deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. Lessor may at any time place on or about the Premises or the Building any ordinary "For Sale" signs and Lessor may at any time during the last 120 days of the term hereof place on or about the Premises any ordinary "For Lease" signs.

32.2 All activities of Lessor pursuant to this paragraph shall be without abatement of rent, nor shall Lessor have any liability to Lessee for the same.

Initials: [signature marks]

of 25)

(d) The failure by Lessee to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Lessee other than those referenced in subparagraphs (b) and (c), above, where such failure shall continue for a period of thirty (30) days after written notice thereof from Lessor to Lessee, provided, however, that if the nature of Lessee's non-compliance is such that more than thirty (30) days are reasonably required for its cure, then Lessee shall not be deemed to be in default if Lessee commenced such cure within said thirty (30) day period and thereafter diligently pursues such cure to completion. To the extent permitted by law such thirty (30) day notice shall constitute the sole and exclusive notice required to be given to Lessee under applicable Unlawful Detainer statutes.

(e) (i) The making by Lessee of any general arrangement or general assignment for the benefit of creditors; (ii) Lessee becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days; (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days. In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f) The discovery by Lessor that any financial statement given to Lessor by Lessee, or its successor in interest or by any guarantor of Lessee's obligation hereunder, was materially false.

**13.2 Remedies.** In the event of any material default or breach of this Lease by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and any real estate commission actually paid; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided; that portion of the leasing commission paid by Lessor pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b) Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have vacated or abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder.

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located. Unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the date due at the maximum rate then allowable by law.

**13.3 Default by Lessor.** Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within a reasonable time, but in no event later than thirty (30) days after written notice by Lessee to Lessor and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Lessee in writing, specifying wherein Lessor has failed to perform such obligation; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are required for performance then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently pursues the same to completion.

**13.4 Late Charges.** Lessee hereby acknowledges that late payment by Lessee to Lessor of Base Rent, Lessee's Share of Operating Expense Increase or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Office Building Project. Accordingly, if any installment of Base Rent, Operating Expense Increase, or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within ten (10) days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a late charge equal to 6% of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.

**14. Condemnation.** If the Premises or any portion thereof or the Office Building Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs, provided that if so much of the Premises or the Office Building Project are taken by such condemnation as would substantially and adversely affect the operation and profitability of Lessee's business conducted from the Premises, Lessee shall have the option, to be exercised only in writing within thirty (30) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession) to terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent and Lessee's Share of Operating Expense Increase shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises. Common Areas taken shall be excluded from the Common Areas usable by Lessee and no reduction of rent shall occur with respect thereto or by reason thereof. Lessor shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Lessee of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Office Building Project. Any award for the taking of all or any part of the Premises or the Office Building Project under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Lessee shall be entitled to any separate award for loss of or damage to Lessee's trade fixtures, removable personal property and unamortized tenant improvements that have been paid for by Lessee. For that purpose the cost of such improvements shall be amortized over the original term of this Lease excluding any options. In the event that this Lease is not terminated by reason of such condemnation, Lessor shall to the extent of severance damages received by Lessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Lessee has been reimbursed therefor by the condemning authority. Lessee shall pay any amount in excess of such severance damages required to complete such repair.

**15. Broker's Fee.**

(a) The brokers involved in this transaction are _____ N/A _____

as "listing broker" and _____ N/A _____ as "cooperating broker." licensed real estate broker(s). A "cooperating broker" is defined as any broker other than the listing broker entitled to a share of any commission arising under this Lease. Upon execution of this Lease by both parties, Lessor shall pay to said brokers jointly, or in such separate shares as they may mutually designate in writing, a fee as set forth in a separate agreement between Lessor and said broker(s), or in the event there is no separate

agreement between Lessor and said broker(s), the sum of $ _____ -0- _____ for brokerage services rendered by said broker(s) to Lessor in this transaction.

(b) Lessor further agrees that (i) if Lessee exercises any Option, as defined in paragraph 39.1 of this Lease, which is granted to Lessee under this Lease, or any subsequently granted option during the term of this Lease, or (ii) if Lessee acquires any rights to the Premises or other premises described in this Lease which are substantially similar to what Lessee would have acquired had the option herein granted to Lessee been exercised, or (iii) if Lessee remains in possession of the Premises after the expiration of the term of this Lease after having failed to exercise an Option, or (iv) if said broker(s) are the procuring cause of any other lease or sale entered into between the parties pertaining to the Premises and/or any adjacent property in which Lessor has an interest, or (v) if the Base Rent is increased, whether by agreement or operation of an escalation clause contained herein, then as to any of said transactions or rent increases, Lessor shall pay said broker(s) a fee in accordance with the schedule of said broker(s) in effect at the time of execution of this Lease. Said fee shall be paid at the time such increased rental is determined.

(c) Lessor agrees to pay said fee not only on behalf of Lessor but also on behalf of any person, corporation, association, or other entity having an ownership interest in said real property or any part thereof, when such fee is due hereunder. Any transferee of Lessor's interest in this Lease, whether such transfer is by agreement or by operation of law shall be deemed to have assumed Lessor's obligation under this paragraph 15. Each listing and cooperating broker shall be a third party beneficiary of the provisions of this paragraph 15 to the extent of their interest in any commission arising under this Lease and may enforce that right directly against Lessor; provided, however, that all brokers having a right to any part of such total commission shall be a necessary party to any suit with respect thereto.

(d) Lessee and Lessor each represent and warrant to the other that neither has had any dealings with any person, firm, broker or finder (other than the person(s), if any, whose names are set forth in paragraph 15(a), above) in connection with the negotiation of this Lease and/or the consummation of the transaction contemplated hereby, and no other broker or other person, firm or entity is entitled to any commission or finder's fee in connection with said transaction and Lessee and Lessor do each hereby indemnify and hold the other harmless from and against any costs, expenses, attorneys' fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party.

**16. Estoppel Certificate.**

(a) Each party (as "responding party") shall at any time upon not less than ten (10) days' prior written notice from the other party ("requesting party") execute, acknowledge and deliver to the requesting party a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date

© 1984 American Industrial Real Estate Association

FULL SERVICE—GROSS

Initials: ___

Doc# 1 Page# 12 - Doc ID = 1735314733 - Do



11.4 Excess Usage by Lessee. Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security services, over standard office usage for the Office Building Project. Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee. Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5 Interruptions. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

## 12. Assignment and Subletting.

12.1 Lessor's Consent Required. Lessee shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Lessee's interest in the Lease or in the Premises, without Lessor's prior written consent, which Lessor shall not unreasonably withhold. Lessor shall respond to Lessee's request for consent hereunder in a timely manner and any attempted assignment, transfer, mortgage, encumbrance or subletting without such consent shall be void, and shall constitute a material default and breach of this Lease without the need for notice to Lessee under paragraph 13.1 "Transfer" within the meaning of this paragraph 12 shall include the transfer or transfers aggregating: (a) if Lessee is a corporation, more than twenty-five percent (25%) of the voting stock of such corporation, or (b) if Lessee is a partnership, more than twenty-five percent (25%) of the profit and loss participation in such partnership.

12.2 Lessee Affiliate. Notwithstanding the provisions of paragraph 12.1 hereof, Lessee may assign or sublet the Premises, or any portion thereof, without Lessor's consent, to any corporation which controls, is controlled by or is under common control with Lessee, or to any corporation resulting from the merger or consolidation with Lessee, or to any person or entity which acquires all the assets of Lessee as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Lessee Affiliate"; provided that before such assignment shall be effective, (a) said assignee shall assume, in full, the obligations of Lessee under this Lease and (b) Lessor shall be given written notice of such assignment and assumption. Any such assignment shall not, in any way, affect or limit the liability of Lessee under the terms of this Lease even if after such assignment or subletting the terms of this Lease are materially changed or altered without the consent of Lessee, the consent of whom shall not be necessary.

12.3 Terms and Conditions Applicable to Assignment and Subletting.

(a) Regardless of Lessor's consent, no assignment or subletting shall release Lessee of Lessee's obligations hereunder or alter the primary liability of Lessee to pay the rent and other sums due Lessor hereunder including Lessee's Share of Operating Expense increase, and to perform all other obligations to be performed by Lessee hereunder.

(b) Lessor may accept rent from any person other than Lessee pending approval or disapproval of such assignment.

(c) Neither a delay in the approval or disapproval of such assignment or subletting, nor the acceptance of rent, shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for the breach of any of the terms or conditions of this paragraph 12 or this Lease.

(d) If Lessee's obligations under this Lease have been guaranteed by third parties, then an assignment or sublease, and Lessor's consent thereto shall not be effective unless said guarantors give their written consent to such sublease and the terms thereof.

(e) The consent by Lessor to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting by Lessee or to any subsequent or successive assignments or subletting by the subleases. However, Lessor may consent to subsequent subletting and assignments of the sublease or any amendments or modifications thereto without notifying Lessee or anyone else liable on the Lease or sublease and without obtaining their consent and such action shall not relieve such persons from liability under this Lease or said sublease; however, such persons shall not be responsible to the extent any such amendment or modification enlarges or increases the obligations of the Lessee or sublessee under this Lease or such sublease.

(f) In the event of any default under this Lease, Lessor may proceed directly against Lessee, any guarantors or any one else responsible for the performance of this Lease, including the sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor or Lessee.

(g) Lessor's written consent to any assignment or subletting of the Premises by Lessee shall not constitute an acknowledgement that no default then exists under this Lease of the obligations to be performed by Lessee nor shall such consent be deemed a waiver of any then existing default, except as may be otherwise stated by Lessor at the time.

(h) The discovery of the fact that any financial statement relied upon by Lessor in giving its consent to an assignment or subletting was materially false shall, at Lessor's election, render Lessor's said consent null and void.

12.4 Additional Terms and Conditions Applicable to Subletting. Regardless of Lessor's consent, the following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all rentals and income arising from any sublease heretofore or hereafter made by Lessee, and Lessor may collect such rent and income and apply same toward Lessee's obligations under this Lease; provided, however, that until a default shall occur in the performance of Lessee's obligations under this Lease, Lessee may receive, collect and enjoy the rents accruing under such sublease. Lessor shall not, by reason of this or any other assignment of such sublease to Lessor nor by reason of the collection of the rents from a sublessee, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee under such sublease. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a default exists in the performance of Lessee's obligations under this Lease, to pay to Lessor the rents due and to become due under the sublease. Lessee agrees that such sublessee shall have the right to rely upon any such statement and request from Lessor, and that such sublessee shall pay such rents to Lessor without any obligation or right to inquire as to whether such default exists and notwithstanding any notice from or claim from Lessee to the contrary whatsoever. Lessee shall have no right or claim against said sublessee, or, until the default has been cured, against Lessor for any such sublessee to Lessor.

(b) No sublease entered into by Lessee shall be effective unless and until it has been approved in writing by Lessor. In entering into any sublease, Lessee shall use only such form of sublease as is satisfactory to Lessor, and once approved by Lessor, such sublease shall not be changed or modified without Lessor's prior written consent. Any sublease shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Lessor, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Lessee other than such obligations as are contrary to or inconsistent with provisions contained in a sublease to which Lessor has expressly consented in writing.

(c) In the event Lessee shall default in the performance of its obligations under this Lease, Lessor at its option and without any obligation to do so, may require any sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of Lessee under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to Lessee or for any other prior defaults of Lessee under such sublease.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) With respect to any subletting to which Lessor has consented, Lessor agrees to deliver a copy of any notice of default by Lessee to the sublessee. Such sublessee shall have the right to cure a default of Lessee within three (3) days after service of said notice of default upon such sublessee, and the sublessee shall have a right of reimbursement and offset from and against Lessee for any such defaults cured by the sublessee.

12.5 Lessee's Expenses. In the event Lessee shall assign or sublet the Premises or request the consent of Lessor to any assignment or subletting or if Lessee shall request the consent of Lessor for any act Lessee proposes to do then Lessee shall pay Lessor's reasonable costs and expenses incurred in connection therewith, including attorneys', architects', engineers' or other consultants' fees.

12.6 Conditions to Consent. Lessor reserves the right to condition any approval to assign or sublet upon Lessor's determination that (a) the proposed assignee or sublessee shall conduct a business on the Premises of a quality substantially equal to that of Lessee and consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusives or rights then held by other tenants, and (b) the proposed assignee or sublessee be at least as financially responsible as Lessee was expected to be at the time of its execution of this Lease or of such assignment or subletting, whichever is greater.

## 13. Default; Remedies.

13.1 Default. The occurrence of any one or more of the following events shall constitute a material default of this Lease by Lessee:

(a) The vacation or abandonment of the Premises by Lessee. Vacation of the Premises shall include the failure to occupy the Premises for a continuous period of sixty (60) days or more, whether or not the rent is paid.

(b) The breach by Lessee of any of the covenants, conditions or provisions of paragraphs 7.3(a), (b) or (d) (alterations), 12.1 (assignment or subletting), 13.1(a) (vacation or abandonment), 13.1(e) (insolvency), 13.1(f) (false statement), 16(a) (estoppel certificate), 30(b) (subordination), 33 (auctions), or 41.1 (easements), all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice by Lessor to Lessee thereof.

(c) The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Lessor to Lessee. In the event that Lessor serves Lessee with a Notice to Pay Rent or Quit pursuant to applicable Unlawful Detainer statutes such Notice to Pay Rent or Quit shall also constitute the notice required by this subparagraph.

© 1984 American Industrial Real Estate Association

FULL SERVICE—GROSS

Initials: ____

Doc# 1 Page# 11 — Doc ID = 1735314733 — Doc Type = OTHE...



9.2  **Premises Damage; Premises Building Partial Damage.**

(a) Insured Loss. Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is an Insured Loss and which falls into the classification of either Premises Damage or Premises Building Partial Damage, then Lessor shall, as soon as reasonably possible and to the extent the required materials and labor are readily available through usual commercial channels, at Lessor's expense, repair such damage (but not Lessee's fixtures, equipment or tenant improvements originally paid for by Lessee) to its condition existing at the time of the damage, and this Lease shall continue in full force and effect.

(b) Uninsured Loss. Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is not an Insured Loss and which falls within the classification of Premises Damage or Premises Building Partial Damage, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), which damage prevents Lessee from making any substantial use of the Premises, Lessor may at Lessor's option either (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of the occurrence of such damage of Lessor's intention to cancel and terminate this Lease as of the date of the occurrence of such damage, in which event this Lease shall terminate as of the date of the occurrence of such damage.

9.3  Premises Building Total Destruction; Office Building Project Total Destruction. Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage, whether or not it is an Insured Loss, which falls into the classifications of either (i) Premises Building Total Destruction, or (ii) Office Building Project Total Destruction, then Lessor may at Lessor's option either (i) repair such damage or destruction as soon as reasonably possible at Lessor's expense (to the extent the required materials are readily available through usual commercial channels) to its condition existing at the time of the damage but not Lessee's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of occurrence of such damage of Lessor's intention to cancel and terminate this Lease, in which case this Lease shall terminate as of the date of the occurrence of such damage.

9.4  **Damage Near End of Term.**

(a) Subject to paragraph 9.4(b), if at any time during the last twelve (12) months of the term of this Lease there is substantial damage to the Premises, Lessor may at Lessor's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Lessee of Lessor's election to do so within 30 days after the date of occurrence of such damage.

(b) Notwithstanding paragraph 9.4(a), in the event that Lessee has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Lessee shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease. If Lessee duly exercises such option during said twenty (20) day period, Lessor shall, at Lessor's expense, repair such damage, but not Lessee's fixtures, equipment or tenant improvements, as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option during said twenty (20) day period, then Lessor may at Lessor's option terminate and cancel this Lease as of the expiration of said twenty (20) day period by giving written notice to Lessee of Lessor's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary.

9.5  **Abatement of Rent; Lessee's Remedies.**

(a) In the event Lessor repairs or restores the Building or Premises pursuant to the provisions of this paragraph 9, and any part of the Premises are not usable (including loss of use due to loss of access or essential services), the rent payable hereunder (including Lessee's Share of Operating Expense Increase) for the period during which such damage, repair or restoration continues shall be abated, provided (1) the damage was not the result of the negligence of Lessee, and (2) such abatement shall only be to the extent the operation and profitability of Lessee's business as operated from the Premises is adversely affected. Except for such abatement of rent, if any, Lessee shall have no claim against Lessor for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b) If Lessor shall be obligated to repair or restore the Premises or the Building under the provisions of this Paragraph 9 and shall not commence such repair or restoration within ninety (90) days after such occurrence, or if Lessor shall not complete the restoration and repair within six (6) months after such occurrence, Lessee may at Lessee's option cancel and terminate this Lease by giving Lessor written notice of Lessee's election to do so at any time prior to the commencement or completion, respectively, of such repair or restoration. In such event this Lease shall terminate as of the date of such notice.

(c) Lessee agrees to cooperate with Lessor in connection with any such restoration and repair, including but not limited to the approval and/or execution of plans and specifications required.

9.6  Termination—Advance Payments. Upon termination of this Lease pursuant to this paragraph 9, an equitable adjustment shall be made concerning advance rent and any advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's security deposit as has not thereto'ore been applied by Lessor.

9.7  Waiver. Lessor and Lessee waive the provisions of any statute which relate to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

10. **Real Property Taxes.**

10.1  Payment of Taxes. Lessor shall pay the real property tax, as defined in paragraph 10.3, applicable to the Office Building Project subject to reimbursement by Lessee of Lessee's Share of such taxes in accordance with the provisions of paragraph 4.2, except as otherwise provided in paragraph 10.2.

10.2  Additional Improvements. Lessee shall not be responsible for paying any increase in real property tax specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Office Building Project by other lessees or by Lessor for the exclusive enjoyment of any other lessee. Lessee shall, however, pay to Lessor at the time that Operating Expenses are payable under paragraph 4.2(c) the entirety of any increase in real property tax if assessed solely by reason of additional improvements placed upon the Premises by Lessee or at Lessee's request.

10.3  Definition of "Real Property Tax." As used herein, the term "real property tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Office Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Lessor in the Office Building Project or in any portion thereof, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Office Building Project. The term "real property tax" shall also include any tax, fee, levy, assessment or charge (i) in substitution of, partially or totally, any tax, fee, levy, assessment or charge hereinabove included within the definition of "real property tax," or (ii) the nature of which was hereinbefore included within the definition of "real property tax," or (iii) which is imposed for a service or right not charged prior to June 1, 1978, or if previously charged, has been increased since June 1, 1978, or (iv) which is imposed as a result of a change in ownership, as defined by applicable local statutes for property tax purposes, of the Office Building Project or which is added to a tax or charge hereinbefore included within the definition of real property tax by reason of such change of ownership, or (v) which is imposed by reason of this transaction, any modifications or changes hereto, or any transfers hereof.

10.4  Joint Assessment. If the improvements or property, the taxes for which are to be paid separately by Lessee under paragraph 10.2 or 10.5 are not separately assessed, Lessee's portion of that tax shall be equitably determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5  **Personal Property Taxes.**

(a) Lessee shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Lessee contained in the Premises or elsewhere.

(b) If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay to Lessor the taxes attributable to Lessee within ten (10) days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11. **Utilities.**

11.1  Services Provided by Lessor. Lessor shall provide heating, ventilation, air conditioning, and janitorial service as reasonably required, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.

11.2  Services Exclusive to Lessee. Lessee shall pay for all water, gas, heat, light, power, telephone and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon. If any such services are not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges jointly metered with other premises in the Building.

11.3  Hours of Service. Said services and utilities shall be provided during generally accepted business days and hours or such other days or hours as may hereafter be set forth. Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

© 1984 American Industrial Real Estate Association

**FULL SERVICE—GROSS**

PAGE 5 OF 10 PAGES

Initials: ____

any such adverse judgment that may be rendered thereon before the enforcement thereof against the Lessor or the Premises, the Building or the Office Building Project, upon the condition that if Lessor shall require, Lessee shall furnish to Lessor a surety bond satisfactory to Lessor in an amount equal to such contested ten claim or demand indemnifying Lessor against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien or claim. In addition, Lessor may require Lessee to pay Lessor's reasonable attorneys' fees and costs in participating in such action if Lessor shall declare it is to Lessor's best interest so to do

(e) All alterations, improvements, additions and Utility Installations (whether or not such Utility Installations constitute trade fixtures of Lessee), which may be made to the Premises by Lessee, including but not limited to, floor coverings, panelings, doors, drapes, built-ins, moldings, sound attenuation and light and telephone or communication systems, conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and of good and sufficient quality and materials and shall be the property of Lessor and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Lessor requires their removal pursuant to paragraph 7.3(a). Provided Lessee is not in default, notwithstanding the provisions of this paragraph 7.3(e), Lessee's personal property and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises or the Building, and other than Utility Installations, shall remain the property of Lessee and may be removed by Lessee subject to the provisions of paragraph 7.2.

(f)  Lessee shall provide Lessor with as-built plans and specifications for any alterations, improvements, additions or Utility Installations.

7.4  Utility Additions. Lessor reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Lessor or Lessee, or any other lessee of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, communication systems, and fire protection and detection systems, so long as such installations do not unreasonably interfere with Lessee's use of the Premises.

**8.  Insurance; Indemnity.**

8.1  Liability Insurance—Lessee. Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Comprehensive General Liability insurance utilizing an Insurance Services Office standard form with Broad Form General Liability Endorsement (GL0404), or equivalent, in an amount of not less than $1,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Lessor and shall insure Lessee with Lessor as an additional insured against liability arising out of the use, occupancy or maintenance of the Premises. Compliance with the above requirement shall not, however, limit the liability of Lessee hereunder.

8.2  Liability Insurance—Lessor. Lessor shall obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Broad Form Property Damage Insurance, plus coverage against such other risks Lessor deems advisable from time to time, insuring Lessor, but not Lessee, against liability arising out of the ownership, use, occupancy or maintenance of the Office Building Project in an amount not less than $5,000,000.00 per occurrence.

8.3  Property Insurance—Lessee. Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to Lessee's personal property, fixtures, equipment and tenant improvements in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing Insurance Services Office standard form, or equivalent, providing protection against loss by fire and extended coverage perils, vandalism, malicious mischief, sprinkler leakage and earthquake sprinkler leakage endorsements, in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Lessee's personal property, fixtures, equipment and tenant improvements.

8.4  Property Insurance—Lessor. Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Office Building Project improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements, in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing Insurance Services Office standard form, or equivalent, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and such other perils as Lessor deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Lessor shall obtain and keep in force, during the term of this Lease, a policy of rental value insurance covering a period of one year, with loss payable to Lessor, which insurance shall also cover all Operating Expenses for said period. Lessee will not be named in any such policies carried by Lessor and shall have no right to any proceeds therefrom. The policies required by these paragraphs 8.2 and 8.4 shall contain such deductibles as Lessor or the aforesaid lender may determine. In the event that the Premises shall suffer an insured loss as defined in paragraph 9.1(f) hereof, the deductible amounts under the applicable insurance policies shall be deemed an Operating Expense. Lessee shall not do or permit to be done anything which shall invalidate the insurance policies carried by Lessor. Lessee shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Lessor's insurance carrier as being caused by the nature of Lessee's occupancy or any act or omission of Lessee.

8.5  Insurance Policies. Lessee shall deliver to Lessor copies of liability insurance policies required under paragraph 8.1 or certificates evidencing the existence and amounts of such insurance within ten (10) days after the Commencement Date of this Lease. No such policy shall be cancellable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Lessor. Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with renewals thereof.

8.6  Waiver of Subrogation. Lessee and Lessor each hereby release and relieve the other, and waive their entire right of recovery against the other, for direct or consequential loss or damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Lessor or Lessee or their agents, employees, contractors and/or invitees. If necessary all property insurance policies required under this Lease shall be endorsed to so provide.

8.7  Indemnity. Lessee shall indemnify and hold harmless Lessor and its agents, Lessor's master or ground lessor, partners and lenders, from and against any and all claims for damage to the person or property of anyone or any entity arising from Lessee's use of the Office Building Project, or from the conduct of Lessee's business or from any activity, work or things done, permitted or suffered by Lessee in or about the Premises or elsewhere and shall further indemnify and hold harmless Lessor from and against any and all claims, costs and expenses arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any act or omission of Lessee, or any of Lessee's agents, contractors, employees, or invitees, and from and against all costs, attorney's fees, expenses and liabilities incurred by Lessor in the result of any such use, conduct, activity, work, things done, permitted or suffered, breach, default or omission and in dealing reasonably therewith, including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein, and in case any action or proceeding be brought against Lessor by reason of any such matter, Lessee upon notice from Lessor shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be so indemnified. Lessee, as a material part of the consideration to Lessor, hereby assumes all risk of damage to property of Lessee or injury to persons, in, upon or about the Office Building Project arising from any cause and Lessee hereby waives all claims in respect thereof against Lessor

8.8  Exemption of Lessor from Liability. Lessee hereby agrees that Lessor shall not be liable for injury to Lessee's business or any loss of income therefrom or for loss of or damage to the goods, wares, merchandise or other property of Lessee, Lessee's employees, invitees, customers, or any other person in or about the Premises or the Office Building Project, nor shall Lessor be liable for injury to the person of Lessee, Lessee's employees, agents or contractors, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Office Building Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Office Building Project, or of the equipment, fixtures or appurtenances applicable thereto, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible, Lessor shall not be liable for any damages arising from any act or neglect of any other lessee, occupant or user of the Office Building Project, nor from the failure of Lessor to enforce the provisions of any other lease of any other lessee of the Office Building Project.

8.9  No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified in this paragraph 8 are adequate to cover Lessee's property or obligations under this Lease.

**9.  Damage or Destruction.**

9.1  Definitions.

(a)  "Premises Damage" shall mean if the Premises are damaged or destroyed to any extent.

(b)  "Premises Partial Damage" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is less than fifty percent (50%) of the then Replacement Cost of the building.

(c)  "Premises Building Total Destruction" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is fifty percent (50%) or more of the then Replacement Cost of the Building.

(d)  "Office Building Project Buildings" shall mean all of the buildings on the Office Building Project site.

(e)  "Office Building Project Buildings Total Destruction" shall mean if the Office Building Project Buildings are damaged or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement Cost of the Office Building Project Buildings.

(f)  "Insured Loss" shall mean damage or destruction which was caused by an event required to be covered by the insurance described in paragraph 8. The fact that an insured Loss has a deductible amount shall not make the loss an uninsured loss.

(g)  "Replacement Cost" shall mean the amount of money necessary to be spent in order to repair or rebuild the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by lessees, other than those installed by Lessor at Lessee's expense.

c 1984 American Industrial Real Estate Association

FULL SERVICE—GROSS

Initials: [handwritten]



agency or shall be discontinued, then the index most nearly the same as the C.P.I. shall be used to make such calculations. In the event that Lessor and Lessee cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in the County in which the Premises are located, in accordance with the then rules of said association and the decision of the arbitrators shall be binding upon the parties notwithstanding one party failing to appear after due notice of the proceeding. The cost of said Arbitrators shall be paid equally by Lessor and Lessee.

4.3.4   Lessee shall continue to pay the rent at the rate previously in effect until the increase, if any, is determined. Within five (5) days following the date on which the increase is determined, Lessee shall make such payment to Lessor as will bring the increased rental current, commencing with the effective date of such increase through the date of any rental installments then due. Thereafter the rental shall be paid at the increased rate.

4.3.5   At such time as the amount of any change in rental required by this Lease is known or determined, Lessor and Lessee shall execute an amendment to this Lease setting forth such change.

5.   Security Deposit. Lessee shall deposit with Lessor upon execution hereof the security deposit set forth in paragraph 1.9 of the Basic Lease Provisions as security for Lessee's faithful performance of Lessee's obligations hereunder. If Lessee fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Lessor may use, apply or retain all or any portion of said deposit for the payment of any rent or other charge in default for the payment of any other sum to which Lessor may become obligated by reason of Lessee's default, or to compensate Lessor for any loss or damage which Lessor may suffer thereby. If Lessor so uses or applies all or any portion of said deposit, Lessee shall within ten (10) days after written demand therefor deposit cash with Lessor in an amount sufficient to restore said deposit to the full amount then required of Lessee. If the monthly Base Rent shall, from time to time, increase during the term of this Lease, Lessee shall, at the time of such increase deposit with Lessor additional money as a security deposit so that the total amount of the security deposit held by Lessor shall at all times bear the same proportion to the then current Base Rent as the initial security deposit bears to the initial Base Rent set forth in paragraph 1.9 of the Basic Lease Provisions. Lessor shall not be required to keep said security deposit separate from its general accounts. If Lessee performs all of Lessee's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Lessor, shall be returned, without payment of interest or other increment for its use, to Lessee (or, at Lessor's option, to the last assignee, if any, of Lessee's interest hereunder) at the expiration of the term hereof, and after Lessee has vacated the Premises. No trust relationship is created herein between Lessor and Lessee with respect to said Security Deposit.

6.   Use.

6.1   Use. The Premises shall be used and occupied only for the purpose set forth in paragraph 1.4 of the Basic Lease Provisions or any other use which is reasonably comparable to that use and for no other purpose.

6.2   Compliance with Law.

(a) Lessor warrants to Lessee that the Premises, in the state existing on the date that the Lease term commences, but without regard to alterations or improvements made by Lessee or the use for which Lessee will occupy the Premises, does not violate any covenants or restrictions of record, or any applicable building code, regulation or ordinance in effect on such Lease term Commencement Date. In the event it is determined that this warranty has been violated, then it shall be the obligation of the Lessor, after written notice from Lessee, to promptly, at Lessor's sole cost and expense, rectify any such violation.

(b) Except as provided in paragraph 6.2(a) Lessee shall, at Lessee's expense, promptly comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises and the occupation and use by Lessee of the Premises. Lessee shall conduct its business in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will tend to create waste or a nuisance or shall tend to disturb other occupants of the Office Building Project.

6.3   Condition of Premises.

(a) Lessor shall deliver the Premises to Lessee in a clean condition on the Lease Commencement Date (unless Lessee is already in possession) and Lessor warrants to Lessee that the plumbing, lighting, air conditioning, and heating system in the Premises shall be in good operating condition. In the event that it is determined that this warranty has been violated, then it shall be the obligation of Lessor, after receipt of written notice from Lessee setting forth with specificity the nature of the violation, to promptly, at Lessor's sole cost, rectify such violation.

(b) Except as otherwise provided in this Lease, Lessee hereby accepts the Premises and the Office Building Project in their condition existing as of the Lease Commencement Date or the date that Lessee takes possession of the Premises, whichever is earlier, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Lessee acknowledges that it has satisfied itself by its own independent investigation that the Premises are suitable for its intended use, and that neither Lessor nor Lessor's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Lessee's business.

7.   Maintenance, Repairs, Alterations and Common Area Services.

7.1   Lessor's Obligations. Lessor shall keep the Office Building Project, including the Premises, interior and exterior walls, roof, and common areas, and the equipment whether used exclusively for the Premises or in common with other premises, in good condition and repair; provided, however, Lessor shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standards. Except as provided in paragraph 9.5, there shall be no abatement of rent or liability of Lessee on account of any injury or interference with Lessee's business with respect to any improvements, alterations or repairs made by Lessor to the Office Building Project or any part thereof. Lessee expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Lessee the right to make repairs at Lessor's expense or to terminate this Lease because of Lessor's failure to keep the Premises in good order, condition and repair.

7.2   Lessee's Obligations.

(a) Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to causes beyond normal wear and tear. Lessee shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that are above then Building standards. Lessor may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder.

(b) On the last day of the term hereof, or on any sooner termination, Lessee shall surrender the Premises to Lessor in the same condition as received, ordinary wear and tear excepted, clean and free of debris. Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices by Lessee. Lessee shall repair any damage to the Premises occasioned by the installation or removal of Lessee's trade fixtures, alterations, furnishings and equipment. Except as otherwise stated in this Lease, Lessee shall leave the air lines, power panels, electrical distribution systems, lighting fixtures, air conditioning, window coverings, wall coverings, carpets, wall panelling, ceilings and plumbing on the Premises and in good operating condition.

7.3   Alterations and Additions.

(a) Lessee shall not, without Lessor's prior written consent make any alterations, improvements, additions, Utility Installations or repairs in, on or about the Premises, or the Office Building Project. As used in this paragraph 7.3 the term "Utility Installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air conditioning, plumbing, and telephone and telecommunication wiring and equipment. At the expiration of the term, Lessor may require the removal of any or all of said alterations, improvements, additions or Utility Installations, and the restoration of the Premises and the Office Building Project to their prior condition, at Lessee's expense. Should Lessor permit Lessee to make its own alterations, improvements, additions or Utility Installations, Lessee shall use only such contractor as has been expressly approved by Lessor, and Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such improvements, to insure Lessor against any liability for mechanic's and materialmen's liens and to insure completion of the work. Should Lessee make any alterations, improvements, additions or Utility Installations without the prior approval of Lessor, or use a contractor not expressly approved by Lessor, Lessor may, at any time during the term of this Lease, require that Lessee remove any part or all of the same.

(b) Any alterations, improvements, additions or Utility Installations in or about the Premises or the Office Building Project that Lessee shall desire to make shall be presented to Lessor in written form, with proposed detailed plans. If Lessor shall give its consent to Lessee's making such alteration, improvement, addition or Utility Installation, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from the applicable governmental agencies, furnishing a copy thereof to Lessor prior to the commencement of the work, and compliance by Lessee with all conditions of said permit in a prompt and expeditious manner.

(c) Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises, the Building or the Office Building Project, or any interest therein.

(d) Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in the Premises by Lessee, and Lessor shall have the right to post notices of non-responsibility in or on the Premises or the Building as provided by law. If Lessee shall, in good faith, contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend itself and Lessor against the same and shall pay and satisfy

Initials: [handwritten initials]

© 1984 American Industrial Real Estate Association          **FULL SERVICE–GROSS**



option, by notice in writing to Lessor within ten (10) days thereafter, cancel this Lease, in which event the parties shall be discharged from all obligations hereunder, provided, however, that as to Lessee's obligations, Lessee first reimburses Lessor for all costs incurred for Non-Standard Improvements and, as to Lessor s obligations Lessor shall return any money previously deposited by Lessee (less any offsets due Lessor for Non-Standard Improvements) and provided further that if such written notice by Lessee is not received by Lessor within said ten (10) day period, Lessee's right to cancel this Lease hereunder shall terminate and be of no further force or effect.

3.2.1 Possession Tendered—Defined. Possession of the Premises shall be deemed tendered to Lessee ("Tender of Possession") when (1) the improvements to be provided by Lessor under this Lease are substantially completed, (2) the Building utilities are ready for use in the Premises, (3) Lessee has reasonable access to the Premises, and (4) ten (10) days shall have expired following advance written notice to Lessee of the occurrence of the matters described in (1), (2) and (3), above of this paragraph 3.2.1

3.2.2 Delays Caused by Lessee. There shall be no abatement of rent, and the sixty (60) day period following the Commencement Date before which Lessee's right to cancel this Lease accrues under paragraph 3.2, shall be deemed extended to the extent of any delays caused by acts or omissions of Lessee, Lessee's agents, employees and contractors.

3.3 Early Possession. If Lessee occupies the Premises prior to said Commencement Date, such occupancy shall be subject to all provisions of this Lease, such occupancy shall not change the termination date, and Lessee shall pay rent for such occupancy.

3.4 Uncertain Commencement. In the event commencement of the Lease term is defined as the completion of the improvements, Lessee and Lessor shall execute an amendment to this Lease establishing the date of Tender of Possession (as defined in paragraph 3.2.1) or the actual taking of possession by Lessee, whichever first occurs, as the Commencement Date.

## 4. Rent.

4.1 Base Rent. Subject to adjustment as hereinafter provided in paragraph 4.3, and except as may be otherwise expressly provided in this Lease, Lessee shall pay to Lessor the Base Rent for the Premises set forth in paragraph 1.6 of the Basic Lease Provisions, without offset or deduction. Lessee shall pay Lessor upon execution hereof the advance Base Rent described in paragraph 1.6 of the Basic Lease Provisions. Rent for any period during the term hereof which is for less than one month shall be prorated based upon the actual number of days of the calendar month involved. Rent shall be payable in lawful money of the United States to Lessor at the address stated herein or to such other persons or at such other places as Lessor may designate in writing.

4.2 Operating Expense Increase. Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share, as hereinafter defined, of the amount by which all Operating Expenses, as hereinafter defined, for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year, such success being hereinafter referred to as the "Operating Expense Increase," in accordance with the following provisions.

(a) "Lessee's Share" is defined, for purposes of this Lease, as the percentage set forth in paragraph 1.10 of the Basic Lease Provisions, which percentage has been determined by dividing the approximate square footage of the Premises by the total approximate square footage of the rentable space contained in the Office Building Project. It is understood and agreed that the square footage figures set forth in the Basic Lease Provisions are approximations which Lessor and Lessee agree are reasonable and shall not be subject to revision except in connection with an actual change in the size of the Premises or a change in the space available for lease in the Office Building Project.

(b) "Base Year" is defined as the calendar year in which the Lease term commences

(c) "Comparison Year" is defined as each calendar year during the term of this Lease subsequent to the Base Year; provided, however Lessee shall have no obligation to pay a share of the Operating Expense increase applicable to the first twelve (12) months of the Lease Term (other than such as are mandated by a governmental authority, as to which government mandated expenses Lessee shall pay Lessee's Share, notwithstanding they occur during the first twelve (12) months). Lessee's Share of the Operating Expense increase for the first and last Comparison Years of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase

(d) "Operating Expenses" is defined, for purposes of this Lease, to include all costs, if any incurred by Lessor in the exercise of its reasonable discretion, for:

(i) The operation, repair, maintenance, and replacement, in neat, clean, safe, good order and condition, of the Office Building Project, including but not limited to, the following:

(aa) The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb) All heating, air conditioning, plumbing, electrical systems, life safety equipment, telecommunication and other equipment used in common by, or for the benefit of, lessees or occupants of the Office Building Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair

(ii) Trash disposal, janitorial and security services;

(iii) Any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

(iv) The cost of the premiums for the liability and property insurance policies to be maintained by Lessor under paragraph 8 hereof;

(v) The amount of the real property taxes to be paid by Lessor under paragraph 10.1 hereof;

(vi) The cost of water, sewer, gas, electricity, and other publicly mandated services to the Office Building Project;

(vii) Labor, salaries and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Office Building Project and accounting and a management fee attributable to the operation of the Office Building Project;

(viii) Replacing and/or adding improvements mandated by any governmental agency and any repairs or removals necessitated thereby amortized over its useful life according to Federal income tax regulations (or guidelines for depreciation thereof (including interest on the unamortized balance as is than reasonable in the judgment of Lessor's accountants);

(ix) Replacements of equipment or improvements that have a useful life for depreciation purposes according to Federal income tax guidelines of five (5) years or less, as amortized over such life

(e) Operating Expenses shall not include the costs of replacements of equipment or improvements that have a useful life for Federal income tax purposes in excess of five (5) years unless it is of the type described in paragraph 4 2(d)(ix), in which case their cost shall be included as above provided.

(f) Operating Expenses shall not include any expenses paid by any lessee directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds

(g) Lessee's Share of the Operating Expense Increase shall be payable by Lessee within ten (10) days after a reasonably detailed statement of actual expenses is presented to Lessee by Lessor. At Lessor's option, however, an amount may be estimated by Lessor from time to time in advance of Lessee's Share of the Operating Expense Increase for any Comparison Year and the same shall be payable monthly or quarterly, as Lessor shall designate, during each Comparison Year of the Lease term, on the same day as the Base Rent is due hereunder. In the event that Lessee pays Lessor's estimate of Lessee's Share of Operating Expense increase as aforesaid, Lessor shall deliver to Lessee within sixty (60) days after the expiration of each Comparison Year a reasonably detailed statement showing Lessee's Share of the actual Operating Expense increase incurred during such year. If Lessee's payments under this paragraph 4.2(g) during said Comparison Year exceed Lessee's Share as indicated on said statement, Lessee shall be entitled to credit the amount of such overpayment against Lessee's Share of Operating Expense increase next falling due. If Lessee's payments under this paragraph during said Comparison Year were less than Lessee's Share as indicated on said statement, Lessee shall pay to Lessor the amount of the deficiency within (an (10) days after delivery by Lessor to Lessee of said statement. Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense increase, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

4.3 Rent Increase.

4.3.1 At the times set forth in paragraph 1.7 of the Basic Lease Provisions, the monthly Base Rent payable under paragraph 4.1 of this Lease shall be adjusted by the increase, if any, in the Consumer Price Index of the Bureau of Labor Statistics of the Department of Labor for All Urban Consumers, (1967=100), "All Items," for the city nearest the location of the Premises, herein referred to as "C.P.I," since the date of this Lease.

4.3.2 The monthly Base Rent payable pursuant to paragraph 4.3.1 shall be calculated as follows: the Base Rent payable for the first month of the term of this Lease, as set forth in paragraph 4.1 of this Lease, shall be multiplied by a fraction the numerator of which shall be the C.P.I of the calendar month during which the adjustment is to take effect, and the denominator of which shall be the C.P.I for the calendar month in which the original Lease term commences. The sum so calculated shall constitute the new monthly Base Rent hereunder, but, in no event, shall such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the date for the rent adjustment.

4.3.3 In the event the compilation and/or publication of the C.P.I. shall be transferred to any other governmental department or bureau or

© 1984 American Industrial Real Estate Association     **FULL SERVICE—GROSS**

PAGE 2 OF 10 PAGES

Initials:





# STANDARD OFFICE LEASE—GROSS

AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION

**1. Basic Lease Provisions ("Basic Lease Provisions")**

1.1 **Parties:** This Lease, dated, for reference purposes only, _____ MAY 8 _____, 19 91,
is made by and between _JOHN P. THROPAY, M.D., & MARICELA O. THROPAY_
(herein called "Lessor") and _MAHMOOD ZIA and ROBERT POMPA_
doing business under the name of _MONTEBELLO UROLOGICAL ASSOCIATES_ (herein called "Lessee").

1.2 **Premises:** Suite Number(s) _224_ _1_ floor, consisting of approximately _1465 sq_ feet, more or less, as defined in paragraph 2 and as shown on Exhibit "A" hereto (the "Premises").

1.3 **Building:** Commonly described as being located at _111 W. BEVERLY BLVD._

in the City of _MONTEBELLO_
County of _LOS ANGELES_
State of _CALIFORNIA_, as more particularly described in Exhibit _A_ hereto, and as defined in paragraph 2.

1.4; **Use:** _UROLOGY_, subject to paragraph 6.

1.5 **Term:** _SEE EXHIBIT D_ commencing _AUGUST 1, 1991_ ("Commencement Date")
and ending _JULY 31, 1996 or JULY 31, 2001_ as defined in paragraph 3.

1.6 **Base Rent:** _SEE EXHIBIT D_ per month, payable on the _1st_ day of each month,
per paragraph 4.1

1.7 **Base Rent increase:** On _AUGUST 1, 1994_ the monthly Base Rent payable under paragraph 1.6 above shall be adjusted as provided in paragraph 4.3 below.

1.8 **Rent Paid Upon Execution:** _(10,450) TEN THOUSAND FOUR HUNDRED FIFTY DOL- 'S FOR THE FIRST 4_
for _MONTHS RENT AND 2000.00 CREDIT TOWARDS THE LAST MONTHS RENT. PLUS 450 FOR SIGNAGE._

1.9 **Security Deposit:** _$2000.00 MAY BE USED FOR TENANT IMPROVEMENTS._

1.10 **Lessee's Share of Operating Expense Increase:** _N/A_ % as defined in paragraph 4.2.

**2. Premises, Parking and Common Areas.**

2.1 **Premises:** The Premises are a portion of a building, herein sometimes referred to as the "Building" identified in paragraph 1.3 of the Basic Lease Provisions. "Building" shall include adjacent parking structures used in connection therewith. The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and improvements thereon or thereunder, are herein collectively referred to as the "Office Building Project." Lessor hereby leases to Lessee and Lessee leases from Lessor for the term, at the rental, and upon all of the conditions set forth herein, the real property referred to in the Basic Lease Provisions, paragraph 1.2, as the "Premises," including rights to the Common Areas as hereinafter specified.

2.2 **Vehicle Parking:** So long as Lessee is not in default, and subject to the rules and regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use _____ parking spaces in the Office Building Project at the monthly rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

2.2.1 If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.2.2 The monthly parking rate per parking space will be $ ____ —0— ____ per month at the commencement of the term of this Lease, and is subject to change upon five (5) days prior written notice to Lessee. Monthly parking fees shall be payable one month in advance prior to the first day of each calendar month.

2.3 **Common Areas—Definition.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Building and the Office Building Project that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and of other lessees of the Office Building Project and their respective employees, suppliers, shippers, customers and invitees, including but not limited to common entrances, lobbies, corridors, stairways and stairwells, public restrooms, elevators, escalators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscaped areas and decorative walls.

2.4 **Common Areas—Rules and Regulations.** Lessee agrees to abide by and conform to the rules and regulations attached hereto as Exhibit B with respect to the Office Building Project and Common Areas, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform. Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right from time to time, to modify, amend and enforce said rules and regulations. Lessor shall not be responsible to Lessee for the non-compliance with said rules and regulations by other lessees, their agents, employees and invitees of the Office Building Project.

2.5 **Common Areas—Changes.** Lessor shall have the right, in Lessor's sole discretion:

(a) To make changes to the Building interior and exterior and Common Areas, including, without limitation, changes in the location, size, shape, number, and appearance thereof, including but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, decorative walls, landscaped areas and walkways; provided, however, Lessor shall at all times provide the parking facilities required by applicable law;

(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c) To designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

(d) To add additional buildings and improvements to the Common Areas;

(e) To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Office Building Project, or any portion thereof;

(f) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Office Building Project as Lessor may, in the exercise of sound business judgment deem to be appropriate.

**3. Term.**

3.1 **Term.** The term and Commencement Date of this Lease shall be as specified in paragraph 1.5 of the Basic Lease Provisions.

3.2 **Delay In Possession.** Notwithstanding said Commencement Date, if for any reason Lessor cannot deliver possession of the Premises to Lessee on said date and subject to paragraph 3.2.2, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Lessee hereunder or extend the term hereof; but, in such case, Lessee shall not be obligated to pay rent or perform any other obligation of Lessee under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Lessee, as hereinafter defined; provided, however, that if Lessor shall not have delivered possession of the Premises within sixty (60) days following said Commencement Date, as the same may be extended under the terms of a Work Letter executed by Lessor and Lessee, Lessee may, at Lessee's

© 1984 American Industrial Real Estate Association

**FULL SERVICE—GROSS**

PAGE 1 of 10 PAGES

Initials: _____



Exhibit A

SHORT TITLE  Throgay, et.al. v. Montebello Urological Association, et.al  CASE NUM  BC291820

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**
**(CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)**

## This form is required in all new civil case filings in the Los Angeles Superior Court

I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☐ YES   CLASS ACTION? ☐YES   LIMITED CASE? ☐YES   TIME ESTIMATED FOR TRIAL __2__ ☐HOURS/☒DAYS.

II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to No. III, Pg. 4):

1 After first completing the Civil Case Cover Sheet form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column 1, the Civil Case Cover Sheet case type you selected.

2 Check **one** Superior Court type of action in Column **2** which best describes the nature of this case.

3 In Column **3**, circle the reason for the court location choice that applies to the type of action you have checked.

### Applicable Reasons for Choosing Courthouse Location (See Column 3 below)

1. Class Actions must be filed in the County Courthouse, Central District
2. May be filed in Central (Other county, or no Bodily Inj/Prop.Damage)
3. Location where cause of action arose
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

4 Fill in the information requested on page 4 in item III; complete item IV. Sign the certificate.

| -1- Civil Case Cover Sheet Category No. | -2- Type of Action (Check only one) | -3- Applicable Reasons - See Step 3 Above |
|---|---|---|
| **Auto (22)** | ☐ A7100  Motor Vehicle - Personal Injury/Property Dam./Wrongful Death<br>Is this an uninsured motorist case? ☐Yes ☐No | 1., 2., 4. |
| **Asbestos (04)** | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestosis - Personal Injury/Wrongful Death | 2.<br>2. |
| **Product Liability (24)** | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| **Medical Malpractice (45)** | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| **Other PI/PD/WD (23)** | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7271  Negligent Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Dam./Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 3.<br>1., 2., 4. |
| **Business Tort (07)** | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| **Civil Rights (08)** | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| **Defamation (13)** | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| **Fraud (16)** | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| **Intellectual Property (19)** | ☐ A6016  Intellectual Property | 2., 3. |

*Auto Tort* / *Other PI/PD/WD Tort* / *Non-PI/PD/WD Tort*

| SHORT TITLE Thropay,et.al. v. Montebe... Urological Association,et.al | | CASE NUM... |
|---|---|---|

| -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|
| **Non-PI/PD/WD Tort** — Prof. Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ A6C50  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| **Employment** — Wrongful Termination (35) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** — Breach of Contract/ Warranty (06) (not insurance) | ☒ A6004  Breach of Rental/Lease Contract (not UD or wrongful eviction) | 2., 5. |
| | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff(no fraud/negligence) | 2., 5. |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** — Emnt Dom/Inv. Cond. (14) | ☐ A7300  Eminent Domain/Condemnation Number of parcels____ | 2. |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ A6032  Quiet Title | 2., 6. |
| | ☐ A6060  Other Real Property(not em. domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** — Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** — Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration Award (11) | ☐ A6115  Petition to Compel/Confirm Arbitration | 2., 5. |

Doc# 1 Page# 23 - Doc ID = 1735314733 - Doc Type = OTHE

SHO :T TITLE.
Thippay, et al. v. Monteber Urological Association, et al    CASE NUMBER

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Judicial Review (Cont'd.) | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Oth. Jud. Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| Provisionally Complex Litig. | Antitrust/Trade Reg.<br>(03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect<br>(10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litig. (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Tox. Tort/Environm<br>(30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Ins Covrage Clms<br>from Complex Case<br>(41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| Enforcement of Judgment | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| Misc. Civ. Cmplts | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| Misc. Civil Petitions | Partnership/Corp.<br>Governance(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9<br>2., 3., 9<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION    LASC Rule 2.0

| SHORT TITLE | | | CASE NUMBER |
|---|---|---|---|
| Thropay,et.al. v. Montebello Urological Association,et.al. | | | |

-4-

III. Statement of Location: Enter the address of the accident, party residence or place of business, performance, or other circumstance indicated in No. II., item **3** on Page 1 as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER ITEM -3- WHICH APPLIES IN THIS CASE<br>☐1.☒2.☐3.☐4.☐5.☐6.☐7.☐8.☐9.☐10. | | | ADDRESS: 111 W. Beverly Blvd., Suite 224 |
|---|---|---|---|
| CITY:<br>Montebello | STATE:<br>CA | ZIP CODE:<br>90640 | |

IV. Certificate/Declaration of Assignment: The undersigned hereby certifies and declares that the above entitled matter is properly filed for assignment to the Los Angeles courthouse in the Central District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2(b), (c) anc (d) of this court for the reason checked above. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on 03/03/2003 at Los Angeles California.
(date)        (city)

(SIGNATURE OF ATTORNEY/FILING PARTY)

## New Civil Case Filing Instructions

This addendum form is required so that the court can assign your case to the correct courthouse location in the proper district for filing and hearing. It satisfies the requirement for a certificate as to reasons for authorizing filing in the courthouse location, as set forth in Los Angeles Superior Court Local Rule 2.0. It must be completed and submitted to the court along with the Civil Case Cover Sheet and the original Complaint or Petition in ALL civil cases filed in any district (including the Central District) of the Los Angeles County Superior Court. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk (Summons forms available at the Forms Counter.).

3. Civil Case Cover Sheet form required by California Rule of Court 982.2(b)(1), completely filled out (Cover Sheet forms available at the Forms Counter).

4. This "Addendum to Civil Case Cover Sheet" form [Superior Court Form Number 982.2(b)(1)A, revised 7/99], completely filled out (Item II. does not apply in limited civil cases) and submitted with the Civil Case Cover Sheet.*

5. Payment in full of the filing fee (unless filing on behalf of state or local government or no fee is due for the type of case being filed) or an Order of the Court waiving payment of filing fees in forma pauperis (fee waiver application forms available at the Filing Window)

6. In case of a plaintiff or petitioner who is a minor under 18 years of age, an Order of the Court appointing an adult as a guardian ad litem to act on behalf of the minor (Guardian ad Litem Application and Order forms available at the Forms Counter.)

7. Additional copies of documents presented for endorsement by the Clerk and return to you.

* With the exception of limited civil and any civil cases concerning bodily injury (including wrongful death) and property damage occurring in this County, Labor Commissioner Appeals, and those types of actions required to be filed in the Central District by Local Court Rule 2(b), all civil actions may be optionally filed either in the Central District or in whichever other court location the rule would allow them to be filed. When a party elects to file a general or unlimited jurisdiction civil action in Central District that would also be eligible for filing in one or more of the other court locations, this form must still be submitted with location and assignment information completed.

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION** LASC Rule 2.0
CIV 109 04-02                                                                                  Page 4 of 4

982.2(b)(1)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
Richard S. Amador Esq., (SB#137417); Marco S. Zambrano, Esq. (SB#204370)
SANCHEZ & AMADOR, LLP
725 South Figueroa Street, Suite 3200
Los Angeles, California 90017

TELEPHONE NO.: (213) 955-7200   FAX NO.: (213) 955-7201
ATTORNEY FOR *(Name):* Plaintiffs JOHN P. THROPAY, M.D.and MARICELA O. THROPAY

INSERT NAME OF COURT, JUDICIAL DISTRICT, AND BRANCH COURT, IF ANY:
Superior Court of California, County of Los Angeles, Central District

CASE NAME:
John P. Thropay, et al. v. Montebello Urological Association, et al.

**FILED**
LOS ANGELES SUPERIOR COURT

MAR 1 0 2003

JOHN A. CLARKE, CLERK

C. L. Clom
BY C. L. GOLFMAN, DEPUTY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☐ Limited  ☒ Unlimited | ☐ Counter   ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 181 1) | BC 291820  ASSIGNED JUDGE: |

*Please complete all five (5) items below.*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights *(e.g., discrimination, false arrest)* (08)
☐ Defamation *(e.g., slander, libel)* (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence *(e.g., legal malpractice)* (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)

☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Collections *(e.g., money owed, open book accounts)* (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property *(e.g., quiet title)* (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)

☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Claims involving mass tort (40)
☐ Securities litigation (28)
☐ Toxic tort/Environmental (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment *(e.g., sister state, foreign, out-of-county abstracts)* (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ☒ is not  complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. ☐ Substantial post-disposition judicial disposition
3. Type of remedies sought *(check all that apply):*
   a. ☒ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* ONE (1)
5. This case ☐ is  ☒ is not  a class action suit.
Date: March 10, 2003

Marco S. Zambrano, Esq.
(TYPE OR PRINT NAME)

▶ *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 982.2.)
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

| Form Adopted for Mandatory Use Judicial Council of California 982.2(b)(1) [Rev. January 1, 2000] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 982.2, 1300-1512; Standards of Judicial Administration § 19  *Judicial Council Forms on HotDocs* |

# Exhibit 26

GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
Email: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. SACV16-00974-CJC (AGRx) |
| Plaintiff, | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RULE 26(a)(2) DESIGNATION OF EXPERT WITNESS** |
| vs. | |
| CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, | |
| Defendants. | |

In accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure and the Court's February 19, 2021 Amended Scheduling Order Regarding Discovery Preliminary Injunction, and Related Matters (Dkt. No. 310), Plaintiff Securities and Exchange Commission ("SEC") hereby designates the retained expert witness identified below as a person who may be used at trial or hearing to present evidence under Federal Rules of Evidence 702, 703, or 705:

> Carlyn Irwin
> Senior Advisor
> Cornerstone Research
> 555 West 5th Street, 38th Floor
> Los Angeles, CA  90013
> 213.553.2533

Ms. Irwin is expected to testify about the topics set forth in her report dated March 26, 2021, attached hereto as Exhibit 1, including evaluating and assessing any opinions offered in rebuttal by defendants' experts in this matter.  Ms. Irwin's rate is $800 per hour.

If any witness disclosed or listed above is not available at the time of trial, the SEC reserves the right to seek the introduction of competent former testimony, including depositions of such witnesses in lieu of their testimony.  The SEC further reserves the right to substitute individuals of equal learning, experience, expertise and/or training, should the schedule of the trial preclude the above individual(s) from testifying at the time of trial in this matter.  The SEC also reserves the right to supplement or amend this designation in accordance with Rule 26(a)(2) and (e) of the Federal Rules of Civil Procedure.

Dated:  March 26, 2021                    Respectfully submitted,

                                          */s/ Gary Y. Leung*
                                          Gary Y. Leung
                                          Jacob A. Regenstreif
                                          Attorneys for Plaintiff
                                          Securities and Exchange Commission

1

# EXHIBIT 1

*Securities and Exchange Commission*

*v.*

*Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al.*

Expert Report of Carlyn Irwin

Carlyn Irwin

Senior Advisor

Cornerstone Research

March 26, 2021

# Table of Contents

I.      Qualifications ....................................................................................................1

II.     Background and Scope of Assignment .........................................................2

        A.      Relevant Entities ...............................................................................2

        B.      EB-5 Immigrant Investor Program .................................................4

        C.      The PPEB5 Fund Offering ...............................................................4

        D.      Scope of Assignment ........................................................................5

III.    Bases for Opinion ............................................................................................6

IV.     Summary of Findings and Conclusions ........................................................8

V.      Represented Flow of Funds.............................................................................9

VI.     Analysis of Actual Flow of Funds ................................................................11

        A.      Procedures Performed ....................................................................12

        B.      Review of General Flow of Investor Deposits ..............................14

        C.      Analysis of Cash Outflows .............................................................15

                1.      Offering Expenses .................................................................15

                2.      Business Expenditures ..........................................................17

                3.      Individual Defendants' Pecuniary Gains ..........................20

VII.    Conclusions .....................................................................................................24

## I.       Qualifications

1.       I am a senior advisor with Cornerstone Research, an economic and financial consulting firm specializing in commercial litigation.  As a litigation consultant, I have been retained on hundreds of matters to analyze financial, economic, and accounting issues, prepare valuations and damages claims, and conduct financial forensic analysis.  In doing so, I have worked on matters involving allegations of fraud, breach of contract, unfair business competition, and false advertising, as well as intellectual property disputes, including patents, copyrights, trademarks, and trade secrets.  In addition, I have been retained by clients to analyze data to reconstruct financial records, estimate profitability, and assess the consistency and reliability of data.  In certain of these matters, I have been retained as an expert witness.  Relevant to this matter, I have testified and previously qualified as an expert regarding forensic accounting, fraud investigations, and factors related to alter ego.  I have provided expert witness testimony in federal and state courts, international arbitration, and other venues.

2.       Prior to joining Cornerstone Research, I was employed as a litigation consultant with the accounting firm of PricewaterhouseCoopers (formerly Price Waterhouse) from 1994 to 2002.  From 1992 to 1994, I served as the assistant controller for a law firm where I was primarily responsible for, among other things, maintaining the general ledger, producing the firm's financial statements, and assisting the executive committee with strategic analyses.

3.       I hold a Bachelor of Arts degree from the University of California at Santa Barbara where I graduated with honors.  I have an MBA from the University of Southern California.  I am also a Certified Public Accountant ("CPA") and a Certified Fraud Examiner ("CFE"), and I am Certified in Financial Forensics, Accredited in Business Valuation, and Certified in Entity and Intangible Valuations by the American Institute of Certified Public Accountants.  A current copy of my curriculum vitae, including a list of my prior testimony, is attached as **Appendix A.**

4.       With respect to this matter, Cornerstone Research shall be compensated at $800 per hour for my time spent in preparation and support of my opinions, and Cornerstone Research will also be compensated for my colleagues who worked on this matter under my direction.  Neither my compensation nor my colleagues' compensation is contingent or based on the content of my opinions or the outcome of this matter.

## II.    Background and Scope of Assignment

5.    I have been retained by counsel for the Securities and Exchange Commission ("SEC") to
provide expert testimony in the matter *Securities and Exchange Commission v. Charles C. Liu,
Xin Wang a/k/a Lisa Wang, et al.*

### A.    Relevant Entities

6.    Relevant parties (collectively the "Defendants") to this matter include the following:

   a.  **Pacific Proton EB-5 Fund, LLC ("PPEB5 Fund")**:[1]  a Delaware limited
       liability company formed in November 2010 to serve as a commercial enterprise
       in an EB-5 Immigrant Investor Program ("EB-5 Program") project offering.[2]  The
       PPEB5 Fund was to offer units of limited liability company membership interests
       to qualified non-U.S. citizens seeking permanent resident status in the United
       States through the EB-5 Program.[3]  Offering proceeds were to be invested in the
       construction and operation of a proton therapy center.[4]

   b.  **Pacific Proton Therapy Regional Center, LLC ("Pacific Proton Regional
       Center")**:[5]  the regional center authorized by U.S. Citizenship and Immigration
       Services ("USCIS") under the EB-5 Program to establish and solicit investment
       from foreign investors.  Pacific Proton Regional Center was to be the sponsor and
       manager of the PPEB5 Fund.[6]

   c.  **Beverly Proton Center, LLC ("Beverly Proton")**, formerly known as Los
       Angeles County Proton Therapy, LLC:[7]  the company sponsored by Pacific

---

[1] Complaint, *Securities and Exchange Commission v. Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al.*, May 26, 2016
("Complaint"), ¶ 12.
[2] Government Exhibit 5, p. 18.
[3] Government Exhibit 5, p. 18.
[4] Government Exhibit 5, p. 18.
[5] Complaint, ¶ 11.
[6] Government Exhibit 5, p. 6.
[7] Complaint, ¶13.  *See also* Deposition Exhibit 120, p. 1.

Proton Regional Center to build and operate the proton therapy center (I collectively refer to PPEB5 Fund, Pacific Proton Regional Center, and Beverly Proton as the "Corporate Defendants").[8]

d. **Charles Liu**:[9]  a member of the Pacific Proton Regional Center and president and one owner of Beverly Proton.  Mr. Liu controlled the PPEB5 Fund, the Pacific Proton Regional Center, and Beverly Proton.

e. **Xin Wang**:[10]  Mr. Liu's spouse (I collectively refer to Mr. Liu and Ms. Wang as the "Individual Defendants").[11]

7.    Other relevant parties include:

a. **United Damei Group ("UDG"), Delsk, and Overseas Chinese Immigration Corp. ("Overseas Chinese")**:  China-based companies that acted as brokers and helped market the PPEB5 Fund offering to foreign investors.[12]

b. **United MPH Ventures LLC, MP Medical Hotel, SC MPH Management, and SC MPH Fund** (collectively "Liu Affiliates"):  other projects and entities controlled by Mr. Liu.[13]

c. **Beverly Hospital and City of Hope:**  third-parties involved in the projects of the Liu Affiliates.

---

[8] Government Exhibit 5, p. 6.

[9]  Complaint, ¶ 9.

[10] Complaint, ¶ 10.

[11] Deposition of Charles Liu, February 24, 2021 ("February 2021 Charles Liu Deposition"), pp. 65:22–68:3; Deposition of Xin Wang, May 4, 2016 ("May 2016 Xin Wang Deposition"), p. 41:9–14.

[12] Deposition of Lorraine Pearson, January 21, 2021 ("January 2021 Lorraine Pearson Deposition"), pp. 29:19–30:4; Deposition of Charles Liu, March 23, 2016 ("March 2016 Charles Liu Deposition"), pp. 85:12–86:12, 140:16–141:5, 145:12–24.

[13] March 2016 Charles Liu Deposition, pp. 12:15–13:15, 14:23–17:16, 18:6–20:25, 22:6–16.

### B.   EB-5 Immigrant Investor Program

8.     The EB-5 Program was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors.[14]  Under the EB-5 Program, foreign investors may qualify for permanent residence by investing through regional centers designated by USCIS based on proposals for promoting economic growth.[15]  The USCIS requires that a qualifying EB-5 investment place capital "at risk for the purpose of generating a return on the capital placed at risk."[16]  Moreover, an EB-5 applicant must prove to the USCIS that an investment in fact led to the creation of at least ten full-time jobs.[17]

### C.   The PPEB5 Fund Offering

9.     The objectives of the PPEB5 Fund are represented in a private offering memorandum ("POM") dated May 1, 2013 that was distributed to prospective investors as part of Mr. Liu's capital raising efforts.[18]  The PPEB5 Fund offered up to 300 units of membership interest to foreign investors at a price of $500,000 per unit.[19]  According to the POM, the resulting pool of capital contributions was to be loaned to Beverly Proton to finance the development and operation of a proton therapy center at 111 W. Beverly Boulevard, Montebello, CA 90640 (the "EB-5 Project"):

> PPEB5 will pool investor funds and make a loan of up to $150 million to Los
> Angeles County Proton Therapy, LLC ("LAPT")….  LAPT will pay interest on
> the loan at the rate of 0.25% per annum with principal due and owing 5 years
> from the date of the last advance under the loan.  LAPT will use the loan proceeds

---

[14] "About the EB-5 Visa Classification," *United States Citizenship and Immigration Services*, March 25, 2021, available at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-the-eb-5-visa-classification (accessed March 16, 2021).

[15] "About the EB-5 Visa Classification," *United States Citizenship and Immigration Services*, March 25, 2021, available at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-the-eb-5-visa-classification (accessed March 16, 2021).

[16] 8 C.F.R. § 204.6(j)(2).

[17] 8 U.S.C. § 1153(b)(5)(A); 8 C.F.R. § 204.6(g)(1); 8 C.F.R. § 216.6(a)(4)(iv).

[18] Government Exhibit 5; March 2016 Charles Liu Deposition, pp. 65:13–17, 69:12–23.

[19] Government Exhibit 5, p. 2.

to partially finance the construction and operation of a proton therapy center with commercial office space in Los Angeles County, CA (the "Project").  The proton therapy center with office space will be located at 111 W. Beverly Boulevard, Montebello, Los Angeles County, CA.  All Project components will be owned and operated by LAPT.[20]

Los Angeles County Proton Therapy, LLC ("LAPT"), will develop and operate the Los Angeles County Proton Center (the "Proton Center") at 111 W. Beverly Boulevard, Montebello, California 90640.  The Proton Center will provide an innovative new cancer treatment to oncology patients using proton beam radiation.[21]

10.     The POM also set forth the manner in which investors' capital contributions were to be used.  Specifically, the POM stated that the EB-5 Project offering proceeds were expected to be used to finance not operating expenses, but rather the construction of the EB-5 Project, including the purchase of equipment, and working capital and other costs.[22]  Profits of Beverly Proton were to be used first to pay operating expenses and service debts and obligations, second to establish any reserves required by law or deemed necessary by Beverly Proton, and last, any remaining profit may be available for distribution to members.[23]

11.     The POM further set forth the manner in which investors' administrative fees were to be used.  In addition to the $500,000 capital contributions, investors in the PPEB5 Fund were to pay a $45,000 administrative fee per unit subscribed for, to the Pacific Proton Regional Center.  The POM represented that this administrative fee would cover all "offering expenses including legal, accounting, and administration expenses, and commissions and fees related to [the] Offering."[24]

### D.     Scope of Assignment

12.     Counsel for the SEC retained me to analyze information and data produced in this matter related to the relevant entities and individuals.  Specifically, I have been asked to analyze financial records and other data, and opine on:

---

[20] Government Exhibit 5, p. 18.
[21] Government Exhibit 5, p. 18.
[22] Government Exhibit 5, p. 20.
[23] Government Exhibit 5, p. 20.
[24] Government Exhibit 5, p. 6.  *See also SEC v. Liu*, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017).

    a.   Represented flow of the $500,000 capital contributions and $45,000 administrative fee by each EB-5 investor based on the POM ("Represented Flow of Funds").

    b.   Actual flow of the capital contributions and administrative fee paid by each EB-5 investor, including an analysis of whether portions of the capital contributions and administrative fee differed from the Represented Flow of Funds.

    c.   Business purpose and consistency with the POM from a forensic accounting perspective of the expenses incurred by the PPEB5 Fund, Pacific Proton Regional Center, and Beverly Proton.[25]

    d.   Reasonable estimate of the net pecuniary gains obtained by Mr. Liu and Ms. Wang.

13.    The opinions expressed in this report and portions of the information presented in the accompanying exhibits are my opinions as of the date of this report.  At the request of counsel for the SEC, I may amend or supplement this report and the accompanying exhibits as a result of developments prior to or at evidentiary hearing, including, but not limited to, the discovery of new evidence, and the testimony of other witnesses in deposition or trial.

14.    At evidentiary hearing, I anticipate using demonstratives that may include, but are not limited to, selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits attached to this report, and additional graphics illustrating concepts described in this report.

## III.    Bases for Opinion

15.    In conducting my analyses and forming my opinions, I have relied upon my education and my own professional judgment and expertise, as well as sources reasonably relied upon by experts in my field.  Specifically, I have relied on deposition testimony of relevant individuals, declarations, financial data and documents, bank records, accounting records, memoranda, and

---

[25] I am not offering an opinion on the compliance to the POM from a legal perspective or offering any other legal opinions.

other agreements.  A complete list of the information I considered is attached as **Appendix B**, including an inventory of the bank records made available to me.

16.     The American Institute of Certified Public Accountants publishes professional standards applicable to my work on this engagement.  In general, those standards require CPAs engaged in litigation services to (i) maintain integrity and objectivity; (ii) only undertake engagements that are expected to be completed with professional competence; (iii) exercise due professional care in performing the services; (iv) adequately plan and supervise the performance of the services; and (v) obtain sufficient relevant data to provide a reasonable basis for the conclusions.[26]  I have complied with these professional standards in this engagement.

17.     Similarly, the Association of Certified Fraud Examiners publishes standards of professional conduct that are applicable to this matter.  Those standards recommend that CFEs adhere to the standards of (i) integrity and objectivity; (ii) professional competence; (iii) due professional care; (iv) understanding with client or employer; (v) communication with client or employer; and (vi) confidentiality.[27]  I have also complied with these standards of professional conduct in this matter.

18.     In addition to relying on data and documents, counsel for the SEC has asked me to make the following assumptions related to my analyses and opinions:

    a.  Based on the June 22, 2020 U.S. Supreme Court decision issued in this matter, that Defendants must disgorge their "net profits from wrongdoing after deducting legitimate expenses," and that expenses which are "merely wrongful gains 'under another name'" are not "legitimate expenses."[28]

    b.  The determination of the expenses that may be deducted from the proceeds of the offering as "legitimate business expenses" should be made based on the representations made to investors in the POM.[29]

---

[26] "Statement on Standards of Forensic Service," *Forensic and Valuation Services Executive Committee*, January 1, 2020, https://future.aicpa.org/resources/download/statement-on-standards-for-forensic-services, accessed March 26, 2021.
[27] "CFE Code of Professional Standards, Section III," *Association of Certified Fraud Examiners*, November 1, 2020, https://www.acfe.com/standards/, accessed March 26, 2021.
[28] *Liu v. SEC*, 140 S. Ct. 1936 (2020).
[29] *See SEC v. Liu*, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017) (finding that defendants violated the antifraud provisions of the federal securities laws:  "[T]heir actions contravene the POM's clear delineation between appropriate uses of Capital Contributions (development and operation of the project) and Administrative Fees (commissions, fees, and marketing).").

     c.   At the time he signed Mr. Liu's employment agreement with Beverly Proton, Michael Cogswell was not an employee of Beverly Proton. As such, the employment agreement is not enforceable.

## IV.    Summary of Findings and Conclusions

19.    As described in more detail in this report, based on my review and analysis of the information provided to me, my opinions are as follows:

     a.   The Pacific Proton Regional Center did not transfer investors' capital contributions to Beverly Proton in a manner consistent with the representations made to investors in the POM.

     b.   The monies deposited into the PPEB5 Fund, Pacific Proton Regional Center, and Beverly Proton accounts were not used in a manner consistent with the representations made to investors in the POM. Specifically, I estimate that between October 2014 and April 2016:[30]

        i.   A net total of $10,954,375 was paid by the Corporate Defendants for Offering Expenses. Of that amount only $2,210,701 may be deducted as Offering Expenses consistent with the POM.

       ii.   A net total amount of $6,105,809 was paid by the Corporate Defendants for Business Expenditures. Of that amount, only $3,105,809 may be deducted as Business Expenditures.

       iii.   A net total of $6,749,692 was transferred from the Corporate Defendants' accounts to the Individual Defendants. None of that amount may be deducted from receipts.

       iv.   A total amount of $2,367,167 was withdrawn from the Corporate Defendants' accounts or paid to settle the Individual Defendants' personal expenses on behalf of the Individual Defendants. None of those outflows may be deducted from receipts.

---

[30] The PPEB5 Fund's Citibank account includes transactions that occurred in September 2013 – October 2014. Specifically, service fees debits amounting to $1,353, and two deposits totaling $500,450, which appear to be related to an investor subscription. *See* Citibank Account 9769 Data, SEC-CITIGROUP-E-0000087 (September 10, 2013 – March 8, 2016).

    v.   A net amount of $210,270 was transferred to the Liu Affiliates.  None of
those outflows may be deducted from receipts.

    vi.   For purposes of calculating the net pecuniary gains to the Defendants, I
have reduced the $26,733,019 ordered as disgorgement by the U.S.
Supreme Court,[31] by the amounts that appear to have been refunded to
investors and unknown parties who made deposits and define the resulting
amount as "Net Receipts."

  c.  Based on my analysis, I estimate that the net pecuniary gains of the Defendants
amount to $20,222,511.

## V.    Represented Flow of Funds

20.    In this section, I describe the flow of investor funds prescribed by the POM.  In
**Section VI** below, I compare the Represented Flow of Funds to the actual flow of funds as
evidenced by the Defendants' bank and accounting records.

21.    The POM that was presented to investors outlined the manner in which capital
contributions were to flow through to the EB-5 Project, from deposit to use.  In summary, and as
illustrated in **Exhibit 1**, investment funds were to circulate as follows:

  a.  Investors were to deposit their $500,000 capital contribution per unit subscribed
for into an escrow account.[32]  The funds were to be released from the escrow
account to the PPEB5 Fund accounts upon the investors' filing of their I-526
petition with USCIS.[33]  I understand that the escrow agent was Atlantic Escrow

---

[31] See SEC v. Liu, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017).
[32] Government Exhibit 5, p. 2.
[33] Government Exhibit 5, p. 7.  Capital contributions were to be refunded by Pacific Proton Regional Center only if an investor's
petition was denied by USCIS without possibility of cure.  *See* Government Exhibit 5, p. 7.

Corporation and that the escrow account was the East West Bank account ending in 9509 (the "Pacific Proton Escrow Account").[34]

b. Upon release from the Pacific Proton Escrow Account, the capital contributions were to be transferred to the PPEB5 Fund accounts and lent to Beverly Proton to finance development and operation of the proton therapy center.[35] I understand the PPEB5 Fund accounts were the JP Morgan Chase account ending in 1028 and the Citibank account ending in 9769 (altogether the PPEB5 Fund Accounts"),[36] and that Beverly Proton's bank account was the JP Morgan Chase account ending in 5152 (the "Beverly Proton Account').[37]

22.     In addition, the POM defined the way the monies paid by investors for administrative fees were to be used.  As illustrated in **Exhibit 2**, investors were to pay a $45,000 administrative fee per unit subscribed for directly to the Pacific Proton Regional Center, which held the JP Morgan Chase account ending in 6428 (the "Pacific Proton Regional Center Account").[38]  The administrative fee was destined "to pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to [the] [o]ffering,"[39] including commissions or other fees paid to brokers, investment advisors, finders, or other parties in connection with the sale of fund units pursuant to the offering.[40]

---

[34] Declaration of Lorraine Pearson, May 26, 2016 ("May 2016 Lorraine Pearson Declaration"), pp. 1:27–2:2; East West Bank Account 9509 Data, SEC-EWB-E-0000027 (August 25, 2015 – December 9, 2015), SEC-EWB-E-0000028 (November 14, 2014 – December 31, 2015), and SEC-EWB-E-0000058 (March 16, 2016).

[35] Government Exhibit 5, pp. 7, 20.

[36] May 2016 Lorraine Pearson Declaration, p. 2:3–5; JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (October 1, 2014 – January 21, 2016) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); Citibank Account 9769 Data, SEC-CITIGROUP-E-0000087 (September 10, 2013 – March 8, 2016).

[37] May 2016 Lorraine Pearson Declaration, p. 2:6–9; JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (October 1, 2014 – January 29, 2016) and Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP xls (October 1, 2014 – April 28, 2016).

[38] Government Exhibit 5, p. 6; May 2016 Lorraine Pearson Declaration, p. 2:10–13; JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (October 1, 2014 – January 26, 2016), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (October 1, 2014 – April 28, 2016).

[39] Government Exhibit 5, p. 6.

[40] Government Exhibit 5, p. 8 ("PPEB5 may make offers and sales of Units directly to investors through its Manager, agents and affiliates and may engage and pay one or more brokers, investment advisors, finders or other parties commissions or other fees in connection with the sale of Units pursuant to this Offering.  Any such commissions or other fees paid in connection with the sale of Units pursuant to this Offering shall be paid only out of the proceeds of Administrative Fees.").

## VI.    Analysis of Actual Flow of Funds

23.    Based on my examination of the bank records of the Corporate Defendants' accounts and as explained in this section, the Pacific Proton Regional Center did not transfer investors' capital contributions to Beverly Proton in a manner consistent with the representations made to investors in the POM.  In addition, the monies deposited into the PPEB5 Fund, Pacific Proton Regional Center, and Beverly Proton accounts were not used in a manner consistent with the representations made to investors in the POM.  Specifically, as further explained in this section, I estimate that between October 2014 and April 2016:[41]

a.  A net total of $10,954,375 was paid by the Corporate Defendants for Offering Expenses.  Of that amount only $2,210,701 may be deducted as Offering Expenses consistent with the POM.

b.  A net total amount of $6,105,809 was paid by the Corporate Defendants for Business Expenditures.  Of that amount, only $3,105,809 may be deducted as Business Expenditures.

c.  A net total of $6,749,692 was transferred from the Corporate Defendants' accounts to the Individual Defendants.  None of that amount may be deducted from Net Receipts.

d.  A total amount of $2,367,167 was withdrawn from the Corporate Defendants' accounts or paid to settle the Individual Defendants' personal expenses on behalf of the Individual Defendants.  None of those outflows may be deducted from Net Receipts.

e.  A net amount of $210,270 was transferred to the Liu Affiliates.  None of those outflows may be deducted from Net Receipts.

f.  For purposes of calculating the net pecuniary gains to the Defendants, I have also reduced the $26,733,019 ordered as disgorgement by the U.S. Supreme Court,[42]

---

[41] The PPEB5 Fund's Citibank account includes transactions that occurred in September 2013 – October 2014.  Specifically, service fees debits amounting to $1,354, and two deposits totaling $500,450, which appear to be related to an investor subscription.  *See* Citibank Account 9769 Data, SEC-CITIGROUP-E-0000087 (September 10, 2013 – March 8, 2016).
[42] See SEC v. Liu, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017).

by the amounts that appear to have been refunded to investors and unknown

parties who made deposits and define the resulting amount.

24.     Based on my analysis, I estimate that the net pecuniary gains to the Defendants amount to
$20,222,511.

### A.      Procedures Performed

25.     I analyzed the Corporate Defendants' cash flows by conducting the following procedures:

a.  Identify the deposits made by named foreign investors into the Pacific Proton
Escrow Account and/or the Corporate Defendants' bank accounts, along with any
refunds these investors might have received.

b.  Determine whether capital contributions deposited by investors into the Pacific
Proton Escrow Account were transferred to the PPEB5 Fund accounts.

c.  Identify cash inflows to the Corporate Defendants' bank accounts other than from
investment deposits, and categorize them based on their nature and/or source.

d.  Identify and analyze cash outflows from the Corporate Defendants' bank accounts
other than for refunds of investments, and categorize them based on their nature
as follows:

i.   Cash outflows representing offering expenses ("Offering Expenses");

ii.  Cash outflows representing capital and operating expenditures ("Business
Expenditures");

iii. Payments and transfers benefitting the Individual Defendants, including
direct transfers and withdrawals, payments of personal expenses, and
transfers to other companies or projects controlled by Mr. Liu (e.g., United
MPH Ventures LLC, Beverly Hospital Management, MP Medical Hotel,
SC MPH Management, and SC MPH Fund).

e.  Estimate the portion of these cash outflows, if any, that deviates from the
representations made in the POM as follows:

i.   Identify Offering Expenses in excess of the total administrative fees
received from investors, if any.

      ii.    Identify Business Expenditures that deviate from those provided for in the POM.

      iii.   Identify pecuniary gains to the Individual Defendants such as transfers to their personal accounts in excess of compensation provided for in their employment agreements, withdrawals, payments of personal expenses, and transfers to the Liu Affiliates.

26.     In performing the aforementioned procedures, I relied on three main sources. First, I compiled available bank records for the Corporate Defendants and the Pacific Proton Escrow Account and examined the transaction descriptions included therein.[43] Second, I considered the payee information compiled from bank records.[44] Third, I examined the general ledger and QuickBooks reports prepared by Marcum LLP ("Marcum"), the Defendants' accountant, as part of a bookkeeping engagement,[45] to identify payee information and obtain an understanding of how Mr. Liu told Marcum to classify cash outlays, particularly when the information contained in the bank records was insufficient to determine the nature of the cash outflows. Generally, I have assumed, for purposes of the calculations set forth above, that Marcum's classification of cash outlays was accurate. I note that Marcum prepared the general ledger and QuickBooks reports based on Mr. Liu's directions and the notes featuring on the records and "check stubs" provided to it,[46] and did not exercise any judgment as to the appropriateness of the classification.[47] As such, I assume that the accuracy and reliability of Marcum LLP's general

---

[43] I was provided the following bank statement data spanning September 2013 through April 2016: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (October 1, 2014 – January 21, 2016) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (October 1, 2014 – January 29, 2016) and Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP xls (October 1, 2014 – April 28, 2016); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (October 1, 2014 – January 26, 2016), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (October 1, 2014 – April 28, 2016); Citibank Account 9769 Data, SEC-CITIGROUP-E-0000087 (September 10, 2013 – March 8, 2016); East West Bank Account 9509 Data, SEC-EWB-E-0000027 (August 25, 2015 – December 9, 2015), SEC-EWB-E-0000028 (November 14, 2014 – December 31, 2015), and SEC-EWB-E-0000058 (March 16, 2016).

[44] In addition to payee information obtained from analysis provided by Marcum LLP, payee information was compared to the exhibits to the May 2016 Lorraine Pearson Declaration. I understand that Ms. Lorraine Pearson performed work in this matter on behalf of counsel for SEC to "review and summarize the Defendants' business records, including bank records, to trace cash flows to and from various…bank accounts." *See* January 2021 Lorraine Pearson Deposition, p. 17:17–22. *See also* May 2016 Lorraine Pearson Declaration, p. 1:21–26.

[45] Deposition of Trang Lam, March 9, 2021 ("March 2021 Trang Lam Deposition"), pp. 22:23–23:5; February 2021 Charles Liu Deposition, p. 129:5–10; Deposition Exhibit 60.

[46] March 2021 Trang Lam Deposition, pp. 38:14–39:12.

[47] March 2021 Trang Lam Deposition, pp. 27:25–28:16, 29:21–30:1, 33:25–34:20.

ledger were dependent on information provided by Mr. Liu. I therefore reserve the right to revise my analysis and conclusions should additional information become available to me.

### B.     Review of General Flow of Investor Deposits

27.     As detailed in **Exhibits 3 and 4**, in summary, the Corporate Defendants' bank records exhibit the following general fund flows:

28.     Between October 2014 and April 2016, at least 50 investors made deposits for capital contributions either into the Pacific Proton Escrow Account or directly into the PPEB5 Fund. Two investors received a refund of their capital contributions. The net total amount of capital contributions received from at least 50 investors observed in the bank statement data amounted to $24,212,467.

> a. Net total capital contributions made into the Pacific Proton Escrow Account amounted to $24,012,387. This entire amount was transferred from the Pacific Proton Escrow Account to the PPEB5 Fund Accounts.[48]
>
> b. Net capital contributions made directly into the PPEB5 Fund account amounted to $200,080.

29.     Between October 2014 and April 2016, at least 50 investors made deposits for the administrative fee into the Pacific Proton Regional Center Account. At least one of those investors received a refund of his/her administrative fee payment. Net total administrative fees received amounted to $2,210,701.[49]

30.     Only $21,210,200 was transferred from the PPEB5 Fund Accounts to Beverly Proton between October 2014 and April 2016. Thus, approximately $3,002,267 of capital contributions were not loaned to Beverly Proton.[50]

---

[48] East West Bank Account 9509 Data, SEC-EWB-E-0000027 (August 25, 2015 – December 9, 2015), SEC-EWB-E-0000028 (November 14, 2014 – December 31, 2015), and SEC-EWB-E-0000058 (March 16, 2016).
[49] See **Exhibit 4**.
[50] $24,212,467 – 21,210,200 = $3,002,267.  *See* **Exhibits 3 and 4**.

31.     Excluding transfers between Corporate Defendant bank accounts, investor deposits, and transfers from unknown payees, a net total of $26,387,312 was paid out of the Corporate Defendants' accounts.[51]  Of that amount and as explained further in **Section VI**, only a total of $5,316,510 was used to pay for expenditures that are consistent with the terms of the POM.

## C.     Analysis of Cash Outflows

32.     I understand that Defendants have claimed total deductible business expenses amounting to $25,278,622.[52]  In this section, I analyze the business purpose of the various types of payments made from Corporate Defendants' accounts and assess their consistency with the terms of the POM from a forensic accounting perspective.  As I show below, a significant portion of the Offering Expenses and Business Expenditures paid for by the Corporate Defendants may not be deducted because they deviate from the provisions of the POM.  In addition, a significant portion of the disbursements from the Corporate Defendants was made for purposes other than the financing and operation of Beverly Proton, and were therefore not expended in a manner consistent with the POM.

## 1.     Offering Expenses

33.     The POM states that the $45,000 administrative fee should be used "for payments of expenses incurred in connection with th[e] Offering."[53]  The POM states that the Offering Expenses include "legal, accounting and administrative expenses, and commissions and fees related to this Offering,"[54] and that Offering Expenses shall not be paid from EB-5 capital

---

[51] Calculated as the sum of the net total cash outflows made for Offering Expenses, Business Expenditures, Transfers from/to Liu/Wang, Personal Expenses, and Transfers from/to Liu Affiliates listed in **Exhibit 3.**
[52] Deposition Exhibit 61.  I have not seen the details of the amounts listed in this document and note that the document bears the mention "Incomplete."
[53] Government Exhibit 5, p. 2.
[54] Government Exhibit 5, p. 6 ("Administrative Fees[:] PPEB5 will charge an Administrative Fee of $45,000 ('Administrative Fee') to pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering.  Investors will pay the Administrative Fee directly to the Regional Center.  The Regional Center will refund the Administrative Fee if (a) an Investor's subscription is not accepted, or (b) if an Investor's I-526 application is denied without

contributions.[55]  Further, "PPEB5…may engage and pay one or more brokers, investment
advisors, finders or other parties [sic] commissions or other fees in connection with the sale of
Units pursuant to this Offering.  Any such commissions or other fees paid in connection with the
sale of Units pursuant to this Offering shall be paid only out of the proceeds of Administrative
Fees."[56]

34.     The POM also mentions that specific professional service providers were retained in
connection with the offering and project:

> Pacific Proton Therapy Regional Center, LLC has engaged Miller Mayer, LLP to
> administer the regional center in accordance with USCIS rules and regulations
> relating to the Pilot Program….[57]  Miller Mayer, LLP represents the Regional
> Center and LAPT in connection with this Offering and the Project.[58]
>
> Evans Carroll & Associates is an economic consultant firm retained by LAPT to
> assist in the preparation of the Borrower's business plan, and the Economic
> Analysis….[59]

35.     In addition to these professional service providers, I understand that the work performed
by various other parties was related to the offering and should therefore be considered as part of
the Offering Expenses.  Those parties include Marcum, which assisted with accounting,[60] Steve
Yale who provided legal services,[61] Michael Hunn who provided consulting services in
connection with the business plan,[62] and Antonio Villaraigosa who assisted with the marketing of

---

possibility of cure.  The Regional Center will not refund all or any part of the Administrative Fee for any other reason.  The
Administrative Fee will not be held in escrow.").
[55] Government Exhibit 5, p. 20 ("Proceeds of this Offering do not include Administrative Fees.  Offering Expenses, commissions
and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5
Capital Contributions.").
[56] Government Exhibit 5, p. 8.
[57] Government Exhibit 5, p. 22.
[58] Government Exhibit 5, p. 23.
[59] Government Exhibit 5, p. 23.
[60] February 2021 Charles Liu Deposition, p. 129:2–10.
[61] February 2021 Charles Liu Deposition, pp. 79:21–80:10.
[62] February 2021 Charles Liu Deposition, p. 128:4–6.

the offering.[63]  Furthermore, the Corporate Defendants engaged the services of UDG, Delsk, and Overseas Chinese to help market and broker the offering to foreign investors.[64]

36.     Based on the foregoing, for the purposes of my analysis, I preliminarily classify the following expenses as Offering Expenses:

      a.  Broker fees paid to UDG, Delsk, and Overseas Chinese;[65]

      b.  Payments made to professional service providers such as Miller Mayer LLP, Marcum, and Evans Carroll & Associates, among others;

      c.  Payments made for marketing services such as fees paid to Mr. Villaraigosa.

37.     Accordingly, as shown in **Exhibit 5**, I estimate that the net amount paid by the Corporate Defendants for Offering Expenses amounts to $10,954,375.  The POM stipulates that Offering Expenses were to be paid from administrative fees and not from EB-5 capital contributions.[66]  Therefore, I have assumed that the amount of Offering Expenses that may be deducted from Net Receipts is limited to $45,000 per investor.  The total net amount of administrative fees received from investors was equal to $2,210,701.[67]  Thus, as shown in **Exhibit 5**, $8,743,674 of the total payments made for Offering Expenses may not be deducted from Net Receipts.

## 2.     Business Expenditures

38.     The POM made specific representations regarding the use of proceeds by the EB-5 Project.  Indeed, Beverly Proton disclosed its intent to use the capital contributions to pay for direct and indirect construction costs, proton center equipment, and other costs including construction financing, architectural and other professional fees, working capital, and fees for

---

[63] Mr. Villaraigosa assisted with marketing of the offering.  *See* Deposition of Ruth Novodor, February 22, 2021 ("February 2021 Ruth Novodor Deposition"), pp. 29:12–21, 170:19–171:1.
[64] January 2021 Lorraine Pearson Deposition, pp. 29:19–30:4; March 2016 Charles Liu Deposition, pp. 85:12–86:12, 140:16–141:5, 145:12–24.
[65] The bank records reflect cash inflows from the accounts associated with UDG, Delsk, and Overseas Chinese.  Thus, for purposes of calculating Offering Expenses, payments to these three firms were reduced by the monies received from them.
[66] Government Exhibit 5, p. 20.
[67] See **Exhibit 4.**

services or required to obtain permits and satisfy regulatory requirements.[68]  For example, the
POM disclosed:

> LAPT will use the loan proceeds to partially finance the construction and
> operation of a proton therapy center with commercial office space in Los Angeles
> County, CA (the "Project").  The proton therapy center with office space will be
> located at 111 W. Beverly Boulevard, Montebello, Los Angeles County, CA.[69]

> [Beverly Proton] intends to use the proceeds from this Offering to finance
> development and operation of the Los Angeles Proton Therapy Center described
> in Borrower's business plan.…[70]

> [Beverly Proton]'s Estimated Use of Proceeds

| Use of Funds | Amount |
|---|---|
| Hard Construction Costs (Direct): | $77,722,156 |
| Soft Costs (Indirect): | $16,814,726 |
| Proton Center Equipment: | $100,000,000 |
| Working Capital & Other Costs: | $5,463,118 |
| TOTAL: | $200,000,000 |

> …Other expected uses of proceeds include construction financing, architectural
> and other professional fees, working capital and fees for services required to
> obtain permits and satisfy regulatory requirements related to the Project.[71]

39.    In addition, the POM disclosed the following material contracts, specifically identifying

Dr. Thropay as landlord, and Optivus as supplier of proton therapy equipment:

> Borrower entered into a lease agreement ("111 Lease") with Dr. John P. Thropay
> for lease of real property located and known as 111 W. Beverly Blvd.,
> Montebello, CA on September 14, 2011 for development and operation of the
> Proton Therapy Center…[72]

---

[68] Government Exhibit 5, p. 20.
[69] Government Exhibit 5, p. 18.
[70] Government Exhibit 5, p. 20.
[71] Government Exhibit 5, p. 20.
[72] Government Exhibit 5, p. 14.

Borrower's business plan requires that it negotiate and enter into certain agreements for equipment and services, among other things, for operation of the Proton Center. Such Agreements include agreements for the purchase of proton beam equipment, license, and maintenance services with Optivus or another provider, real property lease for the Proton Center location, construction contracts, employment agreements with key personnel and agreements with various Individual Practice Associates.[73]

Borrower intends to engage Optivus Proton Beam Therapy, Inc. ("Optivus"), a proton beam technology developer in California, to provide all necessary proton beam treatment technology and related maintenance, under a service contract for the proton center. Optivus is the only U.S. company with U.S. Food and Drug Administration (FDA) clearance to provide proton therapy systems. Borrower has not commenced discussions with Optivus or negotiation of the terms for provision of such services at this time. The terms of engagement of Optivus, or any other service provider, will include costs for the provision of maintenance services, licensing fees, equipment upgrades and related services. Any change in the Borrower's estimate of these costs, or its failure or inability to engage Optivus, could negatively affect the profitability of the Borrower and its ability to repay the Loan.[74]

40.     Based on the terms of the POM, I reviewed the Corporate Defendants' bank statements and accounting records to identify payments that may be considered as deductible Business Expenditures. Specifically, I have assumed that the following types of payments constituted Business Expenditures:

    a.   Construction-related costs such as architectural design fees;

    b.   Rent payments to Dr. Thropay's account;[75]

    c.   Proton equipment purchases provided for in the POM (i.e., equipment purchases from Optivus) and other capital expenditures;

    d.   Operating expenses such as insurance costs, travel to China and Singapore to recruit patients, consulting fees, permit and license fees, and taxes, among others (see **Exhibit 6**).

---

[73] Government Exhibit 5, p. 14.

[74] Government Exhibit 5, p. 15.

[75] I understand that after Mr. Liu and Mr. Thropay ceased to collaborate in early 2016, Mr. Liu decided to relocate the project to a different physical address (i.e., 105 W. Beverly Boulevard) even though the POM had disclosed 111 W. Beverly Boulevard as the address of the project. *See* February 2021 Ruth Novodor Deposition, pp. 166:19–167:11; February 2021 Charles Liu Deposition, pp. 96:20–97:6. Based on the information available to me, I was unable to identify whether specific expenses related to the 105 W. Beverly Boulevard location occurred. I reserve the right to revise my analysis should additional information related to expenses from the change in location be provided to me.

41.     As part of my review, I identified certain payments that do not fall within the aforementioned four categories and do not meet the provisions of the POM surrounding the use of proceeds, and therefore may not be deductible as Business Expenditures.  Those are addressed separately in **Section VI.C.3** below and include withdrawals from Corporate Defendants' accounts, transfers to entities controlled by Mr. Liu that are not directly related to the EB-5 Project, and other payments made on behalf of the Individual Defendants.[76]

42.     As shown in **Exhibit 6**, I estimate that the net total amount paid by the Corporate Defendants for Business Expenditures amounts to $6,105,809.  Based on the aforementioned assumptions and my analysis of the bank statements and accounting records, I identified $3,105,809 of deductible Business Expenditures in total.  Thus, as shown in **Exhibit 6**, $3,000,000 of the total payments made for Business Expenditures may not be deducted from Net Receipts.[77]  Specifically, I exclude the $3 million payment to an equipment manufacturer other than Optivus, Mevion.  The POM only provided for proton equipment purchases from Optivus. Moreover, Dr. Thropay testified that he was not involved in the negotiation with Mevion.[78] Email communications also indicate that the payment to Mevion was made for the benefit of United MPH Ventures, a company other than Beverly Proton.[79]  Therefore, payments to Mevion are not considered to be deductible.

### 3.     Individual Defendants' Pecuniary Gains

43.     The Corporate Defendants' financial records display numerous transfers to the Individual Defendants that well exceeded the amounts that may be considered as deductible compensation, as well as withdrawals and other payments directly or indirectly benefitting them.

---

[76] I understand that Mr. Liu has argued that some of the transfers to him were reimbursement of expenses incurred before his employment agreement was signed.  The POM does not provide for the payment of expenditures that predate the period in which fundraising began using offering proceeds.  Therefore, I expect outflows incurred prior to October 2014 not to be deductible.
[77] $6,105,809 – $3,000,000 = $3,105,809.
[78] Deposition of John Thropay, MD, March 5, 2021 ("March 2021 John Thropay Deposition"), pp. 49:16–50:4, 76:22–77:6.
[79] Deposition Exhibit 109; March 2021 John Thropay Deposition, pp. 129:3–130:7.

a)    **Transfers to Individual Defendants**

44.    Between October 2014 and April 2016, a total of $6,858,092 was transferred to the
Individual Defendants.  Those distributions were classified in Pacific Proton Regional Center's
2015 financial statements as "management fees or distributions" regardless of their underlying
nature.[80]  Per the POM, the amount of money that the PPEB5 Fund managers may receive in the
form of a management fee was limited to 3% of PPEB5 Fund's gross revenues (if any).[81]  In
addition to the fact that the Pacific Proton Regional Center was the sole manager provided for in
the POM and that Mr. Liu and Ms. Wang were not identified as managers therein,[82] I do not
expect Mr. Liu and Ms. Wang to have earned any management fees.  Indeed, I have not seen
evidence that the PPEB5 Fund earned any revenues during the period at issue since the
construction was never completed and the proton center was never constructed nor operational.[83]
Therefore, based on the POM, no amount should be deducted from Net Receipts as management
fees.

45.    I understand that the Individual Defendants pointed to their employment agreements with
the Corporate Defendants as basis for the transfers made to them.[84]  However, such an argument
is fundamentally flawed.  Specifically, the employment agreements between the Individual
Defendants and Beverly Proton, which were signed in 2016, provide that annual salaries of
$550,000 and $280,000 should be paid to Mr. Liu and Ms. Wang respectively, "since January
2011."[85]  I note that Mr. Liu has argued that some of the transfers to him were reimbursement of
expenses incurred before his employment agreement was signed.[86]  However, the POM does not
provide for salaries or expense reimbursement to be paid retroactively using offering proceeds.
As such, the maximum amount of compensation that may be deducted from Net Receipts would

---

[80] March 2021 Trang Lam Deposition, pp. 54:24–56:7, 80:21–81:8.
[81] Government Exhibit 5, p. 26 ("The Manager shall receive a management fee equal to three (3.0%) percent of the gross revenues, if any, of the Company, payable on the first day of each month for the preceding period.").
[82] Government Exhibit 5, p. 6.
[83] February 2021 Charles Liu Deposition, p. 100:7–9.
[84] February 2021 Charles Liu Deposition, pp. 76:15–78:11.
[85] Deposition Exhibit 120, p. 1; Deposition Exhibit 123, p. 1.
[86] February 2021 Charles Liu Deposition, p. 78:4–11.

be limited to the total amount of salaries earned based on employment agreements after October 2014.  Nevertheless, the Memorandum of Understanding of the Pacific Proton Therapy Project between Mr. Liu and Dr. Thropay asserted that compensation would only be earned "[s]ubject to the Project successfully raising the minimum amount of agreed upon capital."[87]  The Beverly Proton project, however, did not raise the funds to complete the project.  Therefore, I have not seen evidence that Mr. Liu and Ms. Wang should have been paid a salary by Beverly Proton.

46.     In addition to a base salary, Mr. Liu's employment agreement with Beverly Proton entitles him to a bonus amounting to "8 percent of the total capital raised, including debt financing raised."[88]  His employment agreement with the Pacific Proton Regional Center also includes a bonus of 8% of the amount raised "when [the number of] total investors reaches 20."[89]  However, the POM does not provide for such bonuses to be paid to Mr. Liu.  Even if the bonuses were allowed under the POM, they are in substance a commission expense and would constitute an Offering Expense.[90]  Given that the maximum amount that may be deducted as Offering Expenses has already been reached as described in **Section VI.C.1** above, no bonuses may be claimed by Mr. Liu.

47.     I understand Mr. Liu also claims that he had employment agreements with Pacific Proton Regional Center and PPEB5 Fund.[91]  To the extent those agreements provided for a salary to be paid to Mr. Liu, they are not deductible.  As discussed in **Section VI.C.1** above, any salary paid by Pacific Proton Regional Center would be limited to administrative fees of $45,000 per investor for which the maximum amount deductible has been reached.  The salary related to PPEB5 Fund would similarly be not deductible since the project did not generate revenue to render a management fee or salary payable to Mr. Liu.  Moreover, the POM does not disclose any salary other than the management fee.

48.     Based on the analysis above and the information available to me, I estimate that the portion of the transfers made to the Individual Defendants that may be deducted from Net Receipts is $0 (see **Exhibit 7**).  This represents a difference of $6,749,692 from the actual

---

[87] SEC-GRASSMUECK-E-000804–811, at 806.
[88] Deposition Exhibit 120, p. 1.
[89] Deposition Exhibit 140, p. 133.
[90] Government Exhibit 5, p. 2.
[91] February 2021 Charles Liu Deposition, p. 104:7–13.

payments made by the Corporate Defendants to Mr. Liu and Ms. Wang.  I reserve the right to modify my calculations should additional documents be provided in connection with Mr. Liu's and Ms. Wang's compensation.

### b)    Withdrawals and Payments of Personal Expenses

49.    In addition to direct transfers to the Individual Defendants, the Corporate Defendants' bank records show numerous withdrawals and transactions that appear to be unrelated to the financing, development, or operation of the EB-5 Project, and may therefore not be deducted from the Net Receipts based on the terms of the POM.[92]  A detailed list of the transactions I have classified as personal expenses is included in **Exhibit 8**.  Based on their bank transaction data and financial records, approximately $1,427,180 was withdrawn from the Corporate Defendants' accounts (see **Exhibit 8**).  In addition, the Corporate Defendants paid several expenses on behalf of Mr. Liu and Ms. Wang, such as credit card payments, luxury vehicle purchases, school tuition fees, and ATM card purchases.[93]  Some of the ATM card purchases occurred in places other than the primary locations where the EB-5 Project was marketed to potential investors, including Las Vegas.[94]  Those various expenses and payments appear to be personal expenses and may therefore not be deducted from Gross Receipts because they deviate from the use of proceeds represented in the POM.  As shown in **Exhibit 7**, the $2,367,167 of personal expenses paid using Corporate Defendants' funds may not be deducted from Net Receipts.

### c)    Other Transfers

50.    Finally, as shown in **Exhibit 3**, between October 2014 and April 2016 a net amount of $210,270 was transferred to the Liu Affiliates.  As Mr. Liu testified, those affiliates were engaged in projects unrelated to the EB-5 Project that was presented to investors in the POM.[95]  Therefore, this amount may not be deducted from Net Receipts.

---

[92] Government Exhibit 5, p. 20.
[93] JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (October 1, 2014 – January 26, 2016), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP xls (October 1, 2014 – April 28, 2016).
[94] May 2016 Xin Wang Deposition, p. 42:6–11; February 2021 Charles Liu Deposition, p. 84:16–24.
[95] March 2016 Charles Liu Deposition, pp. 23:1–24:8.

VII.    **Conclusions**

51.     In summary, based on my review of the available financial records, my analysis of the flow of funds in light of the POM, and my determination that a significant amount of the investor funds were expended on non-deductible Business Expenditures, I estimate that the total amount that may be deducted from Net Receipts is $5,316,510.  Based on my analysis, I estimate that the net pecuniary gains to the Defendants amount to $20,222,511.  See **Exhibit 9**.

Executed this 26th of March, 2021

_____
Carlyn Irwin

**Appendix A**

## CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE
### Senior Advisor

**Cornerstone Research**
555 W. 5th Street, 38th Floor • Los Angeles, CA 90013
213.553.2533 • fax 213.553.2699
cirwin@cornerstone.com

### ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1992 | **University of Southern California** | Los Angeles, California |
| | *M.B.A., Accounting and Finance* | |
| 1989 | **University of California, Santa Barbara** | Santa Barbara, California |
| | *B.A., Organizational Psychology, Cum Laude* | |

### RANGE OF EXPERIENCE

More than twenty-five years of litigation consulting and expert witness experience, including analyzing economic, financial, causation, and accounting issues in context of damages claims, valuing businesses, and conducting financial forensic analysis in a wide variety of commercial disputes. Has experience in broad range of industries including real estate, medical devices, technology, entertainment, consumer products, and financial and professional services. Has worked with clients and counsel throughout the litigation process during all phases of the litigation process. Examples of testimony and casework experience include:

- Financial Forensic Analysis—Reconstructing financial records, tracing transactions through corporate reporting systems, and reviewing financial records (including tax returns) to assess consistency and reliability as part of corporate investigation, complex civil and criminal litigation involving white collar matters, as well as allegations of fraudulent conveyances, breach of contract, money laundering, and fraud. Has provided expert testimony regarding solvency, financial misstatements, fraudulent/preferential transfers, indications of fraudulent transactions and schemes, and misappropriation of assets.

- Contract and Tort Claims—Analyzing loss causation and damages issues and performing business valuations in breach of contract and tort causes of action, including breach of fiduciary duty, alter ego, Lanham Act violations, false advertising, and unfair business competition. Has analyzed compensatory damages as well as claims for statutory and restitution or disgorgement damages.

- Intellectual Property Disputes—Addressing damages issues in patent, copyright, and trademark infringement as well as trade secret misappropriation disputes. Specific expertise in estimating lost profits, unjust enrichment, and reasonable royalty damages, including analysis of loss causation and apportionment issues as well as the application of "Most Favored Licensee" clauses.

- Valuation Services – Providing opinions of value for businesses, intellectual property, and other intangible assets in the context of litigation, economic loss analyses, and partnership disputes.

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

## PROFESSIONAL ACCREDITATIONS

- Certified Public Accountant (CPA), California, State Board of Accountancy, April 2001

- Certified in Financial Forensics (CFF), American Institute of Certified Public Accountants, July 2008 (inception of credential)

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners, March 2011

- Accredited in Business Valuation (ABV), American Institute of Certified Public Accountants, August 2015

- Certified in Entity and Intangible Valuations (CEIV), American Institute of Certified Public Accountants, January 2018

## PROFESSIONAL AND BUSINESS HISTORY

| | | |
|---|---|---|
| 2002–Present | **Cornerstone Research, Inc.**<br>*Senior Advisor (2015-present)*<br>*Principal (2002-2015)* | Los Angeles, California |
| 1994–2002 | **PricewaterhouseCoopers**<br>*Director (2000-2002)*<br>*Manager/Principal (1997-2000)*<br>*Senior Consultant (1994-1997)* | Los Angeles, California |
| 1992–1994 | **Mitchell Silberberg & Knupp**<br>*Assistant Controller* | Los Angeles, California |
| 1991–1992 | **University of Southern California School of Business**<br>*Professor's Assistant, Finance Department* | Los Angeles, California |

## TESTIMONY EXPERIENCE:

- Testified in deposition (February 2021) in a breach of contract and misappropriation of trade secrets matter involving the issuance of a medical marijuana/cannabis license in Florida filed in the Superior Court of the State of Washington.  Calculated damages in the form of the fair market value of the medical marijuana license, the development costs of the trade secrets, and a reasonable royalty for the trade secrets.  (*Left Coast Ventures, Inc. v. Bill's Nursery, Inc., et al.*)

- Provided deposition testimony (January 2021) in a fraud matter involving the offer and sale of securities, issuance of cryptocurrency, and operating a pyramid scheme as part of a multi-level marketing company filed in the United States District Court, Central District of California.  Offered opinions regarding the flow of funds, the underpayment of compensation to distributors, the ability of the company to continue operations, and the pecuniary gain of the defendant.  (*Securities and Exchange Commission v. Daniel Pacheco, et al*)

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

**TESTIMONY EXPERIENCE (CONTINUED)**

- Testified in deposition (April 2020) in a class action matter alleging violations of the Equal Pay Act and Title VII of the Civil Rights Act of 1964 filed in the United States District Court, Central District of California, Western Division.  Conducted forensic accounting analysis of revenue earned by and payments made to members of the US Soccer Men's and Women's national teams.  (*Alex Morgan, et al. v. United States Soccer Federation, Inc.*)

- Provided deposition testimony (January 2020) in a litigation filed in the United States District Court, Central District of California involving allegations of violation of the Lanham Act and interference with prospective economic advantage.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits and unjust enrichment.  (*Multiple Energy Technologies v. Hologenix, LLC*)

- Testified in deposition (January 2020) in a matter filed in Superior Court of the State of California, County of Los Angeles involving the breach of partnership/participation agreements and allegations of fraud.  Performed an accounting of payments due under the participation agreement and provided rebuttal analyses under the terms of the asserted partnership.  (*RadioSurgery Solutions, LLC, et al. v. Select Healthcare Solutions Fund II, LLC, et al.*)

- Provided testimony in deposition (January 2020) in a matter involving claims of theft of trade secrets, tortious interference, and conspiracy filed in the Circuit Court of Cook County, Illinois.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits, unjust enrichment, and reasonable royalties.  (*Newmark Group, Inc., et al. v. Avison Young (Canada) Inc., et al.*)

- Provided testimony in arbitration (November 2019) in a breach of contract matter involving the rights to distribute the film *American Made* in mainland China.  Analysis included reasonableness of estimated foreign box office revenue, structure of "waterfall" payments to interested parties, as well as providing rebuttal testimony regarding Claimant's damages claim.  (*Beijing Galloping Horse Film Co. v. CCP Film Holdings, LLC, et al.*)

- Testified in depositions (August 2019, October 2019) and at trial (October 2019) in a matter involving claims of breach of fiduciary duty, breach of oral contract, fraud, etc. against the co-founder of a privately-held, e-commerce firm which sells women's and children's footwear filed in the Superior Court of the State of California, County of Los Angeles.  Scope included investment analysis of funds misappropriated and expected damages associated with unpaid taxes.  (*Dikla Gavrieli Unatin v. Kfir Gavrieli*, and associated cross-claims on behalf of Dean K. Unatin)

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

**TESTIMONY EXPERIENCE (CONTINUED)**

- Testified in matters (August 2019) for Ford Motor Company alleging fraud, negligence, and violation of the Song-Beverly Act against an automaker.  Reviewed and commented on opposing expert's analysis, observations, and calculation of compensatory and punitive damages associated with Ford's PowerShift/DPS6 transmission.

    o   Deposition (August 2019):  *Mark Pendante v. Ford Motor Company,* United States District Court, Central District of California

    o   Deposition (August 2019):  *Yvonne and Salvador Quintero v. Ford Motor Company,* United States District Court, Central District of California

- Provided deposition testimony (August 2019) in a Lanham Act matter involving country of origin claims for radio-frequency prevention loss labels for a matter filed in the United States District Court, Southern District of Florida.  Analysis included an assessment of the materiality of the allegedly false statement as well as calculation of revenue associated with the sales of the relevant labels.  (*ALL-Tag Corporation v. Checkpoint Systems, Inc.* and associated counterclaim)

- Testified in deposition (April 2019) and arbitration (July 2019) in a breach of sub-license matter involving patents for compact florescent light technology filed with the American Arbitration Association.  Analyzed the economic consequences of a "Most Favored Licensee" provision to amounts owed by licensee.  (*Beacon Point Capital, LLC v. Philips Electronics North America Corporation*)

- Provided deposition testimony (June 2019) in a fraud and breach of fiduciary duty matter filed in the United States Bankruptcy Court, Central District of California, Riverside Division.  Affirmative analysis and testimony included assessing solvency of land development and home building operations, as well as evaluating the companies' compliance with debt covenants.  Rebuttal testimony addressed reasonableness of Trustee's experts' opinions regarding the valuations of the assets, methodology for consolidating intercompany transactions, and calculations of damages in the form of deepening insolvency, wasteful disbursements, and unjust enrichment.  *Richard K. Diamond, Chapter 7 Trustee v. Empire Partners, Inc. et al.*)

- Testified in deposition (May 2019) as part of proceedings related to a motion for preliminary injunction filed in the Circuit Court of Jackson County, Missouri Kansas City Division and in the Court of Chancery for the State of Delaware.  Analysis and opinions related to the ability to calculate damages assuming breach of contract, tortious interference, etc. and provide rebuttal analysis regarding opposing expert's opinions regarding irreparable harm.  (*Mountain West Series of Lockton Companies, LLC, et al. v. Alliant Insurance Services, Inc., and related matters)*

- Provided testimony in deposition (May 2019) in a matter involving claims of theft of trade secrets, tortious interference, and conspiracy filed in the Superior Court for the District of Columbia.  Analyzed damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits, unjust enrichment, and reasonable royalties.  (*BGC Partners, Inc. et al. v. Avison Young (Canada) Inc., et al.*)

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

**TESTIMONY EXPERIENCE (CONTINUED)**

- Testified in deposition (October 2018) and arbitration (February 2019) in a matter involving claims of breach of contract, breach of confidentiality, and fraud, etc. filed before the Judicial Arbitration and Mediation Society in Los Angeles.  Estimated damages and provided rebuttal opinions regarding opposing expert's calculations of lost profits.  (*DAS Group Professionals, Inc. v. Tesla, Inc., and related counterclaims*)

- Provided deposition testimony (October 2018) in a breach of contract and fraud matter filed in the Superior Court of the State of California, County of Los Angeles.  Offered opinions regarding indicators of an allegedly fraudulent transaction and scheme, including related-party transactions, adequate disclosures, and potential economic benefit to defendants.  (<u>*ITV Gurney Holdings, Inc., et al. v. Scott and Deirdre Gurney*</u>)

- Provided deposition (September 2018) and arbitration testimony (December 2018) in a dispute alleging misappropriation of trade secrets, unfair trade practices, false advertising, and fraud filed before the Judicial Arbitration and Mediation Society in Los Angeles.  Testified regarding reasonableness of opposing expert's calculation of lost profits, valuation of trade secrets, and unjust enrichment.  (*Colorado Seasons, Inc., et al. v. <u>Art Brand Studios, LLC, et al.</u>)*

- Testified in deposition (June 2018) in a breach of contract, fraud, and trade secrets dispute filed in the Circuit Court of Jackson County, Missouri.  Reviewed and commented on opposing expert's analysis and opinions regarding lost profits and unjust enrichment. (*Marathon Reprographics, Inc. v. <u>J.E. Dunn Construction Company, et al.</u>*)

- Provided deposition (May 2018) and arbitration (June 2018) testimony in a breach of partnership agreement and fraud matter filed before the American Arbitration Association.  Reviewed and commented on opposing expert's analysis and opinions regarding Claimants' treatment as partners for tax purposes.  (*Daniel Alexander, et al. v. <u>Nicholas R. Halaris, et al.</u>*)

- Testified in a series of matters (January 2018 – March 2019) for Ford Motor Company alleging fraud, negligence, and violation of the Song-Beverly Act against an automaker.  Reviewed and commented on opposing expert's "fraud examination," analysis of indicia of fraud, other observations, and calculation of compensatory and punitive damages associated with Ford's 6.0L Navistar engine.

  o Deposition (March 2019):  *Corey McKinnon v. <u>Ford Motor Company</u>*, Superior Court of the State of California, County of Riverside

  o Deposition (March 2019):  *Evelia Arroyo v. <u>Ford Motor Company,</u>* Superior Court of the State of California, County of Riverside

  o Deposition (October 2018):  *Richard Melton v. <u>Ford Motor Company,</u>* Superior Court of California, County of San Diego

  o Deposition (August 2018):  *Richard R. Guinn v. <u>Ford Motor Company,</u>* Superior Court of California, County of Orange

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

**TESTIMONY EXPERIENCE (CONTINUED)**

- Ford 6.0L Navistar Cases Continued

  o Deposition (July 2018):  *Shelby Anderson, et al. v. Ford Motor Company*, Superior Court of California, County of San Joaquin

  o Deposition (April 2018):  *Timothy Berg v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Gary Skillman v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Mark Hemric, et al. v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Donna Watkins v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Cleveland Watts, et al. v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Marc Siegel v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (April 2018):  *Robert Brown, et al. v. Ford Motor Company*, Superior Court of California, County of Butte

  o Deposition (April 2018):  *Raul Berroteran II v. Ford Motor Company*, Superior Court of California, County of Los Angeles

  o Deposition (March 2018):  *Gregory Scott Misner, et al. v. Ford Motor Company*, Superior Court of California, County of Orange

  o Deposition (January 2018):  *Jeff Ettleman v. Ford Motor Company*, Superior Court of California, County of Riverside

- Testified at deposition (January 2018) in a breach of contract and misappropriation of trade secrets matter filed in the Eastern District of Virginia, Alexandria Division.  Analyzed and commented on opposing expert's estimation of damages under the DTSA and Virginia Uniform Trade Secrets Act.  (*Peraton, Inc. v. Raytheon Company*)

- Provided deposition testimony (October 2017) in a breach of contract and fiduciary duty case filed in the Northern District of California, San Jose Division.  Reviewed and commented on opposing expert analysis of plaintiff's damages and underlying assumptions.  Analyzed historical financial performance of business to assess reasonableness of projections.  (*Kelly Brezoczky v. Domtar Corporation, et al.*)

**CARLYN IRWIN, MBA, CPA/CFF/ABV/CEIV, CFE**
**Senior Advisor**

---

**PROFESSIONAL MEMBERSHIPS**

- Member, California Society of Certified Public Accountants, including Forensic Services Section

- Member, American Institute of Certified Public Accountants, including Forensic and Valuation Services Section

- Member, Association of Certified Fraud Examiners

**SPEAKING ENGAGEMENTS**

- University of California, Los Angeles, UCLA School of Law, Accounting and Financial Skills for Lawyers (Law 434), Guest Lecturer, November 2020

- University of Southern California, Leventhal School of Accounting, PACT Luncheon, Guest Speaker, Fall 2018

- Lost Profits and Damages Calculation: Everything You Need to Know in 2018, The Knowledge Group, Panelist, January 2018

- Cornerstone Research, Consumer Finance Class Actions and Enforcements, Moderator, November 2016

- University of Southern California, Leventhal School of Accounting, Accounting Ethics, Guest Speaker, Spring 2016 and Fall 2016

**FIRM-WIDE SERVICE**

- Cornerstone Research, Analyst Compensation Committee, 2007 to 2014

- Cornerstone Research, Risk Management Committee, 2002 to 2007

**AWARDS & RECOGNITION**

- Who's Who Legal: Investigations – Forensic Accountants, 2020, Global Investigations Review

- Who's Who Legal: Investigations – Forensic Accountants, 2019, Global Investigations Review

# Appendix B

# Documents Considered List

**Legal Pleadings**

- Complaint, *Securities and Exchange Commission v. Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al.*, May 26, 2016

- Plaintiff Securities and Exchange Commission's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment Against Defendants Charles C. Liu and Xin (Lisa) Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017

- Plaintiff Securities and Exchange Commission's Uncontroverted Facts and Conclusions of Law in Support of Its Motion for Summary Judgment, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017

- Defendant Charles C. Liu and Xin Wang's Memorandum of Points and Authorities and Declaration of Hervé Gouraige in Opposition to Plaintiff Securities and Exchange Commission's Motion for Summary Judgment, with Exhibits 1–2, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 17, 2017

- Defendant Charles C. Liu and Xin Wang's Statement of Genuine Disputes of Material Facts and Counter-Statement of Uncontroverted Facts in Opposition to Plaintiff Securities and Exchange Commission's Motion for Summary Judgment, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 17, 2017

- Plaintiff Securities and Exchange Commission's Reply in Support of Its Motion for Summary Judgment Against Defendants Charles C. Liu and Xin (Lisa) Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017

- Plaintiff Securities and Exchange Commission's Response to Defendants' Counter-Statement of Uncontroverted Facts, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017

- Defendant Charles C. Liu and Xin Wang's Objection to Plaintiff Securities and Exchange Commission's Responses to Defendants' Counter-Statement of Uncontroverted Facts; Declaration of Hervé Gouraige, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 26, 2017

- Defendant Charles C. Liu and Xin (Lisa) Wang's Memorandum of Points and Authorities in Opposition to the Plaintiff's Supplemental Brief Regarding Civil Penalties; Declaration of Hervé Gouraige, with Exhibit 1, *Securities and Exchange Commission v. Charles C. Liu, et al.*, February 15, 2017

1

# Appendix B

**Rulings**

- *Liu v. SEC*, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020)

- *SEC v. Liu*, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017)

**Declarations**

- Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Ex Parte Application for a Temporary Restraining Order, Order to Show Cause Why a Preliminary Injunction Should Not Be Granted, and Orders (1) Freezing Assets; (2) Repatriating Assets; (3) Requiring Accountings; (4) Prohibiting the Destruction of Documents, with Exhibits 9–13, *Securities and Exchange Commission v. Charles C. Liu, et al.*, May 26, 2016

- Supplemental Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Motion for Orders Requiring the Repatriation of Assets and Accountings, with Exhibits 1–9, *Securities and Exchange Commission v. Charles C. Liu, et al.*, June 3, 2016

- Second Supplemental Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Surreply in Opposition to Defendants' Motion for Relief from Sections VIII and IX of Preliminary Injunction, *Securities and Exchange Commission v. Charles C. Liu, et al.*, September 20, 2016

- Third Supplemental Declaration of Lorraine Pearson, *Securities and Exchange Commission v. Charles C. Liu, et al.,* September 28, 2016

- Declaration of Gary Y. Leung in Support of Plaintiff Securities and Exchange Commission's Motion for Summary Judgment Against Defendants Liu and Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017

- Supplemental Declaration of Gary Y. Leung in Support of Plaintiff Securities and Exchange Commission's Motion for Summary Judgment Against Defendants Liu and Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017

**Depositions and Exhibits**

- Deposition Exhibits 29, 35, 45–48, 51–88, 101, 103–110, 114–143

- Deposition of Charles C. Liu, March 23, 2016

- Deposition of Charles C. Liu, November 10, 2016

- Deposition of Charles C. Liu, February 24, 2021

# Appendix B

- Deposition of John Thropay, M.D., March 5, 2021

- Deposition of Lorraine Pearson, January 21, 2021

- Deposition of Ruth Novodor, February 22, 2021

- Deposition of Trang Lam, March 9, 2021

- Deposition of Xin Wang, May 4, 2016

- Deposition of Xin Wang, November 9, 2016

- Deposition of Xin Wang (aka Lisa Wang), February 25, 2021

**Testimonies and Exhibits**

- Government Exhibits 1–43

- Testimony of Charles C. Liu, March 23, 2016

- Testimony Errata for Charles C. Liu, May 16, 2016

- Testimony of Wenli Yao, May 12, 2016

- Testimony of Xin Wang, May 4, 2016

**Other Materials**

- "About the EB-5 Visa Classification," *United States Citizenship and Immigration Services*, March 25, 2021, available at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-the-eb-5-visa-classification, accessed March 25, 2021

- 8 CFR § 204.6 – Petitions for Employment Creation Aliens

- 8 CFR § 216.6 – Petition by Entrepreneur to Remove Conditional Basis of Lawful Permanent Resident Status

- 8 U.S. Code § 1153 – Allocation of Immigrant Visas

- "CFE Code of Professional Standards, Section III," *Association of Certified Fraud Examiners*, November 1, 2020, https://www.acfe.com/standards/, accessed March 26, 2021.

- Lorraine Declaration Exhibits 7 and 8 - PPEB5 Fund and Investor List - Acct 1028 SB710008_IR 05Feb16-983LLP.xls

- Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls

3

# Appendix B

- Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls

- "Statement on Standards of Forensic Service," *Forensic and Valuation Services Executive Committee*, January 1, 2020, https://future.aicpa.org/resources/download/statement-on-standards-for-forensic-services, accessed March 26, 2021.

**Produced Documents**

- JPM000143

- JPM000146

- Marcum_Cliu_00002501

- Marcum_Cliu_00002503

- Marcum_Cliu_00002639

- Marcum_Cliu_00002911

- Marcum_Cliu_00005273

- Marcum_Cliu_00005725

- Marcum_Cliu_00005730

- Marcum_Cliu_00006774

- Marcum_Cliu_00006962

- Marcum_Cliu_00007299

- Marcum_Cliu_00007351

- Marcum_Cliu_00007409

- Marcum_Cliu_00007485

- Marcum_Cliu_00007529

- Marcum_Cliu_00007619

- Marcum_Cliu_00007701

- Marcum_Cliu_00007885

- Marcum_Cliu_00008077

- Marcum_Cliu_00008312

# Appendix B

- Marcum_Cliu_00009464
- Marcum_Cliu_00010948
- Marcum_Cliu_00010982
- Marcum_Cliu_00013229
- Marcum_Cliu_00013231
- Marcum_Cliu_00013234
- Marcum_Cliu_00013286
- Marcum_Cliu_00013344
- Marcum_Cliu_00013420
- Marcum_Cliu_00013594
- Marcum_Cliu_00013604
- Marcum_Cliu_00013606
- Marcum_Cliu_00013609
- Marcum_Cliu_00013621
- Marcum_Cliu_00013641
- Marcum_Cliu_00014049
- Marcum_Cliu_00014721
- Marcum_Cliu_00014765
- Marcum_Cliu_00014824
- Marcum_Cliu_00014907
- Marcum_Cliu_00014909
- Marcum_Cliu_00015037
- Marcum_Cliu_00015216
- Marcum_Cliu_00015298
- Marcum_Cliu_00015482
- Marcum_Cliu_00015674
- Marcum_Cliu_00015909

# Appendix B

- Marcum_Cliu_00015910
- Marcum_CLiu_0001864
- Marcum_CLiu_0002147
- Marcum_CLiu_0006103
- SEC-BOA-E-0000195
- SEC-BOA-E-0000291
- SEC-BOA-E-0000298
- SEC-BOA-E-0000374
- SEC-CITIBANK-E-0000001
- SEC-CITIBANK-E-0000087
- SEC-CITIGROUP-E-0000087
- SEC-EWB-E-0000027
- SEC-EWB-E-0000028
- SEC-EWB-E-0000058
- SEC-GRASSMUECK-E-000804–811
- SEC-HSBC-E-0000025
- SEC-JPMCB-E-0000001
- SEC-JPMCB-E-0000018
- SEC-JPMCB-E-0000019
- SEC-JPMCB-P-0000763
- SEC-JPMCB-P-0000764–65
- SEC-JPMCB-P-0000769–70
- SEC-JPMCB-P-0000771–807
- SEC-JPMCB-P-0000808–13
- SEC-JPMC-E-0000001
- SEC-JPMC-E-0000002
- SEC-JPMC-E-0000003

# Appendix B

- SEC-JPMC-E-0000004

- SEC-JPMC-E-0000005

- SEC-JPMC-E-0000006

- SEC-LiuC-E-0000319

- SEC-LiuC-E-0000337

- SEC-LiuC-E-0000342

**Note: In addition to the documents on this list, I considered any other document cited in my report and exhibits to form my opinions.**

# Exhibit 1
# Represented Flow of Capital Contributions



Source: Government Exhibit 5 (Private Offering Memorandum, 300 Limited Liability Company Membership Units of Pacific Proton EB-5 Fund, LLC, May 1, 2013)

Note:
[1]  For first five year Beverly Proton was to pay a 0.25% interest-only repayment.  The loan was to be repaid after 5 years.
[2]  Total funding planned from PPEB5 fund and outside sources were approximately $200,000,000.
[3]  Estimated use of proceeds were $77,722,156 Hard Construction Costs (Direct), $16,814,726 Soft Costs (Indirect), $100,000,000 Proton Center Equipment, and $5,463,118 Working Capital & Other Costs.

# Exhibit 2
# Represented Flow of Administrative Fees



Source: Government Exhibit 5 (Private Offering Memorandum, 300 Limited Liability Company Membership Units of Pacific Proton EB-5 Fund, LLC, May 1, 2013)

Note:
[1]  Funds to be refunded if investor I-526 petition is denied without possibility of cure.
[2]  Offering expenses are to include legal, accounting and administration expenses, and commissions and fees related to the Offering.

**Exhibit 3**
**Summary of Cash Flows**
**PPEB5 Fund, Pacific Proton Regional Center, Pacific Proton**
9/10/13 – 4/28/16

| Category | Inflows | Outflows | Net (Inflows) Outflows |
|---|---|---|---|
| | [a] | [b] | [c] = [b] - [a] |
| *Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428* | | | |
| Transfers from/to Defendants | | | |
| Pacific Proton Therapy Regional Center | $0 | $0 | $0 |
| Pacific Proton EB-5 Fund | $0 | $1,000 | $1,000 |
| Beverly Proton Center[1] | $891,100 | $42,000 | ($849,100) |
| Investor Deposit - Administrative Fee | $2,255,701 | $45,000 | ($2,210,701) |
| Offering Expenses[2] | $34,500 | $1,149,746 | $1,115,246 |
| Business Expenditures[3] | $0 | $852,205 | $852,205 |
| Transfers from/to Liu & Wang | $108,400 | $138,092 | $29,692 |
| Personal Expense[4] | $0 | $1,304,911 | $1,304,911 |
| Transfers from/to Liu Affiliates | | | |
| Beverly Hospital | $0 | $12,500 | $12,500 |
| MP Hotel | $0 | $14,700 | $14,700 |
| United MPH Ventures LLC | $22,000 | $5,070 | ($16,930) |
| Transfers from/to Unknown Payees | $403,852 | $109,498 | ($294,354) |
| **Total** | **$3,715,553** | **$3,674,723** | **($40,830)** |

# Exhibit 3
# Summary of Cash Flows
# PPEB5 Fund, Pacific Proton Regional Center, Pacific Proton
## 9/10/13 – 4/28/16

| Category | Inflows | Outflows | Net (Inflows) Outflows |
|---|---|---|---|
| | [a] | [b] | [c] = [b] - [a] |
| _Pacific Proton EB-5 Fund JP Morgan Chase Account 528951028 and Citibank Account 000000000000204719769_ [5] | | | |
| Transfers from/to Defendants | | | |
|     Pacific Proton Therapy Regional Center | $1,000 | $0 | ($1,000) |
|     Pacific Proton EB-5 Fund | $0 | $0 | $0 |
|     Beverly Proton Center[1] | $9,960 | $21,210,200 | $21,200,240 |
| Investor Deposit - Capital Contributions: Direct | $700,080 | $500,000 | ($200,080) |
| Investor Deposit - Capital Contributions: Pacific Proton Escrow Account #9509 | $24,012,387 | $0 | ($24,012,387) |
| Offering Expenses[2] | $1,500,200 | $2,500,000 | $999,800 |
| Business Expenditures[3] | $0 | $14,228 | $14,228 |
| Transfers from/to Liu & Wang | $0 | $1,000,000 | $1,000,000 |
| Personal Expense[4] | $0 | $500,000 | $500,000 |
| Transfers from/to Liu Affiliates | | | |
|     Beverly Hospital | $0 | $0 | $0 |
|     MP Hotel | $0 | $0 | $0 |
|     United MPH Ventures LLC | $0 | $0 | $0 |
| Transfers from/to Unknown Payees | $500,450 | $500,000 | ($450) |
| **Total** | **$26,724,077** | **$26,224,428** | **($499,649)** |

# Exhibit 3
# Summary of Cash Flows
# PPEB5 Fund, Pacific Proton Regional Center, Pacific Proton
## 9/10/13 – 4/28/16

| Category | Inflows | Outflows | Net (Inflows) Outflows |
|---|---|---|---|
| | [a] | [b] | [c] = [b] - [a] |
| *Beverly Proton Center JP Morgaon Chase Account 427395152* [1] | | | |
| Transfers from/to Defendants | | | |
| Pacific Proton Therapy Regional Center | $42,000 | $891,100 | $849,100 |
| Pacific Proton EB-5 Fund | $21,210,200 | $9,960 | ($21,200,240) |
| Beverly Proton Center[1] | $0 | $0 | $0 |
| Investor Deposit | $0 | $0 | $0 |
| Offering Expenses[2] | $559,930 | $9,399,259 | $8,839,329 |
| Business Expenditures[3] | $0 | $5,239,375 | $5,239,375 |
| Transfers from/to Liu & Wang | $0 | $5,720,000 | $5,720,000 |
| Personal Expense[4] | $0 | $562,255 | $562,255 |
| Transfers from/to Liu Affiliates | | | |
| Beverly Hospital | $0 | $0 | $0 |
| MP Hotel | $0 | $200,000 | $200,000 |
| United MPH Ventures LLC | $0 | $0 | $0 |
| Transfers from/to Unknown Payees | $500,000 | $39,500 | ($460,500) |
| **Total** | **$22,312,130** | **$22,061,449** | **($250,681)** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16); Citibank Account 9769 Data, SEC-CITIBANK-E-0000087 (9/10/13–3/8/16)

Note:
[1]  Beverly Proton Center, LLC, was formally known as Los Angeles County Proton Therapy, LLC.
[2]  Offering Expenses include broker fees paid to Overseas Chinese Immigration Consulting Ltd., United Damei Group (United Damei Investment Company, Ltd. & Be jing Pacific Damei Consulting Co., Ltd), and Hang Seng Bank (Delsk), and other professional fees related to the offering.  See **Exhibit 5**.
[3]  See **Exhibit 6** for a list of Business Expenditures.
[4]  Reflects cash flows that were deemed to be of a personal nature such as withdrawals by Liu or Wang, personal credit card payments, payments to schools, and personal purchases, among others.  See detailed list in **Exhibit 8.**
[5]  Transfers between the two accounts of Pacific Proton EB-5 Fund are not shown.

**Exhibit 4**
**Summary of Investor Deposits**
10/1/14 – 4/28/16

| Investor | Capital Contributions | | | | | Administrative Fees | | | |
| | Pacific Proton Escrow Account #9509 | | PPEB5 Fund Account #1028 | | Combined | Pacific Proton Therapy Regional Center Account #6428 | | | |
| | Deposits | Refunds | Deposits | Refunds | Net Total | Deposits | Refunds | Net Total | Grand Net Total |
| | [a] | [b] | [c] | [d] | [e] = [a] - [b] + [c] - [d] | [f] | [g] | [h] = [f] - [g] | [i] = [e] + [h] |
| Cao, Xiang | $500,250 | $0 | $0 | $0 | $500,250 | $44,975 | $0 | $44,975 | $545,225 |
| Chen, Guichan | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Chen, Lian | $500,230 | $0 | $0 | $0 | $500,230 | $44,980 | $0 | $44,980 | $545,210 |
| Chen, Quan[1] | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Chen, Xiangchun | $500,257 | $0 | $0 | $0 | $500,257 | $45,007 | $0 | $45,007 | $545,264 |
| Chen, Zhong | $500,275 | $0 | $0 | $0 | $500,275 | $45,025 | $0 | $45,025 | $545,300 |
| Dai, Lixia | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Ding, Liang | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Fei, Jia | $500,224 | $0 | $0 | $0 | $500,224 | $45,024 | $0 | $45,024 | $545,248 |
| He, He | $500,230 | $0 | $0 | $0 | $500,230 | $44,980 | $0 | $44,980 | $545,210 |
| Hu, Runyi | $500,350 | $0 | $0 | $0 | $500,350 | $45,100 | $0 | $45,100 | $545,450 |
| Lan, Jie | $500,224 | $0 | $0 | $0 | $500,224 | $44,974 | $0 | $44,974 | $545,198 |
| Li, Chunbo | $500,317 | $0 | $0 | $0 | $500,317 | $45,007 | $0 | $45,007 | $545,324 |
| Li, Li | $500,400 | $0 | $0 | $0 | $500,400 | $45,085 | $0 | $45,085 | $545,485 |
| Li, Longwen | $500,250 | $500,000 | $0 | $0 | $250 [2] | $45,000 | $45,000 | $0 | $250 [2] |
| Li, Zengwei | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Li, Zezhou | $500,255 | $0 | $0 | $0 | $500,255 | $45,005 | $0 | $45,005 | $545,260 |
| Lin, Weiping | $500,275 | $0 | $0 | $0 | $500,275 | $45,027 | $0 | $45,027 | $545,302 |
| Lin, Wen | $500,274 | $0 | $0 | $0 | $500,274 | $45,024 | $0 | $45,024 | $545,298 |
| Liu, Feng | $500,275 | $0 | $0 | $0 | $500,275 | $45,025 | $0 | $45,025 | $545,300 |
| Liu, Genlan | $500,290 | $0 | $0 | $0 | $500,290 | $45,040 | $0 | $45,040 | $545,330 |
| Liu, Jingzhong | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Liu, Rui | $500,275 | $0 | $0 | $0 | $500,275 | $45,025 | $0 | $45,025 | $545,300 |
| Liu, Yimin | $500,020 | $0 | $0 | $0 | $500,020 | $45,020 | $0 | $45,020 | $545,040 |
| Lu, Xueying | $500,275 | $0 | $0 | $0 | $500,275 | $45,025 | $0 | $45,025 | $545,300 |
| Ma, Chaoqi | $500,225 | $0 | $0 | $0 | $500,225 | $44,980 | $0 | $44,980 | $545,205 |
| Qian, Yu | $500,280 | $0 | $0 | $0 | $500,280 | $45,030 | $0 | $45,030 | $545,310 |
| Shan, Yuhan | $500,300 | $0 | $0 | $0 | $500,300 | $45,020 | $0 | $45,020 | $545,320 |
| Shao, Xiaojing | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Shen, Juan | $500,280 | $0 | $0 | $0 | $500,280 | $45,030 | $0 | $45,030 | $545,310 |
| Tang, Xiaomin | $500,350 | $0 | $0 | $0 | $500,350 | $45,000 | $0 | $45,000 | $545,350 |
| Wang, Kexin | $0 | $0 | $0 | $500,000 | ($500,000) | $0 | $0 | $0 | ($500,000) |

**Exhibit 4**
**Summary of Investor Deposits**
10/1/14 – 4/28/16

| | Capital Contributions | | | | | Administrative Fees | | | |
| Investor | Pacific Proton Escrow Account #9509 | | PPEB5 Fund Account #1028 | | Combined | Pacific Proton Therapy Regional Center Account #6428 | | | Grand Net Total |
| | Deposits | Refunds | Deposits | Refunds | Net Total | Deposits | Refunds | Net Total | |
| | [a] | [b] | [c] | [d] | [e] = [a] - [b] + [c] - [d] | [f] | [g] | [h] = [f] - [g] | [i] = [e] + [h] |
| Wang, Wang | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Wang, Zhongsheng | $0 | $0 | $700,080 | $0 | $700,080 | $49,948 | $0 | $49,948 | $750,028 |
| Wang, Zihao | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Wu, Dong | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Xiang, Dong | $500,250 | $0 | $0 | $0 | $500,250 | $45,030 | $0 | $45,030 | $545,280 |
| Xu, Faxiao | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Xu, Guanghe | $500,272 | $0 | $0 | $0 | $500,272 | $45,024 | $0 | $45,024 | $545,296 |
| Yan, Chenglong | $500,224 | $0 | $0 | $0 | $500,224 | $45,004 | $0 | $45,004 | $545,228 |
| Yang, Jianqiang | $500,225 | $0 | $0 | $0 | $500,225 | $45,025 | $0 | $45,025 | $545,250 |
| Yang, Yong | $500,250 | $0 | $0 | $0 | $500,250 | $45,030 | $0 | $45,030 | $545,280 |
| Yu, Lifang | $500,030 | $0 | $0 | $0 | $500,030 | $45,020 | $0 | $45,020 | $545,050 |
| Zhang, Fan | $500,250 | $0 | $0 | $0 | $500,250 | $45,050 | $0 | $45,050 | $545,300 |
| Zhang, Haixia | $500,225 | $0 | $0 | $0 | $500,225 | $45,027 | $0 | $45,027 | $545,252 |
| Zhang, Jiahao | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Zhang, Lu | $500,250 | $0 | $0 | $0 | $500,250 | $45,000 | $0 | $45,000 | $545,250 |
| Zhao, Jian | $500,300 | $0 | $0 | $0 | $500,300 | $45,025 | $0 | $45,025 | $545,325 |
| Zhao, Wei | $500,250 | $0 | $0 | $0 | $500,250 | $45,050 | $0 | $45,050 | $545,300 |
| Zhou, Changgang | $500,250 | $0 | $0 | $0 | $500,250 | $45,050 | $0 | $45,050 | $545,300 |
| Zhou, Yitian | $500,230 | $0 | $0 | $0 | $500,230 | $45,010 | $0 | $45,010 | $545,240 |
| **Total Named Investors** | **$24,512,387** | **$500,000** | **$700,080** | **$500,000** | **$24,212,467** | **$2,255,701** | **$45,000** | **$2,210,701** | **$26,423,168** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP xls (10/1/14–4/28/16); East West Bank Account 9509 Data, SEC-EWB-E-0000027 (8/25/15–12/9/15), SEC-EWB-E-0000028 (11/14/14–12/31/15), and SEC-EWB-E-0000058 (3/16/16)

Note:
[1] For this investor, the Escrow Account data reflects a transfer of $500,250 from the Pacific Proton Escrow Account #9509 to the EB-5 Fund Account #1028, but does not reflect the corresponding deposit.  This discrepancy appears to be due to the fact that the deposit preceded the period captured by the Escrow Account data under review.  For purposes of this analysis, it was assumed that a deposit of $500,250 did occur in a prior period.
[2] $250 service fee was retained in the EB-5 Fund Account #1028 after funds were returned to this investor.

# Exhibit 5
## Summary of Offering Expenses
### 10/1/14 – 4/28/16

| Category | Net Cash Outflow |
|---|---|
| Broker Fees[1] | $10,829,870 |
| Legal Miller Mayer LLP | $498 |
| Evans, Carroll & Associates Inc. | $10,000 |
| Accounting Marcum LLP | $63,435 |
| Antonio Ramon Villaraigosa | $50,572 |
| **Total** | **$10,954,375** |
| Adjustment[2] | ($8,743,674) |
| **Deductible Amount** | **$2,210,701** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16)

Note:
[1]  Represents total amounts paid to UDG, Delsk, Overseas Chinese, net of any deposits received from these firms.
[2]  Per the PPEB5 Fund private offering memorandum, expenses incurred in connection with the offering should be paid using proceeds from administrative fees.  The adjustment reflects the amount by which observed offering expenses should be reduced to limit them to the actual net amount of administrative fees received from PPEB5 investors.  See **Exhibit 4**.

**Exhibit 6**
**Summary of Business Expenditures**
9/10/13 – 4/28/16

| Category | Total Cash Outflows | Adjustments | Deductible Amount |
|---|---|---|---|
| | [a] | [b] | [c] = [a] - [b] |
| *Proton Therapy Expenses* | | | |
| Land Lease payments Dr. Thropay | $524,000 | $0 | $524,000 |
| Land remediation - R. Alan Construction | $466,487 | $0 | $466,487 |
| Construction Design - X Science Studio | $535,292 | $0 | $535,292 |
| Equipment Purchase -  Mevion Medical Systems, Inc. | $3,000,000 | ($3,000,000)[1] | $0 |
| Equipment Purchase - Optivus Proton Beam Therapy, Inc. | $368,100 | $0 | $368,100 |
| Furnitures & Fixtures | $78,532 | $0 | $78,532 |
| Office Equipment | $9,311 | $0 | $9,311 |
| **Total** | **$4,981,722** | **($3,000,000)** | **$1,981,722** |
| | | | |
| *State & Federal Taxes* | | | |
| CA State Franchise Tax | $10,900 | $0 | $10,900 |
| **Total** | **$10,900** | **$0** | **$10,900** |
| | | | |
| *Miscellaneous Expenses* | | | |
| Employee salaries | $167,680 | $0 | $167,680 |
| Office rent | $120,901 | $0 | $120,901 |
| Office expenses | $2,707 | $0 | $2,707 |
| Bank service charges | $19,843 | $0 | $19,843 |
| Travel expense | $20,394 | $0 | $20,394 |
| Telephone expense | $7,764 | $0 | $7,764 |
| Consulting fees | $233,761 | $0 | $233,761 |
| Health Insurance | $14,922 | $0 | $14,922 |
| Vehicle Insurance | $3,027 | $0 | $3,027 |
| Other Insurance | $3,625 | $0 | $3,625 |
| Postage and delivery | $11,730 | $0 | $11,730 |
| Licenses and permits | $2,721 | $0 | $2,721 |
| Miscellaneous | $687 | $0 | $687 |
| **Total** | **$609,763** | **$0** | **$609,763** |
| | | | |
| *Professional Fees* | | | |
| Others | $503,425 | $0 | $503,425 |
| **Total** | **$503,425** | **$0** | **$503,425** |
| | | | |
| **Total Business Expenditures** | **$6,105,809** | **($3,000,000)** | **$3,105,809** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16); Citibank Account 9769 Data, SEC-CITIBANK-E-0000087 (9/10/13–3/8/16)

Note:
[1]  The PPEB5 Fund private offering memorandum only provided for proton equipment purchases from Optivus.  Therefore Mevion equipment purchases are not considered to be deduc ible.

# Exhibit 7
# Summary of Transfers to Liu/Wang and Personal Expenses
## 10/1/14 – 4/28/16

| Category | Net Cash Outflow | Adjustments | Deductible Amount |
|---|---|---|---|
| | [a] | [b] | [c] = [a] - [b] |
| *Transfers to Liu/Wang* | | | |
| Charles Liu | $5,320,092 | ($5,320,092) [1] | $0 |
| Xin Wang | $1,429,600 | ($1,429,600) [1] | $0 |
| **Total** | **$6,749,692** | **($6,749,692)** | **$0** |
| | | | |
| *Personal Expenses* | | | |
| Liu & Wang personal expenses[2] | $2,367,167 | ($2,367,167) [3] | $0 |
| **Total** | **$2,367,167** | **($2,367,167)** | **$0** |
| | | | |
| **Total Transfers and Personal Expenses** | **$9,116,859** | **($9,116,859)** | **$0** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16)

Note:
[1]  Transfers to Liu and Wang are deemed non-deductible.  To the extent they may be considered as reimbursement for expenses incurred before fundraising began, they would also not be deductible since the actual net amount of administrative fees received from PPEB5 investors is less than the observed offering expenses, see **Exhibit 5**.
[2]  Reflects cash flows that were deemed to be of a personal nature such as withdrawals by Liu or Wang, personal credit card payments, payments to schools, personal purchases, and payments to vendors for personal or residential services, among others.  See **Exhibit 8**.
[3]  The PPEB5 Fund private offering memorandum does not provide for the payment of personal expenses using investment proceeds.  Thus, personal expenses are deemed not to be deductible. To the extent they may be considered as reimbuseement for expenses incurred before fundraising began, they would also not be deductible since the actual net amount of administrative fees received from PPEB5 investors is less than the observed offering expenses, see **Exhibit 5**.

# Exhibit 8
# Detailed Summary of Personal Expenses Paid on Behalf of Charles Liu and Xin Wang
## 10/1/14 – 4/28/16

| Paying Entity | Receiving Entity | Cash Outflow |
|---|---|---|
| Pacific Proton EB-5 Fund JP Morgan Chase Account 528951028 | Other Withdrawal | $500,000 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | Other Withdrawal | $465,000 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Other Withdrawal | $462,180 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Chase Credit Card Payment 3763 | $219,326 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Amex Credit Card Payment | $124,010 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Chase Credit Card Payment 0571 | $110,526 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Chase Credit Card Payment 8187 | $70,173 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ALLY Payment | $67,765 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Caesar Palace Las Vegas | $56,173 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Mercedes Benz | $47,828 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Barclay Credit Card Payment | $35,458 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | Chase Card Payment | $33,063 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | IBA Dosimetry America | $31,506 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | Chase Credit Card Payment 9114 | $29,736 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Chase Card Payment | $24,383 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | County of Orange Tax/Fee | $22,409 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | US Best Repair Services | $9,850 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Bear Brand | $7,912 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Nassau | $4,225 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Laguna Niguel | $4,083 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Trinity Foundation Marianapolis Preparatory School | $3,195 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Columbus Data Las Vegas | $3,122 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Rohan Heating & Cooling | $3,040 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Allusions Glass & Mirror | $2,500 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Laguna Niguel Rolling Hills | $2,468 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | Chase Epay Onus Card Purchase | $2,450 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | myschoolaccount | $2,446 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Host Office Right Las Vegas | $2,024 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | West's Pool & Spa Supply | $1,716 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | San Diego Gas & Electric | $1,601 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Miguel Avian Gardening | $1,515 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Ignacio Isas Tree Trimming | $1,150 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase New York | $1,000 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Bahamas Air Nassau | $950 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Hawthorne Radiology | $925 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Benito Rodriguez | $800 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Department of Motor Vehicles | $800 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Aidan's Landscaping | $770 |

# Exhibit 8
# Detailed Summary of Personal Expenses Paid on Behalf of Charles Liu and Xin Wang
## 10/1/14 – 4/28/16

| Paying Entity | Receiving Entity | Cash Outflow |
|---|---|---|
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Mission Viejo | $753 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Kerzner International Paradise Island Nassau | $706 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Pathology Medical Services | $600 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Metlife Ins. Co. | $569 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Takashimaya Singapore | $536 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Kahului Aipport Kahului Hawaii | $503 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Ocean Ranch Dana Point | $503 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Miami | $502 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Irvine | $500 |
| Beverly Proton Center JP Morgan Chase Account 427395152 | ATM/Card Purchase Miami | $500 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Moulton Laguna Niguel Water Bill | $500 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | The Gas Co. | $408 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Henry Tsai | $336 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Sirius XM | $334 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Mauricio Rosas | $320 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | MVEP Medical Group | $292 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Windowmasters | $200 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | CR&R Inc. Enviromental Services | $194 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Choya Japanese Cuisine Dana Point | $168 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Quest Diagnositcs | $144 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase CLB Cage Right Las Vegas | $106 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Arco Mission Viejo Gas | $90 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Los Angeles | $65 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Chevron Barstow Gas | $63 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Aliso Viejo | $60 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | American Bio-Clinical Laboratories | $60 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Texaco Primm Nevada Gas | $53 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | Court of California | $25 |
| Pacific Proton Therapy Regional Center JP Morgan Chase Account 934026428 | ATM/Card Purchase Arco Paypoint Victorville | $3 |
| **Total** | | **$2,367,167** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account
5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase
Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May
2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16)

# Exhibit 9
# Calculation of Defendants' Pecuniary Gains
## 9/10/13 – 4/28/16

|  | Amount |
|---|---|
| Receipts Disgorgement[1] | $26,733,019 |
| *Less:* |  |
| Refunds[2] | $1,193,998 |
| **Net Receipts** | **$25,539,021** |
|  |  |
| Deductible Expenditures |  |
| Offering Expenses | $2,210,701 |
| Business Expenditures | $3,105,809 |
| Transfers to Liu/Wang | $0 |
| **Total Deductible Expenditures** | **$5,316,510** |
|  |  |
| **Defendant's Pecuniary Gains** | **$20,222,511** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16); Citibank Account 9769 Data, SEC-CITIBANK-E-0000087 (9/10/13–3/8/16); SEC v. Liu, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017)

Note:
[1] Disgorgement per the Supreme Court's June 22, 2020 Final Judgment.
[2] Reflects total refunds of capital contributions and administrative fees to named investors, and transfers to unknown payees.

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

       U.S. SECURITIES AND EXCHANGE COMMISSION,
       444 S. Flower Street, Suite 900, Los Angeles, California 90071
       Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On March 26, 2021, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RULE 26(a)(2) DESIGNATION OF EXPERT WITNESS** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

       ☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

       ☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

       I declare under penalty of perjury that the foregoing is true and correct.

Date:  March 26, 2021             */s/ Gary Y. Leung*
                                 GARY Y. LEUNG

2

*SEC v. Liu et al.*
**United States District Court—Central District of California**
**Case No. SACV16-00974-CJC (AGRx)**

**<u>SERVICE LIST</u>**

*Counsel for Defendants Charles C. Liu
and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and
Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu¸ the controlling shareholder of each*)
Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

3

# Exhibit 27

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    SECURITIES AND EXCHANGE            )
      COMMISSION,                        )
 5                                       )
            Plaintiffs,                  )
 6                                       )
              vs.                        ) CASE NO. SACV 16-00974-CJC
 7                                       )
      CHARLES C. LIU; XIN WANG 9 a/k/a   )
 8    LISA WANG, et al.,                 )
                                         )
 9          Defendants.                  )
      _____   )
10
11
12
13              DEPOSITION OF CARLYN IRWIN
14         Taken on Thursday, April 15, 2021
15                 At  9:00 a.m.
16             At Remote Proceeding
17               Las Vegas, Nevada
18
19
20
21
22
23    REPORTED BY:  SHIFRA MOSCOVITZ, CCR NO. 938
24    JOB NO. 4526404
25    PAGES 1-98
```

                                                    Page 1

Page 2

```
 1  APPEARANCES:
 2  For Individual Defendants:
 3        HERVE GOURAIGE, ESQ.
          SILLS CUMMIS & GROSS
 4        1 Riverfront Plaza
          Newark, New Jersey 07102-5400
 5        (973)634-5989
          hgouraige@sillscummis.com
 6
 7
    For Plaintiff:
 8
          GARY Y. LEUNG, ESQ.
 9        UNITED STATES SECURITIES & EXCHANGE COMMISSION
          444 South Flower Street,
10        Suite 900
          Los Angeles, California 90071
11        (323) 965-3998
          leungg@sec.gov
12
13
14
    Also Present:  RON FRIEDMAN
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        LAS VEGAS, NEVADA; APRIL 15, 2021
 2            9:00 A.M.
 3            -oOo-
 4  (NRCP Rule 30(b)(4) waived by the parties prior to the
 5  commencement of the deposition.)
 6  (FRCP Rule 30(b)(5) waived by the parties prior to the
 7  commencement of the deposition.)
 8  Thereupon--
 9        CARLYN IRWIN,
10  was called as a witness, and having been first duly sworn,
11  was examined and testified as follows:
12          EXAMINATION
13  BY MR. GOURAIGE:
14      MR. LEUNG:  Gary Leung for Plaintiff.
15      MR. GOURAIGE:  Herve Gouraige, for the
16  defendants.  Let me just also note, Ron
17  Friedman, an expert witness for the defendants.
18      Q.  Ms. Irwin, as I just indicated, my name is
19  Herve Gouraige, I represent the two individual
20  defendants in this case.  Before we start, I just
21  want to ask you, do you have a copy of your March
22  26th, 2021 report in front of you?
23      A.  I do.
24      Q.  Okay.  In Exhibit B, of that report you
25  list all of the documents that you relied on in
```

Page 3

```
 1          EXAMINATION
 2  WITNESS:              PAGE
    Carlyn Irwin
 3
 4  Examination by
    Mr. Gouraige                  4
 5
 6
 7
 8
 9          EXHIBITS
10  EXHIBIT                PAGE
11  Exhibit 144   Carlyn Irwin's Expert Report    11
12  Exhibit 145   Memorandum of Understanding RE   33
              Exchange of Real Property
13
14  Exhibit 146   Declaration            60
15  Exhibit 147   May 1, 2013 POM              69
16  Exhibit 148   Declaration            70
17  Exhibit 149   Email          91
    Exhibit 150   Westlaw Document            92
18
19
20
21
22
23
24
25
```

Page 5

```
 1  preparing that report?
 2      A.  Yes, that's correct.
 3      Q.  Do you personally read each one of those
 4  documents?
 5      A.  Let me take a look.  I have looked at many
 6  of these, to the extent that these documents are
 7  either scans of bank statements or not scans, pdf of
 8  bank statements or excel files that contains the
 9  transaction data, I did not look at each one
10  personally, but I did review the process of
11  confining that data and putting that data into a
12  form that we could work with.
13      Q.  Did you personally review the deposition
14  transcripts that are listed in Exhibit B?
15      A.  Let me see.  I reviewed portions of, let's
16  see, I think I reviewed portions of each one, on
17  Mr. Liu's there is several.  I don't recall which
18  ones, if I actually reviewed a portion of each one.
19  Or if there is three of them it would be hard for me
20  to remember.  Same thing goes for Ms. Wang, but I
21  did review a portion of each one.
22      Q.  And when you reviewed portions of the
23  deposition transcript, did you review personally any
24  of the exhibits?
25      A.  I believe exhibits that I noted in Exhibit
```

2 (Pages 2 - 5)

1 B, I note all the deposition exhibits I did look at.
2 I don't believe I received any other, any of the
3 deposition transcripts or, excuse me, deposition
4 exhibits.
5    Q.   If a deposition exhibit is not listed in
6 Exhibit B to your report, you did not look at that
7 exhibit, is that correct?
8    A.   I think that's correct, this is a document
9 considered list and the way my firm, our practice is
10 to assemble these is anything that we reviewed, me
11 or my team, and that is part of my report, or
12 anything we have reviewed whether, it's cited or not
13 is listed here.  So I think that's a fair statement.
14    Q.   In your CV, is there any professional or
15 educational experience that you think is relevant to
16 the report you prepared in this case that is not
17 included in the CV?
18    A.   There are several things that I can think
19 of that were not specifically mentioned, they were
20 generally captured in my employment records, there
21 is one employment position I had as an intern when I
22 was in graduate school.  I was a compensation
23 consultant for Mercer, which was a subsidiary of
24 Marshal.  In that capacity, I drafted salary
25 surveys, coordinated the potential contacts who

Page 6

1 would be filling them out, ensuring that they would
2 agree to complete the surveys.  They would send the
3 surveys back and then I would personally review them
4 and summarize the results and then put them into a
5 report that would then be sent back to participants.
6 Also, part of that, I believe that.  I was also
7 putting together survey data that was gathered from
8 external resources and consolidating that into
9 presentation for executives, the partner I was
10 working for, she would give those presentations.  So
11 I was working at her direction to gather that data.
12 So I think that is relevant.  Another aspect of my
13 work, and it's not listed because I never testified
14 or when I did testify in these cases, they were
15 beyond four years, in family law matters, when I was
16 at Price Water, I worked in family law matters which
17 require when you are evaluating a business, require
18 that you consider reasonable compensation for the
19 principal, the principal owner, especially when it's
20 closely held and there are a lot of perks or other
21 types of payments that come along with being in that
22 position and then what I do think is reflected is
23 just generally speaking my 25 years of business
24 experience and evaluation.  It gives me a background
25 in assessing reasonable compensation and all those

Page 7

1 comps specifically go to the point that Mr. Friedman
2 or Mr. Ginsburg made regarding my qualifications.
3    Q.   Have you ever prepared an expert report
4 regarding reasonable compensation?
5    A.   I would say reasonable compensation has
6 been a component of expert reports that I issued,
7 when it comes to valuation.
8    Q.   And how many times do you estimate you
9 have done that?
10    A.   Let me go over to resume, my CV, and see.
11 I can so far find four on my resume, on my CV in
12 cases which I dealt with reasonable compensation one
13 way or the other.
14    Q.   Could you identify the ones and they were
15 components of the report, is that correct?
16    A.   Correct, they were part of the bigger
17 evaluation of damages or whatever issues was at
18 hand.  I will identify them for you.  Well, I
19 wouldn't, the Alex Morgan versus United States
20 Soccer Federation, that dealt with reasonable
21 compensation in terms of the context of
22 discrimination.  Multiple Energy Technology versus
23 Hologynics.  Hologynics is a closely held company,
24 and I had to assess a reasonable compensation there
25 in order to normalize their profit and law

Page 8

1 statement.  Radio Surgery Solutions versus Select
2 Healthcare, that was another one where I am actively
3 working, I just have been deposed on and I am going
4 to be deposed again and we are dealing with
5 reasonable compensation on that matter.  At the
6 bottom of Page 3 of 7, Gavrielli versus Gavrielli,
7 and actually the reasonable compensation I worked on
8 was on behalf of Dean Unitan, who was a
9 cross-claimant.  Let's see, Cross-claim Plaintiff,
10 excuse me.  On the next page Richard K. Diamond
11 versus Empire Partners, there is a bankruptcy
12 matter, one of the things I did there was to assess
13 the reasonableness of the executives compensation,
14 as the trustee was asserting that they had over
15 compensated themselves, some of them, I can't
16 remember for sure.  So I don't add those in say one
17 way or the other.
18    Q.   Before you signed your report on or about
19 March 26, 2021, did you review it carefully to make
20 sure that all factual statements in the report were
21 correct?
22    A.   Yes, that is something that I and my team
23 would entertain.
24    Q.   But did you personally review it and make
25 sure that they were correct?

Page 9

3 (Pages 6 - 9)

1    A.   Yes, yes, I reviewed all of the footnotes
2 that support all of the documents that support all
3 of the footnotes.
4    Q.   Did you personally confirm that the
5 conclusions you reached in your report were your
6 firm conclusions and they were based on evidence
7 that you had personally reviewed?
8    A.   Yes.
9    Q.   Did you personally review the Supreme
10 Court's decision in this case, the June 22, '20
11 decision?
12    A.   I did.
13    Q.   So I am going to ask you now to turn to
14 your expert report, and look at with me, Exhibit 9.
15 Now, I am going to, what I will do is, you have the
16 document before you, correct?
17    A.   I do, I have both the electronic version
18 as well as the printed out version.
19    Q.   Okay.  For purposes of deposition, I am
20 just going to go to exhibit share and I am going to
21 introduce that report.  I believe it should be
22 Number 111.  So I will mark it so you will have
23 access however you want it, hard copy or
24 electronically?
25    A.   Okay.

Page 10

1       MR. LEUNG:  You are marking it 111?
2       MR. GOURAIGE:  Yes.
3       MR. LEUNG:  We ended at 143, with Ms. Lam,
4 so you may want to mark it as 144.
5       MR. GOURAIGE:  Okay, I will mark it 144
6 then.
7           (Exhibit 144 was marked for
8           identification.)
9    Q.   Now, Ms. Irwin, you should either have it
10 on your screen in exhibit share or you should look
11 at the hard copy document you have in front of you,
12 whichever one is more convenient?
13    A.   Okay.
14    Q.   And we will just, I will refer to it as
15 144 for today.  I want to draw your attention to
16 Exhibit 9, to your report?
17    A.   Okay.
18    Q.   So I want to understand the overall
19 approach you took in this report.  As I see this,
20 you determined the total net receipts of investor
21 funds, is that correct?
22    A.   With my starting point being the
23 disgorgement that judge Carney identified, the
24 amount that was identified in the ruling of
25 $26,333,019.

Page 11

1    Q.   You just said Judge Carney, but your
2 report says it was the Supreme Court that awarded
3 the disgorgement?
4    A.   Well, the Supreme Court, I believe, I
5 don't want to mischaracterize what the Supreme Court
6 ruled, but I believe they remanded this issue, based
7 on the number and it was a disgorgement that was set
8 by the Supreme Court, but the number came from Judge
9 Carney's ruling, I believe.
10    Q.   Well, look at Exhibit 9 of your report,
11 and I am reading from note one of that exhibit,
12 well, the footnote, the receipts of disgorgement of
13 $26,733,019, all from note one, disgorgement order
14 Supreme Court June 22, 2020, final judgment end of
15 quote.  Is that your report?
16    A.   Yes, it is.
17    Q.   Did you read it before you signed it?
18    A.   Yes, of course.
19    Q.   And you signed it?
20    A.   Of course I did.
21    Q.   Is that correct?
22    A.   Yes, sir.
23    Q.   Does Supreme Court awarded this
24 disgorgement of $26,733,019?
25    A.   My understanding, and this could be a

Page 12

1 legal issue, the Supreme Court awarded the
2 disgorgement and the amount came from Judge Carney's
3 ruling.  Perhaps that was left off the footnote, but
4 the actual ruling, the disgorgement being relevant
5 came from the Supreme Court.
6    Q.   And where, do you remember where in the
7 Supreme Court decision you saw that statement that
8 it awarded disgorgement?
9    A.   Sorry, it did not.  It's not the right
10 word.  Again, could be a little issue, I am not
11 saying that they awarded disgorgement, but they set
12 forth that the disgorgement should be, that the
13 proper methodology is to have the disgorgement
14 offset by legitimate business expenses.  This is the
15 disgorgement that was identified by Judge Carney in
16 his ruling.
17    Q.   Well, I don't want to get into the legal
18 issues, I just want to get the gist of the fact.  So
19 you go back to Page 9 of your report, Exhibit 144?
20    A.   Page 9 or Exhibit 9?
21    Q.   No, go to Page Nine?
22    A.   Okay.
23    Q.   So at the top of the page, Roman numeral
24 six, and I am quoting at the end of that first
25 sentence beginning with I, I guess I is referring to

Page 13

4 (Pages 10 - 13)

1 you, Ms. Irwin?
2   A.  Correct.
3   Q.  "I have reviewed the $26,733,019 audit as
4 disgorgement by the U.S. Supreme Court"?
5   A.  Yes.
6   Q.  Did you see that the U.S. Supreme Court
7 ordered that amount of disgorgement?
8      MR. LEUNG:  Objection.  You can answer.
9   A.  I think I have explained, the disgorgement
10 amount was set, "disgorgement", not the final
11 conclusion, but the "disgorgement" amount is set by
12 Judge Carney, and then the Supreme court, my
13 understanding is that the Supreme Court ruled it
14 should be offset.  Even Judge Carney said it should
15 be offset by legitimate business expenses.  This
16 was, the "disgorgement" was part of the Supreme
17 Court's ruling.  And if you look down below to
18 footnote 31, which it is referencing, let me confirm
19 which document we are looking at there.  The
20 document it is citing is Judge Carney's ruling.
21   Q.  Where are you?
22   A.  Footnote 31, sir.  GSEC Versus Liu 262S,
23 3D957, 970 to 972.  CDCAL2007, and that document is
24 Judge Carney's ruling.
25   Q.  Okay.  So Judge Carney ordered that amount

Page 14

1 should have included Judge Carney's ruling, but that
2 was certainly wasn't intended to be misleading.
3   Q.  No, I am glad we clarified.  So let's go
4 back to Exhibit 9.  You then deducted certain
5 refunds.  Were these refunds through investors?
6   A.  Yes.
7   Q.  When you took that 26,733,019 as the gross
8 receipt, did you determine that all of those funds
9 were investor funds?
10   A.  Well, I determined first, if you look at
11 Exhibit 4 to my report, I was able to identify, I
12 need my glasses.  If you look at Exhibit 4,
13 electronic version that I can actually, I was able
14 to identify through my forensic work, if you see on
15 the second page of Exhibit 4, net total, excuse me,
16 total named investor named defendants of 26,423,168,
17 but given Judge Carney's ruling, that was, our
18 starting point was higher.  Oh gosh, 300,000 more,
19 based on Judge Carney's ruling.
20   Q.  The report is your report, is that
21 correct?
22   A.  Yes, sir.
23   Q.  You are representing the numbers in your
24 report as numbers that you have actually determined,
25 based on review of evidence?

Page 16

1 in disgorgement, is that what?
2   A.  Yes.
3   Q.  Is that what you meant to say in your
4 report?
5   A.  What he said is, well, several things.  He
6 called it the reasonable approximation of the profit
7 causes and connected to Liu and Wang's violation is
8 the total investment minus funds remaining or
9 26,733,000 actually, it's $18 and 81 cents.  And
10 then elsewhere he says, that it is hereby ordered
11 that judgment is entered in favor of the SEC.
12 Defendants Liu and Wang are jointly and severally
13 reliable for the disgorgement of 26,733,018.81, and
14 prejudgment entered, which I have not dealt with in
15 this report, so that's what the ruling says.
16   Q.  Okay.  So your report, you meant to refer
17 to what Judge Carney ordered in disgorgement, the
18 26,373,019?
19   A.  Well, that's what the footnote says, yes.
20   Q.  Okay.
21   A.  Footnote from Judge Carney's order.  It's
22 not the Supreme court.
23   Q.  Okay so no one cited to the Supreme Court,
24 I just wanted to clarify.
25   A.  Yes, Exhibit 9, and again, perhaps I also

Page 15

1   A.  That's correct.
2   Q.  If I just heard you correctly, there is a
3 difference of roughly 300,000 between the number you
4 calculated and the number that Judge Carney included
5 in his final judgment?
6   A.  That's correct.
7   Q.  You decided to include in your report the
8 higher number from Judge Carney, is that correct?
9   A.  Well, it was, yes, that's correct because
10 it was based on the finding of facts.  I am familiar
11 with all of the information that Judge Carney
12 reviewed in setting that amount on Exhibit 4 was
13 based on my forensic review, detailed review of the
14 actual records.  So that I was provided with.  There
15 is additional information, I know that was
16 considered by Judge Carney that was not reflected in
17 the bank records.  So my job was to substantiate and
18 identify as best as I could, to confirm the accuracy
19 of these numbers.  But the starting point of the
20 disgorgement was a finding of facts.  So that is a
21 starting point that I used.
22   Q.  Did you personally confirm the accuracy of
23 the $26,733,019?
24   A.  Yes, I did, and I think I just went
25 through with you his exact ruling and what he said

Page 17

5 (Pages 14 - 17)

**Page 18**

1 about it.
2     Q.   Where is that number confirmed in your
3 expert report?
4     A.   It is in footnote 31, we just referred to
5 that, it is also, let's see if I could footnote 32.
6     Q.   And you are referring to footnote 32 of
7 your report?
8     A.   Correct, which also cites, sorry, let me
9 check again, which also cites Judge Carney's
10 decision.
11     Q.   Okay.  So footnote 32 is citation of Judge
12 Carney's decision.  Are you then relying on Judge
13 Carney's factual findings for that number?
14     A.   Yes, sir, he is a federal circuit judge
15 and that was a finding of fact.  So yes, I am
16 relying on his conclusion.
17     Q.   Did you personally examine bank or other
18 records to determine that that number was correct?
19     A.   I would say my forensic accounting traits
20 inflows and outflows.  It identified the vast
21 majority of the funds as inflows, but also my
22 forensic accounting was limited to a certain period
23 of time.  Judge Carney's ruling may be based on a
24 longer period of time that included additional
25 investors.  I have not gone back and recalculated

**Page 19**

1 Judge Carney's number, if that's what you are
2 asking.  If a judge makes a ruling, it's not polite
3 to argue with a federal court judge.  So for this
4 purposes I adopted his number.  Again, he may have
5 been looking at a longer time period than my
6 analysis covers.
7     Q.   Do you know whether the number that Judge
8 Carney used included None Noun ED5 Investor Funds?
9     A.   I am sorry, did you say None ED5 Investor
10 Funds?
11     Q.   Yes.
12     A.   I would need to go back and review his
13 ruling and also all of the support that came in with
14 it.  That was part of the motions for summary
15 judgment.  I would need to go back and look at all
16 of those to so answer that question definitively,
17 but I do know for the time period that I reviewed,
18 that I was able to identify 26,400,000 of net
19 investor funds.
20     Q.   And those are all ED5 funds?
21     A.   Correct as, well as they are all ED5
22 funds, capital investment including, as well as the
23 administrative fees.  I just want to be clear on
24 that.
25     Q.   Okay.  Your report determined that there

**Page 20**

1 were 50 investors who made investments, is that
2 correct?
3     A.   Let me go look.  I believe that's correct.
4 We have two refunds, which brought it down to 49.
5 So I believe I started with 51, the lines are dark,
6 which makes it hard to count, but I am just
7 searching my report.
8     Q.   Take your time?
9     A.   Thank you.  I appreciate that.  I was able
10 to identify at least 50 investors, and there were
11 several refunds that I accounted for.
12     Q.   Okay.  So if we have 50 investors in each
13 investor is investing half a million dollars, so I
14 am going to ask you to do this higher math for me
15 because you are better in math than I am.  What is
16 the total amount of investors?
17     A.   I am sorry, did you say 49 investors?
18     Q.   Fifty investors?
19     A.   Fifty investors.
20     Q.   Half a million each?
21     A.   25 million, sir.
22     Q.   Each?
23     A.   You also have to consider Exhibit 4 also
24 includes the administrative fees, which is another
25 45,000 plus some transfer fees, which comes out to

**Page 21**

1 over 2.2 million.
2     Q.   So I am going to ask you to do that.  The
3 45,000 for investor, 50 investors, what does that
4 come out to?
5     A.   $2,200,250.
6     Q.   So if a total is what, 27,250,000?
7     A.   For the time period I was reviewing, yes,
8 but there is a longer time period I mentioned that
9 several times.  My analysis was limited to October
10 1st, 2014, to April 28, 2016, and that was when we
11 had sufficient records to fully analyze, but I
12 understand that there were investor deposit receipts
13 beforehand.  So that's why, that 27 million is, well
14 actually, the 27 million is greater than the amount
15 Judge Carney held.
16     Q.   But you then netted refunds from that
17 total?
18     A.   Yes, I did.  I thought it would be
19 appropriate when, I thought that would be
20 appropriate.
21     Q.   Now, look at your Exhibit 9 to your
22 report, in footnote number two, the refunds of both
23 capital Contributions and administrative fees, you
24 state were to named investors and then you have
25 "Transfers to unknown payees".  Do you know who

6 (Pages 18 - 21)

1 those payees were?
2   A.  So you if look at Exhibit 4, there is one,
3 let's see, there is one refund, and then there was
4 the reason we say unknown payees is if you look at
5 Exhibit 4, there is a "Refund to Kevin Wang".
6 However, we find no investment coming in from
7 Mr. Wang, however, we do find a deposit coming in
8 from Jung Zhang Wang of 700,000 and some.  700,000
9 came in, I think it was three or four different
10 transactions.  One of those transactions also noted
11 Kevin, The name Kevin Wang.  So when we say or said
12 unknown investors, unknown payees, it's because this
13 amount that's going out to Mr. Wang, we don't know
14 if he is really an investor, but we do know he is
15 associated with money coming in from Jung Zhang
16 Wang.  So it was languaged in order to capture the
17 uniqueness of this transaction, which we don't fully
18 understand.  We understand the cash came in and the
19 cash was refunded, but what we don't understand are
20 those two people, individuals, related, are they the
21 same person?
22   Q.  Okay.  Let me see if I can understand and
23 try to summarize what you just testified.  When you
24 say unknown payees, you actually note to whom the
25 funds were refunded, but you didn't know whether

Page 22

1 those individuals were actually investors?
2   A.  I think that's a fair way to characterize
3 it.  The amount of the funds and the way the funds
4 were deposited and documented, some suggested they
5 were investor funds, but because, again, we don't
6 know for sure if Kevin Wang or Shun Zhang Wang are
7 the same person, that's how I characterize it.
8   Q.  So now, going back to Exhibit 9 of your
9 report, I want to move to the next category, what
10 you characterize as deductible expenditures.  As I
11 understand your report, offering expenses are
12 limited to the administrative fees, and that's the
13 2,250,000 we just talked about?
14   A.  Well, no, it's the 49.  If you look at
15 Exhibit 4, right, that calculation that we came up
16 with was based on 50, but we know at least one
17 person was refunded.  So 49, if you look at Exhibit
18 4, you see the exact details, all these intrinsic
19 fees that were collection, and the number there,
20 Exhibit 4, the net amount was $2,210,701.
21   Q.  So I understand, the 49 actual investors,
22 but the point I wanted to establish is, in your
23 report, you concluded that the offering expenses
24 could not exceed the total administrative fees?
25   A.  Well, I think it was my conclusion based

Page 23

1 on quite a bit of information, as well as a legal
2 interpretation provided by counsel, as well, as
3 discussions by Judge Carney.  My understanding,
4 legally offering expenses, excuse me, again,
5 offering expenses are the administrative fees cover
6 offering expenses, as set forth in the private
7 offering memorandum, the POM.  And that it's set
8 forth at 45,000, the administrative fees will be
9 used to cover the offering expenses.
10   Q.  So I understand it, there are two separate
11 issues that I want to try to address them
12 separately.  First is to understand your conclusion,
13 and I also understand you had reason to reach that
14 conclusion.  So the conclusion is, we can agree that
15 the administrative fees, the total administrative
16 fees provided the limit for the offering, it could
17 not exceed that number?
18   A.  That's correct.
19   Q.  Okay.  Now, for the business expenditures,
20 as I understand your report and please correct me, I
21 am just trying to understand your report.  If I got
22 it wrong, the capital contributions were to be used
23 to build the project, the center, the Proton Therapy
24 Center?
25   A.  That's correct.

Page 24

1   Q.  And if it was a legitimate business
2 expenditure, it could come out of the capital
3 contributions?
4   A.  That's correct, associated with this
5 investment, yes.
6   Q.  Okay.  Again, if I understand your report
7 correctly, you concluded that if the offering
8 expense for the expenditure was not specifically
9 identified in the POM.  The May 1, 2014 POM that you
10 reviewed, then it could not be a legitimate business
11 expenditure or offering, is that correct?
12   A.  I think that falls into a lot of different
13 categories.  What we did is, what I did is, we
14 looked at all the debatable details in the bank
15 statements and detail in the excel files, Quick
16 Books, the general ledger.  All of the information
17 that we reviewed and we reviewed the nature of each
18 transaction.  To the extent that any of those
19 transactions appear to be business related,
20 insurance, I think I know I articulate them in my
21 report, the categories that are covered, to the
22 extent that we were able to identify the nature and
23 purpose of these expenses, we capture them.  But
24 generally, yes, we did look to the POM as guidance.
25   Q.  So why did you conclude that a specific

Page 25

7 (Pages 22 - 25)

1 business expenditure had to be identified in the
2 POM?
3       MR. LEUNG:  Objection, misstates the
4   testimony.
5    A.   Yes, the POM discusses the nature of the
6 expenses that will be undertaken in the development
7 of the Proton Center.  I think your question was
8 why, I want to get back to that.  Various reasons,
9 number one, it was an assumption that I was asked to
10 make, but that assumption has a reasonable basis,
11 which was the discussion that Judge Carney had
12 regarding the representation and the POM.  I think
13 he said, you know, they were clear delineations in
14 the POM as to how funds were to be sent.  That's one
15 of the reasons and again, it was an assumption that
16 was provided to me by counsel, counsel for the FEP.
17    Q.   You just testified that the assumption
18 that expenditure had to be provided in a POM was an
19 assumption that was directed for you to make.  Did
20 you list that as an assumption in your report?
21    A.   Yes, first of all, I think you
22 mischaracterized specifically the way I testified.
23 It was in accordance with the POM, it wasn't the POM
24 specifically listed out every single expense that
25 was allowed and that's what I accounted for.  But

Page 26

1 yes, if you turn to Page 6, towards the top of the
2 page, Subparagraph C, specifically as an oust to
3 analyze financial records and other data and opine
4 on and then I skip the business purpose and
5 consistency with the POM from a forensic accounting
6 perspective of the expenses incurred by the EDC5
7 program.
8    Q.   Is that what you just testified to about,
9 the assumption counsel asked you to make about the
10 POM?
11    A.   Yes.
12    Q.   I want you now to turn to Page 7 of your
13 report, at the bottom/
14    A.   Okay.
15    Q.   You see the paragraph 18, subsection B?
16    A.   Yes.
17    Q.   Read that to yourself.  Is that the
18 assumption regarding the POM that counsel asked you
19 to make?
20    A.   Oh, yes, I apologize.  I was looking at
21 the scope, yes, sir, I apologize, yes, the
22 determination of the expenses that may be deducted
23 from the proceeds should be made based on
24 representations made to investors in the POM.
25    Q.   So if the POM did not represent an

Page 27

1 expenditure and expense to the investors, then based
2 on the operating assumption, per your report, you
3 concluded that it was not a legitimate business
4 expense, is that correct?
5       MR. LEUNG:  Objection, misstates the
6   question.  And this question has been asked and
7   answered many times over.
8    A.   Yes, I think the better way to put it,
9 again is, we reviewed the detailed transactions and
10 we included in the business expenses everything that
11 appeared to be a legitimate business expense,
12 including health insurance, auto insurance, I think
13 is even in there, which doesn't really, it could be
14 a legitimate business expense.  So we included it, I
15 would say we were very conservative in how we
16 categorize and captured those business expenses, and
17 if there is a specific expense that you are aware of
18 that you would like to discuss as to whether or not
19 it was a business expense or not, I am happy to look
20 at it, but it was more of a bottom up approach, we
21 started with the raw data and analyzed the purpose
22 of each, what we can identify is the purpose of each
23 payment to the best of our ability.
24    Q.   So before, and I do want to talk about the
25 specific expenses, before I do that, let me just

Page 28

1 establish, is the purpose of the assumption that you
2 made about POM that unless the investors were
3 informed about the expenditure and the POM, it could
4 not be considered legitimate business expense?
5    A.   I think the word informed may be a little
6 too narrow.  I think the expense has to be
7 consistent with the representations made in the POM,
8 that would be the way I would characterize it.
9    Q.   Okay.  So now, let's talk about a specific
10 expenditure.  This is a project to build a Proton
11 Therapy Center, correct?
12    A.   Correct.
13    Q.   So to do that you need Proton equipment,
14 correct?
15    A.   Correct.
16    Q.   The project first made a deposit to a
17 company called Optiva to provide Proton equipment?
18    A.   Yes, that's correct, I think around
19 $300,000 or so.
20    Q.   Yes.  And then they changed and made the
21 deposit of 3 million to another manufacturer called
22 Mevion?
23    A.   There was expenditures associated with
24 Mevion, and I discuss in my report why it is
25 excluded from business expenses in my analysis.

Page 29

8 (Pages 26 - 29)

1   Q.   And why was.  Now, it's the purchase of a
2 proton equipment?  Why was Mevion Expenditure
3 excluded.
4   A.   Well, there is significant evidence that
5 establishes that that expense was not for this
6 program and was not for the benefit of Beverly
7 Proton.  In Mr. Friedman's report, he makes the
8 nuance point that it thinks that it was heavily made
9 to a former name of the Beverly Proton, but it was
10 not.  The former name of the Beverly Proton was Los
11 Angeles County Proton and the actual trust release
12 was Los Angeles Proton Center or something.  It was
13 something similar, however, there is significant
14 evidence that I reviewed that suggests that,
15 including Mr. Liu's deposition that suggested this
16 was made in connection with what is called United, I
17 think it's United MPH, which was a different project
18 that did not include Dr. Rope, and was going to be
19 at a different location and involved different
20 hospitals.
21   Q.   And what was the evidence that you
22 personally reviewed that led you to that conclusion?
23   A.   I would say Mr. Liu's deposition
24 testimony, I don't know which volume it was, Page
25 117 through 121, there is e-mails I reviewed that

Page 30

1 going back and forth on how to characterize the
2 press release.  I would say Dr. Rope's testimony
3 around Page 130, 132 in there, that talks about how
4 the draft of a, there was a draft of a document
5 dealing with United, not Beverly Proton.  There is
6 testimony from Mr. Nividor around Page 165, 168 that
7 discusses this issue.  Those are things I can think
8 of, there are probably others in my report, but
9 those are things I reviewed.
10   Q.   And the testimony that you just cited,
11 indicated that the Mevion machine was not being
12 bought by Beverly Proton?
13   A.   No, it said, it indicated Beverly Proton
14 was purchasing it, but it was not for the purpose of
15 this ED5, it was going to be for the purpose of
16 another venture.  So the investors in this ED5
17 program did not receive value for that, even if the
18 machine had been delivered, these investors would
19 not have received any value for that expenditure
20 because it was not on behalf of this ED5 program.
21   Q.   So now, so I can understand your report,
22 point me to a specific evidence, the document
23 testimony or any other evidence you reviewed that
24 indicated that the Mevion equipment was for another
25 ED5 project?

Page 31

1   A.   Paragraph 42, on Page 20, it says it was
2 excluded.  So number one, first of all, the POM only
3 provided Proton equipment from Optimums, but more
4 importantly, substantively, my issue is that the
5 testimony that I cited and other testimony that is
6 cited in my report says that Dr. Rope was not
7 involved in the negotiations with Mevion, e-mail
8 communications indicate that payment to Mevion was
9 made for the benefit of United MPH Venture, a
10 company, other than Beverly Proton, and it was not
11 going to be for this Proton Center, it was going to
12 be for another one associated with the City of Hope.
13   Q.   So let's take your testimony one at a
14 time.  Dr. Rope testified that he was not involved
15 in the negotiations or the purchase of the Mevion
16 equipment.  Did the POM require that he be involved
17 in all negotiations for purchase of equipment?
18   A.   The POM required or represented that he
19 was going to be involved with Beverly Proton as the
20 medical director in another significant role.
21 However he was not, he did not have those positions
22 with United MPH.  So the fact that he was not
23 associated with United MPH is the part that, the
24 payment was not for the benefit of Beverly Proton.
25 Beverly Proton made the payment, but they were not,

Page 32

1 payment was made on behalf of United MPH, which
2 Dr. Trope was not involved with, which was adverse
3 to what was represented in the POM.
4   Q.   Okay.  So I want to show you another
5 exhibit, so bear with me a second here.  I am going
6 to introduce it, if I have done this correctly,
7 Ms. Irwin, you should see Exhibit marked 145, it was
8 previously marked Exhibit 70 at the deposition of
9 Ruth Nevoger.  Do you see that document?
10           (Exhibit 145 was marked for
11              identification.)
12   A.   I do.
13   Q.   Would you take a look at the document and
14 let me know when you have finished looking at it?
15   A.   Okay.
16   Q.   Have you ever seen that document before?
17   A.   I believe I have.  Let me look at my, you
18 said it was previously marked as another deposition
19 exhibit, okay 70, yes, I have seen it before, it is
20 part of what I considered.
21   Q.   Now, the document is an MOU that
22 contemplates the construction of the Proton Therapy
23 Project on three pieces of land, 11 West Beverly
24 Boulevard, are you familiar with that?
25   A.   I am.

Page 33

9 (Pages 30 - 33)

1    Q.   And then 105 West Beverly Boulevard.
2  That's Beverly Hospital?
3    A.   Okay.
4    Q.   And then the last parcel is 101 East
5  Beverly Boulevard, the adjoining parcel to those two
6  other parcels.  Now that MOU is signed by
7  Dr. Thropay, Charles Liu, Beverly Hospital?
8    A.   Yes.
9    Q.   Isn't that the project that you just
10  testified that United MPH was contemplating doing
11  with Beverly Hospital?
12        MR. LEUNG:  Objection, mischaracterizes
13    the document, misstates the deposition
14    testimony given by Ms. Nevoger when shown this
15    document that was not binding and never went
16    anywhere.
17        MR. GOURAIGE:  I am not asking whether
18    it's a binding document.  I am offering
19    Ms. Irwin who established the knowledge and
20    involvement of Dr. Thropay not representing to
21    you that, in fact, that agreement was
22    consummated, I am just saying that it's an
23    agreement to merge those three pieces of
24    properties, to build a Proton Therapy Center,
25    and Dr. Trope's signed the document.

Page 34

1    Q.   Did you see that document?
2    A.   Yes, I did, but I don't see, I would need
3  to look at the corresponding deposition testimony to
4  put this into context.  It also contradicts
5  Dr. Trope's testimony specifically related to the
6  you United MPH ED5, it's anything associated with
7  United MPH.  And I don't see here, let's see, see I
8  would need to go back and look at the deposition
9  testimony.  So yes, his name is on this and he
10  signed, but again, the other evidence indicates that
11  the, that the purchase, the machine or the
12  $3 million that was sent to Mevion was for MPH, not
13  for Beverly Proton.
14    Q.   I understand that testimony.  And I also
15  understand your testimony that this document
16  contradicts Dr. Thropay specifically, but you now
17  have Dr. Thropay's testimony saying that he had no
18  idea about this United MPH separate deal with
19  Beverly Hospital.  And the Mevion equipment was
20  bought for that deal, and now you are confronted
21  with a document that he signs, where it contemplates
22  that his land and two other parcels would be joined
23  together to build the Proton Therapy Project.  So
24  you are telling me that, if I heard you correctly,
25  that you are choosing to accept Dr. Thropay's

Page 35

1  testimony?
2    A.   I believe my testimony was.
3        MR. LEUNG:  Objection to the preamble.
4    A.   Dr. Thropay's testimony was that he was
5  not involved in the Mevion negotiations.  I don't
6  see anywhere in this document that establishes that
7  this has anything to do with Mevion, unless I am
8  missing it.  This is, I don't see anywhere in here
9  where it's discussing Mevion or the City of Hope.
10  So the testimony for Dr. Thropay was, he was not
11  involved in the Mevion negotiations, it wasn't that
12  he was not part of the MOU.
13    Q.   Okay.  So let us stipulate that
14  Dr. Thropay was not involved in Mevion negotiations,
15  were you aware of an equipment purchase equipment
16  between Mevion and Beverly Proton or los Angeles
17  County Proton therapy?
18    A.   I am aware that Beverly Proton paid Mevion
19  $3 million, but evidence exists that suggests or
20  establishes, in my opinion that it was not for the
21  benefit of these investors, and that's why it's
22  considered a legitimate business expense in my
23  accounting.
24    Q.   I want to establish the facts first before
25  we get to your conclusion.  So were you aware that

Page 36

1  there was a contract between Mevion and Beverly?
2    A.   Yes, I believe I have seen that contract.
3    Q.   Were you aware that there was a service
4  contract between Mevion and Beverly?
5    A.   I would need to go back and review my
6  documents, but I believe it's part of the
7  production, yes.
8    Q.   As I understand your testimony, correct me
9  if I got it wrong, you testified that the money may
10  have come from Beverly to buy the equipment, but the
11  equipment was going to be used for a different
12  project being set up by United MPH, is that your
13  testimony?
14    A.   Yes, based on my review of the records,
15  yes, that's my testimony.
16    Q.   So now, you have in the front of you,
17  Exhibit 145.  And that document, on the face refer s
18  to this so-called separate project of United MPH
19  being built on land that is owned by Dr. Trope, and
20  he signed the document.
21        MR. LEUNG:  Objection, misstates the
22    document, the exhibit doesn't speak to City of
23    Hope, it doesn't speak to Mevion.  It doesn't
24    speak to United MPH.
25        MR. GOURAIGE:  I don't know where you are

Page 37

10 (Pages 34 - 37)

| | |
|---|---|
| 1 going with this Herve. | 1   A.  It says it's adjacent.  Let's see, 105 and |
| 2   A.  My testimony in my next response is going | 2 11 are adjacent, but I would be surprised if it |
| 3 to be, if you could point out to me where in | 3 would, given the numbering of the lot and my |
| 4 document United and PHM reference I would love to | 4 familiarity with Beverly Boulevard. |
| 5 will take a look at it, I don't see it, if I am | 5   Q.  I am sorry, you seem to be doing something |
| 6 missing something, I apologize, again, as I think I | 6 I don't want to distract? |
| 7 mentioned a few minutes ago, it doesn't concern City | 7   A.  I am just flipping through a document. |
| 8 Of Hope.  So there is nothing in this document that | 8   Q.  Do you remember Charles Liu's testimony |
| 9 contradicts evidence that I have seen, that suggests | 9 about lots at 105 West Beverly and 111 West Beverly? |
| 10 that the payment to Mevion was on behalf of MPH. | 10   A.  I don't recall specifically what he said. |
| 11   Q.  Who were the parties to the United MPH | 11   Q.  Let me see if I can refresh your |
| 12 transaction? | 12 recollection.  Do you recall that he testified that |
| 13   A.  Well, they were signed by Dr. Trope, they | 13 after he had Allen Construction demolish the |
| 14 were signed by representative of CEO of Beverly | 14 building on 111, any work that Allen did at 105 West |
| 15 oncology and imaging centers, signed by the | 15 Beverly would not be wasted of resources because the |
| 16 president of Beverly Proton Center, signed by | 16 center would be built on a larger lot that would |
| 17 Beverly community Hospital Association and | 17 have different buildings on each lot.  Do you recall |
| 18 Montibello Community Health Services. | 18 that testimony? |
| 19   Q   (By MR. LEUNG) You are referring to | 19   A.  Not specifically.  I would need to go back |
| 20 exhibit 145, Ms. Irwin? | 20 and refresh my memory. |
| 21   A.  Yes, I am looking at the signature page of | 21   Q.  Okay.  Just to wrap up this discussion, |
| 22 145, in the first paragraph, I believe, those same | 22 Ms. Irwin, so I do understand your testimony |
| 23 entities are referenced. | 23 correctly, that it is not your position in your |
| 24   Q.  And where was the Proton therapy project | 24 report that the Mevion expenditure cannot be |
| 25 that you United MPH was trying to establish with | 25 considered a legitimate business expenditure simply |
| Page 38 | Page 40 |
| 1 Beverly Hospital, where was that going to be | 1 because EON did not venture Mevion, is that correct? |
| 2 located? | 2   A.  I think you had a double negative in |
| 3   A.  I know there is it's not going to include | 3 there, but let me put it this way, it's not simply |
| 4 Dr. It trope's property at 111, but I would need to | 4 because Mevion is not mentioned in the POM, it's for |
| 5 look at the records to give you the precise | 5 all the other reasons that indicate to me that the |
| 6 location. | 6 benefit of that payment is not going to be for the |
| 7   Q.  You said you know it's not going to | 7 ED5 investor.  And therefore, it's not a legitimate |
| 8 include Dr. Thropay's property at 111, how do you | 8 business expense for this project. |
| 9 know that? | 9   Q.  So in other words, as long as the conduct, |
| 10   A.  I am trying to remember where that | 10 the expenditure is consistent with the terms of the |
| 11 information came from.  As I sit here, I don't | 11 POM in your view, it can be considered a legitimate |
| 12 recall, I am happy to look up that on a break and | 12 business expenditure? |
| 13 let you know.  Let me make a note to myself.  As I | 13   A.  Again, it needs to be consistent with the |
| 14 sit here I don't recall but I will look at that on | 14 POM and the POM says that these expenditures, the |
| 15 break and let you know. | 15 investment funds will be dedicated towards the |
| 16   Q.  When you get a chance, please let me know? | 16 building of a Proton Center, Beverly Proton Center |
| 17   A.  Okay. | 17 that would be for their benefit, ultimately, and |
| 18   Q.  The lot at 100 West Beverly, do you know | 18 again, you keep trying to narrow it down, it's all |
| 19 where that lot is in relation to 111 West Beverly, | 19 about the language in the POM that the payment will |
| 20 Dr. Thropay's land? | 20 be for the benefit of these investors in this |
| 21   A.  I am sorry, what was the first address you | 21 project.  The evidence I reviewed indicates that |
| 22 provided to me? | 22 this payment is not for the benefit of these |
| 23   Q.  The lot at 105 West Beverly, do you know | 23 investors, and that's another reason why I have |
| 24 where it is in relation to Dr. Thropay's land at 111 | 24 excluded it. |
| 25 West Beverly? | 25   Q.  Okay.  Now I take it, I didn't see |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

1 anything indicating that you are an attorney, I take
2 it you are not making a legal judgment when you say
3 something is not a legitimate business expense?
4     A.   No, I am not, it's the way I would put it
5 is, it's based on an accounting, it's based on my
6 understanding of real estate development and the
7 development of medical facilities like the Beverly
8 Proton Center.  So it's based on my professional
9 information and opinion, not based on a legal
10 conclusion.
11     Q.   Okay.  So now, I would like again to draw
12 your attention, if I may, to Exhibit 9 of your
13 report?
14     A.   Okay.
15     Q.   Do you have that in front of you?
16     A.   I do.
17     Q.   Okay.  You conclude the total deductible
18 expenditures of 5,360,510, and then, I guess, simple
19 math here, you deduct that from the net receipts and
20 you get defendant's gains pecuniary of 20,222,511?
21     A.   Correct.
22     Q.   Okay.  Now, did you attribute any dollar
23 that you included that was not a legitimate business
24 expenditure as a pecuniary gain?
25     A.   The methodology I followed, if it was not,

Page 42

1 if it exceeded the limit of the offering, the limit
2 of the offering expense of the admin fees that were
3 available to be spent, and it's not identified as a
4 legitimate business expense, it does fall out into
5 the net pecuniary gain.
6     Q.   So assuming it's a pecuniary gain, to whom
7 that you attribute those gains, the $20,222,511?
8     A.   To Mr. Liu and Ms. Wang.
9     Q.   Did you actually trace these dollars to
10 them personally?
11     A.   A significant portion of them I was able
12 to trace to them, let's see, Exhibit 7, I was able
13 to trace 9,116,000 personally to them.  And then,
14 sorry, 9,116,859, and in addition to, I would say,
15 the amounts that were paid to, the 3.8 million that
16 were paid to UDG, UDG, UDH, Ms. Wang's, the company
17 that Ms. Wang owns or she is affiliated with that
18 receives 3.8 million dollars of the offering
19 expenses, and that I would also attribute another,
20 at least, $3 million for the Mevion purchase that
21 was not for the benefit of this project, which they
22 diverted for another project.  So those, is that
23 nine plus 3.8, it's 9.1 plus 3.8 is 12.9, plus
24 another three points.  Let me actually write this
25 down.  9.1, 3.8, plus three.  15.9 million dollars

Page 43

1 of the 20.
2     Q.   So you have 9.1 in Exhibit Seven?
3     A.   Correct.
4     Q.   3.8 UDG, right?
5     A.   Correct.
6     Q.   And 3 million to Mevion?
7     A.   Correct.
8     Q.   And you trace all those, you attribute all
9 of those to Charles Liu and Lisa Wang?
10     A.   Actually, and also there is the 210
11 thousand, I forgot 210,000 that was traced to the
12 Liu affiliates.  I was thinking about that when you
13 asked your question.  I don't know if you want to
14 repeat it or have it read back, I didn't quite catch
15 it.
16     Q.   Okay.  So let's take, the 9.1 is a
17 separate category.  Let's take the 3.8, the UDG, why
18 did you attribute that to the individual defendants?
19     A.   Because that company is owned and run by
20 Ms. Wang directly.  And that amount in it of itself
21 exceeds the legitimate admin fees that were allowed
22 under the POM, as my understanding, allowed under
23 the law.
24     Q.   Did you see evidence of her ownership of
25 that company?

Page 44

1     A.   I am aware that I think, I am sorry, there
2 is documentation testimony that she was the CEO.  I
3 am aware of, I think, it was a business card with
4 her name on it, there would be other supports for
5 that, but I am aware of that, as well as Judge
6 Carney as finding that it was her company.
7     Q.   So Judge Carney's finding that was her
8 company, the business card with her name, indicating
9 that she is the CEO?
10     A.   That's my memory.  Let me actually search
11 for something here.  I know I have seen it, I don't
12 know why I can't find it right now, let me ask you
13 this question.
14     Q.   Are you adopting judge Carney's finding or
15 did you make an independent judgment that he is the
16 owner of UDG?
17     A.   I would say I adopted his finding and also
18 did my own review of the information to confirm the
19 relationship between the defendant and UDG.
20     Q.   And so this is your professional judgment,
21 based on criteria that professionals of your stature
22 would use to make that conclusion, you believe you
23 had sufficient evidence to make that judgment.  So
24 did you ever see a certificate of incorporation that
25 listed her as owner of UDG?

Page 45

12 (Pages 42 - 45)

1   A.   I don't believe I have seen that.
2   Q.   Did you ask for one?
3   A.   I asked for anything in the record
4   regarding UDG's ownership, and management.
5   Q.   And you were given a business card that
6   listed her as the chairman?
7   A.   Not sure if I was given a business card or
8   if it was discussed in a deposition.
9   Q.   I see.  Is that sufficient to conclude
10  that one is an owner of a company?
11  A.   In it of itself, no, but that in
12  combination of all the information that Judge Carney
13  reviewed in his determination, as well as other
14  testimony.  I think Mr. Liu even testified that she
15  was chairman of the company, so it's not just a
16  business card, it's other information that I have
17  been provided with, as well.
18  Q.   Well, I want to keep the two issues
19  separate.  I thought we separated them, I understand
20  Judge Carney's finding, but I believe you just
21  testified that you as an expert professional relying
22  on materials, that account, sorry, let me restart
23  the question, Ms. Irwin, I understand Judge Carney's
24  finding, I am not asking that, I am asking if you
25  adopted it, you indicated you exercised your own

Page 46

1   you are adopting Judge Carney's finding, I
2   understand that, to the extent that you are saying
3   that you exercise independent professional judgment,
4   I am trying to find out what was the evidence that
5   you had that led you to this professional judgment
6   that Lisa Wang was the owner of UDG, and so far I
7   have heard you mention a business card and possible
8   testimony from Charles Liu.  Anything else?
9   A.   Similar to United MPH, those are things
10  that can I recall as I sit here, I am happy to
11  search for more support or find the additional
12  information I relied upon during a break.  In fact,
13  if we can get to a stopping point, so I can do the
14  break, I need more water.
15       MR. GOURAIGE:  Okay.
16  Q.   Okay.  Do you want to take a break now?
17  A.   We can finish this line of questioning.
18  Q.   Let me finish this line of questioning and
19  we can take a break.  All right, so now let me ask
20  you this other question, 3.8 million was paid to
21  UDG, assuming your judgment is correct, Lisa Wang
22  owned or controlled UDG, do you know whether UDG
23  included investors?
24  A.   I believe they did.
25  Q.   Were they entitled to be paid something

Page 48

1   independent professional judgment, and that's what I
2   am exploring now.  What was the evidence you had to
3   exercise that professional judgment?
4   A.   So I think my testimony was that I looked
5   at Judge Carney's finding.  And then I got
6   information that I reviewed and when, as a
7   professional, as a professional who serves as an
8   expert witness, when a finder of fact such as Judge
9   Carney makes a determination based on his review of
10  the evidence that is associated with Ms. Wang, that
11  is one strong indication.  And one thing I relied
12  upon, right, I mean, again, I am not going to argue
13  with the judge and his finding of fact, that's his
14  job and that was his finding.  With my review of the
15  information available to me, that supports that
16  conclusion as a professional, now I take that
17  information and I have my professional opinion, that
18  yes, UDG should be excluded from, well, they are
19  included to a certain extent in, they are part of
20  the offering expenses, but they are part of the
21  direct pecuniary gains that went to the named
22  defendants.
23  Q.   Let me, I just want to close the loop on
24  this, again, it's not my job to challenge your
25  report, I just want to understand your position.  If

Page 47

1   for the POM for the investors they recruited/
2   A.   They were entitled to receive something,
3   something less than 45,000 per individual.
4   Q.   Did you make a judgment about the
5   appropriate amount that should be paid?
6   A.   No, I didn't.
7   Q.   You simply attributed the entire amount to
8   Lisa Wang and Charles Liu?
9   A.   They were funds that were paid to an
10  entity that she controlled, yes.  And she had the
11  ability to do whatever she wanted with them, it was
12  far in excess, I think the record says that she
13  recruited ten individuals, which means at the max
14  they were entitled to 450,000, that's far less than
15  the 3.8 million they received.  So even if we offset
16  450,000 from the 3.8 million, just assuming that she
17  gets a hundred percent of the admin fee, which is
18  ridiculous, it's still 3.35 million, that they
19  received that they were not entitled to, at least.
20  Q.   Did you give credit for this 450 in your
21  report?
22  A.   To the extent that it was captured in the
23  offering expenses, yes, if you look at Exhibit 9,
24  payments to UDG are part of the, of the, were part
25  of the offering expenses.  And let's see if you look

Page 49

13 (Pages 46 - 49)

1 at some more, specifically Exhibit 5, payment of the
2 3.8 was included in the brokers fees captured in
3 Exhibit 5 to my report.  And that 3.8 was part of
4 the top line 10.8 million, and the maximum amount
5 that could have been spent on offering expenses is
6 2.2 million.  So it is included, but because they
7 chose to spend five times that amount to brokers and
8 lawyers, yes, they spent five times that amount to
9 brokers alone it's excluded from my analysis because
10 it exceeds the maximum amount of administrative
11 fees.
12    Q.   Now is a good time to take a break?
13    A.   Yes.
14    Q.   Why don't we take a five minute break.
15    A.   If we could take ten, I would read, I
16 would be able to get those searches, at least one of
17 them done.
18    Q.   Let's take ten.
19         (Whereupon, an off the record
20 discussion was held.)
21         (Whereupon a short recess was taken 10:40
22 a.m. to 10:50 a.m.)
23    Q.   Okay.  So we can go back on the record.
24    A.   I am happy to give you the references for
25 the report that we were talking about before.

Page 50

1    Q.   Okay.
2    A.   So report for that United MPH, or sorry,
3 that yes, United MPH was not going to be affiliated
4 with Dr. Thropay's location, comes from Mr. Liu's
5 deposition, let me find the date here.  February,
6 2021 Liu deposition 9620 through 9706.  And
7 Ms. Noveger's February 20, 21 deposition, 116 to 19
8 to 16711.  And I am still searching for, I am still
9 searching for, I think there is an e-mail I am aware
10 of, we are searching for the City of Hope documents,
11 which is support for the UDG, the fact that Ms. Wang
12 is the owner of UDG, but I will give you the
13 specific reference to that.
14    Q.   Is the e-mail you refer to, Ms. Irwin, is
15 that an e-mail from the consultant, Michael Hon?
16    A.   I don't know it very well, could be.  I
17 don't want to say yes or no until I see it.
18    Q.   So are we ready to proceed?
19    A.   Yes.
20    Q.   Ms. Irwin, is there anything else you want
21 to add?
22    A.   Not at this time.
23    Q.   Okay.  The total I have so far from your
24 testimony, Ms. Irwin, about the net pecuniary gains
25 for the defendants 15.9 million, 9.1 is the

Page 51

1 defendant's personally and 3.8, UDG, 3 million for
2 Mevion?
3    A.   Plus 210,000 went to the Liu affiliates s.
4    Q.   Okay.
5    A.   Also in Exhibit 9.
6    Q.   Okay.
7    A.   Let me check the math here.
8    Q.   That comes out to a little bit more than
9 16 million, 16 million one, so we are still missing
10 about 4 million or so.
11    A.   Well, there were other payments made that
12 were not identified as legitimate business expenses,
13 so those would have fallen out, those were payments
14 made to other entities that Ms. Liu and Ms. Wang, I
15 am sorry, Mr. Liu and Ms. Wang directed, had at
16 their discretion, but did not appear to be
17 legitimate business expenses, but the vast majority
18 of what I calculated went directly to Mr. Liu and
19 Ms. Wang.
20    Q.   Okay.  In preparing your report, did you
21 focus on each individual defendant separately or did
22 you group them together?
23    A.   I think in some instances I was able to
24 differentiate payments that went to each individual,
25 in other instances, such as the credit card payment,

Page 52

1 I don't know, I couldn't separate those out.
2    Q.   So let's take, for example, the $3 million
3 payment to Mevion that you disallowed as a business
4 expenditure and attributed as a gain, pecuniary
5 gain, to whom are you attributing that to, to
6 Charles Liu, Lisa Wang or to both?
7    A.   I would say to whoever, definitely to,
8 definitely would be to Mr. Liu, and I think
9 Ms. Wang, as well.  Whoever is affiliated with
10 United MPH, that's the benefit, Mr. Liu directed,
11 Mr. Liu and Ms. Wang directed that payment for the
12 benefit of United MPH, and not for the benefit of
13 these investors.  And so it was directed and for the
14 benefit of another project that they are involved
15 with.  So I am not sure if United MPH is, if both of
16 their names are affiliated with it, I know Mr. Liu
17 is, so I have to go back and look at the details,
18 that's it.  I would say both of them, it was both.
19    Q.   Do you have any evidence that Ms. Wang who
20 was associated with the United MPH deal?
21    A.   I don't know, I don't know, as I sit here.
22 She may not have been, but to the extent she was
23 involved, yes, I would attribute it to her.
24    Q.   But you don't know whether she was or not?
25    A.   I don't recall seeing documents supporting

Page 53

14 (Pages 50 - 53)

**Page 54**

1 that she was.  But I can do some more due diligence
2 and look at that on the next break.
3     Q.   The 3.8 million to UDG, you allocate to
4 both Mr. Liu and Ms. Wang?
5     A.   I would say I didn't allocate it to one or
6 the other, I know Ms. Wang is affiliated with UDG,
7 but I don't, again, I wasn't asked to, say this
8 amount was for one individual, and that was for the
9 other and I can't figure out.  So I am not sure,
10 it's not really part of my opinion to allocate, I
11 know Ms. Wang is affiliated with UDG.  Perhaps,
12 Mr. Liu is also involved.  I don't know, we don't
13 have a lot of information about UDG, but we do know
14 that Ms. Wang, it's his wife's company.  So perhaps
15 it was her calling, again, it's not my opinion.
16     Q.   So did I understand your testimony, are
17 you saying that you were instructed not to allocate
18 as to one or the other defendant or were you simply
19 not given any instruction on that issue and you
20 decided not to allocate between one or the other
21 defendant?
22         MR. LEUNG:  I object to form.
23     A.   Yes, I would say it this way, I would ask
24 to identify legitimate business expenses and deduct
25 those from the amount that Judge Carney indicated in

**Page 55**

1 his ruling.  And that resulted in $20 million of
2 pecuniary gain.  I have been able to identify
3 specifically 16.1 million that went to the
4 individual defendants at least jointly.  Some for
5 benefit or not, but it was not part of my assignment
6 to allocate the pecuniary gain to one individual or
7 the other.  As said in my, on Page 6, subparagraph D
8 in my report, I was asked to opine on the reasonable
9 pecuniary gains obtained by Ms. Wang and Mr. Liu.
10     Q.   Okay.  So there were two other brokers who
11 were paid.  Let's take them one at a time.  Overseas
12 Chinese was paid brokers fees.
13     A.   Correct.
14     Q.   Did you allocate the payments to them as
15 part of the pecuniary gains?
16     A.   I did not allocate offering expenses to
17 the individual companies that provided the broker to
18 the individual brokers and the lawyers.  I simply
19 know that more than ten million dollars was spent,
20 let's see.  I will refer to an exhibit, it makes it
21 easier, Exhibit 5.  I know that 10.8 million was
22 paid to the brokers, which seems, again, ten times
23 what should be maximum allowed for admin fees.  And
24 we know that, we know that the members and lawyers
25 fees that I recall 10.9 million was spent for

**Page 56**

1 offering expenses, only 2.2 was allowed.  So I
2 didn't allocate the 2.2 to UDG, I didn't allocate it
3 to Overseas, and I didn't allocate it to other
4 firms.  I started with hundred percent of the
5 brokers fees and the lawyers fees associated with
6 the offer and subtracted the allowable amount.  Now,
7 there is ways to allocate it, I didn't.  To me it
8 was because the amount was not allowed, it didn't
9 matter where, it wasn't important to allocate,
10 amongst the brokers.  They received the funds,
11 Mr. Liu and Ms. Wang's depression.
12     Q.   Maybe I misunderstand your report, but let
13 me try to understand what you are saying.  If ten
14 million was spent on broker fees, and you capped the
15 property expenses at 2.2 million, the entire
16 differential, didn't you allocate that as pecuniary
17 gains to the individual defendants?
18     A.   It's included as pecuniary gains, correct.
19     Q.   Okay.  So did you allocate those values?
20     A.   Correct, as 3.8 million of them were
21 directly to Ms. Wang, and the rest were part of,
22 let's see, let me go back to Exhibit 5.  Yes, it's
23 included as part of the pecuniary gains.
24     Q.   Okay.  So with respect to Overseas
25 Chinese, I understand UDG, you concluded that Lisa

**Page 57**

1 Wang was the owner, but with respect to Overseas,
2 what is the reason for allocating that differential
3 as pecuniary gain to the individual defendants?
4     A.   They spent more than 10.9 million on
5 broker fees and only had available to them
6 2.2 million in maximum admin fees for the entire
7 project, including, including other expenses that
8 they would have had to incur.  So I allocated the
9 maximum amount and any other amount was
10 misappropriated under their control.  3.8, we know
11 went to UDG, and we know the other amount that went
12 to Overseas and others.  So anything that was spent
13 that was not suppose to be spent, is part of the
14 pecuniary gain.
15     Q.   Even if it went to a third party unrelated
16 to the defendants?
17     A.   Yes, and we don't know, I don't think we
18 know a lot about Overseas Chinese.  So I don't know
19 if we know whether or not the defendants are
20 affiliated with that company, it's very curious to
21 me why the defendant would choose to overspend and
22 overpay the brokers the way they did when they knew
23 they only had 2.2 million dollars at that time or
24 around that time.  We don't know what their
25 relationship with these brokers are, there could be,

15 (Pages 54 - 57)

1 you know, other funds going, coming back to them, we
2 don't know.
3    Q.   Okay.  So you are actually pointing in the
4 direction of my next line of questioning.  You don't
5 have any evidence that the funds that went to
6 Overseas Chinese ultimately ended up in the pockets
7 of Lisa Wang and Charles Liu?
8    A.   I don't have information one way or the
9 other.  I don't have information to indicate it did
10 and I don't have information that indicates that it
11 was received as an independent entity.  So that's
12 the way I would answer that.
13    Q.   So now, all right, talk about the third
14 broker, and I will shorten the name to Delssk,
15 D-E-L-S-S-K, are you familiar with that broker?
16    A.   I am.
17    Q.   And he was paid brokers fees, I think it
18 precluded 37 investors.  So I assume the same
19 methodology you just testified to would apply to
20 Delssk.  You cap the admin fees and any excess would
21 be deemed pecuniary gains to the two individual
22 defendants, is that correct?
23    A.   That's correct.
24    Q.   Did you, were you showing any documents
25 about Delssk and their relationship to the

Page 58

1 individual defendant?
2    A.   Not that I can recall.  Again, we don't
3 know one way or the other.
4    Q.   You don't know whether the, what do you
5 mean one way or the other, I don't want to put words
6 in your mouth?
7    A.   Sorry, I should be more clear.  We don't
8 know one way or the other if Mr. Liu or Ms. Wang are
9 affiliated in any way.  What I do know is that
10 collectively they spent more than five times the
11 amount and sent it to brokers, at their own
12 discretion.  And that is misappropriation of the
13 investor funds.  For what ultimate purpose they
14 would overpay brokers, I don't know, it seems
15 economically irrational to overpay brokers if they
16 are not getting some benefit down the road on the
17 other side of it, but I don't know one way or the
18 other.  So that's not going to be part of my
19 testimony, because I don't have information on that.
20    Q.   Other than UDG, where you do have some
21 evidence, you claim you don't know one way or the
22 other about Overseas chinese and you don't know one
23 way or the other about Delssk?
24    A.   That's correct.
25    Q.   Okay.  So bear with me a second, I want to

Page 59

1 show you another exhibit.
2    A.   All right.
3    Q.   Would you please take a look at the
4 declaration?
5    A.   Yes.
6    Q.   It's refreshing, it just came up.
7    A.   Let me look at this.  Okay I have looked
8 at it.  Is there a specific page you would like me
9 to consult?
10    Q.   The declaration on June 23rd, 2016, have
11 you seen that document before?
12    A.   I am not sure.  Let me look at something
13 very quickly.  I don't believe I have, it's not
14 listed in my report.
15          (Exhibit 146 was marked for
16          identification.)
17    Q.   Okay.  So the cover e-mail of Exhibit 146
18 is a transmittal e-mail from attorneys for Delssk,
19 and Ms. Irwin, the declaration is a declaration
20 submitted by Edison Zhong to support the SEC's
21 request for preliminary injunction and asset fees
22 against the individual defendants.
23          (Exhibit 146 was marked for
24          identification.)
25    A.   Yes.

Page 60

1    Q.   Now, that you have seen that declaration,
2 do you believe that the monies that went to Delssk
3 might have gone back to the individual defendants as
4 some sort of kick back?
5    A.   This declaration suggests that Mr. Zhong
6 is a director of Delssk, and he talked about the
7 history of the company.  So I would say this
8 information does not affiliate Mr. Liu or Ms. Wang,
9 with Delssk, what is very curious, though, he says
10 that he had an exclusive relationship, and then he
11 also talks about kind of Beverly Proton Center, and
12 ventures off into United MPH.  I am not sure what
13 the connection, what his understanding of the
14 connection is there, but I also looked at Exhibit B,
15 which is supposedly the chart for United MPH.
16    Q.   Let me know, are you looking at something,
17 let me know once you looked at it?
18    A.   I have looked at it.
19    Q.   Okay.
20    A.   I think I have answered your question, if
21 I have not, let me know.
22    Q.   Let me ask a different question then.  At
23 the time you were preparing your report, you were
24 obviously given information about UDG.  Did you ask
25 the SEC for any documents, for other information

Page 61

16 (Pages 58 - 61)

1 they had about Overseas Chinese and Delssk?
2   A.  I know I asked about specifically Overseas
3 Chinese, I talked with Mr. Leon about that to
4 understand, are we aware of any affiliations, and I
5 believe his response was, we don't know much about
6 Overseas Chinese.  So I presume if there was
7 anything in the production about it, he would have
8 provided it to me.  I don't believe, if I asked, I
9 don't believe I asked directly about Delssk, it was
10 really Overseas Chinese that caught my eye.
11   Q.  Why did Overseas Chinese catch your
12 attention?
13   A.  Let me look at something real fast.  It
14 was just that it was, we did a google search on it
15 and there was a not a lot of information about it.
16 It just seemed strange to me that.  Well, the whole
17 thing seemed strange to me that, again, Mr. Liu and
18 Ms. Wang would soon make the choice to spend ten
19 times as much money on broker fees than they were
20 allowed to me.  So it brought into question all of
21 these entities, because it makes no economic sense
22 why you would overpay a broker when you would then
23 have no more funds leftover for the life the
24 project.  So all three caught my eye, Overseas
25 Chinese was kind of a very generic name, so it just

Page 62

1 caught my eye, but I don't have any other
2 information about it one way or the other being
3 associated.  It simply doesn't make economic sense
4 why the defendants would choose to pay that much
5 more than they were even allotted.
6   Q.  Did you google Delssk?
7   A.  I believe someone on my team did, I don't
8 recall what they found.
9   Q.  Did you at the time you were preparing a
10 report, did you know that Delssk had recruited 37 of
11 the 50 investors?
12   A.  I believe we, I don't know if we knew the
13 exact number.  I don't, hold on.  I don't know if we
14 knew the exact number.  Sorry.  Yes, it is Judge
15 Carney's decision, it appears Delssk received about
16 1.4 million, where as we have said UDG received 3.8,
17 and Overseas Chinese received 7.7 million.
18   Q.  Okay.  And so you did not know that Delssk
19 claimed to have an exclusive relationship?
20   A.  No, I didn't, but here is something else.
21 Actually can I go back and supplement my answer.  We
22 knew that out of 49 investors, ten came from UDG, 37
23 came from Delssk, which leaves only two for Overseas
24 China.  Overseas Chinese received the largest
25 portion of broker fees.  So that's another reason

Page 63

1 that it caught my eye.
2   Q.  So of the three brokers, you asked and got
3 information about two, but did not ask about Delssk?
4   A.  I don't recall asking about Delssk
5 specifically, I might have, but again, it was
6 really, the relationship between the number of
7 investors they recruited and the amount that they
8 received made no sense.
9   Q.  Let me strike that.  So now, let's talk
10 about of the 16.1 million, the biggest number was
11 the 9.21 number.  And those are the dollars that
12 went directly to either Charles Liu or Lisa Wang?
13   A.  Correct.
14   Q.  Now, did you understand when you were
15 preparing your report that both of these defendants
16 had maintained that this was compensation paid to
17 them for services they rendered to the companies?
18   A.  Yes, I understand that they represented it
19 to be, I think, they categorized it mostly as
20 management fees.  Let me refer to my analysis.  Yes,
21 I understand that they are characterizing it as
22 compensation.
23   Q.  And I take it from the documents that you
24 reviewed, you looked at some of the contracts that
25 they had with the company, is that correct?

Page 64

1   A.  Which contracts, which contract are you
2 talking about?
3   Q.  Compensation arrangements between Lisa and
4 Beverly and Charles Liu and The Regional Center and
5 then Beverly.  You looked at those?
6   A.  Are you talking about the one that was
7 executed and then retroactive?
8   Q.  Well, which one is that, tell me which one
9 you think was executed in retroactive.
10   A.  There is an agreement that was signed, an
11 agreement that was signed in April of 2016, and it
12 was retroactive.  I can't remember who signed it,
13 but the signature on the contract employment
14 agreement was not an employee of Beverly Proton at
15 the time, I am aware of that one.
16   Q.  When you say it was retroactive, what do
17 you mean?
18   A.  Well, the contract, if we pull it up, let
19 me find it and I will.  Know it was discussed in
20 Charles Liu February 20, '21 deposition at 7615
21 through 7811, it was retroactive since 2011.  So it
22 was signed in April 2014 and it says that annual
23 salaries of 550,000 and 280,000 should be paid to
24 Mr. Liu and Ms. Wang respectively "Since January of
25 2011".  Just for reference, I am looking at

Page 65

17 (Pages 62 - 65)

1 Paragraph 45 of my report on Page 21.
2    Q.   Okay.  So let's see if we can, if I can
3 refresh your recollection from the contract.  There
4 was the contract between Lisa Wang and Beverly
5 Proton that was signed on or about January 20, 2016
6 by Charles Liu and Lisa, and that provided for
7 retroactive payments to Lisa Wang, that's not the
8 contract you are referring to?
9    A.   No, I am referring to, that's correct, I
10 am not referring to that one.
11    Q.   There is a contract that was signed on or
12 about April 5th, 2016, between Charles Liu and Mike
13 Cogsbrow, that I take it is one of the contracts you
14 are referring to?
15    A.   Yes, that's the contract I was discussing
16 when I mentioned Mr. Cogsbrow at the time was not an
17 employee of Beverly Proton, that's one of my
18 assumptions, as well.
19    Q.   How do you know that?
20    A.   That is not, well, it's an assumption I
21 have been asked to make.  If you look at the top of
22 Page 8 to Paragraph C, it's one of my listed
23 assumptions.  I am not sure if I reviewed any
24 deposition testimony about that or if I have seen
25 any documents, but it was an assumption I was asked

Page 66

1 to make, even if Mr. Cogsbrow was an employee of
2 Beverly Proton at the time, I would still have
3 excluded this compensation as pecuniary gains to the
4 defendant, it would not have effected my opinion.
5    Q.   So let's talk about that conclusion so I
6 understand your report.  You conclude that neither
7 defendant is entitled to any compensation?
8    A.   They are only entitled to the compensation
9 that they disclosed in the POM.  They disclosed the
10 admin fee, that's how the admin fees would be spent
11 on the development of the, the development
12 operations.  I am sorry, the admin fees would be
13 spent.  And they listed out that there would be the
14 three percent on revenue.  There is nothing in there
15 about them compensating themselves in any other way.
16    Q.   So their compensation was not consistent
17 with the POM?
18    A.   No, not at all.
19    Q.   Did you ask for documentation about
20 services that either Lisa or Charles provided to the
21 companies?
22    A.   I don't think I asked for documentation
23 because it wasn't relevant.
24    Q.   So it didn't matter what they did in your
25 view because the compensation they took was not

Page 67

1 consistent with the POM, they are entitled to zero?
2    A.   Yes.
3    Q.   So.
4    A.   Put it this way.  You are entering into a
5 contract with a party, as an investor you are
6 entering into a contract with a party.  That
7 investor has the right to know how the defendants in
8 this case would be compensated.  How are you going
9 to spend my money, that is articulated in the POM.
10 They are very specific about the management fees,
11 but they make no mention of any other compensation.
12 And in fact, that's consistent with Judge Carney's
13 finding that reasonable, you know, that reasonable
14 compensation isn't justified if there is a material
15 amount that they paid themselves, and oh, they also
16 paid them selves more than even Mr. Ginsburg sees as
17 a reasonable compensation, which I comment on my
18 rebuttal report.  I mean I think that's the support
19 of my opinion on that.
20    Q.   I need to show you a couple of documents
21 and let me just do that right now.  Let me?
22    A.   Let me know when I should refresh.
23    Q.   I just want to make sure I am getting the
24 right documents to show you.  This one is a large
25 document.  Okay.  I think you should now see what

Page 68

1 has been marked as Exhibit 147.
2             (Exhibit 147 was marked for
3             identification.)
4        You cited in your report as Exhibit
5 5, it's the May 1, 2013 POM.  I have assume you have
6 seen that document before and you have read it?
7    A.   Yes, I have.
8    Q.   Okay.  So I want to draw your attention to
9 a particular part of it.  So let me just get it and
10 I will ask you to take a look at that?
11    A.   Okay.
12    Q.   If you go to Page 14 of that document?
13    A.   Okay.  Trying to get there.
14    Q.   And if you look at the under material
15 contracts, the second paragraph, you see that?
16    A.   Yes.
17    Q.   So that's referring to the lease with
18 Dr. Thropay for his property where the center was
19 going to be built?
20    A.   Correct.
21    Q.   And the POM is telling the investors that
22 the lease would be commencing upon lessee and that's
23 the Beverly, opining at least 100 million of funding
24 for the project.  You do you see that, right?
25    A.   I do.

Page 69

18 (Pages 66 - 69)

1    Q.   And you saw that at the time when you were
2 preparing your report, correct?
3    A.   Yes.
4    Q.   Okay.  So now I am going to show you
5 another document.
6    A.   Let me know when I should refresh.
7    Q.   I will.  This is again a large document,
8 so it's taking a while to just.  You should now be
9 able to see what has been marked Exhibit 148.
10            (Exhibit 148 was marked for
11            identification.)
12    A.   Okay.
13    Q.   Have you seen that document before?
14    A.   I am still refreshing, just a moment.
15 Okay until it's loaded I am going to do a search and
16 answer your question.
17    Q.   Okay.
18    A.   No, I don't believe I have so let me take
19 a look at it.
20    Q.   So I am going to point you to a specific
21 provision, this is a declaration that Dr. Thropay in
22 the state court action.  And to his declaration he
23 attaches the couple of leases, the land lease for
24 111 West Beverly.  So I am going to ask you to
25 scroll down, the land lease is Exhibit Number 1, and

Page 70

1 amendment of section 104 of the original lease that
2 we just looked at.  Do you see that section two,
3 lease term?
4    A.   Yes.
5    Q.   So Section 104 is being amended by this
6 provision.  So Charles Liu and Dr. Thropay amended
7 the lease and removed the hundred million dollar
8 requirement for the lease payments.
9    A.   Yes, it appears to be what they did.
10    Q.   Is that consistent with the POM language
11 we just looked at?
12    A.   No, it's not.
13    Q.   Are the lease payments to Dr. Thropay
14 legitimate business expenses?
15    A.   I have included them as legitimate
16 business expenses, because it's reasonable to assume
17 a lease would have to be paid.
18    Q.   Did you ask to see the lease agreements?
19            MR. LEUNG:  Counsel, it's the defense
20    stipulating that amounts paid on the lease
21    payments on Dr. Thropay's property should not
22    be deducted from disgorgement.  That's my
23    stipulation?
24            MR. GOURAIGE:  Gary, what is that, you are
25    asking me to stipulate that?

Page 72

1 go to section 1.04 of the land lease.  Now, when you
2 get there, let me know.
3    A.   On Page 2 starts effective date?
4    Q.   That's the effective date, yes.  Section
5 104, read that paragraph?
6    A.   Okay.
7    Q.   Now, that language of the lease, is that
8 consistent with the POM language you just looked at,
9 the lease would be effective until the lessee had
10 raised a hundred million dollars?
11    A.   On that provision, yes, I would need to do
12 a closer comparison to say it's all consistent.  And
13 to the extent it's a legal conclusion, I don't have
14 an opinion about that.
15    Q.   Just this provision?
16    A.   Yes, on the provision that the 100 million
17 is the threshold for the effective date of the
18 lease.
19    Q.   Okay.  So now I want you to scroll to the
20 end of this document and go to Exhibit 2, that's the
21 amended lease.  And I want you to go to section two
22 of the amended lease.
23    A.   I am still getting there.  So I am at
24 Exhibit 2, what paragraph?
25    Q.   Take a look at Section 2, which is the

Page 71

1            MR. LEUNG:  Yes, I just thought we could
2    cut to the chase if you want to make that
3    stipulation.
4            MR. GOURAIGE:  No, I am not willing to
5    stipulate.  I am trying to understand your
6    expert witness' report.  She made some
7    conclusions and she has explained the reasons
8    for her conclusion.  And this is another
9    instance where I am trying to understand her
10    thinking and her reasoning.
11            MR. LEUNG:  Thank you for explaining them.
12    Q.   Ms. Irwin, still, I take it you did not,
13 these lease agreements were not listed in Exhibit B,
14 so you did not review them?
15    A.   No, I don't believe I did.
16    Q.   You took it as an article of faith, if
17 there was a lease that the payments were legitimate
18 business payments?
19    A.   I gave the business the benefit of the
20 doubt.  I know these payments were mentioned in the
21 POM that there were certain provisions, but I did
22 give, I did allow about 25,000 of these payments to
23 be counted as legitimate business expenses.
24    Q.   Is that consistent with your professional
25 standard as a CPA?

Page 73

19 (Pages 70 - 73)

1    A.   Well, there is many standards that we have
2  to follow with the CPA.  I would say, yes, and I
3  followed the standard of objectivity, professional
4  care.  There is many listed in my report.  Yes, I
5  would say that including the lease payments as a
6  legitimate business expenses or deducting it was
7  conservative, if nothing else.  I did note that it
8  was inconsistent with the POM, but at least the POM
9  mentions these payments, it doesn't mention anything
10 about salaries going to the defendants.
11    Q.   The POM mentions lease payments becoming
12 effective when the lessee has raised one hundred
13 million dollars, you saw that when you reviewed the
14 POM?
15    A.   Yes.
16    Q.   You did not ask to see the lease
17 agreement?
18    A.   I don't believe so.
19    Q.   And so is that consistent with your
20 professional standards that you would simply accept
21 the reference in the POM to the lease without asking
22 to see the lease document?
23    A.   Yes, I mean based on all the other work
24 that I have done, it's not just that I see it
25 mentioned in the POM, it's based on all the work

Page 74

1  them the benefit of the doubt on the 525,000, I
2  think it is or close to that, but if the trier of
3  fact says no, that's different than the POM, and
4  should be not included as a legitimate business
5  expense, then the pecuniary gains would go up by
6  half a million dollars.
7    Q.   By the way, in your report, you gave
8  credit or lease payments of, I don't have the exact
9  number in front of me, I have to look it up, they
10 were roughly more than a little bit more than half a
11 million dollars?
12    A.   That's what I have been discussing, about
13 525,000.
14    Q.   Did you realize at the time that, in fact,
15 the payment that had been made to Dr. Thropay were
16 $838,500?
17    A.   No, based on the information that I
18 reviewed, that is which, let's see, I am looking at
19 Mr. Friedman's rebuttal report.  No, I was not aware
20 of that.  I think the difference maybe two-fold, it
21 could be the timing that I am looking, the time
22 frame that I looked at from my accounting was more
23 narrow and I didn't have any supportive documents
24 that showed that Dr. Thropay had been paid any
25 additional dollars, but even Mr. Friedman doesn't

Page 76

1  that me and my team have done on this case.  Again,
2  it was conservative to include it and deduct it from
3  the pecuniary gains.  The 2500, even though it was
4  inconsistent with the terms of the POM, but at least
5  the POM mentions these payments, it doesn't mention
6  anything about payments to the defendants again,
7  Mr. Liu and Ms. Wang, other than management fees.
8    Q.   At the time you read the POM, you knew,
9  did you not, that they had not raised a hundred
10 million?
11    A.   Yes, that's what I am alluding to, we knew
12 it was inconsistent with the POM, but at least the
13 POM mentions some sort of lease payments.
14    Q.   So even though they had not raised a
15 hundred million, it wasn't consistent with the POM,
16 you still credit the payments to Dr. Thropay as
17 legitimate business expenses?
18    A.   I did.
19    Q.   And your testimony now is that is
20 consistently your professional standards?
21    A.   And supported by my professional
22 standards, as well as everything else I have done in
23 this case.  And actually being conservative is kind
24 of esteem of accounting, to be conservative and give
25 parties the benefit of the doubt.  So I did give

Page 75

1  validate that he, that the data he relies on is
2  accurate, he just accepts it.  So he has not done
3  what I have done, which is go through and actually
4  identify each individual payment.  And I did so
5  within the time period.  So if there is support for
6  these additional payments, and if I review them and
7  they fit within like the scope of my time period
8  that's been requested by the SEC, then I would amend
9  my report, but I am not aware of any report for the
10 time period that I covered.
11    Q.   When you were preparing your report, did
12 you always ask the SEC for original documentation to
13 support expenses, transactions, did you ask for that
14 in every instance?
15    A.   When you say original documentations, I am
16 going to assume you are referring to copies of the
17 original documentation, yes, obviously the original
18 wouldn't go to an expert firm, they would stay with
19 production.  Yes, we received all of the raw data,
20 all the bank statements, all the excel data, all the
21 Quick Books, et cetera.
22    Q.   Okay.  How do you explain, even though you
23 obviously thoroughly reviewed the POM and relied on
24 it thoroughly, you did not ask the SEC to see the
25 lease agreement?

Page 77

20 (Pages 74 - 77)

1    A.  Because the terms were specified in the
2  POM, I asked if there was, I asked about
3  compensation agreements because the POM doesn't
4  mention compensation.  But the POM does mention
5  leases.  So again, I gave the individual defendants
6  the benefit of the doubt by including payments
7  deducted for pay as leases.  It was not, even though
8  the payments were inconsistent with the POM and
9  again, should the trier of fact find it that it
10 shouldn't be paid because it's inconsistent with
11 POM, then my calculations of the pecuniary gains
12 would increase, perhaps as much as 800,000, if I was
13 provided with the supportive documentation for
14 Mr. Friedman's assertion on Page 6.
15   Q.  Was there any time you made a request to
16 the SEC for documentation on something and that
17 request was declined?
18   A.  No, I think there may have been a request
19 where the response was, we don't have that, such as
20 we don't have a lot of information about Overseas
21 Chinese.  No, we were all the, we were given access
22 to everything, in fact, I think we even have a login
23 to their system to download information.
24   Q.  Everything you asked for, the SEC
25 provided, there was no time when they said this is

Page 78

1  privileged, this is, you don't need to see this or
2  we are not going to give you this, nothing of that
3  sort?
4    A.  Not that I am aware.  And if they had that
5  would have been concerning, because that's not the
6  way.  I mean if there is a legal reason, right, that
7  might be something I am not privileged to because I
8  have not signed a right protective order or
9  confidentiality agreement, that's a legal issue, but
10 I would be very concerned if they were like, oh, yes
11 we have this data, but we are not going to give it
12 to you.
13   Q.  Okay.  Now let's move onto another topic.
14   A.  Okay.
15   Q.  Your report did not include a profit and
16 law statement or an income statement, is that
17 correct?
18   A.  Correct.  Well, first of all profit and
19 law statement starts with revenue, which the
20 investor funds are not considered revenue.  And the
21 analysis that was discussed by Judge Carney, I think
22 also discuss at a high level by the Supreme Court
23 was to have the investor, the analysis should be the
24 investor funds less legitimate business expenses
25 should be categorized as pecuniary gain.  So by

Page 79

1  definition, so the 26.7 million that Judge Carney
2  indicated as the disgorgement, that's not revenue,
3  so you can't use that to start a PNL, that has
4  nothing to do with revenue, that's capital
5  investment.
6    Q.  Didn't the Supreme court say the
7  legitimate business expenses must be deducted from
8  gross receipts to arrive at net profits, didn't it
9  say that?
10   A.  They did call it net profits, they also
11 said, I think, they used a variety of terms, at
12 least in one section, whether you call it
13 restitution, whether you call accounting, whether
14 you call it net profits, whether you call it a
15 multitude of things, the issue is, it's the
16 investors what the investor contributed, what the
17 investor benefited from is the core concept and
18 that's what my analysis were from.
19   Q.  Well, the Supreme court, as I said, and I
20 think you agree, said from the gross receipts
21 legitimate business expenses have to be calculated
22 and deducted.  Now, your report accounts, you report
23 a gross net receipt number, you then make the
24 determinations about legitimate business expenses,
25 you deduct them, but you don't arrive at a net

Page 80

1  profit number, you arrive at a net pecuniary gains
2  number, I am wondering why you did that, was that
3  were you instructed to do that?
4    A.  Well, it could also be and with all due
5  respect, lawyers then always and judges don't always
6  use the term, the proper terminology in accounting.
7  But when you start with the investor funds, you
8  can't get to a net profit number because there is no
9  revenue.  So the net revenue would be, you know, I
10 think all of it.  You have zero revenue and all the
11 expenses and you have the net profit would be a loss
12 of 20 something, maybe $30 million.  But that's not
13 addressing the issue at hand.  The issue at hand
14 that's supposed to be looking at is what is a
15 legitimate business expense that should be deducted
16 from the net receipts and that was consistent with
17 my analysis, and also what I was asked to do, but it
18 seemed reasonable, a reasonable task, given the
19 validations in this matter, as well as the intent or
20 what judge Carney explains that he believes should
21 be tasked with.
22   Q.  So I think I heard you said that was what
23 you were asked to do.  So were you asked to do what
24 you did.  You were asked to determine net profit the
25 way the Supreme court indicated?

Page 81

21 (Pages 78 - 81)

1    A.   The way the Supreme court defined net
2  profit is not net profit, that's why I meant with
3  all due respect, it's not a proper terminology.  You
4  cannot start with gross receipts because that's not
5  revenue.  Net profit is revenue minus expenses.  It
6  doesn't logically conclude for an accountant that
7  you would get net profit from that, that's cash
8  flow.  What is being described by the Supreme Court
9  and Judge Carney is a cash flow analysis.  So I took
10  the concept of what they were explaining and that's
11  the analysis I performed.  It was what I was asked
12  to do, but it also seems to me consistent with what
13  the court's ruling seem to be, also consistent with
14  the issue at hand, which is what benefit or what
15  harm was done to the investor, how were the investor
16  funds misappropriated.
17    Q.   So maybe the justices got it wrong, but
18  you are the expert?
19    A.   No, I am not saying the justices got it
20  wrong.  I am saying that the term net profit,
21  sometimes terminology doesn't, you know, but there
22  was a justice explained, you know, gross receipts
23  minus limited business expenses to get net profit.
24  That logic from an accounting point of view doesn't
25  make sense.  So I did the first few steps, whether

Page 82

1  you call it net profit, whether you call it
2  pecuniary gain, whether you call it restitution.  In
3  fact, I think even a portion of the Supreme Court
4  decision says no matter what you call it, it starts
5  with investor funds, less legitimate business
6  expenses.
7    Q.   So I am going to, I guess, educate me by
8  explaining to me what your report is all about.  If
9  you have a business, your start up business, you
10  don't have revenues the first few years.  You may
11  raise capital, you may have investors and you got
12  capital and you are engaging in some operations to
13  try to develop the business.  Are you saying that
14  during the initial start up phase, you can't really
15  create an income statement for a business?
16    A.   No, that's not what I am saying at all.  I
17  am saying there is no revenue, there was no revenue
18  for this business.  So by definition, when the
19  justices say start with the net proceeds, the
20  investors and deduct legitimate business expenses,
21  what they are describing is a cash flow analysis.  I
22  think that's a misnomer.  So what I have been asked
23  to do and what seems consistent with the allegation
24  and what has been described by the court is a cash
25  flow analysis.  All the cash in, all the cash out

Page 83

1  and looking at what is legitimate and what is not.
2    Q.   So my understanding, and I am not an
3  accountant, I don't want to pretend to be the expert
4  here, you are.  My understanding is financial
5  statements typically have three documents, one is a
6  balance sheet, one is a cash flow that you just
7  described and the third is an income statement.  So
8  what I am trying to find out from you, this is
9  obviously a startup operation.  Until you actually
10  create the center and you get patients, you start
11  earning revenues, you are not going to have
12  revenues.  So are you saying that until you actually
13  develop a center and have patients and have patient
14  revenues, you can't have an income statement?
15    A.   You asked me that three minutes ago.  So
16  that's not what I am saying.  You would have no
17  revenue and you would have development expenses that
18  you would put on that you would expense and would
19  appear on your profit and law statement, and you
20  would have negative income, negative net profit for
21  the first, you know, end years until you started
22  making enough revenue to cover not only your
23  operating expenses, to also cover any additional
24  expenses that you had.
25    Q.   But isn't that true that startup at the

Page 84

1  beginning years, you had lawsuits, you hope as you
2  develop the business down the road you are going to
3  make a profit, the initial fees, you are going to
4  have lawsuits?
5    A.   General speaking, that's true.
6    Q.   And that's what the income statement would
7  show?
8    A.   That's what an income statement would
9  show, but that's not what, yes, I will just answer
10  that, that not correct.
11    Q.   Okay.  So you were not asked to prepare an
12  income statement here?
13    A.   No, because it doesn't answer the
14  question, which is what the gross net receipt
15  legitimate business expenses, that's the question I
16  am answering.
17    Q.   Okay.
18    A.   Whether you call it net profit or net
19  superior gains, whether you call it restitution.
20  Again, the Supreme court says whatever you call it
21  this is how it's defined.
22    Q.   Okay.  So the Supreme Court didn't call it
23  net pecuniary gains, you did in your report?
24    A.   Correct.
25    Q.   You didn't call it net profits, which is

Page 85

22 (Pages 82 - 85)

1 what the Supreme Court called it, is there a
2 difference between net profit and net pecuniary
3 gains?
4     A.   In theory, yes, net profit is from the
5 income statement, which is revenue minus expenses.
6 And which would start with zero in this case, less
7 all legitimate business expenses, which would make
8 no sense given the allegations at hand and the
9 questions being asked.  So I call it net pecuniary
10 gains.  Again, in the Supreme Court ruling they
11 articulate many ways you can refer to it.  They
12 don't use the term pecuniary gains, that's a term I
13 adopted, but it doesn't, my analysis answers the
14 question that's being asked.  It's not just asked of
15 me in my assignment, but asked by the court.
16     Q.   But again, it sounds like you are
17 disputing now, you are disputing the justice, the
18 justices did not say we think there should be a
19 determination of net pecuniary gains for
20 disgorgement.  They said we think there should be a
21 determination of net profit.  It sounds like you are
22 saying they got it wrong?
23     A.   No, I am not saying that.  Again, for the
24 fourth time, I am going to answer your question.
25 What they are describing, I am consistent with.

Page 86

1 Whether you call it net profits, whether you call it
2 net pecuniary gains, justice is not a CPA, and I am
3 not saying she is ignorant, I am saying the
4 terminology.  Somebody put the terminology in front
5 of her and she adopted it.  Net profits is not what
6 they are describing as answering the right question,
7 which is what were the net receipts, legitimate
8 business expenses.  You can't take that process and
9 get to net profits.  It's completely consistent with
10 accounting principals.
11     Q.   Is net pecuniary gain in accounting?
12     A.   No, I would say it's more forensic, it's
13 also called misappropriated funds.
14     Q.   So what you determined was not
15 disgorgement, as the justices were defining it, you
16 determined misappropriation?
17     A.   No, I have done exactly what the justice
18 set forth.  Start with no receipt, less legitimate
19 business expense, whatever you call it at the end, I
20 have done this process consistent with the court.
21 Also I have done it consistent with what has been
22 asked of me, and what I think is the issue at hand,
23 which is what were the appropriated funds, which is
24 how did the defendants benefit through their
25 discretionary use of $27 million, 166 which went to

Page 87

1 them.
2     Q.   If I wanted, as a lay person, to learn
3 about net pecuniary gains, what forensic accounting
4 would I look at to be educated about that?
5     A.   So you would first look at analysis, what
6 is the analysis and the analysis I am looking at is
7 cash flow analysis.  It's a synonym for
8 misappropriation of funds.  I happen to call it net
9 pecuniary gain.  If you look at misappropriation of
10 funds you could go to the Association of Certified
11 Fraud Examiner, and you would find the definition of
12 misappropriated funds.  You would find the
13 definition of self dealing and redirection and
14 diverting funds between related parties.  All that
15 is in there.
16     Q.   So let me give, maybe if I can give an
17 example, I might understand it.  Let's take for
18 example the $3 million payment to Mevion.  You would
19 deem that to be misappropriated funds and therefore
20 a net pecuniary gain to the individual defendants?
21     A.   Correct, because it did not go to the
22 benefit of the investors.
23     Q.   And how about expenses like rent expenses
24 or office space?
25     A.   Those were considered legitimate business

Page 88

1 expenses, and I deducted them, they are not included
2 in the net pecuniary gains, I don't consider them
3 misappropriated funds.
4     Q.   It wouldn't be misappropriated funds?
5     A.   Correct.
6     Q.   How about the payments to Dr. Thropay to
7 rent his land?
8     A.   That's, yes, again, rent, lease for the
9 land would be legitimate business expenses and not
10 part of the net pecuniary gain.
11     Q.   Okay.  Can we just take a five-minute
12 break.  I just want to make sure, I am almost done I
13 have got a couple more questions, just want to make
14 sure I covered everything, and we will wrap it?
15     A.   Okay.  That Would be great.
16          (Whereupon, an off-the-record
17          discussion was held.)
18     (Whereupon a short recess was taken from
19 12:10 p.m. to 12:18 p.m.)
20     Q.   Ms Irwin, did you want to add anything
21 that you might have learned during the break?
22     A.   No, the only thing I would add is, and I
23 have not had a chance to go back and find the e-mail
24 in the City Of Hope production regarding UDG being
25 associated with Ms. Wang.  The only thing I would

Page 89

23 (Pages 86 - 89)

1 add is that to the extent that the court talked
2 about net profits and my analysis called it net
3 pecuniary gain, none of that has a legal conclusion,
4 right. So I know the court calls it net profit and
5 that's defined in the case law over many many
6 hundreds of years. So I am just, I just want to
7 make sure it's clear, I am not offering a legal
8 opinion at all, I am simply describing what the
9 process is and adopting what the courts have said
10 should be the process. You are taking what the
11 defendants were given and you deduct legitimate
12 business expenses. That's the only thing I would
13 add.
14     Q.  Okay. I have I actually, I may be able to
15 help you out with the, I am going to show you a
16 document, and see if it's the e-mail you are
17 referring?
18     A.  Let me know when I should refresh.
19     Q.  I will. Well, it's still, the circle is
20 still spinning around. Wait until we refresh it and
21 see if that's the e-mail you are thinking of?
22     A.  Yes, this is one of the documents, yes.
23     Q.  That's the document you relied on, among
24 other documents, to conclude that the Mevion
25 equipment was for the United MPH deal and not for

Page 90

1     Q.  Okay. Let's see if I can do that.
2     A.  I have it up in front of me if you just
3 point me to the language or page.
4         (Exhibit 150 was marked for
5         identification.)
6     Q.  I need to get the opinion. So if you go
7 to Page 11 of the Westlaw Copy of the document.
8     A.  Okay.
9     Q.  It's the paragraph, it's on the second
10 column, just before Subsection C of the opinion?
11     A.  Okay.
12     Q.  It's the last sentence of that, where the
13 report says, and I will quote we leave it to the
14 ninth circuit on remand to determine whether the
15 facts are such that petitioners can, consistent with
16 equitable principals we found liable for profits as
17 partners in wrongdoing or whether individual
18 liability is required.
19     A.  Okay.
20     Q.  So I don't see that issue as something
21 that you addressed in your report, I just want to
22 make sure that I am not failing to read it carefully
23 enough and miss something.
24     MR. LEUNG:  Objection, form. What issue,
25     the unanswered issue that the Supreme Court

Page 92

1 the Beverly Proton deal?
2         (Exhibit 149 was marked for
3         identification.)
4     A.  Correct.
5     Q.  Okay. That doesn't say anything about
6 Mr. Lisa Wang, does it?
7     A.  No, it does not, to the extent that it,
8 well, let me back up here. That's correct, it does
9 not mention Ms. Wang.
10     Q.  Okay. And while we are on the subject of
11 Lisa Wang, my understanding of the Supreme court was
12 that they directed the district court to treat the
13 defendants as two separate individuals and try to
14 determine the net profits made by each one. I don't
15 see anywhere in your report where you separate the
16 defendants and attribute this 20,222,000 and some
17 odd dollars net pecuniary gains to each of the
18 defendants, am I correct about that, you did not do
19 that?
20     MR. LEUNG:  Object to counsel's preamble,
21     in which he is interposing his own legal
22     interpretation of the Supreme Court's decision.
23     A.  Yes, if you could point me to the language
24 in the Supreme Court's decision that you are
25 referring to, I would be happy to take a look at it.

Page 91

1 left to the ninth circuit on remand. Ms. Irwin
2 is an expert, but not an expert in the law,
3 sir.
4     MR. GOURAIGE:  I am asking if she made an
5 individualized calculation of net pecuniary
6 gains. That was a bad question.
7     A.  Well, the language that you point out is
8 actually asking the ninth circuit court to make this
9 decision. So that's not my, it's a legal, it's
10 asking for a legal conclusion, which is not my area.
11 My analysis does not break it out individually.
12 That was not what I was asked to do. Further, and
13 that may be a legal issue. I understand the parties
14 are married, and in California community property
15 rules apply, which means unless the source of these
16 funds in any way, shape or form can be traced to
17 separate property origins all the funds that they
18 receive are community property. That may be the
19 legal principal for why Mr. Loan asked me to do it
20 that way. That seems like a legal conclusion. To
21 answer your basic question, no, I did not.
22     Q.  Okay. That's all I needed to know that I
23 didn't miss something. Thank you. Now, Ms. Irwin,
24 have you ever submitted an expert report to a court
25 that was excluded by the court?

Page 93

24 (Pages 90 - 93)

**Page 94**

1    A.   Not in its entirety, no.
2    Q.   Partly?
3    A.   I have had one, I have had a court rule
4  that I can't talk about a particular issue, that
5  issue was approximate cause, approximate causation.
6  There was no discussion about why the court thought,
7  number one, I was going to talk about approximate
8  causation in the first place or why I shouldn't talk
9  about that.  In that matter, in my deposition, I
10  made it abundantly clear that I was not talking
11  about approximate causation, which was a legal
12  issue.  I was talking about economic causation and
13  trying to calculate damages holding all else equal.
14  So that's the one thing that I have had a court say
15  that I was not going to be able to talk about at
16  trial.  The case settled right after the motion in
17  limine were held, and I don't know if that ruling
18  was ever finalized.  That's the only one I am aware
19  of.
20    Q.   What is the name of that case you just
21  talked about?
22    A.   Let me look at my resume.  It is on top of
23  page, oh jeez, three of seven of my CD, second
24  bullet down, it's called Multiple Energy
25  Technologies versus Hologynics, LLC.

**Page 95**

1    Q.   Did you submit an expert report in a case
2  called Gavrielli in California Superior Court?
3    A.   I did.
4    Q.   And when was that?
5    A.   I was deposed in August, 2019 and October
6  of 2019.  So I guess my report was probably issued
7  sometime in June or July.
8    Q.   Okay.  And did the court exclude your
9  report in that case?
10    A.   No, it did not.
11    Q.   Okay.  What was the subject of your report
12  in that case?
13    A.   There were multiple topics in that report.
14  One had to do with a calculation of my client's lost
15  profits due to the mismanagement of, her brother's
16  mismanagement of their company.  One had to do with
17  misappropriated funds of the company that the
18  defendant individually invested and owed to my, to
19  Ms. Gavrielli.  I think a third party was tracking
20  returns on investments, let me look at.  And also
21  expected damages associated with tax fraud.
22    Q.   Okay.  And in that case, the court didn't
23  grant the defendants motion in limine to exclude the
24  lost profits part of your report?
25    A.   The court ruled on a legal front, that was

**Page 96**

1  not claimed, that was not appropriate measure of
2  damages, and they have ruled on my motion in limine.
3  They simply said that motion in limine against me
4  personally was moved because of his ruling on the
5  legal issue.
6    Q.   Okay.  Thank you, Ms. Irwin.  I don't have
7  anymore questions at this time.  I will pass the
8  witness in case Mr. Leung has questions for you.
9        MR. LEUNG:  No questions.
10    Q.   That concludes the deposition.
11        MR. LEUNG:  We will review and sign.  Yes,
12  and we will put in an order.
13            (The deposition concluded at
14            1:00 p.m.)
15            * * * * *

**Page 97**

1        CERTIFICATE OF DEPONENT
2  PAGE   LINE    CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
        * * * * *
15
    I, CARLYN IRWIN, deponent herein, do hereby
16  certify and declare under penalty of perjury the within and
    foregoing transcription to be my deposition in said action;
17  that I have read, corrected and do hereby affix my signature
    to said deposition.
18
19            _____
            CARLYN IRWIN, Deponent
20
21
22
23
24
25

25 (Pages 94 - 97)

```
 1          CERTIFICATE OF REPORTER
 2
 3          I, Shifra Moscovitz, Certified Court Reporter,
 4   State of Nevada, do hereby certify:
 5          That I reported the deposition of CARLYN IRWIN,
 6   commencing on Thursday, April 15, 2021, at 9:00 a.m.
 7          That prior to being deposed, the witness was duly
 8   sworn by me to testify to the truth.  That I thereafter
 9   transcribed my said shorthand notes into typewriting and
10   that the typewritten transcript is a complete, true and
11   accurate transcription of my said shorthand notes.  That
12   prior to the conclusion of the proceedings, the reading and
13   signing was requested by the witness or a party.
14          I further certify that I am not a relative or
15   employee of counsel of any of the parties, nor a relative or
16   employee of the parties involved in said action, nor a
17   person financially interested in the action.
18          In witness whereof, I hereunto subscribe my name
19   at Las Vegas, Nevada, this 28th day of April, 2021.
20
21
22
23      SHIFRA MOSCOVITZ, CCR No. 938
24
25
                                               Page 98
```

Veritext Legal Solutions
866 299-5127

**[& - 7]**

**&**

**&** 2:3,9

**0**

**07102-5400** 2:4

**1**

**1** 2:4 3:15 25:9 69:5 70:25
**1-98** 1:25
**1.04** 71:1
**1.4** 63:16
**10.8** 50:4 55:21
**10.9** 55:25 57:4
**100** 39:18 69:23 71:16
**101** 34:4
**104** 71:5 72:1,5
**105** 34:1 39:23 40:1,9,14
**10:50** 50:22
**11** 3:11 33:23 40:2 92:7
**111** 10:22 11:1 39:4,8,19,24 40:9 40:14 70:24
**116** 51:7
**117** 30:25
**12.9** 43:23
**121** 30:25
**12:10** 89:19
**12:18** 89:19
**130** 31:3
**132** 31:3
**14** 69:12
**143** 11:3
**144** 3:11 11:4,5,7 11:15 13:19
**145** 3:12 33:7,10 37:17 38:20,22
**146** 3:14 60:15,17 60:23

**147** 3:15 69:1,2
**148** 3:16 70:9,10
**149** 3:17 91:2
**15** 1:14 4:1 98:6
**15.9** 43:25 51:25
**150** 3:17 92:4
**16** 52:9,9
**16-00974** 1:6
**16.1** 55:3 64:10
**165** 31:6
**166** 87:25
**16711** 51:8
**168** 31:6
**17186** 98:22
**18** 15:9 27:15
**19** 51:7
**1:00** 96:14
**1st** 21:10

**2**

**2** 71:3,20,24,25
**2,200,250** 21:5
**2,210,701** 23:20
**2,250,000** 23:13
**2.2** 21:1 50:6 56:1 56:2,15 57:6,23
**20** 10:10 32:1 44:1 51:7 55:1 65:20 66:5 81:12
**20,222,000** 91:16
**20,222,511** 42:20 43:7
**2011** 65:21,25
**2013** 3:15 69:5
**2014** 21:10 25:9 65:22
**2016** 21:10 60:10 65:11 66:5,12
**2019** 95:5,6
**2020** 12:14
**2021** 1:14 4:1,22 9:19 51:6 98:6,19

**21** 51:7 65:20 66:1
**210** 44:10
**210,000** 44:11 52:3
**22** 10:10 12:14
**23rd** 60:10
**25** 7:23 20:21
**25,000** 73:22
**2500** 75:3
**26** 9:19
**26,333,019** 11:25
**26,373,019** 15:18
**26,400,000** 19:18
**26,423,168** 16:16
**26,733,000** 15:9
**26,733,018.81** 15:13
**26,733,019** 12:13 12:24 14:3 16:7 17:23
**26.7** 80:1
**262s** 14:22
**26th** 4:22
**27** 21:13,14 87:25
**27,250,000** 21:6
**28** 21:10
**280,000** 65:23
**28th** 98:19

**3**

**3** 9:6 29:21 35:12 36:19 43:20 44:6 52:1 53:2 88:18
**3.35** 49:18
**3.8** 43:15,18,23,23 43:25 44:4,17 48:20 49:15,16 50:2,3 52:1 54:3 56:20 57:10 63:16
**30** 4:4,6 81:12
**300,000** 16:18 17:3 29:19

**31** 14:18,22 18:4
**32** 18:5,6,11
**323** 2:11
**33** 3:12
**37** 58:18 63:10,22
**3d957** 14:23

**4**

**4** 3:4 4:4 16:11,12 16:15 17:12 20:23 22:2,5 23:15,18,20 52:10
**42** 32:1
**444** 2:9
**45** 66:1
**45,000** 20:25 21:3 24:8 49:3
**450** 49:20
**450,000** 49:14,16
**4526404** 1:24
**49** 20:4,17 23:14 23:17,21 63:22

**5**

**5** 4:6 50:1,3 55:21 56:22 69:5
**5,360,510** 42:18
**50** 20:1,10,12 21:3 23:16 63:11
**51** 20:5
**525,000** 76:1,13
**550,000** 65:23
**5th** 66:12

**6**

**6** 27:1 55:7 78:14
**60** 3:14
**634-5989** 2:5
**69** 3:15

**7**

**7** 9:6 27:12 43:12

[7.7 - anymore]

**7.7**   63:17
**70**   3:16 33:8,19
**700,000**   22:8,8
**7615**   65:20
**7811**   65:21

**8**

**8**   66:22
**800,000**   78:12
**81**   15:9
**838,500**   76:16

**9**

**9**   1:7 10:14 11:16
   12:10 13:19,20,20
   15:25 16:4 21:21
   23:8 42:12 49:23
   52:5
**9,116,000**   43:13
**9,116,859**   43:14
**9.1**   43:23,25 44:2
   44:16 51:25
**9.21**   64:11
**900**   2:10
**90071**   2:10
**91**   3:17
**92**   3:17
**938**   1:23 98:23
**9620**   51:6
**965-3998**   2:11
**970**   14:23
**9706**   51:6
**972**   14:23
**973**   2:5
**9:00**   1:15 4:2 98:6

**a**

**a.m.**   1:15 4:2
   50:22,22 98:6
**ability**   28:23 49:11
**able**   16:11,13
   19:18 20:9 25:22
   43:11,12 50:16

52:23 55:2 70:9
   90:14 94:15
**abundantly**   94:10
**accept**   35:25 74:20
**accepts**   77:2
**access**   10:23 78:21
**account**   46:22
**accountant**   82:6
   84:3
**accounted**   20:11
   26:25
**accounting**   18:19
   18:22 27:5 36:23
   42:5 75:24 76:22
   80:13 81:6 82:24
   87:10,11 88:3
**accounts**   80:22
**accuracy**   17:18,22
**accurate**   77:2
   98:11
**action**   70:22 97:16
   98:16,17
**actively**   9:2
**actual**   13:4 17:14
   23:21 30:11
**add**   9:16 51:21
   89:20,22 90:1,13
**addition**   43:14
**additional**   17:15
   18:24 48:11 76:25
   77:6 84:23
**address**   24:11
   39:21
**addressed**   92:21
**addressing**   81:13
**adjacent**   40:1,2
**adjoining**   34:5
**admin**   43:2 44:21
   49:17 55:23 57:6
   58:20 67:10,10,12

**administrative**
   19:23 20:24 21:23
   23:12,24 24:5,8,15
   24:15 50:10
**adopted**   19:4
   45:17 46:25 86:13
   87:5
**adopting**   45:14
   48:1 90:9
**adverse**   33:2
**affiliate**   61:8
**affiliated**   43:17
   51:3 53:9,16 54:6
   54:11 57:20 59:9
**affiliates**   44:12
   52:3
**affiliations**   62:4
**affix**   97:17
**ago**   38:7 84:15
**agree**   7:2 24:14
   80:20
**agreement**   34:21
   34:23 65:10,11,14
   74:17 77:25 79:9
**agreements**   72:18
   73:13 78:3
**al**   1:8
**alex**   8:19
**allegation**   83:23
**allegations**   86:8
**allen**   40:13,14
**allocate**   54:3,5,10
   54:17,20 55:6,14
   55:16 56:2,2,3,7,9
   56:16,19
**allocated**   57:8
**allocating**   57:2
**allotted**   63:5
**allow**   73:22
**allowable**   56:6

**allowed**   26:25
   44:21,22 55:23
   56:1,8 62:20
**alluding**   75:11
**amend**   77:8
**amended**   71:21,22
   72:5,6
**amendment**   72:1
**amount**   11:24
   13:2 14:7,10,11,25
   17:12 20:16 21:14
   22:13 23:3,20
   44:20 49:5,7 50:4
   50:7,8,10 54:8,25
   56:6,8 57:9,9,11
   59:11 64:7 68:15
**amounts**   43:15
   72:20
**analysis**   19:6 21:9
   29:25 50:9 64:20
   79:21,23 80:18
   81:17 82:9,11
   83:21,25 86:13
   88:5,6,6,7 90:2
   93:11
**analyze**   21:11 27:3
**analyzed**   28:21
**angeles**   2:10 30:11
   30:12 36:16
**annual**   65:22
**answer**   14:8 19:16
   58:12 63:21 70:16
   85:9,13 86:24
   93:21
**answered**   28:7
   61:20
**answering**   85:16
   87:6
**answers**   86:13
**anymore**   96:7

Page 2

**[apologize - beyond]**

**apologize** 27:20,21
38:6
**appear** 25:19
52:16 84:19
**appearances** 2:1
**appeared** 28:11
**appears** 63:15
72:9
**apply** 58:19 93:15
**appreciate** 20:9
**approach** 11:19
28:20
**appropriate** 21:19
21:20 49:5 96:1
**appropriated**
87:23
**approximate** 94:5
94:5,7,11
**approximation**
15:6
**april** 1:14 4:1
21:10 65:11,22
66:12 98:6,19
**area** 93:10
**argue** 19:3 47:12
**arrangements**
65:3
**arrive** 80:8,25
81:1
**article** 73:16
**articulate** 25:20
86:11
**articulated** 68:9
**asked** 26:9 27:9,18
28:6 44:13 46:3
54:7 55:8 62:2,8,9
64:2 66:21,25
67:22 78:2,2,24
81:17,23,23,24
82:11 83:22 84:15
85:11 86:9,14,14

86:15 87:22 93:12
93:19
**asking** 19:2 34:17
46:24,24 64:4
72:25 74:21 93:4
93:8,10
**aspect** 7:12
**assemble** 6:10
**asserting** 9:14
**assertion** 78:14
**assess** 8:24 9:12
**assessing** 7:25
**asset** 60:21
**assignment** 55:5
86:15
**associated** 22:15
25:4 29:23 32:12
32:23 35:6 47:10
53:20 56:5 63:3
89:25 95:21
**association** 38:17
88:10
**assume** 58:18 69:5
72:16 77:16
**assuming** 43:6
48:21 49:16
**assumption** 26:9
26:10,15,17,19,20
27:9,18 28:2 29:1
66:20,25
**assumptions** 66:18
66:23
**attaches** 70:23
**attention** 11:15
42:12 62:12 69:8
**attorney** 42:1
**attorneys** 60:18
**attribute** 42:22
43:7,19 44:8,18
53:23 91:16

**attributed** 49:7
53:4
**attributing** 53:5
**audit** 14:3
**august** 95:5
**auto** 28:12
**available** 43:3
47:15 57:5
**awarded** 12:2,23
13:1,8,11
**aware** 28:17 36:15
36:18,25 37:3
45:1,3,5 51:9 62:4
65:15 76:19 77:9
79:4 94:18

**b**

**b** 4:4,6,24 5:14 6:1
6:6 27:15 61:14
73:13
**back** 7:3,5 13:19
16:4 18:25 19:12
19:15 23:8 26:8
31:1 35:8 37:5
40:19 44:14 50:23
53:17 56:22 58:1
61:3,4 63:21
89:23 91:8
**background** 7:24
**bad** 93:6
**balance** 84:6
**bank** 5:7,8 17:17
18:17 25:14 77:20
**bankruptcy** 9:11
**based** 10:6 12:6
16:19,25 17:10,13
18:23 23:16,25
27:23 28:1 37:14
42:5,5,8,9 45:21
47:9 74:23,25
76:17

**basic** 93:21
**basis** 26:10
**bear** 33:5 59:25
**becoming** 74:11
**beginning** 13:25
85:1
**behalf** 9:8 31:20
33:1 38:10
**believe** 5:25 6:2
7:6 10:21 12:4,6,9
20:3,5 33:17 36:2
37:2,6 38:22
45:22 46:1,20
48:24 60:13 61:2
62:5,8,9 63:7,12
70:18 73:15 74:18
**believes** 81:20
**benefit** 30:6 32:9
32:24 36:21 41:6
41:17,20,22 43:21
53:10,12,12,14
55:5 59:16 73:19
75:25 76:1 78:6
82:14 87:24 88:22
**benefited** 80:17
**best** 17:18 28:23
**better** 20:15 28:8
**beverly** 30:6,9,10
31:5,12,13 32:10
32:19,24,25 33:23
34:1,2,5,7,11
35:13,19 36:16,18
37:1,4,10 38:14,16
38:17 39:1,18,19
39:23,25 40:4,9,9
40:15 41:16 42:7
61:11 65:4,5,14
66:4,17 67:2
69:23 70:24 91:1
**beyond** 7:15

[bigger - characterizing]

**bigger** 8:16
**biggest** 64:10
**binding** 34:15,18
**bit** 24:1 52:8 76:10
**books** 25:16 77:21
**bottom** 9:6 27:13
  28:20
**bought** 31:12
  35:20
**boulevard** 33:24
  34:1,5 40:4
**break** 39:12,15
  48:12,14,16,19
  50:12,14 54:2
  89:12,21 93:11
**broker** 55:17
  56:14 57:5 58:14
  58:15 62:19,22
  63:25
**brokers** 50:2,7,9
  55:10,12,18,22
  56:5,10 57:22,25
  58:17 59:11,14,15
  64:2
**brother's** 95:15
**brought** 20:4
  62:20
**build** 24:23 29:10
  34:24 35:23
**building** 40:14
  41:16
**buildings** 40:17
**built** 37:19 40:16
  69:19
**bullet** 94:24
**business** 7:17,23
  13:14 14:15 24:19
  25:1,10,19 26:1
  27:4 28:3,10,11,14
  28:16,19 29:4,25
  36:22 40:25 41:8

41:12 42:3,23
43:4 45:3,8 46:5,7
46:16 48:7 52:12
52:17 53:3 54:24
72:14,16 73:18,19
73:23 74:6 75:17
76:4 79:24 80:7
80:21,24 81:15
82:23 83:5,9,9,13
83:15,18,20 85:2
85:15 86:7 87:8
87:19 88:25 89:9
90:12
**buy** 37:10

**c**

**c** 1:7 27:2 66:22
  92:10
**calculate** 94:13
**calculated** 17:4
  52:18 80:21
**calculation** 23:15
  93:5 95:14
**calculations** 78:11
**california** 1:2 2:10
  93:14 95:2
**call** 80:10,12,13,14
  80:14 83:1,1,2,4
  85:18,19,20,22,25
  86:9 87:1,1,19
  88:8
**called** 4:10 15:6
  29:17,21 30:16
  37:18 86:1 87:13
  90:2 94:24 95:2
**calling** 54:15
**calls** 90:4
**cap** 58:20
**capacity** 6:24
**capital** 19:22
  21:23 24:22 25:2
  80:4 83:11,12

**capped** 56:14
**capture** 22:16
  25:23
**captured** 6:20
  28:16 49:22 50:2
**card** 45:3,8 46:5,7
  46:16 48:7 52:25
**care** 74:4
**carefully** 9:19
  92:22
**carlyn** 1:13 3:2,11
  4:9 97:15,19 98:5
**carney** 11:23 12:1
  13:15 14:12,14,25
  15:17 17:4,8,11,16
  19:8 21:15 24:3
  26:11 45:6 46:12
  47:9 54:25 79:21
  80:1 81:20 82:9
**carney's** 12:9 13:2
  14:20,24 15:21
  16:1,17,19 18:9,12
  18:13,23 19:1
  45:7,14 46:20,23
  47:5 48:1 63:15
  68:12
**case** 1:6 4:20 6:16
  10:10 68:8 75:1
  75:23 86:6 90:5
  94:16,20 95:1,9,12
  95:22 96:8
**cases** 7:14 8:12
**cash** 22:18,19 82:7
  82:9 83:21,24,25
  83:25 84:6 88:7
**catch** 44:14 62:11
**categories** 25:13
  25:21
**categorize** 28:16
**categorized** 64:19
  79:25

**category** 23:9
  44:17
**caught** 62:10,24
  63:1 64:1
**causation** 94:5,8
  94:11,12
**cause** 94:5
**causes** 15:7
**ccr** 1:23 98:23
**cd** 94:23
**cdcal2007** 14:23
**center** 24:23,24
  26:7 29:11 30:12
  32:11 34:24 38:16
  40:16 41:16,16
  42:8 61:11 65:4
  69:18 84:10,13
**centers** 38:15
**central** 1:2
**cents** 15:9
**ceo** 38:14 45:2,9
**certain** 16:4 18:22
  47:19 73:21
**certainly** 16:2
**certificate** 45:24
  97:1 98:1
**certified** 88:10
  98:3
**certify** 97:16 98:4
  98:14
**cetera** 77:21
**chairman** 46:6,15
**challenge** 47:24
**chance** 39:16
  89:23
**change** 97:2
**changed** 29:20
**characterize** 23:2
  23:7,10 29:8 31:1
**characterizing**
  64:21

Page 4

[charles - contract]

| | | | |
|---|---|---|---|
| **charles** 1:7 34:7 40:8 44:9 48:8 49:8 53:6 58:7 64:12 65:4,20 66:6,12 67:20 72:6 | **close** 47:23 76:2 | **compensation** 6:22 7:18,25 8:4,5 8:12,21,24 9:5,7 9:13 64:16,22 65:3 67:3,7,8,16 67:25 68:11,14,17 78:3,4 | **confirmed** 18:2 |
| **chart** 61:15 | **closely** 7:20 8:23 | | **confronted** 35:20 |
| **chase** 73:2 | **closer** 71:12 | | **connected** 15:7 |
| **check** 18:9 52:7 | **cogsbrow** 66:13 66:16 67:1 | | **connection** 30:16 61:13,14 |
| **china** 63:24 | **collection** 23:19 | | **conservative** 28:15 74:7 75:2 75:23,24 |
| **chinese** 55:12 56:25 57:18 58:6 59:22 62:1,3,6,10 62:11,25 63:17,24 78:21 | **collectively** 59:10 | **complete** 7:2 98:10 | **consider** 7:18 20:23 89:2 |
| **choice** 62:18 | **column** 92:10 | **completely** 87:9 | **considered** 6:9 17:16 29:4 33:20 36:22 40:25 41:11 79:20 88:25 |
| **choose** 57:21 63:4 | **combination** 46:12 | **component** 8:6 | |
| **choosing** 35:25 | **come** 7:21 21:4 25:2 37:10 | **components** 8:15 | |
| **chose** 50:7 | **comes** 8:7 20:25 51:4 52:8 | **comps** 8:1 | **consistency** 27:5 |
| **circle** 90:19 | **coming** 22:6,7,15 58:1 | **concept** 80:17 82:10 | **consistent** 29:7 41:10,13 67:16 68:1,12 71:8,12 72:10 73:24 74:19 75:15 81:16 82:12 82:13 83:23 86:25 87:9,20,21 92:15 |
| **circuit** 18:14 92:14 93:1,8 | **commencement** 4:5,7 | **concerned** 79:10 | |
| **citation** 18:11 | **commencing** 69:22 98:6 | **concerning** 79:5 | |
| **cited** 6:12 15:23 31:10 32:5,6 69:4 | **comment** 68:17 | **conclude** 25:25 42:17 46:9 67:6 82:6 90:24 | |
| **cites** 18:8,9 | **commission** 1:4 2:9 | **concluded** 23:23 25:7 28:3 56:25 96:13 | **consistently** 75:20 |
| **citing** 14:20 | **communications** 32:8 | **concludes** 96:10 | **consolidating** 7:8 |
| **city** 32:12 36:9 37:22 38:7 51:10 89:24 | **community** 38:17 38:18 93:14,18 | **conclusion** 14:11 18:16 23:25 24:12 24:14,14 30:22 36:25 42:10 45:22 47:16 67:5 71:13 73:8 90:3 93:10 93:20 98:12 | **construction** 33:22 40:13 |
| **cjc** 1:6 | **companies** 55:17 64:17 67:21 | | **consult** 60:9 |
| **claim** 9:9 59:21 | **company** 8:23 29:17 32:10 43:16 44:19,25 45:6,8 46:10,15 54:14 57:20 61:7 64:25 95:16,17 | | **consultant** 6:23 51:15 |
| **claimant** 9:9 | | **conclusions** 10:5,6 73:7 | **consummated** 34:22 |
| **claimed** 63:19 96:1 | | **conduct** 41:9 | **contacts** 6:25 |
| **clarified** 16:3 | **comparison** 71:12 | **confidentiality** 79:9 | **contains** 5:8 |
| **clarify** 15:24 | **compensated** 9:15 68:8 | **confining** 5:11 | **contemplates** 33:22 35:21 |
| **clear** 19:23 26:13 59:7 90:7 94:10 | **compensating** 67:15 | **confirm** 10:4 14:18 17:18,22 45:18 | **contemplating** 34:10 |
| **client's** 95:14 | | | **context** 8:21 35:4 |
| | | | **contract** 37:1,2,4 65:1,13,18 66:3,4 66:8,11,15 68:5,6 |

Page 5

[contracts - deponent]

**contracts** 64:24
65:1 66:13 69:15
**contradicts** 35:4
35:16 38:9
**contributed** 80:16
**contributions**
21:23 24:22 25:3
**control** 57:10
**controlled** 48:22
49:10
**convenient** 11:12
**coordinated** 6:25
**copies** 77:16
**copy** 4:21 10:23
11:11 92:7
**core** 80:17
**correct** 5:2 6:7,8
8:15,16 9:21,25
10:16 11:21 12:21
14:2 16:21 17:1,6
17:8,9 18:8,18
19:21 20:2,3
24:18,20,25 25:4
25:11 28:4 29:11
29:12,14,15,18
37:8 41:1 42:21
44:3,5,7 48:21
55:13 56:18,20
58:22,23 59:24
64:13,25 66:9
69:20 70:2 79:17
79:18 85:10,24
88:21 89:5 91:4,8
91:18
**corrected** 97:17
**correctly** 17:2
25:7 33:6 35:24
40:23
**corresponding**
35:3

**counsel** 24:2 26:16
26:16 27:9,18
72:19 98:15
**counsel's** 91:20
**count** 20:6
**counted** 73:23
**county** 30:11
36:17
**couple** 68:20
70:23 89:13
**course** 12:18,20
**court** 1:1 12:2,4,5
12:8,14,23 13:1,5
13:7 14:4,6,12,13
15:22,23 19:3
70:22 79:22 80:6
80:19 81:25 82:1
82:8 83:3,24
85:20,22 86:1,10
86:15 87:20 90:1
90:4 91:11,12
92:25 93:8,24,25
94:3,6,14 95:2,8
95:22,25 98:3
**court's** 10:10
14:17 82:13 91:22
91:24
**courts** 90:9
**cover** 24:5,9 60:17
84:22,23
**covered** 25:21
77:10 89:14
**covers** 19:6
**cpa** 73:25 74:2
87:2
**create** 83:15 84:10
**credit** 49:20 52:25
75:16 76:8
**criteria** 45:21
**cross** 9:9,9

**cummis** 2:3
**curious** 57:20 61:9
**cut** 73:2
**cv** 6:14,17 8:10,11

**d**

**d** 55:7 58:15
**damages** 8:17
94:13 95:21 96:2
**dark** 20:5
**data** 5:9,11,11 7:7
7:11 27:3 28:21
77:1,19,20 79:11
**date** 51:5 71:3,4
71:17
**day** 98:19
**deal** 35:18,20
53:20 90:25 91:1
**dealing** 9:4 31:5
88:13
**dealt** 8:12,20
15:14
**dean** 9:8
**debatable** 25:14
**decided** 17:7
54:20
**decision** 10:10,11
13:7 18:10,12
63:15 83:4 91:22
91:24 93:9
**declaration** 3:14
3:16 60:4,10,19,19
61:1,5 70:21,22
**declare** 97:16
**declined** 78:17
**dedicated** 41:15
**deduct** 42:19
54:24 75:2 80:25
83:20 90:11
**deducted** 16:4
27:22 72:22 78:7
80:7,22 81:15

89:1
**deductible** 23:10
42:17
**deducting** 74:6
**deem** 88:19
**deemed** 58:21
**defendant** 45:19
52:21 54:18,21
57:21 59:1 67:4,7
95:18
**defendant's** 42:20
52:1
**defendants** 1:9 2:2
4:16,17,20 15:12
16:16 44:18 47:22
51:25 55:4 56:17
57:3,16,19 58:22
60:22 61:3 63:4
64:15 68:7 74:10
75:6 78:5 87:24
88:20 90:11 91:13
91:16,18 95:23
**defense** 72:19
**defined** 82:1 85:21
90:5
**defining** 87:15
**definitely** 53:7,8
**definition** 80:1
83:18 88:11,13
**definitively** 19:16
**delineations** 26:13
**delivered** 31:18
**delssk** 58:14,20,25
59:23 60:18 61:2
61:6,9 62:1,9 63:6
63:10,15,18,23
64:3,4
**demolish** 40:13
**deponent** 97:1,15
97:19

**deposed** 9:3,4 95:5 98:7

**deposit** 21:12 22:7 29:16,21

**deposited** 23:4

**deposition** 1:13 4:5,7 5:13,23 6:1 6:3,3,5 10:19 30:15,23 33:8,18 34:13 35:3,8 46:8 51:5,6,7 65:20 66:24 94:9 96:10 96:13 97:16,17 98:5

**depression** 56:11

**described** 82:8 83:24 84:7

**describing** 83:21 86:25 87:6 90:8

**detail** 25:15

**detailed** 17:13 28:9

**details** 23:18 25:14 53:17

**determination** 27:22 46:13 47:9 86:19,21

**determinations** 80:24

**determine** 16:8 18:18 81:24 91:14 92:14

**determined** 11:20 16:10,24 19:25 87:14,16

**develop** 83:13 84:13 85:2

**development** 26:6 42:6,7 67:11,11 84:17

**diamond** 9:10

**difference** 17:3 76:20 86:2

**different** 22:9 25:12 30:17,19,19 37:11 40:17 61:22 76:3

**differential** 56:16 57:2

**differentiate** 52:24

**diligence** 54:1

**direct** 47:21

**directed** 26:19 52:15 53:10,11,13 91:12

**direction** 7:11 58:4

**directly** 44:20 52:18 56:21 62:9 64:12

**director** 32:20 61:6

**disallowed** 53:3

**disclosed** 67:9,9

**discretion** 52:16 59:12

**discretionary** 87:25

**discrimination** 8:22

**discuss** 28:18 29:24 79:22

**discussed** 46:8 65:19 79:21

**discusses** 26:5 31:7

**discussing** 36:9 66:15 76:12

**discussion** 26:11 40:21 50:20 89:17 94:6

**discussions** 24:3

**disgorgement** 11:23 12:3,7,12,13 12:24 13:2,4,8,11 13:12,13,15 14:4,7 14:9,10,11,16 15:1 15:13,17 17:20 72:22 80:2 86:20 87:15

**disputing** 86:17,17

**distract** 40:6

**district** 1:1,2 91:12

**diverted** 43:22

**diverting** 88:14

**document** 3:17 6:8 10:16 11:11 14:19 14:20,23 31:4,22 33:9,13,16,21 34:13,15,18,25 35:1,15,21 36:6 37:17,20,22 38:4,8 40:7 60:11 68:25 69:6,12 70:5,7,13 71:20 74:22 90:16 90:23 92:7

**documentation** 45:2 67:19,22 77:12,17 78:13,16

**documentations** 77:15

**documented** 23:4

**documents** 4:25 5:4,6 10:2 37:6 51:10 53:25 58:24 61:25 64:23 66:25 68:20,24 76:23 84:5 90:22,24

**doing** 34:10 40:5

**dollar** 42:22 72:7

**dollars** 20:13 43:9 43:18,25 55:19 57:23 64:11 71:10 74:13 76:6,11,25 91:17

**double** 41:2

**doubt** 73:20 75:25 76:1 78:6

**download** 78:23

**dr** 30:18 31:2 32:6 32:14 33:2 34:7 34:20,25 35:5,16 35:17,25 36:4,10 36:14 37:19 38:13 39:4,8,20,24 51:4 69:18 70:21 72:6 72:13,21 75:16 76:15,24 89:6

**draft** 31:4,4

**drafted** 6:24

**draw** 11:15 42:11 69:8

**due** 54:1 81:4 82:3 95:15

**duly** 4:10 98:7

**e**

**e** 30:25 32:7 51:9 51:14,15 58:15 60:17,18 89:23 90:16,21

**earning** 84:11

**easier** 55:21

**east** 34:4

**economic** 62:21 63:3 94:12

**economically** 59:15

**ed5** 19:8,9,20,21 31:15,16,20,25 35:6 41:7

[edc5 - expert]

**edc5**  27:6
**edison**  60:20
**educate**  83:7
**educated**  88:4
**educational**  6:15
**effected**  67:4
**effective**  71:3,4,9
71:17 74:12
**either**  5:7 11:9
64:12 67:20
**electronic**  10:17
16:13
**electronically**
10:24
**email**  3:17
**empire**  9:11
**employee**  65:14
66:17 67:1 98:15
98:16
**employment**  6:20
6:21 65:13
**ended**  11:3 58:6
**energy**  8:22 94:24
**engaging**  83:12
**ensuring**  7:1
**entered**  15:11,14
**entering**  68:4,6
**entertain**  9:23
**entire**  49:7 56:15
57:6
**entirety**  94:1
**entities**  38:23
52:14 62:21
**entitled**  48:25 49:2
49:14,19 67:7,8
68:1
**entity**  49:10 58:11
**eon**  41:1
**equal**  94:13
**equipment**  29:13
29:17 30:2 31:24

32:3,16,17 35:19
36:15,15 37:10,11
90:25
**equitable**  92:16
**especially**  7:19
**esq**  2:3,8
**establish**  23:22
29:1 36:24 38:25
**established**  34:19
**establishes**  30:5
36:6,20
**estate**  42:6
**esteem**  75:24
**estimate**  8:8
**et**  1:8 77:21
**evaluating**  7:17
**evaluation**  7:24
8:17
**evidence**  10:6
16:25 30:4,14,21
31:22,23 35:10
36:19 38:9 41:21
44:24 45:23 47:2
47:10 48:4 53:19
58:5 59:21
**exact**  17:25 23:18
63:13,14 76:8
**exactly**  87:17
**examination**  3:1,4
4:12
**examine**  18:17
**examined**  4:11
**examiner**  88:11
**example**  53:2
88:17,18
**exceed**  23:24
24:17
**exceeded**  43:1
**exceeds**  44:21
50:10

**excel**  5:8 25:15
77:20
**excess**  49:12 58:20
**exchange**  1:4 2:9
3:12
**exclude**  95:8,23
**excluded**  29:25
30:3 32:2 41:24
47:18 50:9 67:3
93:25
**exclusive**  61:10
63:19
**excuse**  6:3 9:10
16:15 24:4
**executed**  65:7,9
**executives**  7:9
9:13
**exercise**  47:3 48:3
**exercised**  46:25
**exhibit**  3:10,11,12
3:14,15,16,17,17
4:24 5:14,25 6:5,6
6:7 10:14,20 11:7
11:10,16 12:10,11
13:19,20 15:25
16:4,11,12,15
17:12 20:23 21:21
22:2,5 23:8,15,17
23:20 33:5,7,8,10
33:19 37:17,22
38:20 42:12 43:12
44:2 49:23 50:1,3
52:5 55:20,21
56:22 60:1,15,17
60:23 61:14 69:1
69:2,4 70:9,10,25
71:20,24 73:13
91:2 92:4
**exhibits**  3:9 5:24
5:25 6:1,4

**exists**  36:19
**expected**  95:21
**expenditure**  25:2
25:8,11 26:1,18
28:1 29:3,10 30:2
31:19 40:24,25
41:10,12 42:24
53:4
**expenditures**
23:10 24:19 29:23
41:14 42:18
**expense**  25:8
26:24 28:1,4,11,14
28:17,19 29:4,6
30:5 36:22 41:8
42:3 43:2,4 76:5
81:15 84:18 87:19
**expenses**  13:14
14:15 23:11,23
24:4,5,6,9 25:23
26:6 27:6,22
28:10,16,25 29:25
43:19 47:20 49:23
49:25 50:5 52:12
52:17 54:24 55:16
56:1,15 57:7
72:14,16 73:23
74:6 75:17 77:13
79:24 80:7,21,24
81:11 82:5,23
83:6,20 84:17,23
84:24 85:15 86:5
86:7 87:8 88:23
88:23 89:1,9
90:12
**experience**  6:15
7:24
**expert**  3:11 4:17
8:3,6 10:14 18:3
46:21 47:8 73:6
77:18 82:18 84:3

Veritext Legal Solutions
866 299-5127

[expert - gains]

93:2,2,24 95:1
**explain** 77:22
**explained** 14:9
   73:7 82:22
**explaining** 73:11
   82:10 83:8
**explains** 81:20
**exploring** 47:2
**extent** 5:6 25:18
   25:22 47:19 48:2
   49:22 53:22 71:13
   90:1 91:7
**external** 7:8
**eye** 62:10,24 63:1
   64:1

**f**

**face** 37:17
**facilities** 42:7
**fact** 13:18 18:15
   32:22 34:21 47:8
   47:13 48:12 51:11
   68:12 76:3,14
   78:9,22 83:3
**facts** 17:10,20
   36:24 92:15
**factual** 9:20 18:13
**failing** 92:22
**fair** 6:13 23:2
**faith** 73:16
**fall** 43:4
**fallen** 52:13
**falls** 25:12
**familiar** 17:10
   33:24 58:15
**familiarity** 40:4
**family** 7:15,16
**far** 8:11 48:6
   49:12,14 51:23
**fast** 62:13
**favor** 15:11

**february** 51:5,7
   65:20
**federal** 18:14 19:3
**federation** 8:20
**fee** 49:17 67:10
**fees** 19:23 20:24
   20:25 21:23 23:12
   23:19,24 24:5,8,15
   24:16 43:2 44:21
   50:2,11 55:12,23
   55:25 56:5,5,14
   57:5,6 58:17,20
   60:21 62:19 63:25
   64:20 67:10,12
   68:10 75:7 85:3
**fep** 26:16
**fifty** 20:18,19
**figure** 54:9
**files** 5:8 25:15
**filling** 7:1
**final** 12:14 14:10
   17:5
**finalized** 94:18
**financial** 27:3 84:4
**financially** 98:17
**find** 8:11 22:6,7
   45:12 48:4,11
   51:5 65:19 78:9
   84:8 88:11,12
   89:23
**finder** 47:8
**finding** 17:10,20
   18:15 45:6,7,14,17
   46:20,24 47:5,13
   47:14 48:1 68:13
**findings** 18:13
**finish** 48:17,18
**finished** 33:14
**firm** 6:9 10:6
   77:18

**firms** 56:4
**first** 4:10 13:24
   16:10 24:12 26:21
   29:16 32:2 36:24
   38:22 39:21 79:18
   82:25 83:10 84:21
   88:5 94:8
**fit** 77:7
**five** 50:7,8,14
   59:10 89:11
**flipping** 40:7
**flow** 82:8,9 83:21
   83:25 84:6 88:7
**flower** 2:9
**focus** 52:21
**fold** 76:20
**follow** 74:2
**followed** 42:25
   74:3
**follows** 4:11
**footnote** 12:12
   13:3 14:18,22
   15:19,21 18:4,5,6
   18:11 21:22
**footnotes** 10:1,3
**foregoing** 97:16
**forensic** 16:14
   17:13 18:19,22
   27:5 87:12 88:3
**forgot** 44:11
**form** 5:12 54:22
   92:24 93:16
**former** 30:9,10
**forth** 13:12 24:6,8
   31:1 87:18
**found** 63:8 92:16
**four** 7:15 8:11
   22:9
**fourth** 86:24
**frame** 76:22

**fraud** 88:11 95:21
**frcp** 4:6
**friedman** 2:14
   4:17 8:1 76:25
**friedman's** 30:7
   76:19 78:14
**front** 4:22 11:11
   37:16 42:15 76:9
   87:4 92:2 95:25
**fully** 21:11 22:17
**funding** 69:23
**funds** 11:21 15:8
   16:8,9 18:21 19:8
   19:10,19,20,22
   22:25 23:3,3,5
   26:14 41:15 49:9
   56:10 58:1,5
   59:13 62:23 79:20
   79:24 81:7 82:16
   83:5 87:13,23
   88:8,10,12,14,19
   89:3,4 93:16,17
   95:17
**further** 93:12
   98:14

**g**

**gain** 42:24 43:5,6
   53:4,5 55:2,6 57:3
   57:14 79:25 83:2
   87:11 88:9,20
   89:10 90:3
**gains** 42:20 43:7
   47:21 51:24 55:9
   55:15 56:17,18,23
   58:21 67:3 75:3
   76:5 78:11 81:1
   85:19,23 86:3,10
   86:12,19 87:2
   88:3 89:2 91:17
   93:6

Veritext Legal Solutions
866 299-5127

**gary** 2:8 4:14 72:24
**gather** 7:11
**gathered** 7:7
**gavrielli** 9:6,6 95:2 95:19
**general** 25:16 85:5
**generally** 6:20 7:23 25:24
**generic** 62:25
**getting** 59:16 68:23 71:23
**ginsburg** 8:2 68:16
**gist** 13:18
**give** 7:10 39:5 49:20 50:24 51:12 73:22 75:24,25 79:2,11 88:16,16
**given** 16:17 34:14 40:3 46:5,7 54:19 61:24 78:21 81:18 86:8 90:11
**gives** 7:24
**glad** 16:3
**glasses** 16:12
**go** 8:1,10 10:20 13:19,21 16:3 19:12,15 20:3 35:8 37:5 40:19 50:23 53:17 56:22 63:21 69:12 71:1 71:20,21 76:5 77:3,18 88:10,21 89:23 92:6
**goes** 5:20
**going** 9:3 10:13,15 10:20,20 20:14 21:2 22:13 23:8 30:18 31:1,15 32:11,11,19 33:5

37:11 38:1,2 39:1 39:3,7 41:6 47:12 51:3 58:1 59:18 68:8 69:19 70:4 70:15,20,24 74:10 77:16 79:2,11 83:7 84:11 85:2,3 86:24 90:15 94:7 94:15
**good** 50:12
**google** 62:14 63:6
**gosh** 16:18
**gouraige** 2:3 3:4 4:13,15,15,19 11:2 11:5 34:17 37:25 48:15 72:24 73:4 93:4
**graduate** 6:22
**grant** 95:23
**great** 89:15
**greater** 21:14
**gross** 2:3 16:7 80:8 80:20,23 82:4,22 85:14
**group** 52:22
**gsec** 14:22
**guess** 13:25 42:18 83:7 95:6
**guidance** 25:24

### h

**half** 20:13,20 76:6 76:10
**hand** 8:18 81:13 81:13 82:14 86:8 87:22
**happen** 88:8
**happy** 28:19 39:12 48:10 50:24 91:25
**hard** 5:19 10:23 11:11 20:6

**harm** 82:15
**health** 28:12 38:18
**healthcare** 9:2
**heard** 17:2 35:24 48:7 81:22
**heavily** 30:8
**held** 7:20 8:23 21:15 50:20 89:17 94:17
**help** 90:15
**hereunto** 98:18
**herve** 2:3 4:15,19 38:1
**hgouraige** 2:5
**high** 79:22
**higher** 16:18 17:8 20:14
**history** 61:7
**hold** 63:13
**holding** 94:13
**hologynics** 8:23,23 94:25
**hon** 51:15
**hope** 32:12 36:9 37:23 38:8 51:10 85:1 89:24
**hospital** 34:2,7,11 35:19 38:17 39:1
**hospitals** 30:20
**hundered** 74:12
**hundred** 49:17 56:4 71:10 72:7 75:9,15
**hundreds** 90:6

### i

**idea** 35:18
**identification** 11:8 33:11 60:16,24 69:3 70:11 91:3 92:5

**identified** 11:23 11:24 13:15 18:20 25:9 26:1 43:3 52:12
**identify** 8:14,18 16:11,14 17:18 19:18 20:10 25:22 28:22 54:24 55:2 77:4
**ignorant** 87:3
**imaging** 38:15
**important** 56:9
**importantly** 32:4
**include** 17:7 30:18 39:3,8 75:2 79:15
**included** 6:17 16:1 17:4 18:24 19:8 28:10,14 42:23 47:19 48:23 50:2 50:6 56:18,23 72:15 76:4 89:1
**includes** 20:24
**including** 19:22 28:12 30:15 57:7 57:7 74:5 78:6
**income** 79:16 83:15 84:7,14,20 85:6,8,12 86:5
**inconsistent** 74:8 75:4,12 78:8,10
**incorporation** 45:24
**increase** 78:12
**incur** 57:8
**incurred** 27:6
**independent** 45:15 47:1 48:3 58:11
**indicate** 32:8 41:5 58:9
**indicated** 4:18 31:11,13,24 46:25

Page 10

[indicated - know]

54:25 80:2 81:25
**indicates** 35:10
41:21 58:10
**indicating** 42:1
45:8
**indication** 47:11
**individual** 2:2
4:19 44:18 49:3
52:21,24 54:8
55:4,6,17,18 56:17
57:3 58:21 59:1
60:22 61:3 77:4
78:5 88:20 92:17
**individualized**
93:5
**individually** 93:11
95:18
**individuals** 22:20
23:1 49:13 91:13
**inflows** 18:20,21
**information** 17:11
17:15 24:1 25:16
39:11 42:9 45:18
46:12,16 47:6,15
47:17 48:12 54:13
58:8,9,10 59:19
61:8,24,25 62:15
63:2 64:3 76:17
78:20,23
**informed** 29:3,5
**initial** 83:14 85:3
**injunction** 60:21
**instance** 73:9
77:14
**instances** 52:23,25
**instructed** 54:17
81:3
**instruction** 54:19
**insurance** 25:20
28:12,12

**intended** 16:2
**intent** 81:19
**interested** 98:17
**intern** 6:21
**interposing** 91:21
**interpretation**
24:2 91:22
**intrinsic** 23:18
**introduce** 10:21
33:6
**invested** 95:18
**investing** 20:13
**investment** 15:8
19:22 22:6 25:5
41:15 80:5
**investments** 20:1
95:20
**investor** 11:20
16:9,16 19:8,9,19
20:13 21:3,12
22:14 23:5 41:7
59:13 68:5,7
79:20,23,24 80:16
80:17 81:7 82:15
82:15 83:5
**investors** 16:5
18:25 20:1,10,12
20:16,17,18,19
21:3,24 22:12
23:1,21 27:24
28:1 29:2 31:16
31:18 36:21 41:20
41:23 48:23 49:1
53:13 58:18 63:11
63:22 64:7 69:21
80:16 83:11,20
88:22
**involved** 30:19
32:7,14,16,19 33:2
36:5,11,14 53:14
53:23 54:12 98:16

**involvement** 34:20
**irrational** 59:15
**irwin** 1:13 3:2 4:9
4:18 11:9 14:1
33:7 34:19 38:20
40:22 46:23 51:14
51:20,24 60:19
73:12 89:20 93:1
93:23 96:6 97:15
97:19 98:5
**irwin's** 3:11
**issue** 12:6 13:1,10
31:7 32:4 54:19
79:9 80:15 81:13
81:13 82:14 87:22
92:20,24,25 93:13
94:4,5,12 96:5
**issued** 8:6 95:6
**issues** 8:17 13:18
24:11 46:18

**j**

**january** 65:24
66:5
**jeez** 94:23
**jersey** 2:4
**job** 1:24 17:17
47:14,24
**joined** 35:22
**jointly** 15:12 55:4
**judge** 11:23 12:1,8
13:2,15 14:12,14
14:20,24,25 15:17
15:21 16:1,17,19
17:4,8,11,16 18:9
18:11,12,14,23
19:1,2,3,7 21:15
24:3 26:11 45:5,7
45:14 46:12,20,23
47:5,8,13 48:1
54:25 63:14 68:12
79:21 80:1 81:20

82:9
**judges** 81:5
**judgment** 12:14
15:11 17:5 19:15
42:2 45:15,20,23
47:1,3 48:3,5,21
49:4
**july** 95:7
**june** 10:10 12:14
60:10 95:7
**jung** 22:8,15
**justice** 82:22
86:17 87:2,17
**justices** 82:17,19
83:19 86:18 87:15
**justified** 68:14

**k**

**k** 1:7 9:10 58:15
**keep** 41:18 46:18
**kevin** 22:5,11,11
23:6
**kick** 61:4
**kind** 61:11 62:25
75:23
**knew** 57:22 63:12
63:14,22 75:8,11
**know** 17:15 19:7
19:17 21:25 22:13
22:14,25 23:6,16
25:20 26:13 30:24
33:14 37:25 39:3
39:7,9,13,15,16,18
39:23 44:13 45:11
45:12 48:22 51:16
53:1,16,21,21,24
54:6,11,12,13
55:19,21,24,24
57:10,11,17,18,18
57:19,24 58:1,2
59:3,4,8,9,14,17
59:21,22 61:16,17

Veritext Legal Solutions
866 299-5127

[know - lots]

| | | | |
|---|---|---|---|
| 61:21 62:2,5 63:10,12,13,18 65:19 66:19 68:7 68:13,22 70:6 71:2 73:20 81:9 82:21,22 84:21 90:4,18 93:22 94:17 | leases  70:23 78:5,7 | liable  92:16 | logic  82:24 |
| **knowledge**  34:19 | leave  92:13 | life  62:23 | logically  82:6 |
| | leaves  63:23 | limine  94:17 95:23 96:2,3 | login  78:22 |
| **l** | led  30:22 48:5 | limit  24:16 43:1,1 | long  41:9 |
| l  58:15 | ledger  25:16 | limited  18:22 21:9 23:12 82:23 | longer  18:24 19:5 21:8 |
| lam  11:3 | left  13:3 93:1 | line  48:17,18 50:4 58:4 97:2 | look  5:5,9 6:1,6 10:14 11:10 12:10 14:17 16:10,12 19:15 20:3 21:21 22:2,4 23:14,17 25:24 28:19 33:13 33:17 35:3,8 38:5 39:5,12,14 49:23 49:25 53:17 54:2 60:3,7,12 62:13 66:21 69:10,14 70:19 71:25 76:9 88:4,5,9 91:25 94:22 95:20 |
| land  33:23 35:22 37:19 39:20,24 70:23,25 71:1 89:7,9 | leftover  62:23 | lines  20:5 | |
| language  41:19 71:7,8 72:10 91:23 92:3 93:7 | legal  13:1,17 24:1 42:2,9 71:13 79:6 79:9 90:3,7 91:21 93:9,10,13,19,20 94:11 95:25 96:5 | lisa  1:8 44:9 48:6 48:21 49:8 53:6 56:25 58:7 64:12 65:3 66:4,6,7 67:20 91:6,11 | |
| languaged  22:16 | legally  24:4 | list  4:25 6:9 26:20 | |
| large  68:24 70:7 | legitimate  13:14 14:15 25:1,10 28:3,11,14 29:4 36:22 40:25 41:7 41:11 42:3,23 43:4 44:21 52:12 52:17 54:24 72:14 72:15 73:17,23 74:6 75:17 76:4 79:24 80:7,21,24 81:15 83:5,20 84:1 85:15 86:7 87:7,18 88:25 89:9 90:11 | listed  5:14 6:5,13 7:13 26:24 45:25 46:6 60:14 66:22 67:13 73:13 74:4 | looked  5:5 25:14 47:4 60:7 61:14 61:17,18 64:24 65:5 71:8 72:2,11 76:22 |
| larger  40:16 | | little  13:10 29:5 52:8 76:10 | |
| largest  63:24 | | liu  1:7 14:22 15:7 15:12 34:7 43:8 44:9,12 46:14 48:8 49:8 51:6 52:3,14,15,18 53:6 53:8,10,11,16 54:4 54:12 55:9 56:11 58:7 59:8 61:8 62:17 64:12 65:4 65:20,24 66:6,12 72:6 75:7 | looking  14:19 19:5 27:20 33:14 38:21 61:16 65:25 76:18 76:21 81:14 84:1 88:6 |
| las  1:17 4:1 98:19 | | | |
| law  7:15,16 8:25 44:23 79:16,19 84:19 90:5 93:2 | | | |
| lawsuits  85:1,4 | leon  62:3 | | |
| lawyers  50:8 55:18,24 56:5 81:5 | lessee  69:22 71:9 74:12 | | loop  47:23 |
| | leung  2:8 4:14,14 11:1,3 14:8 26:3 28:5 34:12 36:3 37:21 38:19 54:22 72:19 73:1,11 91:20 92:24 96:8 96:9,11 | liu's  5:17 30:15,23 40:8 51:4 | los  2:10 30:10,12 36:16 |
| lay  88:2 | | llc  94:25 | loss  81:11 |
| learn  88:2 | | loaded  70:15 | lost  95:14,24 |
| learned  89:21 | | loan  93:19 | lot  7:20 25:12 39:18,19,23 40:3 40:16,17 54:13 57:18 62:15 78:20 |
| lease  69:17,22 70:23,25 71:1,7,9 71:18,21,22 72:1,3 72:7,8,13,17,18,20 73:13,17 74:5,11 74:16,21,22 75:13 76:8 77:25 89:8 | leungg  2:11 | located  39:2 | |
| | level  79:22 | location  30:19 39:6 51:4 | lots  40:9 |
| | liability  92:18 | | |

Veritext Legal Solutions
866 299-5127

[love - need]

**love**  38:4

**m**

**machine**  31:11,18
  35:11
**mail**  32:7 51:9,14
  51:15 60:17,18
  89:23 90:16,21
**mails**  30:25
**maintained**  64:16
**majority**  18:21
  52:17
**making**  42:2 84:22
**management**  46:4
  64:20 68:10 75:7
**manufacturer**
  29:21
**march**  4:21 9:19
**mark**  10:22 11:4,5
**marked**  11:7 33:7
  33:8,10,18 60:15
  60:23 69:1,2 70:9
  70:10 91:2 92:4
**marking**  11:1
**married**  93:14
**marshal**  6:24
**material**  68:14
  69:14
**materials**  46:22
**math**  20:14,15
  42:19 52:7
**matter**  9:5,12 56:9
  67:24 81:19 83:4
  94:9
**matters**  7:15,16
**max**  49:13
**maximum**  50:4,10
  55:23 57:6,9
**mean**  47:12 59:5
  65:17 68:18 74:23
  79:6

**means**  49:13 93:15
**meant**  15:3,16
  82:2
**measure**  96:1
**medical**  32:20
  42:7
**members**  55:24
**memorandum**
  3:12 24:7
**memory**  40:20
  45:10
**mention**  38:7 48:7
  68:11 74:9 75:5
  78:4,4 91:9
**mentioned**  6:19
  21:8 38:7 41:4
  66:16 73:20 74:25
**mentions**  74:9,11
  75:5,13
**mercer**  6:23
**merge**  34:23
**methodology**
  13:13 42:25 58:19
**mevion**  29:22,24
  30:2 31:11,24
  32:7,8,15 35:12,19
  36:5,7,9,11,14,16
  36:18 37:1,4,23
  38:10 40:24 41:1
  41:4 43:20 44:6
  52:2 53:3 88:18
  90:24
**michael**  51:15
**mike**  66:12
**million**  20:13,20
  20:21 21:1,13,14
  29:21 35:12 36:19
  43:15,18,20,25
  44:6 48:20 49:15
  49:16,18 50:4,6
  51:25 52:1,9,9,10

53:2 54:3 55:1,3
  55:19,21,25 56:14
  56:15,20 57:4,6,23
  63:16,17 64:10
  69:23 71:10,16
  72:7 74:13 75:10
  75:15 76:6,11
  80:1 81:12 87:25
  88:18
**minus**  15:8 82:5
  82:23 86:5
**minute**  50:14
  89:11
**minutes**  38:7
  84:15
**misappropriated**
  57:10 82:16 87:13
  88:12,19 89:3,4
  95:17
**misappropriation**
  59:12 87:16 88:8
  88:9
**mischaracterize**
  12:5
**mischaracterized**
  26:22
**mischaracterizes**
  34:12
**misleading**  16:2
**mismanagement**
  95:15,16
**misnomer**  83:22
**missing**  36:8 38:6
  52:9
**misstates**  26:3
  28:5 34:13 37:21
**misunderstand**
  56:12
**moment**  70:14
**money**  22:15 37:9
  62:19 68:9

**monies**  61:2
**montibello**  38:18
**morgan**  8:19
**moscovitz**  1:23
  98:3,23
**motion**  94:16
  95:23 96:2,3
**motions**  19:14
**mou**  33:21 34:6
  36:12
**mouth**  59:6
**move**  23:9 79:13
**moved**  96:4
**mph**  30:17 32:9,22
  32:23 33:1 34:10
  35:6,7,12,18 37:12
  37:18,24 38:10,11
  38:25 48:9 51:2,3
  53:10,12,15,20
  61:12,15 90:25
**multiple**  8:22
  94:24 95:13
**multitude**  80:15

**n**

**name**  4:18 22:11
  30:9,10 35:9 45:4
  45:8 58:14 62:25
  94:20 98:18
**named**  16:16,16
  21:24 47:21
**names**  53:16
**narrow**  29:6 41:18
  76:23
**nature**  25:17,22
  26:5
**need**  16:12 19:12
  19:15 29:13 35:2
  35:8 37:5 39:4
  40:19 48:14 68:20
  71:11 79:1 92:6

Veritext Legal Solutions
866 299-5127

[needed - paid]

needed  93:22
needs  41:13
negative  41:2
  84:20,20
negotiations  32:7
  32:15,17 36:5,11
  36:14
neither  67:6
net  11:20 16:15
  19:18 23:20 42:19
  43:5 51:24 80:8
  80:10,14,23,25
  81:1,8,9,11,16,24
  82:1,2,5,7,20,23
  83:1,19 84:20
  85:14,18,18,23,25
  86:2,2,4,9,19,21
  87:1,2,5,7,9,11
  88:3,8,20 89:2,10
  90:2,2,4 91:14,17
  93:5
netted  21:16
nevada  1:17 4:1
  98:4,19
never  7:13 34:15
nevoger  33:9
  34:14
new  2:4
newark  2:4
nine  13:21 43:23
ninth  92:14 93:1,8
nividor  31:6
normalize  8:25
note  4:16 6:1
  12:11,13 22:24
  39:13 74:7
noted  5:25 22:10
notes  98:9,11
noun  19:8
noveger's  51:7

nrcp  4:4
nuance  30:8
number  10:22
  12:7,8 17:3,4,8
  18:2,13,18 19:1,4
  19:7 21:22 23:19
  24:17 26:9 32:2
  63:13,14 64:6,10
  64:11 70:25 76:9
  80:23 81:1,2,8
  94:7
numbering  40:3
numbers  16:23,24
  17:19
numeral  13:23

**o**

object  54:22 91:20
objection  14:8
  26:3 28:5 34:12
  36:3 37:21 92:24
objectivity  74:3
obtained  55:9
obviously  61:24
  77:17,23 84:9
october  21:9 95:5
odd  91:17
offer  56:6
offering  23:11,23
  24:4,5,6,7,9,16
  25:7,11 34:18
  43:1,2,18 47:20
  49:23,25 50:5
  55:16 56:1 90:7
office  88:24
offset  13:14 14:14
  14:15 49:15
oh  16:18 27:20
  68:15 79:10 94:23
okay  4:24 10:19
  10:25 11:5,13,17
  13:22 14:25 15:16

15:20,23 18:11
  19:25 20:12 22:22
  24:19 25:6 27:14
  29:9 33:4,15,19
  34:3 36:13 39:17
  40:21 41:25 42:11
  42:14,17,22 44:16
  48:15,16 50:23
  51:1,23 52:4,6,20
  55:10 56:19,24
  58:3 59:25 60:7
  60:17 61:19 63:18
  66:2 68:25 69:8
  69:11,13 70:4,12
  70:15,17 71:6,19
  77:22 79:13,14
  85:11,17,22 89:11
  89:15 90:14 91:5
  91:10 92:1,8,11,19
  93:22 95:8,11,22
  96:6
once  61:17
oncology  38:15
ones  5:18 8:14
ooo  4:3
operating  28:2
  84:23
operation  84:9
operations  67:12
  83:12
opine  27:3 55:8
opining  69:23
opinion  36:20 42:9
  47:17 54:10,15
  67:4 68:19 71:14
  90:8 92:6,10
optimums  32:3
optiva  29:17
order  8:25 12:13
  15:21 22:16 79:8
  96:12

ordered  14:7,25
  15:10,17
original  72:1
  77:12,15,17,17
origins  93:17
oust  27:2
outflows  18:20
overall  11:18
overpay  57:22
  59:14,15 62:22
overseas  55:11
  56:3,24 57:1,12,18
  58:6 59:22 62:1,2
  62:6,10,11,24
  63:17,23,24 78:20
overspend  57:21
owed  95:18
owned  37:19
  44:19 48:22
owner  7:19 45:16
  45:25 46:10 48:6
  51:12 57:1
ownership  44:24
  46:4
owns  43:17

**p**

p.m.  89:19,19
  96:14
page  3:2,10 9:6,10
  13:19,20,21,23
  16:15 27:1,2,12
  30:24 31:3,6 32:1
  38:21 55:7 60:8
  66:1,22 69:12
  71:3 78:14 92:3,7
  94:23 97:2
pages  1:25
paid  36:18 43:15
  43:16 48:20,25
  49:5,9 55:11,12,22
  58:17 64:16 65:23

[paid - proceedings]

68:15,16 72:17,20
  76:24 78:10
**paragraph**  27:15
  32:1 38:22 66:1
  66:22 69:15 71:5
  71:24 92:9
**parcel**  34:4,5
**parcels**  34:6 35:22
**part**  6:11 7:6 8:16
  14:16 19:14 32:23
  33:20 36:12 37:6
  47:19,20 49:24,24
  50:3 54:10 55:5
  55:15 56:21,23
  57:13 59:18 69:9
  89:10 95:24
**participants**  7:5
**particular**  69:9
  94:4
**parties**  4:4,6 38:11
  75:25 88:14 93:13
  98:15,16
**partly**  94:2
**partner**  7:9
**partners**  9:11
  92:17
**party**  57:15 68:5,6
  95:19 98:13
**pass**  96:7
**patient**  84:13
**patients**  84:10,13
**pay**  63:4 78:7
**payees**  21:25 22:1
  22:4,12,24
**payment**  28:23
  32:8,24,25 33:1
  38:10 41:6,19,22
  50:1 52:25 53:3
  53:11 76:15 77:4
  88:18

**payments**  7:21
  49:24 52:11,13,24
  55:14 66:7 72:8
  72:13,21 73:17,18
  73:20,22 74:5,9,11
  75:5,6,13,16 76:8
  77:6 78:6,8 89:6
**pdf**  5:7
**pecuniary**  42:20
  42:24 43:5,6
  47:21 51:24 53:4
  55:2,6,9,15 56:16
  56:18,23 57:3,14
  58:21 67:3 75:3
  76:5 78:11 79:25
  81:1 83:2 85:23
  86:2,9,12,19 87:2
  87:11 88:3,9,20
  89:2,10 90:3
  91:17 93:5
**penalty**  97:16
**people**  22:20
**percent**  49:17 56:4
  67:14
**performed**  82:11
**period**  18:22,24
  19:5,17 21:7,8
  77:5,7,10
**perjury**  97:16
**perks**  7:20
**person**  22:21 23:7
  23:17 88:2 98:17
**personally**  5:3,10
  5:13,23 7:3 9:24
  10:4,7,9 17:22
  18:17 30:22 43:10
  43:13 52:1 96:4
**perspective**  27:6
**petitioners**  92:15
**phase**  83:14

**phm**  38:4
**pieces**  33:23 34:23
**place**  94:8
**plaintiff**  2:7 4:14
  9:9
**plaintiffs**  1:5
**plaza**  2:4
**please**  24:20 39:16
  60:3
**plus**  20:25 43:23
  43:23,23,25 52:3
**pnl**  80:3
**pockets**  58:6
**point**  8:1 11:22
  16:18 17:19,21
  23:22 30:8 31:22
  38:3 48:13 70:20
  82:24 91:23 92:3
  93:7
**pointing**  58:3
**points**  43:24
**polite**  19:2
**pom**  3:15 24:7
  25:9,9,24 26:2,5
  26:12,14,18,23,23
  27:5,10,18,24,25
  29:2,3,7 32:2,16
  32:18 33:3 41:4
  41:11,14,14,19
  44:22 49:1 67:9
  67:17 68:1,9 69:5
  69:21 71:8 72:10
  73:21 74:8,8,11,14
  74:21,25 75:4,5,8
  75:12,13,15 76:3
  77:23 78:2,3,4,8
  78:11
**portion**  5:18,21
  43:11 63:25 83:3
**portions**  5:15,16
  5:22

**position**  6:21 7:22
  40:23 47:25
**positions**  32:21
**possible**  48:7
**potential**  6:25
**practice**  6:9
**preamble**  36:3
  91:20
**precise**  39:5
**precluded**  58:18
**prejudgment**
  15:14
**preliminary**  60:21
**prepare**  85:11
**prepared**  6:16 8:3
**preparing**  5:1
  52:20 61:23 63:9
  64:15 70:2 77:11
**present**  2:14
**presentation**  7:9
**presentations**  7:10
**president**  38:16
**press**  31:2
**presume**  62:6
**pretend**  84:3
**previously**  33:8,18
**price**  7:16
**principal**  7:19,19
  93:19
**principals**  87:10
  92:16
**printed**  10:18
**prior**  4:4,6 98:7,12
**private**  24:6
**privileged**  79:1,7
**probably**  31:8
  95:6
**proceed**  51:18
**proceeding**  1:16
**proceedings**  98:12

Page 15

[proceeds - refer]

**proceeds** 27:23 83:19
**process** 5:10 87:8 87:20 90:9,10
**production** 37:7 62:7 77:19 89:24
**professional** 6:14 42:8 45:20 46:21 47:1,3,7,7,16,17 48:3,5 73:24 74:3 74:20 75:20,21
**professionals** 45:21
**profit** 8:25 15:6 79:15,18 81:1,8,11 81:24 82:2,2,5,7 82:20,23 83:1 84:19,20 85:3,18 86:2,4,21 90:4
**profits** 80:8,10,14 85:25 87:1,5,9 90:2 91:14 92:16 95:15,24
**program** 27:7 30:6 31:17,20
**project** 24:23 29:10,16 30:17 31:25 33:23 34:9 35:23 37:12,18 38:24 41:8,21 43:21,22 53:14 57:7 62:24 69:24
**proper** 13:13 81:6 82:3
**properties** 34:24
**property** 3:12 39:4,8 56:15 69:18 72:21 93:14 93:17,18
**protective** 79:8

**proton** 24:23 26:7 29:10,13,17 30:2,7 30:9,10,11,12 31:5 31:12,13 32:3,10 32:11,19,24,25 33:22 34:24 35:13 35:23 36:16,17,18 38:16,24 41:16,16 42:8 61:11 65:14 66:5,17 67:2 91:1
**provide** 29:17
**provided** 17:14 24:2,16 26:16,18 32:3 39:22 46:17 55:17 62:8 66:6 67:20 78:13,25
**provision** 70:21 71:11,15,16 72:6
**provisions** 73:21
**pull** 65:18
**purchase** 30:1 32:15,17 35:11 36:15 43:20
**purchasing** 31:14
**purpose** 25:23 27:4 28:21,22 29:1 31:14,15 59:13
**purposes** 10:19 19:4
**put** 7:4 28:8 35:4 41:3 42:4 59:5 68:4 84:18 87:4 96:12
**putting** 5:11 7:7

**q**

**qualifications** 8:2
**question** 19:16 26:7 28:6,6 44:13 45:13 46:23 48:20 61:20,22 62:20

70:16 85:14,15 86:14,24 87:6 93:6,21
**questioning** 48:17 48:18 58:4
**questions** 86:9 89:13 96:7,8,9
**quick** 25:15 77:21
**quickly** 60:13
**quite** 24:1 44:14
**quote** 12:15 92:13
**quoting** 13:24

**r**

**radio** 9:1
**raise** 83:11
**raised** 71:10 74:12 75:9,14
**raw** 28:21 77:19
**reach** 24:13
**reached** 10:5
**read** 5:3 12:17 27:17 44:14 50:15 69:6 71:5 75:8 92:22 97:17
**reading** 12:11 98:12
**ready** 51:18
**real** 3:12 42:6 62:13
**realize** 76:14
**really** 22:14 28:13 54:10 62:10 64:6 83:14
**reason** 22:4 24:13 41:23 57:2 63:25 79:6
**reasonable** 7:18 7:25 8:4,5,12,20 8:24 9:5,7 15:6 26:10 55:8 68:13 68:13,17 72:16

81:18,18
**reasonableness** 9:13
**reasoning** 73:10
**reasons** 26:8,15 41:5 73:7
**rebuttal** 68:18 76:19
**recalculated** 18:25
**recall** 5:17 39:12 39:14 40:10,12,17 48:10 53:25 55:25 59:2 63:8 64:4
**receipt** 16:8 80:23 85:14 87:18
**receipts** 11:20 12:12 21:12 42:19 80:8,20 81:16 82:4,22 87:7
**receive** 31:17 49:2 93:18
**received** 6:2 31:19 49:15,19 56:10 58:11 63:15,16,17 63:24 64:8 77:19
**receives** 43:18
**recess** 50:21 89:18
**recollection** 40:12 66:3
**record** 46:3 49:12 50:19,23 89:16
**records** 6:20 17:14 17:17 18:18 21:11 27:3 37:14 39:5
**recruited** 49:1,13 63:10 64:7
**redirection** 88:13
**refer** 11:14 15:16 37:17 51:14 55:20 64:20 86:11

[reference - rope's]

**reference** 38:4 51:13 65:25 74:21
**referenced** 38:23
**references** 50:24
**referencing** 14:18
**referred** 18:4
**referring** 13:25 18:6 38:19 66:8,9 66:10,14 69:17 77:16 90:17 91:25
**reflected** 7:22 17:16
**refresh** 40:11,20 66:3 68:22 70:6 90:18,20
**refreshing** 60:6 70:14
**refund** 22:3,5
**refunded** 22:19,25 23:17
**refunds** 16:5,5 20:4,11 21:16,22
**regarding** 8:2,4 26:12 27:18 46:4 89:24
**regional** 65:4
**related** 22:20 25:19 35:5 88:14
**relation** 39:19,24
**relationship** 45:19 57:25 58:25 61:10 63:19 64:6
**relative** 98:14,15
**release** 30:11 31:2
**relevant** 6:15 7:12 13:4 67:23
**reliable** 15:13
**relied** 4:25 47:11 48:12 77:23 90:23
**relies** 77:1

**relying** 18:12,16 46:21
**remaining** 15:8
**remand** 92:14 93:1
**remanded** 12:6
**remember** 5:20 9:16 13:6 39:10 40:8 65:12
**remote** 1:16
**removed** 72:7
**rendered** 64:17
**rent** 88:23 89:7,8
**repeat** 44:14
**report** 3:11 4:22 4:24 5:1 6:6,11,16 7:5 8:3,15 9:18,20 10:5,14,21 11:16 11:19 12:2,10,15 13:19 15:4,15,16 16:11,20,20,24 17:7 18:3,7 19:25 20:7 21:22 23:9 23:11,23 24:20,21 25:6,21 26:20 27:13 28:2 29:24 30:7 31:8,21 32:6 40:24 42:13 47:25 49:21 50:3,25 51:2 52:20 55:8 56:12 60:14 61:23 63:10 64:15 66:1 67:6 68:18 69:4 70:2 73:6 74:4 76:7,19 77:9,9,11 79:15 80:22,22 83:8 85:23 91:15 92:13,21 93:24 95:1,6,9,11,13,24
**reported** 1:23 98:5

**reporter** 98:1,3
**reports** 8:6
**represent** 4:19 27:25
**representation** 26:12
**representations** 27:24 29:7
**representative** 38:14
**represented** 32:18 33:3 64:18
**representing** 16:23 34:20
**request** 60:21 78:15,17,18
**requested** 77:8 98:13
**require** 7:17,17 32:16
**required** 32:18 92:18
**requirement** 72:8
**resources** 7:8 40:15
**respect** 56:24 57:1 81:5 82:3
**respectively** 65:24
**response** 38:2 62:5 78:19
**rest** 56:21
**restart** 46:22
**restitution** 80:13 83:2 85:19
**resulted** 55:1
**results** 7:4
**resume** 8:10,11 94:22
**retroactive** 65:7,9 65:12,16,21 66:7

**returns** 95:20
**revenue** 67:14 79:19,20 80:2,4 81:9,9,10 82:5,5 83:17,17 84:17,22 86:5
**revenues** 83:10 84:11,12,14
**review** 5:10,13,21 5:23 7:3 9:19,24 10:9 16:25 17:13 17:13 19:12 37:5 37:14 45:18 47:9 47:14 73:14 77:6 96:11
**reviewed** 5:15,16 5:18,22 6:10,12 10:1,7 14:3 17:12 19:17 25:10,17,17 28:9 30:14,22,25 31:9,23 41:21 46:13 47:6 64:24 66:23 74:13 76:18 77:23
**reviewing** 21:7
**richard** 9:10
**ridiculous** 49:18
**right** 13:9 23:15 44:4 45:12 47:12 48:19 58:13 60:2 68:7,21,24 69:24 79:6,8 87:6 90:4 94:16
**riverfront** 2:4
**road** 59:16 85:2
**role** 32:20
**roman** 13:23
**ron** 2:14 4:16
**rope** 30:18 32:6,14
**rope's** 31:2

Veritext Legal Solutions
866 299-5127

[roughly - sort]

| | | | |
|---|---|---|---|
| **roughly** 17:3 76:10 | **searches** 50:16 | **sense** 62:21 63:3 64:8 82:25 86:8 | **signature** 38:21 65:13 97:17 98:22 |
| **rule** 4:4,6 94:3 | **searching** 20:7 51:8,9,10 | **sent** 7:5 26:14 35:12 59:11 | **signed** 9:18 12:17 12:19 34:6,25 |
| **ruled** 12:6 14:13 95:25 96:2 | **sec** 15:11 61:25 77:8,12,24 78:16 78:24 | **sentence** 13:25 92:12 | 35:10 37:20 38:13 38:14,15,16 65:10 |
| **rules** 93:15 | | **separate** 24:10 35:18 37:18 44:17 | 65:11,12,22 66:5 66:11 79:8 |
| **ruling** 11:24 12:9 13:3,4,16 14:17,20 | **sec's** 60:20 | 46:19 53:1 91:13 91:15 93:17 | **significant** 30:4,13 32:20 43:11 |
| 14:24 15:15 16:1 16:17,19 17:25 | **sec.gov** 2:11 | **separated** 46:19 | **signing** 98:13 |
| 18:23 19:2,13 55:1 82:13 86:10 | **second** 16:15 33:5 59:25 69:15 92:9 94:23 | **separately** 24:12 52:21 | **signs** 35:21 |
| 94:17 96:4 | **section** 71:1,4,21 71:25 72:1,2,5 80:12 | **serves** 47:7 | **sills** 2:3 |
| **run** 44:19 | | **service** 37:3 | **sillscummis.com** 2:5 |
| **ruth** 33:9 | **securities** 1:4 2:9 | **services** 38:18 64:17 67:20 | **similar** 30:13 48:9 |
| **s** | **see** 5:15,16 8:10 9:9 11:19 14:6 | **set** 12:7 13:11 14:10,11 24:6,7 | **simple** 42:18 |
| **s** 37:17 52:3 58:15 | 16:14 18:5 22:3 22:22 23:18 27:15 | 37:12 87:18 | **simply** 40:25 41:3 49:7 54:18 55:18 |
| **sacv** 1:6 | 33:7,9 35:1,2,7,7,7 36:6,8 38:5 40:1 | **setting** 17:12 | 63:3 74:20 90:8 96:3 |
| **salaries** 65:23 74:10 | 40:11 41:25 43:12 44:24 45:24 46:9 | **settled** 94:16 | **single** 26:24 |
| **salary** 6:24 | 49:25 51:17 55:20 56:22 66:2 68:25 | **seven** 44:2 94:23 | **sir** 12:22 14:22 16:22 18:14 20:21 |
| **saw** 13:7 70:1 74:13 | 69:15,24 70:9 72:2,18 74:16,22 | **severally** 15:12 | 27:21 93:3 |
| **saying** 13:11 34:22 35:17 48:2 54:17 | 74:24 76:18 77:24 79:1 90:16,21 | **shape** 93:16 | **sit** 39:11,14 48:10 53:21 |
| 56:13 82:19,20 83:13,16,17 84:12 | 91:15 92:1,20 | **share** 10:20 11:10 | **six** 13:24 |
| 84:16 86:22,23 87:3,3 | **seeing** 53:25 | **sheet** 84:6 | **skip** 27:4 |
| **says** 12:2 15:10,15 15:19 32:1,6 40:1 | **seen** 33:16,19 37:2 38:9 45:11 46:1 | **shifra** 1:23 98:3,23 | **soccer** 8:20 |
| 41:14 49:12 61:9 65:22 76:3 83:4 | 60:11 61:1 66:24 69:6 70:13 | **short** 50:21 89:18 | **solutions** 9:1 |
| 85:20 92:13 | **sees** 68:16 | **shorten** 58:14 | **somebody** 87:4 |
| **scans** 5:7,7 | **select** 9:1 | **shorthand** 98:9,11 | **soon** 62:18 |
| **school** 6:22 | **self** 88:13 | **show** 33:4 60:1 68:20,24 70:4 | **sorry** 13:9 18:8 19:9 20:17 39:21 |
| **scope** 27:21 77:7 | **selves** 68:16 | 85:7,9 90:15 | 40:5 43:14 45:1 46:22 51:2 52:15 |
| **screen** 11:10 | **send** 7:2 | **showed** 76:24 | 59:7 63:14 67:12 |
| **scroll** 70:25 71:19 | | **showing** 58:24 | **sort** 61:4 75:13 79:3 |
| **search** 45:10 48:11 62:14 70:15 | | **shown** 34:14 | |
| | | **shun** 23:6 | |
| | | **side** 59:17 | |
| | | **sign** 96:11 | |

Veritext Legal Solutions
866 299-5127

[sounds - testified]

| | | | t |
|---|---|---|---|
| sounds 86:16,21 | statement 6:13 9:1 | suite 2:10 | |
| source 93:15 | 13:7 79:16,16,19 | summarize 7:4 | take 5:5 20:8 |
| south 2:9 | 83:15 84:7,14,19 | 22:23 | 32:13 33:13 38:5 |
| space 88:24 | 85:6,8,12 86:5 | summary 19:14 | 41:25 42:1 44:16 |
| speak 37:22,23,24 | statements 5:7,8 | superior 85:19 | 44:17 47:16 48:16 |
| speaking 7:23 | 9:20 25:15 77:20 | 95:2 | 48:19 50:12,14,15 |
| 85:5 | 84:5 | supplement 63:21 | 50:18 53:2 55:11 |
| specific 25:25 | states 1:1 2:9 8:19 | support 10:2,2 | 60:3 64:23 66:13 |
| 28:17,25 29:9 | stature 45:21 | 19:13 48:11 51:11 | 69:10 70:18 71:25 |
| 31:22 51:13 60:8 | stay 77:18 | 60:20 68:18 77:5 | 73:12 87:8 88:17 |
| 68:10 70:20 | steps 82:25 | 77:13 | 89:11 91:25 |
| specifically 6:19 | stipulate 36:13 | supported 75:21 | taken 1:14 50:21 |
| 8:1 25:8 26:22,24 | 72:25 73:5 | supporting 53:25 | 89:18 |
| 27:2 35:5,16 | stipulating 72:20 | supportive 76:23 | talk 28:24 29:9 |
| 40:10,19 50:1 | stipulation 72:23 | 78:13 | 58:13 64:9 67:5 |
| 55:3 62:2 64:5 | 73:3 | supports 45:4 | 94:4,7,8,15 |
| specified 78:1 | stopping 48:13 | 47:15 | talked 23:13 61:6 |
| spend 50:7 62:18 | strange 62:16,17 | suppose 57:13 | 62:3 90:1 94:21 |
| 68:9 | street 2:9 | supposed 81:14 | talking 50:25 65:2 |
| spent 43:3 50:5,8 | strike 64:9 | supposedly 61:15 | 65:6 94:10,12 |
| 55:19,25 56:14 | strong 47:11 | supreme 10:9 12:2 | talks 31:3 61:11 |
| 57:4,12,13 59:10 | subject 91:10 | 12:4,5,8,14,23 | task 81:18 |
| 67:10,13 | 95:11 | 13:1,5,7 14:4,6,12 | tasked 81:21 |
| spinning 90:20 | submit 95:1 | 14:13,16 15:22,23 | tax 95:21 |
| standard 73:25 | submitted 60:20 | 79:22 80:6,19 | team 6:11 9:22 |
| 74:3 | 93:24 | 81:25 82:1,8 83:3 | 63:7 75:1 |
| standards 74:1,20 | subparagraph | 85:20,22 86:1,10 | technologies 94:25 |
| 75:20,22 | 27:2 55:7 | 91:11,22,24 92:25 | technology 8:22 |
| start 4:20 80:3 | subscribe 98:18 | sure 9:16,20,25 | tell 65:8 |
| 81:7 82:4 83:9,14 | subsection 27:15 | 23:6 46:7 53:15 | telling 35:24 69:21 |
| 83:19 84:10 86:6 | 92:10 | 54:9 60:12 61:12 | ten 49:13 50:15,18 |
| 87:18 | subsidiary 6:23 | 66:23 68:23 89:12 | 55:19,22 56:13 |
| started 20:5 28:21 | substantiate 17:17 | 89:14 90:7 92:22 | 62:18 63:22 |
| 56:4 84:21 | substantively 32:4 | surgery 9:1 | term 72:3 81:6 |
| starting 11:22 | subtracted 56:6 | surprised 40:2 | 82:20 86:12,12 |
| 16:18 17:19,21 | sufficient 21:11 | survey 7:7 | terminology 81:6 |
| starts 71:3 79:19 | 45:23 46:9 | surveys 6:25 7:2,3 | 82:3,21 87:4,4 |
| 83:4 | suggested 23:4 | sworn 4:10 98:8 | terms 8:21 41:10 |
| startup 84:9,25 | 30:15 | synonym 88:7 | 75:4 78:1 80:11 |
| state 21:24 70:22 | suggests 30:14 | system 78:23 | testified 4:11 7:13 |
| 98:4 | 36:19 38:9 61:5 | | 22:23 26:17,22 |

Veritext Legal Solutions
866 299-5127

[testified - understand]

27:8 32:14 34:10 37:9 40:12 46:14 46:21 58:19
**testify** 7:14 98:8
**testimony** 26:4 30:24 31:2,6,10,23 32:5,5,13 34:14 35:3,5,9,14,15,17 36:1,2,4,10 37:8 37:13,15 38:2 40:8,18,22 45:2 46:14 47:4 48:8 51:24 54:16 59:19 66:24 75:19
**thank** 20:9 73:11 93:23 96:6
**theory** 86:4
**therapy** 24:23 29:13 33:22 34:24 35:23 36:17 38:24
**thing** 5:20 47:11 62:17 89:22,25 90:12 94:14
**things** 6:18 9:12 15:5 31:7,9 48:9 80:15
**think** 5:16 6:8,13 6:15,18 7:12,22 14:9 17:24 22:9 23:2,25 25:12,20 26:7,12,21 28:8,12 29:5,6,18 30:17 31:7 38:6 41:2 45:1,3 46:14 47:4 49:12 51:9 52:23 53:8 57:17 58:17 61:20 64:19 65:9 67:22 68:18,25 76:2,20 78:18,22 79:21 80:11,20 81:10,22 83:3,22

86:18,20 87:22 95:19
**thinking** 44:12 73:10 90:21
**thinks** 30:8
**third** 57:15 58:13 84:7 95:19
**thoroughly** 77:23 77:24
**thought** 21:18,19 46:19 73:1 94:6
**thousand** 44:11
**three** 5:19 22:9 33:23 34:23 43:24 43:25 62:24 64:2 67:14 84:5,15 94:23
**threshold** 71:17
**thropay** 34:7,20 35:16 36:10,14 69:18 70:21 72:6 72:13 75:16 76:15 76:24 89:6
**thropay's** 35:17 35:25 36:4 39:8 39:20,24 51:4 72:21
**thursday** 1:14 98:6
**time** 18:23,24 19:5 19:17 20:8 21:7,8 32:14 50:12 51:22 55:11 57:23,24 61:23 63:9 65:15 66:16 67:2 70:1 75:8 76:14,21 77:5,7,10 78:15,25 86:24 96:7
**times** 8:8 21:9 28:7 50:7,8 55:22 59:10 62:19

**timing** 76:21
**today** 11:15
**top** 13:23 27:1 50:4 66:21 94:22
**topic** 79:13
**topics** 95:13
**total** 11:20 15:8 16:15,16 20:16 21:6,17 23:24 24:15 42:17 51:23
**trace** 43:9,12,13 44:8
**traced** 44:11 93:16
**tracking** 95:19
**traits** 18:19
**transaction** 5:9 22:17 25:18 38:12
**transactions** 22:10 22:10 25:19 28:9 77:13
**transcribed** 98:9
**transcript** 5:23 98:10
**transcription** 97:16 98:11
**transcripts** 5:14 6:3
**transfer** 20:25
**transfers** 21:25
**transmittal** 60:18
**treat** 91:12
**trial** 94:16
**trier** 76:2 78:9
**trope** 33:2 37:19 38:13
**trope's** 34:25 35:5 39:4
**true** 84:25 85:5 98:10
**trust** 30:11

**trustee** 9:14
**truth** 98:8
**try** 22:23 24:11 56:13 83:13 91:13
**trying** 24:21 38:25 39:10 41:18 48:4 69:13 73:5,9 84:8 94:13
**turn** 10:13 27:1,12
**two** 4:19 20:4 21:22 22:20 24:10 34:5 35:22 46:18 55:10 58:21 63:23 64:3 71:21 72:2 76:20 91:13
**types** 7:21
**typewriting** 98:9
**typewritten** 98:10
**typically** 84:5

**u**

**u.s.** 14:4,6
**udg** 43:16,16 44:4 44:17 45:16,19,25 47:18 48:6,21,22 48:22 49:24 51:11 51:12 52:1 54:3,6 54:11,13 56:2,25 57:11 59:20 61:24 63:16,22 89:24
**udg's** 46:4
**udh** 43:16
**ultimate** 59:13
**ultimately** 41:17 58:6
**unanswered** 92:25
**understand** 11:18 21:12 22:18,18,19 22:22 23:11,21 24:10,12,13,20,21 25:6 31:21 35:14 35:15 37:8 40:22

Page 20

[understand - zhong]

46:19,23 47:25
48:2 54:16 56:13
56:25 62:4 64:14
64:18,21 67:6
73:5,9 88:17
93:13
**understanding**
3:12 12:25 14:13
24:3 42:6 44:22
61:13 84:2,4
91:11
**undertaken** 26:6
**uniqueness** 22:17
**unitan** 9:8
**united** 1:1 2:9 8:19
30:16,17 31:5
32:9,22,23 33:1
34:10 35:6,7,18
37:12,18,24 38:4
38:11,25 49:9
51:2,3 53:10,12,15
53:20 61:12,15
90:25
**unknown** 21:25
22:4,12,12,24
**unrelated** 57:15
**use** 45:22 80:3
81:6 86:12 87:25

**v**

**validate** 77:1
**validations** 81:19
**valuation** 8:7
**value** 31:17,19
**values** 56:19
**variety** 80:11
**various** 26:8
**vast** 18:20 52:17
**vegas** 1:17 4:1
98:19
**venture** 31:16
32:9 41:1

**ventures** 61:12
**version** 10:17,18
16:13
**versus** 8:19,22 9:1
9:6,11 14:22
94:25
**view** 41:11 67:25
82:24
**violation** 15:7
**volume** 30:24
**vs** 1:6

**w**

**wait** 90:20
**waived** 4:4,6
**wang** 1:7,8 5:20
15:12 22:5,7,8,11
22:13,16 23:6,6
43:8,17 44:9,20
47:10 48:6,21
49:8 51:11 52:14
52:15,19 53:6,9,11
53:19 54:4,6,11,14
55:9 56:21 57:1
58:7 59:8 61:8
62:18 64:12 65:24
66:4,7 75:7 89:25
91:6,9,11
**wang's** 15:7 43:16
56:11
**want** 4:21 10:23
11:4,15,18 12:5
13:17,18 19:23
23:9 24:11 26:8
27:12 28:24 33:4
36:24 40:6 44:13
46:18 47:23,25
48:16 51:17,20
59:5,25 68:23
69:8 71:19,21
73:2 84:3 89:12
89:13,20 90:6

92:21
**wanted** 15:24
23:22 49:11 88:2
**wasted** 40:15
**water** 7:16 48:14
**way** 6:9 8:13 9:17
23:2,3 26:22 28:8
29:8 41:3 42:4
54:23 57:22 58:8
58:12 59:3,5,8,9
59:17,21,23 63:2
67:15 68:4 76:7
79:6 81:25 82:1
93:16,20
**ways** 56:7 86:11
**went** 17:24 34:15
47:21 52:3,18,24
55:3 57:11,11,15
58:5 61:2 64:12
87:25
**west** 33:23 34:1
39:18,19,23,25
40:9,9,14 70:24
**westlaw** 3:17 92:7
**whereof** 98:18
**whichever** 11:12
**wife's** 54:14
**willing** 73:4
**witness** 3:2 4:10
4:17 47:8 73:6
96:8 98:7,13,18
**wondering** 81:2
**word** 13:10 29:5
**words** 41:9 59:5
**work** 5:12 7:13
16:14 40:14 74:23
74:25
**worked** 7:16 9:7
**working** 7:10,11
9:3

**wrap** 40:21 89:14
**write** 43:24
**wrong** 24:22 37:9
82:17,20 86:22
**wrongdoing** 92:17

**x**

**xin** 1:7

**y**

**y** 2:8
**years** 7:15,23
83:10 84:21 85:1
90:6

**z**

**zero** 68:1 81:10
86:6
**zhang** 22:8,15
23:6
**zhong** 60:20 61:5

Page 21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 28

**From:** Leung, Gary <LeungG@SEC.GOV>
**Sent:** Friday, April 23, 2021 6:08 PM
**To:** Hervé Gouraige <hgouraige@sillscummis.com>; Steinberg, Larry <LSteinberg@buchalter.com>
**Cc:** Longo, Amy <LongoA@SEC.GOV>; Regenstreif, Jacob (Tony) <RegenstreifJ@sec.gov>; Irwin, Magnolia
<IrwinMa@sec.gov>
**Subject:** RE: SEC v. Liu

## *** External Email ***

Hervé,

Thank you for your email.  We disagree.  The data reflecting all of Ms. Irwin's calculations in Exhibit 9A were disclosed in
her initial report and discussed at length during your thorough examination at deposition, including in Exhibits 4, 5, and
6 and paragraphs 27-29, 42 of the March 26, 2021 report.

Best regards,

Gary

**From:** Hervé Gouraige <hgouraige@sillscummis.com>
**Sent:** Friday, April 23, 2021 2:52 PM
**To:** Leung, Gary <LeungG@SEC.GOV>; Steinberg, Larry <LSteinberg@buchalter.com>
**Cc:** Longo, Amy <LongoA@SEC.GOV>; Regenstreif, Jacob (Tony) <RegenstreifJ@sec.gov>; Irwin, Magnolia
<IrwinMa@sec.gov>
**Subject:** RE: SEC v. Liu



**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you
recognize the sender and know the content is safe.

Gary,
The "supplemental Exhibit 9A" transmitted by your email is in fact a revised "Calculation of
Defendants' Pecuniary Gains" by the SEC's designated expert after she was examined at her

deposition about the incorrect numbers in her initial Exhibit 9 of her March 26, 2021 report. The amended scheduling order does not provide for the experts to submit corrected reports. We have had no opportunity to examine the SEC expert about the new numbers in "supplemental Exhibit 9A," which increases her calculation of "defendants' pecuniary gains." Defendants do not accept "Exhibit 9A" as a supplement, and they reserve all their rights.

Hervé

**From:** Leung, Gary <LeungG@SEC.GOV>
**Sent:** Friday, April 23, 2021 5:14 PM
**To:** Hervé Gouraige <hgouraige@sillscummis.com>; Steinberg, Larry <LSteinberg@buchalter.com>
**Cc:** Longo, Amy <LongoA@SEC.GOV>; Regenstreif, Jacob (Tony) <RegenstreifJ@sec.gov>; Irwin, Magnolia <IrwinMa@sec.gov>
**Subject:** SEC v. Liu

## *** External Email ***

Counsel,

In accordance Rule 26(a)(2)(B) and 26(e) and the Court's amended scheduling order in the above-captioned matter, please see the enclosed supplemental Exhibit 9A to the March 26, 2021 expert report of Carlyn Irwin.

Best regards,

Gary Y. Leung
Assistant Regional Director
Securities and Exchange Commission
Los Angeles Regional Office
Asset Management Unit
444 S. Flower Street, Ste. 900
Los Angeles, CA 90071
323.965.3213
leungg@sec.gov

NOTICE: The contents of this email and any attachments to it contain confidential and/or legally privileged information from the law firm of Sills Cummis & Gross P.C. This information is only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the contained information is strictly prohibited and that the documents should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us by email immediately.

**Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way from its use.

This email message has been scanned for viruses by Mimecast.

# Exhibit 9A
## Calculation of Defendants' Pecuniary Gains
9/10/13 – 4/28/16

|  | Amount |
|---|---|
| Net Investor Deposits Received[1] | $26,423,168 |
| *Less:* | |
| Fund Remaining in the Corporate Defendants' Accounts[2] | $234,899 |
| **Net Receipts** | **$26,188,269** |
| | |
| Deductible Expenditures | |
| Offering Expenses | $2,210,701 |
| Business Expenditures | $3,105,809 |
| Transfers to Liu/Wang | $0 |
| **Total Deductible Expenditures** | **$5,316,510** |
| | |
| **Defendant's Pecuniary Gains** | **$20,871,759** |

Source: JP Morgan Chase Account 1028 Data, SEC-JPMC-E-0000002 (10/1/14–1/21/16) and SEC-JPMCB-P-0000808–13 (2/11/16–3/21/16); JP Morgan Chase Account 5152 Data, SEC-JPMC-E-0000004 (10/1/14–1/29/16) and Lorraine Decl. Ex. 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls (10/1/14–4/28/16); JP Morgan Chase Account 6428 Data, SEC-JPMC-E-0000001 (10/1/14–1/26/16), SEC-JPMCB-P-0000771–807 (2/1/16–3/29/16), and Lorraine Decl. Ex. 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (10/1/14–4/28/16); Citibank Account 9769 Data, SEC-CITIBANK-E-0000087 (9/10/13–3/8/16); SEC v. Liu, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017); East West Bank Account 9509 Data, SEC-EWB-E-0000027 (8/25/15–12/9/15), SEC-EWB-E-0000028 (11/14/14–12/31/15), and SEC-EWB-E-0000058 (3/16/16).

Note:
[1] Net investor funds deposited into the PPEB5 Fund and Pacific Proton Regional Center bank accounts.
[2] Reflects the amount of fund that remained in the corporate accounts for the project.

# Exhibit 29

1  RICK D. NAVARRETTE (CA Bar No. 122653)
   rnavarrette@AlvaradoSmith.com
2  FRANCES Q. JETT (CA Bar No. 175612)
   fjett@AlvaradoSmith.com
3  ALVARADOSMITH
   A Professional Corporation
4  633 W. Fifth Street, Suite 1100
   Los Angeles, CA 90071
5  Tel: (213) 229-2400
   Fax: (213) 229-2499
6
   Attorneys for Interested Party
7  JOHN P. THROPAY, M.D.

8            UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  SECURITIES AND EXCHANGE            CASE NO.: SACV16-00974-
    COMMISSION,                        CJC(AGRX)
12
             Plaintiff,               Assigned To: Judge Cormac J. Carney
13
        v.                            **DECLARATION OF DR. JOHN P.**
14                                     **THROPAY IN SUPPORT OF** *EX*
    CHARLES C. LIU; XIN WANG a/k/a     *PARTE* **APPLICATION TO**
15  LISA WANG; PACIFIC PROTON          **OBTAIN RELIEF FROM**
    THERAPY REGIONAL CENTER,           **LITIGATION STAY IN MONITOR**
16  LLC; PACIFIC PROTON EB-5 FUND,     **ORDER AND PRELIMINARY**
    LLC; and BEVERLY PROTON            **INJUNCTION ORDER**
17  CENTER, LLC f/k/a LOS ANGELES      **APPOINTING RECEIVER**
    COUNTY PROTON THERAPY, LLC,
18                                     Date:
             Defendants.              Time: 1:30 p.m.
19                                     Courtroom: 9B

20

21

22     I, John P. Thropay, M.D., hereby declare as follows:

23     1.     I am the owner of real property located at 111 W. Beverly Blvd.,

24  Montebello, California (the "Property"). I am over the age of 18, and make this

25  declaration in support of my *Ex Parte* Application to Obtain Relief from Litigation

26  Stay in Monitor Order and Preliminary Injunction Order Appointing Receiver. The

27  following facts are within my personal knowledge, and if called upon to testify as a

28  witness hereto, I could and would competently testify as to the following facts.

                              1
             DECLARATION OF DR. JOHN THROPAY
4511855.1 – LJR734.1

EXHIBIT
78

2.      On May 16, 2016, through my attorney I filed an Unlawful Detainer action in state court against Beverly Proton Center, LLC, formerly known as Los Angeles County Proton Therapy, LLC ("Beverly Proton") in Los Angeles County Superior, *Thropay v. Beverly Proton Center, LLC et al.*, Case No. VC065552 (the "UD Action"). In the UD Action, among other things I sought forfeiture of that certain Ground Lease dated September 14, 2011, as amended by that certain Amendment to Ground Lease dated March 31, 2015 (collectively, the "Ground Lease, as amended") and to obtain possession of the Property. (A true and correct copy of the filed Complaint in the UD Action is attached hereto as Exhibit "A".)

3.      It is my understanding that paragraph IX.A of this Court's Order Appointing A Monitor dated July 11, 2016 ("Monitor Order") prevents me from pursuing or prosecuting my UD Action against Beverly Proton. I also understand that Michael Grassmueck has been appointed receiver by this Court (the "Receiver"). It is my further understanding that under paragraph VI of this Court's February 6, 2017 Order Appointing Receiver and Terminating Monitorship ("Receivership Order"), I am enjoined or stopped from, among other things, transferring or selling the Property unless court permission is received. (The Monitor Order and the Receivership Order are collectively referred to hereinafter as the "Orders".)

4.      The Orders have had a tremendous negative financial impact on me and caused me to suffer significant financial harm. Under Section 2.01 of the Ground Lease, as amended, a true and correct copy of which is attached hereto as Exhibit 1 to Exhibit "A", I was entitled to receive a base annual rent of $1,000,000 during the term of the Ground Lease, as amended. The base rent was to be paid in equal monthly installments of $83,333.34. Because of the Monitor Order, I am prevented from pursuing or prosecuting my UD Action against Beverly Proton for forfeiture of the Ground Lease, as amended and possession of the Property. Due to the preliminary injunction provision in the Receivership Order, I have been unable to prosecute the UD Action in order to obtain possession of the Property.

2.
DECLARATION OF DR. JOHN THROPAY

4511855.1 -- LJR/734.1

5.      Since the preliminary injunction litigation stay in the Monitor Order went into effect over nine (9) months ago in July of 2016, I am losing rental income of at least $83,333.34 a month.  I am also unable to lease the Property to another tenant. Even though I have not received any rental income from the Property for almost an entire year—since the filing of my UD Action in April of 2016— I have nevertheless met my obligations to pay real estate taxes and maintain insurance for the Property.

6.      In my capacity as sole owner of the Property, and further based on my review of a recent property appraisal report, I estimate that the Property has a fair market value of $ 3,310,000.  Because of the effect of the preliminary injunction in the Receivership Order, however, I cannot sell or otherwise dispose of the Property and receive any monetary value from the sale or disposition of the Property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _26_ day of April, 2017 at _Montebello_, California.

_John Thropay_

John P. Thropay, M.D.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

E X H I B I T  "A"

1  RICK D. NAVARRETTE (CA Bar No. 122653)
   rnavarrette@AlvaradoSmith.com
2  FRANCES Q. JETT (CA Bar No. 175612)
   fjett@AlvaradoSmith.com
3  ALVARADOSMITH
   A Professional Corporation
4  633 W. Fifth Street, Suite 1100
   Los Angeles, CA 90071
5  Tel: (213) 229-2400
   Fax: (213) 229-2499
6
   Attorneys for Plaintiff
7  JOHN P. THROPAY, M.D.

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         FOR THE COUNTY OF LOS ANGELES, SOUTHEAST DISTRICT

10

11  JOHN P. THROPAY, M.D.,                    CASE NO.:

12            Plaintiffs,
                                              COMPLAINT IN UNLAWFUL
13  v.                                        DETAINER-UNLIMITED CIVIL CASE

14  BEVERLY PROTON CENTER, LLC, formerly      (AMOUNT DEMANDED EXCEEDS
    known as LOS ANGELES COUNTY PROTON        $25,000.00)
15  THERAPY, LLC; CHARLES LIU, an
    individual and Doe 1 through Doe 10, inclusive,
16                                            ACTION FILED:     May 16, 2016

17            Defendants.

18

19       Plaintiff John P. Thropay, M.D. ("Plaintiff"), alleges causes of action against defendant

20  Beverly Proton Center, LLC, formerly known as Los Angeles County Proton Therapy, LLC, as

21  follows:

22       1.      At all times mentioned herein, Plaintiff was and now is an individual who resides in

23  the County of Los Angeles.  At all times herein mentioned, Plaintiff was and now is the owner in fee

24  of the premises located in the City of Montebello, California and commonly known as 111 W.

25  Beverly Boulevard (hereinafter referred to as the "Premises").

26  ///

27  ///

28  ///

                                              1
                         COMPLAINT IN UNLAWFUL DETAINER
4403571.2 -- LJJR734.1

2.     Plaintiff is informed and believes and thereupon alleges that defendant Beverly Proton Center, LLC, formerly known as Los Angeles County Proton Therapy, LLC ("Defendant"), is a limited liability company that is organized and exits under the laws of the State of California. Plaintiff is further informed and believes that thereon alleges that defendant Charles Liu ("defendant "Liu") is the Managing Member of Defendant limited liability company.

3.     The true names and capacities of defendants sued herein as Doe 1 through Doe 10, inclusive, are unknown to Plaintiff who therefore sues said defendants by such fictitious names pursuant to Section 474 of the California *Code of Civil Procedure*. Plaintiff will seek leave of court to amend this Complaint when said true names and capacities have been ascertained.

4.     At all times mentioned herein, each of the defendants, including the defendants served as a Does herein, were the agents, representatives or employees of each of the remaining defendants and in doing the things herein mentioned was acting within the scope of such agency, representation or employment. Plaintiff is further informed and believes and thereupon alleges that each of the defendants, including the defendants served as Does herein, claim some type of possessory interest in and to the Premises.

5.     On or about September 14, 2011, Plaintiff, as Lessor and Defendant Beverly Proton Center, LLC, formerly known as Los Angeles County Proton Therapy, LLC, as Lessee, entered into a certain written GROUND LEASE (the "Lease") under which Defendant agreed to lease the Premises (together with certain appurtenant rights and easements) from Plaintiff for the purpose of constructing a medical facility that would house a proton therapy treatment center and commercial office building (the "Medical Center"), as well as parking areas and related improvements.  A copy of the Lease is attached hereto as Exhibit "1" and incorporated by this reference.

6.     The Lease term was for a period of thirty (30) years commencing on the "Effective Date" as defined in Section 1.04 of the Lease, and continuing for thirty (30) years after the Effective Date, unless terminated earlier as provided in the Lease.  Sections 1.04, 5.01 and 11.03 of the Lease further provide, in relevant part, as follows:

Section 1.04.  **Effective Date**.  This Lease will be effective as of the date on which Lessee receives a minimum of One Hundred Million Dollars ($100,000.00) [sic] in funding for the Project (the "Effective Date").

2

**COMPLAINT IN UNLAWFUL DETAINER**

. . .

Section 5.01.  **Duty to Construct.**  Lessee shall, at Lessee's sole cost and expense, construct or cause to be constructed on the Premises, a medical facility and commercial office building (the "Medical Center") in the manner and according to the terms and conditions specified in this Article.  Construction of the Medical Center must begin within twelve (12) months of the Effective Date and must be completed within three (3) years of the commencement of construction. The failure of Lessee to begin construction within twelve months of the Effective Date . . . shall be an Event of Default by Lessee.

. . .

Section 11.03.  **Breach and Default by Lessee.**  All covenants and agreements contained in this lease are declared to be conditions to this lease and to the term hereby leased to Lessee.  Should Lessee fail to perform any covenant, condition, or agreement contained in this lease and the default is not cured within thirty (30) days after written notice of the default is served on Lessee by Lessor, then Lessee shall be in default under this lease.  In addition to Lessee's failure to perform any covenant, condition, or agreement contained in this Lease within the cure period permitted by this Section, the following shall constitute a default by Lessee under this lease:

(a)     The failure of Lessee to begin construction of the Medical Center within twelve months of the Effective Date;

. . .

7.     Plaintiff and Defendant mutually agreed to amend the Lease and memorialized their agreement in an AMENDMENT TO GROUND LEASE that was entered into as of March 31, 2015 (the "Amendment').  A copy of the Amendment is attached hereto as Exhibit "2" and incorporated herein this reference.

8.     Under the terms of the Amendment, and in consideration of the recitals, mutual promises, representations, warranties, agreements and covenants, and intending to be legally bound, Plaintiff and Defendant agreed, in pertinent part, to amend the Lease as follows:

Section 2.  **Lease Term.**  Section 1.04 of the Lease is amended to provide that the term of the Lease shall commence as of April 1, 2015 (the "Effective Date") and shall end 30 years from the Date of Commencement of Construction as defined in Section 5 below ("Term").

9.     Defendant, through its Managing Member defendant Liu, entered into possession of the Premises and they remain in possession of the Premises under the Lease, as amended by the Amendment (hereinafter referred to as the "Lease, as amended") and said defendants continue to remain in possession and occupy the Premises.

///

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

3

**COMPLAINT IN UNLAWFUL DETAINER**

4403571.2 -- LJJR734.1

1    10.    Defendant breached the Lease, as amended, by failing to begin construction of the

2    Medical Center on the Premises within twelve (12) months of the Effective Date on April 1, 2015 as

3    set forth in the Lease, as amended.  Defendant's failure to begin construction of the Medical Center

4    within twelve months of April 1, 2015 constituted a breach and incurable default under Section

5    11.03(a) of the Lease, as amended, cited above, thereby entitling Plaintiff as Lessor to exercise his

6    right to terminate the Lease effective immediately.

7    11.    Plaintiff has performed or caused to be performed all covenants and conditions of the

8    Lease, as amended.

9    12.    On April 22, 2016, Plaintiff caused a written Notice of Incurable Default, Notice of

10   Termination of the Lease and Demand for Surrender of the Premises (hereinafter the "Notice to

11   Terminate") to be sent by mail to Defendant.  In the Notice to Terminate, Plaintiff notified

12   Defendant of Plaintiff's election to terminate and declare a forfeiture of the Lease, as amended.

13   13.    Thereafter, on May 9, 2016, Plaintiff caused a THREE DAY NOTICE TO QUIT (the

14   "Three Day Notice") be served on and given to Defendant in the manner specified in Section 12.06 of

15   the Lease, as amended, by depositing the Three Day Notice in the United States mail, first class

16   postage prepaid and sending it by Express Mail that allowed for tracking, addressed to Defendant at

17   120 West Beverly Boulevard, Montebello, California 90640.  A copy of the Three Day Notice and

18   proof of service of the Three Day Notice on Defendant are attached hereto as Exhibit "3" and

19   Exhibit "4", respectively.  The period stated in the Three Day Notice expired May 13, 2016 and

20   defendants have failed to comply with the requirements of that Three Day Notice as of that date in

21   that defendants failed to quit and vacate the Premises.

22   14.    Plaintiff is entitled to immediate possession of the Premises.  Defendants, however,

23   continue in possession of the Premises without Plaintiff's permission or consent and contrary to the

24   terms of the Lease, as amended, and contrary to the demand in the Three Day Notice that Defendant

25   quit and vacate the Premises.

26   15.    Plaintiff is informed and believes and thereupon alleges that the reasonable rental

27   value of the Premises is the sum of $1,298.63 per day, and damages to Plaintiff caused by

28   defendants' unlawful detention thereof have accrued at said rate since May 13, 2016 and will

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

4

**COMPLAINT IN UNLAWFUL DETAINER**

4403571.2 -- LJJR734.1

1  continue to accrue at said rate so long as defendants remain in possession of the Premises.

2      16.    The Lease, as amended, provides in Section 12.04 that should any litigation be

3  commenced between the parties thereto concerning the Premises or the rights and duties of the

4  parties under the Lease, as amended, the party prevailing in that litigation shall be entitled, in

5  addition to any other relief that may be granted in the litigation, to a reasonable sum of attorneys'

6  fees incurred in the litigation.  Plaintiff has been compelled to commence this lawsuit and this

7  litigation for the recovery of possession of the Premises and he has retained the law firm

8  AlvaradoSmith, APC as his attorneys.

9      **WHEREFORE,** Plaintiff prays judgment against defendants, and each of them, as follows:

10     1.  For immediate possession of the Premises;

11     2.  For a declaration of forfeiture of the Lease, as amended.

12     3.  For damages at the rate of $1,298.63, according to proof at trial, for each day defendants

13        continue in possession of the Premises, commencing on May 13, 2016;

14     4.  For costs of suit incurred herein, including reasonable attorneys' fees incurred by Plaintiff

15        in this litigation; and

16     5.  For such other and further relief as the Court may deem just and proper.

17

18  DATED: May 16, 2016               ALVARADOSMITH
                                   A Professional Corporation

19

20                                  By:

21                                   RICK D. NAVARRETTE

22                                   FRANCES Q. JETT
                                 Attorneys for  Plaintiff

23                                   JOHN P. THROPAY, M.D.

24

25

26

27

28

**COMPLAINT IN UNLAWFUL DETAINER**

4403571.2 -- LJJR734.1

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

EXHIBIT "1"

## GROUND LEASE

This Ground Lease ("Lease") is entered into on September 14, 2011 by and between John P. Thropay, M. D., a resident of California, referred to in this Lease as "Lessor," and Los Angeles County Proton Therapy, LLC, a California limited liability company, referred to in this Lease as "Lessee." The parties to this Lease are referred to sometimes individually as a "Party" and collectively as the "Parties."

## RECITALS

A. Lessor is the owner of certain real property in the County of Los Angeles, State of California, commonly known as 111 W. Beverly Blvd., Montebello, California 90640, described on Exhibit "A" hereto, which is attached and made a part of this lease (referred to in this lease as "the Premises").

B. Lessee and its related parties are developing a project to for the purpose of constructing a medical facility that will house a proton therapy treatment center and other commercial office operations which shall be financed by a combination of U.S. investors and foreign investors participating in the EB5 visa program ("the Project").

C. Lessee desires to lease the Premises (together with certain appurtenant rights and easements) for the purpose of constructing a medical facility that will house a proton therapy treatment center and commercial office building ("the Medical Center"), appurtenant parking areas, and other related improvements (collectively referred to in this lease as "the Improvements") in accordance with the agreement of the parties as set forth in this Lease.

## ARTICLE 1
## LEASE OF PREMISES AND TERM OF LEASE

Section 1.01. **Agreement to Lease.**  For and in consideration of the rents to be paid and covenants to be performed by Lessee under this Lease, Lessor agrees to lease the Premises to Lessee, and Lessee agrees to lease the Premises from Lessor, on the terms and conditions set forth in this Lease. Except as expressly otherwise provided in this Lease, "the Premises" includes the real property plus any appurtenances and easements described in Exhibit "A" of this Lease, exclusive of any Improvements now or subsequently located on the Premises, notwithstanding that any Improvements may or shall be construed as affixed to and as constituting part of the described Premises, and without regard to whether ownership of the Improvements is in Lessor or in Lessee.

Section 1.02. **Status of Title.**  Title to the leasehold estate created by this Lease is subject to all exceptions, easements, rights, rights-of-way, and other matters of record as of the date hereof.   Within 90 days of the execution of this Lease, Lessor shall obtain a Preliminary Title Report issued by a title company of Lessor's choice, which will be attached as Exhibit "B" hereto.

1

Section 1.03. **Term of Lease.** The term of this Lease shall be for a period of thirty (30) years commencing on the Effective Date as defined in Section 1.04 hereof, and continuing thirty (30) years after the Effective Date, unless terminated earlier as provided in this Lease.

Section 1.04. **Effective Date.** This Lease will be effective as of the date on which Lessee receives a minimum of One hundred million dollars ($100,000.00) in funding for the Project ("the Effective Date"). In the event Lessee does not receive funding for the Project within twelve (12) months from the date of its execution by the Parties, Lessor shall have the right to terminate this Lease upon sixty (60) days written notice to Lessee. If Lessor terminates this Lease in accordance with this Section 1.04, neither Party shall have any further rights or obligations hereunder.

## ARTICLE 2
## RENT

Section 2.01. **Base Rent.** In addition to any other rent required under this lease, Lessee agrees to pay to Lessor a base annual rent ("Base Rent") for each year during the term of this Lease commencing on the Effective Date in the amount of One Million US Dollars ($1,000,000), payable in equal monthly installments of Eighty-Three Thousand, Three Hundred and Thirty Three Dollars and Thirty-Four Cents ($83,333.34), subject to upward adjustment as provide in Section 2.12 hereof.

Section 2.02 **Annual Adjustment of Base Rent.** The Base Rent shall be subject to adjustment on the first day of the month after each one year anniversary of the Lease commencement ("Adjustment Date"), by the amount of the CPI Increase over the prior year. The Base rent as adjusted at each Adjustment Date shall be the "Base Rent for the subsequent year and such adjusted Base Rent shall be paid monthly as provided in Section 2.01 above. The "CPI Increase" shall be calculated on each Adjustment Date by comparing the Consumer Price Index for the Los Angeles Area, All Urban Consumers, All Items, Los Angeles, California (Base Years 1982-84=100) (the "CPI") for the closest calendar month prior to the immediately preceding Adjustment Date (or, with respect to the First Adjustment Date, prior to the Commencement Date) for which the CPI is published, to the CPI for the closest calendar month prior to the applicable Adjustment Date for which the CPI is published. The increase in the CPI indicated by such comparison, stated as a percentage, shall be defined herein with respect to each Adjustment Date as the "CPI Increase". Such adjustments shall be subject to the minimum percentage increase of 4% per year and the maximum percentage of 6% per year.

If, during the Term of the Lease, the CPI is no longer published, the Lessor shall, for the purposes of computation of any adjustments in Monthly Base Rent, substitute such other Index as is then generally recognized as most comparable to the CPI and accepted for similar determinations. If sufficient data is unavailable for Lessor to make the determination specified in this Section 2.02 on any Adjustment Date, Lessee shall continue to pay the Monthly Base Rent payable immediately prior to such Adjustment Date. As soon as the necessary data becomes available, Lessor shall determine the Monthly Base Rent payable from and after such Adjustment Date and notify Lessee of the adjustment in

writing, and within fifteen days after such notice Lessee shall pay to Lessor the amount by which the Monthly Base Rent for the period following such Adjustment Date exceeds the amount previously paid by Lessee as Monthly Base Rent for such period.

Section 2.03.  **Time and Place for Payment of Rent.**  All Base Rent provided for in Section 2.01of this lease, as adjusted annually pursuant to Section 2.01 of this lease shall be paid by Lessee on a monthly basis on the first day of each calendar month. All rent required under this lease shall be paid to Lessor at 120 W. Beverly Boulevard, Suite __, Montebello, California 90640, or any other place or places that Lessor may designate by written notice to Lessee from time to time.

Section 2.04. **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee to Lessor of rent and other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any other sum due from Lessee shall not be received by Lessor or Lessor's designated agent within five (5) days after such amount is due and owing, Lessee shall pay to Lessor a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of rent, then rent shall automatically become due and payable quarterly in advance, rather than monthly, notwithstanding Section 2.03 or any other provision of this Lease to the contrary.

Section 2.05  **Security Deposit.** Lessee will deposit with Lessor as of the Effective Date a security deposit ("the Security Deposit") in the sum of one million five hundred thousand dollars ($1,500,000.00), to be held and applied by Lessor in the following manner:

(a) If, at any time during the term of this lease, any of the rent payable by Lessee to Lessor under this lease should be overdue and unpaid, or if any other sums payable by Lessee to Lessor under the terms of this lease should be overdue and unpaid, Lessor may, at Lessor's option, appropriate and apply any portion of the Security Deposit, up to the whole amount of that deposit, to the payment of the overdue rent or sums. In the event of any such appropriation and application by Lessor, Lessee shall promptly, on receipt of written demand by Lessor, restore the amount so appropriated or applied to the Security Deposit. Lessee's failure to do so within ten (10) days after receipt of the written demand by Lessor, shall constitute a breach of this lease by Lessee.

(b) Should Lessee, at any time during the term of this lease, be in default in the performance of any of the terms, covenants, and conditions of this lease, Lessor may, after terminating this lease, appropriate and apply any portion of the Security Deposit, up to the

3

whole amount of the Security Deposit, that may be required to compensate Lessor for damages caused by Lessee's breach to the payment of those damages to Lessor.

(c) Should Lessee fully and faithfully perform all the terms, covenants, and conditions of this lease, including the prompt payment of rent as required, Lessor shall, on expiration or earlier termination of this lease, return the full amount of the Security Deposit without interest to Lessee.

**Section 2.06. No Partnership or Joint Venture.** Nothing in this lease shall be construed to render Lessor in any way or for any purpose a partner, joint venturer, or associate in any relationship with Lessee other than that of Lessor and Lessee, nor shall this lease be construed to authorize either to act as agent for the other.

## ARTICLE 3
## USE OF PREMISES

**Section 3.01. Condition of Premises at Commencement Date.** Lessee acknowledges that there is currently existing structure on the Premises and that Lessee accepts the Premises "AS IS" and "WHERE IS." Lessee shall be responsible for removing such structure prior to construction of the as of the Medical Center and making such other environmental remediations, any changes to the soil or ground, or other corrections as required by the appropriate zoning authorities. Lessor makes no representation or warranty as to the condition of Premises or the suitability of the Premises for Lessee's intended use. Lessee shall be responsible for conducting any and all soil tests, environmental impact studies, zoning adjustments or any other matters that may be required for the construction and operation of the premises.

**Section 3.02. Permitted Use.** Lessee shall use the Premises solely for the purpose of constructing, maintaining, and leasing for profit a first-class medical facility and commercial office building. Lessee shall not change the use of the Premises without first obtaining the written consent of Lessor. Lessee shall not use, suffer or permit the use of the Premises in any manner that will tend to create or constitute waste, nuisance or unlawful acts.

**Section 3.03. Compliance With Laws.** Lessee shall, at Lessee's own cost and expense, comply with all statutes, ordinances, regulations, and requirements of all governmental entities, both federal and state and county or municipal, including those requiring capital improvements to the Premises or Improvements, relating to any use and occupancy of the Premises (and specifically not limited to any particular use or occupancy by Lessee), whether those statutes, ordinances, regulations, and requirements are now in force or are subsequently enacted. If any license, permit, or other governmental authorization is required for the lawful use or occupancy of the Premises or any portion of the Premises, Lessee shall procure and maintain it throughout the term of this lease. The judgment of any court of competent jurisdiction, or the admission by Lessee in a proceeding brought against Lessee by any government entity, that Lessee has violated any such statute, ordinance, regulation, or requirement shall be conclusive as between Lessor and Lessee and shall constitute grounds for termination of this lease by Lessor.

4

Section 3.04. **Prohibited Uses.** Lessee shall not use or permit the Premises or any portion of the Premises to be improved, developed, used, or occupied in any manner or for any purpose that is in any way in violation of any valid law, ordinance, or regulation of any federal, state, county, or local governmental agency, body, or entity. Furthermore, Lessee shall not maintain, commit, or permit the maintenance or commission of any nuisance as now or hereafter defined by any statutory or decisional law applicable to the Premises or any part of the Premises.

Section 3.05. **Hazardous Materials.**

(a) Definition of Hazardous Materials and Environmental Laws. "Hazardous Materials" means any (a) substance, product, waste or other material of any nature whatsoever which is or becomes listed regulated or addressed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. sections 9601, et seq. ("CERCLA"); the Hazardous Materials Transportation Act ("HMTA") 49 U.S.C. section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. section 6901, et seq. ("RCRA"); the Toxic Substances Control Act, 15 U.S.C. sections 2601, et seq. ("TSCA"); the Clean Water Act, 33 U.S.C. sections 1251, et seq.; the California Hazardous Waste Control Act, Health and Safety Code sections 25100, et seq.; the California Hazardous Substances Account Act, Health and Safety Code sections 26300, et seq.; the California Safe Drinking Water and Toxic Enforcement Act, Health and Safety Code sections 25249.5, et seq.; California Health and Safety Code sections 25280, et seq.; (Underground Storage of Hazardous Substances); the California Hazardous Waste Management Act, Health and Safety Code sections 25170.1, et seq.; California Health and Safety Code sections 25501. et seq. (Hazardous Materials Response Plans and Inventory); or the Porter-Cologne Water Quality Control Act, California Water Code sections 13000, et seq., all as amended, or any other federal, state or local statute, law, ordinance, resolution, code, rule, regulation, order or decree regulating, relating to or imposing liability (including, but not limited to, response, removal and remediation costs) or standards of conduct or performance concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter may be in effect (collectively, "Environmental Laws"); (b) any substance, product, waste or other material of any nature whatsoever whose presence in and of itself may give rise to liability under any of the above statutes or under any statutory or common law theory based on negligence, trespass, intentional tort, nuisance, strict or absolute liability or under any reported decisions of a state or federal court, (c) petroleum or crude oil, including but not limited to petroleum and petroleum products contained within regularly operated motor vehicles and (d) asbestos.

(b) Lessor's Representations and Disclosures. Lessor represents that it has provided Lessee with a description of the Hazardous Materials on or beneath the Property as of the date hereof, attached hereto as Exhibit C and incorporated herein by reference and that except as described in the documents identified in Exhibit C, Lessor has no actual knowledge of any Hazardous Materials at the Premises. Lessee acknowledges that in providing the attached Exhibit C, Lessor has satisfied its obligations of disclosure pursuant to California Health & Safety Code Section 25359.7 which requires:

"Any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substances has come to be

5

located on or beneath that real property shall, prior to the sale, lease or rental of the real property by that owner, give written notice of that condition to the buyer, lessee or renter of the real property."

(c) Use of Hazardous Materials. Lessee shall not cause or permit any Hazardous Materials to be brought upon, kept or used in, on or about the Premises by Lessee, its agents, employees, contractors, licensee, guests, visitors or invitees without the prior written consent of Lessor. Lessor shall not unreasonably withhold such consent so long as Lessee demonstrates to Lessor's reasonable satisfaction that such Hazardous Materials are necessary or useful to Lessee's business and will be used, kept and stored in a manner that complies with all applicable Environmental Laws. Lessee shall, at all times, use, keep, store, handle, transport, treat or dispose all such Hazardous Materials in or about the Premises in compliance with all applicable Environmental Laws. Lessee shall remove all Hazardous Materials used or brought onto the Premises during the Lease Term from the Project prior to the expiration or earlier termination of the Lease.

(d) Lessee's Environmental Indemnity. Lessee agrees to indemnify and hold Lessor harmless from any liabilities, losses, claims, damages, penalties, fines, attorney fees, expert fees, court costs, remediation costs, investigation costs, or other expenses resulting from or arising out of the use, storage, treatment, transportation, release, presence, generation, or disposal of Hazardous Materials on, from or about the Project, and/or subsurface or ground water, after the Commencement Date from an act or omission of Lessee (or Lessee's successor), its agents, employees, invitees, vendors, contractors, guests or visitors.

(e) Lessee's Obligation to Promptly Remediate. If the presence of Hazardous Materials on the Premises after the Commencement Date results from an act or omission of Lessee (or Lessee's successors), its agents, employees, invitees, vendors, contractors, guests, or visitors results in contamination or deterioration of the Premises or any water or soil beneath the Premises, Lessee shall promptly take all action necessary or appropriate to investigate and remedy that contamination, at its sole cost and expense, provided that Lessor's consent to such action shall first be obtained, which consent shall not be unreasonably withheld. In no event shall Lessee be responsible for, and Lessor shall indemnify and hold Lessee harmless with respect to, remediation of Hazardous Materials identified in Exhibit C which are at the Premises prior to the Commencement Date.

(f) Notification. Lessor and Lessee each agree to promptly notify the other of any communication received from any governmental entity concerning Hazardous Materials or the violation of Environmental Laws that relate to the Premises.

## ARTICLE 4
## TAXES AND UTILITIES

Section 4.01. Lessee to Pay Taxes. Lessee shall pay during the term of this lease, without abatement, deduction, or offset, any and all real and personal property taxes, general and special assessments, and other charges (including any increase caused by a change in the tax rate or by a change in assessed valuation) of any description levied or assessed during the term of this lease by any governmental agency or entity on or against the Premises, the

6

Improvements located on the Premises, personal property located on or in the Premises or Improvements, and the leasehold estate created by this lease.

Section 4.02. **Proration of First and Last Year Taxes.** Notwithstanding the provisions of Section 4.01 of this lease, all taxes, assessments, or other charges levied or assessed during the tax years in which the term of this lease commences and ends shall be prorated between Lessor and Lessee as of 12:01 A.M. on the date the term commences and on the date the term ends, respectively, on the basis of tax years that commence on July 1 and end on June 30 of each year. Lessor shall pay the taxes, assessments, or other charges for the year in which the term of this lease commences and Lessee shall promptly, on service of written request by Lessor, reimburse Lessor for Lessee's share of those taxes, assessments, or other charges. Lessee shall pay the taxes, assessments, and other charges for the year in which this lease is to end; and Lessor shall promptly, on service of written request by Lessee, reimburse Lessee for Lessor's share of those taxes, assessments, and other charges.

Section 4.03. **Separate Assessment of Leased Premises.** Should the Premises be assessed and taxed with or as part of other property owned by Lessor before the commencement of the term of this lease, Lessor shall arrange with the taxing authorities to have the Premises taxed and assessed as a separate parcel distinct from any other real or personal property owned by Lessor. Should the Premises be assessed and taxed for the year in which this lease is to commence with or as part of other property owned by Lessor, the share of the taxes, assessments, or other charges for which Lessee is liable to pay under Section 4.02 shall be determined as follows: Lessee shall pay an amount equal to that portion of the taxes, assessments, and other charges that bears the same ratio to the total of the taxes, assessments, and other charges as the ground area of the Premises bears to the ground area of the total taxed property.

Section 4.04. **Payment Before Delinquency.** Any and all taxes and assessments and installments of taxes and assessments required to be paid by Lessee under this lease shall be paid by Lessee at least thirty (30) 10 days before each such tax, assessment, or installment of tax or assessment becomes delinquent. Lessee shall deliver to Lessor the official and original receipt evidencing the payment of any taxes, assessments, and other charges required under this Article.

Section 4.05. **Taxes Payable in Installments.** Should any special tax or assessment be levied on or assessed against the Premises that may be either paid in full before a delinquency date within the term of this lease or paid in installments over a period either within or extending beyond this lease, Lessee shall have the option of paying the special tax or assessment in installments. The fact that the exercise of the option to pay the tax or assessment in installments will cause the Premises to be encumbered with bonds or will cause interest to accrue on the tax or assessment is immaterial and shall not interfere with the free exercise of the option by Lessee. Should Lessee exercise the option to pay any such tax or assessment in installments, Lessee shall be liable to pay only those installments becoming due during the term of this lease. Lessor shall cooperate with Lessee and on written request of Lessee execute or join with Lessee in executing any instruments required to permit any such special tax or assessment to be paid in installments.

7

Section 4.06. **Contest of Tax.** Lessee shall have the right to contest, oppose, or object to the amount or validity of any tax, assessment, or other charge levied on or assessed against the Premises or any part of the Premises; provided, however, that the contest, opposition, or objection must be filed before the tax, assessment, or other charge at which it is directed becomes delinquent and that written notice of the contest, opposition, or objection must be given to Lessor at least thirty (30) days before the date the tax, assessment, or other charge becomes delinquent. Lessor shall, on written request of Lessee, join in any such contest, opposition, or objection if Lessee determines that joinder is necessary or convenient for the proper prosecution of the proceedings. Lessee shall be responsible for and shall pay all costs and expenses in any contest or legal proceeding instituted by Lessee. In no event shall Lessor be subjected to any liability for costs or expenses connected to any contest by Lessee, and Lessee agrees to indemnify and hold Lessor harmless from any such costs and expenses. Furthermore, no such contest, opposition, or objection shall be continued or maintained after the date the tax, assessment, or other charge at which it is directed becomes delinquent unless Lessee has done one of the following:

(a) Paid the tax, assessment, or other charge under protest before its becoming delinquent;

(b) Obtained and maintained a stay of all proceedings for enforcement and collection of the tax, assessment, or other charge by posting a bond or other security required by law for such a stay; or

(c) Delivered to Lessor a good and sufficient surety bond in an amount specified by Lessor and issued by a bonding corporation licensed to do business in California, conditioned on the payment by Lessee of the tax, assessment, or charge together with any fines, interest, penalties, costs, and expenses that may have accrued or been imposed thereon within 30 days after final determination of Lessee's contest, opposition, or objection to the tax, assessment, or other charge.

Section 4.07. **Tax Returns and Statements.** Lessee shall, as between Lessor and Lessee, have the duty of attending to, preparing, making, and filing any statement, return, report, or other instrument required or permitted by law in connection with the determination, equalization, reduction, or payment of any taxes, assessments, or other charges that are or may be levied on or assessed against the Premises, the Improvements located on the Premises, personal property located on or in the Premises or Improvements, and the leasehold estate created by this lease.

Section 4.08. **Tax Hold-Harmless Clause.** Lessee shall indemnify and hold Lessor and Lessor's property, including the Premises and any Improvements now or subsequently located on the Premises, free and harmless from any liability, loss, or damage resulting from any taxes, assessments, or other charges required by this Article to be paid by Lessee and from all interest, penalties, and other sums imposed thereon and from any sales or other proceedings to enforce collection of any such taxes, assessments, or other charges.

Section 4.09. **Utilities.** Lessee shall pay or cause to be paid, and hold Lessor and Lessor's property including the Premises free and harmless from, all charges for the furnishing of gas, water, electricity, telephone service, and other public utilities to the Premises during

8

the lease's term and for the removal of garbage and rubbish from the Premises during the term of this lease.

Section 4.10. **Payment by Lessor.** Should Lessee fail to pay within the time specified in this Article any taxes, assessments, or other charges required by this Article to be paid by Lessee, Lessor may, without notice to or demand on Lessee, pay, discharge, or adjust that tax, assessment, or other charge for the benefit of Lessee. In that event, Lessee shall promptly on written demand of Lessor reimburse Lessor for the full amount paid by Lessor in paying, discharging, or adjusting that tax, assessment, or other charge together with interest thereon at the then-maximum legal rate from the date of payment by Lessor until the date of repayment by Lessee. If this Article does not specify the time within which Lessee must pay any charge required by this Article, Lessee shall pay that charge before it becomes delinquent.

**ARTICLE 5**
**CONSTRUCTION BY TENANT**

Section 5.01. **Duty to Construct.**  Lessee shall, at Lessee's sole cost and expense, construct or cause to be constructed on the Premises, a medical facility and commercial office building ("the Medical Center") in the manner and according to the terms and conditions specified in this Article.  Construction of the Medical Center must begin within twelve (12) months of the Effective Date and must be completed within three (3) years of the commencement of construction.  The failure of Lessee to begin construction within twelve months of the Effective Date or failure of Lessee to complete the construction of the Medical Center within three (3) years of the commencement of construction shall be an Event of Default by Lessee.

Section 5.02. **Construction Bond.** Prior to any construction being done on the Premises, Lessee shall secure a bond in the estimated amount of the cost of construction of the Medical Center naming Lessor as the beneficiary ("Bond").  The Bond shall protect Lessor in the event that Lessee fails to complete construction of the Medical Center by the date agreed to between Lessor and Lessee.  The Bond shall be subject to Lessor's approval prior to issuance and shall be issued by an insurance bonding company licensed to do business in the State of California, rated A+  or better by A.M. Best Company, size category XV or better.  The bond shall be non-cancellable and any cancellation of the Bond prior to completion of the Medical Center will be an Event of Default by Lessee.

Section 5.03. **Requirement of Lessor's Written Approval.** No structure or other improvement of any kind shall be constructed on the Premises unless and until the plans, specifications, and proposed location of that structure or improvement have been approved in writing by Lessor. Furthermore, no structure or other improvement shall be constructed on the Premises that does not comply with plans, specifications, and locations approved in writing by Lessor.

Section 5.04. **Preparation and Submission of Plans.** Lessee shall, at Lessee's own cost and expense, engage a licensed architect or engineer to prepare plans and specifications for

9

the Medical Center and shall submit the following to Lessor for approval:

(a) Within 180 days after execution of this Lease, two copies of the following:

(1) Drawings and materials in the form of plans, elevations, sections, and rendered perspectives sufficient to convey the architectural design of the Medical Center to Lessor; and

(2) A statement of estimated construction costs for the Medical Center prepared by the engaged architect or engineer.

(b) Within 90 days after approval by Lessor of the items specified in subsection (a) of this Section and the obtaining by Lessee of any variance permits, use permits, or rezoning required for the Medical Center, two copies of the following:

(1) Detailed working drawings, plans, and specifications for the Medical Center; and

(2) A revised statement of estimated construction costs for the Medical Center prepared by the engaged architect or engineer.

Section 5.05. **Lessor's Approval or Rejection of Plans.** Within 60 days after receipt by Lessor of any of the documents submitted to Lessor for approval under Section 5.03 of this lease, Lessor shall either approve those documents by endorsing Lessor's approval on each such document and returning one set of the documents to Lessee, or Lessor shall give written notice to Lessee of any objections Lessor may have to those documents. Lessor's failure to give written notice to Lessee within that 60-day period of any objections Lessor may have to the documents shall constitute approval of the documents by Lessor. Within 30 days after service on Lessee of the written notice of Lessor's objections, Lessee may deliver corrective amendments to the documents to Lessor and Lessor shall, within 30 days after receiving the corrective amendments, serve written notice on Lessee of Lessor's approval or rejection of the documents as so amended. Failure of Lessor to serve written notice on Lessee within that 30-day period after receipt of the corrective amendments shall constitute approval by Lessor of the documents as so amended.

Section 5.06. **Changes in Plans.** After approval by Lessor of the documents pertaining to the Medical Center described in Section 5.03(b) of this lease, any substantial change in the plans or specifications for the Medical Center shall be approved by Lessor. For purposes of this Section, "substantial change" means one that materially changes the exterior appearance of the Medical Center or one that results in a decrease in construction costs of $ 100,000 or more. Lessor's failure to give written notice to Lessee of any objections Lessor may have to any proposed changes within 60 days after a written statement of the proposed changes has been given to Lessor by Lessee shall constitute Lessor's approval of the changes. Minor changes in work or materials not constituting a substantial change need not be approved by Lessor but a copy of the altered plans and specifications reflecting those changes shall be given to Lessor.

10

Section 5.07. **All Work on Written Contract.** All work required in the construction of the Medical Center, including any site preparation work, landscaping work, and utility installation work, as well as actual construction work on the Medical Center, shall be performed only by competent contractors licensed under the laws of the State of California and shall be performed in accordance with written contracts with those contractors. Each such contract shall provide that the final payment under the contract due to the contractor shall be in an amount equaling at least ten percent (10%) of the full amount payable under the contract and shall not be paid to contractor until whichever of the following last occurs:

(a) The expiration of 35 days from the date of recording by Lessee as owner of a Notice of Completion of the Medical Center, Lessee agreeing to record that Notice of Completion promptly within the time specified by law for the recording of that notice; or

(b) The settlement and discharge of all liens of record claimed by persons who supplied either labor or materials for the construction of the Medical Center.

Section 5.08. **Performance and Lien Bonds.** Each contractor engaged by Lessee to perform any services for construction of the Medical Center, including any construction, site preparation, utility installation, landscaping, or parking lot construction services, shall furnish to Lessee, who shall deliver copies of both of the following to Lessor, at the contractor's own expense at the time of entering a contract with Lessee for those services:

(a) A bond issued by a corporate surety authorized to issue surety insurance in California in an amount equal to one hundred percent (100%) of the contract price payable under the contract securing the faithful performance by the contractor of its contract with Lessee; and

(b) A bond issued by a corporate surety authorized to issue surety insurance in California in an amount equal to fifty percent (50%) of the contract price payable under the contract securing the payment of all claims for the performance of labor or services on, or the furnishing of materials for, the performance of the contract.

Section 5.09. **Compliance With Law and Standards.** The Medical Center shall be constructed, all work on the Premises shall be performed, and all buildings or other improvements on the Premises shall be erected in accordance with all valid laws, ordinances, regulations, and orders of all federal, state, county, or local governmental agencies or entities having jurisdiction over the Premises; provided, however, that any structure or other improvement erected on the Premises, including the Medical Center, shall be deemed to have been constructed in full compliance with all such valid laws, ordinances, regulations, and orders when a valid final Certificate of Occupancy entitling Lessee and subtenants of Lessee to occupy and use the structure or other improvement has been duly issued by proper governmental agencies or entities. All work performed on the Premises under this lease, or authorized by this lease, shall be done in a good workmanlike manner and only with new materials of good quality and high standard.

Section 5.10. **Construction of Medical Center.** Lessee shall cause construction of the Medical Center to be commenced no later than sixty (60) days after approval by Lessor of the documents described in Section 5.03(b) of this lease, shall then cause construction of

11

the Medical Center to be diligently pursued without unnecessary interruption, and shall cause the Medical Center to be completed and ready for occupancy not later than four (4) years after commencement of its construction. Lessee shall be excused for any delays in construction or commencement of construction caused by the act of Lessor, the act of any agent of Lessor, the act of any governmental authority, the act of any public enemy, acts of God, the elements, war, war defense conditions, litigation, strikes, walkouts, or other causes beyond Lessee's control. Lessee shall, however, use reasonable diligence to avoid any such delay and to resume construction as promptly as possible after the delay.

Section 5.11. **Mechanics' Liens.** At all times during the term of this lease, Lessee shall keep the Premises and all Improvements now or hereafter located on the Premises free and clear of all liens and claims of liens for labor, services, materials, supplies, or equipment performed on or furnished to the Premises. Should Lessee fail to pay and discharge or cause the Premises to be released from any such lien or claim of lien within twenty (20) days after service on Lessee of written request from Lessor to do so, Lessor may pay, adjust, compromise, and discharge any such lien or claim of lien on any terms and in any manner that Lessor may deem appropriate. In that event, Lessee shall, on or before the first day of the next calendar month following any such payment by Lessor, reimburse Lessor for the full amount paid by Lessor in paying, adjusting, compromising, and discharging that lien or claim of lien, including any attorneys' fees or other costs expended by Lessor, together with interest at the then-maximum legal rate from the date of payment by Lessor to the date of repayment by Lessee.

Section 5.12. **Zoning and Use Permits.** Should Lessee deem it necessary or appropriate to obtain any use permit, variance, or rezoning of the Premises to construct or operate the Medical Center, Lessor agrees to execute any documents, petitions, applications, and authorizations that may be necessary or appropriate and hereby appoints Lessee as Lessor's attorney in fact to execute in the name and on behalf of Lessor any such documents, petitions, applications, or authorizations; provided, however, that any such permits, variances, or rezoning shall be obtained at the sole cost and expense of Lessee and Lessee agrees to protect and save Lessor and the property of Lessor, including the Premises, free and harmless from any such cost and expense.

Section 5.13. **Ownership of Improvements.** Title to all Improvements, including the Medical Center, to be constructed on the Premises by Lessee shall be owned by Lessee until expiration of the term or earlier termination of this lease. All Improvements, including the Medical Center, on the Premises at the expiration or earlier termination of this lease shall, without compensation to Lessee, then automatically and without any act of Lessee or any third party become Lessor's property. Lessee shall surrender the Improvements to Lessor at the expiration of the term or earlier termination of this lease, free and clear of all liens and encumbrances, other than those, if any, permitted under this lease or otherwise created or consented to by Lessor. Lessee agrees to execute, acknowledge, and deliver to Lessor any instrument requested by Lessor as necessary in Lessor's opinion to perfect Lessor's right, title, and interest to the Improvements and the Premises.

12

## ARTICLE 6
### ENCUMBRANCE OF LEASEHOLD ESTATE

Section 6.01. **Lessee's Right to Encumber.** Lessee may, at any time and from time to time during the term of this lease, encumber to any institutional lender regulated by state or federal authority (referred to in this lease as "Lender"), by deed of trust or mortgage or other security instrument, all of Lessee's interest under this lease and the leasehold estate hereby created in Lessee (referred to in this lease as a "Leasehold Encumbrance") for any purpose or purposes without the consent of Lessor. However, no Leasehold Encumbrance incurred by Lessee in accordance with this Section shall, and Lessee shall not have power to incur any encumbrance that shall, constitute in any way a lien or encumbrance on Lessor's fee interest in the Premises. Any Leasehold Encumbrance shall be subject to all covenants, conditions, and restrictions set forth in this lease and to all rights and interests of Lessor, except as is otherwise provided in this lease. Lessee shall give Lessor prior written notice of any Leasehold Encumbrance, together with a copy of the deed of trust, mortgage, or other security interest evidencing the Leasehold Encumbrance.

Section 6.02. **Notice to and Service on Lender.** Lessor shall mail to any Lender who has given Lessor written notice of its name and address, a duplicate copy of any and all notices Lessor may from time to time give to or serve on Lessee in accordance with or relating to this lease, including but not limited to any notice of default, notice of termination, or notice regarding any matter on which Lessor may predicate or claim a default. Any notices or other communications permitted by this or any other section of this lease or by law to be served on or given to Lender by Lessor shall be deemed duly served on or given to Lender when deposited in the United States mail, first-class postage prepaid, addressed to Lender at the last mailing address for Lender furnished in writing by Lender to Lessor.

Section 6.03. **No Modification Without Lender's Consent.** For as long as there is any Leasehold Encumbrance in effect, Lessee and Lessor hereby expressly stipulate and agree that they will not modify this lease in any way nor cancel this lease by mutual agreement without the written consent of Lender having that Leasehold Encumbrance.

Section 6.04. **Right of Lender to Realize on Security.** A Lender with a Leasehold Encumbrance shall have the right at any time during the term of this lease and the existence of the encumbrance to do both of the following:

(a) Any act or thing required of Lessee under this lease, and any such act or thing done and performed by Lender shall be as effective to prevent a forfeiture of Lessee's rights under this lease as if done by Lessee; and

(b) Realize on the security afforded by the leasehold estate by foreclosure proceedings, accepting an assignment in lieu of foreclosure, or other remedy afforded in law or in equity or by the security instrument evidencing the Leasehold Encumbrance (referred to in this lease as "the Security Instrument"), and (1) To transfer, convey, or assign the title of Lessee to the leasehold estate created by this lease to any purchaser at any foreclosure sale, whether the foreclosure sale is conducted under court order or a power of sale contained in the Security Instrument, or to an assignee under an assignment in lieu of foreclosure; and

13

(2) To acquire and succeed to the interest of Lessee under this lease by virtue of any foreclosure sale, whether the foreclosure sale is conducted under a court order or a power of sale contained in the Security Instrument, or by virtue of an assignment in lieu of foreclosure.

The Lender or any person or entity acquiring the leasehold estate shall be liable to perform Lessee's obligations under this lease only during the period, if any, in which that entity or person has ownership of the leasehold estate or possession of the Premises.

Section 6.05. **Right of Lender to Cure Defaults.**  For as long as there is in effect any Leasehold Encumbrance, before Lessor may terminate this lease because of any default under or breach of this lease by Lessee, Lessor must give written notice of the default or breach to Lender and afford Lender the opportunity after service of the notice to do one of the following:

(a) Cure the breach or default within ten (10) days after expiration of the time period granted to Lessee under this lease for curing a default, when the default can be cured by the payment of money to Lessor or some other person;

(b) Cure the breach or default within ten (10) days after expiration of the time period granted to Lessee under this lease for curing a default, when the breach or default must be cured by something other than the payment of money and can be cured within that time; or (c) Cure the breach or default in any reasonable time that may be required when something other than money is required to cure the breach or default and cannot be performed within ten (10) days after expiration of the time period granted to the tenant under this lease for curing a default, provided that acts to cure the breach or default are commenced within that time period after service of notice of default on Lender by Lessor and are thereafter diligently continued by Lender.

Section 6.06. **Foreclosure in Lieu of Curing Default.** Notwithstanding any other provision of this lease, a Lender under a Leasehold Encumbrance may forestall termination of this lease by Lessor for a default under or breach of this lease by Lessee by commencing proceedings to foreclose the Leasehold Encumbrance. The proceedings so commenced may be for foreclosure of the Leasehold Encumbrance by order of court or for foreclosure of the Leasehold Encumbrance under a power of sale contained in the Security Instrument. The proceedings shall not, however, forestall termination of this lease by Lessor for the default or breach by Lessee unless all of the following conditions are met:

(a) The proceedings are commenced within 90 days after service on Lender of the notice described in Section 6.05 of this lease;

(b) The proceedings are, after having been commenced, diligently pursued in the manner required by law to completion; and

(c) Lender keeps and performs all of the terms, covenants, and conditions of this lease requiring the payment or expenditure of money by Lessee until the foreclosure proceedings

14

are complete or are discharged by redemption, satisfaction, payment, or conveyance of the leasehold estate to Lender.

Section 6.07. **Assignment Without Consent on Foreclosure** A transfer of Lessee's leasehold interest under this lease to any of the following shall not require the prior consent of Lessor:

(a) A purchaser at a foreclosure sale of the Leasehold Encumbrance, whether the foreclosure sale is conducted under court order or a power of sale in the instrument creating the encumbrance, provided Lender under the Leasehold Encumbrance gives Lessor written notice of the transfer, including the name and address of the purchaser and the effective date of the transfer;

(b) An assignee of the leasehold estate of Lessee under an assignment in lieu of foreclosure, provided Lender under the Leasehold Encumbrance gives Lessor written notice of the transfer, including the name and address of the assignee and the effective date of the assignment; or

(c) A purchaser or assignee of the purchaser at a foreclosure sale of the Leasehold Encumbrance or of the assignee of the leasehold estate of Lessee acquired under an assignment in lieu of foreclosure, provided the purchaser or assignee delivers to Lessor its written agreement to be bound by all of the provisions of this lease.

Section 6.08. **New Lease to Lender.** Notwithstanding any other provision of this lease, should this lease terminate because of any default under or breach of this lease by Lessee, Lessor agrees to enter into a new lease for the Premises with Lender under a Leasehold Encumbrance, as Lessee, provided all of the following conditions are satisfied:

(a) A written request for the new lease is served on Lessor by Lender within 60 days after service on Lender of the notice described in Section 6.05 of this lease;

(b) The new lease (1) Is for a term ending on the same date the term of this lease would have ended had this lease not been terminated; (2) Provides for the payment of rent at the same rate that would have been payable under this lease during the remaining term of this lease had this lease not been terminated; and (3) Contains the same terms, covenants, conditions, and provisions as are contained in this lease (except those that have already been fulfilled or are no longer applicable);

(c) Lender, on execution of the new lease by Lessor, shall pay any and all sums that would at the time of the execution of the new lease be due under this lease but for its termination and shall otherwise fully remedy, or agree in writing to remedy, any other defaults under or breaches of this lease committed by Lessee that can be remedied;

(d) Lender, on execution of the new lease, shall pay all reasonable costs and expenses, including attorneys' fees and court costs, incurred in terminating this lease, recovering possession of the Premises from Lessee or the representative of Lessee, and preparing the new lease;

15

(e) The new lease shall be subject to all existing subleases between Lessee and subtenants, provided that for any sublease, the subtenant agrees in writing to attorn to Lender (or its assignee); and

(f) The new lease shall be assignable by Lender but not by any assignee of Lender without the prior written consent of Lessor.

**Section 6.09. No Merger of Leasehold and Fee Estates.** For as long as any Leasehold Encumbrance is in existence, there shall be no merger of the leasehold estate created by this lease and the fee estate of Lessor in the Premises merely because both estates have been acquired or become vested in the same person or entity, unless Lender otherwise consents in writing.

**Section 6.10. Lender as Assignee of Lease.** No Lender under any Leasehold Encumbrance shall be liable to Lessor as an assignee of this lease unless and until Lender acquires all rights of Lessee under this lease through foreclosure, an assignment in lieu of foreclosure, or as a result of some other action or remedy provided by law or by the instrument creating the Leasehold Encumbrance.

**Section 6.11. Lender as Including Subsequent Security Holders.** Except for purposes of Section 6.08, the term "Lender" as used in this lease shall mean not only the institutional lender that loaned money to Lessee and is named as beneficiary, mortgagee, secured party, or security holder in the Security Instrument creating any Leasehold Encumbrance, but also all subsequent purchasers or assignees of the leasehold interest secured by the Leasehold Encumbrance.

**Section 6.12. Two or More Lenders.** In the event two or more Lenders each exercise their rights under this lease and there is a conflict that renders it impossible to comply with all requests of Lenders, the Lender whose Leasehold Encumbrance would have senior priority in the event of a foreclosure shall prevail.

## ARTICLE 7
## REPAIRS AND RESTORATION

**Section 7.01. Maintenance by Lessee.** At all times during the term of this lease Lessee shall, at Lessee's own cost and expense, keep and maintain the Premises, all Improvements, and all appurtenances (including landscaped and parking areas) now or hereafter on the Premises in a first-class condition, in good order and repair, and in a safe and clean condition.

**Section 7.02. Requirements of Governmental Agencies.** At all times during the term of this lease, Lessee, at Lessee's own cost and expense, shall do all of the following:

(a) Make all alterations, additions, or repairs to the Premises or the Improvements on the Premises required by any valid law, ordinance, statute, order, or regulation now or hereafter made or issued by any federal, state, county, local, or other governmental agency or entity;

16

(b) Observe and comply with all valid laws, ordinances, statutes, orders, and regulations now or hereafter made or issued respecting the Premises or the Improvements on the Premises by any federal, state, county, local, or other governmental agency or entity;

(c) Contest if Lessee, in Lessee's sole discretion, desires by appropriate legal proceedings brought in good faith and diligently prosecuted in the name of Lessee, or in the names of Lessee and Lessor when appropriate or required, the validity or applicability to the Premises of any law, ordinance, statute, order, or regulation now or hereafter made or issued by any federal, state, county, local, or other governmental agency or entity; provided, however, that any such contest or proceeding, though maintained in the names of Lessee and Lessor, shall be without cost to Lessor, and Lessee shall protect the Premises and Lessor from Lessee's failure to observe or comply during the contest with the contested law, ordinance, statute, order, or regulation; and

(d) Indemnify and hold Lessor and the property of Lessor, including the Premises, free and harmless from any and all liability, loss, damages, fines, penalties, claims, and actions resulting from Lessee's failure to comply with and perform the requirements of this Section.

Section 7.03. Lessee's Duty to Restore Premises.   If at any time during this lease's term, any Improvements now or hereafter on the Premises are destroyed in whole or in part by fire, theft, the elements, or any other cause not the fault of Lessor, this lease shall continue in full force and effect and Lessee, at Lessee's own cost and expense, shall repair and restore the damaged Improvements. Any restoration by Lessee shall comply with original plans for the Improvements described in Article 5, except as may be modified by Lessee to comply with the terms of any sublease of the Improvements, or except as may be otherwise modified by Lessee and approved in writing by Lessor. The work of repair and restoration shall be commenced by Lessee within one hundred and twenty (120) days after the damage or destruction occurs and shall be completed with due diligence not later than one year after the work is commenced. In all other respects, the work of repair and restoration shall be done in accordance with the requirements for original construction work on the Premises set forth in Article 5 of this lease. Lessee's obligation for restoration described in this Section shall exist whether or not funds are available from insurance proceeds.

Section 7.04. Option to Terminate Lease for Destruction. Notwithstanding Section 7.03 of this lease, Lessee shall have the right to terminate this lease if, during the last five years of the lease's term, the Improvements are damaged or destroyed by a casualty for which Lessee is not required under this lease to carry insurance and the cost to repair or restore the damaged or destroyed Improvements exceeds 50 percent of the fair market value of the Improvements immediately before the damage or destruction.

Section 7.05. Application of Insurance Proceeds. Any and all fire or other insurance proceeds that become payable at any time during the term of this lease because of damage to or destruction of any Improvements on the Premises shall be paid to Lessee and applied by Lessee toward the cost of repairing and restoring the damaged or destroyed Improvements in the manner required by Section 7.03 of this lease, or, if this lease is terminated under Section 7.04, applied by Lessee toward payment of the Leasehold Encumbrance(s).

17

## ARTICLE 8
## INDEMNITY AND INSURANCE

Section 8.01. **Indemnity Agreement.** Lessee shall indemnify and hold Lessor and Lessor's property, including the Premises and Improvements now or hereafter on the Premises, free and harmless from any and all liability, claims, loss, damages, or expenses resulting from Lessee's occupation and use of the Premises, specifically including, without limitation, any liability, claim, loss, damage, or expense arising by reason of the following:

(a) The death or injury of any person, including Lessee or any person who is an employee or agent of Lessee, or by reason of the damage to or destruction of any property, including property owned by Lessee or by any person who is an employee or agent of Lessee, from any cause whatever while that person or property is in or on the Premises or in any way connected with the Premises or with any of the Improvements or personal property on the Premises;

(b) The death or injury of any person, including Lessee or any person who is an employee or agent of Lessee, or by reason of the damage to or destruction of any property, including property owned by Lessee or any person who is an employee or agent of Lessee, caused or allegedly caused by either (1) the condition of the Premises or some building or improvement on the Premises, or (2) some act or omission on the Premises of Lessee or any person in, on, or about the Premises with the permission and consent of Lessee;

(c) Any work performed on the Premises or materials furnished to the Premises at the instance or request of Lessee or any person or entity acting for or on behalf of Lessee; or

(d) Lessee's failure to perform any provision of this lease or to comply with any requirement of law or any requirement imposed on Lessee or the Premises by any duly authorized governmental agency or political subdivision.

Section 8.02. **Limitations on Lessor's Liability.** The term "Lessor" as used herein shall mean only the owner or owners at the time in question of the fee title of the Premises. In the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership. For any breach of this Lease by Lessor, the liability of Lessor (including all persons and entities that comprise Lessor, and any successor Lessor) and any recourse by Lessee against Lessor shall be limited to the interest of Lessor, and Lessor's successors in interest, in and to the Premises. On behalf of itself and all persons claiming by, through, or under Lessee, Lessee expressly waives and releases Lessor and each owner, member, agent and employee of Lessor from any personal liability for breach of this Lease.

18

Section 8.03. **Liability Insurance.** Lessee shall, at Lessee's own cost and expense, procure and maintain during the entire term of this lease a broad form comprehensive coverage policy of public liability insurance issued by an insurance company licensed by the State of California insuring Lessee and Lessor against loss or liability caused by or connected with Lessee's occupation and use of the Premises under this lease in amounts not less than the following:

(a) Ten Million Dollars ($10,000,000) for injury to or death of one person and, subject to that limitation for the injury or death of one person, of not less than Fifteen Million Dollars ($15,000,000) for injury to or death of two or more persons as a result of any one accident or incident; and

(b) Replacement Value for the Medical Center for damage to or destruction of any property.

Section 8.04. **Fire and Casualty Insurance.** Lessee shall, at Lessee's own cost and expense, at all times during the term of this lease, keep all Improvements on the Premises insured for their full replacement value by insurance companies authorized to do business in the State of California against loss or destruction by fire and the perils commonly covered under the standard extended coverage endorsement to fire insurance policies in the county where the Premises are located. For as long as there is any Leasehold Encumbrance in existence, that policy shall also contain a standard lender endorsement.

Section 8.05. Notwithstanding anything to the contrary contained in Section 8.03 of this lease, the insurance required by Section 8.03 of this lease shall, whether or not included in the standard extended coverage endorsement referred to in Section 8.03, insure all Improvements on the Premises against loss or destruction by windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, fire, smoke damage, and sprinkler leakage. Furthermore, the insurance required by Section 8.04 of this lease during the construction of the Medical Center described in Article 5 shall include coverage for course of construction, vandalism, and malicious mischief, insuring the Medical Center during its construction and all materials delivered to the site of the Medical Center for their full insurable value.

Section 8.06. **Deposit of Insurance With Lessor and Lender** Lessee shall, within 10 days after the execution of this lease and promptly thereafter when any such policy is replaced, rewritten, or renewed, deliver to Lessor and Lender a true and correct copy of each insurance policy required by this Article of this lease or a certificate executed by the insurance company or companies or their authorized agent evidencing that policy or policies.

Section 8.07. **Notice of Cancellation of Insurance.** Each insurance policy required under this Article shall contain a provision that it cannot be cancelled for any reason unless at least thirty (30) days' prior written notice of the cancellation is given to Lessor and to Lender in the manner required by this lease for service of notices on Lessor by Lessee.

19

## ARTICLE 9
## CONDEMNATION

Section 9.01. **Total Condemnation.** If, during the term of this lease, fee title to all of the Premises or to all of the Improvements, or the entire leasehold estate of Lessee is taken under the power of eminent domain by any public or quasi-public agency or entity (a "Total Taking"), this lease shall terminate as of 12:01 A.M. on whichever of the following occurs first: (1) the date legal title becomes vested in the agency or entity exercising the power of eminent domain, or (2) the date actual physical possession is taken by the agency or entity exercising the power of eminent domain. Thereafter, both Lessor and Lessee shall be released from all obligations under this lease, except those specified in Section 9.05.

Section 9.02. **Partial Taking--Parking Areas.** If, at any time during the term of this lease, a taking occurs that is less than a Total Taking and affects the parking areas for the Medical Center, all compensation and damages payable for that taking shall be made available to and used, to the extent reasonably needed, by Lessee to repair any portion of the remaining parking areas damaged by the taking and to replace the parking areas taken with other new parking areas on the portion of the Premises not taken, provided that replacement is then permitted by existing law. Plans and specifications for the replacement parking areas must first be approved in writing by Lessor but may include, when practicable and when permitted by law, deck parking facilities to replace ground level parking facilities taken by eminent domain. Notwithstanding anything to the contrary in this Section, if the portion of the parking areas taken by eminent domain results in a net loss of ten percent (10%) or more of the area of the Premises that can, after considering any replacement parking areas that can be lawfully constructed on the remaining portion of the Premises by reasonable methods, be devoted to parking areas as compared with the area devoted to those parking areas immediately before the taking, Lessee may terminate this lease in the manner prescribed by Section 9.04 of this lease.

Section 9.03. **Partial Taking—Improvements.** If at any time during the term of this lease a taking occurs that is less than a Total Taking and affects the rentable portion of the Improvements on the Premises, all compensation and damages payable for that taking (excluding any portion payable for a taking of parking areas) shall be made available to and used, to the extent reasonably needed, by Lessee to repair any portion of the remaining rentable portion of the Improvements damaged by the taking and to replace the rentable portion of the Improvements taken with other new rentable space on the portion of the Premises not taken, provided that replacement is then permitted by existing law. Plans and specifications for the replacement rental space must be compatible, in terms of architecture and quality of construction, with the Improvements not taken and must be first approved in writing by Lessor. Notwithstanding anything to the contrary in this Section, if the rentable portion of the Improvements taken by eminent domain results in a net loss of ten percent (10%) or more of the area of the Premises that can, after considering any replacement rentable space that can be lawfully constructed on the remaining portion of the Premises, be devoted to rentable space as compared with the area devoted to that rentable space immediately before the taking, Lessee may terminate this lease in the manner prescribed by Section 9.04 of this lease.

20

Section 9.04. **Termination for Partial Taking.** Lessee may terminate this lease for the reasons stated in either Section 9.02 or Section 9.03 of this lease, or both, by serving written notice of termination on Lessor within ninety (90) days after Lessee has received from Lessor or from the condemning authority written notice of an intended taking that sets forth the extent and scope of the intended taking. If Lessee elects to terminate this lease, the effective date of termination shall be the earlier of (1) the date of termination specified in Lessee's notice to Lessor or (2) the date the condemning authority takes physical possession of the portion of the Premises taken by eminent domain. On termination of this lease under this Section, all subleases and subtenancies in or on the Premises or any portion or portions of the Premises created by Lessee under this lease shall also terminate and the Premises shall be delivered to Lessor free and clear of all such subleases and subtenancies; provided, however, that Lessor may, at Lessor's option, by mailing written notice to any subtenant, allow the subtenant to attorn to Lessor and continue its occupancy on the Premises as a tenant of Lessor. On termination of this lease under this Section, both Lessor and Lessee shall be released from all obligations to the other under this lease except those specified in Section 9.05.

Section 9.05. **Condemnation Award.** Any compensation or damages awarded or payable because of the taking of all or any portion of the Premises by eminent domain shall be allocated between Lessor and Lessee as follows:

(a) All compensation or damages awarded or payable for the taking by eminent domain of any land that is part of the Premises shall be paid to and be the sole property of Lessor, free and clear of any claim of Lessee or any person claiming rights to the Premises through or under Lessee.

(b) All compensation or damages awarded or payable because of any Improvements constructed or located on the portion of the Premises taken by eminent domain when only a portion of the Premises is taken by eminent domain and Lessee is not entitled to or does not terminate this lease shall be applied in the manner specified in Section 9.02 or Section 9.03 toward the replacement of those Improvements with equivalent new Improvements on the remaining portions of the Premises.

(c) All compensation or damages awarded or payable because of any Improvements constructed or located on the portion of the Premises taken by eminent domain when this lease is terminated because of the taking by eminent domain, whether all or only a portion of the Premises is taken by eminent domain, shall be allocated between Lessee and Lessor as follows:

(1) That percentage of the compensation or damages awarded or payable because of the Improvements that equals the percentage of the full term of this lease that has, at the time of the taking, not expired shall belong to and be the sole property of Lessee.

(2) That percentage of the compensation or damages awarded or payable because of the Improvements that equals the percentage of the full term of this lease that has, at the time of the taking, expired shall belong to and be the sole property of Lessor.

21

(3) The term "time of taking" as used in this subparagraph shall mean 12:01 A.M. of whichever of the following shall first occur: the date that title, or the date that physical possession of the portion of the Premises on which the Improvements are located, is taken by the agency or entity exercising the eminent domain power.

(d) Any severance damages awarded or payable because only a portion of the Premises is taken by eminent domain shall be:

(1) The sole and separate property of Lessee during the first 10 years of the term of this lease;

(2) Equally divided, except to the extent needed to replace any Improvements taken by eminent domain with equivalent Improvements on the remaining portion of the Premises when Lessee cannot or does not terminate this lease, between Lessor and Lessee during the first to tenth years of the term of this lease; and

(3) The sole and separate property of Lessor during the last ten (10) years of the term of this lease.

Section 9.06. **Rent Abatement for Partial Taking.** If title and possession of only a portion of the Premises is taken under the power of eminent domain by any public or quasi-public agency or entity during the term of this lease and Lessee does not or cannot under Section 9.02 or Section 9.03 terminate this lease, then this lease shall terminate as to the portion of the Premises taken under eminent domain as of 12:01 A.M. on whichever of the following first occurs: the date title is taken, or the date actual physical possession of the portion taken by eminent domain is taken, by the agency or entity exercising the eminent domain power. Furthermore, the rent payable under this lease shall, as of that time, be reduced in the same proportion that the value of the portion of the Premises taken by eminent domain bears to the full value of the Premises at that time; provided, however, that Lessee shall, subject to the provisions of Sections 9.02 and 9.03 of this lease, replace any Improvements or facilities with equivalent new facilities on the remaining portion of the Premises and do all other acts at Lessee's own cost and expense required by the eminent domain taking to make the remaining portion of the Premises fit for the uses specified in this lease.

Section 9.07. **Voluntary Conveyance in Lieu of Eminent Domain.** A voluntary conveyance by Lessor of title to all or a portion of the Premises to a public or quasi-public agency or entity in lieu of and under threat by that agency or entity to take it by eminent domain proceedings shall be considered a taking of title to all or any portion of the Premises under the power of eminent domain subject to the provisions of this Article.

# ARTICLE 10
## ASSIGNMENT AND SUBLEASING

Section 10.01. **No Assignment Without Lessor's Consent.** Lessee may assign this lease or any interest in this lease, subject to the prior written consent of Lessor. Lessor shall not unreasonably withhold or delay its consent, and shall grant consent if the proposed

22

assignee is financially qualified and has sufficient experience in the operation and management of commercial Medical Centers to perform all the agreements, undertakings, and covenants of this lease and all other agreements entered into by Lessee which relate to the management, operation, maintenance, construction, and restoration of the Improvements and the Premises. To assist Lessor in determining whether or not the proposed assignee is so qualified, Lessee shall furnish to Lessor at no expense to Lessor, before that assignment, detailed and complete financial statements of the proposed assignee, audited by a certified public accountant reasonably satisfactory to Lessor (if the proposed transferee causes its statements to be so audited in its normal course of business), together with detailed and complete information about the business of the proposed assignee, including its experience in operating commercial Medical Centers, the use to be made of the Premises and Improvements by the proposed assignee, projections by the proposed assignee of the sources of funds to be used to repay any indebtedness of Lessee that the proposed assignee will assume or take subject to, or agree to pay to Lessee, and other claims on and requirements for those funds, together with any other information as Lessor may reasonably require to assist Lessor in determining whether or not the proposed assignee is so qualified. Lessor shall have forty-five (45) days after receipt of the information described above to notify Lessee of whether it consents or does not consent to the proposed assignment. Absent any such notification by Lessor during the forty-five (45) day period, Lessor shall be conclusively deemed to have consented to the assignment. A consent by Lessor to one assignment shall not be deemed to be a consent to any subsequent assignment. Any assignment made contrary to the terms of this Section shall be null and void unless otherwise permitted by this Article.

Section 10.02. **Leasehold Encumbrances and Subsequent Transfers.** Notwithstanding the provisions of Section 10.01 of this lease, Lessee may without the prior written consent of Lessor transfer and assign all Lessee's interest under this lease and Lessee's leasehold estate created under this lease to a Lender under a Leasehold Encumbrance (as defined in Section 6.01 of this lease). Any transfer, conveyance, or assignment resulting from a foreclosure or acceptance of a deed in lieu of foreclosure by any Lender (as defined in Section 6.01 of this lease), or any transfer, conveyance, or assignment by any Lender following its acquisition of this lease and the leasehold estate of Lessee created by this lease as a result of foreclosure or acceptance of a deed in lieu of foreclosure shall not require the prior consent of Lessor.

Section 10.03. **Lessee's Right to Sublease.** Lessee shall have the right to sublease all or any portion of the Premises from time to time, and at all times during the term of this lease, without Lessor's consent; provided, however, that the following conditions are met:

(a) The term of any sublease shall not extend beyond the term of this lease;

(b) Any and all subleases shall be expressly made subject to all of the terms, covenants, and conditions of this lease; and

(c) Any subtenant shall be required to attorn to Lessor in the event of Lessee's default under this lease.

23

Section 10.04. **Transfers to or by Corporation.** Notwithstanding Section 10.01 of this lease, Lessee may, without the prior consent of Lessor, transfer and assign all of Lessee's interest under the lease and the leasehold estate created under this lease to a corporation now or hereafter organized in which Lessee owns at least eighty percent (80%) of all outstanding shares of stock. If Lessee is a corporation, or if Lessee's interest in this lease is assigned to a corporation under the sentence above, any transfer or assignment of any stock or interest in the corporation totaling in the aggregate more than twenty-five percent (25%) of all such stock or interest in the corporation shall be considered an assignment of this lease requiring the prior written consent of Lessor and subject to the standards set forth in Section 10.01; provided, however, that any transfer of shares to a shareholder's spouse, children, or grandchildren caused by the shareholder's death shall be excepted from this requirement.

## ARTICLE 11
## DEFAULT AND REMEDIES

Section 11.01. **Continuation of Lease in Effect** Should Lessee breach this lease and abandon the Premises before the natural expiration of the lease's term, Lessor may continue this lease in effect by not terminating Lessee's right to possession of the Premises, in which event Lessor shall be entitled to enforce all Lessor's rights and remedies under this lease, including the right to recover the rent specified in this lease as it becomes due under this lease.

Section 11.02. **Termination and Unlawful Detainer.** In the event of a tenant default under this lease, Lessor may terminate this lease by written notice to Lessee and may also do the following:

(a) Bring an action to recover the following from Lessee:

(1) The worth at the time of award of the unpaid rent that had been earned at the time of termination of the lease;

(2) The worth at the time of award of the amount by which the unpaid rent that would have been earned after termination of the lease until the time of award exceeds the amount of rental loss that Lessee proves could have been reasonably avoided;

(3) The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of rental loss that Lessee proves could be reasonably avoided; and

(4) Any other amount necessary to compensate Lessor for all detriment proximately caused by Lessee's failure to perform Lessee's obligations under this lease; and

(b) Bring an action, in addition to or in lieu of the action described in subparagraph (a) of this Section, to reenter and regain possession of the Premises in the manner provided by the laws of unlawful detainer of the State of California then in effect.

24

Section 11.03. **Breach and Default by Lessee.** All covenants and agreements contained in this lease are declared to be conditions to this lease and to the term hereby leased to Lessee. Should Lessee fail to perform any covenant, condition, or agreement contained in this lease and the default is not be cured within thirty (30) days after written notice of the default is served on Lessee by Lessor, then Lessee shall be in default under this lease. In addition to Lessee's failure to perform any covenant, condition, or agreement contained in this lease within the cure period permitted by this Section, the following shall constitute a default by Lessee under this lease:

(a) The failure of Lessee to begin construction of the Medical Center within twelve months of the Effective Date;

(b) The failure of Lessee to complete the construction of the Medical Center within three (3) years of the commencement of construction of the Medical Center;

(c) The cancellation of the Bond required under Section 5.02 prior to completion of construction of the Medical Center;

(d) The appointment of a receiver to take possession of the Premises or Improvements, or of Lessee's interest in, to, and under this lease, the leasehold estate or of Lessee's operations on the Premises for any reason, including, without limitation, assignment for benefit of creditors or voluntary or involuntary bankruptcy proceedings, when not released within sixty (60) days;

(e) An assignment by Lessee for the benefit of creditors; or the voluntary filing by Lessee or the involuntary filing against Lessee of a petition, other court action, or suit under any law for the purpose of (1) adjudicating Lessee a bankrupt, (2) extending time for payment, (3) satisfaction of Lessee's liabilities, or (4) reorganization, dissolution, or arrangement on account of, or to prevent, bankruptcy or insolvency; provided, however, that in the case of an involuntary proceeding, if all consequent orders, adjudications, custodies, and supervisions are dismissed, vacated, or otherwise permanently stayed or terminated within ninety (90) days after the filing or other initial event, then Lessee shall not be in default under this Section; and

(f) The subjection of any right or interest of Lessee to or under this lease to attachment, execution, or other levy, or to seizure under legal process when the claim against Lessee is not released within ninety (90) days.

Section 11.04. **Cumulative Remedies.** The remedies given to Lessor in this Article shall not be exclusive but shall be cumulative with and in addition to all remedies now or hereafter allowed by law and elsewhere provided in this lease.

Section 11.05. **Waiver of Breach.** The waiver by Lessor of any breach by Lessee of any of the provisions of this lease shall not constitute a continuing waiver or a waiver of any subsequent breach by Lessee of either the same or a different provision of this lease.

25

**Section 11.06. Surrender of Premises.** On expiration or earlier termination of this lease, Lessee shall surrender the Premises and all Improvements in or on the Premises to Lessor in as good, safe, and clean condition as practicable, reasonable wear and tear excepted.

## ARTICLE 12
## OTHER PROVISIONS

**Section 12.01. Force Majeure.** Except as otherwise expressly provided in this lease, if the performance of any act required by this lease to be performed by either Lessor or Lessee is prevented or delayed by reason of any act of God, strike, lockout, labor trouble, inability to secure materials, restrictive governmental laws or regulations, or any other cause (except financial inability) not the fault of the party required to perform the act, the time for performance of the act will be extended for a period equivalent to the period of delay and performance of the act during the period of delay will be excused. However, nothing contained in this section shall excuse the prompt payment of rent by Lessee as required by this lease or the performance of any act rendered difficult or impossible solely because of the financial condition of the party required to perform the act.

**Section 12.02. Estoppel Certificate.**

(a) Lessee shall at any time upon not less than fifteen (15) days' prior written notice from Lessor execute, acknowledge and deliver to Lessor a statement in writing (i) certifying, if true, that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying, if true, that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging, if true, that there are not, to Lessee's knowledge, any uncured defaults on the part of Lessor hereunder, or specifying such defaults if any are claimed and (iii) certifying or acknowledging such other matters as are requested by any prospective lender or buyer which are reasonably related to the loan or sale transaction. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.

(b) Lessee's failure to deliver such statement within such time shall be conclusive upon Lessee (i) that this Lease is in full force and effect, without modification except as may be represented by Lessor, (ii) that there are no uncured defaults in Lessor's performance, and (iii) that not more than one month's rent has been paid in advance.

**Section 12.03. Additional Rent.** Any monetary obligations of Lessee to Lessor under the terms of this Lease shall be deemed to be Additional Rent and Lessor shall have all the rights and remedies for the nonpayment of same as it would have for nonpayment of Base Rent, except that the one year requirement of Code of Civil Procedure Section 1161(2) shall apply only to scheduled installments of Base Rent and not to any Additional Rent. All references to "rent" (except specific references to either Base Rent or Additional Rent) shall mean Base Rent and Additional Rent.

**Section 12.04. Attorneys' Fees.** Should any litigation be commenced between the parties to this lease concerning the Premises, this lease, or the rights and duties of either in relation thereto, the party prevailing in that litigation shall be entitled, in addition to any other relief

26

that may be granted in the litigation, to a reasonable sum as and for that party's attorneys' fees in that litigation that shall be determined by the court in that litigation or in a separate action brought for that purpose.

Section 12.05. **Notices to Lessor.** Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to Lessor by Lessee or any Lender described in Article 6 of this lease shall be in writing and shall be deemed duly served and given when personally delivered to Lessor, to any managing employee of Lessor, or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, and sent by express mail that allows for tracking, addressed to Lessor at 120 W. Beverly Blvd., Montebello, California 90640. Lessor may change Lessor's address for the purpose of this section by giving written notice of that change to Lessee in the manner provided in Section 12.04; Lessee shall then transmit a copy of that notice to any Lender described in Article 6 of this lease.

Section 12.06. **Notices to Lessee.** Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to Lessee by Lessor shall be in writing and shall be deemed duly served and given when personally delivered to Lessee, any managing employee of Lessee, or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, and sent by express mail that allows for tracking, addressed to Lessee at 120 West Beverly Blvd. Montebello, CA 90640. Lessee may change its address for the purpose of this section by giving written notice of that change to Lessor in the manner provided in Section 12.03 of this lease.

Section 12.07. **Covenants and Conditions.** Each provision of this Lease to be observed or performed by Lessee shall be deemed both a covenant and a condition.

Section 12.08. **Entry and inspection.** Lessee shall permit Lessor or Lessor's agents to enter the premises at reasonable times and upon reasonable notice for the purpose of inspecting the premises, and shall permit Lessor, at any time within sixty (60) days prior to the expiration of this Lease, to place upon the premises any usual "To Let," "For Lease or "For Sale" signs, and permit persons desiring to purchase or lease the Premises to inspect the Premises at reasonable times.

Section 12.09 **Governing Law.** This lease, and all matters relating to this Lease, shall be governed by the laws of the State of California in force at the time any need for interpretation of this Lease or any decision or holding concerning this Lease arises. Any legal or equitable action or proceeding brought with respect to the Lease or the Premises shall be brought in Los Angeles County, California and the Parties submit to the jurisdiction of the state and federal courts located in Los Angeles County, California.

Section 12.10. **Binding on Heirs and Successors.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of Section 8.02 (lessor liability), this Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto, but nothing in this

27

section shall be construed as a consent by Lessor to any assignment of this Lease or any interest in the Lease by Lessee except as provided in Article 10 of this lease.

Section 12.11. **Partial Invalidity.** If any provision of this lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions of this lease shall remain in full force and effect unimpaired by the holding.

Section 12.12. **Sole and Only Agreement.** This instrument constitutes the sole and only agreement between Lessor and Lessee respecting the Premises, the leasing of the Premises to Lessee, the construction of the Medical Center described in this lease on the Premises, and the lease terms set forth in this lease, and correctly sets forth the obligations of Lessor and Lessee to each other as of its date. Any agreements or representations respecting the Premises, their leasing to Lessee by Lessor, or any other matter discussed in this lease not expressly set forth in this instrument are null and void.

Section 12.09. **Time of Essence.** Time is expressly declared to be of the essence of this lease.

Section 12.10 **Section Headings.** Section headings are for the convenience of the parties only and shall not be considered in construing or interpreting this Agreement.

Section 12.1. **Memorandum of Lease for Recording.** Neither Lessor nor Lessee shall record this lease without the written consent of the other. However, Lessor and Lessee shall, at the request of either at any time during the term of this lease, execute a memorandum or "short form" of this lease for purposes of, and in a form suitable for, recordation. The memorandum or "short form" of this lease shall describe the parties, set forth a description of the leased premises, specify the term of this Lease, incorporate this Lease by reference, and include any other provisions required by Lender(s).

IN WITNESS WHEREOF, the parties hereto by their respective duly authorized officers have executed this Lease on the date noted above to be effective as set forth above:

LANDLORD

John P. Thropay

TENANT
Los Angeles County Proton Therapy, LLC

By: Charles Liu, Manager

28

Exhibit A
Legal Description

To be Provided

29

Exhibit B
Preliminary Title Report

To be Provided

30

Exhibit C
Hazardous Materials Disclosure

To be Provided

31

EXHIBIT "2"

## AMENDMENT TO
## GROUND LEASE

This Amendment to Ground Lease ("Amendment") is entered into as of March 31, 2015, by and between John P. Thropay, M. D., a resident of California ("Lessor") and Los Angeles County Proton Therapy, LLC, a California limited liability company ("Lessee"). The parties to this Amendment are referred to sometimes individually as a "Party" and collectively as the "Parties."

### RECITALS

The Parties entered into a Ground Lease dated September 17, 2013 ("Lease"), and now wish to amend such Lease as hereinafter set forth.

IN CONSIDERATION of the foregoing recitals and the mutual promises, representations, warranties, agreements and covenants set forth herein and intending to be legally bound hereby, the Parties agree to amend the Lease as follows:

Section 1. **Defined Terms.** Unless otherwise indicated in this Amendment, all capitalized terms used in this Amendment shall have the meaning given to them in the Lease. Except as specifically amended by this Amendment, the terms and conditions of the Lease shall continue in effect as provided in the Lease.

Section 2. **Lease Term.** Section 1.04 of the Lease is amended to provide that the term of the Lease shall commence as of April 1, 2015 (the "Effective Date") and shall end 30 years from the Date of Commencement of Construction as defined in Section 5 below ("Term").

Section 3. **Base Rent.** Section 2.01 of the Lease is amended to provide that the initial annual Base Rent shall be $474,000.00, payable in monthly payments installments of $39,500.00 to be made on the first (1st) day of each calendar month during the Term of the Lease commencing as of April 1, 2015, until increased as set forth in Section 4 below.

Section 4. **Increase Upon Commencement of Construction.** Lessee agrees that upon "Commencement of Construction" as defined in Section 5 of this Amendment, the annual Base Rent shall be increased from $474,000.00 to $1,000,000.00 ("Permanent Base Rent"). The Permanent Base Rent shall commence as of the first day of the calendar month prior to the Commencement Date of Construction ("Permanent Base Rent Effective Date") and shall be paid in equal monthly installments of $83,333.34, subject to upward adjustment as provided in the Lease.

Section 5. **Construction of Medical Center.** The date on which Lessee breaks ground for construction of the Medical Center shall be deemed the "Date of Commencement of Construction." Lessor agrees that Lessor will secure a permit from the City of Montebello to demolish the building located on the Premises within 45 days of the date of execution of this Amendment. Demolition will commence only when the Lessor is able to secure permission of its lender, ProAmerica Bank ("Bank"), to demolish the

1

building on the Property, or the Bank's mortgage on the Property shall be paid in full. If Lessee is unable to secure the Bank's permission to demolish the Building, then the Lease will continue in effect until such time as the Lessor is able to secure financing to pay-off the ProAmerica Bank Mortgage, or Lessee may prepay such amount of the Permanent Base Rent as is required in order to obtain the Bank's consent to demolish the Building.

Section 6. Permitted Use. Lessee shall permit continued use of certain portions of the 111 Building by Beverly Oncology & Imaging Centers, Medical Group, Inc. ("Beverly Oncology"), without rent or compensation, such use by Beverly Oncology to continue until such time as Lessee is ready to commence with demolition of the 111 Building. Lessee shall give Beverly Oncology at least forty-five (45) days prior notice of the date scheduled for demolition of the 111 Building and Lessor shall ensure that Beverly Oncology vacates the 111 Building by such date. Thereafter, Lessee shall use the Premises solely for the purpose of demolishing the 111 Building and then constructing, maintaining, and leasing for profit a first-class proton therapy medical facility and commercial office building. Lessee shall not change the use of the Premises without first obtaining the written consent of Lessor. Lessee shall not use, suffer or permit the use of the Premises in any manner that will tend to create or constitute waste, nuisance or unlawful acts.

Section 7. Security Deposit. The Security Deposit of $1,500,000.00 required by Section 2.05 of the Lease will be due on the Date of Commencement of Construction. The $375,000.00 that Lessee has previously advanced to Lessor shall be credited to the Security Deposit.

IN WITNESS WHEREOF, the parties hereto by their respective duly authorized officers have executed this Lease on the date noted above to be effective as set forth above:

LESSOR

John P. Thropay, M.D.

LESSEE
Los Angeles County Proton Therapy, LLC

By: Charles Liu, Manager

2

E X H I B I T  "3"

## THREE DAY NOTICE TO QUIT

TO:    Beverly Proton Center, LLC
        Attn:  Charles Liu, Manager

RE:    Ground Lease dated September 14, 2011, by and between John P.
        Thropay, M.D., as Lessor, and Los Angeles County Proton Therapy LLC, now
        known as Beverly Proton Center, LLC, as Lessee, as amended by the
        Amendment to Ground Lease dated March 31, 2015, for the premises
        commonly known as 111 W. Beverly Boulevard, Montebello, California

      You are hereby notified that within three (3) days after service of this notice to
you in your capacity as Manager of Lessee Beverly Proton Center, LLC ("Lessee"), Lessee
is required to quit the premises described in this notice by its commonly known street
address as 111 W. Beverly Boulevard, Montebello, California (the "Premises") and
deliver possession of the Premises to the undersigned attorney for John P. Thropay,
M.D., as Lessor under that certain Ground Lease, as amended by the Amendment to
Ground Lease dated March 31, 2015 (the "Ground Lease, as amended"), who is
authorized to receive possession of the Premises, or the undersigned will institute legal
proceedings for unlawful detainer against Lessee to recover possession of the Premises.

      You are further notified that by this notice Lessee is required to quit and deliver
possession to the Premises to the undersigned within the stated three (3) days, and that
Lessor elected and declared a forfeiture of the Ground Lease, as amended, for the
reason that Lessee failed to begin construction of that certain medical facility and
commercial office building on the Premises within twelve (12) months of the "Effective
Date" of the Ground Lease, as amended, thereby constituting an incurable default per
Section 11.03(a) of the Ground Lease, as amended, as you were notified by letter
addressed to you dated April 22, 2016.

Dated:  May 3, 2016

                         Rick D. Navarrette, Esq.
                         AlvaradoSmith, APC
                         633 W. Fifth Street, Suite 1100
                         Los Angeles, California 90071
                         Attorney for Lessor
                         John P. Thropay, M.D.

4401187.1 -- LJJR734.1

EXHIBIT "4"

**POS-040**

| ATTORNEY OR PARTY WITHOUT ATTORNEY:   STATE BAR NO: 122653 | FOR COURT USE ONLY |
|---|---|
| NAME: Rick D. Navarrette, Esq. | |
| FIRM NAME: AlvaradoSmith, APC | |
| STREET ADDRESS: 633 West Fifth Street, Suite 1100 | |
| CITY: Los Angeles   STATE: CA   ZIP CODE: 90071 | |
| TELEPHONE NO.: (213) 229-2400   FAX NO.: (213) 229-2499 | |
| E-MAIL ADDRESS: rnavarrette@alvaradosmith.com | |
| ATTORNEY FOR (name): Plaintiff, John P. Thropay, M.D. | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | |
|---|---|
| STREET ADDRESS: 12720 Norwalk Boulevard | |
| MAILING ADDRESS: 12720 Norwalk Boulevard | |
| CITY AND ZIP CODE: Norwalk, California 90650 | |
| BRANCH NAME: Southeast District | |

| Plaintiff/Petitioner: JOHN P. THROPAY, M.D., | CASE NUMBER: |
|---|---|
| Defendant/Respondent: BEVERLY PROTON CENTER, LLC, formerly | |

|  | JUDICIAL OFFICER: |
|---|---|
| **PROOF OF SERVICE—CIVIL** | |
| Check method of service (only one): | DEPARTMENT: |
| [ ] By Personal Service   [X] By Mail   [X] By Overnight Delivery | |
| [ ] By Messenger Service   [ ] By Fax | |

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action.**

2. My residence or business address is: 633 W. Fifth Street, Suite 1100, Los Angeles, CA 90071

3. [ ]  The fax number from which I served the documents is (complete if service was by fax):

4. On (date):May 9, 2016        I served the following **documents** (specify):  THREE DAY NOTICE TO QUIT

   [ ]  The documents are listed in the Attachment to Proof of Service–Civil (Documents Served) (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a.  Name of person served: Charles Liu
   b.  [X] (Complete if service was by personal service, mail, overnight delivery, or messenger service.)
       Business or residential address where person was served: Beverly Proton Center, LLC
       120 West Beverly Boulevard, Montebello, California 90640
   c.  [ ]  (Complete if service was by fax.)
       (1)  Fax number where person was served:

       (2)  Time of service:
       [ ]  The names, addresses, and other applicable information about persons served is on the Attachment to Proof of Service—Civil (Persons Served) (form POS-040(P)).

6. The documents were served by the following means (specify):
   a.  [ ]  **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

Page 1 of 3

| Form Approved for Optional Use | **PROOF OF SERVICE—CIVIL** | Legal | Code of Civil Procedure, §§ 1011, 1013, 1013a, |
|---|---|---|---|
| Judicial Council of California | **(Proof of Service)** | Solutions | 2015.5; Cal. Rules of Court, rule 2.306 |
| POS-040 [Rev. January 1, 2016] | | Plus | www.courts.ca.gov |

**POS-040**

| CASE NAME: Thropay v. Beverly Proton | CASE NUMBER: |
|---|---|

6. b. [X] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one):*

    (1) [ ]  deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2) [X]  placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Los Angeles, California 90071

  c. [ ]  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d. [ ]  **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e. [ ]  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 16, 2016

JODIE ALAMILLO
    (TYPE OR PRINT NAME OF DECLARANT)                   (SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ]  **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

    (NAME OF DECLARANT)                   (SIGNATURE OF DECLARANT)

POS-040

# INFORMATION SHEET FOR PROOF OF SERVICE—CIVIL

*(This information sheet is not part of the official proof of service form and does not need to be copied, served, or filed.)*

## USE OF THIS FORM

This form is designed to be used to show proof of service of documents by (1) personal service, (2) mail, (3) overnight delivery, (4) messenger service, or (5) fax.

This proof of service form should **not** be used to show proof of service of a summons and complaint. For that purpose, use *Proof of Service of Summons* (form POS-010).

Also, this proof of service form should **not** be used to show proof of electronic service. For that purpose, use *Proof of Electronic Service* (form POS-050).

Certain documents must be personally served. For example, an order to show cause and temporary restraining order generally must be served by personal delivery. You must determine whether a document must be personally delivered or can be served by mail or another method.

## GENERAL INSTRUCTIONS

A person must be over 18 years of age to serve the documents. The person who served the documents must complete the Proof of Service. **A party to the action cannot serve the documents.**

The Proof of Service should be typed or printed. If you have Internet access, a fillable version of this proof of service form is available at *www.courts.ca.gov/forms.htm.*

*Complete the top section of the proof of service form as follows:*

<u>First box, left side:</u> In this box print the name, address, and telephone number of the person for whom you served the documents.

<u>Second box, left side:</u> Print the name of the county in which the legal action is filed and the court's address in this box. The address for the court should be the same as the address on the documents that you served.

<u>Third box, left side:</u> Print the names of the plaintiff/petitioner and defendant/respondent in this box. Use the same names as are on the documents that you served.

<u>Fourth box, left side:</u> Check the method of service that was used. You should check only one method of service and should show proof of only one method on the form. If you served a party by several methods, use a separate form to show each method of service.

<u>First box, top of form, right side:</u> Leave this box blank for the court's use.

<u>Second box, right side:</u> Print the case number in this box. The case number should be the same as the case number on the documents that you served.

<u>Third box, right side:</u> State the judge and department assigned to the case, if known.

*Complete items 1–6:*

1. You are stating that you are over the age of 18.
2. Print your home or business address.
3. If service was by fax service, print the fax number from which service was made.
4. List each document that you served. If you need more space, check the box in item 4, complete the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)), and attach it to form POS-040.
5. Provide the names, addresses, and other applicable information about the persons served. If more than one person was served, check the box on item 5, complete the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)), and attach it to form POS-040.
6. Check the box before the method of service that was used, and provide any additional information that is required. The law may require that documents be served in a particular manner (such as by personal delivery) for certain purposes. Service by fax generally requires the prior agreement of the parties.

**You must sign and date the proof of service form. By signing, you are stating under penalty of perjury that the information that you have provided on form POS-040 is true and correct.**

---

POS-040 [Rev. January 1, 2016]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Page 3 of 3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **DECLARATION OF DR. JOHN P. THROPAY IN SUPPORT OF *EX PARTE* APPLICATION TO OBTAIN RELIEF FROM LITIGATION STAY IN MONITOR ORDER AND PRELIMINARY INJUNCTION ORDER APPOINTING RECEIVER** was electronically served via email to the parties listed on the service list below, and to the parties authorized to receive via this Court's CM/ECF system on this 27th day of April, 2017.

By: _____

JODIE ALAMILLO

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1

**CERTIFICATE OF SERVICE**

4511855.1 -- LJJR734.1

# SERVICE LIST

## SEC v. LIU, ET AL

| | |
|---|---|
| **Jacob A Regenstreif**<br>**John W Berry**<br>**Gary Y Leung**<br>US Securities and Exchange Commission<br>444 South Flower Street<br>Suite 900<br>Los Angeles, CA 90071<br>323-965-3985<br>Fax: 213-443-1904<br>Email: regenstreifj@sec.gov<br>Email: berryj@sec.gov<br>Email: LeungG@sec.gov | **Chris W Hailing**<br>Hailing Meza LLP<br>23586 Calabasas Road<br>Suite 200<br>Calabasas, CA 91302<br>818-222-4994<br>Fax: 818-222-4995<br>Email: challing@hallingmeza.com |
| **Hannah M Lynch**<br>Sills Cummis and Gross PC<br>One Riverfront Plaza<br>Newark, NJ 07102<br>973-643-7000<br>Fax: 973-643-6500<br>Email: hlynch@sillscummis.com | **Herve Gouraige**<br>Sills Cummis and Gross PC<br>One Riverfront Plaza<br>Newark, NJ 07102<br>973-634-5989<br>Fax: 973-643-6500<br>Email: hgouraige@sillscummis.com |
| **Lawrence B. Steinberg**<br>Buchalter, A Professional Corporation<br>1000 Wilshire Blvd Suite 1500<br>Los Angeles, CA 90017-2457<br>213-891-0700<br>Fax: 213-896-0400<br>Email: lsteinberg@buchalter.com | **William R Stuart , III**<br>Sills Cummis and Gross PC<br>One Riverfront Plaza<br>Newark, NJ 07102-5400<br>973-643-7000<br>Fax: 973-643-5000<br>Email: wstuart@sillscummis.com |
| **Milena Dolukhanyan**<br>Gartenberg Gelfand Hayton LLP<br>15260 Ventura Boulevard<br>Suite 1920<br>Sherman Oaks, CA 91403<br>213-542-2111<br>Fax: 213-542-2101<br>Email: mdolukhanyan@gghslaw.com | **Michael Grassmueck**<br>PO Box 230091<br>Portland, OR 97281<br>503-294-9928<br>Email:<br>mgrassmueck@grassmueckgroup.corn |

2

**CERTIFICATE OF SERVICE**

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

**Michael R Farrells**
**David R Zaro**
**Peter Allen Griffin**
Allen Matkins Leck Gamble Mallory
and Natsis LLP
865 South Figueroa Street
Suite 2800 Los Angeles, CA 90017
213-622-5555
Fax: 213-620-8815
Email: mfarrell@allenrnatkins.com
Email: dzaro@allenmatkins.com
Email: pgriffin@allenmatkins.com

3
**CERTIFICATE OF SERVICE**

# Exhibit 30

CON01-2, VID: 3

# SYSTEM PURCHASE AGREEMENT
## MEVION S250 PROTON BEAM RADIATION THERAPY SYSTEM

This SYSTEM PURCHASE AGREEMENT (this "Agreement") is entered into and effective as of November 9,2015 (the "Effective Date") by and between Mevion Medical Systems, Inc. ("Mevion"), a Delaware corporation having a principal place of business at 300 Foster Street # 3, Littleton, Massachusetts 01460, and Los Angeles County Proton Center, AKA. Beverly Proton Center, LLC ("Customer"), a Limited Liability Corp. having a principal place of business at 200 East Beverly Blvd #200, Montebello, CA  90640.  Each of Customer and Mevion are sometimes referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, Customer desires to purchase a MEVION S250 Proton Therapy System™ (a "MEVION S250 System"); and

WHEREAS, Mevion is willing to supply a MEVION S250 System to a facility prepared for use by Customer in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the recitals and the mutual covenants, representations, warranties, conditions and agreements hereinafter expressed, the Parties agree as follows:

**1.** **Definitions.**

For the purpose of this Agreement, the following words and phrases shall have the meanings set forth below:

1.1 "Accelerator Module" means the set of components of the System that includes a cyclotron (the "Cyclotron") and that is shipped preassembled and is installed at the Site between the two arms of the Gantry.

1.2 "Authorized Representative" means a corporate officer or senior vice president of Mevion.  For the avoidance of doubt, Warranty Service Technicians and other employees of Mevion that are not corporate officers or senior vice presidents are not Authorized Representatives.

1.3 "Business Day" means a day other than Saturday, Sunday, or any day on which the Federal Reserve Bank in New York, New York is closed.

1.4 "Business Hours" mean the hours between 8:00 am and 8:00 pm (EST) on any Business Day.

1.5 "Clinical Acceptance" means the date on which Customer Clinically Commissions the System, provided that if Customer has not Clinically Commissioned the System within ninety (90) days following Customer Acceptance, solely for the purposes of Section 3.4, Clinical Acceptance will be deemed to have occurred, and the applicable Milestone Payment obligations shall be triggered, on the ninety-first (91) day following Customer Acceptance.

1.6 "Clinically Commission" means the completion of the process whereby Customer commissions the System for clinical use, including acquiring necessary machine-specific beam data and verification of dose delivered.

1.7 "Construction Guide" means the document provided by Mevion that includes specifications for the Facility which the Customer will follow to construct the Facility and prepare the Site for the on-site construction and installation of the System.

1.8 "Customer Acceptance" occurs when Mevion provides Customer with documented evidence confirming the testing and compliance of the System to the Specifications and the Customer acknowledges that the System is in compliance with such Specifications by executing and returning the Acceptance Confirmation in the form attached hereto as Exhibit 5 within ten (10) days of receipt of such documented evidence from Mevion.  Failure of Customer to notify Mevion in writing prior to the expiration of such 10 day period of any reasonable belief that the System does not conform to the Specifications shall also be deemed an acknowledgement by the Customer that the System is in compliance with such Specifications. Mevion reserves the right from time to time to modify the Acceptance Confirmation documentation in Exhibit 5 upon written

1

SEC-DEFC-EPROD-000016890-1

CON01-2, VID: 3

notice to Customer.

1.9    "Dollars" or "$" means United States dollars.

1.10    "Excluded Issue" means any defect, failure or other error the System which would be a System Issue but is caused by (i) unreasonable use, misuse, abuse, neglect or lack of routine care or maintenance of the System, including without limitation, failure to follow the procedures described in the System Documentation; (ii) failure to use or take any proper precautions as indicated in the System Documentation; (iii) relocation, alteration or modification of the System if such alteration or modification is not previously approved in writing by an Authorized Representative; (iv) service, repairs, installation, maintenance or relocation of the System performed by anyone other than by a Warranty Service Technician unless approved in writing by an Authorized Representative; (v) anything external to the System, including without limitation (a) building structural deficiency or (b) power supply, heating, cooling, ventilation, or air conditioning fluctuation or failure; (vi) vandalism, lightning, earthquake, fire, smoke or water damage to the System; or (vii) use of the System in combination with any product or software not specifically approved in writing by an Authorized Representative.

1.11    "Facility" means the proton therapy facility of the Customer where the System will be located.

1.12    "Gantry" has the meaning set forth in Exhibit 1.

1.13    "Gantry Embeds" means the components of the System that are to be supplied by Mevion and cast into the structural concrete of the Site by Customer's construction contractor for the purpose of supporting the Gantry.

1.14    "Issue Resolution" means fixes, workarounds, modifications or Updates that correct a System Issue.

1.15    "Maintenance Guide" means the document attached hereto as Exhibit 3 that lists the planned maintenance services to be performed by Mevion during the Warranty Period, including the schedule for performance thereof, any and all updated or modified versions or revisions of such Maintenance Guide that may be provided by Mevion to Customer from time to time pursuant to this Agreement, provided that such updated or modified versions or revisions do not materially and adversely change or degrade the scope of such services as of the date of this Agreement.

1.16    "Milestone Events" has the meaning set forth in Section 3.4.

1.17    "Milestone Payments" has the meaning set forth in Section 3.4.

1.18    "Operating Software" means the computer software (in object code format only) provided with, and used to operate the System, including any updates, modifications or fixes to such software that Mevion may provide to Customer, as well as any related user documentation and/or manuals provided by Mevion to Customer (the "Software Documentation"). "Operating Software" will not include any third party open source software which may be used in conjunction with the operation of the System, provided that Mevion separately identifies such open source software to the Customer in advance, and makes such open software available to the Customer for license under the terms of the applicable open source license.

1.19    "Preventative Maintenance Services" means the scheduled maintenance services to be provided by Mevion hereunder during the Warranty Period as set forth in the Maintenance Guide, including without limitation periodic System inspection, review of System operation, System lubrication and filter replacement and cleaning, and remedial maintenance of a non-emergency nature.

1.20    "Regulatory Clearance" means the authorizations and approvals of the applicable regulatory authority necessary for the commercial sale, use and importation of a MEVION S250 System in the Territory.

1.21    "Service Agreement" has the meaning set forth in Section 5.8.

1.22    "Site" means the geographic location of the Facility at which the System is to be installed.

1.23    "Specifications" means the specifications for the System as set forth in Exhibit 2.

1.24    "System" means the MEVION S250 System to be installed at the Facility by Mevion and

2

CON01-2, VID: 3

includes any and all components thereof, including the components set forth on <u>Exhibit 1</u>.

    1.25   "<u>System Documentation</u>" means all copies and updates of the documentation related to the operation of the System provided by Mevion to Customer.

    1.26   "<u>System Issue</u>" means any defect, failure or other error in the System during the Warranty Period that (i) prevents the System from operating in accordance with the Specifications, or relates to a discrepancy with workflow or user interfaces, and (ii) is not an Excluded Issue.

    1.27   "<u>Term</u>" has the meaning set forth in Section 10.1.

    1.28   "<u>Territory</u>" means The United States of America, the country in which the System will be installed and used.

    1.29   "<u>Training</u>" means the training services set forth in <u>Exhibit 4</u>.

    1.30   "<u>Updates</u>" means any and all routine changes, error corrections, maintenance releases, updates, fixes and upgrades to the System software, firmware or System Documentation that are generally provided by Mevion without additional charge to Mevion's customers of Mevion 250 Systems under a current warranty. For clarity, Updates do not include features or modules that Mevion may introduce from time to time, that were not previously purchased by the Customer.

    1.31   "<u>Warranty Period</u>" has the meaning set forth in Section 5.1.

    1.32   "<u>Warranty Services</u>" has the meaning set forth in Section 5.1.

    1.33   "<u>Warranty Service Email Address</u>" means support@mevion.com or such other email address as Mevion may notify Customer of from time to time.

    1.34   "<u>Warranty Service Phone Line</u>" means 1 855-4MEVION (855-463-8466) or such other telephone number that Mevion may notify Customer of from time to time.

    1.35   "<u>Warranty Service Request</u>" means a request communicated during the Warranty Period by Customer to Mevion's designated customer support desk (the "<u>Customer Desk</u>") through the Warranty Service Phone Line or Warranty Service Email Address, to report a System Issue and to request an Issue Resolution, or to request some other Service or assistance.

    1.36   "<u>Warranty Service Technician</u>" means an employee or agent of Mevion that is a duly trained service engineer familiar with the System and its operation, support and maintenance.

## 2.   <u>Mevion General Obligations; Customer Obligations</u>

    2.1   <u>Construction</u>. In accordance with the terms and conditions set forth herein, Mevion shall (i) manufacture the System components for Customer, (ii) deliver, install and test the System components at the Site, and (iii) provide Training and Warranty Services for the System.

    2.2 <u>Non-Obsolescence</u>. Prior to final delivery of the System components, Mevion may update the specifications for the MEVION S250 System to include updated or upgraded parts, components or equipment. Mevion shall, to the extent reasonably possible and at no additional charge to Customer, include any such updated or upgraded parts, components or equipment with the System so that the System, as purchased by Customer and as delivered and installed by Mevion, is the then-current generation or model of the MEVION S250 System in all material respects. Notwithstanding the foregoing, starting 120 days prior to the completion of Milestone Event No. 2 (as described in Section 3.5 below) (the "<u>Upgrade Threshold Date</u>"), Mevion shall not be obligated to provide any updated or upgraded parts, components or equipment for the System. This "Non-Obsolescence" policy does not entitle Customer to receive any add-on products or additional Mevion products that are generally sold by Mevion as separately invoiced items from the System ("<u>Optional Technology</u>"). Mevion shall provide Customer with the opportunity to purchase generally available Optional Technology at Mevion's then-current standard rates. For clarity, Optional Technology includes beam scanning technology,

SEC-DEFC-EPROD-000016890-3

CON01-2, VID: 3

which is under development and subject to regulatory clearance prior to sale. Beam scanning technology, if made available, will be under a separate purchase agreement.

2.3 <u>Regulatory Matters</u>. The MEVION S250 System may not be available in the Territory for human use pending Regulatory Clearance. The Parties acknowledge and agree that the applicable regulatory authorities in the Territory have the sole province over the granting or denial of Regulatory Clearance for the MEVION S250 System, and in no event can Mevion guarantee that Regulatory Clearance will be achieved. Mevion or an affiliate of Mevion will seek in good faith to obtain Regulatory Clearance for the MEVION S250 System in the Territory, and Mevion or its affiliate will be registered as the sole owner, licensee, permittee, as the case may be, of any rights, title and interest to any Regulatory Clearances for the MEVION S250 System in the Territory.

## 3.   <u>Price, Milestones, and Payment</u>.

3.1   <u>Price</u>. In consideration for the delivery, assembly and installation of the System, Customer shall pay to Mevion Twenty One Million Three Hundred and Ninety Eight Thousand Dollars ($21,398,000), payable in accordance with the schedule of Milestone Payments (as defined below) set forth in Section 3.4.

3.2   <u>Other Costs.</u> Customer is solely responsible for any and all of the costs and expenses associated with (i) Customer's preparation of the Facility or Site, (ii) delivery of the System components (including associated insurance) from Mevion's facility, (iii) rigging of the System at the Facility and Site (iv) any Service Agreements described in Section 5.8, or (v) calibration or Clinical Commissioning of the System.

3.3   <u>Taxes</u>. Amounts paid or payable to Mevion hereunder do not include any taxes or other charges levied by any governmental entity, including, without limitation, any import or export duties, VAT, property, inventory, sales, use, privileges, or excise taxes (including medical device excise taxes) or other taxes, and Customer shall be solely responsible for the payment of any such taxes or charges. Customer shall pay all such taxes and charges, on or before their due dates. In the event Mevion is required at any time to pay any such tax or charge, Customer shall reimburse Mevion therefore promptly on demand. If Customer is required by the law of any country to make any deduction, or withhold from any sum payable to Mevion hereunder, then the sum payable by Customer upon which the deduction or withholding is based shall be increased to the extent necessary to ensure that, after such deduction or withholding, Mevion receives and retains, free from liability for such deduction or withholding, a net amount equal to the amount Mevion would have received and retained in the absence of such required deduction or withholding.

3.4   <u>Milestone Payments</u>. Customer shall pay to Mevion the following milestone payments ("Milestone Payments") within ten (10) days after each occurrence of the following milestone events ("Milestone Events").

| <u>Milestone Event</u> | <u>Milestone Payment</u> |
|---|---|
| 1. Execution of this Agreement | $3,000,000 |
| 2. Earlier of (i) three months from Execution of Agreement or (ii) Customer's selection of its Facility development team | $0 |
| 3. Earlier of (i) twelve months from Execution of Agreement or (ii) upon completion of Mevion's conformance review of Customer's construction documents | $0 |
| 4. Upon shipment from Mevion's facility of the Gantry Embeds | $6,500,000 |
| 5. Upon shipment from Mevion's facility of the Accelerator Module | $6,500,000 |

4

SEC-DEFC-EPROD-000016890-4

CON01-2, VID: 3

| | |
|---|---|
| 6. Customer Acceptance | $4,000,000 |
| 7. Clinical Acceptance | $1,398,000 |
| **Total** | **$21,398,000** |

Customer's obligation to pay Milestone Payments upon achievement of Milestone Events and as otherwise required by this Agreement, is absolute and is not subject to any abatement, reduction, set-off, defense, counterclaim, interruption, deferment or recoupment. Milestone Payments made by Customer hereunder shall not be refundable, creditable or subject to set-off for any reason, including termination of this Agreement by Customer in accordance with Section 10.2 below. Balances remaining unpaid following their due date are subject to an interest charge of 1.5% per month or the highest rate permitted by law, whichever is lower, until paid. Prior to Mevion's shipment of the Gantry Embeds or Accelerator Module to Customer, Mevion may require that Customer provide Mevion with documentary evidence that is reasonably satisfactory to Mevion establishing that Customer will have sufficient financial resources to perform its obligations to make Milestone Payments as they come due. The Parties acknowledge and agree that, should Mevion request such evidence from Customer, Mevion shall have the right to withhold delivery of the Gantry Embeds or Accelerator Module until such time as Customer provides and Mevion confirms the sufficiency of such evidence, such confirmation not to be unreasonably withheld. Prior to the shipment of the Accelerator Module (Milestone No. 5), Mevion shall require Customer to obtain an unconditional irrevocable letter of credit for payment of Milestone Nos. 6 and 7, issued at Customer's sole cost and by a domestic United States national banking association having at least an AA- S&P rating, naming Mevion as beneficiary and conforming to the terms of this Section 3.4 ("ILOC"). The ILOC shall permit partial draws thereon, be transferable, remain in effect until Customer has fulfilled all of its payment obligations, and contain such other terms and conditions in form and substance acceptable to Mevion. Specifically, the ILOC (i) shall be drawable by delivery to the issuing bank of a sight draft and a written statement by Mevion stating that Mevion has the right to draw upon the ILOC based upon the terms and conditions of this Agreement, (ii) will be honored by the issuing bank without inquiry as to the accuracy thereof and regardless of whether the Customer disputes the content of such statement, and (iii) shall contain a provision whereby the issuer agrees to pay the sight draft or give notice of discrepancies on the date of presentation.

3.5    <u>Delivery Schedule</u>. Mevion shall use commercially reasonable efforts to achieve the following numbered events ("<u>Delivery Events</u>") by the applicable target installation dates ("<u>Target Installation Dates</u>") as follows:

| **Delivery Event** | **Target Installation Date** |
|---|---|
| 1. Delivery of the Gantry Embeds to Customer | May 1, 2016 |
| 2. Delivery of the Accelerator Module to Customer | November 1, 2016 |
| 3. Completion of Customer Acceptance | September 1, 2017 |

Mevion shall re-evaluate the Target Installation Dates shall upon completion of each of the Milestone Events set forth in Section 3.4.

3.6    <u>Passage of Title; Risk of Loss</u>.

(a)    Mevion shall bear the risk of damage and loss for each System component until such component is delivered to the Facility, at which time the risk of damage and loss for such System component shall pass to Customer.

5

SEC-DEFC-EPROD-000016890-5

CON01-2, VID: 3

(b) Upon Mevion's receipt of Customer's payment of the fourth Milestone Payment (i.e., Customer Acceptance), title in and to System (for clarity, excluding Operating Software) shall pass to Customer (subject to Customer's payment of all remaining or outstanding payments due hereunder). Until such time as Customer takes title in and to the System, Customer shall, at its own expense, take such action as may be necessary to prevent any third party from acquiring any right to or interest in the System, including, without limitation materialmen's, mechanics', workmen's, repairmen's, employees', or other like liens or liens for taxes due. Until such time as Customer takes title in and to the System, Customer shall not assign, pledge or otherwise encumber the System or relocate the System or any part thereof.

4. **Site and System Construction.**

4.1     General. Customer shall manage and have responsibility and authority for the overall architectural, structural, and engineering design and construction of the Facility, and shall engage architects, construction managers, structural engineers, mechanical/electrical engineers, and other consultants for that purpose at its own expense. Customer shall apply for, receive, and pay the cost of all permits, licenses, and other governmental authorizations required for preparation of the Facility and pay the cost of all permits, licenses, and other governmental authorizations required to construct the System on-site. Notwithstanding anything herein to the contrary, Customer shall have the sole responsibility, liability and authority for, and shall indemnify Mevion as set forth in Section 6.1(b) for Third Party Claims related to, the design and construction of the shielding required to prevent radiation leakage, the Facility radiation monitoring systems, and the systems and procedures required to handle the disposition of irradiated materials.

4.2     System Component Delivery.

(a) Mevion shall arrange and coordinate, at Customer's cost, for delivery of the System components from Mevion's facility (or those of Mevion's suppliers) to the Facility. Mevion shall obtain, at Customer's cost, adequate freight insurance to cover in-transit damage to the System components. Customer shall be solely responsible for taking all appropriate actions to ensure that the System can be brought safely to the Site and into the Facility, in accordance with building access requirements set forth in the Construction Guide. Mevion shall coordinate, with reasonable assistance from Customer, any unloading and rigging of the System components to be performed by third parties, and Customer shall pay the costs of any such unloading and rigging. Customer shall ensure that the Facility shall be equipped with sufficient access in several locations, including its receiving dock, as set forth in the Construction Guide.

(b) Mevion shall deliver all System components in good and working condition. Claims for any System components damaged in shipping will be filed only by Mevion with the carrier and/or insurance company.

(c) Customer will ensure that the Facility is prepared and is ready for receipt and installation of the System components in advance of the Target Installation Dates. Customer shall promptly notify Mevion in writing upon becoming aware of any facts or circumstances that could result in the Customer or Facility not being prepared for the receipt and installation of any System component in accordance with the Target Installation Dates, and Mevion may elect to withhold shipping of such component until such time as the Customer and Facility are so prepared. Customer agrees to pay Mevion's (or a third party storage facility's) standard fees for the storage of any such System components, as well as any increased costs associated with transporting such System components as a result of any such delay.

(d) If through no fault of Mevion, Customer or the Facility is not ready to accept the delivery and installation of the Gantry Embeds within sixty (60) days following Target Installation Date No. 1 (i.e., May 1, 2016), then solely for the purposes of Section 3.4, Mevion will be deemed to have completed Milestone Event No. 4 and Customer shall pay to Mevion the corresponding Milestone Payment as set forth in Section 3.4. If through no fault of Mevion, Customer or the Facility is not ready to accept the delivery and installation of the Accelerator Module within sixty (60) days following Target Installation Date No. 2 (i.e. November 1, 2016), then solely for the purposes of Section 3.4, Mevion will be deemed to have completed Milestone Event No. 5 and Customer shall pay to Mevion the corresponding Milestone Payment as set

6

CON01-2, VID: 3

forth in Section 3.4. For the avoidance of doubt, the deemed occurrence of any Milestone Event as set forth in this Section 4.2(d) and payment by Customer of the applicable Milestone Payment shall not relieve Mevion of its performance obligations with respect to such Milestone Event.

4.3     On-Site Construction.

(a)   Mevion shall use commercially reasonable efforts to install the System at the Facility according to the schedule of Delivery Events set forth in Section 3.5. All work by Mevion in conjunction with on-site installation shall be in accordance with a degree of care, judgment and expertise commensurate with industry standards. All on-site installation work shall be performed by employees or contractors working for Mevion or its authorized suppliers, provided that if applicable law or the policies of any trade union or other labor organization prevent Mevion from using its own employees or contractors from performing such on-site installation work, Customer shall make all required arrangements to secure, at Customer's costs and expense, adequate and qualified personnel to perform and complete such work, and Mevion's obligations to perform on-site installation work in such circumstances shall be limited to providing technical supervision of such work and connecting the System (or the components for the System, as applicable) to existing wiring.

(b)   Subject to Customer's reasonable advanced written notice and agreement to abide by Mevion's reasonable visitor security policies, Mevion shall provide Customer with reasonable access to Mevion's Littleton, Massachusetts facility for the purposes of physical inspection of the System components at mutually agreeable times, provided that such access does not unreasonably interfere with Mevion's normal business operations.

(c)   Customer acknowledges and agrees that the dose-rate and integrated dose measured by the transmission ionization chamber and dosimetry electronics components of the System must be calibrated by a qualified radiological physicist prior to use of the System for patient treatment, and that such calibration is outside the scope of this Agreement. Customer shall be responsible, at its own expense, for, and shall indemnify Mevion as set forth in Section 6.1(b) for Third Party Claims related to (i) the initial and ongoing calibration of the System, and (ii) performance of any radiation surveys that are required by applicable law or regulation, or necessary to establish that radiation does not exceed safe levels.

5.     **Warranties; Service.**

5.1     Product Warranty. During the twelve (12) month period following Clinical Acceptance (the "Warranty Period"), Mevion shall provide Customer with Issue Resolution services, Preventative Maintenance Services, and Update services (collectively, the "Warranty Services") as set forth in this Section 5.

5.2     Warranty Service Requests.

(a)     All Warranty Service Requests shall be submitted to Mevion through the Warranty Service Phone Line or Warranty Service Email Address. Such Warranty Service Requests may be submitted by Customer 24 hours a day, 7 days a week, 365 days per year or any other method specified my Mevion.

(b)     Mevion shall respond to Warranty Service Requests in accordance with Section 5.3. Upon receipt of a Warranty Service Request regarding a System Issue from Customer, Mevion shall document such System Issue in Mevion's Customer Relationship Management system ("CRM System") and designate such System Issue as a Level 1 Issue, Level 2 Issue, Level 3 Issues or Level 4 Issue (each as defined in Section 5.5). Mevion shall generate a System Issue ticket for each Warranty Service Request, assign a unique ticket number to each System Issue reported in a Warranty Service Request, notify Customer that such ticket was generated, notify Customer when Mevion determines the System Issue has been resolved, and provide Customer with access to such System Issue ticket through the CRM System until such System Issue is marked by Mevion as resolved.

5.3     Response Levels. Mevion shall have a Warranty Service Technician available during Business Hours to respond by telephone or email to Customer within one (1) hour of Customer placing a Warranty Service Request to Mevion during Business Hours (or during the next to occur Business Hour if placed outside

7

CON01-2, VID: 3

of Business Hours) to report any Level 1 Issue or Level 2 Issue. Mevion shall have a Warranty Service Technician available (on-site or remotely) during Business Hours to begin addressing any Level 1 Issue or Level 2 Issue within one (1) hour of a Warranty Service Request placed during Business Hours (or during the next to occur Business Hour if placed outside of Business Hours) regarding such Level 1 Issue or Level 2 Issue, and to remain available thereafter until the resolution of such Level 1 Issue or Level 2 Issue. Customer acknowledges and agrees that "resolution" of a Level 1 Issue or Level 2 Issue may include implementation of a temporary fix, patch, or other temporary measure to resolve such Level 1 Issue or Level 2 Issue in an effort to allow Customer to resume operations. Mevion reserves the right to reclassify any Level 1 Issue or Level 2 Issue as a Level 3 Issue if the conditions for classifying the System Issue as a Level 1 Issue or a Level 2 Issue have been removed or mitigated. Mevion shall respond to Customer by telephone or email with respect to Level 3 Issues within one (1) Business Day of receipt of a Warranty Service Request, and Level 4 issues within two (2) Business Days of receipt of a Warranty Service Request.

5.4     Issue Resolution. For all Level 1 Issues, Level 2 Issues and Level 3 Issues reported during the Warranty Period, Customer's sole and exclusive remedy and Mevion's sole and exclusive obligation shall be for Mevion, without charge to Customer (but subject to Section 4), to use commercially reasonable efforts to remedy such System Issue, including, if necessary, repair or replacement, at Mevion's option, of any defective or deficient System component. Mevion will review all Level 4 Issues and will have the sole determination if a Level 4 Issue Resolution is necessary or feasible, and Mevion makes no guarantee that any Level 4 Issue will be resolved. Customer acknowledges and agrees that Mevion does not warrant that the System is error-free or that Customer will have uninterrupted use. Mevion shall not be obligated to remedy any System Issue which cannot be reproduced using commercially reasonable efforts.

5.5     Service Levels.

(a)     "Level 1 Issue" means a System Issue which prevents patient treatments and for which there is no immediate workaround. Examples of Level 1 Issues include, but are not limited to: (i) System will not turn on or produce a therapeutic quality proton beam, (ii) a condition exists that poses a safety threat to patients, therapists, or other personnel working in close proximity to the System, and (iii) continued use of the System may cause damage to the System or other equipment used by the System.

(b)     "Level 2 Issue" means a System Issue that prevents normal operation of the System but the Customer can still use the System for patient treatments. "Normal Operation" means that the System can be safely used to treat patients scheduled on the System according to a clinical routine established by the Customer For clarity, a Level 2 Issue is one that causes a Customer to change its established clinical routine. Examples of Level 2 Issues include, but are not limited to: (i) any temporarily resolved Level 1 Issues that prevent Normal Operation but where patient treatments can continue, (ii) any other System Issue that prevents Normal Operation, even with workarounds or other temporary solutions in place.

(c)     "Level 3 Issue" means any System Issue that causes the System to not meet the Specifications but does not prevent Normal Operation. The Customer acknowledges and agrees that some Level 1 or Level 2 Issues may be reclassified as a Level 3 Issue if (i) a workaround or other temporary solution allows the Customer to continue with Normal Operation and (ii) Mevion plans a more permanent solution to the System Issue in a future Update.

(d)     "Level 4 Issue" means a non-critical System Issue that does not materially impact the operation of the System. Examples of Level 4 Issues include documentation inaccuracies, user interface or workflow inconsistencies or discrepancies, or other non-critical System Issues.

5.6     Updates. Mevion agrees to provide Customer with Updates to the System (including any updates to System Documentation) as they are made generally available at no additional charge by Mevion. Updates provided to Customer by Mevion shall be accompanied by explanatory functional release notes if reasonably necessary. The Customer understands and agrees that Mevion shall only provide support for the currently released version of the Operating Software and the two immediately preceding minor releases.

5.7     Uptime Warranty. Mevion warrants to Customer that, during the Warranty Period, the System shall operate in accordance with the Uptime guarantee set forth on Exhibit 6 (the "Uptime Warranty", and

8

CON01-2, VID: 3

together with the Warranty Services, the "Warranties").

    5.8    <u>Service Agreement(s)</u>. Customer shall negotiate with Mevion in good faith for a service and maintenance agreement ("<u>Service Agreement</u>") to begin at the end of the Warranty Period. For three (3) months following the Effective Date, the pricing for a five-year Service Agreement shall be reduced to One Million Height Hundred Thousand Dollars ($1,800,000) per year for the initial five year term. After three (3) months from the Effective Date, the annual price of a Service Agreement will be ten percent (10%) of Mevion's then-current list price for the MEVION S250 System (inclusive of all parts and labor) as of the date the Service Agreement is executed by Mevion. The Service Agreement shall be discussed in good faith and mutually agreed upon by the Parties, and shall at a minimum be consistent with the terms and conditions set forth in the Warranties description of this Agreement, excepting only those which are expressly intended to be applicable only to the initial Warranty Period.

    5.9    <u>Replacement Parts</u>. Mevion shall use commercially reasonable efforts to provide all replacement parts for the System as soon as reasonably practicable . All such replacement parts shall be available for not less than seven (7) years following the date when Mevion ceases to sell a product containing such replacements parts.

    5.10    <u>Warranty Conditions</u>. Customer must comply with the terms and conditions of this Agreement in order to be covered by the Warranties. The Warranties shall not apply to any breaches of the Warranties arising as a result of repairs or modifications to the System performed other than by Mevion or trained personnel authorized by Mevion. The Warranties are void if the System is damaged by or malfunctions by reason of any issue that would cause a System Issue to be classified as an Excluded Issue. The Warranties do not cover the System if it has been moved after construction and installation. Customer acknowledges and agrees that all rights of the Customer for any remedy with respect to System Issues are contingent upon Customer's:

    (a)    use of the System only for its intended purpose;

    (b)    following Mevion's System Documentation for System operation;

    (c)    maintaining proper System operating conditions at the Facility as set forth in the System Documentation;

    (d)    exercising safe work practices and reasonable standards for quality control;

    (e)    notifying Mevion of any System Issue in a timely manner and accurately describing the symptoms of such System Issue;

    (f)    ensuring that only duly qualified personnel operate the System;

    (g)    not attempting to repair the System unless Customer's performance of such repair has been agreed to in writing by an Authorized Representative;

    (h)    making the System available to Mevion personnel during Business Days or other days as may be agreed to by the Parties, as required for troubleshooting, scheduled Training, Preventative Maintenance (including periodic inspections), implementation of Updates, or other purposes necessary to maintain the operational status of the System; and

    (i)    providing Mevion employees or agents with sufficient access to the Facility (including any necessary security clearance) as required to access the System to assist with Training, troubleshooting, running remote diagnostics, or other purposes as reasonably requested by Mevion.

    5.11    <u>Preventative Maintenance Services</u>. Mevion shall provide Preventative Maintenance Services at mutually agreed upon times, but no less frequently than as set forth in the Maintenance Guide. In preparation for the Preventative Maintenance Service, Warranty Service Technicians may schedule and perform periodic inspections of the System to evaluate and determine any work that will be required in addition to the Preventative Maintenance Service. Customer acknowledges and agrees that Preventative Maintenance Services by Mevion are required to optimize System performance and to help ensure proper System operation and System Uptime and Customer agrees to cooperate with Mevion as necessary to allow the Preventative Maintenance Services to be performed as and when specified in the System Documentation. All costs and

9

SEC-DEFC-EPROD-000016890-9

CON01-2, VID: 3

expenses incurred by Mevion in connection with providing Preventative Maintenance Services, including without limitation labor, travel expenses and replacement parts, shall be the responsibility of Mevion. Customer's failure to provide access to the System at the agreed upon times shall constitute Customer's waiver of the scheduled Preventative Maintenance Services if the Preventative Maintenance Services cannot be completed within the time frame set forth in the Maintenance Guide, and if any resulting System Issues result in Down Days (as defined below), such Down Days shall not be applied to the calculation of the Uptime Warranty (as defined below).

5.12    <u>Third Party Service Providers</u>.  The Parties acknowledge and agree that Mevion may provide the services described in Section 4.3 and this Section 5 using third party service providers, provided that (a) all such third parties will be qualified by Mevion in accordance with Mevion's standard procedures and policies, (b) all such third parties will be held under obligations of confidentiality consistent with those set forth herein, and (c) Mevion shall be liable for the performance of such third parties to the same extent as if Mevion had performed such services itself.

5.13    <u>Disclaimer; Limitation of Liability</u>.

(a)  THE WARRANTIES IN THIS SECTION 5 AND SECTION 7 ARE EXPRESSLY IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ALL WARRANTIES OF NON-INFRINGEMENT, TITLE, MERCHANTABILITY, COURSE OF DEALING, USAGE OF TRADE, AND FITNESS FOR A PARTICULAR PURPOSE.

(b)  NEITHER MEVION NOR ANY OF MEVION'S LICENSORS OR VENDORS SHALL HAVE ANY LIABILITY WITH RESPECT TO ANY DATA INTENTIONALLY OR UNINTENTIONALLY TRANSMITTED OR MANIPULATED WITH USE OF THE OPERATING SOFTWARE.  CUSTOMER IS SOLELY RESPONSIBLE FOR AND SHALL BEAR ALL RISK ASSOCIATED WITH USE OF THE OPERATING SOFTWARE TO TRANSMIT ANY DATA, INCLUDING, BUT NOT LIMITED TO, LOSS OR CORRUPTION OF DATA OR ANY LACK OF SECURITY.

(c)  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, MEVION'S TOTAL LIABILITY ARISING UNDER THIS AGREEMENT AND IN RELATION TO THE SYSTEM, INCLUDING WITHOUT LIMITATION, ARISING FROM ANY CAUSE OF ACTION SOUNDING IN CONTRACT, TORT, OR STRICT LIABILITY, SHALL NOT EXCEED THE AMOUNTS ACTUALLY RECEIVED BY MEVION FROM CUSTOMER UNDER THIS AGREEMENT.  IN NO EVENT SHALL MEVION BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR SPECIAL LOSS OR DAMAGES OF ANY KIND, SUCH AS BUT NOT LIMITED TO LOST BUSINESS REVENUE, LOST PROFITS OR COSTS OF DOWNTIME RESULTING FROM MEVION'S PRODUCTS OR SERVICES, HOWEVER CAUSED, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF MEVION HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FEES PAID UNDER THIS AGREEMENT REFLECT THIS ALLOCATION OF RISK AND THE LIMITATIONS OF LIABILITY HEREIN.  THE LIMITATIONS OF LIABILITY STATED HEREIN ARE INDEPENDENT OF ANY REMEDIES AND, NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF SUCH REMEDIES, WILL REMAIN IN FULL FORCE AND EFFECT.

**6.    Indemnification; Insurance.**

6.1    <u>Indemnification</u>.

(a)  <u>Mevion General Indemnification</u>. Mevion shall indemnify and hold harmless Customer and its directors, officers, and employees ("<u>Customer Indemnitees</u>"), against any and all damages, losses, costs, and expenses (including reasonable attorneys' fees) (collectively, "<u>Losses</u>") incurred by such Customer Indemnities in connection with any third party claims or demands ("<u>Third Party Claims</u>") to the extent such Losses arise from or are caused by Mevion's gross negligence or willful misconduct in connection with

10

CON01-2, VID: 3

subject matter of this Agreement.

(b) <u>Customer Indemnification</u>. Customer shall indemnify and hold harmless Mevion and its affiliates directors, officers, employees, contractors and licensors ("<u>Mevion Indemnitees</u>"), against any and all Losses incurred by such Mevion Indemnities in connection with any Third Party Claims to the extent such Losses arise from or are caused by Customer's or its agent's (i) gross negligence or willful misconduct in connection with the subject matter of this Agreement, (ii) unreasonable use, abuse, misuse, neglect, lack of routine care or maintenance including without limitation, failure to follow the procedures described in the System Documentation, (iii) failure to use or take any proper precautions as indicated in the System Documentation, (iv) modification, alteration or re-location of the System if not previously approved in writing by an Authorized Representative, or (v) improper service by Customer, or repairs, installation or maintenance by personnel not authorized by Mevion. Customer shall also indemnify and hold harmless the Mevion Indemnities against any and all Losses incurred by such Mevion Indemnities in connection with any Third Party Claims as set forth under Section 4.1 or Section 4.3(c).

(c) <u>Intellectual Property Indemnification</u>. Mevion shall indemnify and hold harmless Customer Indemnities, against any and all Losses arising out of any Third Party Claim brought against Customer to the extent that such Third Party Claim is based on a claim that the use of the System as contemplated hereunder constitutes an infringement of any valid issued United States patent or United States copyright of such third party. Mevion will pay any judgment for damages and costs finally awarded in any such suit or proceeding against Customer to the extent that the damages arise from such infringement. If a notice of commencement or threatened commencement of a suit or proceeding is received by Customer, Customer shall provide Mevion with: (i) prompt written notice of each Third Party Claim received; (ii) full control over the defense and settlement of such Third Party Claim; and (iii) full information and reasonable assistance to settle or defend any such Third Party Claim. The Parties agree that if the System becomes the subject of such a Third Party Claim, or in Mevion's judgment such is likely to occur, or a court of competent jurisdiction issues an injunction preventing use of the System by Customer, Mevion shall, at Mevion's option and expense, use commercially reasonable efforts to either (1) procure the right for Customer to continue using the same, or (2) replace or modify the same such that it is not infringing (while remaining in material compliance with the Specifications) and, if despite using commercially reasonable efforts Mevion is unable to procure for Customer the right to use the System or replace or modify the same such that it is not infringing, Mevion may terminate this Agreement.

(d) <u>Control of Defense</u>. At its option, the indemnifying Party may assume the defense of any Third Party Claim by giving written notice to the indemnified Party within thirty (30) days after the indemnifying Party's receipt of a notice of such claim by the indemnified Party (an "<u>Indemnification Claim Notice</u>"). The assumption of the defense of a Third Party Claim by the indemnifying Party will not be construed as an acknowledgment that the indemnifying Party is liable to indemnify the indemnified Party in respect of the Third Party Claim, nor will it constitute a waiver by the indemnifying Party of any defenses it may assert against the indemnified Party's claim for indemnification. Upon assuming the defense of a Third Party Claim, the indemnifying Party may appoint as lead counsel in the defense of the Third Party Claim any legal counsel selected by the indemnifying Party. In the event the indemnifying Party assumes the defense of a Third Party Claim, the indemnified Party will immediately deliver to the indemnifying Party all original notices and documents (including court papers) received by the indemnified Party in connection with the Third Party Claim. Should the indemnifying Party assume the defense of a Third Party Claim, except as provided in Section 6.1(h), the indemnifying Party will not be liable to the indemnified Party for any legal costs or expenses subsequently incurred by such indemnified Party in connection with the analysis, defense or settlement of the Third Party Claim. In the event that it is ultimately determined that the indemnifying Party is not obligated to indemnify, defend or hold harmless the indemnified Party from and against the Third Party Claim, the indemnified Party will reimburse the indemnifying Party for any and all costs and expenses (including attorneys' fees and costs of suit) and any Third Party Claims incurred by the indemnifying Party in its defense of the Third Party Claim.

(e) <u>Right to Participate in Defense</u>. Without limiting Section 6.1(d), any indemnified Party will be entitled to participate in, but not control, the defense of such Third Party Claim and to employ counsel of its

11

CON01-2, VID: 3

choice for such purpose, provided that such participation and employment will be at the indemnified Party's own cost and expense.

(f) <u>Settlement</u>. With respect to any Third Party Claims that relate solely to the payment of money damages in connection with a Third Party Claim and that will not result in the indemnified Party's becoming subject to injunctive or other relief or otherwise adversely affecting the business of the indemnified Party in any manner, and as to which the indemnifying Party will have acknowledged in writing the obligation to indemnify the indemnified Party hereunder, the indemnifying Party will have the sole right to consent to the entry of any judgment, enter into any settlement or otherwise dispose of such Loss, on such terms as the indemnifying Party, in its sole discretion, deems appropriate. With respect to all other Losses in connection with Third Party Claims, where the indemnifying Party has assumed the defense of the Third Party Claim in accordance with Section 6.1(d), the indemnifying Party will have authority to consent to the entry of any judgment, enter into any settlement or otherwise dispose of such Loss provided it obtains the prior written consent of the indemnified Party (which consent will not be unreasonably withheld, delayed or conditioned). The indemnifying Party will not be liable for any settlement or other disposition of a Loss by an indemnified Party that is reached without the express prior written consent of the indemnifying Party (such consent not to be unreasonably withheld, delayed or conditioned). Regardless of whether the indemnifying Party chooses to defend or prosecute any Third Party Claim, no indemnified Party will admit any liability with respect to or settle, compromise or discharge, any Third Party Claim without the express prior written consent of the indemnifying Party (such consent not to be unreasonably withheld, delayed or conditioned).

(g) <u>Cooperation</u>. Regardless of whether the indemnifying Party chooses to defend or prosecute any Third Party Claim, the indemnified Party will, and will cause each other indemnified Party, as a condition of receiving their indemnity, to, cooperate in the defense or prosecution thereof and will furnish such records, information and testimony, provide such witnesses and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith. Such cooperation will include access during normal business hours afforded to indemnifying Party to, and reasonable retention by the indemnified Party of, records and information that are reasonably relevant to such Third Party Claim, and making the indemnified Party's employees and agents available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The indemnifying Party will reimburse the indemnified Party for all its reasonable out-of-pocket costs and expenses in connection with its obligations under this Section 6.1(g).

(h) <u>Costs and Expenses</u>. Except as provided above in this Section 6.1, the costs and expenses, including attorneys' fees and expenses, incurred by the indemnified Party in connection with any Third Party Claim will be reimbursed on a calendar quarter basis by the indemnifying Party, without prejudice to the indemnifying Party's right to contest the indemnified Party's right to indemnification and subject to refund in the event the indemnifying Party is ultimately held not to be obligated to indemnify the indemnified Party.

6.2 <u>Insurance Policy Coverages and Limits</u>. Each Party shall maintain, during the term of this Agreement, commercial general liability insurance from a recognized, creditworthy insurance company, on a claims-made basis or occurrence basis, including product liability, and with coverage limits of not less than $4,000,000 per claim/per occurrence and in the aggregate. Each Party shall maintain workers' compensation and employers' liability with a limit of not less than $1,000,000. Each Party shall at all times be responsible for any deductibles. The insurance carrier shall have an A. M. Best rating of A-VII or better. Each insurer shall waive its rights of subrogation and/or right to recovery against the Other Party. Promptly following a Party's written request, the other Party shall provide such Party with a certificate of insurance evidencing such coverage as of the date.

7.    **Representations and Warranties.** Each Party represents and warrants that:

7.1    It is a corporation, trust or other duly organized entity, validly existing and in good standing under the laws of state or jurisdiction in which it is incorporated or established, and it has full right and authority to enter into this Agreement.

12

SEC-DEFC-EPROD-000016890-12

CON01-2, VID: 3

7.2     This Agreement has been duly authorized by all requisite entity action, and when executed and delivered will become a valid and binding contract of it enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other law affecting creditors' rights generally from time to time if effect, and to general principles of equity.

7.3     The execution, delivery and performance of this Agreement (i) has been duly authorized, and that upon execution this Agreement shall be a legal, valid, and binding obligation of it, enforceable in accordance with the terms hereof and (ii) does not conflict with any other agreement, contract, instrument or understanding, oral or written, to which it is a party, or by which it is bound.

## 8.    Intellectual Property.

8.1     Proprietary Rights.  Customer hereby agrees that all Proprietary Rights shall be owned by and remain at all times with Mevion or its licensors.  "Proprietary Rights" includes all patent rights, patent applications, copyrights, moral rights, mask works, trademarks, service marks, trade secrets, know how, goodwill, and any other confidential or proprietary information related to the System, the Operating Software, the System Documentation or the Software Documentation. Customer shall leave intact all proprietary notices on the System, the Operating Software, the System Documentation and the Software Documentation.  As between the Parties, all upgrades, redesigns and improvements to the System or the Operating Software and all Proprietary Rights relating thereto (collectively, "Improvements"), shall be owned by and remain at all times with Mevion or its licensors, and to the extent that Customer obtains any right, title or interest in or to such Improvements, Customer hereby assigns and shall promptly assign to Mevion all of such right, title or interest. As between the Parties, Mevion shall have the sole right to prepare, file applications on and registrations for, prosecute, obtain, maintain, defend and enforce all Proprietary Rights relating to the System, Operating Software or the Improvements in such manner as Mevion deems appropriate in its sole discretion.

8.2     Operating Software.  Subject to the terms and conditions of this Agreement, Mevion hereby grants Customer a limited, non-transferable, non-sublicensable, non-assignable, non-exclusive license to use the Operating Software solely in its executable code version to operate the System, together with the Software Documentation, but only in accordance with the terms set forth in this Agreement.  Unless expressly licensed to the Customer in conjunction with the provision of related open source software, Customer shall have no right to access any source code or design documentation relating to the Operating Software.  Customer shall not (and shall not allow any other third party to) (i) decompile, disassemble, or otherwise reverse engineer the Operating Software, (ii) remove or modify any product identification, copyright or other notices, (iii) rent, lease, sublicense, sell, assign or otherwise transfer the Operating Software, use the Operating Software to provide a time-sharing or similar service or otherwise allow others to use the Operating Software to or for the benefit of third parties, or (iv) copy, distribute, sell, modify, translate or incorporate into or with other software or create a derivative work of any part of the Operating Software. Any rights not expressly granted in this Agreement are reserved to Mevion. Customer agrees to notify Mevion promptly in writing of the existence of any unauthorized access, disclosure, distribution, possession, alteration, transfer, reproduction or other unauthorized use of the Operating Software of which Customer becomes aware.

## 9.    Confidentiality; Other Publicity.

9.1     Obligations.  Each Party agrees that it will not, without the prior written consent of the other Party: (i) use any Confidential Information (as defined below) for any purpose except in the performance of its obligations or exercise of its rights under this Agreement, any Services Agreement or as otherwise expressly permitted hereunder; (ii) disclose any Confidential Information except to (a) employees and subcontractors on a need-to-know basis, notifying its employees and subcontractors of the confidential nature of the Confidential Information, and requiring written nondisclosure agreements from each employee and subcontractor protecting the disclosing Party's Confidential Information as required herein and (b) legal and professional advisors and existing and potential investors or acquirers and  their legal and professional advisors, each of which is bound by a written agreement or ethical obligations  requiring such advisors and investors or acquirers to treat, hold and

SEC-DEFC-EPROD-000016890-13

CON01-2, VID: 3

maintain such Confidential Information in confidence. Each Party further agrees to protect such Confidential Information from unauthorized use, access or disclosure in the same manner that it protects its own similar Confidential Information, but not less than a reasonable degree of care.

9.2    "Confidential Information" means the terms and conditions of this Agreement and any Services Agreement (including, in each case, any pricing terms) and any other confidential or proprietary information or data, regardless of whether it is in tangible form, disclosed by either Party (the "disclosing Party") to the other Party (the "receiving Party"), whether before or after the Effective Date, and including information and data disclosed in the performance of a Services Agreement, including such disclosing Party's business plans, strategies, technology, research and development, current and prospective customers, billing records, and products (including, in the case of Mevion, the System, System Documentation, Specifications, Operating Software and Software Documentation). Notwithstanding the foregoing, information will not be deemed Confidential Information hereunder if such information: (i) is known to the receiving Party prior to receipt from the disclosing Party as evidenced by the receiving Party's contemporaneous written records; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving Party from a source other than one having an obligation of confidentiality directly or indirectly to the disclosing Party; or (iii) becomes generally publicly known, except through a breach of this Agreement by the receiving Party.

9.3    Publicity. Either Party may use, in advertising or publicity, the name of the other Party, so long as such Party obtains the other Party's prior written approval for each instance of use. The Parties shall work together, in good faith, to develop a plan for the initial dissemination of public information regarding Customer's acquisition of the System.

## 10.    Term and Termination.

10.1    Term. The term of this Agreement (the "Term") shall commence on the Effective Date, and will be effective until terminated.

10.2    Termination. Other than with respect to breaches of a Party's payment obligations hereunder, this Agreement may be terminated by either Party upon written notice to the other Party in the event that the other Party is in material breach of this Agreement, if such breaching Party has not commenced taking steps to cure such within one hundred twenty (120) days after receipt of such notice. This Agreement may be terminated by either Party upon written notice to the other Party in the event that the other Party is in material breach of its payment obligations under this Agreement, if such breaching Party has not cured such breach within one thirty (30) days after receipt of such notice.

10.3    Effect of Termination. Upon any termination of this Agreement for any reason (i) any obligations (including Milestone Payment obligations for completed Milestone Events) which have accrued as of the effective date of such termination shall survive, (ii) any payments made by Customer hereunder shall be neither refundable nor creditable for any reason, provided that this clause (ii) is not intended to limit Customer's ability to seek damages (other than amounts paid) in the event Mevion materially breaches its obligations under this Agreement, (iii) Customer shall coordinate with Mevion to have the System returned to Mevion, the cost of which shall be borne by Mevion if Customer rightfully terminates this Agreement for cause, by Customer if Mevion rightfully terminates this Agreement for cause, or equally by both Parties if this Agreement is terminated by mutual agreement of the Parties, and Customer shall cease all use of the Operating Software and return or destroy all copies of the Operating Software and all portions thereof, and (iv) the provisions contained in the following sections shall survive: Sections 1, 3.2, 3.3, 3.4, 3.6, 4.1, 4.3(c), 5.13, 6.1(a), 6.1(b), 6.1(d) – (h), 8.1, 9, 10.3 and 11.

## 11.    Miscellaneous.

11.1    Assignment. Neither Party may sell, assign, delegate, or otherwise transfer this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld, except that either Party (the "Assigning Party") may assign this Agreement as a whole without the written consent of

14

SEC-DEFC-EPROD-000016890-14

CON01-2, VID: 3

other Party (the "Non-Assigning Party") to an affiliate or in connection with the acquisition (whether by merger, consolidation, sale or otherwise) of the Assigning Party or of that part of such Assigning Party's business to which this Agreement relates, provided that such corporation or other business entity shall expressly assume all of the Assigning Party's obligations under this Agreement by a writing delivered to the Non-Assigning Party. Subject to this provision, this Agreement shall be binding upon and inure to the benefit of the Parties, their successors and assigns.

11.2   Notice.  Any notice required or permitted under this Agreement will be sufficient if in writing and personally delivered or sent by reputable courier or facsimile to the name and address specified below. Notices shall be deemed delivered on personal delivery or when received.  Either Party may change its address or addressee by giving notice.  Neither Party will be allowed to refuse to accept delivery of any notice hereunder.

If notice to Customer:

Los Angeles Proton Therapy Center
AKA. Beverly Proton Center, LLC
200 East Beverly Blvd #200
Montebello, CA  90640
        Attn: Charles Liu

With a copy to:

If notice to Mevion:

Mevion Medical Systems, Inc.
300 Foster Street
Littleton, MA 01460
Facsimile:  (978) 486-1033
        Attn.:  Joseph K. Jachinowski, President & Chief Executive Officer

With a copy to:

Goodwin Procter LLP
53 State Street
Boston, MA 02109
Facsimile:  (617) 523-1231
        Attn.: Mitchell S. Bloom

11.3   Waiver of Breach.  No failure or delay of either Party to this Agreement to enforce at any time any of the provisions of this Agreement, or to exercise any option which is herein provided, or to require at any time performance of any of the provisions hereof, shall in any way (i) be construed to be a waiver of such provision of this Agreement, (ii) excuse the other Party's failure to perform, or (iii) affect any right to enforce the provision at a later time.  The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be a waiver of any subsequent breach of the same or other provision hereof.  No failure to delay by either Party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

11.4   Severability.  If any provision hereof is held to be unenforceable, subject to applicable payments remaining due and payable, the unenforceability will not affect the remainder of the Agreement, which shall remain in effect and enforceable.

15

CON01-2, VID: 3

11.5    Modifications.  This Agreement, including the Exhibits, comprises the entire agreement and understanding of the Parties relating to the subject matter of this Agreement.  Any agreement to change the terms of this Agreement in any way will be valid only if the change is made in writing and approved by mutual agreement of an authorized representatives of the Customer and an Authorized Representative of Mevion.

11.6    Incorporation of Documents.  All Exhibits to this Agreement are incorporated herein by reference as if fully set forth.  To the extent there is a direct conflict between the terms of the body of this Agreement and the terms of an Exhibit or any purchase order, the terms of the body of this Agreement shall control.  Any terms contained in any proposal, bid or other document, including any purchase order or other similar or related documentation issued by Customer, that exclude, conflict with, or purport to add additional terms to the terms of the body of this Agreement, shall be of no force or effect.

11.7    Dispute Resolution.  In the event of a controversy, dispute or question arising out of or in connection with this Agreement, or the interpretation, performance or non-performance of this Agreement or any breach hereof, the Parties agree that appropriate Mevion and Customer officers shall meet at a mutually agreeable time within ten (10) calendar days after such controversy, dispute or question is identified in writing by one Party to the other in order to attempt to resolve such controversy, dispute or question.  Any controversy, dispute or question arising out of or in connection with this Agreement, or the interpretation, performance or non-performance of this Agreement or any breach hereof, if not resolved to the satisfaction of both Parties in accordance with the preceding sentence within thirty (30) calendar days of the date upon which both Parties became aware of such controversy, dispute or question, shall be determined by arbitration pursuant to the then existing commercial arbitration rules of the American Arbitration Association, in accordance with the following procedures:  Arbitration shall be held in Boston, Massachusetts in the English language.  The arbitration tribunal shall consist of three (3) arbitrators.  Each Party shall nominate in the request for arbitration and the answer thereto one arbitrator and the arbitrators so named shall then jointly appoint the third arbitrator to act as chairman of the arbitration tribunal.  Any decision or award of such arbitration shall be final, conclusive and binding on the Parties hereto.  Nothing contained in this Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration.  Any award rendered by an arbitrator shall be enforceable in any court of competent jurisdiction.

11.8    Remedies.  Except as otherwise provided for herein, no remedy conferred by any of the specific provisions of the Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder, now or hereafter existing at law, in equity, by statute or otherwise.  Except as otherwise provided for herein, the election of any one or more remedies by either Party shall not constitute a waiver of the right to pursue other available remedies.

11.9    Relationship of Parties.  Both Parties, in the performance of this Agreement, will be acting in separate capacities and not as employees, partners, joint venturers, joint developers, associates, or agents of one another.  Each Party acknowledges that it does not have the authority to act for or in the name of the other Party or to commit the other Party in any manner whatsoever.  The employees or agents of one Party shall not be deemed or construed to be the employees or agents of the other Party for any purpose.  Nothing in this Agreement, either express or implied, is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

11.10    Entire Agreement.  This Agreement, including its Exhibits, contains the full and entire agreement between the Parties regarding the subject matter hereof, and expressly supersedes all prior oral and written communications regarding that subject.  In choosing to enter into this Agreement, Customer has not relied on any statement of Mevion or any agent of Mevion which is not expressly set forth herein.

11.11    Governing Law, Jurisdiction.  Subject to Section 11.7, this Agreement shall be governed by and interpreted, construed, and enforced in accordance with the internal laws of the State of New York without regard to conflict of law provisions thereof.  Subject to Section 11.7, each Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the federal and state courts located in the Suffolk County, Massachusetts, for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby. Application of the U.N. Convention on Contracts for the International

16

CON01-2, VID: 3

Sale of Goods is specifically excluded from this Agreement.

11.12   Force Majeure. Except for the obligation to make payment when due, neither Party shall be liable for any delay in delivery or other failure to perform hereunder which is due to unforeseen circumstances, or to causes beyond its reasonable control, including, without limitation, acts of God, fire, flood, and storms, wars, acts of terrorism, sabotage, strike, government actions, lock out, labor disputes, riots, civil commotions, malicious damages, compliances with a law or governmental order, rules, regulations or directions, accidents, breakdown of plant or machinery, difficulties or increased costs in obtaining workers, raw materials or transport and any other similar occurrence beyond the non-performing Party's control (each, a "Force Majeure Event"). Any Party asserting its inability to perform any obligation hereunder for any such Force Majeure Event shall promptly notify the other Party of the existence of any such Force Majeure Event, and shall use its reasonably diligent efforts to re-commence its performance of such obligation as soon as commercially practicable.

11.13   Counterparts. This Agreement and any amendments to this Agreement may be executed in counterparts, including facsimile or scanned PDF documents. Each such counterpart, facsimile or scanned PDF document shall be deemed an original instrument, and all of which, together, shall constitute one and the same executed Agreement.

11.14   Rules of Interpretation. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply: (i) references to Articles, Sections and Exhibits are to articles, sections and exhibits of this Agreement; (ii) except where the context otherwise requires, use of the singular includes the plural and *vice versa*; (iii) headings and titles are for convenience only and shall not affect the interpretation of this Agreement; (iv) any list or examples following the word "including" shall be interpreted without limitation to the generality of the preceding words; (v) except where the context otherwise requires, the word "or" is used in the inclusive sense (i.e., "and/or"); (vi) words connoting a specific gender (*e.g.*, "his") shall be interpreted so as to apply to all genders; and (vii) each Party represents that it has been represented by legal counsel in connection with this Agreement and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement, the Parties agree that no presumption will apply against the Party that drafted such terms and provisions.

11.15   Export Controls and Compliance With Laws. If an export license, customs clearance, permit, or other governmental approval ("Government License") is required before Mevion can sell or transfer the System, confidential information, or related technical data to Customer, Customer acknowledges and agrees that Mevion shall be under no obligation to affect such sale or transfer until the required Government License is obtained. Mevion shall use reasonable efforts to expeditiously obtain any required Government Licenses. Customer acknowledges that Mevion's export of the System, confidential information, and related technical data is subject to regulation by various rules and regulations of the United States which prohibit export or diversion of Mevion's System to certain countries, entities and/or which restrict or prohibit use. Unless Customer has first obtained permission to do so from all applicable United States Government agencies, Customer shall not export or re-export, directly or indirectly, any of the System (including any part of a System), confidential information, or related technical data into any of those countries listed at the time of any shipment of the System in the applicable United States export regulations as "prohibited or restricted" countries, or any other country to which such exports or re-exports may be restricted. Without limiting the foregoing, Customer shall not commit any act which would, directly or indirectly, violate any United States or local law, regulation, treaty or agreement to which the United States adheres or complies relating to the export or re-export of the System (including any part of a System), confidential information, or related technical data. If the Territory is outside of the United States Customer is aware of and agrees to comply with all anti-bribery laws, including, but not limited to, the Foreign Corrupt Practices Act of 1977, as amended.

11.16   Government Rights. The Operating Software is licensed to Customer with restricted rights. The System constitutes "commercial items" – as that term is defined in 48 C.F.R. §2.101– and the Operating Software and System Documentation consist of "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. §12.212. Consistent with 48 C.F.R. §12.212 and 48 C.F.R. §227.7202-1, 227.7202-3 and 227.7202-4, if Customer hereunder is the U.S. Government or any agency or department thereof, the System is provided and the Operating Software is licensed hereunder (i) only

17

CON01-2, VID: 3

as a commercial item and (ii) with only those rights as are granted to all other Customers pursuant to the terms and conditions of this Agreement.


[*__Remainder of Page Intentionally Left Blank__*]

18

**IN WITNESS WHEREOF,** Customer and Mevion each has caused this Agreement to be executed by its duly authorized representative.

| MEVION MEDICAL SYSTEMS, INC. | LOS ANGELES PROTON THERAPY CENTER AKA. BEVERLY PROTON CENTER, LLC |
|---|---|
| By: _(signature)_ | |
| Name: DONALD B. MELSON | By: _(signature)_ |
| Title: CFO | Name: CHARLES LIU |
| | Title: President |

SEC-DEFC-EPROD-000016890-19

**EXHIBIT 1**

**SYSTEM COMPONENTS DESCRIPTION**

1.0 MEVION S250 Proton Beam Radiation Therapy System Purchased

1.1. Proton Accelerator Module
1.2. Accelerator gantry to precisely position proton accelerator module
1.3. Clinical beam-line on in-room high precision treatment gantry
1.4. Large field proton applicator with transfer cart
1.5. Small field proton applicator with transfer cart
1.6. Robotic Couch for high-precision patient positioning with six degrees of motion
1.7. Operator's console
1.8. Interface to Oncology Information System (Varian ARIA™ or Elekta MOSAIQ™):
    1.8.1 Patient treatment data transfer and verification
    1.8.2 Patient treatment data recording
1.9 Two (2) Hand pendant controls
1.10 Two (2) in-room displays
1.11 Verity Patient Positioning System™ with 2D & 3D radiographic imaging software
    Note: Multislice CT Scanner is not part of the System, Customer must purchase separately
1.12 In-room patient alignment console
1.13 Two (2) sets of product manuals
1.14 Training (travel costs not included – see training description in Exhibit 4):
    1.14.1 Clinical Operation: 4 seats
    1.14.2 Physician Course: 2 seats
    1.14.3 Physics Course: 2 seats
    1.14.4 Ancillary Staff Course: 4 seats
    1.14.5 Biomedical Technician Course: 2 seats

SEC-DEFC-EPROD-000016890-20

**EXHIBIT 2**

**SPECIFICATIONS**

The System shall conform in all material respects to the attached system specifications (excluding minor deviations from the specifications that do not interfere with the use of or adversely affect performance of the System) entitled "Mevion S250 Proton Therapy System Specifications" (LSS110907), which document is incorporated herein and made a part hereof.

SEC-DEFC-EPROD-000016890-21

## EXHIBIT 3

### MAINTENANCE GUIDE

**Preventative Maintenance Services:** Preventive Maintenance is a comprehensive program of inspection, adjustment, and exchange of components schedule to maintain System reliability and uptime. The table below presents maintenance activities based on quarterly and annual intervals, which durations and replacement parts used are subject to change upon written notice from Mevion.

| PM Task | Service Item | 3 Mo. | 6 Mo. | 12 Mo. | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
|---|---|---|---|---|---|---|---|---|---|---|
| colspan | **MEVION S250 Preventative Maintenance Schedule** | | | | | | | | | |

| PM Task | Service Item | 3 Mo. | 6 Mo. | 12 Mo. | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inspect, Service as required** | | | | | | | | | | |
| 1 | Vacuum Gauges | X | X | X | X | X | X | | | |
| 2 | Ion Source probe Set | X | X | X | X | X | X | | | |
| 3 | Ion Source Pulser Chassis | X | X | X | X | X | X | | | |
| 4 | Removable Pole Plug Seal | X | X | X | X | X | X | | | |
| 5 | Fixed Pole Plug Seal | X | X | X | X | X | X | | | |
| 6 | Ion Source Gas Chassis | X | X | X | X | X | X | | | |
| 7 | Turbo Vacuum and Scroll pump | X | X | X | X | X | X | | | |
| 8 | Applicators and Mounting Cart | X | X | X | X | X | X | | | |
| 9 | Treatment Gantry Coupler/Detent | X | X | X | X | X | X | | | |
| 10 | RF Amplifier | | X | X | X | X | X | | | |
| 11 | Rotary Joint | | X | X | X | X | X | | | |
| 12 | Rotary Capacitor | | X | X | X | X | X | | | |
| 13 | Gantry Encoder | | X | X | X | X | X | | | |
| 14 | RF Insulator | | X | X | X | X | | | | |
| 15 | RF Surfaces | | X | X | X | X | | | | |
| 16 | Vacuum valves | | X | X | X | X | | | | |
| 17 | Ion Source central region electrodes | | X | X | X | X | | | | |
| 18 | Theta carriage | | X | X | X | X | | | | |
| 19 | Exit window | | X | X | X | X | | | | |
| 20 | Cold Head Power Cord | | X | X | X | X | | | | |
| 21 | X-ray Generator | | X | X | X | X | | | | |
| 22 | Patient Treatment Couch | | X | X | X | X | | | | |



SEC-DEFC-EPROD-000016890-22

## MEVION S250 Preventative Maintenance Schedule

| PM Task | Service Item | Interval (X=PM Action) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 | 6 | 12 | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
| **Clean** | | | | | | | | | | |
| 23 | Couch Controller Vent System | X | X | X | X | X | X | | | |
| 24 | X-ray System (Generator, Collimators, Tubes, Panels) | X | X | X | X | X | X | | | |
| **Lubricate** | | | | | | | | | | |
| 25 | Gantry Bearing | X | X | X | X | X | X | | | |
| 26 | Gantry Drive Pinion Bearing | X | X | X | X | X | X | | | |
| **Operational Test** | | | | | | | | | | |
| 27 | Helium Cryo-compressor | | | X | X | X | X | | | |
| 28 | Hardwired Safety System | X | X | X | X | X | X | | | |
| 29 | Hand Pendant | | | X | X | X | X | | | |
| 30 | Couch End of Travel Limit Switch | | | X | X | X | X | | | |
| 31 | Magnet Rundown Button | | | X | X | X | X | | | |
| 32 | Couch A1 Lowering Circuit | | | | X | | | | | |
| 33 | Panel Image | | X | X | X | X | X | | | |
| **Align Components, Replace as Required** | | | | | | | | | | |
| 34 | Applicators and Mounting Cart | | | | | | X | | | |
| **Replace** | | | | | | | | | | |
| 35 | Gantry Gearbox Oil (Right and Left) | | | | X | | | | | |
| 36 | X-ray Generator CPU Board Battery | | | | | | X | | | |
| 37 | Turbo Vacuum Pump | | | | X | | | | | |
| 38 | Applicator POGO Interconnect | | | X | X | X | X | | | |
| 39 | Scroll Pump Seal set | | | | X | | | | | |
| 40 | WCS Water and Filters | | X | X | X | X | X | | | |
| 41 | Scroll Pump Exhaust Silencer | | | X | X | X | X | | | |
| 42 | ST Cold Heads (SumiTomo) x3 | | | | | | | X | X | X |
| 43 | CM Cold Head (CryoMech) | | | | | | | X | X | X |
| 44 | CM Cryocompressor Oil Absorber | | | | | | | | X | |
| 45 | ST Cryocompressor Oil Absorber x3 | | | | | | | | | X |

SEC-DEFC-EPROD-000016890-23

## EXHIBIT 4

## TRAINING DESCRIPTION

**Physician Course** – Designed for physicians who are new to the MEVION S250 and new to proton therapy clinical work
- **Goals** – Participants will become familiar with the MEVION S250, its capabilities and operational requirements. They will see a range of treatment protocols used in active proton clinics. The participants will review specific processes for preparing, immobilizing, scanning, and designing site-specific treatment plans and delivery techniques.
- **Prequalification** – M.D. with conventional Radiation Oncology experience
- **Length** – 3 days
- **Where** – Customer Site
- **Coursework Modules**
  - Proton Therapy Practice
  - Patient Immobilization, Set Up, and Treatment Design for Physicians
  - Using the MEVION S250 therapy equipment – Lecture plus Hands - On
  - Radiographic patient setup and review

**Clinical Machine Operations Course** – A course design for the Therapist, Physicist, Dosimetrist and other clinical staff who need to understand routine machine operation in the context of patient therapy.
- **Goals** – Participants will be able to successfully perform image guided proton radiotherapy on the MEVION S250. They will also understand all safety features, daily quality tests, and basic troubleshooting associated with the device.
- **Prequalification** – Medical Physics, Medical Dosimetrist or RT training, certification, or experience in a radiation oncology department.
- **Length** – 4 days
- **Where** – Customer Site
- **Coursework Modules**
  - Proton Therapy Practice
  - Radiation Safety and Radiobiology in Proton Therapy Clinic
  - Patient Immobilization, Set Up, and Treatment in the Clinic
  - Safety
  - Operator Training

**Physics Course**– A course designed for Medical Physicists who need to supervise or materially participate in the operation of the MEVION S250.
- **Goals** – Participants will be familiar with the physics of proton therapy as performed on the MEVION S250. They will understand the criteria and standard techniques for acceptance testing and commissioning the equipment. They will understand the safety features, system interlocks, and standard periodic quality tests associated with the equipment. Participants will become familiar with the major components of the MEVION S250 and their operational principals.
- **Prequalification** – completion of Clinical Machine Operation course
- **Length** – 4 days
- **Where** – Training Center
- **Coursework Modules**
  - Proton Therapy Physics
  - Radiation Safety for the Physicist in Proton Therapy
  - Patient Immobilization, Set Up, and Treatment Design
  - The Mevion S250 Compact Proton Therapy System – Subsystems and principle of operation
  - Safety

**Ancillary Staff Course**- A course designed for radiation oncology staff involved in the routine patient care – This includes Dosimetrist, Physicist, Mold Room Technician, Nursing, Simulation Technicians range of treatment protocols used in active proton clinics. The participant will review specific processes for preparing, immobilizing, scanning, and designing site specific treatment plans.
- **Length** – 3 days

SEC-DEFC-EPROD-000016890-24

- **Where** – Customer Site
- **Coursework Modules**
  - Proton Therapy Practice
  - Patient Immobilization, Set Up, and Treatment Design for Physicians
  - Residency work at an active clinic

**Biomedical Technician Course** – A course is designed for the hospital biomedical engineer and physicist who may need to provide basic support for the MEVION S250 proton therapy system.

- **Goals** – Participants will learn the subsystems of the MEVION S250 and techniques for troubleshooting problems, maintaining customer accessible components, and calibrating IGRT equipment, lasers and configurable software
- **Prequalification** – Trained Biomedical technician or physicist
- **Length** – 3 days
- **Where** – Customer Site
- **Coursework Modules**
  - The Mevion Compact Proton Therapy System
  - The MEVION S250 Service for Biomedical Technicians

**<u>EXHIBIT 5</u>**

**ACCEPTANCE CONFIRMATION**

The Customer shall adhere to the attached Mevion document entitled "Customer Acceptance Protocol" (DID: IMP11-1) for Customer Acceptance activities, which document is incorporated herein and made apart hereof.

SEC-DEFC-EPROD-000016890-26

## EXHIBIT 6

## UPTIME WARRANTY

1. <u>Uptime Warranty</u>. Mevion warrants to Customer that, during the Warranty Period, the System shall operate in accordance with at least ninety five percent (95%) Uptime (as defined below) measured over the course of the Warranty Period.

2. <u>Remedies</u>. In the event of any failure to comply with the Uptime Warranty, Customer's sole and exclusive remedy, and Mevion's sole and exclusive obligation to Customer, shall be for Mevion to provide Customer with a credit towards the service fee payable for the first year of a Service Agreement (such fee, the "<u>First Annual Service Fee</u>") equal to (1%) of the First Annual Service Fee for every two-percent (2%) that Uptime is below the ninety five percent (95%), provided that in no event shall such credit act to reduce the First Annual Service Fee by more than twenty percent (20%). For clarity, such credits may be applied only to the First Annual Service Fee and shall not be carried over to subsequent years of a Service Agreement. In the event that Customer does not elect to enter into a Service Agreement, Customer shall not be entitled to receive such credit.

3. <u>Definitions</u>.

   a. "<u>Uptime</u>" means shall be calculated as follows, expressed as percentage:

$$\frac{\text{Base Days} - \text{Down Days}}{\text{Base Days}}$$

   b. "<u>Base Days</u>" means the number of Business Days the System is scheduled for use by Customer during any Service Year. Customer acknowledges and agrees that Base Days will not include any Business Days that are scheduled for Updates, Preventative Maintenance Services or other mutually agreed upon scheduled activities that prevent Customer from using the System.

   c. "<u>Down Day</u>" means a Base Days during which the System is subject to a Level 1 Issue for more than three and one half (3.5) Business Hours (in the aggregate), commencing when Customer issues a Warranty Service Request for a System Issue that Mevion reasonably determines is a Level 1 Issue. For the purposes of the calculating Down Days, the System will not be considered subject to Level 1 Issue due to circumstances beyond Mevion's control, including but not limited to Force Majeure Events (as defined in Section 11.12) and Excluded Issues. The Down Day period shall end when Mevion returns the System for use by the Customer. Time used to determine a Down Day does not include time for testing or validation by the Customer or time where Customer does not provide personnel, access or resources as reasonably required by Mevion to allow prompt mitigation of the Level 1 Issue.



November 9, 2015

**VIA MAIL**

Los Angeles County Proton Center, AKA.
Beverly Proton Center, LLC
200 East Beverly Blvd #200,
Montebello, CA  90640

Attn: Mr. Charles Liu

RE:    Option for Additional Purchases of MEVION S250 Systems

Dear Mr. Liu:

As you know, Mevion Medical Systems and Los Angeles County Proton Center recently entered into a System Purchase Agreement dated November 9, 2015 (the "Agreement") under which Los Angeles County Proton Center is purchasing a MEVION S250 proton therapy system ("System").   As we have discussed, Mevion also understands that Los Angeles County Proton Center may wish to purchase additional Systems in the near future.   The purpose of this letter is to set forth terms and conditions on which Mevion is willing to grant Los Angeles County Proton Center a limited-term option to buy up to two additional Systems from Mevion under the Agreement.

At any time during the Option Period (as defined below) and contingent upon the execution by both parties of the System Purchase Agreement under which Los Angeles County Proton Center is purchasing the initial System referenced in the previous paragraph, Los Angeles County Proton Center shall have the option to purchase up to a total of two (2) additional Systems. If Los Angeles County Proton Center wishes to purchase additional System(s), Los Angeles County Proton Center shall inform Mevion in writing and the parties shall enter into a written order for each such additional System.  The price for each additional System shall be Twenty Million Five Hundred Thousand Dollars ($20,500,000).  The additional System(s) will be paid for in milestone payments, which shall be in the amounts and payable at the milestones set forth in the table at the end of this letter agreement.  The delivery schedule and associated target installation dates for such additional System(s) shall be mutually agreed upon in writing by the parties, and all other terms and conditions of the Agreement shall apply to the purchase (if any) of such additional System(s).



For the purposes of this letter agreement, "Option Period" means:

1.  the period beginning on the Effective Date of the Agreement and ending twelve (12) months after the Effective Date for a 2nd System purchase, and

2.  the period beginning on the Effective Date of the Agreement and ending twenty four (24) months after the Effective Date for a 3rd system purchase, *provided however*, that the option to purchase a 3rd System, and the associated twenty four (24) month Option Period to purchase such 3rd System, is contingent on Los Angeles County Proton Center exercising its option to purchase a 2nd System during the twelve (12) months after the Effective Date of the Agreement.  If Los Angeles County Proton Center does not exercise its option to purchase a 2nd System in such twelve (12) month period, then the Option Period and Los Angeles County Proton Center's option to purchase additional System(s) shall automatically expire on the last day of such twelve (12) month period.

If the terms and conditions of this option are agreeable to Los Angeles County Proton Center, please have this letter countersigned on behalf of Los Angeles County Proton Center where indicated below and return it to my attention at your earliest convenience.

We are pleased to have Los Angeles County Proton Center as a customer, and we look forward to working with you.

Sincerely,

Signature: _____

Name: ~~Joseph K. Jachinowski~~ DONALD B. MELSON
CFO

Title: ~~President & CEO~~, Mevion Medical Systems, Inc.

Date: 11/18/2015

**ACKNOWLEDGED AND AGREED BY LOS ANGELES COUNTY PROTON CENTER AKA BEVERLY PROTON CENTER:**

Signature: _____

Name: CHARLES LIU

Title: President

Date: 11/10/2015



**Payment Schedule for Purchase of Additional System(s)**

| Milestone Event | Milestone Payment |
|---|---|
| 1. Execution of order for additional System | $3,000,000 |
| 2. Earlier of (i) three months from execution of order for additional System, or (ii) Customer's selection of its Facility development team | $0 |
| 3. Earlier of (i) twelve months from execution of order for additional System, or (ii) upon completion of Mevion's conformance review of Customer's construction documents | $0 |
| 4. Upon shipment from Mevion's facility of the Gantry Embeds | $6,000,000 |
| 5. Upon shipment from Mevion's facility of the Accelerator Module | $6,500,000 |
| 6. Customer Acceptance | $4,000,000 |
| 7. Clinical Acceptance | $1,000,000 |
| **Total** | **$20,500,000** |

SEC-DEFC-EPROD-000016890-30