# Exhibit 31

Subject to Contract

**MEVION S250**
**MAINTENANCE AND SUPPORT AGREEMENT**

This MEVION S250 Maintenance and Support Agreement (this "Service Agreement") is entered into as of November 10, 2015 (the "Services Agreement Effective Date") by and between Mevion Medical Systems, Inc. ("Mevion"), a Delaware corporation having a principal place of business at 300 Foster Street, Littleton, Massachusetts 01460, and Los Angeles County Proton Center AKA. Beverly Proton Center LLC, with registered address at 200 East Beverly Blvd. #200 Montebello CA 90640 ("Customer"). Each of Mevion and Customer are referred to herein as "Party" and together as the "Parties".

WHEREAS, Mevion and Customer are parties to a certain System Purchase Agreement dated as of November 10, 2015 (the "System Agreement"), pursuant to which Customer has purchased a MEVION S250 proton beam radiation therapy system (the "MEVION S250 System"); and

WHEREAS, Mevion is willing to provide maintenance and support services, replacement parts and software updates in accordance with the terms and conditions of this Service Agreement, beginning on the first day following the expiration of the Warranty Period as defined in the System Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, conditions and agreements set forth herein, the Parties agree as follows:

**1. Construction; Definitions.**

For the purpose of this Service Agreement, the following words and phrases shall have the meanings set forth below. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the System Agreement. In the event of any conflict between the terms of the System Agreement (notwithstanding Section 11.6 thereof), or other agreements between the Parties, and this Service Agreement, the terms of this Service Agreement shall control

1.1 "Applicable Law" means all United States federal, state, and local laws, rules, regulations and ordinances applicable to the System and other activities undertaken by either Party in connection with this Service Agreement, including, without limitation, the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), as may be amended from time to time, and the federal rules and regulations promulgated thereunder.

1.2 "Authorized Representative" means a corporate officer or vice president of Mevion. For the avoidance of doubt, Support Representatives and other employees of Mevion that are not corporate officers or senior vice presidents are not Authorized Representatives.

1.3 "Business Day" means a day other than Saturday, Sunday, or any day on which the National Reserve Bank in the Territory is closed.

1.4 "Business Hours" mean the hours between 8:00 am and 58:00 pm local standard time in the Territory on any Business Day.

1.5 "Dollars" or "$" means United States dollars.

1.6 "Excluded Issue" means any defect, failure or other error the System which would be a System Issue but is caused by (i) unreasonable use, misuse, abuse, neglect or lack of routine care or



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

MEVION_000040
CONFIDENTIAL

maintenance of the System, including without limitation, failure to follow the procedures described in the System Documentation; (ii) failure to use or take any proper precautions as indicated in the System Documentation; (iii) relocation, alteration or modification of the System if such alteration or modification is not previously approved in writing by an Authorized Representative; (iv) service, repairs, installation, maintenance or relocation of the System performed by anyone other than by Support Representative unless approved in writing by an Authorized Representative; (v) anything external to the System, including without limitation (a) building structural deficiency or (b) power supply, heating, cooling, ventilation, or air conditioning fluctuation or failure; (vi) vandalism, lightning, earthquake, fire, smoke or water damage to the System; or (vii) use of the System in combination with any product or software not specifically approved in writing by an Authorized Representative.

1.7 "Issue Resolution" means fixes, workarounds, modifications or Updates that correct a System Issue.

1.8 "Maintenance Guide" means the document attached hereto as Exhibit A that lists the planned maintenance services to be performed by Mevion, including the schedule for performance thereof, any and all updated or modified versions or revisions of such Maintenance Guide that may be provided by Mevion to Customer from time to time, provided that such updated or modified versions or revisions do not materially and adversely change or degrade the scope of such services as of the date of this Service Agreement.

1.9 "On-Site Support Representative" means a Support Representative who is assigned to the Customer's facility, and whose primary responsibility is to provide System Product Support Services.

1.10 "Operating Software" means the computer software (in object code format only) provided with, and used to operate the System, including any updates, modifications or fixes to such software that Mevion may provide to Customer, as well as any related user documentation and/or manuals provided by Mevion to Customer (the "Software Documentation"). "Operating Software" will not include any third party open source software which may be used in conjunction with the operation of the System, provided that Mevion separately identifies such open source software to the Customer in advance, and makes such open software available to the Customer for license under the terms of the applicable open source license.

1.11 "Preventative Maintenance Services" means a Scheduled Maintenance Service to be provided by Mevion hereunder as set forth in the Maintenance Guide, including without limitation periodic System inspection, review of System operation, System lubrication and filter replacement and cleaning, and remedial maintenance of a non-emergency nature.

1.12 "Scheduled Maintenance Service" means any maintenance services provided by Mevion or an authorized agent of Mevion that is scheduled in advance by mutual agreement of the Parties.

1.13 "Services" means Preventative Maintenance Services, Product Support Services, Update services and other services expressly agreed to be provided by Mevion hereunder.

1.14 "Service Fee" means the amount set forth as the "Service Fee" in Exhibit B.

1.15 "Service Period" means the period of Service Years identified in Exhibit B as the

Service Period during which Mevion will provide the Services to Customer.

1.16 "Service Year" means the twelve (12) month period commencing on the Services Start Date as defined in Section 12.1, or the anniversary date of the start date of a Services Term for multiyear agreements, and ends 12 months later. By example, a Service Year that begins on July 1, 2013, will end June 30, 2014.

1.17 "Specifications" means the specifications referred to in the System Agreement.

1.18 "Support Email Address" means support@mevion.com or such other email address as Mevion may notify Customer of from time to time.

1.19 "Support Phone Line" means 1 855-4MEVION (855-463-8466) or such other telephone number that Mevion may notify Customer of from time to time.

1.20 "Support Request" means a request communicated by Customer to Mevion using approved communication methods as defined in Section 2.3 of this Agreement, to report a System Issue and to request an Issue Resolution, or to request some other Service or assistance.

1.21 "Support Representative" means an employee or agent of Mevion that is a duly trained representative familiar with the System and its operation, support and maintenance.

1.22 "System" has the meaning ascribed to such term in the System Agreement.

1.23 "System Documentation" means all copies and updates of the documentation related to the operation of the System provided by Mevion to Customer.

1.24 "System Issue" means any defect, failure or other error in the System that (i) prevents the System from operating in accordance with the Specifications, or relates to a discrepancy with workflow or user interfaces, and (ii) is not an Excluded Issue.

1.25 "Updates" means any and all routine changes, error corrections, maintenance releases, fixes and upgrades to the System that are generally provided by Mevion without additional charge to Mevion's customers of MEVION S250 Systems under a current Support and Service Level Agreement. System Updates are performed during a Scheduled Maintenance Service activity. For clarity, Updates do not include new features or modules that Mevion may introduce from time to time, that were not previously purchased by the Customer.

**2. Mevion General Obligations.**

2.1 System Support: Mevion requires that a Mevion-trained and certified On-Site Support Representative is working at the Customer site anytime the System is being used for patient treatments. Mevion recommends that the On-Site Support Representative be on site anytime the System is in operation, by Customer personnel, for any other use, including for, but not limited to, simulated treatments, quality assurance, research, or general demonstration to other parties. Mevion will provide such support Services to the Customer according to the provisions in this section.

(a) On-Site Support During Business Hours: Mevion shall assign ~~one~~ two On-Site Support Representatives who will work at the Customer facility and provide support Services to the Customer. ~~The~~ Each ~~O~~On-Site Support Representative will work a standard forty (40)-

hour work week during Business Days, excluding any holidays or paid time off, as follows: (i) a work day for an On-Site Support shall consist of one nine (9) hour shift within the Business Hours of the Business Day; (ii) The On-Site Support Representatives shall have a one (1) hour lunch break and two fifteen (15) minute breaks each work day; (iii) The maximum number of scheduled work hours per week for the On-Site Support Representatives shall be 40 hours. (iv) The assigned On-Site Support Representatives will work staggered shifts to provide support coverage for the full business day; (v) Mevion recognizes that some overtime is occasionally required but all overtime for the On-Site Support Representative must be preapproved in writing by the On-Site Support Representative's manager at Mevion; (vi) For scheduled personal time off for an On-Site Support Representative of greater than five (5) consecutive Business Days, Mevion will assign an alternate On-Site Support Representative to provide on-site support; (vii) Mevion may occasionally require the On-Site Support Representative to provide remote support to other Mevion customers, provided it does not interfere with Mevion's support obligations to the Customer; (viii) On-Site Support Representatives are not authorized to work or consult on any other Customer system or equipment that was not supplied by Mevion.

(b) If Customer chooses Additional System Support Services as defined in Section 2.2, any the additional On-Site Support Representatives will may stagger their specific start and stop times, and their breaks, according to a mutually agreed upon schedule between the Parties and the existing On-Site Support Representatives to provide coverage for the Customer's operating hours.

2.2 Additional System Support. Mevion will provide additional on-site support to Customers who plan to routinely operate the System outside of the Business Hours or Business Days. The Customer acknowledges and agrees that Mevion may need to hire, train and certify additional resources to support the Customer if it intends to operate longer than the Business Hours or on non-Business days. The hire, train and certify process for a new On-Site Support Representative takes approximately nine (9) months so it is important that the Customer provide as much advance notification as possible to Mevion to give it time to plan for the resources required to support the Customer's operation. In the event the Customer does decide to increase operations beyond the Business Hours and Business Days, Mevion will use commercially reasonable efforts to Support the Customer during the ramp up period until such time as additional certified On-Site Support Representative are available. Additional fees will apply according to the rates set forth below and any fees related to additional system support will be added to and hereinafter included with the Service Fees.

(a) Additional Support on Business Days: If a Customer's operation of the System routinely extend beyond a 4060-hour support week (5 Business Days x 8 12 Business Hours per Business Day) the Customer must purchase additional On-Site Support Representative services from Mevion according to the following structure.

(i) One additional On-Site Support Representative shall be required for each 44-hour period, or portion thereof, beyond the Business Hours, up to a maximum of 18 20 operational hours in one Business Day. For example, if the Customer operates the System for 12 16 hours (the Business Hours plus 4 hours), the Customer must purchase the Services of one (1) additional on-Site Support Representative. If the Customer operates the System for 16 18 hours (the Business Hours plus an additional 8 6 hours)

the Customer must purchase the Services of two (2) additional on-Site Support Representatives.

(ii) The annual fee for each additional On-Site Support Representative is three hundred thousand United States dollars ($US 300,000) per year.

(b) Additional Support on Non-Business Days: Customers who plan to operate the System during non-Business Days may request On-Site Support Representative support. Mevion will negotiate with the Customer a support schedule that works for the Customer but that will not violate work hour restrictions set forth in this Agreement for the On-Site Support Representatives. The Customer acknowledges that the fees for additional non-Business Day support will be higher than for additional Business Day support.

(c) Additional Support, Overtime. Mevion recognizes that the Customer may wish to use the System outside of Business Hours or on a non-Business Day, and that such work is not routine and will only occur occasionally. In such cases an additional On-Site Support Representative assigned to the Customer site ~~support~~ is not necessary and Mevion will authorize overtime to the existing On-Site Support Representatives to support the Customer's efforts according to the following fee schedule:

(i) The overtime rates and work hour limits in this section shall apply if the Customer increases System operation beyond the Business Hours or during hours that the On-Site Support Representatives are not scheduled to work.

(ii) Business Day Overtime: Two-hundred fifty United States dollars ($US 250) per hour. Business Day overtime must be contiguous, meaning it is additional time beyond the On-Site Support Representative's regularly scheduled work day.

(iii) Non-Business Day Overtime: Three-hundred seventy-five United States dollars ($US 375) per hour. This is overtime for an On-Site Support Representative that is not scheduled to work on the day the support is requested.

(iv) Minimum Overtime Charges: The Customer acknowledges and agrees that there is a four (4) hour minimum charge for Non-Business Day Overtime, or non-contiguous Business Day overtime.

(v) The maximum hours a Support Representative is authorized to work is 13 hours during a Business Day or Non-Business Day (9 hours + 4 hours). All exceptions must be approved in writing by the On-Site Support Representative's manager.

2.3 Support Requests and Methods.

(a) Support Requests may be submitted by Customer 24 hours a day, 7 days a week, 365 days per year.

(b) All Support Requests shall be submitted to Mevion through (i) the On-Site Support Representative during Business Hours, and if after Business Hours (ii) the Support Phone Line, (iii) the Support Email Address, or (iv) the Customer portal to Mevion's Customer Relationship Management ("CRM") System (if available).

2.4 Product Support Services:

(a) Mevion shall respond to Support Requests and work on reported System Issues in accordance with this Section 2.4 (the "Product Support Services"), and Section 2.5. Upon receipt of a Support Request from Customer regarding a System Issue, Mevion shall document such System Issue in Mevion's CRM System and designate such System Issue as a Level 1 Issue, Level 2 Issue, Level 3 Issues or Level 4 Issue (each as defined in Section 2.4(b)(i)2.4(b)(ii)). Through the CRM System or by email, Mevion shall notify Customer that such System Issue has been documented, and notify the Customer when Mevion determines such System Issue has been resolved. If available, authorized Customer representatives shall have secure access to Customer's own unresolved and resolved System Issues through the CRM System. Customer acknowledges and agrees that "resolution" of a Level 1 Issue or Level 2 Issue may include implementation of a temporary fix, patch, or other temporary measure to resolve such Level 1 Issue or Level 2 Issue in an effort to allow Customer to resume operations, and Mevion reserves the right to reclassify any System Issue if the symptoms for its original classifications have been misstated, removed, or mitigated.

(b) For all reported Level 1, Level 2, and Level 3 Issues, Customer's sole and exclusive remedy and Mevion's sole and exclusive obligation shall be for Mevion, without expense to Customer (but subject to Sections 6 and 78), to use commercially reasonable efforts to remedy such System Issue, including, if necessary, repair or replacement, at Mevion's option, of any defective or deficient System component. Mevion shall review all Level 4 Issues and shall have the sole determination if a Level 4 Issue resolution is necessary or feasible, and Mevion makes no guarantee that any Level 4 Issue will be resolved. Customer acknowledges and agrees that Mevion does not warrant that the System is error-free or that Customer will have uninterrupted use, and Mevion shall not be obligated to remedy any System Issue which cannot be reproduced using commercially reasonable efforts.

(i) Issue Level Definitions:

(A) "Level 1 Issue" means a System Issue which prevents patient treatments and for which there is no immediate workaround. Examples of Level 1 Issues include, but are not limited to: (i) System will not turn on or produce a therapeutic quality proton beam, (ii) a condition exists that poses a safety threat to patients, therapists, or other personnel working in close proximity to the System, and (iii) continued use of the System may cause damage to the System or other equipment used by the System.

(B) "Level 2 Issue" means a System Issue that prevents normal operation of the System but the Customer can still use the System for patient treatments. "Normal Operation" means that the System can be safely used to treat patients scheduled on the System according to a clinical routine established by the



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

MEVION_000045
CONFIDENTIAL

Customer. For clarity, a Level 2 Issue is one that causes a Customer to change its established clinical routine. Examples of Level 2 Issues include, but are not limited to: (i) any temporarily resolved Level 1 Issues that prevent Normal Operation but where patient treatments can continue, (ii) any other System Issue that prevents Normal Operation, even with workarounds or other temporary solutions in place.

(C) "Level 3 Issue" means any System Issue that causes the System to not meet the Specifications but does not prevent Normal Operation. The Customer acknowledges and agrees that some Level 1 or Level 2 Issues may be reclassified as a Level 3 Issue if (i) a workaround or other temporary solution allows the Customer to continue with Normal Operation and (ii) Mevion plans a more permanent solution to the System Issue in a future Update.

(D) "Level 4 Issue" means a non-critical System Issue that does not materially impact the operation of the System. Examples of Level 4 Issues include documentation inaccuracies, user interface or workflow inconsistencies or discrepancies, or other non-critical System Issues.

2.5 Mevion Response; Response Times: Mevion shall employ reasonable efforts to respond to all Customer requests as quickly as reasonably practicable but will give priority to Mevion customers with Level 1 Issues. Customer acknowledges and agrees that response times are dependent on Issue Level, method of contact, and time of contact. Mevion response times, in the absence of an On-Site Support Representative, are typically achieved if Customer reports System Issues to Mevion using the Support Phone Line and Mevion recommends that Customer use the Support Phone Line only for reporting Level 1 and Level 2 Issues.

(a) During Business Hours:

(i) All System Issues shall first be reported to the On-Site Support Representative, if available. Mevion shall provide Customer with On-Site Support Representative's contact information to aid in this process. The On-Site Support Representative will use reasonable efforts to respond to Level 1 and Level 2 Issues within fifteen (15) minutes during Business Hours.

(ii) If the On-Site Support Representative is not available when a System Issue occurs during Business Hours, Mevion shall employ reasonable efforts to respond to Level 1 and Level 2 Issues within thirty (30) minutes for issues reported using Mevion's Support Phone Line.

(iii) Mevion will respond to Level 3 and Level 4 Issues within 1 hour if reported to the On-Site Support Representative during Business Hours, or within 2 hours of the next Business Day if other methods of contact are used.

(b) During Non-Business Hours:

(i) For Level 1 and Level 2 Issues reported after Business Hours, or after the regularly scheduled work shift of additional On-Site Support Mevion will use reasonable efforts to respond within one (1) hour if the Customer uses Mevion's Support Phone Line. If other methods of contact are used, Mevion shall employ reasonable efforts to respond within two (2) hours, or within two (2) hours of the next Business Day.

(ii) For Level 3 and Level 4 Issues reported during non Business Hours, Mevion shall respond within two (2) hours of the next Business Day.

2.6 Preventative Maintenance Services. Mevion shall use commercially reasonable efforts to provide Preventative Maintenance Services at mutually agreed upon times, including, where reasonably possible, on non-Business Days (but excluding Mevion and Customer holidays.) Such Preventative Maintenance Services shall be provided no less frequently than as set forth in the Preventative Maintenance Schedule set forth in Exhibit A. Customer acknowledges and agrees that some Preventative Maintenance activities will take longer than two weekend days and will on occasion extend into one or more Business Days. In most cases, instances of Preventative Maintenance Services items can be completed in two (2) or three (3) work days. In preparation for the Preventative Maintenance Service, Support Representatives may schedule and perform periodic inspections of the System to evaluate and determine any work that will be required in addition to the Preventative Maintenance Services. Customer acknowledges and agrees that Preventative Maintenance Services are required to optimize System performance and to help ensure proper System operation and System Uptime. Customer's failure to provide access to the System at the agreed upon times will constitute Customer's waiver of the scheduled Preventative Maintenance Services if the Preventative Maintenance Services cannot be completed within the time frame set forth in the Maintenance Guide, and if any resulting System Issues result in Down Days (as defined below), such Down Days shall not be applied to the calculation of the Uptime Warranty (as defined below).

2.7 Updates. Mevion agrees to provide Customer with Updates to the System (including any updates to System Documentation) as they are generally made available at no additional charge by Mevion to any of its other customers. Updates provided to Customer by Mevion shall be accompanied by explanatory functional release notes if reasonably necessary. The Customer understands and agrees that Mevion shall only provide support for the currently released version of the Operating Software and the two immediately preceding minor releases.

2.8 Subcontractors. Mevion may engage any subcontractor or other third party to perform any part or all of the Services provided under this Service Agreement without obtaining the consent of the Customer, provided that Mevion shall remain fully responsible and liable for the performance of all of the terms, conditions and obligations of this Service Agreement.

**3. Customer Responsibilities.**

3.1 Generally. Customer acknowledges and agrees that all rights of the Customer for any remedy with respect to System Issues are contingent upon Customer's:

(a) use of the System only for its intended purpose;

(b) following Mevion's System Documentation for System operation;

(c) maintaining proper System operating conditions at the Site as set forth in the System Documentation;

(d) exercising safe work practices and reasonable standards for quality control;

(e) notifying Mevion of any System Issue in a timely manner and accurately describing the symptoms of such System Issue;

(f) ensuring that only duly qualified personnel operate the System;

(g) not attempting to repair the System unless Customer's performance of such repair has been agreed to in writing by an Authorized Representative prior to the repair being implemented;

(h) making the System available to Mevion personnel during Business Days or other days as may be agreed to by the Parties, as required for troubleshooting, scheduled training, Preventative Maintenance (including periodic inspections), implementation of Updates, or other purposes necessary to maintain the operational status of the System; and

(i) providing Mevion employees or agents with sufficient access to the Facility (including any necessary security clearance) as required to access the System to assist with training, troubleshooting, running remote diagnostics, or other purposes as reasonably requested by Mevion.

3.2 Other Customer Responsibilities:

(a) Customer shall provide:

(i) A secure location to store MEVION S250 spare parts, tools and equipment as set forth in the System Documentation, or otherwise agreed to in writing by the Parties, that are accessible only to Mevion authorized personnel; and

(ii) A secure and permanent workspace in the facility for the On-Site Support Representative in close proximity the System, consistent with the space it provides Customer workers with similar type responsibilities, but in all events including parking, telephone service and internet access. Subject to Customer's facility access policies and procedures, the On-Site Support Representative shall be provided with access to the System twenty four (24) hours a day, seven (7) days a week, and shall be given an appropriate building security pass to permit such access.

(iii) Phone and internet access in the treatment room and lower level of the vault.

3. Secure and remote internet access to the System at all times (24/7).

(iv)



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

MEVION_000048
CONFIDENTIAL

(b) Cost of Excluded Issue Repairs: If any System Issues caused by Customer due to an excluded issue, then Customer shall be responsible for the cost of any repair, including the costs for components, cryogens, cooling gases, additional labor, and any travel expenses, beyond those required for a standard Business Day. Any issue caused by an Excluded Issue shall not be included in any downtime calculation.

~~(c) Customer shall be responsible for the cost of cryogens and cooling gases in the event that there is a slow discharge or quench of the superconducting magnet caused by Customer related issues such as, but not limited to, improper operation of the equipment, loss of facility cooling water or power, or denied access to the equipment either physically or remotely.~~

5.4. **Uptime Warranty**.

5.44.1 Uptime: Provided that Customer maintains a fully executed Maintenance and Support Agreement for the System, and that the Customer complies fully with the responsibilities established in Section 3.0 of this Agreement, Mevion warrants to Customer that, during the Term, the System shall operate with at least ninety five percent (95%) Uptime (as defined in Section 4.1(a)) measured over the course of each Service Year (such warranty, the "Uptime Warranty".)

(a) "Uptime" shall be calculated as follows, expressed as percentage:

$$\frac{\text{Base Days} - \text{Down Days}}{\text{Base Days}}$$

(b) "Base Days" means the number of Business Days the System is scheduled for use by Customer during any Service Year. Customer acknowledges and agrees that Base Days shall not include any Business Days that are scheduled for any Scheduled Maintenance Service including Updates, Preventative Maintenance Services or other mutually agreed upon scheduled activities that prevent Customer from using the System. The Base Days shall not exceed two hundred fifty (250) days in any calendar year.

(c) "Down Day" means a Base Days during which the System is subject to a Level 1 Issue for more than three and one half (3.5) Business Hours (in the aggregate), commencing when Customer issues a Support Request for a System Issue that Mevion reasonably determines is a Level 1 Issue. For the purposes of the calculating Down Days, the System shall not be considered subject to Level 1 Issue due to circumstances beyond Mevion's control, including but not limited to Force Majeure Events (as defined in Section 12.1213.11) and Excluded Issues. The Down Day period shall end when Mevion returns the System for use by the Customer. Time used to determine a Down Day does not include time for testing or validation by the Customer or time where Customer does not provide personnel, access or resources as reasonably required by Mevion to allow prompt mitigation of reported issues.

5.24.2 Penalty: In the event of any failure to achieve the Uptime target, Customer's sole and exclusive remedy, and Mevion's sole and exclusive obligation to Customer, shall be for Mevion to provide Customer with a credit towards the Service Fee for the Service Year immediately following the Service Year in which such credits were earned. For clarity, credits may not be carried over to Service Years subsequent to the immediately following Service Year. Customer Service Fee credits under this Service Agreement shall equal one percent (1%) of the annual Service Fee paid for the period in which the Uptime Warranty shortfall occurred for every two-percent (2%) that Uptime is

below the ninety five percent (95%) Uptime minimum, provided that in no event shall such credits act to reduce the Service Fee payable for Service Year immediately following the Service Year in which such credits were earned by more than ten percent (10%) of the Service Fee that would otherwise be payable for such Service Year. Customer agrees that any credits earned may only be applied to Service Fees for the Service Agreement in the immediately following Service Period. In the event that Customer does not elect to enter into a Service Agreement for the following Service Year, any credits earned for the previous period ending shall immediately expire.

6.5. **Replacement Parts.** Mevion shall use its commercially reasonable efforts to make available to Customer, at no extra charge and subject to commercial availability to or by Mevion: (a) spare and/or replacement parts that are included under the terms of this Service Agreement; and (b) any additional parts to the System that are required: (i) to maintain the functionality of the System in accordance with the Specifications; or (ii) required by Applicable Law. For clarity, this Section 5 does not apply to optional or new technology developed or offered by Mevion that is not strictly required for the purposes described in clauses (a) and (b) above.

6.15.1 **Use of Refurbished Parts:** Mevion reserves the right to use refurbished or known good previously used parts to repair the System at Mevion's sole discretion.

6.25.2 **Spare Parts Availability:** All such spare and/or replacement parts shall be available for not less than seven (7) years following the date when Mevion ceases to sell a product containing such replacements parts.

6.35.3 Any part removed from the System is the property of Mevion.

7.6. **Other Services.** Notwithstanding anything in this Agreement to the contrary, Customer may request other services that are beyond the scope of the Services provided herein and, if Mevion is reasonably able to provide such other services, Customer and Mevion shall negotiate in good faith to enter into a separate agreement for such other services, which shall include at a minimum a (a) statement clearly describing the work to be performed, and (b) the fees and payment terms. Customer acknowledges and agrees that Mevion is not obligated to provide other services that are beyond the scope of this agreement and no terms of this Agreement shall apply to any other agreement.

8.7. **Fees.**

8.17.1 Services Fee. Except as noted in Section 2.2 and Section 7, the Service Fees for the Services covered under this Agreement provided by Mevion hereunder (the "Services Fees") are set forth in Exhibit B (Service Fee Schedule).

8.27.2 Payment Terms. Service Fees are payable by Customer on the Services Start Date. Mevion shall issue invoices to Customer for each Service Fee due, and may issue invoices up to sixty (60) days in advance of the Services Start Date or the renewal of a Service Year or Service Period. The Service Fee for each Service Year or Service Period is payable no later than the latter to occur of (a) thirty (30) days following Customer's receipt of an invoice for such Service Fee and (b) the first day of such Service Year or Service Period. Balances remaining unpaid following their due date are subject to an interest charge of 1.5% per month or the highest rate permitted by law, whichever is lower, until paid.

8.37.3 Other Fees. Except as set forth in Section 2.2, Section 3.2(b), Section 6, and this

Section 7.3, the Services and replacement parts provided by Mevion hereunder are included in the Services Fee and are not subject to any additional charge. Notwithstanding anything else in this Agreement to the contrary, in the event that any Services or replacement parts are required to remedy any Excluded Issues, Mevion shall use its commercially reasonable efforts to remedy such Excluded Issues and Customer shall pay Mevion for such Service and/or replacement parts at Mevion's standard rates, and Customer shall reimburse Mevion for the associated actual and reasonable travel and lodging expenses incurred by Mevion personnel performing such services. Payment for such Services, replacement parts and expenses shall be due within thirty (30) days following Customer's receipt of the applicable invoice from Mevion.

8.47.4 Taxes. Amounts paid or payable to Mevion hereunder do not include any taxes or other charges levied by any governmental entity, including, without limitation, any import or export duties, VAT, property, inventory, sales, use, privileges, or excise taxes (including medical device excise taxes) or other taxes, and Customer shall be solely responsible for the payment of any such taxes or charges. Customer shall pay all such taxes and charges, on or before their due dates. In the event Mevion is required at any time to pay any such tax or charge, Customer shall reimburse Mevion therefore promptly on demand. If Customer is required by the law of any country to make any deduction, or withhold from any sum payable to Mevion hereunder, then the sum payable by Customer upon which the deduction or withholding is based shall be increased to the extent necessary to ensure that, after such deduction or withholding, Mevion receives and retains, free from liability for such deduction or withholding, a net amount equal to the amount Mevion would have received and retained in the absence of such required deduction or withholding.

**9.8. Disclaimer; Limitation of Liability.**

9.18.1 DISCLAIMER OF WARRANTIES. THE EXPRESS WARRANTIES SET FORTH IN THIS SERVICE AGREEMENT ARE EXPRESSLY IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ALL WARRANTIES OF NON-INFRINGEMENT, TITLE, MERCHANTABILITY, COURSE OF DEALING, USAGE OF TRADE, AND FITNESS FOR A PARTICULAR PURPOSE.

9.28.2 LIMITATION OF LIABILITY. IN NO EVENT SHALL A PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR SPECIAL LOSS OR DAMAGES OF ANY KIND, SUCH AS BUT NOT LIMITED TO LOST BUSINESS REVENUE, LOST PROFITS OR COSTS OF DOWNTIME RESULTING FROM MEVION'S PRODUCTS OR SERVICES, HOWEVER CAUSED, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. MEVION'S TOTAL LIABILITY ARISING HEREUNDER AND/OR RELATED TO THE SYSTEM SHALL NOT EXCEED THE AMOUNTS ACTUALLY RECEIVED BY MEVION FROM CUSTOMER UNDER THIS SERVICE AGREEMENT. THE FEES PAID UNDER THIS SERVICE AGREEMENT REFLECT THIS ALLOCATION OF RISK AND THE LIMITATIONS OF LIABILITY HEREIN.

9.38.3 EXCEPTIONS. THE LIMITATIONS SET FORTH IN THIS SECTION 8.49 SHALL NOT APPLY TO CLAIMS, DAMAGES, LIABILITIES OR EXPENSES ARISING FROM (i) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (ii) A PARTY'S BREACH OF AN OBLIGATION OF CONFIDENTIALITY.

**10.9. Confidentiality and Proprietary Rights.**



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

~~10.1~~9.1 Confidential Information. The Parties agree that any confidential or proprietary information or data, regardless of whether it is in tangible form, disclosed by either Party to the other Party or otherwise received by the receiving Party in connection with the activities contemplated by this Service Agreement shall be subject to the confidentiality provisions of the System Agreement.

~~10.2~~9.2 Proprietary Rights. The Parties hereby agree that any Proprietary Rights and/or Improvements that are developed in connection with the performance of the activities contemplated by this Agreement shall be subject to the applicable provisions of the System Agreement.

~~11.~~10. **Representations and Warranties.**

~~11.1~~10.1 Of Both Parties. Each Party represents and warrants that:

(a) Existence and Standing. It is a corporation, trust or other duly organized entity, validly existing and in good standing under the laws of state or jurisdiction in which it is incorporated or established, and it has full right and authority to enter into this Service Agreement.

(b) Authorization and Enforceability. This Service Agreement has been duly authorized by all requisite entity action, and when executed and delivered will become a valid and binding contract of it enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other law affecting creditors' rights generally from time to time in effect, and to general principles of equity.

(c) No Conflict. The execution, delivery and performance of this Service Agreement (i) has been duly authorized, and that upon execution this Service Agreement shall be a legal, valid, and binding obligation of it, enforceable in accordance with the terms hereof and (ii) does not conflict with any other agreement, contract, instrument or understanding, oral or written, to which such Party is a party, or by which such Party is bound.

(d) Applicable Law. In fulfilling its obligations, under this Service Agreement, such Party shall comply, and shall not prevent the other Party from complying or materially impede it in complying, with Applicable Law.

~~11.2~~10.2 Services. Mevion warrants and covenants that all the Services to be performed under this Service Agreement shall be performed in accordance with this Service Agreement by qualified personnel, in a timely, professional, work person-like manner, in compliance with Applicable Law, and in reasonable accordance with standard professional practices and standards in the industry.

~~12.~~11. **Term and Termination.**

~~12.1~~11.1 Term. This Service Agreement shall be binding upon the Parties on the Services Agreement Effective Date and continue until it terminates or expires as set forth herein. Notwithstanding the foregoing, neither Mevion nor Customer shall have any obligation or right under this Services Agreement until the first calendar day immediately following the end of the Warranty Period, as such term is defined in the System Agreement (the "Services Start Date). Thereafter, the Parties shall have the rights and obligations set forth herein and this Services Agreement shall continue for a number of Service Years equal to Service Period ("Initial Services Term"). This Service Agreement shall automatically renew for subsequent twelve (12) month terms (each, a "Subsequent Services Term" and together with the Initial Term, the "Services Term") unless Customer provides

Subject to Contract

written notice to Mevion no less than one hundred twenty (120) days prior to the end of the Initial Services Term or any Subsequent Services Term, as applicable, of its election not to renew; provided, however, that the fees and other provisions of any Subsequent Services Term shall be in accordance with the then current standard level service agreements generally offered by Mevion.

12.211.2 Termination.

(a) Breach. This Service Agreement may be terminated by either Party upon written notice to the other Party in the event that the other Party is in material breach of this Service Agreement, if such breaching Party has not commenced taking steps to cure such within thirty (30) days after its receipt of such notice; provided, however, that with respect to a Party's breach of any payment obligations hereunder, the non-breaching Party may terminate this Service Agreement in any event that a breach has not been cured within thirty (30) days after the breaching Party's receipt of such notice.

(b) Mutual Agreement. This Service Agreement may be terminated at any time by mutual written agreement of the Parties.

(c) Effect of Termination. Upon any termination of this Service Agreement for any reason: (i) any obligations **which have accrued as of** the effective date of such termination shall survive, including but not **limited to payment obligat**ions; (ii) any payments made by Customer hereunder shall be neither **refundable nor creditable** for any reason; and (iii) notwithstanding anything else in this Service Agreement to the contrary, the following provisions and or sections of this Service Agreement shall survive any termination of this Service Agreement: 1, 8.4, 7.49, 910, 1011, 11.2(c)12.2(c) and 1213.

**13.12. Miscellaneous.**

13.112.1 Assignment. Neither Party may sell, assign, delegate, or otherwise transfer this Service Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld, except that either Party (the "Assigning Party") may assign this Service Agreement as a whole without the written consent of other Party (the "Non-Assigning Party") to an affiliate or in connection with the acquisition (whether by merger, consolidation, sale or otherwise) of all or substantially all of the Assigning Party's assets or business, or all or substantially all of that part of such Assigning Party's business or assets to which this Service Agreement relates, provided that such affiliate or successor, shall expressly assume all of the Assigning Party's obligations under this Service Agreement by a writing delivered to the Non-Assigning Party. Subject to this provision, this Service Agreement shall be binding upon and inure to the benefit of the Parties, their successors and assigns.

13.212.2 Notice. Any notices, communications and waivers under this Service Agreement shall be deemed adequately given only if in writing and: (a) personally delivered; (b) sent by a nationally recognized overnight courier service; (c) sent by certified United States mail, postage prepaid, return receipt requested; or (d) sent by facsimile transmission, to the party or parties for whom such notices are intended. A written notice shall be deemed received: (i) when delivered in person; (ii) on the next Business Day immediately following the day sent by overnight courier; (iii) on the third (3rd) Business Day following the day sent by certified mail; and (iv) upon receipt by facsimile transmission as evidenced by a receipt transmission report. No Party shall be entitled to affirmatively refuse to accept delivery of any notice hereunder. Either Party may change its address or addressee by



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

giving notice to the other Party in accordance with this Section 12.213.2.

If notice to Customer:

With a copy that shall not constitute notice to:

If notice to Mevion:

Mevion Medical Systems, Inc.
300 Foster Street
Littleton, MA 01460
Facsimile: (978) 486-1033
Attn.: Chief Executive Officer

**With a copy to:**

Goodwin Procter LLP
53 State Street
Boston, MA 02109
Facsimile: (617) 523-1231
Attn: Mitchell S. Bloom

13.312.3 Waiver of Breach. No failure or delay of either Party to this Service Agreement to enforce at any time any of the provisions of this Service Agreement, or to exercise any option which is herein provided, or to require at any time performance of any of the provisions hereof, shall in any way: (a) be construed to be a waiver of such provision of this Service Agreement; (b) excuse the other Party's failure to perform; or (c) affect any right to enforce the provision at a later time. No failure to delay by either Party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

13.412.4 Severability. If any provision hereof is held to be unenforceable, the unenforceability shall not affect the remainder of this Service Agreement, which shall remain in effect and enforceable.

13.512.5 Incorporation of Documents. All Exhibits to this Service Agreement are incorporated herein by reference as if fully set forth herein. To the extent there is a direct conflict between the terms of the body of this Service Agreement and the terms of an Exhibit or any purchase order, the terms of the body of this Service Agreement shall control. Any terms contained in any proposal, bid or other document, including Customer's purchase order, that exclude, conflict with, or purport to add additional terms to the terms of the body of this Service Agreement, shall be of no force or effect.

13.612.6 Dispute Resolution. In the event of a controversy, dispute or question arising out of or in connection with this Service Agreement, or the interpretation, performance or non-performance of this Service Agreement or any breach hereof, the Parties agree that appropriate Mevion and Customer officers shall meet at a mutually agreeable time within ten (10) calendar days after such controversy, dispute or question is identified in writing by one Party to the other in order to

attempt to resolve such controversy, dispute or question, before any other action may be brought by either Party hereunder. Any controversy, dispute or question arising out of or in connection with this Service Agreement, or the interpretation, performance or non-performance of this Service Agreement or any breach hereof, if not resolved to the satisfaction of both Parties in accordance with the preceding sentence within thirty (30) calendar days of the date upon which both Parties became aware of such controversy, dispute or question, shall be determined by arbitration pursuant to the then existing commercial arbitration rules of the American Arbitration Association, in accordance with the following procedures. Arbitration shall be held in Boston, Massachusetts. The arbitration tribunal shall consist of three (3) arbitrators. Each Party shall nominate, in the request for arbitration and the answer thereto, one (1) arbitrator and the arbitrators so named shall then jointly appoint the third arbitrator to act as chairman of the arbitration tribunal. Any decision or award of such arbitration tribunal shall be final, conclusive and binding on the Parties hereto. Nothing contained in this Service Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration. Any award rendered by an arbitrator shall be enforceable in any court of competent jurisdiction.

~~13.7~~12.7 Remedies. Except as otherwise provided for herein, no remedy conferred by any of the specific provisions of this Service Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder, now or hereafter existing at law, in equity, by statute or otherwise. Except as otherwise provided for herein, the election of any one or more remedies by either Party shall not constitute a waiver of the right to pursue other available remedies.

~~13.8~~12.8 Relationship of Parties. Both Parties, in the performance of this Service Agreement, will be acting in separate capacities and not as employees, partners, joint venturers, joint developers, associates, or agents of one another. Each Party acknowledges that it does not have the authority to act for or in the name of the other Party or to commit the other Party in any manner whatsoever. The employees or agents of one Party shall not be deemed or construed to be the employees or agents of the other Party for any purpose. Nothing in this Service Agreement, either express or implied, is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Service Agreement.

~~13.9~~12.9 Non-Solicitation and No Hire. Customer agrees that without the express written consent of Mevion, at all times while Customer is employing the Services of Mevion, and for twelve (12) months after any Service Period terminates, Customer will not, directly or indirectly, whether individually or as an officer, director, employee, consultant, partner, stockholder, individual proprietor, joint venturer, investor, lender, consultant or any other capacity whatsoever: solicit, divert hire, retain (including as a consultant) or encourage to leave the employment or contract period of Mevion any employee or contractor of Mevion, or hire or retain (including as a consultant) any former employee of Mevion who has left the employment or contract period of Mevion within twelve (12) months prior to such hiring or retention.

~~13.10~~12.10 Entire Service Agreement. This Service Agreement, including its Exhibits contain the full and entire agreement between the Parties regarding the subject matter hereof, and expressly supersede all prior oral and written communications regarding that subject. No modifications or amendments to this Service Agreement, including the Exhibits hereto, shall be valid unless made in writing and signed by duly authorized representatives of both Parties. In choosing to enter into this Services Agreement, Customer has not relied on any statement of Mevion or any agent of Mevion which is not expressly set forth herein.

Subject to Contract

~~13.11~~12.11 Governing Law. This Service Agreement shall be governed by and interpreted, construed, and enforced in accordance with the internal laws of the Commonwealth of Massachusetts, **without regard to any choice or** conflict of law **provisions thereof. Subject to Section 13.6, each Party hereby irrevocably and unconditi**onally consents **to submit to the exclusive jurisdiction of the federal and state courts located in the** Suffolk County, M**assachusetts, for any actions, suits or proceedings** arising out of or relating to this Agreement and the transactions contemplated hereby.

~~13.12~~12.12 Force Majeure. Except for the obligation to make payment when due, neither Party shall be liable for any delay in delivery or other failure to perform hereunder which is due to unforeseen circumstances, or to causes beyond its reasonable control, including, without limitation, acts of God, fire, flood, and storms, wars, acts of terrorism, sabotage, strike, government actions, lock out, labor disputes, riots, civil commotions, malicious damages, compliances with a law or governmental order, rules or regulations enacted following the Services Agreement Effective Date, and any other similar occurrence beyond the non-performing Party's control (each, a "Force Majeure Event"). Any Party asserting its inability to perform any obligation hereunder for any such Force Majeure Event shall promptly notify the other Party of the existence of any such Force Majeure Event, and shall use its commercially reasonable efforts to re-commence its performance of such obligation as soon as commercially practicable.

[***Remainder of Page Intentionally Left Blank***]

**IN WITNESS WHEREOF,** Customer and Mevion each has caused this Service Agreement to be executed by its duly authorized representative.

| MEVION MEDICAL SYSTEMS, INC. | Los Angeles Proton Center, AKA. Beverly Proton Center LLC |
|---|---|
| By: Arnold B. Melson | By: C. Liu |
| Name: DONALD B. MELSON | Name: CHARLES LIU |
| Title: CFO | Title: President |

FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

## EXHIBIT A

### Preventative Maintenance Schedule

**Preventative Maintenance Services:** Preventive Maintenance Services are a comprehensive program of inspection, adjustment, and exchange of components scheduled to maintain System reliability and Uptime.

If any inspection or operational test fails during a scheduled Preventative Maintenance, Mevion shall repair or replace components as required to bring the System to operational status. In addition to scheduled Preventative Maintenance items, Mevion may perform other maintenance items as appropriate during a Preventative Maintenance session, including but not limited to, deferred maintenance, upgrades, Engineering Change Orders, or other required System maintenance. Mevion shall use reasonable efforts to perform inspections, adjustments and repairs within the estimated durations and notify Customer of any changes to the expected downtimes for such Services. The Preventative Maintenance schedule, durations, and replacement parts used are subject to change.

**MEVION S250 Preventative Maintenance Schedule**

| PM Task | Service Item | Interval (X=PM Action) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 Mo. | 6 Mo. | 12 Mo. | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
| **Inspect, Service as required** | | | | | | | | | | |
| 1 | Vacuum Gauges | X | X | X | X | X | X | | | |
| 2 | Ion Source probe Set | X | X | X | X | X | X | | | |
| 3 | Ion Source Pulser Chassis | X | X | X | X | X | X | | | |
| 4 | Removable Pole Plug Seal | X | X | X | X | X | X | | | |
| 5 | Fixed Pole Plug Seal | X | X | X | X | X | X | | | |
| 6 | Ion Source Gas Chassis | X | X | X | X | X | X | | | |
| 7 | Turbo Vacuum and Scroll pump | X | X | X | X | X | X | | | |
| 8 | Applicators and Mounting Cart | X | X | X | X | X | X | | | |
| 9 | Treatment Gantry Coupler/Detent | X | X | X | X | X | X | | | |
| 10 | RF Amplifier | | X | X | X | X | X | | | |
| 11 | Rotary Joint | | X | X | X | X | X | | | |
| 12 | Rotary Capacitor | | X | X | X | X | X | | | |
| 13 | Gantry Encoder | | X | X | X | X | X | | | |
| 14 | RF Insulator | | | X | X | X | X | | | |
| 15 | RF Surfaces | | | X | X | X | X | | | |
| 16 | Vacuum valves | | | X | X | X | X | | | |
| 17 | Ion Source central region electrodes | | | X | X | X | X | | | |
| 18 | Theta carriage | | | X | X | X | X | | | |
| 19 | Exit window | | | X | X | X | X | | | |
| 20 | Cold Head Power Cord | | | X | X | X | X | | | |
| 21 | X-ray Generator | | | X | X | X | X | | | |
| 22 | Patient Treatment Couch | | | X | X | X | X | | | |

| MEVION S250 Preventative Maintenance Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Interval (X=PM Action) | | | | | | | | |
| PM Task | Service Item | 3 | 6 | 12 | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
| **Clean** | | | | | | | | | | |
| 23 | Couch Controller Vent System | X | X | X | X | X | X | | | |
| 24 | X-ray System (Generator, Collimators, Tubes, Panels) | X | X | X | X | X | X | | | |
| **Lubricate** | | | | | | | | | | |
| 25 | Gantry Bearing | X | X | X | X | X | X | | | |
| 26 | Gantry Drive Pinion Bearing | X | X | X | X | X | X | | | |
| **Operational Test** | | | | | | | | | | |
| 27 | Helium Cryo-compressor | | | X | X | X | X | | | |
| 28 | Hardwired Safety System | X | X | X | X | X | X | | | |
| 29 | Hand Pendant | | | X | X | X | X | | | |
| 30 | Couch End of Travel Limit Switch | | | X | X | X | X | | | |
| 31 | Magnet Rundown Button | | | X | X | X | X | | | |
| 32 | Couch A1 Lowering Circuit | | | | X | | | | | |
| 33 | Panel Image | | X | X | X | X | X | | | |
| **Align Components, Replace as Required** | | | | | | | | | | |
| 34 | Applicators and Mounting Cart | | | | | | X | | | |
| **Replace** | | | | | | | | | | |
| 35 | Gantry Gearbox Oil (Right and Left) | | | | X | | | | | |
| 36 | X-ray Generator CPU Board Battery | | | | | | X | | | |
| 37 | Turbo Vacuum Pump | | | | X | | | | | |
| 38 | Applicator POGO Interconnect | | | X | X | X | X | | | |
| 39 | Scroll Pump Seal set | | | | X | | | | | |
| 40 | WCS Water and Filters | | X | X | X | X | X | | | |
| 41 | Scroll Pump Exhaust Silencer | | | X | X | X | X | | | |
| 42 | ST Cold Heads (SumiTomo) x3 | | | | | | | X | X | X |
| 43 | CM Cold Head (CryoMech) | | | | | | | X | X | X |
| 44 | CM Cryocompressor Oil Absorber | | | | | | | | X | |
| 45 | ST Cryocompressor Oil Absorber x3 | | | | | | | | | X |



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

## Preventative Maintenance Estimated Durations

| PM Interval # | Estimated Duration |
|---|---|
| 3 Mo. (4x Annually) | 1 day |
| 6 Mo. (2x Annually) | 2 days |
| 12 Mo. | 2 days |
| 24 Mo. | 3 days |
| 10K, 20K, and 30K hours | 5 days (2 weekend days + 3 Business Days) |
| 20K hours | 5 days (2 weekend days + 3 Business Days) |
| 30K hours | 5 days (2 weekend days + 3 Business Days) |

# Service intervals are inclusive. This means that the shorter interval PM items are included in the estimates. For example, the 6 month PM interval also includes the 3 month PM items (and the 12 month PM includes the three month items as well as the 6 month items).



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

MEVION_000060
CONFIDENTIAL

**EXHIBIT B**
**Maintenance and Support Service Fee**

1. Service Fee: The annual Service Fee for the initial Service Year for Services provided under this Agreement is $US 1,800,000.00
2. Annual Adjustment: The Service Fees for the following Service Years of the Service Period shall be adjusted annually by the lessor of (a) the rate of inflation as reflected by the Consumer Price Index - Urban for Boston, MA, USA or (b) 5% (five percent).
3. Payment Terms for the Service Fees are set forth in Section 7 of this Agreement.



FOIA Confidential Treatment
Requested by Mevion Medical Systems, Inc.

MEVION_000061
CONFIDENTIAL

Subject to Contract

**MEVION S250**
**MAINTENANCE AND SUPPORT AGREEMENT**

This MEVION S250 Maintenance and Support Agreement (this "Service Agreement") is entered into as of November 10, 2015 (the "Services Agreement Effective Date") by and between Mevion Medical Systems, Inc. ("Mevion"), a Delaware corporation having a principal place of business at 300 Foster Street, Littleton, Massachusetts 01460, and Los Angeles County Proton Center AKA. Beverly Proton Center LLC, with registered address at 200 East Beverly Blvd. #200 Montebello CA 90640 ("Customer"). Each of Mevion and Customer are referred to herein as "Party" and together as the "Parties".

WHEREAS, Mevion and Customer are parties to a certain System Purchase Agreement dated as of November 10, 2015 (the "System Agreement"), pursuant to which Customer has purchased a MEVION S250 proton beam radiation therapy system (the "MEVION S250 System"); and

WHEREAS, Mevion is willing to provide maintenance and support services, replacement parts and software updates in accordance with the terms and conditions of this Service Agreement, beginning on the first day following the expiration of the Warranty Period as defined in the System Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, conditions and agreements set forth herein, the Parties agree as follows:

**1. Construction; Definitions.**

For the purpose of this Service Agreement, the following words and phrases shall have the meanings set forth below. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the System Agreement. In the event of any conflict between the terms of the System Agreement (notwithstanding Section 11.6 thereof), or other agreements between the Parties, and this Service Agreement, the terms of this Service Agreement shall control

1.1 "Applicable Law" means all United States federal, state, and local laws, rules, regulations and ordinances applicable to the System and other activities undertaken by either Party in connection with this Service Agreement, including, without limitation, the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), as may be amended from time to time, and the federal rules and regulations promulgated thereunder.

1.2 "Authorized Representative" means a corporate officer or vice president of Mevion. For the avoidance of doubt, Support Representatives and other employees of Mevion that are not corporate officers or senior vice presidents are not Authorized Representatives.

1.3 "Business Day" means a day other than Saturday, Sunday, or any day on which the National Reserve Bank in the Territory is closed.

1.4 "Business Hours" mean the hours between 8:00 am and 58:00 pm local standard time in the Territory on any Business Day.

1.5 "Dollars" or "$" means United States dollars.

1.6 "Excluded Issue" means any defect, failure or other error the System which would be a System Issue but is caused by (i) unreasonable use, misuse, abuse, neglect or lack of routine care or



DM

maintenance of the System, including without limitation, failure to follow the procedures described in the System Documentation; (ii) failure to use or take any proper precautions as indicated in the System Documentation; (iii) relocation, alteration or modification of the System if such alteration or modification is not previously approved in writing by an Authorized Representative; (iv) service, repairs, installation, maintenance or relocation of the System performed by anyone other than by Support Representative unless approved in writing by an Authorized Representative; (v) anything external to the System, including without limitation (a) building structural deficiency or (b) power supply, heating, cooling, ventilation, or air conditioning fluctuation or failure; (vi) vandalism, lightning, earthquake, fire, smoke or water damage to the System; or (vii) use of the System in combination with any product or software not specifically approved in writing by an Authorized Representative.

1.7 "Issue Resolution" means fixes, workarounds, modifications or Updates that correct a System Issue.

1.8 "Maintenance Guide" means the document attached hereto as Exhibit A that lists the planned maintenance services to be performed by Mevion, including the schedule for performance thereof, any and all updated or modified versions or revisions of such Maintenance Guide that may be provided by Mevion to Customer from time to time, provided that such updated or modified versions or revisions do not materially and adversely change or degrade the scope of such services as of the date of this Service Agreement.

1.9 "On-Site Support Representative" means a Support Representative who is assigned to the Customer's facility, and whose primary responsibility is to provide System Product Support Services.

1.10 "Operating Software" means the computer software (in object code format only) provided with, and used to operate the System, including any updates, modifications or fixes to such software that Mevion may provide to Customer, as well as any related user documentation and/or manuals provided by Mevion to Customer (the "Software Documentation"). "Operating Software" will not include any third party open source software which may be used in conjunction with the operation of the System, provided that Mevion separately identifies such open source software to the Customer in advance, and makes such open software available to the Customer for license under the terms of the applicable open source license.

1.11 "Preventative Maintenance Services" means a Scheduled Maintenance Service to be provided by Mevion hereunder as set forth in the Maintenance Guide, including without limitation periodic System inspection, review of System operation, System lubrication and filter replacement and cleaning, and remedial maintenance of a non-emergency nature.

1.12 "Scheduled Maintenance Service" means any maintenance services provided by Mevion or an authorized agent of Mevion that is scheduled in advance by mutual agreement of the Parties.

1.13 "Services" means Preventative Maintenance Services, Product Support Services, Update services and other services expressly agreed to be provided by Mevion hereunder.

1.14 "Service Fee" means the amount set forth as the "Service Fee" in Exhibit B.

1.15 "Service Period" means the period of Service Years identified in Exhibit B as the

Subject to Contract

Service Period during which Mevion will provide the Services to Customer.

1.16 "Service Year" means the twelve (12) month period commencing on the Services Start Date as defined in Section 12.1, or the anniversary date of the start date of a Services Term for multiyear agreements, and ends 12 months later. By example, a Service Year that begins on July 1, 2013, will end June 30, 2014.

1.17 "Specifications" means the specifications referred to in the System Agreement.

1.18 "Support Email Address" means support@mevion.com or such other email address as Mevion may notify Customer of from time to time.

1.19 "Support Phone Line" means 1 855-4MEVION (855-463-8466) or such other telephone number that Mevion may notify Customer of from time to time.

1.20 "Support Request" means a request communicated by Customer to Mevion using approved communication methods as defined in Section 2.3 of this Agreement, to report a System Issue and to request an Issue Resolution, or to request some other Service or assistance.

1.21 "Support Representative" means an employee or agent of Mevion that is a duly trained representative familiar with the System and its operation, support and maintenance.

1.22 "System" has the meaning ascribed to such term in the System Agreement.

1.23 "System Documentation" means all copies and updates of the documentation related to the operation of the System provided by Mevion to Customer.

1.24 "System Issue" means any defect, failure or other error in the System that (i) prevents the System from operating in accordance with the Specifications, or relates to a discrepancy with workflow or user interfaces, and (ii) is not an Excluded Issue.

1.25 "Updates" means any and all routine changes, error corrections, maintenance releases, fixes and upgrades to the System that are generally provided by Mevion without additional charge to Mevion's customers of MEVION S250 Systems under a current Support and Service Level Agreement. System Updates are performed during a Scheduled Maintenance Service activity. For clarity, Updates do not include new features or modules that Mevion may introduce from time to time, that were not previously purchased by the Customer.

**2. Mevion General Obligations.**

2.1 System Support: Mevion requires that a Mevion-trained and certified On-Site Support Representative is working at the Customer site anytime the System is being used for patient treatments. Mevion recommends that the On-Site Support Representative be on site anytime the System is in operation, by Customer personnel, for any other use, including for, but not limited to, simulated treatments, quality assurance, research, or general demonstration to other parties. Mevion will provide such support Services to the Customer according to the provisions in this section.

(a) On-Site Support During Business Hours: Mevion shall assign ~~one~~ two On-Site Support Representatives who will work at the Customer facility and provide support Services to the Customer. ~~The~~ Each ~~O~~On-Site Support Representative will work a standard forty (40)-



JM

hour work week during Business Days, excluding any holidays or paid time off, as follows: (i) a work day for an On-Site Support shall consist of one nine (9) hour shift within the Business Hours of the Business Day; (ii) The On-Site Support Representatives shall have a one (1) hour lunch break and two fifteen (15) minute breaks each work day; (iii) The maximum number of scheduled work hours per week for the On-Site Support Representatives shall be 40 hours. (iv) The assigned On-Site Support Representatives will work staggered shifts to provide support coverage for the full business day; (v) Mevion recognizes that some overtime is occasionally required but all overtime for the On-Site Support Representative must be preapproved in writing by the On-Site Support Representative's manager at Mevion; (vi) For scheduled personal time off for an On-Site Support Representative of greater than five (5) consecutive Business Days, Mevion will assign an alternate On-Site Support Representative to provide on-site support; (vii) Mevion may occasionally require the On-Site Support Representative to provide remote support to other Mevion customers, provided it does not interfere with Mevion's support obligations to the Customer; (viii) On-Site Support Representatives are not authorized to work or consult on any other Customer system or equipment that was not supplied by Mevion.

(b) If Customer chooses Additional System Support Services as defined in Section 2.2, any ~~the~~ additional On-Site Support Representatives will ~~may~~ stagger their specific start and stop times, and their breaks, according to a mutually agreed upon schedule between the Parties and the existing On-Site Support Representatives to provide coverage for the Customer's operating hours.

2.2 Additional System Support. Mevion will provide additional on-site support to Customers who plan to routinely operate the System outside of the Business Hours or Business Days. The Customer acknowledges and agrees that Mevion may need to hire, train and certify additional resources to support the Customer if it intends to operate longer than the Business Hours or on non-Business days. The hire, train and certify process for a new On-Site Support Representative takes approximately nine (9) months so it is important that the Customer provide as much advance notification as possible to Mevion to give it time to plan for the resources required to support the Customer's operation. In the event the Customer does decide to increase operations beyond the Business Hours and Business Days, Mevion will use commercially reasonable efforts to Support the Customer during the ramp up period until such time as additional certified On-Site Support Representative are available. Additional fees will apply according to the rates set forth below and any fees related to additional system support will be added to and hereinafter included with the Service Fees.

(a) Additional Support on Business Days: If a Customer's operation of the System routinely extend beyond a ~~40~~60-hour support week (5 Business Days x ~~8~~ 12 Business Hours per Business Day) the Customer must purchase additional On-Site Support Representative services from Mevion according to the following structure.

(i) One additional On-Site Support Representative shall be required for each ~~4~~4-hour period, or portion thereof, beyond the Business Hours, up to a maximum of ~~18~~ 20 operational hours in one Business Day. For example, if the Customer operates the System for ~~12~~ 16 hours (the Business Hours plus 4 hours), the Customer must purchase the Services of one (1) additional on-Site Support Representative. If the Customer operates the System for ~~16~~ 18 hours (the Business Hours plus an additional ~~8~~ 6 hours)

the Customer must purchase the Services of two (2) additional on-Site Support Representatives.

(ii) The annual fee for each additional On-Site Support Representative is three hundred thousand United States dollars ($US 300,000) per year.

(b) Additional Support on Non-Business Days: Customers who plan to operate the System during non-Business Days may request On-Site Support Representative support. Mevion will negotiate with the Customer a support schedule that works for the Customer but that will not violate work hour restrictions set forth in this Agreement for the On-Site Support Representatives. The Customer acknowledges that the fees for additional non-Business Day support will be higher than for additional Business Day support.

(c) Additional Support, Overtime. Mevion recognizes that the Customer may wish to use the System outside of Business Hours or on a non-Business Day, and that such work is not routine and will only occur occasionally. In such cases an additional On-Site Support Representative assigned to the Customer site support is not necessary and Mevion will authorize overtime to the existing On-Site Support Representatives to support the Customer's efforts according to the following fee schedule:

(i) The overtime rates and work hour limits in this section shall apply if the Customer increases System operation beyond the Business Hours or during hours that the On-Site Support Representatives are not scheduled to work.

(ii) Business Day Overtime: Two-hundred fifty United States dollars ($US 250) per hour. Business Day overtime must be contiguous, meaning it is additional time beyond the On-Site Support Representative's regularly scheduled work day.

(iii) Non-Business Day Overtime: Three-hundred seventy-five United States dollars ($US 375) per hour. This is overtime for an On-Site Support Representative that is not scheduled to work on the day the support is requested.

(iv) Minimum Overtime Charges: The Customer acknowledges and agrees that there is a four (4) hour minimum charge for Non-Business Day Overtime, or non-contiguous Business Day overtime.

(v) The maximum hours a Support Representative is authorized to work is 13 hours during a Business Day or Non-Business Day (9 hours + 4 hours). All exceptions must be approved in writing by the On-Site Support Representative's manager.

2.3 Support Requests and Methods.

(a) Support Requests may be submitted by Customer 24 hours a day, 7 days a week, 365 days per year.



Dom

Subject to Contract

(b) All Support Requests shall be submitted to Mevion through (i) the On-Site Support Representative during Business Hours, and if after Business Hours (ii) the Support Phone Line, (iii) the Support Email Address, or (iv) the Customer portal to Mevion's Customer Relationship Management ("CRM") System (if available).

2.4 Product Support Services:

(a) Mevion shall respond to Support Requests and work on reported System Issues in accordance with this Section 2.4 (the "Product Support Services"), and Section 2.5. Upon receipt of a Support Request from Customer regarding a System Issue, Mevion shall document such System Issue in Mevion's CRM System and designate such System Issue as a Level 1 Issue, Level 2 Issue, Level 3 Issues or Level 4 Issue (each as defined in Section 2.4(b)(i)2.4(b)(i)). Through the CRM System or by email, Mevion shall notify Customer that such System Issue has been documented, and notify the Customer when Mevion determines such System Issue has been resolved. If available, authorized Customer representatives shall have secure access to Customer's own unresolved and resolved System Issues through the CRM System. Customer acknowledges and agrees that "resolution" of a Level 1 Issue or Level 2 Issue may include implementation of a temporary fix, patch, or other temporary measure to resolve such Level 1 Issue or Level 2 Issue in an effort to allow Customer to resume operations, and Mevion reserves the right to reclassify any System Issue if the symptoms for its original classifications have been misstated, removed, or mitigated.

(b) For all reported Level 1, Level 2, and Level 3 Issues, Customer's sole and exclusive remedy and Mevion's sole and exclusive obligation shall be for Mevion, without expense to Customer (but subject to Sections 67 and 78), to use commercially reasonable efforts to remedy such System Issue, including, if necessary, repair or replacement, at Mevion's option, of any defective or deficient System component. Mevion shall review all Level 4 Issues and shall have the sole determination if a Level 4 Issue resolution is necessary or feasible, and Mevion makes no guarantee that any Level 4 Issue will be resolved. Customer acknowledges and agrees that Mevion does not warrant that the System is error-free or that Customer will have uninterrupted use, and Mevion shall not be obligated to remedy any System Issue which cannot be reproduced using commercially reasonable efforts.

(i) Issue Level Definitions:

(A) "Level 1 Issue" means a System Issue which prevents patient treatments and for which there is no immediate workaround. Examples of Level 1 Issues include, but are not limited to: (i) System will not turn on or produce a therapeutic quality proton beam, (ii) a condition exists that poses a safety threat to patients, therapists, or other personnel working in close proximity to the System, and (iii) continued use of the System may cause damage to the System or other equipment used by the System.

(B) "Level 2 Issue" means a System Issue that prevents normal operation of the System but the Customer can still use the System for patient treatments. "Normal Operation" means that the System can be safely used to treat patients scheduled on the System according to a clinical routine established by the

Customer. For clarity, a Level 2 Issue is one that causes a Customer to change its established clinical routine. Examples of Level 2 Issues include, but are not limited to: (i) any temporarily resolved Level 1 Issues that prevent Normal Operation but where patient treatments can continue, (ii) any other System Issue that prevents Normal Operation, even with workarounds or other temporary solutions in place.

(C) "Level 3 Issue" means any System Issue that causes the System to not meet the Specifications but does not prevent Normal Operation. The Customer acknowledges and agrees that some Level 1 or Level 2 Issues may be reclassified as a Level 3 Issue if (i) a workaround or other temporary solution allows the Customer to continue with Normal Operation and (ii) Mevion plans a more permanent solution to the System Issue in a future Update.

(D) "Level 4 Issue" means a non-critical System Issue that does not materially impact the operation of the System. Examples of Level 4 Issues include documentation inaccuracies, user interface or workflow inconsistencies or discrepancies, or other non-critical System Issues.

2.5 Mevion Response; Response Times: Mevion shall employ reasonable efforts to respond to all Customer requests as quickly as reasonably practicable but will give priority to Mevion customers with Level 1 Issues. Customer acknowledges and agrees that response times are dependent on Issue Level, method of contact, and time of contact. Mevion response times, in the absence of an On-Site Support Representative, are typically achieved if Customer reports System Issues to Mevion using the Support Phone Line and Mevion recommends that Customer use the Support Phone Line only for reporting Level 1 and Level 2 Issues.

(a) During Business Hours:

(i) All System Issues shall first be reported to the On-Site Support Representative, if available. Mevion shall provide Customer with On-Site Support Representative's contact information to aid in this process. The On-Site Support Representative will use reasonable efforts to respond to Level 1 and Level 2 Issues within fifteen (15) minutes during Business Hours.

(ii) If the On-Site Support Representative is not available when a System Issue occurs during Business Hours, Mevion shall employ reasonable efforts to respond to Level 1 and Level 2 Issues within thirty (30) minutes for issues reported using Mevion's Support Phone Line.

(iii) Mevion will respond to Level 3 and Level 4 Issues within 1 hour if reported to the On-Site Support Representative during Business Hours, or within 2 hours of the next Business Day if other methods of contact are used.

(b) During Non-Business Hours:

(i) For Level 1 and Level 2 Issues reported after Business Hours, or after the regularly scheduled work shift of additional On-Site Support Mevion will use reasonable efforts to respond within one (1) hour if the Customer uses Mevion's Support Phone Line. If other methods of contact are used, Mevion shall employ reasonable efforts to respond within two (2) hours, or within two (2) hours of the next Business Day.

(ii) For Level 3 and Level 4 Issues reported during non Business Hours, Mevion shall respond within two (2) hours of the next Business Day.

2.6 Preventative Maintenance Services. Mevion shall use commercially reasonable efforts to provide Preventative Maintenance Services at mutually agreed upon times, including, where reasonably possible, on non-Business Days (but excluding Mevion and Customer holidays.) Such Preventative Maintenance Services shall be provided no less frequently than as set forth in the Preventative Maintenance Schedule set forth in Exhibit A. Customer acknowledges and agrees that some Preventative Maintenance activities will take longer than two weekend days and will on occasion extend into one or more Business Days. In most cases, instances of Preventative Maintenance Services items can be completed in two (2) or three (3) work days. In preparation for the Preventative Maintenance Service, Support Representatives may schedule and perform periodic inspections of the System to evaluate and determine any work that will be required in addition to the Preventative Maintenance Services. Customer acknowledges and agrees that Preventative Maintenance Services are required to optimize System performance and to help ensure proper System operation and System Uptime. Customer's failure to provide access to the System at the agreed upon times will constitute Customer's waiver of the scheduled Preventative Maintenance Services if the Preventative Maintenance Services cannot be completed within the time frame set forth in the Maintenance Guide, and if any resulting System Issues result in Down Days (as defined below), such Down Days shall not be applied to the calculation of the Uptime Warranty (as defined below).

2.7 Updates. Mevion agrees to provide Customer with Updates to the System (including any updates to System Documentation) as they are generally made available at no additional charge by Mevion to any of its other customers. Updates provided to Customer by Mevion shall be accompanied by explanatory functional release notes if reasonably necessary. The Customer understands and agrees that Mevion shall only provide support for the currently released version of the Operating Software and the two immediately preceding minor releases.

2.8 Subcontractors. Mevion may engage any subcontractor or other third party to perform any part or all of the Services provided under this Service Agreement without obtaining the consent of the Customer, provided that Mevion shall remain fully responsible and liable for the performance of all of the terms, conditions and obligations of this Service Agreement.

**3. Customer Responsibilities.**

3.1 Generally. Customer acknowledges and agrees that all rights of the Customer for any remedy with respect to System Issues are contingent upon Customer's:

(a) use of the System only for its intended purpose;

(b) following Mevion's System Documentation for System operation;

(c) maintaining proper System operating conditions at the Site as set forth in the System Documentation;

(d) exercising safe work practices and reasonable standards for quality control;

(e) notifying Mevion of any System Issue in a timely manner and accurately describing the symptoms of such System Issue;

(f) ensuring that only duly qualified personnel operate the System;

(g) not attempting to repair the System unless Customer's performance of such repair has been agreed to in writing by an Authorized Representative prior to the repair being implemented;

(h) making the System available to Mevion personnel during Business Days or other days as may be agreed to by the Parties, as required for troubleshooting, scheduled training, Preventative Maintenance (including periodic inspections), implementation of Updates, or other purposes necessary to maintain the operational status of the System; and

(i) providing Mevion employees or agents with sufficient access to the Facility (including any necessary security clearance) as required to access the System to assist with training, troubleshooting, running remote diagnostics, or other purposes as reasonably requested by Mevion.

3.2 Other Customer Responsibilities:

(a) Customer shall provide:

(i) A secure location to store MEVION S250 spare parts, tools and equipment as set forth in the System Documentation, or otherwise agreed to in writing by the Parties, that are accessible only to Mevion authorized personnel; and

(ii) A secure and permanent workspace in the facility for the On-Site Support Representative in close proximity the System, consistent with the space it provides Customer workers with similar type responsibilities, but in all events including parking, telephone service and internet access. Subject to Customer's facility access policies and procedures, the On-Site Support Representative shall be provided with access to the System twenty four (24) hours a day, seven (7) days a week, and shall be given an appropriate building security pass to permit such access.

(iii) Phone and internet access in the treatment room and lower level of the vault.

3. Secure and remote internet access to the System at all times (24/7).

(iv)

(b) Cost of Excluded Issue Repairs: If any System Issues caused by Customer due to an Excluded Issue, then Customer shall be responsible for the cost of any repair, including the costs for components, cryogens, cooling gases, additional labor, and any travel expenses, beyond those required for a standard Business Day. Any issue caused by an Excluded Issue shall not be included in any downtime calculation.

~~(c) Customer shall be responsible for the cost of cryogens and cooling gases in the event that there is a slow discharge or quench of the superconducting magnet caused by Customer related issues such as, but not limited to, improper operation of the equipment, loss of facility cooling water or power, or denied access to the equipment either physically or remotely.~~

**~~5.~~4. Uptime Warranty**.

~~5.1~~4.1 Uptime: Provided that Customer maintains a fully executed Maintenance and Support Agreement for the System, and that the Customer complies fully with the responsibilities established in Section 3.0 of this Agreement, Mevion warrants to Customer that, during the Term, the System shall operate with at least ninety five percent (95%) Uptime (as defined in Section 4.1(a)) measured over the course of each Service Year (such warranty, the "Uptime Warranty".)

(a) "Uptime" shall be calculated as follows, expressed as percentage:

$$\frac{\text{Base Days} - \text{Down Days}}{\text{Base Days}}$$

(b) "Base Days" means the number of Business Days the System is scheduled for use by Customer during any Service Year. Customer acknowledges and agrees that Base Days shall not include any Business Days that are scheduled for any Scheduled Maintenance Service including Updates, Preventative Maintenance Services or other mutually agreed upon scheduled activities that prevent Customer from using the System. The Base Days shall not exceed two hundred fifty (250) days in any calendar year.

(c) "Down Day" means a Base Days during which the System is subject to a Level 1 Issue for more than three and one half (3.5) Business Hours (in the aggregate), commencing when Customer issues a Support Request for a System Issue that Mevion reasonably determines is a Level 1 Issue. For the purposes of the calculating Down Days, the System shall not be considered subject to Level 1 Issue due to circumstances beyond Mevion's control, including but not limited to Force Majeure Events (as defined in Section 12.12~~13.11~~) and Excluded Issues. The Down Day period shall end when Mevion returns the System for use by the Customer. Time used to determine a Down Day does not include time for testing or validation by the Customer or time where Customer does not provide personnel, access or resources as reasonably required by Mevion to allow prompt mitigation of reported issues.

~~5.2~~4.2 Penalty: In the event of any failure to achieve the Uptime target, Customer's sole and exclusive remedy, and Mevion's sole and exclusive obligation to Customer, shall be for Mevion to provide Customer with a credit towards the Service Fee for the Service Year immediately following the Service Year in which such credits were earned. For clarity, credits may not be carried over to Service Years subsequent to the immediately following Service Year. Customer Service Fee credits under this Service Agreement shall equal one percent (1%) of the annual Service Fee paid for the period in which the Uptime Warranty shortfall occurred for every two-percent (2%) that Uptime is



DM

below the ninety five percent (95%) Uptime minimum, provided that in no event shall such credits act to reduce the Service Fee payable for Service Year immediately following the Service Year in which such credits were earned by more than ten percent (10%) of the Service Fee that would otherwise be payable for such Service Year. Customer agrees that any credits earned may only be applied to Service Fees for the Service Agreement in the immediately following Service Period. In the event that Customer does not elect to enter into a Service Agreement for the following Service Year, any credits earned for the previous period ending shall immediately expire.

6.5. **Replacement Parts.** Mevion shall use its commercially reasonable efforts to make available to Customer, at no extra charge and subject to commercial availability to or by Mevion: (a) spare and/or replacement parts that are included under the terms of this Service Agreement; and (b) any additional parts to the System that are required: (i) to maintain the functionality of the System in accordance with the Specifications; or (ii) required by Applicable Law. For clarity, this Section 5 does not apply to optional or new technology developed or offered by Mevion that is not strictly required for the purposes described in clauses (a) and (b) above.

6.15.1 **Use of Refurbished Parts:** Mevion reserves the right to use refurbished or known good previously used parts to repair the System at Mevion's sole discretion.

6.25.2 **Spare Parts Availability:** All such spare and/or replacement parts shall be available for not less than seven (7) years following the date when Mevion ceases to sell a product containing such replacements parts.

6.35.3 Any part removed from the System is the property of Mevion.

7.6. **Other Services.** Notwithstanding anything in this Agreement to the contrary, Customer may request other services that are beyond the scope of the Services provided herein and, if Mevion is reasonably able to provide such other services, Customer and Mevion shall negotiate in good faith to enter into a separate agreement for such other services, which shall include at a minimum a (a) statement clearly describing the work to be performed, and (b) the fees and payment terms. Customer acknowledges and agrees that Mevion is not obligated to provide other services that are beyond the scope of this agreement and no terms of this Agreement shall apply to any other agreement.

8.7. **Fees.**

8.17.1 Services Fee. Except as noted in Section 2.2 and Section 7, the Service Fees for the Services covered under this Agreement provided by Mevion hereunder (the "Services Fees") are set forth in Exhibit B (Service Fee Schedule).

8.27.2 Payment Terms. Service Fees are payable by Customer on the Services Start Date. Mevion shall issue invoices to Customer for each Service Fee due, and may issue invoices up to sixty (60) days in advance of the Services Start Date or the renewal of a Service Year or Service Period. The Service Fee for each Service Year or Service Period is payable no later than the latter to occur of (a) thirty (30) days following Customer's receipt of an invoice for such Service Fee and (b) the first day of such Service Year or Service Period. Balances remaining unpaid following their due date are subject to an interest charge of 1.5% per month or the highest rate permitted by law, whichever is lower, until paid.

8.37.3 Other Fees. Except as set forth in Section 2.2, Section 3.2(b), Section 6, and this

Section 7.3, the Services and replacement parts provided by Mevion hereunder are included in the Services Fee and are not subject to any additional charge. Notwithstanding anything else in this Agreement to the contrary, in the event that any Services or replacement parts are required to remedy any Excluded Issues, Mevion shall use its commercially reasonable efforts to remedy such Excluded Issues and Customer shall pay Mevion for such Service and/or replacement parts at Mevion's standard rates, and Customer shall reimburse Mevion for the associated actual and reasonable travel and lodging expenses incurred by Mevion personnel performing such services. Payment for such Services, replacement parts and expenses shall be due within thirty (30) days following Customer's receipt of the applicable invoice from Mevion.

8.47.4 Taxes. Amounts paid or payable to Mevion hereunder do not include any taxes or other charges levied by any governmental entity, including, without limitation, any import or export duties, VAT, property, inventory, sales, use, privileges, or excise taxes (including medical device excise taxes) or other taxes, and Customer shall be solely responsible for the payment of any such taxes or charges. Customer shall pay all such taxes and charges, on or before their due dates. In the event Mevion is required at any time to pay any such tax or charge, Customer shall reimburse Mevion therefore promptly on demand. If Customer is required by the law of any country to make any deduction, or withhold from any sum payable to Mevion hereunder, then the sum payable by Customer upon which the deduction or withholding is based shall be increased to the extent necessary to ensure that, after such deduction or withholding, Mevion receives and retains, free from liability for such deduction or withholding, a net amount equal to the amount Mevion would have received and retained in the absence of such required deduction or withholding.

**9.8. Disclaimer; Limitation of Liability.**

9.18.1 DISCLAIMER OF WARRANTIES. THE EXPRESS WARRANTIES SET FORTH IN THIS SERVICE AGREEMENT ARE EXPRESSLY IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ALL WARRANTIES OF NON-INFRINGEMENT, TITLE, MERCHANTABILITY, COURSE OF DEALING, USAGE OF TRADE, AND FITNESS FOR A PARTICULAR PURPOSE.

9.28.2 LIMITATION OF LIABILITY. IN NO EVENT SHALL A PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR SPECIAL LOSS OR DAMAGES OF ANY KIND, SUCH AS BUT NOT LIMITED TO LOST BUSINESS REVENUE, LOST PROFITS OR COSTS OF DOWNTIME RESULTING FROM MEVION'S PRODUCTS OR SERVICES, HOWEVER CAUSED, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. MEVION'S TOTAL LIABILITY ARISING HEREUNDER AND/OR RELATED TO THE SYSTEM SHALL NOT EXCEED THE AMOUNTS ACTUALLY RECEIVED BY MEVION FROM CUSTOMER UNDER THIS SERVICE AGREEMENT. THE FEES PAID UNDER THIS SERVICE AGREEMENT REFLECT THIS ALLOCATION OF RISK AND THE LIMITATIONS OF LIABILITY HEREIN.

9.38.3 EXCEPTIONS. THE LIMITATIONS SET FORTH IN THIS SECTION 7.49 SHALL NOT APPLY TO CLAIMS, DAMAGES, LIABILITIES OR EXPENSES ARISING FROM (i) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (ii) A PARTY'S BREACH OF AN OBLIGATION OF CONFIDENTIALITY.

**10.9. Confidentiality and Proprietary Rights.**

~~10.1~~9.1 Confidential Information. The Parties agree that any confidential or proprietary information or data, regardless of whether it is in tangible form, disclosed by either Party to the other Party or otherwise received by the receiving Party in connection with the activities contemplated by this Service Agreement shall be subject to the confidentiality provisions of the System Agreement.

~~10.2~~9.2 Proprietary Rights. The Parties hereby agree that any Proprietary Rights and/or Improvements that are developed in connection with the performance of the activities contemplated by this Agreement shall be subject to the applicable provisions of the System Agreement.

**~~11.~~10. Representations and Warranties.**

~~11.1~~10.1 Of Both Parties. Each Party represents and warrants that:

(a) Existence and Standing. It is a corporation, trust or other duly organized entity, validly existing and in good standing under the laws of state or jurisdiction in which it is incorporated or established, and it has full right and authority to enter into this Service Agreement.

(b) Authorization and Enforceability. This Service Agreement has been duly authorized by all requisite entity action, and when executed and delivered will become a valid and binding contract of it enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other law affecting creditors' rights generally from time to time in effect, and to general principles of equity.

(c) No Conflict. The execution, delivery and performance of this Service Agreement (i) has been duly authorized, and that upon execution this Service Agreement shall be a legal, valid, and binding obligation of it, enforceable in accordance with the terms hereof and (ii) does not conflict with any other agreement, contract, instrument or understanding, oral or written, to which such Party is a party, or by which such Party is bound.

(d) Applicable Law. In fulfilling its obligations, under this Service Agreement, such Party shall comply, and shall not prevent the other Party from complying or materially impede it in complying, with Applicable Law.

~~11.2~~10.2 Services. Mevion warrants and covenants that all the Services to be performed under this Service Agreement shall be performed in accordance with this Service Agreement by qualified personnel, in a timely, professional, work person-like manner, in compliance with Applicable Law, and in reasonable accordance with standard professional practices and standards in the industry.

**~~12.~~11. Term and Termination.**

~~12.1~~11.1 Term. This Service Agreement shall be binding upon the Parties on the Services Agreement Effective Date and continue until it terminates or expires as set forth herein. Notwithstanding the foregoing, neither Mevion nor Customer shall have any obligation or right under this Services Agreement until the first calendar day immediately following the end of the Warranty Period, as such term is defined in the System Agreement (the "Services Start Date). Thereafter, the Parties shall have the rights and obligations set forth herein and this Services Agreement shall continue for a number of Service Years equal to Service Period ("Initial Services Term"). This Service Agreement shall automatically renew for subsequent twelve (12) month terms (each, a "Subsequent Services Term" and together with the Initial Term, the "Services Term") unless Customer provides



TM

written notice to Mevion no less than one hundred twenty (120) days prior to the end of the Initial Services Term or any Subsequent Services Term, as applicable, of its election not to renew; provided, however, that the fees and other provisions of any Subsequent Services Term shall be in accordance with the then current standard level service agreements generally offered by Mevion.

~~12.2~~11.2 Termination.

(a) Breach. This Service Agreement may be terminated by either Party upon written notice to the other Party in the event that the other Party is in material breach of this Service Agreement, if such breaching Party has not commenced taking steps to cure such within thirty (30) days after its receipt of such notice; provided, however, that with respect to a Party's breach of any payment obligations hereunder, the non-breaching Party may terminate this Service Agreement in any event that a breach has not been cured within thirty (30) days after the breaching Party's receipt of such notice.

(b) Mutual Agreement. This Service Agreement may be terminated at any time by mutual written agreement of the Parties.

(c) Effect of Termination. Upon any termination of this Service Agreement for any reason: (i) any obligations which have accrued as of the effective date of such termination shall survive, including but not limited to payment obligations; (ii) any payments made by Customer hereunder shall be neither refundable nor creditable for any reason; and (iii) notwithstanding anything else in this Service Agreement to the contrary, the following provisions and or sections of this Service Agreement shall survive any termination of this Service Agreement: 1, 8.4, 7.~~4~~9, 9~~10~~, 10~~11~~, 11.2(c)~~12.2(e)~~ and 12~~13~~.

**~~13.~~12. Miscellaneous.**

~~13.1~~12.1 Assignment. Neither Party may sell, assign, delegate, or otherwise transfer this Service Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld, except that either Party (the "Assigning Party") may assign this Service Agreement as a whole without the written consent of other Party (the "Non-Assigning Party") to an affiliate or in connection with the acquisition (whether by merger, consolidation, sale or otherwise) of all or substantially all of the Assigning Party's assets or business, or all or substantially all of that part of such Assigning Party's business or assets to which this Service Agreement relates, provided that such affiliate or successor, shall expressly assume all of the Assigning Party's obligations under this Service Agreement by a writing delivered to the Non-Assigning Party. Subject to this provision, this Service Agreement shall be binding upon and inure to the benefit of the Parties, their successors and assigns.

~~13.2~~12.2 Notice. Any notices, communications and waivers under this Service Agreement shall be deemed adequately given only if in writing and: (a) personally delivered; (b) sent by a nationally recognized overnight courier service; (c) sent by certified United States mail, postage prepaid, return receipt requested; or (d) sent by facsimile transmission, to the party or parties for whom such notices are intended. A written notice shall be deemed received: (i) when delivered in person; (ii) on the next Business Day immediately following the day sent by overnight courier; (iii) on the third (3rd) Business Day following the day sent by certified mail; and (iv) upon receipt by facsimile transmission as evidenced by a receipt transmission report. No Party shall be entitled to affirmatively refuse to accept delivery of any notice hereunder. Either Party may change its address or addressee by

giving notice to the other Party in accordance with this Section 12.213.2.

If notice to Customer:

With a copy that shall not constitute notice to:

If notice to Mevion:

Mevion Medical Systems, Inc.
300 Foster Street
Littleton, MA 01460
Facsimile: (978) 486-1033
Attn.: Chief Executive Officer

With a copy to:

Goodwin Procter LLP
53 State Street
Boston, MA 02109
Facsimile: (617) 523-1231
Attn: Mitchell S. Bloom

13.312.3 Waiver of Breach. No failure or delay of either Party to this Service Agreement to enforce at any time any of the provisions of this Service Agreement, or to exercise any option which is herein provided, or to require at any time performance of any of the provisions hereof, shall in any way: (a) be construed to be a waiver of such provision of this Service Agreement; (b) excuse the other Party's failure to perform; or (c) affect any right to enforce the provision at a later time. No failure to delay by either Party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

13.412.4 Severability. If any provision hereof is held to be unenforceable, the unenforceability shall not affect the remainder of this Service Agreement, which shall remain in effect and enforceable.

13.512.5 Incorporation of Documents. All Exhibits to this Service Agreement are incorporated herein by reference as if fully set forth herein. To the extent there is a direct conflict between the terms of the body of this Service Agreement and the terms of an Exhibit or any purchase order, the terms of the body of this Service Agreement shall control. Any terms contained in any proposal, bid or other document, including Customer's purchase order, that exclude, conflict with, or purport to add additional terms to the terms of the body of this Service Agreement, shall be of no force or effect.

13.612.6 Dispute Resolution. In the event of a controversy, dispute or question arising out of or in connection with this Service Agreement, or the interpretation, performance or non-performance of this Service Agreement or any breach hereof, the Parties agree that appropriate Mevion and Customer officers shall meet at a mutually agreeable time within ten (10) calendar days after such controversy, dispute or question is identified in writing by one Party to the other in order to



DM

attempt to resolve such controversy, dispute or question, before any other action may be brought by either Party hereunder. Any controversy, dispute or question arising out of or in connection with this Service Agreement, or the interpretation, performance or non-performance of this Service Agreement or any breach hereof, if not resolved to the satisfaction of both Parties in accordance with the preceding sentence within thirty (30) calendar days of the date upon which both Parties became aware of such controversy, dispute or question, shall be determined by arbitration pursuant to the then existing commercial arbitration rules of the American Arbitration Association, in accordance with the following procedures. Arbitration shall be held in Boston, Massachusetts. The arbitration tribunal shall consist of three (3) arbitrators. Each Party shall nominate, in the request for arbitration and the answer thereto, one (1) arbitrator and the arbitrators so named shall then jointly appoint the third arbitrator to act as chairman of the arbitration tribunal. Any decision or award of such arbitration tribunal shall be final, conclusive and binding on the Parties hereto. Nothing contained in this Service Agreement shall in any way deprive either Party of its right to obtain injunctions or other equitable relief from a court of competent jurisdiction, including preliminary relief, pending arbitration. Any award rendered by an arbitrator shall be enforceable in any court of competent jurisdiction.

~~13.7~~12.7 Remedies. Except as otherwise provided for herein, no remedy conferred by any of the specific provisions of this Service Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder, now or hereafter existing at law, in equity, by statute or otherwise. Except as otherwise provided for herein, the election of any one or more remedies by either Party shall not constitute a waiver of the right to pursue other available remedies.

~~13.8~~12.8 Relationship of Parties. Both Parties, in the performance of this Service Agreement, will be acting in separate capacities and not as employees, partners, joint venturers, joint developers, associates, or agents of one another. Each Party acknowledges that it does not have the authority to act for or in the name of the other Party or to commit the other Party in any manner whatsoever. The employees or agents of one Party shall not be deemed or construed to be the employees or agents of the other Party for any purpose. Nothing in this Service Agreement, either express or implied, is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Service Agreement.

~~13.9~~12.9 Non-Solicitation and No Hire. Customer agrees that without the express written consent of Mevion, at all times while Customer is employing the Services of Mevion, and for twelve (12) months after any Service Period terminates, Customer will not, directly or indirectly, whether individually or as an officer, director, employee, consultant, partner, stockholder, individual proprietor, joint venturer, investor, lender, consultant or any other capacity whatsoever: solicit, divert hire, retain (including as a consultant) or encourage to leave the employment or contract period of Mevion any employee or contractor of Mevion, or hire or retain (including as a consultant) any former employee of Mevion who has left the employment or contract period of Mevion within twelve (12) months prior to such hiring or retention.

~~13.10~~12.10 Entire Service Agreement. This Service Agreement, including its Exhibits contain the full and entire agreement between the Parties regarding the subject matter hereof, and expressly supersede all prior oral and written communications regarding that subject. No modifications or amendments to this Service Agreement, including the Exhibits hereto, shall be valid unless made in writing and signed by duly authorized representatives of both Parties. In choosing to enter into this Services Agreement, Customer has not relied on any statement of Mevion or any agent of Mevion which is not expressly set forth herein.



TM

Subject to Contract

~~13.11~~12.11 Governing Law. This Service Agreement shall be governed by and interpreted, construed, and enforced in accordance with the internal laws of the Commonwealth of Massachusetts, without regard to any choice or conflict of law provisions thereof. Subject to Section 13.6, each Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the federal and state courts located in the Suffolk County, Massachusetts, for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

~~13.12~~12.12 Force Majeure. Except for the obligation to make payment when due, neither Party shall be liable for any delay in delivery or other failure to perform hereunder which is due to unforeseen circumstances, or to causes beyond its reasonable control, including, without limitation, acts of God, fire, flood, and storms, wars, acts of terrorism, sabotage, strike, government actions, lock out, labor disputes, riots, civil commotions, malicious damages, compliances with a law or governmental order, rules or regulations enacted following the Services Agreement Effective Date, and any other similar occurrence beyond the non-performing Party's control (each, a "Force Majeure Event"). Any Party asserting its inability to perform any obligation hereunder for any such Force Majeure Event shall promptly notify the other Party of the existence of any such Force Majeure Event, and shall use its commercially reasonable efforts to re-commence its performance of such obligation as soon as commercially practicable.

[***Remainder of Page Intentionally Left Blank***]

**IN WITNESS WHEREOF,** Customer and Mevion each has caused this Service Agreement to be executed by its duly authorized representative.

| MEVION MEDICAL SYSTEMS, INC. | Los Angeles Proton Center, AKA. Beverly Proton Center LLC |
|---|---|
| By: [signature] | By: [signature] |
| Name: DONALD B. MELSON | Name: CHARLES LIU |
| Title: CFO | Title: president |

Subject to Contract

## EXHIBIT A

### Preventative Maintenance Schedule

**Preventative Maintenance Services:** Preventive Maintenance Services are a comprehensive program of inspection, adjustment, and exchange of components scheduled to maintain System reliability and Uptime.

If any inspection or operational test fails during a scheduled Preventative Maintenance, Mevion shall repair or replace components as required to bring the System to operational status. In addition to scheduled Preventative Maintenance items, Mevion may perform other maintenance items as appropriate during a Preventative Maintenance session, including but not limited to, deferred maintenance, upgrades, Engineering Change Orders, or other required System maintenance. Mevion shall use reasonable efforts to perform inspections, adjustments and repairs within the estimated durations and notify Customer of any changes to the expected downtimes for such Services. The Preventative Maintenance schedule, durations, and replacement parts used are subject to change.

**MEVION S250 Preventative Maintenance Schedule**

| PM Task | Service Item | Interval (X=PM Action) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 Mo. | 6 Mo. | 12 Mo. | 24 Mo. | 36 Mo. | 60 Mo. | 10K Hr. | 20K Hr. | 30K Hr. |
| **Inspect, Service as required** | | | | | | | | | | |
| 1 | Vacuum Gauges | X | X | X | X | X | X | | | |
| 2 | Ion Source probe Set | X | X | X | X | X | X | | | |
| 3 | Ion Source Pulser Chassis | X | X | X | X | X | X | | | |
| 4 | Removable Pole Plug Seal | X | X | X | X | X | X | | | |
| 5 | Fixed Pole Plug Seal | X | X | X | X | X | X | | | |
| 6 | Ion Source Gas Chassis | X | X | X | X | X | X | | | |
| 7 | Turbo Vacuum and Scroll pump | X | X | X | X | X | X | | | |
| 8 | Applicators and Mounting Cart | X | X | X | X | X | X | | | |
| 9 | Treatment Gantry Coupler/Detent | X | X | X | X | X | X | | | |
| 10 | RF Amplifier | | X | X | X | X | X | | | |
| 11 | Rotary Joint | | X | X | X | X | X | | | |
| 12 | Rotary Capacitor | | X | X | X | X | X | | | |
| 13 | Gantry Encoder | | X | X | X | X | X | | | |
| 14 | RF Insulator | | | X | X | X | X | | | |
| 15 | RF Surfaces | | | X | X | X | X | | | |
| 16 | Vacuum valves | | | X | X | X | X | | | |
| 17 | Ion Source central region electrodes | | | X | X | X | X | | | |
| 18 | Theta carriage | | | X | X | X | X | | | |
| 19 | Exit window | | | X | X | X | X | | | |
| 20 | Cold Head Power Cord | | | X | X | X | X | | | |
| 21 | X-ray Generator | | | X | X | X | X | | | |
| 22 | Patient Treatment Couch | | | X | X | X | X | | | |

| MEVION S250 Preventative Maintenance Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Interval (X=PM Action) | | | | | | | | |
| **PM Task** | **Service Item** | **3** | **6** | **12** | **24 Mo.** | **36 Mo.** | **60 Mo.** | **10K Hr.** | **20K Hr.** | **30K Hr.** |
| **Clean** | | | | | | | | | | |
| 23 | Couch Controller Vent System | X | X | X | X | X | X | | | |
| 24 | X-ray System (Generator, Collimators, Tubes, Panels) | X | X | X | X | X | X | | | |
| **Lubricate** | | | | | | | | | | |
| 25 | Gantry Bearing | X | X | X | X | X | X | | | |
| 26 | Gantry Drive Pinion Bearing | X | X | X | X | X | X | | | |
| **Operational Test** | | | | | | | | | | |
| 27 | Helium Cryo-compressor | | | X | X | X | X | | | |
| 28 | Hardwired Safety System | X | X | X | X | X | X | | | |
| 29 | Hand Pendant | | | X | X | X | X | | | |
| 30 | Couch End of Travel Limit Switch | | | X | X | X | X | | | |
| 31 | Magnet Rundown Button | | | X | X | X | X | | | |
| 32 | Couch A1 Lowering Circuit | | | | X | | | | | |
| 33 | Panel Image | | X | X | X | X | X | | | |
| **Align Components, Replace as Required** | | | | | | | | | | |
| 34 | Applicators and Mounting Cart | | | | | | X | | | |
| **Replace** | | | | | | | | | | |
| 35 | Gantry Gearbox Oil (Right and Left) | | | | X | | | | | |
| 36 | X-ray Generator CPU Board Battery | | | | | | X | | | |
| 37 | Turbo Vacuum Pump | | | | X | | | | | |
| 38 | Applicator POGO Interconnect | | | X | X | X | X | | | |
| 39 | Scroll Pump Seal set | | | | X | | | | | |
| 40 | WCS Water and Filters | | X | X | X | X | X | | | |
| 41 | Scroll Pump Exhaust Silencer | | | X | X | X | X | | | |
| 42 | ST Cold Heads (SumiTomo) x3 | | | | | | | X | X | X |
| 43 | CM Cold Head (CryoMech) | | | | | | | X | X | X |
| 44 | CM Cryocompressor Oil Absorber | | | | | | | | X | |
| 45 | ST Cryocompressor Oil Absorber x3 | | | | | | | | | X |

## Preventative Maintenance Estimated Durations

| PM Interval # | Estimated Duration |
|---|---|
| 3 Mo. (4x Annually) | 1 day |
| 6 Mo. (2x Annually) | 2 days |
| 12 Mo. | 2 days |
| 24 Mo. | 3 days |
| 10K, 20K, and 30K hours | 5 days (2 weekend days + 3 Business Days) |
| 20K hours | 5 days (2 weekend days + 3 Business Days) |
| 30K hours | 5 days (2 weekend days + 3 Business Days) |

# Service intervals are inclusive. This means that the shorter interval PM items are included in the estimates. For example, the 6 month PM interval also includes the 3 month PM items (and the 12 month PM includes the three month items as well as the 6 month items).



DM

**EXHIBIT B**
**Maintenance and Support Service Fee**

1. Service Fee: The annual Service Fee for the initial Service Year for Services provided under this Agreement is $US 1,800,000.00
2. Annual Adjustment: The Service Fees for the following Service Years of the Service Period shall be adjusted annually by the lessor of (a) the rate of inflation as reflected by the Consumer Price Index - Urban for Boston, MA, USA or (b) 5% (five percent).
3. Payment Terms for the Service Fees are set forth in Section 7 of this Agreement.

# Exhibit 32

**Hervé Gouraige**
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400

**Attorney for Defendants Charles C. Liu and Xin Wang a/k/a Lisa Wang**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**Southern Division**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-v-

CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,

Defendants.

**REBUTTAL REPORT OF RONALD S. FRIEDMAN, CPA, IN RESPONSE TO THE EXPERT REPORT OF CAROLYN IRWIN, CPA, CFE**

**April 9, 2021**

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | **INTRODUCTION** | **1** |
| II. | **QUALIFICATIONS AND BASIS OF OPINIONS** | |
| | **A.** Background and Experience | **2** |
| | **B.** Basis of Opinions | **2** |
| III. | **SUMMARY OF OPINIONS** | **3** |
| IV. | **DETAILED OPINIONS** | |
| | **A.** Overview | **3** |
| | **B.** Incorrect Calculation of Net Pecuniary Gains | **3** |
| | **C.** Incorrect Inclusion of Investors and Their Capital Contribution | **9** |
| | **D.** Other Exclusions/Misinterpretations | **10** |
| V. | **CONCLUSIONS** | **10** |
| VI. | **ASSUMPTIONS AND LIMITING CONDITIONS** | **11** |
| VII. | **CERTIFICATIONS** | **12** |

**APPENDICES**

| | |
|---|---|
| Curriculum Vitae – Ronald S. Friedman | **Appendix A** |
| Documents Read and Relied Upon | **Appendix B** |

**EXHIBIT**

| | |
|---|---|
| Comparison of Expenses Included in between the Friedman Report and the Irwin Report | **Exhibit 1** |

# I. INTRODUCTION

MARCUM LLP ("Marcum") has been retained by Sills Cummis & Gross P.C. ("Counsel") in this matter[1] to provide a summary report and a rebuttal report and as an expert in the area of financial analysis and economic damages. We submit this rebuttal report ("Rebuttal Report") in connection with our anticipated testimony at the trial involving the Securities and Exchange Commission ("SEC" or "Plaintiff") v. Charles C. Liu ("Charles"), Xin Wang a/k/a Lisa Wang ("Lisa"), Pacific Proton Therapy Regional Center, LLC ("PPTRC"), Pacific Proton EB-5 Fund ("EB-5 Fund"), LLC, and Beverly Proton Center, LLC f/k/a Los Angeles Proton Therapy, LLC("BPC") (collectively the "Defendants").

On March 26, 2021, I ("Friedman") issued my Summary Report ("Friedman Report") concluding that as of April 30, 2016[2]:

- The Entities[3] had assets of approximately $12.5 million.
- The Entities had negligible liabilities.
- The Entities' capital accounts between the individuals who invested in the EB-5 Fund ("EB-5 Investors"), Charles and John Thropay ("Thropay"), totaled approximately $12.5 million.
- The Entities' earned total revenues of approximately $2,700,000 between the initial year of operations and April 30, 2016. This revenue was primarily related to the $45,000[4] in administrative fees that were paid by each of the 58 EB-5 investors.
- The Entities' paid approximately $19.3 million in expenses between the initial year of operations and April 30, 2016.
- The Entities' loss from operations was approximately $16,500,000 between the initial year of operations and April 30, 2016.

---

[1] Securities and Exchange Commission ("Plaintiff") versus Charles C. Liu, Xin Wang a/k/a Lisa Wang, Pacific Proton Therapy Regional Center, LLC, Pacific Proton EB-5 Fund, LLC, and Beverly Proton Center, LLC f/k/a Los Angeles County Proton Therapy, LLC (collectively, "Defendants").
[2] Friedman Report. Terms not otherwise defined herein retain the meaning ascribed to them in the Friedman Report.
[3] As defined in the Friedman Report - Pacific Proton Therapy Regional Center, LLC ("PPRC"); Pacific Proton Eb-5 Fund, LLC ("EB-5"); and Beverly Proton Center, LLC ("BPC") (collectively "Entities").
[4] Per the Private Offering Memorandum of the Pacific Proton EB-5 Fund, LLC, each investor has to pay $45,000 of initial administrative fee.

- The Entities through its EB-5 investors' investment, administrative fees and other miscellaneous income accumulated approximately $31,800,000 between the initial year of operations and April 30, 2016. As of April 30, 2016, only approximately $419,000 remained in the bank account of the Entities.

On March 26, 2021, Carolyn Irwin, CPA, CFE ("Irwin") wrote a report to counsel for the Plaintiff providing opinions on the Defendants' financial records and other data ("Irwin Report").

## II. QUALIFICATIONS – RONALD S. FRIEDMAN

### A. Background and Experience – Ronald S. Friedman, CPA

I am a Certified Public Accountant. I am currently employed as a Partner by Marcum specializing in the retail/consumer products/apparel industry group. I have over 48 years of collective experience in the apparel, consumer products, manufacturing, distribution and retail industries. I have provided consulting services and advised entities on strategic planning, budgeting, forecasting, mergers and acquisition, and factor negotiations. Additionally, I have also assisted various clients in the negotiations for the purchase and sale of businesses. I have also, for more than 30 years, served as an expert witness in numerous cases ranging from valuations in divorce proceedings to disputes between partners in business dealings.

My Curriculum Vitae is attached as **Appendix A**, which describes my background, qualifications, articles, and a list of other cases in which I have provided expert testimony. Marcum is being paid its normal hourly rates for the professionals involved in the above matter under my direction, ranging from $170 to $640. My hourly rate on this engagement is $625 for preparation of any work product including but not limited to summary report, rebuttal report and related appendices and exhibits and $750 for preparation of and attendance at any deposition/trial testimony. Marcum's compensation is not contingent on the conclusions reached or the ultimate resolution of the case.

In preparing this Rebuttal Report, Ronald S. Friedman ("Friedman") has read and relied upon the Irwin Report and the documents listed in Appendix B attached hereto.

### B. Basis of Opinions

My opinions are based upon my professional training and experience as well as my reading of the Irwin Report and analysis of documents listed in **Appendix B**.

My Rebuttal Report is qualified by the fact that, in conducting my work, I have made certain assumptions as to factual matters unless the contrary has been disclosed to me. These assumptions are as follows:

a) Copies of documents provided to us are complete and conform to the original documents, and there have been no subsequent amendments, orally or in writing; and

b) All information provided to Marcum, whether the information provided was a paper document, electronic document, or testimony, is true and correct.

This Report is based upon information currently known to me and my opinions are limited to the allegation of damages contained herein. I reserve the right to rely upon additional information that becomes available to me after the date of this Rebuttal Report and to supplement or amend my opinions accordingly, but have no obligation to do so.

## III. SUMMARY OF OPINIONS

The Irwin Report's assumptions, methodology, calculation and resulting conclusions with respect to "net pecuniary gains" asserted in this matter are flawed and exaggerated because of the myriad significant failures described below. As a result, the Irwin Report contains inaccurate conclusions that render it an unreliable basis for determining net profits and unusable for its intended purpose. As I understand from Counsel, the Supreme Court decision in this case documents that the investors are entitled to an award of net profits as restitution for their losses. The Irwin Report does not contain a profit & loss statement nor an income statement that calculates net profits for the Entities. As pointed out in the Friedman Report, the companies incurred substantial losses.

## IV. DETAILED OPINIONS

### A. Overview

In the section below, Marcum has documented the significant deficiencies in the Irwin Report as a result of using flawed assumptions which subsequently resulted in incorrect conclusions.

### B. Incorrect Calculation of Net Pecuniary Gains

Irwin's calculates "net pecuniary gains" by reducing offering expenses and business expenditures for a total of $5,316,510 from net receipts disgorgement of $25,539,021. However, Irwin's calculation of receipts, refunds and business expenditures is incorrect and flawed as follows:

1. **Incorrect Representation of Receipts Disgorgement**

In the Irwin Report, Irwin calculated the "net pecuniary gains" on Receipts Disgorgement of $26,733,019.[5] Irwin provides three separate references that this is the disgorgement per the Supreme Court's June 22, 2020 final judgement.[6]

I read and evaluated the Supreme Court's decision which was decided on June 22, 2020 and there is no mention of the amount referred to above as documented and represented in the Irwin Report. While the Supreme Court decision references, in whole numbers, amounts solicited[7], amount of disgorgement[8] and amount spend on marketing expenses and salaries[9], at no point does the Supreme Court decision even mention the amount referenced in the Irwin Report.

This inclusion of an unsubstantiated amount for receipts disgorgement to calculate the "net pecuniary gains" inflates the "net pecuniary gains" abnormally. In fact, Irwin could have used other approaches to calculate "net pecuniary gains" gained by Charles and Lisa considering pecuniary gains are defined as the additional before – tax profit to the defendant resulting from the relevant conduct of the offense.[10] Simply put the "net pecuniary gains" gained by Charles and Lisa should have been any funds that they received above the fair market value salaries that they should have received for the services they rendered to the different Entities.

2. **The Irwin Report incorrectly excludes the payment to Mevion Medical Systems, Inc. ("Mevion") from calculation of business expenses**

Irwin excludes the payment of the $3 million deposit for proton equipment to Mevion by BPC in Exhibit 6 of the Irwin Report.[11] Irwin documents in Exhibit 6, footnote reference 1 of the Irwin Report that "The PPEB5 Fund Private Offering Memorandum ("POM") only provided for proton equipment purchases from Optivus. Therefore the Mevion equipment purchases are not considered to be deductible."[12]

Irwin draws an incorrect conclusion based on her choice of selective data from the EB-5 Fund POM. Irwin ignores that in several sections of the POM there are several references of acquiring proton equipment from Optivus, the POM also clearly states "or another

[5] Irwin Report, at 9, 11, and Exhibit 9 note 1.
[6] Irwin Report, Exhibit 9.
[7] Supreme Court Decision decided on June 22, 2020, Page 4.
[8] Supreme Court Decision decided on June 22, 2020, Page 7 of J Thomas Dissent.
[9] Supreme Court Decision decided on June 22, 2020, Page 4.
[10] Unites States Sentencing Commission Guideline Manual subsection 8A1.2 cmt 3(H).
[11] Exhibit 6 of Irwin Report
[12] Exhibit 6, Footnote 1 of Irwin Report

provider".[13] Additionally, the POM also clearly documents that BPC had not begun discussions with Optivus nor negotiations of the terms for provision of such terms.[14] Irwin chooses to ignore this language included in the POM.

Irwin also used a footnote reference in the Irwin Report to describe Exhibit 109 of Thropay's deposition and represented that this aforementioned exhibit substantiated that the equipment from Mevion is for United MPH Ventures LLC and not BPC. Irwin further documented on page 20 of the Irwin Report that "Email communications also indicate that the payment to Mevion was made for the benefit of United MPH Ventures, a company other than Beverly Proton".[15]

Irwin chooses to ignore Charles's deposition dated February 24, 2021 wherein he testified under oath that he collaborated with other parties on the proton center due to disagreements with Thropay and was trying to put together an agreement with Mevion, City of Hope and Beverly Hospital to build the same proton center on an extended parcel of land that included the land owned by Thropay and a nearby land.[16] This is evidenced by the Memorandum of Understanding re Exchange of Real Property ("MOU-RE") between the Beverly Community Hospital Association, Montebello Community Health Services Inc., Thropay, Beverly Oncology & Imaging Centers Medical Group Inc. and BPC dated July 23, 2015.[17] Irwin chooses to ignore that Thropay had knowledge of BPC collaborating with City of Hope and Beverly Hospital to build the proton center.

Additionally, Irwin also ignores that the press release by Mevion included in Exhibit 109 does not mention United MPH Ventures LLC. In fact the press release states that. "Mevion Medical Systems is announcing the Los Angeles Proton Center[18] is building a three-room MEVION S250mx Proton Therapy System".[19]

Furthermore, Irwin chooses to ignore that Mevion signed a contract with BPC to manufacture the proton equipment[20] and a separate contract was executed to provide maintenance service[21] approximately 5 days prior to the press release included in Exhibit

[13] POM, Page 14, 15, and 22.
[14] POM, Page 15 and 22.
[15] Irwin Report, Page 20.
[16] Deposition of Charles Liu dated February 24, 2021, Page 117-121.
[17] SEC-DEFC-EPROD-00001299.
[18] Los Angeles Proton Center is the former name of BPC.
[19] https://www.businesswire.com/news/home/20151119006094/en/Mevion-to-Install-Three-Room-Proton-Therapy-System-in-Los-Angeles#:~:text=The%20system%20will%20include%20Mevion's,cancer%20patients%20in%20late%202017.
[20] System Purchase Agreement between Mevion Medical Systems, Inc. and Beverly Proton Center LLC dated November 9, 2015.
[21] Maintenance and Support Agreement between Mevion Medical Systems, Inc. and Beverly Proton Center LLC dated November 10, 2015.

109 to Thropay's deposition. Irwin also fails to take into consideration a letter dated August 18, 2016 from Mevion to BPC requesting milestone payment number four under the System Purchase Agreement between Mevion and BPC dated November 9, 2015.[22]

Due to the foregoing, Irwin's exclusion of the $3 million deposit paid to Mevion was incorrect and inflated the "net pecuniary gains".

3. **Incorrectly Calculating the Business Expense for PPTRC, BPC and EB-5 Fund**

Exhibit 6 of the Irwin Report includes a calculation of business expenses that she concludes are deductible business expenses. These expenses are then reduced from net receipts in Exhibit 9 of the Irwin Report to calculate the "net pecuniary gains".

Irwin incorrectly calculated the deductible business expenses as she did not include several payments made to entities/individuals that she has included in Exhibit 6 of the Irwin Report. Below are several examples of such exclusions:

i. Lease Payments and Lease Deposit paid to Thropay totaled $838,500[23] which included a lease deposit of $100,000.[24] The Irwin Report only included $524,000 of such payments.[25]
ii. Rent payments to parties other than Thropay totaled $321,423.[26] The Irwin Report only included $120,901.[27]
iii. Payments to Optivus Proton Beam Therapy, Inc. totaled $458,170.[28] The Irwin Report only included $368,100.[29]
iv. Other expenses such as office expense, travel expense and telephone expense are included in the Irwin Report but at a lesser value than the amounts in the Friedman Report.

Additionally, there were expenses such as payments in the amount of $402,549[30] to Skanska USA for construction that were not included in the Irwin Report at all. The Irwin

[22] THROPAY0000252.
[23] This amount is treated as a receivable from Thropay/his entity in the Friedman Report because per the lease agreement these amounts were not due until the entirety of capital was raised for the project.
[24] Exhibit 1G and 2F of the Friedman Report.
[25] Exhibit 6 of the Irwin Report.
[26] Exhibit 2 of the Friedman Report.
[27] Exhibit 6 of the Irwin Report.
[28] Exhibit 2C of the Friedman Report.
[29] Exhibit 6 of the Irwin Report.
[30] Exhibit 2C of Friedman Report.

Report does not provide any explanation why certain payments to certain vendors were not included or not included in their entirety.

Therefore, the Irwin Report does not include hundreds of thousands of dollars in expenses for legitimate business expenses or vendors that Irwin herself deems deductible as business expenses, as documented in her report. Hence, the deductible business expenditures calculated are incorrect and inflate the amount of "net pecuniary gains" assigned to Charles and Lisa.

4. **Incorrectly Excluding Any Compensation for Charles and Lisa**

The Irwin Report concludes that no compensation should be paid to Charles and Lisa due to the terms and conditions of various agreements.[31]

For the EB-5 Fund, the Irwin Report documents that, "The salary related to PPEB5 Fund would similarly be not deductible since the project did not generate revenue to render a management fee or salary payable to Mr. Liu. Moreover, the POM does not disclose any salary other than the management fee."[32] Additionally, the Irwin Report also represents the payment of compensation upon reaching the capital goals as documented in the Memorandum of Understanding between Thropay and Charles ("MOU").[33]

Irwin confuses the management fee to be paid as a percentage of EB-5 Fund revenue to the salary paid for services rendered by individuals facilitating the operations of the EB-5 Fund. Moreover, the POM documents the operational expenses several times and there is no mention of any restriction of operational expenses of EB-5 Fund.

Additionally, it is our understanding from Counsel that paragraph 11 of the MOU, it is the employment agreement between Charles and Lisa and BPC and Charles and EB-5 Fund and the services Charles and Lisa rendered that determine the compensation and not the MOU.[34] The Irwin Report ignores paragraph 11 of the MOU and the employment agreements and only cherry picks the data from the MOU that supports its analyses.

In addition to the above flawed arguments, the Irwin Report also documents that the calculation of compensation using the capital raised deems such compensation to be commission expense and thus would constitute an offering expense,[35] this is a flawed argument. First, the 8% of "all" capital raised is part of the employment agreement of BPC

[31] The Irwin Report, paragraph 45, 46 and 47
[32] The Irwin Report, paragraph 47
[33] MOU, paragraph 6B and 6C.
[34] MOU, paragraph 11.
[35] The Irwin Report, paragraph 46.

and BPC is not involved in raising funds.[36] Secondly, the Irwin Report ignores that Charles is in charge of all operations of BPC and is receiving compensation for services rendered and one way such compensation is being calculated is to use capital raised as a base.

The Irwin Report also ignores that the payments being made to Charles and Lisa are guaranteed payments under the employment agreements, not management fees.

Similar arguments apply for compensation paid to Lisa from BPC.

Furthermore, the Irwin Report includes no compensation analyses to determine what fair market value compensation should be paid to Charles and Lisa for the services they are rendering to PPTRC, BPC and EB-5 Fund. Therefore, the Irwin Report incorrectly excludes any compensation for Charles and Lisa as part of the deductible business expenses.

5. **Incorrectly Calculating Refunds and Deductible Offering Expenses**

The Irwin Report includes calculation of refunds as follows:[37]

| | |
|---|---|
| Refund of Capital of 2 Investors | $ 1,000,000 |
| Refund of Admin Fee of 1 Investor | 45,000 |
| Payments to Unknown Payees | 148,998 |
| Total Calculation of Refunds | $ 1,193,998 |

Irwin is incorrect in including refunds of two[38] investors' capital as there was only one investor who was refunded its capital and administrative fee.

Similarly, the calculation of the deductible offering expenses should include all 57 investors times the $45,000 administrative fee per investor, as documented in the POM. The Irwin Report only includes 49 investors in this calculation when in fact there are 57 investors in total. The total administrative fees that should be included as deductible offering expenses should be $2,565,000 (57 investors times $45,000).[39]

[36] Employment Agreement between Charles and BPC, paragraph 4.
[37] The Irwin Report, Exhibit 3 and 4.
[38] The Irwin Report, paragraph 28.
[39] The Friedman Report, Exhibit 2.

Based on Sections IV B1 through B5 of the Irwin Report, the total "net pecuniary gains" calculated by the Irwin used flawed assumptions and facts and hence reaches incorrect conclusions.

6. **Incorrectly Assigning All Net Pecuniary Gains Calculated to Charles and Lisa**

As mentioned above, not only is the calculation of "net pecuniary gains" incorrect, but assigning all such "net pecuniary gains" to Charles and Lisa is not appropriate because these funds did not go directly to or to the benefit of Charles and Lisa.

The Irwin Report fails to document that the payments that are included in its calculation of "net pecuniary gains" did not go directly to or to the benefit of Charles and Lisa. In fact, several of these payments went to third party entities that are not related to Charles and Lisa. Therefore, it is a flawed conclusion that all the "net pecuniary gains" calculated in the Irwin Report should be assigned to Charles and Lisa.

## C. Incorrect Inclusion of Investors and Their Capital Contribution

The Irwin Report documents that between October 2014 and April 2016, there are at least 50 investors that made deposits for capital contributions.[40] It further documents in error that two of these investors received a refund of their capital contributions.[41]

As documented above, not only is the Irwin Report incorrect about two investors being refunded, the Irwin Report is also incorrect about the number of investors contributing capital between October 2014 and April 2016. Based on the bank statements of the Entities, there were 49 investors who contributed capital between October 2014 and April 2016 and not 51 investors as listed in Exhibit 4 of the Irwin Report. Additionally there are five investor names that are listed in Exhibit 4 of the Irwin Report that were not included in the list of investors provided to me. I am unsure where Irwin sourced these investor names.

Lastly, while Irwin include business expenses from September 2013 in Exhibit 6 of the Irwin Report, she only includes capital contribution from October 2014. Had she included the entire data set for investors, there would be a total of 57 investors who contributed capital to the Entities. Therefore, the Irwin Report fails to give credit for approximately $360,000 ($45,000 times (57 investors minus 49 investors)) in revenues earned by the Entities.

[40] The Irwin Report, paragraph 28.
[41] Ibid

### D. Other Exclusions/Misinterpretations

1. The Irwin Report fails to mention and document the refund clause in the agreement between Overseas Chinese Immigration Consulting Ltd. and BPC wherein if the funds raised are less than $50 million in 36 months then Overseas Chinese Immigration Consulting Ltd. will return all marketing fees totaling $2.4 million ($800,000 paid for each contract year) and will pay an additional $1 million in penalty over 36 months.[42]

2. The Irwin Report documents that "the POM states that the EB-5 Project offering proceeds were expected to be used to finance not operating expenses, but rather the construction of the EB-5 Project, including the purchase of equipment and working capital and other costs.[43] Irwin provides a footnote reference to this statement as "Government Exhibit 5, p.20" which is the POM.

   This is yet another example of Irwin cherry picking data and choosing to not include data that does not support her analyses. Upon further analyses of the POM, page 20 I found the following language –

   > *"Although PPEB5 has broad discretion to adjust the application and allocation of the proceeds of this Offering in order to address changed circumstances and opportunities, PPEB5 intends to loan the proceeds of this Offering to Borrower for the uses described in this Offering Memorandum. Borrower intends to use the proceeds from this Offering to finance development and operation of the Los Angeles Proton Therapy Center described Borrower's business plan."*

   The above language documents that not only does the BPC intend to use the proceeds for financing **both** the development and operations of the proton center but that the EB-5 has broad discretion to adjust the application and allocation of the proceeds. The only exception to this is for the use of the administrative fees of $45,000 collected from each investor.[44]

## V. CONCLUSION

It is my opinion, to a reasonable degree of professional certainty, that the Irwin Report has significant deficiencies and has purposefully selected documents that supports the Plaintiff's

---

[42] Contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013.
[43] The Irwin Report, paragraph 10.
[44] The Irwin Report, Page 20, Footnote 2.

position and ignored other facts, documents and information. As a result of the following, the Irwin Report contains assumptions, methodology and flawed conclusions which resulted in an inability to comprehend the issues of the matter and therefore renders it unusable for its intended purpose:

1. The Irwin Report incorrectly calculates the "net pecuniary gains" as a result of using an incorrect approach, an incorrect receipts disgorgement and incorrectly calculating deductible business and offering expenses.

2. The Irwin Report incorrectly assigns all the "net pecuniary gains" to Charles and Lisa while ignoring the payments that were made to third party entities not related to either Charles and/or Lisa.

3. The Irwin Report uses an incorrect number of investors who contributed capital to the project and investors who were refunded their contributions. Additionally, there are several investor names included in the Irwin Report that are not included in the list of investors provided to me.

4. The Irwin Report also ignores several other facts that would materially change the opinion of the report.

We reserve the right to update or amend our report if additional data or discovery material becomes available to us. We reserve the right to amend or supplement our conclusions and opinions based upon analysis of this additional documentation.

## VI. ASSUMPTIONS AND LIMITING CONDITIONS

My report is subject to the following assumptions and limiting conditions:

1. I have not audited or performed any other procedures on this information and consequently assume no liability for the completeness or accuracy of such information;

2. This report is based on the information received up to and including the date of this report. I reserve the right to amend, supplement, and/or modify our report as additional facts and/or data are established in this matter, given its continuing legal process;

3. I have not audited, reviewed, nor compiled any historical financial information or federal or state income tax returns and, consequently, I express no form of assurance on them;

4. I have not audited nor reviewed the information contained herein in accordance with standards promulgated by the American Institute of Certified Public Accountants and, accordingly, express no opinion regarding compliance with such standards, and

5. This report is solely for the use in the matter of litigation of Securities and Exchange Commission, v. Charles C. Liu, Xin Wang a/k/a Lisa Wang, Pacific Proton Therapy Regional Center, LLC, Pacific Proton EB-5 Fund, LLC, and Beverly Proton Center, LLC f/k/a Los Angeles Proton Therapy, LLC.

## VII. <u>CERTIFICATIONS</u>

I certify, to the best of my knowledge and belief, that:

1. The statements of fact contained in this report are true and correct;

2. The report analyses, opinions, and conclusions are limited only to the reported assumptions and limiting conditions, and that they are our personal, unbiased, expert analyses, opinions and conclusions;

3. I have no present or prospective financial interest in the results of this case and I have no personal interest or bias with respect to the parties involved; and

4. My compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this report.

Very truly yours,

Marcum LLP

Ronald S. Friedman, CPA
Partner

# APPENDICES

# APPENDIX A

# Ronald S. Friedman

ASSURANCE SERVICES



**Ronald S. Friedman, CPA***
Partner

Ronald S. Friedman is a Partner and leader in the Firm's National Retail/Consumer Products Industry group, he provides consulting services for closely-held and emerging businesses in the apparel, manufacturing, distribution and retail industries.

Mr. Friedman works very closely with his clients providing assistance with many aspects of their businesses. His services include forecasting and budgeting, profit enhancement, succession planning, exit strategies, preparation for sale of a business, assistance in procuring financing, and workout and reorganization consulting. Mr. Friedman's expertise also includes assisting in the negotiations for the purchase or sale of a business.

Additionally, for more than 30 years Mr. Friedman has served as an expert witness in numerous consumer product cases ranging from valuations in divorce proceedings to disputes between partners in business dealings.

Mr. Friedman is often quoted in the media for his industry expertise with retail, manufacturing and distribution driven companies in the retail/consumer products sector. His recent appearances include television (FOX and PBS), radio (KFWB, Bloomberg Radio and the Wall Street Journal Radio Network) and print (Apparel News, Associated Press, Los Angeles Times, New York Times, The Wall Street Journal, Women's Wear Daily and Fashion Mannuscript).

## Professional & Civic Affiliations

American Institute of Certified Public Accountants (AICPA)
California Society of Certified Public Accountants (CalCPA)
City of Hope, Professions and Finance Associates, Past President
California State University Northridge University Corporation, Board of Directors
National Jewish Hospital, Board of Directors
Temple Ahavat Shalom in Northridge, Past President
Union of Reform Judaism, Presidents Round Table, CHAIR Southern California
New Horizons, Audit Committee Chairman
CSUN, University Corporation, Audit Committee Chairman

## Seminars & Presentations

100 Ways™- The Profit Enhancement Process
Facilitation of Retreats for Professional Service Firms & Other Businesses
Financial Statement Analysis
Inventory Valuations and Auditing
Reading and Understanding Financial Statements
Internal Controls for Business Entities

## Litigation Cases

- Reviewed books and records along with bank statements for cash stolen from company. Bookkeeper signed owners name on personal checks and destroyed them before owner saw bank statements.
- Reviewed credit card charges looking for inappropriate charges by users of the card.
- Worked with private investigators following a clients CFO to casino gambling with company funds he had stolen.
- Reconciled gross profits of a manufacturer to determine why the gross profits were not achieving expected results.
- In a bankruptcy case, looked for money and assets that the owner inappropriately took from the company at the expense of the general creditors.
- Prepared an expert report for litigation in Federal Court as an expert in financial analysis in the Retail/Consumer Products industry.
- Prepared an expert report and testified for an apparel company where minority shareholders claimed they were not fairly charged expenses and the business failed for lack of financial support from the majority shareholders.
- Testified in criminal court regarding the operations of a business.

## AREAS OF EXPERTISE

Forecasting & Budgeting
Succession Planning
Exit Strategies
Workouts & Reorganizations
Purchase & Sale of Businesses
Litigation Support

## KEY CLIENTS

Apparel
Manufacturing
Distribution
Retail
E-Commerce

## EDUCATION

Bachelor of Science, Accounting
California State University, Northridge

MARCUMGROUP
MEMBER

*Licensed by the State of California

Phone 310.432.7414
ron.friedman@marcumllp.com
www.marcumllp.com

MARCUM
ACCOUNTANTS ▲ ADVISORS

# TESTIMONY EXPERIENCE OF RONALD S. FRIEDMAN

**PRIOR TESTIMONY EXPERIENCE IN THE LAST FOUR YEARS:**

| TOPIC | IN THE MATTER OF | NATURE OF TESTIMONY | VENUE |
|---|---|---|---|
| Breach of Fiduciary Duty | Eric Kweach, an individual V. Sang Lee, an individual; Trinity Sports, Inc., a corporation | Trial | Superior Court of the State of California; County of Los Angeles, Central District |
| Breach of Contract | Imperial Toy LLC v Genna Rosenberg | Arbitration | AAA: Los Angeles |
| Shareholder Dispute | Lou et Lin, LLC v Mitchell Quaranta, Bruce Stern, Jonathan Greenberg, Jama JJ,LLC And SwatFame, Inc and Counter Claims | Arbitration | Jams Los Angeles |
| Breach of Fiduciary Duty | Alison Miller Gjersvik, individually and derivatively on behalf of Golden Too, Inc. and Andrew Assael, individually and derivatively on behalf of Planet Gold Clothing, Inc., Claimants, against Jeffrey D. Fisher and Bruce A. Fischer, Respondents and Golden Too, Inc. and Planet Gold Clothing, Inc., Nominal Respondents | Arbitration | AAA: Manhattan |
| Breach of Fiduciary Duty | XCVI, LLC v. Alpha Capital, LLC, Meesh & Mia, Elizabeth Turley, Saw Something Shiny, Columbia State Bank | Mediation | ADR Services – Los Angeles |
| Industry Expert | United States v. Gilbert N. Michaels, et al | Trial | U.S. Federal Court; Santa Ana, CA |
| Industry Expert/Damages | Marc Fisher LC, Fisher Licensing LLC, M.B. Fisher LLC, MBF Holdings LLC, Fisher Design LLC, MBF Licensing LLC, Unisa Fisher Wholesale LLC, Fisher Sigerson Morrison LLC, Marc Fisher Holdings LLC, Marc Fisher Jr Brand LLC, MFKK LLC, and MF-TFC LLC, Against Milberg Factors, Inc. | Deposition | Supreme Court, New York County |

# APPENDIX B

## Appendix B
## Documents Read and Relied Upon

1. Report to counsel for the Plaintiff providing opinions on the Defendants' financial records and other data by Carolyn Irwin, CPA, CFE dated March 26, 2021;
2. Summary Report by Ronald S. Friedman, CPA dated March 26, 2021;
3. All documents included in Appendix B in the Addendum Letter to Counsel dated April 2, 2021;
4. Exhibit 109 to Deposition of John Thropay dated March 5, 2021;
5. Supreme Court Decision in the matter, decided on June 22, 2020;
6. Unites States Sentencing Commission Guideline Manual;
7. Private Offering Memorandum for 300 Limited Liability Company Membership Units of Pacific Proton EB-5 Fund, LLC dated May 1, 2013;
8. Deposition of Charles Liu dated February 24, 2021;
9. Memorandum of Understanding re Exchange of Real Property between the Beverly Community Hospital Association, Montebello Community Health Services Inc., Thropay, Beverly Oncology & Imaging Centers Medical Group Inc. and BPC dated July 23, 2015; Bates Number - SEC-DEFC-EPROD-00001299;
10. https://www.businesswire.com/news/home/20151119006094/en/Mevion-to-Install-Three-Room-Proton-Therapy-System-in-Los-Angeles#:~:text=The%20system%20will%20include%20Mevion's,cancer%20patients%20in%20late%202017.
11. System Purchase Agreement between Mevion Medical Systems, Inc. and Beverly Proton Center LLC dated November 9, 2015;
12. Maintenance and Support Agreement between Mevion Medical Systems, Inc. and Beverly Proton Center LLC dated November 10, 2015
13. Bates Number - THROPAY0000252;
14. Memorandum of Understanding between Charles Liu and John P. Thropay dated February 16, 2011;
15. Employment agreement between the following:
    a. Pacific Proton EB-5 Fund LLC and Charles C. Liu dated July 1, 2012;
    b. Beverly Proton Center LLC and Xin Wang dated January 28, 2016;
    c. Beverly Proton Center LLC and Charles C. Liu dated April 5, 2016;
16. Contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013; and
17. All other documents, if any, mentioned in the attached report.

# EXHIBITS

# EXHIBIT 1

Exhibit 1

**Securities and Exchange Commission v. Charles Liu et.al**
**Comparison of Expenses Included in between the Friedman Report and the Irwin Report**

| | Profit and Loss Statement from Initial Year of Operations through Period Ending April 31, 2016 (1) | Expenses Capitalized on the Balance Sheet (2) | Total Expenses Included in the Friedman Report | Business Expenses Included in Irwin Report (3) | Ref | Difference |
|---|---|---|---|---|---|---|
| | A | B | C=A+B | D | | E=D-C |
| Amortization Expense | $ - | $ - | $ - | $ - | | $ - |
| Automobile Expense | 16,635 | - | 16,635 | - | | (16,635) |
| Automobile Lease | 109,349 | - | 109,349 | - | | (109,349) |
| Broker Fees | 4,266,025 | - | 4,266,025 | - | | (4,266,025) |
| Bank Service Charges | 12,952 | - | 12,952 | 19,843 | | 6,891 |
| Credit Card Charges | - | - | - | - | | - |
| Commissions | 315,000 | - | 315,000 | - | | (315,000) |
| Consulting Fees | 2,040,202 | - | 2,040,202 | 1,304,833 | (4) | (735,369) |
| Contributions | 12,500 | - | 12,500 | - | | (12,500) |
| Computer and Internet Expenses | 9,895 | - | 9,895 | - | | (9,895) |
| Demolition Expense | 466,487 | - | 466,487 | 466,487 | | - |
| Depreciation Expense | 19,124 | - | 19,124 | - | | (19,124) |
| Dues and Subscriptions | 560 | - | 560 | - | | (560) |
| Insurance | 20,887 | - | 20,887 | 21,574 | (5) | 687 |
| Interest Expense | 775 | - | 775 | - | | (775) |
| Legal & Professional Fees | 782,824 | - | 782,824 | 503,425 | | (279,399) |
| Licenses and Permits | 4,568 | - | 4,568 | 2,721 | | (1,847) |
| Management Fees - Charles Liu | 7,211,692 | - | 7,211,692 | - | | (7,211,692) |
| Management Fees - Xin Wang | 367,215 | - | 367,215 | - | | (367,215) |
| Management Fees - PPRC | - | - | - | - | | - |
| Marketing Fees | 2,550,025 | - | 2,550,025 | - | | (2,550,025) |
| Meals & Entertainment | 8,615 | - | 8,615 | - | | (8,615) |
| Miscellaneous | 7,331 | - | 7,331 | 687 | | (6,644) |
| Office Expenses | 179,935 | - | 179,935 | 2,707 | | (177,228) |
| Outside Services | 2,702 | - | 2,702 | - | | (2,702) |
| Penalty | 563 | - | 563 | - | | (563) |

**Securities and Exchange Commission v. Charles Liu et.al**
**Comparison of Expenses Included in between the Friedman Report and the Irwin Report**

| | Profit and Loss Statement from Initial Year of Operations through Period Ending April 31, 2016 (1) | Expenses Capitalized on the Balance Sheet (2) | Total Expenses Included in the Friedman Report | Business Expenses Included in Irwin Report (3) | Ref | Difference |
|---|---|---|---|---|---|---|
| | A | B | C=A+B | D | | E=D-C |
| Postage and Delivery | 12,365 | - | 12,365 | 11,730 | | (635) |
| Printing & Reproduction | 8,022 | - | 8,022 | - | | (8,022) |
| Rent (Thropay) | - | - | - | - | | - |
| Rent | 321,423 | - | 321,423 | 120,901 | | (200,522) |
| Telephone | 44,097 | - | 44,097 | 7,764 | | (36,333) |
| Travel | 414,231 | - | 414,231 | 20,394 | | (393,837) |
| Payroll Expenses | 42,444 | - | 42,444 | - | | (42,444) |
| State Franchise Tax | 18,100 | - | 18,100 | 10,900 | | (7,200) |
| Medical Equipment | - | 3,000,000 | 3,000,000 | - | | (3,000,000) |
| Furniture & Fixtures | - | 65,682 | 65,682 | 78,532 | | 12,850 |
| Office Equipment | - | 16,109 | 16,109 | 9,311 | | (6,798) |
| Receivable from John Paul Thropay | - | 838,500 | 838,500 | 524,000 | | (314,500) |
| Management Fee Receivable from Charles Liu | - | 2,013,579 | 2,013,579 | - | | (2,013,579) |
| Management Fee Receivable from Xin Wang | - | 1,066,285 | 1,066,285 | - | | (1,066,285) |
| Receivable from Overseas Chinese Immigration Consulting | - | 3,400,000 | 3,400,000 | - | | (3,400,000) |
| Lease Deposit | - | 200,000 | 200,000 | - | | (200,000) |
| **Total Expenses** | **$ 19,266,540** | **$ 10,600,155** | **$ 29,866,695** | **$ 3,105,809** | | **$ (26,760,886)** |

**Notes:**
**(1)** Source - Exhibit 2 of the Friedman Report.
**(2)** Source - Exhibit 1 of the Friedman Report.
**(3)** Source - Exhibit 6 of the Irwin Report.
**(4)** This includes payments to the following:
Construction Design - X Science Studio $ 535,292

Exhibit 1

**Securities and Exchange Commission v. Charles Liu et.al**
**Comparison of Expenses Included in between the Friedman Report and the Irwin Report**

| | Profit and Loss Statement from Initial Year of Operations through Period Ending April 31, 2016 (1) | Expenses Capitalized on the Balance Sheet (2) | Total Expenses Included in the Friedman Report | | Business Expenses Included in Irwin Report (3) | Ref | Difference |
|---|---|---|---|---|---|---|---|
| | A | B | C=A+B | | D | | E=D-C |
| Equipment Purchase - Optivus Proton Beam Therapy Inc. | 368,100 | | | | | | |
| Consulting Fees | 233,761 | | | | | | |
| Employee Salaries | 167,680 | | | | | | |
| **Total** | $ 1,304,833 | | | | | | |
| **(5)** This includes the payments for the following: | | | | | | | |
| Health Insurance | $ 14,922 | | | | | | |
| Vehicle Insurance | 3,027 | | | | | | |
| Other Insurance | 3,625 | | | | | | |
| | $ 21,574 | | | | | | |

# Exhibit 33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

)
UNITED STATES SECURITIES )
AND EXCHANGE COMMISSION, )
)
Plaintiff, )
)
v. ) CASE NO.
) 8:16-cv-00974-CJC-AGR
CHARLES C. LIU; XIN WANG a/k/a )
LISA WANG; PACIFIC PROTON )
THERAPY REGIONAL CENTER, LLC; )
PACIFIC PROTON EB-5 FUND, LLC; )
and BEVERLY PROTON CENTER, LLC )
f/k/a LOS ANGELES COUNTY PROTON )
PROTON THERAPY, LLC, )
)
Defendants. )
________________________________)

VIDEOTAPED DEPOSITION OF RONALD FRIEDMAN, CPA
VIA VIDEOCONFERENCE
Tuesday, April 20, 2021

Reported By:
Denise Sankary, RPR, RMR, CRR
Job No. 210420DSA



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

)
UNITED STATES SECURITIES )
AND EXCHANGE COMMISSION, )
)
Plaintiff, )
)
v. ) CASE NO.
) 8:16-cv-00974-CJC-AGR
CHARLES C. LIU; XIN WANG a/k/a )
LISA WANG; PACIFIC PROTON )
THERAPY REGIONAL CENTER, LLC; )
PACIFIC PROTON EB-5 FUND, LLC; )
and BEVERLY PROTON CENTER, LLC )
f/k/a LOS ANGELES COUNTY PROTON )
PROTON THERAPY, LLC, )
)
Defendants. )
________________________________)

Remote videotaped deposition of RONALD FRIEDMAN, CPA taken on behalf of Plaintiff, beginning at 8:59 a.m. and ending at 12:18 p.m. on Tuesday, April 20, 2021before Denise Sankary, Realtime Registered Reporter.



REMOTE APPEARANCES:
On behalf of the Plaintiff:
GARY Y. LEUNG, ESQUIRE
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Phone: 323-965-3998
Email: leungg@sec.gov

On behalf of the Defendants:
HERVE GOURAIGE, ESQUIRE
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Phone: 973-643-7000
Email: hgouraige@sillscummis.com

ALSO PRESENT:
Timothy Hunter, Videographer



WITNESS: EXAMINATION
Ronald Friedman, CPA
By Mr. Leung 7

EXHIBITS

| EXHIBIT NO. | | PAGE |
|---|---|---|
| Exhibit 159 | Mr. Friedman's March 25, 2021 Report | 12 |
| Exhibit 160 | 04/02/21 Letter from Ronald Friedman to Herve Gouraige Re: SEC v. Liu | 13 |
| Exhibit 161 | 04/09/21 Rebuttal Report of Ronald S. Friedman, CPA, in Response to the Expert Report of Carolyn Irwin, CPA, CFE | 16 |
| Exhibit 162 | 04/02/21 E-mail Subject: SEC v. Liu with attachments | 72 |
| Exhibit 162A | Beverly Proton Center, LLC Balance Sheet as of December 31, 2013 | 75 |
| Exhibit 162B | Beverly Proton Center, LLC Balance Sheet as of December 31, 2014 | 75 |
| Exhibit 162C | Pacific Proton EB-5 Fund, LLC Balance Sheet as of December 31, 2013 | 75 |
| Exhibit 162D | Pacific Proton EB-5 Fund, LLC Balance Sheet as of December 31, 2014 | 75 |
| Exhibit 162E | Pacific Proton EB-5 Fund, LLC Balance Sheet as of December 31, 2015 | 75 |
| Exhibit 162F | Pacific Proton Therapy Regional Center, LLC Balance Sheet as of December 31, 2012 | 75 |

INDEX (CONTINUED)

Exhibit 162G Pacific Proton Therapy Regional Center, LLC Balance Sheet as of December 31, 2013 75
Exhibit 162H Pacific Proton Therapy Regional Center, LLC Balance Sheet as of December 31, 2014 75
Exhibit 162I Pacific Proton Therapy Regional Center, LLC Balance Sheet as of December 31, 2015 75
Exhibit 163 Guide and Financial Statement Services, Compilation Overview, and Audit from AICPA's website 111

EXHIBITS REFERENCED

Exhibit 132 10/11/16 E-mail Subject: Pacific Proton EB-5 Investor List with attachment 69



Tuesday, April 20, 2021
8:59 a.m.

THE VIDEOGRAPHER: Here begins the videotaped deposition of Ron Friedman in the matter of SEC versus Liu. This case is being heard in the United States District Court, Central District of California. This deposition is being held via WebEx. Today's date is April 19, 2021 [sic]. The time on the record is 8:59 a.m.

My name is Tim Hunter. I'm the videographer, and our court reporter today is Denise Sankary.

Counsel, would you please introduce and state whom you represent for the record starting with noticing counsel, and the witness will be sworn.

MR. LEUNG: Gary Leung, SEC counsel for plaintiff.

MR. GOURAIGE: Herve Gouraige for defendants Charles Liu and Lisa Wang.

THE COURT REPORTER: Thank you. And today's date is April 20, 2021, Timothy. I'm sorry.



Mr. Friedman, would you raise your right hand, please?

Do you swear the testimony you're about to give today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURT REPORTER: Thank you.

Thereupon:

RONALD FRIEDMAN, CPA

having been first duly sworn, was examined and testified as follows:

MR. LEUNG: Herve, do you stipulate that the remote oath --

THE WITNESS: It's hard to hear you.

THE COURT REPORTER: Yeah, we can't hear you.

MR. LEUNG: Herve, do you stipulate that the remote oath administered by Ms. Sankary meets the requirements of Rule 30(b)(5)?

MR. GOURAIGE: Yes.

EXAMINATION

BY MR. LEUNG:

**Q.** Good morning, Mr. Friedman.

How are you?

**A.** I'm good. And yourself?



**Q.** Not bad. Have you testified under oath before, sir?

**A.** Yes, I have.

**Q.** On how many occasions have you testified under oath?

**A.** I think approximately ten times.

**Q.** And were those ten testimonies under oath all in your capacity as an expert witness in litigation?

**A.** Yes.

**Q.** Well, you probably don't need a refresher, but I will do the preamble, in any event.

So this is a remote video deposition. Ms. Sankary, our court reporter, is on the VTC connection. She's going to be transcribing everything that you say, everything that I say, everything that defense counsel says today. And it's important for us to get an accurate, complete, and correct written transcription of today's proceeding. So if you could help me make Ms. Sankary's job easier, let's try not to interject or interrupt one another. Verbal responses from you in response to my questions are necessary. So shrugs of the head, nods all of that, that's forboden.

You know, there may come a time in the day where I'm asking you a question and you just don't understand what I'm asking. If that's the case, please let me know and I'll endeavor to clear up my question and ask it in a form that works for both you and I. But barring that, if you don't tell me you don't understand my question, I will assume that you do understand my question.
Is that fair?
**A.** Yes.
**Q.** From time to time you may need a break. If that's the case, please let me know and we'll take a break. The only caveat to that --
MR. LEUNG: Herve, are you there? Herve, can you hear me?
Denise, why don't we go off record while we clear up the -- the IT issue?
THE COURT REPORTER: Sure.
MR. LEUNG: Tim, shall we go off record?
THE COURT REPORTER: I'm off.
MR. LEUNG: Okay. Off the record at 9:03.
(Recess taken.)
THE VIDEOGRAPHER: And we're back on the record at 9:05 a.m.



BY MR. LEUNG:
**Q.** Okay. Mr. Friedman, to the extent you need to take a break, just let me know. We can take a break. The one reservation, the one caveat is if there's a pending question that you've not yet answered, I'm going to ask you to answer the question before we take a break.
Is that fair?
**A.** Yes.
**Q.** From time to time, defense counsel may interpose objections to my questions. In that event, you still need to answer the question. The defense or the attorneys on this video deposition are just making a record of a potential dispute that they may or may not want to bring to the judge at some point in time to adjudicate. In contrast, if there's an instruction from counsel and you wish to take that instruction not to answer, you're free to do that. Understood?
**A.** Yes.
**Q.** Mr. Friedman, can you think of anything that would prevent you from testifying truthfully today?
**A.** No.
**Q.** Okay. So, you know, Mr. Friedman, you're



under oath. The testimony that you're giving today is the equivalent of testimony that you'd give in a court of law in front of a judge, in front of a jury. You and I have a shared interest in getting your most accurate and best testimony written down here. I want you to comply with that oath, and I want the transcript to reflect the truth. So I don't want anything to get lost in translation and in the -- in service of that, I would like for us to get on the same page about some defined terms that I'm going to be using a lot in my questions today.
Does that sound good?
**A.** Yes.
**Q.** When I say "Beverly Proton," Mr. Friedman, I mean corporate defendant Beverly Proton Center, formerly known as Los Angeles County Proton Therapy, LLC. Understood? Beverly Proton?
**A.** Yes.
**Q.** When I say "PPEB-5 Fund," Mr. Friedman, I mean Pacific Proton EB-5 Fund, PPEB-5 Fund. Understood?
**A.** Yes.
**Q.** And when I say "Pacific Proton," I'm referring to the regional center entity called Pacific Proton Therapy Regional Center, LLC. So



Pacific Proton. Understood?
**A.** Pacific Proton is --
**Q.** Is Pacific Proton Therapy Regional Center, LLC.
**A.** Understood.
**Q.** Okay. So the court reporting service should have sent you a link for you to open up the Egnyte file share that we've set up for this case.
Have you been able to do that?
**A.** Yes, I have.
**Q.** And if you can go to the Friedman subfolder marked -- marked "Exhibits_Friedman."
**A.** There's three exhibits, 159, 160, and 161.
**Q.** I'd like for you to open up Exhibit 159, please. And I'll share my screen on top of you being able to directly access the exhibit from the file share site.
**A.** I'm with you.
MR. LEUNG: Okay. For the record, I am displaying to the witness a 70-page document that will be marked Exhibit 159.
(Thereupon, marked as Plaintiff Exhibit 159.)
BY MR. LEUNG:
**Q.** Mr. Friedman, take as much time as you

need to flip through the document, but do you recognize Exhibit 159?
**A.** Yes.
**Q.** Is Exhibit 159 a true and accurate copy of your March --
**A.** Yes.
**Q.** I'm sorry, I wasn't finished.
Is it a March 25, 2021 report?
I'll restate the question.
Is Exhibit 159 a true and accurate copy, Mr. Friedman, of your March 25, 2021 expert report?
**A.** It is my report. I'm not sure the exact date was March 25, but it is my report.
**Q.** Well, let's make sure we get that right then.
March 26 -- on or about March 26 your initial report, does that sound like an accurate date?
**A.** Yes, it does.
**Q.** Okay. March 26, 2021. I'm going to periodically refer to that March 26 -- 26, 2021 report as your initial report. Understood?
**A.** Yes.
(Thereupon, marked as Plaintiff Exhibit 160.)



BY MR. LEUNG:
**Q.** Okay. If you can go back and open up Exhibit 160.
MR. LEUNG: And for the record, I'm displaying for the witness --
**A.** I just lost it all.
BY MR. LEUNG:
**Q.** Take your time.
Have you been able to pull up Exhibit 160 from the file share site, sir?
**A.** Give me another minute. I have it up, 160. I'm ready.
MR. LEUNG: For the record, I am displaying for the witness a four-page document that will be marked Exhibit 160. It's under Marcum Advisory Consulting letterhead. It's dated April 2, 2021.
BY MR. LEUNG:
**Q.** Mr. Friedman, do you recognize Exhibit 160?
**A.** Yes.
**Q.** What is Exhibit 160?
**A.** That is a letter from me disclosing my normal billing rates. It's Appendix B documents read and relied upon, four pages.



**Q.** And who is the letter addressed to?
**A.** Mr. Gouraige.
**Q.** Mr. Friedman, you're breaking up quite a bit.
MR. LEUNG: Herve, are you having a hard time?
MR. GOURAIGE: No, I can hear him.
THE COURT REPORTER: He's very low.
THE WITNESS: I'll speak louder then. I'll try to.
BY MR. LEUNG:
**Q.** Mr. Friedman, who is Exhibit 160 addressed to?
**A.** Mr. Herve Gouraige.
**Q.** And was it your understanding in writing this letter that Mr. Gouraige would forward it to counsel for the SEC?
**A.** Yes.
**Q.** Are the statements in Exhibit 160 true?
**A.** Yes.
**Q.** Are the statements in Exhibit 160 complete?
**A.** I believe so.
**Q.** Was it your intention in writing this April 2, 2021 letter that's Exhibit 160 to have



incomplete, inaccurate information forwarded to the SEC?
**A.** No.
**Q.** If you could open up Exhibit 161, please.
(Thereupon, marked as Plaintiff Exhibit 161.)
MR. LEUNG: For the record, I'm displaying for the witness a 25-page document that will be marked Exhibit 161. The first page bears a case caption and sets forth the contact information of defense counsel in the upper left-hand corner.
BY MR. LEUNG:
**Q.** When you've had a chance to review Exhibit 161, Mr. Friedman, my first question is going to be, do you recognize Exhibit 161?
**A.** Yes.
**Q.** What is Exhibit 161?
**A.** Rebuttal report of Ronald Friedman, CPA, in response to the expert report of Carolyn Irwin, CPA, CFE.
**Q.** Did you draft Exhibit 161?
**A.** Yes.
**Q.** Who is Carolyn Irwin?
**A.** She's the expert witness for the SEC.

Q. Are you certain of that?
A. Yes.
Q. Mr. Friedman, did you write every word of this report set forth in Exhibit 161?
A. My team did the writing. I'm responsible for it, but I have a support --
Q. Who is on your team?
A. Natasha. I'll spell her last name for you. G-I-A-R-D-I-N-A, Giardina. Giardina.
Q. Anyone else?
A. She had an assistant that worked with her, but I don't remember her name off the top of my head.
Q. What was that assistant's role in connection with Exhibit 161?
A. Assisting in typing and writing, but Natasha did the writing, the bulk of the writing.
Q. Was Exhibit 161 edited or revised in any way by counsel for the defense?
A. They proofread -- counsel proofread it, made some grammatical changes of substance.
Q. In the report, Exhibit 161, periodically refers to defendant Liu as Charles and defendant Wang as Lisa.
Are those words that you or your team



wrote in the first instance?
A. Yes.
Q. Okay. And are you a first name -- do you know Mr. Liu and Ms. Wang on a first-name basis? Do you engage with them social?
A. I've never met them, and I've never talked to them personally.
Q. Have you ever communicated with either of them?
A. I've communicated through e-mail.
Q. With whom?
A. With Charles, and most of that communication was done by my team in support of my questions. So Natasha is my right arm who wrote the report. And I have a Trang, T-R-A-N-G, Lam, L-A-M, who did the original bookkeeping. I was able to communicate with her, and she would communicate directly with Charles for me.
Q. How many e-mails do you think were exchanged between Charles and any member of your team?
A. I don't know.
Q. Did Mr. Liu communicate information in those e-mails that you considered in the course of forming your opinions in this case?



A. No.
Q. None at all?
A. None that I can remember off the top of my head.
Q. If those communications with Mr. Liu had no bearing on the opinions you've formed in this case, what was the purpose of Mr. Liu communicating with members of your team?
A. Most of my concern was to be certain that we were paid on a timely basis for our time that we were working.
Q. And were you paid on a timely basis for your expert work?
A. Yes, we have been paid timely.
Q. How many times have you been paid by Mr. Liu?
THE COURT REPORTER: Hold on. We lost Mr. Gouraige.
MR. LEUNG: Herve, are you there? Herve, can you hear us? Mr. --
MR. GOURAIGE: Yes. I think the connection was interrupted briefly, but then it was resumed, so I can hear you now, Gary.
MR. LEUNG: Great.



BY MR. LEUNG:
Q. How many times have you been timely paid by Mr. Liu, Mr. Friedman?
A. I believe three, maybe four times.
Q. When did those three, maybe four payments occur?
A. Over the last several months with the final current payment being made this morning.
Q. And what was the method of payment for those three, maybe four payments?
A. Wire transfer.
Q. From what accounts?
A. It's to a Marcum account from -- Charles had friends of him -- of his wire us the money.
Q. How much have you -- has your firm been paid in total in connection with your expert work?
A. I believe somewhere a little over a hundred thousand dollars.
Q. What was the -- what were the names of the friends that wired money to your firm on his behalf?
A. I don't have that information off the top of my head. I'd have to go back to my office and have my staff, you know, my receivable department tell me.
Q. Had Mr. Liu not arranged for the final

wire transfer to occur this morning, would you have testified today?
**A.** I don't know the real answer to that. It would have been a difficult decision.
**Q.** If subpoenaed, will you testify at the scheduled hearing in this case?
**A.** Yes.
**Q.** Will you agree that defense counsel for Mr. Liu and Ms. Wang can accept service of your subpoena?
**A.** Yes.
**Q.** Returning to Exhibit 161, this is not a letter, correct?
**A.** That's correct.
**Q.** Why is it formatted differently than Exhibit 159, which is your original report?
**A.** The original report was done under a consulting engagement letter, and we did not know that it would be required under a different standard with the SEC. This report -- once we found out what was required, we changed this report to conform.
**Q.** Okay. So at the end of Exhibit 161 -- this is your April 9, 2021 report -- you have a Section VI entitled "Assumptions and Limiting Conditions."



Am I correct that those assumptions and limiting conditions set forth in Exhibit 161 don't bear on your original report? Those are -- the original report is not subject to the same assumptions and limiting conditions as your April 9th report, correct?
**A.** I don't understand your question.
**Q.** Okay. Well, let me read for you Exhibit 161. For the record, we're at page 11 of the report.
Do you see the heading Section VI "Assumptions and Limiting Conditions"?
**A.** I see that.
**Q.** That's what your report says, right?
**A.** That is correct.
**Q.** And it reads, "My report is subject to the following assumptions and limiting conditions."
And do you see that there are five items underneath that preface?
**A.** That is correct.
**Q.** The first is, "I have not audited or performed any other procedures on this information and consequently assume no liability for the completeness or accuracy of such information."
I don't see that same assumption and



limiting condition in your original report.
And my question to you is, am I correct in assuming that Exhibit 159, your original report does not contain this same assumption and limiting condition?
**A.** I would have to go back and look at that report.
**Q.** Why don't you look at it? Please feel free to pull it up and take as much time as you need to go through it.
And my question is, I don't see the same assumption and limiting condition in your original report that you've laid out in Exhibit 161, and I am inferring from that that your original report is an audit.
And your original report did involve the performance of other procedures on the information set forth in that report and that, consequently, in your original report, you do assume liability for the completeness or accuracy of the information set forth in Exhibit 159?
**A.** I would say your assumption is incorrect. I did not in my original report do an audit or engage to do a consulting engagement. I was to put the financial statements together from the



information that was provided to us. We did no audit --
**Q.** Okay. Turn -- go ahead.
**A.** We did no auditing or verification of the numbers.
**Q.** In your original report?
**A.** That is correct.
**Q.** So the statement in Exhibit 161, it's the third assumption and limiting condition, it reads, "I have not audited, reviewed, nor compiled any historical financial information or federal or state income tax returns, and consequently, I express no form of assurance on them."
Does that statement equally apply to your initial report?
**A.** Yes.
**Q.** The fourth assumption and limiting condition set forth in Exhibit 161 reads, "I have not audited nor reviewed the information contained herein in accordance with standards promulgated by the American Institute of Certified Public Accountants, and accordingly, express no opinion regarding compliance with such standards."
Does that statement that I've read for you, that assumption and limiting condition found in

Exhibit 161, your rebuttal report, equally apply to the work performed in your initial report in Exhibit 159?
**A.** Yes.
**Q.** And then finally, there is a fifth assumption and limiting condition set forth in Exhibit 161, your rebuttal report. It reads, "This report is solely for -- for the use in the matter of litigation of Securities and Exchange Commission versus Charles C. Liu; Xin Wang, also known as Lisa Wang; Pacific Proton Therapy Regional Center, LLC; Pacific Proton EB-5 Fund, LLC; and Beverly Proton Center, LLC, formerly known as Los Angeles Proton Therapy, LLC."
That assumption and limiting condition that I've just read for you which is set forth in Exhibit 161, does it equally apply to the expert work reflected in your initial report that's Exhibit 159?
**A.** Yes.
**Q.** If we could go back to Exhibit 159, please, sir. And turning to beginning on the fourth page of the exhibit, there's an Appendix A.
**A.** I'm with you.
**Q.** Mr. Friedman, is Appendix A a complete



statement of the educational work and professional experience that you believe qualify you to render the opinions you've disclosed in your initial report and your rebuttal report in this case?
**A.** Yes.
**Q.** Can you identify for me any work experience that you've had in the past in your long career in the area of financial statements analysis involving corporate entities who have been run by an executive that's been found liable for securities fraud?
**A.** Repeat that question.
**Q.** Sure. Have you had any work experience in the area of financial statements analysis involving corporate entities that were run by an executive who has been found liable for securities fraud?
**A.** No.
**Q.** In this case, Mr. Friedman, how would you describe your area of expertise?
**A.** I have 50 years being a CPA in public practice. 50 years, I've represented companies in many industries. I started off as an auditor, light tax work but heavy audit work, working with clients on their audits, preparation of financial statements.



I have worked heavily in the consumer product area. I've worked with closely held companies, working with management from business planning, budgeting, operations, strategic planning. I've been heavily involved in my years in mergers and acquisitions, sale of businesses. I helped companies that have started new enterprises from zero business to growing to over hundreds of millions of dollars in sales.
Experienced in many industries from, as I say, consumer products, could be from toys, furniture, electronics, carpeting, food industry, technology.
So I have a very broad background as an auditor. I would say in the last ten years, I have been more involved in forensic accounting representing individuals with business disputes, the business disputes between partners, outside vendors. So I've had a pretty broad background.
**Q.** In your -- in your professional career, Mr. Friedman, had you ever worked on an audit engagement for a registered investment company?
**A.** No, I have not.
**Q.** In your career, Mr. Friedman, have you ever worked on an audit engagement for a private



fund?
**A.** I have done funds where people have done real estate investments. I think I've done it --
THE COURT REPORTER: I'm sorry, I didn't hear you.
BY MR. LEUNG:
**Q.** Tell me about --
**A.** I believe I've done it where it was a fund that invested in real estate, a group of investors would invest in real estate.
**Q.** Tell me about that engagement.
Was it an audit engagement?
**A.** It was an audit engagement. It goes back several years. I don't remember a lot about it because it's been a number of years ago. I believe I had another audit partner assist me on that audit. I would say over the last ten years, I have been doing less of the actual auditing, more of the planning and being involved in the audit, but I, over the last ten years, have not taken on those lead audit partner responsibilities. I've passed that on to my partners.
**Q.** Okay. With respect to your forensic accounting portfolio, have you had any forensic accounting engagements involving registered

investment companies?
**A.** No.
**Q.** Any forensic accounting engagements involving private funds?
**A.** No.
**Q.** Any forensic accounting engagements involving the raising of capital through the USCIS EB-5 program?
**A.** No.
**Q.** Any audit work in connection with the EB-5 space?
**A.** Repeat that question.
**Q.** Have you had any experience with audits in the EB-5 space?
**A.** Not audits, but I've had experience in the EB-5 area before.
**Q.** Tell me about that experience, please.
**A.** I've worked with lawyers who promoted the programs, and I've talked to them about the potential for bringing EB-5 investors through some of our clients. It never materialized, I didn't do it, but I became familiar with EB-5 through that process a number of years ago.
**Q.** And -- and in that interaction, how would you describe the professional services that you



would have rendered if that venture had moved forward?
**A.** I probably would have been involved on the consulting side of it, and if we turned it into something that materialized and there would have been an audit, I would have brought in the audit and I would have had one of my partners run the audit for me.
**Q.** And with respect to the payments received by Marcum for your professional services from Mr. Liu through his friends, did Mr. Liu explain to you why payment was being made by his friends on his behalf?
**A.** I understood it to be because his friend -- funds were frozen and he did not have access to them.
**Q.** Okay. And did Mr. Liu lead you to believe that he would be paying his friends back?
**A.** That was never discussed.
THE COURT REPORTER: It looks like we lost Mr. Gouraige again.
MR. LEUNG: Give him a moment.
THE WITNESS: This is the tough part about Zooming.
MR. LEUNG: Yeah. It beats flying across



the country, though.
THE WITNESS: Yeah.
MR. LEUNG: Especially in February.
THE WITNESS: So you live in L.A. and I live in L.A. It's beautiful here.
THE COURT REPORTER: Mr. Friedman, can I ask you to use your headset, because I'm really struggling? I apologize.
THE WITNESS: Let me see if I can get it. I've got to see how I can bring it to my headset. Give me a second then.
MR. GOURAIGE: Can I just ask the court reporter to read the last two questions and answers. I think I was disconnected for a brief period.
(Record read.)
THE COURT REPORTER: And then we lost you.
THE WITNESS: All right. Are you -- are you able to hear me on my headset?
THE COURT REPORTER: Much better. Thank you so much.
THE WITNESS: I'll look funny to you, that's all.
THE COURT REPORTER: I appreciate it. Thank you.



BY MR. LEUNG:
**Q.** Mr. Friedman, when were you first contacted to perform work in this case?
**A.** I'd have to go back and look at my engagement letter, but it would have been most likely around February.
**Q.** And who contacted you in connection with this case?
**A.** The contact came through my staff. Trang Lam brought me into it.
**Q.** And did she describe for you the scope of the potential engagement?
**A.** Yes, she gave me very preliminary information at the time, and she put me in touch with Herve.
**Q.** In this case, how would you describe the general subject, the area of the expertise that you're bringing to bear that would assist the finder of fact in resolving the issues in this case?
**A.** I think I have a clear understanding of accounting and business practices. In 50 years of experience, I've seen a lot and I understand how a startup business runs. I understand the need to raise capital to run a business, and I understand the fact that it takes time to get a business off

the ground.
Does that clarify it for you, or do you need more?
**Q.** No, that -- that's helpful. All right.
**A.** Let me add one more thing to that. I mean, I've spent my career working with startup companies. And I've taken clients from actually a concept of having an idea with no money raised, and I usually tell people they have to go to friends and family to start. But I've taken companies from zero revenue up to hundreds of millions of dollars in revenue, and, you know, there's fewer startups today than there used to be, but startups are still way -- many people with ideas go into business. And I have been doing that my whole career, working with startup companies.
**Q.** Your professional experience with startup companies, at any point did you have occasion to work with a startup company that was run by an executive that was later found liable for securities fraud?
**A.** No.
**Q.** Mr. Friedman, in this case, have you been asked to provide any opinions you felt you couldn't give?

33

**A.** That I could not give?
**Q.** Yes, that you could not give. Asked to provide opinions that you felt you could not give.
**A.** No.
**Q.** In this case, have you formed any opinions that you could give that are not stated in your report?
**A.** I believe they're stated in my report, and as you ask me questions, I may come up with more opinions.
**Q.** Fair enough. Since finalizing and signing your initial report in Exhibit 159 and your rebuttal report in Exhibit 161, have the opinions you disclosed in those two reports changed in any way?
**A.** I don't think so.
**Q.** At this time, are Exhibit 159 and 161 complete statements of the opinions you have prepared in this case?
**A.** Yes, as of the time I did those reports, they're my complete opinions, and I say I may have more opinions as you ask me questions.
**Q.** Understood. At this time, are those two reports a complete statement of all the opinions you intend to express at the evidentiary hearing in this case?

34

**A.** Yes, unless you ask me questions again that require me to have other opinions or additional opinions.
**Q.** If you could open up Exhibit 160.
**A.** 160, okay. I got to get back there. All right. 160 is now open.
**Q.** Great. This is your April 2, 2021 letter to Mr. Gouraige. I think we've already covered the fact that this letter is true and accurate and complete. I do want to read for you the second full paragraph which provides, "Additionally, please see attached to this letter Appendix B, documents read and relied upon for the preparation of the summary report submitted on March 26, 2021."
Did I read that right?
**A.** Yes.
**Q.** And then flipping down to Appendix B in Exhibit 160, that is a three-page appendix that itemizes 36 different things, and that Appendix B is entitled "Documents Read and Relied Upon."
**A.** Correct.
**Q.** Did I read that right?
**A.** Correct.
**Q.** Mr. Friedman, the Appendix B to Exhibit 160, is that a complete list of the

35

documents you read and relied upon in forming your opinions in this case?
**A.** Yes.
**Q.** Is that -- is Appendix B a complete list of all the facts or data you considered when forming your opinions in this case?
**A.** I believe so.
**Q.** Is there anything else that you have not listed in Appendix B that you read and relied upon in forming your opinions in this case?
**A.** There's always a possibility that I read something additionally that could be in here, but I just don't off the top of my head remember any.
**Q.** To the best of your knowledge, is Appendix B again a complete listing of the documents you read and relied upon in forming your opinions?
**A.** Yes.
**Q.** How much time did you spend preparing your initial report in Exhibit 159?
**A.** I don't remember how many hours.
**Q.** Okay. What are your billings to date for you and your team on the expert work that you've completed in this case?
**A.** I indicated that already to you. I had stated over a hundred thousand dollars in billings.

36

**Q.** Closer to a hundred thousand dollars or 200,000?
**A.** No, it's closer to a hundred thousand. It could be anywhere from a hundred to 120-.
**Q.** And it looks like your fees are not related to the outcome of this case, right?
**A.** That is correct.
**Q.** Mr. Friedman, have you published in the past on the area of financial statement analysis in connection with an EB-5 capital offering?
**A.** No.
**Q.** Mr. Friedman, have you published in the past on the area of financial statements analysis with respect to private investment offerings?
**A.** No.
**Q.** And I should have covered this before, but your audit work in your career, did any of that have to do with the medical industry?
**A.** No audits in the medical industry that I have done. The firm has done, but I have not done.
**Q.** Any forensic accounting work that you have done in your career with respect to the medical industry?
**A.** No.
**Q.** And you've got no firsthand knowledge of



the proton therapy cancer treatment, correct?
**A.** Correct.
**Q.** No knowledge of its clinical benefits?
**A.** Only what I've heard through the news, but I have no -- I'm not an expert on cancer therapies.
**Q.** What about the business aspects of starting and running and operating a medical clinic that offers, among other things, proton therapy cancer -- or proton therapy cancer treatment?
**A.** I have --
**Q.** Any expertise in that?
**A.** I have no expertise in the medical field when it comes to proton therapy.
**Q.** Business, medical, or otherwise, correct?
**A.** As far as the medical industry is concerned, that is correct.
**Q.** So you've offered expert opinions in court cases in the past, right?
**A.** Yes.
**Q.** Have your expert opinions ever been excluded or limited in any way by a court?
**A.** No.
**Q.** Have you ever been qualified as an expert in a disputed case on the subject of financial statements analysis in an EB-5 investment offering?



**A.** On financial statement analysis, yes. I've never been involved in an EB-5 case.
**Q.** Have you ever been qualified as an expert in a disputed case on the subject of financial statements analysis or any investment offering?
**A.** Not for an investment offering, but as to individual partners that have had disputes, yes.
**Q.** Okay. Have you been qualified as an expert in a disputed case in the area of the raising of capital from private investors?
**A.** Repeat the question.
**Q.** Have you ever been qualified as an expert in a disputed case in the area of raising capital from private investors?
**A.** I have not had that kind of case, no.
**Q.** Have you ever been qualified as an expert in a disputed case on the subject of raising capital through the USCIS EB-5 program?
**A.** No.
**Q.** Have you ever testified at trial?
**A.** Yes.
**Q.** How many times have you testified at trial?
**A.** Two or three times, I believe. Many, many cases are through arbitration or mediation, or we



get as far as deposition and then they settle.
**Q.** Mr. Friedman, how do you think the opinions you've disclosed in your initial expert report and your rebuttal expert report will assist the fact finder in deciding this case?
**A.** I believe they can rely on my opinions.
**Q.** How will those -- how will those opinions assist the fact finder in deciding the disputed issues?
**A.** I think that's for the trier of facts to decide. I think my opinions and my analysis are very accurate and very good.
**Q.** But how does that analysis and how do those opinions actually assist the finder of fact?
**A.** I guess I'm unclear as to how to answer your question, what -- what the real question is.
**Q.** Do you -- well, yeah, maybe I should have laid a foundation for this.
Do you have any view on whether the opinions you've expressed in this case will assist the finder of fact in adjudicating the disputed issues between the parties?
**A.** Yes.
**Q.** Why do you think that?
**A.** Because I think my accounting analysis of

financial statements will indicate what the profit and loss of the company was, what the assets of the company are at the April '16, 2016 date, and I think anybody who looks at our financial statements will understand them.
**Q.** And is there any other way in which you think the opinions you've disclosed in this case will assist the finder of fact in resolving disputed issues apart from what you just said?
**A.** I think my reports will speak for themselves, and I think anybody looking at them can ask me questions and understand how I think they impact the case.
**Q.** How do you think they impact the case?
**A.** I think that the income statement will show that the company never made any profits and that there's net -- no net profits in this company.
**Q.** Any other opinions you think -- do you think any -- okay.
Can you identify your other opinions for me that will impact the case and explain why?
**A.** I think it would be helpful if we go through my exhibits and I could explain them one at a time to you because I think I have many opinions as to what I think the proper treatment and the

41

proper accounting should have been.
**Q.** How do your views on the profitability or lack thereof of the corporate entities impact this case?
**A.** I think everything I've read in the case, the pecuniary gains that Irwin has claimed are totally incorrect. I think she has failed to provide a profit and loss statement that answers the question of what are the pecuniary gains that Charles and Lisa received. I think she was incorrect in her assumption about what are legitimate business expenses and what are not legitimate business expenses. And I think the fact that she never produced a profit and loss statement shows that she completely missed the concept of what is a net profit of a company.
**Q.** Mr. Friedman, are your opinions based on your understanding that a profit and loss statement is a necessary component of the proof required to establish an entitlement to disgorgement in an enforcement action brought by the U.S. Securities and Exchange Commission?
**A.** I believe from everything I've read that a net profit comes from a profit and loss financial statement, which Irwin never produced, and her

42

conclusions are incorrect, and the pecuniary gain that she claimed is totally wrong. And I believe that --
**Q.** I'll ask again.
**A.** I was going to say -- to finish, I was going to say, a profit and loss statement, I think, is necessary to show what the proper pecuniary gains should have been.
**Q.** And how did you arrive at that understanding that a profit and loss statement is a necessary component of the proof required to establish an entitlement to disgorgement in an enforcement action brought by the Securities and Exchange Commission?
**A.** Per discussion with legal counsel and my understanding of -- from legal counsel of the Supreme Court case, a pecuniary gain must be determined through the net profit of the company. And I believe more specifically the definition of net profit in generally accepted accounting principle terms is net revenue minus expenses, and that is the definition of net profit. And --
**Q.** Go ahead. Please go ahead.
**A.** No, I'm done.
**Q.** Legal counsel that you're referring to is

43

Mr. Gouraige?
**A.** Yes.
**Q.** Anybody else?
**A.** No.
**Q.** Have you read the Supreme Court's decision in this matter, sir?
**A.** Yes, I did.
**Q.** Does that decision reference a profit and loss statement in any respect?
**A.** It talks about net profits. And I'd have to pull up the Supreme Court case and look at it to be specific, but I believe the term was "net profit less" -- no. It said net profit. I believe that was in the Supreme Court decision.
**Q.** But my question is slightly different than that.
Does the Supreme Court's decision refer to a profit and loss statement as a necessary component of proof required to establish an entitlement to disgorgement in an SEC enforcement action?
**A.** I believe, and this is my opinion, that when the SEC talks about a net profit, they're talking about a P and L statement, and that's basically the world I live in. When people talk about net profits, they're talking about revenue

44

minus expenses.
Q. And so the helpfulness of your opinions in this case, whether or not they assist the finder of fact, sir, is dependent on the accuracy of the assumption that you spoke to, that a profit and loss statement is a necessary requirement in order to prove an entitlement to disgorgement.
Is that fair?
A. I think it's fair to say that you need a profit and loss statement to see and determine what the net profit is, yes.
Q. Now, I'll just posit a scenario to you.
I raise $10 million in capital by way of fraud. I establish some shell corporate entities that never have any meaningful business operations. I abscond with that $10 million. So those corporate entities are obviously in the red because they never had any operations to begin with, nor were they able to keep the money because I kept it.
Is it your position that under the Supreme Court's decision in this case, I am not required to disgorge a dollar of that 10 million?
MR. GOURAIGE: I'm going to object to the question because --
MR. LEUNG: I'll withdraw it.

45

MR. GOURAIGE: -- you're missing --
MR. LEUNG: I'll withdraw it.
MR. GOURAIGE: Okay.
BY MR. LEUNG:
Q. Mr. Friedman, you indicated that you read the Supreme Court's opinion in this matter.
Have you read the trial judge's summary judgment order in this matter?
A. No, I have not read that.
Q. Do you know whether the trial judge's liability finding was appealed?
A. Well, it's my understanding it went to the Supreme Court, so to me, that means it had to be appealed.
Q. And so it's your understanding that the trial judge's finding of liability in this case as to Mr. Liu and Ms. Wang was appealed?
A. That is my understanding that it was appealed and ultimately went to the Supreme Court.
THE WITNESS: And we lost Herve again.
MR. LEUNG: I'll just pause and wait for him to get back.
Mr. Friedman, it's 10:00. We've been going for almost an hour. Why don't we just take a ten-minute break while Mr. Gouraige

46

works on this issue?
THE WITNESS: He's back.
MR. GOURAIGE: Can you hear me, Gary?
MR. LEUNG: I can.
MR. GOURAIGE: Okay. I missed what the questions and answers were after the witness said, "It's my understanding that it went to the Supreme Court, so it had to be appealed."
So can I just have those questions and answers reread, please?
(Record read.)
MR. GOURAIGE: Anything -- any question or answer after that?
THE COURT REPORTER: No, sir.
MR. GOURAIGE: Okay, thanks.
MR. LEUNG: Okay. We were going to take a break. I'm happy to just proceed. I defer to you, Herve, and you, Mr. Friedman.
THE WITNESS: I'm good for right now.
MR. GOURAIGE: Okay. So why don't we proceed.
BY MR. LEUNG:
Q. If you could pull up Exhibit 160 again, Mr. Friedman, that's your April 2, 2021 letter.
A. I'm with you.

47

Q. My first question is directed to the first paragraph disclosing your compensation and your rates.
Is it standard practice at Marcum for retained experts to charge a higher rate in conjunction with the preparation for and attendance at a deposition compared to the hourly rate which corresponds to the preparation of an expert report?
A. That is correct. It's a firm policy to charge higher rates. We charge 120 percent of our standard rate.
Q. Understood. And returning to the subject of Appendix B. You previously testified that this is a complete statement of the documents you read and relied upon in forming your opinions.
Do you recall that testimony?
A. Yes, I do.
Q. Okay. Number 1 reads, "Private offering memorandum for 300 limited liability company membership units of Pacific Proton EB-5 Fund, LLC," dated May 1, 2013.
What is that document?
A. That's the private offer memorandum. I'm looking at it right now just to make sure I have the right dates.

48

MR. GOURAIGE: Maybe we should -- can we just take a five-minute break because I keep getting -- for the past few minutes I've had frequent brief interruptions.
MR. LEUNG: Sure. Let's go off record at 10:02, Tim.
THE VIDEOGRAPHER: Okay. We're going off the record at 10:02 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 10:12 a.m.
BY MR. LEUNG:
**Q.** Mr. Friedman, I think the last question I had before we went on the break was Item Number 1 in your Appendix B of documents read and relied upon is the private offering memorandum.
What is that document?
**A.** That is the, you know, private offering memorandum for 300 limited liability company membership units of Pacific Proton EB-5 Fund, LLC.
**Q.** Who wrote that document?
**A.** Oh, I don't know the law firm that wrote this. I don't remember the name. I know a law firm wrote it.
**Q.** What was the document used for?



**A.** To raise money for the EB-5 program and solicit investors.
**Q.** How was the document used to raise money for the EB-5 company and solicit investors?
**A.** I think -- I think it set out the -- what was being promised to the investors, how much money was going to be raised, how the money would be spent. I'm looking at page 6 of the document which talks about the issuer securities, minimum investment, administrative fees, the borrower, the estimated use of the fees, the EB-5 regional center sponsorship, the management fees. And this goes on for several more pages outlining what's in the program for the offering.
**Q.** I'm going to refer to that private offering memorandum that's listed as Item 1 in your Appendix B as the POM.
Is that okay?
**A.** Perfect.
**Q.** Did you read the POM in the course of forming your opinions?
**A.** Yes.
**Q.** Every page?
**A.** No, not every page.
**Q.** How did the content of the POM that you



did read bear on your opinions?
**A.** It's based how -- I form my opinions based upon what I read.
**Q.** In what respect?
**A.** As to how they intended to raise the money, who they were soliciting the money from, what the purpose of the proceeds would be for, how they would be spent, what the goal was to create a, you know, regional proton center, how they were going to hopefully earn profits and create jobs in the United States for Chinese nationals to be able to come to the United States and get a, you know, Visa, Green Card to come here and live here.
**Q.** In your initial report on the first page, you've got a number of bullet-pointed items that describe the adjustments that you made to the corporate entities' QuickBook reports.
Do you recall that?
**A.** Which -- which page are we referring to? Which exhibit?
**Q.** Sure. Exhibit 159. If you pull that up. And let's just make a clean record here.
I'm directing your attention to Exhibit 159, page 1. There are five bullet points, and they are preceded by a sentence in which you



write, "Based on the information provided in the above documents, Marcum made the following adjustments to the financial statements including but not limited to," and then there's five bullet-pointed adjustments that are described below.
Do you see that?
**A.** All right. I got to catch up with you. You were on the first page of --
**Q.** Exhibit 159.
**A.** Right. And you're talking about based upon the information provided. Okay. And then there are those bullet points.
**Q.** Yeah.
**A.** Okay.
**Q.** Do you see that?
**A.** Yes.
**Q.** Did the information that you reviewed in the POM form the basis for any of those adjustments?
**A.** Yes.
**Q.** Which ones?
**A.** Well, the first bullet point adjusted the expenses on the entities between the balance sheet and the profit and loss statements based upon the nature of the expense. I mean, I think what -- the POM is a general guideline as to how the money is to

be spent. The detailed accounting records tell me what the expenses were for and how they were categorized, and we put them into the proper categories, whether they be on the balance sheet or on the income statement.
**Q.** So I'll ask you again, what information did you derive from the POM that caused you to make an adjustment that's covered by the five bullet points set forth on page 1 of Exhibit 159 which is your initial report?
**A.** I think the POM was just a guideline as to how the money was to be spent. The accounting records told me how the money was spent, and we had to make various adjustments based upon how we interpreted those expenditures.
**Q.** And those accounting records you're referring to are the general ledgers and the QuickBook reports that have been produced in this case?
**A.** That's correct.
**Q.** And those were prepared by Trang Lam and her team back in 2015, 2016?
**A.** Possibly earlier than that, but they were prepared by her team.
**Q.** Okay. Returning to the Exhibit 160 and



Appendix B. I'll give you a second to pull that up.
**A.** I'm with you.
**Q.** Does the POM reference a business plan?
**A.** It doesn't reference specifically a business plan, it outlines how the expenditures were budgeted. I don't consider this POM a true business plan.
**Q.** You were not provided with a business plan for the project, correct?
**A.** That is correct.
**Q.** Does the POM incorporate by reference a business plan for the Proton Therapy Cancer Center project?
**A.** I don't remember if it did. I can take a quick look if you give me a second.
**Q.** Please.
**A.** I do not see a business plan in here, and maybe you could help me and tell me if it was referenced in here, but I'm not seeing it as, you know, a quick perusal.
**Q.** Mr. Friedman, are you aware that Mr. Liu gave sworn testimony to the SEC during its prefiling investigation of this case back in spring of 2016?
**A.** Your question is again?
**Q.** Do you know whether Mr. Liu provided sworn



testimony to the commission in this case during its prefiling investigation?
**A.** I know you took his deposition.
**Q.** I'll ask you again.
Do you know if Mr. Liu provided investigative testimony prior to the filing of this enforcement action before the commission?
**A.** I don't know.
**Q.** Well, I'll just cut to the chase.
You've not reviewed Mr. Liu's investigative testimony, correct?
**A.** Correct.
**Q.** You've not reviewed Ms. Wang's investigative testimony, correct?
**A.** Correct.
**Q.** You've not reviewed the investigative testimony of Ms. Wang's mother and Mr. Liu's mother-in-law, correct?
**A.** Correct.
**Q.** Did you review Mr. Liu's deposition testimony in this case from 2016?
**A.** No.
**Q.** Did you review Ms. Wang's deposition testimony in this case from 2016?
**A.** No.



**Q.** Who is Ruth Nobodor, N-O-B-O-D-O-R?
**A.** Isn't that Dr. Thropay's sister?
**Q.** Yes. Did you review Ms. Nobodor's deposition testimony in this case?
**A.** No.
**Q.** Did you review Dr. Thropay's deposition testimony in this case?
**A.** Yes.
**Q.** Did you review portions of that deposition testimony or the entirety of the transcript?
**A.** Of Dr. Thropay?
**Q.** Yes.
**A.** I believe I read it all.
**Q.** Okay. Did you consider that deposition testimony in connection with the opinions you've formed in this matter?
**A.** I think it helped me understand the case and his position. I don't know if it was -- helped me form my opinions, but it was helpful to read it.
**Q.** Should Dr. Thropay's deposition transcript be included in your Appendix B of Exhibit 160?
**A.** I did read it, so it possibly should have been included as having been read.
**Q.** Did you read any other deposition transcripts in this matter?

**A.** Let me look.
I don't think I read anybody else's depositions, off the top of my head.
**Q.** When forming your opinions in this case, Mr. Friedman, did you review any of the operating agreements for the entity defendants?
**A.** I believe so.
**Q.** Which operating agreements?
**A.** I believe there was -- I don't remember specifically which operating agreement I did read.
**Q.** What information did you derive from the operating agreement that you did read which -- strike that.
Is there any information that you derived from your review of that operating agreement on which you base your opinions?
**A.** No.
**Q.** In forming your opinions in this case, Mr. Friedman, did you speak with anybody that actually worked at these three corporate entities?
**A.** No.
**Q.** In forming your opinions in this case, did you speak with anyone that did business with these three entities during the relevant period?
**A.** No.

57

**Q.** You never communicated with anyone at Allen Construction, correct?
**A.** Correct.
**Q.** No one at Skanska, correct?
**A.** Correct.
**Q.** No one at SCI.X Science Studio, correct?
**A.** Correct.
**Q.** No one at Nixon Peabody?
**A.** Correct.
**Q.** No one at Mevion?
**A.** Correct.
**Q.** No one at Miller Mayer?
**A.** Correct.
**Q.** No one at Seyfarth Shaw?
**A.** Correct.
**Q.** No one at Greenberg Traurig?
**A.** Correct.
**Q.** No one at Evans, Carroll & Associates?
**A.** Correct.
**Q.** Nobody at JJW Consultancy, Limited?
**A.** Correct.
**Q.** Nobody at Homeier, H-O-M-E-I-E-R, & Law, PC?
**A.** Correct.
**Q.** Never communicated with anybody at the Law

58

Offices of Rachel Liu, APLC?
**A.** Correct.
**Q.** Never communicated with anyone at Thorn Run Partners, LLC?
**A.** Correct.
**Q.** Did you speak with Michael Hunn?
**A.** Who is Michael Hunn?
**Q.** I take it that's a no? H-U-N-N, Michael Hunn?
**A.** Yeah, I did not speak with him.
**Q.** Okay. Never spoke with anybody at Overseas Chinese Immigration Consultant, correct?
**A.** Correct.
**Q.** Never spoke with anybody at an entity called Delsk, D-E-L-S-K?
**A.** Correct.
**Q.** Never received any information directly from Industrial and Commercial Bank regarding any of the transactions that are the subject of your report, correct?
**A.** I never spoke with anyone there, correct.
**Q.** Never received any information from Shanghai Commercial Bank regarding any of the transactions that are the subject of your report, correct?

59

**A.** I never spoke to anyone. I have looked at documentation to support some of the entries we've made. I've reviewed contracts.
**Q.** Ever communicated with anybody at Hang Seng Bank regarding the transactions that were the subject of your report?
**A.** Correct, did not speak with anyone.
**Q.** And you've never -- you've never obtained -- you've never reviewed bank records for any of the financial accounts at Hang Seng Bank that were a counter-party to the transactions that are the subject of the report, correct?
**A.** Correct.
**Q.** You've never received any bank records from Shanghai Commercial Bank for the counter-parties to certain transactions that are the subject of your report, correct?
**A.** Correct.
**Q.** Same question with respect to Industrial and Commercial Bank. You've never received bank records from that banking entity regarding the counter-parties that are on the other side of the transactions, certain other transactions that are the subject of your report, right?
**A.** Correct.

60

**Q.** Did you ask Mr. Liu whether or not those -- those bank records from the Chinese accounts were obtainable as part of your assignment?
**A.** I did not.
**Q.** Do you know whether or not Mr. Liu has testified in this case that several million dollars that he transferred out of the corporate accounts were sent to bank accounts maintained in China?
**A.** I know payments were made to various entities in China, yes.
**Q.** And did Mr. Liu ever indicate to you as part of your expert work that business records, bank records pertaining to the receiving accounts could be made available to you as part of your expert analysis?
**A.** I'm not sure I understand your question.
**Q.** Well, did you ever ask to get the bank records for the overseas bank accounts that were receiving the funds in order to, you know, potentially make your expert analysis more robust?
**A.** I had no reason to ask to see those bank statements.
**Q.** Would those bank statements provide you some information as to the identity of the parties that were receiving these investor funds?



**A.** Not necessarily. They would tell me if it went to that company, and I would see their company. It wouldn't tell me much more than the bank statement says they received the money that was sent. Or it wouldn't tell me -- it wouldn't tell me -- it would not tell me who owned the bank account.
**Q.** Wouldn't that be reflected in the account opening statements that could be provided by the bank with respect to that account?
**A.** Possibly.
**Q.** You get a certificate of corporation, you get some sort of signatory authority, you'd have some individuals, perhaps you'd have a description of the business.
Wouldn't that sort of information inform your expert analysis?
**A.** My analysis was based on the fact that we see and confirm payments went to these various accounts.
**Q.** And to the extent Mr. Liu had an ownership interest or control, the receiving accounts in China, would that have had any bearing on your expert analysis?
**A.** Possibly, if I thought he owned those



accounts, but I have no knowledge that he owned any of those accounts.
**Q.** If you still have Exhibit 160 in front of you, I want to direct your attention again to Appendix B and numbers 5, 6, 7, and 8 -- well, 3, 4, 5, 6, 7, 8.
**A.** Correct.
**Q.** And in 3, 4, 5, 6, 7, and 8, you're listing bank records including canceled check stubs, credit card statements --
**A.** Correct.
**Q.** -- and monthly account statements for four bank accounts held by Beverly Proton, PPEB-5, and Pacific Proton; isn't that correct?
**A.** Correct.
**Q.** So there's time periods that you've indicated for the PPEB-5 Fund account statements and the Pacific Proton account statements and the Beverly Proton account statements.
Do you see that?
**A.** Yes.
**Q.** Let's just take Beverly Proton, for example.
In Number 2 --
**A.** Well, which line item is it? Hold up.



Let me catch up with you.
**Q.** Number 2.
**A.** Number 2, okay.
**Q.** Yeah, it's Los Angeles County Proton Therapy, LLC's account statements.
**A.** Right.
**Q.** That's a Chase accounting ending 5152?
**A.** Correct.
**Q.** How did you arrive at those periods of time for the bank records that you reviewed as part of your expert analysis?
**A.** Those were the bank statements that we actually had.
**Q.** And you did not have available to you any Beverly Proton bank statements prior to February 2013?
**A.** That's correct.
**Q.** Okay. And the financial statement materials that you have attached to your initial exhibit, those report all the way back to 2010, right?
**A.** I believe so.
**Q.** Okay. But nonetheless, you were able without the benefit of bank statements from Beverly Proton prior to February of 2013 to construct the

financial analysis of its financial condition in 2010, 2011, 2012?
**A.** We used the financial data that was provided to us, yes. We were not --
**Q.** What was that -- what -- go ahead.
**A.** They may have been QuickBook financial statements or whatever they had available before we did the accounting. When we took over the accounting, we basically had starting financials or a balance sheet to start with.
**Q.** And when you say "we," you're referring to Trang Lam and --
**A.** That's correct, Trang Lam, yes.
**Q.** All right. And the same is the case for the PPEB-5 Fund and the Pacific Proton Therapy Regional Center to the extent as reflected in your Appendix B to Exhibit 160, you did not have bank account statements for their financial accounts stretching back to the beginning of the period under inspection in your report which goes back to 2010, correct?
**A.** Correct. That's correct.
**Q.** Why did the PPEB-5 have two corporate accounts?
**A.** I don't know.



**Q.** And is it your understanding that the three Chase accounts and the Citibank account for PPEB-5 Fund represent the entirety of the accounts held by Beverly Proton, PPEB-5 Fund, and Pacific Proton from 2013 to 2016?
**A.** Correct.
**Q.** Okay. Number 9, various QuickBooks report for the following entities and time periods: Beverly Proton 2013 through 2016, Pacific Proton EB-5 Fund 2013 through 2016, Pacific Proton Therapy Regional Center 2012 through 2017.
You're referring to the general ledgers in QuickBooks reports that were constructed by Ms. Lam during Marcum's engagement by these companies prior to the SEC even filing suit.
And this is back in 2015, 2016, right?
**A.** That is correct.
**Q.** In those QuickBook reports, in Number 9, they form the basis, the starting point for your analysis, and you then applied the adjustments that you laid out on the first page of your initial report to those QuickBooks reports in the course of generating all the exhibits attached to your initial report, right?
**A.** Yes.



**Q.** And aside from the adjustments categorized and disclosed on the first page of your initial report that's Exhibit 159, you made no further changes to the transaction classifications set forth in all the QuickBooks reports that you disclosed in Number 9 of Appendix B of Exhibit 160.
Is that fair?
**A.** That's fair to state. My Excel spreadsheets speak for themselves with all the adjustments that were made.
**Q.** Okay. And all the adjustments were made are described on the first page of your Exhibit 159 initial report, right?
**A.** I believe that's correct. I'd have to go back and look at the report, but if you're talking about my main Exhibit 1 spreadsheet, that would be correct that those are all the adjustments.
**Q.** Okay. Number 15, a list of investors for Pacific Proton EB-5 Fund, LLC.
Did that have a Bates number on it?
**A.** I don't think so.
**Q.** What did it look like? Was it just a chart with the seven-odd names on it?
**A.** Yes, I believe it came out of our QuickBooks files, and, you know, we took it from the



books and who put in the $500,000. I know Irwin's report has a completely -- you know, had a different list.
**Q.** Uh-huh.
**A.** And there were some names that were different which did not agree with the general ledgers, so I'm not sure where Irwin got her report from and her names.
**Q.** Bear with me, please.
As part of your expert report, did you reconcile all of the names on that investor list that you just spoke to with financial transactions reflected in the actual bank records for the three corporate entity defendants?
**A.** I relied on Trang Lam's work and our QuickBooks file which listed the names of every investor that came in and put up $500,000.
**Q.** Okay.
**A.** And I was comfortable with the list that my team put together based upon the cash coming in.
**Q.** All right. But -- but you did not take the step of sort of vetting and running down and identifying a bank record showing the cash coming in from a payor with the same name as everybody that was on the list appended to Trang Lam's QuickBook

reports, correct?
**A.** Correct. We did compare them to Irwin's list and found discrepancies in names. And it could be people have very common names and use different names, but her list was not consistent with our list.
**Q.** Mr. Friedman, if you could do me a favor and refresh your marked exhibits folder, there should be a new one that's going to pop up. It's Exhibit 132. Once you see that, please open it.
And for the record, Exhibit 132 is a five-page document. It bears the Bates number Marcum_CLIU_00005722 --
**A.** It hasn't popped up yet.
**Q.** -- through 5726. Why don't we refresh and give it some time. And if you still can't see it in about 20 seconds, I'll try to fix this.
**A.** It hasn't refreshed. Is there something I can hit on my machine to make it refresh or is it just we wait?
**Q.** Why don't you open up the marked exhibit folders so that you see 159, 160, and 161, and then on the browser just hit refresh and see what happens.
**A.** All right. Yeah, I'm here on the browser.



Let's go here and hit enter.
**Q.** No such luck. No such luck. Okay. Let me try this. I'm going to share my screen.
**A.** Okay.
**Q.** Am I now displaying to you my screen in which I've pulled up from the file share site in Exhibit 132? Do you see that?
**A.** I see it very small, but I see it.
**Q.** Yeah, why don't you try refreshing again on the file share side? It's just much easier if that's doable.
MR. LEUNG: Herve, are you able to pull this up on Egnyte?
MR. GOURAIGE: No, I did not. I just tried it and it didn't show.
MR. LEUNG: Okay.
MR. GOURAIGE: Maybe I need to wait and see if it will refresh.
THE WITNESS: Should we all log off of it and log back in?
MR. GOURAIGE: I just logged into it, and I still didn't see it.
BY MR. LEUNG:
**Q.** So the list that is available to you, Mr. Friedman, is only 159, 160, and 161?



**A.** That's correct.
**Q.** Okay.
**A.** Would you like to try e-mails?
**Q.** Yeah. Why not.
MR. LEUNG: Okay. For the record, I am downloading a copy of Exhibit 132 which will be filed to the file share subfolder for this deposition. Unfortunately, the witness and defense counsel are not able to access it, so I will be sending Exhibit 132 by e-mail to defense counsel shortly.
MR. GOURAIGE: I just tried to reopen it, still couldn't get it.
BY MR. LEUNG:
**Q.** Mr. Friedman, what's your e-mail address? Is it Ron Friedman --
**A.** Yes, @MarcumLLP.com.
**Q.** All right. You should be receiving this by e-mail shortly. Let me know when you get it.
**A.** It just came through.
**Q.** Please open it up.
MR. LEUNG: And for the record, Exhibit 132 is a five-page document. Transmitting e-mail was sent on or about October 11, 2016 from Trang Lam to Stan, Trang



Lam's transmitting e-mail provides, "Here is list in Excel format for all investors."
BY MR. LEUNG:
**Q.** My question for you, Mr. Friedman, is, if you look at the last three pages of the exhibit, is that the list that you're referring to?
**A.** I'd have to look at my QuickBooks files, but it looks like she's pulling that from the QuickBook file.
**Q.** Okay.
**A.** And the totals look about right to me.
**Q.** All right. If you could go back to Egnyte, I want to see if you're able to access Exhibit 162 which I've just moved into the marked exhibits folder.
(Thereupon, marked as Plaintiff Exhibit 162.)
**A.** All right. I'm in -- back on that page, and I still only have 159, -60, and -61.
BY MR. LEUNG:
**Q.** All right. When I share my screen, are you able to expand it so that it's more visible?
**A.** Go ahead. Let's try it. I'm going full screen.
**Q.** Okay.

**A.** Yeah, it's better.
MR. LEUNG: All right. For the record, I am displaying through WebEx an eight-page document that will be marked Exhibit 162 to the witness. First page of the document is an e-mail dated April 2, 2021 sent from Herve Gouraige to counsel for the SEC, subject SEC versus Liu. And there is -- there are a number of attachments to that e-mail. One is addendum letter to counsel.PDF. Another is an Outlook PST e-mail file entitled "RE: SEC versus Liu, et al., meet and confer RE docket numbers 77, 90, and 91."
BY MR. LEUNG:
**Q.** Do you see that?
And Mr. Friedman, I've printed out the attachment that's your April 2, 2021 letter, right?
**A.** Correct.
**Q.** Okay. Now, Mr. Gouraige is writing, "Gary, please see the attached April 2, 2021 letter from Ron Friedman containing the supplemental information to his March 26, 2021 expert report we agreed to provide at your request. Exhibit B to the attached letter contains a list of documents that Mr. Friedman reviewed and relied upon in preparing



his March 26th report."
That's a true attachment?
**A.** Correct.
**Q.** "Also attached is an August 2, 2016 e-mail from Stan Morris, then corporate counsel, to you attaching the QuickBooks reports that Mr. Friedman reviewed and relied upon in preparing his report."
Is that a true statement?
**A.** I'd have to see that attachment, but it sounds right.
**Q.** Sure. So I'm flipping down to the attached e-mail from Stan Morris. Take as much time if you want. Let me know when I should scroll down so that you can read everything.
But at page 6, 7, and 8 is the e-mail that Mr. Gouraige attached to his April 2, 2021 e-mail to counsel for the SEC, and that's Stan Morris' e-mail from almost five years earlier dated August 2, 2016 --
**A.** Okay.
**Q.** -- in which he is sending to the SEC a number of QuickBooks reports, and you'll see them listed in the attachments to that Stan Morris e-mail.
Do you see that?



**A.** Yes.
**Q.** And so returning to Mr. Gouraige's e-mail from this past month, is it a true statement that also attached is an August 2, 2016 e-mail from Stan Morris, then corporate counsel, to you attaching the QuickBooks reports that Mr. Friedman relied -- reviewed and relied upon in preparing his report?
**A.** Are those QuickBooks reports attached to this e-mail?
(Thereupon, marked as Plaintiff Exhibits 162A through 162I.)
BY MR. LEUNG:
**Q.** Yep, I can pull them up for you. So I'm now showing you Exhibit 162A, which is the 2013 QuickBooks report for Beverly Proton Center that was attached to Stan Morris' August 2, 2016 e-mail. If you'd like, I can flip through this one.
And my question to you will be, is this a true and accurate copy of the 2013 QuickBooks report for Beverly Proton Center that you reviewed and relied upon in forming the opinions disclosed in the initial report?
Let me do this a better way. I'm going to e-mail you 162A through 162I as well as 162. Fair?
**A.** Can I save you sometime maybe?



**Q.** Yeah.
**A.** If these are the same -- if these are the same balance sheets that are in my exhibits, then I'll agree that these are the same QuickBook files because I have them in my report, the ones we relied upon. And I believe it's my Exhibits 4, 5, I think in that range, that have all the QuickBook balance sheets and financial statements.
**Q.** But Mr. Friedman, those -- those exhibits that Exhibit 4 series to your initial report, those QuickBook reports are posts to your adjustments, correct?
**A.** No, no, those are pre my adjustments.
**Q.** These reports?
**A.** Yeah, those exhibits are the original ones.
**Q.** Okay. Why don't you open 159 -- 159 since you can. And if you could go to page 58 of 70.
**A.** Yeah. I'm actually at page -- the balance sheets are -- Exhibit 6A is where the balance sheets begin that are the QuickBook files.
**Q.** Okay. So we're talking about 6A, 6B, 6C, correct?
**A.** Correct.
**Q.** And those are all for 2015 for the three

corporate entities, correct?
**A.** Correct. And I only put those in the report, but we did have the previous financial statements, you know, '14 and '13 years.
**Q.** Yeah.
**A.** But I didn't put them in my exhibits, but you have those, I'm sure.
**Q.** Okay. Well, let's start with 6A.
If you can take a look at 6A to Exhibit 159 of your report, that is the balance sheet for 2015 for Pacific Proton Therapy Regional Center, right?
**A.** I'm with you.
**Q.** Okay. And on the screen that I'm sharing with you, I'm going to redirect your attention to the April 2nd e-mail from counsel from Mr. Gouraige saying that, "Attached is an August 2, 2016 e-mail from Stan Morris attaching the QuickBook reports that Mr. Friedman reviewed and relied upon in preparing his report."
You remember that statement, right?
**A.** Yes.
**Q.** Okay. And for the record, Exhibit 162I is the printout of the balance sheet for the Pacific Proton entity for 2015 that was attached to the Stan



Morris e-mail that Mr. Gouraige is representing as the QuickBooks report that you relied on in forming your opinions, correct?
**A.** That's correct.
**Q.** So there's a discrepancy between the dates, right? I mean, the thing that Mr. Gouraige attached and sent to the SEC in Exhibit 162I, it's dated June 14, 2016. It says "accrual basis." It's got 1:36 p.m. on it. In contrast, Exhibit 6A to your report, that's Exhibit 159, which is the same balance sheet for the same entity, Pacific Proton, it has a date December 31, 2015. It's got a later date June 21, 2016, a different time. It also doesn't have the watermark that's at the bottom of Exhibit 162I, which is what Mr. Gouraige forwarded which says "no assurances provided."
Can you explain that discrepancy?
**A.** Just that they were done on different dates, and maybe it was the way the report read, and there were no headers and dates and pages on it. That's the only -- I can't give you another reason.
**Q.** Okay. Should there be a "no assurance is provided" watermark on the Exhibit 6A to your expert report?
**A.** There's no reason for it to be there or



not be there. I think I made it clear that we didn't audit review these numbers at all.
**Q.** Okay. And so when preparing Exhibit 6A, you did not perform assurance services, correct?
**A.** That is correct.
**Q.** And so would you agree with me that in Exhibit 162, that's the e-mail that Mr. Gouraige sent to the SEC on April 2nd, his statement that, "Also attached is an August 2, 2016 e-mail from Stan Morris" -- then corporate counsel to you -- "attachment QuickBook reports that Mr. Friedman reviewed and relied upon in preparing his report" was not an accurate statement?
**A.** No, I disagree with that comment. I think these financial statements and the numbers are the same. Is it the exact printed copy? No, but it's the same information. Nothing's changed.
**Q.** Okay. Regardless -- okay. All right. So -- okay. I think I hear you.
That's a true statement, right?
**A.** Yeah.
**Q.** Stan Morris forwarded to the SEC on August 2, 2016, those are the QuickBook reports that you used as the foundational basis for your analysis, correct?



**A.** That's correct. We just ran the reports on different days, but it's the same report.
**Q.** Got it. And those reports were prepared by Trang Lam and her team back in, I guess, around 2016, right?
**A.** That's correct.
**Q.** Okay. And, you know, back in 2016, you had not had occasion to work with Mr. Liu on any engagement relating to his corporate entities?
**A.** That's correct. I never knew him, never even knew he was a client of the firm.
**Q.** Okay. I want to turn back to Exhibit 160, which is your initial report. And we -- sorry, Exhibit 159, which is your initial report. And we had briefly addressed the adjustments described on page 1 of your report.
So the very first bullet reads, "Adjusting the expenses of the entities between balance sheet and profit and loss statements based on the nature of the expenses."
Which expenses did you adjust?
**A.** Okay. Let's go to -- if you turn to Exhibit 1.
**Q.** Uh-huh.
**A.** You see we have kind of consolidated all

the financial statements together as of April 30, 2016?
**Q.** Yes. Okay.
**A.** And we stuck -- we have the -- if you look across each line item, you'll see the cash. And I'll give you examples, and then you can ask me questions. You have the cash from all the entities. They total up to $7.1 million. In the period 1/1/2016, we brought the books through 4/30/16, and $6.9 million was used up to bring it to down to a balance of $418,954, which was the ending balance of cash. The next line, we adjusted the other receivables down to $1.5 million, which was money that was being repaid by one of the banks that got money incorrectly and they were paying it back.
**Q.** Which bank was that?
**A.** I'll tell you right now. That will be Exhibit 1A. Exhibit 1A, there was -- if you look at the middle of the page, $3 million was paid out a million and a half to Industrial and Commercial Bank, and a million and a half to Overseas Chinese Bank. And we were informed by Charles that these were inappropriate payments that were made by mistake. The Overseas Chinese Bank did return prior to us, you know, finishing our work, a million and a



half dollars which left the Industry and Commercial Bank outstanding million and a half dollars that was still outstanding as of April of '16. And to my knowledge, I believe that has been paid back.
**Q.** The Industrial Commercial Bank?
**A.** Yes.
**Q.** Okay.
**A.** And then you go down to the next --
**Q.** And who was -- who was the entity that paid that money back that was holding that? Was that Industrial?
**A.** That -- all I know is the bank that sent back the money.
**Q.** Okay. All right. So that's 2. Let's move on. What other adjustments --
**A.** Next line item.
**Q.** -- for the three entities?
**A.** Yeah. We set up a receivable from Overseas Chinese Immigration Consulting for $3.4 million, and that is because if they did not raise enough capital, they had to return the marketing money of $800,000 per year for three years, which was $2.4 million, and they had to pay a penalty of $1 million for not hitting their targets.
So we booked that receivable from them of



$3.4 million.
**Q.** Do you know if the corporate entities have collected on that receivable?
**A.** I do not know at this point if they collected it.
**Q.** Do you know if Mr. Liu was engaged in any efforts to collect on that 3.4 million-dollar receivable from Overseas Chinese?
MR. GOURAIGE: I have an objection to the question. I have an objection to the question.
Gary, I think -- I think you know from the court orders he cannot engage in any discussions regarding the companies.
BY MR. LEUNG:
**Q.** Go ahead.
**A.** It's my understanding that the receiver should have been the one who was going after this money, because at this point in time, Charles was not involved in the company.
**Q.** Is it your understanding that the receivership is still in place?
**A.** I do not know.
MR. LEUNG: Mr. Gouraige, is it -- is it your understanding that the provision of the preliminary injunction entered by Judge Carney



back in 2016 that you just referenced is still valid and in effect?
MR. GOURAIGE: Is still valid as of today? I'd have to go back and look at the preliminary injunction. All that I'm saying is, once the SEC filed its complaint and the Court appointed the monitor, the court orders prohibited Charles Liu and his wife from having anything to do with the companies, and the monitor was the only person authorized by the Court to act on behalf of the companies.
MR. LEUNG: And is it your position that the court orders that you just referenced ten seconds ago are still valid and in effect?
MR. GOURAIGE: As I just said, I would have to go back and look at the court orders.
And are you talking as of today?
BY MR. LEUNG:
**Q.** Mr. Friedman, we just covered the receivable from Overseas Chinese.
What -- what's next? Any other adjustments to the expenses of the entities between the balance sheet and the profit and loss statements?
**A.** Yes. Continuing on, the next line item is

a receivable from Dr. Thropay for $838,500 which was for all the rent that he was paid. We set that up as a receivable for a couple of reasons. One is the original -- you know, the POM called for no rent to be paid until a hundred million dollars had been raised, but the POM also allowed them to make modifications as they deemed necessary, but we are aware of the fact that after the monitor was appointed that he gave the land back to Dr. Thropay without any consideration of all the monies that had previously been paid in to Dr. Thropay.

And we set that up as a receivable because we're not sure Dr. Thropay should have been paid anything since he got his land back when it was a 30-year lease and he paid no consideration to get the land back. I thought at least he should have given back his money that he was paid for rent.

**Q.** Okay. Please continue.
**A.** Okay. And if you -- I assume you're following down with me as I go line by line with you on our financial statement?
**Q.** I am.
**A.** Okay. Medical equipment, the Mevion, $3 million. We set that up as a receivable -- well, it was always a receivable. We left it as a



receivable. We basically -- there's a contract that exists between Mevion and the Proton Center for the equipment. And basically, we felt the monitor should have negotiated something other than just forgetting about it and giving the money to Mevion.

If this project had continued, it would have been -- Mevion was an option for the product. You didn't have to go to the other company. The POM gave you the right to pick any company you wanted for the equipment, and they picked Mevion. And there's no reason if the SEC didn't take this over that the project would have continued and the equipment would have been put into play.

So again, my position is the monitor did nothing to try and get something back from Mevion if the contract wasn't going to go forward. Going to --
**Q.** Just real quick, Mr. Friedman.
Have you read Mr. Liu's deposition testimony on that subject, Mevion?
**A.** No, I did not.
**Q.** Okay. Okay. Go ahead.
**A.** I'm going to go back to other write-offs we did. If I go back a couple lines up when I talked about the other receivables, there was a



receivable on the books for $25,780 which we did write off.
**Q.** I'm very sorry, Mr. Friedman. Just one moment.
MR. LEUNG: Herve, can you hear us?
MR. GOURAIGE: Yep, I can hear you.
MR. LEUNG: Okay. I cannot see your video, but I can hear you.
BY MR. LEUNG:
**Q.** Mr. Friedman, can you hear Mr. Gouraige?
MR. GOURAIGE: I'm looking at Ron Friedman's report and PDF. That's why. But I can hear you.
MR. LEUNG: Okay. I can't see you. Is your camera off?
MR. GOURAIGE: No, I just -- hold on a second. I can just -- I just minimized it so that I can look at the PDF.
MR. LEUNG: Okay. Good.
BY MR. LEUNG:
**Q.** Mr. Friedman, please go ahead.
**A.** Okay. Are you following me in the adjustment column, which is another few columns to the left and there's a number in there for $25,780?
**Q.** Column G?



**A.** Column G, yes.
**Q.** Yeah.
**A.** Okay. We wrote that off, and if you go to Exhibit 1A, you'll see that $25,000 as the write-off, $25,780 and that was all charged directly to Charles and treated as compensation or distribution to him.
**Q.** What is that $25,780? Credit card payments?
**A.** These were payments -- if you look to the left, it says, "Due from MPH Ventures," and you see SEC fund and all those funds.
**Q.** Okay.
**A.** And those were his personal accounts, so we wrote this off to him personally as attributed to him.
**Q.** Okay. So you just classified it as a management fee?
**A.** To, yeah, to Charles. Yeah, management fee is, you know, how --
**Q.** Go ahead. Management fee to Charles which was also an expense --
**A.** That is correct.
**Q.** -- of the entities?
**A.** Yes, as compensation.

**Q.** Okay.
**A.** Okay. The next line I want to take you to is sticking with Column G, medical equipment 368,000-dollar write-off. And if you look down, that is on Column 1. That is Exhibit 1B.
**Q.** Uh-huh.
**A.** And the $360,000 was to Optivus Proton and it was their -- written off as their consulting fee.
**Q.** It was a write-off?
**A.** Well, I'm going to read to you here. We have a Number 2 to explain it at the bottom in a footnote. Per the quotation provided by Optivus Proton Therapy, the quote price was $495,000. Per the check stub for Check 1025 in November 2015 bank statement for account ending in 5152, $368,100 was paid to Optivus Proton Therapy. We were not provided with any invoice to support this payment, but we did expense it.
Going back to Exhibit 1 --
**Q.** Can we pause for a moment, Mr. Friedman?
**A.** Sure.
**Q.** Exhibit 1A of your report, that's Exhibit 159, Exhibit 1A to Exhibit 159.
Apart from MPH Ventures, SC Fund, SC Management, MP Medical Hotel being affiliated with

89

Mr. Liu, do you have any understanding of what those entities are for?
**A.** No, I do not.
**Q.** Okay. Moving down to refunds due and paid in the case of Overseas Chinese Bank Corp, Industrial and Commercial Bank.
In the course of forming your opinions, once again, you did not review any financial records from these overseas financial institutions, correct?
**A.** That's correct.
**Q.** And you received no information about these particular transactions reflected in your Exhibit 1A apart from what's listed in your Exhibit B to Exhibit 160 and what you understand from counsel, correct?
**A.** That's correct. And I mean, we were told in an e-mail from Charles that this $3 million was improperly sent out and would be coming back, and we confirmed the payments went out, the $3 million, and we confirmed by the time we completed our work that 1.5 million had come in as of the April 30th date.
**Q.** Okay. So based on information from Mr. Liu and verified by your review of bank statements insofar as the money went out and some of it went back, right?

90

**A.** That's correct.
**Q.** But, you know, the facts and circumstances of these transactions, apart from what you've just testified to that Mr. Liu communicated, you have no further knowledge, right?
**A.** That's correct.
**Q.** Okay. Turning to Exhibit 1B, with respect to Mevion, you've agreed -- you've reviewed some agreements that were executed with Mevion by Mr. Liu on behalf of Beverly Proton at the end of 2015, correct?
**A.** That's correct.
**Q.** But you've not spoken with Mevion, you've not seen any Mevion invoices, and you've not seen any other evidence that would establish the facts and circumstances of that 3 million-dollar payment, correct?
**A.** Incorrect. I have reviewed a contract for the, I believe it was $22 or million total price. And I could be wrong in the total price, but I did see the $3 million as part -- as part of the contract, and there was a contract between the company and Mevion.
**Q.** And -- and do you have any understanding of what was delivered by Mevion?

91

**A.** Nothing was delivered.
**Q.** But contracts you've reviewed, no invoices, no other documentation, let's say, you know, written correspondence in the course of negotiating that contract, written correspondence in the aftermath of that contract, nothing of the sort, right?
**A.** No, I just reviewed seeing the contract between the companies.
**Q.** Okay. Optivus, you reviewed a quote, you saw a canceled check stub that showed payment, but you were not provided with an invoice to support the payment, nor were you provided any information about what Optivus actually did in exchange for that payment, correct?
**A.** It is my understanding that they did consulting for that payment, but that's the extent of my knowledge.
**Q.** What's that understanding based upon?
**A.** Discussions with counsel, and I think that's pretty much my understanding from counsel.
**Q.** Okay. Turn to Exhibit 1C. Let's start with R Allen Construction.
You reference in the notes to Exhibit 1C a May 2015 contract with R Allen Construction a later

92

work agreement dated July 2015 and some check stubs and bank statements confirming the amounts paid, correct?
**A.** Correct. That's correct.
**Q.** And that's the entire -- that's the entire universe of information you were provided about the work that R Allen Constructed -- Construction did in exchange for this $315,487?
**A.** Yes. And I understand -- I mean, they tore down the existing building that was on the property.
**Q.** Okay. And what is that understanding based upon?
**A.** Discussions with counsel.
**Q.** Okay. So no invoices provided, no other information about the work that was actually performed, correct?
**A.** Correct.
**Q.** Skanska USA, your expert opinions are based on the information set forth in Note 2 to Exhibit 1C which is an April 2013 contract with Skanska at the contract price set forth in that agreement as well as check stubs and bank statements showing the payments, correct?
**A.** That's correct.



**Q.** That's the entire universe of information that you have on that particular -- on those transactions, correct?
**A.** Correct.
**Q.** You know, with respect to the necessity, the legitimacy, the actual value delivered by Skanska, you have no information and no opinion with respect to those issues, correct?
**A.** Correct.
**Q.** SCI.X Science Studio, per Note 3 to Exhibit 1C, you reviewed a contract between SCI.X Science Studio and Beverly Proton dated November 2015 that set forth the contract fee, and you also reviewed some bank account statements showing that there was a funds transfer in November of 2015, correct?
**A.** That's correct.
**Q.** And that's the entire universe of information that you were provided in connection with the corporate entities' financial transactions with SCI.X Science Studio, correct?
**A.** Correct.
**Q.** So the value of -- well, the fact of whatever was delivered, the value of whatever was provided by SCI.X and the legitimacy of those



services, you have no opinion on that, no information to that effect, correct?
**A.** I have no information that they did not perform the services per their contract, correct.
**Q.** Okay. Let's go to Exhibit 1F to your report.
**A.** I'd like to add something on 1C because you did not read Notes 4 and 5 as to why we wrote off those balances, and I think it's important to have on the record that because the project was stopped, we wrote off these assets and did not allow them to be capitalized.
**Q.** Okay. Thank you.
Turning to Exhibit 1F, is this a tabulation of the startup costs for the three corporate entities through April 30, 2016?
**A.** That is correct.
**Q.** Okay. How did you identify Shanghai Commercial Bank; Optivus; Nisy Ipe; John Paul Thropay; Nixon Peabody, LLP; Marcum, LLP? How did you identify those entities who received corporate funds as having provided services in connection with the corporate defendants' startup costs?
**A.** When we got the initial financial statements, these were all categorized as startup



cost. So we didn't put them in there. That's how they originally came to us.
**Q.** Categorized by whom, the prior CPA?
**A.** Prior CPA, yes.
**Q.** Did you speak with the prior CPA as part of your expert engagement?
**A.** No, we did not.
**Q.** Did anybody on your team speak with the prior CPA as part of your expert engagement?
**A.** Not to my knowledge.
**Q.** Did you receive the file that the prior CPA prepared in connection with the financial statements that you started with as part of your expert engagement?
**A.** We would have received their financial statement only. We did not have any supporting documentation, to my knowledge.
**Q.** Okay. So with respect to all the startup costs reflected in Exhibit 1, there was no supporting documentation apart from the financial statements that had been prepared by the prior CPA for these entities, correct?
**A.** And I'm looking at my notes to give you the sources at the bottom.
**Q.** Uh-huh.

A. You know, you could see the bank statement from March of 2013. We have not been provided with any contract or invoices from Shanghai Commercial Bank to support these expenses, so we took it from the bank statement.
For the second item, again, from the QuickBook records and as of 12/31/15, the bank statements and the account ending in 5152, we have been provided -- we have not been provided any contracts or invoices to support these expenses.
Q. But the QuickBook records referenced in your notes to Exhibit 1F that were prepared by Trang Lam and her team at Marcum, they used the financial statements from the prior CPA as the starting point, correct?
A. That is -- that's correct.
Q. Okay.
A. And then we were able to identify what we could identify, and we footnoted them down below, our sources.
Q. Got it. Turning to Exhibit 2A?
A. 2A.
Q. In Exhibit 2A, you list a host of legal and professional services firms that received funds from the corporate entities from the initial year of



operations, so that's 2010, right?
A. Correct.
Q. Through April 30, 2016. With respect to the services rendered by all of these firms listed here, Seyfarth Shaw, Marcum & Partners; Nixon Peabody; Marcum Greenberg Traurig; Law Offices of Rachel Liu; Miller Mayer, JJW Consultancy; Evans, Carroll & Associates; Homeier & Law, PC, and others, you were not provided with invoices?
I'll exclude Marcum from that question for obvious reasons.
A. Thank you. Yes, we did not get invoices from the other entities.
Q. Okay. So, you know, information as to the nature, necessity, reasonableness, legitimacy of the services provided by all these vendors and charged for by all these vendors, you did not have specific information with respect to that topic, correct?
A. That's correct.
Q. Okay. Now let's turn to Exhibit 2C, please.
And Exhibit 2C, is this a tabulation of consultancy -- consulting fees paid by the corporate entities from their initial year of operations in 2010 through April 30, 2016?



A. That's correct.
Q. Number of folks listed. X Science Studio; Optivus Proton; Skanska USA; Lance Gong; Michael Cogswell; Michael Hunn & Associates; Nisy Ipe; Licheng Zheny; IBA Dosimetry; Don Wise; Mintz Levin; Square Peg Design; WayLink LLC; Michael Evans; Creative Design.
As part of your expert analysis, you were not provided invoices in conjunction with professional consulting services referenced by these entities, correct?
A. We were provided with those indicated on the right side. We have four leases and contract agreements, the first being the X Science Studio, the second being Optivus Proton, the third being Skanska USA, and the fourth being Nisy Ipe, we have lease and contract agreements that we were able to review.
Q. Okay. But apart from those agreements, no invoices, no documentary evidence, and no other information about what was actually provided in exchange for these funds, correct?
A. That's correct.
Q. Okay. And so would you agree that it's not part of your expert analysis in this case to be



rendering an opinion on the necessity, reasonableness, or legitimacy of the services that were rendered for these funds by these vendors that are listed in Exhibit 2C?
A. My opinion is that these vendors were paid these amounts of dollars.
Q. And turning to Exhibit 2F, in Exhibit 2F you appear to be tabulating rent expenses associated with office space occupied by the corporate entities from their initial year of operations in 2010 through April 30, 2016.
Did I get that right?
A. That's correct.
Q. Okay. So we've talked about Thropay, but there are a number of different entities under Thropay: AIM Property Services; Arden Realty; Limited; Bre, B-R-E, California Office Owner, LLC; China Civic Bank; Crown Cabot Financial Center; Shanghai Center.
Your notes reference the lease agreement with Thropay.
Have you seen leases for any of these other office properties?
A. No, I did not.
Q. Do you know where these other office

properties are located?
**A.** Nothing more than they say. I mean, Shanghai Center I've got to believe is in Shanghai, but --
**Q.** Good assumption.
**A.** And Chinese, you now, Bank is in China.
**Q.** Okay.
**A.** But I have no knowledge of the specific addresses.
**Q.** Okay. And, you know, no knowledge as to the reasonableness, necessity, or legitimacy of these rent payments apart from the fact that they were made according to the QuickBook reports that you reviewed, correct?
**A.** That's correct. We understand that these amounts have been paid to these various entities.
**Q.** Okay. That was a very long interview, but you were walking me through, very helpfully, your Exhibit 1 and all the adjustments to expenses of the entities between the balance sheet and profit and loss statements.
And I think the last one you covered was the 368,100-dollar adjustment regarding Optivus which was written off.
**A.** Right.

101

**Q.** Any other adjustments to the balance sheet for the expenses -- expenses of the corporate entity?
**A.** Sticking with Column G, going down the page, you have $803,630 was written off. And that was with Note 7, which is Exhibit 1C, which we've already talked about, and that was written off because the project stopped.
**Q.** Got it.
**A.** Auto and truck --
**Q.** Uh-huh.
**A.** -- is the next write-off, along with the accumulated depreciation on those trucks, and we charged that directly to Charles as part of his management fee because those vehicles were sent directly to China after they were purchased.
**Q.** Why was that, I guess, in the aggregate 80-, 90,000-dollar amount expensed as a management fee to Charles?
**A.** Actually, it was a net of $60,000.
**Q.** 60-, you're right. 60-.
**A.** That's why I'm the accountant.
**Q.** Yeah.
**A.** Let me look at my note on that for you. And that would be Exhibit 1D.

102

**Q.** Uh-huh.
**A.** And if you look at Note 2 at the bottom there, "It is our understanding that these cars were shipped to China almost immediately after their purchase. We have not been provided any support that document that these cars were being used for the operational purpose of the entity. Therefore, they are deemed personal use of Charles, and the cost is being expensed as a management fee on the profit and loss statement of the entity for the year ending December 31, 2015."
**Q.** Okay. And because those cars had no evident corporate use, they were expensed to Charles as compensation?
**A.** That's correct.
**Q.** Okay. Moving on, what's next? Any other adjustments?
**A.** Broker fees, management fees, marketing fees, the startups cost. You know, this whole next group that I'm discussing, these were all expensed on the financial statement. They should not have been carried as assets on the balance sheet. They were expenses and appropriately belonged in the expense section of a financial statement.
**Q.** Okay.

103

**A.** If you want to go one by one, we can, but it's up to you.
**Q.** No, I see your notes. And your -- your Footnotes 9, 10, and 11 which cross-reference Exhibit 1E, 1F, 1G set forth your rationale for adjusting those amounts to the expense category, correct?
**A.** That's correct.
**Q.** How have they been previously classified, just as development costs?
**A.** Yes. They were left on the balance sheet. I saw no reason for them to ever be on the balance sheet that way.
**Q.** Okay. And then lease deposit, 68,000-dollar amount.
Was that another adjustment that you made?
**A.** That's Footnote 11 at the bottom here, which takes us to Exhibit 1G.
**Q.** Uh-huh.
**A.** And you can see we had a beginning balance of 31,777. It increased another 36,000 to the Shanghai Center, bringing you up to $68,000. And if I look at my note RE at the bottom, it came from our QuickBooks for the lease deposit at 12/31/15 and the bank statements. We have not been provided with any

104

invoices to support these payments; therefore, we expensed it since we didn't see a lease with a deposit requirement.
**Q.** Okay. And all of the adjustments to the expense category that you've testified to that are reflected in Exhibit 1, you were approaching that task from an accounting perspective, correct?
**A.** That's correct.
**Q.** Okay. The factual issue of whether those expenses were associated with financial transactions that did or did not contravene the language of the POM, that was outside the scope of your expert engagement, correct?
**A.** Not necessarily.
**Q.** Okay. In what respect was it within the scope of your expert engagement?
**A.** I mean, we can go through the financial statements, P and L line by line and go through those expenses and talk about them.
**Q.** Okay. But you've testified, though, that as far as the information you've been provided for many, if not most, if not nearly all of these expenses, you received documentation as to the fact of the financial transaction. You received some form of documentation, you know, contracts and the



like.
But with respect to the facts and circumstances of what was paid for and what was given in return, are you expressing a factual view on legitimacy of those transactions in view of the POM? I mean, are you reading the POM and applying the POM to each and every one of these transactions?
Because I didn't understand that to be the case. If it is, then we should talk about it.
**A.** I think I read the POM and I see what you can spend money on and what the purpose of the POM was, and many of these expenses are okay per the POM. I -- I think you have -- you know, we could go through each one of them and talk about them or at least talk about the major expenses.
**Q.** But would you allow, at least, that the information you have about these expenses and these financial transactions is limited by necessity? You could have, in fact, a payment, perhaps you have an agreement, but you don't have any percipient knowledge and no such knowledge has been communicated to you about what actually happened with these transactions?
**A.** My knowledge is that these amounts were paid out to these various vendors in the years that



we've indicated they were paid. And I have no knowledge that they were not legitimate payments, and I have no knowledge that they weren't for business purposes. And anything we thought was personal of nature, like the cars, like some personal credit card bills of Charles and Lisa were charged to their management fee account, so --
**Q.** Which you then expensed to the companies?
**A.** Which we did expense as part of management fee, but we did limit the management fee to the two of them based on the compensation report done by my partner.
**Q.** Uh-huh. And Mr. Ginsburg's reasonable compensation report is the sole basis for that limitation, right?
**A.** That is correct.
**Q.** Okay. Have we covered all of the expense adjustments that you made to the entities?
**A.** I believe so. Let me check one more column, please.
**Q.** Take as much time as you need.
**A.** I think we've covered every adjustment, yes.
**Q.** Okay. Redirecting your attention to your initial report, Exhibit 159, very first page, let's



move on to the second bullet point. It reads, "Adjusting assets based" --
**A.** Hold it. Stop, stop, stop. I got to catch up with you.
**Q.** Let me know when you're ready.
**A.** I'm ready.
**Q.** Second bullet point, "Adjusting assets based on whether such assets were the assets of the entities as of April 30, 2016."
What asset classifications did you adjust?
**A.** We just went through all those on the Exhibit 1.
**Q.** Got it. "Adjusting management fees based on reasonable compensation studies."
We covered that, right?
**A.** Correct.
**Q.** You classified a certain amount of funds paid to Liu and Wang as management fees expensed to the company, but you capped it at the amount of reasonable compensation that Mr. Ginsburg opined should have been paid to Mr. Liu and Ms. Wang, correct?
**A.** Correct.
**Q.** And -- and that cap that your -- that you applied based on Mr. Ginsburg's opinions is in the

range of about, for Mr. Liu, $7.2 million, right?
**A.** Correct.
**Q.** So in your financial statements that you prepared, these materials that you prepared up to $7.2 million, thereabouts, was expensed through the company if it was provided to Liu?
**A.** That's correct.
**Q.** Okay. "Adjusting the receivable based on contrast between entities and third parties," that's the fourth bullet point.
Have you fully spoken to that? I believe you --
**A.** Yeah.
**Q.** -- referenced a number of different situations. The 1.5 million with Overseas and the 1.5 million with the Industrial and Commercial Bank and the Thropay lease payments.
Any others that we have not talked about?
**A.** I think we covered them all.
**Q.** Okay. And adjusting the expenses between operational and personal expenses, have we covered all of those adjustments?
**A.** Yes.
**Q.** Okay. What is the AICPA?
**A.** What is the AICPA? American Institute of



Certified Public Accountants.
**Q.** What does it do?
MR. GOURAIGE: Gary, are you -- are you moving to -- hold on a second. Are you moving to a new area?
MR. LEUNG: I am. Would you like to take a break?
MR. GOURAIGE: Yeah, I think it's a good time to take a -- I need a personal break.
MR. LEUNG: Ten minutes?
MR. GOURAIGE: Yeah.
MR. LEUNG: All right. Going off the record at 11:48.
THE VIDEOGRAPHER: And we're going off the record at 11:48 a.m.
(Recess taken.)
THE VIDEOGRAPHER: And we're back on the record at 11:57 a.m.
BY MR. LEUNG:
**Q.** Mr. Friedman, I -- I am hoping that things have changed and that you're able to access the marked exhibit sites file and see a lot more than just Exhibit 159, 160, and 161.
If you could just refresh and let me know if that is the case.



**A.** No. Should I completely log out of it and try to log back in?
**Q.** I don't think that would hurt. If you could give that a shot, I would appreciate it. Thank you.
**A.** All right. First, I have to find your e-mail. There it is.
**Q.** Too many passwords in modern life.
**A.** They're killing us, these passwords.
**Q.** Yep.
**A.** Oh, my God. It all populated. They're all there.
(Thereupon, marked as Plaintiff Exhibit 163.)
BY MR. LEUNG:
**Q.** Fantastic. If you could open up Exhibit 163, please.
**A.** Okay.
**Q.** So I'll just represent that I -- I downloaded Exhibit 163 from the web --
**A.** Okay.
**Q.** -- and this was from the AICPA's website. It's entitled, "Guide and Financial Statement Services, Compilation Overview, and Audit."
As a layperson, I've viewed a resource



like this and I just want to ask you a few questions about it, okay?
**A.** Okay.
**Q.** Take -- take as much time as you need to flip through the document just to make sure you're familiar with it.
**A.** You know, I've lived this my whole life, so I'm very familiar with it.
**Q.** Okay. All right. First question is, you know, there's a table of contents in Exhibit 163. And again, this is an AICP document entitled "Guide to Financial Settlement Services: Compilation, Review, and Audits."
The table of contents on page 2 breaks out a number of different financial statement services your CPA can provide: Audit, review, compilation, and basic financial statement preparation.
Does that jibe with your understanding of the levels of service a CPA can provide in the way of financial statements to a client?
**A.** Yes.
**Q.** And Mr. Friedman, your expert work in this case isn't a financial statement audit, correct?
**A.** That is correct.
**Q.** Your expert work in this case is not a

financial statement review, correct?
A. Correct.
Q. Your expert work in this case, Mr. Friedman, isn't a compilation; is that correct?
A. Correct.
Q. And then with respect to basic financial statement preparation under AR-70, that's not what you're doing in this case as part of your expert work, correct?
A. Correct.
Q. All right. And so as part of your engagement in this case, Mr. Friedman, you did not obtain reasonable assurance that the financial statement materials you prepared are free from any material misstatement, correct?
A. That is correct.
Q. And as part of your expert work in this case, you did not obtain limited assurance that there are no material modifications that need to be made to the financial statement materials you prepared, correct?
A. That's correct.
Q. And in fact, Mr. Friedman, am I correct that you did not obtain any assurance that there are no material modifications that should be made,



correct?
A. That's correct.
Q. Okay. As part of this expert engagement, you weren't required to be independent of the client, correct?
A. Required independence is an attest function, and we're not doing attest services. So are my opinions independent? Yes. Do I think independently? Yes. But I'm not doing an attest service which requires independence.
Q. Okay. Fair. And as part of your expert work in this case, you weren't required to obtain an understanding as to the internal controls of the corporate entities and assess any risk for fraud as part of that control review, correct?
A. That's an assurance service which we were not doing.
Q. Okay. You know, returning to Exhibit 163, there's a -- a table at the end. It begins on page 8. I'm going to use this as my guide for questions. And if you can go down to page 9.
A. Page 9?
Q. Yes.
A. Okay. I'm there.
Q. Okay. Your CPA is required to perform



inquiry and analytical procedures. That's required as part -- required as part of the review and part of an audit.
You were not required as part of your expert work in this case to perform inquiry in analytical procedures, correct?
A. That is correct.
Q. And as part of your expert work in this case, you and your team did not perform verification and substantiation procedures that would be required as part of an audit, correct?
A. That is correct.
Q. And you issued no formal report on the financial statements within the meaning of a compilation review or audit engagement, correct?
A. That's correct.
Q. Let's turn to your rebuttal report that's Exhibit 161. I just want to ask a few discreet questions about this report. On page 1, the section entitled "Introduction" of your rebuttal report, one of the bullet provides --
A. Hold it. Hold it. Let me catch up with you. Where are we looking?
Q. Page 1 of Exhibit 161.
A. Okay. Got it.



Q. Which is your rebuttal report, correct?
A. Correct.
Q. And there's a number of bullet points laying out the conclusions presented in your initial report; is that correct?
A. Correct. I want to make sure I'm on the same -- we're on -- I've got to make sure I'm with you. We're on 161, my rebuttal report, and we're on page 3 of 25, okay, which is page 1 of the report. I'm with you. Okay. I'm sorry.
Q. Yep.
A. Okay.
Q. Would you like me to restate the question?
A. Yes, if you can, go ahead, please.
Q. On page 1 of the report, page 3 of 25 of the exhibit, Exhibit 161, you're summarizing the conclusions that you set forth in your initial report, correct?
A. Correct.
Q. And one of those conclusions is, "The entities earned total revenues of approximately $2.7 million between the initial year of operations and April 30, 2016."
Do you see that?
A. Yes.

**Q.** And that's $2.7 million total for all three entities from initial year to April 30, 2016?
**A.** Correct.
**Q.** You know, we've talked about Mr. Ginsburg's reasonable compensation study, and you relied on that comp study -- compensation study in determining the appropriate amount of funds transfers to Liu and Wang to expense as management fees; is that right?
**A.** Correct. That was their compensation that we expensed.
**Q.** Okay. And do you recall how Mr. Ginsburg arrived at his reasonable compensation calculation for Mr. Liu?
**A.** That's not my expertise to testify on.
**Q.** Okay. Okay. Do you know if Mr. Ginsburg, in forming his opinions about the reasonable compensation owed to Mr. Liu, assumed that the three corporate entities earned total revenues of approximately $2.7 million between the initial year of operations and April 30, 2016?
**A.** I don't know what -- what he was looking at and what information he had available to him as to revenues.
**Q.** If you could turn to page 5 of 25, that's



page 3 of your rebuttal report. Section 3, Summary of Opinions.
**A.** Okay.
**Q.** About halfway down the paragraph you write, "As I understand from counsel, the Supreme Court decision in this case documents that the investors are entitled to an award of net profits as restitution for their losses."
What does that mean?
**A.** That, to me, means net profits are revenue minus operating expenses equals net profit.
**Q.** And that's what should be disgorged and returned to investors, according to counsel for the defense?
**A.** If there was a profit, that's what should be disgorged, yes. And if there is a loss, as we have here, then there should be nothing disgorged.
**Q.** Okay. And so if there is a loss, which is what we have here, according to your opinions, there needs to be -- there is no disgorgement to be paid to investors, correct?
**A.** The net profits are zero. Therefore, based upon this, there would be nothing to be disgorged.
**Q.** In the court summary judgment order, Judge



Carney wrote, "Liu and Wang's receipt of millions of dollars of investor funds was unequivocally negligence. No reasonable party managing developments of an EB-5-compliant proton therapy center in accordance with the representations made to investors would allow construction to languish while funneling millions of dollars to themselves to foreign entities they controlled and to foreign entities tasked with enticing more investors."
That's actual finding by the Court.
Does it have any bearing on your opinions in this case?
MR. GOURAIGE: Objection. It's not a factual finding, it's a legal analysis by the Court, and you're asking him for a legal opinion. He's not an expert on legal issues in this case.
BY MR. LEUNG:
**Q.** Does that factual finding bear on your opinions in this case, Mr. Friedman?
**A.** My response is that everybody working for a company is entitled to compensation and should be paid for the efforts they put into the company. I think in the Irwin report she says since there's no revenue, there could be no compensation. I disagree



with that assumption she made because this country was built upon Silicon Valley, for example, where you have all of these startup companies that start up, just like this is a startup company, and they do pay salaries with no revenues.
So I believe you pay people for the services they rendered when they work for a company. It doesn't have any bearing on whether there's revenue or not.
**Q.** And so that factual finding does not cause you to change your opinions in this case, correct?
**A.** Yeah, I don't -- I won't change my opinion. I believe that people are entitled to fair compensation.
**Q.** And that factual finding is not pertinent to your opinions, correct?
**A.** I can't make legal opinions because I'm not competent enough to make a legal opinion. I could make a business opinion. I could tell you what I've seen in the business world, and I've seen many, many startup companies that do pay compensation to people that own companies. And that's the reason you have all these companies raising lots millions of dollars from investors to kick off a new business, and they do pay salaries.

So I think management is entitled to be paid for the services they rendered. And I don't know if that's a legal opinion or an accounting opinion, but it's my personal opinion.
**Q.** Mr. Friedman, if this matter does go to evidentiary hearing, you do plan to testify on the opinions expressed in your reports, correct?
**A.** Yes, I do.
**Q.** Do you plan to testify on any opinions that are not expressed in either your reports or by you on the record today at your deposition?
**A.** I mean, I have a lot more to say, but I will testify to what I've stated and what's in my reports.
**Q.** Is there anything in your two reports, that's March 26th and April 9th, those two reports that you feel you need to change to make it more complete or more accurate?
**A.** I'd have to take some time to look at it, but I think per our discussions, I think everything is pretty accurate and it's pretty well recorded in there.
**Q.** Would you like to clarify any of the testimony that you've given today, sir?
**A.** I hope I was very clear and I covered

121

everything for you.
**Q.** Did you review the deposition of Trang Lam?
**A.** I don't remember reading her deposition. I don't believe I did, but I -- I didn't read it.
**Q.** Did -- did not?
**A.** Yeah, I did not read her deposition.
**Q.** Okay. May Mr. Liu use your expert reports outside the context of this litigation?
**A.** I don't know how to answer that. I don't know. I mean, my reports are for this litigation, so I'm just not sure how to answer that.
**Q.** Under the terms of your engagement, would it be permissible for him to use your reports in order to obtain a loan?
**A.** No.
**Q.** Would it be permissible for him to use your reports to negotiate and engage in some commercial transactions with third parties relating to the corporate entities?
**A.** No. My reports are for this litigation case and should be used for this case only.
**Q.** Is it permissible for Mr. Liu to use these reports in filings with the IRS?
**A.** I'd have to go back to my engagement

122

letter to confirm what the limitations of this -- these reports are, but I think they're strictly to be used for this purpose of this case and no other purpose.
MR. LEUNG: Thank you, Mr. Friedman. I have no further questions at this time. I pass the witness.
MR. GOURAIGE: Thank you, Mr. Friedman. I have no questions, sir, for you. And so I assume that this ends the deposition, and we'd like the witness to get 30 days' opportunity to review and make any changes.
THE VIDEOGRAPHER: This concludes today's videotaped deposition of Mr. Friedman. Off the record at 12:18.
(The proceedings concluded at 12:18 p.m.)

123

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PINELLAS

I, the undersigned authority, certify that RONALD FRIEDMAN, CPA appeared remotely before me and was duly sworn on the 20th day of April, 2021.
Signed this 23rd day of April, 2021.

______________________________
DENISE SANKARY, RPR, RMR, CRR
Notary Public, State of Florida
My Commission No. GG 944837
Expires: 1/27/24

124

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PINELLAS

I, DENISE SANKARY, Registered Merit Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing remote videotaped deposition of RONALD FRIEDMAN, CPA; pages 1 through 123; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 23rd day of April, 2021.

_______________________________
DENISE SANKARY, RPR, RMR, CRR

125

CERTIFICATE OF WITNESS

I, RONALD FRIEDMAN, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on April 20, 2021, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

_____ I have made corrections to my deposition.
_____ I have NOT made any changes to my deposition.

Signed: _________________________
RONALD FRIEDMAN

Dated this ________ day of ______________ of 20____.

(IF REQUIRED)
Sworn to and Subscribed before me,
this_______day of________________, 20____.
_________________
Notary Public My commission expires:__________

126

ERRATA SHEET
Deposition of: RONALD FRIEDMAN
Date taken: APRIL 20, 2021
Case: SEC v. LIU, et al.
PAGE LINE
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________
_____ _____ CHANGE: ________________________
REASON: ________________________

Signed________________________
Dated________________________

127

A

**a.m** 2:17 6:2,11 9:24 49:8,11 110:15,18
**a/k/a** 1:8 2:8
**able** 12:9,16 14:9 18:16 31:19 45:18 51:11 64:23 70:12 71:9 72:13,22 97:18 99:17 110:21
**abscond** 45:16
**accept** 21:9
**accepted** 43:20
**access** 12:16 30:16 71:9 72:13 110:21
**account** 20:13 62:7,8,10 63:12,17,18,19 64:5 65:18 66:2 89:15 94:14 97:8 107:7
**accountant** 102:22
**Accountants** 24:22 110:1
**accounting** 27:16 28:24,25 29:3,6 32:21 37:21 40:25 42:1 43:20 53:1,12,16 64:7 65:8,9 105:7 121:3
**accounts** 20:12 60:10 61:3 61:7,8,13,18 62:20,22 63:1 63:2,13 65:18,24 66:2,3 88:14
**accrual** 78:8
**accumulated** 102:13
**accuracy** 22:24 23:20 45:4
**accurate** 8:18 11:5 13:4,10 13:17 35:9 40:12 75:19 79:13 121:18,21
**acquisitions** 27:6
**act** 84:10
**action** 42:21 43:13 44:20 55:7 125:18,19
**actual** 28:18 68:13 94:6 119:10
**add** 33:5 95:7
**addendum** 73:9
**additional** 35:2
**additionally** 35:11 36:12
**address** 71:15
**addressed** 15:1,12 80:15
**addresses** 101:9
**adjudicate** 10:16
**adjudicating** 40:21
**adjust** 80:21 108:10
**adjusted** 52:21 81:12
**adjusting** 80:17 104:6 108:2 108:7,13 109:8,20
**adjustment** 53:8 87:23 101:23 104:16 107:22
**adjustments** 51:16 52:3,5 52:18 53:14 66:20 67:1,10 67:11,17 76:11,13 80:15 82:15 84:22 101:19 102:1 103:17 105:4 107:18 109:22
**administered** 7:18
**administrative** 50:10
**Advisory** 14:16
**affiliated** 89:25
**aftermath** 92:6
**aggregate** 102:17
**ago** 28:15 29:23 84:14
**agree** 21:8 68:6 76:4 79:6 99:24
**agreed** 73:23 91:8
**agreement** 57:10,12,15 93:1 93:23 100:20 106:20
**agreements** 57:6,8 91:9 99:14,17,19
**ahead** 24:3 43:23,23 65:5 72:23 83:15 86:22 87:21 88:21 116:14
**AICP** 112:11
**AICPA** 109:24,25
**AICPA's** 5:10 111:22
**AIM** 100:16
**al** 73:12 127:3
**Allen** 58:2 92:23,25 93:7
**allow** 95:11 106:16 119:6
**allowed** 85:6
**American** 24:21 109:25
**amount** 102:18 104:15 108:17,19 117:7
**amounts** 93:2 100:6 101:16 104:6 106:24
**analysis** 26:8,14 37:9,13 38:25 39:1,5 40:11,13,25 61:15,20 62:17,18,24 64:11 65:1 66:20 79:25 99:8,25 119:14
**analytical** 115:1,6
**and/or** 126:10,12
**Angeles** 1:11 2:11 3:4 11:16 25:13 64:4
**answer** 10:6,12,18 21:3 40:15 47:13 122:10,12
**answered** 10:6
**answers** 31:14 42:8 47:6,10
**anybody** 41:4,11 44:3 57:2 57:19 58:25 59:11,14 60:4 96:8
**apart** 41:9 89:24 90:13 91:3 96:20 99:19 101:12
**APLC** 59:1
**apologize** 31:8
**appealed** 46:11,14,17,19 47:8
**appear** 100:8
**APPEARANCES** 3:1
**appeared** 124:12
**appended** 68:25
**appendix** 14:24 25:23,25 35:12,17,18,19,24 36:4,9 36:14 48:13 49:15 50:17 54:1 56:21 63:5 65:17 67:6
**applied** 66:20 108:25
**apply** 24:14 25:1,17
**applying** 106:6
**appointed** 84:6 85:9
**appreciate** 31:24 111:4
**approaching** 105:6
**appropriate** 117:7
**appropriately** 103:23
**approximately** 8:6 116:21 117:20
**April** 1:18 2:18 6:1,10,24 14:17 15:25 21:23 22:6 35:7 41:3 47:24 73:6,17,20 74:16 77:16 79:8 81:1 82:3 90:21 93:21 95:16 98:3,25 100:11 108:9 116:23 117:2 117:21 121:16 124:14,15 125:20 126:9 127:2
**AR-70** 113:7
**arbitration** 39:25
**Arden** 100:16
**area** 26:8,14,19 27:2 29:16 32:17 37:9,13 39:9,13 110:5
**arm** 18:14
**arranged** 20:25
**arrive** 43:9 64:9
**arrived** 117:13
**aside** 67:1
**asked** 33:24 34:2
**asking** 9:2,3 119:15
**aspects** 38:6
**assess** 114:14
**asset** 108:10
**assets** 41:2 95:11 103:22 108:2,7,8,8
**assignment** 61:3
**assist** 28:16 32:18 40:4,8,14 40:20 41:8 45:3
**assistant** 17:11
**assistant's** 17:14
**Assisting** 17:16
**associated** 100:8 105:10
**Associates** 58:18 98:8 99:4
**assume** 9:7 22:23 23:19 85:19 123:10
**assumed** 117:18
**assuming** 23:3
**assumption** 22:25 23:4,12 23:22 24:9,17,25 25:6,15 42:11 45:5 101:5 120:1
**assumptions** 21:24 22:1,5 22:12,17
**assurance** 24:13 78:22 79:4 113:13,18,24 114:16
**assurances** 78:16
**attached** 35:12 64:19 66:23 73:20,24 74:4,12,16 75:4,8 75:16 77:17,25 78:7 79:9 126:11
**attaching** 74:6 75:5 77:18
**attachment** 5:14 73:17 74:2 74:9 79:11
**attachments** 4:12 73:9 74:23
**attendance** 48:6
**attention** 51:23 63:4 77:15 107:24
**attest** 114:6,7,9
**attorney** 125:15
**attorneys** 10:13 125:17
**attributed** 88:15
**audit** 5:10 23:15,23 24:2 26:23 27:21,25 28:12,13 28:16,16,19,21 29:10 30:6 30:6,7 37:17 79:2 111:24 112:16,23 115:3,11,15
**audited** 22:21 24:10,19
**auditing** 24:4 28:18
**auditor** 26:22 27:15
**audits** 26:24 29:13,15 37:19 112:13
**August** 74:4,18 75:4,16 77:17 79:9,23
**authority** 62:13 124:11
**authorized** 84:10 125:8
**Auto** 102:10
**available** 61:14 64:14 65:7 70:24 117:23
**award** 118:7
**aware** 54:21 85:8

B

**B** 14:24 35:12,17,19,24 36:4 36:9,15 48:13 49:15 50:17 54:1 56:21 63:5 65:17 67:6 73:23 90:14
**B-R-E** 100:17
**back** 9:23 14:2 20:22 23:6 25:21 28:13 30:18 32:4 35:5 46:22 47:2 49:10 53:22 54:23 64:20 65:19 65:20 66:16 67:15 70:20 72:12,18 80:4,7,12 81:15

82:4,10,13 84:1,4,16 85:9 85:14,16,17 86:15,23,24 89:19 90:18,25 110:17 111:2 122:25
**background** 27:14,19
**bad** 8:1
**balance** 4:14,16,18,20,22,24 5:3,5,7 52:22 53:4 65:10 76:3,7,19,20 77:10,24 78:11 80:18 81:11,11 84:23 101:20 102:1 103:22 104:11,12,20
**balances** 95:9
**bank** 59:18,23 60:5,9,10,14 60:15,20,20 61:2,8,12,17 61:18,21,23 62:3,6,10 63:9 63:13 64:10,12,15,24 65:17 68:13,23 81:16,21 81:22,24 82:2,5,12 89:14 90:5,6,23 93:2,23 94:14 95:19 97:1,4,5,7 100:18 101:6 104:25 109:16
**banking** 60:21
**banks** 81:14
**barring** 9:6
**base** 57:16
**based** 42:17 51:2,2 52:1,10 52:23 53:14 62:18 68:20 80:19 90:22 92:19 93:13 93:20 107:11 108:2,8,13 108:25 109:8 118:23
**basic** 112:17 113:6
**basically** 44:24 65:9 86:1,3
**basis** 18:4 19:10,12 52:18 66:19 78:8 79:24 107:14
**Bates** 67:20 69:12
**bear** 22:3 32:18 51:1 68:9 119:19
**bearing** 19:6 62:23 119:11 120:8
**bears** 16:9 69:12
**beats** 30:25
**beautiful** 31:5
**beginning** 2:16 25:22 65:19 104:20
**begins** 6:4 114:19
**behalf** 2:16 3:2,7 20:20 30:13 84:11 91:10
**believe** 15:23 20:4,17 26:2 28:8,15 30:17 34:8 36:7 39:24 40:6 42:23 43:2,19 44:12,13,21 56:13 57:7,9 64:22 67:14,24 76:6 82:4 91:19 101:3 107:19 109:11 120:6,13 122:5
**belonged** 103:23
**benefit** 64:24
**benefits** 38:3
**best** 11:5 36:14
**better** 31:20 73:1 75:23
**Beverly** 1:10 2:10 4:13,15 11:14,15,17 25:12 63:13 63:19,22 64:15,24 66:4,9 75:15,20 91:10 94:12
**billing** 14:24
**billings** 36:21,25
**bills** 107:6
**bit** 15:4
**booked** 82:25
**bookkeeping** 18:16
**books** 68:1 81:9 87:1
**borrower** 50:10
**bottom** 78:14 89:11 96:24 103:2 104:17,23
**Bre** 100:17
**break** 9:11,13 10:3,4,7 46:25 47:17 49:2,14 110:7,9
**breaking** 15:3
**breaks** 112:14
**brief** 31:15 49:4
**briefly** 19:22 80:15
**bring** 10:15 31:10 81:10
**bringing** 29:20 32:18 104:22
**broad** 27:14,19
**Broker** 103:18
**brought** 30:6 32:10 42:21 43:13 81:9
**browser** 69:23,25
**budgeted** 54:6
**budgeting** 27:4
**building** 93:10
**built** 120:2
**bulk** 17:17
**bullet** 51:24 52:12,21 53:8 80:17 108:1,7 109:10 115:21 116:3
**bullet-pointed** 51:15 52:5
**business** 27:3,8,17,18 32:21 32:23,24,25 33:14 38:6,14 42:12,13 45:15 54:3,5,6,8 54:12,17 57:23 61:12 62:15 107:4 120:19,20,25
**businesses** 27:6

**C**

**C** 1:8 2:8 25:10
**Cabot** 100:18
**calculation** 117:13
**California** 1:2 2:2 3:4 6:8 100:17
**called** 11:24 59:15 85:4
**camera** 87:15
**canceled** 63:9 92:11
**cancer** 38:1,5,9,9 54:12
**cap** 108:24
**capacity** 8:8
**capital** 29:7 32:24 37:10 39:10,13,17 45:13 82:21
**capitalized** 95:12
**capped** 108:19
**caption** 16:10
**card** 51:13 63:10 88:8 107:6
**career** 26:8 27:20,24 33:6,15 37:17,22
**Carney** 83:25 119:1
**Carolyn** 4:11 16:20,24
**carpeting** 27:12
**carried** 103:22
**Carroll** 58:18 98:8
**cars** 103:3,6,12 107:5
**case** 1:7 2:7 6:6 9:3,12 12:8 16:10 18:25 19:7 21:6 26:4 26:18 32:3,8,16,19 33:23 34:5,18,25 36:2,6,10,23 37:6 38:24 39:2,4,9,13,15 39:17 40:5,20 41:7,13,14 41:21 42:4,5 43:17 44:11 45:3,21 46:16 53:19 54:23 55:1,21,24 56:4,7,17 57:4 57:18,22 61:6 65:14 90:5 99:25 106:9 110:25 112:23 112:25 113:3,8,12,18 114:12 115:5,9 118:6 119:12,17,20 120:11 122:22,22 123:3 127:3
**cases** 38:18 39:25
**cash** 68:20,23 81:5,7,12
**catch** 52:7 64:1 108:4 115:22
**categories** 53:4
**categorized** 53:3 67:1 95:25 96:3
**category** 104:6 105:5
**cause** 120:10
**caused** 53:7
**caveat** 9:13 10:4
**center** 1:9,10 2:9,10 4:13,15 4:24 5:3,5,7 11:15,24,25 12:3 25:11,13 50:11 51:9 54:12 65:16 66:11 75:15 75:20 77:12 86:2 100:18 100:19 101:3 104:22 119:5
**Central** 1:2 2:2 6:8
**certain** 17:1 19:9 60:16,23 108:17
**certificate** 62:12 124:4 125:1 126:1
**Certified** 24:21 110:1
**certify** 124:11 125:8,14 126:7
**CFE** 4:11 16:21
**chance** 16:14
**change** 120:11,12 121:17 127:4,6,7,9,10,12,13,15,16 127:18,19,21,22
**changed** 21:21 34:14 79:17 110:21
**changes** 17:21 67:4 123:12 126:10,12,15
**charge** 48:5,10,10
**charged** 88:5 98:16 102:14 107:7
**Charles** 1:8 2:8 6:22 17:23 18:12,18,20 20:13 25:10 42:10 81:22 83:18 84:8 88:6,19,21 90:17 102:14 102:19 103:8,13 107:6
**chart** 67:23
**chase** 55:9 64:7 66:2
**check** 63:9 89:14,14 92:11 93:1,23 107:19
**China** 61:8,10 62:23 100:18 101:6 102:16 103:4
**Chinese** 51:11 59:12 61:2 81:21,24 82:19 83:8 84:20 90:5 101:6
**circumstances** 91:2,16 106:3
**Citibank** 66:2
**Civic** 100:18
**claimed** 42:6 43:2
**clarify** 33:2 121:23
**classifications** 67:4 108:10
**classified** 88:17 104:9 108:17
**clean** 51:22
**clear** 9:4,17 32:20 79:1 121:25
**client** 80:11 112:20 114:5
**clients** 26:23 29:21 33:7
**clinic** 38:7
**clinical** 38:3
**closely** 27:2
**closer** 37:1,3
**Cogswell** 99:4
**collect** 83:7
**collected** 83:3,5
**column** 87:23,25 88:1 89:3 89:5 102:4 107:20
**columns** 87:23
**come** 9:1 34:9 51:11,13 90:21
**comes** 38:13 42:24
**comfortable** 68:19

**coming** 68:20,23 90:18
**comment** 79:14
**commercial** 59:18,23 60:15 60:20 81:20 82:1,5 90:6 95:19 97:3 109:16 122:19
**commission** 1:5 2:5 3:3 25:9 42:22 43:14 55:1,7 124:19 126:23
**common** 69:4
**communicate** 18:17,17,23
**communicated** 18:8,10 58:1 58:25 59:3 60:4 91:4 106:22
**communicating** 19:7
**communication** 18:13
**communications** 19:5
**comp** 117:6
**companies** 26:21 27:3,7 29:1 33:7,10,16,18 66:14 83:13 84:9,11 92:9 107:8 120:3,21,22,23
**company** 27:22 33:19 41:2 41:3,16,17 42:16 43:18 48:19 49:19 50:4 62:2,2 83:19 86:8,9 91:23 108:19 109:6 119:22,23 120:4,7
**compare** 69:2
**compared** 48:7
**compensation** 48:2 88:6,25 103:14 107:11,14 108:14 108:20 117:5,6,10,13,18 119:22,25 120:14,22
**competent** 120:18
**compilation** 5:9 111:24 112:12,16 113:4 115:15
**compiled** 24:10
**complaint** 84:6
**complete** 8:18 15:22 25:25 34:17,20,23 35:10,25 36:4 36:15 48:14 121:18 126:8
**completed** 36:23 90:20
**completely** 42:15 68:2 111:1
**completeness** 22:24 23:20
**compliance** 24:23
**comply** 11:6
**component** 42:19 43:11 44:18
**concept** 33:8 42:15
**concern** 19:9
**concerned** 38:16
**concluded** 123:16
**concludes** 123:13
**conclusions** 43:1 116:4,17 116:20
**condition** 23:1,5,12 24:9,18 24:25 25:6,15 65:1
**conditions** 21:25 22:2,5,12 22:17
**confer** 73:12
**confirm** 62:19 123:1
**confirmed** 90:19,20
**confirming** 93:2
**conform** 21:21
**conjunction** 48:6 99:9
**connected** 125:18
**connection** 8:15 17:15 19:22 20:16 29:10 32:7 37:10 56:15 94:19 95:22 96:12
**consequently** 22:23 23:18 24:12
**consider** 54:6 56:14
**consideration** 85:10,15
**considered** 18:24 36:5
**consistent** 69:5
**consolidated** 80:25
**construct** 64:25
**constructed** 66:13 93:7
**construction** 58:2 92:23,25 93:7 119:6
**consultancy** 58:20 98:7,23
**Consultant** 59:12
**consulting** 14:16 21:18 23:24 30:4 82:19 89:8 92:17 98:23 99:10
**consumer** 27:1,11
**contact** 16:10 32:9
**contacted** 32:3,7
**contain** 23:4
**contained** 24:19
**containing** 73:21
**contains** 73:24
**content** 50:25
**contents** 112:10,14
**context** 122:9
**continue** 85:18
**continued** 5:1 86:6,12
**Continuing** 84:25
**contract** 86:1,16 91:18,22 91:22 92:5,6,8,25 93:21,22 94:11,13 95:4 97:3 99:13 99:17
**contracts** 60:3 92:2 97:10 105:25
**contrast** 10:16 78:9 109:9
**contravene** 105:11
**control** 62:22 114:15
**controlled** 119:8
**controls** 114:13
**copy** 13:4,10 71:6 75:19 79:16
**corner** 16:12
**Corp** 90:5
**corporate** 11:15 26:9,15 42:3 45:14,16 51:17 57:20 61:7 65:23 68:14 74:5 75:5 77:1 79:10 80:9 83:2 94:20 95:16,21,23 97:25 98:23 100:9 102:2 103:13 114:14 117:19 122:20
**corporation** 62:12
**correct** 8:19 21:13,14 22:1,6 22:15,20 23:2 24:7 35:21 35:23 37:7 38:1,2,14,16 48:9 53:20 54:9,10 55:11 55:12,14,15,18,19 58:2,3,4 58:5,6,7,9,11,13,15,17,19 58:21,24 59:2,5,12,13,16 59:20,21,25 60:7,12,13,17 60:18,25 63:7,11,14,15 64:8,17 65:13,21,22,22 66:6,17 67:14,17 69:1,2 71:1 73:18 74:3 76:12,23 76:24 77:1,2 78:3,4 79:4,5 79:25 80:1,6,10 88:23 90:9 90:10,15,16 91:1,6,11,12 91:17 92:15 93:3,4,4,17,18 93:24,25 94:3,4,8,9,16,17 94:21,22 95:2,4,17 96:22 97:15,16 98:2,18,19 99:1 99:11,22,23 100:13 101:14 101:15 103:15 104:7,8 105:7,8,13 107:16 108:16 108:22,23 109:2,7 112:23 112:24 113:1,2,4,5,9,10,15 113:16,21,22,23 114:1,2,5 114:15 115:6,7,11,12,15 115:16 116:1,2,5,6,18,19 117:3,10 118:21 120:11,16 121:7 126:8
**corrections** 126:10,13,14
**correspondence** 92:4,5
**corresponds** 48:8
**cost** 96:1 103:9,19
**costs** 95:15,23 96:19 104:10
**counsel** 6:15,17,19 8:17 10:10,17 15:17 16:11 17:19,20 21:8 43:15,16,25 71:9,11 73:7 74:5,17 75:5 77:16 79:10 90:15 92:20 92:21 93:14 118:5,13 125:15,17
**counsel.PDF** 73:10
**counter-parties** 60:16,22
**counter-party** 60:11
**country** 31:1 120:1
**County** 1:11 2:11 11:16 64:4 124:8 125:4
**couple** 85:3 86:24
**course** 18:24 50:20 66:22 90:7 92:4
**court** 1:1 2:1 6:7,13,23 7:7 7:15 8:14 9:18,20 11:3 12:6 15:8 19:17 28:4 30:20 31:6,12,17,20,24 38:17,21 43:17 44:11,14 46:13,19 47:8,14 83:12 84:6,7,10,13 84:16 118:6,25 119:10,15
**Court's** 44:5,17 45:21 46:6
**covered** 35:8 37:16 53:8 84:19 101:22 107:17,22 108:15 109:19,21 121:25
**CPA** 1:16 2:16 4:2,10,11 7:9 16:19,21 26:20 96:3,4,5,9 96:12,21 97:14 112:16,19 114:25 124:12 125:11
**create** 51:8,10
**Creative** 99:7
**credit** 63:10 88:8 107:6
**cross-reference** 104:4
**Crown** 100:18
**CRR** 1:24 124:18 125:22
**CUMMIS** 3:8
**current** 20:8
**cut** 55:9

**D**

**D-E-L-S-K** 59:15
**data** 36:5 65:3
**date** 6:10,24 13:13,18 36:21 41:3 78:12,13 90:21 127:2
**dated** 14:17 48:21 73:6 74:18 78:8 93:1 94:12 125:20 126:19 127:25
**dates** 48:25 78:6,19,20
**day** 9:1 124:13,15 125:20 126:19,22
**days** 80:2
**days'** 123:11
**December** 4:14,16,18,20,22 4:24 5:4,6,8 78:12 103:11
**decide** 40:11
**deciding** 40:5,8
**decision** 21:4 44:5,8,14,17 45:21 118:6
**declare** 126:4
**deemed** 85:7 103:8
**defendant** 11:15 17:23,23
**defendants** 1:12 2:12 3:7 6:22 57:6 68:14
**defendants'** 95:23
**defense** 8:17 10:10,13 16:11 17:19 21:8 71:9,11 118:14

**defer** 47:17
**defined** 11:10
**definition** 43:19,22
**delivered** 91:25 92:1 94:6 94:24
**Delsk** 59:15
**Denise** 1:24 2:18 6:14 9:16 124:18 125:7,22
**department** 20:23
**dependent** 45:4
**deposit** 104:14,24 105:3
**deposition** 1:16 2:15 6:5,9 8:13 10:13 40:1 48:7 55:3 55:20,23 56:4,6,9,14,20,24 71:8 86:19 121:11 122:2,4 122:7 123:10,14 125:10 126:6,14,15 127:2
**depositions** 57:3
**depreciation** 102:13
**derive** 53:7 57:11
**derived** 57:14
**describe** 26:19 29:25 32:11 32:16 51:16
**described** 52:5 67:12 80:15
**description** 62:14
**Design** 99:6,7
**detailed** 53:1
**determine** 45:10
**determined** 43:18
**determining** 117:7
**development** 104:10
**developments** 119:4
**different** 21:19 35:19 44:15 68:2,6 69:4 78:13,18 80:2 100:15 109:14 112:15
**differently** 21:15
**difficult** 21:4
**direct** 63:4
**directed** 48:1
**directing** 51:23
**directly** 12:16 18:18 59:17 88:5 102:14,16
**disagree** 79:14 119:25
**disclosed** 26:3 34:14 40:3 41:7 67:2,5 75:21
**disclosing** 14:23 48:2
**disconnected** 31:14
**discreet** 115:18
**discrepancies** 69:3
**discrepancy** 78:5,17
**discussed** 30:19
**discussing** 103:20
**discussion** 43:15
**discussions** 83:13 92:20 93:14 121:20
**disgorge** 45:22
**disgorged** 118:12,16,17,24
**disgorgement** 42:20 43:12 44:20 45:7 118:20
**displaying** 12:20 14:5,14 16:7 70:5 73:3
**dispute** 10:14
**disputed** 38:24 39:4,9,13,17 40:8,21 41:8
**disputes** 27:17,18 39:7
**distribution** 88:7
**District** 1:1,2 2:1,2 6:7,8
**DIVISION** 1:3 2:3
**doable** 70:11
**docket** 73:12
**document** 12:20 13:1 14:14 16:8 48:22 49:17,21,25 50:3,8 69:12 71:23 73:4,5 103:6 112:5,11
**documentary** 99:20
**documentation** 60:2 92:3 96:17,20 105:23,25
**documents** 14:24 35:12,20 36:1,15 48:14 49:15 52:2 73:24 118:6
**doing** 28:18 33:15 113:8 114:7,9,17
**dollar** 45:22
**dollars** 20:18 27:9 33:11 36:25 37:1 61:6 82:1,2 85:5 100:6 119:2,7 120:24
**Don** 99:5
**Dosimetry** 99:5
**downloaded** 111:20
**downloading** 71:6
**Dr** 56:2,6,11,20 85:1,9,11,13
**draft** 16:22
**due** 88:11 90:4
**duly** 7:10 124:13

E

**e-mail** 4:12 5:13 18:10 71:10 71:15,19,24 72:1 73:6,9,11 74:4,12,15,16,17,24 75:2,4 75:9,16,24 77:16,17 78:1 79:7,9 90:17 111:7
**e-mails** 18:19,24 71:3
**earlier** 53:23 74:18
**earn** 51:10
**earned** 116:21 117:19
**easier** 8:21 70:10
**EB-5** 1:10 2:10 4:17,19,21 5:13 11:20 25:12 29:8,10 29:14,16,20,22 37:10 38:25 39:2,18 48:20 49:20 50:1,4,11 66:10 67:19
**EB-5-compliant** 119:4
**edited** 17:18
**educational** 26:1
**effect** 84:2,14 95:2
**efforts** 83:7 119:23
**Egnyte** 12:8 70:13 72:13
**eight-page** 73:3
**either** 18:8 121:10
**electronics** 27:12
**else's** 57:2
**Email** 3:5,10
**employee** 125:15,16
**endeavor** 9:4
**ends** 123:10
**enforcement** 42:21 43:13 44:20 55:7
**engage** 18:5 23:24 83:12 122:18
**engaged** 83:6
**engagement** 21:18 23:24 27:22,25 28:11,12,13 32:5 32:12 66:14 80:9 96:6,9,14 105:13,16 113:12 114:3 115:15 122:13,25
**engagements** 28:25 29:3,6
**enter** 70:1
**entered** 83:25
**enterprises** 27:7
**enticing** 119:9
**entire** 93:5,5 94:1,18 126:5
**entirety** 56:10 66:3
**entities** 26:9,15 42:3 45:14 45:17 52:22 57:20,24 61:10 66:8 77:1 80:9,18 81:7 82:17 83:2 84:22 88:24 90:2 95:16,21 96:22 97:25 98:13,24 99:11 100:9,15 101:16,20 107:18 108:9 109:9 114:14 116:21 117:2,19 119:8,9 122:20
**entities'** 51:17 94:20
**entitled** 21:24 35:20 73:11 111:23 112:11 115:20 118:7 119:22 120:13 121:1
**entitlement** 42:20 43:12 44:19 45:7
**entity** 11:24 57:6 59:14 60:21 68:14 77:25 78:11 82:9 102:3 103:7,10
**entries** 60:2
**equally** 24:14 25:1,17
**equals** 118:11
**equipment** 85:23 86:3,10,13 89:3
**equivalent** 11:2
**Errata** 126:11 127:1
**Especially** 31:3
**ESQUIRE** 3:3,8
**establish** 42:20 43:12 44:19 45:14 91:15
**estate** 28:3,9,10
**estimated** 50:11
**et** 73:12 127:3
**Evans** 58:18 98:7 99:6
**event** 8:12 10:12
**everybody** 68:24 119:21
**evidence** 91:15 99:20
**evident** 103:13
**evidentiary** 34:24 121:6
**exact** 13:12 79:16
**EXAMINATION** 4:1 7:21
**examined** 7:10
**example** 63:23 120:2
**examples** 81:6
**Excel** 67:8 72:2
**exchange** 1:5 2:5 3:3 25:9 42:22 43:14 92:14 93:8 99:22
**exchanged** 18:20
**exclude** 98:10
**excluded** 38:21
**executed** 91:9
**executive** 26:10,15 33:20
**exhibit** 4:5,6,7,9,12,13,15,17 4:19,21,23 5:3,5,7,9,13 12:14,16,21,23 13:2,4,10 13:25 14:3,9,15,20,22 15:12,19,21,25 16:4,6,9,15 16:16,18,22 17:4,15,18,22 21:12,16,22 22:2,9 23:3,13 23:21 24:8,18 25:1,3,7,17 25:19,21,23 34:12,13,16 35:4,18,25 36:19 47:23 51:20,21,24 52:9 53:9,25 56:21 63:3 64:20 65:17 67:3,6,12,16 69:10,11,21 70:7 71:6,10,23 72:5,14,17 73:4,23 75:14 76:10,20 77:10,23 78:7,9,10,15,23 79:3,7 80:12,14,23 81:18 81:18 88:4 89:5,19,22,23 89:23,23 90:13,13,14 91:7 92:22,24 93:21 94:11 95:5 95:14 96:19 97:12,21,23 98:20,22 100:4,7,7 101:19 102:6,25 104:5,18 105:6 107:25 108:12 110:22,23 111:14,17,20 112:10 114:18 115:18,24 116:16 116:16
**exhibits** 4:4 5:12 12:13 41:23 66:23 69:8 72:15 75:11 76:3,6,9,15 77:6

**Exhibits_Friedman** 12:12
**existing** 93:10
**exists** 86:2
**expand** 72:22
**expenditures** 53:15 54:5
**expense** 52:24 88:22 89:18 103:24 104:6 105:5 107:9 107:17 117:8
**expensed** 102:18 103:9,13 103:20 105:2 107:8 108:18 109:5 117:11
**expenses** 42:12,13 43:21 45:1 52:22 53:2 80:18,20 80:21 84:22 97:4,10 100:8 101:19 102:2,2 103:23 105:10,19,23 106:12,15,17 109:20,21 118:11
**experience** 26:2,7,13 29:13 29:15,17 32:22 33:17
**Experienced** 27:10
**expert** 4:10 8:8 13:11 16:20 16:25 19:13 20:16 25:17 36:22 38:5,17,20,23 39:3,9 39:12,16 40:3,4 48:8 61:12 61:14,20 62:17,24 64:11 68:10 73:22 78:23 93:19 96:6,9,14 99:8,25 105:12 105:16 112:22,25 113:3,8 113:17 114:3,11 115:5,8 119:16 122:8
**expertise** 26:19 32:17 38:11 38:12 117:15
**experts** 48:5
**expires** 124:20 126:23
**explain** 30:11 41:21,23 78:17 89:11
**express** 24:12,22 34:24
**expressed** 40:20 121:7,10
**expressing** 106:4
**extent** 10:2 62:21 65:16 92:17

F

**f/k/a** 1:11 2:11
**fact** 32:19,25 35:9 40:5,8,14 40:21 41:8 42:13 45:4 62:18 85:8 94:23 101:12 105:23 106:19 113:23
**facts** 36:5 40:10 91:2,15 106:2
**factual** 105:9 106:4 119:14 119:19 120:10,15
**failed** 42:7
**fair** 9:9 10:8 34:11 45:8,9 67:7,8 75:24 114:11 120:13
**familiar** 29:22 112:6,8
**family** 33:10
**Fantastic** 111:16
**far** 38:15 40:1 105:21
**favor** 69:7
**February** 31:3 32:6 64:16,25
**federal** 24:11
**fee** 88:18,20,21 89:8 94:13 102:15,19 103:9 107:7,10 107:10
**feel** 23:8 121:17
**fees** 37:5 50:10,11,12 98:23 103:18,18,19 108:13,18 117:9
**felt** 33:24 34:3 86:3
**fewer** 33:12
**field** 38:12
**fifth** 25:5
**file** 12:8,17 14:10 68:16 70:6 70:10 71:7 72:9 73:11 96:11 110:22
**filed** 71:7 84:6
**files** 67:25 72:7 76:4,21
**filing** 55:6 66:15
**filings** 122:24
**final** 20:8,25
**finalizing** 34:11
**finally** 25:5
**financial** 5:9 23:25 24:11 26:8,14,24 37:9,13 38:24 39:1,4 41:1,4 42:24 52:3 60:10 64:18 65:1,1,3,6,18 68:12 76:8 77:3 79:15 81:1 85:21 90:8,9 94:20 95:24 96:12,15,20 97:13 100:18 103:21,24 105:10,17,24 106:18 109:3 111:23 112:12,15,17,20,23 113:1 113:6,13,20 115:14
**financially** 125:18
**financials** 65:9
**find** 111:6
**finder** 32:18 40:5,8,14,21 41:8 45:3
**finding** 46:11,16 119:10,14 119:19 120:10,15
**finish** 43:5
**finished** 13:7
**finishing** 81:25
**firm** 20:15,20 37:20 48:9 49:22,23 80:11
**firms** 97:24 98:4
**first** 7:10 16:9,15 18:1,3 22:21 32:2 48:1,1 51:14 52:8,21 66:21 67:2,12 73:5 80:17 99:14 107:25 111:6 112:9
**first-name** 18:4
**firsthand** 37:25
**five** 22:18 51:24 52:4 53:8 74:18
**five-minute** 49:2
**five-page** 69:12 71:23
**fix** 69:17
**flip** 13:1 75:17 112:5
**flipping** 35:17 74:11
**Florida** 124:7,19 125:3
**Flower** 3:4
**flying** 30:25
**folder** 69:8 72:15
**folders** 69:22
**folks** 99:2
**following** 22:17 52:2 66:8 85:20 87:22
**follows** 7:11
**food** 27:12
**footnote** 89:12 104:17
**footnoted** 97:19
**Footnotes** 104:4
**forboden** 8:25
**foregoing** 125:9 126:6
**foreign** 119:8,8
**forensic** 27:16 28:23,24 29:3,6 37:21
**forgetting** 86:5
**form** 9:5 24:13 51:2 52:18 56:19 66:19 105:25
**formal** 115:13
**format** 72:2
**formatted** 21:15
**formed** 19:6 34:5 56:16
**formerly** 11:16 25:13
**forming** 18:25 36:1,5,10,16 48:15 50:21 57:4,18,22 75:21 78:2 90:7 117:17
**forth** 16:10 17:4 22:2 23:18 23:21 24:18 25:6,16 53:9 67:4 93:20,22 94:13 104:5 116:17
**forward** 15:16 30:2 86:16
**forwarded** 16:1 78:15 79:22
**found** 21:20 24:25 26:10,16 33:20 69:3
**foundation** 40:18
**foundational** 79:24
**four** 14:25 20:4,5,10 63:12 99:13
**four-page** 14:14
**fourth** 24:17 25:22 99:16 109:10
**fraud** 26:11,16 33:21 45:14 114:14
**free** 10:18 23:9 113:14
**frequent** 49:4
**Friedman** 1:16 2:16 4:2,8,10 6:5 7:1,9,23 10:2,21,25 11:14,19 12:11,25 13:11 14:19 15:3,12 16:15,19 17:3 20:3 25:25 26:18 27:21,24 31:6 32:2 33:23 35:24 37:8,12 40:2 42:17 46:5,23 47:18,24 49:13 54:21 57:5,19 69:7 70:25 71:15,16 72:4 73:16,21,25 74:6 75:6 76:9 77:19 79:11 84:19 86:18 87:3,10,21 89:20 110:20 112:22 113:4 113:12,23 119:20 121:5 123:5,8,14 124:12 125:10 126:4,17 127:2
**Friedman's** 4:6 87:12
**friend** 30:15
**friends** 20:14,20 30:11,12 30:18 33:9
**front** 11:3,3 63:3
**frozen** 30:15
**full** 35:10 72:23
**fully** 109:11
**function** 114:7
**fund** 1:10 2:10 4:17,19,21 11:19,20,20 25:12 28:1,8 48:20 49:20 63:17 65:15 66:3,4,10 67:19 88:12 89:24
**funds** 28:2 29:4 30:15 61:19 61:25 88:12 94:15 95:22 97:24 99:22 100:3 108:17 117:7 119:2
**funneling** 119:7
**funny** 31:22
**furniture** 27:12
**further** 67:3 91:5 123:6 125:14

G

**G** 87:25 88:1 89:3 102:4
**G-I-A-R-D-I-N-A** 17:9
**gain** 43:1,17
**gains** 42:6,9 43:7
**Gary** 3:3 6:19 19:23 47:3 73:20 83:11 110:3
**general** 32:17 52:25 53:17 66:12 68:6
**generally** 43:20
**generating** 66:23
**getting** 11:4 49:3
**GG** 124:19
**Giardina** 17:9,9

**Ginsburg** 108:20 117:12,16
**Ginsburg's** 107:13 108:25 117:5
**give** 7:4 11:2 14:11 30:22 31:11 33:25 34:1,2,3,6 54:1,15 69:16 78:21 81:6 96:23 111:4
**given** 85:17 106:4 121:24 126:9
**giving** 11:1 86:5
**go** 9:16,19 12:11 14:2 20:22 23:6,10 24:3 25:21 32:4 33:9,14 41:22 43:23,23 49:5 65:5 67:14 70:1 72:12 72:23 76:18 80:22 82:8 83:15 84:4,16 85:20 86:8 86:16,22,23,24 87:21 88:3 88:21 95:5 104:1 105:17 105:18 106:13 114:21 116:14 121:5 122:25
**goal** 51:8
**God** 111:11
**goes** 28:13 50:12 65:20
**going** 8:15 10:6 11:11 13:20 16:16 43:5,6 45:23 46:24 47:16 49:7 50:7,15 51:9 69:9 70:3 72:23 75:23 77:15 83:17 86:16,16,23 89:10,19 102:4 110:12,14 114:20
**Gong** 99:3
**good** 7:23,25 11:12 40:12 47:19 87:19 101:5 110:8
**Gouraige** 3:8 4:8 6:21,21 7:20 15:2,7,14,16 19:18,21 30:21 31:12 35:8 44:1 45:23 46:1,3,25 47:3,5,12 47:15,20 49:1 70:14,17,21 71:12 73:7,19 74:16 77:16 78:1,6,15 79:7 83:9,23 84:3,15 87:6,10,11,16 110:3,8,11 119:13 123:8
**Gouraige's** 75:2
**grammatical** 17:21
**Great** 19:24 35:7
**Green** 51:12
**Greenberg** 58:16 98:6
**GROSS** 3:8
**ground** 33:1
**group** 28:9 103:20
**growing** 27:8
**guess** 40:15 80:4 102:17
**guide** 5:9 111:23 112:11 114:20
**guideline** 52:25 53:11

**H**

**H-O-M-E-I-E-R** 58:22
**H-U-N-N** 59:8
**half** 81:20,21 82:1,2
**halfway** 118:4
**hand** 7:2
**Hang** 60:4,10
**happened** 106:22
**happens** 69:24
**happy** 47:17
**hard** 7:14 15:5
**head** 8:24 17:13 19:4 20:22 36:13 57:3
**headers** 78:20
**heading** 22:11
**headset** 31:7,11,19
**hear** 7:14,15 9:15 15:7 19:20 19:23 28:5 31:19 47:3 79:19 87:5,6,8,10,13
**heard** 6:7 38:4
**hearing** 21:6 34:24 121:6
**heavily** 27:1,5
**heavy** 26:23
**held** 6:9 27:2 63:13 66:4
**help** 8:20 54:18
**helped** 27:6 56:17,18
**helpful** 33:4 41:22 56:19
**helpfully** 101:18
**helpfulness** 45:2
**Herve** 3:8 4:8 6:21 7:12,17 9:14,14 15:5,14 19:19,19 32:15 46:20 47:18 70:12 73:6 87:5
**hgouraige@sillscummis....** 3:10
**higher** 48:5,10
**historical** 24:11
**hit** 69:19,23 70:1
**hitting** 82:24
**hold** 19:17 63:25 87:16 108:3 110:4 115:22,22
**holding** 82:10
**Homeier** 58:22 98:8
**hope** 121:25
**hopefully** 51:10
**hoping** 110:20
**host** 97:23
**Hotel** 89:25
**hour** 46:24
**hourly** 48:7
**hours** 36:20
**hundred** 20:18 36:25 37:1,3 37:4 85:5
**hundreds** 27:8 33:11
**Hunn** 59:6,7,9 99:4
**Hunter** 3:14 6:12
**hurt** 111:3

**I**

**IBA** 99:5
**idea** 33:8
**ideas** 33:14
**identify** 26:6 41:20 95:18,21 97:18,19
**identifying** 68:23
**identity** 61:24
**immediately** 103:4
**Immigration** 59:12 82:19
**impact** 41:13,14,21 42:3
**important** 8:18 95:9
**improperly** 90:18
**inaccurate** 16:1
**inappropriate** 81:23
**included** 56:21,23
**including** 52:3 63:9
**income** 24:12 41:15 53:5
**incomplete** 16:1
**incorporate** 54:11
**incorrect** 23:22 42:7,11 43:1 91:18
**incorrectly** 81:15
**increased** 104:21
**independence** 114:6,10
**independent** 114:4,8
**independently** 114:9
**INDEX** 5:1
**indicate** 41:1 61:11
**indicated** 36:24 46:5 63:17 99:12 107:1 126:11
**individual** 39:7
**individuals** 27:17 62:14
**Industrial** 59:18 60:19 81:20 82:5,11 90:6 109:16
**industries** 26:22 27:10
**industry** 27:12 37:18,19,23 38:15 82:1
**inferring** 23:14
**inform** 62:16
**information** 16:1,11 18:23 20:21 22:22,24 23:17,20 24:1,11,19 32:14 52:1,11 52:17 53:6 57:11,14 59:17 59:22 61:24 62:16 73:22 79:17 90:11,22 92:13 93:6 93:16,20 94:1,7,19 95:2,3 98:14,18 99:21 105:21 106:17 117:23
**informed** 81:22
**initial** 13:17,22 24:15 25:2 25:18 26:3 34:12 36:19 40:3 51:14 53:10 64:19 66:21,23 67:2,13 75:22 76:10 80:13,14 95:24 97:25 98:24 100:10 107:25 116:4,17,22 117:2,20
**injunction** 83:25 84:5
**inquiry** 115:1,5
**insofar** 90:24
**inspection** 65:20
**instance** 18:1
**Institute** 24:21 109:25
**institutions** 90:9
**instruction** 10:17,18
**intend** 34:24
**intended** 51:5
**intention** 15:24
**interaction** 29:24
**interest** 11:4 62:22
**interested** 125:19
**interject** 8:21
**internal** 114:13
**interpose** 10:11
**interpreted** 53:15
**interrupt** 8:22
**interrupted** 19:22
**interruptions** 49:4
**interview** 101:17
**introduce** 6:15
**Introduction** 115:20
**invest** 28:10
**invested** 28:9
**investigation** 54:23 55:2
**investigative** 55:6,11,14,16
**investment** 27:22 29:1 37:14 38:25 39:5,6 50:10
**investments** 28:3
**investor** 5:13 61:25 68:11 68:17 119:2
**investors** 28:9 29:20 39:10 39:14 50:2,4,6 67:18 72:2 118:7,13,21 119:6,9 120:24
**invoice** 89:17 92:12
**invoices** 91:14 92:3 93:15 97:3,10 98:9,12 99:9,20 105:1
**involve** 23:16
**involved** 27:5,16 28:19 30:3 39:2 83:19
**involving** 26:9,14 28:25 29:4,7
**Ipe** 95:19 99:4,16
**IRS** 122:24
**Irwin** 4:11 16:20,24 42:6,25 68:7 119:24
**Irwin's** 68:1 69:2
**issue** 9:17 47:1 105:9
**issued** 115:13

**issuer** 50:9
**issues** 32:19 40:9,22 41:9 94:8 119:16
**item** 49:14 50:16 63:25 81:5 82:16 84:25 97:6
**itemizes** 35:19
**items** 22:18 51:15

J

**Jersey** 3:9
**jibe** 112:18
**JJW** 58:20 98:7
**job** 1:25 8:21
**jobs** 51:10
**John** 95:19
**judge** 10:15 11:3 83:25 118:25
**judge's** 46:7,10,16
**judgment** 46:8 118:25
**July** 93:1
**June** 78:8,13
**jury** 11:4

K

**keep** 45:19 49:2
**kept** 45:19
**kick** 120:25
**killing** 111:9
**kind** 39:15 80:25
**knew** 80:10,11
**know** 9:1,4,12 10:3,25 18:4 18:22 20:23 21:3,18 33:12 46:10 49:18,22,23 51:9,12 54:20,25 55:3,5,8 56:18 61:5,9,19 65:25 67:25 68:1 68:2 71:19 74:13 77:4 80:7 81:25 82:12 83:2,4,6,11,22 85:4 88:20 91:2 92:4 94:5 97:1 98:14 100:25 101:10 103:19 105:25 106:13 108:5 110:24 112:7,10 114:18 117:4,16,22 121:3 122:10,11
**knowledge** 36:14 37:25 38:3 63:1 82:4 91:5 92:18 96:10 96:17 101:8,10 106:21,21 106:24 107:2,3
**known** 11:16 25:10,13

L

**L** 44:23 105:18
**L-A-M** 18:15
**L.A** 31:4,5
**lack** 42:3
**laid** 23:13 40:18 66:21
**Lam** 18:15 32:10 53:21 65:12,13 66:13 71:25 80:4 97:13 122:3
**Lam's** 68:15,25 72:1
**Lance** 99:3
**land** 85:9,14,16
**language** 105:11
**languish** 119:6
**law** 11:3 49:22,23 58:22,25 98:6,8
**lawyers** 29:18
**laying** 116:4
**layperson** 111:25
**lead** 28:21 30:17
**lease** 85:15 99:17 100:20 104:14,24 105:2 109:17
**leases** 99:13 100:22
**ledgers** 53:17 66:12 68:7
**left** 82:1 85:25 87:24 88:11 104:11
**left-hand** 16:12
**legal** 43:15,16,25 97:23 119:14,15,16 120:17,18 121:3
**legitimacy** 94:6,25 98:15 100:2 101:11 106:5
**legitimate** 42:12,13 107:2
**let's** 8:21 13:14 49:5 51:22 63:22 70:1 72:23 77:8 80:22 82:14 92:3,22 95:5 98:20 107:25 115:17
**letter** 4:7 14:23 15:1,16,25 21:13,18 32:5 35:7,9,12 47:24 73:10,17,20,24 123:1
**letterhead** 14:16
**Leung** 3:3 4:3 6:19,19 7:12 7:17,22 9:14,19,21 10:1 12:19,24 14:1,4,7,13,18 15:5,11 16:7,13 19:19,24 20:1 28:6 30:22,25 31:3 32:1 45:25 46:2,4,21 47:4 47:16,22 49:5,12 70:12,16 70:23 71:5,14,22 72:3,20 73:2,14 75:12 83:14,23 84:12,18 87:5,7,9,14,19,20 110:6,10,12,19 111:15 119:18 123:5
**leungg@sec.gov** 3:5
**levels** 112:19
**Levin** 99:5
**liability** 22:23 23:19 46:11 46:16 48:19 49:19
**liable** 26:10,16 33:20
**Licheng** 99:5
**life** 111:8 112:7
**light** 26:22
**limit** 107:10
**limitation** 107:15
**limitations** 123:1
**limited** 38:21 48:19 49:19 52:4 58:20 100:17 106:18 113:18
**limiting** 21:24 22:2,5,12,17 23:1,4,12 24:9,17,25 25:6 25:15
**line** 63:25 81:5,12 82:16 84:25 85:20,20 89:2 105:18,18 127:4
**lines** 86:24
**link** 12:7
**Lisa** 1:9 2:9 6:22 17:24 25:10 42:10 107:6
**list** 5:13 35:25 36:4 67:18 68:3,11,19,25 69:3,5,6 70:24 72:2,6 73:24 97:23
**listed** 36:9 50:16 68:16 74:23 90:13 98:4 99:2 100:4
**listing** 36:15 63:9
**litigation** 8:9 25:9 122:9,11 122:21
**little** 20:17
**Liu** 1:8 2:8 4:8,12 6:6,22 17:23 18:4,23 19:5,7,16 20:3,25 21:9 25:10 30:11 30:11,17 46:17 54:21,25 55:5 59:1 61:1,5,11 62:21 73:8,11 80:8 83:6 84:8 90:1,23 91:4,9 98:7 108:18 108:21 109:1,6 117:8,14 117:18 119:1 122:8,23 127:3
**Liu's** 55:10,17,20 86:19
**live** 31:4,5 44:24 51:13
**lived** 112:7
**LLC** 1:9,10,10,11 2:9,10,10 2:11 4:13,15,17,19,21,24 5:3,5,7 11:17,25 12:4 25:11,12,13,14 48:20 49:20 59:4 67:19 99:6 100:17
**LLC's** 64:5
**LLP** 95:20,20
**loan** 122:15
**located** 101:1
**log** 70:19,20 111:1,2
**logged** 70:21
**long** 26:7 101:17
**look** 23:6,8 31:22 32:4 44:11 54:15 57:1 67:15,22 72:5,7 72:11 77:9 81:4,18 84:4,16 87:18 88:10 89:4 102:24 103:2 104:23 121:19
**looked** 60:1
**looking** 41:11 48:24 50:8 87:11 96:23 115:23 117:22
**looks** 30:20 37:5 41:4 72:8
**Los** 1:11 2:11 3:4 11:16 25:13 64:4
**loss** 41:2 42:8,14,18,24 43:6 43:10 44:9,18 45:5,10 52:23 80:19 84:23 101:21 103:10 118:16,18
**losses** 118:8
**lost** 11:8 14:6 19:17 30:20 31:17 46:20
**lot** 11:11 28:14 32:22 110:22 121:12
**lots** 120:24
**louder** 15:9
**low** 15:8
**luck** 70:2,2

M

**machine** 69:19
**main** 67:16
**maintained** 61:8
**major** 106:15
**making** 10:14
**management** 27:3 50:12 88:18,19,21 89:25 102:15 102:18 103:9,18 107:7,9 107:10 108:13,18 117:8 121:1
**managing** 119:3
**March** 4:6 13:5,8,11,13,16 13:16,20,21 35:14 73:22 74:1 97:2 121:16
**Marcum** 14:16 20:13 30:10 48:4 52:2 95:20 97:13 98:5 98:6,10
**Marcum's** 66:14
**Marcum_CLIU_00005722** 69:13
**MarcumLLP.com** 71:17
**marked** 12:12,12,21,22 13:24 14:15 16:5,9 69:8,21 72:14,16 73:4 75:10 110:22 111:13
**marketing** 82:22 103:18
**material** 113:15,19,25
**materialized** 29:21 30:5
**materials** 64:19 109:4 113:14,20
**matter** 6:6 25:8 44:6 46:6,8 56:16,25 121:5
**Mayer** 58:12 98:7
**mean** 11:15,20 33:6 52:24

78:6 90:16 93:9 101:2 105:17 106:6 118:9 121:12 122:11
**meaning** 115:14
**meaningful** 45:15
**means** 46:13 118:10
**mediation** 39:25
**medical** 37:18,19,22 38:7,12 38:14,15 85:23 89:3,25
**meet** 73:12
**meets** 7:19
**member** 18:20
**members** 19:8
**membership** 48:20 49:20
**memorandum** 48:19,23 49:16,19 50:16
**mergers** 27:5
**Merit** 125:7
**met** 18:6
**method** 20:9
**Mevion** 58:10 85:23 86:2,5,7 86:10,15,20 91:8,9,13,14 91:23,25
**Michael** 59:6,7,8 99:3,4,6
**middle** 81:19
**Miller** 58:12 98:7
**million** 45:13,16,22 61:6 81:8,10,13,19,20,21,25 82:2,20,23,24 83:1 85:5,24 90:17,19,21 91:19,21 109:1,5,15,16 116:22 117:1,20
**million-dollar** 83:7 91:16
**millions** 27:9 33:11 119:1,7 120:24
**minimized** 87:17
**minimum** 50:9
**Mintz** 99:5
**minus** 43:21 45:1 118:11
**minute** 14:11
**minutes** 49:3 110:10
**missed** 42:15 47:5
**missing** 46:1
**misstatement** 113:15
**mistake** 81:24
**modern** 111:8
**modifications** 85:7 113:19 113:25
**moment** 30:22 87:4 89:20
**money** 20:14,20 33:8 45:19 50:1,3,6,7 51:6,6 52:25 53:12,13 62:4 81:13,15 82:10,13,22 83:18 85:17 86:5 90:24 106:11
**monies** 85:10
**monitor** 84:7,9 85:8 86:3,14
**month** 75:3
**monthly** 63:12
**months** 20:7
**morning** 7:23 20:8 21:1
**Morris** 74:5,12,23 75:5 77:18 78:1 79:10,22
**Morris'** 74:17 75:16
**mother** 55:17
**mother-in-law** 55:18
**move** 82:15 108:1
**moved** 30:1 72:14
**moving** 90:4 103:16 110:4,4
**MP** 89:25
**MPH** 88:11 89:24

**N**

**N-O-B-O-D-O-R** 56:1
**name** 6:12 17:8,12 18:3 49:23 68:24
**names** 20:19 67:23 68:5,8 68:11,16 69:3,4,5
**Natasha** 17:8,17 18:14
**nationals** 51:11
**nature** 52:24 80:19 98:15 107:5
**nearly** 105:22
**necessarily** 62:1 105:14
**necessary** 8:23 42:19 43:7 43:11 44:18 45:6 85:7
**necessity** 94:5 98:15 100:1 101:11 106:18
**need** 8:11 9:11 10:3,12 13:1 23:9 32:23 33:3 45:9 70:17 107:21 110:9 112:4 113:19 121:17
**needs** 118:20
**negligence** 119:3
**negotiate** 122:18
**negotiated** 86:4
**negotiating** 92:5
**net** 41:17,17 42:16,24 43:18 43:20,21,22 44:10,12,13 44:22,25 45:11 102:20 118:7,10,11,22
**never** 18:6,6 29:21 30:19 39:2 41:16 42:14,25 45:15 45:17 58:1,25 59:3,11,14 59:17,21,22 60:1,8,8,9,14 60:20 80:10,10
**new** 3:9 27:7 69:9 110:5 120:25
**Newark** 3:9
**news** 38:4
**Nisy** 95:19 99:4,16
**Nixon** 58:8 95:20 98:5
**Nobodor** 56:1
**Nobodor's** 56:3
**nods** 8:24
**normal** 14:24
**Notary** 124:19 126:23
**note** 93:20 94:10 102:6,24 103:2 104:23
**notes** 92:24 95:8 96:23 97:12 100:20 104:3 125:13
**Nothing's** 79:17
**noticing** 6:17
**November** 89:14 94:13,15
**number** 28:15 29:23 48:18 49:14 51:15 63:24 64:2,3 66:7,18 67:6,18,20 69:12 73:8 74:22 87:24 89:11 99:2 100:15 109:14 112:15 116:3
**numbers** 24:5 63:5 73:12 79:2,15

**O**

**oath** 7:13,18 8:1,5,7 11:1,6 124:4 126:13
**object** 45:23
**objection** 83:9,10 119:13
**objections** 10:11
**obtain** 113:13,18,24 114:12 122:15
**obtainable** 61:3
**obtained** 60:9
**obvious** 98:11
**obviously** 45:17
**occasion** 33:18 80:8
**occasions** 8:4
**occupied** 100:9
**occur** 20:6 21:1
**October** 71:25
**offer** 48:23 126:12
**offered** 38:17
**offering** 37:10 38:25 39:5,6 48:18 49:16,18 50:14,16
**offerings** 37:14
**offers** 38:8
**office** 20:22 100:9,17,23,25
**Offices** 59:1 98:6
**Oh** 49:22 111:11
**okay** 9:21 10:2,25 12:6,19 13:20 14:2 18:3 21:22 22:8 24:3 28:23 30:17 35:5 36:21 39:8 41:19 46:3 47:5 47:15,16,20 48:18 49:7 50:18 52:11,14 53:25 56:14 59:11 64:3,18,23 66:7 67:11,18 68:18 70:2,4 70:16 71:2,5 72:10,25 73:19 74:20 76:17,22 77:8 77:14,23 78:22 79:3,18,18 79:19 80:7,12,22 81:3 82:7 82:14 85:18,19,23 86:22 86:22 87:7,14,19,22 88:3 88:13,17 89:1,2 90:4,22 91:7 92:10,22 93:12,15 95:5,13,18 96:18 97:17 98:14,20 99:19,24 100:14 101:7,10,17 103:12,16,25 104:14 105:4,9,15,20 106:12 107:17,24 109:8,20 109:24 111:18,21 112:2,3 112:9 114:3,11,18,24,25 115:25 116:9,10,12 117:12 117:16,16 118:3,18 122:8
**once** 21:20 69:10 84:5 90:8
**ones** 52:20 76:5,16
**open** 12:7,14 14:2 16:4 35:4 35:6 69:10,21 71:21 76:17 111:16
**opening** 62:9
**operating** 38:7 57:5,8,10,12 57:15 118:11
**operational** 103:7 109:21
**operations** 27:4 45:15,18 98:1,24 100:10 116:22 117:21
**opined** 108:20
**opinion** 24:22 44:21 46:6 94:7 95:1 100:1,5 119:16 120:13,18,19 121:3,4,4
**opinions** 18:25 19:6 26:3 33:24 34:3,5,10,13,17,20 34:21,23 35:2,3 36:2,6,10 36:16 38:17,20 40:3,6,7,11 40:14,20 41:7,18,20,24 42:17 45:2 48:15 50:21 51:1,2 56:15,19 57:4,16,18 57:22 75:21 78:3 90:7 93:19 108:25 114:8 117:17 118:2,19 119:11,20 120:11 120:16,17 121:7,9
**opportunity** 123:11
**option** 86:7
**Optivus** 89:7,12,16 92:10,14 95:19 99:3,15 101:23
**order** 45:6 46:8 61:19 118:25 122:15
**orders** 83:12 84:7,13,16
**original** 18:16 21:16,17 22:3 22:4 23:1,3,12,14,16,19,23 24:6 76:15 85:4
**originally** 96:2
**outcome** 37:6
**outlines** 54:5
**outlining** 50:13

**Outlook** 73:10
**outside** 27:18 105:12 122:9
**outstanding** 82:2,3
**overseas** 59:12 61:18 81:21 81:24 82:19 83:8 84:20 90:5,9 109:15
**Overview** 5:9 111:24
**owed** 117:18
**owned** 62:6,25 63:1
**Owner** 100:17
**ownership** 62:21

**P**

**P** 44:23 105:18
**P.C** 3:8
**p.m** 2:17 78:9 123:16
**Pacific** 1:9,10 2:9,10 4:17,19 4:21,23 5:3,5,7,13 11:20 11:23,25 12:1,2,3 25:11,12 48:20 49:20 63:14,18 65:15 66:4,9,10 67:19 77:11,24 78:11
**page** 4:5 11:10 16:9 22:9 25:23 50:8,23,24 51:14,19 51:24 52:8 53:9 66:21 67:2 67:12 72:18 73:5 74:15 76:18,19 80:16 81:19 102:5 107:25 112:14 114:19,21,22 115:19,24 116:9,9,15,15 117:25 118:1 127:4
**pages** 14:25 50:13 72:5 78:20 125:11
**paid** 19:10,12,14,15 20:2,16 81:19 82:4,10 85:2,5,11,13 85:15,17 89:16 90:4 93:2 98:23 100:5 101:16 106:3 106:25 107:1 108:18,21 118:20 119:23 121:2
**paragraph** 35:11 48:2 118:4
**part** 30:23 61:3,12,14 64:10 68:10 91:21,21 96:5,9,13 99:8,25 102:14 107:9 113:8,11,17 114:3,11,15 115:2,2,2,4,8,11
**particular** 90:12 94:2
**parties** 40:22 61:24 109:9 122:19 125:16
**parties'** 125:17
**partner** 28:16,21 107:12
**partners** 27:18 28:22 30:7 39:7 59:4 98:5
**party** 119:3
**pass** 123:6
**passed** 28:21
**passwords** 111:8,9
**Paul** 95:19
**pause** 46:21 89:20
**pay** 82:23 120:5,6,21,25
**paying** 30:18 81:15
**payment** 20:8,9 30:12 89:17 91:16 92:11,13,15,17 106:19
**payments** 20:5,10 30:9 61:9 62:19 81:23 88:9,10 90:19 93:24 101:12 105:1 107:2 109:17
**payor** 68:24
**PC** 58:23 98:8
**PDF** 87:12,18
**Peabody** 58:8 95:20 98:6
**pecuniary** 42:6,9 43:1,7,17
**Peg** 99:6
**penalty** 82:24 126:5
**pending** 10:5
**people** 28:2 33:9,14 44:24 69:4 120:6,13,22
**percent** 48:10
**percipient** 106:20
**Perfect** 50:19
**perform** 32:3 79:4 95:4 114:25 115:5,9
**performance** 23:17
**performed** 22:22 25:2 93:17
**period** 31:15 57:24 65:19 81:8
**periodically** 13:21 17:22
**periods** 63:16 64:9 66:8
**perjury** 126:5
**permissible** 122:14,17,23
**person** 84:10
**personal** 88:14 103:8 107:5 107:6 109:21 110:9 121:4
**personally** 18:7 88:15
**perspective** 105:7
**pertaining** 61:13
**pertinent** 120:15
**perusal** 54:20
**Phone** 3:5,10
**pick** 86:9
**picked** 86:10
**PINELLAS** 124:8 125:4
**place** 83:21
**plaintiff** 1:6 2:6,16 3:2 6:20 12:22 13:24 16:5 72:16 75:10 111:13
**plan** 54:3,5,7,8,12,17 121:6 121:9
**planning** 27:4,4 28:19
**play** 86:13
**Plaza** 3:9
**please** 6:15 7:2 9:4,12 12:15 16:4 23:8 25:22 29:17 35:11 43:23 47:10 54:16 68:9 69:10 71:21 73:20 85:18 87:21 98:21 107:20 111:17 116:14
**point** 10:16 33:18 52:21 66:19 83:4,18 97:14 108:1 108:7 109:10
**points** 51:24 52:12 53:9 116:3
**policy** 48:9
**POM** 50:17,20,25 52:18,25 53:7,11 54:3,6,11 85:4,6 86:8 105:12 106:6,6,7,10 106:11,13
**pop** 69:9
**popped** 69:14
**populated** 111:11
**portfolio** 28:24
**portions** 56:9
**posit** 45:12
**position** 45:20 56:18 84:12 86:14
**possibility** 36:11
**possibly** 53:23 56:22 62:11 62:25
**posts** 76:11
**potential** 10:14 29:20 32:12
**potentially** 61:20
**PPEB-5** 11:19,20 63:13,17 65:15,23 66:3,4
**practice** 26:21 48:4
**practices** 32:21
**pre** 76:13
**preamble** 8:12
**preceded** 51:25
**preface** 22:19
**prefiling** 54:22 55:2
**preliminary** 32:13 83:25 84:4
**preparation** 26:24 35:13 48:6,8 112:17 113:7
**prepared** 34:18 53:21,24 80:3 96:12,21 97:12 109:4 109:4 113:14,21
**preparing** 36:18 73:25 74:7 75:7 77:20 79:3,12
**PRESENT** 3:13
**presented** 116:4
**pretty** 27:19 92:21 121:21 121:21
**prevent** 10:22
**previous** 77:3
**previously** 48:13 85:11 104:9
**price** 89:13 91:19,20 93:22
**principle** 43:21
**printed** 73:16 79:16
**printout** 77:24
**prior** 55:6 64:15,25 66:14 81:24 96:3,4,5,9,11,21 97:14
**private** 27:25 29:4 37:14 39:10,14 48:18,23 49:16 49:18 50:15
**probably** 8:11 30:3
**procedures** 22:22 23:17 115:1,6,10
**proceed** 47:17,21
**proceeding** 8:20
**proceedings** 123:16
**proceeds** 51:7
**process** 29:23
**produced** 42:14,25 53:18
**product** 27:2 86:7
**products** 27:11
**professional** 26:1 27:20 29:25 30:10 33:17 97:24 99:10
**profit** 41:1 42:8,14,16,18,24 42:24 43:6,10,18,20,22 44:8,12,13,18,22 45:5,10 45:11 52:23 80:19 84:23 101:20 103:10 118:11,15
**profitability** 42:2
**profits** 41:16,17 44:10,25 51:10 118:7,10,22
**program** 29:8 39:18 50:1,14
**programs** 29:19
**prohibited** 84:7
**project** 54:9,13 86:6,12 95:10 102:8
**promised** 50:6
**promoted** 29:18
**promulgated** 24:20
**proof** 42:19 43:11 44:19
**proofread** 17:20,20
**proper** 41:25 42:1 43:7 53:3
**properties** 100:23 101:1
**property** 93:11 100:16
**proton** 1:9,10,10,11,11 2:9 2:10,10,11,11 4:13,15,17 4:19,21,23 5:3,5,7,13 11:14,15,16,17,20,23,25 12:1,2,3 25:11,12,12,13 38:1,8,9,13 48:20 49:20 51:9 54:12 63:13,14,18,19 63:22 64:4,15,25 65:15 66:4,5,9,9,10 67:19 75:15 75:20 77:11,25 78:11 86:2 89:7,13,16 91:10 94:12 99:3,15 119:4

**prove** 45:7
**provide** 33:24 34:3 42:8 61:23 73:23 112:16,19
**provided** 24:1 52:1,11 54:8 54:25 55:5 62:9 65:4 78:16 78:23 89:12,17 92:12,13 93:6,15 94:19,25 95:22 97:2,9,9 98:9,16 99:9,12 99:21 103:5 104:25 105:21 109:6
**provides** 35:11 72:1 115:21
**provision** 83:24
**PST** 73:11
**public** 24:21 26:20 110:1 124:19 126:23
**published** 37:8,12
**pull** 14:9 23:9 44:11 47:23 51:21 54:1 70:12 75:13
**pulled** 70:6
**pulling** 72:8
**purchase** 103:5
**purchased** 102:16
**purpose** 19:7 51:7 103:7 106:11 123:3,4
**purposes** 107:4
**put** 23:24 32:14 53:3 68:1,17 68:20 77:2,6 86:13 96:1 119:23

**Q**

**qualified** 38:23 39:3,8,12,16
**qualify** 26:2
**question** 9:2,5,7,8 10:5,7,12 13:9 16:15 22:7 23:2,11 26:12 29:12 39:11 40:16 40:16 42:9 44:15 45:24 47:12 48:1 49:13 54:24 60:19 61:16 72:4 75:18 83:10,10 98:10 112:9 116:13
**questions** 8:23 10:11 11:11 18:14 31:13 34:9,21 35:1 41:12 47:6,9 81:7 112:1 114:20 115:19 123:6,9
**quick** 54:15,20 86:18
**QuickBook** 51:17 53:18 65:6 66:18 68:25 72:9 76:4 76:7,11,21 77:18 79:11,23 97:7,11 101:13
**QuickBooks** 66:7,13,22 67:5,25 68:16 72:7 74:6,22 75:6,8,15,19 78:2 104:24
**quite** 15:3
**quotation** 89:12
**quote** 89:13 92:10

**R**

**R** 92:23,25 93:7
**Rachel** 59:1 98:7
**raise** 7:1 32:24 45:13 50:1,3 51:5 82:21
**raised** 33:8 50:7 85:6
**raising** 29:7 39:9,13,17 120:24
**ran** 80:1
**range** 76:7 109:1
**rate** 48:5,7,11
**rates** 14:24 48:3,10
**rationale** 104:5
**read** 14:25 22:8 24:24 25:16 31:13,16 35:10,12,15,20 35:22 36:1,9,11,15 42:5,23 44:5 46:5,7,9 47:11 48:14 49:15 50:20 51:1,3 56:13 56:19,22,23,24 57:2,10,12 74:14 78:19 86:19 89:10 95:8 106:10 122:5,7 126:5 126:7
**reading** 106:6 122:4
**reads** 22:16 24:9,18 25:7 48:18 80:17 108:1
**ready** 14:12 108:5,6
**real** 21:3 28:3,9,10 40:16 86:18
**really** 31:7
**Realtime** 2:18
**Realty** 100:16
**reason** 61:21 78:21,25 86:11 104:12 120:23 127:5 127:6,8,9,11,12,14,15,17 127:18,20,21,23
**reasonable** 107:13 108:14 108:20 113:13 117:5,13,17 119:3
**reasonableness** 98:15 100:2 101:11
**reasons** 85:3 98:11
**rebuttal** 4:9 16:19 25:1,7 26:4 34:12 40:4 115:17,20 116:1,8 118:1
**recall** 48:16 51:18 117:12
**receipt** 119:1
**receivable** 20:23 82:18,25 83:3,8 84:20 85:1,3,12,24 85:25 86:1 87:1 109:8
**receivables** 81:13 86:25
**receive** 96:11
**received** 30:9 42:10 59:17 59:22 60:14,20 62:4 90:11 95:21 96:15 97:24 105:23 105:24
**receiver** 83:16
**receivership** 83:21
**receiving** 61:13,19,25 62:22 71:18
**Recess** 9:22 49:9 110:16
**recognize** 13:2 14:19 16:16
**reconcile** 68:11
**record** 6:11,16 9:16,19,21 9:24 10:14 12:19 14:4,13 16:7 22:9 31:16 47:11 49:5 49:8,11 51:22 68:23 69:11 71:5,22 73:2 77:23 95:10 110:13,15,18 121:11 123:15 125:13
**recorded** 121:21
**records** 53:1,13,16 60:9,14 60:21 61:2,12,13,18 63:9 64:10 68:13 90:8 97:7,11
**red** 45:17
**redirect** 77:15
**Redirecting** 107:24
**refer** 13:21 44:17 50:15
**reference** 44:8 54:3,4,11 92:24 100:20
**referenced** 5:12 54:19 84:1 84:13 97:11 99:10 109:14
**referring** 11:24 43:25 51:19 53:17 65:11 66:12 72:6
**refers** 17:23
**reflect** 11:7
**reflected** 25:18 62:8 65:16 68:13 90:12 96:19 105:6
**refresh** 69:8,15,19,23 70:18 110:24
**refreshed** 69:18
**refresher** 8:11
**refreshing** 70:9
**refunds** 90:4
**regarding** 24:23 59:18,23 60:5,21 83:13 101:23
**Regardless** 79:18
**regional** 1:9 2:9 4:23 5:3,5,7 11:24,25 12:3 25:11 50:11 51:9 65:16 66:11 77:11
**registered** 2:19 27:22 28:25 125:7
**related** 37:6
**relating** 80:9 122:19
**relative** 125:15,16
**relevant** 57:24
**relied** 14:25 35:13,20 36:1,9 36:16 48:15 49:15 68:15 73:25 74:7 75:6,7,21 76:5 77:19 78:2 79:12 117:6
**rely** 40:6
**remember** 17:12 19:3 28:14 36:13,20 49:23 54:14 57:9 77:21 122:4
**remote** 2:15 3:1 7:13,18 8:13 125:10
**remotely** 124:12
**render** 26:2
**rendered** 30:1 98:4 100:3 120:7 121:2
**rendering** 100:1
**rent** 85:2,4,17 100:8 101:12
**reopen** 71:12
**repaid** 81:14
**Repeat** 26:12 29:12 39:11
**report** 4:6,9,10 13:8,11,12 13:13,17,22,22 16:19,20 17:4,22 18:15 21:16,17,20 21:21,23 22:3,4,6,10,14,16 23:1,3,7,13,14,16,18,19,23 24:6,15 25:1,2,7,8,18 26:3 26:4 34:7,8,12,13 35:14 36:19 40:4,4 48:8 51:14 53:10 59:20,24 60:6,12,17 60:24 64:20 65:20 66:7,22 66:24 67:3,13,15 68:2,7,10 73:22 74:1,7 75:7,15,19,22 76:5,10 77:3,10,20 78:2,10 78:19,24 79:12 80:2,13,14 80:16 87:12 89:22 95:6 107:11,14,25 115:13,17,19 115:20 116:1,5,8,9,15,18 118:1 119:24 125:9
**Reported** 1:23
**reporter** 2:19 6:13,23 7:7,15 8:14 9:18,20 15:8 19:17 28:4 30:20 31:6,13,17,20 31:24 47:14 125:1,8
**reporting** 12:6
**reports** 34:14,19,23 41:10 51:17 53:18 66:13,18,22 67:5 69:1 74:6,22 75:6,8 76:11,14 77:18 79:11,23 80:1,3 101:13 121:7,10,14 121:15,16 122:8,11,14,18 122:21,24 123:2
**represent** 6:16 66:3 111:19
**representations** 119:5
**represented** 26:21
**representing** 27:17 78:1
**request** 73:23
**requested** 125:12
**require** 35:2
**required** 21:19,21 42:19 43:11 44:19 45:21 114:4,6 114:12,25 115:1,2,4,10 126:20
**requirement** 45:6 105:3
**requirements** 7:19

**requires** 114:10
**reread** 47:10
**reservation** 10:4
**resolving** 32:19 41:8
**resource** 111:25
**respect** 28:23 30:9 37:14,22 44:9 51:4 60:19 62:10 91:7 94:5,8 96:18 98:3,18 105:15 106:2 113:6
**response** 4:10 8:23 16:20 119:21
**responses** 8:22
**responsibilities** 28:21
**responsible** 17:5
**restate** 13:9 116:13
**restitution** 118:8
**resumed** 19:23
**retained** 48:5
**return** 81:24 82:21 106:4
**returned** 118:13
**returning** 21:12 48:12 53:25 75:2 114:18
**returns** 24:12
**revenue** 33:11,12 43:21 44:25 118:10 119:25 120:9
**revenues** 116:21 117:19,24 120:5
**review** 16:14 55:20,23 56:3 56:6,9 57:5,15 79:2 90:8 90:23 99:18 112:13,16 113:1 114:15 115:2,15 122:2 123:12 125:11
**reviewed** 24:10,19 52:17 55:10,13,16 60:3,9 64:10 73:25 74:7 75:7,20 77:19 79:12 91:8,18 92:2,8,10 94:11,14 101:14
**revised** 17:18
**right** 7:1 13:14 18:14 22:14 31:18 33:4 35:6,15,22 37:6 38:18 47:19 48:24,25 52:7 52:10 60:24 64:6,21 65:14 66:16,24 67:13 68:21 69:25 71:18 72:11,12,18 72:21 73:2,17 74:10 77:12 77:21 78:6 79:18,20 80:5 81:17 82:14 86:9 90:25 91:5 92:7 98:1 99:13 100:12 101:25 102:21 107:15 108:15 109:1 110:12 111:6 112:9 113:11 117:9
**risk** 114:14
**Riverfront** 3:9
**RMR** 1:24 124:18 125:22
**robust** 61:20
**role** 17:14
**Ron** 6:5 71:16 73:21 87:11
**Ronald** 1:16 2:15 4:2,7,10 7:9 16:19 124:12 125:10 126:4,17 127:2
**RPR** 1:24 124:18 125:22
**Rule** 7:19
**run** 26:9,15 30:7 32:24 33:19 59:4
**running** 38:7 68:22
**runs** 32:23
**Ruth** 56:1

**S**

**S** 3:4 4:10
**salaries** 120:5,25
**sale** 27:6
**sales** 27:9
**Sankary** 1:24 2:18 6:14 7:18 8:14 124:18 125:7,22
**Sankary's** 8:21
**save** 75:25 126:9
**saw** 92:11 104:12
**saying** 77:17 84:5
**says** 8:17 22:14 62:4 78:8 78:16 88:11 119:24
**SC** 89:24,24
**scenario** 45:12
**scheduled** 21:6
**SCI.X** 58:6 94:10,11,21,25
**Science** 58:6 94:10,12,21 99:2,14
**scope** 32:11 105:12,16
**screen** 12:15 70:3,5 72:21 72:24 77:14
**scroll** 74:13
**SEC** 4:8,12 6:6,19 15:17 16:2,25 21:20 44:20,22 54:22 66:15 73:7,7,11 74:17,21 78:7 79:8,22 84:6 86:11 88:12 127:3
**second** 31:11 35:10 54:1,15 87:17 97:6 99:15 108:1,7 110:4
**seconds** 69:17 84:14
**section** 21:24 22:11 103:24 115:19 118:1
**securities** 1:5 2:5 3:3 25:9 26:10,16 33:20 42:21 43:13 50:9
**see** 22:11,13,18,25 23:11 31:9,10 35:11 45:10 52:6 52:15 54:17 61:21 62:2,19 63:20 69:10,16,22,23 70:7 70:8,8,18,22 72:13 73:15 73:20 74:9,22,25 80:25 81:5 87:7,14 88:4,11 91:21 97:1 104:3,20 105:2 106:10 110:22 116:24
**seeing** 54:19 92:8
**seen** 32:22 91:14,14 100:22 120:20,20
**sending** 71:10 74:21
**Seng** 60:5,10
**sent** 12:7 61:8 62:5 71:24 73:6 78:7 79:8 82:12 90:18 102:15
**sentence** 51:25
**series** 76:10
**service** 11:9 12:6 21:9 112:19 114:10,16
**services** 5:9 29:25 30:10 79:4 95:1,4,22 97:24 98:4 98:16 99:10 100:2,16 111:24 112:12,15 114:7 120:7 121:2
**set** 12:8 17:4 22:2 23:18,20 24:18 25:6,16 50:5 53:9 67:4 82:18 85:2,12,24 93:20,22 94:13 104:5 116:17
**sets** 16:10
**settle** 40:1
**Settlement** 112:12
**seven-odd** 67:23
**Seyfarth** 58:14 98:5
**Shanghai** 59:23 60:15 95:18 97:3 100:19 101:3,3 104:22
**share** 12:8,15,17 14:10 70:3 70:6,10 71:7 72:21
**shared** 11:4
**sharing** 77:14
**Shaw** 58:14 98:5
**sheet** 4:14,16,18,20,22,24 5:3,5,7 52:22 53:4 65:10 77:11,24 78:11 80:18 84:23 101:20 102:1 103:22 104:11,13 126:11 127:1
**sheets** 76:3,8,20,20
**shell** 45:14
**shipped** 103:4
**shortly** 71:11,19
**shot** 111:4
**show** 41:16 43:7 70:15
**showed** 92:11
**showing** 68:23 75:14 93:24 94:15
**shows** 42:15
**shrugs** 8:24
**sic** 6:10
**side** 30:4 60:22 70:10 99:13
**signatory** 62:13
**Signed** 124:15 126:17 127:24
**signing** 34:11
**Silicon** 120:2
**SILLS** 3:8
**sir** 8:2 14:10 25:22 44:6 45:4 47:14 121:24 123:9
**sister** 56:2
**site** 12:17 14:10 70:6
**sites** 110:22
**situations** 109:15
**Skanska** 58:4 93:19,22 94:7 99:3,16
**slightly** 44:15
**small** 70:8
**social** 18:5
**sole** 107:14
**solely** 25:8
**solicit** 50:2,4
**soliciting** 51:6
**sorry** 6:25 13:7 28:4 80:13 87:3 116:10
**sort** 62:13,16 68:22 92:6
**sound** 11:12 13:17
**sounds** 74:10
**sources** 96:24 97:20
**SOUTHERN** 1:3 2:3
**space** 29:11,14 100:9
**speak** 15:9 41:10 57:19,23 59:6,10 60:7 67:9 96:5,8
**specific** 44:12 98:17 101:8
**specifically** 43:19 54:4 57:10
**spell** 17:8
**spend** 36:18 106:11
**spent** 33:6 50:8 51:8 53:1,12 53:13
**spoke** 45:5 59:11,14,21 60:1 68:12
**spoken** 91:13 109:11
**sponsorship** 50:12
**spreadsheet** 67:16
**spreadsheets** 67:9
**spring** 54:23
**Square** 99:6
**staff** 20:23 32:9
**Stan** 71:25 74:5,12,17,23 75:4,16 77:18,25 79:9,22
**standard** 21:19 48:4,11
**standards** 24:20,23
**start** 33:10 65:10 77:8 92:22 120:3
**started** 26:22 27:7 96:13
**starting** 6:17 38:7 65:9 66:19 97:14

**startup** 32:23 33:6,16,17,19 95:15,23,25 96:18 120:3,4 120:21
**startups** 33:12,13 103:19
**state** 6:16 24:11 67:8 124:7 124:19 125:3
**stated** 34:6,8 36:25 121:13
**statement** 5:9 24:8,14,24 26:1 34:23 37:9 39:1 41:15 42:8,14,18,25 43:6,10 44:9 44:18,23 45:6,10 48:14 53:5 62:4 64:18 74:8 75:3 77:21 79:8,13,20 85:21 89:15 96:16 97:1,5 103:10 103:21,24 111:23 112:15 112:17,23 113:1,7,14,20
**statements** 15:19,21 23:25 26:8,14,25 34:17 37:13 38:25 39:5 41:1,4 52:3,23 61:22,23 62:9 63:10,12,17 63:18,19 64:5,12,15,24 65:7,18 76:8 77:4 79:15 80:19 81:1 84:24 90:24 93:2,23 94:14 95:25 96:13 96:21 97:8,14 101:21 104:25 105:18 109:3 112:20 115:14
**States** 1:1,5 2:1,5 6:7 51:11 51:12
**stenographic** 125:13
**stenographically** 125:9
**step** 68:22
**sticking** 89:3 102:4
**stipulate** 7:12,17
**stop** 108:3,3,3
**stopped** 95:11 102:8
**strategic** 27:4
**Street** 3:4
**stretching** 65:19
**strictly** 123:2
**strike** 57:13
**struggling** 31:8
**stub** 89:14 92:11
**stubs** 63:9 93:1,23
**stuck** 81:4
**studies** 108:14
**Studio** 58:6 94:10,12,21 99:2,14
**study** 117:5,6,6
**subfolder** 12:12 71:7
**subject** 4:12 5:13 22:4,16 32:17 38:24 39:4,17 48:12 59:19,24 60:6,12,17,24 73:7 86:20
**submitted** 35:14
**subpoena** 21:10
**subpoenaed** 21:5
**Subscribed** 126:21
**substance** 17:21
**substantiation** 115:10
**suit** 66:15
**Suite** 3:4
**summarizing** 116:16
**summary** 35:13 46:7 118:1 118:25
**supplemental** 73:21
**support** 17:6 18:13 60:2 89:17 92:12 97:4,10 103:5 105:1
**supporting** 96:16,20
**Supreme** 43:17 44:5,11,14 44:17 45:20 46:6,13,19 47:8 118:5
**sure** 9:18 13:12,14 26:13 48:24 49:5 51:21 61:16 68:7 74:11 77:7 85:13 89:21 112:5 116:6,7 122:12
**swear** 7:3
**sworn** 6:18 7:10 54:22,25 124:13 126:21

**T**

**T-R-A-N-G** 18:15
**table** 112:10,14 114:19
**tabulating** 100:8
**tabulation** 95:15 98:22
**take** 9:13 10:3,3,7,18 12:25 14:8 23:9 46:25 47:16 49:2 54:14 59:8 63:22 68:21 74:12 77:9 86:11 89:2 107:21 110:6,9 112:4,4 121:19
**taken** 2:16 9:22 28:20 33:7 33:10 49:9 110:16 127:2
**takes** 32:25 104:18
**talk** 44:24 105:19 106:9,14 106:15
**talked** 18:6 29:19 86:25 100:14 102:7 109:18 117:4
**talking** 44:23,25 52:10 67:15 76:22 84:17
**talks** 44:10,22 50:9
**targets** 82:24
**task** 105:7
**tasked** 119:9
**tax** 24:12 26:23
**team** 17:5,7,25 18:13,21 19:8 36:22 53:22,24 68:20 80:4 96:8 97:13 115:9
**technology** 27:13
**tell** 9:6 20:24 28:7,11 29:17 33:9 53:1 54:18 62:1,3,5,5 62:6 81:17 120:19
**ten** 8:6,7 27:15 28:17,20 84:13 110:10
**ten-minute** 46:25
**term** 44:12
**terms** 11:10 43:21 122:13
**testified** 7:11 8:1,4 21:2 39:20,22 48:13 61:6 91:4 105:5,20
**testify** 21:5 117:15 121:6,9 121:13
**testifying** 10:22
**testimonies** 8:7
**testimony** 7:3 11:1,2,5 48:16 54:22 55:1,6,11,14 55:17,21,24 56:4,7,10,15 86:20 121:24 126:6,9
**Thank** 6:23 7:7 31:20,25 95:13 98:12 111:5 123:5,8
**thanks** 47:15
**therapies** 38:5
**therapy** 1:9,11 2:9,11 4:23 5:3,5,7 11:16,25 12:3 25:11,14 38:1,8,9,13 54:12 64:5 65:15 66:10 77:11 89:13,16 119:4
**thereabouts** 109:5
**thereof** 42:3
**thing** 33:5 78:6
**things** 35:19 38:8 110:20
**think** 8:6 10:21 18:19 19:21 28:3 31:14 32:20 34:15 35:8 40:2,10,11,24,25 41:3 41:7,10,11,12,14,15,18,19 41:22,24,25 42:5,7,10,13 43:6 45:9 49:13 50:5,5 52:24 53:11 56:17 57:2 67:21 76:6 79:1,14,19 83:11,11 92:20 95:9 101:22 106:10,13 107:22 109:19 110:8 111:3 114:8 119:24 121:1,20,20 123:2
**third** 24:9 99:15 109:9 122:19
**Thorn** 59:3
**thought** 62:25 85:16 107:4
**thousand** 20:18 36:25 37:1 37:3
**three** 12:13 20:4,5,10 39:24 57:20,24 66:2 68:13 72:5 76:25 82:17,22 95:15 117:2,18
**three-page** 35:18
**Thropay** 56:11 85:1,9,11,13 95:20 100:14,16,21 109:17
**Thropay's** 56:2,6,20
**Tim** 6:12 9:19 49:6
**time** 6:10 9:1,11,11 10:10,10 10:16 12:25 14:8 15:6 19:10 23:9 32:14,25 34:16 34:19,22 36:18 41:24 63:16 64:10 66:8 69:16 74:12 78:13 83:18 90:20 107:21 110:9 112:4 121:19 123:6
**timely** 19:10,12,14 20:2
**times** 8:6 19:15 20:2,4 39:22 39:24
**Timothy** 3:14 6:24
**today** 6:13 7:4 8:17 10:23 11:1,11 21:2 33:12 84:3,17 121:11,24
**today's** 6:9,24 8:19 123:13
**told** 53:13 90:16
**top** 12:15 17:12 19:3 20:21 36:13 57:3
**topic** 98:18
**tore** 93:10
**total** 20:16 81:8 91:19,20 116:21 117:1,19
**totally** 42:7 43:2
**totals** 72:11
**touch** 32:14
**tough** 30:23
**toys** 27:11
**Trang** 18:15 32:9 53:21 65:12,13 68:15,25 71:25 71:25 80:4 97:12 122:2
**transaction** 67:4 105:24
**transactions** 59:19,24 60:5 60:11,16,23,23 68:12 90:12 91:3 94:3,20 105:10 106:5,7,18,23 122:19
**transcribing** 8:15
**transcript** 11:7 56:10,20 125:12,12 126:6,8
**transcription** 8:19
**transcripts** 56:25
**transfer** 20:11 21:1 94:15
**transferred** 61:7
**transfers** 117:8
**translation** 11:8
**transmitting** 71:24 72:1
**Traurig** 58:16 98:6
**treated** 88:6
**treatment** 38:1,9 41:25
**trial** 39:20,23 46:7,10,16
**tried** 70:15 71:12
**trier** 40:10
**truck** 102:10
**trucks** 102:13

**true** 13:4,10 15:19 35:9 54:6 74:2,8 75:3,19 79:20 125:13 126:8
**truth** 7:4,4,5 11:7
**truthfully** 10:22
**try** 8:21 15:10 69:17 70:3,9 71:3 72:23 86:15 111:2
**Tuesday** 1:18 2:17 6:1
**turn** 24:3 80:12,22 92:22 98:20 115:17 117:25
**turned** 30:4
**turning** 25:22 91:7 95:14 97:21 100:7
**two** 31:13 34:14,22 39:24 65:23 107:10 121:15,16
**typing** 17:16

U

**U.S** 42:21
**Uh-huh** 68:4 80:24 89:6 96:25 102:11 103:1 104:19 107:13
**ultimately** 46:19
**unclear** 40:15
**underneath** 22:19
**undersigned** 124:11
**understand** 9:3,7,8 22:7 32:22,23,24 41:5,12 56:17 61:16 90:14 93:9 101:15 106:8 118:5
**understanding** 15:15 32:20 42:18 43:10,16 46:12,15 46:18 47:7 66:1 83:16,20 83:24 90:1 91:24 92:16,19 92:21 93:12 103:3 112:18 114:13 126:12
**understood** 10:19 11:17,21 12:1,5 13:22 30:14 34:22 48:12
**unequivocally** 119:2
**Unfortunately** 71:8
**United** 1:1,5 2:1,5 6:7 51:10 51:12
**units** 48:20 49:20
**universe** 93:6 94:1,18
**upper** 16:11
**USA** 93:19 99:3,16
**USCIS** 29:7 39:18
**use** 25:8 31:7 50:11 69:4 103:8,13 114:20 122:8,14 122:17,23
**usually** 33:9

V

**v** 1:7 2:7 4:8,12 127:3
**valid** 84:2,3,14
**Valley** 120:2
**value** 94:6,23,24
**various** 53:14 61:9 62:19 66:7 101:16 106:25
**vehicles** 102:15
**vendors** 27:18 98:16,17 100:3,5 106:25
**venture** 30:1
**Ventures** 88:11 89:24
**Verbal** 8:22
**verification** 24:4 115:9
**verified** 90:23
**versus** 6:6 25:10 73:8,11
**vetting** 68:22
**VI** 21:24 22:11
**video** 8:13 10:13 87:8
**VIDEOCONFERENCE** 1:17
**videographer** 3:14 6:4,13 9:23 49:7,10 110:14,17 123:13
**videotaped** 1:16 2:15 6:5 123:14 125:10
**view** 40:19 106:4,5
**viewed** 111:25
**views** 42:2
**Visa** 51:12
**visible** 72:22
**VTC** 8:14

W

**wait** 46:21 69:20 70:17
**walking** 101:18
**Wang** 1:8,9 2:8,9 6:22 17:24 18:4 21:9 25:10,11 46:17 108:18,21 117:8
**Wang's** 55:13,17,23 119:1
**want** 10:15 11:6,7,8 35:10 63:4 72:13 74:13 80:12 89:2 104:1 112:1 115:18 116:6
**wanted** 86:9
**wasn't** 13:7 86:16
**watermark** 78:14,23
**way** 17:19 33:13 34:14 38:21 41:6 45:13 64:20 75:23 78:19 104:13 112:19
**WayLink** 99:6
**we'll** 9:12
**we're** 9:23 22:9 49:7,10 76:22 85:13 110:14,17 114:7 116:7,8,8
**we've** 12:8 35:8 46:23 60:2 100:14 102:6 107:1,22 117:4
**web** 111:20
**WebEx** 6:9 73:3
**website** 5:10 111:22
**went** 46:12,19 47:7 49:14 62:2,19 90:19,24,25 108:11
**weren't** 107:3 114:4,12
**wife** 84:8
**wire** 20:11,14 21:1
**wired** 20:20
**Wise** 99:5
**wish** 10:17
**withdraw** 45:25 46:2
**witness** 4:1 6:17 7:6,14 8:8 12:20 14:5,14 15:9 16:8,25 30:23 31:2,4,9,18,22 46:20 47:2,6,19 70:19 71:8 73:5 123:7,11 126:1
**word** 17:3
**words** 17:25
**work** 19:13 20:16 25:2,18 26:1,6,13,23,23 29:10 32:3 33:19 36:22 37:17,21 61:12 68:15 80:8 81:25 90:20 93:1,7,16 112:22,25 113:3,9,17 114:12 115:5,8 120:7
**worked** 17:11 27:1,2,21,25 29:18 57:20
**working** 19:11 26:23 27:3 33:6,15 119:21
**works** 9:5 47:1
**world** 44:24 120:20
**wouldn't** 62:3,5,5,8,16
**write** 17:3 52:1 87:2 118:5
**write-off** 88:5 89:4,9 102:12
**write-offs** 86:23
**writing** 15:15,24 17:5,16,17 17:17 73:19
**written** 8:19 11:5 89:8 92:4 92:5 101:24 102:5,7
**wrong** 43:2 91:20
**wrote** 18:1,14 49:21,22,24 88:3,15 95:8,11 119:1

X

**X** 99:2,14
**Xin** 1:8 2:8 25:10

Y

**Y** 3:3
**yeah** 7:15 30:25 31:2 40:17 52:13 59:10 64:4 69:25 70:9 71:4 73:1 76:1,15,19 77:5 79:21 82:18 88:2,19 88:19 102:23 109:13 110:8 110:11 120:12 122:7
**year** 82:22 97:25 98:24 100:10 103:10 116:22 117:2,20
**years** 26:20,21 27:5,15 28:14,15,17,20 29:23 32:21 74:18 77:4 82:23 106:25
**Yep** 75:13 87:6 111:10 116:11

Z

**zero** 27:8 33:10 118:22
**Zheny** 99:5
**Zooming** 30:24

0

**04/02/21** 4:7,12
**04/09/21** 4:9
**07102** 3:9

1

**1** 48:18,21 49:14 50:16 51:24 53:9 67:16 80:16,23 82:24 89:5,19 96:19 101:19 105:6 108:12 115:19,24 116:9,15 125:11
**1.5** 81:13 90:21 109:15,16
**1/1/2016** 81:9
**1/27/24** 124:20
**1:36** 78:9
**10** 45:13,16,22 104:4
**10/11/16** 5:13
**10:00** 46:23
**10:02** 49:6,8
**10:12** 49:11
**1025** 89:14
**11** 22:9 71:25 104:4,17
**11:48** 110:13,15
**11:57** 110:18
**111** 5:9
**12** 4:6
**12/31/15** 97:7 104:24
**12:18** 2:17 123:15,16
**120** 48:10
**120-** 37:4
**123** 125:11
**13** 4:7 77:4
**132** 5:13 69:10,11 70:7 71:6 71:10,23
**14** 77:4 78:8
**15** 67:18
**159** 4:6 12:13,14,21,23 13:2 13:4,10 21:16 23:3,21 25:3 25:19,21 34:12,16 36:19 51:21,24 52:9 53:9 67:3,12 69:22 70:25 72:19 76:17 76:17 77:10 78:10 80:14

89:23,23 107:25 110:23
**16** 4:9 41:3 82:3
**160** 4:7 12:13 13:25 14:3,9 14:12,15,20,22 15:12,19 15:21,25 35:4,5,6,18,25 47:23 53:25 56:21 63:3 65:17 67:6 69:22 70:25 80:12 90:14 110:23
**161** 4:9 12:13 16:4,6,9,15,16 16:18,22 17:4,15,18,22 21:12,22 22:2,9 23:13 24:8 24:18 25:1,7,17 34:13,16 69:22 70:25 110:23 115:18 115:24 116:8,16
**162** 4:12 72:14,17 73:4 75:24 79:7
**162A** 4:13 75:11,14,24
**162B** 4:15
**162C** 4:17
**162D** 4:19
**162E** 4:21
**162F** 4:23
**162G** 5:3
**162H** 5:5
**162I** 5:7 75:11,24 77:23 78:7 78:15
**163** 5:9 111:14,17,20 112:10 114:18
**19** 6:10
**1A** 81:18,18 88:4 89:22,23 90:13
**1B** 89:5 91:7
**1C** 92:22,24 93:21 94:11 95:7 102:6
**1D** 102:25
**1E** 104:5
**1F** 95:5,14 97:12 104:5
**1G** 104:5,18

**2**

**2** 14:17 15:25 35:7 47:24 63:24 64:2,3 73:6,17,20 74:4,16,18 75:4,16 77:17 79:9,23 82:14 89:11 93:20 103:2 112:14
**2.4** 82:23
**2.7** 116:22 117:1,20
**20** 1:18 2:18 6:1,24 69:17 126:9,19,22 127:2
**200,000** 37:2
**2010** 64:20 65:2,20 98:1,25 100:10
**2011** 65:2
**2012** 4:24 65:2 66:11
**2013** 4:14,18 5:4 48:21 64:16,25 66:5,9,10 75:14 75:19 93:21 97:2
**2014** 4:16,20 5:6
**2015** 4:22 5:8 53:22 66:16 76:25 77:11,25 78:12 89:14 91:10 92:25 93:1 94:13,16 103:11
**2016** 41:3 53:22 54:23 55:21 55:24 66:5,9,10,16 71:25 74:4,19 75:4,16 77:17 78:8 78:13 79:9,23 80:5,7 81:2 84:1 95:16 98:3,25 100:11 108:9 116:23 117:2,21
**2017** 66:11
**2021** 1:18 4:6 6:1,10,24 13:8 13:11,20,21 14:17 15:25 21:23 35:7,14 47:24 73:6 73:17,20,22 74:16 124:14 124:15 125:20 126:9 127:2
**2021before** 2:18
**20th** 124:13
**21** 78:13
**210420DSA** 1:25
**22** 91:19
**23rd** 124:15 125:20
**25** 4:6 13:8,11,13 116:9,15 117:25
**25-page** 16:8
**25,000** 88:4
**25,780** 87:1,24 88:5,8
**26** 13:16,16,20,21,21 35:14 73:22
**26th** 74:1 121:16
**2A** 97:21,22,23
**2C** 98:20,22 100:4
**2F** 100:7,7
**2nd** 77:16 79:8

**3**

**3** 63:5,8 81:19 85:24 90:17 90:19 91:16,21 94:10 116:9,15 118:1,1
**3.4** 82:20 83:1,7
**30** 81:1 95:16 98:3,25 100:11 108:9 116:23 117:2 117:21 123:11
**30-year** 85:15
**30(b)(5)** 7:19
**300** 48:19 49:19
**30th** 90:21
**31** 4:14,16,18,20,22,24 5:4,6 5:8 78:12 103:11
**31,777** 104:21
**315,487** 93:8
**323-965-3998** 3:5
**36** 35:19
**36,000** 104:21
**360,000** 89:7
**368,000-dollar** 89:4
**368,100** 89:15
**368,100-dollar** 101:23

**4**

**4** 63:5,8 76:6,10 95:8
**4/30/16** 81:9
**418,954** 81:11
**444** 3:4
**495,000** 89:13

**5**

**5** 63:5,6,8 76:6 95:8 117:25
**50** 26:20,21 32:21
**500,000** 68:1,17
**5152** 64:7 89:15 97:8
**5726** 69:15
**58** 76:18

**6**

**6** 50:8 63:5,6,8 74:15
**6.9** 81:10
**60** 72:19
**60-** 102:21,21
**60,000** 102:20
**61** 72:19
**68,000** 104:22
**68,000-dollar** 104:15
**69** 5:13
**6A** 76:20,22 77:8,9 78:9,23 79:3
**6B** 76:22
**6C** 76:22

**7**

**7** 4:3 63:5,6,8 74:15 102:6
**7.1** 81:8
**7.2** 109:1,5
**70** 76:18
**70-page** 12:20
**72** 4:12
**75** 4:13,15,17,19,21,23 5:3,5 5:7
**77** 73:12

**8**

**8** 63:5,6,8 74:15 114:20
**8:16-cv-00974-CJC-AGR** 1:8 2:8
**8:59** 2:17 6:2,11
**80-** 102:18
**800,000** 82:22
**803,630** 102:5
**838,500** 85:1

**9**

**9** 21:23 66:7,18 67:6 104:4 114:21,22
**9:03** 9:21
**9:05** 9:24
**90** 73:13
**90,000-dollar** 102:18
**900** 3:4
**90071** 3:4
**91** 73:13
**944837** 124:19
**973-643-7000** 3:10
**9th** 22:6 121:16

# Exhibit 34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

vs. ) Case No. 8:16-cv-00974-CJC-AGR

CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, Defendants.

REMOTE VIDEO DEPOSITION OF TRANG LAM
MARCH 9, 2021
CONDUCTED VIA VIDEOCONFERENCE

Reported by
Cynthia J. Vega, RMR, RDR, CSR 6640, CCRR 95
Job No. 210309CJV

1

The remote video deposition of Trang Lam, a Witness herein, located in the City of Costa Mesa, State of California, taken on behalf of Plaintiff, on Tuesday, March 9, 2021, beginning at the hour of 10:04 a.m. PST, remotely before Cynthia J. Vega, CSR No. 6640, located in the City of Carlsbad, County of San Diego, State of California.

REMOTE APPEARANCES

For the Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
By: Gary Y. Leung
Jacob A. Regenstreif
444 South Flower Street, Suite 900
Los Angeles, California 90071
(323) 965-3998
leungg@sec.gov
regenstreifj@sec.gov

2

REMOTE APPEARANCES

For the Defendants Charles C. Liu and Xin Wang aka Lisa Wang:
SILLS CUMMIS & GROSS PC
By: Herve Gouraige
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
hgouraige@sillscummis.com

For the Witness:
VEDDER PRICE
By: Steven R. Berger
1633 Broadway, 31st Floor
New York, New York 10019
(212) 407-7714
sberger@vedderprice.com

The Videographer:
Timothy Hunter

*****

3

INDEX

WITNESS
Trang Lam


| EXAMINATION | PAGE |
|---|---|
| By Mr. Leung | 7 |
| By Mr. Gouraige | 96 |
| By Mr. Leung | 98 |
| By Mr. Gouraige | 99 |


EXHIBITS
(Exhibits Bound Separately)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 135 | Subpoena To Testify at a Deposition in a Civil Action | 18 |
| Exhibit 136 | LinkedIn profile of Trang Lam | 19 |
| Exhibit 138 | Email, April 19, 2016, with attachment | 47 |
| Exhibit 139 | Email string, April 20, 2016, with attachment | 48 |
| Exhibit 140 | Email string, June 14, 2016, with attachment | 49 |
| Exhibit 141 | Email string, August 3, 2016, with attachment | 51 |


4

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 142 | Email string, April 20, 2016 | 44 |
| Exhibit 143 | Deposition Transcript of Charles C. Liu, February 24, 2021 | 79 |

| EXHIBITS PREVIOUSLY MARKED AND REFERENCED | PAGE |
|---|---|
| Exhibit 130 | 35 |
| Exhibit 131 | 36 |



TUESDAY, MARCH 9, 2021, 10:04 A.M. PST

THE VIDEOGRAPHER: Here begins the videotaped deposition of Trang Lam in the matter of the SEC versus Liu, et al. This case is being heard in the United States District Court, Central District of California.
This deposition is being held via Webex.
Today's date is March 9, 2021. The time on the record is 10:04 a.m.
My name is Tim Hunter. I'm your legal videographer.
Our court reporter today is Cynthia Vega.
Counsel, would you please introduce yourselves and state whom you represent for the record starting with noticing counsel, and the witness will be sworn.
MR. BERGER: Steven Berger, B-e-r-g-e-r, from VedderPrice representing Trang Lam.
MR. LEUNG: Gary Leung for the plaintiff and the noticing party.
MR. REGENSTREIF: Tony Regenstreif for the plaintiff.
MR. GOURAIGE: Herve Gouraige for the defendants.



TRANG LAM,
Witness herein, being first duly sworn, testifies as follows:

EXAMINATION
BY MR. LEUNG:
**Q.** Good morning, Ms. Lam.
**A.** Good morning.
**Q.** Can you please state your name and spell it for the record.
**A.** Trang Lam, T-r-a-n-g, L-a-m.
**Q.** Ms. Lam, am I correct that you're located in Costa Mesa, California, today?
**A.** Yes.
MR. LEUNG: Does counsel stipulate that the remote oath administered by the court reporter complies with the requirements of 30(b)(5)?
MR. BERGER: Yes.
MR. LEUNG: Herve?
MR. GOURAIGE: I do. Yes.
MR. LEUNG: Thank you.
BY MR. LEUNG:
**Q.** Ms. Lam, have you ever given a video deposition before?
**A.** No.



**Q.** Okay. This is new for a lot of us, including evidently you.
Just for the record, if we do have an audio or a video connection issue with you or with any of the counsel on this call -- we're doing this video depo through the Webex platform. To the extent you lose your audio or you lose your video, please go to the chat box in the Webex platform --
**A.** Okay.
**Q.** -- and just let everybody know via the chat that we're having a technical issue.
**A.** All right.
**Q.** Is that fair?
**A.** Yes.
**Q.** Okay.
MR. GOURAIGE: Gary, if I may ask, if one of us gets disconnected, will we still have access to the chat?
MR. LEUNG: It's my understanding that you would. When this happened last time, Herve, during Defendant Liu's deposition, you were still connected to the Webex platform. I mean, tell me if I'm wrong, but you still had it up on your screen, you just didn't have an image or sound.
MR. GOURAIGE: I didn't have anything on my

screen. What I had was, I mean, the notice up on -- like on the right-hand corner right now when I look at my screen, it says "Connected" with a green circle. What I had then was "Disconnected."
But anyway, I just want to be clear that if -- and the reason I'm raising it is because I'm actually in a hotel now and I -- we've had Wi-Fi issues.
MR. LEUNG: Okay. Do you see the chat box on your screen, Herve?
MR. GOURAIGE: I do.
MR. LEUNG: Okay. If you can't use that, can you give Tony a call at -- Tony, do you have the number handy?
MR. REGENSTREIF: Yes. My number is (323) 965 --
MR. GOURAIGE: 9 what?
MR. REGENSTREIF: 65-3985.
MR. GOURAIGE: Let me read it back to confirm I've got it correct. (323) 965-3985.
MR. REGENSTREIF: Yes. And also please send an email to both Gary and I. I will be monitoring my email if Gary is not. You should try both.
MR. GOURAIGE: Okay.
MR. REGENSTREIF: I know last time you only



sent it to Gary and he was doing the deposition.
MR. GOURAIGE: Okay.
(Reporter clarification.)
MR. GOURAIGE: Is this better?
THE REPORTER: A bit, yes.
MR. GOURAIGE: If you're having trouble hearing me, please let me know.
BY MR. LEUNG:
**Q.** Ms. Lam, outside of the video setting, have you ever sat for a deposition before?
**A.** Once. One time.
**Q.** Okay. And how long ago did you sit for deposition?
**A.** That was back in 1998.
**Q.** Okay. And did that deposition concern your professional work?
**A.** No.
**Q.** Okay. All right. Well, I think it's been some time since you've been deposed, so I'm going to walk you through the ground rules.
We have a court reporter on the line. She will be making a written transcription of everything that you say, everything that I say, everything that the other counsel on this call say today.
You've been sworn in, so your testimony



today, your answers in my response to my questions, are being given under oath. So that's the equivalent of courtroom testimony. Do you understand that?
**A.** Yes.
**Q.** And because the court reporter is making a written transcription of today's proceedings, it's very important for you and I to make her job as easy as possible by not speaking over each other. So if you could wait until I finish my question before answering, I will do the same for you and wait until you've completed your answer before beginning on to -- or moving on to my next question. Is that fair?
**A.** Yes.
**Q.** And for that same reason, because we need a written transcription of today's proceedings, nods, shrugs, "uh-huhs" and "huh-uhs," those aren't sufficient for the record. So a yes or no is preferable. Do you understand that?
**A.** Yes.
**Q.** To the extent I ask a question that you don't understand, it's very important for you to tell me that you don't understand the question. Otherwise, I'm going to assume that you do understand my question and that your answer is based on a complete understanding of that question. Is that fair?



**A.** Yes.
**Q.** This is not an endurance test. If you want to take a break, just let me know and we can take a break. The only qualification or caveat to that is if there's a question that's pending that you've not yet answered, I'm going to ask that you answer the question before we go on break. Is that okay by you?
**A.** Yes.
**Q.** Ms. Lam, can you think of anything that would prevent you from testifying truthfully today?
**A.** No.
**Q.** Can you think of anything that might impair today your ability to recollect past events?
**A.** No.
**Q.** Okay. We're going to be talking about a number of different corporate entities that I assume you're familiar with, but I did want to define them.
When I say "Pacific Proton," I mean Pacific Proton Therapy Regional Center, LLC.
**A.** All right.
**Q.** Is that understood?
**A.** Yes.
**Q.** When I say "Beverly Proton," I mean Beverly Proton Center, LLC, which was formerly known as Los Angeles County Proton Therapy, LLC. Is that

understood as well?
**A.** Yes.
**Q.** And finally, when I say "PP EB-5 Fund," I'm referring to the entity Pacific Proton EB-5 Fund, LLC. Do you understand that?
**A.** Yes.
**Q.** Okay. This is a yes or no question, Ms. Lam. Has Marcum been recently engaged by Defendant Liu to perform further work?
**A.** Yes.
**Q.** When did that engagement, that recent engagement, commence?
**A.** That was in -- I believe in February.
MR. BERGER: I would -- this is Steve. I would like to correct. Marcum was engaged by Mr. Liu's attorney pursuant to a co-evaluator, not by Mr. Liu directly.
MR. LEUNG: Understood.
BY MR. LEUNG:
**Q.** And the engagement began, you believe, in February.
This is another yes or no question, Ms. Lam. That work by Marcum, is that work being conducted for the purpose of assisting Defendant Liu's counsel in this case?

13

**A.** Yes.
(Reporter clarification.)
**Q.** And, Ms. Lam, yes or no question once again. Are you participating in that recent engagement which began in February of this year?
**A.** Yes.
**Q.** Okay. So I just want to be clear as to the areas of inquiry that I anticipate asking questions about today. I'm only asking you factual questions about the work that Marcum did in 2015 and 2016. Is that understood?
**A.** Yes.
**Q.** Let's talk about your education and work history, Ms. Lam. Did you graduate from college?
**A.** I did.
**Q.** What college degrees do you hold and from what university did you obtain them?
**A.** I had a bachelor degree at the -- from Cal State Northridge in California.
**Q.** And what was your area of study at Cal State Northridge in California?
**A.** Business administration with the specialty in accounting.
**Q.** Did you then engage in any graduate study?
**A.** No.

14

**Q.** What professional certifications do you hold?
**A.** I am a certified public accountant here in the state of California.
**Q.** When did you obtain your CPA license in the state of California?
**A.** 1999.
**Q.** Did you maintain your CPA license in the state of California current from 1999 until today?
**A.** Yes.
**Q.** Do you hold any other professional certifications?
**A.** No.
**Q.** Are you a certified fraud examiner?
**A.** No.
**Q.** Marcum performed professional services for Defendant Liu and his corporate entities in 2015 and 2016; is that correct?
**A.** No '16. We did not do anything for 2016.
**Q.** You did not perform any work with respect to transactions in 2016, but did you conduct work on Defendant Liu and his corporate entity's behalf in calendar year 2016?
**A.** Yes.
**Q.** Okay. Besides that professional work in 2015 and 2016 and the more recent engagement in 2021, are

15

you aware of any other engagements that Marcum has performed for Defendant Liu besides those three?
**A.** Yes.
**Q.** What other work has Marcum done for Liu?
**A.** We also is engaged to perform a compensation study for Mr. Liu.
**Q.** And is this part of the more recent engagement?
**A.** Yes.
**Q.** What is the general subject matter of the compensation study that Marcum has been engaged to perform for Mr. Liu?
MR. BERGER: Excuse me. Is that part of the comp engagement? I thought we were not talking about that.
MR. LEUNG: Just asking for the general subject matter.
MR. BERGER: I think that goes too far.
(Reporter clarification.)
BY MR. LEUNG:
**Q.** Besides the compensation study and the other more recent work beginning in February of 2021 and the work that occurred in 2015 and 2016, are you aware of any other professional services rendered by Marcum to Mr. Liu or his affiliated entities?

16

**A.** We also prepare the return for his other entities which owned by him and his wife.
**Q.** These are the tax returns?
**A.** Yes.
**Q.** And what is the other entity?
**A.** There were like, I believe, five of them. SC Management. I have to look back at the record, because there were like three -- four or five of those entity partnership return that we also prepare.
**Q.** Okay. So besides everything that you've described for us so far, any other engagement -- or any other professional services provided by Marcum to Mr. Liu or his affiliated entities?
**A.** I believe that that's it.
**Q.** Okay. My question is now focused on you and your professional experience. You are a CPA. Have you, besides this case, worked on any professional engagement involving the EB-5 program?
**A.** No.
**Q.** Have you worked on any professional engagement in the area of litigation consulting, again besides this case?
**A.** No.
**Q.** Have you ever testified as an expert witness?
**A.** No.



**Q.** Have you ever assisted on a consultative basis in the preparation of opinion testimony by an expert witness?
**A.** No.
**Q.** If you could pull up Exhibit 135 on your screen in Egnyte.
MR. LEUNG: And for the record, I'll just display it for the benefit of counsel.
I'm showing the witness a document, a three-page document, that will be marked Exhibit 135. First page of the document bears a case caption and is entitled "Subpoena to Testify at a Deposition in a Civil Action."
(Exhibit 135 was marked for identification.)
BY MR. LEUNG:
**Q.** Ms. Lam, have you seen Exhibit 135 before?
**A.** No.
**Q.** You understand, though, that you've been subpoenaed to testify in the SEC versus Liu civil enforcement action filed in the US District Court for the Central District of California?
**A.** Yes.
MR. BERGER: This is Steve Berger. I accepted service on her behalf.
///



BY MR. LEUNG:
**Q.** And you're appearing today pursuant to that subpoena, is that correct, Ms. Lam?
**A.** Yes.
**Q.** Okay. We can close 135.
If you can open up Exhibit 136, please.
MR. LEUNG: For the record, I published to the exhibit and to counsel via my screen share a five-page document that will be marked Exhibit 136.
(Exhibit 136 was marked for identification.)
BY MR. LEUNG:
**Q.** Take as much time as you need to flip through the document on Egnyte, Ms. Lam, but my first question is going to be: Do you recognize Exhibit 136?
**A.** Yes.
**Q.** And what is Exhibit 136?
**A.** It's my LinkedIn profile.
**Q.** Did you cause Exhibit 136 to be published on the Internet at the LinkedIn website?
**A.** Yes.
**Q.** And the employment and educational and professional certification information that's set forth in Exhibit 136 is true and accurate; is that correct?
**A.** Yes.



**Q.** This isn't evident in Exhibit 136, but do you recall listing the AICPA under the "Organizations" heading on your LinkedIn profile?
**A.** I don't think that I did, but we are required to be a member of the AICPA as an employment --
**Q.** What is the -- oh, I'm sorry. Go ahead.
**A.** Yeah. As an employment, you know, for Marcum, we are required to have that, to pay for the dues and be a member of AICPA.
**Q.** And you are a member of AICPA?
**A.** Yes.
**Q.** How long have you been a member of AICPA?
**A.** Ever since I start working with Marcum -- for Marcum.
**Q.** What is the AICPA?
**A.** It's the -- I'm sorry. I can't -- I don't remember the full designation for AICPA.
**Q.** That's fine. The AICPA, does that provide guidance to its membership on their professional standards as certified public accountants?
**A.** Yes.
**Q.** When did you first come to work for Defendant Liu or his affiliated companies?
**A.** I believe in 2015.
**Q.** What do you recall about the facts and

circumstances of Marcum's retention by Mr. Liu in 2015?
**A.** I was working with a partner, Stan Lam. He was the one that brought in the client.
**Q.** And who else was on the team that was working for Mr. Liu as Stan Lam's client?
**A.** There was another bookkeeper. Her name is Nancy McDaniel.
**Q.** Nancy McDaniel was the bookkeeper on the engagements. And what was your role on the engagement, Ms. Lam?
**A.** My role was the manager on the engagement.
**Q.** What does it mean to be a Marcum manager on a professional services engagement?
**A.** I reviewed the -- her work and communicate with the client requesting additional information if necessary.
**Q.** Who did you communicate with at the clients in connection with your 2015 and 2016 professional services work for Mr. Liu and his affiliated entities?
**A.** Mr. Liu.
**Q.** Anybody else?
**A.** That's it.
**Q.** Did you ever speak with a Michael Cogswell?
**A.** No.



**Q.** Did you ever speak with Xin Wang, X-i-n, last name W-a-n-g, also known as Lisa Wang?
**A.** No.
**Q.** Did you ever communicate as part of your 2015 and 2016 engagement with Dr. John Thropay?
**A.** No.
**Q.** Did you ever communicate as part of your 2015 and 2016 engagement with Ruth Novodor?
**A.** No.
**Q.** In connection with your 2015 and 2016 engagement, did you ever communicate with anybody at Mevion?
**A.** No.
**Q.** And during your 2015 and 2016 work on the Liu and affiliated entity engagement, did you ever communicate with anybody at a company called Optivus, O-p-t-i-v-u-s?
**A.** No.
**Q.** In order to perform the work that Marcum had been engaged to do in 2015 and 2016, would you agree that Marcum needed information about Mr. Liu's -- strike that.
In order to do the work that Marcum was engaged to do in 2015 and 2016, would you agree that Marcum needed certain information about Beverly



Proton, PP EB-5 Fund, and Pacific Proton?
**A.** Yes.
**Q.** And you received that information in the course of doing your work; correct?
**A.** Yes.
**Q.** What was that information? Could you describe what information you received and what it was and who communicated it to you?
**A.** Mr. Liu provided us with past year income tax return prepared by another CPA. He also provided us with bank statements for all of the entities and also check stubs.
**Q.** In terms of documents, any other information that Mr. Liu provided to Marcum in the course of its work in 2015 and 2016?
**A.** He also provided us with employment contract for him and Xin Wang.
**Q.** Any other documentary material that Mr. Liu provided to Marcum in the course of its work in 2015 and 2016?
**A.** Also he provided the business credit card statements.
**Q.** How many credit cards was that, if you recall?
**A.** There was one that -- on Beverly Proton



books.
**Q.** Any other credit cards besides the one that was in the name of Beverly Proton?
**A.** That was the only one that we have -- that we have the statements.
**Q.** Okay. Any other documentary materials provided by Mr. Liu to Marcum in connection with its work in 2015 and 2016?
**A.** He also provided payroll return for 2013, I believe.
**Q.** What's a payroll return?
**A.** It is wages paid to employees, and you've got to file that with the IRS and California EDD to report the wages compensation.
**Q.** Any other documentary material that was provided to Marcum in connection with its professional work for Mr. Liu in 2015 and 2016?
**A.** For the business entity, I believe that that's all that we received.
**Q.** Okay. You spoke to bank statements for the three entities. Were you referring to Pacific Proton, Beverly Proton, and PP EB-5 Fund?
**A.** Yes.
**Q.** Do you recall the time periods for those bank statements that Mr. Liu provided to Marcum in

connection with its 2015 and 2016 work?
**A.** At first, we only were engaged to perform bookkeepings and income tax services for 2014 and '15, and we used the beginning balance that was from the return prepared by the other CPA.
Then he came back and say those beginning balance was not correct, so he wanted to -- us to do the bookkeeping from inception to 2015. So we went back, and for some entity -- like, for example, the Regional Pacific Proton, we went back to 2010 and did the bookkeeping from there until 2015. He provided us with bank statement, and we entered the transaction based on the bank statement.
**Q.** Okay. The bookkeeping work from 2010 to 2015 for Pacific Proton, you went back and you got further bank statements. Any other materials that you considered when performing the bookkeeping work that you did for Pacific Proton from 2010 to 2015, anything besides the bank statements?
**A.** Yes. Bank statement.
**Q.** Is that it?
**A.** For Regional Center, for Pacific Proton, there was no credit card, so we did not request that from him. Just bank statements.
**Q.** Okay. Beverly Proton, the project company,



did the bookkeeping work that Marcum was doing, did that extend earlier than 2014 as well?
**A.** Yes, we did.
**Q.** How far back did you -- did the firm go?
**A.** I believe it -- the entity started in 2012, so we went back to 2012.
**Q.** And what materials did Marcum consider when performing the bookkeeping services for Beverly Proton from 2012 up to 2015?
**A.** Bank statements, and we also request check stub from him. And when that is not available, we record the transaction based on the bank statement and we ask him for the description, who was the check paid to and what was it for.
**Q.** When you say "him," you're referring to Mr. Liu?
**A.** Yes.
**Q.** So would it be fair to say that to the extent the bank records and the check stubs for Beverly Proton, for Pacific Proton, the Regional Center, and PP EB-5 Fund did not disclose enough information for you to properly classify a given transaction, you asked Mr. Liu about it and he provided you with information?
**A.** Yes.



**Q.** Apart from what was communicated to you about the reason for a given transaction by Mr. Liu, was Marcum able to obtain any other information verifying Mr. Liu's accounts of what the transaction had been for?
**A.** No. We just based on his representation and bank statement that he provided us.
**Q.** Okay. Just to close the loop, PP EB-5 Fund -- did Marcum perform bookkeeping services for PP EB-5 Fund going back to periods earlier than 2013?
**A.** Yes.
**Q.** How far back did Marcum go?
**A.** I have to check, but I believe that we went back to the beginning.
**Q.** And what year do you recall the beginning being?
**A.** 2012 or '13. I -- I don't remember.
**Q.** And what materials did Marcum consider when performing bookkeeping services for the PP EB-5 Fund going back to potentially 2012?
**A.** He provided us with bank statement and list of investor.
**Q.** Anything else?
**A.** That's it.
**Q.** And to the extent the information contained



in the bank statements or the investor list was not sufficient for Marcum to make an account classification, what did you do with respect to the PP EB-5 bookkeeping work?
**A.** We asked him for clarification.
**Q.** And "him" is Mr. Liu?
**A.** Yes.
**Q.** And on the basis of information communicated to you by Mr. Liu, you then made account classifications for the PP EB-5 Fund; correct?
**A.** Yes.
**Q.** Did Marcum undertake any further verification work to corroborate what Mr. Liu was telling the firm about a given transaction by the PP EB-5 Fund?
**A.** No. That is -- that was not part of our engagement.
**Q.** You explained for me earlier that when Marcum was first engaged, it was engaged to perform bookkeeping and tax services for 2014 and 2015 and that the engagement subsequently changed. You also testified that the dates that the bookkeeping work was performed on went further back than 2014. Did anything else change about the engagement in 2015 and 2016?
**A.** Not that I know of.

Q. Okay. So bookkeeping services, just for a longer time period. Is that fair?
A. Yes. Yes.
Q. Returning to Ms. McDaniel, Nancy McDaniel, who was the bookkeeper on the engagement, what were her roles and responsibilities with respect to the work that Marcum was doing for Liu and Beverly Proton, PP EB-5 Fund, and Pacific Proton Regional Center back in 2015 and 2016?
A. She would input the checks, then reconcile the bank account. She would -- any issue, any transaction that she does not know what the code, she would email me. Then I would clarify that with Mr. Liu and code it accordingly.
Q. How frequently would you communicate with Mr. Liu?
A. My emails. Whenever I -- we have -- we complete a month or a year of account keeping, then we have a list of open item. Then I would email him, then he would reply.
Q. What is a suspense account?
A. It's an account where we put transaction in there that we don't know where to classify it yet until we communicate with him and he instruct us. Then we would move it to a correct general ledger

29

account.
Q. Are you familiar with the term "audit engagement"?
A. I don't do audit.
Q. Are you familiar with the term, though?
A. I got my minimum hours to get certified to become a CPA, and that was 500 hours back in 1999. So -- but my job is accounting and income tax services.
Q. What is a review engagement?
A. Review engagement is a step lower than audit engagement.
Q. Do you do review engagements in the course of your work?
A. No.
Q. What is a compilation engagement?
A. Compilation is to put together financial statement based on the client information.
Q. Is a compilation engagement an assurance engagement or a nonassurance engagement? Assurance.
A. It's -- you don't have to be independent, you know, to perform a compilation. It still, at the end of the day, is the client representation.
Q. And, Ms. Lam, do you do compilation engagements at Marcum?

30

A. No.
Q. What is a financial statement preparation engagement?
A. That would fall under compilation, review, or an audit.
Q. And do you do financial statement preparation engagements in the course of your work at Marcum as of 2016?
A. Yes. But --
Q. And --
A. -- in the -- the financial preparation is not -- is not a compilation or review or an audit. I don't do any of that.
Q. Okay. So it's -- well, let me ask this: Is a financial statement preparation engagement an assurance service?
A. Yes.
Q. Is it an attest engagement?
A. With a review and the audit, yes.
Q. What if it's not part of a review or an audit?
A. Then it will be a compilation.
Q. And is a compilation engagement an attest service?
A. Yes, but the -- it's less stricter. It's you

31

don't have to be independent, you know, from the client.
MR. BERGER: Gary, can I interrupt for one second? Can I provide a legal point in there?
MR. LEUNG: Sure.
MR. BERGER: Depending on state law, some states classify compilation as assurance and some do not.
I think that Ms. Lam is -- there's a difference between -- maybe we can rephrase the question. Financial statement preparation is preparing a financial statement as if you were an internal accountant. It is not providing any assurance of accuracy. It's just taking the numbers that the client provides and putting a financial statement together.
But I would let Ms. Lam clarify if I've got that wrong.
THE WITNESS: Yes. So what we did for Mr. Liu was to input the transaction in QuickBooks. QuickBooks has a predefined chart of account. The balance sheet and profit and loss has already been set up. We input the transaction, we reconcile the bank account, we push a button, then we have the balance sheets and the profit and loss that you had copies of.

32

BY MR. LEUNG:
**Q.** Ms. Lam, did you hear your counsel's description of a financial statement preparation engagement?
**A.** Yes.
**Q.** Do you agree with that characterization of the scope of that sort of engagement, financial statement preparation?
**A.** For Mr. Liu, the engagement for -- with him was bookkeeping and income tax service. So the report that we generate from QuickBooks was to help us prepare tax return. It was only for management use, not third party.
**Q.** Let's -- go ahead.
**A.** Yes, management use only.
**Q.** No third parties?
**A.** No third party.
**Q.** And the work that was -- the bookkeeping work that was done in 2015 and 2016 was not pursuant to a financial statement preparation engagement?
**A.** No.
**Q.** Just to be clear, no, it was not; right?
**A.** No, it was not.
**Q.** Thank you.
Okay. And so as part of the work in 2015 and



2016, you and your team at Marcum did not verify the accuracy or completeness of the information that had been provided by Mr. Liu?
**A.** No, we did not.
**Q.** As part of the work prepared -- Marcum engaged in -- strike that.
As part of the work Marcum did for Mr. Liu and Beverly Proton and PP EB-5 Fund and Pacific Proton in 2015 and 2016, you and your team at Marcum did not gather evidence to express an opinion on the materials generated by QuickBooks pursuant to your bookkeeping work; is that correct?
**A.** No, we did not.
**Q.** As part of your engagement in 2015 and 2016 for Mr. Liu and Pacific Proton, Beverly Proton, and PP EB-5 Fund, you and your team at Marcum did not issue a report on the materials generated by the QuickBooks reports prepared pursuant to your bookkeeping work, did you?
**A.** No, we did not.
**Q.** If you could open up Exhibit 130.
MR. LEUNG: And for the record, Exhibit 130 is a 15-page document. It was previously marked at another deposition. It appears to be an email string between Stan Lam and Charles Liu that begins on



April 29, 2015, leading into May 23, 2015, and there is an attachment to this email string. That attachment appears to be a letter dated April 28, 2015, under Marcum's letterhead.
BY MR. LEUNG:
**Q.** Take your time to flip through the attachment to the email in Exhibit 130, Ms. Lam, but when you're ready, my first question is going to be: Do you recognize that attachment?
**A.** Yes.
**Q.** What is the attachment to the email string in Exhibit 130?
**A.** Is the Marcum engagement letter.
**Q.** And the scope of Marcum's engagement is accurately reflected by this engagement letter?
**A.** Yes.
**Q.** What is the purpose of an engagement letter in your field?
**A.** It's a contract. It's an agreed-upon procedure that -- between us and the client.
**Q.** And then looking at the very first page of the attachment Bates-numbered Marcum_CLiu_7275, it's a letter addressed to Charles Liu, second paragraph begins, "The purpose of this letter, including Attachments A and B (collectively, the 'Agreement'),



is to document the understanding between Marcum LLP ('Marcum,' the 'firm,' 'we,' 'us' or 'our') and Beverly Proton Center, Inc. and related entities (see Attachment B) ('client,' 'company,' 'you' or 'your') related to the tax compliance services ('tax services') and accounting services ('accounting services'), collectively 'services' for the company for the years 2013, 2014 and 2015."
I just read that for you. Is that consistent with your understanding, this engagement letter set forth the scope of the work that Marcum was to perform?
**A.** Yes.
**Q.** Okay. If you can open up Exhibit 131.
MR. LEUNG: For the record, I've displayed to the witness and counsel a document that's been previously marked Exhibit 131. It's a 16-page document. The very first page of the document bears Marcum's letterhead. It's dated May 11, 2016, and the letter is addressed to Charles Liu.
BY MR. LEUNG:
**Q.** Ms. Lam, once again, take as much time as you need to flip through the document. My first question is going to be: Do you recognize Exhibit 131?
**A.** Yes.

**Q.** What is Exhibit 131?
**A.** It's Marcum engagement letter.
**Q.** Why was a second engagement letter executed on or about May 2016?
**A.** You know, for different years. So the other one was, I believe, for '13 and '14, and --
**Q.** This one was for '15?
**A.** Yeah.
**Q.** Okay. So you have the ability to pull up Exhibit 130 and also Exhibit 131. Again, take your time.
Each of these engagement letters has a section entitled "Accounting Services."
**A.** Yes.
**Q.** I would just like you to confirm for me that besides the difference in Exhibit 130, which refers to monthly accounting services, and Exhibit 131, which refers to quarterly accounting services, the language describing the scope of the accounting services to be provided by Marcum is identical in the 2016 engagement letter and the 2015 engagement letter, Exhibits 131 and 130, respectively.
**A.** Yes, they are identical.
**Q.** Okay. Let's stick with Exhibit 131.
So page 3, accounting services -- are you



with me?
**A.** Yes.
**Q.** That sentence or that section begins with, "We will perform accounting -- quarterly accounting services that include," and then there is a series of bullet points. Those bullet points, do they accurately reflect the accounting services that were rendered by Marcum in 2015 and 2016?
**A.** Yes.
**Q.** Okay. The very first bullet point reads, "Post coded transactions to the company's general ledger."
(Reporter clarification.)
**Q.** The very first bullet point reads, "Post coded transactions to the company's general ledger. You must code all check stubs/checks as to the proper account number for recording in the general ledger."
Who is the "you" that's being referred to in Marcum's engagement letter?
**A.** The client.
**Q.** And in this engagement, the client was Mr. Liu?
**A.** Yes.
**Q.** And did Mr. Liu, in connection with Marcum's work in 2015 and 2016, code check stubs and checks as



to the proper account number for recording in the general ledgers of Pacific Proton, Beverly Proton, and PP EB-5 Fund?
**A.** Yes. On the check stub that he provided, he would note what was that check for. Then we would code it to the correct general account.
**Q.** And without that information from Mr. Liu, you and your team at Marcum were not in a position to code those checks --
**A.** Correct.
**Q.** -- to the proper account?
**A.** Yes.
**Q.** Okay. The second bullet point reads, "Proposing adjusting or correcting journal entries to be reviewed and approved by the company."
What's an adjusting or correcting journal entry?
**A.** For example, if we record depreciation or we classify transaction from one account to the other.
**Q.** And to the extent there were adjusting or correcting journal entries in the QuickBooks reports prepared by Marcum for the three entities in 2015 and 2016, those adjustments and corrections needed to be approved by Mr. Liu?
**A.** Yes. We usually communicated with him, and



then we record it.
**Q.** And the bullet point goes on to read, "If while reviewing the journal entries you determine that a journal entry is inappropriate or incorrect, it will be your responsibility to contact us to correct it."
The "you" being referred to in that bullet point is Mr. Liu, the client?
**A.** Yes.
**Q.** Let's move down to the last bullet point. It reads, "Performing the bookkeeping function of the company by recording all cash receipts and cash disbursements in QuickBooks (or similar checkbook computer program). Each quarter you will be responsible for reviewing the general ledger report and tell us of any changes necessary in the classification or distributions of expense."
Who is the "you" that that bullet point refers to?
**A.** The client, Mr. Liu.
**Q.** Okay. Moving on, the next section leads with the sentence, "In this engagement, we have no responsibility to."
That's a reference to Marcum not having responsibility --
**A.** Yes.

**Q.** -- is that right?
**A.** Yes.
**Q.** And there is a series of bullet points.
Those bullet points, do those accurately list tasks that Marcum had no responsibility for undertaking pursuant to its engagement in the work it performed in 2015 and 2016?
**A.** Yes.
**Q.** And did Mr. Liu, the client, have responsibility for doing each of the bullet points listed under the "In this engagement, we," Marcum, "have no responsibility" section?
**A.** That's his responsibility.
**Q.** Okay. Moving on, the next paragraph says, "We are not being engaged to prepare financial statements or perform compilation, review or audit services."
Is that an accurate statement?
**A.** Yes.
**Q.** And Marcum did not, in fact, in 2015 and 2016 prepare financial statements or perform compilation, review, or audit services, did it?
**A.** We did not.
**Q.** It goes on to say, "Accordingly, our work in this engagement is not intended to result in the



preparation or issuance of a financial statement. Should you require a financial statement we would be pleased to discuss with you the requested level of service."
Before this past year, did there come a time when Mr. Liu engaged in discussions with Marcum about increasing the scope of its work to include preparation of financial statements?
**A.** I was not aware.
**Q.** Okay. The next paragraph, we've already discussed adjusting or correcting journal entries. I want to start with the sentence, "You are responsible for reviewing the entries and understanding the nature of any proposed entries and the impact they have on your books and records. You are responsible for adjusting the books and records to correct material misstatements."
The "you" is a reference to Mr. Liu, your client; correct?
**A.** Yes.
**Q.** Next paragraph, "The above accounting services will be performed based on data and information you provide to us. We will not verify or audit this information. None of these services can be relied on to detect errors, fraud or illegal acts that



may exist."
Is that statement accurate?
**A.** Yes.
**Q.** Did the work that Marcum performed for Mr. Liu, Beverly Proton, PP EB-5 Fund, and Pacific Proton in 2015 and 2016 comport with that statement?
**A.** Yes. We did accounting services for him.
**Q.** And those accounting services that you did for Mr. Liu were not to be relied on to detect errors, fraud, or illegal acts; correct?
**A.** Yes.
**Q.** Marcum did not verify or audit any information provided to it by Mr. Liu in connection with the 2015 and 2016 work; correct?
**A.** We did not.
**Q.** I'm not sure if I've covered this. Moving back to page 4 of the engagement letter, second-from-last paragraph at the bottom, there is a sentence that begins, "Additionally." It says, "Additionally, we are prohibited by professional standards from preparing source documents and authorizing or approving transactions. Accordingly, management must determine and approve all transactions including appropriate account classifications."
Is that an accurate statement?



**A.** Yes.
**Q.** And did the work that Marcum performed for Mr. Liu, Beverly Proton, PP EB-5 Fund, and Pacific Proton in 2015 and 2016 comport with that statement?
**A.** Yes.
**Q.** I'm going to skip to Exhibit 142. If you can open up 142, please.
MR. LEUNG: For the record, Exhibit 142 is a three-page document. It will be marked Exhibit 142.
(Exhibit 142 was marked for identification.)
BY MR. LEUNG:
**Q.** It appears to be an email string between you, Stan Lam, Milena Dolukhanyan, D-o-l-u-k-h-a-n-y-a-n, and others. The email string runs from April 19, 2016, to April 20, 2016.
Ms. Lam, do you recognize Exhibit 142?
**A.** Yes.
**Q.** And is 142 a true and accurate copy of the email communications you had regarding the work that Marcum had been engaged in on behalf of Pacific Proton, Beverly Proton, and PP EB-5 Fund back in 2016?
**A.** Yes.
**Q.** Okay. And in Exhibit 142, are you transmitting certain QuickBooks reports to Milena Dolukhanyan?

**A.** Yes.
**Q.** And do you see in her reply email to you on Tuesday, April 19, at 5:44 p.m. -- I'm just going to call her Milena -- Milena writes, "Ms. Lam, Thank you for your email. This is to confirm that we have received balance sheets, profit and loss and general ledgers for Pacific Proton EB-5, LLC, Beverly Proton Center, LLC, and Pacific Medical Regional Center, LLC, for 2014 and 2015. Are there income statements and statements of retained earnings and cash flows for any of these entities for 2014 and 2015? If so, please provide them to us."
And then you write her back on April 20, and you write, "Milena, Profit and loss is the same as income statement. There was no statements of retained earnings and statement of cash flows for these entities. Please keep in mind that we were engaged only to do bookkeeping and tax preparation. These QuickBooks reports were generated from the bookkeeping services and they were intended for management use only."
Those last few sentences, those are accurate statements; correct?
**A.** Yes.
**Q.** And what you told Milena in April 2016 is



consistent with what you've testified to today, that the work Marcum did in 2015 and 2016 was bookkeeping work and not financial statement preparation; is that true?
**A.** Yes.
**Q.** And with respect to the output, you describe those as QuickBooks reports that were generated from the bookkeeping services. What did you mean by that?
**A.** That's when we go to "Report" in QuickBooks and print the balance sheet and the profit and loss on the software.
**Q.** And in the course of pressing the button and having the QuickBooks software generate from the general ledger a report on P&L, did you add any financial notes to the report?
**A.** I believe that when we did the 2014, the beginning balance that we carried forward were from the previous CPA tax return that they prepared. So I put some notes in there that we don't have -- those number came from the tax return prepared with other CPAs.
**Q.** Okay. And do you recall if those QuickBooks reports that you transmitted in April of 2016 had a no assurance -- or sorry -- a "Management Use Only" watermark?



**A.** I believe so. There was some PDF that I sent that I added that "Management Use Only" or "No assurance is provided" in some --
**Q.** What does the "Management Use" -- I'm sorry. What does the "Management Use Only" mean?
**A.** It is for the client use only, not to be distributed to third party.
**Q.** If you could open up Exhibit 138.
MR. LEUNG: For the record, Exhibit 138 is a voluminous 407-page document. The first page of the document is a transmitting email, appears to be from Ms. Lam to Ed Gartenberg and Milena and others. It's dated April 19, 2016. It indicates that a number of PDF attachments are enclosed. And for the record, it bears the Bates number Marcum_CLiu_00002494 through 2767.
(Exhibit 138 was marked for identification.)
BY MR. LEUNG:
**Q.** This is a big document, but, Ms. Lam, if you could just flip through it and tell me if this Exhibit 138 appears to be a true and accurate copy of the QuickBooks reports and the transmitting email that you sent to Ed Gartenberg on or about April 19, 2016.
**A.** Yes.
THE REPORTER: Excuse me, Counsel. Is this a



new one?
MR. LEUNG: Yes, Exhibit 138 is a new one.
BY MR. LEUNG:
**Q.** Okay. If you could open up 139, Ms. Lam.
**A.** Okay.
MR. LEUNG: For the record, Exhibit 139 is another voluminous document. It's 418 pages. It bears the Bates number Marcum_CLiu_00002901 to 2 -- that's not right. The PDF is actually jumbled up.
(Exhibit 139 was marked for identification.)
BY MR. LEUNG:
**Q.** Do you recall whether you suspended work after sending these QuickBooks reports to Mr. Liu's representatives in April of 2016, Ms. Lam?
**A.** Yes. I believe after it stopped, we completed the 2015 tax return and that was it.
**Q.** And did work recommence at some point?
**A.** Not until this year.
**Q.** Not until this year. Okay.
If you could open up Exhibit 140, please.
(Reporter clarification.)
MR. LEUNG: If you could open up Exhibit 140.
Exhibit 140 is a 167-page document. It will be marked Exhibit 140. For the record, it bears the Bates number Marcum_CLiu_12460 through 12626.

(Exhibit 140 was marked for identification.)
BY MR. LEUNG:
**Q.** You're copied on this email. It's sent by Stan Lam to Don Wise, Mike Cogswell, and Charles Liu. It encloses a number of QuickBooks reports, again in PDF form. It's dated June 14th, though. Do you recall the circumstances surrounding this email transmission of the QuickBooks reports prepared by Marcum?
**A.** I don't.
**Q.** If you could take a moment to just flip through the exhibit.
My question is going to be: Does this appear, Exhibit 140, to be a true and accurate copy of an email sent by your partner, Stan Lam, to Charles Liu and others on or about June 14, 2016, which encloses the QuickBooks reports generated by the general ledgers prepared by Marcum in 2015 and 2016 as part of its bookkeeping service to the corporate defendants in this case?
**A.** Yes.
**Q.** Okay. In Mr. Lam's transmitting email, he's got a list of documents he's attached. I'd like to direct your attention to number 4, "Summary of compensation for Charles Liu and related employment



agreements." Do you recall what that is?
**A.** Yes.
**Q.** What is that in reference to, "Summary of compensation for Charles Liu and related employment agreements"?
**A.** The agreement between Charles and the three entity on his compensation.
**Q.** If you could turn to page 129 of 167. It's the page of Exhibit 140 that bears the Bates number Marcum_CLiu_00012588. Do you recognize this spreadsheet?
**A.** Yes.
**Q.** What is this spreadsheet?
**A.** This is a summary of the agreement that he had with the entity.
**Q.** And does it set forth compensation and commissions transferred to Liu and Wang by the three corporate entities that are reflected in the general ledgers prepared by Marcum?
**A.** Yes.
**Q.** Okay. And the classification of these amounts as compensation and commissions was based on information from Mr. Liu and not the employment agreements; correct?
**A.** Yes.



**Q.** Any other information that those account classifications for these transactions -- strike that.
These account classifications for the transactions reflected on page 129 of 167, besides the employment agreements, any other information on which those classifications are based?
**A.** Just based on the employment agreement.
**Q.** And with respect to the Beverly Proton compensation and the Beverly Proton commission amounts, that's based on Liu's employment agreement with Beverly Proton; correct?
**A.** Yes.
**Q.** And nothing else?
**A.** Nothing else.
**Q.** Okay. I'll be marking a new exhibit, Exhibit 141. If you could open that one up, please.
(Exhibit 141 was marked for identification with subparts 141A through 141J.)
MR. LEUNG: This is yet another voluminous document. It's a 1,074-page document. It bears the Bates number Marcum_CLiu_7297 to 8311.
BY MR. LEUNG:
**Q.** The very first page of Exhibit 141 is a transmitting email sent by you to a Don Wise on August 3, 2016. It looks like you're enclosing Excel



versions of the same QuickBooks reports. Do you see that?
**A.** Yes.
**Q.** Ms. Lam, does Exhibit 141 appear to you to be a true and accurate copy of an email and related attachments that you transmitted on or about August 3, 2016, to a Don Wise?
**A.** Yes.
**Q.** So you're writing in response to Mr. Wise. Mr. Wise, in an August 3rd email, was saying, "Hi Trang, Need a favor. I know you did this previously, but I need to have you send me the financials for the three years noted above of the three entities, but this time in Excel." And then it looks like in your response, you're doing for him what he asked you to do.
My question is -- well, first off, is that a fair characterization of what occurred in connection with this email traffic?
**A.** Yes.
**Q.** The -- Ms. Lam, the Excel spreadsheets that you sent Mr. Wise in August 2016, are those the same QuickBooks reports that were transmitted back in June?
**A.** I believe so.
**Q.** Okay.

**A.** There might be some adjustment. Like I said, we did the past year accounting. I remember collecting during that time. So the previous report probably had notes in there that the beginning balance came from tax return prepared by other CPA. These report here probably was done after the bookkeeping that we did for those past year.
**Q.** Okay. So the Excel spreadsheets attached to your email in Exhibit 141 would reflect all the bookkeeping services performed by Marcum for the entire 2012 --
**A.** Yes.
**Q.** -- to 2015 period?
**A.** Right.
**Q.** But once again, these QuickBooks reports that were generated and transmitted in August of 2016, they were not created in connection with the financial statement preparation engagement; correct?
**A.** No, they were not.
**Q.** All right. I want to open up one of the attachments to your email. That is Exhibit 141C. So from Egnyte, you should be able to download the file. I'll also share it on my screen. And once downloaded, you should be able to see it in Excel, as opposed to the web browser. Let me know if you're having some



difficulty with that.
**A.** I've got it.
**Q.** You're faster than me. I'm still trying to pull it up.
Okay. I'm displaying for the witness my screen, which is my Microsoft Excel application having opened up Exhibit 141C.
I'll do the general ledger first. If you can go to the general ledger tab, Ms. Lam.
**A.** Okay.
**Q.** Now, each row is a transaction that was entered into the general ledger that needed to be classified; correct?
**A.** Yes.
**Q.** All right. And those classifications are reflected in column R entitled "Split"; is that correct?
**A.** Yes. Those are the accounts.
**Q.** Okay. And if a transaction is a debit, that was reflected in column T. If it was a credit to the Beverly Proton account, that was a column -- that would be reflected in column B; correct?
**A.** Yes.
**Q.** Okay. With respect to the 1666 account entitled "Management Fees," what types of transactions



did that 1666 account correspond to?
**A.** That is the management fees to Mr. Liu and Xin Wang, depend on the entity.
**Q.** Were there any other transactions coded as management fees that did not go to either Mr. Liu or Xin Wang?
**A.** There was also a management fee that the Beverly Proton paid to the Regional Center that should be -- that's also coded to that account.
**Q.** Any other management -- types of management fee transactions apart from transfers to Liu, transfers to Wang, and transfers from Beverly Proton to the Regional Center account?
**A.** No.
**Q.** Okay. And with respect to the transactions that were coded as 1666 management fee to Mr. Liu, what was the basis for that classification?
**A.** It's personal expense or anything that was paid from the bank account, the entity bank account, those were recorded as management fees to him.
**Q.** Okay. And what information did you receive which provided justification for that classification?
**A.** The employment contract that he provided.
**Q.** Okay. That's the Beverly Proton employment contract; correct?



**A.** Yes.
**Q.** Any other information provided by Mr. Liu that provided justification for that management fee classification with respect to all personal expenses or any other funds transfers to Mr. Liu by the Beverly Proton account?
**A.** Just the employment contract.
**Q.** Okay. You see the account 3110 distribution?
**A.** Yes.
**Q.** What was that account for?
**A.** That account is like a holding account where we would code all of the expenses that the company paid on his behalf, and then later on we reclassify the total to the account 1666 as management fees to him.
**Q.** What information did you receive from Mr. Liu that -- strike that.
You spoke to a number of transfers to Mr. Liu being personal expenses or -- personal expenses or expenses of Beverly Proton, Ms. Lam?
**A.** Any of the Beverly Proton expenses would go to profit and loss related to the -- we would code it to the business expense.
Anything that's personal in nature, we would code it to distribution at first and then reclassify

to management fee.
**Q.** So personal expenses of Mr. Liu were coded as distributions and then reclassified as management fees?
**A.** Yes.
**Q.** In every instance?
**A.** Every instance, yes.
**Q.** And what was the rationale for those classifications?
Actually, first off, were those classifications approved by Mr. Liu?
**A.** Yes.
**Q.** They weren't approved by Marcum; right?
**A.** No.
**Q.** And what was the justification for that treatment of those personal expenses?
**A.** Because they are personal in nature. Cannot -- we cannot treat it as business expense.
**Q.** And then why were they reclassified as management fees?
**A.** Because based on the agreement that he had with the company, he is entitled to a certain amount of compensation. And we reclassify those as management fees to him.
**Q.** And that agreement you're referring to is



Mr. Liu's employment agreement with Beverly Proton; correct?
**A.** Yes.
**Q.** And there isn't anything else that justifies that classification besides the employment agreement with Beverly Proton and Liu?
**A.** Yes, just the employment agreement.
**Q.** Account number 1668 marketing fees, what transactions were classified as marketing fees?
**A.** The marketing fees, I believe those are the payments to Industrial Banking. Let me look at the general ledger.
(Reporter clarification.)
MR. LEUNG: I can't hear you, Herve, what you said.
MR. GOURAIGE: I didn't hear the page number, Gary.
MR. LEUNG: The page number of the -- we're using the native Excel spreadsheet. This is Exhibit 141C.
MR. GOURAIGE: Right.
MR. LEUNG: The Bates number for 141C is -- if you print it out, it's Marcum_CLiu_7409 to 7484.
BY MR. LEUNG:
**Q.** So I've isolated the only transactions,



Ms. Lam, classified as marketing fees under account number 1668. Does that refresh your recollection as to what kinds of transactions were classified to that account?
**A.** I'm trying to expand the general ledger because it's -- so I can see the detail.
**Q.** Are you able to do that on your screen, or are you asking me to do it?
**A.** Yeah. I can't do it on my screen. Can you just point to --
**Q.** Sure. Is there a particular place you'd like me to go to?
**A.** Yeah. The marketing fees that you were referring to.
**Q.** Sure.
**A.** Yeah. So those are payment to Industrial Commercial Bank.
**Q.** Okay. And so what was the basis of that classification?
**A.** We were told by Mr. Liu that the payment to that company was for marketing fees.
**Q.** Okay. Any other information you received from Mr. Liu apart from his oral admonition that these should be marketing fees?
**A.** No. That's all.



**Q.** No documents, no invoices, no bills of sale, nothing in that vein; correct?
**A.** No. We don't have any of those documents.
**Q.** Okay. All right. Account number 1600 medical equipment.
**A.** Yes.
**Q.** Okay. I'm going to show you the general ledger entries associated with that, the couple transactions in 2015. What kinds of transactions were classified as 1600 medical equipment?
**A.** This one here is a payment, electronic fund transfer, that came out of his -- the Beverly Proton bank account for $3 million, and it was to a company called -- I believe it's Mevion or Optivus, one of those.
And Nancy McDaniel, our bookkeeper, she Googled the company and it was a medical company. And we confirmed with Mr. Liu that was it for medical equipment and he was told -- we were told that it was a deposit for equipment.
**Q.** Was Marcum able to review the sales contract for that transaction?
**A.** We don't have any of that.
**Q.** So no documentary information about the transaction itself. An Internet search that confirmed

that Mevion was a company and then information from Mr. Liu formed the basis for this classification; correct?
**A.** Yes.
**Q.** Account number 6165, what kinds of classifications are coded to that account?
**A.** Attorney fees, consulting fees, accounting fees would go to that account.
**Q.** And on what information were these account classifications based?
**A.** We would record these transaction from the check stub that he provided, and on it there was name of these attorney fees and we coded to legal and professional.
**Q.** Okay. So my question is directed to all the years in which you prepared the general ledger for Pacific Proton, Beverly Proton, and PP EB-5 Fund.
For legal and professional fees, am I correct that the documentary information you saw were check stubs, but you did not receive any information in the way of invoices, itemized work statements, engagement letters, anything of that sort that would indicate what services were actually being rendered?
**A.** No. We did not have any of those documents.
**Q.** Okay. And the check stubs that you based the



general ledger on which identified a service provider that Mr. Liu then explained was a law firm or other professional service provider, did those check stubs spell out whether the expenses related to the EB-5 offering or the Pacific Proton Cancer Center project? Offering versus project.
**A.** No.
**Q.** Did the check stubs give you any information on that question?
**A.** No, because they were -- the check stubs were, you know, from the entity. And so for Beverly Proton, then we would just code it to legal and professional. We would have no idea -- we did not know it is related to the offering or to anything else. We don't know.
**Q.** Account number 1750 L/R Pacific Proton Regional. I think L/R means loan repayment; is that correct?
**A.** Loan receivable.
**Q.** Loan receivable.
For each of these account classifications, did Mr. Liu provide Marcum with copies of an actual loan agreement between Beverly Proton and Pacific Proton Regional Center?
**A.** No. I did not see any loan agreement.



**Q.** Account number 1664 agent's fees, what did that account classification pertain to?
**A.** These payment were paid to oversea Chinese immigration consulting.
**Q.** What does agent's fees mean?
**A.** We were told that those were agent fees and -- from Mr. Liu, he said that each investor, EB-5 investor, that they were able to recruit, 75,000 has to be paid to oversea Chinese banking as the agent fees.
**Q.** And did Mr. Liu orally communicate that information?
**A.** I have an email -- we have email communication from him telling us that -- how it need to be booked.
**Q.** Okay. Mr. Liu telling you how it needed to be booked?
**A.** Yes.
**Q.** Did Mr. Liu provide you with an agreement between overseas Chinese banking and any of the subject entities?
**A.** No.
**Q.** Account number 6055 consulting. What transactions did the consulting 6055 account pertain to?



**A.** So like I said, these payment were paid to oversea Chinese banking corporation. Originally we coded to consulting. Then we reclassified and put it on the balance sheet.
**Q.** As agent's fees?
**A.** Yes.
**Q.** Why did Marcum originally classify these amounts as consulting?
**A.** We just -- you know, based on the description on the wire transfer that it went out from the bank statement -- from his bank statement and send it to oversea consulting. And we just -- because the consulting was part of the -- a part of the name of the recipient, then we just code it to consulting. And then confirm it with him where is the proper classification it should be, and we move it to agent fees on the balance sheet.
**Q.** Okay. Account number 2510 L/P Pacific Proton EB-5 Fund. I assume L/P means loan payable?
**A.** Yes.
**Q.** Why were these debit transactions classified in this way?
**A.** Let me see. Because the money came in from -- from the EB-5 program to Beverly Proton. So it's a payable on Beverly Proton book, but it's a

receivable on the EB-5 book.
**Q.** Do you know why the EB-5 investor funds came in to Beverly Proton's account as opposed to the PP EB-5 Fund account?
**A.** I believe all of the fund from the investor came in to the EB-5 program or account, EB-5 account. And then from there, the EB-5 would loan Beverly Proton money to pay for marketing fee, agent fees, all of that.
**Q.** Yeah, maybe I'm misunderstanding this.
These debit amounts, this is money that Beverly Proton is transferring to the PP EB-5 Fund; right?
**A.** No. You're looking at the Beverly Proton general ledger; right?
**Q.** Yes.
**A.** So when the money come in, it will be a debit to cash, then a credit to the loan payable Pacific EB-5 Fund.
**Q.** I see. Okay. All right. One last one, travel expense account number 6500. On what information did Marcum base its classification of transactions to the 6500 travel expense account?
**A.** We review the credit card statement that he provided, the client provided. And, for example, it



say "Air China," then we code it to travel expense.
**Q.** To the extent that travel was personal, would it have been coded to travel expense on the Beverly Proton general ledger?
**A.** We don't know if it's business or -- because the credit card was a business credit card, we assume that all of that transaction was business related, so we code it to travel expense.
THE REPORTER: Counsel, can we take a break when you get to a good place, please?
MR. LEUNG: Yeah. Now is a good stopping point. How about ten minutes?
THE REPORTER: Thank you.
MR. LEUNG: Sure thing. Going off record at 11:42 Pacific time. Let's get back on at 11:52.
THE VIDEOGRAPHER: Going off the record at 11:42 a.m.
(Recess, 11:42 a.m. to 12:00 p.m.)
THE VIDEOGRAPHER: And we're back on the record at 12:00 p.m.
BY MR. LEUNG:
**Q.** Welcome back, Ms. Lam. If you could open up Exhibit 140 again and turn to page 129 of 167.
**A.** Okay.
**Q.** And that is that compensation chart that we



had taken a look at earlier today.
**A.** I have it.
**Q.** Okay. So you testified earlier that the Beverly Proton compensation that's reflected in this page of Exhibit 140 is based on the employment agreement that Mr. Liu had with Beverly Proton; correct?
**A.** Yes.
**Q.** You also explained for me earlier today that with respect to the work that Marcum was doing in the calendar year 2015 and 2016, that bookkeeping did not concern any transactions in 2016. Did I hear that right?
**A.** Yes.
**Q.** Okay. When Mr. Liu was first subpoenaed by the SEC during its investigation in February of 2016, do you recall Mr. Liu advising you or anybody else at your firm of that fact?
**A.** I don't know. Maybe Stan. I have no idea.
**Q.** Maybe Stan. Okay. That was -- that subpoena was issued in February 2016. The SEC filed its case in district court at the end of May 2016. At that time do you recall if Mr. Liu had communicated to you or anybody at your firm that he had been sued by the SEC in a civil enforcement action?



**A.** Maybe Stan.
**Q.** Maybe Stan. Okay. So February is when the investigative subpoena comes from the SEC. End of May is when the SEC files its case. In the course of your work on the engagement with Mr. Liu for bookkeeping services, did he ever communicate to you that in February, March, and April, he had caused about $4.2 million in funds to be transferred from the entity accounts to his and his wife's personal accounts at Chase and Wells Fargo?
**A.** No.
**Q.** Ms. Lam, do you know that Mr. Liu has been found liable for securities fraud by the district court in this case?
**A.** No.
**Q.** If you can turn to page 158 of Exhibit 140.
**A.** Okay.
**Q.** I'm sorry. 159. And if you can flip through 159 to 167.
And for the record, that's Bates number Marcum_CLiu_12618 to 12626.
Are those pages of Exhibit 140 the Beverly Proton Charles Liu employment agreement that you've been testifying to as the informational basis for the account classifications to management fees that you

applied to the general ledger for transfers from Beverly Proton to Mr. Liu in the course of your bookkeeping work in 2015 and 2016?
**A.** Yes.
**Q.** Can you open up for me Exhibit 141A. If you download it, you'll be able to see the document in Excel.
**A.** Yes. I have it.
**Q.** Okay. Is Exhibit 141A a true and accurate copy of the Excel spreadsheets pertaining to the general ledger and related QuickBooks reports for Beverly Proton in 2013 that you transmitted to Don Wise, among others, on or about August 3, 2016?
**A.** Yes.
MR. LEUNG: For the record, I am displaying to counsel and the witness through my share screen function my Microsoft Excel and Exhibit 141A.
BY MR. LEUNG:
**Q.** There is an adjusting journal entry tab to Exhibit 141A. Ms. Lam, am I correct that this tab documents all of the journal adjustments that were made to the general ledger for the Beverly Proton 2013 accounts?
**A.** Yes.
**Q.** And all of these adjusting journal entries



had to be approved by Mr. Liu; correct?
**A.** Yes.
**Q.** And they were approved by Mr. Liu; correct?
**A.** I believe so. Yes.
**Q.** I want to direct your attention to the adjusting entry numbered CPA 123113-1. It's the second one.
**A.** Okay.
**Q.** I think you explained this for us earlier, but what's going on with this journal adjustment?
**A.** So this was the entry to reclassify all of the personal expenses from distribution as management fee to him.
**Q.** Okay. And the basis for that reclassification was the employment agreement that we just looked at; right?
**A.** Yes.
MR. GOURAIGE: Gary, can I just --
(Reporter clarification.)
MR. GOURAIGE: Gary, I'm using the exhibits you sent to us, defense counsel, before the deposition. And I don't -- the page numbers you're citing don't correlate to the exhibit that I'm looking at. Are you using a different document?
THE REPORTER: I'm sorry. You're really



cutting out.
MR. LEUNG: Right now, Herve, we are on Exhibit 141A. It bears the Bates number Marcum_CLiu_7299 to 7350. The native Excel spreadsheet that I sent for your convenience in advance of this deposition bears that Bates number. It's also identified as a 2013 QuickBooks report for Beverly Proton Center. So we're not doing page numbers. I'm showing you on the screen the spreadsheet in Excel itself.
MR. GOURAIGE: Gary, when I click on the Excel document you sent me, I don't see a Bates numbering on that document.
MR. LEUNG: Yeah, because it's a native Excel spreadsheet, Herve.
MR. GOURAIGE: Okay. So then you're using a completely different document?
MR. LEUNG: No. This is what was produced. If you print it out -- if you print the native spreadsheet out, that printout will be Bates numbered 7299 to 7350, but you can't manipulate that printout, which is why I'm showing the witness the native spreadsheet that was produced by Marcum. And we're at the tab entitled "Adjusting journal entries." Are you with me?



MR. GOURAIGE: I am. I'll tell you, the -- if 141A and the last four digits of the Bates numbering is 7299 --
MR. LEUNG: Herve, that's because you're looking at it in Egnyte. If you download it from Egnyte, you can open it up in Excel.
MR. GOURAIGE: I see. Okay. I didn't download it.
BY MR. LEUNG:
**Q.** Okay. Ms. Lam, can I direct your attention to another journal adjusting entry. This one is entitled CPA or numbered CPA 123113-2.
**A.** Yes.
**Q.** What's going on with that reclassification there?
**A.** So the management fees were paid from the Regional Center, so this journal entry is to book the fees through an intercompany receivable, so the actual payment came out from Regional Center.
**Q.** So it would be reclassified as a payment made by Beverly Proton to Liu and then an intercompany loan between the Regional Center and Beverly Proton?
**A.** No. This is -- the management fee was paid by Regional Center.
**Q.** Yes.

**A.** But the expense that we record -- but the expense were actually on Beverly Proton books. So we record this intercompany transfer general entry.
**Q.** I see. So the expense is being booked to Beverly Proton as a management fee and then by Beverly Proton to Liu; correct?
**A.** Yes.
**Q.** And the informational basis for that reclassification again is the employment agreement between Liu and Beverly Proton; right?
**A.** Yes.
**Q.** Okay. With respect to these journal adjustments, I just want to make sure. Liu approved the account classifications; right?
**A.** Yes.
**Q.** And it's not the case that Marcum as part of its engagement obtained reasonable assurance that that account classification wouldn't result in a material misstatement?
**A.** No. It's not our engagement to do that.
**Q.** It didn't obtain limited assurance or any assurance in that respect; correct?
**A.** No. We only -- our engagement was for bookkeeping and income tax services.
**Q.** Got it. And Marcum did not perform any



verification or substantiation procedures with respect to this journal adjustment; correct?
**A.** No, we did not.
**Q.** Then going to the general ledgers tab, if we go to column R, split, and then we pull up only the 1666 management fees --
**A.** Yes.
**Q.** -- transactions.
We're seeing the two transactions that were reclassed to the management fee account; correct?
**A.** Yes.
**Q.** Why don't we close 141A and open up 141B.
**A.** Okay. I'm ready.
**Q.** Your computer is faster than mine. I'm still waiting for mine to download, if you can just bear with me.
I'll ask you a question. Is Exhibit 141B the native version of which you've just opened in your Excel spreadsheet -- or Microsoft Excel program a true and accurate copy of the general ledger report and related QuickBooks reports for the Beverly Proton Center account in 2014 that you transmitted to Don Wise and others on or about August 3, 2016?
**A.** Yes.
**Q.** If we can start with the adjusting journal



entries tab. This is 2014; right?
**A.** Yes.
**Q.** Okay. There is an adjustment numbered CPA 123114-7. Looks like a reclassification of a distribution to management fees. What's going on with that one?
**A.** This general entry here are the original transaction was coded to an expense account management fees on profit and loss. And what we did and we reclassify it from profit and loss to the balance sheet.
**Q.** It was originally coded as a profit to the Beverly -- to Beverly Proton?
**A.** No. It is an expense on Beverly Proton, then we reclassify -- we capitalize it, reclassify to balance sheet.
**Q.** I think you're going to have to be patient with me. What's the difference between account number 6170 management fees and account 1666 management fees?
**A.** One is an expense and the other one is a capitalized expense.
**Q.** Got it. Okay. Journal adjustment numbered CPA 123114-6. What's going on with this reclassification?
**A.** This one here is -- again, the Regional



Center make the payment, but we record the management fees on Beverly Proton.
**Q.** So similar to the other adjusting entry we saw in 2013?
**A.** Yes.
**Q.** And so the informational basis for this classification to management fees is again the Beverly Proton employment agreement between Mr. Liu and Beverly Proton?
**A.** Yes.
**Q.** And nothing else?
**A.** Nothing else.
**Q.** Okay. And then finally CPA-123114-8. What is this journal adjustment about?
**A.** Again, the payment came out of the proton -- the Regional Center and we record the management fees on Beverly Proton.
**Q.** And what's the informational basis for that classification, the payee in this case being Xin Wang?
**A.** Yes. Based on the employment contract that Mr. Liu provide for Xin Wang.
**Q.** Okay. If you can turn in the general ledger tab. I'm going to column R. I'm going to isolate just the 1666 account.
**A.** Okay.

**Q.** Let's open up 141C. And once you've had an opportunity to look at the native Excel file, Ms. Lam, my question is: Is Exhibit 141C a true and accurate copy of a native Excel spreadsheet reflecting Marcum's bookkeeping work with respect to Beverly Proton Center in 2015 that you transmitted to Don Wise and others on or about August 3, 2016?
**A.** Yes.
**Q.** Okay. All right. The adjusting journal entries tab, please. Adjustment number CPA 123115-2. Looks like $354,000 was being reclassified from the suspense account to management fees. Is that -- was that reclassification based on information from Mr. Liu, namely the employment agreement between Xin Wang and Beverly Proton?
**A.** Yes.
**Q.** No other information, right, it's just the employment agreement?
**A.** Yes.
**Q.** And this $354,000 had previously been classified in the suspense account because there was some ambiguity as to what it was for; right?
**A.** Right.
**Q.** Okay. But Mr. Liu cleared up that ambiguity with some information; correct?



**A.** Yes. He provided us with the employment contract for Xin Wang.
**Q.** Okay. And then the very last journal adjustment, CPA 12311510, looks like it's another reclassification of a distribution to Liu from the Regional Center that was booked -- then booked to Beverly Proton as an expense in the form of a management fee --
**A.** Yes.
**Q.** -- is that correct?
**A.** Yes.
**Q.** And again, the reason why you, the bookkeeper, reclassified this amount as a management fee under the 1666 account is because Mr. Liu provided an employment agreement between him and Beverly Proton?
**A.** Yes.
**Q.** And no other information; correct?
**A.** No other information.
**Q.** Turning to the general ledger -- okay.
Sorry for the delay.
So we covered the general ledger in 2013 for Beverly Proton, the general ledger for Beverly Proton in 2014, and in 2015. You walked me through some transfers to Liu that were classified as management



fees and a Beverly Proton expense. Those transactions all occurred in 2013 to 2015. Did Mr. Liu have an employment agreement with Beverly Proton prior to April 2016?
**A.** This is the only agreement that we received from him.
**Q.** Okay. Do you recall the date of that Beverly Proton employment agreement?
**A.** No.
**Q.** Okay. Ms. Lam, you're going to have to refresh your marked exhibits folder on Egnyte. And you might have to do it a couple times, but at some point Exhibit 143 should show up. I'd like for you to open that.
(Exhibit 143 was marked for identification.)
BY MR. LEUNG:
**Q.** Let me know when you've been able to open up Exhibit 143, please.
**A.** 143?
**Q.** Yes. And you might have to refresh because I just moved it into the folder.
**A.** Yeah, because I don't have it originally, so let me.
**Q.** I'm sorry, Ms. Lam. I actually found the thing that I was looking for that resulted in the long



pause. If you can put 143 aside for a second and reopen up 141B.
**A.** Okay. All right.
**Q.** If you can go to the general ledger. This is for 2014, Beverly Proton.
**A.** Okay.
MR. LEUNG: For the record, I'm displaying my screen, my Microsoft Excel, to counsel and the witness. The witness has also opened up 141B on her own.
BY MR. LEUNG:
**Q.** If you go to the column R and you isolate it to the transactions through the 6170 account, management fees, you'll come up with a number of different transactions from 2014. The 6170 management fee account, again, what's the difference between that and the 1666 management fee account? One is capitalized, one is not?
**A.** Yes. One is an expense and the other one is a capitalized expense.
**Q.** And it looks like these transactions involved the use of the Beverly Proton check card at Caesars Palace, a number of withdrawals were classified as management fees 6170. What was the informational basis for that classification?

**A.** From the bank statement.
**Q.** And with respect to whether or not they were management fees rather than a purely personal expense of Mr. Liu, what information, if any, was provided by Mr. Liu to Marcum in that respect?
**A.** These are personal expenses and we reclassified it to management fees based on the employment contract that he provided.
**Q.** Okay. And that's the Beverly Proton employment contract with Charles Liu; right?
**A.** Yes.
**Q.** Okay. So let's go back to 143, please. Have you been able to pull it up?
Do you have Exhibit 143 in front of you, Ms. Lam?
**A.** I'm downloading.
**Q.** Okay.
**A.** Yes. I have it open.
**Q.** Okay. For the record, Exhibit 143 is a transcript of the deposition taken of Charles C. Liu on February 24, 2021.
I just want to direct you to some of the sworn testimony in this case, Ms. Lam. If you can turn with me to page 44 of the transcript, so that will be -- let me see -- page 11 of 67 of the document



itself.
**A.** Okay.
(Reporter clarification.)
MR. LEUNG: Exhibit 143 is a newly marked exhibit.
BY MR. LEUNG:
**Q.** So at his deposition, Mr. Liu was asked:
"Question: You signed an employment agreement with Beverly Proton on or about April 5, 2016. Before April 5, 2016, you didn't have an employment agreement -- contract with Beverly Proton, did you?
"Answer: I did not have an employment contract before, only the MOU we signed with Dr. Thropay."
Ms. Lam, during your work on the Marcum engagement in 2015 and 2016, did Mr. Liu ever communicate to you and your team the fact that before April 5, 2016, he didn't ever have an employment contract with Beverly Proton?
**A.** No. Not that I'm aware.
**Q.** Okay. Let's talk about the MOU that Mr. Liu referenced in his deposition testimony. Have you seen that MOU, that memorandum of understanding, with Dr. Thropay?



**A.** No.
**Q.** Okay. That wasn't provided to you or your team, to your knowledge, during the 2015, 2016 work?
**A.** I have not seen it. I am not sure if it was provided to me.
**Q.** If you can turn to page 62 of Exhibit 143. That's page 16 of 67 on the PDF.
**A.** Okay.
**Q.** Okay. At his deposition, Mr. Liu was asked the following:
"Actually the first five pages of Exhibit 122, sir. Do you recognize it to be a true and accurate copy of the MOU that you had executed with Dr. Thropay regarding the proton therapy project that you were working on in connection with the PP EB-5 Fund, Pacific Proton Regional Center, and Beverly Proton?
"Answer: Yes."
Question -- moving down to 64, page 64, line 21. Right here.
"Mr. Liu, am I correct that the only binding written agreement that you had with Beverly Proton that provided for compensation to you from Beverly Proton is the April 5, 2016, employment agreement that we just talked about, which was marked as Exhibit 120?



"Answer: That's a true copy, yes.
"Do you need the question read back for you sir?
"Can you read back the question, please, Diane.
(Question read.)
"Answer: Yes."
Okay. So again, whether it's the MOU or the employment agreement, nobody from the company or Mr. Liu ever communicated to you that the employment agreement on which you based all of those management fee classifications for Beverly Proton didn't exist until April 2016; right?
**A.** Yes. I did not.
**Q.** Did Mr. Liu ever explain for you or your team at Marcum the facts and circumstances surrounding his signing of that April 5, 2016, employment agreement with Beverly Proton?
**A.** Not to me.
**Q.** You don't recall a Michael Cogswell, do you?
**A.** No. I've never met him. Probably just through email, but I've never met him.
**Q.** Okay. Did you know that Michael Cogswell had been previously employed by a proton therapy equipment manufacturer called Mevion?

**A.** No. I did not know.
**Q.** Were you ever aware that -- did you ever know that Michael Cogswell, when leaving his firm, was under investigation for misconduct when he left Mevion?
**A.** No.
**Q.** Do you know when Mike Cogswell was hired by Beverly Proton and Mr. Liu?
**A.** I don't know.
**Q.** Did anyone ever communicate to you how Mr. Cogswell came to be hired by Beverly Proton and Mr. Liu?
**A.** No.
**Q.** Did anyone ever advise Marcum as to what Michael Cogswell's job responsibilities at Beverly Proton were upon joining the company?
**A.** I wasn't aware of anything.
**Q.** Are you aware of Mr. Liu ever communicating to you or your team at Marcum that even if Michael Cogswell wasn't an employee of Beverly Proton he still had the authority to execute contracts on Beverly Proton's behalf? Did Mr. Liu ever say anything like that to you?
**A.** No.
**Q.** If you can go back to Exhibit 143. That's



the Liu deposition transcript. And turn to page 50 of the transcript.
Okay. Mr. Liu was asked following the questions and he gave the following answers.
"For the record, I'm displaying for the witness a five-page document that will be marked Exhibit 121. The first page of that five-page document is entitled 'Employment Agreement.' It reads, 'This agreement is made by and between Beverly Proton Center, LLC, a California limited liability company formerly known as Los Angeles County Proton Therapy, LLC, hereinafter called company, and Michael Cogswell, hereinafter called employee.'
"Mr. Liu, I'm going to flip through the documents. The first question is going to be: Do you recognize Exhibit 121?
"Answer: Yeah, this is a document I signed.
"Question: Okay. And is Exhibit 121 a true and accurate copy of an employment agreement that you executed on behalf of Beverly Proton with Mr. Cogswell?
"Answer: Yes."
And going down to page 56, talking about the same contract, page 56, line 22.
"Question: You signed this contract?



"Answer: Yes.
"Question: On or about April 11, 2016?
"Answer: Yes.
"Question: Same with Michael Cogswell, he signed it April 11, 2016?
"Answer: Yes.
"Question: And that's when he became an employee of Beverly Proton; correct?
"Answer: Yes."
So keep that date in mind, April 11, 2016. If we can go back to Exhibit 140. And if you can turn to page 158 of 167. Let me know when you've got it in front of you, Ms. Lam.
**A.** What page?
**Q.** I'm sorry. 159 of 167 on Exhibit 140.
**A.** Okay.
**Q.** And once again, this is the employment agreement between Beverly Proton and Mr. Liu that he provided to you and your firm which served as the basis for all of those management fee classifications; right?
**A.** Yes.
**Q.** All right. And if you turn to the last page of the agreement. You'll see it's executed by Mike Cogswell on behalf of Beverly Proton and Mr. Liu signs



it for himself?
**A.** Yes.
**Q.** Do you see it's dated April 5, 2016?
**A.** Yes.
**Q.** Did Mr. Liu ever tell you that the supposed contractual basis for all of your bookkeeping work with respect to the management fee classifications at Beverly Proton was based on the contract that Mike Cogswell had no authority to execute because he wasn't an employee of Beverly Proton as of April 5, 2016?
MR. GOURAIGE: Object to the question.
THE REPORTER: Was there an answer?
THE WITNESS: Can you repeat the question?
BY MR. LEUNG:
**Q.** Sure. The employment agreement is dated April 5, 2016. This is Liu's employment agreement with Beverly Proton; right?
**A.** Yes.
**Q.** This employment agreement was the basis for a lot of account classifications involving management fees that took place in 2013, 2014, 2015, before the execution of this agreement in April 2016; correct?
**A.** Yes.
**Q.** Now, Liu's employment agreement is countersigned by Mike Cogswell on behalf of Beverly

Proton, again on April 5, 2016; correct?
MR. BERGER: I'd like to make a point. His name is not printed there and so we have to take your word for that is his signature.
MR. LEUNG: You can take my word for it.
BY MR. LEUNG:
**Q.** Is that right, Ms. Lam?
**A.** Yes, but I -- can you say the -- repeat the question, the second part?
**Q.** Sure. Mike Cogswell, I'll represent to you and you've seen the deposition testimony, was not an employee of Beverly Proton as of April 5, 2016, when he signed Liu's employment agreement. He testified to that fact less than two weeks ago.
Did Mr. Liu in 2015 and 2016 ever communicate to you or your team that the employment agreement that you were basing your bookkeeping work on had this problem with the dates?
**A.** No.
MR. GOURAIGE: I object to the question, the foundation of the question. Gary, if you're going to ask the witness the question, you should read her the portion of the transcript where Mr. Liu explained the discrepancies.
MR. BERGER: And I believe that Ms. Lam has



also said that she had never met or knew anything about Mr. Cogswell.
BY MR. LEUNG:
**Q.** All right. Well, let's just take a big step back.
In the course of preparing the general ledgers for Beverly Proton, Pacific Proton, and PP EB-5 Fund for all of the years that Marcum did these accounting services for, transactions needed to be classified; correct?
**A.** Yes.
**Q.** Did Marcum approve any of those transactions?
MR. BERGER: What does "approve" mean, please?
MR. LEUNG: It means what it meant in the engagement letter.
BY MR. LEUNG:
**Q.** Did Marcum approve any of those transactions?
MR. GOURAIGE: I'll object to the question.
MR. BERGER: I think that Marcum's engagement letter approval was based on information provided by Mr. Liu. I don't think that Marcum undertook any independent obligations -- we've already established that -- to confirm or look at any -- or confirm the accuracy of --



MR. LEUNG: Steve, I'd like to hear it from the witness. Can I just ask my question?
THE REPORTER: There was a bit of overlap.
BY MR. LEUNG:
**Q.** Ms. Lam, can you please answer my question?
**A.** So we record the transaction in according with the information that was provided to us by the client; for example, the management fees, we base it on the agreement, the employment contract that he provided, so we reclassified it from distribution to management fees.
**Q.** In recording those transactions, Marcum and your team did not approve the transactions; right?
**A.** We record it based --
MR. GOURAIGE: I object to the word "approve."
BY MR. LEUNG:
**Q.** Please go ahead.
**A.** We record it based on the information provided by the client.
**Q.** And when you recorded based on the information provided by the client, Marcum and your team did not approve of any of those transactions; is that correct?
**A.** We recorded it.



MR. GOURAIGE: Again, objection to the word "approve."
BY MR. LEUNG:
**Q.** What's the difference between recording and approving? Did you -- when you say you recorded the transactions, are you testifying that Marcum approved all the transactions?
**A.** We just record it. That doesn't mean that it's approved, it's right or wrong. We record it based on the information provided by the client.
**Q.** And that's -- Ms. Lam, that's all I'm asking.
**A.** Yes.
**Q.** Marcum did not approve any of the transactions recorded in the general ledgers during its work in 2015 and '16; right?
**A.** We just record it, yes. We do not audit. We did not audit. We did not confirm. We did not do any of that. We just record the transaction based on the documents provided to us by the client.
**Q.** And for those transactions and the account classifications, it was management that approved those account classifications, not Marcum; correct?
**A.** Yes.
**Q.** And management in this case was Mr. Liu and Mr. Liu only; correct?

A. Yes.
Q. Okay. For all of those account classifications, it was not Marcum's job to obtain reasonable assurance that the classifications wouldn't result in a material misstatement; right?
A. That was not under the scope of our engagement.
Q. And for all of those account classifications, it was not Marcum's job to obtain even limited assurance that those classifications didn't need to be materially modified; correct?
A. No.
Q. Okay. Throughout the entire course of the 2015 and 2016 accounting services engagement, Marcum did not perform any inquiry or analytical procedures as to the appropriateness of the account classifications for all of these transactions that were recorded to the general ledger; is that correct?
A. That's correct. Our engagement was strictly for bookkeeping and income tax services.
Q. And with respect to all of these transactions and all of these account classifications for Pacific Proton, Beverly Proton, and PP EB-5 Fund, Marcum did not perform any verification or substantiation procedures as to the appropriateness of those



classifications as part of its work in 2015 and 2016; is that correct?
A. That is correct.
Q. And Marcum issued no formal report in conjunction with the QuickBooks reports that it generated in 2015 and 2016; correct?
A. We did not.
Q. Approximately when did you cease work on the Liu and related entity engagement in 2016?
A. When we completed the tax return for the entities. I believe that was September of -- 15 of 2016.
Q. Did you handle billing for the engagement or was that Mr. Lam's end?
A. Mr. Lam did it.
Q. Do you recall if Liu paid his outstanding invoices for services rendered back in 2016?
A. I don't remember. I don't know.
Q. Ms. Lam, earlier today you testified about how the time period for the bookkeeping services expanded to earlier dates for each of the three entities. You also explained that the bookkeeping work for those earlier periods was based on bank statements and canceled checks.
Do you recall reviewing anything in the way



of professional services agreements, related invoices, contracts with equipment manufacturers, lease agreements, any other kinds of documentation besides the bank statements and the checks that helped you perform the bookkeeping services for periods prior to October 2014?
A. No. We did not have any of those information. We record the transaction from the bank statement. And when the check cleared the bank, there is no information on the bank statement with who the check was paid to, for example, and then we would email the client and he would give us the additional information.
MR. LEUNG: Pass the witness.
MR. GOURAIGE: Can we take five minutes?
MR. LEUNG: Sure. Off the record at 12:51 Pacific time. Let's get back on -- do you want five or ten, Herve?
MR. GOURAIGE: Five -- give me ten minutes.
THE VIDEOGRAPHER: We're going off the record at 12:51 p.m.
(Recess, 12:51 p.m. to 1:07 p.m.)
THE VIDEOGRAPHER: And we're back on the record at 1:07 p.m.
///



EXAMINATION
BY MR. GOURAIGE:
Q. Ms. Lam, I have a few questions for you.
The policies that you described when counsel for the SEC was examining you, given the nature of the engagement you did for Mr. Liu and his companies, was that standard polices for Marcum?
A. Yes.
Q. You would rely on information you received from management to make the reports reporting the data in the financial records?
A. Yes. We assume that, you know, when the check cleared the bank or a wire transfer was initiated, that is management -- authorized by management. So we just take that information and we record it in QuickBooks without asking for any additional information.
Unless we have question, then we ask for clarification. But that is the standard. We do not check the bank balance, confirm banks, ask for document, contract. None of that.
Q. And that's what you would do for all of your clients if you did -- given the nature of the engagement; is that correct?
A. Yes.

**Q.** Ms. Lam, you testified that certain expenses would ultimately be classified as management fees. I have a couple questions about that.
First, if you saw from the check for the nature of the expense that it was a personal expense, you would ultimately classify it as management fees?
**A.** We put it in the distribution account and then from there we reclassified it to management fees based on the contract that Charles provided to us.
**Q.** Okay. So if you have an expense that was made at a casino, for example, you would put it into the distribution account and then you would classify it as management fee?
**A.** Yes.
**Q.** Did Charles ever object to you classifying it as management fees?
**A.** No.
**Q.** When you classified it as management fees, that was considered income to Charles?
**A.** Yes, income to him.
**Q.** Did Marcum prepare his personal tax returns?
**A.** We did.
**Q.** Did you do --
(Reporter clarification.)
**Q.** Did you do tax returns for Charles and his



wife?
(Reporter clarification.)
**Q.** Did you do joint tax returns for Charles and his wife?
**A.** Yes.
**Q.** For the year 2015 on their personal tax returns, did you pick up the management fees as income to them?
**A.** Yes, we did.
MR. GOURAIGE: I have no further questions. Pass the witness to you, Gary.

FURTHER EXAMINATION
BY MR. LEUNG:
**Q.** Ms. Lam, did Marcum prepare personal tax returns for Mr. Liu in 2016?
**A.** We did not, because the entity in return was prepared by the monitor, I believe, and we did not receive the K-1 timely, so his return was not filed.
THE REPORTER: I'm sorry. Who did you say it was prepared by?
THE WITNESS: The SEC monitor.
BY MR. LEUNG:
**Q.** Did Marcum prepare a draft personal tax return for Liu for calendar year 2016?



**A.** Yes. We did a draft, but we need a -- we received the information very late. And in order to submit the return, we need a signed authorization from the client before we can hit the button and we never got that.
**Q.** Okay. Do you know if that draft personal tax return for Liu reported as income funds received in connection with his misappropriation of more than $4 million from the corporate accounts in 2016 in the months of February, March, and April?
**A.** We did not do --
THE REPORTER: Is there an objection?
MR. GOURAIGE: There is an objection to the question.
BY MR. LEUNG:
**Q.** Please go ahead.
**A.** We did not do any 2016 work for the entity.
MR. LEUNG: No further questions at this time.

FURTHER EXAMINATION
BY MR. GOURAIGE:
**Q.** I have one question.
Ms. Lam, I think you just -- did you testify that the K-1 was not prepared by Marcum for 2016?



**A.** No, we did not -- Marcum did not prepare 2016.
**Q.** Was that the obligation of the monitor to send a K-1 to Charles?
MR. LEUNG: Objection. Lacks foundation.
BY MR. GOURAIGE:
**Q.** Do you understand the question, Ms. Lam?
**A.** I don't know.
**Q.** Was -- the monitor was appointed by the court to --
(Reporter clarification.)
MR. LEUNG: Herve, you're breaking up quite a bit.
MR. GOURAIGE: I can't understand why.
BY MR. GOURAIGE:
**Q.** Ms. Lam, let me just try the question again.
Were you aware that the monitor was appointed by the court to oversee the operations of the companies?
(Reporter clarification.)
**Q.** Ms. Lam, can you answer that question?
**A.** Can you repeat the question, because you were breaking up.
THE REPORTER: Do you want me to read what I have?

THE WITNESS: Yes.
THE REPORTER: Is it okay, Counsel?
MR. GOURAIGE: Yes.
MR. LEUNG: Yes.
(Pending question read.)
MR. BERGER: Of the companies.
THE WITNESS: I -- all we received was a letter from the monitor and the CPA who, you know, the monitor hired and asked us to provide all of the past year tax returns and work paper that we did. And we release that to the monitor and the CPAs.
MR. GOURAIGE: Thank you.
I don't have any other questions.
MR. LEUNG: Cindy, can you read that answer back for me, please.
(Answer read.)
MR. LEUNG: Thank you.
MR. GOURAIGE: I don't have any further questions.
MR. LEUNG: Steven, review and sign under 30(e)?
MR. BERGER: I'm sorry. Say it again, Gary.
MR. LEUNG: Do you wish to review and sign under 30(e) or do you want to waive signature?
MR. BERGER: I'd like to review and sign.



MR. LEUNG: All right. Off the record at 1:17.
THE VIDEOGRAPHER: And this concludes today's videotaped deposition of Trang Lam. We're going off the record at 1:17 p.m.
(Deposition adjourned at 1:17 p.m.)
* * * * *



CERTIFICATE OF WITNESS

I, TRANG LAM, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on March 9, 2021, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

_____ I have made corrections to my deposition.
_____ I have NOT made any changes to my deposition.

Signed: ____________________________
TRANG LAM

Dated this ________ day of ______________ of 20____.

(IF REQUIRED)
Sworn to and Subscribed before me,
this_______day of________________, 20____.
_____________________
Notary Public My commission expires:__________



REPORTER'S CERTIFICATE

I, Cynthia J. Vega, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing remote deposition was by me duly sworn remotely; that the remote deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported by me stenographically and were transcribed through computerized transcription under my direction; and the foregoing is a true and correct record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

IN WITNESS WHEREOF, I have subscribed my name this 12th day of March, 2021.

Reading and Signing was requested.

_______________________________
Cynthia J. Vega, CSR No. 6640

ERRATA SHEET

Deposition of: TRANG LAM
Date taken: MARCH 9, 2021
Case: SEC v. LIU, et al.

PAGE LINE
_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________
_____ _____ CHANGE: ______________________________
REASON: ______________________________

_____ _____ CHANGE: ______________________________
REASON: ______________________________

Signed____________________________
Dated____________________________

105

**A**

**a.m** 2:5 6:1,10 66:17,18
**a/k/a** 1:7
**ability** 12:13 37:9
**able** 27:3 53:22,24 59:7 60:21 63:8 69:6 79:17 81:13
**accepted** 18:24
**access** 8:17
**account** 28:2,9 29:11,18,21 29:22 30:1 32:21,24 38:17 39:1,6,11,19 43:24 51:1,3 54:21,24 55:1,9,13,19,19 56:6,8,10,11,11,14 58:8 59:1,4 60:4,13 61:5,6,8,9 62:16,21 63:1,2,23,24 64:18 65:3,4,6,6,21,23 68:25 73:14,18 74:10,22 75:8,18,19 76:24 77:12,21 78:14 80:13,16,17 88:20 92:20,22 93:2,8,16,22 97:7 97:12
**accountant** 15:2 32:13
**accountants** 20:20
**accounting** 14:23 30:8 36:6 36:6 37:13,17,18,19,25 38:4,4,7 42:21 43:7,8 53:2 61:7 90:9 93:14
**accounts** 27:4 54:18 68:9 68:10 69:23 99:9
**accuracy** 32:14 34:2 90:25
**accurate** 19:23 41:18 43:2 43:25 44:18 45:22 47:21 49:14 52:5 69:9 74:20 77:3 83:13 86:19
**accurately** 35:15 38:7 41:4
**action** 4:16 18:13,20 67:25
**acts** 42:25 43:10
**actual** 62:22 72:18
**add** 46:14
**added** 47:2
**additional** 21:16 95:12 96:17
**Additionally** 43:19,20
**addressed** 35:23 36:20
**adjourned** 102:6
**adjusting** 39:14,16,20 42:11 42:16 69:19,25 70:6 71:24 72:11 74:25 76:3 77:9
**adjustment** 53:1 70:10 74:2 75:3,22 76:14 77:10 78:4
**adjustments** 39:23 69:21 73:13
**administered** 7:16
**administration** 14:22
**admonition** 59:23
**advance** 71:6
**advise** 85:14
**advising** 67:17
**affiliated** 16:25 17:13 20:23 21:20 22:15
**agent** 63:6,9 64:16 65:8
**agent's** 63:1,5 64:5
**ago** 10:12 89:14
**agree** 22:20,24 33:6
**agreed-upon** 35:19
**agreement** 50:6,14 51:7,10 57:21,25 58:1,5,7 62:23,25 63:19 67:6 68:23 70:15 73:9 76:8 77:14,18 78:15 79:3,5,8 82:9,11 83:22,24 84:9,11,17 86:9,19 87:18 87:24 88:15,16,19,22,24 89:13,16 91:9
**Agreement'** 35:25
**Agreement.'** 86:8
**agreements** 50:1,5,24 51:5 95:1,3
**ahead** 20:6 33:14 91:18 99:16
**AICPA** 20:2,5,9,10,12,15,17 20:18
**Air** 66:1
**aka** 3:3
**al** 6:5 105:3
**ambiguity** 77:22,24
**amount** 57:22 78:13
**amounts** 50:22 51:10 64:8 65:11
**analytical** 93:15
**and/or** 103:10,12
**Angeles** 1:10 2:17 12:25 86:11
**answer** 11:11,24 12:6 82:13 83:18 84:1,7 86:17,22 87:1 87:3,6,9 88:12 91:5 100:21 101:14,16
**answered** 12:6
**answering** 11:10
**answers** 11:1 86:4
**anticipate** 14:8
**anybody** 21:22 22:11,16 67:17,24
**anyway** 9:5
**apart** 27:1 55:11 59:23
**appear** 49:14 52:4
**APPEARANCES** 2:10 3:1
**appearing** 19:2
**appears** 34:24 35:3 44:12 47:11,21
**application** 54:6
**applied** 69:1
**appointed** 100:9,17
**appropriate** 43:24
**appropriateness** 93:16,25
**approval** 90:21
**approve** 43:23 90:12,13,18 91:13,16,23 92:2,13
**approved** 39:15,24 57:11,13 70:1,3 73:13 92:6,9,21
**approving** 43:22 92:5
**Approximately** 94:8
**April** 4:18,20 5:3 35:1,3 44:14,15 45:3,13,25 46:23 47:13,23 48:14 68:7 79:4 82:9,10,19 83:24 84:13,17 87:2,5,10 88:3,10,16,22 89:1,12 99:10
**area** 14:20 17:21
**areas** 14:8
**aside** 80:1
**asked** 26:23 28:5 52:15 82:7 83:9 86:3 101:9
**asking** 14:8,9 16:16 59:8 92:11 96:16
**assisted** 18:1
**assisting** 13:24
**associated** 60:8
**assume** 11:23 12:16 64:19 66:6 96:12
**assurance** 30:19,20 31:16 32:7,14 46:24 47:3 73:17 73:21,22 93:4,10
**attached** 49:23 53:8 103:11
**attachment** 4:19,21,23,25 35:2,3,6,9,11,22 36:4
**attachments** 35:25 47:14 52:6 53:21
**attention** 49:24 70:5 72:10
**attest** 31:18,23
**attorney** 13:16 61:7,13 104:16
**audio** 8:3,7
**audit** 30:2,4,11 31:5,12,19 31:21 41:16,22 42:24 43:12 92:16,17
**August** 4:24 51:25 52:6,10 52:22 53:16 69:13 74:23 77:7
**authority** 85:21 88:9
**authorization** 99:3
**authorized** 96:14
**authorizing** 43:22
**available** 26:11
**aware** 16:1,23 42:9 82:21 85:2,17,18 100:17

**B**

**B** 35:25 36:4 54:22
**B-e-r-g-e-r** 6:18
**bachelor** 14:18
**back** 9:19 10:14 17:7 25:6,9 25:10,15 26:4,6 27:10,12 27:14,20 28:22 29:8 30:7 43:17 44:21 45:13 52:23 66:15,19,22 81:12 84:2,4 85:25 87:11 90:5 94:17 95:17,23 101:15
**balance** 25:4,7 32:22,24 45:6 46:10,17 53:4 64:4,17 75:10,16 96:20
**bank** 23:11 24:20,24 25:12 25:13,16,19,20,24 26:10 26:12,19 27:7,21 28:1 29:11 32:23 55:19,19 59:17 60:13 64:10,11 81:1 94:23 95:4,8,9,10 96:13,20
**banking** 58:11 63:9,20 64:2
**banks** 96:20
**base** 65:22 91:8
**based** 11:24 25:13 26:12 27:6 30:18 42:22 50:22 51:6,7,10 57:21 61:10,25 64:9 67:5 76:20 77:13 81:7 84:11 88:8 90:21 91:14,19 91:21 92:10,18 94:23 97:9
**basing** 89:17
**basis** 18:2 28:8 55:17 59:18 61:2 68:24 70:14 73:8 76:6 76:18 80:25 87:20 88:6,19
**Bates** 47:15 48:8,25 50:9 51:21 58:22 68:20 71:3,6 71:12,20 72:2
**Bates-numbered** 35:22
**bear** 74:15
**bears** 18:11 36:18 47:15 48:8,24 50:9 51:20 71:3,6
**began** 13:20 14:5
**beginning** 2:4 11:11 16:22 25:4,6 27:14,15 46:17 53:4
**begins** 6:3 34:25 35:24 38:3 43:19
**behalf** 2:3 15:21 18:24 44:20 56:13 85:22 86:20 87:25 88:25
**believe** 13:13,20 17:6,14 20:24 24:10,18 26:5 27:13 37:6 46:16 47:1 48:15 52:24 58:10 60:14 65:5 70:4 89:25 94:11 98:18
**benefit** 18:8
**Berger** 3:15 6:18,18 7:18 13:14 16:13,18 18:23,23 32:3,6 89:2,25 90:13,20

101:6,22,25
**better** 10:4
**Beverly** 1:9 12:23,23 22:25 23:25 24:3,22 25:25 26:8 26:19 29:7 34:8,15 36:3 39:2 43:5 44:3,21 45:7 51:8,9,11 54:21 55:8,12,24 56:5,20,21 58:1,6 60:12 61:17 62:11,23 64:24,25 65:3,7,12,14 66:3 67:4,6 68:22 69:2,12,22 71:8 72:21,22 73:2,5,5,10 74:21 75:13,13,14 76:2,7,9,17 77:5,15 78:7,15,23,23 79:1 79:3,7 80:5,22 81:9 82:9 82:11,20 83:16,22,23 84:12,18 85:8,11,15,20,21 86:9,20 87:8,18,25 88:8,10 88:17,25 89:12 90:7 93:23
**big** 47:19 90:4
**billing** 94:13
**bills** 60:1
**binding** 83:21
**bit** 10:5 91:3 100:13
**book** 64:25 65:1 72:17
**booked** 63:15,17 73:4 78:6 78:6
**bookkeeper** 21:7,9 29:5 60:16 78:13
**bookkeeping** 25:8,11,14,17 26:1,8 27:9,19 28:4,19,21 29:1 33:10,18 34:11,19 40:10 45:18,19 46:2,8 49:19 53:6,10 67:11 68:5 69:3 73:24 77:5 88:6 89:17 93:20 94:20,22 95:5
**bookkeepings** 25:3
**books** 24:1 42:15,16 73:2
**bottom** 43:18
**Bound** 4:13
**box** 8:8 9:9
**break** 12:3,4,7 66:9
**breaking** 100:12,23
**Broadway** 3:16
**brought** 21:4
**browser** 53:25
**bullet** 38:6,6,10,14 39:13 40:2,6,9,17 41:3,4,10
**business** 14:22 23:21 24:18 56:23 57:18 66:5,6,7
**button** 32:24 46:12 99:4

**C**

**C** 1:7 3:3 5:5 81:20
**Caesars** 80:22
**Cal** 14:19,20
**calendar** 15:22 67:11 98:25
**California** 1:2 2:3,7,17 6:7 7:13 14:19,21 15:3,5,8 18:21 24:13 86:10 104:4
**call** 8:5 9:13 10:24 45:4
**called** 22:16 60:14 84:25 86:12,13
**canceled** 94:24
**Cancer** 62:5
**capitalize** 75:15
**capitalized** 75:21 80:18,20
**caption** 18:11 104:17,19
**card** 23:21 25:23 65:24 66:6 66:6 80:22
**cards** 23:23 24:2
**Carlsbad** 2:6
**carried** 46:17
**case** 1:6 6:5 13:25 17:17,22 18:11 49:20 67:21 68:4,14 73:16 76:19 81:23 92:24 105:3
**cash** 40:11,11 45:10,16 65:18
**casino** 97:11
**cause** 19:18 104:18
**caused** 68:7
**caveat** 12:4
**CCRR** 1:24
**cease** 94:8
**Center** 1:8,9 3:7 12:19,24 25:22 26:20 29:8 36:3 45:8 45:8 55:8,13 62:5,24 71:8 72:17,19,22,24 74:22 76:1 76:16 77:5 78:6 83:16 86:10
**Central** 1:2 6:6 18:21
**certain** 22:25 44:24 57:22 97:1
**CERTIFICATE** 103:1 104:1
**certification** 19:22
**certifications** 15:1,11
**certified** 15:2,13 20:20 30:6 104:3
**certify** 103:7 104:5,15
**change** 28:23 105:4,6,7,9,10 105:12,13,15,16,18,19,21 105:22
**changed** 28:20
**changes** 40:15 103:10,12,15
**characterization** 33:6 52:18
**Charles** 1:7 3:3 5:4 34:25 35:23 36:20 49:4,15,25 50:4,6 68:23 81:10,20 97:9 97:15,19,25 98:3 100:4
**chart** 32:21 66:25
**Chase** 68:10
**chat** 8:8,10,18 9:9
**check** 23:12 26:10,13,19 27:13 38:16,25 39:4,5 61:12,19,25 62:3,8,10 80:22 95:9,11 96:13,20 97:4
**checkbook** 40:12
**checks** 29:10 38:25 39:9 94:24 95:4
**China** 66:1
**Chinese** 63:3,9,20 64:2
**Cindy** 101:14
**circle** 9:3
**circumstances** 21:1 49:7 84:16
**citing** 70:23
**City** 2:2,6
**civil** 4:16 18:13,19 67:25
**clarification** 10:3 14:2 16:19 28:5 38:13 48:21 58:13 70:19 82:3 96:19 97:24 98:2 100:11,20
**clarify** 29:13 32:17
**classification** 28:3 40:16 50:21 55:17,22 56:4 58:5 59:19 61:2 63:2 64:16 65:22 73:18 76:7,19 80:25
**classifications** 28:10 43:24 51:2,3,6 54:15 57:9,11 61:6,10 62:21 68:25 73:14 84:12 87:20 88:7,20 92:21 92:22 93:3,4,8,10,17,22 94:1
**classified** 54:13 58:9 59:1,3 60:10 64:21 77:21 78:25 80:23 90:10 97:2,18
**classify** 26:22 29:23 32:7 39:19 64:7 97:6,12
**classifying** 97:15
**clear** 9:5 14:7 33:22
**cleared** 77:24 95:9 96:13
**click** 71:11
**client** 21:4,6,16 30:18,23 32:2,15 35:20 38:20,21 40:7,19 41:9 42:19 47:6 65:25 91:8,20,22 92:10,19 95:12 99:4
**client,'** 36:4
**clients** 21:18 96:23
**close** 19:5 27:8 74:12
**co-evaluator** 13:16
**code** 29:12,14 38:16,25 39:6 39:9 56:12,22,25 62:12 64:14 66:1,8
**coded** 38:11,15 55:4,9,16 57:2 61:6,13 64:3 66:3
75:8,12
**Cogswell** 21:24 49:4 84:20 84:23 85:3,7,11,20 86:13 86:21 87:4,25 88:9,25 89:10 90:2
**Cogswell's** 85:15
**collecting** 53:3
**collectively** 35:25 36:7
**college** 14:14,16
**column** 54:16,20,21,22 74:5 76:23 80:12
**come** 20:22 42:5 65:17 80:14
**comes** 68:3
**commence** 13:12
**Commercial** 59:17
**commission** 1:4 2:13 51:9 103:23
**commissions** 50:17,22
**communicate** 21:15,18 22:4 22:7,11,16 29:15,24 63:11 68:6 82:18 85:10 89:15
**communicated** 23:8 27:1 28:8 39:25 67:23 84:10
**communicating** 85:18
**communication** 63:14
**communications** 44:19
**comp** 16:14
**companies** 20:23 96:6 100:19 101:6
**company** 22:16 25:25 36:7 39:15 40:11 56:12 57:22 59:21 60:13,17,17 61:1 84:9 85:16 86:11,12
**company's** 38:11,15
**company,'** 36:4
**compensation** 16:5,11,21 24:14 49:25 50:4,7,16,22 51:9 57:23 66:25 67:4 83:23
**compilation** 30:16,17,19,22 30:24 31:4,12,22,23 32:7 41:16,21
**complete** 11:24 29:18 103:8
**completed** 11:11 48:16 94:10
**completely** 71:17
**completeness** 34:2
**compliance** 36:5
**complies** 7:17
**comport** 43:6 44:4
**computer** 40:13 74:14
**computerized** 104:11
**concern** 10:15 67:12
**concludes** 102:3
**conduct** 15:20

**conducted** 1:17 13:23
**confirm** 9:19 37:15 45:5 64:15 90:24,24 92:17 96:20
**confirmed** 60:18,25
**conjunction** 94:5
**connected** 8:21 9:3
**connection** 8:4 21:19 22:10 24:7,16 25:1 38:24 43:13 52:18 53:17 83:15 99:8
**consider** 26:7 27:18
**considered** 25:17 97:19
**consistent** 36:9 46:1
**consultative** 18:1
**consulting** 17:21 61:7 63:4 63:23,24 64:3,8,12,13,14
**contact** 40:5
**contained** 27:25
**contract** 23:16 35:19 55:23 55:25 56:7 60:21 76:20 78:2 81:8,10 82:11,14,20 86:24,25 88:8 91:9 96:21 97:9
**contracts** 85:21 95:2
**contractual** 88:6
**convenience** 71:5
**copied** 49:3
**copies** 32:25 62:22
**copy** 44:18 47:21 49:14 52:5 69:10 74:20 77:4 83:13 84:1 86:19
**corner** 9:2
**corporate** 12:16 15:16,21 49:19 50:18 99:9
**corporation** 64:2
**correct** 7:12 9:20 13:15 15:17 19:3,24 23:4 25:7 28:10 29:25 34:12 39:6,10 40:5 42:16,19 43:10,14 45:23 50:24 51:11 53:18 54:13,17,22 55:25 58:2 60:2 61:3,18 62:18 67:7 69:20 70:1,3 73:6,22 74:2 74:10 77:25 78:10,18 83:21 87:8 88:22 89:1 90:10 91:24 92:22,25 93:11,18,19 94:2,3,6 96:24 103:8 104:13
**correcting** 39:14,16,21 42:11
**corrections** 39:23 103:10,13 103:14
**correlate** 70:23
**correspond** 55:1
**corroborate** 28:13
**Costa** 2:2 7:13
**counsel** 6:14,16 7:15 8:5 10:24 13:24 18:8 19:8 36:16 47:25 66:9 69:16 70:21 80:8 96:4 101:2 104:15
**counsel's** 33:2
**countersigned** 88:25
**County** 1:10 2:6 12:25 86:11
**couple** 60:8 79:12 97:3
**course** 23:4,14,19 30:13 31:7 46:12 68:4 69:2 90:6 93:13
**court** 1:1 6:6,13 7:16 10:21 11:5 18:20 67:22 68:14 100:9,18
**courtroom** 11:3
**covered** 43:16 78:22
**CPA** 15:4,7 17:16 23:10 25:5 30:7 46:18 53:5 70:6 72:12 72:12 75:3,23 77:10 78:4 101:8
**CPA-123114-8** 76:13
**CPAs** 46:21 101:11
**created** 53:17
**credit** 23:21,23 24:2 25:23 54:20 65:18,24 66:6,6
**CSR** 1:24 2:5 104:25
**CUMMIS** 3:5
**current** 15:8
**cutting** 71:1
**Cynthia** 1:24 2:5 6:13 104:3 104:25

**D**

**D-o-l-u-k-h-a-n-y-a-n** 44:13
**data** 42:22 96:10
**date** 6:9 79:7 87:10 105:2
**dated** 35:3 36:19 47:13 49:6 88:3,15 103:19 105:25
**dates** 28:21 89:18 94:21
**day** 30:23 103:19,22 104:21
**debit** 54:19 64:21 65:11,17
**declare** 103:4
**Defendant** 8:21 13:8,24 15:16,21 16:2 20:22
**defendants** 1:11 3:3 6:25 49:20
**defense** 70:21
**define** 12:17
**degree** 14:18
**degrees** 14:16
**delay** 78:21
**depend** 55:3
**Depending** 32:6
**depo** 8:6
**deposed** 10:19
**deposit** 60:20
**deposition** 1:15 2:1 4:16 5:4 6:4,8 7:24 8:21 10:1,10,13 10:15 18:12 34:24 70:22 71:6 81:20 82:7,23 83:9 86:1 89:11 102:4,6 103:6 103:14,15 104:7,8 105:2
**depreciation** 39:18
**describe** 23:7 46:6
**described** 17:11 96:4
**describing** 37:19
**description** 4:14 5:2 26:13 33:3 64:9
**designation** 20:17
**detail** 59:6
**detect** 42:25 43:9
**determine** 40:3 43:23
**Diane** 84:5
**Diego** 2:7
**difference** 32:10 37:16 75:18 80:16 92:4
**different** 12:16 37:5 70:24 71:17 80:15
**difficulty** 54:1
**digits** 72:2
**direct** 49:24 70:5 72:10 81:22
**directed** 61:15
**direction** 104:12
**directly** 13:17
**disbursements** 40:12
**disclose** 26:21
**disconnected** 8:17 9:4
**discrepancies** 89:24
**discuss** 42:3
**discussed** 42:11
**discussions** 42:6
**display** 18:8
**displayed** 36:15
**displaying** 54:5 69:15 80:7 86:5
**distributed** 47:7
**distribution** 56:8,25 70:12 75:5 78:5 91:10 97:7,12
**distributions** 40:16 57:3
**district** 1:1,2 6:6,6 18:20,21 67:22 68:13
**document** 18:9,10,11 19:9 19:13 34:23 36:1,16,18,18 36:23 44:9 47:10,11,19 48:7,23 51:20,20 69:6 70:24 71:12,13,17 81:25 86:6,8,17 96:21
**documentary** 23:18 24:6,15 60:24 61:19
**documentation** 95:3
**documents** 23:13 43:21 49:23 60:1,3 61:24 69:21 86:15 92:19
**doing** 8:5 10:1 23:4 26:1 29:7 41:10 52:15 67:10 71:8
**Dolukhanyan** 44:13,25
**Don** 49:4 51:24 52:7 69:12 74:22 77:6
**download** 53:22 69:6 72:5,8 74:15
**downloaded** 53:23
**downloading** 81:16
**Dr** 22:5 82:15,25 83:14
**draft** 98:24 99:1,6
**dues** 20:9
**duly** 7:2 104:7

**E**

**earlier** 26:2 27:10 28:17 67:1 67:3,9 70:9 94:19,21,23
**earnings** 45:10,16
**easy** 11:7
**EB-5** 1:9 13:3,4 17:18 23:1 24:22 26:21 27:8,10,19 28:4,10,14 29:8 34:8,16 39:3 43:5 44:3,21 45:7 61:17 62:4 63:7 64:19,24 65:1,2,4,6,6,7,12,19 83:16 90:8 93:23
**Ed** 47:12,23
**EDD** 24:13
**education** 14:13
**educational** 19:21
**Egnyte** 18:6 19:13 53:22 72:5,6 79:11
**either** 55:5 104:16
**electronic** 60:11
**email** 4:18,20,22,24 5:3 9:22 9:23 29:13,19 34:24 35:2,7 35:11 44:12,14,19 45:2,5 47:11,22 49:3,7,15,22 51:24 52:5,10,19 53:9,21 63:13,13 84:22 95:12
**emails** 29:17
**employed** 84:24
**employee** 85:20 87:8 88:10 89:12
**employee.'** 86:13
**employees** 24:12
**employment** 19:21 20:5,7 23:16 49:25 50:4,23 51:5,7 51:10 55:23,24 56:7 58:1,5 58:7 67:5 68:23 70:15 73:9 76:8,20 77:14,18 78:1,15 79:3,8 81:8,10 82:8,11,13

82:19 83:24 84:9,10,17 86:8,19 87:17 88:15,16,19 88:24 89:13,16 91:9
**enclosed** 47:14
**encloses** 49:5,17
**enclosing** 51:25
**endurance** 12:2
**enforcement** 18:20 67:25
**engage** 14:24
**engaged** 13:8,15 16:5,11 22:20,24 25:2 28:18,18 34:6 41:15 42:6 44:20 45:17
**engagement** 13:11,12,20 14:4 15:25 16:8,14 17:11 17:18,21 21:11,12,14 22:5 22:8,11,15 28:16,20,23 29:5 30:3,10,11,12,16,19 30:20,20 31:3,15,18,23 33:4,7,9,20 34:14 35:13,14 35:15,17 36:10 37:2,3,12 37:20,21 38:19,21 40:21 41:6,11,25 43:17 53:18 61:21 68:5 73:17,20,23 82:17 90:16,20 93:7,14,19 94:9,13 96:6,24
**engagements** 16:1 21:10 30:13,25 31:7
**entered** 25:12 54:12
**entire** 53:11 93:13 103:5
**entities** 12:16 15:16 16:25 17:2,13 21:20 23:11 24:21 36:3 39:22 45:11,17 50:18 52:13 63:21 94:11,22
**entitled** 18:12 37:13 54:16 54:25 57:22 71:24 72:12 86:8
**entity** 13:4 17:5,9 22:15 24:18 25:9 26:5 50:7,15 55:3,19 62:11 68:9 94:9 98:17 99:17
**entity's** 15:21
**entries** 39:14,21 40:3 42:11 42:13,14 60:8 69:25 71:24 75:1 77:10
**entry** 39:17 40:4 69:19 70:6 70:11 72:11,17 73:3 75:7 76:3
**equipment** 60:5,10,19,20 84:24 95:2
**equivalent** 11:2
**Errata** 103:11 105:1
**errors** 42:25 43:9
**established** 90:23
**et** 6:5 105:3
**events** 12:13
**everybody** 8:10
**evidence** 34:10
**evident** 20:1
**evidently** 8:2
**EXAMINATION** 4:5 7:5 96:1 98:13 99:21
**examiner** 15:13
**examining** 96:5
**example** 25:9 39:18 65:25 91:8 95:11 97:11
**Excel** 51:25 52:14,21 53:8 53:24 54:6 58:19 69:7,10 69:17 71:4,10,12,14 72:6 74:19,19 77:2,4 80:8
**EXCHANGE** 1:4 2:13
**Excuse** 16:13 47:25
**execute** 85:21 88:9
**executed** 37:3 83:13 86:20 87:24
**execution** 88:22
**exhibit** 4:14,15,17,18,20,22 4:24 5:2,3,4,10,11 18:5,10 18:14,16 19:6,8,9,10,14,16 19:18,23 20:1 34:21,22 35:7,12 36:14,17,24 37:1 37:10,10,16,17,24 44:6,8,9 44:10,16,23 47:8,9,17,21 48:2,6,10,20,22,23,24 49:1 49:12,14 50:9 51:15,16,17 51:23 52:4 53:9,21 54:7 58:20 66:23 67:5 68:16,22 69:5,9,17,20 70:23 71:3 74:17 77:3 79:13,15,18 81:14,19 82:4,5 83:6,12,25 85:25 86:7,16,18 87:11,15
**exhibits** 4:12,13 5:1,9 37:21 70:20 79:11
**exist** 43:1 84:12
**expand** 59:5
**expanded** 94:21
**expense** 40:16 55:18 56:23 57:18 65:21,23 66:1,3,8 73:1,2,4 75:8,14,20,21 78:7 79:1 80:19,20 81:3 97:5,5,10
**expenses** 56:4,12,19,19,20 56:21 57:2,16 62:4 70:12 81:6 97:1
**experience** 17:16
**expert** 17:24 18:3
**expires** 103:23
**explain** 84:15
**explained** 28:17 62:2 67:9 70:9 89:23 94:22
**express** 34:10
**extend** 26:2
**extent** 8:6 11:20 26:18 27:25 39:20 66:2

**F**

**f/k/a** 1:9
**fact** 41:20 67:18 82:18 89:14
**facts** 20:25 84:16
**factual** 14:9
**fair** 8:13 11:12,25 26:18 29:2 52:18
**fall** 31:4
**familiar** 12:17 30:2,5
**far** 16:18 17:11 26:4 27:12
**Fargo** 68:10
**faster** 54:3 74:14
**favor** 52:11
**February** 5:5 13:13,21 14:5 16:22 67:16,21 68:2,7 81:21 99:10
**fee** 55:7,11,16 56:3 57:1 65:8 70:13 72:23 73:5 74:10 78:8,14 80:16,17 84:12 87:20 88:7 97:13
**fees** 54:25 55:2,5,20 56:14 57:4,20,24 58:8,9,10 59:1 59:13,21,24 61:7,7,8,13,18 63:1,5,6,10 64:5,17 65:8 68:25 72:16,18 74:6 75:5,9 75:19,19 76:2,7,16 77:12 79:1 80:14,24 81:3,7 88:21 91:8,11 97:2,6,8,16,18 98:7
**field** 35:18
**file** 24:13 53:22 77:2
**filed** 18:20 67:21 98:19
**files** 68:4
**finally** 13:3 76:13
**financial** 30:17 31:2,6,11,15 32:11,12,15 33:3,7,20 41:15,21 42:1,2,8 46:3,15 53:17 96:11
**financials** 52:12
**fine** 20:18
**finish** 11:9
**firm** 26:4 28:13 62:2 67:18 67:24 85:3 87:19
**firm,'** 36:2
**first** 7:2 18:11 19:13 20:22 25:2 28:18 35:8,21 36:18 36:23 38:10,14 47:10 51:23 52:17 54:8 56:25 57:10 67:15 83:11 86:7,15 97:4
**five** 17:6,8 83:11 95:15,18 95:19
**five-page** 19:9 86:6,7
**flip** 19:12 35:6 36:23 47:20 49:11 68:18 86:14
**Floor** 3:16
**Flower** 2:16
**flows** 45:10,16
**focused** 17:15
**folder** 79:11,21
**following** 83:10 86:3,4
**follows** 7:3
**foregoing** 103:6 104:6,12,17
**form** 49:6 78:7
**formal** 94:4
**formed** 61:2
**formerly** 12:24 86:11
**forth** 19:23 36:11 50:16 104:9
**forward** 46:17
**found** 68:13 79:24
**foundation** 89:21 100:5
**four** 17:8 72:2
**fraud** 15:13 42:25 43:10 68:13
**frequently** 29:15
**front** 81:14 87:13
**full** 20:17
**function** 40:10 69:17
**fund** 1:9 13:3,4 23:1 24:22 26:21 27:9,10,19 28:10,14 29:8 34:8,16 39:3 43:5 44:3,21 60:11 61:17 64:19 65:4,5,12,19 83:16 90:8 93:23
**funds** 56:5 65:2 68:8 99:7
**further** 13:9 25:15 28:12,22 98:10,13 99:18,21 101:18 104:15

**G**

**Gartenberg** 47:12,23
**Gary** 2:14 6:20 8:16 9:22,23 10:1 32:3 58:17 70:18,20 71:11 89:21 98:11 101:22
**gather** 34:10
**general** 16:10,16 29:25 38:11,15,17 39:2,6 40:14 45:6 46:14 49:18 50:18 54:8,9,12 58:12 59:5 60:7 61:16 62:1 65:15 66:4 69:1 69:11,22 73:3 74:4,20 75:7 76:22 78:20,22,23 80:4 90:6 92:14 93:18
**generate** 33:11 46:13
**generated** 34:11,17 45:19 46:7 49:17 53:16 94:6
**give** 9:13 62:8 95:12,19
**given** 7:23 11:2 26:22 27:2

28:14 96:5,23 103:9
**go** 8:7 12:7 20:6 26:4 27:12 33:14 46:9 54:9 55:5 56:21 59:12 61:8 74:5 80:4,12 81:12 85:25 87:11 91:18 99:16
**goes** 16:18 40:2 41:24
**going** 10:19 11:23 12:6,15 19:14 27:10,20 35:8 36:24 44:6 45:3 49:13 60:7 66:14 66:16 70:10 72:14 74:4 75:5,17,23 76:23,23 79:10 86:14,15,23 89:21 95:20 102:4
**good** 7:7,8 66:10,11
**Googled** 60:17
**Gouraige** 3:6 4:7,9 6:24,24 7:20 8:16,25 9:11,17,19,24 10:2,4,6 58:16,21 70:18,20 71:11,16 72:1,7 88:11 89:20 90:19 91:15 92:1 95:15,19 96:2 98:10 99:13 99:22 100:6,14,15 101:3 101:12,18
**graduate** 14:14,24
**green** 9:3
**GROSS** 3:5
**ground** 10:20
**guidance** 20:19

**H**

**handle** 94:13
**handy** 9:14
**happened** 8:20
**heading** 20:3
**hear** 33:2 58:14,16 67:12 91:1
**heard** 6:5
**hearing** 10:7
**held** 6:8
**help** 33:11
**helped** 95:4
**hereinafter** 86:12,13
**Herve** 3:6 6:24 7:19 8:20 9:10 58:14 71:2,15 72:4 95:18 100:12
**hgouraige@sillscummis....** 3:11
**Hi** 52:10
**hired** 85:7,11 101:9
**history** 14:14
**hit** 99:4
**hold** 14:16 15:1,10
**holding** 56:11
**hotel** 9:7
**hour** 2:4
**hours** 30:6,7
**huh-uhs** 11:16
**Hunter** 3:22 6:11

**I**

**idea** 62:13 67:19
**identical** 37:20,23
**identification** 18:14 19:10 44:10 47:17 48:10 49:1 51:17 79:15
**identified** 62:1 71:7
**illegal** 42:25 43:10
**image** 8:24
**immigration** 63:4
**impact** 42:14
**impair** 12:12
**important** 11:7,21
**inappropriate** 40:4
**inception** 25:8
**include** 38:5 42:7
**including** 8:1 35:24 43:24
**income** 23:9 25:3 30:8 33:10 45:9,15 73:24 93:20 97:19 97:20 98:7 99:7
**incorrect** 40:4
**increasing** 42:7
**independent** 30:21 32:1 90:23
**INDEX** 4:1
**indicate** 61:22
**indicated** 103:11
**indicates** 47:13
**Industrial** 58:11 59:16
**information** 19:22 21:16 22:21,25 23:3,6,7,13 26:21 26:24 27:3,25 28:8 30:18 34:2 39:7 42:23,24 43:13 50:23 51:1,5 55:21 56:2,16 59:22 60:24 61:1,9,19,20 62:8 63:12 65:22 77:13,17 77:25 78:18,19 81:4 90:21 91:7,19,22 92:10 95:8,10 95:13 96:9,15,17 99:2
**informational** 68:24 73:8 76:6,18 80:24
**initiated** 96:14
**input** 29:10 32:20,23
**inquiry** 14:8 93:15
**instance** 57:6,7
**instruct** 29:24
**intended** 41:25 45:20
**intercompany** 72:18,21 73:3
**interested** 104:18
**internal** 32:13
**Internet** 19:19 60:25
**interrupt** 32:3
**introduce** 6:14
**investigation** 67:16 85:4
**investigative** 68:3
**investor** 27:22 28:1 63:7,8 65:2,5
**invoices** 60:1 61:21 94:17 95:1
**involved** 80:21
**involving** 17:18 88:20
**IRS** 24:13
**isolate** 76:23 80:12
**isolated** 58:25
**issuance** 42:1
**issue** 8:4,11 29:11 34:17
**issued** 67:21 94:4
**issues** 9:8
**item** 29:19
**itemized** 61:21

**J**

**J** 1:24 2:5 104:3,25
**Jacob** 2:15
**Jersey** 3:9
**job** 1:25 11:7 30:8 85:15 93:3,9
**John** 22:5
**joining** 85:16
**joint** 98:3
**journal** 39:14,16,21 40:3,4 42:11 69:19,21,25 70:10 71:24 72:11,17 73:12 74:2 74:25 75:22 76:14 77:9 78:3
**jumbled** 48:9
**June** 4:22 49:6,16 52:23
**justification** 55:22 56:3 57:15
**justifies** 58:4

**K**

**K-1** 98:19 99:25 100:4
**keep** 45:17 87:10
**keeping** 29:18
**kinds** 59:3 60:9 61:5 95:3
**knew** 90:1
**know** 8:10 9:25 10:7 12:3 20:7 28:25 29:12,23 30:22 32:1 37:5 52:11 53:25 62:11,14,15 64:9 65:2 66:5 67:19 68:12 79:17 84:23 85:1,2,7,9 87:12 94:18 96:12 99:6 100:8 101:8
**knowledge** 83:3
**known** 12:24 22:2 86:11

**L**

**L-a-m** 7:11
**L/P** 64:18,19
**L/R** 62:16,17
**Lacks** 100:5
**Lam** 1:15 2:1 4:3,17 6:4,19 7:1,7,11,12,23 10:9 12:9 13:7,22 14:3,14 18:16 19:3 19:13 21:3,11 30:24 32:9 32:17 33:2 34:25 35:7 36:22 44:13,16 45:4 47:12 47:19 48:4,14 49:4,15 52:4 52:21 54:9 56:20 59:1 66:22 68:12 69:20 72:10 77:2 79:10,24 81:15,23 82:16 87:13 89:7,25 91:5 92:11 94:15,19 96:3 97:1 98:15 99:24 100:7,16,21 102:4 103:4,17 105:2
**Lam's** 21:6 49:22 94:14
**language** 37:18
**late** 99:2
**law** 32:6 62:2
**leading** 35:1
**leads** 40:20
**lease** 95:2
**leaving** 85:3
**ledger** 29:25 38:12,15,17 40:14 46:14 54:8,9,12 58:12 59:5 60:8 61:16 62:1 65:15 66:4 69:1,11,22 74:20 76:22 78:20,22,23 80:4 93:18
**ledgers** 39:2 45:7 49:18 50:19 74:4 90:7 92:14
**left** 85:4
**legal** 3:7 6:11 32:4 61:13,18 62:12
**let's** 14:13 33:14 37:24 40:9 66:15 77:1 81:12 82:22 90:4 95:17
**letter** 35:3,13,15,17,23,24 36:10,20 37:2,3,21,21 38:19 43:17 90:16,21 101:8
**letterhead** 35:4 36:19
**letters** 37:12 61:22
**Leung** 2:14 4:6,8 6:20,20 7:6,15,19,21,22 8:19 9:9 9:12 10:8 13:18,19 16:16 16:20 18:7,15 19:1,7,11 32:5 33:1 34:22 35:5 36:15 36:21 44:8,11 47:9,18 48:2 48:3,6,11,22 49:2 51:19,22 58:14,18,22,24 66:11,14 66:21 69:15,18 71:2,14,18 72:4,9 79:16 80:7,11 82:4

82:6 88:14 89:5,6 90:3,15 90:17 91:1,4,17 92:3 95:14 95:16 98:14,23 99:15,18 100:5,12 101:4,14,17,20 101:23 102:1
**leungg@sec.gov** 2:19
**level** 42:3
**liability** 86:10
**liable** 68:13
**license** 15:4,7
**limited** 73:21 86:10 93:9
**line** 10:21 83:20 86:24 105:4
**LinkedIn** 4:17 19:17,19 20:3
**Lisa** 1:8 3:4 22:2
**list** 27:21 28:1 29:19 41:4 49:23
**listed** 41:11
**listing** 20:2
**litigation** 17:21
**Liu** 1:7 3:3 5:5 6:5 13:8,17 15:16,21 16:2,4,6,12,25 17:13 18:19 20:23 21:1,6 21:20,21 22:14 23:9,14,18 24:7,17,25 26:16,23 27:2 28:6,9,13 29:7,14,16 32:20 33:9 34:3,7,15,25 35:23 36:20 38:22,24 39:7,24 40:7,19 41:9 42:6,18 43:5 43:9,13 44:3 49:4,16,25 50:4,17,23 55:2,5,11,16 56:2,5,16,18 57:2,11 58:6 59:20,23 60:18 61:2 62:2 62:22 63:7,11,16,19 67:6 67:15,17,23 68:5,12,23 69:2 70:1,3 72:21 73:6,10 73:13 76:8,21 77:14,24 78:5,14,25 79:2 81:4,5,10 81:20 82:7,17,22 83:9,21 84:10,15 85:8,12,18,22 86:1,3,14 87:18,25 88:5 89:15,23 90:22 92:24,25 94:9,16 96:6 98:16,25 99:7 105:3
**Liu's** 8:21 13:16,24 22:21 27:4 48:13 51:10 58:1 88:16,24 89:13
**LLC** 1:8,9,9,10 12:19,24,25 13:4 45:7,8,8 86:10,12
**LLP** 36:1
**loan** 62:17,19,20,23,25 64:19 65:7,18 72:21
**located** 2:2,6 7:12
**long** 10:12 20:12 79:25
**longer** 29:2
**look** 9:2 17:7 58:11 67:1 77:2 90:24
**looked** 70:16
**looking** 35:21 65:14 70:23 72:5 79:25
**looks** 51:25 52:14 75:4 77:11 78:4 80:21
**loop** 27:8
**Los** 1:10 2:17 12:25 86:11
**lose** 8:7,7
**loss** 32:22,25 45:6,14 46:10 56:22 75:9,10
**lot** 8:1 88:20
**lower** 30:11

**M**

**maintain** 15:7
**making** 10:22 11:5
**management** 17:7 33:12,15 43:23 45:20 46:24 47:2,4,5 54:25 55:2,5,7,10,10,16,20 56:3,14 57:1,3,20,24 68:25 70:12 72:16,23 73:5 74:6 74:10 75:5,8,19,19 76:1,7 76:16 77:12 78:8,13,25 80:14,15,17,24 81:3,7 84:11 87:20 88:7,20 91:8 91:11 92:21,24 96:10,14 96:15 97:2,6,8,13,16,18 98:7
**manager** 21:12,13
**manipulate** 71:21
**manufacturer** 84:25
**manufacturers** 95:2
**March** 1:16 2:4 6:1,9 68:7 99:10 103:9 104:21 105:2
**Marcum** 13:8,15,23 14:10 15:15 16:1,4,11,24 17:12 20:8,13,14 21:13 22:19,21 22:23,25 23:14,19 24:7,16 24:25 26:1,7 27:3,9,12,18 28:2,12,17 29:7 30:25 31:7 34:1,5,7,9,16 35:13 36:1 36:11 37:2,20 38:8 39:8,22 40:23 41:5,11,20 42:6 43:4 43:12 44:2,20 46:2 49:9,18 50:19 53:10 57:13 60:21 62:22 64:7 65:22 67:10 71:23 73:16,25 81:5 82:16 84:16 85:14,19 90:8,12,18 90:22 91:12,22 92:6,13,22 93:14,23 94:4 96:7 97:21 98:15,24 99:25 100:1
**Marcum's** 21:1 35:4,14 36:19 38:19,24 77:4 90:20 93:3,9
**Marcum,'** 36:2
**Marcum_CLiu_00002494** 47:15
**Marcum_CLiu_00002901** 48:8
**Marcum_CLiu_00012588** 50:10
**Marcum_CLiu_12460** 48:25
**Marcum_CLiu_12618** 68:21
**Marcum_CLiu_7275** 35:22
**Marcum_CLiu_7297** 51:21
**Marcum_CLiu_7299** 71:4
**Marcum_CLiu_7409** 58:23
**marked** 5:9 18:10,14 19:9 19:10 34:23 36:17 44:9,10 47:17 48:10,24 49:1 51:17 79:11,15 82:4 83:25 86:6
**marketing** 58:8,9,10 59:1,13 59:21,24 65:8
**marking** 51:15
**material** 23:18 24:15 42:16 73:18 93:5
**materially** 93:11
**materials** 24:6 25:16 26:7 27:18 34:10,17
**matter** 6:4 16:10,17
**McDaniel** 21:8,9 29:4,4 60:16
**mean** 8:22 9:1 12:18,23 21:13 46:8 47:5 63:5 90:13 92:8
**means** 62:17 64:19 90:15
**meant** 90:15
**medical** 45:8 60:5,10,17,18
**member** 20:5,9,10,12
**membership** 20:19
**memorandum** 82:24
**Mesa** 2:2 7:13
**met** 84:21,22 90:1
**Mevion** 22:12 60:14 61:1 84:25 85:5
**Michael** 21:24 84:20,23 85:3 85:15,19 86:12 87:4
**Microsoft** 54:6 69:17 74:19 80:8
**Mike** 49:4 85:7 87:24 88:8 88:25 89:10
**Milena** 44:13,24 45:4,4,14 45:25 47:12
**million** 60:13 68:8 99:9
**mind** 45:17 87:10
**mine** 74:14,15
**minimum** 30:6
**minutes** 66:12 95:15,19
**misappropriation** 99:8
**misconduct** 85:4
**misstatement** 73:19 93:5
**misstatements** 42:17
**misunderstanding** 65:10
**modified** 93:11
**moment** 49:11
**money** 64:23 65:8,11,17
**monitor** 98:18,22 100:3,9,17 101:8,9,11
**monitoring** 9:22
**month** 29:18
**monthly** 37:17
**months** 99:10
**morning** 7:7,8
**MOU** 82:14,22,24 83:13 84:8
**move** 29:25 40:9 64:16
**moved** 79:21
**moving** 11:12 40:20 41:14 43:16 83:19

**N**

**name** 6:11 7:9 21:7 22:2 24:3 61:12 64:13 89:3 104:20
**named** 104:17
**Nancy** 21:8,9 29:4 60:16
**native** 58:19 71:4,14,19,22 74:18 77:2,4
**nature** 42:13 56:24 57:17 96:5,23 97:5
**necessary** 21:17 40:15
**need** 11:14 19:12 36:23 52:11,12 63:14 84:2 93:10 99:1,3
**needed** 22:21,25 39:23 54:12 63:16 90:9
**never** 84:21,22 90:1 99:4
**new** 3:9,17,17 8:1 48:1,2 51:15
**Newark** 3:9
**newly** 82:4
**nods** 11:15
**nonassurance** 30:20
**Northridge** 14:19,21
**Notary** 103:23
**note** 39:5
**noted** 52:13
**notes** 46:15,19 53:4
**notice** 9:1
**noticing** 6:16,21
**Novodor** 22:8
**number** 9:14,15 12:16 38:17 39:1 46:20 47:13,15 48:8 48:25 49:5,24 50:9 51:21 56:18 58:8,16,18,22 59:2 60:4 61:5 62:16 63:1,23 64:18 65:21 68:20 71:3,6 75:18 77:10 80:14,23
**numbered** 70:6 71:20 72:12

75:3,22
**numbering** 71:13 72:3
**numbers** 32:14 70:22 71:9

**O**

**O-p-t-i-v-u-s** 22:17
**oath** 7:16 11:2 103:13
**object** 88:11 89:20 90:19 91:15 97:15
**objection** 92:1 99:12,13 100:5
**obligation** 100:3
**obligations** 90:23
**obtain** 14:17 15:4 27:3 73:21 93:3,9
**obtained** 73:17
**occurred** 16:23 52:18 79:2
**October** 95:6
**offer** 103:12
**offering** 62:5,6,14
**oh** 20:6
**okay** 8:1,9,15 9:9,12,24 10:2 10:12,15,18 12:7,15 13:7 14:7 15:24 17:10,15 19:5 24:6,20 25:14,25 27:8 29:1 31:14 33:25 36:14 37:9,24 38:10 39:13 40:20 41:14 42:10 44:23 46:22 48:4,5 48:19 49:22 50:21 51:15 52:25 53:8 54:5,10,19,24 55:15,21,24 56:8 59:18,22 60:4,7 61:15,25 63:16 64:18 65:20 66:24 67:3,15 67:20 68:2,17 69:9 70:8,14 71:16 72:7,10 73:12 74:13 75:3,22 76:13,22,25 77:9 77:24 78:3,20 79:7,10 80:3 80:6 81:9,12,17,19 82:2,22 83:2,8,9 84:8,23 86:3,18 87:16 93:2,13 97:10 99:6 101:2
**once** 10:11 14:3 36:22 53:15 53:23 77:1 87:17
**open** 19:6 29:19 34:21 36:14 44:7 47:8 48:4,20,22 51:16 53:20 66:22 69:5 72:6 74:12 77:1 79:14,17 81:18
**opened** 54:7 74:18 80:9
**operations** 100:18
**opinion** 18:2 34:10
**opportunity** 77:2
**opposed** 53:24 65:3
**Optivus** 22:16 60:14
**oral** 59:23
**orally** 63:11
**order** 22:19,23 99:2
**Organizations** 20:2
**original** 75:7
**originally** 64:2,7 75:12 79:22
**our'** 36:2
**outcome** 104:18
**output** 46:6
**outside** 10:9
**outstanding** 94:16
**overlap** 91:3
**oversea** 63:3,9 64:2,12
**overseas** 63:20
**oversee** 100:18
**owned** 17:2

**P**

**P&L** 46:14
**p.m** 45:3 66:18,20 95:21,22 95:22,24 102:5,6
**Pacific** 1:8,8 12:18,18 13:4 23:1 24:21 25:10,15,18,22 26:20 29:8 34:8,15 39:2 43:5 44:3,20 45:7,8 61:17 62:5,16,23 64:18 65:18 66:15 83:16 90:7 93:22 95:17
**page** 4:5,14 5:2,9 18:11 35:21 36:18 37:25 43:17 47:10 50:8,9 51:4,23 58:16 58:18 66:23 67:5 68:16 70:22 71:8 81:24,25 83:6,7 83:19 86:1,7,23,24 87:12 87:14,23 105:4
**pages** 48:7 68:22 83:11
**paid** 24:12 26:13 55:8,19 56:13 63:3,9 64:1 72:16,23 94:16 95:11
**Palace** 80:23
**paper** 101:10
**paragraph** 35:23 41:14 42:10,21 43:18
**part** 16:7,13 22:4,7 28:15 31:20 33:25 34:5,7,14 49:19 64:13,13 73:16 89:9 94:1
**participating** 14:4
**particular** 59:11
**parties** 33:16 104:16
**partner** 21:3 49:15
**partnership** 17:9
**party** 6:21 33:13,17 47:7
**Pass** 95:14 98:11
**patient** 75:17
**pause** 80:1
**pay** 20:8 65:8
**payable** 64:19,25 65:18
**payee** 76:19
**payment** 59:16,20 60:11 63:3 64:1 72:19,20 76:1,15
**payments** 58:11
**payroll** 24:9,11
**PC** 3:5
**PDF** 47:1,14 48:9 49:6 83:7
**penalty** 103:5
**pending** 12:5 101:5
**perform** 13:9 15:19 16:5,12 22:19 25:2 27:9 28:18 30:22 36:12 38:4 41:16,21 73:25 93:15,24 95:5
**performed** 15:15 16:2 28:22 41:7 42:22 43:4 44:2 53:10
**performing** 25:17 26:8 27:19 40:10
**period** 29:2 53:13 94:20
**periods** 24:24 27:10 94:23 95:5
**perjury** 103:5
**personal** 55:18 56:4,19,19 56:24 57:2,16,17 66:2 68:9 70:12 81:3,6 97:5,21 98:6 98:15,24 99:6
**pertain** 63:2,24
**pertaining** 69:10
**pick** 98:7
**place** 59:11 66:10 88:21 104:9
**plaintiff** 1:5 2:3,12 6:20,23
**platform** 8:6,8,22
**Plaza** 3:8
**please** 6:14 7:9 8:7 9:21 10:7 19:6 44:7 45:11,17 48:20 51:16 66:10 77:10 79:18 81:12 84:4 90:14 91:5,18 99:16 101:15
**pleased** 42:3
**point** 32:4 38:10,14 39:13 40:2,7,9,17 48:17 59:10 66:12 79:13 89:2
**points** 38:6,6 41:3,4,10
**polices** 96:7
**policies** 96:4
**portion** 89:23
**position** 39:8
**possible** 11:8
**Post** 38:11,14
**potentially** 27:20
**PP** 13:3 23:1 24:22 26:21 27:8,10,19 28:4,10,14 29:8 34:8,16 39:3 43:5 44:3,21 61:17 65:4,12 83:15 90:7 93:23
**predefined** 32:21
**preferable** 11:18
**preparation** 18:2 31:2,6,11 31:15 32:11 33:3,8,20 42:1 42:8 45:18 46:3 53:18
**prepare** 17:1,9 33:12 41:15 41:21 97:21 98:15,24 100:1
**prepared** 23:10 25:5 34:5,18 39:22 46:18,20 49:8,18 50:19 53:5 61:16 98:18,21 99:25
**preparing** 32:12 43:21 90:6
**pressing** 46:12
**prevent** 12:10
**previous** 46:18 53:3
**previously** 5:9 34:23 36:17 52:11 77:20 84:24
**PRICE** 3:14
**print** 46:10 58:23 71:19,19
**printed** 89:3
**printout** 71:20,21
**prior** 79:3 95:5
**probably** 53:4,6 84:21
**problem** 89:18
**procedure** 35:20
**procedures** 74:1 93:15,25
**proceeding** 104:17
**proceedings** 11:6,15 104:10 104:13
**produced** 71:18,23
**professional** 10:16 15:1,10 15:15,24 16:24 17:12,16 17:17,20 19:22 20:19 21:14,19 24:16 43:20 61:14,18 62:3,13 95:1
**profile** 4:17 19:17 20:3
**profit** 32:22,25 45:6,14 46:10 56:22 75:9,10,12
**program** 17:18 40:13 64:24 65:6 74:19
**prohibited** 43:20
**project** 25:25 62:5,6 83:14
**proper** 38:16 39:1,11 64:15
**properly** 26:22
**proposed** 42:14
**Proposing** 39:14
**proton** 1:8,9,9,10 12:18,19 12:23,24,25 13:4 23:1,1,25 24:3,21,22 25:10,15,18,22 25:25 26:8,20,20 29:7,8 34:8,8,15,15 36:3 39:2,2 43:5,6 44:3,4,21,21 45:7,7 51:8,9,11 54:21 55:8,12,24 56:6,20,21 58:1,6 60:12 61:17,17 62:5,12,16,23,24 64:18,24,25 65:8,12,14

66:4 67:4,6 68:23 69:2,12 69:22 71:8 72:21,22 73:2,5 73:6,10 74:21 75:13,14 76:2,8,9,15,17 77:5,15 78:7,16,23,23 79:1,3,8 80:5,22 81:9 82:9,11,20 83:14,16,17,22,24 84:12 84:18,24 85:8,11,16,20 86:10,11,20 87:8,18,25 88:8,10,17 89:1,12 90:7,7 93:23,23
**Proton's** 65:3 85:22
**provide** 20:18 32:4 42:23 45:12 62:22 63:19 76:21 101:9
**provided** 17:12 23:9,10,14 23:16,19,21 24:7,9,16,25 25:11 26:23 27:7,21 34:3 37:20 39:4 43:13 47:3 55:22,23 56:2,3 61:12 65:25,25 78:1,14 81:4,8 83:2,5,23 87:19 90:21 91:7 91:10,20,22 92:10,19 97:9
**provider** 62:1,3
**provides** 32:15
**providing** 32:13
**PST** 2:5 6:1
**public** 15:2 20:20 103:23
**published** 19:7,18
**pull** 18:5 37:9 54:4 74:5 81:13
**purely** 81:3
**purpose** 13:24 35:17,24
**pursuant** 13:16 19:2 33:19 34:11,18 41:6
**push** 32:24
**put** 29:22 30:17 46:19 64:3 80:1 97:7,11
**putting** 32:15

**Q**

**qualification** 12:4
**quarter** 40:13
**quarterly** 37:18 38:4
**question** 11:9,12,20,22,23 11:25 12:5,7 13:7,22 14:3 17:15 19:13 32:11 35:8 36:23 49:13 52:17 61:15 62:9 74:17 77:3 82:8 83:19 84:2,4,6 86:15,18,25 87:2 87:4,7 88:11,13 89:9,20,21 89:22 90:19 91:2,5 96:18 99:14,23 100:7,16,21,22 101:5
**questions** 11:1 14:8,9 86:4 96:3 97:3 98:10 99:18 101:13,19
**QuickBooks** 32:20,21 33:11 34:11,18 39:21 40:12 44:24 45:19 46:7,9,13,22 47:22 48:13 49:5,8,17 52:1 52:23 53:15 69:11 71:7 74:21 94:5 96:16
**quite** 100:12

**R**

**R** 3:15 54:16 74:5 76:23 80:12
**raising** 9:6
**rationale** 57:8
**RDR** 1:24
**read** 9:19 36:9 40:2 84:2,4,6 89:22 100:24 101:5,14,16 103:5,7
**Reading** 104:22
**reads** 38:10,14 39:13 40:10 86:9
**ready** 35:8 74:13
**really** 70:25
**reason** 9:6 11:14 27:2 78:12 105:5,6,8,9,11,12,14,15,17 105:18,20,21,23
**reasonable** 73:17 93:4
**recall** 20:2,25 23:24 24:24 27:15 46:22 48:12 49:7 50:1 67:17,23 79:7 84:20 94:16,25
**receipts** 40:11
**receivable** 62:19,20 65:1 72:18
**receive** 55:21 56:16 61:20 98:19
**received** 23:3,7 24:19 45:6 59:22 79:5 96:9 99:2,7 101:7
**Recess** 66:18 95:22
**recipient** 64:14
**reclassed** 74:10
**reclassification** 70:15 72:14 73:9 75:4,24 77:13 78:5
**reclassified** 57:3,19 64:3 72:20 77:11 78:13 81:7 91:10 97:8
**reclassify** 56:13,25 57:23 70:11 75:10,15,15
**recognize** 19:14 35:9 36:24 44:16 50:10 83:12 86:16
**recollect** 12:13
**recollection** 59:2
**recommence** 48:17
**reconcile** 29:10 32:23
**record** 6:10,15 7:10 8:3 11:17 17:7 18:7 19:7 26:12 34:22 36:15 39:18 40:1 44:8 47:9,14 48:6,24 61:11 66:14,16,20 68:20 69:15 73:1,3 76:1,16 80:7 81:19 86:5 91:6,14,19 92:8,9,16 92:18 95:8,16,20,24 96:16 102:1,5 104:13
**recorded** 55:20 91:21,25 92:5,14 93:18
**recording** 38:17 39:1 40:11 91:12 92:4
**records** 26:19 42:15,16 96:11
**recruit** 63:8
**reference** 40:23 42:18 50:3
**referenced** 5:9 82:23
**referred** 38:18 40:6
**referring** 13:4 24:21 26:15 57:25 59:14
**refers** 37:16,18 40:18
**reflect** 38:7 53:9
**reflected** 35:15 50:18 51:4 54:16,20,22 67:4
**reflecting** 77:4
**refresh** 59:2 79:11,20
**regarding** 44:19 83:14
**Regenstreif** 2:15 6:22,22 9:15,18,21,25
**regenstreifj@sec.gov** 2:20
**Regional** 1:8 12:19 25:10,22 26:20 29:8 45:8 55:8,13 62:17,24 72:17,19,22,24 75:25 76:16 78:6 83:16
**related** 36:3,5 49:25 50:4 52:5 56:22 62:4,14 66:7 69:11 74:21 94:9 95:1
**release** 101:11
**relied** 42:25 43:9
**rely** 96:9
**remember** 20:17 27:17 53:2 94:18
**remote** 1:15 2:1,10 3:1 7:16 104:6,8
**remotely** 2:5 104:7
**rendered** 16:24 38:8 61:23 94:17
**reopen** 80:2
**repayment** 62:17
**repeat** 88:13 89:8 100:22
**rephrase** 32:10
**reply** 29:20 45:2
**report** 24:13 33:10 34:17 40:14 46:9,14,15 53:3,6 71:7 74:20 94:4
**reported** 1:23 99:7 104:10
**reporter** 6:13 7:16 10:3,5,21 11:5 14:2 16:19 38:13 47:25 48:21 58:13 66:9,13 70:19,25 82:3 88:12 91:3 97:24 98:2,20 99:12 100:11,20,24 101:2 104:4
**REPORTER'S** 104:1
**reporting** 96:10
**reports** 34:18 39:21 44:24 45:19 46:7,23 47:22 48:13 49:5,8,17 52:1,23 53:15 69:11 74:21 94:5 96:10
**represent** 6:15 89:10
**representation** 27:6 30:23
**representatives** 48:14
**representing** 6:19
**request** 25:23 26:10
**requested** 42:3 104:22
**requesting** 21:16
**require** 42:2
**required** 20:4,8 103:20
**requirements** 7:17
**respect** 15:19 28:3 29:6 46:6 51:8 54:24 55:15 56:4 67:10 73:12,22 74:1 77:5 81:2,5 88:7 93:21
**respectively** 37:22
**response** 11:1 52:9,15
**responsibilities** 29:6 85:15
**responsibility** 40:5,22,24 41:5,10,12,13
**responsible** 40:14 42:12,15
**result** 41:25 73:18 93:5
**resulted** 79:25
**retained** 45:10,15
**retention** 21:1
**return** 17:1,9 23:10 24:9,11 25:5 33:12 46:18,20 48:16 53:5 94:10 98:17,19,25 99:3,7
**Returning** 29:4
**returns** 17:3 97:21,25 98:3,7 98:16 101:10
**review** 30:10,11,13 31:4,12 31:19,20 41:16,22 60:21 65:24 101:20,23,25
**reviewed** 21:15 39:15
**reviewing** 40:3,14 42:13 94:25
**right** 8:12 9:2 10:18 12:20 33:22 41:1 48:9 53:14,20 54:15 57:13 58:21 60:4 65:13,15,20 67:13 70:16 71:2 73:10,14 75:1 77:9,17 77:22,23 80:3 81:10 83:20 84:13 87:21,23 88:17 89:7

90:4 91:13 92:9,15 93:5 102:1
**right-hand** 9:2
**Riverfront** 3:8
**RMR** 1:24
**role** 21:10,12
**roles** 29:6
**row** 54:11
**rules** 10:20
**runs** 44:14
**Ruth** 22:8

S

**sale** 60:1
**sales** 60:21
**San** 2:7
**sat** 10:10
**save** 103:9
**saw** 61:19 76:4 97:4
**saying** 52:10
**says** 9:3 41:14 43:19
**sberger@vedderprice.com** 3:19
**SC** 17:6
**scope** 33:7 35:14 36:11 37:19 42:7 93:6
**screen** 8:23 9:1,3,10 18:6 19:8 53:23 54:6 59:7,9 69:16 71:9 80:8
**search** 60:25
**SEC** 6:4 18:19 67:16,21,25 68:3,4 96:5 98:22 105:3
**second** 32:4 35:23 37:3 39:13 70:7 80:1 89:9
**second-from-last** 43:18
**section** 37:13 38:3 40:20 41:12
**securities** 1:4 2:13 68:13
**see** 9:9 36:3 45:2 52:1 53:24 56:8 59:6 62:25 64:23 65:20 69:6 71:12 72:7 73:4 81:25 87:24 88:3
**seeing** 74:9
**seen** 18:16 82:23 83:4 89:11
**send** 9:21 52:12 64:11 100:4
**sending** 48:13
**sent** 10:1 47:1,23 49:3,15 51:24 52:22 70:21 71:5,12
**sentence** 38:3 40:21 42:12 43:19
**sentences** 45:22
**Separately** 4:13
**September** 94:11
**series** 38:5 41:3
**served** 87:19
**service** 18:24 31:16,24 33:10 42:4 49:19 62:1,3
**services** 15:15 16:24 17:12 21:14,20 25:3 26:8 27:9,19 28:19 29:1 30:9 36:5,6 37:13,17,18,19,25 38:5,7 41:17,22 42:22,24 43:7,8 45:20 46:8 53:10 61:23 68:6 73:24 90:9 93:14,20 94:17,20 95:1,5
**services'** 36:6,7,7
**set** 19:22 32:22 36:10 50:16 104:9
**setting** 10:9
**share** 19:8 53:23 69:16
**sheet** 32:22 46:10 64:4,17 75:11,16 103:11 105:1
**sheets** 32:25 45:6
**Shorthand** 104:3
**show** 60:7 79:13
**showing** 18:9 71:9,22
**shrugs** 11:16
**sign** 101:20,23,25
**signature** 89:4 101:24
**signed** 82:8,14 86:17,25 87:5 89:13 99:3 103:17 105:24
**signing** 84:17 104:22
**signs** 87:25
**SILLS** 3:5
**similar** 40:12 76:3
**sir** 83:12 84:3
**sit** 10:12
**skip** 44:6
**software** 46:11,13
**sorry** 20:6,16 46:24 47:4 68:18 70:25 78:21 79:24 87:15 98:20 101:22
**sort** 33:7 61:22
**sound** 8:24
**source** 43:21
**South** 2:16
**speak** 21:24 22:1
**speaking** 11:8
**specialty** 14:22
**spell** 7:9 62:4
**split** 54:16 74:5
**spoke** 24:20 56:18
**spreadsheet** 50:11,13 58:19 71:5,10,15,20,23 74:19 77:4
**spreadsheets** 52:21 53:8 69:10
**Stan** 21:3,6 34:25 44:13 49:4,15 67:19,20 68:1,2
**standard** 96:7,19
**standards** 20:20 43:21
**start** 20:13 42:12 74:25
**started** 26:5
**starting** 6:16
**state** 2:3,7 6:15 7:9 14:19,20 15:3,5,8 32:6 104:4
**statement** 25:12,13,20 26:12 27:7,21 30:18 31:2,6 31:15 32:11,12,16 33:3,8 33:20 41:18 42:1,2 43:2,6 43:25 44:4 45:15,16 46:3 53:18 64:11,11 65:24 81:1 95:9,10
**statements** 23:11,22 24:5 24:20,25 25:16,19,24 26:10 28:1 41:16,21 42:8 45:9,10,15,23 61:21 94:24 95:4
**states** 1:1 6:6 32:7
**stenographically** 104:10
**step** 30:11 90:4
**Steve** 13:14 18:23 91:1
**Steven** 3:15 6:18 101:20
**stick** 37:24
**stipulate** 7:15
**stopped** 48:15
**stopping** 66:11
**Street** 2:16
**stricter** 31:25
**strictly** 93:19
**strike** 22:22 34:6 51:2 56:17
**string** 4:20,22,24 5:3 34:24 35:2,11 44:12,14
**stub** 26:11 39:4 61:12
**stubs** 23:12 26:19 38:25 61:20,25 62:3,8,10
**stubs/checks** 38:16
**study** 14:20,24 16:6,11,21
**subject** 16:10,17 63:21
**submit** 99:3
**subparts** 51:18
**subpoena** 4:15 18:12 19:3 67:20 68:3
**subpoenaed** 18:19 67:15
**subscribed** 103:21 104:20
**subsequently** 28:20
**substantiation** 74:1 93:24
**sued** 67:24
**sufficient** 11:17 28:2
**Suite** 2:16
**summary** 49:24 50:3,14
**supposed** 88:5
**sure** 32:5 43:16 59:11,15 66:14 73:13 83:4 88:15 89:10 95:16
**surrounding** 49:7 84:16
**suspended** 48:12
**suspense** 29:21 77:12,21
**sworn** 6:17 7:2 10:25 81:23 103:21 104:7

T

**T** 54:20
**T-r-a-n-g** 7:11
**tab** 54:9 69:19,20 71:24 74:4 75:1 76:23 77:10
**take** 12:3,3 19:12 35:6 36:22 37:10 49:11 66:9 89:3,5 90:4 95:15 96:15
**taken** 2:3 67:1 81:20 104:8 104:13 105:2
**talk** 14:13 82:22
**talked** 83:25
**talking** 12:15 16:14 86:23
**tasks** 41:5
**tax** 17:3 23:9 25:3 28:19 30:8 33:10,12 36:5,5 45:18 46:18,20 48:16 53:5 73:24 93:20 94:10 97:21,25 98:3 98:6,15,24 99:6 101:10
**team** 21:5 34:1,9,16 39:8 82:18 83:3 84:15 85:19 89:16 91:13,23
**technical** 8:11
**tell** 8:22 11:21 40:15 47:20 72:1 88:5
**telling** 28:13 63:14,16
**ten** 66:12 95:18,19
**term** 30:2,5
**terms** 23:13
**test** 12:2
**testified** 17:24 28:21 46:1 67:3 89:13 94:19 97:1
**testifies** 7:2
**testify** 4:15 18:12,19 99:24
**testifying** 12:10 68:24 92:6
**testimony** 10:25 11:3 18:2 81:23 82:23 89:11 103:6,9 104:9,13
**Thank** 7:21 33:24 45:4 66:13 101:12,17
**therapy** 1:8,10 12:19,25 83:14 84:24 86:12
**thing** 66:14 79:25
**think** 10:18 12:9,12 16:18 20:4 32:9 62:17 70:9 75:17 90:20,22 99:24
**third** 33:13,16,17 47:7
**thought** 16:14
**three** 16:2 17:8 24:21 39:22 50:6,17 52:13,13 94:21
**three-page** 18:10 44:9
**Thropay** 22:5 82:15,25

83:14
**Tim** 6:11
**time** 6:9 8:20 9:25 10:11,19 19:12 24:24 29:2 35:6 36:22 37:11 42:5 52:14 53:3 66:15 67:23 94:20 95:17 99:19 104:8,14
**timely** 98:19
**times** 79:12
**Timothy** 3:22
**today** 6:13 7:13 10:24 11:1 12:10,13 14:9 15:8 19:2 46:1 67:1,9 94:19
**today's** 6:9 11:6,15 102:3
**told** 45:25 59:20 60:19,19 63:6
**Tony** 6:22 9:13,13
**total** 56:14
**traffic** 52:19
**Trang** 1:15 2:1 4:3,17 6:4,19 7:1,11 52:11 102:4 103:4 103:17 105:2
**transaction** 25:12 26:12,22 27:2,4 28:14 29:12,22 32:20,23 39:19 54:11,19 60:22,25 61:11 66:7 75:8 91:6 92:18 95:8
**transactions** 15:20 38:11,15 43:22,23 51:2,4 54:25 55:4 55:11,15 58:9,25 59:3 60:9 60:9 63:24 64:21 65:23 67:12 74:8,9 79:1 80:13,15 80:21 90:9,12,18 91:12,13 91:23 92:6,7,14,20 93:17 93:21
**transcribed** 104:11
**transcript** 5:4 81:20,24 86:1 86:2 89:23 103:6,8
**transcription** 10:22 11:6,15 104:11
**transfer** 60:12 64:10 73:3 96:13
**transferred** 50:17 68:8
**transferring** 65:12
**transfers** 55:11,12,12 56:5 56:18 69:1 78:25
**transmission** 49:8
**transmitted** 46:23 52:6,23 53:16 69:12 74:22 77:6
**transmitting** 44:24 47:11,22 49:22 51:24
**travel** 65:21,23 66:1,2,3,8
**treat** 57:18
**treatment** 57:16
**trouble** 10:6
**true** 19:23 44:18 46:4 47:21 49:14 52:5 69:9 74:19 77:3 83:12 84:1 86:18 103:8 104:12
**truthfully** 12:10
**try** 9:23 100:16
**trying** 54:3 59:5
**Tuesday** 2:4 6:1 45:3
**turn** 50:8 66:23 68:16 76:22 81:24 83:6 86:1 87:11,23
**Turning** 78:20
**two** 74:9 89:14
**types** 54:25 55:10

**U**

**uh-huhs** 11:16
**ultimately** 97:2,6
**understand** 11:3,18,21,22 11:23 13:5 18:18 100:7,14
**understanding** 8:19 11:25 36:1,10 42:13 82:24 103:12
**understood** 12:21 13:1,18 14:11
**undertake** 28:12
**undertaking** 41:6
**undertook** 90:22
**United** 1:1 6:6
**university** 14:17
**us'** 36:2
**use** 9:12 33:12,15 45:20 46:24 47:2,4,5,6 80:22
**usually** 39:25

**V**

**v** 105:3
**VEDDER** 3:14
**VedderPrice** 6:19
**Vega** 1:24 2:5 6:13 104:3,25
**vein** 60:2
**verification** 28:12 74:1 93:24
**verify** 34:1 42:23 43:12
**verifying** 27:3
**version** 74:18
**versions** 52:1
**versus** 6:5 18:19 62:6
**video** 1:15 2:1 7:23 8:4,5,7 10:9
**VIDEOCONFERENCE** 1:17
**videographer** 3:21 6:3,12 66:16,19 95:20,23 102:3
**videotaped** 6:3 102:4
**voluminous** 47:10 48:7 51:19
**vs** 1:6

**W**

**W-a-n-g** 22:2
**wages** 24:12,14
**wait** 11:9,10
**waiting** 74:15
**waive** 101:24
**walk** 10:20
**walked** 78:24
**Wang** 1:7,8 3:3,4 22:1,2 23:17 50:17 55:3,6,12 76:19,21 77:15 78:2
**want** 9:5 12:2,17 14:7 42:12 53:20 70:5 73:13 81:22 95:17 100:24 101:24
**wanted** 25:7
**wasn't** 83:2 85:17,20 88:9
**watermark** 46:25
**way** 61:21 64:22 94:25 104:17
**we're** 8:5,11 12:15 58:18 66:19 71:8,23 74:9 95:20 95:23 102:4
**we've** 9:7 42:10 90:23
**we,'** 36:2
**web** 53:25
**Webex** 6:8 8:6,8,22
**website** 19:19
**weeks** 89:14
**Welcome** 66:22
**Wells** 68:10
**went** 25:8,10,15 26:6 27:13 28:22 64:10
**weren't** 57:13
**WHEREOF** 104:20
**Wi-Fi** 9:7
**wife** 17:2 98:1,4
**wife's** 68:9
**wire** 64:10 96:13
**Wise** 49:4 51:24 52:7,9,10 52:22 69:13 74:23 77:6
**wish** 101:23
**withdrawals** 80:23
**witness** 2:2 3:13 4:2 6:16 7:2 17:24 18:3,9 32:19 36:16 54:5 69:16 71:22 80:9,9 86:6 88:13 89:22 91:2 95:14 98:11,22 101:1 101:7 103:1 104:6,20
**word** 89:4,5 91:15 92:1
**work** 10:16 13:9,23,23 14:10 14:13 15:19,20,24 16:4,22 16:23 20:22 21:15,20 22:14,19,23 23:4,15,19 24:8,17 25:1,14,17 26:1 28:4,13,21 29:7 30:14 31:7 33:18,18,25 34:5,7,12,19 36:11 38:25 41:6,24 42:7 43:4,14 44:2,19 46:2,3 48:12,17 61:21 67:10 68:5 69:3 77:5 82:16 83:3 88:6 89:17 92:15 94:1,8,23 99:17 101:10
**worked** 17:17,20
**working** 20:13 21:3,5 83:15
**wouldn't** 73:18 93:4
**write** 45:13,14
**writes** 45:4
**writing** 52:9
**written** 10:22 11:6,15 83:22
**wrong** 8:22 32:18 92:9

**X**

**X-i-n** 22:1
**Xin** 1:7 3:3 22:1 23:17 55:3,6 76:19,21 77:14 78:2

**Y**

**Y** 2:14
**Yeah** 20:7 37:8 59:9,13,16 65:10 66:11 71:14 79:22 86:17
**year** 14:5 15:22 23:9 27:15 29:18 42:5 48:18,19 53:2,7 67:11 98:6,25 101:10
**years** 36:8 37:5 52:13 61:16 90:8
**York** 3:17,17
**you'** 36:4
**your'** 36:4

**Z**

**0**

**07102** 3:9

**1**

**1,074-page** 51:20
**1:07** 95:22,24
**1:17** 102:2,5,6
**10:04** 2:5 6:1,10
**10019** 3:17
**11** 36:19 81:25 87:2,5,10
**11:42** 66:15,17,18
**11:52** 66:15
**12:00** 66:18,20
**12:51** 95:17,21,22
**120** 83:25
**121** 86:7,16,18
**122** 83:12
**123113-1** 70:6
**123113-2** 72:12
**123114-6** 75:23

**123114-7** 75:4
**123115-2** 77:10
**12311510** 78:4
**12626** 48:25 68:21
**129** 50:8 51:4 66:23
**12th** 104:21
**13** 27:17 37:6
**130** 5:10 34:21,22 35:7,12 37:10,16,22
**131** 5:11 36:14,17,24 37:1 37:10,17,21,24
**135** 4:15 18:5,10,14,16 19:5
**136** 4:17 19:6,9,10,14,16,18 19:23 20:1
**138** 4:18 47:8,9,17,21 48:2
**139** 4:20 48:4,6,10
**14** 4:22 37:6 49:16
**140** 4:22 48:20,22,23,24 49:1,14 50:9 66:23 67:5 68:16,22 87:11,15
**141** 4:24 51:16,17,23 52:4 53:9
**141A** 51:18 69:5,9,17,20 71:3 72:2 74:12
**141B** 74:12,17 80:2,9
**141C** 53:21 54:7 58:20,22 77:1,3
**141J** 51:18
**142** 5:3 44:6,7,8,9,10,16,18 44:23
**143** 5:4 79:13,15,18,19 80:1 81:12,14,19 82:4 83:6 85:25
**14th** 49:6
**15** 25:3 37:7 94:11
**15-page** 34:23
**158** 68:16 87:12
**159** 68:18,19 87:15
**16** 15:18 83:7 92:15
**16-page** 36:17
**1600** 60:4,10
**1633** 3:16
**1664** 63:1
**1666** 54:24 55:1,16 56:14 74:6 75:19 76:24 78:14 80:17
**1668** 58:8 59:2
**167** 50:8 51:4 66:23 68:19 87:12,15
**167-page** 48:23
**1750** 62:16
**18** 4:15
**19** 4:17,18 44:14 45:3 47:13 47:23
**1998** 10:14
**1999** 15:6,8 30:7

**2**

**2** 48:8
**20** 4:20 5:3 44:15 45:13 103:19,22
**2010** 25:10,14,18
**2012** 26:5,6,9 27:17,20 53:11
**2013** 24:9 27:10 36:8 69:12 69:22 71:7 76:4 78:22 79:2 88:21
**2014** 25:3 26:2 28:19,22 36:8 45:9,11 46:16 74:22 75:1 78:24 80:5,15 88:21 95:6
**2015** 14:10 15:16,24 16:23 20:24 21:2,19 22:4,7,10,14 22:20,24 23:15,19 24:8,17 25:1,8,11,14,18 26:9 28:19 28:23 29:9 33:19,25 34:9 34:14 35:1,1,4 36:8 37:21 38:8,25 39:22 41:7,20 43:6 43:14 44:4 45:9,11 46:2 48:16 49:18 53:13 60:9 67:11 69:3 77:6 78:24 79:2 82:17 83:3 88:21 89:15 92:15 93:14 94:1,6 98:6
**2016** 4:18,20,22,24 5:3 14:10 15:17,18,20,22,25 16:23 21:19 22:5,8,10,14 22:20,24 23:15,20 24:8,17 25:1 28:24 29:9 31:8 33:19 34:1,9,14 36:19 37:4,20 38:8,25 39:23 41:7,20 43:6 43:14 44:4,15,15,21 45:25 46:2,23 47:13,23 48:14 49:16,18 51:25 52:7,22 53:16 67:11,12,16,21,22 69:3,13 74:23 77:7 79:4 82:10,10,17,19 83:3,24 84:13,17 87:2,5,10 88:3,10 88:16,22 89:1,12,15 93:14 94:1,6,9,12,17 98:16,25 99:9,17,25 100:2
**2021** 1:16 2:4 5:5 6:1,9 15:25 16:22 81:21 103:9 104:21 105:2
**21** 83:20
**210309CJV** 1:25
**212** 3:18
**22** 86:24
**23** 35:1
**24** 5:5 81:21
**2510** 64:18
**2767** 47:16
**28** 35:3
**29** 35:1

**3**

**3** 4:24 37:25 51:25 52:6 60:13 69:13 74:23 77:7
**30(b)(5)** 7:17
**30(e)** 101:21,24
**3110** 56:8
**31st** 3:16
**323** 2:18 9:16,20
**35** 5:10
**354,000** 77:11,20
**36** 5:11
**3rd** 52:10

**4**

**4** 43:17 49:24 99:9
**4.2** 68:8
**407-7714** 3:18
**407-page** 47:10
**418** 48:7
**44** 5:3 81:24
**444** 2:16
**47** 4:18
**48** 4:20
**49** 4:22

**5**

**5** 82:9,10,19 83:24 84:17 88:3,10,16 89:1,12
**5:44** 45:3
**50** 86:1
**500** 30:7
**51** 4:24
**56** 86:23,24

**6**

**6055** 63:23,24
**6165** 61:5
**6170** 75:19 80:13,15,24
**62** 83:6
**64** 83:19,19
**643-7000** 3:10
**65-3985** 9:18
**6500** 65:21,23
**6640** 1:24 2:6 104:25
**67** 81:25 83:7

**7**

**7** 4:6
**7299** 71:21 72:3
**7350** 71:4,21
**7484** 58:23
**75,000** 63:8
**79** 5:4

**8**

**8:16-cv-00974-CJC-AGR** 1:6
**8311** 51:21

**9**

**9** 1:16 2:4 6:1,9 9:17 103:9 105:2
**900** 2:16
**90071** 2:17
**95** 1:24
**96** 4:7
**965** 9:16
**965-3985** 9:20
**965-3998** 2:18
**973** 3:10
**98** 4:8
**99** 4:9

# Exhibit 35

## Proton Payments to MM

| Matter Name | | Invoice Number | Billing Date | Total | Payments | Balance |
|---|---|---|---|---|---|---|
| 9520.0001 Pacific Proton Cancer Project | | 00117426 | 1/14/2016 | $150.00 | $150.00 | $0.00 |
| **Subtotal** | Sum | | | $150.00 | $150.00 | |
| 9520.0100 Proton Beam Therapy Regional Center in Los Angeles, CA | | 00144194 | 9/8/2010 | $420.00 | $420.00 | $0.00 |
| | | 00088014 | 10/8/2010 | $3,227.50 | $3,227.50 | $0.00 |
| | | 00089105 | 11/3/2010 | $1,600.00 | $1,600.00 | $0.00 |
| | | 00090487 | 12/10/2010 | $8,607.13 | $8,607.13 | $0.00 |
| | | 00144784 | 1/11/2011 | $363.20 | $363.20 | $0.00 |
| | | 00092700 | 4/14/2011 | $397.50 | $397.50 | $0.00 |
| | | 00144460 | 6/7/2011 | $52.50 | $52.50 | $0.00 |
| | | 00146308 | 8/11/2011 | $717.50 | $717.50 | $0.00 |
| | | 00166241 | 9/15/2011 | $2,273.00 | $2,273.00 | $0.00 |
| | | 00092371 | 10/12/2011 | $4,757.38 | $4,757.38 | $0.00 |
| | | 00093066 | 11/7/2011 | $95.00 | $95.00 | $0.00 |
| | | 00147708 | 12/6/2011 | $119.00 | $119.00 | $0.00 |
| | | 00149090 | 1/9/2012 | $1,012.00 | $1,012.00 | $0.00 |
| | | 00094059 | 2/8/2012 | $476.00 | $476.00 | $0.00 |
| | | 00095714 | 3/6/2012 | $3,022.68 | $3,022.68 | $0.00 |
| | | 00167537 | 4/12/2012 | $6,105.85 | $6,105.85 | $0.00 |
| | | 00168182 | 5/8/2012 | $1,920.11 | $1,920.11 | $0.00 |
| | | 00096548 | 6/5/2012 | $10,571.17 | $10,571.17 | $0.00 |
| | | 00100009 | 8/7/2012 | $14,366.91 | $14,366.91 | $0.00 |
| | | 00097548 | 9/18/2012 | $339.41 | $339.41 | $0.00 |
| | | 00098152 | 10/4/2012 | $2,875.76 | $2,875.76 | $0.00 |
| | | 00165715 | 11/7/2012 | $788.78 | $788.78 | $0.00 |
| | | 00166147 | 1/7/2013 | $937.22 | $937.22 | $0.00 |
| | | 00098967 | 3/7/2013 | $120.00 | $120.00 | $0.00 |
| | | 00119586 | 2/18/2016 | $347.50 | $347.50 | $0.00 |
| **Subtotal** | Sum | | | $65,513.10 | $65,513.10 | |
| 9520.0101 CA-Proton Therapy Corporate | | 00090734 | 9/3/2010 | $637.50 | $637.50 | $0.00 |
| | | 00087398 | 10/7/2010 | $445.00 | $445.00 | $0.00 |
| | | 00088549 | 11/2/2010 | $3,976.25 | $3,976.25 | $0.00 |
| | | 00090321 | 12/7/2010 | $21,614.00 | $21,614.00 | $0.00 |
| | | 00091593 | 1/6/2011 | $4,369.38 | $4,369.38 | $0.00 |
| | | 00092662 | 4/14/2011 | $1,410.00 | $1,410.00 | $0.00 |
| | | 00144461 | 6/7/2011 | $52.50 | $52.50 | $0.00 |
| **Subtotal** | Sum | | | $32,504.63 | $32,504.63 | |
| 9520.0104 Formation of Pacific Proton Therapy Regional Center | | 00090735 | 9/3/2010 | $935.00 | $935.00 | $0.00 |
| | | 00087399 | 10/7/2010 | $2,805.00 | $2,805.00 | $0.00 |
| **Subtotal** | Sum | | | $3,740.00 | $3,740.00 | |
| 9520.0105 Los Angeles County Proton Center, LLC | | 00146684 | 3/11/2011 | $212.50 | $212.50 | $0.00 |
| | | 00092458 | 10/13/2011 | $1,360.00 | $1,360.00 | $0.00 |
| **Subtotal** | Sum | | | $1,572.50 | $1,572.50 | |
| **Total** | Sum | | | $103,480.23 | $103,480.23 | |

# Exhibit 36

MARCUM
ACCOUNTANTS ▲ ADVISORS

March 25, 2021

Mr. Hervé Gouraige
Sills, Cummins and Gross
One Riverfront Plaza
Newark, NJ 07102

Re: Charles Liu and Xin Wang

Dear Mr. Gouraige,

Attached please find the compensation analysis and supporting documentation which we have prepared for you regarding the determination of what reasonable compensation should have been paid to Charles Liu ("Liu") and Xin Wang ("Wang") by the following entities (referred to collectively as the "Project"): Pacific Proton Therapy Regional Center, LLC; Pacific Proton EB-5 Fund, LLC; and, Beverly Proton Center, LLC. This letter will discuss the situation presented to us, our methodology for preparing the report, and our conclusions.

**Background**

During 2010, Liu, in conjunction with Dr. John Thropay, an unrelated party, created and operated a program designed to construct and operate the Project, which was to be a cancer therapy center that used a proton-based therapy to treat patients. The Project was owned 75% by Liu and 25% by Dr. Thropay. Part of the funding for the Project was to come from individuals who were not citizens or residents of the United States who wished to apply for a United States visa under the EB-5 Immigrant Investor Program. The individual entities that comprised the Project served different purposes: the Pacific Proton Therapy Regional Center, LLC was a vehicle used to obtain authorization to offer EB-5 status to appropriate investors, manage the EB-5 investor visa program and investor relations functions; the Pacific Proton EB-5 Fund, LLC was the investment vehicle for the EB-5 visa investors; and, the Beverly Proton Center was the entity that would provide non-medical services to the medical corporation. Liu raised funds for the Project, but was unable to raise sufficient funds to bring the operation to fruition.

You have inquired as to what reasonable compensation for Liu and Wang should have been from each member of the Project; additionally, you inquired as to a reasonable finder's fee/commission for Liu for having investors join the project. We understand that Liu served in the following roles: the President of Pacific Proton Therapy Regional Center, LLC; the sole manager of Pacific Proton EB-5 Fund, LLC; and the President and Treasurer of Beverly Proton Center. We also understand that Wang served in the following role: the Vice President of Marketing of Beverly Proton Center.

You have asked us to determine what reasonable compensation would have been for Liu and Wang from the individual entities of the Project. It is our understanding that Liu performed services for the following entities during the following years: Pacific Proton Therapy Regional Center, LLC from August 25, 2010, to May 26, 2016; Pacific Proton EB-5 Fund, LLC from November 15, 2010, to May 26, 2016; and Beverly Proton Center from November 16, 2010, to May 26, 2016. It is also our understanding that Wang performed services for the Beverly Proton Center during 2013 and 2014.

**Our methodology**

We view reasonable compensation paid by the Project to Liu and/or Wang as having two distinct sources: a commission or finder's fee relating to obtaining investors in the Project; and, compensation for services rendered to the various entities of the Project for management and operation of each entity's business.

Commission/finder's fees

Companies that are seeking investors who would want to avail themselves of the EB-5 program often pay commissions or finder's fees ("commissions") to individuals/entities who refer prospective investors to their programs. The commission levels are negotiable between the program sponsor and the referral source.

We were unable to find any publicly available surveys of commissions in EB-5 programs; discussions with numerous promoters of these programs were unaware of the existence of this data.

We searched the Securities and Exchange Commission's EDGAR database for Form D, Notice of Exempt Offering of Securities (Form D); among the data contained on Form D are 'offering and sales amounts' and 'sales commissions and finder's fee expenses'. We then reviewed 20 Forms D for those entities who were involved in EB-5 programs and paid some type of commission or finder's fee, and summarized our findings. Appendix A provides a listing of the Forms D that we reviewed and the pertinent data.

The commissions and/or finder's fees paid to Liu during the respective time period was 8% of the total capital raised for the Project. The SEC Form D survey data indicated that of the entities involved in EB-5 programs that were paid a commission and/or finder's fee, the median fee paid was 9.25%.

Services rendered to entities

To determine the market value of services rendered by Liu and Wang to the various Project entities, we reviewed publicly available survey sources that would provide information on employers who are in the same type of business as the Project.

We selected the Executive Compensation Assessor, which is a survey source operated by the Economic Research Institute (ERI). ERI has been conducting compensation surveys for over 30 years and is widely used in the compensation consulting industry. It acquires data from Securities and Exchange Commission filings, other survey providers and surveys that it conducts with employers. The survey provides compensation information for over 700 executive positions in over 8,000 locations around the world in over 1,000 industries. ERI reports compensation information by job title, and then narrows the information based on industry (using NAICS and SIC codes), revenue and position location. Data provided consists of total cash compensation, stock and option awards, non-equity compensation, changes in pension and all other compensation. Survey data is reported at the 25th percentile, median and the 75th percentile of respondents. The database is refreshed on a daily basis; as a result, a report that is generated represents the information contained in the database on that day. Position location is reflected by

localized cost of living indices. Our analysis using the Executive Compensation Assessor will be referred to as the "survey report."

The survey report only provides data for the current year. To determine compensation levels for prior years, we have discounted the results of the survey report generated by the Consumer Price Index Inflation Calculator ("CPI Inflation Calculator") which is provided by the Department of Labor's Bureau of Labor Statistics. In this manner, we have been able to estimate pay levels for the years that are the subject of this report.

In the review of Liu' compensation, we ran the survey report using the following criteria and reported total compensation data at the median of the survey report. Total compensation is defined as base pay and annual cash incentives; it does not include equity grants or fringe benefits. We selected survey data using the following demographics:

- For all Project entities:
  - Geographic area: Los Angeles, California
  - Revenue: $7,250,000. This represents our pro-rated estimate of funds raised less administrative expenses over the course of the capital raise period.
  - Industry: General medical Services

- For services rendered to Pacific Proton Therapy Regional Center, LLC:
  - Job title: Liu--President

- For services rendered to Pacific Proton EB-5 Fund, LLC
  - Job title: Liu--President

- For services rendered to Beverly Proton Center
  - Job title: Liu—President
  - Job title: Wang—Vice President of Marketing

**Conclusions**

Our analysis of the commissions study is as follows. We reviewed Forms D for 20 distinct entities which were filed with the SEC between 2011 and 2019. The total of commissions, finder's fees and payments to executives and promoters related to the sale of the interests, as reflected on the Forms D, ranged from .06% to 27.93% of the sale price of the securities offered; the data only reflected payments related to actual sales, as opposed to rates/fees that were disclosed in the offering. The median rate was 9.25%, which we believe to be a reasonable commission rate based on the study. As Liu reported sales of $24,712,217 related to the Project, which were contributed to Pacific Proton EB-5 Fund, LLC, a reasonable amount of commission/finder's fee would be $2,285,880.

Our analysis of the survey report is as follows, based on the median reported total compensation, adjusted for cost of living changes and pro-rated for partial years of service:

| **Wang** | **Beverly Proton** |
|---|---|
| 2013 | $ 182,915 |
| 2014 | $ 184,300 |
| **TOTAL** | $ 367,215 |

| **Liu** | **Pacific Proton Therapy** | **Pacific Proton EB-5** | **Beverly Proton Center** |
|---|---|---|---|
| 2010 (from inception date) | $ 95,479 | $ 37,131 | $ 37,131 |
| 2011 | $ 284,000 | $ 284,000 | $ 284,000 |
| 2012 | $ 288,944 | $ 288,944 | $ 288,944 |
| 2013 | $ 293,284 | $ 293,284 | $ 293,284 |
| 2014 | $ 295,504 | $ 295,504 | $ 295,504 |
| 2015 | $ 297,659 | $ 297,659 | $ 297,659 |
| 2016 (through 5/26/2016) | $ 125,966 | $ 125,966 | $ 125,966 |
| **TOTAL** | $ 1,680,836 | $ 1,622,488 | $ 1,622,488 |

We believe that the compensation owed to Liu and Wang from the Project is the sum of the finder's fee study and the survey report study. The two types of compensation are mutually exclusive—one related to fund raising, and one related to the formation and the operation of the businesses. Therefore, we have concluded that reasonable compensation for Liu from all entities in the Project for the time period 2010-2015, and through May 26, 2016, related to his service as an officer totals $4,925,812, and that reasonable compensation to Wang from Beverly Proton for the time period 2013-2014 related to her service as an officer is $367,215.

To summarize the results, our calculation of reasonable total compensation to Liu for the 2011-2016 period (including all commissions) is $7,211,692 and total compensation to Wang is $367,215.

This report does not take into consideration any amounts actually paid to Liu or Wang by the Project entities, or any amounts that any of the Project entities may have not yet paid Liu or Wang.

In the preparation of this study, we relied on information provided by the Pacific Proton Therapy Regional Center, LLC, Pacific Proton EB-5 Fund, LLC and Beverly Proton Center, LLC and a complaint filed on May 26, 2016 by the Securities and Exchange Commission against Liu, Wang and the members of the Project (SACV 16-00974(AGRX)). If that information is incomplete, inaccurate or misinterpreted, our conclusion may change and we reserve the right to update our analysis if we consider it necessary.

A statement of my professional qualifications can be found as Appendix B.

Very truly yours,

MARCUM LLP

Theodore R. Ginsburg, Director
Cc: Karen Connair, Marcum LLP

APPENDIX A
SUMMARIZATION OF SEC EDGAR FORM D EB-5 FILINGS

| **Filing Date** | **Filing entity** | **Sales Commissions** | **Finder's Fees Expenses** | **Gross Proceeds Paid to Executives, Promoters** | **TOTAL PERCENTAGE PAID** |
|---|---|---|---|---|---|
| 3/3/2017 | 88th Ave EB5 Capital, LLC | $ - | $ 1,200,000 | $ - | 10.00% |
| 3/29/2018 | A1A EB5 LLC | $ - | $ 500,000 | $ - | 10.00% |
| 9/16/2019 | CPT EB5 LLC | $ 660,000 | $ - | $ - | 0.19% |
| 1/3/2017 | DS 30 Morningside Drive EB5 LLC | $ 198,000 | $ - | $ - | 0.40% |
| 3/9/2012 | EB5 Capital - Jobs Fund 4, L.P. | $ - | $ - | $ 1,120,000 | 5.60% |
| 9/6/2018 | EB5 Irving Hotel Investment Limited Partnership | $ - | $ 4,500,000 | $ - | 10.00% |
| 3/15/2016 | EB5 Pearl Office Investors LP | $ - | $ - | $ 450,000 | 7.50% |
| 6/29/2011 | EB5 Ports - Baltimore LP | $ 30,000 | $ 30,000 | $ - | 0.15% |
| 8/6/2013 | EB5 Riverplace Hotel Investment LP | $ - | $ - | $ 6,375,000 | 12.50% |
| 3/7/2013 | EB-5 SF Investment Limited Partnership | $ - | $ - | $ 6,612,057 | 15.74% |
| 7/7/2011 | EB5 StateCenter II, LLC | $ 20,000 | $ 20,000 | $ - | 0.06% |
| 10/16/2019 | EB5 United Big Sky, LLC | $ 6,350,000 | $ - | $ - | 10.00% |
| 7/21/2015 | EB5 United Fund 5 – Hollywood Apartments LP | $ 14,850,000 | $ - | $ 495,000 | 27.93% |
| 11/30/2018 | EB5 United NYC VI LP | $ 17,640,000 | $ - | $ 735,000 | 22.73% |
| 7/31/2018 | EB5 United Puerto Rico FS LP | $ 30,265,000 | $ - | $ 1,035,000 | 23.81% |
| 10/30/2019 | GS EB5 X LLC | $ 42,500 | $ - | $ - | 8.50% |
| 11/5/2015 | La Moda (Gale) EB-5 Investment LP | $ - | $ 190,000 | $ - | 1.19% |
| 1/30/2019 | QB Ventures EB5 Capital, LLC | $ - | $ 800,000 | $ - | 10.00% |
| 8/16/2011 | Riviera Point Holdings, Ltd. | $ - | $ - | $ 30,000 | 0.18% |
| 3/6/2012 | Washington Green Energy EB-5 Investments LP | $ - | $ 30,000 | $ - | 6.00% |
| | | | | **MEDIAN** | **9.25%** |

MARCUM
ACCOUNTANTS ▲ ADVISORS

**Theodore R. Ginsburg, CPA, J.D., MBA**
6685 Beta Dr. Office: (440) 459-5700
Mayfield Village, OH Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

APPENDIX B

PROFESSIONAL EXPERIENCE RELATING TO COMPENSATION ISSUES

*Marcum LLP:* Certified Public Accountants, Cleveland Ohio
2019 - Present
Director and national head of the Compensation and Benefits consulting practice for this multinational accounting firm that acquired Skoda Minotti during 2019. Activities in the compensation consulting area (for both publicly traded and privately held companies) include market pricing for executive and non-executive positions, preparation of reasonable compensation analyses for litigation purposes, planning for and preparation of golden parachute excise tax calculations, design and implementation of executive compensation programs, including base pay, short term incentives and long term incentive programs, assisting corporate clients in employment contract negotiation.

*Skoda Minotti;* Certified Public Accountants, Cleveland Ohio
*2010 – 2019*
Principal and head of the Compensation and Benefits consulting practice. Activities in the compensation consulting area include market pricing, preparation of reasonable compensation analyses for boards of directors, preparation of compensation expert report for a Tax Court case, design and implementation of executive compensation programs, including base pay, short term incentives and long term incentive programs, conducting private survey of executive positions for a specialized industry, assisting individual clients in employment contract negotiation. All compensation consulting was performed for privately held companies.

*BDO, LLP;* Certified Public Accountants, Cleveland Ohio
2009-2010
Principal in the Compensation and Benefits practice of this multinational accounting firm. Activities in the compensation consulting area include designing executive compensation programs, analyzing the reasonableness of compensation for key executives based on SEC filings and private survey results for both publicly traded and privately held companies.

*Top Five Data Services/Remedy Compensation Consulting;* Consulting firm, Cleveland Ohio
2003-2009
Principal (Top Five) and shareholder (Remedy) in this executive compensation consulting boutique firm providing services to primarily publicly traded companies. Duties included serving as outside compensation consultant to publicly traded company board of directors, determining reasonableness of compensation paid to executives of publicly traded companies, designing executive compensation programs, conducting surveys relating to executive pay in certain industries.

*Buck Consultants;* Consulting firm, Cleveland Ohio
2000-2003
Principal in charge of the Cleveland office compensation consulting group of this international actuarial and employee benefit consulting firm; national practice leader for the executive compensation consulting practice (2003).

*Grant Thornton, LLP*; Certified Public Accountants, Cincinnati Ohio
1995-2000
Partner in charge of the Cincinnati office compensation consulting group of this multinational accounting firm; co-national practice leader for the compensation and benefits practice (1998-2000), serving both publicly traded and privately held companies.

MARCUM
ACCOUNTANTS ▲ ADVISORS

**Theodore R. Ginsburg, CPA, J.D., MBA**
6685 Beta Dr. Office: (440) 459-5700
Mayfield Village, OH Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

*Mayer, Brown and Platt;* Law firm, Chicago, Illinois
1994-1995

Of counsel in the employee benefits practice group of this multinational law firm. Duties included qualified plan document drafting, deferred compensation program design for publicly traded companies.

*Laner, Muchin Dombrow and Becker*; Law firm, Chicago, Illinois
1992-1994
Partner in charge of the ERISA practice. Duties included executive compensation program design and implementation, serving both publicly traded and privately held companies.

*KPMG;* public accounting firm, Houston, Texas
1983-1992
Partner in charge of the employee benefits tax consulting practice of this multinational accounting firm serving both publicly traded and privately held companies. Duties included executive compensation program design and benchmarking, executive employment agreement design and negotiation, firm wide expert on various executive compensation areas (such as golden parachute excise tax)

Positions prior to 1983 included services for Price Waterhouse (public accounting firm) and two small law firms in St. Louis, Missouri with no experience relative to compensation matters

EDUCATION AND DEGREES

- Juris Doctor, Washington University School of Law, St. Louis, Missouri (1978)
- Masters of Business Administration, Olin Business School, Washington University, St. Louis, Missouri (1978)
- Bachelor of Arts, Political Science, Washington University, St. Louis, Missouri (1975)

PROFESSIONAL LICENSES

- Certified Public Accountant, Ohio (1995), Texas (1984—inactive), Missouri (1978—inactive)
- Member of the bar, Illinois (1993—inactive), Missouri (1978—inactive)

PROFESSIONAL ORGANIZATIONS AND MEMBERSHIPS

- American Institute of Certified Public Accountants
- Ohio Society of Certified Public Accountants (prior chairman Human Resources section)
- Cleveland Bar Association
- National Council of Employee Ownership
- World at Work
- American Society of Pension Professionals and Actuaries

MARCUM
ACCOUNTANTS ▲ ADVISORS

**Theodore R. Ginsburg, CPA, J.D., MBA**
6685 Beta Dr. Office: (440) 459-5700
Mayfield Village, OH Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

PRESENTATIONS

During his career, Ted has spoken before a number of non-client organizations on topics related to compensation and benefits. Among those organizations are:

- Associated Builders and Contractors, Inc.
- Case Western Reserve University
- Cleveland Bar Association
- Construction Management Association
- Financial Managers Society
- Global Equity Organization
- Illinois Bar Association
- Independent Community Bankers of Minnesota
- Institute of Management Accountants
- Leading Edge Alliance
- Ohio Society of Certified Public Accountants
- Tax Executive's Institute
- University of Akron
- WEB

MARCUM
ACCOUNTANTS ▲ ADVISORS

April 2, 2021

Mr. Hervé Gouraige
Sills, Cummins and Gross
One Riverfront Plaza
Newark, NJ 07102

Re: Charles Liu and Xin Wang

Dear Mr. Gouraige,

This letter is written in response to your request for supplemental disclosures about my March 25, 2021 compensation study letter.

Compensation: Marcum LLP shall be compensated at $450 per hour for my time spent in preparation of my expert report, and $540 per hour for my time spent related to depositions and testimony in court. Marcum LLP will also be compensated for my colleagues who worked on this matter under my direction. Neither mine nor my colleagues' compensation is contingent or based on the content of my opinions or the outcome of this matter.

Sources relied upon in my expert witness report: In the preparation of the March 25 expert witness report, as indicated in my letter, I reviewed the following documents, and relied only on the following documents, for my conclusions:

- Reports generated by Economic Research Institute's (ERI) Executive Compensation Assessor for the president and vice president of marketing job positions for the year 2020
- Securities and Exchange Commission Form D for the issuers noted in Appendix A of the March 25, 2021compensation study.
- The complaint filed on May 26, 2016 by the Securities and Exchange Commission against Liu, Wang and the three Project companies (SACV 16-00974(AGRX))
- Employment agreement dated June 28, 2012 between Charlies Liu and Pacific Proton Therapy Regional Center LLP

Copies of the ERI reports, the SEC EDGAR Form D's, and the June 28, 2012 employment agreement that I relied upon are enclosed in a zip file with this letter and marked Ginsburg.Supp.Report 000001-000127.

Recent trial experience: I have neither appeared as an expert witness in a court proceeding nor been deposed as an expert witness in a litigation matter during the last four (4) years.

Attachments: I have attached a listing of publications within the last ten years.

Very truly yours,
MARCUM LLP

Ted Ginsburg

Theodore R. Ginsburg, Director

LISTING OF PUBLICATIONS BY THEODORE R. GINSBURG

Publications found on the Skoda Minotti website:

“Final Overtime Eligibility Rule Poses Problems for Employers”, December 9, 2019

“Final Regulations Can Help Smaller Employers Subsidize Health Insurance Premiums for Employees”, June 18, 2019

“Final Regulations Offer Small Employers an Alternative Source for Health Care Coverage”, June 27, 2018

“Does Your Health Reimbursement Account Need to File an Annual Tax Return”, June 21, 2018

“IRS Now Issuing Penalties for Obamacare Violations”, November 20, 2017

“IRS Compliance for 2017 ACA Coverage Is Needed Despite Earlier Executive Order”, August 30, 2017

“Entrepreneurs May Not Be Aware of Tax-Advantaged Fringe Benefits”, July 16, 2017

“Smaller Employers Can Now Offer Pre-Tax Medical Reimbursement Programs”, December 21, 2016

“ACA Compliance Update: Deadline Extended for providing 2016 IRS Forms 1095-B and 1095-C to employees”, November 21, 2016

“Be Aware of Tax Scams Related to the Affordable Care Act”, October 31, 2016

“Get Ready for New Overtime Regulations”, June 23, 2016

“DOL Issues Significant Change in Retirement and IRS Accounts”, April 27, 2016

“What is the affordable Care Act?”, March 16, 2016

“ACA Reporting Deadlines Extended and Penalties Potentially Abated”, January 5, 2016

“Don’t Be Caught Unaware of the ACA – You May Be Subject To It”, October 7, 2015

“2016 Planning for Employers Already Subject to ACA”, August 19, 2015

“Employers providing health benefits to employees need formal documentation”, April 3, 2015

“IRS provides ACA relief for certain premium reimbursement plans”, February 20, 2015

“IRS Issues Employer Reporting Guidelines for the Affordable Care Act”, September 10, 2014

“Will You Be Impacted by the Affordable Care Act, and If So, When?”, June 27, 2014

“Affordable Care Act Mandate: Updates to the 2015 Regulations”, February 11, 2014

“Department of Labor: No penalty for failure to provide required notices under Affordable Care Act”, September 18, 2013

“Key Obamacare Provisions are Delayed Until 2015”, September 11, 2013

“A Dose of Financial Medicine: Obamacare-Related Fees Due July 31”, July 2, 2013

“What You Must know About the Patient Protection and Affordable Care Act”, June 10, 2013

“Tick, Tick, Tock…Count on Corporate Minutes – Three areas where they offer protection”, May 24, 2013

# EXECUTIVE COMPENSATION ASSESSOR®

Individual Job Report

## President

Estimated Survey Median Annual Total Cash

| Revenue | 10th Percentile | 25th Percentile | Survey Median | 75th Percentile | 90th Percentile |
|---|---|---|---|---|---|
| 7250000 | 164,717 | 243,198 | 330,994 | 444,563 | 544,524 |
| 7000000 | 163,077 | 240,818 | 327,754 | 440,202 | 539,154 |
| 5000000 | 148,034 | 218,972 | 298,028 | 400,202 | 489,981 |
| 1000000 | 90,028 | 136,410 | 186,770 | 250,813 | 306,904 |

### Specifications

| | |
|---|---|
| Prepared For: | Beverly Proton Center |
| **Area:** | **Los Angeles, California** |
| **Industry:** | **General Medical and Surgical Hospitals** |
| **Industry Codes:** | **eSIC: 8062, NAICS: 622110, usSEC: 8062** |
| **Organization Size:** | **7,250,000** |
| **Planning Date:** | **2/18/2021** |
| **Database as of:** | **1/1/2021** |
| **Annualized Salary Trend:** | **Data Driven** |
| eDot: | 189117026 |
| SOC: | 111011 |
| Printout Date: | 2/18/2021 |
| | (Items in bold affect salary estimates) |

### Annual Total Compensation Graph



# EXECUTIVE COMPENSATION ASSESSOR®

**Individual Job Report**

## Vice President Marketing

### Estimated Survey Median Annual Total Cash

| Revenue | 10th Percentile | 25th Percentile | Survey Median | 75th Percentile | 90th Percentile |
|---|---|---|---|---|---|
| 7250000 | 130,912 | 166,568 | 206,434 | 257,802 | 303,061 |
| 7000000 | 130,189 | 165,672 | 205,347 | 256,448 | 301,471 |
| 5000000 | 123,707 | 157,687 | 195,633 | 244,362 | 287,281 |
| 1000000 | 100,024 | 128,925 | 160,570 | 200,981 | 236,384 |

### Specifications

Prepared For: Beverly Proton Center

**Area:** **Los Angeles, California**
**Industry:** **General Medical and Surgical Hospitals**
**Industry Codes:** **eSIC: 8062, NAICS: 622110, usSEC: 8062**
**Organization Size:** **7,250,000**

**Planning Date:** **2/18/2021**
**Database as of:** **1/1/2021**

**Annualized Salary Trend:** **2.6% (Adjustment: 0.21%)**

eDot: 189117115
SOC: 112021

Printout Date: 2/18/2021

(Items in bold affect salary estimates)

### Annual Total Compensation Graph






Ginsburg.Supp. Report.000002

16 (4)

# EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made by and between Pacific Proton Therapy Regional Center, LLC, a California Limited Liability Company (hereinafter called "Company") and Charles C Liu (hereinafter called "Employee").

## RECITALS

A. **WHEREAS** Company is in the business of EB-5 marketing and requires the services of a President of the company, and wishes to extend to employee an offer of employment;

B. **WHEREAS** Employee has represented to Company that he has the skills and experience necessary to perform the duties of such President;

C. **WHEREAS** Employee desires to accept an offer of employment by Company as its President;

**NOW THEREFORE**, in consideration of the above, and of the mutual agreements hereinafter set forth, the parties hereto do hereby agree as follows:

## AGREEMENT

1. Offer of Employment: Company hereby offers employment to Employee as President upon the terms and conditions set forth in this Agreement.

2. Acceptance of Employment: Employee accepts Company's employment offer upon the terms and conditions set forth in this Agreement.

3. Term of Agreement:

This Agreement shall have a term of five years and shall be renewable upon the mutual agreement of the parties by separate contract at the expiration of the term of employment.

4. Employee Compensation:

a. Employee shall receive as compensation an annual base salary of $350,000.00.In addition to base salary, Employee shall earn bonus on the following basis:

Eight percent of total capital raised when total investors reaches 20

5. Payment of Salary:

Company shall pay Employee base salary according to the Company's regular payroll schedule.

6. Employee's Employment Duties:

a. Employee shall be responsible for the day-to-day operation of the corporation and its production facility.

b. In performing his job duties for Company, Employee shall devote his full time attention and efforts to discharge the responsibilities assigned to him, shall not in any manner work for any other Company, in any business related to or unrelated to the business of Company, or to compete with Company on an independent basis, or otherwise, and shall perform such other duties consistent with his position, as may from time to time be assigned to him by Company. The term "full time", for purposes of this Agreement is agreed to be not less than forty (40) hours per week.

7. Telephone Service:

Company shall provide Employee with one Cellular Telephone and one Cellular Telephone Account, corresponding thereto.

8. Employee's Reimbursement for Expenses:

a. Employee shall be entitled to the reimbursement of all normal and justified business expenses (reimbursable business expenses) reasonably incurred in connection with the performance of Employee's employment duties with Company.

b. Company shall provide Employee with an American Express Corporate Gold Card for purposes of payment of business expenses.

c. For cash disbursements by Employee for reimbursable busienss exenses, Employee shall submit a monthly itemized business expense report to Company on or about the first (1st) day of each month, along with actual receipts for such expenditures. Such business expenses shall be paid to Employee by Company on or about the fifteenth (15th) day of that month.

9. Vacations, Holidays, and Sick Time:

a. Employee shall be entitled to fourteen (14) working days paid vacation to be taken within the next 365 calendar days. Vacation time shall be earned and shall accrue to the benefit of Employee on the anniversary date of Employee's employment. Vacation shall be taken at a time mutually convenient to Company and Employee, and shall be upon at least thirty (30) days written notice by Employee to Company. Company and Employee shall be reasonable with each other in the scheduling of vacation time, and neither shall be arbitrary or capricious in such scheduling. Vacation time not taken within 365 days of accrual shall be paid to Employee by Employer as bonus.

b. Employee shall be entitled to fourteen (14) sick or personal days per year in

addition to vacation time.

c. At a minimum, Employee shall be entitled to the following paid holidays:

1. New Year's day
2. Day on Good Friday
3. Memorial Day
4. July 4th official government holiday
5. Labor Day
6. Thanksgiving
7. Day on Christmas Eve
8. Christmas Day

In addition, Employee shall be entitled to any religious holiday of Employee's religion, not exceeding one day, which is normally recognized and celebrated by that religion as a day off work.

10. Insurance Benefits:

a. Company shall provide to Employee and his family, through a Group Medical Insurance Plan, or otherwise, at Company's sole expense, a policy of medical insurance. Employee shall be responsible for any co-payments to health care providers as required by the insurance policy at Employee's sole expense.

11. Disclosure:

a. Employee agrees to make available to Company all knowledge possessed by him relating to any methods, developments, invention, and/or improvements, which concern in any way the business of Company, whether acquired by Employee before or during the term of his employment hereunder, provided that nothing herein shall be construed as requiring any disclosure where the method, development, invention and/or improvement is lawfully protected from disclosure as a trade secret of a third party or by any other lawful bar to such disclosure.

b. Any ideas, methods, developments, inventions and/or improvements which Employee may conceive of or make along the lines of the business of Company, while in Company's employ, shall be and remain the property of Company. Employee agrees to promptly communicate and disclose all such ideas, methods, developments, inventions and/or improvements to Company and to execute and deliver to Company any instruments deemed necessary by Company to effect the disclosure and assignment thereof to it.

c. Employee agrees to receive and maintain in confidence and not to disclose to any third party all ideas, methods, developments, client lists, inventions, improvements and business plans and information of Company of which Employee becomes aware during his employment hereunder or which Employee conceives or makes, whether solely

or jointly, while in Company's employ.

d. Confidentiality: Employee acknowledges that during the course of employment with Company, Employee will have access to certain information that is of great value to Company, and which is not readily available to outsiders. Employee understands that such information, including but not limited to trade secrets, clients lists, customer lists, designs, drawings, plans, documents, prototypes, manufacturing techniques, equipment, sales and clilent or customer information, pricing and purchasing plans, business and financial information, work in progress, products, files, reports, memoranda, computer software or programming and budgets or other financial plans or information regarding Company and its business, property and affairs, employees, clients, customers, vendors or suppliers, proposals and projections, included but not limited to long-range plans for Company's growth, expansion, development, and continued fostering of its relationships with its employees, clients, customers, vendors or suppliers (hereinafter referred to as "Confidential Information"), is protected, confidential and proprietary information of Company.

12. Covenant of Confidentiality: Employee agrees to hold in the strictest confidence, and agrees not to publish or disclose to any other person or entity at any time, either during or after employment, any Confidential Information of Company without the prior written consent of Company.

13. Use of Confidential Information: Employee agrees not to use any such Confidential Information to compete with Company in any way, either directly or indirectly, and will not otherwise use or misuse any such Confidential Information for Employee's own benefit, or to the detriment of Company.

14. Delivery of Confidential Information: Employee further agrees to promptly deliver to Company, upon request or upon termination from employment, all correspondence, notes, computer disks, computer data, books, records, memoranda, worksheets, drawings, reports, and other written or computer information or data of any kind, relating to or arising out of business, products, practices, or techniques of Company. It is understood that all work product of Employee while in Company's employ belongs to and is proprietary to Company, and Employee shall not be entitled to take or use any such information, in any form whatsoever for personal use or otherwise.

15. Non-Solicitation of Employees, Clients, Customers, Vendors or Suppliers:

a. Employee agrees that during the term of his employment under this Agreement and after termination thereof, regardless of however such termination shall be brought about, he will not contact any employee, vendor, client, customer or supplier of Company or any of its affiliates regarding any matter which is likely to disrupt employer's good employment or business relationship with such employees, vendors, clients, customers or suppliers. Further, Employee shall make no statement, whether true, false, deceptive or misleading, to any employee, vendor, client, customer or supplier of Company which is

likely to cause such disruption.

b. Employee agrees that for a period of two (2) years after Employee leaves the employ of Company, he will not, directly or indirectly, or through others, approach or solicit any employee of Company for purposes of causing such employee to leave the employ of Company. During said two (2) year period Employee shall not, directly or indirectly, or through others, hire, employ, or contract with any employee or former employee of Company.

c. Employee agrees that during his period of employ with Company he will not authorize his name to be used by any person, partnership, corporation or other business entity without Company's written consent.

16. Covenants Not to Compete:

a. Employee covenants and agrees that for a period of two (2) years from and after the termination of Employee's employment with Company, regardless of however such termination shall be brought about, he will not either individually, or on behalf of any other person, firm, company or entity as an employee, agent, contractor, owner, partner, shareholder, or joint venturer, which directly or indirectly, solicit or perform any services with regard to any client, customer, vendor or supplier of Company, or which has been a client, customer, vendor or supplier of Company in
the two (2) years preceeding Employee's termination, or which Company is actively engaged in soliciting as such while Employee is in the employ of Company.

b. Employee covenants and agrees that for a period of two (2) years from and after the termination of Employee's employment with Company, regardless of however such termination shall be brought about, he will not directly or indirectly or through any scheme, trick or device or otherwise, become an employee of any client, customer, vendor or supplier of Company, or which has been a client, customer, vendor or supplier of Company in the two (2) years preceeding Employee's termination, or which Company is actively engaged in soliciting as such while Employee is in the employ of Company.

c. Employee covenants and agrees that for a period of two (2) years from and after the termination of Employee's employment with Company, regardless of however such termination shall be brought about, he will not directly or indirectly or through any scheme, trick or device or otherwise, become an owner or principal in any business which does business with any client, customer, vendor or supplier of Company, or which has been a client, customer, vendor or supplier of Company in the two (2) years preceeding Employee's termination, or which Company is actively engaged in soliciting as such while Employee is in the employ of Company.

17. Definition of "Client, Customer, Vendor, or Supplier": The term "client, customer, vendor or supplier" as used herein singularly and conjunctively, shall mean and include any person, firm, corporation or entity of whatever description, for whom Company shall have performed or been engaged to perform sales or services, or for whom such client,

customer, vendor or supplier has been engaged to perform any sales or services to Company, at any time within the two (2) year period preceding the date employment is terminated.

18. Definition of "Services": The term "services" shall mean and include all services of the nature and type customarily offered and furnished by Company or by the client, customer, vendor or supplier.

19. Consideration for Covenants: It is agreed by and between Company and Employee that the confidentiality agreement and covenant not to compete set forth herein are necessary for the protection of the business of Company, and that as consideration for Employee's agreement thereto, Employee will receive access to Company's confidential business information, as well as special training in Company's manner of doing business. Were it not for this agreement, Company would not release such confidential information to Employee.

20. Liquidated Damages Clause: The parties hereto recognize that it would be difficult if not impossible to formulate and offer proof as to the damages that will be sustained by Company upon breach of the covenants and agreements above expressed, and in recognition thereof the parities hereby agree that a fair and reasonable stipulation of the damages that will be suffered by Company as to each breach of the Covenant herein made binding upon employee, are as hereinafter described, and therefore Employee hereby agrees:

If Employee should breach any covenant of confidentiality or competition heretofore expressed, Employee shall be obligated to pay to Company, as to each such vendor, client or customer regarding whom a breach a occurred, as liquidated damages for breach of the covenants herein expressed, an amount equal to the greater of the following amounts:

a. the aggregate gross billings to or from each such client, customer, vendor or supplier for sales or services performed by Company or for Company by such client, customer, vendor or supplier during the twelve (12) months immediately preceding the month in which termination of employment occurred; or

b. one half (1/2) of the aggregate gross billings of Company to such client, customer, vendor or supplier for sales or services performed by Company for such client, customer, vendor or supplier, and net profit to Company for all sales or services to such client, customer, vendor or supplier during the twenty-four (24) months immediately preceding the month in which termination of employment occurred; or

c. the aggregate gross billings of Employee to or from each such client, customer, vendor or supplier for sales or services performed by Employee or for Employee by such client, customer, vendor or supplier during the twenty-four (24) months immediately after the date of Employee's termination of employment.

d. Such liquidated damages shall be due and payable when written demand for same has been made by Company. If not paid in full within thirty (30) days after such demand is made, it is hereby agreed that all amounts due Company shall bear interest at the maximum legal rate permitted by law from the date any such demand for payment has been made until all amounts due Company hereunder have been paid in full.

e. Each breach of the Covenants and agreements herein expressed shall give rise to a separate and independent cause of action.

f. Company shall be authorized to deduct any amounts owing to it hereunder from any salary or other payments owing by Company to Employee.

g. This damage provision shall not be construed as precluding Company, at its sole option, from seeking any type of injunctive relief for enforcement of the covenants herein contained, or any other type of relief which Company deems advisable or appropriate.

21. Right to Injunction: Company and Employee agree that Company will be irreparably damaged in the event of a breach of any of Employee's covenants or agreements relating to "Disclosure", "Confidentiality", or "Competition" above. Accordingly, Employee hereby agrees that such covenants and agreements shall be specifically enforceable and that, in addition to any other remedies, any breach or threatened breach thereof may be enjoined by any court of competent jurisdiction. It is further agreed that any breach or evasion of any of the terms of this Agreement by either party hereto will result in immediate and irreparable injury to the other party and will authorize recourse to injunction and/or specific performance as well as to all other legal or equitable remedies to which such injured party may be entitled.

22. Benefit of Agreement: This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective legal representatives, administrators, executors, successors, subsidiaries and affiliates, partnerships, corporations, and other business entities, and upon other persons or business entities with whom the parties hereafter have a business affiliation.

23. Litigation Expenses: If Company is forced to seek the services of an attorney concerning the interpretation of this Agreement, or any provision of this Agreement, or the enforcement of this Agreement, or any portion of this Agreement, by any action at law or equity, Company shall be entitled to reasonable attorneys fees, costs and necessary disbursements and shall be due and payable by Employee to Company within fourteen (14) days after invoice date. Any legal action to recover attorneys fees provided herein may be brought within any legal action brought to enforce or interpret the terms of this Agreement, or in a separate action brought solely for payment of attorneys fees and costs.

24. Applicable Law; Jurisdiction; Captions; Time of Essence: It is stipulated by Company

and Employee that this Agreement is entered into in the State of California, and shall be governed and construed in accordance with the law of the State of California. Jurisdiction is deemed by Company and Employee to be the appropriate court of jurisdiction in Orange County, California.

25. Captions: The captions at the beginning of each paragraph of this Agreement are solely for the convenience of the parties and are not part of this Agreement. Time is of the essence in this Agreement.

26. Waiver: The waiver by either party of a breach of a provision of this Agreement shall not operate or be construed as a waiver of a subsequent breach thereof.

27. Severability: Each provision of this Agreement is intended to be severable from the others so that if any provision or term hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remaining provisions and terms hereof.

28. Assignment: This Agreement and all rights hereunder are personal to Employee and shall not be assignable, and any purported assignment thereof shall not be valid and binding upon Company. Company may assign all of its rights hereunder to any person, firm or corporation succeeding to the business of Company.

29. Modification of Agreement: This Agreement may be modified only by a writing signed by the parties, or their respective authorized agents. Any modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

30. Survival of Agreements and Covenants: It is the intent of the parties to this Agreement that the confidentiality agreements and covenants not to compete will survive the termination of Employee's employment with Company unless the contrary is set forth in writing and signed by Company and Employee.

31. Scope of Validity: This Agreement and all covenants herein shall be valid in, and shall extend worldwide, and not withstanding any provision of this Agreement regarding Jurisdiction, may at the sole option of Company, be enforced by Company in any jurisdiction where any violation takes place.

32. No Conflicts: Employee represents and warrants to Company that he is not now under any obligation of a contractual or other nature to any person, firm or entity which is inconsistent or in conflict with this Agreement, or which would prevent, limit, impair, or conflict with in any way, the performance by him of his obligations and covenants made hereunder.

33. Entire Agreement: The execution of this Agreement by Company and Employee alike is free and voluntary. No inducement to enter into this Agreement except as expressly stated herein, is made by either Company or Employee. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties

hereto and contains all of the covenants and agreements between them. Each party acknowledges that no representation, inducement, promise or agreement, orally or otherwise, has been made by any party or anyone acting on behalf of any party which is not embodied herein.

**WHEREFORE**, this Agreement is executed by the parties, in duplicate original, on the dates hereinbelow written.

**NOTE: THIS IS A LEGAL DOCUMENT. DO NOT SIGN IT UNLESS YOU HAVE READ AND UNDERSTOOD THE ENTIRE AGREEMENT, AND AGREE WITH ALL OF THE PROVISIONS HEREIN.**

Dated: 6-28-2012

PACIFIC PROTON THERAPY
REGIONAL CENTER, LLC

By: [signature]

Dated: 6-28-2012

CHARLES C LIU

By: [signature]

Voided
4/4/2016

# EXECUTIVE COMPENSATION ASSESSOR®

**Individual Job Report**

## President

| Estimated Survey Median Annual Total Cash | | | | | |
|---|---|---|---|---|---|
| **Revenue** | **10th Percentile** | **25th Percentile** | **Survey Median** | **75th Percentile** | **90th Percentile** |
| 7250000 | 164,717 | 243,198 | 330,994 | 444,563 | 544,524 |
| 7000000 | 163,077 | 240,818 | 327,754 | 440,202 | 539,154 |
| 5000000 | 148,034 | 218,972 | 298,028 | 400,202 | 489,981 |
| 1000000 | 90,028 | 136,410 | 186,770 | 250,813 | 306,904 |

### Specifications

Prepared For: Pacific Proton EB-5 Fund

**Area:** **Los Angeles, California**
**Industry:** **General Medical and Surgical Hospitals**
**Industry Codes:** **eSIC: 8062, NAICS: 622110, usSEC: 8062**
**Organization Size:** **7,250,000**

**Planning Date:** **2/18/2021**
**Database as of:** **1/1/2021**

**Annualized Salary Trend:** **Data Driven**

eDot: 189117026
SOC: 111011

Printout Date: 2/18/2021

(Items in bold affect salary estimates)

### Annual Total Compensation Graph






Ginsburg.Supp. Report.000012

# EXECUTIVE COMPENSATION ASSESSOR®

**Individual Job Report**

## President

### Estimated Survey Median Annual Total Cash

| Revenue | 10th Percentile | 25th Percentile | Survey Median | 75th Percentile | 90th Percentile |
|---|---|---|---|---|---|
| 7250000 | 164,717 | 243,198 | 330,994 | 444,563 | 544,524 |
| 7000000 | 163,077 | 240,818 | 327,754 | 440,202 | 539,154 |
| 5000000 | 148,034 | 218,972 | 298,028 | 400,202 | 489,981 |
| 1000000 | 90,028 | 136,410 | 186,770 | 250,813 | 306,904 |

### Specifications

| | |
|---|---|
| Prepared For: | Pacific Proton Therapy Regional Center |
| **Area:** | **Los Angeles, California** |
| **Industry:** | **General Medical and Surgical Hospitals** |
| **Industry Codes:** | **eSIC: 8062, NAICS: 622110, usSEC: 8062** |
| **Organization Size:** | **7,250,000** |
| **Planning Date:** | **2/18/2021** |
| **Database as of:** | **1/1/2021** |
| **Annualized Salary Trend:** | **Data Driven** |
| eDot: | 189117026 |
| SOC: | 111011 |
| Printout Date: | 2/18/2021 |
| | (Items in bold affect salary estimates) |

### Annual Total Compensation Graph



The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)

0001697052

Previous Names

[X] None

Entity Type

[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

Name of Issuer

88th Ave EB5 Capital, LLC

Jurisdiction of Incorporation/Organization

NEW YORK

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2015
[ ] Yet to Be Formed

### 2. Principal Place of Business and Contact Information

Name of Issuer

88th Ave EB5 Capital, LLC

| Street Address 1 | Street Address 2 | | |
|---|---|---|---|
| 35-06 LEAVITT ST., SUITE CF-A | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| FLUSHING | NEW YORK | 11354 | 7189391060 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Xu | George | |
| **Street Address 1** | **Street Address 2** | |
| 35-06 Leavitt St., Suite CF-A | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| Li | QiLi | |
| **Street Address 1** | **Street Address 2** | |

35-06 Leavitt St., Suite CF-A

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Pan | David | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Ho | James | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Chen | Robert | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Quan | Anthea | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Law | Tracy | |
| Street Address 1 | Street Address 2 | |

35-06 Leavitt St., Suite CF-A

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Wei | Lynn | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
  - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [X] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

Revenue Range OR Aggregate Net Asset Value Range

[ ] No Revenues [ ] No Aggregate Net Asset Value

| | |
|---|---|
| [ ] $1 - $1,000,000 | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | [ ] Over $100,000,000 |
| [X] Decline to Disclose | [ ] Decline to Disclose |
| [ ] Not Applicable | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [ ] Rule 506(b)
- [X] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

[ ] Investment Company Act Section 3(c)

| | |
|---|---|
| [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Section 3(c)(7) | |

**7. Type of Filing**

[X] New Notice Date of First Sale 2016-10-15 [ ] First Sale Yet to Occur

[ ] Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| [X] Equity | [ ] Pooled Investment Fund Interests |
| [ ] Debt | [ ] Tenant-in-Common Securities |
| [ ] Option, Warrant or Other Right to Acquire Another Security | [ ] Mineral Property Securities |
| [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | [ ] Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States

[ ] Foreign/non-US

## 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | $12,000,000 USD | or [ ] Indefinite |
| Total Amount Sold | $800,000 USD | |
| Total Remaining to be Sold | $11,200,000 USD | or [ ] Indefinite |

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 0

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $1,200,000 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| 88th Ave EB5 Capital, LLC | George Xu | George Xu | Chief Executive Officer | 2017-03-03 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)

0001735899

Previous Names: [X] None

Name of Issuer

A1A EB5 LLC

Jurisdiction of Incorporation/Organization

FLORIDA

Year of Incorporation/Organization

- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2016
- [ ] Yet to Be Formed

Entity Type

- [ ] Corporation
- [ ] Limited Partnership
- [X] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer

A1A EB5 LLC

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 11 1ST STREET NORTH | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| JACKSONVILLE BEACH | FLORIDA | 32250 | 6789779009 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Patel | Akshar | |
| **Street Address 1** | **Street Address 2** | |
| 11 1st Street North | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Jacksonville Beach | FLORIDA | 32250 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

## 4. Industry Group

[ ] Agriculture Health Care [ ] Retailing

- [ ] Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [X] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 506(b)
- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(2)
  - [ ] Section 3(c)(3)
  - [ ] Section 3(c)(9)
  - [ ] Section 3(c)(10)
  - [ ] Section 3(c)(11)

[X] Rule 506(c)
[ ] Securities Act Section 4(a)(5)
[ ] Section 3(c)(4)
[ ] Section 3(c)(5)
[ ] Section 3(c)(6)
[ ] Section 3(c)(7)
[ ] Section 3(c)(12)
[ ] Section 3(c)(13)
[ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2018-03-23 [ ] First Sale Yet to Occur
[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity
[ ] Debt
[ ] Option, Warrant or Other Right to Acquire Another Security
[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
[X] Pooled Investment Fund Interests
[ ] Tenant-in-Common Securities
[ ] Mineral Property Securities
[ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $5,000,000 USD or [ ] Indefinite
Total Amount Sold $500,000 USD
Total Remaining to be Sold $4,500,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $500,000 USD ☒ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| A1A EB5 LLC | Akshar Patel | Akshar Patel | Managing Member | 2018-03-29 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)
0001684032

Previous Names: [X] None

Name of Issuer
CPT EB5 LLC

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2016
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
CPT EB5 LLC

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 805 THIRD AVENUE | | FLOOR 7 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| NEW YORK | NEW YORK | 10022 | 212-712-6000 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Barnett | Gary | |
| **Street Address 1** | **Street Address 2** | |
| 805 Third Avenue | Floor 7 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| New York | NEW YORK | 10022 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Gary Barnett is the Manager of CPT EB5 Manager LLC, the Manager.

### 4. Industry Group

- [ ] Agriculture

Banking & Financial Services

- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

- [ ] Yes
- [ ] No

- [ ] Other Banking & Financial Services
- [ ] Business Services

Energy

- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care

- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

- [ ] Manufacturing

Real Estate

- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [X] Other Real Estate

- [ ] Retailing
- [ ] Restaurants

Technology

- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

- [ ] Other

## 5. Issuer Size

Revenue Range OR

- [ ] No Revenues
- [ ] $1 - $1,000,000
- [ ] $1,000,001 - $5,000,000
- [ ] $5,000,001 - $25,000,000
- [ ] $25,000,001 - $100,000,000
- [ ] Over $100,000,000
- [X] Decline to Disclose
- [ ] Not Applicable

Aggregate Net Asset Value Range

- [ ] No Aggregate Net Asset Value
- [ ] $1 - $5,000,000
- [ ] $5,000,001 - $25,000,000
- [ ] $25,000,001 - $50,000,000
- [ ] $50,000,001 - $100,000,000
- [ ] Over $100,000,000
- [ ] Decline to Disclose
- [ ] Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [X] Rule 506(b)

- [ ] Investment Company Act Section 3(c)

- [ ] Section 3(c)(1)
- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(9)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)

☐ Rule 506(c)
☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(4) ☐ Section 3(c)(12)
☐ Section 3(c)(5) ☐ Section 3(c)(13)
☐ Section 3(c)(6) ☐ Section 3(c)(14)
☐ Section 3(c)(7)

## 7. Type of Filing

☐ New Notice Date of First Sale 2016-07-28 ☐ First Sale Yet to Occur
X Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? X Yes ☐ No

## 9. Type(s) of Securities Offered (select all that apply)

X Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
☐ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes X No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient: New City Capital LLC

Recipient CRD Number ☐ None: 172913

(Associated) Broker or Dealer X None: None

(Associated) Broker or Dealer CRD Number X None: None

Street Address 1: 1999 S. Bascom Avenue

Street Address 2: Suite 700

City: Campbell

State/Province/Country: CALIFORNIA

ZIP/Postal Code: 95008

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

CALIFORNIA
GEORGIA

ILLINOIS
MARYLAND
MASSACHUSETTS
NEW JERSEY
NEW YORK
OHIO
PENNSYLVANIA
TEXAS
VIRGINIA
WASHINGTON

---

Recipient: BCW SECURITIES LLC
Recipient CRD Number [ ] None: 144930
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 55 GREENS FARMS ROAD, SUITE 200
Street Address 2:
City: WESTPORT
State/Province/Country: CONNECTICUT
ZIP/Postal Code: 068880
State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[ ] Foreign/non-US

ILLINOIS

---

Recipient: Kornova Investments Limited
Recipient CRD Number [X] None: None
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 41 Nguyen Thi Minh Khai Street
Street Address 2: 9th Floor
City: HCMC District 1
State/Province/Country: VIET NAM
ZIP/Postal Code: 00000
State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

---

Recipient: NMS CAPITAL ADVISORS, LLC
Recipient CRD Number [ ] None: 140356
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1 | Street Address 2
159 DUMOND DRIVE

City | State/Province/Country | ZIP/Postal Code
LAGUNA BEACH | CALIFORNIA | 92651

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
☐ All States
☐ Foreign/non-US

CALIFORNIA

---

Recipient: BCI SECURITIES, INC.
Recipient CRD Number ☐ None: 168047

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: 1450 BRICKELL AVENUE
Street Address 2: SUITE 2850

City: MIAMI
State/Province/Country: FLORIDA
ZIP/Postal Code: 33131

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
☐ All States
☐ Foreign/non-US

CALIFORNIA
INDIANA
MISSOURI
NEW YORK
WASHINGTON

---

## 13. Offering and Sales Amounts

Total Offering Amount $340,000,000 USD or ☐ Indefinite

Total Amount Sold $24,500,000 USD

Total Remaining to be Sold $315,500,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 49

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $660,000 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| CPT EB5 LLC | Gary Barnett | Gary Barnett | Manager of CPT EB5 Manager LLC, Manager | 2019-09-16 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)
0001688616

Previous Names
[X] None

Name of Issuer
DS 30 Morningside Drive EB5 LLC

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2016
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
DS 30 Morningside Drive EB5 LLC

| Street Address 1 | Street Address 2 | | |
|---|---|---|---|
| C/O AANYRC 575 MADISON AVE., 23 FL | | | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| NEW YORK | NEW YORK | 10022 | 6467702095 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Shum | Victor | T |

| Street Address 1 | Street Address 2 |
|---|---|
| 575 Madison Avenue, 23 Fl | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| NEW YORK | NEW YORK | 10022 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager

| Last Name | First Name | Middle Name |
|---|---|---|

| | | |
|---|---|---|
| Gardinier | Justin | S |
| Street Address 1 | Street Address 2 | |
| 575 Madison Avenue, 23 Fl | | |
| City | State/Province/Country | ZIP/PostalCode |
| New York | NEW YORK | 10022 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Park | Julia | Y |
| Street Address 1 | Street Address 2 | |
| 575 Madison Avenue, 23 Fl | | |
| City | State/Province/Country | ZIP/PostalCode |
| New York | NEW YORK | 10022 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [X] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

[ ] Investment Company Act Section 3(c)

| | |
|---|---|
| [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Section 3(c)(7) | |

## 7. Type of Filing

[X] New Notice    Date of First Sale [X] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| [X] Equity | [ ] Pooled Investment Fund Interests |
| [ ] Debt | [ ] Tenant-in-Common Securities |
| [ ] Option, Warrant or Other Right to Acquire Another Security | [ ] Mineral Property Securities |
| [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | [ ] Other (describe) |

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

| | |
|---|---|
| Recipient | Recipient CRD Number [X] None |
| N/A | None |
| (Associated) Broker or Dealer [ ] None | (Associated) Broker or Dealer CRD Number [ ] None |
| Multivista Securities LLC | 175024 |
| Street Address 1 | Street Address 2 |
| 575 Madison Avenue, 23 Fl | |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| New York | NEW YORK | 10022 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

NEW YORK

## 13. Offering and Sales Amounts

Total Offering Amount $49,500,000 USD or [ ] Indefinite

Total Amount Sold $0 USD

Total Remaining to be Sold $49,500,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 0

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $198,000 USD [ ] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| DS 30 Morningside Drive EB5 LLC | Julia Y Park | Julia Y Park | Executive Officer | 2017-01-03 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)
0001543183

Previous Names
[X] None

Name of Issuer
EB5 Capital - Jobs Fund 4, L.P.

Jurisdiction of Incorporation/Organization
DISTRICT OF COLUMBIA

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2011
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 Capital - Jobs Fund 4, L.P.

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 1776 I ST NW, SUITE 900 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| WASHINGTON, DC | DISTRICT OF COLUMBIA | 20006 | 202-652-2437 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| DC Jobs Fund II, LLC, a series of Pettles Group, LLC | N/A | |
| **Street Address 1** | **Street Address 2** | |
| 1776 I ST NW, SUITE 900 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Washington | DISTRICT OF COLUMBIA | 20006 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

General Partner of the Issuer

| Last Name | First Name | Middle Name |
|---|---|---|

Brunner | Angelique

Street Address 1: 1776 I ST NW, SUITE 900

Street Address 2:

City: Washington

State/Province/Country: DISTRICT OF COLUMBIA

ZIP/PostalCode: 20006

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Managing Director of General Partner

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [X] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |

| | |
|---|---|
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | ☐ Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- ☐ Rule 504(b)(1) (not (i), (ii) or (iii))
- ☐ Rule 504 (b)(1)(i)
- ☐ Rule 504 (b)(1)(ii)
- ☐ Rule 504 (b)(1)(iii)
- ☐ Rule 505
- ☒ Rule 506
- ☐ Securities Act Section 4(5)
- ☐ Investment Company Act Section 3(c)

| | |
|---|---|
| ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Section 3(c)(7) | |

**7. Type of Filing**

☒ New Notice Date of First Sale 2012-02-24 ☐ First Sale Yet to Occur

☐ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? ☒ Yes ☐ No

**9. Type(s) of Securities Offered (select all that apply)**

- ☒ Equity
- ☐ Debt
- ☐ Option, Warrant or Other Right to Acquire Another Security
- ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- ☒ Pooled Investment Fund Interests
- ☐ Tenant-in-Common Securities
- ☐ Mineral Property Securities
- ☐ Other (describe)

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes ☒ No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient | Recipient CRD Number X None

(Associated) Broker or Dealer X None | (Associated) Broker or Dealer CRD Number X None

Street Address 1 | Street Address 2

City | State/Province/Country | ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $20,000,000 USD or ☐ Indefinite

Total Amount Sold $500,000 USD

Total Remaining to be Sold $19,500,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$1,120,000 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 Capital - Jobs Fund 4, L.P. | /s/Ethan McLaughlin | Ethan McLaughlin | Attorney in Fact | 2012-03-08 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)
0001751916

Previous Names
[X] None

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

Name of Issuer
EB5 Irving Hotel Investment Limited Partnership

Jurisdiction of Incorporation/Organization
OREGON

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2017
[ ] Yet to Be Formed

## 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 Irving Hotel Investment Limited Partnership

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW EVERETT STREET | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| PORTLAND | OREGON | 97209 | 971-222-1288 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Homber | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW Everett Street | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

President of Manager of General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

Williams Devin

Street Address 1 | Street Address 2
1308 NW Everett Street

City | State/Province/Country | ZIP/PostalCode
Portland | OREGON | 97209

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

President

---

Last Name | First Name | Middle Name
Finicle | Gary

Street Address 1 | Street Address 2
1308 NW Everett Street

City | State/Province/Country | ZIP/PostalCode
Portland | OREGON | 97209

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Secretary/Treasurer

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?

  [ ] Yes [ ] No

- [ ] Other Banking & Financial Services

[ ] Business Services

Energy

- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care

- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate

- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [X] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

[ ] Investment Company Act Section 3(c)

- [ ] Section 3(c)(1)
- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(6)
- [ ] Section 3(c)(7)
- [ ] Section 3(c)(9)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)
- [ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2017-04-10 [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

- [X] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

**13. Offering and Sales Amounts**

Total Offering Amount $45,000,000 USD or [ ] Indefinite

Total Amount Sold $8,500,000 USD

Total Remaining to be Sold $36,500,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

**14. Investors**

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 17

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $4,500,000 USD [X] Estimate

Clarification of Response (if Necessary):

$4,500,000 is an estimate only, based off average fee of $50,000 per investor

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 Irving Hotel Investment Limited Partnership | Homer G. Williams | Homer G. Williams | President of Manager of General Partner | 2018-08-27 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)
0001668661

Previous Names [X] None

Name of Issuer
EB5 Pearl Office Investors LP

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2015
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 Pearl Office Investors LP

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 1308 NW EVERETT STREET | | | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| PORTLAND | OREGON | 97209 | 971-222-1288 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Homer | |
| Street Address 1 | Street Address 2 | |
| 1308 NW EVERETT STREET | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

President of Manager of Manager of General Partner and Chairman of General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

Williams | Devin

Street Address 1 | Street Address 2

1308 NW EVERETT STREET

City | State/Province/Country | ZIP/PostalCode

Portland | OREGON | 97209

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

President of General Partner of Issuer

---

Last Name | First Name | Middle Name

Finicle | Gary | A.

Street Address 1 | Street Address 2

1308 NW EVERETT STREET

City | State/Province/Country | ZIP/PostalCode

Portland | OREGON | 97209

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Secretary/Treasurer of General Partner of Issuer

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [X] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(2)
  - [ ] Section 3(c)(3)
  - [ ] Section 3(c)(4)
  - [ ] Section 3(c)(5)
  - [ ] Section 3(c)(6)
  - [ ] Section 3(c)(7)
  - [ ] Section 3(c)(9)
  - [ ] Section 3(c)(10)
  - [ ] Section 3(c)(11)
  - [ ] Section 3(c)(12)
  - [ ] Section 3(c)(13)
  - [ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2015-09-28 [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

- [X] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States

[ ] Foreign/non-US

**13. Offering and Sales Amounts**

| | | |
|---|---|---|
| Total Offering Amount | $6,000,000 USD | or [ ] Indefinite |
| Total Amount Sold | $1,500,000 USD | |
| Total Remaining to be Sold | $4,500,000 USD | or [ ] Indefinite |

Clarification of Response (if Necessary):

**14. Investors**

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 3

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$450,000 USD [X] Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 Pearl Office Investors LP | Gary A. Finicle | Gary A. Finicle | Secretary/Treasurer of General Partner | 2016-02-25 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)

0001524486

Previous Names: [X] None

Name of Issuer

EB5 Ports - Baltimore LP

Jurisdiction of Incorporation/Organization

MARYLAND

Year of Incorporation/Organization

[ ] Over Five Years Ago

[X] Within Last Five Years (Specify Year) 2010

[ ] Yet to Be Formed

Entity Type

[ ] Corporation

[X] Limited Partnership

[ ] Limited Liability Company

[ ] General Partnership

[ ] Business Trust

[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer

EB5 Ports - Baltimore LP

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 2600 BROENING HIGHWAY | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| BALTIMORE | MARYLAND | 21224 | 202-747-1814 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| MORRIS | DAVID | |
| **Street Address 1** | **Street Address 2** | |
| 1806 11TH STREET NW | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| WASHINGTON | DISTRICT OF COLUMBIA | 20001 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

MANAGING MEMBER, PORT PARTNERS I LLC, AS MANAGING GENERAL PARTNER OF EB5 PORTS - BALTIMORE LP

| Last Name | First Name | Middle Name |
|---|---|---|

LOCKYER STEPHEN

Street Address 1 | Street Address 2

5475 SPRING GARDEN ROAD, #303

| City | State/Province/Country | ZIP/PostalCode |
| --- | --- | --- |
| HALIFAX | CANADA (FEDERAL LEVEL) | B3J 3T2 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

PRESIDENT, CONFEDERATION USA LTD., AS GENERAL PARTNER OF EB5 PORTS - BALTIMORE LP

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

- [ ] Commercial Banking
- [ ] Insurance
- [X] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

[ ] Yes [ ] No

- [ ] Other Banking & Financial Services

[ ] Business Services

Energy

- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care

- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate

- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
| --- | --- | --- |
| [X] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |

| | |
|---|---|
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | ☐ Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Rule 504(b)(1) (not (i), (ii) or (iii))
☐ Rule 504 (b)(1)(i)
☐ Rule 504 (b)(1)(ii)
☐ Rule 504 (b)(1)(iii)
☐ Rule 505
☒ Rule 506
☐ Securities Act Section 4(5)
☐ Investment Company Act Section 3(c)

| | |
|---|---|
| ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Section 3(c)(7) | |

**7. Type of Filing**

☒ New Notice Date of First Sale ☒ First Sale Yet to Occur
☐ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? ☐ Yes ☒ No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| ☒ Equity | ☐ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes ☒ No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient | Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None

Street Address 1 | Street Address 2

City | State/Province/Country | ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $40,000,000 USD or [ ] Indefinite

Total Amount Sold $0 USD

Total Remaining to be Sold $40,000,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 0

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $30,000 USD [X] Estimate

Finders' Fees $30,000 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking

to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 Ports - Baltimore LP | DAVID MORRIS | DAVID MORRIS | MANAGING MEMBER, PORT PARTNERS I LLC (MANAGING GEN. PARTNER) | 2011-06-29 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)

0001583707

Previous Names: [X] None

Entity Type

- [ ] Corporation
- [X] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

Name of Issuer

EB5 RIVERPLACE HOTEL INVESTMENT LP

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2012
- [ ] Yet to Be Formed

### 2. Principal Place of Business and Contact Information

Name of Issuer

EB5 RIVERPLACE HOTEL INVESTMENT LP

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW EVERETT STREET | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| PORTLAND | OREGON | 97209 | 971-222-1288 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| EB5 Global RiverPlace LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW Everett Street | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

General Partner of Issuer

| Last Name | First Name | Middle Name |
|---|---|---|

WD EB5G RiverPlace, LLC N/A

Street Address 1 Street Address 2

1308 NW Everett Street

City State/Province/Country ZIP/PostalCode

Portland OREGON 97209

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Manager of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Devin | |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

President of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Finicle | Gary | A |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Secretary/Treasurer of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Homer | G |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Chairman of General Partner

---

**4. Industry Group**

[ ] Agriculture

Banking & Financial Services

[ ] Commercial Banking

[ ]

Health Care

[ ] Biotechnology

[ ] Health Insurance

[ ] Retailing

[ ] Restaurants

Technology

- [ ] Insurance
- [X] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?

  - [ ] Yes
  - [ ] No
- [ ] Other Banking & Financial Services
- [ ] Business Services

Energy

- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care
- [ ] Manufacturing

Real Estate

- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel
- [ ] Other

**5. Issuer Size**

Revenue Range OR Aggregate Net Asset Value Range

| Revenue Range | Aggregate Net Asset Value Range |
|---|---|
| [ ] No Revenues | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | [ ] Over $100,000,000 |
| [X] Decline to Disclose | [ ] Decline to Disclose |
| [ ] Not Applicable | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506
- [ ] Securities Act Section 4(5)
- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(2)
  - [ ] Section 3(c)(3)
  - [ ] Section 3(c)(9)
  - [ ] Section 3(c)(10)
  - [ ] Section 3(c)(11)

☐ Section 3(c)(4) ☐ Section 3(c)(12)
☐ Section 3(c)(5) ☐ Section 3(c)(13)
☐ Section 3(c)(6) ☐ Section 3(c)(14)
☐ Section 3(c)(7)

## 7. Type of Filing

[X] New Notice Date of First Sale 2013-05-30 ☐ First Sale Yet to Occur
☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? ☐ Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
☐ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $51,000,000 USD or ☐ Indefinite
Total Amount Sold $2,000,000 USD
Total Remaining to be Sold $49,000,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 4

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$6,375,000 USD [X] Estimate

Clarification of Response (if Necessary):

The persons named in Item 3 will receive no payments from offering proceeds directly, but will receive a fee equal to 12.5% of the total budgeted costs. The estimated fee is listed above.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 RIVERPLACE HOTEL INVESTMENT LP | Gary A. Finicle | Gary A. Finicle | Secty./Treas. of EB5 Global RiverPlace LLC, General Partner | 2013-08-05 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)
0001571174

Previous Names: [X] None

Name of Issuer
EB-5 SF INVESTMENT LIMITED PARTNERSHIP

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2012
- [ ] Yet to Be Formed

Entity Type
- [ ] Corporation
- [X] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer
EB-5 SF INVESTMENT LIMITED PARTNERSHIP

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW EVERETT STREET | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| PORTLAND | OREGON | 97209 | 971-222-1288 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| EB5 Global SF LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 1308 NW Everett Street | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

General Partner of Issuer

| Last Name | First Name | Middle Name |
|---|---|---|

WD EB5G SF, LLC N/A
Street Address 1 Street Address 2
1308 NW Everett Street
City State/Province/Country ZIP/PostalCode
Portland OREGON 97209
Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Manager of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Homer | G. |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Chairman of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Fuller | B. | Scott |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Chief Executive Officer of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Williams | Devin | |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

President of General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Finicle | Gary | A. |
| Street Address 1 | Street Address 2 | |
| 1308 NW Everett Street | | |
| City | State/Province/Country | ZIP/PostalCode |
| Portland | OREGON | 97209 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Secretary/Treasurer of General Partner

---

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [X] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506
- [ ] Securities Act Section 4(5)
- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(2)
  - [ ] Section 3(c)(3)
  - [ ] Section 3(c)(4)
  - [ ] Section 3(c)(5)
  - [ ] Section 3(c)(6)
  - [ ] Section 3(c)(7)
  - [ ] Section 3(c)(9)
  - [ ] Section 3(c)(10)
  - [ ] Section 3(c)(11)
  - [ ] Section 3(c)(12)
  - [ ] Section 3(c)(13)
  - [ ] Section 3(c)(14)

## 7. Type of Filing

- [X] New Notice   Date of First Sale 2013-02-01   [ ] First Sale Yet to Occur
- [ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

- [X] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

☐ All States ☐ Foreign/non-US

## 13. Offering and Sales Amounts

| | |
|---|---|
| Total Offering Amount | $42,000,000 USD or ☐ Indefinite |
| Total Amount Sold | $27,500,000 USD |
| Total Remaining to be Sold | $14,500,000 USD or ☐ Indefinite |

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 55

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$6,612,057 USD [X] Estimate

Clarification of Response (if Necessary):

The persons named in Item 3 will receive no payments from offering proceeds directly, but will receive a fee equal to 10.5% of the project development expenses. The estimated fee is listed above.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any

notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB-5 SF INVESTMENT LIMITED PARTNERSHIP | Gary A. Finicle | Gary A. Finicle | Secretary/Treasurer of EB5 Global SF LLC, General Partner | 2013-03-07 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)

0001524496

Previous Names [X] None

Entity Type

- [ ] Corporation
- [ ] Limited Partnership
- [X] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

Name of Issuer

EB5 StateCenter II, LLC

Jurisdiction of Incorporation/Organization

MARYLAND

Year of Incorporation/Organization

- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2011
- [ ] Yet to Be Formed

## 2. Principal Place of Business and Contact Information

Name of Issuer

EB5 StateCenter II, LLC

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 3500 PARKDALE AVENUE | | BUILDING 1 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| BALTIMORE | MARYLAND | 21211 | 202-747-1814 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Morris | David | |
| **Street Address 1** | **Street Address 2** | |
| 1806 11th Street NW | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Washington DC | DISTRICT OF COLUMBIA | 20001 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Managing Member, SC Management Services LLC (Managing Member, EB5 StateCenter II LLC)

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [X] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    - [ ] Yes
    - [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [X] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506
- [ ] Securities Act Section 4(5)
- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(9)

- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(6)
- [ ] Section 3(c)(7)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)
- [ ] Section 3(c)(14)

**7. Type of Filing**

[X] New Notice    Date of First Sale [X] First Sale Yet to Occur

[ ] Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? [ ] Yes [X] No

**9. Type(s) of Securities Offered (select all that apply)**

[X] Equity
[ ] Debt
[ ] Option, Warrant or Other Right to Acquire Another Security
[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
[ ] Pooled Investment Fund Interests
[ ] Tenant-in-Common Securities
[ ] Mineral Property Securities
[ ] Other (describe)

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

**13. Offering and Sales Amounts**

Total Offering Amount $65,000,000 USD or [ ] Indefinite

Total Amount Sold $0 USD

Total Remaining to be Sold $65,000,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

**14. Investors**

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 0

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $20,000 USD ☒ Estimate

Finders' Fees $20,000 USD ☒ Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 StateCenter II, LLC | David M. Morris | David M. Morris | Managing Mem., SC Management Services LLC (Managing Mem.) | 2011-07-06 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)
0001790137

Name of Issuer
EB5 United Big Sky, LLC

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
☐ Over Five Years Ago
☒ Within Last Five Years (Specify Year) 2017
☐ Yet to Be Formed

Previous Names ☐ None
Crossharbor EB-5 Opportunity Partners II LLC

Entity Type
☐ Corporation
☐ Limited Partnership
☒ Limited Liability Company
☐ General Partnership
☐ Business Trust
☐ Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 United Big Sky, LLC

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 10250 CONSTELLATION BOULEVARD, SUITE 100 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| LOS ANGELES | CALIFORNIA | 90067 | 424-279-8308 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Stedem | Bradford | |
| **Street Address 1** | **Street Address 2** | |
| 10250 Constellation Boulevard, Suite 100 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Los Angeles | CALIFORNIA | 90087 |

Relationship: ☒ Executive Officer ☐ Director ☐ Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| Fuller | Scott | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 10250 Constellation Boulevard, Suite 100 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Los Angeles | CALIFORNIA | 90087 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [X] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [X] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] | | [ ] |

☐ Decline to Disclose
☐ Not Applicable

☐ Decline to Disclose
☐ Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))
☐ Rule 504 (b)(1)(i)
☐ Rule 504 (b)(1)(ii)
☐ Rule 504 (b)(1)(iii)
X Rule 506(b)
☐ Rule 506(c)
☐ Securities Act Section 4(a)(5)

☐ Investment Company Act Section 3(c)

☐ Section 3(c)(1)
☐ Section 3(c)(2)
☐ Section 3(c)(3)
☐ Section 3(c)(4)
☐ Section 3(c)(5)
☐ Section 3(c)(6)
☐ Section 3(c)(7)

☐ Section 3(c)(9)
☐ Section 3(c)(10)
☐ Section 3(c)(11)
☐ Section 3(c)(12)
☐ Section 3(c)(13)
☐ Section 3(c)(14)

## 7. Type of Filing

X New Notice Date of First Sale 2019-09-27 ☐ First Sale Yet to Occur
☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? X Yes ☐ No

## 9. Type(s) of Securities Offered (select all that apply)

X Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☐ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes X No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient: Dalmore Group

Recipient CRD Number ☐ None: 136352

(Associated) Broker or Dealer ☐ None

(Associated) Broker or Dealer CRD Number ☐ None

Dalmore Group 136352

Street Address 1 | Street Address 2
525 Green Place

City | State/Province/Country | ZIP/Postal Code
Woodmere | NEW YORK | 11598

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[X] All States
[ ] Foreign/non-US

---

Recipient | Recipient CRD Number [ ] None
Investment Visa Consultants | 169254

(Associated) Broker or Dealer [ ] None | (Associated) Broker or Dealer CRD Number [ ] None
Investment Visa Consultants | 169254

Street Address 1 | Street Address 2
5139 Geary Boulevard

City | State/Province/Country | ZIP/Postal Code
San Francisco | CALIFORNIA | 94118

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[X] All States
[ ] Foreign/non-US

---

Recipient | Recipient CRD Number [ ] None
Primary Capital LLC | 127921

(Associated) Broker or Dealer [ ] None | (Associated) Broker or Dealer CRD Number [ ] None
Primary Capital LLC | 127921

Street Address 1 | Street Address 2
90 Broad Street, 9th Floor

City | State/Province/Country | ZIP/Postal Code
New York | NEW YORK | 10004

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[X] All States
[ ] Foreign/non-US

---

## 13. Offering and Sales Amounts

Total Offering Amount $63,500,000 USD or [ ] Indefinite

Total Amount Sold $4,000,000 USD

Total Remaining to be Sold $59,500,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 5

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $6,350,000 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 United Big Sky, LLC | Tiffany M. Winkles | Tiffany M. Winkles | CFO | 2019-10-16 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)

0001647786

Previous Names: [X] None

Name of Issuer

EB5 UNITED FUND 5 - HOLLYWOOD APARTMENTS LP

Jurisdiction of Incorporation/Organization

WASHINGTON

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2015
[ ] Yet to Be Formed

Entity Type

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer

EB5 UNITED FUND 5 - HOLLYWOOD APARTMENTS LP

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 501 SE COLUMBIA SHORES BLVD | | SUITE 400 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| VANCOUVER | WASHINGTON | 98661 | 4242798308 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| FULLER | BRIAN | SCOTT |
| **Street Address 1** | **Street Address 2** | |
| 501 SE Columbia Shores Blvd | Suite 400 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Vancouver | WASHINGTON | 98661 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|

STEDEM BRADFORD BRENNAN

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 1431 OCEAN AVE | SUITE 100 | |
| City | State/Province/Country | ZIP/PostalCode |
| SANTA MONICA | CALIFORNIA | 90401 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| HOLLYWOOD LLC | EB5U 6200 | |
| Street Address 1 | Street Address 2 | |
| 501 SE Columbia Shores Blvd | Suite 400 | |
| City | State/Province/Country | ZIP/PostalCode |
| Vancouver | WASHINGTON | 98661 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

GENERAL PARTNER OF THE EB5 UNITED FUND 5 - HOLLYWOOD APARTMENTS LP

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [X] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [X] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

- [ ] Investment Company Act Section 3(c)

| | |
|---|---|
| [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Section 3(c)(7) | |

## 7. Type of Filing

[X] New Notice Date of First Sale 2015-07-08 [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| [X] Equity | [ ] Pooled Investment Fund Interests |
| [ ] Debt | [ ] Tenant-in-Common Securities |
| [ ] Option, Warrant or Other Right to Acquire Another Security | [ ] Mineral Property Securities |
| [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | [ ] Other (describe) |

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $555,000 USD

**12. Sales Compensation**

| Recipient | Recipient CRD Number [X] None |
|---|---|
| SHANGHAI AUCAN BUSINESS & MANAGEMENT CONSULTING CO LTD | None |
| (Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None |
| None | None |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| HENGJI MANSION HUAI HAI EAST ROAD NO 99 | FLOOR 16 SUITE D-H | |
| City | State/Province/Country | ZIP/Postal Code |
| SHANGHAI | CHINA | 200 021 |

State(s) of Solicitation (select all that apply) Check "All States" or check individual States [ ] All States [X] Foreign/non-US

**13. Offering and Sales Amounts**

Total Offering Amount $54,945,000 USD or [ ] Indefinite

Total Amount Sold $555,000 USD

Total Remaining to be Sold $54,390,000 USD or [ ] Indefinite

Clarification of Response (if Necessary):

**14. Investors**

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $14,850,000 USD [X] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

Sales commissions includes 4% annual fee for 5 years.

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$495,000 USD [X] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 UNITED FUND 5 - HOLLYWOOD APARTMENTS LP | BRADFORD B. STEDEM | BRADFORD B. STEDEM | PRESIDENT | 2015-07-21 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)
0001722445

Previous Names: [X] None

Name of Issuer
EB5 UNITED NYC VI LP

Jurisdiction of Incorporation/Organization
WASHINGTON

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2017
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 UNITED NYC VI LP

| Street Address 1 | Street Address 2 |
|---|---|
| 900 WASHINGTON STREET SUITE 850 | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| VANCOUVER | WASHINGTON | 98660 | 4242798308 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| FULLER | BRIAN | SCOTT |
| **Street Address 1** | **Street Address 2** | |
| 900 WASHINGTON STREET | SUITE 850 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| VANCOUVER | WASHINGTON | 98660 |

Relationship: [X] Executive Officer [X] Director [X] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| STEDEM | BRADFORD | BRENNAN |
| **Street Address 1** | **Street Address 2** | |

10250 CONSTELLATION BLVD | SUITE 100

City: LOS ANGELES
State/Province/Country: CALIFORNIA
ZIP/PostalCode: 90067

Relationship: [X] Executive Officer [X] Director [X] Promoter

Clarification of Response (if Necessary):

---

Last Name: NYC LLC
First Name: EB5U
Middle Name:
Street Address 1: 900 WASHINGTON STREET
Street Address 2: SUITE 850
City: VANCOUVER
State/Province/Country: WASHINGTON
ZIP/PostalCode: 98660

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

GENERAL PARTNER OF THE EB5 UNITED NYC VI LP

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [X] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

Revenue Range OR Aggregate Net Asset Value Range

| | |
|---|---|
| [X] No Revenues | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | [ ] Decline to Disclose |
| [ ] Not Applicable | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

[ ] Investment Company Act Section 3(c)

| | | |
|---|---|---|
| [ ] Rule 504(b)(1) (not (i), (ii) or (iii)) | [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Rule 504 (b)(1)(i) | [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Rule 504 (b)(1)(ii) | [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Rule 504 (b)(1)(iii) | [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [X] Rule 506(b) | [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Rule 506(c) | [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Securities Act Section 4(a)(5) | [ ] Section 3(c)(7) | |

## 7. Type of Filing

[ ] New Notice Date of First Sale 2017-10-27 [ ] First Sale Yet to Occur

[X] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| [X] Equity | [ ] Pooled Investment Fund Interests |
| [ ] Debt | [ ] Tenant-in-Common Securities |
| [ ] Option, Warrant or Other Right to Acquire Another Security | [ ] Mineral Property Securities |
| [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | [ ] Other (describe) |

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $550,000 USD

## 12. Sales Compensation

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| INVESTMENT VISA CONSULTANTS LLC | 169254 | |
| (Associated) Broker or Dealer ☒ None | (Associated) Broker or Dealer CRD Number ☒ None | |
| VAUGHAN DE KIRBY | None | |
| Street Address 1 | Street Address 2 | |
| 5139 GEARY BLVD | | |
| City | State/Province/Country | ZIP/Postal Code |
| SAN FRANCISCO | CALIFORNIA | 94118 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

- CALIFORNIA

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| DALMORE GROUP | 136352 | |
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None | |
| SHELLY WOLFSDORF | 2644785 | |
| Street Address 1 | Street Address 2 | |
| 525 GREEN PLACE | | |
| City | State/Province/Country | ZIP/Postal Code |
| WOODMERE | NEW YORK | 11598 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

- CALIFORNIA
- NEW YORK

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| PINNACLE CAPITAL GROUP | 106213 | |
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None | |
| KURT EDWARD REUSS | 6200373 | |
| Street Address 1 | Street Address 2 | |
| 7401 WATSON ROAD SUITE 90 | | |
| City | State/Province/Country | ZIP/Postal Code |
| ST LOUIS | MISSOURI | 63319 |

State(s) of Solicitation (select all that apply) ☐ All States ☒ Foreign/non-US

Check "All States" or check individual States

| |
|---|
| CALIFORNIA |
| GEORGIA |
| NEW YORK |
| WISCONSIN |

---

Recipient | Recipient CRD Number [ ] None

PRIMARY CAPITAL LLC | 127921

(Associated) Broker or Dealer [ ] None | (Associated) Broker or Dealer CRD Number [ ] None

SUDHIR ALFRED BHATT | 6281921

Street Address 1 | Street Address 2

90 BROAD STREET 9TH FLOOR

City | State/Province/Country | ZIP/Postal Code

NEW YORK | NEW YORK | 10004

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [X] All States [X] Foreign/non-US

---

Recipient | Recipient CRD Number [ ] None

DALMORE GROUP | 136352

(Associated) Broker or Dealer [ ] None | (Associated) Broker or Dealer CRD Number [ ] None

JOHN FRANCIS ROTH | 5850102

Street Address 1 | Street Address 2

525 GREEN PLACE

City | State/Province/Country | ZIP/Postal Code

WOODMERE | NEW YORK | 11598

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

| |
|---|
| CALIFORNIA |
| NEW YORK |

---

Recipient | Recipient CRD Number [X] None

WORLDWAY INTERNATIONAL INVESTMENT HOLDINGS LTD | None

(Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None

None | None

Street Address 1 | Street Address 2

RM 604-612 6/F EXCELLENCE TIME SQ BLDG | 4068 YITIAN RD FUTIAN CBD

City | State/Province/Country | ZIP/Postal

| | | |
|---|---|---|
| | | Code |
| SHENZHEN | CHINA | 518048 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

---

| | |
|---|---|
| Recipient | Recipient CRD Number ☒ None |
| BCI CO LTD | None |
| (Associated) Broker or Dealer ☒ None | (Associated) Broker or Dealer CRD Number ☒ None |
| None | None |
| Street Address 1 | Street Address 2 |
| SEOKWAN 1102 322 TEHERAN-RO | GANGNAM-GU |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| SEOUL | KOREA, REPUBLIC OF | 06211 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

---

| | |
|---|---|
| Recipient | Recipient CRD Number ☒ None |
| KORNOVA INVESTMENTS LIMITED | None |
| (Associated) Broker or Dealer ☒ None | (Associated) Broker or Dealer CRD Number ☒ None |
| None | None |
| Street Address 1 | Street Address 2 |
| 9TH FLOOR 41 NGUYEN THI MINH STREET | DISTRICT 1 |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| HO CHI MINH CITY | VIET NAM | 00000 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

---

## 13. Offering and Sales Amounts

Total Offering Amount $80,850,000 USD or ☐ Indefinite

Total Amount Sold $46,200,000 USD

Total Remaining to be Sold $34,650,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 84

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $17,640,000 USD [X] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$735,000 USD [X] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 UNITED NYC VI LP | TIFFANY WINKLES | TIFFANY WINKLES | CFO | 2018-11-30 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)
0001612780

Previous Names [X] None

Name of Issuer
EB5 UNITED PUERTO RICO FS LP

Jurisdiction of Incorporation/Organization
WASHINGTON

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2014
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
EB5 UNITED PUERTO RICO FS LP

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 900 WASHINGTON STREET | | SUITE 850 | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| VANCOUVER | WASHINGTON | 98660 | 4242798308 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| FULLER | BRIAN | SCOTT |
| Street Address 1 | Street Address 2 | |
| 900 WASHINGTON STREET | SUITE 850 | |
| City | State/Province/Country | ZIP/PostalCode |
| VANCOUVER | WASHINGTON | 98660 |

Relationship: [X] Executive Officer [X] Director [X] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| STEDEM | BRADFORD | BRENNAN |
| Street Address 1 | Street Address 2 | |

10250 CONSTELLATION BLVD | SUITE 100

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| LOS ANGELES | CALIFORNIA | 90067 |

Relationship: [X] Executive Officer [X] Director [X] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| PR LLC | EB5U | |
| **Street Address 1** | **Street Address 2** | |
| 900 WASHINGTON STREET | SUITE 850 | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| VANCOUVER | WASHINGTON | 98660 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

GENERAL PARTNER OF THE EB5 UNITED PUERTO RICO FS LP.

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
    - [ ] Yes [ ] No
  - [X] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

Revenue Range OR Aggregate Net Asset Value Range

| | |
|---|---|
| [X] No Revenues | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | [ ] Decline to Disclose |
| [ ] Not Applicable | [ ] Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

[ ] Investment Company Act Section 3(c)

| | | |
|---|---|---|
| [ ] Rule 504(b)(1) (not (i), (ii) or (iii)) | [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Rule 504 (b)(1)(i) | [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Rule 504 (b)(1)(ii) | [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Rule 504 (b)(1)(iii) | [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [X] Rule 506(b) | [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Rule 506(c) | [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Securities Act Section 4(a)(5) | [ ] Section 3(c)(7) | |

## 7. Type of Filing

[ ] New Notice Date of First Sale 2014-06-23 [ ] First Sale Yet to Occur

[X] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| [X] Equity | [ ] Pooled Investment Fund Interests |
| [ ] Debt | [ ] Tenant-in-Common Securities |
| [ ] Option, Warrant or Other Right to Acquire Another Security | [ ] Mineral Property Securities |
| [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | [ ] Other (describe) |

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $550,000 USD

## 12. Sales Compensation

Recipient: Trevor Saliba
Recipient CRD Number [ ] None: 2692057
(Associated) Broker or Dealer [ ] None: NMS Capital Group, LLC
(Associated) Broker or Dealer CRD Number [ ] None: 140356
Street Address 1: 433 N. Camden Drive
Street Address 2: 4th Floor
City: Beverly Hills
State/Province/Country: CALIFORNIA
ZIP/Postal Code: 90210

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

| |
|---|
| CALIFORNIA |
| FLORIDA |
| KENTUCKY |
| NEW JERSEY |
| OKLAHOMA |
| WASHINGTON |

---

Recipient: Cansine
Recipient CRD Number [X] None: None
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: Chaoyang District E China Overseas Plaza
Street Address 2: No 8 Bldg 2 5th Floor
City: Beijing
State/Province/Country: CHINA
ZIP/Postal Code: 100020

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

---

Recipient: JOHN LEO
Recipient CRD Number [ ] None: 1690545
(Associated) Broker or Dealer [ ] None: PRIMARY CAPITAL, LLC
(Associated) Broker or Dealer CRD Number [ ] None: 127921
Street Address 1: 80 WALL STREET
Street Address 2: 5TH FLOOR
City
State/Province/Country
ZIP/Postal Code

NEW YORK | NEW YORK | 10005

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

---

Recipient: CHAO XUE
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: ATLANTIC INVESTMENT INTERNATIONAL GROUP LTD
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: 1158 JIANGNING ROAD, SUITE 2703
Street Address 2: UNITED POWER INTERNATIONAL PLAZA

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| SHANGHAI | CHINA | 200060 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

---

Recipient: GLENN DORE
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: EB5 GLOBAL ACCESS INC
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: 147 CARTIER AVENUE
Street Address 2: SUITE 304

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| POINTE CLAIRE | QUEBEC, CANADA | H9S 4R9 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States
[ ] All States
[X] Foreign/non-US

---

Recipient: VAUGHAN DE KIRBY
Recipient CRD Number [ ] None: 6189313

(Associated) Broker or Dealer [ ] None: INVESTMENT VISA CONSULTANTS, LLC
(Associated) Broker or Dealer CRD Number [ ] None: 169254

Street Address 1: 5139 GEARY BLVD
Street Address 2:

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| SAN FRANCISCO | CALIFORNIA | 94118 |

State(s) of Solicitation (select all that apply)
[ ] All States
[X] Foreign/non-US

Check "All States" or check individual States [ ]

---

Recipient: HWAPYUNG D&C, INC.
Recipient CRD Number [X] None: None
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 62 NONHYUN-DONG
Street Address 2: CHOYIL BLDG 7FL, KANGNAM
City: SEOUL
State/Province/Country: KOREA, REPUBLIC OF
ZIP/Postal Code: 135-010
State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: VINCENT CHEN
Recipient CRD Number [X] None: None
(Associated) Broker or Dealer [X] None: VISAS CONSULTING GROUP
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 29/F HUAIHAI ROAD CENTERAL
Street Address 2:
City: SHANGHAI
State/Province/Country: CHINA
ZIP/Postal Code: 200031
State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: WORLDWAY
Recipient CRD Number [X] None: None
(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None
Street Address 1: 604-612, TIMES SQUARE EXCELLENCE
Street Address 2: 4068 YITIAN ROAD
City: SHENZHEN
State/Province/Country: CHINA
ZIP/Postal Code: 518048
State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

**13. Offering and Sales Amounts**

Total Offering Amount $131,450,000 USD or ☐ Indefinite

Total Amount Sold $131,450,000 USD

Total Remaining to be Sold $0 USD or ☐ Indefinite

Clarification of Response (if Necessary):

**14. Investors**

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 239

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $30,265,000 USD [X] Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$1,035,000 USD [X] Estimate

Clarification of Response (if Necessary):

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| EB5 UNITED PUERTO RICO FS LP | B SCOTT FULLER | B. SCOTT FULLER | CEO | 2018-07-30 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)
0001789483

Previous Names: [X] None

Name of Issuer
GS EB5 X LLC

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2018
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer
GS EB5 X LLC

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 152 West 57th Street | | 60th Floor | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| New York | NEW YORK | 10019 | 212-649-9700 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| GS EB5 X Manager LLC | n/a | |
| **Street Address 1** | **Street Address 2** | |
| 152 West 57th Street | 60th Floor | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| New York | NEW YORK | 10019 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager of the Issuer

| Last Name | First Name | Middle Name |
|---|---|---|

Berman Allison

Street Address 1: 152 West 57th Street
Street Address 2: 60th Floor
City: New York
State/Province/Country: NEW YORK
ZIP/PostalCode: 10019

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [X] Pooled Investment Fund
    - [ ] Hedge Fund
    - [ ] Private Equity Fund
    - [ ] Venture Capital Fund
    - [X] Other Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [X] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

Revenue Range OR Aggregate Net Asset Value Range

| Revenue Range | Aggregate Net Asset Value Range |
| --- | --- |
| [ ] No Revenues | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | [ ] $5,000,001 - $25,000,000 |

| | |
|---|---|
| ☐ $5,000,001 - $25,000,000 | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | X Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

X Investment Company Act Section 3(c)

| | | |
|---|---|---|
| ☐ Rule 504(b)(1) (not (i), (ii) or (iii)) | X Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Rule 504 (b)(1)(i) | ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| X Rule 506(b) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Rule 506(c) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(7) | |

**7. Type of Filing**

X New Notice Date of First Sale 2019-01-08 ☐ First Sale Yet to Occur

☐ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? ☐ Yes X No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| ☐ Equity | X Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes X No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient | Recipient CRD Number ☐ None
Dalmore Group, LLC | 136352
(Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None
Bryan Caulkins | 6489532
Street Address 1 | Street Address 2
525 Green Place
City | State/Province/Country | ZIP/Postal Code
Woodmere | NEW YORK | 11598

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

FLORIDA

---

Recipient | Recipient CRD Number ☐ None
Dalmore Group, LLC | 136352
(Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number ☐ None
Mickayla Rosard | 6795784
Street Address 1 | Street Address 2
525 Green Place
City | State/Province/Country | ZIP/Postal Code
Woodmere | NEW YORK | 11598

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☒ Foreign/non-US

FLORIDA

---

## 13. Offering and Sales Amounts

Total Offering Amount $500,000 USD or ☐ Indefinite
Total Amount Sold $500,000 USD
Total Remaining to be Sold $0 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $42,500 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| GS EB5 X LLC | /s/ Allison Berman | Allison Berman | Vice President | 2019-10-30 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)

0001621885

Previous Names: [X] None

Name of Issuer

La Moda (Gale) EB-5 Investment LP

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2014
[ ] Yet to Be Formed

Entity Type

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer

La Moda (Gale) EB-5 Investment LP

| Street Address 1 | Street Address 2 |
|---|---|
| 17961 GALE AVENUE | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| INDUSTRY | CALIFORNIA | 91748 | (213)494-8918 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Teng | Daniel | |

| Street Address 1 | Street Address 2 |
|---|---|
| 18555 Fieldbrook St. | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Rowland Heights | CALIFORNIA | 91748 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager, La Moda EB5 Investment LLC, General Partner of Applicant

| Last Name | First Name | Middle Name |
|---|---|---|

Wang | Jay

Street Address 1 | Street Address 2

18555 Fieldbrook St.

City | State/Province/Country | ZIP/PostalCode

Rowland Heights | CALIFORNIA | 91748

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

CFO, La Moda EB5 Investment LLC, General Partner of Applicant

---

Last Name | First Name | Middle Name

Hu | Wei

Street Address 1 | Street Address 2

18555 Fieldbrook St.

City | State/Province/Country | ZIP/PostalCode

Rowland Heights | CALIFORNIA | 91748

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Employee, La Moda EB5 Investment LLC, General Partner of Applicant

---

Last Name | First Name | Middle Name

Jin | Jianhua

Street Address 1 | Street Address 2

18555 Fieldbrook St.

City | State/Province/Country | ZIP/PostalCode

Rowland Heights | CALIFORNIA | 91748

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

Ultimate owner, La Moda EB5 Investment LLC, General Partner of Applicant

---

**4. Industry Group**

[ ] Agriculture

Banking & Financial Services

- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

[ ] Yes [ ] No

- [ ] Other Banking & Financial Services

[ ]

Health Care

- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate

- [X] Commercial
- [ ] Construction
- [ ] REITS & Finance

[ ] Retailing

[ ] Restaurants

Technology

- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Residential

☐ Other Real Estate

☐ Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| X Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☐ Rule 505

☐ Rule 506(b)

X Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Investment Company Act Section 3(c)

| | |
|---|---|
| ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Section 3(c)(7) | |

**7. Type of Filing**

☐ New Notice Date of First Sale 2014-09-26 ☐ First Sale Yet to Occur

X Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? X Yes ☐ No

### 9. Type(s) of Securities Offered (select all that apply)

- [X] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

### 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

### 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

### 12. Sales Compensation

Recipient: Lu, Songfei
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: Unit 26-201, Zhachui Garden
Street Address 2: Chongchuan District

City: Nanlong, Jiangsu
State/Province/Country: CHINA
ZIP/Postal Code: 00000

State(s) of Solicitation (select all that apply)
Check “All States” or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: Wanda Fund Investment Group Limited
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: 11/F AXA Centre, 151 Gloucester Road
Street Address 2:

City: Hong Kong
State/Province/Country: HONG KONG
ZIP/Postal Code: 00000

State(s) of Solicitation (select all that apply)
Check “All States” or check individual States [ ] All States [X] Foreign/non-US

---

Recipient
Recipient CRD Number [X] None

Fujian Morgan Investment Co., Ltd. | None

(Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None

None | None

Street Address 1: Unit 3-10, Guiyuan Yijing II
Street Address 2: No. 184-186 Acfeng Road, Taiijang Dist,

City: Fuzhou, Fujian
State/Province/Country: CHINA
ZIP/Postal Code: 00000

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: Zhao, Yang
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: Jianshe Road 79-2-605
Street Address 2: Heping District

City: Tianjin
State/Province/Country: CHINA
ZIP/Postal Code: 00000

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: Li, Jinfu
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1: Longquanyi District
Street Address 2: Bei Quan Street, No. 1068

City: Chengdu, Sichuan
State/Province/Country: CHINA
ZIP/Postal Code: 00000

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [X] Foreign/non-US

---

Recipient: Yu, Fengxiang
Recipient CRD Number [X] None: None

(Associated) Broker or Dealer [X] None: None
(Associated) Broker or Dealer CRD Number [X] None: None

Street Address 1
Street Address 2

| | | |
|---|---|---|
| Room 4-4-3, Lvyou VIllage | Wuhou District | |
| City | State/Province/Country | ZIP/Postal Code |
| Chengdu, Sichuan | CHINA | 00000 |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

☐ All States ☒ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $16,000,000 USD or ☐ Indefinite

Total Amount Sold $7,500,000 USD

Total Remaining to be Sold $8,500,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 15

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $190,000 USD ☐ Estimate

Clarification of Response (if Necessary):

Finders' fees paid to Chinese immigration agents/agencies in China.

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

The entire amount of gross proceeds from the sale of securities will be invested and used in the business of the issuer.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| La Moda (Gale) EB-5 Investment LP | /s/ Daniel Teng | Daniel Teng | Manager, GP of Applicant | 2015-11-04 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)
0001697077

Previous Names: [X] None

Name of Issuer
QB Ventures EB5 Capital, LLC

Jurisdiction of Incorporation/Organization
NEW YORK

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2015
- [ ] Yet to Be Formed

Entity Type
- [ ] Corporation
- [ ] Limited Partnership
- [X] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
QB Ventures EB5 Capital, LLC

| Street Address 1 | Street Address 2 |
|---|---|
| 35-06 LEAVITT ST. | SUITE CF-A |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| FLUSHING | NEW YORK | 11354 | 7189391060 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Xu | George | |

| Street Address 1 | Street Address 2 |
|---|---|
| 35-06 Leavitt St., Suite CF-A | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| Li | QiLi | |

| Street Address 1 | Street Address 2 |
|---|---|

35-06 Leavitt St., Suite CF-A

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Pan | David | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Ho | James | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Chen | Robert | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Quan | Anthea | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Law | Tracy | |
| Street Address 1 | Street Address 2 | |

35-06 Leavitt St., Suite CF-A

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Wei | Lynn | |
| Street Address 1 | Street Address 2 | |
| 35-06 Leavitt St., Suite CF-A | | |
| City | State/Province/Country | ZIP/PostalCode |
| Flushing | NEW YORK | 11354 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [X] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

Revenue Range OR Aggregate Net Asset Value Range

[ ] No Revenues [ ] No Aggregate Net Asset Value

| | |
|---|---|
| ☐ $1 - $1,000,000 | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| X Decline to Disclose | ☐ Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Investment Company Act Section 3(c)

| | | |
|---|---|---|
| ☐ Rule 504(b)(1) (not (i), (ii) or (iii)) | ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Rule 504 (b)(1)(i) | ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Rule 506(b) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| X Rule 506(c) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(7) | |

**7. Type of Filing**

☐ New Notice  Date of First Sale 2017-03-03 ☐ First Sale Yet to Occur

X Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? X Yes ☐ No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| X Equity | ☐ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes X No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States

[ ] Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $8,000,000 USD or [ ] Indefinite

Total Amount Sold $8,000,000 USD

Total Remaining to be Sold $0 USD or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 16

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $800,000 USD [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| QB Ventures EB5 Capital, LLC | George Xu | George Xu | Managing Member | 2019-01-30 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)

0001527996

Previous Names [X] None

Name of Issuer

Riviera Point Holdings, Ltd.

Jurisdiction of Incorporation/Organization

FLORIDA

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2010
[ ] Yet to Be Formed

Entity Type

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer

Riviera Point Holdings, Ltd.

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 2700 GLADES CIR., SUITE 130 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| WESTON | FLORIDA | 33327 | 954-727-1828 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Azpurua | Rodrigo | |
| **Street Address 1** | **Street Address 2** | |
| 2700 Glades Cir., Suite 130 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Weston | FLORIDA | 33327 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Manager to the Managing General Partner

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    - [ ] Yes
    - [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [X] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [X] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506
- [ ] Securities Act Section 4(5)
- [ ] Investment Company Act Section 3(c)
  - [ ] Section 3(c)(1)
  - [ ] Section 3(c)(9)

- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(6)
- [ ] Section 3(c)(7)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)
- [ ] Section 3(c)(14)

## 7. Type of Filing

[X] New Notice Date of First Sale 2011-07-29 [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

## 9. Type(s) of Securities Offered (select all that apply)

- [X] Equity
- [ ] Debt
- [ ] Option, Warrant or Other Right to Acquire Another Security
- [ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security
- [ ] Pooled Investment Fund Interests
- [ ] Tenant-in-Common Securities
- [ ] Mineral Property Securities
- [ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount $17,000,000 USD or [ ] Indefinite

Total Amount Sold $1,500,000 USD

Total Remaining to be Sold $15,500,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 3

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$30,000 USD ☐ Estimate

Clarification of Response (if Necessary):

$30,000.00 of administration fee to be paid to EB5 Financing Management Company, LLC, as the Managing General Partner

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Riviera Point Holdings, Ltd. | Rodrigo Azpurua | Rodrigo Azpurua | Manager to Managing General Partner | 2011-08-16 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)
0001543847

Previous Names: [X] None

Name of Issuer
WASHINGTON GREEN ENERGY EB-5 INVESTMENTS LP

Jurisdiction of Incorporation/Organization
WASHINGTON

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2011
[ ] Yet to Be Formed

Entity Type
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer
WASHINGTON GREEN ENERGY EB-5 INVESTMENTS LP

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 3411 184TH ST SW, SUITE 190 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| LYNNWOOD | WASHINGTON | 98037 | 2063566944 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Ryu | Keun | |
| **Street Address 1** | **Street Address 2** | |
| 3207 159th Pl SE | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Mill Creek | WASHINGTON | 98012 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Managing Partner of LP

**4. Industry Group**

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes [ ] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [X] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [X] Over $100,000,000 | | [ ] Over $100,000,000 |
| [ ] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 505
- [X] Rule 506
- [ ] Securities Act Section 4(5)
- [ ] Investment Company Act Section 3(c)

| | |
|---|---|
| ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Section 3(c)(7) | |

**7. Type of Filing**

[X] New Notice Date of First Sale 2012-02-15 ☐ First Sale Yet to Occur

☐ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? [X] Yes ☐ No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| [X] Equity | ☐ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States ☐ All States ☐ Foreign/non-US

**13. Offering and Sales Amounts**

| | |
|---|---|
| Total Offering Amount | $110,500,000 USD or ☐ Indefinite |
| Total Amount Sold | $500,000 USD |
| Total Remaining to be Sold | $110,000,000 USD or ☐ Indefinite |

Clarification of Response (if Necessary):

This offering is being made in conjunction to the Federal EB5 Program that requires a minimum investment of $500,000. The amount being raised is based on the number of jobs the project will create.

## 14. Investors

☒ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering. 0

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 1

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $30,000 USD ☒ Estimate

Clarification of Response (if Necessary):

We estimate that up to $30,000 per investor may be paid.

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

None of the investment proceeds will be used to pay any of the executives, all funds will be invested in the development of the project.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with

the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| WASHINGTON GREEN ENERGY EB-5 INVESTMENTS LP | Keun Ryu | Keun Ryu | Managing Partner | 2012-03-05 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# Exhibit 37

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, Defendants.

Case No. 8:16-cv-00974-CJC-AGR

REMOTE VIDEO DEPOSITION OF
THEODORE R. GINSBURG, CPA, JD, MBA
Defense Expert Witness
Friday, April 16, 2021
CONDUCTED VIA VIDEOCONFERENCE

Stenographically Reported by:
Marty E. McArver, RDR, FPR
CA-Certified Shorthand Reporter #2769
Job No. 210416MEM



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, Defendants.

Case No. 8:16-cv-00974-CJC-AGR

Videotaped deposition of THEODORE R. GINSBURG, CPA, JD, MBA taken on behalf of Plaintiff, via Webex internet videoconference, beginning at 10:05 a.m. and ending at 1:58 p.m. EDT on Friday, April 16, 2021, before Marty E. McArver, Certified Shorthand Reporter #2769, Registered Diplomate Reporter.



APPEARANCES (Remote):

For the Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
BY: Gary Y. Leung, Esq.
444 S. Flower Street, Suite 900
Los Angeles, California 90071
(323)965-3998 Fax: (213)443-1904
leungg@sec.gov

For the Defendants Charles C. Liu and Xin Wang a/k/a Lisa Wang
SILLS, CUMMIS & GROSS, PC
BY: Herve Gouraige, Esq.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973)643-5989 Fax: (973)643-6500
hgouraige@sillscummis.com

The Videographer:
Timothy Hunter



INDEX

WITNESS:
THEODORE R. GINSBURG, CPA, JD, MBA


| EXAMINATION | PAGE |
|---|---|
| BY MR. LEUNG | 10 |

EXHIBITS
(EXHIBITS BOUND SEPARATELY)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 151 | Ginsburg letter report of March 25, 2021; Appendix A and Appendix B 8 pages) | 28 (151) |
| Exhibit 152 | Ginsburg letter supplemental responses of April 2, 2021; Listing of Publications 3 pages) | 30 (151) |
| Exhibit 153 | Ginsburg letter rebuttal report of April 9, 2021 3 pages) | 31 (151) |
| Exhibit 154 | Employment Agreement between Pacific Proton Therapy Regional Center, LLC, and Charles C Liu; Ginsburg.Supp. Report.000003 through -011 | 78 (151) |
| Exhibit 155 | Executive Compensation Assessor Individual Job Report, President and Vice President Marketing, for Beverly Proton Center; Ginsburg. Supp.Report.000001 and -02 | 100 (151) |



DEPOSITION EXHIBITS (continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 156 | Executive Compensation Assessor Individual Job Report, President and Vice President Marketing, for Beverly Proton Center; Ginsburg. Supp.Report.000001 and -02; Executive Compensation Assessor Individual Job Report, President for Pacific Proton EB-5 Fund; Ginsburg.Supp.Report.000012; and Executive Compensation Assessor Individual Job Report, President for Pacific Proton Therapy Regional Center; Ginsburg.Supp. Report.000013 | 104 (151) |
| Exhibit 157 | SEC Form Ds; Ginsburg.Supp. Report.000014 through -0127 | 128 (151) |
| Exhibit 158 | Order Granting Plaintiff's Motion for Summary Judgment Against Defendants Liu and Wang and Appendix (46 pages) | 134 (151) |



EXHIBITS PREVIOUSLY MARKED AND REFERENCED

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Employment Agreement between Pacific Proton EB-5 Fund, LLC, and Charles C Liu (8 pages) | 118 |



FRIDAY, APRIL 16, 2021; 10:05 A.M. EDT

THE VIDEOGRAPHER: Here begins the videotaped deposition of Ted Ginsburg in the matter of the SEC vs. Charles Liu, et al.
The case is being heard in the United States District Court, Central District of California.
This deposition is being held via Webex.
Today's date is April 16, 2021.
Time on the record is 7:05 -- sorry, 10:05 a.m.
I'm Tim Hunter. I'm the legal videographer.
Our court reporter today is Marty McArver.
Counsel, would you please introduce yourselves and state whom you represent for the record, starting with noticing counsel, and our witness will be sworn.
MR. LEUNG: Gary Leung, noticing counsel, for the plaintiff.
MR. GOURAIGE: Herve Gouraige, counsel for individual defendants, Liu and Wang.
THE REPORTER: And my name is Marty McArver. I'll be the court reporter and deposition

officer for this deposition, which is being taken via internet videoconference and is being conducted remotely using Webex.
California Senate Bill 1146 was signed into law on September 18, 2020, and specifically provides that a deponent is not required to be physically present with the deposition officer -- that's me -- when being sworn in at the time of the deposition.
At this time if anyone has an objection to my administering the oath to the deponent remotely or to the taking of this deposition via internet videoconference, please state so now.
(No objection heard.)
Hearing no objection, I will now swear in the witness.
THEODORE R. GINSBURG, CPA, JD, MBA, being first duly sworn remotely, testifies as follows:
THE WITNESS: I so swear.
THE REPORTER: Thank you.
Counsel, you may proceed.
MR. LEUNG: Thank you, Ms. McArver.
Just to close that out, Herve, do you stipulate on behalf of the individual defendants that the remote administration of the oath complies



with the requirements of Federal Rule of Civil Procedure 30(b)(5)?
MR. GOURAIGE: I stipulate.
EXAMINATION
BY MR. LEUNG:
**Q** Okay. Good morning, Mr. Ginsburg.
Could you please state your name for the record and spell it?
**A** Yeah. It is Ted Ginsburg.
**Q** And if you could spell it, please?
**A** Oh, yeah.
Ted -- T-e-d. Ginsburg, G-i-n-s-b-u-r-g.
**Q** Mr. Ginsburg, have you been deposed before?
**A** I have.
**Q** Why don't you tell me about that.
What was the subject of your sworn testimony in the past?
**A** I've done this a few times.
At one time it was the administration of a tax-qualified retirement plan.
Another time it was the operation of a horse-breeding facility.
Those are the two -- Those are the two times that I recall that I went -- my expert work went to the stage of being deposed.



**Q** Okay. And the tax-qualified retirement plan case and the horse-breeding facility case, were those both civil matters?
**A** Yes.
**Q** And you were deposed as an expert witness in both of those matters?
**A** Correct.
**Q** When were you deposed in the tax-qualified retirement plan case?
**A** Probably 1999.
**Q** When were you deposed in the horse-breeding facility dispute?
**A** Probably 1990.
**Q** Okay. And what was the subject of your expert testimony in the tax-qualified retirement plan action?
**A** Yeah. Whether the methodology in which the plan administrator administered the plan was in compliance with the plan document and with common practice.
**Q** Did that testimony address executive compensation in any respect?
**A** It did not.
**Q** Were the opinions that you offered in the tax-qualified retirement plan dispute limited or



excluded by the court in any respect?
**A** No.
**Q** Let's turn to the horse-breeding facility case. What was your testimony in that case about?
**A** That was in regard to whether -- trying to think of the right way to say this -- whether the expenses claimed in connection with the operation of the facility were reasonable in terms of being able to be deducted on federal tax return and seen within common practice of -- or was the client charged too much.
**Q** Okay. And same question for that matter:
Did your expert opinions regarding the reasonableness of an expense deduction under a federal tax return, did that concern in any respect executive compensation?
**A** It did not.
**Q** Setting aside the two engagements in which you were deposed, have you offered, in your professional career, expert opinions in other matters?
**A** Yes.
**Q** How many times, if you could ballpark it?
**A** When you say "expert opinions," do you mean related to court proceedings or in general, just

clients asking for advice or opinions?
**Q** Let's start with --
I'm sorry to cut you off.
Let's start with expert opinions related to a court proceeding.
**A** I've -- I've done that a few times. I can -- Only one time -- I did one about a year and a half ago.
**Q** And what was the subject of your expert opinions in that matter from about a year and a half ago?
**A** This was an issue as to whether the compensation paid to the owner of a business was reasonable.
**Q** And what was the nature of the dispute, as you understood it?
**A** The client was having a dispute with the Internal Revenue Service, which wanted to claim that payments to this person should not be deductible as reasonable compensation but, instead, should be treated as dividends to this individual and, therefore, not deductible.
**Q** What was the nature of the business?
**A** A retail operation.
**Q** What did it sell?



**A** I'm sorry?
**Q** What did that retail operation sell?
**A** Footwear.
**Q** What was the name of the retail operation?
THE WITNESS: I guess I would ask my counsel, is that something I have to disclose in this? It's, you know, a private matter.
Or do you have a feeling -- Is it okay to answer that?
MR. LEUNG: Feel free to let me know if you'd like to confer with your counsel offline.
MR. GOURAIGE: Let me ask, is that a matter of public record or was that something that was private with the IRS?
THE WITNESS: Well, it was -- I mean, a legal action was filed by the IRS. Okay? And so --
But the court case settled before it went to trial. So I don't know if there's any public record or not.
MR. GOURAIGE: Well, if it's a matter of public record, unless there was some contractual provision that would prohibit you from publicly disclosing it, I don't have an objection to your identifying the client.



THE WITNESS: Okay.
The taxpayer's name was Rick's (inaudible)...
(Reporter requests clarification.)
BY MR. LEUNG:
**Q** Sir, you broke up just a little bit. Can you repeat that, please?
**A** Yeah. Rick's -- R-i-c-k-'s -- Ranchwear, R-a-n-c-h-w-e-a-r.
**Q** And you can tell me if I'm right or if I'm wrong.
Am I correct that your expert opinions in the Rick's Ranchwear matter concerned the reasonableness of executive compensation from a tax code standpoint, specifically whether or not the compensation could be deducted as an expense as opposed to recognized as a dividend under the tax code?
**A** That would be correct.
**Q** Okay. And the retail owner at issue, had he been accused of securities fraud?
**A** No.
**Q** The retailer owner at issue in that expert engagement, had he been found liable of securities fraud?



**A** No.
**Q** Okay. You previously referenced a few other expert engagements. If you could, just at a high level, give me a complete list of the expert work that you've done in the past.
**A** From a pretty high level -- Excuse me.
Companies engage me and engage my -- the firm that I work for, to deal with me, to help them with various types of matters related to both executive and nonexecutive compensation.
These types of matters -- And I've been doing this type of work for over thirty years.
These things have included such things as determining what reasonable pay is for purposes of disputes with the Internal Revenue Service; for helping employers decide how much to pay executives; for designing programs to compensate executives; to determining the amount of liability under the Golden Parachute excise tax rules for corporate -- major corporate transactions.
I've also helped executives negotiate their employment agreements with their employers in terms of how they get paid, how much they should get paid and the manner of that.
That's kind of -- That's sort of a high

level of some of the things that I've done.
Q Okay. So you've given me five high level categories. I heard: One, determining reasonable pay within the context of an IRS dispute.
Two, assessments on how much to just pay an executive.
Three, designing programs in-house for executive compensation.
Four, determining the amount of liability under Golden Parachute excise tax rules.
And, five, negotiations on behalf of executives for employment contracts.
With respect to those five categories, have you provided expert opinions in a court matter?
A No.
Q Have you recently engaged in consulting work for that third category -- sorry, second category, just the general assessment of how much to pay a given executive?
A Well, I've certainly -- Probably within the last four to five months, I've probably done that six or seven times. I mean, I'd have to go back and look at my records. But, yeah, I do that frequently.
Q And in those six or seven instances, did



you arrive at a conclusion on what a given executive should be paid in the form of compensation?
A I would -- I would give the employer my analysis. And I would tell them that paying within a certain range would be consistent with market practice.
Q Okay. Let's just --
A And I --
Q Go ahead. Please go ahead. I didn't mean to interrupt.
A No.
If a client would ask me, "Is paying a thousand dollars to an executive reasonable?" I would say to -- I would say to them, based on the data provided, it was or it wasn't.
If a client asked me, "How much should I pay this executive?" I would give them the data and let them make that decision.
Q Okay. Let's just take, as an example, the most recent instance in time in which you've provided a client with compensation data and made a recommendation.
I don't need to know names. I don't need to know --
A Sure, sure.



Q -- the identity of the company. But if you could just walk me through, exhaustively, your methodology and connection with that assessment.
What kind of data did you provide them? What did you look for? What did you give consideration to, ultimately, in making recommendation on executive compensation?
So let's just do the last one you had out the door.
A Okay. On that one...
Let me think. On that one, I asked this client for a description of what the executive -- the services the executive provided, his or her title, his or her duties, an organization -- an organization chart. Okay? Who does this executive report to, that type of thing.
I obtained from them an understanding of the business that they were in. I obtained from them an understanding of revenue.
I determined, either from their tax filings or from the data that I was given, what their standard industry classification code was.
I took that data. I took that data, and I went to a survey source that we use, the same survey source that was used in the report that I



did in this case.
And I analyzed survey results and I pulled survey reports, that are exactly the same as the ones that have been entered into evidence here.
I --
Q How do you have an understanding that those reports are in evidence, sir?
A That's -- I assume they are. I assume they're in the folder that we dealt with earlier in our conversation.
Q Okay. Please go ahead.
A And I then sent those survey reports to the client, along with an explanation of what the survey reports meant.
And then I think I spoke with the client -- And the client in this case was the owner of the business who was hiring -- who was hiring executives or paying executives.
Well, we talked about what is -- based on that data, what are reasonable amounts to pay.
And that is --
Q Thank you.
A -- procedure, and that's the procedure -- That's the procedure that we use in this type of thing.

If we were to use -- And I've done this on other occasions. If the company is large enough or is publicly traded, we take a different approach. And I've done these, also.

And in that approach what we do is -- Again, we learn about -- we find out about the company's duties -- excuse me, the executive's duties. We understand the client's SIC code.

We then go to the EDGAR database of SEC filings, which I'm sure you're familiar with. And we pull proxy statements from peer companies.

We create a peer group of companies, companies in the same -- hopefully, in the same business line, with similar revenues, maybe perhaps revenues half again as much as the client, one-and-a-half times the client. And we create a peer group of companies.

We then look at that -- We look at those proxy statements, which, in the compensation discussion and analysis portion of the proxy are detailed compensation for the top five executives.

We then compile those, that data, for the executives, and provide a report to the client saying that here is what your peer group of companies pays as a compensation program --



it's for compensation purposes -- to executives with the same job positions.

And we provide a report for that and we give them an analysis of that.

**Q** Thank you. That's helpful.

It sounds like a very robust analysis.

Would you agree with me, Mr. Ginsburg, that in order to reliably conduct the analysis that you just testified to, you have to have a good understanding of the company's business?

**A** I don't believe that is necessarily the case.

When we -- When we pull the data from the survey's results or we go from the proxies, right, we rely very heavily on the SIC code/the NAICS code provided, that the client provides to us.

If we're doing a public company study, we would probably want to know more about the client's business so that we could -- so that we could say that, yes, a member of the peer group, their business is only partially what the client does, but a lot of it is not, so it's probably not a good peer.

But for most clients, for privately held clients, our reliance is primarily on the SIC code



or on the NAICS code as to what the business is.

**Q** What's the difference between the SIC code and the NAICS code?

**A** There really isn't a huge difference. The NAICS codes are probably more detailed. There's a greater number of those codes within each business line. And we can --

And, again, we're using what the client tells us, and says: Here's what our business is. Here's what our business is.

So, you know, they do -- They work together. You know, we can use either one. Our survey source can use either one. The numbers are reported on client filings. So, you know --

I'd -- Personally, I'd rather use NAICS, because it's focused. I can drill down -- I can drill down further.

**Q** If the client gives you an incorrect SIC code or an incorrect NASIC[sic] --

-I-C-S? N-A-I-C-S or N-A-S-C-S?

**A** N-A-I -- I think it's N-A-I-C-S. I think. I believe that's what it is.

**Q** Let me start over, then.

Let's suppose, Mr. Ginsburg, that the client miscodes their business and they give you the



wrong SIC code or the wrong NAICS code. Would that bear on the accuracy of any conclusions you reached with respect to the reasonable range of executive compensation for a given executive?

**A** It's possible. It's possible.

Again, those codes -- You know, we get those codes -- We have the ability to be able to get them from the -- their corporate tax return.

So, you know, you would hope that the client had figured out that properly.

**Q** I mean, but can we agree that with --

**A** We can agree --

**Q** -- as with most things, the reliability of your work is dependent on the accuracy of the information that you're given by your clients?

Is that a general rule of thumb in your area of expertise?

**A** I think that would -- That's a fair statement.

**Q** Okay. And in conducting the compensation assessments that you testified to, is it important for you to understand -- let me see how you put it -- the duties of the given executive and what services they provide to the employer?

**A** That is important, because the survey data

that we use -- and in the surveys that we used in the case that we're talking about before us -- are tied to the individual's title.
So if the individual is not, in fact, doing the job that relates to that title, your information may be not applicable.
**Q** Okay. We kind of went off on a tangent, but I did think I'd cover some ground rules for depositions real briefly. I think this is going well, but to the extent you need to have your recollection of the process refreshed from 1999 and 1990, I'm happy to do that.
Mr. Ginsburg, we have Ms. McArver, our court reporter, on the line. She is making a written transcription of everything you say, everything that I say, everything that defense counsel says today.
So in order for that written transcription to be as accurate as possible, it's important for us to not interrupt each other, to not speak over each other, and for you to provide verbal responses to my questions, which I think so far you've been doing an okay job of.
Is that fair?
**A** That is fair.



**Q** And once again, Mr. Ginsburg, you've been placed under oath. So the answers that you're giving in response to my question are answers under oath and they're the equivalent of testimony that you'd give in a courtroom in front of a federal judge.
Do you understand that?
**A** I do.
**Q** If I ask you a question that I have misphrased or is confusing, if my question causes you confusion or you don't understand it in any way, please let me know and I'll endeavor to fix the question.
But barring that, if you don't tell me, I'm going to assume that you do understand my question.
Is that fair?
**A** That is fair.
**Q** From time to time, counsel may interpose objections. You're still required to answer the question in the event of an objection.
The lawyers are putting objections on record to questions and answers in order to make a record for the judge, should they bring that dispute to the judge at a later date.
But if there's an objection, you still have



to answer.
If there is, in contrast, an instruction by your counsel not to answer, then that's a different scenario and you are free to take that advice.
Do you understand that?
**A** Yes.
So if I understand what you're saying, if counsel objects to a question that you ask, I do not have to answer that question.
**Q** You do have to answer the question.
**A** But I still have to answer the question.
**Q** If you are instructed not to answer, then you can take that instruction if you so choose.
**A** Okay. I understand.
**Q** Mr. Ginsburg, as you sit here today, can you think of anything that might prevent you from being able to testify truthfully in response to my questions?
**A** No.
**Q** All right. Okay. One more housekeeping issue. You are under oath. You and I both have a shared interest in getting your most accurate and best testimony written down here. And I want you to be able to comply with that. I want the transcript to reflect the truth. I don't want



anything to get lost in translation.
So I would like for you and I to get on the same page on certain terms that are going to be coming up again and again during the course of today.
So when I say "Beverly Proton," I am referring to Defendant Beverly Proton Center, LLC, which was formerly known as the Los Angeles County Proton Therapy, LLC, entity.
Understood?
**A** Okay. I understand.
**Q** And when I say "PPEB5 Fund," I am referring to the Pacific Proton EB-5 Fund.
Understood?
**A** Understood.
**Q** And when I say "Pacific Proton," I am referring to Pacific Proton Therapy Regional Center, LLC.
Understood?
**A** Okay. I understand that.
MR. LEUNG: All right. If you could go to the Egnyte file share site and just open up Exhibit 151 with me.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:

Q Do you recognize Exhibit 151, Mr. Ginsburg?
A I have "unexpected error."
Q Okay.
A It says "unable to preview the file," that I should download.
Q Why don't you give that a shot?
A Yeah. I come up with another "unexpected error." I get a red bar across the top of the screen.
Q Why don't we do this a little differently. I'm trying to share my screen with you on the Webex application.
A Okay.
Q Are you able to see my screen?
A Let's take a look.
I can see that.
Q Okay. I will flip through what will be marked Exhibit 151.
(Scrolling)
A Okay.
Q And for the record, it's an eight-page document.
And my question, Mr. Ginsburg, is: Do you recognize Exhibit 151?
A I do recognize this document.



Q What is Exhibit 151, sir?
A That is a letter that I wrote to counsel, dated March 25, 2021, discussing my reasonable compensation analysis in this case.
Q Okay. And is Exhibit 151 a true and accurate copy of the letter that you wrote to Mr. Gouraige on or about March 25, 2021, discussing your reasonable compensation analysis in this case?
A It certainly appears to be. It certainly appears to be that.
MR. LEUNG: Okay. I'm going to pull up Exhibit -- what will be a document that will be marked Exhibit 152. And I'm sharing it with you on my screen.
(Exhibit 152 screen-shared.)
BY MR. LEUNG:
Q Do you see that --
A I see that.
Q -- document now, sir?
A I see that.
Q Let me flip through all three pages of it. And once you've had a chance to have a look at that, same question: Do you recognize Exhibit 152?
A Yes. This is a letter dated April 2, that I wrote to counsel providing some additional information related to, really, my background and how my firm is compensated for this engagement.
Q Okay. And is Exhibit 152, Mr. Ginsburg, a true and accurate copy of a letter that you sent to Mr. Gouraige on or about April 2, 2021, that discusses your background and your compensation in this case?
A It certainly appears to be. Yes, it looks like it is.
MR. LEUNG: Okay. Last one for now. I'm going to pull up and display to you on the Webex share application a document that will be marked Exhibit 153.
(Exhibit 153 screen-shared.)
BY MR. LEUNG:
Q This is another three-page document. I'm scrolling down, so please have a look at it.
And once you're done, my question is going to be: Do you recognize Exhibit 153?
A I do recognize the exhibit. It's a letter that I wrote dated April 9, 2021, that contains some issues I had with the report of Carlyn Irwin's report related to reasonable compensation in this case.
Q And, Mr. Ginsburg, is Exhibit 153 a true





and accurate copy of a letter that you drafted and sent to Mr. Gouraige on or about April 9, 2021, that discusses some issues that you had with Carlyn Irwin's reasonable compensation opinions in this case?
A Yeah, it absolutely appears to be that. Yes.
Q Okay. Mr. Ginsburg, do you understand that you've been designated as an expert witness in this case, as a testifying expert?
A Yes.
Q And the work that you've done in connection with that retained expert engagement, is that fully reflected in your March 25, April 2, and April 9 letters?
Those are Exhibits 151, 152, and 153.
A Yes.
Q And those three letters -- Exhibits 151, 152, and 153 -- those are collectively your expert reports under Rule 26(a)(2)(B).
Right?
A Yes.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:
Q Okay. Let's go back to Exhibit 151.

And I'm displaying that to you over the Webex connection.
And I am going to scroll down to page 6, 7, and 8 of the document, which is entitled "Appendix B."
Do you see that?
**A** Yes, I do.
**Q** Mr. Ginsburg, is Appendix B a complete statement of your educational, work, and professional experience which you believe qualifies you to render the opinions you've disclosed in your expert reports in this matter?
**A** Yes.
**Q** Is there anything else that's not reflected in Appendix B to Exhibit 151 in the vein of education, work, and professional experience that leads you to believe you're qualified to render the opinions that you formed in this case?
**A** No. I think -- I think that is the totality of my experience that would lead me to be an expert in this matter.
**Q** Okay. And you previously described for me five types of engagements that you have worked on in your long career, concerning executive compensation.
Do you recall that testimony?



**A** Uh-huh, I do.
**Q** With respect to those five types of engagements -- Again, that's assessing reasonable pay in connection with an IRS dispute. That's one.
Two, assessments of how much to pay, again, an executive.
Three, designing compensation programs for executives.
Four, making determinations as to the amount of liability under Golden Parachute excise tax rules.
And, five, counseling in connection with negotiation of employment agreements.
How many times do you think you've rendered those services?
Just a very rough number. Hundreds of times? A thousand times?
**A** Hundreds --
**Q** Several thousand times?
**A** I would say -- I would say thousands of times.
**Q** Okay. But again, in those thousands of times that you've performed consulting or given advice on executive compensation issues, those engagements were not within the context of a civil



case in which you were offering an expert opinion.
Correct?
**A** That would -- That would be correct.
**Q** Okay. And so thousands, are we talking two thousand? three thousand? four thousand?
Best estimate.
**A** I would say between one and two thousand.
**Q** Okay. In those between one and two thousand engagements, were you ever tasked with assessing reasonable compensation for an executive who had been found liable for securities fraud?
**A** Not to the best of my recollection.
**Q** In those one to two thousand engagements, have you ever been tasked with assessing reasonable compensation for an executive who had appropriated corporate funds for exorbitant personal enrichment?
**A** Not to the best of my recollection. I don't recall doing that.
**Q** In those one to two thousand engagements involving executive compensation, have you ever been tasked with assessing what might be reasonable compensation for an executive who had been found to have acted negligently?
**A** Could you -- Could you tell me what you mean by acting negligently? Would you explain that?



**Q** Let me -- Yeah. Let me ask a better question.
In your one to two thousand executive compensation engagements, have you ever addressed the scenario in which a court has found that the executive whose compensation you were assessing had violated the standard of care to the company?
**A** Not to the --
MR. GOURAIGE: I object to the question as an inappropriate characterization of the court's finding.
BY MR. LEUNG:
**Q** Please go ahead, Mr. Ginsburg.
**A** Not to the best of my recollection.
**Q** In those one to two thousand executive compensation engagements, have you ever encountered or had you ever encountered a scenario in which the executive was found by a court to have conducted company business with a fraudulent intent?
**A** Not to the best of my recollection.
**Q** Do you think negligence or a fraudulent intent or a finding that the conduct amounted to securities fraud would have beared on your analysis in the course of your career when conducting these reasonable compensation analyses?

A I would -- I would say no. If the --
When clients ask me to determine what is reasonable compensation, that analysis is done -- unless I'm instructed otherwise -- purely on the basis of what would the market say that an individual in this position, in this type of company, perhaps in this industry, in this geography, whatever, what does the market say you would have to pay this person, pay a person, to get them to take the job, to take the position.
Whether the person had been -- not been doing a good job or had been stealing from the company or other issues wouldn't bear on what the marketplace would pay a person -- not that person, but a person -- with the right experience, or whatever, to do that job.
So I'd have to say that what that person actually did, what that employee actually did, is irrelevant, I guess, to the nature of my study.
Q Okay. And so stealing on the job is irrelevant to your view of what an employee should be paid?
A I would say yes. I mean, my proposition surveys that I would use to make these judgments(inaudible)...



(Reporter requests clarification.)
A I would say that the issue of whether an employee is stealing from the employer is irrelevant to the studies that I perform.
When I look at my survey sources or I do my proxy reviews, there isn't a survey source that says: Here is compensation for executives who steal and here is compensation for executives who don't. That's not -- That data is not broken out.
So I would say that it is irrelevant to my study.
Q Well, beyond your study --
I understand the services that you provided in your career to generally be along the lines of: Here's what this person is supposed to do at the company. Here's what I think is reasonable compensation.
Are you saying it's completely irrelevant if you know for a fact that the person is stealing from the company? That fact is irrelevant to how much that person should be paid?
I understand your study. I'm just wondering, you know --
A Yeah. I think --
Q -- with respect to --



A I think it is irrelevant.
I will, however, say -- I'll give you an example of another situation. In fact, this one, I'm working on right now, okay, that involves an executive who the company believes has been taking too much money, okay, from the company.
Partially, there's an issue of reasonable compensation; but partially there's an issue of the type of expense reports, things that the executive has received reimbursement from the company, for expenses paid on behalf of the company.
And I'm asked sometimes -- sometimes, and this is what I'm working on right now -- to opine as to whether or not certain expenses are typically allowed to be reimbursed by an employer or not, what are employers typically allowed to reimburse.
So in that regard -- So I never make a conclusion that says, yes, the executive is stealing from the company because they received reimbursement for this expenditure.
I merely provide the client -- and in this case it is the board of directors of this company -- with a list of, for the expenses that you have told me, here are expenses that are typically reimbursed by companies; here are ones that are not.



But I never make -- But I never make the decision that says, yes, this expenditure, this was stealing or this was inappropriate. I just give them market data and my view of the market data.
(Screen-sharing stopped.)
BY MR. LEUNG:
Q Okay. Let's --
A And I'm sorry I went off on a tangent there.
Q No, that was helpful.
Let's talk about your analysis in this case.
A Uh-huh.
Q Whether or not Mr. Liu engaged in securities fraud is irrelevant to your analysis in this case.
Correct?
A That is correct.
Q Whether or not Ms. Wang engaged in securities fraud is irrelevant to your analysis in this case.
Correct?
A That is correct.
Q Whether or not Mr. Liu actually performed

his duties for the corporate entities is irrelevant to your analysis in this case.
Correct?
A That is correct.
Q Whether or not Ms. Wang performed her stated duties for the corporate entities is irrelevant to your analysis in this case.
Fair?
A That is correct.
Q And would you agree that whether or not Mr. Liu misappropriated corporate funds is irrelevant to your analysis in this case?
A That is correct. It is irrelevant.
Q Am I also correct that whether or not Ms. Wang misappropriated corporate funds is irrelevant to your analysis in this case, of what reasonable compensation she should be entitled to?
A That is correct. It is irrelevant.
Q Whether or not Mr. Liu conducted his duties in a negligent way is irrelevant to your analysis in this case on what he's entitled to in the form of reasonable compensation?
A That is correct.
As I said -- As I said before, the -- what my analysis provides is, what does the market say



an employer should pay to an executive to perform the duties of that job title. It's what the market would say, this is what should be paid to that person.
Q Okay. And whether or not Ms. Wang performed her job in a negligent way is also irrelevant to your assessment in this case of how much reasonable compensation she should have been paid?
A That is correct. It is irrelevant.
Q Whether or not Mr. Liu conducted company business with a fraudulent intent is likewise irrelevant to your executive compensation analysis in this case.
Is that correct, sir?
A That is correct.
Q Whether or not Ms. Wang acted with a high degree of scienter in conducting company business, also irrelevant to your assessment in this case of the executive compensation she is reasonably entitled to.
Is that correct?
A That is correct.
Q Whether or not Mr. Liu actually showed up for work in the course of many years under



analysis, that's irrelevant to your analysis in this case on the appropriate amount of executive compensation Mr. Liu should have been entitled to?
A That is correct. It is irrelevant.
Q Whether or not Ms. Wang ever performed a single hour, a single minute of work on behalf of the corporate entities in the United States is irrelevant to your analysis, in this case of the executive compensation that she might be reasonably entitled to.
Is that fair?
A That -- That is a fair statement. It's irrelevant.
Q Okay. And whether or not Mr. Liu engaged in self-dealing to the detriment of his business partners is irrelevant to your executive compensation analysis in this case.
Correct?
A That is irrelevant to my -- to my analysis.
All of the things -- You know, in my mind, if any or all of those things occurred, then it was really the responsibility of the company's board of directors, or whatever, perhaps, to deal with those issues.
It is not an issue of -- It's not an issue



of, because you acted badly, however you define that, you should not be paid, as far as my services go, as far as my work is concerned.
MR. LEUNG: Ms. McArver, can you read back that answer for me, please.
THE REPORTER: Sure. Just a moment.
"A That is irrelevant to my -- to my analysis.
"All of the things -- You know, in my mind, if any and all of those things occurred, then it was really the responsibility of the company's board of directors, or whatever, perhaps, to deal with those issues.
"It is not an issue of -- It's not an issue of, because you acted badly, however you define that, you should not be paid, as far as my services go, as far as my work is concerned."
BY MR. LEUNG:
Q Mr. Ginsburg, when were you first contacted by the defense to perform work on this case?
A I would -- I could probably go on my e-mails and look that up. I would say perhaps six

months? Perhaps six months ago? Perhaps, I think.
Q And who contacted you?
A I was contacted -- Well, I was contacted by one of my partners in the firm, who I guess -- by a partner in the firm.
And then that partner introduced me to counsel. And then I was -- and then I was retained.
Q And your partner at the firm that connected you with counsel was Mr. Friedman?
A I believe I was initially contacted by another partner whose name was -- is, excuse me, Karen Connair. C-o-n-n-a-i-r.
I have never spoken to Ron Friedman. You know, we've passed a couple of e-mails, but I've never spoken with him.
Q Ms. Connair, what is her role at Marcum?
A Well, she is a tax partner at Marcum in one of the, I think southern California offices. She and I have worked together on a number of occasions and...
Q What is the name of defense counsel that Ms. Connair introduced you to?
A Herve. Mr. --
Q Mr. Gouraige?
A Yeah, absolutely.



Q And when you began communicating with Mr. Gouraige about this engagement, what was the scope -- how was the scope of the potential engagement expressed to you?
A Basically that they wanted a compensation, as to reasonable compensation for, I guess both Liu and Wang, as a result of working in this. I mean, it was mentioned that there was a legal action being conducted.
Q And during that initial conversation did you have questions for Mr. Gouraige? Did you need to understand the context of the executive compensation analysis to be conducted?
A Well, you know, we certainly discussed what it was he wanted done, because we operated with -- and it's standard practice for our firm -- with an engagement letter that sets out what it is we're going to do and timing and fees and that type of thing.
And then that was sent -- I believe counsel reviewed that letter. It was -- It was sent, actually, to Mr. Liu, who formally engaged us to do it.
That's my recollection as to how that worked. That's my recollection.



Q Have you communicated with Mr. Liu in the course of forming your opinions in this case?
A No.
He received that -- He received that initial letter that he signed. And I had no further direct communication with him. And we have never spoken -- we have never spoken in person.
Q Have you had occasion to communicate with Ms. Wang in the course of performing your opinions in this case?
A I have not.
Q So you never talked to Mr. Liu about what he did for the corporate entities from, say, 2010 to 2016?
A I have never spoken with Mr. Liu.
Q And so you've never had occasion to speak with Ms. Wang about what she actually did for the corporate entities from, say, 2010 to 2016?
A I have never -- I have never spoken to Ms. Wang.
Q In the course of this engagement, have you been asked to provide any opinions that you felt you couldn't give?
A No.
Q In the course of this engagement have you formed opinions that you could give that aren't stated in your report?



A No. No.
MR. LEUNG: Okay. Let me share my screen with you again.
(Exhibit 151 screen-shared.)
MR. LEUNG: And for the record, I am directing the witness' attention to Exhibit 151, which is the March 25 Ginsburg letter.
BY MR. LEUNG:
Q Now, this is your initial expert report. Right? Exhibit 151?
A Right, right. This is the first one.
Q Yeah.
And for the initial report, it's dated March 25, 2021. I assume you signed it and finalized it on or about that date?
A That would be correct.
Q Okay. Since finalizing and signing Exhibit 151, have the opinions you disclosed in this initial expert report changed in any way?
A They have not.
Q Okay. And this expert report, Exhibit 151, dated March 25, and the second rebuttal report that's Exhibit 153, dated April 9, are those a

complete statement of the opinions you have prepared in this case?
A Yes.
The second -- The second exhibit is things that relate -- is really things that relate to how we get paid and some questions about -- more about my background, I believe, than about the case.
(Exhibit 152 screen-shared.)
BY MR. LEUNG:
Q And you're referring to Exhibit 152 as the second exhibit.
A Right, right.
Q That's the April 2 letter.
Right?
A The April 2 letter. The April 2 letter, yeah.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:
Q Okay. And so Exhibit 151, that is your March 25 report; and Exhibit 153, that is your April 9 rebuttal report.
(Exhibit 153 screen-shared.)
BY MR. LEUNG:
Q Are those a complete statement of all of the opinions you intend to express at the

49

evidentiary hearing in this case?
A That is correct.
Q If subpoenaed to testify at that June --
Let me get the right date.
If subpoenaed to testify at that June 7, 2021 evidentiary hearing before Judge Carney, will you comply with that testimony on subpoena?
A Yes.
Q Will you agree to accept service of any testimony on subpoena through Mr. Gouraige?
A Yes.
Q Do you have any opinions that you anticipate testifying to at hearing which aren't expressed in either Exhibit 151 or Exhibit 153?
Those are your March 25 and April 9 reports.
A No.
(Exhibit 152 screen-shared.)
MR. LEUNG: Directing your attention to Exhibit 152.
I'm showing the witness the April 2, 2021 letter.
BY MR. LEUNG:
Q Does Exhibit 152, Mr. Ginsburg, provide a complete statement of all facts or data that

50

you considered when forming your opinions?
A Yes.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:
Q How much time did you spend preparing Exhibit 151, your initial report?
A I would have to go back and look at our time records. It was a -- I can't --
To my mind, this was a significant engagement. This was certainly a -- certainly in excess of 30 hours of my time.
I could provide time records, if that's an issue. But, you know, it was a significant time.
Q Will you agree to provide your time records?
A If -- If you would want them, I certainly will.
Q Okay. Were you assisted by anyone in preparing your opinions in this case?
A I was -- I was assisted by two, two of my associates.
Q What were the names of your associates?
A One is Catherine -- that's C-a-t-h-e-r-i-n-e -- Davis, D-a-v-i-s.
And --

51

Q And the other?
A -- the other was Julie -- J-u-l-i-e -- Ipavec, I-p-a-v-e-c.
Q What did Ms. Davis do to assist you in forming your opinions in this case?
A Davis prepared the analysis of the SEC Form Ds.
She reviewed the ERI surveys that were used.
She read the same information that I wrote -- that I relied upon, and reviewed the letter once I had drafted it.
That was her role.
Q And what was Ms. Ipavec's contribution to your expert work in this case?
A Ipavec, I believe, pulled -- That's a technical term. I'm sorry.
She researched the surveys and generated the survey reports that were from ERI.
She also provided some clerical support in the preparation of the letter.
Q With respect to Ms. Davis' work on the Form D piece of your opinions, what did you tell her to do?
A I told her to go to the EDGAR website to

52

basically find Form Ds that involved EB-5 offerings, to compare it, to analyze those offerings in terms of were any fees of any type -- be it commissions, expenses, whatever -- to the promotors or to someone, and to summarize that data on an initial spreadsheet for my review.
Once she prepared that spreadsheet, I reviewed -- I reviewed that work. We discussed inclusion or exclusion of some of the schedule Ds. And so we refined the list to what was provided in this case.
And she then performed a little statistical analysis of it. And we prepared this spreadsheet that was attached to the initial letter.
**Q** You explained for me that you asked Ms. Davis to search EDGAR for Form Ds involving EB-5 offerings. Any other limitations associated with that initial search?
So you wanted EB-5 offerings. Any other sort of guidance that you gave Ms. Davis about the Form Ds that you wanted?
**A** Not -- Yeah, not -- not that I recall.
I mean, you know, I asked her to --
Yeah, no. No. I said, well, let's look at the universe -- It's, like, let's look at the



universe of Form Ds with EB-5s on them. And then let's see what we want to pull from -- pull from that group.
**Q** And, Mr. Ginsburg, do you know how Ms. Davis specifically searched for these types of EB-5 offerings on EDGAR? What did she actually do on the website?
**A** Well, I -- I don't know specific -- I don't know specifically how -- I don't know specifically how she did it.
I mean, you know, I performed initially -- Excuse me. I initially did an EDGAR search. I would have to go back and try to re-create it for you. I'm sure that's not the purpose of this.
**Q** Sure.
**A** And I -- You know, I put in some -- I put in some key words and some -- and, you know, a time frame -- a time frame. And was able to pull up any number of them.
So I think she did something similar. She did something similar to that.
**Q** In the universe of data that she brought to you that you then discussed with her issues of inclusion and exclusion, I take it that that first cut was bigger than the 20 offerings that are



summarized --
**A** That is correct.
**Q** -- in your report?
**A** That is correct.
**Q** Roughly speaking, how many offerings did she find on the first cut?
**A** I -- I would want to say 60? Maybe 60 to 80.
**Q** And can you describe for me the way in which you reduced that field of 60 to 80 down to the 20 that are referenced in your report?
**A** Yeah. Very basically, what we did was that, if an entity filed a Form D and did not indicate that any fees were taken, we eliminated them from the report.
**Q** And why did you do that?
**A** Well, the reason why we looked at the Form D was that, from my knowledge of the case, Liu received some -- received commissions when an interest was purchased.
I may be using not the technical term, so forgive me for that.
So in looking in Liu's agreement, the only agreement of his that we looked at, the agreement said that he was entitled to a commission -- to



commissions.
And so I felt it was not -- I felt -- I felt that excluding those Form Ds that paid no commissions or any payments like that, was relevant because my analysis was going to focus on, for those EB-5 entities, lack of a better term, that charged commissions, what was the market rate of commissions that were being charged to those purchasers who went in understanding that a commission would be charged.
And that's why -- that's why I decided to exclude those other entities.
**Q** Mr. Ginsburg, the agreement that you referenced just now, what agreement is that?
**A** That was -- And that was on that -- one of the pages, I can tell you. Bear with me for a second.
I have a hard copy of all -- of all this.
**Q** Great.
**A** So you're going to hear me flip through, look through a couple of pages here, if I printed up them.
This would have been the -- excuse me -- the employment agreement dated June 28, 2012, between Charles Liu and Pacific Proton Therapy

Regional Center, LLC.
**Q** So Pacific Proton, the regional center entity.
Correct?
**A** Right, right.
And that's on the second -- you know, and that's on the April 2 letter that is in evidence.
**Q** Now, Mr. Ginsburg, do you have an understanding of the amount of money each individual investor invested in the Pacific Proton cancer therapy center project?
**A** Not -- Not specifically in his -- My -- I'd say not specifically. I did not -- I did not review or did not see or look at any signed agreements between any investor and the entity. So, no, I did not.
**Q** But it is your understanding that investors invested a capital contribution to the project.
Correct?
**A** Correct. Right.
My knowledge as to how much was invested and all that was entirely based -- and, again, I'm going back to the letter of April 2 -- on the complaint filed May 26, 2016, by the Securities and Exchange Commission. I used the numbers there



as the facts as to how much was raised.
**Q** And the agreement you referenced between Liu -- This is the employment agreement between Liu and Pacific Proton, the regional center, in 2012.
Was it your understanding that the regional center entity, Pacific Proton, was the corporate entity that received these capital contribution investments from these EB-5 investors?
**A** I did not -- I did not address that issue in my opinion.
**Q** So you explained for us, the initial cut was about 60 to 80 offerings.
**A** I think.
**Q** That was reduced to 20, you think.
**A** Yeah.
**Q** And that reduction was based on whether or not a given Form D provided for fees and commissions to the promoter. If it didn't, it was removed. If it did, it was kept in the universe of 20.
Did I hear that right?
**A** Correct.
**Q** And so, you know, you just gave me an estimate of 60 to 80, but that excess of 40 to 60 Form Ds that ultimately didn't make it into your report, those were all cut because they did not



provide for any commissions or fees to the given EB-5 promoter, as far as you could tell.
Is that correct?
**A** Right, right.
**Q** Let's return to Ms. Ipavec. And you testified that she assisted you in researching the ERI surveys that you discuss in your report.
Is that right?
**A** Correct.
**Q** And so what did you tell Ms. Ipavec to do? What were your instructions to her with respect to that component of your analysis?
**A** Sure, sure.
(Screen-sharing stopped.)
MR. LEUNG: So what I instructed her to do was --
And this is what we do, because we do use this survey source all the time in our practice. And what this survey source allows us to do is to identify the industry that your target employer is in, their geographic location, their revenue, and then to select a job title.
And this is a very large survey and it is commonly used in the compensation consulting industry because it covers information -- I



think in their advertising material, over 9,000 employers, you know, a very large number of companies with great range.
So I went to Ms. Ipavec and I said, okay. We have a company. This is the SIC code or the NAICS code for the company. They're located in Los Angeles or they're in southern California.
The revenue number -- I gave her a revenue number. And I said, and here are the job titles to use.
She then goes to the survey. She goes to the survey source.
And this is all online. They don't have a hard-copy book, of course, which is what was done in the past, the distant past.
And she downloaded the reports that, again, are part of the exhibit package that counsel had sent to you.
And she -- So she just generated the reports.
BY MR. LEUNG:
**Q** And similar question, though, kind of the Form D analysis: Did you rerun the reports using different assumptions or was it just the

one cut?
A On the Form Ds?
Q On the ERI --
A Or the ERI -- or on the ERI?
Q On the ERI.
A I think -- I believe it was just --
Excuse me. My screen goes blank for a while. My computer falls asleep.
To the best of my recollection, I think we only -- I think we ran it once. I think we only ran it once. I could be wrong, but I'm not -- I don't recall what facts would have changed from those -- you know, from the SIC code or the job code that would have changed that would have caused us to rerun it.
So, you know, I will also say -- and, again, I'm not sure it's super relevant to this conversation -- that --
And, really, Catherine Davis helped on this part of it. The reports that ERI gives are current, real-time reports. So if I ran a report on February 1, 2021, it's going to give us the numbers as of February 1, 2021.
We then have -- We then discount those numbers to get back to the years at issue in the



report -- 2012, 2013, whatever the time frame. And we use the cost-of-living index to back those numbers down.
And that calculation was made -- And that calculation was made by Catherine Davis, and I repeat that calculation.
So the numbers that you may see on those reports, if you'll note, are going to be bigger than the numbers that we put on our letter because of the factoring in, the cost-of-living increases.
Q Mr. Ginsburg, what are your approximate billings to date for your time and that of your team?
A I'm -- An estimate? $35,000.
Q And have those fees been paid?
A They have been paid.
Q How have they been paid?
A I -- I mean, like, you know, I've received -- I checked -- I checked this morning with our accounts receivable department, because I thought this question may come up.
And they said they were -- I could ask them. I don't know. Could have been ACH, could have been a check, could have been a credit card. I don't know.



Q Okay. And I take it that your professional fees are not related to the outcome of this case in the sense that they're not contingent on how it shakes out?
A Yes. It is just number of hours times the rate per hour. And that is how it's laid out in our engagement -- in our engagement letter that Liu signed.
Q Mr. Ginsburg, you understand that Defendant Liu and Defendant Wang are both subject to a court-ordered asset freeze in this matter?
A No.
You're saying that their assets are frozen?
Q Yes.
A I had heard -- I'd heard that incidentally from someone at our firm. I don't think it was...
Could have been Karen Connair, the partner who got me into this initially.
I may have gotten an e-mail about this from Ron Friedman, who, again, I've never spoken to in person.
I was aware of it.
Q Do you believe you and your firm's receipt of compensation in this case is contingent in any way on the lifting of asset freeze?



A Not that I'm aware of.
MR. LEUNG: I'm going to need to take a break to use the restroom. So five minutes?
MR. GOURAIGE: Okay.
THE WITNESS: Yeah.
MR. LEUNG: Let's go off the record.
MR. GOURAIGE: Sure.
THE VIDEOGRAPHER: We're going off the record at 11:34 a.m.
(A recess transpires.)
THE VIDEOGRAPHER: And we're back on the record at 11:39 a.m.
MR. LEUNG: Welcome back, Mr. Ginsburg.
BY MR. LEUNG:
Q During the break did defense counsel convey any factual information to you that bears on your opinions in this case?
A We -- No. We did not speak.
MR. LEUNG: Okay. I'm going to share with you my screen again, and we'll display Exhibit 151. That's your initial report. Bear with me.
(Exhibit 151 screen-shared.)
MR. LEUNG: Okay. Actually, you know what? For the record, I'm going to share

Exhibit 152. That's your April 2 letter.
THE WITNESS: Okay.
(Exhibit 152 screen-shared.)
BY MR. LEUNG:
**Q** And turning to pages 2 and 3 of Exhibit 152, am I correct that that's a list of all the publications you have written in the last ten years?
**A** I -- I think that's a fairly detailed list.
There are probably a few that are on there that I've written that -- after the --
My prior firm -- You'll see at the top it says "Publications found on the Skoda Minotti website." Okay? And Skoda Minotti was acquired by Marcum, which is the current firm I'm with.
I've probably written a few things for them, but that's certainly -- That's a list of everything at Skoda in -- since 2011 or 2013. There may be a few others, but I think that's fairly accurate.
**Q** Have you written on compensation in connection with an EB-5 investment offering in the past?
(Reporter requests clarification.)
In connection with an EB-5 investment offering in the past. E, as in Edgar. B, as in boy.
**A** No, I have not.
**Q** Okay. And, you know, before your involvement in this case, have you had occasion to address in any respect in your professional career EB-5 investment offerings?
**A** Not to the best of my recollection, no.
**Q** Have you written in the past on the subject of the medical industry?
**A** Medical industry in general?
**Q** Yeah, that's way too broad. I'll strike that.
Mr. Ginsburg, have you written papers, articles, any sort of professional writing in the past with respect to the business of medical centers offering treatment of cancer by way of proton therapy?
**A** No.
**Q** Okay. Do you have any understanding of proton cancer therapy?
**A** I do not.
**Q** So no understanding of its clinical benefits?
**A** No.
**Q** And no understanding of the business aspects associated with operating a medical clinic that provides that cancer therapy.
Correct?
**A** No.
**Q** And aside from the two depositions that you testified to at the start of today, in 1990 and 1999, you've not testified at a trial in the past, have you?
**A** No.
**Q** And you've not --
Go ahead.
**A** The -- The case in roughly 1990 did go to trial, and I was a witness at that trial.
**Q** Oh, okay.
**A** Is that what you're asking? Maybe I'm not answering what you're asking.
**Q** Yeah, I'll ask a better question.
I am drawing the distinction, sir, between a deposition, like what we're doing today --
**A** Right.
**Q** -- and hearing, trial, or arbitration testimony in front of a fact finder, whether it's a judge or a jury.
Can you give me a list of your trial testimony -- trial, hearing or arbitration testimony?
**A** The only -- Okay. The case I referred to in, again, around 1990, did go to trial. And I was a witness at that trial.
**Q** Okay. And that 1990 case is the horse-breeding facility matter?
**A** The horse -- Right.
I was...
I'm trying to think of the right words to say this.
I had, at one point in my career, a business dispute with some of my partners. And our dispute went to arbitration. And we had an arbitration hearing in front of an arbitrator, so I testified at that.
And a much longer time ago, okay? This is probably in 1982? Right?
I am an attorney. I am an attorney as well as a CPA.
I actually was a participant in a couple of court cases, you know, from the -- you know, from -- counsel. I did two cases of that nature.
And those cases did not relate to executive compensation.

Q And in the 1990 proceeding that you testified at trial for, were your expert opinions admitted by the court?
A Yes.
Q Okay. Do you recall what subject area the court deemed you qualified to render expert opinions on?
A Well, I have to think about this a little bit.
It was as being the -- my client's, the plaintiff's accountant, representative of our accounting firm at that time. I guess I was an expert as an accountant.
I'm not sure if that's answering what you want me to answer.
Q I have in my notes that the issues that you testified on in that matter concerned whether expenses were reasonable deductions --
A Right.
Q -- on a tax return.
Are we talking about compensation expenses?
A No, this was not -- No, it was not.
Q Okay. So would you agree, Mr. Ginsburg, that you've never been qualified by a court or an arbitrator as an expert in a disputed case on the

69

subject of executive compensation?
A Well, I was in -- Again, and I think we spoke about this case briefly earlier. In a case I did about a year and a half ago involving a client with a dispute with the Internal Revenue Service, I was qualified as the expert. That case never did go to trial.
Q And by qualify, I mean the court deemed your expert testimony admitted, so that's why I did not include that.
Is it your understanding that in the engagement from a year and a half ago the judge reviewed your qualifications and found you qualified to render an expert opinion on the matters at hand?
A I believe that's the case. My -- Again, I may be saying this the wrong way, so bear with me.
The IRS accepted or filed with the court an acceptance that I was an expert. They agreed to accept my testimony as an expert.
And I'm not so sure if that's different from what you're saying or not. I'm sensing it might be, but...
Q I'll take a step back.
Mr. Ginsburg, how do you think the opinions you disclosed in your expert reports as Exhibit 151

70

and 153 will assist the finder of fact in this enforcement action?
A Well, I should think -- you know, more so the first one, obviously, which really discusses it -- I think it would be extremely instructive to the finder of fact as to what reasonable compensation is.
If you were to paraphrase my reading of the Carlyn's report, her report seems to say that Liu and Wang were entitled to no compensation because not enough money was raised. This project never got off the ground; and, therefore, they're entitled to nothing.
That is, on its face, a ludicrous argument. Okay? Many companies pay executives, and employees alike, compensation even before any revenue or profits are generated. We see that all the time in today's financial markets, where a company or pre-revenue companies go public or -- with huge valuations. And they pay their executives some funds.
My report assists the trier of fact in understanding that reasonable compensation is not based on the financial success of the venture, but is based on the positions that are filled by

71

the people who fill them. Because the issue is more what would the market pay the employer to get a person to perform those tasks.
And that's -- And that's what my opinion -- That's how my opinion would help the trier.
Q You spoke to many situations that you've seen and occurred in your career where a pre-revenue company pays its executives, notwithstanding the pre-revenue nature of the business at that time.
A Sure.
Q Can you think of any instance in which that outcome -- you know, compensation at the pre-revenue stage -- was paid notwithstanding an adjudicated finding of securities fraud and an adjudicated finding of that executive's looting of the company?
A No.
(Exhibit 152 screen-shared.)
BY MR. LEUNG:
Q Okay. I am looking back to the first page of Exhibit 152. We've talked about this before. But, again, Exhibit 152 is a list of the facts or data that you considered in forming your opinions.
Is that right?
A Right. Correct.
Q And Exhibit 152 is true and accurate and

72

a complete statement of the facts and data that you considered in forming your opinions.
Correct?
**A** That is correct. That is correct.
**Q** Okay. So I'll just read it for the record.
Second paragraph, with the heading:
"Sources relied upon in my expert witness report: In the preparation of the March 25 expert witness report, as indicated in my letter, I reviewed the following documents, and relied only on the following documents, for my conclusions:"
Bullet point one: "Reports generated by Economic Research Institute's (ERI) Executive Compensation Assessor for the president and vice president of marketing job positions for the year 2020."
Bullet point two: "Securities and Exchange Commission Form D for the issuers noted in Appendix A of the March 25, 2021 compensation



study."
Next bullet point: "The complaint filed on May 26, 2016 by the Securities and Exchange Commission against Liu, Wang and the three Project companies (SACV 16-00974 (AGRX))"
And last bullet point: "Employment agreement dated June 28, 2012 between Charles Liu and Pacific Proton Therapy Regional Center LLP."
Did I read that right, sir?
**A** You did.
**Q** And so in forming your opinions you didn't review any of the offering materials that Liu and Wang provided to investors in the project.
Correct?
**A** I did not.
**Q** In forming your opinions you did not consider the private offering memorandum that Liu and Wang provided to investors in the project.
Correct?
**A** I did not.
**Q** In forming your opinions you did not



consider the business plan that Liu prepared and provided to investors in connection with their investment with the project.
Correct?
**A** I did not.
**Q** Okay. When forming your opinions, you did not review any of the sworn testimony in this case.
Is that also correct?
**A** That is correct.
**Q** When forming your opinions, Mr. Ginsburg, you did not consider any of the operating agreements for the three entities under discussion -- that's Pacific Proton, Beverly Proton, and the PPEB5 Fund.
Is that right?
**A** I did not. I did not.
**Q** In forming your opinions, Mr. Ginsburg, you did not consider any of the corporate minutes that may or may not have been prepared in conjunction with the three entities in this case -- that's Beverly Proton, Pacific Proton, and PPEB5 Fund.
Correct?
**A** I did not. I did not.
**Q** You did not speak with anyone that actually worked for these three entities.
Fair?



**A** I did not.
**Q** You did not speak with anyone that did business with any of the corporate entities.
Correct?
**A** I mean -- And this may be splitting hairs, right?
It is my understanding -- It is my understanding that Marcum, my employer, prepared some or all of the tax returns for those -- for those entities.
And I've spoken with people at Marcum, but I asked them to get me -- to get me the SIC code that I used in the ER study, but that would be -- that would be the extent of it.
I know of no one, I've spoken to no one who did any work for any of these entities. So I may be splitting hairs there with respect to Marcum.
**Q** No, that's a very good clarification.
And that was the extent of the information that you received --
**A** Yeah, yeah.
**Q** -- in conversations with folks at Marcum?
**A** Yeah, yeah.
**Q** In forming your opinions, Mr. Ginsburg, you did not speak with any investors in the project.

Is that correct?
A I did not.
Q In forming your opinions, Mr. Ginsburg, am I correct that you did not consider the employment agreements purportedly executed between Ms. Wang and Beverly Proton in February of 2016.
Correct?
A I -- You know, that is correct. I did not.
And again, I did not because what the agreement said was irrelevant to my study. My study is what would the marketplace pay someone to perform these tasks.
Q And you did not consider, in connection with the opinions you formed in this case, Liu's employment agreements with Beverly Proton and the PPEB5 Fund.
Correct?
A That is correct. That is correct.
Q But you did consider the employment agreements dated June 28, 2012 between Liu and Pacific Proton. That's according to your letter.
That's right?
A Correct. And again, only for the -- for me to receive validation that commissions were or could be paid to Liu as a result of his work, his work on



the project.
MR. LEUNG: Okay. I'm sharing with you my screen. And I pulled up a document that will be marked Exhibit 154.
(Exhibit 154 screen-shared.)
MR. LEUNG: For the record, the first page of this nine-page document bears the heading "Employment Agreement."
And the very first paragraph of Exhibit 154 reads:
"This agreement is made by and between Pacific Proton Therapy Regional Center, LLC, a California Limited Liability Company (hereinafter called 'Company') and Charles C. Liu (hereinafter called "Employee')."
BY MR. LEUNG:
Q I'm going to flip through it for you, but my first question for you, sir, is:
Do you recognize Exhibit 154?
And I will also note for the record that Exhibit 154 bears the Bates number Ginsburg.Supp.Report.000003 to -11.
So again, do you recognize Exhibit 154?
A I -- I do.



Q What is it?
A Well, it's an employment agreement between Liu and Pacific Proton Therapy Regional Center.
Q And Exhibit 154 is one of the materials that you relied upon --
A Right.
Q -- in forming your opinions.
Correct?
A Correct.
Q Okay. I'm going to turn to section 6 on page two entitled "Employee's Employment Duties."
Did you review section 6 in the course of forming your opinions?
A No, I did not.
Q Okay. And so section 6 is immaterial to the opinions that you formed in this case.
Correct?
A That is -- That is correct.
Q All right. I'll read it for the record. Section 6, heading:
"Employee's Employment Duties:
"a. Employee shall be responsible for the day-to-day operation of the corporation and its production facility."



Do you have any understanding of what Liu's responsibilities for the day-to-day operation of the corporation were, as represented in this agreement?
A No.
Q And subsection a. refers to day-to-day operation of both the corporation and its production facility. Do you have any understanding of what that production facility was?
A No.
Q Do you have any understanding of whether the production facility called out in this agreement actually existed at any point in human history?
A Well, it would be my impression, understanding, right, that had this project come to fruition, that the production facility would have been where the cancer treatments were provided.
Q What was to be produced at this production facility, Mr. Ginsburg, to your understanding?
A Well, if -- if my --
Again, much of my understanding is based on, really, the SEC -- the SEC complaint filed against them.
My understanding was that the production facility was to treat people with a certain type of cancer using this proton therapy. And I don't

really understand or know what that is.
Q In the course of your long career in the employee benefits field, Mr. Ginsburg, have you ever heard a medical clinic being called a production facility?
A Have I heard it being called that? No. But, you know, that's kind of a scrivener's description, you know, by the author of the document.
(Reporter requests clarification.)
Q I'll go on and read, for the record, section 6, subsection b.
"In performing his job duties for Company, Employee shall devote his full time attention and efforts to discharge the responsibilities assigned to him, shall not in any manner work for any other Company, in any business related to or unrelated to the business of the Company, or to compete with Company on an independent basis, or otherwise, and shall perform such other duties consistent with his position, as may from time to time be assigned



to him by Company. The term 'full time,' for purposes of this Agreement is agreed to be not less than forty (40) hours per week."
Mr. Ginsburg, do you have any understanding of whether Mr. Liu worked a full 40-hour per week during the relevant period of time in which he was assessed his reasonable compensation?
A I have no information at all as to that.
Q Do you have any understanding of whether Liu, in the period of time in which you're offering an opinion on what his reasonable compensation should be, engaged in conduct for companies other than Pacific Proton?
A I have no -- I have no information on that.
Q Do you have any understanding of whether Mr. Liu, in the relevant time period, actually did perform whatever duties were consistent with his position according to this contract?
A I do not have -- I do not have that information.
Q But it's your view that those factual issues are irrelevant to the analysis that you performed in this case.
Correct?



A I -- That's my review[sic].
If we look at, you know, my -- the main letter that I wrote, the March 25 letter, okay, it's my -- it was my --
The facts as presented to me, and again, is that he provided services to three different entities at different points of time. And my -- And my analysis was, what is reasonable comp for a person providing services related to the title that he was, you know, charged with providing for those entities.
The amount of -- the amount of time that he worked for those entities, the duties that he actually performed, is irrelevant to my -- to my report. My report is what's reasonable compensation for a person providing services related to that job title during those periods.
Q So, Mr. Ginsburg, that was helpful. You explained that it was your understanding that Mr. Liu provided services to three different entities at different points in time.
What services did Mr. Liu provide to PPEB5 Fund and at what time did he provide those services?
A Well, if we go -- if we go back to my letter of the 25th, okay...



And I have a -- Kind of on page 4 of that letter --
There's no reason for you to bring it up, right?
Q I can bring it up. I'll bring it up.
A I mean, you can if you want to.
MR. LEUNG: For the record, I'm displaying for the witness page 4 of Exhibit 151.
(Exhibit 151 screen-shared.)
THE WITNESS: And page 4, okay.
So for those years, that's -- So I wanted to look at the table at the top of that page. Right? For those years, it is my understanding that he provided those services during those periods for each -- for each of the three entities from the inception, from the inception date through May 26, 2016. Okay?
And if you go to -- if you go to the prior page, page 3 of 5 of the report, it says that Liu's job title in those periods was president -- was president.
Wang -- Wang's job title was vice president of marketing. She only -- She only provided those services. Again, we're at the bottom of page 3. There's a table there for two of the years. And

those were only provided to Beverly Proton.
So I -- So in my study, my study is what does a person get paid serving as president, in this case -- or vice president of marketing, in Wang's case -- in those years for those -- for entities in those fields that -- for those years.
And we did do a proration of the annual pay from the inception date in 2010 and through May 26, '16, for the 2016 year.
The actual services that were provided by Liu or by Wang, I don't know exactly what they did. I based my study on what would a president or a vice president of marketing be paid for providing services for entities in these fields during those periods.
BY MR. LEUNG:
**Q** You said you don't know exactly what Mr. Liu and Ms. Wang did.
**A** No, I do not know what they did.
**Q** Do you generally know what they did?
**A** No. I -- If they were the president and the --
If Liu -- Pick on him. If Liu was president of the company, again, the surveys, the survey source that I used, would have a generic



job description for that role. And I assume that he provided the duties that were commensurate with that generic job description.
**Q** And I understand you've made that assumption. But you have no understanding as to whether Mr. Liu or Ms. Wang actually performed services commensurate with the generic job description you've just testified to?
**A** Correct. Correct.
**Q** Let's turn back to Exhibit 154.
(Exhibit 154 screen-shared.)
MR. LEUNG: Again, for the record, I'm displaying Exhibit 154 -- that's the Pacific Proton-Liu employment agreement -- to the witness.
BY MR. LEUNG:
**Q** Directing your attention to the very last page, page 8 of 8 -- or is it 9 of 9. 9 of 9.
Do you see there are a couple of signature blocks for this employment agreement?
**A** Uh-huh.
**Q** There's a signature block for Charles C. Liu.
Do you see that?
**A** Uh-huh.



**Q** There is a signature block for Pacific Proton Therapy Regional Center, LLC.
Do you see that?
**A** I do.
**Q** Each of those signature blocks is dated June 28, 2012.
Do you see that?
**A** Correct.
**Q** Do you know who executed this employment agreement on behalf of Pacific Proton Therapy?
**A** No. I mean, I can see the signature. I don't know -- I don't know who's name that is.
**Q** Do you know who executed this employment agreement in Exhibit 154 on behalf of Mr. Liu?
**A** I would presume it was Mr. Liu. I can't verify that. I don't know if that's his signature or not.
**Q** Okay. And there's a handwritten notation below the Liu signature block that reads, in English, "Voided," and then I think it's a "4/4/2016."
Do you know what that means?
**A** No, I -- But I presume it says that we're canceling this agreement on 4/4/2016. I guess. I don't know.



**Q** That notation --
**A** I see it there. I see it, for sure, you know. Yeah, I see it.
**Q** That notation, did it bear on your expert analysis in this case?
**A** It did -- It did not. It did not. I -- I -- Going back -- And again, I don't -- you don't need to bring it up to show me.
Going back to page 4 of 5 of my March 25 letter --
(Exhibit 151 screen-shared.)
THE WITNESS: -- we stopped the calculation for 2016 as of May 26, 2016, which was a date, I believe referred to in the SEC complaint, that I picked -- that I used for some reason. Don't recall exactly why. That's the date that operation stopped, so -- in my calculation. And I don't remember exactly what that date meant.
BY MR. LEUNG:
**Q** Okay. I am directing your attention to our shared screen, which is displaying Exhibit 151.
Let's go to page 1. And feel free to use the copy in front of you. I'm just going to keep displaying this --
**A** Sure, sure.

**Q** -- for counsel, to the extent it helps.
All right. Your letter is addressed to Mr. Gouraige?
**A** Uh-huh.
**Q** The last sentence of the first paragraph, you conclude that paragraph by writing:
"This letter will discuss the situation presented to us, our methodology for preparing the report, and our conclusions."
Who presented the situation to you?
**A** Well, it's -- I would assume it was counsel, Mr. Gouraige.
**Q** What counsel?
Mr. Gouraige.
**A** Mr. Gouraige.
**Q** Okay. And there's a heading after that. It says "Background." And then there's a full paragraph that begins, "During 2010."
The information contained in that paragraph, is that what you're referring to when you wrote "the situation presented to us" by Mr. Gouraige?
**A** Yes.
**Q** Okay. Any other information that was



presented to you situationally that's not laid out in that first paragraph after the section Background that begins with the words "During 2010"?
**A** Not that was -- Not that's relevant to my opinion.
I mean, I was made aware that there was, you know, in the overall background, that there was legal action between -- you know, involving the SEC and all that. That was explained. That was explained to me as part of the background. But it's not really relevant to the work that I did, or I didn't feel it was.
**Q** Okay. The first sentence reads:
"During 2010, Liu, in conjunction with Dr. John Thropay, an unrelated party, created and operated a program designed to construct and operate the Project, which was to be a cancer therapy center that used a proton-based therapy to treat patients."
What did you mean when you wrote or when you identified Dr. John Thropay as an unrelated party?
**A** I -- I guess I'm not understanding your question.



That was -- I mean, this was merely some of the -- a little bit of the background I put in, for the reader to understand the situation.
**Q** I'm just asking what your report means. You wrote "unrelated party." What did you mean by that?
**A** Well, an unrelated party means that he was unrelated to -- from my understanding, he was not related in any business sense to Liu or other sense to Liu, aside from being involved in this project.
And again, I believe I probably took that language from the SEC's complaint. Again, I could be wrong, but that's where I would have -- that's probably where I would have arrived at that description.
**Q** What was Dr. Thropay's role in the project?
**A** I don't really have any understanding except from what I read in the SEC complaint, which I have not looked at in quite some time.
I think -- I think he was a partial owner. I believe he was a partial owner. And that's all that I -- that's all that comes to mind right now, on that.
**Q** Do you know whether Dr. Thropay was the chief executive officer of Beverly Proton?



**A** I do not.
**Q** Do you know whether --
**A** I might have -- From what I read, I don't recall that he was, but he may have been. It would only -- Again, only what you would have put in or what someone would have put in the SEC complaint.
**Q** Do you know whether Dr. Thropay received compensation from the three corporate entities during the same time period under inspection for your report on Mr. Liu?
**A** Yeah, I'm not aware that he did.
**Q** Well, if Dr. Thropay was a chief executive officer at one of the companies, and he did or didn't receive compensation, wouldn't that fact bear on the reasonableness of any compensation that Mr. Liu was or should have received?
**A** Not necessarily. Many companies have both a president and a chief executive officer.
**Q** But the amount of money the chief executive officer is being paid, doesn't that have some relevance to the amount of money that the president in the same organization might want to receive?
**A** Not necessarily. Not necessarily.
I mean, again, in looking -- in looking at the marketplace studies and all that, again, as

I said, companies often will have both.
Typically, the CEO will get paid more than the president, but it's not always. So it could have a bearing on how much -- You know, the title has some bearing as to what you get.
But the fact that you have one doesn't mean that you would not have another.
**Q** Directing your attention to page 4 of 5 of Exhibit 151, which is your initial report, tell me if I'm reading this wrong, but I see your summary chart as providing that reasonable compensation owed to Liu, apart from finder's fees, which is additive to this amount --
**A** Right.
**Q** -- is in the range of about $4.8 million from all three entities from 2010 through May 26, 2016.
Right? 4.8?
**A** Yeah, that's -- Yeah, that's right. I think it's 4.9, in that paragraph underneath the table. Yeah.
**Q** And so it's your opinion that 4.9 million, at least, could reasonably be paid to Liu in his capacity as president of Pacific Proton, PPEB5 Fund, and Beverly Proton.



Correct?
**A** Correct.
**Q** If it's the case that Dr. Thropay, who was the chief executive officer of those three entities, was not paid a dollar in compensation, would that have any relevance to your opinion as disclosed in this report that Mr. Liu was entitled, not to nothing, but to $4.9 million?
**A** It would not. It would not.
**Q** And once again, just I want to make clear that I understand your opinions.
Mr. Liu's entitled not just to the $4.9 million in compensation, but also an additional $2.285 million and change, in the form of a reasonable commission/finder's fee.
Correct?
**A** That would -- Based on market rule, yes.
**Q** So if Dr. Thropay gets paid nothing, that doesn't mean anything for your analysis, sir?
**A** That does not mean anything for my analysis.
**Q** Okay. Returning to page 1, same paragraph, I had read this sentence for you earlier. You said that Liu:
"...created and operated a program designed to construct and operate the Project..."
What do those words mean? What did Liu do to create and operate the referenced program?



**A** Okay. Again, my recollection is that this language was used -- was based on what I read in the complaint that the SEC laid out.
I have no independent knowledge of what things Liu did or did not do about -- did or did not do to create and operate the project, as I referred to it in this letter.
**Q** And the final sentence of that first paragraph underneath Background reads:
"Liu raised funds for the Project, but was unable to raise sufficient funds to bring the operation to fruition."
"Unable to raise sufficient funds to bring the operation to fruition," what does that mean?
**A** Again, that was just -- just came from my reading of the SEC -- the SEC complaint. I would assume that a certain amount of funds had to be raised to be able to begin construction of the center and get it going and is -- The amount of funds that were raised relative to it did not



reach that level.
**Q** And do you know what amount of funds that was that would have reached a sufficiency?
**A** No. I mean, I thought it was roughly -- I thought there was some reference made to it in the SEC complaint.
Here again, I haven't looked at that in quite some time, so I don't -- Any knowledge I would have about the amount of funds that needed to be raised would have come from anything disclosed in the complaint.
If it wasn't talked about in the complaint, my assumption is, you know, that the project never did get off the ground, quote-unquote. And so that would have theoretically been the reason for that not to occur.
So no, I don't know what that number is.
**Q** Okay. And moving on to the second paragraph underneath the section Background, I'm going to read for you the second full sentence in that paragraph. It begins, "We understand..."
"We understand that Liu served in the following roles: the President of Pacific Proton Therapy Regional Center, LLC; the sole manager of

Pacific Proton EB-5 Fund, LLC; and
the President and Treasurer of
Beverly Proton Center."
Again, and tell me if I'm wrong, Mr. Ginsburg, but am I correct that you have no specific understanding of what Mr. Liu did in practice, what he actually did in his capacity as president for Pacific Proton, sole manager for the PPEB5 Fund, and president and treasurer of Beverly Proton?
**A** That is correct. Again, those duties and all that, those roles, I would have obtained that information from the SEC's complaint.
**Q** Okay. And then, finally, the sentence concludes with you writing:
"We also understand that Wang
served in the following role: the
Vice President of Marketing of
Beverly Proton Center."
Do you know what Wang did as VP of marketing for Beverly Proton?
**A** Right, I do not, except, again, from what was described what her role was, in the SEC complaint.
**Q** Do you know how she came to become VP



of marketing for Beverly Proton?
**A** I don't have any independent information of that aside from what it said in the complaint.
**Q** Okay. Next paragraph on page 2, at the top of page 2 of Exhibit 151, you're laying out your understanding as to the time periods in which Mr. Liu and Ms. Wang performed services for the entities.
Is that correct?
**A** Right.
**Q** The last sentence of the paragraph reads:
"It is also our understanding
that Wang performed services for
the Beverly Proton Center during
2013 and 2014."
How did you come to that understanding?
**A** It would have been in the SEC complaint.
**Q** Okay. And what about 2015 and 2016? Do you have any knowledge of Ms. Wang performing services for Beverly Proton in those years?
**A** I do -- I do not.
And our -- You know, further on down in this letter, you'll see that I only -- I limited our calculation of what she was entitled to, to those years.



**Q** Yes.
And so it's your opinion that Ms. Wang was not entitled to reasonable compensation based on the facts presented to you, in 2015 or 2016.
Is that correct?
**A** That -- That is correct.
**Q** Okay. The next section is entitled "Our methodology." The first paragraph reads:
"We view reasonable compensation
paid by the Project to Liu and/or
Wang as having two distinct sources:
a commission or finder's fee relating
to obtaining investors in the Project;
and, compensation for services rendered
to the various entities of the Project
for management and operation of each
entity's business."
Once again, that reference to management and operation of the three corporate entities by Wang and Liu, you have no specific knowledge as to what they actually did in those areas. Correct?
**A** That is correct.
This was -- Again, this type of study is based on what would an employer have to pay someone to -- in the marketplace to come and perform the



duties commensurate with the titles, the positions for which they are being hired.
So that's it. So what Liu or Wang actually did is not actually relevant to this study. It's what is reasonable in the marketplace for that position.
**Q** You know, you wrote the words "each entity's business" at the end of that paragraph.
What was the business of the PPEB5 Fund?
**A** Well, as we -- I mean, the business of the three entities is laid out -- You know, the EB-5 fund is a fund that, I guess, received the contributions, the investments that Beverly Proton Center is -- was to operate the business.
And the Pacific Proton Therapy Regional Center, I believe was set up to provide overall general -- I'd have to go back and look at whatever notes I made. Yeah, overall --
This was, again, all the info -- What I based my opinion on as to what these three entities does was in the SEC complaint. It's obvious SEC laid out, here's what each entity did.
(Exhibit 155 screen-shared.)
BY MR. LEUNG:
**Q** Mr. Ginsburg, I am displaying for you on

our Webex application a two-page document that has been marked -- will be marked Exhibit 155.

These two pages bear the Bates numbers Ginsburg.Supp.Report.000001 to -000002.

Do you recognize Exhibit 155, sir?

**A** I do.

**Q** And what is Exhibit 155?

**A** This is the ERI, what we refer to as the ERI report. It talks about, in the page I'm looking at, what the president of the Beverly Proton Center could have been paid, would have reasonably been paid.

And the second page is what the vice president of marketing for the Beverly Proton Center would have been paid.

**Q** And are these the ERI survey reports that you previously testified that -- let me just get the names so we have a clear record -- Ms. Ipavec pulled for you from that database?

**A** Correct.

**Q** Were there any other outputs that you or your team retrieved from ERI apart from the two pages set forth in Exhibit 155?

**A** I -- ERI can provide additional reports that could include a job description. It can



provide a report -- I don't know that we pulled it -- something that would -- a report that would be base pay only, that would be short-term incentives only.

We pulled, you know -- So we could have printed those out. But we used total cash, which is the sum of base pay and incentives. And that's --

So this is certainly the report that is used to generate the figures that I put on the opinion letter, the letter of March 25.

**Q** The job description report --

Go ahead.

**A** Should I go on? Are we okay?

**Q** I think I cut you off, Mr. Ginsburg. Please go ahead. I'm sorry.

**A** Okay. So I was saying that this is the report that is the basis of the table report that I put on the letter of March 25.

As I said earlier, we then -- and as is discussed in the letter, the numbers reported here are then discounted back to -- based on cost-of-living index based on the appropriate years.

**Q** The job descriptions report that you explained is available on ERI, what information does that contain?



**A** It typically provides a four- to five-sentence description of what the person holding the title of president or vice president of marketing might be responsible for.

**Q** And you did not pull those job description reports as part of your expert report in this case --

**A** No.

**Q** -- correct?

**A** No, we didn't. I did not include those.

And the reason for that is that if I'm being asked to say what does the president get paid of a place of Beverly Proton Center's nature, I don't have any real reason to include -- to include that as part of the report.

Why that is used, again, if it's used -- and I don't mean to get off topic here -- is that if you have an employee or an executive and you're not sure if what you are asking him or her to do fits in that job title, then you would look at that job description. It would help you decide, yes, yes, that does fit, as the president.

If you are -- But if you're coming to me -- you, the person requesting the report -- saying to me: I have a president. I have somebody serving



as president. And we know that person is titled as the president and they're supposed to perform the job of president, there's no real reason for me to attach that job description.

**Q** And so you did not engage in any inquiry as to whether what Liu actually did in 2010 through 2016 comported with the description that you would have been able to obtain for a president from this ERI survey database?

**A** Correct.

**Q** And by that same token, you did not engage into any analysis as to whether what Ms. Wang did, in actuality, from 2013 to 2014, comported with the description for a vice president of marketing that you would have been able to pull from ERI as a job description report.

Correct?

**A** Correct.

MR. LEUNG: Real quick, I'm going to show you what will be marked Exhibit 156. Bear with me a second.

(Exhibit 156 screen-shared.)

BY MR. LEUNG:

**Q** This is later in the production.

For the record, it bears the Bates number

Ginsburg.Supp.Report.000012 to -13, but they appear to be the same printouts.
Am I getting that right?
A Well, the difference --
Q Do you have those materials in front of you?
A The difference appears to be, if you look down under Specifications, one says Pacific Proton Therapy Regional Center.
If you go further up, it --
Q Oh, I get it.
A That's probably it.
Q Okay. I got it. Thank you for pointing out that detail.
So you generated a report for each entity for each individual defendant. Correct?
A Right.
Q And, you know, I'm looking at, for example, Beverly Proton and Pacific Proton EB-5 Fund. I see the same industry codes. I see the same organization size. I see the same dates on which this data was pulled. I see the same area as well as industry.
Why are the figures slightly different?
For example, PPEB5 Fund, assuming revenue

105

of 2.25 million, you've got a survey median of 330,994. But turning back to the regionals --
Actually, they are the same. I see. Strike that.
Okay. Okay. I mean, I can obviously confirm this, but the figures that you pulled for each of these entities are the same because you've taken the same assumptions when pulling that data. Correct?
A Yeah, that would be correct. I mean, the difference would be, obviously, the president numbers would be different from the vice president of marketing number.
Q I see. I see.
A And if you were to look -- if you were to look on the March 25 report, you know, on the table -- on the table at the bottom of -- or the top of page 4, the numbers are pretty much the same -- They are the same for the -- for all three entities, the 2011 to the 2016 year.
And I hope you can hear me.
Q Yes --
A I was turned --
Q -- we can hear you.
A I was turned away.

106

The first year is different. I would have to go back and see why that was. I sense that maybe those entities commenced business on a slightly different date. I'd have to go back and look for that, as to why that was.
MR. LEUNG: I just need to make an exhibit so we can just close out this line of questions. I'm happy to have you watch me do it. It's going to take a couple minutes.
If you wish, in the alternative, we can take a five-minute break.
MR. GOURAIGE: We can take a five-minute break.
MR. LEUNG: All right. Let's go off record, Tim.
THE VIDEOGRAPHER: We're going off the record at 12:45 p.m.
(A recess transpires.)
THE VIDEOGRAPHER: Okay. We're back on the record at 12:52 p.m.
(Exhibit 156 screen-shared.)
BY MR. LEUNG:
Q Mr. Ginsburg, I am displaying for you what will be marked as Exhibit 156.
For the record, this exhibit bears the

107

Bates numbers Ginsburg.Supp.Report.000001, -2, -12, and -13.
My question is: Is Exhibit 156 a true and accurate copy of all the ERI compensation surveys that you generated for your report?
A Yes.
Q And one is for a president, and this corresponds to the Beverly Proton Center.
One is for a vice president of marketing, and that corresponds to Beverly Proton Center.
A third is for a president again, corresponding to Pacific Proton EB-5 fund.
And the fourth is for a president, and this one corresponds to Pacific Proton Therapy Regional Center.
Am I understanding that correctly?
A That is correct.
Q And on each of these compensation surveys, in the lower left-hand corner there's a section entitled "Specifications."
Am I correct that that box in the lower left-hand corner of each of these reports lays out the filtering factors that you applied in order to retrieve this compensation data from the survey database?

108

**A** Yeah, that's correct.
And you'll recall earlier in our discussion today, I said these are the instructions that I gave to Ms. Ipavec, to go to the surveys and pull the data with the specifications on it.
**Q** And all four of these surveys apply the same assumptions: One being area, Los Angeles, California; two being industry, general medical and surgical hospitals; industry codes of 8062 for the SIC, 622110 for the NAICS, and 8062 for the SEC code; and finally, the last assumption is organization size, and each of these assumed 7,250,000.
Correct?
**A** Correct. Right.
**Q** I'm going to go through each of these assumptions. I think you previously testified to them to some degree, but area is just where the business is located.
Right?
**A** Yeah, that's correct.
What that's, again -- And then just for everybody to understand this, what that's used for in the survey is they will -- the survey folks will apply a cost-of-living index to their overall



database to come up with that.
So our overall numbers, if instead of putting in Los Angeles, California, if that's a high place, high and expensive place to live, as I understand it is, compared to, say, Cleveland, Ohio, which is where I'm sitting, if we put Cleveland, Ohio, the numbers would change slightly. They would do down. So that's why the area -- that's why area is on there.
**Q** And then industry, industry matters, because the industry that a given executive position is in will bear on the reasonable compensation.
Correct?
**A** That is correct.
And that title is what the survey uses based on the SIC and NAICS codes down below. You know, when I type in or where she would type in the SIC code, that's the industry name that would pop up.
**Q** Okay. Is there a list of SIC codes and corresponding industries for each of those codes available to you?
**A** Right this second? Yeah. I mean, you can go on the Internet and you can pull up that list of codes, sure.



**Q** Is that behind a pay wall? I mean, this is a paid service. Correct? ERI.
**A** Well, yeah. Well, yeah, but the NAICS codes and SIC codes are available. You know, they're -- You can look them up. You don't --
**Q** Oh, I understand. Okay. Got it.
**A** Maybe I'm misunderstanding your question, but --
Yeah, no. I have to go find that code, type it into the -- type it into the system, the survey system, and then this will pop up.
**Q** Got it.
And then organization size, what does the number 7,250,000 correspond to?
**A** Okay. Well, the system wants some figure to use for the organization size. In a simple thing, the CEO of a local delicatessen, okay, will probably be paid a lot less than the CEO of Subway.
And so you somehow have to indicate what is the size of the organization that you are representing here. That's it. Okay?
So there is a difference -- there is a difference. What we -- The organization size refers to the annual revenue of the organization.
Now, in our case here, and in -- and we



have a little bit of not a typical situation in the case before us, because, to my understanding, we never had revenue in any of these entities from ongoing operations. Right?
You know, the -- You know, Beverly Proton never really opened its doors, right? The building was never built and all that.
And so in that case what I have done in my career, when I've had situations like this -- and I'll describe those in a second -- you have to use -- you have to use something instead that really deals with the capital raise -- you know, capital raise, the essence of the company.
And so what I -- in my judgment, what I did is, okay, I, for some reason -- Again, I haven't looked at the numbers recently. But again, you know, I did determine that over the course of this period -- this period, that approximately --
And I'm talking out of school here, so that wouldn't be completely accurate.
(Reporter requests clarification.)
I'm talking -- I'm speaking roughly, because I don't have the numbers in front of me.
Approximately $23 million, $24 million was raised, was raised. And so I divided that

by 3, 3 1/2, by some figure, and I came up with the $7.25 million figure to use -- to use as an estimation of revenue for purposes of running the study. I mean, I understand that none of these entities had $7.25 million of income in any one year -- in any one year, but I used that number for the study.

You know, when you do this type of work, and my reasoning for doing this is, when you're doing work for a pre-revenue company, right, as we were -- as we were here, okay? You have to find some way to determine what can we use for -- you know, as company size, company value, for figuring out these type of studies.

And, you know, I've done this for any number of pre-revenue companies, as we know. And we see in the business pages all the time that pre-revenue companies operate all the time. They get investor backing, venture capital backing, whatever -- You know, whatever you want to call it, investors will invest in them, to say, okay. We understand you're running at a loss and you're going to run at a loss for a while, while you build and create this business. And then there's going to be value to the company.



So we have to pick a figure. And the figures that I've used over the course of my career is, I take a number -- you know, I'll take a number based on the capital that's actually been raised over the course of time, and I'm going to plug that in.

Now, you will see as you look at one -- as you look at any of the schedules, as you look at any of the schedules we have -- and right now the one that's up is the Beverly Proton Center, and the numbers are the same through -- for the position. Right?

There's a difference. You know? We pick the survey median, okay? We use the median number, that column, because the median represents what is the market value of this position.

If you were to pay -- If you, the employer, were to pay somebody at the 25th percentile or the 10th percentile, you would run a risk of that person, really, leaving for just the next place that would offer him the market -- the market amount of income.

If you pay at the 75th or the 90th percentile we have there, those are usually paid by companies that are viewed to be performing far



above the market in terms of their revenue or their profitability or, you know, whatever reason it may be.

So the median is used. I mean, that's the level at which an employee wouldn't leave for issues solely related to pay. Okay?

Below that, there's a good chance of that. Above that, there's a very small chance of that.

They might leave for other reasons. And again, I'm a little off the point here. They might leave for other reasons.

So the median is what we use. And you'll see in this report that there is a significant difference between what I had at the top as 7,250,000 and the million dollars, which is the minimum level that can be used to generate any results out of this survey, under the survey.

So that was my -- That was the methodology that I have used for a number of years over my career.

And I'm sorry for that being a long explanation to a simple question.

**Q** No, that's helpful.

This is Beverly Proton I'm looking at, the first page of the document. And the industry is



designated general medical and surgical hospitals. Was Beverly Proton in the business of operating a general medical and surgical hospital?

**A** Based on the SIC code that I was provided with, and I think was reported on their tax return, that was the -- that was the code.

Now, when I look -- You know, when I did some of the research on the SIC codes, there are, in the SIC and NAICS classifications, other types of medical facilities, for lack of a better word, okay, of other medical facilities that were listed.

And there are some specialized -- There were some specialized types of medical facilities, but none of which related -- related to a cancer center.

Proton, you know, which I think is kind of -- which I sense is kind of a newer thing, right? Not there. Cancer, not there.

I think a special service would be, like, mental health is one that's broken up. They've got their own NAICS code. Okay?

This didn't. This didn't. So the codes to a general medical and surgical hospital fits in this situation.

If there would have been an NAICS code that

said cancer center, I would have used that. I would have used that. But there is not.
Q Was there a Beverly Proton general medical hospital?
A In existence?
Q Yes.
A My impression from reading the SEC complaint is that there was not.
But, again, this was the code that was used on whatever tax filings they used.
Q Was there a Beverly Proton surgical hospital?
A In existence? Again, not that I'm aware of.
Q Did Beverly Proton provide medical services to a single patient in a hospital setting?
A I have no -- My impression would be no. I have no independent knowledge of that occurring.
Q Did Beverly Proton provide surgical services to a single patient in a hospital setting?
A I have no independent knowledge of that.
Q Did Beverly Proton employ any nurses?
A I have no information on that. I don't know.
Q Any doctors?

117

A I do not have any -- I have no information on that.
Q Turning to page 3 of Exhibit 156, this is the report for Pacific Proton EB-5 Fund. That's the PPEB5 Fund.
Same industry code. Right?
A Yes.
Q SIC, 8062?
A Right.
Q And that code corresponds to general medical and surgical hospitals?
(Reporter requests clarification.)
A Oh. That's what that code relates to, yes.
Q And so you assume, for purposes of your expert analysis in this case, Mr. Ginsburg, that PPEB5 Fund was in the industry of general medical and surgical hospitals.
Correct?
A Yeah, that is correct. Based on the filings that were made by that entity, that was the SIC code that was provided to me that they -- that was used.
(Exhibit 14 screen-shared.)
MR. LEUNG: Showing for the witness a document that's been previously marked

118

Exhibit 14, Government Exhibit 14.
BY MR. LEUNG:
Q This is an employment agreement between Pacific Proton EB-5 Fund and Charles C. Liu. I just want you to have a look at the Recitals.
I'll read recital number A.
"Whereas Company" -- that's in reference to the PPEB5 Fund -- "is in the business of raising EB-5 Capital overseas and requires the services of a Manager of the company, and wishes to extend to employee an offer of employment."
In the course of forming your opinions, did you not understand that the PPEB5 Fund was in the business of raising EB-5 capital as opposed to the industry of general medical and surgical hospitals, sir?
A I did understand that.
Q I'm sorry. Your answer was you did understand --
A I did understand. No, I did understand that. Yeah, I did understand.
(Reporter requests clarification.)
A I did. I did understand.

119

Q Okay. So can you explain for me, again, I suppose, why the general medical and surgical hospital code was appropriate --
A Sure.
Q -- for use in drawing down this survey data for the PPEB5 Fund?
A That number was provided to me. It was the -- either the SIC code or the NAICS code that was reported on the entity's tax return.
Q And if that information was reported incorrectly on the federal tax return, would that give you cause for concern with respect to the opinions you formed in this case?
A If that was incorrect, I would rerun -- I would rerun the study. I would -- I don't -- I don't know if there would be a significant difference. And I cannot say if it would be higher or lower, but it would be easy enough to rerun the study. But I...
(Exhibit 154 screen-shared.)
MR. LEUNG: Okay. I'm showing for the witness Exhibit 154 again. We covered this a little bit earlier.
BY MR. LEUNG:
Q This is the employment agreement that you

120

did consider when forming your opinions.
A Sure.
Q It's between Liu and the Pacific Proton Therapy Regional Center.
I do want to direct your attention, Mr. Ginsburg, to the Recitals. The very first recital reads, recital A:
"Whereas Company" -- and that's in reference to Pacific Proton -- "is in the business of EB-5 marketing and requires the services of a President of the company, and wishes to extend to employee an offer of employment."
Did you understand that the Pacific Proton Therapy Regional Center, LLC, entity was in the business of EB-5 marketing and not the industry of general medical and surgical hospitals, when forming your opinions in this case?
A Well, I understood that the Pacific Proton was in -- dealt with the entity that marketed the program that the funds were turned over to the fund, and that the fund then provided the funds for the cancer center -- again, all coming from the SEC, coming from the SEC complaint. So I was aware of that.



But again, as I said, we had the SIC code was provided to us from tax -- tax return funds. That's my recollection that's where it came from. And that's what we would have and that's what we went with.
And again, if we went back and said, this is merely -- If I could find a -- If there's an SIC code for a company involved in marketing EB-5 programs, for lack of a better term, the numbers could be rerun again. I don't know if the numbers would change significantly or not.
Q And that's because you have not done that specific analysis.
Correct?
A That is right. That's correct.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:
Q All right. I am showing you again, Exhibit 151, which is your initial report dated March 25, 2021.
I want to go to Appendix A. That's page 5 of the exhibit.
Mr. Ginsburg, is Appendix A a complete list of the Form D offerings that you based your opinions on in this case?



A Yes.
Q And you previously testified that the initial cut that was pulled from the SEC EDGAR website by your associate contained other additional Form D exempt offerings, but that you did not include them in your expert analysis because those offerings, according to the information you pulled from EDGAR, did not provide for sales commissions, finder's fees, expenses, or other payments to promoters.
Did I hear that right?
A That is correct.
Q Okay. So let's start off with the very first one. The filing entity is 88th Avenue EB5 Capital, LLC. For that investment offering, did you review the offering materials?
A I reviewed nothing more than the Form D. So, no, I did not.
You mean like their private placement offering, that type of thing?
Q Yes.
A No, I did not, for any of these.
Q Okay. Well, yeah, let me ask a better question, then.
There are 20 unregistered offerings listed



in your Appendix A. Are those the entire universe of Form D filings that you considered in forming your opinions?
A Yes.
Q Did you review the offering materials for any of those 20 unregistered offerings?
A I did not. My -- My review was strictly limited to the Form D filings.
Q Did you have any understanding of what kinds of EB-5 projects were being funded by the 20 unregistered offerings listed in Appendix A?
A Yes.
Q And what did you --
What information were you able to glean from the Form Ds?
A They were in a variety of industries. I recall that perhaps one was related to healthcare. There were --
You know, they were across the country. They were --
But these are not all EB-5s related to healthcare projects.
Q Do you recall which of these unregistered offerings was intended to finance a healthcare business?

**A** I -- I could try to look through my electronic files here to find that, but I do not recall off the top of my head.
**Q** Why did you consider data from unregistered EB-5 offerings outside of the healthcare area, in forming your opinions?
**A** Well, that's an interesting question.
When we compare these types of studies, we have to get a certain sample size, for lack of a better term. Because if you only have one or two that would fit a certain -- a narrow criteria, it's not a great sample, because you could have widely disparate results. If you have a place that pays a lot of finder's fees to the one that pays very little, you would -- you might have a very high figure, and it wouldn't be representative.
So we -- So when we do this, we have to expand our search to get a good representative sample size.
Now, earlier in the conversation when I was talking about publicly traded company executive compensation studies, and we talked about -- and I talked about how we have to get a sample of companies, a peer group, a peer group, as it were, of a certain size so that outliers, their effect,



is softened on the overall results. And then I usually use 12 to -- 12 to 15, is a number that I like to use. Okay?
In the case that we have here, the case we have here, because we didn't have a whole bunch, a whole group of healthcare companies, okay, then let's instead look at all of the Form Ds that were issued during or close to the time when this operation was -- you know, the project was going on.
So I didn't pull any that were before the start date, the start date. And I did run through the end of 2019 -- 2019, which is kind of up towards what the current date is.
And so that's all -- I pulled everything that had a commission, finder's fee, other amounts paid to executives, however you want to call that, through that -- through that period, because that gave me, in my mind, a large enough sample size to be able to come up with a number that I'd feel comfortable using in the report.
**Q** Are you sure you pulled the healthcare unregistered offering?
**A** I thought -- I thought there was one. I thought there was one. I mean, I could try to go back to my file to see what, while we're talking.



I thought there was one.
And again, I could be wrong, but that's what I recall.
(Screen-sharing stopped.)
THE WITNESS: Did you want me to try to look for it or --
MR. LEUNG: No, no. Just give me a moment, though.
(Pause)
BY MR. LEUNG:
**Q** The 15 observations that you like to see, how did you arrive at that figure? What's that based on? Is that an industry standard?
**A** It's -- On the public side, it's kind of an industry standard, you know, and the way that it's done.
In some -- Even if you look at compensation surveys -- And it's not the case with ERI, because they have such a large database.
But there aren't -- You can participate, acquire, use surveys that are conducted by private entities for specific industries, for specific industries. Okay?
And in those, they typically will not report any data if they have less than seven



responses. Okay? That's kind of on the private side, because they say you could just have too much fluctuation to make a valid -- a valid opinion.
I am not a statistician by training, but I would say that 12 to 15 is kind of -- on the public side, that's kind of an industry standard. I try to go with that. I would rather get -- have more data than less.
MR. LEUNG: I am going to display for you a copy of what will be marked as Exhibit 157.
(Exhibit 157 screen-shared.)
BY MR. LEUNG:
**Q** Mr. Ginsburg, are you able to access the Egnyte file share site or are you still having the same technical difficulties you had earlier?
**A** Let me give it another check here.
Okay. So I have it open. I can now see -- You know, it gives you a list of -- Exhibit 14's at the top, down to Exhibit 157, so it's about eight documents.
**Q** Would you open Exhibit 157, please.
**A** Let me see if I can get that.
Yeah, that's open. It's a file of Form Ds.
**Q** Okay. And for the record, Exhibit 157 bears the Bates number Ginsburg.Supp.Report.000014,

that's 14, all the way through -127.
Take as much time as you need to go through this, sir. But my question is simply this:
Is Exhibit 157, which was produced by the defense to the SEC, a complete copy of the Form Ds that you reviewed in connection with the unregistered offerings that are listed in Appendix A to your March 25, 2021 report that's been marked as Exhibit 151?
**A** Give me just a second. I mean, certainly, you know, the size of the file seems right, you know. It was around this size...
Give me -- Give me one second to check on it here.
I'm just...
**Q** Please take as much time as you need.
**A** Yeah.
**Q** If you want to go off record, I'm happy to do that, too.
**A** No, you don't need to. I mean, all I'm doing is I'm going through and just checking a few of the forms that are in there against what's in the report. I've checked two now. I'll check one more and...
(Perusing document)



Okay. Yeah, I will -- This appears to be a true and accurate copy.
MR. LEUNG: All right. Let's go back to Exhibit 151, still displaying it on your screen through Webex --
THE WITNESS: Yeah.
(Exhibit 151 screen-shared.)
BY MR. LEUNG:
**Q** -- and returning to Appendix A.
Are you with me?
**A** Yeah.
**Q** Of the 20 unregistered EB-5 offerings listed in your Appendix A, which you considered in forming your opinions in this case, do you know whether any of the offering materials for these investment offerings clearly delineated the appropriate use of investor funds?
**A** Well, I didn't -- I didn't review any of the underlying offerings. So I cannot -- I can't answer that. I did not look at those.
**Q** Mr. Ginsburg, for --
Go ahead.
**A** No, no. I -- No, go on. Go on.
**Q** For the 20 EB-5 investment offerings listed in your Appendix A that you relied on in forming



your opinions in this case, do you know whether those offerings had materials that capped offering expenses, commissions, and fees incurred in connection with the offering at a set amount?
**A** I -- I don't -- I don't believe so because, again, when you look -- Again, all I looked at was the Form Ds. And I don't believe the Form Ds discuss a cap.
It talks about the minimum investment. It -- You know, you can have -- Sometimes there can be a clarification of response that might discuss it a little bit, but I don't -- There's no requirement. There's no checkbox that says what's the cap on that Form D.
**Q** And so you don't know, with respect to any of these 20 unregistered EB-5 offerings, whether investors were told that offering expenses, commissions, and fees incurred in connection with the offering would be capped at a set amount.
You don't know that. Right?
**A** I don't have that independent knowledge, unless it's broken out -- and I'd have to go back through all the files -- unless it's broken out as a note on the Form D.
**Q** Mr. Ginsburg, what is Overseas Chinese?



**A** I'm -- I guess in what context? I don't know what that was --
**Q** Are you familiar with an entity called Overseas Chinese as it pertains to this case?
**A** I don't -- I do not see that on my list, so I would say no.
**Q** Are you familiar with an entity known as Delsk, as it pertains to this case?
D-e-l-s-k.
**A** No, I do not see that on my list on Appendix A. No.
**Q** Are you familiar with an entity known as U-D-G, as it pertains to this case?
**A** I do not see it on the list, so I would say no.
**Q** Mr. Ginsburg, I'm not talking about your study. I'm just talking about executive compensation in general.
**A** Sure.
**Q** Would you agree with me that negligence by a given executive should bear on what reasonable compensation is owed to them?
**A** In terms of a study, no. No, I don't think so.
In terms of an executive sitting down with

the board or with his or her superior, and talking about how much they should be paid for the next year or whatever, that could be -- that could be an issue that could be discussed. That could be discussed.
We see that -- We see that written up in the newspapers sometimes, with large public companies where there's a problem. And the executive falls on his sword a little bit and gets paid a lower amount of money in a future year because things went -- had gone bad the last year.
But not in terms of studies for executive compensation. That would -- It would just never appear.
**Q** Does corporate malfeasance bear on what is reasonable compensation owed to an executive?
**A** Again, when we're trying to set up using a study, it would not bear on that.
In future salary negotiations, it could play a very important role.
**Q** Does conducting corporate business with a fraudulent intent, does that bear on what is reasonable compensation owed to an executive?
**A** Again, not when we're setting up, figuring out what the market would pay. The market, you would assume -- The market would pay an executive



an amount that does not include that, fraudulent activities.
But again, it could very well be a subject for discussion between the executive and the board once it's found out.
(Exhibit 158 screen-shared.)
BY MR. LEUNG:
**Q** I'm sharing my screen with you and displaying for you Exhibit 158. And you're free to pull that up on your computer. I'll also just show it to you on the Webex function as well.
**A** Okay.
**Q** Take your time to flip through it. It is a 46-page document. It's got a case caption on the very first page. It's entitled "Order Granting Plaintiff's Motion for Summary Judgment Against Defendants Liu and Wang."
And for the record, if you flip to the very last page, that's page 40.
If you flip to page 30 of 46, you'll see that it's dated April 20, 2017. And there's a signature block entitled "Cormac J. Carney, United States District Judge."
Do you see that?
**A** Yeah, I see that. Yeah.



**Q** Have you read this order of the court before, sir?
**A** No.
**Q** Did counsel for the defense describe this ruling by the judge for you as part of you preparing your opinions in this matter?
**A** No. Never seen it.
**Q** Now, it's your opinion that with respect to Liu, reasonable compensation in the form of a finder's fee as well as salary is $7,211,692 for the period of time from 2010, from inception date, through May 26, 2016.
That's your opinion in this case. Correct?
**A** Correct.
**Q** That's about 7.2 million.
And then reasonable compensation of Wang in 2013 and 2014, you have formed the opinion that that amounts to $367,215.
Right?
**A** Right.
**Q** Okay. Let's focus on your $7.2 million in reasonable compensation opinion.
I'm going to turn to page 9 of Exhibit 158. Judge Carney writes:
"Despite significant



investment, nearly no construction on the proton therapy center has taken place. Instead, Liu burned through the millions left after payments to himself, Wang, and the marketers on half-hearted attempts to convey the illusion of progress."
You don't disagree with that factual finding from the court, do you?
**A** I have --
MR. GOURAIGE: Objection to the question. He has no basis to agree or disagree with the factual finding of the court.
BY MR. LEUNG:
**Q** Do you agree or disagree with this factual finding by the court?
**A** I have -- I have no idea if it's right or wrong, if it's right or wrong. I mean, I don't know. I have no idea.
So we can continue to talk assuming that I agree with that, but I can't say that I agree or disagree.
**Q** Okay. So you don't disagree?
MR. GOURAIGE: Objection --

THE WITNESS: No --
MR. GOURAIGE: Objection.
THE WITNESS: -- nor do I agree. Yeah. I have no view.
(Reporter requests clarification.)
MR. GOURAIGE: Objection, that you don't disagree. I think the witness said he has no information to either agree or disagree.
THE WITNESS: My answer is I neither agree or disagree with this. I have no basis to know whether or not it's true.
BY MR. LEUNG:
**Q** Okay. Turning to page 19 of Exhibit 158. The court rules that there is no dispute that Liu and Wang received $6,714,580 and $1,538,000 of investor monies.
Do you disagree with that factual finding of the court?
MR. GOURAIGE: Again, same objection. Absolutely no basis to ask the witness that question.
BY MR. LEUNG:
**Q** Answer the question.
**A** My answer is, I have no basis to know whether that is true or not true and --



**Q** Okay.
**A** Yeah, yeah.
**Q** All right. But keep that $6.714 million number in mind. Okay?
**A** Let me write it down.
**Q** Let's turn to page 20, going into 21. The court ruled that Liu and Wang's ignoring the plain language of the private offering memorandum and appropriating investor funds for exorbitant personal enrichment -- I'm going to skip the parenthetical -- and enticing additional investors renders the terms of the private offering memorandum untrue.
Do you disagree with that factual finding of the report?
MR. GOURAIGE: Objection. Again, this witness is proffered as a witness to grant an expert opinion on reasonable compensation. He is not an expert on whether or not the judge's factual findings are correct.
BY MR. LEUNG:
**Q** Do you disagree with that factual finding, sir?
**A** I have no basis to agree or disagree with it. I have no facts to agree or disagree, basically.



**Q** Well, you've rendered opinions in this case to the effect that the compensation owed to Liu that would be reasonable would be in the range of $7.2 million.
Right?
**A** Yeah, right.
**Q** And I've read for you the judge's factual finding that Liu's receipt of $6.7 million in compensation is, quote, "exorbitant personal enrichment."
That factual finding by the court, does it have any relevance or impact at all in any way in your opinions in this case or give you cause for concern?
**A** It does not. It does not.
And the reason, again, my report is based on what would an employer have to pay an executive to fill the role, the role for which Liu was hired, based on his title. What would you have to pay -- What would you have to pay that person. Okay?
To me it's completely irrelevant what Liu received or did not receive. Okay?
My report is strictly what does the market tell us, what does it tell us a person with that title would be entitled to earn at the median of



the survey.
**Q** Your opinions assume that Liu did not commit securities fraud?
**A** My opinion has -- ignores that fact. What Liu did or Wang did is not relevant to my opinion.
My opinion is what will the market say. We're hiring somebody. What do we need to pay that person to do the job denoted in the title that they were hired to do.
MR. GOURAIGE: I would add an objection. Here again, I don't know why we're spending the time on this. This witness is not brought forth as an expert on whether or not Liu or Wang violated the securities laws.
He's brought here as an expert who has done a reasonable compensation study.
None of this examination about the judge's summary judgment ruling has anything to do with his expert testimony.
BY MR. LEUNG:
**Q** Turning to page 22 of Exhibit 158, the court found:
"Liu and Wang's receipt of millions of dollars of investor funds was unequivocally negligent.

No reasonable party managing the development of an EB-5-compliant proton therapy center in accordance with the representations made to investors would allow construction to languish while funneling millions of dollars to themselves, to foreign entities they controlled, and to foreign entities tasked with enticing more investors."

Do you disagree with that factual finding of the court?

MR. GOURAIGE: Objection. Again, this has nothing to do with the witness' designation as an expert witness under his reasonable compensation study. It is absolutely irrelevant to his testimony. And it's just basically, frankly, a waste of time.

BY MR. LEUNG:

**Q** Answer the question.

**A** My -- My response is, I have no basis to determine whether or not the receipt was negligent, whether what they did was reasonable or unreasonable.

I actually have no understanding of what



it was that Liu and Wang did or did not do with any funds that were raised for this program.

**Q** Well, were you asked to give consideration to those facts, the adjudication of securities fraud and the actual findings of the court?

Did counsel direct you to consider those exigent -- that exigent information in forming your opinions?

**A** He did not. And everything --

**Q** Did you ask him about it?

**A** Pardon me?

**Q** Did you ask about it?

**A** I did not. I did not because, again, it is irrelevant to the study that I had done, which is what would the marketplace pay people to fill these positions.

So what happened, what actually happened, is irrelevant to my determination.

And as I said before, this is the first time I've seen this summary judgment report or any other report related -- any legal report related to this entire matter aside from the SEC original complaint.

**Q** And, Mr. Ginsburg, if what actually happened is irrelevant to the opinions you formed



in this case, how do your opinions fit the facts of this case?

**A** I guess I'm not quite following what you're -- what you're asking.

**Q** We can move on.

In your report you opine that -- this is a quote:

"...our calculation of reasonable total compensation to Liu for the 2011-2016 period (including all commissions) is $7,211,692..."

Now, that $7.2 million is more than the $6.7 million in money referenced by Judge Carney in his order. He described that compensation as exorbitant and contrary to the representations made in the private offering memorandum.

Is "reasonable," as you use the term in your report, synonymous with "exorbitant"?

MR. GOURAIGE: Objection to the question. The judge's opinion was not conducting a reasonable compensation study to determine what the market would pay anyone performing the functions that Liu and Wang were performing. So this is like two ships passing each other in the



night.

What you're asking him, Gary, has absolutely nothing to do with his compensation study that he's described over and over again.

BY MR. LEUNG:

**Q** Is "reasonable," as you use the term in your report, synonymous with the word "exorbitant"?

**A** Well, the definition of a reasonable compensation study would be what is the market willing to pay an executive for providing services commensurate with what the position he or she was entitled. That's reasonable.

The judge's use of the term "exorbitant" would not imply -- Exorbitant would not generally imply reasonable. But perhaps --

And again, I haven't read the judge's opinion. It's not my place to do so.

But maybe the judge feels that it was exorbitant for what was actually done in the project. Okay?

My study doesn't relate at all to what was done in the project. Okay?

My study relates solely to what the market says is reasonable pay for doing -- for doing the work on that position.

(Pause)
Q Showing you what we previously marked as Exhibit 153, this is your rebuttal report dated April 9, 2021.
Want me to pull that up?
A Okay.
(Exhibit 153 screen-shared.)
BY MR. LEUNG:
Q I'm just going to read for you a little bit of this report you wrote. Third paragraph from the top --
Again, this is a letter addressed to Mr. Gouraige. Correct?
A Uh-huh, correct.
Q And you write:
"Irwin's qualifications demonstrate no experience or training in executive or other compensation matters; her firm does also not list this as an area of expertise on its website. I would therefore question whether Irwin or any member of her firm should be allowed to testify as an expert in this case in the area of the reasonableness of compensation paid to Liu and Wang."



Mr. Ginsburg, do you understand your role here to be to sit in judgment of what evidence is or is not admissible in this federal securities fraud enforcement action?
A No. It's --
MR. GOURAIGE: Objection to the question.
BY MR. LEUNG:
Q Please go ahead.
A That is -- That is not my role.
My role is merely to provide my report regarding the reasonableness of the compensation that a person in this situation should be paid.
But I will tell you that if counsel asks me to review the other expert's report, I feel that it is my role to let counsel -- to let counsel know what I feel about the other expert.
Q Regardless of what you were asked by counsel, I mean, you agree with me that your opinion on this front is inconsequential to the party's evidentiary disputes, right, which are going to have to be ruled on by the judge.
Do we agree on that?
MR. GOURAIGE: I object to the form of the question, that the opinion is



inconsequential to the party's evidentiary dispute.
He's an expert. He has looked at the qualifications of another expert. And based on his expertise in the area, he has opined an opinion that the other person is not qualified as an expert in this area. That's -- That's all he's done. He's rendered an opinion. The judge will make the decision.
MR. LEUNG: Have you finished your speaking objection?
MR. GOURAIGE: Yes, I stated my objection.
BY MR. LEUNG:
Q Mr. Ginsburg, you can answer now.
A Okay.
I know that it is the judge's role, duty, to determine whether or not a person is an expert.
Q At the June evidentiary hearing in this matter or at any evidentiary hearing in this matter, Mr. Ginsburg, do you plan to testify on opinions that you haven't disclosed in your two expert reports and the supplement dated April 2?
A No.
Q Are there anything in those materials that



you feel like you need to change to make it more complete or more accurate?
A Unless -- No, I would say not, unless for some reason counsel for the -- for Liu and Wang ask me to make some changes. You know, I will consider -- I will consider those. But, no.
MR. GOURAIGE: I will state this objection, Gary, for the record.
If the judge at the hearing were to direct questions to Mr. Ginsburg, I think he would be obligated to answer the judge's questions.
MR. LEUNG: Of course.
BY MR. LEUNG:
Q At this time do you need to clarify any of the testimony that you've given today?
A I do not feel so unless -- unless you have -- unless you want further clarification. I think what I have said is -- stands on its own.
I would -- I would state, though, that my review of what Irwin prepared just does not comport with reality. And that is that individuals who go to work or start up companies are entitled to compensation, are entitled to compensation, even if the venture does not succeed or come to fruition.

And I read Irwin as saying because -- You know, your compensation is entirely based on the success of the venture. And that's just not the way the world works. That -- I'd kind of just like to say that.

**Q** In your opinion according to your study in this case and the work that you've done in this case that you've been paid for in this case, reasonable compensation for a pre-revenue company has nothing to do with whether or not the executive has engaged in securities fraud, misappropriated millions of dollars from investors, absconded with the money by expatriating it to Chinese bank accounts, refused to abide by an order of the court to repatriate that money, and have not returned to the United States in any respect in the last five years.

Is that correct?

**A** That would be correct.

My determination of reasonable compensation is solely based on the job, the job position, the job position and the industry.

And what has been done, what actually transpired between the employer and the employee, or the employer and the executive is of no



consequence in this opinion.

(Screen-sharing stopped.)

MR. LEUNG: Thank you, Mr. Ginsburg. Pass the witness.

MR. GOURAIGE: I have no questions for the witness.

Thank you, Mr. Ginsburg, for taking the time to answer these questions today.

We would like to review the transcript. I guess a 30-day review, Marty?

THE REPORTER: Sure.

MR. GOURAIGE: Okay. Thank you.

THE REPORTER: And I would ask that everybody not go yet. I have just a few questions after we go off the record.

THE VIDEOGRAPHER: Going off the record at 1:58 p.m.

(Internet videoconferenced proceedings concluded at 1:58 p.m. EDT.)

(Discussion off the record)

THE REPORTER: Mr. Leung, is this regular delivery or expedited?

MR. LEUNG: I'm going to have to have somebody follow up with you on the order,



because I can't -- It's the federal government. We pay somebody to put in the order. It's a strange thing --

THE REPORTER: Okay. Well, I was told it was a three-business-day expedite.

MR. LEUNG: Yeah, it is. It is.

THE REPORTER: Okay. Fine. I just want to make sure that I'm clear on that.

Mr. Gouraige, are you ordering a copy?

MR. GOURAIGE: Yes. And we'll take it expedited, too.

THE REPORTER: Okay, perfect.

And then may I send all of the information regarding reading and signing to you, Mr. Gouraige?

MR. GOURAIGE: Yes, you can send it to me.

Ted, I'll send it to you and you can get it to your company counsel.

THE WITNESS: That will be fine.

(Deposition Exhibits 151 through 158 marked for identification.)

(Internet videoconferenced proceedings concluded at 2:02 p.m. EDT.)



CERTIFICATE OF WITNESS

I, THEODORE R. GINSBURG, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on April 16, 2021, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

_____ I have made corrections to my deposition.

_____ I have NOT made any changes to my deposition.

Signed: ____________________________
THEODORE R. GINSBURG

Dated this ________ day of ______________ of 20____.

(IF REQUIRED)
Sworn to and Subscribed before me,
this_______day of________________, 20____.

____________________
Notary Public My commission expires:__________

ERRATA SHEET

Deposition of: THEODORE R. GINSBURG
Date taken: APRIL 16, 2021
Case: SEC v. LIU, et al.
PAGE LINE
_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________
_____ _____ CHANGE: _____________________________
REASON: _____________________________

_____ _____ CHANGE: _____________________________
REASON: _____________________________

Signed___________________________
Dated____________________________

153

REPORTER'S CERTIFICATION

I, Marty E. McArver, Registered Diplomate Reporter and Certified Shorthand Reporter #2769 in and for the State of California, do hereby certify:

That the witness was administered the oath remotely by me pursuant to California Senate Bill 1146, signed into law on September 18, 2020, allowing the witness to be sworn remotely;

That the deposition was then taken via Webex internet videoconference before me at the time herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings heard and understood by me at that time; and that counsel requested that the witness read and sign the deposition transcript.

I further certify that I am not interested in the outcome of said action, nor am I connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of April, 2021.

_______________________________

MARTY E. McARVER, CA CSR #2769

154

**A**

**a.m** 2:21 8:1,12 64:9,12
**a/k/a** 1:8 2:8 3:13
**abide** 149:14
**ability** 24:7
**able** 12:9 24:7 27:17,24 29:14 54:18 95:23 104:8 104:15 124:14 126:19 128:13
**absconded** 149:12
**absolutely** 32:6 45:25 137:20 141:16 144:3
**accept** 50:9 70:19
**acceptance** 70:18
**accepted** 70:17
**access** 128:13
**accountant** 69:11,13
**accounting** 69:12
**accounts** 62:20 149:14
**accuracy** 24:2,14
**accurate** 25:19 27:22 30:6 31:4 32:1 65:20 72:25 108:4 112:20 130:2 148:2
**accused** 15:21
**ACH** 62:23
**acquire** 127:21
**acquired** 65:14
**acted** 35:23 42:17 44:1,16
**acting** 35:25
**action** 11:16 14:16 46:8 71:2 90:8 146:4 154:19,20
**activities** 134:2
**actual** 85:10 142:5
**actuality** 104:13
**add** 140:10
**additional** 30:25 94:13 101:24 123:4 138:11
**additive** 93:12
**address** 11:21 58:9 66:6
**addressed** 36:4 89:2 145:12
**adjudicated** 72:13,14
**adjudication** 142:4
**administered** 11:18 154:5
**administering** 9:10
**administration** 9:25 10:19
**administrator** 11:18
**admissible** 146:3
**admitted** 69:3 70:9
**advertising** 60:1
**advice** 13:1 27:4 34:24
**ago** 13:8,11 45:1 68:17 70:4 70:12
**agree** 22:7 24:11,12 41:10 50:9 51:14 69:23 132:20 136:13,16,22,22 137:3,8 137:10 138:23,24 146:19 146:23
**agreed** 70:18 82:3
**agreement** 5:16 7:4 55:23 55:24,24 56:13,14,24 58:2 58:3 74:9 77:10 78:8,11 79:2 80:3,11 82:2 86:14,20 87:10,14,24 119:3 120:25
**agreements** 16:22 34:13 57:14 75:11 77:5,15,20
**AGRX** 74:7
**ahead** 18:9,9 20:11 36:13 67:12 102:12,15 130:22 146:9
**al** 8:5 153:3
**alike** 71:16
**allow** 141:5
**allowed** 39:15,16 145:23
**allowing** 154:8
**allows** 59:19
**alternative** 107:10
**amount** 16:18 17:9 34:10 43:2 57:9 83:12,12 92:19 92:21 93:13 95:22,24 96:2 96:9 114:21 131:4,19 133:9 134:1
**amounted** 36:22
**amounts** 20:20 126:15 135:18
**analyses** 36:25
**analysis** 18:4 21:20 22:4,6,8 30:4,8 36:23 37:3 40:12,16 40:21 41:2,7,12,16,20,25 42:13 43:1,1,8,17,19 44:8 46:13 52:6 53:13 56:5 59:12 60:24 82:23 83:8 88:5 94:19,21 104:12 118:15 122:13 123:6
**analyze** 53:2
**analyzed** 20:2
**and/or** 99:10 152:10,12
**Angeles** 1:11 2:11 3:7 28:8 60:7 109:7 110:3
**annual** 85:7 111:24
**answer** 14:9 26:19 27:1,3,9 27:10,11,12 44:5 69:15 119:20 130:20 137:9,23,24 141:20 147:15 148:11 150:8
**answering** 67:17 69:14
**answers** 26:2,3,22
**anticipate** 50:13
**apart** 93:12 101:22
**appear** 105:1 133:13
**APPEARANCES** 3:1
**appears** 30:9,10 31:8 32:6 105:7 130:1
**Appendix** 5:6,7 6:23 33:5,8 33:15 73:24 122:21,23 124:1,11 129:7 130:9,13 130:25 132:11
**applicable** 25:6
**application** 29:12 31:12 101:1
**applied** 108:23
**apply** 109:6,25
**approach** 21:3,5
**appropriate** 43:2 102:22 120:3 130:17
**appropriated** 35:15
**appropriating** 138:9
**approximate** 62:11
**approximately** 112:18,24
**April** 1:19 2:22 5:10,14 8:1 8:10 30:24 31:5,21 32:2,14 32:14 48:25 49:13,15,15 49:21 50:15,21 57:7,23 65:1 134:21 145:4 147:23 152:9 153:2 154:23
**arbitration** 67:22 68:1,14,15
**arbitrator** 68:15 69:25
**area** 24:17 69:5 105:22 109:7,18 110:8,9 125:5 145:20,24 147:5,7
**areas** 99:21
**argument** 71:14
**arrive** 18:1 127:12
**arrived** 91:14
**articles** 66:15
**aside** 12:18 67:6 91:10 98:3 142:22
**asked** 18:16 19:11 39:12 47:22 53:15,23 76:12 103:12 142:3 146:18
**asking** 13:1 67:16,17 91:4 103:19 143:4 144:2
**asks** 146:14
**asleep** 61:8
**aspects** 67:2
**assessed** 82:8
**assessing** 34:3 35:10,14,21 36:6
**assessment** 17:18 19:3 42:7 42:19
**assessments** 17:5 24:21 34:5
**Assessor** 5:21 6:4,9,13 73:18
**asset** 63:11,25
**assets** 63:13
**assigned** 81:17,25
**assist** 52:4 71:1
**assisted** 51:18,20 59:6
**assists** 71:22
**associate** 123:4
**associated** 53:17 67:2
**associates** 51:21,22
**assume** 20:8,8 26:15 48:16 86:1 89:12 95:22 118:14 133:25 140:2
**assumed** 109:12
**assuming** 105:25 136:21
**assumption** 86:5 96:13 109:11
**assumptions** 60:25 106:8 109:7,17
**attach** 104:4
**attached** 53:14 152:11
**attempts** 136:7
**attention** 48:8 50:19 81:15 86:17 88:20 93:8 121:5
**attorney** 68:19,19
**author** 81:8
**available** 102:24 110:22 111:4
**Avenue** 123:14
**aware** 63:22 64:1 90:6 92:11 117:13 121:24

**B**

**b** 5:7 33:5,8,15 66:1 81:12
**back** 17:23 32:25 44:5 51:7 54:13 57:23 61:25 62:2 64:11,13 70:23 72:19 83:24 86:10 88:7,9 100:17 102:21 106:2 107:2,4,19 122:6 126:25 130:3 131:22
**background** 31:1,6 49:7 89:18 90:3,7,10 91:2 95:13 96:19
**backing** 113:19,19
**bad** 133:10
**badly** 44:1,17
**ballpark** 12:23
**bank** 149:13
**bar** 29:8
**barring** 26:14
**base** 102:3,7
**based** 18:14 20:19 57:22 58:16 71:24,25 80:20 85:12 94:17 95:6 99:3,24 100:20 102:21,22 110:16 114:4 116:4 118:19 122:24 127:13 139:16,19 147:4 149:2,21
**basically** 46:5 53:1 55:12 138:25 141:17
**basis** 37:5 81:22 102:17 136:13 137:10,20,24

138:23 141:21
**Bates** 78:22 101:3 104:25 108:1 128:25
**bear** 24:2 37:13 56:16 64:22 70:16 88:4 92:14 101:3 104:20 110:12 132:21 133:14,17,21
**beared** 36:23
**bearing** 93:4,5
**bears** 64:16 78:7,22 104:25 107:25 128:25
**began** 46:1
**beginning** 2:20
**begins** 8:3 89:19 90:3 96:21
**behalf** 2:19 9:24 17:11 39:11 43:6 87:10,14
**believe** 22:11 23:22 33:10 33:17 45:10 46:20 49:7 52:16 61:6 63:23 70:15 88:14 91:11,21 100:16 131:5,7
**believes** 39:5
**benefits** 66:24 81:3
**best** 27:23 35:6,12,17 36:14 36:20 61:9 66:8
**better** 36:1 56:6 67:18 116:10 122:9 123:23 125:10
**Beverly** 1:10 2:10 5:24 6:7 28:6,7 75:13,20 77:6,15 85:1 91:25 93:25 97:3,10 97:19,21 98:1,14,20 100:13 101:10,14 103:13 105:19 108:8,10 112:5 114:10 115:24 116:2 117:3 117:11,15,19,22
**beyond** 38:12
**bigger** 54:25 62:8
**Bill** 9:4 154:6
**billings** 62:12
**bit** 15:6 69:9 91:2 112:1 120:23 131:12 133:8 145:9
**blank** 61:7
**block** 86:22 87:1,19 134:22
**blocks** 86:20 87:5
**board** 39:22 43:22 44:13 133:1 134:4
**book** 60:15
**bottom** 84:24 106:17
**BOUND** 5:2
**box** 108:21
**boy** 66:2
**break** 64:3,15 107:11,13
**briefly** 25:9 70:3
**bring** 26:23 84:3,5,5 88:8 95:16,18
**broad** 66:12
**broke** 15:6
**broken** 38:9 116:20 131:22 131:23
**brought** 54:22 140:13,15
**build** 113:23
**building** 112:6
**built** 112:7
**bullet** 73:15,22 74:2,8
**bunch** 126:5
**burned** 136:3
**business** 13:13,23 19:18 20:17 21:14 22:10,19,21 23:1,6,9,10,25 36:19 42:12 42:18 43:15 66:16 67:1 68:13 72:9 75:1 76:3 81:19 81:20 91:9 99:17 100:8,9 100:10,14 107:3 109:19 113:17,24 116:2 119:9,16 121:10,16 124:25 133:20

**C**

**C** 1:8 2:8 3:12 5:19 7:6 78:15 86:22 119:4
**C-a-t-h-e-r-i-n-e** 51:24
**C-o-n-n-a-i-r** 45:12
**CA** 154:25
**CA-Certified** 1:24
**calculation** 62:4,5,6 88:13 88:17 98:24 143:8
**California** 1:2 2:2 3:7 8:8 9:4 45:18 60:8 78:13 109:8 110:3 154:4,6
**call** 113:20 126:16
**called** 78:15,16 80:11 81:4,6 132:3
**canceling** 87:24
**cancer** 57:10 66:17,21 67:3 80:16,25 90:18 116:14,18 117:1 121:23
**cap** 131:8,13
**capacity** 93:24 97:7
**capital** 57:18 58:7 112:12,12 113:19 114:4 119:10,16 123:15
**capped** 131:2,19
**caption** 134:14
**card** 62:24
**care** 36:7
**career** 12:20 33:24 36:24 38:14 66:6 68:12 72:7 81:2 112:9 114:2 115:20
**Carlyn** 31:22 32:3
**Carlyn's** 71:9
**Carney** 50:6 134:22 135:24 143:14
**case** 1:6 2:6 8:6 11:2,2,9 12:4,4 14:18 20:1,16 22:12 25:2 30:4,8 31:7,24 32:5 32:10 33:18 35:1 39:22 40:13,17,22 41:2,7,12,16 41:21 42:7,14,19 43:2,8,17 44:23 47:2,10 49:2,7 50:1 51:19 52:5,15 53:11 55:18 63:2,24 64:17 66:5 67:13 68:3,6 69:25 70:3,3,6,15 75:7,19 77:14 79:16 82:24 85:4,5 88:5 94:3 103:7 111:25 112:2,8 118:15 120:13 121:18 122:25 126:4,4 127:18 130:14 131:1 132:4,8,13 134:14 135:13 139:2,13 143:1,2 145:24 149:7,8,8 153:3
**cases** 68:22,23,24
**cash** 102:6
**categories** 17:3,13
**category** 17:17,18
**Catherine** 51:23 61:19 62:5
**cause** 120:12 139:13
**caused** 61:15
**causes** 26:10
**center** 1:9,10 2:9,10 3:16 5:18,24 6:7,16 28:7,17 57:1,2,11 58:4,6 74:12 78:13 79:3 87:2 90:19 95:24 96:25 97:3,19 98:14 100:14,16 101:10,14 105:9 108:8,10,15 114:10 116:15 117:1 121:4,15,23 136:2 141:3
**Center's** 103:13
**centers** 66:17
**Central** 1:2 2:2 8:7
**CEO** 93:2 111:17,18
**certain** 18:5 28:3 39:14 80:24 95:22 125:9,11,25
**certainly** 17:20 30:9,9 31:8 46:14 51:10,10,16 65:17 102:8 129:10
**CERTIFICATE** 152:1
**CERTIFICATION** 154:1
**Certified** 2:22 154:3
**certify** 152:7 154:4,18
**chance** 30:22 115:7,8
**change** 94:14 110:7 122:11 148:1 153:4,6,7,9,10,12,13 153:15,16,18,19,21,22
**changed** 48:21 61:12,14
**changes** 148:5 152:10,12,15
**characterization** 36:10
**charged** 12:11 56:7,8,10
83:10
**Charles** 1:8 2:8 3:12 5:19 7:6 8:5 56:25 74:10 78:15 86:22 119:4
**chart** 19:15 93:11
**check** 62:24 128:16 129:13 129:23
**checkbox** 131:13
**checked** 62:19,19 129:23
**checking** 129:21
**chief** 91:25 92:12,18,19 94:4
**Chinese** 131:25 132:4 149:13
**choose** 27:13
**civil** 10:1 11:3 34:25
**claim** 13:18
**claimed** 12:7
**clarification** 15:4 38:1 65:24 76:18 81:10 112:21 118:12 119:24 131:11 137:5 148:18
**clarify** 148:15
**classification** 19:22
**classifications** 116:9
**clear** 94:10 101:18 151:8
**clearly** 130:16
**clerical** 52:20
**Cleveland** 110:5,7
**client** 12:10 13:17 14:25 18:12,16,21 19:12 20:13 20:15,16 21:15,16,24 22:16,21 23:8,14,18,25 24:10 39:21 70:4
**client's** 21:8 22:18 69:10
**clients** 13:1 22:24,25 24:15 37:2
**clinic** 67:3 81:4
**clinical** 66:23
**close** 9:23 107:7 126:8
**code** 15:15,18 19:22 21:8 22:16,25 23:1,2,3,19 24:1 24:1 60:5,6 61:13,14 76:12 109:11 110:18 111:9 116:4 116:6,21,25 117:9 118:6 118:10,13,21 120:3,8,8 122:1,8
**code/the** 22:15
**codes** 23:5,6 24:6,7 105:20 109:9 110:16,20,21,25 111:4,4 116:8,22
**collectively** 32:19
**column** 114:15
**come** 29:7 62:21 80:14 96:10 98:16 99:25 110:1 126:19 148:25
**comes** 91:22

**comfortable** 126:20
**coming** 28:4 103:23 121:23 121:24
**commenced** 107:3
**commensurate** 86:2,7 100:1 144:11
**commission** 1:5 2:5 3:4 55:25 56:10 57:25 73:23 74:5 99:12 126:15 152:23
**commission/finder's** 94:15
**commissions** 53:3 55:19 56:1,4,7,8 58:17 59:1 77:24 123:8 131:3,18 143:11
**commit** 140:3
**common** 11:20 12:10
**commonly** 59:24
**communicate** 47:8
**communicated** 47:1
**communicating** 46:1
**communication** 47:6
**comp** 83:8
**companies** 16:7 21:11,12 21:13,17,25 39:25 60:3 71:15,19 74:6 82:13 92:13 92:17 93:1 113:16,18 114:25 125:24 126:6 133:7 148:23
**company** 19:1 21:2 22:17 36:7,19 37:7,13 38:16,20 39:5,6,10,11,19,22 42:11 42:18 60:5,6 71:18 72:8,15 78:14 81:14,18,21,21 82:1 85:24 112:13 113:10,13,13 113:25 119:7,11 121:8,12 122:8 125:21 149:9 151:19
**Company'** 78:15
**company's** 21:7 22:10 43:22 44:12
**compare** 53:2 125:8
**compared** 110:5
**compensate** 16:17
**compensated** 31:2
**compensation** 5:21 6:4,9,13 11:22 12:16 13:13,20 15:14,16 16:10 17:8 18:2 18:21 19:7 21:19,21,25 22:1 24:4,20 30:4,8 31:6 31:23 32:4 33:24 34:7,24 35:10,15,20,22 36:4,6,16 36:25 37:3 38:7,8,17 39:8 41:17,22 42:8,13,20 43:3,9 43:17 46:5,6,13 59:24 63:24 65:21 68:25 69:21 70:1 71:7,10,16,23 72:12 73:18,25 82:8,12 83:15 92:8,14,15 93:11 94:5,13 99:3,9,14 108:4,18,24 110:12 125:22 127:17 132:18,22 133:12,15,22 135:9,16,22 138:17 139:2 139:9 140:16 141:16 143:9 143:15,22 144:3,9 145:18 145:25 146:12 148:24,24 149:2,9,20
**compete** 81:21
**compile** 21:22
**complaint** 57:24 74:3 80:21 88:14 91:12,18 92:6 95:7 95:21 96:6,11,12 97:13,24 98:3,17 100:21 117:8 121:24 142:23
**complete** 16:4 33:8 49:1,24 50:25 73:1 122:23 129:5 148:2 152:8
**completely** 38:18 112:20 139:21
**compliance** 11:19
**complies** 9:25
**comply** 27:24 50:7
**component** 59:12
**comport** 148:21
**comported** 104:7,13
**computer** 61:8 134:10
**concern** 12:15 120:12 139:14
**concerned** 15:13 44:3,20 69:17
**concerning** 33:24
**conclude** 89:6
**concluded** 150:19 151:24
**concludes** 97:15
**conclusion** 18:1 39:18
**conclusions** 24:2 73:14 89:10
**conduct** 22:8 36:22 82:13
**conducted** 1:20 9:2 36:18 41:19 42:11 46:9,13 127:21
**conducting** 24:20 36:24 42:18 133:20 143:21
**confer** 14:11
**confirm** 106:6
**confusing** 26:10
**confusion** 26:11
**conjunction** 75:18 90:14
**Connair** 45:12,16,22 63:17
**connected** 45:8 154:19
**connection** 12:7 19:3 32:12 33:2 34:4,12 65:22,25 75:2 77:13 129:6 131:4,18
**consequence** 150:1
**consider** 74:21 75:1,11,17 77:4,13,19 121:1 125:4 142:6 148:6,6
**consideration** 19:6 142:3
**considered** 51:1 72:22 73:2 124:2 130:13
**consistent** 18:5 81:24 82:18
**construct** 90:17 95:1
**construction** 95:23 136:1 141:5
**consulting** 17:16 34:23 59:24
**contacted** 44:22 45:2,3,3,10
**contain** 102:25
**contained** 89:20 123:4
**contains** 31:21
**context** 17:4 34:25 46:12 132:1
**contingent** 63:3,24
**continue** 136:21
**continued** 6:1
**contract** 82:19
**contracts** 17:12
**contractual** 14:22
**contrary** 143:16
**contrast** 27:2
**contribution** 52:14 57:18 58:7
**contributions** 100:13
**controlled** 141:8
**conversation** 20:10 46:10 61:18 125:20
**conversations** 76:22
**convey** 64:15 136:7
**copy** 30:6 31:4 32:1 56:18 88:23 108:4 128:10 129:5 130:2 151:9
**Cormac** 134:22
**corner** 108:19,22
**corporate** 16:19,20 24:8 35:16 41:1,6,11,15 43:7 47:13,18 58:6 75:17 76:3 92:8 99:19 133:14,20
**corporation** 79:24 80:3,6
**correct** 11:7 15:12,19 35:2,3 40:18,19,23,24 41:3,4,9,13 41:14,18,23 42:10,15,16 42:22,23 43:4,18 48:18 50:2 55:2,4 57:4,19,20 58:21 59:3,9 65:6 67:4 72:24 73:3,4,4 74:18,23 75:4,8,9,21 76:4 77:1,4,7,8 77:17,18,18,23 79:8,9,17 79:18 82:25 86:9,9 87:8 94:1,2,16 97:5,11 98:9 99:5,6,21,22 101:20 103:9 104:10,17,18 105:16 106:9 106:10 108:17,21 109:1,14 109:15,21 110:13,14 111:2 118:18,19 122:14,15 123:12 135:13,14 138:19 145:13,14 149:18,19 152:8
**corrections** 152:10,13,14
**correctly** 108:16
**correspond** 111:14
**corresponding** 108:12 110:21
**corresponds** 108:8,10,14 118:10
**cost-of-living** 62:2,10 102:22 109:25
**counsel** 8:16,18,20,22 9:21 14:6,11 25:17 26:18 27:3,8 30:2,25 45:7,9,21 46:21 60:19 64:15 68:23 89:1,13 89:14 135:4 142:6 146:14 146:16,16,19 148:4 151:19 154:15,21
**counseling** 34:12
**country** 124:19
**County** 1:11 2:11 28:8
**couple** 45:14 56:21 68:21 86:19 107:9
**course** 28:4 36:24 42:25 47:2,9,21,25 60:15 79:12 81:2 112:17 114:2,5 119:14 148:13
**court** 1:1 2:1 8:7,15,25 12:1 12:25 13:5 14:18 17:14 25:14 36:5,18 68:22 69:3,6 69:24 70:8,17 135:1 136:10,14,17 137:14,18 138:7 139:11 140:22 141:12 142:5 149:14
**court's** 36:11
**court-ordered** 63:11
**courtroom** 26:5
**cover** 25:8
**covered** 120:22
**covers** 59:25
**CPA** 1:17 2:19 4:3 9:16 68:20
**create** 21:12,16 95:4,10 113:24
**created** 90:16 94:25
**credit** 62:24
**criteria** 125:11
**CSR** 154:25
**CUMMIS** 3:14
**current** 61:20 65:15 126:13
**cut** 13:3 54:25 55:6 58:11,25 61:1 102:14 123:3

**D**

**D** 52:23 55:13,18 58:17 60:24 73:23 122:24 123:5 123:17 124:2,8 131:14,24
**D-a-v-i-s** 51:24
**D-e-l-s-k** 132:9
**data** 18:15,17,21 19:4,21,23 19:23 20:20 21:22 22:13 24:25 38:9 40:4,5 50:25 53:5 54:22 72:22 73:1 105:22 106:8 108:24 109:5 120:6 125:4 127:25 128:8
**database** 21:9 101:19 104:9 108:25 110:1 127:19
**date** 8:10 26:24 48:17 50:4 62:12 84:16 85:8 88:14,16 88:18 107:4 126:11,11,13 135:11 153:2
**dated** 30:3,24 31:21 48:15 48:24,25 56:24 74:9 77:20 87:5 122:19 134:21 145:3 147:23 152:19 153:25
**dates** 105:21
**Davis** 51:24 52:4,6 53:16,20 54:5 61:19 62:5
**Davis'** 52:22
**day** 152:19,22 154:23
**day-to-day** 79:23 80:2,5
**deal** 16:8 43:23 44:14
**deals** 112:12
**dealt** 20:9 121:20
**decide** 16:16 103:21
**decided** 56:11
**decision** 18:18 40:2 147:9
**declare** 152:4
**deducted** 12:9 15:16
**deductible** 13:19,22
**deduction** 12:14
**deductions** 69:18
**deemed** 69:6 70:8
**defendant** 28:7 63:9,10 105:16
**defendants** 1:12 2:12 3:12 6:22 8:23 9:24 134:17
**defense** 1:18 25:16 44:23 45:21 64:15 129:5 135:4
**define** 44:1,17
**definition** 144:8
**degree** 42:18 109:18
**delicatessen** 111:17
**delineated** 130:16
**delivery** 150:23
**Delsk** 132:8
**demonstrate** 145:16
**denoted** 140:8
**department** 62:20
**dependent** 24:14
**deponent** 9:6,10
**deposed** 10:13,25 11:5,8,11 12:19
**deposition** 1:16 2:18 6:1 8:4 8:9,25 9:1,7,8,11 67:20 151:21 152:6,14,15 153:2 154:9,16
**depositions** 25:9 67:6
**describe** 55:9 112:10 135:4
**described** 33:22 97:23 143:15 144:4
**description** 5:4 6:3 7:3 19:12 81:8 86:1,3,8 91:15 101:25 102:11 103:2,5,21 104:4,7,14,16
**descriptions** 102:23
**designated** 32:9 116:1
**designation** 141:14
**designed** 90:17 95:1
**designing** 16:17 17:7 34:7
**Despite** 135:25
**detail** 105:14
**detailed** 21:21 23:5 65:9
**determination** 142:18 149:20
**determinations** 34:9
**determine** 37:2 112:17 113:12 141:22 143:22 147:18
**determined** 19:20
**determining** 16:14,18 17:3,9
**detriment** 43:15
**development** 141:2
**devote** 81:14
**difference** 23:2,4 105:4,7 106:11 111:22,23 114:13 115:14 120:17
**different** 21:3 27:3 60:25 70:20 83:6,7,20,21 105:24 106:12 107:1,4
**differently** 29:10
**difficulties** 128:15
**Diplomate** 2:23 154:2
**direct** 47:6 121:5 142:6 148:10
**directing** 48:8 50:19 86:17 88:20 93:8
**direction** 154:13
**directors** 39:22 43:23 44:13
**disagree** 136:9,13,16,23,24 137:7,8,10,17 138:13,21 138:23,24 141:11
**discharge** 81:16
**disclose** 14:6
**disclosed** 33:11 48:20 70:25 94:6 96:10 147:22
**disclosing** 14:24
**discount** 61:24
**discounted** 102:21
**discuss** 59:7 89:7 131:8,11
**discussed** 46:14 53:8 54:23 102:20 133:4,4
**discusses** 31:6 32:3 71:4
**discussing** 30:3,7
**discussion** 21:20 75:12 109:2 134:4 150:21
**disparate** 125:13
**display** 31:11 64:20 128:9
**displaying** 33:1 84:7 86:13 88:21,24 100:25 107:23 130:4 134:9
**dispute** 11:12,25 13:15,17 17:4 26:23 34:4 68:13,14 70:5 137:14 147:2
**disputed** 69:25
**disputes** 16:15 146:21
**distant** 60:16
**distinct** 99:11
**distinction** 67:19
**District** 1:1,2 2:1,2 8:7,7 134:23
**divided** 112:25
**dividend** 15:17
**dividends** 13:21
**DIVISION** 1:3 2:3
**doctors** 117:25
**document** 11:19 29:22,25 30:12,19 31:12,16 33:4 78:3,7 81:9 101:1 115:25 118:25 129:25 134:14
**documents** 73:12,13 128:20
**doing** 16:12 22:17 25:4,22 35:18 37:12 67:20 113:9 113:10 129:21 144:24,24
**dollar** 94:5
**dollars** 18:13 115:15 140:24 141:7 149:12
**door** 19:9
**doors** 112:6
**download** 29:5
**downloaded** 60:17
**Dr** 90:15,22 91:16,24 92:7 92:12 94:3,18
**drafted** 32:1 52:12
**drawing** 67:19 120:5
**drill** 23:16,17
**Ds** 6:18 52:7 53:1,9,16,21 54:1 56:3 58:24 61:2 124:15 126:7 128:23 129:6 131:7,7
**duly** 9:17
**duties** 19:14 21:7,8 24:23 41:1,6,19 42:2 79:11,21 81:13,23 82:18 83:13 86:2 97:11 100:1
**duty** 147:17

**E**

**E** 1:24 2:22 66:1 154:2,25
**e-mail** 63:19
**e-mails** 44:25 45:14
**earlier** 20:9 70:3 94:23 102:19 109:2 120:23 125:20 128:15
**earn** 139:25
**easy** 120:18
**EB-5** 1:10 2:10 6:11 7:5 28:13 53:1,17,19 54:6 56:6 58:8 59:2 65:22,25 66:7 97:1 100:12 105:19 108:12 118:4 119:4,9,16 121:10 121:16 122:8 124:10 125:5 130:12,24 131:16
**EB-5-compliant** 141:2
**EB-5s** 54:1 124:21
**EB5** 123:14
**Economic** 73:16
**Edgar** 21:9 52:25 53:16 54:6 54:12 66:1 123:3,8
**EDT** 2:21 8:1 150:20 151:25
**education** 33:16
**educational** 33:9
**effect** 125:25 139:2
**efforts** 81:15
**Egnyte** 28:22 128:14
**eight** 128:19
**eight-page** 29:21
**either** 19:20 23:12,13 50:14 120:8 137:8
**electronic** 125:2
**eliminated** 55:14
**employ** 117:22
**employee** 37:18,21 38:3 79:22 81:3,14 103:18 115:5 119:12 121:13 149:24
**Employee'** 78:16
**Employee's** 79:11,21
**employees** 71:15
**employer** 18:3 24:24 38:3 39:15 42:1 59:21 72:2 76:8 99:24 114:17 139:17 149:24,25
**employers** 16:16,22 39:16 60:2
**employment** 5:16 7:4 16:22 17:12 34:13 56:24 58:3

74:9 77:4,15,19 78:8 79:2 79:11,21 86:14,20 87:9,13 119:3,13 120:25 121:13
**encountered** 36:16,17
**endeavor** 26:12
**enforcement** 71:2 146:4
**engage** 16:7,7 104:5,11
**engaged** 17:16 40:15,20 43:14 46:22 82:13 149:11
**engagement** 15:24 31:2 32:13 46:2,4,17 47:21,25 51:10 63:7,7 70:12
**engagements** 12:18 16:3 33:23 34:3,25 35:9,13,19 36:4,16
**English** 87:20
**enrichment** 35:16 138:10 139:10
**entered** 20:4
**enticing** 138:11 141:9
**entire** 124:1 142:22 152:5
**entirely** 57:22 149:2
**entities** 41:1,6 43:7 47:13,18 56:6,12 75:12,19,24 76:3 76:10,16 83:7,11,13,21 84:15 85:6,14 92:8 93:16 94:4 98:8 99:15,19 100:11 100:20 106:7,20 107:3 112:3 113:5 127:22 141:8 141:9
**entitled** 33:4 41:17,21 42:21 43:3,10 55:25 71:10,13 79:11 94:7,12 98:24 99:3,7 108:20 134:15,22 139:25 144:12 148:23,24
**entity** 28:9 55:13 57:3,15 58:6,7 100:22 105:15 118:20 121:15,20 123:14 132:3,7,12
**entity's** 99:17 100:8 120:9
**equivalent** 26:4
**ER** 76:13
**ERI** 52:8,19 59:7 61:3,4,4,5 61:20 73:17 101:8,9,16,22 101:24 102:24 104:9,15 108:4 111:2 127:18
**Errata** 152:11 153:1
**error** 29:2,8
**Esq** 3:5,15
**essence** 112:13
**estimate** 35:6 58:23 62:14
**estimation** 113:3
**et** 8:5 153:3
**event** 26:20
**everybody** 109:23 150:14
**evidence** 20:4,7 57:7 146:2
**evidentiary** 50:1,6 146:21 147:1,19,20
**exactly** 20:3 85:11,17 88:16 88:18
**examination** 4:5 10:4 140:17
**example** 18:19 39:3 105:18 105:25
**excess** 51:11 58:23
**Exchange** 1:5 2:5 3:4 57:25 73:23 74:4
**excise** 16:19 17:10 34:10
**exclude** 56:12
**excluded** 12:1
**excluding** 56:3
**exclusion** 53:9 54:24
**excuse** 16:6 21:7 45:11 54:12 56:23 61:7
**executed** 77:5 87:9,13
**executive** 5:21 6:4,9,13 11:21 12:16 15:14 16:10 17:6,8,19 18:1,13,17 19:7 19:12,13,15 24:3,4,23 33:24 34:6,24 35:10,15,20 35:22 36:3,6,15,18 39:5,9 39:18 42:1,13,20 43:2,9,16 46:12 68:24 70:1 73:17 91:25 92:12,18,19 94:4 103:18 110:11 125:21 132:17,21,25 133:8,11,15 133:22,25 134:4 139:17 144:10 145:17 149:10,25
**executive's** 21:7 72:15
**executives** 16:16,17,21 17:12 20:17,18 21:21,23 22:1 34:8 38:7,8 71:15,20 72:8 126:16
**exempt** 123:5
**exhaustively** 19:2
**exhibit** 5:4,5,9,13,16,21 6:3 6:4,18,20 7:3,4 28:23,24 29:1,18,24 30:1,5,12,13,15 30:23 31:3,13,14,19,20,25 32:23,25 33:15 48:6,8,12 48:20,23,25 49:4,8,10,11 49:17,19,20,22 50:14,14 50:18,20,24 51:3,6 60:18 64:21,23 65:1,3,6 70:25 72:17,20,21,25 78:4,5,10 78:20,22,24 79:4 84:8,9 86:10,11,13 87:14 88:11 88:21 93:9 98:5 100:23 101:2,5,7,23 104:20,22 107:7,21,24,25 108:3 118:3,23 119:1,1 120:20 120:22 122:16,19,22
128:10,11,18,19,21,24 129:4,9 130:4,7 134:6,9 135:23 137:13 140:21 145:3,7
**Exhibits** 5:1,2 6:1 7:1 32:16 32:18 151:21
**exigent** 142:7,7
**existed** 80:12
**existence** 117:5,13
**exorbitant** 35:16 138:9 139:9 143:16,19 144:7,13 144:14,19
**expand** 125:18
**expatriating** 149:13
**expedite** 151:5
**expedited** 150:23 151:11
**expenditure** 39:20 40:2
**expense** 12:14 15:16 39:9
**expenses** 12:7 39:11,14,23 39:24 53:4 69:18,21 123:9 131:3,17
**expensive** 110:4
**experience** 33:10,16,20 37:15 145:17
**expert** 1:18 10:24 11:5,15 12:13,20,24 13:4,9 15:12 15:23 16:3,4 17:14 32:9,10 32:13,19 33:12,21 35:1 48:11,21,23 52:15 69:2,6 69:13,25 70:6,9,14,18,19 70:25 73:8,9 88:4 103:6 118:15 123:6 138:17,18 140:13,15,19 141:15 145:23 146:17 147:3,4,7 147:18,22
**expert's** 146:15
**expertise** 24:17 145:20 147:5
**expires** 152:23
**explain** 35:25 120:1
**explained** 53:15 58:11 83:19 90:9,10 102:24
**explanation** 20:13 115:22
**express** 49:25
**expressed** 46:4 50:14
**extend** 119:12 121:12
**extent** 25:10 76:14,19 89:1
**extremely** 71:5

**F**

**f/k/a** 1:10 2:10
**face** 71:14
**facilities** 116:10,11,13
**facility** 10:22 11:2,12 12:3,8 68:7 79:25 80:7,8,11,15,18 80:24 81:5
**fact** 25:4 38:19,20 39:3 67:23 71:1,6,22 92:14 93:6 140:4
**factoring** 62:10
**factors** 108:23
**facts** 50:25 58:1 61:12 72:21 73:1 83:5 99:4 138:24 142:4 143:1
**factual** 64:16 82:22 136:9,14 136:16 137:17 138:13,19 138:21 139:7,11 141:11
**fair** 24:18 25:24,25 26:16,17 41:8 43:11,12 75:25
**fairly** 65:9,20
**falls** 61:8 133:8
**familiar** 21:10 132:3,7,12
**far** 25:22 44:2,3,18,19 59:2 114:25
**Fax** 3:8,19
**February** 61:22,23 77:6
**federal** 10:1 12:9,15 26:5 120:11 146:3 151:1
**fee** 94:15 99:12 126:15 135:10
**feel** 14:10 88:22 90:12 126:19 146:15,17 148:1,17
**feeling** 14:8
**feels** 144:18
**fees** 46:18 53:3 55:14 58:17 59:1 62:15 63:2 93:12 123:9 125:14 131:3,18
**felt** 47:22 56:2,2,3
**field** 55:10 81:3
**fields** 85:6,14
**figure** 111:15 113:1,2 114:1 125:16 127:12
**figured** 24:10
**figures** 102:9 105:24 106:6 114:2
**figuring** 113:13 133:23
**file** 28:22 29:4 126:25 128:14,23 129:11
**filed** 14:16 55:13 57:24 70:17 74:3 80:21
**files** 125:2 131:23
**filing** 123:14
**filings** 19:20 21:10 23:14 117:10 118:20 124:2,8
**fill** 72:1 139:18 142:15
**filled** 71:25
**filtering** 108:23
**final** 95:12
**finalized** 48:17
**finalizing** 48:19
**finally** 97:14 109:11
**finance** 124:24

**financial** 71:18,24
**find** 21:6 53:1 55:6 111:9 113:11 122:7 125:2
**finder** 67:23 71:1,6
**finder's** 93:12 99:12 123:9 125:14 126:15 135:10
**finding** 36:11,22 72:14,15 136:10,14,17 137:17 138:13,21 139:8,11 141:11
**findings** 138:19 142:5
**fine** 151:7,20
**finished** 147:10
**firm** 16:8 31:2 45:4,5,8 46:16 63:16 65:12,15 69:12 145:19,22
**firm's** 63:23
**first** 9:17 44:22 48:13 54:24 55:6 71:4 72:19 78:6,9,19 89:5 90:2,13 95:12 99:8 107:1 115:25 121:6 123:14 134:15 142:19
**fit** 103:22 125:11 143:1
**fits** 103:20 116:23
**five** 17:2,11,13,21 21:21 33:23 34:2,12 64:3 149:16
**five-minute** 107:11,12
**five-sentence** 103:2
**fix** 26:12
**flip** 29:17 30:21 56:20 78:18 134:13,18,20
**Flower** 3:6
**fluctuation** 128:3
**focus** 56:5 135:21
**focused** 23:16
**folder** 20:9
**folks** 76:22 109:24
**follow** 150:25
**following** 73:11,13 96:23 97:17 143:3
**follows** 9:18
**Footwear** 14:3
**foregoing** 152:6 154:13
**foreign** 141:7,9
**forgive** 55:22
**form** 6:18 18:2 41:21 52:7 52:23 53:1,16,21 54:1 55:13,18 56:3 58:17,24 60:24 61:2 73:23 94:14 122:24 123:5,17 124:2,8 124:15 126:7 128:23 129:6 131:7,7,14,24 135:9 146:25
**formally** 46:22
**formed** 33:18 48:1 77:14 79:16 120:13 135:17 142:25
**formerly** 28:8
**forming** 47:2 51:1 52:5 72:22 73:2 74:15,20,25 75:6,10,16 76:24 77:3 79:7 79:13 119:14 121:1,18 124:2 125:6 130:14,25 142:7
**forms** 129:22
**forth** 101:23 140:13 154:11
**forty** 82:3
**found** 15:24 35:11,22 36:5 36:18 65:13 70:13 134:5 140:22
**four** 17:9,21 34:9 35:5 109:6
**four-** 103:1
**fourth** 108:13
**FPR** 1:24
**frame** 54:18,18 62:1
**frankly** 141:18
**fraud** 15:21,25 35:11 36:23 40:16,21 72:14 140:3 142:4 146:4 149:11
**fraudulent** 36:19,21 42:12 133:21 134:1
**free** 14:10 27:4 88:22 134:9
**freeze** 63:11,25
**frequently** 17:24
**Friday** 1:19 2:21 8:1
**Friedman** 45:9,13 63:20
**front** 26:5 67:23 68:15 88:23 105:5 112:23 146:20
**frozen** 63:13
**fruition** 80:15 95:17,19 148:25
**full** 81:15 82:1,6 89:18 96:20
**fully** 32:13
**function** 134:11
**functions** 143:24
**fund** 1:10 2:10 6:11 7:5 28:12,13 75:13,20 77:16 83:23 93:24 97:1,9 100:9 100:12,12 105:19,25 108:12 118:4,5,16 119:4,8 119:15 120:6 121:21,22
**funded** 124:10
**funds** 35:16 41:11,15 71:21 95:14,16,18,22,25 96:2,9 121:21,22 122:2 130:17 138:9 140:25 142:2
**funneling** 141:6
**further** 23:17 47:5 98:22 105:10 148:18 154:18
**future** 133:9,18

**G**

**G-i-n-s-b-u-r-g** 10:12
**Gary** 3:5 8:20 144:2 148:8
**general** 12:25 17:18 24:16 66:11 100:17 109:8 116:1 116:3,23 117:3 118:10,16 119:17 120:2 121:17 132:18
**generally** 38:14 85:20 144:14
**generate** 102:9 115:16
**generated** 52:18 60:20 71:17 73:16 105:15 108:5
**generic** 85:25 86:3,7
**geographic** 59:21
**geography** 37:8
**getting** 27:22 105:3
**Ginsburg** 1:17 2:19 4:3 5:5 5:9,13,24 6:7 8:4 9:16 10:6 10:9,12,13 22:7 23:24 25:13 26:1 27:15 29:1,23 31:3,25 32:8 33:8 36:13 44:22 48:9 50:24 54:4 56:13 57:8 62:11 63:9 64:13 66:14 69:23 70:24 75:10,16 76:24 77:3 80:18 81:3 82:5 83:18 97:5 100:25 102:14 107:23 118:15 121:6 122:23 128:13 130:21 131:25 132:16 142:24 146:1 147:15,21 148:10 150:3,7 152:4,17 153:2
**Ginsburg.Supp** 5:19 6:16 6:18
**Ginsburg.Supp.Report.0...** 101:4 108:1
**Ginsburg.Supp.Report.0...** 78:23
**Ginsburg.Supp.Report.0...** 6:12 105:1
**Ginsburg.Supp.Report.0...** 128:25
**give** 16:4 18:3,17 19:5 22:4 23:25 26:5 29:6 39:2 40:4 47:23 48:1 61:22 67:25 120:12 127:7 128:16 129:10,13,13 139:13 142:3
**given** 17:2,19 18:1 19:21 24:4,15,23 34:23 58:17 59:1 110:11 132:21 148:16 152:9
**gives** 23:18 61:20 128:18
**giving** 26:3
**glean** 124:14
**go** 17:22 18:9,9 20:11 21:9 22:14 28:21 32:25 36:13 44:3,19,24 51:7 52:25 54:13 64:6 67:12,13 68:4 70:7 71:19 81:11 83:24,24 84:18,18 88:22 100:17 102:12,13,15 105:10 107:2 107:4,14 109:4,16 110:24 111:9 122:21 126:24 128:7 129:2,18 130:3,22,23,23 131:22 146:9 148:23 150:14,15
**goes** 60:12,12 61:7
**going** 25:9 26:15 28:3 30:11 31:11,18 33:3 46:18 56:5 56:20 57:23 61:22 62:8 64:2,8,19,25 78:18 79:10 88:7,9,23 95:24 96:20 104:19 107:9,16 109:16 113:22,24 114:5 126:9 128:9 129:21 135:23 138:6 138:10 145:9 146:21 150:16,24
**Golden** 16:18 17:10 34:10
**good** 10:6 22:10,23 37:12 76:18 115:7 125:18
**gotten** 63:19
**Gouraige** 3:15 8:22,22 10:3 14:12,21 30:7 31:5 32:2 36:9 45:24 46:2,11 50:10 64:4,7 89:3,13,15,16,23 107:12 136:12,25 137:2,6 137:19 138:15 140:10 141:13 143:20 145:13 146:6,24 147:12 148:7 150:5,12 151:9,10,15,16
**government** 119:1 151:1
**grant** 138:16
**Granting** 6:20 134:15
**great** 56:19 60:3 125:12
**greater** 23:6
**GROSS** 3:14
**ground** 25:8 71:12 96:14
**group** 21:12,17,24 22:20 54:3 125:24,24 126:6
**guess** 14:5 37:19 45:4 46:6 69:12 87:24 90:24 100:12 132:1 143:3 150:10
**guidance** 53:20

**H**

**hairs** 76:5,17
**half** 13:8,11 21:15 70:4,12
**half-hearted** 136:6
**hand** 70:14 154:22
**handwritten** 87:18
**happened** 142:17,17,25
**happy** 25:12 107:8 129:18
**hard** 56:18

**hard-copy** 60:15
**head** 125:3
**heading** 73:6 78:7 79:20 89:17
**health** 116:20
**healthcare** 124:17,22,24 125:5 126:6,21
**hear** 56:20 58:20 106:21,24 123:11
**heard** 8:6 9:13 17:3 63:15 63:15 81:4,6 154:14
**hearing** 9:14 50:1,6,13 67:22 68:1,15 147:19,20 148:9
**heavily** 22:15
**held** 8:9 22:24
**help** 16:8 72:5 103:21
**helped** 16:21 61:19
**helpful** 22:5 40:11 83:18 115:23
**helping** 16:16
**helps** 89:1
**hereinafter** 78:14,16
**hereunto** 154:22
**Herve** 3:15 8:22 9:23 45:23
**hgouraige@sillscummis....** 3:20
**high** 16:4,6,25 17:2 42:17 110:4,4 125:15
**higher** 120:17
**hired** 100:2 139:18 140:9
**hiring** 20:17,17 140:7
**history** 80:12
**holding** 103:2
**hope** 24:9 106:21
**hopefully** 21:13
**horse** 68:8
**horse-breeding** 10:22 11:2 11:11 12:3 68:7
**hospital** 116:3,23 117:4,12 117:16,20 120:3
**hospitals** 109:9 116:1 118:11,17 119:18 121:17
**hour** 43:6 63:6
**hours** 51:11 63:5 82:4
**housekeeping** 27:20
**huge** 23:4 71:19
**human** 80:12
**Hundreds** 34:16,18
**Hunter** 3:24 8:13

**I**

**I-C-S** 23:20
**I-p-a-v-e-c** 52:3
**idea** 136:18,20
**identification** 151:22
**identified** 90:22
**identify** 59:20
**identifying** 14:25
**identity** 19:1
**ignores** 140:4
**ignoring** 138:7
**illusion** 136:7
**immaterial** 79:15
**impact** 139:12
**imply** 144:14,15
**important** 24:21,25 25:19 133:19
**impression** 80:13 117:7,17
**in-house** 17:7
**inappropriate** 36:10 40:3
**inaudible** 15:3
**incentives** 102:4,7
**inception** 84:16,16 85:8 135:11
**incidentally** 63:15
**include** 70:10 101:25 103:10 103:14,14 123:6 134:1
**included** 16:13
**including** 143:11
**inclusion** 53:9 54:24
**income** 113:5 114:22
**inconsequential** 146:20 147:1
**incorrect** 23:18,19 120:14
**incorrectly** 120:11
**increases** 62:10
**incurred** 131:3,18
**independent** 81:22 95:8 98:2 117:18,21 131:21
**index** 4:1 62:2 102:22 109:25
**indicate** 55:14 111:19
**indicated** 73:10 152:11
**individual** 5:22 6:5,10,14 8:23 9:24 13:21 25:4 37:6 57:9 105:16
**individual's** 25:3
**individuals** 148:22
**industries** 110:21 124:16 127:22,23
**industry** 19:22 37:7 59:20 59:25 66:10,11 105:20,23 109:8,9 110:10,10,11,18 115:25 118:6,16 119:17 121:16 127:13,15 128:6 149:22
**info** 100:19
**information** 24:15 25:5 31:1 52:10 59:25 64:16 76:19 82:9,15,21 89:20,25 97:13 98:2 102:24 117:23 118:1 120:10 123:7 124:14 137:8 142:7 151:14
**initial** 46:10 47:5 48:11,15 48:21 51:6 53:5,14,18 58:11 64:21 93:9 122:19 123:3
**initially** 45:10 54:11,12 63:18
**inquiry** 104:5
**inspection** 92:9
**instance** 18:20 72:11
**instances** 17:25
**Institute's** 73:17
**instructed** 27:12 37:4 59:15
**instruction** 27:2,13
**instructions** 59:11 109:3
**instructive** 71:5
**intend** 49:25
**intended** 124:24
**intent** 36:19,22 42:12 133:21
**interest** 27:22 55:20
**interested** 154:18
**interesting** 125:7
**Internal** 13:18 16:15 70:5
**internet** 2:20 9:2,11 110:24 150:18 151:23 154:10
**interpose** 26:18
**interrupt** 18:10 25:20
**introduce** 8:16
**introduced** 45:6,22
**invest** 113:21
**invested** 57:10,18,21
**investment** 65:22,25 66:7 75:3 123:15 130:16,24 131:9 136:1
**investments** 58:8 100:13
**investor** 57:10,15 113:19 130:17 137:16 138:9 140:24
**investors** 57:17 58:8 74:17 74:22 75:2 76:25 99:13 113:21 131:17 138:11 141:5,10 149:12
**involved** 53:1 91:10 122:8
**involvement** 66:5
**involves** 39:4
**involving** 35:20 53:16 70:4 90:8
**Ipavec** 52:3,16 59:5,10 60:4 101:18 109:4
**Ipavec's** 52:14
**irrelevant** 37:19,21 38:3,10 38:18,20 39:1 40:16,21 41:1,7,12,13,16,18,20 42:7 42:10,13,19 43:1,4,8,13,16 43:19 44:7 77:10 82:23 83:14 139:21 141:16 142:14,18,25
**IRS** 14:14,16 17:4 34:4 70:17
**Irwin** 145:21 148:21 149:1
**Irwin's** 31:22 32:4 145:16
**issue** 13:12 15:20,23 27:21 38:2 39:7,8 43:25,25 44:15 44:16 51:13 58:9 61:25 72:1 133:3
**issued** 126:8
**issuers** 73:24
**issues** 31:22 32:3 34:24 37:13 43:24 44:14 54:23 69:16 82:23 115:5

**J**

**J** 134:22
**J-u-l-i-e** 52:2
**JD** 1:17 2:19 4:3 9:16
**Jersey** 3:18
**job** 1:25 5:22 6:5,10,14 22:2 25:5,23 37:10,12,16,20 42:2,6 59:22 60:11 61:13 73:20 81:13 83:16 84:20 84:22 86:1,3,7 101:25 102:11,23 103:5,20,21 104:3,4,15 140:8 149:21 149:21,22
**John** 90:15,22
**judge** 26:6,23,24 50:6 67:24 70:12 134:23 135:5,24 143:14 144:18 146:22 147:8 148:9
**judge's** 138:18 139:7 140:18 143:21 144:13,16 147:17 148:11
**judgment** 6:21 112:14 134:16 140:18 142:20 146:2
**judgments(inaudible)** 37:25
**Julie** 52:2
**June** 50:3,5 56:24 74:10 77:20 87:6 147:19
**jury** 67:24

**K**

**Karen** 45:12 63:17
**keep** 88:23 138:3
**kept** 58:19
**key** 54:17
**kind** 16:25 19:4 25:7 60:23 81:7 84:1 116:16,17 126:12 127:14 128:1,5,6 149:4

**kinds** 124:10
**know** 14:7,10,19 18:23,24 22:18 23:11,12,14 24:6,9 26:12 38:19,23 43:20 44:9 45:14 46:14 51:13 53:23 54:4,8,9,9,11,16,17 57:6 58:22 60:2 61:13,16 62:18 62:23,25 64:24 66:4 68:22 68:22 71:3 72:12 76:15 77:8 81:1,7,8 83:2,10 85:11,17,19,20 87:9,12,12 87:13,16,22,25 88:3 90:7,8 91:24 92:2,7 93:4 96:2,13 96:17 97:20,25 98:22 100:7,11 102:1,5 104:1 105:18 106:16 110:17 111:4 112:5,5,12,17 113:8 113:13,15,16,20 114:3,13 115:2 116:7,16 117:24 120:16 122:10 124:19 126:9 127:15 128:18 129:11,12 130:15 131:1,10 131:15,20 132:2 136:20 137:11,24 140:11 146:16 147:17 148:5 149:2
**knowledge** 55:18 57:21 95:8 96:8 98:19 99:20 117:18 117:21 131:21
**known** 28:8 132:7,12

**L**

**lack** 56:6 116:10 122:9 125:9
**laid** 63:6 90:1 95:7 100:11 100:22
**language** 91:12 95:6 138:8
**languish** 141:6
**large** 21:2 59:23 60:2 126:18 127:19 133:6
**law** 9:5 154:7
**laws** 140:14
**lawyers** 26:21
**laying** 98:5
**lays** 108:22
**lead** 33:20
**leads** 33:17
**learn** 21:6
**leave** 115:5,9,11
**leaving** 114:20
**left** 136:4
**left-hand** 108:19,22
**legal** 3:16 8:13 14:16 46:8 90:8 142:21
**let's** 12:3 13:2,4 18:7,19 19:8 23:24 29:15 32:25 40:8,12 53:24,25 54:2 59:5 64:6 86:10 88:22 107:14 123:13 126:7 130:3 135:21 138:6
**letter** 5:5,9,13 30:2,6,24 31:4,20 32:1 46:17,21 47:5 48:9 49:13,15,15 50:22 52:12,21 53:14 57:7,23 62:9 63:7 65:1 73:11 77:21 83:3,3,25 84:2 88:10 89:2 89:7 95:11 98:23 102:10 102:10,18,20 145:12
**letters** 32:15,18
**Leung** 3:5 4:6 8:20,20 9:22 10:5 14:10 15:5 28:21,25 30:11,16 31:10,15 32:24 36:12 40:7 44:4,21 48:4,7 48:10 49:9,18,23 50:19,23 51:4 59:15 60:22 64:2,6,13 64:14,19,24 65:4 72:18 78:2,6,17 84:7 85:16 86:12 86:16 88:19 100:24 104:19 104:23 107:6,14,22 118:24 119:2 120:21,24 122:17 127:7,10 128:9,12 130:3,8 134:7 136:15 137:12,22 138:20 140:20 141:19 144:5 145:8 146:8 147:10 147:14 148:13,14 150:3,22 150:24 151:6
**leungg@sec.gov** 3:9
**level** 16:4,6 17:1,2 96:1 115:5,16
**liability** 16:18 17:9 34:10 78:14
**liable** 15:24 35:11
**lifting** 63:25
**likewise** 42:12
**limitations** 53:17
**limited** 11:25 78:14 98:23 124:8
**line** 21:14 23:7 25:14 107:7 153:4
**lines** 38:14
**Lisa** 1:8 2:8 3:13
**list** 16:4 39:23 53:10 65:6,9 65:17 67:25 72:21 110:20 110:25 122:23 128:18 132:5,10,14 145:19
**listed** 116:11 123:25 124:11 129:7 130:13,24
**Listing** 5:11
**little** 15:6 29:10 53:12 69:8 91:2 112:1 115:10 120:23 125:15 131:12 133:8 145:9
**Liu** 1:8 2:8 3:12 5:19 6:22 7:6 8:5,23 40:15,25 41:11 41:19 42:11,24 43:3,14 46:6,22 47:1,12,15 55:19 56:25 58:3,3 63:8,10 71:10 74:5,11,16,21 75:1 77:20 77:25 78:15 79:3 82:6,11 82:17 83:20,22 85:11,18 85:23,23 86:6,23 87:14,15 87:19 90:14 91:9,10 92:10 92:16 93:12,23 94:7,24 95:3,9,14 96:22 97:6 98:7 99:10,20 100:3 104:6 119:4 121:3 134:17 135:9 136:3 137:14 138:7 139:3 139:18,21 140:2,5,14,23 142:1 143:10,24 145:25 148:4 153:3
**Liu's** 55:23 77:14 80:1 84:19 94:12 139:8
**live** 110:4
**LLC** 1:9,10,10,11 2:9,10,10 2:11 5:18 7:5 28:7,9,18 57:1 78:13 87:2 96:25 97:1 121:15 123:15
**LLP** 74:12
**local** 111:17
**located** 60:7 109:19
**location** 59:21
**long** 33:24 81:2 115:21
**longer** 68:17
**look** 17:23 19:5 21:18,18 29:15 30:22 31:17 38:5 44:25 51:7 53:24,25 56:21 57:14 83:2 84:12 100:17 103:20 105:8 106:15,16 107:5 111:5 114:7,8,8 116:7 119:5 125:1 126:7 127:6,17 130:20 131:6
**looked** 55:17,24 91:19 96:7 112:16 131:6 147:3
**looking** 55:23 72:19 92:24 92:24 101:9 105:18 115:24
**looks** 31:8
**looting** 72:15
**Los** 1:11 2:11 3:7 28:8 60:7 109:7 110:3
**loss** 113:22,23
**lost** 28:1
**lot** 22:22 111:18 125:14
**lower** 108:19,21 120:18 133:9
**ludicrous** 71:14

**M**

**main** 83:2
**major** 16:19
**making** 19:6 25:14 34:9
**malfeasance** 133:14
**management** 99:16,18
**manager** 96:25 97:8 119:11
**managing** 141:1
**manner** 16:24 81:18
**March** 5:6 30:3,7 32:14 48:9 48:16,24 49:20 50:15 73:9 73:25 83:3 88:9 102:10,18 106:16 122:20 129:8
**Marcum** 45:16,17 65:15 76:8,11,17,22
**marked** 7:1 29:18 30:13 31:13 78:4 101:2,2 104:20 107:24 118:25 128:10 129:8 145:2 151:22
**market** 18:5 37:5,8 40:4,4 41:25 42:2 56:8 72:2 94:17 114:16,21,21 115:1 133:24 133:24,25 139:23 140:6 143:23 144:9,23
**marketed** 121:20
**marketers** 136:6
**marketing** 5:23 6:6 73:20 84:23 85:4,13 97:18,21 98:1 101:14 103:4 104:14 106:13 108:9 121:10,16 122:8
**marketplace** 37:14 77:11 92:25 99:25 100:5 142:15
**markets** 71:18
**Marty** 1:24 2:22 8:15,24 150:10 154:2,25
**material** 60:1
**materials** 74:16 79:4 105:5 123:16 124:5 130:15 131:2 147:25
**matter** 8:5 12:12 13:10 14:7 14:13,21 15:13 17:14 33:12,21 63:11 68:7 69:17 135:6 142:22 147:20,20
**matters** 11:3,6 12:21 16:9 16:11 70:14 110:10 145:18
**MBA** 1:17 2:19 4:3 9:16
**McArver** 1:24 2:22 8:15,25 9:22 25:13 44:4 154:2,25
**mean** 12:24 14:15 17:22 18:10 24:11 35:25 37:23 46:7 53:23 54:11 62:18 70:8 76:5 84:6 87:11 90:6 90:21 91:1,5 92:24 93:7 94:19,20 95:3,19 96:4 100:10 103:17 106:5,10 110:23 111:1 113:4 115:4 123:19 126:24 129:10,20 136:19 146:19
**means** 87:22 91:4,7

**meant** 20:14 88:18
**median** 106:1 114:14,14,15 115:4,12 139:25
**medical** 66:10,11,16 67:2 81:4 109:8 116:1,3,10,11 116:13,23 117:3,15 118:11 118:16 119:17 120:2 121:17
**member** 22:20 145:22
**memorandum** 74:21 138:8 138:12 143:17
**mental** 116:20
**mentioned** 46:8
**merely** 39:21 91:1 122:7 146:11
**methodology** 11:17 19:3 89:9 99:8 115:18
**million** 93:15,22 94:8,13,14 106:1 112:24,24 113:2,5 115:15 135:15,21 138:3 139:4,8 143:13,14
**millions** 136:4 140:24 141:6 149:12
**mind** 43:20 44:10 51:9 91:22 126:18 138:4
**minimum** 115:16 131:9
**Minotti** 65:13,14
**minute** 43:6
**minutes** 64:3 75:17 107:9
**misappropriated** 41:11,15 149:11
**miscodes** 23:25
**misphrased** 26:10
**misunderstanding** 111:7
**moment** 44:6 127:8
**money** 39:6 57:9 71:11 92:19,21 133:9 143:14 149:13,15
**monies** 137:16
**months** 17:21 45:1,1
**morning** 10:6 62:19
**Motion** 6:21 134:16
**move** 143:5
**moving** 96:18

**N**

**N-A-I** 23:21
**N-A-I-C-S** 23:20,21
**N-A-S-C-S** 23:20
**NAICS** 22:15 23:1,3,5,15 24:1 60:6 109:10 110:16 111:3 116:9,21,25 120:8
**name** 8:24 10:7 14:4 15:2 45:11,21 87:12 110:18
**names** 18:23 51:22 101:18
**narrow** 125:11
**NASIC[sic** 23:19
**nature** 13:15,23 37:19 68:23 72:9 103:13
**nearly** 136:1
**necessarily** 22:11 92:17,23 92:23
**need** 18:23,23 25:10 46:12 64:2 88:8 107:6 129:2,16 129:20 140:7 148:1,15
**needed** 96:9
**negligence** 36:21 132:20
**negligent** 41:20 42:6 140:25 141:23
**negligently** 35:23,25
**negotiate** 16:21
**negotiation** 34:13
**negotiations** 17:11 133:18
**neither** 137:9
**never** 39:17 40:1,1 45:13,15 47:6,7,12,15,16,19,19 63:20 69:24 70:6 71:12 96:13 112:3,6,7 133:12 135:7
**New** 3:18
**Newark** 3:18
**newer** 116:17
**newspapers** 133:6
**night** 144:1
**nine-page** 78:7
**nonexecutive** 16:10
**Notary** 152:23
**notation** 87:18 88:1,4
**note** 62:8 78:21 131:24
**noted** 73:24
**notes** 69:16 100:18
**noticing** 8:18,20
**notwithstanding** 72:8,13
**number** 23:6 34:16 45:19 54:19 60:2,9,10 63:5 78:22 96:17 104:25 106:13 111:14 113:6,16 114:3,3 114:14 115:19 119:6 120:7 126:2,19 128:25 138:4
**numbers** 23:13 57:25 61:22 61:25 62:3,7,9 101:3 102:20 106:12,18 108:1 110:2,7 112:16,23 114:11 122:9,10
**nurses** 117:22

**O**

**oath** 9:10,25 26:2,4 27:21 152:13 154:5
**object** 36:9 146:24
**objection** 9:9,13,14 14:24 26:20,25 136:12,25 137:2 137:6,19 138:15 140:11 141:13 143:20 146:6 147:11,13 148:8
**objections** 26:19,21
**objects** 27:8
**obligated** 148:11
**observations** 127:11
**obtain** 104:8
**obtained** 19:17,18 97:12
**obtaining** 99:13
**obvious** 100:21
**obviously** 71:4 106:5,11
**occasion** 47:8,16 66:5
**occasions** 21:2 45:20
**occur** 96:16
**occurred** 43:21 44:11 72:7
**occurring** 117:18
**offer** 114:21 119:13 121:13 152:12
**offered** 11:24 12:19
**offering** 35:1 65:22 66:1,17 74:16,21 82:11 123:15,16 123:20 124:5 126:22 130:15 131:2,4,17,19 138:8,12 143:17
**offerings** 53:1,2,17,19 54:6 54:25 55:5 58:12 66:7 122:24 123:5,7,25 124:6 124:11,24 125:5 129:7 130:12,16,19,24 131:2,16
**officer** 9:1,7 91:25 92:13,18 92:20 94:4
**offices** 45:18
**offline** 14:11
**Oh** 10:11 67:15 105:11 111:6 118:13
**Ohio** 110:6,7
**okay** 10:6 11:1,14 12:12 14:8,16 15:1,20 16:2 17:2 18:7,19 19:10,15 20:11 24:20 25:7,23 27:14,20 28:11,20 29:3,13,17,20 30:5,11 31:3,10 32:8,25 33:22 34:22 35:4,8 37:20 39:4,6 40:8 42:5 43:14 48:4,19,23 49:19 51:18 60:5 63:1 64:4,19,24 65:2 65:14 66:4,20 67:15 68:3,6 68:17 69:5,23 71:15 72:19 73:5 75:6 78:2 79:10,15 83:3,25 84:10,17 87:18 88:20 89:17,25 90:13 94:22 95:5 96:18 97:14 98:4,18 99:7 102:13,16 105:13 106:5,5 107:19 110:20 111:6,15,17,21 112:15 113:11,21 114:14 115:6 116:11,21 120:1,21 123:13,23 126:3,6 127:23 128:1,17,24 130:1 134:12 135:21 136:24 137:13 138:1,4 139:20,22 144:20 144:22 145:6 147:16 150:12 151:4,7,12
**once** 26:1 30:22 31:18 52:12 53:7 61:10,11 94:10 99:18 134:5
**one-and-a-half** 21:16
**ones** 20:4 39:25
**ongoing** 112:4
**online** 60:14
**open** 28:22 128:17,21,23
**opened** 112:6
**operate** 90:17 95:2,4,10 100:14 113:18
**operated** 46:15 90:16 94:25
**operating** 67:2 75:11 116:2
**operation** 10:21 12:7 13:24 14:2,4 79:23 80:2,6 88:16 95:17,19 99:16,19 126:9
**operations** 112:4
**opine** 39:13 143:6
**opined** 147:5
**opinion** 35:1 58:10 70:14 72:4,5 82:12 90:5 93:22 94:6 99:2 100:20 102:10 128:3 135:8,13,17,22 138:17 140:4,5,6 143:21 144:17 146:19,25 147:6,8 149:6 150:1
**opinions** 11:24 12:13,20,24 13:1,4,10 15:12 17:14 32:4 33:11,18 47:2,9,22 48:1,20 49:1,25 50:12 51:1,19 52:5 52:23 64:17 69:2,6 70:24 72:22 73:2 74:15,20,25 75:6,10,16 76:24 77:3,14 79:7,13,16 94:11 119:14 120:13 121:1,18 122:24 124:3 125:6 130:14 131:1 135:6 139:1,13 140:2 142:8,25 143:1 147:21
**opposed** 15:17 119:16
**order** 6:20 22:8 25:18 26:22 108:23 134:15 135:1 143:15 149:14 150:25 151:2
**ordering** 151:9
**organization** 19:14,15 92:22 105:21 109:12 111:13,16 111:20,23,24
**original** 142:22

**outcome** 63:2 72:12 154:19
**outliers** 125:25
**outputs** 101:21
**outside** 125:5
**overall** 90:7 100:16,18 109:25 110:2 126:1
**overseas** 119:10 131:25 132:4
**owed** 93:11 132:22 133:15 133:22 139:2
**owner** 13:13 15:20,23 20:16 91:20,21

**P**

**p.m** 2:21 107:17,20 150:17 150:20 151:25
**Pacific** 1:8,9 2:8,9 5:17 6:11 6:15 7:5 28:13,16,17 56:25 57:2,10 58:4,6 74:11 75:13 75:20 77:21 78:12 79:3 82:14 86:14 87:1,10 93:24 96:24 97:1,8 100:15 105:8 105:19 108:12,14 118:4 119:4 121:3,9,14,19
**package** 60:18
**page** 4:5 5:4 6:3 7:3 28:3 33:3 72:19 78:7 79:11 84:1 84:8,10,12,19,19,24 86:18 86:18 88:9,22 93:8 94:22 98:4,5 101:9,13 106:18 115:25 118:3 122:21 134:15,19,19,20 135:23 137:13 138:6 140:21 153:4
**pages** 5:8,12,15 6:24 7:7 30:21 56:16,21 65:5 101:3 101:23 113:17
**paid** 13:13 16:23,23 18:2 37:22 38:21 39:11 42:3,9 44:2,18 49:6 56:3 62:15,16 62:17 72:13 77:25 85:3,13 92:20 93:2,23 94:5,18 99:10 101:11,12,15 103:12 111:2,18 114:24 126:16 133:2,9 145:25 146:13 149:8
**papers** 66:14
**Parachute** 16:19 17:10 34:10
**paragraph** 73:6 78:9 89:5,6 89:19,21 90:2 93:20 94:22 95:13 96:19,21 98:4,11 99:8 100:8 145:10
**paraphrase** 71:8
**Pardon** 142:11
**parenthetical** 138:10
**part** 60:18 61:20 90:10 103:6,15 135:5
**partial** 91:20,21
**partially** 22:21 39:7,8
**participant** 68:21
**participate** 127:20
**parties** 154:20
**partner** 45:5,6,8,11,17 63:17
**partners** 43:16 45:4 68:13
**party** 90:16,23 91:5,7 141:1
**party's** 146:20 147:1
**Pass** 150:4
**passed** 45:14
**passing** 143:25
**patient** 117:16,20
**patients** 90:20
**Pause** 127:9 145:1
**pay** 16:14,16 17:4,5,19 18:17 20:20 34:4,5 37:9,9 37:14 42:1 71:15,20 72:2 77:11 85:8 99:24 102:3,7 111:1 114:17,18,23 115:6 133:24,25 139:17,19,20 140:7 142:15 143:23 144:10,24 151:2
**paying** 18:4,12 20:18
**payments** 13:19 56:4 123:9 136:5
**pays** 21:25 72:8 125:13,14
**PC** 3:14
**peer** 21:11,12,17,24 22:20 22:23 125:24,24
**penalty** 152:5
**people** 72:1 76:11 80:24 142:15
**percentile** 114:18,19,24
**perfect** 151:12
**perform** 38:4 42:1 44:23 72:3 77:11 81:23 82:18 99:25 104:2
**performed** 34:23 40:25 41:5 42:6 43:5 53:12 54:11 82:24 83:14 86:6 98:7,13
**performing** 47:9 81:13 98:19 114:25 143:23,24
**period** 82:7,11,17 92:9 112:18,18 126:17 135:11 143:10
**periods** 83:17 84:14,20 85:15 98:6
**perjury** 152:5
**person** 13:19 37:9,9,11,14 37:14,15,17 38:15,19,21 42:4 47:7 63:21 72:3 83:9 83:16 85:3 103:2,24 104:1 114:20 139:20,24 140:8 146:13 147:6,18
**personal** 35:16 138:9 139:9
**Personally** 23:15
**pertains** 132:4,8,13
**Perusing** 129:25
**physically** 9:6
**pick** 85:23 114:1,13
**picked** 88:15
**piece** 52:23
**place** 103:13 110:4,4 114:20 125:13 136:3 144:17
**placed** 26:2
**placement** 123:19
**plain** 138:7
**plaintiff** 1:6 2:6,19 3:3 8:21
**plaintiff's** 6:20 69:11 134:16
**plan** 10:20 11:2,9,16,18,18 11:19,25 75:1 147:21
**play** 133:19
**Plaza** 3:17
**please** 8:16 9:12 10:7,10 15:7 18:9 20:11 26:12 31:17 36:13 44:5 102:15 128:21 129:16 146:9
**plug** 114:5
**point** 68:12 73:15,22 74:2,8 80:12 115:10
**pointing** 105:13
**points** 83:7,21
**pop** 110:18 111:11
**portion** 21:20
**position** 37:6,10 81:24 82:19 100:6 110:11 114:11 114:16 144:11,25 149:21 149:22
**positions** 22:2 71:25 73:20 100:1 142:16
**possible** 24:5,5 25:19
**potential** 46:3
**PPEB5** 28:12 75:13,20 77:16 83:22 93:24 97:9 100:9 105:25 118:5,16 119:8,15 120:6
**practice** 11:20 12:10 18:6 46:16 59:19 97:7
**pre-revenue** 71:19 72:7,9,12 113:10,16,18 149:9
**preparation** 52:21 73:9
**prepared** 49:1 52:6 53:7,13 75:1,18 76:8 148:21
**preparing** 51:5,19 89:9 135:6
**present** 9:7
**presented** 83:5 89:8,11,22 90:1 99:4
**president** 5:22,23 6:5,6,10 6:14 73:19,19 84:20,21,22 85:3,4,12,13,21,24 92:18 92:21 93:3,24 96:23 97:2,8 97:9,18 101:10,14 103:3,3 103:12,22,25 104:1,2,3,8 104:14 106:11,12 108:7,9 108:11,13 121:11
**presume** 87:15,23
**pretty** 16:6 106:18
**prevent** 27:16
**preview** 29:4
**previously** 7:1 16:2 33:22 101:17 109:17 118:25 123:2 145:2
**primarily** 22:25
**printed** 56:21 102:6
**printouts** 105:2
**prior** 65:12 84:18
**private** 14:7,14 74:21 123:19 127:21 128:1 138:8 138:12 143:17
**privately** 22:24
**probably** 11:10,13 17:20,21 22:18,22 23:5 44:24 65:10 65:16 68:18 91:11,14 105:12 111:18
**problem** 133:7
**procedure** 10:2 20:23,23,24
**proceed** 9:21
**proceeding** 13:5 69:1
**proceedings** 12:25 150:19 151:24 154:11,14
**process** 25:11
**produced** 80:17 129:4
**production** 79:24 80:6,8,11 80:15,17,23 81:4 104:24
**professional** 12:20 33:10,16 63:1 66:6,15
**proffered** 138:16
**profitability** 115:2
**profits** 71:17
**program** 21:25 90:16 95:1,4 121:21 142:2
**programs** 16:17 17:7 34:7 122:9
**progress** 136:8
**prohibit** 14:23
**project** 57:11,18 71:11 74:6 74:17,22 75:3 76:25 78:1 80:14 90:18 91:10,16 95:2 95:10,15 96:13 99:10,13 99:15 126:9 144:20,22
**projects** 124:10,22
**promoter** 58:18 59:2
**promoters** 123:10
**promotors** 53:4
**properly** 24:10

**proposition** 37:23
**proration** 85:7
**proton** 1:9,9,10,11 2:9,9,10 2:11 5:17,24 6:7,11,15 7:5 28:6,7,9,13,16,17 56:25 57:2,10 58:4,6 66:18,21 74:11 75:13,13,20,20 77:6 77:15,21 78:12 79:3 80:25 82:14 85:1 87:2,10 91:25 93:24,25 96:24 97:1,3,8,10 97:19,21 98:1,14,20 100:13,15 101:10,14 103:13 105:9,19,19 108:8 108:10,12,14 112:5 114:10 115:24 116:2,16 117:3,11 117:15,19,22 118:4 119:4 121:3,9,14,19 136:2 141:3
**proton-based** 90:19
**Proton-Liu** 86:14
**provide** 19:4 21:23 22:3 24:24 25:21 39:21 47:22 50:24 51:12,14 59:1 83:22 83:23 100:16 101:24 102:1 117:15,19 123:8 146:11
**provided** 17:14 18:15,21 19:13 22:16 38:13 52:20 53:10 58:17 74:17,22 75:2 80:16 83:6,20 84:14,23 85:1,10 86:2 116:4 118:21 120:7 121:22 122:2
**provides** 9:5 22:16 41:25 67:3 103:1
**providing** 30:25 83:9,10,16 85:14 93:11 144:10
**provision** 14:23
**proxies** 22:14
**proxy** 21:11,19,20 38:6
**public** 14:13,20,22 22:17 71:19 127:14 128:5 133:6 152:23
**publications** 5:11 65:7,13
**publicly** 14:23 21:3 125:21
**pull** 21:11 22:13 30:11 31:11 54:2,2,19 103:5 104:15 109:4 110:24 126:10 134:10 145:5
**pulled** 20:2 52:16 78:3 101:18 102:1,5 105:22 106:6 123:3,7 126:14,21
**pulling** 106:8
**purchased** 55:20
**purchasers** 56:9
**purely** 37:4
**purportedly** 77:5
**purpose** 54:14
**purposes** 16:14 22:1 82:2
113:3 118:14
**pursuant** 154:6
**put** 24:22 54:16,17 62:9 91:2 92:5,6 102:9,18 110:6 151:2
**putting** 26:21 110:3

**Q**

**qualifications** 70:13 145:16 147:4
**qualified** 33:17 69:6,24 70:6 70:13 147:6
**qualifies** 33:10
**qualify** 70:8
**question** 12:12 26:3,9,10,13 26:15,20 27:8,9,10,11 29:23 30:23 31:18 36:2,10 60:23 62:21 67:18 78:19 90:25 108:3 111:7 115:22 123:24 125:7 129:3 136:13 137:21,23 141:20 143:21 145:21 146:7,25
**questions** 25:22 26:22 27:18 46:11 49:6 107:8 148:10,12 150:5,8,15
**quick** 104:19
**quite** 91:19 96:8 143:3
**quote** 139:9 143:7
**quote-unquote** 96:14

**R**

**R** 1:17 2:18 4:3 9:16 152:4 152:17 153:2
**R-a-n-c-h-w-e-a-r** 15:9
**R-i-c-k-'s** 15:8
**raise** 95:15,18 112:12,13
**raised** 58:1 71:11 95:14,23 95:25 96:10 112:25,25 114:4 142:2
**raising** 119:9,16
**ran** 61:10,11,21
**Ranchwear** 15:8,13
**range** 18:5 24:3 60:3 93:15 139:3
**rate** 56:8 63:6
**RDR** 1:24
**re-create** 54:13
**reach** 96:1
**reached** 24:2 96:3
**read** 44:4 52:10 73:5 74:13 79:19 81:11 91:18 92:3 94:23 95:6 96:20 119:6 135:1 139:7 144:16 145:9 149:1 152:5,7 154:16
**reader** 91:3
**reading** 71:8 93:10 95:21
117:7 151:14
**reads** 78:10 87:19 90:13 95:13 98:11 99:8 121:7
**real** 25:9 103:14 104:3,19
**real-time** 61:21
**reality** 148:22
**really** 23:4 31:1 43:22 44:11 49:5 61:19 71:4 80:21 81:1 90:11 91:17 112:6,11 114:20
**reason** 55:17 84:3 88:15 96:15 103:11,14 104:3 112:15 115:2 139:16 148:4 153:5,6,8,9,11,12,14,15,17 153:18,20,21,23
**reasonable** 12:8 13:14,20 16:14 17:3 18:13 20:20 24:3 30:3,8 31:23 32:4 34:3 35:10,14,21 36:25 37:3 38:16 39:7 41:17,22 42:8 46:6 69:18 71:6,23 82:8,12 83:8,15 93:11 94:15 99:3,9 100:5 110:12 132:21 133:15,22 135:9,16 135:22 138:17 139:3 140:16 141:1,15,23 143:9 143:18,22 144:6,8,12,15 144:24 149:9,20
**reasonableness** 12:14 15:14 92:15 145:24 146:12
**reasonably** 42:20 43:9 93:23 101:11
**reasoning** 113:9
**reasons** 115:9,11
**rebuttal** 5:13 48:24 49:21 145:3
**recall** 10:24 33:25 35:18 53:22 61:12 69:5 88:16 92:4 109:2 124:17,23 125:3 127:3
**receipt** 63:23 139:8 140:23 141:22
**receivable** 62:20
**receive** 77:24 92:14,22 139:22
**received** 39:10,19 47:4,4 55:19,19 58:7 62:19 76:20 92:7,16 100:12 137:15 139:22
**recess** 64:10 107:18
**recital** 119:6 121:7,7
**Recitals** 119:5 121:6
**recognize** 29:1,24,25 30:23 31:19,20 78:20,24 101:5
**recognized** 15:17
**recollection** 25:11 35:12,17
36:14,20 46:24,25 61:9 66:8 95:5 122:3
**recommendation** 18:22 19:7
**record** 8:11,18 10:8 14:13 14:20,22 26:22,23 29:21 48:7 64:6,9,12,25 73:5 78:6,21 79:19 81:11 84:7 86:12 101:18 104:25 107:15,17,20,25 128:24 129:18 134:18 148:8 150:15,17,21 154:14
**records** 17:23 51:8,12,15
**red** 29:8
**reduced** 55:10 58:14
**reduction** 58:16
**refer** 101:8
**reference** 96:5 99:18 119:8 121:9
**referenced** 7:1 16:2 55:11 56:14 58:2 95:4 143:14
**referred** 68:3 88:14 95:10
**referring** 28:7,12,17 49:10 89:21
**refers** 80:5 111:24
**refined** 53:10
**reflect** 27:25
**reflected** 32:14 33:14
**refreshed** 25:11
**refused** 149:14
**regard** 12:5 39:17
**regarding** 12:13 146:12 151:14
**Regardless** 146:18
**regional** 1:9 2:9 5:18 6:16 28:17 57:1,2 58:4,5 74:12 78:13 79:3 87:2 96:24 100:15 105:9 108:15 121:4 121:15
**regionals** 106:2
**Registered** 2:23 154:2
**regular** 150:23
**reimburse** 39:16
**reimbursed** 39:15,24
**reimbursement** 39:10,19
**relate** 49:5,5 68:24 144:21
**related** 12:25 13:4 16:9 31:1 31:23 63:2 81:19 83:9,16 91:9 115:6 116:14,14 124:17,21 142:21,21 154:20
**relates** 25:5 118:13 144:23
**relating** 99:12
**relative** 95:25
**relevance** 92:21 94:6 139:12
**relevant** 56:5 61:17 82:7,17

90:4,11 100:4 140:5
**reliability** 24:13
**reliably** 22:8
**reliance** 22:25
**relied** 52:11 73:7,12 79:5 130:25
**rely** 22:15
**remember** 88:18
**remote** 1:16 3:1 9:25
**remotely** 9:3,10,17 154:6,8
**removed** 58:18
**render** 33:11,17 69:6 70:14
**rendered** 34:14 99:14 139:1 147:8
**renders** 138:11
**repatriate** 149:15
**repeat** 15:7 62:6
**report** 5:5,14,22 6:5,10,14 19:16,25 21:23 22:3 31:22 31:23 48:2,11,15,21,23,24 49:20,21 51:6 55:3,11,15 58:25 59:7 61:21 62:1 64:21 71:9,9,22 73:8,10 83:15,15 84:19 89:10 91:4 92:10 93:9 94:7 101:9 102:1,2,8,11,17,17,23 103:6,15,24 104:16 105:15 106:16 108:5 115:13 118:4 122:19 126:20 127:25 129:8,23 138:14 139:16,23 142:20,21,21 143:6,19 144:7 145:3,10 146:11,15
**Report.000003** 5:20
**Report.000013** 6:17
**Report.000014** 6:19
**reported** 1:23 23:14 102:20 116:5 120:9,10 154:12
**reporter** 1:24 2:23,24 8:15 8:24,25 9:20 15:4 25:14 38:1 44:6 65:24 81:10 112:21 118:12 119:24 137:5 150:11,13,22 151:4 151:7,12 154:3,3
**REPORTER'S** 154:1
**reports** 20:3,7,12,14 32:20 33:12 39:9 50:16 52:19 60:17,21,24 61:20,21 62:8 70:25 73:15 101:16,24 103:6 108:22 147:23
**represent** 8:17
**representations** 141:4 143:16
**representative** 69:11 125:16 125:18
**represented** 80:3
**representing** 111:21
**represents** 114:15
**requested** 154:16
**requesting** 103:24
**requests** 15:4 38:1 65:24 81:10 112:21 118:12 119:24 137:5
**required** 9:6 26:19 152:20
**requirement** 131:12
**requirements** 10:1
**requires** 119:10 121:11
**rerun** 60:24 61:15 120:14,15 120:18 122:10
**research** 73:16 116:8
**researched** 52:18
**researching** 59:6
**respect** 11:22 12:1,15 17:13 24:3 34:2 38:25 52:22 59:12 66:6,16 76:17 120:12 131:15 135:8 149:16
**respective** 154:21
**response** 26:3 27:17 131:11 141:21
**responses** 5:10 25:21 128:1
**responsibilities** 80:2 81:16
**responsibility** 43:22 44:12
**responsible** 79:22 103:4
**restroom** 64:3
**result** 46:7 77:25
**results** 20:2 22:14 115:17 125:13 126:1
**retail** 13:24 14:2,4 15:20
**retailer** 15:23
**retained** 32:13 45:7
**retirement** 10:20 11:1,9,15 11:25
**retrieve** 108:24
**retrieved** 101:22
**return** 12:9,15 24:8 59:5 69:20 116:5 120:9,11 122:2
**returned** 149:15
**returning** 94:22 130:9
**returns** 76:9
**revenue** 13:18 16:15 19:19 59:22 60:9,10 70:5 71:16 105:25 111:24 112:3 113:3 115:1
**revenues** 21:14,15
**review** 53:6 57:13 74:16 75:7 79:12 123:16 124:5,7 130:18 146:15 148:21 150:9,10
**review[sic** 83:1
**reviewed** 46:21 52:8,11 53:8 53:8 70:13 73:11 123:17 129:6
**reviews** 38:6
**Rick's** 15:2,8,13
**right** 12:6 15:10 22:14 27:20 28:21 32:21 37:15 39:4,13 48:12,13,13 49:12,12,14 50:4 57:5,5,20 58:20 59:4 59:4,8 67:21 68:8,10,18 69:19 72:23,24 74:13 75:14 76:6 77:22 79:6,19 80:14 84:4,13 89:2 91:22 93:14,18,19 97:22 98:10 105:3,17 107:14 109:15,20 110:23 112:4,6 113:10 114:9,12 116:17 118:6,9 122:15,18 123:11 129:11 130:3 131:20 135:19,20 136:18,19 138:3 139:5,6 146:21
**risk** 114:19
**Riverfront** 3:17
**robust** 22:6
**role** 45:16 52:13 86:1 91:16 97:17,23 133:19 139:18,18 146:1,10,11,16 147:17
**roles** 96:23 97:12
**Ron** 45:13 63:20
**rough** 34:16
**roughly** 55:5 67:13 96:4 112:22
**rule** 10:1 24:16 32:20 94:17
**ruled** 138:7 146:22
**rules** 16:19 17:10 25:8 34:11 137:14
**ruling** 135:5 140:18
**run** 113:23 114:19 126:11
**running** 113:3,22

## S

**S** 3:6
**SACV** 74:7
**salary** 133:18 135:10
**sales** 123:8
**sample** 125:9,12,19,23 126:18
**save** 152:9
**saying** 21:24 27:7 38:18 63:13 70:16,21 102:16 103:24 149:1
**says** 23:9 25:17 29:4 38:7 39:18 40:2 65:13 84:19 87:23 89:18 105:8 131:13 144:24
**scenario** 27:4 36:5,17
**schedule** 53:9
**schedules** 114:8,9
**school** 112:19
**scienter** 42:18
**scope** 46:3,3
**screen** 29:9,11,14 30:14 48:5 61:7 64:20 78:3 88:21 130:5 134:8
**screen-shared** 28:24 30:15 31:14 32:23 48:6 49:8,17 49:22 50:18 51:3 64:23 65:3 72:17 78:5 84:9 86:11 88:11 100:23 104:22 107:21 118:23 120:20 122:16 128:11 130:7 134:6 145:7
**Screen-sharing** 40:6 59:14 127:4 150:2
**scrivener's** 81:7
**scroll** 33:3
**scrolling** 29:19 31:17
**search** 53:16,18 54:12 125:18
**searched** 54:5
**SEC** 6:18 8:5 21:9 52:6 80:21,21 88:14 90:9 91:18 92:6 95:7,21,21 96:6 97:23 98:17 100:21,21 109:11 117:7 121:23,24 123:3 129:5 142:22 153:3
**SEC's** 91:12 97:13
**second** 17:17 48:24 49:4,4 49:11 56:17 57:6 73:6 96:18,20 101:13 104:21 110:23 112:10 129:10,13
**section** 79:10,12,15,20 81:12 90:2 96:19 99:7 108:19
**securities** 1:5 2:5 3:4 15:21 15:24 35:11 36:23 40:16 40:21 57:24 72:14 73:22 74:4 140:3,14 142:4 146:3 149:11
**see** 24:22 29:14,16 30:17,18 30:20 33:6 54:2 57:14 62:7 65:12 71:17 86:19,24 87:3 87:7,11 88:2,2,3 93:10 98:23 105:20,20,21,22 106:3,14,14 107:2 113:17 114:7 115:13 126:25 127:11 128:17,22 132:5,10 132:14 133:5,5 134:20,24 134:25
**seen** 12:9 72:7 135:7 142:20
**select** 59:22
**self-dealing** 43:15
**sell** 13:25 14:2
**Senate** 9:4 154:6

**send** 151:13,16,18
**sense** 63:3 91:9,9 107:2 116:17
**sensing** 70:21
**sent** 20:12 31:4 32:2 46:20 46:22 60:19
**sentence** 89:5 90:13 94:23 95:12 96:20 97:14 98:11
**SEPARATELY** 5:2
**September** 9:5 154:7
**served** 96:22 97:17
**service** 13:18 16:15 50:9 70:5 111:2 116:19
**services** 19:13 24:24 34:15 38:13 44:2,19 83:6,9,16,20 83:22,23 84:14,24 85:10 85:14 86:7 98:7,13,20 99:14 117:15,20 119:11 121:11 144:10
**serving** 85:3 103:25
**set** 100:16 101:23 131:4,19 133:16 154:11,22
**sets** 46:17
**setting** 12:18 117:16,20 133:23
**settled** 14:18
**seven** 17:22,25 127:25
**shakes** 63:4
**share** 28:22 29:11 31:12 48:4 64:19,25 128:14
**shared** 27:22 88:21
**sharing** 30:13 78:2 134:8
**Sheet** 152:11 153:1
**ships** 143:25
**short-term** 102:3
**Shorthand** 1:24 2:23 154:3
**shot** 29:6
**show** 88:8 104:20 134:11
**showed** 42:24
**showing** 50:21 118:24 120:21 122:18 145:2
**SIC** 21:8 22:15,25 23:2,19 24:1 60:5 61:13 76:12 109:10 110:16,18,20 111:4 116:4,8,9 118:8,21 120:8 122:1,8
**side** 127:14 128:2,6
**sign** 154:16
**signature** 86:19,22 87:1,5 87:11,16,19 134:22
**signed** 9:4 47:5 48:16 57:14 63:8 152:17 153:24 154:7
**significant** 51:9,13 115:13 120:16 135:25
**significantly** 122:11
**signing** 48:19 151:14
**SILLS** 3:14
**similar** 21:14 54:20,21 60:23
**simple** 111:16 115:22
**simply** 129:3
**single** 43:6,6 117:16,20
**sir** 15:6 20:7 30:1,19 42:15 67:19 74:13 78:19 94:19 101:5 119:18 129:3 135:2 138:22
**sit** 27:15 146:2
**site** 28:22 128:14
**sitting** 110:6 132:25
**situation** 39:3 89:8,11,22 91:3 112:1 116:24 146:13
**situationally** 90:1
**situations** 72:6 112:9
**six** 17:22,25 44:25 45:1
**size** 105:21 109:12 111:13 111:16,20,23 113:13 125:9 125:19,25 126:18 129:11 129:12
**skip** 138:10
**Skoda** 65:13,14,18
**slightly** 105:24 107:4 110:7
**small** 115:8
**softened** 126:1
**sole** 96:25 97:8
**solely** 115:6 144:23 149:21
**somebody** 103:25 114:18 140:7 150:25 151:2
**sorry** 8:11 13:3 14:1 17:17 40:9 52:17 102:15 115:21 119:20
**sort** 16:25 53:20 66:15
**sounds** 22:6
**source** 19:24,25 23:13 38:6 59:18,19 60:13 85:25
**sources** 38:5 73:7 99:11
**southern** 1:3 2:3 45:18 60:7
**speak** 25:20 47:16 64:18 75:23 76:2,25
**speaking** 55:5 112:22 147:11
**special** 116:19
**specialized** 116:12,13
**specific** 54:8 97:6 99:20 122:13 127:22,22
**specifically** 9:5 15:15 54:5,9 54:9 57:12,13
**specifications** 105:8 108:20 109:5
**spell** 10:8,10
**spend** 51:5
**spending** 140:12
**splitting** 76:5,17
**spoke** 20:15 70:3 72:6
**spoken** 45:13,15 47:7,7,15 47:19 63:20 76:11,15
**spreadsheet** 53:6,7,13
**stage** 10:25 72:13
**standard** 19:22 36:7 46:16 127:13,15 128:6
**standpoint** 15:15
**stands** 148:19
**start** 13:2,4 23:23 67:7 123:13 126:11,11 148:23
**starting** 8:18
**state** 8:17 9:12 10:7 148:7 148:20 154:4
**stated** 41:6 48:2 147:12
**statement** 24:19 33:9 43:12 49:1,24 50:25 73:1
**statements** 21:11,19
**States** 1:1 2:1 8:7 43:7 134:23 149:16
**statistical** 53:12
**statistician** 128:4
**steal** 38:7
**stealing** 37:12,20 38:3,19 39:18 40:3
**stenographically** 1:23 154:12
**step** 70:23
**stipulate** 9:24 10:3
**stopped** 40:6 59:14 88:12 88:17 127:4 150:2
**strange** 151:3
**Street** 3:6
**strictly** 124:7 139:23
**strike** 66:12 106:4
**studies** 38:4 92:25 113:14 125:8,22 133:11
**study** 22:17 37:19 38:11,12 38:22 74:1 76:13 77:10,10 85:2,2,12 99:23 100:4 113:4,7 120:15,19 132:17 132:23 133:17 140:16 141:16 142:14 143:22 144:4,9,21,23 149:6
**subject** 10:16 11:14 13:9 63:10 66:9 69:5 70:1 134:3
**subpoena** 50:7,10
**subpoenaed** 50:3,5
**Subscribed** 152:21
**subsection** 80:5 81:12
**Subway** 111:18
**succeed** 148:25
**success** 71:24 149:3
**sufficiency** 96:3
**sufficient** 95:16,18
**Suite** 3:6
**sum** 102:7
**summarize** 53:5
**summarized** 55:1
**summary** 6:21 93:10 134:16 140:18 142:20
**super** 61:17
**superior** 133:1
**Supp.Report.000001** 5:25 6:8
**supplement** 147:23
**supplemental** 5:9
**support** 52:20
**suppose** 23:24 120:2
**supposed** 38:15 104:2
**sure** 18:25,25 21:10 44:6 54:14,15 59:13,13 61:17 64:7 69:14 70:20 72:10 88:2,25,25 103:19 110:25 120:4 121:2 126:21 132:19 150:11 151:8
**surgical** 109:9 116:1,3,23 117:11,19 118:11,17 119:17 120:2 121:17
**survey** 19:24,25 20:2,3,12 20:14 23:13 24:25 38:5,6 52:19 59:18,19,23 60:12 60:13 85:25 101:16 104:9 106:1 108:24 109:24,24 110:15 111:11 114:14 115:17,17 120:5 140:1
**survey's** 22:14
**surveys** 25:1 37:24 52:8,18 59:7 85:24 108:5,18 109:4 109:6 127:18,21
**swear** 9:14,19
**sword** 133:8
**sworn** 8:19 9:8,17 10:16 75:7 152:21 154:8
**synonymous** 143:19 144:7
**system** 111:10,11,15

**T**

**T-e-d** 10:12
**table** 84:12,25 93:21 102:17 106:17,17
**take** 18:19 21:3 27:4,13 29:15 37:10,10 54:24 63:1 64:2 70:23 107:9,11,12 114:3,3 129:2,16 134:13 151:10
**taken** 2:19 9:1 55:14 106:8 136:3 153:2 154:9
**talk** 40:12 136:21
**talked** 20:19 47:12 72:20 96:12 125:22,23
**talking** 25:2 35:4 69:21 112:19,22 125:21 126:25

132:16,17 133:1
**talks** 101:9 131:9
**tangent** 25:7 40:9
**target** 59:21
**tasked** 35:9,14,21 141:9
**tasks** 72:3 77:12
**tax** 12:9,15 15:15,18 16:19 17:10 19:20 24:8 34:11 45:17 69:20 76:9 116:5 117:10 120:9,11 122:2,2
**tax-qualified** 10:20 11:1,8 11:15,25
**taxpayer's** 15:2
**team** 62:13 101:22
**technical** 52:17 55:21 128:15
**Ted** 8:4 10:9,12 151:18
**tell** 10:15 15:10 18:4 26:14 35:24 52:23 56:16 59:2,10 93:9 97:4 139:24,24 146:14
**tells** 23:9
**ten** 65:8
**term** 52:17 55:21 56:7 82:1 122:9 125:10 143:18 144:6 144:13
**terms** 12:8 16:22 28:3 53:2 115:1 132:23,25 133:11 138:11
**testified** 22:9 24:21 59:6 67:7,8 68:16 69:2,17 86:8 101:17 109:17 123:2
**testifies** 9:17
**testify** 27:17 50:3,5 145:23 147:21
**testifying** 32:10 50:13
**testimony** 10:17 11:15,21 12:4 26:4 27:23 33:25 50:7 50:10 67:23 68:1,2 70:9,19 75:7 140:19 141:17 148:16 152:6,9 154:11,14
**Thank** 9:20,22 20:22 22:5 105:13 150:3,7,12
**THEODORE** 1:17 2:18 4:3 9:16 152:4,17 153:2
**theoretically** 96:15
**therapy** 1:9,11 2:9,11 5:17 6:15 28:9,17 56:25 57:11 66:18,21 67:3 74:11 78:12 79:3 80:25 87:2,10 90:19 90:20 96:24 100:15 105:9 108:14 121:4,15 136:2 141:3
**thing** 19:16 20:25 46:19 111:17 116:17 123:20 151:3
**things** 16:13,13 17:1 24:13 39:9 43:20,21 44:9,11 49:4 49:5 65:16 95:9 133:10
**think** 12:6 19:11 20:15 23:21 23:21 24:18 25:8,9,22 27:16 33:19,19 34:14 36:21 38:16,24 39:1 45:1 45:18 54:20 58:13,14 60:1 61:6,9,10,10 63:16 65:9,19 68:10 69:8 70:2,24 71:3,5 72:11 87:20 91:20,20 93:20 102:14 109:17 116:5 116:16,19 132:23 137:7 148:10,19
**third** 17:17 108:11 145:10
**thirty** 16:12
**thought** 62:21 96:4,5 126:23 126:23,24 127:1
**thousand** 18:13 34:17,19 35:5,5,5,7,9,13,19 36:3,15
**thousands** 34:20,22 35:4
**three** 17:7 30:21 32:18 34:7 35:5 74:6 75:12,19,24 83:6 83:20 84:15 92:8 93:16 94:4 99:19 100:11,20 106:20
**three-business-day** 151:5
**three-page** 31:16
**Thropay** 90:15,22 91:24 92:7,12 94:3,18
**Thropay's** 91:16
**thumb** 24:16
**tied** 25:3
**Tim** 8:13 107:15
**time** 8:11 9:8,9 10:19,21 13:7 18:20 26:18,18 51:5,8 51:11,12,13,14 54:18,18 59:18 62:1,12 68:17 69:12 71:17 72:9 81:15,25,25 82:7,11,17 83:7,12,21,23 91:19 92:9 96:8 98:6 113:17,18 114:5 126:8 129:2,16 134:13 135:11 140:12 141:18 142:20 148:15 150:8 154:10,15
**time,'** 82:2
**times** 10:18,24 12:23 13:6 17:22 21:16 34:14,17,17 34:19,21,23 63:5
**timing** 46:18
**Timothy** 3:24
**title** 19:14 25:3,5 42:2 59:22 83:9,17 84:20,22 93:5 103:3,20 110:15 139:19,25 140:8
**titled** 104:1
**titles** 60:11 100:1
**today** 8:15 25:17 27:15 28:5 67:7,20 109:3 148:16 150:8
**today's** 8:10 71:18
**token** 104:11
**told** 39:23 52:25 131:17 151:4
**top** 21:21 29:8 65:12 84:12 98:5 106:18 115:14 125:3 128:19 145:11
**topic** 103:17
**total** 102:6 143:9
**totality** 33:20
**traded** 21:3 125:21
**training** 128:4 145:17
**transactions** 16:20
**transcribed** 154:12
**transcript** 27:25 150:9 152:6 152:8 154:17
**transcription** 25:15,18
**translation** 28:1
**transpired** 149:24
**transpires** 64:10 107:18
**treasurer** 97:2,9
**treat** 80:24 90:20
**treated** 13:21
**treatment** 66:17
**treatments** 80:16
**trial** 14:19 67:8,14,14,22,25 68:1,4,5 69:2 70:7
**trier** 71:22 72:5
**true** 30:5 31:4,25 72:25 108:3 130:2 137:11,25,25 152:8 154:14
**truth** 27:25
**truthfully** 27:17
**try** 54:13 125:1 126:24 127:5 128:6
**trying** 12:5 29:11 68:10 133:16
**turn** 12:3 79:10 86:10 135:23 138:6
**turned** 106:23,25 121:21
**turning** 65:5 106:2 118:3 137:13 140:21
**two** 10:23,23 12:18 17:5 34:5 35:5,7,8,13,19 36:3 36:15 51:20,20 67:6 68:23 73:22 79:11 84:25 99:11 101:3,22 109:8 125:10 129:23 143:25 147:22
**two-page** 101:1
**type** 16:12 19:16 20:24 37:6 39:9 46:18 53:3 80:24 99:23 110:17,17 111:10,10 113:8,14 123:20
**types** 16:9,11 33:23 34:2 54:5 116:9,13 125:8
**typewriting** 154:13
**typical** 112:1
**typically** 39:14,16,24 93:2 103:1 127:24

**U**

**U-D-G** 132:13
**Uh-huh** 34:1 40:14 86:21,25 89:4 145:14
**ultimately** 19:6 58:24
**unable** 29:4 95:15,18
**underlying** 130:19
**underneath** 93:20 95:13 96:19
**understand** 21:8 24:22 26:7 26:11,15 27:5,7,14 28:11 28:20 32:8 38:13,22 46:12 63:9 81:1 86:4 91:3 94:11 96:21,22 97:16 109:23 110:5 111:6 113:4,22 119:15,19,21,22,22,23,25 121:14 146:1
**understanding** 19:17,19 20:6 22:10 56:9 57:9,17 58:5 66:20,23 67:1 70:11 71:23 76:7,8 80:1,7,10,14 80:18,20,23 82:5,10,16 83:19 84:13 86:5 90:24 91:8,17 97:6 98:6,12,16 108:16 112:2 124:9 141:25 152:12
**understood** 13:16 28:10,14 28:15,19 121:19 154:15
**unequivocally** 140:25
**unexpected** 29:2,7
**United** 1:1 2:1 8:6 43:7 134:22 149:16
**universe** 53:25 54:1,22 58:19 124:1
**unreasonable** 141:24
**unregistered** 123:25 124:6 124:11,23 125:4 126:22 129:7 130:12 131:16
**unrelated** 81:20 90:15,22 91:5,7,8
**untrue** 138:12
**use** 19:24 20:24 21:1 23:12 23:13,15 25:1 37:24 59:18 60:11 62:2 64:3 88:22 111:16 112:11,11 113:2,2 113:12 114:14 115:12 120:5 126:2,3 127:21 130:17 143:18 144:6,13

**uses** 110:15
**usually** 114:24 126:2

V

**v** 1:7 2:7 153:3
**valid** 128:3,3
**validation** 77:24
**valuations** 71:20
**value** 113:13,25 114:16
**variety** 124:16
**various** 16:9 99:15
**vein** 33:15
**venture** 71:24 113:19 148:25 149:3
**verbal** 25:21
**verify** 87:16
**vice** 5:23 6:6 73:19 84:22 85:4,13 97:18 101:13 103:3 104:14 106:12 108:9
**VIDEO** 1:16
**videoconference** 1:20 2:20 9:2,12 154:10
**videoconferenced** 150:18 151:23
**videographer** 3:23 8:3,14 64:8,11 107:16,19 150:16
**videotaped** 2:18 8:4
**view** 37:21 40:4 82:22 99:9 137:4
**viewed** 114:25
**violated** 36:7 140:14
**Voided** 87:20
**VP** 97:20,25
**vs** 8:5

W

**walk** 19:2
**wall** 111:1
**Wang** 1:8,8 2:8,8 3:13,13 6:23 8:23 40:20 41:5,15 42:5,17 43:5 46:7 47:9,17 47:20 63:10 71:10 74:5,17 74:22 77:5 84:22 85:11,18 86:6 97:16,20 98:7,13,19 99:2,11,20 100:3 104:12 134:17 135:16 136:5 137:15 140:5,14 142:1 143:24 145:25 148:4
**Wang's** 84:22 85:5 138:7 140:23
**want** 22:18 27:23,24,25 51:16 54:2 55:7 69:15 84:6 92:22 94:10 113:20 119:5 121:5 122:21 126:16 127:5 129:18 145:5 148:18 151:8
**wanted** 13:18 46:5,15 53:19 53:21 84:11
**wants** 111:15
**wasn't** 18:15 96:12
**waste** 141:18
**watch** 107:8
**way** 12:6 26:11 41:20 42:6 48:21 55:9 63:25 66:12,17 70:16 113:12 127:15 129:1 139:12 149:4
**we'll** 64:20 151:10
**we're** 22:17 23:8 25:2 46:17 64:8,11 67:20 84:24 87:23 107:16,19 126:25 133:16 133:23 140:7,11
**we've** 45:14 72:20
**Webex** 2:20 8:9 9:3 29:11 31:12 33:1 101:1 130:5 134:11 154:9
**website** 52:25 54:7 65:14 123:4 145:20
**week** 82:4,6
**Welcome** 64:13
**went** 10:24,25 14:19 19:24 25:7 40:9 56:9 60:4 68:14 122:5,6 133:10
**WHEREOF** 154:22
**widely** 125:12
**willing** 144:10
**wish** 107:10
**wishes** 119:12 121:12
**witness** 1:18 4:2 8:19 9:15 9:19 11:5 14:5,15 15:1 32:9 50:21 64:5 65:2 67:14 68:5 73:8,10 84:8,10 86:15 88:12 118:24 120:22 127:5 130:6 137:1,3,7,9,20 138:16,16 140:12 141:15 150:4,6 151:20 152:1 154:5,8,16,22
**witness'** 48:8 141:14
**wondering** 38:23
**word** 116:10 144:7
**words** 54:17 68:10 90:3 95:3 100:7
**work** 10:24 16:5,8,12 17:17 23:11 24:14 32:12 33:9,16 42:25 43:6 44:3,19,23 52:15,22 53:8 76:16 77:25 77:25 81:18 90:11 113:8 113:10 144:25 148:23 149:7
**worked** 33:23 45:19 46:25 75:24 82:6 83:13
**working** 39:4,13 46:7
**works** 149:4
**world** 149:4
**wouldn't** 37:13 92:14 112:20 115:5 125:16
**write** 138:5 145:15
**writes** 135:24
**writing** 66:15 89:6 97:15
**written** 25:15,18 27:23 65:7 65:11,16,21 66:9,14 133:5
**wrong** 15:11 24:1,1 61:11 70:16 91:13 93:10 97:4 127:2 136:19,19
**wrote** 30:2,6,25 31:21 52:11 83:3 89:22 90:21 91:5 100:7 145:10

X

**Xin** 1:8 2:8 3:12

Y

**Y** 3:5
**yeah** 10:9,11 11:17 15:8 17:23 29:7 32:6 36:1 38:24 45:25 48:14 49:16 53:22 53:24 55:12 58:15 64:5 66:12 67:18 76:21,21,23 76:23 88:3 92:11 93:19,19 93:21 100:18 106:10 109:1 109:21 110:23 111:3,3,9 118:19 119:23 123:23 128:23 129:17 130:1,6,11 134:25,25 137:3 138:2,2 139:6 151:6
**year** 13:7,10 70:4,12 73:21 85:9 106:20 107:1 113:6,6 133:2,9,10
**years** 16:12 42:25 61:25 65:8 84:11,13,25 85:5,6 98:20,25 102:22 115:19 149:17

Z

0

**000002** 101:4
**011** 5:20
**0127** 6:19
**02** 5:25 6:8
**07102** 3:18

1

**1** 61:22,23 88:22 94:22
**1,538,000** 137:15
**1/2** 113:1
**1:58** 2:21 150:17,20
**10** 4:6
**10:05** 2:21 8:1,12
**100** 5:21
**104** 6:4
**10th** 114:19
**11** 78:23
**11:34** 64:9
**11:39** 64:12
**1146** 9:4 154:7
**118** 7:4
**12** 108:1 126:2,2 128:5
**12:45** 107:17
**12:52** 107:20
**127** 129:1
**128** 6:18
**13** 105:1 108:2
**134** 6:20
**14** 7:4 118:23 119:1,1 129:1
**14's** 128:18
**15** 126:2 127:11 128:5
**151** 5:5,6,10,14,17,22 6:5,19 6:21 28:23,24 29:1,18,24 30:1,5 32:16,18,23,25 33:15 48:6,8,12,20,23 49:17,19 50:14 51:3,6 64:21,23 70:25 84:8,9 88:11,21 93:9 98:5 122:16 122:19 129:9 130:4,7 151:21
**152** 5:9 30:13,15,23 31:3 32:16,19 49:8,10 50:18,20 50:24 65:1,3,6 72:17,20,21 72:25
**153** 5:13 31:13,14,19,25 32:16,19 48:25 49:20,22 50:14 71:1 145:3,7
**154** 5:16 78:4,5,10,20,22,24 79:4 86:10,11,13 87:14 120:20,22
**155** 5:21 100:23 101:2,5,7 101:23
**156** 6:4 104:20,22 107:21,24 108:3 118:3
**157** 6:18 128:10,11,19,21,24 129:4
**158** 6:20 134:6,9 135:23 137:13 140:21 151:22
**16** 1:19 2:22 8:1,10 85:9 152:9 153:2
**16-00974** 74:7
**18** 9:5 154:7
**19** 137:13
**1982** 68:18
**1990** 11:13 25:12 67:7,13 68:4,6 69:1
**1999** 11:10 25:11 67:8

2

**2** 5:10 30:24 31:5 32:14

49:13,15,15 50:21 57:7,23 65:1,5 98:4,5 108:1 147:23
**2.25** 106:1
**2.285** 94:14
**2:02** 151:25
**20** 54:25 55:11 58:14,19 123:25 124:6,11 130:12,24 131:16 134:21 138:6 152:19,22
**2010** 47:13,18 85:8 89:19 90:3,14 93:16 104:6 135:11
**2011** 65:18 106:20
**2011-2016** 143:10
**2012** 56:24 58:4 62:1 74:10 77:20 87:6
**2013** 62:1 65:18 98:15 104:13 135:17
**2014** 98:15 104:13 135:17
**2015** 98:18 99:4
**2016** 47:14,18 57:24 74:3 77:6 84:17 85:9 88:13,13 93:17 98:18 99:4 104:7 106:20 135:12
**2017** 134:21
**2019** 126:12,12
**2020** 9:5 73:21 154:7
**2021** 1:19 2:22 5:6,10,14 8:1 8:10 30:3,7 31:5,21 32:2 48:16 50:6,22 61:22,23 73:25 122:20 129:8 145:4 152:9 153:2 154:23
**21** 138:6
**210416MEM** 1:25
**213)443-1904** 3:8
**21st** 154:23
**22** 140:21
**23** 112:24
**24** 112:24
**25** 5:6 30:3,7 32:14 48:9,16 48:24 49:20 50:15 73:9,25 83:3 88:9 102:10,18 106:16 122:20 129:8
**25th** 83:25 114:18
**26** 57:24 74:3 84:16 85:9 88:13 93:16 135:12
**26(a)(2)(B)** 32:20
**2769** 1:24 2:23 154:3,25
**28** 5:5 56:24 74:10 77:20 87:6

**3**

**3** 5:12,15 65:5 84:19,24 113:1,1 118:3
**30** 5:9 51:11 134:20
**30-day** 150:10
**30(b)(5)** 10:2
**31** 5:13
**323)965-3998** 3:8
**330,994** 106:2
**35,000** 62:14
**367,215** 135:18

**4**

**4** 84:1,8,10 88:9 93:8 106:18
**4.8** 93:15,18
**4.9** 93:20,22 94:8,13
**4/4/2016** 87:21,24
**40** 58:23 82:4 134:19
**40-hour** 82:6
**444** 3:6
**46** 6:24 134:20
**46-page** 134:14

**5**

**5** 84:19 88:9 93:8 122:21

**6**

**6** 33:3 79:10,12,15,20 81:12
**6,714,580** 137:15
**6.7** 139:8 143:14
**6.714** 138:3
**60** 55:7,7,10 58:12,23,23
**622110** 109:10

**7**

**7** 33:4 50:5
**7,211,692** 135:10 143:12
**7,250,000** 109:13 111:14 115:15
**7.2** 135:15,21 139:4 143:13
**7.25** 113:2,5
**7:05** 8:11
**75th** 114:23
**78** 5:16

**8**

**8** 5:8 7:7 33:4 86:18,18
**8:16-cv-00974-CJC-AGR** 1:7 2:7
**80** 55:8,10 58:12,23
**8062** 109:9,10 118:8
**88th** 123:14

**9**

**9** 5:14 31:21 32:2,14 48:25 49:21 50:15 86:18,18,18 86:18 135:23 145:4
**9,000** 60:1
**900** 3:6
**90071** 3:7
**90th** 114:23
**973)643-5989** 3:19
**973)643-6500** 3:19

# Exhibit 38

MARCUM
ACCOUNTANTS ▲ ADVISORS

April 9, 2021

Mr. Hervé Gouraige
Sills, Cummins and Gross
One Riverfront Plaza
Newark, NJ 07102

Re: Charles Liu and Xin Wang

Dear Mr. Gouraige,

You have asked me to review the expert report of Carlyn Irwin (Irwin) of Cornerstone Research that was submitted on behalf of the Securities and Exchange Commission (SEC) as part of the action entitled SEC vs. Charles C. Liu; Xin Wand a/k/a Lisa Wang; Pacific Proton Therapy Regional Center, LLC; Pacific Proton EB-5 Fund, LLC; and Beverly Proton Center, LLC f/k/a/ Los Angeles County Proton Therapy, LLC (SACV 16-00974-CJC (AGRx)).

**General comments:** In general, I have the following comments about the report dated March 26, 2021; my review will refer to the pages in the expert report.

Irwin's qualifications demonstrate no experience or training in executive or other compensation matters; her firm does also not list this as an area of expertise on its website. I would therefore question whether Irwin or any member of her firm should be allowed to testify as an expert in this case in the area of the reasonableness of compensation paid to Liu and Wang.

Irwin's argument that Liu and Wang are not entitled to any compensation because the Beverly Proton Center never generated any revenue ignores reality—that is, compensable work can be performed while an operation is in a pre-revenue phase. In this way, Irwin does not address the amount of reasonable compensation in the case before us because in her view all compensation would be unreasonable.

**Specific comments:**

- I. Qualifications: Irwin's qualifications demonstrate no training or experience in the topic of executive compensation or the determination of reasonable compensation. Her experience appears to lie primarily in forensic accounting and the estimation of economic damages. She states the following on page 1 of her report:

> "Relevant to this matter, I have testified and previously qualified as an expert regarding forensic accounting, fraud investigations, and factors related to alter ego."

Irwin's resume (Appendix A) does not disclose any expertise or experience in determining reasonable compensation amounts.

I do not believe that Irwin's experience would qualify her as an expert in the area of executive compensation or the determination of reasonable compensation.

- II. D. Scope of Assignment: Irwin indicates that she has been asked to opine on various issues in this action, including the represented and actual flows of contributions by each investor, the relationship between actual expenditures and business purpose of the investments and the amount of the net pecuniary gain by Liu and Wang. Irwin does not indicate that she was asked to specifically opine on the reasonableness of the compensation paid to Liu and Wang in this matter; at a minimum, she could have reviewed whether the payments to Liu and Wang satisfied the business purpose of the investments, but she did not appear to do so based on her opinions as discussed in the following paragraph.

- VI. C. 3. Individual Defendants' Pecuniary Gains: Irwin's analysis (paragraphs 44 through 48) focuses on the facts that physical construction on the project never began and the proton center never generated any revenue. Irwin's argument is that if there is no revenue, no compensation is justified; therefore, she ignores the issue of how much compensation paid to Liu and Wang is reasonable, because in her view no compensation is reasonable for an entity without revenue. While those facts may be correct, Irwin's argument is not. It is clear that start-up entities and entities that are classified as "pre-revenue" can pay compensation to those individuals who perform services for the entities, and can deduct that compensation, if reasonable, on the entities' tax returns even if those entities do not have revenue. This is standard practice; entities that have expenses prior to the generation of revenue result in net operating losses that are offset against future income. There are many tasks that must be performed in the operation of a pre-revenue business such as the business in the instant case, including but not limited to the development of a marketing campaign, construction supervision, accounting related activities (such as maintaining financial records and income tax compliance), and human resource related activities. Irwin contradicts herself when she allows for the payment of fees to outside service providers (paragraph 35).

  Irwin would have the reader believe that executives and employees of pre-revenue companies are not entitled to receive any compensation for their work in bringing the companies to the marketplace. If that were the case, the only businesses that would be created would be those that are the employees' hobby and/or started by individuals who can afford to work for no compensation.

- Appendix B: Documents Considered List: While I did not review any of the documents listed in this appendix, aside from the SEC's complaint, I did not see any reference to any study or survey of executive compensation.

With respect to this matter, Marcum LLP shall be compensated at $450 per hour for my time spent in preparation of my expert report, and $540 per hour for my time spent related to depositions and testimony in court. Marcum LLP will also be compensated for my colleagues who worked on this matter under my direction. Neither my compensation nor my colleagues' compensation is contingent or based on the content of my opinions or the outcome of this matter.

Very truly yours,

MARCUM LLP

Theodore R. Ginsburg, Director
Cc: Karen Connair, Marcum LLP

# Exhibit 39

EXHIBIT
119
2-24-2021 C. Liu

16(6)

# EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made by and between Pacific Medical Regional Center, LLC, a California Limited Liability Company (hereinafter called "Company") and Michael Cogswell (hereinafter called "Employee").

## RECITALS

A. **WHEREAS** Company is in the business of developing Proton Therapy Center and requires the services of a President in business development of the company, and wishes to extend to employee an offer of employment;

B. **WHEREAS** Employee has represented to Company that he has the skills and experience necessary to perform the duties of such President;

C. **WHEREAS** Employee desires to accept an offer of employment by Company as its President;

**NOW THEREFORE**, in consideration of the above, and of the mutual agreements hereinafter set forth, the parties hereto do hereby agree as follows:

## AGREEMENT

1. Offer of Employment: Company hereby offers employment to Employee as Vice President upon the terms and conditions set forth in this Agreement.

2. Acceptance of Employment: Employee accepts Company's employment offer upon the terms and conditions set forth in this Agreement.

3. Term of Agreement:

This Agreement shall have a term of five years and shall be renewable upon the mutual agreement of the parties by separate contract at the expiration of the term of employment.

4. Employee Compensation:

Employee shall receive as compensation an annual base salary of $250,000.00. The Company agrees to pay the employee since April 5, 2016. In addition to base salary, Employee shall earn bonus on the following basis:

5. Payment of Salary:

Company shall pay Employee base salary each quarter in advance.

6. Employee's Employment Duties:

a. Employee shall be responsible for the development of the corporation and its fund

raising in both US and overseas.

b. In performing his job duties for Company, Employee shall devote effort to discharge the responsibilities assigned to him, shall not in any manner work for any other Company, that would compete with Company on an independent basis, or otherwise, and shall perform such other duties consistent with his position, as may from time to time be assigned to him by Company.

7. Employee's Reimbursement for Expenses:

c. Employee shall be entitled to the reimbursement of all normal and justified business expenses (reimbursable business expenses) reasonably incurred in connection with the performance of Employee's employment duties with Company.

b. For cash disbursements by Employee for reimbursable business expenses, Employee shall submit a monthly itemized business expense report to Company on or about the first (1st) day of each month, along with actual receipts for such expenditures. Such business expenses shall be paid to Employee by Company on or about the fifteenth (15th) day of that month.

8. Vacations, Holidays, and Sick Time:

a. Employee shall be entitled to fourteen (14) working days paid vacation to be taken within the next 365 calendar days. Vacation shall be taken at a time mutually convenient to Company and Employee._Company and Employee shall be reasonable with each other in the scheduling of vacation time, and neither shall be arbitrary or capricious in such scheduling.

b. Employee shall be entitled to fourteen (14) sick or personal days per year in addition to vacation time.

c. At a minimum, Employee shall be entitled to the following paid holidays:

1. New Year's day
2. Day on Good Friday
3. Memorial Day
4. July 4th official government holiday
5. Labor Day
6. Thanksgiving
7. Day on Christmas Eve
8. Christmas Day

In addition, Employee shall be entitled to any religious holiday of Employee's religion, not exceeding one day, which is normally recognized and celebrated by that religion as a day off work.

9. Insurance Benefits:

The insurance policy shall be at Employee's sole expense.

10. Disclosure:

a. Employee agrees to make available to Company all knowledge possessed by him relating to any methods, developments, invention, and/or improvements, which concern in any way the business of Company, whether acquired by Employee before or during the term of his employment hereunder, provided that nothing herein shall be construed as requiring any disclosure where the method, development, invention and/or improvement is lawfully protected from disclosure as a trade secret of a third party or by any other lawful bar to such disclosure.

b. Employee agrees to receive and maintain in confidence and not to disclose to any third party all ideas, methods, developments, client lists, inventions, improvements and business plans and information of Company of which Employee becomes aware during his employment hereunder or which Employee conceives or makes, whether solely or jointly, while in Company's employ.

c. Confidentiality: Employee acknowledges that during the course of employment with Company, Employee will have access to certain information that is of great value to Company, and which is not readily available to outsiders. Employee understands that such information, including but not limited to trade secrets, clients lists, customer lists, designs, drawings, plans, documents, prototypes, manufacturing techniques, equipment, sales and client or customer information, pricing and purchasing plans, business and financial information, work in progress, products, files, reports, memoranda, computer software or programming and budgets or other financial plans or information regarding Company and its business, property and affairs, employees, clients, customers, vendors or suppliers, proposals and projections, included but not limited to long-range plans for Company's growth, expansion, development, and continued fostering of its relationships with its employees, clients, customers, vendors or suppliers (hereinafter referred to as "Confidential Information"), is protected, confidential and proprietary information of Company.

11. Covenant of Confidentiality: Employee agrees to hold in the strictest confidence, and agrees not to publish or disclose to any other person or entity at any time, either during or after employment, any Confidential Information of Company without the prior written consent of Company.

12. Use of Confidential Information: Employee agrees not to use any such Confidential Information to compete with Company in any way, either directly or indirectly, and will not otherwise use or misuse any such Confidential Information for Employee's own benefit, or to the detriment of Company.

13. Delivery of Confidential Information: Employee further agrees to promptly deliver to Company, upon request or upon termination from employment, all correspondence, notes, computer disks, computer data, books, records, memoranda, worksheets, drawings, reports, and other written or computer information or data of any kind, relating to or arising out of business, products, practices, or techniques of Company. It is understood that all work product of Employee while in Company's employ belongs to and is proprietary to Company, and Employee shall not be entitled to take or use any such information, in any form whatsoever for personal use or otherwise.

14. Consideration for Covenants: It is agreed by and between Company and Employee that the confidentiality agreement and covenant not to compete set forth herein are necessary for the

protection of the business of Company, and that as consideration for Employee's agreement thereto, Employee will receive access to Company's confidential business information, as well as special training in Company's manner of doing business. Were it not for this agreement, Company would not release such confidential information to Employee.

15. Benefit of Agreement: This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective legal representatives, administrators, executors, successors, subsidiaries and affiliates, partnerships, corporations, and other business entities, and upon other persons or business entities with whom the parties hereafter have a business affiliation.

16. Applicable Law; Jurisdiction; Captions; Time of Essence: It is stipulated by Company and Employee that this Agreement is entered into in the State of California, and shall be governed and construed in accordance with the law of the State of California. Jurisdiction is deemed by Company and Employee to be the appropriate court of jurisdiction in Orange County, California.

17. Captions: The captions at the beginning of each paragraph of this Agreement are solely for the convenience of the parties and are not part of this Agreement. Time is of the essence in this Agreement.

18. Waiver: The waiver by either party of a breach of a provision of this Agreement shall not operate or be construed as a waiver of a subsequent breach thereof.

19. Severability: Each provision of this Agreement is intended to be severable from the others so that if any provision or term hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remaining provisions and terms hereof.

20. Assignment: This Agreement and all rights hereunder are personal to Employee and shall not be assignable, and any purported assignment thereof shall not be valid and binding upon Company. Company may assign all of its rights hereunder to any person, firm or corporation succeeding to the business of Company.

21. Modification of Agreement: This Agreement may be modified only by a writing signed by the parties, or their respective authorized agents. Any modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

22. Survival of Agreements and Covenants: It is the intent of the parties to this Agreement that the confidentiality agreements and covenants will survive the termination of Employee's employment with Company unless the contrary is set forth in writing and signed by Company and Employee.

23. Scope of Validity: This Agreement and all covenants herein shall be valid in, and shall extend worldwide, and not withstanding any provision of this Agreement regarding Jurisdiction, may at the sole option of Company, be enforced by Company in any jurisdiction where any violation takes place.

24. No Conflicts: Employee represents and warrants to Company that he is not now under any obligation of a contractual or other nature to any person, firm or entity which is inconsistent or in conflict with this Agreement, or which would prevent, limit, impair, or conflict with in any way, the

performance by him of his obligations and covenants made hereunder.

7. Entire Agreement: The execution of this Agreement by Company and Employee alike is free and voluntary. No inducement to enter into this Agreement except as expressly stated herein, is made by either Company or Employee. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto and contains all of the covenants and agreements between them. Each party acknowledges that no representation, inducement, promise or agreement, orally or otherwise, has been made by any party or anyone acting on behalf of any party which is not embodied herein.

**WHEREFORE**, this Agreement is executed by the parties, in duplicate original, on the dates herein below written.

**NOTE: THIS IS A LEGAL DOCUMENT. DO NOT SIGN IT UNLESS YOU HAVE READ AND UNDERSTOOD THE ENTIRE AGREEMENT, AND AGREE WITH ALL OF THE PROVISIONS HEREIN.**

Dated: April 5, 2016

Pacific Medical Regional Center

By: CHARLES LIU

Dated: April 5, 2016

CHARLES C LIU

By: [signature]

[signature]
Michael Cogswell-President

Date 4/4/16

# Exhibit 40

GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
Email: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Southern Division**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,

Defendants.

Case No. SACV16-00974-CJC (AGRx)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RULE 26(a)(2) DESIGNATION OF REBUTTAL EXPERT WITNESS**

In accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure and the Court's February 19, 2021 Amended Scheduling Order Regarding Discovery Preliminary Injunction, and Related Matters (Dkt. No. 310), Plaintiff Securities and Exchange Commission ("SEC") hereby designates the retained expert witness identified below as a person who may be used at trial or hearing to present evidence under Federal Rules of Evidence 702, 703, or 705 in rebuttal to defendants' disclosed experts in this matter:

Carlyn Irwin
Senior Advisor
Cornerstone Research
555 West 5th Street, 38th Floor
Los Angeles, CA 90013
213.553.2533

Ms. Irwin is expected to testify about the topics set forth in her report dated March 26, 2021 and her rebuttal report dated April 9, 2021, attached hereto as Exhibit 1. Ms. Irwin's rate is $800 per hour.

If Ms. Irwin is not available at the time of hearing, the SEC reserves the right to seek the introduction of competent former testimony, including depositions of such witnesses in lieu of their testimony. The SEC further reserves the right to substitute individuals of equal learning, experience, expertise and/or training, should the schedule of the trial preclude the above individual(s) from testifying at the time of trial in this matter. The SEC also reserves the right to supplement or amend this designation in accordance with Rule 26(a)(2) and (e) of the Federal Rules of Civil Procedure.

Dated: April 9, 2021

Respectfully submitted,

*/s/ Gary Y. Leung*

Gary Y. Leung
Jacob A. Regenstreif
Attorneys for Plaintiff
Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On April 9, 2021, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RULE 26(a)(2) DESIGNATION OF REBUTTAL EXPERT WITNESS** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April 9, 2021

*/s/ Gary Y. Leung*
GARY Y. LEUNG

***SEC v. Liu et al.***
**United States District Court—Central District of California**
**Case No. SACV16-00974-CJC (AGRx)**

**<u>SERVICE LIST</u>**

*Counsel for Defendants Charles C. Liu and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu, the controlling shareholder of each*)

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

# EXHIBIT 1

***Securities and Exchange Commission***

***v.***

***Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al.***

Rebuttal Expert Report of Carlyn Irwin

Carlyn Irwin
Senior Advisor
Cornerstone Research

APRIL 9, 2021

# Table of Contents


I. Introduction ..... 1

II. Mr. Friedman's Assertions ..... 1

III. Mr. Ginsburg's Assertions ..... 3

IV. Summary of Opinions ..... 4

V. Mr. Friedman Does Not Present Any Analysis of the Reasonableness of the Cash Payments Made By the Corporate Defendants ..... 5

- A. The Friedman Report Fails to Analyze the Nature and Purpose of Payments Made By the Corporate Defendants ..... 5
- B. The Friedman Report Acknowledges That Management Fees Paid to Mr. Liu and Ms. Wang Were Excessive ..... 7
- C. The Friedman Report Overstates Assets as of April 30, 2016 ..... 7

VI. Mr. Ginsburg Fails to Establish That Ms. Wang's Compensation Was Reasonable and Consistent with the POM ..... 10

- A. Mr. Ginsburg's Finder's Fee Estimate Is Based on a Fundamentally Flawed Analysis ..... 11
  - 1. Mr. Ginsburg's Interpretation of His Finder's Fee Estimate Does Not Consider the Terms of the POM nor the Composition of the Pacific Proton Regional Center's Offering Expenses ..... 11
  - 2. Mr. Ginsburg's Sample Is Flawed and the Data It Reflects Are Unreliable ..... 13
  - 3. Mr. Ginsburg's Finder's Fee Calculation Is Fundamentally Flawed ..... 15
- B. Mr. Ginsburg's Base Compensation Estimates Are Overstated and Based on a Fundamentally Flawed Analysis ..... 17
  - 1. Mr. Ginsburg Fails to Account for the Terms of the POM ..... 17
  - 2. Mr. Ginsburg's Salary Compensation Estimates Are Overstated Because They Result from a Flawed Selection and Usage of Survey Data ..... 19

## I. Introduction

1. I have been retained by counsel for the Securities and Exchange Commission ("SEC") to provide expert testimony in the matter *Securities and Exchange Commission v. Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al*. I filed an expert report in this matter on March 26, 2021 ("Initial Report") in which I analyze the flow of funds and cash outflows of the EB-5 Project.[1]

2. I have been asked to evaluate and respond to the assertions made by Mr. Ronald S. Friedman in his undated expert report (the "Friedman Report") and by Mr. Theodore R. Ginsburg in his expert report dated March 26, 2021 ("Ginsburg Report"). A complete list of materials I considered in forming my opinions in this matter are cited in this report and listed in **Appendix A**.

## II. Mr. Friedman's Assertions

3. In the Friedman Report, Mr. Friedman presents adjusted financial statements for the PPEB5 Fund, Pacific Proton Regional Center, and Beverly Proton as of April 30, 2016 and for the period of operations ending April 30, 2016, which he prepared based on the documents provided to him.[2] Mr. Friedman, however, has not established the reliability and relevance of these adjusted financial statements. Mr. Friedman, who is a CPA, does not define the framework under which the financial statements were prepared nor the professional standards, if any, under which he conducted his work. Moreover, he does not purport to have conducted an assurance or attestation engagement (i.e., audit, review, or compilation engagements) or even to have prepared financial statements in conformity with AICPA rules (i.e., preparation of financial statements under AR-C Section 70). Assurance and attestation engagements are governed by rules that require the practitioner to perform a number of procedures to verify and substantiate

---

[1] This report supplements my Initial Report. As such, it does not repeat the material included in that report (e.g., Section I: Qualifications, and Section II: Background). Unless otherwise indicated, all defined terms are as used in my Initial Report.

[2] Expert Report of Ronald Friedman with Appendix and Exhibits, March 25, 2021 ("Friedman Report"), pp. 1–2.

the information presented in the financial statements.[3] Attest engagements such as a compilation do not require the accountant to verify or substantiate the underlying financial information but require him/her to consider disclosing any known departures from the applicable financial reporting framework.[4] Other non-attest engagements such as the preparation of financial statements under AR-C section 70 require the accountant to disclose material misstatements or omissions.[5] Because Mr. Friedman failed to disclose the type of engagement he conducted and whether he followed any professional standards, he has not established the level of reliance that can be placed on his work.

4. The financial statement adjustments made by Mr. Friedman primarily consist of classifying the payments made by the Corporate Defendants as expenses or assets, and determining the amount of certain expenses and assets to calculate the equity of the Corporate Defendants.[6] Based on these adjusted financial statements, Mr. Friedman concludes that between 2010 and 2016 the Corporate Defendants accumulated approximately $31.8 million from capital contributions, administrative fees, and miscellaneous income[7] and paid approximately $19.3 million in expenses,[8] purportedly leaving them with assets of approximately $12.5 million as of April 30, 2016.[9]

5. In summary, Mr. Friedman concludes that the Corporate Defendants' expenses were as follows:

- Liu fees: $7.2 million
- Broker fees: $4.3 million (net of receivable)

---

[3] *See* "Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance with Generally Accepted Auditing Standards," AICPA, § 200.14, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/au-c-00200.pdf, accessed on April 7, 2021; "Review of Financial Statements," AICPA, § 90.03, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00090.pdf, accessed on April 7, 2021; "Review Engagements," AICPA, § 210A.04, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/at-c-00210-a.pdf, accessed on April 7, 2021.

[4] *See* "Compilation Engagements," AICPA, § 80.29, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00080.pdf, accessed on April 7, 2021.

[5] *See* "Preparation of Financial Statements," AICPA, §§ 70.A17–8, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00070.pdf, accessed on April 7, 2020.

[6] Friedman Report, p. 1.

[7] Friedman Report, p. 3.

[8] Friedman Report, pp. 2–3.

[9] Friedman Report, p. 2.

- Marketing fees: $2.5 million
- Consulting fees: $2.0 million
- Legal and professional fees: $783,000
- Demolition: $466,000
- Travel: $414,000
- Wang salary: $367,000
- Rent: $321,000
- Other: $0.9 million

6. In addition, Mr. Friedman concludes that the Corporate Defendants' assets as of April 30, 2016 included the following:

- Receivable from Overseas Chinese Immigration: $3.4 million
- Receivable from Liu and Wang: $3.1 million
- Deposit to Mevion: $3.0 million
- Receivables: $1.5 million
- Receivable from Thropay: $838,500
- Cash: $419,000
- Lease Deposit: $200,000
- Other: $72,000

7. Mr. Friedman then estimates the equity balance of the entities as of April 30, 2016 by subtracting the operating loss generated by the enterprise from the capital invested by the foreign investors. For the operating loss, he allocates 75% to Mr. Liu and 25% to Dr. Thropay.[10]

## III. Mr. Ginsburg's Assertions

8. In the Ginsburg Report, Mr. Ginsburg presents his determination of "what reasonable compensation would have been for Liu and Wang" from [Pacific Proton Regional Center, the

[10] Friedman Report, Exhibit 1.

PPEB5 Fund, and Beverly Proton]."[11] Specifically, Mr. Ginsburg calculates Mr. Liu's "reasonable compensation" from the Pacific Proton Regional Center, the PPEB5 Fund, and Beverly Proton between 2010 and 2016 as the sum of:

a. A finder's fee based on the median finder's fee that Mr. Ginsburg estimates for a sample of other EB-5 entities,[12] and

b. The "market value of services rendered by Liu … to the various Project entities,"[13] which Mr. Ginsburg derives from a survey of the compensation earned by executives bearing job titles similar to Mr. Liu.[14]

9. Mr. Ginsburg applies the same approach to calculate Ms. Wang's "reasonable compensation" from Beverly Proton during 2013 and 2014.[15] Based on these calculations, Mr. Ginsburg concludes that "reasonable compensation for Liu from [the Corporate Defendants] for the time period 2010-2015, and through May 26, 2016, related to his service as an officer totals $4,925,812, and that reasonable compensation to Wang from Beverly Proton for the time period 2013-2014 related to her service as an employee is $367,215."[16]

## IV. Summary of Opinions

10. Based on my analysis of the Ginsburg Report and the Friedman Report, my opinions as stated in my Initial Report have not changed. In this report, I respond to assertions made by Mr. Ginsburg and Mr. Friedman and have concluded the following:

a. Mr. Friedman overstates the Corporate Defendants' assets. Mr. Friedman also fails to provide an analysis of the reasonableness of the cash payments made by the Corporate Defendants, and fails to evaluate whether they are consistent with the terms of the private offering memorandum ("POM").

b. Mr. Ginsburg's compensation analysis is fundamentally flawed. Therefore, Mr. Ginsburg fails to establish that any compensation received

---

[11] Expert Report of Theodore R. Ginsburg, March 25, 2021 ("Ginsburg Report"), p. 1.
[12] Ginsburg Report, p. 2, Appendix A.
[13] Ginsburg Report, p. 2.
[14] Ginsburg Report, pp. 2–4.
[15] Ginsburg Report, pp. 2–4.
[16] Ginsburg Report, p. 4.

by Mr. Liu and Ms. Wang was reasonable based on the terms of the POM and the activities of the Corporate Defendants.

## V. Mr. Friedman Does Not Present Any Analysis of the Reasonableness of the Cash Payments Made By the Corporate Defendants

11. As an initial matter, the Friedman Report fails to address the two main outstanding issues of the current matter. Specifically, Mr. Friedman does not assess whether the Corporate Defendants were looted by Mr. Liu and/or Ms. Wang. Moreover, Mr. Friedman does not present any analysis of the reasonableness of the cash payments made by the Corporate Defendants, and fails to evaluate whether they are consistent with the terms of the POM. Instead, the Friedman Report merely classifies all cash outflows as expenses or assets. As such, the Friedman Report does not cause me to alter the opinions expressed in my Initial Report.

12. To the extent Mr. Friedman is using the financial statements he prepared to establish that the payments made by the Corporate Defendants were consistent with the POM or that the entities were solvent, those financial statements fail to accomplish that goal because the Friedman Report overstates the Corporate Defendants' assets as of April 30, 2016.

### A. The Friedman Report Fails to Analyze the Nature and Purpose of Payments Made By the Corporate Defendants

13. The Friedman Report fails to assess whether the payments made by the Corporate Defendants were consistent with the terms of the POM. Mr. Friedman fails to acknowledge a number of facts that suggest that some of the payments made by the Corporate Defendants were excessive. For example, Mr. Friedman fails to acknowledge that the payments that he categorizes as "Legal and Professional Fees," "Broker Fees," and "Marketing Fees" ($7.6 million total)[17] were greater than the amount of administrative fees collected from investors,[18]

---

[17] $782,824+$4,266,025+$2,550,025 = $7,598,874. *See* Friedman Report, Exhibits 2A, 2B, 2E.

[18] In my Initial Report, I estimated that administrative fees receipts amounted to $2.21 million between October 2014 and April 2016. I note that Mr. Friedman reviewed a longer time period, which explains the difference in amounts. *See* Initial Report, ¶ 29.

and therefore were inconsistent with the terms of the POM.[19] Similarly, Mr. Friedman fails to provide an analysis of the reasonableness of the payments made to the Liu Affiliates, including whether they were related to the EB-5 Project.[20]

14. Furthermore, the Friedman Report does not analyze whether any payments made by the Corporate Defendants gave rise to pecuniary gains for the Individual Defendants. For instance, despite noting that certain payments made by the Corporate Defendants are of a personal nature (e.g., car purchases of $75,258),[21] Mr. Friedman fails to reach any conclusion as to pecuniary gains to the Individual Defendants. Similarly, while he acknowledges that there is insufficient documentation evidencing the nature and purpose of certain payments,[22] Mr. Friedman fails to discuss whether this absence of evidence has any bearing on his analysis or on the amount of pecuniary gains to the Defendants. Mr. Friedman acknowledges that approximately $5,715,592 worth of payments were not supported by an invoice or were in excess of the amounts stipulated on the contracts.[23]

15. Mr. Friedman also fails to acknowledge that several payments made to Mr. Liu and Ms. Wang occurred after they received a subpoena from the SEC in February 2016.[24] Those payments also occurred before relevant employment contracts were signed.[25]

---

[19] Government Exhibit 5, p. 8.

[20] *See* Initial Report, ¶ 50.

[21] Friedman Report, Exhibit 1D.

[22] *See, e.g.*, Friedman Report, Exhibit 1D, note 2 ("We have not been provided any support that documents that these cars were being used for operational purposes of the entity.…").

[23] Sum of all the payments for which Mr. Friedman noted that he was not provided any invoices and/or were in excess of purchases agreements or contracts. *See* Friedman Report, Exhibits 1B, 1C, 1E, 1F, 1G, 2. $368,100+$315,487+$402,549+$932,500+$2,350,025+$100,000+$90,070+$53,285+$380,500+$40,027+$100,000+$200,000+$68,049+$315,000 = $5,715,592.

[24] Deposition Exhibit 116; JP Morgan Chase Account 5152 Data, Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP xls (October 1, 2014 – April 28, 2016); JP Morgan Chase Account 1028 Data, SEC-JPMCB-P-0000808–13 (February 11, 2016 – March 21, 2016).

[25] Deposition Exhibits 120, 123; JP Morgan Chase Account 5152 Data, Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP xls (October 1, 2014 – April 28, 2016); JP Morgan Chase Account 1028 Data, SEC-JPMCB-P-0000808–13 (February 11, 2016 – March 21, 2016); JP Morgan Chase Account 6428 Data, Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls (October 1, 2014 – April 28, 2016).

### B. The Friedman Report Acknowledges That Management Fees Paid to Mr. Liu and Ms. Wang Were Excessive

16. Mr. Friedman acknowledges that Mr. Liu and Ms. Wang received management fees in excess of reasonable compensation amounts.[26] In this regard, the Friedman Report confirms the conclusion I reached in my Initial Report about the excessive nature of purported compensation payments made to the Individual Defendants.[27]

17. Specifically, Mr. Friedman notes that management fees to Mr. Liu and Ms. Wang were at least $3,079,864 greater than the "reasonable compensation" amounts Mr. Ginsburg estimates in his report.[28] In addition, as shown in Section VI below, the overpayment amount is substantially understated because it is based on a fundamentally flawed analysis. Hence, Mr. Ginsburg has not established that any compensation received by Mr. Liu and Ms. Wang was reasonable or supported by the POM. As such, based on the compensation figures disclosed in the Friedman Report, I estimate that Mr. Liu and Ms. Wang received at least $10,658,771 of excess management fees.[29]

### C. The Friedman Report Overstates Assets as of April 30, 2016

18. Mr. Friedman classifies several payments as assets without evaluating whether they can indeed be considered as assets from an accounting standpoint. As such, the financial statements he prepares constitute a misleading summary of the Corporate Defendants' financial position as of April 30, 2016. Moreover, even if certain amounts could be considered assets, Mr. Friedman does not present any analysis of the reasonableness of the assets given the activities of the Corporate Defendants, nor does he evaluate whether they are consistent with the terms of the POM.

19. Under U.S. generally accepted accounting principles ("GAAP"), which I expect Mr. Friedman used because the entities were in the United States, assets are defined as "probable future economic benefits obtained or controlled by a particular entity as a result of past

---

[26] Friedman Report, Exhibit 2D.
[27] Initial Report, Section VI.C.3.
[28] Friedman Report, Exhibit 2D.
[29] Friedman Report, Exhibit 2D.

transactions or events."[30] In order for a company to recognize an item as an asset, the item must have the capacity to contribute directly or indirectly to the company's future net cash inflows, at the time the item is being assessed for recognition.[31] In other words, the amount at which the item is being recognized must be recoverable.

20. In numerous instances, Mr. Friedman fails to establish that payments he classifies as assets meet the aforementioned definition of an asset. Specifically:

a. Mr. Friedman capitalizes the $3 million payment to Mevion as "Medical Equipment"[32] without assessing whether Beverly Proton would reap future economic benefits from it, and if so, whether the full amount paid would have been recoverable as of April 30, 2016. In a letter dated August 26, 2016, counsel for Mevion asserted that the $3 million paid to Mevion was not refundable and thus should not be considered an asset to the Corporate Defendants.[33] Moreover, the letter also stated that Mevion should be considered a creditor to the Corporate Defendants.[34]

b. Mr. Friedman presents $1.5 million worth of payments to Industrial and Commerce Bank as "Other Receivables" as of April 30, 2016,[35] without establishing that they are recoverable and despite acknowledging that he has "not made a determination about the collectability of the receivables on the balance sheet."[36] Similarly, Mr. Friedman fails to establish that the receivable of $3.4 million from Overseas Chinese he presents on the consolidated balance sheet as of April 30, 2016 was recoverable and thus

---

30 FASB, Concept Statement No. 6, as amended, § 25.

31 FASB, Concept Statement No. 6, as amended, § 174 ("To assess whether a particular item constitutes an asset of a particular entity at a particular time requires at least two considerations…: (a) whether the item obtained by the entity embodied future economic benefit in the first place and (b) whether all or any of the future economic benefit to the entity remains at the time of assessment.").

32 Friedman Report, Exhibit 1B.

33 Caroline Bullerjahn, "Re: SEC v. Liu, et al., Case No. 8:16-cv-00974 (C.D. Cal.)," August 26, 2016, p. 2.

34 Caroline Bullerjahn, "Re: SEC v. Liu, et al., Case No. 8:16-cv-00974 (C.D. Cal.)," August 26, 2016, p. 3.

35 Friedman Report, Exhibit 1A.

36 Friedman Report, p. 1.

should not be considered an additional Offering Expense.[37]

c. Mr. Friedman does not present his basis for capitalizing the $200,000 payment to Montebello Community Health Service as of 2016 nor does he present any evidence that it was indeed a lease deposit payment.[38] Notably, Mr. Friedman states that the payment is not supported by any invoice or contract. This statement suggests that the nature of this payment has not been ascertained by contemporaneous documentation. Even if it were, Mr. Friedman has not shown that the payment would either be returned or provide Beverly Proton with future economic benefits, and therefore that it meets the definition of assets as of April 30, 2016.

d. Mr. Friedman presents the $100,000 lease deposit to Dr. Thropay as a receivable as of April 30, 2016, noting that "[s]ince Beverly Proton Center, LLC never received the $100 million in funding, the lease never became effective and therefore none of the rent and security deposit was due to John Thropay."[39] He also capitalizes $738,500 worth of rental payments paid to Dr. Thropay as assets.[40] Mr. Friedman, however, fails to establish that the monies paid to Dr. Thropay would have provided future economic benefits to the Corporate Defendants as of April 30, 2016 and that they can thus be considered as assets receivable, rather than be written off.

e. In addition to understating the excess management fees paid to Mr. Liu and Ms. Wang which Mr. Friedman estimates at $3.1 million as described above, Mr. Friedman does not demonstrate that those fees will be recoverable and that they can indeed be considered as assets receivable

[37] Friedman Report, p. 2.
[38] Friedman Report, Exhibits 1, 1G.
[39] Friedman Report, Exhibit 1G, note 5.
[40] Friedman Report, Exhibit 2F.

rather than be written off.[41]

21. Furthermore, Mr. Friedman inconsistently writes off payments he capitalized as assets in 2013–2015 as of April 30, 2016. Such a treatment suggests a subjective determination of the Corporate Defendants' assets balance as of April 30, 2016. For instance, Mr. Friedman records $1.5 million worth of payments to Industrial and Commercial Bank to be receivable as of April 30, 2016,[42] yet he writes off $25,780 worth of payments to the Liu Affiliates as uncollectible,[43] without explaining why he reached different conclusions about the collectability of these two amounts as of April 30, 2016. Similarly, Mr. Friedman's decision to capitalize the payment to Mevion but write off $803,636 worth of consulting and demolition expenses[44] and the $368,100 payment to Optivus[45] as of April 30, 2016 is also inconsistent. Although Mr. Friedman points to the fact that the EB-5 Project did not continue as a reason for writing off the Optivus deposit[46] and $1,072,007 worth of start-up costs,[47] he fails to assess whether the failure of the EB-5 Project would have an impact on the recoverability of the $3 million Mevion payment and of other assets capitalized as of April 30, 2016.

22. Given the aforementioned issues, it is my opinion that the Friedman Report overstates the Corporate Defendants' assets.

## VI. Mr. Ginsburg Fails to Establish That Ms. Wang's Compensation Was Reasonable and Consistent with the POM

23. The Ginsburg Report presents fundamentally flawed estimates of the finder's fee that Mr. Liu is allegedly entitled to, and of the market value of the services rendered by Mr. Liu and Ms. Wang. As such, the Ginsburg Report fails to establish that any payments to the Individual Defendants represented "reasonable compensation" paid to Mr. Liu and Ms. Wang.

---

[41] Friedman Report, Exhibit 2D.
[42] Friedman Report, Exhibit 1A.
[43] Friedman Report, Exhibit 1A.
[44] Friedman Report, Exhibit 1C.
[45] Friedman Report, Exhibit 1B.
[46] Friedman Report, Exhibit 1B.
[47] Sum of $668,116 Beverly Proton start-up costs, and $403,891 start-up costs per Friedman Report, Exhibit 1F.

24. Notably, the Ginsburg Report fails to consider the POM, or the deposition testimonies collected in this matter,[48] and Mr. Ginsburg's compensation estimates are inconsistent with the information contained therein.

### A. Mr. Ginsburg's Finder's Fee Estimate Is Based on a Fundamentally Flawed Analysis

25. Mr. Ginsburg estimates that the reasonable commission rate Mr. Liu should be entitled to is 9.25% of total capital raised based on a limited sample of Form Ds filed by other EB-5 projects.[49] As explained in this section, Mr. Ginsburg's estimate is irrelevant because it is inconsistent with the POM. Even if it were relevant, Mr. Ginsburg's estimate is misleading because it stems from a fundamentally flawed methodology and misleading interpretation of the Form Ds under study. As such, Mr. Ginsburg fails to establish that any payments to Mr. Liu represented reasonable finder's fees.

#### 1. Mr. Ginsburg's Interpretation of His Finder's Fee Estimate Does Not Consider the Terms of the POM nor the Composition of the Pacific Proton Regional Center's Offering Expenses

26. Mr. Ginsburg concludes that the median finder's fee of 9.25% he derives from the results of his "commissions study" is a reasonable commission rate for Mr. Liu, and thus estimates that, based on total reported sales of $24.7 million, Mr. Liu was entitled to a "reasonable amount of commission/finder's fee" of $2,285,880.[50] This conclusion is irrelevant because it is not consistent with the terms of the POM.

27. First, the Ginsburg Report fails to acknowledge that the POM provides for Offering Expenses (including commissions and fees) broadly, without limiting them to a single recipient.[51] Given that Mr. Ginsburg's methodology consists of estimating the total percentage paid based on total fees paid and total offering amount, his median fee estimate represents an estimate of the

---

[48] Letter from Theodore R. Ginsburg (Marcum Group) to Herve Gouraige (Sills, Cummins, and Gross), "Re: Charles Liu and Xin Wang," April 2, 2021.

[49] Ginsburg Report, p. 3.

[50] Ginsburg Report, p. 3.

[51] Government Exhibit 5, p. 6.

amount of compensation that would be payable to all promoters of the offering. Yet, by allocating his entire commission fee estimate to Mr. Liu, Mr. Ginsburg fails to acknowledge that the Corporate Defendants engaged and paid fees to other brokers to recruit investors.[52] Indeed, three companies—UDG, Delsk, and Overseas Chinese—acted as brokers and helped market the PPEB5 Fund offering to foreign investors.[53] Notably, the PPEB5 Fund's Form D disclosed that sales commissions and/or finder's fees would be payable to Overseas Chinese and did not list Mr. Liu as a recipient.[54] Even if Mr. Liu was considered a recipient, the amount he is entitled to would be contingent on the amount of administrative fees paid by the investors.

28. Second, by failing to account for the fact that multiple parties may be entitled to total commission fees, Mr. Ginsburg disregards the information disclosed in the Form Ds that underlie his "study." Indeed, of the eight Form Ds that disclose sales compensation recipients, 75% of them list more than one recipient of finder's fees, sales commissions, or gross proceeds payments.[55] These disclosures suggest that in most instances, total reported compensation was earned by more than one party.

29. Third, Mr. Ginsburg fails to acknowledge the fact that the POM limits the amount of Offering Expenses, including commissions, that can be paid by the Pacific Proton Regional Center to the total amount of administrative fees paid by investors.[56] Thus, even if Mr. Liu were the sole recipient of offering-related compensation—which was not the case—he could not have been entitled to $2,285,880 because only approximately $2.21 million was collected from investors by the Corporate Defendants between October 2014 and April 2016.[57] Notably, the PPEB5 Fund's Form D disclosed that only $45,000 in sales commission and/or finder's fees would be payable to Overseas Chinese.[58] Even by Mr. Friedman's account, total expenses from fees paid by the Pacific Proton Regional Center to brokers including Overseas Chinese through April 30, 2016 amounted to $3,856,000.[59] Hence, there would not have been any administrative

---

[52] Initial Report, ¶ 36.

[53] Initial Report, ¶¶ 7, 36.

[54] "Pacific Proton Therapy Regional Center, LLC, Form D," Securities and Exchange Commission, October 24, 2014, https://www.sec.gov/Archives/edgar/data/0001622343/000162234314000001/xslFormDX01/primary_doc.xml, accessed on April 7, 2021 ("PPEB5 Fund Form D, October 27, 2014").

[55] *See* Exhibit 2.

[56] Government Exhibit 5, pp. 2, 20.

[57] Initial Report, ¶ 29.

[58] PPEB5 Fund Form D, October 27, 2014.

[59] Friedman Report, Exhibit 2B.

fee money eligible to pay Mr. Liu a finder's fee.

30. Finally, Mr. Ginsburg's "reasonable" commission fee analysis rests on the flawed assumption that the Pacific Proton Regional Center was obligated to pay Mr. Liu a commission fee during its years of existence, and that the payment of such fees was consistent with the terms of the POM. However, the POM does not provide for the retroactive payment of any commissions to Mr. Liu. Moreover, any commission earned by Mr. Liu would be considered as an Offering Expense based on the terms of the POM, and would therefore need to be considered alongside all other Offering Expenses and limited to the administrative fees collected by the Pacific Proton Regional Center.[60] As such, Mr. Ginsburg's "reasonable" commission fee analysis disregards the terms of the POM and only considers the terms of Mr. Liu's employment agreement.

31. Based on the above, Mr. Ginsburg's estimate of Mr. Liu's reasonable commission fee estimate is irrelevant. As such, Mr. Ginsburg fails to establish that any payments to Mr. Liu represented reasonable finder's fees.

### 2. Mr. Ginsburg's Sample Is Flawed and the Data It Reflects Are Unreliable

32. Notwithstanding the fact that it fails to consider the terms of the POM and other Offering Expenses incurred, the Ginsburg Report presents an estimate of Mr. Liu's alleged commission fee that is based on inappropriate assumptions, flawed sampling, and unreliable data. First, Mr. Ginsburg's analysis appears to rest on the inappropriate assumption that it would not be reasonable for the compensation package of an EB-5 Project's executive officer not to include a commission. Indeed, Mr. Ginsburg asserts that he "view[s] reasonable compensation paid by the Project to Liu and/or Wang as having two distinct sources: a commission or finder's fee relating to obtaining investors in the Project and, compensation for services rendered to the various entities."[61] Mr. Ginsburg does not present the rationale behind such a view.

33. He then proceeds to define his sample as that consisting of the Form Ds filed by "entities

[60] Initial Report, ¶ 46.

[61] Ginsburg Report, p. 2.

who were involved in EB-5 programs and paid some type of commission or finder's fee" between 2011 and 2019.[62] Based on my review, I was able to identify 54 Form Ds–substantially more than the 20 included by Mr. Ginsburg–that were filed with the SEC by EB-5 issuers during 2011–2019,[63] and 61% of those forms[64] do not report any commission or finder's fee (see **Exhibit 1**). Even assuming Form Ds are appropriate proxies for determining the types and amount of compensation paid by EB-5 programs as asserted by Mr. Ginsburg, the fact that some Form Ds not report any commission or finder's fee suggests that it is not uncommon for EB-5 programs not to provide such sales compensation. Thus, by limiting his sample to those EB-5 issuers that did pay sales commissions or finder's fees, Mr. Ginsburg unreasonably increases the median commission percentage that can be derived from the full population of EB-5 issuers' Form Ds.

34. Second, the Ginsburg Report does not include any discussion of Mr. Ginsburg's sampling considerations, and it is unclear to what extent the sample he uses is homogeneous and representative of the population of EB-5 issuers that are comparable to the PPEB5 Fund. As shown in **Exhibit 2**, the sample used in the Ginsburg Report reflects EB-5 issuers with varied industry focus and total offering amounts ranging from $500,000 to $340,000,000. However, the actual size of the issuers cannot be determined consistently as Form Ds do not require issuers to disclose their revenue range or net asset value.[65] Out of the 20 Form Ds cited in the Ginsburg Report, 12 do not disclose the issuer's revenues, and only two of the remaining eight reported revenues greater than $0.[66] Without information on issuer size or the total amount sold, Mr. Ginsburg fails to establish that the issuers included in the sample are comparable to the PPEB5 Fund. In addition, Form Ds do not provide fulsome information about the total amounts raised by EB-5 issuers on a periodic basis. Form Ds should be filed 15 days after the "date of first sale"

---

[62] Ginsburg Report, p. 2.

[63] Based on a search for Form Ds filed during 2011–2019 containing the keyword "EB5" or "EB-5" and only considering the most recently amended Form Ds during the period, when the same entity filed multiple Form Ds. *See* "Edgar, Company Filings," Securities and Exchange Commission, https://www.sec.gov/edgar/searchedgar/companysearch html, accessed on April 7, 2021.

[64] 33/54 = 61%.

[65] *See* "Securities and Exchange Commission, Form D," Securities and Exchange Commission, https://www.sec.gov/about/forms/formd.pdf, accessed on April 7, 2021 ("Form D Instructions").

[66] *See* Exhibit 2.

and generally do not need to be amended if there is a change in the amount of securities sold in the offering or the amount remaining to be sold except when the offering continues for more than one year.[67] As reflected in **Exhibit 2**, the disparity in the percentage of total capital offered raised across issuers, and the fact that 55% of the forms sampled by Mr. Ginsburg were more than a year old in 2019, suggest that the issuers Mr. Ginsburg considered are at different stages in terms of fundraising.

35. Finally, Form Ds do not always provide information about actual sales compensation amounts, and therefore they may lead to misleading estimates of "reasonable" commission-based compensation. EB-5 issuers are allowed to provide estimates of the sales commissions and finder's fee expenses, and of payments to executive officers, directors, or promoters.[68] Of the Form Ds included by Mr. Ginsburg, 60% report sales commissions and/or finder's fees as estimates, rather than actual compensation amounts. Thus, to the extent estimates differ significantly from actual amounts paid, the median fee Mr. Ginsburg calculated would not be representative of actual compensation policies.

### 3. Mr. Ginsburg's Finder's Fee Calculation Is Fundamentally Flawed

36. Mr. Ginsburg calculates the "total percentage paid" by each issuer in his sample as the sum of reported sales commission expenses, finder's fees, and gross offering proceeds paid to executives, divided by the total offering amount.[69] This calculation is fundamentally flawed. Because the purpose of Mr. Ginsburg's calculation is to determine the "commission or finder's fee relating to obtaining investors in the Project,"[70] the numerator should only include sales

[67] Form D instructions ("An issuer must file a new notice with the SEC for each new offering of securities no later than 15 calendar days after the 'date of first sale' of securities in the offering.… An issuer must file an amendment to a previously filed notice for an offering: to correct a material mistake of fact or error in the previously filed notice, as soon as practicable after discovery of the mistake or error; to reflect a change in the information provided in the previously filed notice, except as provided below, as soon as practicable after the change; and annually, on or before the first anniversary of the most recent previously filed notice, if the offering is continuing at that time.… When amendment is not required: An issuer is not required to file an amendment to a previously filed notice to reflect a change that occurs after the offering terminates or a change that occurs solely in the following information: …the amount of securities sold in the offering or the amount remaining to be sold").

[68] Form D Instructions, Items 13, 15.

[69] Ginsburg Report, Appendix A.

[70] Ginsburg Report, p. 2.

commissions and finder's fees. Mr. Ginsburg has not established that the gross proceeds paid to executives "relat[e] to obtaining investors in the Project,"[71] which appears to be his criterion for determining the total fee paid.[72] Based on the Form D filing instructions, this item represents gross amounts paid to any person named as an executive officer, director, or promoter and may therefore include compensation that is unrelated to fundraising.[73] Mr. Ginsburg has not established that such payments were relevant to his comparison. Notably, only eight of the 20 issuers included in Mr. Ginsburg's study disclosed gross proceeds payments to executives, and five of the 20 issuers did not disclose any finder's fee or sales commission expense (*see* **Exhibit 1**).

37. The denominator based on which Mr. Ginsburg calculates his "total percentage paid" similarly leads to misleading results. The total offering amount represents the "dollar amount of securities being offered" under the EB-5 Program,[74] not actual funds raised as Mr. Ginsburg claims.[75] Hence, using the total offering amount is not a good benchmark of fundraising performance. For example, in the case of the PPEB5 Fund, total monies raised (i.e., $26.4 million) were significantly lower than the total offering amounts disclosed in the POM (i.e., $150 million) or in the PPEB5 Fund's Form D (i.e., $100 million).[76]

38. Moreover, even if Mr. Ginsburg's choice of numerator and denominator were correct, he fails to acknowledge that the approach he takes to calculate reasonable compensation is inappropriate for at least two of the issuers included in his sample. EB5 Riverplace Hotel Investment LP's Form D disclosed that executives would "receive no payments from offering proceeds directly, but [would] receive a fee equal to 12.5% of the total budgeted cost."[77] Similarly, the Form D filed by EB-5 SF Investment Limited disclosed that executives would "receive no payments from offering proceeds directly, but [would] receive a fee equal to 10.5% of the total budgeted cost."[78] These disclosures suggest that these EB-5 issuers did not pay a bonus tied directly to fundraising performance; therefore, the percentages that Mr. Ginsburg

[71] Ginsburg Report, p. 2.
[72] Ginsburg Report, p. 2.
[73] Form D Instructions, Item 16.
[74] Form D Instructions, Item 13.
[75] Ginsburg Report, p. 3.
[76] Initial Report, ¶ 31; Government Exhibit 5, p. 2; PPEB5 Fund Form D, October 27, 2014.
[77] EB 5 Riverplace Hotel Investment LP Form D, Item 16, August 6, 2013.
[78] EB-5 SF Investment Limited Partnership Form D, Item 16, March 7, 2013.

calculated for these two funds are inaccurate and should not be part of his determination of the median fee paid.

39. As shown in **Exhibit 3**, adjusting Mr. Ginsburg's median fee calculation to exclude gross proceeds payments and the two EB-5 issuers that did not directly tie compensation to fundraising, would reduce the median total percentage estimate from 9.25% to 7.25%.

### B. Mr. Ginsburg's Base Compensation Estimates Are Overstated and Based on a Fundamentally Flawed Analysis

40. Mr. Ginsburg concludes that Ms. Wang was owed $367,215 from Beverly Proton[79] and Mr. Liu was owed $1,680,836 from Pacific Proton Regional Center, $1,622,488 from the PPEB5 Fund, and $1,622,488 from Beverly Proton in total base compensation for the 2010–2016 period.[80] This conclusion is irrelevant because it is does not take into account the terms of the POM or the actual services performed by Mr. Liu and Ms. Wang. As such, Mr. Ginsburg fails to establish that any payments to Mr. Liu and Ms. Wang represented reasonable compensation for services.

#### 1. Mr. Ginsburg Fails to Account for the Terms of the POM

41. Mr. Ginsburg calculates that "based on the median reported total compensation [per the ERI Survey Reports], adjusted for cost of living changes and pro-rated for partial years of service," the Corporate Defendants owed Mr. Liu $4,925,812 and Ms. Wang $367,215 in total base compensation for their services between 2010 and 2016.[81] As explained in this section, Mr. Ginsburg's base compensation estimates are based on fundamentally flawed assumptions and are irrelevant given the representations made in the POM and the Memorandum of Understanding of the Pacific Proton Therapy Project between Mr. Liu and Dr. Thropay (the "MOU").

42. The base compensation Mr. Ginsburg estimates for Mr. Liu appears to be based on the assumption that Mr. Liu was entitled to the same amount of compensation from each of the Corporate Defendants after the entities were formed.[82] In other words, Mr. Ginsburg implies that Mr. Liu should have been compensated based on the salary of three full-time executive positions

---

[79] Ginsburg Report, p. 3.

[80] Ginsburg Report, p. 4.

[81] Ginsburg Report, pp. 3–4.

[82] Pacific Proton Therapy Center was incepted earlier than the PPEB5 Fund and Beverly Proton. Thus, Mr. Ginsburg assigned a higher compensation to Mr. Liu in 2010 from Pacific Proton Therapy Center than from the other two entities. *See* Ginsburg Report, p. 4.

at three different companies at the same time. Not only does Mr. Ginsburg fail to present any document to justify this assumption, but he also fails to assess whether there was any overlap in the work Mr. Liu performed for the Corporate Defendants. Moreover, he also fails to establish that the services performed by Mr. Liu represented the equivalent of full-time employment at three firms.

43. Even if Mr. Liu had indeed performed the same amount of work for each of the Corporate Defendants in each year from 2010 to 2016, and Ms. Wang performed work for Beverly Proton in 2013 and 2014, Mr. Ginsburg fails to establish that they were entitled to any compensation from the Corporate Defendants. First, as described in my Initial Report, Mr. Liu's employment agreement with Beverly Proton, which is the purported contractual basis for the monies Mr. Liu received from that entity, was signed only in April 2016 and was signed by Michael Cogswell who was not yet an employee of Beverly Proton.[83] Furthermore, the base compensation amounts Mr. Ginsburg estimates for Mr. Liu and Ms. Wang are irrelevant because they are inconsistent with the terms of the POM. As explained in my Initial Report, Mr. Liu would not have been entitled to any base compensation from the Corporate Defendants.[84] Specifically, the POM does not provide for the payment of any remuneration by the PPEB5 Fund or Beverly Proton except for the payment of management fees that are limited to 3% of the amount of revenues earned by those two entities, if any, prorated across all managers.[85] Given that Beverly Proton and the PPEB5 Fund earned no revenue from operations of the proton center during 2010–2016, Mr. Liu would not have earned management fees during that period.[86] Furthermore, the MOU asserted that compensation would only be earned "[s]ubject to the Project

[83] Deposition of Charles C. Liu, February 24, 2021, pp. 50:19–52:10, 52:14–16, 56:18–57:7, 57:10–58:1, 58:12–61:16, 62:9–65:8.

[84] Initial Report, Section VI.C.3.

[85] *See* Government Exhibit 5, pp. 6, 25–26. Note that the POM does not list Mr. Liu as a manager.

[86] I have not seen evidence that the PPEB5 Fund earned any income during 2010–2016 but note that Mr. Friedman reported total "interest income" of $63,162 during that period. Even if Mr. Friedman were correct, Mr. Liu would not be entitled to more than 1.5% of this amount (i.e., $947). Indeed, per the POM, the Pacific Proton Regional Center was also a manager of the PPEB5 Fund; therefore, the 3% management fee would be divided between Mr. Liu and the Pacific Proton Regional Center. *See* Government Exhibit 5, p. 6; Friedman Report, Exhibit 5C.

As for Beverly Proton, the Friedman Report acknowledges that Beverly Proton did not earn any revenues and, therefore, Mr. Liu would not be eligible for any salary from that entity. *See* Friedman Report, Exhibit 5B.

successfully raising the minimum amount of agreed upon capital."[87] The Beverly Proton project, however, did not raise the funds to complete the project. Therefore, I have not seen evidence that Mr. Liu or Ms. Wang should have been paid a salary by Beverly Proton.

44. As for the Pacific Proton Regional Center, Mr. Liu could not have received base compensation from that entity. The POM represents that the proceeds of the administrative fees, which would be the Pacific Proton Regional Center's main source of revenues,[88] may only be used to pay for Offering Expenses.[89] Given that proceeds of administrative fees were exhausted from the payment of Offering Expenses as described in Section VI. A above,[90] Mr. Liu could not have received base compensation from the Pacific Proton Regional Center.

45. Based on the foregoing observations, Mr. Ginsburg has not established any amount of reasonable compensation for Mr. Liu and Ms. Wang from the Corporate Defendants.

### 2. Mr. Ginsburg's Salary Compensation Estimates Are Overstated Because They Result from a Flawed Selection and Usage of Survey Data

46. Even if Mr. Ginsburg's estimates were relevant, they are overstated because they result from a flawed selection and usage of survey data. Mr. Ginsburg derived the "market value of services rendered by Liu and Wang" (i.e., their base compensation) from a database operated by the Economic Research Institute ("ERI Survey Reports").[91] Those ERI Survey Reports present "estimated survey median annual total cash" compensation amounts for a President and a Vice President of Marketing as of January 1, 2021.[92] The ERI Survey Reports list four sets of

---

[87] SEC-GRASSMUECK-E-000804–811, at 806.

[88] The POM represented that the Pacific Proton Regional Center was a manager of Beverly Proton, and "shall receive a management fee equal to three…percent of the gross revenues, if any, of [Beverly Proton]." Given that Beverly Proton earned no revenue during 2010–2016, the Pacific Proton Regional Center could not have earned any management fee income during that period. I note that Mr. Friedman reports that the Pacific Proton Regional Center earned "miscellaneous income" in 2012–2016 but he fails to explain what those amounts represent. *See* Government Exhibit 5, p. 6, 25–26; Friedman Report, Exhibits 5A and 5B.

[89] Government Exhibit 5, pp. 2, 6.

[90] Initial Report, Section VI.C.3.a.

[91] Ginsburg Report, p. 2.

[92] Executive Compensation Assessor Individual Job Report, President, Ginsburg.Supp. Report.000001; Executive Compensation Assessor Individual Job Report, Vice President Marketing, Ginsburg.Supp. Report.000002 (collectively, the "ERI Survey Reports).

amounts representing the cash compensation amounts paid by enterprises in the "General Medical and Surgical Hospitals industry," in the Los Angeles area, that earn revenues of $1 million, $5 million, $7 million, or $7.25 million.[93]

47. First, the industry criterion based on which Mr. Ginsburg ran the survey report is inappropriate. Mr. Ginsburg does not list the types of companies included in the "general medical services" industry category on which he extracted data. However, based on the components of the industry codes reported on the ERI Survey Reports, it appears that the "general medical services" category includes offices and clinics of various medical specialists, general medical and surgical hospitals, and specialty outpatient clinics, among others.[94] As such, this industry category does not appear to be representative of the range of compensation payable to the executives of a yet to be built proton center such as Beverly Proton. Moreover, Mr. Ginsburg fails to analyze whether another industry classification such as real estate development would have been more appropriate given the status of the project through 2016.

48. Second, Mr. Ginsburg inappropriately uses the median amount of base compensation paid by surveyed enterprises earning annual revenues of $7.25 million as a proxy for Mr. Liu's and Ms. Wang's salaries.[95] This revenue threshold is inappropriate. As a preliminary matter, Mr. Ginsburg asserts that this revenue threshold represents the "pro-rated estimate of funds raised less administrative expenses over the course of the capital raise period."[96] I was not able to verify the accuracy of this assertion, but assuming it is correct, the amount Mr. Ginsburg so describes represents an estimate of the total equity invested by EB-5 investors over the period under review, not an estimate of revenues earned from operations.

49. Notwithstanding this issue, Mr. Ginsburg's $7.25 million revenue threshold is not

---

[93] ERI Survey Reports.

[94] The ERI Survey Reports report that the data presented therein are based on the following industry codes: SIC 8062 and NAICS 622110. SIC code 8062 includes medical and surgical hospitals that are engaged in providing general medical and surgical services and other hospital services. *See also* "NAICS Links & Resources: SIC Industry Description," NAICS Association, https://www.naics.com/sic-industry-description/?code=8062, accessed on April 7, 2020. NAICS 622110 code includes "General Medical and Surgical Hospitals," which provide diagnostic and medical treatment (both surgical and nonsurgical) to inpatients with any of a wide variety of medical conditions. *See* "North American Industry Classification System: 1997 NAICS," U.S. Census Bureau, https://www.census.gov/eos/www/naics/reference_files_tools/1997/sec62 htm, accessed on April 7, 2020.

[95] Ginsburg Report, p. 3.

[96] Ginsburg Report, p. 3.

representative of the actual amounts of revenues earned by the Corporate Defendants. Indeed, assuming the Friedman Report is correct, then:

a. Beverly Proton earned no revenue from operations during the 2010–2016 period;[97]

b. PPEB5 Fund earned no revenue from operations;[98]

c. Pacific Proton Regional Center earned no revenue until 2012, less than $300,000 of revenues per year in 2012–2014 and 2016, and only earned revenues in excess of $1 million in 2015 (consistent with the fact that substantial fundraising only began at the end of 2014);[99]

d. Total consolidated revenue of the Corporate Defendants from 2010 through the period ending April 30, 2016 only amounted to $2,769,208.[100]

50. Moreover, Mr. Ginsburg fails to describe how the ERI Survey Reports define "annual total cash" compensation. To the extent it includes both a fixed salary and incentive compensation, Mr. Ginsburg fails to describe how they are applicable to Mr. Liu and Ms. Wang.

51. Given the above, Mr. Ginsburg fails to establish that the survey data to which he cites are relevant to determine the reasonable compensation for services of Mr. Liu and Ms. Wang.

Executed this 9th of April, 2021



Carlyn Irwin

[97] Friedman Report, Exhibit 5B.

[98] Friedman Report, Exhibit 5C. PPEB5 Fund earned no revenues until 2013 and only a total of $63,162 from miscellaneous sources during the 2013–2015 period.

[99] Friedman Report, Exhibit 5A.

[100] Friedman Report, Exhibit 2.

# Appendix A

# Documents Considered List

**Legal Pleadings**

- Complaint, *Securities and Exchange Commission v. Charles C. Liu, Xin Wang a/k/a Lisa Wang, et al.*, May 26, 2016
- Plaintiff Securities and Exchange Commission's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment Against Defendants Charles C. Liu and Xin (Lisa) Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017
- Plaintiff Securities and Exchange Commission's Uncontroverted Facts and Conclusions of Law in Support of Its Motion for Summary Judgment, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017
- Defendant Charles C. Liu and Xin Wang's Memorandum of Points and Authorities and Declaration of Hervé Gouraige in Opposition to Plaintiff Securities and Exchange Commission's Motion for Summary Judgment, with Exhibits 1–2, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 17, 2017
- Defendant Charles C. Liu and Xin Wang's Statement of Genuine Disputes of Material Facts and Counter-Statement of Uncontroverted Facts in Opposition to Plaintiff Securities and Exchange Commission's Motion for Summary Judgment, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 17, 2017
- Plaintiff Securities and Exchange Commission's Reply in Support of Its Motion for Summary Judgment Against Defendants Charles C. Liu and Xin (Lisa) Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017
- Plaintiff Securities and Exchange Commission's Response to Defendants' Counter-Statement of Uncontroverted Facts, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017
- Defendant Charles C. Liu and Xin Wang's Objection to Plaintiff Securities and Exchange Commission's Responses to Defendants' Counter-Statement of Uncontroverted Facts; Declaration of Hervé Gouraige, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 26, 2017
- Defendant Charles C. Liu and Xin (Lisa) Wang's Memorandum of Points and Authorities in Opposition to the Plaintiff's Supplemental Brief Regarding Civil Penalties; Declaration of Hervé Gouraige, with Exhibit 1, *Securities and Exchange Commission v. Charles C. Liu, et al.*, February 15, 2017

# Appendix A

**Rulings**

- *Liu v. SEC*, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020)
- *SEC v. Liu*, 262 F. Supp. 3d 957, 970–972 (C.D. Cal. 2017)

**Declarations**

- Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Ex Parte Application for a Temporary Restraining Order, Order to Show Cause Why a Preliminary Injunction Should Not Be Granted, and Orders (1) Freezing Assets; (2) Repatriating Assets; (3) Requiring Accountings; (4) Prohibiting the Destruction of Documents, with Exhibits 9–13, *Securities and Exchange Commission v. Charles C. Liu, et al.*, May 26, 2016
- Supplemental Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Motion for Orders Requiring the Repatriation of Assets and Accountings, with Exhibits 1–9, *Securities and Exchange Commission v. Charles C. Liu, et al.*, June 3, 2016
- Second Supplemental Declaration of Lorraine Pearson in Support of Plaintiff Securities and Exchange Commission's Surreply in Opposition to Defendants' Motion for Relief from Sections VIII and IX of Preliminary Injunction, *Securities and Exchange Commission v. Charles C. Liu, et al.*, September 20, 2016
- Third Supplemental Declaration of Lorraine Pearson, *Securities and Exchange Commission v. Charles C. Liu, et al.,* September 28, 2016
- Declaration of Gary Y. Leung in Support of Plaintiff Securities and Exchange Commission's Motion for Summary Judgment Against Defendants Liu and Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 4, 2017
- Supplemental Declaration of Gary Y. Leung in Support of Plaintiff Securities and Exchange Commission's Motion for Summary Judgment Against Defendants Liu and Wang, *Securities and Exchange Commission v. Charles C. Liu, et al.*, January 23, 2017

**Depositions and Exhibits**

- Deposition Exhibits 29, 35, 45–48, 51–88, 101, 103–110, 114–143
- Deposition of Charles C. Liu, March 23, 2016
- Deposition of Charles C. Liu, November 10, 2016
- Deposition of Charles C. Liu, February 24, 2021

# Appendix A

- Deposition of John Thropay, M.D., March 5, 2021
- Deposition of Lorraine Pearson, January 21, 2021
- Deposition of Ruth Novodor, February 22, 2021
- Deposition of Trang Lam, March 9, 2021
- Deposition of Xin Wang, May 4, 2016
- Deposition of Xin Wang, November 9, 2016
- Deposition of Xin Wang (aka Lisa Wang), February 25, 2021

**Testimonies and Exhibits**

- Government Exhibits 1–43
- Testimony of Charles C. Liu, March 23, 2016
- Testimony Errata for Charles C. Liu, May 16, 2016
- Testimony of Wenli Yao, May 12, 2016
- Testimony of Xin Wang, May 4, 2016

**Expert Reports**

- Expert Report of Ronald Friedman with Appendix and Exhibits, March 25, 2021
- Letter from Ronald Friedman to Mr. Herve Gouraige Re: Securities and Exchange Commission vs Charles Liu and Xin Wang a/k/a Lisa Wang, April 2, 2021
- Expert Report of Theodore R. Ginsburg, March 25, 2021
- Letter from Theodore R. Ginsburg (Marcus Group) to Mr. Herve Gouraige (Skills, Cummins, and Gross), Re: Charles Liu and Xin Wang, April 2, 2021

**Accounting and AICPA Standards**

- "Preparation of Financial Statements," AICPA, § 70.A17–8, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00070.pdf, accessed on April 7, 2020
- "Compilation Engagements," AICPA, § 80.29, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00080.F

# Appendix A

- "Review of Financial Statements," AICPA, § 90.03, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar-c-00090.pdf, accessed on April 7, 2021
- "Review Engagements," AICPA § 210A.04, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/at-c-00210-a.pdf, accessed on April 7, 2021
- "Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance with Generally Accepted Auditing Standards," AICPA, § 200.14, 2020, https://www.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/au-c-00200.pdf, accessed on April 7, 2021
- FASB, Concept Statement No. 6, as amended

**SEC Filings**

- Edgar, Company Filings, Securities and Exchange Commission, https://www.sec.gov/edgar/searchedgar/companysearch.html, accessed April 7, 2021
- Pacific Proton Therapy Regional Center, LLC, Form D, Securities and Exchange Commission, October 24, 2014, https://www.sec.gov/Archives/edgar/data/0001622343/000162234314000001/xslFormDX01/primary_doc.xml, accessed April 7, 2021
- "Securities and Exchange Commission, Form D," Securities and Exchange Commission, https://www.sec.gov/about/forms/formd.pdf, accessed April 7, 2021
- Securities and Exchange Commission Form Ds for the issuers listed in Appendix A of the Ginsburg Report

**Other Materials**

- "About the EB-5 Visa Classification," United States Citizenship and Immigration Services, March 25, 2021, available at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-the-eb-5-visa-classification, accessed March 25, 2021
- 8 CFR § 204.6 – Petitions for Employment Creation Aliens
- 8 CFR § 216.6 – Petition by Entrepreneur to Remove Conditional Basis of Lawful Permanent Resident Status
- 8 U.S. Code § 1153 – Allocation of Immigrant Visas

# Appendix A

- Caroline Bullerjahn, "Re: SEC v. Liu, et al., Case No. 8:16-cv-00974 (C.D. Cal.)," August 26, 2016
- "CFE Code of Professional Standards, Section III," Association of Certified Fraud Examiners, November 1, 2020, https://www.acfe.com/standards/, accessed March 26, 2021.
- Employment Agreement by and between Pacific Proton Therapy Regional Center, LLC and Charles C Liu, June 28, 2012, Ginsburg.Supp. Report.0000011
- Executive Compensation Assessor Individual Job Report, President, Ginsburg.Supp. Report.000001
- Executive Compensation Assessor Individual Job Report, Vice President Marketing, Ginsburg.Supp. Report.000002
- Lorraine Declaration Exhibits 7 and 8 - PPEB5 Fund and Investor List - Acct 1028 SB710008_IR 05Feb16-983LLP.xls
- Lorraine Declaration Exhibit 9 - Bev Proton - 5152 SB710008_IR 05Feb16-985LLP.xls
- Lorraine Declaration Exhibit 11 - Pac Proton Regional Center - May 2016 Acct 6428 SB710008_IR 05feb16-980LLP.xls
- "NAICS Links & Resources: SIC Industry Description," NAICS Association, https://www.naics.com/sic-industry-description/?code=8062, accessed on April 7, 2020.
- "North American Industry Classification System: 1997 NAICS," U.S. Census Bureau, https://www.census.gov/eos/www/naics/reference_files_tools/1997/sec62.htm, accessed on April 7, 2020.
- "Statement on Standards of Forensic Service," Forensic and Valuation Services Executive Committee, January 1, 2020, https://future.aicpa.org/resources/download/statement-on-standards-for-forensic-services, accessed March 26, 2021.

**Produced Documents**

- JPM000143
- JPM000146
- Marcum_Cliu_00002501
- Marcum_Cliu_00002503

# Appendix A

- Marcum_Cliu_00002639
- Marcum_Cliu_00002911
- Marcum_Cliu_00005273
- Marcum_Cliu_00005725
- Marcum_Cliu_00005730
- Marcum_Cliu_00006774
- Marcum_Cliu_00006962
- Marcum_Cliu_00007299
- Marcum_Cliu_00007351
- Marcum_Cliu_00007409
- Marcum_Cliu_00007485
- Marcum_Cliu_00007529
- Marcum_Cliu_00007619
- Marcum_Cliu_00007701
- Marcum_Cliu_00007885
- Marcum_Cliu_00008077
- Marcum_Cliu_00008312
- Marcum_Cliu_00009464
- Marcum_Cliu_00010948
- Marcum_Cliu_00010982
- Marcum_Cliu_00013229
- Marcum_Cliu_00013231
- Marcum_Cliu_00013234
- Marcum_Cliu_00013286
- Marcum_Cliu_00013344
- Marcum_Cliu_00013420
- Marcum_Cliu_00013594

# Appendix A

- Marcum_Cliu_00013604
- Marcum_Cliu_00013606
- Marcum_Cliu_00013609
- Marcum_Cliu_00013621
- Marcum_Cliu_00013641
- Marcum_Cliu_00014049
- Marcum_Cliu_00014721
- Marcum_Cliu_00014765
- Marcum_Cliu_00014824
- Marcum_Cliu_00014907
- Marcum_Cliu_00014909
- Marcum_Cliu_00015037
- Marcum_Cliu_00015216
- Marcum_Cliu_00015298
- Marcum_Cliu_00015482
- Marcum_Cliu_00015674
- Marcum_Cliu_00015909
- Marcum_Cliu_00015910
- Marcum_CLiu_0001864
- Marcum_CLiu_0002147
- Marcum_CLiu_0006103
- SEC-BOA-E-0000195
- SEC-BOA-E-0000291
- SEC-BOA-E-0000298
- SEC-BOA-E-0000374
- SEC-CITIBANK-E-0000001
- SEC-CITIBANK-E-0000087

# Appendix A

- SEC-CITIGROUP-E-0000087
- SEC-EWB-E-0000027
- SEC-EWB-E-0000028
- SEC-EWB-E-0000058
- SEC-GRASSMUECK-E-000804–811
- SEC-HSBC-E-0000025
- SEC-JPMCB-E-0000001
- SEC-JPMCB-E-0000018
- SEC-JPMCB-E-0000019
- SEC-JPMCB-P-0000763
- SEC-JPMCB-P-0000764–65
- SEC-JPMCB-P-0000769–70
- SEC-JPMCB-P-0000771–807
- SEC-JPMCB-P-0000808–13
- SEC-JPMC-E-0000001
- SEC-JPMC-E-0000002
- SEC-JPMC-E-0000003
- SEC-JPMC-E-0000004
- SEC-JPMC-E-0000005
- SEC-JPMC-E-0000006
- SEC-LiuC-E-0000319
- SEC-LiuC-E-0000337
- SEC-LiuC-E-0000342

**Note: In addition to the documents on this list, I considered any other document cited in my report and exhibits, and my Initial Report to form my opinions.**

# Exhibit 1
## EB-5 Form D Filings
2011–2019[1]

| Filing entity | Filing Date | Sampled by Mr. Ginsburg | Reported Sales Commissions or Finder's Fees | Reported Gross Proceeds Paid to Executives, Promoters | No Fee or Distribution |
|---|---|---|---|---|---|
| 88th Ave EB5 Capital, LLC | 3/3/2017 | 1 | 1 | | |
| A1A EB5 LLC | 3/29/2018 | 1 | 1 | | |
| CPT EB5 LLC | 9/16/2019 | 1 | 1 | | |
| DS 30 Morningside Drive EB5 LLC | 1/3/2017 | 1 | 1 | | |
| EB5 Capital - Jobs Fund 10, LP | 4/1/2015 | | | | 1 |
| EB5 Capital - Jobs Fund 11, LP | 9/18/2014 | | | | 1 |
| EB5 Capital - Jobs Fund 12 LP | 9/23/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 13 LP | 7/1/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 14 LP | 4/16/2015 | | | | 1 |
| EB5 Capital - Jobs Fund 15 LP | 6/17/2015 | | | | 1 |
| EB5 Capital - Jobs Fund 16 LP | 2/23/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 17 LP | 2/11/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 18 LP | 5/4/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 19 LP | 5/18/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 20, LP | 12/9/2016 | | | | 1 |
| EB5 Capital - Jobs Fund 21 LP | 1/10/2017 | | | | 1 |
| EB5 Capital - Jobs Fund 22 LP | 10/9/2019 | | | | 1 |
| EB5 Capital - Jobs Fund 23 L.P. | 4/20/2017 | | | | 1 |
| EB5 Capital - Jobs Fund 24 LP | 9/18/2017 | | | | 1 |
| EB5 Capital - Jobs Fund 25, LLC | 6/8/2018 | | | | 1 |
| EB5 Capital - Jobs Fund 26, LLC | 4/11/2019 | | | | 1 |
| EB5 Capital - Jobs Fund 27, LLC | 10/9/2019 | | | | 1 |
| EB5 Capital - Jobs Fund 4, L.P. | 3/9/2012 | 1 | | 1 | |
| EB5 Capital - Jobs Fund 5, L.P. | 1/10/2014 | | | | 1 |
| EB5 Capital - Jobs Fund 6, L.P. | 1/10/2014 | | | | 1 |
| EB5 Capital - Jobs Fund 7, L.P. | 3/14/2014 | | | | 1 |
| EB5 Capital - Jobs Fund 8, L.P. | 1/13/2014 | | | | 1 |
| EB5 Capital - Jobs Fund 9 LP | 9/11/2015 | | | | 1 |
| EB5 HEALTHCARE INVESTORS, LLC | 1/18/2017 | | | | 1 |
| EB5 Holding 6776, LLC | 12/11/2015 | | | | 1 |
| EB5 PEARL INVESTMENT LIMITED PARTNERSHIP | 5/9/2012 | | | 1 | |
| EB5 Irving Hotel Investment Limited Partnership | 9/6/2018 | 1 | 1 | | |

# Exhibit 1
# EB-5 Form D Filings
2011–2019[1]

| Filing entity | Filing Date | Sampled by Mr. Ginsburg | Reported Sales Commissions or Finder's Fees | Reported Gross Proceeds Paid to Executives, Promoters | No Fee or Distribution |
|---|---|---|---|---|---|
| EB5 Pearl Office Investors LP | 3/15/2016 | 1 | | 1 | |
| EB5 Ports - Baltimore LP | 6/29/2011 | 1 | 1 | | |
| EB5 RIVERPLACE HOTEL INVESTMENT LP | 8/6/2013 | 1 | | 1 | |
| EB-5 SF INVESTMENT LIMITED PARTNERSHIP | 3/7/2013 | 1 | | 1 | |
| EB5 StateCenter II, LLC | 7/7/2011 | 1 | 1 | | |
| EB5 United Big Sky, LLC | 10/16/2019 | 1 | 1 | | |
| EB5 UNITED FUND 5 - HOLLYWOOD APARTMENTS LP | 7/21/2015 | 1 | 1 | 1 | |
| EB5 UNITED NYC VI LP | 11/30/2018 | 1 | 1 | 1 | |
| EB5 UNITED PUERTO RICO FS LP | 7/31/2018 | 1 | 1 | 1 | |
| GS EB5 IX LLC | 1/23/2019 | | | | 1 |
| GS EB5 X LLC | 10/30/2019 | 1 | 1 | | |
| La Moda (Gale) EB-5 Investment LP | 11/5/2015 | 1 | 1 | | |
| MEDICAL CAMPUS ONE LLC | 11/24/2014 | | | | 1 |
| NJ EB5 REAL ESTATE FUND, LP | 7/3/2019 | | | | 1 |
| NRIA EB5 Bergenline Fund, LLC | 11/13/2018 | | | | 1 |
| PALMS MIAMI EB5 LLLP | 5/26/2017 | | | | 1 |
| REN LA Limited Partnership | 1/8/2014 | | | | 1 |
| QB Ventures EB5 Capital, LLC | 1/30/2019 | 1 | 1 | | |
| Wilshire EB5 Investment Fund I, LLC | 1/25/2017 | | | | 1 |
| Wilshire EB5 Investment Fund II, LLC | 1/25/2017 | | | | 1 |
| Riviera Point Holdings, Ltd. | 8/16/2011 | 1 | | 1 | |
| WASHINGTON GREEN ENERGY EB-5 INVESTMENTS LP | 3/6/2012 | 1 | 1 | | |
| **Total** | **54** | **20** | **15** | **9** | **33** |
| **Ginsburg Sample** | **20** | **20** | **15** | **8** | **0** |

Source: Form D Filings; Expert Report of Theodore R. Ginsburg, March 25, 2021; SEC EDGAR Full Text Search, https://www.sec.gov/edgar/search/

Note:
[1] Includes all Form D filings that meet the following three criteria: (i) filed between 2011–2019, which is the time period used by Mr. Ginsburg, (ii) contain the keywords "EB5" or "EB-5", and (iii) have minimum investment of at least $500,000 USD. In instances where an EB-5 issuer filed more than one Form D between 2011–2019 (i.e. filed amendments), the most recent Form D was reflected in the table.

## Exhibit 2
## Summary of Mr. Ginsburg's EB-5 Form D Filings Sample[1]

| Filing Date | Filing Entity | Industry | Total Offering Amount | Total Amount Sold as of Form D Filing Date | Amount Sold/Total Offering Amount % | Intended Offering Duration > 1 year | Issuer Size Revenue[2] | Issuer Size Net Asset Value[2] | Sales Commissions & Finder's Fees[3] | Sales Commissions & Finder's Fees are Estimated | Gross Proceeds Paid to Executives, Promoters | Gross Proceeds Paid is Estimated | Number of Executives or Related Persons | Number of sales compensation recipients |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/3/17 | 88th Ave EB5 Capital, LLC | Real Estate - Construction | $12,000,000 | $800,000 | 7% | X | NA | NA | $1,200,000 | X | $0 | | 8 | 0 |
| 3/29/18 | A1A EB5 LLC | Real Estate - REITS & Finance | $5,000,000 | $500,000 | 10% | | NA | NA | $500,000 | X | $0 | | 1 | 0 |
| 9/16/19 | CPT EB5 LLC | Real Estate - Other Real Estate | $340,000,000 | $24,500,000 | 7% | X | NA | NA | $660,000 | | $0 | | 1 | 5 |
| 1/3/17 | DS 30 Morningside Drive EB5 LLC | Real Estate - Other Real Estate | $49,500,000 | $0 | 0% | | NA | NA | $198,000 | | $0 | | 3 | 1 |
| 3/9/12 | EB5 Capital - Jobs Fund 4, L.P. | Banking & Financial Services - Investing | $20,000,000 | $500,000 | 3% | X | NA | NA | $0 | | $1,120,000 | | 2 | 0 |
| 9/6/18 | EB5 Irving Hotel Investment Limited Partnership | Real Estate - Other Real Estate | $45,000,000 | $8,500,000 | 19% | | NA | NA | $4,500,000 | X | $0 | | 3 | 0 |
| 3/15/16 | EB5 Pearl Office Investors LP | Banking & Financial Services - Investing | $6,000,000 | $1,500,000 | 25% | | NA | NA | $0 | X | $450,000 | X | 3 | 0 |
| 6/29/11 | EB5 Ports - Baltimore LP | Banking & Financial Services - Investing | $40,000,000 | $0 | 0% | | $0 | NA | $60,000 | X | $0 | | 2 | 0 |
| 8/6/13 | EB5 Riverplace Hotel Investment LP | Banking & Financial Services - Investing | $51,000,000 | $2,000,000 | 4% | | NA | NA | $0 | | $6,375,000 | X | 5 | 0 |
| 3/7/13 | EB-5 SF Investment Limited Partnership | Banking & Financial Services - Investing | $42,000,000 | $27,500,000 | 65% | | NA | NA | $0 | | $6,612,057 | X | 6 | 0 |
| 7/7/11 | EB5 StateCenter II, LLC | Banking & Financial Services - Investing | $65,000,000 | $0 | 0% | | $0 | NA | $40,000 | X | $0 | | 1 | 0 |
| 10/16/19 | EB5 United Big Sky, LLC | Other | $63,500,000 | $4,000,000 | 6% | X | $25,000,001 - $100,000,000 | NA | $6,350,000 | | $0 | | 2 | 3 |
| 7/21/15 | EB5 United Fund 5 – Hollywood Apartments LP | Banking & Financial Services - Other Banking & Financial Services | $54,945,000 | $555,000 | 1% | X | $0 | NA | $14,850,000 | X | $495,000 | X | 3 | 1 |
| 11/30/18 | EB5 United NYC VI LP | Banking & Financial Services - Other Banking & Financial Services | $80,850,000 | $46,200,000 | 57% | X | $0 | NA | $17,640,000 | X | $735,000 | X | 3 | 8 |
| 7/31/18 | EB5 United Puerto Rico FS LP | Banking & Financial Services - Other Banking & Financial Services | $131,450,000 | $131,450,000 | 100% | X | $0 | NA | $30,265,000 | X | $1,035,000 | X | 3 | 9 |
| 10/30/19 | GS EB5 X LLC | Pooled Investment Fund - Other Investment Fund | $500,000 | $500,000 | 100% | | NA | NA | $42,500 | | $0 | | 2 | 2 |
| 11/5/15 | La Moda (Gale) EB-5 Investment LP | Real Estate - Commercial | $16,000,000 | $7,500,000 | 47% | X | NA | NA | $190,000 | | $0 | | 4 | 6 |
| 1/30/19 | QB Ventures EB5 Capital, LLC | Banking & Financial Services - Investing | $8,000,000 | $8,000,000 | 100% | X | NA | NA | $800,000 | | $0 | | 8 | 0 |
| 8/16/11 | Riviera Point Holdings, Ltd. | Real Estate - Commercial | $17,000,000 | $1,500,000 | 9% | X | $0 | NA | $0 | | $30,000 | | 1 | 0 |
| 3/6/12 | Washington Green Energy EB-5 Investments LP | Energy - Other Energy | $110,500,000 | $500,000 | 0% | X | Over $100,000,000 | NA | $30,000 | X | $0 | | 1 | 0 |
| **Total** | | | | | | **11** | | | | **10** | | **6** | | |

Source Form D Filings; Expert Report of Theodore R. Ginsburg, March 25, 2021

Note
[1] The set of EB-5 SEC Form D filings presented in this table correspond to those selected by Mr. Ginsburg as identified in Appendix A of the Ginsburg Report.
[2] Form D f lings that do not report Item 5, Issuer Size, or affirmatively decline to disclose are shown as NA.
[3] Calculated as the sum of sales commissions and finders fees listed in Form D, under Item 15.

# Exhibit 3

## Mr. Ginsburg's EB-5 Form D Filings Sample[1]
## Total Percentage Paid Calculation

| Filing Date | Filing Entity | Sales Commissions | Finder's Fees | Gross Proceeds Paid to Executives, Promoters | Total Offering Amount | Total Percentage Paid: Per Mr. Ginsburg | Total Percentage Paid: Adjusted[2] |
|---|---|---|---|---|---|---|---|
| | | [a] | [b] | [c] | [d] | [e] = ([a]+[b]+[c]) / [d] | [f] = ([a]+[b]) / [d] |
| 3/3/17 | 88th Ave EB5 Capital, LLC | $0 | $1,200,000 | $0 | $12,000,000 | 10.00% | 10.00% |
| 3/29/18 | A1A EB5 LLC | $0 | $500,000 | $0 | $5,000,000 | 10.00% | 10.00% |
| 9/16/19 | CPT EB5 LLC | $660,000 | $0 | $0 | $340,000,000 | 0.19% | 0.19% |
| 1/3/17 | DS 30 Morningside Drive EB5 LLC | $198,000 | $0 | $0 | $49,500,000 | 0.40% | 0.40% |
| 3/9/12 | EB5 Capital - Jobs Fund 4, L.P. | $0 | $0 | $1,120,000 | $20,000,000 | 5.60% | 0.00% |
| 9/6/18 | EB5 Irving Hotel Investment Limited Partnership | $0 | $4,500,000 | $0 | $45,000,000 | 10.00% | 10.00% |
| 3/15/16 | EB5 Pearl Office Investors LP | $0 | $0 | $450,000 | $6,000,000 | 7.50% | 0.00% |
| 6/29/11 | EB5 Ports - Baltimore LP | $30,000 | $30,000 | $0 | $40,000,000 | 0.15% | 0.15% |
| 8/6/13 | EB5 Riverplace Hotel Investment LP | $0 | $0 | $6,375,000 | $51,000,000 | 12.50% | –[3] |
| 3/7/13 | EB-5 SF Investment Limited Partnership | $0 | $0 | $6,612,057 | $42,000,000 | 15.74% | –[3] |
| 7/7/11 | EB5 StateCenter II, LLC | $20,000 | $20,000 | $0 | $65,000,000 | 0.06% | 0.06% |
| 10/16/19 | EB5 United Big Sky, LLC | $6,350,000 | $0 | $0 | $63,500,000 | 10.00% | 10.00% |
| 7/21/15 | EB5 United Fund 5 – Hollywood Apartments LP | $14,850,000 | $0 | $495,000 | $54,945,000 | 27.93% | 27.03% |
| 11/30/18 | EB5 United NYC VI LP | $17,640,000 | $0 | $735,000 | $80,850,000 | 22.73% | 21.82% |
| 7/31/18 | EB5 United Puerto Rico FS LP | $30,265,000 | $0 | $1,035,000 | $131,450,000 | 23.81% | 23.02% |
| 10/30/19 | GS EB5 X LLC | $42,500 | $0 | $0 | $500,000 | 8.50% | 8.50% |
| 11/5/15 | La Moda (Gale) EB-5 Investment LP | $0 | $190,000 | $0 | $16,000,000 | 1.19% | 1.19% |
| 1/30/19 | QB Ventures EB5 Capital, LLC | $0 | $800,000 | $0 | $8,000,000 | 10.00% | 10.00% |
| 8/16/11 | Riviera Point Holdings, Ltd. | $0 | $0 | $30,000 | $17,000,000 | 0.18% | 0.00% |
| 3/6/12 | Washington Green Energy EB-5 Investments LP | $0 | $30,000[4] | $0 | $110,500,000 | 6.00%[4] | 6.00% |
| **Median** | | | | | | **9.25%** | **7.25%** |

Source: Form D Filings; Expert Report of Theodore R. Ginsburg, March 25, 2021

Note:
[1] The set of EB-5 SEC Form D filings presented in this table correspond to those selected by Mr. Ginsburg as identified in Appendix A of the Ginsburg Report.
[2] Excludes the gross proceeds paid to executive officers, directors or promoters as they are distinct from sales incentive payments (i.e. sales commission and finder's fees).
[3] The Form D filings of EB5 Riverplace Hotel Investment LP and EB-5 SF Investment Limited Partnership describe that the executives will receive no payments from offering proceeds, but will receive a fee tied to total budgeted costs or project development expenses. Thus, they are excluded from the adjusted median percentage paid calculation.
[4] The Form D of this issuer reports finder's fee of $30,000 per investor. The Ginsburg Report calculates total percentage paid for this issuer of 6%, based on the ratio between the sales commission / finder's fee per investor and the accepted minimum investment of $500,000 per investor.

# Exhibit 41

MEVION
medical systems

# BUDGETARY QUOTATION FOR BEVERLY ONCOLOGY

QUOTATION # PITT06232014BEVERLYONCOLOGYv01
JUNE 23, 2014

Exhibit
00072
Novodor

Mevion Medical Systems, Inc., 300 Foster Street, Littleton, MA 01460

MEVION medical systems

**QUOTATION FOR:**
Ruth Novodor, CEO
200 East Beverly BLVD, Suite 200
Montebello, CA 90640

**INQUIRES, REPLIES AND QUESTIONS:**
Michael Pittman
Vice President of Sales
Mevion Medical Systems
300 Foster Street
Littleton, MA 01460
O: 978-540-1730/ C: 731-499-4310

| QUOTATION DATE | PAYMENT TERMS | SHIPPING ALLOCATION | VALID TILL |
|---|---|---|---|
| 06/23/2014 | See Exhibit One | See Exhibit 1 | 90 Day from Quotation Date |

These Proposed Terms summarize the principal terms currently proposed by Mevion Medical Systems, Inc ("Mevion") with respect to a potential sale of a System to **Beverly Oncology**. These Proposed Terms are intended solely as a basis for further discussions and are not intended and do not constitute a legally binding obligation. No legally binding obligations will be created, implied or inferred until the parties execute final documents. This document is confidential and intended solely for the information and benefit of the immediate recipient.

| ITEM | QTY | ITEM DESCRIPTION | OFFER PRICE |
|---|---|---|---|
| 1 | 1 | **MEVION S250 Proton Therapy System™ ("System")**<br>1.1. Proton Accelerator Module<br>1.2. Accelerator gantry to precisely position proton accelerator module<br>1.3. Clinical beam line on in-room high precision gantry<br>1.4. Large field proton applicator with transfer cart<br>1.5. Small field proton applicator with transfer cart<br>1.6. Robotic Couch for high-precision patient positioning with 6 degrees of motion<br>1.7. Treatment console system<br>1.8. Interface to Oncology Information System (ARIA or MOSAIQ):<br>1.8.1. Patient treatment data transfer and verification<br>1.8.2. Patient treatment data recording<br>1.9. Two (2) Hand pendant controls<br>1.10. Two (2) in room display console<br>1.11. 2D Radiographic patient alignment system<br>1.12. In room patient alignment console<br>1.13. Two (2) sets of product manuals<br>1.14. System warranty – 1 year | Included |
| 1 | 1 | **3D Radiographic CT imaging system**<br>*BodyTom Portable CT scanner from SamsungNeurologica.* | Included |
| 1 | 4 | **Training - Clinical Machine Operations**<br>*Scope: Participants will be able to successfully perform Image guided proton radiotherapy on the MEVION S250. They will also understand all safety features, daily quality tests, and basic troubleshooting associated with the device.*<br>*Length – 4 days*<br>*Location – Customer Site* | Included |
| 1 | 2 | **Training - Physician Course**<br>*Scope: Participants will become familiar with the MEVION S250, its capabilities and operational requirements. They will see a range of treatment protocols used in active proton clinics. The participants will review specific processes for preparing, immobilizing, scanning, and designing site-specific treatment plans and delivery techniques.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |

MEVION medical systems

| | | | |
|---|---|---|---|
| 1 | 3 | **Training Physics Course**<br>*Scope: Participants will be familiar with the physics of proton therapy as performed on the MEVION S250. They will understand the criteria and standard techniques for acceptance testing and commissioning the equipment. They will understand the safety features, system interlocks, and standard periodic quality tests associated with the equipment. Participants will become familiar with the major components of the MEVION S250 and their operational principals.*<br>*Length – 4 days*<br>*Location – Training Center* | Included |
| 1 | 4 | **Training - Ancillary Staff Course**<br>*Scope: A course designed for radiation oncology staff involved in the routine patient care – This includes Dosimetrist, Physicist, Mold Room Technician, Nursing, Simulation Technicians range of treatment protocols used in active proton clinics. The participant will review specific processes for preparing, immobilizing, scanning, and designing site specific treatment plans.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |
| 1 | 2 | **Training - Biomedical Technician Course**<br>*Scope: A course is designed for the hospital biomedical engineer and physicist who may need to provide basic support for the MEVION S250 proton therapy system.*<br>*Length – 3 days*<br>*Location – Customer Site* | Included |
| | | **List Price** | **$26,495,000.00 (USD)** |
| | | **Reference Site Discount** | **$4,495,000 (USD)** |
| | | **Quotation Total** | **$22,000,000(USD)** |

MEVION medical systems

## EXHIBIT 1: FEES AND DELIVERY

### PAYMENT TERMS

For each System ordered, payment terms are as follows:

| MILESTONE | MILESTONE PAYMENT |
|---|---|
| 1. Execution of Definitive System Purchase Agreement | $4,000.000 |
| 2. Upon shipment of the Gantry Embeds component for the System | $5,000,000 |
| 3. Upon Shipment of the Accelerator Module of the System | $6,000,000 |
| 4. Customer Acceptance of the System | $6,000,000 |
| 5. Clinical Acceptance of the System | $1,000,000 |

### ADDITIONAL PURCHASE TERMS

- Payments terms are net thirty (30) days.
- All prices are quoted in U.S. Dollars
- Funds may be emitted by check or wire transfer. Wire transfer information supplied upon request.
- All site modifications and preparation are the customer's responsibility and are to be completed to the specifications given by Mevion Medical Systems prior to the installation date.
- Any payments, once they are paid, shall not be refundable nor creditable for any reason whatsoever, including termination of the definitive agreement by Customer.
- The Total Price is in consideration of Mevion's building of the System, Mevion's grant of a license to the applicable software, on-site assembly of the System, and all documentation, training, warranties and services that Mevion will provide.
- The Total Price does not include the cost of (i) delivery of the System components from Mevion's facility in Littleton, Massachusetts to Customer's facility and the cost of insurance during transport; (ii) rigging required to move the System components from the delivery truck to the point of on-site construction; (iii) preparation of Customer's facility required to accommodate on-site Construction and assembly of the System, including provision of all utility services; (iv) any service agreements after the warranty period, (v) calibration or commissioning of the System, (vi) any taxes or duties, now or hereafter applicable, levied on, absorbed or otherwise imposed on any of the transactions contemplated here under, including sales or value-added taxes, or other governmental charges otherwise imposed upon any amounts due hereunder, in each case of clauses (i) through (vi) above, for which costs the Customer shall solely be solely responsible.
- Additional terms and Conditions of Sales are provided in **Exhibit 2**

### TARGET DATE SCHEDULE

- Final delivery schedule will be provided upon execution of a definitive agreement.

### WARRANTY

- The System will be warranted to be free from material defects in materials and workmanship and will perform in all material respects in accordance with the Specifications for a period of twelve (12) months commencing on clinical commissioning of the System.
- The Warranties are void if the System is (i) damaged by or malfunctions by reason of unreasonable use, misuse, neglect, lack of routine care, or maintenance as described in any System Documentation, failure to use or take any proper precautions as indicated in the System Documentation, user modification of the System if not previously authorized by Mevion, improper service by Customer, repairs, installation or maintenance by personnel not authorized by Mevion, abuse or other causes not arising out of defects in materials or workmanship or (ii) used for the Restricted Uses or otherwise for uses other than the Intended Uses (each defined below). The Warranties do not cover the System if used in violation of the System Documentation or if the System has or have been moved after construction and installation, or materially altered or modified.

MEVION
medical systems

## EXHBIT 2: OTHER TERMS AND CONDITIONS OF SALE

A definitive agreement will contain other terms and conditions usual and customary for an agreement of this type, including without limitation:

- Confidentiality
- Representations and Warranties
- Termination and Termination Rights
- Change of control provisions
- Insurance requirements
- Limitations on liability and disclaimers of damages
- Indemnifications
- Dispute resolution

# Exhibit 42

McGuireWoods LLP
1800 Century Park East
8th Floor
Los Angeles, CA 90067
Phone: 310.315.8200
Fax: 310.315.8210
www.mcguirewoods.com

Molly M. White
Direct: 310.956.3423

MCGUIREWOODS

mwhite@mcguirewoods.com
Direct Fax: 310.315.8210

Exhibit
00075
Novodor

March 28, 2016

**VIA EMAIL AND FIRST CLASS MAIL**

Tony Regenstreif
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

Re: Pacific Proton

Dear Mr. Regenstreif:

We are writing to provide the S.E.C. Staff with additional information and documents in connection with the Pacific Proton EB-5 Fund, LLC. The following is a list of information that the Staff requested at our March 10th meeting. Please do not hesitate to contact me if we missed something, or if the Staff needs additional information.

1. The Staff asked our clients to complete background questionnaires, which you sent on March 11th. My clients were traveling the week of March 14th, so they have not yet completed their background questionnaires. I hope to send you the questionnaires and the bios of Ruth Lopez Novodor and Dr. John Thropay later this week.

2. Our clients had indicated that there was a lawyer in Florida who had initially helped find EB-5 investors. You had asked them to provide the name of the lawyer. My clients are still researching that issue. Stephen Yale Loehr, with Miller Mayer LLP, is the attorney who drafted the initial deal documents. I noticed that on the I-924A, which we produced on January 28, 2016, there is reference to an immigration attorney in Boca Raton, Florida:

David G. Derrico
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432

You can find this information on the page that is Bates numbered PPEB5-00471. Our clients believe that there may have been another lawyer in Florida, who reached out to potential investors, whose first name is Joseph. They are still researching his last name.

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO 17 C.F.R. § 200.83.

3. You asked Dr. Thropay to provide a list of all trips that he took to China. Dr. Thropay traveled to China on:

- August 17, 2012
- December 15, 2014
- Friday, March 6, 2015
- Tuesday, August 4, 2015; and
- November 18, 2015 (this was the trip during Thanksgiving)

4. We are providing a copy of the ground lease (Bates No. PPEB5-00522 through PPEB5-00552) and the amendment to the ground lease (Bates No. PPEB5-00553-PPEB5-00554).

5. The Staff had also asked to see a draft of the shareholders agreement that Charles Liu presented to Dr. Thropay. Enclosed please find an email from Charles Liu to Dr. Thropay and Ruth Lopez Novodor, to which the draft shareholders agreement was attached. It is Bates numbered PPEB5-0559 through PPEB5-00565.

6. The Staff asked us to provide the names of the individuals at Delsk, with whom Dr. Thropay and Ruth Lopez Novodor met. They are:

President: Xin Wang

Vice President and Secretary to the President: Edison Zhan.

7. The Staff asked us to provide the letter that Edison Zhan sent to Dr. Thropay and Ms. Novodor, from the Australian construction group. That document is enclosed and is Bates numbered PPEB5-00555 through PPEB5-00558.

8. Finally, you asked to see the Da Mei advertisement that was sent to Dr. Thropay and Ms. Novodor. We still need to provide you that document. We believe that the document may be written in Mandarin.

Please call me at (310) 956-3423 if you have any questions or would like to discuss this further.

Sincerely yours,

Molly White

Molly M. White
McGuireWoods LLP

Enclosures

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO 17 C.F.R.§ 200.83.

RECEIVED
MAIL ROOM
2016 MAR 31 AM 7:39
U.S.SEC
LOS ANGELES
REGIONAL OFFICE

neopost®
03/28/2016
US POSTAGE
$02.74º
ZIP 90067
041L11244356

From: Molly White

McGUIREWOODS
1800 Century Park East | 8th Floor | Los Angeles, CA 90067

To: Tony Regenstreif
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

McGuireWoods LLP
1800 Century Park East
8th Floor
Los Angeles, CA 90067
Phone: 310.315.8200
Fax: 310.315.8210
www.mcguirewoods.com

Molly M. White
Direct: 310.956.3423

McGUIREWOODS

mwhite@mcguirewoods.com
Direct Fax: 310.315.8210

March 29, 2016

**VIA EMAIL AND FIRST CLASS MAIL**

Tony Regenstreif
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

Re: Pacific Proton

Dear Mr. Regenstreif:

We are writing to apprise you of additional developments in connection with Pacific Proton Therapy Center and Los Angeles County Proton Therapy, LLC.

On or about March 18, 2016, our clients received a letter from Alston & Bird, who represents Optivus Proton Therapy, Inc., which letter was directed to Charles Liu and Dr. John Thropay. (Bates No. PPEB5-005566 through PPEB5-00568.) As you recall, when Charles Liu initially approached Dr. Thropay and Ms. Lopez Novodor, the plan was to have Optivus build and maintain a proton beam system in connection with the project. In November 2015, however, Mr. Liu apparently entered into an agreement with Mevion Medical Systems. The March 18 letter asks Pacific Proton Therapy Center and Los Angeles County Proton Therapy, LLC to cease and desist from using Optivus's name in their materials. As you are aware, on January 19, 2016, Charles Liu had Dr. Thropay removed as an officer and director of Beverly Proton LLC. Dr. Thropay has no control of the entity and now has no visibility into its operaion. On March 24, 2016, counsel for Dr. Thropay sent the enclosed response to Alston & Bird. (Bates No. PPEB5-00569 through PPEB5-00570.)

On or about March 22, 2016, Dr. Thropay received a letter from Knobbe Martens, which represents Loma Linda University, asking Los Angeles Proton Therapy Center, LLC to cease and desist from using Loma Linda's trademark on its website. (Bates No. PPEB5-00571 through PPEB5-00574.) Dr. Thropay's counsel responded to that letter on March 25, 2016. (Bates No. PPEB5-00575 through PPEB5-00576.)

We will continue to keep you apprised of additional developments. Please call me at (310) 956-3423 if you have any questions or would like to discuss this further.

Sincerely yours,

Molly White

Molly M. White
McGuireWoods LLP

Enclosures

RECEIVED
MAIL ROOM

2016 MAR 31 AM 7:38

U.S. SEC
LOS ANGELES
REGIONAL OFFICE

neopost [illegible]
[illegible]
US POSTAGE $01.42⁰
ZIP 90067
041L11244356

From: Molly White

McGUIREWOODS
1800 Century Park East | 8th Floor | Los Angeles, CA 90067

To: Tony Regenstreif
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

McGuireWoods LLP
1800 Century Park East
8th Floor
Los Angeles, CA 90067
Phone: 310.315.8200
Fax: 310.315.8210
www.mcguirewoods.com

Molly M. White
Direct: 310.956.3423

McGUIREWOODS

mwhite@mcguirewoods.com
Direct Fax: 310.315.8210

April 25, 2016

**VIA FIRST CLASS MAIL AND EMAIL**

Tony Regenstreif
Karen Matteson
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

Re: Pacific Proton

Dear Mr. Regenstreif and Ms. Matteson:

We are writing to apprise you of additional developments in connection with Pacific Proton Therapy Center and Los Angeles County Proton Therapy, LLC. As we have previously mentioned, Dr. Thropay and Ms. Lopez Novodor have ongoing business interests that they must protect. Given our clients' concerns about Mr. Liu's conduct, our clients have sent Mr. Liu the enclosed notice of incurable default and notice of termination of the ground lease. The document is Bates numbered PPEB5-00584 through PPEB5-00585.

We will continue to keep you apprised of additional developments. Please call me at (310) 956-3423 if you have any questions or would like to discuss this further.

Sincerely yours,

Molly M. White
McGuireWoods LLP

Enclosures

CONFIDENTIAL TREATMENT REQUESTED PURSUANT TO 17 C.F.R. § 200.83.

RECEIVED
MAIL ROOM
2016 APR 28 AM 7:03
U.S. S.E.C
LOS ANGELES
REGIONAL OFFICE

LOS ANGELES
CA 900
25 APR '16
PM 9 L

neopost
04/25/2016
US POSTAGE

FIRST-CLASS MAIL
$00.46⁵

ZIP 90067
041L11244356

McGUIREWOODS

Karen Matteson
Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

90071293425

# Exhibit 43

**From:** Levine, Harlan
**To:** Michael Hunn
**CC:** Berkey, Anita
**Sent:** 10/21/2015 9:38:34 PM
**Subject:** RE: Mevion Medical Systems to Install a Proton Therapy System in Switzerland

Michael,

I am in China all week next week; you can meet with my SVP and team, or wait to the following week. I am okay either way.
I will call you around 3:30 p.m. tomorrow (Thursday) if that is convenient for you?

Regards,

Harlan

P.S. As discussed, I am copying my assistant, Anita Berkey, who can help coordinate my calendar and those of my team.

---

**From:** Michael Hunn [mailto:michael.hunn@cox.net]
**Sent:** Wednesday, October 21, 2015 1:40 PM
**To:** Levine, Harlan
**Cc:** Stone, Robert
**Subject:** Mevion Medical Systems to Install a Proton Therapy System in Switzerland

Harlan,

Good talking with you this morning. I did a site visit at the Beverly Campus today. Attached is the Proton vendor that I mentioned.

I spoke to Jill Gordon and know that the MOU has been distributed for signature by the parties. Jill and I will be meeting on Friday. I was hoping to schedule a time to meet with you and the team at COH next week - let me know what time would work best.

http://mevion.com/news/1105-mevion-medical-systems-to-install-a-proton-therapy-system-in-switzerland

Looking forward to working with you and Robert again.

*Michael*

Michael Hunn
Healthcare Advisor
michael.hunn@cox.net
714-272-9639

IMPORTANT NOTICE TO RECIPIENT: This email is meant only for the intended recipient of the transmission. In addition, this email may be a communication that is privileged by law. If you received this email in error, any review, use, disclosure, distribution, or copying of this email is strictly prohibited. Please notify us immediately of the error by return email, and please delete this email from your system. Thank you for your cooperation.

EXHIBIT
107

# Exhibit 44

**From:** Chung, Jae
**To:** 'Charles Liu'; Cheng, Alice
**CC:** Hebson, Heidi; Levine, Harlan; Hsiao, Angel
**Sent:** 7/14/2015 11:38:03 PM
**Subject:** RE: Draft MOU Meeting Tomorrow
**Attachments:** Initial Terms Beverly Proton Center.docx

Dear Charles and Alice,

My apologies in the delay of getting you the document. Please find attached for your review the initial draft terms and discussion points of the MOU. As noted in my prior email, I will work with Geri Mitchell at Beverly Hospital to schedule a follow up call/meeting with our COH executives and yourselves to further clarify the terms and to establish common grounds.

Thank you,

Jae

**Jae Chung**
Senior Director, Business Development
Business Development & Transaction Management
City of Hope
1500 E. Duarte Road | Duarte, CA 91010
Internal: 89315 | Direct: (626) 218-9315
Fax: (626) 218-9176 | Mobile: (626) 260-3295
jchung@coh.org

City of Hope

***"There is no profit in curing the body if in the process we destroy the soul." Samuel H. Golter***

SECURITY/CONFIDENTIALITY WARNING:
This message and any attachments are intended solely for the individual or entity to which they are addressed. This communication may contain information that is privileged, confidential, or exempt from disclosure under applicable law (e.g., personal health information, research data, financial information). Because this e-mail has been sent without encryption, individuals other than the intended recipient may be able to view the information, forward it to others or tamper with the information without the knowledge or consent of the sender. If you are not the intended recipient, or the employee or person responsible for delivering the message to the intended recipient, any dissemination, distribution or copying of the communication is strictly prohibited. If you received the communication in error, please notify the sender immediately by replying to this message and deleting the message and any accompanying files from your system. If, due to the security risks, you do not wish to receive further communications via e-mail, please reply to this message and inform the sender that you do not wish to receive further e-mail from the sender.

---

**From:** Charles Liu [mailto:charlesliu@me.com]
**Sent:** Tuesday, July 14, 2015 11:18 PM
**To:** Chung, Jae
**Cc:** Cheng, Alice; Hebson, Heidi; Levine, Harlan; Hsiao, Angel
**Subject:** Re: Draft MOU Meeting Tomorrow

Hi Jae,

I have not received the draft of MOU. Thanks

Best, Charles

EXHIBIT 111

On Jul 13, 2015, at 15:19, Chung, Jae <jchung@coh.org> wrote:

Hi Alice,

Thank you for your email. I concur with your recommendations on moving forward. I will email you and Charles a draft of the MOU/terms by tomorrow. I will also coordinate the follow up call/meeting with Geri Mitchell at Beverly Hospital.

Best,

Jae

**Jae Chung**
Senior Director, Business Development
Business Development & Transaction Management
City of Hope
1500 E. Duarte Road | Duarte, CA 91010
Internal: 89315 | Direct: (626) 218-9315
Fax: (626) 218-9176 | Mobile: (626) 260-3295
jchung@coh.org
<image001.jpg>
***"There is no profit in curing the body if in the process we destroy the soul." Samuel H. Golter***

SECURITY/CONFIDENTIALITY WARNING:
This message and any attachments are intended solely for the individual or entity to which they are addressed. This communication may contain information that is privileged, confidential, or exempt from disclosure under applicable law (e.g., personal health information, research data, financial information). Because this e-mail has been sent without encryption, individuals other than the intended recipient may be able to view the information, forward it to others or tamper with the information without the knowledge or consent of the sender. If you are not the intended recipient, or the employee or person responsible for delivering the message to the intended recipient, any dissemination, distribution or copying of the communication is strictly prohibited. If you received the communication in error, please notify the sender immediately by replying to this message and deleting the message and any accompanying files from your system. If, due to the security risks, you do not wish to receive further communications via e-mail, please reply to this message and inform the sender that you do not wish to receive further e-mail from the sender.

---

**From:** Cheng, Alice [mailto:acheng@beverly.org]
**Sent:** Monday, July 13, 2015 12:33 PM
**To:** Chung, Jae
**Cc:** Hebson, Heidi; Levine, Harlan; Hsiao, Angel; Charles Liu
**Subject:** RE: Draft MOU Meeting Tomorrow
**Importance:** High

Hi Jae:

I want to thank you for coordinating tomorrow's meeting and your understanding of Charles's schedule. I had a discussion with Charles this morning. In respect of schedule challenges for all parties, we would appreciate a draft MOU/Key terms be sent via email for review **in lieu of** in-person meeting. A follow-up conference call or in-person meeting with your executive team members to discuss the terms and establish common grounds before proceeding to legal review would be ideal. If you suggest otherwise, please advise.

Best,

Alice

*Alice Cheng*
President and CEO
Beverly Hospital

309 West Beverly Blvd.,Montebello, CA 90640
(323)725-4250 (T)
(323)725-4338 (F)
acheng@beverly.org

---------------------------------------------------------------------

*SECURITY/CONFIDENTIALITY WARNING:
This message and any attachments are intended solely for the individual or entity to which they are addressed. This communication may contain information that is privileged, confidential, or exempt from disclosure under applicable law (e.g., personal health information, research data, financial information). Because this e-mail has been sent without encryption, individuals other than the intended recipient may be able to view the information, forward it to others or tamper with the information without the knowledge or consent of the sender. If you are not the intended recipient, or the employee or person responsible for delivering the message to the intended recipient, any dissemination, distribution or copying of the communication is strictly prohibited. If you received the communication in error, please notify the sender immediately by replying to this message and deleting the message and any accompanying files from your system. If, due to the security risks, you do not wish to receive further communications via e-mail, please reply to this message and inform the sender that you do not wish to receive further e-mail from the sender. (fpc5p)

---------------------------------------------------------------------

# Exhibit 45

## APPLICATION FOR PAYMENT REQUEST #3
APRIL 16, 2016

TO: Beverly Proton LLC
28202 Cabot Rd STE 640
Laguna Niguel CA 92667

RE: Building Demolition
105 W Beverly Blvd
Montebello Ca 90640

**A. PART I - INVOICE**

| | | |
|---|---|---|
| Original Contract Sum | | $215,268 |
| Approved Change Orders | | $0.00 |
| TOTAL CHANGE ORDERS | | $0.00 |
| Revised Sum(original + chng orders) | | $215,268 |

**Pay Request NO 3 - WORK COMPLETED**

| | | |
|---|---|---|
| **CURRENT BILLING-per contract payment schedule** | | |
| **Item 1 Retainer, signing of Contract** | | $1,000 |
| **Item 2 Mobilization, start up** | | $50,000 |
| **Item 3 7 days** | | $50,000 |
| **Item 4 14 days** | | $50,000 |
| **Item 5 21 days** | | $50,000 |
| | MATERIAL & LABOR | $201,000 |
| | Contractor OH/P | Included |

| | | |
|---|---|---|
| Total Value of work in Place | 93.4% | $201,000 |
| Total change order work completed | | $0 |
| Subtotal - Total-All Work Completed | | $201,000 |
| Previous Payments (inv 1, inv 2) | | $151,000 |
| **AMOUNT DUE - THIS INVOICE** | | **$50,000** |

**B: CONTRACTOR CERTIFICATION**

The Undersigned certifies that as of this invoice the foregoing is a true and correct statement of all sums due under this Contract, except for change work work performed for which Change Orders ~~have not~~ been approved

BY: R A Stupin 4/16/16
Richard Stupin, R ALAN Construction Lic B-351787 Date

APPROVED BY:
Charles Liu, Beverly Proton Center LLC Date



EXHIBIT
113

# Exhibit 46

# Ronald S. Friedman

ASSURANCE SERVICES



**Ronald S. Friedman, CPA***
Partner

Ronald S. Friedman is a Partner and leader in the Firm's National Retail/Consumer Products Industry group, he provides consulting services for closely-held and emerging businesses in the apparel, manufacturing, distribution and retail industries.

Mr. Friedman works very closely with his clients providing assistance with many aspects of their businesses. His services include forecasting and budgeting, profit enhancement, succession planning, exit strategies, preparation for sale of a business, assistance in procuring financing, and workout and reorganization consulting. Mr. Friedman's expertise also includes assisting in the negotiations for the purchase or sale of a business.

Additionally, for more than 30 years Mr. Friedman has served as an expert witness in numerous consumer product cases ranging from valuations in divorce proceedings to disputes between partners in business dealings.

Mr. Friedman is often quoted in the media for his industry expertise with retail, manufacturing and distribution driven companies in the retail/consumer products sector. His recent appearances include television (FOX and PBS), radio (KFWB, Bloomberg Radio and the Wall Street Journal Radio Network) and print (Apparel News, Associated Press, Los Angeles Times, New York Times, The Wall Street Journal, Women's Wear Daily and Fashion Mannuscript).

## Professional & Civic Affiliations

American Institute of Certified Public Accountants (AICPA)
California Society of Certified Public Accountants (CalCPA)
City of Hope, Professions and Finance Associates, Past President
California State University Northridge University Corporation, Board of Directors
National Jewish Hospital, Board of Directors
Temple Ahavat Shalom in Northridge, Past President
Union of Reform Judaism, Presidents Round Table, CHAIR Southern California
New Horizons, Audit Committee Chairman
CSUN, University Corporation, Audit Committee Chairman

## Seminars & Presentations

100 Ways™- The Profit Enhancement Process
Facilitation of Retreats for Professional Service Firms & Other Businesses
Financial Statement Analysis
Inventory Valuations and Auditing
Reading and Understanding Financial Statements
Internal Controls for Business Entities

## Litigation Cases

- Reviewed books and records along with bank statements for cash stolen from company. Bookkeeper signed owners name on personal checks and destroyed them before owner saw bank statements.
- Reviewed credit card charges looking for inappropriate charges by users of the card.
- Worked with private investigators following a clients CFO to casino gambling with company funds he had stolen.
- Reconciled gross profits of a manufacturer to determine why the gross profits were not achieving expected results.
- In a bankruptcy case, looked for money and assets that the owner inappropriately took from the company at the expense of the general creditors.
- Prepared an expert report for litigation in Federal Court as an expert in financial analysis in the Retail/Consumer Products industry.
- Prepared an expert report and testified for an apparel company where minority shareholders claimed they were not fairly charged expenses and the business failed for lack of financial support from the majority shareholders.
- Testified in criminal court regarding the operations of a business.

## AREAS OF EXPERTISE

Forecasting & Budgeting
Succession Planning
Exit Strategies
Workouts & Reorganizations
Purchase & Sale of Businesses
Litigation Support

## KEY CLIENTS

Apparel
Manufacturing
Distribution
Retail
E-Commerce

## EDUCATION

Bachelor of Science, Accounting
California State University, Northridge

MARCUMGROUP MEMBER

*Licensed by the State of California

Phone 310.432.7414
ron.friedman@marcumllp.com
www.marcumllp.com

MARCUM ACCOUNTANTS ▲ ADVISORS

# TESTIMONY EXPERIENCE OF RONALD S. FRIEDMAN

**PRIOR TESTIMONY EXPERIENCE IN THE LAST FOUR YEARS:**

| TOPIC | IN THE MATTER OF | NATURE OF TESTIMONY | VENUE |
|---|---|---|---|
| Breach of Fiduciary Duty | Eric Kweach, an individual V. Sang Lee, an individual; Trinity Sports, Inc., a corporation | Trial | Superior Court of the State of California; County of Los Angeles, Central District |
| Breach of Contract | Imperial Toy LLC v Genna Rosenberg | Arbitration | AAA: Los Angeles |
| Shareholder Dispute | Lou et Lin, LLC v Mitchell Quaranta, Bruce Stern, Jonathan Greenberg, Jama JJ,LLC And SwatFame, Inc and Counter Claims | Arbitration | Jams Los Angeles |
| Breach of Fiduciary Duty | Alison Miller Gjersvik, individually and derivatively on behalf of Golden Too, Inc. and Andrew Assael, individually and derivatively on behalf of Planet Gold Clothing, Inc., Claimants, against Jeffrey D. Fisher and Bruce A. Fischer, Respondents and Golden Too, Inc. and Planet Gold Clothing, Inc., Nominal Respondents | Arbitration | AAA: Manhattan |
| Breach of Fiduciary Duty | XCVI, LLC v. Alpha Capital, LLC, Meesh & Mia, Elizabeth Turley, Saw Something Shiny, Columbia State Bank | Mediation | ADR Services – Los Angeles |
| Industry Expert | United States v. Gilbert N. Michaels, et al | Trial | U.S. Federal Court; Santa Ana, CA |
| Industry Expert/Damages | Marc Fisher LC, Fisher Licensing LLC, M.B. Fisher LLC, MBF Holdings LLC, Fisher Design LLC, MBF Licensing LLC, Unisa Fisher Wholesale LLC, Fisher Sigerson Morrison LLC, Marc Fisher Holdings LLC, Marc Fisher Jr Brand LLC, MFKK LLC, and MF-TFC LLC, Against Milberg Factors, Inc. | Deposition | Supreme Court, New York County |

# Exhibit 47

**From:** Michael Hunn
**To:** Hebson, Heidi
**CC:** Jensen, Vincent; Levine, Harlan; Alice Cheng; Mike Cogswell
**Sent:** 11/16/2015 3:16:23 PM
**Subject:** Re: Communications Planning - Drafts Pending

Heidi,

I am working on a draft communication for United MPH Ventures, LLC ("United") and am also coordinating the communication with Mevion. Mevion is drafting a press release on the purchase of the Proton System by United. I would recommend that we match the communications for consistency. I will forward to you tomorrow so that you can review what is being drafted. We want to be in sync and look forward to your input.

Additionally, United is soliciting a proposal for a web-site from the same web-developer that created the one in Jacksonville, FL with Dr. Ackerman. FYI.

Let me know if you have any questions. Thanks Heidi.

Michael

Michael Hunn
Healthcare Advisor
michael.hunn@cox.net
714-272-9639

IMPORTANT NOTICE TO RECIPIENT: This email is meant only for the intended recipient of the transmission. In addition, this email may be a communication that is privileged by law. If you received this email in error, any review, use, disclosure, distribution, or copying of this email is strictly prohibited. Please notify us immediately of the error by return email, and please delete this email from your system. Thank you for your cooperation.

On Nov 13, 2015, at 10:06 AM, Michael Hunn <michael.hunn@cox.net> wrote:

Heidi,

I will draft up the communication and send to you for review if that works for you?

Michael

Michael Hunn
Healthcare Advisor
michael.hunn@cox.net
714-272-9639 (c)

EXHIBIT
109

On Nov 13, 2015, at 9:04 AM, Hebson, Heidi <HHebson@coh.org> wrote:

Thank you Michael. Our communications team will want to see the draft release, script and any associated documents in both English and Chinese (and any other languages). They have some ideas around how we would be comfortable framing CoH's involvement given the definitive documents have not been executed. Who is supporting you on the drafting of these pieces? I would like to connect them directly to our Communications team.

Heidi

On Nov 13, 2015, at 7:53 AM, Michael Hunn <michael.hunn@cox.net> wrote:

Heidi,

Here are the responses to the communications planning. Let me know if you have any questions.

Thanks for putting this together.

Michael

Michael Hunn
Healthcare Advisor
michael.hunn@cox.net
714-272-9639

IMPORTANT NOTICE TO RECIPIENT: This email is meant only for the intended recipient of the transmission. In addition, this email may be a communication that is privileged by law. If you received this email in error, any review, use, disclosure, distribution, or copying of this email is strictly prohibited. Please notify us immediately of the error by return email, and please delete this email from your system. Thank you for your cooperation.

On Nov 11, 2015, at 10:34 AM, "Hebson, Heidi" <HHebson@coh.org> wrote:

*Investors:*
*EB5 Investors of United MPH Ventures, LLC*

*Specific Need:*
*Update on Progress of the Project - Time Frames and Overview of Plans*

*Type of Announcement (written, verbal):Written*
*Proposed Announcement (a draft of language, script, Q&A): Noting that an MOU has been signed, that an Equipment Vendor has been selected (Mevion), that the site has been prepared for construction, that there is a 120 exclusive negotiating period and that the project is moving forward.*
*Timing: 2 Weeks*

*International/ China Announcement:*
**This would be for the Screening Program and Outreach Program - no action needed on these at this time. The Programs need to have Business Plans developed and then we would be able to determine Communications**

Specific Need
Proposed language
Timing

Heidi Hebson
Vice President, Business Development
Business Development & Transaction Management
City of Hope

1500 E. Duarte Road
Duarte, CA 91010
External calls: 626.471.9387
Cell: 626.216.2037
Internal calls: 69387
email: hhebson@coh.org

---------------------------------------------------------------------
*SECURITY/CONFIDENTIALITY WARNING:
This message and any attachments are intended solely for the individual or entity to which they are addressed. This communication may contain information that is privileged, confidential, or exempt from disclosure under applicable law (e.g., personal health information, research data, financial information). Because this e-mail has been sent without encryption, individuals other than the intended recipient may be able to view the information, forward it to others or tamper with the information without the knowledge or consent of the sender. If you are not the intended recipient, or the employee or person responsible for delivering the message to the intended recipient, any dissemination, distribution or copying of the communication is strictly prohibited. If you received the communication in error, please notify the sender immediately by replying to this message and deleting the message and any accompanying files from your system. If, due to the security risks, you do not wish to receive further communications via e-mail, please reply to this message and inform the sender that you do not wish to receive further e-mail from the sender. (fpc5p)
---------------------------------------------------------------------

LPR151119

MEVION
medical systems

**For Immediate Release**
November 19, 2015
Contact: Tom Langford
tom.langford@fkhealth.com
617-761-6775

***Additional Images Available***

# Mevion to Install a Three-Room Proton Therapy System in Los Angeles

*Excellent results from Mevion's clinically operational systems, advantages of MEVION S250mx are key factors in purchase*

LITTLETON, Mass., November 19, 2015 – Mevion Medical Systems is announcing the Los Angeles Proton Center is building a three-room MEVION S250mx proton therapy system. The system will include Mevion's HYPERSCAN pencil beam scanning technology and will be installed near Los Angeles, in the city of Montebello, on the campus of Beverly Hospital. The installation will take place in phases, with the first of the three rooms treating cancer patients in late 2017.

"The MEVION S250mx was the optimal solution for our facility because it allows for a flexible, phased installation," said Charles Liu, president of the Los Angeles Proton Center. "Just as importantly, we continue to be impressed with the proven results of all of Mevion's clinically operational systems, including Mevion's industry-leading ramp up time, high patient throughput, and low staffing and maintenance requirements. The decision to select Mevion and its product solutions will allow us to consistantly provide high-quality proton therapy to a large number of patients."

Site Photo to Come

**Construction is underway on the Los Angeles Proton Center in Montebello, Calif., where a three-room MEVION S250mx proton therapy system will begin treating patients in 2017.**

The MEVION S250mx is the fully scalable version of Mevion's revolutionary proton therapy technology and is available in two, three or four room configurations. Each room is fully independent, with its own proton accelerator, providing inherent redundancy and guaranteeing 100 percent facility uptime 365 days per year.

"The MEVION S250mx is unique in the industry because it allows cancer centers to phase-in the installation of a multi-room system as their patient volume increases. By adding one room at a time, initial cash flow demands are lower and financial risk is reduced," said Joseph K. Jachinowski, president and CEO of Mevion Medical Systems.

The Los Angeles Proton Center is an independent proton center that will collaborate with renowned cancer specialists to treat adult and pediatric cancer patients from the Greater Los Angeles area. The center will also serve international patients who are seeking cancer care on the West Coast of the United States.

Similar Mevion systems have ramped up to full capacity in as little as three months and achieved an annualized rate of 350 patients per room, per year. That is more than 25 percent better than the average U.S. proton therapy center.

The Los Angeles system is the third system purchase announced by Mevion in the past six weeks. In October, Mevion announced the installation of a MEVION S250 to Centre Hospitalier Universitaire Vaudois (CHUV) in Lausanne, Switzerland, and a MEVION S250i with HYPERSCAN to the Ackerman Cancer Center in Jacksonville, Florida.

**About Mevion Medical Systems**

Mevion Medical Systems, Inc. is a leading provider of high-quality proton therapy systems for use in radiation treatment for cancer patients. Mevion is privately held and based in Littleton, Massachusetts, with international offices in the United Kingdom and Japan and a joint venture in China. For more information, please visit www.mevion.com.

**About the MEVION S250 Series**

The MEVION S250 Series is elegantly designed to deliver high-powered, efficient proton therapy treatments. Built upon the world's only gantry-mounted proton accelerator and benefitting from Mevion's patented direct beam technology, the MEVION S250 Series delivers on the therapeutic promise of proton therapy while enhancing beam quality, stability and uptime. The result is reduced system complexity, higher reliability and throughput, and lower capital and operating costs—making the MEVION S250 Series a compelling, financially viable solution for all cancer centers. The series is comprised of:

- **MEVION S250**, offering highly stable, next-generation volumetric delivery capabilities
- **MEVION S250i with HYPERSCAN technology**, overcoming pencil beam scanning uncertainties by delivering robust Intensity Modulated Proton Therapy treatment at hyper-speed
- **MEVION S250mx**, making proton therapy fully scalable, with two, three and four room designs that are inherently redundant and guarantee 100 percent facility uptime

*HYPERSCAN has not been cleared by the USFDA for clinical use.*

###

# Exhibit 48

FINAL!

# Table of Contents


I. Executive Summary ..... 1

II. Description of Proton Therapy ..... 6

III. Business Opportunity for the Los Angeles Proton Therapy Center ..... 12

IV. Defined Service Area Demographics and Cancer Epidemiology . 17

V. Marketing Plan and Demand Analysis ..... 20

VI. Reimbursement and Payer Mix ..... 23

VII. Pro Forma Financial Information ..... 26

VIII. Facility Planning and Development; Project Timeline ..... 32

IX. Management and Development Team ..... 34

EXHIBITS

A. Construction Bid and Detailed Project Timeline
B. Equipment Quotes for Mevion S250 Proton Therapy System
C. Organizational Chart and Job Descriptions for the Beverly Proton Therapy Center
D. Architectural Renderings for the Beverly Proton Therapy Center
E. Professional Services Agreement with Oncology Medical Group
F. Beverly Proton Center Pro Forma Financial Model
G. Beverly Proton Center Market Analysis – Demographics and Cancer Epidemiology


Exhibit
86

**FINAL!**

## I. Executive Summary

Beverly Proton Center, LLC, ("Beverly" or the "Company") will develop the Beverly Proton Center (the "Center" or "BPC"), an innovative new cancer treatment center using proton beam therapy for treatment of oncology patients.

The Center, to be located at 105 W. Beverly Boulevard, Montebello, California 90640, will provide radiation oncology treatment using proton beam therapy to patients from Southern California and (through our management team's international connections) and Asia, particularly Southern China.

The management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching and serving those markets. This experience will help both in establishing the venture with Southern California patients and in working with international patients.

Proton beam therapy has demonstrated clinical advantages for cancer treatment over other forms of radiation therapy, including greater control of the beam and higher concentration of energy in the tumor. Associated side effects are generally less severe. The nearest competing proton beam facility is at Loma Linda University, which is geographically distant from the proposed center and already running at close to capacity. Another proton therapy center, located in San Diego and in affiliation with Scripps, opened in early 2014. As is the case with Loma Linda, this facility is geographically inconvenient for patients from Los Angeles and northern and western Orange County to seek treatment there. The increasing utilization of Proton Therapy and its continued growth in acceptance presents room for additional proton beam centers in Southern California, and the Beverly Proton Therapy Center will tap that opportunity. At present, Management of Beverly is not aware of any planned proton therapy centers in either Los Angeles or Orange Counties. As capacity in the region grows and waiting times for treatment shorten, the types of cancer that can be treated with proton therapy will increase.

An estimated 33 million people are living in the Southern California market area at the present time. By the time the Center is open, which is anticipated to be sometime in 2019, that number will undoubtedly be higher. Many of these people are from ethnicities and cultural backgrounds that make it difficult for them to utilize conventional (i.e., English-only) centers. Thus, the market area contains a sizable base of patients who will benefit from the Center's services. The Center's marketing plan, based in part on successful approaches currently in use at the Loma Linda facility, is designed to reach patients, doctors, and other decision-influencers with a range of message and media types.

The Beverly Proton Center has set the following objectives:

- To complete construction of the facility, and be certified and ready to begin treatment, within 30 months of funding.
- To execute provider contracts for proton beam therapy with Individual Practice Associations (IPAs) and other health care payers, including Medicare covering half the insured population in Southern California within 30 months of funding.
- To achieve throughput of 1,200 proton therapy cases per year by the end of Year 3.

**FINAL!**

**Financial Summary**

The Demographic and Epidemiological Analysis and resulting forecasted patient volumes has provided Management of Beverly with the foundation for the Ten-Year Pro Forma Financial Model.

Below are the key financial/investment and operational metrics from the Pro Forma Financial Model of the planned Beverly Proton Therapy Center:

- The planned Beverly Proton Therapy Center is anticipated to produce an Internal Rate of Return under the current Capital Structure of 23.7% over the Ten-year Time Horizon of the Financial Forecast and gross cumulative cash flow of $428,819,006 over such time frame. Net cash generated after considering the required equity investment of $129,022,056 is $299,796,951.
- Total number of patients treated is predicted to be 10,260 over ten years.
- Average Technical Reimbursement per case is anticipated to be $74,217, and was decreased by 1.0% per year.
- Payer benchmark is 140.5% of the prevailing Medicare APC Reimbursement Rate and is based upon the estimates made by Beverly taking into consideration Case Mix, Payer Mix and estimated benchmarking of the Medicare benchmarks.
- Total Project Capitalization is currently projected at $129,022,055, which includes capital equipment, construction, and all soft costs such as development and start-up expenses of the program. At present, the capital structure assumes that the project capitalization will be 100% Equity.

?TRUE?.





CONFIDENTIAL THROPAY0000913

**FINAL!**

## Source and Application of Capital

A total of $129,000,000 million is anticipated to be required to organize, design, construct, develop, purchase equipment, and provide working capital for the Center. At present, Management of Beverly anticipates that the required capital will be obtained from investors for the full amount to execute the opening and operationalization of the Center. No debt financing is presently anticipated. The Sources and Applications of Capital are set forth in the following table:

| | | | | |
|---|---|---|---|---|
| **Total Capital Costs:** | | | **Initial Capital Investment:** | |
| Equipment | $67,294,000 | | Equipment | $84,882,896 |
| Facility Buildout/Vault Construction | $24,084,205 | | Facility Buildout/Vault Construction | $35,139,159 |
| Soft Costs - Equipment | $17,588,896 | | Working Capital | 9,000,000 |
| Soft Costs - Facility | $11,054,954 | | | |
| Working Capital | $9,000,000 | | | |
| Total Capital Expenditure | $129,022,055 | | Total Initial Capital Investment | $129,022,055 |
| **Sources of Capital:** | | | **Applications of Capital:** | |
| Equity Capital | $129,022,055 | 100.0% | Equipment Costs (Including Soft Costs) | $84,882,896 |
| Long Term Debt | | | Facility Costs (Including Soft Costs) | $35,139,159 |
| Equipment - Amount Financed | $0 | | Working Capital | $9,000,000 |
| Total Sources of Capital | $129,022,055 | | Total Applications of Capital | $129,022,055 |

The total construction cost for the facility (direct hard construction costs and indirect soft construction costs) is $35,139,150. This figure is further detailed and supported in the construction bid attached hereto as Attachment A.

The proton center equipment necessary for treatment includes a Mevion S250 Proton Therapy System and other medical equipment, and is anticipated to cost $67,294,000 for the actual equipment itself, plus $17,588,896 in equipment soft costs.

Approximately $12.3 million is set aside for costs incurred during the construction and pre-opening phase as well as to provide sufficient working capital for post-opening operations, and which will be used until revenues from operations are sufficient to cover operational costs and expenses. This total working capital fund will also provide a cushion for debt service payments for six months from the date the debt instruments convert to permanent financing, as opposed to construction financing.

**FINAL!**

### The Proton Therapy Center

25% OWNED BY DR T.

### Overview

Beverly Proton Center, LLC, is a California limited liability company that will own, develop and operate a new, state-of-the-art proton beam therapy treatment facility in the City of Montebello, California. The Center will operate under the name of the Beverly Proton Center and will provide comprehensive proton beam therapy treatment services to people suffering from a number of cancers and other diseases.

### Location

Montebello is located 15 minutes to the east of downtown Los Angeles. The population in and around the city represents a wide range of ethnicities and socioeconomic circumstances. Montebello is surrounded by freeways providing quick access (under one hour) to each of the four major airports serving Southern California, as well as to the world-famous attractions of Hollywood, Rodeo Drive, Beverly Hills, Malibu, Disneyland, and Universal Studios.

The site of the proposed Facility comprises approximately 1.5 acres adjacent to Beverly Hospital, which holds more than 200 inpatient beds. Both sites share frontal access to Beverly Boulevard, one of the main streets in Montebello. The site is owned by Beverly Hospital.

SUE BEVERLY HOSPITAL

**Beverly Proton Therapy Center Location**




**City Detail**





Exhibit 2



CONFIDENTIAL

THROPAY0000915

**FINAL!**

**Stakeholders** 25% DR. T. CAN HE BE DILUTED?

**Beverly Proton Center, LLC** – Beverly will be the owner, developer and operator of the planned Facility.

**Oncology Medical Group** (TBD) – Beverly will enter into a formal professional services agreement with respected radiation oncologists in Southern California to provide the professional component of the proton therapy being provided at the Center. There will be multiple radiation oncologists working at any given time at the Center and these physicians may be from different groups as well as being affiliated with prominent radiation oncology medical groups and hospitals.

**Mevion Medical Systems** – Mevion is the manufacturer of the medical equipment being deployed for the provision of clinical services to the Center's patients.

**SCI-X Studio** – SCIX is the Architectural/Engineering firm preparing the architectural and engineering services for the Beverly Proton Center.

**Beverly Hospital** – Beverly Hospital, an acute-care hospital in Montebello, CA, will be an integral stakeholder by having the Center located on its campus on land it owns that will be leased to the Center's landlord. Beverly Hospital will benefit from the Center being located there. Not only will this program enhance the status and prestige of the Hospital, but will provide "spin-off" revenues that it presently does not capture.

**City of Montebello** – The City of Montebello will benefit from having this prestigious medical complex within the community. It will further benefit from new jobs that are being created by virtue of the construction and on-going staff employed by the Center. It will achieve an increase in its tax base and will see additional patronage of its merchants by virtue of the patients who will seek Proton Therapy services at the Center. Many of these patients will be from Asia and Southern China, who will stay at a planned hotel adjacent to the Center.

SUE HOSPITAL FOR INTERFERENCE W/ PROSPECTIVE BUSINESS OPPORTUNITY

**FINAL!**

## II. Description of Proton Therapy

NOT REVISED by JAV

**Proton Therapy – How It Works**

Cancer in the simplest terms is the uncontrolled growth of cells. Left untreated, these cells will take over parts of the body and cause death. Treatment is directed at controlling and eliminating cell growth. Surgery and chemotherapy are used to remove or poison cancer. Radiation therapy "ionizes" cancer by interrupting the DNA of cells and slowing or stopping the growth of cancerous cells. Conventional radiation therapy is used in approximately 60% of all cancer cases. However, it is often limited because of its inability to put a high enough "dose" of radiation into a cancerous tumor to kill it while not damaging healthy tissue at the same time. Proton therapy, on the other hand, is highly precise and will put a very high dose of radiation into a tumor with reduced adverse side effects. Consequently, particle therapy is more effective in treating many malignancies with fewer complications.

Radiation therapy is an integral component of cancer therapy, where different approaches (surgery, chemotherapy, and immunotherapy) are combined to accomplish the most effective eradication of disease. Sixty to seventy percent of all cancer patients require radiation therapy in the treatment of their tumor. Currently, virtually all these patients are treated with conventional photon (x-ray) radiation therapy.

There is a significant difference between standard photon (x-ray) radiation treatment and proton therapy. If given in sufficient doses, x-ray radiation techniques will control many cancers. However, because of the inability to adequately conform the irradiation pattern to the cancer, healthy tissues may receive a similar dose and can be damaged. Consequently, a less-than-desired dose is frequently used to reduce damage to healthy tissues and avoid unwanted side effects. The power of protons is that higher doses of radiation can be used to control and manage cancer while significantly reducing damage to healthy tissue and vital organs.

Understanding how protons work provides patients and physicians with an insight into this mainstream treatment modality. Essentially, protons are a superior form of radiation therapy. Fundamentally, all tissues are made up of molecules with atoms as their building blocks. In the center of every atom is the nucleus. Orbiting the nucleus of the atom are negatively charged electrons. When energized charged particles, such as protons or other forms of radiation, pass near orbiting electrons, the positive charge of the protons attracts the negatively charged electrons, pulling them out of their orbits. This is called ionization; it changes the characteristics of the atom and consequentially the character of the molecule within which the atom resides. This crucial change is the basis for the beneficial aspects of all forms of radiation therapy. As a result of ionization, the radiation damages molecules within the cells, especially the DNA or genetic material.

Damaging the DNA destroys specific cell functions, particularly the ability to divide or proliferate. Enzymes develop with the cells and attempt to rebuild the injured areas of the DNA; however, if damage from the radiation is too extensive, the enzymes fail to adequately repair the injury. While both normal and cancerous cells go through this repair process, a cancer cell's ability to repair molecular injury is frequently inferior. As a result, cancer cells sustain more permanent damage and subsequent cell death than occurs in the normal cell population. This permits selective destruction of bad cells growing among good cells.

**FINAL!**

Both standard x-ray therapy and proton beams work on the principle of selective cell destruction. However, the major advantage of proton treatment over conventional radiation is that the energy distribution of protons can be directed and deposited in tissue volumes designated by the physicians in a three-dimensional pattern from each beam used. This capability provides greater control and precision and, therefore, superior management of treatment.

Radiation therapy requires that conventional x-rays be delivered into the body in total doses sufficient to assure that enough ionization events occur to damage all the cancer cells. The conventional x-rays' lack of charge and mass, however, results in most of their energy from a single conventional x-ray beam being deposited in normal tissues near the body's surface, as well as undesirable energy deposition beyond the cancer site. This undesirable pattern of energy placement can result in unnecessary damage to healthy tissues, often preventing physicians from using sufficient radiation to control the cancer.

Protons, on the other hand, are energized to specific velocities. These energies determine how deeply in the body protons will deposit their maximum energy. As the protons move through the body, they slow down, causing increased interaction with orbiting electrons. Maximum interaction with electrons occurs as the protons approach their targeted stopping point. Thus, maximum energy is released within the designated cancer volume. The surrounding healthy cells receive significantly less injury than the cells in the designated volume.

As a result of protons' dose-distribution characteristics, the radiation oncologist can increase the dose to the tumor while reducing the dose to surrounding normal tissues. This allows the dose to be increased beyond that which less-conformal radiation will allow. The overall effects lead to the potential for fewer harmful side effects, more direct impact on the tumor, and increased tumor control. The patient feels nothing during treatment. The minimized normal-tissue injury results in the potential for fewer effects following treatment, such as nausea, vomiting, or diarrhea. The patients experience a better quality of life during and after proton treatment.

Three key elements are required for an ideal radiation therapy delivery system for optimal treatment outcome and survival in tumor patients:

- *High-precision delivery* of radiation therapy to the tumor (conformal therapy planning)
- *Containment* of the delivered radiation dose within the tumor (target) to minimize exposure to surrounding normal tissue
- Improved ability of the radiation to destroy the cancerous cells *(Improved Relative Biological Effectiveness*

Leading medical/academic institutions have made significant investments to achieve great advances in tumor delineation, imaging and treatment delivery methods with conventional photon (x-ray) radiation therapy. However, even with the most advanced delivery technologies, including intensity-modulated radiation therapy (IMRT), Tomotherapy, and stereotactic radiosurgery (including Linac radiosurgery, CyberKnife and Gamma Knife), the capabilities of conventional radiation therapy are now approaching a new plateau. This plateau is due to the inherent physical and biological limitations of conventional photon radiation and can be overcome by particle beam radiation.

*High-precision delineation has* been achieved by novel imaging techniques. High precision radiation therapy delivery and dose *containment to* the tumor target can only be partially

**FINAL!**

achieved with advanced conventional photon (x-ray) beam delivery techniques, but can be significantly improved with particle beam techniques. *Improvement of biological effectiveness of* the radiation can only be achieved with proton therapy.

| **Proton Therapy Fact Sheet** | |
|---|---|
| Precision | • Most precise form of radiation treatment available today.<br>• Destroys primary tumor site, and can leave surrounding healthy tissue and organs intact and unharmed. |
| Non-Invasive | • Is non-invasive and painless.<br>• Maintains a patient's quality-of-life during treatment process as an out-patient.<br>• Patients continue with normal activities during treatment.<br>• Play golf, tennis, swim, walk, run, workout in a gym, or go on a "radiation vacation." |
| Minimum Side-Effects | • Avoids the usual side effects of standard x-ray radiation.<br>• Minimum to no side effects with protons |
| Combination of Treatments | • Protons can be used in conjunction with other cancer treatment modalities such as chemotherapy.<br>• Treatment time can take from one day for certain conditions up to eight weeks (prostate cancer) depending on disease site. |
| Preferred form of Treatment for Pediatric Patients | • Highly preferred radiation treatment modality option for pediatric cases because children are susceptible to damage to surrounding tissue from standard X-Ray radiation as their tissue and organs are rapidly growing.<br>• Children don't have to be subjected to needless exposure from damaging radiation. |
| Growing Population of Treated Patients | • As of 2010, nearly 35,000 patients treated in U.S.<br>• First hospital-based proton center opened in 1991 at Lorna Linda University Medical Center<br>• Most operating proton centers can treat 50-200 patients daily. |
| Reimbursement | • Proton Therapy is covered by Medicare, Medicaid and nearly all health care insurance providers. |

**History of Proton Therapy in the United States.** The study of particle accelerators was first extended to medical use in proposals put forth in the 1940s, stemming from work done to develop the atomic bombs used in World War II. Research continued over several decades and major advances were made by the U.S. Department of Energy and the Fermi National Accelerator Laboratory in the 1980s. The first hospital-based proton beam therapy center in the U.S. was established in Loma Linda, California in 1990.

**FINAL!**

Between 1990 and December 2008, the Loma Linda facility treated over 13,000 patients, or roughly one quarter of those treated with proton therapy worldwide. Over the past 15 years, proton beam therapy facilities have been installed at a handful of locations around the country.

**Cancer Treatment Options.** Several cancer treatment options have been used successfully for many years and continue to be refined to improve results and reduce unwanted side effects. As with proton beam therapy, these other treatment options are most successful in treating certain types of cancers at certain stages. The three major categories of treatment options include:

- **Chemotherapy.** Chemotherapy is the treatment of cancer with drugs that can destroy cancer cells by impeding their growth and reproduction. Chemotherapy drugs are given by injection or taken orally. Chemotherapy can have many unpleasant side effects, such as nausea, vomiting, hair loss, and mouth sores.

- **Radiation Therapy.** Radiation therapy (of which proton beam therapy is one type) uses energy concentrated into waves or streams of particles that are aimed at cancer cells to kill or change them so they can no longer grow. Radiation therapy can be used on almost any part of the body and generally attempts to deliver high doses of radiation to cancer cells while limiting damage to healthy body tissues. Some of the more common types of radiation used for cancer treatment are:

  - *High-energy photons* – the most common type of treatment in use today
  - *Electron or particle beams* – generally used for tumors close to the skin because these beams cannot penetrate deep into the body
  - *Proton beams* – a relatively new treatment type that is good at limiting collateral damage
  - *Neutron beams* – in limited use due to severe side effects.

- **Surgical Oncology**. Surgery can be done as a preventative measure, as part of the diagnosis, or as a treatment approach.

**Potential for Growth in Use of Proton Beam Therapy.** Proton beam therapy is an effective treatment for a wide range of localized tumors in the head and neck, lungs, prostate, bladder, spinal cord, gastrointestinal tract, and eyes, among others. New research is pioneering the use of proton beam therapy for other locations, including breast cancer, which affects one in eight women in the U.S. Despite the advantages of proton beam therapy over other cancer treatments, market penetration of this technology has been slow. Today, relatively few cancers are typically treated with proton beam therapy.

The vast majority of proton beam treatments have historically been for prostate cancer. As shown in Figure 2, over 68% of treatments performed at the Loma Linda Facility have been for prostate cancer, followed at a distant second by cancers of the head and neck (5.7%).

**FINAL!**




A number of related factors are behind the slow market penetration of proton beam therapy. First, the expensive and highly specialized equipment required has deterred many cancer facilities from investing in this technology. Few cancer centers in the U.S. currently offer proton beam therapy. This is true even among the centers with the best reputations, where patients are most likely to want to go.

Oncologists tend to recommend the treatment options available at the centers where they practice, both because they are readily available and because those are the options with which they are most familiar. Thus, oncologists are less likely to recommend proton beam therapy, even to patients who might benefit from it, if it is not offered at the center where they practice. Referral networks – that is, the existing relationships between doctors and other types of cancer treatment facilities – have thus minimized the penetration of proton beam therapy into the overall market for cancer treatment. In the vast majority of cases, patients become aware of proton beam therapy through their own research, without the help of existing mainstream hospital networks.

With few centers offering proton beam therapy, patients who choose it must often wait weeks or months to begin treatment. Long waiting periods are generally unacceptable to people with rapidly spreading types of cancer; they will only entertain treatment options that can begin immediately. This is one reason behind the prominence of prostate cancer in the list of conditions historically treated with proton beam therapy. This type of cancer is often slow-growing; thus, patients can wait to start treatment.

Still, the decreased incidence of side effects makes proton beam therapy a potentially superior treatment for many patients with many forms of cancer. The imbalance between the potential demand for and the current availability of proton beam treatment is typical of new or developing products or services gaining popularity in the market. As the benefits of the proton beam treatment option become more widely understood by patients, demand for these services is expected to grow, leading to the development of additional facilities. In fact, proton beam therapy is ultimately expected to partially or fully replace other cancer treatment options that cause more negative side effects.

FINAL!

## Proton Therapy – Treatment Type and Disease Site

While proton therapy applications are being continually expanded, the listing below presents a representative list of the diseases presently treated at currently operating proton centers:

**Brain and Spinal Cord:**

- Arteriovenous Malformations (AVMs) -Treatment of defects of the circulatory system
- Isolated Brain Metastases - High radiation reduces symptoms
- Pituitary Adenomas - Fractionated radiation over Radiosurgery

**Base of Skull**

- Acoustic Neuromas - Benign tumors affecting hearing
- Chordomas and Chondrosarcomas -Tumors of the brain stem, spinal cord or central nervous system
- Meningiomas - Tumors treated in a few treatments

**Breast**

- Treatment of early-stage breast cancers, including ductal carcinoma in situ

**Eye/Ocular**

- Uveal Melanomas - Malignant tumors treated with protons to minimize eye removal

**Head and Neck**

- Nasopharynx - Local carcinoma treatment via protons to reduce side effects
- Oropharynx Cancer (locally advanced) - Dose localization to minimize healthy tissue damage

**Chest and Abdomen**

- Early Lung Cancer
- Chordomas and Chondosarcomas of the chest and abdomen

**Prostate**

- Prostate Cancer – High-dose, localized treatment for higher survival rate and minimal side effects

**Pediatric Tumors**

- Brain tumors – Highly-individualized, localized treatment options available with Protons
- Orbital and Ocular Tumors – Proton Therapy can prevent health lens and anterior chamber damage
- Sarcomas of the Base of the Skull and Spine

**FINAL!**

## III. Business Opportunity for the Beverly Proton Therapy Center

### Project Market Area

The Center will draw the majority of its patients from within Los Angeles County as well as the northern and northwestern areas of Orange County. This Defined Service Area has a combined population of approximately 11,517,000.

In addition to patients from Southern California, the Center will draw patients from throughout Asia, particularly from Southern China, using the Company's Asian investor relations to identify patients seeking state-of-the-art radiation oncology treatment in the U.S. The Southern California market, however, is still of strong interest for the Center.

Within the Defined Proton Therapy Service Area, the National Cancer Institute - Cancer Incidence Profile presents a significant level of newly-diagnosed cancers in the Defined Proton Service Area. The following Table sets forth newly-diagnosed cases in the Defined Proton Service Area based upon tumor registry data for the period form 2008 – 2012:

| | Los Angeles/North Orange County | | |
|---|---|---|---|
| | Predicted New Cancer Cases | | |
| Site of Cancer | Male | Female | Total |
| All Sites | 25,903.4 | 21,891.7 | 47,795.1 |
| Bladder and Urinary Tract | 1,705.2 | 406.9 | 2,112.1 |
| Brain and ONS* | 373.2 | 258.2 | 631.4 |
| Breast (female) | | 6,894.7 | 6,894.7 |
| Breast (female) (in situ) | | 1,526.2 | 1,526.2 |
| Cervix | | 496.1 | 496.1 |
| Childhood, Ages <15 | | | |
| Childhood, Ages <20 | 1,051.7 | 936.5 | 1,988.3 |
| Colon and Rectum | 2,706.5 | 2,068.9 | 4,775.3 |
| Esophageal | 326.6 | 87.6 | 414.2 |
| Kidney and Renal Pelvis | 1,064.8 | 523.7 | 1,588.5 |
| Leukemia | 902.9 | 553.3 | 1,456.3 |
| Liver and Bile Duct | 843.0 | 309.2 | 1,152.1 |
| Lung and Bronchus | 2,878.8 | 2,101.4 | 4,980.1 |
| Melanoma | 1,186.5 | 633.8 | 1,820.3 |
| NON-Hodgkins Lymphoma | 1,257.5 | 902.7 | 2,160.2 |
| Oral Cavity and Pharynx | 809.9 | 315.0 | 1,125.0 |
| Ovarian | | 731.7 | 731.7 |
| Pancreatic | 718.3 | 586.8 | 1,305.1 |
| Prostate | 6,914.3 | | 6,914.3 |
| Stomach/Digestive | 717.3 | 426.0 | 1,143.3 |
| Thyroid | 350.8 | 1,098.2 | 1,449.0 |
| Uterine | 0.0 | 1,447.4 | 1,447.4 |
| Other Disease Sites | 2,096.2 | 0.0 | 2,096.2 |
| Total | 25,903.4 | 22,304.2 | 48,207.6 |

**FINAL!**

The Center is expected to have a capacity of at least 1,200 patients per year by 2021, as outlined in the Pro Forma Financial Information section of this Business Plan. The patient throughput capacity can be appreciably increased by scaling additional treatment systems.

**FINAL!**

## Competitors

According to the National Association for Proton Therapy, there are 19 proton beam therapy centers currently operating in the U.S. and an additional 8 under construction.

Proton Beam Therapy Centers in the US

**Supporting operating center members:**

Ackerman Cancer Center; Jacksonville, Florida

Hampton University Proton Therapy Institute, Hampton, Virginia

James M. Slater, M.D. Proton Treatment and Research Center at Loma Linda University Medical Center

Maryland Proton Treatment Center, Baltimore, Maryland

Mayo Clinic Proton Beam Therapy Program, Phoenix, Arizona

Mayo Clinic Proton Beam Therapy Program, Rochester, Minnesota

MD Anderson Cancer Center's Proton Center, Houston

Northwestern Medicine Chicago Proton Center, Chicago Area, Illinois

ProCure Proton Therapy Center, Oklahoma City

ProCure Proton Therapy Center in partnership with Princeton Radiation Oncology Group and

**Supporting members under construction:**

Cincinnati Children's Proton Therapy Center, Liberty Township, Ohio

Dallas Proton Treatment Center, Dallas, Texas

Emory Proton Therapy Center, Atlanta, Georgia

The McLaren Proton Therapy Center, Flint, Michigan

Miami Cancer Institute at Baptist Health South Florida

New York Proton Center, Inc.
225 E. 126th Street
New York, NY 10035

University Hospitals Seidman Cancer Center, Case Medical Center

UF Health Cancer Center at Orlando Health

**Other operating centers:**

Francis H. Burr Proton Center at Mass. General Hospital

UCSF Ocular Tumor Proton Radiation Program
Crocker Nuclear Laboratory
1600 Divisadero Street
San Francisco, CA 94115

St. Jude Red Frog Events Proton Therapy Center
262 Danny Thomas Place
Memphis, TN 38105

Laurie Proton Therapy Center at Robert Wood Johnson University Hospital
141 French Street
New Brunswick, NJ 08901

**Other centers in construction or development:**

Georgetown Lombardi Comprehensive Cancer Center at Medstar Georgetown University Hospital
3800 Reservoir Road, N.W.,
Washington D.C. 20057

Johns Hopkins Sibley Hospital Proton Therapy Center
5255 Loughboro Rd NW,
Washington, DC 20016

Beverly Proton Therapy Center Montebello, CA

Proton Therapy Center at Beaumont Hospital Cancer Institute
3601 W. Thirteen Mile Road
Royal Oak, MI 48073

**FINAL!**

CentraState Healthcare System, Somerset, N.J

The Provision Center for Proton Therapy, Knoxville, Tennessee

The Roberts Proton Therapy Center at University of PA Health System

Scripps Proton Therapy Center, San Diego, California

SCCA Proton Therapy Center Seattle, Washington

S. Lee Kling Proton Therapy Center at the Siteman Cancer Center, St. Louis, Missouri

Texas Center for Proton Therapy, Irving, Texas

The University of Florida Health Proton Therapy Institute

Willis-Knighton Health System, Shreveport, Louisiana

Scott Hamilton Proton Therapy Center
Franklin, TN

Stephenson Cancer Center Proton Center at University of Oklahoma
Lower Level, Stephenson Cancer Center
800 NE 10th Street
OKC, OK 73104

There are no direct competitors in the Defined Proton Therapy Service Area. The nearest competing proton beam facility is at Loma Linda University in California. This facility is well-known and has been operating for almost 20 years. Its pricing structure is similar to that proposed for the BPC. However, it is three times farther away from Los Angeles, has not been updated in several years, and is already running at close to capacity.

Conventional radiation therapy is available at many freestanding facilities in Southern California, including OnCure, Vantage, and other chains. These facilities have good penetration into managed care contracting, good conventional therapy equipment, and a pricing structure similar to the Center's (most facilities do, as they are based on insurance

BOIC!

**FINAL!**

reimbursement rates). However, they do not provide proton beam therapy, with its many clinical advantages. With considerable capital sunk into their existing equipment, adding proton beam equipment is unlikely. In addition, these facilities are hard pressed to show significant differentiation from each other.

Throughout California, hospitals have their own radiation oncology centers. These centers have strong relations with referring physician networks, good managed care contracting in their local areas, and credibility at the community level. However, as they do not differentiate on the basis of equipment, it is difficult for them to build up referrals over a wider geographic area. None of them offers proton beam therapy.

Individual radiation oncologists also operate in freestanding offices throughout California. While they have credibility as physicians and knowledge of the communities they serve, they generally have limited capital backing and lack state-of-the-art technology.

Given the limitations of other providers in the area, there is room for an additional proton beam center in Southern California. The Beverly Proton Center will tap that opportunity, serving a patient population that does not have a local option for proton beam treatment.

FINAL!

## IV. Defined Service Area Demographics and Cancer Epidemiology

### Overview

The planned Beverly Proton Center will serve the residents of Los Angeles and parts of Orange County for those seeking access to Proton Therapy services. The Management of Beverly conducted a detailed Market Analysis of the market for Proton Therapy services in the two counties. A detailed demographic and epidemiological profile was prepared by Management of Beverly.

Following are the key findings and conclusions of this analysis:

- The Defined Service Area for Proton Therapy services encompasses all of Los Angeles County and the northern and western portions of Orange County. This Defined Proton Service Area has a total population of approximately 11,517,000, of which 9,974,000 reside in Los Angeles County and 1,543,000 reside in Orange County. The figure for the population of Orange County represents approximately one-half of its total population. These population statistics are based on US Census Bureau Population Estimates for 2014.
- From this population base, the analysis applied NCI Cancer Incidence Rates for newly-diagnosed cancer cases in each of two the counties in the Defined Service Area for Proton Therapy. The epidemiology/demographic analysis predicts approximately 48,200 newly-diagnosed cancer cases annually.
- Using a conversion factor of 60.0% of newly-diagnosed cancer cases that are clinically-appropriate for some form of radiation therapy translates into a potential pool of approximately 29,000 annual patients for which radiation therapy would be clinically appropriate.
- Using a conversion factor of 20.0% of those patients who are clinically-appropriate for radiation therapy, but for whom Proton Therapy is better suited to their particular condition, results in a potential pool of proton therapy patients in the defined service area of approximately 5,800 patients annually. However, certain disease sites were excluded from the conversion due to the inappropriateness of proton therapy for these disease sites, which resulted in approximately 5,000 potential proton therapy cases in the defined service area.
- For purposes of financial forecasting, it was assumed that approximately 25.0% of these potential proton cases could be captured by the Beverly Proton Center by its fourth year of operations. However, the Beverly Proton Center will actively attract patients from Asia, particularly China. In fact, Management of Beverly believes that a significant number of the patients who will seek treatment at Beverly Proton Center the will be residents of Asian countries, particularly southern China Therefore, the actual market capturement from the Defined Proton Therapy

**FINAL!**

Service Area would be somewhat reduced.

## Demographic Profile of the Defined Service Area

The following table sets forth aggregate population data for the Defined Proton Service Area.

| Subject | Los Angeles County, California Estimate | Margin of Error | Percent | Percent Margin |
|---|---|---|---|---|
| SEX AND AGE | | | | |
| Total population | 9,974,203 | ***** | 9,974,203 | (X) |
| Male | 4,913,688 | ***** | 49.30% | ***** |
| Female | 5,060,515 | ***** | 50.70% | ***** |
| Under 5 years | 644,638 | ***** | 6.50% | ***** |
| 5 to 9 years | 629,141 | +/-3,382 | 6.30% | +/-0.1 |
| 10 to 14 years | 651,107 | +/-3,381 | 6.50% | +/-0.1 |
| 15 to 19 years | 714,751 | ***** | 7.20% | ***** |
| 20 to 24 years | 776,820 | ***** | 7.80% | ***** |
| 25 to 34 years | 1,522,133 | ***** | 15.30% | ***** |
| 35 to 44 years | 1,419,395 | ***** | 14.20% | ***** |
| 45 to 54 years | 1,379,750 | ***** | 13.80% | ***** |
| 55 to 59 years | 596,246 | +/-3,432 | 6.00% | +/-0.1 |
| 60 to 64 years | 490,329 | +/-3,431 | 4.90% | +/-0.1 |
| 65 to 74 years | 628,108 | ***** | 6.30% | ***** |
| 75 to 84 years | 356,889 | +/-2,126 | 3.60% | +/-0.1 |
| 85 years and over | 164,896 | +/-2,127 | 1.70% | +/-0.1 |
| Median age (years) | 35.3 | +/-0.1 | (X) | (X) |
| 18 years and over | 7,626,603 | ***** | 76.50% | ***** |
| 21 years and over | 7,175,857 | +/-2,711 | 71.90% | +/-0.1 |
| 62 years and over | 1,429,374 | +/-2,814 | 14.30% | +/-0.1 |
| 65 years and over | 1,149,893 | ***** | 11.50% | ***** |
| 18 years and over | 7,626,603 | ***** | 7,626,603 | (X) |
| Male | 3,714,170 | ***** | 48.70% | ***** |
| Female | 3,912,433 | ***** | 51.30% | ***** |
| 65 years and over | 1,149,893 | ***** | 1,149,893 | (X) |
| Male | 492,621 | ***** | 42.80% | ***** |
| Female | 657,272 | ***** | 57.20% | ***** |

| Subject | Orange County, California Estimate | Margin of Error | Percent | Percent Margin |
|---|---|---|---|---|
| SEX AND AGE | | | | |
| Total population | 3,086,331 | ***** | 3,086,331 | (X) |
| Male | 1,525,071 | ***** | 49.40% | ***** |
| Female | 1,561,260 | ***** | 50.60% | ***** |
| Under 5 years | 191,910 | ***** | 6.20% | ***** |
| 5 to 9 years | 198,002 | +/-2,327 | 6.40% | +/-0.1 |
| 10 to 14 years | 208,157 | +/-2,327 | 6.70% | +/-0.1 |
| 15 to 19 years | 218,356 | ***** | 7.10% | ***** |
| 20 to 24 years | 226,171 | ***** | 7.30% | ***** |
| 25 to 34 years | 428,055 | ***** | 13.90% | ***** |
| 35 to 44 years | 433,257 | ***** | 14.00% | ***** |
| 45 to 54 years | 452,475 | ***** | 14.70% | ***** |
| 55 to 59 years | 190,763 | +/-2,292 | 6.20% | +/-0.1 |
| 60 to 64 years | 157,023 | +/-2,292 | 5.10% | +/-0.1 |
| 65 to 74 years | 210,057 | +/-86 | 6.80% | +/-0.1 |
| 75 to 84 years | 117,928 | +/-1,614 | 3.80% | +/-0.1 |
| 85 years and over | 54,177 | +/-1,614 | 1.80% | +/-0.1 |
| Median age (years) | 36.7 | +/-0.1 | (X) | (X) |
| 18 years and over | 2,356,681 | ***** | 76.40% | ***** |
| 21 years and over | 2,221,387 | +/-1,604 | 72.00% | +/-0.1 |
| 62 years and over | 472,575 | +/-1,690 | 15.30% | +/-0.1 |
| 65 years and over | 382,162 | ***** | 12.40% | ***** |
| 18 years and over | 2,356,681 | ***** | 2,356,681 | (X) |
| Male | 1,151,839 | ***** | 48.90% | ***** |
| Female | 1,204,842 | ***** | 51.10% | ***** |
| 65 years and over | 382,162 | ***** | 382,162 | (X) |
| Male | 167,063 | ***** | 43.70% | ***** |
| Female | 215,099 | ***** | 56.30% | ***** |

Source: Source: U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates

Note: For purposes of the Demographic Profile of the Defined Proton Service Area, BPC is anticipated to draw patients from all of Los Angeles County and the northern and western areas of Orange County. The population for Orange County shown above is for the entire county. This was reduced by one-half to reflect the fact that BPC will only draw from an area that encompasses roughly one-half of the total county population.

**FINAL!**

## Cancer Epidemiology in the Defined Service Area

The table below presents the total number of newly-diagnosed cancer cases in the Defined Proton Therapy Service Area.

| Site of Cancer | Predicted New Cancer Cases | | |
|---|---|---|---|
| | Male | Female | Total |
| All Sites | 25,903.4 | 21,891.7 | 47,795.1 |
| Bladder and Urinary Tract | 1,705.2 | 406.9 | 2,112.1 |
| Brain and ONS* | 373.2 | 258.2 | 631.4 |
| Breast (female) | | 6,894.7 | 6,894.7 |
| Breast (female) (in situ) | | 1,526.2 | 1,526.2 |
| Cervix | | 496.1 | 496.1 |
| Childhood, Ages <15 | | | |
| Childhood, Ages <20 | 1,051.7 | 936.5 | 1,988.3 |
| Colon and Rectum | 2,706.5 | 2,068.9 | 4,775.3 |
| Esophageal | 326.6 | 87.6 | 414.2 |
| Kidney and Renal Pelvis | 1,064.8 | 523.7 | 1,588.5 |
| Leukemia | 902.9 | 553.3 | 1,456.3 |
| Liver and Bile Duct | 843.0 | 309.2 | 1,152.1 |
| Lung and Bronchus | 2,878.8 | 2,101.4 | 4,980.1 |
| Melanoma | 1,186.5 | 633.8 | 1,820.3 |
| NON-Hodgkins Lymphoma | 1,257.5 | 902.7 | 2,160.2 |
| Oral Cavity and Pharynx | 809.9 | 315.0 | 1,125.0 |
| Ovarian | | 731.7 | 731.7 |
| Pancreatic | 718.3 | 586.8 | 1,305.1 |
| Prostate | 6,914.3 | | 6,914.3 |
| Stomach/Digestive | 717.3 | 426.0 | 1,143.3 |
| Thyroid | 350.8 | 1,098.2 | 1,449.0 |
| Uterine | 0.0 | 1,447.4 | 1,447.4 |
| Other Disease Sites | 2,096.2 | 0.0 | 2,096.2 |
| Total | 25,903.4 | 22,304.2 | 48,207.6 |

**FINAL!**

## V. Marketing Plan and Demand Analysis

The marketing strategy will extend the strategy used by Company management in other radiation therapy projects, emphasizing its ability to supply the area's white, Hispanic, and Asian customers with the linguistic/cultural understanding that they need as well as the leading-edge clinical tools that will give them the best care.

### Target Customer Groups

As prostate cancer is the cancer type most frequently treated with proton beam therapy, men aged 50 and older will be the primary group targeted in the marketing effort. A secondary group of cancer patients who will be targeted include those with cancers of the brain and spinal cord, eye, head and neck, chest, and pelvis. While cancer is much more common in the older segments of the population, proton beam therapy is also applicable to localized tumors in children and some effort will be expended to inform people in the 21 to 45 age group who are most likely to be parents of children ages 0 to 18.

### Marketing Approach

Management has developed a two-pronged marketing approach consisting of marketing (1) directly to potential patients, and (2) to doctors and other health professionals for the Center. As noted earlier, the majority of proton beam therapy patients have historically been self-referred. The Company's marketing approach seeks to continue growing the number of self-referred patients but also to establish BPC within the existing referral network of physicians to the Defined Proton Therapy Service Area.

The strategy to reach *potential patients directly* will include the following approaches:

- **Media Strategy.** A media strategy consisting of newspaper, radio, and magazine advertisements will be deployed in successive three-month campaigns. The media strategy will be supplemented by public relations efforts that will include a press kit and supplemental information that can be used to create stories on the new Facility.

- **Public Relations Strategy.** Through news outlets and other public forums, the Company will advertise events such as grand openings and make major milestone announcements. It will also sponsor educational seminars on all aspects of proton beam therapy to help build the new Center's credibility. The Company will retain a public relations firm and begin an initial PR campaign in Southern California three months before the site opens. This effort will stress the treatment benefits of proton therapy and will note that the location provides access to underserved ethnic populations in the Southern California market.

- **Alumni Referral Program.** Alumni are one of the most valuable sources of referrals. The Company will develop a structured program to allow BPC's patients

**FINAL!**

to share their experiences with prospective patients and provide contact information to people they know who may be interested in the Facility's services.

The marketing strategy to penetrate *existing doctor referral networks* will revolve around a select group of internal specialists and doctors from the Center who will meet with and educate physicians, medical groups, and other hospital personnel in the Defined Proton Therapy Service Area. This group of staff will develop avenues to disseminate new information to the medical community and streamline communication channels so that questions from patients and medical practitioners are answered quickly. For example, six months before the site will open, the Company will retain experts including both physicians and other knowledgeable parties who will give a series of regional presentations to potential referring physicians to learn about proton beam therapy and what it can do for their patients. These presentations will be videotaped and put on the Beverly Proton Center's website, which will then be cross-linked to other cancer sites. Coinciding with the PR effort described above, the Company will conduct walk-throughs of the site with managed care plans, IPAs, referring physician groups, and media personnel.

*Patient inquiries* will be handled by an internal call center staffed with trained personnel who can answer questions about proton beam treatment and direct callers to case managers or physicians if necessary. Callers will have access to the alumni network of patients for first-hand reports on their experience, as well as insurance advisors to answer questions about financial aspects of the treatment.

A collection of marketing materials will be sent to each caller to provide additional information and background on the procedure. Brochures, frequently-asked-question sheets, flow and process charts, articles and studies on proton beam therapy, and informational videos will be part of a comprehensive package. Finally, all of this information and additional materials will be made available on a comprehensive website. The website is one of the most important components of the marketing plan, as most people who do not know about proton beam therapy will begin their search for cancer treatment options on the internet.

Plans for reaching international patients include these:

- Within six months of the opening of the Center, the Company will have master referral arrangements with health channels throughout East Asia, particularly the People's Republic of China/Hong Kong/Macau.
- Within nine months after the Center's opening, the Company will begin public relations and marketing campaigns in these international markets.

**<u>Demand and Market Share</u>**

At the present time, there are no Proton Therapy Centers in either Los Angeles or Orange counties and Management has no information as to other entities that may be planning on developing Proton Therapy centers in the two counties. Management of

**FINAL!**

Beverly is well underway in the planning phase and will be the "first-to-market" in the area. This places BPC at a competitive advantage as compared to potential competitors.

As noted in Section IV, the Case Prediction Analysis results in approximately 5,000 cancer patients being clinically-suitable for proton therapy annually in the Defined Proton Therapy Service Area. By Year Four of the Center's operations, the annual volume is anticipated to be approximately 1,200 cases annually. This would represent a market share of 24%. However, the actual market share of BPC within the Defined Proton Therapy Service Area will be somewhat lower due to the fact that a significant number of the forecasted 1,200 annual patients will be from Asia seeking treatment at the Center.

Case 8:16-cv-00974-CJC-AGR Document 38-2 Filed 06/21/16 Page 26 of 39 Page ID #:1929

**FINAL!**

## VI. Reimbursement and Payer Mix

### Reimbursement

Reimbursement is perhaps the most contentious and volatile element of the business side of the healthcare industry in the US today. New technologies that offer better clinical outcomes and are more clinically efficacious for the patients invariably result in the deployment of new technologies, which come at a significant capital cost. Healthcare payers are invariably reluctant to add new methods and technologies that are clinically superior to existing technologies, which will result in greater expenditures. The list of these technologies is quite numerous and includes imaging modalities, such as PET/CT, as well as the development of Intensity Modulated Radiation Therapy in the early 2000's and now Proton Therapy.

Proton Therapy was first offered in a clinical setting in 1990 at Loma Linda University Medical Center, and that center has been the most successful location for Proton Therapy of any location in the world and has treated more patients than any other center anywhere. Loma Linda was able to bill and collect for Medicare patients under a "cost-based" reimbursement protocol. However, it was not until August, 2000 that Medicare instituted HCPCS/CPT ("Healthcare Common Procedure Coding System/Current Procedure Terminology") Codes for Proton Therapy. This was only applicable to hospital-based programs at the time. By 2005, Medicare had approved the addition of reimbursement for Proton Therapy in the freestanding setting under the Medicare Physician Fee Schedule – Part B. Despite this positive step, Medicare left it to the discretion of each of the regional Medicare Administrative Contractors ("MAC") to actually agree to cover the service, and it also allowed each MAC to establish its own pricing. This is known as a "Local Carrier Determination" or "Carrier-based Pricing"). As of 2016, all of the various MAC's still classify Proton therapy under Carrier-based Pricing" for Proton Therapy that is provided in any non-hospital setting.

Medicare does set reimbursement for Proton Therapy that is delivered for a hospital-based service line and has established CPT Codes under the Ambulatory Payment Classification System for outpatient hospital services and procedures ("APC"). MORE?

**FINAL!**

The table set forth below illustrates the relevant CPT Codes for the Delivery of Proton Therapy and the Medicare Reimbursement therefor in Los Angeles County for 2016:

| HCPCS Code | Short Descriptor | APC | Regional Selected APC Payment Rate for Los Angeles County | Regional Selected APC Payment Rate for your location w/ Sequestration |
|---|---|---|---|---|
| 77520 | Proton treatment simple w/o comp | 5623 | $ 586.31 | $ 574.58 |
| 77522 | Proton treatment simple w/comp | 5625 | $ 1,334.62 | $ 1,307.92 |
| 77523 | Proton treatment intermediate | 5625 | $ 1,334.62 | $ 1,307.92 |
| 77525 | Proton treatment complex | 5625 | $ 1,334.62 | $ 1,307.92 |

Additional tasks are involved in the delivery of a full course of Proton Therapy. The table below sets forth a typical treatment protocol for Prostate Cancer. The actual Units of Service will vary depending on the particular oncologic disease site and the fact that each and every tumor is unique in terms of shape, size and density.

| | | Proton Prostate (MPFS) Professional | | | Proton Prostate APC Technical | | |
|---|---|---|---|---|---|---|---|
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare 100.00% Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare 100.00% Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 9 | $124.57 | $1,121.10 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 41 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 9 | $202.02 | $1,818.22 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 42 | $1,334.62 | $56,053.88 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,950 | | | $60,445 |

Global Reimbursement $63,395

**FINAL!**

To summarize, for a patient with Prostate Cancer utilizing the above-noted clinical protocol and assuming that such patient is a Medicare enrollee, the total reimbursement would be $63,395, of which $2,950 would compensate for the professional medical services rendered to the patient by the radiation oncologist(s), and the balance of $60,445 would be paid to Beverly for the technical component of providing the clinical proton therapy service.

In addition to Medicare, most of the major proprietary health plans, such as Anthem Blue Cross, Aetna, United Healthcare, and others are now reimbursing for Proton Therapy. Some of these entities cover any clinical disease site, while others are limited as to what specific disease site that will be covered. However, as Proton Therapy gains greater acceptance and more centers offering such services, the coverages will invariably expand.

Of particular note for the Center, a significant number of patients seeking treatment at the Center will be "medical tourists" from Asia and Latin America who will be seeking Proton Therapy treatment and will not be covered by any third-party insurance carrier but will instead cover the cost of their treatment out-of-pocket. Management of Beverly anticipates this to be a significant number of patients.

## Payer Mix

The Management of Beverly anticipates that the mix of patients from a reimbursement standpoint will be approximately 50% Medicare and 50% Commercial/Private Pay. For purposes of the Pro Forma Financial Model, no differential has been made as to what percentage will be covered by commercial insurance and what percentage will be private pay. However, it is anticipated that private pay patients will pay a rate higher than commercial insurance.

For purposes of calculating the "benchmark" of the prevailing Medicare reimburse rate for Proton Therapy services at BPC, Management assumes that the Center will ultimately collect 90% of the prevailing Medicare reimbursement rate and 150% of the prevailing Medicare reimbursement rate for commercial/private pay patients.

The following table sets forth the Payer Mix and Medicare benchmarking and shows the "blended" reimbursement rate.

| Payer Mix | | Benchmark % of Medicare | Weighted Average* |
|---|---|---|---|
| Medicare | 40.0% | 95.0% | 38.0% |
| Commercial | 35.0% | 150.0% | 52.5% |
| Private/Cash Pay Patients | 25.0% | 200.0% | 50.0% |
| Total | 100.00% | *Weighted Avg. Payor Mix | **140.5%** |

*Weighted avereage payor mix as a percentage of Medicare

**FINAL!**

## VII. Pro Forma Financial Information – Summary of the Financial Forecast

Attached as Exhibit F hereto, is the comprehensive Pro Forma Financial Model for the Beverly Proton Center.

Set forth in the Table below is a Financial Summary of the ten-year projected operations of the Beverly Proton Center:

| | Initial Investment | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Total Collected Revenues | | 16,330,148 | 44,269,945 | 70,603,199 | 81,815,309 | 80,997,156 |
| Total Costs and Expenses | | 11,369,851 | 20,698,240 | 24,082,933 | 27,562,210 | 27,976,493 |
| Depreciation and Amortization | | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 |
| Interest Expense | | 0 | 0 | 0 | 0 | 0 |
| Earnings Before Taxes (EBT) | | ($4,699,298) | $13,912,110 | $36,860,671 | $44,593,504 | $43,361,068 |
| EBT as a % of NET Revenue | | -28.78% | 31.43% | 52.21% | 54.51% | 53.53% |
| Net Cash Flow | ($129,022,055) | $2,486,032 | $21,285,761 | $44,358,593 | $54,357,038 | $53,088,842 |
| Total Project Capital Contribution (Equity) | $129,022,055 | | | | | |
| 10 Year Internal Rate of Return (IRR) | 23.7% | | | | | |
| 10 Year Net Present Value (NPV) | $140,463,002 | | | | | |

| | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|
| Total Collected Revenues | 80,187,184 | 79,385,312 | 78,591,459 | 77,805,544 | 77,027,489 | 687,012,745 |
| Total Costs and Expenses | 28,402,135 | 28,839,410 | 29,288,599 | 29,749,990 | 30,223,879 | 258,193,740 |
| Depreciation and Amortization | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 96,595,949 |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 |
| Earnings Before Taxes (EBT) | $42,125,455 | $40,886,308 | $39,643,265 | $38,395,959 | $37,144,015 | $332,223,057 |
| EBT as a % of NET Revenue | 52.53% | 51.50% | 50.44% | 49.35% | 48.22% | |
| | | | | | | $0 |
| Net Cash Flow | $51,852,547 | $50,612,725 | $49,369,015 | $48,121,047 | $53,287,405 | $299,796,951 |

The following Table sets for the Pro Forma Operating Statistics for the Beverly Proton Therapy Center:

| Proton Therapy | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Patient Load | 220.0 | 620.1 | 1,020.0 | 1,200.0 | 1,200.0 |
| Average Number of Treatments per Patient | 36.4 | 35.8 | 35.3 | 35.2 | 35.2 |
| Treatments per Day | 31.8 | 88.0 | 142.8 | 167.5 | 167.5 |
| Annual Patient Growth | | 181.80% | 64.50% | 17.65% | 0.00% |
| Average Reimbursement per Patient | $74,217 | $71,393 | $69,209 | $68,178 | $67,497 |
| Average Reimbursement per Treatment | $2,037 | $1,996 | $1,962 | $1,938 | $1,919 |

**FINAL!**

| Proton Therapy | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|
| Patient Load | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 10,260.2 |
| Average Number of Treatments per Patient | 35.2 | 35.2 | 35.2 | 35.2 | 35.2 | |
| Treatments per Day | 167.5 | 167.5 | 167.5 | 167.5 | 167.5 | |
| Annual Patient Growth | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| Average Reimbursement per Patient | $66,822 | $66,153 | $65,492 | $64,837 | $64,189 | |
| Average Reimbursement per Treatment | $1,900 | $1,881 | $1,862 | $1,843 | $1,825 | |

## Overview

Management of Beverly has prepared a detailed Pro Forma Financial Model for the Beverly Proton Center. The planned Proton Therapy Center would be sited on land owned by Beverly Hospital that is adjacent to the main hospital campus. BPC will deploy a total of three Mevion Medical Systems S250 Proton Therapy System. The three systems will be deployed one year apart, with the first system becoming operational sometime in 2019, with the second system becoming operational approximately twelve months later and the third system coming online approximately twelve months after the deployment of the second system.

The comprehensive Ten-year Pro Forma Financial Model for the BPC includes Ten-year Income Statements, Statements of Cash Flows and Balance Sheets. Beverly has also prepared detailed supporting schedules for volumes, reimbursement, operating costs and expenses, capital requirements, and financing options. In addition, Management's analysis specifically addresses key financial/operational metrics including case volume required to achieve a "break-even" cash flow, overall estimated project capital costs and the level of equity capital required to initiate the project, a typical financial forecast as to the anticipated financial results of operations over a ten-year time frame, and a sensitivity analysis of both reimbursement and volume levels.

The Pro Forma Financial Model was prepared using a typical proton therapy case mix, reimbursement levels based upon the prevailing APC Rates for 2016 in Los Angeles County, California, a standard cost structure based upon the typical capital costs for a Proton Therapy Center as envisioned by Beverly and the anticipated operating and administrative costs that would be associated with such a facility.

Beverly prepared the analysis of the proposed Proton Therapy Center under two transaction structures, the first being that the proposed Proton Therapy Services would be provided by Beverly Hospital as a Hospital Outpatient Department ("HOPD"), and the second would assume that the Proton Therapy Center would function as a Freestanding Center with ownership shared by select outside investors, as well. Under the HOPD Model, reimbursement would be based upon the APC Reimbursement Rates available to hospitals, whereas the Joint Venture Model assumes Medicare Physician Fee Schedule – Part B Reimbursement Rates.

## Summary Financial Results from Operations

The Pro Forma Financial Model predicts that the Proton Therapy program envisioned herein generates $299,796,000 in cumulative Debt-free Cash Flow over the Ten-year Time Horizon of the Financial Forecast.

**FINAL!**

These positive financial results are dependent upon the achievement of the following key variables:

Achievement of Patient Volume Forecasts as set forth herein;

Reimbursement Levels are maintained at the forecasted levels, considering that the planned Proton Therapy Center will not actually serve patients until five years from the date of this Feasibility Analysis

The cost structure as set forth herein for both capital and operating components is consistent with the actual costs incurred.

**Financial and Operating Summary**

Set forth below is a summary of the key assumptions utilized in the construct of the Pro Forma Financial Model for BPC:

1. **Proton Therapy Patient Volume**

   The starting point for this analysis was a determination of the expected patient case volume for the planned Beverly Proton Center.

   Beverly's Management examined Cancer Incidence Rates in Los Angeles and Orange Counties and the utilization of Radiation Therapy for the treatment of cancer.

   The need for the Proton Therapy services that will be provided by BPC is based upon a forecast of newly-diagnosed cancer cases per year in Los Angeles and Orange County that would be clinically appropriate for some form of external-beam radiation therapy. The next step is to ascertain that portion of these cancer cases that could benefit from proton therapy service.

   Specific forecast modeling assumptions used in this need projection included:

   - Use of population demographics from which it would be reasonable to draw patients seeking Proton Therapy Services
   - Use of a ten-year planning horizon forecast need
   - Apply specific cancer rates for Los Angeles and Orange Counties to the forecast population to forecast future cancer cases
   - Apply a 60% radiation treatment factor to the cancer case forecast to identify the number of new radiation therapy appropriate patients
   - Apply an appropriate conversion factor to the forecasted radiation therapy-appropriate patients to identify the potential pool of proton therapy.

2. **Program Growth**

   Using the theoretical maximum case load for the Mevion S250, Beverly has assumed that the first year for each system would experience a "ramp-up" of patient throughput. Therefore, in the first year of operations for each system, patient load is forecast to be 220 patients and then achieve 400 patients annually in years two through ten.

FINAL!

3. **Payer Analysis**

The Management of Beverly anticipates that the mix of patients from a reimbursement standpoint will be approximately 40% Medicare, 35% Commercial and 25% Cash/Private Pay.

4. **Reimbursement Assumptions**

Reimbursement is based upon the prevailing Medicare Rates in Los Angeles County for Proton Therapy Services.

| Payer Mix | | Benchmark % of Medicare | Weighted Average* |
|---|---|---|---|
| Medicare | 40.0% | 95.0% | 38.0% |
| Commercial | 35.0% | 150.0% | 52.5% |
| Private/Cash Pay Patients | 25.0% | 200.0% | 50.0% |
| Total | 100.00% | *Weighted Avg. Payor Mix | 140.5% |

*Weighted avereage payor mix as a percentage of Medicare

5. **Revenue**

Revenue has been calculated based upon the anticipated Proton Therapy Treatment Volumes anticipated over the Ten-year time Horizon of the Financial Forecast and the anticipated Reimbursement for the Proton Therapy services that will be provided. While Case Load increases as noted in Section 2 above, anticipated reimbursement is expected to decline by 1.0% annually.

It should be noted that the Revenue as shown in the Pro Forma Income Statement includes only the Technical Component for the actual delivery of treatment. The Professional Component is not included in this analysis.

6. **Operating Costs and Administrative Expenses**

Operating Costs and Expenses include items such as Staff Salaries, Wages and Benefits, Service Contracts, Facility Rental, Utilities and other normal and routine administrative expenses.

Direct Costs includes items such as Salaries, Wages and Benefits, Equipment Service Contracts, Medical Supply Costs, Utilities and other ancillary costs and expenses directly related to the delivery of care. Each of these items is summarized below. A detailed breakout of these costs is set forth in the attached Pro Forma Financial Model, Tab 11 for a detailed Cost and Expense Analysis by year for the Ten-year Time Horizon of the Financial Forecast.

Salaries, Wages and Benefits – The cost for the required Staffing Complement to operate the planned Proton Therapy Center includes a total of 24.0 Full-time Equivalent Employees.

**FINAL!**

Benefits were assumed to be 30.0% of Base Compensation.

Total Staffing Compensation has been escalated at 2.5% per year.

Equipment Service Contracts – This is the cost for the Maintenance Contract, which covers preventive maintenance and repairs to the Proton Therapy equipment and all related Treatment Equipment, as well as the CT Simulator. These contracts begin in the Second Year of operations and remain fixed for the remaining years of the forecast time horizon.

Medical Supply Costs – This cost category includes consumable supplies used for each treatment and have been estimated at $350 per patient for all Proton Therapy cases. The cost of these items has been escalated at 2.5% per year for inflation.

Administrative Expenses includes the following items:

General/Administrative Expenses

**Accounting and Bookkeeping**
**Advertising and Promotion**
**Commercial Insurance**
**Dues and Subscriptions**
**Internet Access**
**Janitorial**
**Other Professional Fees**
**Licenses**
**Liability Insurance**
**Meals and Entertainment**
**Medical Directorship**
**Medical Waste and Garbage**
**Miscellaneous**
**Office Supplies**
**Postage and FEDEX**
**Property Insurance (Equipment)**
**Repairs and Maintenance**
**Snacks**
**Telephone**
**Travel**
**Uniforms and Laundry**

These expense items were escalated at 2.5% per year.

A detailed breakout of these costs is set forth in the attached Pro Forma Financial Model, Tab 11 for a detailed Cost and Expense Analysis by year for the Ten-year Time Horizon of the Financial Forecast.

**FINAL!**

7. Equipment Cost – Total equipment cost for all three Mevion systems is estimated to be $67,294,000 for the Proton Therapy equipment, plus an additional $17,588,796 for the cost of all required ancillary/support equipment;

8. Cost for Facility Construction and Vault – Total cost for the facility improvements and the vaults to house the Proton Therapy Systems is estimated to be $39,139,150.

9. Capitalization – The entire project is being funded with equity capital and will require no debt financing. The Pro Forma Financial Model attached hereto reflects the all-equity capital structure. Thus, the forecasted Internal Rate of Return of 23.7% is an unlevered rate.

**FINAL!**

## VIII. Facility Planning and Development; Project Timeline

The Center is expected to begin operations sometime in 2019. Construction of the facility shell and acquisition of necessary technology will be undertaken concurrently to allow development to proceed as quickly as possible. Some operating employees will be trained during construction to allow the least amount of system downtime possible upon opening for patient treatment. Shown below is the anticipated schedule for the timing of major project phases.

The rest of this page has been intentionally left blank.

**FINAL!**






**Exhibit 2**

**FINAL!**

## IX. Management and Development Team

The Company's management team has considerable experience meeting the needs of ethnically/culturally distinct Latino and Asian populations, has clinical professionals who speak Spanish and Mandarin, and has success in reaching those markets. This experience will help both in establishing the venture with Southern California patients and in working with international patients.

**Michael Cogswell, President**

Mike Cogswell has over 30 years of professional experience in the development and operations of leading radiation oncology centers. Proton Therapy has specific and unique needs that require his level of business acumen. With Mr. Cogswell's radiation clinical background and overall knowledge of the latest and ground-breaking technology advances, he has remarkable insight into the diverse technical workflows required for a high performing medical center.

He most recently worked at Mevion Medical Systems, which is the supplier of the Proton Therapy equipment for the Center. Previously, he worked for Elekta, the world's second-largest manufacturer of radiation therapy equipment.

**Leslie Yonemoto, MD, BS, MBA, Medical Director**

Dr. Yonemoto is a Johns Hopkins University Medical School trained, Radiation Oncologist, with more than 13 years of clinical and academic experience in proton therapy, at Loma Linda University Medical Center and ProCure Oklahoma. He has successfully treated more than 2,600 patients. He has lectured and consulted on clinical, research, and operational aspects of proton therapy in many domestic and international forums and has been featured in several national and regional news programs. While at Loma Linda, Dr. Yonemoto simultaneously held both positions of Residency Director and Director of Operations for Radiation Therapy. Since 2004 Les has been instrumental in leading the development efforts on multiple major proton center initiatives, including key projects in Germany, Tennessee, San Diego and Seattle, while continuing his radiation oncology practice in southern California, and most recently, in Oklahoma. Dr. Yonemoto also has BS in Electrical Engineering as well as an MBA.

**Patrick Reilly**

Mr. Reilly has owned and operated a very successful land development and building business for over 35 years. He has created numerous residential and commercial developments. Mr. Reilly comes to the Company with a vast knowledge in land use and development and has sat on many boards and commissions sharing his knowledge. He has a proven ability to foster relationships and help leaders and companies reach their professional goals. He has been instrumental in developing multi-million dollar projects throughout the U.S. Most recently, Mr. Reilly has focused his expertise on the

**FINAL!**

development of Proton Therapy projects, since 2003 when his wife was diagnosed with a terminal brain tumor. Mr. Reilly has dedicated his life to the pursuit of gaining knowledge about brain tumors and cancer. Mr. Reilly's visions and ability to create relationships lead to long-term solutions and success.

**Stephen E. Courtney, AIA, LEED**

As a nationally recognized specialist in the development of Proton Therapy facilities, Mr. Courtney and his design/development firm, SCI·X Studio staff and advisory board have been involved in 14 of the 23 operating proton facilities in the US, and has another being commissioned in Michigan for McLaren Health Systems, a facility under construction for Beaumont Health Systems and numerous facilities in the planning stages.

Mr. Courtney's studies focus on emerging technologies in medical diagnostic and treatment modalities such as Proton Therapy has positioned him as a frequent speaker in the healthcare industry. His management career spans over 3 decades, throughout which he has been involved in the development of medical and research facilities both in the United States and abroad, private and public.

**Donald K. Wise, Chief Financial Officer**

Mr. Wise has extensive experience in the financial aspects of healthcare finance and accounting, including the preparation of financial feasibility analyses and modeling, particularly in the development and financing of radiation therapy centers. He has also worked with outpatient surgery centers, diagnostic imaging facilities and cardiac diagnostic/interventional programs operating throughout the United States. Mr. Wise has worked as a healthcare finance and business development professional for physicians and large medical groups, as well as hospitals and health systems.

Prior to joining the Company, Mr. Wise was Vice President of Healthcare Finance and Analytics for MEI Healthcare, LLC, a healthcare development company focused on the development of radiation and proton therapy centers, a position he has held for the last nine years. Prior to his joining MEI, MR wise worked for three years as a business development associate for Alliance Imaging, Inc., the largest single provider of MRI, CT and PET/CT services in the United States. Prior to his affiliation with Alliance, which began in 2003, he served as Vice President of Business Development and Director of Physician Relations for a nationwide chain of freestanding diagnostic imaging centers.

Prior to that, Mr. Wise served as Chief Financial Officer for Friendly Hills HealthCare Network under Med Partners. He previously served as Vice President of Venture Development for National Medical Enterprises, now known as Tenet Healthcare, where he developed numerous imaging centers, cardiac diagnostic centers, cancer care centers and surgery centers and served as the Chief Financial Officer of these ventures. Prior to Tenet he managed all financial reporting and analysis for American Medical International where he oversaw this function for the company's116 hospitals worldwide.

**FINAL!**

Mr. Wise began his career in the Audit Division of Arthur Andersen & Co. Mr. Wise has a B.S. in Business Administration from East Carolina University, holds an M.S. in Accountancy from the University of Houston, and is a Certified Public Accountant.

# Beverly Proton Therapy Center

Exhibit 3 Page 49



ProtonOneConsulting, LLC

# Beverly Proton Center, LLC

## Beverly Proton Therapy Center

## Pro Forma Financial Model

**FINAL**

**April 12, 2016**

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Index
FINAL


| Section | Tab |
|---|---|
| Financial Forecast Disclaimer | 1 |
| Project Overview | 2 |
| Map of the Proposed Defined Service Area | 2A |
| Proton Therapy Conversion Analysis by Disease Site with Market Share Sensitivity | 2B |
| Volume Forecast - Proton Therapy Cases | 3 |
| CPT Code Summary for Proton Therapy Treatment Protocol | 4 |
| Hospital APC - Final Rules for 2016 | 4A |
| MPFS - 2016 Reimbursement | 4C |
| Disease Site Summary | 5 |
| Reimbursement Summary by Disease Site | 6 |
| Payer Mix and Payer Benchmarking | 7 |
| Revenue Calculation - Proton Therapy | 8 |
| Staffing Profile | 9 |
| Operating Costs and Administrative Expenses | 10 |
| Equipment Maintenance Contracts | 11 |
| Capital Expenditures | 12 |
| Amortization Schedule - Equipment | 13 |
| Amortization Schedule - Construction - Vault and Facility Improvements | 14 |
| Pro Forma Income Statement - Proton Therapy Program - Ten-year Forecast Horizon | 15 |
| Pro Forma Income Statement - Proton Therapy Program - First Twelve Months | 16 |
| Pro Forma Income Statement - Proton Therapy Program - Second Twelve Months | 17 |
| Pro Forma Income Statement - Proton Therapy Program - Third Twelve Months | 18 |
| Cash Flow Forecast - Proton Therapy Program - Ten-year Forecast Horizon | 19 |
| Pro Forma Balance Sheets - Proton Therapy Program - Ten-year Forecast Horizon | 20 |
| Project Dashboard | 21 |
| Break-even Sensitivity | 22 |

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
INPUT DASHBOARD
FINAL

## Operations

Entity Name: Beverly Proton Center, LLC

Date: 4/12/2016

Location
City: Montebello
State: California
Zip: 90640

Target Year for Day 1 of Operations: 2019
# of Operating Days per Year: 252
Treatment Time per Patient: 18

Business Hours: Open (AM) 6:00 AM; Close (PM) 10:00 PM

Hours in Work Year: 2016

| Total Business Hours per Day: | |
|---|---|
| Year 1 | 8.0 |
| Year 2 | 16.0 |
| Year 3 | 16.0 |
| Years 4 - 10 | 16.0 |

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
INPUT DASHBOARD
FINAL

## Patient Volume

Predicted Number of Patients per Year: 400.0 NOTE: This Value is derived from the Market Analysis Study

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Proton Therapy<br>Annual Patient Volume Growth Rate (%) - FROM BASELINE | 0.00% | 0.0% | 0.0% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year Patient Ramp-up | 15.00% | 20.00% | 20.00% | 25.00% | 35.00% | 50.00% | 60.00% | 75.00% | 80.00% | 85.00% | 95.00% | 100.00% |

| | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2nd Year Patient Ramp-up | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

## Reimbursement

Hospital Based Program (Reimbursement On: Yes

Show Part B Professional Reimbursements? Yes

2016 PART A - APC Wage Index: CA - Los Angeles-Long Beach-Glendale, CA

2016 PART B - GPCI Index: CA - Los Angeles, CA - 18

Total Net Medicare Collections per Treatment (%): 100.00%

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Change in Medicare Reimbursement IMPT (%) | 0.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% |
| Change in Medicare Reimbursement NON-IMPT (%) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Changes in Professional Reimbursement (%) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

## Payer Mix

| Payers | (%) | Medicare Benchmark | Weighted AVG Payer Mix |
|---|---|---|---|
| Medicare | 40.00% | 95.0% | 38.0% |
| Commercial | 35.00% | 150.0% | 52.5% |
| Private/Cash Pay Patients | 25.00% | 200.0% | 50.0% |
| Other Payer 2 | 0.00% | 0.0% | 0.0% |
| Other Payer 3 | 0.00% | 0.0% | 0.0% |
| Other Payer 4 | 0.00% | 0.0% | 0.0% |
| Other Payer 5 | 0.00% | 0.0% | 0.0% |
| Other Payer 6 | 0.00% | 0.0% | 0.0% |
| Total | 100.0% | | 140.5% |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
INPUT DASHBOARD
FINAL

## Capital Expenditures

| Sales Tax Rate |
|---|
| 9.00% |

| Facility Contingency |
|---|
| 0.00% |

| Equipment | ($) |
|---|---|
| Proton Systems - All 3 gantries | $64,194,000 |
| FFE | $600,000 |
| Major Medical Equip /Software | $2,000,000 |
| Owner's Hard Cost Contingency | $500,000 |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Sales Tax | |
| Total | $ 67,294,000 |

| Construction - Direct | ($) |
|---|---|
| 105 W. Beverly Demolition | $215,268 |
| 101 E Beverly Demolition | $318,937 |
| Vault - (3) Lower Level | $3,600,000 |
| Vault - (3) Treatment Level | $4,000,000 |
| Vault - (3) Catwalk Level | $2,000,000 |
| PT Equipment Rigging | $2,250,000 |
| PT Support Area | $1,600,000 |
| PT Clinical Area | $4,800,000 |
| Entrance and Maintenance area | $4,000,000 |
| Parking Garage - 80 Above Grad | $0 |
| Parking Garage - 0 Below Grade | $0 |
| Site work/Hardscape | $1,000,000 |
| Roofscape | $0 |
| Utilities Allowance | $300,000 |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Total | $ 24,084,205 |

| Equipment Soft Costs | ($) |
|---|---|
| PMPOC Fees @ 3.0% | $2,635,436 |
| A/E Basic Service Fees | $3,600,000 |
| A/E Additional Services | $800,000 |
| Specialty Consultants | $700,000 * |
| Owner's Consultants | $800,000 * |
| Reimbursable Expenses | $750,000 |
| Legal and Accounting | $250,000 |
| Insurance | $500,000 |
| Owner Personnel - Adv And Misc Ex | $1,400,000 * |
| Field Office Expenses | $72,000 * |
| Working Capital | $9,000,000 |
| Owner's Soft Cost Contingency | $250,000 * |
| Commissioning | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Sales Tax | $5,831,460 |
| Total | $26,588,896 |

| Construction - Indirect | ($) |
|---|---|
| Construction Contingency at 15% | $3,612,637 |
| Design Contingency at 5% | $1,204,211 |
| Owner's Construction Contingenc | $500,000 |
| CM - Pre-construction Services | $350,000 |
| Utility Permit and Approval | $200,000 |
| General Conditions | $3,612,633 |
| Construction Management Fee | $1,575,473 |
| Licenses/Permits | |
| Legal | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Other | |
| Total | $11,054,954 |

$93,882,896 $35,139,159 $129,022,055

## Financing

$3,222,000

| | |
|---|---|
| Include Physician Leasing Model? | No |
| Financing Required to Purchase Capital Expenditures? | Yes |

| Equipment | |
|---|---|
| Interest Rate | 5.25% |
| Term (Years) | 10 |
| Amount Financed | 0% |

| Facility | |
|---|---|
| Interest Rate | 4.75% |
| Term (Years) | 30 |
| Amount Financed | 0% |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
INPUT DASHBOARD
FINAL

## Staffing

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Change in Employee Salary (%) | 0.0% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Employee Benefits as a % of Salary | 30% | | | | | | | | | |

| Staff | Annual Salary | Baseline Volume | Total Number of FTE's per Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASST MGR RADIATION ONCO | $85,800 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| CLINICAL PHYSICIST | $149,365 | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| COORD CLINICAL RESEARC | $55,370 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOSIMETRIST I | $96,262 | 1 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| LICENSED PRACTICAL NURS | $42,827 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEDICAL RECORDS CLERK | $25,813 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| MGR RADIATION ONCOLOGY | $150,000 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| PHYSICIST ASSISTANT | $71,032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RADIATION THERAPIST | $95,000 | 2 | 5 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| RADIATION THERAPIST - PRI | $73,029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| REGISTERED NURSE | $64,043 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| RN REGISTRY OPT I | $55,370 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| UNIT SUPPORT REP I | $26,582 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Telemarketers | $65,000 | 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| CHIEF CLINICAL PHYSICIST | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SECRETARY II | $35,000 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Billing/Pre. Auth./ Pre. Cert. | $75,000 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Medical Director | $400,000 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | $1,629,536.00 | 12 | 23 | 27 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

| Staff | Hourly |
|---|---|
| ASST MGR RADIATION ONCO | $41.25 |
| CLINICAL PHYSICIST | $71.81 |
| COORD CLINICAL RESEARC | $26.62 |
| DOSIMETRIST I | $46.28 |
| LICENSED PRACTICAL NURS | $20.59 |
| MEDICAL RECORDS CLERK | $12.41 |
| MGR RADIATION ONCOLOGY | $43.77 |
| PHYSICIST ASSISTANT | $34.15 |
| RADIATION THERAPIST | $34.15 |
| RADIATION THERAPIST - PRI | $35.11 |
| REGISTERED NURSE | $30.79 |
| RN REGISTRY OPT I | $26.62 |
| UNIT SUPPORT REP I | $12.78 |
| Telemarketers | $12.78 |
| CHIEF CLINICAL PHYSICIST | $62.52 |
| SECRETARY II | $15.70 |
| Billing/Pre. Auth./ Pre. Cert. | $26.62 |
| Medical Director | |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
INPUT DASHBOARD
FINAL

## Operational Expenditures & Supply Cost

Annual Cost Inflation Rate: 2.50%

Supply Costs

Proton Therapy Patient Supply Cost: $350.00

Direct Expenses

| | Monthly Expenses | Annual Expense |
|---|---|---|
| Billing and Collections Fee (% of Rev) (Years One and Two Only) | 8.0% | |
| Employee Salary w/ Benefits | $49,083.33 | |
| Facility Rental | $133,333.33 | $1,600,000.00 |
| Management Fee | 3.5% | |
| Physics - Contracted | $41,666.67 | $500,000.00 |
| Service/Maintenance Contract(s) | | $0.00 |
| Supply Costs (Variable) | $23,859.78 | $286,317.35 |
| Transcription - Contracted | $5,000.00 | $60,000.00 |
| Utilities | $20,000.00 | $240,000.00 |
| EMR License Fee | $0.00 | $0.00 |

General/Administrative Expenses

| | Monthly Expenses | Annual Expense |
|---|---|---|
| Accounting and Bookkeeping | $25 000.00 | $300,000.00 |
| Advertising and Promotion | $25 000.00 | $300,000.00 |
| Commercial Insurance | $66 667.00 | $800,004.00 |
| Dues and Subscriptions | $1 000.00 | $12,000.00 |
| Internet Access | $3 500.00 | $42,000.00 |
| Janitorial | $10 000.00 | $120,000.00 |
| Other Professional Fees | $10,000.00 | $120,000.00 |
| Licenses | $1 500.00 | $18,000.00 |
| Liability Insurance | $50 000.00 | $600,000.00 |
| Meals and Entertainment | $2 500.00 | $30,000.00 |
| Medical Directorship | $0.00 | $0.00 |
| Medical Waste and Garbage | $2 500.00 | $30,000.00 |
| Miscellaneous | $5 000.00 | $60,000.00 |
| Office Supplies | $2 500.00 | $30,000.00 |
| Postage and FEDEX | $750.00 | $9,000.00 |
| Property Insurance (Equipment) | $166 667.00 | $2,000,004.00 |
| Repairs and Maintenance | $15,000.00 | $180,000.00 |
| Snacks | $2 500.00 | $30,000.00 |
| Telephone | $2 500.00 | $30,000.00 |
| Travel | $2 500.00 | $30,000.00 |
| Uniforms and Laundry | $7 500.00 | $90,000.00 |
| (enter expense here) | $0.00 | $0.00 |
| (enter expense here) | $0.00 | |
| (enter expense here) | $0.00 | |
| (enter expense here) | | |

Total Operation Expenditures: $675,527.23 | $7,517,325.35

| Maintenance Contract | # of Units | Annual ($) | Monthly ($) |
|---|---|---|---|
| Proton System | 1 | $1,980,000 | $165,000 |
| CBCT System | 1 | $90,000 | $7,500 |
| Vision RT | 1 | $35,200 | $2,933 |
| IT Hardware | 1 | $175,000 | $14,583 |
| Medical Supplies/Equipment | 1 | $39,120 | $3,260 |
| Physics Support | 1 | $8,000 | $667 |
| | | | $0 |
| | | | $0 |
| Total | 6.00 | $ 2,327,320 | $ 193,943 |

$975,000.00

Exhibit 3



**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Financial Forecast Disclaimer**
**FINAL**

## Financial Forecast Disclaimer

The financial projections, including the estimated return on investment, accompanying this proposal are based on information provided to ProtonOneConsulting from various sources that it believes are dependable and on certain assumptions that it believes are reasonable; however, the data is subject to change and the projections are forward looking and speculative. While ProtonOneConsulting believes this to be a reasonable forecast of the financial strength of the project, some of the projections will inevitably be incorrect. Actual financial results following full implementation of the project may be more or less favorable than the forecasted results, and such variations may be material and/or adverse. The financial projections prepared by ProtonOneConsulting and the estimated return on investment are neither a promise that these projections will happen and that the investor will obtain the suggested return on investment, nor a guaranty by ProtonOneConsulting of such results.

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Project Overview
FINAL

Hospital Based

## Project Overview

| | Initial Investment | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Collected Revenues | | 16,330,148 | 44,269,945 | 70,603,199 | 81,815,309 | 80,997,156 | 80,187,184 | 79,385,312 | 78,591,459 | 77,805,544 | 77,027,489 | 687,012,745 |
| Total Costs and Expenses | | 11,369,851 | 20,698,240 | 24,082,933 | 27,562,210 | 27,976,493 | 28,402,135 | 28,839,410 | 29,288,599 | 29,749,990 | 30,223,879 | 258,193,740 |
| Depreciation and Amortization | | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 9,659,595 | 96,595,949 |
| Interest Expense | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Earnings Before Taxes (EBT) | | ($4,699,298) | $13,912,110 | $36,860,671 | $44,593,504 | $43,361,068 | $42,125,455 | $40,886,308 | $39,643,265 | $38,395,959 | $37,144,015 | $332,223,057 |
| EBT as a % of NET Revenue | | -28.78% | 31.43% | 52.21% | 54.51% | 53.53% | 52.53% | 51.50% | 50.44% | 49.35% | 48.22% | |
| | | | | | | | | | | | | $0 |
| Net Cash Flow | ($129,022,055) | $2,486,032 | $21,285,761 | $44,358,593 | $54,357,038 | $53,088,842 | $51,852,547 | $50,612,725 | $49,369,015 | $48,121,047 | $53,287,405 | $299,796,951 |

| | |
|---|---|
| otal Project Capital Contribution (Equity) | $129,022,055 |
| Year Internal Rate of Return (IRR) | 23.7% |
| ) Year Net Present Value (NPV) | $140,463,002 |

## Components of Capital Expenditure

| Total Capital Costs: | |
|---|---|
| Equipment | $67,294,000 |
| Facility Buildout/Vault Construction | $24,084,205 |
| Soft Costs - Equipment | $17,588,896 |
| Soft Costs - Facility | $11,054,954 |
| Working Capital | $9,000,000 |
| Total Capital Expenditure | $129,022,055 |

| Initial Capital Investment: | |
|---|---|
| Equipment | $84,882,896 |
| Facility Buildout/Vault Construction | $35,139,159 |
| Working Capital | 9,000,000 |
| Total Initial Capital Investment | $129,022,055 |

| Sources of Capital: | | |
|---|---|---|
| Equity Capital | $129,022,055 | 100.0% |
| Long Term Debt | | |
| Equipment - Amount Financed | $0 | |
| Total Sources of Capital | $129,022,055 | |

| Applications of Capital: | |
|---|---|
| Equipment Costs (Including Soft Costs) | $84,882,896 |
| Facility Costs (Including Soft Costs) | $35,139,159 |
| Working Capital | $9,000,000 |
| Total Applications of Capital | $129,022,055 |



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Project Overview**
**FINAL**

**Hospital Based**

## Pro Forma Operating Statistics

| Proton Therapy | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Load | 220.0 | 620.1 | 1,020.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 10,260.2 |
| Average Number of Treatments per Patient | 36.4 | 35.8 | 35.3 | 35.2 | 35.2 | 35.2 | 35.2 | 35.2 | 35.2 | 35.2 | |
| Treatments per Day | 31.8 | 88.0 | 142.8 | 167.5 | 167.5 | 167.5 | 167.5 | 167.5 | 167.5 | 167.5 | |
| Annual Patient Growth | | 181.80% | 64.50% | 17.65% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | |
| Average Reimbursement per Patient | $74,217 | $71,393 | $69,209 | $68,178 | $67,497 | $66,822 | $66,153 | $65,492 | $64,837 | $64,189 | |
| Average Reimbursement per Treatment | $2,037 | $1,996 | $1,962 | $1,938 | $1,919 | $1,900 | $1,881 | $1,862 | $1,843 | $1,825 | |

## Proton Therapy Equipment Capacity

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Days | 252 | | | | | | | | | | |
| Hours in Workday | | 8.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| Minutes in Workday | | 480.0 | 960.0 | 960.0 | 960.0 | 960.0 | 960.0 | 960.0 | 960.0 | 960.0 | 960.0 |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Treatments per Day | 31.82 | 88.00 | 142.82 | 167.49 | 167.49 | 167.49 | 167.49 | 167.49 | 167.49 | 167.49 |
| Time Required per Treatment (mins) | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 | 18.00 |
| Allocated Time per Patient at Forecasted Volume | 15.09 | 21.82 | 20.17 | 17.20 | 17.20 | 17.20 | 17.20 | 17.20 | 17.20 | 17.20 |
| (+/-) Minutes per Patient | (2.9) | 3.8 | 2.2 | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |

## Labor Schedule

| Staffing | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Increase | 0.0% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| TOTAL FTE'S | | 12.0 | 23.0 | 27.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 |
| Total Salary with Benefits | | $1,583,865 | $2,640,636 | $3,104,898 | $3,450,280 | $3,536,537 | $3,624,950 | $3,715,574 | $3,808,464 | $3,903,675 | $4,001,267 |
| Benefits as a % of salary | 30.0% | | | | | | | | | | |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Map of the Proposed Defined Service Area
FINAL



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Market Demographics and Cancer Epidemiology
Proton Therapy Conversion Analysis by Disease Site with Market Share Sensitivity
FINAL

| Site of Cancer | Proton Service Area Newly Diagnosed Cases – Males – Average Annual Cases | Proton Service Area Newly Diagnosed Cases – Females – Average Annual Cases | Total Cases | RT Conversion Factor | Predicted RT Cases | Predicted RT Cases* | Proton Conversion 20.0% | Proton Conversion 17.5% | Proton Conversion 15.0% | Proton Conversion 12.5% | Proton Conversion 10.0% | Market Share Cases 16.6% / 20.0% | Market Share Cases 25.0% / 17.5% | Market Share Cases 35.0% / 17.5% | Market Share Cases 35.0% / 15.0% | Market Share Cases 50.0% / 12.5% | Market Share Cases 60.0% / 10.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Sites | 6,438.5 | 5,209.0 | | | | | | | | | | | | | | | |
| Bladder and Urinary Tract | 473.4 | 73.8 | 547.2 | 60.0% | 328.3 | 328.3 | 65.7 | 57.5 | 49.2 | 41.0 | 32.8 | 10.9 | 14.4 | 20.1 | 17.2 | 20.5 | 19.7 |
| Brain and ONS (Head and Neck)** | 86.7 | 67.5 | 154.2 | 60.0% | 92.5 | 92.5 | 18.5 | 16.2 | 13.9 | 11.6 | 9.3 | 3.1 | 4.0 | 5.7 | 4.9 | 5.8 | 5.6 |
| Breast (female) | | 1,490.3 | 1,490.3 | 60.0% | 894.2 | 894.2 | 178.8 | 156.5 | 134.1 | 111.8 | 89.4 | 29.7 | 39.1 | 54.8 | 46.9 | 55.9 | 53.7 |
| Breast (female) (in situ) | | 363.6 | 363.6 | 60.0% | 218.2 | 218.2 | 43.6 | 38.2 | 32.7 | 27.3 | 21.8 | 7.2 | 9.5 | 13.4 | 11.5 | 13.6 | 13.1 |
| Cervix | | 55.6 | 55.6 | 60.0% | 33.4 | 33.4 | 6.7 | 5.8 | 5.0 | 4.2 | 3.3 | 1.1 | 1.5 | 2.0 | 1.8 | 2.1 | 2.0 |
| Childhood, Ages <15 | | | 0.0 | 60.0% | 0.0 | | | | | | | | | | | | |
| Childhood, Ages <20 | 202.7 | 193.5 | 396.1 | 60.0% | 237.7 | 237.7 | 47.5 | 41.6 | 35.7 | 29.7 | 23.8 | 7.9 | 10.4 | 14.6 | 12.5 | 14.9 | 14.3 |
| Colon and Rectum | 636.7 | 485.0 | 1,121.7 | 60.0% | 673.0 | 673.0 | 134.6 | 117.8 | 101.0 | 84.1 | 67.3 | 22.3 | 29.4 | 41.2 | 35.3 | 42.1 | 40.4 |
| Esophageal | 80.0 | 2.9 | 82.9 | 60.0% | 49.8 | 49.8 | 10.0 | 8.7 | 7.5 | 6.2 | 5.0 | 1.7 | 2.2 | 3.0 | 2.6 | 3.1 | 3.0 |
| Kidney and Renal Pelvis | 249.9 | 129.2 | 379.2 | 60.0% | 227.5 | 227.5 | 45.5 | 39.8 | 34.1 | 28.4 | 22.8 | 7.6 | 10.0 | 13.9 | 11.9 | 14.2 | 13.7 |
| Leukemia | 137.6 | 67.5 | 205.0 | 60.0% | 123.0 | | | | | | | | | | | | |
| ver and Bile Duct | 72.7 | 15.4 | 88.0 | 60.0% | 52.8 | 52.8 | 10.6 | 9.2 | 7.9 | 6.6 | 5.3 | 1.8 | 2.3 | 3.2 | 2.8 | 3.3 | 3.2 |
| ig and Bronchus | 1,062.0 | 766.4 | 1,828.4 | 60.0% | 1,097.0 | 1,097.0 | 219.4 | 192.0 | 164.6 | 137.1 | 109.7 | 36.4 | 48.0 | 67.2 | 57.6 | 68.6 | 65.8 |
| lanoma | 288.0 | 223.0 | 511.0 | 60.0% | 306.6 | | | | | | | | | | | | |
| ON-Hodgkin's Lymphoma | 226.8 | 155.7 | 382.5 | 60.0% | 229.5 | | | | | | | | | | | | |
| Oral Cavity and Pharynx | 182.2 | 52.9 | 235.1 | 60.0% | 141.0 | 141.0 | 28.2 | 24.7 | 21.2 | 17.6 | 14.1 | 4.7 | 6.2 | 8.6 | 7.4 | 8.8 | 8.5 |
| Ovarian | | 115.7 | 115.7 | 60.0% | 69.4 | 69.4 | 13.9 | 12.2 | 10.4 | 8.7 | 6.9 | 2.3 | 3.0 | 4.3 | 3.6 | 4.3 | 4.2 |
| Pancreatic | 118.5 | 91.7 | 210.2 | 60.0% | 126.1 | 126.1 | 25.2 | 22.1 | 18.9 | 15.8 | 12.6 | 4.2 | 5.5 | 7.7 | 6.6 | 7.9 | 7.6 |
| Prostate | 1,636.1 | | 1,636.1 | 60.0% | 981.7 | 981.7 | 196.3 | 171.8 | 147.3 | 122.7 | 98.2 | 32.6 | 42.9 | 60.1 | 51.5 | 61.4 | 58.9 |
| Stomach/Digestive | 55.3 | 18.1 | 73.4 | 60.0% | 44.1 | 44.1 | 8.8 | 7.7 | 6.6 | 5.5 | 4.4 | 1.5 | 1.9 | 2.7 | 2.3 | 2.8 | 2.6 |
| Thyroid | 52.7 | 203.4 | 256.1 | 60.0% | 153.7 | | | | | | | | | | | | |
| Uterine | | 298.7 | 298.7 | 60.0% | 179.2 | 179.2 | 35.8 | 31.4 | 26.9 | 22.4 | 17.9 | 5.9 | 7.8 | 11.0 | 9.4 | 11.2 | 10.8 |
| Other Disease Sites | 994.2 | 458.3 | 1,452.5 | 60.0% | 871.5 | 871.5 | 174.3 | 152.5 | 130.7 | 108.9 | 87.2 | 28.9 | 38.1 | 53.4 | 45.8 | 54.5 | 52.3 |
| TOTALS - Proton Service Area Newly-Diagnosed Cases | 6,555.6 | 5,328.0 | 11,883.6 | | 7,130.2 | 6,317.4 | 1,263.5 | 1,105.5 | 947.6 | 789.7 | 631.7 | 209.7 | 276.4 | 386.9 | 331.7 | 394.8 | 379.0 |

Need to CONFIRM appropriateness for PBT

11,883.6

| | 20.0% | 17.5% | 15.0% | 12.5% | 10.0% |
|---|---|---|---|---|---|
| Proton Therapy Conversion Factors - RT-appropriate to PBT | 20.0% | 17.5% | 15.0% | 12.5% | 10.0% |
| Proton Cases as a Percentage of Total Newly-diagnosed. | 10.6% | 9.3% | 8.0% | 6.6% | 5.3% |

* - Excludes Melanoma, Lymphoma and Thyroid.
** - Incidence Data Adjusted for non-Reporting Counties

**Market Share Overview**

| Conversion | 20.0% | 17.5% | 15.0% | 12.5% | 10.0% |
|---|---|---|---|---|---|
| Total PBT Cases | 1,263.5 | 1,105.5 | 947.6 | 789.7 | 631.7 |
| **Market Share** | | | | | |
| 16.6% | 209.7 | 183.5 | 157.3 | 131.1 | 104.9 |
| 25.0% | 315.9 | 276.4 | 236.9 | 197.4 | 157.9 |
| 35.0% | 442.2 | 386.9 | 331.7 | 276.4 | 221.1 |
| 50.0% | 631.7 | 552.8 | 473.8 | 394.8 | 315.9 |
| 60.0% | 758.1 | 663.3 | 568.6 | 473.8 | 379.0 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Volume Forecast - Proton Therapy Cases
FINAL

| Gantry One: | Growth: | Year 1 | | | Year 2 | | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| All Invasive Malignant Tumors by Disease Site | | Year 1 Baseline | by Disease Site | Year 1 Actual | Year 2 Baseline | | | | | | | | |
| Bladder and Urinary Tract | | 20.8 | 5.2% | 11.4 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 | 20.8 |
| Brain and ONS (Head and Neck)** | | 5.9 | 1.5% | 3.2 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 |
| Breast (female) | | 45.5 | 11.4% | 25.0 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Breast (female) (in situ) | | 0.0 | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cervix | | 2.1 | 0.5% | 1.2 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| Childhood, Ages <20 | | 15.0 | 3.8% | 8.3 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Colon and Rectum | | 27.6 | 6.9% | 15.2 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 |
| Esophageal | | 3.2 | 0.8% | 1.7 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 |
| Kidney and Renal Pelvis | | 14.4 | 3.6% | 7.9 | 14.4 | 14.4 | 14.4 | 14.4 | 14.4 | 14.4 | 14.4 | 14.4 | 14.4 |
| Leukemia | | 0.0 | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Liver and Bile Duct | | 3.3 | 0.8% | 1.8 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 |
| Lung and Bronchus | | 19.5 | 4.9% | 10.7 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 |
| Melanoma | | 0.0 | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| NON-Hodgkin's Lymphoma | | 0.0 | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Oral Cavity and Pharynx | | 8.9 | 2.2% | 4.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 |
| Ovarian | | 4.4 | 1.1% | 2.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 |
| Pancreatic | | 8.0 | 2.0% | 4.4 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| Prostate | | 160.0 | 40.0% | 88.0 | 160.0 | 160.0 | 160.0 | 160.0 | 160.0 | 160.0 | 160.0 | 160.0 | 160.0 |
| Stomach/Digestive | | 2.8 | 0.7% | 1.5 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 |
| Thyroid | | 0.0 | 0.0% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Uterine | | 11.3 | 2.8% | 6.2 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 |
| Other Disease Sites | | 47.3 | 11.8% | 26.0 | 47.3 | 47.3 | 47.3 | 47.3 | 47.3 | 47.3 | 47.3 | 47.3 | 47.3 |
| Total Predicted Proton Therapy Cases | | 400.1 | 100% | 220.0 | 400.1 | 400.1 | 400.0 | 400.0 | 400.0 | 400.0 | 400.0 | 400.0 | 400.0 |
| | | | | 220.032086 | | | | | | | | | |



Exhibit 3

| Year 10 |
|---|
| 0.0% |
| [redacted] |
| 20.8 |
| 5.9 |
| 45.5 |
| 0.0 |
| 2.1 |
| 15.0 |
| 27.6 |
| 3.2 |
| 14.4 |
| 0.0 |
| 3.3 |
| 19.5 |
| 0.0 |
| 0.0 |
| 8.9 |
| 4.4 |
| 8.0 |
| 160.0 |
| 2.8 |
| 0.0 |
| 11.3 |
| 47.3 |
| 400.0 |

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
CPT Code Summary for Proton Therapy Treatment Protocol
FINAL

| | |
|---|---|
| Hospital Based? | Yes |
| Show Part B Professional? | Yes |

| CPT HSPCS Code | Description | Hospital | |
|---|---|---|---|
| | | Medicare Allowable Professional | Medicare Hospital APC Payment Rate |
| 77011 | Ct scan for localization | $68.46 | $ - |
| 77014 | Ct scan for therapy guide | $47.74 | $ - |
| 76000 | Fluoroscope examination | $54.36 | $ 222.65 |
| 77261 | Radiation therapy planning | $82.52 | $ - |
| 77262 | Radiation therapy planning | $123.13 | $ - |
| 77263 | Radiation therapy planning | $179.76 | $ - |
| 77280 | Set radiation therapy field | $39.30 | $ 193.29 |
| 77285 | Set radiation therapy field | $59.32 | $ 338.41 |
| 77290 | Set radiation therapy field | $87.83 | $ 338.41 |
| 77293 | Respirator motion mgmt. simul | $112.48 | $ - |
| 77295 | 3-d radiotherapy plan | $112.48 | $ 1,190.94 |
| 77299 | Radiation therapy planning | $241.24 | $ 124.57 |
| 77300 | Radiation therapy dose plan | $35.05 | $ 124.57 |
| 77301 | Radiotherapy dose plan imrt | $448.88 | $ 1,190.94 |
| 77306 | Telethx isodose plan simple | $78.59 | $ 193.29 |
| 77307 | Telethx isodose plan cplx | $163.02 | $ 338.41 |
| 77321 | Special teletx port plan | $53.58 | $ 338.41 |
| 77331 | Special radiation dosimetry | $48.91 | $ 124.57 |
| 77332 | Radiation treatment aid(s) | $30.89 | $ 124.57 |
| 77333 | Radiation treatment aid(s) | $47.37 | $ 193.29 |
| 77334 | Radiation treatment aid(s) | $69.77 | $ 338.41 |
| 77336 | Radiation physics consult | $92.54 | $ 124.57 |
| 77338 | Design mlc device for imrt | $241.24 | $ 338.41 |
| 77370 | Radiation physics consult | $141.59 | $ 193.29 |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
CPT Code Summary for Proton Therapy Treatment Protocol
FINAL

| | | | |
|---|---|---|---|
| | | Hospital Based? | Yes |
| | | Show Part B Professional? | Yes |
| | | Hospital | |
| CPT HSPCS Code | Description | Medicare Allowable Professional | Medicare Hospital APC Payment Rate |
| 77387 | Guidance for radiaj tx dlvr | $0.00 | $ - |
| G6002 | Stereoscopic x-ray guidance | [redacted] | $ - |
| 77417 | Radiology port film(s) | $12.80 | $ - |
| 77427 | Radiation tx management x5 | $202.02 | $ - |
| 77431 | Radiation therapy management | $111.23 | $ - |
| 77470 | Special radiation treatment | $56.39 | $ 586.31 |
| 77499 | Radiation therapy management | $0.00 | $ 586.31 |
| 77520 | Proton trmt simple w/o comp | [redacted] | $ 586.31 |
| 77522 | Proton trmt simple w/comp | [redacted] | $ 1,334.62 |
| 77523 | Proton trmt intermediate | [redacted] | $ 1,334.62 |
| 77525 | Proton treatment complex | [redacted] | $ 1,334.62 |
| G0463 | Hospital outpt clinic visit | [redacted] | $ 118.44 |
| 99204 | Office/outpatient visit new | $181.09 | $ - |
| 99205 | Office/outpatient visit new | $226.51 | $ - |
| 99213 | Office/outpatient visit est | $80.68 | $ - |
| 99214 | Office/outpatient visit est | $118.59 | $ - |
| 99215 | Office/outpatient visit est | $159.32 | $ - |

Hospital APC - Final Rules for 2016

10/30/2015

| Enter city county to the right | Los Angeles-Long Beach-Glendale, CA | Enter wage Index here from Wage Index tab below | 1.2664 | | Courtesy of AMAC 770-693-6031 info.amac@amac-usa.com |
|---|---|---|---|---|---|

Addendum B.-Final OPPS Payment by HCPCS Code for CY 2016

| HCPCS Code | Short Descriptor | CI | SI | APC | Relative Weight | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment | Regional Selected APC Payment Rate for your location | Regional Selected APC Payment Rate for your location w/ Sequestration |
|---|---|---|---|---|---|---|---|---|---|---|
| 77011 | Ct scan for localization | | N | | | | | | $ - | $ - |
| 77012 | Ct scan for needle biopsy | | N | | | | | | $ - | $ - |
| 77013 | Ct guide for tissue ablation | | N | | | | | | $ - | $ - |
| 77014 | Ct scan for therapy guide | | N | | | | | | $ - | $ - |
| 77021 | Mr guidance for needle place | | N | | | | | | $ - | $ - |
| 77022 | Mri for tissue ablation | | N | | | | | | $ - | $ - |
| 77051 | Computer dx mammogram add-on | | A | | | | | | $ - | $ - |
| 77052 | Comp screen mammogram add-on | | A | | | | | | $ - | $ - |
| 77053 | X-ray of mammary duct | CH | Q2 | 5523 | 2.6039 | $191.97 | | $38.40 | $ 222.65 | $ 218.20 |
| 77054 | X-ray of mammary ducts | CH | Q2 | 5523 | 2.6039 | $191.97 | | $38.40 | $ 222.65 | $ 218.20 |
| 77055 | Mammogram one breast | | A | | | | | | $ - | $ - |
| 77056 | Mammogram both breasts | | A | | | | | | $ - | $ - |
| 77057 | Mammogram screening | | A | | | | | | $ - | $ - |
| 77058 | Mri one breast | | B | | | | | | $ - | $ - |
| 77059 | Mri both breasts | | B | | | | | | $ - | $ - |
| 77061 | Breast tomosynthesis uni | | E | | | | | | $ - | $ - |
| 77062 | Breast tomosynthesis bi | | E | | | | | | $ - | $ - |
| 77063 | Breast tomosynthesis bi | | A | | | | | | $ - | $ - |
| 77071 | X-ray stress view | | Q1 | 5521 | 0.8247 | $60.80 | | $12.16 | $ 70.52 | $ 69.11 |
| 77072 | X-rays for bone age | | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77073 | X-rays bone length studies | CH | Q1 | 5521 | 0.8247 | $60.80 | | $12.16 | $ 70.52 | $ 69.11 |
| 77074 | X-rays bone survey limited | | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77075 | X-rays bone survey complete | CH | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77076 | X-rays bone survey infant | | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77077 | Joint survey single view | | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77078 | Ct bone density axial | | S | 5521 | 0.8247 | $60.80 | $0.00 | $0.00 | $ 70.52 | $ 69.11 |
| 77080 | Dxa bone density axial | | S | 5522 | 1.3658 | $100.69 | $0.00 | $0.00 | $ 116.78 | $ 114.45 |
| 77081 | Dxa bone density/peripheral | | S | 5521 | 0.8247 | $60.80 | $0.00 | $0.00 | $ 70.52 | $ 69.11 |
| 77084 | Magnetic image bone marrow | | S | 5581 | 3.7103 | $273.54 | $107.79 | $54.71 | $ 317.26 | $ 310.92 |
| 77085 | Dxa bone density study | | Q1 | 5522 | 1.3658 | $100.69 | | $20.14 | $ 116.78 | $ 114.45 |
| 77086 | Fracture assessment via dxa | | Q1 | 5521 | 0.8247 | $60.80 | | $12.16 | $ 70.52 | $ 69.11 |
| 77261 | Radiation therapy planning | | B | | | | | | $ - | $ - |
| 77262 | Radiation therapy planning | | B | | | | | | $ - | $ - |
| 77263 | Radiation therapy planning | | B | | | | | | $ - | $ - |
| 77280 | Set radiation therapy field | CH | S | 5612 | 2.2604 | $166.65 | $50.33 | $33.33 | $ 193.29 | $ 189.42 |
| 77285 | Set radiation therapy field | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77290 | Set radiation therapy field | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |



Exhibit 3

Hospital APC - Final Rules for 2016 — 10/30/2015

| Enter city county to the right | Los Angeles-Long Beach-Glendale, CA | Enter wage Index here from Wage Index tab below | 1.2664 | Courtesy of AMAC 770-693-6031 info.amac@amac-usa.com |
|---|---|---|---|---|

Addendum B.-Final OPPS Payment by HCPCS Code for CY 2016

| HCPCS Code | Short Descriptor | CI | SI | APC | Relative Weight | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment | Regional Selected APC Payment Rate for your location | Regional Selected APC Payment Rate for your location w/ Sequestration |
|---|---|---|---|---|---|---|---|---|---|---|
| 77293 | Respirator motion mgmt simul | | N | | | | | | $ - | $ - |
| 77295 | 3-d radiotherapy plan | CH | S | 5614 | 13.9276 | $1,026.81 | $321.60 | $205.37 | $ 1,190.94 | $ 1,167.12 |
| 77299 | Radiation therapy planning | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77300 | Radiation therapy dose plan | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77301 | Radiotherapy dose plan imrt | CH | S | 5614 | 13.9276 | $1,026.81 | $321.60 | $205.37 | $ 1,190.94 | $ 1,167.12 |
| 77306 | Telethx isodose plan simple | CH | S | 5612 | 2.2604 | $166.65 | $50.33 | $33.33 | $ 193.29 | $ 189.42 |
| 77307 | Telethx isodose plan cplx | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77316 | Brachytx isodose plan simple | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77317 | Brachytx isodose intermed | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77318 | Brachytx isodose complex | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77321 | Special teletx port plan | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77331 | Special radiation dosimetry | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77332 | Radiation treatment aid(s) | CH | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77333 | Radiation treatment aid(s) | CH | S | 5612 | 2.2604 | $166.65 | $50.33 | $33.33 | $ 193.29 | $ 189.42 |
| 77334 | Radiation treatment aid(s) | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77336 | Radiation physics consult | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77338 | Design mlc device for imrt | CH | S | 5613 | 3.9575 | $291.77 | $82.35 | $58.36 | $ 338.41 | $ 331.64 |
| 77370 | Radiation physics consult | CH | S | 5612 | 2.2604 | $166.65 | $50.33 | $33.33 | $ 193.29 | $ 189.42 |
| 77371 | Srs multisource | CH | J1 | 5627 | 99.0199 | $7,300.24 | | $1,460.05 | $ 8,467.11 | $ 8,297.77 |
| 77372 | Srs linear based | CH | J1 | 5627 | 99.0199 | $7,300.24 | | $1,460.05 | $ 8,467.11 | $ 8,297.77 |
| 77373 | Sbrt delivery | CH | S | 5626 | 22.6777 | $1,671.91 | | $334.39 | $ 1,939.15 | $ 1,900.37 |
| 77385 | Ntsty modul rad tx dlvr smpl | | S | 5623 | 6.8567 | $505.51 | | $101.11 | $ 586.31 | $ 574.58 |
| 77386 | Ntsty modul rad tx dlvr cplx | | S | 5623 | 6.8567 | $505.51 | | $101.11 | $ 586.31 | $ 574.58 |
| 77387 | Guidance for radiaj tx dlvr | | N | | | | | | $ - | $ - |
| 77399 | External radiation dosimetry | | S | 5611 | 1.4567 | $107.40 | $32.44 | $21.48 | $ 124.57 | $ 122.08 |
| 77401 | Radiation treatment delivery | | S | 5621 | 1.4966 | $110.34 | | $22.07 | $ 127.98 | $ 125.42 |
| 77402 | Radiation treatment delivery | | S | 5621 | 1.4966 | $110.34 | | $22.07 | $ 127.98 | $ 125.42 |
| 77407 | Radiation treatment delivery | | S | 5621 | 1.4966 | $110.34 | | $22.07 | $ 127.98 | $ 125.42 |
| 77412 | Radiation treatment delivery | | S | 5622 | 2.6362 | $194.35 | | $38.87 | $ 225.41 | $ 220.91 |
| 77417 | Radiology port images(s) | | N | | | | | | $ - | $ - |
| 77422 | Neutron beam tx simple | | S | 5622 | 2.6362 | $194.35 | | $38.87 | $ 225.41 | $ 220.91 |
| 77423 | Neutron beam tx complex | CH | S | 5623 | 6.8567 | $505.51 | | $101.11 | $ 586.31 | $ 574.58 |
| 77424 | Io rad tx delivery by x-ray | | J1 | 5093 | 102.5127 | $7,557.75 | | $1,511.55 | $ 8,765.78 | $ 8,590.47 |
| 77425 | Io rad tx deliver by elctrns | | J1 | 5093 | 102.5127 | $7,557.75 | | $1,511.55 | $ 8,765.78 | $ 8,590.47 |
| 77427 | Radiation tx management x5 | | B | | | | | | $ - | $ - |
| 77431 | Radiation therapy management | | B | | | | | | $ - | $ - |
| 77432 | Stereotactic radiation trmt | | B | | | | | | $ - | $ - |



Exhibit 3

Hospital APC - Final Rules for 2016 | 10/30/2015

| Enter city county to the right | Los Angeles-Long Beach-Glendale, CA | Enter wage Index here from Wage Index tab below | 1.2664 | | Courtesy of AMAC 770-693-6031 info.amac@amac-usa.com |
|---|---|---|---|---|---|

Addendum B.-Final OPPS Payment by HCPCS Code for CY 2016

| HCPCS Code | Short Descriptor | CI | SI | APC | Relative Weight | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment | Regional Selected APC Payment Rate for your location | Regional Selected APC Payment Rate for your location w/ Sequestration |
|---|---|---|---|---|---|---|---|---|---|---|
| 77435 | Sbrt management | | N | | | | | | $ - | $ - |
| 77469 | Io radiation tx management | | B | | | | | | $ - | $ - |
| 77470 | Special radiation treatment | | S | 5623 | 6.8567 | $505.51 | . | $101.11 | $ 586.31 | $ 574.58 |
| 77499 | Radiation therapy management | | B | | | | | | $ - | $ - |
| 77520 | Proton trmt simple w/o comp | | S | 5623 | 6.8567 | $505.51 | . | $101.11 | $ 586.31 | $ 574.58 |
| 77522 | Proton trmt simple w/comp | CH | S | 5625 | 15.6079 | $1,150.69 | . | $230.14 | $ 1,334.62 | $ 1,307.92 |
| 77523 | Proton trmt intermediate | CH | S | 5625 | 15.6079 | $1,150.69 | . | $230.14 | $ 1,334.62 | $ 1,307.92 |
| 77525 | Proton treatment complex | CH | S | 5625 | 15.6079 | $1,150.69 | . | $230.14 | $ 1,334.62 | $ 1,307.92 |



Exhibit 3

| Enter Location below | Work Expense | Practice Expense | Malpractice Expense | | | 2016 Final Rule | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | 1.047 | 1.161 | 0.908 | | | | | RELEASED 10-30-15 | | | |
| Conversion factor (CF) | | $35.82790 | 2016 Final Rule effective 1/1/2016 | 770-693-6031 | | | | | | | |
| Addendum B – Relative Value Units and Related Information Used in CY 2016 Final Rule | | | | | | | | | | | |
| 77011 | | A | Ct scan for localization | 1.21 | 4.98 | NA | 0.08 | 6.27 | NA | XXX | $255.14 |
| 77011 | TC | A | Ct scan for localization | 0.00 | 4.48 | NA | 0.01 | 4.49 | NA | XXX | $186.68 |
| 77011 | 26 | A | Ct scan for localization | 1.21 | 0.50 | 0.50 | 0.07 | 1.78 | 1.78 | XXX | $68.46 |
| 77012 | | A | Ct scan for needle biopsy | 1.16 | 2.26 | NA | 0.08 | 3.50 | NA | XXX | $140.12 |
| 77012 | TC | A | Ct scan for needle biopsy | 0.00 | 1.86 | NA | 0.01 | 1.87 | NA | XXX | $77.69 |
| 77012 | 26 | A | Ct scan for needle biopsy | 1.16 | 0.40 | 0.40 | 0.07 | 1.63 | 1.63 | XXX | $62.43 |
| 77013 | | C | Ct guide for tissue ablation | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77013 | TC | C | Ct guide for tissue ablation | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77013 | 26 | A | Ct guide for tissue ablation | 3.99 | 1.34 | 1.34 | 0.23 | 5.56 | 5.56 | XXX | $212.89 |
| 77014 | | A | Ct scan for therapy guide | 0.85 | 2.42 | NA | 0.05 | 3.32 | NA | XXX | $134.17 |
| 77014 | TC | A | Ct scan for therapy guide | 0.00 | 2.07 | NA | 0.01 | 2.08 | NA | XXX | $86.43 |
| 77014 | 26 | A | Ct scan for therapy guide | 0.85 | 0.35 | 0.35 | 0.04 | 1.24 | 1.24 | XXX | $47.74 |
| 77021 | | A | Mr guidance for needle place | 1.50 | 9.72 | NA | 0.10 | 11.32 | NA | XXX | $463.84 |
| 77021 | TC | A | Mr guidance for needle place | 0.00 | 9.18 | NA | 0.01 | 9.19 | NA | XXX | $382.18 |
| 77021 | 26 | A | Mr guidance for needle place | 1.50 | 0.54 | 0.54 | 0.09 | 2.13 | 2.13 | XXX | $81.66 |
| 77022 | | C | Mri for tissue ablation | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77022 | TC | C | Mri for tissue ablation | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77022 | 26 | A | Mri for tissue ablation | 4.24 | 1.54 | 1.54 | 0.26 | 6.04 | 6.04 | XXX | $231.57 |
| 77051 | | A | Computer dx mammogram add-on | 0.06 | 0.17 | NA | 0.00 | 0.23 | NA | ZZZ | $9.32 |
| 77051 | TC | A | Computer dx mammogram add-on | 0.00 | 0.15 | NA | 0.00 | 0.15 | NA | ZZZ | $6.24 |
| 77051 | 26 | A | Computer dx mammogram add-on | 0.06 | 0.02 | 0.02 | 0.00 | 0.08 | 0.08 | ZZZ | $3.08 |
| 77052 | | A | Comp screen mammogram add-on | 0.06 | 0.17 | NA | 0.00 | 0.23 | NA | ZZZ | $9.32 |
| 77052 | TC | A | Comp screen mammogram add-on | 0.00 | 0.15 | NA | 0.00 | 0.15 | NA | ZZZ | $6.24 |
| 77052 | 26 | A | Comp screen mammogram add-on | 0.06 | 0.02 | 0.02 | 0.00 | 0.08 | 0.08 | ZZZ | $3.08 |
| 77053 | | A | X-ray of mammary duct | 0.36 | 1.25 | NA | 0.03 | 1.64 | NA | XXX | $66.48 |
| 77053 | TC | A | X-ray of mammary duct | 0.00 | 1.12 | NA | 0.01 | 1.13 | NA | XXX | $46.91 |
| 77053 | 26 | A | X-ray of mammary duct | 0.36 | 0.13 | 0.13 | 0.02 | 0.51 | 0.51 | XXX | $19.56 |
| 77054 | | A | X-ray of mammary ducts | 0.45 | 1.67 | NA | 0.04 | 2.16 | NA | XXX | $87.65 |
| 77054 | TC | A | X-ray of mammary ducts | 0.00 | 1.50 | NA | 0.01 | 1.51 | NA | XXX | $62.72 |
| 77054 | 26 | A | X-ray of mammary ducts | 0.45 | 0.17 | 0.17 | 0.03 | 0.65 | 0.65 | XXX | $24.93 |
| 77055 | | A | Mammogram one breast | 0.70 | 1.78 | NA | 0.05 | 2.53 | NA | XXX | $101.93 |
| 77055 | TC | A | Mammogram one breast | 0.00 | 1.52 | NA | 0.01 | 1.53 | NA | XXX | $63.55 |
| 77055 | 26 | A | Mammogram one breast | 0.70 | 0.26 | 0.26 | 0.04 | 1.00 | 1.00 | XXX | $38.37 |



Exhibit 3

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 23 of 87 Page ID #:1965

| Enter Location below | Work Expense | Practice Expense | Malpractice Expense | | | 2016 Final Rule | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | 1.047 | 1.161 | 0.908 | | | | | RELEASED 10-30-15 | | | |
| Conversion factor (CF) | | $35.82790 | 2016 Final Rule effective 1/1/2016 | 770-693-6031 | | | | | | | |
| Addendum B – Relative Value Units and Related Information Used in CY 2016 Final Rule | | | | | | | | | | | |
| 77056 | | A | Mammogram both breasts | 0.87 | 2.32 | NA | 0.06 | 3.25 | NA | XXX | $131.09 |
| 77056 | TC | A | Mammogram both breasts | 0.00 | 2.00 | NA | 0.01 | 2.01 | NA | XXX | $83.52 |
| 77056 | 26 | A | Mammogram both breasts | 0.87 | 0.32 | 0.32 | 0.05 | 1.24 | 1.24 | XXX | $47.57 |
| 77057 | | A | Mammogram screening | 0.70 | 1.57 | NA | 0.05 | 2.32 | NA | XXX | $93.19 |
| 77057 | TC | A | Mammogram screening | 0.00 | 1.31 | NA | 0.01 | 1.32 | NA | XXX | $54.82 |
| 77057 | 26 | A | Mammogram screening | 0.70 | 0.26 | 0.26 | 0.04 | 1.00 | 1.00 | XXX | $38.37 |
| 77058 | | A | Mri one breast | 1.63 | 13.35 | NA | 0.12 | 15.10 | NA | XXX | $620.36 |
| 77058 | TC | A | Mri one breast | 0.00 | 12.75 | NA | 0.03 | 12.78 | NA | XXX | $531.33 |
| 77058 | 26 | A | Mri one breast | 1.63 | 0.60 | 0.60 | 0.09 | 2.32 | 2.32 | XXX | $89.03 |
| 77059 | | A | Mri both breasts | 1.63 | 13.28 | NA | 0.12 | 15.03 | NA | XXX | $617.45 |
| 77059 | TC | A | Mri both breasts | 0.00 | 12.68 | NA | 0.03 | 12.71 | NA | XXX | $528.42 |
| 77059 | 26 | A | Mri both breasts | 1.63 | 0.60 | 0.60 | 0.09 | 2.32 | 2.32 | XXX | $89.03 |
| 77061 | | I | Breast tomosynthesis uni | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77061 | TC | I | Breast tomosynthesis uni | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77061 | 26 | I | Breast tomosynthesis uni | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77062 | | I | Breast tomosynthesis bi | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77062 | TC | I | Breast tomosynthesis bi | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77062 | 26 | I | Breast tomosynthesis bi | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77063 | | A | Breast tomosynthesis bi | 0.60 | 0.93 | NA | 0.04 | 1.57 | NA | ZZZ | $62.49 |
| 77063 | TC | A | Breast tomosynthesis bi | 0.00 | 0.71 | NA | 0.01 | 0.72 | NA | ZZZ | $29.86 |
| 77063 | 26 | A | Breast tomosynthesis bi | 0.60 | 0.22 | 0.22 | 0.03 | 0.85 | 0.85 | ZZZ | $32.63 |
| 77071 | | A | X-ray stress view | 0.41 | 0.89 | 0.89 | 0.07 | 1.37 | 1.37 | XXX | $54.68 |
| 77072 | | A | X-rays for bone age | 0.19 | 0.44 | NA | 0.02 | 0.65 | NA | XXX | $26.08 |
| 77072 | TC | A | X-rays for bone age | 0.00 | 0.37 | NA | 0.01 | 0.38 | NA | XXX | $15.72 |
| 77072 | 26 | A | X-rays for bone age | 0.19 | 0.07 | 0.07 | 0.01 | 0.27 | 0.27 | XXX | $10.36 |
| 77073 | | A | X-rays bone length studies | 0.27 | 0.72 | NA | 0.03 | 1.02 | NA | XXX | $41.05 |
| 77073 | TC | A | X-rays bone length studies | 0.00 | 0.60 | NA | 0.01 | 0.61 | NA | XXX | $25.28 |
| 77073 | 26 | A | X-rays bone length studies | 0.27 | 0.12 | 0.12 | 0.02 | 0.41 | 0.41 | XXX | $15.77 |
| 77074 | | A | X-rays bone survey limited | 0.45 | 1.32 | NA | 0.04 | 1.81 | NA | XXX | $73.09 |
| 77074 | TC | A | X-rays bone survey limited | 0.00 | 1.15 | NA | 0.01 | 1.16 | NA | XXX | $48.16 |
| 77074 | 26 | A | X-rays bone survey limited | 0.45 | 0.17 | 0.17 | 0.03 | 0.65 | 0.65 | XXX | $24.93 |
| 77075 | | A | X-rays bone survey complete | 0.54 | 1.88 | NA | 0.04 | 2.46 | NA | XXX | $99.76 |
| 77075 | TC | A | X-rays bone survey complete | 0.00 | 1.68 | NA | 0.01 | 1.69 | NA | XXX | $70.21 |
| 77075 | 26 | A | X-rays bone survey complete | 0.54 | 0.20 | 0.20 | 0.03 | 0.77 | 0.77 | XXX | $29.55 |
| 77076 | | A | X-rays bone survey infant | 0.70 | 1.95 | NA | 0.05 | 2.70 | NA | XXX | $109.00 |
| 77076 | TC | A | X-rays bone survey infant | 0.00 | 1.69 | NA | 0.01 | 1.70 | NA | XXX | $70.62 |
| 77076 | 26 | A | X-rays bone survey infant | 0.70 | 0.26 | 0.26 | 0.04 | 1.00 | 1.00 | XXX | $38.37 |
| 77077 | | A | Joint survey single view | 0.31 | 0.71 | NA | 0.03 | 1.05 | NA | XXX | $42.14 |
| 77077 | TC | A | Joint survey single view | 0.00 | 0.58 | NA | 0.01 | 0.59 | NA | XXX | $24.45 |
| 77077 | 26 | A | Joint survey single view | 0.31 | 0.13 | 0.13 | 0.02 | 0.46 | 0.46 | XXX | $17.69 |



Exhibit 3

| Enter Location below | Work Expense | Practice Expense | Malpractice Expense | | | | | 2016 Final Rule | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | 1.047 | 1.161 | 0.908 | | | | | RELEASED 10-30-15 | | | |
| Conversion factor (CF) | | $35.82790 | 2016 Final Rule effective 1/1/2016 | 770-693-6031 | | | | | | | |
| Addendum B – Relative Value Units and Related Information Used in CY 2016 Final Rule | | | | | | | | | | | |
| 77078 | | A | Ct bone density axial | 0.25 | 2.91 | NA | 0.02 | 3.18 | NA | XXX | $131.07 |
| 77078 | TC | A | Ct bone density axial | 0.00 | 2.82 | NA | 0.01 | 2.83 | NA | XXX | $117.63 |
| 77078 | 26 | A | Ct bone density axial | 0.25 | 0.09 | 0.09 | 0.01 | 0.35 | 0.35 | XXX | $13.45 |
| 77080 | | A | Dxa bone density axial | 0.20 | 0.94 | NA | 0.02 | 1.16 | NA | XXX | $47.25 |
| 77080 | TC | A | Dxa bone density axial | 0.00 | 0.86 | NA | 0.01 | 0.87 | NA | XXX | $36.10 |
| 77080 | 26 | A | Dxa bone density axial | 0.20 | 0.08 | 0.08 | 0.01 | 0.29 | 0.29 | XXX | $11.16 |
| 77081 | | A | Dxa bone density/peripheral | 0.22 | 0.55 | NA | 0.02 | 0.79 | NA | XXX | $31.78 |
| 77081 | TC | A | Dxa bone density/peripheral | 0.00 | 0.47 | NA | 0.01 | 0.48 | NA | XXX | $19.88 |
| 77081 | 26 | A | Dxa bone density/peripheral | 0.22 | 0.08 | 0.08 | 0.01 | 0.31 | 0.31 | XXX | $11.91 |
| 77084 | | A | Magnetic image bone marrow | 1.60 | 9.25 | NA | 0.11 | 10.96 | NA | XXX | $448.36 |
| 77084 | TC | A | Magnetic image bone marrow | 0.00 | 8.65 | NA | 0.02 | 8.67 | NA | XXX | $360.46 |
| 77084 | 26 | A | Magnetic image bone marrow | 1.60 | 0.60 | 0.60 | 0.09 | 2.29 | 2.29 | XXX | $87.90 |
| 77085 | | A | Dxa bone density study | 0.30 | 1.24 | NA | 0.03 | 1.57 | NA | XXX | $63.81 |
| 77085 | TC | A | Dxa bone density study | 0.00 | 1.13 | NA | 0.01 | 1.14 | NA | XXX | $47.33 |
| 77085 | 26 | A | Dxa bone density study | 0.30 | 0.11 | 0.11 | 0.02 | 0.43 | 0.43 | XXX | $16.48 |
| 77086 | | A | Fracture assessment via dxa | 0.17 | 0.81 | NA | 0.02 | 1.00 | NA | XXX | $40.72 |
| 77086 | TC | A | Fracture assessment via dxa | 0.00 | 0.74 | NA | 0.01 | 0.75 | NA | XXX | $31.11 |
| 77086 | 26 | A | Fracture assessment via dxa | 0.17 | 0.07 | 0.07 | 0.01 | 0.25 | 0.25 | XXX | $9.61 |
| 77261 | | A | Radiation therapy planning | 1.39 | 0.66 | 0.66 | 0.09 | 2.14 | 2.14 | XXX | $82.52 |
| 77262 | | A | Radiation therapy planning | 2.11 | 0.94 | 0.94 | 0.15 | 3.20 | 3.20 | XXX | $123.13 |
| 77263 | | A | Radiation therapy planning | 3.14 | 1.31 | 1.31 | 0.23 | 4.68 | 4.68 | XXX | $179.76 |
| 77280 | | A | Set radiation therapy field | 0.70 | 6.97 | NA | 0.04 | 7.71 | NA | XXX | $317.48 |
| 77280 | TC | A | Set radiation therapy field | 0.00 | 6.68 | NA | 0.01 | 6.69 | NA | XXX | $278.19 |
| 77280 | 26 | A | Set radiation therapy field | 0.70 | 0.29 | 0.29 | 0.03 | 1.02 | 1.02 | XXX | $39.30 |
| 77285 | | A | Set radiation therapy field | 1.05 | 11.05 | NA | 0.06 | 12.16 | NA | XXX | $500.98 |
| 77285 | TC | A | Set radiation therapy field | 0.00 | 10.61 | NA | 0.01 | 10.62 | NA | XXX | $441.66 |
| 77285 | 26 | A | Set radiation therapy field | 1.05 | 0.44 | 0.44 | 0.05 | 1.54 | 1.54 | XXX | $59.32 |
| 77290 | | A | Set radiation therapy field | 1.56 | 12.88 | NA | 0.08 | 14.52 | NA | XXX | $596.88 |
| 77290 | TC | A | Set radiation therapy field | 0.00 | 12.23 | NA | 0.01 | 12.24 | NA | XXX | $509.05 |
| 77290 | 26 | A | Set radiation therapy field | 1.56 | 0.65 | 0.65 | 0.07 | 2.28 | 2.28 | XXX | $87.83 |
| 77293 | | A | Respirator motion mgmt simul | 2.00 | 11.03 | NA | 0.11 | 13.14 | NA | ZZZ | $537.41 |
| 77293 | TC | A | Respirator motion mgmt simul | 0.00 | 10.20 | NA | 0.02 | 10.22 | NA | ZZZ | $424.93 |
| 77293 | 26 | A | Respirator motion mgmt simul | 2.00 | 0.83 | 0.83 | 0.09 | 2.92 | 2.92 | ZZZ | $112.48 |
| 77295 | | A | 3-d radiotherapy plan | 4.29 | 9.31 | NA | 0.23 | 13.83 | NA | XXX | $555.67 |
| 77295 | TC | A | 3-d radiotherapy plan | 0.00 | 7.52 | NA | 0.05 | 7.57 | NA | XXX | $314.43 |
| 77295 | 26 | A | 3-d radiotherapy plan | 4.29 | 1.79 | 1.79 | 0.18 | 6.26 | 6.26 | XXX | $241.24 |

| Enter Location below | Work Expense | Practice Expense | Malpractice Expense | | 2016 Final Rule | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | 1.047 | 1.161 | 0.908 | | | | RELEASED 10-30-15 | | | | |
| Conversion factor (CF) | | $35.82790 | 2016 Final Rule effective 1/1/2016 | 770-693-6031 | | | | | | | |
| Addendum B – Relative Value Units and Related Information Used in CY 2016 Final Rule | | | | | | | | | | | |
| 77299 | | C | Radiation therapy planning | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77299 | TC | C | Radiation therapy planning | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77299 | 26 | C | Radiation therapy planning | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77300 | | A | Radiation therapy dose plan | 0.62 | 1.22 | NA | 0.04 | 1.88 | NA | XXX | $75.31 |
| 77300 | TC | A | Radiation therapy dose plan | 0.00 | 0.96 | NA | 0.01 | 0.97 | NA | XXX | $40.26 |
| 77300 | 26 | A | Radiation therapy dose plan | 0.62 | 0.26 | 0.26 | 0.03 | 0.91 | 0.91 | XXX | $35.05 |
| 77301 | | A | Radiotherapy dose plan imrt | 7.99 | 46.51 | NA | 0.59 | 55.09 | NA | XXX | $2,253.55 |
| 77301 | TC | A | Radiotherapy dose plan imrt | 0.00 | 43.19 | NA | 0.25 | 43.44 | NA | XXX | $1,804.67 |
| 77301 | 26 | A | Radiotherapy dose plan imrt | 7.99 | 3.32 | 3.32 | 0.34 | 11.65 | 11.65 | XXX | $448.88 |
| 77306 | | A | Telethx isodose plan simple | 1.40 | 2.73 | NA | 0.08 | 4.21 | NA | XXX | $168.68 |
| 77306 | TC | A | Telethx isodose plan simple | 0.00 | 2.15 | NA | 0.02 | 2.17 | NA | XXX | $90.08 |
| 77306 | 26 | A | Telethx isodose plan simple | 1.40 | 0.58 | 0.58 | 0.06 | 2.04 | 2.04 | XXX | $78.59 |
| 77307 | | A | Telethx isodose plan cplx | 2.90 | 5.09 | NA | 0.15 | 8.14 | NA | XXX | $325.39 |
| 77307 | TC | A | Telethx isodose plan cplx | 0.00 | 3.88 | NA | 0.03 | 3.91 | NA | XXX | $162.37 |
| 77307 | 26 | A | Telethx isodose plan cplx | 2.90 | 1.21 | 1.21 | 0.12 | 4.23 | 4.23 | XXX | $163.02 |
| 77316 | | A | Brachytx isodose plan simple | 1.40 | 3.83 | NA | 0.09 | 5.32 | NA | XXX | $214.76 |
| 77316 | TC | A | Brachytx isodose plan simple | 0.00 | 3.24 | NA | 0.03 | 3.27 | NA | XXX | $135.75 |
| 77316 | 26 | A | Brachytx isodose plan simple | 1.40 | 0.59 | 0.59 | 0.06 | 2.05 | 2.05 | XXX | $79.01 |
| 77317 | | A | Brachytx isodose intermed | 1.83 | 4.97 | NA | 0.12 | 6.92 | NA | XXX | $279.28 |
| 77317 | TC | A | Brachytx isodose intermed | 0.00 | 4.21 | NA | 0.04 | 4.25 | NA | XXX | $176.42 |
| 77317 | 26 | A | Brachytx isodose intermed | 1.83 | 0.76 | 0.76 | 0.08 | 2.67 | 2.67 | XXX | $102.86 |
| 77318 | | A | Brachytx isodose complex | 2.90 | 6.92 | NA | 0.18 | 10.00 | NA | XXX | $402.49 |
| 77318 | TC | A | Brachytx isodose complex | 0.00 | 5.71 | NA | 0.06 | 5.77 | NA | XXX | $239.47 |
| 77318 | 26 | A | Brachytx isodose complex | 2.90 | 1.21 | 1.21 | 0.12 | 4.23 | 4.23 | XXX | $163.02 |
| 77321 | | A | Special teletx port plan | 0.95 | 1.62 | NA | 0.05 | 2.62 | NA | XXX | $104.65 |
| 77321 | TC | A | Special teletx port plan | 0.00 | 1.22 | NA | 0.01 | 1.23 | NA | XXX | $51.07 |
| 77321 | 26 | A | Special teletx port plan | 0.95 | 0.40 | 0.40 | 0.04 | 1.39 | 1.39 | XXX | $53.58 |
| 77331 | | A | Special radiation dosimetry | 0.87 | 0.88 | NA | 0.05 | 1.80 | NA | XXX | $70.87 |
| 77331 | TC | A | Special radiation dosimetry | 0.00 | 0.52 | NA | 0.01 | 0.53 | NA | XXX | $21.96 |
| 77331 | 26 | A | Special radiation dosimetry | 0.87 | 0.36 | 0.36 | 0.04 | 1.27 | 1.27 | XXX | $48.91 |
| 77332 | | A | Radiation treatment aid(s) | 0.54 | 1.78 | NA | 0.03 | 2.35 | NA | XXX | $95.27 |
| 77332 | TC | A | Radiation treatment aid(s) | 0.00 | 1.54 | NA | 0.01 | 1.55 | NA | XXX | $64.38 |
| 77332 | 26 | A | Radiation treatment aid(s) | 0.54 | 0.24 | 0.24 | 0.02 | 0.80 | 0.80 | XXX | $30.89 |
| 77333 | | A | Radiation treatment aid(s) | 0.84 | 0.61 | NA | 0.05 | 1.50 | NA | XXX | $58.51 |
| 77333 | TC | A | Radiation treatment aid(s) | 0.00 | 0.26 | NA | 0.01 | 0.27 | NA | XXX | $11.14 |
| 77333 | 26 | A | Radiation treatment aid(s) | 0.84 | 0.35 | 0.35 | 0.04 | 1.23 | 1.23 | XXX | $47.37 |
| 77334 | | A | Radiation treatment aid(s) | 1.24 | 3.00 | NA | 0.06 | 4.30 | NA | XXX | $173.26 |
| 77334 | TC | A | Radiation treatment aid(s) | 0.00 | 2.48 | NA | 0.01 | 2.49 | NA | XXX | $103.48 |
| 77334 | 26 | A | Radiation treatment aid(s) | 1.24 | 0.52 | 0.52 | 0.05 | 1.81 | 1.81 | XXX | $69.77 |
| 77336 | | A | Radiation physics consult | 0.00 | 2.17 | NA | 0.07 | 2.24 | NA | XXX | $92.54 |



Exhibit 3

| Enter Location below | Work Expense | Practice Expense | Malpractice Expense | | | 2016 Final Rule | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | 1.047 | 1.161 | 0.908 | | | | | RELEASED 10-30-15 | | | |
| Conversion factor (CF) | $35.82790 | 2016 Final Rule effective 1/1/2016 | | 770-693-6031 | | | | | | | |
| Addendum B – Relative Value Units and Related Information Used in CY 2016 Final Rule | | | | | | | | | | | |
| 77338 | | A | Design mlc device for imrt | 4.29 | 9.79 | NA | 0.24 | 14.32 | NA | XXX | $575.96 |
| 77338 | TC | A | Design mlc device for imrt | 0.00 | 8.00 | NA | 0.06 | 8.06 | NA | XXX | $334.72 |
| 77338 | 26 | A | Design mlc device for imrt | 4.29 | 1.79 | 1.79 | 0.18 | 6.26 | 6.26 | XXX | $241.24 |
| 77370 | | A | Radiation physics consult | 0.00 | 3.31 | NA | 0.12 | 3.43 | NA | XXX | $141.59 |
| 77371 | | C | Srs multisource | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77372 | | A | Srs linear based | 0.00 | 30.09 | NA | 0.16 | 30.25 | NA | XXX | $1,256.83 |
| 77373 | | A | Sbrt delivery | 0.00 | 38.24 | NA | 0.20 | 38.44 | NA | XXX | $1,597.14 |
| 77385 | | I | Ntsty modul rad tx dlvr smpl | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77386 | | I | Ntsty modul rad tx dlvr cplx | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77387 | | I | Guidance for radiaj tx dlvr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77399 | | C | External radiation dosimetry | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77399 | TC | C | External radiation dosimetry | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77399 | 26 | C | External radiation dosimetry | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77401 | | A | Radiation treatment delivery | 0.00 | 0.68 | NA | 0.01 | 0.69 | NA | XXX | $28.61 |
| 77402 | | I | Radiation treatment delivery | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77407 | | I | Radiation treatment delivery | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77412 | | I | Radiation treatment delivery | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77417 | | A | Radiology port images(s) | 0.00 | 0.30 | NA | 0.01 | 0.31 | NA | XXX | $12.80 |
| 77422 | | C | Neutron beam tx simple | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77423 | | C | Neutron beam tx complex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77424 | | X | Io rad tx delivery by x-ray | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77425 | | X | Io rad tx deliver by elctrns | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77427 | | A | Radiation tx management x5 | 3.37 | 1.63 | 1.63 | 0.24 | 5.24 | 5.24 | XXX | $202.02 |
| 77431 | | A | Radiation therapy management | 1.81 | 0.94 | 0.94 | 0.13 | 2.88 | 2.88 | XXX | $111.23 |
| 77432 | | A | Stereotactic radiation trmt | 7.92 | 3.29 | 3.29 | 0.58 | 11.79 | 11.79 | XXX | $452.81 |
| 77435 | | A | Sbrt management | 11.87 | 5.05 | 5.05 | 0.87 | 17.79 | 17.79 | XXX | $683.63 |
| 77469 | | A | Io radiation tx management | 5.75 | NA | 2.96 | 0.38 | NA | 9.09 | XXX | #VALUE! |
| 77470 | | A | Special radiation treatment | 2.09 | 2.21 | NA | 0.11 | 4.41 | NA | XXX | $173.91 |
| 77470 | TC | A | Special radiation treatment | 0.00 | 1.34 | NA | 0.02 | 1.36 | NA | XXX | $56.39 |
| 77470 | 26 | A | Special radiation treatment | 2.09 | 0.87 | 0.87 | 0.09 | 3.05 | 3.05 | XXX | $117.52 |
| 77499 | | C | Radiation therapy management | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77499 | TC | C | Radiation therapy management | 0.00 | 0.00 | NA | 0.00 | 0.00 | NA | XXX | $0.00 |
| 77499 | 26 | C | Radiation therapy management | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77520 | | C | Proton trmt simple w/o comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77522 | | C | Proton trmt simple w/comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77523 | | C | Proton trmt intermediate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |
| 77525 | | C | Proton treatment complex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | XXX | $0.00 |



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Disease Site Summary
FINAL

The following pages in the financial model are set for each disease site, the standard clinica protocol, relevant CPT code for each component of the treatment pathway, the units of service delivered and the Medicare reimbursement for each component. Each component is further broken down into the concomitant Professional and Technical component, where necessary

Each disease site shown is in accordance with the ICD-10 code for such site

A total reimbursement value is shown for each disease site, with the Professional and Technica component being shown separately.

Warning: Reimbursement policies vary widely from insurer to insurer and reimbursement policies of the same insurance may vary in different sections of the United States. As reimbursement policies are subject to change, AMAC® 770-693-6031 will endeavor, on a periodic basis, to review and revise, as necessary, all pertinent reimbursement information. Therefore, the information contained herein (while accurate at the time of print) may not be accurate at the time of use. Prior to submission of a claim for reimbursement, the user should contact the insurer (i.e., Medicare, Medicaid or private payer) to verify applicable codes and reimbursement levels.

PLEASE NOTE: All five-digit numeric CPT codes, descriptions, instructions and guidelines are Copyright of the American Medical Associatio To purchase AMA's products please contact the American Medical Association at 800-634-6922. AMAC® 770-693-6031 assumes no responsibility for the consequences related to the use of information contained in this publication. All codes presented in this guide are for informational purposes only. Presented is a menu of codes intended for treatment prescription guidelines. AMAC® 770-693-6031 realizes there are variations between physicians and hospitals concerning the performance of procedures, depending upon physician technique and/o education/training. All codes and descriptions are excerpted from the AMA CPT-4 Codebook, AMA case studies and the Radiation Oncology Coding User's Guide. DRG guidelines will determine inpatient reimbursement for Medicare recipients. Only the specific services performed b the healthcare provider should be billed. Procedures and/or other operative reports should be detailed, dictated, signed, and placed in the medical chart.

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Bladder - Urinary Tract**
**FINAL**

| | | Proton Bladder - Urinary Tract Professional | | | Proton Bladder - Urinary Tract APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $41,387 |

| Global Reimbursement | $43,731 |
|---|---|

**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Brain and ONS - Head and Neck**
**FINAL**

| | | Proton Brain and ONS - Head and Neck Professional | | | Proton Brain and ONS - Head and Neck APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Breast - Both**
**FINAL**

| | | Proton Breast - Both Professional | | | Proton Breast - Both APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 31 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 32 | $1,334.62 | $42,707.72 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $46,725 |

| Global Reimbursement | $49,069 |
|---|---|

**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Cervix**
**FINAL**

| | | Proton Cervix Professional | | | Proton Cervix APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $41,387 |

| Global Reimbursement | $43,731 |
|---|---|

**Exhibit 3**



CONFIDENTIAL

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Childhood - Pediatric**
**FINAL**

| | | Proton Childhood - Pediatric Professional | | | Proton Childhood - Pediatric APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 31 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 32 | $1,334.62 | $42,707.72 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $46,850 |

| | |
|---|---|
| Global Reimbursement | $49,396 |

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Colon adn Rectum**
**FINAL**

| | | Proton Colon adn Rectum Professional | | | Proton Colon adn Rectum APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 7285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| '7290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|

**Exhibit 3**

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Disease Site Revenue Calculation - Esophageal
FINAL

| | | Proton Esophageal Professional | | | Proton Esophageal APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 28 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trnt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trnt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trnt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $50,729 |

| Global Reimbursement | $53,073 |
|---|---|

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Kidney - Renal - Pelvis**
**FINAL**

| | | Proton Kidney - Renal - Pelvis Professional | | | Proton Kidney - Renal - Pelvis APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $41,387 |

| Global Reimbursement | $43,731 |
|---|---|



**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Leukemia**
**FINAL**

| | | Proton Leukemia Professional | | | Proton Leukemia APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 28 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $50,729 |

| Global Reimbursement | $53,073 |
|---|---|



**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Liver - Bile Duct**
**FINAL**

| | | Proton Liver - Bile Duct Professional | | | Proton Liver - Bile Duct APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $41,387 |

| Global Reimbursement | $43,731 |
|---|---|



**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Lung and Bronchus**
**FINAL**

| | | Proton Lung and Bronchus Professional | | | Proton Lung and Bronchus APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|

**Exhibit 3**





CONFIDENTIAL

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Melanoma**
**FINAL**

| | | Proton Melanoma Professional | | | Proton Melanoma APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $41,387 |

| | |
|---|---|
| Global Reimbursement | $43,731 |



**Exhibit 3**

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 40 of 87 Page ID #:1982

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Disease Site Revenue Calculation - Non-Hodgkin's Lymphoma
FINAL

| | | Proton Non-Hodgkin's Lymphoma Professional | | | Proton Non-Hodgkin's Lymphoma APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 27 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 28 | $1,334.62 | $37,369.26 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 6 | $1,334.62 | $8,007.70 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $49,519 |

| Global Reimbursement | $52,065 |
|---|---|

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Oral Cavity and Pharynx**
**FINAL**

| | | Proton Oral Cavity and Pharynx Professional | | | Proton Oral Cavity and Pharynx APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|

Page 40 of 86

**Exhibit 3**

**Page 88**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Ovarian**
**FINAL**

| | | Proton Ovarian Professional | | | Proton Ovarian APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 29 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 30 | $1,334.62 | $40,038.49 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $44,056 |

| | |
|---|---|
| Global Reimbursement | $46,400 |

**Exhibit 3**

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Pancreatic**
**FINAL**

| | | Proton Pancreatic Professional | | | Proton Pancreatic APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Prostate**
**FINAL**

| | | Proton Prostate Professional | | | Proton Prostate APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 9 | $124.57 | $1,121.10 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 41 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 9 | $202.02 | $1,818.22 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 42 | $1,334.62 | $56,053.88 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,950 | | | $60,445 |

| Global Reimbursement | $63,395 |
|---|---|

**Exhibit 3**

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Disease Site Revenue Calculation - Stomach and Digestive System
FINAL

| | | Proton Stomach and Digestive System Professional | | | Proton Stomach and Digestive System APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 28 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $50,729 |

| | |
|---|---|
| Global Reimbursement | $53,073 |



Exhibit 3

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 46 of 87 Page ID
#:1988

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Thyroid**
**FINAL**

| | | Proton Thyroid Professional | | | Proton Thyroid APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 28 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | **Proton trnt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trnt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trnt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $50,729 |

| | |
|---|---|
| Global Reimbursement | $53,073 |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Disease Site Revenue Calculation - Uterine
FINAL

| | | Proton Uterine Professional | | | Proton Uterine APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 6 | $124.57 | $747.40 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 29 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 6 | $202.02 | $1,212.15 | 0 | | $0.00 |
| 77520 | Proton trmt, simple w/o comp | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | Proton trmt, simple w/comp | 0 | | $0.00 | 30 | $1,334.62 | $40,038.49 |
| 77523 | Proton trmt, intermediate | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | Proton treatment, complex | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,344 | | | $44,056 |

| Global Reimbursement | $46,400 |
|---|---|



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Disease Site Revenue Calculation - Other Disease Sites**
**FINAL**

| | | Proton Other Disease Sites - Professional | | | Proton Other Disease Sites - APC Technical | | |
|---|---|---|---|---|---|---|---|
| | | | Medicare 100.00% | | | Medicare 100.00% | |
| CPT HCPCS Code | Description | UNIT TOTAL QUANTITY PER PATIENT | Medicare Allowable Professional | Total | UNIT TOTAL QUANTITY PER PATIENT | Medicare Hospital APC Payment Rate | Total |
| 77014 | CT Guidance for Placement of RTX Fields (TC only) | 0 | $47.74 | $0.00 | 0 | $0.00 | $0.00 |
| 76000 | Fluoroscope examination | 0 | $54.36 | $0.00 | 0 | | $0.00 |
| 77263 | Comples Clinical Treatmetnt | 1 | $179.76 | $179.76 | 1 | | $0.00 |
| 77280 | Simple Simulation | 1 | $39.30 | $39.30 | 1 | $193.29 | $193.29 |
| 77285 | Intermediate Simulation | 0 | $59.32 | $0.00 | 0 | $338.41 | $0.00 |
| 77290 | Complex Simulation | 1 | $87.83 | $87.83 | 1 | $338.41 | $338.41 |
| 77293 | Respirator motion mgmt. simul | 0 | $112.48 | $0.00 | 0 | $0.00 | $0.00 |
| 77295 | 3-d radiotherapy plan | 1 | $112.48 | $112.48 | 1 | $1,190.94 | $1,190.94 |
| 77299 | Radiation therapy planning | 0 | $241.24 | $0.00 | 0 | $124.57 | $0.00 |
| 77300 | Radiation therapy dose plan | 2 | $35.05 | $70.10 | 2 | $124.57 | $249.13 |
| 77301 | Radiotherapy dose plan imrt | 0 | $448.88 | $0.00 | 0 | $1,190.94 | $0.00 |
| 77306 | Telethx isodose plan simple | 0 | $78.59 | $0.00 | 0 | $193.29 | $0.00 |
| 77307 | Telethx isodose plan cplx | 0 | $163.02 | $0.00 | 0 | $338.41 | $0.00 |
| 77321 | Special Teletherapy Port Plan | 1 | $53.58 | $53.58 | 1 | $338.41 | $338.41 |
| 77331 | Special Dosimetry | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77332 | Simple Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77333 | Intermedicate Treatment Device | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77334 | Complex Treatment Device | 3 | $48.91 | $146.73 | 3 | $124.57 | $373.70 |
| 77336 | Weekly Physics | 0 | | $0.00 | 7 | $124.57 | $871.97 |
| 77370 | Special Physics Consult | 1 | | $0.00 | 0 | | $0.00 |
| 77470 | Special Treatment Procedure | 1 | $56.39 | $56.39 | 1 | $586.31 | $586.31 |
| 77417 | Port Films | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77421 | KV-MV stereoscopic X ray guidance | 0 | | $0.00 | 0 | | $0.00 |
| 77387 | Guidance for radiaj tx dlvr | 0 | $0.00 | $0.00 | 34 | $0.00 | $0.00 |
| G6002 | Stereoscopic x-ray guidance | 34 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 77427 | Weekly Management | 7 | $202.02 | $1,414.17 | 0 | | $0.00 |
| 77520 | **Proton trmt, simple w/o comp** | 0 | | $0.00 | 0 | $586.31 | $0.00 |
| 77522 | **Proton trmt, simple w/comp** | 0 | | $0.00 | 35 | $1,334.62 | $46,711.57 |
| 77523 | **Proton trmt, intermediate** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 77525 | **Proton treatment, complex** | 0 | | $0.00 | 0 | $1,334.62 | $0.00 |
| 99205 | New Patient Visit | 1 | $226.51 | $226.51 | 0 | $0.00 | $0.00 |
| G0463 | Hospital clinic visit Medicare | 0 | | $0.00 | 2 | | $0.00 |
| 99215 | Follow up Visit | 1 | $159.32 | $159.32 | 0 | $0.00 | $0.00 |
| Total | | | | $2,546 | | | $50,854 |

| Global Reimbursement | $53,400 |
|---|---|



Exhibit 3

**Summary of Treatment Reimbursements**

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center

**Intensity Modulated Proton Therapy**
Total Course U.S. Medicare Reimbursement

| | | | Professional | Technical | Combined | Professional Revenue as a Percentage of Global |
|---|---|---|---|---|---|---|
| 1 | Bladder and Urinary Tract | A | $2,344.14 | $41,386.84 | $43,730.98 | 5.4% |
| 2 | Brain and ONS (Head and Neck)** | B | $2,546.16 | $50,853.72 | $53,399.88 | 4.8% |
| 3 | Breast (female) | C | $2,344.14 | $46,725.30 | $49,069.44 | 4.8% |
| 4 | Breast (female) (in situ) | | | | | |
| 5 | Cervix | D | $2,344.14 | $41,386.84 | $43,730.98 | 5.4% |
| 6 | Childhood, Ages <15 | | | | | |
| 7 | Childhood, Ages <20 | E | $2,546.16 | $46,849.87 | $49,396.03 | 5.2% |
| 8 | Colon and Rectum | F | $2,546.16 | $50,853.72 | $53,399.88 | 4.8% |
| 9 | Esophageal | G | $2,344.14 | $50,729.15 | $53,073.29 | 4.4% |
| 10 | Kidney and Renal Pelvis | H | $2,344.14 | $41,386.84 | $43,730.98 | 5.4% |
| 11 | Leukemia | I | $2,344.14 | $50,729.15 | $53,073.29 | 4.4% |
| 12 | Liver and Bile Duct | J | $2,344.14 | $41,386.84 | $43,730.98 | 5.4% |
| 13 | Lung and Bronchus | K | $2,546.16 | $50,853.72 | $53,399.88 | 4.8% |
| 14 | Melanoma | L | $2,344.14 | $41,386.84 | $43,730.98 | 5.4% |
| 15 | NON-Hodgkin's Lymphoma | M | $2,546.16 | $49,519.10 | $52,065.27 | 4.9% |
| 16 | Oral Cavity and Pharynx | N | $2,546.16 | $50,853.72 | $53,399.88 | 4.8% |
| 17 | Ovarian | O | $2,344.14 | $44,056.07 | $46,400.21 | 5.1% |
| 18 | Pancreatic | P | $2,546.16 | $50,853.72 | $53,399.88 | 4.8% |
| 19 | Prostate | Q | $2,950.21 | $60,445.17 | $63,395.38 | 4.7% |
| 20 | Stomach/Digestive | R | $2,344.14 | $50,729.15 | $53,073.29 | 4.4% |
| 21 | Thyroid | S | $2,344.14 | $50,729.15 | $53,073.29 | 4.4% |
| 22 | Uterine | T | $2,344.14 | $44,056.07 | $46,400.21 | 5.1% |
| 23 | Other Disease Sites | U | $2,546.16 | $50,729.15 | $53,275.32 | 4.8% |
| | | | | | $50,233.70 | |

All totals are based off of Average Number of Treatments, Medicare Reimbursement Rates, and a full course of treatment for each disease site as provided by AMAC.



**Exhibit 3**



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Payer Mix and Payer Benchmarking
FINAL

| Payer Mix | | Benchmark % of Medicare | Weighted Average* |
|---|---|---|---|
| Medicare | 40.0% | 95.0% | 38.0% |
| Commercial | 35.0% | 150.0% | 52.5% |
| Private/Cash Pay Patients | 25.0% | 200.0% | 50.0% |
| Total | 100.00% | *Weighted Avg. Payer Mix | 140.5% |

*Weighted average payer mix as a percentage of Medicare

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Revenue Calculation - Proton Therapy**
**FINAL**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| **Weighted-Average Payer Mix** | 140.5% | | | | | | | | |
| **Total Net Medicare Collections per Treatment:** | 100% | | | | | | | | |
| **% Change in Medicare Reimbursement (IMPT)** | 0.0% | -1.0% | -1.0% | -1.0% | -1.0% | -1.0% | -1.0% | -1.0% | -1.0% |
| | 100.0% | 99.0% | 98.0% | 97.0% | 96.1% | 95.1% | 94.1% | 93.2% | 92.3% |
| **% Change in Medicare Reimbursement (Non-IMPT)** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Reimbursement by Disease Site** | | | | | | | | | |
| Bladder and Urinary Tract | $58,148.51 | $57,567.02 | $56,991.35 | $56,421.44 | $55,857.22 | $55,298.65 | $54,745.66 | $54,198.21 | $53,656.23 |
| Brain and ONS (Head and Neck)** | $71,449.47 | $70,734.98 | $70,027.63 | $69,327.35 | $68,634.08 | $67,947.74 | $67,268.26 | $66,595.58 | $65,929.62 |
| Breast (female) | $65,649.05 | $64,992.56 | $64,342.63 | $63,699.21 | $63,062.22 | $62,431.59 | $61,807.28 | $61,189.20 | $60,577.31 |
| Breast (female) (in situ) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cervix | $58,148.51 | $57,567.02 | $56,991.35 | $56,421.44 | $55,857.22 | $55,298.65 | $54,745.66 | $54,198.21 | $53,656.23 |
| Childhood, Ages <15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Childhood, Ages <20 | $65,824.07 | $65,165.83 | $64,514.17 | $63,869.03 | $63,230.34 | $62,598.03 | $61,972.05 | $61,352.33 | $60,738.81 |
| Colon and Rectum | $71,449.47 | $70,734.98 | $70,027.63 | $69,327.35 | $68,634.08 | $67,947.74 | $67,268.26 | $66,595.58 | $65,929.62 |
| Esophageal | $71,274.46 | $70,561.71 | $69,856.10 | $69,157.54 | $68,465.96 | $67,781.30 | $67,103.49 | $66,432.45 | $65,768.13 |
| Kidney and Renal Pelvis | $58,148.51 | $57,567.02 | $56,991.35 | $56,421.44 | $55,857.22 | $55,298.65 | $54,745.66 | $54,198.21 | $53,656.23 |
| Leukemia | $71,274.46 | $70,561.71 | $69,856.10 | $69,157.54 | $68,465.96 | $67,781.30 | $67,103.49 | $66,432.45 | $65,768.13 |
| Liver and Bile Duct | $58,148.51 | $57,567.02 | $56,991.35 | $56,421.44 | $55,857.22 | $55,298.65 | $54,745.66 | $54,198.21 | $53,656.23 |
| Lung and Bronchus | $71,449.47 | $70,734.98 | $70,027.63 | $69,327.35 | $68,634.08 | $67,947.74 | $67,268.26 | $66,595.58 | $65,929.62 |
| Melanoma | $58,148.51 | $57,567.02 | $56,991.35 | $56,421.44 | $55,857.22 | $55,298.65 | $54,745.66 | $54,198.21 | $53,656.23 |
| NON-Hodgkin's Lymphoma | $69,574.34 | $68,878.59 | $68,189.81 | $67,507.91 | $66,832.83 | $66,164.50 | $65,502.86 | $64,847.83 | $64,199.35 |
| Oral Cavity and Pharynx | $71,449.47 | $70,734.98 | $70,027.63 | $69,327.35 | $68,634.08 | $67,947.74 | $67,268.26 | $66,595.58 | $65,929.62 |
| Ovarian | $61,898.78 | $61,279.79 | $60,666.99 | $60,060.32 | $59,459.72 | $58,865.12 | $58,276.47 | $57,693.71 | $57,116.77 |
| Pancreatic | $71,449.47 | $70,734.98 | $70,027.63 | $69,327.35 | $68,634.08 | $67,947.74 | $67,268.26 | $66,595.58 | $65,929.62 |
| Prostate | $84,925.46 | $84,076.20 | $83,235.44 | $82,403.09 | $81,579.06 | $80,763.27 | $79,955.63 | $79,156.08 | $78,364.52 |
| Stomach/Digestive | $71,274.46 | $70,561.71 | $69,856.10 | $69,157.54 | $68,465.96 | $67,781.30 | $67,103.49 | $66,432.45 | $65,768.13 |
| Thyroid | $71,274.46 | $70,561.71 | $69,856.10 | $69,157.54 | $68,465.96 | $67,781.30 | $67,103.49 | $66,432.45 | $65,768.13 |
| Uterine | $61,898.78 | $61,279.79 | $60,666.99 | $60,060.32 | $59,459.72 | $58,865.12 | $58,276.47 | $57,693.71 | $57,116.77 |
| Other Disease Sites | $71,274.46 | $70,561.71 | $69,856.10 | $69,157.54 | $68,465.96 | $67,781.30 | $67,103.49 | $66,432.45 | $65,768.13 |



Exhibit 3



CONFIDENTIAL



**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Revenue Calculation - Proton Therapy**
**FINAL**

| Forecasted Volumes by Disease Sites: | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| Bladder and Urinary Tract | 11.4 | 32.2 | 53.0 | 62.4 | 62.4 | 62.4 | 62.4 | 62.4 | 62.4 |
| Brain and ONS (Head and Neck)** | 3.2 | 9.1 | 14.9 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 | 17.6 |
| Breast (female) | 25.0 | 76.6 | 133.3 | 158.7 | 158.7 | 158.7 | 158.7 | 158.7 | 158.7 |
| Breast (female) (in situ) | - | 7.6 | 21.4 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 | 27.6 |
| Cervix | 1.2 | 3.3 | 5.4 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 |
| Childhood, Ages <15 | - | - | - | - | - | - | - | - | - |
| Childhood, Ages <20 | 8.3 | 23.3 | 38.4 | 45.1 | 45.1 | 45.1 | 45.1 | 45.1 | 45.1 |
| Colon and Rectum | 15.2 | 51.0 | 93.6 | 112.8 | 112.8 | 112.8 | 112.8 | 112.8 | 112.8 |
| Esophageal | 1.7 | 4.9 | 8.0 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 | 9.5 |
| Kidney and Renal Pelvis | 7.9 | 22.3 | 36.7 | 43.2 | 43.2 | 43.2 | 43.2 | 43.2 | 43.2 |
| Leukemia | - | - | - | - | - | - | - | - | - |
| Liver and Bile Duct | 1.8 | 5.2 | 8.5 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Lung and Bronchus | 10.7 | 57.7 | 127.2 | 158.4 | 158.4 | 158.4 | 158.4 | 158.4 | 158.4 |
| Melanoma | - | - | - | - | - | - | - | - | - |
| NON-Hodgkin's Lymphoma | - | - | - | - | - | - | - | - | - |
| Oral Cavity and Pharynx | 4.9 | 13.8 | 22.8 | 26.8 | 26.8 | 26.8 | 26.8 | 26.8 | 26.8 |
| Ovarian | 2.4 | 6.8 | 11.2 | 13.2 | 13.2 | 13.2 | 13.2 | 13.2 | 13.2 |
| Pancreatic | 4.4 | 12.4 | 20.4 | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 |
| Prostate | 88.0 | 194.2 | 256.3 | 284.3 | 284.3 | 284.3 | 284.3 | 284.3 | 284.3 |
| Stomach/Digestive | 1.5 | 4.3 | 7.1 | 8.4 | 8.4 | 8.4 | 8.4 | 8.4 | 8.4 |
| Thyroid | - | - | - | - | - | - | - | - | - |
| Uterine | 6.2 | 17.6 | 28.9 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| Other Disease Sites | 26.0 | 77.7 | 132.8 | 157.7 | 157.7 | 157.7 | 157.7 | 157.7 | 157.7 |
| | 220.0 | 620.1 | 1,020.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 |

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Revenue Calculation - Proton Therapy
FINAL

| Forecasted Revenue by Disease Site: | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|
| Bladder and Urinary Tract | $664,840 | $1,854,903 | $3,020,985 | $3,518,578 | $3,483,393 | $3,448,559 | $3,414,073 | $3,379,932 | $3,346,133 |
| Brain and ONS (Head and Neck)** | $230,220 | $642,313 | $1,046,103 | $1,218,409 | $1,206,225 | $1,194,162 | $1,182,221 | $1,170,399 | $1,158,695 |
| Breast (female) | $1,642,867 | $4,980,957 | $8,573,698 | $10,110,843 | $10,009,734 | $9,909,637 | $9,810,540 | $9,712,435 | $9,615,311 |
| Breast (female) (in situ) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cervix | $67,564 | $188,504 | $307,006 | $357,574 | $353,998 | $350,458 | $346,954 | $343,484 | $340,049 |
| Childhood, Ages <15 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Childhood, Ages <20 | $544,801 | $1,519,995 | $2,475,537 | $2,883,289 | $2,854,456 | $2,825,911 | $2,797,652 | $2,769,676 | $2,741,979 |
| Colon and Rectum | $1,084,603 | $3,610,095 | $6,557,864 | $7,821,683 | $7,743,466 | $7,666,031 | $7,589,371 | $7,513,477 | $7,438,343 |
| Esophageal | $123,517 | $344,611 | $561,250 | $653,695 | $647,158 | $640,687 | $634,280 | $627,937 | $621,658 |
| Kidney and Renal Pelvis | $460,698 | $1,285,348 | $2,093,379 | $2,438,185 | $2,413,803 | $2,389,665 | $2,365,768 | $2,342,111 | $2,318,689 |
| Leukemia | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Liver and Bile Duct | $106,974 | $298,456 | $486,081 | $566,144 | $560,483 | $554,878 | $549,329 | $543,836 | $538,397 |
| Lung and Bronchus | $766,296 | $4,081,643 | $8,904,856 | $10,982,791 | $10,872,963 | $10,764,233 | $10,656,591 | $10,550,025 | $10,444,524 |
| Melanoma | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| NON-Hodgkin's Lymphoma | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Oral Cavity and Pharynx | $350,954 | $979,161 | $1,594,708 | $1,857,376 | $1,838,803 | $1,820,415 | $1,802,210 | $1,784,188 | $1,766,347 |
| Ovarian | $149,677 | $417,599 | $680,122 | $792,147 | $784,226 | $776,383 | $768,620 | $760,933 | $753,324 |
| Pancreatic | $313,870 | $875,696 | $1,426,201 | $1,661,114 | $1,644,503 | $1,628,058 | $1,611,778 | $1,595,660 | $1,579,703 |
| Prostate | $7,473,440 | $16,326,458 | $21,335,593 | $23,427,111 | $23,192,840 | $22,960,911 | $22,731,302 | $22,503,989 | $22,278,949 |
| Stomach/Digestive | $109,350 | $305,086 | $496,877 | $578,719 | $572,932 | $567,203 | $561,531 | $555,915 | $550,356 |
| Thyroid | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Uterine | $386,273 | $1,077,703 | $1,755,199 | $2,044,302 | $2,023,859 | $2,003,621 | $1,983,584 | $1,963,748 | $1,944,111 |
| Other Disease Sites | $1,854,205 | $5,479,127 | $9,278,822 | $10,903,349 | $10,794,315 | $10,686,372 | $10,579,509 | $10,473,714 | $10,368,976 |
| | $16,330,148 | $44,267,654 | $70,594,281 | $81,815,309 | $80,997,156 | $80,187,184 | $79,385,312 | $78,591,459 | $77,805,544 |
| Average Reimbursement - All Cases | $74,217 | $71,393 | $69,209 | $68,178 | $67,497 | $66,822 | $66,153 | $65,492 | $64,837 |



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Revenue Calculation - Proton Therapy**
**FINAL**

| Total Number of Treatments: | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bladder and Urinary Tract | 28 | 320.1 | 902.2 | 1,484.2 | 1,746.1 | 1,746.1 | 1,746.1 | 1,746.1 | 1,746.1 | 1,746.1 |
| Brain and ONS (Head and Neck)** | 35 | 112.8 | 317.8 | 522.8 | 615.1 | 615.1 | 615.1 | 615.1 | 615.1 | 615.1 |
| Breast (female) | 32 | 800.8 | 2,452.4 | 4,264.0 | 5,079.3 | 5,079.3 | 5,079.3 | 5,079.3 | 5,079.3 | 5,079.3 |
| Breast (female) (in situ) | 32 | 0.0 | 243.1 | 685.1 | 884.0 | 884.0 | 884.0 | 884.0 | 884.0 | 884.0 |
| Cervix | 28 | 32.5 | 91.7 | 150.8 | 177.5 | 177.5 | 177.5 | 177.5 | 177.5 | 177.5 |
| Childhood, Ages <15 | 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Childhood, Ages <20 | 32 | 264.9 | 746.4 | 1,227.9 | 1,444.6 | 1,444.6 | 1,444.6 | 1,444.6 | 1,444.6 | 1,444.6 |
| Colon and Rectum | 35 | 531.3 | 1,786.3 | 3,277.6 | 3,948.8 | 3,948.8 | 3,948.8 | 3,948.8 | 3,948.8 | 3,948.8 |
| Esophageal | 35 | 60.7 | 170.9 | 281.2 | 330.8 | 330.8 | 330.8 | 330.8 | 330.8 | 330.8 |
| Kidney and Renal Pelvis | 28 | 221.8 | 625.2 | 1,028.5 | 1,210.0 | 1,210.0 | 1,210.0 | 1,210.0 | 1,210.0 | 1,210.0 |
| Leukemia | 35 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Liver and Bile Duct | 28 | 51.5 | 145.2 | 238.8 | 281.0 | 281.0 | 281.0 | 281.0 | 281.0 | 281.0 |
| Lung and Bronchus | 35 | 375.4 | 2,019.6 | 4,450.7 | 5,544.7 | 5,544.7 | 5,544.7 | 5,544.7 | 5,544.7 | 5,544.7 |
| Melanoma | 28 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| NON-Hodgkin's Lymphoma | 28 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Oral Cavity and Pharynx | 35 | 171.9 | 484.5 | 797.0 | 937.7 | 937.7 | 937.7 | 937.7 | 937.7 | 937.7 |
| Ovarian | 30 | 72.5 | 204.4 | 336.3 | 395.7 | 395.7 | 395.7 | 395.7 | 395.7 | 395.7 |
| Pancreatic | 35 | 153.8 | 433.3 | 712.8 | 838.6 | 838.6 | 838.6 | 838.6 | 838.6 | 838.6 |
| Prostate | 42 | 3,696.0 | 8,155.8 | 10,765.8 | 11,940.6 | 11,940.6 | 11,940.6 | 11,940.6 | 11,940.6 | 11,940.6 |
| Stomach/Digestive | 35 | 53.7 | 151.3 | 249.0 | 292.9 | 292.9 | 292.9 | 292.9 | 292.9 | 292.9 |
| Thyroid | 35 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Uterine | 30 | 187.2 | 527.6 | 868.0 | 1,021.1 | 1,021.1 | 1,021.1 | 1,021.1 | 1,021.1 | 1,021.1 |
| Other Disease Sites | 35 | 910.5 | 2,717.8 | 4,649.0 | 5,518.1 | 5,518.1 | 5,518.1 | 5,518.1 | 5,518.1 | 5,518.1 |
| | | 8,017.4 | 22,175.6 | 35,989.6 | 42,206.5 | 42,206.5 | 42,206.5 | 42,206.5 | 42,206.5 | 42,206.5 |



Exhibit 3

| Year 10 |
|---|
| -1.0% |
| 91.4% |
| 0.0% |
| 100.0% |
| |
| $53,119.66 |
| $65,270.33 |
| $59,971.54 |
| $0.00 |
| $53,119.66 |
| $0.00 |
| $60,131.42 |
| $65,270.33 |
| $65,110.45 |
| $53,119.66 |
| $65,110.45 |
| $53,119.66 |
| $65,270.33 |
| $53,119.66 |
| $63,557.36 |
| $65,270.33 |
| $56,545.60 |
| $65,270.33 |
| $77,580.87 |
| $65,110.45 |
| $65,110.45 |
| $56,545.60 |
| $65,110.45 |

| Year 10 |
|---|
| 62.4 |
| 17.6 |
| 158.7 |
| 27.6 |
| 6.3 |
| - |
| 45.1 |
| 112.8 |
| 9.5 |
| 43.2 |
| - |
| 10.0 |
| 158.4 |
| - |
| - |
| 26.8 |
| 13.2 |
| 24.0 |
| 284.3 |
| 8.4 |
| - |
| 34.0 |
| 157.7 |
| 1,200.0 |

| Year 10 |
| --- |
| $3,312,672 |
| $1,147,108 |
| $9,519,158 |
| $0 |
| $336,649 |
| $0 |
| $2,714,559 |
| $7,363,959 |
| $615,441 |
| $2,295,503 |
| $0 |
| $533,013 |
| $10,340,079 |
| $0 |
| $0 |
| $1,748,683 |
| $745,791 |
| $1,563,906 |
| $22,056,160 |
| $544,853 |
| $0 |
| $1,924,670 |
| $10,265,287 |
| $77,027,489 |
| $64,189 |

| Year 10 |
|---|
| 1,746.1 |
| 615.1 |
| 5,079.3 |
| 884.0 |
| 177.5 |
| 0.0 |
| 1,444.6 |
| 3,948.8 |
| 330.8 |
| 1,210.0 |
| 0.0 |
| 281.0 |
| 5,544.7 |
| 0.0 |
| 0.0 |
| 937.7 |
| 395.7 |
| 838.6 |
| 11,940.6 |
| 292.9 |
| 0.0 |
| 1,021.1 |
| 5,518.1 |
| 42,206.5 |

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Staffing Profile**
**FINAL**

| Position | Baseline Quantity (FTE) | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASST MGR RADIATION ONCOLOGY | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| CLINICAL PHYSICIST | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| COORD CLINICAL RESEARCH II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOSIMETRIST I | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| LICENSED PRACTICAL NURSE I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEDICAL RECORDS CLERK I | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| MGR RADIATION ONCOLOGY | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Proton Therapy Billing Specialist | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RADIATION THERAPIST | 2 | 2 | 5 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| RADIATION THERAPIST - PRN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| REGISTERED NURSE | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| RN REGISTRY OPT I | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| UNIT SUPPORT REP I | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Telemarketers | 2 | 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| CHIEF CLINICAL PHYSICIST | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SECRETARY II | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Billing/Pre. Auth./ Pre. Cert. | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Medical Director | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 12.0 FTE | 12.0 FTE | 23.0 FTE | 27.0 FTE | 29.0 FTE | 29.0 FTE | 29.0 FTE | 29.0 FTE | 29.0 FTE | 29.0 FTE | 29.0 FTE |



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Staffing Profile**
**FINAL**

| Position | Salary (Annual) | Salary (hour) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Raise/Increase | | | | 0.0% | 2.5% | 2.5% | 2.5% | 2.5% |
| | | | | 100.0% | 102.5% | 105.1% | 107.7% | 110.4% |
| Hours Per Day | | | | 8.0 | 16 | 16 | 16 | 16 |
| Working Days Per Year | | | | 252 | 252 | 252 | 252 | 252 |
| Total Hours Worked | | | | 2500 | 2500 | 2500 | 2500 | 2500 |
| Total Hours Worked-Fixed | | | | 2500 | 2500 | 2500 | 2500 | 2500 |
| VarASST MGR RADIATION ONCOLOG | $85,800.00 | $34.32 | | 42,900 | 87,945 | 90,144 | 92,397 | 94,707 |
| VarDOSIMETRIST I | $96,262.40 | $38.50 | | 96,262 | 197,338 | 202,271 | 310,992 | 318,767 |
| FixLICENSED PRACTICAL NURSE I | $42,827.20 | $17.13 | | 0 | 0 | 0 | 0 | 0 |
| FixMEDICAL RECORDS CLERK I | $25,812.80 | $10.33 | | 12,906 | 26,458 | 27,120 | 27,798 | 28,493 |
| FixMGR RADIATION ONCOLOGY | $150,000.00 | $60.00 | | 150,000 | 153,750 | 157,594 | 161,534 | 165,572 |
| FixProton Therapy Billing Specialist | $71,032.00 | $28.41 | | 0 | 0 | 0 | 0 | 0 |
| RADIATION THERAPIST | $95,000.00 | $38.00 | | 190,000 | 486,875 | 698,666 | 818,437 | 838,898 |
| RADIATION THERAPIST - PRN | $73,028.80 | $29.21 | | 0 | 0 | 0 | 0 | 0 |
| REGISTERED NURSE | $64,043.20 | $25.62 | | 32,022 | 65,644 | 67,285 | 68,968 | 70,692 |
| RN REGISTRY OPT I | $55,369.60 | $22.15 | | 27,685 | 56,754 | 58,173 | 59,627 | 61,118 |
| UNIT SUPPORT REP I | $26,582.40 | $10.63 | | 26,582 | 54,494 | 83,784 | 85,879 | 88,026 |
| Telemarketers | $65,000.00 | $26.00 | | 130,000 | 266,500 | 273,163 | 279,992 | 266,991 |
| CHIEF CLINICAL PHYSICIST | $0.00 | $0.00 | | 0 | 0 | 0 | 0 | 0 |
| SECRETARY II | $35,000.00 | $14.00 | | 35,000 | 71,750 | 73,544 | 75,382 | 77,267 |
| Billing/Pre. Auth./ Pre. Cert. | $75,000.00 | $30.00 | | 75,000 | 153,750 | 236,391 | 242,300 | 248,358 |
| Medical Director | $400,000.00 | $160.00 | | 400,000 | 410,000 | 420,250 | 430,756 | 441,525 |
| Total | | | $0 | $1,218,358 | $2,031,258 | $2,388,383 | $2,654,062 | $2,720,413 |
| Benefits as a % of Salary | | | 30.0% | $365,507 | $609,377 | $716,515 | $796,218 | $816,124 |
| Total Salary + Benefits | | | | $1,583,865 | $2,640,636 | $3,104,898 | $3,450,280 | $3,536,537 |

| Position | | | | | |
|---|---|---|---|---|---|
| Raise/Increase | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| | 113.1% | 116.0% | 118.9% | 121.8% | 124.9% |
| Hours Per Day | 16 | 16 | 16 | 16 | 16 |
| Working Days Per Year | 252 | 252 | 252 | 252 | 252 |
| Total Hours Worked | 2500 | 2500 | 2500 | 2500 | 2500 |
| Total Hours Worked-Fixed | 2500 | 2500 | 2500 | 2500 | 2500 |
| VarASST MGR RADIATION ONCOLOG | 97,075 | 99,502 | 101,989 | 104,539 | 107,152 |
| VarDOSIMETRIST I | 326,736 | 334,905 | 343,277 | 351,859 | 360,656 |
| FixLICENSED PRACTICAL NURSE I | 0 | 0 | 0 | 0 | 0 |
| FixMEDICAL RECORDS CLERK I | 29,205 | 29,935 | 30,683 | 31,450 | 32,237 |
| FixMGR RADIATION ONCOLOGY | 169,711 | 173,954 | 178,303 | 182,760 | 187,329 |
| FixProton Therapy Billing Specialist | 0 | 0 | 0 | 0 | 0 |
| RADIATION THERAPIST | 859,870 | 881,367 | 903,401 | 925,986 | 949,136 |
| RADIATION THERAPIST - PRN | ' | 0 | 0 | 0 | 0 |
| REGISTERED NURSE | 72,459 | 74,270 | 76,127 | 78,030 | 79,981 |
| RN REGISTRY OPT I | 62,646 | 64,212 | 65,817 | 67,462 | 69,149 |
| UNIT SUPPORT REP I | 90,227 | 92,482 | 94,794 | 97,164 | 99,593 |
| Telemarketers | 294,166 | 301,520 | 309,058 | 316,785 | 324,704 |
| CHIEF CLINICAL PHYSICIST | 0 | 0 | 0 | 0 | 0 |
| SECRETARY II | 79,199 | 81,179 | 83,208 | 85,288 | 87,420 |
| Billing/Pre. Auth./ Pre. Cert. | 254,567 | 260,931 | 267,454 | 274,141 | 280,994 |
| Medical Director | 452,563 | 463,877 | 475,474 | 487,361 | 499,545 |
| Total | $2,788,423 | $2,858,134 | $2,929,587 | $3,002,827 | $3,077,898 |
| Benefits as a % of Salary | $836,527 | $857,440 | $878,876 | $900,848 | $923,369 |
| Total Salary + Benefits | $3,624,950 | $3,715,574 | $3,808,464 | $3,903,675 | $4,001,267 |



Exhibit 3



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Equipment Maintenance Contracts
FINAL

| Equipment | # of Systems | Annual |
|---|---|---|
| Proton System | 1 | $1,980,000 |
| CBCT System | 1 | $90,000 |
| Vision RT | 1 | $35,200 |
| IT Hardware | 1 | $175,000 |
| Medical Supplies/Equipment | 1 | $39,120 |
| Physics Support | 1 | $8,000 |
| Total | 6 | $2,327,320 |

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 62 of 87 Page ID
#:2004

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Operating Costs and Administrative Expenses**
**FINAL**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual Proton Therapy Treatments | 8,017 | 22,176 | 35,990 | 42,207 | 42,207 | 42,207 | 42,207 | 42,207 | 42,207 | 42,207 |
| Cost Increase Per Year | | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Per Patient Treatment Expense | | | | | | | | | | |
| Number of Patients | 220.0 | 620.1 | 1,020.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 |
| Proton Therapy Patient Supply Cost | $350.00 | $358.75 | $367.72 | $376.91 | $386.33 | $395.99 | $405.89 | $416.04 | $426.44 | $437.10 |
| *Total Proton Therapy Supply Cost* | $77,011 | $222,446 | $375,080 | $452,302 | $463,609 | $475,199 | $487,079 | $499,256 | $511,738 | $524,531 |
| Total Supply Costs | $77,011 | $222,446 | $375,080 | $452,302 | $463,609 | $475,199 | $487,079 | $499,256 | $511,738 | $524,531 |

## Unit Operating Expenses

| | | Monthly Expense | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Expenses | | | | | | | | | | | | |
| Billing and Collections Fee (% of Rev) (Ye | 8.0% | | 1,306,412 | 3,541,596 | | | | | | | | |
| Employee Salary w/ Benefits | | $131,989 | 1,583,865 | 2,640,636 | 3,104,898 | 3,450,280 | 3,536,537 | 3,624,950 | 3,715,574 | 3,808,464 | 3,903,675 | 4,001,267 |
| Facility Rental | | $133,333 | 1,600,000 | 1,640,000 | 1,681,000 | 1,723,025 | 1,766,101 | 1,810,253 | 1,855,509 | 1,901,897 | 1,949,445 | 1,998,181 |
| Management Fee | 3.5% | of revenue | 571,555 | 1,549,448 | 2,471,112 | 2,863,536 | 2,834,900 | 2,806,551 | 2,778,486 | 2,750,701 | 2,723,194 | 2,695,962 |
| Physics - Contracted | | $41,667 | 500,000 | 512,500 | 525,313 | 538,445 | 551,906 | 565,704 | 579,847 | 594,343 | 609,201 | 624,431 |
| Service/Maintenance Contract(s) | | $193,943 | | | | | | | | | | |
| Gantry One | | | 0 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 |
| Gantry Two | | | | 0 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 |
| Gantry Three | | | | | 0 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 | 2,327,320 |
| | | | 0 | 2,327,320 | 4,654,640 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 |
| Supply Costs (Variable) Per Case | $350.00 | | 77,011 | 222,457 | 375,080 | 452,302 | 463,609 | 475,199 | 487,079 | 499,256 | 511,738 | 524,531 |
| Transcription - Contracted | | $5,000 | 60,000 | 61,500 | 63,038 | 64,613 | 66,229 | 67,884 | 69,582 | 71,321 | 73,104 | 74,932 |
| Utilities | | $20,000 | 240,000 | 246,000 | 252,150 | 258,454 | 264,915 | 271,538 | 278,326 | 285,285 | 292,417 | 299,727 |
| EMR License Fee | | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | | | | | | | | | | | | |
| | | | $5,938,843 | $12,741,456 | $13,127,231 | $16,332,615 | $16,466,158 | $16,604,041 | $16,746,364 | $16,893,227 | $17,044,734 | $17,200,991 |
| General/Administrative Expenses | | | | | | | | | | | | |
| Accounting and Bookkeeping | | $25,000 | 300,000 | 307,500 | 315,188 | 323,067 | 331,144 | 339,422 | 347,908 | 356,606 | 365,521 | 374,659 |
| Advertising and Promotion | | $25,000 | 900,000 | 512,500 | 525,313 | 538,445 | 551,906 | 565,704 | 579,847 | 594,343 | 609,201 | 624,431 |
| Commercial Insurance | | $66,667 | 800,004 | 1,620,004 | 2,460,504 | 2,522,017 | 2,585,067 | 2,649,694 | 2,715,936 | 2,783,835 | 2,853,431 | 2,924,766 |
| Dues and Subscriptions | | $1,000 | 12,000 | 12,300 | 12,608 | 12,923 | 13,246 | 13,577 | 13,916 | 14,264 | 14,621 | 14,986 |
| Internet Access | | $3,500 | 42,000 | 43,050 | 44,126 | 45,229 | 46,360 | 47,519 | 48,707 | 49,925 | 51,173 | 52,452 |
| Janitorial | | $10,000 | 120,000 | 123,000 | 126,075 | 129,227 | 132,458 | 135,769 | 139,163 | 142,642 | 146,208 | 149,864 |
| Other Professional Fees | | $10,000 | 120,000 | 123,000 | 126,075 | 129,227 | 132,458 | 135,769 | 139,163 | 142,642 | 146,208 | 149,864 |
| Licenses | | $1,500 | 18,000 | 18,450 | 18,911 | 19,384 | 19,869 | 20,365 | 20,874 | 21,396 | 21,931 | 22,480 |
| Liability Insurance | | $50,000 | 600,000 | 615,000 | 630,375 | 646,134 | 662,288 | 678,845 | 695,816 | 713,211 | 731,042 | 749,318 |
| Meals and Entertainment | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Medical Directorship | | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical Waste and Garbage | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Miscellaneous | | $5,000 | 60,000 | 61,500 | 63,038 | 64,613 | 66,229 | 67,884 | 69,582 | 71,321 | 73,104 | 74,932 |
| Office Supplies | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Postage and FEDEX | | $750 | 9,000 | 9,225 | 9,456 | 9,692 | 9,934 | 10,183 | 10,437 | 10,698 | 10,966 | 11,240 |
| Property Insurance (Equipment) | | $166,667 | 2,000,004 | 4,050,004 | 6,151,254 | 6,305,036 | 6,462,661 | 6,624,228 | 6,789,834 | 6,959,580 | 7,133,569 | 7,311,908 |
| Repairs and Maintenance | | $15,000 | 180,000 | 184,500 | 189,113 | 193,840 | 198,686 | 203,653 | 208,745 | 213,963 | 219,313 | 224,795 |
| Snacks | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Telephone | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Travel | | $2,500 | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 |
| Uniforms and Laundry | | $7,500 | 90,000 | 92,250 | 94,556 | 96,920 | 99,343 | 101,827 | 104,372 | 106,982 | 109,656 | 112,398 |
| (enter expense here) | | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | $5,431,008 | $7,956,783 | $10,955,703 | $11,229,595 | $11,510,335 | $11,798,094 | $12,093,046 | $12,395,372 | $12,705,256 | $13,022,888 |
| Total Operating Expenses | | | $11,369,851 | $20,698,239 | $24,082,933 | $27,562,210 | $27,976,493 | $28,402,135 | $28,839,410 | $29,288,599 | $29,749,990 | $30,223,879 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Capital Expenditures
FINAL

## Facility Costs

| Construction - Direct | ($) |
|---|---|
| 105 W. Beverly Demolition | $215,268 |
| 101 E Beverly Demolition | $318,937 |
| Vault - (3) Lower Level | $3,600,000 |
| Vault - (3) Treatment Level | $4,000,000 |
| Vault - (3) Catwalk Level | $2,000,000 |
| PT Equipment Rigging | $2,250,000 |
| PT Support Area | $1,600,000 |
| PT Clinical Area | $4,800,000 |
| Entrance and Maintenance area | $4,000,000 |
| Parking Garage - 80 Above Grade | $0 |
| Parking Garage - 0 Below Grade | $0 |
| Site work/Hardscape | $1,000,000 |
| Roofscape | $0 |
| Utilities Allowance | $300,000 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Total | $ 24,084,205 |

| Construction - Indirect | ($) |
|---|---|
| Construction Contingency at 15% | $3,612,637 |
| Design Contingency at 5% | $1,204,211 |
| Owner's Construction Contingency | $500,000 |
| CM - Pre-construction Services | $350,000 |
| Utility Permit and Approval | $200,000 |
| General Conditions | $3,612,633 |
| Construction Management Fee | $1,575,473 |
| Licenses/Permits | $0 |
| Legal | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Total | $ 11,054,954 |

| | |
|---|---|
| *Total Facility Costs* | $ 35,139,159 |

## Equipment Costs

| Equipment | ($) |
|---|---|
| Proton Systems - All 3 gantries | $64,194,000 |
| FFE | $600,000 |
| Major Medical Equip./Software | $2,000,000 |
| Owner's Hard Cost Contingency | $500,000 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Sales Tax | $0 |
| Total | $ 67,294,000 |

| Equipment Soft Costs | ($) |
|---|---|
| PMPOC Fees @ 3.0% | $2,635,436 |
| A/E Basic Service Fees | $3,600,000 |
| A/E Additional Services | $800,000 |
| Specialty Consultants | $700,000 |
| Owner's Consultants | $800,000 |
| Reimbursable Expenses | $750,000 |
| Legal and Accounting | $250,000 |
| Insurance | $500,000 |
| Owner Personnel - Adv. And Misc. Expenses | $1,400,000 |
| Field Office Expenses | $72,000 |
| Working Capital | $9,000,000 |
| Owner's Soft Cost Contingency | $250,000 |
| Commissioning | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Other | $0 |
| Sales Tax | $5,831,460 |
| Total | $ 26,588,896 |

| | |
|---|---|
| Soft Costs - Net of Working Capital | $ 17,588,896 |
| *Total Equipment Costs* | $ 93,882,896 |
| Equipment Costs - Net of WC | $ 84,882,896 |

## Capital Expenditure

**Equipment**

| | |
|---|---|
| Total Equipment Cost = | $ 84,882,896 |
| Down Payment Required (%) = | 100.0% |
| Down Payment = | $84,882,896 |
| Amount to be Financed = | $ - |
| % of total Financing | 0% |

**Facility**

| | |
|---|---|
| Total Facility Cost = | $35,139,159 |
| Down Payment Required (%) = | 100.0% |
| Down Payment = | $35,139,159 |
| Amount to be Financed = | $0 |
| % of total Financing | 0% |

| | |
|---|---|
| Total Required Down Payment = | $120,022,055 |

## Upgrades

| | Cost | Year of Upgrade |
|---|---|---|
| Upgrade 1 | $0 | 0 |
| Upgrade 2 | $0 | 0 |

Exhibit 3





CONFIDENTIAL

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Capital Expenditures**
**FINAL**

**Depreciation Schedule**

| Item | Asset Cost | Asset Life | Depreciation | Year Start | Year End | Annual Depreciation | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equipment | $ 67,294,000 | 10 | SL | 1 | 10 | $ 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 | 6,729,400 |
| Facility | $ 24,084,205 | 30 | SL | 1 | 30 | $ 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 | 802,807 |
| Upgrade 1 | $0 | 7 | SL | 0 | 6 | $ - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Upgrade 2 | $0 | 7 | SL | 0 | 6 | $ - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Asset Total* | $ 91,378,205 | | | | | $ 7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 | $7,532,207 |

**Amortization Schedule**

| Item | Asset Cost | Asset Life | Year Start | Year End | Annual Amortization | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equipment | $ 17,588,896 | 10 | 1 | 10 | $ 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 | 1,758,890 |
| Facility | $ 11,054,954 | 30 | 1 | 30 | $ 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 | 368,498 |
| *Total* | $ 28,643,850 | | | | $ 2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 | $2,127,388 |



**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Amortization Schedule - Equipment**
**FINAL**

| | | | |
|---|---|---|---|
| Loan Amount | $0 | Total Interest Paid | 0 |
| Interest | 5.250% | | |
| Term (Years) | 10 | Total Paid | 0 |
| Monthly Payment | $0.00 | | |



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Amortization Schedule - Construction - Vault and Facility Improvements
FINAL

| | | | |
|---|---|---|---|
| Loan Amount | $0 | Total Interest Paid | 0 |
| Interest | 4.750% | | |
| Term (Years) | 30 | Total Paid | 0 |
| Monthly Payment | $0.00 | | |

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Pro Forma Income Statement - Proton Therapy Program - Ten-year Forecast Horizon**
**FINAL**

**Hospital Based**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volumes and Revenue** | | | | | | | | | | | | |
| Proton Therapy Case Volume | | 220.0 | 620.1 | 1,020.1 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 1,200.0 | 10,260.4 |
| Proton Therapy Technical Revenue | | 16,330,148 | 44,269,945 | 70,603,199 | 81,815,309 | 80,997,156 | 80,187,184 | 79,385,312 | 78,591,459 | 77,805,544 | 77,027,489 | 687,012,745 |
| *Global Collected Revenue* | | $16,330,148 | $44,269,945 | $70,603,199 | $81,815,309 | $80,997,156 | $80,187,184 | $79,385,312 | $78,591,459 | $77,805,544 | $77,027,489 | $687,012,745 |
| **Costs and Expenses** | | | | | | | | | | | | |
| Direct Costs: | | | | | | | | | | | | |
| Billing and Collections Fee (% of Rev) ( | 8.0% | 1,306,412 | 3,541,596 | 0 | | | | | | | | 4,848,007 |
| Employee Salary w/ Benefits | 30.0% | 1,583,865 | 2,640,636 | 3,104,898 | 3,450,280 | 3,536,537 | 3,624,950 | 3,715,574 | 3,808,464 | 3,903,675 | 4,001,267 | 33,370,146 |
| Facility Rental | | 1,600,000 | 1,640,000 | 1,681,000 | 1,723,025 | 1,766,101 | 1,810,253 | 1,855,509 | 1,901,897 | 1,949,445 | 1,998,181 | 17,925,411 |
| Management Fee | 3.5% | 571,555 | 1,549,448 | 2,471,112 | 2,863,536 | 2,834,900 | 2,806,551 | 2,778,486 | 2,750,701 | 2,723,194 | 2,695,962 | 24,045,446 |
| Physics - Contracted | | 500,000 | 512,500 | 525,313 | 538,445 | 551,906 | 565,704 | 579,847 | 594,343 | 609,201 | 624,431 | 5,601,691 |
| Service/Maintenance Contract(s) | | 0 | 2,327,320 | 4,654,640 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 6,981,960 | 55,855,680 |
| Supply Costs (Variable) | | 77,011 | 222,457 | 375,080 | 452,302 | 463,609 | 475,199 | 487,079 | 499,256 | 511,738 | 524,531 | 4,088,264 |
| Transcription - Contracted | | 60,000 | 61,500 | 63,038 | 64,613 | 66,229 | 67,884 | 69,582 | 71,321 | 73,104 | 74,932 | 672,203 |
| Utilities | | 240,000 | 246,000 | 252,150 | 258,454 | 264,915 | 271,538 | 278,326 | 285,285 | 292,417 | 299,727 | 2,688,812 |
| EMR License Fee | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Direct Costs* | | $5,938,843 | $12,741,457 | $13,127,231 | $16,332,615 | $16,466,158 | $16,604,041 | $16,746,364 | $16,893,227 | $17,044,734 | $17,200,991 | $149,095,659 |



Exhibit 3

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 68 of 87 Page ID #:2010

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - Ten-year Forecast Horizon
FINAL

## Hospital Based

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **General/Administrative Expenses** | | | | | | | | | | | |
| Accounting and Bookkeeping | 300,000 | 307,500 | 315,188 | 323,067 | 331,144 | 339,422 | 347,908 | 356,606 | 365,521 | 374,659 | 3,361,015 |
| Advertising and Promotion | 900,000 | 512,500 | 525,313 | 538,445 | 551,906 | 565,704 | 579,847 | 594,343 | 609,201 | 624,431 | 6,001,691 |
| Commercial Insurance | 800,004 | 1,620,004 | 2,460,504 | 2,522,017 | 2,585,067 | 2,649,694 | 2,715,936 | 2,783,835 | 2,853,431 | 2,924,766 | 23,915,258 |
| Dues and Subscriptions | 12,000 | 12,300 | 12,608 | 12,923 | 13,246 | 13,577 | 13,916 | 14,264 | 14,621 | 14,986 | 134,441 |
| Internet Access | 42,000 | 43,050 | 44,126 | 45,229 | 46,360 | 47,519 | 48,707 | 49,925 | 51,173 | 52,452 | 470,542 |
| Janitorial | 120,000 | 123,000 | 126,075 | 129,227 | 132,458 | 135,769 | 139,163 | 142,642 | 146,208 | 149,864 | 1,344,406 |
| Other Professional Fees | 120,000 | 123,000 | 126,075 | 129,227 | 132,458 | 135,769 | 139,163 | 142,642 | 146,208 | 149,864 | 1,344,406 |
| Licenses | 18,000 | 18,450 | 18,911 | 19,384 | 19,869 | 20,365 | 20,874 | 21,396 | 21,931 | 22,480 | 201,661 |
| Liability Insurance | 600,000 | 615,000 | 630,375 | 646,134 | 662,288 | 678,845 | 695,816 | 713,211 | 731,042 | 749,318 | 6,722,029 |
| Meals and Entertainment | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Medical Directorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical Waste and Garbage | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Miscellaneous | 60,000 | 61,500 | 63,038 | 64,613 | 66,229 | 67,884 | 69,582 | 71,321 | 73,104 | 74,932 | 672,203 |
| Office Supplies | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Postage and FEDEX | 9,000 | 9,225 | 9,456 | 9,692 | 9,934 | 10,183 | 10,437 | 10,698 | 10,966 | 11,240 | 100,830 |
| Property Insurance (Equipment) | 2,000,004 | 4,050,004 | 6,151,254 | 6,305,036 | 6,462,661 | 6,624,228 | 6,789,834 | 6,959,580 | 7,133,569 | 7,311,908 | 59,788,078 |
| Repairs and Maintenance | 180,000 | 184,500 | 189,113 | 193,840 | 198,686 | 203,653 | 208,745 | 213,963 | 219,313 | 224,795 | 2,016,609 |
| Snacks | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Telephone | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Travel | 30,000 | 30,750 | 31,519 | 32,307 | 33,114 | 33,942 | 34,791 | 35,661 | 36,552 | 37,466 | 336,101 |
| Uniforms and Laundry | 90,000 | 92,250 | 94,556 | 96,920 | 99,343 | 101,827 | 104,372 | 106,982 | 109,656 | 112,398 | 1,008,304 |
| *Total General/Administrative Expenses* | $5,431,008 | $7,956,783 | $10,955,703 | $11,229,595 | $11,510,335 | $11,798,094 | $12,093,046 | $12,395,372 | $12,705,256 | $13,022,888 | $109,098,080 |
| *Total Cost and Expenses* | $11,369,851 | $20,698,240 | $24,082,933 | $27,562,210 | $27,976,493 | $28,402,135 | $28,839,410 | $29,288,599 | $29,749,990 | $30,223,879 | $258,193,740 |
| Expenses a % of Net Revenue | 70% | 47% | 34% | 34% | 35% | 35% | 36% | 37% | 38% | 39% | |
| Operating Income (EBITDA) | $4,960,297 | $23,571,705 | $46,520,266 | $54,253,098 | $53,020,663 | $51,785,049 | $50,545,903 | $49,302,860 | $48,055,554 | $46,803,610 | $428,819,006 |
| EBITDA as a % of Net Revenues | 30% | 53% | 66% | 66% | 65% | 65% | 64% | 63% | 62% | 61% | |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - Ten-year Forecast Horizon
FINAL

## Hospital Based

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Depreciation | | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 75,322,068 |
| Amortization | | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 21,273,881 |
| Equipment Interest | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facility Interest | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Earnings Before Taxes (EBT)** | | ($4,699,298) | $13,912,110 | $36,860,671 | $44,593,504 | $43,361,068 | $42,125,455 | $40,886,308 | $39,643,265 | $38,395,959 | $37,144,015 | $332,223,057 |
| EBT as a % of Net Revenues | | -29% | 31% | 52% | 55% | 54% | 53% | 52% | 50% | 49% | 48% | |
| **Cash Flow Reconciliation** | | | | | | | | | | | | |
| ADD: Depreciation | | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 7,532,207 | 75,322,068 |
| ADD: Amortization | | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 2,127,388 | 21,273,881 |
| LESS: Equipment Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Facility Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 Day Cash Lag | | (2,474,265) | (4,760,209) | (6,921,882) | (6,817,942) | (6,749,763) | (6,682,265) | (6,615,443) | (6,549,288) | (6,483,795) | | (54,054,853) |
| 30 Day Collection: | | | 2,474,265 | 4,760,209 | 6,921,882 | 6,817,942 | 6,749,763 | 6,682,265 | 6,615,443 | 6,549,288 | 6,483,795 | 54,054,853 |
| **Net Cash Flow** | | $2,486,032 | $21,285,761 | $44,358,593 | $54,357,038 | $53,088,842 | $51,852,547 | $50,612,725 | $49,369,015 | $48,121,047 | $53,287,405 | $428,819,006 |
| Cumulative Cash Flow | | $2,486,032 | $23,771,793 | $68,130,386 | $122,487,424 | $175,576,266 | $227,428,813 | $278,041,539 | $327,410,553 | $375,531,600 | $428,819,006 | |
| Net Cash Position | 9,000,000 | $11,486,032 | $32,771,793 | $77,130,386 | $131,487,424 | $184,576,266 | $236,428,813 | $287,041,539 | $336,410,553 | $384,531,600 | $437,819,006 | $9,000,000 |

*Assumes year the 10 year of operations collects all revenues and there is no lag in collections.

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - First Twelve Months
FINAL

**Hospital Based**

| GANTRY ONE ONLY! | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Load Ramp Up: | 15% | 20% | 20% | 25% | 35% | 50% | 60% | 75% | 80% | 85% | 95% | 100% | |
| **Volumes and Revenues** | | | | | | | | | | | | | |
| Case Volume | 5.0 | 6.7 | 6.7 | 8.3 | 11.7 | 16.7 | 20.0 | 25.0 | 26.7 | 28.3 | 31.7 | 33.3 | 220.0 |
| Average Technical Reimbursement per Case | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | $74,217 | |
| Gantry One - Baseline Patient Volume 400.1 | | | | | | | | | | | | | |
| Proton Therapy Technical Revenue | $371,140 | $494,853 | $494,853 | $618,566 | $865,993 | $1,237,132 | $1,484,559 | $1,855,699 | $1,979,412 | $2,103,125 | $2,350,552 | $2,474,265 | $16,330,148 |
| *Global Collected Revenue* | $371,140 | $494,853 | $494,853 | $618,566 | $865,993 | $1,237,132 | $1,484,559 | $1,855,699 | $1,979,412 | $2,103,125 | $2,350,552 | $2,474,265 | $16,330,148 |
| **Costs and Expenses** | | | | | | | | | | | | | |
| Direct Expenses | | | | | | | | | | | | | |
| Billing and Collections Fee (% of Rev) (Years One and Two Only) | 29,691 | 39,588 | 39,588 | 49,485 | 69,279 | 98,971 | 118,765 | 148,456 | 158,353 | 168,250 | 188,044 | 197,941 | 1,306,412 |
| Employee Salary w/ Benefits | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 131,989 | 1,583,865 |
| Facility Rental | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 133,333 | 1,600,000 |
| Management Fee | 12,990 | 17,320 | 17,320 | 21,650 | 30,310 | 43,300 | 51,960 | 64,949 | 69,279 | 73,609 | 82,269 | 86,599 | 571,555 |
| Physics - Contracted | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 500,000 |
| Service/Maintenance Contract(s) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supply Costs (Variable) | 1,750 | 2,334 | 2,334 | 2,917 | 4,084 | 5,834 | 7,001 | 8,751 | 9,335 | 9,918 | 11,085 | 11,668 | 77,011 |
| Transcription - Contracted | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Utilities | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| EMR License Fee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Direct Expenses* | $376,420 | $391,231 | $391,231 | $406,041 | $435,662 | $480,093 | $509,714 | $554,145 | $568,956 | $583,766 | $613,387 | $628,198 | $5,938,843 |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - First Twelve Months
FINAL

**Hospital Based**

GANTRY ONE ONLY!

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Load Ramp Up: | 15% | 20% | 20% | 25% | 35% | 50% | 60% | 75% | 80% | 85% | 95% | 100% | |
| **General/Administrative Expenses** | | | | | | | | | | | | | |
| Accounting and Bookkeeping | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Advertising and Promotion | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 900,000 |
| Commercial Insurance | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 66,667 | 800,004 |
| Dues and Subscriptions | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Internet Access | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Janitorial | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Other Professional Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Licenses | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Liability Insurance | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| Medical Directorship | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Medical Directorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical Waste and Garbage | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Miscellaneous | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Postage and FEDEX | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,000 |
| Property Insurance (Equipment) | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 2,000,004 |
| Repairs and Maintenance | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Snacks | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Telephone | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Travel | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Uniforms and Laundry | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| ***Total General/Administrative Expenses*** | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $452,584 | $5,431,008 |
| ***Total Cost and Expenses*** | $829,004 | $843,815 | $843,815 | $858,625 | $888,246 | $932,677 | $962,298 | $1,006,729 | $1,021,540 | $1,036,350 | $1,065,971 | $1,080,782 | $11,369,851 |
| Expenses a % of Net Revenue | 223% | 171% | 171% | 139% | 103% | 75% | 65% | 54% | 52% | 49% | 45% | 44% | |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - First Twelve Months
FINAL

**Hospital Based**

| GANTRY ONE ONLY! | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Patient Load Ramp Up: | 15% | 20% | 20% | 25% | 35% | 50% | 60% | 75% | 80% | 85% | 95% | 100% | |
| Operating Income | | ($457,864) | ($348,962) | ($348,962) | ($240,059) | ($22,253) | $304,456 | $522,261 | $848,969 | $957,872 | $1,066,775 | $1,284,580 | $1,393,483 | $4,960,297 |
| EBITDA as a % of Net Revenues | | -123% | -71% | -71% | -39% | -3% | 25% | 35% | 46% | 48% | 51% | 55% | 56% | |
| Depreciation | | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| Amortization | | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| Equipment Interest | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facility Interest | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Earnings Before Taxes (EBT)** | | ($1,262,831) | ($1,153,928) | ($1,153,928) | ($1,048,025) | ($827,219) | ($500,511) | ($282,705) | $44,003 | $152,906 | $261,809 | $479,614 | $588,517 | ($4,699,298) |
| EBT as a % of Net Revenues | | -340% | -233% | -233% | -169% | -96% | -40% | -19% | 2% | 8% | 12% | 20% | 24% | |
| **Cash Flow Reconciliation** | | | | | | | | | | | | | | |
| ADD: Depreciation | | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| ADD: Amortization | | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| LESS: Equipment Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Facility Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Revenue | | 371,140 | 494,853 | 494,853 | 618,566 | 865,993 | 1,237,132 | 1,484,559 | 1,855,699 | 1,979,412 | 2,103,125 | 2,350,552 | 2,474,265 | 16,330,148 |
| Monthly Cash Flow | | (829,004) | (843,815) | (843,815) | (858,625) | (888,246) | (932,677) | (962,298) | (1,006,729) | (1,021,540) | (1,036,350) | (1,065,971) | (1,080,782) | (11,369,851) |
| umulative Cash Flow | | (829,004) | (1,672,819) | (2,516,633) | (3,375,258) | (4,263,504) | (5,196,181) | (6,158,479) | (7,165,208) | (8,186,748) | (9,223,098) | (10,289,070) | (11,369,851) | |
| Net Collections - 30 Day Lag | | $0 | $371,140 | $494,853 | $494,853 | $618,566 | $865,993 | $1,237,132 | $1,484,559 | $1,855,699 | $1,979,412 | $2,103,125 | $2,350,552 | $13,855,883 |
| **Net Cash Flow** | | ($829,004) | ($472,675) | ($348,962) | ($363,772) | ($269,680) | ($66,684) | $274,834 | $477,830 | $834,159 | $943,062 | $1,037,154 | $1,269,770 | $2,486,032 |
| Cumulative Cash Flow | | ($829,004) | ($1,301,679) | ($1,650,640) | ($2,014,412) | ($2,284,092) | ($2,350,776) | ($2,075,942) | ($1,598,113) | ($763,954) | $179,108 | $1,216,262 | $2,486,032 | |
| Net Cash position | $9,000,000 | $8,170,996 | $7,698,321 | $7,349,360 | $6,985,588 | $6,715,908 | $6,649,224 | $6,924,058 | $7,401,887 | $8,236,046 | $9,179,108 | $10,216,262 | $11,486,032 | |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - Second Twelve Months
FINAL

**Hospital Based**

| | | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volumes and Revenues** | | | | | | | | | | | | | | |
| Gantry One: | | | | | | | | | | | | | | |
| Case Volume | | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 400.1 |
| Average Technical Reimbursement | | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | |
| Pt. Volume | 400.1 | | | | | | | | | | | | | |
| Proton Therapy Technical Revenue | | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $2,380,105 | $28,561,255 |
| Gantry Two: | | | | | | | | | | | | | | |
| Case Volume | | 5.0 | 6.7 | 6.7 | 8.3 | 11.7 | 16.7 | 20.0 | 25.0 | 26.7 | 28.3 | 31.7 | 33.3 | 220.0 |
| Average Technical Reimbursement | | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | $71,393 | |
| Pt. Volume | 400.1 | | | | | | | | | | | | | |
| Proton Therapy Technical Revenue | | $357,016 | $476,021 | $476,021 | $595,026 | $833,037 | $1,190,052 | $1,428,063 | $1,785,078 | $1,904,084 | $2,023,089 | $2,261,099 | $2,380,105 | 15,708,690 |
| *Collected Technical Revenue* | | $2,737,120 | $2,856,125 | $2,856,125 | $2,975,131 | $3,213,141 | $3,570,157 | $3,808,167 | $4,165,183 | $4,284,188 | $4,403,193 | $4,641,204 | $4,760,209 | $44,269,945 |
| Total Case Volume: | | 38.3 | 40.0 | 40.0 | 41.7 | 45.0 | 50.0 | 53.3 | 58.3 | 60.0 | 61.7 | 65.0 | 66.7 | 620.1 |
| **Costs and Expenses** | | | | | | | | | | | | | | |
| Direct Costs | | | | | | | | | | | | | | |
| Billing and Collections Fee (% of Rev) (Years One and Tw | | 218,970 | 228,490 | 228,490 | 238,010 | 257,051 | 285,613 | 304,653 | 333,215 | 342,735 | 352,255 | 371,296 | 380,817 | 3,541,596 |
| Employee Salary w/ Benefits | | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 220,053 | 2,640,636 |
| Facility Rental | | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 136,667 | 1,640,000 |
| Management Fee | | 95,799 | 99,964 | 99,964 | 104,130 | 112,460 | 124,955 | 133,286 | 145,781 | 149,947 | 154,112 | 162,442 | 166,607 | 1,549,448 |
| Physics - Contracted | | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 512,500 |
| Service/Maintenance Contract(s) | | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 193,943 | 2,327,320 |
| Supply Costs (Variable) | | 13,754 | 14,352 | 14,352 | 14,950 | 16,146 | 17,940 | 19,136 | 20,930 | 21,528 | 22,126 | 23,322 | 23,920 | 222,457 |
| Transcription - Contracted | | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 61,500 |
| Utilities | | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 246,000 |
| EMR License Fee | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Direct Costs* | | $947,519 | $961,803 | $961,803 | $976,086 | $1,004,654 | $1,047,504 | $1,076,072 | $1,118,922 | $1,133,206 | $1,147,490 | $1,176,057 | $1,190,340 | $12,741,457 |



Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - Second Twelve Months
FINAL

## Hospital Based

| | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General/Administrative Expenses | | | | | | | | | | | | | |
| Accounting and Bookkeeping | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 25,625 | 307,500 |
| Advertising and Promotion | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 42,708 | 512,500 |
| Commercial Insurance | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 1,620,004 |
| Dues and Subscriptions | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 12,300 |
| Internet Access | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 3,588 | 43,050 |
| Janitorial | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 123,000 |
| Other Professional Fees | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 10,250 | 123,000 |
| Licenses | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 1,538 | 18,450 |
| Liability Insurance | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 51,250 | 615,000 |
| Meals and Entertainment | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Medical Directorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical Waste and Garbage | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Miscellaneous | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 5,125 | 61,500 |
| Office Supplies | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Postage and FEDEX | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 9,225 |
| Property Insurance (Equipment) | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 337,500 | 4,050,004 |
| Repairs and Maintenance | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 15,375 | 184,500 |
| Snacks | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Telephone | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Travel | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 2,563 | 30,750 |
| Uniforms and Laundry | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 7,688 | 92,250 |
| *Total General/Administrative Expenses* | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $663,065 | $7,956,783 |
| *Total Costs & Expenses* | $1,610,584 | $1,624,868 | $1,624,868 | $1,639,152 | $1,667,719 | $1,710,570 | $1,739,137 | $1,781,988 | $1,796,271 | $1,810,555 | $1,839,122 | $1,853,406 | $20,698,240 |
| Expenses a % of Net Revenue | 59% | 57% | 57% | 55% | 52% | 48% | 46% | 43% | 42% | 41% | 40% | 39% | |



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Pro Forma Income Statement - Proton Therapy Program - Second Twelve Months**
**FINAL**

**Hospital Based**

| | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Income | $1,126,536 | $1,231,257 | $1,231,257 | $1,335,979 | $1,545,422 | $1,859,587 | $2,069,030 | $2,383,195 | $2,487,917 | $2,592,639 | $2,802,082 | $2,906,803 | $23,571,705 |
| EBITDA as a % of Net Revenues | 41% | 43% | 43% | 45% | 48% | 52% | 54% | 57% | 58% | 59% | 60% | 61% | 53% |
| Depreciation | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| Amortization | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| Equipment Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facility Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Earnings Before Taxes (EBT)** | $321,570 | $426,291 | $426,291 | $531,013 | $740,456 | $1,054,621 | $1,264,064 | $1,578,229 | $1,682,951 | $1,787,672 | $1,997,116 | $2,101,837 | $13,912,110 |
| EBT as a % of Net Revenues | 12% | 15% | 15% | 18% | 23% | 30% | 33% | 38% | 39% | 41% | 43% | 44% | |
| **Cash Flow Reconciliation** | | | | | | | | | | | | | |
| ADD: Depreciation | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| ADD: Amortization | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| LESS: Equipment Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Facility Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Revenue | 2,737,120 | 2,856,125 | 2,856,125 | 2,975,131 | 3,213,141 | 3,570,157 | 3,808,167 | 4,165,183 | 4,284,188 | 4,403,193 | 4,641,204 | 4,760,209 | 44,269,945 |
| Monthly Cash Flow | (1,610,584) | (1,624,868) | (1,624,868) | (1,639,152) | (1,667,719) | (1,710,570) | (1,739,137) | (1,781,988) | (1,796,271) | (1,810,555) | (1,839,122) | (1,853,406) | (20,698,240) |
| Cumulative Cash Flow | (1,610,584) | (3,235,453) | (4,860,321) | (6,499,472) | (8,167,191) | (9,877,761) | (11,616,898) | (13,398,886) | (15,195,157) | (17,005,712) | (18,844,834) | (20,698,240) | |
| Net Collections - 30 Day Lag | $2,474,265 | $2,737,120 | $2,856,125 | $2,856,125 | $2,975,131 | $3,213,141 | $3,570,157 | $3,808,167 | $4,165,183 | $4,284,188 | $4,403,193 | $4,641,204 | $41,984,001 |
| **Net Cash Flow** | $863,680 | $1,112,252 | $1,231,257 | $1,216,974 | $1,307,412 | $1,502,571 | $1,831,020 | $2,026,180 | $2,368,912 | $2,473,633 | $2,564,071 | $2,787,798 | $21,285,761 |
| Cumulative Cash Flow | $863,680 | $1,975,933 | $3,207,190 | $4,424,164 | $5,731,576 | $7,234,147 | $9,065,167 | $11,091,347 | $13,460,258 | $15,933,892 | $18,497,963 | $21,285,761 | |
| Net Cash Position | $12,349,712 | $13,461,964 | $14,693,222 | $15,910,196 | $17,217,608 | $18,720,179 | $20,551,199 | $22,577,379 | $24,946,290 | $27,419,923 | $29,983,995 | $32,771,793 | |

Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Pro Forma Income Statement - Proton Therapy Program - Third Twelve Months**
**FINAL**

## Hospital Based

| | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gantry One — Patient Load Ramp Up: | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Gantry Two — Patient Load Ramp Up: | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Gantry Three — Patient Load Ramp Up: | 15.00% | 20.00% | 20.00% | 25.00% | 35.00% | 50.00% | 60.00% | 75.00% | 80.00% | 85.00% | 95.00% | 100.00% | |
| **Volumes and Revenues** | | | | | | | | | | | | | |
| **Gantry One:** | | | | | | | | | | | | | |
| **Case Volume** | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 400.1 |
| **Average Technical Reimbursement** | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | |
| Pt. Volume 400.1 | | | | | | | | | | | | | |
| **Proton Therapy Technical Revenue** | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $27,687,529 |
| **Gantry Two:** | | | | | | | | | | | | | |
| **Case Volume** | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 33.3 | 400.1 |
| **Average Global Reimbursement Case** | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | |
| Pt. Volume 400.1 | | | | | | | | | | | | | |
| **Proton Therapy Technical Revenue** | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | $2,307,294 | 27,687,529 |
| **Gantry Three:** | | | | | | | | | | | | | |
| **Case Volume** | 5.0 | 6.7 | 6.7 | 8.3 | 11.7 | 16.7 | 20.0 | 25.0 | 26.7 | 28.3 | 31.7 | 33.3 | 220.0 |
| **Average Global Reimbursement Case** | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | $69,209 | |
| Pt. Volume 400.1 | | | | | | | | | | | | | |
| **Proton Therapy Global Revenue** | $346,094 | $461,459 | $461,459 | $576,824 | $807,553 | $1,153,647 | $1,384,376 | $1,730,471 | $1,845,835 | $1,961,200 | $2,191,929 | $2,307,294 | 15,228,141 |
| ***Collected Technical Revenue*** | $4,960,682 | $5,076,047 | $5,076,047 | $5,191,412 | $5,422,141 | $5,768,235 | $5,998,965 | $6,345,059 | $6,460,423 | $6,575,788 | $6,806,518 | $6,921,882 | $70,603,199 |
| Total Case Volume: | 71.7 | 73.3 | 73.3 | 75.0 | 78.3 | 83.3 | 86.7 | 91.7 | 93.3 | 95.0 | 98.3 | 100.0 | 1,020.1 |
| **Costs and Expenses** | | | | | | | | | | | | 6,921,882 | |
| | | | | | | | | | | | | 0 | |
| **Direct Costs** | | | | | | | | | | | | | |
| Billing and Collections Fee (% of Rev) (Years One and Two Only) | | | | | | | | | | | | | 0 |
| Employee Salary w/ Benefits | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 258,742 | 3,104,898 |
| Facility Rental | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 140,083 | 1,681,000 |
| Management Fee | 173,624 | 177,662 | 177,662 | 181,699 | 189,775 | 201,888 | 209,964 | 222,077 | 226,115 | 230,153 | 238,228 | 242,266 | 2,471,112 |
| Physics - Contracted | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 525,313 |
| Service/Maintenance Contract(s) | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 387,887 | 4,654,640 |
| Supply Costs (Variable) | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 31,257 | 375,080 |
| Transcription - Contracted | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 63,038 |
| Utilities | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 21,013 | 252,150 |
| EMR License Fee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ***Total Direct Costs*** | $1,061,634 | $1,065,672 | $1,065,672 | $1,069,709 | $1,077,785 | $1,089,898 | $1,097,974 | $1,110,087 | $1,114,125 | $1,118,162 | $1,126,238 | $1,130,276 | $13,127,231 |



Exhibit 3

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Pro Forma Income Statement - Proton Therapy Program - Third Twelve Months**
**FINAL**

**Hospital Based**

| | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General/Administrative Expenses** | | | | | | | | | | | | | |
| Accounting and Bookkeeping | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 26,266 | 315,188 |
| Advertising and Promotion | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 43,776 | 525,313 |
| Commercial Insurance | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 205,042 | 2,460,504 |
| Dues and Subscriptions | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 1,051 | 12,608 |
| Internet Access | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 3,677 | 44,126 |
| Janitorial | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 126,075 |
| Other Professional Fees | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 10,506 | 126,075 |
| Licenses | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 1,576 | 18,911 |
| Liability Insurance | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 52,531 | 630,375 |
| Meals and Entertainment | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Medical Directorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical Waste and Garbage | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Miscellaneous | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 5,253 | 63,038 |
| Office Supplies | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Postage and FEDEX | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 9,456 |
| Property Insurance (Equipment) | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 512,605 | 6,151,254 |
| Repairs and Maintenance | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 15,759 | 189,113 |
| Snacks | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Telephone | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Travel | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 | 31,519 |
| Uniforms and Laundry | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 7,880 | 94,556 |
| ***Total General/Administrative Expenses*** | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $912,975 | $10,955,703 |
| ***Total Costs & Expenses*** | $1,974,609 | $1,978,647 | $1,978,647 | $1,982,685 | $1,990,760 | $2,002,873 | $2,010,949 | $2,023,062 | $2,027,100 | $2,031,138 | $2,039,213 | $2,043,251 | $24,082,933 |
| Expenses a % of Net Revenue | 40% | 39% | 39% | 38% | 37% | 35% | 34% | 32% | 31% | 31% | 30% | 30% | |

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Income Statement - Proton Therapy Program - Third Twelve Months
FINAL

**Hospital Based**

| | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Income | $2,986,073 | $3,097,400 | $3,097,400 | $3,208,727 | $3,431,381 | $3,765,362 | $3,988,016 | $4,321,997 | $4,433,324 | $4,544,650 | $4,767,304 | $4,878,631 | $46,520,266 |
| EBITDA as a % of Net Revenues | 60% | 61% | 61% | 62% | 63% | 65% | 66% | 68% | 69% | 69% | 70% | 70% | 66% |
| Depreciation | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| Amortization | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| Equipment Interest | | | | | | | | | | | | | 0 |
| Facility Interest | | | | | | | | | | | | | 0 |
| **Earnings Before Taxes (EBT)** | $2,181,107 | $2,292,434 | $2,292,434 | $2,403,761 | $2,626,415 | $2,960,396 | $3,183,050 | $3,517,030 | $3,628,357 | $3,739,684 | $3,962,338 | $4,073,665 | $36,860,671 |
| EBT as a % of Net Revenues | 44% | 45% | 45% | 46% | 48% | 51% | 53% | 55% | 56% | 57% | 58% | 59% | |
| **Cash Flow Reconciliation** | | | | | | | | | | | | | |
| ADD: Depreciation | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 627,684 | 7,532,207 |
| ADD: Amortization | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 177,282 | 2,127,388 |
| LESS: Equipment Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Facility Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LESS: Revenue | 4,960,682 | 5,076,047 | 5,076,047 | 5,191,412 | 5,422,141 | 5,768,235 | 5,998,965 | 6,345,059 | 6,460,423 | 6,575,788 | 6,806,518 | 6,921,882 | 70,603,199 |
| Monthly Cash Flow | (1,974,609) | (1,978,647) | (1,978,647) | (1,982,685) | (1,990,760) | (2,002,873) | (2,010,949) | (2,023,062) | (2,027,100) | (2,031,138) | (2,039,213) | (2,043,251) | (24,082,933) |
| Cumulative Cash Flow | (1,974,609) | (3,953,256) | (5,931,903) | (7,914,587) | (9,905,347) | (11,908,221) | (13,919,169) | (15,942,232) | (17,969,332) | (20,000,469) | (22,039,682) | (24,082,933) | |
| Net Collections - 30 Day Lag | $4,760,209 | $4,960,682 | $5,076,047 | $5,076,047 | $5,191,412 | $5,422,141 | $5,768,235 | $5,998,965 | $6,345,059 | $6,460,423 | $6,575,788 | $6,806,518 | $68,441,526 |
| **Net Cash Flow** | $2,785,600 | $2,982,036 | $3,097,400 | $3,093,362 | $3,200,652 | $3,419,268 | $3,757,286 | $3,975,902 | $4,317,959 | $4,429,286 | $4,536,575 | $4,763,267 | $44,358,593 |
| Cumulative Cash Flow | $2,785,600 | $5,767,636 | $8,865,036 | $11,958,398 | $15,159,050 | $18,578,318 | $22,335,604 | $26,311,507 | $30,629,465 | $35,058,751 | $39,595,326 | $44,358,593 | |
| Net Cash Position | $35,557,393 | $38,539,429 | $41,636,829 | $44,730,191 | $47,930,843 | $51,350,111 | $55,107,397 | $59,083,300 | $63,401,258 | $67,830,544 | $72,367,119 | $77,130,386 | |



Exhibit 3



CONFIDENTIAL

THROPAY0001024

**ProtonOneConsulting, LLC**
**Beverly Proton Center, LLC**
**Beverly Proton Therapy Center**
**Pro Forma Financial Model**
**Cash Flow Forecast - Proton Therapy Program - Ten-year Forecast Horizon**
**FINAL**

## Statement of Cash Flows

| | Construction | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Inflows:** | | | | | | | | | | | | |
| Cash Collections | | $13,855,883 | $41,984,001 | $68,441,526 | $81,919,249 | $81,065,335 | $80,254,682 | $79,452,135 | $78,657,613 | $77,871,037 | $83,511,284 | $687,012,745 |
| Capital for Equipment and Buildout | 120,022,055 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 120,022,055 |
| Working Capital | 9,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,000,000 |
| Other - All Soft Costs and W/C | | | | | | | | | | | | 0 |
| Total Inflows | $129,022,055 | $13,855,883 | $41,984,001 | $68,441,526 | $81,919,249 | $81,065,335 | $80,254,682 | $79,452,135 | $78,657,613 | $77,871,037 | $83,511,284 | $816,034,800 |
| **Cash Outflows:** | | | | | | | | | | | | |
| Direct Expenses | | 5,938,843 | 12,741,457 | 13,127,231 | 16,332,615 | 16,466,158 | 16,604,041 | 16,746,364 | 16,893,227 | 17,044,734 | 17,200,991 | 149,095,659 |
| General/Administrative Expenses | | 5,431,008 | 7,956,783 | 10,955,703 | 11,229,595 | 11,510,335 | 11,798,094 | 12,093,046 | 12,395,372 | 12,705,256 | 13,022,888 | 109,098,080 |
| Upgrades and Down Payment for Facility/Equipment | $120,022,055 | | | | | | | | | | | 120,022,055 |
| Physician Compensation (Professional Fees) | | | | | | | | | | | | 0 |
| Principal Payment - Equipment | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Principal Payment - Facility | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense - Equipment | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense - Facility | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Soft Costs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Soft Costs - Paid Upfront | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | 0 |
| Total Outflow | $120,022,055 | $11,369,851 | $20,698,240 | $24,082,933 | $27,562,210 | $27,976,493 | $28,402,135 | $28,839,410 | $29,288,599 | $29,749,990 | $30,223,879 | $378,215,795 |
| ***Net Cash Flow*** | $9,000,000 | $2,486,032 | $21,285,761 | $44,358,593 | $54,357,038 | $53,088,842 | $51,852,547 | $50,612,725 | $49,369,015 | $48,121,047 | $53,287,405 | $437,819,006 |
| Cumulative Cash Flow | $9,000,000 | $11,486,032 | $32,771,793 | $77,130,386 | $131,487,424 | $184,576,266 | $236,428,813 | $287,041,539 | $336,410,553 | $384,531,600 | $437,819,006 | $437,819,006 |
| | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |

## Return on Investment

| | Construction | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Stream | ($129,022,055) | $2,486,032 | $21,285,761 | $44,358,593 | $54,357,038 | $53,088,842 | $51,852,547 | $50,612,725 | $49,369,015 | $48,121,047 | $53,287,405 |

10 Year IRR: 23.7%

10 Year NPV: $140,463,002

Exhibit 3

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 80 of 87 Page ID
#:2022

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy Program - Ten-year Forecast Horizon
FINAL

| | | Year 1 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Construction Period | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Assets** | | | | | | | | | | | | | |
| **Current Assets:** | | | | | | | | | | | | | |
| Cash | $9,000,000 | $8,170,996 | $7,698,321 | $7,349,360 | $6,985,588 | $6,715,908 | $6,649,224 | $6,924,058 | $7,401,887 | $8,236,046 | $9,179,108 | $10,216,262 | $11,486,032 |
| Accounts Receivable | | $371,140 | $494,853 | $494,853 | $618,566 | $865,993 | $1,237,132 | $1,484,559 | $1,855,699 | $1,979,412 | $2,103,125 | $2,350,552 | $2,474,265 |
| Inventory | | | | | | | | | | | | | |
| Prepaid Expenses | | | | | | | | | | | | | |
| Other Current Assets | | | | | | | | | | | | | |
| *Total Current Assets* | $9,000,000 | $8,542,136 | $8,193,174 | $7,844,213 | $7,604,154 | $7,581,901 | $7,886,356 | $8,408,617 | $9,257,586 | $10,215,458 | $11,282,233 | $12,566,813 | $13,960,297 |
| **Fixed Assets:** | | | | | | | | | | | | | |
| Furniture & Fixt. | | | | | | | | | | | | | |
| Vehicles | | | | | | | | | | | | | |
| Medical Equip. | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 |
| Computer Equip. | | | | | | | | | | | | | |
| Equipment | | | | | | | | | | | | | |
| Vault and Buildout | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 |
| Facility Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Land | | | | | | | | | | | | | |
| Accumulated Depreciation | | (627,684) | (1,255,368) | (1,883,052) | (2,510,736) | (3,138,420) | (3,766,103) | (4,393,787) | (5,021,471) | (5,649,155) | (6,276,839) | (6,904,523) | (7,532,207) |
| *Net Fixed Assets* | $91,378,205 | $90,750,521 | $90,122,837 | $89,495,153 | $88,867,469 | $88,239,785 | $87,612,102 | $86,984,418 | $86,356,734 | $85,729,050 | $85,101,366 | $84,473,682 | $83,845,998 |
| **Other Assets:** | | | | | | | | | | | | | |
| Investments | | | | | | | | | | | | | |
| Soft Costs - Equipment | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 |
| Soft Costs - Facility | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 |
| Other Assets | | | | | | | | | | | | | |
| Accumulated Amortization | | ($177,282) | ($354,565) | ($531,847) | ($709,129) | ($886,412) | ($1,063,694) | ($1,240,976) | ($1,418,259) | ($1,595,541) | ($1,772,823) | ($1,950,106) | ($2,127,388) |
| *Net Other Assets* | $28,643,850 | $28,466,568 | $28,289,285 | $28,112,003 | $27,934,721 | $27,757,438 | $27,580,156 | $27,402,874 | $27,225,591 | $27,048,309 | $26,871,027 | $26,693,744 | $26,516,462 |
| *Total Assets* | $129,022,055 | $127,759,224 | $126,605,297 | $125,451,369 | $124,406,344 | $123,579,124 | $123,078,614 | $122,795,908 | $122,839,911 | $122,992,817 | $123,254,626 | $123,734,240 | $124,322,75 |
| **Liabilities and Equity:** | | | | | | | | | | | | | |
| **Current Liabilities:** | | | | | | | | | | | | | |
| Accounts Payable | | | | | | | | | | | | | |
| Accrued Expenses | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Short-Term Notes Pay. | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Curr. Por. - LTD - Facility | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Curr. Por. - LTD - Equipment | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Current Liabilities* | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Long-Term Liabilities:** | | | | | | | | | | | | | |
| Notes Pay. - Long-Term | | | | | | | | | | | | | |
| LTD - Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LTD - Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Long-Term Liabilities | | | | | | | | | | | | | |
| *Total Long-Term Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Equity:** | | | | | | | | | | | | | |
| Equity in Project | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,05 |
| Capital Stock | | | | | | | | | | | | | |
| Paid-In capital | | | | | | | | | | | | | |
| Current Earnings | | ($1,262,831) | ($2,416,758) | ($3,570,686) | ($4,615,711) | ($5,442,931) | ($5,943,441) | ($6,226,147) | ($6,182,144) | ($6,029,238) | ($5,767,429) | ($5,287,815) | |
| Retained Earnings | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($4,899,298) |
| Less Cash Distributed | | | | | | | | | | | | | |
| *Total Equity* | $129,022,055 | $127,759,224 | $126,605,297 | $125,451,369 | $124,406,344 | $123,579,124 | $123,078,614 | $122,795,908 | $122,839,911 | $122,992,817 | $123,254,626 | $123,734,240 | $124,322,75 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy Program - Ten-year Forecast Horizon
FINAL

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Total Liabilities and Equity* | $129,022,055 | $127,759,224 | $126,606,297 | $125,451,369 | $124,406,344 | $123,579,124 | $123,078,614 | $122,795,908 | $122,839,911 | $122,992,817 | $123,254,626 | $123,734,240 | $124,322,757 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy P
FINAL

| | Year 2 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 |
| **Assets** | | | | | | | | | | | | |
| Current Assets: | | | | | | | | | | | | |
| Cash | $12,349,712 | $13,461,964 | $14,893,222 | $15,910,196 | $17,217,608 | $18,720,179 | $20,551,199 | $22,577,379 | $24,946,290 | $27,419,923 | $29,983,995 | $32,771,793 |
| Accounts Receivable | $2,737,120 | $2,856,125 | $2,856,125 | $2,975,131 | $3,213,141 | $3,570,157 | $3,808,167 | $4,165,183 | $4,284,188 | $4,403,193 | $4,641,204 | $4,760,209 |
| Inventory | | | | | | | | | | | | |
| Prepaid Expenses | | | | | | | | | | | | |
| Other Current Assets | | | | | | | | | | | | |
| *Total Current Assets* | $15,086,833 | $16,318,090 | $17,549,347 | $18,885,326 | $20,430,749 | $22,290,336 | $24,359,366 | $26,742,562 | $29,230,478 | $31,823,117 | $34,625,199 | $37,532,002 |
| Fixed Assets: | | | | | | | | | | | | |
| Furniture & Fixt. | | | | | | | | | | | | |
| Vehicles | | | | | | | | | | | | |
| Medical Equip. | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 |
| Computer Equip. | | | | | | | | | | | | |
| Equipment | | | | | | | | | | | | |
| Vault and Buildout | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 |
| Facility Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Land | | | | | | | | | | | | |
| Accumulated Depreciation | (8,159,891) | (8,787,575) | (9,415,259) | (10,042,942) | (10,670,626) | (11,298,310) | (11,925,994) | (12,553,678) | (13,181,362) | (13,809,046) | (14,436,730) | (15,064,414) |
| *Net Fixed Assets* | $83,218,314 | $82,590,630 | $81,962,946 | $81,335,263 | $80,707,579 | $80,079,895 | $79,452,211 | $78,824,527 | $78,196,843 | $77,569,159 | $76,941,475 | $76,313,791 |
| Other Assets: | | | | | | | | | | | | |
| Investments | | | | | | | | | | | | |
| Soft Costs - Equipment | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 |
| Soft Costs - Facility | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 |
| Other Assets | | | | | | | | | | | | |
| Accumulated Amortization | ($2,304,670) | ($2,481,953) | ($2,659,235) | ($2,836,517) | ($3,013,800) | ($3,191,082) | ($3,368,364) | ($3,545,647) | ($3,722,929) | ($3,900,211) | ($4,077,494) | ($4,254,776) |
| *Net Other Assets* | $26,339,180 | $26,161,897 | $25,984,615 | $25,807,333 | $25,630,050 | $25,452,768 | $25,275,486 | $25,098,203 | $24,920,921 | $24,743,639 | $24,566,356 | $24,389,074 |
| *Total Assets* | $124,644,326 | $125,070,618 | $125,496,909 | $126,027,922 | $126,768,378 | $127,822,999 | $129,087,063 | $130,665,292 | $132,348,242 | $134,135,915 | $136,133,030 | $138,234,867 |
| **Liabilities and Equity:** | | | | | | | | | | | | |
| Current Liabilities: | | | | | | | | | | | | |
| Accounts Payable | | | | | | | | | | | | |
| Accrued Expenses | $0 | | | | | | | | | | | |
| Short-Term Notes Pay. | $0 | | | | | | | | | | | |
| Curr. Por. - LTD - Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Curr. Por. - LTD - Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Current Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Long-Term Liabilities: | | | | | | | | | | | | |
| Notes Pay. - Long-Term | | | | | | | | | | | | |
| LTD - Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LTD - Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Long-Term Liabilities | | | | | | | | | | | | |
| *Total Long-Term Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Equity:** | | | | | | | | | | | | |
| Equity in Project | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 |
| Capital Stock | | | | | | | | | | | | |
| Paid-In capital | | | | | | | | | | | | |
| Current Earnings | $321,570 | $747,861 | $1,174,152 | $1,705,165 | $2,445,621 | $3,500,242 | $4,764,306 | $6,342,535 | $8,025,485 | $9,813,158 | $11,810,273 | |
| Retained Earnings | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | ($4,699,298) | $9,212,812 |
| Less Cash Distributed | | | | | | | | | | | | |
| *Total Equity* | $124,644,326 | $125,070,618 | $125,496,909 | $126,027,922 | $126,768,378 | $127,822,999 | $129,087,063 | $130,665,292 | $132,348,242 | $134,135,915 | $136,133,030 | $138,234,867 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy P
FINAL

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Total Liabilities and Equity* | $124,644,326 | $125,070,618 | $125,496,909 | $126,027,922 | $126,768,378 | $127,822,999 | $129,087,063 | $130,665,292 | $132,348,242 | $134,135,915 | $136,133,030 | $138,234,867 |

Case 8:16-cv-00974-CJC-AGR Document 38-3 Filed 06/21/16 Page 84 of 87 Page ID #:2026

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy P
FINAL

| | Years 3-10 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
| **Assets** | | | | | | | | |
| Current Assets: | | | | | | | | |
| Cash | $77,130,386 | $131,487,424 | $184,576,266 | $236,428,813 | $287,041,539 | $336,410,553 | $384,531,600 | $437,819,006 |
| Accounts Receivable | $6,921,882 | $6,817,942 | $6,749,763 | $6,682,265 | $6,615,443 | $6,549,288 | $6,483,795 | $0 |
| Inventory | | | | | | | | |
| Prepaid Expenses | | | | | | | | |
| Other Current Assets | | | | | | | | |
| *Total Current Assets* | $84,052,268 | $138,305,366 | $191,326,029 | $243,111,079 | $293,656,981 | $342,959,842 | $391,015,396 | $437,819,006 |
| Fixed Assets: | | | | | | | | |
| Furniture & Fixt. | | | | | | | | |
| Vehicles | | | | | | | | |
| Medical Equip. | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 | $67,294,000 |
| Computer Equip. | | | | | | | | |
| Equipment | | | | | | | | |
| Vault and Buildout | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 | $24,084,205 |
| Facility Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Land | | | | | | | | |
| Accumulated Depreciation | (22,596,621) | (30,128,827) | (37,661,034) | (45,193,241) | (52,725,448) | (60,257,655) | (67,789,862) | (75,322,068) |
| *Net Fixed Assets* | $68,781,585 | $61,249,378 | $53,717,171 | $46,184,964 | $38,652,757 | $31,120,550 | $23,588,344 | $16,056,137 |
| Other Assets: | | | | | | | | |
| Investments | | | | | | | | |
| Soft Costs - Equipment | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 | $17,588,896 |
| Soft Costs - Facility | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 | $11,054,954 |
| Other Assets | | | | | | | | |
| Accumulated Amortization | ($6,382,164) | ($8,509,552) | ($10,636,940) | ($12,764,328) | ($14,891,716) | ($17,019,105) | ($19,146,493) | ($21,273,881) |
| *Net Other Assets* | $22,261,686 | $20,134,298 | $18,006,910 | $15,879,522 | $13,752,134 | $11,624,745 | $9,497,357 | $7,369,969 |
| *Total Assets* | $175,095,638 | $219,689,042 | $263,050,110 | $305,175,664 | $346,061,872 | $385,705,137 | $424,101,097 | $461,245,112 |
| **Liabilities and Equity:** | | | | | | | | |
| Current Liabilities: | | | | | | | | |
| Accounts Payable | | | | | | | | |
| Accrued Expenses | | | | | | | | |
| Short-Term Notes Pay. | | | | | | | | |
| Curr. Por. - LTD - Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Curr. Por. - LTD - Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Current Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Long-Term Liabilities: | | | | | | | | |
| Notes Pay. - Long-Term | | | | | | | | |
| LTD - Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LTD - Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Long-Term Liabilities | | | | | | | | |
| *Total Long-Term Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| *Total Liabilities* | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Equity:** | | | | | | | | |
| Equity in Project | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 | $129,022,055 |
| Capital Stock | | | | | | | | |
| Paid-in capital | | | | | | | | |
| Current Earnings | $36,860,671 | $44,593,504 | $43,361,068 | $42,125,455 | $40,886,308 | $39,643,265 | $38,395,959 | $37,144,015 |
| Retained Earnings | $9,212,812 | $46,073,483 | $90,666,987 | $134,028,055 | $176,153,509 | $217,039,817 | $256,683,082 | $295,079,042 |
| Less Cash Distributed | | | | | | | | |
| *Total Equity* | $175,095,538 | $219,689,042 | $263,050,110 | $305,175,564 | $346,061,872 | $385,705,137 | $424,101,097 | $461,245,112 |

Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Pro Forma Balance Sheets - Proton Therapy P
FINAL

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *Total Liabilities and Equity* | $175,095,538 | $219,689,042 | $263,050,110 | $305,176,664 | $346,061,872 | $385,705,137 | $424,101,097 | $461,245,112 |



ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Project Dashboard
FINAL







Exhibit 3

ProtonOneConsulting, LLC
Beverly Proton Center, LLC
Beverly Proton Therapy Center
Pro Forma Financial Model
Break-even Sensitivity
FINAL

| Units Start | Units Increment | AVG Reimbursement | Billing Variable | Unit Variable Cost | Total Fixed Cost |
|---|---|---|---|---|---|
| 100 | 25 | $71,393 | $5,711.42 | $350.00 | $15,607,196 |

| Patients | Revenue | Variable Cost | Contribution Margin | Fixed Costs + Debt Service | Fixed Costs + Debt Service + Variable Cost | Net Income |
|---|---|---|---|---|---|---|
| 100 | $7,139,272.51 | $606,142 | $6,533,131 | $15,607,196 | $16,213,338 | ($9,074,065) |
| 125 | $8,924,090.64 | $757,677 | $8,166,413 | $15,607,196 | $16,364,873 | ($7,440,783) |
| 150 | $10,708,908.77 | $909,213 | $9,799,696 | $15,607,196 | $16,516,409 | ($5,807,500) |
| 175 | $12,493,726.90 | $1,060,748 | $11,432,979 | $15,607,196 | $16,667,944 | ($4,174,217) |
| 200 | $14,278,545.02 | $1,212,284 | $13,066,261 | $15,607,196 | $16,819,480 | ($2,540,935) |
| 225 | $16,063,363.15 | $1,363,819 | $14,699,544 | $15,607,196 | $16,971,015 | ($907,652) |
| **238.9** | **$17,055,722.03** | **$1,448,073** | **$15,607,649** | **$15,607,196** | **$17,055,269** | **$453** |
| 250 | $17,848,181.28 | $1,515,355 | $16,332,827 | $15,607,196 | $17,122,551 | $725,631 |
| 275 | $19,632,999.41 | $1,666,890 | $17,966,109 | $15,607,196 | $17,274,086 | $2,358,913 |
| 300 | $21,417,817.53 | $1,818,425 | $19,599,392 | $15,607,196 | $17,425,622 | $3,992,196 |
| 325 | $23,202,635.66 | $1,969,961 | $21,232,675 | $15,607,196 | $17,577,157 | $5,625,479 |
| 350 | $24,987,453.79 | $2,121,496 | $22,865,957 | $15,607,196 | $17,728,692 | $7,258,761 |
| 375 | $26,772,271.92 | $2,273,032 | $24,499,240 | $15,607,196 | $17,880,228 | $8,892,044 |
| 400 | $28,557,090.05 | $2,424,567 | $26,132,523 | $15,607,196 | $18,031,763 | $10,525,327 |

| break-even x | break-even y | Label |
|---|---|---|
| 238.9 | $17,055,226.86 | BE Patients 239 |

**NOTE: Based on Year Two Cost Structure**




Exhibit 3