GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
Email: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHARLES C. LIU;<br>XIN WANG a/k/a LISA WANG;<br>PACIFIC PROTON THERAPY REGIONAL CENTER, LLC;<br>PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,<br><br>        Defendants. | Case No. 8:16-cv-00974-CJC-AGR<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF ITS MOTION FOR DISGORGEMENT**<br><br>Date:      June 7, 2021<br>Time:      1:30 p.m.<br>Ctrm:      9B<br>Judge:     Hon. Cormac J. Carney |

1
2

# **TABLE OF CONTENTS**

3   I.      INTRODUCTION ............................................................................1

4   II.     ARGUMENT ..................................................................................2

5           A.      Defendants' Contorted Construction of "Net Profits"
                    Has No Basis ....................................................................2
6
7                   1.      Massive losses due to fraudulent misappropriation
                            do not preclude disgorgement of net profits .............................3

8                   2.      Defendants have no authority for their cabined
                            definition of "net profits".............................................4
9
10                  3.      A "profit and loss statement" is not required to
                            prove disgorgement.......................................................7

11          B.      Friedman's Profit-and-Loss Statement is Irrelevant
                    and Unreliable ................................................................8
12
13                  1.      Friedman's opinions are irrelevant ............................................8

14                  2.      Friedman did not "review expenses" and "determine
                            which ones were legitimate and which ones
15                          were personal"...........................................................9

16                  3.      Friedman's opinions are unreliable.........................................10

17          C.      Ginsburg's "Reasonable Compensation" Opinion is Irrelevant
                    and Unreliable ...............................................................12

18                  1.      Ginsburg's methodology is unreliable ....................................13

19                  2.      Ginsburg's opinions do not fit the facts of the case................15

20          D.      Defendants' Civil Penalty Argument is Unpersuasive .....................17

21          E.      Defendants' Efforts to Shift Fault are Specious........................19

22          F.      Liu and Wang are Jointly and Severally Liable for
                    Disgorgement .................................................................20
23
24          G.      If Collected, Disgorgement Will Be Distributed to
                    Defrauded Investors .........................................................23

25  III.    CONCLUSION.................................................................................24

26
27
28

i

# TABLE OF AUTHORITIES

## CASES

*Bakst v. Community Memorial Health Sys., Inc.*,
   2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ...................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .........................................................8, 12, 17

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................8, 10

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ...........................................................10

*FTC v. Noland*,
   Case No. Cv-20-00047-PHX-DWL, 2020 WL 4530459
   (D. Ariz. Aug. 6, 2020) .........................................................................4

*In re Toyota Motor Corp. Unintended Acceleration Marketing,
   Sales Practices, and Products Liability Litig.*,
   284 F.R.D. 485 (C.D. Cal. 2012) .........................................................10

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................8

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ...................................................................4, 5, 18

*Maheu v. Hughes Tool Co.*,
   569 F. 2d 459 (9th Cir. 1977) .............................................................17

*SEC v. Amerindo Inv. Advisors Inc.*,
   No. 05-cv-5231, 2014 WL 2112032 (S.D.N.Y. May 6, 2014),
   *aff'd sub nom.* 639 Fed.Appx. 752 (2d Cir. 2016) ...........................18

*SEC v. Credit Bancorp, Ltd.*,
   No. 99-cv-11395, 2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002) ...................18

*SEC v. Curative Biosciences, Inc.*,
   Case No. 8:18-cv-00925-SVW, 2020 WL 7345681
   (C.D. Cal. Oct. 22, 2020) .......................................................7, 23, 24

*SEC v. First Pacific Bancorp*,
   142 F.3d 1186 (9th Cir. 1998) ...............................................................7

*SEC v. Fowler*,
   440 F. Supp. 3d 284 (S.D.N.Y. 2020) ....................................................18

*SEC v. Great Lakes Equities Co.*,
   775 F. Supp. 211 (E.D. Mich. Sept. 24, 1991) ....................................3

*SEC v. Huff*,
   Case No. 08-60315-CIV, 2011 WL 1102777 (S.D. Fla. Mar. 23, 2011)............3

*SEC v. Hussain*,
Case No. 2:16-cv-03250-ODW (Ex), 2021 WL 1146381
(C.D. Cal. Mar. 25, 2021).................................................................................4

*SEC v. Liu*,
262 F. Supp. 2d 857 (C.D. Cal. 2017) ................... 1, 2, 3, 4, 5, 7, 14, 20, 23, 24

*SEC v. Merchant Capital, LLC*,
486 Fed. Appx. 93 (11th Cir. 2012) ................................................................17

*SEC v. Mizrahi*,
Case No. CV 19-2284 PA (JEMx), 2020 WL 6114913
(C.D. Cal. Oct. 5, 2020)...................................................................................7

*SEC v. Penn*,
Case No. 14-CV-581 (VEC), 2021 WL 1226978
(S.D.N.Y. Mar. 31, 2021)..........................................................................5, 6, 24

*SEC v. Premier Holding Corp.*,
Case No. 18-00813-CJC (KESx), 2021 WL 1048565
(C.D. Cal. Jan. 20, 2021).................................................................................23

*SEC v. Rinfret*,
Case No. 19-cv-6037 (AJN), 2020 WL 6559411
(S.D.N.Y. Nov. 9, 2020)...................................................................................7

*SEC v. San Francisco Regional Center, LLC*,
2020 WL 4569844 (N.D. Cal. Aug. 7, 2020) ....................................................4

*SEC v. Shaoulian*,
Case No. 00-4614-CBM MANx, 2003 WL 26085847 (C.D. Cal. May
12, 2003) .........................................................................................................3

*SEC v. Slowinski*,
Case No. 1:19-cv-03552, 2020 WL 7027639 (N.D. Ill. Nov. 29, 2020).........6, 7

*SEC v. Smith*,
Case No. CV 20-1056, 2020 WL 6712257 (C.D. Cal. Oct. 19, 2020)...............7

*SEC v. Valdez*,
661 Fed.Appx. 814 (5th Cir. 2016) ................................................................18

*SEC v. Yang*,
824 Fed. Appx. 445 (9th Cir. 2020) ..................................................................4

*Springsteen-Abbott v. SEC*,
989 F.3d 4 (D.C. Cir. 2021)..............................................................................6

*United States v. Gwaltney*,
790 F.2d 1378 (9th Cir. 1986) ..........................................................................8

iii

## FEDERAL STATUTES

### Securties Act of 1933

Section 20(d)(2)(B)
  [15 U.S.C. § 77t(d)(2)(B)] ............................................................... 18

Section 20(d)(2)(C)
  [15 U.S.C. § 77t(d)(2)(C)] ............................................................... 18

### Securities Exchange Act of 1934

Section 21(d)(3)(B)
  [15 U.S.C. § 78u(d)(3)(B)] ............................................................. 18

Section 21(d)(7)
  [15 U.S.C. § 78u(d)(7)] ................................................................... 24

### Sarbanes-Oxley Act of 2002

Section 308(a)
  [15 U.S.C. § 7246(a)] ...................................................................... 24

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 403 ................................................................................. 8

Fed. R. Evid. 702 ........................................................................... 8, 12

Fed. R. Evid. 702(a) ........................................................................... 8

## OTHER AUTHORITIES

3 Jack B. Weinstein and Margaret A. Berger,
  Weinstein's Federal Evidence, P 702[04][1][b] at 702-45 ................ 8

## I.     **INTRODUCTION**

Although larded with immaterial facts and stubbornly unresponsive to the SEC's direct arguments on disgorgement, defendants Liu's and Wang's opposition brief can be reduced to this.  According to Ginsburg, their retained expert, Liu and Wang are entitled to more than $7.5 million in "reasonable compensation," never mind the fact of their securities fraud, and never mind the more than $26 million in investor losses they left in their wake.  Dkt. No. 324 ("Opp.") at 18.  According to Friedman, their other retained expert, that supposed "reasonable compensation" and every other purported expense they incurred – whether violative of the POM or not – were business expenses and appropriately coded as such on the corporate defendants' general ledgers, just because Liu said so.  Since these "legitimate" expenses included payments to Liu, Wang, and marketers in excess of 75% of all capital raised, the "profit and loss statements" that Friedman prepared from those general ledgers show, to no surprise, that defendants Beverly Proton, Pacific Proton, and the PPEB5 Fund sustained $16.5 million in losses.  With their straw man thus complete, defendants now urge that they have no liability at all for disgorgement, since the corporate defendants never made any "net profits."  (Opp. at 21.)  Neither the Supreme Court's ruling in *Liu* nor basic principles of equity countenance such an illogical result.

The through line for all of defendants' contentions is their refusal to grapple with the fact that the POM "clearly delineated the purposes and legitimate uses" of the more than $26 million in capital contributions and administrative fees they raised, *SEC v. Liu*, 262 F. Supp. 2d 857, 962 (C.D. Cal. 2017), and that their claimed expenses are not made "legitimate" merely by Liu's say-so.  At deposition, Liu's strained thinking could not have been clearer.  After counsel asked why, on the heels of receiving an investigative subpoena from the SEC, Liu transferred millions of dollars of investor funds to his foreign bank accounts in spring 2016, he testified as follows:

> Q.     … That's a lot of money.  Do you remember where you sent that money to and why you sent it?

1

A.    <u>It's my personal money</u>.

Q.    So –

A.    <u>I can send it wherever I want to</u>.

Leung Supp. Decl. at ¶ 3, Ex. 1 (2/24/21 Liu Depo. Tr.) at 81:13-84:12 (emphasis added).  That is not true.  Liu and Wang could not take and spend investor funds as they pleased.  The POM set forth what defendants could and could not do with investor funds, and "Liu did not adhere to the POM.  Instead, he diverted approximately $20 million of investor money to marketing companies, himself, and Wang." *Liu*, 262 F. Supp. at 962.

Defendants' alternate reality – where misappropriation of funds is "reasonable compensation," and where payments to marketers in violation of representations to investors are a "legitimate" use of investor proceeds – does not withstand any degree of scrutiny.  For all of the reasons given below, the SEC respectfully requests that this Court grant its motion for disgorgement in full.

## II.    <u>ARGUMENT</u>

### A.    **Defendants' Contorted Construction of "Net Profits" Has No Basis**

After citing a handful of post-*Liu* authorities for basic principles not in dispute here, defendants leap to the conclusion that "[t]he SEC has not shown any net profit by defendants."  (Opp. at 20-21.)  Though Liu and Wang never own up to it, their narrow definition of "net profits" is clear from the thrust of their argument:

> Defendants' expert has demonstrated the project companies incurred significant losses.  In short, there are no net profits to award as equitable disgorgement … Any disgorgement award will exceed the proof of zero net profit.

*Id.* at 21.  According to defendants' construction, "net profits" to be disgorged can only be:  (i) profits generated by corporate defendants according to a profit & loss statement; that are then (ii) transferred to Liu and Wang.  This false standard is completely untethered to the Supreme Court's ruling in *Liu*.

///

2

### 1. Massive losses due to fraudulent misappropriation do not preclude disgorgement of net profits

First, in this civil enforcement action, the SEC proved an offering fraud in which defendants looted the project companies and accomplished nothing of economic substance.  The fact defendants advance as reason enough to preclude any disgorgement award at all – massive losses by the corporate defendants – owes entirely to defendants' fraud.  However, Liu's and Wang's fraudulent dissipation of investor funds in violation of the POM, and its commensurate death knell for the business prospects of the corporate defendants, does not afford them an escape hatch from disgorgement.  *See SEC v. Great Lakes Equities Co*., 775 F. Supp. 211, 214-15 (E.D. Mich. Sept. 24, 1991) ("[The defendant's] construction would permit the perpetrator of a successful scheme, who was just as successful at dissipating the ill-gotten gains, to avoid a disgorgement order because at the time of the order, [it] had retained none of the proceeds from the scheme"); *SEC v. Shaoulian*, Case No. 00-4614-CBM MANx, 2003 WL 26085847, *6 (C.D. Cal. May 12, 2003) ("Expenditures a defendant makes for his or her own use from illegally obtained funds are counted against the defendant, precisely because he or she benefited from those expenditures."); *SEC v. Huff*, Case No. 08-60315-CIV, 2011 WL 1102777, *6 (S.D. Fla. Mar. 23, 2011) ("[I]t matters not how the ill-gotten gains were ultimately expended, so long as the spending of the ill-gotten gains bestowed a benefit on the person from whom the monies are to be disgorged.").

According to defendants' interpretation of *Liu* and "net profits," so long as a defendant uses a corporate entity as a vehicle for a fraudulent securities offering, and then takes good care to avoid a paper corporate profit by engaging in rampant misappropriation sufficient to undermine that entity's represented commercial endeavors, no amount of disgorgement against that defendant can ever be ordered by this Court.  The Court should reject defendants' incorrect reading of *Liu.*

///

### 2.    Defendants have no authority for their cabined definition of "net profits"

None of the cases cited by defendants espouse a definition of "net profits" even remotely like the meaning advanced by Liu and Wang here.  *See* Opp. at 20; *SEC v. San Francisco Regional Center*, *LLC*, 2020 WL 4569844, *2 (N.D. Cal. Aug. 7, 2020) (holding simply that disgorgement is "*net* profits after deductions for legitimate business expenses") (emphasis in original); *SEC v. Hussain*, Case No. 2:16-cv-03250-ODW (Ex), 2021 WL 1146381, *10 (C.D. Cal. Mar. 25, 2021) (noting only that *Liu* held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)"); *FTC v. Noland*, Case No. Cv-20-00047-PHX-DWL, 2020 WL 4530459, *4 (D. Ariz. Aug. 6, 2020) (addressing FTC statute – "*Liu* addressed the disgorgement remedy the SEC may seek under its governing statute and didn't once discuss the FTC, which is governed by an entirely different statute"); *SEC v. Yang*, 824 Fed. Appx. 445, 447 (9th Cir. 2020) (unpublished order) (reiterating that ordering disgorgement in an amount that "does not exceed a wrongdoer's net profits and [that] is awarded for victims" is permissible under the equitable authority granted in 15 U.S.C. § 78u(d)(5)").

To the contrary, *Liu* is clear:  defendants must disgorge net profits after deductions for legitimate business expenses.  *Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020).  And that is exactly what the SEC's disgorgement calculation does:

1.    The offering expenses that defendants spent in excess of the $45,000 administrative fees violated the POM:  that was <u>$8,743,674</u> more than the administrative fees received.  *See Liu*, 262 F. Supp. 3d at 970-72; Dkt. No. 320 at ¶ 3,

///

///

///

///

///

4

Ex. 1 (Irwin Report) at ¶ 37, Ex. 5.[1]

2.      Liu's and Wang's exorbitant compensation rendered the POM misleading:  that totaled $9,116,859 in bank transfers and personal expenses paid with corporate funds.  *See Liu*, 262 F. Supp. 3d at 970-71; Dkt. No. 320 at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 44-49, Ex. 7.

3.      Liu's self-dealing with respect to Dr. Thropay and Mevion contravened the representations of the POM and its included business plan, which placed Dr. Thropay and Optivus front and center as vital to the represented cancer therapy center's commercial success:  that was another $3 million that Liu transferred to Mevion, for the benefit of Liu's own United MPH venture.  *See* Dkt. No. 322 at pp. 9-15; Dkt. No. 320 at ¶ 3, Ex. 1 (Irwin Report) at ¶ 41, Ex. 6 (column b).

Because they all violated the terms of the POM, none of the foregoing amounts ($8,743,674 + $9,116,859 + $3,000,000) are legitimate expenses that may be deducted from net profits to be disgorged.  Rather, they are wrongful gains to Liu and Wang under another name.  *Liu*, 140 S. Ct. at 1950.

Nor does the fact that Liu transferred certain funds to Mevion and potentially unaffiliated overseas marketers alter this conclusion.  What matters is that these transfers were a misappropriation in contravention of the POM at the outset.  "Money is fungible, so any portion of the misappropriated funds that were subsequently spent on allegedly legitimate expenses are 'merely wrongful gains under another name.'" *SEC v. Penn*, Case No. 14-CV-581 (VEC), 2021 WL 1226978, *11 (S.D.N.Y. Mar. 31, 2021).

The court's application of *Liu* in *Penn* is instructive.  In *Penn*, the defendant

---

[1] Defendants' response to this point is unpersuasive.  They argue that since they expected to raise $150 million in capital contributions (they had not and did not), they could count on obtaining $11.25 million in corresponding administrative fees (they had not and did not), and thus, they could appropriately spend up to $11.25 million on offering costs in accordance with the POM, rather than just the $2.21 million in administrative fees they had actually received (in the real, not counter-factual or imagined world).  (Opp. at 12-13.)

fund manager misappropriated $9.3 million from a private fund by falsely billing it for due diligence services.  *Id.* at *1.  He then caused some of the misappropriated funds to be spent by defendant entities he controlled on their business expenses – rent and salaries to third-parties.  *Id.* at *11.  But because the money had been fraudulently taken in the first instance ("CGI used the commingled funds to pay overhead expenses, such as rent and salary, which were not permissible fund expenses under the [F]und's governing document"), the trial court declined to deduct those expenses under *Liu*:  "such expenses are somewhat analogous to the payments in *Liu* for marketing expenses and salaries that went beyond what the offering memorandum permitted; an illegitimate expense that should not be deducted when calculating the amount of disgorgement."  *Id.*; *see also Springsteen-Abbott v. SEC*, 989 F.3d 4, 9 (D.C. Cir. 2021) (rejecting argument that misallocated expenses were not "net profits" to be disgorged – "by paying for continuing-education expenses out of the funds, rather than her wholly-owned business, Petitioner enriched herself by the amount of the savings."); *SEC v. Slowinski*, Case No. 1:19-cv-03552, 2020 WL 7027639, *4 (N.D. Ill. Nov. 29, 2020) ("Slowinski funneled funds from Rebuilding America's investors to cover unrelated business expenses for companies that he partially owns … Because Slowinski had an interest in the profitability of those companies, cost offsets to their general operations still amount to his personal gain.").

The $3 million Mevion expenditure is of the same ilk.  Liu made that payment to further his own course of self-dealing, since documentary evidence and Liu's deposition testimony all show that:  (i) in the latter-half of 2015, Liu sought to form a new joint venture for the very same proton cancer therapy EB-5 project, but without Dr. Thropay; (ii) Liu and his new partners wanted to purchase Mevion equipment for Liu's United MPH project; but (iii) Liu instead used Beverly Proton funds to pay Mevion, unbeknownst to Dr. Thropay and Liu's new business partners.  *See* Dkt. No. 322 at pp. 9-15.  As in *Penn*, *Slowinski*, and *Springsteen-Abbott*, the $3 million Mevion payment was a wrongful gain under another name to Liu, and thus an

illegitimate expense that should not be deducted from disgorgement.

Last, defendants have refused to allow discovery into their financial affairs, an inquiry that would shed light on what happened to investor funds sent overseas – including whether any portion of the inexplicably high commissions paid to Overseas Chinese made their way back to defendants, or otherwise inured to their benefit.  *See Liu*, 262 F. Supp. 3d at 966-67, 976-85.  Under these circumstances, the amounts defendants spent on marketing in violation of the POM were not only unquestionably illegitimate, equity dictates that they should be treated as such and not deducted from defendants' disgorgement liability.

### 3.    A "profit and loss statement" is not required to prove disgorgement

Defendants further suggest that without a "P&L statement showing profits or losses," the SEC cannot prove disgorgement.  (Opp. at 11, 15.)  Defendants have no authority for this illusory evidentiary requirement; rather, the case law is replete with instances in which, post-*Liu*, federal courts have ordered disgorgement on the strength of proof that did not include the "P&L statement" insisted upon by defendants.  *See*, *e.g.*, *Slowinski*, 2020 WL 7027639, *3 (ordering disgorgement based on declaration of SEC staff accountant documenting flow of funds); *SEC v. Mizrahi*, Case No. CV 19-2284 PA (JEMx), 2020 WL 6114913, *2-6 (C.D. Cal. Oct. 5, 2020) (same); *SEC v. Smith*, Case No. CV 20-1056, 2020 WL 6712257, *3 (C.D. Cal. Oct. 19, 2020) (same); *SEC v. Rinfret*, Case No. 19-cv-6037 (AJN), 2020 WL 6559411, *5-6 (S.D.N.Y. Nov. 9, 2020) (same).

"Disgorgement need be 'only a reasonable approximation of profits causally connected to the violation," *SEC v. Curative Biosciences*, *Inc.*, Case No. 8:18-cv-00925-SVW, 2020 WL 7345681, *4 (C.D. Cal. Oct. 22, 2020) (quoting *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir. 1998)), and the forensic accounting analysis set forth in Irwin's expert report has fully met that burden here. ///

7

**B.    Friedman's Profit-and-Loss Statement is Irrelevant and Unreliable**

**1.    Friedman's opinions are irrelevant**

The financial statements that defendants paid Friedman to prepare – the sum of which show only that the corporate defendants sustained "significant losses ($16,500,000)," a conclusion distant from any true controversy – are apropos of nothing. *See* Leung Supp. Decl. at ¶ 4, Ex. 2 (Friedman Depo. Tr.) at 19:5-20:18. They should be excluded.

The admissibility of expert testimony is governed by Rule 702 and Rule 403 of the Federal Rules of Evidence. To be admissible under Rule 702, the proposed expert testimony must "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). As the Supreme Court explained in *Daubert v. Merrell Dow Pharms., Inc*., Rule 702 imposes a special gatekeeping function upon trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 590-591 (1993) ("*Daubert I*"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Thus, in order for an expert to testify, he must have "specialized knowledge" that is sufficiently related to the issues and evidence before the trier of fact such that the witness's proposed testimony will be helpful to the trier of fact. *See* 3 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence, P 702[04][1][b] at 702-45.

An expert opinion must be relevant to be admissible – in other words, a court must find "that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc*. ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). The Supreme Court referred to this prong of the analysis as the "fit" requirement, *Daubert I*, 509 U.S. at 591-92, and in the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).

Friedman concedes that his opinions can only assist the trier of fact if, as

defendants contend, a "P&L statement" is a necessary form of proof to establish liability for disgorgement. Leung Supp. Decl. at ¶ 4, Ex. 2 (Friedman Depo. Tr.) at 43:9-45:11. As explained *supra*, that legal conceit is wrong, and Friedman's opinions are therefore inadmissible because they fail to meet *Daubert*'s "fit" requirement.

### 2.   Friedman did not "review expenses" and "determine which ones were legitimate and which ones were personal"

Defendants nevertheless claim that Friedman "reviewed the expenses in light of the POM and determined which ones were legitimate business expenses and which ones were personal," and because "[p]ersonal expenses were charged to Liu as compensation," Friedman applied a high degree of "independence" in arriving at his opinions. (Opp. at 16, 23.) This assertion is willfully misleading.

What defendants' brief omits is that "personal expenses were charged to Liu as compensation," but then that "compensation" – a total of $7,578,907 – was booked by Friedman as a legitimate business expense of the corporate entities. Leung Supp. Decl. at ¶ 5, Ex. 3 (Friedman Report) at Ex. 2 (consolidated profit and loss statement showing $7,211,692 and $367,215 in "Management Fees" expense paid to Liu and Wang), Ex. 2D (same); *see, e.g., id.* at ¶ 4, Ex. 2 (Friedman Depo. Tr.) at 102:24-103:15 (cars purchased by Liu with corporate funds had no evident corporate use, yet were booked as a corporate expense in the form of Liu's "management fee"); 107:4-16, 108:17-109:7. This "management fee" expense item – in truth, the general ledger manifestation of defendants' corporate looting – was an obvious and proximate cause of the "significant losses ($16,500,00)" that Friedman arrived at in his report. (Opp. at 16.) And those "significant losses" per Friedman are, in turn, the foundation for defendants' final conclusion that no amount of disgorgement may be ordered by this Court since "[a]ny disgorgement award will exceed the proof of zero net profit." (Opp. at 21.) Defendants' assertion that Friedman appropriately and fairly accounted for defendants' rampant misappropriation of investor funds is clever to a fault. It should carry no weight with this Court.

9

Last, and more broadly, defendants' description of Friedman's analysis – that he "determined which ones were legitimate business expenses and which ones were personal" – is wrong:

> Q.     Okay.  And so would you agree that it's not part of your expert analysis in this case to be rendering an opinion on the necessity, reasonableness, or legitimacy of the services that were rendered for these funds by these vendors that are listed in Exhibit 2C?
>
> A.     My opinion is that these vendors were paid these amounts of dollars.

Leung Supp. Decl. at ¶ 4, Ex. 2 (Friedman Depo. Tr.) at 98:22-100:6 (same re: asserted consulting fee expenses at Ex. 2C of Friedman report); *see also id.* at 97:23-98:19 (same re:  asserted legal and professional fee expenses at Ex. 2A of Friedman report); *id.* at 100:7-101:16 (same re:  asserted rent expenses at Ex. 2F of Friedman report).  Friedman lacked the facts or data to assess whether defendants' asserted expenses were legitimate, reasonable, or necessary, and his deposition testimony makes clear that he undertook no such inquiry.  *Id.* at 91:7-95:4, 95:14-96:17.

### 3.     Friedman's opinions are unreliable

Finally, in addition to being relevant, an expert's opinion must be reliable.  The Supreme Court in *Daubert I* "provided a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique had been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community."  *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.*, 284 F.R.D. 485, 498 (C.D. Cal. 2012) (quoting *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002)).

Friedman's expert opinions are severely cabined.  He did not audit or verify any of the line items, expense-related or otherwise, contained in the general ledgers he used to construct his own financial statements.  Leung Supp. Decl. at ¶ 4, Ex. 2

(Friedman Depo. Tr.) at 23:23-24:7.  His work is based instead on general ledgers
prepared by Trang Lam in 2015 and 2016, when the corporate defendants retained
Marcum for mere bookkeeping services.  *Id.* at 53:16-24, 64:9-67:10, 79:22-80:6.
However, the expense classifications applied by Lam in the general ledgers were
dependent on Liu's say-so since she performed no verification or substantiation work
of her own, did not engage in an audit, review, or even compilation in accordance
with professional accounting standards, and thus provided no assurance as to those
expense classifications.  *See* Dkt. No. 322 at pp. 18-20.

Despite the limitations in Lam's original bookkeeping engagement, Friedman
took no efforts to verify or substantiate the figures reflected in those general ledgers
for himself.  He did not review Liu's and Wang's deposition and investigative
testimony.  Leung Supp. Decl. at ¶ 4, Ex. 2 (Friedman Depo. Tr.) at 55:9-25.  He did
not speak with anyone who had ever worked for the corporate defendants.  *Id.* at
57:18-21.  He did not speak with anyone who had ever done business with the
corporate defendants.  *Id.* at 57:22-25.  He did not communicate with or seek
information from any of the third-party vendors purportedly responsible for the
expenses reflected on Lam's general ledgers.  *Id.* at 58:1-61:4.  He did not attempt to
verify the investor list Liu had provided to Lam by locating transfers in the relevant
bank records that would corroborate Liu's list.  *Id.* at 68:10-69:6.[2]  And last, there
were glaring holes in the universe of relevant documentary evidence made available

---

[2] Defendants' criticism of Irwin's count of 50 investors in the relevant period is
therefore baffling.  (Opp. at 12.)  Unlike Friedman – who made no effort to verify
Liu's investor list against evidence of capital contributions and payment of
administrative fees in the actual bank records of the corporate defendants – Irwin
completed that analysis and arrived at her verifiable investor list, in contrast to taking
Liu's at face value.  *See* Dkt. No. 320 at ¶ 3, Ex. 1 (Irwin Report) at ¶¶ 27-29, Ex. 4.
Defendants' objection to Exhibit 9A of the Irwin Report is also unavailing.  *See* Opp.
at 11.  The source, method of calculation, and figures for each of the line items
reflected in Exhibit 9A was fully disclosed in Irwin's March 25 expert report:  (i)
$26,423,168 in net investor deposits disclosed at  ¶¶ 27-29 and Ex. 4; (ii) $2,210,701
in deductible offering expenses disclosed at ¶¶ 29, 33-37 and Ex. 5; and (iii)
$3,105,809 in deductible business expenses disclosed at ¶¶ 40-42 and Ex. 6.  *See* Dkt.
No. 320 at ¶ 3, Ex. 1 (3/25/21 Irwin Report); *see also* Leung Supp. Decl. at ¶ 11, Ex.
9 (complete 4/23/21 email string between counsel).

to him.  *Id.* at 91:7-95:4, 95:14-96:17; *compare* Opp. at 17 (claiming "Friedman relied on documentary evidence to prepare the financials.").

In sum, according to Friedman himself:

- "I have not audited, reviewed, nor compiled any historical financial information or federal or state income tax returns, and consequently, I express no form of assurance on them."

- "I have not audited nor reviewed the information contained herein in accordance with standards promulgated by the American Institute of Certified Public Accountants, and accordingly, express no opinion regarding compliance with such standards."

- "This report is solely for the use in the matter of litigation of *Securities and Exchange Commission v. Charles C. Liu …*"

*Id.* at 24:8-25:20; *see also id.* at 78:22-79:5, 112:9-113:5, 113:11-114:2, 114:11-115:16.  Friedman's work product was, at most, prepared as part of a bookkeeping service:  he admitted that he did not meet even the professional standards for a basic, non-attest, non-assurance financial statement preparation.  *Id.* at 113:6-10 (AR-C 70, *Preparation of Financial Statements*).  So for reasons that are self-evident, Friedman does not want Liu and Wang to file his work with the IRS, or use the financial statements he prepared to obtain a loan or to negotiate with and engage in commercial transactions with third-parties.  *Id.* at 122:8-123:4.

Besides being irrelevant, Friedman's opinions, by his own admission, did not meet the professional standards of those in his field, should not be used for any purpose other than this litigation, and consequently lack a reliable basis as required by Rule 702 and *Daubert II*.

### C.   Ginsburg's "Reasonable Compensation" Opinion is Irrelevant and Unreliable

Defendants' other retained expert, Ginsburg, opines that $7,578,907 of the investor funds they took are in fact "reasonable compensation."  (Opp. at 18.)  In the

main, defendants argue that no disgorgement should be ordered because the corporate defendants lost $16.5 million.  That contention fails.  *See* Argument, § II(A), *supra*. Based on Ginsburg's opinions, however, defendants will not even allow that the exorbitant compensation they paid themselves was wrong.  Ginsburg's opinions, however, are methodologically flawed and they fail to fit the facts of this case.

To arrive at $7.57 million in "reasonable compensation," Ginsburg took two tacks.  He first calculated "finder's fee compensation" that Liu should have been paid ($2,285,880).  Then on top of that, he conducted a compensation survey to arrive at annual salaries, additive to Liu's finder's fees, that Liu and Wang should have been paid in their supposed capacities as "President" and "Vice President of Marketing" for the corporate defendants ($4,925,812 and $367,215, respectively).  *See* Leung Supp. Decl. at ¶ 6, Ex. 4 (3/25/21 Ginsburg report) at pp. 1-4.  This exercise was the textbook definition of overreach.

### 1.    Ginsburg's methodology is unreliable

As to Ginsburg's finder's fee analysis, he had his staff search EDGAR for Form-D filings on unregistered EB-5 securities offerings, and used those observations to arrive at a 9.25% median finder's fee, which he then applied to investor funds raised, and calculated a $2.285 million fee for which Liu was reasonably entitled. But Ginsburg did not know how his support staff had actually searched the EDGAR website for this data, Leung Supp. Decl. at ¶ 7, Ex. 5 (Ginsburg Depo. Tr.) at 52:22-55:15, and worse, he:  (i) discarded any and all EB-5 offerings his staff found that did not provide for a finder's fee, thereby culling an initial cut of 60-80 offerings down to just 20, *see id.* at 55:5-15; (ii) with those remaining 20 observations, he settled on a host of unregistered securities offerings that concerned businesses completely unlike the proton cancer therapy center EB-5 project at issue in this case, *see id.* at 124:5-22; and most significantly, (iii) Ginsburg did not review the offering materials for any of his remaining EB-5 data points to determine if the finder's fees disclosed in these Form D filings were in fact prohibited by the terms of the offering.  *See id.* at 130:12-

131:24.  This cherry-picking of data, though itself disqualifying, is of course trumped by a fundamental fact.  The median 9.25% finder's fee that Ginsburg concluded Liu should rightly be paid is inarguably barred by the POM.  *See Liu*, 262 F. Supp. 3d at 962 (9.25% of a $500,000 capital contribution is $46,250; $46,250 is bigger than $45,000; and that does not count the more than $10 million defendants separately paid to UDG, Overseas Chinese, and Delsk in sales commissions that Ginsburg says Liu may add his own purported $2.28 million finder's fee to).

As to Ginsburg's reasonable executive salary analysis, he searched a compensation database using three blunt filters:  (1) industry code; (2) job title; and (3) geographic location.  *Id.* at 59:5-60:21, 61:19-62:10.  He then used that data to conclude that Liu deserved $4.9 million in salary compensation, and Wang deserved $367,215 in salary compensation.  The filters he applied were wrong.  Ginsburg admitted that he did not inquire as to whether Liu or Wang had actually performed the job responsibilities of an executive corresponding to the filters he had selected for Liu ("President") and Wang ("VP of Marketing").  *Id.* at 104:5-17.  When filtering for revenue, Ginsburg assumed that investors' capital contributions were "revenue" and then divided the amount raised from October 2014 through April 2016 by four years, thus arriving at a rough estimate of $7.25 million in "annual revenue" from 2010 to 2016 for his survey search.  *Id.* at 23:23-24:19, 24:20-25:6, 111:12-115:22; *but compare* Leung Supp. Decl. at ¶ 5, Ex. 3 (Friedman Report) at p. 2 (claiming aggregate revenues for all corporate defendants since 2010 to be just $2.7 million).  And last, for his industry filter, Ginsburg selected "general medical hospital," notwithstanding defendants' failure to develop the represented cancer center in any meaningful respect.  *Id.* at 115:23-118:22.  What's more, this survey evidence, in Ginsburg's view, outweighed a more proximate point of data.  Dr. Thropay, the chief executive officer of the entity defendants, was never paid employment compensation because the project never got off the ground.  Ginsburg nonetheless opined that this fact "does not mean anything for my analysis."  *Id.* at 94:10-21.

## 2.     Ginsburg's opinions do not fit the facts of the case

There are other disabling problems.  Ginsburg has no professional experience or familiarity with the business or the industry at hand – the development and operation of a proton therapy cancer center or even EB-5 investment offerings in general, *see id.* at 66:4-67:4, and Ginsburg conceded that his engagement in this case was personally novel.  Though he has prepared hundreds of reasonable compensation analyses in the past, he has never prepared an assessment where the subject executives:  (i) have been found liable for securities fraud; (ii) have appropriated corporate funds for exorbitant personal enrichment; (iii) have acted negligently in the course of their duties; and (iv) have conducted company business with a fraudulent intent.  *Id.* at 35:8-36:20.  Even so, these crucial facts posed no analytical obstacle at all, since they were meaningless in Ginsburg's estimation:

> Whether the person had been – not been doing a good job or had been stealing from the company or other issues wouldn't bear on what the marketplace would pay a person – not that person, but a person – with the right experience, or whatever, to do that job.  <u>So I'd have to say that what that person actually did, what that employee actually did, is irrelevant, I guess, to the nature of my study</u> … I would say that the issue of whether an employee is stealing from the employer is irrelevant to the studies I perform.

*Id.* at 36:21-38:4 (emphasis added.)  And so all of the following were irrelevant to Ginsburg's analysis:  (i) "[w]hether or not Mr. Liu engaged in securities fraud," *id.* at 40:11-19; (ii) "[w]hether or not Ms. Wang engaged in securities fraud," *id.* at 40:20-24; (iii) "[w]hether or not Mr. Liu actually performed his duties for the corporate entities," *id.* at 40:25-41:4; (iv) "[w]hether or not Ms. Wang performed her stated duties for the corporate entities," *id.* at 41:5-9; (v) "whether or not Mr. Liu misappropriated corporate funds," *id.* at 41:10-13 (vi) "whether or not Ms. Wang misappropriated corporate funds," *id.* at 41:14-18; (vii) "whether or not Mr. Liu conducted his duties in a negligent way," *id.* at 41:19-23 (viii) "whether or not Ms. Wang performed her job in a negligent way," *id.* at 42:5-10; (ix) "[w]hether or not Mr. Liu conducted company business with a fraudulent intent," *id.* at 42:11-16; (x)

"[w]hether or not Ms. Wang acted with a high degree of scienter in conducting

company business," *id.* at 42:17-23; (xi) "[w]hether or not Mr. Liu actually showed

up for work in the course of [the] many years under analysis," *id.* at 42:24-43:4; (xii)

"[w]hether or not Ms. Wang ever performed a single hour, a single minute of work on

behalf of the corporate entities in the United States," *id.* at 43:5-13; and (xiii)

"whether or not Mr. Liu engaged in self-dealing to the detriment of his business

partners," *id.* at 43:14-19.  In Ginsburg's words:

> You know, in my mind, if any or all of those things occurred, then it
> was really the responsibility of the company's board of directors, or
> whatever, perhaps, to deal with those issues.  It is not an issue of …
> because you acted badly, however you define that, you should not be
> paid … as far as my work is concerned.

*Id.* at 43:20-44:3; *see also id.* at 72:6-16.

What defendants actually told investors about how their funds would be used –

*i.e.*, the representations contained in the POM and the Pacific Proton business plan –

was likewise of no consequence to Ginsburg.  *Id.* at 74:15-75:5.  Ginsburg reviewed

no sworn testimony and spoke to no percipient witnesses at the subject companies.

*Id.* at 75:6-76:1.  He accordingly had no understanding of either Liu's or Wang's

stated job responsibilities, or whether they ever performed those responsibilities.  *Id.*

at 22:7-12, 78:2-82:21, 83:18-86:9, 96:18-98:3 ("The actual services that were

provided by Liu or by Wang, I don't know exactly what they did.").

In sum, when given the opportunity, Ginsburg could not articulate how his

opinions fit the facts of this case:

> A. … My response is, I have no basis to determine whether or
> not the receipt was negligent, whether what they did was reasonable
> or unreasonable.  I actually have no understanding of what it was that
> Liu and Wang did or did not do with any funds that were raised for
> this program.
>
> Q.  Well, were you asked to give consideration to those facts,
> the adjudication of securities fraud and the actual findings of the
> [C]ourt?  Did counsel direct you to consider those exigent – that
> exigent information in forming your opinions?

***

16

A.  I did not.  I did not because, again, it is irrelevant to the study that I had done, which is what would the marketplace pay people to fill these positions.  <u>So what happened, what actually happened is irrelevant to my determination</u> …

Q.  And, Mr. Ginsburg, <u>if what actually happened is irrelevant to the opinions you formed in this case, how do your opinions fit the facts of this case?</u>

A.  <u>I guess I'm not quite following what you're – what you're asking</u>.

*Id.* at 141:20-143:4 (emphasis added.)

Ginsburg's "reasonable compensation" opinions are therefore inadmissible under *Daubert II* because they do not fit the facts of this case.  *See*, *e.g.*, *Bakst v. Community Memorial Health Sys., Inc.*, 2011 WL 13214315, \*20 (C.D. Cal. Mar. 7, 2011) ("The court agrees that because Wunderlich's damages calculation is based on factual assumptions that are entirely unsupported in the record, it fails [to] meet the second prong of *Daubert*."); *Maheu v. Hughes Tool Co.*, 569 F. 2d 459 (9th Cir. 1977) (reversing jury verdict based in part on erroneous admission of expert damages testimony premised on assumptions that were "sheer fantasy, nothing more" – "Plaintiff's charts are an 'array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it.  They should not have been admitted.") (citation omitted); *see also SEC v. Merchant Capital*, *LLC*, 486 Fed. Appx. 93, 96 (11th Cir. 2012) ("Insofar as the appellants argue that their salaries were legitimately earned because they were commensurate with their level of experience and sophistication, we are not persuaded by the argument.  We know of no authority, and the appellants cite none, which holds that salaries received, if modest and/or reasonable, cannot be considered ill-gotten gains.  The purpose of disgorgement is to deprive the wrongdoer of his ill-gotten gain . . . and there is no reason why salaries earned cannot be used to determine disgorgement.") (citation omitted).

## D.    Defendants' Civil Penalty Argument is Unpersuasive

Defendants next contend that the SEC's disgorgement request for net pecuniary

17

gains "redefines the Court's equitable disgorgement standard from 'net profits' to 'net pecuniary gains,' the standard for civil monetary penalties." (Opp. at 1, 22-23.) This argument is easily dispatched. "Net pecuniary gains" – calculated by the SEC's expert – means "net profits." By contrast, "net pecuniary gains" does not mean "gross pecuniary gains," which is how Securities Act Section 20(d)(2) defines the statutory cap on second and third-tier civil monetary penalties. *See* 15 U.S.C. §§ 77t(d)(2)(B) and (C). Defendants either miss or ignore the manifest difference between the words, "net" and "gross."

In any case, unlike disgorgement, which is capped at defendant's net gain and excludes legitimate expenses, district courts have express discretion to order a civil penalty up to the amount of defendant's gross gain, including such expenses. District courts calculating disgorgement "must deduct legitimate expenses" so that disgorgement does not become a "penalty" that exceeds a "wrongdoer's net gains" or "net profits." *Liu v. SEC*, 140 S. Ct. at 1944-46 ("net" means "the gain made upon any business or investment, when both the receipts and payments are taken into the account"); *see id*. at 1949-50. In contrast, district courts ordering "money penalties" in SEC actions have discretion to include such expenses in their calculation and set the civil penalty as high as the "gross amount of pecuniary gain to such defendant as a result of the violation." *See, e.g.,* Securities Act Section 20(d)(2), 15 U.S.C. § 77t(d)(2) (emphasis added). Courts accordingly conclude that even legitimate expenses can be included in the civil penalty because the "civil penalties statutes focus on the gross amount of pecuniary gain – as opposed to disgorgement, which is focused on simple gains." *SEC v. Amerindo Inv. Advisors Inc*., No. 05-cv-5231, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), *aff'd sub nom*. 639 Fed.Appx. 752 (2d Cir. 2016); *see also SEC v. Valdez*, 661 Fed.Appx. 814, 816 (5th Cir. 2016); *SEC v. Fowler*, 440 F. Supp. 3d 284, 298-99 (S.D.N.Y. 2020); *SEC v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2002 WL 31422602, at *2-*3 (S.D.N.Y. Oct. 29, 2002).

Although in 2017, the SEC conservatively sought only $6,714,580 and

$5,353,000 in civil monetary penalties, *see* Dkt. No. 220, it bears mentioning that this Court has discretion under the penalty statute to impose penalties equal to Liu's and Wang's "gross pecuniary gains" with no reduction for legitimate expenses.  And so first and foremost, defendants' objection to the SEC's disgorgement request as conflating penalties with disgorgement elides the fact that the SEC is seeking "net" pecuniary gains as disgorgement, and not "gross" pecuniary gains.  Yet even taken at face value, the argument is of no practical use to defendants:  it remains within this Court's power to now order payment of defendants' gross pecuniary gains as a civil penalty.

### E.    Defendants' Efforts to Shift Fault are Specious

Next, a long section of defendants' brief devolves into a conspiracy theory not supported by fact.  Liu's attempt to whitewash his self-dealing with respect to Mevion is without merit, and defendants' determination to cast blame on their former partners, Dr. Thropay and Novdor, doesn't ring true.  (Opp. at 6-11.)

To begin with, defendants have no evidence to rebut the following:  they removed Dr. Thropay from management in January 2016; with Dr. Thropay and Novodor gone, they quickly executed purported employment agreements awarding themselves years of putative back pay and began transferring corporate funds to their personal accounts in earnest; in the months prior, Liu had engaged in extensive discussions and executed an MOU with new partners for the very same proton therapy cancer center EB-5 project as the one represented to investors as being the goal of the corporate defendants (who had raised the subject investor capital and were jointly owned with Dr. Thropay); and in November 2015, Liu ultimately spent $3 million on Mevion equipment with the intention of using that equipment for his new venture.  *See* Dkt. No. 322 at pp. 10-15.

Defendants' retort that Dr. Thropay and Novodor were aware of Liu's plans for United MPH and Mevion is not backed by evidence.  That Dr. Thropay's own, operational medical clinic – Beverly Oncology – knew of Mevion and had been pitched that equipment in the past is in no way evidence that he knew of Liu's self-

dealing.  (Opp. at 10.)  An unconsummated land deal between Beverly Hospital and Dr. Thropay – silent as to United MPH – is not probative of that conceit either. Leung Supp. Decl. at ¶ 8, Ex. 6 (Dr. Thropay Depo. Tr.) at 97:2-23.  Liu's half-hearted attempt to cast his late-2015 efforts to salvage things, once Dr. Thropay deduced that Liu was working with COH and Beverly Hospital in contravention of the business plan represented in the POM, as a good faith effort to do his level best to bring Dr. Thropay into the fold strains credulity.  Dkt. No. 320 at ¶ 14, Ex. 12 (Depo. Ex. 106) ("Charles' vision for the Cancer Center is strictly between United MHP [sic], COH, and Beverly.")  Defendants further argue that the Mevion equipment could not be later transferred from Beverly Proton to United MPH anyway without Dr. Thropay's consent.  (Opp. at 10.)  Not so – Liu's ownership interest in Beverly Proton was not transferable to United MPH, *see* Dkt. No. 322 at 17, but as far as the Mevion equipment was concerned, Liu had removed Dr. Thropay from Beverly Proton's management, and in his own telling, "[s]tarting from 1/18/2016, I will act as CEO/President and Dr. Thropay and his sister, Ruth will no longer be officers of this entity."  *See* Dkt. No. 320 at ¶ 21, Ex. 19 (Depo. Ex. 110) at p. 1.  Finally, defendants' story that "Dr. Thropay chose another path," *see* Opp. at 8-9, and sought to ruin Liu and Wang by reporting their conduct to the government warrants no response other than the the most obvious one:  Liu and Wang have been found liable for a massive securities fraud, and so Dr. Thropay's actions were not without basis.

## F.  Liu and Wang are Jointly and Severally Liable for Disgorgement

Wang disputes her joint and several liability.  She seizes on *Liu*'s reference to "partners" who are engaged in concerted wrongdoing, and thus concludes that since Dr. Thropay and Novodor were Liu's "business partners," while she was not, she cannot be held jointly and severally liable.  (Opp. at 24.)  Once again, defendants have manufactured a false standard out of whole cloth.  The key to joint and several liability is concerted wrongdoing, and there is little doubt that Liu's and Wang's conduct was both wrong and concerted.

First, despite Wang's efforts to downplay her "marketing" role, she sold EB-5 investments in the PPEB5 Fund to defrauded investors.  Dr. Thropay testified to that fact:

> Q.     Did you talk with her about what her role was in the project?
>
> A.     Yes.
>
> Q.     And did you ask her what it was?
>
> A.     Yes.
>
> Q.     What did she tell you?
>
> A.     She would help set up meetings.  And also she started her own company on the side to do some auxiliary work, I guess, to help her husband.  And she would sell EB-5 and try and promote sales.  Meetings that I went to, she would set up everything and sometimes introduce a speaker.  And she was just there to help is all I could see, and that's what she would explain to me.
>
> Q.     Did she have anything to do with the finances?
>
> A.     She seemed to be acutely aware of the finances.
>
> ***
>
> Q.     Did she tell you what she did in China for the project?
>
> A.     No, but I saw her selling EB-5s.
>
> Q.     I'm sorry.  What do you mean selling EB-5s?
>
> A.     When I was there, she was in discussion with a family, and it was without the knowledge of Delsk.  And she sold an EB-5 share to someone, and they were celebrating.  They were very happy.  And I was told not to say anything to Delsk.

Leung Supp. Decl. at ¶ 8, Ex. 6 (Dr. Thropay Depo. Tr.) at 105:4-18, 108:17-25. Novodor testified to that fact:

> Q.     Was it ever your understanding that she was an employee of Beverly Proton?
>
> A.     I did not know what her role was in Beverly Proton.  I know that she was helping him market.  That's all I know.

*Id.* at ¶ 9, Ex. 7 (Novodor Depo. Tr.) at 179:23-180:2.  And most significantly, Wang testified to that fact:

> Q.     Ms. Wang, the clients you refer to, those were potential investors in your EB-5 project in the United States; correct?

21

A.      Yes.  However, it was not to a particular individual.  Just many people want to learn projects and wanted to make investments, not necessarily to invest in this project, but in China there are many people who wanted to invest overseas.  Many clients who – they want to choose projects; therefore, they would ask about the – your project, what is the proton?  Because perhaps I knew a bit more than them.

***

Q.      And was it your understanding that Beverly Proton was to develop a proton therapy cancer center in Montebeloo, California?

A.      Yes, it's at the site of the Beverly hospital.

Q.      And that projected needed capital to occur; right?  You needed money to build the center; correct?

A.      That would be needed.

Q.      Part of that capital was to come from EB-5 investors from China.  Is that your understanding?

A.      Yes.

*Id.* at ¶ 10, Ex. 8 (2/25/21 Wang Depo. Tr.) at 18:5-16, 19:18-20:3.

Wang cannot have it both ways.  On the one hand, she strains to describe her role in the Pacific Proton EB-5 offering as *de minimis*, yet on the other, as Beverly Proton's "VP of Marketing," Wang unwaveringly contends that her efforts to promote the offering were so substantial, and of such commercial value, that she was within her rights to simply take nearly $1 million in investor funds, all while the project was being investigated by the SEC and at a time when no tangible progress had occurred.  *See id.* at 26:8-28:6.

Second, defendants sent $3.815 million in marketing fees to UDG, and Wang's deep connection to UDG is supported by substantial evidence:  (i) she held herself out in business cards as the chairman and CEO of UDG; (ii) she was identified in UDG's website marketing as part of the company's management team; (iii) she was listed as UDG's manager in governmental filings for the company; (iv) her mother executed the marketing agreement which provided for UDG's receipt of commission payments from the corporate defendants, and was designated in governmental filings as UDG's executive director and a shareholder; and (v) Liu himself referred to UDG as his

wife's company.  *Liu*, 262 F. Supp. 3d at 964.

Third, there is no dispute that Liu and Wang commingled their finances, used their personal accounts to abscond with investor funds in tandem, and both transferred money to overseas accounts, at which point they steadfastly refused to respond to any discovery on their financial entanglements.  *Liu*, 262 F. Supp. 3d at 966-67, 976-85.

Accordingly, Liu and Wang acted in concert.  Liu and Wang both sold EB-5 investments in the fraudulent project.  Liu and Wang both misappropriated investor funds.  Liu and Wang both – with Wang on the receiving end of these payments via UDG – violated the POM by paying sales commissions far in excess of that allowable under the POM.  Liu and Wang both flouted a repatriation order by refusing to repatriate a single dollar of the millions of investor funds they sent overseas after receiving an SEC subpoena in February 2016.  Liu and Wang are jointly and severally liable for disgorgement.  As in *Curative Biosciences*, defendants "provide [no] evidence indicating that one of them 'did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust[.]'"  2020 WL 7345681, *6.  The same outcome – imposition of joint and several liability for disgorgement – is warranted here.  *See also SEC v. Premier Holding Corp.*, Case No. 18-00813-CJC (KESx), 2021 WL 1048565, *3 (C.D. Cal. Jan. 20, 2021) (imposing joint and several liability where individual and entity defendant commingled finances).

### G.      If Collected, Disgorgement Will Be Distributed to Defrauded Investors

Finally, defendants contend that disgorgement must be distributed to investors in order to comport with *Liu*.  (Opp. at 25.)  But that is exactly what will occur once disgorgement is ordered and defendants pay their judgment:

> The disgorgement award sought here satisfies both this provision and the standard in Liu because if the Commission is able to collect the requested disgorgement from Liu and Wang a distribution to harmed investors is feasible.  There are a limited number of investors in this

case, who are identified, along with the amounts of their investment. Accordingly, a distribution would be relatively inexpensive to accomplish provided the Commission collects disgorgement.

Dkt. No. 322 at p. 25. The SEC's proposed final judgment further contains language providing for the establishment of a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002. *See* Dkt. No. 319-2 at pp. 4-5. Accordingly, the disgorgement sought by the SEC complies with both the new provision for disgorgement in Exchange Act Section 21(d)(7) enacted by the NDAA, 15 U.S.C. § 78u(d)(7), as well as the Supreme Court's holding in *Liu* that disgorgement should be distributed to harmed investors where feasible, 140 S. Ct. at 1948-4. *See, e.g.*, *Curative Biosciences*, 2020 WL 7345681, *6 ("The Court finds that the disgorgement requested by the SEC is consistent with the equitable principles identified in *Liu*. First, the SEC asserts that it 'intends to distribute the funds to investors harmed by the Alversons' sale of unregistered securities."); *Penn*, 2021 WL 1226978, at *13-14.

## III.   **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that this Court grant its motion for disgorgement against defendants Liu and Wang in its entirety.


Dated:  May 14, 2021                            Respectfully submitted,

                                               */s/ Gary Y. Leung*
                                               Gary Y. Leung
                                               Jacob A. Regenstreif
                                               Attorneys for Plaintiff
                                               Securities and Exchange Commission

24

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 14, 2021, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF ITS MOTION FOR DISGORGEMENT** on all the parties to this action addressed as stated on the attached service list:

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 14, 2021                    */s/ Gary Y. Leung*
                                       GARY Y. LEUNG

1
2

*SEC v. Liu, et al.*
**United States District Court—Central District of California
Case No. 8:16-cv-00974-CJC-AGR**

3

**<u>SERVICE LIST</u>**

4
5

*Counsel for Defendants Charles C. Liu
and Xin Wang a/k/a Lisa Wang*:

6
7
8
9
10

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

11
12
13
14

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

15
16

*Defendants Pacific Proton Therapy Regional Center, LLC and
Beverly Proton Center, LLC:*

17
18
19
20
21

(*on counsel for Charles C. Liu¸ the controlling shareholder of each*)
Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

22
23
24
25

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email: LSteinberg@buchalter.com

26
27
28