GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
Email: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES C. LIU;<br>XIN WANG a/k/a LISA WANG;<br>PACIFIC PROTON THERAPY REGIONAL CENTER, LLC;<br>PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,<br><br>Defendants. | Case No. 8:16-cv-00974-CJC-AGR<br><br>**SUPPLEMENTAL DECLARATION OF GARY Y. LEUNG IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR DISGORGEMENT AGAINST DEFENDANTS LIU AND WANG**<br><br>Date:          June 7, 2021<br>Time:          1:30 p.m.<br>Ctrm:         9B<br>Judge:        Hon. Cormac J. Carney |

I, Gary Y. Leung, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney admitted to practice law by the State Bar of California and by this Court.  I am an Assistant Regional Director with Plaintiff Securities and Exchange Commission's ("SEC") Los Angeles Regional Office. I have personal knowledge of the matters set forth below, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I submit this supplemental declaration in support of the SEC's motion for disgorgement against defendants Charles C. Liu and Xin (Lisa) Wang.

3.      A true and accurate copy of transcript excerpts from the February 24, 2021 deposition of defendant Charles C. Liu is attached hereto as Exhibit 1.

4.      A true and accurate copy of transcript excerpts from the April 20, 2021 deposition of Ronald Friedman is attached hereto as Exhibit 2.

5.      A true and correct copy of the March 25, 2021 expert report of Ronald S. Friedman is attached hereto as Exhibit 3.

6.      A true and correct copy of the March 25, 2021 expert report of Theodore R. Ginsburg is attached hereto as Exhibit 4.

7.      A true and accurate copy of transcript excerpts from the April 16, 2021 deposition of Theodore Ginsburg is attached hereto as Exhibit 5.

8.      A true and accurate copy of transcript excerpts from the March 5, 2021 third-party deposition of Dr. John Thropay is attached hereto as Exhibit 6.

9.      A true and accurate copy of transcript excerpts from the February 22, 2021 third-party deposition of Ruth Novodor is attached hereto as Exhibit 7.

10.      A true and accurate copy of transcript excerpts from the February 25, 2021 deposition of defendant Xin a/k/a Lisa Wang, is attached hereto as Exhibit 8.

///

///

///

///

1

11.    A true and accurate copy of an April 23, 2021 email exchange between counsel for the SEC and defense counsel is attached hereto as Exhibit 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of May, 2021 in Redondo Beach, California.


_/s/ Gary Y. Leung_____
GARY Y. LEUNG

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 14, 2021, I caused to be served the document entitled **SUPPLEMENTAL DECLARATION OF GARY Y. LEUNG IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR DISGORGEMENT AGAINST DEFENDANTS LIU AND WANG** on all the parties to this action addressed as stated on the attached service list:

☐     **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐     **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐     **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐     **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐     **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐     **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒     **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐     **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 14, 2021

/s/ Gary Y. Leung
Gary Y. Leung

*SEC v. Liu, et al.*
**United States District Court—Central District of California
Case No. 8:16-cv-00974-CJC-AGR**

## SERVICE LIST

*Counsel for Defendants Charles C. Liu
and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and
Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu¸ the controlling shareholder of each*)
Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

# EXHIBIT 1

1            UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   SECURITIES AND EXCHANGE    ) Case No.
    COMMISSION,                ) 8:16-cv-00974-CJC-AGR
5                              )
            Plaintiff,         )
6                              )
        vs.                    )
7                              )
    CHARLES C. LIU; XIN WANG   )
8   a/k/a LISA WANG;           )
    PACIFIC PROTON THERAPY     )
9   REGIONAL CENTER, LLC;      )
    PACIFIC PROTON EB-5        )
10  FUND, LLC; and BEVERLY     )
    PROTON CENTER,             )
11  LLC f/k/a LOS ANGELES      )
    COUNTY PROTON THERAPY,     )
12  LLC,                       )
                               )
13          Defendants.        )
    _____)

14

15

16

17     REMOTE VIDEOTAPED DEPOSITION OF CHARLES C. LIU

18                    VIA WEBEX

19          Wednesday, February 24, 2021

20

21

22

23

24  Reported by:
    Diane M. Bolan, CSR No. 12883
25  Job No. 210224DBO

                                                        1

1          Webex Proceedings, Wednesday, February 24, 2021

2               5:19 p.m. (PT) - 11:46 p.m. (PT)

3

4               THE VIDEOGRAPHER:  Here begins the

05:19   5  videotape deposition of Charles Liu in the matter of

6   the SEC versus Liu, et al.  This case is being heard in

7   the United States District Court, Central District of

8   California, Southern Division, case number

9   8:16-cv-00974-CJC-AGR.  The deposition is being held

05:20 10  via Webex.

11               Today's date is February 24th, 2021.  The

12   time on the record is 5:19 p.m.  My name is Tim Hunter.

13   I'm the legal videographer.  Our court reporter today

14   is Diane Bolan.

05:20 15               Counsel, will you please introduce yourself

16   and state whom you represent for the record, starting

17   with noticing counsel.

18               MR. LEUNG:  Gary Leung for plaintiff.

19               MR. REGENSTREIF:  Tony Regenstreif for

05:20 20  plaintiffs.

21               MR. GOURAIGE:  Mr. Gouraige for defendant.

22               THE VIDEOGRAPHER:  Can you please swear in

23   the witness.

24               (Whereupon, CHARLES C. LIU, called as a

05:21 25  witness on behalf of the Plaintiff, was sworn and

5

Exhibit 1 Page 6

1  one of the reasons.

2      Q.   Okay.  So your earlier testimony about how

3  you paid yourself this $4.27 million because of your

4  employment agreement, that's not true, right, and

07:57  5  instead, you paid yourself the $4.27 million because

6  you felt like you were owed money by Beverly Proton;

7  fair?

8          MR. GOURAIGE:  I object to the question.

9  It's -- I'm not even sure I understand the question.

07:57 10          MR. LEUNG:  Okay.

11      Q.   BY MR. LEUNG:  Fair?

12      A.   Can you repeat?

13      Q.   When I first started asking you questions

14  about this $4.27 million that you pulled out of Beverly

07:58 15  Proton and Pacific Regional Center after receiving an

16  SEC subpoena, you explained that that was compensation

17  owed to you under your employment agreement.  Remember

18  that?

19      A.   Yes.

07:58 20      Q.   And then I explained to you that your

21  employment agreement, which we just looked at, was

22  dated April 5th, 2016, which is subsequent to all these

23  transfers.  Do you recall that line of questioning?

24      A.   Yes.

07:58 25      Q.   So is it your sworn testimony that you paid

81

1   yourself this $4.27 million because Beverly Proton owed

2   you some sort of money for everything you had put into

3   the company?  That's your testimony; right?

4       A.   And also my time, my effort to make the

07:58  5   project work.

6       Q.   And the basis of that obligation isn't the

7   later employment agreement, it's just what you said:

8   You put in time, you put in work, you paid some

9   expenses, and you wanted to get paid back; right?

07:59  10      A.   Yes.

11      Q.   Dr. Thropay, did he approve these transfers?

12      A.   No.  I was -- you know, he authorized me to

13  sign by myself at the bank.

14      Q.   He gave you that blank check.

07:59  15      A.   Sorry?

16      Q.   I'll withdraw it.

17           Okay.  So that amount of money, that

18  $4.27 million, was transferred to your personal account

19  at Chase; right?  You remember you had a personal

07:59  20  account at Chase Bank, as well?

21      A.   Yes.

22      Q.   Okay.  And do you recall then transferring

23  funds out of your personal Chase account to an account

24  in China at China Merchants Bank?  Do you recall

08:00  25  anything like that?

82

1       A.    China Merchants Bank?

2       Q.    Yeah.

3       A.    Can you...

4             Yeah, it's been a while.  I really cannot

08:00  5   remember exactly.

6       Q.    Okay.  Let me see if I --

7       A.    Mostly transferred to Chase Bank.

8       Q.    Let me see if I can refresh your

9   recollection.  You had a personal account at Chase.

08:00 10  You testified to that; right?

11      A.    Yes.

12      Q.    On February 26th, you sent $250,000 out of

13  that personal Chase account to an account at China

14  Merchants Bank.  On February 29th, you sent another

08:01 15  $250,000 out of that personal account to an account at

16  China Merchants Bank.  On March 1st, the next day, you

17  sent another $250,000 out of your personal account to

18  China Merchants Bank.  Six days later, March 7th, from

19  your personal account at Chase, you sent $500,000, half

08:01 20  a million dollars, to an overseas account in China at

21  China Merchants Bank.  On March 11th, four days after

22  that, you sent $750,000 from your Chase personal

23  account to an overseas account in China at China

24  Merchants Bank.  On March 14th, you sent $500,000 from

08:01 25  your Chase personal account to a foreign bank account

83

Exhibit 1 Page 9

1    in China, China Merchants Bank.  March 24th, another

2    $250,000 out of your personal account at Chase to China

3    Merchants Bank in China.  April 1st, another $250,000

4    out of your personal account to China Merchants Bank,

08:02  5    and finally, April 5th, 2016, a final $250,000 was

6    transferred from your personal Chase account to China

7    Merchants Bank.

8            That's a lot of money.  Do you remember where

9    you sent that money to and why you sent it?

08:02  10        A.   It's my personal money.

11        Q.   So --

12        A.   I can send it wherever I want to.

13        Q.   Okay.  And you sent it to your personal

14    account overseas at China Merchants Bank?

08:02  15        A.   I think so.

REDACTED

84

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 1 Page 10

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, DIANE M. BOLAN, Certified Shorthand

 4    Reporter No. 12883, in and for the State of California,

 5    do hereby certify:

 6              That prior to being examined, the witness

 7    named in the foregoing deposition was by me duly sworn

 8    to testify the truth, the whole truth, and nothing but

 9    the truth;

10              That said deposition was taken down by me

11    in shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my direction,

13    and that the foregoing transcript contains a full, true

14    and verbatim record of the said deposition.

15              I further certify that I have no interest

16    in the event of the action.

17              DATED this 1st day of March, 2021.

18

19

20

21              _____
                         Diane M. Bolan

22              DIANE M. BOLAN, CSR No. 12883

23

24

25
```

184

Exhibit 1 Page 11

# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         SOUTHERN DIVISION

4                                         )
5   UNITED STATES SECURITIES             )
    AND EXCHANGE COMMISSION,             )
6                                         )
                    Plaintiff,           )
7                                         )
         v.                              )  CASE NO.
8                                         )  8:16-cv-00974-CJC-AGR
    CHARLES C. LIU; XIN WANG a/k/a       )
9   LISA WANG; PACIFIC PROTON            )
    THERAPY REGIONAL CENTER, LLC;        )
10  PACIFIC PROTON EB-5 FUND, LLC;       )
    and BEVERLY PROTON CENTER, LLC       )
11  f/k/a LOS ANGELES COUNTY PROTON      )
    PROTON THERAPY, LLC,                 )
12                                        )
                    Defendants.          )
13  _____)

14

15

16      VIDEOTAPED DEPOSITION OF RONALD FRIEDMAN, CPA

17                    VIA VIDEOCONFERENCE

18                  Tuesday, April 20, 2021

19

20

21

22

23  Reported By:

24  Denise Sankary, RPR, RMR, CRR

25  Job No. 210420DSA

                                                          1

09:00  1          Mr. Friedman, would you raise your right

       2     hand, please?

       3          Do you swear the testimony you're about to

       4     give today will be the truth, the whole truth,

09:00  5     and nothing but the truth?

       6          THE WITNESS:  Yes, I do.

       7          THE COURT REPORTER:  Thank you.

       8  Thereupon:

       9          RONALD FRIEDMAN, CPA

09:00 10  having been first duly sworn, was examined and

      11  testified as follows:

      12          MR. LEUNG:  Herve, do you stipulate that

      13     the remote oath --

      14          THE WITNESS:  It's hard to hear you.

09:00 15          THE COURT REPORTER:  Yeah, we can't hear

      16     you.

      17          MR. LEUNG:  Herve, do you stipulate that

      18     the remote oath administered by Ms. Sankary

      19     meets the requirements of Rule 30(b)(5)?

09:01 20          MR. GOURAIGE:  Yes.

      21              EXAMINATION

      22   BY MR. LEUNG:

      23     Q.   Good morning, Mr. Friedman.

      24          How are you?

09:01 25     A.   I'm good.  And yourself?

                                                            7

09:17 1        A.    No.

      2        Q.    None at all?

      3        A.    None that I can remember off the top of my

      4   head.

09:17 5        Q.    If those communications with Mr. Liu had

      6   no bearing on the opinions you've formed in this

      7   case, what was the purpose of Mr. Liu communicating

      8   with members of your team?

      9        A.    Most of my concern was to be certain that

09:18 10  we were paid on a timely basis for our time that we

     11   were working.

     12        Q.    And were you paid on a timely basis for

     13   your expert work?

     14        A.    Yes, we have been paid timely.

09:18 15       Q.    How many times have you been paid by

     16   Mr. Liu?

     17             THE COURT REPORTER:  Hold on.  We lost

     18        Mr. Gouraige.

     19             MR. LEUNG:  Herve, are you there?  Herve,

09:18 20        can you hear us?  Mr. --

     21             MR. GOURAIGE:  Yes.  I think the

     22        connection was interrupted briefly, but then it

     23        was resumed, so I can hear you now, Gary.

     24             MR. LEUNG:  Great.

     25

                                                              19

09:19 1    BY MR. LEUNG:

2       Q.   How many times have you been timely paid

3  by Mr. Liu, Mr. Friedman?

4       A.   I believe three, maybe four times.

09:19 5      Q.   When did those three, maybe four payments

6  occur?

7       A.   Over the last several months with the

8  final current payment being made this morning.

9       Q.   And what was the method of payment for

09:19 10  those three, maybe four payments?

11      A.   Wire transfer.

12      Q.   From what accounts?

13      A.   It's to a Marcum account from -- Charles

14  had friends of him -- of his wire us the money.

09:19 15      Q.   How much have you -- has your firm been

16  paid in total in connection with your expert work?

17      A.   I believe somewhere a little over a

18  hundred thousand dollars.

19      Q.   What was the -- what were the names of the

09:20 20  friends that wired money to your firm on his behalf?

21      A.   I don't have that information off the top

22  of my head.  I'd have to go back to my office and

23  have my staff, you know, my receivable department

24  tell me.

09:20 25      Q.   Had Mr. Liu not arranged for the final

20

Exhibit 2 Page 15

09:23  1    limiting condition in your original report.

       2            And my question to you is, am I correct in

       3    assuming that Exhibit 159, your original report does

       4    not contain this same assumption and limiting

09:23  5    condition?

       6        A.   I would have to go back and look at that

       7    report.

       8        Q.   Why don't you look at it?  Please feel

       9    free to pull it up and take as much time as you need

09:23 10    to go through it.

      11            And my question is, I don't see the same

      12    assumption and limiting condition in your original

      13    report that you've laid out in Exhibit 161, and I am

      14    inferring from that that your original report is an

09:23 15    audit.

      16            And your original report did involve the

      17    performance of other procedures on the information

      18    set forth in that report and that, consequently, in

      19    your original report, you do assume liability for

09:24 20    the completeness or accuracy of the information set

      21    forth in Exhibit 159?

      22        A.   I would say your assumption is incorrect.

      23    I did not in my original report do an audit or

      24    engage to do a consulting engagement.  I was to put

09:24 25    the financial statements together from the

                                                              23

09:24  1    information that was provided to us.  We did no

2    audit --

3          Q.    Okay.  Turn -- go ahead.

4          A.    We did no auditing or verification of the

09:24  5    numbers.

6          Q.    In your original report?

7          A.    That is correct.

8          Q.    So the statement in Exhibit 161, it's the

9    third assumption and limiting condition, it reads,

09:25 10    "I have not audited, reviewed, nor compiled any

11    historical financial information or federal or state

12    income tax returns, and consequently, I express no

13    form of assurance on them."

14          Does that statement equally apply to your

09:25 15    initial report?

16          A.    Yes.

17          Q.    The fourth assumption and limiting

18    condition set forth in Exhibit 161 reads, "I have

19    not audited nor reviewed the information contained

09:25 20    herein in accordance with standards promulgated by

21    the American Institute of Certified Public

22    Accountants, and accordingly, express no opinion

23    regarding compliance with such standards."

24          Does that statement that I've read for

09:25 25    you, that assumption and limiting condition found in

24

Exhibit 2 Page 17

09:25 1    Exhibit 161, your rebuttal report, equally apply to

2    the work performed in your initial report in

3    Exhibit 159?

4       A.   Yes.

09:25 5       Q.   And then finally, there is a fifth

6    assumption and limiting condition set forth in

7    Exhibit 161, your rebuttal report.  It reads, "This

8    report is solely for -- for the use in the matter of

9    litigation of Securities and Exchange Commission

09:26 10   versus Charles C. Liu; Xin Wang, also known as Lisa

11   Wang; Pacific Proton Therapy Regional Center, LLC;

12   Pacific Proton EB-5 Fund, LLC; and Beverly Proton

13   Center, LLC, formerly known as Los Angeles Proton

14   Therapy, LLC."

09:26 15       That assumption and limiting condition

16   that I've just read for you which is set forth in

17   Exhibit 161, does it equally apply to the expert

18   work reflected in your initial report that's

19   Exhibit 159?

09:26 20      A.   Yes.

21      Q.   If we could go back to Exhibit 159,

22   please, sir.  And turning to beginning on the fourth

23   page of the exhibit, there's an Appendix A.

24      A.   I'm with you.

09:27 25      Q.   Mr. Friedman, is Appendix A a complete

25

09:53  1    conclusions are incorrect, and the pecuniary gain

2    that she claimed is totally wrong.  And I believe

3    that --

4        Q.    I'll ask again.

09:54  5        A.    I was going to say -- to finish, I was

6    going to say, a profit and loss statement, I think,

7    is necessary to show what the proper pecuniary gains

8    should have been.

9        Q.    And how did you arrive at that

09:54  10    understanding that a profit and loss statement is a

11    necessary component of the proof required to

12    establish an entitlement to disgorgement in an

13    enforcement action brought by the Securities and

14    Exchange Commission?

09:54  15        A.    Per discussion with legal counsel and my

16    understanding of -- from legal counsel of the

17    Supreme Court case, a pecuniary gain must be

18    determined through the net profit of the company.

19    And I believe more specifically the definition of

09:55  20    net profit in generally accepted accounting

21    principle terms is net revenue minus expenses, and

22    that is the definition of net profit.  And --

23        Q.    Go ahead.  Please go ahead.

24        A.    No, I'm done.

09:55  25        Q.    Legal counsel that you're referring to is

43

09:55 1    Mr. Gouraige?

2          A.    Yes.

3          Q.    Anybody else?

4          A.    No.

09:55 5    Q.    Have you read the Supreme Court's decision

6    in this matter, sir?

7          A.    Yes, I did.

8          Q.    Does that decision reference a profit and

9    loss statement in any respect?

09:55 10   A.    It talks about net profits.  And I'd have

11   to pull up the Supreme Court case and look at it to

12   be specific, but I believe the term was "net profit

13   less" -- no.  It said net profit.  I believe that

14   was in the Supreme Court decision.

09:55 15   Q.    But my question is slightly different than

16   that.

17          Does the Supreme Court's decision refer to

18   a profit and loss statement as a necessary component

19   of proof required to establish an entitlement to

09:56 20   disgorgement in an SEC enforcement action?

21          A.    I believe, and this is my opinion, that

22   when the SEC talks about a net profit, they're

23   talking about a P and L statement, and that's

24   basically the world I live in.  When people talk

09:56 25   about net profits, they're talking about revenue

44

09:56  1    minus expenses.

2        Q.    And so the helpfulness of your opinions in

3    this case, whether or not they assist the finder of

4    fact, sir, is dependent on the accuracy of the

09:56  5    assumption that you spoke to, that a profit and loss

6    statement is a necessary requirement in order to

7    prove an entitlement to disgorgement.

8            Is that fair?

9        A.    I think it's fair to say that you need a

09:57  10   profit and loss statement to see and determine what

11   the net profit is, yes.

12       Q.    Now, I'll just posit a scenario to you.

13            I raise $10 million in capital by way of

14   fraud.  I establish some shell corporate entities

09:57  15   that never have any meaningful business operations.

16   I abscond with that $10 million.  So those corporate

17   entities are obviously in the red because they never

18   had any operations to begin with, nor were they able

19   to keep the money because I kept it.

09:57  20            Is it your position that under the Supreme

21   Court's decision in this case, I am not required to

22   disgorge a dollar of that 10 million?

23            MR. GOURAIGE:  I'm going to object to the

24       question because --

09:57  25            MR. LEUNG:  I'll withdraw it.

45

```
10:17   1   be spent.  The detailed accounting records tell me
        2   what the expenses were for and how they were
        3   categorized, and we put them into the proper
        4   categories, whether they be on the balance sheet or
10:17   5   on the income statement.
        6       Q.   So I'll ask you again, what information
        7   did you derive from the POM that caused you to make
        8   an adjustment that's covered by the five bullet
        9   points set forth on page 1 of Exhibit 159 which is
10:17  10   your initial report?
       11       A.   I think the POM was just a guideline as to
       12   how the money was to be spent.  The accounting
       13   records told me how the money was spent, and we had
       14   to make various adjustments based upon how we
10:18  15   interpreted those expenditures.
       16       Q.   And those accounting records you're
       17   referring to are the general ledgers and the
       18   QuickBook reports that have been produced in this
       19   case?
10:18  20       A.   That's correct.
       21       Q.   And those were prepared by Trang Lam and
       22   her team back in 2015, 2016?
       23       A.   Possibly earlier than that, but they were
       24   prepared by her team.
10:18  25       Q.   Okay.  Returning to the Exhibit 160 and
```

53

10:21   1    testimony to the commission in this case during its

       2    prefiling investigation?

       3        A.   I know you took his deposition.

       4        Q.   I'll ask you again.

10:21   5          Do you know if Mr. Liu provided

       6    investigative testimony prior to the filing of this

       7    enforcement action before the commission?

       8        A.   I don't know.

       9        Q.   Well, I'll just cut to the chase.

10:21 10          You've not reviewed Mr. Liu's

      11    investigative testimony, correct?

      12        A.   Correct.

      13        Q.   You've not reviewed Ms. Wang's

      14    investigative testimony, correct?

10:21 15        A.   Correct.

      16        Q.   You've not reviewed the investigative

      17    testimony of Ms. Wang's mother and Mr. Liu's

      18    mother-in-law, correct?

      19        A.   Correct.

10:22 20        Q.   Did you review Mr. Liu's deposition

      21    testimony in this case from 2016?

      22        A.   No.

      23        Q.   Did you review Ms. Wang's deposition

      24    testimony in this case from 2016?

10:22 25        A.   No.

55

10:23  1        A.    Let me look.

       2              I don't think I read anybody else's

       3    depositions, off the top of my head.

       4        Q.    When forming your opinions in this case,

10:25  5    Mr. Friedman, did you review any of the operating

       6    agreements for the entity defendants?

       7        A.    I believe so.

       8        Q.    Which operating agreements?

       9        A.    I believe there was -- I don't remember

10:26 10    specifically which operating agreement I did read.

      11        Q.    What information did you derive from the

      12    operating agreement that you did read which --

      13    strike that.

      14              Is there any information that you derived

10:26 15    from your review of that operating agreement on

      16    which you base your opinions?

      17        A.    No.

      18        Q.    In forming your opinions in this case,

      19    Mr. Friedman, did you speak with anybody that

10:26 20    actually worked at these three corporate entities?

      21        A.    No.

      22        Q.    In forming your opinions in this case, did

      23    you speak with anyone that did business with these

      24    three entities during the relevant period?

10:26 25        A.    No.

                                                              57

10:26  1        Q.   You never communicated with anyone at

       2   Allen Construction, correct?

       3        A.   Correct.

       4        Q.   No one at Skanska, correct?

10:27  5        A.   Correct.

       6        Q.   No one at SCI.X Science Studio, correct?

       7        A.   Correct.

       8        Q.   No one at Nixon Peabody?

       9        A.   Correct.

10:27 10        Q.   No one at Mevion?

      11        A.   Correct.

      12        Q.   No one at Miller Mayer?

      13        A.   Correct.

      14        Q.   No one at Seyfarth Shaw?

10:27 15        A.   Correct.

      16        Q.   No one at Greenberg Traurig?

      17        A.   Correct.

      18        Q.   No one at Evans, Carroll & Associates?

      19        A.   Correct.

10:27 20        Q.   Nobody at JJW Consultancy, Limited?

      21        A.   Correct.

      22        Q.   Nobody at Homeier, H-O-M-E-I-E-R, & Law,

      23   PC?

      24        A.   Correct.

10:27 25        Q.   Never communicated with anybody at the Law

58

Exhibit 2 Page 25

10:28  1   Offices of Rachel Liu, APLC?

2          A.    Correct.

3          Q.    Never communicated with anyone at Thorn

4   Run Partners, LLC?

10:28  5   A.    Correct.

6          Q.    Did you speak with Michael Hunn?

7          A.    Who is Michael Hunn?

8          Q.    I take it that's a no?  H-U-N-N, Michael

9   Hunn?

10:28 10   A.    Yeah, I did not speak with him.

11         Q.    Okay.  Never spoke with anybody at

12   Overseas Chinese Immigration Consultant, correct?

13         A.    Correct.

14         Q.    Never spoke with anybody at an entity

10:28 15   called Delsk, D-E-L-S-K?

16         A.    Correct.

17         Q.    Never received any information directly

18   from Industrial and Commercial Bank regarding any of

19   the transactions that are the subject of your

10:28 20   report, correct?

21         A.    I never spoke with anyone there, correct.

22         Q.    Never received any information from

23   Shanghai Commercial Bank regarding any of the

24   transactions that are the subject of your report,

10:29 25   correct?

59

Exhibit 2 Page 26

10:29  1       A.   I never spoke to anyone.  I have looked at

2  documentation to support some of the entries we've

3  made.  I've reviewed contracts.

4       Q.   Ever communicated with anybody at Hang

10:29  5  Seng Bank regarding the transactions that were the

6  subject of your report?

7       A.   Correct, did not speak with anyone.

8       Q.   And you've never -- you've never

9  obtained -- you've never reviewed bank records for

10:29  10  any of the financial accounts at Hang Seng Bank that

11  were a counter-party to the transactions that are

12  the subject of the report, correct?

13       A.   Correct.

14       Q.   You've never received any bank records

10:29  15  from Shanghai Commercial Bank for the

16  counter-parties to certain transactions that are the

17  subject of your report, correct?

18       A.   Correct.

19       Q.   Same question with respect to Industrial

10:30  20  and Commercial Bank.  You've never received bank

21  records from that banking entity regarding the

22  counter-parties that are on the other side of the

23  transactions, certain other transactions that are

24  the subject of your report, right?

10:30  25       A.   Correct.

60

10:30   1        Q.   Did you ask Mr. Liu whether or not

        2   those -- those bank records from the Chinese

        3   accounts were obtainable as part of your assignment?

        4        A.   I did not.

10:30   5        Q.   Do you know whether or not Mr. Liu has

        6   testified in this case that several million dollars

        7   that he transferred out of the corporate accounts

        8   were sent to bank accounts maintained in China?

        9        A.   I know payments were made to various

10:31  10   entities in China, yes.

       11        Q.   And did Mr. Liu ever indicate to you as

       12   part of your expert work that business records, bank

       13   records pertaining to the receiving accounts could

       14   be made available to you as part of your expert

10:31  15   analysis?

       16        A.   I'm not sure I understand your question.

       17        Q.   Well, did you ever ask to get the bank

       18   records for the overseas bank accounts that were

       19   receiving the funds in order to, you know,

10:31  20   potentially make your expert analysis more robust?

       21        A.   I had no reason to ask to see those bank

       22   statements.

       23        Q.   Would those bank statements provide you

       24   some information as to the identity of the parties

10:32  25   that were receiving these investor funds?

                                                              61

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 28

10:34  1    Let me catch up with you.

2         Q.    Number 2.

3         A.    Number 2, okay.

4         Q.    Yeah, it's Los Angeles County Proton

10:35  5    Therapy, LLC's account statements.

6         A.    Right.

7         Q.    That's a Chase accounting ending 5152?

8         A.    Correct.

9         Q.    How did you arrive at those periods of

10:35  10   time for the bank records that you reviewed as part

11   of your expert analysis?

12        A.    Those were the bank statements that we

13   actually had.

14        Q.    And you did not have available to you any

10:35  15   Beverly Proton bank statements prior to

16   February 2013?

17        A.    That's correct.

18        Q.    Okay.  And the financial statement

19   materials that you have attached to your initial

10:35  20   exhibit, those report all the way back to 2010,

21   right?

22        A.    I believe so.

23        Q.    Okay.  But nonetheless, you were able

24   without the benefit of bank statements from Beverly

10:35  25   Proton prior to February of 2013 to construct the

64

10:35    1    financial analysis of its financial condition in

         2    2010, 2011, 2012?

         3       A.   We used the financial data that was

         4    provided to us, yes.  We were not --

10:36    5       Q.   What was that -- what -- go ahead.

         6       A.   They may have been QuickBook financial

         7    statements or whatever they had available before we

         8    did the accounting.  When we took over the

         9    accounting, we basically had starting financials or

10:36   10    a balance sheet to start with.

       11       Q.   And when you say "we," you're referring to

       12    Trang Lam and --

       13       A.   That's correct, Trang Lam, yes.

       14       Q.   All right.  And the same is the case for

10:36   15    the PPEB-5 Fund and the Pacific Proton Therapy

       16    Regional Center to the extent as reflected in your

       17    Appendix B to Exhibit 160, you did not have bank

       18    account statements for their financial accounts

       19    stretching back to the beginning of the period under

10:36   20    inspection in your report which goes back to 2010,

       21    correct?

       22       A.   Correct.  That's correct.

       23       Q.   Why did the PPEB-5 have two corporate

       24    accounts?

10:37   25       A.   I don't know.

65

10:37 1      Q.   And is it your understanding that the

2    three Chase accounts and the Citibank account for

3    PPEB-5 Fund represent the entirety of the accounts

4    held by Beverly Proton, PPEB-5 Fund, and Pacific

10:37 5    Proton from 2013 to 2016?

6      A.   Correct.

7      Q.   Okay.  Number 9, various QuickBooks report

8    for the following entities and time periods:

9    Beverly Proton 2013 through 2016, Pacific Proton

10:38 10   EB-5 Fund 2013 through 2016, Pacific Proton Therapy

11   Regional Center 2012 through 2017.

12           You're referring to the general ledgers in

13   QuickBooks reports that were constructed by Ms. Lam

14   during Marcum's engagement by these companies prior

10:38 15   to the SEC even filing suit.

16           And this is back in 2015, 2016, right?

17     A.   That is correct.

18     Q.   In those QuickBook reports, in Number 9,

19   they form the basis, the starting point for your

10:38 20   analysis, and you then applied the adjustments that

21   you laid out on the first page of your initial

22   report to those QuickBooks reports in the course of

23   generating all the exhibits attached to your initial

24   report, right?

10:38 25     A.   Yes.

66

10:39  1    Q.   And aside from the adjustments categorized

2  and disclosed on the first page of your initial

3  report that's Exhibit 159, you made no further

4  changes to the transaction classifications set forth

10:39  5  in all the QuickBooks reports that you disclosed in

6  Number 9 of Appendix B of Exhibit 160.

7       Is that fair?

8    A.   That's fair to state.   My Excel

9  spreadsheets speak for themselves with all the

10:39 10  adjustments that were made.

11    Q.   Okay.  And all the adjustments were made

12  are described on the first page of your Exhibit 159

13  initial report, right?

14    A.   I believe that's correct.  I'd have to go

10:39 15  back and look at the report, but if you're talking

16  about my main Exhibit 1 spreadsheet, that would be

17  correct that those are all the adjustments.

18    Q.   Okay.  Number 15, a list of investors for

19  Pacific Proton EB-5 Fund, LLC.

10:40 20       Did that have a Bates number on it?

21    A.   I don't think so.

22    Q.   What did it look like?  Was it just a

23  chart with the seven-odd names on it?

24    A.   Yes, I believe it came out of our

10:40 25  QuickBooks files, and, you know, we took it from the

67

10:40  1   books and who put in the $500,000.  I know Irwin's

2   report has a completely -- you know, had a different

3   list.

4       Q.   Uh-huh.

10:40  5       A.   And there were some names that were

6   different which did not agree with the general

7   ledgers, so I'm not sure where Irwin got her report

8   from and her names.

9       Q.   Bear with me, please.

10:41  10          As part of your expert report, did you

11   reconcile all of the names on that investor list

12   that you just spoke to with financial transactions

13   reflected in the actual bank records for the three

14   corporate entity defendants?

10:42  15       A.   I relied on Trang Lam's work and our

16   QuickBooks file which listed the names of every

17   investor that came in and put up $500,000.

18       Q.   Okay.

19       A.   And I was comfortable with the list that

10:42  20   my team put together based upon the cash coming in.

21       Q.   All right.  But -- but you did not take

22   the step of sort of vetting and running down and

23   identifying a bank record showing the cash coming in

24   from a payor with the same name as everybody that

10:43  25   was on the list appended to Trang Lam's QuickBook

68

10:43   1    reports, correct?

         2      A.    Correct.   We did compare them to Irwin's

         3    list and found discrepancies in names.   And it could

         4    be people have very common names and use different

10:43   5    names, but her list was not consistent with our

         6    list.

         7      Q.    Mr. Friedman, if you could do me a favor

         8    and refresh your marked exhibits folder, there

         9    should be a new one that's going to pop up.   It's

10:43 10    Exhibit 132.   Once you see that, please open it.

       11        And for the record, Exhibit 132 is a

       12    five-page document.   It bears the Bates number

       13    Marcum_CLIU_00005722 --

       14      A.    It hasn't popped up yet.

10:44 15      Q.    -- through 5726.   Why don't we refresh and

       16    give it some time.   And if you still can't see it in

       17    about 20 seconds, I'll try to fix this.

       18      A.    It hasn't refreshed.   Is there something I

       19    can hit on my machine to make it refresh or is it

10:44 20    just we wait?

       21      Q.    Why don't you open up the marked exhibit

       22    folders so that you see 159, 160, and 161, and then

       23    on the browser just hit refresh and see what

       24    happens.

10:45 25      A.    All right.   Yeah, I'm here on the browser.

                                                              69

11:00 1    Morris e-mail that Mr. Gouraige is representing as

2    the QuickBooks report that you relied on in forming

3    your opinions, correct?

4        A.   That's correct.

11:00 5        Q.   So there's a discrepancy between the

6    dates, right?  I mean, the thing that Mr. Gouraige

7    attached and sent to the SEC in Exhibit 162I, it's

8    dated June 14, 2016.  It says "accrual basis."  It's

9    got 1:36 p.m. on it.  In contrast, Exhibit 6A to

11:01 10   your report, that's Exhibit 159, which is the same

11   balance sheet for the same entity, Pacific Proton,

12   it has a date December 31, 2015.  It's got a later

13   date June 21, 2016, a different time.  It also

14   doesn't have the watermark that's at the bottom of

11:01 15   Exhibit 162I, which is what Mr. Gouraige forwarded

16   which says "no assurances provided."

17         Can you explain that discrepancy?

18        A.  Just that they were done on different

19   dates, and maybe it was the way the report read, and

11:01 20   there were no headers and dates and pages on it.

21   That's the only -- I can't give you another reason.

22        Q.   Okay.  Should there be a "no assurance is

23   provided" watermark on the Exhibit 6A to your expert

24   report?

11:02 25        A.   There's no reason for it to be there or

78

11:02   1   not be there.   I think I made it clear that we

2   didn't audit review these numbers at all.

3       Q.   Okay.   And so when preparing Exhibit 6A,

4   you did not perform assurance services, correct?

11:02   5       A.   That is correct.

6       Q.   And so would you agree with me that in

7   Exhibit 162, that's the e-mail that Mr. Gouraige

8   sent to the SEC on April 2nd, his statement that,

9   "Also attached is an August 2, 2016 e-mail from Stan

11:02  10   Morris" -- then corporate counsel to you --

11   "attachment QuickBook reports that Mr. Friedman

12   reviewed and relied upon in preparing his report"

13   was not an accurate statement?

14       A.   No, I disagree with that comment.   I think

11:02  15   these financial statements and the numbers are the

16   same.   Is it the exact printed copy?   No, but it's

17   the same information.   Nothing's changed.

18       Q.   Okay.   Regardless -- okay.   All right.

19   So -- okay.   I think I hear you.

11:03  20           That's a true statement, right?

21       A.   Yeah.

22       Q.   Stan Morris forwarded to the SEC on

23   August 2, 2016, those are the QuickBook reports that

24   you used as the foundational basis for your

11:03  25   analysis, correct?

79

11:03   1      A.   That's correct.   We just ran the reports

        2    on different days, but it's the same report.

        3      Q.   Got it.   And those reports were prepared

        4    by Trang Lam and her team back in, I guess, around

11:03   5    2016, right?

        6      A.   That's correct.

        7      Q.   Okay.   And, you know, back in 2016, you

        8    had not had occasion to work with Mr. Liu on any

        9    engagement relating to his corporate entities?

11:03 10      A.   That's correct.   I never knew him, never

    11    even knew he was a client of the firm.

    12      Q.   Okay.   I want to turn back to Exhibit 160,

    13    which is your initial report.   And we -- sorry,

    14    Exhibit 159, which is your initial report.   And we

11:05 15    had briefly addressed the adjustments described on

    16    page 1 of your report.

    17          So the very first bullet reads, "Adjusting

    18    the expenses of the entities between balance sheet

    19    and profit and loss statements based on the nature

11:05 20    of the expenses."

    21          Which expenses did you adjust?

    22      A.   Okay.   Let's go to -- if you turn to

    23    Exhibit 1.

    24      Q.   Uh-huh.

11:05 25      A.   You see we have kind of consolidated all

    80

11:20 1   A. That's correct.

2   Q. But, you know, the facts and circumstances

3 of these transactions, apart from what you've just

4 testified to that Mr. Liu communicated, you have no

11:20 5 further knowledge, right?

6   A. That's correct.

7   Q. Okay.  Turning to Exhibit 1B, with respect

8 to Mevion, you've agreed -- you've reviewed some

9 agreements that were executed with Mevion by Mr. Liu

11:20 10 on behalf of Beverly Proton at the end of 2015,

11 correct?

12   A. That's correct.

13   Q. But you've not spoken with Mevion, you've

14 not seen any Mevion invoices, and you've not seen

11:20 15 any other evidence that would establish the facts

16 and circumstances of that 3 million-dollar payment,

17 correct?

18   A. Incorrect.  I have reviewed a contract for

19 the, I believe it was $22 or million total price.

11:20 20 And I could be wrong in the total price, but I did

21 see the $3 million as part -- as part of the

22 contract, and there was a contract between the

23 company and Mevion.

24   Q. And -- and do you have any understanding

11:21 25 of what was delivered by Mevion?

91

11:21  1          A.    Nothing was delivered.

       2          Q.    But contracts you've reviewed, no

       3    invoices, no other documentation, let's say, you

       4    know, written correspondence in the course of

11:21  5    negotiating that contract, written correspondence in

       6    the aftermath of that contract, nothing of the sort,

       7    right?

       8          A.    No, I just reviewed seeing the contract

       9    between the companies.

11:21 10          Q.    Okay.  Optivus, you reviewed a quote, you

      11    saw a canceled check stub that showed payment, but

      12    you were not provided with an invoice to support the

      13    payment, nor were you provided any information about

      14    what Optivus actually did in exchange for that

11:22 15    payment, correct?

      16          A.    It is my understanding that they did

      17    consulting for that payment, but that's the extent

      18    of my knowledge.

      19          Q.    What's that understanding based upon?

11:22 20          A.    Discussions with counsel, and I think

      21    that's pretty much my understanding from counsel.

      22          Q.    Okay.  Turn to Exhibit 1C.  Let's start

      23    with R Allen Construction.

      24                You reference in the notes to Exhibit 1C a

11:22 25    May 2015 contract with R Allen Construction a later

                                                                    92

11:22  1    work agreement dated July 2015 and some check stubs

2    and bank statements confirming the amounts paid,

3    correct?

4         A.   Correct.  That's correct.

11:22  5         Q.   And that's the entire -- that's the entire

6    universe of information you were provided about the

7    work that R Allen Constructed -- Construction did in

8    exchange for this $315,487?

9         A.   Yes.  And I understand -- I mean, they

11:23 10    tore down the existing building that was on the

11    property.

12         Q.   Okay.  And what is that understanding

13    based upon?

14         A.   Discussions with counsel.

11:23 15         Q.   Okay.  So no invoices provided, no other

16    information about the work that was actually

17    performed, correct?

18         A.   Correct.

19         Q.   Skanska USA, your expert opinions are

11:23 20    based on the information set forth in Note 2 to

21    Exhibit 1C which is an April 2013 contract with

22    Skanska at the contract price set forth in that

23    agreement as well as check stubs and bank statements

24    showing the payments, correct?

11:23 25         A.   That's correct.

93

11:23  1      Q.   That's the entire universe of information

2   that you have on that particular -- on those

3   transactions, correct?

4      A.   Correct.

11:23  5      Q.   You know, with respect to the necessity,

6   the legitimacy, the actual value delivered by

7   Skanska, you have no information and no opinion with

8   respect to those issues, correct?

9      A.   Correct.

11:24  10      Q.   SCI.X Science Studio, per Note 3 to

11   Exhibit 1C, you reviewed a contract between SCI.X

12   Science Studio and Beverly Proton dated

13   November 2015 that set forth the contract fee, and

14   you also reviewed some bank account statements

11:24  15   showing that there was a funds transfer in November

16   of 2015, correct?

17      A.   That's correct.

18      Q.   And that's the entire universe of

19   information that you were provided in connection

11:24  20   with the corporate entities' financial transactions

21   with SCI.X Science Studio, correct?

22      A.   Correct.

23      Q.   So the value of -- well, the fact of

24   whatever was delivered, the value of whatever was

11:24  25   provided by SCI.X and the legitimacy of those

94

11:24  1    services, you have no opinion on that, no

2    information to that effect, correct?

3         A.   I have no information that they did not

4    perform the services per their contract, correct.

11:25  5         Q.   Okay.  Let's go to Exhibit 1F to your

6    report.

7         A.   I'd like to add something on 1C because

8    you did not read Notes 4 and 5 as to why we wrote

9    off those balances, and I think it's important to

11:25 10   have on the record that because the project was

11   stopped, we wrote off these assets and did not allow

12   them to be capitalized.

13        Q.   Okay.  Thank you.

14             Turning to Exhibit 1F, is this a

11:26 15   tabulation of the startup costs for the three

16   corporate entities through April 30, 2016?

17        A.   That is correct.

18        Q.   Okay.  How did you identify Shanghai

19   Commercial Bank; Optivus; Nisy Ipe; John Paul

11:26 20   Thropay; Nixon Peabody, LLP; Marcum, LLP?  How did

21   you identify those entities who received corporate

22   funds as having provided services in connection with

23   the corporate defendants' startup costs?

24        A.   When we got the initial financial

11:27 25   statements, these were all categorized as startup

95

11:27   1   cost.  So we didn't put them in there.  That's how

2   they originally came to us.

3          Q.    Categorized by whom, the prior CPA?

4          A.    Prior CPA, yes.

11:27   5          Q.    Did you speak with the prior CPA as part

6   of your expert engagement?

7          A.    No, we did not.

8          Q.    Did anybody on your team speak with the

9   prior CPA as part of your expert engagement?

11:27  10          A.    Not to my knowledge.

11          Q.    Did you receive the file that the prior

12   CPA prepared in connection with the financial

13   statements that you started with as part of your

14   expert engagement?

11:27  15          A.    We would have received their financial

16   statement only.  We did not have any supporting

17   documentation, to my knowledge.

18          Q.    Okay.  So with respect to all the startup

19   costs reflected in Exhibit 1, there was no

11:28  20   supporting documentation apart from the financial

21   statements that had been prepared by the prior CPA

22   for these entities, correct?

23          A.    And I'm looking at my notes to give you

24   the sources at the bottom.

11:28  25          Q.    Uh-huh.

96

11:28 1        A.   You know, you could see the bank statement

2    from March of 2013.  We have not been provided with

3    any contract or invoices from Shanghai Commercial

4    Bank to support these expenses, so we took it from

11:28 5    the bank statement.

6              For the second item, again, from the

7    QuickBook records and as of 12/31/15, the bank

8    statements and the account ending in 5152, we have

9    been provided -- we have not been provided any

11:28 10   contracts or invoices to support these expenses.

11        Q.   But the QuickBook records referenced in

12   your notes to Exhibit 1F that were prepared by Trang

13   Lam and her team at Marcum, they used the financial

14   statements from the prior CPA as the starting point,

11:29 15   correct?

16        A.   That is -- that's correct.

17        Q.   Okay.

18        A.   And then we were able to identify what we

19   could identify, and we footnoted them down below,

11:29 20   our sources.

21        Q.   Got it.  Turning to Exhibit 2A?

22        A.   2A.

23        Q.   In Exhibit 2A, you list a host of legal

24   and professional services firms that received funds

11:30 25   from the corporate entities from the initial year of

97

Exhibit 2 Page 44

11:30  1    operations, so that's 2010, right?

2          A.    Correct.

3          Q.    Through April 30, 2016.  With respect to

4    the services rendered by all of these firms listed

11:30  5    here, Seyfarth Shaw, Marcum & Partners; Nixon

6    Peabody; Marcum Greenberg Traurig; Law Offices of

7    Rachel Liu; Miller Mayer, JJW Consultancy; Evans,

8    Carroll & Associates; Homeier & Law, PC, and others,

9    you were not provided with invoices?

11:31 10          I'll exclude Marcum from that question for

11    obvious reasons.

12          A.    Thank you.  Yes, we did not get invoices

13    from the other entities.

14          Q.    Okay.  So, you know, information as to the

11:31 15    nature, necessity, reasonableness, legitimacy of the

16    services provided by all these vendors and charged

17    for by all these vendors, you did not have specific

18    information with respect to that topic, correct?

19          A.    That's correct.

11:31 20          Q.    Okay.  Now let's turn to Exhibit 2C,

21    please.

22          And Exhibit 2C, is this a tabulation of

23    consultancy -- consulting fees paid by the corporate

24    entities from their initial year of operations in

11:32 25    2010 through April 30, 2016?

98

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 45

11:32  1        A.   That's correct.

2        Q.   Number of folks listed.  X Science Studio;

3   Optivus Proton; Skanska USA; Lance Gong; Michael

4   Cogswell; Michael Hunn & Associates; Nisy Ipe;

11:32  5   Licheng Zheny; IBA Dosimetry; Don Wise; Mintz Levin;

6   Square Peg Design; WayLink LLC; Michael Evans;

7   Creative Design.

8            As part of your expert analysis, you were

9   not provided invoices in conjunction with

11:32  10   professional consulting services referenced by these

11   entities, correct?

12        A.   We were provided with those indicated on

13   the right side.  We have four leases and contract

14   agreements, the first being the X Science Studio,

11:32  15   the second being Optivus Proton, the third being

16   Skanska USA, and the fourth being Nisy Ipe, we have

17   lease and contract agreements that we were able to

18   review.

19        Q.   Okay.  But apart from those agreements, no

11:33  20   invoices, no documentary evidence, and no other

21   information about what was actually provided in

22   exchange for these funds, correct?

23        A.   That's correct.

24        Q.   Okay.  And so would you agree that it's

11:33  25   not part of your expert analysis in this case to be

99

11:33  1   rendering an opinion on the necessity,

2   reasonableness, or legitimacy of the services that

3   were rendered for these funds by these vendors that

4   are listed in Exhibit 2C?

11:33  5        A.   My opinion is that these vendors were paid

6   these amounts of dollars.

7        Q.   And turning to Exhibit 2F, in Exhibit 2F

8   you appear to be tabulating rent expenses associated

9   with office space occupied by the corporate entities

11:34 10   from their initial year of operations in 2010

11   through April 30, 2016.

12            Did I get that right?

13        A.   That's correct.

14        Q.   Okay.  So we've talked about Thropay, but

11:34 15   there are a number of different entities under

16   Thropay:  AIM Property Services; Arden Realty;

17   Limited; Bre, B-R-E, California Office Owner, LLC;

18   China Civic Bank; Crown Cabot Financial Center;

19   Shanghai Center.

11:34 20            Your notes reference the lease agreement

21   with Thropay.

22            Have you seen leases for any of these

23   other office properties?

24        A.   No, I did not.

11:34 25        Q.   Do you know where these other office

100

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 47

11:34  1    properties are located?

       2         A.   Nothing more than they say.  I mean,

       3    Shanghai Center I've got to believe is in Shanghai,

       4    but --

11:35  5         Q.   Good assumption.

       6         A.   And Chinese, you now, Bank is in China.

       7         Q.   Okay.

       8         A.   But I have no knowledge of the specific

       9    addresses.

11:35 10         Q.   Okay.  And, you know, no knowledge as to

      11    the reasonableness, necessity, or legitimacy of

      12    these rent payments apart from the fact that they

      13    were made according to the QuickBook reports that

      14    you reviewed, correct?

11:35 15         A.   That's correct.  We understand that these

      16    amounts have been paid to these various entities.

      17         Q.   Okay.  That was a very long interview, but

      18    you were walking me through, very helpfully, your

      19    Exhibit 1 and all the adjustments to expenses of the

11:35 20    entities between the balance sheet and profit and

      21    loss statements.

      22         And I think the last one you covered was

      23    the 368,100-dollar adjustment regarding Optivus

      24    which was written off.

11:36 25         A.   Right.

                                                              101

11:36   1      Q.   Any other adjustments to the balance sheet

2   for the expenses -- expenses of the corporate

3   entity?

4      A.   Sticking with Column G, going down the

11:36   5   page, you have $803,630 was written off.  And that

6   was with Note 7, which is Exhibit 1C, which we've

7   already talked about, and that was written off

8   because the project stopped.

9      Q.   Got it.

11:36  10      A.   Auto and truck --

11      Q.   Uh-huh.

12      A.   -- is the next write-off, along with the

13   accumulated depreciation on those trucks, and we

14   charged that directly to Charles as part of his

11:37  15   management fee because those vehicles were sent

16   directly to China after they were purchased.

17      Q.   Why was that, I guess, in the aggregate

18   80-, 90,000-dollar amount expensed as a management

19   fee to Charles?

11:37  20      A.   Actually, it was a net of $60,000.

21      Q.   60-, you're right.  60-.

22      A.   That's why I'm the accountant.

23      Q.   Yeah.

24      A.   Let me look at my note on that for you.

11:37  25   And that would be Exhibit 1D.

102

11:37 1      Q.   Uh-huh.

2      A.   And if you look at Note 2 at the bottom

3    there, "It is our understanding that these cars were

4    shipped to China almost immediately after their

11:37 5    purchase.  We have not been provided any support

6    that document that these cars were being used for

7    the operational purpose of the entity.  Therefore,

8    they are deemed personal use of Charles, and the

9    cost is being expensed as a management fee on the

11:38 10   profit and loss statement of the entity for the year

11   ending December 31, 2015."

12      Q.   Okay.  And because those cars had no

13   evident corporate use, they were expensed to Charles

14   as compensation?

11:38 15      A.   That's correct.

16      Q.   Okay.  Moving on, what's next?  Any other

17   adjustments?

18      A.   Broker fees, management fees, marketing

19   fees, the startups cost.  You know, this whole next

11:39 20   group that I'm discussing, these were all expensed

21   on the financial statement.  They should not have

22   been carried as assets on the balance sheet.  They

23   were expenses and appropriately belonged in the

24   expense section of a financial statement.

11:39 25      Q.   Okay.

103

11:43  1   we've indicated they were paid.  And I have no

2   knowledge that they were not legitimate payments,

3   and I have no knowledge that they weren't for

4   business purposes.  And anything we thought was

11:44  5   personal of nature, like the cars, like some

6   personal credit card bills of Charles and Lisa were

7   charged to their management fee account, so --

8        Q.   Which you then expensed to the companies?

9        A.   Which we did expense as part of management

11:44  10  fee, but we did limit the management fee to the two

11  of them based on the compensation report done by my

12  partner.

13       Q.   Uh-huh.  And Mr. Ginsburg's reasonable

14  compensation report is the sole basis for that

11:44  15  limitation, right?

16       A.   That is correct.

17       Q.   Okay.  Have we covered all of the expense

18  adjustments that you made to the entities?

19       A.   I believe so.  Let me check one more

11:45  20  column, please.

21       Q.   Take as much time as you need.

22       A.   I think we've covered every adjustment,

23  yes.

24       Q.   Okay.  Redirecting your attention to your

11:45  25  initial report, Exhibit 159, very first page, let's

107

11:45  1    move on to the second bullet point.  It reads,

2    "Adjusting assets based" --

3        A.   Hold it.  Stop, stop, stop.  I got to

4    catch up with you.

11:45  5        Q.   Let me know when you're ready.

6        A.   I'm ready.

7        Q.   Second bullet point, "Adjusting assets

8    based on whether such assets were the assets of the

9    entities as of April 30, 2016."

11:45  10            What asset classifications did you adjust?

11        A.   We just went through all those on the

12    Exhibit 1.

13        Q.   Got it.  "Adjusting management fees based

14    on reasonable compensation studies."

11:45  15            We covered that, right?

16        A.   Correct.

17        Q.   You classified a certain amount of funds

18    paid to Liu and Wang as management fees expensed to

19    the company, but you capped it at the amount of

11:46  20    reasonable compensation that Mr. Ginsburg opined

21    should have been paid to Mr. Liu and Ms. Wang,

22    correct?

23        A.   Correct.

24        Q.   And -- and that cap that your -- that you

11:46  25    applied based on Mr. Ginsburg's opinions is in the

108

11:46 1  range of about, for Mr. Liu, $7.2 million, right?

2       A.   Correct.

3       Q.   So in your financial statements that you

4  prepared, these materials that you prepared up to

11:46 5  $7.2 million, thereabouts, was expensed through the

6  company if it was provided to Liu?

7       A.   That's correct.

8       Q.   Okay.  "Adjusting the receivable based on

9  contrast between entities and third parties," that's

11:47 10  the fourth bullet point.

11          Have you fully spoken to that?  I believe

12  you --

13       A.   Yeah.

14       Q.   -- referenced a number of different

11:47 15  situations.  The 1.5 million with Overseas and the

16  1.5 million with the Industrial and Commercial Bank

17  and the Thropay lease payments.

18          Any others that we have not talked about?

19       A.   I think we covered them all.

11:47 20       Q.   Okay.  And adjusting the expenses between

21  operational and personal expenses, have we covered

22  all of those adjustments?

23       A.   Yes.

24       Q.   Okay.  What is the AICPA?

11:48 25       A.   What is the AICPA?  American Institute of

109

11:59   1    like this and I just want to ask you a few questions

        2    about it, okay?

        3         A.   Okay.

        4         Q.   Take -- take as much time as you need to

11:59   5    flip through the document just to make sure you're

        6    familiar with it.

        7         A.   You know, I've lived this my whole life,

        8    so I'm very familiar with it.

        9         Q.   Okay.  All right.  First question is, you

12:00  10    know, there's a table of contents in Exhibit 163.

       11    And again, this is an AICP document entitled "Guide

       12    to Financial Settlement Services:  Compilation,

       13    Review, and Audits."

       14              The table of contents on page 2 breaks out

12:00  15    a number of different financial statement services

       16    your CPA can provide:  Audit, review, compilation,

       17    and basic financial statement preparation.

       18              Does that jibe with your understanding of

       19    the levels of service a CPA can provide in the way

12:00  20    of financial statements to a client?

       21         A.   Yes.

       22         Q.   And Mr. Friedman, your expert work in this

       23    case isn't a financial statement audit, correct?

       24         A.   That is correct.

12:00  25         Q.   Your expert work in this case is not a

                                                                  112

12:00  1    financial statement review, correct?

       2         A.    Correct.

       3         Q.    Your expert work in this case,

       4    Mr. Friedman, isn't a compilation; is that correct?

12:01  5         A.    Correct.

       6         Q.    And then with respect to basic financial

       7    statement preparation under AR-70, that's not what

       8    you're doing in this case as part of your expert

       9    work, correct?

12:01 10         A.    Correct.

      11         Q.    All right.  And so as part of your

      12    engagement in this case, Mr. Friedman, you did not

      13    obtain reasonable assurance that the financial

      14    statement materials you prepared are free from any

12:01 15    material misstatement, correct?

      16         A.    That is correct.

      17         Q.    And as part of your expert work in this

      18    case, you did not obtain limited assurance that

      19    there are no material modifications that need to be

12:01 20    made to the financial statement materials you

      21    prepared, correct?

      22         A.    That's correct.

      23         Q.    And in fact, Mr. Friedman, am I correct

      24    that you did not obtain any assurance that there are

12:01 25    no material modifications that should be made,

                                                            113

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 2 Page 55

12:01  1    correct?

2          A.    That's correct.

3          Q.    Okay.  As part of this expert engagement,

4    you weren't required to be independent of the

12:02  5    client, correct?

6          A.    Required independence is an attest

7    function, and we're not doing attest services.  So

8    are my opinions independent?  Yes.  Do I think

9    independently?  Yes.  But I'm not doing an attest

12:02  10    service which requires independence.

11          Q.    Okay.  Fair.  And as part of your expert

12    work in this case, you weren't required to obtain an

13    understanding as to the internal controls of the

14    corporate entities and assess any risk for fraud as

12:02  15    part of that control review, correct?

16          A.    That's an assurance service which we were

17    not doing.

18          Q.    Okay.  You know, returning to Exhibit 163,

19    there's a -- a table at the end.  It begins on page

12:03  20    8.  I'm going to use this as my guide for questions.

21    And if you can go down to page 9.

22          A.    Page 9?

23          Q.    Yes.

24          A.    Okay.  I'm there.

12:03  25          Q.    Okay.  Your CPA is required to perform

114

12:03  1    inquiry and analytical procedures.  That's required

       2    as part -- required as part of the review and part

       3    of an audit.

       4           You were not required as part of your

12:03  5    expert work in this case to perform inquiry in

       6    analytical procedures, correct?

       7      A.   That is correct.

       8      Q.   And as part of your expert work in this

       9    case, you and your team did not perform verification

12:04 10    and substantiation procedures that would be required

      11    as part of an audit, correct?

      12      A.   That is correct.

      13      Q.   And you issued no formal report on the

      14    financial statements within the meaning of a

12:04 15    compilation review or audit engagement, correct?

      16      A.   That's correct.

      17      Q.   Let's turn to your rebuttal report that's

      18    Exhibit 161.  I just want to ask a few discreet

      19    questions about this report.  On page 1, the section

12:05 20    entitled "Introduction" of your rebuttal report, one

      21    of the bullet provides --

      22      A.   Hold it.  Hold it.  Let me catch up with

      23    you.  Where are we looking?

      24      Q.   Page 1 of Exhibit 161.

12:05 25      A.   Okay.  Got it.

                                                              115

12:15 1    everything for you.

2         Q.   Did you review the deposition of Trang

3    Lam?

4         A.   I don't remember reading her deposition.

12:15 5    I don't believe I did, but I -- I didn't read it.

6         Q.   Did -- did not?

7         A.   Yeah, I did not read her deposition.

8         Q.   Okay.   May Mr. Liu use your expert reports

9    outside the context of this litigation?

12:16 10        A.   I don't know how to answer that.   I don't

11   know.   I mean, my reports are for this litigation,

12   so I'm just not sure how to answer that.

13        Q.   Under the terms of your engagement, would

14   it be permissible for him to use your reports in

12:16 15   order to obtain a loan?

16        A.   No.

17        Q.   Would it be permissible for him to use

18   your reports to negotiate and engage in some

19   commercial transactions with third parties relating

12:16 20   to the corporate entities?

21        A.   No.   My reports are for this litigation

22   case and should be used for this case only.

23        Q.   Is it permissible for Mr. Liu to use these

24   reports in filings with the IRS?

12:17 25        A.   I'd have to go back to my engagement

122

12:17   1    letter to confirm what the limitations of this --

        2    these reports are, but I think they're strictly to

        3    be used for this purpose of this case and no other

        4    purpose.

12:17   5           MR. LEUNG:  Thank you, Mr. Friedman.  I

        6    have no further questions at this time.  I pass

        7    the witness.

        8           MR. GOURAIGE:  Thank you, Mr. Friedman.  I

        9    have no questions, sir, for you.  And so I

12:18  10    assume that this ends the deposition, and we'd

       11    like the witness to get 30 days' opportunity to

       12    review and make any changes.

       13           THE VIDEOGRAPHER:  This concludes today's

       14    videotaped deposition of Mr. Friedman.  Off the

12:18  15    record at 12:18.

       16           (The proceedings concluded at 12:18 p.m.)

       17

       18

       19

       20

       21

       22

       23

       24

       25

                                                                    123

1

2

3

4                    **CERTIFICATE OF OATH**

5

6

7     **STATE OF FLORIDA**

8     **COUNTY OF PINELLAS**

9

10

11            I, the undersigned authority, certify

12     that RONALD FRIEDMAN, CPA appeared remotely

13     before me and was duly sworn on the 20th day of

14     April, 2021.

15            Signed this 23rd day of April, 2021.

16

17

18            _Denise Sanken_
       _____
19     *DENISE SANKARY, RPR, RMR, CRR*
       Notary Public, State of Florida
       My Commission No. GG  944837
20     Expires: 1/27/24

21

22

23

24

25

Exhibit 2 Page 60

# CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PINELLAS

        I, *DENISE SANKARY*, Registered Merit
Reporter, do hereby certify that I was authorized
to and did stenographically report the foregoing
remote videotaped deposition of RONALD FRIEDMAN,
CPA; pages 1 through 123; that a review of the
transcript was requested; and that the transcript
is a true record of my stenographic notes.

        I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.

        Dated this 23rd day of April, 2021.


*DENISE SANKARY, RPR, RMR, CRR*

Exhibit 2 Page 61

# EXHIBIT 3

Hervé Gouraige
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400

Attorneys for Defendants Charles C. Liu And Xin
Wang A/K/A Lisa Wang

---

Securities and Exchange Commission,

Plaintiff,

Vs.

Charles C. Liu; Xin Wang A/K/A Lisa Wang; Pacific Proton Therapy Regional Center, LLC; Pacific Proton Eb-5 Fund, LLC; And Beverly Proton Center, LLC F/K/A Los Angeles County Proton Therapy, LLC,

Defendants.

---

Marcum LLP ("Marcum") was retained by Sills Cummis & Gross P.C. ("Counsel") in this matter as an expert in financial statements analysis.

Marcum analyzed the document provided including but not limited to QuickBooks records, leases, agreements, bank statements, cancelled checks and tax returns for Pacific Proton Therapy Regional Center, LLC ("PPRC"); Pacific Proton Eb-5 Fund, LLC ("EB-5"); and Beverly Proton Center, LLC ("BPC") (collectively "Entities").

Based on the information provided in the above documents, Marcum made the following adjustments to the financial statements including but not limited to:

➢ Adjusting the expenses of the Entities between balance sheet and profit & loss statements based on the nature of the expenses;
➢ Adjusting assets based on whether such assets were the assets of the Entities as of April 30, 2016;
➢ Adjusting management fees based on reasonable compensation studies;
➢ Adjusting the receivable based on contracts between Entities and third parties[1]; and
➢ Adjusting the expenses between operational and personal expenses.

Based on the above adjustments Marcum created including but not limited to the following in the exhibits attached:

---

[1] We have not made a determination about the collectability of the receivables on the balance sheet.

Exhibit 3 Page 62

➢ Consolidated Balance Sheet at April 30, 2016 for the Entities (Exhibit 1);
➢ Consolidated Profit and Loss Statement from the Initial Year of Operations through the period ending April 30, 2016 for the Entities (Exhibit 2); and
➢ Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016 (Exhibit 3).

Marcum concluded that as of April 30, 2016:

➢ The Entities has assets of approximately $12.5 million (Exhibit 1) which included the following:

1. Cash of approximately $419,000;
2. Receivables of $1,500,000;
3. Receivable from Overseas Chinese Immigration Consulting of $3,400,000;
4. Receivable from John Paul Thropay of $838,500;
5. Receivable related to excess management fees paid to Charles Liu of approximately $2,000,000;
6. Receivable related to excess management fees paid to Xin Wang of approximately $1,066,000;
7. Deposit related to the purchase of medical equipment of $3,000,000;
8. Lease Deposit of $200,000; and
9. Other assets of approximately $72,000.

➢ The Entities had negligible liabilities. (Exhibit 1)

➢ The Entities' capital accounts between the EB-5 investors, Charles Liu and John Thropay totaled approximately $12.5 million. (Exhibit 1)

➢ The Entities' earned a total revenue of approximately $2,700,000 between initial year of operations and April 30, 2016. (Exhibit 2). This revenue was primarily related to the $45,000[2] in administrative fees that were paid by each of the 58 EB-5 investors.

➢ The Entities' paid approximately $19.3 million in expenses between initial year of operations and April 30, 2016. (Exhibit 2). The majority of funds were spent as follows:

1. Management fees to Charles Liu of approximately $7,200,000 (Exhibit 2D);
2. Broker Fees to various third party vendors of approximately $4,300,000 (Exhibit 2B);

---

[2] Per the Private Offering Memorandum of the Pacific Proton EB-5 Fund, LLC, each investor has to pay $45,000 of initial administrative fee.

Exhibit 3 Page 63

3. Marketing fees to various third party vendors of approximately $2,500,000 (Exhibit 2E);

4. Consulting fees to various third party vendors of approximately $2,000,000 (Exhibit 2C);

5. Legal and professional fees to various third party vendors of approximately $783,000 (Exhibit 2A);

6. Demolition expense of approximately $466,000 (Exhibit 2);

7. Travel expense of approximately $414,000 (Exhibit 2);

8. Management fees to Xin Wang of approximately $367,000 (Exhibit 2D); and

9. Rent expense paid to various third party vendors of approximately $321,000 (Exhibit 2F).

The above listed expenses totaled approximately $18,400,000 of the $19,300,000 of the total expenses spent by the Entities.

➢ The Entities' loss from operations was approximately $16,500,000 between initial year of operations and April 30, 2016. (Exhibit 2).

➢ The Entities' through it EB-5 investors investment, administrative fees and other miscellaneous income accumulated approximately $31,800,000 between the initial year of operations and April 30, 2016. As of April 30, 2016, only approximately $419,000 remained in the bank accounts of the Entities. (Exhibit 1)

The above discussion is based upon information currently known to us. We reserve the right to rely upon additional information that becomes available to us after the submission of the above and the related exhibits and to supplement or amend our opinions accordingly, but have no obligation to do so.

Ronald Friedman, CPA
Partner

Exhibit 3 Page 64

# APPENDIX A

Exhibit 3 Page 65

# Ronald S. Friedman

## ASSURANCE SERVICES



Ronald S. Friedman is a Partner in the Firm's National Retail/Consumer Products Industry group, he provides consulting services for closely-held and emerging businesses in the apparel, manufacturing, distribution and retail industries.

Mr. Friedman works very closely with his clients providing assistance with many aspects of their businesses. His services include forecasting and budgeting, profit enhancement, succession planning, exit strategies, preparation for sale of a business, assistance in procuring financing, and workout and reorganization consulting. Mr. Friedman's expertise also includes assisting in the negotiations for the purchase or sale of a business.

Additionally, for more than 30 years Mr. Friedman has served as an expert witness in numerous apparel industry cases ranging from valuations in divorce proceedings to disputes between partners in business dealings.

Mr. Friedman is often quoted in the media for his industry expertise with retail, manufacturing and distribution driven companies in the retail/consumer products sector. His recent appearances include television (FOX and PBS), radio (KFWB, Bloomberg Radio and the Wall Street Journal Radio Network) and print (Apparel News, Associated Press, Los Angeles Times, New York Times, The Wall Street Journal and Women's Wear Daily).

**Ronald S. Friedman, CPA***
Partner

### Professional & Civic Affiliations
American Institute of Certified Public Accountants (AICPA)
California Society of Certified Public Accountants (CalCPA)
City of Hope, Professions and Finance Associates, Past President
California State University, Northridge
University Corporation, Board of Directors
National Jewish Hospital, Board of Directors
Temple Ahavat Shalom in Northridge, Past President
Union of Reform Judaism, Presidents Round Table, CHAIR Southern California

### Seminars & Presentations
100 Ways™- The Profit Enhancement Process
Facilitation of Retreats for Professional Service Firms & Other Businesses
Financial Statement Analysis
Inventory Valuations and Auditing
Reading and Understanding Financial Statements
Internal Controls for Business Entities

### Litigation Cases
- Reviewed books and records along with bank statements for cash stolen from company. Bookkeeper signed owners name on personal checks and destroyed them before owner saw bank statements.
- Reviewed credit card charges looking for inappropriate charges by users of the card.
- Worked with private investigators following a clients CFO to casino gambling with company funds he had stolen.
- Reconciled gross profits of a manufacturer to determine why the gross profits were not achieving expected results.
- In a bankruptcy case, looked for money and assets that the owner inappropriately took from the company at the expense of the general creditors.
- Prepared an expert report for litigation in Federal Court as an expert in financial analysis in the Retail/Consumer Products industry.
- Prepared an expert report and testified for an apparel company where minority shareholders claimed they were not fairly charged expenses and the business failed for lack of financial support from the majority shareholders.

### AREAS OF EXPERTISE
Forecasting & Budgeting
Succession Planning
Exit Strategies
Workouts & Reorganizations
Purchase & Sale of Businesses
Litigation Support

### KEY CLIENTS
Apparel
Manufacturing
Distribution
Retail
E-Commerce

### EDUCATION
Bachelor of Science, Accounting
California State University, Northridge



MARCUMGROUP
MEMBER

*Licensed by the State of California*

Phone 310.432.7414
ron.friedman@marcumllp.com
**www.marcumllp.com**



MARCUM
ACCOUNTANTS ▲ ADVISORS

Exhibit 3 Page 66

# TESTIMONY EXPERIENCE OF RONALD S. FRIEDMAN

**PRIOR TESTIMONY EXPERIENCE IN THE LAST FOUR YEARS:**

| TOPIC | IN THE MATTER OF | NATURE OF TESTIMONY | VENUE |
|---|---|---|---|
| Breach of Fiduciary Duty | Eric Kweach, an individual V. Sang Lee, an individual; Trinity Sports, Inc., a corporation | Trial | Superior Court of the State of California; County of Los Angeles, Central District |
| Breach of Contract | Imperial Toy LLC v Genna Rosenberg | Arbitration | AAA: Los Angeles |
| Shareholder Dispute | Lou et Lin, LLC v Mitchell Quaranta, Bruce Stern, Jonathan Greenberg, Jama JJ,LLC And SwatFame, Inc and Counter Claims | Arbitration | Jams Los Angeles |
| Breach of Fiduciary Duty | Alison Miller Gjersvik, individually and derivatively on behalf of Golden Too, Inc. and Andrew Assael, individually and derivatively on behalf of Planet Gold Clothing, Inc., Claimants, against Jeffrey D. Fisher and Bruce A. Fischer, Respondents and Golden Too, Inc. and Planet Gold Clothing, Inc., Nominal Respondents | Arbitration | AAA: Manhattan |

Exhibit 3 Page 67

**TABLE OF CONTENTS FOR THE EXHIBITS**

| Exhibit # | Name of Exhibit |
|---|---|
| | |
| Exhibit 1 | Consolidated Balance Sheet at April 30, 2016 |
| Exhibit 1A | Other Receivables |
| Exhibit 1B | Medical Equipment |
| Exhibit 1C | Leasehold Improvements |
| Exhibit 1D | Auto & Truck |
| Exhibit 1E | Development Cost |
| Exhibit 1F | Start Up Cost |
| Exhibit 1G | Lease Deposit |
| Exhibit 2 | Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016 |
| Exhibit 2A | Legal and Professional Fees from Initial Year of Operations through April 30, 2016. |
| Exhibit 2B | Broker Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2C | Consulting Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2D | Management Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2E | Marketing Fees from Initial Year of Operations through April 30, 2016 |
| Exhibit 2F | Rent Expenses from Initial Year of Operations through April 30, 2016 |
| Exhibit 3 | Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016 |
| Exhibit 4A | Consolidated Profit and Loss Statement for the period from January 1 through April 30, 2016. |
| Exhibit 4B | Consolidated Profit and Loss Statement for the year ending in December 31, 2015 |
| Exhibit 4C | Consolidated Profit and Loss Statement for the year ending in December 31, 2014 |
| Exhibit 4D | Consolidated Profit and Loss Statement for the year ending in December 31, 2013 |
| Exhibit 5A | 2010-2016 Profit and Loss Statement for Pacific Proton Therapy Regional Center, LLC |
| Exhibit 5B | 2012-2016 Profit and Loss Statement for Beverly Proton Center, LLC |
| Exhibit 5C | 2013-2016 Profit and Loss Statement for Pacific Proton EB-5 Fund, LLC |
| Exhibit 6A | Balance Sheet as of December 31, 2015 for Pacific Proton Therapy Regional Center, LLC |
| Exhibit 6B | Balance Sheet as of December 31, 2015 for Beverly Proton Center, LLC |
| Exhibit 6C | Balance Sheet as of December 31, 2015 for Pacific Proton EB-5 Fund, LLC |

Exhibit 3 Page 68

# EXHIBIT 1

Exhibit 3 Page 69

Securities and Exchange Commission v. Charles Liu et.al
Consolidated Balance Sheet at April 30, 2016

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Combined | Consolidating Entries (4) | Consolidated Total | Adjusting Entries | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Ref | Adjusting Entries | Ref | Balance 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | | H=F+G | I | | J | | K=H+I+J |
| **ASSETS** | | | | | | | | | | | | | | |
| Cash | $ 97,389 | $ 29,314 | $ 7,011,293 | $ 7,137,996 | $ - | $ 7,137,996 | $ - | | $ 7,137,996 | $ (6,719,042) | (12) | $ - | | $ 418,954 |
| Intercompany Receivables | | 4,490,191 | 18,782,169 | 23,272,360 | (23,272,360) | - | | | - | | | | | |
| Other Receivables | 25,780 | - | 3,000,000 | 3,025,780 | - | 3,025,780 | (25,780) | (5) | 3,000,000 | (1,500,000) | (5) | - | | 1,500,000 |
| Receivable from Overseas Chinese Immigration Consulting (25) | - | - | - | - | - | - | - | | - | - | | 3,400,000 | (20) | 3,400,000 |
| Receivable from John Paul Thropay (25) | - | - | - | - | - | - | - | | - | - | | 838,500 | (23) | 838,500 |
| Management Fee Receivable from Charles Liu (25) | - | - | - | - | - | - | - | | - | - | | 2,013,579 | (26) | 2,013,579 |
| Management Fee Receivable from Xin Wang (25) | - | - | - | - | - | - | - | | - | - | | 1,066,285 | (26) | 1,066,285 |
| Accrued Interest | - | - | 63,162 | 63,162 | (63,162) | - | - | | - | - | | - | | - |
| Medical Equipment | - | 3,368,100 | - | 3,368,100 | - | 3,368,100 | (368,100) | (6) | 3,000,000 | - | | - | | 3,000,000 |
| Furniture & Fixtures | 63,335 | 2,347 | - | 65,682 | - | 65,682 | - | | 65,682 | - | | - | | 65,682 |
| Office Equipment | 16,109 | - | - | 16,109 | - | 16,109 | - | | 16,109 | - | | - | | 16,109 |
| Leasehold Improvements | 9,784 | 803,636 | - | 813,420 | - | 813,420 | (803,636) | (7) | 9,784 | - | | - | | 9,784 |
| Auto & Truck | 75,258 | - | - | 75,258 | - | 75,258 | (75,258) | (8) | (0) | - | | - | | (0) |
| Accumulated Depreciation | (34,328) | - | - | (34,328) | - | (34,328) | 15,204 | (8) | (19,124) | - | | - | | (19,124) |
| Development Costs | - | - | - | - | - | - | - | | - | - | | - | | - |
| Broker's Fees | - | 932,500 | - | 932,500 | - | 932,500 | (932,500) | (9) | - | - | | - | | - |
| Agent's Fees | - | 2,810,025 | - | 2,810,025 | - | 2,810,025 | (2,810,025) | (9) | - | - | | - | | - |
| Management Fees | - | 2,810,799 | 200,000 | 3,010,799 | - | 3,010,799 | (3,010,799) | (9) | - | - | | - | | - |
| Marketing Fees | - | 2,350,025 | - | 2,350,025 | - | 2,350,025 | (2,350,025) | (9) | - | - | | - | | - |
| Start Up Costs | 403,891 | 668,116 | - | 1,072,007 | - | 1,072,007 | (1,072,007) | (10) | - | - | | - | | - |
| A/A - Start Up Costs | (72,139) | (51,100) | - | (123,239) | - | (123,239) | 123,239 | (10) | - | - | | - | | - |
| Lease Deposit | 68,048 | 100,000 | - | 168,048 | - | 168,048 | (68,048) | (11) | 100,000 | 200,000 | (11) | (100,000) | (24) | 200,000 |
| **Total Assets** | **$ 653,126** | **$ 18,313,952** | **$ 29,056,624** | **$ 48,023,703** | **$ (23,335,522)** | **$ 24,688,181** | **$ (11,377,734)** | | **$ 13,310,446** | **$ (8,019,042)** | | **$ 7,218,364** | | **$ 12,509,768** |
| | | | | | | - | | | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | | | | | | | | | |
| C/C - Chase Card #3763 | $ 2,094 | $ - | $ - | $ 2,094 | $ - | $ 2,094 | $ - | | $ 2,094 | $ (2,094) | (13) | - | | $ - |
| Accrued Interest Payable | - | 63,162 | - | 63,162 | (63,162) | - | - | | - | - | | - | | - |
| Intercompany Payable | 4,675,568 | 18,596,792 | - | 23,272,360 | (23,272,360) | - | - | | - | - | | - | | - |
| Other Payable | - | 2,100 | - | 2,100 | - | 2,100 | - | | 2,100 | - | | - | | 2,100 |
| Total Liabilities | 4,677,662 | 18,662,054 | - | 23,339,716 | (23,335,522) | 4,194 | - | | 4,194 | (2,094) | | - | | 2,100 |
| | | | | | | | | | | | | | | |
| Capital - Investors | - | - | 29,056,624 | 29,056,624 | - | 29,056,624 | (200,000) | (14) | 28,856,624 | (999,876) | (17) | - | | 27,856,748 |
| Capital - Charles Liu | (3,018,401) | (261,077) | - | (3,279,478) | - | (3,279,478) | (8,384,551) | (15) | (11,664,029) | (5,262,804) | (18) | 5,413,773 | (21) | (11,513,060) |

Securities and Exchange Commission v. Charles Liu et.al
Consolidated Balance Sheet at April 30, 2016

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Combined | Consolidating Entries (4) | Consolidated Total | Adjusting Entries | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Ref | Adjusting Entries | Ref | Balance 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | | H=F+G | I | | J | | K=H+I+J |
| Capital - John P. Thropay | (1,006,134) | (87,025) | - | (1,093,160) | - | (1,093,160) | (2,793,184) | (16) | (3,886,343) | (1,754,268) | (19) | 1,804,591 | (22) | (3,836,020) |
| Total Liabilities | (4,024,536) | (348,102) | 29,056,624 | 24,683,987 | - | 24,683,987 | (11,377,735) | | 13,306,252 | (8,016,948) | | 7,218,364 | | 12,507,668 |
| Total Liabilities & Equity | $ 653,126 | $ 18,313,952 | $ 29,056,624 | $ 48,023,703 | $ (23,335,522) | $ 24,688,181 | $ (11,377,735) | | $ 13,310,446 | $ (8,019,042) | | $ 7,218,364 | | $ 12,509,768 |

**Notes:**
**(1)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Pacific Medical Regional Center, LLC. - Exhibit 6A.
**(2)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Beverly Proton Center, LLC. - Exhibit 6B.
**(3)** Source - 2015 Form 1065 U.S. Return for Partnership Income, Schedule L for Pacific Proton EB-5 Fund, LLC. - Exhibit 6C.
**(4)** Intercompany payables and receivables were eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** From Exhibit 1A.
**(6)** From Exhibit 1B.
**(7)** From Exhibit 1C.
**(8)** From Exhibit 1D.
**(9)** From Exhibit 1E.
**(10)** From Exhibit 1F.
**(11)** From Exhibit 1G.
**(12)** From Exhibit 3.
**(13)** There was a payment of $10,945.71 made to the Chase Card ending in 3763 in April 2016. We are presuming that this payment included the amount outstanding for this card as of December 31, 2015.
**(14)** From Exhibit 2.
**(15)** This includes 75% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 2 and Exhibit 1F.
**(16)** This includes 25% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 2.
**(17)** From Exhibit 4A.
**(18)** This includes 75% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 4A.
**(19)** This includes 25% of the sum of adjusting entries of Beverly Proton Center, LLC and of Pacific Medical Regional Center, LLC. From Exhibit 4A.
**(20)** From Exhibit 2B.
**(21)** This includes 75% of the sum of adjusting entries. From Exhibit 2.
**(22)** This includes 25% of the sum of adjusting entries. From Exhibit 2.
**(23)** From Exhibit 2F and Exhibit 1G.
**(24)** From Exhibit 1G.
**(25)** We have not made a determination about the collectability of the receivables on the balance sheet.
**(26)** From Exhibit 2D

# EXHIBIT 1A

Exhibit 3 Page 72

Securities and Exchange Commission v. Charles Liu et.al
Other Receivables

| | 2014 Pacific Proton Regional Center (1) | | 2015 Pacific Proton Regional Center (1) | | 30-Apr-16 Pacific Proton Regional Center (1) | |
|---|---|---|---|---|---|---|
| Beginning Balance | $ | - | $ | 9,131.25 | $ | - |
| | | | | | | |
| Due from MPH Ventures (2) | $ | (1,768.75) | $ | 1,755.00 | $ | - |
| Due from SC Fund (3) | | 10,100.00 | | (400.00) | | - |
| Due from SC Mgmt (4) | | 800.00 | | 5,130.57 | | - |
| Due from MP Medical Hotel (5) | | - | | 10,163.31 | | - |
| Total Other Receivables | $ | 9,131.25 | $ | 16,648.88 | $ | - |
| | | | | | | |
| Ending Balance | $ | 9,131.25 | $ | 25,780.13 | $ | - |

| | Pacific Proton EB-5 Fund | | Pacific Proton EB-5 Fund (6) | | Pacific Proton EB-5 Fund (6) | |
|---|---|---|---|---|---|---|
| Beginning Balance | $ | - | $ | - | $ | 3,000,000.00 |
| | | | | | | |
| Due From Industrial and Commercial Bank (7) | | - | | 1,500,000.00 | | - |
| Due From Overseas Chinese Banking Corp. (8) (9) | | - | | 1,500,000.00 | | (1,500,000.00) |
| Total Other Receivables | $ | - | $ | 3,000,000.00 | $ | (1,500,000.00) |
| | | | | | | To Exhibit 1 |
| | | | | | | |
| Ending Balance | $ | - | $ | 3,000,000.00 | $ | 1,500,000.00 |
| | | | | | | |
| Total Other Receivables | $ | 9,131.25 | $ | 3,025,780.13 | $ | 1,500,000.00 |
| | | | | | | |
| Write off (10) | $ | - | $ | (25,780.13) | $ | - |
| | | | | | To Exhibit 1 & 2 | |
| | | | | | | |
| Total Ending Balance of Other Receivables | $ | 9,131.25 | $ | 3,000,000.00 | $ | 1,500,000.00 |

---

Notes:

(1) Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transactions by Account Report for Due To/From - Group Two as of 12/31/2015.

(2) This entity is owned by Charles Liu (75%) and Xin Wang (25%).

(3) The general partner is SC Management and the limited partners would be future EB5 investors.

(4) This entity is owned by Charles Liu 100% as a Manager and Member.

(5) This entity is owned by MPH Ventures, LLC  (75%) and Xin Wang (25%).

(6) Per email from Charles Liu dated April 6, 2016, these funds were erroneously sent to the above banks from the Pacific Proton EB-5 Fund and that these funds will be returned.

(7) Bank statement for account ending in 1028 for August, October and December 2015 shows withdrawal of $500,000 in each month for a total of $1.5 million.

(8) Bank statement for account ending in 1028 for (a) August and October 2015 shows withdrawal of $500,000 in each month, (b) November 2015 shows withdrawal of $150,000 and ('c) December 2015 shows withdrawal of $350,000, for a total of $1.5 million.

(9) Bank statement for account ending in 1028 for March 2016 documents the return of $1.5 million from Overseas Chinese Banking Corp.

(10) These amounts of other receivables were written off as they were deemed to be uncollectible as of December 31, 2015. These were expensed as management fees to Charles Liu since he owns the majority interest in each of these entities.

# EXHIBIT 1B

Exhibit 3 Page 74

### Securities and Exchange Commission v. Charles Liu et.al
### Medical Equipment

| | 2014 | 2015 | 30-Apr-16 |
|---|---|---|---|
| | | **Beverly Proton Center, LLC** | |
| **Beginning Balance** | $ - | $ - | $ 3,000,000 |
| | | | |
| **Mevion Medical Systems (1)** | - | 3,000,000 | - |
| **Optivus Proton Therapy (2)** | - | 368,100 | - |
| **Total Medical Equipment** | $ - | $ 3,368,100 | $ - |
| | | | |
| **Ending Balance** | $ - | $ 3,368,100 | $ 3,000,000 |
| | | | |
| **Adjustments (3)** | $ - | $ (368,100) | $ - |
| | | **To Exhibit 1 & 2** | |
| | | | |
| **Total Ending Balance of Medical Equipment** | $ - | $ 3,000,000 | $ 3,000,000 |

---

**Notes:**

**(1)** Per the System Purchase Agreement dated November 9, 2015 between Mevion Medical Systems and Beverly Proton Center LLC, $3 million was payable upon the execution of the agreement. Per the November 2015 bank statement for account ending in 5152, Mevion Medical Systems was wired these funds on November 12, 2015.

**(2)** Per the Quotation provided by Optivus Proton Therapy, the quotation price is $495,000. Per check stub for check # 1025 and November 2015 bank statement for account ending in 5152, $368,100 was paid to Optivus Proton Therapy. We were not provided any invoice to support this payment.

**(3)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015.

Exhibit 3 Page 75

# EXHIBIT 1C

Exhibit 3 Page 76

**Securities and Exchange Commission v. Charles Liu et.al**
**Leasehold Improvements**

| | 2014 | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|
| | | **Beverly Proton Center, LLC** | | |
| Beginning Balance | $           - | $           - | | $           - |
| | | | | |
| R Alan Construction (1) | - | 315,487 | | - |
| Skanska USA Building Inc. (2) | - | 402,549 | | - |
| SCI.X Science Studio, LLC (3) | - | 85,600 | | - |
| Total Leasehold Improvements | $           - | $     803,636 | | $           - |
| | | | | |
| Ending Balance | $           - | $     803,636 | | $           - |
| | | | | |
| Adjustments | | | | |
| Consulting Expense (4) | | (488,149) | To Exhibit 2 | |
| Demolition Expense (5) | | (315,487) | To Exhibit 2 | |
| Total Adjustments | $           - | $    (803,636) | | $           - |
| | | **To Exhibit 1** | | |
| | | | | |
| Total Ending Balance of Leasehold Improvements | $           - | $           - | | $           - |

**Notes:**

**(1)** Per the contract dated between R Alan Construction and Beverly Proton Center, LLC dated May 2015 proposed price was $183,687. An additional work agreement dated July 2015, there an additional proposed price for work to be performed of $53,400 for a total of $237,087. We have been provided check stubs and bank statements to support the payments above, however no invoices have been provided. Additionally, there is no support for the payments that were in addition to the proposed prices in the contracts.

**(2)** Per the contract dated April 2013, between Skanska USA Building Inc. and Beverly Proton Center, LLC, the contract price was $5,211,308. We have been provided check stubs and bank statements to support the payments above, however no invoices have been provided.

**(3)** Per the contract between SCI.X Science Studio LLC and Beverly Proton Center, LLC dated November 2015, the fee was $171,200 with half of $85,600 payable upon the execution of the contract . Per the November 2015 bank statement for account ending in 5152, SCI.X Science Studio, LLC was wired these funds on November 16, 2015.

**(4)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015.

**(5)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as demolition expense in the profit and loss statement for year ending December 31, 2015.

Exhibit 3 Page 77

# EXHIBIT 1D

Exhibit 3 Page 78

**Securities and Exchange Commission v. Charles Liu et.al**
**Auto & Truck**

| | 2014 | | 2015 | Reference | 30-Apr-16 | |
|---|---|---|---|---|---|---|
| | | | **Beverly Proton Center, LLC** | | | |
| Beginning Balance | $ | - | $ | 75,258 | | $ | - |
| | | | | | | |
| Auto 14 - Place in Service 9/10/2014 (1) | | 38,378 | | - | | | - |
| Auto 14 - Place in Service 11/19/2014 (1) | | 36,880 | | - | | | - |
| Total Auto & Truck | | 75,258 | $ | - | | $ | - |
| | | | | | | |
| Ending Balance | $ | 75,258 | $ | 75,258 | | $ | - |
| | | | | | | |
| Depreciation Expense - Current (1) | $ | 5,004 | $ | 10,200 | | | |
| Accumulated Depreciation | | - | | 5,004 | | | |
| Total Accumulated Depreciation | $ | 5,004 | $ | 15,204 | | $ | - |
| | | | | | | |
| Adjustments | | | | | | |
| Management Fees - Charles Liu (2) | | - | | 75,258 | **To Exhibit 2** | | |
| Depreciation Expense (3) | | - | | 15,204 | **To Exhibit 2** | | |
| Total Adjustments | $ | - | $ | 90,462 | | $ | - |
| | | | **To Exhibit 1** | | | |

---

**Notes:**

**(1)** Source - 2015 Depreciation Schedule for Pacific Medical Regional Center, LLC.

**(2)** It is our understanding that these cars were shipped to China almost immediately after their purchase. We have not been provided any support that documents that these cars were being used for operational purposes of the entity, therefore they are being deemed as for personal use of Charles Liu and the cost of the cars is being expensed as management fees on the profit and loss statement of the entity for year ending December 31, 2015.

**(3)** Since the cars are being expensed as management fees and are no longer deemed as operational asset of the entity, the depreciation on such cars is being reduced since the expense is not an operational expense of the entity.

# EXHIBIT 1E

Exhibit 3 Page 80

Securities and Exchange Commission v. Charles Liu et.al
Development Cost

| | Entity | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|---|
| | | | | **Broker Fees** | | | | |
| Beginning Balance | | $ - | | $ - | | $ - | | $ - |
| Hang Seng Bank (1) | Beverly Proton Center, LLC | $ - | | $ - | | $ 932,500.00 | | $ - |
| Total Broker Fees | | $ - | | $ - | | $ 932,500.00 | | $ - |
| Ending Balance | | $ - | | $ - | | $ 932,500.00 | | $ - |
| Adjustments (2) | | $ - | | $ - | | $ (932,500.00) | | $ - |
| | | | | | | To Exhibit 1 & 2 | | |
| Total Ending Balance of Broker Fee | | $ - | | $ - | | $ - | | $ - |
| | Entity | | | **Agent's Fees** | | | | |
| Beginning Balance | | $ - | | $ - | | $ 350,000.00 | | $ - |
| Oversea Chinese Immigration Consulting (Agent's Fees) (3) | Beverly Proton Center, LLC | $ - | | $ 350,000.00 | | $ - | | $ - |
| Oversea Chinese Immigration Consulting (Consulting Fees) (3) | Beverly Proton Center, LLC | - | | - | | 5,265,000.00 | | |
| Oversea Chinese Immigration Consulting (Refund of Fees in Consulting Fees) (3) | Beverly Proton Center, LLC | - | | - | | (29,975.00) | | |
| Oversea Chinese Immigration Consulting (Reallocation to Pacific Proton Regional Center from Consulting Fees) (3) | Beverly Proton Center, LLC | - | | - | | (2,775,000.00) | | |
| Total Agent's Fees | | $ - | | $ 350,000.00 | | $ 2,460,025.00 | | $ - |
| Ending Balance | | $ - | | $ 350,000.00 | | $ 2,810,025.00 | | $ - |
| Adjustments (2) | | $ - | | $ - | | $ (2,810,025.00) | | $ - |
| | | | | | | To Exhibit 1 & 2 | | |
| Total Ending Balance of Agent's Fee | | $ - | | $ 350,000.00 | | $ - | | $ - |

Securities and Exchange Commission v. Charles Liu et.al
Development Cost

| | Entity | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|---|
| | | | | **Marketing Fees** | | | | |
| Beginning Balance | | $ - | | $ - | | $ - | | $ - |
| Antonio Ramon Villaraigosa (5) | Beverly Proton Center, LLC | $ - | | $ - | | $ 50,025.00 | | $ - |
| Industrial and Commercial Bank (5) | Beverly Proton Center, LLC | | | | | $ 2,300,000.00 | | |
| Total Marketing Fees | | $ - | | $ - | | $ 2,350,025.00 | | $ - |
| Ending Balance | | $ - | | $ - | | $ 2,350,025.00 | | $ - |
| Adjustments (6) | | $ - | | $ - | | $ (2,350,025.00) | | $ - |
| | | | | | | To Exhibit 1 & 2 | | |
| Total Ending Balance of Marketing Fees | | $ - | | $ - | | $ - | | $ - |
| | Entity | | | **Management Fees** | | | | |
| Beginning Balance | | $ - | | $ 433,637.67 | | $ 1,991,298.75 | | $ - |
| Charles Liu (Reclass of Distribution to Management Fees) (7) | Beverly Proton Center, LLC | 222,084.22 | To Exhibit 2 | | | | | |
| Charles Liu (Reclass of Management Fee paid by Pacific Proton Regional Center, LLC) (7) | Beverly Proton Center, LLC | 211,553.45 | To Exhibit 2 | 1,449,155.09 | To Exhibit 2 | | | |
| Charles Liu (Reclass of Guaranteed Payments to Management Fees) (7) | Beverly Proton Center, LLC | | | 25,005.99 | To Exhibit 2 | | | |
| Xin Wang (Reclass of Management Fee paid by Pacific Proton Regional Center, LLC) (7) | Beverly Proton Center, LLC | | | 83,500.00 | To Exhibit 2 | | | |
| Xin Wang (Reclass the Cash Disbursements) (7) | Beverly Proton Center, LLC | - | | | | 354,000.00 | To Exhibit 2 | - |
| Charles Liu (Reclass the Cash Disbursements) (7) | Beverly Proton Center, LLC | | | | | 165,500.00 | To Exhibit 2 | |
| Management Fee paid to Pacific Proton Regional Center, LLC (7) | Beverly Proton Center, LLC | - | | - | | 300,000.00 | To Exhibit 2 | |
| Charles Liu (Record Management Fees paid by Pacific Proton Regional Center ) (7) | Pacific Proton EB-5 Fund | | | | | 200,000.00 | To Exhibit 2 | |
| Total Management Fees | | $ 433,637.67 | | $ 1,557,661.08 | | $ 1,019,500.00 | | $ - |
| Ending Balance | | $ 433,637.67 | | $ 1,991,298.75 | | $ 3,010,798.75 | | $ - |

Securities and Exchange Commission v. Charles Liu et.al
Development Cost

| | 2013 | Reference | 2014 | Reference | 2015 | Reference | 30-Apr-16 |
|---|---|---|---|---|---|---|---|
| **Adjustments (8)** | $ - | | $ - | | $ (3,010,798.75) | | $ - |
| | | | | | **To Exhibit 1** | | |
| **Total Ending Balance of Agent's Fee** | $ 433,637.67 | | $ 1,991,298.75 | | $ - | | $ - |
| **Total Ending Balance of Development Costs** | $ 433,637.67 | | $ 2,341,298.75 | | $ - | | $ - |

Notes:

**(1)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Broker Fees as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices from Hang Seng Bank to support these expenses.

**(2)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015.

**(3)** Source - Beverly Proton Center, LLC QuickBooks General Ledger for 12/31/2014 and 12/31/2015 and Bank Statement for account ending in 5152.

**(4)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months. We have now recorded this as a receivable on the balance sheet.

**(5)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Marketing Fees as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices with Industrial & Commercial Bank and Antonio Ramon Villaraigosa to support these expenses.

**(6)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as marketing fees in the profit and loss statement for year ending December 31, 2015.

**(7)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Management Fees for 12/31/2013, 12/31/2014, and 12/31/2015 and Pacific Proton EB-5 Fund QuickBooks General Ledger for 12/31/2014. These payments are based on the employment and management agreements. See further discussion in Exhibit 2D.

**(8)** These funds are related to compensation and therefore should be expensed and not capitalized. Therefore, these expenses were adjusted and expensed in the profit and loss statements for year ending 12/31/2015.

# EXHIBIT 1F

Exhibit 3 Page 84

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

|  | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|
| | | | **Beverly Proton Center, LLC** | | |
| **Beginning Balance** | $ - | $ 243,354.69 | $ 243,354.69 | | $ - |
| | | | | | |
| **Shanghai Commercial Bank (1)** | $ 100,000.00 | $ - | | | $ - |
| **Optivus Proton Therapy, Inc. (2)** | 90,069.83 | | | | |
| **Nisy IPE (3)** | 53,284.86 | | | | |
| **John Paul Thropay (4)** | - | | 380,500.00 | | |
| **Nixon Peabody LLP (5)** | - | | 40,027.30 | To Exhibit 2A | |
| **Marcum LLP (6)** | - | | 4,233.71 | To Exhibit 2A | |
| **Total Start Up Cost** | $ 243,354.69 | $ - | $ 424,761.01 | | $ - |
| | | | | | |
| **Ending Balance** | $ 243,354.69 | $ 243,354.69 | $ 668,115.70 | | $ - |
| | | | | | |
| **Adjustments** | | | | | |
| **Broker Fees (7)** | $ - | $ - | $ (100,000.00) | To Exhibit 2 | $ - |
| **Consulting Fees (8)** | - | - | (143,354.69) | To Exhibit 2 | |
| **Rent (9)** | - | - | (380,500.00) | To Exhibit 2 | |
| **Legal and Professional Fees (10)** | - | - | (44,261.01) | To Exhibit 2 | |
| **Total Adjustments** | $ - | $ - | $ (668,115.70) | | $ - |
| | | | **To Exhibit 1** | | |
| **Total Ending Balance of Start Up Costs** | $ - | $ 243,354.69 | $ - | | $ - |
| | | | | | |
| **Amortization Expense - Current (18)** | $ 4,496.00 | $ 16,223.00 | 30,381.00 | | |
| **Accumulated Amortization** | - | 4,496.00 | 20,719.00 | | |
| **Total Accumulated Amortization** | $ 4,496.00 | $ 20,719.00 | $ 51,100.00 | | $ - |
| | | | | | |
| **Adjustment to Amortization Expense (18)** | - | - | (51,100.00) | | - |
| | | | **To Exhibit 1 & 2** | | |
| **Total Balance of Amortization Expense** | $ 4,496.00 | $ 20,719.00 | $ - | | $ - |
| | | | | | |
| | | | **Pacific Proton Regional Center, LLC** | | |
| **Beginning Balance (11)** | $ 73,274.00 | $ 73,274.00 | $ 403,891.19 | | $ - |

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|
| Payments to Luxury Aquilaria (12) | $ - | $ 222,000.00 | $ - | | $ - |
| Refund of Shanghai Office Deposit (12) | - | (36,270.00) | - | | |
| Payment of Expenses for Shanghai Office (12) | - | (191,112.81) | - | | |
| Overseas Chinese Immigration Consulting Payment (13) | - | 331,000.00 | - | | |
| Charles Liu Distribution for Certain  Costs paid by him (14) | - | 5,000.00 | - | | - |
| Total Start Up Costs | $ - | $ 330,617.19 | $ - | | $ - |
| | | | | | |
| Ending Balance | $ 73,274.00 | $ 403,891.19 | $ 403,891.19 | | $ - |
| | | | | | |
| Adjustments | | | | | |
| Broker Fees (15) | $ - | $ - | $ (331,000.00) | To Exhibit 2 | $ - |
| Rent - Other  (16) | - | - | 36,270.00 | To Exhibit 2 | - |
| Office Expense (17) | - | - | (104,161.19) | To Exhibit 2 | - |
| Charles Liu Distribution (14) | - | - | (5,000.00) | To Exhibit 1 | - |
| Total Adjustments | $ - | $ - | $ (403,891.19) | | $ - |
| | | | To Exhibit 1 | | |
| | | | | | |
| Total Ending Balance of Start Up Costs | $ 73,274.00 | $ 403,891.19 | $ - | | $ - |
| | | | | | |
| Amortization Expense - Current (19) | $ 7,327.00 | $ 18,348.00 | $ 29,368.00 | | |
| Accumulated Amortization | 17,096.00 | 24,423.00 | 42,771.00 | | |
| Total Accumulated Amortization | $ 24,423.00 | $ 42,771.00 | $ 72,139.00 | | $ - |
| | | | | | |
| Adjustment to Amortization Expense (19) | - | - | (72,139.00) | | - |
| | | | To Exhibit 1 & 2 | | |
| Total Balance of Amortization Expense | $ 24,423.00 | $ 42,771.00 | $ - | | $ - |
| | | | | | |
| Total Ending Balance of Start Up Costs | $ 316,628.69 | $ 647,245.88 | $ - | | $ - |
| | | | | | |
| Total Ending Balance of Amortization Costs | $ 28,919.00 | $ 63,490.00 | $ - | | $ - |

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|

**Notes:**

**(1)** Source - Beverly Proton Center, LLC Bank Statements for account ending in 5152 for March 2013. We have not been provided any contract or invoices from Shanghai Commercial Bank to support these expenses.

**(2)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices to support these expenses. Per the Quotation provided by Optivus Proton Therapy, the quotation price is $495,000. Of this $368,100 was expensed under consulting expense in Exhibit 1B. We are assuming that this is remainder of the quotation price being charged.

**(3)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152 for December 2013. Per the contract between Dr. Nisy E. Ipe and Beverly Proton Center, LLC dated September 2013, the proposed price was $372,000. We have not been provided with any invoices to support these payments.

**(4)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, he will be paid $1 million per year or $83,333.34 per month for the land. We have not been provided any invoices to support these payments.

**(5)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in 5152. We have not been provided any contract or invoices from Nixon Peabody to support these expenses.

**(6)** Source - Beverly Proton Center, LLC QuickBooks Transactions by Account Report for Start Up Cost as of 12/31/2015 and Bank Statements for account ending in

**(7)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to the Shanghai Commercial Bank.

**(8)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as consulting fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to Optivus and Dr. Ipe.

**(9)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent to Dr. Thorpay in the profit and loss statement for year ending December 31, 2015.

**(10)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as legal and professional fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to Marcum LLP and Nixon Peabody.

**(11)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transaction By Account for Start Up Cost as of 12/31/2015. The beginning balance of the start up cost was a balance forward from a previous year. Since Marcum did not participate in calculating this amount and that this information was provided by the client, we do not have a breakdown of this amount nor can we track where the expense came from.

**(12)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transaction By Account for Start Up Cost as of 12/31/2015. These payments and refund were related to the Shanghai office and hence should be expenses similarly and not capitalized.

**(13)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months.

**(14)** There was a payment of $5,000 where in Charles Liu paid for some operational expenses. Payments similar to this amount/description were adjusted as distribution to Charles Liu. Therefore, this amount is also adjusted to distributions.

**Securities and Exchange Commission v. Charles Liu et.al**
**Start Up Cost**

| | 2013 | 2014 | 2015 | Ref | 30-Apr-16 |
|---|---|---|---|---|---|

**(15)** These funds should have been expensed and not capitalized on the balance sheet since the project did not continue. Therefore, as December 31, 2015, these funds were expensed as broker fees in the profit and loss statement for year ending December 31, 2015. This includes the funds paid to the Overseas Chinese Immigration Consulting.

**(16)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent - other in the profit and loss statement for year ending December 31, 2015. This includes the refund of deposit for the Shanghai Office.

**(17)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as Office Expense in the profit and loss statement for year ending December 31, 2015. This includes the payments made to Luxury Aquilaria in 2014 and other expenses from prior to 2013.

**(18)** The source is the Beverly Proton Center, LLC tax returns for 2013 through 2015. Since these expenses were deemed to be expensed and not capitalized the amortization expenses has to be adjusted accordingly.

**(19)** The source is the Pacific Proton Therapy Regional Center, LLC tax returns for 2013 through 2015. Since these expenses were deemed to be expensed and not capitalized the amortization expenses has to be adjusted accordingly.

Exhibit 3 Page 88

# EXHIBIT 1G

Exhibit 3 Page 89

Securities and Exchange Commission v. Charles Liu et.al
Lease Deposit

| | 2013 | 2014 | 2015 | 30-Apr-16 |
|---|---|---|---|---|
| | **Beverly Proton Center, LLC** | | | |
| Beginning Balance | $ - | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 |
| John Paul Thropay (1) (5) | $ 100,000.00 | $ - | | $ (100,000.00) |
| Total Lease Deposit | $ 100,000.00 | $ - | $ - | $ (100,000.00) |
| Ending Balance | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ - |
| Adjustments | | | | |
| Montebello Community Health Service (2) | $ - | $ - | $ - | $ 200,000.00 |
| Total Adjustments | $ - | $ - | $ - | $ 200,000.00 |
| | | | | **To Exhibit 1** |
| Total Ending Balance of Lease Deposit | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 200,000.00 |
| | **Pacific Proton Regional Center, LLC** | | | |
| Beginning Balance (3) | $ 31,777.60 | $ 68,048.56 | $ 68,048.56 | $ - |
| Payments to Shanghai Center (3) | $ 36,270.96 | $ - | $ - | $ - |
| Total Lease Deposit | $ 36,270.96 | $ - | $ - | $ - |
| Ending Balance | $ 68,048.56 | $ 68,048.56 | $ 68,048.56 | $ - |
| Adjustments | | | | |
| Rent Other (4) | - | - | (68,048.56) | - |
| Total Adjustments | $ - | $ - | $ (68,048.56) | $ - |
| | | | **To Exhibit 1 & 2** | |
| Total Ending Balance of Lease Deposit | $ 68,048.56 | $ 68,048.56 | $ - | $ - |
| Total Ending Balance of Lease Deposit | $ 168,048.56 | $ 168,048.56 | $ 100,000.00 | $ 200,000.00 |

**Notes:**

**(1)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, he will be paid $1 million per year or $83,333.34 per month for the land. Per the agreement, $100,000 was to be paid as deposit upon the execution of the lease agreement. We have not been provided any invoices to support these payments. Additionally, we have been provided the bank statements for Beverly Proton Center, LLC for February 2013 which documents the $100,000 check.

**(2)** Source - Beverly Proton Center, LLC Bank Statements for account ending in 5152 for a check #1043. We have not been provided any contract or invoices to support these expenses. However, since this was for a lease deposit, it needs to be added into lease deposit calculation.

**(3)** Source - Pacific Proton Therapy Regional Center, LLC QuickBooks Transactions by Account Report for Lease Deposit as of 12/31/2015 and Bank Statements for account ending in 6428. We have not been provided with any invoices to support these payments.

**(4)** These funds should have been expensed and never capitalized on the balance sheet. Therefore, as December 31, 2015, these funds were expensed as rent expense in the profit and loss statement for year ending December 31, 2015. This includes the payments to Shanghai Center.

**(5)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, Section 1.04 states that the effective date of the lease is when Beverly Proton Center, LLC receives a minimum of $100 million in funding for the project. Therefore, the rent and security deposit was only due as of or after the effective date. Since Beverly Proton Center, LLC never received the $100 million in funding, the lease never became effective and therefore none of the rent and security deposit was due to John Thropay. We have now recorded this as a receivable on the balance sheet.

Exhibit 3 Page 90

# EXHIBIT 2

Exhibit 3 Page 91

Securities and Exchange Commission v. Charles Liu et.al
Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Total 12.31.2015 | Adjusting Entries Pacific Proton Regional Center | Ref | Beverly Proton | Ref | Pacific Proton EB-5 Fund | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.16 (22) | Adjusting Entries | Ref | Adjusted Total 4.30.2016 | Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F | H | | I | | J | | K=H+I+J | L | M | | N=K+L+M | |
| **Income** | | | | | | | | | | | | | | | | | | | |
| Miscellaneous Income | $ 893,803 | $ - | $ - | $ (300,000) | $ 593,803 | (389,595) | $ 204,208 | $ 58 - | | $ - | | $ - | | $ 204,208 | $ - | $ - | | $ 204,208 | |
| Investor Admin Fees (23) | 2,220,405 | - | - | - | 2,220,405 | 389,595 | 2,610,000 | - | | - | | - | | 2,610,000 | (45,000) | - | | 2,565,000 | |
| Interest Income | - | - | 63,162 | (63,162) | - | - | - | - | | - | | - | | - | - | - | | - | |
| **Total Income** | 3,114,208 | - | 63,162 | (363,162) | 2,814,208 | - | 2,814,208 | | | | | | | 2,814,208 | (45,000) | - | | 2,769,208 | |
| **Expense** | | | | | | | | | | | | | | | | | | | |
| Amortization Expense | 72,139 | 51,100 | - | - | 123,239 | - | 123,239 | (72,139) | (6) | (51,100) | (6) | - | | - | - | - | | - | |
| Automobile Expense | 16,635 | - | - | - | 16,635 | - | 16,635 | - | | - | | - | | 16,635 | - | - | | 16,635 | |
| Automobile Lease | 109,349 | - | - | - | 109,349 | - | 109,349 | - | | - | | - | | 109,349 | - | - | | 109,349 | |
| Broker Fees (24) | 3,525,000 | - | - | - | 3,525,000 | - | 3,525,000 | 331,000 | (7) | 3,842,525 | (8) | - | | 7,698,525 | (32,500) | (3,400,000) | (30) | 4,266,025 | From Exhibit 2B |
| Bank Service Charges | 5,494 | 3,453 | 4,159 | - | 13,106 | - | 13,106 | - | | - | | - | | 13,106 | (154) | - | | 12,952 | |
| Credit Card Charges | - | - | - | - | - | - | - | - | | - | | - | | - | - | - | | - | |
| Commissions (25) | 315,000 | - | - | - | 315,000 | - | 315,000 | - | | - | | - | | 315,000 | - | - | | 315,000 | |
| Consulting Fees | 163,324 | - | - | - | 163,324 | - | 163,324 | - | | 999,603 | (9) | - | | 1,162,928 | 877,274 | - | | 2,040,202 | From Exhibit 2C |
| Contributions | 12,500 | - | - | - | 12,500 | - | 12,500 | - | | - | | - | | 12,500 | - | - | | 12,500 | |
| Computer and Internet Expenses | 9,895 | - | - | - | 9,895 | - | 9,895 | - | | - | | - | | 9,895 | - | - | | 9,895 | |
| Demolition Expense | - | - | - | - | - | - | - | - | | 315,487 | (10) | - | | 315,487 | 151,000 | - | | 466,487 | |
| Depreciation Expense | 34,328 | - | - | - | 34,328 | - | 34,328 | (15,204) | (11) | - | | - | | 19,124 | - | - | | 19,124 | |
| Dues and Subscriptions | 560 | - | - | - | 560 | - | 560 | - | | - | | - | | 560 | - | - | | 560 | |
| Insurance | 20,370 | - | - | - | 20,370 | - | 20,370 | - | | - | | - | | 20,370 | 517 | - | | 20,887 | |
| Interest Expense | 775 | 63,162 | - | (63,162) | 775 | - | 775 | - | | - | | - | | 775 | - | - | | 775 | |
| Legal & Professional Fees (26) | 607,190 | - | 524 | - | 607,714 | - | 607,714 | - | | 44,261 | (12) | - | | 651,975 | 130,849 | - | | 782,824 | From Exhibit 2A |
| Licenses and Permits | 1,888 | 2,130 | 70 | - | 4,088 | - | 4,088 | - | | - | | - | | 4,088 | 480 | - | | 4,568 | |
| Management Fees - Charles Liu (27) | 1,400,000 | - | - | - | 1,400,000 | - | 1,400,000 | 101,038 | (13) | 2,073,299 | (14) | 200,000 | (15) | 3,774,337 | 5,450,934 | (2,013,579) | (32) | 7,211,692 | From Exhibit 2D |
| Management Fees - Xin Wang | - | - | - | - | - | - | - | - | | 437,500 | (16) | - | | 437,500 | 996,000 | (1,066,285) | (32) | 367,215 | From Exhibit 2D |
| Management Fees - PPRC | - | - | - | (300,000) | (300,000) | - | (300,000) | - | | 300,000 | (17) | - | | - | - | - | | - | |
| Marketing Fees | - | - | - | - | - | - | - | - | | 2,350,025 | (18) | - | | 2,350,025 | 200,000 | - | | 2,550,025 | From Exhibit 2E |
| Meals & Entertainment | 8,483 | 131 | - | - | 8,615 | - | 8,615 | - | | - | | - | | 8,615 | - | - | | 8,615 | |
| Miscellaneous | 7,331 | - | - | - | 7,331 | - | 7,331 | - | | - | | - | | 7,331 | - | - | | 7,331 | |
| Office Expense | 71,379 | - | - | - | 71,379 | - | 71,379 | 104,161 | (19) | - | | - | | 175,540 | 4,395 | - | | 179,935 | |
| Outside Services | 2,702 | - | - | - | 2,702 | - | 2,702 | - | | - | | - | | 2,702 | - | - | | 2,702 | |
| Penalty | 307 | 71 | 185 | - | 563 | - | 563 | - | | - | | - | | 563 | - | - | | 563 | |
| Postage and Delivery | 12,365 | - | - | - | 12,365 | - | 12,365 | - | | - | | - | | 12,365 | - | - | | 12,365 | |
| Printing & Reproduction | 8,022 | - | - | - | 8,022 | - | 8,022 | - | | - | | - | | 8,022 | - | - | | 8,022 | |
| Rent (Thropay) | - | 200,000 | - | - | 200,000 | - | 200,000 | - | | 380,500 | (20) | - | | 580,500 | 158,000 | (738,500) | (31) | - | From Exhibit 2F |
| Rent (28) | 263,997 | - | - | - | 263,997 | - | 263,997 | 31,779 | (21) | - | | - | | 295,775 | 25,648 | - | | 321,423 | From Exhibit 2F |
| Telephone | 41,317 | 1,675 | - | - | 42,992 | - | 42,992 | - | | - | | - | | 42,992 | 1,105 | - | | 44,097 | |
| Travel (29) | 390,251 | 23,980 | - | - | 414,231 | - | 414,231 | - | | - | | - | | 414,231 | - | - | | 414,231 | |
| Payroll Expenses | 42,444 | - | - | - | 42,444 | - | 42,444 | - | | - | | - | | 42,444 | - | - | | 42,444 | |
| State Franchise Tax | 5,700 | 2,400 | 1,600 | - | 9,700 | - | 9,700 | - | | - | | - | | 9,700 | 8,400 | - | | 18,100 | |
| **Total Expense** | 7,148,744 | 348,102 | 6,538 | (363,162) | 7,140,221 | - | 7,140,221 | 480,635 | | 10,692,100 | | 200,000 | | 18,512,956 | 7,971,948 | (7,218,364) | | 19,266,540 | |
| **Net Income (Loss)** | $ (4,034,536) | $ (348,102) | $ 56,624 | $ - | $ (4,326,013) | $ - | $ (4,326,013) | $ (480,635) | | $ (10,692,100) | | $ (200,000) | | $ (15,698,748) | $ (8,016,948) | $ 7,218,364 | | $ (16,497,332) | |
| | | | | | | | | To Exhibit 1 | | To Exhibit 1 | | To Exhibit 1 | | | | To Exhibit 1 | | | |

Notes:
(1) Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC  - Exhibit 5A.
(2) Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC  - Exhibit 5B.
(3) Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC  - Exhibit 5C.

Exhibit 3 Page 92

Securities and Exchange Commission v. Charles Liu et.al
Consolidated Profit and Loss Statement from Initial Year of Operations through the period ending April 30, 2016

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **Adjusting Entries** | | | | | | | |
| Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Total 12.31.2015 | Pacific Proton Regional Center | Ref | Beverly Proton | Ref | Pacific Proton EB-5 Fund | Ref | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.16 (22) | Adjusting Entries | Ref | Adjusted Total 4.30.2016 | Ref |
| A | B | C | D | E=A+B+C+D | F | G= E+F | H | | I | | J | | K=H+I+J | L | M | | N=K+L+M | |

(4) Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
(5) Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.
(6) From Exhibit 1F.
(7) From Exhibit 1F.
(8) From Exhibit 1E & 1F.
(9) From Exhibit 1B, 1C & 1F.
(10) From Exhibit 1C.
(11) From Exhibit 1D.
(12) From Exhibit 1F.
(13) From Exhibit 1A & D.
(14) From Exhibit 1E.
(15) From Exhibit 1E - Recorded as Management Fees to Charles Liu, instead of capitalized management fees on the balance sheet.
(16) From Exhibit 1E.
(17) From Exhibit 1E.
(18) From Exhibit 1E.
(19) From Exhibit 1F.
(20) From Exhibit 1F.
(21) From Exhibit 1F &1G.
(22) From Exhibit 4A.
(23) Per the Private Offering Memorandum of the Pacific Proton EB-5 Fund, LLC, each investor has to pay $45,000 of initial administrative fee. Since there were 58 investors, the total fee would be $2,610,000 (58 times $45,000).
(24) This includes broker fees of $3,182,500 paid to Overseas Chinese Consulting and $342,500 paid to Hang Seng Bank. Of the $3,182,500 paid to Overseas Chinese Consulting, $2,775,000 was paid by Beverly Proton Center, LLC on behalf of Pacific Proton Regional Center, LLC and the remainder was paid by Pacific Proton Regional Center, LLC directly.
(25) These commissions were paid to United Damei Investment Co. based on the September 2015 bank statement ending in 6428. We were not provided any contract and/or invoice to support such payment.
(26) From Exhibit 2A.
(27) Per the employment agreement between Pacific Proton Regional Center, LLC and Charles Liu, Charles Liu was to be paid compensation of $350,000 each year. These above amount represents the payment of $350,000 from 2012 through 2015.
(28) Per Pacific Proton Regional Center, LLC QuickBooks Transaction Detail by Account for Rent for 2013 through 2015.
(29) Per Pacific Proton Regional Center, LLC, QuickBooks Transaction Detail by Account for Travel Expenses for 2013 through 2015 and Beverly Proton Center, LLC, QuickBooks Transaction Detail by Account for Travel Expenses for 2010 through 2015.
(30) From Exhibit 2B.
(31) From Exhibit 2F.
(32) From Exhibit 2D.

# EXHIBIT 2A

Exhibit 3 Page 94

**Securities and Exchange Commission v. Charles Liu et.al**
**Legal and Professional Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund (1) | Pacific Proton Regional Center (2) | Total Legal and Professional Fees for 2015 | Adjustment (3) | Adjusted Legal and Professional Fees - 12.31.2015 | Pacific Proton Regional Center – 1.1.2016 to 4.30.2016 (2) | Beverly Proton - 1.1.2016 to 4.30.2016 (4) | Adjusted Legal and Professional Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C=A+B | D | E=C+D | F | G | H=E+F+G |
| Seytarth Shaw LLP | $          - | $   145,330 | $   145,330 | $          - | $   145,330 | $   36,857 | $          - | $   182,186 |
| Thorn Run Partners LLC | | 103,500 | 103,500 | | 103,500 | | | 103,500 |
| Nixon Peabody | | 1,636 | 1,636 | 40,027 | 41,663 | | 31,346 | 73,009 |
| Marcum LLP | | 50,802 | 50,802 | 4,234 | 55,036 | 8,399 | | 63,435 |
| Greenberg Traurig | | - | - | - | - | | 50,000 | 50,000 |
| Law Offices of Rachel Lew APLC | | 47,671 | 47,671 | | 47,671 | | | 47,671 |
| Miller Mayer | | 42,536 | 42,536 | | 42,536 | 498 | | 43,033 |
| Jjw Consultancy LTD | | 32,000 | 32,000 | | 32,000 | | | 32,000 |
| Evans, Carroll & Assoc | | 22,500 | 22,500 | | 22,500 | | | 22,500 |
| Homeier & Law PC | | 22,086 | 22,086 | | 22,086 | | | 22,086 |
| Others | 524 | 139,129 | 139,653 | | 139,653 | 3,750 | | 143,403 |
| | $   524 | $   607,190 | $   607,714 | $   44,261 | $   651,975 | $   49,503 | $   81,346 | $   782,824 |
| | | | | | To Exhibit 2 | | | To Exhibit 2 |

Notes:
**(1)** Source: Pacific Proton EB-5 Fund, LLC QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.
**(2)** Source: Pacific Proton Regional Center QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.
**(3)** Source: Exhibit 1F.
**(4)** Source: Beverly Proton Center, LLC QuickBooks Transaction Detail by Account for Legal and Professional Fees for 2010 - 2016.

Exhibit 3 Page 95

# EXHIBIT 2B

Exhibit 3 Page 96

**Securities and Exchange Commission v. Charles Liu et.al**
**Broker Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Broker Fees | Adjustment | Adjusted Broker Fees - 12.31.2015 | Beverly Proton - 1.1.2016 to 4.30.2016 | Adjusted Broker Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=E+D | G | H=E+F+G |
| Overseas Chinese Immigration Consulting | $ - | $ 3,513,500 | $ 2,810,025 | $ 6,323,525 | | $ 6,323,525 | $ (145,000) | $ 6,178,525 |
| Hang Seng Bank | - | 342,500 | 932,500 | 1,275,000 | | 1,275,000 | 112,500 | 1,387,500 |
| Shanghai Commercial Bank | - | - | 100,000 | 100,000 | | 100,000 | - | 100,000 |
| | $ - | $ 3,856,000 | $ 3,842,525 | $ 7,698,525 | $ - | $ 7,698,525 | $ (32,500) | $ 7,666,025 |
| Overseas Chinese Immigration Consulting (1) | | | | | | | | $ (3,400,000) |
| | | | | | | | | $ 4,266,025 |
| | | | | | | | | **To Exhibit 2** |

**Notes:**

**(1)** Per the contract between Beverly Proton Center, LLC and Overseas Chinese Immigration Consulting Ltd. effective as of March 8, 2013, Overseas will be paid consulting fees of $75,000 per investor who invests $500,000 and a marketing fee of $800,000 per year. The contract lasts for 36 months. If the funds raised are less than $50 million in 36 months then Overseas will return all the marketing fees totaling $2.4 million ($800,000 each year) and pay a penalty of $1 million in 36 months. We have now recorded this as a receivable on the balance sheet.

# EXHIBIT 2C

Exhibit 3 Page 98

Exhibit 2C

**Securities and Exchange Commission v. Charles Liu et.al**
**Consulting Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Consulting Fees | Adjustment | Adjusted Consulting Fees | Pacific Proton Regional Center - 1.1.2016 to 4.30.2016 | Beverly Proton - 1.1.2016 to 4.30.2016 | Adjusted Legal and Professional Fees - 4.30.2016 |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | F | E=F+D | G | H | I=E+G+H |
| X Science Studio | - | - | 85,600.00 | 85,600 | - | 85,600 | | 449,692 | 535,292 |
| Optivus Proton | | | 458,170.00 | 458,170 | | 458,170 | | - | 458,170 |
| Skanska USA | | | 402,549.00 | 402,549 | | 402,549 | | | 402,549 |
| Lance Gong | 113,424 | | | 113,424 | | 113,424 | 103,460 | | 216,884 |
| Michael Cogswell | | | | - | | - | 62,500 | 87,500 | 150,000 |
| Michael Hunn & Assoc | | | | - | | - | | 93,282 | 93,282 |
| Nisy IPE | | | 53,284.86 | 53,285 | | 53,285 | | | 53,285 |
| Licheng Zheny | 45,000 | | | 45,000 | | 45,000 | | | 45,000 |
| IBA Dosimetry | | | | - | | - | | 31,506 | 31,506 |
| Don Wise | | | | - | | - | | 17,500 | 17,500 |
| Mintz Levin | | | | - | | - | | 15,570 | 15,570 |
| Square Peg Design | | | | - | | - | 13,487 | | 13,487 |
| WayLink LLC | 4,900 | | | 4,900 | | 4,900 | | | 4,900 |
| Michael Evans | | | | - | | - | 2,500 | | 2,500 |
| Creative Design | | | | - | | - | 277 | | 277 |
| | $ 163,324 | $ - | $ 999,604 | $ 1,162,928 | $ - | $ 1,162,928 | $ 182,224 | $ 695,050 | $ 2,040,202 |

To Exhibit 2

Exhibit 3 Page 99

# EXHIBIT 2D

Exhibit 3 Page 100

Exhibit 2D

**Securities and Exchange Commission v. Charles Liu et.al**
**Management Fees from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Management Fees |
|---|---|---|---|---|
| | A | B | C | D=A+B+C |
| Charles Liu | $ 200,000 | $ 1,501,038 | $ 7,524,233 | $ 9,225,271 |
| Xin Wang | - | | 1,433,500 | 1,433,500 |
| | $ 200,000 | $ 1,501,038 | $ 8,957,733 | $ 10,658,771 |

| | | |
|---|---|---|
| Reasonable Compensation/Management Fees | | |
| Charles Liu (1) | $ | (7,211,692) |
| Xin Wang (1) | | (367,215) |
| Total Reasonable Compensation/Management Fees | $ | (7,578,907) |
| | | |
| Management Fees Receivable to be included in the Assets of the Entities | | |
| Charles Liu | $ | 2,013,579 |
| Xin Wang | $ | 1,066,285 |
| | | **To Exhibit 1 & 2** |

Notes:
(1) Based on Ted Ginsburg's compensation analysis dated March 25, 2021 prepared in this matter, the total reasonable compensation for Charles Liu for 2011 through 2016 should have been $7,211,692 and total reasonable compensation for Xin Wang for 2011 through 2016 should have been $367,215. We have now recorded the management fees in excess of the reasonable compensation/management fees as a receivable on the balance sheet.

Exhibit 3 Page 101

# EXHIBIT 2E

Exhibit 3 Page 102

Exhibit 2E

**Securities and Exchange Commission v. Charles Liu et.al**
**Marketing Fees from Initial Year of Operations through April 30, 2016.**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton | Total Marketing Fees |
|---|---|---|---|---|
| | A | B | C | D=A+B+C |
| Antonio Ramon Villaraigosa | $ - | $ - | $ 50,025 | $ 50,025 |
| Industrial and Commercial Bank | - | - | 2,500,000 | 2,500,000 |
| | $ - | $ - | $ 2,550,025 | $ 2,550,025 |
| | | | | **To Exhibit 2** |

Exhibit 3 Page 103

# EXHIBIT 2F

Exhibit 3 Page 104

**Securities and Exchange Commission v. Charles Liu et.al**
**Rent Expenses from Initial Year of Operations through April 30, 2016**

| | Pacific Proton EB-5 Fund | Pacific Proton Regional Center | Beverly Proton |
|---|---|---|---|
| | A | B | C |
| John Paul Thropay | $ - | $ - | $ 738,500 |
| AIM Property Services | | 19,878 | - |
| Arden Realty LTD | | 118,634 | - |
| Bre CA Office Owner LLC | | 15,394 | - |
| China Citic Bank | | 42,085 | - |
| Crown Cabot Financial Center | | 38,499 | - |
| Shanghai Centre | | 86,932 | - |
| | $ - | $ 321,423 | $ 738,500 |
| | | **To Exhibit 2** | |
| Rent Expense Paid to John Paul Thropay (1) | | | $ (738,500) |
| | | | $ - |
| | | | **To Exhibit 2** |

**Notes:**

**(1)** Per the lease agreement between Beverly Proton Center, LLC and John P. Thropay, Section 1.04 states that the effective date of the lease is when Beverly Proton Center, LLC receives a minimum of $100 million in funding for the project. Therefore, the rent and security deposit was only due as of or after the effective date. Since Beverly Proton Center, LLC never received the $100 million in funding, the lease never became effective and therefore none of the rent and security deposit was due to John Thropay. We have now recorded this as a receivable on the balance sheet.

# EXHIBIT 3

Exhibit 3 Page 106

Securities and Exchange Commission v. Charles Liu et.al
Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016

| | Pacific Proton EB-5 Fund | Beverly Proton | Pacific Proton Regional Center | Total | Reclassifying | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Adjusted Total 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | H=F+G |
| **CASH IN:** | | | | | | | | |
| | | | | | | | | |
| Investors' Capital | $ 29,000,000 | $ - | $ - | $ 29,000,000 | $ - | $ 29,000,000 | $ - | $ 29,000,000 |
| Investors' Admin Fees | - | - | 2,220,405 | 2,220,405 | 389,595 | 2,610,000 | (45,000) | 2,565,000 |
| Interest Income | 63,162 | - | - | 63,162 | (63,162) | - | - | - |
| Miscellaneous Income | - | - | 593,803 | 593,803 | (389,595) | 204,208 | - | 204,208 |
| Management Fees (from Beverly Proton) | - | - | 300,000 | 300,000 | (300,000) | - | - | - |
| Capital Contribution | - | - | 10,000 | 10,000 | - | 10,000 | - | 10,000 |
| Loan from credit card | - | - | 2,094 | 2,094 | - | 2,094 | (2,094) | - |
| Loan from Member | - | 2,100 | - | 2,100 | - | 2,100 | - | 2,100 |
| **Total Cash Inflow** | **$ 29,063,162** | **$ 2,100** | **$ 3,126,302** | **$ 32,191,564** | **$ (363,162)** | **$ 31,828,402** | **$ (47,094)** | **$ 31,781,308** |
| | | | | | | | | |
| **CASH OUT:** | | | | | | | | |
| **Capital Expenditures** | | | | | | | | |
| Medical Equipment Deposit (Melvion) | $ - | $ 3,368,100 | $ - | $ 3,368,100 | $ (368,100) | $ 3,000,000 | $ - | $ 3,000,000 |
| Medical Equipment Consulting (Optivus Proton) | - | - | - | - | 458,170 | 458,170 | - | 458,170 |
| Leasehold Improvements (R. Alan Construction) | - | 315,487 | - | 315,487 | - | 315,487 | 151,000 | 466,487 |
| Leasehold Improvement (Skanska USA) | - | 402,549 | - | 402,549 | - | 402,549 | - | 402,549 |
| Leasehold Improvement (X Science Studio) | - | 85,600 | - | 85,600 | - | 85,600 | 449,692 | 535,292 |
| Leasehold Improvement | - | - | 9,784 | 9,784 | - | 9,784 | - | 9,784 |
| Auto & Trucks | - | - | 75,258 | 75,258 | (75,258) | - | - | - |
| Furniture & Fixtures | - | 2,347 | 63,335 | 65,682 | - | 65,682 | - | 65,682 |
| Office Equipment | - | - | 16,109 | 16,109 | - | 16,109 | - | 16,109 |
| **Total Capital Expenditures** | **$ -** | **$ 4,174,083** | **$ 164,485** | **$ 4,338,568** | **$ 14,812** | **$ 4,353,380** | **$ 600,692** | **$ 4,954,072** |
| | | | | | | | | |
| **Broker/Commission/Agent Fees** | | | | | | | | |
| Oversea Chinese Immigration Consulting | $ 1,500,000 | $ 2,810,025 | $ 3,182,500 | $ 7,492,525 | $ 331,000 | $ 7,823,525 | $ (1,645,000) | $ 6,178,525 |
| Industrial & Commercial Bank (United Damei Group) | 1,500,000 | 2,300,000 | - | 3,800,000 | 315,000 | 4,115,000 | 200,000 | 4,315,000 |
| Hang Seng Bank (Delsk) | - | 932,500 | 342,500 | 1,275,000 | 100,000 | 1,375,000 | 112,500 | 1,487,500 |
| United Damei Investment | - | - | 315,000 | 315,000 | (315,000) | - | - | - |

Exhibit 3 Page 107

Securities and Exchange Commission v. Charles Liu et.al
Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016

| | Pacific Proton EB-5 Fund | Beverly Proton | Pacific Proton Regional Center | Total | Reclassifying | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Adjusted Total 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | H=F+G |
| Antonio Ramon Villaraigosa | - | 50,025 | - | 50,025 | - | 50,025 | - | 50,025 |
| **Total Broker/Commission/Agent Fees** | **$ 3,000,000** | **$ 6,092,550** | **$ 3,840,000** | **$ 12,932,550** | **$ 431,000** | **$ 13,363,550** | **$ (1,332,500)** | **$ 12,031,050** |
| | | | | | | | | |
| **Management Fees/Distributions** | | | | | | | | |
| Charles Liu - Management Fees | $ 200,000 | $ 2,073,299 | $ 1,400,000 | $ 3,673,299 | $ 101,038 | $ 3,774,337 | $ 5,450,934 | $ 9,225,271 |
| Charles Liu - Distributions | - | - | - | - | 5,000 | 5,000 | $ - | 5,000 |
| Xin Wang | - | 437,500 | - | 437,500 | - | 437,500 | 996,000 | 1,433,500 |
| Pacific Proton Regional Center | - | 300,000 | - | 300,000 | (300,000) | - | - | - |
| **Total Management Fees** | **$ 200,000** | **$ 2,810,799** | **$ 1,400,000** | **$ 4,410,799** | **$ (193,962)** | **$ 4,216,837** | **$ 6,446,934** | **$ 10,663,771** |
| | | | | | | | | |
| **Others** | | | | | | | | |
| Loan to Other Entities | | $ - | $ 25,780 | $ 25,780 | $ (25,780) | $ - | $ - | $ - |
| Start Up Cost | - | 668,116 | 403,891 | 1,072,007 | (1,072,007) | - | - | - |
| Lease Deposit (Montebello Community Health Service) | - | - | - | - | - | - | 200,000 | 200,000 |
| Lease Deposit (Thropay) | - | 100,000 | 68,048 | 168,048 | (68,048) | 100,000 | - | 100,000 |
| **Total Other Expenses** | **$ -** | **$ 768,116** | **$ 497,719** | **$ 1,265,835** | **$ (1,165,835)** | **$ 100,000** | **$ 200,000** | **$ 300,000** |
| | | | | | | | | |
| **General & Administrative** | | | | | | | | |
| Auto Expenses | $ - | $ - | $ 125,984 | $ 125,984 | $ - | $ 125,984 | $ - | $ 125,984 |
| Bad Debts | - | - | - | - | | - | - | - |
| Bank Service Charges | 4,159 | 3,453 | 5,494 | 13,106 | - | 13,106 | (154) | 12,952 |
| Business License & Permits | 70 | 2,130 | 1,888 | 4,088 | - | 4,088 | 480 | 4,568 |
| Computer & Internet | - | - | 9,895 | 9,895 | - | 9,895 | | 9,895 |
| Consulting Fees | - | - | 163,324 | 163,324 | 53,285 | 216,609 | 427,583 | 644,192 |
| Contributions | - | - | 12,500 | 12,500 | - | 12,500 | - | 12,500 |
| Dues & Subscriptions | - | - | 560 | 560 | - | 560 | - | 560 |
| Insurance | - | - | 20,370 | 20,370 | - | 20,370 | 517 | 20,887 |
| Interest Expense | - | 63,162 | 775 | 63,937 | (63,162) | 775 | - | 775 |
| Legal & Professional | 524 | - | 607,190 | 607,714 | 44,261 | 651,975 | 130,849 | 782,824 |
| Meals & Entertainment | - | 131 | 8,483 | 8,615 | - | 8,615 | - | 8,615 |

**Securities and Exchange Commission v. Charles Liu et.al**
**Cash Flow Statement from the Initial Year of Operations through the period ending April 30, 2016**

| | Pacific Proton EB-5 Fund | Beverly Proton | Pacific Proton Regional Center | Total | Reclassifying | Adjusted Total 12.31.2015 | 1.1.2016 to 4.30.2016 | Adjusted Total 4.30.2016 |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D=A+B+C | E | F=D+E | G | H=F+G |
| Miscellaneous | - | - | 7,331 | 7,331 | - | 7,331 | - | 7,331 |
| Office Expense | - | - | 71,379 | 71,379 | 104,161 | 175,540 | 4,395 | 179,935 |
| Outside Services | - | - | 2,702 | 2,702 | - | 2,702 | - | 2,702 |
| Payroll & Related Expenses | - | - | 42,444 | 42,444 | - | 42,444 | - | 42,444 |
| Penalties | 185 | 71 | 307 | 563 | - | 563 | - | 563 |
| Postage & Delivery | - | - | 12,365 | 12,365 | - | 12,365 | - | 12,365 |
| Printing & Reproduction | - | - | 8,022 | 8,022 | - | 8,022 | - | 8,022 |
| Rent (John Paul Thropay) | - | 200,000 | - | 200,000 | 380,500 | 580,500 | 158,000 | 738,500 |
| Rent (Others) | - | - | 263,997 | 263,997 | 31,778 | 295,775 | 25,648 | 321,423 |
| State Tax | 1,600 | 2,400 | 5,700 | 9,700 | - | 9,700 | 8,400 | 18,100 |
| Telephone | - | 1,675 | 41,317 | 42,992 | - | 42,992 | 1,105 | 44,097 |
| Travel | - | 23,980 | 390,251 | 414,231 | - | 414,231 | - | 414,231 |
| **Total General & Administrative Expenses** | $      6,538 | $    297,002 | $  1,802,276 | $  2,105,816 | $    550,823 | $  2,656,639 | $    756,822 | $  3,413,461 |
| **Total Cash Outflow** | $   3,206,538 | $  14,142,549 | $  7,704,481 | $ 25,053,568 | $  (363,162) | $ 24,690,406 | $  6,671,948 | $ 31,362,354 |
| **Net before Intercompany Loans** | $  25,856,624 | $ (14,140,449) | $ (4,578,179) | $  7,137,996 | $         (0) | $  7,137,996 | $ (6,719,042) | $    418,954 |
| **Intercompany Loans** | $  18,845,331 | $ (14,169,763) | $ (4,675,568) | $          - | $          - | $          - | $          - | $          - |
| **Net Cash Flow** | $   7,011,293 | $     29,314 | $     97,389 | $  7,137,996 | | $  7,137,996 | $ (6,719,042) | $    418,954 |
| | | | | | | | To Exhibit 1 | |
| **Ending Cash (December 31, 2015)** | $   7,011,293 | $     29,314 | $     97,389 | $  7,137,996 | | $  7,137,996 | | |
| **Ending Cash (April 30, 2016)** | $     112,217 | $    261,256 | $     45,481 | | | | | $    418,954 |

# EXHIBIT 4A

Exhibit 3 Page 110

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the period from January 1, 2016 through April 30, 2016.**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total |
|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D |
| **Income** | | | | | |
| Miscellaneous Income | $ 350,000 | $ - | $ - | $ (350,000) | $ - |
| Investor Admin Fees | (45,000) | - | | | (45,000) |
| Interest Income | | | | - | - |
| Total Income | 305,000 | - | | (350,000) | (45,000) |
| **Expense** | | | | | |
| Amortization Expense | | - | | | - |
| Automobile Expense | | - | | | - |
| Automobile Lease | - | | | | - |
| Broker Fees | | (32,500) | | | (32,500) |
| Bank Service Charges | 105 | 665 | (924) | | (154) |
| Credit Card Charges | | - | | | - |
| Commissions | | - | | | - |
| Consulting Fees | 182,224 | 695,050 | | | 877,274 |
| Contributions | | - | | | - |
| Computer and Internet Expenses | | - | | | - |
| Demolition Expense | | 151,000 | | | 151,000 |
| Depreciation Expense | | - | | | - |
| Dues and Subscriptions | | - | | | - |
| Insurance | 517 | - | | | 517 |
| Interest Expense | | - | | - | - |
| Legal & Professional Fees | 49,503 | 81,346 | | | 130,849 |
| Licenses and Permits | 480 | - | | | 480 |
| Management Fees - Charles Liu | 84,521 | 4,366,413 | 1,000,000 | | 5,450,934 |
| Management Fees - Xin Wang | | 996,000 | | | 996,000 |
| Management Fees - PPRC | | 350,000 | | (350,000) | - |
| Marketing Fees | | 200,000 | | | 200,000 |
| Meals & Entertainment | | - | | | - |
| Miscellaneous | | - | | | - |
| Office Expenses | 4,216 | 179 | | | 4,395 |
| Outside Services | | - | | | - |
| Penalty | | - | | | - |
| Postage and Delivery | | - | | | - |
| Printing & Reproduction | | - | | | - |
| Rent | 25,648 | 158,000 | | | 183,648 |
| Telephone | | 1,105 | | | 1,105 |
| Travel | | - | | | - |
| Payroll Expenses | | - | | | - |
| State Franchise Tax | 6,800 | 800 | 800 | | 8,400 |
| Total Expense | 354,014 | 6,968,058 | 999,876 | (350,000) | 7,971,948 |
| **Net Income (Loss)** | $ (49,014) | $ (6,968,058) | $ (999,876) | $ - | $ (8,016,948) |

**Securities and Exchange Commission v. Charles Liu et.al**

**Consolidated Profit and Loss Statement for the period from January 1, 2016 through April 30, 2016.**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total |
|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D |

**Notes:**

**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC  - Exhibit 5A.

**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC  - Exhibit 5B.

**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC  - Exhibit 5C.

**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.

Exhibit 3 Page 112

# EXHIBIT 4B

Exhibit 3 Page 113

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the year ending in December 31, 2015**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| Miscellaneous Income | $ 386,895 | $ - | $ - | $ (300,000) | $ 86,895 | $ (11,297) | $ 75,598 |
| Investor Admin Fees | 2,180,727 | - | | | 2,180,727 | 11,297 | 2,192,024 |
| Interest Income | | | 46,492 | (46,492) | - | | |
| **Total Income** | 2,567,622 | - | 46,492 | (346,492) | 2,267,622 | | 2,267,622 |
| **Expense** | | | | | | | |
| Amortization Expense | 29,368 | 30,381 | | | 59,749 | | 59,749 |
| Automobile Expense | 3,943 | - | | | 3,943 | | 3,943 |
| Automobile Lease | 34,345 | - | | | 34,345 | | 34,345 |
| Broker Fees | 3,525,000 | - | | | 3,525,000 | | 3,525,000 |
| Bank Service Charges | 2,398 | 2,235 | 1,469 | | 6,102 | | 6,102 |
| Credit Card Charges | - | | | | - | | - |
| Commissions | 315,000 | - | | | 315,000 | | 315,000 |
| Consulting Fees | 81,714 | - | | | 81,714 | | 81,714 |
| Contributions | 12,500 | - | | | 12,500 | | 12,500 |
| Computer and Internet Expenses | 5,875 | - | | | 5,875 | | 5,875 |
| Demolition Expense | - | | | | - | | |
| Depreciation Expense | 22,054 | - | | | 22,054 | | 22,054 |
| Dues and Subscriptions | 420 | - | | | 420 | | 420 |
| Insurance | 3,737 | - | | | 3,737 | | 3,737 |
| Interest Expense | 775 | 46,492 | | (46,492) | 775 | | 775 |
| Legal & Professional Fees | 274,540 | - | 524 | | 275,064 | | 275,064 |
| Licenses and Permits | 660 | 30 | 70 | | 760 | | 760 |
| Management Fees - Charles Liu | 350,000 | | | - | 350,000 | | 350,000 |
| Management Fees - Xin Wang | - | | | | - | | - |
| Management Fees - PPRC | - | | | (300,000) | (300,000) | | (300,000) |
| Marketing Fees | - | | | | - | | - |
| Meals & Entertainment | 6,188 | 131 | | | 6,319 | | 6,319 |
| Miscellaneous | 3,831 | - | | | 3,831 | | 3,831 |
| Office Expenses | 25,253 | - | | | 25,253 | | 25,253 |
| Outside Services | - | - | | | - | | |
| Penalty | 156 | 71 | 185 | | 412 | | 412 |
| Postage and Delivery | 11,730 | - | | | 11,730 | | 11,730 |
| Printing & Reproduction | - | - | | | - | | - |
| Rent | 79,467 | - | | | 79,467 | | 79,467 |
| Telephone | 12,441 | 1,675 | | | 14,116 | | 14,116 |
| Travel | 159,120 | 18,705 | | | 177,825 | | 177,825 |
| Payroll Expenses | - | - | | | - | | |
| State Franchise Tax | 1,700 | 800 | 800 | | 3,300 | | 3,300 |
| **Total Expense** | 4,962,213 | 100,520 | 3,048 | (346,492) | 4,719,289 | | 4,719,289 |
| **Net Income (Loss)** | $ (2,394,592) | $ (100,520) | $ 43,444 | $ - | $ (2,451,667) | | $ (2,451,667) |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC  - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC  - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC  - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.

Exhibit 3 Page 114

# EXHIBIT 4C

Exhibit 3 Page 115

**Securities and Exchange Commission v. Charles Liu et.al**
**Consolidated Profit and Loss Statement for the year ending in December 31, 2014**

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| Miscellaneous Income | $ 285,128 | $ - | $ - | $ - | $ 285,128 | $ (285,128) | $ - |
| Investor Admin Fees | - | - | | | - | 285,128 | 285,128 |
| Interest Income | | | 11,492 | (11,492) | - | | |
| Total Income | 285,128 | - | 11,492 | (11,492) | 285,128 | | 285,128 |
| **Expense** | | | | | | | |
| Amortization Expense | 18,348 | 16,223 | | | 34,571 | | 34,571 |
| Automobile Expense | 1,789 | 890 | | | 2,679 | | 2,679 |
| Automobile Lease | 40,533 | - | | | 40,533 | | 40,533 |
| Broker Fees | - | | | | - | | - |
| Bank Service Charges | 2,087 | - | 2,163 | | 4,250 | | 4,250 |
| Credit Card Charges | - | - | | | - | | - |
| Commissions | - | - | | | - | | - |
| Consulting Fees | 62,680 | - | | | 62,680 | | 62,680 |
| Contributions | - | - | | | - | | - |
| Computer and Internet Expenses | - | | | | - | | |
| Depreciation Expense | 6,793 | - | | | 6,793 | | 6,793 |
| Dues and Subscriptions | 140 | - | | | 140 | | 140 |
| Insurance | 8,520 | - | | | 8,520 | | 8,520 |
| Interest Expense | - | 11,492 | | (11,492) | - | | - |
| Legal & Professional Fees | 59,544 | - | - | | 59,544 | | 59,544 |
| Licenses and Permits | 340 | - | - | | 340 | | 340 |
| Management Fees | 350,000 | - | | - | 350,000 | | 350,000 |
| Meals & Entertainment | - | - | | | - | | - |
| Miscellaneous | - | - | | | - | | - |
| Office Expenses | 11,487 | - | | | 11,487 | | 11,487 |
| Outside Services | - | - | | | - | | - |
| Penalty | - | - | - | | - | | - |
| Postage and Delivery | - | - | | | - | | - |
| Printing & Reproduction | - | - | | | - | | - |
| Rent | 148,598 | 100,000 | | | 248,598 | | 248,598 |
| Telephone | 12,012 | - | | | 12,012 | | 12,012 |
| Travel | 110,762 | - | | | 110,762 | | 110,762 |
| Payroll Expenses | 7,640 | - | | | 7,640 | | 7,640 |
| State Franchise Tax | 800 | 800 | 800 | | 2,400 | | 2,400 |
| Total Expense | 842,072 | 129,405 | 2,963 | (11,492) | 962,949 | | 962,949 |
| **Net Income (Loss)** | $ (556,944) | $ (129,405) | $ 8,529 | $ - | $ (677,821) | | $ (677,821) |

**Notes:**
**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC  - Exhibit 5A.
**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC  - Exhibit 5B.
**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC  - Exhibit 5C.
**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.
**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee

# EXHIBIT 4D

Exhibit 3 Page 117

Securities and Exchange Commission v. Charles Liu et.al
Consolidated Profit and Loss Statement for the year ending in December 31, 2013

| | Pacific Proton Regional Center (1) | Beverly Proton (2) | Pacific Proton EB-5 Fund (3) | Consolidating Entries (4) | Total | Reclassifying Entries (5) | Adjusted Total |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E=A+B+C+D | F | G= E+F |
| **Income** | | | | | | | |
| **Miscellaneous Income** | $ 93,170 | $ - | $ - | $ - | $ 93,170 | $ (93,170) | $ - |
| **Investor Admin Fees** | 39,678 | - | | | 39,678 | $ 93,170 | 132,848 |
| **Interest Income** | | | 5,178 | (5,178) | - | | |
| **Total Income** | 132,848 | - | 5,178 | (5,178) | 132,848 | | 132,848 |
| **Expense** | | | | | | | |
| **Amortization Expense** | 7,327 | 4,496 | | | 11,823 | | 11,823 |
| **Automobile Expense** | 1,098 | - | | | 1,098 | | 1,098 |
| **Automobile Lease** | 34,472 | | | | 34,472 | | 34,472 |
| **Broker Fees** | - | | | | - | | - |
| **Bank Service Charges** | 562 | 328 | 526 | | 1,416 | | 1,416 |
| **Credit Card Charges** | - | | | | - | | - |
| **Commissions** | | | | | - | | - |
| **Consulting Fees** | 10,930 | | | | 10,930 | | 10,930 |
| **Contributions** | - | | | | - | | - |
| **Computer and Internet Expenses** | 2,655 | | | | 2,655 | | 2,655 |
| **Depreciation Expense** | 1,156 | | | | 1,156 | | 1,156 |
| **Dues and Subscriptions** | - | | | | - | | - |
| **Insurance** | 7,006 | | | | 7,006 | | 7,006 |
| **Interest Expense** | - | 5,178 | | (5,178) | - | | - |
| **Legal & Professional Fees** | 187,933 | | - | | 187,933 | | 187,933 |
| **Licenses and Permits** | 638 | - | - | | 638 | | 638 |
| **Management Fees** | 700,000 | | | - | 700,000 | | 700,000 |
| **Meals & Entertainment** | 531 | - | | | 531 | | 531 |
| **Miscellaneous** | 3,500 | | | | 3,500 | | 3,500 |
| **Office Expenses** | 11,539 | | | | 11,539 | | 11,539 |
| **Outside Services** | 401 | | | | 401 | | 401 |
| **Penalty** | - | | - | | - | | - |
| **Postage and Delivery** | - | | | | - | | - |
| **Printing & Reproduction** | 8,022 | | | | 8,022 | | 8,022 |
| **Rent** | 35,932 | 100,000 | | | 135,932 | | 135,932 |
| **Telephone** | 10,357 | - | | | 10,357 | | 10,357 |
| **Travel** | 60,508 | 5,275 | | | 65,783 | | 65,783 |
| **Payroll Expenses** | 34,804 | | | | 34,804 | | 34,804 |
| **State Franchise Tax** | 1,600 | 800 | - | | 2,400 | | 2,400 |
| **Total Expense** | 1,120,969 | 116,077 | 526 | (5,178) | 1,232,394 | | 1,232,394 |
| **Net Income (Loss)** | $ (988,121) | $ (116,077) | $ 4,652 | $ - | $ (1,099,546) | | $ (1,099,546) |

**Notes:**

**(1)** Source - 2010 - 2016 profit and loss statements from QuickBooks for Pacific Medical Regional Center, LLC  - Exhibit 5A.

**(2)** Source - 2012 - 2016 profit and loss statements from QuickBooks for Beverly Proton Center, LLC  - Exhibit 5B.

**(3)** Source - 2013 - 2016 profit and loss statements from QuickBooks for Pacific Proton EB-5 Fund, LLC  - Exhibit 5C.

**(4)** Intercompany income was eliminated in consolidation. Accrued interest which was due intercompany was also eliminated in consolidation.

**(5)** Reclassifying entries include reclassifying of the administrative fees received from the investors from miscellaneous income to administrative fee income.

# EXHIBIT 5A

Exhibit 3 Page 119

6:26 PM
01/19/21
Accrual Basis

Case 8:16-cv-00974-CJC-AGR   Document 292-5   Filed 05/14/21   Page 124 of 228   Page ID
#:11329

Exhibit 5A

**Pacific Proton Therapy Regional Ctr, LLC**
**Profit & Loss**
January through December

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Jan - Dec 12 | Jan - Dec 11 | Jan - Dec 10 | Total | Jan - April 16 |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| 4000 · Income - Consulting | | | | | | | | |
| 4002 · Miscellaneous Income | $ 386,895 | $ 285,128 | $ 93,170 | $ 128,610 | | | $ 893,803 | $ 350,000 |
| 4003 · Investor Admin Fees | 2,180,727 | 0 | 39,678 | 0 | | | 2,220,405 | (45,000) |
| Total 4000 · Income - Consulting | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| **Total Income** | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| **Gross Profit** | 2,567,622 | 285,128 | 132,848 | 128,610 | 0 | 0 | 3,114,208 | 305,000 |
| **Expense** | | | | | | | | |
| 6100 · Amortization Expense | 29,368 | 18,348 | 7,327 | 7,327 | 7,327 | 2,442 | 72,139 | 0 |
| 6110 · Automobile Expense | 3,943 | 1,789 | 1,098 | 159 | 6,277 | 3,370 | 16,635 | |
| 6111 · Automobile Lease | 34,345 | 40,533 | 34,472 | 0 | | | 109,349 | 0 |
| 6115 · Broker Fees | 3,525,000 | 0 | 0 | 0 | | | 3,525,000 | |
| 6120 · Bank Service Charges | 2,398 | 2,087 | 562 | 447 | | | 5,494 | 105 |
| 6125 · Credit Card Charges | 0 | 0 | 0 | 0 | | | 0 | |
| 6134 · Commissions | 315,000 | 0 | 0 | 0 | | | 315,000 | |
| 6135 · Consulting Fees | 81,714 | 62,680 | 10,930 | 8,000 | | | 163,324 | 179,724 |
| 6140 · Contributions | 12,500 | 0 | 0 | 0 | | | 12,500 | |
| 6145 · Computer and Internet Expenses | 5,875 | 0 | 2,655 | 1,365 | | | 9,895 | |
| 6150 · Depreciation Expense | 22,054 | 6,793 | 1,156 | 4,325 | | | 34,328 | |
| 6160 · Dues and Subscriptions | 420 | 140 | 0 | 0 | | | 560 | |
| 6180 · Insurance | 3,737 | 8,520 | 7,006 | 1,107 | | | 20,370 | 517 |
| 6200 · Interest Expense | 775 | 0 | 0 | 0 | | | 775 | |
| 6220 · Legal & Professional Fees | 274,540 | 59,544 | 187,933 | 64,190 | 20,984 | | 607,190 | 49,503 |
| 6230 · Licenses and Permits | 660 | 340 | 638 | 250 | | | 1,888 | 480 |
| 6231 · Management Fees | 350,000 | 350,000 | 700,000 | 0 | | | 1,400,000 | 84,521 |
| 6235 · Meals & Entertainment | 6,188 | 0 | 531 | 1,765 | | | 8,483 | |
| 6240 · Miscellaneous | 3,831 | 0 | 3,500 | 0 | | | 7,331 | |
| 6245 · Office Expenses | 25,253 | 11,487 | 11,539 | 3,437 | 12,336 | 7,327 | 71,379 | 4,216 |
| 6247 · Outside Services | 0 | 0 | 401 | 2,301 | | | 2,702 | 2,500 |
| 6248 · Penalty | 156 | 0 | 0 | 151 | | | 307 | |
| 6250 · Postage and Delivery | 11,730 | 0 | 0 | 184 | | 451 | 12,365 | |
| 6255 · Printing & Reproduction | 0 | 0 | 8,022 | 0 | | | 8,022 | |
| 6290 · Rent | 79,467 | 148,598 | 35,932 | 0 | | | 263,997 | 25,648 |
| 6340 · Telephone | 12,441 | 12,012 | 10,357 | 2,054 | | 4,453 | 41,317 | |
| 6350 · Travel | 159,120 | 110,762 | 60,508 | 8,602 | 33,522 | 17,737 | 390,251 | |
| 6600 · Payroll Expenses | 0 | 7,640 | 34,804 | 0 | | | 42,444 | |
| 6900 · State Franchise Tax | 1,700 | 800 | 1,600 | 0 | 800 | 800 | 5,700 | 6,800 |
| **Total Expense** | 4,962,213 | 842,072 | 1,120,969 | 105,663 | 81,246 | 36,580 | 7,148,744 | 354,014 |
| **Net Income** | $ (2,394,592) | $ (556,944) | $ (988,121) | $ 22,947 | $ (81,246) | $ (36,580) | $ (4,034,536) | $ (49,014) |

# EXHIBIT 5B

Exhibit 3 Page 121

**Beverly Proton Center, LLC (LA County Proton Therapy)**
**Profit & Loss**
January through December

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Jan - Dec 12 | Total | Jan - Apr 16 |
|---|---:|---:|---:|---:|---:|---:|
| **Income** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Expense** | | | | | | |
| 6010 · Amortization Expense | 30,381 | 16,223 | 4,496 | 0 | 51,100 | |
| 6040 · Bank Service Charges | 2,235 | 890 | 328 | 0 | 3,453 | 665 |
| 6050 · Broker Fees | 0 | 0 | 0 | 0 | 0 | (32,500) |
| 6054 · Business License & Permits | 30 | 0 | 0 | 2,100 | 2,130 | |
| 6055 · Consulting | 0 | 0 | 0 | 0 | 0 | 695,050 |
| 6075 · Demolition Expense | | | | | 0 | 151,000 |
| 6140 · Interest Expense | 46,492 | 11,492 | 5,178 | 0 | 63,162 | |
| 6165 · Legal & Professional Fees | 0 | 0 | 0 | 0 | 0 | 81,346 |
| 6170 · Management Fees | 0 | 0 | 0 | 0 | 0 | 5,712,413 |
| 6175 · Marketing Fees | 0 | 0 | 0 | 0 | 0 | 200,000 |
| 6180 · Meals and Entertainment | 131 | 0 | 0 | 0 | 131 | |
| 6200 · Office Supplies | | | | | 0 | 179 |
| 6320 · Penalty | 71 | 0 | 0 | 0 | 71 | |
| 6400 · Rent Expense | 0 | 100,000 | 100,000 | 0 | 200,000 | 158,000 |
| 6480 · Telephone Expense | 1,675 | 0 | 0 | 0 | 1,675 | 1,105 |
| 6500 · Travel Expense | 18,705 | 0 | 5,275 | 0 | 23,980 | |
| 6900 · State Franchise Tax | 800 | 800 | 800 | 0 | 2,400 | 800 |
| **Total Expense** | 100,520 | 129,405 | 116,077 | 2,100 | 348,102 | 6,968,058 |
| **Net Income** | $ (100,520) | $ (129,405) | $ (116,077) | $ (2,100) | $ (348,102) | $ (6,968,058) |

# EXHIBIT 5C

Exhibit 3 Page 123

**Pacific Proton EB-5 Fund, LLC**
**Profit & Loss**
January through December

| | Jan - Dec 15 | Jan - Dec 14 | Jan - Dec 13 | Total | Jan - Apr 16 |
|---|---|---|---|---|---|
| **Income** | | | | | |
| 4000 · Sales - Consulting | $          - | $          - | $          - | $          - | $          - |
| 4100 · Interest Income | 46,492 | 11,492 | 5,178 | 63,162 | 0 |
| **Total Income** | 46,492 | 11,492 | 5,178 | 63,162 | 0 |
| **Expense** | | | | | |
| 6040 · Bank Service Charges | 1,469 | 2,163 | 526 | 4,159 | (924) |
| 6070 · Consulting | 0 | 0 | 0 | 0 | |
| 6165 · Legal & Professional Fees | 524 | 0 | 0 | 524 | |
| 6175 · License & Permit | 70 | 0 | 0 | 70 | |
| 6170 . Management Fees | | | | 0 | 1,000,000 |
| 6190 · Miscellaneous Expense | 0 | 0 | 0 | 0 | |
| 6350 · Penalty | 185 | 0 | 0 | 185 | |
| 6900 · State Franchise Tax | 800 | 800 | 0 | 1,600 | 800 |
| **Total Expense** | 3,048 | 2,963 | 526 | 6,538 | 999,876 |
| **Net Income** | $   43,444 | $   8,529 | $   4,652 | $   56,624 | $   (999,876) |

# EXHIBIT 6A

Exhibit 3 Page 125

**3:17 PM**
**06/21/16**
**Accrual Basis**

# Pacific Proton Therapy Regional Ctr, LLC
## Balance Sheet
### As of December 31, 2015

|  | Dec 31, 15 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1010 · Cash in Bank - Checking | $ 97,389 |
| **Total Checking/Savings** | 97,389 |
| **Other Current Assets** | |
| 1225 · Due To/From - Group Two | |
| 1226 · Due to MPH Ventures | (14) |
| 1227 · Due From - SC Fund (153216) | 9,700 |
| 1228 · Due From - SC Mgmt (153215) | 5,931 |
| 1229 · Due From - MP Medical Hotel | 10,163 |
| Total 1225 · Due To/From - Group Two | 25,780 |
| **Total Other Current Assets** | 25,780 |
| **Total Current Assets** | 123,169 |
| **Fixed Assets** | |
| 1610 · Furniture & Fixtures | 63,335 |
| 1620 · Office Equipment | 16,109 |
| 1630 · Leasehold Improvements | 9,784 |
| 1640 · Auto & Truck | 75,258 |
| 1699 · Accum Depreciation | (34,328) |
| **Total Fixed Assets** | 130,157 |
| **Other Assets** | |
| 1705 · Start Up Cost | 403,891 |
| 1706 · A/A - Start Up Costs | (72,139) |
| 1730 · Lease Deposit | 68,048 |
| **Total Other Assets** | 399,800 |
| **TOTAL ASSETS** | $ 653,126 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Credit Cards** | |
| 2030 · Chase Card #3763 | $ 2,094 |
| **Total Credit Cards** | 2,094 |
| **Total Current Liabilities** | 2,094 |
| **Long Term Liabilities** | |
| 2301 · Pacific Proton EB-5 | 185,377 |
| 2420 · L/P - Beverly Proton Center LLC | 4,490,191 |
| **Total Long Term Liabilities** | 4,675,568 |
| **Total Liabilities** | 4,677,662 |
| **Equity** | |
| 3100 · Capital - Charles Liu | (3,018,401) |
| 3200 · Capital - John P. Thropay | (1,006,134) |
| **Total Equity** | (4,024,536) |
| **TOTAL LIABILITIES & EQUITY** | $ 653,126 |

# EXHIBIT 6B

Exhibit 3 Page 127

**Beverly Proton Center, LLC (LA County Proton Therapy)**
**Balance Sheet**
**As of December 31, 2015**

| | Dec 31, 15 |
|---|---|
| **ASSETS** | |
|   **Current Assets** | |
|     **Checking/Savings** | |
|       1010 · Cash in Bank - Checking | $ 29,314 |
|     **Total Checking/Savings** | 29,314 |
|   **Total Current Assets** | 29,314 |
|   **Fixed Assets** | |
|     1600 · Medical Equipment | 3,368,100 |
|     1610 · Furniture & Fixtures | 2,347 |
|     1630 · Leasehold Improvements | 803,636 |
|     1660 · Development Costs | |
|       1662 · Broker Fees | 932,500 |
|       1664 · Agent's Fees | 2,810,025 |
|       1666 · Management Fees | 2,810,799 |
|       1668 · Marketing Fees | 2,350,025 |
|     **Total 1660 · Development Costs** | 8,903,349 |
|   **Total Fixed Assets** | 13,077,432 |
|   **Other Assets** | |
|     1700 · Start up Cost | 668,116 |
|     1705 · Accumulated Amortization | (51,100) |
|     1730 · Lease Deposit | 100,000 |
|     1750 · L/R - Pacific Proton Regional | 4,490,191 |
|   **Total Other Assets** | 5,207,207 |
| **TOTAL ASSETS** | $ 18,313,952 |
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Long Term Liabilities** | |
|       2500 · Loan Payable - Member | $ 2,100 |
|       2505 · Accrued Interest Payable | 63,162 |
|       2510 · L/P Pacific Proton EB-5 Fund | 18,596,792 |
|     **Total Long Term Liabilities** | 18,662,054 |
|   **Total Liabilities** | 18,662,054 |
|   **Equity** | |
|     3100 · Capital - Charles Liu | (261,077) |
|     3200 · Capital - John P. Thropay | (87,025) |
|   **Total Equity** | (348,102) |
| **TOTAL LIABILITIES & EQUITY** | $ 18,313,952 |

# EXHIBIT 6C

Exhibit 3 Page 129

# Pacific Proton EB-5 Fund, LLC
## Balance Sheet
### As of December 31, 2015

|  |  | Dec 31, 15 |
|---|---|---:|
| **ASSETS** |  |  |
|   **Current Assets** |  |  |
|     **Checking/Savings** |  |  |
|       1010 · Checking - Chase | $ | 7,001,348 |
|       1020 · Checking - Citibank |  | 9,945 |
|       **Total Checking/Savings** |  | 7,011,293 |
|     **Other Current Assets** |  |  |
|       1300 · L/R - Others |  |  |
|         Industrial & Commercial Bank |  | 1,500,000 |
|         Overseas Chinese Immigration Co |  | 1,500,000 |
|       **Total 1300 · L/R - Others** |  | 3,000,000 |
|     **Total Other Current Assets** |  | 3,000,000 |
|   **Total Current Assets** |  | 10,011,293 |
|   **Fixed Assets** |  |  |
|     1660 · Development Costs |  |  |
|       1666 · Management Fees |  | 200,000 |
|     **Total 1660 · Development Costs** |  | 200,000 |
|   **Total Fixed Assets** |  | 200,000 |
|   **Other Assets** |  |  |
|     1800 · L/R - Beverly Proton Center LLC |  | 18,596,792 |
|     1810 · Accrued Interest Receivable |  | 63,162 |
|     1850 · L/R - Pacific Proton Regional |  | 185,377 |
|   **Total Other Assets** |  | 18,845,331 |
| **TOTAL ASSETS** | **$** | **29,056,624** |
| **LIABILITIES & EQUITY** |  |  |
|   **Equity** |  |  |
|     **2013** |  |  |
|       LI, Qiong | $ | 501,706 |
|       Ll, Yanli |  | 501,706 |
|       SHI, Zhaohui |  | 501,706 |
|       SUN, Dian |  | 501,706 |
|       ZHAO, Xin |  | 501,706 |
|     **Total 2013** |  | 2,508,528 |
|     **2014** |  |  |
|       CHEN, Jun |  | 500,775 |
|       LIU, Feng |  | 500,775 |
|       LIU, Jing |  | 500,775 |
|       SUN, Xiaoming |  | 500,775 |
|       WANG, Wang |  | 500,775 |
|       XU, Haijuan |  | 500,775 |
|     **Total 2014** |  | 3,004,652 |
|     **2015** |  |  |
|       CAO, Xiang |  | 500,000 |
|       CHEN, Guichan |  | 500,000 |
|       CHEN, Zhong |  | 500,000 |
|       DAI, Lixia |  | 500,000 |
|       DING, Liang |  | 500,000 |
|       FEI, Jia |  | 500,000 |
|       HE, He |  | 500,000 |
|       HU,Runyi |  | 500,000 |

**Pacific Proton EB-5 Fund, LLC**
**Balance Sheet**
**As of December 31, 2015**

| | Dec 31, 15 |
|---|---|
| JIANHAO, Zhang | 500,000 |
| LAN, Jie | 500,000 |
| LI, Li | 500,000 |
| LI, Longwen | 500,000 |
| LI, Zengwei | 500,000 |
| LIAN, Chen | 500,000 |
| LIN, Weiping | 500,000 |
| LIN, Wen | 500,000 |
| LIU, Feng (2015) | 500,000 |
| LIU, Genlan | 500,000 |
| LIU, Jingzhong | 500,000 |
| LIU, Rui | 500,000 |
| LIU, Yimin | 500,000 |
| LU, Xueying | 500,000 |
| LU, Zhang | 500,000 |
| MA, Chaoqi | 500,000 |
| QIAN, Yu | 500,000 |
| SHAO, Xiaojing | 500,000 |
| SHEN, Juan | 500,000 |
| SHI, Jinyu | 500,000 |
| TANG, Xiaomin | 500,000 |
| WANG, Kexin | 500,000 |
| WANG, Zihao | 500,000 |
| WEI, Zhao | 500,000 |
| WU, Dong | 500,000 |
| XIANG, Dong | 500,000 |
| XU, Faxiao | 500,000 |
| XU, Guanghe | 500,000 |
| YAN, Chenglong | 500,000 |
| YANG, Jianqiang | 500,000 |
| YANG, Yong | 500,000 |
| YITIAN, Zhou | 500,000 |
| YU, Lifang | 500,000 |
| YUHAN, Shan | 500,000 |
| ZHANG, Fan | 500,000 |
| ZHANG, Haixia | 500,000 |
| ZHAO, Jian | 500,000 |
| ZHOU, Changgang | 500,000 |
| ZHOU, Zhuoxiong | 500,000 |
| **Total 2015** | 23,500,000 |
| **Net Income** | 43,444 |
| **Total Equity** | 29,056,624 |
| **TOTAL LIABILITIES & EQUITY** | $ 29,056,624 |

Exhibit 3 Page 131

# EXHIBIT 4

**MARCUM**
ACCOUNTANTS ▲ ADVISORS

March 25, 2021

Mr. Hervé Gouraige
Sills, Cummins and Gross
One Riverfront Plaza
Newark, NJ 07102

Re: Charles Liu and Xin Wang

Dear Mr. Gouraige,

Attached please find the compensation analysis and supporting documentation which we have prepared for you regarding the determination of what reasonable compensation should have been paid to Charles Liu ("Liu") and Xin Wang ("Wang") by the following entities (referred to collectively as the "Project"): Pacific Proton Therapy Regional Center, LLC; Pacific Proton EB-5 Fund, LLC; and, Beverly Proton Center, LLC.  This letter will discuss the situation presented to us, our methodology for preparing the report, and our conclusions.

**Background**

During 2010, Liu, in conjunction with Dr. John Thropay, an unrelated party, created and operated a program designed to construct and operate the Project, which was to be a cancer therapy center that used a proton-based therapy to treat  patients.  The Project was owned 75% by Liu and 25% by Dr. Thropay. Part of the funding for the Project was to come from individuals who were not citizens or residents of the United States who wished to apply for a United States visa under the EB-5 Immigrant Investor Program. The individual entities that comprised the Project served different purposes: the Pacific Proton Therapy Regional Center, LLC was a vehicle used to obtain authorization to offer EB-5 status to appropriate investors, manage the EB-5 investor visa program and investor relations functions; the Pacific Proton EB-5 Fund, LLC was the investment vehicle for the EB-5 visa investors; and, the Beverly Proton Center was the entity that would provide non-medical services to the medical corporation.  Liu raised funds for the Project, but was unable to raise sufficient funds to bring the operation to fruition.

You have inquired as to what reasonable compensation for Liu and Wang should have been from each member of the Project; additionally, you inquired as to a reasonable finder's fee/commission for Liu for having investors join the project.  We understand that Liu served in the following roles: the President of Pacific Proton Therapy Regional Center, LLC; the sole manager of Pacific Proton EB-5 Fund, LLC; and the President and Treasurer of Beverly Proton Center. We also understand that Wang served in the following role: the Vice President of Marketing of Beverly Proton Center.



Exhibit 4 Page 132

**Marcum LLP** ▪ 6685 Beta Drive ▪ Mayfield Village, Ohio 44143 ▪ **Phone** 440.459.5700 ▪ **Fax** 440.459.5701 ▪ **www.marcumllp.com**

Mr. Hervé Gouraige
Sills, Cummins and Gross
March 25, 2021
Page **2** of **5**

You have asked us to determine what reasonable compensation would have been for Liu and Wang from
the individual entities of the Project.  It is our understanding that Liu performed services for the following
entities during the following years:  Pacific Proton Therapy Regional Center, LLC from August 25, 2010,
to May 26, 2016; Pacific Proton EB-5 Fund, LLC from November 15, 2010, to May 26, 2016; and
Beverly Proton Center from November 16, 2010, to May 26, 2016. It is also our understanding that Wang
performed services for the Beverly Proton Center during 2013 and 2014.

**Our methodology**

We view reasonable compensation paid by the Project to Liu and/or Wang as having two distinct sources:
a commission or finder's fee relating to obtaining investors in the Project; and, compensation for services
rendered to the various entities of the Project for management and operation of each entity's business.

Commission/finder's fees

Companies that are seeking investors who would want to avail themselves of the EB-5 program often pay
commissions or finder's fees ("commissions") to individuals/entities who refer prospective investors to
their programs.  The commission levels are negotiable between the program sponsor and the referral
source.

We were unable to find any publicly available surveys of commissions in EB-5 programs; discussions
with numerous promoters of these programs were unaware of the existence of this data.

We searched the Securities and Exchange Commission's EDGAR database for Form D, Notice of Exempt
Offering of Securities (Form D); among the data contained on Form D are 'offering and sales amounts'
and 'sales commissions and finder's fee expenses'.  We then reviewed 20 Forms D for those entities who
were involved in EB-5 programs and paid some type of commission or finder's fee, and summarized our
findings.  Appendix A provides a listing of the Forms D that we reviewed and the pertinent data.

The commissions and/or finder's fees paid to Liu during the respective time period was 8% of the total
capital raised for the Project. The SEC Form D survey data indicated that of the entities involved in EB-5
programs that were paid a commission and/or finder's fee, the median fee paid was 9.25%.

Services rendered to entities

To determine the market value of services rendered by Liu and Wang to the various Project entities, we
reviewed publicly available survey sources that would provide information on employers who are in the
same type of business as the Project.

We selected the Executive Compensation Assessor, which is a survey source operated by the Economic
Research Institute (ERI). ERI has been conducting compensation surveys for over 30 years and is widely
used in the compensation consulting industry. It acquires data from Securities and Exchange Commission
filings, other survey providers and surveys that it conducts with employers. The survey provides
compensation information for over 700 executive positions in over 8,000 locations around the world in
over 1,000 industries. ERI reports compensation information by job title, and then narrows the
information based on industry (using NAICS and SIC codes), revenue and position location. Data
provided consists of total cash compensation, stock and option awards, non-equity compensation, changes
in pension and all other compensation. Survey data is reported at the 25th percentile, median and the 75th
percentile of respondents. The database is refreshed on a daily basis; as a result, a report that is generated
represents the information contained in the database on that day.  Position location is reflected by

Exhibit 4 Page 133

Mr Hervé Gouraige
Sills, Cummins and Gross
March 25, 2021
Page **3** of **5**

localized cost of living indices.  Our analysis using the Executive Compensation Assessor will be referred to as the "survey report."

The survey report only provides data for the current year.  To determine compensation levels for prior years, we have discounted the results of the survey report generated by the Consumer Price Index Inflation Calculator ("CPI Inflation Calculator") which is provided by the Department of Labor's Bureau of Labor Statistics. In this manner, we have been able to estimate pay levels for the years that are the subject of this report.

In the review of Liu' compensation, we ran the survey report using the following criteria and reported total compensation data at the median of the survey report.  Total compensation is defined as base pay and annual cash incentives; it does not include equity grants or fringe benefits.  We selected survey data using the following demographics:

- For all Project entities:
    - Geographic area: Los Angeles, California
    - Revenue: $7,250,000.  This represents our pro-rated estimate of funds raised less administrative expenses over the course of the capital raise period.
    - Industry: General medical Services

- For services rendered to Pacific Proton Therapy Regional Center, LLC:
    - Job title: Liu--President

- For services rendered to Pacific Proton EB-5 Fund, LLC
    - Job title:  Liu--President

- For services rendered to Beverly Proton Center
    - Job title:  Liu—President
    - Job title: Wang—Vice President of Marketing

**Conclusions**

Our analysis of the commissions study is as follows.  We reviewed Forms D for 20 distinct entities which were filed with the SEC between 2011 and 2019.  The total of commissions, finder's fees and payments to executives and promoters related to the sale of the interests, as reflected on the Forms D, ranged from .06% to 27.93% of the sale price of the securities offered; the data only reflected payments related to actual sales, as opposed to rates/fees that were disclosed in the offering.  The median rate was 9.25%, which we believe to be a reasonable commission rate based on the study. As Liu reported sales of $24,712,217 related to the Project, which were contributed to Pacific Proton EB-5 Fund, LLC, a reasonable amount of commission/finder's fee would be $2,285,880.

Our analysis of the survey report is as follows, based on the median reported total compensation, adjusted for cost of living changes and pro-rated for partial years of service:

| Wang | Beverly Proton |
|---|---|
| 2013 | $ 182,915 |
| 2014 | $ 184,300 |
| **TOTAL** | $ 367,215 |

Exhibit 4 Page 134

| Liu | Pacific Proton Therapy | Pacific Proton EB-5 | Beverly Proton Center |
|---|---|---|---|
| 2010 (from inception date) | $   95,479 | $   37,131 | $   37,131 |
| 2011 | $ 284,000 | $ 284,000 | $ 284,000 |
| 2012 | $ 288,944 | $ 288,944 | $ 288,944 |
| 2013 | $ 293,284 | $ 293,284 | $ 293,284 |
| 2014 | $ 295,504 | $ 295,504 | $ 295,504 |
| 2015 | $ 297,659 | $ 297,659 | $ 297,659 |
| 2016 (through 5/26/2016) | $ 125,966 | $ 125,966 | $ 125,966 |
| **TOTAL** | $ 1,680,836 | $ 1,622,488 | $ 1,622,488 |

We believe that the compensation owed to Liu and Wang from the Project is the sum of the finder's fee study and the survey report study.  The two types of compensation are mutually exclusive—one related to fund raising, and one related to the formation and the operation of the businesses.  Therefore, we have concluded that reasonable compensation for Liu from all entities in the Project for the time period 2010-2015, and through May 26, 2016, related to his service as an officer totals $4,925,812, and that reasonable compensation to Wang from Beverly Proton for the time period 2013-2014 related to her service as an officer is $367,215.

To summarize the results, our calculation of reasonable total compensation to Liu for the 2011-2016 period (including all commissions) is $7,211,692 and total compensation to Wang is $367,215.

This report does not take into consideration any amounts actually paid to Liu or Wang by the Project entities, or any amounts that any of the Project entities may have not yet paid Liu or Wang.

In the preparation of this study, we relied on information provided by the Pacific Proton Therapy Regional Center, LLC, Pacific Proton EB-5 Fund, LLC and Beverly Proton Center, LLC and a complaint filed on May 26, 2016 by the Securities and Exchange Commission against Liu, Wang and the members of the Project (SACV 16-00974(AGRX)).  If that information is incomplete, inaccurate or misinterpreted, our conclusion may change and we reserve the right to update our analysis if we consider it necessary.

A statement of my professional qualifications can be found as Appendix B.

Very truly yours,

MARCUM LLP

Theodore R. Ginsburg, Director
Cc: Karen Connair, Marcum LLP

Exhibit 4 Page 135

APPENDIX A
SUMMARIZATION OF SEC EDGAR FORM D EB-5 FILINGS

| Filing Date | Filing entity | Sales Commissions | Finder's Fees Expenses | Gross Proceeds Paid to Executives, Promoters | TOTAL PERCENTAGE PAID |
|---|---|---|---|---|---|
| 3/3/2017 | 88th Ave EB5 Capital, LLC | $ - | $ 1,200,000 | $ - | 10.00% |
| 3/29/2018 | A1A EB5 LLC | $ - | $ 500,000 | $ - | 10.00% |
| 9/16/2019 | CPT EB5 LLC | $ 660,000 | $ - | $ - | 0.19% |
| 1/3/2017 | DS 30 Morningside Drive EB5 LLC | $ 198,000 | $ - | $ - | 0.40% |
| 3/9/2012 | EB5 Capital - Jobs Fund 4, L.P. | $ - | $ - | $ 1,120,000 | 5.60% |
| 9/6/2018 | EB5 Irving Hotel Investment Limited Partnership | $ - | $ 4,500,000 | $ - | 10.00% |
| 3/15/2016 | EB5 Pearl Office Investors LP | $ - | $ - | $ 450,000 | 7.50% |
| 6/29/2011 | EB5 Ports - Baltimore LP | $ 30,000 | $ 30,000 | $ - | 0.15% |
| 8/6/2013 | EB5 Riverplace Hotel Investment LP | $ - | $ - | $ 6,375,000 | 12.50% |
| 3/7/2013 | EB-5 SF Investment Limited Partnership | $ - | $ - | $ 6,612,057 | 15.74% |
| 7/7/2011 | EB5 StateCenter II, LLC | $ 20,000 | $ 20,000 | $ - | 0.06% |
| 10/16/2019 | EB5 United Big Sky, LLC | $ 6,350,000 | $ - | $ - | 10.00% |
| 7/21/2015 | EB5 United Fund 5 – Hollywood Apartments LP | $ 14,850,000 | $ - | $ 495,000 | 27.93% |
| 11/30/2018 | EB5 United NYC VI LP | $ 17,640,000 | $ - | $ 735,000 | 22.73% |
| 7/31/2018 | EB5 United Puerto Rico FS LP | $ 30,265,000 | $ - | $ 1,035,000 | 23.81% |
| 10/30/2019 | GS EB5 X LLC | $ 42,500 | $ - | $ - | 8.50% |
| 11/5/2015 | La Moda (Gale) EB-5 Investment LP | $ - | $ 190,000 | $ - | 1.19% |
| 1/30/2019 | QB Ventures EB5 Capital, LLC | $ - | $ 800,000 | $ - | 10.00% |
| 8/16/2011 | Riviera Point Holdings, Ltd. | $ - | $ - | $ 30,000 | 0.18% |
| 3/6/2012 | Washington Green Energy EB-5 Investments LP | $ - | $ 30,000 | $ - | 6.00% |
| | | | | **MEDIAN** | **9.25%** |

Exhibit 4 Page 136

**Theodore R. Ginsburg, CPA, J.D., MBA**

6685 Beta Dr.                           Office: (440) 459-5700
Mayfield Village, OH                     Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

APPENDIX B

PROFESSIONAL EXPERIENCE RELATING TO COMPENSATION ISSUES

*Marcum LLP:* Certified Public Accountants, Cleveland Ohio
2019 - Present
Director and national head of the Compensation and Benefits consulting practice for this multinational accounting firm that acquired Skoda Minotti during 2019. Activities in the compensation consulting area (for both publicly traded and privately held companies) include market pricing for executive and non-executive positions, preparation of reasonable compensation analyses for litigation purposes, planning for and preparation of golden parachute excise tax calculations, design and implementation of executive compensation programs, including base pay, short term incentives and long term incentive programs, assisting corporate clients in employment contract negotiation.

*Skoda Minotti;* Certified Public Accountants, Cleveland Ohio
*2010 – 2019*
Principal and head of the Compensation and Benefits consulting practice. Activities in the compensation consulting area include market pricing, preparation of reasonable compensation analyses for boards of directors, preparation of compensation expert report for a Tax Court case, design and implementation of executive compensation programs, including base pay, short term incentives and long term incentive programs, conducting private survey of executive positions for a specialized industry, assisting individual clients in employment contract negotiation. All compensation consulting was performed for privately held companies.

*BDO, LLP;* Certified Public Accountants, Cleveland Ohio
2009-2010
Principal in the Compensation and Benefits practice of this multinational accounting firm. Activities in the compensation consulting area include designing executive compensation programs, analyzing the reasonableness of compensation for key executives based on SEC filings and private survey results for both publicly traded and privately held companies.

*Top Five Data Services/Remedy Compensation Consulting;* Consulting firm, Cleveland Ohio
2003-2009
Principal (Top Five) and shareholder (Remedy) in this executive compensation consulting boutique firm providing services to primarily publicly traded companies. Duties included serving as outside compensation consultant to publicly traded company board of directors, determining reasonableness of compensation paid to executives of publicly traded companies, designing executive compensation programs, conducting surveys relating to executive pay in certain industries.

*Buck Consultants;* Consulting firm, Cleveland Ohio
2000-2003
Principal in charge of the Cleveland office compensation consulting group of this international actuarial and employee benefit consulting firm; national practice leader for the executive compensation consulting practice (2003).

*Grant Thornton, LLP*; Certified Public Accountants, Cincinnati Ohio
1995-2000
Partner in charge of the Cincinnati office compensation consulting group of this multinational accounting firm; co-national practice leader for the compensation and benefits practice (1998-2000), serving both publicly traded and privately held companies.



Exhibit 4 Page 137

**MARCUM LLP** ▪ 6685 Beta Drive ▪ Mayfield Village, Ohio 44143 ▪ **Phone** 440.459.5700 ▪ **Fax** 440.459.5701 ▪ **www.marcumllp.com**

**Theodore R. Ginsburg, CPA, J.D., MBA**

6685 Beta Dr.                          Office: (440) 459-5700
Mayfield Village, OH                   Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

*Mayer, Brown and Platt;* Law firm, Chicago, Illinois
1994-1995

Of counsel in the employee benefits practice group of this multinational law firm. Duties included qualified plan document drafting, deferred compensation program design for publicly traded companies.

*Laner, Muchin Dombrow and Becker*; Law firm, Chicago, Illinois
1992-1994
Partner in charge of the ERISA practice. Duties included executive compensation program design and implementation, serving both publicly traded and privately held companies.

*KPMG;* public accounting firm, Houston, Texas
1983-1992
Partner in charge of the employee benefits tax consulting practice of this multinational accounting firm serving both publicly traded and privately held companies. Duties included executive compensation program design and benchmarking, executive employment agreement design and negotiation, firm wide expert on various executive compensation areas (such as golden parachute excise tax)

Positions prior to 1983 included services for Price Waterhouse (public accounting firm) and two small law firms in St. Louis, Missouri with no experience relative to compensation matters

EDUCATION AND DEGREES

- Juris Doctor, Washington University School of Law, St. Louis, Missouri (1978)
- Masters of Business Administration, Olin Business School, Washington University, St. Louis, Missouri (1978)
- Bachelor of Arts, Political Science, Washington University, St. Louis, Missouri (1975)

PROFESSIONAL LICENSES

- Certified Public Accountant, Ohio (1995), Texas (1984—inactive), Missouri (1978—inactive)
- Member of the bar, Illinois (1993—inactive), Missouri (1978—inactive)

PROFESSIONAL ORGANIZATIONS AND MEMBERSHIPS

- American Institute of Certified Public Accountants
- Ohio Society of Certified Public Accountants (prior chairman Human Resources section)
- Cleveland Bar Association
- National Council of Employee Ownership
- World at Work
- American Society of Pension Professionals and Actuaries



Exhibit 4 Page 138



**Theodore R. Ginsburg, CPA, J.D., MBA**

6685 Beta Dr.                    Office: (440) 459-5700
Mayfield Village, OH          Fax: (440) 459-5701
E-mail: ted.ginsburg@marcumllp.com

<u>PRESENTATIONS</u>

During his career, Ted has spoken before a number of non-client organizations on topics related to compensation and benefits. Among those organizations are:

- Associated Builders and Contractors, Inc.
- Case Western Reserve University
- Cleveland Bar Association
- Construction Management Association
- Financial Managers Society
- Global Equity Organization
- Illinois Bar Association
- Independent Community Bankers of Minnesota
- Institute of Management Accountants
- Leading Edge Alliance
- Ohio Society of Certified Public Accountants
- Tax Executive's Institute
- University of Akron
- WEB

Exhibit 4 Page 139

**Marcum LLP** ▪ 6685 Beta Drive ▪ Mayfield Village, Ohio 44143 ▪ **Phone** 440.459.5700 ▪ **Fax** 440.459.5701 ▪ **www.marcumllp.com**

# EXHIBIT 5

1              UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
3                   SOUTHERN DIVISION
4
5   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
6                                  )
                   Plaintiff,      )   Case No.
7   v.                             )   8:16-cv-00974-CJC-AGR
                                   )
8   CHARLES C. LIU; XIN WANG       )
    a/k/a LISA WANG; PACIFIC       )
9   PROTON THERAPY REGIONAL        )
    CENTER, LLC; PACIFIC PROTON    )
10  EB-5 FUND, LLC; and BEVERLY    )
    PROTON CENTER, LLC f/k/a       )
11  LOS ANGELES COUNTY PROTON      )
    THERAPY, LLC,                  )
12                                 )
                   Defendants.     )
13  _____)
14
15
16           REMOTE VIDEO DEPOSITION OF
17        THEODORE R. GINSBURG, CPA, JD, MBA
18             Defense Expert Witness
19             Friday, April 16, 2021
20          CONDUCTED VIA VIDEOCONFERENCE
21
22
23
    Stenographically Reported by:
24  Marty E. McArver, RDR, FPR
    CA-Certified Shorthand Reporter #2769
25  Job No. 210416MEM

                                                       1

10:06:23  1    officer for this deposition, which is being taken

10:06:23  2    via internet videoconference and is being conducted

10:06:23  3    remotely using Webex.

10:06:23  4         California Senate Bill 1146 was signed into

10:06:23  5    law on September 18, 2020, and specifically provides

10:06:23  6    that a deponent is not required to be physically

10:06:23  7    present with the deposition officer -- that's me --

10:06:23  8    when being sworn in at the time of the deposition.

10:06:23  9         At this time if anyone has an objection to

10:06:23 10    my administering the oath to the deponent remotely

10:06:23 11    or to the taking of this deposition via internet

10:06:23 12    videoconference, please state so now.

10:06:23 13         (No objection heard.)

10:06:23 14         Hearing no objection, I will now swear

10:06:23 15    in the witness.

10:06:23 16         THEODORE R. GINSBURG, CPA, JD, MBA,

10:06:25 17    being first duly sworn remotely, testifies as

10:06:25 18    follows:

10:07:25 19         THE WITNESS:  I so swear.

10:07:27 20         THE REPORTER:  Thank you.

10:07:28 21         Counsel, you may proceed.

10:07:32 22         MR. LEUNG:  Thank you, Ms. McArver.

10:07:34 23         Just to close that out, Herve, do you

10:07:39 24    stipulate on behalf of the individual defendants

10:07:42 25    that the remote administration of the oath complies

9

10:27:29  1    it's for compensation purposes -- to executives

10:27:35  2    with the same job positions.

10:27:38  3           And we provide a report for that and we

10:27:40  4    give them an analysis of that.

10:27:46  5       Q    Thank you.   That's helpful.

10:27:47  6           It sounds like a very robust analysis.

10:27:49  7           Would you agree with me, Mr. Ginsburg,

10:27:51  8    that in order to reliably conduct the analysis

10:27:55  9    that you just testified to, you have to have a

10:27:57 10    good understanding of the company's business?

10:28:05 11       A    I don't believe that is necessarily the

10:28:09 12    case.

10:28:10 13           When we -- When we pull the data from the

10:28:17 14    survey's results or we go from the proxies, right,

10:28:22 15    we rely very heavily on the SIC code/the NAICS

10:28:31 16    code provided, that the client provides to us.

10:28:35 17           If we're doing a public company study, we

10:28:39 18    would probably want to know more about the client's

10:28:43 19    business so that we could -- so that we could say

10:28:46 20    that, yes, a member of the peer group, their

10:28:51 21    business is only partially what the client does,

10:28:55 22    but a lot of it is not, so it's probably not a

10:28:58 23    good peer.

10:28:59 24           But for most clients, for privately held

10:29:03 25    clients, our reliance is primarily on the SIC code

22

Exhibit 5 Page 142

```
10:29:07  1   or on the NAICS code as to what the business is.
10:29:13  2       Q    What's the difference between the SIC code
10:29:18  3   and the NAICS code?
10:29:21  4       A    There really isn't a huge difference.  The
10:29:24  5   NAICS codes are probably more detailed.  There's a
10:29:30  6   greater number of those codes within each business
10:29:33  7   line.  And we can --
10:29:37  8            And, again, we're using what the client
10:29:39  9   tells us, and says:  Here's what our business is.
10:29:43 10   Here's what our business is.
10:29:45 11            So, you know, they do -- They work
10:29:49 12   together.  You know, we can use either one.  Our
10:29:52 13   survey source can use either one.  The numbers
10:29:55 14   are reported on client filings.  So, you know --
10:30:03 15            I'd -- Personally, I'd rather use NAICS,
10:30:07 16   because it's focused.  I can drill down -- I can
10:30:09 17   drill down further.
10:30:10 18       Q    If the client gives you an incorrect
10:30:13 19   SIC code or an incorrect NASIC[sic] --
10:30:19 20            -I-C-S?  N-A-I-C-S or N-A-S-C-S?
10:30:21 21       A    N-A-I -- I think it's N-A-I-C-S.  I think.
10:30:25 22   I believe that's what it is.
10:30:26 23       Q    Let me start over, then.
10:30:27 24            Let's suppose, Mr. Ginsburg, that the
10:30:30 25   client miscodes their business and they give you the
```

23

Exhibit 5 Page 143

10:30:32  1  wrong SIC code or the wrong NAICS code.  Would that

10:30:38  2  bear on the accuracy of any conclusions you reached

10:30:41  3  with respect to the reasonable range of executive

10:30:45  4  compensation for a given executive?

10:30:48  5      A    It's possible.  It's possible.

10:30:54  6           Again, those codes -- You know, we get

10:30:56  7  those codes -- We have the ability to be able to

10:30:58  8  get them from the -- their corporate tax return.

10:31:03  9           So, you know, you would hope that the

10:31:09  10 client had figured out that properly.

10:31:14  11     Q    I mean, but can we agree that with --

10:31:17  12     A    We can agree --

10:31:19  13     Q    -- as with most things, the reliability

10:31:21  14 of your work is dependent on the accuracy of the

10:31:25  15 information that you're given by your clients?

10:31:28  16          Is that a general rule of thumb in your

10:31:32  17 area of expertise?

10:31:34  18     A    I think that would -- That's a fair

10:31:37  19 statement.

10:31:37  20     Q    Okay.  And in conducting the compensation

10:31:42  21 assessments that you testified to, is it important

10:31:46  22 for you to understand -- let me see how you put

10:31:51  23 it -- the duties of the given executive and what

10:31:56  24 services they provide to the employer?

10:32:04  25     A    That is important, because the survey data

24

| | | |
|---|---|---|
| 10:32:09 | 1 | that we use -- and in the surveys that we used in |
| 10:32:14 | 2 | the case that we're talking about before us -- are |
| 10:32:21 | 3 | tied to the individual's title. |
| 10:32:29 | 4 | So if the individual is not, in fact, doing |
| 10:32:39 | 5 | the job that relates to that title, your information |
| 10:32:46 | 6 | may be not applicable. |
| 10:33:03 | 7 | Q    Okay.  We kind of went off on a tangent, |
| 10:33:08 | 8 | but I did think I'd cover some ground rules for |
| 10:33:12 | 9 | depositions real briefly.  I think this is going |
| 10:33:13 | 10 | well, but to the extent you need to have your |
| 10:33:16 | 11 | recollection of the process refreshed from 1999 |
| 10:33:19 | 12 | and 1990, I'm happy to do that. |
| 10:33:25 | 13 | Mr. Ginsburg, we have Ms. McArver, our |
| 10:33:28 | 14 | court reporter, on the line.  She is making a |
| 10:33:30 | 15 | written transcription of everything you say, |
| 10:33:32 | 16 | everything that I say, everything that defense |
| 10:33:35 | 17 | counsel says today. |
| 10:33:36 | 18 | So in order for that written transcription |
| 10:33:39 | 19 | to be as accurate as possible, it's important for us |
| 10:33:42 | 20 | to not interrupt each other, to not speak over each |
| 10:33:45 | 21 | other, and for you to provide verbal responses to |
| 10:33:48 | 22 | my questions, which I think so far you've been doing |
| 10:33:52 | 23 | an okay job of. |
| 10:33:54 | 24 | Is that fair? |
| 10:33:55 | 25 | A    That is fair. |

25

| | | |
|---|---|---|
| 10:46:00 | 1 | case in which you were offering an expert opinion. |
| 10:46:04 | 2 | Correct? |
| 10:46:09 | 3 | A    That would -- That would be correct. |
| 10:46:13 | 4 | Q    Okay.  And so thousands, are we talking |
| 10:46:19 | 5 | two thousand? three thousand? four thousand? |
| 10:46:22 | 6 | Best estimate. |
| 10:46:23 | 7 | A    I would say between one and two thousand. |
| 10:46:33 | 8 | Q    Okay.  In those between one and two |
| 10:46:36 | 9 | thousand engagements, were you ever tasked with |
| 10:46:40 | 10 | assessing reasonable compensation for an executive |
| 10:46:43 | 11 | who had been found liable for securities fraud? |
| 10:46:49 | 12 | A    Not to the best of my recollection. |
| 10:47:35 | 13 | Q    In those one to two thousand engagements, |
| 10:47:38 | 14 | have you ever been tasked with assessing reasonable |
| 10:47:41 | 15 | compensation for an executive who had appropriated |
| 10:47:46 | 16 | corporate funds for exorbitant personal enrichment? |
| 10:47:52 | 17 | A    Not to the best of my recollection.  I |
| 10:47:55 | 18 | don't recall doing that. |
| 10:47:57 | 19 | Q    In those one to two thousand engagements |
| 10:48:00 | 20 | involving executive compensation, have you ever |
| 10:48:03 | 21 | been tasked with assessing what might be reasonable |
| 10:48:06 | 22 | compensation for an executive who had been found to |
| 10:48:09 | 23 | have acted negligently? |
| 10:48:24 | 24 | A    Could you -- Could you tell me what you |
| 10:48:26 | 25 | mean by acting negligently?  Would you explain that? |

35

| | | |
|---|---|---|
| 10:48:33 | 1 | Q    Let me -- Yeah.   Let me ask a better |
| 10:48:39 | 2 | question. |
| 10:48:40 | 3 | In your one to two thousand executive |
| 10:48:42 | 4 | compensation engagements, have you ever addressed |
| 10:48:46 | 5 | the scenario in which a court has found that the |
| 10:48:50 | 6 | executive whose compensation you were assessing |
| 10:48:56 | 7 | had violated the standard of care to the company? |
| 10:49:00 | 8 | A    Not to the -- |
| 10:49:04 | 9 | MR. GOURAIGE:   I object to the |
| 10:49:07 | 10 | question as an inappropriate characterization |
| 10:49:11 | 11 | of the court's finding. |
| 10:49:16 | 12 | BY MR. LEUNG: |
| 10:49:17 | 13 | Q    Please go ahead, Mr. Ginsburg. |
| 10:49:19 | 14 | A    Not to the best of my recollection. |
| 10:49:24 | 15 | Q    In those one to two thousand executive |
| 10:49:27 | 16 | compensation engagements, have you ever encountered |
| 10:49:30 | 17 | or had you ever encountered a scenario in which the |
| 10:49:35 | 18 | executive was found by a court to have conducted |
| 10:49:38 | 19 | company business with a fraudulent intent? |
| 10:49:43 | 20 | A    Not to the best of my recollection. |
| 10:49:51 | 21 | Q    Do you think negligence or a fraudulent |
| 10:49:57 | 22 | intent or a finding that the conduct amounted to |
| 10:50:01 | 23 | securities fraud would have beared on your analysis |
| 10:50:04 | 24 | in the course of your career when conducting these |
| 10:50:07 | 25 | reasonable compensation analyses? |

36

```
10:50:11   1      A    I would -- I would say no.  If the --
10:50:22   2           When clients ask me to determine what
10:50:27   3   is reasonable compensation, that analysis is done --
10:50:34   4   unless I'm instructed otherwise -- purely on
10:50:41   5   the basis of what would the market say that an
10:50:48   6   individual in this position, in this type of
10:50:51   7   company, perhaps in this industry, in this
10:50:55   8   geography, whatever, what does the market say
10:50:58   9   you would have to pay this person, pay a person,
10:51:02  10   to get them to take the job, to take the position.
10:51:10  11           Whether the person had been -- not been
10:51:16  12   doing a good job or had been stealing from the
10:51:19  13   company or other issues wouldn't bear on what the
10:51:25  14   marketplace would pay a person -- not that person,
10:51:30  15   but a person -- with the right experience, or
10:51:35  16   whatever, to do that job.
10:51:37  17           So I'd have to say that what that person
10:51:41  18   actually did, what that employee actually did, is
10:51:46  19   irrelevant, I guess, to the nature of my study.
10:51:52  20      Q    Okay.  And so stealing on the job is
10:51:56  21   irrelevant to your view of what an employee should
10:51:58  22   be paid?
10:52:00  23      A    I would say yes.  I mean, my proposition
10:52:10  24   surveys that I would use to make these
10:52:33  25   judgments(inaudible)...
```

37

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 148

10:52:33  1          (Reporter requests clarification.)

10:52:33  2     A    I would say that the issue of whether an

10:52:38  3  employee is stealing from the employer is irrelevant

10:52:45  4  to the studies that I perform.

10:52:48  5          When I look at my survey sources or I do

10:52:54  6  my proxy reviews, there isn't a survey source that

10:53:01  7  says:  Here is compensation for executives who steal

10:53:06  8  and here is compensation for executives who don't.

10:53:11  9  That's not -- That data is not broken out.

10:53:15 10          So I would say that it is irrelevant to

10:53:20 11  my study.

10:53:28 12     Q    Well, beyond your study --

10:53:30 13          I understand the services that you provided

10:53:32 14  in your career to generally be along the lines of:

10:53:36 15  Here's what this person is supposed to do at the

10:53:39 16  company.  Here's what I think is reasonable

10:53:42 17  compensation.

10:53:42 18          Are you saying it's completely irrelevant

10:53:45 19  if you know for a fact that the person is stealing

10:53:48 20  from the company?  That fact is irrelevant to how

10:53:52 21  much that person should be paid?

10:53:55 22          I understand your study.  I'm just

10:53:57 23  wondering, you know --

10:53:57 24     A    Yeah.  I think --

10:53:59 25     Q    -- with respect to --

                                                              38

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 149

10:55:49   1          But I never make -- But I never make the

10:55:52   2   decision that says, yes, this expenditure, this

10:55:56   3   was stealing or this was inappropriate.  I just

10:55:59   4   give them market data and my view of the market

10:56:03   5   data.

10:56:04   6          (Screen-sharing stopped.)

10:56:04   7   BY MR. LEUNG:

10:56:05   8      Q    Okay.  Let's --

10:56:07   9      A    And I'm sorry I went off on a tangent

10:56:09  10   there.

10:56:11  11      Q    No, that was helpful.

10:56:17  12          Let's talk about your analysis in this

10:56:19  13   case.

10:56:20  14      A    Uh-huh.

10:56:20  15      Q    Whether or not Mr. Liu engaged in

10:56:23  16   securities fraud is irrelevant to your analysis

10:56:26  17   in this case.

10:56:27  18          Correct?

10:56:27  19      A    That is correct.

10:56:28  20      Q    Whether or not Ms. Wang engaged in

10:56:32  21   securities fraud is irrelevant to your analysis

10:56:34  22   in this case.

10:56:35  23          Correct?

10:56:36  24      A    That is correct.

10:56:38  25      Q    Whether or not Mr. Liu actually performed

                                                          40

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 150

10:56:40  1   his duties for the corporate entities is irrelevant

10:56:44  2   to your analysis in this case.

10:56:45  3          Correct?

10:56:47  4      A   That is correct.

10:56:49  5      Q   Whether or not Ms. Wang performed her

10:56:51  6   stated duties for the corporate entities is

10:56:55  7   irrelevant to your analysis in this case.

10:56:58  8          Fair?

10:56:58  9      A   That is correct.

10:57:00  10     Q   And would you agree that whether or

10:57:02  11  not Mr. Liu misappropriated corporate funds is

10:57:07  12  irrelevant to your analysis in this case?

10:57:10  13     A   That is correct.  It is irrelevant.

10:57:13  14     Q   Am I also correct that whether or not

10:57:15  15  Ms. Wang misappropriated corporate funds is

10:57:19  16  irrelevant to your analysis in this case, of what

10:57:22  17  reasonable compensation she should be entitled to?

10:57:26  18     A   That is correct.  It is irrelevant.

10:57:29  19     Q   Whether or not Mr. Liu conducted his duties

10:57:33  20  in a negligent way is irrelevant to your analysis

10:57:37  21  in this case on what he's entitled to in the form

10:57:40  22  of reasonable compensation?

10:57:42  23     A   That is correct.

10:57:43  24          As I said -- As I said before, the -- what

10:57:48  25  my analysis provides is, what does the market say

                                                            41

10:57:56 1    an employer should pay to an executive to perform

10:57:59 2    the duties of that job title.  It's what the market

10:58:03 3    would say, this is what should be paid to that

10:58:06 4    person.

10:58:08 5         Q    Okay.  And whether or not Ms. Wang

10:58:12 6    performed her job in a negligent way is also

10:58:16 7    irrelevant to your assessment in this case of how

10:58:19 8    much reasonable compensation she should have been

10:58:23 9    paid?

10:58:23 10        A    That is correct.  It is irrelevant.

10:58:27 11        Q    Whether or not Mr. Liu conducted company

10:58:30 12   business with a fraudulent intent is likewise

10:58:34 13   irrelevant to your executive compensation analysis

10:58:38 14   in this case.

10:58:39 15            Is that correct, sir?

10:58:40 16        A    That is correct.

10:58:42 17        Q    Whether or not Ms. Wang acted with a high

10:58:45 18   degree of scienter in conducting company business,

10:58:49 19   also irrelevant to your assessment in this case

10:58:52 20   of the executive compensation she is reasonably

10:58:56 21   entitled to.

10:58:57 22            Is that correct?

10:58:58 23        A    That is correct.

10:59:02 24        Q    Whether or not Mr. Liu actually showed

10:59:06 25   up for work in the course of many years under

42

10:59:09  1    analysis, that's irrelevant to your analysis in

10:59:12  2    this case on the appropriate amount of executive

10:59:14  3    compensation Mr. Liu should have been entitled to?

10:59:17  4        A    That is correct.  It is irrelevant.

10:59:21  5        Q    Whether or not Ms. Wang ever performed

10:59:24  6    a single hour, a single minute of work on behalf

10:59:27  7    of the corporate entities in the United States is

10:59:30  8    irrelevant to your analysis, in this case of the

10:59:34  9    executive compensation that she might be reasonably

10:59:38  10   entitled to.

10:59:38  11            Is that fair?

10:59:39  12       A    That -- That is a fair statement.  It's

10:59:42  13   irrelevant.

10:59:44  14       Q    Okay.  And whether or not Mr. Liu engaged

10:59:47  15   in self-dealing to the detriment of his business

10:59:51  16   partners is irrelevant to your executive

10:59:54  17   compensation analysis in this case.

10:59:56  18            Correct?

10:59:57  19       A    That is irrelevant to my -- to my analysis.

11:00:04  20            All of the things -- You know, in my mind,

11:00:08  21   if any or all of those things occurred, then it was

11:00:13  22   really the responsibility of the company's board of

11:00:21  23   directors, or whatever, perhaps, to deal with those

11:00:24  24   issues.

11:00:24  25            It is not an issue of -- It's not an issue

                                                              43

| | | |
|---|---|---|
| 11:00:28 | 1 | of, because you acted badly, however you define |
| 11:00:33 | 2 | that, you should not be paid, as far as my services |
| 11:00:41 | 3 | go, as far as my work is concerned. |
| 11:00:46 | 4 | MR. LEUNG:  Ms. McArver, can you read |
| 11:00:48 | 5 | back that answer for me, please. |
| 11:00:49 | 6 | THE REPORTER:  Sure.  Just a moment. |
| 11:00:49 | 7 | "A   That is irrelevant to my -- to |
| 11:00:02 | 8 | my analysis. |
| 11:00:03 | 9 | "All of the things -- You know, |
| 11:00:06 | 10 | in my mind, if any and all of those |
| 11:00:10 | 11 | things occurred, then it was really |
| 11:00:14 | 12 | the responsibility of the company's |
| 11:00:21 | 13 | board of directors, or whatever, |
| 11:00:21 | 14 | perhaps, to deal with those issues. |
| 11:00:24 | 15 | "It is not an issue of -- It's |
| 11:00:28 | 16 | not an issue of, because you acted |
| 11:00:31 | 17 | badly, however you define that, you |
| 11:00:36 | 18 | should not be paid, as far as my |
| 11:00:41 | 19 | services go, as far as my work is |
| 11:00:45 | 20 | concerned." |
| 11:00:49 | 21 | BY MR. LEUNG: |
| 11:01:32 | 22 | Q   Mr. Ginsburg, when were you first contacted |
| 11:01:34 | 23 | by the defense to perform work on this case? |
| 11:01:37 | 24 | A   I would -- I could probably go on my |
| 11:01:48 | 25 | e-mails and look that up.  I would say perhaps six |

44

Exhibit 5 Page 154

11:12:44  1      Q    And the other?

11:12:46  2      A    -- the other was Julie -- J-u-l-i-e --

11:12:49  3  Ipavec, I-p-a-v-e-c.

11:12:59  4      Q    What did Ms. Davis do to assist you in

11:13:03  5  forming your opinions in this case?

11:13:11  6      A    Davis prepared the analysis of the SEC

11:13:20  7  Form Ds.

11:13:26  8           She reviewed the ERI surveys that were

11:13:37  9  used.

11:13:42 10           She read the same information that I

11:13:48 11  wrote -- that I relied upon, and reviewed the

11:13:52 12  letter once I had drafted it.

11:13:58 13           That was her role.

11:14:02 14      Q    And what was Ms. Ipavec's contribution

11:14:08 15  to your expert work in this case?

11:14:10 16      A    Ipavec, I believe, pulled -- That's a

11:14:18 17  technical term.  I'm sorry.

11:14:21 18           She researched the surveys and generated

11:14:24 19  the survey reports that were from ERI.

11:14:31 20           She also provided some clerical support

11:14:36 21  in the preparation of the letter.

11:14:54 22      Q    With respect to Ms. Davis' work on the

11:14:59 23  Form D piece of your opinions, what did you tell

11:15:03 24  her to do?

11:15:04 25      A    I told her to go to the EDGAR website to

                                                          52

11:15:22  1   basically find Form Ds that involved EB-5 offerings,

11:15:33  2   to compare it, to analyze those offerings in terms

11:15:44  3   of were any fees of any type -- be it commissions,

11:15:49  4   expenses, whatever -- to the promotors or to

11:15:55  5   someone, and to summarize that data on an initial

11:16:04  6   spreadsheet for my review.

11:16:07  7           Once she prepared that spreadsheet, I

11:16:11  8   reviewed -- I reviewed that work.  We discussed

11:16:18  9   inclusion or exclusion of some of the schedule Ds.

11:16:24  10  And so we refined the list to what was provided

11:16:29  11  in this case.

11:16:32  12          And she then performed a little statistical

11:16:38  13  analysis of it.  And we prepared this spreadsheet

11:16:45  14  that was attached to the initial letter.

11:16:51  15      Q    You explained for me that you asked

11:16:54  16  Ms. Davis to search EDGAR for Form Ds involving

11:16:58  17  EB-5 offerings.  Any other limitations associated

11:17:02  18  with that initial search?

11:17:03  19          So you wanted EB-5 offerings.  Any other

11:17:06  20  sort of guidance that you gave Ms. Davis about the

11:17:10  21  Form Ds that you wanted?

11:17:11  22      A    Not -- Yeah, not -- not that I recall.

11:17:14  23          I mean, you know, I asked her to --

11:17:19  24          Yeah, no.  No.  I said, well, let's look

11:17:22  25  at the universe -- It's, like, let's look at the

53

11:17:23  1   universe of Form Ds with EB-5s on them.   And then

11:17:28  2   let's see what we want to pull from -- pull from

11:17:31  3   that group.

11:17:34  4       Q     And, Mr. Ginsburg, do you know how

11:17:37  5   Ms. Davis specifically searched for these types

11:17:42  6   of EB-5 offerings on EDGAR?   What did she actually

11:17:48  7   do on the website?

11:17:49  8       A     Well, I -- I don't know specific -- I don't

11:17:54  9   know specifically how -- I don't know specifically

11:17:57  10  how she did it.

11:17:59  11          I mean, you know, I performed initially --

11:18:05  12  Excuse me.   I initially did an EDGAR search.   I

11:18:10  13  would have to go back and try to re-create it for

11:18:14  14  you.   I'm sure that's not the purpose of this.

11:18:18  15      Q     Sure.

11:18:19  16      A     And I -- You know, I put in some -- I

11:18:26  17  put in some key words and some -- and, you know,

11:18:31  18  a time frame -- a time frame.   And was able to

11:18:37  19  pull up any number of them.

11:18:39  20          So I think she did something similar.

11:18:41  21  She did something similar to that.

11:18:44  22      Q     In the universe of data that she brought

11:18:49  23  to you that you then discussed with her issues of

11:18:59  24  inclusion and exclusion, I take it that that first

11:19:03  25  cut was bigger than the 20 offerings that are

54

Exhibit 5 Page 157

11:19:06  1  summarized --

11:19:07  2       A    That is correct.

11:19:07  3       Q    -- in your report?

11:19:08  4       A    That is correct.

11:19:10  5       Q    Roughly speaking, how many offerings

11:19:13  6  did she find on the first cut?

11:19:15  7       A    I -- I would want to say 60?  Maybe 60

11:19:23  8  to 80.

11:19:27  9       Q    And can you describe for me the way in

11:19:30 10  which you reduced that field of 60 to 80 down to

11:19:33 11  the 20 that are referenced in your report?

11:19:37 12       A    Yeah.  Very basically, what we did was

11:19:39 13  that, if an entity filed a Form D and did not

11:19:45 14  indicate that any fees were taken, we eliminated

11:19:52 15  them from the report.

11:19:56 16       Q    And why did you do that?

11:19:59 17       A    Well, the reason why we looked at the

11:20:05 18  Form D was that, from my knowledge of the case,

11:20:18 19  Liu received some -- received commissions when

11:20:26 20  an interest was purchased.

11:20:29 21            I may be using not the technical term,

11:20:33 22  so forgive me for that.

11:20:36 23            So in looking in Liu's agreement, the only

11:20:42 24  agreement of his that we looked at, the agreement

11:20:45 25  said that he was entitled to a commission -- to

                                                          55

| | | |
|---|---|---|
| 11:25:37 | 1 | provide for any commissions or fees to the given |
| 11:25:40 | 2 | EB-5 promoter, as far as you could tell. |
| 11:25:43 | 3 | Is that correct? |
| 11:25:44 | 4 | A    Right, right. |
| 11:25:52 | 5 | Q    Let's return to Ms. Ipavec.  And you |
| 11:25:57 | 6 | testified that she assisted you in researching |
| 11:26:10 | 7 | the ERI surveys that you discuss in your report. |
| 11:26:16 | 8 | Is that right? |
| 11:26:17 | 9 | A    Correct. |
| 11:26:19 | 10 | Q    And so what did you tell Ms. Ipavec to do? |
| 11:26:23 | 11 | What were your instructions to her with |
| 11:26:25 | 12 | respect to that component of your analysis? |
| 11:26:28 | 13 | A    Sure, sure. |
| 11:26:28 | 14 | (Screen-sharing stopped.) |
| 11:26:29 | 15 | MR. LEUNG:  So what I instructed her |
| 11:26:31 | 16 | to do was -- |
| 11:26:33 | 17 | And this is what we do, because we |
| 11:26:35 | 18 | do use this survey source all the time in our |
| 11:26:41 | 19 | practice.  And what this survey source allows |
| 11:26:49 | 20 | us to do is to identify the industry that your |
| 11:27:07 | 21 | target employer is in, their geographic location, |
| 11:27:13 | 22 | their revenue, and then to select a job title. |
| 11:27:25 | 23 | And this is a very large survey and it |
| 11:27:29 | 24 | is commonly used in the compensation consulting |
| 11:27:35 | 25 | industry because it covers information -- I |

59

11:27:40  1   think in their advertising material, over 9,000

11:27:43  2   employers, you know, a very large number of

11:27:46  3   companies with great range.

11:27:52  4        So I went to Ms. Ipavec and I said,

11:27:56  5   okay.  We have a company.  This is the SIC code

11:28:00  6   or the NAICS code for the company.  They're

11:28:04  7   located in Los Angeles or they're in southern

11:28:07  8   California.

11:28:09  9        The revenue number -- I gave her a

11:28:12 10   revenue number.  And I said, and here are the

11:28:15 11   job titles to use.

11:28:17 12        She then goes to the survey.  She goes

11:28:19 13   to the survey source.

11:28:21 14        And this is all online.  They don't have

11:28:24 15   a hard-copy book, of course, which is what was

11:28:28 16   done in the past, the distant past.

11:28:32 17        And she downloaded the reports that,

11:28:34 18   again, are part of the exhibit package that

11:28:38 19   counsel had sent to you.

11:28:43 20        And she -- So she just generated the

11:28:49 21   reports.

11:28:49 22   BY MR. LEUNG:

11:28:59 23        Q    And similar question, though, kind of

11:29:02 24   the Form D analysis:  Did you rerun the reports

11:29:05 25   using different assumptions or was it just the

60

| | | |
|---|---|---|
| 11:29:08 | 1 | one cut? |
| 11:29:09 | 2 | A    On the Form Ds? |
| 11:29:10 | 3 | Q    On the ERI -- |
| 11:29:11 | 4 | A    Or the ERI -- or on the ERI? |
| 11:29:14 | 5 | Q    On the ERI. |
| 11:29:17 | 6 | A    I think -- I believe it was just -- |
| 11:29:23 | 7 | Excuse me.  My screen goes blank for a |
| 11:29:26 | 8 | while.  My computer falls asleep. |
| 11:29:36 | 9 | To the best of my recollection, I think |
| 11:29:38 | 10 | we only -- I think we ran it once.  I think we only |
| 11:29:45 | 11 | ran it once.  I could be wrong, but I'm not -- I |
| 11:29:49 | 12 | don't recall what facts would have changed from |
| 11:29:53 | 13 | those -- you know, from the SIC code or the job |
| 11:29:58 | 14 | code that would have changed that would have |
| 11:30:00 | 15 | caused us to rerun it. |
| 11:30:02 | 16 | So, you know, I will also say -- and, |
| 11:30:06 | 17 | again, I'm not sure it's super relevant to this |
| 11:30:09 | 18 | conversation -- that -- |
| 11:30:12 | 19 | And, really, Catherine Davis helped on this |
| 11:30:18 | 20 | part of it.  The reports that ERI gives are current, |
| 11:30:25 | 21 | real-time reports.  So if I ran a report on |
| 11:30:29 | 22 | February 1, 2021, it's going to give us the numbers |
| 11:30:35 | 23 | as of February 1, 2021. |
| 11:30:40 | 24 | We then have -- We then discount those |
| 11:30:43 | 25 | numbers to get back to the years at issue in the |

61

11:30:49  1    report -- 2012, 2013, whatever the time frame.

11:30:53  2    And we use the cost-of-living index to back those

11:30:59  3    numbers down.

11:31:00  4            And that calculation was made -- And that

11:31:02  5    calculation was made by Catherine Davis, and I

11:31:08  6    repeat that calculation.

11:31:09  7            So the numbers that you may see on those

11:31:11  8    reports, if you'll note, are going to be bigger

11:31:13  9    than the numbers that we put on our letter because

11:31:16 10    of the factoring in, the cost-of-living increases.

11:31:28 11        Q    Mr. Ginsburg, what are your approximate

11:31:29 12    billings to date for your time and that of your

11:31:35 13    team?

11:31:40 14        A    I'm -- An estimate?  $35,000.

11:31:49 15        Q    And have those fees been paid?

11:31:51 16        A    They have been paid.

11:31:53 17        Q    How have they been paid?

11:31:56 18        A    I -- I mean, like, you know, I've

11:32:04 19    received -- I checked -- I checked this morning

11:32:10 20    with our accounts receivable department, because

11:32:15 21    I thought this question may come up.

11:32:17 22            And they said they were -- I could ask

11:32:18 23    them.  I don't know.  Could have been ACH, could

11:32:21 24    have been a check, could have been a credit card.

11:32:23 25    I don't know.

                                                          62

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 162

11:42:17  1   offering in the past.  E, as in Edgar.  B, as

11:42:20  2   in boy.

11:42:21  3       A    No, I have not.

11:42:22  4       Q    Okay.  And, you know, before your

11:42:24  5   involvement in this case, have you had occasion to

11:42:27  6   address in any respect in your professional career

11:42:31  7   EB-5 investment offerings?

11:42:35  8       A    Not to the best of my recollection, no.

11:42:42  9       Q    Have you written in the past on the subject

11:42:46  10  of the medical industry?

11:42:57  11      A    Medical industry in general?

11:43:01  12      Q    Yeah, that's way too broad.  I'll strike

11:43:07  13  that.

11:43:08  14           Mr. Ginsburg, have you written papers,

11:43:11  15  articles, any sort of professional writing in

11:43:15  16  the past with respect to the business of medical

11:43:22  17  centers offering treatment of cancer by way of

11:43:31  18  proton therapy?

11:43:32  19      A    No.

11:43:33  20      Q    Okay.  Do you have any understanding

11:43:34  21  of proton cancer therapy?

11:43:39  22      A    I do not.

11:43:40  23      Q    So no understanding of its clinical

11:43:42  24  benefits?

11:43:43  25      A    No.

66

11:43:45  1      Q      And no understanding of the business

11:43:47  2  aspects associated with operating a medical

11:43:50  3  clinic that provides that cancer therapy.

11:43:55  4          Correct?

11:43:56  5      A      No.

11:44:19  6      Q      And aside from the two depositions that

11:44:21  7  you testified to at the start of today, in 1990 and

11:44:26  8  1999, you've not testified at a trial in the past,

11:44:32  9  have you?

11:44:32  10     A      No.

11:44:37  11     Q      And you've not --

11:44:39  12         Go ahead.

11:44:42  13     A      The -- The case in roughly 1990 did go

11:44:55  14  to trial, and I was a witness at that trial.

11:44:58  15     Q      Oh, okay.

11:44:59  16     A      Is that what you're asking?  Maybe I'm

11:45:02  17  not answering what you're asking.

11:45:04  18     Q      Yeah, I'll ask a better question.

11:45:06  19         I am drawing the distinction, sir, between

11:45:08  20  a deposition, like what we're doing today --

11:45:11  21     A      Right.

11:45:12  22     Q      -- and hearing, trial, or arbitration

11:45:14  23  testimony in front of a fact finder, whether it's

11:45:17  24  a judge or a jury.

11:45:18  25         Can you give me a list of your trial

67

| | |
|---|---|
| 11:52:55 | 1 |
| 11:53:00 | 2 |
| 11:53:05 | 3 |
| 11:53:09 | 4 |
| 11:53:12 | 5 |
| 11:53:20 | 6 |
| 11:53:27 | 7 |
| 11:53:30 | 8 |
| 11:53:31 | 9 |
| 11:53:34 | 10 |
| 11:53:34 | 11 |
| 11:53:36 | 12 |
| 11:53:40 | 13 |
| 11:53:44 | 14 |
| 11:53:48 | 15 |
| 11:53:51 | 16 |
| 11:53:51 | 17 |
| 11:54:06 | 18 |
| 11:54:06 | 19 |
| 11:54:09 | 20 |
| 11:54:13 | 21 |
| 11:54:17 | 22 |
| 11:54:20 | 23 |
| 11:54:20 | 24 |
| 11:54:22 | 25 |

the people who fill them.  Because the issue is more what would the market pay the employer to get a person to perform those tasks.

And that's -- And that's what my opinion -- That's how my opinion would help the trier.

Q    You spoke to many situations that you've seen and occurred in your career where a pre-revenue company pays its executives, notwithstanding the pre-revenue nature of the business at that time.

A    Sure.

Q    Can you think of any instance in which that outcome -- you know, compensation at the pre-revenue stage -- was paid notwithstanding an adjudicated finding of securities fraud and an adjudicated finding of that executive's looting of the company?

A    No.

(Exhibit 152 screen-shared.)

BY MR. LEUNG:

Q    Okay.  I am looking back to the first page of Exhibit 152.  We've talked about this before.  But, again, Exhibit 152 is a list of the facts or data that you considered in forming your opinions.

Is that right?

A    Right.  Correct.

Q    And Exhibit 152 is true and accurate and

72

| | | |
|---|---|---|
| 11:55:22 | 1 | study." |
| 11:55:23 | 2 | Next bullet point:  "The |
| 11:55:24 | 3 | complaint filed on May 26, 2016 |
| 11:55:27 | 4 | by the Securities and Exchange |
| 11:55:29 | 5 | Commission against Liu, Wang and |
| 11:55:32 | 6 | the three Project companies |
| 11:55:35 | 7 | (SACV 16-00974 (AGRX))" |
| 11:55:43 | 8 | And last bullet point: |
| 11:55:44 | 9 | "Employment agreement dated |
| 11:55:46 | 10 | June 28, 2012 between Charles |
| 11:55:49 | 11 | Liu and Pacific Proton Therapy |
| 11:55:52 | 12 | Regional Center LLP." |
| 11:55:55 | 13 | Did I read that right, sir? |
| 11:55:57 | 14 | A    You did. |
| 11:55:57 | 15 | Q    And so in forming your opinions you didn't |
| 11:56:00 | 16 | review any of the offering materials that Liu and |
| 11:56:04 | 17 | Wang provided to investors in the project. |
| 11:56:06 | 18 | Correct? |
| 11:56:07 | 19 | A    I did not. |
| 11:56:08 | 20 | Q    In forming your opinions you did not |
| 11:56:11 | 21 | consider the private offering memorandum that Liu |
| 11:56:16 | 22 | and Wang provided to investors in the project. |
| 11:56:18 | 23 | Correct? |
| 11:56:19 | 24 | A    I did not. |
| 11:56:21 | 25 | Q    In forming your opinions you did not |

74

11:56:24  1    consider the business plan that Liu prepared and

11:56:28  2    provided to investors in connection with their

11:56:32  3    investment with the project.

11:56:34  4           Correct?

11:56:35  5      A    I did not.

11:56:37  6      Q    Okay.  When forming your opinions, you did

11:56:40  7    not review any of the sworn testimony in this case.

11:56:43  8           Is that also correct?

11:56:45  9      A    That is correct.

11:56:47  10     Q    When forming your opinions, Mr. Ginsburg,

11:56:49  11   you did not consider any of the operating agreements

11:56:53  12   for the three entities under discussion -- that's

11:56:55  13   Pacific Proton, Beverly Proton, and the PPEB5 Fund.

11:57:05  14          Is that right?

11:57:06  15     A    I did not.  I did not.

11:57:08  16     Q    In forming your opinions, Mr. Ginsburg, you

11:57:09  17   did not consider any of the corporate minutes that

11:57:12  18   may or may not have been prepared in conjunction

11:57:15  19   with the three entities in this case -- that's

11:57:17  20   Beverly Proton, Pacific Proton, and PPEB5 Fund.

11:57:21  21          Correct?

11:57:22  22     A    I did not.  I did not.

11:57:23  23     Q    You did not speak with anyone that actually

11:57:25  24   worked for these three entities.

11:57:28  25          Fair?

75

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 167

11:57:29  1      A    I did not.

11:57:32  2      Q    You did not speak with anyone that did

11:57:35  3  business with any of the corporate entities.

11:57:37  4      Correct?

11:57:38  5      A    I mean -- And this may be splitting hairs,

11:57:47  6  right?

11:57:47  7      It is my understanding -- It is my

11:57:50  8  understanding that Marcum, my employer, prepared

11:57:53  9  some or all of the tax returns for those -- for

11:57:57  10  those entities.

11:58:00  11      And I've spoken with people at Marcum, but

11:58:05  12  I asked them to get me -- to get me the SIC code

11:58:13  13  that I used in the ER study, but that would be --

11:58:15  14  that would be the extent of it.

11:58:19  15      I know of no one, I've spoken to no one

11:58:22  16  who did any work for any of these entities.  So I

11:58:29  17  may be splitting hairs there with respect to Marcum.

11:58:34  18      Q    No, that's a very good clarification.

11:58:36  19      And that was the extent of the information

11:58:37  20  that you received --

11:58:38  21      A    Yeah, yeah.

11:58:39  22      Q    -- in conversations with folks at Marcum?

11:58:41  23      A    Yeah, yeah.

11:58:42  24      Q    In forming your opinions, Mr. Ginsburg,

11:58:44  25  you did not speak with any investors in the project.

                                                      76

```
12:00:19   1    the project.
12:01:00   2              MR. LEUNG:  Okay.  I'm sharing with
12:01:02   3    you my screen.  And I pulled up a document that
12:01:07   4    will be marked Exhibit 154.
12:01:09   5              (Exhibit 154 screen-shared.)
12:01:15   6              MR. LEUNG:  For the record, the first
12:01:16   7    page of this nine-page document bears the heading
12:01:19   8    "Employment Agreement."
12:01:20   9              And the very first paragraph of
12:01:22   10   Exhibit 154 reads:
12:01:24   11                 "This agreement is made by
12:01:25   12             and between Pacific Proton Therapy
12:01:28   13             Regional Center, LLC, a California
12:01:31   14             Limited Liability Company (hereinafter
12:01:34   15             called 'Company') and Charles C. Liu
12:01:37   16             (hereinafter called "Employee')."
12:01:41   17   BY MR. LEUNG:
12:01:42   18      Q    I'm going to flip through it for you,
12:01:44   19   but my first question for you, sir, is:
12:01:49   20             Do you recognize Exhibit 154?
12:01:54   21             And I will also note for the record
12:01:58   22   that Exhibit 154 bears the Bates number
12:02:03   23   Ginsburg.Supp.Report.000003 to -11.
12:02:19   24             So again, do you recognize Exhibit 154?
12:02:22   25      A    I -- I do.
```

78

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 169

| | | | |
|---|---|---|---|
| 12:02:24 | 1 | Q | What is it? |
| 12:02:25 | 2 | A | Well, it's an employment agreement between |

Liu and Pacific Proton Therapy Regional Center.

12:02:38   4   Q   And Exhibit 154 is one of the materials

12:02:40   5   that you relied upon --

12:02:41   6   A   Right.

12:02:42   7   Q   -- in forming your opinions.

12:02:44   8       Correct?

12:02:44   9   A   Correct.

12:02:46   10   Q   Okay.  I'm going to turn to section 6 on

12:02:51   11   page two entitled "Employee's Employment Duties."

12:02:55   12       Did you review section 6 in the course

12:02:58   13   of forming your opinions?

12:03:00   14   A   No, I did not.

12:03:03   15   Q   Okay.  And so section 6 is immaterial

12:03:09   16   to the opinions that you formed in this case.

12:03:12   17       Correct?

12:03:14   18   A   That is -- That is correct.

12:03:16   19   Q   All right.  I'll read it for the record.

12:03:18   20   Section 6, heading:

12:03:20   21           "Employee's Employment Duties:

12:03:23   22           "a. Employee shall be responsible

12:03:26   23       for the day-to-day operation of the

12:03:28   24       corporation and its production

12:03:29   25       facility."

79

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 170

12:03:32   1        Do you have any understanding of what Liu's

12:03:35   2   responsibilities for the day-to-day operation of the

12:03:40   3   corporation were, as represented in this agreement?

12:03:45   4        A    No.

12:03:49   5        Q    And subsection a. refers to day-to-day

12:03:53   6   operation of both the corporation and its production

12:03:56   7   facility.  Do you have any understanding of what

12:03:58   8   that production facility was?

12:04:03   9        A    No.

12:04:05  10        Q    Do you have any understanding of whether

12:04:07  11   the production facility called out in this agreement

12:04:13  12   actually existed at any point in human history?

12:04:18  13        A    Well, it would be my impression,

12:04:25  14   understanding, right, that had this project come to

12:04:32  15   fruition, that the production facility would have

12:04:38  16   been where the cancer treatments were provided.

12:04:47  17        Q    What was to be produced at this production

12:04:50  18   facility, Mr. Ginsburg, to your understanding?

12:04:52  19        A    Well, if -- if my --

12:04:55  20             Again, much of my understanding is based

12:04:58  21   on, really, the SEC -- the SEC complaint filed

12:05:07  22   against them.

12:05:08  23             My understanding was that the production

12:05:10  24   facility was to treat people with a certain type

12:05:15  25   of cancer using this proton therapy.  And I don't

80

12:05:19  1   really understand or know what that is.

12:05:22  2       Q    In the course of your long career in the

12:05:26  3   employee benefits field, Mr. Ginsburg, have you ever

12:05:29  4   heard a medical clinic being called a production

12:05:32  5   facility?

12:05:41  6       A    Have I heard it being called that?   No.

12:05:46  7   But, you know, that's kind of a scrivener's

12:06:02  8   description, you know, by the author of the

12:06:07  9   document.

12:06:07  10           (Reporter requests clarification.)

12:06:09  11      Q    I'll go on and read, for the record,

12:06:11  12   section 6, subsection b.

12:06:14  13               "In performing his job duties

12:06:16  14           for Company, Employee shall devote

12:06:18  15           his full time attention and efforts

12:06:21  16           to discharge the responsibilities

12:06:23  17           assigned to him, shall not in any

12:06:25  18           manner work for any other Company,

12:06:27  19           in any business related to or

12:06:29  20           unrelated to the business of the

12:06:30  21           Company, or to compete with Company

12:06:34  22           on an independent basis, or otherwise,

12:06:37  23           and shall perform such other duties

12:06:40  24           consistent with his position, as

12:06:43  25           may from time to time be assigned

81

12:06:45  1          to him by Company.  The term 'full

12:06:48  2          time,' for purposes of this Agreement

12:06:50  3          is agreed to be not less than forty

12:06:53  4          (40) hours per week."

12:06:56  5          Mr. Ginsburg, do you have any understanding

12:06:57  6  of whether Mr. Liu worked a full 40-hour per week

12:07:02  7  during the relevant period of time in which he was

12:07:05  8  assessed his reasonable compensation?

12:07:08  9     A    I have no information at all as to that.

12:07:12 10     Q    Do you have any understanding of whether

12:07:15 11  Liu, in the period of time in which you're offering

12:07:19 12  an opinion on what his reasonable compensation

12:07:21 13  should be, engaged in conduct for companies other

12:07:30 14  than Pacific Proton?

12:07:32 15     A    I have no -- I have no information on that.

12:07:41 16     Q    Do you have any understanding of whether

12:07:43 17  Mr. Liu, in the relevant time period, actually did

12:07:46 18  perform whatever duties were consistent with his

12:07:49 19  position according to this contract?

12:07:51 20     A    I do not have -- I do not have that

12:07:55 21  information.

12:08:01 22     Q    But it's your view that those factual

12:08:05 23  issues are irrelevant to the analysis that you

12:08:08 24  performed in this case.

12:08:09 25          Correct?

82

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 173

```
12:08:10  1      A    I -- That's my review[sic].

12:08:11  2           If we look at, you know, my -- the main

12:08:18  3   letter that I wrote, the March 25 letter, okay,

12:08:21  4   it's my -- it was my --

12:08:24  5           The facts as presented to me, and again,

12:08:27  6   is that he provided services to three different

12:08:35  7   entities at different points of time.  And my --

12:08:42  8   And my analysis was, what is reasonable comp for a

12:08:48  9   person providing services related to the title that

12:08:51 10   he was, you know, charged with providing for those

12:08:57 11   entities.

12:08:59 12           The amount of -- the amount of time that

12:09:02 13   he worked for those entities, the duties that he

12:09:04 14   actually performed, is irrelevant to my -- to my

12:09:09 15   report.  My report is what's reasonable compensation

12:09:12 16   for a person providing services related to that job

12:09:16 17   title during those periods.

12:09:22 18      Q    So, Mr. Ginsburg, that was helpful.  You

12:09:25 19   explained that it was your understanding that

12:09:27 20   Mr. Liu provided services to three different

12:09:30 21   entities at different points in time.

12:09:33 22           What services did Mr. Liu provide to PPEB5

12:09:39 23   Fund and at what time did he provide those services?

12:09:44 24      A    Well, if we go -- if we go back to my

12:09:49 25   letter of the 25th, okay...
```

                                                              83

Exhibit 5 Page 174

| | | |
|---|---|---|
| 12:10:00 | 1 | And I have a -- Kind of on page 4 of that |
| 12:10:08 | 2 | letter -- |
| 12:10:09 | 3 | There's no reason for you to bring it up, |
| 12:10:11 | 4 | right? |
| 12:10:13 | 5 | Q    I can bring it up.  I'll bring it up. |
| 12:10:17 | 6 | A    I mean, you can if you want to. |
| 12:10:21 | 7 | MR. LEUNG:  For the record, I'm displaying |
| 12:10:23 | 8 | for the witness page 4 of Exhibit 151. |
| 12:10:28 | 9 | (Exhibit 151 screen-shared.) |
| 12:10:28 | 10 | THE WITNESS:  And page 4, okay. |
| 12:10:29 | 11 | So for those years, that's -- So I wanted |
| 12:10:32 | 12 | to look at the table at the top of that page. |
| 12:10:34 | 13 | Right?  For those years, it is my understanding |
| 12:10:37 | 14 | that he provided those services during those periods |
| 12:10:41 | 15 | for each -- for each of the three entities from the |
| 12:10:47 | 16 | inception, from the inception date through May 26, |
| 12:10:53 | 17 | 2016.  Okay? |
| 12:10:55 | 18 | And if you go to -- if you go to the prior |
| 12:11:00 | 19 | page, page 3 of 5 of the report, it says that Liu's |
| 12:11:07 | 20 | job title in those periods was president -- was |
| 12:11:13 | 21 | president. |
| 12:11:14 | 22 | Wang -- Wang's job title was vice president |
| 12:11:16 | 23 | of marketing.  She only -- She only provided those |
| 12:11:21 | 24 | services.  Again, we're at the bottom of page 3. |
| 12:11:24 | 25 | There's a table there for two of the years.  And |

84

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 175

12:11:27  1   those were only provided to Beverly Proton.

12:11:31  2         So I -- So in my study, my study is

12:11:39  3   what does a person get paid serving as president,

12:11:44  4   in this case -- or vice president of marketing, in

12:11:47  5   Wang's case -- in those years for those -- for

12:11:51  6   entities in those fields that -- for those years.

12:11:56  7         And we did do a proration of the annual

12:12:01  8   pay from the inception date in 2010 and through

12:12:06  9   May 26, '16, for the 2016 year.

12:12:13  10        The actual services that were provided

12:12:14  11  by Liu or by Wang, I don't know exactly what they

12:12:17  12  did.  I based my study on what would a president

12:12:20  13  or a vice president of marketing be paid for

12:12:23  14  providing services for entities in these fields

12:12:28  15  during those periods.

12:12:29  16  BY MR. LEUNG:

12:12:39  17     Q    You said you don't know exactly what

12:12:43  18  Mr. Liu and Ms. Wang did.

12:12:45  19     A    No, I do not know what they did.

12:12:47  20     Q    Do you generally know what they did?

12:12:50  21     A    No.  I -- If they were the president and

12:12:56  22  the --

12:12:56  23        If Liu -- Pick on him.  If Liu was

12:12:59  24  president of the company, again, the surveys, the

12:13:06  25  survey source that I used, would have a generic

85

Exhibit 5 Page 176

```
12:13:15  1   job description for that role.  And I assume that
12:13:18  2   he provided the duties that were commensurate with
12:13:23  3   that generic job description.
12:13:26  4       Q    And I understand you've made that
12:13:29  5   assumption.  But you have no understanding as
12:13:31  6   to whether Mr. Liu or Ms. Wang actually performed
12:13:35  7   services commensurate with the generic job
12:13:39  8   description you've just testified to?
12:13:41  9       A    Correct.  Correct.
12:13:42  10      Q    Let's turn back to Exhibit 154.
12:13:45  11           (Exhibit 154 screen-shared.)
12:13:48  12           MR. LEUNG:  Again, for the record,
12:13:49  13  I'm displaying Exhibit 154 -- that's the
12:13:52  14  Pacific Proton-Liu employment agreement --
12:13:56  15  to the witness.
12:13:57  16  BY MR. LEUNG:
12:13:59  17      Q    Directing your attention to the very last
12:13:59  18  page, page 8 of 8 -- or is it 9 of 9.  9 of 9.
12:14:01  19           Do you see there are a couple of signature
12:14:04  20  blocks for this employment agreement?
12:14:07  21      A    Uh-huh.
12:14:08  22      Q    There's a signature block for Charles C.
12:14:11  23  Liu.
12:14:11  24           Do you see that?
12:14:12  25      A    Uh-huh.
```

86

```
12:24:20   1            Correct?
12:24:20   2        A   Correct.
12:24:22   3        Q   If it's the case that Dr. Thropay, who was
12:24:27   4   the chief executive officer of those three entities,
12:24:30   5   was not paid a dollar in compensation, would that
12:24:33   6   have any relevance to your opinion as disclosed
12:24:35   7   in this report that Mr. Liu was entitled, not to
12:24:39   8   nothing, but to $4.9 million?
12:24:42   9        A   It would not.  It would not.
12:24:44  10        Q   And once again, just I want to make clear
12:24:47  11   that I understand your opinions.
12:24:49  12            Mr. Liu's entitled not just to the
12:24:51  13   $4.9 million in compensation, but also an additional
12:24:55  14   $2.285 million and change, in the form of a
12:24:59  15   reasonable commission/finder's fee.
12:25:02  16            Correct?
12:25:02  17        A   That would -- Based on market rule, yes.
12:25:09  18        Q   So if Dr. Thropay gets paid nothing, that
12:25:13  19   doesn't mean anything for your analysis, sir?
12:25:16  20        A   That does not mean anything for my
12:25:18  21   analysis.
12:25:19  22        Q   Okay.  Returning to page 1, same paragraph,
12:25:22  23   I had read this sentence for you earlier.  You said
12:25:24  24   that Liu:
12:25:25  25            "...created and operated a
```

94

Exhibit 5 Page 178

| | | |
|---|---|---|
| 12:27:00 | 1 | reach that level. |
| 12:27:03 | 2 | Q    And do you know what amount of funds that |
| 12:27:05 | 3 | was that would have reached a sufficiency? |
| 12:27:11 | 4 | A    No.  I mean, I thought it was roughly -- |
| 12:27:12 | 5 | I thought there was some reference made to it in |
| 12:27:15 | 6 | the SEC complaint. |
| 12:27:17 | 7 | Here again, I haven't looked at that in |
| 12:27:19 | 8 | quite some time, so I don't -- Any knowledge I |
| 12:27:22 | 9 | would have about the amount of funds that needed |
| 12:27:25 | 10 | to be raised would have come from anything disclosed |
| 12:27:28 | 11 | in the complaint. |
| 12:27:29 | 12 | If it wasn't talked about in the complaint, |
| 12:27:33 | 13 | my assumption is, you know, that the project never |
| 12:27:36 | 14 | did get off the ground, quote-unquote.  And so that |
| 12:27:39 | 15 | would have theoretically been the reason for that |
| 12:27:42 | 16 | not to occur. |
| 12:27:43 | 17 | So no, I don't know what that number is. |
| 12:27:46 | 18 | Q    Okay.  And moving on to the second |
| 12:27:49 | 19 | paragraph underneath the section Background, I'm |
| 12:27:52 | 20 | going to read for you the second full sentence in |
| 12:27:55 | 21 | that paragraph.  It begins, "We understand..." |
| 12:27:58 | 22 | "We understand that Liu served |
| 12:28:01 | 23 | in the following roles: the President |
| 12:28:04 | 24 | of Pacific Proton Therapy Regional |
| 12:28:06 | 25 | Center, LLC; the sole manager of |

96

**GRADILLAS COURT REPORTERS**
(424) 239-2800

Exhibit 5 Page 179

| | | |
|---|---|---|
| 12:28:11 | 1 | Pacific Proton EB-5 Fund, LLC; and |
| 12:28:15 | 2 | the President and Treasurer of |
| 12:28:18 | 3 | Beverly Proton Center." |
| 12:28:21 | 4 | Again, and tell me if I'm wrong, |
| 12:28:25 | 5 | Mr. Ginsburg, but am I correct that you have no |
| 12:28:29 | 6 | specific understanding of what Mr. Liu did in |
| 12:28:33 | 7 | practice, what he actually did in his capacity |
| 12:28:36 | 8 | as president for Pacific Proton, sole manager |
| 12:28:41 | 9 | for the PPEB5 Fund, and president and treasurer |
| 12:28:46 | 10 | of Beverly Proton? |
| 12:28:48 | 11 | A    That is correct.  Again, those duties |
| 12:28:50 | 12 | and all that, those roles, I would have obtained |
| 12:28:57 | 13 | that information from the SEC's complaint. |
| 12:29:01 | 14 | Q    Okay.  And then, finally, the sentence |
| 12:29:04 | 15 | concludes with you writing: |
| 12:29:06 | 16 | "We also understand that Wang |
| 12:29:08 | 17 | served in the following role: the |
| 12:29:13 | 18 | Vice President of Marketing of |
| 12:29:15 | 19 | Beverly Proton Center." |
| 12:29:16 | 20 | Do you know what Wang did as VP of |
| 12:29:20 | 21 | marketing for Beverly Proton? |
| 12:29:22 | 22 | A    Right, I do not, except, again, from |
| 12:29:23 | 23 | what was described what her role was, in the SEC |
| 12:29:27 | 24 | complaint. |
| 12:29:29 | 25 | Q    Do you know how she came to become VP |

97

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 180

12:29:34  1    of marketing for Beverly Proton?

12:29:36  2        A      I don't have any independent information

12:29:39  3    of that aside from what it said in the complaint.

12:29:43  4        Q      Okay.  Next paragraph on page 2, at the

12:30:05  5    top of page 2 of Exhibit 151, you're laying out

12:30:09  6    your understanding as to the time periods in which

12:30:12  7    Mr. Liu and Ms. Wang performed services for the

12:30:15  8    entities.

12:30:16  9             Is that correct?

12:30:16 10        A      Right.

12:30:17 11        Q      The last sentence of the paragraph reads:

12:30:23 12                 "It is also our understanding

12:30:24 13             that Wang performed services for

12:30:25 14             the Beverly Proton Center during

12:30:26 15             2013 and 2014."

12:30:29 16             How did you come to that understanding?

12:30:31 17        A      It would have been in the SEC complaint.

12:30:33 18        Q      Okay.  And what about 2015 and 2016?

12:30:36 19    Do you have any knowledge of Ms. Wang performing

12:30:40 20    services for Beverly Proton in those years?

12:30:44 21        A      I do -- I do not.

12:30:45 22             And our -- You know, further on down in

12:30:49 23    this letter, you'll see that I only -- I limited

12:30:52 24    our calculation of what she was entitled to, to

12:30:56 25    those years.

                                                              98

Exhibit 5 Page 181

```
12:40:14  1   as president.  And we know that person is titled
12:40:19  2   as the president and they're supposed to perform
12:40:22  3   the job of president, there's no real reason for
12:40:25  4   me to attach that job description.
12:40:28  5       Q    And so you did not engage in any inquiry
12:40:32  6   as to whether what Liu actually did in 2010 through
12:40:37  7   2016 comported with the description that you would
12:40:43  8   have been able to obtain for a president from this
12:40:47  9   ERI survey database?
12:40:49  10      A    Correct.
12:40:50  11      Q    And by that same token, you did not engage
12:40:53  12  into any analysis as to whether what Ms. Wang did,
12:40:57  13  in actuality, from 2013 to 2014, comported with the
12:41:03  14  description for a vice president of marketing that
12:41:07  15  you would have been able to pull from ERI as a job
12:41:11  16  description report.
12:41:12  17           Correct?
12:41:13  18      A    Correct.
12:41:29  19           MR. LEUNG:  Real quick, I'm going to
12:41:30  20  show you what will be marked Exhibit 156.  Bear
12:41:35  21  with me a second.
12:41:36  22           (Exhibit 156 screen-shared.)
12:42:01  23  BY MR. LEUNG:
12:42:01  24      Q    This is later in the production.
12:42:03  25           For the record, it bears the Bates number
```

104

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 182

```
12:57:24  1      Q    Is that behind a pay wall?  I mean, this

12:57:27  2   is a paid service.  Correct?  ERI.

12:57:30  3      A    Well, yeah.  Well, yeah, but the NAICS

12:57:36  4   codes and SIC codes are available.  You know,

12:57:40  5   they're -- You can look them up.  You don't --

12:57:41  6      Q    Oh, I understand.  Okay.  Got it.

12:57:43  7      A    Maybe I'm misunderstanding your question,

12:57:45  8   but --

12:57:47  9           Yeah, no.  I have to go find that code,

12:57:50 10   type it into the -- type it into the system, the

12:57:54 11   survey system, and then this will pop up.

12:57:57 12      Q    Got it.

12:57:58 13           And then organization size, what does the

12:58:02 14   number 7,250,000 correspond to?

12:58:07 15      A    Okay.  Well, the system wants some figure

12:58:14 16   to use for the organization size.  In a simple

12:58:23 17   thing, the CEO of a local delicatessen, okay, will

12:58:33 18   probably be paid a lot less than the CEO of Subway.

12:58:42 19           And so you somehow have to indicate what

12:58:46 20   is the size of the organization that you are

12:58:52 21   representing here.  That's it.  Okay?

12:58:56 22           So there is a difference -- there is a

12:59:01 23   difference.  What we -- The organization size

12:59:06 24   refers to the annual revenue of the organization.

12:59:14 25           Now, in our case here, and in -- and we
```

111

12:59:17  1   have a little bit of not a typical situation in

12:59:25  2   the case before us, because, to my understanding,

12:59:30  3   we never had revenue in any of these entities

12:59:37  4   from ongoing operations.   Right?

12:59:40  5         You know, the -- You know, Beverly Proton

12:59:47  6   never really opened its doors, right?   The building

12:59:51  7   was never built and all that.

12:59:54  8         And so in that case what I have done in

12:59:57  9   my career, when I've had situations like this --

12:59:59 10   and I'll describe those in a second -- you have to

01:00:02 11   use -- you have to use something instead that really

01:00:06 12   deals with the capital raise -- you know, capital

01:00:10 13   raise, the essence of the company.

01:00:13 14         And so what I -- in my judgment, what I

01:00:15 15   did is, okay, I, for some reason -- Again, I haven't

01:00:20 16   looked at the numbers recently.   But again, you

01:00:24 17   know, I did determine that over the course of this

01:00:27 18   period -- this period, that approximately --

01:00:31 19         And I'm talking out of school here, so

01:00:46 20   that wouldn't be completely accurate.

01:00:46 21         (Reporter requests clarification.)

01:00:47 22         I'm talking -- I'm speaking roughly,

01:00:48 23   because I don't have the numbers in front of me.

01:00:52 24         Approximately $23 million, $24 million

01:00:55 25   was raised, was raised.   And so I divided that

                                                      112

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 184

01:01:03  1   by 3, 3 1/2, by some figure, and I came up with

01:01:08  2   the $7.25 million figure to use -- to use as an

01:01:15  3   estimation of revenue for purposes of running the

01:01:18  4   study.   I mean, I understand that none of these

01:01:23  5   entities had $7.25 million of income in any one

01:01:27  6   year -- in any one year, but I used that number

01:01:30  7   for the study.

01:01:32  8          You know, when you do this type of work,

01:01:35  9   and my reasoning for doing this is, when you're

01:01:41  10  doing work for a pre-revenue company, right, as we

01:01:46  11  were -- as we were here, okay?   You have to find

01:01:49  12  some way to determine what can we use for -- you

01:01:54  13  know, as company size, company value, for figuring

01:01:59  14  out these type of studies.

01:02:03  15         And, you know, I've done this for any

01:02:05  16  number of pre-revenue companies, as we know.   And

01:02:09  17  we see in the business pages all the time that

01:02:14  18  pre-revenue companies operate all the time.   They

01:02:17  19  get investor backing, venture capital backing,

01:02:20  20  whatever -- You know, whatever you want to call it,

01:02:22  21  investors will invest in them, to say, okay.   We

01:02:26  22  understand you're running at a loss and you're going

01:02:29  23  to run at a loss for a while, while you build and

01:02:32  24  create this business.   And then there's going to

01:02:35  25  be value to the company.

113

01:02:36  1       So we have to pick a figure.  And the

01:02:36  2   figures that I've used over the course of my career

01:02:39  3   is, I take a number -- you know, I'll take a number

01:02:45  4   based on the capital that's actually been raised

01:02:48  5   over the course of time, and I'm going to plug that

01:02:51  6   in.

01:02:52  7       Now, you will see as you look at one --

01:02:55  8   as you look at any of the schedules, as you look at

01:02:58  9   any of the schedules we have -- and right now the

01:03:00  10  one that's up is the Beverly Proton Center, and the

01:03:03  11  numbers are the same through -- for the position.

01:03:06  12  Right?

01:03:07  13      There's a difference.  You know?  We pick

01:03:10  14  the survey median, okay?  We use the median number,

01:03:15  15  that column, because the median represents what is

01:03:20  16  the market value of this position.

01:03:23  17      If you were to pay -- If you, the employer,

01:03:25  18  were to pay somebody at the 25th percentile or

01:03:28  19  the 10th percentile, you would run a risk of that

01:03:33  20  person, really, leaving for just the next place that

01:03:38  21  would offer him the market -- the market amount of

01:03:41  22  income.

01:03:42  23      If you pay at the 75th or the 90th

01:03:46  24  percentile we have there, those are usually paid

01:03:49  25  by companies that are viewed to be performing far

114

01:03:53 1  above the market in terms of their revenue or their

01:03:56 2  profitability or, you know, whatever reason it may

01:04:00 3  be.

01:04:00 4          So the median is used.  I mean, that's the

01:04:04 5  level at which an employee wouldn't leave for issues

01:04:10 6  solely related to pay.  Okay?

01:04:14 7          Below that, there's a good chance of that.

01:04:16 8  Above that, there's a very small chance of that.

01:04:20 9          They might leave for other reasons.  And

01:04:23 10 again, I'm a little off the point here.  They might

01:04:26 11 leave for other reasons.

01:04:27 12         So the median is what we use.  And you'll

01:04:29 13 see in this report that there is a significant

01:04:32 14 difference between what I had at the top as

01:04:35 15 7,250,000 and the million dollars, which is the

01:04:39 16 minimum level that can be used to generate any

01:04:42 17 results out of this survey, under the survey.

01:04:47 18         So that was my -- That was the methodology

01:04:50 19 that I have used for a number of years over my

01:04:54 20 career.

01:04:54 21         And I'm sorry for that being a long

01:04:57 22 explanation to a simple question.

01:04:59 23     Q    No, that's helpful.

01:05:02 24         This is Beverly Proton I'm looking at, the

01:05:07 25 first page of the document.  And the industry is

115

01:05:12  1   designated general medical and surgical hospitals.

01:05:15  2   Was Beverly Proton in the business of operating a

01:05:20  3   general medical and surgical hospital?

01:05:23  4       A    Based on the SIC code that I was provided

01:05:27  5   with, and I think was reported on their tax return,

01:05:30  6   that was the -- that was the code.

01:05:33  7           Now, when I look -- You know, when I did

01:05:36  8   some of the research on the SIC codes, there are,

01:05:43  9   in the SIC and NAICS classifications, other types

01:05:49  10  of medical facilities, for lack of a better word,

01:05:54  11  okay, of other medical facilities that were listed.

01:05:58  12          And there are some specialized -- There

01:06:02  13  were some specialized types of medical facilities,

01:06:09  14  but none of which related -- related to a cancer

01:06:17  15  center.

01:06:21  16          Proton, you know, which I think is kind

01:06:22  17  of -- which I sense is kind of a newer thing, right?

01:06:25  18  Not there.  Cancer, not there.

01:06:27  19          I think a special service would be, like,

01:06:30  20  mental health is one that's broken up.  They've got

01:06:34  21  their own NAICS code.  Okay?

01:06:38  22          This didn't.  This didn't.  So the codes

01:06:40  23  to a general medical and surgical hospital fits in

01:06:44  24  this situation.

01:06:47  25          If there would have been an NAICS code that

116

01:06:53  1   said cancer center, I would have used that.   I would

01:06:55  2   have used that.   But there is not.

01:06:57  3       Q     Was there a Beverly Proton general medical

01:07:02  4   hospital?

01:07:04  5       A     In existence?

01:07:06  6       Q     Yes.

01:07:07  7       A     My impression from reading the SEC

01:07:11  8   complaint is that there was not.

01:07:12  9             But, again, this was the code that was

01:07:15  10  used on whatever tax filings they used.

01:07:24  11      Q     Was there a Beverly Proton surgical

01:07:27  12  hospital?

01:07:28  13      A     In existence?   Again, not that I'm aware

01:07:32  14  of.

01:07:35  15      Q     Did Beverly Proton provide medical services

01:07:39  16  to a single patient in a hospital setting?

01:07:42  17      A     I have no -- My impression would be no.

01:07:47  18  I have no independent knowledge of that occurring.

01:07:50  19      Q     Did Beverly Proton provide surgical

01:07:53  20  services to a single patient in a hospital setting?

01:07:56  21      A     I have no independent knowledge of that.

01:08:02  22      Q     Did Beverly Proton employ any nurses?

01:08:09  23      A     I have no information on that.   I don't

01:08:11  24  know.

01:08:12  25      Q     Any doctors?

117

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 189

01:08:14  1       A     I do not have any -- I have no information

01:08:17  2   on that.

01:08:31  3       Q     Turning to page 3 of Exhibit 156, this is

01:08:34  4   the report for Pacific Proton EB-5 Fund.  That's

01:08:40  5   the PPEB5 Fund.

01:08:41  6             Same industry code.  Right?

01:08:42  7       A     Yes.

01:08:43  8       Q     SIC, 8062?

01:08:43  9       A     Right.

01:08:43  10      Q     And that code corresponds to general

01:08:45  11  medical and surgical hospitals?

01:08:46  12            (Reporter requests clarification.)

01:08:47  13      A     Oh.  That's what that code relates to, yes.

01:09:08  14      Q     And so you assume, for purposes of your

01:09:10  15  expert analysis in this case, Mr. Ginsburg, that

01:09:15  16  PPEB5 Fund was in the industry of general medical

01:09:19  17  and surgical hospitals.

01:09:21  18            Correct?

01:09:21  19      A     Yeah, that is correct.  Based on the

01:09:22  20  filings that were made by that entity, that was

01:09:25  21  the SIC code that was provided to me that they --

01:09:32  22  that was used.

01:09:32  23            (Exhibit 14 screen-shared.)

01:09:55  24            MR. LEUNG:  Showing for the witness

01:09:56  25  a document that's been previously marked

                                                           118

| | | |
|---|---|---|
| 01:16:01 | 1 | in your Appendix A.  Are those the entire universe |
| 01:16:05 | 2 | of Form D filings that you considered in forming |
| 01:16:08 | 3 | your opinions? |
| 01:16:08 | 4 | A    Yes. |
| 01:16:11 | 5 | Q    Did you review the offering materials for |
| 01:16:14 | 6 | any of those 20 unregistered offerings? |
| 01:16:19 | 7 | A    I did not.  My -- My review was strictly |
| 01:16:23 | 8 | limited to the Form D filings. |
| 01:16:26 | 9 | Q    Did you have any understanding of what |
| 01:16:30 | 10 | kinds of EB-5 projects were being funded by the |
| 01:16:35 | 11 | 20 unregistered offerings listed in Appendix A? |
| 01:16:40 | 12 | A    Yes. |
| 01:16:42 | 13 | Q    And what did you -- |
| 01:16:44 | 14 | What information were you able to glean |
| 01:16:46 | 15 | from the Form Ds? |
| 01:16:52 | 16 | A    They were in a variety of industries.  I |
| 01:17:02 | 17 | recall that perhaps one was related to healthcare. |
| 01:17:14 | 18 | There were -- |
| 01:17:17 | 19 | You know, they were across the country. |
| 01:17:20 | 20 | They were -- |
| 01:17:21 | 21 | But these are not all EB-5s related to |
| 01:17:27 | 22 | healthcare projects. |
| 01:17:30 | 23 | Q    Do you recall which of these unregistered |
| 01:17:34 | 24 | offerings was intended to finance a healthcare |
| 01:17:40 | 25 | business? |

124

```
01:28:18   1              Okay.  Yeah, I will -- This appears to
01:28:22   2    be a true and accurate copy.
01:28:28   3              MR. LEUNG:  All right.  Let's go back
01:28:30   4    to Exhibit 151, still displaying it on your
01:28:34   5    screen through Webex --
01:28:36   6              THE WITNESS:  Yeah.
01:28:36   7              (Exhibit 151 screen-shared.)
01:28:36   8    BY MR. LEUNG:
01:28:36   9       Q    -- and returning to Appendix A.
01:28:39  10              Are you with me?
01:28:40  11       A    Yeah.
01:28:45  12       Q    Of the 20 unregistered EB-5 offerings
01:28:48  13    listed in your Appendix A, which you considered
01:28:51  14    in forming your opinions in this case, do you
01:28:53  15    know whether any of the offering materials for
01:28:55  16    these investment offerings clearly delineated
01:28:59  17    the appropriate use of investor funds?
01:29:04  18       A    Well, I didn't -- I didn't review any of
01:29:08  19    the underlying offerings.  So I cannot -- I can't
01:29:13  20    answer that.  I did not look at those.
01:29:17  21       Q    Mr. Ginsburg, for --
01:29:18  22              Go ahead.
01:29:19  23       A    No, no.  I -- No, go on.  Go on.
01:29:24  24       Q    For the 20 EB-5 investment offerings listed
01:29:29  25    in your Appendix A that you relied on in forming
```

130

01:29:32  1   your opinions in this case, do you know whether

01:29:35  2   those offerings had materials that capped offering

01:29:41  3   expenses, commissions, and fees incurred in

01:29:45  4   connection with the offering at a set amount?

01:29:48  5        A    I -- I don't -- I don't believe so because,

01:29:59  6   again, when you look -- Again, all I looked at was

01:30:02  7   the Form Ds.  And I don't believe the Form Ds

01:30:10  8   discuss a cap.

01:30:12  9            It talks about the minimum investment.

01:30:16  10  It -- You know, you can have -- Sometimes there can

01:30:31  11  be a clarification of response that might discuss it

01:30:34  12  a little bit, but I don't -- There's no requirement.

01:30:38  13  There's no checkbox that says what's the cap on that

01:30:43  14  Form D.

01:30:47  15       Q    And so you don't know, with respect to

01:30:49  16  any of these 20 unregistered EB-5 offerings,

01:30:53  17  whether investors were told that offering expenses,

01:30:56  18  commissions, and fees incurred in connection with

01:30:59  19  the offering would be capped at a set amount.

01:31:01  20           You don't know that.  Right?

01:31:02  21       A    I don't have that independent knowledge,

01:31:04  22  unless it's broken out -- and I'd have to go back

01:31:08  23  through all the files -- unless it's broken out as

01:31:13  24  a note on the Form D.

01:31:15  25       Q    Mr. Ginsburg, what is Overseas Chinese?

                                                              131

01:43:42  1          No reasonable party managing the

01:43:44  2          development of an EB-5-compliant

01:43:47  3          proton therapy center in accordance

01:43:49  4          with the representations made to

01:43:50  5          investors would allow construction

01:43:52  6          to languish while funneling millions

01:43:55  7          of dollars to themselves, to foreign

01:43:57  8          entities they controlled, and to

01:43:59  9          foreign entities tasked with enticing

01:44:01 10          more investors."

01:44:03 11          Do you disagree with that factual finding

01:44:05 12  of the court?

01:44:08 13          MR. GOURAIGE:   Objection.  Again, this

01:44:09 14  has nothing to do with the witness' designation

01:44:14 15  as an expert witness under his reasonable

01:44:19 16  compensation study.  It is absolutely irrelevant

01:44:22 17  to his testimony.  And it's just basically,

01:44:25 18  frankly, a waste of time.

01:44:29 19  BY MR. LEUNG:

01:44:30 20      Q    Answer the question.

01:44:31 21      A    My -- My response is, I have no basis

01:44:34 22  to determine whether or not the receipt was

01:44:41 23  negligent, whether what they did was reasonable

01:44:44 24  or unreasonable.

01:44:46 25          I actually have no understanding of what

                                                              141

01:44:50  1    it was that Liu and Wang did or did not do with

01:44:55  2    any funds that were raised for this program.

01:45:12  3        Q    Well, were you asked to give consideration

01:45:14  4    to those facts, the adjudication of securities fraud

01:45:20  5    and the actual findings of the court?

01:45:22  6            Did counsel direct you to consider those

01:45:26  7    exigent -- that exigent information in forming

01:45:28  8    your opinions?

01:45:30  9        A    He did not.  And everything --

01:45:34  10       Q    Did you ask him about it?

01:45:36  11       A    Pardon me?

01:45:37  12       Q    Did you ask about it?

01:45:38  13       A    I did not.  I did not because, again, it

01:45:41  14   is irrelevant to the study that I had done, which

01:45:46  15   is what would the marketplace pay people to fill

01:45:50  16   these positions.

01:45:52  17           So what happened, what actually happened,

01:45:54  18   is irrelevant to my determination.

01:45:57  19           And as I said before, this is the first

01:45:59  20   time I've seen this summary judgment report or any

01:46:04  21   other report related -- any legal report related

01:46:09  22   to this entire matter aside from the SEC original

01:46:14  23   complaint.

01:46:17  24       Q    And, Mr. Ginsburg, if what actually

01:46:19  25   happened is irrelevant to the opinions you formed

                                                            142

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 5 Page 195

01:46:22  1    in this case, how do your opinions fit the facts

01:46:26  2    of this case?

01:46:35  3        A    I guess I'm not quite following what

01:46:39  4    you're -- what you're asking.

01:46:43  5        Q    We can move on.

01:46:45  6             In your report you opine that -- this

01:46:47  7    is a quote:

01:46:47  8                  "...our calculation of

01:46:48  9             reasonable total compensation

01:46:50 10             to Liu for the 2011-2016 period

01:46:54 11             (including all commissions) is

01:46:55 12             $7,211,692..."

01:46:57 13             Now, that $7.2 million is more than the

01:47:00 14    $6.7 million in money referenced by Judge Carney

01:47:07 15    in his order.  He described that compensation as

01:47:10 16    exorbitant and contrary to the representations

01:47:13 17    made in the private offering memorandum.

01:47:15 18             Is "reasonable," as you use the term in

01:47:18 19    your report, synonymous with "exorbitant"?

01:47:25 20             MR. GOURAIGE:  Objection to the

01:47:26 21    question.  The judge's opinion was not conducting

01:47:31 22    a reasonable compensation study to determine

01:47:35 23    what the market would pay anyone performing the

01:47:39 24    functions that Liu and Wang were performing.  So

01:47:44 25    this is like two ships passing each other in the

143

```
 1              REPORTER'S CERTIFICATION
 2      I, Marty E. McArver, Registered Diplomate
 3  Reporter and Certified Shorthand Reporter #2769 in
 4  and for the State of California, do hereby certify:
 5      That the witness was administered the oath
 6  remotely by me pursuant to California Senate Bill
 7  1146, signed into law on September 18, 2020,
 8  allowing the witness to be sworn remotely;
 9      That the deposition was then taken via Webex
10  internet videoconference before me at the time herein
11  set forth; that the testimony and proceedings were
12  reported stenographically by me and later transcribed
13  into typewriting under my direction; that the foregoing
14  is a true record of the testimony and proceedings heard
15  and understood by me at that time; and that counsel
16  requested that the witness read and sign the deposition
17  transcript.
18      I further certify that I am not interested in
19  the outcome of said action, nor am I connected with
20  nor related to any of the parties in said action, nor
21  to their respective counsel.
22      IN WITNESS WHEREOF, I have hereunto set my hand
23  this 21st day of April, 2021.
24  _____
25          MARTY E. McARVER, CA CSR #2769
```

Exhibit 5 Page 197

# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4     _____
                                   )
 5     SECURITIES AND EXCHANGE     )
       COMMISSION,                 )
 6                                 )
            Plaintiff,             )
 7                                 )
         vs.                       ) No. SACV 16-00974-CJC
 8                                 )     (AGRx)
       CHARLES C. LIU; XIN WANG    )
 9     a/k/a LISA WANG, et al.,    )
                                   )
10          Defendants.            )
       _____)
11
12
13
14          REMOTE DEPOSITION OF JOHN THROPAY, M.D.
15                 ZOOM VIDEOCONFERENCE
16                Friday, March 5, 2021
17                     Volume I
18
19
20
21     Reported by:
       VALERIE D. GRANILLO
22     CSR No. 11469
       Job No. 4413389
23
24
25     PAGES 1 - 144

                                          Page 1
```

```
 1                    Friday, March 5, 2021

 2                       9:00 a.m.

 3

 4                  JOHN THROPAY, M.D.,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8         MR. GOURAIGE:  Dr. Thropay, my name is Herve

 9    Gouraige.  I'm an attorney for Charles Liu and Lisa Wang

10    in this SEC enforcement act.

11         MR. LEUNG:  Gary Leung for plaintiff.

12         MS. WHITE:  Molly White for the witness, Dr. John

13    Thropay.

14                       EXAMINATION

15    BY MR. GOURAIGE:

16     Q    Dr. Thropay, have you had experience in having

17    your deposition taken before?

18     A    Yes.

19     Q    So I'm sure you're familiar with some ground

20    rules.  But because of our current pandemic -- and I

21    appreciate that both you and your attorney are wearing

22    face masks -- I'm going to ask you to speak up a bit so

23    both I and the court reporter can hear you when you answer

24    the question.  Okay?

25     A    Uh-huh.
```

                                                    Page  7

Exhibit 6 Page 199

```
 1    get another exhibit for you.  Bear with me a second.

 2               (Exhibit 81 was marked for identification by

 3               the court reporter and is attached hereto.)

 4               MR. GOURAIGE:  Dr. Thropay, you should now see

 5    Exhibit 81.

 6               MS. WHITE:  Hold on.  It's still loading.

 7               MR. GOURAIGE:  Okay.  It's incredibly slow.  I

 8    don't understand why.

 9               MS. WHITE:  We have it.

10    BY MR. GOURAIGE:

11       Q    Dr. Thropay, once you look at it, tell me if you

12    recognize the document.

13       A    This, I don't know.

14       Q    You've never seen this document?

15       A    Only in the last few days when they pulled out

16    documents to send to you.  I just saw this maybe a week

17    ago.

18       Q    So you don't know what this is?

19       A    No.

20       Q    Up in the first paragraph where it refers to 111

21    West Beverly Boulevard, that is the address of your lot

22    where the Beverly Center was going to be built, right?

23       A    Correct, uh-huh.

24               MR. GOURAIGE:  Okay.  So we'll go on to the next

25    exhibit.  You should be seeing Exhibit 82, Dr. Thropay.
```

Page 97

1      A    Yes.

2      Q    Did she speak at that meeting?

3      A    I don't recall.

4      Q    Did you talk with her about what her role was in

5   the project?

6      A    Yes.

7      Q    And did you ask her what it was?

8      A    Yes.

9      Q    What did she tell you?

10     A    She would help set up meetings.  And also she

11  started her own company on the side to do some auxiliary

12  work, I guess, to help her husband.  And she would sell

13  EB-5 and try and promote sales.  Meetings that I went to,

14  she would set up everything and sometimes introduce a

15  speaker.  And she was just there to help is all I could

16  see, and that's what she would explain to me.

17     Q    Did she have anything to do with the finances?

18     A    She seemed to be acutely aware of finances.

19     Q    And what did she say that led you to believe

20  that?

21     A    She didn't tell me anything, but I would hear her

22  speaking to her husband in the van.

23     Q    You would hear her speaking to her husband.  And

24  what would she be saying to her husband?

25     A    She'd be asking about money.

Page 105

1       A    No, in her English and courtesies, you know, the

2   standard, you know, how are you and what have you.

3       Q    Didn't say much beyond that?

4       A    Correct.

5       Q    At any time did you and Charles discuss having a

6   position for Lisa Wang in the Beverly Center after the

7   center was built?

8       A    Mostly he would tell me what he was doing.  There

9   was very little discussion.  But yes, he did say she was

10  working with him.

11      Q    He told you that when?

12      A    When we went to China and she was there.  When

13  she came to the office, it was just the polite hello.  But

14  when we were there, I saw she took an active role.  And he

15  said she was helping him and also starting her own

16  business.

17      Q    Did she tell you what she did in China for the

18  project?

19      A    No, but I saw her selling EB-5s.

20      Q    I'm sorry.  What do you mean selling EB-5s?

21      A    When I was there, she was in discussion with a

22  family, and it was without the knowledge of Delsk.  And

23  she sold an EB-5 share to someone, and they were

24  celebrating.  They were very happy.  And I was told not to

25  say anything to Delsk.

                                              Page 108

```
 1                I, the undersigned, a Certified Shorthand

 2     Reporter of the State of California, do hereby

 3     certify:

 4                That the foregoing proceedings were taken

 5     before me at the time and place herein set forth;

 6     that any witnesses in the foregoing proceedings,

 7     prior to testifying, were administered an oath; that

 8     a record of the proceedings was made by me using

 9     machine shorthand which was thereafter transcribed

10     under my direction; that the foregoing transcript is

11     a true record of the testimony given.

12                Further, that if the foregoing pertains to

13     the original transcript of a deposition in a Federal

14     Case, before completion of the proceedings, review

15     of the transcript [X] was [ ] was not requested.

16                I further certify I am neither financially

17     interested in the action nor a relative or employee

18     of any attorney or any party to this action.

19                IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21     Dated: March 17, 2021

22

23                       Valerie D. Granillo

24                       VALERIE D. GRANILLO

25                       CSR No. 11469
```

Page 144

# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4      _____
                                      )
 5      SECURITIES AND EXCHANGE       )
        COMMISSION,                   )
 6                                    )
              Plaintiff,              )
 7                                    )
           vs.                        ) No. SACV 16-00974-CJC
 8                                    )      (AGRx)
        CHARLES C. LIU; XIN WANG      )
 9      a/k/a LISA WANG, et al.,      )
                                      )
10            Defendants.             )
        _____)
11
12
13
14       REMOTE DEPOSITION OF RUTH THROPAY LOPEZ NOVODOR
15                  ZOOM VIDEOCONFERENCE
16              Monday, February 22, 2021
17                     Volume I
18
19
20
21      Reported by:
        VALERIE D. GRANILLO
22      CSR No. 11469
        Job No. 4413391
23
24
25      PAGES 1 - 189
```

                                            Page 1

```
 1                    Monday, February 22, 2021

 2                         9:15 a.m.

 3

 4              RUTH THROPAY LOPEZ NOVODOR,

 5     having been administered an oath, was examined and

 6     testified as follows:

 7

 8          MR. GOURAIGE:  Gary, do you want to note

 9     appearances before we start?

10          MR. LEUNG:  Yes, please.  You want to go ahead?

11          MR. GOURAIGE:  Yeah, I'll start.  Herve Gouraige

12     of Sills Cummis & Rose, Ms. Novodor.  I represent the

13     defendant in this case, Charles Liu, and his wife.  I'm

14     not sure I'm pronouncing her first name correctly, Xin

15     Wang or Lisa Wang.

16          THE WITNESS:  Thank you.

17          MR. LEUNG:  Good morning, Ms. Novodor.  Gary

18     Leung for plaintiff SEC.

19          THE WITNESS:  Good morning.

20          MS. GOLDSTEIN:  Good morning, Counsel.  Anya

21     Goldstein for the witness, Ruth Lopez Novodor.

22                         EXAMINATION

23     BY MR. GOURAIGE:

24       Q   Ms. Novodor, let me start with a preliminary

25     question.  Could you just state your full name for the
```

                                                        Page 8

Exhibit 7 Page 205

```
 1      A    No.

 2      Q    Okay.  After your attorney's letter to Mr. Liu

 3   dated December 1, 2015, what was the state of

 4   communications between you and Mr. Liu?  Did you talk with

 5   him after that?

 6      A    No.

 7      Q    In fact, on January 19th, 2016, he removed your

 8   brother from the project; isn't that correct?

 9      A    According to his documentation, yes.

10           MR. GOURAIGE:  No further questions at this

11   point.  Gary, it's your witness.

12                      FURTHER EXAMINATION

13   BY MR. LEUNG:

14      Q    Ms. Wang, Lisa Wang, Mr. Lui's spouse, you

15   testified you met her about three or four times, right?

16      A    I can't hear you if you're talking to me.

17      Q    Am I muted or I should just speak up?  I need to

18   speak up?

19      A    Speak up a little, yes, please.

20      Q    Okay.  Okay.  Let me ask you a couple questions

21   about Ms. Wang, Mr. Lui's wife.

22      A    Yes.

23      Q    Was it ever your understanding that she was an

24   employee of Beverly Proton?

25      A    I did not know what her role was in Beverly
```

Page 179

Exhibit 7 Page 206

1    Proton.  I know that she was helping him market.  That's

2    all I know.

3        Q    And so if she had no formal employment

4    relationship with Beverly Proton until, say, February

5    2016, can you think of any reason why she'd be receiving

6    close to a million dollars in the form of one single

7    transfer from Beverly Proton's corporate account?

8            MR. GOURAIGE:  Object to lack of foundation to

9    the question.  I think you should ask her first if she has

10   any knowledge of services she provided.

11   BY MR. LEUNG:

12       Q    Any idea why she might have been getting a

13   million dollars from the Beverly Proton corporate account

14   without any formal employment relationship with Beverly

15   Proton?  It seems a bit odd.

16       A    Mr. Leung, I was not aware of whatever

17   relationship she had.  I'm sorry.  I can't address what

18   she did, what she didn't do other than she did marketing.

19   I was not privy to what she was getting paid or not paid

20   until I read all the transcripts.

21       Q    What was your understanding of the marketing work

22   that Ms. Wang was engaged in?

23       A    Well, she helped put the marketing materials

24   together.  She would set up travel plans for Dr. Thropay

25   across the country and China to meet doctors.  And that

Page 180

1              I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16             I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19             IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: March 3, 2021

23                          *Valerie D. Granillo*

24                          VALERIE D. GRANILLO

25                          CSR No. 11469

                                          Page 189

# EXHIBIT 8

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                     Plaintiff,      )
6                                    ) Case No.
             vs.                     ) 8:16-cv-00974-CJC-AGR
7                                    )
    CHARLES C. LIU; XIN WANG         )
8   a/k/a LISA WANG; PACIFIC         )
    PROTON THERAPY REGIONAL          )
9   CENTER, LLC; PACIFIC PROTON      )
    EB-5 FUND, LLC; and BEVERLY      )
10  PROTON CENTER, LLC f/k/a         )
    LOS ANGELES COUNTY PROTON        )
11  THERAPY, LLC,                    )
                                     )
12                   Defendants.     )
    _____)

13

14

15

16

17     REMOTE VIDEO DEPOSITION OF XIN WANG aka LISA WANG

18                    FEBRUARY 25, 2021

19              CONDUCTED VIA VIDEOCONFERENCE

20

21

22

23
    Reported by
24  Cynthia J. Vega, RMR,
    RDR, CSR 6640, CCRR 95
25  Job No. 210225CJV

                                                          1

05:42:34 1    United States in advance and receive treatment from

2    our facility.  These are the things that -- these are

3    things like these.  So these are the presentations

4    that I made.

05:42:49 5        Q.    Ms. Wang, the clients you refer to, those

6    were potential investors in your EB-5 project in the

7    United States; correct?

8        A.    Yes.  However, it was not to a particular

9    individual.  Just many people want to learn projects

05:44:28 10    and wanted to make investments, not necessarily to

11    invest in this project, but in China there are many

12    people who wanted to invest overseas.  Many clients

13    who -- they want to choose projects; therefore, they

14    would ask about the -- your project, what is the

05:44:53 15    proton?  What's the use of it?  Because perhaps I knew

16    a bit more than them.

17          So they would ask me.  In addition, they

18    would ask me about -- ask me to tell them briefly

19    about what -- about the proton.  And also since they

05:45:18 20    knew that I had lived in the United States for many

21    years, so they will also wanted to talk with me about

22    the cultures and about the habits and things like that

23    in the -- of the United States.

24        Q.    Ms. Wang, when did you first start giving

05:45:37 25    these presentations on proton therapy?

18

05:46:22  1      A.   I do not recall clearly.  It's not the -- at

2   the very beginning -- the first time about the proton,

3   I do not recall clearly.  It's about -- I do not

4   recall.  It was at the time of the project, at the

05:46:46  5   start before the project is being promoted in China,

6   around that time.

7      Q.   When you say "project" -- when you say

8   "project," you're referring to the Beverly Proton?

9      A.   Yes.  Yes.  I think it was the year '14, but

05:47:32 10   I do not recall clearly.  It was when they were about

11   to start the promotion.

12      Q.   2014?  2014?

13      A.   I think that's the date.  At the time I

14   remember there was a trade -- a show and the people

05:48:23 15   attending the show would ask a question and they would

16   discuss about it.  It was at a show, what I remember.

17   But as to which year, I think it was year '14.

18      Q.   And was it your understanding that Beverly

19   Proton was to develop a proton therapy cancer center

05:48:45 20   in Montebello, California?

21      A.   Yes.  It's at the site of the Beverly

22   hospital.

23      Q.   And that project needed capital to occur;

24   right?  You needed money to build the center; correct?

05:49:46 25      A.   That would be needed.

19

05:49:51  1      Q.   Part of that capital was to come from EB-5

2   investors from China.   Is that your understanding?

3      A.   Yes.

4      Q.   And you were involved in that process when

05:50:16  5   you were presenting to folks about proton therapy and

6   explaining to them how that therapy worked to treat

7   cancer; correct?

8           MR. GOURAIGE:   Objection to the word

9   "process."   I don't understand that.

05:51:04 10           THE WITNESS:   I do not understand either.

11           THE INTERPRETER:   Before we proceed, the

12   interpreter would request -- with all due respect,

13   would like to request that the witness's counsel wait

14   until the interpreter finish the interpretation of the

05:51:21 15   question before raising his objection.

16           MR. GOURAIGE:   That's fine.

17   BY MR. LEUNG:

18      Q.   I'll ask a different question.

19           The presentations that you gave beginning in

05:51:34 20   2014, that wasn't your hobby.   It was your job; right?

21      A.   How should I understand this?   Because at the

22   time that my father was already diagnosed with cancer

23   and which -- without me, but my husband told me about

24   this work and about this proton system in the United

05:53:26 25   States, which has very good efficacy on treating

20

06:18:03   1   the million dollars from the project company's

2   corporate account to your Chase personal account in

3   March 2016?

4        A.   I remember there was such a fund transferred

06:19:00   5   to my account, but as to specific to the time and to

6   the specific bank card information, that I do not

7   recall.

8        Q.   Why were you receiving a million dollars from

9   Beverly Proton in March of 2016?

06:19:36  10        A.   That's the wage they had promised before to

11   pay me.

12        Q.   Who promised to pay you a million dollars

13   before?

14        A.   At the time when the promise was made, there

06:21:25  15   was not a specific figure of 100 -- 1 million or

16   something.  But at the very beginning -- my husband,

17   when this started to make this project, it was even

18   earlier.  It was about around year '11 or maybe

19   year '10 or sometime.

06:21:49  20           At that time -- so at that time they wanted

21   to make such a project -- do such a project.  But at

22   the time, because in China I have many friends and

23   many contacts, so he asked me to be in charge of

24   doing -- interfacing with China and do some research

06:22:13  25   and to develop connections.  And he told me that he

26

06:22:19  1    would pay me a wage at the time.  As to specific time,

2    I think it was a year '11.

3              So he said on this time you'll be counted as

4    working, however, the company does not -- didn't have

06:22:33  5    money.  So right now it looked like you are just

6    helping, but eventually you will be paid.  That's how

7    it was set.  At the time it didn't say it was

8    1 million figure.  It was when I was paid that they

9    tallied up to be the number, that the number was they

06:23:05  10   came up with.

11        Q.   Who is "they"?

12        A.   My husband and his team.

13        Q.   Who was your husband's team?

14        A.   As to who in the team -- because my English

06:24:20  15   was not good, he interpreted all this to me.  So I do

16   not know specifically who that person was, but I know

17   there was loose -- that radiation doctor, what was his

18   name?  A radiation doctor.  I forgot the name.

19   Thropay.  Yes, Thropay.  Dr. Thropay.  And they

06:24:49  20   started this together, so they started this project

21   together.

22        Q.   So you were paid this $1 million in March of

23   2016 because Beverly Proton now had money to pay you;

24   right?

06:25:41  25        A.   That's my understanding.  How they arrived at

27

06:25:47 1  it, I do not know.  I didn't know how -- so my

2  understanding was that perhaps they had money.  That's

3  why they paid my wage.

4         Because nobody would -- nobody would do the

06:26:20 5  work for so many years without the pay, because I need

6  to live.

7         MR. LEUNG:  I'm sorry, Mr. Li.  Because I

8  need to?

9         THE INTERPRETER:  Live, l-i-v-e.

06:26:39 10         MR. LEUNG:  Oh, live.

11         THE INTERPRETER:  Live.

12         MR. LEUNG:  Okay.

13         THE INTERPRETER:  To make a life.

14  BY MR. LEUNG:

06:26:46 15     Q.   Ms. Wang, you testified that you started some

16  sort of work for Beverly Proton as early as 2011.

17  From 2011 to 2016, did you keep any records of the

18  time you spent engaged in providing services for

19  Beverly Proton?

06:29:38 20     A.   I have not written down things.  However, for

21  this, I did a lot of work because at the very

22  beginning I thought this was a good thing.  It's a

23  thing to cure people, to save lives.

24         And also in my own family we had elder

06:30:01 25  peoples who were sick; therefore, I spent a lot of

28

```
 1              REPORTER'S CERTIFICATE

 2

 3         I, Cynthia J. Vega, a Certified Shorthand

 4    Reporter for the State of California, do hereby

 5    certify:

 6              That the witness in the foregoing remote

 7    deposition was by me duly sworn remotely; that the

 8    remote deposition was then taken before me at the time

 9    and place herein set forth; that the testimony and

10    proceedings were reported by me stenographically and

11    were transcribed through computerized transcription

12    under my direction; and the foregoing is a true and

13    correct record of the testimony and proceedings taken

14    at that time.

15              I further certify that I am not of counsel or

16    attorney for either or any of the parties in the

17    foregoing proceeding and caption named or in any way

18    interested in the outcome of the cause in said

19    caption.

20              IN WITNESS WHEREOF, I have subscribed my name

21    this 2nd day of March, 2021.

22              Reading and Signing was requested.

23

24    _____

25              Cynthia J. Vega, CSR No. 6640
```

Exhibit 8 Page 216

# EXHIBIT 9

| | |
|---|---|
| **From:** | Leung, Gary |
| **To:** | "Hervé Gouraige"; Steinberg, Larry |
| **Cc:** | Longo, Amy; Regenstreif, Jacob (Tony); Irwin, Magnolia |
| **Subject:** | RE: SEC v. Liu |
| **Date:** | Friday, April 23, 2021 3:08:00 PM |

Hervé,

Thank you for your email.  We disagree.  The data reflecting all of Ms. Irwin's calculations in Exhibit 9A were disclosed in her initial report and discussed at length during your thorough examination at deposition, including in Exhibits 4, 5, and 6 and paragraphs 27-29, 42 of the March 26, 2021 report.

Best regards,

Gary

**From:** Hervé Gouraige <hgouraige@sillscummis.com>
**Sent:** Friday, April 23, 2021 2:52 PM
**To:** Leung, Gary <LeungG@SEC.GOV>; Steinberg, Larry <LSteinberg@buchalter.com>
**Cc:** Longo, Amy <LongoA@SEC.GOV>; Regenstreif, Jacob (Tony) <RegenstreifJ@sec.gov>; Irwin, Magnolia <IrwinMa@sec.gov>
**Subject:** RE: SEC v. Liu

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary,
The "supplemental Exhibit 9A" transmitted by your email is in fact a revised "Calculation of Defendants' Pecuniary Gains" by the SEC's designated expert after she was examined at her deposition about the incorrect numbers in her initial Exhibit 9 of her March 26, 2021 report. The amended scheduling order does not provide for the experts to submit corrected reports. We have had no opportunity to examine the SEC expert about the new numbers in "supplemental Exhibit 9A," which increases her calculation of "defendants' pecuniary gains." Defendants do not accept "Exhibit 9A" as a supplement, and they reserve all their rights.
Hervé

**From:** Leung, Gary <LeungG@SEC.GOV>
**Sent:** Friday, April 23, 2021 5:14 PM
**To:** Hervé Gouraige <hgouraige@sillscummis.com>; Steinberg, Larry <LSteinberg@buchalter.com>

Exhibit 9 Page 217

**Cc:** Longo, Amy <LongoA@SEC.GOV>; Regenstreif, Jacob (Tony) <RegenstreifJ@sec.gov>; Irwin, Magnolia <IrwinMa@sec.gov>
**Subject:** SEC v. Liu



*** External Email ***

---

Counsel,

In accordance Rule 26(a)(2)(B) and 26(e) and the Court's amended scheduling order in the above-captioned matter, please see the enclosed supplemental Exhibit 9A to the March 26, 2021 expert report of Carlyn Irwin.

Best regards,

Gary Y. Leung
Assistant Regional Director
Securities and Exchange Commission
Los Angeles Regional Office
Asset Management Unit
444 S. Flower Street, Ste. 900
Los Angeles, CA 90071
323.965.3213
leungg@sec.gov

NOTICE: The contents of this email and any attachments to it contain confidential and/or legally privileged information from the law firm of Sills Cummis & Gross P.C. This information is only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the contained information is strictly prohibited and that the documents should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us by email immediately.

**Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way from its use.

This email message has been scanned for viruses by Mimecast.

Exhibit 9 Page 218