UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY LLC,<br><br>Defendants. | Case No.: SACV 16-00974-CJC(AGRx)<br><br>ORDER GRANTING SEC'S MOTION FOR DISGORGEMENT AGAINST DEFENDANTS CHARLES C. LIU AND XIN WANG [Dkt. 319] |

I.   INTRODUCTION

Defendant Charles C. Liu formed and controlled three corporate entities—Beverly Proton Center LLC, Pacific Proton EB 5 Fund LLC, and Pacific Proton Therapy Regional

-1-

Center LLC—purportedly to build and operate a proton therapy cancer treatment center in Southern California. Liu financed the cancer center with nearly $27 million dollars of international investment through the EB–5 Immigrant Investor Program. Instead of pursuing proton therapy, though, Liu funneled over $20 million of investor money to himself, his wife Defendant Xin Wang, and marketing companies associated with them.

In April 2017, the Court granted summary judgment in favor of the SEC, granted injunctive relief, imposed a civil penalty, and ordered disgorgement of the full amount Defendants raised from investors, less the funds that remained in corporate accounts for the project. *S.E.C. v. Liu*, 262 F. Supp. 3d 957, 961 (C.D. Cal. 2017). The Ninth Circuit affirmed. 754 F. App'x 505 (9th Cir. 2018). The Supreme Court granted certiorari to decide whether 15 U.S.C. § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. Concluding that the SEC may seek only disgorgement that does not exceed a wrongdoer's net profits and that is awarded for victims, the Court vacated and remanded "for the courts below to ensure the award was so limited." *Liu v. S.E.C.*, 140 S. Ct. 1936, 1940 (2020). The Ninth Circuit then remanded for further proceedings. *S.E.C. v. Liu*, 814 F. App'x 311 (9th Cir. 2020).

In these remand proceedings, there is no question that Liu and Wang committed securities fraud. There also is no question that they must pay civil penalties for that fraud. And there is no question they must disgorge their net profits. The limited questions presented on remand are the amount of Defendants' net profits, and whether there is enough evidence to support holding Liu and Wang jointly and severally liable. *Liu*, 140 S. Ct. at 1940. Now before the Court is the SEC's motion for the Court to order Liu and Wang to disgorge, jointly and severally, $20,871,758.81 in net profits, and to hold Liu and Wang jointly and severally liable for that amount. (Dkt. 319 [Motion], Dkt. 322 [Corrected Memorandum in Support of Motion, hereinafter "Mot."].) For the following reasons, the motion is **GRANTED**.

## II. BACKGROUND

Unless otherwise noted, the following facts are found in the Court's summary judgment order, *Liu*, 262 F. Supp. 3d at 961–65, and have not been disturbed on appeal. To ostensibly develop and run a proton cancer therapy center in Montebello, California, Liu used the EB-5 Immigrant Investor Program. Through that program, foreigners can obtain permanent residency in the United States by investing at least $500,000 in a "Targeted Employment Area" and thereby creating at least ten full-time jobs for United States workers.[1] Investments are often administered by "regional centers," which are designated and approved by the United States Customs and Immigration Service ("USCIS") as EB-5 eligible projects.

### A. Formation of Corporate Defendants and the EB-5 Offering

Liu, along with his business partner Dr. John Thropay, formed three entities in 2010—Pacific Proton, PPEB5 Fund, and Beverly Proton[2] (together, "Corporate Defendants")—to facilitate investment. Ownership of Pacific Proton was originally split 75% for Liu and 25% for Dr. Thropay. Beverly Proton was allocated the same way with Liu as Beverly Proton's President and Dr. Thropay as its CEO. Pacific Proton was PPEB5 Fund's sole manager.

On November 19, 2010, Liu and Dr. Thropay applied to USCIS to designate Pacific Proton as an EB-5 regional center. As the job-creating vehicle sponsored by

---

[1] This program allows foreign investors who make requisite capital investments in eligible commercial enterprises to file an I-526 Petition for conditional permanent residency status for a two-year period. Thereafter, the foreign investor can apply to have the conditions removed and live and work in the United States permanently.

[2] This entity was originally named Los Angeles County Proton Therapy, LLC. It was renamed Beverly Proton Center, LLC, for branding purposes in 2015. For clarity, the Court refers to it as Beverly Proton.

Pacific Proton—the USCIS-approved regional center—Beverly Proton purportedly would develop and operate the proton therapy treatment center. The USCIS application estimated that the cancer treatment facility would create more than 4,500 new jobs and have an economic impact of $728 million per year. USCIS approved Pacific Proton's application on June 28, 2012.

Pacific Proton, PPEB5 Fund, and Beverly Proton each played an important role in Liu's scheme. Foreign investors purchased shares in PPEB5 Fund, enabling them to petition USCIS for permanent residency in the United States. Each share of PPEB5 Fund was $500,000 (the "capital contribution"). Investors also paid a $45,000 "administrative fee" directly to Pacific Proton. Investing members of PPEB5 Fund had limited rights to participate in its management, as Pacific Proton had "full, exclusive and complete authority, power, and discretion" to run it. PPEB5 Fund loaned investor money to Beverly Proton to support the development of the proton therapy center.

From October 1, 2014, to April 2016, at least 50 investors purchased shares of PPEB5 Fund, totaling over $26 million.[3] No non-EB-5 funds were raised for the project.

The private offering memorandum ("POM") clearly delineated the purposes and legitimate uses of capital contributions and administrative fees. (Dkt. 320-4 [hereinafter "POM"].) It stated that Liu and Corporate Defendants would use the entire capital contribution to create the proton therapy center. (*See* POM at 20 ["Other expected uses

---

[3] In total, USCIS received 58 I-526 Petitions for this project and approved 8. Per Liu's EB-5 Application and the private offering memorandum ("POM"), investor capital contributions would initially be placed in escrow. Liu's EB-5 Application stated that the funds would be released upon USCIS' *approval* of an investor's I-526 petition. Liu's POM, given to investors, however, stated that the funds would be released from escrow and loaned to Beverly Proton upon an investor's *filing* of their I-526 Petition. In addition, the EB-5 Application stated that if USCIS were to deny the investor's application, the capital contribution and half of the administrative fee would be returned to the investor. The POM, however, stated that the entire application fee and capital contribution would be refunded in the event of USCIS denial.

of [capital contributions] include construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the project."]; *id.* at 20 n.2 ["Offering expenses, commissions and fees incurred in connection with this Offering shall [not] be paid . . . from EB-5 Capital Contributions."]; *id.* at 18 [Beverly Proton "will use the [capital contributions] to partially finance the construction and operation of a proton therapy center."].)  And it stated that the administrative fee would be spent on offering expenses and marketing.  (POM at 2 ["PPEB5 charges an administrative fee . . . for payment of expenses incurred in connection with this Offering."]; *id.* at 6 [administrative fee to "pay for Offering Expenses, including legal, accounting and administration expenses, and commissions and fees related to this Offering."]; *id.* at 20 n.2 ["Offering Expenses, commissions and fees incurred in connection with this Offering shall be paid from the proceeds of Administrative Fees and not from EB-5 Capital Contributions."].)

### B. Diversion of Funds

Defendants did not adhere to the POM.  Instead, they diverted approximately $20 million of the $26 million raised from investors to marketing companies, Liu, and Wang.

#### 1. Marketing Companies

Defendants made payments totaling $12,924,500 to three overseas marketing companies: Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), United Damei Group, United Damei Investment Company, Ltd., and/or Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), and Hong Kong Delsk Business Co., Ltd. ("Delsk").  On March 8, 2013, Liu signed an agreement with Overseas Chinese to pay it $800,000 per year and $75,000 per successful investor.  Overseas Chinese successfully

solicited 11 investors, and received $7,722,000 from Corporate Defendants.[4]  In August 2013,[5] Liu signed an agreement with UDG to pay it $80,000 per investor, $500,000 immediately as a "document preparation fee," and $650,000 annually.  UDG successfully solicited 10 investors and received $3,815,000.  On September 24, 2014, Liu signed an agreement with Delsk to pay it $75,000 per successful investor.  Delsk recruited 37 successful investors and received $1,387,500.

### 2. Liu and Wang

Liu received $6,714,580 and Wang received $1,400,000 from Corporate Defendants, ostensibly as "salary."  In 2012, Liu signed 5-year employment agreements with Pacific Proton and PPEB5 Fund with annual salaries of $350,000[6] and $200,000, respectively.  (Dkts. 320-5, 320-6.)  A few days later, on January 28, 2016, Wang signed a 5-year employment agreement with Liu (acting for Beverly Proton), entitling her to an annual compensation of $250,000, applied retroactively from January 2011.  (Dkt. 320-31.)  According to Liu, she had recruited investors since 2011.

In April 2016, two months *after* the SEC's February 4, 2016 subpoena and shortly following his March 23, 2016 questioning by the SEC, Liu signed a 5-year employment agreement with Beverly Proton.  (Dkt. 320-25.)  His annual salary was $550,000 retroactively from January 2011.[7]

---

[4] Overseas Chinese returned $2,060,130 of this money.

[5] Liu signed two identical contracts with UDG on August 13 and August 18, 2013.  Since the contract expressly supersedes all prior agreements, the Court treats the August 18, 2013, contract as controlling.

[6] The Pacific Proton employment agreement also promised Liu a bonus of 8% of total capital raised once there were 20 investors.

[7] He was also promised a bonus of 8% of total capital raised (with a maximum of $28,000,000).

The substantial majority of the money Liu and Wang directly received was transferred in 2016. Liu received $5,000 between October 1, 2014, and December 31, 2014; $1,389,580 in 2015; and $4,270,000 between January 1, 2016, and April 30, 2016. Wang received $50,000 from October 1, 2014, to December 31, 2014; $354,000 in 2015; and $996,000 in March 2016.[8]

Not only did Liu and Wang collect significant sums directly from investor money, but it is also very likely that Liu and Wang indirectly benefitted from investor money transferred to third parties. For example, Liu and Wang were deeply connected to UDG, which was paid $3,815,000. Wang's business card listed her as the chairman and the company website includes her picture as part of the management team. She is also identified in photos as UDG's president,[9] and Liu referred to UDG as "my wife's company." By all appearances, Wang's mother, Ms. Yao Wenli, signed the marketing agreement between UDG and Liu in August 2013 on behalf of UDG.[10] UDG's public listing on the Chinese Government's website for Chinese companies named Ms. Yao as the person with ownership interest, UDG's executive director, and a shareholder until

---

[8] According to the Monitor, Liu and Wang received $10,878,545 ($8,034,567 in cash to Liu, $335,997 in expenses, including tuition, rent, insurance, and utilities, $543,042 in credit card bills, all "with no identified business purpose," $357,245 of casino-related expenses, and $1,607,694 in transfers to Wang or payments on her behalf). Additionally, over $225,000 was paid for the lease and/or purchase of seemingly more than one automobile, but the Monitor did not locate any vehicles or records related to them.

[9] It is possible that the underlying Chinese word is variously translated as President and Chairman. Clarifying the particulars is unnecessary since the underlying point, that Wang is a senior controlling member of UDG, does not turn on whether she is President or Chairman.

[10] When confronted with the contract by the SEC in March 2016 during his investigatory testimony, Liu claimed that he had never spoken to Ms. Yao and that he did not know who she was. Wang stated it was impossible for her mother to work for UDG, since she lived with Liu and Wang raising and taking care of their children. Ms. Yao does not speak or read English, the language of the contract; she denied signing it. Liu later submitted a correction to his testimony admitting that Ms. Yao is his mother in law, though he stated he does not believe she signed the contract.

May 19, 2016.  The same listing stated that Wang was UDG's manager until May 19, 2016.  The individual who is currently listed as UDG's Supervisor is Liu's assistant.

### C.     State of the Proton Therapy Center

Despite significant investment, nearly no construction on the proton therapy center took place.  Instead, Liu burned through the millions left after payments to himself, Wang, and the marketers on half-hearted attempts to convey the illusion of progress.

The original planned site of the project was land owned by Dr. Thropay at 111 W. Beverly Blvd.  (*See* POM at 14 [describing the lease agreement with Dr. Thropay at 111 W. Beverly Blvd. as a "Material Contract"].)  Beverly Proton signed a 30-year lease with Dr. Thropay with rent of $1,000,000 per year.  The existing building on the land was only demolished in mid-2015 after Liu "scream[ed] at [Dr. Thropay] on the phone" that "he had to prove" to Delsk and other investors that progress was being made.  (Dkt. 320-5 [Excerpts from Dr. Thropay Deposition, hereinafter "Thropay Dep."] at 117–18; *see* Dkt. 324 Ex. 9 [letter from Delsk to Dr. Thropay referencing "a lot of requests from the investors to update them on the progress made in construction"].)

However, in 2015, Liu devised a plan to cut Dr. Thropay out of the project altogether.  (*See* Liu Dep. at 97 [explaining that a dispute between Liu and Dr. Thropay caused Liu "to think maybe it's better to find another site, to disconnect relationship with [Dr. Thropay] and to find a better site"]).  On January 19, 2016, Liu removed Dr. Thropay as CEO of Pacific Proton and elected himself as President and Treasurer and Wang as Secretary.  (*See* Dkt. 324-2, Ex. 17.)  The same day, Liu held a meeting of Beverly Proton with only himself in attendance at which he nominated himself and Wang as the sole directors.  Liu then decided to pursue a partnership with the City of Hope cancer hospital which would preclude Dr. Thropay's involvement in the project.  As a

result, Dr. Thropay sought to cancel the lease and reclaim the property;[11] Liu subsequently had to explore a second location for the center, at 105 West Beverly Blvd.

Liu also paid Optivus, a California proton therapy unit manufacturer, $368,100 for consulting services to design the center based on Dr. Thropay's property and an Optivus proton therapy machine. However, as part of his plan to oust Dr. Thropay, Liu later decided to purchase a Mevion proton therapy machine instead, making a $3 million deposit in November 2015. (*See* Dkt. 324-3, Ex. 30.) Liu then retained an entirely different architectural firm to design the center on the second location (without Dr. Thropay) for a Mevion unit. Unsurprisingly, no construction permits were ever obtained. Proton cancer therapy equipment was never delivered to any project site. (Liu Dep. at 98–99.) And no patient was ever treated. (*Id.* at 99.)

## III. DISCUSSION

Liu and Wang must disgorge net profits from their unlawful activity. *See Liu*, 140 S.Ct. at 1942. Net profits are the total profits (here, the $26,423,168 raised from investors) minus legitimate expenses. *Id.* at 1946. In this motion, then, the Court must determine what expenses were legitimate, and which were not legitimate.[12] The Court must also decide whether there is sufficient evidence to support holding Liu and Wang jointly and severally liable for the disgorgement award.

//
//

---

[11] Dr. Thropay initiated an unlawful detainer proceeding against Beverly Proton and Liu on May 16, 2016. Those proceedings are stayed pending the outcome of this case.

[12] The other requirement the Supreme Court described—that disgorgement be for the benefit of investors—is also met. (*See* Mot. at 25; Reply at 24.)

### A. Legitimate Expenses

"[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Liu*, 140 S.Ct. at 1950. The Supreme Court gave some guidance addressing what expenses were legitimate in this case, "not[ing] that some expenses from [Liu and Wang's] scheme went toward lease payments and cancer-treatment equipment," and that "[s]uch items arguably have value independent of fueling a fraudulent scheme." *Liu*, 140 S.Ct. at 1950. The Supreme Court, however, left it to this Court "to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)." *Id.* The SEC has taken a conservative approach on remand that is very generous to Liu and Wang, allowing for deduction as legitimate expenses (1) the $45,000 administrative fee each investor paid, and (2) certain amounts paid for development of the physical proton therapy center.

What makes the Court's task of dividing legitimate expenses from "wrongful gains under another name" challenging, *Liu*, 140 S.Ct. at 1050, is how difficult it is to know precisely where money raised was spent and who benefitted from the various payments. Both parties rely heavily on numbers from bookkeeping performed by Marcum LLP, the Corporate Defendants' accountant. (*See, e.g.*, Dkt. 320-1 [Expert Report of Carlyn Irwin, hereinafter "Irwin Rep."] ¶ 26 ["Generally, I have assumed, for purposes of the calculations set forth above, that Marcum's classification of cash outlays was accurate."]; Dkt. 324-2, Ex. 5 [Expert Report of Ronald S. Friedman, CPA, hereinafter "Friedman Rep."].) But Marcum itself disclaimed the reliability of its numbers for anything resembling an audit. (Dkt. 230-27 [Marcum Engagement Letter].) It stated that its services would be performed based on data and information that Liu provided, which would not be verified or audited, and therefore "[n]one of [its] services can be relied on to detect errors, fraud or illegal acts that may exist." (*Id.* at 4.) Trang Lam, the Marcum accountant who worked on Corporate Defendants' account, testified that throughout the

course of Marcum's engagement, "Marcum did not perform any inquiry or analytical procedures as to the appropriateness of the account classifications for all of these transactions that were recorded to the general ledger," but rather relied only on Liu's statements as to how money should be classified. (Dkt. 320-24 [Excerpts from Trang Lam Deposition Transcript, hereinafter "Lam. Tr."] at 22–27, 90–93.) Marcum did not try to verify or corroborate what Liu said about any given transaction, speak to the counterparty involved in any transaction, or speak with Dr. Thropay or others. (*Id.* at 21–22, 27–38, 73–74.)

The Court is left, then, with a general ledger prepared primarily on the say-so of an adjudicated fraudster, which the preparing accountant expressly stated could not be relied upon to detect errors or fraud, and parties and experts who did exactly that—relied on the ledger assuming its accuracy in order to determine what expenses were legitimate and what expenses were not. From this evidence, the Court must determine what expenses were legitimate, and deduct them from the total amount raised from investors. In conducting this difficult task, and taking heed of the Supreme Court's admonitions, the Court has chosen to take a very liberal approach, arguably unduly favorable to Liu and Wang, as to what constitutes a legitimate expense.

### 1. $45,000 in Administrative Fees from Each Investor

The POM solicited $545,000 from each investor. That investment was divided into two types of payment: (1) a $500,000 capital contribution, the entire amount of which the POM stated would be used to construct and operate the proton therapy center (including construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the projects), and (2) $45,000 in administrative fees, which the POM stated would be spent on offering expenses and marketing (including legal,

accounting, and administrative expenses, and also commissions and fees related to the offering). *Liu*, 262 F. Supp. 3d at 962; (POM at 6–7).  Among all investors, Defendants collected a total of $2,210,701 in administrative fees.  (Irwin Rep. ¶ 29, Ex. 4.)  However, Defendants spent much more on offering expenses and marketing than the $45,000 per investor in administrative fees they collected.

For example, the POM states that Defendants "may engage and pay one or more brokers, investment advisors, finders or other parties commissions or other fees in connection with the sale of Units pursuant to this Offering," and that "[a]ny such commissions or other fees paid in connection with the sale of Units pursuant to this Offering shall be paid only out of the proceeds of Administrative Fees."  (POM at 8.)  However, Defendants spent over $10 million on broker fees paid to UDG, Delsk, and Overseas Chinese alone—far more than the $2,210,701 in administrative fees Defendants raised for such commissions.  (*See* Irwin Rep. ¶¶ 33–37, Ex. 5.)  Defendants also paid money for administrative fee activities to Marcum LLP (the CPA that performed bookkeeping services), Steve Yale and Miller Mayer, LLP (counsel that performed legal work on USCIS and EB-5 issues), Michael Hunn and Evans Carroll & Associates (an economic consultant firm retained to work on the Pacific Proton regional center application), and then-mayor of Los Angeles Antonio Villaraigosa (who assisted with marketing the offering).  (Irwin Rep. ¶¶ 34–35; Mot. at 7.)

Because the amount spent on activities for which the POM says administrative fees may be used far exceeded the amount raised for such activities, the SEC suggests that the entirety of administrative fees collected may be deducted as legitimate expenses.  (Mot. at 5–8.)  The Court has serious concerns as to whether money spent on administrative fees was indeed legitimate.  For example, UDG—the marketing company Liu paid over $3.8 million—had deep connections to Liu and Wang, with Liu even referring to UDG as "my wife's company." *Liu*, 262 F. Supp. 3d at 964.  It is not a stretch to believe that

payments to marketing companies—which the SEC states may be deducted as "legitimate expenses"—were actually "wrongful gains under another name." *Liu*, 140 S.Ct. at 1950.

However, out of an abundance of caution, and lacking any way to know whether any administrative fee expenses were legitimate, the Court will deduct the amount the SEC suggests. Investors understood that some of the money they paid would be spent on marketing and other administrative fees and commissions. They further understood that capital contributions would not be used to pay for administrative fee activities. *Liu*, 262 F. Supp. 3d at 962. Based on the limited usefulness of the data available, and in light of the Supreme Court's admonitions, then, the Court will deduct $2,210,701—the total amount of administrative fees raised—as legitimate expenses.

### 2. Expenses for Development of a Proton Therapy Center

Next, the SEC proposes that the Court deduct $3,105,809 in expenses related to construction of the proton therapy center—including construction, rent, equipment, tax payments, insurance costs, travel, consulting fees, and permit and license fees. (Mot. at 7–8.) The SEC's proposed deduction includes (1) construction-related costs such as architectural design fees, (2) rent payments to Dr. Thropay, (3) proton equipment purchases provided for in the POM (i.e., from Optivus) and other capital expenditures, and (4) operating expenses such as insurance costs, travel to China and Singapore to recruit patients, consulting fees, permit and license fees, and taxes, among others. (Irwin Rep. ¶ 40, Ex. 6.)

The SEC's proposal is extremely generous to Liu and Wang for three reasons. First, again, the calculation relies heavily on Marcum's bookkeeping, which relied almost exclusively on Liu's representations regarding classification. For example, Marcum

placed expenses into categories including construction, rent, and permit and license fees based on representations from Liu. Those representations can hardly be trusted.

Second, the SEC's deduction includes, as just one example, payments made to R. Alan Construction, a company that performed demolition at 111 West Beverly but also construction on 105 West Beverly—the site to which Liu moved the project in order to cut out Dr. Thropay. (*See* Thropay Dep. at 132; Irwin Rep. Ex. 6.) Any construction done at the 105 West Beverly site would seem to the Court to be part of the fraud and not a legitimate business expense.

Third, Defendants' entire scheme was to defraud investors. Barely any construction occurred on the proton therapy center because Defendants' plan was to misappropriate the investors' money and use it for themselves at the outset. It is difficult to consider money spent to rent land on which Defendants never actually planned to operate a proton therapy center as a legitimate expense.

Although no fault or negligence can be attributed to the SEC or its expert, it is far from clear to the Court that the business expenses the SEC and its expert categorize as legitimate business expenses were actually legitimate business expenses. Again, Defendants' scheme was fraudulent from the outset. However, in an abundance of caution, and in light of the Supreme Court's admonitions, the Court will deduct $3,105,809 as legitimate expenses as the SEC proposes.

**B.    Non-Legitimate Expenses**

Defendants argue that deductions for legitimate expenses should include (1) a $3 million payment to Mevion for proton therapy equipment, and (2) Liu and Wang's salaries.

### 1. Payment to Mevion

As part of its deduction for legitimate business expenses, the SEC deducts $368,100 paid to Optivus for the Optivus proton therapy machine. (*See* Irwin Rep. at ¶¶ 40–42, Ex. 6.) As support for classifying this payment as a legitimate expense, the SEC notes that the POM relied heavily on Defendants' cooperation with Optivus. The POM stated that Defendants planned to engage Optivus "to provide all necessary proton beam treatment technology and related maintenance, under a service contract for the proton center" because "Optivus is the only U.S. company with U.S. Food and Drug Administration (FDA) clearance to provide proton therapy systems." (POM at 15.) The POM further stated that Defendants' "failure or inability to engage Optivus could negatively affect the profitability of the Borrower and its ability to repay the Loan." (*Id.*)

Defendants argue that Liu's $3 million payment to Mevion for a proton therapy machine is also a legitimate expense that should be deducted. Although the POM did not mention Mevion, Defendants still argue that the payment to Mevion was a legitimate expense based on the POM's language allowing Defendants to contract with "another service provider" to provide proton beam treatment equipment. (*See* Opp. at 13.) But the fact that the POM does not absolutely require Defendants to use Optivus for equipment is not the point. The point is that Liu decided to order a Mevion unit in addition to the Optivus unit he had already ordered in order to cut Dr. Thropay out of the project and therefore divert more money to himself and his wife Wang. By setting up a new location for the proton therapy center that did not use Dr. Thropay's land, entering into contracts using an entity with which Dr. Thropay was not involved, and getting a new unit for the new location, Liu endeavored to create a proton therapy center that did not involve Dr. Thropay at all. That using Mevion was contrary to the POM is just another piece of evidence supporting the conclusion that the Mevion payment was not a legitimate business expense, but rather another overt act of Liu's fraud.

Simply put, the Mevion payment is not a legitimate expense. The purpose of the Mevion payment was not to secure a proton therapy machine; Liu had that with Optivus. The purpose of the Mevion payment was to cut Dr. Thropay out of the project so that Liu could get away with his fraud and make more money. The Mevion payment is clearly wrongful gains under another name and will not be deducted from the disgorgement award. *Liu*, 140 S.Ct. at 1950.

### 2. Liu and Wang's Salaries

Defendants also argue that $7.57 million in purported reasonable compensation for Liu and Wang should be deducted as legitimate expenses. (*See* Opp. at 18–20; Dkt. 324-4, Ex. 36 [Reasonable Compensation Analysis by Theodore R. Ginsburg].) The Court strongly disagrees. The POM does not contemplate Liu or Wang receiving any salary at all. Although it contemplates a management fee, the POM names Pacific Proton Regional Center as the manager, not Liu or Wang, and in any case the management fee is limited to 3% of PPEB5 Fund's gross revenues. (POM at 6.)

Defendants seek to have salaries deducted as legitimate expenses based on employment agreements Liu and Wang signed with the Corporate Defendants. (*See* Opp. at 18–19.) Again, the POM does not contemplate funds raised from investors being used to pay salaries.[13] But that is not the only problem with the employment agreements. Indeed, Liu's Beverly Proton employment agreement was executed on Beverly Proton's behalf by a person who was not an employee of the company at the time. (Liu Dep. at 60.)[14] The agreement, like Wang's, also inexplicably awarded years of back pay. (Dkts.

---

[13] In rendering his opinion on reasonable compensation, Defendants' expert did not review the POM. (Dkt. 324-4, Ex. 37 [Excerpts from Deposition of Theodore R. Ginsburg, hereinafter "Ginsburg Dep."] at 74, 130–31.)

[14] Liu testified that the document must not have been dated correctly. (*Id.*)

320-26, 320-30.)  The Court will not deduct one penny of the exorbitant salaries that Liu and Wang paid themselves for perpetrating their fraud on investors.[15]

### C. Whether, as Defendants Argue, There are No Net Profits

Defendants argue that "there are no net profits to award as equitable disgorgement" because "the project companies incurred significant losses"—about $16.5 million, in fact. (Dkt. 324 [Opposition, hereinafter "Opp."] at 21; Friedman Rep.)  Nonsense.  Of course the companies incurred significant losses—Defendants looted them for their own personal gain until the companies had nothing.  To do only what was necessary to keep up appearances that the project was moving forward, while funneling enormous sums of the money raised to himself, was the plan from the beginning—or at least very close to it, particularly after Liu eliminated Dr. Thropay from the project.  "Expenditures a defendant makes for his or her own use from illegally obtained funds are counted against the defendant, precisely because he or she benefited from those expenditures." *S.E.C. v. Shaoulian*, 2003 WL 26085847, at *6 (C.D. Cal. May 12, 2003), *judgment entered*, 2003 WL 26085848 (C.D. Cal. May 12, 2003).

---

[15] It is worth noting that beyond salaries based on employment agreements, Liu and Wang also withdrew money from the companies for their own expenses.  These withdrawals were coded as a management fee in the general ledger.  In other words, every time Liu and Wang spent corporate money for personal use—including $56,173 spent at Caesar's Palace in Las Vegas and various bills for gardening and landscaping, water, gas, Sirius XM, the DMV, and school tuition—the accountants classified it as a management fee.  (*See* Irwin Rep. Ex. 8 [Summary of Personal Expenses Paid on Behalf of Liu and Wang].)

Liu testified that he paid little attention to whether he used money from his personal account or corporate accounts for his expenses.  Asked why he took money out of a corporate account, Liu responded, "I just needed cash."  (Liu Tr. at 86.)  Asked why he did not withdraw the money from his personal account, he responded, "Because it's Vegas, Gary.  Have you been to Vegas?"  (*Id.*)  When asked about $4.27 million that Liu transferred from Beverly Proton accounts to his own personal accounts after receiving an SEC subpoena, Liu stated that the money was his own "personal money" that he "c[ould] send wherever [he] want[ed] to."  (*Id.* at 81–84.)  Marcum recorded each personal expense in the accounting as a "management fee."  (Lam Tr. at 56–58; Irwin Rep. at 33.)

Similarly, Defendants' protestation that some of the funds were paid to companies that had no connection to Defendants (i.e. Defendants did not receive the funds indirectly) misses the point. (*See* Opp. at 15.) For example, there is no evidence that Overseas Chinese or Delsk—which together received over $9 million—had any connection to Liu or Wang. (*Id.*) But Defendants' "construction would permit the perpetrator of a successful scheme, who was just as successful at dissipating the ill-gotten gains, to avoid a disgorgement order because at the time of the order, [they] had retained none of the proceeds from the scheme." *Id.* (quoting *S.E.C. v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993). Liu and Wang must be held accountable, and not given any deduction in the disgorgement award, for the monies that they paid to independent companies to perpetrate their fraud.[16]

### D. Joint and Several Liability

Disgorgement is generally not ordered against multiple wrongdoers under a joint-and-several liability theory. *Liu*, 140 S. Ct. at 1945. The purpose of this rule is to ensure defendants are held "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no participation." *Id.* at 1949 (quotation omitted). However, joint-and-several liability is available for partners engaged in concerted wrongdoing. *Id.* The Supreme Court left it to this Court "to determine whether the facts are such that [Liu and Wang] can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required." *Id.*

---

[16] Nothing in the Supreme Court's opinion indicates that Defendants' successful dissipation of investor funds eliminates their need to pay disgorgement. The Supreme Court was careful to describe certain possible legitimate expenses as "lease payments and cancer-treatment equipment," but never insinuated that *all* of Defendants' expenses were legitimate. *Liu*, 140 S.Ct. at 1950.

The Supreme Court outlined some facts that are relevant to this inquiry. *Id.* Liu and Wang were married. Liu formed business entities and solicited investments, which he misappropriated. Wang held herself out as the president, and a member of the management team, of an entity to which Liu directed misappropriated funds. Defendants did not (and still do not) introduce evidence to suggest that Wang was a mere passive recipient of profits. Nor did they (nor can they credibly) suggest that their finances were not commingled, or that Wang did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust.

Contrary to her assertion, Wang played an integral role in the scheme. She made investor presentations promoting the proton cancer therapy project, and helped raise investor capital through promotion. (Dkt. 320-30 [Excerpts from Wang Deposition Transcript, hereinafter "Wang Dep."] at 15–18; Dkt. 320-2 [Excerpts from Liu Deposition Transcript] at 66–68 [describing his wife's duties]; Thropay Dep. at 105–109 [describing Wang's role as selling and promoting sales, and noting that Wang "seemed to be acutely aware of finances"].) Most troubling, Wang was paid and accepted without reservation well over a million dollars in investor funds that were wrongfully diverted by Liu. She also was an officer of UDG, one of the marketing companies that raised over $26 million in investor funds and was paid $3,815,000 for securing additional investors. Wang was Liu's active partner and accomplice in the fraudulent investor scheme. She is jointly and severally responsible for the net profits of that scheme. *See Liu*, 140 S. Ct. at 1945.

### IV. CONCLUSION

For the foregoing reasons, Liu and Wang are **ORDERED** to disgorge, jointly and severally, $20,871,758.81. This award of disgorgement is calculated by subtracting from the $26,423,168 that Liu and Wang raised from investors (1) $2,210,701 in

administrative expenses, (2) $3,105,809 in business expenses as legitimate expenses, and (3) the $234,899.19 remaining in Defendants' corporate accounts, plus prejudgment interest.[17]

DATED: June 7, 2021

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

CC: FISCAL

---

[17] The Court will defer entry of judgment until after it has ruled on Defendants' motion on *Morrison* extraterritoriality. (*See* Dkt. 311.)