**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) |
| | ) **Certified Transcript** |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. |
| | ) 8:16-cv-00974-CJC-AGR |
| CHARLES C. LIU; | ) |
| XIN WANG a/k/a LISA WANG; | ) |
| PACIFIC PROTON THERAPY | ) |
| REGIONAL CENTER, LLC; | ) |
| PACIFIC PROTON EB-5 FUND, | ) |
| LLC; and BEVERLY PROTON | ) |
| CENTER, LLC f/k/a LOS ANGELES | ) |
| COUNTY PROTON THERAPY, | ) |
| LLC, | ) |
| Defendants. | ) |
| | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MOTION HEARING
**REPORTED VIA ZOOM VIDEOCONFERENCE AND IN PERSON**
MONDAY, JUNE 7, 2021
1:33 P.M.
SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1                     **APPEARANCES OF COUNSEL:**

2


3    **FOR THE PLAINTIFF:**

4            U.S. SECURITIES AND EXCHANGE COMMISSION
             BY:  GARY Y. LEUNG, ESQ.
5            444 South Flower Street
             Suite 900
6            Los Angeles, California 90071
             323-965-3998
7            leungg@sec.gov

8    **FOR THE DEFENDANTS:**

9            SILLS CUMMIS & GROSS PC
             BY:  HERVE GOURAIGE, ESQ. (via Zoom videoconference)
10           One Riverfront Plaza
             Newark, New Jersey 07102
11           973-634-5989
             hgouraige@sillscummis.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25


**UNITED STATES DISTRICT COURT**

1          **SANTA ANA, CALIFORNIA; MONDAY, JUNE 7, 2021**

2                           **1:33 P.M.**

3                            **- - -**

4

01:33PM  5          THE COURT:  Calling Item Number 4, SACV 16-00974,

6     *Securities and Exchange Commission vs. Charles Liu.*

7          Counsel, please state your appearances.

8          MR. LEUNG:  Gary Leung for the SEC, Your Honor.

9          THE COURT:  Hello, Mr. Leung.

01:33PM 10          MR. GOURAIGE:  Herve Gouraige for the defendants,

11    Your Honor.

12          THE COURT:  Hello, Mr. Gouraige.

13          Well, I appreciate everybody at this hearing.  I

14    know this case has been pending for a long time and back from

01:34PM 15    the Circuit.  Before me, obviously, is the motion for

16    disgorgement against Mr. Liu and Ms. Wang.  I thought what I'd

17    do is ask a few questions of each of you.  Why don't I start

18    with Mr. Leung since it is the SEC's motion, and then I'd like

19    to hear anything else either of you would like to say.

01:34PM 20          I think I made the findings pretty clear, that there

21    was widespread fraud in this scheme.  And I think the record

22    before me suggests that the fraud started pretty early on.  In

23    light of those findings, why should I deduct any expenses as

24    legitimate expenses?  If you'd let me just expand on the

01:35PM 25    question.

1          Again, I'm not trying to say I'm making any further

2  findings.  I'm just trying to get this clear in my mind.  As I

3  understand the admonitions from the United States Supreme

4  Court, you have to deduct legitimate expenses.  But in many

01:35PM  5  cases, including in this one, the fraud started early on.  And

6  what a lot of people do, and arguably what Mr. Liu did here,

7  was to perpetrate the fraud.  He had to give some impression of

8  legitimate expenses, if you follow me.  That's how he can

9  continue to generate more investor funds.  He's not going to

01:36PM  10  come out and say, "Just give me your money, and I'll see what I

11  can do"; right?

12          So what I'm struggling with is trying to find that

13  line, when you have a scheme like this, what's legitimate and

14  what's not.  And I -- the SEC has put forth its

01:36PM  15  recommendations.  And I want to talk about that.  But the

16  threshold issue is why do you think any expenses should be

17  deducted?

18          MR. LEUNG:  Your Honor, the SEC -- we certainly

19  share your instinctual reaction to the facts in front of you

01:36PM  20  today.  This was a long-running fraud.  We have, however,

21  presented for the Court's consideration a disgorgement

22  calculation that we do think is exceedingly conservative.  And

23  conservative in ways that, frankly, do benefit Defendant Liu

24  and Defendant Wang.

01:37PM  25          But the distinction that we drew in sort of

proffering that conservative calculation is this:  We think the

Supreme Court laid down a couple of really -- of relevant

markers here.  A legitimate expense cannot be wrongful gain

under another name.  A legitimate expense, it can't be part and

01:37PM  parcel with fraud.  It can't fuel the fraudulent scheme.  And

it has to have value independent of fueling the fraudulent

scheme for investors.  And I think that prong is sort of the

legal underpinning of what I understand Your Honor to be

focusing my attention on.

01:37PM            And with respect to that second point, we have not

offset any amount of the compensation that Liu and Wang took

for themselves in the course of misappropriating corporate

funds.  That's about $9-plus million that's not being deducted.

We have not deducted any amount of marketing fees beyond the

01:38PM  administrative fees that were set forth in the POM.  So about

10 million-plus were paid to marketers.  The POM did say, "For

this $45,000 administrative fee, we are going to pay off any

expenses."

            So based on the bank records, we are seeing

01:38PM  2.2 million in administrative fees coming in, and we deducted

that.  We deducted that because those are, arguably, tied back

to the representations in the POM and have not been infected by

this sort of top-to-bottom fraud.

            THE COURT:  Let me stop you on that because that is

01:38PM  what I had in mind.  Yeah, you're right, that's what was

1    represented to the investors.  So you had to expect you were

2    going to lose that money.  I get that.

3              But doesn't that assume that, at the outset, that

4    this was legitimate?  I mean, if you just assume, maybe this

01:39PM 5   case or another case, that it was outright fraud, that the

6    organizer and leader of the scheme had no intention of

7    legitimately using the money for the stated purposes and had

8    this administrative expense and used it to pay some of the

9    marketers, but pocketed a lot of it -- just because it's in the

01:39PM 10  memorandum doesn't give them a license to deduct it as a

11   legitimate expense, if you follow me.

12             MR. LEUNG:  I do, Your Honor.  And I think the

13   Supreme Court's opinion did allow for that scenario if proven

14   by the facts.  If you have an outright fraud, even something

01:39PM 15  that is arguably tethered to the representations in the offer

16   materials doesn't pass muster as a legitimate expense.

17             You know, frankly, we made this calculation in an

18   effort to take the most conservative approach we could given

19   the markers that were laid down by the Court.  To the extent,

01:40PM 20  you know, you, Your Honor, are not persuaded by the

21   availability of legitimate expenses here given the record, then

22   we would certainly defer to you, and we would advocate for that

23   factual finding.

24             THE COURT:  Well, now, with all that said, I do

01:40PM 25  appreciate your effort to identify some significant deductions.

**UNITED STATES DISTRICT COURT**

1     I read the Supreme Court authority as saying, "You should be

2     able to find some."  Am I interpreting their guidance too much?

3     Am I giving it too much credit?  Because when that -- they

4     clearly were saying some expenses are not legitimate.  I get

01:41PM  5     that.  But I couldn't help but think the tone of it was "You

6     should be able to find some here that are legitimate expenses."

7          And I'm not here to argue with the Supreme Court.

8     I'm a big believer in the rule of law.  They are the final

9     word, and I want to do exactly what they say.  So I felt -- and

01:41PM  10     maybe that was what was driving your position was, "We've got

11     to find some because the Supreme Court says there are some that

12     should be."  But I'm not sure I can buy that -- into that

13     conceptually for many of the fraudulent schemes that I see

14     including maybe the one in this case.

01:42PM  15          MR. LEUNG:  Your Honor is a much more experienced

16     lawyer than I am.  And I think you're -- I agree with your

17     reading of the tea leaves here.  The Supreme Court's opinion

18     was notably silent with respect to the marketing fees; right?

19     That's the 10 million-plus that clearly violated the POM.  That

01:42PM  20     was a factual finding of this Court.

21          It did make passing reference to a couple of items,

22     like payment of rent for the commercial property on which the

23     site was to be built, construction.  And this equipment

24     manufacturer, Mevion, that was the $3 million down payment.

01:42PM  25     What the Court did not have before it, though, was the record

1   that has been further developed on remand.  We don't include

2   the $3 million Mevion down payment in our deductions of

3   legitimate expenses here, and that's for all the reasons that

4   we laid out on the brief -- in our brief.

01:42PM 5        The latter half of 2015, there's very clear and

6   probative evidence of Mr. Liu engaging in self-dealing.  He set

7   out on his own to start his own project for the very same EB-5

8   proton cancer therapy clinic with new partners in order to cut

9   out Dr. Thropay.  And that evidence shows that this $3 million

01:43PM 10  paid to Mevion was for the benefit of his new endeavor.  And

11  that's not the endeavor that was represented to investors when

12  the capital was raised.

13       And that, therefore, means that that $3 million

14  payment falls squarely within the Court's discussion of is this

01:43PM 15  a wrongful gain under another name as opposed to something that

16  is of true legitimacy.  And the answer is yes, Your Honor.  He

17  made that payment in service of his own company.  He made that

18  payment in the course of self-dealing and, therefore, it should

19  not be offset.  So that's not included.  What we have included,

01:43PM 20  however, about 3.1 million in business and other operational

21  expenditures that were identified by our expert.

22       So we are not taking out the compensation he took.

23  We are not taking out the $3 million Mevion payment.  We have

24  not taken out every dollar of the marketing expenses paid to

01:44PM 25  the third-party marketers above that $2.2 million in

1    administrative fees.  That's how we arrived at the 20.87

2    million.

3              And in our estimation, that was, you know, kind of a

4    fair balance, given the ground rules that were laid down by the

01:44PM  5    Supreme Court in its decision.

6              THE COURT:  You were talking about some of the

7    expenses that were deducted, including the rent.

8              And I wanted to ask you a question about that

9    because I sense there was a dispute in the record.

01:44PM 10             Mr. Gouraige, this might be a more appropriate

11    question for you, and I will ask it to you at the time when

12    you're speaking.

13             But, Mr. Leung, in the opposition that was filed --

14    Dr. Thropay is it?  "Thropay" or "Thropay"?

01:44PM 15             MR. LEUNG:  "Thropay," Your Honor.

16             THE COURT:  "Thropay."  Neither.

17             The Irwin report said the rental payment was

18    $524,000.  But in the opposition, it says, "Marcum calculates

19    Dr. Thropay's rental payments as $838,500."  So there's over a

01:45PM 20    $300,000 discrepancy between those two numbers.  And I'm not --

21    what is the evidence to support either number?  And why is

22    there that discrepancy?

23             I have the -- in front of me Exhibit 6, the Irwin

24    chart, which has the 524,000, but it's a summary chart.  So I'm

01:45PM 25    trying to understand.  Which is it?

1      MR. LEUNG:  Sure.  Your Honor, Ms. Irwin's
2 calculation is based on her review of the bank statements.  So
3 there were three corporate accounts here.  One for the fund,
4 one for the Regional Center, one for the operating center.  To
01:45PM 5 the extent she saw a transfer out that was identifiable as
6 going to a payee, going to Dr. Thropay as a payee -- and that
7 was -- these were these periodic payments -- she characterized
8 that as a rental payment.  So that's her analysis.

9      With respect to the Marcum opinions and
01:46PM 10 calculations, there's a fundamental deficit there.  I mean, we
11 don't think the evidentiary chain has been fully linked up for
12 each and every one of these expenses.  There's a fair amount of
13 contextual background.  But prior to this case being filed, Liu
14 retained Marcum as the entity's corporate bookkeeper.  That
01:46PM 15 wasn't an audit engagement, it wasn't a financial statement
16 preparation engagement.  They essentially constructed the
17 general ledger using what they could from the bank records
18 and, also, if those records weren't enough, information from
19 Mr. Liu.

01:46PM 20      I think the deposition testimony by their expert,
21 Mr. Friedman, the deposition testimony by his colleague,
22 Ms. Lam, is fairly clear on this point.  We didn't have a
23 complete set of documentation.  The bank statements only go
24 back so far.  We don't have invoices from the early years of
01:47PM 25 the project.  And so if they had questions about what a funds

transfer was really about and if it should be coded and
classified as an expense, they conferred with Mr. Liu, and they
took Mr. Liu's word at face value.

01:47PM
So I think that's kind of the breakdown that we have
between Marcum -- which constructed the general ledger that was
based only in part on bank records and, in addition to that,
information from Mr. Liu -- and the calculation that our expert
arrived at, which is based on bank records and, to the extent
those records are substantiated by the general ledger, the
01:47PM
former general ledger entries of Marcum as well.

THE COURT:  And didn't Marcum say, "Mine's not
reliable"?

MR. LEUNG:  Yes, Your Honor.  Mr. Friedman, the
retained expert, he took care in his reports to make it clear
01:47PM
that he was not engaging in an audit; he was not engaging in a
review, a compilation; that he hadn't even performed the
financial statement preparation under the lowest possible
professional standard for a non-attest engagement.  He said, "I
took the general ledger that had been previously prepared, and
01:48PM
from that I constructed a P&L statement."  That's it.  That's
the sum total of his opinion.

So to the extent there are factual issues here and
competing calculations, I think Ms. Irwin's analysis, which is
based on the bank records, is certainly more reliable and
01:48PM
certainly meets our burden of putting forth a reasonable

1      approximation.

2              THE COURT:  Okay.  And then the last question I

3      have, and I'll give you an opportunity to say anything else you

4      want, is I know Mr. Gouraige, in his papers or somewhere, he

01:48PM  5      says "Do not enter judgment" until I've ruled on the

6      jurisdictional motion.

7              What is your response to that?

8              MR. LEUNG:  Your Honor, the current scheduling order

9      allows Mr. Gouraige to put in a submission at the end of, I

01:49PM 10      believe, this week.  We don't think it has merit.  We're going

11      to respond to it, obviously.  We don't think there's a

12      jurisdictional issue here.

13              And without belaboring it, it's fairly clear from

14      our standpoint that *Morrison* isn't implicated because this was

01:49PM 15      for a project that was to be constructed in the United States.

16      Capital was raised through the United States CIS EB-5 program.

17      Investors visited the project site in the United States.  We

18      have more than enough connection in this jurisdiction to the

19      fraud at hand.

01:49PM 20              THE COURT:  Well, I get it.  And I appreciate that.

21      And I know you'll be responding in writing.

22              I think my question is a pure procedural one.

23      Should I wait until I rule on that motion?  Because if I

24      don't -- the concern I have, and maybe it's not one I need to

01:50PM 25      worry about, is say I enter judgment and then that's taken up

1    on appeal right away, and then I make some sort of ruling on

2    this jurisdictional issue; or I haven't ruled on the

3    jurisdictional issue, and the Circuit says, "Wait.  You got to

4    do the jurisdictional.  It's a threshold issue.  You have

01:50PM  5    jurisdiction.  We're not going to waste our time until that

6    jurisdictional issue has been resolved."  I guess that's the

7    concern I have.

8              MR. LEUNG:  I see your order of operations concern,

9    Your Honor.  We're confident that the jurisdictional issue will

01:50PM 10    be resolved in the SEC's favor.  But to avoid the scenario that

11    you just outlined, perhaps it makes sense from a procedural

12    standpoint to defer entering final judgment on disgorgement and

13    the other monetary relief and injunctive relief sought by the

14    SEC until that jurisdictional issue is finally adjudicated by

01:50PM 15    this Court.

16              THE COURT:  Okay.  I appreciate that.

17              Is there anything else you want to say?  Or do you

18    want to wait to see what Mr. Gouraige has to say, and then you

19    can respond?

01:51PM 20              MR. LEUNG:  I'd like to respond to Mr. Gouraige,

21    please.  Thank you, Your Honor.

22              THE COURT:  Mr. Gouraige, could you give me your

23    thoughts, sir.  I'm actually looking at you, but I see on my

24    screen it looks like I'm looking the other way.

01:51PM 25              MR. GOURAIGE:  (No audible response.)

1           THE COURT:  Can you hear me?

2           MR. GOURAIGE:  Yes, I can hear you, Your Honor.  Do

3   you want me to address the question you just asked to the SEC?

4           THE COURT:  I'd appreciate that.  And then give me

01:51PM 5   any further thoughts you would like to make too.

6           MR. GOURAIGE:  If I may, Your Honor, I will begin

7   with the first one, why allow any legitimate business expenses,

8   given the Court's earlier findings.

9           The Justices were aware of Your Honor's findings in

01:52PM 10  this case, and yet they concluded that it was appropriate to

11  remand for factual findings and determination on the issue of

12  disgorgement.  I think what is key to the Justices' position is

13  that disgorgement was reformulated by the Court to be an

14  equitable remedy, and that changes the nature of the remedy.

01:52PM 15          As Your Honor knows, there are three categories of

16  judicial remedies.  One is -- putting aside the issues of

17  criminal penalties, but one is a penalty, civil penalty.

18  Another is restitution in the form of disgorgement for unjust

19  enrichment.  And the third is compensatory damages.

01:53PM 20          I think what the Justice has concluded is that

21  Your Honor has made certain factual findings and had concluded

22  that the defendants have violated the securities rules.  And

23  for those violations, the Court imposed penalties on the

24  defendants, penalties of $8.2 million.  The Court, obviously,

01:53PM 25  given that this is a public offense, did not have a claim for

compensatory damages.  Because compensatory damages looks to the losses of the plaintiff.

So what the Justices said is, "Look, you have to look at disgorgement as an equitable remedy."  And I think the best way to illustrate the point that I believe the Justices were trying to make is this:  Assume someone raises $10,000 to engage in a business venture.  It makes certain representations to the investor as to how he will engage in that business venture.  He then takes the $10,000.  He does not engage in the venture or engages in it in ways that are materially different from the way in which he represented to the investor that he would engage in the business.

As a result, the person, let's assume, makes 20,000 in profits.  Traditionally, a court of equity, dating to the English Court of Chancery prior to the 18th Century, would have issued a judgment that said to the defendant, "Turn over the $20,000 to the plaintiff."  That was an unjust enrichment by using the capital that belonged to the plaintiff and he abused it to another business or to do it differently than the way you represented.  And that is the gist of the disgorgement remedy now.

And that is why the Court emphasized the importance of looking at net profits.  Did the defendant earn a profit on the capital that the defendant received from the investor?  It does not mean -- and I think Your Honor is -- Your Honor made

1    certain findings.  Those findings are given in this case.  We

2    have to take them as a point of departure.  And the defendants

3    have been penalized from those findings by the Court.

4            So now the -- and putting aside the issue of

01:56PM 5    compensatory damages, which is being faced in a separate class

6    action in a California case, the only issue that Your Honor has

7    to face now is the issue of restitution.  So that issue has to

8    come on whether or not there are net profits.  If it turns out

9    that the individual unwisely spent that $10,000 in capital and

01:56PM 10   lost 8,000, well, there are no net profits.  Or if he lost more

11   than that, more than the 10,000, there are no net profits.

12   And, therefore, a court of equity -- and this Court right now

13   sits as a court of equity.

14           When Your Honor determined the violation of the

01:56PM 15   Section 2- -- pardon me -- the violation of the Securities Act

16   of 1933, Your Honor sat as the Court making a legal judgment.

17   Now Your Honor is sitting as a court of equity to determine an

18   equitable remedy of restitution.  And that remedy, the Supreme

19   Court has said, has to be established where the plaintiff

01:57PM 20   proves the gross receipts; the defendant proves the legitimate

21   business expenses; Your Honor makes the factual findings,

22   determines if there are any profits.  And at the end of the

23   day, the plaintiff has the burden of proving whether there are

24   profits.  And we have argued and we submit in this case the SEC

01:57PM 25   has failed to meet that burden.

1          So if one looks at what the SEC is trying to recover

2     from the individual defendants, they are not profits at all.

3     Indeed, much of the funds have not even been accrued by the

4     defendants.

01:58PM 5          There are three categories of funds that are at

6     issue.  One is the $3 million deposit to Mevion.  Clearly, that

7     3 million did not go to either defendant.  Second, you have the

8     payments to the Chinese marketers.  And I'm going to leave that

9     aside now, the payments to UDG, because Your Honor made certain

01:58PM 10    factual findings regarding UDG.  But there's been no factual

11    findings regarding Delsk.  And it's very difficult to argue,

12    given the position of Delsk, his posture the case, that the

13    defendants somehow benefited by payments that went to Delsk.

14         With respect to Overseas Chinese, we have a separate

01:58PM 15    argument.  It's a third party.  There's no evidence that

16    there's a connection between Overseas Chinese and the two

17    defendants; and, therefore, it's very difficult, mere

18    speculation that is what -- that the SEC's expert stated she

19    did.  She speculated that there must have been some funds that

01:59PM 20    got back to the defendants.  Unfortunately, that is not a legal

21    judgment.  That is not a legal determination.  It has to be

22    based on evidence.  And there is no evidence to support that.

23         With respect, if I may, Your Honor, the second

24    question, I think, as I understand the question, Your Honor was

01:59PM 25    saying, "Well, didn't the Supreme Court say that 'Look,

**UNITED STATES DISTRICT COURT**

Your Honor looked at these expenses.  There must be some

legitimate expenses here.'"  I think -- and I agree with the

sense in which Your Honor phrases it, but I think, to be a bit

more precise about it, I would frame it differently.

01:59PM   I think what the Justices were saying in the

decision was if we look at -- even if we accept the

District Court's factual findings, if we look at the cost of

this enterprise and we see expenditures of about 5- to

6 million that are directly related to the promotion of a

02:00PM proton beam therapy center, it is very difficult for us to

conclude that there are no legitimate expenses.  And,

therefore, I don't understand the Court to be saying that one

has to focus solely on those specific expenses.

  I think the Court took those expenses to illustrate

02:00PM the larger point, which is that perhaps there are more than

these that are legitimate business expenses, which is why the

Justices remanded it back to Your Honor.

  If they had concluded that these were the only

expenses, that Your Honor had made factual findings, the

02:01PM Justices would have probably resolved the issue.  But they

wanted Your Honor to take a look at -- to have what we

discovered under these issue and make factual findings by these

additional issues.

  And the last question, Your Honor, with respect to

02:01PM Marcum, I think the SEC has been -- I understand they're

advocating their position, and they're taking a very aggressive

position.  But I think, in fairness, it's not been quite fair

to Marcum.

If one looks at the deposition testimony of Trang

Lam -- who is the person who testified on behalf of Marcum --

she was not an expert witness -- she explained that Marcum

started work in 2015 for these companies.  Initially, they just

started work for 2014 and 2015, and then they were asked for

additional work.  So you have to go back to earlier years.

What Marcum relied on were the bank account

statements, the credit card statements, the checks -- these

check stubs and copies of checks that they had, and other

documents, the employment agreements that they were provided.

And when they had a question about any of these documents, the

only person they would turn to would be Mr. Liu to get an

answer from him to any clarification they needed.

But Marcum did precisely what Lorraine Pearson, the

SEC's accountant, did and what Irwin, the SEC's expert, did

which is to look at the documents and make your best judgment

of that particular expenditures.

To be candid and fair, Marcum did not do an audit.

They did not verify each expenditure.  They did not call Mevion

and ask for documentation that, in fact, the $3 million had

been transferred to Mevion.  But they did have a contract with

Mevion.  Actually, two.  One was an equipment contract; second

1    one was a service contract.  They had themselves a press

2    release from Mevion saying that they had sold proton equipment

3    to Beverly.

4         Then they had a check.  They had a check from

02:03PM 5    Beverly for $3 million going to Mevion.  Therefore, they

6    concluded that was sufficient evidence to support that

7    particular expenditure.  And Marcum, obviously, as the

8    accountant is saying, "Yes, this expenditure was made.  It

9    seems to be a legitimate business expense.  This was a business

02:04PM 10   to promote a proton beam center.  This was a purchase of a

11   proton beam equipment.  Therefore, we think it's fair to

12   conclude that it's a legitimate business expense."

13        I will stop now with these responses to Your Honor's

14   three questions.  I'm happy to answer more questions.  But I do

02:04PM 15   want to make a couple additional points unless Your Honor has

16   some additional questions for me.

17        THE COURT:  No.  I want to hear the additional

18   points, but do you want to address the -- I know I haven't seen

19   the jurisdictional motion, but do you agree that I need to wait

02:04PM 20   on entering any judgment in this case until after I've ruled on

21   that jurisdictional motion?

22        MR. GOURAIGE:  And that's a pure procedural -- and I

23   think Your Honor understands my position as I heard your

24   question, that is a pure procedural question.

02:05PM 25        I do not believe the Court, at this stage, could

1    grant partial final judgment and, under Rule 54, enter final

2    judgment the way the proceedings are.  I think it's best to

3    wait until all of the issues have been decided by the Court,

4    and a final judgment would then be entered both on the issue of

02:05PM  5    the disgorgement remedy and on the issue regarding Lisa Wang.

6    And that is our objection to the entry of final judgment at

7    this point.

8         For example, I think without a 54(b) certification,

9    if Your Honor were to enter costs for final judgment now on the

02:05PM 10    disgorgement issue, it's arguable and probably not appealable

11    until final judgment has been entered.

12         THE COURT:  Okay.  Tell me your other points.

13         MR. GOURAIGE:  Your Honor, if I may just -- I want

14    to address the issue of joint and several liability.  That is

02:06PM 15    the second of the three important issues the Court addressed.

16    And in the Liu decision -- and the Court made it clear that the

17    equity common law rule was a presumption of individual

18    liability.  As we all know, equity was focused on doing justice

19    in the individual case.  And, therefore, equity did not impose

02:07PM 20    group or concerted liability.

21         So the Court said, "Even though they're married and

22    they're sued in the same case, they were engaged in the same

23    enterprise, the District Court has to look at each individual

24    and make determinations as to whether or not this individual

02:07PM 25    received profits, if any were made; and, second, if the other

party received profits and none to Lisa Wang, whether Lisa Wang benefited because Lisa Wang engaged in concerted action with her husband.

And I think the record in this case establishes that Lisa Wang was supporting her husband. Everything she did was to help him. Indeed, I think both Ms. Novodor and Dr. Thropay conceded in their depositions -- Dr. Thropay did testify about certain conduct in China. But, basically, he said, "She showed up once in my office with her husband for a meeting. She did not say much." She doesn't speak English; so she relies on her husband entirely to translate for her and to translate documents to her.

Ms. Novodor basically said the same thing, she was there supporting Mr. Liu. There is no evidence -- there is no evidence that -- we do know she's not an equity owner of any of the entities. There is no evidence that she had control over the bank accounts, no evidence that she directed, transferred the payments of any of these dollars. To be sure, there are funds transferred that went into her personal account. But all of that was in control, as she says in her deposition, by her husband.

The principal function was twofold. Because of the history of cancer among her family members, she -- and she's also trained as a pharmacist in China -- she used her knowledge and the knowledge of proton beam therapy to explain this new

tool to Chinese patients.  She was promoting it in China to

recruit patients to come to the center to receive treatment.

            And that's the issue -- that addresses the issue of

joint and several liability.  And, of course, the other aspect

02:09PM  of that issue, which we will address in a motion that we will

file on Friday, is where did she do that?  And she did that, we

will establish, in China.  And that raises an issue as to

whether or not she should be subject to the U.S. securities

laws, given that her conduct was entirely in China.

02:09PM            THE COURT:  Okay.  Well, I appreciate the arguments.

            Mr. Leung, you want to respond?

            MR. LEUNG:  I would like to, Your Honor.

            THE COURT:  Maybe if you could, on the joint and

several liability -- that wasn't one of my questions I asked

02:10PM  you, but I think it is an important issue, obviously.

            MR. LEUNG:  Sure, I will address that.

            Before I get to joint and several liability for

Defendant Wang, real briefly, this is the crux of the defense's

argument.

02:10PM            Under equity principles, if I create a corporate

entity and use that as the mechanism by which I engage in an

offering fraud, and I am diligent about looting and

misappropriating from that corporate entity and not following

my offering materials to the extent that that corporate entity

02:10PM  loses $16.5 million, never turns an entity profit, I don't have

1   to disgorge a dime.

2          There is no suggestion for that proposition in the

3   Supreme Court's opinion.  And equity doesn't warrant that sort

4   of illogical, absurd result.  Noticeably absent from that

02:10PM   5   argument is any acknowledgment of why the PP EB-5 Fund, Beverly

6   Proton, and Pacific Proton collectively lost $16.5 million.  We

7   know why.  We know that they lost $16.5 million because Liu and

8   Wang took 9- and they paid more than 10 million to overseas

9   marketers.  That's the reason why these entities weren't

02:11PM  10   profitable.  That's not an escape hatch for disgorgement.  And

11   the Supreme Court did not hold that in its opinion.

12          THE COURT:  Can you give me an estimate or refresh

13   my recollection about how much construction of the center

14   actually took place.

02:11PM  15          MR. LEUNG:  The deposition testimony discloses this.

16   So the Regional Center had been improved for a number of years.

17   But by mid-2015, no construction had occurred on Dr. Thropay's

18   property.  And that was the site that was disclosed in the POM

19   and the offering materials.

02:11PM  20          At that point, Liu starts to feel pressure from

21   potential investors and investors.  He goes to Dr. Thropay and

22   says, "You got to start construction now.  You have to knock

23   down the existing commercial office building, and we got to get

24   going because people don't think we've done anything here."

02:12PM  25          So, essentially, what occurred that summer was the

existing building was torn down.  The existing medical tenants

and commercial tenants were told to leave.  That was remediated

and a hole was dug because, ultimately, the proton beam

equipment needed to be stored underground.  That's about it.

02:12PM          THE COURT:  So it's just a big hole.

          MR. LEUNG:  Correct, Your Honor.

          And then turning to the argument that Mr. Gouraige

made with respect to the marketing fees and the Mevion

payments, and I think the thrust of what he's saying is there's

02:12PM no evidence that Liu and Wang took these funds, kept these

funds.  That's not the dispositive consideration that's laid

out in the Supreme Court's opinion.

          What the Supreme Court says it is, you can order

disgorgement of net profits from the fraud after deducting

02:13PM legitimate expenses -- after deducting legitimate expenses.

The touchstone for what is legitimate here and what is

illegitimate here are the representations that were made in the

POM.  On that front, the fact that Liu and Wang paid an extra

$8 million to overseas marketers, that forms the basis for the

02:13PM very findings of securities fraud in this case.  That cannot be

a legitimate expense.

          The same holds true for Mevion, the Court's language

about a wrongful gain under another name is not a legitimate

expense.  Again, because of the self-dealing, because Mr. Liu

02:13PM opted to cut out Dr. Thropay -- who was front and center in the

offering materials, who was an actual practicing physician who had started medical clinics in his professional life -- chose to cut out Dr. Thropay and make a $3 million payment to Mevion for the benefit of his new venture with his new partners, that can't be a legitimate expense either.

And, finally, sort of this notion of "Well, they didn't keep the money," the Supreme Court sort of noted that one of the characteristics of this remedy is that disgorgement is intended to restore the status quo.

So how do we restore the status quo here?  If I'm a defrauded investor and funds are only used in accordance with the offering material, with the POM, and no fraud occurred, in that counterfactual scenario when I'm restored to my innocent position, that $3 million payment to Mevion never takes place. The extra 8 million that was paid to overseas marketers, that's never sent out.

So the fact that Mr. Liu and Ms. Wang dissipated investor money in violation of the POM, that's the start and end of the inquiry under the Court's opinion in Liu.

Turning to joint and several liability, Your Honor, this Court has the authority to impose joint and several liability for disgorgement consistent with equitable principles if the defendants engaged in concerted wrongdoing.  That occurred here.

Ms. Wang testified at her own deposition, "I

marketed this EB-5 project."  They're trying to whitewash it
now.  They're trying to say that all she did was tell people
about a cure for cancer and that all she did was try to drum up
patients that would ultimately receive care at the anticipated
medical center.  That's not true.

Dr. Thropay testified to that fact.  Ms. Novodor
testified to that fact.  And Ms. Wang admitted that fact.  She
sold the EB-5 project.  She marketed the securities offering.
And the securities offering was fraudulent.

And in its decision, the Supreme Court, you know,
made note of three things.  There's no evidence here that
Ms. Wang is a mere passive recipient of profits.  The Supreme
Court also noted that there's no evidence here that Ms. Wang
and Mr. Liu did not commingle their finances.  Finally, the
Supreme Court noted that there's no evidence here, at least
when the case was before the Supreme Court, that Ms. Wang did
not enjoy in the fruit of the fraud.

Now, we've been back on remand.  We've had a fair
amount of factual and expert discovery.  We took nine
depositions.  None of those three considerations has changed.
They did commingle their finances.  Ms. Wang did take part in
the misappropriation of corporate funds.  And she did receive
the benefit of the fruit of the fraud.  She's been found liable
for securities fraud, Your Honor.

And to the extent there's any sort of doubt or lack

1    of clarity on the current state of their finances, I think the

2    context really does matter in this case.  We only have bank

3    records for U.S.-based accounts.

4              In discovery back in 2016, in discovery this past

02:17PM  5    year, Mr. Liu and Ms. Wang did not allow the SEC to take

6    factual discovery into their finances.  And more than that,

7    when this Court ordered both of them to repatriate some amount

8    of funds back to the United States, they both refused to abide

9    by that order of the Court.

02:17PM 10              So, yes, there's a little bit of a black box here,

11    but that black box is entirely the product of misconduct by

12    Ms. Wang and Mr. Liu.

13              THE COURT:  I know Ms. Wang received over a million

14    dollars in compensation, but was the SEC ever able to trace --

02:17PM 15    or how far were they able to trace that the significant amount

16    of money that was paid UDG, she had her hands and control on?

17              MR. LEUNG:  Our evidence established that she held

18    herself out as a senior officer of that company.

19              Mr. Liu in e-mails -- contemporaneous e-mails

02:18PM 20    referred to UDG as his wife's company.  And as far as the

21    evidence of the transfers, we see the transfer leaving a Chase

22    account, a Chase corporate account, and going to an overseas

23    account in China in the name of UDG.  At that point, we were

24    not able to develop any further facts because the subpoena to a

02:18PM 25    Chinese bank typically does not yield bank records.

1          THE COURT:  I'm curious.  Was there any

2    coordination, contact, communication with Chinese authorities

3    to try to get more information?  Did any of the investors -- I

4    assume some of the investors are in China, I would think.  Did

02:18PM 5    they ever complain to the authorities?  And what happened there

6    and -- obviously, not much happened -- and, if you know, why?

7          MR. LEUNG:  I'm unaware of any specific steps that

8    may have been taken by Chinese investors with respect to the

9    Chinese regulators or Chinese legal authorities.  I can say

02:19PM 10   that we were not able to obtain Chinese bank records.

11         And, finally, you know, there is a shareholder

12   lawsuit that has been filed on behalf of the purported class.

13   I'm not entirely familiar with it.  I don't even know if

14   Mr. Liu or Ms. Wang are parties to that litigation.  It's my

02:19PM 15   understanding that, since leaving the United States in 2016,

16   they've not returned.

17         THE COURT:  I know I've had many of these cases

18   before, and there have been many victims that -- in criminal

19   cases, not a civil case -- where victims made impact

02:19PM 20   statements.  And to your knowledge, has there been any of the

21   investors complained to the SEC or asked for information?  And

22   if so, how many?

23         MR. LEUNG:  We received information requests from

24   investors in the Pacific Proton project back in 2016-2017.  I'd

02:20PM 25   quantify it as a handful, you know.  We made some efforts to

 1   communicate with these folks and develop a record.

 2          THE COURT:  So if there's a disgorgement award

 3   issued in this case, who's going to get the money?

 4          MR. LEUNG:  If there is a disgorgement awarded in

02:20PM 5   this case, and once those funds are collected, we, in our

 6   proposed judgment, have suggested that we would place all that

 7   money -- all of those funds in a Fair Fund for distribution to

 8   defrauded investors.  This case does not present the

 9   feasibility issues that you have in a lot of situations.

02:20PM 10          Here we have a fairly discrete universe of

11   investors.  We have identified investors based on the bank

12   records.  It's about 50 or so.  We know exactly when they

13   invested.  And we think we will be able to distribute, if

14   collected, any amounts ordered in disgorgement as well as any

02:21PM 15   amounts collected pursuant to the civil monetary penalty

16   imposed by this Court.

17          THE COURT:  And this might be -- and please don't

18   hesitate to tell me that -- beyond the issues before me.  But,

19   obviously, you're asking for a significant disgorgement award.

02:21PM 20   What are the chances that you're going to be able to collect

21   anything near that?

22          MR. LEUNG:  As far as the bank accounts that we have

23   identified as of this date, I think the total funds there are

24   probably in the range of high six figures.  There is a house in

02:21PM 25   Liu and Wang's name in Orange County that appears to be, you

1    know, an asset of significant value.

2            As far as what other facts, circumstances, accounts

3    our collections group might be able to honor, I can't speculate

4    to that.  But I do know that we have a unit in D.C. that's

02:22PM 5    devoted to doing those things.

6            THE COURT:  Okay.  Mr. Gouraige, I'll give you the

7    last word, sir.

8            MR. GOURAIGE:  Thank you, Your Honor.

9            Your Honor, I think the SEC is focused on the wrong

02:22PM 10   target, if I may put it that way.  A court of equity seeks to

11   do justice by taking unjust enrichment from a defendant and

12   making restitution to plaintiff.  The reason why a court of

13   equity would focus on profits is because profits is the

14   defendant's gain.  And if equity did not restore the profits to

02:23PM 15   the plaintiff, what you would have is a fundamental injustice.

16           In the case where at law, a court would impose a

17   penalty, as Your Honor did in this case.  So all of the SEC's

18   arguments about misappropriation and misconduct by the

19   defendants have been already accounted for by the Court and

02:23PM 20   remedied by the penalty.

21           And in a civil action, compensatory damages would

22   focus only on the losses of the plaintiff.  And, therefore, the

23   profit that the defendant might have earned would then fall in

24   this class.  So equities and supplements, we already

02:23PM 25   determined.  Did the defendant make profits?  And if he did,

then equity will act directly on that defendant and ask the

defendant, in the form of a judgment, to turn over those

profits to plaintiff, or impose an equitable lien, or impose a

constructive trust, some equitable remedy of that type.

02:24PM    Now, that raises another issue with respect to the

final judgment, Your Honor, as we've argued in our papers.  The

final judgment, in our view, in a court of equity -- in this

case, the SEC's the party.  So a final judgment actually has to

direct that, if the Court were to award a disgorgement of that

02:24PM amount, that amount must go to the investors so that the SEC

would not have discretion to say, "Well, the funds here are

insufficient; therefore, it's impractical.  And so we won't

make distribution to the investors."

    And I do want to address the two factual issues,

02:24PM Your Honor.  One is with respect to the argument that

Dr. Thropay was cut out of this.  That argument will not bear

scrutiny when one reviews the documents.  Dr. Thropay was fully

engaged in this up until the very end of mid-November 2015.

Charles Liu wanted Dr. Thropay to be part of this enterprise.

02:25PM Thropay made a different choice.  And that's -- he basically

took himself out of this.  This was not an effort by Liu to get

rid of Thropay.

    Similarly, with respect to Lisa Wang's own interest

in UDG -- and here I'm, again, taking as a point of departure

02:25PM Your Honor's finding about her relationship to UDG.  Still one

has to concede that UDG came up with investors.  Delsk had 37 investors; UDG had 10 investors.  Clearly they're entitled to some compensation for what they did.

The SEC takes the position that, if the conduct -- the nature of the conduct was inappropriate, then you get no compensation for it.  Same argument they made with respect to compensation of the defendants.

I would submit to Your Honor that is not the appropriate approach to this kind of an issue.  To the extent that UDG produced ten investors and had merited to be paid some of that work, then that's the appropriate amount.  Maybe it's not the 3.5 million that they paid, but perhaps some other amount that is appropriate to be paid.

Unless the Court has further questions of me, I have nothing -- I don't have anything else to say, Your Honor.

THE COURT:  I appreciate the arguments of both sides.  I'll take this under submission, and I'll work the problem and try to get an order out as soon as possible.  But based on the argument from everybody, I'm not going to be entering judgment until I decide the threshold issue of whether I have jurisdiction.  All right.  Thank you.

**(Proceedings concluded at 2:27 p.m.)**

**--oOo--**

1                        *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5               I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  June 10, 2021*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**