Lawrence B. Steinberg (State Bar No. 101966)
    *LSteinberg@buchalter.com*
BUCHALTER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Hervé Gouraige (admitted *pro hac vice*)
    *hgouraige@sillscummis.com*
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
Telephone: (973) 643-5989
Facsimile: (973) 643-6500

Attorneys for defendants CHARLES C. LIU
and XIN WANG, a/k/a LISA WANG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. SACV 16-00974 CJC (AGRx) |
| Plaintiff, | |
| vs. | **DECLARATION OF HERVÉ GOURAIGE IN SUPPORT OF MOTION TO DISMISS CLAIMS AGAINST DEFENDANT XIN WANG, A/K/A LISA WANG BASED ON EXTRATERRITORIAL CONDUCT** |
| CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, | |
| Defendants. | Date:  July 12, 2021 |
| | Time:  1:30 p.m. |
| | Courtroom:  9B |
| | Judge: Honorable Cormac J. Carney |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

8119665 v1

## DECLARATION OF HERVÉ GOURAIGE

I, Hervé Gouraige, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney at law duly licensed to practice law in the States of New Jersey and New York.  I am also admitted *pro hac vice* to practice before this Court. I am the primary attorney responsible for representing defendants Charles C. Liu and Xin Wang, a/k/a Lisa Wang in this case. I have personal knowledge of the matters set forth below, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I submit this declaration in support of defendant Xin Wang, a/k/a Lisa Wang's motion to dismiss claims against her based on extraterritorial conduct.

3.      Attached hereto as Exhibit A is a true and accurate copy of the May 4, 2016 SEC Xin Wang investigative deposition transcript.

4.      Attached hereto as Exhibit B is a true and accurate copy of the relevant portions of the February 25, 2021 Xin Wang, a/k/a Lisa Wang litigation deposition transcript.

5.      Attached hereto as Exhibit C is a true and accurate copy of the relevant portions of the March 5, 2021 John Thropay, M.D. deposition transcript.

6.      Attached hereto as Exhibit D is a true and accurate copy of the relevant portions of the February 22, 2021 Ruth Thropay Lopez Novodor deposition transcript.

7.      Attached hereto as Exhibit E is a true and accurate copy of the March 23, 2016 SEC Charles C. Liu investigative deposition transcript.

8.      Attached hereto as Exhibit F is a true and accurate copy of the relevant portions of the February 24, 2021 Charles C. Liu litigation deposition transcript.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of June 2021 in Summit, New Jersey.


/s/ *Hervé Gouraige*
HERVÉ GOURAIGE

# Exhibit A

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:        )

4                          ) File No. LA-04639-A

5 PACIFIC PROTON THERAPY    )

6 REGIONAL CENTER, LLC      )

7

8 WITNESS:  Xin Wang

9 PAGES:   1 through 88

10 PLACE:   Securities and Exchange Commission

11      444 South Flower Street, Suite 900

12      Los Angeles, California  90071

13 DATE:   Wednesday, May 4, 2016

14

15    The above entitled matter came on for hearing,

16 pursuant to notice, at 9:18 a.m.

17

18

19

20

21

22

23

24      Diversified Reporting Services, Inc.

25         (202) 467 9200

---

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4    TONY REGENSTREIF, ESQ.

5    VICTORIA A. LEVIN, Assistant Regional Director

6    Securities and Exchange Commission

7    Division of Enforcement

8    444 South Flower Street, Suite 900

9    Los Angeles, California 90071

10    (323) 965-3998

11

12 On behalf of the Witness:

13    EDWARD GARTENBERG, ESQ.

14    MILENA DOLUKHANYAN, ESQ.

15    Gartenberg, Gelfand & Hayton, LLP

16    15260 Ventura Blvd., Suite 1920

17    Sherman Oaks, California  91403

18    (213) 542-2100

19

20 Also Present:

21    Catherine Shu - Mandarin Interpreter for SEC

22    Penny Kole - Mandarin Interpreter for Gartenberg

23

24

25

---

Page 3

1           C O N T E N T S

2

3 WITNESS:                  EXAMINATION

4 Xin Wang                      5

5

6 EXHIBITS:    DESCRIPTION          IDENTIFIED

7 26      Letter and Subpoena         11

8 27      Background Questionnaire      13

9 28      Los Angeles Proton Therapy    39

10      Center Document in Mandarin

11 29      Employment Agreement between   42

12 Beverly Proton and Ms. Wang

13 30      Minutes of Beverly Proton     47

14 Center for 1/19/16

15 31      Engagement Agreement between   54

16 Beijing Pacific Damei

17 Consulting Company and

18 Pacific Proton

19 Therapy Regional Center

20 32      Pamphlet Entitled Polular     58

21 Project for Safety

22 33      Printout of Executive Team     64

23 United Damei Website page

24 34      Printout of Government Support   70

25 page of United Damei's Website

---

Page 4

1           C O N T E N T S (CONT.)

2

3 EXHIBITS:    DESCRIPTION          IDENTIFIED

4 35      Investor List              77

5 36      E-Mail dated 12/22/15        80

6 37      Check, dated 10/15/14, to IRS    81

7 38      Check Dated 10/24/14         82

8 from Regional Center to

9 West Pacific Medical Laboratory

10 39      Check Dated 11/21/14,        83

11 to the IRS from the Regional

12 Center

13 40      Check Dated 6/19/15,         84

14 from the Regional Center to

15 Yan Leung, M.D.

16

17      EXHIBITS PREVIOUSLY IDENTIFIED

18 EXHIBITS:    DESCRIPTION          IDENTIFIED

19 1      Form 1662               8

20 5      Offering Memorandum for Pacific   36

21 Proton EB-5 Fund, LLC

22 11      Engagement Agreement with     50

23 United Damei Investment Company

24 and Pacific Proton Regional

25 Therapy Center

---

Page 5

1              P R O C E E D I N G S
2        MR. REGENSTREIF:  We're on the record at
3   9:18 a.m. on Wednesday, May 4th, 2016.
4        Please raise your right hand.
5   Whereupon,
6              XIN WANG
7   was called as a witness and, having been first duly
8   sworn, was examined and testified as follows:
9              EXAMINATION
10       BY MR. REGENSTREIF:
11       Q   You can put your hand down.  Please state
12   your name.
13       A   Xin Wang.
14       Q   Can you spell that in English for me.
15       A   X-i-n, W-a-n-g.
16       Q   Thank you.
17           My name is Tony Regenstreif, and this is
18   Victoria Levin.  We are officers of the Commission
19   for the purposes of this proceeding.
20           This is an investigation by the United
21   States Securities & Exchange Commission in the matter
22   of Pacific Proton Therapy Regional Center LLC to
23   determine whether there have been violations of
24   certain provisions of the federal Securities laws,
25   however, the facts developed in this investigation

Page 6

1   might constitute violations of other federal or
2   state, civil or criminal laws.
3        MR. GARTENBERG:  May I ask the interpreter
4   to speak up a little bit louder.
5        THE INTERPRETER:  Of course.  I try my
6   best.
7        MR. GARTENBERG:  Thank you.
8        BY MR. REGENSTREIF:
9        Q   Ms. Wang, do you understand that your oath
10   here today is the same oath as in a court of law?
11       A   Yes.
12       MS. LEVIN:  Would your interpreter like to
13   move between our interpreter and the witness?
14       MR. GARTENBERG:  I would like the
15   interpreter where I can speak to her.  I would like
16   the interpreter to be able to hear the
17   interpretation.  The interpreter -- I want the
18   interpreter where she's sitting.
19       MS. LEVIN:  I understand you may not --
20   it's not a perfect world so --
21       MR. REGENSTREIF:  We'll try our best.
22       MR. GARTENBERG:  I have no problem.  My
23   request was just to try to speak up a little bit.
24       MR. REGENSTREIF:  Great.
25       MR. GARTENBERG:  Thank you.  I appreciate

Page 7

1   it.
2        BY MR. REGENSTREIF:
3        Q   Ms. Wang, have you ever had your testimony
4   or deposition taken before?
5        A   No.
6        Q   Okay.  So I'll explain briefly how this
7   works.  I'll ask you a question and I'll stop, and
8   then you will have an opportunity to answer me.  We
9   should let each other finish before we start
10   speaking.  You have to give me a verbal answer.  No
11   head shakes or other nonverbal responses.
12       A   Okay.
13       Q   If you don't understand a question, just
14   let me know and I'll try to make it understandable.
15       A   Okay.
16       Q   Before we began I provided you a copy of
17   the Formal Order and the Supplemental Formal Order of
18   Investigation.  And that will be available for you to
19   review during the course of this proceeding. Have you
20   had an opportunity to review the Formal Order?
21       A   This one you just referred to?
22       Q   Yes.
23       MR. GARTENBERG:  I'll state for the record
24   I have summarized for her what is included in the
25   Formal Order, and I have summarized what is in the

Page 8

1   1552.
2        MS. LEVIN:  1662.
3        MR. GARTENBERG:  1662, the information that
4   basically says you must tell the truth and the SEC
5   could do whatever it wishes with the information in
6   substance so as to save the time for the
7   word-for-word translation, we will stipulate that my
8   having read it and summarized it for her is
9   satisfactory.
10       MR. REGENSTREIF:  Thank you.
11           (SEC Exhibit No. 1 was referred
12           to.)
13       BY MR. REGENSTREIF:
14       Q   And I appreciate that, but just to tie it
15   up in a bow, I've also provided you with a copy of
16   Form 1662 which sets forth how we use the
17   information.
18       MR. GARTENBERG:  So the record is clear and
19   we can have her testimony on this, it's my
20   understanding that Ms. Wang does not read English.
21       MR. REGENSTREIF:  Okay.  We'll take your
22   representation that you summarized it adequately in
23   the course of your representation and she understands
24   that?
25       MR. GARTENBERG:  Yes.

Page 9

1       THE WITNESS:  Yes.
2       BY MR. REGENSTREIF:
3    Q   Ms. Wang, are you represented by a lawyer
4    today?
5    A   Yes.
6       MR. REGENSTREIF:  Would Counsel please
7    identify themselves?
8       MR. GARTENBERG:  Edward Gartenberg and
9    Milena Dolukhanyan with the law firm Gartenberg,
10   Gelfand & Hayton, LLP.  We represent another witness
11   in -- another witness under subpoena in this action.
12   We previously represented Pacific Proton Therapy
13   Center and advised the staff that they have a new
14   managing member and shortly thereafter we've arranged
15   for separate counsel for Pacific Proton Therapy
16   Center.
17      BY MR. REGENSTREIF:
18   Q   I just want to bring to your attention, as
19   your counsel already did, that you are represented by
20   counsel who also represents
21   other persons involved in the Commission's
22   investigation.
23   A   Okay.
24   Q   This multiple representation, however,
25   presents a potential conflict of interest if one

Page 10

1    client's interests are or may be adverse to
2    another's.
3       MR. GARTENBERG:  I can, perhaps, save you
4    some time.  The Commission could be rest-assured that
5    we've advised -- I can perhaps save you some time,
6    please feel free to put what you like on the record,
7    which you should understand is consistent with our
8    ethical responsibilities.  We explained all this to
9    the client.
10      MR. REGENSTREIF:  We can rest with that.
11      BY MR. REGENSTREIF:
12   Q   Ms. Wang, do you understand that we request
13   your testimony here today based on your own
14   recollection of events?
15   A   Okay.
16   Q   So I don't want you to guess.
17   A   Okay.
18   Q   If you have some basis for recollection,
19   please tell me that.  Are you aware of any reason why
20   you feel you cannot go forward with your best
21   testimony today?
22   A   No.
23      MR. REGENSTREIF:  I'm going to ask the
24   court reporter to mark as Exhibit 26 a letter and
25   subpoena addressed to Ms. Wang.

Page 11

1       (SEC Exhibit No. 26 was marked
2         for identification.)
3       BY MR. REGENSTREIF:
4    Q   I've handed you Exhibit 26.  Is this a copy
5    of the subpoena you are appearing pursuant to today?
6    A   Are you asking me?
7    Q   Yes.
8       (A discussion was held off the record.)
9       MS. LEVIN:  If I can interrupt you, we're
10   on the record so unless it's a privileged
11   communication --
12      MR. GARTENBERG:  It is a privileged
13   communication.
14      MS. LEVIN:  -- can you please speak up so
15   our court reporter can put it on the record?
16      Then we can go off the record and you need
17   to step outside, and then we'll come back on.  You
18   understand?
19      MR. GARTENBERG:  No problem.  I'm trying to
20   expedite it.
21      MR. REGENSTREIF:  Let's go off.
22      MS. LEVIN:  We're off the record at 9:29.
23      (Recess taken from 9:29 until 9:35.)
24      MR. REGENSTREIF:  Back on the record.
25      MR. GARTENBERG:  I have talked with my

Page 12

1    client through an interpreter, and I appreciate the
2    SEC's accommodation time and space to do that. What
3    we have learned and, frankly, did not understand
4    until just now, despite having reviewed it
5    beforehand, is that Charles Liu, her husband, went
6    over the subpoena generally with her and he handled
7    getting together the documents that were responsive
8    because she does not read English.  So in that sense,
9    she's gone through the subpoena but she did not
10   personally item-by-item go through the subpoena.  We
11   have no reason to believe that that's not a complete
12   production, but if the staff wants something further,
13   we will certainly have our translator at a later date
14   go through each item with her.
15      But the difficulty is to the extent she's
16   producing documents that are in English, she really
17   doesn't know that that's the exact right document. So
18   we've made every effort to comply, but that's the
19   limit of what we've been able to do.
20      MR. REGENSTREIF:  Thank you for that. Thank
21   you for clarifying that.  In the event through
22   today's testimony or some other later date it comes
23   to our attention we need more, we will get in touch
24   with you.
25      MR. GARTENBERG:  Thank you.

Page 13

1    MR. REGENSTREIF:  With that, I'm assuming
2  that, and maybe this should be directed to you, Ed,
3  that at least for Exhibit 26, we are agreeing this is
4  the subpoena she's appearing pursuant today?
5    MR. GARTENBERG:  Yes, this is the subpoena
6  that has been explained to her rather than a verbatim
7  translation.  We are satisfied that the explanation
8  is sufficient and that she understands she is under
9  subpoena here and is here to testify.
10    MR. REGENSTREIF:  Great.  That's enough for
11  me.
12  BY MR. REGENSTREIF:
13    Q   I'm going to ask the court reporter to mark
14  as Exhibit 27 a Background Questionnaire.
15        (SEC Exhibit No. 27 was marked
16        for identification.)
17  BY MR. REGENSTREIF:
18    Q   Ms. Wang, I'm handing you Exhibit 27.
19    MR. GARTENBERG:  I apologize again for
20  interrupting.  May I request that we have had the
21  questionnaire filled out by her husband who speaks
22  both Chinese and English based on information that he
23  obtained from his wife and so, again, I don't think
24  she can go through and obviously can't read these,
25  but we have made that effort to respond to the

Page 14

1  questionnaire.
2      I also want to add that while we understand
3  that with respect to citizenship as of the April 10th
4  date what I've been advised is that -- forgive me I'm
5  speaking more slowly, because I want to allow for the
6  translation, it's not that I suddenly became unable
7  to speak faster -- we understand that it was
8  completed as of April 10th, but we have learned that
9  since April 10th she was accepted for citizenship in
10  Granada as well based upon an application we are told
11  that was pending more than a year earlier or
12  approximately one year earlier.
13  BY MR. REGENSTREIF:
14    Q   Thank you for bringing that to my
15  attention.  Understanding what your lawyer has said
16  about the completion of Exhibit 27, do you recognize
17  Exhibit 27?
18    A   Yes.
19    Q   Did you provide the information to complete
20  Exhibit 27?
21    A   Yes.
22    Q   And the answers or the information provided
23  to complete Exhibit 27 are accurate and truthful, to
24  the best of your knowledge?
25    A   Yes.

Page 15

1    Q   Other than what your counsel said about
2  your now citizenship in Granada, has anything else
3  changed with respect to the information on Exhibit
4  27?
5    A   No.
6    Q   Can you turn the page to page 2. Number 10
7  on page 2 it lists a user name for Yahoo; do you see
8  that?
9    A   Yes.
10    Q   It says Lisa Wang.
11    A   Yes, yes.
12    Q   Do you ever go by the name Lisa?
13    A   Where are you referring to?  I don't --
14    Q   I'm going to direct you on the page right
15  there it says, "Lisa Wang Yahoo."
16    A   Are you asking me if I used a name of Lisa
17  Wang Yahoo?
18    Q   Other than going by Xin, do you also go by
19  the first name Lisa?
20    A   On my business card in English.
21    Q   The English name you will introduce
22  yourself as sometimes Lisa?
23    A   Yes, it's easy to remember.
24    Q   Okay.  Thank you.
25    MR. GARTENBERG:  May I ask does she also

Page 16

1  have an e-mail in Chinese characters?
2    THE WITNESS:  No.
3    MR. REGENSTREIF:  Thank you.
4  BY MR. REGENSTREIF:
5    Q   The next page on Exhibit 27, page 3, there
6  are questions about whether you have ever been an
7  officer or director of a publically-held company.
8    A   No.  Public company?  No public company.
9    Q   Have you ever been an officer or director
10  of any privately-held company?
11    A   Okay.  There's one here, but I don't know
12  the English name, but it's like right now it's a
13  hospital, and then the future they're going to build
14  into a building.  It's a future construction. We just
15  finished restoration.
16    Q   Is this the hospital -- hotel near Beverly
17  Hospital?
18    A   Yes.
19    Q   And that's the only entity that you've been
20  an officer or director of?
21    A   But there's another one, Beverly Hospital I
22  am the vice chairman or vice CEO.
23    Q   Of Beverly Hospital?
24    INTERPRETER KOLE:  Vice president.
25  BY MR. GARTENBERG:

Page 17

1    Q    Beverly Proton Center, you're vice
2  president of Beverly Proton Center?
3    A    Yes.
4    Q    And any other positions as officer or
5  director?
6        INTERPRETER SHU:  This is the interpreter
7  speaking, what would you like me to do?
8        MR. GARTENBERG:  I think there's an issue
9  with respect to the translation.  We can do one of
10  two things, whichever the SEC wants, I say this with
11  respect to the interpreter and fully appreciate how
12  difficult it is to interpret, but I believe that
13  she's translating -- I'm informed she's translating
14  the word "officer" as "supervisor."  We can either do
15  what we're doing and try to go forward with what we
16  have, or you can have a court reporter also keep an
17  actual audio transcript, if not, I would ask that we
18  correct supervisor and officer so the record is
19  clear.
20        MS. LEVIN:  I would just like to state that
21  none of us are in a position to determine whether the
22  SEC's interpreter or your interpreter has made the
23  correct interpretation.  So I suggest that we put it
24  on the record that your interpreter believes that our
25  interpreter is using the word "supervisor" on

Page 18

1  Mandarin Chinese as opposed to "officer."
2        MR. GARTENBERG:  Absolutely.  I agree with
3  you a hundred percent.  I'm suggesting a way to
4  proceed, but that's fine.  I agree with you
5  completely.
6        MS. LEVIN:  Let's proceed.
7        INTERPRETER SHU:  Thank you.
8        BY MR. REGENSTREIF:
9    Q    So the answer is?
10    A    What's your question?
11    Q    Who knows.
12    A    Are you asking me if I have any other
13  companies or --
14    Q    Yes.
15    A    No.
16    Q    Great.
17        MS. LEVIN:  Setting aside officer and
18  director, are you affiliated with any other companies
19  either as an employee, an advisor, or in any other
20  position?
21        THE WITNESS:  In China or in the U.S. or
22  both?
23        MS. LEVIN:  Both, please.
24        THE WITNESS:  In China, actually, I
25  represented Beverly Proton Center to do the marketing

Page 19

1  promotion in China, so in China they probably would
2  print a business card for me stating I am the
3  director of the board, but actually in China, it's
4  just on the paper.  It doesn't mean anything.
5        BY MR. REGENSTREIF:
6    Q    Just Beverly Proton?
7    A    In China, actually, I didn't get paid, no
8  wages, just a card.
9    Q    That said you were director, board of
10  directors of Beverly Proton?
11    A    No, it's a business card that has business
12  relationship with because they have business -- they
13  have business relationship with Beverly Proton so
14  when I went to China for marketing promotion, they
15  hoped that I could do the promotion for both sides,
16  so that's a business card.
17        MR. GARTENBERG:  I would like to point out,
18  while I do not know the practice in China, elsewhere
19  in the world director is used different than we use
20  board of directors.  Your question you assume a
21  director is a member of the board. Director in some
22  countries is an officer title. With that, I need to
23  speak to my client.
24        MS. LEVIN:  I have one follow-up question.
25        MR. GARTENBERG:  Please, absolutely.

Page 20

1        MS. LEVIN:  When you said "both sides,"
2  what did you mean?
3        THE WITNESS:  Okay.  The Chinese
4  partnership company as well as the agency for the
5  Beverly Proton here.
6        BY MR. REGENSTREIF:
7    Q    What is the name of the Chinese partnership
8  company?
9    A    Pacific Damei, D-a-m-e-i, UDG Group, UDG
10  Group, and with the logo it says UDG Group, but the
11  name is Pacific Damei, D-a-m-e-i.
12    Q    Your role with Pacific Damei is what?
13    A    No role, just help them.  The Pacific
14  Proton send me to China to help them to do marketing
15  promotion.  I also represented U.S. Beverly Proton to
16  go to China to do some medical seminar or
17  consultation.
18        MR. GARTENBERG:  May I now have a moment to
19  speak to my client?
20        MR. REGENSTREIF:  Absolutely.  Off the
21  record.
22        (Recess taken from 9:52 until 9:57.)
23        MR. REGENSTREIF:  Back on the record.
24        BY MR. REGENSTREIF:
25    Q    So back to Exhibit 27, page 7.  So on page

Page 21

1   7 it says that you have a diploma from Jinzhou
2   Medical School; is that right?
3       A   Yes.
4       Q   Is that a medical degree to be a doctor?
5       A   In China, actually, it's for the
6   pharmacist, not for the doctor.
7       Q   You were trained to be a pharmacist?
8       A   Correct.
9       Q   Were you ever a pharmacist?
10      A   Yes.
11      Q   In China?
12      A   Yes.
13      Q   And in the United States?
14      A   No.
15      Q   How long were you a pharmacist?
16      A   It was a long time ago.  Let me think.
17  Approximately a year.
18      Q   Did you have any specialty?
19      A   What do you mean by "specialty"?
20      Q   Any particular type of pharmacy that you
21  did or just generally?
22      A   Just general.
23      Q   Do you know of an entity called Pacific
24  Proton Therapy Regional Center?
25      A   I did not hear it clearly.  What is the

Page 22

1   first word?
2       Q   Pacific Proton.
3       A   I didn't talk about you.  I'm talking about
4   the interpreter.
5       Q   That makes sense.
6       A   Could you please repeat.
7       Q   Do you know Pacific Proton Therapy Regional
8   Center?
9       A   What is your question?
10      Q   Do you know it?
11      A   Yes.  Okay.
12      Q   What is it?
13      A   It's a regional center.
14      Q   What does that mean?
15      A   For EB-5.
16      Q   And do you work for the Regional Center?
17      A   No.
18      Q   Have you worked on any other EB-5 projects?
19      A   No.
20      Q   Do you know what EB-5 is?
21      A   Generally.
22      Q   Tell me.
23      A   Investment and immigration.
24      Q   How do those two things go together,
25  investment and immigration?

Page 23

1       A   I just know Chinese people that can invest
2   on a project and afterwards they can immigrate here.
3       Q   Okay.  And you said before you were the
4   vice president for Beverly Proton Center?
5       A   I don't know if that's the corresponding
6   translation in Chinese.
7       Q   What do you do for Beverly Proton Center?
8       A   Actually, before the Beverly Proton was
9   established here in the U.S., I went to China to do
10  some medical marketing promotion because in China a
11  lot of people didn't know what this Beverly Proton
12  was about.
13      Q   And what did you tell people?
14      A   I told them the strengths about this Proton
15  center in terms of cancer cure.  And also in the
16  future after this business is established they can
17  bring patients here for treatment.
18      Q   When did you first go to China to talk
19  about Beverly Proton?
20      A   Are you talking about the Beverly Proton
21  Center?
22      Q   Yes.
23      A   I was not talking about the facility, the
24  company or the hospital, I was talking about the
25  cure.

Page 24

1       Q   Okay.  When did you first go to talk about
2   the cure?
3       A   Probably it was in year '11 or --
4       Q   Around 2011?
5       A   Approximately.
6       Q   How many times have you been to China to
7   talk about the cure?
8       A   Many times.
9       Q   How many times a year?
10      A   In the first couple of years I don't
11  remember, many times.  However, the recent two years
12  I spent more time in China.
13      Q   More time in China than in the United
14  States?
15      A   Correct.
16      Q   And while you were in China you were
17  talking about the cure?
18      A   Correct.
19          MR. GARTENBERG:  I just want to make sure
20  there's no translation issue, just to be sure, you
21  spend more time in China than you do in the United
22  States; is that correct?
23          THE WITNESS:  I did not really do the
24  calculation, but I feel I spend more time away from
25  my children.

Page 25

BY MR. REGENSTREIF:

1
2    Q   A lot of time?
3    A   Yes.
4    Q   That's a good enough answer for me.  When
5  you're talking in China, are you asking people to
6  invest money in the project?
7    A   No.
8    Q   So it's just about the cure?
9    A   Yes.
10   Q   And the goal when you're talking about the
11 cure is for people to sign up for the cure?
12   A   Yes.
13       MR. GARTENBERG:  Excuse me.
14       (A discussion was held off the record.)
15       MR. REGENSTREIF:  She's been using
16 treatment instead of cure.  Treatment is a more
17 professional word than cure.
18       MR. GARTENBERG:  That was my concern
19 whether that was a language issue.
20       MS. LEVIN:  I didn't know you had learned
21 Mandarin in the last ten minutes.
22       MR. GARTENBERG:  I have a sense for when a
23 word might mean something different.
24       MR. REGENSTREIF:  That's quite a skill.
25       BY MR. REGENSTREIF:

Page 26

1    Q   Do you get a salary from Beverly Proton?
2    A   Yes.
3    Q   How much?
4    A   280,000 per year.
5    Q   How long have you received that salary?
6    A   Before they did not pay me.  They just paid
7  me.
8    Q   This year?
9    A   Yes.
10       MR. GARTENBERG:  May I double check that?
11 Were you paid at all -- this is on the record -- were
12 you paid at all in 2015?  If you don't know, say you
13 don't know.
14       THE WITNESS:  I can check my accounting
15 records.
16       BY MR. REGENSTREIF:
17   Q   Right now you're not sure if you were paid
18 before 2016?
19   A   They paid me, but I'm not sure about the
20 timing.
21   Q   Okay.
22       MR. GARTENBERG:  May I have a minute,
23 please?
24       (A discussion was held off the record.)
25       BY MR. REGENSTREIF:

Page 27

1    Q   So did you receive any payments at all
2  before 2016?
3    A   Yes, just a little.
4    Q   Most of the payments to you have been made
5  in 2016, this year?
6    A   I'm not sure about the timing.  I have to
7  check.
8        MR. GARTENBERG:  May I remind her that if
9  you -- please translate.
10       INTERPRETER SHU:  I'm waiting for your
11 statement.
12       MR. GARTENBERG:  If you're not sure, tell
13 them you're not sure.  If he wants to have you try to
14 remember or something else, he will tell you. But it
15 is -- if you are not sure, it is better to say you're
16 not sure than guess and make him think you know for
17 sure if you don't.
18       THE WITNESS:  Okay.
19       BY MR. REGENSTREIF:
20   Q   Have you ever met with anyone who is
21 investing money into the project?
22   A   What do you mean?
23   Q   If someone invested money into Beverly
24 Proton EB-5, did you meet with them?
25   A   Yes.

Page 28

1    Q   Why?
2    A   Because while I was doing the marketing
3  promotion, they may have some questions or they want
4  to get more information about the cure, I would tell
5  them.  And also they would ask me or try to get more
6  information about the school here, the taxes here, as
7  well as the real estate market. They hope I could
8  help them.
9    Q   Did you ever ask them to invest?
10   A   No.
11       MS. LEVIN:  You said you were paid a salary
12 by Beverly Proton Center; correct?
13       THE WITNESS:  Correct.
14       MS. LEVIN:  How much have you, in fact,
15 been paid?
16       THE WITNESS:  Right now approximately --
17 they already paid me.
18       MS. LEVIN:  And how much approximately?
19       THE WITNESS:  Per year $280,000 on that
20 basis.
21       MS. LEVIN:  I understand but what have you
22 actually received?
23       THE WITNESS:  Adding up together over a
24 million.  I don't remember the exact amount because
25 in the beginning there was little by little.

Page 29

1      MR. REGENSTREIF:  Let's go off the record.
2      (Recess taken from 10:13 until 10:21.)
3      MR. REGENSTREIF:  Back on the record.
4      BY MR. REGENSTREIF:
5    Q    So when you were meeting with people about
6  the treatment, was that a meeting with lots of people
7  or one-on-one?
8    A    On some occasions it was one-on-one, on
9  some occasions I met a lot of people at once.
10   Q    So there would be a big meeting and you
11  would give, like, a speech?
12   A    Correct.
13   Q    Did you have a presentation with you?
14   A    What do you mean by "presentation"?
15   Q    Slides, a PowerPoint, pictures, graphs.
16   A    There would be a video, pictures.
17   Q    Was it the same material used over and over
18  again?
19   A    No, actually, in the beginning it would be
20  just some basic information, and then afterwards I
21  may add more information because some clients they
22  did not understand what the cure would be.
23   Q    So then do you have a copy of the
24  information that you would show to clients when you
25  were talking to them about the treatment?

Page 30

1    A    Are you referring to -- what information?
2  What materials?
3    Q    When you would give a speech, did you have
4  behind you on a screen maybe a video that played?
5    A    Yes.
6    Q    Yes?
7    A    Yes.
8    Q    Do you have a copy of that video?
9    A    Yes.
10   Q    Have you given a copy of that video to your
11  lawyer?
12   A    Not yet.
13      MR. GARTENBERG:  First we hear of it. We'll
14  follow it up.
15      MR. REGENSTREIF:  Thank you.
16      MS. LEVIN:  Also, copies of the business
17  card or cards used in China for the marketing.
18      MR. GARTENBERG:  We'll be happy to follow
19  it up.
20      BY MR. REGENSTREIF:
21   Q    Also, did you show any, you know, other
22  information on a screen other than a video?
23   A    I didn't make that video.
24      MR. GARTENBERG:  May I ask because I think
25  there may be some misunderstanding about the video?

Page 31

1  Thank you.  Is this a video that you produced or one
2  that the agents like Damei or Delsk or Overseas
3  Chinese produced?
4      THE WITNESS:  They produced.
5      MR. GARTENBERG:  They have the video;
6  correct?
7      THE WITNESS:  Correct.
8      MR. GARTENBERG:  Do you personally have a
9  copy of the video?
10      THE WITNESS:  I don't have it.
11      MR. GARTENBERG:  To answer your question,
12  and we're happy to follow up with more detail, it
13  sounds to me like this is not something she would
14  have to produce in response to a subpoena, but it
15  would be Damei or Overseas Chinese or Delsk that
16  would have it.
17      MS. LEVIN:  Okay.  But I think you need to
18  follow up.
19      MR. GARTENBERG:  I'd be happy to follow up
20  to try to locate it so that it's clear, it's not that
21  she hasn't produced it in response to the subpoena.
22      MR. REGENSTREIF:  Sure.
23      BY MR. REGENSTREIF:
24   Q    Do you have a speech that you would give to
25  clients?

Page 32

1    A    No.
2    Q    Who was your contact at Damei?
3    A    Mr. Chen, C-h-e-n.
4    Q    What was Mr. Chen's first name?
5    A    Xiao Chun, X-i-a-o, C-h-u-n.
6    Q    What is his role at Damei?
7    A    He -- I'm not sure.
8    Q    And how many times have you met with Mr.
9  Chen?
10   A    We meet very often.
11   Q    Many times a year?
12   A    Not sure.
13   Q    How many times have you met with him in
14  2016?
15   A    I'm really not sure.
16   Q    You met with him many times?
17   A    Correct.
18   Q    Do you get paid by Damei?
19   A    No.
20      MS. LEVIN:  What do you discuss when you
21  meet with Mr. Chen?
22      THE WITNESS:  He will tell me nothing,
23  actually.  We would talk -- we will talk about
24  something related to the medical, and he will also
25  ask me about the progress on Proton.  Sometimes we

Page 33

1 had patients he will like me to help.  Before the
2 center was built, he would like me to help in the
3 U.S. to see.  Sometimes we will talk about --
4 sometimes we will talk about afterwards when the
5 patients came to the U.S. for treatment, things like
6 that, because there was an insurance company which
7 will like to come here to have partnership to work
8 together, some hospitals and similar channels like
9 that.
10     BY MR. REGENSTREIF:
11   Q   Did any patients ever come here?
12     MR. GARTENBERG:  I think she was in the
13 middle of the sentence.
14     THE WITNESS:  Finished.
15     BY MR. REGENSTREIF:
16   Q   Did any patients ever come here?
17   A   They do now, yes.
18   Q   Where are they being treated?
19   A   There was no treatment provided.  They came
20 here for exam.
21     MR. GARTENBERG:  For?
22     INTERPRETER SHU:  Exam.
23     BY MR. REGENSTREIF:
24   Q   Did Beverly Proton get paid for bringing
25 patients for exams?

Page 34

1   A   Beverly Proton is not finished yet.  They
2 will not exam at Beverly Proton.
3   Q   Did you help bring the patients to be
4 examined here in the United States?
5   A   I was -- I just help them for the
6 coordinating.
7   Q   Did you get paid for helping them?
8   A   No.
9   Q   What doctors are you working with to
10 examine these patients?
11   A   Dr. Supay.
12   Q   Where does Dr. Supay work?
13   A   Before he or she was working at this
14 Proton, I believe he or she in the future will work
15 at Proton, but before it is established he or she has
16 his or her clinic.
17   Q   You don't know if the doctor is a man or a
18 woman?
19   A   Man.
20     MR. GARTENBERG:  Is Supay Thropay?
21     THE WITNESS:  Thropay.
22     MR. REGENSTREIF:  T-h-r-o-p-a-y.
23     MR. GARTENBERG:  Is this the Thropay, and I
24 use the word loosely, who was partners with your
25 husband?

Page 35

1     THE WITNESS:  Yes.
2     BY MR. REGENSTREIF:
3   Q   Are you still sending patients to Dr.
4 Thropay?
5   A   When?
6   Q   Last month.
7   A   No.
8   Q   March?
9   A   No.
10   Q   February?
11   A   No.
12   Q   January?
13   A   I don't recall.
14   Q   Do you recall the last time you referred a
15 patient to Dr. Thropay?
16   A   I don't recall.  Sometimes there's no
17 referral, just phone call consultations.
18   Q   They would talk to Dr. Thropay?
19   A   Yes.
20   Q   I'm going to hand the witness previously
21 marked Exhibit 5.  Exhibit 5 is the Offering
22 Memorandum for Pacific Proton EB-5 Fund, LLC.  Have
23 you ever seen Exhibit 5?
24   A   No.
25     (SEC Exhibit No. 5 was referred

Page 36

1     to.)
2     MR. GARTENBERG:  Just to clarify, she may
3 have seen this document.  Obviously it's in English,
4 so you may want to ask if she has seen a PPM for
5 Pacific Proton EB-5 Fund in Chinese.
6     THE WITNESS:  No.
7     MR. REGENSTREIF:  Apparently not.
8     BY MR. REGENSTREIF:
9   Q   I'm going to ask --
10     MR. GARTENBERG:  May I have a word with
11 her, please?
12     MR. REGENSTREIF:  You know --
13     MR. GARTENBERG:  I've got to speak to her.
14 You don't want me to lean over her, and I have a
15 reason for doing that, I assume not to interrupt
16 testimony.
17     MR. REGENSTREIF:  All right.  Off the
18 record.
19     (Recess taken from 10:36 until 10:39.)
20     MR. REGENSTREIF:  Let's go back on the
21 record.
22     BY MR. REGENSTREIF:
23   Q   Let me ask again, have you seen a copy of
24 an Offering Memorandum for the Pacific Proton EB-5
25 Fund in Mandarin?

Page 37

1    A    No.
2    Q    So is there -- do you have any reason to
3  believe that there is an offering document for
4  investors for Pacific Proton EB-5 in Mandarin?
5    A    I'm not sure.
6        MR. REGENSTREIF: Let's go off the record.
7        (A discussion was held off the record.)
8        MR. REGENSTREIF: On the record.
9        MR. GARTENBERG: We're about -- off the
10  record -- we're about 70 percent overlapped between
11  the questions and my prep.
12       MR. REGENSTREIF: We're on the record;
13  right?
14       THE REPORTER: Yes.
15       MR. GARTENBERG: My comment was not on the
16  record?
17       THE REPORTER: Counsel said "on the
18  record."
19       MR. REGENSTREIF: Don't worry about it. So
20  we're all on the same page --
21       MR. GARTENBERG: I did not want my comment
22  on the record. I thought we were off the record.
23       MS. LEVIN: Ed, as you well know having
24  done this a million times, we are the ones that
25  control the record.

Page 38

1        MR. GARTENBERG: There was no intention to
2  waive any attorney-client privilege or undertake any
3  obligations with respect to what my client is
4  testifying to or not.
5        MR. REGENSTREIF: To go back and put on the
6  record what was off the record was there appears to
7  be a Mandarin version of the Offering Memorandum, you
8  will undertake to identify that in the production for
9  me, and we'll go with that.
10       MR. GARTENBERG: That part I have no
11  problem being on the record. Any comment to my prep
12  was not supposed to be on the record.
13       MR. REGENSTREIF: I'm going to hand the
14  court reporter a Mandarin document titled Los Angeles
15  Proton Therapy Center, and ask the court reporter to
16  mark it as Exhibit 28.
17       (SEC Exhibit No. 28 was marked
18        for identification.)
19  BY MR. REGENSTREIF:
20    Q    Handing you Exhibit 28. Do you recognize
21  Exhibit 28?
22    A    Yes, I have seen it.
23    Q    What is Exhibit 28?
24    A    I believe this is promotional materials
25  from the agency.

Page 39

1    Q    Which agency?
2    A    Delsk, I believe it is.
3    Q    But you've seen this before?
4    A    Yes, I have.
5    Q    When did you see it?
6    A    A year, approximately a year ago. I'm not
7  sure. It has been around for a long time. Where
8  did you see it?
9    A    Sometimes when they have seminars they will
10  hand this to the clients.
11       It has been around for a long time. Where
12    Q    And this is when Delsk was trying to get
13  investors?
14    A    I believe so.
15    Q    And you were at those meetings when Delsk
16  was handing out this Exhibit 28?
17    A    Sometimes.
18    Q    Was your husband at those meetings?
19    A    I'm not sure. I don't recall.
20    Q    Okay. Do you know who wrote Exhibit 28?
21    A    I don't know.
22    Q    Did you ever hand out Exhibit 28?
23    A    What do you mean by "hand out"?
24    Q    Did you ever give it to a client?
25    A    Exactly speaking if there's a client that

Page 40

1  talks about Proton, if that client ask for more
2  information or materials about the introduction of
3  Proton. I would have one of the sales come over here
4  bringing this material, and I will tell the client
5  there's some information in this material in that
6  regard.
7    Q    Can you turn to page 11 of Exhibit 28. Do
8  you see at the bottom of the page there are two
9  pictures?
10    A    Uh-huh.
11    Q    The picture on the left on page 11, is that
12  a picture of you?
13    A    Yes.
14    Q    Who are you with?
15    A    My husband, this one is Rose's partner.
16    Q    Ruth?
17    A    Ruth.
18    Q    And the other woman?
19    A    She is a congresswoman.
20    Q    Why were you meeting with a congresswoman?
21    A    I don't know. At that time Charles just
22  told me, Let's go to the congress since you have
23  never been there.
24    Q    So you went?
25    A    Yes.

Page 41

1    Q    Do you remember what was discussed?
2    A    I didn't understand, they all spoke
3 English.
4    Q    Okay.  Do you know why there would be a
5 picture of President Clinton on the right bottom of
6 page 11?
7    A    I don't know why, probably just for
8 promotions.
9        MS. LEVIN:  When did your husband meet
10 former President Clinton?
11       THE WITNESS:  Before we got married.
12 BY MR. REGENSTREIF:
13   Q    When did you get married?
14   A    2003.
15       MR. REGENSTREIF:  I'm going to ask the
16 court reporter to mark as Exhibit 29 an Employment
17 Agreement between Beverly Proton and Ms. Wang.
18       (SEC Exhibit No. 29 was marked
19       for identification.)
20 BY MR. REGENSTREIF:
21   Q    Do you recognize Exhibit 29?
22   A    Yes.
23   Q    Can you tell me what Exhibit 29 is?
24   A    It's an agreement reached between myself
25 and Beverly Proton.

Page 42

1    Q    An agreement to do what?
2    A    Agreement is something reached between both
3 parties.
4    Q    And what was the agreement to do?  What did
5 the agreement ask you to do?
6    A    This thing actually asked me to do the
7 promotions and the marketings in China and also
8 overseas medical treatment in the U.S.  Before the
9 business was established the marketing and promotion
10 will be done in China, and this is my understanding
11 about my duty.
12   Q    Turn to the last page of Exhibit 29.  Is
13 that your signature on the right?
14   A    Yes.
15   Q    And it was -- did you sign this January
16 28th, 2016?
17   A    Yes.
18   Q    Why did you sign an agreement January 28,
19 2016?
20   A    Because, actually, we have been willing to
21 sign on this agreement but it just did not happen.  I
22 don't know on that date, we just did.  Before the
23 company has not had money since the business was not
24 established, and afterwards and then we talk about
25 that, it's the time to reach the agreement.

Page 43

1    Q    So there was -- you didn't have an
2 agreement before Exhibit 29?
3        MR. GARTENBERG:  Written agreement or oral
4 agreement?  For the record, I think the question is
5 clear without an explanation of whether he is
6 referring to a written agreement or an oral
7 agreement.
8        BY MR. REGENSTREIF:
9    Q    Did you have a written agreement before
10 Exhibit 29?
11   A    No.
12   Q    Did you have an oral agreement before
13 Exhibit 29?
14   A    Yes.
15   Q    What was the oral agreement?
16   A    Just ask me to do the promotions in China.
17   Q    Did the oral agreement include terms for
18 payment?
19   A    As I said in the beginning, there would be
20 no payment and they hope I would understand and
21 afterwards they would pay me back.
22   Q    And so you signed an agreement in January
23 2016 because at that point the company had money to
24 pay you?
25   A    I don't know.

Page 44

1        MS. LEVIN:  Who was the oral agreement
2 with?
3        THE WITNESS:  At the time, actually, it
4 just occurred in conversation with Thropay, also my
5 husband, they were talking about the project, then
6 they help me to do the promotions in China.  Probably
7 Ruth was there as well.  I'm not sure.  It was a long
8 time ago.
9        BY MR. REGENSTREIF:
10   Q    Let's go to the first page of Exhibit 29,
11 it says number 4.  It says, "Agrees to an annual base
12 salary of $280,000"; is that right?
13   A    Yes.
14   Q    How did you come to agree on that number?
15   A    I don't know.  They just ask me to give
16 them a number because I said in China to do the
17 promotion I will need some expenses like flights,
18 hotel, per diems.
19   Q    But that's different than your salary?
20   A    What do you mean by "different from
21 salary"?
22   Q    On page 2 of Exhibit 29, number 8, says,
23 "employee's reimbursement for expenses."  So you have
24 an American Express corporate gold card?
25   A    I'm not sure.

Page 45

1    Q    Do you have a credit card?
2    A    With my husband together.
3    Q    But not from the company?
4    A    I believe so, I'm not sure.
5    Q    Back to the first page of Exhibit 29, why
6  aren't you getting the salary since January 2011?
7    A    At that time the business was not
8  established.  They had no money.
9    Q    So back to the end of the document Exhibit
10  29, on the left, the signature, whose signature is
11  that?
12    A    I believe it is my husband's.
13    Q    When you entered into this agreement
14  Exhibit 29, January 2016, were you now an officer of
15  the Beverly Proton?
16    A    Yes.
17    Q    Was Dr. Thropay still involved with Beverly
18  Proton when you signed Exhibit 29?
19        THE INTERPRETER:  I'm sorry, what was the
20  question?
21        BY MR. REGENSTREIF:
22    Q    Was he still involved in Beverly Proton?
23    A    I don't know.
24    Q    Did Dr. Thropay agree to this employment
25  agreement, if you know?

Page 46

1    A    I believe so.  We had agreement earlier.
2    Q    And you've now been paid by Beverly Proton
3  under Exhibit 29?
4    A    Yes.
5    Q    For moneys all the way back to 2011?
6    A    I believe so.
7    Q    Do you know where Beverly Proton got the
8  money to pay for your salary?
9    A    I'm not sure.
10    Q    But you were secretary of Beverly Proton at
11  this point, officer?
12    A    Vice president in marketing promotions.
13        MR. REGENSTREIF:  I'm going to ask the
14  court reporter to mark as Exhibit 30 the Minutes of
15  Beverly Proton Center for January 19, 2016.
16        (SEC Exhibit No. 30 was marked
17        for identification.)
18        BY MR. REGENSTREIF:
19    Q    Do you recognize Exhibit 30?
20    A    No.
21    Q    I'm not sure.  Are you reading Exhibit 30?
22    A    No.  I just try to check the numbers.
23        MR. GARTENBERG:  I think this is clear but
24  let's make it clear, do you read English?
25        THE WITNESS:  No, no.

Page 47

1        BY MR. REGENSTREIF:
2    Q    Did you attend a meeting January 19, 2016,
3  at the company's office?
4    A    Which year?
5    Q    This year, 2016.
6    A    Which office?
7    Q    Beverly Proton's office at Cabot Road in
8  Laguna Niguel.
9    A    No.
10    Q    You are a director of Beverly Proton?
11    A    Beverly Proton's director?
12    Q    Yes.
13    A    I'm not sure.
14        MS. LEVIN:  Is your husband a director of
15  Beverly Proton?
16        THE WITNESS:  I don't know.
17        BY MR. REGENSTREIF:
18    Q    Have you ever met Michael Cogswell?
19    A    Not yet.
20    Q    Who is Michael Cogswell?
21    A    I don't know.  Probably, allegedly, I'm not
22  sure.
23    Q    Have you ever heard the name Michael
24  Cogswell?
25    A    It's in English, you know, my English even

Page 48

1  though I have a hard about that name, I cannot
2  remember.  It's just a simple name like Mike.
3    Q    Have you ever heard of a Mike working now
4  with Pacific Proton Therapy Regional Center?
5    A    I heard there's a new guy or new person,
6  but I don't know if that individual is the person
7  you're referring to.
8    Q    Who's the new person?
9    A    I don't know.
10    Q    Do you know what the new person is going to
11  be doing?
12    A    I don't know.
13        MS. LEVIN:  Who did you hear about the new
14  person from?
15        THE WITNESS:  While I was in Beijing I
16  heard about that.  I was in Beijing.
17        MS. LEVIN:  Who told you?
18        THE WITNESS:  They were -- there was -- let
19  me think.  Probably there was a salesperson, talking
20  about there's a replacement in the Regional Center.
21  They were talking about that.
22        BY MR. REGENSTREIF:
23    Q    Replacement of who?
24    A    I don't know.
25        MS. LEVIN:  And when were you in Beijing?

Page 49

1    THE WITNESS:  Yes.
2    MS. LEVIN:  When?
3    THE WITNESS:  Earlier.
4    MS. LEVIN:  This month?
5    THE WITNESS:  In April.
6    MS. LEVIN:  What were the dates that you
7  were in Beijing in April?
8    THE WITNESS:  I'm not sure.  I have to
9  refer to my passport.
10   BY MR. REGENSTREIF:
11   Q   What were you doing in Beijing?
12   A   Marketing, promotions.
13   Q   For Beverly Proton?
14   A   Yes.
15   MR. REGENSTREIF:  Go off the record.
16   (Recess taken from 11:07 until 11:28.)
17   MR. REGENSTREIF:  Back on the record.
18   BY MR. REGENSTREIF:
19   Q   Ms. Wang, I'm handing you what has been
20  previously marked Exhibit 11.  Do you recognize
21  Exhibit 11?
22   A   No.
23       (SEC Exhibit No. 11 was referred
24       to.)
25   BY MR. REGENSTREIF:

Page 50

1    Q   Can you look through it --
2    A   I cannot read.
3    Q   So let me say that this is a -- Exhibit 11
4  is an Engagement Agreement with United Damei
5  Investment Company and Pacific Proton Regional
6  Therapy Center.
7    A   I don't know.
8    Q   Okay.  So you've never seen Exhibit 11
9  before?
10   A   Correct.
11   Q   Did you know there was an agreement between
12  United Damei and the Regional Center?
13   A   I don't know.
14   Q   Can you turn to the last page of Exhibit
15  11.
16   A   (Witness complies.)
17   Q   The signature there is Yao, Wen Li, then it
18  says by Wen Li Yao director.  Do you know Wen Li Yao?
19   A   My mother's name.
20   Q   Your mother's name.  Do you recognize your
21  mother's signature on Exhibit 11?
22   A   I have never seen her signature.
23   Q   So you don't recognize it?
24   A   Correct.
25   Q   Do you know if your mother Ms. Yao works

Page 51

1  for United Damei?
2    A   That's not possible.
3    Q   Why is it not possible?
4    A   Because she's here taking care of my
5  children for trial.
6    Q   She's never worked for United Damei?
7    A   Of course not.
8    Q   Does she have a job other than taking care
9  of your children?
10   A   No, she's retired.
11   Q   What did she do?
12   A   In China?
13   Q   Yes.
14   A   Electricity.
15   Q   She was an electrician?
16   A   You can say that.
17   MS. LEVIN:  When did she come to the United
18  States?
19   THE WITNESS:  It has been a long time.  It
20  was a long time ago, let me think.  I'm not sure the
21  exact time.
22   MS. LEVIN:  Was it before or after your
23  children were born?
24   THE WITNESS:  After.
25   BY MR. REGENSTREIF:

Page 52

1    Q   How old are your children?
2    A   One is 12, but according to the Chinese way
3  to calculate age, that one should be 13, that child
4  was born in year 2003, and then the other one is ten
5  years old.
6    MS. LEVIN:  Did your mother come to the
7  United States when your oldest child was still a
8  baby?
9    THE WITNESS:  No, the oldest was six
10  already.
11   MS. LEVIN:  Has your mother always lived
12  with you?
13   THE WITNESS:  Yes.
14   MS. LEVIN:  Do you know anybody else with
15  your mother's name, anybody else that has the same
16  name as your mother?
17   THE WITNESS:  Same last name, probably
18  there are; same first name, I'm not sure.
19   MS. LEVIN:  Which is her first name and
20  which is her last name?
21   THE WITNESS:  Yao, Y-a-o is the last name,
22  Wen Li is the first name.
23   MS. LEVIN:  Thank you.
24   BY MR. REGENSTREIF:
25   Q   What language do you speak at home to your

Page 53

1 children?

2    A   Chinese.

3    Q   Do they speak -- they must speak English;
4 right?

5    A   I want my children to learn Chinese, so at
6 home we all speak in Chinese.

7        MS. LEVIN:  Mandarin Chinese?

8        THE WITNESS:  Correct.

9        MR. GARTENBERG:  Can we go off the record
10 for a moment?

11       MR. REGENSTREIF:  I want to do one more
12 before we go off.

13       MR. GARTENBERG:  It was for a comment to
14 you.

15       MR. REGENSTREIF:  All right.  Let's go off
16 the record.

17       (A discussion was held off the record.)

18       MR. REGENSTREIF:  Back on the record.

19       I'm going to ask the court reporter to mark
20 as Exhibit 31 an Engagement Agreement between Beijing
21 Pacific Damei Consulting Company and Pacific Proton
22 Therapy Regional Center.

23       (SEC Exhibit No. 31 was marked
24       for identification.)

25 BY MR. REGENSTREIF:

Page 54

1    Q   I've handed you Exhibit 31.  Have you ever
2 seen Exhibit 31 before?

3    A   No.

4    Q   Have you ever heard of in the last page of
5 Exhibit 31 this is signed by Chen, Xiao Chun.  Do you
6 recognize that name?

7    A   Yes, I recognize the name.

8    Q   Is this Mr. Chen who we spoke about this
9 morning who you work with at United Damei?

10    A   Same name.

11    Q   Same name.  Do you know if Mr. Chen speaks
12 English?

13    A   I'm not sure.

14    Q   Do you know if there's a difference between
15 Beijing Pacific Damei and United Damei?

16    A   I'm not sure.

17       MS. LEVIN:  Before today -- before today
18 have you heard the name Beijing Pacific Damei?

19       THE WITNESS:  Yes.

20       BY MR. REGENSTREIF:

21    Q   You've heard of both names?

22    A   Yes.

23    Q   But you don't know the difference between
24 the two?

25    A   I don't know.

Page 55

1        MS. LEVIN:  Do you know if they are both
2 part of the UDG Group that you mentioned earlier?

3        THE WITNESS:  I'm not sure, however, I
4 feel -- I don't know.

5        BY MR. REGENSTREIF:

6    Q   Have you ever been to an office that
7 belongs to Damei?

8    A   The office had UDG.

9    Q   Where was the office?

10    A   Beijing, Chao Yang District, Chao Yang,
11 Shen Fu building, S-h-e-n F-u.

12    Q   Are there any other Damei offices?

13    A   UDG?

14    Q   UDG.

15    A   I know -- I know there are some in other
16 cities.

17    Q   Have you ever been to any of the other
18 offices?

19    A   Yes.

20    Q   Which ones?

21    A   Beijing, Shanghai, Qingdao, Q-i-n-g-d-a-o,
22 and Guangzhou, G-u-a-n-g-z-h-o-u.

23    Q   Is that all when you were talking to the
24 clients about the treatment?

25    A   Yes.

Page 56

1    Q   And other than Mr. Chen, have you ever met
2 anyone else that works at UDG?

3    A   They had many employees.

4    Q   Have you ever worked with any of them
5 closely other than Mr. Chen?

6    A   What do you mean by working close, working
7 together?

8    Q   Is there an employee you worked with many
9 times?

10    A   Working together on many occasions?

11    Q   Yes.

12    A   Okay.  From my understanding you cannot say
13 we work together.  When they need me to tell them
14 about the strengths or advantages of Proton, I would
15 go.

16    Q   Is there any other names of people at UDG
17 that you talk to?

18    A   UDG, Huang Xiao Zui, H-u-a-n-g, X-i-a-o,
19 Z-u-i, Ying Xiao Jie, Y-i-n-g, X-i-a-o, J-i-e.  I
20 have talked to many people.

21    Q   Okay.

22       MS. LEVIN:  What does UDG stand for? What's
23 the full name?

24       THE WITNESS:  UDG is the full name for UDG,
25 that's the interpreter's interpretation, United

Page 57

1 Damei.
2      MR. REGENSTREIF:  I'm going to ask the
3 court reporter to mark Exhibit 32 a pamphlet, that's
4 one, two, three, four, five, six, seven pages long.
5 Says Polular Project for Safety.
6      MS. LEVIN:  Polular, for the record, we
7 believe that might be a typo, P-o-l-u-l-a-r.
8           (SEC Exhibit No. 32 was marked
9            for identification.)
10      BY MR. REGENSTREIF:
11   Q   I've handed you Exhibit 32.  Do you
12 recognize Exhibit 32?
13   A   I recognize the photo.
14   Q   What's the photo?
15   A   It's the picture which features myself, my
16 husband, and the president from Granada.
17      MS. LEVIN:  When was it taken?
18      THE WITNESS:  I don't know which time that
19 photo was taken.
20      BY MR. REGENSTREIF:
21   Q   On the first page of Exhibit 32, it says
22 that you are chairman of the board of United Damei
23 Group.
24   A   That's what I told you.  That's why I told
25 you earlier on the business card it stated my title.

Page 58

1   Q   And the business card says chairman of the
2 board United Damei Group?
3   A   Yes, it stated that on my business card.
4      MR. GARTENBERG:  May I check?  Are you sure
5 the business card says chairman?
6      THE WITNESS:  I don't know about in
7 English.
8      BY MR. REGENSTREIF:
9   Q   What does it say in Chinese?
10   A   President or chairman.
11      MR. GARTENBERG:  This might be important.
12      MS. LEVIN:  Sure.
13      MR. REGENSTREIF:  Speak up.  Tell me what
14 you think.
15      MS. LEVIN:  For the record, this is Mr.
16 Gartenberg's translator.  May I have your name.
17      INTERPRETER KOLE:  This is Penny Kole,
18 P-e-n-n-y, K-o-l-e, court certified Mandarin
19 interpreter.  The interpreter is very familiar with
20 the term "chairman of the board" in Chinese, and that
21 term is always translated into dong shi xhang,
22 chairman of the board.  That's what I heard from the
23 witness.
24      MR. REGENSTREIF:  That's what the witness
25 said?

Page 59

1      INTERPRETER KOLE:  Correct.
2      MR. GARTENBERG:  Did she say that her title
3 from the card is chairman of the board?
4      INTERPRETER KOLE:  Yes, that's what this
5 interpreter heard.
6      BY MR. REGENSTREIF:
7   Q   Are you chairman of the board of United
8 Damei Group?
9   A   Just on the business card.
10      MS. LEVIN:  So just for marketing purposes?
11      THE WITNESS:  Correct.
12      MS. LEVIN:  You are not, in fact, the
13 chairman of the board?
14      THE WITNESS:  Correct.
15      MR. GARTENBERG:  May I have a minute?
16      MR. REGENSTREIF:  Sure.  Let's go off the
17 record.
18      (Recess taken from 11:47 until 11:59.)
19      MR. REGENSTREIF:  Back on the record.
20      BY MR. REGENSTREIF:
21   Q   Do you recognize Exhibit 32, other than the
22 picture?
23   A   I have never seen this.
24   Q   Let's turn to the second page of Exhibit
25 32.  Have you ever seen, if not in this exhibit,

Page 60

1 elsewhere the pictures of former Governor
2 Schwarzenegger, former President George W. Bush, and
3 former President George H. Bush in this context?
4   A   Their photos?
5   Q   Why would their -- have you ever seen
6 photos of --
7      MR. GARTENBERG:  I didn't hear the answer.
8      MR. REGENSTREIF:  She said "their photos,"
9 question mark.  And I said, yes, their photos --
10      THE WITNESS:  These photos it seems like --
11 I'm not sure I have seen all of them, but I remember
12 I have seen maybe some of them in the office
13 somewhere.
14      BY MR. REGENSTREIF:
15   Q   Which office?
16   A   UDG's office.
17   Q   Pictures -- some pictures of President
18 George W. Bush?
19   A   I have seen this, Schwarzenegger.
20   Q   You've seen Schwarzenegger's picture?
21   A   Uh-huh.
22   Q   Why are these included in Damei's offices?
23   A   I don't know.  They -- I don't know, maybe
24 for promotion purpose.
25   Q   What kind of promotion purpose?

Page 61

1    A    Maybe he wrote a letter to one of the
2 leaders in China and stating his support to Proton.
3    Q    Support for this particular Proton project?
4    A    I'm not sure.
5        MR. GARTENBERG:  Would you ask her, looking
6 at her face, it's her testimony, if she knows this or
7 is she assuming this.
8        BY MR. REGENSTREIF:
9    Q    Do you know this or are you assuming this?
10    A    Know what?
11    Q    Why these pictures would be used for the
12 Proton Therapy Center.
13    A    Proton Therapy Center, they were not in the
14 Proton Therapy Center.  I saw them at UDG's office.
15    Q    These pictures?
16    A    This one.  I'm not sure about the other
17 two.
18    Q    But the Schwarzenegger picture?
19    A    Yes.
20        MS. LEVIN:  That's fine.  Sorry.
21        BY MR. REGENSTREIF:
22    Q    Why was the Schwarzenegger picture up in
23 the Damei office?
24    A    You have to ask Damei.
25        MR. REGENSTREIF:  Did you have a question?

Page 62

1        MS. LEVIN:  If you turn back to the first
2 page of Exhibit 32, did you ever see the picture of
3 you and your husband and the prime minister of
4 Granada in Damei's office?
5        THE WITNESS:  I'm not sure.  I'm not sure
6 the photo was hanging there.
7        MS. LEVIN:  So you don't know if you saw it
8 in UDG's office?
9        THE WITNESS:  I don't recall.  I'm not
10 sure.
11        BY MR. REGENSTREIF:
12    Q    Can you turn to the fifth page of Exhibit
13 32.
14    A    (Witness complies.)
15    Q    Have you ever heard of the law firm Miller
16 Meyer?
17    A    I'm not sure.
18    Q    Turn to the last page of Exhibit 32.
19    A    (Witness complies.)
20    Q    Have you ever seen this page of Exhibit 32
21 before?
22    A    No.
23    Q    Have you ever seen an invitation to
24 investors to come to the United States made by Damei
25 to see the project before?

Page 63

1    A    No.
2    Q    Have you ever seen anything that invited
3 investors by Damei to meet with government officials
4 in the United States?
5    A    No.
6        MR. GARTENBERG:  Whichever you prefer, I
7 have a few questions about the business card, do it
8 at the end or now when it's fresh?
9        MR. REGENSTREIF:  I want you to do at the
10 end.
11        MR. GARTENBERG:  No problem.
12        MR. REGENSTREIF:  I'm going to ask the
13 court reporter to mark as Exhibit 33, a printout of
14 the Executive Team United Damei Website page.
15        (SEC Exhibit No. 33 was marked
16        for identification.)
17        BY MR. REGENSTREIF:
18    Q    I handed you, Ms. Wang, Exhibit 33.  Do you
19 recognize Exhibit 33?
20    A    This page?
21    A    Yes.
22    A    No.
23    Q    The top picture, is that a picture of you?
24    A    Yes.
25    Q    And then there are three pictures below

Page 64

1 you, the first one on the left, who is that?
2    A    This one?
3    Q    Yes.
4    A    This is the photo of an individual who used
5 to work at Damei on projects.
6    Q    What was her name?
7    A    We always referred to her as Teacher Ann
8 A-n-n.
9    Q    Teacher Ann.  What projects did she work
10 on?
11    A    I don't know, maybe, I assume EB-5.
12    Q    And then the person under your picture, the
13 woman to the next -- over to the right?
14    A    Huang Xiao Zui.  H-u-a-n-g, X-i-a-o, Z-u-i.
15    Q    We mentioned her before?
16    A    Correct.
17    Q    And she works at Damei also?
18    A    I'm not sure what do you mean by Damei,
19 she's not in Beijing.  They have the unified logos,
20 I'm not sure.
21    Q    Where does she work?
22    A    In Guangzhou.
23    Q    But UDG?
24    A    Yeah.
25    Q    The picture of the woman next to her?

1    A    Also belong to UDG, however, she's not in
2  Beijing, she's in Qingdao.
3    Q    What's her name?
4    A    Ying Xiao Jie, Y-i-n-g, X-i-a-o, J-i-e.
5    Q    You mentioned her this morning too?
6    A    Yes.
7    Q    Those two, Huang and Ying, are the two who
8  you talked about this morning about working with them
9  at UDG?
10    A    Correct.
11    Q    The third woman there, her name is Teacher
12  Ann?
13    A    Yes.
14    Q    She worked in the Beijing office?
15    A    Probably, she's not there anymore.
16    Q    That's where she used to work?
17    A    Yes.
18    Q    Has any of these women been to the United
19  States?
20    A    I'm not sure.
21    Q    You only met with them in China?
22    A    Correct.
23    Q    Do you know why your picture is listed on
24  the management team for UDG?
25    A    My understanding -- my understanding is

1  they wanted me to do the project, you know, this
2  project is related to the medical, so they want me --
3  actually, I really don't know, however, that person
4  in charge, Chen, he does not want himself to show --
5  does not want his own picture listed here.
6    Q    So instead they put yours?
7    A    He told me before, he asked me if they
8  could list my photo on the top since I have better
9  image.
10    Q    And you said yes?
11    A    Yes.
12    Q    Below, the last two pictures, the two men
13  underneath, who are they?  Who's the man on the left?
14    A    Dr. Thropay.
15    Q    The second man to his right?
16    A    I believe he was in the role of assistant,
17  but I don't remember exactly what was stated on his
18  business card.
19    Q    Okay.
20    MS. LEVIN:  Do you remember his name?
21    THE WITNESS:  Li Yinan, L-i or L-e-e,
22  Y-i-n-a-n.
23    BY MR. REGENSTREIF:
24    Q    On Exhibit 33 on the far right it says,
25  "There are branches located in Los Angeles, Granada

1  Shanghai, Qingdao, Guangzhou of UDG."
2    A    Where?
3    Q    Do you see that?
4    A    Right now I see it.
5    Q    Have you ever been to the Los Angeles
6  branch of UDG?
7    A    Does UDG have a branch in Los Angeles?
8    Q    That's what the Website says.
9    A    No.
10    Q    There's no branch in Los Angeles?
11    A    I don't know, but I have never been there.
12    Q    What about Granada?
13    A    I'm not sure.
14    Q    Have you ever been to Granada?
15    A    Yes.
16    Q    How many times?
17    A    Approximately three to four times, I'm not
18  sure.
19    Q    When were you last in Granada?
20    A    In year 2015, I don't know.
21    Q    Sometime in 2015?
22    A    I don't recall the exact time.
23    MS. LEVIN:  Why did you decide to become a
24  citizen of Granada?
25    THE WITNESS:  It's Visa free if you travel

1  to China with their passport.
2    MS. LEVIN:  The Granada passport?
3    THE WITNESS:  Uh-huh.
4    MS. LEVIN:  Yes?
5    THE WITNESS:  Yes.
6    BY MR. REGENSTREIF:
7    Q    So you don't have to get a Visa to go back
8  to China if you use your Granada passport?
9    A    Correct.
10    Q    So you had a passport from Granada?
11    A    Correct.
12    Q    Do you have a home in Granada?
13    A    No.
14    Q    Do you have any bank accounts in Granada?
15    A    No.
16    MR. REGENSTREIF:  I'm going to ask the
17  court reporter to mark as Exhibit 34 a Printout of
18  the Government Support Page of United Damei's
19  Website, 11 pages long.
20        (SEC Exhibit No. 34 was marked
21         for identification.)
22    BY MR.
23    Q    I've handed you Exhibit 34.  Do you
24  recognize Exhibit 34?
25    A    I just saw it.

Page 69

1    Q    So, no?
2    A    Correct.
3    Q    So let's turn to -- let's stay on the first
4 page.  Do you know why there's a picture of former
5 President George Walker Bush on the first page?
6    A    I don't know.  He represents the United
7 States.
8    Q    Let's turn to the third page.
9        MR. GARTENBERG:  One second while there's
10 no question pending.  When you answer a question, do
11 not guess at an answer.  If you know, tell them.  If
12 you're guessing, tell them you're guessing.
13       BY MR. REGENSTREIF:
14   Q    Okay.  Let's turn to the third page of
15 Exhibit 34.
16       MS. LEVIN:  Read the top right corner so we
17 can show her where.
18       BY MR. REGENSTREIF:
19   Q    It says page 2 of 10 at the top.  Have you
20 ever seen this letter before?
21   A    I'm not sure.
22   Q    Do you know why it would have been on UDG's
23 Web page?
24   A    I'm not sure.
25   Q    The next page of Exhibit 34, says page 3 of

Page 70

1 10.  Again, a picture of former Governor
2 Schwarzenegger, do you know why this would have been
3 on UDG's Web page?  No guessing.
4    A    I don't know.
5    Q    And then the page after that, which is page
6 5 of Exhibit 34, it's a letter from Governor
7 Schwarzenegger, says page 4 of 10.  Have you ever
8 seen that letter before?
9    A    I'm not sure.
10   Q    Next page of Exhibit 34, do you know who
11 that is?
12   A    Yes.
13   Q    Who is it?
14   A    Former mayor of Los Angeles.
15   Q    Have you ever met the former mayor?
16   A    Yes.
17   Q    How did you meet him?
18   A    On one occasion, a promotion in China.
19   Q    What was he in China promoting?
20   A    At that time he was in China and there was
21 an event with Delsk and he was present.
22   Q    He made a presentation on behalf of Beverly
23 Proton with Delsk?
24   A    I'm not sure I heard from the
25 interpretation of the interpreter's at the meeting

Page 71

1 that he was representing the United States to welcome
2 Chinese people to invest in the U.S.
3    Q    Did you make any presentation at that
4 meeting?
5    A    No.
6    Q    Turn to the eighth page of Exhibit 34, says
7 page 7 of 10 at top.
8    A    (Witness complies.)
9    Q    Bottom picture on that page, is that you on
10 the far left?
11   A    Yes.
12   Q    Who are these people?
13   A    And that individual was from Beijing
14 Hospital 301.  I'm not sure at that time what kind of
15 capacity he was holding.
16   Q    The gentleman next to you?
17   A    Correct.
18   Q    And then next to him?
19   A    My husband, Charles.
20   Q    And then next to your husband to the right
21 in the middle, who is that?
22   A    That's the leader from Hospital 301.
23   Q    And the gentleman to his right?
24   A    I believe that individual was in the leader
25 role from the manufacturer of Proton.

Page 72

1    Q    And then the man next to the leader of the
2 Proton manufacturer to his right?
3    A    That person was under him, but I'm not sure
4 what kind of capacity he was holding.
5    Q    Part of the hospital?
6    A    Yes.
7    Q    The last man on the far right part of the
8 picture --
9    A    Xiao Chun Chen X-i-a-o, C-h-u-n, C-h-e-n.
10   Q    This is Mr. Chen from Damei?
11   A    Correct.
12   Q    Got it.
13       Why were you all taking a picture?
14   A    That was many years ago when we were
15 promoting Proton to China.
16   Q    What year was that?
17   A    Long time ago.  It was year '10, I'm not
18 sure.  It was a long time ago.
19   Q    Okay.  And then the next page of pictures,
20 page 9 of Exhibit 34, says page 8 of 10, the top
21 picture on the page, is that you in the picture on
22 the left?
23   A    Yes, yes.
24   Q    And then the two gentlemen in the picture,
25 who is in the middle of the picture?

Page 73

1    A    We always referred to him as the father of
2  Proton.  He was the first person to transfer or to
3  apply the Proton technology from military to medical
4  purpose.
5    Q    And the man with him to the right?
6    A    Actually, this person is the president of
7  Beijing tumor hospital or cancer hospital.
8    Q    The second picture is the one we've already
9  seen before, right, with the congresswoman, Ruth, and
10  you and your husband; is that right?
11    A    Correct.
12    Q    And the next page, page 10 -- the page 9 of
13  10, are those both -- are you in both of those
14  pictures?
15    A    Correct.
16    Q    And the top picture, is that you with the
17  prime minister of Granada?
18    A    Correct.
19    Q    Where were you when you were with the prime
20  minister?
21    A    At his office.
22    Q    In Granada?
23    A    Yes.
24    Q    The second picture, is that you with former
25  Mayor Villaraigosa?

Page 74

1    A    Correct.
2    Q    And when was that taken?
3    A    When he went -- when he visit China.
4    Q    When he gave the presentation?
5    A    Correct.
6    Q    And the office that you're in, whose office
7  is that?
8    A    Mr. Chen's.
9    Q    Mr. Chen from UDG?
10    A    Yes.
11    Q    The last picture, the last page of Exhibit
12  34, so this, again, is with former Mayor
13  Villaraigosa, is that from that same time you were
14  there for the presentation?
15    A    Yes.
16    Q    Starting on the left side of the page, who
17  is that man?
18    A    Xiao Chun Chen X-i-a-o, C-h-u-n, C-h-e-n.
19    Q    Mr. Chen?
20    A    Yes.
21    Q    Next to him on the right, that woman?
22    A    She's a lawyer.
23    Q    Do you know her name?
24    A    I don't know her full name, but I know her
25  last name is Liu, L-i-u.

Page 75

1    Q    She's a lawyer for who?
2    A    I believe she's personalizing in EB-5.
3    Q    Is she a Chinese lawyer?
4    A    She's in the United States but she can
5  speak Chinese.
6    Q    Do you know what law firm she works for?
7    A    I'm not sure.
8    Q    Okay.  And then to her right, that's a
9  picture of you?
10    A    Correct.
11    Q    And then to your right that's your husband
12  Charles Liu?
13    A    Yes.
14    Q    And then to Charles's right, that's the
15  former mayor?
16    A    Yes.
17    Q    And next to the former mayor to the right,
18  who is that?
19    A    All right.  I don't know what type of
20  capacity he was or what kind of relationship he had
21  here, but I always referred to him as hun zhong,
22  H-u-n, Z-h-o-n-g.
23    INTERPRETER SHU:  This is the interpreter's
24  interpretation, that means general manager or
25  president.

Page 76

1    BY MR. REGENSTREIF:
2    Q    Of what company?
3    A    I don't know.  I don't know which company
4  he is working for right now.
5    Q    And then next to him, that's a picture of
6  Ruth and Dr. Thropay?
7    A    Yes.
8    MR. REGENSTREIF:  I'm going to ask the
9  court reporter to mark as Exhibit 35 an Investor List
10  provided by Charles Liu.
11    (SEC Exhibit No. 35 was marked
12    for identification.)
13    BY MR. REGENSTREIF:
14    Q    I've handed you Exhibit 35.  Do you
15  recognize Exhibit 35?
16    A    This is my first time.
17    Q    Did you ever work with Delsk?
18    A    What do you mean?
19    Q    Like you worked with UDG, did you do the
20  same work with Delsk?
21    A    I help them to answer their clients'
22  questions in medical business.
23    Q    So if a client called them with a question
24  about the medical process and they didn't know the
25  answer, they called you and you answered it to them?

Page 77

1    A    Correct.  And also for those patients who
2  are interested in coming here, then before they were
3  coming I would gather their medical records and also
4  translated those records and then bring to the U.S.
5  hospitals to see if the doctors here were able to
6  help them.
7       MR. GARTENBERG:  Translated --
8       BY MR. REGENSTREIF:
9    Q    You translated the records?
10   A    Not myself, not myself.  I was not the one
11 doing the translation.  I hope it would be me but --
12      MR. GARTENBERG: I'm going get worried when
13 you and I have the same questions at the same time.
14      THE WITNESS:  Sorry.
15      BY MR. REGENSTREIF:
16   Q    On Exhibit 35 it lists ten people as having
17 invested in the project through being solicited by
18 Damei.  Do you recognize any of the names?
19   A    Where are the names?
20   Q    The last -- second page, all of those
21 names, and the last name on the first page.
22      MR. GARTENBERG:  Do you want to read the
23 names -- I don't know if she can read the translation
24 of the English names or not.  Do you want to, Madam
25 Translator?

Page 78

1       INTERPRETER SHU:  The last names on the
2  bottom of the first page?
3       MR. REGENSTREIF:  Yes.
4       INTERPRETER SHU:  Zhang Lu?
5       THE WITNESS:  No.
6       INTERPRETER SHU:  Juan Shen?
7       THE WITNESS:  No.
8       THE INTERPRETER:  Dai Luia?
9       THE WITNESS:  No
10      INTERPRETER SHU:  Zhang Rai?
11      THE WITNESS:  No.
12      INTERPRETER SHU:  Zhang Fan?
13      THE WITNESS:  No.
14      INTERPRETER SHU:  Xu Faxiao
15      THE WITNESS:  No.
16      INTERPRETER SHU:  Yan Longwen?
17      THE WITNESS:  No.
18      INTERPRETER SHU:  Wang Kexin?
19      THE WITNESS:  No.
20      INTERPRETER SHU:  Li Longwen?
21      THE WITNESS:  No.
22      BY MR. REGENSTREIF:
23   Q    So none?
24   A    No.
25   Q    Okay.

Page 79

1       MS. LEVIN:  Can we take a short break?
2       MR. REGENSTREIF:  Off the record.
3       (Recess taken from 12:37 until 12:47.)
4       MR. REGENSTREIF:  Back on the record.
5       I'm going to ask the court reporter to mark
6  as Exhibit 36 an e-mail dated December 22nd, 2015.
7            (SEC Exhibit No. 36 was marked
8            for identification.)
9       BY MR. REGENSTREIF:
10   Q    Do you recognize the e-mail on Exhibit 36?
11   A    Let me take a look.
12      MR. GARTENBERG:  Before you ask a question,
13 can I talk to my translator so I know what I'm
14 looking at?
15      MR. REGENSTREIF:  Do you want to do it off
16 the record?
17      MR. GARTENBERG:  Yes, Milena and the client
18 can stay here.
19      MR. REGENSTREIF:  Off the record.
20      (Recess taken from 12:48 until 12:50.)
21      MR. REGENSTREIF:  Back on the record.
22      BY MR. REGENSTREIF:
23   Q    Do you -- Ms. Wang, do you recognize
24 Exhibit 36?
25   A    I have never seen it.

Page 80

1       MR. REGENSTREIF:  Okay.  I'm going to ask
2  the court reporter to mark as Exhibit 37 a check
3  dated October 15, 2014, to the Internal Revenue
4  Service.
5            (SEC Exhibit No. 37 was marked
6            for identification.)
7       BY MR. REGENSTREIF:
8    Q    Ms. Wang, I've handed you Exhibit 37, do
9  you recognize it?
10   A    I don't know.
11   Q    Do you know why it says in the memo line of
12 Exhibit 37 it says Wen Li Yao, so Wen Li Yao is your
13 mother?
14   A    Yes.
15   Q    Do you know why there would be payment to
16 the IRS for your mother from the Regional Center's
17 bank account?
18   A    I don't know.
19   Q    Do you pay your mother for watching your
20 children?
21   A    No.  In China we don't do it that way.
22   Q    Okay.  And you've never seen a check from
23 the Regional Center to the IRS for your mother's
24 benefit?
25   A    Correct.

Page 81

1        MR. REGENSTREIF:  I'm going to ask the
2  court reporter to mark as Exhibit 38 a check dated
3  October 24, 2014, from the Regional Center to West
4  Pacific Medical Laboratory.
5        (SEC Exhibit No. 38 was marked
6        for identification.)
7        BY MR. REGENSTREIF:
8    Q   I've handed you Exhibit 38.  Do you
9  recognize Exhibit 38?
10   A   No.
11   Q   Do you know -- have you ever heard of West
12  Pacific Medical Laboratory?
13   A   I don't know.
14   Q   Do you know why it says in the memo line
15  for the check, Ms. Wen Li Yao microsomal antibody?
16   A   I don't know.
17   Q   Do you know why a payment like this would
18  be made from the Regional Center bank account?
19   A   I don't know.  I'm not there at the
20  Regional Center.
21       MR. REGENSTREIF:  I'm going to ask the
22  court reporter to mark as Exhibit 39 a check dated
23  November 21, 2014, to the IRS from the Regional
24  Center.
25       (SEC Exhibit No. 39 was marked

Page 82

1        for identification.)
2        BY MR. REGENSTREIF:
3    Q   Do you recognize Exhibit 39, Ms. Wang?
4    A   No.
5    Q   You don't know why there would be a payment
6  to the IRS from the Regional Center for your mother?
7    A   I don't know, correct.
8        MR. REGENSTREIF:  Ask the court reporter to
9  mark as Exhibit 40 a check dated June 19th, 2015,
10  from the Regional Center to Yan Leung, M.D.
11       (SEC Exhibit No. 40 was marked
12       for identification.)
13       BY MR. REGENSTREIF:
14   Q   I've handed you Exhibit 40.  Do you
15  recognize Exhibit 40?
16   A   No, never seen it.
17   Q   Have you ever heard of the doctor named Yan
18  Leung?
19   A   I don't recall.
20       MR. REGENSTREIF:  So I think we're near the
21  wrap up here.  Would you rather the questions now?
22       MR. GARTENBERG:  Sure.  I have two or three
23  questions.
24       MR. REGENSTREIF:  Go ahead.
25       MR. GARTENBERG:  You testified about a

Page 83

1  business card for United Damei; remember?
2        THE WITNESS:  Yes.
3        MR. GARTENBERG:  Who gave you that card?
4        THE WITNESS:  Li Yinan, L-i or L-e-e,
5  Y-i-n-a-n.
6        MR. GARTENBERG:  Is he with United Damei?
7        THE WITNESS:  Yes.
8        MR. GARTENBERG:  I believe you said it said
9  chairman of the board?
10       THE WITNESS:  Yes.
11       MR. GARTENBERG:  Except for what I have
12  explained to you, I do not want you to say anything
13  about what I have explained to you, except for that,
14  did you know what chairman of the board meant?
15       THE WITNESS:  No.
16       MR. GARTENBERG:  Thank you.
17       MS. LEVIN:  Has your husband ever seen that
18  business card?
19       THE WITNESS:  I'm not sure.
20       MR. REGENSTREIF:  Let's do some wrap-up
21  questions.
22       BY MR. REGENSTREIF:
23   Q   Other than the documents that I showed you
24  today, did you review any documents to prepare for
25  your testimony?

Page 84

1    A   No.
2    Q   Have you spoken with anyone, other than
3  your lawyers, about this investigation?
4    A   No.
5        MR. GARTENBERG:  You would have spoken to
6  your husband to assist in connection with this;
7  correct?
8        THE WITNESS:  He talked to me.
9        MS. LEVIN:  What about your mother, have
10  you spoken to your mother about this investigation?
11       THE WITNESS:  She doesn't know anything.
12       BY MR. REGENSTREIF:
13   Q   Have you spoken to anyone other than your
14  attorneys about being here today?
15       MR. GARTENBERG:  And her husband.
16       BY MR. REGENSTREIF:
17   Q   And her husband.
18   A   No.
19   Q   Has anyone told you how to answer the
20  questions today?
21       MR. GARTENBERG:  Just to make it clear,
22  any -- he means other than conversations with your
23  lawyers.
24       THE WITNESS:  No.
25       BY MR. REGENSTREIF:

Page 85

1    Q   I have no further questions for you at this
2  time.  I may, however, call you again to testify in
3  this matter.  Should that be necessary, I'll contact
4  you through your lawyers.  Do you wish to clarify
5  anything or add anything to the statements you've
6  made here today?
7    A   No.
8        MR. REGENSTREIF:  Counsel, do you have any
9  additional clarifying questions.
10       MR. GARTENBERG:  No additional clarifying
11 questions.  We will reserve the right to clarify and
12 go through her testimony after receiving her
13 transcript.  In that light, I would advise the SEC
14 and then follow up that we made a copy of the
15 transcript of Mr. Liu's testimony available to him
16 and received some corrections from him, which we will
17 let the staff know.
18       MS. LEVIN:  When will you produce those to
19 us?
20       MR. GARTENBERG:  I'm leaving for New York
21 tomorrow so sometime next week, if that's okay?
22       MS. LEVIN:  Can it be done this week?
23       MR. GARTENBERG:  I'm leaving for New York
24 at 7:00 in the morning.
25       MS. LEVIN:  I --

Page 86

1        MR. GARTENBERG:  I would like to go through
2  it myself.  I will be at the SEC on Monday when I
3  return and return to it Tuesday.
4        MS. LEVIN:  I understand.  I thought he had
5  already made the corrections and is submitting to
6  produce them to us.
7        MR. REGENSTREIF:  With that, we are off the
8  record.
9        (Whereupon, at 1:00 p.m., the examination
10 was concluded.)
11            * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1            PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   PACIFIC PROTON THERAPY
4            REGIONAL CENTER, LLC
5  Witness:      Xin Wang
6  File Number:      LA-04639-A
7  Date:         Wednesday, May 4, 2016
8  Location:      Los Angeles, California  90071
9
10       This is to certify that I, Donna S. Raya,
11 (the undersigned), do hereby swear and affirm that
12 the attached proceedings before the U.S. Securities
13 and Exchange Commission were held according to the
14 record and that this is the original, complete, true
15 and accurate transcript that has been compared to the
16 reporting or recording accomplished at the hearing.
17
18 _____      _____
19 (Proofreader's Name)      (Date)
20
21
22
23
24
25

# Exhibit B

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
         Plaintiff,               )
 6                                ) Case No.
     vs.                          ) 8:16-cv-00974-CJC-AGR
 7                                )
     CHARLES C. LIU; XIN WANG     )
 8   a/k/a LISA WANG; PACIFIC     )
     PROTON THERAPY REGIONAL      )
 9   CENTER, LLC; PACIFIC PROTON  )
     EB-5 FUND, LLC; and BEVERLY  )
10   PROTON CENTER, LLC f/k/a     )
     LOS ANGELES COUNTY PROTON    )
11   THERAPY, LLC,                )
                                  )
12          Defendants.           )
     _____)
13
14
15
16
17   REMOTE VIDEO DEPOSITION OF XIN WANG aka LISA WANG
18          FEBRUARY 25, 2021
19        CONDUCTED VIA VIDEOCONFERENCE
20
21
22
23
     Reported by
24   Cynthia J. Vega, RMR,
     RDR, CSR 6640, CCRR 95
25   Job No. 210225CJV
```

1

```
 1        The remote video deposition of Xin Wang aka
 2   Lisa Wang, a Defendant herein, located in Beijing,
 3   China, taken on behalf of Plaintiff, on Thursday,
 4   February 25, 2021, beginning at the hour of 5:03 p.m.
 5   PST, remotely before Cynthia J. Vega, CSR No. 6640,
 6   located in the City of Carlsbad, County of San Diego,
 7   State of California.
 8
 9
10
11          REMOTE APPEARANCES
12
13   For the Plaintiff:
14   SECURITIES AND EXCHANGE COMMISSION
15   By:  Gary Y. Leung
16        Jacob A. Regenstreif
17   444 South Flower Street, Suite 900
18   Los Angeles, California  90071
19   (323) 965-3998
20   leungg@sec.gov
21   regenstreifj@sec.gov
22
23
24
25
```

2

```
 1          REMOTE APPEARANCES
 2
 3   For the Defendants Charles C. Liu and Xin Wang aka
 4   Lisa Wang:
 5   SILLS CUMMIS & GROSS PC
 6   By:  Herve Gouraige
 7   The Legal Center
 8   One Riverfront Plaza
 9   Newark, New Jersey  07102
10   (973) 643-7000
11   hgouraige@sillscummis.com
12
13   The Interpreter:
14   Gang Li
15
16   The Videographer:
17   Timothy Hunter
18
19          * * * * *
20
21
22
23
24
25
```

3

```
 1              INDEX
 2   WITNESS
 3   Xin Wang aka Lisa Wang
 4
 5   EXAMINATION                     PAGE
 6   By Mr. Leung                     6
 7   By Mr. Gouraige                 75
 8   By Mr. Leung                    77
 9   By Mr. Gouraige                 87
10   By Mr. Leung                    89
11
12
13          EXHIBITS
14   EXHIBIT     DESCRIPTION         PAGE
15   Exhibit 134  Plaintiff Securities and    71
16              Exchange Commission's Second Set
17              of Requests for Production of
18              Documents to Defendant Xin Wang
19              a/k/a Lisa Wang
20
21   Exhibit     Previously marked and attached   50
22   29/123      for reference
23
24
25
```

4

1    A.   There is a lease.
2    Q.   Do you have a copy of that lease?
3    A.   It's not with me.  It should be with my
4 husband.  Mainly these things are handled by my
5 husband.
6    Q.   Your husband's got a copy of that lease;
7 right?
8    A.   These are in the home.  There has got to be a
9 lease agreement.  Otherwise, how can it be leased out?
10    Q.   And so just to be clear, it's your
11 understanding that you have a tenant currently living
12 in your 55 Asilomar residence in Laguna Niguel,
13 A-s-i-m-o-l-a-r [as spelled]?
14    A.   Yes.  However, I think like a while ago, the
15 draining system was out of order, so it was being
16 repaired.  But also it was because of the pandemic,
17 the repair couldn't be carried out, couldn't be
18 carried out.  So it's still in the process of being
19 repaired.
20    Q.   I saw you glance to your left just now.  Is
21 there somebody in the room with you?
22    A.   No.  It was just for the last couple of days
23 while I was sleeping, my shoulder feel not very well,
24 so I was just moving around.  There was nobody here.
25    Q.   I'm sorry to hear your shoulder is not

13

1 feeling well.
2    A.   No problem.
3    Q.   Ms. Wang, do you recall giving sworn
4 testimony before the SEC back in 2016 in the month of
5 May?
6    A.   I remember the event, but I do not recall the
7 specific time of it.
8    Q.   Okay.  And do you recall telling the SEC
9 during your sworn testimony that you had previously
10 worked to give presentations on the proton therapy
11 cancer treatment?  Do you recall that testimony?
12    A.   Presentation of the cancer treatment?
13    Q.   Yes.  Let me just ask you again.
14        In your professional life, have you ever
15 given presentations about proton cancer therapy
16 treatment?
17    A.   I only did something on the health of the
18 protons to cancer, things like that.  I do not know --
19 I'm not sure whether I have answered this question.
20    Q.   What do you mean by health of protons to
21 cancer?
22    A.   It's because my dad, who has passed away with
23 cancer, my grandfather and my uncle too, who were all
24 killed by cancer, so I was hopeful that the protons
25 could help others with their treatment.  So what I

14

1 learned that the proton can help cancer patients and
2 to avoid surgery and chemotherapy, which would be
3 better for their health than chemotherapy.  Therefore,
4 I recommended the proton.  So in China I had made such
5 a presentation.
6    Q.   Who did you present to?
7    A.   It's to many patients and friends.  And also
8 there are -- there were people who wanted to come to
9 the United States with EB-5, with investment and
10 immigration because they knew that I came back from
11 the United States and I had some understanding of this
12 equipment.  So they learned about this.
13        I used to learn about the pharmacy, so I have
14 some medical background; therefore, I have more
15 understanding.  So I give them some -- from my
16 understanding, from the point of a patient, from my
17 viewpoint to give them some educational introduction.
18        Also, there were people in -- because I
19 learned medicine in China, so I have many friends and
20 classmates in many hospitals.  So sometimes I would
21 get them together and to promote the idea to them, to
22 introduce this to them.  Because many of them are with
23 radiation and specialists, doctors with radiation,
24 because at the time proton was not used in China and I
25 hope that it can be introduced into China.  Because at

15

1 that time my family members was still alive, but they
2 had the cancer and they couldn't go to the United
3 States to get treatments; therefore, I was hoping that
4 this technology could be introduced into China.
5        So I had many communications with them.  And
6 also sometimes I will get them together to talk about
7 the doctors who -- maybe who want to go to the United
8 States to invest and to give them presentation on
9 these as well.
10        (Reporter clarification.)
11    Q.   Please go ahead.
12    A.   Also, there were people -- there was people
13 that was helping my husband to promote the project.  I
14 would talk with some clients because many of them had
15 not been to the United States and also didn't have
16 much idea about the proton.  Because the project is
17 related to the proton and at the time there were no
18 doctors present.  So they would ask some simple
19 questions about proton and how -- what kind of
20 treatment they do too.  So I will give them some
21 simple and the conceptional introduction.
22        And also sometimes there were -- some
23 graphics will be distributed and I will give some
24 introduction about the graphics, just a simple and
25 conceptional introduction.

16

**Page 17**

1    Also, I will establish contact to -- have
2  them establish contact with my friends and with
3  doctors to be -- to give them a more in-depth
4  professional consultation.
5      Q.  Go ahead.
6      A.  To some hospitals, they want to introduce the
7  proton system.  Sometime I will discuss with them and
8  to learn about some relevant information.  I also want
9  to learn from them about some relevant and more
10  in-depth information in regard to proton.  So,
11  therefore, there are many of these communications and
12  the discussions.
13    Also, we hope that China can introduce this
14  technology, so I have these interactions with them.
15  In addition, there are patients who want to go to the
16  United States.  My husband told me that there are many
17  of the patients may go to the United States to our
18  project, to treatment; therefore, we would need to
19  establish a channel.  We would then need to form a
20  network with doctors of hospitals in China to make the
21  preparation, therefore, when the project is
22  established.  So for the patients who have the need,
23  we will do something.
24    Because to build a proton would take a long
25  time.  So if patients is capable, they can go to the

**Page 18**

1  United States in advance and receive treatment from
2  our facility.  These are the things that -- these are
3  things like these.  So these are the presentations
4  that I made.
5      Q.  Ms. Wang, the clients you refer to, those
6  were potential investors in your EB-5 project in the
7  United States; correct?
8      A.  Yes.  However, it was not to a particular
9  individual.  Just many people want to learn projects
10  and wanted to make investments, not necessarily to
11  invest in this project, but in China there are many
12  people who wanted to invest overseas.  Many clients
13  who -- they want to choose projects; therefore, they
14  would ask about the -- your project, what is the
15  proton?  What's the use of it?  Because perhaps I knew
16  a bit more than them.
17    So they would ask me.  In addition, they
18  would ask me about -- ask me to tell them briefly
19  about what -- about the proton.  And also since they
20  knew that I had lived in the United States for many
21  years, so they would also wanted to talk with me about
22  the cultures and about the habits and things like that
23  in the -- of the United States.
24      Q.  Ms. Wang, when did you first start giving
25  these presentations on proton therapy?

**Page 19**

1      A.  I do not recall clearly.  It's not the -- at
2  the very beginning -- the first time about the proton,
3  I do not recall clearly.  It's about -- I do not
4  recall.  It was at the time of the project, at the
5  start before the project is being promoted in China,
6  around that time.
7      Q.  When you say "project" -- when you say
8  "project," you're referring to the Beverly Proton?
9      A.  Yes.  Yes.  I think it was the year '14, but
10  I do not recall clearly.  It was when they were about
11  to start the promotion.
12      Q.  2014?  2014?
13      A.  I think that's the date.  At the time I
14  remember there was a trade -- a show and the people
15  attending the show would ask a question and they would
16  discuss about it.  It was at a show, what I remember.
17  But as to which year, I think it was year '14.
18      Q.  And was it your understanding that Beverly
19  Proton was to develop a proton therapy cancer center
20  in Montebello, California?
21      A.  Yes.  It's at the site of the Beverly
22  hospital.
23      Q.  And that project needed capital to occur;
24  right?  You needed money to build the center; correct?
25      A.  That would be needed.

**Page 20**

1      Q.  Part of that capital was to come from EB-5
2  investors from China.  Is that your understanding?
3      A.  Yes.
4      Q.  And you were involved in that process when
5  you were presenting to folks about proton therapy and
6  explaining to them how that therapy worked to treat
7  cancer; correct?
8          MR. GOURAIGE:  Objection to the word
9  "process."  I don't understand that.
10          THE WITNESS:  I do not understand either.
11          THE INTERPRETER:  Before we proceed, the
12  interpreter would request -- with all due respect,
13  would like to request that the witness's counsel wait
14  until the interpreter finish the interpretation of the
15  question before raising his objection.
16          MR. GOURAIGE:  That's fine.
17  BY MR. LEUNG:
18      Q.  I'll ask a different question.
19    The presentations that you gave beginning in
20  2014, that wasn't your hobby.  It was your job; right?
21      A.  How should I understand this?  Because at the
22  time that my father was already diagnosed with cancer
23  and which -- without me, but my husband told me about
24  this work and about this proton system in the United
25  States, which has very good efficacy on treating

Xin Wang
2/25/2021

1  cancer.  And he said that we could -- this could be a
2  very good project to be worked on in China.  We should
3  go to China to do such a promotion and asked me
4  whether I'm willing.  I said, "Of course I'm willing.
5  This is a good thing."
6        And helping patients with their -- helping
7  patients to treat their illness is always a good
8  thing; therefore, it's -- it's work, but it's also my
9  wish to help more people.  This kind of mentality
10  resulted in me to help him to do this work.
11     Q.  Did you not intend to be compensated for
12  giving these presentations?
13     A.  At the time I wasn't paid a wage because at
14  the very beginning to start a project, a lot of money
15  would be needed.  That, I knew.  And this is not --
16  this was not a small project.  So at the time I was
17  not paid a wage, but I was promised that a wage would
18  be paid to me.
19     Q.  Who made that promise to you?  Who made that
20  promise to you?
21     A.  At the time it was the team of my husband.
22        Sorry.  I need to take a drink.
23     Q.  Would you like to take a break or just have a
24  drink?
25     A.  I need a couple of minutes to move around

21

1  because -- because right now I can't move my head.
2  I'm feeling hurt.
3        MR. LEUNG:  Why don't we take a five-minute
4  break.  Is that enough?
5        THE WITNESS:  Okay.  Thank you.
6        MR. LEUNG:  Let's go off record at 5:56
7  Pacific time; 9:56 Beijing time.
8        THE VIDEOGRAPHER:  And we're going off the
9  record at 5:56 p.m.
10        (Recess, 5:56 p.m. to 6:05 p.m.)
11        THE VIDEOGRAPHER:  And we're back on the
12  record at 6:05 p.m.
13  BY MR. LEUNG:
14     Q.  Ms. Wang, besides your house in Laguna
15  Niguel, do you own any other property in the United
16  States?
17     A.  No others.
18     Q.  Did you purchase your Laguna Niguel house in
19  spring of 2015?
20     A.  I do not recall clearly.  Do not recall
21  clearly.  Perhaps it's even earlier than that, but I
22  do not recall clearly.
23     Q.  How long did you live in the house?
24     A.  Lived for approximately -- not for too long
25  before I went back to China, but the children were

22

1  there and I was just coming back and forth.
2     Q.  Are your children still in that house?
3     A.  No.
4     Q.  When did your family vacate the home?
5     A.  It was '16, year '16 or '15.  It was because
6  of this case.  This case had caused the troubles for
7  our family.  The children at the school were asked by
8  classmates or maybe parents of the classmates, who
9  asked them that perhaps -- that your parents --
10        THE INTERPRETER:  Just a second.  Give me a
11  second.
12        MR. LEUNG:  That's fine.
13        THE WITNESS:  Were your parents cheaters.
14  And so I do not know why this thing happened.  And
15  they had many harassment to their mentality;
16  therefore, I made them -- as I said, "Okay.  Let's go
17  back to China."
18        And also even after they came back to China
19  there were people in China, Delsk and the companies
20  that are filing suits and the people in China, the
21  partner, their partner, they went to my hometown and
22  make all kinds of announcements and all kinds of --
23  using all kind of independent media or media to
24  publish many bad articles to say that my family are
25  cheaters and even saying that my mother was a cheater.

23

1  And that was what happened at my hometown.
2        Because at my local place, I used to be -- I
3  was an anchorwoman for a time; therefore, I was a
4  celebrity at the -- locally.  But this is the first
5  time.  It never happened before.  Maybe they knew what
6  it is.  That's how -- why they did it.  I do not know
7  the purpose of theirs.
8        And my relatives work -- care about us, so
9  they came to ask me and they wanted to know.  But the
10  children, especially for my son who was at the middle
11  school and who was in the rebelling age, and he had
12  received many interferences.
13  BY MR. LEUNG:
14     Q.  Did you purchase your house -- did you
15  purchase your house in Laguna Niguel in spring 2015
16  with $2.91 million in cash?
17        THE INTERPRETER:  $2.91 million, Counsel?
18        THE WITNESS:  2.91 million, I do not recall
19  the specific figure.  I do not recall the specific
20  figure.  However, at the time the entire purchase --
21  the process of purchasing was handled by my husband
22  because I knew -- I knew very little about things in
23  the United States.
24  BY MR. LEUNG:
25     Q.  Did you know your husband had raised about

24

1  $26.9 million in investor funds from EB-5 investors
2  beginning in October 2014 through the end of 2015,
3  26.9 million, did you ever hear about that?
4      A.  I do not know at the time how the capital and
5  the funds, how the -- how it handled, I didn't know.
6  He might have mentioned about whether -- mentioned
7  that there was a investor coming in and occasionally
8  he would mention that, but it was just for a checkery.
9  But I do not know specifics as to how much money and
10 how much money arrived at what time, I think like
11 those, but the specifics I do not know.
12     Q.  Did your husband ever tell you he had caused
13 to be transferred about $8.3 million in investor funds
14 from the corporate accounts to his personal account?
15     A.  He wouldn't tell me.  For this corporate
16 operations, he never tell me.
17     Q.  You had a bank account of your own, though,
18 at Chase, didn't you?
19         Chase, the bank.
20     A.  Before there was one opened.  Yeah, yeah.  I
21 think there was one opened.  It was while I was in the
22 United States, I needed to buy grocery, but I -- but I
23 do not know whether it was Chase.  I do not recall.
24 It was a long time ago.
25     Q.  Do you recall receiving a wire transfer of

25

1  the million dollars from the project company's
2  corporate account to your Chase personal account in
3  March 2016?
4      A.  I remember there was such a fund transferred
5  to my account, but as to specific to the time and to
6  the specific bank card information, that I do not
7  recall.
8      Q.  Why were you receiving a million dollars from
9  Beverly Proton in March of 2016?
10     A.  That's the wage they had promised before to
11 pay me.
12     Q.  Who promised to pay you a million dollars
13 before?
14     A.  At the time when the promise was made, there
15 was not a specific figure of 100 -- 1 million or
16 something.  But at the very beginning -- my husband,
17 when this started to make this project, it was even
18 earlier.  It was about around year '11 or maybe
19 year '10 or sometime.
20         At that time -- so at that time they wanted
21 to make such a project -- do such a project.  But at
22 the time, because in China I have many friends and
23 many contacts, so he asked me to be in charge of
24 doing -- interfacing with China and do some research
25 and to develop connections.  And he told me that he

26

1  would pay me a wage at the time.  As to specific time,
2  I think it was a year '11.
3         So he said on this time you'll be counted as
4  working, however, the company does not -- didn't have
5  money.  So right now it looked like you are just
6  helping, but eventually you will be paid.  That's how
7  it was set.  At the time it didn't say it was
8  1 million figure.  It was when I was paid that they
9  tallied up to be the number, that the number was they
10 came up with.
11     Q.  Who is "they"?
12     A.  My husband and his team.
13     Q.  Who was your husband's team?
14     A.  As to who in the team -- because my English
15 was not good, he interpreted all this to me.  So I do
16 not know specifically who that person was, but I know
17 there was loose -- that radiation doctor, what was his
18 name?  A radiation doctor.  I forgot the name.
19 Thropay.  Yes, Thropay.  Dr. Thropay.  And they
20 started this together, so they started this project
21 together.
22     Q.  So you were paid this $1 million in March of
23 2016 because Beverly Proton now had money to pay you;
24 right?
25     A.  That's my understanding.  How they arrived at

27

1  it, I do not know.  I didn't know how -- so my
2  understanding was that perhaps they had money.  That's
3  why they paid my wage.
4         Because nobody would -- nobody would do the
5  work for so many years without the pay, because I need
6  to live.
7         MR. LEUNG:  I'm sorry, Mr. Li.  Because I
8  need to?
9         THE INTERPRETER:  Live, l-i-v-e.
10        MR. LEUNG:  Oh, live.
11        THE INTERPRETER:  Live.
12        MR. LEUNG:  Okay.
13        THE INTERPRETER:  To make a life.
14 BY MR. LEUNG:
15     Q.  Ms. Wang, you testified that you started some
16 sort of work for Beverly Proton as early as 2011.
17 From 2011 to 2016, did you keep any records of the
18 time you spent engaged in providing services for
19 Beverly Proton?
20     A.  I have not written down things.  However, for
21 this, I did a lot of work because at the very
22 beginning I thought this was a good thing.  It's a
23 thing to cure people, to save lives.
24        And also in my own family we had elder
25 peoples who were sick; therefore, I spent a lot of

28

1 time to interact with all hospitals in China, to
2 interface with them, including sometimes when my
3 husband came back to China and I would prearrange for
4 him and then we would do the market research together
5 with him, including for this project whether there
6 would be a market in China for it.
7     Also, as to the records, I did not -- I did
8 not specifically written it down, right.  However,
9 whatever work I did, my husband side knew -- would
10 know because I need to interact with him.  I need to
11 go there to brief them to the team because my English
12 is not good.  So I was through my husband.  And
13 whatever promotions he wanted or whatever help he
14 wanted, I would do it in China to contact -- to
15 connect with specialists, with cooperative entities
16 including some insurance companies and because --
17 cooperating with the insurance.
18     Because in China and in the United States,
19 the medical systems are not very fit.  They have
20 different rules.  Therefore, a lot of coordinations
21 need to be done.  And I think we were successful in
22 that area as well.  But these were all written.  I
23 relied on my husband to brief his team about it.  I
24 personally did not make such a record.
25     Q.  And, Ms. Wang, in order to do all of this

29

1 important work, you had to be knowledgeable about the
2 proton therapy; right?
3     It's okay.  Ms. Wang, when I want to ask you
4 about the insurance companies, I'll ask you about the
5 insurance companies.  If you can limit yourself to
6 responding to my question, I'd appreciate that.  Can
7 we do that?
8     A.  What I have said, you haven't interpreted
9 what I said yet.
10     Q.  I can understand some of it.
11     Please interpret it for me, sir.
12     THE INTERPRETER:  All right.
13     THE WITNESS:  I learned a lot about the
14 advantages in the three ways of treating cancer,
15 chemotherapy, surgery, and proton -- radiation,
16 including how the proton can be used in radiation of
17 other -- of the ordinary treatment and the advantages.
18 I have learned a lot in advance.  Therefore, I had
19 some conceptional interface, but for specifics is
20 still required my husband or his team to interface
21 with him, but I did some preliminary preparation work
22 and the interface to some relevant units, including
23 insurance companies.
24     At the time insurance companies was very
25 important because it affects later on when the project

30

1 was billed.  So what about the customer, where would
2 the customer come or the patients, that -- well, how
3 do you get patients?
4     So for the Chinese patients, could they go to
5 the United States, would their treatment be covered by
6 the insurance.  So I said this was very important.  So
7 at the time I already started to work on interfacing
8 with the insurance companies.  Eventually I reached
9 Chief Kang [ph] of Xinhua Insurance.  I knew him very
10 well.  And I even brought him to the United States to
11 do some -- to do some research and investigation.
12     And also they're including many hospitals and
13 they are radiation specialists.  They had been to the
14 United States to -- they have been to the United
15 States to study as well.  Sorry.  Maybe I said too
16 much.
17     (Reporter clarification.)
18     MR. GOURAIGE:  Mr. Li, would you be sure to
19 translate everything that the witness says because,
20 unlike Mr. Leung, I do not understand Chinese.  And
21 it's also important that I hear the witness's
22 testimony.
23     THE INTERPRETER:  Very well.
24 BY MR. LEUNG:
25     Q.  Ms. Wang, what kinds of cancer -- what kinds

31

1 of cancer can be treated with proton therapy?
2     A.  There are many, but the United States, the
3 promotion in the United States, what they told me that
4 in the United States, it's nose and throat cancer and
5 the brain cancer of children and also breast cancer
6 all had very good result, treatment results.
7     And it had to the body -- in theory, it can
8 treat most of cancers from head to toe and if it was
9 in the early or in the median stage.  That's what I
10 have -- that's what I learned from the professor and
11 that is -- but in China, in the region and in
12 Guangdong of China, there are many nose and throat
13 cancer patients.  And in Shanghai, there are many
14 stomach cancer.
15     In Beijing because of the -- because of the
16 air pollution, there were many lung cancers.  In
17 China, they are a huge population.  So we really need
18 to introduce this type of document -- this type of
19 equipment to do such treatment.  And before the
20 equipment in China, they would choose to do this
21 treatment.
22     If you want to make it very specific --
23 whenever I talk about this, I become excited because I
24 had been telling others about it.  The advantages of
25 proton treatment is that it has very little damage to

32

1  normal cells compared with ordinary chemotherapy.
2  It's a very advantageous treatment and method, because
3  for a ordinary chemotherapy, it's -- that's an X-ray
4  spectrum.
5      It's not only targeted at the tumor but also
6  have a huge damage to normal -- to normal cells of
7  human bodies, but for the proton it's kind of like
8  targeted but not totally targeted.  It only kills the
9  tumor cells and this killing --
10     THE INTERPRETER:  The interpreter needs to
11 make a clarification with the witness.
12     MR. LEUNG:  She's trying to spell Bragg peak.
13     THE INTERPRETER:  Bragg peak.
14     THE WITNESS:  Okay.  It's Bragg peak.  So
15 that is a very slow linear speed and has a very small
16 Bragg peak; therefore, it would not go through -- it
17 will only arrive at the tumor, so --
18     (Reporter clarification.)
19     THE INTERPRETER:  It will not go through --
20 it will not go through.  And that's it.  I don't think
21 the witness finished that sentence actually.
22 BY MR. LEUNG:
23     Q.  So is it --
24     A.  It will be very, very protective, so it only
25 kills tumor itself.  And it has a maximum protection

33

1  of normal cells.  Because while it -- at the Bragg
2  peak, it will go down quickly and then it will be
3  effective to the tumor, but it will not go to the
4  normal cells.  So I'm using the most ordinary -- some
5  layman's language to talk about this.
6      For other radiation equipment, they have a
7  lot of radiation points because some of the tumors are
8  not in regular shapes.  So it is a different radiation
9  zone to -- so they will have to pass lots of normal
10 cells and they will have a huge killing effect on the
11 normal cells, but the proton function, that is a good
12 thing.  It's only targeted these.
13     At that time -- I think they've used the
14 equipment.  They were the first one in the world about
15 it.  They were the father of proton.  They had this --
16 they had a military system, militarized, a military
17 system to be used in medicine.  And they were the only
18 one who were able to do a pen scanning in the world
19 for the tumor cells to make a very accurate treatment
20 of cancer cells.  And they would make the arrow
21 between the cancer cells and the normal cells, they
22 can make the tolerance to be .11 millimeter tolerance.
23 Therefore, it can -- it will maximize the protection
24 of normal cells from being damaged.  And it's a
25 recovery.  It's also very good.

34

1      In the United States, the patients could
2  go -- even go play golf after they receive the
3  treatment or to do normal things, but they would have
4  very little pain.  For a certain patient, there will
5  be a recovery period for chemotherapy after the
6  treatment need to be metabolized by kidney and the
7  liver, which was very harmful to internal organs.
8      But this is -- the proton is the best for the
9  cancer patients, but for lung, because lung is moving,
10 so there is a tracking capability.  I do not know
11 whether the technology now is good enough to track the
12 lung.
13     (Reporter clarification.)
14     A.  However, but in theory, it can treat all kind
15 of -- the majority of part of the body -- the majority
16 of the cancer of the body, it will be effective.  But
17 in the United States data, it's very -- the data shows
18 that it is very effective to nose and throat cancer
19 and also to breast cancer, very effective.
20     But also in the United States we had a big
21 promotion because it was also very good to brain tumor
22 of children, because children keep moving while they
23 are doing the treatment.  But the proton in this
24 process, the obtuse equipment has a rotating rack.
25 That's all the machine could move instead of people

35

1  move.  So it's a big help to patients.  I've done lots
2  of homework at the time.
3      If you want me to continue, I can talk a lot
4  more.  I'm sorry about -- I'm sorry, the interpreter,
5  I do not know how you are going to interpret all
6  these.
7      (Reporter clarification.)
8      Q.  Ms. Wang, the $1 million that you received
9  from Beverly Proton in March of 2016, what did you do
10 with that money?
11     MR. GOURAIGE:  I object to the relevance of
12 what she did with the money.
13 BY MR. LEUNG:
14     Q.  Please answer the question.
15     A.  The majority of it was used to repay, because
16 for so many years I received no wage.  During the
17 project that my husband had to borrow the money and so
18 the majority of the money was to repay relatives and
19 friends.  And also at the time to develop the project,
20 some money was borrowed.  So those money were repaid
21 as the majority was used for that.
22     Q.  What are the names of the relatives and
23 friends that were repaid with these investor funds?
24     MR. GOURAIGE:  I again object to the
25 relevance of this whole line of questioning.

36

Xin Wang
2/25/2021

1  this money came from the corporate accounts of Pacific
2  Proton, the PP EB-5 Fund, and Beverly Proton.  That's
3  a lot of money.  Did you have any understanding as to
4  where that money was coming from?
5      **A.**   I do not know.
6          I do not know.  For my family account,
7  maybe -- I don't know if you can understand.  For me,
8  I'm a person who rely on others, so for our family
9  finance, mostly it was handled by my husband on my
10  behalf.
11         As to whether for how much money was sent to
12  his account, I do not know.  As to the figure, how
13  many dollars to his account, I do not know.
14         As to my account, my understanding is that
15  the -- that was the wage that owed to me for the five
16  years and it was made out to me.
17         As to where this money was from and their
18  company, the company in the United States, how the
19  capital was handled and how the fund was put in, my
20  understanding was that they had other investors who
21  came in, other cooperating partners came in.  And
22  whether there will be transferred by shareholders, I
23  do not know.  I do not understand.
24         But all I understand is that this was -- this
25  money was just made up of my wages for the five years.

65

1  As to others, I do not know.
2      I do not know.  He had -- this is -- as far
3  as I know, this project was a big project.  It would
4  require a total of 200,000, $200,000.  So it could not
5  be just the EB-5 Fund.
6      As to the EB-5, there was a process, and so
7  at the beginning there will be some early investment,
8  so it may not be -- he may not be able to borrow them
9  all.  So there may be other cooperative partners to
10  participate in and as to -- to find employees.
11         And the reason he asked me to do it was at
12  the very beginning, he had no way to help all the
13  people and also I had some resources.  He could asking
14  me to do things for him without paying me.  This is my
15  understanding.
16         As to in this process, I believe that we had
17  used our best effort to do -- to make this project
18  successful.
19         As to how the capital was handled, how the
20  money turned around, I do not know.
21         And also because it was in the United States,
22  due to the language barrier and also, in my
23  understanding, that Xinhua Insurance had the intention
24  to invest.  And later on I talked with them.  They not
25  only wanted to do this like that, I also wanted this

66

1  to be -- to happen to be successful, to work hard to
2  get them involved.  And then they would -- if they
3  wanted to get in, they would invest too.
4          And we also had a letter of cooperation
5  intent signed.  Therefore, everything I said was what
6  really happened and was truth.
7          And also there may be a difference in the
8  cultural background in the United States.  There are
9  difference between family values of the United States
10  and the China.
11         The understanding of family in the United
12  States, some of my friends were American friend, but
13  they were American-Chinese.  But sometimes they would
14  talk with me about the roles of family members.
15  American women are more independent, especially in
16  financial, in finance.  But to me, for me, I think a
17  family is a unit.  So if we had income together and if
18  I had work, I will do my work best.  So I did not pay
19  attention to where his money was from.
20         As to how much money was transferred to his
21  account, I didn't even know.  Only until you mentioned
22  it a moment ago that I know.  I didn't know how much
23  money was transferred to his account.  I know it was
24  a big project.  He needed it to have it to keep it
25  running.  His previous projects were pretty big too.

67

1          So as to how he handled it, he never told me.
2  He never tell me about this.  He just tell me what he
3  needed me to do, and as long as it was not the wrong
4  things, it was not illegal things or rule violating
5  things, I would help him out.  I would do my best to
6  do it.
7      **Q.**   From 2011 to 2016, did you keep records of
8  the expenses that you needed to be reimbursed for and
9  the work that you needed to be paid for?
10     **A.**   If I had them, I had given them to my
11  husband.
12     **Q.**   Did you have records in September of 2015
13  that explained for your husband you wrote at least
14  $50,000 in expense reimbursements?  Did you have
15  records that supported that number, the 50,000?
16     **A.**   I really do not remember.  This would also be
17  with my husband.  I could search for them.  I had to
18  ask him to search for them because it is always him.
19     **Q.**   You haven't searched for them yet; right?
20     **A.**   For -- it's not that I didn't search for it.
21  It was with him, but he was not a very careful person
22  either.  He may not actually kept them well.  He often
23  have piles of things sitting there.  Maybe he would
24  organize them once in a while.
25         So when there were expenses of what happened

68

1  **Q.**  When did this conversation with your husband
2  occur?
3      **A.**  What date is today?  About a month.  That's
4  about right.  Because it was around the spring
5  festival, the Chinese New Year.  Everyone -- before
6  and after everyone was very busy and with family and
7  very busy.  So he mentioned about it.  And he said he
8  might not have them either.  He might be able to find
9  them, but -- to find them.  But I said, "I've turned
10 everything to you, so you have to search for them for
11 me."  That's what's happened.
12     **Q.**  When was the last time you traveled to the
13 United States?
14     **A.**  Which year was that?  It was a rather long
15 time.  I think it was interview.  It was when the
16 interview with the SEC.  I think that was the time.
17 And then I went back to the Mainland, to China.
18     **Q.**  Why haven't you come back since?
19     THE INTERPRETER:  I'm sorry?
20 BY MR. LEUNG:
21     **Q.**  Why haven't you come back since?
22     **A.**  It was -- I had work here and also I had
23 family, had elders who passed away and was sick.
24 So for a long time I had no way to -- also for the
25 children, the children were -- received in the United

73

1  States -- in the schools of United States received a
2  bad treatment.  I feel that they may be mistreated.
3  Therefore, I said, okay, I let them too and also the
4  elders to come back here.
5      After they come back to China to study, so I
6  didn't go back.  And also for the children, if they
7  come back and forth often, it may not be good for
8  their growth.  And it also give them a very bad
9  impression, but the kids do not actually want to stay
10 in China, but I had no way right now.
11     I had always been looking forward to go back
12 to the US, United States.  I hoped that the children
13 would have a better environment, because their
14 language is not very good.  Their Chinese not very
15 good.
16     **Q.**  If subpoenaed, Ms. Wang, will you testify at
17 the evidentiary hearing in this matter before the
18 district judge?
19     MR. GOURAIGE:  I object to this question.
20 That is an issue that the witness would have to
21 consult with her counsel about before making a
22 decision.
23 BY MR. LEUNG:
24     **Q.**  Please answer, Ms. Wang.
25     **A.**  Yes, I also believe I need to discuss with my

74

1  lawyer before I make a decision.
2      MR. LEUNG:  Pass the witness.
3
4          EXAMINATION
5  BY MR. GOURAIGE:
6      **Q.**  Ms. Wang, did you ever show the site where
7  the Beverly Proton Center was going to be built to any
8  EB-5 investor?
9      **A.**  Shown to EB-5 investors?
10     I'm sorry, Interpreter, could you say this
11 question again?
12     **Q.**  Did you ever show the place where the proton
13 center, the Beverly Proton Center was going to be
14 built to any investor?
15     **A.**  No.  I do not get involved into their EB-5
16 things.  I have no involvement.
17     **Q.**  When you did your work in China, did you work
18 with Pacific Damei Company?
19     **A.**  What company?
20     **Q.**  Pacific Damei.
21     **A.**  I know there is such a company.  And also as
22 I mentioned, when they need someone to give a high
23 level introduction about the proton, I had made such
24 introductions with them.
25     **Q.**  Did you do work in China for the Grenada?

75

1      **A.**  Yes.
2      **Q.**  Did you have an official position with the
3  Embassy of Grenada in China?
4      **A.**  Yes.  Yes.  I'm the cultural counselor for
5  the cultural exchanges between the two countries.
6      **Q.**  Did you work to promote tourism to Grenada by
7  Chinese citizens?
8      **A.**  Yes.
9      (Reporter clarification.)
10     **Q.**  Did you work with a company called United
11 Damei in China as a tourist agency for Grenada?
12     **A.**  It was for tourist promotion and agency, yes.
13     It was promotion.  I do not know about
14 agency.  I do not want to have a misunderstanding of
15 it.  I was doing promotion.
16     **Q.**  Did you ever work with either the United
17 Damei or Pacific Damei to recruit EB-5 investors in
18 China?
19     **A.**  No.  I have never touched about the EB-5
20 content.
21     **Q.**  Did you do all of the work for Beverly Proton
22 in Beijing?
23     **A.**  Yes.
24     MR. GOURAIGE:  I have no further questions,
25 so I'll pass the witness back.

76

1      MR. GOURAIGE:  I have no further questions.
2      MR. LEUNG:  Just one last question.
3
4              FURTHER EXAMINATION
5  BY MR. LEUNG:
6      **Q.**  Ms. Wang, you know all this because you saw
7  things on the Internet and you saw WeChats and you
8  listened to what a lot of people were saying?
9      **A.**  The announcement that was on the website that
10  I saw myself as to people's ideas on the -- that the
11  industry had their own group and some people saw it in
12  the group and sent it to us.  They said that they had
13  this -- they had preplanning of this.  They had the
14  plan and they had a regimen to do these things step by
15  step.
16      MR. LEUNG:  No further questions.
17      MR. GOURAIGE:  No further questions.
18      MR. LEUNG:  Review and sign?
19      MR. GOURAIGE:  Yes.  Review and sign within
20  30 days.
21      Could you explain to the witness that she'll
22  get a chance to review the transcript and correct any
23  errors within 30 days and she'll work with her lawyer
24  to do that.
25      THE WITNESS:  Okay.  Thank you.

89

1      MR. LEUNG:  Thank you, Ms. Wang.
2      MR. GOURAIGE:  Thank you, Ms. Wang.
3      THE VIDEOGRAPHER:  This concludes today's
4  videotaped deposition of Lisa Wang.  We're going off
5  the record at 10:10 p.m.
6      (Deposition adjourned at 10:10 p.m.)
7                    * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

90

1              CERTIFICATE OF WITNESS
2
3
4  I, XIN WANG AKA LISA WANG, do hereby declare under
5  penalty of perjury that I have read the entire
6  foregoing transcript of my deposition testimony,
7  or the same has been read to me, and certify that
8  it is a true, correct and complete transcript of
9  my testimony given on    ,  , 20__, save and
10  except for changes and/or corrections, if any, as
11  indicated by me on the attached Errata Sheet, with
12  the understanding that I offer these changes and/or
13  corrections as if still under oath.
14      _____ I have made corrections to my deposition.
15      _____ I have NOT made any changes to my deposition.
16
17  Signed: _____
18          XIN WANG AKA LISA WANG
19  Dated this _____ day of _____ of 20____.
20
    (IF REQUIRED)
21  Sworn to and Subscribed before me,
22  this_____day of_____, 20____.
23  _____
    Notary Public        My commission expires:_____
24
25

91

1              REPORTER'S CERTIFICATE
2
3      I, Cynthia J. Vega, a Certified Shorthand
4  Reporter for the State of California, do hereby
5  certify:
6      That the witness in the foregoing remote
7  deposition was by me duly sworn remotely; that the
8  remote deposition was then taken before me at the time
9  and place herein set forth; that the testimony and
10  proceedings were reported by me stenographically and
11  were transcribed through computerized transcription
12  under my direction; and the foregoing is a true and
13  correct record of the testimony and proceedings taken
14  at that time.
15      I further certify that I am not of counsel or
16  attorney for either or any of the parties in the
17  foregoing proceeding and caption named or in any way
18  interested in the outcome of the cause in said
19  caption.
20      IN WITNESS WHEREOF, I have subscribed my name
21  this 2nd day of March, 2021.
22      Reading and Signing was requested.
23
24      _____
25          Cynthia J. Vega, CSR No. 6640

92

# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    _____
                                     )
 5    SECURITIES AND EXCHANGE        )
      COMMISSION,                    )
 6                                   )
             Plaintiff,              )
 7                                   )
          vs.                        ) No. SACV 16-00974-CJC
 8                                   )     (AGRx)
      CHARLES C. LIU; XIN WANG       )
 9    a/k/a LISA WANG, et al.,       )
                                     )
10           Defendants.             )
      _____)
11
12
13
14         REMOTE DEPOSITION OF JOHN THROPAY, M.D.
15               ZOOM VIDEOCONFERENCE
16              Friday, March 5, 2021
17                    Volume I
18
19
20
21    Reported by:
      VALERIE D. GRANILLO
22    CSR No. 11469
      Job No. 4413389
23
24
25    PAGES 1 - 144

                                          Page 1
```

1 submitted by the corporate defendants in this case at
2 document number 38-2.
3      THE WITNESS: Yeah. This didn't come from me.
4 He's working with somebody else.
5      MS. WHITE: We're still scrolling through the
6 document. I don't know if you want to start asking
7 questions.
8 BY MR. GOURAIGE:
9   Q   Dr. Thropay, do you recognize the document? Do
10 you know what it is?
11  A   No.
12  Q   Okay. So let me -- I think there's some things
13 maybe you could answer anyway. The address up on -- I
14 think it's the first -- it's page 12 under "Executive
15 Summary," 105 West Beverly Boulevard, Montebello,
16 California. That is not your lot; is that correct?
17  A   That is correct.
18  Q   And you had never seen this document before
19 today?
20  A   Correct.
21  Q   Do you know whose handwriting it is? If you go
22 to page 13, there is a circle around the number 74,217 and
23 then a line, and it looks like a question mark. And then
24 there's a handwritten something next to it. Do you know
25 whose handwriting that is?

Page 102

1   A   No.
2   Q   Again, if you keep scrolling down, I think at
3 page 15 there are more handwritten notes, one at the top.
4 It looks like "25 owned." And it looks like a D-R for me
5 there. I'm not sure what that is. And then below, above
6 "City Detail" it says "Sue Beverly Hospital." Do you know
7 whose handwriting that is?
8   A   No, I don't recognize it.
9   Q   If you go to the next page where it says "25
10 percent Doctor" -- looks like D-R, period, capital T,
11 period. Is that referring to you?
12  A   Dr. T?
13  Q   Yes.
14  A   I would assume they're talking about my
15 percentage.
16  Q   And it looks like the handwritten note says "Can
17 he be diluted," question mark.
18  A   Right. I don't know whose writing that is.
19  Q   And then at the page 16, "Sue hospital for
20 interference with prospective business opportunity."
21 Sounds like a first rate legal mind wrote that note.
22  A   Yeah, it doesn't look like any writing I
23 recognize.
24  Q   Dr. Thropay, did you at any time, after you found
25 out Charles Liu was talking to City of Hope and Beverly

Page 103

1 Hospital, did you at any time consider suing Liu and
2 Beverly Hospital and City of Hope for interference with
3 your contract with Charles Liu?
4   A   No. I don't sue people.
5   Q   You've never sued anybody?
6   A   No.
7   Q   You sure about that?
8   A   As far as I'm aware. I always try and settle
9 everything peaceably.
10  Q   Have you been sued?
11  A   Yes.
12  Q   So I guess if I continue to ask, you just don't
13 recognize the handwriting on this document?
14  A   No. It's not mine, and it's not Ruth's.
15  Q   Okay. So we are almost done, you'll be happy to
16 know, Dr. Thropay. And I think these will be very quick.
17      I believe you testified that when you went to
18 China -- and I'm not talking about the November 2015 trip,
19 an early trip where you met the Delsk people -- and you
20 spoke to them about proton therapy, did you meet Charles
21 Lui's wife, Lisa Wang, at that meeting?
22  A   At the Delsk meeting?
23  Q   Yes.
24  A   Yes.
25  Q   And did you talk with her?

Page 104

1   A   Yes.
2   Q   Did you speak at that meeting?
3   A   I don't recall.
4   Q   Did you talk with her about what her role was in
5 the project?
6   A   Yes.
7   Q   And did you ask her what it was?
8   A   Yes.
9   Q   What did she tell you?
10  A   She would help set up meetings. And also she
11 started her own company on the side to do some auxiliary
12 work, I guess, to help her husband. And she would sell
13 EB-5 and try and promote sales. Meetings that I went to,
14 she would set up everything and sometimes introduce a
15 speaker. And she was just there to help is all I could
16 see, and that's what she would explain to me.
17  Q   Did she have anything to do with the finances?
18  A   She seemed to be acutely aware of finances.
19  Q   And what did she say that led you to believe
20 that?
21  A   She didn't tell me anything, but I would hear her
22 speaking to her husband in the van.
23  Q   You would hear her speaking to her husband. And
24 what would she be saying to her husband?
25  A   She'd be asking about money.

Page 105

27 (Pages 102 - 105)

| | |
|---|---|
| 1  Q   Money, capital invested in this project? | 1  A   No, in her English and courtesies, you know, the |
| 2  A   Just money. I don't understand -- at that time I | 2  standard, you know, how are you and what have you. |
| 3  didn't understand much Chinese, but I knew the word for | 3  Q   Didn't say much beyond that? |
| 4  money. | 4  A   Correct. |
| 5  Q   And what is the word for money? | 5  Q   At any time did you and Charles discuss having a |
| 6  A   Qian. | 6  position for Lisa Wang in the Beverly Center after the |
| 7  Q   And she was speaking in Chinese, and you | 7  center was built? |
| 8  understood it? | 8  A   Mostly he would tell me what he was doing. There |
| 9  A   I understood a few words here and there, but | 9  was very little discussion. But yes, he did say she was |
| 10  indirectly I could figure it out. | 10  working with him. |
| 11  Q   And where do -- did you have any conversations | 11  Q   He told you that when? |
| 12  with her in Chinese when you were there? | 12  A   When we went to China and she was there. When |
| 13  A   Yes. | 13  she came to the office, it was just the polite hello. But |
| 14  Q   And you could speak the language enough that you | 14  when we were there, I saw she took an active role. And he |
| 15  could talk with her? | 15  said she was helping him and also starting her own |
| 16  A   Only a few things, like the weather. You know, | 16  business. |
| 17  things that I had learned in my vocabulary I would | 17  Q   Did she tell you what she did in China for the |
| 18  practice with her, uh-huh. | 18  project? |
| 19  Q   How many times did you meet with her when you | 19  A   No, but I saw her selling EB-5s. |
| 20  traveled -- I think you traveled about five times to | 20  Q   I'm sorry. What do you mean selling EB-5s? |
| 21  China? | 21  A   When I was there, she was in discussion with a |
| 22  A   Yeah, almost. | 22  family, and it was without the knowledge of Delsk. And |
| 23  Q   How many times did you meet with her? | 23  she sold an EB-5 share to someone, and they were |
| 24  A   I think except the first time, I think -- I think | 24  celebrating. They were very happy. And I was told not to |
| 25  the first time we met up with her somewhere in China | 25  say anything to Delsk. |
| *Page 106* | *Page 108* |
| 1  briefly. And then after that, I believe she was on every | 1  Q   And who told you not to say anything to Delsk? |
| 2  trip except the last one with Delsk. | 2  A   Charles Liu. |
| 3  Q   Did you ever have meetings with her and Charles | 3  Q   And did he explain to you why you should not say |
| 4  in the U.S.? | 4  anything to Delsk? |
| 5  A   I think once she came to the office. Might have | 5  A   Because he had an exclusive contract with Delsk. |
| 6  been more times, but at least once she came to the | 6  Q   So Delsk was supposed to sell all the units? |
| 7  corporate office, if I recall correctly. | 7  A   That was what he told me. |
| 8  Q   Which corporate office? | 8  Q   And when Lisa Wang was speaking to that investor, |
| 9  A   200 East Beverly Boulevard. | 9  this was all in Chinese? |
| 10  Q   And whose corporate office was that? | 10  A   Yes. |
| 11  A   Beverly Oncology. | 11  Q   And you fully understood what they were saying? |
| 12  Q   And why did she come to the office? | 12  A   I wasn't in the room. I saw them outside the |
| 13  MS. WHITE:  Objection; lacks foundation. If you | 13  room. And they told me she was having the discussion to |
| 14  know. | 14  sell an EB-5. I was told that in English. |
| 15  THE WITNESS:  Just accompanying her husband and | 15  Q   And who told you that? |
| 16  to talk about the project. | 16  A   Charles Liu. |
| 17  BY MR. GOURAIGE: | 17  Q   I see. And then Charles told you not to mention |
| 18  Q   And she sat in on a meeting with you and Charles | 18  it to Delsk? |
| 19  and Ruth? | 19  A   Correct. |
| 20  A   Yes, as far as I can recall one time. | 20  Q   Later on in November of 2015 when you met with |
| 21  Q   And was the meeting conducted in English? | 21  Delsk, did you tell Delsk about that sale? |
| 22  A   Yes. | 22  A   No. |
| 23  Q   Did she speak any -- at all during the meeting? | 23  Q   Have you ever told anybody else about that sale |
| 24  A   A little. | 24  before today's testimony? |
| 25  Q   In Chinese? | 25  A   No. |
| *Page 107* | *Page 109* |

28 (Pages 106 - 109)

1  Q  Okay.  And then turning back to binding
2  section -- nonbinding section 6 dash --
3      MR. GOURAIGE:  Objection to the implication --
4      MR. LEUNG:  -- it says Mr. Liu.
5      MR. GOURAIGE:  Objection to the implication that
6  the defendants took $8.2 million from the account.
7      MR. LEUNG:  It's in the record.
8  Q  Section 6A reads, "Mr. Liu shall be entitled to a
9  success fee for all capital raised from the EB-5 and other
10 investors in an amount equal to 8 percent of the capital
11 raised."
12     So that's nonbinding section 6A.  Let's live in a
13 world -- let's suppose that it was actually binding, which
14 it isn't.  Is 8 percent of $27 million equal to 8 million
15 or dramatically less than 8 million?
16 A  Dramatically less.
17     MR. LEUNG:  Pass the witness.
18     MR. GOURAIGE:  I have no further questions for
19 the witness.
20     MR. LEUNG:  Review and sign, Molly?
21     MS. WHITE:  Yes, please.  Send it to me.
22        (TIME NOTED: 1:55 p.m.)
23
24
25
                                          Page 142

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10 under my direction; that the foregoing transcript is
11 a true record of the testimony given.
12     Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [X] was [ ] was not requested.
16     I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or any party to this action.
19     IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: March 17, 2021
22
23     *Valerie D. Granillo*
24     VALERIE D. GRANILLO
25     CSR No. 11469
                                          Page 144

1
2
3
4      I, JOHN THROPAY, M.D., do hereby declare under
5  penalty of perjury that I have read the foregoing
6  transcript; that I have made any corrections as appear
7  noted, in ink, initialed by me, or attached hereto; that
8  my testimony as contained herein, as corrected, is true
9  and correct.
10     EXECUTED this _____ day of _____,
11 2021, at _____, _____.
          (City)          (State)
12
13
14
15
16     _____
       JOHN THROPAY, M.D.
17     VOLUME I
18
19
20
21
22
23
24
25
                                          Page 143

37 (Pages 142 - 144)

# Exhibit D

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4   _____

                           )

5   SECURITIES AND EXCHANGE     )

   COMMISSION,                )

6                            )

        Plaintiff,       )

7                            )

     vs.                ) No. SACV 16-00974-CJC

8                      )    (AGRx)

   CHARLES C. LIU; XIN WANG   )

9   a/k/a LISA WANG, et al.,   )

                            )

10         Defendants.      )

   _____)

11

12

13

14     REMOTE DEPOSITION OF RUTH THROPAY LOPEZ NOVODOR

15            ZOOM VIDEOCONFERENCE

16         Monday, February 22, 2021

17              Volume I

18

19

20

21   Reported by:

   VALERIE D. GRANILLO

22   CSR No. 11469

   Job No. 4413391

23

24

25   PAGES 1 - 189

                                   Page 1

Page 178

1   A   Okay.
2   Q   Now, all of those communications Mr. Liu had with
3 Beverly Hospital and City of Hope about the site at 105
4 and the Mevion equipment, et cetera, all those occurred
5 prior to that December 2015 letter; is that correct?
6   A   I can't recall the dates.
7   Q   Before December 2015, I think you testified when
8 I was examining you, you had no access to the bank
9 accounts.  Is that correct?
10   A   That's true.  Bank accounts defined as being able
11 to look up an account online or going into the bank and
12 getting access to what numbers or balances are, that's
13 what I mean.
14   Q   Right.  Mr. Liu did not tell -- did not share
15 with you how he was handling the funds in the accounts
16 prior to January 2016; is that correct?
17   A   He would make comments about what he's -- that
18 he's going to pay Optivus or he's going to do this or do
19 that.  So I'm not sure exactly what your question is.
20   Q   Well, he would make comments that he's going to
21 pay, what, a vendor or a consultant?
22   A   Or he already did, either way.  It wasn't a big
23 deal then.  We didn't think it was a big deal then.
24   Q   Did he tell you where he was transferring the
25 funds?

Page 179

1   A   No.
2   Q   Okay.  After your attorney's letter to Mr. Liu
3 dated December 1, 2015, what was the state of
4 communications between you and Mr. Liu?  Did you talk with
5 him after that?
6   A   No.
7   Q   In fact, on January 19th, 2016, he removed your
8 brother from the project; isn't that correct?
9   A   According to his documentation, yes.
10      MR. GOURAIGE:  No further questions at this
11 point.  Gary, it's your witness.
12          FURTHER EXAMINATION
13 BY MR. LEUNG:
14   Q   Ms. Wang, Lisa Wang, Mr. Lui's spouse, you
15 testified you met her about three or four times, right?
16   A   I can't hear you if you're talking to me.
17   Q   Am I muted or I should just speak up?  I need to
18 speak up?
19   A   Speak up a little, yes, please.
20   Q   Okay.  Okay.  Let me ask you a couple questions
21 about Ms. Wang, Mr. Lui's wife.
22   A   Yes.
23   Q   Was it ever your understanding that she was an
24 employee of Beverly Proton?
25   A   I did not know what her role was in Beverly

Page 180

1 Proton.  I know that she was helping him market.  That's
2 all I know.
3   Q   And so if she had no formal employment
4 relationship with Beverly Proton until, say, February
5 2016, can you think of any reason why she'd be receiving
6 close to a million dollars in the form of one single
7 transfer from Beverly Proton's corporate account?
8      MR. GOURAIGE:  Object to lack of foundation to
9 the question.  I think you should ask her first if she has
10 any knowledge of services she provided.
11 BY MR. LEUNG:
12   Q   Any idea why she might have been getting a
13 million dollars from the Beverly Proton corporate account
14 without any formal employment relationship with Beverly
15 Proton?  It seems a bit odd.
16   A   Mr. Leung, I was not aware of whatever
17 relationship she had.  I'm sorry.  I can't address what
18 she did, what she didn't do other than she did marketing.
19 I was not privy to what she was getting paid or not paid
20 until I read all the transcripts.
21   Q   What was your understanding of the marketing work
22 that Ms. Wang was engaged in?
23   A   Well, she helped put the marketing materials
24 together.  She would set up travel plans for Dr. Thropay
25 across the country and China to meet doctors.  And that

Page 181

1 was about it.  That's what she did.  She set those up, so,
2 you know, I don't know more than that.
3   Q   Did investors -- potential investors ever visit
4 the project site at 111 West Beverly?
5   A   The Delsk ones for sure.  If the others came, I
6 believe, yes, Charlie would let us know somebody's coming
7 to the site.
8   Q   And do you recall whether Ms. Wang was present at
9 any of these visits by potential investors at the project
10 site?
11   A   I did see her at a couple of those.
12   Q   And she was there in her capacity as somebody
13 working on marketing; is that right?
14   A   You know, they spoke Chinese.  I'm not sure what
15 she told them.  I always thought she was just doing
16 marketing.
17      MR. LEUNG:  Fair enough.  Thank you, Ms. Novodor.
18      Pass the witness.
19      MR. GOURAIGE:  Couple of questions, Ms. Novodor.
20          FURTHER EXAMINATION
21 BY MR. GOURAIGE:
22   Q   The total number of investors, depending on which
23 version is correct, is either 50 or 58.  Let's assume it's
24 within that range, 50 or 58 investors.
25   A   Okay.

46 (Pages 178 - 181)

1 before or after the building was demolished?

2    A  Oh, there were some that came before.

3    Q  No.  Lisa Wang, was she there before or after the

4 building was demolished?

5    A  You know what, I am guessing at this point.  My

6 guess -- and I want to emphasize g-u-e-s-s -- is while it

7 was still up, the building, and she was introducing a

8 couple of her clients or whoever.  And I only remember two

9 times right now.  That doesn't mean that this is an

10 accurate depiction of what happened.

11      MR. GOURAIGE:  Okay.  So I understand your

12 testimony now.  Thank you.  I have no further questions.

13      THE WITNESS:  No problem.

14      Can you tell me what's hanging behind your head?

15 It has been entertaining me for the last -- I think I

16 deserve an explanation.

17      MR. GOURAIGE:  That is a piece of art created by

18 my young daughter.  And every time I walk into the study,

19 it reminds me of her so I keep it there.

20      THE WITNESS:  You have it very high.

21      MR. GOURAIGE:  I'm glad you noticed it.  It's a

22 great piece of art.

23      THE WITNESS:  It's actually very cute, very

24 charming.  I've been trying to figure out if it was a

25 cookie on a stick, and she had thrown it up there.

Page 186

---

1      Sorry.  Sorry for the diversion.

2      MR. GOURAIGE:  It's okay.  No further questions.

3 Gary, your witness.

4      MR. LEUNG:  I think we're all done today.  Thank

5 you very much, Ms. Novodor.

6      MR. GOURAIGE:  Thank you, Ms. Novodor.

7      MR. LEUNG:  Counsel, reviewing time?

8      MS. GOLDSTEIN:  Yes.  I was just going to say

9 before we go off the record, we would like to request 30

10 days to review the deposition transcript and sign.

11      MR. LEUNG:  So stipulated.

12      MR. GOURAIGE:  I'm sorry.  Anya, I didn't hear

13 your request.

14      MS. GOLDSTEIN:  We're requesting the 30-day

15 period to review the deposition transcript and sign.

16      MR. GOURAIGE:  Okay.  That's fine.

17      THE WITNESS:  Many thanks.

18      MR. GOURAIGE:  Thank you.

19      MR. LEUNG:  Thank you.

20      (TIME NOTED: 4:15 p.m.)

21

22

23

24

25

Page 187

---

1

2

3

4      I, RUTH THROPAY LOPEZ NOVODOR, do hereby declare

5 under penalty of perjury that I have read the foregoing

6 transcript; that I have made any corrections as appear

7 noted, in ink, initialed by me, or attached hereto; that

8 my testimony as contained herein, as corrected, is true

9 and correct.

10      EXECUTED this _____ day of _____,

11 2021, at _____, _____.

     (City)         (State)

12

13

14

15

16    _____

     RUTH THROPAY LOPEZ NOVODOR

17      VOLUME I

18

19

20

21

22

23

24

25

Page 188

---

1      I, the undersigned, a Certified Shorthand

2 Reporter of the State of California, do hereby

3 certify:

4      That the foregoing proceedings were taken

5 before me at the time and place herein set forth;

6 that any witnesses in the foregoing proceedings,

7 prior to testifying, were administered an oath; that

8 a record of the proceedings was made by me using

9 machine shorthand which was thereafter transcribed

10 under my direction; that the foregoing transcript is

11 a true record of the testimony given.

12      Further, that if the foregoing pertains to

13 the original transcript of a deposition in a Federal

14 Case, before completion of the proceedings, review

15 of the transcript [ ] was [ ] was not requested.

16      I further certify I am neither financially

17 interested in the action nor a relative or employee

18 of any attorney or any party to this action.

19      IN WITNESS WHEREOF, I have this date

20 subscribed my name.

21

22 Dated: March 3, 2021

23      *Valerie D. Granillo*

24      VALERIE D. GRANILLO

25      CSR No. 11469

Page 189

48 (Pages 186 - 189)

# Exhibit E

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:              )

                               )   File No. LA-04639-A

PACIFIC PROTON THERAPY         )

REGIONAL CENTER, LLC           )


WITNESS:  Charles C. Liu

PAGES:    1 through 177

PLACE:    Securities and Exchange Commission

          444 South Flower Street, Suite 900

          Los Angeles, California  90071

DATE:     Wednesday, March 23, 2016


    The above entitled matter came on for hearing,

pursuant to notice, at 9:17 a.m.


Diversified Reporting Services, Inc.

(202) 467 9200

## Page 2

```
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4       TONY REGENSTREIF, ESQ.
 5       VICTORIA A. LEVIN, Assistant Regional Director
 6       Securities and Exchange Commission
 7       Division of Enforcement
 8       444 South Flower Street, Suite 900
 9       Los Angeles, California 90071
10       (323) 965-3998
11
12   On behalf of the Witness:
13       EDWARD GARTENBERG, ESQ.
14       MILENA DOLUKHANYAN, ESQ.
15       Gartenberg, Gelfand & Hayton, LLP
16       15260 Ventura Blvd., Suite 1920
17       Sherman Oaks, California  91403
18       (213) 542-2100
19
20
21
22
23
24
25
```

## Page 4

```
 1       C O N T E N T S (CONT.)
 2
 3   EXHIBITS:    DESCRIPTION         IDENTIFIED
 4   11     Engagement Agreement dated
 5          8/18/13 and 8/25/13        117
 6   12     Chase bank statement (6428)
 7          through October 2014, Bates
 8          Nos. SEC-JPMCB-P-187 through 192   122
 9   13     Chase bank statement (5152)
10          dated 1/1/15 through 1/30/15, Bates
11          Nos. SEC-JPMCB-P-103 through 106   127
12   14     Chase bank statement (6428) dated
13          4/1/15 through 4/30/15, Bates
14          Nos. SEC-JPMCB-P-377 through 384   129
15   15     Chase bank statement (5152) dated
16          10/31/15 through 11/30/15, Bates
17          Nos. SEC JPMCB P 158 through 161   133
18   16     Three-page document, Bates
19          Nos. PPEB5-419 through 421     139
20   17     Chase bank statement (5152) dated
21          10/1/15 through 10/30/15, Bates
22          Nos. SEC-JPMCB-P-149 through 152   145
23   18     Chase bank statement (5152) dated
24          1/1/16 through 1/29/16, Bates
25          Nos. SEC-JPMCB-P-176 through 179   147
```

## Page 3

### C O N T E N T S

```
 1       C O N T E N T S
 2
 3   WITNESS:              EXAMINATION
 4   Charles C. Liu            6
 5
 6   EXHIBITS:    DESCRIPTION         IDENTIFIED
 7   1      Form 1662           8
 8   2      Subpoena            10
 9   3      Background questionnaire  10
10   4      G-28 Notice of Entry of Appearance
11          from the Department of Homeland
12          Security and application submitted
13          11/19/10               43
14   5      Offering memorandum for 300
15          membership units of Pacific Proton
16          EB-5 Fund, LLC dated 5/1/2013    69
17   6      Signature card, Bates Nos.
18          SEC-JPMCB-P-184 through 186    99
19   7      Signature card, Bates Nos.
20          SEC-JPMCB-P-3 through 11      101
21   8      Signature card, Bates No.
22          SEC-JPMCB-P-83 through 90     102
23   9      Signature card, Bates Nos.
24          SEC-JPMCB-P-78 through 82     111
25   10     Engagement Agreement dated 1/28/13  113
```

## Page 5

```
 1       C O N T E N T S (CONT.)
 2
 3   EXHIBITS:    DESCRIPTION         IDENTIFIED
 4   19     Chase withdrawal slip (5152)
 5          dated 11/26/15, Bates No.
 6          SEC-JPMCB-P-168           152
 7   20     Check dated 11/25/15 to Optivus   154
 8   21     Check dated 4/10/15 to Licheng Zheng 155
 9   22     I-924A Annual Filing Supplement
10          to Regional Center Designation   156
11   23     Minutes of Annual Meeting of Members
12          of Beverly Proton Center, LLC    161
13   24     Consent of Majority Member of
14          Pacific Proton Therapy Regional
15          Center, LLC            162
16   25     Pacific Proton EB-5 Fund, LLC,
17          Proton Therapy Center Project,
18          Supplemental Update to Business
19          Plan, February 2016        164
20
21
22
23
24
25
```

Page 6

PROCEEDINGS

1      MR. REGENSTREIF: We're on the record at
2  9:17 a.m. on Wednesday, March 23rd, 2016.
3      Please raise your right hand.
4      MR. LIU: (As requested.)
5      MR. REGENSTREIF: Do you swear to tell the
6  truth, the whole truth and nothing but the truth?
7      MR. LIU Yes, I do.
8  Whereupon,
9      CHARLES C. LIU
10 was called as a witness and, having been first duly
11 sworn, was examined and testified as follows:
12     EXAMINATION
13     BY MR. REGENSTREIF:
14     **Q**   **Please state and spell your full name,**
15 **including your middle name, for the record.**
16     A  Charles C. Liu.
17     **Q**   **Can you spell Liu, please.**
18     A  L-i-u.
19     **Q**   **My name is Tony Regenstreif, and this is**
20 **Victoria Levin, and we are officers of the Commission**
21 **for the purposes of this proceeding.**
22     **This is an investigation by the United**
23 **States Securities and Exchange Commission in the**
24 **matter of Pacific Proton Therapy Regional Center,**

Page 7

1  **LLC, to determine whether there have been violations**
2  **of certain provisions of the federal securities laws.**
3  **However, the facts developed in this investigation**
4  **might constitute violations of other federal or**
5  **state, civil or criminal laws.**
6      **Mr. Liu, do you understand that your oath**
7  **here today is the same oath as in a court of law?**
8      A  Yes, I do.
9      **Q**   **Have you ever had your deposition or**
10 **testimony taken before?**
11     A  No.
12     **Q**   **I'll just generally explain the rules of**
13 **the road. Everything that we're saying is being**
14 **transcribed into written form by the court reporter,**
15 **so we should try to talk clearly and not over one**
16 **another. So if I ask you a question, you should wait**
17 **until the completion of the question to answer, and I**
18 **will try to let you answer before I ask a follow-up.**
19     **There should only be verbal responses, so**
20 **no head nods or nonverbal responses. And if you**
21 **don't understand something, please let me know and**
22 **I'll try to rephrase the question. Otherwise, I**
23 **assume you've understood the question.**
24     **Prior to the opening of the record, I**
25 **provided you with a copy of the Formal Order and**

Page 8

1  **Supplemental Formal Order of Investigation in this**
2  **matter. It will be available for your examination**
3  **during the course of this proceeding.**
4      **Have you had an opportunity to review the**
5  **Formal Order?**
6      A  Yes.
7      MR. REGENSTREIF: So I'm going to ask the
8  court reporter to mark as Exhibit 1 Supplemental
9  Information Form 1662.
10     (SEC Exhibit 1 was marked
11     for identification.)
12     BY MR. REGENSTREIF:
13     **Q**   **Mr. Liu, I've handed you Exhibit 1.**
14     **Have you had an opportunity to review**
15 **Exhibit 1?**
16     A  Yes.
17     **Q**   **Do you have any questions concerning**
18 **Exhibit 1?**
19     A  No.
20     **Q**   **Mr. Liu, are you represented by counsel**
21 **today?**
22     A  Yes.
23     MR. REGENSTREIF: Would counsel please
24 identify themselves.
25     MR. GARTENBERG: Yes. Edward Gartenberg

Page 9

1  and Milena Dolukhanyan from the Law Firm of
2  Gartenberg, Gelfand & Hayton.
3      MR. REGENSTREIF: So as I explained before,
4  Counsel, all the exhibits will be returned to us at
5  the end of today's deposition. And so as a result,
6  please don't write on them except to note the exhibit
7  number.
8      BY MR. REGENSTREIF:
9      **Q**   **Mr. Liu, do you understand that the staff**
10 **requests your testimony here today based on your best**
11 **recollection of events?**
12     A  Yes.
13     **Q**   **So I don't want you to speculate or guess.**
14 **Just give me the best answers to your personal**
15 **knowledge. If you do have a belief or an**
16 **understanding, let me know, and then I can ask some**
17 **questions about that.**
18     **Are you aware of any reason why you feel**
19 **that you cannot go forward with your best testimony**
20 **today?**
21     A  No.
22     MR. REGENSTREIF: I'm going to ask the
23 court reporter to mark as Exhibit 2 a multi-page
24 document consisting of a cover letter addressed to
25 Mr. Liu and an accompanying subpoena for testimony

Page 10

```
 1   and documents.
 2          (SEC Exhibit 2 was marked
 3           for identification.)
 4          BY MR. REGENSTREIF:
 5       Q   Mr. Liu, I've handed you Exhibit 2.  This
 6   is the subpoena that calls for your testimony today.
 7          Is this a copy of the subpoena that you're
 8   appearing to pursuant here today?
 9       A   Yes.
10          MR. REGENSTREIF:  I'm going to ask the
11   court reporter to mark as Exhibit 3 a background
12   questionnaire dated March 15th, 2016.
13          (SEC Exhibit 3 was marked
14           for identification.)
15          BY MR. REGENSTREIF:
16       Q   Mr. Liu, I've handed you Exhibit 3.
17          Mr. Liu, did you complete this background
18   questionnaire as requested by the staff?
19       A   I completed it by myself.
20       Q   Exhibit 3 is what you completed?
21       A   Yes.  I think that I saw one error here.
22       Q   So what's the error that you noticed?
23       A   My resume in the last page, education is
24   1988 to 1991 instead of -- it's a typo here, and I
25   provided -- I think there's two versions, so
```

Page 11

```
 1   obviously this was the previous one.
 2       Q   So just for clarification, under
 3   "Education," your MFA in Arts Administration from
 4   Columbia University was '88 to '91?
 5       A   Yes.
 6       Q   And are the answers contained in Exhibit 3
 7   accurate and truthful to the best of your knowledge?
 8       A   Yes.
 9       Q   And have there been any changes since you
10   completed Exhibit 3?
11       A   No.
12       Q   Is there anything in Exhibit 3 you'd like
13   to clarify?
14       A   No.
15       Q   When did you become a U.S. citizen?
16       A   It was a long time ago.
17       Q   Approximately.
18       A   Approximately 17 years ago.
19       Q   And when did you get granted citizenship?
20       A   It was 2014.
21       Q   And you're currently married to Xin Wang?
22       A   Yes.
23       Q   And your current residence is 55 Asilomar
24   Road?
25       A   Correct.
```

Page 12

```
 1       Q   Let me direct you to Page 3 of Exhibit 3.
 2   Question 14, "Privately-held companies."
 3          Do you see that?
 4       A   Yes.
 5       Q   So you're currently president of Beverly
 6   Proton Center?
 7       A   Yes.
 8       Q   Pacific Proton Therapy Regional Center?
 9       A   Yes.
10       Q   You're president there too?
11       A   Yes.
12       Q   And you're the manager of Pacific Proton
13   EB-5 Fund?
14       A   Yes.
15       Q   Now you're also president of United MPH
16   Ventures, LLC?
17       A   Yes.
18       Q   What is that?
19       A   It's a holding company.  The company is to
20   develop -- because currently we're developing the
21   proton center, the Kansas center in Montebello, but
22   our business plan is to develop more centers over the
23   United States, like San Francisco, Seattle, Miami,
24   New York, to use the same model to develop the cancer
25   and the proton centers.
```

Page 13

```
 1       Q   So United MPH Ventures --
 2       A   Is a holding company.
 3       Q   -- that will develop additional proton
 4   therapy centers?
 5       A   Yes.
 6       Q   Are there any other officers of United MPH
 7   Ventures?
 8       A   Officers?  Not at this moment.
 9       Q   Are there any investors in United MPH
10   Ventures?
11       A   Not yet.
12       Q   And are you the sole owner of United MPH
13   Ventures?
14       A   Yes -- no, actually, I'm sorry.  My wife
15   owns partially.
16       Q   How much does she own?
17       A   I think it's 25 percent.
18       Q   And it's just the two of you?
19       A   Yes.
20       Q   Any of these potential centers, are they in
21   some level of development?
22       A   Early stage.  Early stage means we have
23   some medical staff and business representatives
24   looking at sites, talking to the potential partners
25   of medical centers and universities.
```

Page 14

1    Q   And where have you started that process?
2    A   We started in San Francisco, Seattle and in
3  Miami.
4    Q   Have any funds been raised for any of those
5  sites?
6    A   No, not yet.
7    Q   And in San Francisco, who's your partner in
8  San Francisco?
9    A   Again, it's early stage -- you know,
10  discussions.  The partner has not been identified up
11  to today.
12    Q   Is that the same for Seattle and Miami?
13    A   It's different.
14    Q   So in Seattle, do you have a partner?
15    A   No.  It's all the same status.
16    Q   So each of the three sites --
17    A   We just started, actually, not too long
18  ago, because our focus is to complete the first one
19  first, use the first one as a model, and then copy
20  the same model to different cities in the United
21  States.  So we are focused primarily on the first
22  one.
23    Q   The next company you list is MP Medical
24  Hotel, Inc.
25    A   Uh-huh.

Page 15

1    Q   And you're the director?
2    A   Yes.
3    Q   What is MP Medical Hotel?
4    A   The concept -- first, let me introduce the
5  concept of this -- MPH Ventures.  Our business model
6  is to build proton center, cancer center, and also a
7  hotel, a medical hotel, within the same complex, and
8  then to target the international cancer patients
9  because there's more and more cancer patients from
10  overseas coming to the United States for treatment.
11  That's why we picked up all the gateway cities.  They
12  all have international flights in and out of United
13  States.
14        For example, the Montebello site, it's 30
15  minutes away from LAX.  So that is our business
16  model.  So we have set up this company called MP
17  Medical Hotel.  We have signed a lease with Beverly
18  Hospital which is adjacent to the current proton site
19  just across the street.  So that's what it's for.  We
20  just actually hired architect to do the initial
21  conceptual drawings for their project.
22        So basically, again, the model is proton
23  center, cancer center and medical hotel.  Why do we
24  need medical hotel?  For the cancer patients, for the
25  proton patients.  The treatment lasts between 30 days

Page 16

1  and 90 days, particularly like prostate cancer, it
2  takes about 50 treatments.  50 treatments means you
3  do a treatment per day.  So you add it up, you spend
4  about three months.
5        But proton therapy is outpatient.  You
6  don't -- it's not hospitalized.  You go there 20
7  minutes a day, but you still have to travel there.  So
8  that's why, for the sake of convenience, it's
9  important to build a hotel.  Particularly we target
10  all the international patients because, you know,
11  with the current medical reimbursement rates, it's
12  pretty low.
13        But cash patients, international patients,
14  they pay cash.  Actually, they spend more money on
15  the treatment side.  So to provide a concierge
16  service in a hotel like this is important.
17    Q   So who is the architect that you hired for
18  the hotel at the Montebello site?
19    A   The architect's name is Creative Design.
20  It's called Creative Design Associates.
21        MR. GARTENBERG:  May I have a minute while
22  nothing is pending?  I just want to speak to my
23  client.
24        MR. REGENSTREIF:  Let me just finish this
25  line, and then we'll get to it; okay?

Page 17

1        MR. GARTENBERG:  Sure.
2        BY MR. REGENSTREIF:
3    Q   Is the MP Medical Hotel part of the Beverly
4  Proton Center, LLC?
5    A   No.  It's not part of the EB-5 offering.
6    Q   It's separate from the EB-5 offering?
7    A   It's separate.
8    Q   And then has there been investors for the
9  hotel?
10    A   No, not yet.
11    Q   There's no investors?
12    A   No.
13    Q   And there's been no fundraising?
14    A   No.
15    Q   And it's not part of the EB-5?
16    A   No.
17        MR. GARTENBERG:  Okay now?
18        MR. REGENSTREIF:  Yeah, that's fine.
19  Let's go off the record.
20        (Counsel conferred with the witness.)
21        MR. REGENSTREIF:  Let's go back on the
22  record.
23        So where were we?
24        MR. GARTENBERG:  We had just gone through
25  what MP Medical Hotel was and whether there were

Page 18

1    investors.
2        BY MR. REGENSTREIF:
3        Q   So as I understand it, there are no
4    investors in MP Medical Hotel; is that correct?
5        A   That is correct.
6        Q   So what is the next entity, SC MPH Fund,
7    LP?
8        A   Okay.  This is a vehicle entity we set up
9    to raise capital for the Beverly Hospital, which is a
10   neighbor of current site.
11       Q   So this is raising capital for the
12   hospital?
13       A   Yes.  It's a separate venture through
14   the -- sponsored by Pacific Proton Therapy Regional
15   Center.
16       Q   So this is through the regional center?
17       A   Yes.  It's a separate project.  Our site is
18   on the campus of Beverly Hospital, and Beverly
19   Hospital is trying to raise some EB-5 money capital
20   through the regional center and to upgrade the
21   current emergency room and the maternity center.
22       Q   So SC MPH Fund is a project sponsored
23   through the regional center?
24       A   Yes.
25       Q   And it will be raising EB-5 funds?

Page 19

1        A   Uh-huh.
2        Q   Could you say "yes"?  I'm sorry.
3        A   Yes.
4        MR. GARTENBERG:  Wait until he finishes the
5    question.
6        THE WITNESS:  Okay.  I'm sorry.
7        BY MR. REGENSTREIF:
8        Q   It will be raising EB-5 funds?
9        A   (Witness nods head.)
10       Q   You have to say "yes."
11       A   Yes.
12       Q   And then, as I understand it, it's Beverly
13   Hospital to upgrade their emergency room and
14   maternity ward?
15       A   Yes.
16       Q   And you're the general partner of that?
17       A   Yes.
18       Q   And so SC MPH Fund, is that equivalent to
19   the Pacific Proton EB-5 Fund?
20       A   Similar.
21       Q   So it's another of the NCEs through the
22   regional center?
23       A   Yes.
24       Q   Does that require --
25       MR. GARTENBERG:  I'm sorry, "NCEs"?

Page 20

1        MR. REGENSTREIF:  That is the term used by
2    the United States Customs and Immigration Service
3    through approved regional centers.
4        THE WITNESS:  "New Commercial Enterprise."
5        MR. GARTENBERG:  Thank you.  I've learned
6    something today.  Thanks.
7        BY MR. REGENSTREIF:
8        Q   Now, to do a new commercial enterprise, do
9    you have to get approved from USCIS?
10       A   Yes, because the regional center -- as long
11   as the project is in the same geographic area or
12   shares the same industrial codes, you don't have to
13   get the separate approval.  You can file contingent
14   upon the approval.  You can file -- in other words,
15   you can file a separate case.
16       Q   Under the regional center?
17       A   Under the regional center.
18       Q   And have you done that for SC MPH Fund?
19       A   No.
20       Q   Have you raised any money for SC MPH Fund?
21       A   No.
22       Q   You said you're a general partner for SC
23   MPH Fund.
24       Are there any other partners?
25       A   No.

Page 21

1        Q   And there are no investors?
2        A   No.
3        Q   Have you done any offerings or attempted to
4    sell any interests in SC MPH Fund?
5        A   No.  Not yet.
6        Q   Who do you deal with at Beverly Hospital?
7    Who do you talk to there?
8        A   The CEO, president and the executive team.
9        Q   Who are those people?
10       A   Do you want to know the names?
11       Q   Yes, please.
12       A   The CEO is Alice Cheng.  I don't know how
13   to spell it, honestly.
14       Q   That's fine.
15       A   Alice Cheng, and also Wendy.  Wendy is
16   their COO.  Sorry, I can't remember the last name.
17       Q   That's okay.  Whatever you know.
18       A   And then Larry.  Larry is the CFO.  So
19   these three individuals are being worked with.
20       Q   And is there some kind of MOU or agreement
21   between SC MPH Fund and Beverly Hospital?
22       A   Yes.
23       Q   And has that been provided to us in the
24   productions?
25       A   No.

Page 22

1    MR. GARTENBERG:  Was it called for?
2    MR. REGENSTREIF:  It was not.  We didn't
3  know about any of these entities, so it may yet be
4  called for.
5    BY MR. REGENSTREIF:
6    Q   So let's go into the next one.
7    SC MPH Management, LLC.  What is that?
8    A   It's the management company of SC MPH Fund.
9    Q   I see.
10    So it's the management company for the fund
11  for what will be an EB-5 project for Beverly
12  Hospital?
13    A   Yes.
14    Q   And are you the sole owner of SC MPH
15  Management, LLC?
16    A   Yes.
17    Q   And are there any other members besides
18  yourself?
19    A   I'm the only member.
20    MS. LEVIN:  What does "MPH" stand for?
21    THE WITNESS:  Medical Proton Hotel.
22    MS. LEVIN:  And what does "SC" stand for?
23    THE WITNESS:  Southern California.
24    MS. LEVIN:  Thank you.
25    BY MR. REGENSTREIF:

Page 23

1    Q   Just so I'm clear, for the medical hotel
2  and the MPH Fund and the MPH Management, LLC, there
3  have been no investors yet?
4    A   No investors.
5    Q   But United MPH Ventures is separate from
6  those three other entities?
7    A   Yes.
8    Q   And there's still no investors in United
9  MPH Ventures either?
10    A   No.
11    Q   And United MPH Ventures, your wife is also
12  a 25 percent owner?
13    A   Yes.
14    Q   But in none of the other three entities,
15  MPH Medical Hotel, SC MPH Fund or SC MPH Management?
16    A   No.
17    Q   On Page 4 -- top of Page 4, Exhibit 3, you
18  list yourself as "President of Beverly International
19  Cancer Center, LLC."
20    What is that?
21    A   It's entity to develop the cancer center.
22  As I explained, it was part of United MPH Ventures.
23  So cancer center, proton center and the hotel.
24    Q   So this is the third component?
25    A   Yeah, for project development.

Page 24

1    Q   And this is one that is not -- it's not
2  EB-5?
3    A   No, no.
4    Q   And there are no investors yet?
5    A   No investors yet, but we are in discussion
6  with potential strategic non EB-5 investors.
7    Q   Non EB-5?
8    A   Uh-huh.
9    Q   Let's go to Page 5 of Exhibit 3.  It's the
10  carryover for Question 19.  It's identified in "Bank
11  Accounts."  Go to Page 5, please.
12    A   Sure.
13    Q   Do you see the two bank accounts
14  identified?
15    A   Yes.
16    Q   Are those your only two bank accounts?
17    A   Yes.
18    Q   And so the digits there, 30221 for Bank of
19  America, those are the last five of the account
20  number?
21    A   No.  Actually that's the address.
22    Q   Oh, that's the address?
23    A   Yeah.
24    Q   You didn't identify account numbers?
25    A   Is it required?

Page 25

1    Q   If you look -- for some reason, this got
2  split up.  If you look at 20, it says -- little four,
3  it says the account number.
4    A   That's easy.  I can provide that.  That's
5  no problem.
6    Q   Great.  I appreciate that.
7    A   Yeah.
8    Q   So if you could -- and maybe your lawyers
9  can note that we need the account numbers for the two
10  bank accounts.
11    A   But the first one is already closed.
12    Q   Bank of America is closed?
13    A   A while ago, but it was within three years.
14  That's why I provided it.
15    Q   So Chase is the one you're using currently?
16    A   Yeah, Chase is the one I'm using, because
17  it's the last three years, so I provided it.
18    Q   Thank you.  I appreciate that.  So if we
19  can get the account numbers for those.
20    A   Yeah.
21    Q   So if we could go to Page 10.  Question 35
22  asks about your employment activities.
23    A   Okay.
24    Q   So at the bottom of Page 10, prior to
25  Pacific Proton EB-5, you worked at Century Medical

Page 26

1    Investment --
2    A. Yes.
3    Q. -- from 2004 to 2009?
4    A. Yes.
5    Q. What was that?
6    A. It was a company set up to sell the medical
7    equipment, particularly the proton equipment, in
8    China.
9    Q. And what was your position?
10   A. I was president and also CEO for this
11   company, and we will try to promote a U.S. technology
12   to China.
13   Q. The company was based in Hong Kong?
14   A. Yes.
15   Q. And what kind of medical --
16   A. Proton therapy.
17   Q. So it's all proton therapy?
18   A. That's why I got involved.
19   Q. And how did you get involved with proton
20   therapy?
21   A. How did I get involved? First, I started
22   my own business a long time ago by selling medical
23   equipment, radiation. Actually, diagnostic equipment
24   like MRI and computer tomography. And then I was
25   able to know one of the key U.S. proton therapy

Page 27

1    manufacturer called Optivus. Optivus was a company
2    we developed in Loma Linda Proton Center.
3    Q. Can you speak up just a little bit? I'm
4    sorry.
5    A. Optivus was the company to develop Loma
6    Linda Proton Center. It was a famous one.
7    Q. So through Century Medical Investment --
8    A. Yes, I was the -- this company was
9    appointed as a chief representative to sell that
10   equipment.
11   Q. Optivus equipment?
12   A. Yes, in China.
13   Q. And how did you go from your previous job,
14   McCall Five-Star Satellite TV, to being hooked up
15   with Optivus?
16   A. I have been an entrepreneur since I left my
17   first job. I have been the boss of my own --
18   actually worked on my own and then started different
19   ventures, and this is one of the ventures I started
20   in China. So medical, media, real estate, these main
21   three areas I got involved in the past 25 years, I
22   guess.
23   Q. So your involvement with proton therapy
24   goes back to at least 2004?
25   A. 2004, yeah.

Page 28

1    Q. Did you have any involvement before that?
2    A. Before, no.
3    Q. So your current wife is Xin Wang?
4    A. Yes.
5    Q. When did you get married?
6    A. 13 years ago.
7    Q. And she's involved in the -- as we
8    discussed -- in these entities related to SC MPH; is
9    that right? Does she have any other employment?
10   A. She also has a position with Beverly Proton
11   Center.
12   Q. She does?
13   A. Yeah.
14   Q. And what's her position at Beverly Proton
15   Center?
16   A. She's vice president in overseas marketing,
17   in marketing Asia.
18   Q. And when did she assume that position with
19   Beverly Proton Center?
20   A. She got involved from day one, which is
21   2011.
22   Q. 2011?
23   A. Yeah.
24   Q. What does her job entail? What are her
25   responsibilities with Beverly Proton Center?

Page 29

1    A. Her responsibility is to promote because
2    she had some medical background before. I basically
3    am on the sales side, and she did a lot of promotions
4    and also marketing work for this company, for this
5    project.
6    Q. Promotions and marketing work for the
7    company related to --
8    A. Related to raising capital, related to
9    bringing overseas patients to the United States as
10   well.
11   Q. So both the operational side of bringing
12   patients --
13   A. Yes.
14   Q. -- and also fundraising capital?
15   A. Yes, yeah, on the marketing side.
16   Q. On the marketing side?
17   A. Yeah.
18   Q. So what does that mean, "the marketing
19   side"?
20   A. Just to give example, she hosts seminars
21   for clients, for the medical centers, United States,
22   because we are also working with major U.S. cancer
23   centers in the United States such as City of Hope and
24   Mayo Clinic and others, because our center is still
25   under construction, before we -- our center is open

Page 30

1 to the public, we started a program called "patient
2 referral program," so we're able to bring overseas
3 patients to the United States for treatment.
4     **Q  So before the center was opened, was there**
5 **a company that did that work?**
6     A  Beverly Proton Center was the company
7 because this is our model. We target international
8 patients.
9     **Q  Has Beverly Proton Center brought any**
10 **international patients over to the U.S. already?**
11     A  Yes.
12     **Q  And have you generated revenue from those**
13 **patients?**
14     A  I took referral fees.
15     **Q  Referral fees?**
16     A  Yes.
17     **Q  From the cancer centers?**
18     A  Because we're not finished yet. We're
19 still under construction, so we refer our patients to
20 the other cancer centers in the United States.
21     **Q  And what is the referral fee received by**
22 **Beverly Proton?**
23     A  What's the referral fee?
24     **Q  How much?**
25     A  I don't have that number, but we signed

Page 31

1 agreements, and that was overseas accounts.
2     **Q  So you signed agreements to overseas**
3 **companies to bring the patients over?**
4     A  Yes.
5     **Q  And the overseas companies pay you?**
6     A  The overseas company pays us, yes. And
7 also the -- yeah. Overseas company pays us, yes.
8     **Q  And who are the overseas companies?**
9     A  Who are these overseas companies? Quite a
10 few. I don't have my -- I can't remember because a
11 lot of it is in different language, in Chinese.
12     **Q  Let's just do one.**
13     A  One of them is --
14     MR. GARTENBERG: It's not a memory test.
15 If you don't remember, you don't remember.
16     THE WITNESS: Yeah. I can't remember, but
17 it was certainly -- there's an insurance company we
18 also worked with called NCL. They provide the
19 patients. They're called "New China Life."
20     BY MR. REGENSTREIF:
21     **Q  And they provide the patients to you?**
22     A  Yes.
23     **Q  And they pay you a referral fee?**
24     A  They pay us a referral fee, yes, yes.
25     MR. GARTENBERG: Just for the record, when

Page 32

1 you're saying "you," it's not necessarily -- it's not
2 clear that it's him, but maybe the entity.
3     BY MR. REGENSTREIF:
4     **Q  Which entity receives the referral fee?**
5     A  Which entity? It's Beverly Proton Center.
6     **Q  So Beverly Proton Center, LLC, not the EB-5**
7 **Fund?**
8     A  No.
9     **Q  And not the regional center?**
10     A  No, no.
11     **Q  The Beverly Proton Center, LLC?**
12     A  Yeah, because it's different category.
13     **Q  So since we're discussing this, do you**
14 **receive a salary from Beverly Proton Center?**
15     A  Yes.
16     **Q  What's your salary?**
17     A  I think it's $750,000 a year.
18     **Q  $750,000 a year?**
19     A  Yeah.
20     **Q  And do you receive that weekly? Monthly?**
21     A  Not exactly, not monthly. I receive -- if
22 there's sufficient funds because the fundraising --
23 if it's only sufficient funds, then I withdrew the
24 money from the company. If not sufficient, I don't.
25     **Q  So you receive a salary from Beverly**

Page 33

1 **Proton, LLC?**
2     A  Yes.
3     **Q  Not the EB-5 Fund?**
4     A  EB-5 Fund I receive some compensation as
5 well because I'm the manager.
6     **Q  So you receive compensation from them, too?**
7     A  Yeah.
8     **Q  How much do you receive from them?**
9     A  $200,000 a year.
10     **Q  So that's in addition to the 750- from**
11 **Beverly Proton?**
12     A  Yes.
13     **Q  And then do you receive compensation from**
14 **the regional center?**
15     A  Yes.
16     **Q  How much is that?**
17     A  350- a year.
18     **Q  $350,000 a year?**
19     A  Yeah.
20     **Q  In addition to the 200- and the 750-?**
21     A  Yeah.
22     **Q  And does your wife receive a salary from**
23 **any of these entities?**
24     A  My wife receives a salary from the project
25 company, not the other two.

Page 34

1    Q    So that would be Beverly Proton?
2    A    Yes.
3    Q    And how much in salary does she receive
4    from Beverly Proton?
5    A    $200,000 a year.
6    Q    But not from the EB-5, LLC?
7    A    No.
8    Q    And not from the regional center?
9    A    Not from the regional center.
10        MS. LEVIN:  And besides salary, do you or
11   your wife receive any other compensation from any of
12   these entities?
13        THE WITNESS:  Just the salary.
14        BY MR. REGENSTREIF:
15   Q    So let's back up and talk about Pacific
16   Proton Therapy Regional Center.
17        Are you familiar with that?
18   A    Yes.
19   Q    And what is Pacific Proton?
20   A    Pacific Proton --
21   Q    Let's agree on a name for it.  Let's just
22   call it "the regional center."
23   A    Okay.  The regional center was established
24   and set up to get the approval from USCIS and also to
25   promote proton project.

Page 35

1    Q    Approval from USCIS for what?
2    A    To raise funds, EB-5 funds overseas to
3    promote project.
4    Q    And what do you understand to be the EB-5
5    program?  What is that to you?
6    A    EB-5 program is -- what does it mean to me?
7    Q    Yeah.  What is the EB-5 program?
8    A    EB-5 program was created by U.S. Congress
9    in the early '90s to allow the regional center to
10   raise funds for the Employment-Based Category 5
11   investors to create jobs.  That's my basic
12   understanding.
13   Q    And so the investors have to provide a
14   certain amount of funds pursuant to the EB-5 program;
15   is that right?
16   A    Yes.  Each investor has to invest up to
17   either half a million or $1 million in an area
18   designated by the state government.  It depends on
19   the employment/unemployment rate.  It can be half a
20   million dollars or $1 million.  It depends on the
21   targeted employment/unemployment area.
22   Q    And to take advantage of the EB-5 program,
23   the regional center has to be approved by USCIS?
24   A    Yes.
25   Q    And your regional center was approved by

Page 36

1    USCIS?
2    A    Yes.
3    Q    And did you initiate that approval?  Did
4    you seek that approval?
5    A    What do you mean "seek approval"?
6    Q    Did you, Charles Liu --
7    A    I submitted the applicant.
8    Q    You submitted the application?
9    A    Yeah, with our legal counsel's assistance.
10   Q    And what is your formal title with the
11   regional center?
12   A    Formal title is, I was the president from
13   day one.
14   Q    And are you the sole owner of the regional
15   center?
16   A    No.  I have a partner.
17   Q    And your partner's name is?
18   A    Dr. Thropay, who is radiation oncologist.
19   Q    And how much of the regional center do you
20   own?
21   A    I own 75 percent, and he owns 25 percent.
22   Q    And so through the regional center, explain
23   to me how you first came to the EB-5 program.
24        How did you decide to access that program
25   as a means of fundraising?  Where did you hear about

Page 37

1    the EB-5 program first?
2    A    The first time I heard about EB-5 was
3    through a local Chinese newspaper.  Actually before
4    that, I did not know this kind of program existed
5    because I was already a U.S. citizen for a long time.
6    Personally it's not my concern in terms of
7    immigration.  But I looked at this paper and find out
8    there's an EB-5 program -- existed, which can help
9    developers to raise funds overseas to develop
10   project.  That's how it started.
11   Q    And the regional center was your first EB-5
12   project?
13   A    Yes.
14   Q    And as we discussed, you're in the process
15   of doing another EB-5 project; is that right?
16   A    Yes.
17   Q    Have you done any others besides the two we
18   discussed?
19   A    No.
20   Q    So explain the structure to me.
21        It's the regional center; is that right?
22   A    Yes.
23   Q    And the structure is approved by USCIS?
24   A    That is correct.
25   Q    And under the regional center, you get, as

Page 38

1   we discussed, a commercial enterprise, a new
2   commercial enterprise; is that right?
3       A   Yes.
4       Q   And so the EB-5 Fund, LLC, that is the NCE?
5       A   Pacific Proton EB-5 Fund is NCE.
6       Q   And then Beverly Proton Center, LLC is the
7   job-creating vehicle for the EB-5, LLC fund; is that
8   right?
9       A   That is correct.
10      Q   Are there any other job-creating entities
11  besides Beverly Proton under the Pacific Proton EB-5
12  Fund?
13      A   No.
14      Q   And Beverly Proton Center, has it been
15  known by any other names?
16      A   Yes.  Previously it was called Los Angeles
17  County Proton Therapy, LLC.
18      Q   And when did the name change?
19      A   I think mid 2015.
20      Q   Why did the name change?
21      A   The name changed because we tried to be
22  part of the Beverly Hospital complex and because we
23  also have a plan to develop Beverly Hotel and Beverly
24  Cancer Center, so we tried to consolidate all the
25  names to be consistent.

Page 39

1       Q   Are there any employees of the Beverly
2   Proton, LLC?
3       A   Not direct employees.  Contractors.
4       Q   So Beverly Proton has contracts with
5   employment agencies -- they have contractors -- or
6   you have independent contractors?
7       A   Independent contractors and also business
8   consultants.  We have a lot of business consultants.
9       Q   Let's start with the independent
10  contractors.
11          How many independent contractors do you
12  have?
13      A   Two.
14      Q   What are their names?
15      A   One is called Lance, L-a-n-c-e; Gong,
16  G-o-n-g is the last name.  And we have another one
17  but who already left -- who left the company.
18      Q   What was that person's name?
19      A   Richard Zheng.  Last name is Z-h-e-n-g.
20      Q   What does Lance do?
21      A   Lance does lots of administrative work, and
22  also to the airport, to pick up visitors, clients,
23  investors coming from overseas.  A lot of concierge
24  work.
25      Q   And what did Richard do?

Page 40

1       A   We have two separate offices.  One is in
2   Orange County.  The other is in Montebello within the
3   hospital complex.  And because we have a site for
4   development, from time to time, we had a lot of
5   investors and also visitors.  So Richard is based in
6   that office.
7       Q   In Montebello?
8       A   In Montebello.
9       Q   So Richard would take investors to look at
10  the site?
11      A   Yes.
12      Q   And would anyone else accompany Richard
13  when he was taking investors on the site?
14      A   I'm sorry?
15      Q   Was anybody else with Richard when he would
16  take investors on the site?
17      A   He was the only one because the distance,
18  it's still pretty far, so he's on site and he lives
19  nearby.
20      Q   The investors who are coming to look at the
21  site, these were investors for the EB-5 Fund?
22      A   Well, you have the investors, EB-5 Fund and
23  non EB-5.  We have potential strategic investors as
24  well, not just for EB-5.
25      Q   But they toured the site?

Page 41

1       A   Yes.
2       Q   Did you ever meet the investors at the
3   site?
4       A   Yes, a number of times.
5       Q   How many times, approximately?
6       A   About ten.
7       Q   Ten times at the site?
8       A   Yeah.
9       Q   Ten different investors or more than that?
10      A   Well, obviously there are more than
11  investors.  But for me, because I travel quite often
12  internationally back and forth -- so every time we
13  have an investor, if I'm out of town, I don't go.
14          MR. GARTENBERG:  We've been going about an
15  hour.
16          MR. REGENSTREIF:  Let's go off the record.
17          (A brief recess was taken.)
18          MR. REGENSTREIF:  Let's go back on the
19  record.
20          MR. GARTENBERG:  I just wanted to make one
21  thing clear.  Mr. Liu referred to "non EB-5
22  investors."  I'd be happy to ask him questions now or
23  if you want to put it to him.  But from my
24  conversation with him, I understand these are not
25  people who've actually invested.  What he testified

Page 42

1 to, from what he's explained to me is these are
2 potential investors.
3        If he gets to the stage where we're dealing
4 with actual investments before making the investment,
5 he would consult with counsel to make sure that he's
6 in compliance within the applicable securities laws
7 in dealing with those people.
8        So you may want to ask questions, or if you
9 want, I can ask him questions, but I want to make
10 sure when he says "investors," particularly given
11 that English is obviously not his first language,
12 what he means is "potential future investors" when
13 he's talking about non EB-5 people.
14        BY MR. REGENSTREIF:
15    Q   But there have been EB-5 investors?
16    A   Sure.
17    Q   And the funds are in receipt of the EB-5
18 Fund, LLC?
19    A   Yes.
20    Q   How many EB-5 investors are there?
21    A   47, 48, I think.  47.
22    Q   And approximately how much money does that
23 amount to?
24    A   23 million.
25    Q   23 million from EB-5 investors?

Page 43

1    A   Uh-huh.
2    Q   And the non EB-5 investors are all at the
3 potential stage?
4    A   Potential stage.
5    Q   So there are no non EB-5 investors right
6 now?
7    A   No, as of today.
8        MR. GARTENBERG:  Thank you.
9        MR. REGENSTREIF:  So I'm going to ask the
10 court reporter to mark as Exhibit 4 this document
11 which is a G-28 Notice of Entry of Appearance from
12 the Department of Homeland Security and an
13 application submitted thereunder dated November 19,
14 2010.
15        (SEC Exhibit 4 was marked
16          for identification.)
17        BY MR. REGENSTREIF:
18    Q   So, Mr. Liu, I will hand you, in just a
19 second, Exhibit 4.  I want you to take a look.  And
20 I'd like you to turn to Page 6 at the top and just
21 confirm for me that that is your signature.
22        MR. GARTENBERG:  Do you have a copy for us?
23        MR. REGENSTREIF:  I don't, unfortunately.
24        MR. GARTENBERG:  Let me look at it first
25 before you look at it.

Page 44

1        BY MR. REGENSTREIF:
2    Q   Do you recognize Exhibit 4?
3    A   Yes.
4    Q   Is that your signature on the first page?
5    A   Yes.
6    Q   So you've seen this request for designation
7 sent to USCIS?
8    A   Yes.
9    Q   And did you provide the information
10 contained within the request in the exhibits?
11    A   Yes.
12    Q   And did you write the application to USCIS?
13    A   No.
14    Q   Who wrote the application?
15    A   My legal counsel.
16    Q   But you provided your legal counsel with
17 all the information contained in Exhibit 4?
18    A   Yes.
19    Q   And did you review the application before
20 it was submitted to USCIS?
21    A   Yes.
22    Q   And why did you go with Miller Mayer as
23 your lawyer?  How did you hook up with them?
24        MR. GARTENBERG:  You can answer that.
25        THE WITNESS:  Miller Mayer was the leading

Page 45

1 law firm in the United States focusing on the
2 regional center application as well as the EB-5
3 program and one of the key principals who was also a
4 law professor at Cornell University.  And I was
5 referred to them by a lawyer friend of mine because
6 at that time I didn't know which firm is the best.
7        BY MR. REGENSTREIF:
8    Q   And is Miller Mayer still your legal
9 counsel on the EB-5 portion of your project?
10    A   Yes.  They are still our legal counsel,
11 yes.
12        MS. LEVIN:  What was the name of your
13 lawyer friend that referred you to them?
14        THE WITNESS:  The name?
15        MS. LEVIN:  Yes.
16        THE WITNESS:  Richard Lew, L-e-w.
17        MS. LEVIN:  Thank you.
18        BY MR. REGENSTREIF:
19    Q   And when was that?
20    A   2010, because that's when I started the
21 application.
22        MS. LEVIN:  So you're saying 2010 because
23 you looked at Exhibit 4 which shows the application
24 was 2010, correct?
25        THE WITNESS:  Yes, that is correct.

Page 46

1      MS. LEVIN:  Okay.  Thank you.
2      BY MR. REGENSTREIF:
3      Q    So who manages the regional center day to
4  day?
5      A    I do.
6      Q    And you and Dr. Thropay are the only owners
7  of the regional center?
8      A    That is correct.
9      Q    And there are no other investors in the
10  regional center?
11      A    No.
12      Q    And the EB-5, LLC, who manages the EB-5,
13  LLC?
14      A    I manage the EB-5, LLC.
15      Q    Is there anyone else?
16      A    No.
17      Q    And do the investors of the EB-5, LLC have
18  a management role in the EB-5, LLC?
19      A    No.
20      Q    And let me direct you to Exhibit 4 again.
21  It's Page 224 of the exhibit, but I've marked it with
22  a paper clip for your convenience.  This is an org
23  chart for the Los Angeles County Proton Center.  Take
24  a look.
25         Do you recognize the organization chart?

Page 47

1      A    Yes.
2      Q    Is that accurate?
3         MR. GARTENBERG:  As of today or as of when
4  the application was filed?
5         MR. REGENSTREIF:  As of the application.
6         THE WITNESS:  As of the application, it was
7  correct.  Not correct today.
8         BY MR. REGENSTREIF:
9      Q    And how is it not correct today?
10      A    Because this chart is about the future
11  operation management of this center, and we change
12  the structure I think last December, I think, or last
13  November.  Yeah.  At the end of last year.
14      Q    Last year, 2015?
15      A    Yeah, last year, 2015.  And Dr. Thropay
16  is -- there's -- he's no longer the managing director
17  of this company because we signed an MOU with the
18  City of Hope, and the City of Hope will be our
19  manager, operational company, to run the center.
20      Q    Dr. Thropay, you said he's 25 percent owner
21  of Beverly?
22      A    Yes.
23      Q    Is he still involved?
24      A    He's no longer involved on the operational
25  side.  He's just a passive -- we had a resolution

Page 48

1  passed early this year.  He's no longer -- he does
2  not hold any management titles and officers of this
3  company.  He's just a member of LLC.
4      Q    And why is that?
5      A    Because City of Hope does not want -- for
6  medical center, there's no -- there's only one
7  medical director, not two.  So I think it's important
8  for our center to be associated with a big
9  prestigious cancer center, so that's why we passed
10  the board resolution and work with City of Hope
11  instead of Dr. Thropay who is just individual
12  radiation oncologist.
13         MR. GARTENBERG:  I'm not entirely sure
14  what's encompassed by your question, so you may want
15  to ask if there was some kind of dispute between them
16  because it seemed to be called for.  I'm not sure
17  it's called for.
18         MR. REGENSTREIF:  Yeah.  Usually I'd ask a
19  follow-up, so you don't have to presume that I won't
20  ask a follow-up.
21         MR. GARTENBERG:  I want to make sure not
22  only that he's telling the truth, but that the Staff
23  has confidence that he's telling the truth.
24         MR. REGENSTREIF:  Absolutely.
25         MR. GARTENBERG:  It was not in any way to

Page 49

1  suggest you wouldn't ask a follow-up, but I was just
2  reaching out to --
3         MR. REGENSTREIF:  Our job is to find the
4  truth.  So if you can help me find the truth, I
5  invite you to help me.
6         MR. GARTENBERG:  I want you to come out of
7  the meeting comfortable.
8         MR. REGENSTREIF:  Yeah.
9         MS. LEVIN:  Can I just ask a question?
10         MR. REGENSTREIF:  Sure.
11         MS. LEVIN:  Before we move on, the City of
12  Hope, who are you working with there?
13         THE WITNESS:  Dr. Harlan Levine, who is the
14  CEO.
15         MS. LEVIN:  Harlan Levine?
16         THE WITNESS:  L-e-v-i-n-e.
17         MS. LEVIN:  He's the CEO at the City of
18  Hope?
19         THE WITNESS:  City of Hope foundation.
20  There's two vehicles -- two within City of Hope, and
21  he's the person working with us.
22         MS. LEVIN:  Are you working with anybody
23  else at the City of Hope?
24         THE WITNESS:  A few doctors.
25         MS. LEVIN:  And what are their names?

Page 50

```
 1        THE WITNESS:  Dr. Fong, who is also
 2   well-known.  I don't know what his specialty is, but
 3   he's a very well-known doctor in the City of Hope.
 4        Primarily I have a legal team.  I have also
 5   a consultant.  They are working on behalf of Beverly
 6   Proton Center.  I have consultants, I have a legal
 7   attorney, legal counsel and myself directly dealing
 8   with Dr. Harlan Levine.  We signed the MOU together.
 9        MS. LEVIN:  Dr. Fong at City of Hope.
10        Any other doctors at City of Hope?
11        THE WITNESS:  I know their names, but I'm
12   not directly working with them because I'm not a
13   doctor.
14        MS. LEVIN:  But who was going to be the
15   medical director from the City of Hope?
16        THE WITNESS:  From the City of Hope,
17   there's a chairman of radiation department, Jeffrey
18   Wong.  And actually we're going to form a committee
19   to hire a nation- -- an individual nationwide -- a
20   well-known individual who has done proton before
21   because City of Hope has not -- there's no proton
22   center.
23        In California there's only one proton
24   center, which is Loma Linda.  And the rest of
25   centers, they want to build.  But so far, there's no
```

Page 51

```
 1   other centers. So we'll find a medical director -- a
 2   nationwide name. We have few candidates already whom
 3   we're going to recruit for this venture because City
 4   of Hope is a well-known brand national cancer center.
 5        MS. LEVIN:  And who is the legal team
 6   working on your behalf?
 7        THE WITNESS:  Who is my legal team?
 8        MS. LEVIN:  Yeah.
 9        THE WITNESS:  Nixon Peabody.  They have
10   office in Downtown which is a leading firm
11   specializing in medical.  Jill was my chief legal
12   counsel, J-i-l-l.  I can't remember her last name.
13        BY MR. REGENSTREIF:
14    Q   Is she at Nixon Peabody, Jill?
15    A   Yes, she's with Nixon Peabody, and she
16   directly works with City of Hope's legal counsel.
17   First name is James.  James has been with City of
18   Hope for over 25 years, and they work together.
19        And I have my own consultant, Michael Hunn.
20   Michael used to be a CEO for a big medical system in
21   the United States, Providence.  He was a CEO for
22   Providence, and now he's my consultant working with
23   City of Hope for this venture.
24        MS. LEVIN:  Okay.  Thank you.
25        BY MR. REGENSTREIF:
```

Page 52

```
 1    Q   I want to go back to two areas.
 2    A   If you want the truth, I will tell you the
 3   truth.
 4    Q   Excellent.  Your counsel suggested there
 5   was some kind of dispute between you and Dr. Thropay.
 6    A   Yes.
 7    Q   So what was that?
 8    A   Early stage, development stage, when we
 9   submitted the applications to USCIS, we signed -- I
10   signed a nonbinding MOU with Dr. Thropay.  First of
11   all, Dr. Thropay is a radiation oncologist.  He owns
12   Beverly Oncology.  Beverly Oncology has seven
13   clinical centers in Southern California.
14        Dr. Thropay is a doctor.  He's very busy
15   seeing patients every day.  And his sister is Ruth
16   Novodor, chief operating officer.  Ruth Novodor is
17   the name that's here (indicating).
18        MS. LEVIN:  And the witness is pointing to
19   the chart on Exhibit 4.
20        THE WITNESS:  She runs all the clinic
21   centers for her brother, Dr. Thropay.  And based on
22   the nonbinding MOU, Ruth Novodor is supposed to be
23   the operational person in the future to run this
24   proton center.  That's what this chart is about.
25        And then later, after Thropay found out we
```

Page 53

```
 1   are working with -- I'm working with City of Hope, he
 2   was extremely mad and pissed off for two reasons:  He
 3   told me he has one enemy within City of Hope who is
 4   Dr. Jeffrey Wong.  Dr. Jeffrey Wong is a chairman of
 5   the radiation department.  He told me it's his enemy,
 6   from doctor's perspective.  I don't know what is
 7   that.
 8        And also he strongly opposed my position in
 9   dealing with City of Hope.  He told me he can find
10   another branch to work with, or he can just run by
11   himself as a medical director.  And to me, I think
12   it's for the future development, it's important for a
13   new center to be associated with prestigious cancer
14   center to develop further.
15        Also at the same time, his sister was
16   running everything for him, got also pissed off and
17   mad because she is now going to -- she's going to
18   lose that job on the management side which means she
19   is not going to be compensated for the operation
20   because if we hire our side, operational firm or
21   center, we have to pay -- our center has to pay a
22   management fee. It's very standard in this industry.
23   So she is also very, very mad.
24        But to me, I think for the future, for the
25   investors, for the future -- the interest, I think
```

Page 54

1  this is the best I should do.  And also City of Hope
2  is very strongly -- they feel if they manage this
3  center, they will not allow another medical director.
4  Only one medical director.  That's the reason --
5  that's the dispute.  That's where the dispute came
6  from.
7       BY MR. REGENSTREIF:
8       Q   And this happened approximately when?  In
9  late 2015?
10      A   Yeah.
11      Q   So when did you start talking to City of
12  Hope?
13      A   Mid 2015.
14      Q   And when did you tell Dr. Thropay that you
15  were talking to City of Hope?
16      A   Right after I started and I informed him,
17  and he was extremely -- not happy.
18      MS. LEVIN:  So is there an agreement or MOU
19  with City of Hope?
20      THE WITNESS:  Yes, we had MOU signed.
21      BY MR. REGENSTREIF:
22      Q   And when was that signed?
23      MR. GARTENBERG:  If you're not sure, tell
24  them you're not sure, but give them your best memory.
25      THE WITNESS:  My best memory is November.

Page 55

1  That's my guess, but I can go back to check.
2       MS. LEVIN:  Sometime in 2015?
3       THE WITNESS:  Yeah, for sure.
4       BY MR. REGENSTREIF:
5       Q   And then I wanted to back up again also on
6  business consultants for Beverly Proton.  We
7  discussed that you have two independent contractors
8  or had two independent contractors.
9       A   Yes.
10      Q   And then you said you had business
11  consultants?
12      A   Yes.
13      Q   How many business consultants?
14      A   Including architecture?
15      Q   Yes.
16      A   That's a lot.
17      Q   Well, let's do entities; okay?  How many
18  architects do you have, companies?
19      A   Two.  Two major ones.  But because of the
20  complexity of this project, you have small -- other
21  individual ones.
22      Q   So when you say "business consultants," are
23  these people that you have some kind of contractual
24  arrangements with?
25      A   Oh, yeah.  We have contract.

Page 56

1       Q   So business consultants, you have firms
2  you've hired to do certain processes?
3       A   Yes.
4       Q   So you have two architectural firms?
5       A   Two major ones.
6       Q   And then what are the other business
7  consultants?
8       A   You know, for example -- what are others?
9  We have a consultant on the shielding, the radiation,
10  because the radiation center you have to put a big
11  wall, and we have special consultant on the
12  shielding.
13          We signed an agreement, purchase agreement,
14  with another U.S. proton therapy company.  They
15  provide the equipment, a company in Boston called
16  Mevion, and they are our consultants as well because
17  we signed the purchase agreement.  We already spent
18  money and paid the deposit.  And that's one of them.
19  That's the major one.
20          On the construction side we have -- we hire
21  demolishing company to demolish the building, the
22  existing building.  And then we have special
23  consultant on the use of a dosage for the treatment
24  because that's in line with the proton equipment.
25  You have to have professional medical company

Page 57

1  providing the dosage for the patients.  So by the
2  time we get the equipment, it has to be
3  simultaneously ready for that.  That's another one.
4       There are a lot.
5       Q   So there's contracts for all of these
6  people?
7       A   Yes, we have contracts.  We have signed
8  contracts.
9       MR. REGENSTREIF:  Were these contracts part
10  of the production?
11      MR. GARTENBERG:  They weren't asked for.
12  Anything else that's related, if you give us a list
13  at the end -- we'll keep a list, but I just want to
14  make sure.
15      MR. REGENSTREIF:  Sure.
16      MR. GARTENBERG:  We'll check with you what
17  it is, and we'll be happy to get it for you.
18      THE WITNESS:  Yeah.  We have a stack of
19  documents.
20      BY MR. REGENSTREIF:
21      Q   And have you paid these people yet?
22      A   Yeah, of course.
23      Q   So you mentioned demolishing.
24      A   Yes.
25      Q   What was that about?

Page 58

1    A   There was an existing building onsite.  It
2  was an old MOB building.  It has to be demolished.
3    Q   What's an "MOB building"?
4    A   MOB means "medical office building."
5    Q   And so the building was on the site where
6  the proton therapy center is going?
7    A   Yes.
8    Q   And who owned the building?  Did Beverly
9  Proton own the building?
10   A   No.
11   Q   Who owned it?
12   A   Dr. Thropay.  Dr. Thropay owns a piece of
13  land.
14   Q   Where the center is going?
15   A   Yes.
16   Q   And the building was demolished?
17   A   Yes.
18   Q   Is there currently construction going on at
19  the site?
20   A   Not at this moment.  Not at this moment
21  because we had some -- this dispute with Dr. Thropay.
22   Q   And it's his site?
23   A   Yes.
24   Q   Do you intend to build on that site?
25   A   I have two options.  One is to build --

Page 59

1  continue the path, build on his site.  And also we're
2  about to sign a lease agreement with Beverly
3  Hospital.  Beverly Hospital is adjacent to the site.
4  Next to the site there's a parcel available for us to
5  develop the proton center as well.
6    Q   So you have two possible sites?
7    A   Yes, we have two possible sites.
8    Q   Why did you demolish the first site then?
9    A   Why?  Because there's no Option 2 before
10  the dispute.  Now, because of dispute, we have Option
11  2.  Before, it was Option 1 only.
12   Q   So before the dispute -- and you demoed the
13  site -- you were ready to start building?
14   A   Yes.
15   Q   And that's on hold now?
16   A   Yes.  And then we're preparing for Option B
17  because we have to build.
18   Q   And when investors came, you mentioned
19  investors visited the site, correct?
20   A   Yes.
21   Q   And when they came with you, did they see
22  the already existing building or did they see
23  something else?
24   A   Well, we had investors come in earlier who
25  saw the building is still there.  And then we also

Page 60

1  have some investors -- you know, visitors come in
2  after the demolishment -- after demolishing the
3  building.
4    Q   And you took investors after demolishing?
5    A   Yes.
6    Q   You personally?
7    A   On some occasions, yes.
8        MS. LEVIN:  Were these people who were
9  visiting the site, had they already invested in the
10  EB-5 or were they thinking about investing?
11       THE WITNESS:  Some already invested.  Very
12  few invested because once -- the normal pattern is
13  once they invested, they probably don't come back to
14  see it again.  But most of them came to see it before
15  they sign the agreement.
16       MS. LEVIN:  So there were people who
17  visited the site, and then subsequently invested?
18       THE WITNESS:  Yes.
19       BY MR. REGENSTREIF:
20   Q   Have there been any permits yet to build
21  again?
22   A   The permits -- we have demolishing permit,
23  and that the architect is applying for the
24  construction permit.  We should get it pretty soon
25  because the city is being very cooperative.

Page 61

1    Q   And the architect -- which architect?
2    A   We have two.  One of them -- one of the
3  first is called Skanska.  Skanska is I think one of
4  the largest construction companies in the United
5  States. And we signed an agreement for them to take
6  care of all the pre-construction work.  And then
7  because of potential change of the site and also the
8  change of the equipment, before we were considering a
9  company called hospital Optivus, this is the company
10  that has been in the United States for a while.
11   Q   This was the company that you had previous
12  business relationships with, correct?
13   A   Yes, yes.  And now we signed a purchase
14  agreement with a company called Mevion.  It's an
15  excellent, great company, and they have sold more
16  than ten systems to the United States, and they're
17  all over the United States now.
18       And because of change of technology, so we
19  switched to another architect in Boston area.  The
20  key principal in architect is Steve Cooney
21  (phonetic), who is also our project manager.  We
22  signed agreement already.
23   Q   And the name of the firm?
24   A   The name of the firm is called -- it's very
25  hard to pronounce.

Page 62

1    Q   That's fine.  As best you can.
2    A   If I have access to the phone, I can tell
3    you right away.
4        Do you want me to find it?
5    Q   No, no, no.
6        MR. GARTENBERG:  If they need something,
7    they will ask us to find it later.
8        BY MR. REGENSTREIF:
9    Q   It's called Studio something?
10   A   Studio something.
11   Q   As your lawyer had said a couple of times,
12   I just want what you know.  No guesses, so "Studio
13   something" is fine.
14   A   We signed an agreement on the architectural
15   site, and also they would act as a project manager
16   for Beverly Proton.
17   Q   So have investor funds been used for all of
18   these various actions?
19   A   Yes.
20       MR. GARTENBERG:  Well, just to be clear,
21   the investment in the regional center offering is to
22   make a loan.  So in a sense, the investor funds are
23   used just to make a loan.  I assume your question is:
24   What is the money that's loaned, then used for?
25       MR. REGENSTREIF:  Right.  That's right.

Page 63

1    Great.
2        Now is a good time to take a break.  Let's
3    go off the record.
4        (A brief recess was taken.)
5        MR. REGENSTREIF:  Back on the record.
6        BY MR. REGENSTREIF:
7    Q   So I'm going to direct you back to Exhibit
8    4. And contained within Exhibit 4, there is something
9    called "Exhibit 16" which is a private offering
10   memorandum for 386 limited liability company
11   membership units of Pacific Proton EB-5 Fund, LLC.
12       MR. GARTENBERG:  May I see that for a
13   minute or two?
14       MR. REGENSTREIF:  Sure.
15       BY MR. REGENSTREIF:
16   Q   When counsel is done with that, I'm going
17   to hand it to you to review.
18       MS. LEVIN:  And just to be clear, Exhibit
19   16 is not the Government 16 from this investigation.
20   It was Exhibit 16 that was part of the application.
21       MR. GARTENBERG:  Okay.  Thank you.
22       BY MR. REGENSTREIF:
23   Q   Mr. Liu, so I handed you that PPM.
24       Do you recognize that?
25   A   Yes.

Page 64

1    Q   Is that the final version of the offering
2    memorandum for the EB-5 Fund, LLC?
3    A   Final version as of today?
4    Q   As of what was provided to investors.
5    A   Yes.
6        MR. GARTENBERG:  Let's make sure that that
7    question is accurate -- that that answer is accurate.
8        Was there a later version of the PPM that
9    was sent out to investors?
10       THE WITNESS:  We have not sent out to
11   investors, but we almost complete the revision,
12   updated one.
13       BY MR. REGENSTREIF:
14   Q   But there was an offering memorandum
15   provided to the EB-5 investors?
16   A   That was the one.  This was the one.
17   Q   Are you sure?
18   A   Yes.
19       MR. GARTENBERG:  Let me have a moment.
20   Frankly, I am confused.  We looked at the production
21   that we gave you, and the production of the PPM that
22   we produced is not identical to this.
23       MR. REGENSTREIF:  Which was my question.
24       THE WITNESS:  Oh, yes, yes.  That's why
25   I -- let me tell you, this is a PPM we provided from

Page 65

1    day one.  When we submitted the full application to
2    USCIS for approval, this is the first set of
3    documents.  And then when we filed -- when the
4    attorney does the real filing for each applicant for
5    each investor for green cards -- they call it "I-526
6    application" -- they amend it.  So that was for the
7    first application.
8        BY MR. REGENSTREIF:
9    Q   What we're looking at now was for the first
10   application?
11   A   Yes.  And then we have another version
12   which is for the filing of the I-526 petition.
13   Q   And that second version of the offering
14   memorandum, it's the offering memorandum that was
15   provided to the EB-5 investors?
16   A   Provided it to EB-5 investors, provided it
17   to USCIS.
18       MR. GARTENBERG:  But what he wants to make
19   sure -- if I may -- is the second version, the
20   version that you gave to my firm that we produced,
21   that's the one that was actually used with the
22   investors?
23       THE WITNESS:  Yes.
24       Mr. G and we produced a version in English
25   originally.  And then I think last night, I believe

Page 66

1  we provided one that we were given that was in
2  Chinese.
3          Were the investors given one --
4          THE WITNESS:  The Chinese translation was
5  also based on the second one, not the first one.
6          MR. GARTENBERG:  That's what I wanted to
7  make sure was clear.  Thank you.
8          And when he says one is being prepared,
9  that's yet a third version that has not been used,
10  correct?
11          THE WITNESS:  Yes, but will be used soon.
12          BY MR. REGENSTREIF:
13      Q   But has not yet been?
14      A   Not yet because of the -- as indicated,
15  because of change of vendor -- change to the size of
16  investment.
17      Q   Right.
18          MR. GARTENBERG:  Among other things, there
19  were other changes, not just the size of the
20  investment.
21          THE WITNESS:  And also the changes because
22  of the management side because it was through City of
23  Hope instead of Dr. Thropay.
24          MS. LEVIN:  What's the change to the size
25  of the investment?

Page 67

1          THE WITNESS:  It was $200 million before.
2  Now we downsized to $120 million because the new
3  equipment is cheaper.  And the construction, of
4  course, accordingly, is less.  So the new offering is
5  $120 million instead of $200 million.
6          MR. GARTENBERG:  You say "200-."
7          Was it 200- or -- I'm pointing to the
8  document -- 150-?
9          THE WITNESS:  150-.  I'm sorry.  I'm
10  talking about total investment because we have
11  also -- potentially have some equity money for the
12  investment.  But for EB-5 it's -- for EB-5 it was a
13  different number.  This is 193- something.
14          MR. REGENSTREIF:  193 million.
15          THE WITNESS:  This is 150 million.  Now the
16  new number will be $60 million.
17          BY MR. REGENSTREIF:
18      Q   I'm going to summarize this, and you catch
19  me if I'm wrong.
20      A   Uh-huh.
21      Q   There have been two offering memorandum.
22  There is a third in process.
23      A   Yes.
24      Q   The first one, which was part of Exhibit 4
25  which was the application to USCIS, was not provided

Page 68

1  to EB-5 investors?
2      A   No.  It's provided to set up regional
3  center, for approval of regional center.
4          MS. LEVIN:  And the dollar amount on that
5  one was --
6          BY MR. REGENSTREIF:
7      Q   And the dollar amount on that one was $193
8  million?
9      A   Yes.
10      Q   And the second one, which we will come to,
11  was the one provided to the EB-5 investors?
12      A   Correct.
13      Q   And the dollar amount on that one, which we
14  will look at, was $150 million?
15      A   Correct.
16      Q   And that one was provided to USCIS through
17  the I-526 application?
18      A   Yes.
19      Q   The I-526 application is made for each
20  individual EB-5 investor as part of their green card
21  process?
22      A   Yes.
23          MS. LEVIN:  And so what's the dollar amount
24  of the third one that has not been used yet?
25          THE WITNESS:  $60 million.

Page 69

1          MS. LEVIN:  60 million for the EB-5?
2          THE WITNESS:  Yes.
3          MS. LEVIN:  Thank you.
4          MR. REGENSTREIF:  So I'm going to ask the
5  court reporter to mark as Exhibit No. 5 an offering
6  memorandum for 300 membership units of Pacific Proton
7  EB-5 Fund, LLC, and it has the date at the bottom of
8  5/1/2013.
9          (SEC Exhibit 5 was marked
10          for identification.)
11          BY MR. REGENSTREIF:
12      Q   I've handed you Exhibit 5.  Take a minute
13  to look at it.
14          Do you recognize Exhibit 5?
15      A   Yes.
16      Q   And what is Exhibit 5?
17      A   Exhibit 5 is the private memorandum for
18  Pacific Proton EB-5 Fund.  This is the latest version
19  of the PPM.
20      Q   So this is the second version --
21      A   Second -- in other words second, yes.
22      Q   -- that we just discussed?
23      A   Yes.
24      Q   And did you provide the information
25  contained within Exhibit 5?

Page 70

1  A  Did I provide it to the attorney?  Yes,
2  yes.
3  Q  And did you review Exhibit 5?
4  A  Yes.
5  Q  And approve it?
6  A  Yes.
7  Q  And the attorney who drafted Exhibit 5,
8  which attorney was that?
9  A  Well, the first draft version was prepared
10  by Miller Mayer, and the second one was updated or
11  revised by an attorney called David Derrico.  David
12  Derrico is a legal counsel, and he did the second
13  draft.
14  Q  What firm is Mr. Derrico with?
15  A  David Derrico.
16  Q  His own firm?
17  A  His own firm.
18  MS. LEVIN:  So Exhibit 5 was the version of
19  the PPM that was provided to investors?
20  THE WITNESS:  Yes.
21  BY MR. REGENSTREIF:
22  Q  Let's turn to Page 6 of Exhibit 5.
23  Are you on Page 6 which is the summary of
24  the offering terms?
25  A  Yes.  Uh-huh.

Page 71

1  Q  So under "Securities," the security offered
2  was one unit of the limited liability company
3  membership of the EB-5 Fund, LLC; is that right?
4  A  That's right.
5  Q  And each unit was for $500,000?
6  A  Yes.
7  Q  And it was for a total of 300 units?
8  A  Yes.
9  Q  And then under that, there are
10  administrative fees of $45,000.
11  A  Yes.
12  Q  And that administrative fee, did you
13  understand that that would be where the offering
14  expenses, including legal, accounting and
15  administrative expenses, and commissions and fees
16  relating to the offering would come from that
17  administrative fee?
18  A  Yes.
19  Q  And only from that administrative fee?
20  A  Yes.
21  Q  And that $45,000, that was directed to the
22  EB-5 Fund or was it directed to the regional center?
23  A  You mean when investor sent in the funds?
24  Q  Yes.
25  A  It was directly to the regional center.

Page 72

1  MR. GARTENBERG:  May I have a minute while
2  no question is pending?
3  MR. REGENSTREIF:  You know what?  Let's
4  just finish this one thought.
5  MR. GARTENBERG:  I really want to speak to
6  my client while there's no question pending.
7  MR. REGENSTREIF:  Fine.  Let's go off the
8  record.
9  (Counsel conferred with the witness.)
10  MR. REGENSTREIF:  Let's go back on the
11  record.
12  BY MR. REGENSTREIF:
13  Q  So under that, back to Page 6 of Exhibit 5,
14  we're looking at "borrower."
15  Do you see that?
16  A  Yes.
17  Q  So it says, "Los Angeles County Proton
18  Therapy, LLC" is the borrower.
19  A  Uh-huh.
20  Q  That's now Beverly Proton; is that correct?
21  A  Yes.
22  Q  And the investment basically -- I'm going
23  to characterize it; tell me if I'm right here -- the
24  investors are investing in the EB-5, LLC which then
25  makes a loan to L.A. County Proton; is that right?

Page 73

1  A  That is correct.
2  MR. REGENSTREIF:  Can we go off the record?
3  MR. GARTENBERG:  Sure.
4  (A brief recess was taken.)
5  MR. REGENSTREIF:  Back on the record.
6  BY MR. REGENSTREIF:
7  Q  So your understanding of what the loan to
8  what was then Los Angeles County Proton Therapy and
9  is now Beverly Proton --
10  A  Yes.
11  Q  -- the purpose of that loan was what?
12  A  To fund the project, to develop the
13  project.
14  Q  And then the bottom of Page 6 of Exhibit 5,
15  there's a management fee.
16  Do you see that?
17  A  Uh-huh.
18  Q  So that is the fee that the regional center
19  would have received from the EB-5 Fund, LLC; is that
20  right?
21  A  Yes.
22  Q  And that was to be three percent of gross
23  revenues?
24  A  Yes.
25  Q  Has the EB-5 Fund, LLC had any gross

Page 74

1  revenues?
2      A   EB-5 Fund has gross revenues?  I don't
3  quite understand that question because when you say
4  "gross revenue" -- it's talking about the total
5  amount of funds being raised?
6      Q   Well, you tell me.  So here in Exhibit 5 it
7  says, "Three percent of the gross revenues."
8          Do you see that?
9      A   I think it's -- I think we're referring to
10 the project, not referring to the PP EB-5 Fund,
11 because PP EB-5 Fund is a vehicle to raise EB-5
12 money, but EB-5 money called "gross revenues"?  That,
13 I'm not sure.
14     Q   So you're not sure?
15     A   I don't write this, you know.
16         MR. GARTENBERG:  You answered.  You said
17 you're not sure.
18         THE WITNESS:  I'm not sure.  I'm not sure.
19         BY MR. REGENSTREIF:
20     Q   That's fine.
21         Has a management fee been paid to the
22 regional center?
23     A   I'm not sure.
24     Q   Has the fee been paid to the regional
25 center?

Page 75

1          MR. GARTENBERG:  And he does not want you
2  to guess.  If you know, please answer.  If you don't
3  know, you don't know.  You can check the books later.
4          THE WITNESS:  Not through PB EB-5.
5          BY MR. REGENSTREIF:
6      Q   Has any management fee been paid to the
7  regional center --
8      A   No.
9      Q   -- from any source?
10     A   From the -- no.  There's a sponsorship
11 agreement between the project company and regional
12 center, so the regional center received the
13 sponsorship fees from Pacific Proton, from Beverly
14 Proton Center.
15     Q   So a sponsorship fee from Beverly Proton to
16 the regional center?
17     A   Yes.
18     Q   And that is laid out in a sponsorship
19 agreement?
20     A   Yes.
21     Q   And do you know what that sponsorship fee
22 is?
23     A   Yes.
24     Q   What is it?
25     A   It's 800,000 per year.

Page 76

1      Q   800,000 per year?
2      A   Yes.
3      Q   From Beverly Proton to the regional center?
4      A   Yes.
5      Q   And that's in the sponsorship agreement?
6      A   Yes.
7      Q   Was the sponsorship agreement provided to
8  the EB-5 investors?
9          MR. GARTENBERG:  If you know, tell him.  If
10 you don't know -- if you truthfully don't know, then
11 tell him you don't know.
12         THE WITNESS:  I'm not sure.  I'm not sure
13 because how do you interpret that, you know?
14         MR. GARTENBERG:  If you know, tell him.  If
15 you don't, tell him you don't know.
16         THE WITNESS:  If I'm not sure, what do I
17 say?
18         MR. GARTENBERG:  If you're not sure, you
19 say, "I'm not sure."  Without waiving privilege, we
20 went over this.  If the answer is, "I don't
21 remember," "I'm not sure," that's the correct answer,
22 if that's what the facts are.
23         THE WITNESS:  I'm not sure.
24         BY MR. REGENSTREIF:
25     Q   Absolutely.  No speculating, no guessing.

Page 77

1  If you don't know, you don't know.  It's okay.
2      A   All right.
3      Q   Let's turn to Page 7 of Exhibit 5, the
4  "Escrow capital contributions."
5          Do you see that?
6      A   Yes.
7      Q   So the EB-5 investor funds were escrowed;
8  is that right?
9      A   Yes.
10     Q   And who was the escrow agent?
11     A   East West Bank.
12     Q   East West Bank is the escrow?
13     A   And actually East West Bank is a depository
14 bank, and the escrow agent is called Atlantic Escrow.
15     Q   And then the funds are released upon notice
16 of the filing of each investor's I-526 petition?
17     A   Upon filing, upon receipt of USCIS
18 application.
19     Q   Receipt by who?
20     A   By USCIS.
21     Q   And do you notify the escrow agent?  Is
22 that how it works?
23     A   Yes, every time we got a receipt from
24 USCIS, I would submit the receipt to the escrow
25 agent, and then escrow agent release the funds.

Page 78

1    Q   And then the funds are released to the EB-5
2  Fund, LLC account?
3    A   Yes.
4    Q   And approximately $23 million of that has
5  been released to the EB-5 Fund?
6    A   Yes.
7    Q   Let me turn to page 15 of Exhibit 5 to the
8  bottom, the "Distribution of Profits From
9  Operations."
10    A   Page 15.  Okay.
11    Q   Do you see the bottom paragraph,
12  "Distribution"?
13    A   Yes.
14    Q   Reviewing that, has there been any
15  repayment on the loan by Beverly Proton to the EB-5
16  Fund?
17    A   No.
18    Q   Now, let's turn to Page 18 of Exhibit 5.
19        Do you see the second paragraph under --
20  from the top under, "Pacific Proton EB-5 Fund, LLC"?
21    A   The second paragraph?
22    Q   Yes.
23    A   Okay.
24    Q   So it says, "The EB-5 will pull investor
25  funds and make a loan of up to 150 million to Los

Page 79

1  Angeles County Proton Therapy."
2    A   Yes.
3    Q   Is that correct?
4    A   Yes.
5    Q   The loan has already -- it's already
6  happened.
7        There's funds going from EB-5 to Beverly
8  Proton?
9    A   Yes.
10    Q   But there have been no payments made under
11  that loan yet back to EB-5?
12    A   No, because it's a five-year loan.
13    Q   And LAPT is Beverly Proton; is that right?
14    A   Yes.
15    Q   It says, "We'll use the loan proceeds to
16  partially finance a construction and operation of a
17  proton therapy center."
18        Is that your understanding of what the use
19  of funds of the loan was for?
20    A   Yes.
21    Q   And all the investor funds were to go to
22  the loan?
23    A   Yes.
24    Q   Let's turn to Page 20 now of Exhibit 5.  It
25  says, "PP EB-5 estimated use of proceeds."

Page 80

1        Do you see that in that paragraph?
2    A   Yes.
3    Q   So again, it says "Borrower" -- which means
4  Beverly Proton; is that right?
5    A   Yes.
6    Q   -- "intends to use the proceeds from this
7  offering to finance development and operation of the
8  now Beverly Proton Center"; is that right?
9    A   Yes.
10    Q   And then there's a Footnote 2.
11        Do you see that at the bottom of the page?
12    A   Yes.
13    Q   And that says, "The proceeds of this
14  offering do not include administrative fees.
15  Offering expenses, commissions and fees inferred in
16  connection with this offering shall be paid from the
17  proceeds in," capital "A," "Administrative," capital
18  "F," "Fees, and not from EB-5 capital contributions."
19    A   Yes.
20    Q   And that's inaccurate?
21    A   Yes.
22    Q   So the $500,000 in investor funds to the
23  EB-5 Fund were solely to go to the loan?
24    A   Uh-huh.
25    Q   "Yes"?

Page 81

1    A   Yes.
2    Q   And then the loan was to be used for -- to
3  finance development and operation of Beverly Proton?
4    A   Correct.
5    Q   Let's turn to Page 25 of Exhibit 5.
6        Do you see "Management" at the bottom of
7  the page, that last paragraph?
8    A   Yes.
9    Q   So the "manager," which is the regional
10  center; is that right?
11    A   Yes.
12    Q   And the "regional center," you are the
13  manager of the regional center?
14    A   Yes.
15    Q   "The manager," it says in Exhibit 5 on Page
16  25, "has full, exclusive and complete authority and
17  power and discretion to manage and control the
18  business affairs."
19        Do you see that?
20    A   Yes.
21    Q   So no investor has management
22  responsibilities of the EB-5 Fund?
23    A   No.
24    Q   I'm sorry?
25    A   No.

Page 82

1    Q   It's just solely you as the manager of the
2    regional center?
3    A   Yes.
4        MR. GARTENBERG:  Just reading from the
5    document that you authored and noted -- and he's not
6    a lawyer -- it says here that members have limited
7    rights to take part in management or to bind the
8    company, and then it refers to specific sections of
9    the operating agreement.
10        So would it be correct that you don't know,
11    as a nonlawyer, exactly what those sections of the
12    operating agreements say, correct?  I'm looking at
13    Page 26, "Members have limited rights to take part in
14    the management to bind the company," and then it
15    refers to Article 4, Sections 4.1 through 4.2 of the
16    operating agreement.
17        As far as you know, are those sections in
18    effect?
19        THE WITNESS:  I'm not sure I fully
20    understand.
21        MR. GARTENBERG:  That's really my point.
22        When you say the members don't have
23    management authority, you're not overruling whatever
24    the operating agreement says, are you?  The operating
25    agreement is the operating instrument.

Page 83

1        THE WITNESS:  Yes.  Operating agreement,
2    yes, is the core, I guess.
3        BY MR. REGENSTREIF:
4    Q   So let me ask you this:  Has any EB-5
5    investor had any management responsibilities for the
6    EB-5 Fund?
7    A   No.
8    Q   You're the only one that's managed the EB-5
9    Fund?
10    A   Yes.
11    Q   When did the offering begin?  When did you
12    start fundraising?
13    A   2013, because we received approval in 2012.
14    Q   Approximately when in 2013?
15    A   Mid.
16    Q   And did you retain any brokers?
17    A   Yes.
18        MR. GARTENBERG:  Let him finish the
19    question, please.  Wait until he finishes.
20        BY MR. REGENSTREIF:
21    Q   Who?
22    A   Quite a few.  One of them is Overseas
23    Chinese Immigration.  The other is U.S. RITA --
24    called U.S. RITA.  It was another company.
25    Q   U.S. RITA?

Page 84

1    A   Yes, called U.S. RITA, yeah.  And then we
2    have United Damei Investment.  And then -- well,
3    there's -- it's kind of -- because of the Chinese
4    names, it's a translation, so it's sometimes -- I
5    can't remember all the names.
6    Q   But those three, were those the three
7    brokers, or were there other brokers?
8    A   There were other brokers.
9    Q   How many others?
10    A   Another three, four.
11    Q   Do you know the other three, four names?
12    A   I can't.  I know who I'm dealing with, but
13    I can't remember the company's name.
14    Q   Who are you dealing with?
15    A   Because a lot of translations -- because
16    the Chinese translation, we communicate -- because I
17    grew up in China also, so I can speak the local
18    dialect.  So we speak the local dialect, local
19    language.  I can't remember.
20    Q   What about the names of the individuals you
21    were dealing with, those three or four other brokers?
22    A   I can remember one of them is Mr. Wang.
23    Last name is Wang, and first name is J-i-n.
24    Q   But he doesn't work for either Overseas
25    Chinese, U.S. RITA or United Damei?

Page 85

1    A   Yeah.
2    Q   Anyone else from one of those other
3    brokerage firms?
4    A   Not that I can think of.
5        MS. LEVIN:  And, I'm sorry.  You were
6    mentioning that you spoke a local dialect.
7        So is that something other than Mandarin
8    Chinese?
9        THE WITNESS:  Yeah, Shanghainese, because I
10    grew up in Shanghai.  So many dialects.
11        BY MR. REGENSTREIF:
12    Q   So let's start with Overseas Chinese.
13        Where are they based?
14    A   Hong Kong, I think.  Based in Hong Kong.
15    Q   And is there some kind of brokerage
16    agreement with them?
17    A   Yeah, we had agreement.
18    Q   You had an agreement with them?
19    A   Yeah.
20    Q   And were they paid a commission?
21    A   Yeah, they were paid a commission, yes.
22    Q   And did EB-5 Fund pay the commission to
23    them or were they being paid commission by the
24    investors?
25        MR. GARTENBERG:  Or some other alternative?

Page 86

1    MR. REGENSTREIF:  Sure.  Of course.
2    THE WITNESS:  Yeah.  They were paid by the
3  regional center, and also by the project.
4    BY MR. REGENSTREIF:
5    **Q   By both?**
6    A   Yeah, by both.
7    **Q   So Overseas Chinese was paid by both the**
8  **regional center and by Beverly Proton?**
9    A   Yes.
10   **Q   And these were fees associated with their**
11 **successful selling of investments to EB-5 investors?**
12   A   Correct.
13   **Q   And what was the arrangement?  What was the**
14 **commission?**
15   A   Commissions paid 75,000 per each investor.
16   **Q   75,000 per each investor?**
17   A   Yeah.
18     MS. LEVIN:  And how many investors did they
19 get to date?
20     THE WITNESS:  How many investors --
21     MS. LEVIN:  -- did Overseas Chinese obtain
22 to date?
23     THE WITNESS:  I don't have exact numbers.
24 I can't remember exact.
25     BY MR. REGENSTREIF:

Page 87

1    **Q   And was the agreement between -- I'm not**
2  **sure if it was regional center or if it was the EB-5**
3  **Fund or what have you.**
4    A   Not EB-5 Fund for sure.
5    **Q   So the agreement with one of the entities,**
6  **Overseas Chinese, is that provided to us in the**
7  **production?**
8     MR. GARTENBERG:  Yes.  I'm looking at it.
9     MR. REGENSTREIF:  Well, it was relatively
10 shortly, so that's fine.
11     BY MR. REGENSTREIF:
12   **Q   It was provided?**
13   A   Yes.
14     MR. GARTENBERG:  But based on the
15 conversation that I've had with my client, I'm not
16 sure that all of the terms are reflected in the
17 writing.
18     BY MR. REGENSTREIF:
19   **Q   So let's talk about, you sitting here**
20 **today, what the terms of the agreement with Overseas**
21 **Chinese were.**
22     MR. GARTENBERG:  If you don't have it at
23 your fingertips, if you want to take a minute, I've
24 got it at mine.  You can make copies of it.
25     MR. REGENSTREIF:  Well, let's go first this

Page 88

1  way.
2    MR. GARTENBERG:  Okay.
3    BY MR. REGENSTREIF:
4    **Q   So tell me, what were the terms?**
5    A   The term is upon the successful completion
6  of the fundraising, we pay 75- for each -- the
7  clients they brought in.  And we also pay a marketing
8  fee to them as well.
9    **Q   So a marketing fee on top of 75,000?**
10   A   Yeah.  Marketing fee is different.  It's to
11 do the promotions, other stuff.
12   **Q   And how much was the marketing fee?**
13   A   Marketing fee is --
14   **Q   Just do what you know.**
15     MR. GARTENBERG:  I offered to do that.  You
16 prefer what he remembers.
17     BY MR. REGENSTREIF:
18   **Q   First I want to know what you remember.**
19   A   About half a million a year for marketing.
20   **Q   And you said that Overseas Chinese is based**
21 **in Hong Kong?**
22   A   Yes.
23   **Q   And who do you work with at Overseas**
24 **Chinese?**
25   A   A gentleman called Mr. Wang and his

Page 89

1  associates.  They have an office in China.
2    **Q   And does Mr. Wang own Overseas Chinese?**
3    A   I guess so.
4    **Q   If you don't know, that's fine.**
5    A   Yeah.  I guess so.
6     MR. GARTENBERG:  Do you know for a fact --
7  because when you say, "I guess," did you ever ask
8  him?
9     THE WITNESS:  No, because when you deal
10 with the company, you don't ask.
11     MR. REGENSTREIF:  Sure.  That's why you
12 said, "I guess."
13     THE WITNESS:  Yeah.
14     MR. REGENSTREIF:  I heard what he meant.
15     THE WITNESS:  It's a business community.
16     MR. REGENSTREIF:  I got it.  Thank you.
17     MS. LEVIN:  What's his first name, Mr.
18 Wong's first name?
19     THE WITNESS:  I think he's called Walter.
20     BY MR. REGENSTREIF:
21   **Q   Walter?**
22   A   Yeah, Walter.
23     MS. LEVIN:  Thank you.
24     BY MR. REGENSTREIF:
25   **Q   So next, United Damei.**

Page 90

1    So they are another broker retained?
2    A   Yes.
3    Q   So sitting here, without looking at the
4    documents, what generally were the terms with United
5    Damei?
6    A   It's marketing fees plus the brokerage fee
7    of 75,000 for each client.
8    Q   And the marketing fee was also 500,000?
9    A   In that neighborhood.
10   Q   In that neighborhood.
11       And who did you deal with at Untied Damei?
12   A   They have a gentleman called Mr. Chen, last
13   name is C-h-e-n.
14       MS. LEVIN:  First name?
15       THE WITNESS:  X-i-a-o.
16       MS. LEVIN:  Xiao.
17       THE WITNESS:  J-u-n-g.  Xiao Jung Chen.  So
18   last name is Chen, first name is Xiao Jung.
19       BY MR. REGENSTREIF:
20   Q   Does your wife have any involvement with
21   United Damei?  I know that you said she was involved
22   in the --
23   A   Yes.  Partially she's helping them from
24   marketing.  Because they're Chinese, they work
25   together.

Page 91

1    Q   Did Untied Damei pay your wife?
2    A   No.
3    Q   And where is Untied Damei based?
4    A   Beijing.
5    Q   They're in Beijing?
6    A   Yeah.
7    Q   And how many investors have they
8    successfully solicited?
9    A   Quite a few.
10   Q   10?  15?
11   A   20.
12   Q   20?
13   A   Yeah.
14   Q   Approximately?
15   A   Approximately.
16   Q   And Overseas, approximately how many have
17   they solicited?
18       MR. GARTENBERG:  You mean who actually
19   became --
20       MR. REGENSTREIF:  Right, successfully
21   solicited.
22       THE WITNESS:  Four to five.
23       BY MR. REGENSTREIF:
24   Q   Four to five?
25   A   Yes.

Page 92

1    Q   And then U.S. RITA, they were also a broker
2    you dealt with?
3    A   For a short period of time.
4    Q   Did they successfully solicit any
5    investors?
6    A   No.
7    Q   Let's start with Untied Damei.
8        How did they solicit investors?  What was
9    their marketing process, if you know?
10   A   I'm here most of the time, so the reason we
11   want to hire the broker is to -- I don't have this
12   headache.  I can focus on the construction, on the
13   business development for our center.  So in terms of
14   how they do that, it's, I guess, through the
15   networks, business seminars, advertising, website,
16   local magazine, newspapers, friends.
17   Q   Let me ask it this way:  Have you,
18   yourself, ever participated in any of the marketing
19   efforts to investors by the brokers?
20   A   Not myself, but I --
21       MR. GARTENBERG:  That's all he asked.
22       THE WITNESS:  No.
23       BY MR. REGENSTREIF:
24   Q   Did your wife participate in those -- in
25   that process?

Page 93

1    A   Yes.
2    Q   And how did she participate in that
3    process?
4    A   She's made a speech, spoke about the
5    project on behalf of Beverly Proton.
6    Q   A speech to who?
7    A   Speech to the guests, invited guests,
8    potential clients on behalf of the company.
9    Q   And those invited guests were potential
10   investors as well as clients?
11   A   Yes.
12   Q   And when was that meeting?
13   A   When was that meeting?  She told me she
14   went to multiple meetings in 2014, '15, but I can't
15   remember.
16   Q   So more than one of those kinds of
17   meetings?
18   A   Yes.
19   Q   In person?
20   A   In person.
21   Q   And those were in Mainland China?
22   A   Yes.
23   Q   Do you know where in Mainland China?
24   A   Beijing, Shanghai, Guangzhou is the primary
25   three major cities where you do business.

Page 94

1    Q   That's where the money is?
2    A   Yes.  Exactly.
3    Q   You did not accompany her?
4    A   No.
5    Q   And have you ever been on one of these
6  trips to get investors in Mainland China?
7    A   Once.
8    Q   When was that?
9    A   I was there I think 2015.  I accompanied
10  the former mayor Antonio Villaraigosa.  He was an
11  invited speaker, and I was there.  I think that was
12  the only -- to my best knowledge, that was the only
13  occasion because of him, so I went there.
14    Q   And so you accompanied the former mayor to
15  China for a speaking engagement?
16    A   Yes.
17    Q   And he spoke to investors, potential
18  investors?
19    A   The audience.
20    Q   So the audience was made up of potential
21  investors?
22    A   As far as I know, yes.
23    Q   And was this particular audience -- did
24  Overseas Chinese sponsor this, or was it Untied Damei
25  or one of the brokers?

Page 95

1    A   I think Untied Damei.
2    Q   United Damei did it?
3    A   Yes.
4    Q   And did you pay Mayor Villaraigosa for this
5  appearance?
6    A   The regional center, yes.
7    Q   The regional center?
8    A   Yes.
9    Q   Travel?
10    A   Travel.
11    Q   And any other sort of fee?
12    A   I think just the travel.
13    Q   So he was part of the marketing to
14  potential investors?
15    A   Uh-huh.
16    Q   You have to say "yes."
17    A   Yes.  I'm sorry.
18    Q   It's unnatural because we can nod and see
19  each other.
20    A   Yeah.
21    Q   Did anyone else go on that trip besides
22  yourself and the mayor?
23    A   Thropay and his sister.
24    Q   Novodor?
25    A   Ruth Novodor.

Page 96

1    Q   So the four of you went?
2    A   Yes.
3    Q   Was there any typed-up remarks that you
4  made or a speech?
5    A   No.  I was just sitting there.
6    Q   You were just sitting there?
7    A   Uh-huh.
8    Q   The mayor gave the speech?
9    A   Yes.
10    Q   Did you provide him with a speech to give?
11    A   No.  He was a natural speaker.
12    Q   What did he say?  He's a politician, right?
13    A   He's a great speaker.  He was a great
14  speaker.  Actually, we have a video recording.
15    Q   So this is one of the videos?
16    MR. GARTENBERG:  First I hear of this
17  speech.
18    MR. REGENSTREIF:  But you guys said there
19  are videos, right?
20    THE WITNESS:  Yes.  He made a great, great
21  speech in talking about Los Angeles, and he invited
22  the Chinese to be the second home.
23    MR. GARTENBERG:  But if that's something
24  you want, we'll get you that video.
25    THE WITNESS:  He's a great speaker.  We

Page 97

1  didn't offer him anything to say.  He just --
2  naturally he just --
3    BY MR. REGENSTREIF:
4    Q   He sold Los Angeles?
5    A   How great the city, how -- everybody was --
6    MR. GARTENBERG:  May I ask:  Did he talk
7  about the proton therapy center?
8    THE WITNESS:  Yes, of course.  He did a lot
9  of homework, actually, because before he didn't know
10  too much about the proton therapy.  And then he did a
11  lot of research and find out, and then he talked
12  about the proton therapy.
13    MR. GARTENBERG:  It's called for by the
14  subpoena.  It's the first time we hear of it.  We'll
15  get you a copy.
16    MR. REGENSTREIF:  That's fine.
17    BY MR. REGENSTREIF:
18    Q   And so related to that, were there EB-5
19  investors who made investments who were at that
20  meeting?
21    A   That, I can't tell.  There's so many, like,
22  over --
23    Q   How many people were there?
24    A   A couple of hundred.  I don't know.
25    Q   And was that in Beijing or Shanghai?

Page 98

1    A   Beijing.
2    Q   **And that was approximately when?  2015?**
3    A   Yeah, 2015.
4    Q   **Early?  Mid?**
5    A   I remember he was wearing a coat.
6    Q   **So, cold?**
7    A   So I think it was March or February.
8    Q   **Early 2015?**
9    A   Yeah, early 2015.
10   Q   **We won't pin you down.**
11       **Early 2015?**
12   A   He said, "It's like New York, the weather,"
13   so it must be that period of time.
14       MR. GARTENBERG:  Just keep in mind that
15   he's going to need from 1:00 to 1:30 to make a call.
16   And separate from that, we also need to eat lunch.
17   So if you can try to work that into your schedule.
18       MR. REGENSTREIF:  Then let's go off the
19   record, and we'll break for lunch.
20       (Whereupon, a luncheon recess was taken.)
21       A F T E R N O O N   S E S S I O N
22       MR. REGENSTREIF:  Back on the record.
23       So I'm going to ask the court reporter to
24   mark as Exhibit 6 a document Bates-stamped
25   SEC-JPMCB-P-184 through 186.

Page 99

1        (SEC Exhibit 6 was marked
2         for identification.)
3    BY MR. REGENSTREIF:
4    Q   **So take a minute to look at Exhibit 6, Mr.**
5    **Liu.**
6        **So, Mr. Liu, on the first page of Exhibit**
7    **6, which is a signature card for a bank account at**
8    **Chase, is that your signature?**
9    A   Yes.
10   Q   **And then on the second page of Exhibit 6,**
11   **at the bottom, is that your signature under**
12   **"Partner/Member/Manager"?**
13   A   Yes.
14   Q   **And this is for the signature card --**
15   **Exhibit 6 is for Chase Bank account No. 6 -- last**
16   **four, 6428 at the top of Page 1 on the right.**
17       **Do you see that?**
18   A   Yes.
19   Q   **And is that the bank account for the**
20   **regional center?**
21   A   Yes.
22   Q   **And are you the only signatory on the bank**
23   **account for the regional center?**
24   A   Yes.
25   Q   **And does anyone else have access to that**

Page 100

1    bank account?
2    A   No.
3    Q   **And is that bank account for business at**
4    the regional center?
5    A   Yes.
6    Q   **And only business for the regional center?**
7    A   Yes.
8    Q   **And is this the account, account 6428 in**
9    Exhibit 6, where the administrative fee goes?
10   A   Yes.
11   Q   **And the administrative fee is only for the**
12   operating expenses and marketing fees and commissions
13   as we discussed previously as numbered in the
14   offering memorandum?
15   A   Yes. You mean is it the only account?
16   Q   **This is the account where the**
17   administrative fee goes?
18   A   Yes.
19   Q   **And the administrative fee is for those**
20   items that we discussed before?
21   A   Yes.
22       MS. LEVIN:  Does the administrative fee
23   ever go to any other bank accounts or only this
24   account?
25       THE WITNESS:  This is the only one.

Page 101

1        MS. LEVIN:  Okay.  Thank you.
2        MR. REGENSTREIF:  I'm going to ask the
3    court reporter to mark as Exhibit 7 a document --
4    another signature card that is nine pages long and
5    Bates-stamped SEC-JPMCB-P-3 through 11.
6        (SEC Exhibit 7 was marked
7         for identification.)
8        BY MR. REGENSTREIF:
9    Q   **Mr. Liu, I've handed you Exhibit 7.**
10   A   Okay.
11   Q   **Mr. Liu, on Exhibit 7, the first page, is**
12   that your signature?
13   A   Yes.
14   Q   **And this signature card is for the Chase**
15   account with the last four digits 1028.
16       **And is this the account for the EB-5 Fund,**
17   **LLC?**
18   A   Yes.
19   Q   **And are you the only signatory on this**
20   account?
21   A   Yes.
22   Q   **And does anyone have any access to the**
23   funds in this account?
24   A   No.
25   Q   **And this is the account that the EB-5**

Page 102

```
 1    investor funds, once they're released from escrow,
 2    come to this account?
 3       A   Yes.
 4       Q   And only this account?
 5       A   Yes.
 6       Q   And this account is solely used for the
 7    EB-5, LLC Fund?
 8       A   Yes.
 9           MR. REGENSTREIF:  I'm going to ask the
10    court reporter to mark as Exhibit 8 a signature card
11    from Chase for account ending, last four, 5152, and
12    it's Bates-stamped SEC-JPMCB-P-83 through 90.
13           (SEC Exhibit 8 was marked
14            for identification.)
15    BY MR. REGENSTREIF:
16       Q   Mr. Liu, I handed you Exhibit 8 which is
17    the signature card as I described.
18           On Page 1 of Exhibit 8, is that your
19    signature at the first line?
20       A   Yes.
21       Q   And then under it says -- the second line,
22    it lists "John P. Thropay."  There's no signature.
23    It just says, "Refer to add partner or member not
24    president"; is that right?
25       A   Yes.
```

Page 103

```
 1       Q   Are you the only signatory of this account?
 2       A   Yes.
 3       Q   You have access to this account?
 4       A   Yes.
 5       Q   Dr. Thropay can't access funds in this
 6    account?
 7       A   Well, I think he has access to the account,
 8    but I'm the only member to sign.
 9       Q   Yeah.  That makes sense.
10       A   Because he's a member.
11       Q   Right, and you'll see in a minute that that
12    makes sense.
13           And so this account in Exhibit 8, which is
14    5152, this one is for Los Angeles County Proton
15    Therapy, LLC.  This is for Beverly Proton, LLC.
16       A   Yes.
17       Q   So this is the project's account?
18       A   Yes.
19       Q   And the funds in this account are only for
20    the project?
21       A   Yes.
22       Q   And so the loan from the EB-5 Fund would
23    then go to this account?
24       A   Yes.
25       Q   And the funds in this account are meant
```

Page 104

```
 1    for -- to be spent on the project and construction;
 2    is that right?
 3       A   And marketing and other work capital.
 4       Q   When you say "marketing," what do you mean?
 5       A   "Marketing" means to promote this project.
 6       Q   To promote the project for clients to come
 7    and use the project, or investors?  What do you mean?
 8       A   "Promotion" means -- because we're in the
 9    healthcare business, we were trying to -- before the
10    construction completed, we were trying to bring
11    patients through this center to other U.S. medical
12    cancer centers.
13           In other words, by the time we complete our
14    construction, we were able to see immediately enough
15    clients particularly from overseas to come to our
16    center.  We don't have to start a campaign, advertise
17    right away, you know.  But that takes time for people
18    to absorb the patient, to the clients to absorb.
19    So what we're trying to do is to do the marketing
20    right away.
21       Q   So "marketing" means for clients/patients?
22       A   Patients, yes.
23           MS. LEVIN:  And what kind of marketing was
24    done or is being done or has been done to get
25    patients?
```

Page 105

```
 1           THE WITNESS:  What kind of marketing?  You
 2    know, magazine articles, newspaper articles and press
 3    release, video, seminar and working with hospital
 4    networks in China.
 5           MS. LEVIN:  So who is doing that marketing
 6    for you?
 7           THE WITNESS:  My wife.
 8           MS. LEVIN:  Your wife is?
 9           THE WITNESS:  Yeah.
10    BY MR. REGENSTREIF:
11       Q   And only your wife?
12       A   Wife and other agents.  My wife represents
13    Beverly Proton Center because she's paid to do this.
14       Q   But these other agents are agents seeking
15    out patients?
16       A   Yes.  We have our agents, brokers working.
17       Q   But this is for patients?
18       A   Yes, for the patients.  And also publicity,
19    you know, to make our center known.
20           MR. GARTENBERG:  May I ask a question that
21    I think will help?
22           To some extent, are the same people who are
23    marketing to the investors in the EB-5 Fund also
24    marketing for patients?
25           THE WITNESS:  We have one firm, yes.
```

Page 106

1  BY MR. REGENSTREIF:
2  Q   What's that firm?
3  A   United Damei Group.
4  Q   So that one firm is also marketing for
5  patients?
6  A   Yes.
7  Q   But that's it?
8  A   Yeah, for EB-5 marketing, and also for the
9  patient referral.
10  MR. GARTENBERG:  What about Overseas
11  Chinese?  Do they help with marketing for patients,
12  too?
13  THE WITNESS:  They do some, too.  They do
14  some, too.  Because when they are promoting our
15  project, it's promoting medical project.  So they are
16  trying to -- we try to fully utilize the resources
17  because one of the investors can be potentially a
18  patient, or their friends, their relatives may become
19  a patient.  So we're actually doing both.
20  BY MR. REGENSTREIF:
21  Q   Were the EB-5 investors told that their
22  investment would also be used for marketing, for this
23  kind of marketing, as you described?
24  A   They were told by -- in what way?  Written
25  language or verbal conversation?

Page 107

1  Q   Either.  Both.
2  A   Yeah.  Verbally, yes.  But written
3  language, we don't have that kind of document to
4  provide to them.
5  Q   But verbally you told them that their
6  investment would be used both to construct and
7  operate the center and also to market it?
8  A   Yes.
9  Q   But there's no written documentation of
10  that?
11  MR. GARTENBERG:  May I have a minute after
12  he answers before you go on to the next question?
13  BY MR. REGENSTREIF:
14  Q   So there's no documentation of that?
15  A   (Witness nods head.)
16  Q   You have to verbalize.  You shook your head
17  "no."
18  A   Verbal, written document to each of our
19  investors.  The agents knows, not the investors.
20  There's a difference between the agents, brokers and
21  investors.
22  "Investors," you're referring to each
23  individual EB-5 investor?
24  Q   Yes.
25  A   No, we did not verbally.  It's not -- we're

Page 108

1  directly not dealing with the investors.  We deal
2  with investors -- each investor through our agents.
3  So our agents, they may just verbally tell his
4  clients/investors, but we don't directly tell them.
5  MR. GARTENBERG:  And just to be clear,
6  you're asking about that specific use of it, not the
7  broad language that's in the offering document that
8  broadly covers, for example, other costs without
9  defining them?
10  MR. REGENSTREIF:  I'm asking exactly what
11  he said.
12  MR. GARTENBERG:  Right.
13  He's asking:  To your knowledge, did you
14  specifically tell the investors that part of the
15  marketing was for ultimate use of the facility?
16  THE WITNESS:  Did we tell the investors?
17  MR. GARTENBERG:  That specifically.
18  THE WITNESS:  No, because we don't -- we
19  don't talk to investors directly.  It's all through
20  the marketing agent.
21  MS. LEVIN:  So did you instruct the brokers
22  to tell the EB-5 investors that some of the money
23  would be used for marketing to patients?
24  THE WITNESS:  Did we instruct?  No, I did
25  not instruct.

Page 109

1  MS. LEVIN:  So you don't know whether --
2  THE WITNESS:  But they know -- they're
3  fully aware of what we are doing.
4  MS. LEVIN:  And how do you know that?
5  THE WITNESS:  Because we had the agreement
6  signed to refer patients.  It's between this company
7  and also the brokers.  It's not between this company
8  and individual investors.
9  BY MR. REGENSTREIF:
10  Q   So this goes to what Ed raised this
11  morning.
12  You have these written agreements
13  between -- I'm not sure which of the entities, but
14  the three entities and the brokers?
15  MR. GARTENBERG:  No.  What we produced --
16  and remember, if you would, please, that the subpoena
17  called for, I believe, October 2014 forward.  And
18  from what he's testified to, the two written
19  agreements are with UDG and with China Overseas, and
20  we produced those to you.
21  I have copies here.  To the extent he has
22  any additional agreements with them -- I don't know
23  if he does or doesn't -- I'd be happy to talk to him
24  about those.  But the agreements that we understood
25  to be covered by the subpoena, we have, yes.

Page 110

1      MR. REGENSTREIF:  Could we get those now?
2      MR. GARTENBERG:  Absolutely.
3      MR. REGENSTREIF:  Great.  Thank you.
4      MR. GARTENBERG:  To clarify, because I
5  think it's important, in addition to the agreements
6  that I've given to the SEC here again, my question
7  is:  Are there other agreements dealing with other
8  subjects?
9      THE WITNESS:  Yeah, because I thought it
10  was irrelevant, so I didn't provide.
11      BY MR. REGENSTREIF:
12      Q    So are there agreements with Damei and
13  Overseas Chinese?
14      A    Yes.
15      Q    And those agreements are about what?
16      A    About referral patient.  It's about
17  marketing and referral patient.
18      Q    Are those post 2014?
19      A    Post 2014, yes.
20      MR. GARTENBERG:  I don't think that's
21  called for by the subpoena, but we'll be very happy,
22  if you want, you know -- give it to you.
23      MR. REGENSTREIF:  Yes, of course.  I would
24  like that.
25      MR. GARTENBERG:  And if we could at the

Page 111

1  end, either after the testimony or by e-mail,
2  whatever, if we can make sure our list matches with
3  your list so nothing is overlooked.
4      MR. REGENSTREIF:  Absolutely.  And I
5  appreciate that.  And we'll come back to these two.
6  Let's close the loop on this, and then we'll come
7  back.
8      MR. GARTENBERG:  Okay.
9      MR. REGENSTREIF:  So I'm going to ask the
10  court reporter to mark as Exhibit 9 a signature card
11  for an account at Chase 5152, and Bates-stamped
12  SEC-JPMCB-P-78 through 82.
13      (SEC Exhibit 9 was marked
14      for identification.)
15      BY MR. REGENSTREIF:
16      Q    So I've handed you Exhibit 9, Mr. Liu.
17      Is that signature yours, the first
18  signature at the top there?
19      A    Yes.
20      Q    And this Exhibit 9 is the signature card
21  for Beverly Proton's account at Chase?
22      A    Yes.
23      Q    So this is the account for the project?
24      A    Yes.
25      Q    And then the second signature underneath,

Page 112

1  it says "John Thropay."
2      Is that Dr. Thropay's signature?  Do you
3  know?
4      A    That's his signature because I handed it to
5  him.
6      Q    You handed it to him?
7      A    Yes.  But the truth is, he's no longer part
8  of this after the new board resolution.
9      Q    Once he's on the signature card in Exhibit
10  9, did he have access to the funds in the account or
11  not?
12      A    Well, I don't know what's the banking rule,
13  but I'm assuming, yes, because he had his signature.
14  But after the new board resolution, he was no longer
15  on the list.
16      Q    October 25, 2015?
17      A    Yeah.
18      Q    And so once the board resolution -- which
19  is when exactly?
20      A    January.
21      Q    January 2016?
22      A    January -- I think January 18.
23      Q    2016?
24      A    2016, yeah.
25      Q    So it would only be from October 2015 to

Page 113

1  January 2016?
2      A    Yes.
3      MR. REGENSTREIF:  So let's go off the
4  record.
5      (A brief recess was taken.)
6      MR. REGENSTREIF:  Let's go back on the
7  record.
8      We're at Exhibit 10, right?
9      DEPOSITION REPORTER:  Yes.
10      MR. REGENSTREIF:  I'm going to ask the
11  court reporter to mark a four-page document entitled,
12  "Engagement Agreement," dated January 28, 2013,
13  between L.A. County Proton Therapy and Overseas
14  Chinese Immigration Consulting.
15      (SEC Exhibit 10 was marked
16      for identification.)
17      BY MR. REGENSTREIF:
18      Q    Mr. Liu, I handed you Exhibit 10.  This is
19  the engagement agreement with Overseas Chinese
20  Immigration Consulting.
21      A    Uh-huh.
22      Q    Do you recognize Exhibit 10?
23      A    Yes.
24      Q    And on the last page of Exhibit 10, is that
25  your signature for Los Angeles County Proton Therapy?

Page 114

1    A   Yes.
2    Q   And this is the engagement agreement with
3  Overseas Chinese Immigration Consulting?
4    A   Yes.
5    Q   This is for their efforts to solicit EB-5
6  investors?
7    A   Yes.
8    Q   And then on Page 1 of Exhibit 10, paragraph
9  4, "Consultants Compensation."
10       Do you see that?
11   A   Yes.
12   Q   Are these terms accurate, "$75,000 per
13 investor who invests"?
14   A   Uh-huh.
15   Q   Is that a "yes?"
16       MR. GARTENBERG:  He needs a verbal answer.
17       THE WITNESS:  Yes.
18       BY MR. REGENSTREIF:
19   Q   And that was to be paid upon filing of the
20 I-526 petition?
21   A   Yes.
22   Q   And then No. 5, underneath that on Page 1
23 of Exhibit 10, the marketing fee.
24       So it's $800,000 per year?
25   A   Yes.

Page 115

1    Q   Plus some provision if funds don't exceed
2  $50 million; is that right?
3    A   Yeah.
4    Q   There should be a return?
5    A   Yes.
6    Q   Has there been any funds returned?
7    A   Not yet.
8    Q   Because you haven't raised $50 million yet?
9    A   Yeah, but still ongoing.
10   Q   Is there still ongoing EB-5 investors?
11   A   Yeah, because --
12       MR. GARTENBERG:  Let's make sure this is
13 clear.
14       Since about the end of November 2015 until
15 today, have you raised any EB-5 funds for this?
16       THE WITNESS:  No, because we went through a
17 structure change internally.
18       MR. GARTENBERG:  That's why I was concerned
19 when you said "ongoing."
20       MR. REGENSTREIF:  Okay.
21       THE WITNESS:  Because lawyers are working
22 on the new PPM.
23       BY MR. REGENSTREIF:
24   Q   So no one is currently soliciting EB-5
25 investors?

Page 116

1    A   We asked them to hold.
2    Q   Okay.  Now, Exhibit 10 only concerns
3  Overseas Chinese Immigration's efforts to get EB-5
4  investors; is that right?
5    A   Yes.
6    Q   This document, Exhibit 10, does not concern
7  marketing efforts that we were discussing earlier
8  with respect to the clients and patients and the
9  general promotion?
10   A   There was a separate agreement.  I didn't
11 provide it because I thought it was irrelevant.
12   Q   That's fine.
13       But Exhibit 10 does not cover that?
14   A   Yes, yes.
15   Q   And do you know if L.A. County Proton
16 Therapy has paid the marketing fee on Exhibit 10, the
17 $800,000 fee per year?
18   A   Partial.
19   Q   Partial?
20   A   Yeah.
21   Q   What does that mean?
22   A   "Partial" means we paid some, and we still
23 holding some because the numbers has not been fully
24 solicited.
25       MR. REGENSTREIF:  I'm going to ask the

Page 117

1  court reporter to mark as Exhibit 11 a document
2  titled, "Engagement Agreement," and it looks like
3  between United Damei Investment Company and Pacific
4  Proton Regional Center, Los Angeles County Proton
5  Therapy, dated August 18 and August 15, 2013.
6        (SEC Exhibit 11 was marked
7         for identification.)
8        BY MR. REGENSTREIF:
9    Q   Mr. Liu, I handed you Exhibit 11.
10       So in the second to last page of Exhibit
11 11, did you sign this?
12   A   Yes.
13   Q   And then the following page, "Yao Wenli."
14   A   Uh-huh.
15   Q   Who is Yao Wenli?
16   A   I think it's their legal representative of
17 this company in China.
18   Q   Have you spoken to Yao?
19   A   No.  Actually, I spoke a lot with the
20 executive teams.
21   Q   But not with --
22   A   Not with Ms. Yao.
23   Q   Not with Ms. Yao?
24   A   No.
25       MS. LEVIN:  Is Yao Wenli any relation to

Page 118

1  you?
2       THE WITNESS: No.
3       MS. LEVIN: Is she a friend?
4       THE WITNESS: No.
5  BY MR. REGENSTREIF:
6       Q    And so Exhibit 11 is the agreement through
7  which Damei was to solicit EB-5 investors for the
8  project?
9       A  Yes.
10      Q    And then if you turn to Page 3 of Exhibit
11  11, so paragraph 2, "Rates, fees and charges," under
12  2.1, "Fees A."
13      A  Yes.
14      Q    "500,000 shall become due and payable to
15  UDG upon signing."
16      A  Yes.
17      Q    Was $500,000 paid to Damei?
18      A  Yes.
19      Q    And then it looks like in paragraph C
20  there, it looks like there was -- $35,000 was due to
21  Damei per investor.
22      A  Uh-huh.
23      Q    Is that correct?
24      A  Yes.
25      Q    And then it also says in paragraph D that

Page 119

1  "UDG will receive $45,000 of the administrative fee."
2       A  Yes.
3       Q    So they were also paid 45,000 of the
4  administrative fee per investor?
5       A  Yes.
6       Q    So it was 35,000 plus 45,000?
7       A  That is correct.
8       Q    So it was 45,000 from the administrative
9  fee?
10      A  Yes.
11      MS. LEVIN: So then where was the 35,000
12  coming from?
13      THE WITNESS: That's from the project
14  company, not the regional center.
15      BY MR. REGENSTREIF:
16      Q    From Beverly Proton?
17      A  Yes.
18      Q    And then "E," it says "Marketing fee."
19           So that's $650,000 per year?
20      A  Yes.
21      Q    And has that been paid to Damei?
22      A  I think it's partially.
23      Q    Now, again, Exhibit 11 does not contain the
24  marketing efforts as we spoke before related to
25  clients and general promotion?

Page 120

1       A  Patient, yeah.
2       Q    It does not?
3       A  It does not.
4       Q    Did Dr. Thropay or anyone else review
5  either Exhibit 10 or Exhibit 11 before he signed it?
6       A  Did he review?  I don't think so.
7       Q    Just "yes" or "no."
8       A  No, no.
9       MR. GARTENBERG: I want to make sure that
10  you understood the question.  He said Dr. Thropay or
11  anyone else.
12      Do you know who else reviewed the
13  agreement?
14      THE WITNESS: Well, our legal counsel
15  prepared this draft for us.
16  BY MR. REGENSTREIF:
17      Q    Exhibit 11?
18      A  Yes.
19      Q    Who was your legal counsel for Exhibit 11?
20      A  Legal counsel was -- well, actually, their
21  legal counsel.
22      Q    Damei?
23      A  Damei's legal counsel.
24      And then I have our legal counsel review
25  it, so we didn't draft this.  They're more

Page 121

1  experienced than we ck do, actually.  This my
2  first time to do the EB-5.
3       MR. GARTENBERG: I think he wants to know,
4  other than lawyers and Damei, did anybody else review
5  it?
6       THE WITNESS: No.
7       BY MR. REGENSTREIF:
8       Q    Just you?
9       A  Yeah.
10      MS. LEVIN: And who was your legal counsel
11  that reviewed this Exhibit 11?
12      MR. GARTENBERG: Again, if you don't
13  remember, you don't.
14      THE WITNESS: Yeah, I don't remember this
15  one because it was a while ago.  I had multiple
16  attorneys. I don't know.
17      MS. LEVIN: And was there a board
18  resolution?
19      THE WITNESS: Yes.
20      MS. LEVIN: There is a board resolution
21  that relates to both Exhibits 10 and 11?
22      THE WITNESS: There's a board resolution
23  authorizing me to represent the company 100 percent
24  to deal with these issues.  And my partner, Dr.
25  Thropay, authorized me -- I have that document. I

Page 122

1    have that resolution.
2        BY MR. REGENSTREIF:
3    Q   And then back to Exhibit 10.
4    A   If you need it, I can provide it.
5    Q   Back to Exhibit 10, which is the agreement
6    of Overseas Chinese.
7        You were the only one on behalf of then Los
8    Angeles County Proton Therapy to review and approve
9    this Exhibit 10?
10   A   Yes.
11       MR. REGENSTREIF:  I'm going to ask the
12   court reporter to mark as Exhibit 12 a bank statement
13   for Chase Bank account, last four, 6428, through
14   October 2014, Bates-stamped SEC-JPMCB-P-187 through
15   192.
16       (SEC Exhibit 12 was marked
17        for identification.)
18       BY MR. REGENSTREIF:
19   Q   This is Exhibit 12.  Take a look.  So
20   Exhibit 12 is a bank statement.
21       It's the regional center bank account --
22   right? -- 6428?
23   A   Yes.
24   Q   So I want to ask about a couple of
25   deposits.  So on Page 1, the first one, the deposit

Page 123

1    was a $50,000 deposit on October 1st, 2014.
2        Do you see that?
3    A   That's the first page, right?
4    Q   Yeah, right at the top.
5    A   The top.  Okay.
6    Q   It says "transfer," and it's Xin Wang.
7        Is that your wife?
8    A   Yes.
9    Q   So she made a $50,000 deposit.  And then
10   carry over to the second page of Exhibit 12 at the
11   top, she made two additional deposits on October 15
12   for $45,000 and $3,500.
13   A   Yes.
14       Which page?
15   Q   The second page at the top.
16   A   Yes.
17   Q   Do you know why she was making that
18   deposit?
19   A   I think it was -- I think the original
20   center at that time did not have sufficient funds, so
21   I asked her to make a loan to the company.
22   Q   Was there a written loan document for that?
23   A   No, because she is my wife.
24   Q   But this is the regional center's business
25   account.

Page 124

1    A   Yes.
2    Q   So let's turn to Page 3 of Exhibit 12.
3    Looking at the ATM --
4        MS. LEVIN:  Let's make sure we're all on
5    the same page.
6        MR. REGENSTREIF:  Yeah.
7        THE WITNESS:  Page 3, right?
8        BY MR. REGENSTREIF:
9    Q   Yes, Page 3 or Exhibit 12 --
10   A   Yeah.  Uh-huh.
11   Q   -- is ATM credit card withdrawals.
12   A   Uh-huh.
13   Q   So the second one down on October 6th is
14   Caesars Palace for $10,400.
15   A   Uh-huh.
16   Q   What was that for?
17   A   That's for the -- you know, I had a group
18   of visitors from China, so it's for entertainment.
19   Q   And so the following ones for Caesars on
20   October 7 --
21   A   Yeah.  We stayed there a couple of days.
22   Q   -- and then the 9th?
23   A   Three days, I think.  I remember.
24   Q   Those were visitors?
25   A   Yeah.

Page 125

1    Q   Who were those visitors?
2    A   Just potential clients.
3    Q   Clients, not investors?
4    A   Potential investors and clients, both.
5    Q   How many?
6    A   Five.
7    Q   Do you remember who they were?
8    A   Do I remember --
9    Q   Who the five people were?
10   A   They are from China.
11   Q   Yeah.
12   A   They are from China.  They are not here.
13   Q   That's fine.
14       Do you know their names?
15   A   I can't remember.
16       MS. LEVIN:  Did any of those five
17   ultimately become EB-5 investors?
18       THE WITNESS:  That, I don't -- I can't
19   remember because there's other people I never met.
20   They brought friends' friends.  So in terms of names,
21   I can't remember their names.
22       BY MR. REGENSTREIF:
23   Q   And Page 4, the next page of Exhibit 12,
24   there are more electronic withdrawals.
25       Do you see that?

Page 126

1  A  Could you say it again.
2  Q  That page you're on, Page 4 of Exhibit 12,
3  there's a title that says, "Electronic Withdrawals."
4  Do you see that?
5  A  Yes.
6  Q  And then under that, there are payments --
7  at the top, there are payments to Chase credit card
8  ending in 3763, and then one for a Chase credit card
9  ending in 0571.
10  Do you see those two entries?
11  A  Yeah.  That's my credit card.
12  Q  That's your credit card?
13  A  Yeah.  I used my credit card to pay for
14  business expenses.
15  Q  And that credit card is for business
16  expenses?
17  A  Yes.
18  Q  And then also on that same page on October
19  2nd, there's a Barclaycard, U.S. credit card.  There's
20  a $5,000 withdrawal.
21  Do you see that?
22  A  That's my credit card, too.
23  Q  Is that also a business credit card?
24  A  I don't use often for business.  It's my
25  personal card, but I think I only used a few times.

Page 127

1  But most of the time I used the other one ending in
2  3763 for business purposes.
3  MR. REGENSTREIF:  I'm going to ask the
4  court reporter to mark as Exhibit 13 a bank statement
5  for a bank account from Chase, 5152, which is L.A.
6  County Proton Therapy bank account, dated January 1,
7  2015 through January 30, 2015, Bates-stamped
8  SEC-JPMCB-P 103 through 106.
9  (SEC Exhibit 13 was marked
10  for identification.)
11  BY MR. REGENSTREIF:
12  Q  Mr. Liu, I handed you Exhibit 13.  So this
13  is a statement for Chase account 5152.
14  So that is Beverly Proton's bank account --
15  A  Uh-huh.
16  Q  -- is that right?
17  A  Yes.
18  Q  So this would be the account that received
19  the loan from the EB-5 Fund?
20  A  Yes.
21  Q  So let me direct you to the second page of
22  Exhibit 13.  That second one, January 2nd, $50,025
23  withdrawal, and it's to Antonio Villaraigosa.
24  A  Yes.
25  Q  In that same description, there's the word

Page 128

1  "honorarium."
2  A  Yes.
3  Q  So is this the honorarium that was paid to
4  former mayor Villaraigosa that we discussed earlier
5  this morning?
6  A  Yes.
7  Q  And this came from the Beverly Proton
8  account?
9  A  Yes.
10  Q  And then further down on the same page of
11  Exhibit 13, on January 3rd, 2015, there's a wire
12  transfer out for $200,000, it says, "to
13  Overseas-Chinese Banking Corp., Singapore."
14  A  Yes.
15  Q  So is this Overseas Chinese Immigration
16  Consulting that we were discussing before?
17  A  Yes.
18  Q  Do you know what this $200,000 payment was
19  for?
20  A  It's for the commissions and marketing fee,
21  I think.
22  Q  The marketing fee discussed in Exhibit 10,
23  or is this the marketing fee separate in that other
24  document that we don't have?
25  A  It's for the document we talked about

Page 129

1  today.
2  Q  So then the next wire out that same day,
3  January 23rd, 2015, to Overseas-Chinese Banking Corp.
4  for 150,000, is that also for fees related to
5  successfully soliciting EB-5 investors?
6  A  Yes.
7  Q  And then again on January 27th for $225,000
8  out, it's "Overseas-Chinese Banking Corp."
9  Do you see that?
10  A  Yes.
11  Q  Is that also a brokerage fee for
12  successfully soliciting EB-5?
13  A  Yes.
14  Q  So wires of this account 5152 to
15  Overseas-Chinese Immigration is going to be these
16  fees associated with soliciting EB-5 investors?
17  A  That is correct.
18  MR. REGENSTREIF:  I'm going to ask the
19  court reporter to mark as Exhibit 14 a bank statement
20  from Chase account 6428, April 1, 2015 through April
21  30, 2015.  This is from the regional center bank
22  account, Bates-stamped SEC-JPMCB-P 377 through 384.
23  (SEC Exhibit 14 was marked
24  for identification.)
25  BY MR. REGENSTREIF:

Page 130

1    Q    Mr. Liu, I handed you Exhibit 14.
2         So this, again, is from the regional center
3    bank account; is that right?
4    A    Okay.
5         MS. LEVIN:  And just for the record, ending
6    in 428.
7         BY MR. REGENSTREIF:
8    Q    So the first page of Exhibit 14, that first
9    deposit, April 1, 2015, for $45,050, is that a
10   administrative fee from an EB-5 investor?
11   A    Yes.
12   Q    So they, the EB-5 investor, was directed to
13   wire the $45,000 administrative fee directly to the
14   regional center bank account?
15   A    That is correct.
16   Q    And, again, on Page 3 of Exhibit 14, ATM
17   withdrawals on April 8th, there's a Caesars Palace
18   charge for $1,905.
19        Do you see that?
20   A    Yes.
21   Q    And then again on April 8, there are two
22   more, one of $2,602.95 and one of $2,082.95.
23        Do you see that?
24   A    Yes.
25   Q    What was that for?

Page 131

1    A    It's the same -- it's for the trips, for
2    our visitors and the clients.
3    Q    Let's turn to Page 4 of Exhibit 4,
4    "Electronic Withdrawals."
5         You can see on April 3rd, there are a
6    number of Anthem Blue premium payments.
7         What is that?
8    A    Yes.  That's the insurance payment.
9    Q    Insurance payment for what?
10   A    For myself and also my family members.
11   Q    Now, at the bottom of the page, April 20th,
12   the second to the last entry for $1,500.
13        Do you see that?
14   A    Which page?
15   Q    The same page we're on.
16   A    The bottom one?
17   Q    Yes, Page 4 of Exhibit 14.
18        Do you see that?
19   A    Yes.
20   Q    What's "Marianapolis Preparatory School,"
21   the second to last entry on April 20th?
22   A    That's for my son's boarding school.
23   Q    It's a payment to the boarding school?
24   A    Yes.
25   Q    And then again up on that same page, Page 4

Page 132

1    of Exhibit 14, on April 14th, there are four American
2    Express payments.
3    A    Uh-huh.
4    Q    What's that?
5    A    It's for travel.  Sometimes I use American
6    Express because the company does not have American
7    Express card, so it's reimbursement of my travel
8    expenses.
9    Q    And then on April 14 on that same page,
10   there's a $15,000 charge to the Law Offices of Rachel
11   Lew, and then it says "fee."
12   A    That's for the immigration -- one of the
13   immigration lawyers.
14   Q    Immigration lawyer?
15   A    Yeah.
16   Q    And it also says "Kexin Wang."
17        Who is that?  Do you know?
18   A    One of the investors.
19        MS. LEVIN:  An EB-5 investor?
20        THE WITNESS:  Yeah.
21        MS. LEVIN:  Because before, we talked about
22   EB-5 investors and other investors, so I just want to
23   make sure.
24        THE WITNESS:  Uh-huh.
25        MR. REGENSTREIF:  I'm going to ask the

Page 133

1    court reporter to mark as Exhibit 15 a bank statement
2    from October 31, 2015 to November 30, 2015, Chase
3    account 5152 which is Beverly Proton's account, and
4    it is Bates-stamped SEC-JPMCB-P-158 through 161.
5         (SEC Exhibit 15 was marked
6          for identification.)
7         BY MR. REGENSTREIF:
8    Q    Mr. Liu, I handed you Exhibit 15 which is a
9    statement from October 31 through November 30, 2015
10   for Beverly Proton.  And so on the second page of
11   Exhibit 15, on November 2nd, at the top of the
12   "electronic withdrawals" -- do you see that?
13   A    Uh-huh.
14   Q    -- there's a $50,000 withdrawal for Xin
15   Wang.
16   A    Yeah.
17   Q    Xin Wang is your wife?
18   A    Yes.
19   Q    What was that for?
20   A    For the compensation.
21   Q    You said earlier today her compensation is
22   $200,000 a year?
23   A    Yeah.
24   Q    And it's paid in $50,000 chunks?
25   A    Yeah.

Page 134

1     MS. LEVIN:  And how is that decided?  Who
2  decided that and how is it documented?
3     THE WITNESS:  There is an employment
4  agreement to reflect this.
5     BY MR. REGENSTREIF:
6     Q   For the regional center?
7     A   Yes, for the -- oh, this is Beverly Center.
8     Q   I'm sorry.  Beverly Proton, yes.
9     A   Because she's recruited by the Beverly
10  Proton Center, as I mentioned earlier.
11     Q   So there's an employment agreement between
12  Beverly Proton and Xin Wang.
13     A   Yes.
14     Q   Do we have that?
15     MR. GARTENBERG:  You didn't ask for that, I
16  don't think.  I'll be happy to get it for you.
17     MR. REGENSTREIF:  Great.
18     BY MR. REGENSTREIF:
19     Q   And, again, let me direct you now to an
20  entry for a $250,000 wire on November 4th on that
21  same page of Exhibit 15.  And this wire is to
22  "Industrial and Commercial Bank, Central Hong Kong."
23     Do you see that?
24     A   Yes.
25     Q   The reference there, it says "broker fees."

Page 135

1     Do you see that?
2     A   Yes.
3     Q   What's that for?
4     A   That is for United Damei for the brokerage
5  fee.
6     Q   So wires to Industrial and Commercial Bank?
7     A   Yeah.  This is the bank name.  It doesn't
8  show that.  I don't know why it doesn't show the
9  company name.
10     Q   So wires to that bank are to the Damei
11  account?
12     A   Yes.
13     Q   Then on November 12, 2015, there's a $3
14  million wire to Mevion?
15     A   Yes.
16     Q   So Mevion, we discussed this morning?
17     A   Yes.
18     Q   Mevion makes proton --
19     A   Therapy equipment.
20     Q   And what is this $3 million wire for?
21     A   It's for the deposit and down payment --
22  actually, what we call "phase one payment."  We have
23  a purchase agreement to reflect that.  We'll be happy
24  to provide it.
25     Q   Sure.  And then right under that on

Page 136

1  November 13, there's a $150,000 wire to a Wells Fargo
2  account.  It says, "Beneficiary:  Xin Wang."
3     A   That's her compensation.
4     Q   That's her compensation?  That's part of
5  the salary from Beverly Proton?
6     A   Yeah.
7     Q   And then on 11/16 on that same page,
8  there's an $85,600 wire to something called --
9     A   Oh, yeah.
10     Q   -- "Size X Studio."
11     A   That's the new architects and our project
12  manager for the --
13     Q   The new site?
14     A   For the new site, for Mevion Systems.
15     Q   So we've got that.  And then on that same
16  page, November 24th, there's a $75,000 wire to Hang
17  Seng Bank.
18     Do you see that?
19     A   Same page?
20     Q   Yeah, same page.  "November 24th," three
21  from the bottom.
22     A   Yeah.  This is another brokerage firm.
23     Q   Do you know which one?  It's not Hang Seng,
24  right?
25     A   Hang Seng is a bank.  It's called Delsk.

Page 137

1     Q   Delsk.  So we didn't mention Delsk this
2  morning.
3     Who is Delsk?
4     A   Another brokerage firm.  They also provide
5  clients, you know, investors to us.
6     MR. GARTENBERG:  I'm sorry, what date was
7  that withdrawal?
8     MR. REGENSTREIF:  That's November 24th,
9  2015.
10     THE WITNESS:  That's a brokerage fee.
11     BY MR. REGENSTREIF:
12     Q   That's a brokerage fee?
13     A   Yeah.
14     MR. GARTENBERG:  May I have a minute with
15  my client?
16     MR. REGENSTREIF:  Sure.
17     Let's go off the record.
18     (Counsel conferred with the witness.)
19     MR. REGENSTREIF:  Let's go back on the
20  record.
21     BY MR. REGENSTREIF:
22     Q   So we were still looking at Exhibit 15.
23     So Hang Seng -- $75,000 was to Delsk --
24     A   Uh-huh.
25     Q   -- is that right?

Page 138

1      A   Yeah.
2          MR. GARTENBERG:  And just to add, what I've
3  learned is that there -- I've learned there is some
4  written agreement with Delsk that I was unaware of
5  before.  We'll get you a copy of that, but I've been
6  told it's in Chinese.
7          MR. REGENSTREIF:  Well, we're coming to
8  that.
9          MR. GARTENBERG:  Okay.
10         MR. REGENSTREIF:  I appreciate that.
11     BY MR. REGENSTREIF:
12     Q   And then again at the bottom of that second
13  page on Exhibit 15, that $250,000 wire to Industrial
14  and Commercial Bank, that's the account for Damei,
15  right?
16     A   Yes.
17     Q   And that would have been for -- a success
18  fee?
19     A   Yes.
20     Q   Let me also ask:  The second one there for
21  $39,500, that's for John and Maricela Thropay.
22         That's Dr. Thropay; is that right?
23     A   Yes.
24     Q   A lease fee?
25     A   Yeah, land lease fee.

Page 139

1      Q   For where the building was; is that right?
2      A   Yes.
3          MR. REGENSTREIF:  I'm going to ask the
4  court reporter to mark as Exhibit 16 a three-page
5  document, Bates-stamped PPEB5-419 through 421.
6          (SEC Exhibit 16 was marked
7          for identification.)
8      BY MR. REGENSTREIF:
9      Q   I've handed you Exhibit 16 which looks like
10  a letter to you, Mr. Liu, which is -- well, you'll
11  confirm for me, Exhibit 16, is this Mandarin?
12     A   Yeah.
13     Q   And then there's English translation under
14  it.
15         Have you seen Exhibit 16 before?
16     A   It's a letter sent to me in Chinese.
17     Q   They sent it to you in Chinese?
18     A   Yeah.  They sent it to me in Chinese.  In
19  Chinese, not English.
20     Q   So you have not seen --
21     A   This is the first time I see the English
22  one.
23     Q   But you have see the Chinese in Exhibit 16
24  before?
25     A   Yes.

Page 140

1      Q   And so can you tell me -- I don't need a
2  forensic translation here -- but to your eyes -- and
3  take your time -- is the English translation
4  contained in Exhibit 16 under the Mandarin on top
5  generally accurate?
6      A   Sorry.  I can't do.
7          You mean right away?
8      Q   No, no.  Not right away.  Let's go through
9  one at a time.
10     A   If you give me a day.
11     Q   Okay.  That's fair enough.  I don't speak
12  Mandarin, so I thought I'd take my best shot.
13     A   Sorry.  I wish I could.
14     Q   So let's go through and let me ask you some
15  questions.
16         The first full paragraph in English, it
17  says, as I read it, that "Hong Kong Delsk Business
18  Company" -- that's Delsk; is that right?
19     A   Yes.
20     Q   -- "signed an exclusive sales agency
21  agreement for the Chinese region on September 24th,
22  2014"; is that correct?
23     A   Yes.
24     Q   So they were the exclusive Chinese region
25  sales agent for L.A. County Proton Therapy project

Page 141

1  after September 24, 2014?
2      A   Yeah, but they still -- does not include --
3  we had also agreement before we signed this agreement
4  which allow the other agents we signed before to
5  continue to do fundraising for our project.
6      Q   And then the next paragraph, it says,
7  "There's a capital structure problem," and they
8  request --
9      A   That's what it says.
10     Q   So what was that?
11     A   I don't know.  I think it's bullshit.  They
12  try to accuse us because --
13     Q   So tell me what they said and why it's not
14  accurate.
15     A   Let me tell you the story, the true story.
16         MR. GARTENBERG:  But -- but -- I'm sorry.
17  Lawyers get nervous when a question is put to you and
18  you're about to tell a story.  If the story is the
19  direct answer to what he said, please answer it.  If
20  it's something else, I'd like to discuss it with you
21  first.
22         Can you answer his question?
23         THE WITNESS:  I think it's in terms of
24  knowing the truth.  I think I pretty much would like
25  to tell Tony the background information.

## Page 142

1    MR. REGENSTREIF:  You've got to ask Ed.
2    MR. GARTENBERG:  Go ahead.
3    THE WITNESS:  The owner of this company --
4    BY MR. REGENSTREIF:
5    Q   Delsk?
6    A   -- Delsk, he likes this project so much and
7  he was trying to get rid of me, take over the
8  project. And he approached my partner, Thropay, which
9  I think was very unethical.  I was very mad.  And Dr.
10 Thropay didn't even share that information with me.
11 That was after I engaged in a conversation with City
12 of Hope. So they worked together behind my back.
13    I just wanted to share that information.
14    Q   That's the background?
15    A   And they started to give me a hard time,
16 you know.
17    Q   So Exhibit 16 is part of that hard time?
18    A   Yes.
19    Q   So the capital structure --
20    A   Why he got this copy obviously is through
21 Dr. Thropay.  I'm dealing with the client and brokers
22 myself?  Dr. Thropay is not supposed to have access
23 to this kind of document.  How did he get it?  Think
24 about it.  They worked together against me.  Just
25 think about it twice.

## Page 143

1    Q   So that's basically the story of Exhibit
2  16?
3    A   They think they can bring their own clients
4  and get rid of me and work with Dr. Thropay.  That
5  was the intention.
6    MS. LEVIN:  So that was the November 3rd,
7  2015 meeting?  Who was at that meeting?
8    THE WITNESS:  November?
9    MS. LEVIN:  It's the third English
10 paragraph down on the first page of Exhibit 16.  It
11 says, "Both parties met again regarding the capital
12 structure problem of this project on November 3rd,
13 2015."
14    THE WITNESS:  Yeah.  It was we had a number
15 of meetings back and forth, you know.  Arguing back
16 and forth, each other.
17    BY MR. REGENSTREIF:
18    Q   You and --
19    A   And the Delsk representatives.
20    Q   You said the owner of Delsk likes the
21 project.
22    Who is that?
23    A   Because he's the owner of the company.
24    Q   Who is that?
25    A   Mr. Wang.  He's the owner.  He controls 100

## Page 144

1  percent of that company.  So all the employees, all
2  the representatives are working under him.  And he
3  thinks he made an offer once -- well, not verbally,
4  you know.  Just trying to say, you know, he can put
5  money in.  I can get bought out.
6    But again, what made me very angry was he
7  approached Dr. Thropay and Thropay's sister and
8  brother-in-law, and they worked together behind the
9  scene, behind my back.
10    MR. GARTENBERG:  Did you ever reach an
11 agreement with them after this letter?
12    THE WITNESS:  No, no.  And then they
13 started giving me a hard time, you know, trying to
14 dig all the problems of the project.  "Oh, you have
15 no equity."  I just give you --
16    MR. GARTENBERG:  Just answer his questions;
17 okay?
18    THE WITNESS:  But I think this is
19 important, you know.  It's important.
20    MS. LEVIN:  And what's Mr. Wong's first
21 name?
22    THE WITNESS:  J-i-n-g.
23    MR. GARTENBERG:  May I have a minute now?
24    MR. REGENSTREIF:  Yeah.  Sure.
25    Off the record.

## Page 145

1    (Counsel conferred with the witness.)
2    MR. REGENSTREIF:  Let's go back on the
3  record.
4    I'm going to ask the court reporter to mark
5  Exhibit 17.  Exhibit 17 is a bank statement dated
6  October 1, 2015 through October 30, 2015, Chase
7  account ending in 5152, Beverly Proton, LLC,
8  Bates-stamped SEC-JPMCB-P-149 through 152.
9    (SEC Exhibit 17 was marked
10    for identification.)
11    BY MR. REGENSTREIF:
12    Q   Mr. Liu, I hand you Exhibit 17.  So this is
13 the account for Beverly Proton.  I want to direct you
14 to the second page of Exhibit 17 under "Electronic
15 Withdrawals."  So, again, October 2nd, 2015, that
16 first electronic withdrawal for 450,000.
17    So that's Industrial and Commercial Bank --
18 you determined that's the broker's fees for Untied
19 Damei?
20    A   Yes.
21    Q   So that's, again, one of those fees for
22 successful EB-5 investors?
23    A   Yes, and marketing.
24    Q   And marketing.
25    Is there a list of EB-5 investors that

Page 146

```
 1   shows who United Damei solicited and who Overseas
 2   Chinese and who Delsk did?
 3       A   We don't have that.
 4       Q   You don't have that kind of list?
 5       A   No.
 6       Q   The investor list you provided to us, is
 7   there some way to determine whether they came from
 8   Damei or from Overseas or from Delsk?
 9       A   I can do homework.
10           MR. GARTENBERG:  We'll get back to you
11   about that.
12           Just to remind you, any requests for
13   documents or more information, we'll discuss it.
14           MR. REGENSTREIF:  I will always go through
15   Ed.  I'm not going to get to you and ask for this.
16   Ed knows the process.  Don't worry, but I appreciate
17   your diligence.  Let's go on here.
18           BY MR. REGENSTREIF:
19       Q   So on Exhibit 17, Page 2, on October 7,
20   2015, there is a $90,000 wire to Xin Wang.
21           Do you see that?
22       A   Yes.
23       Q   What's that for?
24       A   That's for the compensation.
25       Q   That's for the compensation?
```

Page 147

```
 1       A   With the employment.
 2       Q   Pursuant to that employment agreement?
 3       A   Uh-huh.
 4       Q   And then again on October 14, 2015, that
 5   $150,000 wire out to Hang Seng, that's the Delsk bank
 6   account?
 7       A   Yes.
 8           MR. REGENSTREIF:  I'm going to ask the
 9   court reporter to mark as Exhibit 18 a bank statement
10   from Chase, dated January 1, 2016 through January 29,
11   2016, account number, last four, 5152, Beverly Proton
12   account, SEC-JPMCB-P-176 through 179.
13           (SEC Exhibit 18 was marked
14            for identification.)
15           BY MR. REGENSTREIF:
16       Q   Mr. Liu, I've handed you Exhibit 18.  I
17   want to direct you to the second page, the exhibit,
18   the last two withdrawal entries on that page, January
19   4th for $180,000.  That's to you.
20           Do you see that?
21       A   Yeah.
22       Q   And then there's another one underneath
23   January 8th to you for $150,000.
24           What was that for?
25       A   My compensation.
```

Page 148

```
 1       Q   And then carry over to the third page of
 2   Exhibit 18, again, on January 14th, there's another
 3   $100,000 transfer to you.  And then under that on
 4   January 19th, there's a $350,000 to you.  And then on
 5   January 21st and 25th, there are two more transfers
 6   to you, one for $90,000 and one for $180,000.
 7           Do you see that?
 8       A   Yeah.  That's all part of my compensation.
 9       Q   So this $1.05 million is your compensation?
10       A   Yes.
11       Q   So typically you receive it -- you don't
12   get -- well, have you been paid since this from
13   Beverly Proton?
14       A   I think so.
15       Q   Is there any disclosure to EB-5 investors
16   about your salary?
17       A   You're not required to do that.
18           MR. GARTENBERG:  He doesn't want you to
19   argue.
20           THE WITNESS:  I'm not arguing.
21           BY MR. REGENSTREIF:
22       Q   "Yes" or "no" is fine.
23       A   Sorry.  This is my first time.  I'm not
24   used to this.
25       Q   That's okay.
```

Page 149

```
 1           MS. LEVIN:  That's okay.  But you said
 2   you're not required to do that.
 3           What is your knowledge based on?
 4           MR. GARTENBERG:  If that's based on
 5   attorney-client communication, just tell her it's
 6   based on attorney-client, but do not discuss anything
 7   further than that.
 8           THE WITNESS:  Yeah.  It's based on the -- I
 9   consulted with attorneys.
10           MS. LEVIN:  And which attorney did you
11   consult with?
12           THE WITNESS:  Michael Homier.
13           MR. GARTENBERG:  May I have a minute with
14   him because this is a delicate attorney-client -- I
15   want to make sure we're not treading on
16   attorney-client hereon.
17           MS. LEVIN:  Sure, but I'm allowed to find
18   out what attorney he talked to.
19           MR. GARTENBERG:  I'm not questioning that
20   you are.  But as soon as we trip into attorney-client
21   information from his volunteering something that I'm
22   not really sure he should -- which was really not
23   triggered by your question as much as by his
24   volunteering, I want to make sure that we don't wind
25   up with attorney-client spilling out any more than it
```

Page 150

1    has already.
2         MR. REGENSTREIF:  Okay.  Off the record.
3         (Counsel conferred with the witness.)
4         MR. REGENSTREIF:  Let's go back on the
5    record.
6         MR. GARTENBERG:  Just so I can make a
7    record, to the extent that Mr. Liu made any
8    disclosure which might be deemed by somebody else's
9    attorney-client, it certainly was not an intentional
10   waiver of attorney-client.  And I want to preserve
11   whatever rights we can with respect to
12   attorney-client, make clear that there's no
13   intentional waiver.
14        MS. LEVIN:  Okay.  And can he tell me who
15   counsel was?
16        MR. GARTENBERG:  I think he responded to
17   that already.
18        MR. REGENSTREIF:  We missed it.
19        MR. GARTENBERG:  Did the reporter get it?
20        THE COURT REPORTER:  Yes.
21        (The reporter read back the record.)
22        MR. REGENSTREIF:  What firm is he with?
23        MR. GARTENBERG:  We can give you the
24   contact information from Mr. Homier, if you need it,
25   but there's no intentional waiver of any

Page 151

1    attorney-client.
2         MR. REGENSTREIF:  But what firm he is with
3    is not privileged either.
4         MR. GARTENBERG:  If he knows the name of
5    the firm, he can give it to you.  I'm was offering to
6    go beyond what he knows.  If you'd rather go on what
7    he knows, that's fine.
8         THE WITNESS:  I can tell you it's a big
9    firm, leading firm.
10        MR. GARTENBERG:  My intention is not to
11   shut you down from information but to offer you more
12   information.
13        MR. REGENSTREIF:  Sure.
14        BY MR. REGENSTREIF:
15   **Q    So Exhibit 18, on January 29, Page 3,**
16   **there's a $50,000 wire to Greenberg Traurig.**
17   **Do you see that?**
18   A    Yeah.
19   **Q    What is that for?**
20   A    It's attorney retainer fee for the
21   construction.
22   **Q    For the construction?**
23   A    Yeah.
24   **Q    The construction related to?**
25   A    Related to the previous arrangement with

Page 152

1    another big construction company.
2    **Q    Skanska?**
3    A    Yeah.
4    **Q    That construction is not happening now?**
5    A    Yeah.  That's why we need an attorney.
6         MR. REGENSTREIF:  I'm going to ask the
7    court reporter to mark as Exhibit 19 a withdrawal
8    slip from Chase from account ending 5152, Bates-stamp
9    SEC-JPMCB-P-168, and it's dated November 26, 2015.
10        (SEC Exhibit 19 was marked
11        for identification.)
12        BY MR. REGENSTREIF:
13   **Q    Mr. Liu, I've handed you Exhibit 19.**
14   **Is that your signature on it?**
15   A    Yes.
16   **Q    And it's for $160,000, a withdrawal from**
17   **the 5152 account.**
18   A    Yes.
19   **Q    Do you know what that was for?**
20   A    I can't remember.  There's no -- we should
21   have something attached to it.  Based on this -- I
22   write checks, I make payments almost every day.  I
23   don't know, but I can easily find out.
24   **Q    But right now, you don't know?**
25   A    No.  Just based on this --

Page 153

1    **Q    Okay.  Earlier this morning, you disclosed**
2    **that you had an account at Chase.**
3    A    Yes.
4    **Q    If I said that the last four of that**
5    **account was 3076, does that sound right?**
6    A    Sounds right.
7         MS. LEVIN:  That's a personal account?
8         THE WITNESS:  Yes.
9         BY MR. REGENSTREIF:
10   **Q    Let me ask:  R. Allen Construction, what's**
11   **that?**
12   A    It's demolishing company.
13   **Q    Are they the company that demolished the**
14   **building?**
15   A    Yes.
16   **Q    Have they done any other work for you?**
17   A    They finished the construction -- the
18   demolishing work for me for the Thropay site, but
19   they're also going to be the demolishing company for
20   the site on the Beverly Hospital.
21   **Q    The Beverly Hospital site that you're --**
22   **the second option?**
23   A    Also signed agreement.
24   **Q    Now, Optivus is another company that makes**
25   **proton therapy equipment; is that right?**

Page 154

```
1        A   That was previous.  This is the one more
2   expensive.
3        MR. REGENSTREIF:  So let me ask the court
4   reporter to mark as Exhibit 20 a check dated November
5   25th, 2015 to Optivus.
6        (SEC Exhibit 20 was marked
7         for identification.)
8        BY MR. REGENSTREIF:
9        Q   I handed you a check, the check in Exhibit
10  20, for $368,099.69.  In the memo line, it says,
11  "Pre-construction services."
12       What is that?
13       A   Yes.  Yes.  We hired them as the
14  consultants on the technology side for half a million
15  dollars, the total agreement.  This is the remaining
16  payment.
17       Q   Are they still involved now that you've
18  gone with Mevion?
19       A   (Witness nods head.)  Competitors.
20       MS. LEVIN:  So the answer was "no"?  You
21  shook your head.
22       THE WITNESS:  The answer is "no."
23       MR. REGENSTREIF:  I'm going to ask the
24  court reporter to mark as Exhibit 21 a check dated
25  April 10, 2015.
```

Page 155

```
1        (SEC Exhibit 21 was marked
2         for identification.)
3        BY MR. REGENSTREIF:
4        Q   I've handed you Exhibit 21.
5        It's to Licheng Zheng; is that right?
6        A   Uh-huh.
7        Q   Who is that?
8        A   He's our independent contractor.  He's no
9   longer with us.  He was there with us for one year,
10  so this is a monthly payment to him.
11       Q   Was he based in Montebello?
12       A   Montebello.
13       Q   He was in Montebello?
14       A   Uh-huh.
15       Q   And Lance was --
16       A   Based in Orange County.
17       Q   And Lance is still an independent
18  contractor --
19       A   Yes.
20       Q   -- with the regional center?
21       A   Yes.
22       MR. REGENSTREIF:  I'm going to ask the
23  court reporter to mark as Exhibit 22 a document dated
24  December 28th, 2015, which is titled, "I-924A Annual
25  Filing Supplement to Regional Center Designation."
```

Page 156

```
1        (SEC Exhibit 22 was marked
2         for identification.)
3        BY MR. REGENSTREIF:
4        Q   I've handed you, Mr. Liu, Exhibit 22.  It's
5   a cover letter from the law firm of Seyfarth & Shaw.
6        Do you recognize Exhibit 22?
7        A   Yes.
8        Q   Can you tell me what it is?
9        A   They are our legal counsel for the regional
10  center.
11       Q   So they are handling the USCIS portion?
12       A   Yes, yes.
13       Q   So it's no longer Miller Mayer?
14       A   We're still using Miller Mayer --
15       Q   In addition to --
16       A   -- in addition.
17       Q   On Page 1 of Exhibit 22, it says that -- at
18  the bottom there it says, "For the fiscal year ended
19  September 30, 2015, the regional center reports that
20  there were $4,086,906 in capital investment."
21       Do you see that?
22       A   Yes.
23       Q   And then there was an additional -- in the
24  following period after September 30, 2015, there was
25  an additional $3,239,174 in capital investment.
```

Page 157

```
1        A   Yes.
2        Q   Can you tell me what constituted that 4
3   million fiscal year ended in September 30, 2015?
4        A   I should have a list somewhere.
5        Q   Sure.  We'll get there.  So then let's just
6   go on.
7        A   Yeah.  We paid a deposit for Mevion.
8        Q   Right, and we looked at that.
9        A   There's a list in the back.
10       Q   So Page 5 of Exhibit 22, that's your
11  signature, the signature of the applicant?
12       A   Yes.
13       Q   So did you review and approve the
14  information contained in Exhibit 22?
15       A   Yes.
16       Q   It's Part 3 of the form.  At the bottom of
17  the page, it's PPEB5-449.
18       A   Yes.
19       Q   So it says that the 4 million was
20  construction industrial building.
21       A   Uh-huh.
22       Q   Does that help?
23       A   Yes, the aggregate EB-5 capital investment.
24       Q   So what does that entail?
25       A   What's included?
```

Page 158

1   Q   Yes.
2   A   The down payment and deposit we paid to the
3   new vendor, to Mevion.
4       Q   So why don't we go to the last three pages
5   of Exhibit 22.  It's the continuation sheet.  So it
6   says at the top of the page under Parts 1 and 3, it
7   says that, "The regional center was changing its name
8   to Pacific Regional Medical Center."
9           Has that happened yet?
10  A   Yes.
11      Q   Has that happened yet?
12  A   It was changed at the state level, but
13  regional center has to be approved by USCIS.  So at
14  USCIS we have not heard from them, in terms of the
15  name.
16      Q   So it's not completely approved yet?
17  A   From USCIS, it's not.  From state
18  government, yes.
19      Q   Understood.  And then the chart at the
20  bottom of that page in Exhibit 22, it says, "Included
21  cost for job creation."
22          Do you see that?
23  A   Yes.
24      Q   So these are the descriptions of the
25  expenses.  So it says, "Construction of building,

Page 159

1   pre-construction work, hard or a soft cost."  This
2   one is listed as "soft."
3       Q   What's a "hard" or a "soft cost"?
4   A   The soft cost -- I learned that before.  I
5   didn't know that before.  Soft cost means
6   architectural, design, consulting.  Hard cost means
7   equipment, demolishing and reconstruction.
8       Q   And these are all costs -- when you're
9   saying the hard cost or a soft cost, these are all
10  particular types of cost associated with the EB-5 --
11  A   Yeah.
12      Q   -- and the jobs created thereunder?
13  A   It's a terminology used by the economist
14  and approved for USCIS.
15      Q   So those are terms that are specific to
16  EB-5 funds?
17  A   Yes.
18      Q   Got it.  So the pre-construction word
19  "soft," which is what you described before, is about
20  two-and-a-half million dollars --
21  A   Uh-huh.
22      Q   -- is that right?
23  A   Yes.
24      Q   And then, again, "consulting work by
25  equipment vendor" is also a soft cost.  It's another

Page 160

1   nearly $500,000.
2   A   Yes.
3       Q   And then the following page, the second
4   page of the continuation sheet of Exhibit 22, at the
5   top, it's "hard, $158,763."
6           Was that the demolition?
7   A   Yes.
8       Q   And then, "architectural consulting, soft,"
9   for 171,000 and change.
10  A   Yeah.
11      Q   So that's the total -- then there's the
12  total from that?
13  A   Uh-huh.
14      Q   That was for fiscal 2015?
15  A   Yes.
16      Q   And then substantially all of the funds
17  paid after fiscal year 2015 were the $3 million
18  deposit with Mevion?
19  A   Yes.
20      Q   And this 7 million plus represents the
21  money paid by Beverly Proton as part of generating
22  the jobs for the EB-5 program?
23  A   Yes.
24      Q   And that's all of the funds paid by Beverly
25  Proton as generating the jobs in fiscal 2015, and

Page 161

1   then till the date of this filing?
2   A   Yeah.  To the date of this filing, yes.
3       Q   Have there been any other funds like these,
4   represented in a form like this, "Paid out by Beverly
5   Proton," prior to fiscal 2015?
6   A   Could you elaborate?
7       Q   Yes.  So has Beverly Proton spent any money
8   on hard or soft costs or related expenses that are
9   not contained in Exhibit 22 in this list we just
10  reviewed in any other fiscal year?
11  A   Yes, because this is filed annually.
12      Q   Approximately how much?
13  A   A million.
14      MR. GARTENBERG:  I'm sorry?
15      THE WITNESS:  A-million-dollar range.
16  Think about the lease fee every month.
17      MR. REGENSTREIF:  I'm going to ask the
18  court reporter to mark as Exhibit 23 a document
19  titled, "Minutes of Annual Meeting of Members of
20  Beverly Proton Center, LLC."
21      (SEC Exhibit 23 was marked
22       for identification.)
23      BY MR. REGENSTREIF:
24      Q   I've handed you Exhibit 23.
25          Do you recognize Exhibit 23?

Page 162

1    A   Yes.
2    Q   And so what is it?
3    A   This is an annual meeting for all the
4   members of Beverly Proton Center, LLC conducted --
5   held on January 19, 2016.
6    Q   And it looks like in the minutes report,
7   that you and Xin Wang, your wife, were appointed sole
8   directors of the company; is that right?
9    A   Yes, starting from this date, that date.
10    Q   And it authorizes you as the managing
11   member to execute documents, agreements and
12   instruments?
13    A   Uh-huh.
14    Q   And you're the only one authorized to do
15   that?
16    A   Yeah, because -- yes.
17    Q   And there are no other officers at this
18   point at Beverly Proton?
19    A   No.
20        MR. REGENSTREIF:  I'm going to ask the
21   court reporter to mark as Exhibit 24 a document
22   titled, "Consent of Majority Member of Pacific Proton
23   Therapy Regional Center, LLC."
24        (SEC Exhibit 24 was marked
25          for identification.)

Page 163

1        BY MR. REGENSTREIF:
2    Q   Mr. Liu, I handed you Exhibit 24.
3        Mr. Liu, do you recognize Exhibit 24?
4    A   Yes.
5    Q   Is Exhibit 24 a consent by the regional
6   center to make you the president and treasurer and
7   chief financial officer of the regional center, and
8   your wife as secretary; is that right?
9    A   Yes.
10    Q   And the two of you are the only officers of
11   the regional center?
12    A   That is correct, starting from that date.
13    Q   Was Dr. Thropay ever an officer of the
14   regional center?
15    A   He was.  I think he had a title, but never
16   exercised it because I was also authorized to -- by
17   the books I think he was included.  But as a matter
18   of fact, he also authorized me to act 100 percent.  I
19   have that document, too.
20    Q   But starting from January 19, 2016, the
21   only two officers are you and your wife?
22    A   Yes.
23        MR. REGENSTREIF:  I'm going to ask the
24   court reporter to mark as Exhibit 25 a document
25   titled, "Pacific Proton EB-5 Fund, LLC, Proton

Page 164

1   Therapy Center Project, Supplemental Update to
2   Business Plan, February 2016."
3        (SEC Exhibit 25 was marked
4          for identification.)
5        BY MR. REGENSTREIF:
6    Q   Mr. Liu, I've handed you Exhibit 25.
7        Do you recognize it?
8    A   Yes.
9    Q   And can you tell me what it is?
10    A   It's a revised business plan.
11    Q   And did you draft the business plan?
12    A   Legal counsel, not me.
13    Q   Did you provide legal counsel with the
14   information contained in Exhibit 25?
15    A   Yes.
16    Q   And did you review Exhibit 25 --
17    A   Yes.
18    Q   -- and approve it?
19    A   Yes.
20    Q   And has Exhibit 25 been provided to any
21   investors?
22    A   There's still a few.
23        MR. GARTENBERG:  The question is --
24        THE WITNESS:  No, no, no.
25        BY MR. REGENSTREIF:

Page 165

1    Q   It has not been provided to any investors?
2    A   No.
3    Q   And is this part of the process of drafting
4   the offering memorandum No. 3?
5    A   Yes.
6    Q   And so Page 1 of Exhibit 25, "It's
7   management's position" is the last few lines of it.
8   It's Page 1, "It's management's position that" --
9        MR. GARTENBERG:  Before we get too far down
10   the road here, if this is a draft from --
11        This is a draft that your lawyers worked
12   on?
13        THE WITNESS:  Yes.
14        MR. GARTENBERG:  Sounds to me like this is
15   work product.  I don't know how the SEC has work
16   product from Pacific Proton Therapy Center.
17        Can you tell me?
18        MR. REGENSTREIF:  No.
19        MR. GARTENBERG:  Well, if it's work
20   product, I'm not going to have him answer questions
21   about work product.  However, this has gotten into
22   your hands, it's gotten into your hands without
23   authority.  And now you're on notice of it, so I'm
24   asking for it back.
25        MS. LEVIN:  Well, we don't -- you don't

Page 166

1    even know if it's work product.
2        MR. GARTENBERG:  It sounds like it.  It
3    sounds like it from the testimony.  If this is a
4    draft that counsel prepared -- let me ask him.  Let
5    me talk to him, because if it's a draft that counsel
6    prepared -- I don't know who gave you work product
7    for the EB-5 Fund.
8        MR. REGENSTREIF:  Let me ask one question,
9    not about that document.  Not about this document.
10       MR. GARTENBERG:  That's fine.
11       BY MR. REGENSTREIF:
12    Q    Did you send it to anyone, not an investor
13    and who is not represented by that lawyer?
14       MR. GARTENBERG:  That's a good question.
15    Perfect.
16       THE WITNESS:  Delsk.
17       MR. REGENSTREIF:  So I think that's waived,
18    right?
19       MR. GARTENBERG:  I need to make an inquiry,
20    but probably.
21       MR. REGENSTREIF:  Will you let him answer
22    questions about that?
23       MR. GARTENBERG:  Not until I talk to him
24    outside.
25       MR. REGENSTREIF:  So let's go off the

Page 167

1    record.
2        (Counsel conferred with the witness.)
3        MR. REGENSTREIF:  Let's go back on the
4    record.
5        MR. GARTENBERG:  Based upon the information
6    that I've now -- kindly, thanks to the SEC -- have
7    been able to inquire, it sounds to me like this was
8    intended as work product, that an attorney drafted
9    it, but that Mr. Liu took it on himself to send it to
10    Delsk as a third party.
11       And accordingly I will withdraw my
12    objection to your questioning about it and the demand
13    that it's work product and properly obtained and
14    inadvertently -- not improperly in the sense that the
15    SEC has done anything improper, but possibly
16    inadvertently obtained.
17       In any event, based on the information I
18    have, I withdraw that.  As I said on the record, I
19    assume the Staff understands, under the
20    circumstances, why I had to take the position before
21    that I did.
22       MR. REGENSTREIF:  Absolutely.
23       BY MR. REGENSTREIF:
24    Q    So now we'll ask some questions about
25    Exhibit 25.  So back to Page 1 of Exhibit 25.

Page 168

1        It says, "It's management's position that
2    updating a specific brand of equipment used or
3    updating financial projections to match the change in
4    medical pricing landscape do not constitute material
5    changes from the proton therapy center project
6    presented in May 2013."
7        So is that about the change from Optivus to
8    Mevion?
9    A    Yes.
10       MR. GARTENBERG:  May we just clarify one
11    thing?
12       At this point, this is still a draft,
13    correct?
14       THE WITNESS:  This is a draft, not final,
15    because the information needs to be filled in.
16       BY MR. REGENSTREIF:
17    Q    So it's a draft; is that right?
18    A    Yes.
19    Q    And it has not been shown to any investors
20    or potential investors?
21    A    No, because it's not final.
22    Q    But this specific language that I read on
23    Page 1 of Exhibit 25 relates from the change of
24    Optivus to Mevion?
25    A    Yes.

Page 169

1    Q    Now, regarding that, did you discuss that
2    change with Dr. Thropay?
3    A    Yes.
4    Q    And what was his reaction to that?
5    A    At the beginning -- the truth was, at the
6    beginning, he was okay.  And later he was opposed to
7    this idea.  And then he particularly opposed to the
8    management, the MOU I signed with City of Hope.
9    Q    So originally he was --
10   A    He was okay.  But later he
11   said, "No.  Don't do this.  Do something else," you
12   know.  But now the original -- he was also opposed to
13   the original vendor, which is Optivus, because the
14   price is much higher.
15   Q    That's fine.  Second page of Exhibit 25, it
16   has the sources of funds.  So I think we discussed
17   earlier this morning the offering amount has been
18   decreased to 120 million; is that right?
19   A    Yes.  We discussed this.
20   Q    So this document contains that information,
21   and that information is what we discussed this
22   morning?
23   A    Yes.
24   Q    And now the EB-5 Capital, the goal is 60
25   million raised?

Page 170

1    A   Yes.
2    Q   Now, it says here in the paragraph -- in
3  the middle of Page 2, it says, "GCS Capital," in
4  parens, "HA Company, Limited signed a memorandum of
5  understanding dated September 28, 2015" --
6    A   Uh-huh.
7    Q   -- "regarding financing of $60 million
8  towards the project."
9    A   Uh-huh.
10    Q   What is GCS Capital?
11    A   It's a private equity investment company in
12  Hong Kong.  They're interested in the equity
13  investment.
14    Q   This would be the non EB-5 portion?
15    A   Non EB-5.  And then also interested in --
16  if we sign the final agreement with City of Hope.
17    Q   So they have an MOU, but there's not an
18  agreement to fund?
19    A   Not yet.  Not yet.
20    Q   And then, "Use of Funds" on Page 2,
21  underneath it says, "Hard construction costs and soft
22  costs" -- do you see that? -- and then "equipment" on
23  Page 2?
24    A   Yeah.
25    Q   So is that hard and soft as we discussed?

Page 171

1    A   Yes.
2    Q   And so when you use the terms "hard cost"
3  and "soft cost," you mean those EB-5 terms?
4    A   Yes.
5    Q   And then at the bottom of Page 2, you say,
6  "Soft costs includes 5.8 million."
7    A   Yeah.
8    Q   And then on Page 5 of Exhibit 25, it says
9  the address has been updated from 111 West Beverly
10  Boulevard to 105 West Beverly.
11    A   Yes.
12    Q   So that 105 is the hospital land --
13    A   Yes.
14    Q   -- and not Dr. Thropay's land?
15    A   Exactly.
16    Q   Now, do you have to provide USCIS with
17  these updates?
18    A   Yes.
19    Q   You do?
20    A   Yes.
21    Q   Have you provided USCIS with this?
22    A   Yes.
23    Q   And then the last page of Exhibit 25, it
24  refers to the MOU with City of Hope.
25    A   Yeah.

Page 172

1    Q   So that MOU has been signed?
2    A   Oh, yeah.
3    Q   Is there more --
4    A   Lawyers are working on the definitive
5  agreement.
6    Q   So that's in process, but that's not
7  complete?  It's simply still a Memorandum of
8  Understanding?
9    A   Yes.
10    Q   So it's a process.
11    A   Yes.
12        MR. REGENSTREIF:  Now is a good time for a
13  break.
14        Let's go off the record.
15        (A brief recess was taken.)
16        MR. REGENSTREIF:  Let's go back on the
17  record.
18        BY MR. REGENSTREIF:
19    Q   Other than the documents I showed you
20  during this proceeding, did you review any documents
21  in preparation for your testimony today?
22    A   Did I review documents for the testimony
23  today?
24    Q   And I don't want you to tell me that you
25  talked -- anything that you talked about with your

Page 173

1  lawyer, any privileged conversations.  Just
2  documents.
3    A   Documents.
4    Q   Did you review any documents?
5    A   Yes, I reviewed.
6    Q   And were there documents that you didn't
7  review today that we reviewed?
8        MR. GARTENBERG:  Except to the extent I
9  showed you anything -- I don't want you to disclose
10  that.  Except for what I showed you when we met, did
11  you look at anything else?
12        THE WITNESS:  No.
13        MR. GARTENBERG:  On the record he has to
14  hear that.
15        Is the answer "no"?
16        THE WITNESS:  No.
17        BY MR. REGENSTREIF:
18    Q   And other than with your attorney, have you
19  spoken with anyone about this investigation?
20    A   (Witness nods head.)
21        MR. GARTENBERG:  He needs a verbal answer.
22        THE WITNESS:  No.
23        BY MR. REGENSTREIF:
24    Q   And other than with your attorney, have you
25  spoken with anyone about your appearance here today?

Page 174

1    A   No.

2    Q    And has anyone suggested to you how you

3  should --

4    MR. GARTENBERG:  He also had other counsel

5  that he spoke to.

6    When you say, "your attorney," he's

7  including not just me but --

8    MR. REGENSTREIF:  His other lawyers.

9    MR. GARTENBERG:  Right.  He had another

10  lawyer who referred him to me when he got the

11  subpoena.

12    MR. REGENSTREIF:  Okay.

13    MS. LEVIN:  And who was that lawyer?

14    MR. GARTENBERG:  I'm not sure that that's

15  really relevant who he spoke to, to refer him to me.

16    MS. LEVIN:  So was it just for --

17    MR. GARTENBERG:  The other lawyer you spoke

18  to about this investigation was simply to get the

19  name of who you should hire, and he referred you to

20  me?

21    MS. LEVIN:  Okay.  Yeah.

22    MS. LEVIN:  I just wanted to confirm it was

23  purely for referral purposes.

24    BY MR. REGENSTREIF:

25    Q    And so has anyone suggested to you how you

Page 175

1  should respond to questions asked of you today?

2    A   No.

3    MR. REGENSTREIF:  So at the moment I have

4  no further questions for you at this time.  I may,

5  however, call you again to testify in this matter.

6  And should that be necessary, we'll contact you

7  through your lawyer.

8    Do you wish to clarify anything or add

9  anything to the statements you've made here today?

10    THE WITNESS:  No.

11    MR. REGENSTREIF:  Counsel, do you wish to

12  ask any questions?

13    MR. GARTENBERG:  We reserve whatever

14  rights -- and it's never quite clear to me what those

15  rights are that we have -- to ask questions at a

16  later time.  But to the extent we have them, we

17  reserve them.

18    MR. REGENSTREIF:  And so we are off the

19  record.  Thank you.

20    (Whereupon, at 4:06 p.m., the examination

21  was concluded.)

22    * * * * *

23

24

25

Page 176

1    PROOFREADER'S CERTIFICATE

2

3  In the Matter of:  PACIFIC PROTON THERAPY

4    REGIONAL CENTER, LLC

5  Witness:    Charles C. Liu

6  File Number:    LA-04639-A

7  Date:    Wednesday, March 23, 2016

8  Location:    Los Angeles, California  90071

9

10    This is to certify that I, Donna S. Raya,

11  (the undersigned), do hereby swear and affirm that

12  the attached proceedings before the U.S. Securities

13  and Exchange Commission were held according to the

14  record and that this is the original, complete, true

15  and accurate transcript that has been compared to the

16  reporting or recording accomplished at the hearing.

17

18  _____   _____

19  (Proofreader's Name)    (Date)

20

21

22

23

24

25

# Exhibit F

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3
 4   SECURITIES AND EXCHANGE   ) Case No.
     COMMISSION,               ) 8:16-cv-00974-CJC-AGR
 5                             )
          Plaintiff,           )
 6                             )
          vs.                  )
 7                             )
     CHARLES C. LIU; XIN WANG  )
 8   a/k/a LISA WANG;          )
     PACIFIC PROTON THERAPY    )
 9   REGIONAL CENTER, LLC;     )
     PACIFIC PROTON EB-5       )
10   FUND, LLC; and BEVERLY    )
     PROTON CENTER,            )
11   LLC f/k/a LOS ANGELES     )
     COUNTY PROTON THERAPY,    )
12   LLC,                      )
                               )
13        Defendants.          )
     _____)
14
15
16
17       REMOTE VIDEOTAPED DEPOSITION OF CHARLES C. LIU
18                     VIA WEBEX
19          Wednesday, February 24, 2021
20
21
22
23
24   Reported by:
     Diane M. Bolan, CSR No. 12883
25   Job No. 210224DBO
```

1

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3
 4   SECURITIES AND EXCHANGE   ) Case No.
     COMMISSION,               ) 8:16-cv-00974-CJC-AGR
 5                             )
          Plaintiff,           )
 6                             )
          vs.                  )
 7                             )
     CHARLES C. LIU; XIN WANG  )
 8   a/k/a LISA WANG;          )
     PACIFIC PROTON THERAPY    )
 9   REGIONAL CENTER, LLC;     )
     PACIFIC PROTON EB-5       )
10   FUND, LLC; and BEVERLY    )
     PROTON CENTER,            )
11   LLC f/k/a LOS ANGELES     )
     COUNTY PROTON THERAPY,    )
12   LLC,                      )
                               )
13        Defendants.          )
     _____)
14
15
16
17          Remote videotaped deposition of CHARLES C.
18   LIU, taken on behalf of Plaintiff, via Webex, beginning
19   at 5:19 p.m. (PT) and ending at 11:46 p.m. (PT) on
20   Wednesday, February 24, 2021, before Diane M. Bolan,
21   Certified Shorthand Reporter No. 12883.
22
23
24
25
```

2

**Page 3**

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4      UNITED STATES SECURITIES AND EXCHANGE COMMISSION
        BY: GARY Y. LEUNG, ESQ.
 5          TONY REGENSTREIF, ESQ.
        444 S. Flower Street, Suite 900
 6      Los Angeles, California 90071
        (323) 965-3998
 7
 8   For Defendants:
 9      SILLS CUMMIS & GROSS P.C.
        BY: HERVE GOURAIGE, ESQ.
10      The Legal Center
        One Riverfront Plaza
11      Newark, New Jersey 07102
        (973) 643-7000
12
13   Videographer:  Tim Hunter
14
15
16
17
18
19
20
21
22
23
24
25
```

3

**Page 4**

```
 1                   I N D E X
 2   WITNESS:                    EXAMINATION
 3   CHARLES C. LIU
 4      BY MR. LEUNG                  6
 5
 6             EXHIBITS
 7   EXHIBIT                      PAGE
 8   Exhibit 115                   9
     Exhibit 116                  17
 9   Exhibit 117                  25
     Exhibit 118                  45
10   Exhibit 119                  47
     Exhibit 120                  50/57
11   Exhibit 121                  50
     Exhibit 122                  62
12   Exhibit 123                  70
     Exhibit 124                 105
13   Exhibit 104                 129
     Exhibit 126                 137
14   Exhibit 114                 143
     Exhibit 127                 150
15   Exhibit 128                 155
     Exhibit 129                 156
16   Exhibit 130                 158
     Exhibit 131                 167
17   Exhibit 35                  170
     Exhibit 132                 173
18
19
20
21   NOTE:  All exhibits were premarked by plaintiff's
     counsel.
22
23
24
25
```

4

1 as Exhibit 120?
2       Do you need the question read back for you,
3 sir?
4       **A.**  That's a true copy, yes.
5       MR. LEUNG:  Can you read back the question,
6 please, Diane.
7       (Question read.)
8       THE WITNESS:  Yes.
9       **Q.**  BY MR. LEUNG:  Defendant Wang is your spouse;
10 correct?
11      **A.**  Yes.
12      **Q.**  When were you and defendant Wang married?
13      **A.**  When what?
14      **Q.**  When were you and defendant Wang married?
15      **A.**  Oh, married.
16      **Q.**  Yes.  I think you better know the answer to
17 this question.
18      A year is good.  What year?
19      **A.**  2000...I think 2002.  2002, December 8th.  I
20 could be wrong.  If you need it, I can -- I have my
21 marriage certificate.
22      **Q.**  Was Miss Wong ever an employee of Beverly
23 Proton?
24      **A.**  I don't remember.  Please just check the
25 records.  It's all dated.  I'm not good with

65

1 remembering these things, Gary.  It not happened
2 yesterday.
3       **Q.**  I'm not asking you for a date yet, sir.  I'm
4 asking you if you remember your wife being employed by
5 the company.
6       **A.**  Yes, of course I remember.
7       **Q.**  Okay.  And what was the nature of her
8 employment?  What were her job responsibilities at
9 Beverly Proton?
10      **A.**  I think vice president, vice president in
11 marketing.
12      **Q.**  And what did she have to do as VP of
13 marketing?  What was her responsibilities when she
14 showed up for work?  What was she responsible for
15 doing --
16      **A.**  Basically she did --
17      (Interruption by the court reporter.)
18      THE WITNESS:  Okay.  She was responsible for
19 promoting the project in China, only in China.
20      **Q.**  BY MR. LEUNG:  How would she promote the
21 project in China?
22      **A.**  Attended seminars, you know, present -- you
23 know, introduce the project to clients, to potential
24 clients, attended a few functions, meetings, and also
25 meetings also working with Chinese insurance companies,

66

1 tried to bring them over to U.S., and one of them she
2 successfully completed was Xinhua Insurance Company,
3 which is one of the largest insurance companies in
4 China, and we signed an MOU because of her
5 contribution.
6       **Q.**  Do you know if you produced that Xinhua MOU
7 to the SEC as part of its pre-file investigation or in
8 this enforcement action?
9       **A.**  Before.  Before.  We provided before.  I
10 remember.
11      **Q.**  I just want to make sure I've got the
12 insurance spelling right.  One word, X-i-n-h-u-a?
13      **A.**  Yes.
14      **Q.**  Okay.  And I don't think you were...
15      Well, I'll just ask you.  Did Miss Wang have
16 any role in raising capital?
17      **A.**  No, she has no role raising capital, but she
18 was facilitating.
19      **Q.**  What do you mean by "facilitating"?
20      **A.**  Facilitating means, you know, to promote.
21      **Q.**  Promote what?
22      **A.**  Promote the project, introduce a project,
23 because she was used to be a TV hostess.  She's good at
24 Chinese, you know, Mandarin, good at presentation, good
25 at, you know, introducing the project, you know,

67

1 showing the video, showing the PPT, you know, to the
2 potential investors and the clients.  That's her
3 strength.
4       **Q.**  Okay.
5       **A.**  She was a very well-known TV hostess in China
6 before.
7       **Q.**  That must be nice.
8       Did Miss Wang ever travel to the United
9 States and meet with potential investors or investors
10 here?
11      **A.**  Never.
12      **Q.**  Never.  Not even once; right?
13      **A.**  Not even once.
14      **Q.**  Okay.  But you had a home here, though;
15 right?
16      **A.**  Yes, rented.
17      **Q.**  What's the address --
18      Rented home.
19      **A.**  No, no, no.  Leased out.  It's our home.
20 It's our home.  I'm saying just we just leased out
21 because we were not there.
22      **Q.**  Oh, you're leasing that home out to people
23 now.
24      **A.**  Yes.
25      **Q.**  Okay.  How much rent are you charging your

68

Charles Liu
2/24/2021

---

1 that doesn't go to whether or not you can instruct not
2 to answer.
3          MR. GOURAIGE:  Because I'm trying to bring
4 this deposition to a close.  We've been at it now for
5 almost seven hours and we're --
6          MR. LEUNG:  We're well under the seven-hour
7 period for examination because of the technical
8 difficulties that we've had to deal with on your end.
9 So don't tell me that we've been going long.
10          MR. GOURAIGE:  I understand.  I'm not sure
11 what the technical difficulties -- we're still having
12 echoes here.  But you can't just feel that you can ask
13 any question you want that has nothing to do with the
14 issues in litigation.  The scope of examination is
15 limited to those issues.
16          MR. LEUNG:  I have no further questions at
17 this time.  Pass the witness.
18          MR. GOURAIGE:  I have no questions for the
19 witness.
20          MR. LEUNG:  Review and sign?
21          MR. GOURAIGE:  Yes.
22          Does he have 30 days, Diane?
23          THE COURT REPORTER:  Yes, Herve, 30 days, and
24 are you ordering a copy?
25          MR. GOURAIGE:  Yes, Diane, please.

181

---

1          THE COURT REPORTER:  Okay.  Thanks so much,
2 gentlemen.
3          THE VIDEOGRAPHER:  This concludes the
4 videotaped deposition.  We're going off the record at
5 11:46 p.m.
6          (Deposition concluded at 11:46 p.m.)
7          (Signature requested.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

182

---

1                  CERTIFICATE OF WITNESS
2
3
4          I, CHARLES C. LIU, do hereby declare under
5 penalty of perjury that I have read the entire
6 foregoing transcript of my deposition testimony,
7 or the same has been read to me, and certify that
8 it is a true, correct and complete transcript of
9 my testimony given on February 24, 2021, save and
10 except for changes and/or corrections, if any, as
11 indicated by me on the attached Errata Sheet, with
12 the understanding that I offer these changes and/or
13 corrections as if still under oath.
14          _____ I have made corrections to my deposition.
15          _____ I have NOT made any changes to my deposition.
16
17 Signed: _____
         CHARLES C. LIU
18
19 Dated this _____ day of _____ of 20____.
20
   (IF REQUIRED)
21 Sworn to and Subscribed before me,
22 this_____day of_____, 20_____.
23
   Notary Public       My commission expires:_____
24
25

183

---

1                  REPORTER'S CERTIFICATE
2
3          I, DIANE M. BOLAN, Certified Shorthand
4 Reporter No. 12883, in and for the State of California,
5 do hereby certify:
6          That prior to being examined, the witness
7 named in the foregoing deposition was by me duly sworn
8 to testify the truth, the whole truth, and nothing but
9 the truth;
10          That said deposition was taken down by me
11 in shorthand at the time and place therein named and
12 thereafter reduced to typewriting under my direction,
13 and that the foregoing transcript contains a full, true
14 and verbatim record of the said deposition.
15          I further certify that I have no interest
16 in the event of the action.
17          DATED this 1st day of March, 2021.
18
19
20
21          _____
22                  DIANE M. BOLAN, CSR No. 12883
23
24
25

184

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**