GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
E-mail: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. SACV16-00974-CJC (AGRx) |
| Plaintiff, | **DECLARATION OF GARY Y. LEUNG IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT WANG'S MOTION TO DISMISS CLAIMS AGAINST HER BASED ON EXTRATERRITORIAL CONDUCT** |
| vs. | |
| CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC, | Date:      July 12, 2021<br>Time:      1:30 p.m.<br>Ctrm:      9B<br>Judge:    Hon. Cormac J. Carney |
| Defendants. | |

I, Gary Y. Leung, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney admitted to practice law by the State Bar of California and by this Court.   I am an Assistant Director with Plaintiff Securities and Exchange Commission's ("SEC") Los Angeles Regional Office. I have personal knowledge of the matters set forth below, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I submit this declaration in support of the SEC's opposition to Defendant Wang's motion to dismiss claims against her based on extraterritorial conduct.

3.      A true and accurate copy of transcript excerpts from the February 25, 2021 deposition of defendant Xin a/k/a Lisa Wang is attached hereto as Exhibit 1.

4.      A true and accurate copy of transcript excerpts from the February 22, 2021 third-party deposition of Ruth Novodor is attached hereto as Exhibit 2.

5.      A true and accurate copy of transcript excerpts from the March 5, 2021 third-party deposition of Dr. John Thropay is attached hereto as Exhibit 3.

6.      A true and accurate copy of transcript excerpts from the November 10, 2016 deposition of defendant Charles C. Liu is attached hereto as Exhibit 4.

7.      A true and correct copy of a document produced to the SEC from the corporate defendants' files by the court-appointed receiver in this matter on or about October 25, 2016, and bates-labeled SEC-GRASSMUECK-E-0000018-029 is attached hereto as Exhibit 5.

8.      A true and accurate copy of transcript excerpts from the March 23, 2016 investigative testimony of defendant Charles C. Liu is attached hereto as Exhibit 6.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of June, 2021 in Los Angeles, California.


                                  */s/ Gary Y. Leung*
                                  GARY Y. LEUNG

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On June 21, 2021, I caused to be served the document entitled **DECLARATION OF GARY Y. LEUNG IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT WANG'S MOTION TO DISMISS CLAIMS AGAINST HER BASED ON EXTRATERRITORIAL CONDUCT** on all the parties to this action addressed as stated on the attached service list:

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  June 21, 2021

*/s/ Gary Y. Leung*
Gary Y. Leung

*SEC v. Liu et al.*
**United States District Court—Central District of California**
**Case No. SACV16-00974-CJC (AGRx)**

**SERVICE LIST**

*Counsel for Defendants Charles C. Liu
and Xin Wang a/k/a Lisa Wang*:

Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

*Defendants Pacific Proton Therapy Regional Center, LLC and
Beverly Proton Center, LLC:*

(*on counsel for Charles C. Liu¸ the controlling shareholder of each*)
Hervé Gouraige, Esq. (by CM/ECF)
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Email: hgouraige@sillscummis.com

Lawrence B. Steinberg, Esq. (by CM/ECF)
Buchalter Nemer, P.C.
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Email:  LSteinberg@buchalter.com

# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                    Plaintiff,        )
6                                     ) Case No.
          vs.                         ) 8:16-cv-00974-CJC-AGR
7                                     )
     CHARLES C. LIU; XIN WANG         )
8    a/k/a LISA WANG; PACIFIC         )
     PROTON THERAPY REGIONAL          )
9    CENTER, LLC; PACIFIC PROTON      )
     EB-5 FUND, LLC; and BEVERLY      )
10   PROTON CENTER, LLC f/k/a         )
     LOS ANGELES COUNTY PROTON        )
11   THERAPY, LLC,                    )
                                      )
12                  Defendants.       )
     _____)

13

14

15

16

17     REMOTE VIDEO DEPOSITION OF XIN WANG aka LISA WANG

18                    FEBRUARY 25, 2021

19             CONDUCTED VIA VIDEOCONFERENCE

20

21

22

23

24   Reported by
     Cynthia J. Vega, RMR,
     RDR, CSR 6640, CCRR 95
25   Job No. 210225CJV

                                                            1

09:25:38   1                    FURTHER EXAMINATION

           2   BY MR. LEUNG:

           3        Q.   You had a home in Laguna Niguel; correct?

           4             Yes?

09:26:09   5        A.   You asked me at the beginning; right?

           6        Q.   Yeah.   You lived in Laguna Niguel for a time;

           7   right?

           8        A.   Yes.

           9        Q.   And before that, you lived in Irvine; right?

09:26:27  10        A.   Yes.

          11        Q.   When did you start living in Irvine?

          12        A.   It was when the child, when the school --

          13   which year was that?   This was when the child -- when

          14   the eldest one went to the -- the last year of the

09:27:55  15   eldest one -- the kindergarten was '03, '04, '05, '06,

          16   '07, I think it was '08, year '08.   I think that was

          17   the year.

          18        Q.   Okay.   So you were living in California since

          19   2008.   Your sons were attending school in California

09:28:19  20   during that period of time.   The Beverly Proton Cancer

          21   Center project site was in California.   But it's your

          22   sworn testimony that all the work you performed for

          23   Beverly Proton since 2011 only occurred overseas?

          24   Whenever you came to the United States, you just

09:28:34  25   stopped working on Beverly Proton.   Is that your sworn

                                                                    77

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Exhibit 1 Page 5

09:28:37  1    testimony?

2        A.    This question is very strange.  As to the

3    time, my child went to the kindergarten in year '08,

4    and the proton project was after that, started after

09:30:23  5    that.  Right?  It was after 0 -- year '08.  It was

6    initiated in year '11.

7            So since year '11, I have been going back and

8    forth between United States and California.  And I

9    have -- my mother was in the United States to help me

09:30:50  10   to take care of the children.  So how come that I

11   wouldn't -- I was not be able to work?

12           Right.  Many of the things can be done over

13   phone.  It's my connections that are accumulated.  It

14   was not something that I could get to know people

09:31:52  15   right away and do things right away.  Right?  It was

16   not the people that I just got acquainted.  I had used

17   many of my connections.  And many of this could be

18   coordinated over the phone.

19           And after the coordination was done, after

09:32:11  20   the communications was done, then for a period I would

21   fly to China to work for a period and then flew back.

22   I could only be done like that.  Therefore, it was a

23   very hard work.  And at the time I wasn't even paid a

24   wage.

09:33:20  25           And also previously I was asked about a

78

Exhibit 1 Page 6

09:33:24  1   question about whether I was moving back to China.  My

2   understanding is that -- the way I answer the

3   question, my understanding was that based on the -- to

4   stay in China for long term without going back to the

09:33:39  5   United States or rarely going back to the United

6   States, that based on that understanding, based on

7   that premise that my understanding was that it was

8   like in year '14.

9            However, it was only just a possibility

09:33:58  10  because I couldn't -- I cannot recall very clearly

11  because in that period I had been flying back and

12  forth, back and forth.  It just -- the only difference

13  is if I stayed mainly in China or in the United

14  States, based on the duration of stays.

09:34:19  15           It's not very clearly to remember that.  I

16  would need to -- if needed I need to look up for my

17  previous itineraries.  I do not know if I still have

18  those, the records of those itineraries.

19           Also I'm not very independent as financially,

09:39:01  20  especially not like the American, that people have a

21  very clear financial responsibilities.  And while I

22  have not had such a clear division with my husband,

23  also that was not the case.  But it doesn't mean that

24  I did not have a -- I was not capable to work.  I had

09:39:28  25  never stopped working.

79

Exhibit 1 Page 7

09:39:33   1          In this process, the taking care of a family
           2    is only part of it and also in stages.  The children
           3    were young.  There would be more when they were --
           4    gradually it became less.
09:39:52   5          And also for this project at the very
           6    beginning, the work was not as concentrated.  It was
           7    gradually -- many things were added gradually.  At the
           8    very beginning, there were many things was just a
           9    preparation to do some market research.  To do
09:40:18  10    something I will just communicate with many contact,
          11    many connections.  That's how it was done.  So that's
          12    my way of doing things.
          13          I'm not a lawyer.  I'm not a counselor.
          14    Therefore, I would not be able to put a lot of things
09:40:38  15    in documents to make all kinds of record from the very
          16    beginning.  In some sense my husband was my boss and I
          17    only report to him.  It was just because of the
          18    relationship.  It was the understanding, there was
          19    something between us.
09:41:03  20          However, many of the work I would just tell
          21    him and verbally many times.  There was no need to
          22    send something.  So it was just verbally.  And the
          23    communication had to be very good.  There was -- so
          24    not like regular employees that need to follow
09:41:27  25    procedures and send records for us for the promotion.

                                                                    80

1                    REPORTER'S CERTIFICATE

2

3            I, Cynthia J. Vega, a Certified Shorthand

4    Reporter for the State of California, do hereby

5    certify:

6            That the witness in the foregoing remote

7    deposition was by me duly sworn remotely; that the

8    remote deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported by me stenographically and

11   were transcribed through computerized transcription

12   under my direction; and the foregoing is a true and

13   correct record of the testimony and proceedings taken

14   at that time.

15           I further certify that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing proceeding and caption named or in any way

18   interested in the outcome of the cause in said

19   caption.

20           IN WITNESS WHEREOF, I have subscribed my name

21   this 2nd day of March, 2021.

22           Reading and Signing was requested.

23

24   _____

25           Cynthia J. Vega, CSR No. 6640

# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4      _____
                                       )
5      SECURITIES AND EXCHANGE        )
       COMMISSION,                     )
6                                      )
                Plaintiff,             )
7                                      )
           vs.                         )  No. SACV 16-00974-CJC
8                                      )      (AGRx)
       CHARLES C. LIU; XIN WANG        )
9      a/k/a LISA WANG, et al.,        )
                                       )
10              Defendants.            )
       _____)

11

12

13

14       REMOTE DEPOSITION OF RUTH THROPAY LOPEZ NOVODOR

15                  ZOOM VIDEOCONFERENCE

16              Monday, February 22, 2021

17                     Volume I

18

19

20

21     Reported by:
       VALERIE D. GRANILLO
22     CSR No. 11469
       Job No. 4413391

23

24

25     PAGES 1 - 189

                                              Page 1

```
 1                    Monday, February 22, 2021

 2                         9:15 a.m.

 3

 4              RUTH THROPAY LOPEZ NOVODOR,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8         MR. GOURAIGE:  Gary, do you want to note

 9    appearances before we start?

10         MR. LEUNG:  Yes, please.  You want to go ahead?

11         MR. GOURAIGE:  Yeah, I'll start.  Herve Gouraige

12    of Sills Cummis & Rose, Ms. Novodor.  I represent the

13    defendant in this case, Charles Liu, and his wife.  I'm

14    not sure I'm pronouncing her first name correctly, Xin

15    Wang or Lisa Wang.

16         THE WITNESS:  Thank you.

17         MR. LEUNG:  Good morning, Ms. Novodor.  Gary

18    Leung for plaintiff SEC.

19         THE WITNESS:  Good morning.

20         MS. GOLDSTEIN:  Good morning, Counsel.  Anya

21    Goldstein for the witness, Ruth Lopez Novodor.

22                       EXAMINATION

23    BY MR. GOURAIGE:

24      Q   Ms. Novodor, let me start with a preliminary

25    question.  Could you just state your full name for the
```

Veritext Legal Solutions
866 299-5127

Exhibit 2 Page 11

```
 1   was about it.  That's what she did.  She set those up, so,
 2   you know, I don't know more than that.
 3       Q    Did investors -- potential investors ever visit
 4   the project site at 111 West Beverly?
 5       A    The Delsk ones for sure.  If the others came, I
 6   believe, yes, Charlie would let us know somebody's coming
 7   to the site.
 8       Q    And do you recall whether Ms. Wang was present at
 9   any of these visits by potential investors at the project
10   site?
11       A    I did see her at a couple of those.
12       Q    And she was there in her capacity as somebody
13   working on marketing; is that right?
14       A    You know, they spoke Chinese.  I'm not sure what
15   she told them.  I always thought she was just doing
16   marketing.
17            MR. LEUNG:  Fair enough.  Thank you, Ms. Novodor.
18            Pass the witness.
19            MR. GOURAIGE:  Couple of questions, Ms. Novodor.
20                      FURTHER EXAMINATION
21   BY MR. GOURAIGE:
22       Q    The total number of investors, depending on which
23   version is correct, is either 50 or 58.  Let's assume it's
24   within that range, 50 or 58 investors.
25       A    Okay.
```

Page 181

1          Q     Delsk recruited 7 investors.  Do you recall how

2     many investors you saw from Delsk visiting the proposed

3     site?

4          A     No.

5          Q     Do you recall when you saw them visiting the

6     site?

7          A     After we went to Beijing, after we did the event

8     with Delsk.

9          Q     So I think you testified earlier you went to

10    Beijing around Thanksgiving of 2015; is that correct?

11         A     That wasn't when I went.

12         Q     That was what?

13         A     I didn't -- I don't believe I testified I went --

14    I went in -- at Thanksgiving to Beijing to meet with Delsk

15    corporate, not to do the big event.

16         Q     Okay.

17         A     The big event happened earlier than that, and I

18    don't remember exactly what month it was before that.

19         Q     The investors you saw looking at the site -- and

20    by the way, when we say "the site," which site are we

21    talking about?  111?

22         A     Our site.

23         Q     111?

24         A     They would show up or call from Beverly Hills,

25    because they thought it might be in Beverly Hills, and say

                                               Page  182

```
 1    they were here and they wanted to come see the land.
 2        Q    So they were Chinese investors speaking Chinese?
 3        A    Yeah, and some of them spoke English.  You know,
 4    they had -- they weren't perfect or fluent, but they were
 5    Chinese.
 6        Q    And were you invited to see them come and see the
 7    site?
 8        A    Yes, I would set it up.  I also set it up with
 9    Alice Chang at the hospital, because Charlie wanted them
10    to walk through the hospital.  But I -- you know, we
11    wanted them to see that there was a hospital next to it.
12    That's what we were doing.  I don't know what he was
13    doing.  But yeah, we had a really good working
14    relationship for a while.  And it -- if he said people are
15    coming, I dropped what I was doing, and we would give them
16    the royal treatment, of course.
17        Q    And you saw Lisa Wang present at that site visit?
18        A    I may have seen her once or twice.  That's about
19    it.  She didn't come to all of them, that's for sure.  But
20    I've see her once or twice.
21        Q    Well, once or twice at a site visit?
22        A    Yeah.
23        Q    And do you recall what time period that was?
24        A    That was early on.  That was a little earlier
25    before we went to the event with Delsk.  It was earlier.
```

Page 183

```
 1     That's my recollection.  And let me tell you, I'm doing
 2     what I can at this point.
 3         Q    What month?  What year?
 4         A    I don't know.
 5         Q    Okay.  They were speaking Chinese?
 6         A    Yes.
 7         Q    So you didn't understand what they were talking
 8     about?
 9         A    Only if we had a little English, but mostly
10     somebody had to translate.
11         Q    Who was translating for you?
12         A    You know, Charles.  Sometimes they would just
13     talk, and he'd fill me in later.  But I relied on Charles
14     if he was there.
15         Q    You're not sure whether Charles was there?
16         A    Charles was there most of the time.  He wanted to
17     personally show them around, go meet the hospital, look at
18     his nice office up in the other building.  And, you know,
19     he gave them the royal treatment.
20              MS. GOLDSTEIN:  I think there might be some
21     confusion, because Ms. Lopez Novodor has testified that
22     there were multiple site visits, and sometimes you are
23     saying "at the site visit" like there was just one time.
24              THE WITNESS:  Yeah, there were multiple.
25     BY MR. GOURAIGE:
```

Page 184

```
 1      Q     How many site visits were there at which you
 2   personally were present, Ms. Novodor?
 3      A     I can't count them.  I want to say maybe ten.
 4      Q     And was Charles Liu present at all of them?
 5      A     I can't tell you.  Sometimes he would tell us to
 6   walk them through, and they had enough English speaking
 7   that they could go through.
 8      Q     And how many times did you see his wife, Lisa
 9   Wang, present at those site visits?
10      A     I only saw -- I only remember two right now that
11   I can remember.
12      Q     And you don't remember the time period of those
13   visits?
14      A     They were before we went to Beijing.  From her
15   when she was present?
16      Q     Yes.
17      A     It was before we went to Beijing and had the big
18   party.  Before Villaraigosa, remember him?
19      Q     Yes.
20      A     Before that.  And then after that people were
21   coming to see the land and the building demolished, and
22   they were upset because the building was still up.
23      Q     Well, you took the words out of my mouth.  I was
24   going to ask you that question.  You demolished a building
25   during the summer of 2015.  So did you see her there
```

Page 185

```
 1                    I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby

 3    certify:

 4                    That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that any witnesses in the foregoing proceedings,

 7    prior to testifying, were administered an oath; that

 8    a record of the proceedings was made by me using

 9    machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12                    Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16                    I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19                    IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: March 3, 2021

23                              Valerie D. Granillo

24                              VALERIE D. GRANILLO

25                              CSR No. 11469
```

Page 189

# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    _____
                                    )
5    SECURITIES AND EXCHANGE        )
     COMMISSION,                     )
6                                    )
            Plaintiff,               )
7                                    )
        vs.                          )  No. SACV 16-00974-CJC
8                                    )       (AGRx)
     CHARLES C. LIU; XIN WANG        )
9    a/k/a LISA WANG, et al.,        )
                                     )
10          Defendants.              )
     _____)

11

12

13

14         REMOTE DEPOSITION OF JOHN THROPAY, M.D.

15               ZOOM VIDEOCONFERENCE

16              Friday, March 5, 2021

17                    Volume I

18

19

20

21   Reported by:
     VALERIE D. GRANILLO

22   CSR No. 11469
     Job No. 4413389

23

24

25   PAGES 1 - 144

                                              Page 1

Exhibit 3 Page 18

```
 1                    Friday, March 5, 2021

 2                       9:00 a.m.

 3

 4                  JOHN THROPAY, M.D.,

 5   having been administered an oath, was examined and

 6   testified as follows:

 7

 8        MR. GOURAIGE:  Dr. Thropay, my name is Herve

 9   Gouraige.  I'm an attorney for Charles Liu and Lisa Wang

10   in this SEC enforcement act.

11        MR. LEUNG:  Gary Leung for plaintiff.

12        MS. WHITE:  Molly White for the witness, Dr. John

13   Thropay.

14                     EXAMINATION

15   BY MR. GOURAIGE:

16     Q   Dr. Thropay, have you had experience in having

17   your deposition taken before?

18     A   Yes.

19     Q   So I'm sure you're familiar with some ground

20   rules.  But because of our current pandemic -- and I

21   appreciate that both you and your attorney are wearing

22   face masks -- I'm going to ask you to speak up a bit so

23   both I and the court reporter can hear you when you answer

24   the question.  Okay?

25     A   Uh-huh.
```

```
 1   briefly.  And then after that, I believe she was on every

 2   trip except the last one with Delsk.

 3       Q    Did you ever have meetings with her and Charles

 4   in the U.S.?

 5       A    I think once she came to the office.  Might have

 6   been more times, but at least once she came to the

 7   corporate office, if I recall correctly.

 8       Q    Which corporate office?

 9       A    200 East Beverly Boulevard.

10       Q    And whose corporate office was that?

11       A    Beverly Oncology.

12       Q    And why did she come to the office?

13            MS. WHITE:  Objection; lacks foundation.  If you

14   know.

15            THE WITNESS:  Just accompanying her husband and

16   to talk about the project.

17   BY MR. GOURAIGE:

18       Q    And she sat in on a meeting with you and Charles

19   and Ruth?

20       A    Yes, as far as I can recall one time.

21       Q    And was the meeting conducted in English?

22       A    Yes.

23       Q    Did she speak any -- at all during the meeting?

24       A    A little.

25       Q    In Chinese?
```

Exhibit 3 Page 20

```
 1   your companies?

 2            MR. GOURAIGE:  Objection.

 3            THE WITNESS:  Of course not.

 4            MR. GOURAIGE:  Pure speculation.

 5            THE WITNESS:  No.  I would have -- in fact, that

 6   was my question to Ruth.  He has all the money.

 7   BY MR. LEUNG:

 8       Q    Mr. Liu asked you and your sister for that

 9   pledge; is that correct?

10       A    Correct.

11       Q    Do you recall what he communicated to you with

12   respect to why he wanted that pledge from your medical

13   practice?

14       A    He said it was requested by the clients and that

15   it was a pure formality.

16       Q    Do you recall that around summer of 2015, your

17   existing office building on your 111 West Beverly property

18   was demolished?  Do you recall that?

19       A    Yes.

20       Q    Did Mr. Liu, before that demolition work had

21   occurred, before that construction work had occurred, did

22   he pressure you to commence that work?

23            MR. GOURAIGE:  Objection to the word "pressure."

24            THE WITNESS:  He was screaming at us on the

25   phone.
```

Page 117

1  BY MR. LEUNG:

2      Q    What was he saying?

3      A    He said that the people were passing by the

4  property, and I guess he found out that the Delsk people

5  were looking at it.  And he said he had to prove that the

6  project was moving ahead.  And I said yeah, I want it to

7  move ahead, and I'll do everything I can to help it move

8  ahead.  And I didn't want to demolish it because we were

9  losing so much money.  We couldn't -- we were already

10  scraping up money to make the mortgage payment, because

11  the rents were inadequate, because we couldn't fill it

12  with anybody.  I said without it, then we have to pay the

13  whole thing, which we're still doing.  But I said if this

14  will promote the project, I'll make the sacrifice.  And he

15  was really saying, "You gotta do it fast, because they're

16  calling me, and they're pressuring me to see some

17  progress."  And I said, "Well, if it's going to progress,

18  I'll do everything I can."

19      Q    And the "they" you're referring to -- or the

20  "they" that Mr. Liu was referring to were investors and

21  potential investors?

22      A    Correct.

23      Q    If you could refer to your Marked Exhibits folder

24  on the Egnyte page and open up for me Exhibit 101, please.

25          And for the record, I've directed the witness's

Page 118

```
 1                    I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby

 3    certify:

 4                    That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that any witnesses in the foregoing proceedings,

 7    prior to testifying, were administered an oath; that

 8    a record of the proceedings was made by me using

 9    machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12                    Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [X] was [ ] was not requested.

16                    I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19                    IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21    Dated: March 17, 2021

22

23                    Valerie D. Granillo

24                    VALERIE D. GRANILLO

25                    CSR No. 11469
```

Page 144

# EXHIBIT 4

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   SOUTHERN DIVISION

4    - - - - - - - - - - - - - - - -

5    SECURITIES AND EXCHANGE          )

6    COMMISSION,                      )

7            Plaintiff,       ) CASE NO.

8    V.                       ) 8:16-cv-00974-CJC-AGR

9    CHARLES C. LIU; XIN WANG a/k/a   )

10   LISA WANG; PACIFIC PROTON        )

11   THERAPY REGIONAL CENTER, LLC;    )

12   PACIFIC PROTON EB-5 FUND, LLC;   )

13   and BEVERLY PROTON CENTER, LLC   )

14   f/k/a/ LOS ANGELES COUNTY        )

15   PROTON THERAPY, LLC,             )

16          Defendants.              )

17   - - - - - - - - - - - - - - - -

18        VIDEOTAPED DEPOSITION OF CHARLES C. LIU

19             THURSDAY, NOVEMBER 10, 2016

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22             BY:  GRACE CHUNG, CSR NO. 6246, RMR, CRR

23                      160 SPEAR STREET, SUITE 300

24              SAN FRANCISCO, CALIFORNIA 94105

25                      (415) 597-5600

1     Q.   Do you have any copies of the investor

2     list in your possession, custody, or control?

3     A.   No.

4     Q.   Have you ever destroyed any copies of the

5     investor list?

6     A.   Never.

7     Q.   Did the corporate defendants keep and

8     maintain a list of investors that had been

9     solicited for investments in the Pacific Proton

10    EB-5 Fund, whether or not they actually invested?

11    A.   Say it again.  I'm sorry.

12    Q.   Did the corporate defendants maintain a

13    list of solicited individuals, so people that have

14    been solicited for investment, whether or not they

15    actually invested?

16    A.   We only have the list of investors who

17    have invested into our project.

18    Q.   Did the corporate defendants keep records

19    of the marketing materials that it provided to

20    investors and potential investors?

21    A.   Yes.

22    Q.   What kinds of marketing materials did the

23    corporate defendants use?

24    A.   Brochure.

25    Q.   I'm sorry?

1        A.   Website.  Catalog, brochure, and website.

2        Q.   The catalog, how many different versions

3   were there of that?

4        A.   Quite a few, because we had different

5   versions at a different time.  We updated, you

6   know, from time to time.

7        Q.   What was the content of those updates?

8   How was the catalog changed over time?

9        A.   Well, for example, we -- you know, we used

10  Optivus as our vendor.  Initially, our plan -- our

11  original plan is to purchase Optivus proton system

12  to be installed for our center, and later we

13  changed to Mevion.  So after we sign an agreement

14  with Mevion, we printed out a new brochure, a new

15  catalog and was new -- different picture.

16       Q.   Who was responsible for the contents of

17  that catalog?

18       A.   I was responsible as -- you know, for the

19  regional center.

20       Q.   How many pages, roughly, was -- were those

21  categories?

22       A.   Actually, we gave a copy, a hard copy, to

23  SEC.  Actually, more than one copy to SEC before.

24  So in terms of pages, 15, 16, roughly.

25       Q.   And you had final approval over these

1    Q.   And you had final approval over their

2    contents.  I'm referring to brochures.  Is that

3    correct?

4    A.   That is correct.

5    Q.   And those brochures were provided to

6    investors and potential investors in the Pacific

7    Proton EB-5 Fund; is that right?

8    A.   That is right.

9    Q.   Where were the corporate defendants'

10   records of those brochures kept?

11   A.   At the office.

12   Q.   Do you have any copies of the brochures in

13   your possession, custody, or control?

14   A.   No.

15   Q.   Do you have any electronic copies of those

16   brochures in your possession, custody, or control?

17   A.   I don't remember.  I may have some PDF

18   copies.

19   Q.   And you may have PDF copies of the catalog

20   as well; is that right?

21   A.   Yeah.

22   Q.   The website, did the corporate defendants

23   engage an outside vendor to publish their website?

24   A.   Yes.

25   Q.   Who did the corporate defendants work

1    with?

2        A.   I can't remember which provider.  It was

3    called Kelly.com?  I -- I can't remember.

4        Q.   What was the URL address for the website?

5        A.   We had -- we had PPTUS.com from day one.

6        Q.   Any other Web addresses?

7        A.   No, that's the only Web address we had

8    from the beginning of this project.

9        Q.   And were you responsible for the content

10   of the Web pages published at PPT -- PPTUS.com?

11       A.   That is correct.

12       Q.   You had final approval over that content;

13   is that right?

14       A.   Yes.

15       Q.   Did the corporate defendants maintain

16   records of its interaction with the web vendor,

17   drafts of the website materials?

18       A.   Sorry?  Would you repeat?

19       Q.   Were there any corporate books and records

20   that were generated in the course of retaining

21   somebody to publish your website and getting that

22   website on the Web?

23       A.   I think so.

24       Q.   What kinds of records were kept?

25       A.   Some visual images, description of the --

```
 1     STATE OF CALIFORNIA        )

 2                                ) ss.

 3     COUNTY OF LOS ANGELES      )

 4          I hereby certify that the witness in the

 5     foregoing deposition, CHARLES C. LIU, was by me duly

 6     sworn to testify to the truth, the whole truth and

 7     nothing but the truth, in the within-entitled cause;

 8     that said deposition was taken at the time and place

 9     herein named; and that the deposition is a true record

10     of the witness's testimony as reported by me, a duly

11     certified shorthand reporter and a disinterested

12     person, and was thereafter transcribed into typewriting

13     by computer.

14          I further certify that I am not interested in

15     the outcome of the said action, nor connected with nor

16     related to any of the parties in said action, nor to

17     their respective counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19     hand this 16th day of November, 2016.

20     Reading and Signing was:

21     _X_ requested   ___ waived   ___ not requested

22

23

24     _____

25          GRACE CHUNG, CSR NO. 6246
```

# EXHIBIT 5



Kell Web Solutions, Inc. (KWS)

Pacific Proton Therapy Regional Center (PPT)

Web Site & Hosting Terms and Conditions

1. Authorization.

Pacific Proton Therapy Regional Center (PPT) has engaged Kell Web Solutions, Inc. (KWS), as an independent contractor for the specific web design project of developing and maintaining the domain www.pptus.com, hereinafter referred to as "web design project" which is hosted on the client's account on KWS' dedicated server managed by the hosting company Liquid Web, hereinafter refer to as "Hosting Service". If required to perform services the client hereby authorizes KWS to access this account and authorizes KWS with "full access" to the client's account and any other programs needed for this web design project that are included as part of the client's service agreement/level.

2. Acceptable Use.

An acceptable use policy is part of these terms and conditions of hosting any information associated with the domain name. This is necessary because the proliferation of abusive electronic mail and practices generated by a minority of the Internet users can interrupt services. The exhibit with the description of the acceptable use policy is posted on our website and the exhibit is part of these terms and conditions.

3. Copyright and Trademarks.

PPT unconditionally guarantees that any elements of text, graphics, photos, designs, trademarks, or other artwork furnished to KWS for inclusion in the web design project are owned by the client, or that the client has permission from the rightful owner to use each of these elements, and will hold harmless, protect and defend KWS from any claim or suit arising from the use of such elements furnished by the client.

4. Web Site Maintenance.

This agreement allows for minor web site maintenance to pages over a 1-month period, up to an average of one half hour per regular web site, including updating lines and making minor changes to a

Exhibit 5 Page 30

SEC-GRASSMUECK-E-0000018

sentence or paragraph. It does not include updating or replacing nearly all the text from a page with new text, major page reconstruction, new pages, guest books, discussion webs, and navigation structure changes, attempted updates by client repairs or web design projects delivered to the client via diskette. The period of 1 month begins on the date the PPT web design site has been published to client's hosting service and ended on 10/5/12. If the client's web design package includes database access using Server Side Script, then very minor page code changes will be accepted under this maintenance plan. Thereafter, web maintenance requested by PPT and completed by KWS will be charged at the hourly rate of $85/hour.

5. Completion Date.

KWS and the client must work together to complete the web design project in a timely manner. We agree to work expeditiously to complete the web design project no later than 45 days after the client has submitted all necessary materials. If the client does not supply KWS with complete text and graphic content for this web design project within 60 days of the date this agreement was signed, the entire amount of the agreement becomes due and payable. If the client still has not submitted all the required contents within 90 days after signing this agreement, an additional continuation fee of 15% of the total agreement price can be assessed for each month until the web design project is published or the client cancels the web design project in writing.

6. Project Delivery.

The web site design project delivery shall be completed upon receipt of the payment associated with delivery. Delivery may be accomplished by publishing, electronic transfer, or physical media. The client understands that KWS may not be providing any hosting services in connection with this web design project. Hosting services may require a separate contract. The client will be solely responsible for all hosting service charges. The client assumes all responsibility for the use and functionality of the web design project.

7. Web Design Project Copyright.

Original web site content specifically requested by the customer and designed under work for hire shall be the intellectual property of PPT once final payment under this agreement and any additional charges incurred have been paid. Rights to clipart, photos, graphics, source code, work-up files and computer programs that are not specifically requested and designed under work for hire are not transferred to the client, and remain the property of their respective owners. KWS retains the right to display graphics and other web design elements as examples of their work in the Partner's Gallery.

Exhibit 5 Page 31

SEC-GRASSMUECK-E-0000019

8. Payments.

Payments must be made promptly by credit card based on the agreed schedule. Delinquent bills may be assessed a $15 charge if payment is not received within 10 days of the due date. If an amount remains delinquent 30 days after its due date, an additional 5% penalty may be added for each month of delinquency. KWS reserves the right to remove any web design project from viewing on the Internet until final payment is made. In case collection proves necessary, the client agrees to pay all fees incurred by that process. This agreement becomes effective only when signed by an authorized representative KWS. Regardless of the place of signing of this agreement, the client agrees that for purposes of venue, this agreement was entered into in San Bernardino, CA and any dispute will be arbitrated in San Bernardino. Please pay on time. All payments will be made in US $ funds unless agreed upon in writing by both parties.

9. Legal Notice.

KWS does not warrant that the functions contained in the web design project will be uninterrupted or error-free. The entire risk as to the quality and performance of the web design project is with the client. In no event will KWS be liable to the client or any third party for any damages, including, but not limited to service interruptions caused by Acts of God or any other circumstances beyond our control, any lost profits, lost savings or other incidental, consequential or special damages arising out of the operation of or inability to operate this web design project, failure of any service provider, of any telecommunications carrier, of the Internet backbone, of any Internet servers, your or site visitor's computer or Internet software, even if KWS has been advised of the possibility of such damages.

10. This Agreement.

This agreement constitutes the sole agreement between KWS and the client regarding this web design project. Any additional work not specified in this contract must be authorized by a written request. All prices specified in this contract will be honored for 3 months from date offered. Acknowledgement of agreement after that time will require a review of current pricing and new agreement. This agreement supersedes any prior written or oral agreements between the parties.

11. Amendment.

This agreement may be modified or amended if the amendment is made in writing and is signed by both parties.

12. Severability.

Exhibit 5 Page 32

SEC-GRASSMUECK-E-0000020

If any provision of this agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed written, construed, and enforced as so limited.

15. Waiver of Contractual Right.

The failure of either party to enforce any provision of this agreement shall not be construed as a waiver of limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this agreement.

16. Governing Law.

This agreement shall be governed by and interpreted and enforced in accordance with the laws of the Sate if California and the Federal Laws of the United States of America applicable therein without reference to rules governing choice of laws. Any action relating to this agreement must be brought in San Bernardino CA and you irrevocably consent to the jurisdiction of such courts.

17. Notices.

Any notice, direction or other communication given under this Agreement shall be in writing and given by sending it via e-mail or via regular mail. In the case of e-mail, valid notice shall only have been deemed to have been given when an electronic confirmation of delivery has been obtained by the sender, in the case of notice to us to Gregg.kell@gmail.com or authorized representative, in the case of notice to you, at the e-mail address provided by you in this agreement, in your WHOIS record for the website domain name or as updated from time to time. Mail shall be sent to KWS, PO Box 1946 Lake Arrowhead, CA and to you at the mailing address provided in this agreement or as updated in writing. Any e-mail communication shall be deemed to have been validly and effectively given on the date of such communication, if such date is a business day and such delivery was made prior to 4:00 p.m. Pacific Standard Time and otherwise on the next business day. Any communication sent via regular mail shall be deemed to have been validly and effectively given 5 business days after the date of mailing.

Company:

KWS

PO Box 1946

Lake Arrowhead, CA 92352

Exhibit 5 Page 33

SEC-GRASSMUECK-E-0000021

If any provision of this agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed written, construed, and enforced as so limited.

## 15. Waiver of Contractual Right.

The failure of either party to enforce any provision of this agreement shall not be construed as a waiver of limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this agreement.

## 16. Governing Law.

This agreement shall be governed by and interpreted and enforced in accordance with the laws of the Sate if California and the Federal Laws of the United States of America applicable therein without reference to rules governing choice of laws. Any action relating to this agreement must be brought in San Bernardino CA and you irrevocably consent to the jurisdiction of such courts.

## 17. Notices.

Any notice, direction or other communication given under this Agreement shall be in writing and given by sending it via e-mail or via regular mail. In the case of e-mail, valid notice shall only have been deemed to have been given when an electronic confirmation of delivery has been obtained by the sender, in the case of notice to us to Gregg.kell@gmail.com or authorized representative, in the case of notice to you, at the e-mail address provided by you in this agreement, in your WHOIS record for the website domain name or as updated from time to time. Mail shall be sent to KWS, PO Box 1946 Lake Arrowhead, CA and to you at the mailing address provided in this agreement or as updated in writing. Any e-mail communication shall be deemed to have been validly and effectively given on the date of such communication, if such date is a business day and such delivery was made prior to 4:00 p.m. Pacific Standard Time and otherwise on the next business day. Any communication sent via regular mail shall be deemed to have been validly and effectively given 5 business days after the date of mailing.

Company:

KWS    *Gregg Kell President*

PO Box 1946

Lake Arrowhead, CA 92352

Exhibit 5 Page 34

SEC-GRASSMUECK-E-0000022



# Mobile App Proposal

## - *Mobile App Pro* -

### *October 16, 2012*

*Direct Contact*

# 1-909-744-8985

*Email*

# Gregg.Kell@gmail.com

**Mobile App Pro** Proposal 2012

Exhibit 5 Page 35

SEC-GRASSMUECK-E-0000023

# TABLE OF CONTENTS

01.   PPT

02.   Introduction

03.   Project Overview & Objectives

04.   Mobile Website / Mobile Applications Development Strategies

05.   QR Codes

06.   Analytics

07.   Secure Hosting

08.   Maintenance

09.   Client Tasks

10.   Monthly Fees

11.   Billing Schedule

12.   Terms and Conditions

**Mobile App Pro** Proposal 2012

Exhibit 5 Page 36

SEC-GRASSMUECK-E-0000024



Kell Web Solutions, Inc. (KWS)

Pacific Proton Therapy Regional Center (PPT)

Web Site & Hosting Terms and Conditions

1. Authorization.

Pacific Proton Therapy Regional Center (PPT) has engaged Kell Web Solutions, Inc. (KWS), as an independent contractor for the specific web design project of developing and maintaining the domain www.pptus.com, hereinafter referred to as "web design project" which is hosted on the client's account on KWS' dedicated server managed by the hosting company Liquid Web, hereinafter refer to as "Hosting Service". If required to perform services the client hereby authorizes KWS to access this account and authorizes KWS with "full access" to the client's account and any other programs needed for this web design project that are included as part of the client's service agreement/level.

2. Acceptable Use.

An acceptable use policy is part of these terms and conditions of hosting any information associated with the domain name. This is necessary because the proliferation of abusive electronic mail and practices generated by a minority of the Internet users can interrupt services. The exhibit with the description of the acceptable use policy is posted on our website and the exhibit is part of these terms and conditions.

3. Copyright and Trademarks.

PPT unconditionally guarantees that any elements of text, graphics, photos, designs, trademarks, or other artwork furnished to KWS for inclusion in the web design project are owned by the client, or that the client has permission from the rightful owner to use each of these elements, and will hold harmless, protect and defend KWS from any claim or suit arising from the use of such elements furnished by the client.

4. Web Site Maintenance.

This agreement allows for minor web site maintenance to pages over a 1-month period, up to an average of one half hour per regular web site, including updating lines and making minor changes to a

Exhibit 5 Page 37

SEC-GRASSMUECK-E-0000025

sentence or paragraph. It does not include updating or replacing nearly all the text from a page with new text, major page reconstruction, new pages, guest books, discussion webs, and navigation structure changes, attempted updates by client repairs or web design projects delivered to the client via diskette. The period of 1 month begins on the date the PPT web design site has been published to client's hosting service and ended on 10/5/12. If the client's web design package includes database access using Server Side Script, then very minor page code changes will be accepted under this maintenance plan. Thereafter, web maintenance requested by PPT and completed by KWS will be charged at the hourly rate of $85/hour.

## 5. Completion Date.

KWS and the client must work together to complete the web design project in a timely manner. We agree to work expeditiously to complete the web design project no later than 45 days after the client has submitted all necessary materials. If the client does not supply KWS with complete text and graphic content for this web design project within 60 days of the date this agreement was signed, the entire amount of the agreement becomes due and payable. If the client still has not submitted all the required contents within 90 days after signing this agreement, an additional continuation fee of 15% of the total agreement price can be assessed for each month until the web design project is published or the client cancels the web design project in writing.

## 6. Project Delivery.

The web site design project delivery shall be completed upon receipt of the payment associated with delivery. Delivery may be accomplished by publishing, electronic transfer, or physical media. The client understands that KWS may not be providing any hosting services in connection with this web design project. Hosting services may require a separate contract. The client will be solely responsible for all hosting service charges. The client assumes all responsibility for the use and functionality of the web design project.

## 7. Web Design Project Copyright.

Original web site content specifically requested by the customer and designed under work for hire shall be the intellectual property of PPT once final payment under this agreement and any additional charges incurred have been paid. Rights to clipart, photos, graphics, source code, work-up files and computer programs that are not specifically requested and designed under work for hire are not transferred to the client, and remain the property of their respective owners. KWS retains the right to display graphics and other web design elements as examples of their work in the Partner's Gallery.

Exhibit 5 Page 38

SEC-GRASSMUECK-E-0000026

8. Payments.

Payments must be made promptly by credit card based on the agreed schedule. Delinquent bills may be assessed a $15 charge if payment is not received within 10 days of the due date. If an amount remains delinquent 30 days after its due date, an additional 5% penalty may be added for each month of delinquency. KWS reserves the right to remove any web design project from viewing on the Internet until final payment is made. In case collection proves necessary, the client agrees to pay all fees incurred by that process. This agreement becomes effective only when signed by an authorized representative KWS. Regardless of the place of signing of this agreement, the client agrees that for purposes of venue, this agreement was entered into in San Bernardino, CA and any dispute will be arbitrated in San Bernardino. Please pay on time. All payments will be made in US $ funds unless agreed upon in writing by both parties.

9. Legal Notice.

KWS does not warrant that the functions contained in the web design project will be uninterrupted or error-free. The entire risk as to the quality and performance of the web design project is with the client. In no event will KWS be liable to the client or any third party for any damages, including, but not limited to service interruptions caused by Acts of God or any other circumstances beyond our control, any lost profits, lost savings or other incidental, consequential or special damages arising out of the operation of or inability to operate this web design project, failure of any service provider, of any telecommunications carrier, of the Internet backbone, of any Internet servers, your or site visitor's computer or Internet software, even if KWS has been advised of the possibility of such damages.

10. This Agreement.

This agreement constitutes the sole agreement between KWS and the client regarding this web design project. Any additional work not specified in this contract must be authorized by a written request. All prices specified in this contract will be honored for 3 months from date offered. Acknowledgement of agreement after that time will require a review of current pricing and new agreement. This agreement supersedes any prior written or oral agreements between the parties.

11. Amendment.

This agreement may be modified or amended if the amendment is made in writing and is signed by both parties.

12. Severability.

Exhibit 5 Page 39

SEC-GRASSMUECK-E-0000027

If any provision of this agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed written, construed, and enforced as so limited.

15. Waiver of Contractual Right.

The failure of either party to enforce any provision of this agreement shall not be construed as a waiver of limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this agreement.

16. Governing Law.

This agreement shall be governed by and interpreted and enforced in accordance with the laws of the Sate if California and the Federal Laws of the United States of America applicable therein without reference to rules governing choice of laws. Any action relating to this agreement must be brought in San Bernardino CA and you irrevocably consent to the jurisdiction of such courts.

17. Notices.

Any notice, direction or other communication given under this Agreement shall be in writing and given by sending it via e-mail or via regular mail. In the case of e-mail, valid notice shall only have been deemed to have been given when an electronic confirmation of delivery has been obtained by the sender, in the case of notice to us to Gregg.kell@gmail.com or authorized representative, in the case of notice to you, at the e-mail address provided by you in this agreement, in your WHOIS record for the website domain name or as updated from time to time. Mail shall be sent to KWS, PO Box 1946 Lake Arrowhead, CA and to you at the mailing address provided in this agreement or as updated in writing. Any e-mail communication shall be deemed to have been validly and effectively given on the date of such communication, if such date is a business day and such delivery was made prior to 4:00 p.m. Pacific Standard Time and otherwise on the next business day. Any communication sent via regular mail shall be deemed to have been validly and effectively given 5 business days after the date of mailing.

Company:

KWS

PO Box 1946

Lake Arrowhead, CA 92352

Exhibit 5 Page 40

SEC-GRASSMUECK-E-0000028

Upon approval of this agreement Mobile App Pro expects that the project will be completed in approximately seven days. This depends greatly on the efficiency of receiving all the needed content and how fast a mobile strategy is approved.

KWS

PO Box 1946

Lake Arrowhead, CA 92352

Authorized Representative and date:

Gregg Keel    10/16/12

Customer:

Authorized Representative and date:

Charles    10/17/12

**Mobile App Pro** Proposal 2012

Exhibit 5 Page 41

SEC-GRASSMUECK-E-0000029

# EXHIBIT 6

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )

                               )   File No. LA-04639-A

PACIFIC PROTON THERAPY         )

REGIONAL CENTER, LLC           )


WITNESS:  Charles C. Liu

PAGES:    1 through 177

PLACE:    Securities and Exchange Commission

          444 South Flower Street, Suite 900

          Los Angeles, California  90071

DATE:     Wednesday, March 23, 2016


     The above entitled matter came on for hearing,

pursuant to notice, at 9:17 a.m.


Diversified Reporting Services, Inc.

(202) 467 9200

Exhibit 6 Page 42

Page 77

1    If you don't know, you don't know.  It's okay.

2         A    All right.

3         Q    Let's turn to Page 7 of Exhibit 5, the

4    "Escrow capital contributions."

5              Do you see that?

6         A    Yes.

7         Q    So the EB-5 investor funds were escrowed;

8    is that right?

9         A    Yes.

10        Q    And who was the escrow agent?

11        A    East West Bank.

12        Q    East West Bank is the escrow?

13        A    And actually East West Bank is a depository

14   bank, and the escrow agent is called Atlantic Escrow.

15        Q    And then the funds are released upon notice

16   of the filing of each investor's I-526 petition?

17        A    Upon filing, upon receipt of USCIS

18   application.

19        Q    Receipt by who?

20        A    By USCIS.

21        Q    And do you notify the escrow agent?  Is

22   that how it works?

23        A    Yes, every time we got a receipt from

24   USCIS, I would submit the receipt to the escrow

25   agent, and then escrow agent release the funds.

Exhibit 6 Page 43

Page 101

1          MS. LEVIN:  Okay.  Thank you.

2          MR. REGENSTREIF:  I'm going to ask the

3     court reporter to mark as Exhibit 7 a document --

4     another signature card that is nine pages long and

5     Bates-stamped SEC-JPMCB-P-3 through 11.

6          (SEC Exhibit 7 was marked

7           for identification.)

8          BY MR. REGENSTREIF:

9     Q     Mr. Liu, I've handed you Exhibit 7.

10    A     Okay.

11    Q     Mr. Liu, on Exhibit 7, the first page, is

12    that your signature?

13    A     Yes.

14    Q     And this signature card is for the Chase

15    account with the last four digits 1028.

16          And is this the account for the EB-5 Fund,

17    LLC?

18    A     Yes.

19    Q     And are you the only signatory on this

20    account?

21    A     Yes.

22    Q     And does anyone have any access to the

23    funds in this account?

24    A     No.

25    Q     And this is the account that the EB-5

Exhibit 6 Page 44

Page 102

1    investor funds, once they're released from escrow,
2    come to this account?
3        A    Yes.
4        Q    And only this account?
5        A    Yes.
6        Q    And this account is solely used for the
7    EB-5, LLC Fund?
8        A    Yes.
9             MR. REGENSTREIF:  I'm going to ask the
10   court reporter to mark as Exhibit 8 a signature card
11   from Chase for account ending, last four, 5152, and
12   it's Bates-stamped SEC-JPMCB-P-83 through 90.
13            (SEC Exhibit 8 was marked
14             for identification.)
15            BY MR. REGENSTREIF:
16       Q    Mr. Liu, I handed you Exhibit 8 which is
17   the signature card as I described.
18            On Page 1 of Exhibit 8, is that your
19   signature at the first line?
20       A    Yes.
21       Q    And then under it says -- the second line,
22   it lists "John P. Thropay."  There's no signature.
23   It just says, "Refer to add partner or member not
24   president"; is that right?
25       A    Yes.

Exhibit 6 Page 45

Page 103

1    Q    Are you the only signatory of this account?

2    A    Yes.

3    Q    You have access to this account?

4    A    Yes.

5    Q    Dr. Thropay can't access funds in this

6    account?

7    A    Well, I think he has access to the account,

8    but I'm the only member to sign.

9    Q    Yeah.  That makes sense.

10    A    Because he's a member.

11    Q    Right, and you'll see in a minute that that

12    makes sense.

13         And so this account in Exhibit 8, which is

14    5152, this one is for Los Angeles County Proton

15    Therapy, LLC.  This is for Beverly Proton, LLC.

16    A    Yes.

17    Q    So this is the project's account?

18    A    Yes.

19    Q    And the funds in this account are only for

20    the project?

21    A    Yes.

22    Q    And so the loan from the EB-5 Fund would

23    then go to this account?

24    A    Yes.

25    Q    And the funds in this account are meant

Exhibit 6 Page 46

Page 176

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of:    PACIFIC PROTON THERAPY

4                         REGIONAL CENTER, LLC

5    Witness:            Charles C. Liu

6    File Number:        LA-04639-A

7    Date:               Wednesday, March 23, 2016

8    Location:           Los Angeles, California  90071

9

10           This is to certify that I, Donna S. Raya,

11   (the undersigned), do hereby swear and affirm that

12   the attached proceedings before the U.S. Securities

13   and Exchange Commission were held according to the

14   record and that this is the original, complete, true

15   and accurate transcript that has been compared to the

16   reporting or recording accomplished at the hearing.

17

18   _____          _____4/1/16_____

19   (Proofreader's Name)             (Date)

20

21

22

23

24

25

Exhibit 6 Page 47

```
 1        UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 2                    REPORTER'S CERTIFICATE

 3

 4        I, Ann Morales, Professional Shorthand

 5   Reporter, hereby certify that the foregoing

 6   transcript consisting of 175 pages is a complete,

 7   true, and accurate transcript of the testimony

 8   indicated, held on March 23____, 2016, in the

 9   matter of Pacific Protos Therapy Regional Center

10        I further certify that this proceeding was

11   recorded by me, and the foregoing transcript has been

12   prepared under my direction.

13

14        DATE:  ____April_____, 2016

15

16   Official Reporter:  Ann Morales_____

17                       Ann Morales

18

19

20

21

22

23

24

25
```

Exhibit 6 Page 48