UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY LLC,<br><br>Defendants. | Case No.: SACV 16-00974-CJC(AGRx)<br><br>**ORDER DENYING DEFENDANT XIN WANG'S MOTION TO DISMISS BASED ON EXTRATERRITORIAL CONDUCT [Dkt. 331]** |

## I.    INTRODUCTION

Defendant Charles C. Liu formed and controlled three corporate entities—Beverly Proton Center LLC, Pacific Proton EB 5 Fund LLC, and Pacific Proton Therapy Regional

Center LLC—purportedly to build and operate a proton therapy cancer treatment center in Southern California. Liu financed the cancer center with nearly $27 million of international investment through the EB-5 Immigrant Investor Program. Instead of pursuing proton therapy, though, Liu funneled over $20 million of investor money to himself, his wife, Defendant Xin Wang, and marketing companies associated with them.

In April 2017, the Court granted summary judgment in favor of the SEC, granted injunctive relief, imposed a civil penalty, and ordered disgorgement of the full amount Defendants raised from investors, less the funds that remained in corporate accounts for the project. *S.E.C. v. Liu*, 262 F. Supp. 3d 957, 961 (C.D. Cal. 2017). The Ninth Circuit affirmed. 754 F. App'x 505 (9th Cir. 2018). The Supreme Court granted certiorari to decide whether 15 U.S.C. § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. Concluding that the SEC may seek only disgorgement that is awarded for victims and does not exceed a wrongdoer's net profits, the Court vacated and remanded "for the courts below to ensure the award was so limited." *Liu v. S.E.C.*, 140 S. Ct. 1936, 1940 (2020). After the Ninth Circuit remanded for further proceedings, *S.E.C. v. Liu*, 814 F. App'x 311 (9th Cir. 2020), the Court granted the SEC's motion for the Court to order Liu and Wang to disgorge $20,871,758.81 in net profits, and to hold Liu and Wang jointly and severally liable for that amount. (Dkt. 328.)

Now before the Court is Defendant Xin Wang's motion to dismiss the claims against her on the grounds that her wrongful conduct occurred outside the United States. (Dkt. 331 [hereinafter "Mot."].) For the following reasons, Wang's motion is **DENIED**.

## II. BACKGROUND[1]

To ostensibly develop and run a proton cancer therapy center in Montebello, California, Liu used the EB-5 Immigrant Investor Program. Through that program, foreign investors can obtain permanent residency in the United States by investing at least $500,000 in a "Targeted Employment Area" and thereby creating at least ten full-time jobs for United States workers. EB-5 program investments are often administered by "regional centers," which are designated and approved by the United States Customs and Immigration Service ("USCIS") as EB-5 eligible projects.

Liu, along with his business partner Dr. John Thropay, formed three entities in 2010—Pacific Proton, PPEB5 Fund, and Beverly Proton—to facilitate investment. In their application to USCIS to designate Pacific Proton as an EB-5 regional center, Liu and Dr. Thropay estimated that their cancer treatment facility would create more than 4,500 new United States jobs and have a domestic economic impact of $728 million per year. From October 2014 to April 2016, at least 50 investors purchased shares of PPEB5 Fund, totaling over $26 million. The investors were then able to petition for permanent residency in the United States. No non-EB-5 funds were raised for the project.

A private offering memorandum ("POM") clearly delineated the purposes and legitimate uses of investor funds. The POM stated that Liu and the corporate defendants would use investors' capital contributions to create the proton therapy center, and their administrative fees for offering expenses and marketing. However, Defendants did not adhere to the POM. Instead, they diverted approximately $20 million of the $26 million raised from investors to Liu and Wang as well as marketing companies including United

---

[1] The facts of this case have been set out in detail in both the Court's summary judgment order, *Liu*, 262 F. Supp. 3d at 961–65, and the Court's disgorgement order, (Dkt. 328). The Court outlines here only the facts relevant to this motion.

Damei Group, United Damei Investment Company, Ltd., and/or Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), Overseas Chinese Immigration Consulting Ltd., and Hong Kong Delsk Business Co., Ltd.

Liu received $6,714,580 and Wang received $1,400,000, ostensibly as "salary." In 2012, Liu signed 5-year employment agreements with Pacific Proton and PPEB5 Fund with annual salaries of $350,000 and possible bonuses of $200,000. A few days later, on January 28, 2016, Wang signed a 5-year employment agreement with Liu (acting for Beverly Proton), entitling her to an annual compensation of $250,000, applied retroactively from January 2011, for her work recruiting investors since 2011. Then, in April 2016, two months after the SEC's February 4, 2016 subpoena and shortly after his March 23, 2016 questioning by the SEC, Liu signed a 5-year employment agreement with Beverly Proton. (Dkt. 320-25.) His annual salary was $550,000 retroactively from January 2011, with bonuses under certain conditions.

The substantial majority of the money Liu and Wang directly received was transferred in 2016. Liu received $5,000 between October 1, 2014, and December 31, 2014; $1,389,580 in 2015; and $4,270,000 between January 1, 2016, and April 30, 2016. Wang received $50,000 from October 1, 2014, to December 31, 2014; $354,000 in 2015; and $996,000 in March 2016.[2]

Not only did Liu and Wang collect significant sums directly from investor money, but it is also very likely that Liu and Wang indirectly benefitted from investor money transferred to third parties. For example, Liu and Wang were deeply connected to UDG,

---

[2] Liu and Wang received $10,878,545: $8,034,567 in cash to Liu, $335,997 in expenses, including tuition, rent, insurance, and utilities, $543,042 in credit card bills, all "with no identified business purpose," $357,245 of casino-related expenses, and $1,607,694 in transfers to Wang or payments on her behalf. Additionally, over $225,000 was paid for the lease and/or purchase of seemingly more than one automobile, but vehicles or related records could not be located.

which was paid $3,815,000.  Wang's business card listed her as UDG's chairperson and the company website includes her picture as part of the management team.  She is also identified in photos as UDG's president, and Liu referred to UDG as "my wife's company."  By all appearances, Wang's mother, Ms. Yao Wenli, signed the marketing agreement between UDG and Liu in August 2013 on behalf of UDG.  UDG's public listing on the Chinese Government's website for Chinese companies named Ms. Yao as the person with ownership interest, UDG's executive director, and a shareholder until May 19, 2016.  The same listing stated that Wang was UDG's manager until May 19, 2016.  The individual who is currently listed as UDG's Supervisor is Liu's assistant.

Despite significant investment, nearly no construction on the proton therapy center took place.  Instead, Liu burned through the millions left after payments to himself, Wang, and the marketers on half-hearted attempts to convey the illusion of progress.  Unsurprisingly, no construction permits were ever obtained to build the proton therapy center.  Proton cancer therapy equipment was never delivered to any project site.  And no patient was ever treated.

## III. DISCUSSION

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (cleaned up).  Consistent with this presumption, the United States' Securities Exchange Act generally does not apply extraterritorially.  *Id.* at 265.  Instead, "the focus of the Exchange Act is . . . upon purchases and sales of securities in the United States." *Id.* at 266.

Wang argues that the Complaint against her should be dismissed because her wrongful conduct took place entirely in China. (Mot. at 4–7.) She argues that the applicable test for extraterritorial conduct is found in *Morrison*, 561 U.S. 247. The government responds that Congress overruled *Morrison* when it amended the jurisdictional language of the Exchange Act through Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376 (2010), and, in any event, the allegations in the Complaint satisfy the *Morrison* test. (Dkt. 332 [Opposition, hereinafter "Opp."] at 2.) The Court concludes that under either test—*Morrison* or Dodd-Frank—Wang's wrongful conduct has a sufficient connection to the United States for her to be held liable.

### A. *Morrison*

In *Morrison,* the Supreme Court addressed the extraterritorial reach of Section 10(b)[3] and Rule 10b–5, holding that there is a presumption against extraterritorial application of the Exchange Act. 561 U.S. at 266–67. In that case, three Australian individual investors brought a civil action against an Australian bank for securities fraud relating to securities traded on the Australian Stock Exchange. *Id.* at 272. The Supreme Court held that Section 10(b) did not apply because the case did not involve securities listed on a United States exchange, and because all aspects of the purchases occurred abroad, even though a subsidiary of Australia Bank and its executives engaged in the deceptive conduct in the United States. *See id.* at 252–53, 273.

---

[3] Wang has been found liable for violating Securities Act Section 17(a)(2)—which concerns fraudulent conduct "in the offer or sale of any securities"—not Section 10(b)(5)—which concerns fraudulent conduct "in connection with the purchase or sale" of securities. In this order, the Court assumes that *Morrison*'s holding applies to Section 17(a)(2). *See United States v. Sumeru*, 449 F. App'x 617, 621 (9th Cir. 2011) (making the same assumption).

The Supreme Court explained that the Exchange Act "reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 273. It adopted a "transactional test," which asks "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 269–70. "Section 10(b) focuses not upon the place where deception originated, but upon purchases and sales of securities in the United States." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 944 (9th Cir. 2018). A transaction is domestic if the purchaser incurred "irrevocable liability" within the United States to take and pay for a security, or the seller incurred "irrevocable liability" within the United States to deliver a security. *Id.* at 948.

### B. Dodd-Frank

The government argues that Congress responded to *Morrison* by changing the extraterritorial reach of the Exchange Act. (Opp. at 2.) The government argues that after Dodd-Frank, the Exchange Act applies when the SEC's allegations concern "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." 15 U.S.C. § 77v(c). Citing the legislative history, the government contends that Dodd-Frank reinstated the disjunctive "conduct test" and "effects test" that governed before *Morrison*, giving the SEC authority to pursue violations of the Exchange Act where either significant conduct by the defendant occurred in the United States, or foreseeable substantial effects of the violation were felt here. (Opp. at 2–3.)

//

### C. Application of *Morrison* and Dodd-Frank to Wang's Conduct

Wang's wrongful conduct meets both the *Morrison* and Dodd-Frank standards. Wang played an integral role in the scheme to defraud investors through an EB-5 offering designed to attract foreign capital to the United States and create United States jobs. She directly recruited investors in the California proton cancer therapy project both in person and by phone in the United States, and helped to raise investor capital that would benefit the United States. (Dkt. 324-5, Ex. 50 [Wang Deposition Transcript, hereinafter "Wang Dep."] at 15–18; Dkt. 320-2 [Excerpts from Liu Deposition Transcript] at 66–68 [describing Wang's duties]; Dkt. 320-5 [Excerpts from Dr. Thropay Deposition, hereinafter "Thropay Dep."] at 105–09 [describing Wang's role as selling and promoting sales, and noting that Wang "seemed to be acutely aware of finances"].)

Wang's conversations promoting the project and making offers of investment occurred both in the United States and in China. (*See* Wang Dep. at 15–16, 77–80 [explaining how she spoke by phone with potential investors in both the United States and China]; Thropay Dep. at 108–09 [discussing how Wang sold EB-5s in China].) This is in part because since 2011, Wang has split her time between the United States and China. (Wang Dep. at 78–79 [explaining she has been "flying back and forth, back and forth" since 2011, and that she would have to consult her itineraries to determine whether she "stayed mainly in China or in the United States"]; Dkt. 163, Ex. 2 at 22 [background questionnaire with the SEC, stating that Wang lived primarily at two different addresses in Laguna Niguel, California between June 2012 and the date she filled out the questionnaire in 2016].) Wang explained that when she was in the United States, she talked by phone with people in China to market the project. (Wang Dep. at 15–16, 77–80.) In addition, on two occasions, Wang personally visited a proposed California project site with potential investors. (Dkt. 324-2, Ex. 19 [Novodor Deposition Transcript] at

180–181, 185.)  She also visited one of the corporate defendants' California offices "to talk about the project."  (Thropay Dep. at 107.)

Not only did Wang market and offer, in the United States, investment opportunities in a project meant to benefit the United States, but she also was paid and accepted without reservation well over a million dollars in investor funds that were wrongfully diverted by Liu and placed in Wang's United States bank accounts.  (*See* Dkt. 320-1 [Expert Report of Carlyn Irwin] ¶¶ 43–50, Ex. 7; Dkt. 163, Ex. 2, at 25 [listing Wang's bank accounts, including foreign accounts, as located only at two California banks].)

Taking all of this conduct together, it is clear that Wang's wrongful conduct meets the transactional test in *Morrison*.  She made domestic offers of securities by soliciting potential investors in the United States, whether by phone or in person, in connection with the purchase or sale of a United States security.  561 U.S. at 269–70; *see Sumeru*, 449 F. App'x at 621 ("[T]here was sufficient evidence for a rational jury to conclude that Hall and Sumeru made numerous domestic offers of securities by soliciting potential investors in the United States" because "[b]oth defendants, for example, met with potential investors in Santa Barbara, California and solicited potential investors through the U.S. mail.").  Indeed, this case is nothing like *Morrison*, where foreign investors sought to hold liable a foreign corporation in connection with foreign securities.  Rather, this case involves domestic corporations, domestic securities, and wrongdoers who had their primary residence in the United States and traveled back and forth between the United States and China only to further perpetuate their fraud based on a United States immigration program.

Wang's conduct also meets Dodd-Frank's "conducts test" and "effects test."  Her conduct in the United States constituted significant steps in furtherance of the securities violations.  Specifically, Wang attended in-person meetings with potential investors in

the United States and also contacted them by phone while she was in the United States. Her conduct occurring outside the United States also had foreseeable substantial effects within the United States. Wang sold securities for a California cancer treatment facility related to an immigration program run by the United States government which purported to create more than 4,500 new United States jobs and have an economic impact in the United States of $728 million per year.

In sum, under either standard—*Morrison* or Dodd-Frank—Wang's participation in the fraudulent scheme had enough ties to the United States for her to be held liable here.

## IV. CONCLUSION

For the foregoing reasons, Wang's motion to dismiss based on extraterritorial conduct is **DENIED.**

DATED:    July 13, 2021

_____
HON. CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE