Lawrence B. Steinberg (State Bar No. 101966)
  *LSteinberg@buchalter.com*
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Attorneys for defendants CHARLES C. LIU
and XIN WANG a/k/a LISA WANG

Hervé Gouraige (admitted *pro hac vice*)
  *hgouraige@sillscummis.com*
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5400
Telephone: (973) 643-5989
Facsimile: (973) 643-6500

Attorneys for defendants CHARLES C. LIU
and XIN WANG, a/k/a LISA WANG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>     vs.<br><br>CHARLES C. LIU; XIN WANG, a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER, LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER, LLC, f/k/a LOS ANGELES COUNTY PROTON THERAPY, LLC,<br><br>        Defendants. | Case No. SACV 16-00974 CJC (AGRx)<br><br>**NOTICE OF APPEAL OF DEFENDANTS CHARLES C. LIU AND XIN WANG, a/k/a LISA WANG**<br><br>Judge: The Honorable Cormac J. Carney |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

PLEASE TAKE NOTICE that defendants CHARLES C. LIU ("Liu") and his wife, XIN WANG, a/k/a LISA WANG ("Wang"), hereby appeal to the United States Court of Appeals for the Ninth Circuit from the June 7, 2021 Order Granting the SEC's Motion for Disgorgement ("June 7 Order") (Docket No. 328), the July 13, 2021 Order Denying Defendant Xin Wang's Motion to Dismiss Based on Extraterritorial Conduct ("July 13 Order") (Docket No. 335), and the July 14, 2021 Final Judgment ("July 14 Final Judgment") (Docket No. 336).

A copy of the June 7 Order, the July 13 Order, the July 14 Final Judgment, and the Representation Statement are attached hereto as Exhibits A, B, C, and D respectively.

DATED: September 13, 2021

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.

By _____/s/  Hervé Gouraige_____
Attorneys for defendants CHARLES C. LIU
and XIN WANG, a/k/a LISA WANG

BUCHALTER,
A Professional Corporation
Attorneys for defendants CHARLES C. LIU
and XIN WANG a/k/a LISA WANG

**EXHIBIT A**

Case 8:16-cv-00974-CJC-AGR  Document 341  Filed 09/13/21  Page 4 of 46  Page ID
Case 8:16-cv-00974-CJC-AGR  Document 337  Filed 06/07/21  Page 1 of 20  Page ID
#:10330

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> CHARLES C. LIU; XIN WANG a/k/a LISA WANG; PACIFIC PROTON THERAPY REGIONAL CENTER LLC; PACIFIC PROTON EB-5 FUND, LLC; and BEVERLY PROTON CENTER LLC f/k/a LOS ANGELES COUNTY PROTON THERAPY LLC, <br><br> Defendants. | Case No.: SACV 16-00974-CJC(AGRx) <br><br> **ORDER GRANTING SEC'S MOTION FOR DISGORGEMENT AGAINST DEFENDANTS CHARLES C. LIU AND XIN WANG [Dkt. 319]** |

## I.    INTRODUCTION

Defendant Charles C. Liu formed and controlled three corporate entities—Beverly Proton Center LLC, Pacific Proton EB 5 Fund LLC, and Pacific Proton Therapy Regional

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 5 of 46   Page ID
#:10698
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 2 of 20   Page ID
#:10331

1   Center LLC—purportedly to build and operate a proton therapy cancer treatment center
2   in Southern California.  Liu financed the cancer center with nearly $27 million dollars of
3   international investment through the EB–5 Immigrant Investor Program.  Instead of
4   pursuing proton therapy, though, Liu funneled over $20 million of investor money to
5   himself, his wife Defendant Xin Wang, and marketing companies associated with them.
6
7        In April 2017, the Court granted summary judgment in favor of the SEC, granted
8   injunctive relief, imposed a civil penalty, and ordered disgorgement of the full amount
9   Defendants raised from investors, less the funds that remained in corporate accounts for
10  the project.  *S.E.C. v. Liu*, 262 F. Supp. 3d 957, 961 (C.D. Cal. 2017).  The Ninth Circuit
11  affirmed.  754 F. App'x 505 (9th Cir. 2018).  The Supreme Court granted certiorari to
12  decide whether 15 U.S.C. § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a
13  defendant's net profits from wrongdoing.  Concluding that the SEC may seek only
14  disgorgement that does not exceed a wrongdoer's net profits and that is awarded for
15  victims, the Court vacated and remanded "for the courts below to ensure the award was
16  so limited."  *Liu v. S.E.C.*, 140 S. Ct. 1936, 1940 (2020).  The Ninth Circuit then
17  remanded for further proceedings.  *S.E.C. v. Liu*, 814 F. App'x 311 (9th Cir. 2020).
18
19       In these remand proceedings, there is no question that Liu and Wang committed
20  securities fraud.  There also is no question that they must pay civil penalties for that
21  fraud. And there is no question they must disgorge their net profits.  The limited
22  questions presented on remand are the amount of Defendants' net profits, and whether
23  there is enough evidence to support holding Liu and Wang jointly and severally liable.
24  *Liu*, 140 S. Ct. at 1940.  Now before the Court is the SEC's motion for the Court to order
25  Liu and Wang to disgorge, jointly and severally, $20,871,758.81 in net profits, and to
26  hold Liu and Wang jointly and severally liable for that amount.  (Dkt. 319 [Motion], Dkt.
27  322 [Corrected Memorandum in Support of Motion, hereinafter "Mot."].)  For the
28  following reasons, the motion is **GRANTED**.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 6 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 329   Filed 06/07/21   Page 3 of 20   Page ID
#:10332
#:10329

## II.    BACKGROUND

Unless otherwise noted, the following facts are found in the Court's summary judgment order, *Liu*, 262 F. Supp. 3d at 961–65, and have not been disturbed on appeal. To ostensibly develop and run a proton cancer therapy center in Montebello, California, Liu used the EB-5 Immigrant Investor Program. Through that program, foreigners can obtain permanent residency in the United States by investing at least $500,000 in a "Targeted Employment Area" and thereby creating at least ten full-time jobs for United States workers.[1] Investments are often administered by "regional centers," which are designated and approved by the United States Customs and Immigration Service ("USCIS") as EB-5 eligible projects.

### A.    Formation of Corporate Defendants and the EB-5 Offering

Liu, along with his business partner Dr. John Thropay, formed three entities in 2010—Pacific Proton, PPEB5 Fund, and Beverly Proton[2] (together, "Corporate Defendants")—to facilitate investment. Ownership of Pacific Proton was originally split 75% for Liu and 25% for Dr. Thropay. Beverly Proton was allocated the same way with Liu as Beverly Proton's President and Dr. Thropay as its CEO. Pacific Proton was PPEB5 Fund's sole manager.

On November 19, 2010, Liu and Dr. Thropay applied to USCIS to designate Pacific Proton as an EB-5 regional center. As the job-creating vehicle sponsored by

---

[1] This program allows foreign investors who make requisite capital investments in eligible commercial enterprises to file an I-526 Petition for conditional permanent residency status for a two-year period. Thereafter, the foreign investor can apply to have the conditions removed and live and work in the United States permanently.

[2] This entity was originally named Los Angeles County Proton Therapy, LLC. It was renamed Beverly Proton Center, LLC, for branding purposes in 2015. For clarity, the Court refers to it as Beverly Proton.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 7 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 330   Filed 06/07/21   Page 4 of 20   Page ID
#:10333

1   Pacific Proton—the USCIS-approved regional center—Beverly Proton purportedly
2   would develop and operate the proton therapy treatment center.  The USCIS application
3   estimated that the cancer treatment facility would create more than 4,500 new jobs and
4   have an economic impact of $728 million per year.  USCIS approved Pacific Proton's
5   application on June 28, 2012.

6

7       Pacific Proton, PPEB5 Fund, and Beverly Proton each played an important role in
8   Liu's scheme.  Foreign investors purchased shares in PPEB5 Fund, enabling them to
9   petition USCIS for permanent residency in the United States.  Each share of PPEB5 Fund
10  was $500,000 (the "capital contribution").  Investors also paid a $45,000 "administrative
11  fee" directly to Pacific Proton.  Investing members of PPEB5 Fund had limited rights to
12  participate in its management, as Pacific Proton had "full, exclusive and complete
13  authority, power, and discretion" to run it.  PPEB5 Fund loaned investor money to
14  Beverly Proton to support the development of the proton therapy center.

15

16      From October 1, 2014, to April 2016, at least 50 investors purchased shares of
17  PPEB5 Fund, totaling over $26 million.[3]  No non-EB-5 funds were raised for the project.

18

19      The private offering memorandum ("POM") clearly delineated the purposes and
20  legitimate uses of capital contributions and administrative fees.  (Dkt. 320-4 [hereinafter
21  "POM"].)  It stated that Liu and Corporate Defendants would use the entire capital
22  contribution to create the proton therapy center.  (*See* POM at 20 ["Other expected uses

23

24  [3] In total, USCIS received 58 I-526 Petitions for this project and approved 8.  Per Liu's EB-5
25  Application and the private offering memorandum ("POM"), investor capital contributions would
    initially be placed in escrow.  Liu's EB-5 Application stated that the funds would be released upon
26  USCIS' *approval* of an investor's I-526 petition.  Liu's POM, given to investors, however, stated that
    the funds would be released from escrow and loaned to Beverly Proton upon an investor's *filing* of their
27  I-526 Petition.  In addition, the EB-5 Application stated that if USCIS were to deny the investor's
    application, the capital contribution and half of the administrative fee would be returned to the investor.
28  The POM, however, stated that the entire application fee and capital contribution would be refunded in
    the event of USCIS denial.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 8 of 46   Page ID
#:10781
Case 8:16-cv-00974-CJC-AGR   Document 328-1   Filed 06/07/21   Page 5 of 20   Page ID
#:10334

1   of [capital contributions] include construction financing, architectural and other

2   professional fees, working capital and fees for services required to obtain permits and

3   satisfy regulatory requirements related to the project."]; *id.* at 20 n.2 ["Offering expenses,

4   commissions and fees incurred in connection with this Offering shall [not] be paid . . .

5   from EB-5 Capital Contributions."]; *id.* at 18 [Beverly Proton "will use the [capital

6   contributions] to partially finance the construction and operation of a proton therapy

7   center."].)  And it stated that the administrative fee would be spent on offering expenses

8   and marketing.  (POM at 2 ["PPEB5 charges an administrative fee . . . for payment of

9   expenses incurred in connection with this Offering."]; *id.* at 6 [administrative fee to "pay

10  for Offering Expenses, including legal, accounting and administration expenses, and

11  commissions and fees related to this Offering."]; *id.* at 20 n.2 ["Offering Expenses,

12  commissions and fees incurred in connection with this Offering shall be paid from the

13  proceeds of Administrative Fees and not from EB-5 Capital Contributions."].)

14

15  **B.     Diversion of Funds**

16

17          Defendants did not adhere to the POM.  Instead, they diverted approximately $20

18  million of the $26 million raised from investors to marketing companies, Liu, and Wang.

19

20          **1.  Marketing Companies**

21

22          Defendants made payments totaling $12,924,500 to three overseas marketing

23  companies: Overseas Chinese Immigration Consulting Ltd. ("Overseas Chinese"), United

24  Damei Group, United Damei Investment Company, Ltd., and/or Beijing Pacific Damei

25  Consulting Co. Ltd. (collectively, "UDG"), and Hong Kong Delsk Business Co., Ltd.

26  ("Delsk").  On March 8, 2013, Liu signed an agreement with Overseas Chinese to pay it

27  $800,000 per year and $75,000 per successful investor.  Overseas Chinese successfully

28

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 9 of 46   Page ID
#:10335
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 6 of 20   Page ID
#:10335

1    solicited 11 investors, and received $7,722,000 from Corporate Defendants.[4]  In August

2    2013,[5] Liu signed an agreement with UDG to pay it $80,000 per investor, $500,000

3    immediately as a "document preparation fee," and $650,000 annually.  UDG successfully

4    solicited 10 investors and received $3,815,000.  On September 24, 2014, Liu signed an

5    agreement with Delsk to pay it $75,000 per successful investor.  Delsk recruited 37

6    successful investors and received $1,387,500.

7

8            **2.    Liu and Wang**

9

10    Liu received $6,714,580 and Wang received $1,400,000 from Corporate

11    Defendants, ostensibly as "salary."  In 2012, Liu signed 5-year employment agreements

12    with Pacific Proton and PPEB5 Fund with annual salaries of $350,000[6] and $200,000,

13    respectively.  (Dkts. 320-5, 320-6.)  A few days later, on January 28, 2016, Wang signed

14    a 5-year employment agreement with Liu (acting for Beverly Proton), entitling her to an

15    annual compensation of $250,000, applied retroactively from January 2011.  (Dkt. 320-

16    31.)  According to Liu, she had recruited investors since 2011.

17

18            In April 2016, two months *after* the SEC's February 4, 2016 subpoena and shortly

19    following his March 23, 2016 questioning by the SEC, Liu signed a 5-year employment

20    agreement with Beverly Proton.  (Dkt. 320-25.)  His annual salary was $550,000

21    retroactively from January 2011.[7]

22

23

24    [4] Overseas Chinese returned $2,060,130 of this money.

25    [5] Liu signed two identical contracts with UDG on August 13 and August 18, 2013.  Since the contract
26    expressly supersedes all prior agreements, the Court treats the August 18, 2013, contract as controlling.

27    [6] The Pacific Proton employment agreement also promised Liu a bonus of 8% of total capital raised
      once there were 20 investors.

28
      [7] He was also promised a bonus of 8% of total capital raised (with a maximum of $28,000,000).

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 10 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 7 of 20   Page ID
#:10336

1        The substantial majority of the money Liu and Wang directly received was

2  transferred in 2016.  Liu received $5,000 between October 1, 2014, and December 31,

3  2014; $1,389,580 in 2015; and $4,270,000 between January 1, 2016, and April 30, 2016.

4  Wang received $50,000 from October 1, 2014, to December 31, 2014; $354,000 in 2015;

5  and $996,000 in March 2016.[8]

7        Not only did Liu and Wang collect significant sums directly from investor money,

8  but it is also very likely that Liu and Wang indirectly benefitted from investor money

9  transferred to third parties.  For example, Liu and Wang were deeply connected to UDG,

10  which was paid $3,815,000.  Wang's business card listed her as the chairman and the

11  company website includes her picture as part of the management team.  She is also

12  identified in photos as UDG's president,[9] and Liu referred to UDG as "my wife's

13  company."  By all appearances, Wang's mother, Ms. Yao Wenli, signed the marketing

14  agreement between UDG and Liu in August 2013 on behalf of UDG.[10]  UDG's public

15  listing on the Chinese Government's website for Chinese companies named Ms. Yao as

16  the person with ownership interest, UDG's executive director, and a shareholder until

---

[8] According to the Monitor, Liu and Wang received $10,878,545 ($8,034,567 in cash to Liu, $335,997 in expenses, including tuition, rent, insurance, and utilities, $543,042 in credit card bills, all "with no identified business purpose," $357,245 of casino-related expenses, and $1,607,694 in transfers to Wang or payments on her behalf).  Additionally, over $225,000 was paid for the lease and/or purchase of seemingly more than one automobile, but the Monitor did not locate any vehicles or records related to them.

[9] It is possible that the underlying Chinese word is variously translated as President and Chairman.  Clarifying the particulars is unnecessary since the underlying point, that Wang is a senior controlling member of UDG, does not turn on whether she is President or Chairman.

[10] When confronted with the contract by the SEC in March 2016 during his investigatory testimony, Liu claimed that he had never spoken to Ms. Yao and that he did not know who she was.  Wang stated it was impossible for her mother to work for UDG, since she lived with Liu and Wang raising and taking care of their children.  Ms. Yao does not speak or read English, the language of the contract; she denied signing it.  Liu later submitted a correction to his testimony admitting that Ms. Yao is his mother in law, though he stated he does not believe she signed the contract.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 11 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 8 of 20   Page ID
#:10337

1   May 19, 2016.  The same listing stated that Wang was UDG's manager until May 19,

2   2016.  The individual who is currently listed as UDG's Supervisor is Liu's assistant.

3

4   **C.     State of the Proton Therapy Center**

5

6       Despite significant investment, nearly no construction on the proton therapy center

7   took place.  Instead, Liu burned through the millions left after payments to himself,

8   Wang, and the marketers on half-hearted attempts to convey the illusion of progress.

9

10      The original planned site of the project was land owned by Dr. Thropay at 111 W.

11  Beverly Blvd.  (*See* POM at 14 [describing the lease agreement with Dr. Thropay at 111

12  W. Beverly Blvd. as a "Material Contract"].)  Beverly Proton signed a 30-year lease with

13  Dr. Thropay with rent of $1,000,000 per year.  The existing building on the land was only

14  demolished in mid-2015 after Liu "scream[ed] at [Dr. Thropay] on the phone" that "he

15  had to prove" to Delsk and other investors that progress was being made.  (Dkt. 320-5

16  [Excerpts from Dr. Thropay Deposition, hereinafter "Thropay Dep."] at 117–18; *see* Dkt.

17  324 Ex. 9 [letter from Delsk to Dr. Thropay referencing "a lot of requests from the

18  investors to update them on the progress made in construction"].)

19

20      However, in 2015, Liu devised a plan to cut Dr. Thropay out of the project

21  altogether.  (*See* Liu Dep. at 97 [explaining that a dispute between Liu and Dr. Thropay

22  caused Liu "to think maybe it's better to find another site, to disconnect relationship with

23  [Dr. Thropay] and to find a better site"]).  On January 19, 2016, Liu removed Dr.

24  Thropay as CEO of Pacific Proton and elected himself as President and Treasurer and

25  Wang as Secretary.  (*See* Dkt. 324-2, Ex. 17.)  The same day, Liu held a meeting of

26  Beverly Proton with only himself in attendance at which he nominated himself and Wang

27  as the sole directors.  Liu then decided to pursue a partnership with the City of Hope

28  cancer hospital which would preclude Dr. Thropay's involvement in the project.  As a

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 12 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 326   Filed 06/07/21   Page 9 of 20   Page ID
#:10338

1  result, Dr. Thropay sought to cancel the lease and reclaim the property;[11] Liu

2  subsequently had to explore a second location for the center, at 105 West Beverly Blvd.

3

4        Liu also paid Optivus, a California proton therapy unit manufacturer, $368,100 for

5  consulting services to design the center based on Dr. Thropay's property and an Optivus

6  proton therapy machine.  However, as part of his plan to oust Dr. Thropay, Liu later

7  decided to purchase a Mevion proton therapy machine instead, making a $3 million

8  deposit in November 2015.  (*See* Dkt. 324-3, Ex. 30.)  Liu then retained an entirely

9  different architectural firm to design the center on the second location (without Dr.

10  Thropay) for a Mevion unit.  Unsurprisingly, no construction permits were ever obtained.

11  Proton cancer therapy equipment was never delivered to any project site.  (Liu Dep. at

12  98–99.)  And no patient was ever treated.  (*Id.* at 99.)

13

14  **III.   DISCUSSION**

15

16        Liu and Wang must disgorge net profits from their unlawful activity.  *See Liu*, 140

17  S.Ct. at 1942.  Net profits are the total profits (here, the $26,423,168 raised from

18  investors) minus legitimate expenses.  *Id.* at 1946.  In this motion, then, the Court must

19  determine what expenses were legitimate, and which were not legitimate.[12]  The Court

20  must also decide whether there is sufficient evidence to support holding Liu and Wang

21  jointly and severally liable for the disgorgement award.

22

23  //

24  //

25

26  [11] Dr. Thropay initiated an unlawful detainer proceeding against Beverly Proton and Liu on May 16,

27  2016.  Those proceedings are stayed pending the outcome of this case.

28  [12] The other requirement the Supreme Court described—that disgorgement be for the benefit of
investors—is also met.  (*See* Mot. at 25; Reply at 24.)

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 13 of 46   Page ID
#:10886
Case 8:16-cv-00974-CJC-AGR   Document 336   Filed 06/07/21   Page 10 of 20   Page ID
#:10339

## A.   Legitimate Expenses

"[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Liu*, 140 S.Ct. at 1950.  The Supreme Court gave some guidance addressing what expenses were legitimate in this case, "not[ing] that some expenses from [Liu and Wang's] scheme went toward lease payments and cancer-treatment equipment," and that "[s]uch items arguably have value independent of fueling a fraudulent scheme." *Liu*, 140 S.Ct. at 1950.  The Supreme Court, however, left it to this Court "to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)." *Id.*  The SEC has taken a conservative approach on remand that is very generous to Liu and Wang, allowing for deduction as legitimate expenses (1) the $45,000 administrative fee each investor paid, and (2) certain amounts paid for development of the physical proton therapy center.

What makes the Court's task of dividing legitimate expenses from "wrongful gains under another name" challenging, *Liu*, 140 S.Ct. at 1050, is how difficult it is to know precisely where money raised was spent and who benefitted from the various payments.  Both parties rely heavily on numbers from bookkeeping performed by Marcum LLP, the Corporate Defendants' accountant.  (*See, e.g.*, Dkt. 320-1 [Expert Report of Carlyn Irwin, hereinafter "Irwin Rep."] ¶ 26 ["Generally, I have assumed, for purposes of the calculations set forth above, that Marcum's classification of cash outlays was accurate."]; Dkt. 324-2, Ex. 5 [Expert Report of Ronald S. Friedman, CPA, hereinafter "Friedman Rep."].)  But Marcum itself disclaimed the reliability of its numbers for anything resembling an audit.  (Dkt. 230-27 [Marcum Engagement Letter].)  It stated that its services would be performed based on data and information that Liu provided, which would not be verified or audited, and therefore "[n]one of [its] services can be relied on to detect errors, fraud or illegal acts that may exist." (*Id.* at 4.)  Trang Lam, the Marcum accountant who worked on Corporate Defendants' account, testified that throughout the

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 14 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 337   Filed 06/07/21   Page 11 of 20   Page ID
#:10340

course of Marcum's engagement, "Marcum did not perform any inquiry or analytical procedures as to the appropriateness of the account classifications for all of these transactions that were recorded to the general ledger," but rather relied only on Liu's statements as to how money should be classified.  (Dkt. 320-24 [Excerpts from Trang Lam Deposition Transcript, hereinafter "Lam. Tr."] at 22–27, 90–93.)  Marcum did not try to verify or corroborate what Liu said about any given transaction, speak to the counterparty involved in any transaction, or speak with Dr. Thropay or others.  (*Id.* at 21–22, 27–38, 73–74.)

The Court is left, then, with a general ledger prepared primarily on the say-so of an adjudicated fraudster, which the preparing accountant expressly stated could not be relied upon to detect errors or fraud, and parties and experts who did exactly that—relied on the ledger assuming its accuracy in order to determine what expenses were legitimate and what expenses were not.  From this evidence, the Court must determine what expenses were legitimate, and deduct them from the total amount raised from investors.  In conducting this difficult task, and taking heed of the Supreme Court's admonitions, the Court has chosen to take a very liberal approach, arguably unduly favorable to Liu and Wang, as to what constitutes a legitimate expense.

## 1. $45,000 in Administrative Fees from Each Investor

The POM solicited $545,000 from each investor.  That investment was divided into two types of payment:  (1) a $500,000 capital contribution, the entire amount of which the POM stated would be used to construct and operate the proton therapy center (including construction financing, architectural and other professional fees, working capital and fees for services required to obtain permits and satisfy regulatory requirements related to the projects), and (2) $45,000 in administrative fees, which the POM stated would be spent on offering expenses and marketing (including legal,

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 15 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 12 of 20   Page ID
#:10341

1   accounting, and administrative expenses, and also commissions and fees related to the

2   offering). *Liu*, 262 F. Supp. 3d at 962; (POM at 6–7). Among all investors, Defendants

3   collected a total of $2,210,701 in administrative fees. (Irwin Rep. ¶ 29, Ex. 4.) However,

4   Defendants spent much more on offering expenses and marketing than the $45,000 per

5   investor in administrative fees they collected.

6

7         For example, the POM states that Defendants "may engage and pay one or more

8   brokers, investment advisors, finders or other parties commissions or other fees in

9   connection with the sale of Units pursuant to this Offering," and that "[a]ny such

10   commissions or other fees paid in connection with the sale of Units pursuant to this

11   Offering shall be paid only out of the proceeds of Administrative Fees." (POM at 8.)

12   However, Defendants spent over $10 million on broker fees paid to UDG, Delsk, and

13   Overseas Chinese alone—far more than the $2,210,701 in administrative fees Defendants

14   raised for such commissions. (*See* Irwin Rep. ¶¶ 33–37, Ex. 5.) Defendants also paid

15   money for administrative fee activities to Marcum LLP (the CPA that performed

16   bookkeeping services), Steve Yale and Miller Mayer, LLP (counsel that performed legal

17   work on USCIS and EB-5 issues), Michael Hunn and Evans Carroll & Associates (an

18   economic consultant firm retained to work on the Pacific Proton regional center

19   application), and then-mayor of Los Angeles Antonio Villaraigosa (who assisted with

20   marketing the offering). (Irwin Rep. ¶¶ 34–35; Mot. at 7.)

21

22         Because the amount spent on activities for which the POM says administrative fees

23   may be used far exceeded the amount raised for such activities, the SEC suggests that the

24   entirety of administrative fees collected may be deducted as legitimate expenses. (Mot.

25   at 5–8.) The Court has serious concerns as to whether money spent on administrative

26   fees was indeed legitimate. For example, UDG—the marketing company Liu paid over

27   $3.8 million—had deep connections to Liu and Wang, with Liu even referring to UDG as

28   "my wife's company." *Liu*, 262 F. Supp. 3d at 964. It is not a stretch to believe that

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 16 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 13 of 20   Page ID
#:10342

payments to marketing companies—which the SEC states may be deducted as "legitimate expenses"—were actually "wrongful gains under another name." *Liu*, 140 S.Ct. at 1950.

However, out of an abundance of caution, and lacking any way to know whether any administrative fee expenses were legitimate, the Court will deduct the amount the SEC suggests. Investors understood that some of the money they paid would be spent on marketing and other administrative fees and commissions. They further understood that capital contributions would not be used to pay for administrative fee activities. *Liu*, 262 F. Supp. 3d at 962. Based on the limited usefulness of the data available, and in light of the Supreme Court's admonitions, then, the Court will deduct $2,210,701—the total amount of administrative fees raised—as legitimate expenses.

## 2. Expenses for Development of a Proton Therapy Center

Next, the SEC proposes that the Court deduct $3,105,809 in expenses related to construction of the proton therapy center—including construction, rent, equipment, tax payments, insurance costs, travel, consulting fees, and permit and license fees. (Mot. at 7–8.) The SEC's proposed deduction includes (1) construction-related costs such as architectural design fees, (2) rent payments to Dr. Thropay, (3) proton equipment purchases provided for in the POM (i.e., from Optivus) and other capital expenditures, and (4) operating expenses such as insurance costs, travel to China and Singapore to recruit patients, consulting fees, permit and license fees, and taxes, among others. (Irwin Rep. ¶ 40, Ex. 6.)

The SEC's proposal is extremely generous to Liu and Wang for three reasons. First, again, the calculation relies heavily on Marcum's bookkeeping, which relied almost exclusively on Liu's representations regarding classification. For example, Marcum

Case 8:16-cv-00974-CJC-AGR  Document 341  Filed 09/13/21  Page 17 of 46  Page ID
Case 8:16-cv-00974-CJC-AGR  Document 330  Filed 06/07/21  Page 14 of 20  Page ID
#:10343

1  placed expenses into categories including construction, rent, and permit and license fees

2  based on representations from Liu. Those representations can hardly be trusted.

3

4      Second, the SEC's deduction includes, as just one example, payments made to R.

5  Alan Construction, a company that performed demolition at 111 West Beverly but also

6  construction on 105 West Beverly—the site to which Liu moved the project in order to

7  cut out Dr. Thropay. (*See* Thropay Dep. at 132; Irwin Rep. Ex. 6.) Any construction

8  done at the 105 West Beverly site would seem to the Court to be part of the fraud and not

9  a legitimate business expense.

10

11      Third, Defendants' entire scheme was to defraud investors. Barely any

12  construction occurred on the proton therapy center because Defendants' plan was to

13  misappropriate the investors' money and use it for themselves at the outset. It is difficult

14  to consider money spent to rent land on which Defendants never actually planned to

15  operate a proton therapy center as a legitimate expense.

16

17      Although no fault or negligence can be attributed to the SEC or its expert, it is far

18  from clear to the Court that the business expenses the SEC and its expert categorize as

19  legitimate business expenses were actually legitimate business expenses. Again,

20  Defendants' scheme was fraudulent from the outset. However, in an abundance of

21  caution, and in light of the Supreme Court's admonitions, the Court will deduct

22  $3,105,809 as legitimate expenses as the SEC proposes.

23

24      **B.    Non-Legitimate Expenses**

25

26      Defendants argue that deductions for legitimate expenses should include (1) a $3

27  million payment to Mevion for proton therapy equipment, and (2) Liu and Wang's

28  salaries.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 18 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328-1   Filed 06/07/21   Page 15 of 20   Page ID
#:10344

1

2

### 1. Payment to Mevion

3       As part of its deduction for legitimate business expenses, the SEC deducts
4   $368,100 paid to Optivus for the Optivus proton therapy machine. (*See* Irwin Rep. at
5   ¶¶ 40–42, Ex. 6.) As support for classifying this payment as a legitimate expense, the
6   SEC notes that the POM relied heavily on Defendants' cooperation with Optivus. The
7   POM stated that Defendants planned to engage Optivus "to provide all necessary proton
8   beam treatment technology and related maintenance, under a service contract for the
9   proton center" because "Optivus is the only U.S. company with U.S. Food and Drug
10  Administration (FDA) clearance to provide proton therapy systems." (POM at 15.) The
11  POM further stated that Defendants' "failure or inability to engage Optivus could
12  negatively affect the profitability of the Borrower and its ability to repay the Loan." (*Id.*)

13

14      Defendants argue that Liu's $3 million payment to Mevion for a proton therapy
15  machine is also a legitimate expense that should be deducted. Although the POM did not
16  mention Mevion, Defendants still argue that the payment to Mevion was a legitimate
17  expense based on the POM's language allowing Defendants to contract with "another
18  service provider" to provide proton beam treatment equipment. (*See* Opp. at 13.) But the
19  fact that the POM does not absolutely require Defendants to use Optivus for equipment is
20  not the point. The point is that Liu decided to order a Mevion unit in addition to the
21  Optivus unit he had already ordered in order to cut Dr. Thropay out of the project and
22  therefore divert more money to himself and his wife Wang. By setting up a new location
23  for the proton therapy center that did not use Dr. Thropay's land, entering into contracts
24  using an entity with which Dr. Thropay was not involved, and getting a new unit for the
25  new location, Liu endeavored to create a proton therapy center that did not involve Dr.
26  Thropay at all. That using Mevion was contrary to the POM is just another piece of
27  evidence supporting the conclusion that the Mevion payment was not a legitimate
28  business expense, but rather another overt act of Liu's fraud.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 19 of 46   Page ID
#:10928
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 16 of 20   Page ID
#:10345

Simply put, the Mevion payment is not a legitimate expense.  The purpose of the Mevion payment was not to secure a proton therapy machine; Liu had that with Optivus. The purpose of the Mevion payment was to cut Dr. Thropay out of the project so that Liu could get away with his fraud and make more money.  The Mevion payment is clearly wrongful gains under another name and will not be deducted from the disgorgement award. *Liu*, 140 S.Ct. at 1950.

### 2.  Liu and Wang's Salaries

Defendants also argue that $7.57 million in purported reasonable compensation for Liu and Wang should be deducted as legitimate expenses. (*See* Opp. at 18–20; Dkt. 324-4, Ex. 36 [Reasonable Compensation Analysis by Theodore R. Ginsburg].)  The Court strongly disagrees.  The POM does not contemplate Liu or Wang receiving any salary at all.  Although it contemplates a management fee, the POM names Pacific Proton Regional Center as the manager, not Liu or Wang, and in any case the management fee is limited to 3% of PPEB5 Fund's gross revenues.  (POM at 6.)

Defendants seek to have salaries deducted as legitimate expenses based on employment agreements Liu and Wang signed with the Corporate Defendants.  (*See* Opp. at 18–19.)  Again, the POM does not contemplate funds raised from investors being used to pay salaries.[13]  But that is not the only problem with the employment agreements. Indeed, Liu's Beverly Proton employment agreement was executed on Beverly Proton's behalf by a person who was not an employee of the company at the time.  (Liu Dep. at 60.)[14]  The agreement, like Wang's, also inexplicably awarded years of back pay.  (Dkts.

---

[13] In rendering his opinion on reasonable compensation, Defendants' expert did not review the POM. (Dkt. 324-4, Ex. 37 [Excerpts from Deposition of Theodore R. Ginsburg, hereinafter "Ginsburg Dep."] at 74, 130–31.)

[14] Liu testified that the document must not have been dated correctly.  (*Id.*)

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 20 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 328   Filed 06/07/21   Page 17 of 20   Page ID
#:10346

1 | 320-26, 320-30.)  The Court will not deduct one penny of the exorbitant salaries that Liu
2 | and Wang paid themselves for perpetrating their fraud on investors.[15]

3

4 | ## C.    Whether, as Defendants Argue, There are No Net Profits

5

6 | Defendants argue that "there are no net profits to award as equitable disgorgement"
7 | because "the project companies incurred significant losses"—about $16.5 million, in fact.
8 | (Dkt. 324 [Opposition, hereinafter "Opp."] at 21; Friedman Rep.)  Nonsense.  Of course
9 | the companies incurred significant losses—Defendants looted them for their own
10 | personal gain until the companies had nothing.  To do only what was necessary to keep
11 | up appearances that the project was moving forward, while funneling enormous sums of
12 | the money raised to himself, was the plan from the beginning—or at least very close to it,
13 | particularly after Liu eliminated Dr. Thropay from the project.  "Expenditures a
14 | defendant makes for his or her own use from illegally obtained funds are counted against
15 | the defendant, precisely because he or she benefited from those expenditures."  *S.E.C. v.*
16 | *Shaoulian*, 2003 WL 26085847, at *6 (C.D. Cal. May 12, 2003), *judgment entered*, 2003
17 | WL 26085848 (C.D. Cal. May 12, 2003).

18

19

---

20 | [15]It is worth noting that beyond salaries based on employment agreements, Liu and Wang also withdrew money from the companies for their own expenses.  These withdrawals were coded as a management fee
21 | in the general ledger.  In other words, every time Liu and Wang spent corporate money for personal use—including $56,173 spent at Caesar's Palace in Las Vegas and various bills for gardening and
22 | landscaping, water, gas, Sirius XM, the DMV, and school tuition—the accountants classified it as a
23 | management fee. (*See* Irwin Rep. Ex. 8 [Summary of Personal Expenses Paid on Behalf of Liu and Wang].)

24

25 | Liu testified that he paid little attention to whether he used money from his personal account or corporate accounts for his expenses.  Asked why he took money out of a corporate account, Liu
26 | responded, "I just needed cash." (Liu Tr. at 86.)  Asked why he did not withdraw the money from his personal account, he responded, "Because it's Vegas, Gary.  Have you been to Vegas?" (*Id.*)  When
27 | asked about $4.27 million that Liu transferred from Beverly Proton accounts to his own personal accounts after receiving an SEC subpoena, Liu stated that the money was his own "personal money" that
28 | he "c[ould] send wherever [he] want[ed] to." (*Id.* at 81–84.)  Marcum recorded each personal expense in the accounting as a "management fee." (Lam Tr. at 56–58; Irwin Rep. at 33.)

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 21 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 334   Filed 06/07/21   Page 18 of 20   Page ID
#:10347

1    Similarly, Defendants' protestation that some of the funds were paid to companies
2    that had no connection to Defendants (i.e. Defendants did not receive the funds
3    indirectly) misses the point. (*See* Opp. at 15.)  For example, there is no evidence that
4    Overseas Chinese or Delsk—which together received over $9 million—had any
5    connection to Liu or Wang.  (*Id.*)  But Defendants' "construction would permit the
6    perpetrator of a successful scheme, who was just as successful at dissipating the ill-gotten
7    gains, to avoid a disgorgement order because at the time of the order, [they] had retained
8    none of the proceeds from the scheme."  *Id.* (quoting *S.E.C. v. Great Lakes Equities Co.*,
9    775 F. Supp. 211, 214 (E.D. Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993).  Liu and
10   Wang must be held accountable, and not given any deduction in the disgorgement award,
11   for the monies that they paid to independent companies to perpetrate their fraud.[16]

12
13   **D.    Joint and Several Liability**
14
15   Disgorgement is generally not ordered against multiple wrongdoers under a joint-
16   and-several liability theory. *Liu*, 140 S. Ct. at 1945.  The purpose of this rule is to ensure
17   defendants are held "liable to account for such profits only as have accrued to themselves
18   . . . and not for those which have accrued to another, and in which they have no
19   participation."  *Id.* at 1949 (quotation omitted).  However, joint-and-several liability is
20   available for partners engaged in concerted wrongdoing.  *Id.*  The Supreme Court left it to
21   this Court "to determine whether the facts are such that [Liu and Wang] can, consistent
22   with equitable principles, be found liable for profits as partners in wrongdoing or whether
23   individual liability is required."  *Id.*

24
25
26

27   [16] Nothing in the Supreme Court's opinion indicates that Defendants' successful dissipation of investor
     funds eliminates their need to pay disgorgement.  The Supreme Court was careful to describe certain
28   possible legitimate expenses as "lease payments and cancer-treatment equipment," but never insinuated
     that *all* of Defendants' expenses were legitimate. *Liu*, 140 S.Ct. at 1950.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 22 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 335   Filed 06/07/21   Page 19 of 20   Page ID
#:10348

1        The Supreme Court outlined some facts that are relevant to this inquiry. *Id.* Liu
2   and Wang were married. Liu formed business entities and solicited investments, which
3   he misappropriated. Wang held herself out as the president, and a member of the
4   management team, of an entity to which Liu directed misappropriated funds. Defendants
5   did not (and still do not) introduce evidence to suggest that Wang was a mere passive
6   recipient of profits. Nor did they (nor can they credibly) suggest that their finances were
7   not commingled, or that Wang did not enjoy the fruits of the scheme, or that other
8   circumstances would render a joint-and-several disgorgement order unjust.

9

10        Contrary to her assertion, Wang played an integral role in the scheme. She made
11   investor presentations promoting the proton cancer therapy project, and helped raise
12   investor capital through promotion. (Dkt. 320-30 [Excerpts from Wang Deposition
13   Transcript, hereinafter "Wang Dep."] at 15–18; Dkt. 320-2 [Excerpts from Liu
14   Deposition Transcript] at 66–68 [describing his wife's duties]; Thropay Dep. at 105–109
15   [describing Wang's role as selling and promoting sales, and noting that Wang "seemed to
16   be acutely aware of finances"].) Most troubling, Wang was paid and accepted without
17   reservation well over a million dollars in investor funds that were wrongfully diverted by
18   Liu. She also was an officer of UDG, one of the marketing companies that raised over
19   $26 million in investor funds and was paid $3,815,000 for securing additional investors.
20   Wang was Liu's active partner and accomplice in the fraudulent investor scheme. She is
21   jointly and severally responsible for the net profits of that scheme. *See Liu*, 140 S. Ct. at
22   1945.

23

24   ## IV.   CONCLUSION

25

26        For the foregoing reasons, Liu and Wang are **ORDERED** to disgorge, jointly and
27   severally, $20,871,758.81. This award of disgorgement is calculated by subtracting from
28   the $26,423,168 that Liu and Wang raised from investors (1) $2,210,701 in

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 23 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 336   Filed 06/07/21   Page 20 of 20   Page ID
#:10349

administrative expenses, (2) \$3,105,809 in business expenses as legitimate expenses, and

(3) the \$234,899.19 remaining in Defendants' corporate accounts, plus prejudgment

interest.[17]

DATED:      June 7, 2021

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

CC: FISCAL

---

[17] The Court will defer entry of judgment until after it has ruled on Defendants' motion on *Morrison* extraterritoriality.  (*See* Dkt. 311.)

-20-

**EXHIBIT B**

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 25 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 333   Filed 07/13/21   Page 1 of 10   Page ID
#:10583
#:10583



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

      v.

CHARLES C. LIU; XIN WANG a/k/a
LISA WANG; PACIFIC PROTON
THERAPY REGIONAL CENTER
LLC; PACIFIC PROTON EB-5 FUND,
LLC; and BEVERLY PROTON
CENTER LLC f/k/a LOS ANGELES
COUNTY PROTON THERAPY LLC,

                Defendants.

Case No.: SACV 16-00974-CJC(AGRx)

ORDER DENYING DEFENDANT XIN
WANG'S MOTION TO DISMISS
BASED ON EXTRATERRITORIAL
CONDUCT [Dkt. 331]

## I.    INTRODUCTION

      Defendant Charles C. Liu formed and controlled three corporate entities—Beverly
Proton Center LLC, Pacific Proton EB 5 Fund LLC, and Pacific Proton Therapy Regional

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 26 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 339   Filed 07/13/21   Page 2 of 10   Page ID
#:10584

Center LLC—purportedly to build and operate a proton therapy cancer treatment center in Southern California. Liu financed the cancer center with nearly $27 million of international investment through the EB-5 Immigrant Investor Program. Instead of pursuing proton therapy, though, Liu funneled over $20 million of investor money to himself, his wife, Defendant Xin Wang, and marketing companies associated with them.

In April 2017, the Court granted summary judgment in favor of the SEC, granted injunctive relief, imposed a civil penalty, and ordered disgorgement of the full amount Defendants raised from investors, less the funds that remained in corporate accounts for the project. *S.E.C. v. Liu*, 262 F. Supp. 3d 957, 961 (C.D. Cal. 2017). The Ninth Circuit affirmed. 754 F. App'x 505 (9th Cir. 2018). The Supreme Court granted certiorari to decide whether 15 U.S.C. § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. Concluding that the SEC may seek only disgorgement that is awarded for victims and does not exceed a wrongdoer's net profits, the Court vacated and remanded "for the courts below to ensure the award was so limited." *Liu v. S.E.C.*, 140 S. Ct. 1936, 1940 (2020). After the Ninth Circuit remanded for further proceedings, *S.E.C. v. Liu*, 814 F. App'x 311 (9th Cir. 2020), the Court granted the SEC's motion for the Court to order Liu and Wang to disgorge $20,871,758.81 in net profits, and to hold Liu and Wang jointly and severally liable for that amount. (Dkt. 328.)

Now before the Court is Defendant Xin Wang's motion to dismiss the claims against her on the grounds that her wrongful conduct occurred outside the United States. (Dkt. 331 [hereinafter "Mot."].) For the following reasons, Wang's motion is **DENIED**.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 27 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 330   Filed 07/13/21   Page 3 of 10   Page ID
#:10585

## II.    BACKGROUND[1]

To ostensibly develop and run a proton cancer therapy center in Montebello, California, Liu used the EB-5 Immigrant Investor Program.  Through that program, foreign investors can obtain permanent residency in the United States by investing at least $500,000 in a "Targeted Employment Area" and thereby creating at least ten full-time jobs for United States workers.  EB-5 program investments are often administered by "regional centers," which are designated and approved by the United States Customs and Immigration Service ("USCIS") as EB-5 eligible projects.

Liu, along with his business partner Dr. John Thropay, formed three entities in 2010—Pacific Proton, PPEB5 Fund, and Beverly Proton—to facilitate investment.  In their application to USCIS to designate Pacific Proton as an EB-5 regional center, Liu and Dr. Thropay estimated that their cancer treatment facility would create more than 4,500 new United States jobs and have a domestic economic impact of $728 million per year.  From October 2014 to April 2016, at least 50 investors purchased shares of PPEB5 Fund, totaling over $26 million.  The investors were then able to petition for permanent residency in the United States.  No non-EB-5 funds were raised for the project.

A private offering memorandum ("POM") clearly delineated the purposes and legitimate uses of investor funds.  The POM stated that Liu and the corporate defendants would use investors' capital contributions to create the proton therapy center, and their administrative fees for offering expenses and marketing.  However, Defendants did not adhere to the POM.  Instead, they diverted approximately $20 million of the $26 million raised from investors to Liu and Wang as well as marketing companies including United

---

[1] The facts of this case have been set out in detail in both the Court's summary judgment order, *Liu*, 262 F. Supp. 3d at 961–65, and the Court's disgorgement order, (Dkt. 328).  The Court outlines here only the facts relevant to this motion.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 28 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 335   Filed 07/13/21   Page 4 of 10   Page ID
#:10586

Damei Group, United Damei Investment Company, Ltd., and/or Beijing Pacific Damei Consulting Co. Ltd. (collectively, "UDG"), Overseas Chinese Immigration Consulting Ltd., and Hong Kong Delsk Business Co., Ltd.

Liu received $6,714,580 and Wang received $1,400,000, ostensibly as "salary." In 2012, Liu signed 5-year employment agreements with Pacific Proton and PPEB5 Fund with annual salaries of $350,000 and possible bonuses of $200,000. A few days later, on January 28, 2016, Wang signed a 5-year employment agreement with Liu (acting for Beverly Proton), entitling her to an annual compensation of $250,000, applied retroactively from January 2011, for her work recruiting investors since 2011. Then, in April 2016, two months after the SEC's February 4, 2016 subpoena and shortly after his March 23, 2016 questioning by the SEC, Liu signed a 5-year employment agreement with Beverly Proton. (Dkt. 320-25.) His annual salary was $550,000 retroactively from January 2011, with bonuses under certain conditions.

The substantial majority of the money Liu and Wang directly received was transferred in 2016. Liu received $5,000 between October 1, 2014, and December 31, 2014; $1,389,580 in 2015; and $4,270,000 between January 1, 2016, and April 30, 2016. Wang received $50,000 from October 1, 2014, to December 31, 2014; $354,000 in 2015; and $996,000 in March 2016.[2]

Not only did Liu and Wang collect significant sums directly from investor money, but it is also very likely that Liu and Wang indirectly benefitted from investor money transferred to third parties. For example, Liu and Wang were deeply connected to UDG,

---

[2] Liu and Wang received $10,878,545: $8,034,567 in cash to Liu, $335,997 in expenses, including tuition, rent, insurance, and utilities, $543,042 in credit card bills, all "with no identified business purpose," $357,245 of casino-related expenses, and $1,607,694 in transfers to Wang or payments on her behalf. Additionally, over $225,000 was paid for the lease and/or purchase of seemingly more than one automobile, but vehicles or related records could not be located.

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 29 of 46   Page ID
#:10632
Case 8:16-cv-00974-CJC-AGR   Document 335   Filed 07/13/21   Page 5 of 10   Page ID
#:10587

1   which was paid $3,815,000.  Wang's business card listed her as UDG's chairperson and

2   the company website includes her picture as part of the management team.  She is also

3   identified in photos as UDG's president, and Liu referred to UDG as "my wife's

4   company."  By all appearances, Wang's mother, Ms. Yao Wenli, signed the marketing

5   agreement between UDG and Liu in August 2013 on behalf of UDG.  UDG's public

6   listing on the Chinese Government's website for Chinese companies named Ms. Yao as

7   the person with ownership interest, UDG's executive director, and a shareholder until

8   May 19, 2016.  The same listing stated that Wang was UDG's manager until May 19,

9   2016.  The individual who is currently listed as UDG's Supervisor is Liu's assistant.

10

11   Despite significant investment, nearly no construction on the proton therapy center

12   took place.  Instead, Liu burned through the millions left after payments to himself,

13   Wang, and the marketers on half-hearted attempts to convey the illusion of progress.

14   Unsurprisingly, no construction permits were ever obtained to build the proton therapy

15   center.  Proton cancer therapy equipment was never delivered to any project site.  And no

16   patient was ever treated.

17

18   **III.   DISCUSSION**

19

20   "It is a longstanding principle of American law that legislation of Congress, unless

21   a contrary intent appears, is meant to apply only within the territorial jurisdiction of the

22   United States."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)

23   (cleaned up).  Consistent with this presumption, the United States' Securities Exchange

24   Act generally does not apply extraterritorially.  *Id.* at 265.  Instead, "the focus of the

25   Exchange Act is . . . upon purchases and sales of securities in the United States."  *Id.* at

26   266.

27

28

Case 8:16-cv-00974-CJC-AGR  Document 341  Filed 09/13/21  Page 30 of 46  Page ID
Case 8:16-cv-00974-CJC-AGR  Document 335  Filed 07/13/21  Page 6 of 10  Page ID
#:10588

1    Wang argues that the Complaint against her should be dismissed because her
2  wrongful conduct took place entirely in China. (Mot. at 4–7.) She argues that the
3  applicable test for extraterritorial conduct is found in *Morrison*, 561 U.S. 247. The
4  government responds that Congress overruled *Morrison* when it amended the
5  jurisdictional language of the Exchange Act through Section 929P(b) of the Dodd-Frank
6  Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376
7  (2010), and, in any event, the allegations in the Complaint satisfy the *Morrison* test.
8  (Dkt. 332 [Opposition, hereinafter "Opp."] at 2.) The Court concludes that under either
9  test—*Morrison* or Dodd-Frank—Wang's wrongful conduct has a sufficient connection to
10  the United States for her to be held liable.

11

12    **A.    *Morrison***

13

14    In *Morrison,* the Supreme Court addressed the extraterritorial reach of Section
15  10(b)[3] and Rule 10b–5, holding that there is a presumption against extraterritorial
16  application of the Exchange Act. 561 U.S. at 266–67. In that case, three Australian
17  individual investors brought a civil action against an Australian bank for securities fraud
18  relating to securities traded on the Australian Stock Exchange. *Id.* at 272. The Supreme
19  Court held that Section 10(b) did not apply because the case did not involve securities
20  listed on a United States exchange, and because all aspects of the purchases occurred
21  abroad, even though a subsidiary of Australia Bank and its executives engaged in the
22  deceptive conduct in the United States. *See id.* at 252–53, 273.

23

24

25

---

26  [3] Wang has been found liable for violating Securities Act Section 17(a)(2)—which concerns fraudulent
27  conduct "in the offer or sale of any securities"—not Section 10(b)(5)—which concerns fraudulent
    conduct "in connection with the purchase or sale" of securities. In this order, the Court assumes that
28  *Morrison*'s holding applies to Section 17(a)(2). *See United States v. Sumeru*, 449 F. App'x 617, 621
    (9th Cir. 2011) (making the same assumption).

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 31 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 334   Filed 07/13/21   Page 7 of 10   Page ID
#:10589

1    The Supreme Court explained that the Exchange Act "reaches the use of a

2   manipulative or deceptive device or contrivance only in connection with the purchase or

3   sale of a security listed on an American stock exchange, and the purchase or sale of any

4   other security in the United States." *Id.* at 273.  It adopted a "transactional test," which

5   asks "whether the purchase or sale is made in the United States, or involves a security

6   listed on a domestic exchange." *Id.* at 269–70.  "Section 10(b) focuses not upon the place

7   where deception originated, but upon purchases and sales of securities in the United

8   States." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 944 (9th Cir. 2018).  A transaction is

9   domestic if the purchaser incurred "irrevocable liability" within the United States to take

10   and pay for a security, or the seller incurred "irrevocable liability" within the United

11   States to deliver a security.  *Id.* at 948.

12

13   **B.    Dodd-Frank**

14

15    The government argues that Congress responded to *Morrison* by changing the

16   extraterritorial reach of the Exchange Act.  (Opp. at 2.)  The government argues that after

17   Dodd-Frank, the Exchange Act applies when the SEC's allegations concern "(1) conduct

18   within the United States that constitutes significant steps in furtherance of the violation,

19   even if the securities transaction occurs outside the United States and involves only

20   foreign investors; or (2) conduct occurring outside the United States that has a

21   foreseeable substantial effect within the United States." 15 U.S.C. § 77v(c).  Citing the

22   legislative history, the government contends that Dodd-Frank reinstated the disjunctive

23   "conduct test" and "effects test" that governed before *Morrison*, giving the SEC authority

24   to pursue violations of the Exchange Act where either significant conduct by the

25   defendant occurred in the United States, or foreseeable substantial effects of the violation

26   were felt here.  (Opp. at 2–3.)

27

28   //

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 32 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 335   Filed 07/13/21   Page 8 of 10   Page ID
#:10590

1

2

## C.     Application of *Morrison* and Dodd-Frank to Wang's Conduct

3        Wang's wrongful conduct meets both the *Morrison* and Dodd-Frank standards.

4 Wang played an integral role in the scheme to defraud investors through an EB-5 offering

5 designed to attract foreign capital to the United States and create United States jobs.  She

6 directly recruited investors in the California proton cancer therapy project both in person

7 and by phone in the United States, and helped to raise investor capital that would benefit

8 the United States.  (Dkt. 324-5, Ex. 50 [Wang Deposition Transcript, hereinafter "Wang

9 Dep."] at 15–18; Dkt. 320-2 [Excerpts from Liu Deposition Transcript] at 66–68

10 [describing Wang's duties]; Dkt. 320-5 [Excerpts from Dr. Thropay Deposition,

11 hereinafter "Thropay Dep."] at 105–09 [describing Wang's role as selling and promoting

12 sales, and noting that Wang "seemed to be acutely aware of finances"].)

13

14        Wang's conversations promoting the project and making offers of investment

15 occurred both in the United States and in China.  (*See* Wang Dep. at 15–16, 77–80

16 [explaining how she spoke by phone with potential investors in both the United States

17 and China]; Thropay Dep. at 108–09 [discussing how Wang sold EB-5s in China].)  This

18 is in part because since 2011, Wang has split her time between the United States and

19 China.  (Wang Dep. at 78–79 [explaining she has been "flying back and forth, back and

20 forth" since 2011, and that she would have to consult her itineraries to determine whether

21 she "stayed mainly in China or in the United States"]; Dkt. 163, Ex. 2 at 22 [background

22 questionnaire with the SEC, stating that Wang lived primarily at two different addresses

23 in Laguna Niguel, California between June 2012 and the date she filled out the

24 questionnaire in 2016].)  Wang explained that when she was in the United States, she

25 talked by phone with people in China to market the project.  (Wang Dep. at 15–16, 77–

26 80.)  In addition, on two occasions, Wang personally visited a proposed California project

27 site with potential investors.  (Dkt. 324-2, Ex. 19 [Novodor Deposition Transcript] at

28

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 33 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 335   Filed 07/13/21   Page 9 of 10   Page ID
#:10591

1 | 180–181, 185.)  She also visited one of the corporate defendants' California offices "to
2 | talk about the project."  (Thropay Dep. at 107.)

3 |

4 | Not only did Wang market and offer, in the United States, investment opportunities
5 | in a project meant to benefit the United States, but she also was paid and accepted
6 | without reservation well over a million dollars in investor funds that were wrongfully
7 | diverted by Liu and placed in Wang's United States bank accounts.  (*See* Dkt. 320-1
8 | [Expert Report of Carlyn Irwin] ¶¶ 43–50, Ex. 7; Dkt. 163, Ex. 2, at 25 [listing Wang's
9 | bank accounts, including foreign accounts, as located only at two California banks].)

10 |

11 | Taking all of this conduct together, it is clear that Wang's wrongful conduct meets
12 | the transactional test in *Morrison*.  She made domestic offers of securities by soliciting
13 | potential investors in the United States, whether by phone or in person, in connection
14 | with the purchase or sale of a United States security.  561 U.S. at 269–70; *see Sumeru*,
15 | 449 F. App'x at 621 ("[T]here was sufficient evidence for a rational jury to conclude that
16 | Hall and Sumeru made numerous domestic offers of securities by soliciting potential
17 | investors in the United States" because "[b]oth defendants, for example, met with
18 | potential investors in Santa Barbara, California and solicited potential investors through
19 | the U.S. mail.").  Indeed, this case is nothing like *Morrison*, where foreign investors
20 | sought to hold liable a foreign corporation in connection with foreign securities.  Rather,
21 | this case involves domestic corporations, domestic securities, and wrongdoers who had
22 | their primary residence in the United States and traveled back and forth between the
23 | United States and China only to further perpetuate their fraud based on a United States
24 | immigration program.

25 |

26 | Wang's conduct also meets Dodd-Frank's "conducts test" and "effects test."  Her
27 | conduct in the United States constituted significant steps in furtherance of the securities
28 | violations.  Specifically, Wang attended in-person meetings with potential investors in

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 34 of 46   Page ID
#:10593
Case 8:16-cv-00974-CJC-AGR   Document 337   Filed 07/13/21   Page 10 of 10   Page ID
#:10592

1  the United States and also contacted them by phone while she was in the United States.

2  Her conduct occurring outside the United States also had foreseeable substantial effects

3  within the United States.  Wang sold securities for a California cancer treatment facility

4  related to an immigration program run by the United States government which purported

5  to create more than 4,500 new United States jobs and have an economic impact in the

6  United States of $728 million per year.

7

8        In sum, under either standard—*Morrison* or Dodd-Frank—Wang's participation in

9  the fraudulent scheme had enough ties to the United States for her to be held liable here.

10

11 **IV.    CONCLUSION**

12

13       For the foregoing reasons, Wang's motion to dismiss based on extraterritorial

14 conduct is **DENIED.**

15

16

17       DATED:     July 13, 2021

18                                        _____

19                                        HON. CORMAC J. CARNEY

20                                        UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

**EXHIBIT C**

# JS-6

1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

### Southern Division

11

12 SECURITIES AND EXCHANGE
COMMISSION,

13                     Plaintiff,

14          vs.

15 CHARLES C. LIU;
XIN WANG a/k/a LISA WANG;
16 PACIFIC PROTON THERAPY
REGIONAL CENTER, LLC;
17 PACIFIC PROTON EB-5 FUND,
LLC; and BEVERLY PROTON
18 CENTER, LLC f/k/a LOS ANGELES
COUNTY PROTON THERAPY,
19 LLC,

20                     Defendants.

Case No. 8:16-cv-00974-CJC-AGR

**FINAL JUDGMENT AS TO
DEFENDANT CHARLES C. LIU AND
XIN a/k/a LISA WANG**

21

22

23

24

25

26

27

28

1    The Court, having granted the Securities and Exchange Commission's ("SEC")

2  Motion for Summary Judgment against Defendants Charles C. Liu and Xin (Lisa)

3  Wang and the SEC's Motion for Disgorgement against Defendants Charles C. Liu and

4  Xin (Lisa) Wang (collectively, "Defendants"), and having considered all of the

5  evidence and arguments presented by the parties with regard to those motions,

6  including the parties' respective memoranda of points and authorities as to the

7  motions, the parties' briefing on disgorgement on remand, and the other filings and

8  records in this action:

9                                          **I.**

10    IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

11  Defendants are permanently restrained and enjoined from violating Section 17(a) of

12  the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or

13  sale of any security by the use of any means or instruments of transportation or

14  communication in interstate commerce or by use of the mails, directly or indirectly:

15       (a)    to employ any device, scheme, or artifice to defraud;

16       (b)    to obtain money or property by means of any untrue statement of a

17                material fact or any omission of a material fact necessary in order to

18                make the statements made, in light of the circumstances under which

19                they were made, not misleading; or

20       (c)    to engage in any transaction, practice, or course of business which

21                operates or would operate as a fraud or deceit upon the purchaser.

22    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

23  provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also

24  binds the following who receive actual notice of this Final Judgment by personal

25  service or otherwise:  (a) Defendants' officers, agents, servants, employees, and

26  attorneys; and (b) other persons in active concert or participation with Defendants or

27  with anyone described in (a).

28

                                          1

## II.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendants are permanently restrained and enjoined from, directly or indirectly, participating in the offer or sale of any security which constitutes an investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service ("USCIS"), including engaging in activities with a broker, dealer, or issuer, or a Regional Center designated by the USCIS, for purposes of issuing, offering, trading, or inducing or attempting to induce the purchase or sale of any such EB-5 investment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

## III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendants Liu and Wang are jointly and severally liable for disgorgement of $20,871,758.81, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $70,713.06, that Defendant Liu is further liable for a civil penalty in the amount of $6,714,580 pursuant to Section 20(d)(2)(C) of the Securities Act, and that Defendant Wang is further liable for a civil penalty in the amount of $1,538,000 pursuant to Section 20(d)(2)(C) of the Securities Act.  Defendants Liu and Wang shall satisfy their disgorgement obligation by paying $20,942,471.87, Defendant Liu satisfy his penalty obligation by paying $6,714,580, and Defendant Wang shall satisfy her penalty obligation by paying $1,538,000, all to the Securities and Exchange

1 | Commission and all within 30 days after entry of this Final Judgment.

2 |       Defendants may transmit payment electronically to the Commission, which

3 | will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may

4 | also be made directly from a bank account via Pay.gov through the SEC website at

5 | http://www.sec.gov/about/offices/ofm.htm.  Defendants may also pay by certified

6 | check, bank cashier's check, or United States postal money order payable to the

7 | Securities and Exchange Commission, which shall be delivered or mailed to

8 |       Enterprise Services Center

9 |       Accounts Receivable Branch

10 |       6500 South MacArthur Boulevard

11 |       Oklahoma City, OK 73169

12 | and shall be accompanied by a letter identifying the case title, civil action number,

13 | and name of this Court; Charles C. Liu and Xin a/k/a Lisa Wang as defendants in this

14 | action; and specifying that payment is made pursuant to this Final Judgment.

15 |       Defendants shall simultaneously transmit photocopies of evidence of payment

16 | and case identifying information to the Commission's counsel in this action.  By

17 | making this payment, Defendants relinquishes all legal and equitable right, title, and

18 | interest in such funds and no part of the funds shall be returned to Defendants.

19 |       The Commission may enforce the Court's judgment for disgorgement and

20 | prejudgment interest by using all collection procedures authorized by law, including,

21 | but not limited to, moving for civil contempt at any time after 30 days following entry

22 | of this Final Judgment.

23 |       The Commission may enforce the Court's judgment for penalties by the use of

24 | all collection procedures authorized by law, including the Federal Debt Collection

25 | Procedures Act, 28 U.S.C. § 3001 et seq., and moving for civil contempt for the

26 | violation of any Court orders issued in this action.  Defendants shall pay post

27 | judgment interest on any amounts due after 30 days of the entry of this Final

28 | Judgment pursuant to 28 U.S.C. § 1961.  The Commission shall hold the funds,

Case 8:16-cv-00974-CJC-AGR   Document 341   Filed 09/13/21   Page 40 of 46   Page ID
Case 8:16-cv-00974-CJC-AGR   Document 308-4 Filed 07/14/21   Page 5 of 7   Page ID #:10597
#:10643

1  together with any interest and income earned thereon (collectively, the "Fund"),

2  pending further order of the Court.

3       The Commission may propose a plan to distribute the Fund subject to the

4  Court's approval.  Such a plan may provide that the Fund shall be distributed

5  pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of

6  2002.  The Court shall retain jurisdiction over the administration of any distribution

7  of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

8       Regardless of whether any such Fair Fund distribution is made, amounts

9  ordered to be paid as civil penalties pursuant to this Judgment shall be treated as

10  penalties paid to the government for all purposes, including all tax purposes.  To

11  preserve the deterrent effect of the civil penalty, Defendants shall not, after offset or

12  reduction of any award of compensatory damages in any Related Investor Action

13  based on Defendant's payment of disgorgement in this action, argue that they are

14  entitled to, nor shall they further benefit by, offset or reduction of such compensatory

15  damages award by the amount of any part of Defendants' payment of a civil penalty

16  in this action ("Penalty Offset").  If the court in any Related Investor Action grants

17  such a Penalty Offset, Defendants shall, within 30 days after entry of a final order

18  granting the Penalty Offset, notify the Commission's counsel in this action and pay

19  the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as

20  the Commission directs.  Such a payment shall not be deemed an additional civil

21  penalty and shall not be deemed to change the amount of the civil penalty imposed in

22  this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a

23  private damages action brought against Defendants by or on behalf of one or more

24  investors based on substantially the same facts as alleged in the Complaint in this

25  action.

26  **IV.**

27       IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3

28  days after being served with a copy of this Final Judgment, J.P. Morgan Chase Bank,

4

Case 8:16-cv-00974-CJC-AGR  Document 341  Filed 09/13/21  Page 41 of 46  Page ID
Case 8:16-cv-00974-CJC-AGR  Document 336-1Filed 07/14/21  Page 6 of 7  Page ID #:10598
#:10644

N.A. Citibank, N.A., Wells Fargo Bank, N.A., and East West Bank shall transfer the
entire balance of the following bank accounts which were frozen pursuant to an Order
of this Court to the Commission:

| BANK NAME | ACCOUNT NAME | ACCOUNT NO. |
|---|---|---|
| J.P. Morgan Chase Bank, N.A. | Charles Liu | xxxxx3076 |
| J.P. Morgan Chase Bank, N.A. | Charles Liu | xxxxx1055 |
| J.P. Morgan Chase Bank, N.A. | Pacific Proton Therapy Regional Center, LLC | xxxxx6428 |
| J.P. Morgan Chase Bank, N.A. | Pacific Proton EB-5 Fund, LLC | xxxxx1028 |
| J.P. Morgan Chase Bank, N.A. | Los Angeles County Proton Therapy, LLC | xxxxx5152 |
| J.P. Morgan Chase Bank, N.A. | United MPH Ventures, LLC | xxxxx7035 |
| J.P. Morgan Chase Bank, N.A. | MP Medical Hotel, Inc. | xxxxx9018 |
| J.P. Morgan Chase Bank, N.A. | SC MPH Fund, LP | xxxxx2522 |
| J.P. Morgan Chase Bank, N.A. | SC MPH Management, LLC | xxxxx2978 |
| Citibank, N.A. | Charles Liu | xxxxxxx0486 |
| East West Bank | Pacific Proton Regional Center LLC by Atlantic Escrow Corporation as escrow agent | xxxx9509 |
| J.P. Morgan Chase Bank, N.A. | Xin Wang | xxxxx3983 |
| Wells Fargo Bank, N.A. | Xin Wang | xxxxx9793 |

The foregoing financial institutions may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire instructions upon
request. Payment may also be made directly from a bank account via Pay.gov

1    through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  The

2    foregoing financial institutions also may transfer these funds by certified check, bank

3    cashier's check, or United States postal money order payable to the Securities and

4    Exchange Commission, which shall be delivered or mailed to

5
          Enterprise Services Center
6         Accounts Receivable Branch
          6500 South MacArthur Boulevard
7         Oklahoma City, OK 73169

8    and shall be accompanied by a letter identifying the case title, civil action number,

9    and name of this Court; and specifying that payment is made pursuant to this Final

10   Judgment.

11                                             **V.**

12        IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for

13   purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code,

14   11 U.S.C. §523, the allegations in the complaint are true and admitted by Defendants,

15   and further, any debt for disgorgement, prejudgment interest, civil penalty or other

16   amounts due by Defendants under this Final Judgment or any other judgment, order,

17   consent order, decree or settlement agreement entered in connection with this

18   proceeding, is a debt for the violation by Defendants of the federal securities laws or

19   any regulation or order issued under such laws, as set forth in Section 523(a)(19) of

20   the Bankruptcy Code, 11 U.S.C. §523(a)(19).

21                                            **VI.**

22        IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court

23   shall retain jurisdiction of this matter for the purposes of enforcing the terms of this

24   Judgment.

25

26   Dated:   July 14, 2021

27                                            HON. CORMAC J. CARNEY
                                              UNITED STATES DISTRICT JUDGE
28

                                               6

**EXHIBIT D**

1 | Lawrence B. Steinberg (State Bar No. 101966)
   | LSteinberg@buchalter.com
2 | BUCHALTER, A Professional Corporation
   | 1000 Wilshire Boulevard, Suite 1500
3 | Los Angeles, CA  90017-2457
   | Telephone: (213) 891-0700
4 | Facsimile: (213) 896-0400

5 | Attorneys for defendants CHARLES C. LIU
   | and XIN WANG a/k/a LISA WANG
6

7 | Hervé Gouraige (admitted *pro hac vice*)
   | hgouraige@sillscummis.com
8 | SILLS CUMMIS & GROSS P.C.
   | One Riverfront Plaza
9 | Newark, New Jersey 07102-5400
   | Telephone: (973) 643-5989
10 | Facsimile: (973) 643-6500

11 | Attorneys for defendants CHARLES C. LIU
    | and XIN WANG a/k/a LISA WANG
12

13

14

15 |                  UNITED STATES DISTRICT COURT

16 |                 CENTRAL DISTRICT OF CALIFORNIA

17

18 | SECURITIES AND EXCHANGE           ) Case No. SACV 16-00974 CJC (AGRx)
    | COMMISSION,                        )
19 |                                    ) **REPRESENTATION STATEMENT**
    |                  Plaintiff,        ) **OF DEFENDANTS CHARLES C.**
20 |                                    ) **LIU AND XIN WANG, a/k/a LISA**
    |            vs.                     ) **WANG**
21 | CHARLES C. LIU; XIN WANG a/k/a     )
    | LISA WANG; PACIFIC PROTON          ) Judge: The Honorable Cormac J. Carney
22 | THERAPY REGIONAL CENTER,           )
    | LLC; PACIFIC PROTON EB-5 FUND,     )
23 | LLC; and BEVERLY PROTON            )
    | CENTER, LLC f/k/a LOS ANGELES      )
24 | COUNTY PROTON THERAPY,             )
    | LLC,                               )
25 |                                    )
    |                  Defendants.       )
26 | _____ )

27

28

1    The undersigned represent defendants-appellants CHARLES C. LIU ("Liu")

2    and his wife, XIN WANG, a/k/a LISA WANG ("Wang") (collectively,

3    "Defendants") in this appeal.  The following list identifies all parties and

4    participants in the action, and it identifies their respective counsel by name, firm,

5    address, telephone number, and e-mail, where appropriate.  Fed. R. App. P. 12(b);

6    Ninth Circuit Rule 3-2(b).

| PARTIES | COUNSEL OF RECORD |
| --- | --- |
| Defendants-appellants Charles C. Liu and Xin Wang, a/k/a Lisa Wang | Hervé Gouraige (admitted *pro hac vice* in Central District of California) SILLS CUMMIS & GROSS P.C. One Riverfront Plaza Newark, New Jersey 07102-5400 Telephone: (973) 643-5989 Facsimile: (973) 643-6500 hgouraige@sillscummis.com Lawrence B. Steinberg (State Bar No. 101966) BUCHALTER, A Professional Corporation 1000 Wilshire Boulevard, Suite 1500 Los Angeles, CA  90017-2457 Telephone: (213) 891-0700 Facsimile: (213) 896-0400 lsteinberg@buchalter.com |
| Plaintiff-Appellee Securities and Exchange Commission | Gary Y. Leung (Cal. Bar No. 302928) Jacob A. Regenstreif (Cal. Bar No. 234734) SECURITIES AND EXCHANGE COMMISSION 444 South Flower Street, Suite 900 Los Angeles, California 90071 Telephone: (323) 965-3998 Facsimile: (213) 443-1904 leungg@sec.gov regenstreifj@sec.gov |
| Court-appointed Receiver Michael A. Grassmueck for Defendants Pacific Proton Therapy Regional Center, LLC, Pacific Proton EB 5 Fund, LLC, Beverly Proton Center LLC, f/k/a Los Angeles County Proton Therapy LLC. Final judgment was entered against these corporate | David R. Zaro (Bar No. 124334) Michael R. Farrell (Bar No. 17381) Peter A. Griffin (Bar No. 306201) ALLEN MATKINS LECK GAMBLE  MALLORY & NATSIS LLP 865 South Figueroa Street, Suite 2800 Los Angeles, California 90017-2543 Telephone: (213) 622-5555 |

| | |
|---|---|
| defendants on Feb. 5, 2018 (Docket No. 277) and the Receiver was discharged upon completing final tasks on May 4, 2018 (Docket Nos. 276 & 279). | Facsimile: (213) 620-8816<br>dzaro@allenmatkins.com<br>mfarrell@allenmatkins.com<br>pgriffin@allenmatkins.com |
| Interested Party John P. Thropay, M.D. | Rick D. Navarrette (CA Bar No. 122653)<br>ALVARADO SMITH APC<br>633 W. Fifth Street, Suite 1100<br>Los Angeles, CA 90071<br>Telephone: (213) 229-2400<br>Facsimile: (213) 229-2499<br>rnavarrette@AlvaradoSmith.com |
| Intervenor Lijun Liu | M. Candice Bryner<br>Tumy N. Nguyen<br>LAW OFFICES OF M. CANDICE BRYNER<br>A PROFESSIONAL CORPORATION<br>780 Roosevelt, Suite 206<br>Irvine, CA 92620<br>Telephone: (949) 371-9056<br>Candice@brynerlaw.com<br>Tumy@brynerlaw.com |

DATED:  September 13, 2021

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.

By _____/s/  Hervé Gouraige_____
    Attorneys for defendants CHARLES C. LIU and XIN WANG a/k/a LISA WANG

BUCHALTER,
A Professional Corporation
    Attorneys for defendants CHARLES C. LIU and XIN WANG a/k/a LISA WANG